THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

UNITED STATES OF AMERICA )
)
v. ) CRIMINAL NO. 4:02-992
)
CHADRICK E. FULKS )
)

## DECLARATION OF ANDREA LYON

1. My name is Andrea Lyon. I am a Clinical Professor of Law at the DePaul University College of Law. I am also the Associate Dean for Clinical Programs. I am admitted to practice in Illinois, Michigan and the District of Columbia, the federal district courts in the Northern District of Illinois and the Eastern District of Michigan, the United States Courts of Appeals for the Seventh and Sixth Circuits, and the United States Supreme Court.

2. I have been practicing law since 1976, as a public defender, as director of a division of the State Appellate Defender's Office in Illinois, and as a clinical professor of law at the University of Michigan and DePaul College of Law. My resume is attached to this affidavit.

3. I have been defending death penalty cases since 1979 at the trial level and in collateral review.

4. I am a frequent Continuing Legal Education presenter on topics relating to capital defense and have published many articles and manuals on the subject.

5. I have testified a number of times as an expert witness on the standards in the profession

1

PA Document #1

for purposes of courts' and agencies' consideration of the question of effective assistance of counsel, and have been qualified as an expert in state courts in Illinois, Indiana and Florida, in federal court in Illinois and for the Attorney Registration and disciplinary Commission of Illinois.

6. I have been cited as an expert by the Illinois Supreme Court in *People v. Perez*, 148 Ill.2d 168, 182, 592 N.E.2d 984, 991 (1992)and my writing in the field has been cited by the United States Supreme Court in *Florida v. Nixon*, 543 U.S. 175, 191 (2004).

7. I am familiar with the standards set forth by the American Bar Association (ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases) regarding the performance of defense counsel which was cited with approval by the United States Supreme Court in *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) as well as in *Florida v. Nixon*, 543 U.S. 175, 190 (2004).

8. There are a number of tasks that must be performed in order to adequately represent someone charged with capital murder. This affidavit discusses some but not all of them.

9. A death penalty case is really two trials. First, it is a trial on the merits (Did the defendant client commit the crime?) Second, if there is a conviction of a death eligible offense, it is a trial on punishment.

10. The question of eligibility for the death penalty in a capital prosecution is often answered in part at the trial on the merits. This means that in order for the prosecution to even ask for the death penalty, it must prove a first-degree murder as well as an aggravating factor that takes the case into the small group of cases where the death penalty can even be sought. A common aggravating factor that makes a first-degree murder case into a

capital case is the first-degree murder of a police officer acting in the line of duty, or a first-degree murder of a woman during a rape.[1]

11.     As the 2003 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, which are found at Http://www.abanet.org/deathpenalty/DPGuidelines42003.pdf)  (hereinafter the ABA Guidelines) say, "[a]n attorney representing the accused in a death penalty case must fully investigate the relevant facts. Because counsel faces what are effectively two different trials—one regarding whether the defendant is guilty of a capital crime, and the other concerning whether the defendant should be sentenced to death —providing quality representation in capital cases requires counsel to undertake correspondingly broad investigation and preparation. Investigation and planning for both phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty." ( Guideline 1.1)

12.     Under the Guidelines, a capital defendant should have, at a minimum, lead counsel, associate counsel, and a team that includes "at least one mitigation investigator and one fact investigator," "at least one member qualified by training and experience to screen individuals for the presence or mental or psychological disorders or impairments," and "any other member needed to provide high quality legal representation." (Guideline 10.4).

13.     As a clinical professor I myself use law students for preparation of cases. One needs to be cognizant of their skill sets, needed training, and adequate supervision. For example,

---

[1] The Supreme Court is currently considering *Kennedy v. Louisiana*, No. 07-343, and one of the questions presented is whether the Eighth Amendment permits a State to punish the crime of rape of a child with the death penalty. Hence, there are some possibilities that an offense not involving murder are death eligible.

some students may be assigned to work on mitigation development with the mitigation specialist on the team. That does not mean they will conduct significant mitigation interviews alone, but rather that they would work with the mitigation specialist, accompanying him or her, finding relevant records, helping to organize the mitigation investigation plan.

