IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

UNITED STATES OF AMERICA )
 )
v. ) CRIMINAL NO. 4:02-992
 )
CHADRICK E. FULKS )
 )

## DECLARATION OF MARK D. CUNNINGHAM

1. My name is Mark D. Cunningham. My curriculum vita is attached as Exhibit A. I am a clinical and forensic psychologist with a nation-wide practice.

2. I serve on the Editorial Board of the Journal Assessment and am a Ad Hoc reviewer for Behavioral Sciences and the Law, Criminal Justice Policy Review, Law and Human Behavior, and the Southwest Journal of Criminal Justice.

3. In 2006, I received the American Psychological Association Award for distinguished contributions to research in public policy. In 2005, I received the Texas Psychological Association Award for outstanding contributions to science. In 2004, The National Association of Sentencing Advocates bestowed on me The John Augusta Award. I am a fellow of the American Psychological Association.

4. I have presented numerous papers and addresses to various organizations, including the American Psychological Association, The Southern Poverty Law Center, The American Academy of Forensic Psychology, The Texas Psychological Association, and the American Bar Association.

5. I have contributed chapters to several books, including Encyclopedia of Psychology and Law (Thousand Oaks, Cal.: Sage Publications, Inc.), Violent Offenders:

PA Document #6

Theory, Research, Public Policy, and Practice (Boston, Mass.:   Jones & Bartlett Publishers), Learning Forensic Assessment (Mahwah, N.J.:   Lawrence Erlbaum Associates, Inc.).   My book chapters and other scholarly articles have dealt with the competency of individuals to waive appeals, institutional misconduct among capital murders, psychological evaluations at capital sentencing, prison violence, and future dangerousness.

6.     I was asked by trial counsel for Chad Fulks to evaluate the likelihood that Mr. Fulks would engage in serious violence during a natural life term in the Federal Bureau of Prisons.   After I presented my findings to trial counsel, I was prepared to testify at Mr. Fulks' sentencing hearing.   I was not called by trial counsel to testify at the sentencing hearing.   Attached as Exhibit B are the slides I would have presented to the jury had I been called to testify.

7.     In preparing my assessment, I relied upon a review of Mr. Fulks' incarceration records, scholarly research literature, correctional statistical data, BOP statistical data and information.   I did not interview Mr. Fulks as a part of this process. Because interview data is a minor aspect of a capital sentencing violence risk assessment, the absence of an interview has minimal impact on the associated risk assessment. Reliance on records of a criminal defendant's past pattern of conduct while incarcerated, particularized characteristics of the defendant, group statistical data, and BOP statistics and information allow the findings to be offered with a reasonable degree of psychological certainty.

8.     Had I been called to testify at Mr. Fulks' capital sentencing, I would have described that behavior pattern in a similar setting and group statistical approaches are

most reliable in assessing the likelihood of violent behavior in a prison context. Behavior pattern analysis that is specific to context is critically important because prison represents a fundamentally different context from the community. Prison violence does not predictably follow from pre-confinement violence or the capital offense of conviction.

9.     I would have further testified that review of Mr. Fulks' prior prison incarceration and incarceration pre-trial records reveals that he has no serious violence in his past prison confinement, and has exhibited no serious violence in past extended jail incarcerations. Violence towards correctional staff has not been predatory, rather it has been restricted to two instances where he resisted. Mr. Fulks was constructively involved in prison educational and work programs when in State custody. Further, correctional appraisal in pre-trial confinement points to his not being a disproportionate risk of present violence. Because of the marketed higher security in U.S. penitentiaries and because of research conclusions, Mr. Fulks' escape from the Hopkins County Jail and his planned escape from the Columbia Care Facility have only a modest, if any, effect in increasing his likelihood of serious violence or escape during a capital life sentence in the Bureau of Prisons.

10.     I would have further testified that group statistical analysis reveals that rates of disciplinary infractions and violence in prison are negatively correlated with age. Long-term inmates have lower rates of disciplinary infractions than short-term inmates. Rates of serious violence in U.S. penitentiaries are low, with that rate decreasing markedly as the severity of violence specified increases. Additionally, BOP data demonstrates that prison-specific factors, rather than simply inmate-factors, have significant effects on the occurrence of serious violence. Further, multiple group

statistical studies indicate that the majority of individuals convicted of capital murder do not represent a disproportionate risk of violence while confined in prison. Research data on the limited follow-up of federal capital defendants sentenced to life indicates that the majority of these inmates have not been involved in serious violence in the BOP. The majority of inmates in comparison offender groups most similar to Mr. Fulks (inmates age 26-30, convicted of capital offenses, convicted of federal capital offenses, facing long-term sentences) have not engaged in serious institutional violence. Research summaries published by the U.S. Department of Justice, studies of the comparative assault rates of commuted capital offenders, and research where I am a co-investigator regarding death-sentence, life-without-parole (LWOP) and parole-eligible offenders demonstrate that neither the severity of the offense of conviction nor a sentence of LWOP are reliably predictive of an increased risk of serious violence in prison.

11. I would have further testified that utilizing studies of death-commuted and life-sentence capital offenders as anchors regarding the probability of a serious act of prison violence from a capital offender, there is a 20-30 percent likelihood of a capital offender committing an act of violence at some time across his capital prison term. There is an approximately 8-10 percent likelihood that a capital offender would present a more chronic violence problem. Applying group statistical data from an exceptional large (N=6,390) study of assaultive conduct by convicted murderers in state prison, an offender matching the offense characteristics, demographic features, and incarceration history of Mr. Fulks would have the following probabilities of serious institutional violence across a capital life term: 26.2-31.5 percent any serious assault, 1-2 percent aggravated assault on staff, .2-.4 percent homicide of an inmate. These risk estimates include consideration of a

risk enhancing factors of multiple murder victims, attempted murder associated with capital offense, robbery associated with capital offense, and a prior prison term; as well as the risk reducing factor of being age 27 at entrance to the Federal Bureau of Prisons. The likelihood of a homicide of a BOP staff member is one per five hundred thousand inmates annually. Stated more simply, I would have testified that confined for the remainder of his life in federal prison, it was improbable that Mr. Fulks would commit criminal acts of violence that would constitute a continuing threat to society. That improbability would become increasingly diminished as the severity of the violence specified increased (i.e., more serious violence would be less likely to occur).

