IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 4:02-992 |
| | ) |
| CHADRICK E. FULKS | ) |

## AFFIDAVIT OF JAMES E. AIKEN

1.

PERSONALLY APPEARED BEFORE ME, JAMES EVANS AIKEN, who,

being first duly sworn upon an oath, deposes and says:

I am James E. Aiken. I have been retained as an expert witness in this matter.

My qualifications are set forth in my resume, attached hereto. I have been

involved in corrections in various positions and locations since 1971, as reflected

on my resume. I have previously been found qualified as an expert witness and

testified in death penalty cases relative to future dangerousness and prison

adjustment issues in United States District Court as well as state proceedings also

submitted on my resume. All opinions set forth in this Affidavit are based on my

knowledge, education, experience, and expertise, the materials reviewed by me,

and the facts made known to me, and all are expressed within a reasonable degree

of certainty. I am competent to testify to the truth of the matters set forth herein.

2.

Serving in the various prison positions has provided extensive experience in the

areas of prison classification, programmatic interventions and the management of

PA Document #7

inmate population. During my years in prison work, I have conducted thousands of inmate classification evaluations relative to their overall adjustment to confinement and current future danger to society, to include the general public, prison staff, and other inmates. These reviews ranged from minimum custody (low security offenders) to maximum/super maximum security (violent, high escape risk, predator and mentally challenged inmates). I also fully understand the application and effectiveness of inmate management techniques to include disciplinary action, use of force, criminal sanctions, as well as programmatic delivery to those confined. I have also managed inmates awaiting execution under death sentences and carried out such sentences as ordered by the Court. Additionally, I have been directly involved in the design and development of prison classification systems in various jurisdictions to include both objective and internal systems. These systems were established and/or redesigned to better manage, house, secure and program offender population in confinement status for short and extended confinement periods.

3.

I received a Masters Degree in Criminal Justice from the University of South Carolina and a Bachelors of Arts Degree from Benedict College, Columbia, South Carolina. I have also taught a number of courses, receiving compensation, concerning corrections at the university and technical college levels.

4.

I have provided private contract consultant services to the U. S. Department of Justice, National Institute of Corrections/National Academy of Corrections, and national/international jurisdictions in a number of prison/jail related areas to include, but not limited to inmate classification, managing violent youthful offenders in adult prisons, managing prison security systems, correctional leadership development, managing hard to manage-violent inmates, assessment of prison facility security operational performance, prison critical event abatement (escape, hostage situations, assaults, murders, etc.), training new prison wardens, correctional leadership development, security threat group (STG)/gang management, emergency/disturbance/riot control, updating existing prison wardens and training wardens of super-max prisons. I began my work with the National Institute of Corrections/National Academy of Corrections in 1986.

5.

The United States Congress appointed me, in July 2004 to the National Prison Rape Elimination Commission. Over a multi-year period, the Commission will conduct "comprehensive hearings and examine all penalogical, economic, physical, mental, medical and social issues relating to prison rape in America." At the conclusion of it's review, the Commission will issue a comprehensive report on the subject, including a recommended set of national standards to reduce and eliminate prison

rape. Also, a grant program will make annual grants (up to $40 million each year) to state and local programs that enhance the prevention and punishment of prison rape and maintain safe and secure prisons despite budget reductions. The Commission has authority to issue subpoenas, and the statue allows for the Attorney General to seek enforcement of subpoenas in district court.

6.

I have been retained by Counsel to evaluate Mr. Chadrick Fulks as an inmate, preparing myself to address any risk he might present to other prisoners, staff, the public and his ability to adjust to confinement in general.  Preparation for such evaluation entailed reviewing the Alvin S. Glenn Detention Center  (Richland County, South Carolina) confinement records, Cabell County court  records (Huntington, West Virginia), Columbia Care records ( Richland County,  South Carolina), Elkhart Sheriff's Office records (Elkhart, Indiana), and Hamilton  County Sheriff's office (Kentucky), Hopkins County Jail records (Madisonville, Kentucky), Horry County Court records (South Carolina), Horry County incident  reports (South Carolina), Indiana Pretrial Services Report, Mr. Fulks' juvenile records, Lagrange County Court records (Indiana), Lagrange County Jail  records (Indiana), Tennessee Federal Indictment, Plea Agreement and Judgment (Re:  Mr. Fulks), Tennessee Probation records, Discovery Probation Records ( Indiana),  Federal Pre-Sentence

report (Re: Mr. Fulks), and Indiana Department of Correction records (Re: Mr. Fulks).

