IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA          )          Cr. No. 4:02-992-JFA
                                  )
        v.                        )
                                  )
CHADRICK E. FULKS                 )
                                  )

Response of the United States in Opposition to Petitioner's
Motion for Leave to Conduct Discovery

Petitioner has motioned the Court, pursuant to Rule 6 of the Rules Governing 28

U.S.C. § 2255 Procedures, to order the Government to provide extensive discovery.  The

United States respectfully requests that the Court deny Petitioner's Motion for leave to

conduct discovery based on the following:

Memorandum of Law

Under Rule 6(a) of the Rules Governing Section 2255 Proceedings, "[a] judge

may, for good cause, authorize a party to conduct discovery."  Good cause is shown "if

the petitioner makes a specific allegation that shows good reason to believe that the

petitioner may be able to demonstrate that he is entitled to relief."  Quesinberry v, Taylor,

162 F.3d 273, 279 (4th Cir. 1998); see also United States v. Roane, 378 F.3d 382, 403 (4th

Cir. 2004)(discussing the legal standards for assessing discovery requests set forth in

Harris v. Nelson, 394 U.S. 286, 290 (1969) and Bracey v. Gramley, 520 U.S. 899, 908-09

(1997)); Stockton v. Murray, 41 F.3d 920, 927 (4th Cir. 1994)(addressing defendant's

claim that the state had failed to disclose information it should have provided under

Brady, the court stated: "Aware of the existence of potentially exculpatory information, a

defendant cannot sit idly by in the hopes that the prosecution will discover and disclose that information and, when it does not do so, seize upon the prosecutor's conduct as grounds for habeas relief"). Conclusory allegations by a habeas petitioner are insufficient to warrant discovery. United States v. Webster, 392 F.3d 787, 801-02 (5th Cir. 2004). If a petitioner fails to identify, with specific allegations, dispositive factual disputes, courts will not sanction "fishing expeditions." Id. ; see also Stanford v. Parker 266 F.3d 442, 460 (6th Cir. 2001)( "We will not find that a district court erred by denying a fishing expedition masquerading as discovery."). The burden of demonstrating the materiality of the information requested pursuant to Rule 6 is on the moving party. Williams v. Bagley, 380 F.3d 932, 974 (6th Cir. 2004). If the discovery sought would not resolve any factual disputes that could entitle a petitioner to relief, even if the facts were found in his favor, then he is not entitled to the requested discovery. 266 F.3d at 460.

Petitioner has failed to show how any of the information he seeks would entitle him to have the Court vacate his sentence. Further, much of the discovery Petitioner seeks was provided to him prior to his trial. Some of it does not exist, and most of it is non-specific and over- broad, clear indications that Petitioner is doing nothing more than engaging in a fishing expedition.

A.     Petitioner already possesses or has access to information he is seeking regarding Basham's role in the murders.

In discovery requests 1-8, Petitioner essentially asks for anything and everything the Government has which might show that Brandon Basham was the killer of Alice

Donovan and Samantha Burns, or that Basham played the lead role in the murders. To make sure he acquires anything else, he includes a catchall category in request number 5. Petitioner asks this Court to require the Government to provide:

1. "all information within its possession, or at its disposal, regarding exculpatory, inculpatory, or mitigating statements made by co-defendant **Basham** during his incarceration prior to Petitioner's trial about Petitioner's role in the crimes . . . includ[ing] any evidence that Petitioner's role in this offense was limited or differed from that argued by the government at Petitioner's trial"

2. "all information . . . regarding co-defendant **Basham**'s role in the crime spree occurring in November 2002. . . . includ[ing] any evidence that **Basham**'s role in this offense was limited or differed from that argued by the government at Petitioner's trial"

3. "all information . . . intending [sic] to show that Petitioner had a lesser role in the crime spree during November 2002 than was argued by the government at Petitioner's trial"

4. "all information . . . tending to support the government's statement in the Basham trial that 'in fact, probably better evidence [exists] to suggest that Brandon **Basham** was the killer than Chad Fulks was the killer'"

