# Attachment A

Excerpts of 2/25/04 Motion Hearing

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,          )          Cr. No. 4:02-992
                                   )
                                   )
VERSUS                             )          Columbia, S.C.
                                   )          February 25, 2004
CHADRICK E. FULKS and              )
BRANDEN L. BASHAM,                 )
                                   )
                                   )
          Defendants.              )
------------------------------)

EXCERPT OF MOTIONS HEARING
TESTIMONY OF JEFFREY LONG, RONALD HEWETT,
WILLIAM H. MONCKTON, CAMERON B. LITTLEJOHN, JR.,
AND ROSE MARY PARHAM
BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:          STROM THURMOND, JR., ESQ.
                             U.S. Attorney for South Carolina
                             SCOTT SCHOOLS, ESQ.
                             JONATHAN S. GASSER, ESQ.
                             Assistant U.S. Attorneys
                             1441 Main Street, Suite 500
                             Columbia, S.C.  29201

For the Defendant            JOHN H. BLUME, ESQ.
        Fulks:               KEIR M. WEYBLE, ESQ.
                             1247 Sumter Street, Suite 202
                             Columbia, S.C.  29201

                             SHERI LYNN JOHNSON, ESQ.
                             Cornell Law School
                             Myron Taylor Hall
                             Ithaca, NY  14853

                             WILLIAM F. NETTLES, ESQ.
                             Assistant Federal Public Defender
                             401 Evans Street, Room 240
                             Florence, S.C.  29503

(Appearances continued:)

For the Defendant            JACK B. SWERLING, ESQ.
        Basham:              1720 Main Street
                             Columbia, S.C.  29201

                             GREGORY P. HARRIS, ESQ.
                             1720 Main Street
                             Columbia, S.C.  29201

Court Reporter:              Gary N. Smith, CM
                             901 Richland Street
                             Columbia, S.C.  29201
                             (803) 256-7743

            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION


* * * * * * * * * * * * * * * * * * * * * * * * * * *

        THE COURT:  All right, what is next?

        MR. GASSER:  Your Honor, at this time the government
would call Agent Jeff Long.

        THE CLERK:  Mr. Long, if you would come forward to be
sworn.  Place you left hand on the Bible and raise your right
hand, and state your name for the record.

        THE WITNESS:  Jeffrey McClain Long.

                    JEFFREY LONG, SWORN

                    DIRECT EXAMINATION

BY MR. GASSER:

Q   Agent Long, where are you employed, sir?

A.  The Federal Bureau of Investigation, assigned to the Myrtle
Beach resident agency.

Q.  How long have you been with the FBI?

A.  A few months short of seven years.

witness.

THE WITNESS  Thank you, sir.

MR. GASSER:  The government would call Sheriff Ronald Hewett.

THE COURT:  How long do you think he will be?

MR. GASSER:  He will be much briefer, Your Honor. Probably 15 or 20 minutes on direct.

THE COURT:  Okay.

THE CLERK:  Please place your left hand on the Bible and raise your right hand.  State your name for the record.

THE WITNESS:  Sheriff Ronald E. Hewett.

THE CLERK:  Spell your last name, please.

THE WITNESS:  H-e-w-e-t-t.

RONALD E. HEWETT, SWORN

DIRECT EXAMINATION

BY MR. GASSER:

Q.  Sheriff, would you tell us, please, where you are the sheriff of?

A.  I'm sheriff of Brunswick County, North Carolina.

Q.  And where is Brunswick County in relation to Horry County, South Carolina?

A.  It is just north.  Brunswick County is the most southeastern county in the State of North Carolina.

Q.  How long have you been the sheriff of Brunswick County?

A.  10 and-a-half years.

Q.   Totally how many years of law enforcement do you have?

A.   21 and-a-half.

Q.   Sheriff, I'm going to briefly, just to put your testimony in context, briefly go over how the Brunswick County Sheriff's Department became involved in this matter.  I believe that was on -- you learned of this particular case on Sunday night, November the 17th; is that correct?

A.   That is correct.

Q.   You were actually out of your county attending a law enforcement related meeting in another county in North Carolina?

A.   Mitchell County, yes, sir.

Q.   And the days after Sunday, November the 17th, on the 18th and the 19th and the 20th, did your department -- was your department actively involved in obtaining and/or sharing information with South Carolina authorities?

A.   Yes, sir.

Q.   And particularly did you on November the 20th hold a press conference and request assistance or information from members of the community in Brunswick County, relative to the disappearance of Alice Donovan?

A.   I did.

Q.   And was certain information provided to the Brunswick County Sheriff's Department relating to Bee Tree Farm, the Bee Tree Farm area of Brunswick County?

A.   Yes, sir.

Q.   By citizens?

A.   Yes, sir.

Q.   And starting on November the 21st, Thursday, November the 21st, were extensive searches then conducted in rural parts of Brunswick County attempting to locate Alice Donovan?

