EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF INDIANA

Chadrick Fulks,

        Plaintiff,

vs.

James Metts
        Sheriff/Lexington County
and

Bernice Mitchell
        Deputy Sheriff
and

Paula Lybrand
        Deputy Sheriff
and

Valerie Allen
        Deputy Sheriff
and

Cain Mayrant
        Deputy Sheriff
and

John Doe #1
        Deputy Sheriff
and

John Doe #2
        Deputy Sheriff
                Defendants.

CASE NO. 2 06 - CV- 056 LJM

**J U R Y**

**T R I A L**

**D E M A N D**

## C I V I L   R I G H T S   C O M P L A I N T

### Preliminary Statement

**COMES NOW** Chadrick Fulks, plaintiff/in propria persona, whom for all purposes of this action was a pretrial detainee housed at the Lexington County Detention Center, South Carolina brings this Civil Rights Com-

1.

plaint against all the defendants pursuant to 28 U.S.C. § 1331, the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States, and **Bivens v. Six Unknown Named Agents of the Federal Bureau of Investigation,** infra, to vindicate and redress deprivations committed under color of federal authority by the defendants against the plaintiff's rights, privilieges, and immunities secured to him by the Constitution of the United States. Further' the plaintiff seeks redress and remedy through both compensatory and punitive damages for Constitutional Proscriptions committed against him by the defendants when they subject him to: 1) punitive segregation with a total absence of due process of law; 2) deplorable and egregious inhumane conditions in those punitive segregation confinement; 3) denial of legal materials, including law books and resort to jail administrative remedies by denying him access to a jail Inmate Handbook, as well as writing utensils and also reading materials, including but not limited to newspapers, magazines and books; and 4) a brutal and salvage unprovoked beating at the hands of multi jail deputies where he sustained long term and permanent injuries. Lastly' the plaintiff request the court to grant him reasonable attorney fees and expenses, and all cost incurred in prosecuting this action against the named and unnamed defendants.

## Jurisdictional    Statement

1.   This Court has jurisdiction over the plaintiff's claims for violation of federal constitutional rights under 28 U.S.C. §§ 2201, 2202, and Rule 57 of the federal Rules of Civil Procedures, and under **Bivens v. Six Unknown Name Agents of the Federal Bureau of Investigation,** 403 U.S. 388 (1971).

2.

3. This Court has jurisdiction of this action under 28 U.S.C. § 1346(b) which holds, inter alia, that a civil rights action may be either prosecuted where the plaintiff is incarcerated, or where the actually constitutional torts occurred. **Merritt v. Hawk,** 2000 U.S. Dist. LEXIS 21460, March 24th, 2000.

4. Certain designated counts of this action, the amount in controversy which is greater than $75,000, are brought relying upon this Court's diversity of citizenship jurisdiction pursuant to 28 U.S.C § 1332(a)(1).

## Identification Of Parties

1. Chadrick Fulks is, the plaintiff in this action and for all purposes of this action was a pretrial detainee housed under contract by the United States Marshal Services at the Lexington County Detention Center ("LCDC"). The plaintiff's present address is:

Chadrick Fulks #16617-074
P.O. Box 12015
Terre Haute, Indiana 47801

**Defendant Parties Are:**

2. James R. Metts is, the Sheriff of LCDC, South Carolina and is responsible for the conditions and treatment for all prisoners so confined.

3. Bernice Mitchell is, a Deputy Sheriff at LCDC with the rank of Segreant.

4. Puala Lybrand is, a Deputy Sheriff at LCDC and is in charge of transportation.

5. Velerie Allen is, a Deputy Sheriff at LCDC, rank unknown.

6. John Doe #1 is, a Deputy Sheriff at LCDC, rank unknown. He is

a black male, approximately six feet tall and weighs about two hundred pounds. He is approximately twenty-eight to thirty years of age. During the time of the incidence complained of he wore a regular jail correction uniform.

