IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 4:02-992 |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | The Honorable Joseph F. Anderson, Jr. |
| | ) | U.S.D.J. |
| CHADRICK E. FULKS, | ) | |
| | ) | This is a Capital Case |
| Petitioner. | ) | |

**AMENDED MOTION OF CHADRICK E. FULKS TO VACATE CONVICTION
AND SENTENCE AND FOR A NEW TRIAL PURSUANT TO 28 U.S.C.A. § 2255
AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND
MEMORANDUM IN SUPPORT**

Beattie B. Ashmore[*]
PRICE, PASCHAL & ASHMORE, PA
644 E. Washington Street
Greenville, SC 29601
(864) 467-1001

William J. Watkins, Jr.[*]
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
550 South Main Street, Suite 400
Greenville, South Carolina 29601
(864) 255-5400

Pro Bono Counsel
Amy Laurendeau
David Dalke
Danielle Oakley
Kymberleigh Damron-Hsiao
Stephanie Noble
O'MELVENY & MYERS, LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA  92660
(949) 823-7926

[*]Counsel of Record

October 21, 2008

# TABLE OF CONTENTS

Preliminary Statement ....................................................................................................1

Jurisdiction ...................................................................................................................3

Standard of Review for IAC Claims .............................................................................3

Procedural History ........................................................................................................4

Grounds for Relief ........................................................................................................6

Factual Background and Introduction ............................................................................6

        A.   The Events of November 2002 ...........................................................7

        B.   On Trial for His Life.........................................................................12
            1.  Pre-trial decisions and missteps .................................................13
            2.  Governmental misconduct ........................................................17
            3.  Incomplete mitigation investigation...........................................18
            4.  The jury never learned about Petitioner's mental illness...........24
            5.  Future dangerousness................................................................27
            6.  The unconstitutional two-step process .......................................28

Legal Argument...........................................................................................................29

Claim I.  Petitioner's trial counsel were ineffective for failing to present a meaningful mental health case in mitigation inasmuch as they did not call critical expert witnesses who were prepared to educate the jury on Petitioner's multiple impairments ......................................................................................................29

        A.  Petitioner's trial counsel were ineffective because they presented no evidence that Fulks suffered from mental illness and psychological impairments.............................................................................37

        B.  The FASD experts were the only experts presented to the jury.............38

        C.  The failure to present the available mental health evidence defies explanation ......................................................................................44

        D.  The mental health experts, who were prepared to testify at trial, are at the top of their fields and could have presented the sentencing jury with ample evidence of Fulks' lifelong mental illness and long-standing addictions that Fulks was constitutionally entitled to have his capital sentencer consider ...........................................................................47
            1.  Dr. Seymour Halleck...............................................................47

2. Dr. Margaret Melikian ........................................................ 48

3. James H. Hilkey, Ph.D. .................................................... 48

4. William Alexander Morton ............................................... 49

E. Chad Fulks has severe cognitive problems that the jury never learned about ........................................................................ 50

F. Chad Fulks suffers from major depressive disorder which the jury never learned about ............................................................. 51

G. The jury never learned that Chad Fulks meets the diagnostic requirements for Amphetamine Dependence, Cannabis Dependence, and Alcohol Dependence ........................................................ 54

H. The jury never appreciated the sexual trauma experienced by a young Chad Fulks ....................................................................... 58

I. The jury never learned that Chad Fulks suffers from Adjustment Disorder with Anxiety ....................................................... 61

J. The jury never heard testimony that Chad Fulks' cognitive deficiencies made it unlikely that he would be a leader ................. 62

K. Putting it all in perspective ................................................... 62

Claim II. Petitioner's trial counsel were ineffective for not realizing the Ward/Bruning testimony could come in as rebuttal testimony ..................... 66

Claim III. Petitioner's trial counsel were ineffective for failing to undertake an adequate and meaningful mitigation investigation ........................... 70

Claim IV. Trial counsel were ineffective by using untrained and unsupervised law students to conduct key aspects of the investigation ....................... 84

Claim V. Petitioner's appellate counsel were ineffective for failing to appeal the Court's jury charge on mitigation as violating the Eight Amendment inasmuch as it created a substantial risk that the jury would screen out, and thus fail to consider and give effect to, factors that were unquestionably mitigating ......................... 91

Claim VI. Trial counsel were ineffective for failing to object to the Government's imposition of a nexus requirement on the jury's mitigation finding ............... 97

Claim VII. Petitioner's trial counsel were ineffective in advising Petitioner to give a statement to the FBI when no proffer letter or plea agreement was in place ..... 104

Claim VIII. Petitioner's trial counsel were ineffective in failing to request that the statutory catch-all mitigating factor and the minor participation factor be included in the verdict form so that the jury could give meaningful effect or a reasoned moral response to Petitioner's mitigating evidence ....................... 107

A. The "Catch-All" Mitigating Factor.................................................. 108

B. The "Minor Participation" Mitigating Factor ............................... 110

Claim IX. Petitioner suffered a complete miscarriage of justice when he relied on the Court's incomplete and incorrect explanation of the <u>Pinkerton</u> doctrine and agreed to a guilty plea as to the carjacking count despite the fact that such plea ran completely afoul of Petitioner's own statements and the evidence presented ......................................112

  A. Change of plea proceeding............................................................113

  B. The explanation of <u>Pinkerton</u> was legally incorrect because it presupposed that Donovan's death was "reasonably foreseeable" to Petitioner........................ 117

  C. Petitioner's guilty plea was legally insufficient because it was neither knowing nor intelligent.................................................................................. 126

Claim X. Petitioner was denied the effective assistance of counsel when trial counsel unreasonably advised Petitioner to plead guilty based upon a grossly inaccurate analysis of the <u>Pinkerton</u> doctrine and an improper factual basis........................128

  A. Trial counsel provided Petitioner with a grossly inaccurate explanation of <u>Pinkerton</u> upon which Petitioner detrimentally relied ...................................128

  B. Trial counsel was ineffective for advising Petitioner to plead guilty to carjacking when the plea lacked a proper factual basis to support the plea....................132

Claim XI. Trial counsel rendered ineffective assistance in advising Petitioner to plead guilty because the distinction between intent under <u>Pinkerton</u> and the gateway intent factors is far too fine for a lay juror to appreciate...................................................... 134

Claim XII. The Eighth Amendment precludes the application of <u>Pinkerton</u> in a capital case ........................................................................................... 136

Claim XIII. Petitioner's trial counsel were ineffective for failing to offer additional and readily discoverable evidence of Basham's leadership and manipulation that would have firmly established Petitioner's minor participation ................................ 138

Claim XIV. Petitioner's trial counsel were ineffective for failing to present meaningful evidence that Petitioner would not be dangerous in the future to prison inmates or BOP personnel ..................................................................................... 144

Claim XV. Petitioner's trial counsel were ineffective in their conduct of voir dire inasmuch as their questioning of prospective jurors fell below accepted capital defense practices ............................................................................................ 150

Claim XVI. Trial counsel were ineffective inasmuch as the failure to read questionnaires and to examine prospective jurors on the questionnaires fell below accepted capital defense practices .................................................................... 156

Claim XVII. Trial counsel were ineffective for choosing to sit automatic death veniremen on the jury instead of making a motion for additional strikes ................................. 159

Claim XVIII. Petitioner's appellate counsel were ineffective for failing to appeal this Court's refusal to admit statements made by Basham tending to show that Basham killed Alice Donovan ...................................................................... 163

Claim XIX. Petitioner's due process rights were violated by the Government's presentation of inconsistent theories ....................................................... 165

    A. The "puppet" becomes the leader ................................................ 167

    B. Basham demonstrated how he – not Fulks -- killed Alice Donovan............. 171

    C. Basham made all life and death decisions .................................... 173

    D. Intentional killing of Alice Donovan .......................................... 174

Claim XX. The Prosecution's attempts to influence witness testimony were inappropriate and rendered the resulting verdict a denial of due process ......................................... 177

    A. Andrea Roddy.......................................................................... 177

    B. Tina Severance ....................................................................... 178

Claim XXI. The Government violated its obligations under <u>Brady v. Maryland </u>by failing to disclose to Petitioner information material to his ability to prepare and present a defense at trial and sentencing denying Petitioner his rights under the Fifth, Sixth and Eighth amendments to the United States Constitution ...................................................................... 179

Claim XXII. Prosecutorial misconduct in closing argument denied Petitioner his constitutional right to due process and his rights under the Sixth and Eighth Amendments to the United States Constitution................................................. 180

    A. Life without parole is not a free pass .......................................... 181

    B. There was no evidence Petitioner raped Samantha Burns............................ 181

    C. The prosecutor engaged in misconduct by referring to Petitioner as a "zoo animal."............................................................................. 182

    D. The prosecution improperly impugned Petitioner's silence ......................... 183

E. The prosecutor engaged in misconduct by telling the jury that giving the Petitioner the death penalty would be "an act of self-defense" .......................... 183

F. Conclusion.................................................................................................. 183

Claim XXIII. Trial counsel were ineffective in failing to object to the prosecutor's improper and unduly prejudical statements and closing argument..................................... 184

Claim XXIV. The Government engaged in serious misconduct by asserting that Petitioner had been armed with a .45 caliber revolver ....................................................... 185

Claim XXV. Trial counsel were ineffective for failing to question Ronnie Fulks about the .45 caliber revolver ..................................................................................... 186

Claim XXVI. Trial counsel were ineffective for failing to prepare key witnesses for trial testimony ...................................................................................................... 187

Claim XXVII. Trial counsel were ineffective in advising Petitioner to plead guilty because this allowed the prosecution to present Petitioner's prior bad acts in conjunction with the evidence related to the offense charged ............................ 190

Claim XXVIII. Trial counsel were ineffective in failing to explain to the jury the concept of acceptance of responsibility ................................................................................. 191

Claim XXIX. Trial counsel were ineffective in failing to object to the Government's insertion of religion into Petitioner's trial .......................................................................... 192

Claim XXX. Petitioner's trial counsel were ineffective for failing to introduce Petitioner's artistic talent as a mitigating factor .................................................................... 194

Claim XXXI. The cumulative errors set forth in this Petition, and the prejudice that resulted from those errors, denied Petitioner a fundamentally fair trial in violation of rights guaranteed under the Fourth, Fifth, Sixth and Eighth Amendment to the United States Constitution ................................................... 195

Claim XXXII. The manner in which the Government would carry out Petitioner's execution would violate the Eighth Amendment ............................................................... 196

Request for Relief............................................................................................................ 196

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
Florence Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 4:02-992 |
| | ) | |
| CHADRICK E. FULKS | ) | |
| | ) | |

**AMENDED MOTION OF CHADRICK E. FULKS TO VACATE CONVICTION AND SENTENCE AND FOR A NEW TRIAL PURSUANT TO 28 U.S.C.A. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND MEMORANDUM IN SUPPORT**

COMES NOW, Chadrick E. Fulks, Petitioner, and would respectfully show to this Court that he is a prisoner in the custody of the United States government. Petitioner is sentenced to death and currently resides in the United States Penitentiary, Federal Death Row, at Terre Haute, Indiana. The Petitioner would show this Court that he was convicted and sentenced to death in a manner which violated the Constitution and laws of the United States. The Petitioner herein demonstrates constitutional error and moves this Court to set aside and vacate his conviction and sentence, and order a new trial.

**PRELIMINARY STATEMENT**

Petitioner and Branden Basham were indicted in the District of South Carolina on December 17, 2002. On April 23, 2003, a grand jury returned a superseding indictment charging Petitioner and Basham with eight separate offenses and requesting the death penalty on the first two counts: carjacking resulting in the death of Alice Donovan and kidnapping resulting in the death of Alice Donovan. Petitioner's trial and Basham's trial were severed.

1

On the advice of counsel, Petitioner pled guilty to all counts in the indictment. Following a sentencing hearing, the jury recommended that Petitioner be sentenced to death on both of the death-eligible counts. On December 20, 2004, this Court gave effect to the jury's verdict and sentenced Petitioner to death on the carjacking and kidnapping counts. The Court also sentenced Petitioner to 744 months in prison on the remaining six counts, to run consecutively to the two death sentences.

In this Amended Petition and supporting Memorandum, Mr. Fulks demonstrates that his convictions and sentences, including each of his death sentences, were obtained in violation of the United States Constitution and federal law in multiple respects.

References to the transcripts of the sentencing proceeding before this Court are cited as "TT" (Trial Transcript) followed by the date of the proceedings, and a page citation. Pre-trial proceedings are identified by "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation. The transcripts from the Basham trial are cited as "Basham TT." The opinion of the United States Court of Appeals for the Fourth Circuit rendered on direct appeal is reported at United States v. Fulks, 454 F.3d 410 (2006).

Mr. Fulks has filed an Appendix with this Motion containing documents relevant to the claims contained herein. The Appendix will be referred to as Petitioner's Appendix and will be cited as "PA" followed by a number assigned to each document.

Chadrick E. Fulks will be referred to by name, or as Petitioner. The United States will be referred to as the government or the prosecution.

All other citations are either self-explanatory or are explained.

# JURISDICTION

This Court has jurisdiction to provide the relief requested herein pursuant to 28 U.S.C.A. § 2255.

# STANDARD OF REVIEW FOR IAC CLAIMS

Under 28 U.S.C.A. § 2255, a federal conviction and sentence must be vacated if they were obtained in violation of the Constitution or laws of the United States. Petitioner alleges, <u>inter alia</u>, violations of the right to effective assistance of counsel at trial and on direct appeal, secured by the Sixth and Fifth Amendments.

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel. First, the petitioner must show that counsel's representation "fell below an objective standard of reasonableness." <u>Id</u>. at 688. Second, the petitioner must show prejudice, meaning "[t]here is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at 694. This reasonable probability standard is <u>less</u> rigorous than the preponderance of the evidence standard that typically governs civil litigation. <u>See</u> <u>Gray v. Banker</u>, 529 F.3d 220, 234-35 (4th Cir. 2008).

Claims of ineffective assistance of counsel are properly pursued in a § 2255 proceeding and are not waived even though they were not presented on direct appeal. <u>United States v. Massaro</u>, 538 U.S. 500, 509 (2003) ("Failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255.").

3

In many of Petitioner's ineffective assistance of counsel claims, Petitioner will refer to Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, American Bar Association, revised edition, February 2003 (hereinafter "ABA Guidelines"), as embodying what is expected of capital trial and appellate counsel. The Supreme Court has repeatedly cited these standards as the measure of whether capital counsel performs in a reasonable manner. Wiggins v. Smith, 539 U.S. 510, 523 (2003) ("Counsel's conduct similarly fell short of standards for capital defense work articulated by the American Bar Association (ABA) – standards to which we have long referred as 'guides to determining what is reasonable'") (citing Strickland and Williams v. Taylor, 529 U.S. 362 (2000)).

**PROCEDURAL HISTORY**

Branden Basham and Petitioner were charged in the United States District Court for the District of South Carolina, Florence Division, on eight counts: carjacking resulting in death (18 U.S.C.A. § 2119), kidnapping resulting in death (18 U.S.C.A. § 3571), interstate transportation of a stolen motor vehicle (18 U.S.C.A. § 2312), conspiracy (18 U.S.C.A. § 371), conspiracy to use and carry firearms in relation to and to possess firearms in furtherance of a crime of violence (18 U.S.C.A. § 924(0)), use of a firearm during and in relation to a crime of violence (18 U.S.C.A. § 924(c)(1)(A)), felon in possession of a firearm (18 U.S.C.A. § 922(g)(1)), and possession of a stolen firearm (18 U.S.C.A. § 922(j)).

The government filed a notice of intent to seek the death penalty on September 12, 2003. Less then eight months later, based on the advice of counsel, Petitioner pled guilty to all eight counts of the superseding indictment. (PTT, 5/04/2004 & 5/05/07/2004 at 52-193). During the plea colloquy, Petitioner denied any knowledge of, or the

participation in, the death of Alice Donovan; however, the plea was accepted based on the Pinkerton doctrine.

On June 1, 2004, Petitioner's sentencing trial began. On June 30, 2004, the jury returned a unanimous verdict, recommending that Petitioner be sentenced to death on both the carjacking and kidnapping counts. On December 20, 2004, this Court sentenced Petitioner to death on the kidnapping count and on the carjacking count. The Court also sentenced Petitioner to a total of 744 months in prison on the remaining six counts.

Petitioner filed a direct appeal to the United States Court of Appeals for the Fourth Circuit. On July 27, 2006, the Fourth Circuit affirmed Petitioner's conviction and sentence in all respects. United States v. Fulks, 454 F.3d 410 (2006). On January 19, 2007, Petitioner filed a timely Petition for a Writ of Certiorari with the United States Supreme Court. On June 25, 2007, the Petition was denied. Fulks v. United States, 127 S.Ct. 3002 (2007).

During the sentencing proceeding, Petitioner was represented by John H. Blume and Sherri Lynn Johnson, both of the Cornell Law School in Ithaca, New York, and William F. Nettles of the Federal Public Defender's Office. The government was represented by Strom Thurmond, Jr., Scott Schools, and Jonathan S. Gasser.

On direct appeal to the Fourth Circuit, Petitioner was represented by Messrs. Blume and Nettles. The government was represented by Messrs. Schools, Gasser, and John C. Duane.

Petitioner was represented by Messrs. Blume and Nettles in his unsuccessful Petition for Certiorari. On September 12, 2007, almost three months after the Supreme

Court denied certiorari, the undersigned counsel were appointed to represent the Petitioner.

Petitioner is currently incarcerated at the United States Penitentiary in Terre Haute, Indiana (Register # 16617-074).

## GROUNDS FOR RELIEF

Petitioner herein alleges that his convictions and sentences, including his sentences of death, were obtained in violation of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution. These violations relate to ineffective assistance of counsel and violations of his right to due process of law.

## FACTUAL BACKGROUND AND INTRODUCTION

Chad Fulks' life story is one of deprivation. As a child, his parents deprived him of basic necessities such as food, adequate clothing, safety, and, most importantly, love. The State of West Virginia, recognizing the deplorable conditions of the home, recommended that Fulks be placed in foster care. Bureaucratic inefficiency caused this recommendation to fall through the cracks. Fulks was never removed from the debauched residence of his alcoholic parents. He was deprived of a chance to have a decent upbringing.

Later in his early teen years, professionals recognized that Fulks suffered from mental illness. Both parents were given the opportunity to arrange for psychiatric treatment, but they did nothing. Fulks' parents deprived him of medication and professional help that could have made a difference—given him a chance to cope with childhood trauma and genetic predispositions. Instead of treatment, Fulks suffered through alone and self-medicated with illegal drugs and alcohol.

Unfortunately, this theme of deprivation continued when Fulks was put on trial for his life in the District of South Carolina. Accused of kidnapping and carjacking resulting in death, Fulks was deprived of adequate representation and a fair trial. The proceedings were marred by overtaxed law professors serving as trial counsel (whose true expertise lay in arcane habeas law), prosecutorial overreaching, and a plea that was problematic on its face as well as a matter of strategy. Trial counsel, using untrained and unsupervised law students, missed critical mitigation evidence that could have persuaded the jury to spare Fulks' life. Mental health experts were not called to testify because trial counsel overreacted to witness testimony that should have been inconsequential. In short, the jury never heard the full story of Fulks' childhood and mental illness.

Urged on by the prosecution, the Court gave an unconstitutional mitigation charge that diminished the effect of what little mitigation evidence the jury did hear. Although the issue was preserved, appellate counsel did not raise this error to the Fourth Circuit Court of Appeals. Fulks was deprived of appellate relief and remains on federal death row.

This story of deprivation need not continue. While this Court has no elixir that can cure the failings of Petitioner's parents or the State in allowing him to remain in a neglectful home, the Court can recognize the legal deprivations that led to a sentence of death in December 2004 and grant the relief requested herein. This Petition is an opportunity for the Petitioner to receive justice and for the story of deprivation to end.

### A. The Events of November 2002

On August 25, 2002, Petitioner was arrested and incarcerated in the Hopkins County Detention Center ("HCDC") in Madisonville, Kentucky. <u>Fulks</u>, 454 F.3d at 414.

The charges against Petitioner related to credit card fraud. Id.; TT 06/02/2004 at 18. While at the HCDC, Petitioner was eventually placed in a cell with Basham. TT 06/02/2004 at 18. According to authorities, Basham was "non-compliant, [a] problematic type of guy that you moved constantly." TT 06/02/2004 at 19. Petitioner, on the other hand, was described as "quiet" and someone who had not caused any problems at the HCDC. TT 06/02/2004 at 21.

On November 4, 2002, Basham and Petitioner escaped from the HCDC. Basham had earlier tried to escape from a courtroom in Hopkins County, and successfully eluded authorities for almost an hour until he was apprehended. Basham TT 09/13/2004 at 1-132 to 1-133. The November 2002 escape was facilitated by a malfunctioning security camera and an improperly installed fence. TT 06/02/2004 at 27-28 & 31. At around 6:30 p.m. on November 4, 2002, a correctional officer left Basham and Petitioner unsupervised in the outdoor recreation area while she delivered medications to other inmates. Using a homemade rope constructed from jail bedding, Basham and Petitioner climbed down the outside wall after pulling away the improperly installed fence. Basham took Petitioner to an abandoned school bus that had been converted into living quarters. TT 06/02/2004 at 87. Basham had previously lived in the bus and his relatives resided nearby.

Basham and Petitioner obtained a vehicle from James Hawkins in Hanson, Kentucky. Basham duped Hawkins into believing that Basham and Petitioner were having car trouble and needed a ride. TT 06/02/2004 at 99. While in transit to the supposedly broken down vehicle, Basham pulled a knife on Hawkins. TT 06/02/2004 at 118. Basham and Petitioner eventually left Hawkins duct taped to a tree. TT 06/02/2004

at 136. Approximately 15 hours later, Hawkins freed himself and secured the aid of a passing car. TT 06/02/2004 at 149.

Driving Hawkins' truck, Petitioner and Basham went to Portage, Indiana, to the trailer of Tina Severance. TT 06/03/2004 at 50-53. Severance was a former prison guard whom Petitioner had met during an earlier incarceration. TT 06/03/2004 at 23. The next morning, Petitioner, Basham, Severance, and Severance's friend, Andrea Roddy, collaborated on a successful scheme to steal guns and checks from Severance's former co-worker, Robert Talsma, then headed out of town. TT 06/03/2004 at 80-86.

The foursome drove to Sturgis, Michigan, where they met Petitioner's brothers. In Sturgis, the group consumed large quantities of methamphetamine and marijuana. TT 06/03/2004 at 91-92; TT 06/04/2004 at 119-120; TT 06/09/2004 at 259-58. Petitioner, Basham, Severance, and Roddy then traveled to Piketon, Ohio, on November 10, 2002. TT 06/03/2004 at 100. The group wrote bad checks for items that Roddy later returned for cash. TT 06/04/2004 at 71. Petitioner met a young woman named Heather Jo Jacobi with whom he used drugs. Fulks, 454 F.3d at 415.

On November 11, 2002, the foursome drove to Kenova, West Virginia, and rented a motel room. Id. While in Kenova, Petitioner and Basham continued to smoke methamphetamine. Id. Petitioner and Basham broke into cars and stole purses in the Kenova area. According to Petitioner's statement to the FBI, Petitioner and Basham split up to search for cars to rob, and Petitioner later saw Basham with a vehicle driving up and down the rows of the mall parking lot calling Petitioner's name. Id. Basham had gone far beyond the plan to steal when he abducted a 19-year-old Marshall University student named Samantha Burns. After spotting Basham, Petitioner returned to his vehicle

and followed Burns' vehicle. Id. Funds were withdrawn from Burns' bank account, and Basham informed Petitioner that he wanted to find a place to rape Burns. Petitioner followed Basham to a secluded area by the Ohio River. Petitioner parked some distance away from Burns' car and observed Basham walk around to the passenger side of the vehicle. Because his view was obstructed, Petitioner did not see the rape or what Basham did after the rape. Petitioner and Basham later burned Samantha Burns' automobile. Id. at 416. Petitioner assumed that Basham had tied up Burns in the manner as Hawkins, but learned days later that Basham had killed Burns. TT 06/14/2004 at 241-42.

On November 12, 2002, Petitioner, Basham, Severance, and Roddy drove to Little River, South Carolina. Fulks, 454 F.3d at 416. Petitioner and Basham continued to break into cars and steal purses. Id. On November 14, 2002, the group relocated to Myrtle Beach, South Carolina. Basham and Petitioner burglarized a home, but were interrupted by Carl Jordan. TT 06/07/2004 at 51-55. Jordan described an exchange of gunfire and was chased by Basham and Petitioner for some distance. TT 06/07/2004 at 56-58.

Shortly after the encounter with Jordan, Basham and Petitioner abandoned their vehicle. After obtaining an older farm truck, they drove to Wal-Mart to find another car. Fulks, 454 F.3d at 416. Wal-Mart surveillance cameras showed a blue BMW driven by Alice Donovan entering the parking lot and the stolen farm truck trailing it. TT 06/07/2004 at 140. After the BMW parked, Basham emerged from the pick-up and approached the BMW. Id. Petitioner parked the pick-up truck in the next row while Basham entered Alice Donovan's vehicle. Id. Petitioner believed that Basham merely intended to steal the BMW, but Basham abducted Donovan as well. TT 06/14/2004 at 215.

Petitioner eventually took over driving Donovan's vehicle and made several attempts to obtain money using Donovan's ATM card. TT 06/14/2004 at 215 & 222-23. The vehicle traveled into North Carolina where Basham and Petitioner raped Alice Donovan in a cemetery. TT 06/14/2004 at 227. After reentering South Carolina, Basham ordered Petitioner to stop along a dirt road so that he could leave Donovan tied up to prevent her from contacting the authorities. Fulks, 454 F.3d at 416. Basham led Donovan into the woods and out of Petitioner's sight. He returned thirty minutes later and had with him Donovan's shoes and undergarments. He explained to Petitioner that he had taken these from her so once she freed herself, her progress would be slowed when she tried to contact authorities. Id. at 416-17.

Petitioner and Basham then returned to Myrtle Beach, where they informed Severance and Roddy that they had abandoned Severance's vehicle and needed to return to West Virginia alone. Id. at 417. On this return journey to West Virginia, Basham informed Petitioner that he had killed Burns and Donovan. TT 06/14/2004 at 241-42. On November 15, 2002, Petitioner and Basham arrived in Huntington, West Virginia, and spent the next two nights smoking crack cocaine at the residence of Beth McGuffin, a childhood friend of Petitioner. Fulks, 454 F.3d at 417.

On Sunday, November 17, 2002, Petitioner and Basham crossed the Ohio River from West Virginia and went to the Ashland Mall in Ashland, Kentucky. TT 06/14/2004 at 250. After Petitioner dropped Basham off and left the area in the BMW, Basham approached a mother and daughter and attempted to carjack them. Fulks, 454 F.3d at 417. Basham eventually exchanged shots with police officers, hid in the Ohio River, and was apprehended at 9:00 p.m. that evening. Id.

11

With Basham in custody, Petitioner spent one more night at McGuffin's home before driving to Goshen, Indiana. TT 06/14/2004 at 251. After escaping from police during a high-speed chase, Petitioner arrived at his brother Ronnie's house on November 19, 2002. TT 06/09/2004 at 224-32. The next morning, Ronnie and his girlfriend, Andrea Adams, followed Petitioner to Bristol, Indiana, where Petitioner hid the BMW in a barn, and then entered the vehicle with Ronnie and Adams. TT 06/09/2004 at 273-74. The trio was subsequently intercepted by police; Petitioner jumped from the car and fled on foot, but was soon captured without further incident. TT 06/09/2004 at 248-49; 275-76.

### B.    On Trial for His Life

Petitioner and Basham were indicted in the District of South Carolina on December 17, 2002. On April 23, 2003, a grand jury returned a superseding indictment charging them with eight separate offenses and requesting the death penalty on the first two counts: carjacking resulting in the death of Alice Donovan and kidnapping resulting in the death of Alice Donovan.

Three lawyers were appointed to represent Petitioner: John Blume, Sheri Johnson, and Bill Nettles. Had Petitioner needed a habeas team to represent him, he could not have asked for better counsel. But Petitioner, of course, did not need a habeas team. He needed experienced federal capital trial counsel to fully investigate his case and present it to a jury of his peers. Petitioner needed a team of lawyers thoroughly familiar with federal trial work. He needed this team to advise him on such issues as giving statements to the government, his right to a guilt and penalty trial, and the workings of the federal system.

Blume, a law professor from Cornell, served as lead counsel. Petitioner's trial was his first federal capital jury trial. Blume's only other jury experience in the federal system was one white-collar criminal case. Johnson, a Blume colleague from Cornell, likewise had never tried a federal capital case nor any other case in federal court. Nettles had federal experience, but had never been involved with any kind of capital proceeding in his career. This proceeding in the District of South Carolina was very much a novel endeavor for Fulks' appointed counsel.

### 1.     Pre-trial decisions and missteps

The inexperience of trial counsel evinced itself early. On April 28, 2003, on the advice of counsel, Petitioner gave a voluntary statement to the FBI regarding the events of November 2002. Counsel had not arranged for a proffer agreement which would have permitted Petitioner to give the government some information about the alleged crimes with assurances that Petitioner would be protected against the introduction of those statements at trial or that the death penalty would be off the table. Typically, in federal practice, these agreements prohibit the government from using actual proffer session statements against the individual in its case-in-chief and it is the norm to obtain such an agreement before permitting one's client to give a statement.

Trusting his counsel, Petitioner talked to the FBI. Because no proffer agreement was in place, the statement would later come back to haunt Petitioner at trial. TT 06/14/2004 at 214-53. The statement was key to the government's case. In front of the Grand Jury, the government admitted that it had "no evidence" that Alice Donovan was actually killed in North Carolina or South Carolina. PTT 04/22/2003 at 94. The government had no body, no clothing worn by the victim, no clothing worn by the alleged perpetrators – very little hard evidence. The statement that counsel instructed

Petitioner to give cured many of the government's problems and pushed Petitioner's trial counsel towards a plea. Id. at 221.

In addition to giving a statement on the advice of counsel, Petitioner also pled guilty based on counsel's advice. In so doing, Petitioner gave up his rights to put the government's guilt-phase evidence to the test and to proceed under the protection of the Federal Rules of Evidence. Instead of a guilt phase, Petitioner went straight to the penalty phase where the government was not bound by the Rules of Evidence and relished introducing a plethora of alleged prior bad acts irrelevant to the offenses charged. This strategy is widely rejected by experienced capital trial counsel as no "residual doubt" can be placed in the minds of the jurors.

Had Petitioner gone through the guilt phase and been subject to an adverse verdict, the trial team in the penalty phase could have appealed to the jurors' residual doubts, i.e. doubts that may have lingered in the minds of some jurors who were convinced of guilt, but not absolutely certain that Fulks was the "trigger-man." Moreover, jurors may have had doubt about who was the instigator and/or a minor participant in the crimes, or whether Fulks foresaw or had knowledge about what Basham planned to do with Donovan. By advising Petitioner to plead guilty, trial counsel was unable to appeal to residual doubt in the penalty phase.

The plea itself was an oddity. Petitioner has steadfastly asserted that he neither personally took part in the homicide of Donovan nor had any awareness of Basham's intent to commit the killing before it occurred. PTT 05/04/2004 at 67. Petitioner has passed two polygraph tests that confirm he did not personally take part in the killing of Burns or Donovan. See Polygraph Results, dated May 10, 2003 (contained in *PA,*

14

document #24); Polygraph Results, dated May 22, 2003 (contained in *PA,* document #25). Basham failed his polygraph tests.[1] Petitioner's trial counsel, however, devised a plea under <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946), whereby Fulks could stick to his position of denying involvement in the death, but plead guilty to all the requisite intent elements of the kidnapping and carjacking counts.

This plea was ineffectual. There was an insufficient factual basis for the plea under the <u>Pinkerton</u> doctrine; and the plea was not knowing and intelligent because the <u>Pinkerton</u> doctrine was explained incorrectly to Petitioner before his plea was accepted. Specifically, Petitioner did not admit to any facts that established that Donovan's death was "reasonably foreseeable" to him, which is an essential element of <u>Pinkerton</u> liability. Moreover, the nature of the charge to which he was pleading guilty was never adequately explained. Neither the Court nor counsel informed Petitioner that he had to have "reasonably foreseen" that Donovan was going to be killed as part of the carjacking conspiracy to be liable under the <u>Pinkerton</u> doctrine. Based on Petitioner's statement to the FBI, which formed the basis of the plea, he did not foresee that Donovan would be killed by Basham.

Trial counsel's inexperience was also evident during voir dire. The ultimate objective of voir dire is to discover prejudice and bias that exists in a juror's thinking. A seasoned trial lawyer understands that he must establish a dialog with the juror. Lawyers must use concise, open-ended questions and then patiently listen to the prospective juror's response. Speeches and lectures are not helpful and should be avoided. Petitioner's trial counsel failed at gathering useful information or establishing a rapport

---

[1] Basham Polygraph Results (Contained in PA, document #26).

with the jury. "Questions" rambled on for multiple pages in the transcript and often elicited only a "yes" or "no" answer from the prospective juror. The questioner seemed more comfortable in the mode of addressing a law school class than engaging in a dialog with ordinary South Carolinians.

Trial counsel also failed to carefully read and examine juror questionnaires. Sylvia Allison, who served on Petitioner's jury, left a question blank that sought information regarding victimization by crime. Petitioner's trial counsel never asked Allison why she left the question blank instead of checking yes or no. At the end of trial, counsel for Petitioner learned that Allison's husband had been a murder victim. Allison mentioned this murder when talking to reporters after the trial and explaining how she could sympathize with the Donovan family. Trial counsel's inattention to the blank on the questionnaire was inexcusable.

Counsel also evinced a perplexing use of preemptory challenges. Rather than request additional preemptory challenges, counsel intentionally let the Court seat jurors who counsel believed were automatic death jurors. Trial counsel believed that the only way to challenge these jurors on appeal was to permit them to serve on the jury. This was an incorrect understanding of the law. Counsel should have moved for additional challenges, and, if the motion was denied, appealed from this decision.

Fatal inexperience also showed in witness preparations. Reasonable and competent counsel has a duty to prepare his witnesses for direct and cross examination. Witnesses are often unfamiliar with legal proceedings and are nervous when testifying in court. Accordingly, counsel should, at a minimum, walk the witness through direct examination and give the witness some idea of what questions might be asked by the

prosecution on cross examination. According to the affidavits from Petitioner's brother, uncle, and school teacher, trial counsel failed to engage in any preparation. These witnesses formed the core of trial counsel's mitigation case, but were treated like minor witnesses in a wreck case.

### 2. Governmental misconduct

In addition to inexperienced trial counsel, Petitioner also faced an overly zealous prosecution team who told contradictory stories to the jury in garnering the death penalty for Petitioner and later Basham. For example, the prosecution in Petitioner's trial fought to keep out statements made by Basham wherein he admitted to a North Carolina Sheriff that Basham used a purse strap to strangle Alice Donovan. The prosecution argued that Basham's statements were meaningless or taken out of context by Petitioner's trial counsel. However, just three months later at the Basham trial, these same prosecutors introduced these "meaningless" statements and argued <u>successfully</u> that Basham should get the death penalty because he admitted to personally performing the act that took Donovan's life.

During Petitioner's trial, the prosecutors carefully painted Petitioner as the mastermind of the events of November 2002, characterized Basham as a mere puppet, and described Petitioner as having the final say in all life and death decisions. At Basham's trial, the government argued the contrary. The government painted Basham as an inmate who took commands from no one, was a leader, and was a methodical plotter of criminal activity. Petitioner, on the other hand, was described as someone so dumb that he had to take instructions from Basham.

Prosecutors were also unafraid to use religious values for temporal adversarial gain in Petitioner's trial. The government inflamed the passions of the jury by describing

17

Petitioner as one who would dupe born-again Christians because of his total disregard for the Deity. Petitioner's fastidious hygiene habits were ridiculed as efforts of a Godless killer to wash away sins. The government peppered Petitioner's trial with Bible verses and generally injected religion into the legal proceedings.

Prosecutors argued that Petitioner, throughout the November travels, was armed with a weapon stolen from Robert Talsma but never recovered. Prosecutors knew this was not true. Petitioner's counsel filed a Motion to Compel Immunity for Ronnie Fulks wherein counsel disclosed that Petitioner had given the unaccounted for weapon to Ronnie on November 8 or 9, 2002—long before the Burns and Donovan homicides. Ronnie needed immunity because he is a felon and would be subject to prosecution for possessing a weapon. Although the Court denied the motion, this did not give the prosecution license to mislead the jury. Knowing that Ronnie risked felon in possession charges if he testified about the weapon, prosecutors implied that this weapon could have been used to kill Burns or Donovan. This was improper.

Government misconduct with key witnesses was beyond the pale. Andrea Roddy, who traveled with Petitioner and Basham in November 2002, has now stated under oath that FBI agents pressured her to testify that Petitioner threatened her life and the life of Tina Severance. Roddy repeatedly told the agents that this was not true. She refused to lie or exaggerate the conduct of Petitioner. Despite her protestations, the government agents continued to pressure her on these issues. Such police-state tactics are detestable, deserve the most powerful condemnation, and call into question the government's handling of witnesses.

### 3.     Incomplete mitigation investigation

Having been advised by his lawyers to give a statement and plead guilty, Petitioner depended on a strong mitigation case during the penalty phase. For Petitioner to have a chance, a thorough, empathetic account of Petitioner's life and mental illness needed to be presented to the jury. This was not done. Petitioner's mitigation team, many of whom were untrained and unsupervised law students, failed to find key witnesses who could have chronicled appalling conditions of Petitioner's upbringing and sexual abuse that shaped Petitioner's mind and attitudes.

Law students were given crucial tasks beyond their law school training and experience. The students delegated these tasks have acknowledged that "law student training was the exception and not the rule." Without appropriate training and thrust into an unfamiliar environment, the students reported that they were "apprehensive about knocking on doors and conducting witness interviews."

The primary mitigation witnesses called at trial did not convey the true depth of the despair of Petitioner's life. The jury learned that Petitioner's parents "drank a lot," TT 06/22/2004 at 129, and that the parents often fought, id. at 132. In discussing discipline, the mitigation witnesses observed that Petitioner's father would often use "his hands or fists" to hit the children. Id. at 135. Most witness agreed that the Fulks children roamed the streets unsupervised, id. at 136, and that the home on Leeward was "pretty nasty and dirty," id. at 137. The jury heard multiple stories about drunken poolroom parties in the Fulks home and how the police had to break up fights. They also heard stories about pornography in the home. TT06/04/2004 at 135.

In addition to these witnesses with personal knowledge, the trial team also called Arlene Andrews, a social worker, to give a family history assessment based on her

interviews with witnesses and document review.  She testified that the parents had very little memory of Petitioner's childhood and did not even remember suicide attempts. TT06/24/2004 at 151-52.  Andrews discovered that Petitioner's mother "drank through her pregnancies with all of the sons."  Id. at 154.  Andrews explained that after Petitioner acted out by pulling a little girl's pants down, he was referred to a mental health center for treatment.  His mother took him to the center once or twice, but made no further appointments.  Id. at 159-60.

Andrews further told the jury that Petitioner was diagnosed with major depression and his father was warned about the possibility of Petitioner developing an addictive disorder.  Id. at 169.  Petitioner's father however did not arrange for any follow-up treatment.  Id. at 170.  Because she lacked qualifications, Andrews did not explain to the jury what this diagnosis meant, or its potential long-term effects, or whether Petitioner still suffered from mental or psychological problems.  For all the jury knew, Petitioner had overcome these childhood issues and was now doing fine.

While the evidence presented through witnesses with personal knowledge and then Andrews showed a rough existence, it did not come close to capturing the essence of Petitioner's childhood. Had a proper mitigation investigation been conducted, witnesses would have been discovered who could have painted a compelling picture for the jury—a picture that would have accurately depicted Chad Fulks' life, especially the horrendous cycle of sexual abuse.

For example, the trial counsel never located or interviewed Monica Wolowinski, the mother of Petitioner's best friend.  Wolowinski witnessed beatings for which she had to give Petitioner first aid afterwards.  Monica could have described placing balm on

20

Petitioner's welts, alcohol on his bruises, and her cleaning lacerations on his face. Wolowinski was so concerned about Petitioner's home environment that she offered to raise Petitioner herself. Petitioner's mother refused the offer because she wanted to continue to receive a public assistance check, which was based on Petitioner living with her. Most importantly, Wolowinski could also have testified about childhood sexual abuse where Petitioner's drunken father molested him.[2] Declaration of Monica Wolowinski (contained in *PA, document* #13, ¶ 8). Wolowinski's declaration reveals that Petitioner was forced to sit on his father's lap while his thigh and groin were massaged. Id. Wolowinski also reported how Petitioner could be heard frantically begging his father to stop and crying out, but no one came to his rescue. Id.

Wolowinski's testimony could have been corroborated by Nathan Fulks, Petitioner's second cousin. Unfortunately, like Wolowinski, he was never located nor interviewed by the trial team. Nathan Fulks would have testified that Petitioner's father was a "sexual deviant" who liked to run sex trains[3] and that the Fulks' home was a crucible of improper sexual conduct, violence, substance abuse, and neglect of the children. Nathan witnessed Petitioner's parents beat and throw their children against walls. He observed cuts and bruises on Petitioner's face and body from these vicious beatings. One time Petitioner's back was so badly scourged that dried blood caused his shirt to stick to his skin. Nathan also had knowledge of a sexual assault against Petitioner that occurred in 1989 or 1990 when a much older man lured Petitioner behind a building and tried to force himself on a young Chad Fulks.

---

[2]  For an account of this incident, see Declaration of Monica Wolowinski contained in the Appendix.

[3] A sex train is an encounter where multiple men take turns having sexual relations with one woman.

Tracy Graybeal attended Enslow Middle School with Petitioner. She also dated Petitioner when he was a young teen. She could have testified about Petitioner's use of alcohol and how he used this to cope with the childhood abuse he suffered at the hands of his parents—the two people a child should trust most. Petitioner and Graybeal remained friends even after they broke up and later Petitioner disclosed to Graybeal a dark family secret: Petitioner's older sister had molested him when he was a small boy.

As a young boy and teen, Petitioner was often surrounded with those who took indecent liberties with children. After Petitioner's father left his mother in approximately 1989, Petitioner's mother began dating and later married Leslie Dean Thompson. While Petitioner's penalty phase trial was underway, Thompson sexually abused his granddaughter on June 7, 2004. Thompson was convicted of gross sexual imposition, a third degree felony, and the court found that he had "not shown genuine remorse for his actions." Leslie Dean Thompson Judgment (contained in *PA, document #*33 at 2); see also Leslie Dean Thompson Indictment (contained in *PA, document #*34). Petitioner, as a young teen, lived with his mother and Thompson for several years.

Evidence of sexual abuse would have been powerful in mitigation. Had a proper mitigation investigation been conducted, this abuse could have been uncovered and witnesses presented to the jury. Because Petitioner admitted, on advice of counsel, to raping Alice Donovan, evidence of Petitioner's own sexual abuse would have been key evidence for a jury to consider when weighing the fate of a young man found guilty of rape. Sexual abuse could have been discovered had proper resources been devoted to this aspect of the investigation. Resources, however, were allocated elsewhere. Andrews'

mention of one vague report of sexual abuse in passing did not give the jury any glimpse into the horrors and shame Petitioner experienced.

Elvin Taylor was another crucial mitigation witness the trial team missed. Taylor served as a counselor at the Westville Correctional Facility when Petitioner was an inmate. Taylor was involved in a long-term substance abuse program in which Petitioner successfully participated. Taylor could have testified that one of Petitioner's chief complaints upon entering the program was his susceptibility to being influenced by others using drugs. In an assessment of weaknesses, it was revealed that Petitioner was a follower and went along with others even when he knew their actions were wrong. What powerful testimony this would have been on the leader/follower distinction that was so crucial in Petitioner's trial: a year before he ever met Basham, it was recognized that he was easily manipulated and was influenced by others engaging in criminal activity.

Taylor could also have testified that Petitioner adapted well to a structured prison environment and was a model inmate. Petitioner had a positive attitude in the classroom and in the dorm, completed his homework assignments, demonstrated knowledge of the material, took responsibility for his behavior, displayed improvement with the control of impulsive behavior, and completed his seminar presentations. Petitioner eventually was put in charge of the dorm maintenance department and was actively involved in resolving disputes between inmates through conflict resolution training. Petitioner responded well to authority figures in this structured environment. This testimony would have

counteracted much of the prosecution's future dangerousness argument and shown that Petitioner could—and did—adapt well to a prison environment.[4]

### 4. The jury never learned about Petitioner's mental illness

Trial counsel were aware of Petitioner's various mental illnesses and psychological deficiencies but did nothing to educate the jury because of an alleged "three-day rule" violation. The trial court permitted the government to present the testimony of Donna Ward and Agent Jeff Bruning despite the government's failure to include them on the pretrial witness list. See 18 U.S.C.A. § 3432 (requiring the government to provide a capital defendant with a list of witnesses "three entire days before the commencement of trial"). During her testimony, Donna Ward described a November 17, 2004 phone call allegedly made by Petitioner while Branden Basham was hiding from the police in the Ohio River. TT 06/18/2004 at 268-69. The caller asked for Ward's daughter and claimed that the daughter had a job interview at 10:30 p.m. that evening. Agent Bruning provided testimony that the call was placed via a calling card in Petitioner's possession. TT 06/21/2004 at 22. The prosecution used this call to argue that Petitioner, without the aid of Basham, attempted to lure Ms. Ward's daughter out in order to harm her.

This revelation sent the inexperienced trial team into a panic—even though the trial team's investigator had disclosed the Ward testimony to the team weeks before trial began. This apoplexy caused by the Ward testimony, which should have been a nonevent, led trial counsel to abandon the lion's share of its mental health case. The retained forensic psychiatrists, psychologist, and pharmacologist were left sitting on the

---

[4] The witnesses discussed in this background section are but a few of the witnesses missed by the trial team. For a full discussion of the witnesses missed and the compelling testimony they would have provided, please see Claim III and the witness affidavits contained in Petitioner's Appendix.

sidelines. Had trial counsel calmly evaluated the situation and consulted with these experts, counsel would have learned that the Ward testimony would not have hampered the expert testimony, but rather would have buttressed the experts' opinions. There was no reason to hit the panic button. The Court offered the trial team a three day recess to remedy the "three day rule" but this offer was declined by the trial team.

Instead of educating the jury about Petitioner's severe mental illness and psychological impairments, trial counsel focused on fetal alcohol spectrum disorder ("FASD"), which is not a diagnosis but rather a term describing the effects of prenatal alcohol exposure. The jurors were presented with hours of academic testimony regarding the impact of alcohol on the corpus callosum (a connective pathway in the human brain) and viewed MRIs of Petitioner's brain. No juror found that FASD impaired Petitioner's ability to make decisions. FASD was but a small portion of Petitioner's story, yet it became the focal point of his trial counsel.

The retained mental health experts could have personalized Petitioner as well as presented and explained his mental illness in such a way that no brain scan could. These experts could have explained the significance of the evidence presented regarding the mistreatment suffered by Petitioner, the chaotic family environment, drug and alcohol abuse, sexual abuse, and deprivations. Had the retained experts been called, the jury would have gained insight into psychological impairments and mental illness that elucidate Petitioner's behaviors. The jury could have learned about the depression that Petitioner suffered from since childhood, the substance abuse dependence, the impaired ability to process and store information, the limited reasoning and problem solving skills, anxiety, dependent personality, fragile self-image, and misperception of events. Instead,

the jury only heard that Petitioner suffered from FASD—a hard sell because Petitioner showed no signs of the facial features or growth deficits that often characterize FASD kids.

The jury did hear that Petitioner began using drugs and alcohol at an early age, but no one explained that drug and alcohol abuse beginning in childhood is often evidence of self-medication, a desperate effort to "treat" one's own mental illness. Neither did the jury learn that heavy methamphetamine use, such as the kind Petitioner participated in after escaping from Hopkins County, can lead to confusion, paranoia, hallucinations, and homicidal thoughts. The jury was not given the opportunity to understand Petitioner's possible state of mind when he and Basham encountered Alice Donovan.

Petitioner's history of abusive conduct towards women also needed to be explained in the context of his psychological impairments. A child's early brain development and caregiver-child relationships interact to create a foundation for future growing and learning. In our culture, the mother typically performs this caregiver role and should be perceived by the child as a safe harbor from the vicissitudes of the world. Rather than performing a nurturing role, Petitioner's mother often hid food from her children, focused on keeping up the stock of beer in the refrigerator, and beat the children when they got in her way. The violence in the home, sexual abuse, and lack of nurturing shaped Petitioner's attitudes toward women.

Dr. Seymour Halleck, a highly regarded expert that has testified many times for the Government as well as for defendants, could have put Petitioner's mental illness in perspective for the jury: "Mr. Fulks at the time of the crime had a serious mental illness

based on his serious depression, anxiety, substance abuse, and the many cognitive difficulties he experienced prenatally and in early childhood." Declaration of Seymour Halleck (contained in *PA, document #*2, ¶ 28). "Cognitive impairment and drug use made it difficult for him to undertake a benefit-risk analysis in the situations where he was at risk of engaging in criminal acts. He also likely lacked understanding how some of these situations were influencing him. The many insults to his brain caused impairment to his executive functions." Id.

### 5. Future dangerousness

Capital jurors are concerned that a capital defendant sentenced to life in prison will pose a danger to guards and other inmates. The jury's familiarity with the heinousness of the capital offense and knowledge of other aggravating factors or acts are likely, in many instances, to result in a perception of high future violence risk in prison that is not justified by the research. To avoid the fundamental errors in violence risk assessment, trial counsel should have presented to the jury scientifically sound methodology and empirical data. Petitioner's trial team had retained Dr. Mark Cunningham and Mr. James Aiken to testify at trial. However, neither witness was called. Instead, Petitioner's trial team presented only a former prison warden who provided basic information that federal prisons are secure institutions and that inmates are unlikely to escape.

The jury never learned that prison violence does not predictably follow from pre-confinement violence of the capital offense of conviction. Prison is a very different world, and an offender's acts of violence in the community have little worth in evaluating prison behavior. A review of Petitioner's prior incarceration records would have shown

that he had no serious violence in his past prison confinement and that he has exhibited an adaptability to a structured environment.

Dr. Cunningham and Mr. Aiken could have further educated the jury that a risk of violence was not <u>from</u> Petitioner but <u>to</u> Petitioner. Had he been called at trial, Mr. Aiken would have testified that "[i]n fact, the major concern I have of Mr. Fulks is the need to protect him from the predator, more dangerous, violent and disruptive prison population, especially as he grows older." The jury heard none of this testimony and instead was convinced by the prosecution's virtually unrebutted assertions that Petitioner would pose a threat to others.

### 6. The unconstitutional two-step process

Because of the mishandling of his case by trial counsel and the government's improper tactics, Petitioner's case went to a jury that never heard the real story of his life and key mitigation evidence. On top of this, the Court incorrectly instructed the jury on the fact-finding process with respect to mitigating factors. Rather than advising the jury that it may give whatever weight it deems appropriate to a particular mitigating factor, the Court's charge required the jury, once it had already found that a particular fact exists, to further screen that fact to determine whether it is, indeed, mitigating. A mitigating fact either exists or it does not.

This instruction violated the Eighth Amendment because it created a substantial risk that the jury would screen out, and therefore fail to consider and give effect to, facts that were unquestionably mitigating. Because 18 U.S.C.A. § 3592(a) recognizes many of the factors submitted to the jury are mitigating as a matter of law, the statute obviates the need for the jury to engage in further screening. A juror who finds the existence of a mitigating factor is constitutionally obligated to consider and give effect to that

mitigating factor. The jury has a right to weigh mitigating evidence as it sees fit, but it may not discount proven facts as not mitigating at all. Based on this constitutionally erroneous instruction, the jury could have ignored the mitigation that it did have before it.

To compound the damage caused by the instruction, trial counsel did not object when the prosecutor encouraged the jury to evaluate mitigation in terms of a causal nexus that was rejected by the United States Supreme Court. The prosecutor argued that the proffered mitigation evidence needed to have either a close temporal relationship to the offense to be truly mitigating, or it had to explain the specific motivations behind Petitioner's actions. The Supreme Court of the United States has repeatedly emphasized that any evidence that might tend to show the capital defendant should not be put to death is admissible, and the High Court has explicitly rejected any requirement that mitigating evidence bear a nexus to the crime before it can be considered by the jury.

Because of the failings of trial counsel, prosecutorial overreaching, and the instructional error, neither the jury nor the Court was presented with a complete story of Petitioner's life nor the mental illness and psychological impairments that shaped his conduct. These circumstances, as described and documented in this Amended Petition and Memorandum, require that the writ issue in this case.

## LEGAL ARGUMENT

### CLAIM I: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT A MEANINGFUL MENTAL HEALTH CASE IN MITIGATION INASMUCH AS THEY DID NOT CALL CRITICAL EXPERT WITNESSES WHO WERE PREPARED TO EDUCATE THE JURY ON PETITIONER'S MULTIPLE IMPAIRMENTS.

Capital defense lawyers have a constitutional obligation to investigate and where appropriate present and explain their clients' disabilities and impairments to their clients' capital sentencers. The United States Supreme Court has described mental health

testimony as "literally a life or death matter." <u>Estelle v. Smith</u>, 451 U.S. 454, 473 (1981) (internal quotation marks omitted); <u>see also</u> Commentary to ABA Guideline 4.1, 31 Hofstra L. Rev. at 956-57 ("In particular, mental health experts are essential to defending capital cases."). Jurors must be made to understand empathetically the disabilities, brain damage, and tormented psyches that mitigate a sentence of death. Mental conditions which inspire compassion, without justifying or excusing the capital crime, can be powerful in mitigation.

Recognizing the importance of mitigation evidence, the ABA Guidelines provide that mitigation investigations "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." <u>ABA Guidelines </u>11.4.1(C); <u>see also</u> <u>Wiggins v. Smith</u>, 539 U.S. 510, 524 (2003) (the ABA Guidelines are guides to what is reasonable). The <u>Wiggins</u> Court referred to the Guidelines as "well-defined norms" a year before the Fulks trial began. The United States Supreme Court has also observed that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." <u>Penry v. Lynaugh</u>, 492 U.S. 302, 319 (1989) (internal quotation marks omitted). This is an ancient principle of the law, existing long before the establishment of the United States. <u>See</u> 4 William Blackstone, <u>Commentaries</u> *24(noting that criminal defendants suffering from mental illness or other such infirmities are not as culpable as a defendant who has no such excuse).

Academic literature supports case law on the importance of mental health evidence. Researchers have concluded that "psychological and psychosocial mitigating evidence can have significant effects on sentencing outcomes in death penalty litigation." Michelle E. Barnett, et al., When Mitigation Evidence Makes a Difference: Effects of Psychological Mitigating Evidence on Sentencing Decisions in Capital Trials, 22 Behav. Sci. Law 751, 766 (2004). "[A] little more than half of the jurors reported that they would be at least slightly less likely to vote for death if the killing was committed under the influence of extreme mental or emotional disturbance, and almost a quarter of them reported that this fact would make them much less likely to vote for death." Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What Do Jurors Think?, 98 Colum. L. Rev. 1538, 1564 (1998). Unquestionably, mental health evidence can be very potent if used by trial counsel.

An instructive case from this circuit on the importance of mental health evidence is Gray v. Branker, 529 F.3d 220 (4th Cir. 2008), which was a capital case reviewed by the Fourth Circuit under 28 U.S.C.A. § 2254. Id. at 223. Gray was convicted and sentenced to death in North Carolina state court for the murder of his wife during contentious divorce proceedings. In sentencing Gray to death, the jury "rejected two mitigating factors relating to mental health: that the offense was committed while Gray was under the influence of mental or emotional disturbance and that Gray's capacity to conform his conduct to the requirements of law was impaired." Id. at 227. Gray was denied relief on direct appeal and in a state habeas proceeding. He then sought relief under 28 U.S.C.A. § 2254 and was denied relief at the district court level. Gray appealed the district court's order to the Fourth Circuit.

In examining Gray's ineffective assistance of counsel claims, the Court observed that the ABA Guidelines are relevant in determining what constitutes reasonable performance of trial counsel and that the ABA Guidelines stress the importance of exploring and presenting to the jury "the condition of the defendant's mental health." Id. at 229. Gray's trial counsel, however, did not adequately explore his mental health nor introduce to the jury readily available mental health testimony.

For example, Gray's trial counsel were in possession of "Dr. Lara's report diagnosing Gray with a mental disorder, specifically, 'adjustment disorder with mixed disturbance of emotions and conduct' together with 'reductions in impulse control.'" Id. at 236. Another physician, Dr. Bellard, "diagnosed Gray as having 'paranoid personality disorder' and "adjustment disorder.'" Id. Despite having this information in their files, trial counsel did not present Dr. Lara nor Dr. Bellard to the jury. The Fourth Circuit found that trial counsel were ineffective for failing to introduce this evidence at sentencing:

> The two mental health mitigating factors—largely ignored by defense counsel—were Gray's best hope of convincing the jury that he did not deserve the death penalty. The missing expert evidence on Gray's impaired mental condition would have provided essential support for these factors.
> . . . .
> This expert evidence, which was missing entirely, would have provided the jury with a medical explanation for Gray's compulsive behavior and his inability to control his reactions. The jury would have known that he suffered from a severe mental illness. In short, this evidence would have provided direct support for the two mental health mitigating factors. Given the significance of the mental health evidence, there is a reasonable probability that a competent lawyer would have introduced it at sentencing.

Id. at 236.

After determining that counsel's failure to introduce the mental health evidence was deficient, the Court moved on to consider "whether there is a reasonable probability

that it would have outweighed the state's evidence in support of the death penalty." <u>Id.</u> at 237. In examining the aggravating evidence, the Court noted that the murder was committed to disrupt the legal process of the divorce case, the murder interfered with Mrs. Gray's duty as a witness in the divorce case, and that the murder was especially heinous. <u>Id.</u> at 237-38.

The Court then moved on to weigh the mitigating evidence. The Court described the mental health evidence as "powerful" testimony that "would have given the jury the full picture of Gray and his crime, including the fact that he was acting under a severe mental or emotional disturbance and with impaired capacity when he killed his wife." <u>Id.</u> at 238. Based on this balancing, the Court concluded that "there is a reasonable probability that at least one juror would have struck a different balance." <u>Id.</u> at 238 (internal quotation marks omitted).

Another recent case highlighting the importance of mental health evidence is <u>Belmontes v. Ayers</u>, 529 F.3d 834 (9th Cir. 2008), in which the Ninth Circuit granted relief under 28 U.S.C.A. § 2254. Belmontes was convicted and sentenced to death for the murder of a victim during a robbery. <u>Id.</u> at 839-40. After an unsuccessful direct appeal and state habeas proceedings, he filed a 2254 motion alleging, <u>inter alia</u>, ineffective assistance of counsel in investigating and presenting mental health testimony. The district court denied relief, but the court of appeals reversed.

The Ninth Circuit observed that had trial counsel undertaken an adequate investigation, counsel would have learned that Belmontes suffered from depression, self-medicated with illegal drugs, was using illegal drugs at the time of the crime, experienced poor impulse control, was easily influenced by others, and should have been diagnosed

with a host of other psychological problems. The court noted that lay witnesses did testify that Belmontes faced a difficult situation growing up, but trial counsel "should have offered the testimony of a psychologist or psychiatrist in order effectively to explain to the jury in day-to-day terms the practical impact on an individual of the kind of traumas Belmontes experienced as a child and adolescent." Id. at 868. The panel went on elaborate:

> Such an expert could have explained to the jury the psychological impact on a child of his father's serious alcoholism, of witnessing severe domestic violence between his parents, of his family's poverty, of his mother's humiliating sexual performances, of being severely ill during a critical stage in his social development, of his depressive reactions to being told he would not live past 21, and of his history of substance abuse. Such an expert could also have explained the extent to which these problems can cause or contribute to a change in individuals that can lead to subsequent criminal conduct.

Id.

This expert testimony, according to the panel, "would have humanized [Belmontes] in the eyes of the jurors and allowed them to view him as an individual deserving of sympathy and mercy." Id. at 869. Because there existed compelling mental health evidence and trial counsel did not call any mental health experts, the panel had no trouble concluding that counsel's performance was deficient.

Turning to prejudice, the panel recognized that there were lay witnesses who presented mitigating evidence about Belmonte's upbringing and challenges faced in life. Id. at 866. However, "the fact that a capital jury was presented with a cursory or incomplete presentation of mitigating circumstances that should have been more thorough and fully presented does not obviate a finding of prejudice." Id. In comparing the evidence that was actually presented to the evidence that could have been presented, the court found that the absence of mental health experts established a reasonable

probability that at least one juror would have struck a different balance between life and death. Id. at 871-72.

Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004), presents a scenario of ineffectiveness and prejudice very similar to what Mr. Fulks experienced. Smith was convicted and sentenced to death for the murders of his wife and children. The crucial issue in Smith was whether trial counsel was ineffective in the penalty phase for failing to introduce evidence of Smith's mental illness, organic brain impairment, brain damage, and cognitive problems. Recognizing "the overwhelming importance of the role mitigation evidence plays in the just imposition of the death penalty," id. at 939 (internal quotation marks omitted), the Tenth Circuit held that it "was patently unreasonable for [trial counsel] to omit this evidence from his case for mitigation," id. at 942. Counsel's heavy caseload and lack of funding was no excuse for failing to present this powerful mental health evidence. Id. at 939-40.

In focusing on prejudice, the court noted that the jury did have evidence of Smith's "impulsiveness and lack of emotional control." Id. at 943. What the jury did not have was "an explanation of how Mr. Smith's organic brain damage caused these outbursts of violence and caused this 'kind hearted' person to commit such a shocking crime." Id. The mental health experts could have provided this explanation and humanized Smith. Even though the Tenth Circuit found that the government's case for the death penalty "was strong," it held that the lack of a mental health case created a reasonable probability that at least one juror would have struck a different balance. Id. at 944.

Finally, this Court should also take note of <u>Saranchak v. Beard</u>, 538 F.Supp.2d 847 (M.D. Pa. 2008), in which the district court granted relief under 28 U.S.C.A. § 2254. Saranchak was sentenced to death for the murders of his grandmother and uncle. He was unsuccessful on direct appeal and in the state habeas system. In his federal habeas petition, Saranchak raised issues of ineffective assistance of counsel. Specifically, Saranchak contended that his trial counsel was ineffective for failing to investigate, develop, and present mental health evidence in support of a diminished capacity defense to the charges of first degree murder. <u>Id.</u> at 864.

Trial counsel could have called experts at trial who would have testified that Saranchak "is a chronically emotionally disturbed individual whose judgment was even more impaired resultant to his extensive use of alcohol (and drugs) on the day and night of the offense." <u>Id.</u> at 869 (internal quotation marks omitted). Experts would have also testified that Saranchak "suffers from chronic psychiatric/psychological disturbance with diagnoses of adult attention deficit disorder—Not Otherwise Specified ("NOS"), with paranoid and anti-social features (PCRA NT 14), and depressive disorder—NOS." <u>Id.</u> (internal quotation marks omitted). Rather than calling these experts, trial counsel used only lay witnesses to show diminished capacity. <u>Id.</u> at 871. Because signs of mental illness were abundant and "[l]ay testimony alone is inadequate when presenting a diminished capacity defense," the district court found that the first prong of <u>Strickland</u> was satisfied. <u>Id.</u> at 875.

The quality of the expert testimony led the court to also find in favor of Saranchak on the second prong. "The court is persuaded that if the trial court had heard testimony from Dr. Kruszewski on his evaluation of Saranchak's mental capacity following his

extensive review of Saranchak's medical and social history, there is a reasonable probability that the trial court, following the law, would have found Saranchak guilty of third degree murder, not first degree murder." Id. at 877.

**A. Petitioner's trial counsel were ineffective because they presented no evidence that Fulks suffered from mental illness and psychological impairments**

In the present case, the government made the most of trial counsels' failure to call Petitioner's retained mental health experts—experts who could have educated the jury about Mr. Fulks' lifelong mental illness and long-standing drug addiction. According to the prosecutor: "There is absolutely no evidence, none, that he suffers from a diagnosed mental illness. But it is another buzzword to touch on your emotions. Ladies and Gentlemen, there is no evidence of that. None." TT 06/29/2004 at 229-30.

The prosecutor was correct. Petitioner's jury was not presented with evidence of Petitioner's mental illness and the resulting diminished capacity to conform his conduct to the requirements of the law--but that is plainly not because such evidence did not exist. Also, the jury was not educated on this compelling case for mercy when evaluating moral culpability. According to the verdict form, no juror found the existence of either of the following mitigating factors:

> 38. Chadrick Evan Fulks' capacity to conform his conduct to requirements of law was impaired.

> 39. Chadrick Evan Fulks took part in the offenses under mental and/or emotional disturbance.

Verdict Form (contained in *PA, document* #27 at 8); see also Gray, 529 F.3d at 236 ("The two mental health mitigating factors—largely ignored by defense counsel—were Gray's best hope of convincing the jury that he did not deserve the death penalty. The missing

expert evidence on Gray's impaired condition would have provided essential support for these factors.").

Instead of educating the jury about Petitioner's severe mental illness and psychological impairments, trial counsel focused exclusively on fetal alcohol spectrum disorder ("FASD"), which is not a diagnosis but rather a term describing the effects of prenatal alcohol exposure, and failed to discover ample readily available evidence of the true extent of Fulks' deprived, abused background. The jurors were presented with hours of academic testimony regarding the impact of alcohol on the corpus callosum (a connective pathway in the human brain) and viewed MRIs of Petitioner's brain. The defense experts presented to the jury opined that cognitive abnormalities often exist in FASD kids. These abnormalities include learning disabilities, impulse control problems, short attention spans, poor memory, and bad judgment. While Petitioner's mother's consumption of alcohol was part of the story, and one that the jury needed to hear, it was the only explanation offered by counsel for Petitioner's antisocial acts. See generally, Belmontes, 529 F.3d at 866 (noting that "the fact that a capital jury was presented with a cursory or incomplete presentation of mitigating circumstances that should have been more thorough and fully presented does not obviate a finding of prejudice"). Ultimately, no juror found that FASD impaired Petitioner's ability to make decisions.

### B. The FASD experts were the <u>only</u> experts presented to the jury.

In support of the FASD defense, trial counsel called Dr. Ruben Gur, an expert in cognitive neuroscience (the branch of neuroscience that studies the biological foundations of mental phenomena). TT 06/16/2008 at 39. Dr. Gur examined existing scans of Petitioner's brain, ordered additional PET scans, compared the scans with normal,

healthy people, and opined that Fulks "has a highly abnormal brain." Id. at 40 & 88. This abnormality, according to Dr, Gur, was consistent with fetal exposure to alcohol. Id. at 134.

Dr. James Evans was qualified as an expert in neuropsychology. TT 06/23/2004 at 8. Neuropsychology is a branch of psychology that aims to understand how the structure and function of the brain relates to specific psychological processes. The bulk of Dr. Evans' testimony centered on results of a Quantitative EEG and other neuropsychological tests. A Quantitative EEG attempts to measure brain function based on brain electrical activity mapping. In this form of functional brain imaging, the brain's electrical activity, as measured in 19 or 25 sites on the head, is analyzed using complex mathematical and statistical tools in comparison to norms or averages. Id. at 18-19. Based on his testing and comparisons with healthy brains, Dr. Evans testified that Petitioner had moderate brain impairment. Id. at 13.

Dr. Howard Becker was qualified as an expert in FASD. TT 06/23/2004 at 114. As stated earlier, FASD describes a continuum of defects caused by maternal consumption of alcohol during pregnancy. Id. at 117. He testified that a mother's consumption of alcohol during pregnancy produces serious neurobehaviorial effects in a fetus. Id. at 128. Dr. Becker also observed that the corpus callosum, the largest connective pathway in a human brain, is especially sensitive to alcohol induced damage. Id. at 134. Most children with FASD have lower IQ scores than the general population and often exhibit behavioral problems. Id. at 137.

Dr. David Bachman was qualified as an expert in behavioral neurology. TT 06/24/2004 at 8. A behavioral neurologist studies the neurological basis of behavior,

memory, and cognition, and the impact of neurological damage and disease upon these functions. Dr. Bachman conducted a mental status examination on Petitioner and determined that Petitioner had a brain impairment. Id. at 18. Dr. Bachman also ordered several brain scans that revealed Petitioner had brain abnormality. Id. at 23. After consulting with another physician, Dr. Bachman determined that there was a high correlation on Petitioner's brain scans and scans from other individuals with FASD. Id. at 25.

Dr. Fred Bookstein was qualified as an expert in biostatistics and morphometrics, fields concerned with studying variation and change in the form of organisms. TT 06/24/2008 at 91. Dr. Bookstein reviewed MRI scans of Petitioner's brain and measured the corpus callosum. He testified that the corpus callosum is sensitive to fetal alcohol damage and easy to measure. Id. at 96. Comparing Petitioner's scan with those of others suffering from fetal alcohol exposure, Dr. Bookstein opined that the odds were better than 600 to 1 that Petitioner has FASD. Id. at 111-12.

Rather than just FASD, the jury should have been informed, for example, that one of the foremost psychiatrists in America had examined Petitioner and that "Mr. Fulks at the time of the crime had a serious mental illness based on his serious depression, anxiety, substance abuse, and the many cognitive difficulties he experienced prenatally and in early childhood." Declaration of Seymour Halleck (contained in *PA, document #2*, ¶ 28). The retained experts could have explained that "[c]ognitive impairment and drug use made it difficult for him to undertake a benefit-risk analysis in the situations where he was at risk of engaging in criminal acts. He also likely lacked understanding of how

40

some of these situations were influencing him. The many insults to his brain caused impairment to his executive functions." Id.

Counsel's failure to present a meaningful mental health case was a result of their failure to investigate, prepare, coordinate, and present readily available testimony through numerous witnesses, both lay and expert, about Petitioner's life and the development and course of his mental illness. Counsel never explained Petitioner's mental illness and behavior in the context of his entire life. All the jury heard was the government's parade of ex-wives, girlfriends, and acquaintances who testified about Petitioner's allegedly abusive and violent history. This barrage of aggravation went on for hundreds of pages in the transcript. The government presented Petitioner as an unrepentant, evil man. Other than highly technical FASD testimony, trial counsel offered no mental health evidence to contextualize these damaging allegations.

The available, retained, and uncalled mental health experts could have personalized Petitioner in such a way that no brain scan could. See Summerlin v. Schriro, 427 F.3d 623, 634 (9th Cir. 2005) ("A capital defense attorney not only has the duty to investigate potential mitigation defenses, but to present them."). These experts could have explained the significance of the evidence presented regarding the beatings received by Petitioner, the chaotic family environment, drug and alcohol abuse, sexual abuse, deprivations, etcetera. Had the trial team's professionals been called, the jury would have gained insight into psychological impairments and mental illness that elucidate Petitioner's behaviors. The jury could have learned about the depression that Petitioner suffered from since childhood, the substance abuse dependence, the cognitive

41

disorder, anxiety, and a host of other psychological issues.  Instead, the jury only heard that Petitioner suffered from FASD.

Because of trial counsel's failure, the jury was left with the impression that Petitioner was a hedonistic druggie merrily going about life.  They never heard testimony that drug and alcohol abuse beginning in childhood is often evidence of self-medication, as it was here.  Nor did they hear that genetic predispositions, vulnerabilities, or a corrupting home environment are proven to be major contributors to early drug use.

Both of Petitioner's parents knew that psychiatric treatment for Petitioner was recommended; however, neither parent followed up and thus left Petitioner to continue to treat his mental illness with whatever street drugs he could procure.  Just as Petitioner had to fend for himself to eat and clothe himself, he also had to fend for himself to "treat" his mental illness.  Things got so desperate for Petitioner that he twice attempted to take his own life.

Similarly, the jury never learned the true effects of powerful stimulants such as methamphetamine.  Fortunately, most lay people are unfamiliar with the array of illegal drugs and their effects; therefore, mental health experts are needed to educate jurors on the toll that drugs take on the mind and body.  Heavy methamphetamine use, such as the kind Petitioner participated in after escaping from Hopkins County, can lead to confusion, paranoia, hallucinations, and homicidal thoughts.  In fact, Fulks used so much meth in November 2002 that he developed lockjaw and could only consume milkshakes for nourishment. Declaration of Margaret Melikian (contained in *PA, document # 3 ¶ 15*) The jury never understood Petitioner's possible state of mind when he encountered Alice

Donovan—they only heard the government's characterization that it was just another pleasant day in the life of Chad Fulks.

Petitioner's history of abusive conduct towards women also needed to be explained in the context of his psychological impairments. Petitioner was brought up in a chaotic household with an absentee mother. A child's early brain development and caregiver-child relationships interact to create a foundation for future growing and learning. Early development does not always proceed in a way that encourages a child's curiosity, creativity and self-confidence. For some children, early experiences are neither supportive nor predictable. The brain develops in response to chronic stress, or other types of abuse and neglect. When children are vulnerable to these risks, problematic early experiences can lead to poor outcomes. Petitioner's parents were drunk during his early years and, on good days, they at best neglected him. When his mother found religion, she gave even less attention to her offspring and then married a man who served a prison sentence for child molestation. The violence in the home and absentee mother shaped Petitioner's interactions with women.

Petitioner's interaction with women also needed to be viewed in conjunction with the sexual abuse he experienced as a child and teen. Children and adolescents who have been sexually abused can suffer a range of psychological and behavioral problems. These problems typically include depression, anxiety, guilt, fear, withdrawal, and acting out. The negative effects of child sexual abuse can affect the victim for many years and into adulthood. Adults who were sexually abused as children commonly experience depression. Additionally, high levels of anxiety in these adults can result in self-

destructive behaviors, such as alcoholism or drug abuse, anxiety attacks, and situation-specific anxiety disorders.

Petitioner suffered from depression, anxiety, and developed alcohol and drug problems. He reported several incidents of sexual abuse and the mental health experts could have explained to the jury how some of Petitioner's inappropriate actions could have been an acting out related to his own sexual abuse. Instead, the jury was left only with the government conclusions about Petitioner's treatment of women and trial counsel's myopic focus on FASD. Trial counsels' failure to call the retained mental heath experts (Drs. Halleck, Melikian, Hilkey, and Professor Morton), fell below an objective standard of reasonableness . See Strickland, 466 U.S. at 688.

**C. The failure to present the available mental health evidence defies explanation.**

In Petitioner's appellate brief to the Fourth Circuit, counsel explained that the mental health experts were not used because the trial court permitted the government to present the testimony of Donna Ward and Agent Bruning despite the government's failure to include them on the pretrial witness list. See 18 U.S.C.A. § 3432 (requiring the government to provide a capital defendant with a list of witnesses "three entire days before the commencement of trial"). During her testimony, Donna Ward described a November 17, 2004 phone call allegedly made by Petitioner while Branden Basham was hiding from the police in the Ohio River. TT 06/18/2004 at 268-69. The caller asked for Ms. Ward's daughter and claimed that the daughter had a job interview at 10:30 p.m. that evening. Agent Bruning provided testimony that the call was placed via a calling card in Petitioner's possession. TT 06/21/2004 at 22. The prosecution used this call to argue

44

that Petitioner, without the aid of Basham, attempted to lure Ms. Ward's daughter out to harm her.

In Petitioner's appellate brief, trial counsel explained why Ward's and Bruning's testimony led to the decision to pull all mental health testimony:

> *Fourth*, the late notice irreparably damaged the ability of the defense to present testimony from mental health experts, ordinarily an important element in mitigation and the penalty phase of capital trials, and clearly an aspect of the case counsel had planned to present. The defense promised in opening statement to present evidence of appellant's mental illness; although it claimed in closing that he was mentally ill, <u>the prosecution was able to point out that no evidence of mental illness had in fact been presented</u>. As counsel explained to the judge, it had presented its mental health experts with a set of facts determined in reliance upon the government capital list. The late addition of Ward and Bruning radically altered that known version of the facts, comprising the mental health experts' opinions and calling into question their ability to revise their opinions in light of this information – and, consequently, leading to a defense decision not to present the <u>evidence of mental illness they had promised the jury in opening statement</u>.

Fulks' Appellate Brief at 64 (emphasis added).

The United States Court of Appeals for the Fourth Circuit held that the three-day rule claim failed because Petitioner "suffered no prejudice as a result of the prosecution's failure to include Donna Ward and Agent Bruning on its pretrial witness list." <u>Fulks</u>, 454 F.3d at 427. In her concurring opinion, Chief Judge Williams also noted that the three-day rule aside, the government could have presented Ward and Bruning as rebuttal witnesses. <u>Id</u>. at 440-41 (Williams, C.J. concurring); <u>see also</u> <u>United States v. Gregory</u>, 266 F.Supp. 484 (D.D.C. 1967) (noting that the three-day rule does not prevent the government from putting on "as rebuttal witnesses persons whose names were not included on the witness list given to defendant prior to trial" and citing multiple cases for this proposition).

In the federal system, rebuttal evidence is evidence that explains, repels, counteracts, or disproves facts given in evidence by the opposing party. <u>United States v.</u>

<u>Stitt</u>, 250 F.3d 878, 897 (4th Cir. 2001). "Any fact tended to be proved by the original evidence – whether directly, by inference, or by logic – can be refuted." <u>United States v. Jackson</u>, 327 F.3d 273, 293 (4th Cir. 2003). During Petitioner's case-in-chief, trial counsel attempted to show that Petitioner was not the instigator or the leader during the events of November 2002. The testimony of Ward and Agent Bruning would have rebutted this. Thus, the three-day rule violation did not give Petitioner's counsel legal or strategic justification to withdraw the mental health experts—Ward and Bruning could have testified whether they were on the witness list or not. Counsel should have been prepared for their testimony before the trial ever began.

Moreover, Petitioner's trial counsel knew or should have known about the possibility of Ward and Bruning's testimony prior to trial. The sentencing trial began on June 1, 2004. On May 21, 2004, Petitioner's investigator Pete Skidmore learned about the call placed to Donna Ward and testified that he alerted trial counsel to this fact. <u>Fulks</u>, 454 F.3d at 427. Hence, to the extent the mental health experts needed to be presented with the fact of the call to Ward, trial counsel had ample time to do so. (Additionally, the Court offered counsel three days to prepare his witnesses for the Ward testimony, but counsel declined this offer).

Importantly, since the conclusion of Petitioner's trial, the mental health experts have reviewed Donna Ward's trial testimony. These experts have confirmed that Petitioner's alleged call to Ward would not have altered their opinions. The experts have further opined that this testimony would have actually buttressed their opinions. For example, Dr. Seymour Halleck, consistent with the other experts, has stated that "Donna Ward's testimony would not have altered the opinions I was prepared to give at the

sentencing hearing.  In fact, the Ward incident supports my assessment that Mr. Fulks is cognitively impaired and has difficulty in assessing the benefits, risks, and alternatives to antisocial acts."  Declaration of Seymour Halleck (contained in *PA, document #2*, ¶ 32). Rather than discussing these matters calmly with the experts, trial counsel panicked and deprived the jury of their compelling testimony.

In short, no objectively reasonable ground existed for depriving the jury of the testimony from the mental health experts.  Trial counsels' failure to call these experts and to present the mental health evidence falls below an objective standard of reasonableness. Thus, the first prong of Strickland is satisfied.  Strickland, 466 U.S. at 688.

**D.**	**The mental health experts, who were prepared to testify at trial, are at the top of their fields and could have presented the sentencing jury with ample evidence of Fulks' lifelong mental illness and long-standing addictions that Fulks was constitutionally entitled to have his capital sentencer consider.**

**1.**	**Dr. Seymour Halleck**

Dr. Halleck is one of the foremost psychiatrists in America.  He has served as a Professor of Psychiatry at the University of North Carolina School of Medicine, Chapel Hill, since 1972.  He has written or edited twelve books, including Evaluation of the Psychiatric Patient:  A Primer (New York:  Plenum Medical Book Co., 1991), The Mentally Disordered Offender (Rockville, Md.:  National Institute of Mental Health, 1986), and Law in the Practice of Psychiatry (New York:  Plenum Publishing Co., 1980).

In addition to working as a psychiatrist for over fifty years, Dr. Halleck has served as a consultant to the Federal Bureau of Investigation, a federal monitor to the Ohio Department of Corrections, Chief Psychiatric Consultant for the Wisconsin Division of

Corrections, and a Staff Psychiatrist for the Department of Justice's Medical Center for Federal Prisoners in Springfield, Missouri. <u>Id.</u>

From 1983 to 1990, Dr. Halleck was a member of the Advisory Research Council of the Federal Bureau of Prisons. From 1988 to 1990, he chaired the American Psychiatric Association's Task Force on Uses and Misuses of Psychiatric Diagnosis in the Legal Process.

### 2. Dr. Margaret Melikian

Dr. Melikian is a dynamic forensic psychiatrist and teaches at the Medical University of South Carolina. She is currently an Assistant Professor of Psychiatry and Behavioral Sciences, and has also served as the Program Director of Forensic Psychiatry at the Medical University of South Carolina. Dr. Melikian's research and work has focused on forensic inpatient care, evaluation of competency of criminal defendants to stand trial, criminal responsibility evaluations, evaluation of sexually violent predators, and evaluation of criminal defendants scheduled to be executed. Declaration of Margaret Melikian (contained in *PA, document # 3*, ¶1-3).

### 3. James H. Hilkey, Ph.D.

Dr. Hilkey is a licensed practicing psychologist in Durham, North Carolina. From 1980 to 1996, he was the Chief of Psychology Services with the Federal Bureau of Prisons in Butner, North Carolina. He was responsible for the clinical and administrative supervision of twenty psychologists servicing the forensic/psychiatric in-patient unit, substance and sex offender programs, and general psychological services for the Federal Correctional Institution.

Prior to becoming the Chief of Psychology Services, Dr. Hilkey served as a supervisory clinical psychologist at FCI Butner from 1976 to 1980. In this position, he

was responsible for clinical and administrative services to an acute psychiatric in-patient population of mentally ill federal offenders. He often conducted pre-trial forensic evaluations for the federal courts and the Witness Protection Program. From 1973 to 1976, Dr. Hilkey was a staff psychologist for the substance abuse program at USP Terre Haute, the facility where Petitioner is currently incarcerated.

Dr. Hilkey has served on the Federal Bureau of Prisons Task Force for Correctional Medical Center Design, the Federal Bureau of Prisons Standing Committee for Psychological Testing, and the Federal Bureau of Prisons Task Force for Critical Incident Debriefing. He has presented papers to the International Congress of Mental Health, the National Sheriffs' Association, the American Correctional Association, and the Southeastern Psychological Association. His current research and work focuses on assessing and evaluating federal prisoners in a psychiatric in-patient setting.

### 4. William Alexander Morton

Professor Morton is a renowned pharmacologist. He a Professor Emeritus of Pharmacy and Clinical Sciences at the Medical University of South Carolina. He also serves as a Clinical Associate Professor of Psychiatry and Behavioral Sciences in the Department of Psychiatry and Behavioral Sciences at the Medical University of South Carolina.

Professor Morton's research and work has focused on the psychological and neurological effects of prescribed and illicit drug use (including methamphetamine) on the brain and the highly addictive nature of many of the illegal drugs abused in our society. He has written extensively on these subjects.

49

**E.  Chad Fulks has severe cognitive problems that the jury never learned about.**

Cognition is the ability of the brain to think, process information, store information, and solve problems. Cognition is a high level of behavior and separates human beings from other forms of animal life. Cognition is essential to our existence in an ordered society. The jury did not know that Mr. Fulks suffered from Cognitive Disorder, NOS.

In the words of Dr. Melikian:

It is my opinion that Chad Fulks meets the diagnostic criteria for Axis I diagnosis of Cognitive Disorder, Not Otherwise Specified (NOS).  Cognitive Disorder, NOS is diagnosed when a patient has a syndrome of cognitive impairment that does not meet the criteria for delirium, dementia, or amnesic disorders.  The impairment is often due to a specific medical condition and/or a pharmacological reaction.  Mr. Fulks' cognitive problems include low IQ, difficulties concentrating or paying attention, visual and motor abnormalities, and limited reasoning and problem solving skills.  These deficits showed up very early in his childhood and in his poor performance in school.  Mr. Fulks was slow to walk and talk, required special education placement by the fourth grade, had a speech impediment, and tested for a very low IQ.  Mr. Fulks' cognitive dysfunction is due to the direct effect of general medical conditions.  Medical conditions affecting his cognitive ability are fetal alcohol spectrum disorder, chronic substance abuse, and multiple head injuries.

Declaration of Margaret Melikian (contained in *PA, document #2*, ¶ 6)

Dr. Halleck would have concurred in Dr. Melikian's diagnosis and could have explained to the jury the significance of Petitioner's head injuries, especially the eight or more instances where Mr. Fulks lost consciousness.  The jury needed to understand that repeated head injuries or cumulative concussions can have long-term implications. Declaration of Seymour Halleck (contained in *PA, document #2*, ¶ 19). A concussion, of course, is caused by severe head trauma where the brain moves violently within the skull. Brain cells suffer damage and multiple incidents can lead to long-term brain damage.  Id.

Dr. Hilkey verified Petitioner's cognitive deficits with the Weschsler Adult Intelligence Scale, Third Edition, which was given to Fulks on August 12 & 13, 2003. Declaration of James H. Hilkey (contained in *PA, document #4, ¶ 14*). This was a global assessment of Fulks' problem-solving skills. Petitioner obtained a full-scale IQ score of 78, placing him in the borderline range of intelligence. He ranks in the seventh percentile of his peers, which means that approximately 93 percent of the population functions at a higher level than does Petitioner. Dr. Hilkey further found that there is a 95 percent chance that his true IQ falls between 74 and 83. Id.

Petitioner's ability to think, to process information, to store information, and to solve problems was severely impaired. Evidence of this impairment was evident at a young age and the effects followed Fulks throughout his life. Fulks was impulsive, unable to conduct an efficacious benefit-risk analysis of conduct, and was susceptible to the influence of others, such as Basham, who did not have his best interests in mind. Unfortunately, the jury heard none of this evidence.

**F.      Chad Fulks suffers from major depressive disorder which the jury never learned about.**

Depressive disorders are a form of mental illnesses characterized by a profound and persistent feeling of sadness or despair and/or a loss of interest in things that once were enjoyable. This disorder hampers an individual's functioning. Had she been called at trial, Dr. Melikian would have offered the following opinion:

> It is my opinion that Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Major Depressive Disorder. Major Depressive Disorder is a condition characterized by a long-lasting depressed mood or marked loss of interest or pleasure in activities. These symptoms are sufficiently severe to interfere with the patient's daily functioning. Mr. Fulks attempted suicide on two occasions at the ages of 13 and 16. During my evaluation, Mr. Fulks presented with a sad mood,

decreased appetite, poor sleep, poor concentration, and feelings of worthlessness and guilt. He has been on antidepressant medication and has had improvement in his symptoms.

Declaration of Margaret Melikian (contained in *PA, document #3, ¶ 7*).

Dr. Halleck would have further explained that symptoms of depression existed long before the November 2002 incidents and persisted long after the crimes:

Mr. Fulks has had symptoms of depression throughout much of his adolescence and adult life. He has been treated with a variety of anti-depressant drugs, including Imipramine, Elavil, Zoloft, and Effexor. During the time that I evaluated him he was primarily on Elavil and Zoloft and an anti-anxiety drug, Klonopin. His symptoms of depression generally include sad mood, sleep disturbance, both falling and staying asleep, diet variations, low energy, difficulty concentrating, anxiety and agitation, low self esteem and occasional suicidal thoughts.

Declaration of Seymour Halleck (contained in *PA, document # 2, ¶ 21*).

Dr. Halleck would also have elaborated how, after a suicide attempt by an overdose of pills when Fulks was a young teen, both of Petitioner's parents were informed that he needed psychiatric treatment or, at a minimum, outpatient counseling. No one cared enough to see that the Petitioner got the help he desperately needed. Id. at ¶ 16. Despite an attempt to take his own life and a diagnosis of major depression, nothing was done for Petitioner.

Dr. Halleck could have explained the significance of the suicide attempts from a mental health perspective. He could have spoken about the risk factors for taking one's life such as mental illness, a history of being physically or sexually abused, or a family history of attempting suicide. He could have told the jury that data regarding mental illnesses as risk factors indicate that depression, substance abuse, and severe anxiety increase the probability of suicide attempts and completions. And he could have addressed these risk factors in young Chad Fulks' life and shown that many were present.

Rather than Dr. Halleck's erudition, the defense's social worker, Arlene Andrews, just mentioned suicide attempts in passing as she discussed Petitioner's family history.

Tests administered by Dr. Hilkey, which the jury did not hear about, support the diagnosis of depression. According to Dr. Hilkey, the Millon Clinical Multiaxial Inventory, Third Edition, revealed that:

> Mr. Fulks has marked deficiencies in the abilities to effectively manage his feelings, thinking, and behavior. He is likely to show signs of depression and <u>dependent personality features</u>. The modal diagnoses from the MCMI-III include <u>dependent personality disorder</u> with schizotypical personality features and depressive personality traits.

Declaration of James H. Hilkey (contained in *PA, document #4*, ¶ 16) (emphasis added).

Dependent personality features accompanying the depression would also have given the jury insight into Fulks' susceptibility to manipulation by Basham. Dependent personality disorder is a pervasive and excessive need to be taken care of that leads to submissive and clinging behavior. What a powerful counter to the government's argument that Fulks did not leave Basham because Fulks was the leader and using Basham as a puppet. See Belmontes, 529 F.3d at 868 (noting the importance of mental health expert's testimony on defendant's "susceptibility to peer pressure").

In sum, from a young age Petitioner has suffered from depressive disorder and exhibited dependent personality features. This form of mental illness hampered his functioning and should have been considered by the jury when it deliberated. The jury, however, was unable to consider this mitigating evidence because it only heard testimony about FASD.

**G. The jury never learned that Chad Fulks meets the diagnostic requirements for Amphetamine Dependence, Cannabis Dependence, and Alcohol Dependence.**

The jury heard that Chad Fulks abused alcohol and drugs from a very early age; however, the jury never heard that "early drug use is often an act of self-medication in response to mental illness or other psychological issues." Declaration of William Alexander Morton (contained in *PA, document #*5, ¶ 17). The jury did not hear that depression, for example, is notorious for being a trigger of alcohol, marijuana or other mind-altering drug use. These drugs may provide immediate relief of some symptoms such as anxiety, but may also evoke and/or exacerbate other symptoms. This self-medication often leads to drug dependence. See Belmontes, 529 F.3d at 834 (expert testimony should have been offered "to explain to the jury how Belmontes's harmful youthful experiences may have led to his turning to substance abuse to help him cope with the trauma in his life or to describe how those experiences when coupled to the related substance abuse may have contributed to Belmontes's criminal conduct").

Had she been called at trial, Dr. Melikian would have offered the following opinions on Petitioner's drug dependence:

> Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Amphetamine Dependence. Amphetamines are addictive stimulants and extensive use can result in both physical and psychological addiction. This means that, without the substance, a person will feel that he cannot function properly. Additionally, when abruptly stopping use, the person will also experience physical symptoms of withdrawal. Mr. Fulks has a long history of amphetamine abuse. At age 17 he began using crack cocaine and used it approximately two times per week. He also used powder cocaine for 2 to 3 months on a daily basis. He also reported snorting Ritalin on occasion. He began smoking crystal methamphetamine at age 21 and smoked on a daily basis for 2 years. He has built up a tolerance to the effect of amphetamines, has had withdrawal symptoms, has used increasing amounts, and has given up other activities in order to use the substances.

It is my opinion that Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Cannabis Dependence and Alcohol Dependence. Mr. Fulks began using cannabis and alcohol at a young age and was eventually able to use large amounts with a lesser effect than most people. He began smoking marijuana at age 10 and would smoke approximately 10 joints per day. He would also lace his marijuana with embalming fluid. Mr. Fulks began drinking alcohol at age 10 and also consumed moonshine. He reported drinking on a daily basis starting at age 14. He has built up a tolerance to the effect of these substances, has had withdrawal symptoms, has used increasing amounts, and has given up other activities in order to use the substances.

Declaration of Margaret Melikian (contained in *PA, document #*3, ¶ 10 -11).

Drs. Halleck and Hilkey took note of substance abuse issues and tendered a diagnosis of poly-substance dependence. Declaration of Seymour Halleck (contained in *PA, document # 2*, ¶ 27); Declaration of James H. Hilkey (contained in *PA, document # 4*, ¶ 18). Polysubstance dependence refers to a type of substance dependence disorder in which an individual uses at least three different classes of substances indiscriminately and does not have a favorite drug that qualifies for dependence on its own. The individual either has to use increasingly higher amounts of the drugs over time in order to achieve the same drug effect or finds that the same amount of the drug has much less of an effect over time than before. After using several different drugs regularly for a while, an individual may find that he needs to use at least 50 percent more of the amount he began using in order to get the same effect.

Not only was the jury unaware of the long history of substance abuse and possible reasons behind the abuse, but it was uninformed of the effects of methamphetamine—a substance Petitioner heavily abused in November 2002. Indeed, not one juror found mitigating factor no. 40: "Chadrick Evan Fulks was under the influence of drugs and

alcohol at the time of his offenses."[5] This is despite the fact that Petitioner and Basham were undeniably under the influence of massive quantities of drugs and alcohol throughout the 16-day period.  Belmontes, 529 F.3d at 860 (trial counsel should have introduced as mitigating evidence the amount and types of drugs the defendant was using at the time he committed the offense); Stankewitz, 365 F.3d at 719 (noting the importance of mitigation evidence that "for at least the 48 hours before the murder, [defendant] had binged on substantial quantities of alcohol, heroin and methamphetamine, and had not slept").

Citizens not a part of the drug culture have difficulty in understanding the true effects of a potent drug like methamphetamine.  Professor Morton, had he been called at trial, could have provided the jury with helpful information.

Methamphetamine is a potent nervous system stimulant.  By artificially stimulating the brain system, methamphetamine "tricks" the brain into thinking a survival need is being met.  Once the brain has been "tricked," the user's continued use of the substance is a reaction to what feels like an overwhelming survival need.

The temporary effects of methamphetamine include reduced fatigue, increased efficiency, and an increased sense of well being.  The effect of methamphetamine is similar to cocaine, except that the effect is often slower to start and lasts much longer (typically, 10-12 hours).

Methamphetamine can be taken orally, nasally, smoked, or injected.

A person using methamphetamine typically experiences a euphoria, followed by a fight or flight response, and then often experiences paranoid feelings.  The initial feelings of physically and mentally enhanced powers following the use of methamphetamine can quickly deteriorate with high doses or chronic use, resulting in emotional lability, confusion, paranoia and hallucinations.  Users of methamphetamine can have both "positive" and "negative" effects the same time. Addiction is a condition in which a person does

---

[5] It should have been explained to the jury that methamphetamine contains such things as battery acid and automobile starter fluid.

not have control of their drug use and continues to use despite the negative consequences.

The potential deleterious effects of methamphetamine on the brain include impulsiveness, irritability, aggressiveness, anxiousness, restlessness, paranoia, and delusional thinking.

The paranoia often associated with methamphetamine use can result in homicidal as well as suicidal thoughts.

In toxic doses, methamphetamine can produce symptoms such as agitation, anxiety, hallucinations, delirium, psychosis, seizures, and death.

A withdrawal syndrome will frequently occur when methamphetamine is stopped after repeated use. During this syndrome, which can last weeks, numerous negative symptoms can occur and include significant changes in mood such as irritability as well as symptoms of agitation and paranoia.

Declaration of William Alexander Morton (contained in *PA, document # 5*, ¶ 4-12) (emphasis added).

Petitioner and Basham consumed large quantities of methamphetamine and other drugs while on the run in November 2002. As the government recognized in opening: "whether it was crystal meth, or it was marijuana, or it was cocaine, from the time Chad Fulks and Branden Basham got out of prison, they got high." TT 06/01/2004 at 93. During this period, approximately 10-15 "eight balls" (approximately 3.5 grams each) were consumed. Id. ¶ 17; Declaration of Margaret Melikian (contained in *PA, document #3*, ¶ 15). Petitioner consumed such large quantities of methamphetamine and other drugs that he did not sleep for days, suffered from lockjaw, and experienced hallucinations. Declaration of Margaret Melikian (contained in *PA, document #3*, ¶ 15).

Had the jury known about the impulsiveness, irritability, aggressiveness, anxiousness, restlessness, paranoia, and delusional thinking associated with Petitioner's drug use, which could ultimately result in homicidal and/or suicidal thoughts, they could have understood the events leading to the death of Alice Donovan. Caro, 280 F.3d at 1255 (noting the importance of a toxicologist to explain to the jury about the effect of

chemicals on the defendant's brain). Instead, the jury only absorbed the government's theme that Chad Fulks is evil with no mental health professionals offering an explanation for his behavior.

> Professor Morton sums up the importance of the drug use:

> The actions of Mr. Fulks from November 4, 2002, until his arrest on November 20, 2002, are not properly placed in context without an appreciation for the effects of methamphetamine and other stimulants. There is a high likelihood that a person using methamphetamine and/or other stimulants will inflict damage on himself or others. Because of his history of use and use of methamphetamine in November 2002, Chad Fulks most probably experienced one or more of the following: impulsiveness, irritability, aggressiveness, anxiousness, restlessness, paranoia, and delusional thinking.

Declaration of William Alexander Morton (contained in *PA, document #*5, ¶ 4-18).

The jury never knew that during his encounter with Alice Donovan, Mr. Fulks likely experienced impulsiveness, irritability, aggressiveness, anxiousness, restlessness, paranoia, and delusional thinking. They did not understand that the withdrawal effects of methamphetamine can last for weeks. Without this evidence, the jurors could only assume that Petitioner suffered no impairment at the time of Donovan's abduction, which is proven by the fact that no juror found as a mitigating factor that Fulks was under the influence of drugs and alcohol at the time of the offenses. That assumption, not corrected by trial counsel, could cost Mr. Fulks his life.

**H.     The jury never appreciated the sexual trauma experienced by young Chad Fulks.**

Petitioner admitted to raping Alice Donovan. Rape is a heinous act and Petitioner's admission undoubtedly inflamed the jury. The jury also heard from Petitioner's ex-girlfriends who chronicled aberrant sexual activity and abuse. The jury did hear through the defense social worker that records from a mental health evaluation in

Fulks' teen years revealed a report of sexual abuse by an older man, and that Petitioner had regular sexual activities with a nymphomaniac in her late twenties. But the social worker gave no context to these events. These were but additional "facts" to mention as she read to the jury from her notes. See Cunningham v. Zant, 928 F.2d 1006, 1017-18 (11th Cir. 1991) (death penalty case where the court found that witness testimony that petitioner had a metal plate in his head was insufficient when trial counsel does not call other witnesses or introduce other evidence to explain the effects of the injury on petitioner's behavior).

What the jury did not hear was a psychiatric perspective on how a young Chad Fulks was sexually abused and how this abuse permanently scarred him. See Kennedy v. Louisiana, 128 S.Ct. 2641, 2676 (2008) (Alito, J., dissenting) (sexual abuse "inflicts great injury, and '[s]ome victims are so grievously injured physically or psychologically that life is beyond repair.'") No picture was painted of a young Chad Fulks, sitting on his father's lap, and crying out as his father rubbed his groin and thighs.[6] Id. at 2677. ("Long-term studies show that sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate."). No one painted a picture of a teenage babysitter pulling down the pants of an eight-year-old Chad and performing fellatio on a confused and frightened boy. The uncalled experts could have provided the jury with much education and explained that Petitioner learned behaviors that he later perpetrated. Id. at 2677 ("Victims of child rape are nearly 5 times more likely than non-victims to be arrested for sex crimes. . . .:").

---

[6] Neither the social worker or the mental health experts knew of this paternal sexual abuse because defense counsel never talked with Monica Wolowinski.

59

Mr. Fulks also experienced sexual abuse at a young age. A teenage babysitter performed oral sex on him at the age of eight or nine. When Mr. Fulks was approximately twelve or thirteen, he was fondled by the father of one of his friends. At the age of fifteen, Mr. Fulks moved in with a twenty-eight year old woman. Although a child may find such experiences pleasurable, the child is not able to understand the meaning of the intimacy in a situation in which sex is divorced from love. <u>This can lead to an increased likelihood of aberrant sexual activity in the future, including violent sexuality such as rape</u>. Rape is an act of violence and anger toward women. Because Mr. Fulks' mother failed to provide a nurturing environment and deprived him of the necessaries of life, anger toward women was a probable result.

Declaration of Seymour Halleck (contained in *PA, document #2,* ¶ 18) (emphasis added).

Mr. Fulks had several instances of sexual abuse by adults at a young age. A teenage babysitter performed oral sex on him at age 8 or 9. Around age 13 he was molested by a friend's father. At age 15 he moved in with a 28 year-old woman. At approximately at age 10, he was disciplined at school for pulling down the pants of another child, which may have been <u>acting out due to his own sexual abuse</u>. Mr. Fulks was raised in an environment with inappropriate sexual activity in the home and graphic sexual imagery adorning the walls.

Declaration of Margaret Melikian (contained in *PA, document #*3, ¶ 14) (emphasis added).

Molestation, premature sexual encounters, a mother choosing alcohol over the nurturing of her children, and acting out because of his own sexual abuse: While these circumstances do not excuse the mistreatment of women, they do offer insight into the badly damaged brain of Chad Fulks. See <u>Simmons v. Luebbers</u>, 299 F.3d 929, 936 (8th Cir. 2002) (counsel was ineffective for introducing expert testimony that sexual abuse of defendant possibly led to defendant's inability to control violent behavior). Unfortunately, this powerful mitigation testimony was never heard by the jury. Incomplete facts ticked off by a social worker reviewing her notes is not a proper substitute for psychiatric testimony about sexual abuse and its permanent effects on a person's behavior.

**I.     The jury never learned that Chad Fulks suffers from Adjustment Disorder with Anxiety.**

A person with adjustment disorder often experiences feelings of depression or anxiety or combined depression and anxiety. As a result, that person may act out behaviorally against the "rules and regulations" of family, employers, or society. In some people, an adjustment disorder may manifest itself in such behaviors as truancy, unexpected fighting, recklessness, or legal problems.  Had she been called at trial, Dr. Melikian would have offered the following opinion about this disorder:

> It is my opinion that Mr. Fulks meets the diagnostic criteria for Axis I diagnosis of Adjustment Disorder with Anxiety.  Adjustment Disorder with Anxiety is a condition in which the patient continues to feel nervous, worried, or afraid after a stressful event or events.  Mr. Fulks required the medication Klonopin for his anxiety.  Klonopin is a benzodiazepine, which, in my experience, is rarely given to inmates unless they present with the most serious indicators of anxiety.  Mr. Fulks also reported a history of problems with anxiety prior to his incarceration. He reported being diagnosed with panic disorder between the ages of 13 and 14. Mr. Fulks reported increased anxiety, believing others are talking about him and having trouble functioning in groups.  He described separation anxiety and would hide from the school bus to avoid leaving his mother.  Based on my observation and assessment, Mr. Fulks displayed an excessive amount of anxiety given his situation.

Declaration of Margaret Melikian (contained in *PA, document #*3, ¶ 8).

The prosecution painted a picture of Chad Fulks as a societal outlaw, a person who does not play by the rules.  The opinion testimony on adjustment disorder would have given the jury some perspective on Petitioner's conduct.  Again, this disorder does not excuse the crimes committed but it may well have borne on the jury's evaluation of Petitioner's moral culpability.  This mitigating circumstance should have, at a minimum, been presented to the jury.

**J.   The jury never heard testimony that Chad Fulks' cognitive deficiencies made it unlikely that he would be a leader.**

As mentioned earlier, the government contended that Petitioner was a leader and mastermind of the alleged crime spree.   The mental health evidence, had it been introduced at trial, would have shown the Petitioner was unlikely to have been a leader. According to Dr. Melikian, "Mr. Fulks' below average intelligence and impulsivity make it unlikely that he would be a leader among his peers."  Declaration of Margaret Melikian (contained in *PA, document # 3*, ¶ 13).   Similarly, Dr. Halleck would have opined that "[b]ecause of Mr. Fulks' early deprivations and cognitive deficits, he is more likely to be a follower."  Declaration of Seymour Halleck (contained in *PA, document #2*, ¶ 30).

Leadership was a central issue at Petitioner's trial.   The jury should have considered the opinions of these two preeminent psychiatrists on the subject, but their testimony was not offered.  See Belmontes, 529 F.3d at 853 (counsel was ineffective for not calling expert to testify that defendant was "a conformist, not a manipulator"). Petitioner suffered great prejudice from the lack of mental health testimony.

**K.   Putting it all in perspective.**

Mental health evidence is key to defending a capital case.   Jurors must be educated on the various conditions impairing a defendant's normal cognitive, emotional, or behavioral functioning.  Without this education, popular misconceptions about mental illness will pervade deliberations.  The jury will not understand that dangerous or violent behavior exhibited by persons with brain disorders is often the result of neglect and inappropriate/insufficient treatment of their illness.

Unfortunately, the Fulks jury did not hear from Dr. Halleck, Dr. Melikian, Dr. Hilkey, or Professor Morton.  They did not hear about Petitioner's mental illness and how it affected his behavior.  Had Dr. Halleck testified at trial, he could have cogently summed up the psychiatric state of Petitioner's mind in November 2002:

> Mr. Fulks at the time of the crime had a serious mental illness based on his serious depression, anxiety, substance abuse, and the many cognitive difficulties he experienced prenatally and in early childhood.  Cognitive impairment and drug use made it difficult for him to undertake a benefit-risk analysis in the situations where he was at risk of engaging in criminal acts.  He also likely lacked understanding how some of these situations were influencing him.  The many insults to his brain caused impairment to his executive functions.  Particularly his ability to control angry feelings.

Declaration of Seymour Halleck (contained in *PA, document #*2, ¶ 28).

> Similarly, Dr. Hilkey could have summed up Petitioner's psychological situation:

> In sum, Mr. Fulks presents with multiple significant psychological problems.  He is a young man who has a number of biological problems.  Both parents have had significant substance abuse problems, which in itself drastically increases the likelihood that he will be more prone to have problems with substance abuse. Specialists in neuropsychology and neurology have identified cognitive problems most likely stemming from Mr. Fulks' mother's consumption of alcohol during pregnancy.  Mr. Fulks has a history of head trauma with loss of consciousness. Environmentally, Mr. Fulks was raised in a highly chaotic home characterized by poverty and a history of drug abuse, inconsistent supervision and neglect, and physical abuse.  He also reports being sexually abused.  Psychologically, Mr. Fulks has never developed adequate coping mechanisms.  This failure severely limited his ability to meet the demands of daily life.  He has also been chronically depressed, lacks self esteem, and is easily influenced by those around him. Consistent with his neurological impairment and his socialization, Mr. Fulks' behavior has been marked by impulsivity and his thinking influenced by extremely poor judgment.

Declaration of James H. Hilkey (contained in *PA, document #*4, ¶ 19).

Petitioner's trial counsel were responsible for insuring that Petitioner's disabilities and impairments were accurately identified and understandably explained. It is well settled that persons with mental impairments "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from

experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Atkins v. Virginia, 536 U.S. 304, 318 (2002).

Had the mental health experts been called, the jurors could have understood the disabilities, brain damage, and tormented psyche that helps explain Petitioner's behavior. Smith, 379 F.3d at 943 (stressing the importance of mental health testimony in providing an explanation for defendant's "outbursts of violence"); Frazier v. Huffman, 343 F.3d 780, 798 (6th Cir. 2003) ("Had the jurors been confronted with the mitigating evidence of Frazier's brain injury, the probability that at least one juror would not have decided that the aggravating circumstances of the case outweighed the mitigating circumstances beyond a reasonable doubt 'is a probability sufficient to undermine confidence in the outcome.'"). The prosecution's case in aggravation could not have overcome the mental health evidence. The jury could have weighed the depression that Petitioner suffered from since childhood, the substance abuse dependence, the impaired ability to process and store information, the limited reasoning and problem solving skills, anxiety, dependent personality, fragile self-image, and misperception of events. See Gray, 529 F.3d at 235 ("Evidence of mental disturbance of the type omitted at Gray's sentencing can be persuasive mitigating evidence for jurors considering the death penalty, and this evidence can determine the outcome."). This testimony would have easily outweighed the aggravating circumstances relied on by the government—or, at a minimum, caused at least one juror to strike a different balance. Wiggins, 539 U.S. at 537; Smith, 379 F.3d at 944 (mental health evidence can outweigh evidence in aggravation even when the government's case for the death penalty is "strong").

Of course, the jury did not hear this powerful mitigation evidence because trial counsel hit the panic button over the three-day rule issue. The Donna Ward testimony should have been a nonevent and all the mental health experts have affirmed that the Ward testimony only buttressed their opinions. Counsel knew about the Ward testimony prior to trial, knew or should have known that this evidence would have been proper reply by the government, and should have consulted their mental health experts before pulling the plug on this key aspect of Petitioner's case. Hence, counsel's failure to call the mental health experts "cannot be justified as a tactical decision" because the decision was made "after a less than complete investigation" and analysis of the three-day rule issue. Wiggins, 539 U.S. at 522 & 533; see also Smith, 379 F.3d at 942 (holding it "was patently unreasonable for [trial counsel] to omit [mental health] evidence from his case for mitigation").

This Court graciously offered trial counsel three days to prepare for the Ward testimony and to plan a response. Apoplectic counsel declined this generous offer which would have given counsel ample time to consult with the experts on the impact of the Ward testimony. Had Petitioner's jury heard from these mental health experts, the result of the trial most assuredly would have been different. See Strickland, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermined confidence in the outcome."). At least one member of the jury would have seen the mental health evidence as "humaniz[ing]" and thus viewed Petitioner "as an individual deserving of sympathy and mercy." Belmontes, 529 F.3d at 869.

**CLAIM II: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE FOR NOT REALIZING THE WARD/BRUNING TESTIMONY COULD COME IN AS REBUTTAL TESTIMONY.**

The Petitioner's trial counsel were ineffective because they failed to familiarize themselves with the law of rebuttal. In a capital case, the prosecution must provide the defendant with a list of potential witnesses at least three days prior to trial. See 18 U.S.C.A. § 3432. While the prosecution's obligation to provide its witness list is mandatory, the statute does not apply to witnesses called to rebut or disprove the defendant's defense. See United States v. Hessler, 469 F.2d 1294 (7th Cir. 1972); Turner v. United States, 441 F.2d 736 (5th Cir. 1971); United States v. Fernandez, 172 F.Supp.2d 1265 (C.D. Cal. 2001); United States v. Gregory, 266 F.Supp. 484 (D.D.C. 1967).

In Hessler, the court upheld the prosecution's ability to call a rebuttal witness who had not been named on the witness list provided to the defendant prior to trial. Hessler, 469 F.2d at 1295. Convicted of kidnapping, the defendant objected to a police officer's testimony related to the officer's examination of the automobile that the defendant used to kidnap the victims. Id. The victim testified that, after the vehicle got stuck, the defendant got out of the car and placed his hands on the exterior of the car in order to push it. Id. The prosecution called the police chief to testify that he had examined the vehicle for fingerprints, but was unable to find any identifiable prints. Id. The court concluded that the police chief's testimony added nothing to the prosecution's case to prove the defendant's guilt, but rather served to negate a *possible* defense argument. Id. (emphasis added). When a potential witness testifies to disprove a defense argument, even a potential one, the government may call the witness as a rebuttal witness without violating the three-day rule.

66

Courts have found counsel ineffective and granted relief because of counsel's failure to familiarize themselves with relevant law. For example, in <u>Saranchak</u>, 538 F.Supp.2d at 880-81, trial counsel failed to litigate a suppression issue under <u>Miranda v. Arizona</u>, 384 U.S. 435 (1966), even though the police had failed to scrupulously honor the defendant's invocation of his right to silence. Saranchak's attorney withdrew the suppression motion after Saranchak decided to plead guilty. The withdrawal of the motion was based on counsel's belief that he had to withdraw the motion so the plea could go forward. <u>Id.</u> at 882. Pennsylvania law, however, permitted a defendant that pled guilty to challenge improper evidence that bears on the degree of guilt or punishment. <u>Id.</u> at 883. The district court found that counsel was ineffective for failing to familiarize himself with the law relating to suppression of evidence and further held that Saranchak was prejudiced by his counsel's failure to litigate this issue. <u>Id.</u> at 890-91.

In the present case, Petitioner's trial counsel argued that Petitioner was not the leader during the events of November 2002. Because the testimony of Donna Ward would rebut this argument, the prosecution could have called her as a rebuttal witness without violating § 3432. In fact, Chief Judge Williams affirmed the prosecution's ability to call a rebuttal witness in her concurring opinion in <u>United States v. Fulks</u>, 454 F.3d at 440-41. Petitioner's trial counsel believed that the prosecution violated the three-day rule and that the prejudice from this violation required the discontinuation of mental health testimony. Trial counsels believed that they had no reason to anticipate the testimony of Ward and Bruning. This expectation is not supported by clearly established law. Trial counsel had an obligation to familiarize themselves with the law of rebuttal,

and had they done so, would have realized that Ward and Bruning could have been called as a rebuttal witnesses whether they were on the list or not.

A principal purpose of § 3432 is to protect the defendant from surprise by allowing ample time to prepare for the testimony of the prosecution's witnesses. United States v. Greene, 497 F.2d 1068, 1082 (1974) (noting that § 3432 "was never intended to preclude the United States from making use of any material testimony discovered during the progress of the trial, and all that it exacts of the prosecuting officer is that he shall in good faith furnish to the prisoner, before the trial, the names of all witnesses then known to him and intended to be used at the trial"). The defendant in Greene objected to the testimony of a doctor who was not included on the witness list. Id. at 1081. In holding that the testimony of the doctor was not a violation of the statute, the court reasoned that the defense counsel knew that the doctor had examined the defendant and should have realized his potential to serve as a witness at trial. Id. at 1082. Additionally, the court supported the admission of the testimony by highlighting the two days that the defense had to prepare and plan a cross-examination of the doctor. Id. Another court considered four days of notice to be sufficient for the defense to respond and prepare for a witness who was not included on the initial witness list pursuant to § 3432. Gregory, 266 F.Supp. at 487. The court stated that it would not apply the statute on "a narrow technical ground" because the government could have offered the witness as a rebuttal witness, rather than as part of its case in chief. Id.

The admission of Ward's and Bruning's testimony would not have violated the primary purpose of the statute. The petitioner's trial counsel should not have been surprised by the witnesses because the trial team's investigator disclosed the Ward

testimony to the team weeks before the trial began.  Additionally, the Court offered trial counsel three days to prepare their witnesses for the testimony, but counsel declined this offer.  Despite not including Donna Ward and Agent Bruning on their list of potential witnesses, the prosecution could have called them to testify as rebuttal witnesses.  The Petitioner's trial counsel should have recognized their ability to testify and were ineffective as a result of their failure to do so.  See Saranchak, 538 F.Supp.2d at 890 (counsel's failure to familiarize himself with suppression law and to litigate propriety of statement fell below the standards of the profession).   The case should have been prepared with the knowledge that evidence about the phone call to Amy Ward would likely come in.

Trial counsel's failure greatly prejudiced Petitioner.  Because the mental health experts were pulled, the jury "never heard a credible expert . . . testify about the impact on an individual of the kind of childhood traumas that [Fulks] suffered or explain that involvement in criminal activity can sometimes be explained by the hardships an individual experienced as a youth."  Belmontes, 529 F.3d at 869.  This type of evidence "serves to humanize the defendant and is critical in the determination of whether a jury should spare the defendant's life."  Id. at 864; see also Smith, 379 F.3d at 943.

Had the jury been able to balance the aggravating factors such as the alleged acts of violence and sexual misconduct testified to by ex-girlfriends and acquaintances against Petitioner's mental illness and psychological impairments, at least one juror would have struck a different balance and voted for life in prison.  Wiggins, 539 U.S. at 537; Saranchak, 538 F.Supp.2d at 890 (prejudice established for counsel's failure to familiarize himself with the law of suppression).

**CLAIM III: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO UNDERTAKE AN ADEQUATE AND MEANINGFUL MITIGATION INVESTIGATION.**

Trial counsel failed to present a mitigation case that painted an empathetic and accurate picture of Petitioner's life because their investigation was inadequate. "The ABA Guidelines provide that investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." Wiggins v. Smith, 539 U.S. 510, 524 (2003) (internal quotation marks omitted); see also Declaration of Andrea Lyon (contained in *PA, document # 1, ¶¶ 11-12*). Counsel is ineffective when the background investigation is stopped "after having acquired only rudimentary knowledge of [a defendant's] history from a narrow set of sources." Id.; see also Williams v. Taylor, 529 U.S. 362, 393 (2000) (noting that a criminal defendant has "a constitutionally protected right [] to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer."). "[C]onducting a partial, but ultimately incomplete, mitigation investigation does not satisfy Strickland's requirements." Dickerson v. Bagley, 453 F.3d 690, 695 (6th Cir. 2006).

Belmontes v. Ayers, 529 F.3d 834 (9th Cir. 2008), is instructive on this issue. At Belmontes' trial, counsel presented some mitigating evidence that the defendant grew up in a poverty-stricken family with alcoholic parents. Id. at 864. However, because of an incomplete mitigation investigation, counsel did not present the jury with a true picture of Belmontes' life.

> [Trial counsel] failed to call witnesses to testify that when Belmontes was five years old, his 10-month-old sister died of a brain tumor. After her death, Belmontes exhibited symptoms of depression and would repeatedly visit the cemetery where his sister had been buried. Belmontes also suffered as a result of his maternal grandmother's alcoholism and prescription drug addiction, which, in

70

combination with her manipulative and controlling behavior, caused constant strife within both his immediate and extended family.  [Trial counsel] could also have introduced testimony about Belmontes's positive attributes and strong character as a child in the face of adversity; he was a kind, responsible, and likeable child who got along well with his siblings, was respectful towards his grandparents despite their disapproval of his mixed racial background. . . .

Id. at 864.

In addition to the above mitigating circumstances, trial counsel should have discovered lay witnesses who could have described "wholly inadequate living conditions—a single room in a cheap hotel where his mother frequently had sex with various men," drug use to cope with his struggles, and isolation from his peers. Id. at 865. These was no excuse for counsel not to have found additional lay witnesses; therefore, the court found that the deficient performance prong of Strickland had been met.

Turning to prejudice, the court noted that the jury only heard about Belmontes' father's alcoholism, poverty, and Christian faith.  Id. at 866.  The jury was never presented with the true traumas Belmontes faced. The court thus concluded that "[i]f the jury had considered the additional humanizing evidence that [trial counsel] could and should have presented through lay witness testimony in this case, there is a reasonable probability that the jury would have come to a different conclusion about Belmontes's sentence." Id.

Another helpful case is Harries v. Bell, 417 F.3d 631 (6th Cir. 2005), in which the Sixth Circuit affirmed the district court's grant of a new penalty phase because of counsel's deficient mitigation investigation.  Harries shot and killed a convenience store clerk during an armed robbery.  Id. at 634.  He was convicted of the crime and sentenced to death in Tennessee state court.  After unsuccessful state appeals and PCR proceedings,

Harries filed a 2254 petition in federal court. The district court granted relief because of ineffective assistance of counsel.

In affirming the district court, the court of appeals noted that trial counsel's mitigation investigation was limited to interviews with immediate family members, records requests, and interviews of Harries' co-defendants. Id. at 638. While some mitigation evidence was uncovered, it was not sufficient to give the jury an appreciation for the challenges Harries faced as a child.

Had counsel conducted an adequate investigation, counsel would have learned about significant childhood abuse, exposure to violence in the home, exposure to violent sexual activity, multiple head injuries, the unsanitary childhood home, and his father's rape of Harries' siblings. Id. at 639-40. The Sixth Circuit made clear that counsel's deficient performance was prejudicial to Harries: "Had the jury been able to place [Harries'] excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." Id. at 642 (internal quotation marks omitted).

In the present case, the primary mitigation witnesses called at trial did not convey the true depth of the despair of Petitioner's life. See Outten v. Kearney, 464 F.3d 401 (3d Cir. 2006) (reversing death sentencing and finding counsel ineffective for failing to put on additional evidence of the defendant's background, despite the fact that some of this evidence was put on at trial, because the trial presentation likely failed to give the jury a comprehensive understanding of the defendant's life). The jury learned that Petitioner's parents "drank a lot," TT 06/22/2004 at 129, and that the parents often fought, id. at 132. In discussing discipline, the mitigation witnesses observed that Petitioner's father would

often use "his hands or fists" to hit the children. Id. at 135. Most witnesses agreed that the Fulks children roamed the streets unsupervised, id. at 136, and that the home on Leeward Avenue was "pretty nasty and dirty," id. at 137. The jury heard multiple stories about drunken poolroom parties in the Fulks home and how the police had to break up fights. They also heard stories about pornography in the home. TT06/04/2004 at 135.

In addition to these witnesses with personal knowledge, trial counsel also called Arlene Andrews, a social worker, to give a family history assessment based on her interviews with witnesses and her document review. Andrews testified that Petitioner's parents' fighting and use of alcohol dated back to the 1960s. TT 06/04/2004 at 142-43. The parents did not take an interest in Petitioner and had trouble remembering events that occurred prior to Petitioner's 12th birthday. Andrews testified that "Chad was educationally neglected by his parents" and that "he actually failed the first grade." Id. at 157. Andrews saw in the records that things eventually got so bad for Petitioner that he attempted suicide. Id. at 166.

This mitigation evidence presented at trial was important, but it was also just a small part of Chad Fulks' story. Trial counsel fell below an objective standard of reasonableness, see Strickland, 466 U.S. at 688, because counsel did not conduct a thorough mitigation investigation whereby the jury could have walked in Petitioner's shoes from the time of Petitioner's birth in 1976 until he walked into the courtroom in Columbia, South Carolina. A complete walk through a defendant's life is critical because jurors often identify with some part of a defendant's life. This identification enables them to find value in a defendant's life and a reason to believe the person should not be executed. See California v. Brown, 479 U.S. 538 (1987) (O'Connor, J., concurring)

73

("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.").

Had a proper mitigation investigation been conducted, witnesses would have been discovered who could have guided the jury on a walk through the entire life of Chad Fulks. An important witness overlooked by the trial team was Monica Wolowinski, the mother of Petitioner's best friend. Wolowinski's son and Petitioner became friends in 1984 or 1985. Declaration of Monica Wolowinski (contained in *PA, document #*13, ¶ 2). Wolowinski had seen Petitioner sleeping under bridges and trees and asked her son to invite him home. Id. Petitioner would stay at the Wolowinski home for days at a time. Petitioner's mother did not care that her eight-year-old son was gone for these extended periods. Id. at ¶ 7. Monica noticed that Petitioner was often hungry and he ate hundreds of meals with Monica's family. Id. ¶ 11.

As her son and Chad grew closer, Monica had occasion to visit the Fulks' home. She noticed that the residence "was filthy and very disorderly" and once saw feces on the floor. Id. ¶ 3. While in the Fulks' residence, she also observed Diana's interaction with the children. Monica heard Diana curse at Chad and his siblings and saw her slap them across the face. Id. ¶ 4. She observed Diana actually pick up objects and throw them at Chad. Id.

Monica knew that Chad suffered vicious beatings at the hands of his parents. She saw "visible marks on Chad from beatings given to him by his parents with extension

74

cords and other objects." Id. ¶ 5  On one occasion Chad was hurt so badly that she put balm on his welts and alcohol on his bruises.  Id.

While the beatings were horrific, Monica also received reports that Roger Fulks was sexually abusing his son.  A young Ronnie Fulks told Monica that Roger "made Chad sit on Roger's lap and would rub Chad's thighs and groin area."  Id. ¶ 8.  Chad was heard begging his father to stop, but no one in the Fulks' house dared come to his rescue. Id.  Monica observed behavior that suggested extensive abuse.  Monica often washed Petitioner's clothes because Diane did not.  Chad appeared very uncomfortable while waiting for his clothes to dry and sat in his boxers with a pillow over his lap.  Id. ¶ 9.

Monica was so concerned about Petitioner's home environment that she asked Diana if she could adopt Chad.  Diana refused the offer "because she wanted to continue to receive a public assistance check, which was based on Chad living with her."  Id. ¶ 6. Monica responded that she "did not want any money for raising Chad, and that [she] would get another job" if necessary.  Id. Diana still refused to risk a cut in public assistance money, which would have impacted her alcohol consumption.  Id.

Although Monica could not adopt Chad, she still tried to provide for his needs. She bought him clothes and shoes when he lacked suitable attire and kept them clean for him.  Id. ¶12.  In addition to physical needs, Monica tried to instill basic limits that Chad did not have at home.  She was a strict parent and provided a structured environment for her children.  Id. ¶13.  In response to this strict environment, Chad never stole from Monica and adapted well to the rules of her house.  Id.  This was a big change from his parents' home where the children roamed the streets as they pleased.  Monica's intervention and assistance was needed, but she could not undo the years of neglect and

abuse Petitioner had been subjected to. The guidance she offered was too little and much too late.

Nathan Fulks was another crucial mitigation witness whom the trial team overlooked. Nathan is Petitioner's cousin and spent much time around the Fulks residence. Nathan could have corroborated Monica's observations about abuse in the household. Nathan could have testified that the parents were so neglectful that the children's diapers often did not get changed. Declaration of Nathan Fulks (contained in *PA, document #*18, ¶ 7). Roger did not believe that this was a man's job and Diane "just did not care." Id. ¶ 7. Nathan would have described the home as "filthy" with "[g]arbage and auto parts" scattered about. Id. ¶ 8. The family was so poor that one of Chad's brothers, with the approval of Diane, stole from Nathan to buy food. Id. ¶ 10.

Nathan would have testified that Petitioner's father was a sexual deviant who ran sex trains on various women. Declaration of Nathan Fulks (contained in *PA, document #* 18, ¶ 3). In addition to sexual deviance, Petitioner's father "was a very violent man and would look for any excuse to fight." Id. ¶ 5. When Roger fought, he "took pride in the damage he could cause." Id. Nathan witnessed many brawls between Roger and Diane, and recounted how Roger would throw her on the floor and stomp her in front of the children. Id. In desperation, the children would try to halt the beatings of their mother, but Roger "thought it was funny when the children tried to intervene." Id. Violence was not limited to the parents. Nathan recalled various characters congregating in Roger's basement, where alcohol and drug consumption was the norm. Id. ¶ 6. In this environment, fights were common and Nathan has seen "firearms pulled during the altercations." Id.

This violence spilled over to the children:

> I have seen Roger and Diane beat and throw their children against the walls. The Fulks children have been whipped with heater hoses from cars, electrical cords, and fan belts. I have seen cuts and bruises on Chad's face and body from these vicious beatings. I recall one time Chad's back was so badly scourged that dried blood caused Chad's shirt to stick to his back.

Id. ¶ 9.

Had Nathan been interviewed by the trial team, they would have learned information leading them to a discovery of sexual abuse.

> In approximately 1989 or 1990, Roger Fulks disclosed to me an incident that had occurred with Chad. I was in the pool room on Leeward Avenue with Roger. Roger made a comment that something was going on with Chad. I pressed Roger for information and he was reluctant to provide it. I could tell Roger was deeply embarrassed. He made a comment that he did not want to end up in prison for retaliating over what had happened to Chad. Some years later, I learned from Chad that he had been sexually abused by a man during this time period.

Id. ¶ 12.

Another important witness from Petitioner's childhood was Tracy Graybeal. Petitioner and Graybeal attended Enslow Middle School together and also dated. Declaration of Tracy Graybeal (contained in *PA, document #*12, ¶ 3-4). She could have testified about Petitioner's use of alcohol and how he used this to cope with the childhood abuse he suffered at the hands of his parents. Id. ¶ 5. Petitioner and Graybeal remained friends even after they broke up and later Petitioner disclosed to Graybeal a dark family secret: Petitioner's older sister had molested him when he was a small boy. Id. ¶ 7.

Further evidence of sexual impropriety in Fulks home could have been discovered had counsel interviewed Christina Kirkman. Kirkman lived at the Fulks residence one summer and suffered several instances of sexual abuse. Supplemental Declaration of Christina Kirkman (contained in *PA, document #* 40, ¶ 2). Kirkman was raped by one of Petitioner's uncles who was frequently at the home. Id. ¶ 12. This uncle was a gang

member and was unfortunately a role model for the Fulks children.  Id..  Kirkman was also assaulted by Petitioners brothers: "I was sleeping in the room with Chad's sister and the boys came in and fondled us and tried to remove our underwear.  This was a traumatic experience and I do not remember if Chad was with his brothers or not."  Id..  Kirkman was subjected to crude comments made by Petitioner's father and pornography at every turn in the house.  Id. ¶ 10.  "In addition to having access to porn, the children were permitted to watch "R" rated movies or whatever else was in the VCR."  Id. ¶ 11.

Kirkman witnessed other forms of violence in the home: "The children suffered severe beatings from the parents.  The children were punched in the head and hit with all kinds of objects.  It was a common occurrence for a child to be smacked or punched in the Fulks home.  When I lived there, I was treated like the other kids and have been punched by Roger."  Id. ¶ 5.  Roger was "often in a rage and looking for someone to hit."  Id. ¶ 6.  The children were so afraid of him that they would not come home until after dark—in hopes their father had passed out and would not beat them.  Id. ¶ 6.  The children were so used to seeing their parents passed out that they "played in their mother's vomit" like they were sitting in a sandbox.  Id. ¶ 9.

Beth McGuffin, who grew up with Petitioner, testified at trial but counsel did not elicit helpful information about Petitioner's childhood from her.  McGuffin's parents attended parties in the Fulks' poolroom and McGuffin "often saw Chad's mother with black eyes."  Declaration of Beth McGuffin (contained in *PA, document #*22, ¶ 3-4).  McGuffin could have told the jury about a man named Ed who used to pick up her and Petitioner off the street and take them to drink alcohol and smoke.  Id. at 5.  Beth and Petitioner were 10 or 11 years old when Ed would get them drunk at a local cemetery.  Id.

McGuffin also had knowledge of early drug use inasmuch as she "smoked marijuana, used acid, and huffed gas" with Petitioner when they were 12 years old. Id. ¶ 6.

Beth also had knowledge of sexual abuse:

Rhonda Lawhon lived in the same neighborhood as Chad and I did. She was in her late twenties, but allowed the teenagers in the neighborhood to party with her. She supplied alcohol and drugs. Rhonda had sex with the teenage boys in the neighborhood, including Chad. I recall one instance where teenage boys went into Rhonda's bedroom one after another to run a sex train on her.

Id. ¶ 8.

Petitioner and McGuffin also dated for a short time. McGuffin could have rebutted the governments allegations that Fulks abused all the women in his life: "As we got older, Chad asked me to have sex with him, but I refused. Chad respected my decision not to have sex with him. He never forced himself on me." Id. ¶ 7. Had trial counsel simply asked McGuffin questions about Petitioner's childhood, they would have gotten a wealth of information. Id. ¶ 9.

Evidence of sexual abuse would have been powerful in mitigation. Had a proper mitigation investigation been conducted, this abuse could have been uncovered and witnesses presented to the jury. Because Petitioner admitted, on advice of counsel, to raping Alice Donovan, evidence of Petitioner's own sexual abuse would have mitigated this damaging admission.

Trial counsel was also deficient for not locating Harry Tyree. Tyree would have been a credible, and compelling witness. Tyree was deacon at the Abundant Life Baptist Church in Proctorville, Ohio. Declaration of Harry Tyree (contained in *PA, document #20*, ¶ 2). In 1979, Tyree began driving the church bus that picked up poor families who did not have transportation. Id. On Saturdays, Tyree visited rough neighborhoods in the

Huntington area and encouraged the families to attend church with him.  Id.  In this role, Tyree visited the Fulks' family.

> I have had occasion to visit the Fulks house on Leeward Avenue.  The house was very dirty when I visited.  There were beer cans on the floor and the ashtrays overflowed with cigarette butts.  Chad Fulks' father and uncle almost always had a beer in their hands when I visited.

Id. ¶ 3.

Petitioner, his mother, and brother attended the church for several years.  The church programs were "supportive, structured environments."  Id. ¶ 5. In these structured environments, Petitioner behaved well and Tyree "never had trouble with Chad Fulks." Id. ¶ 4.  This testimony would have been very helpful in showing the jury that Petitioner, in a structured environment, behaves well and is not dangerous.

Trial counsel failed to interview mitigation witnesses who knew Petitioner and his family after Roger Fulks moved to Indiana.  Mark Thompson lived down the road from the trailer that Diane rented.  Declaration of Mark Thompson(contained in *PA, document #8*, ¶ 1).  Petitioner's mother had stopped drinking and was consumed with church, but she provided no better care for her children.

> I remember that Diane was never at home because of her involvement in church. Chad would come home from school, put his books down, and then hang out around my house.  I often fed Chad because Diane was not there to cook meals for him. Chad and his brothers had little or no adult supervision.  They were left to roam the streets and do as they pleased.

Id. ¶ 2.

Based on the time that he spent around Petitioner, Mark Thompson was unequivocal that "Chad was a follower and not a leader."  Id. ¶ 3.

The trial team never interviewed Sharon Dotson, Petitioner's maternal aunt. Declaration of Sharon Dotson (contained in *PA, document #21, ¶ 2*).  Inexplicably, members of the Fulks trial team came to Sharon's home and spoke with her mother, but

80

declined to interview Sharon. <u>Id</u>. ¶ 2. Had they done so, they would have learned critical information about Petitioner's mother, Petitioner's childhood, and how his mother passed on to her children what she learned as a child. <u>See</u> Commentary to ABA Guideline 10.7, 31 Hofstra L. Rev. at 1025 ("A multigenerational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.").

Diane grew up in a turbulent home with violence and alcoholism. Declaration of Sharon Dotson (contained in *PA, document #*21, ¶ 3). Her parents fought constantly and her mother suffered severe beatings. <u>Id</u>. Diane herself suffered physical abuse at the hands of her father. <u>Id</u>. ¶ 4. Diane and her siblings grew up in extreme poverty and often went hungry. <u>Id</u>. ¶ 6. The family had to live in a chicken coop because they were so destitute. <u>Id</u>. Diane's father eventually walked out on the family when the children were very young. <u>Id</u>. ¶ 7.

Diane married a husband much like her father. The couple fought constantly, and one time Roger punched Sharon when she tried to pull him off of Diane. <u>Id</u>. ¶ 9. Things were so bad that Diane often contemplated suicide. <u>Id</u>. ¶ 10.

Sharon witnessed the Fulks children being abused. Diane and Roger treated their children just like Diane's father had treated his. <u>Id</u>. ¶ 11. The children were hit in the head, cursed, and had items thrown at them. <u>Id</u>. ¶ 11. The environment was sexually inappropriate, with "pictures up on the wall of naked women with their legs spread." <u>Id</u>. ¶ 13. Sexual impropriety in Diane's life continued after Roger left. She married Dean

Thompson, who was eventually convicted of molesting his own granddaughter. Id. ¶ 14. Sharon was in court when Dean pled guilty to this terrible crime. Id.

Dicie Fulks could have corroborated Diane's lack of parenting skills. She could have offered compelling testimony on how Diane would prepare "Kool-Aid" bottles for the babies rather than nutritious bottles containing milk or formula. Declaration of Dicie Fulks (contained in *PA document # 39,* ¶ 4). Dicie encouraged Diane to purchase milk for the children, but she chose to buy beer instead. Id.. Once Dicie accompanied Diane to the store, removed beer from the cart, and replaced it with milk for the children. When Diane arrived at home, Roger was angry that the money had been used on the children and not on alcohol. He ordered Diane back to the store to purchase a case. Id.. With both parents so intoxicated, Dicie observed that dirty diapers covered the floors and would often "be stuffed under furniture." Id. ¶ 3. The stench from the diapers attracted a bevy of flies, but Diane and Roger did not care because their priority was alcohol. Id. ¶¶ 3 & 5.

Elvin Taylor was another crucial mitigation witness missed by the trial team. Taylor served as a counselor at the Westville Correctional Facility when Petitioner was an inmate. Declaration of Elvin Taylor (contained in *PA document #19,* ¶ 2). Taylor was involved in a long-term substance abuse program in which Petitioner successfully participated. Taylor could have testified that one of Petitioner's chief complaints upon entering the program was his susceptibility to being influenced by others using drugs. Id. ¶ 7 In an assessment of weakness, it was revealed that Petitioner was a follower and went along with others even when he knew their actions were wrong. Id. What powerful testimony this would have been on the leader/follower distinction that was so crucial in

Petitioner's trial: a year before he ever met Basham, it was recognized that he was easily manipulated and was influenced by others engaging in criminal activity.

Taylor could also have testified that Petitioner adapted well to a structured prison environment and was a model inmate. Id. ¶ 8 Petitioner had a positive attitude in the classroom and in the dorm, completed his homework assignments, demonstrated knowledge of the material, took responsibility for his behavior, displayed improvement with the control of impulsive behavior, and completed his seminar presentations. Id. Petitioner eventually was put in charge of the dorm maintenance department and was actively involved in resolving disputes between inmates through conflict resolution training. Petitioner responded well to authority figures in this structured environment. This testimony would have counteracted much of the prosecution's future dangerousness argument and shown that Petitioner could adapt well to a prison environment.

In conclusion, the complete picture of Petitioner's childhood, sexual abuse, physical abuse, self-medication with drugs and alcohol, and evidence that he did well in a structured environment "might well have influenced the jury's appraisal of his moral culpability." Williams v. Taylor, 529 U.S. 362, 398 (2000). The jury never heard about sexual abuse from Petitioner's father as reported by Wolowinski, his father's deviant sexual proclivities, beatings so severe that dried blood caused Petitioner's shirt to stick to his back, facial lacerations from beatings, an eight-year-old child sleeping under bridges because home was so deplorable, a preteen child using drugs and alcohol to self-medicate, a boy who did well in structured environments, and a young offender who sought counseling in Westville Correctional Institute because he was a "follower" and easily manipulated. This mitigation evidence would have easily outweighed the case in

83

aggravation relied upon by the government. In fact, it explains the sources that led to Petitioner's antisocial conduct.

Trial "counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision . . . because counsel had not fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." Wiggins v. Smith, 539 U.S. 510, 522 (2003) (internal quotation marks omitted). The jury, via the scant mitigation presented at trial, could not walk in Petitioner's shoes from the time of his birth in 1976 until he entered the courtroom in Columbia, South Carolina. Thus, the jurors were precluded from identifying with Petitioner when asked to choose life or death; Petitioner suffered great prejudice because of counsel's lack of diligence. See Lambright v. Schriro, 490 F.3d 1103, 1121 (9th Cir. 2007) (noting that the Supreme Court has "consistently held that counsel's failure to present readily available evidence of childhood abuse, mental illness, and drug addiction is sufficient to undermine confidence in the result of a sentencing proceeding, and thereby to render counsel's performance prejudicial."). Had trial counsel discovered and called Monica Wolowinski, Nathan Fulks, Tracy Graybeal, Dicie Fulks, Elvin Taylor, Harry Tyree, Christina Kirkman, Mark Thompson, Sharon Dotson, and the other witnesses mentioned above, at least one juror would have voted for life instead of death. See Strickland, 466 U.S. at 694.

**CLAIM IV: TRIAL COUNSEL WERE INEFFECTIVE BY USING UNTRAINED AND UNSUPERVISED LAW STUDENTS TO CONDUCT KEY ASPECTS OF THE INVESTIGATION**

Petitioner's trial counsel assigned law students critical aspects of the mitigation investigation without first properly training the students on how to effectively conduct an

interview, locate witnesses, gather documents, or conduct any of the other tasks necessary for the completion of an adequate mitigation investigation. While the use of law students can be beneficial in the representation of a capital defendant and in the investigation of mitigating circumstances, it is important that the students be trained and continuously supervised by the attorneys representing the defendant. See Declaration of Andrea Lyon (contained in *PA, document* # 1, ¶¶ 13-14). Defense counsel were deficient in that respect. As noted by one former Cornell University law student who, among other things, interviewed witnesses and gathered documents, "When I began work on [Petitioner's] case, I had no prior investigative experience and I received no formal investigative training from [defense counsel]. I am not aware of any of the other Cornell students involved in the investigation undergoing a training program." Declaration of Matthew Rawlings (contained in *PA* Document #16, ¶ 3). Another student who worked to locate and interview witnesses recalled that students were "apprehensive about knocking on doors and conducting witness interviews" and that "law student training was the exception and not the rule. [Defense counsel] did not provide the students with much guidance. The failure to give specific guidance was a common complaint" from students involved in Petitioner's case. Declaration of Tim Kane (contained in *PA* Document #11, ¶¶ 3-5).

The failure to provide sufficient training and supervision to law students who were assigned critical investigative tasks amounts to ineffective assistance of counsel because of the resulting inadequate mitigation investigation. "[I]nvestigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be

introduced by the prosecutor.'" Wiggins, 539 U.S. at 524 (quoting ABA Guidelines § 11.4.1(C), p. 93 (1989)) (emphasis added by Wiggins Court).

Obtaining investigative resources and conducting a comprehensive investigation in preparation of a capital trial and in anticipation of the prosecution requesting the death sentence is critical to ensuring due process for the defendant. See Commentary to 2003 ABA Guidelines at 926–27. "Only then can counsel protect the accused's Fourteenth Amendment right to deny or rebut factual allegations made by the prosecution in support of a death sentence . . . ." Id. at 927. Accordingly, "[c]omprehensive pretrial investigation is a necessary prerequisite to enable counsel to negotiate a plea that will allow the defendant to serve a lesser sentence or . . . to uncover facts that will make the client legally ineligible for the death penalty." Id. at 925 (emphasis added). To be comprehensive, "at minimum the assistance of a professional investigator and a mitigation specialist" should be obtained. Id. For that reason, 2003 ABA Guideline 4.1 requires that the defense team consist of such an investigator and mitigation specialist. 2003 ABA Guidelines at § 4.1, p. 952. Indeed, defense counsel lacks the expertise necessary to conduct the required thorough investigation, making "[t]he assistance of an investigator who has received specialized training . . . indispensable to discovering and developing the facts that must be unearthed at trial or in post-conviction proceedings." Commentary to 2003 ABA Guidelines at 958 (emphasis added). Without a comprehensive investigation by trained personnel, the right to offer mitigating evidence found in the Eighth Amendment becomes meaningless. See id. at 927.

"It is well established under Strickland and its progeny that trial counsel's failure to conduct an 'adequate investigation in preparing for the sentencing phase of a capital

trial' may amount to ineffective assistance." Emmett v. Kelly, 474 F.3d 154, 161 (4th Cir. 2007) (citing Rompilla v. Beard, 545 U.S. 374, 380 (2005)). Under Strickland, defense counsel's performance in effective assistance cases is measured against what is "reasonable[] under prevailing professional norms," Strickland, 466 U.S. at 688, and under the Supreme Court's Wiggins decision, the ABA Guidelines are considered to be "well-defined norms," Wiggins, 539 U.S. at 524. Consequently, the failure to use trained investigators in conducting a mitigation investigation, as mandated by the 2003 ABA Guidelines, has caused some federal courts to conclude that the defense counsel failed the competency prong of the Strickland test. See e.g. Sowell v. Collins, No. 1:94CV237, 2008 WL 859137, at *21 (S.D. Ohio Mar. 31, 2008) (finding a lack of reasonable professional judgment where defense counsel "did not request or obtain a mitigation specialist or investigator, and instead relied on the investigations of others who were not trained to conduct the type of investigation required in a capital case"); Green v. Johnson, No. CIVA 2:05CV340, 2006 WL 3746138, at *23 (E.D. Va. Dec. 15, 2006) ("Because the decision not to request a mitigation expert was clearly a mistake, and because prevailing professional norms (as evinced by the ABA Guideline) recommended a mitigation expert, this Court finds that [defense counsels'] performance fails the competence prong of the Strickland test.").

Inflicting a penalty of death is both "extraordinary and irrevocable"; as such, "at every stage of the proceedings counsel must make extraordinary efforts on behalf of the accused." Commentary to 2003 ABA Guidelines at 923 (internal quotations omitted). The law students' investigation in Petitioner's case was less than ordinary due to the lack of training and supervision necessary to effectively carry out the critical investigation

which they were assigned by defense counsel to pursue. While it is possible to use law students effectively in a mitigation investigation, defense counsel are obliged to provide the students with effective training, development, and education. 2003 ABA Guidelines at § 8.1, p. 976 ("The Legal Representation Plan should provide funds for the effective training, professional development, and continuing education of <u>all</u> members of the defense team.") (emphasis added). As noted by one professor familiar with law school capital clinic programs, law students are capable of providing meaningful contributions to the defense, but "[t]he work appropriate for law students is best limited to tasks that can be specified, detailed, and those tasks which have <u>already been looked into by the defendant's lawyer or investigator</u>. Law students can do <u>follow-up</u> and <u>confirming interviews</u> that can be checked against the initial interview by fully qualified professionals." Roark Reed, <u>Are Law Students Capable of Delivering a "Reasonable Investigation" as Required by the U.S. Supreme Court in Capital Cases?</u>, 13 L. & Bus. Rev. Am. 923, 942 (2007). Law student involvement in the representation of capital defendants and in the investigation of mitigating circumstances must involve adequate training, be limited, be of a cumulative nature, and be highly supervised.

Petitioner's defense counsel was deficient in its performance for failing to conduct an adequate mitigation investigation. Defense counsel assigned to their law students investigation responsibilities which were beyond their capabilities—responsibilities that were far more than merely cumulative or confirming in nature. As noted by the Declarations of Matthew Rawlings and Tim Kane, defense counsel provided students with either no training or minimal training while expecting them to adequately and effectively locate potential witnesses, interview witnesses, and gather documents

with the goal of piecing together a mitigation case that would result in the Petitioner's life being spared. Declaration of Matthew Rawlings (contained in *PA* Document #16, ¶¶ 1-5), Declaration of Tim Kane (contained in *PA* Document #11, ¶¶ 1-6). Assigning critical interviewing and investigation duties to untrained and unsupervised law students was unreasonable under professional standards at the time, as evidenced by the 2003 ABA Guidelines which require the use of an "investigator who has received specialized training." Commentary to 2003 ABA Guidelines at 958. Petitioner concedes that defense counsel did hire trained investigators and mitigation specialists to conduct certain aspects of the mitigation investigation. But this does not cure the issues with the law students because the "specialists" also failed to locate key witnesses.

The fact remains that many important investigation tasks were left to law students who were unprepared and ill-equipped to handle them. It is intuitive that the requirements found within the 2003 ABA Guidelines extend to <u>all</u> aspects of the investigation, making it irrelevant that trained personnel conducted some aspects of Petitioner's mitigation investigation; what is important is that untrained personnel were used for critical parts of the investigation. If that were not the case, the 2003 ABA Guideline requiring the use of trained investigators would provide little benefit to capital defendants.

Defense counsel's deficient conduct prejudiced Petitioner. Had defense counsel not used untrained law students to conduct critical parts of the investigation, additional witnesses and testimony would have been elicited and presented to the jury. The students missed key witnesses such as Monica Wolowinski, Nathan Fulks, and Tracy Graybeal. These witnesses would have provided non-cumulative testimony relating to the shocking

89

childhood of Petitioner. Had defense counsel not been deficient in their use of untrained law students, Wolowinski could have testified as to the neglect and physical abuse which Petitioner suffered and how she did what she could to look after Petitioner and treat the injuries which resulted from the beatings he endured. Declaration of Monica Wolowinski (contained in *PA* Document #13, ¶¶ 2-5, 7, 11). Even more shocking, Wolowinski could have also testified that Petitioner was being sexually abused by his father. Id. at ¶¶ 8-9. Had defense counsel not been deficient in their use of untrained law students, Nathan Fulks could have been called as a witness to corroborate Wolowinski's testimony regarding the abuse of Petitioner by his parents, and he could have testified that Petitioner's father was a sexual deviant and very violent. Declaration of Nathan Fulks (contained in *PA* Document #18, ¶¶ 3, 5-6, 9). Like Wolowinski, Nathan Fulks could have testified as to the sexual abuse Petitioner suffered. Id. at ¶ 12. Had defense counsel not been deficient in their use of untrained law students, Tracy Graybeal could have testified that Petitioner's older sister had molested him when he was a small boy and that Petitioner was driven to alcohol in an effort to cope with his childhood abuse. Declaration of Tracy Graybeal (contained in *PA* Document #12, ¶¶ 5, 7). Had defense counsel not been deficient in their use of untrained law students, Beth McGuffin could have also corroborated the sexual abuse inflicted on Petitioner when he was a child. Declaration of Beth McGuffin (contained in *PA* Document #22, ¶¶ 8).

"[A]lthough we suppose it is possible that a jury could have heard [all this evidence] and still have decided on the death penalty, that is not the test." Rompilla, 545 U.S. at 393. Petitioner must merely demonstrate "[a] reasonable probability that despite [Petitioner's] legal eligibility for the death penalty, one juror considering the original and

newly raised evidence together would have voted for life imprisonment." <u>Buckner v. Polk</u>, 453 F.3d 195, 203 (4th Cir. 2006). The shocking account of neglect, physical abuse, and sexual abuse of Petitioner which these witnesses could have provided would have made for a very compelling mitigation case. Had this newly raised evidence been presented, the jury would have been obliged to weigh the evidence against the aggravating circumstances. There is a reasonable probability that least one juror, upon the hearing of the additional mitigation witnesses, would have voted for life imprisonment rather than a death sentence. Such a probability undermines confidence in the outcome of Petitioner's capital sentencing proceeding, making defense counsel's errors unarguably prejudicial.

Defense counsel assigned law students critical aspects of the mitigation investigation, such as locating and interviewing witnesses, but failed to provide more than a minimal amount of training in proper interviewing and investigative techniques. As a result, key testimony and witnesses were overlooked, causing compelling mitigation evidence to remain unseen by the jury. The failure to use trained investigators for all aspects of the mitigation investigation was unreasonable under prevailing professional standards at the time, as evidenced by the 2003 ABA Guidelines. Had the newly discovered mitigation evidence been presented to the jury, there is reasonable probability that at least one juror would have been compelled to vote for life imprisonment rather than death. This prejudice resulting from defense counsel's deficiencies amounts to ineffective assistance of counsel, and Petitioner's death sentence should, therefore, be reversed.

**CLAIM V: PETITIONER'S APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO APPEAL THE COURT'S JURY CHARGE ON MITIGATION**

**AS VIOLATING THE EIGHTH AMENDMENT INASMUCH AS IT CREATED A SUBSTANTIAL RISK THAT THE JURY WOULD SCREEN OUT, AND THUS FAIL TO CONSIDER AND GIVE EFFECT TO, FACTORS THAT WERE UNQUESTIONABLY MITIGATING.**

Appellate counsel failed to raise in the Fourth Circuit that this Court incorrectly instructed the jury on the fact-finding process with respect to mitigating factors. The instruction was as follows:

> As to the mitigating factors asserted by the defendant, Mr. Fulks, in this case, the law provides that there is, essentially, no limit on the number of factors or things that the jury may consider in mitigation. As to each of the factors submitted by the defendant, and which I am about to list, you must, essentially, engage in a two-step process in determining whether any one or more of them have been proven.
>
> Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence.
>
> Secondly, if you determine that the factor has been proven, you must determine whether the fact is mitigating, as I have defined that term for you. That is, it tends to suggest that life in prison without parole and not death is the appropriate punishment.

TT 06/29/2004 at 274 (emphasis added).

Rather than advising the jury that it may give whatever weight it deems appropriate to a particular mitigating factor, the instruction given by the Court asks the jury, once it has already found that a particular fact exists, to further screen that fact to determine whether it is, in fact, mitigating. The only guidance the jury is given in making that determination is the Court's definition of "mitigating" as "tend[ing] to suggest that life in prison without parole and not death is the appropriate punishment." TT 06/29/2004 at 274.

This instruction violates the Eighth Amendment in that it creates a substantial risk that the jury will screen out, and therefore fail to consider and give effect to, facts that are unquestionably mitigating. A mitigating factor either exists or it does not. For example,

the mitigating factors list submitted to the jury here included three mitigators that were modeled on statutory mitigating factors included under 18 U.S.C. § 3592(a):

1.      Mitigator #38: "Chadrick Evan Fulks' capacity to conform his conduct to the requirements of law was impaired." This is modeled on the "impaired capacity" mitigator at 18 U.S.C. § 3592(a)(1). No jurors found this mitigator.

2.      Mitigator #39: "Chadrick Evan Fulks took part in the offenses under mental and/or emotional disturbance." This is modeled on the "disturbance" mitigator at 18 U.S.C. § 3592(a)(6). No jurors found this mitigator.

3.      Mitigator #41: "Other factors in Chadrick Evan Fulks' childhood, background, or character weigh against the imposition of a sentence of death." This is modeled on the "other factors" mitigator, a.k.a the "catch all" mitigator, at 18 U.S.C. § 3592(a)(8), although it is woefully inadequate because it is not as extensive as the statutory language. Only one juror found this mitigator.

Because the statute recognizes these factors as being mitigating, there is no need for the jury to make this same determination. The only relevant question for the jury to determine with respect to these factors is whether they exist by a preponderance of the evidence. If there is a finding that they do exist, then there is no need to engage in the second step of the two-step process articulated by this Court because there has already been a legislative determination that such facts <u>are</u> mitigating. At that point, any juror who so finds that fact is constitutionally obligated to consider and give effect to that mitigating factor. <u>See, e.g.</u>, <u>Boyde v. California</u>, 494 U.S. 370, 377-78 (1990) (once the threshold for relevance has been met, the "Eighth Amendment requires that the jury be able <u>to consider and give effect to</u>" a capital defendant's mitigating evidence) (emphasis

added); <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 114-15 (1982) (sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration").

However, under the instructions given to the jury here, these unquestionably mitigating factors could be screened out at the second step if a juror, contrary to § 3592(a), determined that these factors were not, in fact, cognizable mitigators. Thus, a juror might improperly fail to consider and give effect to a mitigating factor found to exist because he or she improperly concluded at the second step that the factor was not mitigating, i.e., not relevant to whether or not a life sentence was more appropriate than a death sentence.[7]

Indeed, the verdict form indicates that none of the jurors found the impaired capacity or the disturbance mitigators, and only one juror found the insufficiently paraphrased "catch all" mitigator. Because of the defective charge, the jurors likely did not find the existence of those factors – i.e., they made their decision based on the first step of the two-step process. The verdict form, however, does not separate out the findings for each mitigator into these two steps. Consequently, it is difficult to determine whether the jurors decided that the factors in question did not exist, or whether it was based on the (incorrect) conclusion that even if the factors existed, they were not valid mitigators.

---

7 While it would certainly be permissible for a juror to give little or no weight to a given mitigating factor, that is not the same thing as a determination that a factor is not mitigating. In the former case, the juror recognizes that the factor is mitigating in nature, but merely decides that in the circumstances of the case before it, the factor is not persuasive enough to tip the balance in favor of life. In the latter case, however, there is simply no recognition that the factor is a valid mitigator. In other words, it is one thing to argue that a defendant's cognitive impairments had little weight when balanced against a particular aggravating factor, and quite another to argue that a defendant's cognitive impairments are not relevant to the question of whether a life sentence is more appropriate than a death sentence.

This ambiguity is reminiscent of the Supreme Court's decision in <u>Mills v. Maryland</u>, 486 U.S. 367 (1988). There, the Supreme Court identified the following constitutional harm in capital sentencing proceedings: if a jury is instructed that it cannot find that the defendant has proven mitigation unless the jury is unanimous in that finding, there is a grave risk that the defendant may be sentenced to death even though some of the jurors may have believed that mitigation did, in fact, exist. <u>Mills</u>, 486 U.S. at 373-74.

The <u>Mills</u> court illustrated the problem with the following hypothetical: if eleven jurors believe mitigation exists, but one juror does not, the jury might erroneously conclude that they must report that no mitigation was proven because they could not obtain a unanimous "yes" vote. <u>Id.</u> In other words, the jurors who did find mitigation may have thought they were precluded from considering and giving effect to that mitigation because it was not found unanimously. A defendant, therefore, might be sentenced to death even though eleven jurors believed there was mitigating evidence.

In order to remedy that problem, the <u>Mills</u> Court held that it was unconstitutional to instruct the jury that it could only answer "yes" as to the existence of mitigation if the jury was unanimous that mitigation was proven. Otherwise, a "no" answer on the existence of mitigation would be inherently ambiguous – it could either mean that the jury unanimously rejected the existence of mitigation, or that the jury was hung on the issue, and voted "no" because it was the default answer: "The jury was instructed to mark each answer 'yes' or 'no.' Although it was clear that the jury could not mark 'yes' in any box without unanimity, nothing the judge said dispelled the probable inference that 'no' is the opposite of 'yes,' and therefore the appropriate answer to reflect an inability to answer a question in the affirmative." 486 U.S. at 378-79.

The findings on the Fulks verdict form are similarly ambiguous: a "zero" vote on a given mitigator could either mean that no jurors found that the factor existed, or it could mean that one or more jurors found the existence of that factor, but did not think it was, in fact, mitigating.

This Court's instruction that mitigation had to be found pursuant to a two-step process is analogous to the scheme that the Supreme Court found unconstitutional in Tennard v. Dretke, 542 U.S. 274 (2004). There, the Court addressed a judicially created requirement that mitigating evidence be screened for "constitutional relevance" before considering whether the jury instructions on mitigation comported with the Eighth Amendment. Tennard, 542 U.S. at 284. Specifically, the Fifth Circuit required that mitigating evidence show "(1) a uniquely severe permanent handicap with which the defendant was burdened through no fault of his own, . . . and (2) that the criminal act was attributable to this severe permanent condition." Id. at 283 (internal quotation marks and citation omitted).

The Supreme Court rejected the Fifth Circuit's two-part test for mitigating evidence and ruled that it violated the Eighth Amendment because it would preclude a jury's ability to consider and give effect to what is otherwise obviously mitigating evidence. In Tennard's case, the mitigating evidence in question was evidence of his low IQ. As the Court noted, "impaired intellectual functioning is inherently mitigating. . . . [W]e cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence . . . unless the defendant also establishes a nexus to the crime." Id. at 287. See also id. at 288 ("Impaired intellectual functioning has mitigating dimension beyond the impact it has on the individual's ability to act deliberately.").

96

Appellate counsel had clearly established case law to demonstrate to the Fourth Circuit that this Court's instruction violated the Eighth Amendment. Under Tennard, Mills, and Eddings, the instruction created a substantial risk that the jury would screen out, and therefore fail to consider and give effect to, facts that were unquestionably mitigating. Because 18 U.S.C.A. § 3592(a) recognizes many of the factors submitted to the jury are mitigating as a matter of law, the statute obviates the need for the jury to engage in further screening. See Tennard, 542 U.S. at 286 ("But under the Fifth Circuit's test, the evidence would have been screened out before the time came to consider" what weight to give the evidence). A juror who finds the existence of a mitigating factor is constitutionally obligated to consider and give effect to that mitigating factor.

The unconstitutionality of the two-part test was clearly established at the time of Petitioner's appeal. Trial counsel objected to this jury instruction, preserving the issue for review. Petitioner was prejudiced by this failure of appellate counsel inasmuch as the Fourth Circuit would likely have held that this Eighth Amendment violation required that Petitioner receive a new trial.

## CLAIM VI: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE GOVERNMENT'S IMPOSITION OF A NEXUS REQUIREMENT ON THE JURY'S MITIGATION FINDING.

The prosecutor encouraged the jury to think about mitigation in terms of a causal nexus that was rejected by the United States Supreme Court in Tennard v. Dretke, 542 U.S. 274 (2004). Trial counsel did not make any contemporaneous objections to the prosecutors comment, nor did trial counsel move for a mistrial based on these comments.

In his initial summation, the prosecutor argued:

Now the defendant's mitigation. I am almost done. Two points I want to make, reminders, and, again, I will discuss with you in reply. One is this, this whole idea of cause-and-effect. You heard that phrase used in some of the questions.

> Every one of the defense experts admitted there is no cause-and-effect. That whatever issues that Chad Fulks has, there is no cause-and-effect. What does that mean? That means, despite the fact that Chad Fulks might have had a bad upbringing, the fact that those causes exist, does not make people commit violent crimes. There is no evidence of that. Anyone to come in the courtroom and claim that, that is junk science. Even their experts acknowledge that. There is no cause-and-effect.
>
> Ladies and gentlemen, think about, think about all of the millions of Americans that suffer, that have significant brain injuries, that have cysts and tumors on their brain, that have damaged brains from gunshot wounds, epilepsy, from all kinds of diseases and accidents. Think about the millions of Americans who have damaged brains but don't carjack women. And think about the millions of Americans with IQs of 79 or lower that don't rape women. And think of all the citizens in this country throughout the years from the – even before the Great Depression . . . all the struggles that people have faced, all of the prejudice, all of the biases, all of the poverty, all of the horrible upbringings, but the overwhelming majority of people that grow up in crack-infested households, with alcoholic parents and abusive situations that have a terrible upbringing, the overwhelming majority of these people, they don't kill women. There is no cause-and-effect.

TT 06/29/2004 at 129-30.

The prosecution clearly set forth a legally flawed argument that the jury must find some causal nexus between the evidence offered as mitigating and the crime committed before such evidence can be taken into account by the jury in arriving at its sentencing decision. This is legally incorrect.

In a capital sentencing proceeding, mitigating evidence must be considered by the sentencer: "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978); see also Woodson v. North Carolina, 428 U.S. 280, 304 (1976). The sentencer may assign whatever weight to the mitigating evidence it chooses, but it "may not give it no weight by excluding such evidence from [its] consideration." Eddings v. Oklahoma, 455 U.S.

104, 114-15 (1982). The relevance standard for the admission of mitigating evidence in such a proceeding is very liberal. Tennard v. Dretke, 542 U.S. 274, 284, 287 (2004). Importantly, it is not enough that the jury simply be presented with certain mitigating evidence by the defendant; in addition, "the trial court [is required] to empower the jury with a vehicle capable of giving effect to that evidence." Smith v. Texas, 543 U.S. 37, 45 (2004) (emphasis added).

Additionally, any requirement that there be some nexus between the crime charged and the mitigating evidence offered has been specifically rejected by the Supreme Court. Smith, 543 U.S. at 45; Tennard, 542 U.S. at 287. Such a nexus test "has no basis in [Supreme Court] precedents and, indeed, is inconsistent with the standard [the Supreme Court has] adopted for relevance in the capital sentencing context." Id. Supreme Court precedents predating Tennard made "plain" that there is no nexus required in order for mitigating evidence to be considered relevant; in fact, the nexus test is one that has "never [been] countenanced and now [is] unequivocally rejected." Smith, 543 U.S. at 45.

The principles underlying the foregoing rules of law are clear: "in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson, 428 U.S. at 304. It is only after the proceeding provides the jury with the appropriate means to evaluate and give effect to a defendant's mitigating evidence that there can be certainty "that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable

determination that death is the appropriate sentence." <u>Penry v. Lynaugh</u>, 492 U.S. 302, 319 (1989) *overruled on other grounds*, <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002) (quoting <u>Woodson</u>, 428 U.S. at 304–05).

The erroneous legal argument occurred in the prosecution's closing statement, and while "arguments of counsel generally carry less weight with a jury than do instructions from the court," the Supreme Court has recognized the danger which misstatements made by prosecutors carry, acknowledging that they may "have a decisive effect on the jury." <u>Boyde v. California</u>, 494 U.S. 370, 384 (1990). When evaluating misstatements made by counsel during closing arguments to the sentencer, the misstatements "must be judged in the context in which they are made." <u>Id.</u>

As an initial matter, it is clear that the prosecution's statements regarding "cause and effect," TT 06/29/2004 at 129-30, were an attempt to convince the jury that if it found that Petitioner's background did not cause him to commit the crimes he was accused of, the jury could not consider Petitioner's background for its mitigating effect at all. This background evidence was crucial in Petitioner's effort to convince the jury that death was inappropriate. Demanding a causal nexus before evidence can be considered for its mitigating effect, as the prosecution did, goes against the great weight of authority. The prosecution's argument goes past an attempt to merely convince the jury to assign little weight to Petitioner's mitigating evidence; instead, the prosecution's argument implied that Petitioner's background had no relevance in the capital sentencing proceeding at all. However, the relevance standard for the admission of mitigating evidence in such a proceeding is extraordinarily liberal, and as <u>Tennard</u> and <u>Smith</u> made clear, a nexus requirement conflicts with this liberal relevance standard and is not now,

nor has it ever been, a condition precedent to the consideration of mitigating evidence. Smith, 543 U.S. at 45; Tennard, 542 U.S. at 287. The prosecution's insistent cause-and-effect argument was inconsistent with these standards and Supreme Court cases.

Defense counsel's subsequent failure to object to the prosecution's line of argument was clearly unreasonable under professional standards at the time. The full consideration of all of Petitioner's mitigation evidence was critical to his hope that a jury would find that the aggravating circumstances of Petitioner's crime were outweighed by the unfortunate circumstances of his upbringing and personal situation. Defense counsel, knowing that to be the case, should have been prepared to object to the prosecution's incorrect legal argument, which very likely completely removed Petitioner's mitigation evidence from the jury's consideration.

Additionally, that Tennard was decided only five days before the prosecution made its flawed nexus argument is no excuse for the failures and omissions of defense counsel because sufficient case law already existed from which defense counsel could have based an objection. As noted, a nexus test is inconsistent with the liberal relevance standard, "has no basis in [Supreme Court] precedents," Tennard, 542 U.S. at 287, and had has "never [been] countenanced" by the Supreme Court, Smith, 543 U.S. at 45. Defense counsel should have known the importance and potential impact of the prosecution's argument and that the argument was not on solid legal ground, making the failure to object gross error sufficient to overcome the initial presumption of adequate representation within the range of accepted professional standards. Thus, Petitioner was deprived of "Counsel" as guaranteed under the Sixth Amendment.

Defense counsel's unacceptable failure to object resulted in prejudice to Petitioner. As mentioned, Petitioner desperately needed all of his mitigation evidence to be considered by the jury if he was to have any hope that the jury would spare him his life. The prosecution's argument and defense counsel's corresponding failure to object deprived the jury of the required "effective vehicle," Smith, 543 U.S. at 44, with which it should have been able to evaluate and give effect to the mitigation evidence, thus stripping Petitioner of his guaranteed due process rights and his rights under the Sixth and Eighth Amendments. Steadfast adherence to such rights becomes crucial, and cannot be dispensed with, in the context of a capital sentencing proceeding. An effective vehicle would have involved sending the jurors into deliberations with the absolute knowledge that they could consider evidence to be mitigating despite the lack of a causal nexus. The jury, and ultimately Petitioner, was failed in that respect.

Further, there is, at the very least, a reasonable probability that the jury followed the prosecution's urging not to consider Petitioner's mitigation evidence at all due to the absence of cause-and-effect, or a causal nexus. A failure by the sentencer to consider mitigating evidence is clearly inconsistent with Lockett principles, and "[a]ny barrier" to the consideration of such evidence "must therefore fall." McKoy v. North Carolina, 494 U.S. 433, 442 (1990). No matter what causes the barrier, "the conclusion would necessarily be the same: Because the [sentencer's] failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of Lockett, it is our duty to remand this case for resentencing." Id. (internal quotations and citations omitted). There was an obvious barrier in Petitioner's case: the prosecution's urging of the jury not to consider the Petitioner's background, the failure to object by defense

counsel, and the absence of any curative instruction addressing the prosecution's erroneous legal argument.  The prosecution's misstatements had a "decisive effect on the jury" and "must be judged in the context" of the corresponding failures by defense counsel.  Boyde v. California, 494 U.S. at 384.  The result was nothing short of prejudice to Petitioner because "[w]hen . . . jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error."  Griffin v. United States, 502 U.S. 46, 59 (1991).

In defense closing arguments, counsel only compounded the problems associated with their failure to object to the prosecution's nexus argument and effectively affirmed the prosecution's argument.  Defense counsel stated:

> I think Mr. Gasser was talking about cause and effect.  You know, it is not like kicking a soccer ball.  My foot hits it, the ball moves.  It is not cause-and-effect in that kind of way.  Not even the cause of brain damage and his childhood together.  No, it is not cause-and-effect.  People do have choices.

TT 06/29/2004 at 207.  Defense counsel addressed the cause-and-effect issue which the prosecution raised but failed to even assert that there was no cause and effect required in the context of mitigation.  In fact, defense counsel conceded the absence of cause and effect without arguing to the jury that the absence was legally irrelevant.  As a result, the jury entered deliberations having heard (1) the prosecution argue that the jury should not consider Petitioner's background as mitigating evidence due to the lack of a causal nexus and (2) defense counsel essentially recognize the merit of the prosecution's nexus argument without successfully rebutting it.  Additionally, while the jury charge addressed mitigating evidence generally, no aspect of the jury charge addressed the improper argument made by the prosecutor.  Even taking the general jury charge into account, the

prosecution's comments likely still prevented the jury from giving effect to the factors Petitioner offered as mitigating: "[I]n some circumstances the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Simmons v. South Carolina, 512 U.S. 154, 171 (1994) (internal quotations omitted). Considering all of this together, the jurors were only "left the option of relying upon a legally inadequate theory." Griffin, 502 U.S. at 59.

Given that the jury entered deliberations without full knowledge that it could consider mitigating evidence in the absence of a nexus to the crime, it cannot be said that a reliable result was reached on the basis of a fair trial. It is likely that had defense counsel objected to the prosecution's argument, the jury would have considered Petitioner's background and weighed it against the aggravating circumstances. The abuse and neglect which Petitioner suffered during his upbringing was shocking, and had the jury known that it was in fact obligated to consider that evidence, it may have sympathized with Petitioner and sentenced him to life in prison, rather than death. In the end, there is a reasonable probability that, without the defense error, the jury would have found that the balance between the aggravating and mitigating evidence in fact favored mercy for the Petitioner. As it currently stands, Petitioner very well may have been sentenced to death without enjoying the guarantee that some of his most important mitigating evidence would be considered by his sentencer.

**CLAIM VII. PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN ADVISING PETITIONER TO GIVE A STATEMENT TO THE FBI WHEN NO PROFFER LETTER OR PLEA AGREEMENT WAS IN PLACE.**

Petitioner's constitutional rights protected him from being subjected to government inquiries about the alleged crimes. As courts widely recognize, those rights

are very valuable.  See, e.g., United States v. Heatley, 39 F. Supp. 2d 287, 299 (S.D.N.Y. 1999) ("A defendant entering a proffer session is waiving valuable rights – first and foremost, his or her Fifth Amendment right not to incriminate oneself – which, even if that waiver is mitigated somewhat by the government's agreement not to use the statements directly in its case-in-chief, still may provide substantial leads or material for impeachment which the defendant would otherwise be free not to provide.")  Of course, in criminal prosecutions it is not uncommon for a criminal defendant to cooperate with the authorities.  Indeed, resolving a case with a plea of guilty or assistance to the government in exchange for a sentence less than death is proper.  Declaration of Andrea Lyon (contained in *PA*, document #1, ¶ 19).  It is virtually unheard of for an individual accused of a crime – especially one facing capital charges – and represented by counsel to submit to questioning in exchange for nothing from the government.  Indeed, allowing a client to cooperate with law enforcement without either a proffer letter[8] or plea agreement falls below accepted capital defense practices.  Declaration of Andrea Lyon (contained in PA, document # 1, ¶ 21).  Yet that is precisely what Petitioner's counsel did here.

Upon being arrested on November 20, 2002 and for the five months that followed, Petitioner gave no statement to the police.  In or around April 2003, Petitioner's counsel – despite having conducted an inadequate and incomplete investigation – advised

---

[8] A proffer letter is a written agreement between federal prosecutors and an individual under criminal investigation.  Declaration of Andrea Lyon (contained in PA, document # 1, ¶ 21). The agreement permits the individual to give the government information about the alleged crimes with some assurances that the individual will be protected against prosecution.  Id. Typically the agreements prohibit the government from using actual proffer session statements against the individual in its case-in-chief.  The government can, however, use information provided to follow up leads and conduct further investigations. Additionally, if the defendant testifies contrary to the statements given under proffer, the contrary proffered statements are then admissible.  If the new leads and further investigations reveal new evidence, this new evidence can be used by the government to indict and convict the individual.

Petitioner to sit down with law enforcement and provide a statement. Although Petitioner strenuously objected at first, he ultimately followed his counsel's advice. On April 28, 2003, as counsel advised, Petitioner admitted to being involved in the abduction and rape of Alice Donovan.

Prior to Petitioner's April 28, 2003 statement, the government had very little evidence establishing a capital case against Petitioner. Indeed, less than a week earlier, the government admitted to the grand jury that it had "no evidence" that Alice Donovan was actually killed in North Carolina or South Carolina – the only two states in which the death could have occurred. PTT 04/22/2003 at 94. The government admitted that it did not have a body "which is the most critical evidence" in a homicide case. PTT 1/20/2004 at 36. The second most critical piece of evidence, according to the government, is the clothing of the victim. Id. The government candidly admitted that it had no clothing items from Alice Donovan. Id. at 37. The government also lacked the clothing allegedly worn by the perpetrators when the homicide occurred. Id. at 37. The government claimed to have "a bunch of clothing items," but stated "we don't have any evidence to suggest what specific clothing items the two defendants were wearing when the act of homicide occurred, nor do we have any idea what that act of homicide was." Id. at 37. In sum, the government was very short on physical evidence and, absent Petitioner's voluntary statement, it would have had difficulty proving either Petitioner's or Basham's guilt beyond a reasonable doubt. Thus, Petitioner's willingness to provide a statement was of great value to the government, and counsel's advice that Petitioner take nothing in exchange for his statement was objectively unreasonable. See, e.g., Davis v. Greiner, 428

F.3d 81, 91 (2d Cir. 2005) (finding trial counsel's failure to advise client of "major risks" associated with providing proffer to government was objectively unreasonable ).

Further, because of counsel's objectively unreasonable advice, the government was able to fill the gaps in its evidence. Petitioner's cooperation without any protections of his own interests enhanced the government's trial presentation for death. Petitioner filled many holes where the evidence was lacking. Had trial counsel not provided unreasonable advice, there is a reasonable probability that: (1) Petitioner could have obtained an agreement from the government that would have spared his life in exchange for the missing information; or (2) Petitioner would not have provided the government with critical information, and the end result of the proceeding would have been different. See Strickland, 466 U.S. at 694.

**CLAIM VIII: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO REQUEST THAT THE STATUTORY CATCH-ALL MITIGATING FACTOR AND THE MINOR PARTICIPATION FACTOR BE INCLUDED IN THE VERDICT FORM SO THAT THE JURY COULD GIVE MEANINGFUL EFFECT OR A REASONED MORAL RESPONSE TO PETITIONER'S MITIGATING EVIDENCE.**

According to long-standing Supreme Court jurisprudence, a capital defendant may present any aspect of his character, record, or offense in mitigation of his culpability for the crime. The Court has determined that "in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the death penalty." Woodson v. North Carolina, 428 U.S. 280, 304 (1976). Two years later, the Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the

rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604.

In the present case, trial counsel was ineffective for two fundamental reasons. First, trial counsel did a poor job of gathering mitigation evidence. Second, compounding the lax efforts to collect mitigation evidence, certain important pieces of evidence that were collected could not be used by the jury because trial counsel failed to request that the statutory catch-all factor or the statutory minor participation factor be included on the verdict form. Consequently, the jury had no place on the verdict form to report or consider the full breadth of the mitigating evidence, including evidence demonstrating Basham's greater role and culpability.

### A. The "Catch-All" Mitigating Factor

Recognizing the importance of the Supreme Court's death penalty case law, Congress drafted the Federal Death Penalty Act, which specifically sets forth "catch-all" and "minor participation" mitigation categories. Under 18 U.S.C.A. § 3592(a)(8), in evaluating a sentence of death, the jury "shall consider . . . [o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." The statutory language is clear. The finder of fact must consider this specific catch-all mitigating factor during deliberations. Juries must have both the opportunity and the means to consider and give effect to relevant mitigating evidence. Penry v. Johnson, 532 U.S. 782 (2001) (reversing death sentence because the judge's instructions failed to allow the jury to consider and

give effect to defendant's mental retardation.)  Instead of listing this mandatory factor, the following appeared on the jury form: "41. Other factors in Chadrick Evan Fulks's childhood, background, or character weigh against imposition of the death sentence." Verdict Form (contained in *PA, document #27*).  Trial counsel's formulation omitted crucial, statutory language.  See 18 U.S.C.A. § 3592(a)(8).  Specifically, the Verdict Form offered by Petitioner's trial counsel failed to include the following phrase:  "<u>or any other circumstance of the offense that mitigate against imposition of the death sentence.</u>" <u>Id.</u>

The mandated statutory mitigating factor was relevant because there were some facts about the offense that suggested that Basham was much more culpable than Petitioner.  For example, Basham took the lead in the Hawkins abduction, was always armed with a weapon, and fired shots at the police.  The verdict form submitted to the jury does not address this notion of "relative culpability" and factor 41 as submitted to the jury was so narrowly drafted that it did not give the jury the opportunity to consider Basham's greater culpability.  Because trial counsel neglected to argue for the proper verdict form, the jury was unable to consider Petitioner's lesser involvement in the crime. See <u>Lockett v. Ohio</u>, 438 U.S. 280 (1978) (discussing individualized sentencing, particularly defendant's lesser involvement).

The omission of 18 U.S.C.A. § 3592(a)(8) on the Fulks verdict form is prejudicial.  There was no other place in the verdict form where a juror could express that Petitioner played a lesser role in the offense.  The United States Supreme Court has held that a capital sentencing jury must be "permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence" and that the sentencing process is

"fatally flawed" when the jury is precluded from doing so. <u>Abdul-Kabir v. Quarterman</u>, 127 S.Ct. 1654, 1675 (2007).

Considering the amount of time that Petitioner's counsel spent during closing argument trying to make the point that Petitioner was not the leader, it is baffling that counsel would not have included a corresponding mitigator on the verdict form. Petitioner's sentencing process was fatally flawed because the jury had no place on the verdict form to consider Basham's greater culpability. Failure of the jury to properly consider important mitigating factors foments an atmosphere in which a death sentence may be administered in an arbitrary and capricious manner in violation of Supreme Court jurisprudence. <u>See</u> <u>generally</u> <u>Lockett</u>, 438 U.S. at 601.

**B.     The "Minor Participation" Mitigating Factor**

Minor participation is also a statutory mitigating factor. Under 18 U.S.C.A. § 3592(a)(3), the "finder of fact shall consider . . . (3) Minor Participation. The defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge."

Petitioner has steadfastly asserted that he neither personally took part in the homicide of Donovan nor had he any awareness of Basham's intent to commit the killing before it occurred. PTT 05/04/2004 at 67. The evidence produced at trial regarding Donovan showed that Basham carjacked Donovan, secured the vehicle, and Petitioner did not enter the vehicle until after Basham was in complete control. In fact, Petitioner believed that Basham merely intended to steal a car, but instead Basham abducted Donovan and took her automobile. TT 06/14/2004 at 215. Regarding Donovan's death,

the evidence showed that after reentering South Carolina from North Carolina, Basham ordered Petitioner to stop along a dirt road so that Basham could leave Donovan tied up to prevent her from contacting the authorities.  Fulks, 454 F.3d at 416.  Basham led Donovan into the woods and out of Petitioner's sight.  He returned thirty minutes later, alone.  Id. at 416-17.

As stated above, the jury could have concluded that Basham was the leader of the November 2002 crime spree, was manipulative, aggressive, always carried a firearm, threatened to kill several people during the crime spree, and thus likely killed Alice Donovan.  Hence, the jury could have concluded that Petitioner was a minor participant had this been included on the verdict form.  Indeed, in a proper sentencing proceeding, a jury must be "provided with a vehicle for expressing its reasoned moral response to mitigating evidence in rendering its sentencing decision."  Penry v. Lynaugh, 492 U.S. 302, 328 (1989).  Petitioner's sentencing proceeding was "fatally flawed" because the jury could not have given meaningful effect to Petitioner's minor participation.  Abdul-Kabir v. Quarterman, 127 S.Ct. 1654, 1675 (2007).

The United States Supreme Court has held that a capital sentencing jury must be "permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence" and that the sentencing process is "fatally flawed" when the jury cannot so act.  Abdul-Kabir, 127 S.Ct. at 1675.  Trial counsels' failure to request the statutory catch-all factor or the statutory minor participation factor inhibited the jury from giving meaningful effect to mitigation evidence.  Accordingly, Petitioner has suffered prejudice and the outcome would have been different had these factors been included on the verdict form.  See Strickland, 466 U.S. 694.

111

**CLAIM IX: PETITIONER SUFFERED A COMPLETE MISCARRIAGE OF JUSTICE WHEN HE RELIED ON THE COURT'S INCOMPLETE AND INCORRECT EXPLANATION OF THE <u>PINKERTON</u> DOCTRINE AND AGREED TO A GUILTY PLEA AS TO THE CARJACKING COUNT DESPITE THE FACT THAT SUCH PLEA RAN COMPLETELY AFOUL OF PETITIONER'S OWN STATEMENTS AND THE EVIDENCE PRESENTED.**

In reliance on the Court's incomplete and incorrect explanation of the <u>Pinkerton</u> doctrine and upon advice of counsel, Petitioner erroneously pled guilty to the carjacking count pursuant to 18 U.S.C. § 2119. <u>Pinkerton</u> could not be used to support Petitioner's liability as to the carjacking count because Petitioner never had the intent to cause death or serious bodily injury to Alice Donovan. By accepting the plea, however, intent was imputed onto Petitioner despite his steadfast assertions to the contrary. Even the Court, prior to accepting the plea, acknowledged the lack of Petitioner's intent. The Court stated:

> Now the other count, count I, car-jacking resulting in death does have a mental state requirement. The fifth element was that…the taking is done or is attempted by force, violence or intimidation, and then fifth, in doing so the defendant intends to cause death or serious bodily injury.
>
> And that's where we had a problem with the 302 statement not relating any facts that would support a finding of intent to cause death or serious bodily harm.

PTT 05/04/2004 at 81. Moreover, Petitioner could not have reasonably foreseen that Basham had the intent to cause serious bodily injury or death to Donovan. In fact, at the time they entered the Wal-Mart parking lot and until Basham waved for Petitioner to join him, Petitioner was under the assumption that they had agreed to steal an *unoccupied* parked car. Had Petitioner been fully apprised as to the nature of the <u>Pinkerton</u> doctrine and its implications - i.e. that it was reasonably foreseeable that Basham was going to select an occupied car, and in doing so had the intent to cause serious bodily injury or death to Donovan -- Petitioner would not have pled guilty to any of the death-

112

eligible counts and instead would have forced the government to carry its burden of proof.

### A. Change of Plea Proceeding

Petitioner pled guilty to an eight-count superseding indictment. Count One alleged a violation of the federal carjacking statute, 18 U.S.C. § 2119. The crime of carjacking involves the following five elements:

(1) The taking of a motor vehicle from a person or presence of another;
(2) The taking is accomplished by force and violence or by intimidation;
(3) The motor vehicle has previously been transported, shipped, or received in interstate or foreign commerce;
(4) The intent to cause death or serious bodily harm at the time the motor vehicle is taken;
(5) Death results from the commission of the offense.

At Petitioner's initial plea colloquy on May 4, 2004, this Court was concerned about whether there was a sufficient factual basis for the plea on the carjacking count. PTT 05/04/2004 at 67. Specifically, the Court was concerned that the facts to which Petitioner admitted[9] did not establish the intent element. Id. at 68.[10] Indeed, Petitioner stated in his 302 statement that, "Basham was supposed to locate a car to

---

[9] Mr. Fulks did not submit a written or oral statement of offense conduct at the plea colloquy. Rather, defense counsel submitted a copy of the FBI 302 report which contained Mr. Fulks's statement to the FBI regarding his role in the carjacking and kidnapping of the victim, Alice Donovan. PTT 05/04/2004 at 66.

[10] In Holloway v. United States, 525 U.S. 1 (1999), the Supreme Court described the intent requirement of § 2119 thusly:

> The carjacking statute essentially is aimed at providing a federal penalty for a particular type of robbery. The statute's *mens rea* component thus modifies the act of "taking" the motor vehicle. It directs the factfinder's attention to the defendant's state of mind at the precise moment he demanded or took control over the car "by force and violence or by intimidation." If the defendant has the proscribed state of mind at that moment, the statute's scienter element is satisfied.

525 U.S. at 8. As the Court further explained: "The intent requirement of § 2119 is satisfied when the Government proves that at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car (or, alternatively, if unnecessary to steal the car)." *Id*. at 12.

steal…[Petitioner] assumed that Basham was going to steal an *unoccupied* car." FBI 302 04/28/2003 (contained in *PA, document* # 41 at 1). Petitioner never formed the requisite intent, nor was it reasonably foreseeable that Basham had the intent to cause death or bodily injury in carrying out the goal of the conspiracy -- to steal a car. Consequently, the Court opined that guilt might be established by resort to either an aiding and abetting theory of liability, or <u>Pinkerton</u> liability, but was rightly hesitant about both:

> So, on the state of the record here, we have to look at either aiding and abetting liability or Pinkerton liability. Aiding and abetting requires some type of specific intent to help bring about the crime.

> I don't think it fits the facts set out in his 302 form, because, as I said, Mr. Fulks does not admit that he knew that she was going to be killed, and he does not admit that he wanted to help bring it about.

> Then we are left with so-called Pinkerton liability, which was established by the Supreme Court in the case of Pinkerton versus United States back in 1946. In that case the Supreme Court held that a conspirator may be convicted of substantive offenses committed by co-conspirators in the course of and in furtherance of the conspiracy.

> But what I have been agonizing over is, counts 1 and 2, two counts that carry the death penalty, do not charge a conspiracy. And count – is it 3 or 4 that does charge a conspiracy? 4. Count 4 that charges the laundry list of the conspiracy, if you wanted to apply Pinkerton to that, you could. But the problem is that the maximum penalty for count 4 is five years.

> So, I'm not sure that we need to – I think the thing to do is to just stop right here and resume tomorrow and let me hit the books and y'all hit books tonight to see if the law is that Pinkerton can apply to a murder case where there is a conspiracy is not charged.

PTT 05/04/2004 at 68-69.

> At the conclusion of that hearing, this Court again reiterated valid concerns:

> My concern is, I did not know when I walked out here that all I was going to have for a factual statement was his 302 that really admits kidnapping and admits car-jacking, but does not admit any complicity in death.

And so the two options we have I think are looking at aiding and abetting, which I don't think fits. Because aiding and abetting requires some manifestation of an intent to help bring about the crime that occurred. I don't think this 302 says that.

Then we have Pinkerton liability, the co-conspirator theory of imputing liability. But I'm just not sure of my authority to apply that doctrine to counts 1 and 2 which do not charge a conspiracy, and that's my precise question that I would like for y'all to take a look at.

Id. at 72-73.

By May 6th, both the government and the defense had filed legal memoranda regarding the Pinkerton issue. Both the government and the defense argued that the Pinkerton doctrine was applicable to the carjacking offense and sufficient to establish a valid guilty plea on that count.[11] *See* Defendant's Memorandum of Law Regarding the Propriety of a Guilty Plea (contained in *PA, document* #35); Memorandum of the United States in response to Issues Raised by the Court (contained in *PA, document* # 36).

The plea colloquy resumed on May 7, 2004. At that time, this Court was apparently satisfied with the memoranda of the defense and government so that the plea continued. The Court then read the 302, and after each paragraph, asked Petitioner on the record whether he admitted to the facts as stated in the 302. PTT 05/07/2004 at 83-99. At the conclusion of this process, the Court stated:

All right. I'm prepared to accept the plea – I'm prepared to state that there's a factual basis for the plea. We have got a ways to go before I can accept the plea. I'm prepared to conclude that there's a factual basis for the plea as to counts 1 and 2, all the elements appearing to have been satisfied.

As I said earlier, I do not think it is necessary to rely on the Pinkerton doctrine to accept the plea as to count 2, the kidnapping. As to count 1, because it does have an intent requirement in the fifth element, it is necessary to rely on Pinkerton.

---

[11] Both parties also agreed that resort to Pinkerton was unnecessary on the kidnapping count, as there was no intent element to satisfy, and the statements in the 302 sufficed to establish a guilty plea on that count.

I have concerns about the applicability of Pinkerton, and I cancelled all my hearings yesterday all day so I could read and have my law clerk help me look through the law on this. But with the concession by the government and the defense counsel that Pinkerton applies, I'm prepared to accept the factual basis for count 1 based on Pinkerton.

I realize that one could make a due process argument that although Pinkerton has been applied to ordinary conspiracies and ordinary criminal ventures, that due process would prevent it from applying to a capital case. But we found no authority in any reported decision or anything anywhere to suggest that due process, or any other constitutional provision, would bar the use of Pinkerton.

Id. at 100-101.

In canvassing Petitioner as to the factual basis for his guilty plea on the carjacking count, the Court had the following exchange with Petitioner as to the intent element:

The Court:    And then the only one left is number 5. That in taking the car, you intended to cause death or intended to cause serious bodily harm to Ms. Donovan. Your 302 statement does not indicate that you intended to cause death or bodily harm.

There is a body of law known as the Pinkerton doctrine – and this is very legalistic but I need to explain it to you – that holds that in a conspiracy where two or more people agree to commit some illegal act, the act of any conspirator can be imputed to the other members of the conspiracy.

For purposes of this case, that means if Mr. Basham intended to cause death or intended to cause serious bodily harm at the time Ms. Donovan was abducted, that will be sufficient to meet this element, element number 5, if y'all were working in a conspiracy together.

The government and your lawyers have agreed that this Pinkerton doctrine that I have just tried to explain on a very elementary basis would apply to number 5. Do you agree with that?

Mr. Fulks:    Yes, sir.

Id. at 162-63.

The Court later clarified in the proceeding that by pleading guilty on the carjacking count, Petitioner was not conceding any of the FDPA gateway intent factors, and reserved the right to argue about those factors to the jury in the penalty phase:

116

| The Court: | All right, So, let's be very clear now, the defendant takes the position that there is an adequate basis for taking the plea to count 1, the car-jacking resulting in death, based on Pinkerton, and you concede that is enough for acceptance of a guilty plea; you reserve the right to take issue with the government's contention that your client had the requisite intent to receive the death penalty, which will be a question for the jury in the penalty phase? |
| --- | --- |
| Mr. Nettles: | That's correct. |

Id. at 173.

At the conclusion of the hearing, the Court accepted the plea on all eight counts of the indictment and stated:

> I found that he has admitted to an adequate factual basis to support a finding of guilt as to each of the eight counts of the indictment.
>
> As I said, count 1 creates the most difficulty, but I am persuaded that the Pinkerton doctrine can be applied to allow the plea to go forward based on the statements contained in the 302 report of [the] interview provided by the FBI. No party has raised any due process challenge or other challenge to the application of Pinkerton to count 1 of this case.
>
> For all the foregoing reasons, I find that the defendant's plea is freely and voluntarily made and it is accepted by this court, which means we will proceed then to a penalty phase before a jury as to counts 1 and 2.

Id. at 192.

**B     The explanation of Pinkerton was legally incorrect because it presupposed that Donovan's death was "reasonably foreseeable" to Petitioner.**

In Pinkerton v. United States, 328 U.S. 640 (1946), the Supreme Court held that the criminal act of one conspirator in furtherance of the conspiracy is attributable to the other conspirators for the purpose of holding them responsible for the substantive offense. 328 U.S. at 647. This aspect of Pinkerton, commonly referred to as "Pinkerton liability" or the "Pinkerton doctrine," permits the government to prove the guilt of one defendant through the acts of another committed within the scope of and in furtherance of

the conspiracy of which the defendant was a member, provided that the acts are "reasonably foreseen as a necessary or natural consequence of the unlawful agreement." Id. at 647-48. In other words, mere membership in the conspiracy is insufficient to establish Pinkerton liability – there must also be some evidence that the act for which the government seeks to hold the defendant liable was a "reasonably foreseeable" consequence of the conspiracy that the defendant entered into. Id. at 648. As the Fourth Circuit explained in United States v. Irvin, 2 F.3d 72, 75 (4th Cir. 1993): "In order to be reasonably foreseeable to another member of the criminal organization, and thus to hold a co-conspirator criminally liable, acts of a co-conspirator must fall within the scope of the agreement between the specific individual and the co-conspirator." (Internal quotation marks and citation omitted).

As the preceding excerpts of the plea colloquy demonstrate, the "reasonable foreseeability" aspect of the Pinkerton doctrine was not considered or discussed at the time of Petitioner's change of plea. The Court's explanation of the doctrine to Petitioner was as follows:

> There is a body of law known as the Pinkerton doctrine – and this is very legalistic but I need to explain it to you – that holds that in a conspiracy where two or more people agree to commit some illegal act, the act of any conspirator can be imputed to the other members of the conspiracy.
>
> For purposes of this case, that means if Mr. Basham intended to cause death or intended to cause serious bodily harm at the time Ms. Donovan was abducted, that will be sufficient to meet this element, element number 5, if y'all were working in a conspiracy together.

PTT 05/07/2004 at 162.

This explanation of the Pinkerton doctrine was legally incorrect. First, it failed to explain that in order for Petitioner to be liable as a co-conspirator, he had to have reasonably foreseen Donovan's death as a necessary and natural consequence of the

118

unlawful agreement between Basham and Petitioner to commit the carjacking. Additionally, the Court's explanation of the doctrine was impermissibly broad – it indicated that as long as two people were working in a conspiracy together, any act committed by one conspirator was attributable to the other. The <u>Pinkerton</u> doctrine is not nearly that expansive. As the Supreme Court explained in <u>Pinkerton</u>, conspiratorial liability has some important caveats:

> A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.

<u>Pinkerton</u>, 328 U.S. at 647-48.

The significance of the Court's failure to properly articulate the <u>Pinkerton</u> doctrine at the plea colloquy is that Petitioner was not properly informed of the nature of the charges against him – he was misled into believing that the proof and elements necessary to find him guilty of the carjacking count were much less stringent than they actually were. See <u>United States v. Douglass</u>, 780 F.2d 1472, 1475-76 (9th Cir. 1986) (requiring the court instruct the jury that the defendant could only be found liable under <u>Pinkerton</u> if the government established all the essential elements of the offense *and* the three <u>Pinkerton</u> factors: (1) the substantive offense was committed in furtherance of the conspiracy; (2) the offense fell within the scope of the unlawful project; and (3) the offense could reasonably have been foreseen as a necessary or natural consequence of the unlawful agreement)(emphasis added). This is particularly significant here, where Petitioner maintained, even at the time of the guilty plea, that he assumed that Basham was going to steal an unoccupied car and, moreover, did not know that when Basham carjacked Donovan's car Basham had any intent to cause death or serious bodily injury.

*See* <u>Holloway v. United States</u>, 526 US 1, 7-8 (stating that the intent element in Section 2119 modifies the act of "taking," and thus "directs the factfinder's attention to the defendant's state of mind at the precise moment he took or took control over the car 'by force and violence or by intimidation'"). In addition, Petitioner could not have reasonably foreseen that Basham planned to kill Donovan when he took her in the woods, as Basham told Petitioner he had no intent of hurting her. Petitioner only learned of Donovan's murder after the fact. According to Petitioner's 302, when Basham left with Donovan, he told Petitioner that he was just going to tie her to a tree. When he returned from the woods holding Ms. Donovan's clothes, Basham told Petitioner that he left her naked so that she would have a more difficult time once she managed to escape. Petitioner had no reason to doubt Basham's representation as it was consistent with the Hawkins abduction just days earlier wherein the duo left Hawkins alive and duct taped to a tree.

Despite these very relevant admissions, under the Court's formulation of <u>Pinkerton</u>, none of this information was relevant to assessing conspirator liability. Under a proper understanding of <u>Pinkerton</u>, however, this information was critical in forming the basis of a defense to <u>Pinkerton</u> – i.e., that <u>Pinkerton</u> liability cannot attach because the death of Donovan was not reasonably foreseeable to Petitioner.

An instructive case is <u>United States v. Allard</u>, 926 F.2d 1237 (1st Cir. 1991), in which the defendant pled guilty to a mail fraud charge stemming from lying about his education credentials in order to fraudulently obtain a license to practice medicine. The Information filed against him included three counts charging him with acting pursuant to

a scheme to defraud both the hospital he worked at (Worcester Hospital) as well as the state from which he obtained the license (Massachusetts).

At his plea colloquy, the district court advised him that the count to which he was pleading guilty (Count One) only involved allegations that he defrauded the state. As a matter of fact, however, that count also alleged that the defendant had defrauded the hospital, too, but the district judge did not read the Information during the course of the plea colloquy. The defendant argued that he was not informed of the true nature of the charge, and that had he understood that the charge included defrauding the hospital, he would not have pled guilty because he believed he had a valid defense, namely that the hospital was not defrauded because it did receive something of value in the form of his services as an intern. 926 F.2d at 1241. The defendant, therefore, filed a § 2255 motion requesting that he be permitted to withdraw his guilty plea. In analyzing the issue, the First Circuit stated:

> The effect of a failure to comply with the requirements of Rule 11 depends upon the nature of the failure. Mere technical violations of its procedural requirements do not warrant setting aside a plea. That is especially true if the defendant was not misled or the omission did not affect his decision. . . . *On the other hand, a violation that implicates one of the rule's core concerns mandates that the plea be set aside. It cannot be disputed that an adequate explanation of the charge and a determination that the defendant understands it are two of those core concerns.* . . . There is no talismanic test for determining whether the core concerns of Rule 11 have been satisfied. The manner in which the charge is explained and the method for determining the defendant's understanding necessarily vary from case to case depending upon the capacity of the defendant and the attendant circumstances.

Id. at 1244-45 (internal quotation marks and citations omitted) (emphasis added).

Here, the First Circuit found that the mail fraud charge was not adequately explained at the time of the plea colloquy. The Information itself, which accurately stated the nature of the charge, was not read by the judge or the government at the plea colloquy, nor did the record contain any evidence that the defendant had previously read

121

it.  Id. at 1245-46.  Moreover, neither the judge's explanation of the charge, nor the prosecutor's recitation of the facts underlying the plea, described the mail fraud scheme as one to defraud the hospital.  Id.  On these facts, the First Circuit held that the defendant was not adequately informed of the nature of that charge to which he pled guilty.  Id.  Additionally, the Court noted that "the Rule 11 standard takes into account the individual defendant's level of understanding.  Consequently, a mere reading of the indictment or information does not always satisfy the requirement of Rule 11 particularly when the charges are complex and the defendant possesses appreciably less than average intelligence."  Id. at 1247.

A Rule 11 violation has served as a basis for relief in numerous habeas corpus cases.  For example, in United States v. Gobert, 139 F.3d 436 (5th Cir. 1998), the movant raised a § 2255 claim arguing that his plea was invalid.  Specifically, he alleged that his conviction for using a firearm during and in relation to a drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1), was invalid because the district court failed to develop an adequate factual basis to support his guilty plea.  The Fifth Circuit agreed:

> Relief from a formal or technical violation under Rule 11 is not available in a § 2255 collateral attack, but instead is available only upon a showing of prejudice. We conclude that James Gobert has suffered prejudice, and is therefore entitled to relief.  First, the factual basis for his guilty plea to the § 924(c)(1) charge is grossly underdeveloped.  The factual basis filed by the government – and relied upon by the district court at the time he entered his guilty plea – contains nothing more than the bare assertion that "there was a .45 caliber pistol in David Gobert's vehicle."  Even though James Gobert admitted during the plea colloquy that he violated § 924(c)(1), the factual basis is devoid of evidence that he or David Gobert used or carried the pistol in relation to the underlying offense.

Gobert, 139 F.3d at 439-40 (internal quotation marks and citations omitted).  The Fifth Circuit held that in the absence of an adequate factual basis for the plea, it was clear error

for the district court to have accepted it, and therefore vacated the conviction and remanded for the entry of a new plea. Id. at 441.

Similarly, in United States v. Carter, 117 F.3d 262 (5th Cir. 1997), the movant challenged his conviction under § 924(c)(1) on the grounds that the factual basis for his guilty plea was insufficient, as there was no evidence developed at the plea colloquy that the movant "used" a firearm per the meaning of the statute. The Fifth Circuit agreed:

> A court cannot accept a guilty plea unless there is a sufficient factual basis for the plea. The factual basis must appear in the record and must be sufficiently specific to allow the court to determine if the defendant's conduct was within the ambit of that defined as criminal. . . . Relief from a formal or technical violation under Rule 11 is not available in a § 2255 collateral attack, but instead is available only upon a showing of prejudice. There is obvious prejudice to Carter in entering a plea of guilty to a crime which, based on the facts in the record, he did not actually commit.

Carter, 117 F.3d at 264 (internal citations omitted). The Fifth Circuit vacated the conviction and remanded for entry of a new plea. Id. at 265.

The present case is analogous to Allard, Gobert, and Carter. Petitioner's plea was defective because the Court provided an inadequate explanation of liability under the Pinkerton doctrine. Both anxious that the plea go forward at all costs, neither the government nor the defense corrected the Court's inadequate explanation at any time during the colloquy. Indeed, the parties' failure in this regard was consistent with the positions they had each taken in their legal memoranda.

In the case of the government, it argued in its memo that the "reasonable foreseeability" element of Pinkerton is not required in the Fourth Circuit. Memorandum of the United States in response to Issues Raised by the Court (contained in *PA* Document #36, at 12-13). The government's claim is fatally flawed. As an initial matter,

the decision in Pinkerton makes clear that vicarious liability cannot be established if the "reasonable foreseeability" element is not met:

> A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.

Pinkerton, 328 at 647-48. The government's argument that the Fourth Circuit could simply disregard the Supreme Court's pronouncement in this regard is wrong. Under clearly established case law, the Fourth Circuit does require that reasonable foreseeability be established to satisfy a conviction pursuant to Pinkerton. See, e.g., United States v. Wilson, 135 F.3d 291, 305 (4th Cir. 1998) (in case where defendant alleged that there was insufficient evidence to convict him of federal gun charge on the basis of Pinkerton liability, court states that a "defendant may be convicted of a § 924(c) charge on the basis of a co-conspirator's use of a gun if the use was in furtherance of the conspiracy and was reasonably foreseeable to the defendant") (emphasis added); United States v. Gray, 47 F.3d 1359, 1368 (4th Cir. 1995) ("In order to hold a conspirator criminally liable for the acts of other members of the conspiracy, the Supreme Court has held that the acts must be 'reasonably foreseen as a necessary or natural consequence' of the conspiracy"); United States v. Irvin, 3 F.3d 72, 75 (4th Cir. 1993) ("Under Pinkerton, in order to hold a co-conspirator criminally liable for acts of other members of the conspiracy, the act must be 'done in furtherance of the conspiracy' and 'be reasonably foreseen as a necessary or natural consequence of the conspiracy'); United States v. Cummings, 937 F.2d 941, 944 (4th Cir. 1991) (noting that Pinkerton "makes conspirators liable for all reasonably foreseeable acts of their coconspirators done in furtherance of the conspiracy"); United States v. McHan, 101 F.3d 1027, 1043 (4th Cir. 1996)(stating that conspirators are liable

at sentencing for their co-conspirators "reasonably foreseeable acts and omissions"); United States v. Estrada, 42 F.3d 228, 231 (4th Cir. 1994)("…[I]n order to attribute to a defendant…the acts of others in jointly-undertaken criminal activity, those acts must have been within the scope of the defendant's agreement and must have been reasonably foreseeable to the defendant")(citation omitted).

The government's claim that "reasonable foreseeability" is not required in the Fourth Circuit to establish a conviction under Pinkerton rested entirely on a citation to United States v. Aramony, 88 F.3d 1369 (4th Cir. 1996). There, the defendant challenged the district court's instruction on Pinkerton liability because it did not include "reasonably foreseeable" language as part of its instruction. In deciding against the defendant, the Fourth Circuit stated that the claim was foreclosed by its decision in Chorman v. United States, 910 F.2d 102 (4th Cir. 1990), where the court approved of a similar Pinkerton instruction. Notably, however, the defendant in Chorman did not raise a claim regarding the omission of "reasonably foreseeable" language from the Pinkerton charge, so that issue was not actually litigated and considered there. In any event, the holding in Aramony is not that there is no "reasonable foreseeability" requirement in the Fourth Circuit, but rather that it was not an abuse of discretion for the trial judge to have omitted such language from the Pinkerton instruction. Aramony, 88 F.3d at 1381. Cf. United States v. Carrington, 301 F.3d 204, 211 (4th Cir. 2002)(interpreting Pinkerton to include a reasonably foreseeable requirement in the determination of liability of co-conspirators).

The erroneous explanation of the Pinkerton doctrine, led to a complete miscarriage of justice. See United States v. Timmrek, 441 U.S. 780 (1979). Because of

the erroneous explanation, Petitioner pled guilty rather than putting the government's evidence to the test. Had Petitioner been adequately informed about his plea, that it meant that Donovan's death was reasonably foreseeable, Petitioner would not have accepted it. Petitioner never wavered on the facts related to Donovan's carjacking, and his polygraph results further corroborate this. Petitioner consistently stated from the time of his proffer with the FBI until the end of his trial that he never knew nor anticipated that Basham was going to kill Donovan. Accordingly, because his plea ran in direct contradiction of his understanding and admissions, as a matter of law, Petitioner's plea was not knowing or intelligent and resulted in a complete miscarriage of justice.

**C.      Petitioner's guilty plea was legally insufficient because it was neither knowing nor intelligent.**

Petitioner's reliance on the Court's incomplete instruction as well as his own counsel's advice that was based on faulty analysis of <u>Pinkerton</u> resulted in Petitioner accepting the guilty plea without full appreciation of its meaning and implications. In <u>Brady v. United States</u>, 397 U.S. 742, 748 (1970), the Supreme Court held that "waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." To satisfy this standard, a defendant seeking to plead guilty must possess "an understanding of the law in relation to the facts." <u>United States v. Nelson</u>, 484 F.3d 257, 261 (4th Cir. 2007) (quoting <u>McCarthy v. United States</u>, 394 U.S. 459, 466 (1969)). Petitioner does not satisfy this standard. Because Petitioner received an incomplete and incorrect explanation of the <u>Pinkerton</u> doctrine he did not possess a legally sufficient

126

understanding of the law in relation to the facts.  Consequently, his guilty plea was neither knowing nor intelligent.

In <u>United States v. Gandia-Maysonet</u> the First Circuit vacated and remanded a conviction based upon a guilty plea where the defendant was affirmatively misinformed about the *mens rea* element of the offense.  227 F.3d 1 (1st Cir. 2000).  Upon pleading guilty, the defendant was convicted of one count of carjacking (18 U.S.C. § 2119 (1994)) and one count of using a firearm (18 U.S.C. § 924 (c)(1) (1994)).  <u>Id.</u> at 2.  During the change-of-plea hearing, the court informed Gandia that the scienter requirement was "knowing and unlawfully," <u>id.</u> at 4, when the statutory standard was "with the intent to cause death or serious bodily harm," <u>id.</u>.  The court concluded that "the error was not merely 'harmful' but also 'plain'…because it seriously affected the guilty plea colloquy's fairness and integrity."  <u>Id.</u> at 6.  Although the court opined that had the defendant been advised of the proper *mens rea* requirement, the plea may have had a rational basis in the facts, the court nevertheless reversed and remanded the conviction and sentence.  <u>See id.</u> at 7.  <u>See also</u> <u>Henderson v. Morgan</u>, 426 U.S. 637 (1976) (holding that when neither counsel nor the court explained to petitioner that an intent to cause the death of the victim was an element of the offense of second-degree murder and the petitioner made no factual statement or admission that he had such intent, the petitioner's plea of guilty to second-degree murder was involuntary and the judgment of conviction was entered without due process of law).

Akin to <u>Gandia-Mayosenet</u>, Petitioner's decision to plead guilty was not knowing or intelligent because Petitioner was misled into believing that the requisite elements necessary to establish guilt were much less stringent than less actually were.  As the

preceding sections have demonstrated, Petitioner was not properly informed by counsel or by the Court of the nature of the charges against him. But for this grossly inaccurate explanation of the <u>Pinkerton</u> doctrine, Petitioner would not have pled guilty -- particularly in light of the fact that Petitioner never admitted (and the Court acknowledged during the plea colloquy) to possessing the requisite intent to cause serious bodily injury or death to Donovan. Accordingly, Petitioner's plea was neither knowing nor intelligent because he lacked an incomplete and incorrect understanding of the both the nature of the <u>Pinkerton</u> doctrine and its implications.

**CLAIM X: PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL UNREASONABLY ADVISED PETITIONER TO PLEAD GUILTY BASED UPON A GROSSLY INACCURATE ANALYSIS OF THE <u>PINKERTON</u> DOCTRINE AND AN IMPROPER FACTUAL BASIS.**

There are two independent, yet equally compelling, reasons why Petitioner was denied the effective assistance of counsel in accepting his counsel's advice to plead guilty as to the carjacking count. First, Petitioner was prejudiced by trial counsel's incomplete and inaccurate assessment of <u>Pinkerton</u>, which formed the basis for his decision to accept counsel's advice to plead guilty. Second, Petitioner suffered prejudice by acting in reliance on his counsel's erroneous advice that he plead guilty when the plea lacked a legally sufficient factual basis. Consequently, Petitioner was prejudiced by trial counsel's unreasonable errors. Indeed, had trial counsel thoroughly and accurately advised Petitioner about the meaning of the <u>Pinkerton</u> doctrine and its implications and explained to Petitioner that the plea lacked a legally sufficient factual basis, Petitioner would have rejected the plea.

**A. Trial counsel provided Petitioner with a grossly inaccurate explanation of <u>Pinkerton</u> upon which Petitioner detrimentally relied.**

128

Trial counsel rendered constitutionally deficient assistance by providing Petitioner with an inaccurate and incomplete analysis of the <u>Pinkerton</u> doctrine when the correct interpretation was plain as day. This resulted in prejudice to Petitioner, who, in reliance on the inaccurate information from his counsel waived his right to a guilt-phase trial. In <u>Hill v. Lockhart</u>, 474 U.S. 52, 58 (1985), the Supreme Court adopted and applied the two-part ineffective assistance of counsel test first articulated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), to claims involving guilty pleas. The first part of the test requires the defendant to show that counsel's performance fell below an objective standard of reasonableness. <u>Id.</u> at 58-9. The second part of the test pronounced in <u>Lockhart</u> is unique to the plea bargaining context. It requires the defendant to demonstrate that there is a *reasonable probability* that but-for counsel's errors the defendant would have exercised his/her constitutional right and insisted upon a trial. <u>Id.</u> at 59. In the instant case, counsel's performance fell below an objective standard of reasonableness. Failing to properly analyze a readily available doctrine and subsequently advising Petitioner to plead guilty based upon seriously flawed analysis cannot and does not fall within the scope of reasonableness. Petitioner was fighting for his life, and, but for his trial counsel's gross errors, he would have insisted upon going to trial.

Two cases in this Circuit are instructive in ascertaining the parameters of "reasonableness" in this context. In <u>Strader v. Garrison</u>, the Fourth Circuit held that when a defendant is "grossly misinformed" by his lawyer and then relies upon that misinformation "he is deprived of his constitutional right to counsel." 611 F.2d 61, 65 (4th Cir. 1979). The <u>Strader</u> court subsequently vacated defendant's guilty plea on the basis that counsel "could have discovered the applicable rule had he looked in the

published material." Id. at 63. Similarly, in VIA v. Superintendent, Powhatan Correctional Center, the Fourth Circuit reiterated a prior holding that "a prisoner 'must establish that his counsel's error was so flagrant that a court can conclude that it resulted from neglect or ignorance rather than from informed, professional deliberation.'" 643 F.2d 167, 171 (4th Cir. 1981)(quoting, in part Marzullo v. Maryland, 561 F.2d 540, 544 (4th Cir. 1977)). By employing either of these tests to the instant case, Petitioner's trial counsel's incorrect and incomplete analysis of the Pinkerton doctrine falls well-outside the bounds of reasonableness. The memo drafted by Petitioner's counsel regarding the Pinkerton doctrine contained incorrect interpretations of law tantamount of those of Petitioner's adversary -- the government.

At the very least, trial counsel had a duty to inform Petitioner that pleading guilty based upon the Pinkerton doctrine meant that Petitioner should have reasonably foreseen Donovan's death. This issue garners momentous importance in light of counsel's knowledge that Petitioner has adamantly maintained that he never knew Basham intended to cause serious bodily injury or death to Donovan. Petitioner has never wavered from this position. First, there is nothing in Petitioner's 302 which satisfies the foreseeability standard. Second, during the plea colloquy the only facts that Petitioner would admit to were those contained in the 302, which support Petitioner's position that he had no prior knowledge about Basham's intent to kill Donovan. Alas, the failure to accurately analyze this doctrine, when the proper interpretation of it was readily attainable, amounts to deficient performance of counsel within the meaning of Strickland, Lockhart, Strader, and VIA.

130

Petitioner is also able satisfy the second part of the <u>Lockhart</u> test -- there is a *reasonable probability* that had counsel advised him properly, he would not have entered a guilty plea. See <u>Lockhart</u>, 474 U.S. at 59 (emphasis added)(explaining that "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a *reasonable probability* that, but-for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."). Petitioner was fighting for his life. There is at least a reasonable probability that Petitioner would not have chosen to plead guilty under the <u>Pinkerton</u> doctrine if he had been adequately informed that this entailed admitting that he reasonably foresaw that Donovan would be killed as part of his conspiracy with Basham to steal an *unoccupied* car. Petitioner performed no act that resulted in the death of Donovan and no facts have been established, nor has Petitioner ever admitted, that Basham killing Donovan was ever reasonably foreseeable. Had he known that his plea amounted to an admission that he foresaw or knew that Basham was going to kill Donovan, he would have rejected counsel's advice and would have put the government evidence to the test. At a minimum, the existing record establishes that there is a *reasonable probability* that Petitioner would not have pled guilty to either death-eligible count had trial counsel not grossly erred in misinterpreting the <u>Pinkerton</u> doctrine.

As the Fourth Circuit explained, "The judgment of conviction must be vacated when it appears…that the guilty plea would never have been tendered if the defendant had been properly advised by his lawyer." <u>Strader</u>, 611 F.2d at 64. Petitioner was denied the effective assistance of counsel because he would not have pled guilty to either death-eligible count but-for trial counsel's seriously inaccurate analysis of the <u>Pinkerton</u> doctrine.

**B. Trial counsel was ineffective for advising Petitioner to plead guilty to carjacking when the plea lacked a proper factual basis to support the plea.**

Petitioner was prejudiced within the meaning of Lockhart when he detrimentally relied upon trial counsel's unreasonable advice that he plead guilty to the carjacking count when the plea lacked the statutorily required factual basis  Petitioner's 302 and the record demonstrate that there was not a proper factual basis to support the plea.  As the Court correctly pointed out on the first day of the plea colloquy, the facts contained in the 302 did not establish that Petitioner intended to kill Donovan, or that he even knew that she would be killed.  PTT 05/04/2004 at 68.  Given that the statements in the 302 were the only facts to which Petitioner admitted as a basis for the plea, id. at 110-11, and the only facts on which the Court relied to accept the plea, id. at 153, 192, there is no factual basis for the claim that Donovan's death was reasonably foreseeable to Petitioner.

Petitioner's 302 contains no admissions that Donovan's death was an act within the scope of the agreement Petitioner discussed with Basham when they entered the Wal-Mart parking lot and decided to steal a car.  Rather, Petitioner stated in the 302 that his understanding that Basham was going to steal an unoccupied car.  PTT 05/07/2004 at 91-93.  Even when Petitioner learned that Basham had carjacked Donovan's car, Petitioner still believed that Basham was not going to cause serious bodily injury or death.  It was days after Donovan's death that Petitioner first learned of her death.

In accepting the plea on the carjacking count, the Court stated that it was "persuaded that the Pinkerton doctrine can be applied to allow the plea to go forward based on the statements contained in the 302 report of [the] interview provided by the FBI."  Id. at 192.  The Court did not articulate which statements in the 302 report

established that Petitioner was liable under the <u>Pinkerton</u> doctrine, perhaps because none existed. Instead it appears that the Court based its decision on both parties' briefing, which commonly asserted that the <u>Pinkerton</u> doctrine was applicable. <u>Id.</u> at 100.

Furthermore, the Court failed to find any facts with respect to another aspect of the plea – Basham's intent. That is, the Court explained in its articulation of <u>Pinkerton</u> that "if Mr. Basham intended to cause death or intended to cause serious bodily harm at the time Ms. Donovan was abducted, that will be sufficient to meet this element, element number 5, if y'all were working in a conspiracy together." PTT 05/07/2004 at 162. Simply put, there is no factual basis that establishes that Basham's actions were done in furtherance of the conspiracy. Basham acted outside of the scope of the conspiracy when he unilaterally decided to carjack Donovan's car as opposed to a parked, unoccupied vehicle. Counsel should have known this, but recklessly pushed his client for a plea that was not factually supported. In so doing, counsel acted outside the bounds of reasonableness.

In the present case, there is obvious prejudice to Petitioner in entering a plea of guilty to a crime which, based on the transcript and 302, he did not commit. The facts contained in the 302 did not establish that Petitioner intended to kill Donovan, or that he even knew that she would be killed. In the absence of an adequate factual basis for the plea, counsel performed unreasonably in urging his client to accept a plea. Had Petitioner known and understood that there was no factual basis for the plea, he would have opted for a guilt phase proceeding on both death-eligible counts of the indictment. This was an "all in" situation (either plead guilty to carjacking and kidnapping or put the government's evidence to the test) and the faulty advice caused Petitioner to risk

133

everything on a guilt phase proceeding. As a result, Petitioner has been prejudiced by the deficient performance of his trial counsel.

**CLAIM XI: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN ADVISING PETITIONER TO PLEAD GUILTY BECAUSE THE DISTINCTION BETWEEN INTENT UNDER PINKERTON AND THE GATEWAY INTENT FACTORS IS FAR TOO FINE FOR A LAY JUROR TO APPRECIATE.**

Though Petitioner's trial counsel recognized that a Pinkerton guilty plea is not tantamount to establishing a gateway intent factor necessary for a defendant to be eligible for a death sentence under 18 U.S.C. § 3591(a)(2),[12] counsel nevertheless advised Petitioner to plead guilty before a lay jury incapable of drawing that distinction. By so advising Petitioner, trial counsel essentially directed the jury to find that Petitioner had acted with the requisite gateway intent for him to be eligible to receive a death sentence. Trial counsel was therefore constitutionally ineffective.

Even assuming *arguendo* that Petitioner's Pinkerton guilty plea was valid, the only intent Petitioner admitted was being a member of a conspiracy in which it was reasonably foreseeable that someone might be killed as a necessary or natural consequence of the conspiracy. As a result of counsel's advice to plead guilty, however, the jury was instructed that Petitioner had pled guilty to carjacking "with the intent to cause death or serious bodily harm." See 18 U.S.C. § 2119. See United States v. Brooks, 524 F.3d 549, 558-59 (4th Cir. 2008)(stating that it was error for the jury to determine the amount of drugs attributable to the conspiracy as a whole; rather, the jury must determine the threshold amount that was reasonably foreseeable to *each* individual defendant); see also United States v. Foster, 507 F.3d 233, 250-51 (4th Cir. 2007)(concluding that in order for the statutory maximums and mandatory minimums to apply in sentencing a defendant

---

[12] See Defendant's Memorandum of Law Regarding the Propriety of a Guilty Plea (contained in PA Document # 35, at 7).

guilty of a drug conspiracy, the jury must determine the threshold amount of drugs reasonably foreseeable to each defendant). Once a defendant has pled guilty to a crime that has "intent to cause death or serious bodily harm" as an element of the offense, a lay jury will certainly view that as a concession that Petitioner had acted with the requisite gateway intent set forth in 18 U.S.C. § 3591(a)(2)(D) of "intentionally and specifically engag[ing] in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in he act constituted a reckless disregard for human life." Thus, before the first witness was ever called at trial, the jury likely had already assumed that gateway intent existed.

By advising Petitioner to plead guilty, trial counsel absolved the government of its burden of proving the requisite gateway intent element and, in effect, directed the jury to find that Petitioner acted with the requisite intent. Such advice falls below the acceptable standards of capital defense practice when Petitioner admitted—at most—that he was a member of conspiracy in which it was reasonably foreseeable that someone might be killed as a necessary or natural consequence of the conspiracy.

But for counsel's ineffective advice to plead guilty under the <u>Pinkerton</u> doctrine, Petitioner would not have pled guilty, but would have insisted on going to trial. <u>Hill v. Lockhart</u>, 474 U.S. 52 (1985)(suggesting that the second prong of <u>Strickland</u> may have been met if Petitioner had alleged in his habeas petition that but for his counsel's failure to inform him of the consequences of his plea he would have gone to trial). At trial, the government would have been forced to prove beyond a reasonable doubt something it was never forced to prove: that Petitioner carjacked Alice Donovan "with the intent to cause death or serious bodily harm." Instead, because Petitioner's counsel advised him to

135

plead that he was a member of a conspiracy in which it was reasonably foreseeable that someone might be killed as a necessary or natural consequence of the conspiracy, Petitioner's counsel released the government from its obligation to prove any intent element whatsoever and directed the lay jury to find the presence of the requisite gateway intent element. At trial, the government would not have been able to prove the requisite intent element to obtain a conviction under 18 U.S.C. § 2119 or to justify a sentence of death under 18 U.S.C. § 3591 based upon the facts Petitioner admitted in his FBI 302, and Petitioner was therefore prejudiced by his trial counsel's ineffective assistance.

## CLAIM XII: THE EIGHTH AMENDMENT PRECLUDES THE APPLICATION OF PINKERTON IN A CAPITAL CASE.

The Supreme Court has never held that conspirators, convicted of conspiracy alone, can receive the death penalty. The Court has held for the non-homicidal crimes of rape, kidnapping, and armed robbery that absent the intent to kill, the death penalty is a disproportionate punishment under the Eighth Amendment. See Coker v. Georgia, 433 U.S. 584 (1977); Eberheart v. Georgia, 433 U.S. 917 (1977); Enmund v. Florida, 458 U.S. 782, 797 (1982).

In considering the death penalty for accomplices to felony-murder, the Court's Eighth Amendment jurisprudence focuses on the defendant's "intent to kill." See Enmund, 458 U.S. at 801 ("Putting [defendant] to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute ... to just deserts."); see also Tison v. Arizona, 481 U.S. 137, 158 (1987) (holding that for a defendant convicted vicariously of felony-murder, "major

136

participation" in the underlying felony and a "reckless indifference to human life" suffced to meet Enmund's "intent to kill" requirement).

In the Pinkerton context, the question of whether the fact that a killing was "reasonably foreseeable" necessarily rises to the necessary level of intent required by the Eighth Amendment. Using the "gateway" intent factors under 18 U.S.C. § 3591 as a guide, the closest intent factor listed is subsection (D), which requires a finding that the defendant:

> intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a result of the act[.]

18 U.S.C. § 3591 (a)(2)(D). There is no equivalence between (1) being a member of conspiracy in which it is reasonably foreseeable that someone might be killed as a necessary or natural consequence of the conspiracy (Pinkerton), and (2) specifically engaging in an act of violence, knowing that the act created a grave risk of death to a person, such that participation in the act constituted a reckless disregard for human life (Enmund/Tison). In the present case, there is little or no evidence that the murder of Alice Donovan was reasonably foreseeable. Petitioner's 302 clearly states that he did not know Donovan would be murdered by Basham. In fact, Petitioner merely thought that Basham was going to locate an unoccupied car to steal. Even after Basham had taken control of Donovan's car, he assured Petitioner that he had no intention of causing her bodily injury. Petitioner reasonably believed that history would repeat itself and Basham would tie Donovan to a tree, unharmed, just as Basham did with Hawkins just days prior. Petitioner did not learn about the death of Donovan until several days later.

Because the federal carjacking statute is a capital offense, Petitioner's level of intent must be heavily scrutinized. He has never admitted to having any intent to cause harm or serious bodily injury to Donovan, and would equally assert that it was not reasonably foreseeable that Basham would kill Donovan -- an assertion he was unconstitutionally deprived of making. Upon closer review of the facts and the evident lack of intent Petitioner possessed, the Eighth Amendment dictates that Petitioner's severe punishment does not meet the crime.

## CLAIM XIII: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OFFER ADDITIONAL AND READILY DISCOVERABLE EVIDENCE OF BASHAM'S LEADERSHIP AND MANIPULATION THAT WOULD HAVE FIRMLY ESTABLISHED PETITIONER'S MINOR PARTICIPATION.

Under 21 U.S.C.A. § 848(m)(3), minor participation is a statutory mitigating factor. The leader-follower distinction is directly relevant to this statutory mitigating factor. Indeed, the Supreme Court has recognized that "the level of criminal responsibility of a person convicted of murder may vary according to the extent of that individual's participation in the crime." Summer v. Shuman, 483 U.S. 66, 79 (1987). Petitioner's counsel presented evidence that Petitioner was a follower but neglected to introduce readily discoverable evidence that Basham was a master manipulator and the leader. Had Petitioner's trial counsel made a motion to offer evidence of Basham's leadership for the purpose of a comparative analysis between Basham and Fulks, such a motion would have been granted—just as it was in the Basham trial. Basham's lawyers argued as follows:

> We intend on putting up a case that involves comparative analysis. We believe that this is an integral part of assisting this jury in making that comparative

analysis. So that they can determine who was the major participant and who was the minor participant.

Basham TT 10/8/2004 at 14-57.

The Court rightly permitted introduction of such evidence:

The Court: I am letting you go into that. The jury has already heard a lot about who was pulling the strings. I will let in evidence of Mr. Fulks's manipulation, and so forth. So, you have won that battle.

Id. at 14-58.

In Buttrum v. Black, the District Court for the Northern District of Georgia addressed the issue of a co-defendant's history of violence and domination. Buttrum v. Black, 721 F. Supp. 1268, 1314 (N.D. Ga. 1989). Buttrum involved a husband and wife who were convicted, and sentenced to death, for the rape and murder of a nineteen-year-old woman. Id. at 1272. Following affirmance of Janice Buttrum's murder conviction and death sentence, she petitioned for habeas corpus relief. Id. Buttrum asserted, among other claims, that the trial court's exclusion of mitigating evidence, which would have shown a history of her husband's domination and violence, was prejudicial error. Id. at 1314.

The excluded evidence consisted of testimony from a social worker, who had treated Buttrum's husband, and would testify that he "had complained that he was preoccupied with sex and at times felt uncontrollable urges to rape; that he had a drinking problem and nightmares that someone was trying to kill him; that he had homicidal feelings toward his mother, and had attacked her with a butcher knife and scissors." Id. The evidence was excluded by the trial court as being "no more relevant than the personal history of any other person on death row." Id. at 1314-15.

On appeal, the court determined that, "different degrees of culpability among co-defendants are relevant to the individualized sentencing mandated by the Eighth

139

Amendment." Id. at 1315. The court found the evidence relevant to the defense that her co-defendant was "the initiator" and that she "acted under his dominion and influence," further noting that the "testimony about his hostility toward women and his violent, abusive personality were highly relevant to show that she was abused by him and that this abuse could have led her to be submissive toward him and his desires." Id.

The court further held that the exclusion of evidence was prejudicial, as "the question of who was the primary actor was central to the defense theory of the case." Id. The court noted that the state portrayed Janice as the primary perpetrator, and therefore her husband's history of violence and domination was "highly relevant," as it would have "helped to prove the defendant's theory of the case." Id. The court concluded that "where the exclusion of evidence in mitigation 'may have affected the jury's decision to impose the death sentence,' the exclusion is 'sufficiently prejudicial' to require a new sentencing hearing." Id.

The Buttrum decision comports with Supreme Court precedent, which recognizes that the Eighth Amendment forbids the treatment of "all persons convicted of a designated offense not as uniquely individual human beings, but as member of a faceless, undifferentiated class." Woodson v. North Carolina, 428 U.S. at 304. Justice Blackmun recognized the constitutional necessity of establishing some limit by which the States assess punishment for actions less immediately connected to the deliberate taking of human life. Lockett v. Ohio, 438 U.S. at 616. Trial counsels' inability to uncover readily available evidence demonstrating the manipulative nature of Basham would have been precisely the type of mitigation evidence the jury could have relied upon to differentiate the degrees of culpability displayed by Basham and Petitioner.

The Buttrum decision is not an island unto itself. The Florida Supreme Court decisions in Barclay v. State, 470 So.2d 691 (1985) and Hawkins v. State, 436 So.2d 44 (1983) demonstrate that courts are willing to defer to jury recommendations of life imprisonment based on the defendant's lesser role in the capital crime. In Barclay, the defendant was part of group known as the Black Liberation Army, which abducted a hitchhiker and drove him to a trash dump where he was repeatedly stabbed by Barclay. Barclay v. State, 343 So.2d 1266, 1267 (1977). The apparent leader of the group, Jacob Dougan, shot the victim in the head, twice. Id. The jury returned a sentence of life imprisonment for Barclay, and the Florida Supreme Court found the jury's decision reasonable:

> The jury apparently distinguished between Barclay and his main co-defendant, Jacob John Dougan, as evidenced by its recommendations of life imprisonment for Barclay (the follower) and death for Dougan (the leader). We hold that there was a rational basis for the jury's distinction between these co-defendants and that the trial court erred in overriding the jury's recommendation.

Barclay, 470 So.2d at 695. The Florida Supreme Court reached a similar decision in Hawkins, commenting that the evidence indicated that the defendant was not the triggerman and concluding that "there was a reasonable basis for the jury not to recommend the imposition of the death sentence." Hawkins, 436 So.2d at 47.

Similar to Buttrum, where the state portrayed the defendant as the primary perpetrator, the government portrayed Fulks as the leader during his sentencing trial. Fulks maintained that his co-defendant acted as the leader, and thus, it logically followed that his co-defendant's history of manipulation would be highly relevant in supporting Fulks's theory and would have been very helpful when the jury analyzed Petitioner's culpability.

Had Petitioner's trial counsel made a similar motion as Basham's counsel, Petitioner's trial counsel could have called a number of witnesses to testify about Basham's leadership qualities and manipulation. In fact, Petitioner's counsel could have called a number of witnesses who were exposed both to Fulks and Basham and who would have testified about Basham's leadership skills.

For example, Petitioner's counsel could have called Jeremiah Bush. Mr. Bush was a detention officer at Columbia Care Center, a facility that housed both Petitioner and Basham. Mr. Bush could have testified how Basham constructed a 40 foot-long rope made of bed sheets. Basham TT 10/12/2004 at 15-241 & 15-243. Basham constructed this rope for a planned escape at the facility. A similar rope was constructed for the escape at the Hopkins County Detention Center. A jury could reasonably conclude that Basham's role in constructing the rope was some evidence of his leadership in the Hopkins County escape and the later incidents.

Petitioner's counsel could have also called Celia Bowman. Ms. Bowman was a nurse supervisor at the Columbia Care Center. She was called as a witness at the Basham trial and testified that Basham was a very manipulative inmate. Basham TT 10/12/2004 at 15-227. Basham skillfully manipulated the staff to obtain medication and other items.

Robert McEachern was a guard at the Alvin S. Glenn Detention Center. This facility housed both Basham and Fulks. Mr. McEachern described Basham as "very observant," "intelligent," and "crafty." Basham TT 10/13/2004 at 16-102. Francis Kirkland was also a prison guard. He pointedly described Mr. Basham: "He is very aggressive. Aggressive-type individual. He likes to have things his way or no way at all. He wants to take control." Basham TT 10/13/2004 at 16-162. Lee James, also a guard at

142

the Alvin S. Glenn Detention Center, described Basham's leadership qualities: "He is a leader. He can lead. He can get the dorm in an uproar when he wants to." Basham TT 10/14/2004 at 17-57. Like many of the other guards, Erick Dash commented on the volatility of Mr. Basham: "He is manipulative. He can go off at anytime. You never know. He can just go off." Basham TT 10/14/2004 at 17-65.

This testimony was readily available to Petitioner's counsel. The witnesses discussed above all worked in facilities in Richland County. Trial counsel was simply ineffective in failing to introduce evidence of Basham's leadership and manipulation. The failure to introduce this evidence damaged Petitioner's case.

The question of who was the primary actor was central to the defense theory of the case. Because the government portrayed Fulks (at least in the Fulks trial) as the primary perpetrator, Basham's history of violence, domination, and manipulation was highly relevant. Trial counsel's failure to discover and introduce this evidence, when it was readily available, likely affected the jury's decision to impose the death sentence because the jury is charged with the responsibility of scrutinizing not only the character, record and history of the defendant, but also the "particularized nature of the crime." Gregg v. Georgia, 428 U.S. at 190. Accordingly, the sentencing jury would have been "guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed." Proffitt v. Florida, 428 U.S. 242, 258 (1976); see also Woodson v. North Carolina, 428 U.S. at 304; Roberts v. Louisiana, 428 U.S. 325, 333-34 (1976).

Had the additional evidence of Basham's leadership and manipulation been introduced, the jury would have seen that Basham was the force behind that death of

Donovan and thus Petitioner would not have been sentenced to death. Unlike the defendants in <u>Hawkins</u> and <u>Barclay</u>, Petitioner is on record as having no direct part in the death of Alice Donovan. Thus, like the defendants in <u>Hawkins</u> and <u>Barclay</u>, it is reasonable that had trial counsel developed evidence of Petitioner's role as a follower and not a leader, Petitioner would have had an increased chance of obtaining a sentence of life imprisonment. Accordingly, Petitioner suffered great prejudice. <u>See</u> <u>Strickland</u>, 466 U.S. at 694.

**CLAIM XIV: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILURE TO PRESENT MEANINGFUL EVIDENCE THAT PETITIONER WOULD NOT BE DANGEROUS IN THE FUTURE TO PRISON INMATES OR BOP PERSONNEL.**

The jury unanimously found that Chad Fulks would be a danger in the future.

Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the Defendant, CHADRICK EVAN FULKS, would be a danger in the future to the lives and safety of other persons, including, but not limited to, inmates and correctional officers in an institutional correctional setting, and that this factor is aggravating?

☒ Yes ☐ No

Jurors clearly feared that Fulks would be a danger to others in prison. According to a news article written just after the verdict, Juror Mary Ellen Huggins told reporters that "she feared Fulks would be a danger to others if he were sentenced to life in prison." <u>Myrtle Beach Sun News</u>, 07/01/2004 (contained in *PA, document #*28).

Juror Silvia Allison stated the matter more forcefully: "we decided no matter what, he would try to escape. We feel like he was dangerous, would never be rehabilitated and we did not want to take the chance. … I think that was our clincher." <u>Beaufort Gazette</u>, 07/12/2004 (contained in *PA, document #*29). Juror Marlene Novinger echoed Allison: "one of the main things was where he was violent while he was

144

incarcerated, where he was still a threat to people, mainly the ones working in the prison. We didn't want him to get loose." Id.

Based on the comments of the jurors, future dangerousness was the "clincher" in voting for the death penalty. These comments aside, reasonable and competent death penalty litigators are aware that they must disabuse jurors of the belief that their clients will be a danger to prison guards and other inmates. See Declaration of Andrea Lyon (contained in *PA, document # 1*, ¶ 34) ("Most jurors are concerned with whether a defendant sentenced to life would pose a danger."). This need was especially heightened in this case because on March 3, 2004, Mr. Fulks made a pathetic attempt to escape from a prison hospital by removing a screen from a high window that was too small for him to fit through. The government used this incident, and an altercation with the guards that followed, to paint Petitioner as a problem inmate.

The government also used Mr. Fulks' past history of violence in the community to press its future dangerousness argument. "You have all of this evidence. You have the history of Chad Fulks. You have all the violence he has committed against people, against men and women." TT 06/29/2004 at 115.

Trial counsel needed to explain to the jury that Petitioner did not have a high likelihood of engaging in serious violence while incarcerated with the BOP. Trial counsel needed to counteract the tendency in lay jurors to "commit a number of fundamental errors unless guided by reliable scientific methodology and data." Declaration of Mark Cunningham (contained in PA document #6, ¶ 13(b)). The errors jurors typically commit "more often result in an overestimation of the violence risk." Id. Moreover, "[a] capital jury's familiarity with the heinousness of the capital offense and

145

knowledge of other aggravating factors or acts are likely in many instances to result in a perception of high future violence risk in prison that is not justified by research." Id. ¶ 13(c).

Scholars studying South Carolina capital jurors have found that "future dangerousness" is a "significant aggravating factor[]" and that a majority of capital jurors are more likely to vote for death if they believe that the defendant presents future threat to society. Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What Do Jurors Think?, 98 Colum. Law. Rev. 1538, 1538 &1559-60 (1998). Thus., future dangerousness is always at issue in a capital case and defense counsel must be prepared to vigorously dispute that his client poses a threat to others. Declaration of Andrea Lyon (contained in *PA, document* # 1, ¶ 34)

To avoid the fundamental errors in violence risk assessment that often occur in capital cases, trial counsel should have called Mark D. Cunningham, Ph.D.—a qualified expert who had been retained and who could have informed the jury of scientifically sound methodology and empirical data. Dr. Cunningham is a recognized expert in the field of prison adaptability and violence risk assessments. He has a nationwide practice and an impressive array of scholarly works. Id. ¶¶ 3-5. Dr. Cunningham was prepared to testify at Petitioner's sentencing hearing; however, trial counsel chose not to call Dr. Cunningham. Had Dr. Cunningham been called at trial, he would have educated the jury on violence risk assessments.

First, Dr. Cunningham would have explained to the jury that, contrary to the arguments of the prosecution, an offender's alleged acts of violence in the community have little value in evaluating violent behavior in a prison context.

Had I been called to testify at Mr. Fulks' capital sentencing, I would have described that behavior pattern in a similar setting and group statistical approaches are most reliable in assessing the likelihood of violent behavior in a prison context. Behavior pattern analysis that is specific to context is critically important because prison represents a fundamentally different context from the community. Prison violence does not predictably follow from pre-confinement violence of the capital offense of conviction.

Declaration of Mark Cunningham (contained in PA document #6, ¶ 8)

Rather than being a problem inmate, Dr. Cunningham could have explained that

Petitioner has generally adapted well to prison environments and that the few incidents in

which Petitioner has been involved in have not been predatory.

I would have further testified that review of Mr. Fulks' prior prison incarceration and incarceration pre-trial records reveal that he has no serious violence in his past prison confinement, and has exhibited no serious violence in past extended jail incarcerations. Violence towards correctional staff has not been predatory, rather it has been restricted to two instances where he resisted. Mr. Fulks was constructively involved in prison educational and work programs when in State custody. Further, correctional appraisal in pre-trial confinement points to his not being a disproportionate risk of present violence. Because of the marked higher security in U.S. penitentiaries and because of research conclusions, Mr. Fulks' escape from the Hopkins County Jail and his planned escape from the Columbia Care Facility have only a modest, if any, effect in increasing his likelihood of serious violence or escape during a capital life sentence in the Bureau of Prisons.

Declaration of Mark Cunningham (contained in PA document #6, ¶ 9)

Risks of prison violence are lower for long-term inmates, such as Petitioner, and

rapidly decrease as an inmate ages:

I would have further testified that group statistical analysis reveals that rates of disciplinary infractions and violence in prison are negatively correlated with age. Long-term inmates have lower rates of disciplinary infractions than short-term inmates. Rates of serious violence in U.S. penitentiaries are low, with that rate decreasing markedly as the severity of violence specified increases. Additionally, BOP data demonstrates that prison-specific factors, rather than simply inmate-factors, have significant effects on the occurrence of serious violence. Further, multiple group statistical studies indicate that the majority of individuals convicted of capital murder do not represent a disproportionate risk of violence while confined in prison. Research data on the limited follow-up of federal capital defendants sentenced to life indicates that the majority of these inmates have not been involved in serious violence in the BOP. The majority of inmates in comparison offender groups most similar to Mr. Fulks (inmates age 26-30,

convicted of capital offenses, convicted of federal capital offenses, facing long-term sentences) have not engaged in serious institutional violence. Research summaries published by the U.S. Department of Justice, studies of the comparative assault rates of commuted capital offenders, and research where I am a co-investigator regarding death-sentence, life-without-parole (LWOP) and parole-eligible offenders demonstrate that neither the severity of the offense of conviction nor a sentence of LWOP are reliably predictive of an increased risk of serious violence in prison.

Declaration of Mark D. Cunningham (contained in PA document #6, ¶ 10).

Dr. Cunningham could also have testified about studies of death-commuted and life-sentence capital offenders as anchors regarding the probability of a serious act of prison violence from a capital offender. Id. ¶ 11. The data show that there was not a high likelihood that Petitioner would harm a BOP staff member or another inmate. And in Dr. Cunningham's words "it was improbable that Mr. Fulks would commit criminal acts of violence that would constitute a continuing threat to society." Id. ¶ 11. The likelihood of a homicide of a BOP staff member is one per five hundred thousand (1/500,000) inmates annually. The facts simply do not back up the prosecution's assertion that Petitioner was a danger to BOP staff or others.

Lastly, Dr. Cunningham could have testified that risk of violence could be further reduced by ultra-secure confinement in the BOP, such as those available in secure housing units and/or ADX Florence. "Security measures at this level of custody are quite effective, as demonstrated by the associated low rates of serious violence in a Federal super-maximum confinement such as ADX. In other words, the Department of Justice and Federal Bureau of Prisons are more than capable of incapacitating Mr. Fulks should they believe he represents a disproportionate risk of violence." Id. at ¶ 12.

In addition to Dr. Cunningham, the trial team retained, but did not call, James Aiken. Mr. Aiken has extensive experience in inmate classifications and has conducted

148

thousands of inmate evaluations ins his career.  Declaration of James Aiken (contained in *PA, document* #7, ¶ 2). Mr. Aiken has served as a consultant to the U.S. Department of Justice and was appointed by the U.S. Congress to a national prison commission in 2004. Id. ¶ 4.

Similar to Dr. Cunningham, Mr. Aiken could have explained to the jury that Petitioner has never been a problem inmate: "It is apparent that Mr. Fulks' criminal history and confinement record do not reflect a pattern of a prison predator nor is there evidence of his continual, methodical use of violence to gain control over inmates, staff or the operation of the prison." Id. ¶ 8.  Based on his review of the data and experience, Mr. Aiken could have assured the jury that Petitioner "does not present an unusual risk to society, which included correctional staff, other inmates, and the general community while properly confined and managed in a secured confinement environment." Id. ¶ 10.

Rather than Petitioner being a threat to other inmates or guards, Mr. Aiken recognized that the real concern in prison is Petitioner's safety: "the major concern I have of Mr. Fulks is the need to protect him from the predator, more dangerous, violent and disruptive prison population, especially as he grows older." Id. ¶ 12.

Perceived future dangerousness was a key issue at trial and counsel were ineffective for not addressing this issue via experts such as Dr. Cunningham and Mr. Aiken.  A capital defendant's future dangerousness is always an important issue in the penalty phase, see, e.g., Garvey, supra, at 1538 &1559-60, and trial counsel should directly address the jury's concerns.  Without an expert to provide the jury with an accurate and scientific method to evaluate risk of future violence, a lay jury typically overestimates the violence risk.  Here, Petitioner's jury never learned that a capital

149

defendant's alleged acts of violence in the community have little value in examining violent behavior in a prison context. The BOP is a different world that a juror cannot comprehend without expert assistance.

Moreover, the jurors never knew that Petitioner had generally adapted well to prison environments and had been constructively involved in educational and work programs. Rather than hearing evidence that it was improbable that Mr. Fulks would engage in a serious act of violence or that the danger was to Mr. Fulks and not from Mr. Fulks, the jurors only had the government's unsupported assertions that Petitioner was evil and would pose a danger to society if he was not given the death penalty. Had the jury heard from Dr. Cunningham and Mr. Aiken, future dangerousness would not have been the "clincher" in voting for a death sentence. See Strickland, 466 U.S. at 694. The government's unsupported assertions would not have been able to overcome an accurate and scientific method to evaluate risk of future violence. At least one juror would surely have chosen life over death had he heard the compelling evidence that could have been offered by Dr. Cunningham and/or Mr. Aiken.

**CLAIM XV: PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN THEIR CONDUCT OF VOIR DIRE INASMUCH AS THEIR QUESTIONING OF PROSPECTIVE JURORS FELL BELOW ACCEPTED CAPITAL DEFENSE PRACTICES.**

Voir dire is one of the most critical aspects of any trial. See Morgan v. Illinois, 504 U.S. 719 (1992) (noting that the law recognizes the important role of the voir dire process in ensuring a fair and impartial criminal trial as guaranteed by the Sixth Amendment); Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) (proper voir dire is necessary for a defendant's exercise of peremptory challenges); Swain v. Alabama, 380

U.S. 202 (1965) (voir dire and exercises of peremptory challenges is deemed an important aspect of trial by jury).

This is an opportunity for an attorney to gather information, educate the prospective jurors, and to develop a rapport with the decision-maker in his or her client's case. See Jeffrey T. Frederick, Mastering Voir Dire and Jury Selection 3 (2005). The ultimate objective of voir dire, of course, is to discover prejudice and bias that exists in a juror's thinking. United States v. Brown, 799 F.2d 134, 135 (4th Cir. 1986). Consequently, a trial lawyer's duty during voir dire is to ask intelligible questions aimed at establishing a dialog. To establish this dialog, the lawyer must use a concise, open-ended question and then patiently listen to the prospective juror's response. Voir dire is not a time for grandiloquent speeches, questions replete with legalese, or lectures. See Declaration of Andrea D. Lyon (contained in *PA, document #*1, ¶ 30 ("During voir dire, it is important to ask open-ended questions, to listen to the answers, and to show the juror the respect he or she deserves. If a capital defense attorney is making speeches at the potential jurors, he or she is not asking questions, not getting information, and therefore not able to effectively represent their client by making appropriate challenges for cause, and good use of peremptory challenges.")

While the lawyer is evaluating the prospective jurors during voir dire, the jurors are also evaluating the attorney. The lawyer should be trustworthy, confident, and focused with the questioning. A series of rambling and painfully repetitious questions reflects poorly on the attorney and his client. Moreover, if a prospective juror believes that the lawyer is trying to trick him, a prejudice is established against the lawyer and his client that is difficult, if not impossible, to remove.

Petitioner's trial counsel utterly failed at gathering useful information, educating the prospective jurors, or establishing a rapport. The following is typical from the voir dire examination conducted by trial counsel:

Q. Now, the law says that before the death penalty can be imposed, you have to have this intention proven, and you also have to have – you have to have an aggravating factor, something that made it worse that happened, and those things have to be proved beyond a reasonable doubt to the satisfaction of all 12 jurors. That's just the way the law is.

Now, the rule is a little bit different for mitigating factors, the things that the defendant wants to show would argue against the death penalty. And here is where it comes in while we have a jury of 12. We don't just want you and your experience or the next person and their experience, we want 12 people's walks of lives, what they have learned from their walk of life, and how they hear the evidence, how they hear the witnesses.

So, it might be that one juror says, "I find this thing to be mitigating." Maybe it's the defendant's childhood, maybe its drug use, something like that. And another juror says, "what's the matter with you, that's not mitigating." And the juror who thinks that's mitigating, that juror is entitled to have that view.

It's different than the aggravating, where we have to have total agreement that there is an aggravating circumstance before it can become – where a mitigating circumstance that an individual juror can say, "I'm persuaded by that evidence and I'm persuaded that its mitigating."

And the next step is, you know, you are going to weigh aggravating against mitigating, because in order to impose the death penalty every juror has to find that the aggravating circumstances outweigh the mitigating circumstances.

A. Okay.

Q. And, again every single juror has to be convinced of that. And then at the very last stage, even if the aggravating circumstances outweigh them, the death penalty is never required. So, a juror could say, "but they do outweigh them, but I am convinced that a life sentence is the appropriate sentence in this case."

Now it could be that when we are kind of done with all the deliberations, we have heard all the evidence, we have heard all the arguments, you go back, you talk, whether you talk hours, you talk days, everybody is done talking. And then you are you and your walk of life, and you are the only one voting one way.

Now I'm not saying which way it is, but you have to have that view. And there are 11 of them over there with a different view. And you say, "this is just what I think." Now, there are some people who if it gets to be wrong enough they will

152

just say, "well if 11 of them think it, then they must be right." Are you the kind of person who will say, "well, if 11 of them think it, they must be right"?

A. No.

PTT, 05/17/2004 at 6-245 to 6-247.

Q. Okay. So, what I want to do now is talk to you a little bit about the legal system and how it works. Because as the judge said, everybody is entitled to their own opinion about the death penalty. There are no right answers, there are no wrong answers, its not a test, its not a quiz, nobody gets graded.

But there is – it's a subject about which people have views. And some people's views are religious, some people's views are just what they think or how they form their opinion over their life's experience.

But there are certain categories of people that aren't eligible for the death penalty under federal law. If you are under 18, its not possible for you to get the death penalty, no matter what you have done.

If you are mentally retarded, its not possible for you to get the death penalty, no matter what you have done. If you are legally insane, that means – basically, that's just legal – in lay terms, that means if you didn't know the difference between right and wrong because of mental illness, not only are you not eligible for the death penalty, you are not guilty by reason of insanity.

So, before a jury would ever decide, or a juror would ever decide the question of life and death, you would have a defendant who is over 18, not retarded, and not insane. But the question really becomes – and the judge talked to you about there are aggravating circumstances and there are mitigating circumstances.

And aggravating circumstances are questions about – the reasons the government wants you to sentence the defendant to death. And it might be evidence about other things the defendant has done, other crimes he's committed. It might be about the circumstances in a particular offense, it might be bad conduct in jail, anything vague – a reason they think the jury's – the juror's, sorry – should chose life over death.

The defense will present evidence in mitigation of punishment. And that's evidence that the judge talked to you about, the defendant's life and background, and that evidence may be unrelated to the offense itself. It might not be – it may have nothing to do with the circumstances of the offense.

So, when the judge says that its sort of like a baseball game, it is to a degree, both sides get to put up their evidence, but really at the end the evidence isn't going to be necessarily about the same thing. Everybody isn't going to be talking just about the facts of the crime, there are going to be different categories. Do you understand what I'm saying?

153

A.  (Nods head in the affirmative).

Q.  In the evidence about the defendant's life and background, whether he was abused as a child or under the influence of drugs or alcohol, that kind of thing.

So, what I want to ask you is, if you had heard the evidence in the case, but once you got back there you had determined that the defendant himself intentionally took the life of a human being – and "intentional" under the law, it means purposeful.

In other words, its saying that – its not like – its not accident, its not self-defense, its not what we commonly talk about, manslaughter or somebody acting under a heat of passion, its not somebody acting under duress.

Its somebody that intentionally takes another human being's life.  What I'm trying to get at, under those circumstances, if you found the defendant intentionally took the life of another human being, at that point are you going to vote for the death penalty?

In other words, let me try and put it a little different.  There are some people who once they've heard this evidence – and I'm talking about, you have heard the aggravation and you have heard the mitigation – there are some people, and they are certainly entitled to have that view, who once they determine that somebody intentionally took somebody's life and that's – that's what they want to know.  They are going to impose death under those circumstances.

And although they have listened to and heard the evidence about the defendant's life and background, that's not something that is really going to impact on their decision.  The fact that somebody intentionally killed is what matters to them, and so the other stuff just couldn't – couldn't outweigh that or would never be a reason for that person to vote for life.

And so I'm just trying to see if you – if you know – the reason I ask you, you seemed to pause when you were talking about an intentional killing and it didn't mention deliberate – if you could do that?  Or am I just confusing –

The Court:  Let me develop – let me say, I'm not letting the lawyer ask you how you would vote on a set of facts on a hypothetical case, that would be an improper question.

Mr. Blume is just asking you, if you heard about an intentional killing by someone who was over 18, not under duress, etcetera, etcetera, would you always vote for the death penalty in that situation, or could you consider the entire case, including the defendant's mitigating factor?

Juror Allison:  I wouldn't always vote for the death penalty, no.

PTT 5/19/2004 at 8-112 to 8-116.

These questions were rambling, confusing, intimidating, and ultimately useless. The questions were too long to follow and counsel acknowledged the ensuing confusion. The ultimate "question" at the end of trial counsel's long soliloquy at best aimed for a yes or no response. Trial counsel did not attempt to actually engage the prospective juror in a discussion—a discussion necessary to learn basic, relevant information about the venireman or the likelihood of bias.

Instead of establishing a dialog, counsel pedantically lectured the prospective jurors about aggravating circumstances, mitigating circumstances, legal insanity, intent, and manslaughter. To make matters worse, counsel appeared to be tricking the jurors with his lengthy questions. After the Court had asked the prospective jurors a series of questions about fairness and impartiality, Petitioner's counsel would launch into a speech/question, with the result often being that the prospective juror answered in a manner that called into doubt his impartiality. The Court then stepped in to try to sort the manner out. At the end, the prospective juror responded "No, no, no, I didn't mean to tell Mr. Blume that. I didn't understand him to ask me that question." Basham TT 08/04/2004 at 12 (Judge Anderson's description of Fulks voir dire). During the Basham trial, this Court candidly informed Basham's lawyers about the confusion caused by Petitioner's counsel and averred that "the result was, I think Mr. Blume really paid a price with the jurors because it looked like he was trying to trick them." Basham TT 08/04/2004 at 12-13. The ultimate price, however, was paid by Chad Fulks.

The sentencing trial began with a jury distrustful of Petitioner's counsel and one that ultimately sentenced him to death after just a few short hours of deliberations. Petitioner's counsel was ineffective by failing to ask open-ended questions, to listen to

155

the answers, and to show the jurors respect and honesty. The lectures and speeches given by counsel were not questions, not suitable for gathering information, and ultimately resulted in a jury that did not trust trial counsel. Because of counsel's gaffes, Petitioner was behind the eight ball with the jury before trial ever started and was denied a fair trial.

**CLAIM XVI: TRIAL COUNSEL WERE INEFFECTIVE INASMUCH AS THE FAILURE TO READ QUESTIONNARIES AND TO EXAMINE PROSPECTIVE JURORS ON THE QUESTIONNAIRES FELL BELOW ACCEPTED CAPITAL DEFENSE PRACTICES.**

In addition to questioning prospective jurors, counsel can learn much information from jury questionnaires. In Petitioner's case, two questionnaires were used: the first was comprehensive with a total of 58 questions, and the second was limited to attitudes toward capital punishment. The comprehensive questionnaire provided information about a prospective juror's education, occupation, family, hobbies, and past experience with crime.

At a minimum, trial counsel should read the questionnaires and examine the prospective jurors about their responses or failures to respond to the questions posed. See United States v. Quinones, 511 F.3d 289, 299-300 (2d Cir. 2007) (cataloging cases where the use of questionnaires is sanctioned and facilitates voir dire); see also Indiana v. Dye, 784 N.E.2d 469 (Ind. 2003) (failure to question juror in capital case on questionnaire answer constituted ineffective assistance of counsel); Knese v. Missouri, 85 S.W.3d 628 (Mo. 2002) (counsel's failure to read questionnaire constituted ineffective assistance). Morales v. Texas, 217 S.W.3d 731 (Tex. Ct. App. 2007) (holding that defense counsel has a duty to read jury questionnaire).

Petitioner's counsel was certainly aware of the importance of studying the questionnaires and asking questions based on the questionnaire responses. For example,

when conducting voir dire of Anthony Vick, counsel for Petitioner observed that he had been a victim of a crime because his car was broken into.  In so questioning Mr. Vick, counsel for Petitioner specifically referred to question 42 of the comprehensive questionnaire.  PTT 05/12/2004 at 3-165 to 3-166.  This question reads:

42.  Have you or any close friend or relative been the victim of a crime, whether it was reported to law enforcement authorities or not (including robbery, burglary, assault, kidnapping, sexual assault, domestic violence, etc.)?

____ Yes  ___ No

If yes, please explain the following for each incident:

a.  Type of crime: _____

b.  Who was the victim? _____

c.  What was the relationship between victim and the perpetrator? _____

d.  Was the crime reported to the police? _____

e.  Was anyone charged with the crime? _____

f.  If someone was charged, what was the outcome of the prosecution? _____

g.  Was the case handled well or poorly by law enforcement officials? _____

h.  Will this experience affect your ability to be impartial during this trial? _____

If yes, please explain: _____

Allison Questionnaire (contained in *PA, document #*32)

Answers to question 42 indicating that jurors or a family member had been victims of crime were clearly important to Petitioner's counsel inasmuch as a number of follow-up questions were posed to members of the jury pool who answered that they had direct experience with crime.  See PTT 05/13/2004 at 4-42 to 4-43 (questioning Ann Lee

157

on questionnaire response that she had been a victim of a burglary); PTT 05/14/04 at 5-60 to 5-61 (questioning of Jesse Moore regarding purse stolen from wife's car); PTT 05/14/2004 at 5-87 (questioning of Charles David Paramore regarding being a victim of a burglary); PTT 05/14/2004 at 5-165 to 5-166 (questioning of Wanda Burkett regarding questionnaire response indicating her family had been the victim of a burglary); PTT 05/14/2004 at 5-312 (questions posed to Joni Novinger about disclosure on questionnaire that her sister had been a victim of sexual assault); PTT 05/17/2004 at 6-36 (questioning regarding questionnaire response that indicated a friend had been the victim of a murder); PTT 05/18/2004 at 7-98 (questioning of Janice J. Richards on questionnaire response indicating sister had been a burglary victim); PTT 05/19/2004 at 8-248 to 8-249 (questioning of Timothy Kurzwell regarding questionnaire response indicating he had been a victim of a robbery); PTT 05/19/2004 at 8-282 (questioning of Edmond Stutts regarding questionnaire response indicating he and his stepson had been victims of crime); PTT 05/20/2004 at 9-82 (questioning of Colleen Turner about questionnaire response indicating that her son had been a robbery victim).

Often as important as a response on a questionnaire is a non-response. For example, prospective juror Laura Pressley was questioned about the fact that she did not put anything on her questionnaire about her feelings on the death penalty. PTT 05/11/2004 at 2-91. With Pressley, counsel exercised proper voir dire by reading the questionnaire, noticing the blank, and following up on the non-response.

Despite knowing the importance of question no. 42 and having asked veniremen about blanks on questionnaires, trial counsel did not ask perspective juror Sylvia Allison why she left question 42 blank. Question 42 had to be answered with a yes or no. "Not

158

applicable" or leaving a blank was not a possible response. Had counsel questioned Allison on this matter, he would have learned that Allison's husband was murdered in 1971. In fact, Allison was pregnant with her husband's child at the time he was murdered. This knowledge would have certainly caused reasonable and competent trial counsel to strike juror Allison, who after the trial, told newspaper reporters that Petitioner was "evil" and that it was "a good feeling" to sentence him to death. Myrtle Beach On Line, 7/01/2004 (contained in *PA, document # 28*).

There can be no question that the failure to read questionnaires or follow-up with questions about the blanks was prejudicial. Questionnaires contain vital information and counsel cannot properly evaluate a juror unless each answer is thoroughly reviewed. Because of these failures, counsel allowed a juror to be seated whose husband was a murder victim. The result was a juror, in light of her own life experience, who used Petitioner's verdict as a cathartic experience. The result of the proceeding would surely have been different had not Allison served on the jury.

## CLAIM XVII: TRIAL COUNSEL WERE INEFFECTIVE FOR CHOOSING TO SIT AUTOMATIC DEATH VENIREMEN ON THE JURY INSTEAD OF MAKING A MOTION FOR ADDITIONAL STRIKES.

Not only was Petitioner the victim of ineffective *voir dire* and misuse of questionnaires, but these errors were compounded when trial counsel chose to seat "automatic death" veniremen on the jury. Under well-established Supreme Court precedent, defense counsel may challenge, for cause, any potential juror who would automatically vote for the death penalty. See Morgan v. Illinois, 504 U.S. 719, 729 (1992). In order to ascertain whether jurors should be excluded, it becomes necessary to assess whether "the prospective jurors' feelings concerning capital punishment would 'substantially impair' their ability to render a fair and impartial verdict." Stamper v.

Muncie, 944 F.2d 170, 176 (4th Cir. 1991). In highlighting the seriousness with which this inquiry must be conducted, the Morgan Court noted that "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." Morgan, 504 U.S. at 729. With the foregoing in mind, trial counsel's failure to move for additional strikes fell below an objective standard of reasonableness.

Trial counsel believed that the District Court erred in finding that jurors Goehring, Harvey, Allison, Novinger, and Plyer were qualified. Counsel should have struck these jurors or asked the Court for additional challenges. Because of lead counsel's unfamiliarity with federal jury selection procedures, neither step was taken. See Declaration of Andrea Lyon (contained in PA, document #1, ¶ 25) ("There is also a need to be familiar with and able to employ sophisticated jury selection techniques. Jury selection in a capital case is far more complicated and difficult than in an ordinary case."). Instead, counsel believed that the only recourse was to seat the jurors so a challenge could be made on appeal. This decision was reckless and cannot be considered permissible trial strategy.

The importance of the voir dire process cannot be overstated. See Meghan H. Morgan, Standby Me: Self-Representation and Standby Counsel in a Capital Case, 16 Cap. Def. J. 367, 381 (2004) ("because of the significance of voir dire, it arguably constitutes the most important component of a capital murder trial"). One study found that 14% of jurors *who served* in capital cases believe that the *only* acceptable punishment for a murder conviction is death. See John H. Blume et al., Probing Life Qualification" Through Expanded Voir Dire, 29 Hofstra L. Rev. 1209, 1209, 1220 (2001) (internal reference omitted).

In light of the importance of the jury selection process, reasonable and competent counsel should have moved the court for additional preemptory challenges instead of intentionally permitting the Court to seat jurors who counsel believed were automatic death jurors. See United States v. Potts, 420 F.2d 964 (4th Cir. 1970) (approving of district court granting additional challenges); see also Declaration of Andrea Lyon (contained in PA, document #1, ¶ 24) ("Motions practice is far more complex and requires significant preparation by the capital defender. . . ."). If the Court denied the motion, then counsel could have appealed from this decision. Id. Instead, counsel's egregious misunderstanding of the law led to trading fundamental trial rights for speculative appellate benefit.

Rather than hoping for relief on appeal, trial counsel should have used every means possible to keep automatic death jurors off Petitioner's jury. But, instead of making a motion for additional strikes, counsel permitted the Court to seat jurors likely to sentence Petitioner to death. In so doing, counsel ignored the dangers of group-think. See, e.g., Samuel R. Sommers, On Racial Diversity and Group Decision-Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations, 90 Journal of Personality and Social Psychology 597, 601 (2006) (internal citations omitted). Studies also show that a group's majority tends to obtain its preferred result and the larger this majority, the greater its impact on the group. Id. at 599. This effect occurs because not only are there more people voting for their own preferred outcome, but more of the debate is focused on favorable information regarding that outcome. Id. Moreover, some scholars argue that "the very process of death qualification may make the jury more likely to convict or vote for death." Adam M. Clark, An Investigation of Death

Qualification as a Violation of the Rights of Jurors, 24 Buff. Pub. Int. L.J. 1, 11 (2005-2006).

It is intuitive that the compounded effect of adding several death-oriented jurors to the jury will make it more likely that the jury returns a verdict of death. Further studies have shown that pressures to conform and loyalty to the group can have an adverse affect on moral judgment. Erica Beecher-Monas, The Epistemology of Prediction, 60 Wash. & Lee L. Rev. 353, 400 (2003). This concept is commonly referred to as group-think, and the result is that individuals within groups may stifle personal opinions in order to promote group unity. Id. at 400. Such an effect is particularly pronounced in groups isolated from outside influences and lacking systematic procedures for evaluating evidence, both of which are characteristic of juries. Id. at 400.

Trial counsel willingly placed veniremen on the jury who counsel believed were automatic death jurors. Counsel did this because he did not know that, under clearly established Fourth Circuit case law, he could have requested additional strikes. He did not understand the basics of error preservation in the federal system and his conduct was objectively unreasonable. Because of counsel's failure here, the adversarial process was completely broken down. Fulks' Sixth Amendment rights were compromised. Counsel's error certainly undermines confidence in the outcome of the proceedings. See Strickland, 466 U.S. at 694.

**CLAIM XVIII: PETITIONER'S APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO APPEAL THIS COURT'S REFUSAL TO ADMIT STATEMENTS MADE BY BASHAM TENDING TO SHOW THAT BASHAM KILLED ALICE DONOVAN.**

On November 28, 2002 Branden Basham met with law enforcement representatives in Brunswick County, North Carolina. The purpose of this excursion was

162

to look for the remains of Alice Donovan.  Basham was accompanied by Sheriff Ronald

Hewitt, FBI Agent Jeff Long, an unidentified police officer, and two of Mr. Basham's

attorneys.  While driving along Highway 17, a doe jumped in front of the van.  At that

time Branden Basham said to Sheriff Hewitt "you know, I could never kill a deer and

here I have . . . ."  Basham was stopped from completing his sentence by attorney Bruce

Littlejohn.  Hewitt interview, 12/03/02 (Contained in *PA, document # 37*, at ¶3).

During Petitioner's trial, Petitioner's counsel sought to introduce this statement as

a declaration against penal interest or an excited utterance.  TT 06/22/2004 at 247-48.

Petitioner's counsel argued that this statement was evidence that Basham, and not

Petitioner, was the actual killer of Alice Donovan.  Petitioner's counsel emphasized that

this statement was made contemporaneously at the time Basham was attempting to put all

the blame on  Fulks for the death of Alice Donovan.

The government argued against admission of the statement.  According to the

government, Petitioner's counsel was taking the statement "out of context."

TT 06/22/2004 at 250.  The government further argued that the statement had "no

meaning."  Id.  Instead of being an admission to killing Alice Donovan, the government

argued that Basham could have meant "I helped Chad hide these bodies."  Id. at 251.  The

government vociferously argued that the statement "doesn't say he killed her, it doesn't

say that."  Id. at 253.  Branden Basham "could have been talking about anything."  Id. at

253.  This Court accepted the government's arguments and did not permit the defense to

introduce the statement.  Id. at 255-54.

Just months later during the Basham trial, the government introduced, through

Sheriff Hewitt, Basham's statement about the deer.  Basham TT, 09/27/2004 at 10-24 to

163

10-25.  In closing argument of the Basham trial, the government specifically argued that

this statement about the deer was an admission that Basham killed Alice Donovan:

> Do you remember what Branden Basham's comments were?  He sees that doe
> and he says to himself, spontaneously, "here I couldn't even kill a deer, and I
> have," and his lawyer, Mr. Littlejohn stops him.  "Here, I couldn't even kill a
> deer, and here I have" – what do you think he is thinking about?  Here I have
> smoked a joint?  Here I have stolen a car?

Basham TT, 9/29/2004 at 12-79.

Petitioner's direct appeal was not heard by the Fourth Circuit Court of Appeals

until May 23, 2006—approximately 18 months after the Basham trial.  Petitioner's

appellate counsel should have known of the government's inconsistent use of the deer

statement and should have raised this issue on appeal.  See Smith v. Groose, 205 F.3d

1045, 1051 (8th Cir. 2000); United States v. Higgs, 353 F.3d 281,326 (4th Cir. 2003)

("[T]he Due Process Clause prohibits the government from presenting mutually

inconsistent theories of the same case against different defendants."); Thompson v.

Calderon, 120 F.3d 1045, 1058 (9th Cir. 1997) (en banc) ("[i]t is well established that

when no new significant evidence comes to light a prosecutor cannot, in order to convict

two defendants at separate trials, offer inconsistent theories and facts regarding the same

crime."), rev'd on other grounds, 523 U.S. 538 (1998).

The government misled this Court when it argued that the deer statement was

meaningless and it successfully obtained a ruling excluding the statement.  This statement

was a key piece of evidence showing that  Fulks did not strike the fatal blow that killed

Alice Donovan.  This would have been powerful testimony during the Fulks trial and

would likely have led the jury to a different conclusion about Petitioner's moral

responsibility for Donovan's death. Appellate counsel erred and was ineffective by not

raising this issue to the Fourth Circuit Court of Appeals.  Had this issue have been raised,

the outcome of the appeal would have been different.  See <u>Smith v. Robbins</u>, 528 U.S.

259, 286 (2000).

## CLAIM XIX: PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED BY THE GOVERNMENT'S PRESENTATION OF INCONSISTENT THEORIES.

In violation of the Due Process Clause and contrary to established guidelines, the

government prosecutors argued several starkly contrasting and mutually inconsistent

theories during Petitioner's sentencing hearing and later during Basham's trial.

Depending on the defendant, for example, the government averred that either Basham or

Fulks acted as mastermind of the crime spree, that either Basham or Fulks was solely

responsible for allegedly strangling Alice Donovan, and that either Basham or Fulks

deferred decisions of life and death to the other.  The government's relentless pursuit of a

death sentence against Petitioner and a conviction against his co-defendant based on

inherently factually contradictory theories violates due process.  See <u>Smith v. Groose</u>,

205 F.3d 1045, 1051 (8th Cir. 2000).

"[T]he Due Process Clause prohibits the government from presenting mutually

inconsistent theories of the same case against different defendants."  <u>United States v.</u>

<u>Higgs</u>, 353 F.3d 281,326 (4th Cir. 2003); <u>Thompson v. Calderon</u>, 120 F.3d 1045, 1058

(9th Cir. 1997) (en banc) ("[i]t is well established that when no new significant evidence

comes to light a prosecutor cannot, in order to convict two defendants at separate trials,

offer inconsistent theories and facts regarding the same crime."), <u>rev'd on other grounds</u>,

523 U.S. 538 (1998).  Due process is violated when an inconsistency exists "at the core

of the prosecutor's cases against defendants for the same crime."  <u>Smith v. Groose</u>, 205

F.3d 1045, 1052 (8th Cir. 2000).

Courts and commentators have determined that prosecutorial inconsistency violates the Constitution, ethics, and the ideals of fundamental fairness.[13]  The Supreme Court and ethics cannons make clear that prosecutors have a duty pursuant to the Fourteenth Amendment to ensure integrity and fairness during the legal process.  See, e.g., Berger v. United States, 295 U.S. 78, 88 (1935).  Affirmatively arguing inconsistent theories undermines the reliability of sentences and allows an unacceptable risk that the death penalty may be administered in an arbitrary or capricious manner in contravention of the Eighth Amendment.

Relying on principles of fundamental fairness, the Supreme Court has repeatedly argued that prosecutors, as representative of the State, have a responsibility to uphold the integrity of the legal process.  Indeed, as Justice Douglas said, "[t]he function of prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall.  His function is to vindicate the rights of people as expressed in the laws and give those accused of crime a fair trial."  Donnelly v. DeChristofor, 416 U.S. 637, 648-49 (1974) (Douglas, J., dissenting).  Other Justices espouse the same belief: "[t]he criminal trial should be viewed not as an adversarial sporting contest," United States v. Kattar, 840 F.2d 118, 127 (1st Cir. 1988), but as a truth-seeking forum in which the prosecutor strives to uncover the actual facts surrounding the commission of a crime. United States v. Wade, 388 U.S. 218, 256 (1967) (White, J., concurring).  Because

---

[13] See, e.g., Stumpf v. Mitchell, 367 F.3d 594 (6th Cir. 2004), rev'd in part, remanded in part, Bradshaw v. Stumpf, 125 S. Ct. 2398 (2005); Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000); In re Sakarias, 35 Cal. 4th 140, 25 Cal. Rptr. 3d 265 (2005).  See also, Anne Bowen Poulin, Prosecutorial Inconsistency, Estoppel, and Due Process:  Making the Prosecution Get Its Story Straight, 89 Cal. L. Rev. 1423 (2001); Michael Q. English, A Prosecutor's Use of Inconsistent Factual Theories of a Crime in Successive Trials:  Zealous Advocacy or Due Process Violation, 68 Fordham L. Rev. 25 (1999); Steven F. Shatz & Lazuli M. Whitt, The California Death Penalty:  Prosecutors' Use of Inconsistent Theories Plays Fast and Loose with the  Courts and the Defendants, 36 U.S.F. L. Rev. 853 (2002); Barry Tarlow, Limitations on the Prosecutor's  Ability to Make Inconsistent Arguments in Successive Cases, 21 Champion 40 (1997).

prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction," <u>Berger</u>, 295 U.S. at 88, the use of wholly contradictory prosecutorial arguments is "inconsistent with the principles of public prosecution and the integrity of the criminal system." <u>In re Sakarais</u>, 35 Cal. 4th 140, 159, 25 Cal. Rptr. 3d 265, 281 (2005).

For a government prosecutor to take flatly inconsistent positions in two different capital cases raises serious questions about prosecutorial misconduct and fundamental fairness. The obligation of a federal prosecutor is not to "win a case, but that justice shall be done." <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935). As a servant of the law, a prosecutor has a "two fold aim" to see "that guilt shall not escape or innocents suffer." <u>Id.</u>

### A. The "puppet" becomes the leader

A key trial strategy for Petitioner was to cast Basham as the instigator and sole murderer. <u>Fulks</u>, 454 F.3d at 426. By contrast, the government's trial strategy was to show that Fulks was the leader during the events of November 2002. During the Fulks trial, the prosecution stated that "the plain fact of the matter is, he is the leader." TT 06/29/2004 at 66. Branden Basham, according to the prosecution, was not an equal in the crime spree, but rather a puppet who would act when Fulks gave the command: "but make no mistake about it, Branden Basham was a <u>puppet</u>, and Chad Fulks was pulling his strings throughout a lot of this crime spree." TT 06/29/2004 at 66 (emphasis added).

Had Basham not been a "puppet" and instead posed a danger to Petitioner and the others, the prosecution argued, Petitioner would have abandoned Basham: "If he is afraid, if he is not driving this train, if he is not the leader, if he is not calling the shots,

that is what he would have done." <u>Id.</u> The prosecution's emphasis on Petitioner allegedly being the leader was not limited to closing argument, but was a theme running throughout the prosecution's case-in-chief. <u>See</u>, <u>e.g.,</u> TT 06/02/2004 at 61 (questioning of Diane Blair on Basham being a follower); <u>Id.</u> at 81 (questioning of Chris Shaffer on Basham being a follower); TT 06/03/2004 at 151 (questioning of Tina Severance on Basham being a follower); TT 06/08/2004 at 141 (questioning of Beth McGuffin on Basham following orders from Fulks).

Then, approximately two months after Petitioner's sentencing hearing, the government tried Basham for the same crimes. Although only a short period of time had elapsed, the government no longer portrayed Basham as a "puppet" or a "follower." On the contrary, the government asserted that logic precluded the jury from believing that Basham was a follower:

> It is interesting, when Mr. Swerling [Basham's trial counsel] was explaining to you why, putting in context why Mr. Basham would react the way he did with some of the guards, well, some of these guards would tell him what to do and he didn't like that. That is not how you deal with Branden Basham. <u>You don't tell Branden Basham what to do</u>. Do you remember that portion of his closing argument? So, on the one hand, they want you to believe that Branden Basham can't be told what to do by the prison guards, and on the other hand, Branden Basham is being told what to do throughout this entire crime spree by Chad Fulks. How do you balance those two? They want you to believe that, they offer as an explanation, you can't tell Branden Basham what to do by a prison guard or else he will explode. On the other hand, they want you to believe that Chad Fulks was telling him everything of what to do. He is leading him. I'm not talking about leading about where they are going. It doesn't make sense. You can't have it both ways.

Basham TT 11/01/2004 at 29-169 to 29-170 (emphasis added).

The government is right about one thing: you can't have it both ways. Nonetheless, the government offered inconsistent arguments and presented inconsistent evidence regarding the core leadership issue. In pursuing these inconsistent positions, the

government violated Fourth Circuit authority: "In some situations, the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants. For example, due process may be violated if 'an inconsistency exist[s] at the *core* of the prosecutor's case against the defendants for the same crime, or where the evidence used at the two trials is 'factually inconsistent and irreconcilable.'" United States v. Higgs, 353 F.3d 281, 326 (4th Cir. 2003) (citations omitted); see also Smith v. Groose, 205 F.3d 1045, 1052 (8th Cir. 2000); Thompson v. Calderon, 120 F.3d 1045, 1055 (9th Cir. 1997) (Fletcher, J., writing for an en banc plurality), rev'd on other grounds, 523 U.S. 538 (1998); Drake v. Kemp, 762 F.2d 1449, 1470 (11th Cir. 1985) (Clark, J., concurring).

The core inconsistency in the government's theories during the two trials was the relationship between the co-defendants. Instead of categorizing Basham as a mindless puppet as they had done during the Fulks trial, the same prosecutors candidly admitted during the Basham trial that

> the entire theme of the government … is that he [Basham] is an absolute manipulator. Basham TT 10/14/2004 at 17-178.

> I think it is important for the jury to know that, you know, one of our theories about Mr. Basham's mental state is that he is purely manipulative, all of his acting out and aggressiveness is for the purpose purely of securing some benefit, some advantage that he wants. Basham TT 10/14/2004 at 17-7.

The government focused on Basham's ability to manipulate and to instigate based on testimony from guards at the Hopkins County Detention Center who knew Petitioner and Basham very well. As the guards testified, had they "thought in some way Chad Fulks was going to be able to equally manipulate Mr. Basham, they would [not] have put him in the cell with him if they had some concern." Basham TT 11/1/2004 at 29-171. In

169

other words, under the government's theory, from the onset of the Fulks and Basham relationship, Basham was the party most likely to manipulate and cause problems.

In stark contrast to the Fulks trial, the government portrayed Basham as the leader during the Basham trial:

> But I remind you, ladies and gentlemen, who was the one that took the lead during all of those hours when Samantha Burns was alone in the car with her perpetrator? It was Branden Basham because Mr. Fulks had to be driving the van. As Mr. Fulks was in the van, it was Mr. Basham taking the lead. It was Mr. Basham that had that gun on Samantha Burns, the government submits to you. Who was the one who took the lead and approached Andrea Frances? It was Branden Basham that took the lead.

Basham TT 11/1/2004 at 29-168.

In support of its arguments that Basham was a leader, the government elicited testimony from a number of witnesses. See Basham TT 10/12/2004 at 15-227 (testimony of Celia Bowman that Basham was manipulative); Basham TT 10/13/2004 at 16-102 (testimony of Robert McEachearn describing Basham as observant, intelligent, crafty, and skilled); Id. at 16-162 (testimony of Francis Kirkland indicating that Basham "likes to have things his way or no way at all" and "he wants to take control"); Basham TT 10/14/2004 at 17-57 (testimony of Lee James indicating that Basham "is a leader. He can lead. He can get the dorm in an uproar when he wants to."); Id. at 17-65 (testimony of Eric Dash that Basham is manipulative and can go off at any time).

In summary, the government took inconsistent positions in the capital trials of Fulks and Basham. These positions regarding who was the leader and who was the follower went to the core of the case. A key strategy for the Petitioner was to show the jury that he was not the instigator and murderer; therefore, Petitioner should have been sentenced to life rather than death. Unfortunately, Petitioner was sentenced to death. The government went to great lengths in Petitioner's trial to show that Petitioner

170

masterminded the crime spree and controlled Branden Basham. In the Basham trial, the government took the opposite position. Had the jury in Petitioner's trial heard the government's argument in the Basham trial, it would not have viewed Petitioner as an instigator or leader and therefore would not have sentenced him to death because he would have been viewed as less morally culpable than Basham. The government's "use of inherently factually contradictory theories violates the principles of due process." Smith, 205 F.3d at 1052.

**B.      Basham demonstrated how he -- not Fulks -- killed Alice Donovan.**

In arguing for a life sentence, Petitioner sought to demonstrate that Basham struck the fatal blow that killed Alice Donovan. In support of this position, Petitioner presented two key pieces of evidence -- Basham's "deer statement" and Basham's demonstration of how he used a purse strap to strangle Alice Donovan. The government vigorously opposed Petitioner's evidence. Instead, the government contended that Petitioner had an equal role in the death of Alice Donovan and that Petitioner "intentionally killed Alice Donovan." TT 06/29/2004 at 107 & 131.

The government irreconcilably manipulated this key evidence depending on which defendant was on trial. During the Fulks trial, for example, the government argued that Branden Basham's "deer statement" to Sheriff Hewitt meant nothing and did not indicate that Basham, rather than Fulks, killed Alice Donovan.

The other key piece of evidence was Basham's demonstration, in the presence of Sheriff Hewitt, illustrating how Alice Donovan was allegedly strangled with a purse strap. During Petitioner's trial, the government argued that Basham was explaining how "Chad Fulks took the purse strap and strangled" Alice Donovan. TT 06/22/2004 at 255.

171

During the Basham trial, however, the government took a contrary position. Sheriff Hewitt adamantly testified that Basham was demonstrating how Basham – not Fulks – used the purse strap to strangle Alice Donovan. Basham TT 09/27/2004 at 10-53. In closing argument the government characterized Basham's demonstration an admission that Basham killed Alice Donovan with her own purse strap. Basham TT 09/29/2004 at 12-80. The government also argued that a jury verdict for the death penalty was required based on Sheriff Hewitt's testimony that explained "how Branden Basham demonstrated how Alice Donovan was strangled." Id. at 12-81.

The argument that Basham struck the fatal blow was a critical part of Petitioner's mitigation case. At Petitioner's trial, the government averred that statements/demonstrations made by Basham to Sheriff Hewitt were ambiguous and meant nothing. However, during the Basham trial, the government used these statements to paint Basham as the killer of Alice Donovan. Such contradictory positions resulted in a denial of due process.

The Supreme Court has a long history of frowning upon prosecutorial inconsistency of the type demonstrated in the Fulks and Basham trials. See e.g., Green v. Georgia, 442 U.S. 95 (1979) (rejecting prosecutor's attempt to use hearsay rules to prevent defendant from presenting evidence that the prosecutor previously used to convict a different defendant of the same crime.); Miller v. Pate, 386 U.S. 1 (1967) (condemning prosecutor's use of inconsistent theories in a case involving prosecutor's knowledge of false testimony.)

> [I]t is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime.

Thompson, 120 F.3d at 1058.  Knowingly advancing inconsistent theories results in "fundamental and egregious error" that violates the Due Process Clause.  Drake v. Kemp, 762 F.2d 1449, 1470 (11th Cir. 1985)(Clark, J., concurring).  Knowingly advancing inconsistent theories is also fundamentally unfair.  "The state cannot divide and conquer in this manner.  Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for truth."  Thompson, 120 F.3d at 1059.

> The issue is whether the Constitution requires that the State employ basic honesty in prosecuting those accused of crime or whether it can join in the game of seeking a result without much regard for the tactics.  The Court does not make this observation lightly and recognizes that the horrible murder of the victim in these cases would likely have moved any community and any prosecutor to do whatever was necessary to bring the responsible parties to justice.  The Court seriously doubts, however, that the Constitution can stand many cases where the expedient of exacting justice overpowers completely all sense of fairplay [sic].

> Drake v. Kemp 762 F.2d at 1477.

### C.      Basham made all life and death decisions.

In the Basham trial, the government argued that the jury should be consistent in its deliberation.  "Well, ladies and gentlemen, let's be consistent.  Let's be consistent back in that jury room."  Basham TT 09/29/2004 at 12-176.  The government then made the following argument:

> Chad Fulks left it up to Branden Basham when James Hawkins was there and Branden Basham chose not to kill Mr. Hawkins.  And Chad Fulks chose not to kill Mr. Hawkins.  Well, if Chad Fulks is consistent, then doesn't consistency say that he would have left it up to Branden Basham with Samantha Burns, and that he would have left it up to Branden Basham with Alice Donovan?  They want you to think that Chad Fulks is consistent when it hurts Chad Fulks or helps Branden Basham, but not when it hurts Branden Basham.  If Chad Fulks is consistent, then he left up the life and death of Samantha Burns and Alice Donovan to Branden Basham, just like he did with James Hawkins.

Id. at 12-76 to 12-177.

This is yet another core inconsistency between the two trials. In Petitioner's trial, the government argued that Petitioner intentionally killed Alice Donovan. At the Basham trial, the government argued that Basham decided who would live and who would die. Because the government affirmatively and intentionally advocated mutually inconsistent positions, Petitioner was not accorded due process of law.

**D.    Intentional killing of Alice Donovan.**

During opening statements at Petitioner's trial, the government ridiculed evidence it expected Petitioner would offer to show that Basham killed Alice Donovan: "Ladies and Gentlemen of the jury, we will present evidence in this case to show you that Chadrick Evan Fulks' assertion that Branden Basham acted alone and killed Alice Donovan and Samantha Burns is the last desperate attempt of a desperate criminal to avoid the consequences of his own deadly choices." TT 06/01/25 at 58.

In closing, the government asserted that both Petitioner and Basham acted together to intentionally kill Alice Donovan:

> All the testimony that you have heard from the time that they escaped, everything that you have heard is consistent on one fact, they were together. They were a two-man team. Everything they did together, ladies and gentlemen. They needed each other to escape. They needed each other to do Hawkins. They needed each other to go to Talsma's residence. They needed each other to do Samantha Burns. They needed each other to scope out Savannah Bluff. They needed each other to rob Sam Jordan. They were both shooting at Carl Jordan. They needed each other to abduct Alice Donovan. They both carjacked her, both kidnapped her, both raped her. Do you honestly believe that, at one point in time, that the two of them were not going to act together? Circumstantial evidence, both of them, ladies and gentlemen, intentionally killed Alice Donovan, the government submits to you.

TT 06/29/2004 at 106-07.

In the government's opening and closing, an argument was offered that Petitioner and Basham acted together to kill Alice Donovan. Despite using this recurrent theme

174

during Petitioner's trial, the government later admitted during the Basham trial that these statements were untrue. He admitted that the evidence pointed to Branden Basham as the actual killer of Alice Donovan.

> We think there is evidence to suggest that Branden Basham was the killer. In fact, probably better evidence to suggest that Branden Basham was the killer than that Chad Fulks was the killer.

Basham TT 10/8/2004 at 14-21 (emphasis added).

The government misled the Fulks jury by stating during Petitioner's trial that Fulks and Basham had an equal hand in the killing of Alice Donovan. In reality, the government all along knew that Basham was the killer and that the evidence supported this. There was no "newly discovered evidence" to account for this change in the government's theme. "[I]t is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." Thompson,120 F.3d at 1058. Thus, the prosecutors' arguments prejudiced Petitioner and violated his due process rights.

Intentionally advancing inconsistent arguments is "inconsistent with the principles of public prosecution." In re Sakarias, 106 P.3d 931, 944 (Cal. 2005). Indeed, a "criminal prosecutor's function 'is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible during the course of the criminal prosecution and trial.'" In re Sakarais, 106 P.3d at 13.

The established case law closely tracks the prosecutors' professional obligations: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." ABA Model Rules of Professional Conduct, Rule 3.8 Comment 1 (1983), see also ABA Standards for Criminal Justice, Prosecution Function § 3-1.2 (1992).

Prosecutors serve as representatives of the sovereign which is charged with the duty of governing impartially. Berger, 295 U.S. at 88. Prosecutors have the obligation to seek truth: "The State's obligation is not to convict, but to see that, so far as possible, truth emerges. This is also the ultimate statement of its responsibility to provide a fair trial under the Due Process Clause of the Fourteenth Amendment." Giles v. Maryland, 386 U.S. 66, 98 (1967) (Fortas, J. concurring).

Prosecutors have a duty to ensure that defendants' rights are protected and that convictions are based on sufficient evidence. ABA Model Rules of Professional Conduct, Rule 3.8 Comment 1 (2003). Prosecutors may not misrepresent facts to the court and must seek withdrawal of false evidence upon its discovery. ABA Standards for Criminal Justice, Prosecution Function § 3-5.6, 3-2.8 (1992).

In sum, contrary to established canons and established case law, the government's incessant pursuit of the death penalty, principally relying on inconsistent theories and depictions of evidence, violated Petitioner's Constitutional guarantee of due process.

## CLAIM XX: THE PROSECUTION'S ATTEMPTS TO INFLUENCE WITNESS TESTIMONY WERE INAPPROPRIATE AND RENDERED THE RESULTING VERDICT A DENIAL OF DUE PROCESS.

"Relief for prosecutorial misconduct is appropriate when the conduct renders the trial so fundamentally unfair that the resulting conviction is a denial of due process." Davis v. Zant, 36 F.3d 1538, 1545 (11th Cir.1994) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 645, (1974)). "[T]he standard for reviewing prosecutorial misconduct requires a weighing of the nature and scope of the instances of misconduct against the evidence of guilt against the accused." Id. at 1546. See also Guerra v. Johnson, 90 F.3d 1075, 1079 (5th Cir. 1996).

**A.       Andrea Roddy**

Andrea Roddy was a critical trial witness.  She was one of the four people who traveled from Indiana to Conway, South Carolina, where Alice Donovan was abducted. She spent substantial amounts of time with Petitioner and Basham.  Other than Tina Severance, Roddy was the only other witness who had personal knowledge of many of the group's activities during November 2002.  She participated in the burglary of Robert Talsma's house, accompanied the group on drug binges, witnessed several events where Basham threatened to kill police and other persons, assisted the group in using fraudulent checks, and generally observed the actions and demeanor of Petitioner and Basham. Unfortunately, Ms. Roddy was subject to government misconduct.  According to her declaration:

> Prior to testifying at the Fulks sentencing hearing, I met on multiple occasions with agents of the Federal Bureau of Investigation.
>
> During questioning, the agents focused on Chad Fulks and asked me very few questions about Branden Basham.  I questioned the agents why they were not interested in Basham, and they responded that I need not worry about the target of their questioning.
>
> The FBI agents put pressure on me to testify that, during the events of November 2002, Chad Fulks threatened my life and the life of Teena Severence. I repeatedly told the agents that this was not the case and was not true.  I told them that I would not lie or exaggerate the conduct of Chad Fulks.  Despite my protestations, the agents continued to push me on these issues.  The way they tried to influence my testimony made me very uncomfortable.

Declaration of Andrea Roddy (contained in *PA, document #17, ¶ 3-5*).

The conduct of the FBI agents was highly improper.  They were uninterested in Basham, targeted Petitioner, and attempted to make Roddy falsely testify that Fulks had threatened her life and the life of Severance.  This was a desperate attempt by the

government to falsely paint Petitioner as a dangerous man and the leader of the November events.

**B.  Tina Severance**

Tina Severance was a key witness for the Government.  Like Roddy, she was in the van for many of the events of November 2002.  She also offered damaging testimony that Petitioner put a gun to her head in a Myrtle Beach hotel room.  TT 06/03/2004 at 173-74. Roddy was also in the room at this time, but never remembered Petitioner pointing a gun at anyone. Severance testified that the government offered no deals or promises in exchange for her testimony.  Id. at 184.  However, counsel has learned that in exchange for her cooperation in trial, Severance had all charges dropped related to her filing false police reports in South Carolina. According to a January 24, 2008, letter from the Myrtle Beach Police Department:

> In regards to State v. Severance, all charges against her were dismissed.  There are currently no active warrants against her.  This is pursuant to her cooperation in a case in 2002 in which she was a witness.

Severance Letter (contained in *PA, document #31* ).

While the letter is dated post-trial, it helps explain the major discrepancy between Roddy's and Severance's testimony and casts further light on the government's improper attempts to force Roddy to testify that Fulks threatened her.  At a minimum, this letter casts serious doubt on the government's conduct and serves as grounds for additional discovery.

Additionally, testimony was presented to the grand jury that Roddy and Severance conspired with Basham and Fulks to lure Robert Talsma away from his home so that it could be robbed and that they engaged in multiple offenses.  They were never charged

with the dozens of felonies related to the events of November 2002. This can only be explained as the prosecutor's reward for their cooperation.

**CLAIM XXI: THE GOVERNMENT VIOLATED ITS OBLIGATIONS UNDER BRADY V. MARYLAND BY FAILING TO DISCLOSE TO PETITIONER INFORMATION MATERIAL TO HIS ABILITY TO PREPARE AND PRESENT A DEFENSE AT TRIAL AND SENTENCING DENYING PETITION HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTS AMENDMENTS TO THE UNITED STATES CONSTITUION.**

The due process clause of the Fifth Amendment to the United States Constitution states that no person may be deprived of life, liberty, or property without due process of law. The clause requires that a federal prosecutor disclose favorable evidence that is material to either guilt or sentencing. See Brady v. Maryland, 373 U.S. 83 (1963).

As discussed in the previous section, the government did not disclose that its operatives pressured witnesses to lie or that charges were dropped in exchange for cooperation at trial. The government's failure to disclose these understandings and its elicitation of false testimony violated every aspect of its duty under Brady and its progeny. These due process violations were material to guilt, and to punishment, and require vacation of the judgment of conviction.

**CLAIM XXII: PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT DENIED PETITIONER HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND HIS RIGHTS UNDER THE SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

A prosecutor's duty is not merely to seek a conviction, but to seek justice. ABA Standards for Criminal Justice 3.1-1(c) ("The duty of the prosecutor is to seek justice, not merely to convict."). Part of the duty to seek justice requires a prosecutor to avoid improper argument. The prosecutor's duty to avoid improper argument arises, in part, because prosecutorial comments are in the prosecutor's role as a representative of the government. Accordingly, jurors are predisposed to defer to the prosecutor's words.

179

Improper prosecutorial arguments are likely to carry much weight against the accused when they should properly carry none. For this reason, misconduct by the prosecutor must be scrutinized carefully. The prosecutor's obligations and the Court's scrutiny are never greater than in capital proceedings. See United States v. Mullins, 446 F.3d 750, 759 (8th Cir. 2006) ("It is improper for a prosecutor to make comments that are likely to inflame bias in the jury and to result in a verdict based on something other than the evidence.").

During Petitioner's sentencing trial, the United States attorney repeatedly crossed the line of acceptable and legitimate trial advocacy and engaged in inflammatory rhetoric and argument, and prosecutorial misconduct. This violated Petitioner's right to due process, a fair trial, and a reliable capital sentencing verdict.

The prosecutor's actions, both individually and cumulatively, amounted to prosecutorial misconduct. To the extent that trial counsel failed to object to any of these comments and arguments or request a curative instruction, they were ineffective. Appellate counsel was also ineffective to the extent they failed to litigate these issues on appeal. Petitioner was denied his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

### A.     Life without parole is not a free pass

The government argued during closing that Petitioner was facing life without parole while incarcerated in the Hopkins County Detention Center. TT 06/29/2004 at 30-31. Because Petitioner was allegedly already facing a life sentence, the prosecutor argued that a sentence of life in the capital proceeding would be giving Petitioner "a pass." Id. at 31.

> So, what is he asking you to do, facing all of that time, commits all of these horrible crimes, kills two women, and he is asking you for a life sentence. It is the government's contention, in essence, that that 2-week crime spree, he is not held accountable for. He was looking at serious and significant time before, and now he is looking at life without parole. So, where is the punishment? Where is the accountability for what he did to these two women?

Id. at 31-32.

The government blatantly misled the jury and trial counsel did object to this improper argument. Id. at 31 The Court, however, did not correct the prosecution's deception. Id.

While there were serious non-capital charges pending against Petitioner, he had not entered a plea, had not been appointed counsel, and had not been tried before a jury of his peers. The government's assertion that a life sentence in the capital proceeding would be a free pass was misleading, inaccurate, and improper argument.

### B. There was no evidence Petitioner raped Samantha Burns

During closing argument, the prosecutor told the jury that Petitioner raped Samantha Burns. This was improper because there was no evidence introduced at trial that Samantha Burns was raped by Petitioner.

> What are Branden Basham and Chad Fulks doing dressed out in camouflage that night? No other night. No evidence or testimony they wore camouflage any other night. They were hunting, the government submits to you. They were hunting down somebody. They were hunting, and they located, and they isolated, and they abducted, and they raped, and they robbed, and they killed their prey. She just happened to be a 19 year old college co-ed named Samantha Burns.

TT 06/29/2004 at 41 (emphasis added). Trial counsel failed to object to this outright lie.

It was improper to state to the jury that Chad Fulks raped Samantha Burns when the prosecutor knew there was no evidence of a rape. The prosecution knew better, yet he could not resist this unfounded suggestion that Petitioner raped Samantha Burns.

Employing a scorched-earth trial strategy, the government conveyed false information to the jury.

**C.      The prosecutor engaged in misconduct by referring to Petitioner as a "zoo animal."**

During closing, the prosecutor argued to the jury that the Chad Fulks they saw at counsel table was not the same Chad Fulks who committed the alleged crimes.

> The Chad Fulks you see sitting in this courtroom here today is not the Chad Fulks Samantha Burns confronted. It is not the Chad Fulks that Alice Donovan saw face-to-face lying on top of her. You know, I refer to this as a caged lion analysis. You take your kids to the zoo. The lions are lethargic. We know zoo animals have to be doped up, drugged up. Lethargic.

TT 06/29/2004 at 76-77. Trial counsel objected, but the Court overruled the objection. Id.

This comment was highly improper. The Constitution requires that the life or death decision of a capital sentencing jury be based on a reasoned moral response to the aggravating and mitigating evidence presented at trial. The dehumanizing comment in this case – labeling Mr. Fulks as a "zoo animal" – was solely intended to inflame the passions and prejudices of the jury and distract them from their proper sentencing role.

**D.      The prosecution improperly impugned Petitioner's silence**

It is well settled that the prosecution may not use a defendant's exercise of his Fifth Amendment right to silence as evidence of guilt. In Petitioner's trial, the prosecution improperly brought up his silence:

> Sometimes, ladies and gentlemen, it is not only what people say that matters, it is what people don't say that is every bit as important.

TT 06/29/2004 at 91. There was no objection to this argument.

Although this statement was made during a discussion of Petitioner's interaction with his family during the events of November 2002, such a blanket statement impugned

Petitioner's decision not to testify at trial. This improperly prejudiced the jury against Petitioner and violated his basic constitutional rights.

**E.    The prosecutor engaged in misconduct by telling the jury that giving Petitioner the death penalty would be "an act of self-defense."**

Petitioner pled guilty and was willing to accept a life sentence for his involvement in the events of November 2002. Petitioner would not have been eligible for parole. Nonetheless, the prosecutor told the jury that in sentencing Chad Fulks to death they would be engaging in "an act of self-defense." TT 06/29/2004 at 114. Counsel objected, but the Court refused to instruct the jury to disregard the statement. Id. at 115.

The insinuation that Petitioner was in a position to harm the jury and that the jury needed to protect themselves was wrong. Appealing directly to the jurors in order to create fear crossed the line.

**F.    Conclusion**

The prosecutor's comments and arguments in this case were not simply isolated instances of prosecutorial excess. Individually and cumulatively, the prosecutor's comments so infected the trial with unfairness as to make the conviction a denial of due process. The jury was misinformed that Petitioner was facing life without parole before the events of November 2002, raped Samantha Burns, was drugged up in the courtroom because he was so dangerous, posed a danger to the jury requiring that they act in self-defense, and that Petitioner's choice to remain silent was evidence of guilt.

Moreover, the Court took no steps to cure these errors. The Court's failure to correct any of the above errors, or to immediately instruct the jury as to their impropriety, contributes to and enhances the constitutional violations. Counsel's failure to object,

request a limiting instruction, or raise and preserve all these issues at trial or on appeal, denied Petitioner his right to effective assistance of counsel. These errors undermined the reliability of the verdict determination and deprived Petitioner of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

**CLAIM XXIII:  TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO OBJECT TO THE PROSECUTOR'S IMPROPER AND UNDULY PREJUDICIAL STATEMENTS AND CLOSING ARGUMENT.**

Petitioner's trial counsel did not object to the prosecutor's statement and closing argument that Petitioner raped Samantha Burns. TT06/29/2004 at 41. There was also no objection when the prosecutor improperly impugned Petitioner's silence. TT06/29/2004 at 91. Reasonable and competent defense counsel must object to such inflammatory and unduly prejudicial statements in order to secure a corrective instruction from the trial judge and to preserve the issue for appeal. See United States v. Gastiaburo, 16 F.3d 582, 589-90 (4th Cir. 1994).

Petitioner's trial counsel permitted the prosecutor to inflame the passions of the jury by making completely untrue statements. These statements about key matters needed correction, or at least preservation, in this case. Instead, the jury took the prosecutor's words as the gospel and took this information into the jury room. Petitioner was prejudiced by trial counsel's failures to protect his trial and appellant rights. Had trial counsel been diligent, the outcome of Petitioner's trial/appeal most assuredly would have been different.

**CLAIM XXIV: THE GOVERNMENT ENGAGED IN SERIOUS MISCONDUCT BY ASSERTING THAT PETITIONER HAD BEEN ARMED WITH A .45 CALIBER REVOLVER.**

On June 18, 2004, trial counsel for Petitioner filed a motion to compel a grant of immunity to Ronnie Fulks. Motion for Immunity (contained in *PA, document #*30)

Petitioner's counsel indicated in the motion that Petitioner left a .45 caliber revolver with Ronnie on November 8 or 9, 2002. Id. Because Ronnie Fulks is a convicted felon, counsel observed that Ronnie could not testify as to his receipt and possession of the firearm from Petitioner without exposing himself to criminal liability.

Trial counsel realized that this testimony was important because it would eliminate the possibility that this firearm was the weapon that was used in either the Burns or Donovan homicide. It would also eliminate the resulting inference that Petitioner disposed of the murder weapon at some point prior to his arrest. Second, the testimony that Petitioner left a .45 revolver with Ronnie Fulks would have, when viewed in light of the fact that the other .45 revolver had inoperable ammunition, and that the .45 automatic had no ammunition clip, established that Petitioner and Basham had only one operational firearm with them: the .22 revolver. Myriad witnesses testified that Basham was never without the .22 revolver. After reviewing written submissions and hearing arguments, the Court denied the immunity motion. TT 06/22/2004 at 118.

Despite being put on notice that Petitioner gave a .45 caliber revolver to his brother, the government argued at trial that Fulks was in possession of this weapon throughout the crime spree and fired this weapon at Carl Jordan. TT 06/29/2004 at 58. "So, there is a gun. Don't know where the gun is, could be hiding." TT 06/29/2004 at 73. "Chad Fulks is armed with these two .45's that Friday." Id. at 38. See also id. at 58 (asserting Fulks used a .45 to shoot at Carl Jordan). This argument was improper. By implying that Petitioner was in possession of the missing .45 throughout November 2002 and that Petitioner possibly hid the weapon before capture, the prosecutor misled the jury and offered evidence he knew to be false.

185

In examining prosecutorial misconduct, a court should consider the nature of the misconduct, the extent of the misconduct, the issuance of curative instructions, defense activity inviting the misconduct, and the weight of the evidence. Humphries v. Ozmint, 397 F.3d 206, 218 (4th Cir. 2005). These factors all favor Petitioner. The false statements about Petitioner being armed with an operation .45 pervaded the entire trial and were made with the knowledge of the fact that Petitioner gave the weapon to Ronnie long before Petitioner encountered the Burns or Donovan. The Court issued no curative instruction and the defense team did nothing to invite the prosecutors comments. The issue of whether Petitioner was armed was important to the jury as they determined such matters as who was the leader and who was the trigger-man in this case. Hence, at least one juror would likely have struck a different balance had the prosecutor told the truth about the possession of the weapon.

## CLAIM XXV: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO QUESTION RONNIE FULKS ABOUT THE .45 CALIBER REVOLVER.

When the Court denied Petitioner's Motion for Immunity for Ronnie Fulks, counsel had a duty to nonetheless question Ronnie Fulks about the .45 caliber revolver. Had counsel done so, Ronnie would have invoked his Fifth Amendment right against self-incrimination. Legal counsel could then have been appointed for Ronnie. Had Ronnie been given the opportunity to invoke his Fifth Amendment right, the jury would have understood, at a minimum, that there was some question whether Petitioner was armed with the .45 caliber revolver during the events of November 2002.

Trial counsel's duty was to Petitioner, not Ronnie. By failing to ask a straightforward question that would have lead to the assertion of Fifth Amendment rights, counsel prejudiced Petitioner. The jury never heard this critical information about the

186

gun that could have changed their perception about Petitioner's activities in November 2002. Had the jury known this information, the outcome of the proceedings would surely have been different.

**CLAIM XXVI: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PREPARE KEY WITNESSES FOR TRIAL TESTIMONY.**

Trial counsel had a duty to discuss with the lay witnesses the purpose of their testimony, reveal to them the type of questions they would be asked on the stand, and instruct them as to what kind of information the jury would find helpful and what testimony would not be relevant. See generally, Belmontes, 529 F.3d at 861. "A lawyer with ordinary training and skill in the criminal law [will take] steps to…determine the statutory and non-statutory mitigating circumstances and prepare witnesses properly before they testify." Groseclose v. Bell, 895 F. Supp. 935, 954 (M.D.Tenn. 1995). When a lawyer fails to prepare a witness adequately for testimony at the penalty phase, it means the testimony introduced is less than compelling. Douglas v. Woodford, 316 F.3d 1079, 1089 (9th Cir. 2003).

Witnesses are often unfamiliar with legal proceedings and are nervous when testifying in court; therefore, counsel has a duty to, at a minimum, walk the witness through direct examination and give the witness some idea of what questions might be asked by the prosecution on cross examination. In Belmontes, the petitioner's trial counsel did not discuss with the lay witnesses the purpose of their testimony, did not reveal to them the type of questions they would be asked on the stand, and did not instruct them as to what kind of information the jury would find helpful and what testimony would not be relevant. Accordingly, some of the defendant's witnesses, who could have provided

compelling mitigating evidence, did not testify about the defendant's positive qualities. 529 F.3d at 861.

The court held that the trial counsel's failure to prepare the lay witnesses constituted deficient performance. Id. at 862. The court reasoned that the trial counsel had a duty to discuss with the lay witnesses the purpose of their testimony, reveal to them the type of questions they would be asked, and explain to them what mitigation evidence the jury would find compelling. Id. at 861. The circuit court granted habeas relief, inter alia, because of trial counsel's failures regarding the lay witnesses. Id. at 878-79.

In the present case, Petitioner's trial lawyers failed in their basic task of representation by not preparing important lay witnesses for testimony. According to the affidavits from Petitioner's brother, uncle, and school teacher, trial counsel failed to engage in any preparation.

For example, Mark Fulks described his "preparation" as follows:

I was asked by Chad's trial team to testify about Chad's childhood. The only preparation I received was the night before I testified when the lawyers told me to tell the truth on the stand. No member of the Fulks trial team ever went over what types of questions they would ask me when I took the stand. They also did not prepare me for cross examination or give me any examples of what the U.S. Attorney might ask me on cross examination.

Declaration of Mark Fulks (contained in *PA, document #*9, ¶ 2)

Martha Floyd, Petitioner's sixth grade teacher, had a similar experience:

Mr. Fulks' trial team asked me to testify at trial about Chad's childhood and my interaction with the Fulks family. The only preparation for my testimony was one meeting at a Shoney's with John Blume. I met the trial team in the hotel prior to testifying, but we did not discuss in-depth my testimony. Mr. Blume simply asked me to tell him what I knew about Chad. I did so. There was no further discussion of my testimony. The Fulks trial team never prepared me for cross examination or gave me any examples of what the U.S. Attorney might ask me on cross examination. The Fulks trial team never went over what questions they might ask me on direct exam.

Declaration of Martha Floyd (contained in *PA, document* #10, ¶ 2)

> Petitioner's brother Ronnie has stated as follows:

> I was subpoenaed by the Government to testify at trial. I was also in willing communication with Chad's trial team. Although Chad's trial team knew I would be testifying at trial and that I was happy to cooperate with them, the Fulks trial team never went over the questions they might ask me and they never gave me any examples of what the U.S. Attorney might ask me during the Government's examination. Testifying at trial was a difficult experience. I was very nervous and would have appreciated some preparation from the Fulks trial team.

Declaration of Ronnie Fulks (contained in *PA, document* #14, ¶ 2)

These three witnesses were among the most important lay witnesses called to testify in the sentencing hearing. Petitioner depended on a strong mitigation presentation and these witnesses testified about the conditions of the home, the alcoholism of the parents, the inattentiveness of the parents, and the severe poverty experienced by the Fulks family. Despite the importance of these witnesses, trial counsel did not meet their duty when they failed to prepare the witnesses for trial testimony. Trial counsel did not go over the anticipated direct, or possible questions the government would ask on cross, but simply left these witnesses to sink or swim. Petitioner's trial counsel should have prepared these witnesses for their trial testimony by discussing with them the purpose of their testimony, revealing to them they type of questions they would be asked on the stand, and instructing them about what types of testimony would be helpful to the jury. Had counsel prepared these witnesses, their testimony would have been much more compelling and could have changed the outcome of the proceeding.

**CLAIM XXVII: TRIAL COUNSEL WERE INEFFECTIVE IN ADVISING PETITIONER TO PLEAD GUILTY BECAUSE THIS ALLOWED THE PROSECUTION TO PRESENT PETITIONER'S PRIOR BAD ACTS IN CONJUNCTION WITH THE EVIDENCE RELATED TO THE OFFENSE CHARGED.**

Had Petitioner gone through the guilt phase, the rules of evidence would have applied and would have prohibited admission of alleged prior bad acts, such as violence toward former wives and girlfriends. The case law and Federal Rules recognize that with character evidence and uncharged misconduct evidence, there is a significant risk that the jury may be improperly affected and will give undue weight to that evidence. See Huddleston v. United States, 485 U.S. 681 (1988). Hence, character evidence is generally inadmissible to prove actions in conformity with character but will be admissible in limited cases where character is at issue. Fed. R. Evid. 404(a). Other acts or wrongs are similarly inadmissible to prove the character of a person to show action in conformity with character. Fed. R. Evid. 404(b).

These safeguards of the Federal Rules do not apply at a capital sentencing hearing. Romano v. Oklahoma, 512 U.S. 1 (1994); 18 U.S.C.A. § 3593(c) ("Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials."). Accordingly, the government presented a parade of witnesses who had no personal knowledge about Alice Donovan, but were permitted to testify to alleged multiple bad acts of Petitioner. These uncharged bad acts, such as beatings and rapes of former girlfriends, greatly prejudiced Petitioner. With Petitioner having pled guilty on the advice of counsel despite the fact that no body was recovered and that Petitioner made no confession when arrested, the jury was left to judge Petitioner's role in the offense based on generally inadmissible character evidence. The

prior bad acts were known to counsel and call into question counsels' decision to permit Fulks to talk with the FBI and later plead guilty.

But for counsel's errors, Petitioner would not have pled guilty, but would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52 (1985). Had Petitioner known that the jury would judge his role in the offense based on generally inadmissible character evidence, Petitioner would have put the government's evidence to the test and the outcome would most assuredly have been different. This would have been a viable alternative because the jurors may have had doubts about who was the instigator and/or a minor participant in the crimes, or whether Fulks foresaw or had knowledge about what Basham planned to do with Donovan.

**CLAIM XXVIII: TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO EXPLAIN TO THE JURY THE CONCEPT OF ACCEPTANCE OF RESPONSIBILITY.**

Petitioner received no benefit from the entry of his guilty plea. As this court is well aware, and the United States Sentencing Guidelines demonstrate, a defendant who enters a plea of guilty should receive a lesser sentence. Trial counsel never made this point, nor was an expert called to explain this concept to the jury. Petitioner saved the government a significant amount of time and money by pleading guilty and he received nothing in exchange.

As the background to the United States Sentencing Guideline § 3E1.1 states: "The reduction of offense level provided by this section recognizes legitimate societal interest. For several reasons, a defendant who clearly demonstrates acceptance of responsibility … is appropriately given a lower offense level than a defendant who has not demonstrated acceptance of responsibility."

Because of counsel's errors, Petitioner received no credit for pleading guilty. Had Petitioner known that counsel would not introduce evidence of acceptance of responsibility, Petitioner would not have pled guilty. Instead, Petitioner would have put the government's evidence to the test and the outcome of the proceeding most likely would have been different.

## CLAIM XXIX: TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO OBJECT TO THE GOVERNMENT'S INSERTION OF RELIGION INTO PETITIONER'S TRIAL.

"Federal and state courts have universally condemned . . . religiously charged arguments as confusing, unnecessary, and inflammatory." Bennett v. Angelone, 92 F.3d 1336, 1346 (4th Cir. 1996); see also Hicks v. Collins, 384 F.3d 204, 223 (6th Cir. 2004) (same). "[R]eligious arguments have been condemned by virtually every federal and state court to consider their challenge." Sandoval v. Calderon, 241 F.3d 765, 777 (9th Cir. 2000) (finding constitutional error in use of Biblical law to support the imposition of the death penalty, and the argument had a prejudicial effect). Our courts rightly recognize that "[r]eligious values should not be used for temporal, adversarial gain or to invoke sectarian prejudice or bias. Such tactics have no utility in an unbiased search for truth and as such are improper in the courtroom." Whitfield v. Harris, 474 F.Supp.2d 822, 824 (N.D. Miss. 2007). "Injection of religion into the case was flatly wrong and contrary to what the public has a right to expect of government prosecutors." United States v. Cartagena-Carrasquillo, 70 F.3d 706, 713 (1st Cir. 1995).

Petitioner's trial counsel called Petitioner's paternal uncle Mark Fulks to the stand. TT 06/22/2004 at 159. Uncle Mark was an important witness because he testified to some of the deplorable home conditions, the frequent parties, the open display of

pornography—to which children were exposed--in the home, the lack of food, and the general depravity that surrounded the Fulks' children. Uncle Mark did not know the full story of the Petitioner's upbringing, but he was able to provide a glimpse into the Fulks' home.

The prosecution understood that Uncle Mark was a compelling witness. To deflect attention from Uncle Mark's testimony, the government focused on a letter Uncle Mark wrote to an Indiana state court judge in 2000 after Petitioner pled guilty to burglary. Uncle Mark asked the state judge for leniency and recorded his belief that Petitioner had begun to make positive changes in his life. TT 06/22/2004 at 177-78. The prosecution improperly inserted religion in the closing argument:

> In 2000, in front of the Judge in Indiana, he gets his Uncle Mark, a good and solid man, Mark Fulks. A man that truly has found God. A born-again Christian. Took that witness stand, told you how Chad, Chad comes to him and says Uncle Mark, I am following the path of the Lord. Please write this letter. Please write this letter to the Judge so my sentence is not so bad. Uncle Mark believes him. Uncle Mark writes that letter, and the Judge accepts that letter that Chad Fulks, this man that would go on to rape, and to carjack, and to kill, was a man of God.

TT, 06/29/2004 at 122.

The government's use of the term "born-again" comes directly from the Apostle John's account of Christ's encounter with the Pharisee Nicodemus. "Jesus answered and said unto him, Verily, verily, I say unto thee. Except a man be born again, he cannot see the kingdom of God." (John 1:3). Christ's teaching to Nicodemus is key to the Christian doctrine of salvation, and the government improperly inserted this powerful religious reference into closing when it painted Petitioner as a Godless killer.

The government's improper use of religion did not stop there. When commenting on Petitioner's habit of taking multiple showers during the day, the prosecution stated that "There are no amount of showers that Chad Fulks could take that could wash his sins

away.  None."  TT, 06/29/2004 at 232.  The government's discussion of "sin" relates to the third chapter of the Book of Genesis when Adam and Eve chose to eat the forbidden fruit and thus introduced sin into the world.  The washing away of sin is a reference to the description of Christ in the book of Revelation:  "And from Jesus Christ, who is the faithful witness, and the first begotten of the dead, and the prince of the kings of the earth. Unto him that loved us, and washed us from our sins in his own blood." (Rev. 1:5).  Basic Christian doctrine holds that Adam's original disobedience made all sinners, while Christ's death on the cross saves man from sin if he is born again.  The religious connotation of the government's statements is unmistakable.

In sum, the government's interjection of religion had no place in the courtroom.  The government sought to gain an improper advantage by invoking Christian doctrine to a Bible-belt jury.  The government's misuse of Scripture should have caused trial counsel to promptly object and request a curative instruction.  Counsel failed to take action and this failure influenced the outcome of the proceedings.

**CLAIM XXX:  PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INTRODUCE PETITIONER'S ARTISTIC TALENT AS A MITIGATING FACTOR.**

Art is the use of skill and imagination in the creation of esthetic objects, environments, or experiences that can be shared with others.  Art may be a painting, sculpture, photograph, symphony, dance or any other creative endeavor that incorporates intellectual rigor, structural excellence, a strong element of beauty, and a core of spirituality.  Art has the capacity to transport the artist and his audience to a higher level of being.

As evidenced by the photograph of Petitioner's paintings contained in the Appendix, Petitioner has great artistic talent.  It evidences a sympathetic response of

Petitioner's mind, heart, and spirit to the world, people and ideas around them. The paintings show that Petitioner has the ability to transcend human suffering and bring joy and enlightenment to both himself and those viewing his work. In short, Petitioner's artistic ability reflects a positive trait that the jury never saw.

Counsel has a duty to uncover and present any and all mitigating evidence. Wiggins v. Smith, 539 U.S. 510, 522 (2003). Petitioner's artistic talents show his worth and promise. This failure to present this mitigation evidence undermines confidence in the outcome of the proceeding.

**CLAIM XXXI: THE CUMULATIVE ERRORS SET FORTH IN THIS PETITION, AND THE PREJUDICE THAT RESULTED FROM THESE ERRORS, DENIED PETITIONER A FUNDAMENTALLY FAIR TRIAL IN VIOLATION OF RIGHTS GUARANTEED UNDER THE FOURTH, FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Petitioner, relying on the Fourth, Fifth, Sixth and Eighth Amendments, incorporates by reference the discussion of facts from the previous allegations of substantive errors, as well as the allegations of ineffective assistance of counsel. Each of the grounds for relief standing alone requires reversal of Petitioner's conviction. Each of the allegations of ineffective assistance of counsel also warrants relief. Yet, even if this Court concludes that each individual circumstance is insufficient to warrant reversal, in conjunction with one another, these circumstances rise to the level of cumulative error.

Errors which, standing alone, may be insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting that is fundamentally unfair. See Williams v. Washington, 59 F.3d 673, 682 (7th Cir. 1995); Rodriguez v. Hoke, 928 F.2d 534, 538 (2nd Cir. 1991). The cumulative effect of the numerous errors in

Petitioner's trial and appellate proceedings denied him due process and his rights to a fair trial.

**CLAIM XXXII: THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT PETITIONER'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT.**

Petitioner alleges that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution. This constitutional violation would arise because of the combination of drugs used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out, would all result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment.

**REQUEST FOR RELIEF**

Based upon all of the above allegations and the entire record of this prosecution, Petitioner respectfully requests that the Court provide the following relief:

A. That this Court conduct an evidentiary hearing addressing all material and disputed issues of fact;

B. That the Court permit oral argument as appropriate and required; and

C. That at the conclusion of the proceedings that the Court vacate Petitioner's conviction and sentence and order that appropriate retrial and/or new sentencing hearings be conducted.

Respectfully submitted,

/s/ Beattie B. Ashmore, Federal Bar #5215
Beattie B. Ashmore, Federal Bar #5215
PRICE, PASCHAL & ASHMORE, PA
644 E. Washington Street
Greenville, South Carolina 29601
(864) 467-1001

William J. Watkins, Jr., Federal Bar #7863
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
550 South Main Street, Suite 400
Greenville, South Carolina 29601
(864) 255-5400

Attorneys for Chadrick E. Fulks

October 21, 2008