IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION


UNITED STATES OF AMERICA,    )    Cr. No. 4:02-992
                             )
     Respondent,             )
                             )
VERSUS                       )    Columbia, SC
                             )    August 21, 2008
CHADRICK E. FULKS,           )
                             )
     Petitioner.             )
                             )
 ---------------------------)


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
UNITED STATES DISTRICT JUDGE


Appearances:

For the Respondent:      JIMMIE EWING, ESQ.
                         ROBERT DALEY, ESQ.
                         Assistant U.S. Attorneys
                         1441 Main Street, Suite 500
                         Columbia, SC  29201

For the Petioner:        BEATTIE B. ASHMORE, ESQ.
                         644 E. Washington Street
                         Greenville, SC  29601

                         WILLIAM J. WATKINS, JR., ESQ.
                         550 South Main Street, Suite 400
                         Greenville, SC  29601

Also present:            JONATHAN S. GASSER, ESQ.

Court Reporter:      Gary N. Smith, CM
                     901 Richland Street
                     Columbia, SC  29201
                     (803) 256-7743

Stenotype/Computer-aided Transcription

THE COURT:  All right, this case is the United States of America versus Chadrick E. Fulks.  We are here this morning on the petitioner's motion to conduct discovery.

And I see we have brought Mr. Gasser back.  Nice to see all of you.  Let me ask, who will be handling this case for the government essentially from this point forward?

MS. EWING:  I will, Your Honor.

THE COURT:  All right.  And I know you are at somewhat of a disadvantage in that you weren't at trial, but have you had enough time to acclimate yourself with what all happened in the history of this case?

MS. EWING:  Somewhat, Your Honor.  I still have not read through all of the transcripts.

THE COURT:  Right.

MS. EWING:  So, I have a great deal of work to do before I complete the response to the 2255.

THE COURT:  All right.  Well, let's go through the motion for discovery then.  I think we can kind of take it up in groups, as you indicated in your responsive brief.

The first set of materials that the defendants seek is information that might have shown that Mr. Basham was the predominant wrongdoer here, or a leader.  And I know what you said in your brief, that the government was very careful to walk a tightrope in both trials, and in neither case did the government suggest that the other absent defendant was really a

follower.

But back of that, I think the petitioner is going to want to know, do you have anything in your file that was undisclosed to the defendant that might have showed that the codefendant, Mr. Basham, was the leader?  And I would certainly think that that would have been a subject of a request for discovery prior to trial by the trial counsel.

MS. EWING:  Your Honor, and my first comment today was going to be, we don't have anything.  The government doesn't have anything that wasn't provided.

After I crafted that response, I spent a lot of time in the record and realized that the government had certainly provided everything -- certainly everything that was required and more.  In fact, I would like to submit to the court copies of all of the discovery the government did provide.

THE COURT:  This is an itemization of the 12,000-some-odd documents?

MS. EWING:  Yes, Your Honor, one of our paralegals prepared it as she was providing the documents.  And I have already provided --

THE COURT:  Mr. Ashmore, I mean, have you talked to trial counsel?  I mean, did they request this same information?  Because it seems to me that would be one of the first things they would have sought preparing for the trial of the case was information in the government's file that

indicated that Mr. Basham was the leader.

MR. ASHMORE: Yes, sir, I -- we have met with Mr. Blume and we talked to him, and of course they filed all the appropriate discovery motions. But it's almost -- it's a situation, Judge, where it's the Basham trial that makes us curious about what might exist -- really, perhaps in the Basham file and not in the Fulks file. It's sort of a -- I think a number of our requests would be resolved if we could get access actually to the Basham file, and --

THE COURT: Well, I just assumed it was all one file; is that not the case?

MS. EWING: Your Honor -- I'm sorry -- Your Honor, the discovery was the same for both.

THE COURT: It was one case until I ordered separate trials.

MS. EWING: Yes.

THE COURT: So you didn't have two physical separate files in your office at any time?

MS. EWING: No, Your Honor. I think in the discovery request at the very end, it indicates that a few things were just provided to Mr. Basham and a few things were provided to Mr. Fulks that were relevant only to them. But other than that, everything on each one was in the file.

THE COURT: Well, Mr. Ashmore, let me -- I keep cutting you off. Let me hear your full argument on this

subject matter.

MR. ASHMORE: Well, that's news to me, Judge. I just was under the impression that there were separate Basham documents that the Fulks trial team didn't receive.

Mr. Gasser, my friend who is seated here today, indicated during the trial that in fact probably better evidence -- there is better evidence to suggest that Branden Basham was the killer than that Chad Fulks was the killer.

And, you know, we need to try to determine if in fact there is some other evidence that our trial team didn't get. And if the government is here today representing that it was the same file and that file -- complete file was made available to our trial team, then -- and I don't -- frankly, Your Honor, I don't know how much further we can go on that.