14. It has been my privilege to teach some extremely skilled, dedicated law students. Nonetheless, I cannot imagine a situation where I would send a law student alone without supervision to interview a witness critical to the defense of the case or theory of mitigation

15. Assuming the prosecution is able to establish both guilt and eligibility beyond a reasonable doubt, the jury then decides whether death is the appropriate choice of punishment. At that part of the trial, the prosecution may present aggravating evidence, some of which is statutory and some of which is not. Some examples might include prior criminal records or other violent acts that were not charged or that did not result in a conviction and victim impact evidence.

16. Mitigation—reasons to punish with imprisonment rather than death—is any evidence which might tend to explain the client, including but not limited to, circumstances of the offense, family history, mental health issues, physical health matters or the impact the client's execution would have on his or her loved ones. The rules of evidence are relaxed at a penalty phase; this means that anything that is "relevant and reliable" is admissible.

17. A capital defender thus faces the daunting task of investigating and preparing to meet the evidence against the client in the trial, as well as investigating and preparing to meet the

4

aggravating evidence at a penalty phase, in addition to locating and presenting mitigating evidence—much of which may be a matter of shame to the client and his family.

18. The ABA Guidelines state: "Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty. The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented." (ABA Guideline 10.7 A and 10.7 A.1.).

19. Resolving a case with a plea of guilt in return for a sentence other than death is an important goal in the appropriate case, as indicated in Guideline 10.9.1—the Duty to Seek an Agreed-upon Disposition. Subsection A of that guideline reads "Counsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these Guidelines to achieve an agreed-upon disposition." As the commentary make clear, this duty is to seek a disposition that provides a guarantee to the client that upon a plea, he receives something in return – at the minimum a sentence other than death. Experience has taught capital defenders that an open plea of guilt is unlikely to result in a sentence other than death and further waives issues regarding relative culpability and many appellate issues.

20. Many plea agreements include cooperation with law enforcement officers.

21. In the federal system a proffer agreement is a written agreement between federal prosecutors and an individual under criminal investigation. The agreement permits the individual to give the government information about the alleged crimes with some

5

assurances that the individual will be protected against use of that information at trial, with some certain exceptions. See Exhibit B (Proffer Agreement). Allowing a client to cooperate with law enforcement without either a plea agreement or a proffer letter falls below accepted capital defense practices.

22.    A capital defender must also investigate her client's life. Such an investigation has two basic goals: (1) to provide evidence consistent with any theory that is developed concerning the capital defendant's lesser degree of culpability; and (2) to provide the sentencer a full, reliable and accurate understanding of the capital defendant.

23.    The commentary to ABA Guideline 10.7 – the duty to investigate – catalogues mitigation investigation as including (but not limited to) the following:

   a.    Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

   b.    Family and social history (including physical, sexual, or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

   c.    Educational history (including achievement, performance, behavior, and

6

activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

d. Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

e. Employment; and

f. Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

24. Motions practice is far more complex and requires significant preparation by the capital defender who should file any motion for which there is a good faith basis. This should be done because it is the right thing to do for the capital defendant client, because it might just work, and very importantly, because it may indeed lay the groundwork for a successful appeal. If the defender does not object to improper evidence or trial conduct, it is almost certainly waived for appellate purposes. Worse yet, if it isn't done in the right way, it is almost certainly insulated from federal direct or collateral review.

25. There is also the need to be familiar with and able to employ sophisticated jury selection techniques. Jury selection in a capital case is far more complicated and difficult than in an ordinary case.

26. There are negative process effects of death qualification and excluding people opposed to the death penalty increases the likelihood of conviction and of decisional errors. *See* Craig Haney, "On the Selection of Capital Juries The Biasing Effects of the Death Qualification Process," 8 Law & Hum. Behav. 121 (1984); Craig Haney, "Examining

7

Death Qualification Further Analysis of the Process Effect," 8 Law & Hum. Behav. 133 (1984). It is clear, however, that the "process effect" of asking about the death penalty before the question of guilt or innocence has been determined has the effect of predisposing the jury to believe the trial to be a foregone conclusion regarding culpability and that the judge approves of the death sentence.

27. Under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the State has the right to exclude, for cause, anyone who could not consider giving the death penalty. *Adams v. Texas*, 448 U.S. 38 (1980), as interpreted in *Wainwright v. Witt*, 469 U.S. 412 (1984), modified the "automatic" and "unmistakably clear" language of *Witherspoon*'s footnotes 9 and 21, which allowed the exclusion for cause only when a juror unqualifiedly expressed their unwillingness to consider the death penalty. While this relaxed somewhat the rigors of inquiry on one side of the question, in the long run it complicated matters. This is because "death-qualification" became a three-dimensional phenomenon for the interrogator.