12.    Finally, I would have testified that the above estimates of the risk of serious violence could be markedly reduced by ultra-secure confinement in the Bureau of Prisons such as that available in secure housing units and/or ADX Florence.  Security measures at this level of custody are quite effective, as demonstrated by the associated low rates of serious violence in a federal super-maximum confinement such as ADX. In other words, the Department of Justice and federal Bureau of Prisons are more than capable of incapacitating Mr. Fulks should they believe that he represents a disproportionate risk of violence.

13.    The testimony of a well-qualified expert regarding violence risk assessment at federal capital sentencing can be quite important for the following reasons.

    a. Capital jurors are concerned with the future violence risk of a capital defendant whether or not this is directly alleged at trial, and may regard this as a fundamental sentencing determination.

b. Individuals undertaking violence risk assessment are likely to commit a number of fundamental errors unless guided by reliable scientific methodology and data. These errors more often result in an overestimation of violence risk. The jury is unlikely to have knowledge of this methodology and research data unless informed by expert testimony.

c. A capital jury's familiarity with the heinousness of the capital offense and knowledge of other aggravating factors or acts are likely in many instances to result in a perception of high future violence risk in prison that is not justified by research.

d. The combination of these factors is likely to result in a capital sentencing jury that is strongly biased toward overestimation of violence risk when scientifically grounded expert testimony is excluded.

e. In the absence of expert testimony, a capital jury has no mechanism to understand or incorporate base rate data, appreciate the importance of context, avoid illusory correlation, maintain skepticism of clinical methods, understand the implications of Antisocial Personality Disorder or related characterizations, incorporate the effects of aging, reliably evaluate patterns of behavior, factor in preventive measures, acquire the broad information relevant to violence risk considerations, appreciate the probabilistic nature of their task, or critically evaluate the arguments of the government or the defense.

f. The scientific methodology and data relevant to violence risk assessment of capital offenders is based on multiple independent research studies, has been

subjected to peer-review, articulates an error rate through the range of probabilities expressed, and is generally accepted in the violence risk assessment scientific community. The confinement options available in BOP are detailed in government documents. Confinement options and general security procedures at ADX Florence are detailed in government documents and were described to me during my tours of that facility.

g. Avoidance of fundamental errors in violence risk assessment at capital sentencing requires the testimony of an expert to inform the jury of scientifically sound methodology and empirical data.

h. Particularly when accompanied by demonstrative exhibits that assist the jury's understanding and retention, testimony detailing violence risk assessment methodology and empirical data can be presented in a clear, organized, logical fashion that neither confuses nor misleads the jury.

i. A federal capital jury is at best almost certain to be ignorant of rates of prison violence, inmate demographics and criminal histories, and federal prison confinement options and security procedures. At worst a federal capital jury comes to capital sentencing risk assessment holding assumptions regarding the probability of future violence that are false. Such false assumptions spring from intuitive but erroneous beliefs. It must be emphasized that much of the research data on the violence risk assessment of prison inmates is counter-intuitive.

14.     In accordance with 28 U.S.C.A. § 1746, I declare that under penalty of perjury that the foregoing is true and accurate.

Mark D. Cunningham

Signed before me this 20th day of
May , 2008

Notary Public for State Of Texas

My Commission Expires: July 11, 2010

SHANNON T. CASEY
MY COMMISSION EXPIRES
JULY 11, 2010

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology
*Board Certified in Forensic Psychology, American Board of Professional Psychology*
417 Oak Bend, Suite 260    Lewisville, Texas 75067
972-459-0658   Fax 972-459-0958   mdc@markdcunningham.com

*Licensed psychologist: Arizona #3662, Arkansas #98-17P, Colorado #2305, Connecticut #846,*
*Idaho #PSY-379, Illinois #071-006010, Indiana #20041376A, Louisiana #794, New Mexico #0768,*
*New York #017111, Oklahoma #1002, Oregon #1333, South Carolina #764, Tennessee #2255, Texas #22351*

## CURRICULUM VITAE
Updated 04-11-08

## EDUCATION

**Postdoctoral:**  Yale University School of Medicine, New Haven, Connecticut
(September 1979 to June 1981)
NIMH-sponsored training program, part-time

**Internship:**  National Naval Medical Center, Bethesda, Maryland
(February 1977 to February 1978)
Specialty:  Clinical Psychology (APA accredited)

**Graduate:**  Oklahoma State University, Stillwater, Oklahoma
*Doctor of Philosophy* (December 1977)
*Master of Science* (December 1976)
Specialty:  Clinical Psychology (APA accredited)

**Undergraduate:**  Abilene Christian College, Abilene, Texas
*Bachelor of Arts*, (May 1973)
Majors: Psychology, Mass Communications

## BOARD CERTIFICATION

Forensic Psychology (1995), American Board of Professional Psychology (ABPP)

## PROFESSIONAL PRACTICE

**1981 - date**  Clinical and Forensic Psychologist
Private practice (Texas: Abilene, 1981-2002; Dallas, 2002 - date)

**1998 - date**  Research scientist

**1978 - 1981**  Clinical Psychologist (Lieutenant, MSC, USNR)
Naval Submarine Medical Center, Groton, Connecticut



## HONORS, AWARDS, AND DISTINCTIONS

*American Psychological Association Award for Distinguished Contributions to Research in Public Policy* – annual award bestowed for distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work, 2006 recipient.

*Texas Psychological Association Award for Outstanding Contribution to Science* – annual award in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge, 2005 recipient.