7.

Mr. Fulks was not personally interviewed in preparation of this affidavit. I have conducted security/classification/programmatic evaluations on thousands of inmates to which I have not conducted personal interviews with each. I have found that my level of proficiency was not diminished when evaluations were conducted based upon information contained in official documents such as the documents provided by Counsel in this case.

8.

Based upon the above referenced qualifications and review of documents provided by Counsel, it is apparent that Mr. Fulks' criminal history and confinement record do not reflect a pattern of a prison predator nor is there evidence of his continual, methodical use of violence to gain control over inmates, staff or the operation of the prison. My experience in the management and control of inmate population reveals that behaviors cannot be faked for an extended period of time.

9.

Additionally, the Federal Bureau of Prisons is capable of addressing any potential disruptive behavior that Mr. Fulks may demonstrate. The correctional system is authorized and staff is trained to apply necessary force and restraints to control any behavior that may endanger staff, inmates or the general community. The system is authorized to kill the inmate in order to protect.

10.

Mr. Fulks does not present as an unusual risk to society, which includes correctional staff, other inmates, and the general community while properly confined and managed in a secured confinement environment.

11.

Additionally, due to Mr. Fulks' inability to adjust to a community environment based on his current conviction, he will be sanctioned to prison confinement for life. This action removes the importance of his adjustment or lack thereof in the community or the need for the prison system to prepare him for return to society. The purpose of life does not include the need of preparing him for such return. He will be confined in a prison setting for life. The priority for the prison system regarding Mr. Fulks is incapacitation not community reintegration.

12.

My extensive experience in managing inmate population has shown that usually age forces people to be less aggressive and disruptive as they grow older. Mr. Fulks' adjustment to prison at his present age will be more enhanced as he ages. This factor as well as the confinement facilities' ability to manage him, even reduces the likelihood of a future critical security event to occur. In fact, the major concern I have of Mr. Fulks is the need to protect him from the predator, more dangerous, violent and disruptive prison population, especially as he grows older.

13.

The undersigned will supplement and revise this report as required.

14.

## Opinion

It is my opinion that Mr. Fulks can be safely confined within a secure confinement

facility for the remainder of his life and the specific agency responsible can properly

manage him.

_____

James E. Aiken

Sworn to before me this )
)
)
18 day of June , 2008 )
)
_____ (L.S.)

Notary Public for _____ NC _____ (state)

My commission expires __5/2/2012__ (date)

DEBORAH J HARVILLE
NOTARY PUBLIC
TRANSYLVANIA COUNTY, NC
My Commission Expires 5-2-2012

# Resume
# James Evans Aiken

**36 Tsiya Court**
**Brevard, North Carolina 28712**
**(828) 883-9490 Telephone**
**(828) 883-9491 Fax**
jea1assocs@aol.com  e-mail

## Summary of Qualifications:

Mr. Aiken has over thirty-six years experience in correctional administration, facility operations/management, inspection/assessment of facility performance and technical assistance consultations with clients in the United States, Dutch Kingdom, Canada, Costa Rica, Puerto Rico, and U.S. Virgin Islands. He has provided services to federal, state, county and local correctional facilities and jurisdictions in the areas of correctional leadership/organizational development, management of prison disturbances, system productivity, cost containment, enhancing prison security systems, managing the violent youthful offender in adult prisons, gang/security threat group (STG) management, new warden's training, super maximum security facility management training, inmate classification, assessment of prison security/operational performance, prison staffing analyses, reduction of prison critical security events and advising governments relative to prison privatization transactions/productivity. He has been granted court expert status in the states of South Carolina, North Carolina, Indiana, Arizona, Maryland, Florida, New York, Georgia, Virginia, Missouri, Mississippi, Alabama, Louisiana and the United States Federal District Courts in the areas of criminal justice and corrections/prisons.