5. "all evidence . . . concerning any mitigating evidence which questions the jury's verdict in any manner and was not presented during Petitioner's trial"

6. Make Sheriff Ronald Hewitt available for a deposition "to establish what he told the government about the deer statement and/or **Basham**'s admission that he took the life of Alice Donovan"

7. "all information . . . regarding Sheriff Hewitt's knowledge about the 'deer statement' and/or other admissions made by Brandon **Basham**"

8. "all information . . . tending to show that **Basham** killed Alice Donovan and/or Samantha Burns"

3

Petitioner has or has access to all of the requested information. During the discovery process, the Government provided Petitioner at least 12,166 pages of discovery. Discovery regarding Basham, including FBI reports of interviews with Basham, was contained in this discovery. The discovery provided to Petitioner also included interviews with Sheriff Hewitt. Additionally, Petitioner has access to the transcript of Basham's trial, and has referenced portions of the testimony at Basham's trial. The jury recommended that Basham receive the death penalty. Obviously, the Government presented extensive, probably all, evidence of Basham's role in the murders during his trial. It is, thus, inconceivable that the Government withheld any evidence during Basham's trial regarding Basham's role in the murders. Thus, Petitioner already has access to all evidence regarding Basham's role.

B.    <u>Petitioner has failed to show the materiality of the discovery he is seeking regarding Brandon Basham.</u>

Petitioner claims he needs discovery regarding Basham in order to show that his trial counsel were ineffective for failing to offer additional and "readily discoverable" evidence of Basham's leadership and manipulation that would have "firmly established Petitioner's minor participation." To be entitled to relief under his Petition pursuant to 28 U.S.C. § 2255 based on ineffective assistance of counsel, Fulks will be required to show that his trial counsel's performance was constitutionally defective to the extent it fell below an objective standard of reasonableness, and that he was prejudiced thereby, that is, there is a reasonable probability that, but for the error, the outcome would have been

different.  See Strickland v. Washington, 466 U.S. 668, 687-91 (1984).   In making this determination, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. Id. at 689; Fields v. Attorney General of Maryland, 956 F.2d 1290,1297-99 (4th Cir.1995). Petitioner bears the burden of proving Strickland prejudice. Id. at 1297.  If the petitioner fails to meet this burden, a "reviewing court need not consider the performance prong." Id. at 1290.

Petitioner has not suggested one thing that he expects to find through additional discovery that would have caused the outcome of his trial to be different.  Petitioner offers absolutely nothing in his Motion for discovery or his Motion pursuant to 28 U.S.C. § 2255 to support his claim that he was a "minor participant."  Indeed, it is nearly impossible to conceive of evidence which could counter the extensive evidence regarding Fulks' role in the kidnaping and murders.  Contrary to Petitioner's characterization of the Government's argument as to why Petitioner should receive the death penalty, the Government did not assert that Basham did not kill Samantha Burns and Alice Donovan. The Government argued that it is impossible to know which one actually struck the killing blow or fired the fatal shot.

Contrary to Petitioner's claim, the Government did not present a theory at his trial which conflicted with the theory of its case at Brandon Basham's trial.  The theme of the prosecution's argument to jurors was that Petitioner Fulks and Brandon Basham acted in unison to kill Alice Donovan and Samantha Burns. Throughout his closing argument, the

government prosecutor argued that it took both Petitioner and Brandon Basham to commit the murders:

> They were a two-man death squad. Two men, forming a team. They could not have done things that they did to Samantha, and they could not have done things they did to Alice without acting in unison, without acting as one. The Government is not saying Chad Fulks is more culpable than Brandon Basham. And the Government is not saying that Brandon Basham is more culpable than Chad Fulks. They are equally culpable.