A.   Yes.

Q.   Now, on Monday, November the 25th, do you recall receiving a phone call from Agent Jeff Long with the FBI?

A.   I do.

Q.   You were in North Carolina, correct?

A.   Yes, sir.

Q.   And so the court understands, you were on the phone with Jeff Long?

A.   Yes.

Q.   And you were aware that Jeff Long was on the phone with a lawyer for Mr. Basham in Kentucky; were you aware of that?  In other words, he had two phones?

A.   Absolutely.

Q.   And did you record the information, the information that Jeff Long was getting from Attorney Mr. Hughes in Kentucky, and then it was passed on to you, did you then memorialize that information in a document?

A.   I did.  I pulled over to the side of the road.

Q.   And was that information relating to what Branden Basham

was saying as to the disappearance, or the probable or possible location of Alice Donovan in your county?

A.   That is exactly what the conversation was about.

Q.   Now, I want to draw your attention to November the 27th, Wednesday, the day before Thanksgiving.  Did you participate in a strategy meeting with other North Carolina officials relating to an event that was to occur the next day, on Thanksgiving Day?

A.   I did.

Q.   And what was that meeting all about?

A.   That meeting was with our district attorney, which will be the South Carolina equivalent of a solicitor, Rex Gore, Tim Flynn, who is the resident agent in charge of the Wilmington office of the FBI, and we did meet.

Q.   Now, Sheriff, were you yourself privy to any conversations that anybody with the U.S. Attorney's Office had with either Mr. Basham or his South Carolina lawyers?  Were you aware of any of those conversations, sir?

A.   No.

Q.   What was your understanding as to what was to take place on Thursday morning, Thanksgiving day, November the 28th, what was your understanding?

A.   It was my understanding at that time that Mr. Basham would come to Brunswick County, North Carolina to attempt to locate the body of Alice Donovan.  In the 27th meeting it was

discussed, a strategy, on what to do if and when that incident did occur.

Q.   And on the morning of November the 28th, where did you first come into contact with the defendant, Branden Basham?

A.   I met at the intersection of U.S. 17 and Highway 211 and met the transport van.

Q.   And when you met the transport van, was Mr. Basham in the presence of at least one of his lawyers at that point?

A.   I did not get out of the vehicle other than to find out what they wanted to do at that time, Mr. Gasser.  And at that time they stated they wanted to return to the Amoco station in Shallotte.

Q.   And did you do that, did you go to the Amaco station?

A.   Yes, sir.

Q.   I believe that -- is that the same Amaco station where we have a videotape of Mr. Fulks in Ms. Donovan's -- or with Ms. Donovan's car?

A.   It is.

Q.   Subsequent to the Amaco station, where did the van carrying Mr. Basham and your vehicle, where did y'all go?

A.   We went to Bee Tree Farm in the Winnabow community in northern Brunswick County.

Q.   And is there a particular hunt club there?

A.   Bee Tree Farm.

Q.   Are you familiar with that area, Sheriff?

A.   I am.

Q.   In fact, sir, are you personal friends with the people that own the --

A.   I am.

Q.   What happened when you got to the hunt club?  Tell us, please, what happened.

A.   When I got to the hunting club at that time was the first opportunity that I really had the opportunity to meet the people, the attorneys and Mr. Basham and Jeff Long, and two Conway police officers.

Q.   So, were you introduced to a lawyer by the name of Cam Littlejohn and a lawyer by the name of Billy Monckton?

A.   I met both of them at that time.

Q.   Had you ever met them before?

A.   Never.

Q.   And, of course, you met Mr. Basham; is that correct?

A.   Yes, I did.

Q.   What decision was made as to how this search for Ms. Donovan's body physically was going to take place?  What decision was made?

A.   A decision was made that a local officer with knowledge of the area would be necessary to accompany the individuals that I previously have stated that were in the van.  And it was agreed upon with -- by Mr. Littlejohn and Mr. Monckton that that would be their decision, that person would be me.

Q.   And did you find it necessary that you yourself had to advise Mr. Basham of any constitutional rights?  Did you find that necessary at that point?

A.   No, sir, I didn't.

Q.   And tell us why.

A.   Because both his attorneys were present and there, and they agreed that they wanted me in the vehicle to help then locate Alice Donovan.

Q.   So, place the individuals in the van for the court.  Would you do that, please?

A.   I can.  May I use my hands, Your Honor?

Q.   Sure.

A.   I was sitting in the front passenger seat of the transport van; a Conway, South Carolina police officer was driving. Directly behind me over to my left was Branden Basham.

Q.   So, he would have been sitting behind the driver?

A.   Correct.  Directly to his right, Branden Basham's right, was Mr. Cam Littlejohn.  In the back seat of the van was the other sergeant from Conway, Special Agent Jeff Long of the FBI, and Billy Monckton.

Q.   I show you what's been marked Government's Exhibit 7 through 17, do you recognize those photographs, Sheriff?

A.   I do.

Q.   Did you utilize Government's Exhibits 7 through 17 in your discussions with Branden Basham and Cam Littlejohn on November

the 28th?