7. John Doe #2 is, a Deputy Sheriff at LCDC. He goes by the nick name of "The Rock", and is approximately six feet tall and weighs around two hundred and sixty pounds. During the times of the incidence complained of he wore a regular jail correction uniform.

8. **All of the Defendants** acted and continue to act under color of federal authority at all times germane to this complaint.

9. **All the Defendants** are being sued in their **individual capacities**, and can be issued summons at:

Lexington County Detention Center
521 Gibson Road
Lexington, SC 29072

## Exhaustion Of Administrative Remedies Pursuant To 42 U.S.C. § 1997e(a)

1. Arriving at LCDC Fulks was immediately placed in the lockdown unit and during the duration of his incarceration there he was denied access to both legal materials and a copy of the Jail Handbook.

2. After requesting grievance forms and/or procedures from several of the defendants, which will be clarified in subsequent paragraphs he was denied access to these materials.

3. Based on these denials he was prohibited from resort of applicable administrative remedies, and thereby under § 1997e(a) availed himself of all available remedies.

4. Because Fulks was transferred immediately after being subject

4.

to the brutal and salvage unprovoked beating at the hands of multi jail deputies, he is to considered as a non/prisoner for purposes of his excessive force claim. Thereby' under the foregoing reasons Fulks has satisfied exhaustion requirements under the applicable PLRA statutory provisions.

## COUNT ONE

### Plaintiff's Punitive Segregation Was Proscribed Under Tenets Of The Fifth Amendment

1. Immediately after being booked into LCDC Fulks was excorted and placed in the disciplinary segregation unit, in Cell #1.

2. The following day Fulks requested to use the phone and was told by the deputy that he was not allowed phone or visitation privileges by order of the Sheriff. Further' this officer informed him that he was not allowed any propery of any kind, including writing utensils. "You mean that I am not allowed books, magazines or newpapers," Fulks asked the deputy. "No you are not by order of the sheriff," the deputy clarified. Why is this Fulks asked the deputy, who stated inter alia, that is something you will ahve to take up with the sheriff himself because we cannot override anything he orders pertaining to you or for that matter any other prisoner of you high profile.

3. Within days of speaking with the initial deputy pertaining to the restrictions place on Fulks segregation confinement he spoke with Sgt. Mitchell and questioned her in reference with the status of his confinement. She basically reiterated that he was not allowed any personal property what-so-ever, including commissiary, and further' that he was not allowed personal or legal property during his confinement at

5.

LCDC.

4. Within days of discussing his confinement restrictions with Sgt. Mitchell Fulks spoke with Sheriff Metts during his rounds in the unit. The sheriff did not hesitate to clarify to Fulks that per my orders you are not allowed no personal, nor legal property during your stay in my jail, and this includes phone calls and visitation. "I have not broken any jail rules or regulations that would warrant this punitive treatment have I,"Fulks ask the sheriff. That does not make any difference, this is my jail and I will hold you under any conditions I see fit. You are a rap'o murdered and we do not like your kind here, and your neighbor will be able to brief you on those sentiments the sheriff told Fulks, as he turned around and existed the unit.

5. The reference the sheriff made to Fulks asking his neighbor about the treatment of rap'o murders was in regard with the prisoner in cell #2 who was facing state capital charges for rape and murder also.

6. Throughout Fulks stay at LCDC he spoke many times with the sheriff in regard with his confinement in the disciplinary unit, and pertaining to the restrictions he had arbitrarily placed on him and generally received the same basic reply by the sheriff or the sheriff was simply reticent.

7. On several occasions Fulks requested both a copy of the Inmate Handbook and grievance forms so he could seek redress for the arbitrary punitive segregation confinement and the restrictions place on him in that confinement by the sheriff. He was refused these by each deputy he spoke with, including the sheriff who generally just ignored his request for these materials.