THE COURT: Well, I know Mr. Blume vigorously -- I mean, from day one it was obvious that, after getting separate trials, each defendant was going to try to put the blame on the other.

MR. ASHMORE: Sure.

THE COURT: Even though we didn't have details of how the death occurred. And I do know that the government, as I said, walked the tightrope both times to carefully not tell one jury that this guy was the ringleader and then tell the next jury something entirely different. They were careful.

But back of that, if there was any discovery

revealing that one defendant or the other was the ringleader or the predominant bad actor, I think it would have been a subject of a discovery motion. And if the government tells me they have turned over everything they had in that respect. I think we just need to leave it at that and move on to the next subject matter. All right.

So, what will be next then?

MR. ASHMORE: Well, Your Honor, we have requested the deposition of Sheriff Hewitt, and here is why. In the Fulks trial, Sheriff Hewitt was not called by the government, he didn't testify in the Fulks trial.

THE COURT: All right. And this is for Horry -- he was sheriff of Horry County?

MR. ASHMORE: It's not Horry, Judge, Brunswick County up in North Carolina.

THE COURT: Brunswick, North Carolina, all right.

MR. ASHMORE: Yes, sir. So, he didn't testify in the Fulks trial. However, it was represented on June the 22nd, 2004 to you, by the government, that Chad Fulks took the purse strap and strangled Alice Donovan. So, here the government says that Fulks strangled Alice Donovan with her purse strap in an argument to you in June of '04.

Later, during the Basham trial, Sheriff Hewitt does testify, and he testifies that it was Basham that showed him how he strangled Alice Donovan with the purse strap. And --

THE COURT: And you want to take the sheriff's deposition to try to run that down?

MR. ASHMORE: Yes, sir.

THE COURT: He did testify in the second trial but not the first trial, and arguably there was some inconsistency between the first statement that you told me about that said that Fullks took the strap and strangled Ms. Donovan -- who allegedly made that, the sheriff?

MR. ASHMORE: Sheriff Hewitt.

THE COURT: And that was from a paper discovery that statement was made?

MR. ASHMORE: In the paper discovery, Your Honor, it is actually somewhat ambiguous. In the paper discovery, it indicates that "Sheriff Hewitt states while at the cemetery Basham indicated how the victim's pocketbook was used. Sheriff Hewitt was able to determine this meant the pocketbook strap was used to strangle the victim to death."

And it's really, when you look at it, somewhat ambiguous whether it's Fulks doing it or whether Basham doing it, and that's what I want to know. I want to know if it was the sheriff's impression at the time when they were out looking for Alice Donovan's body that Basham was demonstrating how he, Basham, actually strangled Alice Donovan.

THE COURT: So, if I allow this, it would be a short deposition, would it not?

MR. ASHMORE: Yes, sir.

THE COURT: I mean, you want to focus just on that one issue about the strap and the strangling and not full-blown discovery on everything the sheriff knows about the case?

MR. ASHMORE: That's right, Judge. I want to focus on that one issue on -- you know, how we learned about it, who had reported it mostly.

I mean, did the government have his version prior to the Fulks trial? Did the government have his version that it was Basham that was the actual killer of Alice Donovan?

THE COURT: All right. Ms. Ewing, what about that?

MS. EWING: Well, first I'm a little surprised because in their request for discovery they focus on the deer statement. So, I'm a little surprised to hear that they want to focus on this.

First of all, I would argue that it's immaterial because we maintained the entire time that it really doesn't matter who actually did the killing, that they were equally culpable. And I understand from the team back here that --

MR. DALEY: Your Honor, Robert Daley, if you wouldn't mind me chiming in.

THE COURT: Go ahead. Certainly. Go ahead.

MR. DALEY: I talked to Mr. Gasser a little bit about this. Your Honor, if you look at the in camera testimony that was taken and then the in court testimony, you would see that

there really is not an ambiguity.

This is another example where they are trying to create ambiguity, create an opportunity to go on this fishing expedition.  And what they are trying to do is create an opening to then blow open all sorts of discussion, having done this kind of work before.

THE COURT:  All right, it's been four years, you are going to have to refresh my memory on the in camera testimony of this witness, I don't independently recall that.  Has it been four years, is that right, Ms. Floyd?  The spring of '04.

THE CLERK:  Yes, '04.  Spring of '04.

MR. DALEY:  It was the Thanksgiving day search, Your Honor.

THE COURT:  I remember that.

MR. DALEY:  And they were trying to get --

THE COURT:  Well, I know we had some testimony early on when the issue of disqualification of counsel came up.

MR. DALEY:  Correct.

THE COURT:  Is that what you are talking about?

MR. DALEY:  That, and then the motion to suppress, the Jackson v. Denno.

THE COURT:  And the motion to suppress related to that statement?