28. First, jurors who are "substantially impaired" by virtue of anti-capital punishment views must be identified. Second, jurors who are "substantially impaired" by virtue of *pro*-capital punishment views must be identified. *See Morgan v. Illinois*, 504 U.S. 719 (1992) (venire members must be identified who are substantially impaired *in considering lawful mitigating evidence.*). "Presumably, under today's decision a juror who thinks a 'bad childhood' is never mitigating must also be excluded." *Id.* at 744 (Scalia, J., dissenting). Inquiry into a prospective juror's thoughts and feeling on the death penalty is a far more complex process than simply that a juror is "for or against" capital punishment. It is

8

imperative to discover if the juror is generally favorable to or against the concept, whether the juror can listen to both aggravating and mitigating evidence and actually give effect to each.

29. Under the Fourteenth Amendment to the United States Constitution, a defendant in a capital case has a right to an impartial jury for capital sentencing as well as for trial. *Morgan*, 504 U.S. 727; U.S. Const., amend. XIV. This constitutional guarantee includes the right to an adequate voir dire to permit the identification of unqualified jurors. *Morgan* at 729. Accordingly, voir dire should ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are closed by bias and prejudice such that they cannot fairly apply the law as instructed.

30. During voir dire, it is important to ask open-ended questions, to listen to the answers, and to show the juror the respect he or she deserves. If a capital defense attorney is making speeches at the potential jurors, he or she is not asking questions, not getting information, and therefore not able to effectively represent the client by making appropriate challenges for cause, nor making good use of peremptory challenges.

31. The major difference between trial preparation in a capital case and a non-capital case is that the theory of the case must work with the theory of mitigation.

32. Some theories of the case flow obviously into the life phase of the case. For example, if the defense is insanity, the mitigation presentation will likely be an extension of the defense at trial. If the client is convicted of felony murder—say in the course of an armed robbery where the victim went for the gun—part of mitigation will likely focus on

the unintentional nature of the homicide: i.e., it is felony murder even if the deceased died of a heart attack during an armed robbery, but it is not the cold-blooded "worst of the worst" case one thinks as deserving of the death penalty.

33. If the defender has a case where he or she is presenting a vigorous "wrong guy" defense, the capital defender must face up to the fact that the jury disagreed, then present mitigation out of respect for the awesome challenge facing the jury— choosing punishment.

34. Most jurors are concerned with whether a defendant sentenced to life would pose a danger. For that reason it is a standard practice to obtain records of prior incarceration to try to present evidence under *Skipper v. South Carolina*, 476 U.S. 1 (1986).

35. In accordance with 28 U.S.C.A. § 1746, I declare that under penalty of perjury that the foregoing is true and accurate.

_____
Andrea Lyon

Signed before me this __19__ day of
__June__ ,2008
_____
Notary Public for __State of Illinois__
My Commission Expires: __12/12/10__

OFFICIAL SEAL
CRYSTAL D JACKSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/12/10

10

# ANDREA D. LYON

**Office:**
25 E. Jackson Boulevard Crescent
Chicago, Illinois 60604
(312) 362-8402
(312) 362-5421  FAX
alyon1@depaul.edu

**Home:**
3017 MacHeath

Flossmoor, Illinois 60422
(708) 206-0293 (home office)

## PROFESSIONAL EXPERIENCE

**July 1, 2006 to present**
Programs

Associate Dean For Clinical

DePaul University College of Law

Administration of all live-client clinics at the DePaul University College of Law.  Responsibilities include budgetary, development, faculty recruitment and training, standardization of evaluative measures, in addition to teaching and practice described below.

**July 1, 2007 to present**

Cases

Clinical Professor of Law
Director, Center for Justice In Capital

DePaul University College of Law
Chicago, Illinois

Teaching students in a death penalty clinic including doctrinal law in capital cases, trial practice, preparation and strategy, and directly representing clients in state and federal court on the trial, appellate and collateral level in capital cases. The center also trains capital defense lawyers and other members of the team such as investigators and mitigation specialists at various seminars throughout the state of Illinois. Additional course: federal habeas corpus practice and procedure.

**August 1, 2000 to 2007**

Associate Clinical Professor



Cases

Director, Center for Justice In Capital

DePaul University College of Law
Chicago, Illinois

**September 1999 to present**                    Director, Darrow Death
Penalty Defense College

DePaul University College of Law
Chicago, Illinois

Designed and direct Continuing Legal Education six-day program to train attorneys defending death penalty cases in small groups as well as lecture format.