*John Augustus Award* - annual award bestowed for outstanding contributions to the profession of sentencing advocacy, National Association of Sentencing Advocates, 2004 recipient.

*Fellow, American Psychological Association (Division 41: American Psychology-Law Society)* – peer reviewed distinction reflecting outstanding and uncommon contributions having national impact on the science and practice of psychology, 2006 election.

*Fellow, American Academy of Forensic Psychology* – distinction reflecting diplomate in forensic psychology by the American Board of Professional Psychology, 1995- .

*Al Brown Memorial Award* – award bestowed for outstanding achievement, National Institute of Mental Health (NIMH) Sex Therapy Training Program, Yale University School of Medicine, 1979-1981.

*Navy Commendation Medal* – decoration for meritorious service as a clinical psychologist, Naval Submarine Medical Center, United States Navy, 1978-1980.

*Magna cum Laude* - Bachelor of Arts, Abilene Christian College, 1973.

## PROFESSIONAL LICENSES

*Licensed Psychologist:*

| | | |
|---|---|---|
| Arizona #3662 | Arkansas #98-17P | Colorado #2305 |
| Connecticut #846 | Idaho #PSY-379 | Illinois #071-006010 |
| Indiana #20041376A | Louisiana #794 | New Mexico #0768 |
| New York #017111 | Oklahoma #1002 | Oregon #1333 |
| South Carolina #764 | Tennessee #2255 | Texas #22351 |

## ACADEMIC APPOINTMENTS

**1981 - 1983**  Assistant Professor: Psychology Department,
Hardin-Simmons University, Abilene, Texas

**1978 - 1980**  Instructor (part-time): Psychology Department,
Old Dominion University (U.S. Submarine Base Extension);
Mohegan Community College, Norwich, Connecticut

**1974 - 1977**  Teaching Assistant: Psychology Department
Oklahoma State University, Stillwater, Oklahoma

## PROFESSIONAL AFFILIATIONS

American Board of Professional Psychology - *Diplomate*
American Academy of Forensic Psychology - *Fellow*
    Workshop faculty, 1998-
    ABFP examiner, 1996-2006
American Psychological Association – *Fellow* (Division 41)

National Register of Health Service Providers in Psychology
Certificate of Professional Qualification in Psychology (CPQ)

Texas Psychological Association
National Association of Sentencing Advocates
American Association for Correctional Psychology

## EDITORIAL

Guest editor: Capital sentencing (special issue in preparation). *Journal of Psychiatry and Law*

Consulting editor:  *Assessment* (2006- )

Ad hoc reviewer: *Behavioral Sciences & the Law*
                *Criminal Justice Policy Review*
                *Criminal Justice Review*
                *Law & Human Behavior*
                *Southwest Journal of Criminal Justice*

Pre-publication book manuscript reviewer: John Wiley & Sons, Inc. (2007)
                                Professional Resource Press (2003)

## SCHOLARLY PUBLICATIONS

### *Chapters in edited books:*

Cunningham, M. D. (*in press*). Competency to waive appeals. In B. L. Cutler (Ed.), *Encyclopedia of psychology and law*. Thousand Oaks, CA: Sage Publications, Inc.

Cunningham, M. D. (2008). Institutional misconduct among capital murderers (pp. 237-253). In M. DeLisi & P. J. Conis (Eds.), *Violent offenders: Theory, research, public policy, and practice*. Boston: Jones & Bartlett Publishers.

Cunningham, M. D. (2007). Forensic psychology evaluations at capital sentencing (pp. 211-238). In R. L. Jackson (Ed.), *Learning forensic assessment*. Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Cunningham, M. D. & Goldstein, A. M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), *Forensic psychology* (vol. 11 of 12). I. Weiner (Ed.), *Handbook of psychology*. New York: John Wiley & Sons.

### *Papers in peer-reviewed journals:*

Kuanliang, A., Sorensen, J. R., & Cunningham, M. D. (*in press*). Juvenile offenders in an adult prison system: A comparative examination of rates and correlates of misconduct. *Criminal Justice and Behavior.*

Sorensen, J. R. & Cunningham, M. D. (*in press*). Conviction offense and prison violence: A comparative study of murderers and other offenders. *Crime & Delinquency.*

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2008). Assertions of "future dangerousness" at federal capital sentencing: Rates and correlates of subsequent prison misconduct and violence. *Law and Human Behavior, 32,* 46-63.

Cunningham, M. D. & Sorensen, J. R. (2007). Capital offenders in Texas prisons: Rates, correlates, and an actuarial analysis of violent misconduct. *Law and Human Behavior, 31,* 553-571.

Cunningham, M. D. & Sorensen, J. R. (2007). Predictive factors for violent misconduct in close custody. *Prison Journal, 87,* 241-253.

Sorensen, J. R. & Cunningham, M. D. (2007). Operationalizing risk: The influence of measurement choice on the prevalence and correlates of violence among incarcerated murderers. *Journal of Criminal Justice, 35*, 546-555.

Cunningham, M. D. (2006). Dangerousness and death: A nexus in search of science and reason. *American Psychologist, 61*, 828-839.

Cunningham, M. D. (2006). Informed consent in capital sentencing evaluations: Targets and content. *Professional Psychology: Research and Practice, 37*, 452-459.

Cunningham, M. (2006). Special issues in capital sentencing. In Conroy, M. A., Lyons, P. M., Jr., & Kwartner, P. P. (Eds.). *Forensic mental health services in Texas* [special issue, electronic version]. *Applied Psychology in Criminal Justice, 2*, 205-236.

Cunningham, M. D. & Sorensen, J. R. (2006). Actuarial models for assessment of prison violence risk: Revisions and extensions of the Risk Assessment Scale for Prison (RASP). *Assessment, 13*, 253-265.

Cunningham, M. D. & Sorensen, J. R. (2006). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. *Criminal Justice and Behavior, 33*, 683-705.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. *Behavioral Sciences & the Law, 23*, 307-320.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. *Assessment, 12,* 40-49.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. *Criminal Justice Policy Review, 15*, 365-376.