## Education:

M. A., Criminal Justice, University of South Carolina - Columbia, South Carolina. 1985
B. A., Benedict College- Columbia, South Carolina. 1972

## Employment History:

August 1994 to present, president, James E. Aiken and Associates, Inc. (correctional consultant firm); August, 1992 to August 1994, Director, Bureau of Corrections, United States Virgin Islands and consultant; March, 1989 to August, 1992, Commissioner, Indiana Department of Correction; April, 1987 to March 1989, Deputy Regional Administrator, South Carolina Department of Corrections; May, 1982 to April, 1987, Warden, Central Correctional Institution (state penitentiary) South Carolina Department of Corrections; September, 1979 to May, 1982, Warden, Women's Correctional Center, South Carolina Department of Corrections; September, 1976 to September, 1979, Deputy Warden for Administration, Central Correctional Institution(state penitentiary) South Carolina Department of Corrections; February, 1974 to September, 1976, Deputy Warden for Institutional Operations, Manning Correctional Institution, South Carolina Department of Corrections; September, 1972 to February 1974 Administrative Assistant to Warden, Manning Correctional Institution, South Carolina Department of Corrections;

September, 1971 to September, 1972, Social Worker for Substance Abuse Treatment, South Carolina Department of Corrections.

**Relevant Experience:**
Mr. Aiken has provided direct professional and consultant services in almost every aspect of the correctional field. More specifically, his scope of expertise includes the following:

Director, Bureau of Corrections, United States Virgin Islands
Held the position as Director that encompassed authority and responsibility for the overall administration of the Corrections Bureau for the United States Virgin Islands. Worked closely with other territorial agencies, the legislature, courts and federal governmental agencies.

Mr. Aiken's task was to coordinate a project to re-establish a correctional system which was diminished by overcrowded conditions, escapes, and noncompliance to court orders, corruption, general mismanagement, negative media, gang involvement, work force dysfunction, and public mistrust.

Commissioner, Indiana Department of Correction
The position encompassed the overall administration of the Department of Correction for the State of Indiana, which consisted of forty-six (46) separate adult and juvenile facilities (population 14,000) and parole services (population 3, 490) with an operations budget of $305 Million.

As Commissioner, reported directly to the Governor of the State of Indiana and worked closely with the legislature, other state and federal agencies, the courts and the public. Mr. Aiken's tasks were to establish an operational mission and priority of issues for the agency; establish agency mission goals; develop a new basic employee supervision program; and reorganized daily operations to ensure a more responsive and efficient structure.

His accomplishments included but were not limited to:

*Offender Health Care Delivery:* The department contracted with the Indiana University School of Medicine to provide a medical director for clinical services. Developed and implemented a program to reduce cost and increase the quality of medical care.

*Security:* Created the Division of Security to address agency security needs. Initiated a gang intelligence network to tract and evaluate their activities. Increased contraband control efforts by additional searches, drug testing, use of K-9 units, provided additional training and equipment, and increased prosecution efforts. Designed 650 bed maximum security unit that conforms to modern correctional security management and Court mandates. Conducted meetings with the National Guard, State Police, as well as other mutual aid agencies to coordinate and develop an emergency response and disaster preparedness program. Conducted full response drills to evaluate the agency's response

capability. Evaluated and enhanced escape prevention/apprehension measures. Conducted security audits and inspections of facilities.

***Offender Relations:*** Established an Offender Relations Division and appointed a coordinator. This division functions as part of Internal Audits and works in tandem with the Division of Internal Affairs, the Operations Division and the Division of Legislative and Information Services. The task of this division is to resolve offender grievances and complaints that originate from inside the agency and resolve them prior to court involvement.

***Prison Population:***
- Completed site selection, plans and construction of a new maximum security Institution
- Increased community corrections coverage from 35 to 50 counties (from 3,500 to 7,000 clients)
- Established community service/restitution programs
- Established county work release programs
- Established residential treatment programs and created home detention utilizing electronic monitoring
- Created over five hundred (500) new emergency prison beds within the first nine months of tenure

***Juvenile Justice:***
- Reduced Indiana Boy's School population from a high of 670 in 1989 to a low of 380 in 1990
- Conducted comprehensive reviews using several committees of community representatives concerning treatment programs, educational programs and employee training programs
- Established a Research Department at the Indiana Boy's School.
- Group home placements had tripled during 1992.
- Community involvement and recreational programs have been increased at both Indiana Boy's School and Indiana Girl's School.

***Cost Containment:*** Developed a plan to increase participative management and input to the budget process. Meetings were held with State Budget Agency personnel on a regular basis in an effort to increase the Budget Agency's participation in the department's budget preparation regarding cost control. Reduced the operational budget of 305 million dollars by 41 million dollars for fiscal year 1992.