Tr. of Trial, Vol. XXI at 24. After reviewing the evidence regarding the kidnaping and murder of Alice Donovan, the prosecutor again argued: "Alice Donovan could not have been abducted by Brandon Basham alone. Alice Donovan could not have been abducted by Chad Fulks alone. It required both of them acting together as a team." Tr. of Trial, Vol. XXI at 61. In countering Petitioner's attempt to minimize his role in the murders, the prosecutor pointed out that the night Samantha Burns was killed, both Fulks and Basham were covered in mud when they returned to the motel room where their two female friends were staying, and that this was evidence that both had been involved in disposing of Samantha Burns' body. Tr. of Trial, Vol. XXI at 46-47. The prosecution observed that Petitioner, after he began driving Alice Donovan's car during her abduction, could have chosen not to leave the parking lot with Donovan in the car, could have chosen to let her go, but he did not. Tr. of Trial, Vol. XXI at 61. The prosecutor argued that at this point, because Petitioner had control of the car, he had control of the situation, and, thus, control of Alice Donovan's life. Tr. of Trial, Vol. XXI at 61. He pointed out, however, that the crime was a team effort. The Prosecution pointed out the

evidence that while Basham sat in Alice Donovan's car pointing a gun at her, Petitioner

drove her car to an Amoco station, went inside and purchased duct or electrical tape, and

re-fueled the car.[1]  Tr. of Trial, Vol. XXI at 62-63.

While the theme of the Government's closing argument was that it took both

Basham and Petitioner to kidnap and kill Samantha Burns and Alice Donovan, the

Government did not ignore the evidence that Fulks was a leader in the commission of the

crime and that he clearly chose of his own free will to participate in the murders.  During

the entire crime spree, from the time Petitioner and Basham escaped from the county jail

until the time they were apprehended after the murders, Petitioner made the decisions as

to where they went.  The Prosecution observed that Fulks was the one with the motive to

escape from the Hopkins County Detention center, because he was the one who was

concerned that the recent charges filed against him would result in a lengthy prison

sentence, while Brandon Basham was nearing the end of his prison sentence.  Tr. of Trial,

Vol. XXI at 28-30.  The prosecution reminded the jury of the testimony from James

Hawkins regarding how Petitioner had ordered Basham to tape his hands and to tape him

to a tree, and how, when he didn't think Basham was doing a good enough job, cursed at

him and took over the taping, and taped Hawkins' head and his mouth.  Tr. of Trial, Vol.

XXI at 34.  The prosecution traced the route that Petitioner and Basham took during their

---

[1]     Due to time constraints and the voluminous record, in this response, the Government has relied to a large extent on the summary of evidence presented by AUSA Johnny Gasser during closing arguments.  However, the Government will cite to specific testimony in its response to Petitioner's § 2255 motion.

crime spree, going where Fulks', not Basham's, friends and family lived.  Tr. of Trial, Vol. XXI at 35, 39.  He pointed out that Fulks, not Basham, asked his friend, Tina Severance, where they could find guns, and that it was Fulks who drove Samantha Burns' car after they abducted her from a mall. Tr. of Trial, Vol. XXI at 36, 41.  The prosecution pointed out that Fulks was the one who knew his way around the area where Samantha Burns was killed, and, in fact, used to go to the same spot where they took Samantha with his girlfriend when he lived in West Virginia.  Tr. of Trial, Vol. XXI at 50.   The Prosecution also observed that it was Petitioner who determined that Alice Donovan would be the person they carjacked, and that it was Petitioner who chose to drive Alice Donovan and Basham to the isolated spot where they raped and killed her.  Tr. of Trial, Vol. XXI at 60, 63-64.

Petitioner's argument that he needs discovery to show that Basham was so manipulative that he controlled Petitioner simply collapses under the weight of the evidence presented at trial.  Petitioner's trial counsel presented evidence designed to show that Petitioner was not a leader and did not have the ability to plan the crimes of which he was convicted.  Petitioner's trial counsel argued during closing that Brandon Basham was the one pulling the strings during the crimes.  Tr. of Trial, Vol. XXI at 138-141.