A.  I did.

MR. GASSER:  Your Honor, we would move those exhibits, for purposes of this hearing, into evidence.

MR. SWERLING:  No objection.

THE COURT:  Without objection admitted.

BY MS. GASSER:

Q.  Prior to utilizing those photographs in the van that day, did you show those photographs to Mr. Littlejohn?

A.  I showed them to Mr. Littlejohn and Mr. Monckton.

Q.  And was part of that reason so that they could give you the okay to go ahead and use those photographs in your discussions with their client?

A.  Yes, sir.

Q.  And, in fact, after Mr. Monckton and Mr. Littlejohn looked at Government's Exhibits 7 through 17, what did they tell you you could do with the photographs?

A.  They said that they were fine to use and I may show them to Mr. Basham.

Q.  Just in general would you describe for the court what transpired over the next several hours in the van, Sheriff? Not necessarily specifically what was said -- I might get to a few things -- but just in general?

A.  In general?

Q.  Yes, sir.

A. In general, I developed a rapport where I would -- could speak with Mr. Basham, and the whole object of that day was to find Alice Donovan. We left the hunting camp and we went in several areas of Brunswick County, in the northern parts of the county, attempting to locate Alice Donovan.

Q. Now, during the entire time, the several hours that you were in the presence of Mr. Basham, did you or anyone in your presence promise Mr. Basham anything, Sheriff?

A. Never.

Q. Did you or anyone in your presence promise his lawyers anything?

A. No.

Q. Were any threats or any coercive tactics used against Mr. Basham or his lawyers by you or anyone in your presence?

A. It was always cordial, and the answer is no.

Q. Did you -- do you feel you developed a rapport with Mr. Basham?

A. Yes.

Q. Did you have any difficulty understanding him when he was -- when he was responding to your questions?

A. No. We turned face to face. I looked at him and he answered my questions and he understood.

Q. That was my next question. Did it appear as if he was understanding you when you were asking him certain questions?

A. Every question, yes.

Q.  In the van when you were asking him questions, how close was Mr. Littlejohn seated to Mr. Basham when you were asking him these questions?

A.  16 inches.  The width of the -- from one seat to the other.

Q.  And did you afford Mr. Basham the opportunity to have whatever discussions or consultations with either Mr. Littlejohn or Mr. Monckton inside the van?  Did you allow that to happen?

A.  Yes.

Q.  In fact, did that happen several times in your presence?

A.  It did.

Q.  Just so the record is clear, I'm going to draw your attention to one incident.  Do you recall when you were on the -- capital C, capital C -- CC Road, where there were several hunters lined up and down the road?

A.  I remember that.

Q.  Would you describe that, what occurred inside the van, to the court, please?

A.  Yes, sir.  We had turned -- we had turned onto CC Road traveling towards Columbus County to a small community known as Prosper.  Along the road that day were several deer hunters. We turned the van around and went back towards Green Hill Road and Bee Tree Farm.  While we were traveling back towards Bee Tree Farm, a doe, a female deer, ran in front of the van.

Q.  Go ahead.

A.   And at that point Branden Basham said, "You know, I could never kill a deer, and here I have --" and at that point -- would you like me to continue?

Q.   Certainly.

A.   At that point Mr. Littlejohn placed his left hand on his leg and moved his head in a left to right motion, and Branden Basham never finished the statement.

Q.   Let me -- let the record be absolutely clear, had anyone posed a question to Mr. Basham prior to him making the statement when he saw the deer, "You know, I could never kill a deer, and here I have --" or was that just a spontaneous statement by Mr. Basham?

A.   That was a spontaneous statement by Mr. Basham.  And up until that point, I had not noticed Mr. Littlejohn object to anything.

Q.   So, Mr. Littlejohn had an opportunity to keep his client from finishing that statement; is that your understanding?

A.   I saw it.  Yes, sir, that's what happened.

Q.   Every -- prior to that incident, everything leading up -- every statement that Mr. Basham had made, did Mr. Littlejohn have an opportunity to keep his client from making those statements?

A.   He did.

Q.   Subsequent to the incident involving the doe crossing the road, did Mr. Littlejohn have every opportunity to keep his

client from making other statements to you?

A.   He did.

Q.   When Mr. Littlejohn tapped Branden Basham on the leg and shook his head, did you attempt to get more information about what Mr. Basham was going to say from him?

A.   I never mentioned it again.

Q.   Now, did there occur, after that incident, the statement that Mr. Basham made when the doe crossed the road, did there come another time when Mr. Basham wanted to consult with Mr. Littlejohn?

A.   Yes.

Q.   Would you describe that incident to the court?

A.   Yes.  We were in the van, and Branden motioned -- Branden Basham motioned for Mr. Littlejohn to come over.  And, of course, I was turned in the same manner that I'm demonstrating now on the stand, I was turned during the conversation, not wearing my seatbelt, listening to Branden, because we were trying to find Alice.