8. During Fulks stay at LCDC and in the segregation unit numerous

deputy sheriff officers brought newspaper clippings concerning his criminal proceedings, holding them up to his cell window and mading insipid remarks such as: "you are going to die FOR ~~you~~ this you punk; try and do something like this to a real man you piece of shit; and you will see how we treat piece of shit rap'o murder's in South Carlino." These incidents started happening within a short time of Fulks arrival at LCDC and continued until the day he left.

9. Fulks remained in the lockdown segregation unit his entire time at LCDC and was subject to the foregoing restriction so mentioned in the above paragraphs.

10. Mr. Fulks requests that he be awarded from Sheriff Metts compensatory damages in the amount of $150 for each and everyday he was arbitrarily held in punitive segregation without any form of due process of law as proscribed under the Fifth and Fourteenth Amendment(s), as well as punitive damages in the amount of $50,000.

## COUNT TWO

### Conditions Of Fulks Punitive Confinement Were Proscribed Under

### The Eighth Amendment

1. When entering his cell in the lockdown unit Fulks waded in water approximately a half inch deep and immediately was over taken by a pungent smell of excreta and extremely cold temperatures. He had been given only one sheet and one blanket and nothing else entering the unit. Fulks asked the escorting officer if he could have a mop to clean up all of the water laying in the front part of the cell and the cell itself, plus cleaning supplies to clean up the feces and and other substances that were smeared on the fitures and walls of the cell. The officer told him that,

7.

"this is the water front cell, and you can get cleaning suppies when they are passed out in the unit during the week. You can just deal with this 'shit' until then." After seeing feces laying in the toilet Fulks tried to flush the toilet it started to run over onto the floor. He immediately started hollowing for an officer, and the same officer who escort him came back to his cell and asked him what he wanted. The toilet is clogged up and it has feces sitting in it and it is really foul, I cannot even breath in here it is so bad. The officer left and returned with a handful of newspapers tell Fulks to put those on top of the toilet and they would get someone down to fix it just as soon as possible, but don't expect anyone to soon the officer told him.

2. Because of the water on the floor Fulks had to reside on his bunk, as if it was an island and because the cell had absolutely no heat he had to stay wrapped up in the blanket, shivering and shaking because of the cold night temperature in the damp and unheated cell. He placed the newspapers on top of his toilet to contain the malodorous smell from the excreta, but he was literally gagging from breathing this foul and unbelieveable ordor.

3. Shortly after talking with the escorting Officer about cleaning supplies, the toilet being clogged, excessive water lying on his cell floor Fulks spoke with Sgt. Mitchell about these issues, as well as why he was locked down in segregation. Sgt. Mitchell affirmed that he was placed in lockdown by order of the sheriff, as well as ordered placed in cell #1. This cell is always flooded after showers, but it will be up to the officer who is with the inmate who passes out cleaning supplies whether he want to let you use them or not, I am not going to order anyone to do that, she told Fulks. As far as the toilet goes we will get

8.

someone over here when we can to fix that.  Further'she told Fulks that the heat is turned off because of the condensation caused by it during the winter, and besides you have a blanket she told him, use it, it's not that cold in here.

4.  The walls of Fulks cell had black moss laid thick across the them, whereas moisture ran down his walls and drip from the ceiling saturating everying in his cell.  During the day he had to roll his one blanket and sheet up into his bed matress to keep it as dry as possible. Fulks wore both of the jump suits he was given at all times because of the extrmely damp and cold conditions of his cell.  At one point he became deathly sick from the inhumane conditions and remain sick for well over two weeks befoe being taken to see a doctor.  His toilet remain clogged up for six days before it was fixed, and at no time during his confinement at LCDC was he allowed cleaning supplies, given clean clothing and or bedding.  He repeatedly asked the sheriff for such, as he did Sgt. Mitchell also and was refused by both of these defendants.

5.  Fulks' cell remain flood his entire time at LCDC and he either had to remain on his bunk as if it were an island or wade in the water on his cell floor.  He was give tissue paper for almost two weeks after being placed in lockdown.  He was denied basic hygiene items during his confinement with the exception of using soap and a tooth brush during showers three times a week.