MR. DALEY:  Yes --

THE COURT:  Partial statement, "I have never killed a

deer, but here I have," blank, blank, blank?  That was the motion to suppress that statement?

MR. DALEY:  And then there was the whole Bruton issue in that.

THE COURT:  And so we held a hearing and received testimony on that Thanksgiving day episode at which defense counsel were present.  The jury was not here, but counsel was here.

MR. DALEY:  And so they had the opportunity to do the very thing that they now want to do --

THE COURT:  Well, but these lawyers might want to allege ineffective assistance of counsel of the trial attorneys for not developing that inconsistency, if there was one.

MR. DALEY:  Well, then we are in the whole hindsight -- you know, I mean, I can certainly think of any number of things that they are going to claim should have been done differently.

THE COURT:  Right.

MR. DALEY:  But again, we are in a discovery situation.  If you head down a fishing expedition, you know, I don't know where you stop --

THE COURT:  Well, I understand.  I was just thinking if I would allow it, it would be very tightly confined.  Let me go back to the petitioner.

Mr. Ashmore, have you studied the transcript of this

motion to suppress that he has been discussing?

Mr. Ashmore:  Your Honor, it's been some time, I'm not -- I can't tell you I'm well versed on it as I stand here today.  But we are talking about the deer statement, and that's certainly -- that's certainly something I would like to explore with the sheriff.  But I think -- so really that's --

THE COURT:  So you want to ask him two subject matters, in other words?

MR. ASHMORE:  Yes, sir, and I -- yes, I would.  I would.

THE COURT:  Well, I know the deer statement was thoroughly explored.  And I did allow it in in the Basham trial, but I did not allow it in the Fulks trial; is that correct?

MR. ASHMORE:  The government said it was meaningless in the Fulks trial and so you didn't let it in, and then in the Basham trial, it was argued that it was an admission by Basham.  Totally inconsistent theories, Judge.

MR. DALEY:  Mr. Ashmore may not have fully understood this.  I understood that it was a Bruton issue that kept that statement out, Your Honor, it wasn't -- the government has never tried to argue inconsistently and we certainly weren't attempting to in that instance either.

And it was Fulks' folks trying to get in what they wanted to -- they wanted to point the finger at Basham, and

obviously the Basham folks wanted to point it at Fulks, and that was creating --

THE COURT: And I'm just thinking, how did the Bruton issue keep it -- in the Fulks trial where Mr. Fulks wanted to introduce Mr. Basham's statement, "I never killed a deer, but here I have," blank, blank, blank?

MR. DALEY: They wanted to put in -- they wanted to selectively put in certain things and keep out other things. And it either all -- you said it either all comes in or none of it comes in. That's what happened in that hearing, Your Honor.

I mean, if you wanted us to focus on this specific issue in more detail, clearly we would be happy to do that and further explore this issue. We don't think it's appropriate to depose this sheriff, and if you want us to --

THE COURT: Well, we are all kind of groping in the dark here. Maybe I need to just take this under advisement on this issue and go back and dig out the transcript.

MR. DALEY: We would have a great deal of confidence in you looking that. And then if you wanted further briefing on it or further argument on it, we would welcome that opportunity, Your Honor.

THE COURT: But I need to find the -- you know, we had so many hearings in that case and so many times we would interrupt the trial and send the jury home and have two or three hours of testimony out of the jury's presence -- I will

find it; I can dig it up, though.

MR. DALEY:  We would be happy to dig it up for you, Your Honor.

THE COURT:  All right.

MR. DALEY:  Give it to the other side so that we are all playing from the same --

THE COURT:  Mr. Ashmore, what about that?  To me, this is one of your stronger arguments for discovery, but I would like to take it under advisement and just see.  But once again, the sheriff, Sheriff Hewitt, from North Carolina, you would like to depose him on the deer statement and the strap strangle statement?

MR. ASHMORE:  Yes, sir.  And Mr. Watkins has pointed out to me, Mr. Schools argued the Fulks -- and I understand you will take it under advisement, and we would look to provide you with a brief, Judge.

THE COURT:  All right.

MR. ASHMORE:  If that would suit you.  But in the Fulks trial, they were trying to get the deer statement in as an excited utterance.  And Mr. Schools indicated that that statement, the deer statement, that statement was taken out of context, first of all, it has no meaning.

I don't -- I don't think there was a Bruton issue, I think it was an excited utterance and you decided against allowing it.  But if we could --

THE COURT: Let me ask you this, if y'all have already got it, rather than give me something with a page number and a line number I have got to go dig out, if y'all could copy and highlight in yellow the pertinent stuff you want me to read, it would just help my effort a lot to do that.

MR. ASHMORE: Yes, sir.

THE COURT: Both sides. Let's do that. After today, both sides copy and submit to me highlighted versions of what you think is the pertinent language I need to look at to decide this discovery issue. All right. So, I will take Sheriff Hewitt under advisement.