**September 1, 1995 to July 31, 2000**    Assistant Clinical Professor
University of Michigan Law School
Ann Arbor, Michigan

Teaching students trial practice, preparation and strategy, and overseeing their representation of clients in the criminal defense component of the general law clinic, and directly representing clients in state and federal court on the trial, appellate and collateral level.

**February 1, 1990 to August 30, 1995**  Director, Illinois Capital Resource Center

Chicago, Illinois

The resource center trained, backed-up and selected attorneys who represented death row inmates on collateral review. Responsibilities included managing and raising funds from two governmental sources, fulfilling both federal and state reporting and auditing requirements, in-house publications, supervision of staff and outside attorneys, recruitment and placement of panel attorneys on cases, maintenance of brief bank and related material, designing and implementing training seminars, as well as direct representation of clients in capital cases both at the trial and collateral levels.

**September 1, 1976 to January 31, 1990**    Office of the Cook County Public Defender
Chicago, Illinois

Last position: Chief of the Homicide Task Force, a 22 lawyer unit representing persons accused of homicides.  Personally tried over 100 homicide cases, many of which were capital cases, recognized by a number of courts as an expert in the field of death penalty defense. Other assignments included the felony trial division, post-conviction/habeas corpus unit, preliminary hearing/first municipal (misdemeanor) unit, and

3

the appeals division.

## *CONTINUING LEGAL EDUCATION :*

Trial advocacy programs: National Criminal Defense College, at Mercer Law School, Macon, Georgia faculty since 1983, various programs in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Illinois, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New York, Nevada, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, Wisconsin, .

Death penalty seminars: in Alabama, Arkansas, Arizona, California, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maine, Missouri, Nevada, North Carolina, Oklahoma, Tennessee, Texas, Virginia, Washington and for the NAACP.

## PUBLICATIONS

1Managing Capital Cases, ( with Stephen Richards and Ajitha Reddy) (published by the Office of the State Appellate Defender of Illinois and the Center for Justice in Capital Cases at the DePaul College of Law), 2007.

"But He Doesn't *Look* Retarded: Challenges to Jury Selection in the Capital Case for the Mentally Retarded Client Not Excluded under *Atkins v. Virginia*" upcoming in the DePaul Law Review symposium issue 2007.

"Reason Not the Need:  Does the Lack of Compelling State Interest in Maintaining a Separate Death Row Make it Unlawful? " (with Dr. Mark Cunningham), 33 AMJCRL 1 , spring 2006.

Mitigation Compendium,( 2nd ed).( ed. With Jessica Covell) (published by the Office of the State Appellate Defender of Illinois and the Center for Justice in Capital Cases at the DePaul College of Law), 2006.

"Defending the Life-or-Death Case", American Bar Association Litigation Journal, Volume 32, Number 2, Winter 2006.

Illinois Capital Defense  Motions Manual, (With  Stephen Richards and Emily Hughes) ( 2nd ed. published by the Office of the State Appellate Defender of Illinois and the Center for Justice in Capital Cases at the DePaul College

4

of Law) Summer 2005

"Symposium: Toward a Model Death Penalty Code: The Massachusetts Governor's Council Report: The Capital Jury" Indiana Law Journal, Volume 80, Number 1, Winter 2005.

Federal Habeas Corpus: Cases and Materials, (with Emily Hughes and Mary Prosser), Carolina Academic Press, 2004.

"Naming the Dragon: Litigating Race Issues During a Death Penalty Trial" DePaul Law Review, Volume 53, Number 4, 2004.

Investigation Manual, (ed.) (published by the Office of the State Appellate Defender of Illinois and the Center for Justice in Capital Cases at the DePaul College of Law, 2004.)

Illinois Death Penalty Defense Law and Practice Manual (with Stephen L. Richards and Emily Hughes).(published by the Office of the State Appellate Defender of Illinois and the Center for Justice in Capital Cases at the DePaul College of Law, 2003.)

Mitigation Handbook,( ed.)(published by the Office of the State Appellate Defender of Illinois and the Center for Justice in Capital Cases at the DePaul College of Law, 2002.)