Shuman, D. W., Cunningham, M. D., Connell, M. A, & Reid, W. H. (2003). Interstate forensic psychology consultations: A call for reform and proposal for a model rule. *Professional Psychology: Research and Practice, 34*, 233-239.

Cunningham, M. D. & Reidy, T .J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29*, 512-537.

Cunningham, M. D. & Vigen, M. P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. *Behavioral Sciences & the Law, 20*, 191-210.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. *Behavioral Sciences & the Law, 19*, 473-490.

Reidy, T. J., Cunningham, M. D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. *Criminal Justice and Behavior, 28*, 62-82.

Cunningham, M. D., & Reidy, T. J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26*, 20-43.

Cunningham, M. D. & Vigen, M. P. (1999). Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi death row inmates. *Criminal Justice and Behavior, 26*, 293-321.

Cunningham, M. D., & Reidy, T. J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. *Behavioral Sciences & the Law, 16*, 333-351.

Cunningham, M. D. & Reidy, T. J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences & the Law, 16*, 71-95.

Cunningham, M. D. & Murphy, P. J. (1981). The effects of bilateral EEG biofeedback on verbal, visual-spatial, and creative skills in learning disabled male adolescents. *Journal of Learning Disabilities, 14*, 204 -208.


***Papers in edited legal journals:***

Lyon, A. D. & Cunningham, M. D. (2006) Reason not the need: Does the lack of compelling state interest in maintaining a separate death row make it unlawful? *American Journal of Criminal Law, 33*, 1-30.


***Case reports and teaching points:***

Cunningham, M. D. (2007*)* Capital violence risk assessment [case report]. In Mary A. Conroy & D. Murrie, *From risk assessment to risk management: A model for forensic practice.* New York: John Wiley & Sons.

Curriculum Vitae                                                                                        Page 6

Cunningham, M. D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (152-171). New York: Oxford University Press.

Cunningham, M. D. (2002). Competence to be executed [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (96-114). New York: Oxford University Press.

Cunningham, M. D. (2002). How do you evaluate the accuracy of different sources of third-party information? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (171-173). New York: Oxford University Press.

Cunningham, M. D. (2002). Why and how do you attribute information to sources in a forensic mental health assessment? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (114-115). New York: Oxford University Press.


*Articles in professional periodicals:*

Cunningham, M. D. (2001). Bias in capital sentencing evaluations [invited opinion column]. *American Psychology and Law Society News, 21, 2,* 8-9.

Cunningham, M. D. & Reidy, T. J. (1998). Antisocial personality disorder vs. psychopathy as diagnostic tools. *Prosecutor's Brief: California District Attorneys Association, 20,* 9-11.

Marcy, M. R., Hopkins, J. B. & Cunningham, M. D. (1978). A behavioral treatment of nocturnal enuresis, *U.S. Navy Medicine, 69,* 26-28.


*Manuscripts in preparation:*

Cunningham, M. D. (*invited book under contract*). *Evaluations for capital sentencing.* A volume in the *Oxford forensic best practices series*, Series Editors: A. Goldstein, T. Grisso, Ph.D., and K. Heilbrun. New York: Oxford University Press.

Cunningham, M.D., & Sorensen, J. R. (*manuscript under review*). Improbable predictions at capital sentencing: A self-report.

Cunningham, M. D., & Hedrick, M. (*manuscript in preparation*). Slippery slope: Bias in forensic evaluations.

Sorensen, J. R., Reidy, T. J., & Cunningham, M. D. (*manuscript in preparation*). A comparative study of inmate misconduct on federal death row.


## SCHOLARLY SYMPOSIA / ADDRESSES

Death penalty on trial. Symposium with Joel Dvoskin, Ph.D., Solomon Fulero, Ph.D., & Christopher Slobogin, J.D., Ph.D., American Psychological Association 115th Annual Convention. San Francisco, California, August 2007.

Implications of developmental research for juvenile adjudications. Alabama Council of Community Mental Health Boards, Southern Poverty Law Center: 33rd annual conference. Birmingham, Alabama, May 2007.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. San Diego, California, January 2007.

Dangerousness and death: A nexus in search of science and reason. Invited Award Address, American Psychological Association 114th Annual Convention. New Orleans, Louisiana, August 2006.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. La Jolla, California, March 2005.

Informed consent in forensic evaluations. Symposium with Mary Connell, Ph.D., William Foote, Ph.D., & Daniel Shuman, J.D., American Psychology-Law Society Annual Conference. LaJolla, California, March 2005.

Psychological evaluations in death penalty litigation. Texas Psychological Association, Pre-convention workshop. Dallas, Texas, November 2003.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. Cincinnati, Ohio, September 2003.

Competency to be executed. Symposium with Stanley Brodsky, Ph.D. & Patricia Zapf, Ph.D., American Psychology-Law Society Annual Conference. Austin, Texas, March 2002.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. San Diego, California, February 2002.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. Monterey, California, January 2000.

Psychological expertise and criminal justice (panel member). American Psychological Association / American Bar Association Conference. Washington, DC, October 1999.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. Austin, Texas, February 1999

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series. Milwaukee, Wisconsin, March 1998

## AMICUS CURIAE

*Consultation and assistance in preparation of:*

Brief of the *Amici Curiae* Texas Psychological Association and Texas Appleseed in Support of Appellant, *Noah Espada vs. The State of Texas*, in the Court of Criminal Appeals of Texas at Austin (2007).

Brief of *Amicus Curiae* American Psychological Association in Support of Defendant-Appellant, *U.S. v. Sherman Lamont Fields* in the United States Court of Appeals for the Fifth Circuit (2005).