Deputy Regional Administrator, Midlands Correctional Region, South Carolina Department of Corrections

Served as the Deputy Chief Administrator for the following:  Directly planned, prescribed and supervised activities of sixteen (16) institutions, including minimum, medium and work release, shock probation (boot camp), restitution centers and maximum security facilities. Also, had general supervision of a ninety-seven (97) million dollar budget, as well as a work force of 2,500 employees. Duties also included policy development and interaction with lawmakers, the community and other departmental agencies concerning long-range agency planning and developing agency future needs. Additionally, made selections of institutional heads, as well as being involved in new facility design, reviewed all use of force actions, and provided supervision to prison wardens during emergency situations and normal operations.

### Warden, Central Correctional Institution, South Carolina Department of Corrections

The previous largest correctional facility in South Carolina with 1800 medium/-maximum/super maximum custody inmates, 530 staff members, and an operating budget of eight (8) million dollars. Served as the chief administrator for the following areas/-activities:  Directly planned, prescribed and supervised all security control and safety activities/operations, as well as, conducted announced and unannounced inspections of the institution. Interviewed, selected and evaluated employee's performance and effected other personnel actions as required. Personally responsible for all activities involving security and treatment staff, as well as, coordinated and supervised all welfare/morale services for inmates. Supervised and coordinated all activities with representatives from non-departmental agencies. Duties also involved emergency preparedness, interpreting all laws, policies, rules and regulations, compliance with court orders (conditions of confinement) and operating procedures for employees and inmates. Studied and analyzed long-range department requirements for institutions, as well as participating in litigation action involving the South Carolina Department of Corrections. Duties also included meeting with the Inmate Advisory Council and acting on recommendations received from the Inmate Grievance Committee, as well as meeting with members of the legislature on matters relating to corrections. Also was responsible for carrying out the capital punishment laws for the state of South Carolina.

### Warden, Women's Correctional Institution, South Carolina Department of Corrections
Served as the chief administrator for the following:  Directly planned, prescribed and supervised all security, control and safety activities and operations, personally responded to all disturbances and emergencies, interviewed/selected and evaluated employee's performance, counseled employees, supervised and coordinated all activities of the security and treatment staff, coordinated ad supervised all welfare and morale services for female inmates including clothing, food service, mail service, visitation, medical services, religious services, educational programs and recreational programs. Supervised the implementation and executing of all laws, policies, rules, regulations and operating procedures applicable to the Women's Correctional Center. Also, studied and reviewed all available records/files on assigned inmates to evaluate their behavioral changes and rehabilitation progress.  Duties included meeting with the Inmate Advisory Council as well as receiving and acting upon recommendations received from the Inmate Grievance Committee.

Deputy Warden/Administration, Central Correctional Institution, South Carolina Department of Corrections

Served as the Institutional Coordinator for the following areas/activities:

Maintenance/construction, boiler room/energy, food service, employee parking, canteen services, Adjustment Committee, mail service, all security systems, transportation, pest control, criminal investigations and emergency response.

Deputy Warden/Institutional Operations, Manning Correctional Institution South Carolina Department of Corrections

Served as the Institutional Coordinator for the following areas:  Youthful Offender Division, medical services, living areas, maintenance/construction, laundry services, visitation, emergency response, security, transportation, food service, commissary, administrative/punitive segregation, officer's quarters, classification teams, inmate interview/correspondence, recreation programs, energy (usage/conservation), Parole Board (prepared parole evaluations), supervision of security staff of fifty-five (55) employees, Chairman of  Employee Evaluation Committee, purchasing, inmate pay and Chairman of  Adjustment Committee.   Prepared correspondence for the warden, conducted the majority of institutional investigations, coordinated all escape apprehension efforts and remained on twenty-four (24) hour call.

Administrative Assistant/Institutional Operations, Manning Correctional Institution, South Carolina Department of Corrections

Responsibilities included vocational rehabilitation, alcoholics anonymous, Project Mate (Paraprofessional Counseling Program), Classification Team #2, Pastoral Care, Drug Abuse Treatment Program, Recreation Program, Occupational Safety and Health Act (O.S.H.A.), Emergency Response, Work Release Program, Education Program, tours, Employee Evaluation Committee member and inmate interviewing/correspondence.

Performed duties of deputy warden in his absence and remained on twenty- four (24) hour call at all times.

Social Worker/Drug Abuse Treatment Program, Manning Correctional Institution, South Carolina Department of Corrections

Responsibilities included conducting group therapy and individualized counseling to offenders with drug problems.  Conferred with the warden and staff to integrate the Drug Abuse Program with other institutional activities. Member of the Adjustment committee and the Warden's Treatment Team.