The Government argued that, in  addition to showing that Petitioner made most of the decisions during their crime spree, the evidence also showed that Petitioner had violently abused women prior to his meeting Basham.  The prosecution reminded the jury of the testimony from women with whom Petitioner had been involved - testimony of

how Petitioner had slapped and kicked them, bloodied their lips and noses, blackened

their eyes, pistol whipped them, and made them suck on the ends of gun barrels.  Tr. of

Trial, Vol. XXI at 67.  The evidence presented at trial and argued by the prosecution at

closing also shows that Petitioner planned and attempted to carry out another crime

against a teenage girl after he and Basham were no longer together.   Vol. XXI at 84-86.

The evidence at trial was clear - Petitioner was not being manipulated by Basham.

Therefore, the discovery Petitioner seeks regarding Brandon Basham is immaterial and

should be denied.

> C.    <u>The discovery Petitioner has requested with the hope of showing the Government attempted to influence witness testimony has been provided to petitioner, never existed, or is information to which Petitioner is not entitled.</u>

Petitioner claims that the Government attempted to influence witness testimony

and in so doing rendered the verdict a denial of due process.  Petitioner also claims the

Government violated its obligations under <u>Brady v. Maryland</u> by failing to disclose to

Petitioner information material to his ability to prepare a defense at trial.  Based on these

allegations, Petitioner asks the Court to order the Government to produce:

> 9.    "all information . . . regarding promises or deals made with witnesses in exchange for their testimony at Petitioner's capital trial"
>
> 10.    "all correspondence regarding any and all witnesses who testified at Petitioner's trial"
>
> 11.    "the rough drafts of reports or notes made by government agents pertaining to the investigation and prosecution of Mr. Fulks, including but not limited to, those notes kept on the 'I-drive' of the FBI's computer system"

12.  "any evidence that any government witness was biased or prejudiced against Petitioner or had a motive to falsify or distort his/her testimony"

13.  "all documents of the personnel file of any agent involved in the investigation and/or interviewing of witnesses in this case tending to show that the agent(s) have been reprimanded , disciplined, or reported for attempts to influence witness testimony"

The Constitution does not accord an accused the right of unrestricted access to the government's files.  United States v. Trevino, 89 F.3d 187, 189 (4th Cir. 1996)(citing Pennsylvania v. Ritchie, 480 U.S. 39, 59-60 (1987); Love v. Johnson, 57 F.3d 1305, 1313; see also United States v. Leung, 40 F.3d 577, 583 (2d Cir.1994) ("In the rare circumstances where [an in camera ] inspection is required, its purpose is not to provide a general discovery device for the defense[.]").   Due process requires that the government disclose to the accused any favorable evidence in its possession that is material to guilt or punishment. Id. (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)).  "Favorable" evidence includes not only that evidence tending to exculpate the accused, but also any evidence adversely affecting the credibility of the government's witnesses. Id. (citing United States v. Bagley, 473 U.S. 667, 676 (1985); Giglio v. United States, 405 U.S. 150, 154-55 (1972)).  In order for a habeas petitioner to obtain relief under Brady, the evidence he claims was withheld, (1) must be favorable to his case; (2) must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material, i.e., it must have prejudiced the defense at trial.  McHone v. Polk, 392 F.3d 691, 697 (4th Cir. 2004)(citing Monroe v. Angelone, 323 F.3d 286, 299 (4th Cir.2003)).

10

Exculpatory evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. (citing Kyles v. Whitley, 514 U.S. 419 (1995)). Materiality is not considered item by item, rather it must be assessed collectively. Id.

To support his claim of a right to his broad discovery requests, Petitioner offers a statement by Andrea Roddy that when F.B.I. agents interviewed her, they did not ask her as many questions about Brandon Basham, and that they pressured her to testify that Petitioner threatened her life and the life of Tina Severance.[2] Petitioner also offers a letter written by the Myrtle Beach Police Department on January 24, 2008, stating that pursuant to Tina Severance's "cooperation in a case in 2002 in which she was a witness, charges against her were dismissed." The Government made no deal with Tina Severance and is not aware of any deal by any agency with Severance. The letter does not suggest that there was a deal or that any promises were made to Severance.