And Branden Basham asked Cam Littlejohn, "Should I tell them about --" and at that point they started whispering, and I couldn't understand any more other than, "Should I tell them about."  And then Cam Littlejohn said, "Go ahead, it will be okay."

Q.   And did you memorialize that and record that as well?

A.   Yes.

Q.  So, just so the record is clear on this, Mr. Basham wanted to whisper something to his lawyer, Mr. Littlejohn, correct? Correct?

A.  Yeah, he did.  Yes, sir.

Q.  Ostensibly so you or other law enforcement people couldn't hear what he was saying?

A.  Correct.

Q.  And after having that whisper and conversation with his lawyer, did his lawyer orally tell Mr. Basham to "Go ahead and say what you want to say"?

A.  Cam Littlejohn said, "Go ahead."  He did.

Q.  And I believe -- again, not getting into the full substance of what was said, isn't that the point in time when Mr. Basham starts talking about a leather strap that was used to kill Ms. Donovan with?

A.  Yes, it was.

Q.  You were with him for several hours in the van, were you not, with Mr. Basham and Mr. Littlejohn?

A.  Correct.

Q.  And suffice it to say, you must have posed several, multiple questions over those hours to Mr. Basham; is that a fair statement?

A.  That is correct.

Q.  Do you even know how many square miles you covered that day in the van with Mr. Basham?  Could you even estimate?

A.   Maybe not square miles, but I know that we traveled well over 100 miles.

Q.   And did you continue to use Government's Exhibits 7 through 17 as informational sources with Mr. Basham, in the presence of Mr. Littlejohn and Mr. Monckton?

A.   Yes.

Q.   And did he actually respond and orally tell you certain things about not only the location but about what happened to Ms. Donovan?

A.   He did.

Q.   And did you memorialize what he told you in a written report?

A.   I did.

Q.   Now, drawing your attention to -- towards the latter part of the day on Thanksgiving day, did there come a time when law enforcement seemed to be frustrated with the information that Mr. Basham was providing to y'all that day?  Is that a fair statement?

A.   Yes.

Q.   And would you describe what occurred to the court at the end of the day with Mr. Basham at the cemetery near the hunt club?

A.   Yes, I would.  We pulled back into the cemetery at Bee Tree Farm, which has a U horseshoe circle that leads back to a cemetery.  At that time there was a conference with law

enforcement officials who were there.

Q.   You previously indicated to the court that you were having many discussions with Mr. Basham, to include a purse strap?

A.   Yes.

Q.   Do you recall that testimony?

A.   I do.

Q.   And did you want to know more information about that purse strap and how it was used and where it might be located?

A.   I did.

Q.   Wanting that to occur, tell the judge what you did with Mr. Basham.

A.   Mr. Basham and myself and the two Conway sergeants, which was Sergeant Parker and Sarvis, I believe, we walked back down to the cemetery.  Branden Basham, he was shackled at his hands, belly chained around the waist, and shackled at his feet.  He walked down to the cemetery, he got tears in his eyes and tears rolled down his cheek.  He showed me the length of the strap --

Q.   How did he do that?

A.   May I demonstrate?

Q.   Certainly.

A.   Like this.  Because he couldn't pull his hands very -- very far apart, he was shackled.  He showed me the length of the strap.  Says that he believed it to be a Liz Claiborne strap, and that he had thrown it in the woods.  He then demonstrated the manner in which he threw it in the woods.

Q. Would you stand up and do that for the court so the record is complete as well?

A. Yes, sir, I will. We were standing at the corner of the cemetery, Branden Basham is chained. I said, "Branden, how did you do that?" And he said, "Like that. And I threw it over there."

Q. Now, where were his lawyers when he was having this discussion with you at the cemetery?

A. Cam Littlejohn and Mr. Billy Monckton were back at what I described earlier as the horseshoe circle, talking with other law enforcement officials, including Chief Hendrick of Conway.

Q. And could you estimate, using this courtroom, the distance that you and Mr. Basham were with regards to where his lawyers were?

A. The bush at the back of the courtroom.

Q. The plant back there?

A. Yes, sir.

Q. And at any time did Mr. Monckton or Mr. Littlejohn not allow you to take their client over to the cemetery part to demonstrate this, as you just described to the court?

A. They had no opposition to that.

Q. Did there come a time also then after that that Mr. Basham was able to meet with his two lawyers in the van? Do you recall that?

A. Yes, sir. They went back to the van, the van we had

traveled in all day. The two lawyers and Mr. Basham went into the van, the van door shut, and we all waited outside.

Q. Were you present when Agent Long and other FBI agents or other law enforcement authorities requested certain information from Mr. Littlejohn? Were you present then, Sheriff Hewett?

A. Was I present at the -- at that site when Mr. Littlejohn stepped back out of the van and wanted more information?

Q. Yes. Before that did you participate, did you ask of Mr. Littlejohn what it was that y'all wanted from Mr. Basham, or did you tell him that you weren't -- you didn't believe that he was telling the truth, or did you leave that to somebody else?