6.  A Private Investigator took pictures of Fulks cell one day after Fulks had been take from the cell without reason given why, and the cell had been cleaned up to a certain extent prior to the investigator taking pictures, yet the pictures vividly show the moss and moisture running from the walls of the cell.  Plus these pictures will show Fulks

9.

blanket lying soak and wet on the cell floor, even though the floor had been mopped prior to the pictures being taken.

7. Because of the continual inhumane conditions Fulks became sick again and this time lost 25 lbs during this period, thinking he was literally going to die in these deplorable and living threatening conditions. At no time he any jail personnel, Sgt. Mitchell or Sheriff Metts intercede on his behalf in reference with the conditions Fulks. suffered, even after he brought these conditions to their attention. In Sgt. Mitchell and Sheriff Metts actually aggravated these conditions by not providing Fulks with basic materials to clean with and/or cleaning clothing and bedding.

8. Further' the windows in Fulks cell had holes burnt into them where cold air would flow into his cell, and Fulks was force to use damp and wet blankets in effort to stay warm when the temperatures drop during the winter months of January, February and March.

9. The conditions of confinement Fulks was subject to absolutely served no legitimate objective and were posed or deliberately ignored for punishement, whereas he was subject to those for over a hundred and twenty days.

10. In redress Fulks request that he be awarded from Sheriff Metts and Sgt. Mitchell collectively compensatory damages for the egregious and fragnant inhumane conditions of confinement in the amount of $250 for each and everyday he was subject to these inconscientable conditions of confinement, as well as $150,000 punitive damages for these flagrant Eighth Amendment proscriptions.

## COUNT THREE

### The Defendants Interferred And Prohibited Fulks Resort To

Administrative Remedies And Thereby He Availed Himself Of All
Remedies Available To Him Satisfying Requirements Under
42 U.S.C. § 1997e(a)

1.   By order of Sheriff Metts Fulks was denied writing utensils during his initial stay in the lockdown unit, this included writing paper.  See (Count One, paragraph (2)). FoR over 40 DAYS

2.   The defendants, Metts and Mitchell refused Fulks legal material of any nature, including access to a Jail Handbook while at LCDC.  See (Count One, paragraph (4)).

3.   Fulks repeatedly requested information and access to the grievance procedures and was denied these requests by Sheriff Metts and Sgt. Mitchell during his incarceration at LCDC.

4.   Because the defendants refused to provide Fulks with the LCDC Rule Book and/or Jail Manual he was not able to acertain how to implement or comply with the LCDC grievance procedures.  Thereby he was denied resort to applicable administrative remedies by the defendants.

## COUNT FOUR

Fulks Was Subject To A Brutal And Salvage Beating At The Hands
Of Multi Jail Deputies In Violation Of The Eighth Amendment

1.   Without access to applicable documents Fulks is not able to cite definitively the date of his transfer from LCDC to Alvin S. Glenn Detention Center ("ASGDC").  For the purpose of this 'Excessive Force Claim' Fulks will refer to that date as being April 29th, 2003.

2.   On April 29th, 2003 Fulks was escorted to the booking area from the lockdown unit at approximately 1 p.m. for transfer to ASGDC.  After being searched prior to being taken to booking, he was placed in handcuffs and belly chains with a blackbox, as well as leg irons being apllied at