Now, what's next?

MR. ASHMORE: Well, Your Honor, a number of our requests I think have been resolved. If I could make one request. If Mr. Blume's office does not for whatever reason have the 1,000 -- or 12,166 documents, if I could come back to Ms. Ewing and request of her that we be allowed access to any missing documents.

You know, I know from Mr. -- our interview of Mr. Blume, he's got boxes here and he's got boxes there, and it's just the nature of this case.

THE COURT: All right. Was discovery turned over on disk or was it on hard copy paper?

MS. EWING: I believe it was turned over on disk. I just found the file --

THE COURT: So, it should be easy to do it again then, I guess.

MR. ASHMORE: Well, if we have got all the disks then obviously we are in good shape, Judge. But if I can confirm that with Mr. Blume?

THE COURT: All right.

MR. ASHMORE: If we are missing anything, I will get back to Ms. Ewing on that and we will resolve that.

THE COURT: All right.

MR. ASHMORE: So, again, a number of our requests I think have already therefore been addressed, Your Honor. We had requested the personnel files of the FBI agents, Your Honor. We simply want to know -- and we filed an affidavit in our 2255 from Andrea Roddy and have had interviews with other witnesses concerning whether or not the FBI -- or the government, I should say, in general attempted to tailor the testimony of some of these witnesses. And we want to satisfy ourselves that there were no other such allegations by any other witnesses.

THE COURT: Of coercion?

MR. ASHMORE: Yes, sir.

THE COURT: All right, Ms. Ewing, what about that?

MS. EWING: Your Honor, prior to the trial the government asked the FBI counsel to check all the personnel records of any agents or any FBI employees involved in this

case.

They did, and they came back and said that there was nothing in the personnel file that would be impeaching or exculpatory or -- as far as --

THE COURT: Mr. Ashmore --

MR. ASHMORE: I will accept that, Judge.

THE COURT: -- I think I -- she is an officer of the court, I think I have to accept that representation.

MR. ASHMORE: I'll accept that.

THE COURT: All right.

MS. EWING: I do have the letters from the FBI if the court would like to see them.

THE COURT: Your representation is enough for me. All right.

MR. ASHMORE: And he has looked at Mr. Brunty's personnel file?

MS. EWING: Oh, yes.

MR. ASHMORE: Wanted to be sure.

MS. EWING: And Mr. Long's.

MR. ASHMORE: Your Honor, we also requested access to the FBI I-drive. And I'm not well versed in computers, Your Honor, but we want to make sure that we got all the agents' notes. And this almost relates back to the Sheriff Hewitt issue. We would request that we get any and all notes of interview from all law enforcement.

My understanding that the FBI I-drive has just that, every note that they take goes into this I-drive, and we would like -- we would like access to notes or reports kept on the FBI I-drive.

THE COURT:  Well, I had it come up fairly recently where the defendant in the case had the 302 documents -- 302 reports, but they wanted the backup data, the raw information that went in to composing those 302s.  And there is Fourth Circuit law that says the defendant is not entitled to that backup material.  It sounds to me that's like what we are talking about here.

What about it, Ms. Ewing?

MS. EWING:  First of all, I am informed that that is incorrect, as far as their keeping the information on the I-drive.  And, yes, sir, you are right, that did come up before you recently I believe, and I think the main case was United States v. Hinton, and that would be 719 F. 2d 711.

THE COURT:  Is that the one that said that the 302s should be enough?

MS. EWING:  Yes, Your Honor, that the notes of the FBI agent were not allowed.  And there's another one, and I'm sorry I don't have it written down, I believe it was the Brother (phonetic) case.

THE COURT:  Well, I know that's the law.  This is a death penalty case.

Mr. Ashmore, do you have any reason to suggest that there would be anything in those notes that contradicts what you were given?  I mean, I don't fault you for asking for it, but I do think this is good law in the Fourth Circuit that the backup -- I call them backup material or rough notes -- is not discoverable.  But if you could point to any one thing that might raise a question, I would take another look at it, but --

MR. ASHMORE:  Well, again, Your Honor, I think it's the Sheriff Hewitt episode comes to mind.  I can't imagine that Sheriff Hewitt is going to get an admission from Brandon Basham, which is what he testified to.  I can't imagine he's going to get an admission and he's not going to tell Agent Brunty or one of these other agents, or someone on the government's team that, "Yeah, Brandon Basham showed me how he strangled Alice Donovan."

We have got one ambiguous statement --

THE COURT:  But if I let you take the sheriff's deposition you have got firsthand information then.  Whatever went in the FBI notes would only be secondhand.  So, if you get the deposition, that cures this question of FBI notes, doesn't it?

MR. ASHMORE:  Well, as to the Sheriff Hewitt issue, yes, sir, it would.