"The People v. Juanita Thomas: A Battered Woman's Journey to Freedom" (with Emily Hughes and Juanita Thomas), Women & Criminal Justice, Volume 13, Number 1, 2001.
"Criminal Justice in the Supreme Court: A Review of United States Supreme Court Criminal and Habeas Corpus Decisions (October 4, 1999 – October 1, 2000)" (with Larry A. Benner, Marshal J. Hartman, Shelvin R. Singer, and Nancy Allen Goldberg) California Western Law Review, Volume 38 Number 1, Fall 2001.

"Criminal Justice in the Supreme Court: A Review of United States Supreme Court Criminal and Habeas Corpus Decisions (October 4, 1999 – October 1, 2000)" (with Larry A. Benner, Marshal J. Hartman and Shelvin R. Singer) California Western Law Review, Volume 37 Number 2, Spring 2001.

"Setting the Record Straight: A Proposal for Handling Prosecutorial Appeals to Racial, Ethnic or Gender Prejudice During Trial", Michigan Journal of Race & Law, Volume 6, Number 2, Spring 2001.

<u>Illinois Capital Defense  Motions Manual</u>, (published by the Office of the State Appellate Defender of Illinois and the Center for Justice in Capital Cases at the DePaul College of Law), 2001.

"Deportment Does Matter: A review of <u>Battered Women in the Courtroom: The Power of Judicial Response</u> by James Ptacek" Women & Criminal Justice, Volume 12, Number 1, 2000.

<u>Michigan Criminal Defense Motions</u> with Professor Bridget McCormack, ( published by the Michigan State Appellate Defender's Office, 2000)

"Be Careful What You Wish For: An Examination of Arrest and Prosecution Patterns of Domestic Violence in Two Cities in Michigan" Michigan Journal of Gender and Law Vol.5, Issue 2, 1999.

"Investigating and Trying a Homicide Case", The Champion, September/October 1998.

"Lessons From the Fall" (Book review of <u>After the Madness: A Judge's Own Prison Memoir</u> by Sol Wachtler) Michigan Law Review Vol. 96, No. 6, May 1998.

<u>Federal Death Penalty Defense Manual</u> (published by the National Association of Criminal Defense Lawyers, July 1997)

"New Opportunities for Defense Attorneys: How Record Preservation Requirements After the New Habeas Bill Require Extensive and Exciting Trial Preparation".  The John Marshall Law Review: Volume 30, Number 2, Winter 1997.

"Is There Any Habeas Left in this Corpus". Symposium published in Loyola University Law Journal, Vol. 27, No.3, Spring 1996.

"Affirmative Defenses," in Institute of Continuing Legal Education's Defending Illinois Criminal Cases, Chapter 8, 1996. (First published in 1988 with an update in 1991.)

"Unintended Consequences: The United States Supreme Court's Mission to Restrict Remedies for State Prisoners Backfires" California Western Law Review: Volume 30, Number 3, Spring 1994

Illinois Capital Post-Conviction Defense Manual (2nd edition September 1993, 1st Edition with Chandra Walker, July, 1990)

"Defending the Death Penalty Case: What Makes Death Different?" Mercer Law Review, Volume 42, Number 2, Winter 1991

"In Case of Confession" with Michael J. Morrissey, The Champion, May 1990.

Illinois Death Penalty Defense Manual (2nd Ed. March, 1988, 1st Ed.1985, update 1986)

"Self-Defense and Battered Spouse Syndrome:  A Legal and Psychological Perspective" with Helen Morrison, M.D. Criminal Defense, Volume 9, Number 3, May-June 1984.

"Equal Access to Evidence:  The Case for Defense Use of Immunity for Essential Witnesses,"  Criminal Defense, Volume 8, Number 4, July-August 1982.

"The Preliminary Hearing:  A Necessary Part of Due Process," Criminal Defense, Volume 6, Number 3, May-June 1979.

## EDUCATION

Antioch School of Law, Washington, DC                    J.D., May 16, 1976


Livingston College, Rutgers University, New Brunswick, NJ B.A., May 30, 1973


## ADMITTED TO PRACTICE BEFORE:

Illinois Supreme Court, 1976

7

U.S. District Court for the Northern District of Illinois, 1976

District of Columbia Court of Appeals, 1978

Supreme Court of the United States, 1979

Federal Trial Bar, Northern District of Illinois, 1983

United States Court of Appeals, Seventh Circuit, 1987

Michigan Supreme Court, 1995

Federal Bar, Eastern District of Michigan, 2000

United States Court of Appeals, Sixth Circuit, 2001

Illinois Capital Litigation Trial Bar, certified as lead counsel, 2002

## PROFESSIONAL MEMBERSHIPS

**Illinois Association of Criminal Defense Lawyers**
President 2003-2006, Vice-President 1989-1991, Board of Directors, 1992-1995, 2000-2002, **2006-2007.**