## TESTIMONY BEFORE COMMISSIONS AND LEGISLATIVE COMMITTEES

Texas State Senate, Criminal Justice Committee, 79th Legislative Session, Austin, 2005

Texas State Senate, Criminal Justice Committee, 78th Legislative Session, Austin, 2003

Illinois Governor's Commission on Capital Sentencing, Chicago, 2002

## Risk Assessment

U.S. v Chad Fulks

2004

## Risk Components

**Will there be violence?**

1. What probability?

2. Of what form of violence?

3. At what time period?

4. In what context?

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.

## Risk Components

**Will there be violence?**
1. What probability?
2. Of what form of violence?
3. At what time period?
4. In what context?

**Will this driver have an accident?**
1. What probability?
2. Of what type of accident?
3. At what age?
4. In what locale?

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.
Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

## Risk Assessment Techniques

*More Scientific*

1. **Group statistical**
   (insurance company method)

2. **Pattern**
   (using patterns of how the individual behaved in the past to estimate behavior in similar situations)

3. **Intensive clinical evaluation**
   (inferring violence risk from personality characteristics -- notoriously unreliable in forecasting long-term violence)

4. **Hypothetical inference**
   (seeing animals in the stars)

*Less Scientific*

Morris, N., & Miller, M. (1985). Predictions of dangerousness. In M. Tonry & N. Morris (Eds.), Crime and justice: An annual review of research (Vol. 6) (pp.1-50). Chicago: University of Chicago Press.
Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.



*1*

## Group Statistical Steps

1. Identify general characteristics

2. Review experience

3. Establish an outcome rate

4. Adjust the rate for context

5. Adjust the rate for individual differences

6. Adjust the rate for preventive measures

7. Compare to other outcome rates

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.
Cunningham, M.D. & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.
Monahan, J. (1981). Predicting violent behavior: An assessment of clinical techniques. Beverly Hills: Sage.

## Outcome Rates Relevant to Likelihood of Violence in Prison

1. Capital offenders and murderers in the general prison population

2. Assaults by inmates in Federal prisons

3. Homicide of inmates or staff in state and Federal prison

4. Disciplinary infractions of short-term and long-term inmates

5. Aging effects on criminality and violence

Cunningham, M.D. & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.
Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.
Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

## Why capital offender violence rates apply to capital inmates in BOP

- Offense histories sufficiently violent and aggravated that a death sentence was sought and returned.

- Prison facilities and procedures have broad similarity.

- Consistency of findings
  - diverse geographic regions
  - diverse time periods
  - diverse prison settings
  - diverse capital statutes
  - diverse capital offense characteristics

- Peer reviewed acceptance of broad applications

Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

## Furman Commutees: Serious Rule Violations Across 15 years

-533 former death row inmates nationwide
- prison behavior over a 15 year period after removal from death row

69.5%
No Serious Violations

Marquart, J. & Sorensen, J. (1989). A national study of the Furman-commuted inmates: Assessing the threat to society from capital offenders. Loyola of Los Angeles Law Review, 23(5), 5-28.







*More about the capital inmates in this study*

Most adjusted positively

- 2/3 of both groups have never been in solitary confinement (punishment for serious disciplinary infractions).

- 90% of both the former death row inmates and the life sentence inmates held trustee status.

Marquart, J., Ekland-Olson, S., & Sorensen, J. (1989). Gazing into the crystal ball: Can jurors accurately predict dangerousness in capital cases? Law & Society Review, 23 (3), 449-468

## What about capital defendants predicted to be violent by experts?

155 capital defendants in Texas sentenced to death after mental health experts testified at trial predicting future violence.

- 67 executed after serving an average of 12 years.

- 40 remain on death row and have served an average of 8 years.

- 48 have had their sentences reduced and have served an average of 22 years in prison.

Texas Defender Services (2004). Deadly speculation: Misleading Texas capital juries with false predictions of future dangerousness.

---

- No prison homicides

- 5% (8 of 155) committed assaults requiring more than first aid treatment

- 1% (2 of 155) were criminally prosecuted for assault



**95%**
**No Serious**
**Assaults**

- 20% received no disciplinary write-ups whatsoever

Texas Defender Services (2004). Deadly speculation: Misleading Texas capital juries with false predictions of future dangerousness.

---

*Prison violence rates:*
## Other studies of murderers who are sentenced to life in prison

*Disciplinary records review 1977-1992*
(Missouri state prisons)

    93 death row inmates
    323 life-without-parole inmates
    232 life-with-parole inmates
    648 total

**Three groups similar in assaultive rule violations**

*Cumulative prevalence across 15 years:*



1/3 minor assaults
2/3 more serious assaults
1.2% inmate homicide
**78.2% no assaults**

Sorensen, J. & Wrinkle, R. D. (1996). No hope for parole: Disciplinary infractions among death-sentenced and life-without-parole inmates. Criminal Justice and Behavior, 23, 542-552.

---

Prison Behavior 1924-1972:
## Commuted Texas Capital Offenders

- 100 death row inmates commuted
- Pre-Furman: 1924-1972
- Averaged 12 years in general prison population
- 80 committed no violent infractions



violent offenses
20%
0 inmate/officer violence

no violent
offenses
80%

Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994). The rope, the chair, & the needle: Capital punishment in Texas, 1923-1990. Austin: University of Texas Press.

4

BOP Assaultive Infractions
## Capital Defendants Convicted and Sentenced to Life

- 1995-1998
- 25 capital inmates reported

    2 inmates - aggravated assaults (8%)

    2 inmates - simple assaults (8%)

    1 inmate - weapons contraband charges (4%)



- 11 inmates had no disciplinary write-ups of any sort

Source of data: Correspondence of Miles Harer, BOP, 12-14-98

---

## Incarcerated Murderers

Study of 6,390 murderers:
- Admitted to prison between 1990-1998
- Frequency of serious violent offenses in prison reviewed
- Likelihood of a murderer exhibiting a serious act of prison violence across a 40-year capital life term extrapolated.