The Government is not aware of any deals made with any witnesses. Besides failing to show that the Government suppressed information favorable to him, Petitioner has failed to show the materiality of his requests. He has provided a statement by one of 130 witnesses. Roddy does not claim in her statement that she lied at Petitioner's trial

---

[2] The Government has contacted F.B.I. Agents Jeff Bruning and Jeff Long regarding Andrea Roddy's assertions. Agent Bruning stated that Roddy's claims are "outrageous" and that they asked witnesses only for the truth, whether it helped or hurt the Government's case. Agent Bruning is currently away from his office, but will provide an affidavit regarding this issue when he returns to his office next week. Agent Long will also provide an affidavit.

about something that adversely affected the outcome of Petitioner's trial.  In fact, at trial,

Roddy appears to have misrepresented evidence in order to help Petitioner.  When the

prosecutor discussed the fact that Petitioner and Basham both had mud on them the night

they returned from raping and murdering Samantha Burns, he observed that Roddy,

contrary to her statement to F.B.I. agents, testified under questioning by Petitioner's trial

counsel that there was mud on the floorboard on only one side of the vehicle.  Tr. of Trial,

Vol. XXl at 46-47.  The prosecutor pointed out that a picture of the floorboards showed

that there was mud on both sides. Tr. of Trial, Vol. XXI at 47.   He also pointed out that

by the time of the trial, Andrea Roddy had begun corresponding with Petitioner.  Tr. of

Trial, Vol. XXI at 46-47(closing argument);  Tr. of Trial, Vol. IV at 79-80 (Roddy's

testimony).   Andrea Roddy was before the Court, under oath, when she misrepresented

evidence, ostensibly to help Petitioner.  Therefore, it is not beyond the realm of belief that

she would sign a piece of paper with generalized accusations under oath in order to help

Petitioner.

The Government presented a total of 130 witnesses who provided extensive

evidence regarding Petitioner's participation in the murders of Samantha Burns and Alice

Donovan.  Yet Petitioner has provided the statement of one witness who appears to have a

personal motive to help Petitioner.[3]  Thus, Petitioner has not met his burden of identifying

---

[3]    Brady does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense. Stockton v. Murray, 41 F.3d 920, 927 (4th Cir. 1994)(citing United States v. Wilson, 901 F.2d 378, 380 (4th Cir.1990)).  Just as counsel for Petitioner acquired a statement from Angela Roddy, it

evidence withheld by the Government which would have been favorable to his case.

Neither has Petitioner satisfied his burden of showing the materiality of his requests for

"all correspondence regarding any and all witnesses who testified at Petitioner's trial,"

"the rough drafts of reports or notes made by government agents pertaining to the

investigation and prosecution of Mr. Fulks, including but not limited to, those notes kept

on the 'I-drive' of the FBI's computer system," "any evidence that any government

witness was biased or prejudiced against Petitioner or had a motive to falsify or distort

his/her testimony"[4] and "all documents of the personnel file of any agent involved in the

investigation and/or interviewing of witnesses in this case tending to show that the

agent(s) have been reprimanded , disciplined, or reported for attempts to influence

witness testimony."  Petitioner's requests are non-specific, overly burdensome, and

would not resolve any factual disputes that would entitle a petitioner to relief.

---

could also request statements from other witnesses.  Since Petitioner has not provided statements from other witnesses claiming the F.B.I. attempted to influence their testimony, the Petitioner apparently did not ask other witnesses for such statements, or the other witnesses do not feel the F.B.I. attempted to influence their testimony.

[4]     In the Court's charge to the jury, he instructed jurors: "How much you choose to believe a witness may be influenced by a witness's bias. . . . does the witness have some bias, prejudice, or hostility that may have caused the witness, consciously or not, to give you something other than a completely accurate account of the facts to which the witness testified?"  Tr. of Trial, Vol. XXI at 253.  Petitioner had an opportunity to explore the biases of witnesses during cross examination of government witnesses, and did, in fact, attempt to discredit some government witnesses through the testimony of defense witnesses.  See, for example, the testimony of Joe Jones and Dina Jones regarding the bad character of government witness, Petitioner's ex-wife, Veronica Evans at Vol.  XVII, pp. 180-185, 192-197.