A. I never disputed Branden Basham's word of what he had told me. My sole job that day was to locate the body of Alice Donovan.

Q. So, were you then present when Mr. Littlejohn and Mr. Monckton came back outside the van after they had this conversation with their client?

A. I was.

Q. And suffice it to say, Mr. Littlejohn then told law enforcement, told y'all a, quote, "hypothetical;" is that a fair statement?

A. He did.

Q. He qualified what he was about to tell by saying "hypothetically speaking," something to that effect?

A. That's exactly what Mr. Littlejohn said.

Q.   And did you record in a document to the best of your recollection what Mr. Littlejohn told y'all out there at the cemetery, after he qualified as his "hypothetically speaking," did you record that in a document?

A.   I did.

Q.   Again, not getting into all the specifics, Mr. Littlejohn basically told you a scenario as to how Ms. Donovan was killed, where she was killed, where the body was, where the purse strap or the knife was; is that a fair statement, Sheriff?

A.   That is accurate and fair, and it's true.

Q.   And all this was from the words of Mr. Littlejohn, correct?

A.   Yes.

Q.   After he qualified it by saying "hypothetically speaking," correct?

A.   Correct.

Q.   After he had a conversation with his client in the van?

A.   Correct.

Q.   Now, did you or anyone in your presence force Mr. Littlejohn or Mr. Monckton to go into the van and have this conversation?  Did you force them to do that?

A.   Nothing happened forceful that day, it was -- everything was voluntary and cordial, and every one in the van was a gentleman.

Q.   Were any promises or threats or coercive tactics used, either out there at the cemetery at the end of the day or any

time in your presence on Thanksgiving day, to either Mr. Basham or his lawyers?

A.  No, sir.

MR. GASSER:  Beg the court's indulgence.

That's all I have, Your Honor.

THE COURT:  We have been going an hour and-a-half, let's take our mid morning recess at this point.  We will take a 15 minute recess.

(Short recess)

THE COURT:  All right.

MR. SWERLING:  Go ahead?

THE COURT:  Mr. Swerling, cross-examination.

MR. SWERLING:  Thank you, Judge.

CROSS EXAMINATION

BY MR. SWERLING:

Q.  I'm Jack Swerling, how are you?

A.  Morning.

Q.  Let me ask you a few things here.  Did you have any discussions with anyone concerning what the scope of the activities that day were going to be?  For example -- and let me just clarify that.

A.  Yes.

Q.  Did you have any discussions with Mr. Littlejohn or Mr. Monckton about what could be and what could not be used against Mr. Basham?

A.  No, sir.

Q.  Did you at any point advise Mr. Basham that anything he said could be used against him?

A.  No, sir.

Q.  Did you ever advise Mr. Littlejohn or Mr. Monckton anything could be used against him?

A.  No, sir.

Q.  Or against Mr. Basham, obviously.  Okay.  Okay, did you give either Mr. Littlejohn or Mr. Monckton any of the information that you had from other sources concerning what was known to law enforcement about the case?

A.  By that, what are you meaning?

Q.  Did you relate to them anything you knew about the case that you had gotten from other law enforcement agencies?  Because, you understand, they had just gotten involved in the case.

A.  Yes, sir, I did.  There were certain clues, certain words that were important to the case.  It seemed like a puzzle, but, yes.

Q.  Okay.  And what was that, for example?

A.  Wild life, sanctuary, park, bucket truck.

Q.  Basically landmarks?

A.  Yes, sir.

Q.  This area is a very rural area, am I correct?

A.  Yes, sir.

Q.   Lot of dirt roads?  Okay.  It was your understanding that day the purpose of what was going to be that day -- in fact, why you went out on Thanksgiving day is to see whether or not you could find -- Mr. Basham could help you find Alice Donovan's body?

A.   That's correct.

Q.   It was not for the purpose of taking any statements from Mr. Basham?

A.   My purpose was to find Alice Donovan.

Q.   Okay.  And again, there was no -- you were not seeking to take any statements from Mr. Basham?

A.   My primary purpose was to find Alice Donovan.

Q.   Does that mean that you were not going to take any statements?

A.   My job, sir, was to try to find Alice Donovan.

Q.   Did Mr. Littlejohn and Mr. Monckton tell you that they were not going to allow Mr. Basham to be interviewed or give a statement?

A.   No, sir.

Q.   They never told you that?

A.   No, sir.

Q.   Okay.  You never -- did you ever attempt to take a statement from him?

A.   Okay, sir, tell me exactly -- did I attempt to take a statement?  We talked all day, and I want to be respectful, but

I don't understand the question.  We talked all day to find Alice Donovan.

Q.  You said the purpose of the -- of the activities that day was to find Alice Donovan's body.  What I was asking you was, were you aware that there was an agreement to not interview Mr. Basham that day, that Mr. Littlejohn and Mr. Monckton had said that?