booking. The escorting Officer, LyBrand started using expletives toward Fulks telling him that, "now I will watch them kill your rap'o ass; I wish you would try and get away while I am transferring you so I could get the satisfaction of killing you; and you are just a piece of shit that doesn't deserve to live another day. Numerous other officers were present during this scene including, Maryrant, Allen, John Doe #1 and #2, and Sgt. Mitchell. Some of my property' letters and pictures were sitting onto of the booking desk where LyBrand told Fulks that you will not be allowed to take those with you, so throw them in the trash. Fulks complied with her orders reaching up and grabbing the letters with a lot of effort and throw them in the trash. He told Officer LyBrand that the pictures were legal material to be used in his pending capital case and briefly explained what the substance of that evidence was. Further' he told her if there was any doubt to the genuineness of these pictures being evidence she could contact his attorney and he would very the evidentiary nature of these pictures. "I don't give a fuck, what those god damn pictures, you piece of shit throw them in the god damn trash like I told you to do and do it now," she told Fulks. Fulks reached up, grabbed the pictures and stuck them down the front of his pants, telling her that these are evidence in my pending case and they cannot be dulicated, and I am not throwing them away.

3. This scene was unfolding in front of nine of ten inmates who were situated in a holding cell with clear view of the entire booking. These prisoners were all awaiting transfer, pulling chain that morning which Fulks were to be transferred with.

4. Fulks tried to reason with the numerous officers who had him surrounded at the booking area, he asked to please speak with the captain,

12.

the officers remained reticent with the exception of LyBrand who literally screamed, "I didn't tell you to talk with this fucking asshole, I told you to get those god damn pictures from him." This is when Officer Mayrant grabbed Fulks around the throat and with the other hand balled into a fist began striking Fulks repeatedly in the face. John Doe #1 rushed in grabbed Fulks by the balck box, twisting Fulks wrist in the process and grabbed him by the other arm twisting him around and slamming him to the floor.

5. Lying on his back John Doe #2 jumped on Fulks slamming his knee into Fulks's stomack knocking the air out of him with excruciating pain. Fulks heard Officer Allen telling the other officers to hold him still so she could get the pictures from him. She jumped down while the other officers were holding him down and reached down Fulks's pant's and grabbed him by his genitals and penis, she started squeezing until Fulks thought she was going to literally ripe his genitals and penis off, and this is when she started pulling on them and yanking them yelling, "you won't need these anymore you rap'o piece of shit." Fulks said', "take the pic- tures and leave me alone, just take the pictures."

6. While Fulks was still screaming to take the pictures Officer Mitchell started slamming his head back and forth into the floor, and then stuck her fingers and nails into his eyes and clawed his eyes and face all the way to his chin, leaving toren flesh and blood in its wake.

7. Fulks heard the other inmates screaming at the officers to stop beating the the guy - you are going to kill him, and in reply he heard Officer LyBrand screaming at them to shut the fuck-up and mind their own business.

8. After Officer Allen had the pictures I seen her give those to

13.

Officer LyBrand, and then LyBrand told the other Officers to take Fulks to a holding cell. John Doe #1 picked Fulks up by the back of his shackels from behind where Fulks was lying face down and Allen and some other officer picked him up by his hair and arms, Allen having him by the hair. After picking him up waste high they dropped him and began laughing. When Fulks tried to raise up into a fetal position kneeing because of the intense pain from being dropped John Doe #1 kicked him full force in the butt knocking him across the cell. Officer Mayrant then jumped on top of Fulks after he landed and began hitting him in the face, side of the head and neck area repeatedly and continued to do so for ten or fifteen seconds until Officer Mitchell screamed to stop, "you going to kill him."

9.    Officer LyBrand, Mayrant and John Doe #1 then picked Fulks up and placed him in a restraint chair, and this is when Mayrant struck him in the throat and then started twisting his head all the way around until Fulks thought he was going to break his neck. Officer LyBrand told Mayrant to stop, and this is when John Doe #1 jumped up and came down on Fulks leg irons driving the leg irons into his ankles, and screamed, "punk how do you like that."

10.    Officer LyBrand brought a hood and placed over Fulks head and told him, "don't bleed on this you son-of-a-bitch or you will get some more of the same." Fulks thought he was going to die, the beating had went on so long without any intervention and now he was blinded by a hood, he had no idea what they were going to do next. He heard LyBrand telling someone that we cannot sent him on the chain like he is, I am going to call the marshals and have them come pick up themselves.