THE COURT:  All right.

MR. ASHMORE:  There was inconsistent testimony from

Tina Severance and Andrea Roddy, Your Honor, two of the key witnesses in this case. And there was apparently an undisclosed deal with -- with both of these ladies. Tina Severance, we found out subsequent to both trials, had a charge in Myrtle Beach dismissed due to her testimony in the Fulks case, according to --

THE COURT: All right. Now, this is a new subject matter here, right? That's what -- I knew we had to come to this eventually, but this is a new subject, right?

MR. ASHMORE: Yes, sir. And I'm just trying to provide you with examples --

THE COURT: Of why you need the backup notes?

MR. ASHMORE: Why we need backup notes.

THE COURT: Well, let's talk about Tina Severance. The government says the charges may have later been dropped but there was no deal to do that.

Is that right, that the government had no control over what the state law enforcement did in the case, in her case?

MS. EWING: That's correct, Your Honor. In fact, Mr. Gasser would be perfectly happy I believe to state there were no deals with any of the witnesses.

THE COURT: In the whole case?

MS. EWING: In the entire case there were no deals.

THE COURT: What were the charges that were dismissed

against Ms. Severance, what were they?

MR. ASHMORE: Reporting false police reports. She reported the van as being stolen and, of course, that was false.

THE COURT: Now, what was the time sequence? How long after the Fulks trial went down did the charges get dismissed?

MR. ASHMORE: Maybe a year or two. And the thing, Judge, the thing that strikes me as relevant and critical is that, again, on the Myrtle Beach Police Department letterhead it says, "We are dismissing this because you testified on behalf of the government."

THE COURT: But that was after the trial was over.

MR. ASHMORE: Your Honor, it was -- yes, sir. If I may?

THE COURT: All right.

MR. ASHMORE: This is to Tina Severance.

"To whom it may concern: In regards to State v. Tina Severance, all charges against her were dismissed. There are currently no active warrants against her. This is pursuant to her cooperation in a case in 2002 in which she was a witness."

That's the City of Myrtle Beach in -- dated January 24th of this year.

THE COURT: Well, I'm still not convinced you should get the FBI backup information on Ms. Severance. But let's

talk about, you still want to explore that issue some more with her deposition?

MR. ASHMORE: Yes, sir. Well, I -- frankly, Your Honor, I don't know if Tina Severance would sit for a deposition or not. I don't think I'm asking you to take the deposition of Tina Severance.

THE COURT: All right. But you have an affidavit from her -- I'm sorry, you have that letter that raises this issue.

MR. ASHMORE: Yes, sir. And our interview of her. She would certainly be called as a witness at a 2255 hearing.

THE COURT: Ms. Ewing.

MS. EWING: Your Honor, there were no deals that the government was aware of. The government has not been involved in any deal. And I understand it was only very recently that those charges were dropped against Ms. Severance.

Can I also bring something out? A case that unfortunately I did not cite in my response but I think is right on point, because we are getting into the Brady claim.

I mean, basically Mr. Fulks is saying we had information that we didn't provide to them that we should have. Royal v. Taylor, 188 F. 3d 239. That case is very much on point in that the person pled guilty to murdering a police officer along with a couple of other people. He was convicted, sentenced to death. He appealed. He did not raise any Brady

claims on appeal.

Then he filed a habeas petition, and he raised the Brady claims. The court found that under the standard of review for Brady claims, he cannot show that the information that he wanted to bring in was material.

The information that the government actually had was withheld in that case, that apparently a law enforcement officer had hidden a gun or planted a gun. So, the court said that under Brady he was not entitled to that based on the totality of the evidence.

He also raised ineffective assistance of counsel because counsel failed to develop mitigating circumstances based on psychological factors, and he requested discovery under Rule 6(a). The court found that he was not entitled to discovery because he had defaulted his claims under Brady, and that he had failed to develop any specific information that would be material.

So, I do believe that Royal v. Taylor is very much on point --

THE COURT: Right. Well, refresh my memory on what Ms. Severance testified about. Somebody.

Mr. Ashmore, you can do it if you want to. I know she was the girlfriend.

MS. EWING: She was the girlfriend, she -- I know one piece of information she testified to, and probably the ones

they are saying that Ms. Roddy disagrees with, is that Mr. Fulks got angry with her one night back in the hotel room and he held a gun to her head.

THE COURT: Right, I remember that.

MS. EWING: Basically she testified to -- when they stole the guns that Mr. Fulks had asked when he first went to her house after the escape if -- excuse me, if she knew any place that she could get guns. That's when she said, "Yeah, we can get some from Mr. --" the name slips my mind now -- "Talsma."

And the next morning they went over to Mr. Talsma's house, and Mr. Fulks and Mr. Basham stole the guns while Ms. Roddy and Ms. Severance took him out to breakfast, I believe.