**Illinois Pattern Instruction Criminal Committee**
Member 1994, 1995

**National Association of Criminal Defense Lawyers**
Co-Chair, death penalty committee, 1990-1991, 2000-2002, vice-chair death penalty committee 2003-2006

**Black Ensemble Theater Board**
President, 1982 to 1987; Member, Board of Directors, 1987-1991

**Women's Bar Association of Illinois**
Co-Chair, Trial Lawyer's Committee, 1984 to 1987, Board of Directors 1988-1990

## AWARDS AND HONORS

National Association of Criminal Defense Lawyers' President's Commendation , 2005

Illinois Association of Criminal Defense Lawyers Lifetime Achievement

8

Award, 2003

Clarence Darrow Award, 2003

DePaul University College of Law Excellence in Teaching Award, 2002-2003

University of Michigan Law School  L. Hart Wright Award for Excellence in Teaching, 1999-2000

University of Michigan Law School  L. Hart Wright Award for Excellence in Teaching, 1998-1999
National Conference on Wrongful Convictions and the Death Penalty's "Justice for All" Award, 1998

Reginald Heber Smith Award, given by the National Legal Aid and Defender Association, 1995

Illinois Academy of Criminology's Anne O'Brien Stevens Award, 1991

Cook County Public Defender's Guardian of Liberty Award, 1990

## PERSONAL

Born: September 23, 1952, Boston, Massachusetts

Married to Arnold D. Glass, two children: Samantha and William Glass.

## LANGUAGES

English and Spanish

9



**U.S. Department of Justice**

*United States Attorney*

*District of South Carolina*

| | | | |
|---|---|---|---|
| Wachovia Building<br>Suite 500<br>1441 Main Street<br>Columbia, SC 29201<br>(803) 929-3000<br>FAX (803) 254-2912 | 151 Meeting Street<br>Suite 200<br>Post Office Box 978<br>Charleston, SC 29402<br>(843) 727-4381<br>FAX (843) 727-4443 | John L. McMillan Federal<br>Building, Room 222<br>401 W. Evans Street<br>Post Office Box 1567<br>Florence, SC 29503<br>(843) 665-6688<br>FAX (843) 678-8809 | 105 N. Spring Street<br>Suite 200<br>Post Office Box 10067<br>Greenville, SC 29603<br>(864) 282-2100<br>FAX (864) 233-3158 |

Reply to: Greenville

June 26, 2006

RE:

Dear

The following constitutes the proffer agreement between the Attorneys for the Government and                              , hereinafter referred to as "Client."

### PROFFER AGREEMENT

The purpose of Client making a Proffer is to provide the Government with an opportunity to assess the value, extent, and truthfulness of Client's information about the criminal liability of Client and others.

**THIS IS NOT A COOPERATION AGREEMENT**. Client has agreed to provide the Government with statements and information, and to respond to questions so that the Government may evaluate Client's statements and other information in making prosecutive decisions. By receiving Client's Proffer, the Government does not agree to make a motion for downward departure on the Client's behalf or to enter into a cooperation agreement, plea agreement, immunity or non-prosecutive agreement. The Government makes no representation about the likelihood that any such agreement will be reached in connection with this Proffer.

By signing this "Proffer Agreement," Client agrees to be fully truthful and forthright with the United States Attorney's Office for the District of South Carolina and federal law enforcement agents in their investigation of all unlawful activities, to include, but not limited to, truthful and complete debriefings with no misstatements or material omissions of fact of Client's knowledge concerning all unlawful activities. Also, Client understands that Client must fully disclose and provide truthful information to

**EXHIBIT**

B

tabbies

June 26, 2006
Page 2

Government including any books, papers, or documents or any other items of evidentiary value to the investigation. Client must also testify fully and truthfully before any grand juries and at any trials or other proceedings if called upon to do so by the Government, subject to prosecution for perjury for not testifying truthfully. Client's failure to be fully truthful and forthright at any stage will, at the sole election to the Government, cause the obligations of the Government within this Agreement to become null and void. **Further, it is expressly agreed that if the obligations of the Government within this Agreement become null and void due to the lack of truthfulness on Client's part:**

> **(1) the Government may file any and all charges known to the Government in the appropriate district; and**
>
> **(2) the Government may use for any purpose any and all statements made and other information provided by Client in the prosecution of Client on any charges, including perjury.** Client accepts this provision being fully advised that, under Fed.R.Crim.P. 11(e)(6) and Fed.R.Evid. 410, statements made by Client pursuant to this Agreement would not ordinarily be admissible in any criminal proceedings including perjury and making false statements unless the statements were made under oath, on the record, and in the presence of counsel.