**Findings:**

**Overall risk 16.4%**

*Incremental increases or decreases in risk relative to the overall risk rate:*

| | |
|---|---|
| • Robbery/burglary in capital offense | +7.4% |
| • Multiple murder victims in capital offense | + 5.6% |
| • Attempted murder/assault in capital offense | + 4.0% |
| • Prison gang membership | +10.4% |
| • Prior prison term (unless non-violent record) | + 5.3% |
| • Age less than 21 | + 5.5% |
| • Age 26-30 | - 7.2% |
| • Age 31-35 | -12.3% |
| • Age over 35 | -14.4% |

**Risk of aggravated assault on a correctional officer = 1%**
**Risk of inmate-on-inmate homicide = .2% (2 per thousand)**

Sorensen, J. & Pilgrim, R. (2000) An actuarial risk assessment of violence posed by capital murder defendants. Journal of Criminal Law and Criminology, 90, 1251-1270.

---

## The Relationship of Offense History to Prison Adjustment

- Past violence in the community is not strongly or consistently associated with prison violence.

- Severity of offense is not a good predictor of prison adjustment.

Alexander, J. & Austin, J. (1992). Handbook for Evaluating Objective Prison Classification Systems. San Francisco: National Council on Crime and Delinquency. Sponsored by U.S. Department of Justice.
National Institute of Corrections, U.S. Department of Justice. (1992) Jail Classification System Development: A Review of the Literature, revised edition.

---

AVERAGE NUMBER OF PRISON RULE VIOLATIONS PER INMATE PER YEAR BY OFFENSE, 1986

| ADMISSION OFFENSE | AVERAGE ANNUAL # OF INFRACTIONS PER INMATE |
|---|---|
| TOTAL | 1.5 |
| VIOLENT OFFENSES | 1.4 |
| HOMICIDE | 0.9 |
| MANSLAUGHTER | 0.8 |
| ASSAULT | 1.5 |
| ROBBERY | 1.9 |
| RAPE | 1.1 |
| PROPERTY OFFENSES | 1.8 |
| DRUG OFFENSES | 0.9 |
| PUBLIC ORDER | 1.1 |

SOURCE: BUREAU OF JUSTICE STATISTICS-SPECIAL REPORT 1989

## Study of a Violent Misconduct in a Maximum Security Prison

N = 2,505
Violent misconduct 1991-2002
Potosi Correctional Center, Missouri DOC

Preliminary findings:

- Inmates sentenced to life were half as likely to have violent misconduct in prison.

- Mainstreamed death-sentenced inmates were half as likely to have violent misconduct in prison.

- Property offenders had higher rates of violent misconduct in prison than inmates convicted of violent offenses.

- Probability of violent misconduct lower with older inmates.

## Comparing "mainstreamed" death-sentenced, LWOP, and parole eligible inmates

Potosi Correctional Center, Missouri DOC

*Disciplinary infractions: 1991-2002*
- 149 mainstreamed death sentenced inmates
- 1,054 life-without-parole (LWOP) inmates
- 2,199 parole eligible inmates

*Findings:*
- Death-sentenced and LWOP had equivalent low rates of assaultive disciplinary infractions.
- Parole eligible inmates had <u>4-5</u> times that rate.
- 84% of current death-sentenced inmates were on general population units – compared to 52% of other inmates.
- Only a single DS inmate was in administrative segregation for misconduct.

Reidy, T.J., Cunningham, M.D., & Sorensen, J.R. (manuscript under review)





6



*Rates of Assault: 10-02 to 09-03*

## U.S. Penitentiaries

2.2% on inmate without weapon

.4% on staff with weapon

1.1% on inmate with weapon

3.2% on staff without weapon

**93%**

2 inmate homicides: 1.25 per 10,000 inmates
0 staff homicides



Person ⟷ Interaction

Context

*Violence*



***Prison***

Inmate ⟷ -Other Inmates -Vigilant Staff

**Restrictive Context**

Serious Violence

## Base Rate of Inmate and Staff Homicide

**Inmate-on-inmate homicide**
Federal = 6 per 100,000 inmates (2000, 2001)
State = 5.6 per 100,000 inmates (1997)

**Inmate-on-staff homicide**
Federal = 1 per 500,000 inmates
(last in 1997)
State = 1 per 1,000,000 inmates

**Comparison** ( Murder & Non-negligent homicide- 2001):
United States = 5.6 per 100,000
South Carolina = 6.3 per 100,000
Columbia = 12.7 per 100,000

*Source of data:*
Maguire, K. & Pastore, A.L.,eds. (2003). Sourcebook of Criminal Justice
Statistics – (2002). U.S. Department of Justice, Bureau of Justice Statistics,
Washington, D.C.
Corrections Compendium, June 1998
U.S. Bureau of Prisons (January 2002)

7



Disciplinary Infraction Rates

(Median, by age at admission and time served group)

source of data: Flanagan, T.J. (1979). Long-term prisoners: A study of the characteristics, institutional experience and perspectives of long-term inmates in State correctional facilities. Dissertation: School of Criminal Justice, State University of New York at Albany.

see also: Flanagan, T.J. (1980). Time served and institutional misconduct: Patterns of involvement in disciplinary infractions among long-term and short-term inmates. Journal of Criminal Justice, 8, 357-367.



Graph reproduced in:

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences and the Law, 16, 71-95.



AVERAGE NUMBER OF PRISON RULE VIOLATIONS PER INMATE PER YEAR BY AGE

SOURCE: PRISON RULE VIOLATORS-BUREAU OF JUSTICE STATISTICS 1989

## Summary of Prison Violence Base Rate Findings

- Capital inmates have low rates of violence in the general prison population

- Seriousness of offense does not predict prison violence.

- Infraction rates are progressively lower as an inmate ages.