Petitioner's non-specific and inappropriate requests prove he is simply attempting to go on a "fishing expedition masquerading as discovery."

    D.    <u>Whether Ronnie Fulks claimed that Petitioner gave him a .45 caliber revolver is immaterial.</u>

Petitioner's argument that the Government knew or should have known that he gave a .45 caliber revolver to his brother, and, therefore, the Government engaged in "serious misconduct" by asserting that Petitioner had been armed with a .45 caliber revolver, is incredible.  Nonetheless, Petitioner claims he is entitled to:

> 14.    "all information . . . regarding the .45 caliber revolver that Petitioner gave to his brother"

> 15.    "all information . . . indicating that the government knew or should have known that a weapon was disposed of by the Petitioner or Ronnie Fulks prior to any encounter with Burns or Donovan"

> 16.    "all information . . . about the interrogation, investigation, or arrest of Ronnie Fulks, which proceeded [sic] Ronnie's transfer or extradition to Indiana authorities"

The Government presented evidence and argued that Chad Fulks and Brandon Basham, on November 8, 2002,  stole four handguns from Robert Talsma - two, .45 caliber revolvers, a semiautomatic .45 revolver, and a .22 revolver.   Petitioner claims that Petitioner gave a .45 caliber revolver to his brother, Ronnie Fulks, on November 8 or 9, 2002.  At trial, Tina Severance testified, and the Government argued, that on November 13, 2002, Chad Fulks grabbed one of the guns, either the .45 or the .22, and held it approximately a foot from her head.  Tr. of Trial, Vol. XXI at 52-54.  Petitioner's brother, Dwayne Fulks, testified that he saw Petitioner with two .45 caliber guns on November 9.

Witness Carl Jordan testified that on November 14, 2002, while Brandon Basham was shooting at him from the front of his vehicle, someone fired at him from behind the vehicle, and the Government argued that the only person who could have fired the shot from behind the vehicle was Petitioner.   Tr. of Trial, Vol. XXI at 55-57.  The prosecution also pointed out that Petitioner and Basham were exchanging guns during their crime spree, and that there were witnesses who saw Petitioner with the .22 caliber gun.  Tr. of Trial, Vol. XXI at 55-58.

Whether Petitioner disposed of a particular gun prior to the murder of Alice Donovan is immaterial.  Evidence showed that Petitioner had the ability to acquire guns. Additionally, the Government presented evidence that showed Petitioner had and used guns after November 9.  Petitioner's trial counsel presented the testimony of a firearms expert in an effort to refute testimony by government witnesses.  Tr. of Trial, Vol. XVI at 182-199.  However, whether Petitioner gave a gun to his brother prior to the murders is immaterial because the Government did not argue that Petitioner shot Samantha Burns or Alice Donovan.  It argued that the crimes could not have been committed without Petitioner's participation, and that Fulks was aware that the crimes would likely result in the deaths of Samantha Burns and Alice Donovan.

E.     The Government is not required to provide evidence to Petitioner it may possess about the physical, mental, or sexual abuse he or his family experienced in the past.

To support his claims that his trial counsel were ineffective for failing to undertake an "adequate and meaningful mitigation investigation," and "for failing to present a

15

meaningful mental health case in mitigation," Petitioner asks the Court to require the

Government to produce:

> 17.   "all evidence . . . concerning any physical, mental, or sexual abuse suffered by Petitioner or other members of his family"
>
> 18.   "all evidence . . . concerning any mental or psychological illness or impairment suffered by Petitioner or other members of his family"

The Government is not required to provide Petitioner with evidence available to

him from other sources or through diligent investigation. See Stockton v. Murray, 41

F.3d 920, 927 (4th Cir. 1994)(citing United States v. Wilson, 901 F.2d 378, 380 (4th

Cir.1990)). Petitioner's counsel certainly have access to evidence regarding any physical,

mental, or sexual abuse or mental illness suffered by Petitioner or his family.