A.  No, sir.

Q.  So, that was never said in your presence?

A.  No, sir.

Q.  Okay.  And following in that line, at no time during the day, even when later on there was a hypothetical presented to you, did you tell Mr. Monckton or Mr. Littlejohn that what they related to you would be used against Mr. Basham?

A.  We never discussed that.

Q.  Okay.  Do you know if any promises had been made, other than yours?  I asked you about whether you had, do you know about any other promises?

A.  Did I make any promise?

Q.  No.  Other than -- do you know of any promises that were made other than what you have said, that there were none?

A.  Right.

Q.  Okay.

A.  I'm not aware of any, no, sir.

Q.  Okay.  That's what I'm asking you.  You said that you did

not make any promises, correct?

A.   Correct.

Q.   No agreements on your part.  What I'm asking you is, are you aware whether there was another agreement with someone else?

A.   It was my understanding from talking with Jeff Long and with our district attorney, Rex Gore, that no promises had been made.

Q.   Okay.  Was it also discussed as to whether statements that were made by Mr. Basham could be used against him?

A.   In the van?

Q.   Yes.

A.   No, sir.

Q.   You did not -- you did not believe that those statements could be used against him?

A.   It was never discussed.  Our main purpose, my sole purpose was to find Alice Donovan.

Q.   I understand.  Now, you described -- and I guess what I'm trying -- your statement does not indicate where the discussion broke up during the day about directions, whether something looked familiar, or make a right or make a left -- which was Mr. Basham's purpose out there that day, correct?  Was to try to locate the area?

A.   Correct.

Q.   Okay.  It does not distinguish between those directional

statements that he made and the hypothetical, where it ends -- stops and ends, okay?  Do you understand what I'm saying?

A.  No, sir, I don't.  On a separate sheet of paper I put everything hypothetical, so I think it does distinguish.

Q.  On a separate piece of paper?

A.  Yes, sir.

Q.  I was just going to ask you that.

A.  Yes.

Q.  But your initial report does not distinguish between what was said in the van and then what was later said as a hypothetical?

A.  My report -- once again, ask me that question, I want to answer it --

Q.  Your initial report --

A.  Yes, sir.

Q.  -- longer report --

A.  Yes, sir.

Q.  -- that's detailed --

A.  Yes, sir.

Q.  -- does not break somewhere as to what was said prior to the hypothetical or after the hypothetical?

A.  No, it doesn't.  "Hypothetically" was listed separately.

Q.  Listed separately, okay.  And during the course of the day -- just let me see if I understand what you were saying. Did you ask him questions --

A.   All day.

Q.   -- about the events that took place?

A.   About the events?

Q.   Yes.

A.   Yes.  An example of that is, when we went into a wooded area with Basham to help find the body.

Q.   Okay.

A.   He --

Q.   What sort of questions did you ask him and what sort of statements did he give you about events -- and I'm not talking about directions -- about what happened out there?

A.   About what happened out there?

Q.   Right.

A.   That the body was covered up with leaves.

Q.   Okay.

A.   That they had covered the body with leaves after pulling Ms. Donovan out the right side of the vehicle, both Fulks and Basham.  Dragging distance, 50 feet, approximately, and that he had stepped in a hole --

Q.   Mr. Basham?

A.   Mr. Basham had stepped in what was called a -- he called a gopher hole, and in this gopher hole was a stake.  I took it to be a wooden or a metal stake that he scraped his leg on.  And in the conversation in the van, he reached down, chained and shackled, and pulled his leg up and he says, "Here, you see?"

So, that sort of conversation was going on, sir, all throughout the day.

Q.   Other than that, other than what you just testified to, was there any other descriptive information given you about what happened between Mr. Fulks, Mr. Basham, and Ms. Donovan?

A.   Can I reflect on the notes I wrote?

Q.   No question about it, go ahead.

A.   Mr. Basham indicated, and I will have to continue, but the first thing I see, "Mr. Basham indicated that some signs and some locations looked familiar, and some signs and locations did not look familiar."

Q.   Okay.  Basically I would consider those directional information.

A.   Yes, sir.

Q.   Okay.

A.   Okay.

Q.   I'm talking about the actual details of what actually happened.

A.   Yes, sir, he also did.  "At the cemetery Basham told me personally, 'We pulled right in there and cut to the left behind the fence.'"

Q.   Okay.

A.   "Basham described the Liz Claiborne 16 to 20 inch strap."

Q.   Okay.

A.   "And indicated by this motion that it was used to strangle

Alice Donovan."

Q. Okay. It wasn't said, it wasn't verbalized, it was just used in --

A. Yes, sir.

Q. Okay. And that is in your report?

A. Yes, sir. The other things that I see, "He once again indicated about the stake that he had struck his leg with. He indicated that Chad, referring to Mr. Fulks, wanted to take her to a park. And Branden Basham agreed to that, to which Chad Fulks then stated to Basham, 'No, there will be too many people there.' Basham stated he remembered the park to the right and the green animal sign.