11.    A short time later a jail nurse came and did a cursory examine

14.

of Fulks, basically looking at the wounds to his face and witnessing the enormous blood and swelling to his face and neck area. Fulks told her that he was suffering extreme pain to his lower hip area, butt where he had been viciously kicked by John Doe #1, that his eyes were on fire and he felt as though his head was spilting, plus the injuries to his ankles were on fire and acking bad. The nurse told LyBrand that she needed to loosen the restraint cuffs and leg irons get this guy to the hospital and she said, "if the marshals want to do that, they can, but we are not sending him anywhere."

12. The entire booking area was monitored with three survillance cameras which vividly witnessed the brutal and salvage beating Fulks was subject to by the multi defendants. Defendants Metts testified at a different proceedings that the video of this incident was rendered dsyfunctional by lightening striking the jail that day. Thereby the film of those videos' were erased.

13. Upon arriving at LCDC Defendants LyBrand and Mitchell told the two United States Marshals that Fulks had inflicted the many injuries they seen on himself. The marshals said that they would not transfer him as he was, so Fulks was taken out of the restraint chair and relieved of his belly chains, blackbox and leg irons and taken to a bathroom. There even though Fulks was blacking out the defendants held him in position while he took wet towels and washed the blood from his body.

14. Leaving the jail the marshals took several pictures of Fulks injuries that were visible without requiring him to disrobe. The marshals told Fulks that he would be seen by medical personnel at ASCDC, Columbia, S.C. and if they determinied that he needed to go to the hospital then their deputies could take care of that.

15.

15. Arriving at ASCDC the booking officer noted the majority of Fulks injuries and told him that medical would see him after he the booking process was complete. Fulks was not seen that days by medical.

16. Finally after two and a half weeks Fulks was seen by Dr. Burg who told him that she had only recently been advised of his medical situation. After just a cursory examination and noting the massive blood coming from Fulks rectum and the broken blood vessels to both of his eyes, she ordered that he immediately be taken to the hospital.

17. At the hospital it was noted that Fulks tailbone was ruptured, numerous severe bruises to his back and upper body, where his ribs had been bruised, as well as up and down both legs and arms. He had several wounds to his mouth where he had been busted in the mouth during the April 29th beating. His nose was bruised, as well as both ears. Both of Fulks eyes had blood lying in them with scratch marks from his eyes to his chin. There was four dominate holes in Fulks's throat from finger nails being stuck into his throat. There were number wounds to his head and bumps or different magnitude covering his head. Fulks was suffering severe whiplash where he could not even lay his head in any position other than totally flat, and he had to actually use his hands to help raise his head from that position when sitting up from a lying position. One tooth had been so severely cracked that it had to be taken out in pieces which caused excruciating pain.

18. Fulks continues to have severe back and neck pain from the injuries sustained, as well as both ankles have permanent scaring from Officer John Doe jumping on his leg irons while he was in the restraint chair. Fulks is plagued with constant nightmares of the brutal and salvage beating he took and continues to suffer mental and emotional anguish as well.

16.

19. Mr. Fulks request that he be awarded collectively and severally from defendants Mitchell, LyBrand, Allen, Mayrant and John Doe #1 and #2 compensatory damages in the amounts of $50,000 for the excessive force he was subject to at the hands of the multi defendants, and further he request punitive damages in the amount of $150,000 for the brutal and salvage nature of the unprovoked beating which was proscribed and runs afoul of the Eighth Amendment to the United States Constitution.

## Mr. Fulks's Certification, Submission, And Jury Trial Request

I, Chadrick Fulks, do hereby request trial by jury, and do hereby attest, under penalty of perjury, that the allegations made in the foregoing are true and correct to the best of my knowledge and belief. I do further sumit this petition signed by me this 5th day of March, 2006.

CHADRICK FULKS

RESPECTFULLY SUBMITTED,

Chadrick Fulks/PRO SE
USP Terre Haute
P.O. Box 12015
Terre Haute, IN 47801

17.