Ms. Severance testified I believe to the comings and goings of Mr. Fulks and Mr. Basham. I think she testified that Mr. Basham -- or Mr. Fulks did all of the driving. Mr. Fulks did all of the driving. Mr. Basham could not drive, based on her statement, I believe, and Ms. Roddy's statement.

THE COURT: Is that about it? I'm just trying to think if her testimony was -- how critical it was, and if it was corroborated by other testimony.

MS. EWING: I think mainly it had to do with the guns, because they challenged whether Mr. Fulks had a gun. And, of course, she testified that they were in Myrtle Beach

when he held the gun to her head. I think it had to do with his role in the murders, that he wasn't just this dupe that was following Mr. Basham's orders.

THE COURT: All right. Mr. Ashmore, tell me again now, the charge that was dropped was for filing a false police report about a trailer?

MR. ASHMORE: About a van.

THE COURT: But did that have anything to do with this case?

MR. ASHMORE: It was the van that Fulks and Basham were driving --

THE COURT: All right. All right.

MR. ASHMORE: -- and Severance and Roddy, that the four of them were riding in when they drove down to Myrtle Beach.

THE COURT: All right.

MR. ASHMORE: And, you know, why was this generated, Judge? Why in January of this year does the City of Myrtle Beach issue a letter stating that the charge against Tina Severance has been dismissed? I mean, how did this come to be?

THE COURT: Yes, sir, Mr. Daley.

MR. DALEY: Your Honor, as the supervisor who has to deal with this issue on a number of cases, we often have -- it turns out that the state attorney general's office, for example, a month ago called me about somebody who had

cooperated, somebody who had been sentenced.

And we had not known about it, it just happened. And they said, "We would really like -- we think it would be appropriate to have this person get a Rule 35." We had had no conversations like that.

In this instance it's even more removed. I talked to Mr. Gasser about this again during this discussion. No discussions. In fact, during the trial this issue was explored, that she had a pending charge in Myrtle Beach, that there were no deals, that there was no promises about anything.

The fact that Myrtle Beach now, well after the fact, has decided to drop the charges, even if it is based upon the testimony in this courtroom, that doesn't prove anything, Your Honor, except that they decided --

THE COURT: Well, you say at best it was an after the fact decision to drop the charges in a fairly inconsequential case.

MR. DALEY: Yes, Your Honor, I mean -- yes. And again, very -- I would call it a very minor charge --

THE COURT: I'm sure the Myrtle Beach Police Department has, in the total scheme of things, a lot more serious crimes to worry about than prosecuting someone for a false police report.

MR. DALEY: And again, this was all -- I mean, this is news to us that it had happened. I mean, again, nobody

sitting here, nobody that I know of within the government's prosecution team had any role in this whatsoever, Your Honor.

THE COURT: Mr. Ashmore, we were talking about the FBI -- all right, go ahead, Ms. Ewing.

MS. EWING: I'm sorry, I need to correct something there.

Mr. Long was telling me that Ms. Severance called him about a year ago and said that she was having trouble getting a job, I believe, because this was on her record. And she asked if he could assist her in getting this removed from her record. I'm sorry, I didn't mean to interrupt, but --

THE COURT: So, it was a pending charge that was just unresolved, it was interfering with her getting a job?

MS. EWING: Yes, Your Honor. And it was just related to the van when they got stranded because Mr. Fulks and Mr. Basham didn't bring the van back.

THE COURT: All right. Mr. Ashmore, what do you -- do you want to do any discovery with Ms. Severance? I mean, you said that she probably wouldn't sit for a deposition, but she probably will testify at trial?

MR. ASHMORE: Yes, sir.

THE COURT: I mean at the hearing, if we have an evidentiary hearing.

MR. ASHMORE: Yes, sir.

THE COURT: But is there anything you want from me

today on that issue?

MR. ASHMORE:  No, sir, Your Honor, but it sort of opens -- sort of opens another issue.  I spoke with Beth McGuffin, who was another witness in the Basham case.  She was actually found wearing the jacket of Samantha Burns.

And she indicated to me that there was a letter from the U.S. Attorney's Office to her parole board expressing that they supported her in her efforts to gain parole.

So, what I'm asking the court for are any and all communications between law enforcement and witnesses in this case post trial.  I don't know how else I'm -- how can I find that?  I think --

THE COURT:  It sounds like it's a reasonable request.  What about that, Ms. Ewing, if there is any correspondence to witnesses who testified in the past?

MS. EWING:  Well, I was about to say that that's totally nonspecific, but I understand from my manager that we will provide that.

THE COURT:  You are talking about correspondence now, written correspondence?

MR. ASHMORE:  Yes, sir.  That would be from, you know, law enforcement in this case and/or the U.S. Attorney's Office.