Client agrees to submit to polygraph examination(s) by any qualified polygraph examiner should Client be requested to do so. **Failure to pass to the satisfaction of the Government any polygraph examination administered pursuant to this Agreement constitutes a breach of the Agreement, and the Government may use for any purpose any statements made and other information provided by Client in the prosecution of Client on any charges.**

Provided Client is truthful as described above, remaining terms of the Agreement are as follows:

> 1. No statements made or other information provided by Client during this Proffer or discussion will be used against Client in any criminal or civil case except as provided herein.
>
> 2. The Government may make derivative use of and may pursue any investigation leads suggested by any statements made or other information provided by Client for the purpose of obtaining other evidence which may be used in a prosecution of Client. This is necessary to prevent the Government from having to prove that evidence it would introduce at any future trial is not tainted by any statements made or other information provided by Client during this Proffer.

June 26, 2006
Page 3

3. In the event that Client is a witness at a trial or other proceeding concerning any matter discussed in this Proffer and testifies materially different from any statements made or other information provided during this Proffer, the Government may cross-examine Client concerning any statements made or other information provided during this Proffer or use such to rebut any evidence or arguments offered by or on behalf of Client (including arguments made or issues raised sua sponte by the District Court) at any stage of the criminal prosecution (including bail, trial, and sentencing) should any prosecution of Client be undertaken.

4. The Government agrees that any self-incriminating statements made and other information provided by Client during this Proffer will not be used in determining the applicable sentencing guideline range should Client be convicted or enter a guilty plea unless there is a breach of this Agreement. However, these statements made and other information provided will be made available to the court for its consideration pursuant to 18 U.S.C. § 3661. The provisions of this paragraph shall not be applied to restrict the use of any such statements or information:

(A) known to the Government prior to the date Client makes this Proffer;

(B) concerning the existence of prior convictions and sentences in determining § 4B1.1 (career offender);

© in a prosecution for perjury or giving false statement; or

(D) in the event there is a breach of the terms of this Agreement or subsequent plea agreement. §1B1.8, United States Sentencing Commission Guidelines.

The obligations of and restrictions on the Government within this Agreement are expressly contingent upon Client's abiding by federal and state laws and complying with the terms and conditions of any bond executed in this case. **Therefore, Client's violation of federal or state law or of the provisions of any bond executed in this case constitutes a breach of this Agreement, and upon such violation, the Government may use for any purpose any and all statements made and other information provided by Client in the prosecution of Client on any charges.**

Client is hereby informed and understands that this Agreement does not extend to any statements or other information involving any homicides or other crimes of extreme violence. Any statements made or other information provided by Client during the Proffer regarding any homicide or other extreme acts of violence may be used against Client in any criminal proceedings which may be undertaken by any authorities.

JUN-26-2006 MON 03:22 PM US ATTORNEYS OFFICE          FAX NO. 18642333158          P. 05

WILLIAM J. WATKINS
June 26, 2006
Page 4

To the extent the Government is entitled under this Agreement to offer in evidence any statements made or other information provided by Client or leads obtained therefrom, Client shall assert no claim under the United States Constitution, any Statute, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rules that such statements made or other information provided or any leads therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

Client is advised that making a false statement in a matter within the jurisdiction of the United States is a federal offense punishable by imprisonment for up to five years, and a fine of up to $250,000.

The parties hereby agree that this Agreement contains the entire agreement of the parties; that this Agreement supersedes all prior promises, representations and statements of the parties; that this Agreement may be modified only in writing signed by all parties; and that any and all other promises, representations and statements made prior to this Agreement are null and void.

REGINALD I. LLOYD
UNITED STATES ATTORNEY

By: s/ Regan A. Pendleton
REGAN A. PENDLETON
Assistant U.S. Attorney

I AGREE AND ACCEPT THE TERMS OF THIS AGREEMENT:

7-10-06
Date

_____
ATTORNEY