Anchoring Group Rates (Across capital life sentence):

- Assault                    =        20 - 30%
- Repetitive assault    =           10%
- Aggravated assault on staff =    1%
- Homicide of inmate =        .2 - 1%
- Homicide of staff    = 1 per 500,000 annual (BOP)

8

## Likelihood of Chad Fulks Exhibiting Serious Violence in Prison

### Relative to Group Rates

| *Increased Risk* | *Decreased Risk* |
|---|---|
| Prior prison incarceration ($\pm$) | **Age**<br>27 years old |
| Multiple murder victims | **Prior conduct in custody**<br>Infrequent write-ups<br>No serious assaults |
| Attempted murder | **Constructive use of prior prison confinement:**<br>Obtained GED<br>Participated in prison work |
| Robbery associated with murder | |
| Escape-related conduct ($\pm$) | **Staff appraisal:**<br>*Alvin Glenn Detention Center:*<br>Group inmate housing or day room access.<br>Unshackled contact with staff. |
| Resistance to staff | *Columbia Care Center:*<br>4-person cell.<br>Unshackled contact with staff. |

## Past behavior in jail and prison:

**Huntington, W.VA.** (6 months)
- No records

**Horry County Detention Center, S.C.**
- No records

**Federal Medical Center, Lexington, Kentucky** (6/98 – 8/98)
- No disciplinary write-ups

**Federal Bureau of Prisons** (3/99 - 6/99)
- No records

**Indiana Department of Corrections** (3/00 – 3/02)
- 2 disciplinary write-ups
- No assaults
- Requested protection
- Obtained GED
- Involved in prison work programs

**Hopkins County Jail** (9/02 – 11/02)
- Escaped from recreation yard
- Investigation findings: construction flaws, inadequate training, understaffed

Current offense, prior convictions, and escape history are only weakly associated with prison misconduct.

Alexander. J. & Austin. J. (1992). Handbook for Evaluating Objective Prison Classification Systems. San Francisco: National Council on Crime and Delinquency. Sponsored by U.S. Department of Justice.

National Institute of Corrections. U.S. Department of Justice. (1992) Jail Classification System Development: A Review of the Literature. revised edition.



USP Allenwood

9



USP Allenwood



USP Allenwood

## Indicators of Security Level

* Nature of outer wall or fence

* Towers and external patrols

* Perimeter detection devices

* Concentric layers of security

* Type of housing

* Control of movement of inmates

* Intensity of staffing and supervision



USP Lee

*10*

**Lexington County Detention Center** (12/02 - 4/03)
- Resisted confiscation of family photographs when being transported out of facility.
- No record of other disciplinary write-ups.

**Alvin S. Glenn Detention Center** (4/03 - 12/03)
- Minor disciplinary write-ups for verbal disrespect, refusing movement to another unit.
- Requested protection
- Assaulted by other inmates – hit in the head with battery-filled socks and suffered multiple stab wounds.

**Columbia Care Center** (12/03 – 1/04)
- Treatment for stab wound and affective disorder.
- No record of disciplinary write-ups.

**Butner FCI** (1/04 - 2/04)
- Court ordered evaluation.
- No record of disciplinary write-ups.

**Columbia Care Center** (2/04 – date)
- Treatment for complications of stab wounds.
- Cited for escape-related planning; resisting staff in putting on paper gown for suicide precautions

---

## Likelihood of Chad Fulks Exhibiting Serious Violence in Prison

### Relative to Group Rates

| _Increased Risk_ | _Decreased Risk_ |
|---|---|
| Prior prison incarceration (±) | Age<br>- 27 years old |
| Multiple murder victims | Prior conduct in custody<br>- Infrequent write-ups<br>- No serious assaults |
| Attempted murder | Constructive use of prior prison confinement:<br>- Obtained GED<br>- Participated in prison work |
| Robbery associated with murder | |
| Escape-related conduct (±) | Staff appraisal:<br>_Alvin Glenn Detention Center:_<br>- Group inmate housing or day room access.<br>- Unshackled contact with staff. |
| Resistance to staff | _Columbia Care Center:_<br>- 4-person cell.<br>- Unshackled contact with staff. |

---

## Individualized Actuarial Likelihood of Chad Fulks Exhibiting Serious Violence in Prison

- 6,390 murderers convicted 1989-1999
- Followed an average of 4.55 years
- Rates of serious violence* extrapolated for life sentence

| | |
|---|---|
| 16.4 | Base rate of serious violence |
| 7.4 | Robbery in capital offense |
| 5.6 | Multiple murder victims |
| 4.0 | Attempted murder |
| ± 5.3 | Prior prison term |
| [10.4] | _Prison gang membership_ |
| - 7.2 | Age 26-30 years |

**26.2 – 31.5% Overall risk rate**

*Homicide, attempted homicide, assault with a weapon, fight with a weapon, sexual assault, robbery on inmate. Aggravated assault on correctional officer.

Sorensen J.R. & Pilgrim, R.L. (2000). Actuarial assessments of future dangerousness in the punishment phase of capital trials. Journal of Criminal Law &

---

## Individualized Actuarial Likelihood of Chad Fulks Exhibiting Serious Violence in Prison:

_Lifetime risk_

- Any serious violence = 26.2 - 31.5%

- Aggravated assault on staff = 1 - 2%

- Homicide of inmate = .2 - .4 %

_Annual risk_

- Homicide of prison staff = 1 per 500,000

## Custody Options
### (Federal)

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security), general population

U.S. Penitentiary Marion (high security)

U.S. Penitentiary (high security)
   Secure Housing Unit (SHU)

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)

Special security arrangements

---

" A male inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) shall be housed in a High security level institution unless the PSF [Public Safety Factor] has been waived."