Furthermore, Petitioner cannot show that the information he requests is material, because

the jury heard and rejected extensive evidence and arguments regarding Petitioner's

alleged mental illness and the abuse and neglect he suffered as a child. See McHone v.

Polk, 392 F.3d 691, 706 (4th Cir. 2004) (counsel's failure to put forth additional evidence

quantifying petitioner's drinking after it had presented testimony that petitioner consumed

vast quantities of alcohol did not satisfy either prong of Strickland).

Petitioner's trial counsel presented the expert testimony of highly-credentialed and

published Dr. James Evans, who has taught clinical psychology at the University of South

Carolina Department of Psychology for thirty years. Dr. Evans administered a battery of

neuropsychological tests to Fulks and reviewed tests administered by others. He testified

regarding his conclusions that Petitioner suffered from borderline intelligence and

cognitive impairment.  Tr. of Trial, Vol. XVII, 5-29.  Dr. Howard Becker, Professor of Psychiatry at the Medical University provided expert testimony regarding fetal alcohol exposure and how it influences brain functions and can result in lower intellect, poor adaptive behavior, and poor judgment.  Tr. of Trial, Vol. XVII, 110-149.

Petitioner's trial counsel also presented extensive evidence regarding the bad conditions which existed during Petitioner's childhood.  Petitioner's former teachers, neighbors, friends, former probation officer, and family testified about his parents' alcoholism.  They described how Petitioner's father hit him, how his parents physically fought each other and neglected their children, and how their home was dirty and infested by rats and roaches.   Petitioner's former probation officer testified that Petitioner's parents encouraged stealing, and that she had recommended placing him in foster care. A former teacher said that Petitioner had a speech impairment as a child and that he was a follower.  Tr. of Trial, Vol. XVII, 72-103.  Petitioner's uncle testified that Petitioner's mother drank alcohol the entire time she was pregnant with Petitioner, that his father hit him with his fists and kicked him, and that Petitioner's parents called their children degrading names.  Tr. of Trial, Vol. XVI, 132-43.  The former girlfriend of Petitioner's brother testified about the wild parties, with heavy drinking and fighting, Petitioner's parents had at their house almost every weekend, and how his parents encouraged the children to steal.  She testified that Petitioner's father had "dirty pictures . . . worse than Playboy" on the walls and ceilings of the house, and that Petitioner's father had made advances toward her.  Tr. of Trial, Vol. XVI, 222-228.

17

Essentially, Petitioner's trial counsel presented everything Petitioner asserts they should have presented.   They did, indeed, present  meaningful mitigation evidence. Twelve jurors found that Petitioner's mother abused alcohol while she was pregnant with him, that Petitioner was neglected by both his parents, that he suffered from learning disabilities as a child, that he lived in a house that was often filthy and infested by roaches and ants, that his parents did not provide him with adequate clothing or school supplies, that Petitioner was often left without supervision, that a police officer and a probation officer recommended that he be removed from his home at age nine, and that he was subjected to physical and emotional abuse as a child.   Tr. of Trial, Vol. XXII at 20-22. However, such evidence did not mitigate the cruel, cold, and callous kidnapings and murders in which Petitioner participated.   The jurors unanimously found all of the aggravating factors to exist.  Tr. of Trial, Vol. XXII at 17-19.  The jury ultimately determined that: "the aggravating factors proved in this case outweigh the mitigating factors so as to justify a sentence of death." Tr. of Trial, Vol. XXII at 25.  Therefore, the discovery demanded by Petitioner is immaterial.

Conclusion

For the foregoing reasons, Defendant respectfully requests that Petitioner's Motion for Discovery be denied.

Respectfully submitted,

W. Walter Wilkins
United States Attorney


s/Jimmie Ewing
Jimmie Ewing (ID No. 7292)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, South Carolina  29201
(803) 929-3114

August 6, 2008