"Basham states shortly thereafter, 'Many of the roads that we went down looked very similar in that they did have pine trees on either side.' But he said, 'All of it looks familiar, but I think the trees were closer together,' referring to the night of the -- this event."

Q. Again, that would be directional, or whether or not an area is familiar or not. I'm again referring to the details of what happened between the three of them.

A. Yes, sir. And also Branden Basham did state in the van and while we are in the wooded area attempting to stop once on the Lewis Swamp Road, which is a dirt road off Green Hill Road, this was the second -- this was the first time I saw Branden become emotional, the second time was at the cemetery.

But he said, "Stop here, stop here."  And at that point that's when Branden Basham made the following statements, he states that, "After dragging -- that after they drug, being Fulks and Basham, drug her out the right-hand side of the car, they got back in the vehicle, did a turn around."

Once again, in my testimony or in my statement Branden specifically -- Branden Basham specifically stated at the cemetery, "This is the spot, this is the exact spot."

Q.  Okay.

A.  "And we are here, we are here."  And, sir, any other thing -- you want me to continue?  Just a couple of more things.  But ended it up --

Q.  What I'm primarily interested in is the information that he gave you prior to the hypothetical.  Where does that end and where does the hypothetical start?

A.  I can tell you exactly where it ends.

Q.  Okay.

A.  It ends where -- it ends when we are at the cemetery, as I demonstrated earlier for the judge.  And we walked back up to the van, and Branden Basham got back in the van with Cam Littlejohn and Billy Monckton, at that point our search was over.

Q.  Okay.

A.  And everything from that point on was when Mr. Littlejohn stepped out of the van and said, "Hypothetically, if this

happened, this is the way it happened."

Q.  All right.  In looking at your statement, it does not appear that there were any other statements made after what you just described prior to the hypothetical?

A.  You are correct, sir.

Q.  That's what I wanted to establish.  Okay.  Now that situation, when they went to the van -- well, when you walked back to the van, took place at what point in the day?

A.  The end of the day, about 2:45 on Thanksgiving.

Q.  And you had been out there about how long?

A.  Since 8:30.

Q.  Okay.  And there had been several trips to that particular cemetery, correct?

A.  We drove by it coming in, we drove past it on the way out, and then we stopped at the cemetery at 2:30, 2:35.

Q.  Okay.  And on one or two occasions he said he did not recognize the area, but on the last occasion he did?

A.  Yes, sir.

Q.  Is that correct?

A.  That is correct.

Q.  And that was a statement directly to you --

A.  Yes.

Q.  -- as I understand, some distance away from the lawyers?

A.  Yes, sir.

Q.  They were with Mr. Long?

A.   They were, once again, as far as from here to the bush,
standing there talking with Chief Sam Hendrick.

Q.   30 feet maybe or something like that?  25 to 30 feet?

A.   Yes, sir.

Q.   All right.  Now, the conversations that you overheard, one
involved the deer and then one involved a strap?

A.   Yes, sir.

Q.   And then somebody said, "Go ahead and tell them about it"?

A.   Yes.

Q.   Okay, now, there were some other points during the day
where Mr. Basham was whispering to Mr. Littlejohn, correct?

A.   Yes.

Q.   And that obviously was trying to communicate with Mr.
Littlejohn as his lawyer?

A.   I didn't hear your last words.

Q.   As his lawyer, that was his lawyer?

A.   Right.  Yes, sir.

Q.   And you were seated in the vehicle -- how far were you from
Mr. Long?

A.   He was at the back of the van.  So, we were from the front
of the van to the back of the van.

Q.   Okay.

A.   Jeff Long was at the back.

Q.   How many rows of seats were there?

A.   Sir, there is the front seat, the front passenger's seat,

there was a seat directly behind -- a captain's chair directly behind me to my left, that was Basham's seat.

Littlejohn was directly behind me.  You have got a small area where people can get in and out, and then a bench seat across the back where the second Conway officer and Agent Long and Billy Monckton sat.  So, that was the length of a standard transport van, and I don't know how long they are.

Q.  Okay.

A.  It was just a standard van.  It wasn't a really big one and it wasn't a mini van.

Q.  Now, obviously from what you could determine, Mr. Basham was not familiar with the area, correct?

A.  No, sir.  I think that he was familiar with certain --

Q.  Let me strike that.

A.  Yes, sir.

Q.  Familiar from the standpoint of having been there a number of times?  Obviously he had said that they were there that night.

A.  Sir, it appeared to me that certain signs, road signs, the hunting camp, he recognized.

Q.  Okay.

A.  Then there were things he did not recognize.  So, was he as familiar as me or anyone that lived in the area?  Absolutely not.  He was turned around.  But there were things that he specifically remembered.

Q.   There are things he remembered, he related that to you?

A.   Yes, sir, he did.

Q.   Now, at some point when you walked off, Mr. Littlejohn and Mr. Monckton were standing at the van, you said it was about the distance to the bush, 25 or 30 feet.  Do you know what was being told to Mr. Monckton and Mr. Littlejohn at that point, what they were being asked?