MR. DALEY:  Well, let me get this -- before I -- letters that we would send to them, correct?  Correspondence to

a witness?

MR. ASHMORE:  Or witness letters to law enforcement.

MR. DALEY:  Your Honor, that's well beyond anything that we could --

THE COURT:  All right, I --

MR. DALEY:  I mean, they could be writing --

THE COURT:  Well, what about correspondence -- if you have any correspondence going to witnesses.  That doesn't mean that there was a preexisting deal necessarily, but if there was some after the fact agreement to help with parole or help with dropping a charge.  It might not go anywhere, but I think as a matter of discovery the petitioner is entitled to see that.

MS. EWING:  Is that the correspondence to and from our office?

THE COURT:  Correspondence from the U.S. Attorneys Office or from law enforcement associated with this case to any of the trial witnesses relating to efforts to help them in some way.

MS. EWING:  Relating to efforts to help them?

THE COURT:  Yes.

MR. DALEY:  Your Honor, before we go down this road, it is unfortunate that all the prosecutors are now no longer in our office.  Mr. Gasser has -- again, we are well down the road and into a whole other area.

During the trial in each instance where there was

cross-examination, and often it was brought out in direct, there was discussion about, "Were there any deals presently? No."

"Could there possibly be a benefit in the future? Yes, there could possibly be, but there were no current deals."

All these letters would do, to the extent there are any letters, would show that happening.

THE COURT: So, you say with each witness there was exploration of --

MR. DALEY: Yes. Your Honor, I would love to continue to repeat what Mr. Gasser is saying, but he can say it much better --

THE COURT: Is there any objection to hearing directly from Mr. Gasser?

MR. ASHMORE: Your Honor, yes, sir, I would object.

MR. DALEY: I'm not certain under what grounds he would object. It's certainly much more relevant that the actual prosecutor of the case would speak. In many instances that's happened.

We could in a moment's time, I guess, try to make him specially appointed as a Special Assistant U. S. Attorney. I think it's within your discretion, Your Honor, and I think it would be the most direct way for you to hear the information.

THE COURT: Well, over the petitioner's objection I'm going to go hear from Mr. Gasser directly. I think it would

help save time and cut to the heart of the matter, and maybe help us figure out what we should do.

MR. GASSER: Thank you, Your Honor.

If you recall, during the -- and the transcripts will bear this out -- every single witness in both trials, the Fulks trial and the Basham trial that I -- obviously we are here on the Fulks case. And particularly with the first trial, every witness that had a pending charge, or all of the witnesses -- he's referencing the witnesses -- the female witnesses that we brought down from West Virginia that were relevant and relative toward Samantha Burns' factual scenarios, all of these individuals involved had pending charges or that -- or that were on parole, all of that was thoroughly explored.

All of those witnesses happened to be my witnesses, by the way. They were all thoroughly explored on direct examination first. And then Mr. Fulks' three lawyers, whoever was doing the cross-examination, explored during cross-examination what -- the fact of whether there were any benefits, whether there were any promises, and what their future expectations were.

So, all of these issues -- this was the most transparent criminal prosecution that I was involved in in the 20 years that I was a prosecutor, both the state and federal level.

I mean, everything was laid out, everything was

provided, and everything -- being the first federal death penalty case and Fulks being the first one to go, first defendant to go, everything was transparent. From the discovery perspective, every single negativity or wart, if you will, or anything potentially negative, we brought out on direct examination.

Because it was our theory that -- you know, we did not want -- we had nothing to hide and we -- Mr. Schools explained in the opening statement what type of witnesses and who they were going to hear from.

And it was so transparent. If you recall, Your Honor, that one of the witnesses that came down from West Virginia, and he was wearing a Spiderman suit, almost, because that movie had just come out. He came down and he had never flown before, and he had drank that morning in the airport in West Virginia, and I even -- you could smell it on him.

I even brought it to the court's attention that he had been drinking. We kept him -- we took him out of turn and coffee-ed him up for about three or four hours. And then I brought it out on -- the first question out of my mouth, if you remember, in front of the jury, that he had been drinking and why he had been drinking, and he had never flown on an airplane before. He had never even been out of the State of West Virginia.

I mean, it was so transparent. I bring that up as an

example because -- it's just an example. Every single negative aspect of every government witness was brought out before we even started asking them fact questions, including all of these witnesses that either had pending charges or were in prison. And he's referencing the girls at this juncture, at this hearing, that we actually brought down and were in custody in West Virginia.

THE COURT: So you can say categorically that there were no deals with any government witnesses in terms of helping them in pending cases?

MR. GASSER: Absolutely. No, we even brought ought that those same West Virginia girls, that Strom Thurmond Jr.'s wife had gone to the Wal-Mart or the Target to purchase the clothes that they were wearing when they were testifying in front of the jury. That was brought out.