*Security Designation and Custody Classification Manual (5100.07, p. 4)*

---

## Custody Options
### (Federal)

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security), general population

U.S. Penitentiary Marion (high security)

U.S. Penitentiary (high security)
   Secure Housing Unit (SHU)

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)

Special security arrangements

---

## U.S. Penitentiaries

| Unit | Census |
|---|---|
| USP Allenwood | 1111 |
| USP Atlanta | 2333 |
| USP Atwater | 1371 |
| USP Beaumont | 1451 |
| USP Coleman | 1573 |
| USP Florence | 953 |
| USP Leavenworth | 1731 |
| USP Lee | 1455 |
| USP Lewisburg | 1215 |
| USP Lompoc | 1399 |
| USP Pollock | 1460 |
| USP Terre Haute | 1195 |
| USP Marion (mid-level) | 400 |
| | 17,647 |

(10% of BOP inmate population)

*12*



USP Atlanta



USP Beaumont



USP Leavenworth



USP Lewisburg

*13*



USP Pollock



USP Terre Haute



USP Marion



Cell at USP Florence

Source: Bureau of Prisons, Department of Justice

*14*

## Available Measures to Control Disruptive or Violent Inmates

**Treatment**
- Counseling
- Medication
- Education

**Discipline**
- Cell restriction
- Loss of privileges: visitation, commissary, job, recreation
- Fines and loss of property
- Administrative segregation

**Security**
- Move to higher security facility
- Secure Housing Unit (SHU)
- USP Marion
- ADX Florence
- Control Unit, ADX Florence



USP Allenwood

## Common Features of Security Measures

- Single celled

- Very limited movement (23 & 1)

- Meals in cell

- Handcuffed and escorted movement

- Solitary or small group recreation

- Frequent inmate searches



*15*











ADX Florence

# Super Maximum Custody

- single cell, bar door and steel door
- window faces inner recreation yard
- poured reinforced concrete fixtures
- 23 hour a day lockdown
- meals in cell

- double escort with baton, cuffed behind back, feet shackled
- 1-2 fifteen minute phone calls monthly, (monitored)
- no contact visits, glass has high hammer rating, (monitored)
- mail x-rayed, opened, read





*17*






## Administrative Maximum Penitentiary
### Florence, Colorado    6-19-98

### General Information
- Current Population      417 (379 on 6-15-01)
- Rated Capacity      490
- Percent Under Capacity      15%
- Housing Units      9
- General Population (3), Intermediate, Transitional, Pre-Transfer, Control, Special Housing, High Security

### Sentence Imposed
- 21 Years to Life (1997)      46.0%
- Life Sentences (1997)      25.0%
- Average Sentence      36.3 Years

### Reason for Referral
- Inmate murder/attempt      22.3%
- Assaults on inmates      20.0%
- Assaults on staff      17.1%
- Greater security - increased monitoring needs / concerns      12.9%
- Escape behavior      9.2%
- Rioting      4.6%
- Court Commitment      4.1%

---

ADX Florence
### General Population and Step-Down Unit Operations

**General Population Units**
- restraints and two officer escorts when removed from cells
- 12 hours weekly of out of cell exercise in small groups
- meals in cell, shower in cell
- *12 month minimum*

**Intermediate Unit**
- restraints and two officer escorts when removed from cells
- several hours daily out of cell on ranges
- meals in common area on range
- out of cell exercise in large outside rec. yard / gymnasium
- *7 month minimum*

**Transitional Unit**
- escorted off unit unrestrained in small groups to programming areas
- *5 month minimum*

**Pre-Transfer Unit**
- unrestrained when out of cells and when escorted
- employed in UNICOR for half the day
- meals in institutional dining hall
- *12 month minimum*

---

## Assaults in ADX Florence

| Offense | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| *Assaults* | | | | | | | |
| On Inmate w/ weap | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| On Inmate | 5 | 3 | 4 | 3 | 2 | 2 | 2 |
| On Staff w/ weap | 1 | 0 | 2 | 2 | 3 | 0 | 3 |
| On Staff | 25 | 12 | 18 | 13 | 23 | 11 | 39 |
| Total | 27 | 16 | 24 | 18 | 28 | 13 | 44 |
| *Homicides* | | | | | | | |
| Homicide of inmate | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Homicide of staff | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Escapes* | | | | | | | |
| Escape | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ave daily census | 342 | 377 | 410 | 371 | 342 | 372 | 412 |

---

### PS5212.06 Control Unit Programs

**541.40, 1.a.**  In an effort to maintain a safe and orderly environment within its institutions, the Bureau of Prisons operates control unit programs intended to place into a separate unit those inmates who are unable to function in a less restrictive environment without being a threat to others or to the orderly operation of the institution.

*19*

**541.41, 5.b.** The Warden shall consider the following factors in a recommendation for control unit placement:

(1) Any incident during confinement in which the inmate has caused injury to other persons;

(2) Any incident in which the inmate has expressed threats to the life or well-being of other persons;

(3) Any incident involving possession by the inmate of deadly weapons or dangerous drugs;

(4) Any incident in which the inmate is involved in a disruption of the orderly operation of a prison, jail, or correctional institution;

(5) An escape from a correctional institution;

(6) An escape attempt;

(7) The nature of the offense for which committed [considered only in combination with other factors of this section].

## ADX Control Unit

- in cell 23 hours a day

- sliding outer steel door, sliding inner bar door

- legs shackled and hands handcuffed behind back before removed from cell or otherwise moved

- triple escort when out of cell

- 7 hours out-of-cell solitary exercise weekly

- meals taken in cell

- *duration:*
  *-until able to function in a less restrictive environment without posing a threat to others or to the orderly operation of the institution  (CFR 541.50)*

December 1994 to June 2001
## Assaults on Staff in ADX Control Unit

**14 minor assaults on staff:**
- 9 throwing unknown liquid/feces or spitting in face of officer
- 1 kicking foot forward as leg shackles removed, jerking officer's hand into bars
- 1 pulling away and then throwing ice tray full of   water and carton of milk at officer
- 1 throwing head back against officer's face
- 1 attempting to pull away from officer while being escorted, causing cuffs to scrape officer's      hand
- 1 grabbing officer's shirt and pulling him into the  bars

**3 attempted/threatened minor assaults on staff:**
- 2 attempting or threatening to throw liquid
- 1 attempted head-butt

**10 of the above 17 involved a single inmate**
**6 total inmates involved**



*20*



Conclude

*21*