A.   I couldn't hear a thing, because I had Branden Basham with me, and the two officers for security.  I was in full uniform that day, and I had no idea what Mr. Monckton, Chief Hendrick, Jeff Long, or anybody else was doing, I only know what happened at the cemetery.

Q.   Okay.  You are with him and he says, "This is -- this is the place"?

A.   Yes, sir.

Q.   Okay.  And he said that before you ever got back to the van?

A.   Yes, sir.

Q.   He said that before he ever got in the van with Mr. Monckton and Mr. Littlejohn?

A.   Yes, sir.  Yes, sir.

Q.   So, the purpose for which you were sent out that day, as to where Ms. Donovan -- where certain events took place had been accomplished at that point?

A.   It had --

Q.   He had knowledge that that was the area?

A.   It had not, and it's still not accomplished, sir.  We still haven't found Alice.

Q.   I'm talking about as far as the particular area.

A.   We had at that point decided that we had looked everywhere that we possibly knew where to look, with the clues that I have expressed to this court that we had.  We were -- we had exhausted every effort to find Alice Donovan with Branden Basham's assistance.

Q.   And you did a lot of driving?

A.   We drove over 100 miles, just in that area.

Q.   Now, when you got there and Mr. Littlejohn and Mr. Monckton were in the van, how long -- do you know whether or not -- they were in there?  Could you give us an estimate of the time involved?

A.   How long were they in where?

Q.   In the van with Mr. Basham.

A.   We -- we were in the van.

Q.   So, you went in the van with --

A.   All day, sir.

Q.   No, I'm not talking -- I'm talking about at the end of the day --

A.   Okay, I'm sorry.

Q.   -- when they went in there to talk with Mr. Basham.  As I understood it, they went in the van?

A.   They did, sir.

Q.   Okay.  Nobody from law enforcement was standing there to overhear the information?

A.   Five to 10 minutes.

Q.   Okay.

A.   The doors were shut.

Q.   The doors were shut.  Now, when they come out, clearly Mr. Littlejohn presents you with a hypothetical situation?

A.   Yes, sir.

Q.   He's not stating that it's true, he's just saying hypothetically?

A.   He specifically said, "hypothetically."

Q.   Okay.

A.   Like this, "hypothetically."

Q.   And "hypothetically" means exactly to you what it means, correct?  It is, "What if this situation took place?"

A.   And actually Mr. Littlejohn used the words "if this happened."

Q.   "If this happened"?

A.   "If this."

Q.   All right.  That's when you made this separate notation that we just referred to?

A.   Yes, sir.

Q.   It's separate --

A.   Yes, sir.

Q.   Okay.   Prior to Mr. Littlejohn and Mr. Monckton going into the van to talk with Mr. Basham, did you or anybody else in your presence advise them that whatever they came back and told law enforcement would be used against Mr. Basham?

A.   It was never discussed.

Q.   Okay.   What about when they came out prior to Mr. Littlejohn saying, "This is a hypothetical," and said, "What if," did anybody say that "Whatever you tell us is going to be used or we are going to attempt to use against Mr. Basham"?

A.   Sir, I can only from my heart and on my hand to God tell you, all I know is what I know.   What -- Agent Long could get up here and say that conversation happened.   I wasn't there, I didn't hear it.

Q.   Understood.   And I'm just asking to your knowledge, did anybody tell them that?

A.   I didn't ever hear that, no, sir.   No.

Q.   Now, one of the things I wanted to ask you about, is you wrote in your notes that Fulks, after slitting the victim's throat in the woods, gave the knife to Basham.   That's what the testimony -- or that's what you wrote down in your notes?

A.   Yes, sir.

Q.   And those were written on December 3rd, several days after --

A.   Yes, sir.

Q.   Okay.

MR. SWERLING:  Judge, that's all I have, thank you.

THE COURT:  Redirect?

MR. GASSER:  No, sir.

THE COURT:  Thank you, sir, you may step down.

THE WITNESS:  Thank you, sir.

MR. GASSER:  May the sheriff be excused, Your Honor?

THE COURT:  Yes, sir.  You are excused.  Any additional witness on this series of statements?

MR. GASSER:  Nothing.

THE COURT:  Anything from the defendant?

MR. SWERLING:  Judge, we have Mr. Monckton here and Mr. Littlejohn, and what I would like to do is put them up as to the procedural aspects that took place that day, without waiving the privilege as to what Mr. Basham told them directly. And I think that would be -- since we are dealing with a Jackson versus Deno hearing, the actual substance of what Mr. Basham told them would not be relevant at this time.

THE COURT:  Does the government have any problem with that, with it not being a waiver of the privilege?

MR. SCHOOLS:  The only tricky part, Your Honor, is with respect to whether Mr. Monckton and Mr. Littlejohn were authorized by Mr. Basham -- by Mr. Basham to deliver the information to law enforcement at the end of the Thanksgiving day search that they in fact delivered.

Now, we would take the position that for this