During preparation at the U.S. Attorney's Office prior to those same witnesses that Mr. Ashmore is referring to, it was brought out that I personally paid for the Domino's Pizza, even the type of pizza they were eating, and purchased them Cokes and purchased them cigarettes and allowed them to make long distance phone calls. That's how transparent we proceeded.

And every single potential benefit they were getting, smoking cigarettes, eating pizza, the clothes on their back when they testified, purchased for them, that's how meticulous

we were in bringing out the facts about all of our witnesses during the Fulks trial.

THE COURT: All right. And to follow up, you say categorically no deals were promised, and you brought that out on direct? And then on cross of those same witnesses you say Mr. Blume further explored the fact that they might expect some favorable treatment even though there was no deal promised?

MR. GASSER: Yes, sir.

THE COURT: I do think -- you know, my memory gets worse every year that goes by, but I do think that pretty much is the way it played out, Mr. Ashmore.

MR. ASHMORE: Well, Your Honor, again, we have circumstantial evidence that it looks like -- I would like to explore the possibility that there was some deal, be it by a nod and a wink, or what have you, that may not have come out at trial. Maybe these witnesses at trial say one thing, but in truth and in fact at the end of the day there was some other deal that had been reached.

And, again, we know from Tina Severance and from Beth McGuffin that the government has done things since this trial in terms of going to bat for them -- dismissing charges and going to the parole board, and there may be others out there, and I want to get to the bottom of that. And while I respect Mr. Gasser's comments, I would point out that I'm here to tell you that there is no bar in the Huntington, West Virginia

Airport.  So, I don't know how much --

THE COURT:  You have been there?

MR. ASHMORE:  I have been there, Judge.

THE COURT:  You tried to find it?

MR. ASHMORE:  Yes, sir, I have.  And it's a tough airport.

THE COURT:  But I do remember that testimony pretty graphically.  He must have found -- must have gone down the road a ways to find it.

Well, how about this, what about if I require the government to turn over any correspondence to these two witnesses, Ms. McGuffin and Ms. Severance, about post trial efforts to help them on their criminal cases?

I think that's a reasonable -- since a colorable issue has been raised, and I don't express any conclusions at all, but I do think if there were any written communications with Ms. Severance or Ms. McGuffin after the trial was over about dropping charges, ending parole early, or something such as that, as a matter of discovery it should be turned over.  But that's not to say that it's going to go anywhere at a hearing, it may not, but I think as a matter of discovery it ought to be turned over.

All right, what is next?

MR. ASHMORE:  Your Honor, again, if the government represents, and we accept their representation, that we've got

everything, that everything was given to our trial team, to include the 12,166 documents, then I don't know what else, frankly, Your Honor to ask of the court at this stage.

THE COURT: All right. Well, I have ordered the letters to McGuffin and Severance be produced, and I'm going to take under advisement the deposition of the sheriff after I look at the transcripts. Sheriff Hewitt, it was?

MR. ASHMORE: Yes, sir.

MR. DALEY: Your Honor --

THE COURT: As to the defendant's upbringing in West Virginia, I assume whatever the government had about that, that is not something that the government would really explore very much in its case in chief.

But whatever you had you gave them; is that right?

MS. EWING: Yes, Your Honor.

THE COURT: And I tried to be pretty liberal with the defendants in terms of expense money for investigators to go back and kind of backtrack that whole history of what happened up there as a youth. So, I think the defendant -- the petitioner has plenty of resources to develop that and I will be glad to hear whatever evidence comes forward.

MR. ASHMORE: Thank you, Judge.

THE COURT: All right. Anything else?

MS. EWING: No, Your Honor.

THE COURT: I'm not going to require the I-drive, the

government's I-drive to be produced, based on that Fourth Circuit authority that we discussed.

So, the only thing I have ordered today is the correspondence to McGuffin and Severance about helping them with their criminal matters. And then I'm going to take under advisement the request to take a discovery deposition of Sheriff Hewitt after I review the marked-up pages of the transcript that both sides are going to submit to me.

All right, anything else?

MR. ASHMORE: When would you like those submissions, Judge?

THE COURT: As soon as possible. I mean, can you do it within a week? Is that doable?

MR. ASHMORE: Certainly.

THE COURT: Let's say within a week.

MR. ASHMORE: Yes, sir.

THE COURT: I would like to do it while I'm hot on the case. All right. Anything else?

MS. EWING: No.

MR. ASHMORE: Thank you, Judge.

THE COURT: Nice to see all of you. We will take a short recess before the civil motion at 10. We will be in recess.

(Thereupon, the proceedings were adjourned.)

* * * * * * * * * * * * * * * * * * * * * * * * * * *

# CERTIFICATE OF REPORTER

        I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.


s/ Gary N. Smith                         November 7, 2008
_____        _____

Gary N. Smith, CM
Official Court Reporter
United States District Court
District of South Carolina