IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Cr. No. 4:02-992-JFA |
| | ) |
| v. | ) |
| | ) |
| CHADRICK E. FULKS | ) |
| | ) |

## THE UNITED STATES'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S MOTION PURSUANT TO 28 U.S.C. § 2255

## TABLE OF CONTENTS

PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. Events Prior to Fulks' Incarceration at Hopkins County Jail.. . . . . . . . . . . . . . . . . . . 3

    B. Hopkins County Jail.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C. After the Escape.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    Response to Claim I: Fulks trial counsel presented a compelling mental health case in mitigation after extensive and thorough research. . . . . . . . . . . . 27

        A. Fulks trial counsel presented extensive expert testimony regarding the effects of Fulks' brain damage, cognitive impairment, abused and neglected childhood, substance abuse, and depression.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        1. Defense counsel presented testimony by experts specializing in psychiatry, psychology, neurology, radiology, and child development, as well as fetal alcohol spectrum disorder (FASD):.. . . . . . . . . . . . . . . . . . . . 28

            a. Ruben Gur. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

            b. David Bachman.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

            c. Howard Becker. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            d. Arlene Andrews. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            e. James Evans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

            f. Fred Bookstein.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        2. Experts integrated information regarding Fulks' damaged brain, his childhood of abuse and neglect, and his extensive substance abuse to present a compelling case in mitigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . 32

            a. Cognitive and Communication Deficiencies.. . . . . . . . . . . . . . 32

            b. Childhood Neglect and Abuse, Substance Abuse, Anxiety and Attempted Suicide. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

i

c. Borderline Intellectual Ability.. . . . . . . . . . . . . . . . . . . . . . . . 42

d. Sexual Trauma. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B. Much of the opinions of the experts not presented would have been detrimental and would have been in conflict with the themes of Fulks' defense.. 44

1. Fulks' trial counsel pursued a reasonable trial strategy which would have undermined by expert testimony that Fulks' antisocial personality disorder, drug use, and early experiences, pre-disposed him to homicidal thoughts, aggressiveness, deceitfulness, manipulativeness, violent sexuality, and lack of remorse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

2. Testimony by experts not called to testify may have opened the door for the prosecution to present evidence regarding child abuse by Fulks.. . . . 51

C. Connecting behavior to observable physical evidence was logical, since Fulks had previously tried to fake symptoms of psychological disorders.. . . . . . . . . . . 54

D. The facts of the cases Fulks discusses to support his claims are significantly different from the facts of Fulks' case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Response to Claim II: Fulks was not prejudiced by counsel's failure to anticipate testimony by Donna Ward and Jeff Bruning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Response to Claim III: witnesses provided a detailed view of Fulks' early life. . . . . . . . 59

A. Testimony Fulks' claims should have been presented would have lacked credibility or would have been cumulative. . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

B. Fulks' counsel presented believable and touching testimony regarding Fulks difficult childhood. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

C. Some of the testimony Fulks claims should have been presented would have been harmful. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

D. Fulks' counsel presented an effective mitigation case regarding Fulks' early life as evidenced by the jury's findings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Response to Claim IV: Fulks was not prejudiced by the use of law students to assist with investigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Response to Claim V: Appellate counsel was not ineffective for failing to appeal the Court's jury instruction regarding mitigation evidence.. . . . . . . . . . . . . . . . . . . . . . . 71

Response to Claim VI: Prosecution's closing argument did not impose a nexus requirement in order for the jury to consider evidence in mitigation.. . . . . . . . . . . . . . 74

Response to Claim VII: Trial counsel was not ineffective for allowing Fulks to give a statement to the FBI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

    A.  The Government would not have entered into a proffer agreement.. . . . . . . . 78

    B.  Fulks provided no significant information not already discovered by the Government... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

    C.  Fulks' statement to the government provided benefits to the defense. . . . . . . 80

Response to Claim VIII: The catch-all factor used by the jurors allowed jurors to consider all mitigating evidence, including any evidence that Fulks was a minor participant in the crimes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

    A.  Jurors understood they could consider any mitigating factors. . . . . . . . . . . . 80

    B.  There is no reasonable likelihood that the jury believed it was required to disregard any evidence intended to show that Basham was more culpable.. . . . . 83

Response to Claims IX, X, XI & XII: Trial counsel was not ineffective for advising Fulks to plead guily to carjacking because it was done pursuant to well recognized legal trial strategy. Furthermore, this issue was rendered moot when the jury sentenced Fulks to death pursuant to the kidnapping resulting in death count. Finally, there was a sufficient factual basis to support the guilty plea.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    A.  The Court conducted an exhaustive and complete guilty plea hearing. . . . . . 88

        1.  May 4, 2004 hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

        2.  Parties researched/briefed applicability of Pinkerton to counts 1 & 2. 91

        3.  Change of Plea hearing continued on May 7, 2004. . . . . . . . . . . . . . 92

    B.  Fulks' arguments attacking his guilty plea to count 1 are without merit. . . . 106

        1.  Fulks' direct challenge and attacks to his guilty plea are procedurally defaulted.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

        2.  Because the jury imposed the death penalty pursuant to the kidnapping count, any alleged infirmity of the guilty plea to carjacking would be harmless and moot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

iii

3. Fulks guilty plea was done as part of a valid trial strategy. . . . . . . . 108

4. Fulks and his counsel were fully aware of the possibility that <u>Pinkerton</u> required a co-conspirator's actions to be reasonably foreseeable. . . . . 112

5. There was a sufficient factual basis for Fulks guilty plea to the carjacking count . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

6. The jury's finding of the gateway intent to qualify Fulks to receive the death penalty renders his attacks on his guilt plea to be without merit. 118

Response to Claim XIII: Fulks was at least an equal participant with Basham in their crimes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

    A. Fulks was not a "minor participant". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

    B. Fulks was a "master manipulator.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Response to Claim XIV: The additional evidence Fulks claimed his trial counsel should have presented would have shown him to be a future danger to future inmates and personnel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Response to Claims XV and XVII: Trial counsel was not ineffective in performing jury selection. Fulks has not shown that any selected juror failed to perform his or her duties in accordance with the Court's instructions or failed to give meaningful consideration to mitigating evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

Response to Claim XVI: Trial counsel was not ineffective in reviewing juror questionnaires. Any attempt to revisit the issue regarding Juror Allison is precluded because the issue was ruled on by this Court and on direct appeal. Even if the Court and counsel had been aware of the murder of Juror Allison's husband more than twenty years earlier, the Court would not have excluded her from the jury. . . . . . . . . . . . . . . . . . . . . 134

Response to Claim XVIII: Appellate counsel was not ineffective because the Fourth Circuit would not have found that this Court abused its discretion in denying the admission of Basham's statement to Sheriff Hewitt. . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

Response to Claim XIX: The prosecution did not present inconsistent theories in Fulks' trial and Basham's trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Response to Claims XX and XXI: Prosecution did not attempt to improperly influence witness testimony. The Government provided all information relevant to Fulks' case to his trial counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

iv

Response to Claims XXII and XXIII: The prosecution did not make any improper comments in closing arguments and trial counsel was not ineffective for failing to object to some of the purported comments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

Response to Claims XXIV and XXV: The prosecutor's statements regarding guns during closing were based on reliable evidence presented at trial . . . . . . . . . . . . . . . . . . . . . . . 154

Response to Claim XXVI: Trial counsel was not ineffective in preparation of numerous mitigation witnesses.  Trial counsel prepared a thorough mitigation presentation which included various lay witnesses testifying regarding Fulks childhood.. . . . . . . . . . . . . . 157

Response to Claim XXVII: Trial counsel was not ineffective for advising Fulks to plead guilty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

  A.  Fulks' decision was part of a reasonable trial strategy.. . . . . . . . . . . . . . . 161

  B.  Fulks cannot show prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

  C.  Evidence of Fulks' prior bad acts may have been admissible during the guilt phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Response to Claim XXVIII: Trial counsel effectively utilized Fulks' guilty plea to argue acceptance of responsibility as a mitigating factor. . . . . . . . . . . . . . . . . . . . . . . . . . . . .166

Response to Claim XXIX: Trial counsel was not ineffective for failing to object to the prosecution's alleged insertion of religion in reply closing argument because any comment was fleeting and was done in response to the numerous religious and biblical arguments made by the defense in it's closing argument.. . . . . . . . . . . . . . . . . . . . . . . . 167

Response to Claim XXX: Trial counsel was not ineffective for failing to introduce Fulk's alleged artistic talent as a mitigating factor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

Response to Claim XXXI: There was no cumulative error committed. . . . . . . . . . . . . 173

Response to Claim XXXII: Lethal injection does not violate the Eighth Amendment. . 174

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA ) Cr. No. 4:02-992-JFA
)
v. )
)
CHADRICK E. FULKS )
)

<u>THE UNITED STATES'S MEMORANDUM OF LAW IN  OPPOSITION TO
PETITIONER'S MOTION PURSUANT TO 28 U.S.C. § 2255</u>

The Government submits the following Memorandum of Law in response to Petitioner

Chadrick E. Fulks' ("Fulks," "Petitioner") Amended Motion to Vacate and  for relief pursuant to

28 U.S.C. § 2255.

## I.   **Procedural Background**

On April 23, 2003, a federal grand jury returned an eight-count Superseding Indictment

charging Chadrick E. Fulks ("Fulks," "Petitioner") and Brandon Basham (Basham) with Count 1,

carjacking resulting in death, in violation of 18 U.S.C. § 2119(3); Count 2, kidnapping resulting

in death, in violation of 18 U.S.C. § 1201; Count 3, interstate transportation of a stolen motor

vehicle, in violation of 18 U.S.C. § 2312; Count 4, conspiracy to commit the offenses charged in

Counts 1-3 and 7-8, in violation of 18 U.S.C. § 371; Count 5, conspiracy to use and carry

firearms during and in relation to crimes of violence, in violation of 18 U.S.C. § 922(o); Count 6,

using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c);

Count 7, possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g); and

Count 8, possession of stolen firearms, in violation of 18 U.S.C. § 922(j).  The Superseding

Indictment, filed on April 23, 2003, alleged aggravating factors and special findings to support

the imposition of the death penalty for the offenses charged in Counts 1 and 2.  On September

-1-

12, 2003, the United States notified Fulks and Basham that it intended to seek the death penalty. On May 4, 2004, Fulks tendered his plea to the Superseding Indictment. Fulks admitted in his plea colloquy to raping murder victim Alice Donovan, but denied any knowledge of or participation in her murder. The Court reconvened Fulks' change of plea hearing on May 7, 2004, and accepted his plea.

Jury selection for a sentencing trial on Counts 1 and 2 began on May 10, 2004, and the jury was selected on May 21, 2004. The trial began on June 1, 2004. During its three-week-long presentation of evidence, the Government presented the testimony of approximately a hundred witnesses. United States v. Fulks, 454 F.3d 410, 419 (4th Cir. 2006). From June 22 to June 25, 2004, Fulks presented testimony consisting primarily of mitigating evidence, detailing his miserable childhood and asserting his alleged mental deficiencies. Id. at 420. The Government and Fulks gave closing arguments on June 29, 2004. Id. The following day, the jury returned a unanimous verdict, finding the threshold intent factor, a statutory aggravating factor, and non-statutory aggravating factors for count 1, carjacking resulting in death, and count 2, kidnapping resulting in death. TT, Vol. XXII, pp. 17-19, 26-29. Even though the jury found the existence of a number of mitigating factors, nonetheless, determined that Fulks should be sentenced to death. Id. Fulks sought a new trial based on juror misconduct, and the Court held a hearing on the motion on July 16, 2004, after which it took the motion under advisement. On December 20, 2004, the Court held a hearing, during which it denied Fulks' motion for a new trial and imposed a death sentence.

Fulks appealed his sentence, raising issues regarding the testimony of witnesses identified after the Government submitted its witness list, qualification of jurors, omission of polygraph

evidence, admission of victim impact testimony, and the constitutionality of the death penalty. The Fourth Circuit Court of Appeals rejected all of Fulks' contentions of error and affirmed the judgment of this Court. 454 F.3d at 438.

## II. Factual Background

Chadrick Fulks' life prior to his arrest for the actions leading to his current conviction, was one of crime, violence against women, psychological manipulation of others, and total disregard for the law. This life of crime and violence culminated in the kidnappings, rapes and murders of Alice Donovan and Samantha Burns.

### A. Events Prior to Fulks' Incarceration at Hopkins County Jail

In June, 2002, college students Nick James and Corey Hutchison rented an RV to drive to a music festival. TT, Vol. XIV, pp. 65-67. While traveling on Highway I-65 toward Murfreesboro, Tennessee, they had an accident which forced them to park the RV on the side of the road and wait for help. Id. at 68-69. As they waited inside the RV in the early evening, a stocky blond-haired man, wearing fatigue pants and a shirt bearing an FBI emblem and claiming to be from the FBI, came to the RV with a flashlight, which he pointed toward a holstered gun. Id. at 69-70. As Hutchison slept, the man asked James to get out of the vehicle. Id. at 70. The man asked James for identification, and when James took out his wallet with his ID, the man grabbed his entire wallet. Id. at 70-71. The man told James to get Hutchison out of the vehicle. Id. at 71. He then asked for Hutchison's ID and took his wallet, also. The man pretended to use a radio to call in their license plate number or driver's license numbers and to request backup. Id. at 72, 97. He pulled a gun, pointed it at them, and told them to get up against the RV. Id. at 97. The man asked them if they had any drugs, informing them that he had a light that could

detect drugs on them.  Id. at 72-73.  Hutchison admitted that there was a little marijuana in the RV, and the alleged FBI agent told him to get it.  The "agent" became very aggressive and ordered the young men to lie on the ground face down.  Id. at 74.  Fortunately, the AAA person arrived and the "agent" fled.[1]  Id. at 75.

On the evening of June 19, 2002, Billy Minton, an operator of a wrecker service business, was sitting in the back of an overturned tractor-trailer on I-65.  TT, Vol. XIV, pp. 108-113.  Fulks walked up, identified himself as being with the FBI, and ordered Minton to stand up.  Id. at 114.  Minton refused to stand because his foot was injured, so Fulks pulled a gun out and pointed it at him.  Id.  Fulks told a truck driver at the scene to give him his wallet, and the driver complied.  Id. at 116.  Fulks pretended to use a cell phone to call the Kentucky State Police.  Id. at 116.  Minton told him a state police car had arrived, and Fulks ran.  Id. at 118.

Though he had not yet been charged with the crimes involving Billy Minton or the two college students, Fulks had become a prime suspect when he was arrested on August 25, 2002, at a Walmart parking lot in Madisonville, Kentucky.  (Change of Plea Hearing, May 4 & 7, 2004 (PT), p. 108.)   The arrest occurred after Fulks' wife, Veronica Evans, went into the WalMart and asked customer service personnel to call 911 because she feared for her safety and the safety of her three-year-old son, Miles Evans.  (Change of Plea Hearing, May 7, 2004 (PT), p. 3.)  When police officers arrived, they found the three-year-old boy and a firearm inside the car.

---

[1]  Veronica Evans testified that she was with Fulks when he stopped the car on I-65 and approached an RV on the side of the highway.  TT, Vol. XIII, p. 131.  She said after fifteen minutes Fulks came running back to the car with two wallets, a pipe, and a bag of marijuana, and that he was laughing because the boys were "really scared."  Id.  Evans testified that Fulks was wearing a shirt with an FBI emblem, and that he had a gun.  Id. at 132.

Id.  After an NCIC check revealed that Fulks was a felon and that he was wanted for a supervised release violation in the Eastern District of Tennessee, the officers arrested him.  Id.  at 3, 6.  At the time, Fulks was on parole from an Indiana state prison, and there was a warrant for Fulks for violating the terms of his parole.  Id. at 6. Additionally, Fulks was out on bond pending a hearing on a resisting arrest charge.  Id.  Fulks was taken to the Hopkins County Detention Center.  Id. at 4.  Law enforcement obtained a search warrant for the mobile home where Fulks and Evans were living, and they discovered an AK 47, a shotgun, some pistols, and thousands of dollars worth of stolen goods.  Id. at 6.

Because Veronica Evans possessed stolen credit cards, she was also arrested, and social services was called to take Miles into protective custody.  Id.  On August 26, 2002, when the foster mother with whom social services had placed Miles was bathing him, she noticed bruising and other injuries.  Id. at 7.  As a result, an aggravated child abuse investigation was commenced.  Id.  Miles was taken to the hospital, and Evans, the foster parents, and social services personnel were interviewed.  Id.  The facts of the investigation were presented to a Kentucky grand jury, which indicted Fulks for aggravated child abuse.  Id. at 8. On November 3, 2002, Fulks was served with the indictment at the Hopkins County Jail.  Id. at 8.  By that time, Fulks had been interviewed by the FBI, and he was aware he was a suspect in the armed robbery on I-65 in Tennessee.  Id.  Fulks told the detective who served him with the indictment:  "Y'all want to put me away for the rest of my life, and I'm not going to stick around to be here."  Id.

**B.** **Hopkins County Jail**

The jailer at the Hopkins County, Kentucky jail had been in his position for seventeen years, and no inmate, prior to Fulks and Basham, had escaped during that time.  TT, Vol. II, pp.

13, 32. The jail was an eleven-million-dollar structure, which had been completed in April 2001. Id. at 14. It housed 342 inmates at three different security levels. Id. at p. 15. The jail had three outdoor recreation areas surrounded by fencing and 15-foot-high ceilings. Id. at 23-24. An employee in the control center of the jail could view the recreation areas through two cameras located in each. Id. at 24. Unbeknownst to the jailer prior to the escape by Fulks and Basham, the ceiling fencing in the recreation areas had not been properly secured by the builder. Id. at 28-29.

Approximately two or three weeks prior to their escape, Fulks and Basham became cellmates. Id. at 18. Basham had already been in the jail for approximately a year-and-a-half. Id. Fulks had been in the jail for two to three months. Id. The jailer had to move Basham often because he would "pester" other inmates, who would report the behavior to the jailer and threaten to hurt Basham if the jailer did not move Basham to another area. Id. at 34. According to a deputy jailer who had delivered medications to Basham for more than a year, Basham was "like a twelve-year-old." Id. at 61. The deputy jailer and the chief of operations for the jail both described Basham as a follower. Id. at 61, 81. The deputy jailer said that she was not aware of any problems between Fulks and Basham, and that Basham had recently asked to be allowed to remain in the cell with Fulks. Id.

At approximately 6:30 p.m. on November 4, 2002, deputy jailer Dian Blair, at Basham's request, allowed Basham and Fulks into the outdoor recreation area. Id. at 55. After performing other duties, Blair returned to the recreation area at approximately 8:10 p.m. and discovered that Fulks and Basham were no longer in the area. Id. at 57-58. Madisonville Police Department began a search for the escapees. Id. at 76.

## C.       After the Escape

By the evening of November 5, 2002, shortly before 9:00 p.m., Fulks and Basham had made their way to the home of James Hawkins in Hanson, Kentucky, where Hawkins, his thirteen-year-old son, and his mother were watching television. Id. at 92-93. Basham knocked on Hawkins' door and asked if he could use the telephone because his vehicle had broken down. Id. at 96. After appearing to unsuccessfully attempt to contact someone, Basham asked Hawkins to drive him and his brother to the Pantry convenience store. Id. at 99. Hawkins agreed to do so. However, as Hawkins turned onto the highway, Basham asked Hawkins to take them to their vehicle and jump-start it. Id. at 107.

After not finding the vehicle where Basham said it was located, Fulks began giving directions. Hawkins stopped at a McDonalds to allow Fulks to use a pay phone. Id. at 114. After Fulks used the pay phone twice, he directed Hawkins back to the highway so that they could go to Fulks' friend's house to obtain a credit card to get gas. Id. at 113, 117. Shortly after Hawkins began driving down the highway, Basham pulled a knife out, and Fulks directed Hawkins to stop on the side of the road. Id. at 118-120. Fulks began driving the truck. He asked Hawkins if he had any guns or money in the truck, and Hawkins responded that he did not. Id. at 122. Fulks told Basham to tape Hawkins hands, and Basham complied. Id. at 123. Later, Basham noticed that the tape was cutting off the circulation in Hawkins' hands, and Basham asked Fulks if he would mind if he loosened the duct tape. Fulks gave Basham a "real hateful look," but did not say anything. Id. at 127. Eventually, Fulks pulled onto a secondary road and into a field. Id. at 131. Basham told Hawkins to get out of the truck, and Fulks ordered him to

go to a tree, sit down, and put his arms around it.[2]  Id. at 134-136.  Fulks ordered Basham to tape

Hawkins hands, but then became angry when Basham was not taping his hands tightly enough

complaining: "Man, you ain't doing this fucking right."  Id. at 136, 146.  Fulks then took the tape

from Basham and taped Hawkins' hands tightly together.  Id.  Fulks went to Hawkins' truck, cut

a cord from a compressor, and then tied Hawkins' wrists with the cord.  Id. at 138.  Fulks also

tied Hawkins' legs together around the tree and duct-taped his mouth closed.  Id. at 139, 146.

After taking measures to prevent anyone from seeing Hawkins, Fulks and Basham left

him.  Id. at 146-147.  Hawkins was eventually able to loose the tape from his legs, but it was not

until fifteen hours later that he was able to free his hands and remove the tape from his mouth.

Id. at 148-149.  Hawkins walked to a road, where he flagged down a motorist and asked her to

call the police.[3]  Id. at 151.  Hawkins was taken to a hospital.  Id.  He had injuries to his face,

arms, legs and neck, which he received while trying to free his limbs and while trying to get his

head through a hole in the truck seat cover, which Fulks and Basham had tied around him.[4]  Id. at

152-154, 145.  Hawkins went to a medical clinic because he had swelling and numbness in his

right hand.  Id. at 155.  For two months, Hawkins' hand did not have complete feeling.  Id.

During Fulks' trial, Hawkins testified that his hand continued to ache very badly when it became

cold.  Id.

---

[2]  Fulks had ordered Basham to cut the duct tape after Hawkins got out of the truck.

[3]  At the time the police arrived to investigate, the temperature was probably 30 to 35 degrees, and Hawkins was dressed in shorts, a sleeveless jacket, and flip-flops.  TT, Vol. II, p. 189.

[4]  he seat cover was apparently over Hawkins' head.  He testified: "That night, I tried rubbing my hands up the tree, but I couldn't see because of the seat cover."  TT, Vol. II, p. 148.

On Wednesday, November 6, 2002, the morning after Fulks and Basham left Hawkins tied to a tree during freezing-cold weather, they arrived at Tina Severance's mobile home in Portage, Indiana. TT, Vol. III, pp. 53-55. Fulks had previously befriended Severance when she was a correctional officer at a prison where Fulks was an inmate. Id. at 28-29. After Fulks and Basham became concerned that law enforcement might discover them at Severance's home, they, along with Severance and her roommate, Angela Roddy, went to the Sands Motel, where they stayed for two nights. Id. at 60-61, 68-69. The second day at the Sands Motel, Fulks told Severance they needed guns for protection. Id. at 78. Severance told Fulks she did not know too many people with guns. Id. at 79. Fulks responded that he knew that Robert Talsma was teaching Severance to shoot. Id. That night, Fulks, Basham, and Severance devised a plan to steal Talsma's guns. Id. at 81-82, 84-87.

The next morning, November 8, 2002, after Severance and Roddy lured Talsma away from his home, Fulks and Basham stole his four guns.[5] Id. at 84-87, TT, Vol. IV, pp. 58-59. The four then traveled to Sturgis, Michigan.[6] TT, Vol. III, p. 92. After checking into the Wood Motel, Fulks and Severance went to Fulks' father's house to pick up Fulks' brother, Dewayne. The three drove to Goshen, Indiana to visit with Fulks' other brother, Ronnie. Id. at 94-95. After the three Fulks brothers and Severance smoked marijuana and crank all night, Severance and Dewayne went to the motel and discovered a very-upset Basham, crouched beside a door

---

[5] Three of the guns, a "cowboy gun," a semiautomatic gun, and a revolver were entered as Exhibits 48, 49, and 50 at trial. TT, Vol. III, pp. 88-89. Fulks and Basham maintained possession of the guns during the two weeks after they stole them. Id. at 89.

[6] Fulks or Severance always drove. Basham never drove when the four were traveling. TT, Vol. IV, p. 85. Basham told Beth McGuffin that he could not drive. TT, Vol. VI, p. 105.

holding a gun, and three teenage boys in the room.  Id. at 96-99.  Severance, after observing police outside the motel, decided they should leave.  Id.  Severance, Dewayne, Basham, and Roddy went to Ronnie's house.  Id. at 101.

After Fulks joined the others at Ronnie's house, and Severance told him what had happened at the motel, he became quiet and angry, and told everyone to get in the van because they were leaving.  Id. at 102.  Fulks drove them to Piketon, Ohio, where they checked into the Town and Country Motel.  Id. at 103-105.  Fulks and Basham left Severance and Roddy at the motel, departing in Severance's van.  Id. at 107.  When they returned around 2:30 or 3:00 a.m., they had a bag with two sets of camouflage clothing, boots, hats, masks, and gloves.  Id. at 108.  That day, November 11, 2002, Fulks drove the group to the Hollywood Motel in Kenova, West Virginia, just outside of Huntington, West Virginia, where Fulks had once lived.  Id. at 109-111.  After arriving at the Hollywood Motel, Fulks and Basham put on the camouflage gear and left the motel sometime during daylight hours.  Id. at 112, 116.

The evening Fulks and Basham departed the Hollywood Motel in camouflage gear, Samantha Burns, afer hugging her mother, left her home and drove to the Huntington Mall, in Barboursville, to meet her aunt.  TT, Vol. IV, pp. 173, 188.  Samantha had invited her fourteen-year-old brother to go with her, but he was "hanging out" with his friends and did not want to go. TT, Vol. V, pp. 9-10.  Samantha, a nineteen-year-old, 5'2", 105-pound college student, studying to be a physical therapy assistant, worked part-time at J.C. Penney's at the mall, and she was meeting her aunt in order to purchase her young nieces some clothes using her employee discount.  TT, Vol. IV, pp. 174, 177.  She left the mall around 6:30 p.m.  Her car was parked at the back entrance to Penney's, where employees usually parked.  Id. at 175.  Around 9:46 p.m.,

Samantha called her mother to tell her she was at a male friend's house and would be leaving in a few minutes.[7] Id. at 188-189. When Samantha's mother had not heard from her by the next morning, she went to the police station. Id. at 190. Family and friends launched a search for Samantha. On November 13 or 14, Samantha Burn's family received a call informing them that a badly-burned car with Samantha's license plate number had been found in a rural area, five or six miles from Huntington, West Virginia. TT, Vol. IV, pp. 193, 215-216.

Around 3:00 a.m. on November 12, 2002, Mack Filmore, who lived on Haney's Branch Road, a narrow, winding, hilly country road, was awaken by his barking dog. TT, Vol. IV, pp. 226-227. About ten or fifteen minutes later, he heard a series of explosions. Id. at 227. He called 9-1-1. Id. at 228. Filmore subsequently discovered that there was a burning car at the top of the hill at the end of a remote cemetery.[8] Id. at 229-230. FBI agents searched the area around the vehicle, but found nothing of evidentiary value. The state police searched the area in a helicopter, and on foot, with dogs that could track the scent of a person, dead or alive. TT, Vol. IV, pp. 193-194, 213, 224. During the following few weeks, family, friends, and members of the community continued to search for Samantha. TT, Vol. V, pp. 22-24. However, in early December, Basham's attorney provided information to the FBI which caused Samantha's family to realize that they would not find her alive. Id. at 24.

---

[7] Based on this telephone call, the FBI originally focused its investigation on a college student Samantha Burns had previously dated who lived in the Marshall University area. TT, Vol. X, pp. 17-20. Investigators eventually determined that there was no evidence that Samantha Burns had ever been at the student's apartment. TT, Vol. X, p. 120.

[8] FBI Agent James Harper, who was very familiar with the area because he lived in it, described the area as being "very remote," not "someplace that the average person, unless they were familiar with the area, would go to." TT, Vol. X, pp. 65-66.

As part of its investigation, the West Virginia State Police reviewed records of five attempted transactions using Samantha Burns' ATM card at two different locations between 8:03 p.m. and 8:13 p.m. TT, Vol. X, pp. 108-118. Video at one of the ATM locations showed what appeared to be a white male wearing a booney hat, a "turkey mask," a camouflage shirt, and dark leather gloves. Id. The car the man was driving appeared to be Samantha Burns' car. Id. at 117.

Fulks and Basham returned to the Hollywood Motel between 2:30 a.m. and 4:00 a.m. the morning after Samantha's disappearance. TT, Vol. III, p. 116. They had on other clothes that they had taken with them, and these clothes had mud on them. TT, Vol. IV, p. 77. Fulks ate a sandwich, drank a pop, and watched television. TT, Vol. III, p. 117. Later the same morning, the group checked out of the motel. Id. at 119. Severance noticed that there was mud on the passenger's seat, on the driver's-side floorboard, and on the first seat in the back of the van. Id. at 131. After the four arrived at their next destination, Severance observed an M & M candy box used for fund raising, which had not been in the van prior to their stay in Kenova. Id. at 128. Fulks said they had gotten the box from one of the cars from which they had stolen a purse. Id. at 130. At the time she disappeared, Samantha was selling candy for a school fund-raiser. TT, Vol. X, p. 178.

When Fulks, Basham, Severance, and Roddy departed the Hollywood Motel in Kenova, West Virginia on Tuesday, November 12, 2002, Severance thought they were going to visit Fulks' mother, since he had previously expressed a desire to visit her. Instead, Fulks drove the group to the Lake Shore Motel in Myrtle Beach, South Carolina. Id. at 121-122. Except for a brief period where Severance drove so Fulks could sleep, Fulks drove the entire distance. Id. at 123. After they arrived in Myrtle Beach, the group went shopping, drank cheap wine, smoked

marijuana, and played cards.  Id. at 135; TT, Vol. IV, pp. 93-94.  Prior to the shopping trip, Severance was going through stolen identification cards in an effort to find one with a picture resembling her.  Id. at 179.  She decided one with the name "Samantha" would work, but when she mentioned it, Fulks said "no, not that one," and threw it in the garbage.  Id. at 180.  While at the Lake Shore Motel, Fulks became upset because he could not find a revolver he had hidden under one of the beds.  He was "frantic" because he thought Basham or Severance had taken it.  Id. at 138.  Severance found the gun in the sheets.  Id.  Also, while at the Lake Shore, Fulks became angry after Severance commented about the legs of a man on a television program.  Id. at 176.  When Severance attempted to leave the room, Fulks, pointing a revolver at Severance's head, told her she was not leaving the room.  Id. at 177-178.

On Thursday, November 14, 2002, the group checked out of the Lake Shore Motel and, with Fulks driving, began looking for another motel.  Id. at 139.  Fulks pulled into the parking lot of the Beach Walk Motel, gave Severance a stolen ID, and told her to use it to check into the motel.  Id. at 140-141.  Because the motel room was dirty, Severance asked Fulks and Basham to purchase cleaning supplies.  Fulks and Basham departed in Severance's van.  Id. at 143.

Fulks and Basham apparently decided to do something other than purchase cleaning supplies.  At approximately 1:50 or 2:00 p.m., Carl Jordan was making his usual check of the family property where his son lived.  TT, Vol. V, 46-47.  When he pulled into the driveway, he saw a green minivan.  Id. at 47.  As Jordan pulled his truck beside the van, he saw his own gun, plus four or five more in a pile.  Id. at 48.  Jordan pulled in front of the van and stopped.  Id.  Less than a minute later, Fulks walked out the back door of the house.  Id.  As Fulks looked Jordan in the eye, Jordan said, "hold it, I got you."  Id.  Fulks got into the van, came "flying" at

Jordan, and hit the brakes.  Id.  As Jordan crunched down in his seat, he heard shooting, and looked up to see Basham in front of him shooting.  Id.  As Jordan ducked, Fulks shot the glass out behind Jordan's head.  Id. at 49.  Jordan, believing that Fulks was trying to kill him, "took off."  Id. at 49, 61.  Fulks and Basham pursued him, continuing to shoot at him.  Id. at 57-58.  About 75 yards after turning to follow Jordan, the van began to back up.  Id. at 58.  After approximately half-a-mile, Jordan lost sight of the van.  Id. at 59.  Later, officers discovered the green van backed into some trees.  Id. at 96-97, 100, 104, 108-109.

After Fulks and Basham abandoned the van, close to 2:00 p.m. on November 14, they knocked on the back door of Margaret Moore's house and asked if she could take them to the store because they were out of gas.  TT, Vol. V, pp 112-113, 115.  After Ms. Moore refused to drive Fulks and Basham anywhere or to let them use her telephone, they walked down the driveway and hid behind a tree.  Id. at 115-116.  Fulks came back to Moore's back door and knocked, but then went back down the driveway and hid behind some azaleas while a car passed.  Id. at 117.  Moore called the police.[9]  Id. at 118.

Oleita Hyman lived across the street from Margaret Moore.  TT, Vol. V, p. 121.  At approximately 2:15 p.m., Fulks and Basham stole her white Ford pickup truck, which was discovered in the Wal Mart parking lot the next morning.  Id. at 126, 130.  Id. at 123-126, 130.

After Fulks and Basham stole Oleita Hyman's truck, they decided they needed a different vehicle.  Alice Donovan would be the source of that vehicle.  November 14 was Alice

---

[9] On November 25, 2002, Moore's daughter discovered a camouflage bag near the back of Moore's property.  TT, Vol. V, pp. 118-120.  The bag contained a ski mask, binoculars, gloves, a flashlight, a charger for two-way radios, and a .45 caliber handgun.  TT, Vol. V, pp. 162-163, 169.  Law enforcement officers determined that the firearm had been stolen from someone in Michigan City, Indiana.  Id. at 164.

Donovan's day off from work. Her husband, Barry, kissed her good-bye and told her he loved her as he left for work that morning. TT, Vol. XVI, p. 62. He talked with her at noon, and she told him she planned to go shopping at Wal-Mart. Id. At 4:30 p.m., Alice Donovan called her home and told her daughter she was Christmas shopping and would be home late. TT, Vol. XV, p. 260. By 2:00 a.m. the next morning, Alice Donovan had not returned home. TT, Vol. XVI, p. 64. Barry Donovan drove through the Wal-Mart parking lot and through the K-Mart parking lot. Id. He called the Horry County Police Department. Id. at 65. An officer told Barry Donovan that he could not file a missing person report for 48 hours. Id. Barry Donovan continued to search. He went to Carolina First Federal Credit Union, and asked an employee to check for transactions on Alice's ATM card. Id. at 68. After Barry Donovan discovered that there had been two transactions, one in South Carolina and one in North Carolina, he again contacted Horry County Police. Id. at 68-69.

After Alice Donovan was determined to be missing, the Horry County Police Department contacted the manager of Wal-Mart in order to review the video taken by the security cameras on November 14, 2002. TT, Vol. V, p. 138. The video showed Ms. Donovan's car, a blue BMW, turning into the Wal-Mart parking lot at 2:37 p.m., followed by the white pickup truck which had been stolen from Olieta Hyman. Id. at 140, 142, 151. The white truck slowed down behind Ms. Donovan's car, and the passenger of the white truck jumped out of the truck. Id. Alice Donovan's car went, with the white pickup truck following it, to the furthest section of the Wal-Mart parking lot, where the white truck parked and Ms. Donovan's car pulled up beside it. Id. at 140, 144, 154-155.

At 3:38 p.m. on November 14, a male used Alice Donovan's ATM card at the Carolina

-15-

First Bank in Little River, South Carolina to withdraw $300.00. TT, Vol. V, pp. 171-173, 183. Around 4:30 or 5:30 p.m., Vincent Driggers and David Hall were at the Bee Tree Farms Hunt Club in Brunswick County, North Carolina, when they noticed a blue BMW with three people in it drive past the camp, turn around, and leave. TT, Vol. VI, pp 29-30, 32, 63-64. A man with short hair was driving, and another man with short hair and a woman were sitting very close together in the back seat. Id. at 34, 65. The same day, Ron Perdue, who lived on Bee Tree Farm Trail, saw the blue car, with a male in the front and a male in the back, drive up the road and back down it a few minutes later. TT, Vol. VI, p. 43, 45. About 20 minutes later, Purdue saw the back of the same car parked in a small cemetery. Id. at 45, 56.

When Fulks and Basham returned to the Beach Walk Motel the evening of November 14, Fulks told Severance that Basham had shot at some cops, that the cops had Severance's van, and that he and Basham had to leave. TT, Vol. III, p. 148. A person again tried to use Ms. Donovan's ATM card at NBSC in North Myrtle Beach at 8:48 p.m. on November 14. TT, Vol. V, pp. 185-186. At 12:20 a.m. on November 15, a person, using Ms. Donovan's ATM card, withdrew $600.00 in Raleigh, North Carolina. Id. at 187-188.

On November 15, 2002, Horry County Police Department received information that the abandoned green van used in the robbery of the Jordan house belonged to Tina Severance, a suspected friend of two prison escapees from Kentucky, and that she could possibly be located at the Beach Walk Motel. Id. at 204-206. The same day, around noon, Fulks and Basham arrived at Beth McGuffin's house in Huntington, West Virginia in a blue BMW with a West Virginia license plate dangling by one screw. TT, Vol. VI, pp. 99-100, 107. McGuffin and Fulks had lived in the same neighborhood and were friends when they were growing up. Id. at 84-87.

However, McGuffin was married in 1994 or 1995, and did not see Fulks again until he came to her grandmother's house seven or eight years later and asked McGuffin to find him $150 worth of marijuana. Id. at 88, 90-92. He had appeared one other time at her house and had convinced McGuffin and her cousin to drive him to Indiana, after which he disappeared and left them with no money to purchase gas to return home. Id. at 93-98.

After Fulks and Basham arrived at McGuffin's house, they brought their laundry into the house, and McGuffin volunteered to wash it, but Fulks and Basham refused. TT, Vol. VI, p. 124. Fulks and Basham had detergent and bleach with them. Id. at 125. Fulks wanted McGuffin to get him some crank but McGuffin did not know where to purchase it. Id. at 102-103. Fulks ended up going to McGuffin's brother's house, where he purchased marijuana from Anthony Cremeans. TT, Vol. VII, p. 33. Fulks asked Cremeans where to go to party and find women and drugs, because he wanted to "get fucked up" and get some "pussy." Id. at 32-34. Later that evening, Fulks purchased crack cocaine and returned to McGuffin's house. TT, Vol. VI, p. 108, 115. Two of McGuffin's friends came to her house, and the group talked and smoked crack. Id. at 118. Fulks wanted McGuffin to "get him fixed up" with her friend, Stacey Workman. Id. at 119. Fulks and Basham were really excited about plans to go to a bike rally in Arizona, and they wanted McGuffin and Workman to go with them. Id. at 126, Vol. VII, p. 27.

The following day, Saturday, November 16, Fulks went back to McGuffin's brother's house, where he, again, saw Cremeans. Fulks invited Cremeans to go to the gas station with him. TT, Vol. VII, pp. 35-36. Fulks also went to a car dealership because he wanted to trade the BMW for a Firebird. Id. at 36. Fulks told Cremeans that he had received $125,000.00 as a result of a law suit after he was injured by metal getting all over his body during a gas explosion at a

camping place where he was working.  Id. at 37-38.  Saturday night, as Fulks and McGuffin were driving around, Fulks wanted to get a motel room because staying at McGuffin's house made him "too paranoid."  TT, Vol. VI, p. 133.  Fulks handed McGuffin an I.D. for Amy Ward, which she unsuccessfully attempted to use to get a room.  Id.  While McGuffin was sitting in the back seat of the BMW, she noticed a gun in the glove box.  Fulks told her the gun belonged to him.  TT, Vol. VI, pp. 113-114.  Fulks drove to the Huntington Mall, because he and Basham said they had left a bag of clothes in the mall parking lot near the J.C. Penney store.  Id. at 137-138.  After not finding the bag of clothes at the Huntington Mall, Fulks, Basham, and McGuffin returned to McGuffin's house and began watching the 6:00 p.m. news.  The news showed Samantha Burns' picture, and McGuffin commented that it was a shame and that Burns was probably dead.  TT, Vol. VI, p. 139.  Fulks looked at McGuffin and said: "Yes, she is dead."  Id.

The next afternoon, Sunday, November 17,  Fulks and Basham departed McGuffin's house (Id. at 144) and, apparently, began hunting for their next victim.   fifteen-year-old Andrea Francis and her mother were leaving the Ashland Mall, in Kentucky.[10]  TT, Vol. VII, pp. 43-44. Andrea, who was walking about ten feet in front of her mother and talking on the cell phone, sat down in the car.  Id. at 44.  Brandon Basham approached her and pointed a gun into her side, saying he wanted directions.  Id. at 44-45.  He tried to get into the car, until he saw the cell phone and a security guard.  At that point, Basham backed away.  Id. at 45.  Francis' mother called 9-1-1.  Id. at 56.  A police officer responded and began pursuing Basham around 7:15 p.m.  Id. at 67. Basham fired several shots at the police officer and evaded capture until after 9:00 p.m.  Id. at 82.

---

[10]  Ashland, Kentucky is about a ten to fifteen minute drive from Huntington, West Virginia.  TT, Vol. VII, p. 62.

The same evening, Francis identified Basham as the person who had tried to get into her car. Id. at 48.

Shortly before 11:00 p.m., Fulks returned to Beth McGuffin's house. TT, Vol. VI, 145-146. Fulks sat down with McGuffin and a drug dealer, who was at McGuffin's house, to watch the news. Id. at 147. A late-breaking story came on about a police officer being shot at. When McGuffin saw the shooter, she realized it was Basham, and asked Fulks: "What is going on?" Id. Fulks told McGuffin that he had dropped Basham off at his ex-girlfriend's house, and that they must have gotten into a fight, causing her to call the police. Id. at 148. Fulks stayed at McGuffin's house Sunday night, and departed the following morning. Id. at 149-150. On Tuesday, November 19, McGuffin saw Fulks' picture in a news story stating that he might have been involved in the kidnapping of Samantha Burns and another woman in South Carolina. Id. at 151. McGuffin called the police. Id. at 152.

After Fulks departed McGuffin's house, he drove to Marion, Ohio.[11] About 10:30 p.m. on Monday, November 18, 2002, Ohio State Highway Patrol Trooper Brent Hunter was making a routine check of a rest area when he became suspicious of a lone vehicle, a blue BMW, backed into an angle-in parking space. TT, Vol. VII, pp. 154-157, 178. He determined that the car's license plate had been stolen, and that it was for a Pontiac. Id. at 158-159. Hunter radioed for some units to assist. Id. at 159. He observed that the driver was watching him continuously, so Hunter decided to confront the driver in order to keep him in the rest area and prevent a pursuit situation. Id. at 159-160. Hunter moved his patrol car so that it was directly in front of the

---

[11] Marion, Ohio is approximately a three-hour drive from the West Virginia border. TT, Vol. VII, p. 155.

BMW.  Id. at 160.  He got out of the car, and, when the driver sat straight up, he turned on his take-down lights, ordering the driver to "put your hands up."  Id.  The driver went straight down in the seat.  Id.  Hunter believed the driver was attempting to reach under the front seat, so he drew his weapon.  Id. at 160, 162.  As he walked toward the BMW, he continued to instruct the driver to get his hands up.  He saw the driver raise one hand and heard him say, "okay, okay."  Immediately afterward, the driver quickly accelerated out of the rest area, heading north.  Id. at 163-164.  Trooper Hunter began pursuit.  Id. at 164.

Reaching speeds up to 130 mph, the BMW and the patrol car flew past other vehicles on the highway.  TT, Vol. VII, pp. 166-167.  As the vehicles sped north, a highway patrol officer was ahead, setting up spikes designed to cause tires, once pierced, to slowly deflate.  Id. at 168.  However, just before the BMW reached the spikes, it crossed over the median and headed south.  Id. at 168-169.  Trooper Malo heard that the BMW was heading south, so he stopped his patrol car in the left lane of the south-bound part of the highway and attempted to set up spikes in the right lane.  Id. at 192.  The BMW was difficult to see because its lights were not on.  Id. at 169.  As the BMW appeared to be quickly approaching, Malo moved onto the berm to avoid being hit.  Id. at 193.  The BMW drove onto the berm, so Malo had to jump out of the way, falling on his hands and knees and rolling down the hill.  Id. at 197-198.  Trooper Hunter, thinking Malo had been struck, slowed to determine if he needed assistance.  Id. at 170.  After Hunter slowed his vehicle, Fulks managed to evade the troopers.  Id. at 171.

Fulks drove back to Goshen, Indiana, and on Tuesday, November 19, 2002, at approximately 5:00 or 6:00 p.m., knocked on the door of the house where his brother, Ronnie, was living with his girlfriend.  TT, Vol. VII, pp. 223-224.  Fulks was smoking a cigar and

appeared "mellow . . . like nothing was wrong." Id. at 227; see also TT, Vol. VIII, p. 28 (Davion Nolte testified: "You couldn't tell anything was bothering him or anything was going on."). The same evening, Fulks, Ronnie, Davion Nolte, and the son of Ronnie's girlfriend were watching the local 9:00 p.m. news, when it showed Fulks being pursued by the trooper at the rest stop. TT, Vol. VIII, p. 26. Ronnie asked Fulks where he got the car from, and Fulks responded that he took it from a woman in South Carolina. Id. at 27.

On Wednesday morning, November 20, Andrea Adams, Ronnie Fulks' girlfriend, arrived home from her third-shift job. TT, Vol. VII, p. 239. Ronnie asked her to follow Fulks to drop off a car at a friend's house. Id. at 240. She and Ronnie followed Fulks into the nearby countryside of Bristol, where Fulks covered the BMW with a tarp and some hay and left it in a shed on an abandoned farm and, carrying two bags, got into Adams' car. Id. at 240, 245; Vol. VIII, p. 94, Vol. X, p. 251. Fulks said he needed to go back to Ronnie's house because he had forgotten something. TT, Vol. VII, p. 246. After going to Ronnie's house, they began driving toward Bristol, when Ronnie or Fulks screamed, "stop the car." Id. at 147-148. Fulks jumped out of the car and ran through a field. Id. at 249. A quarter-mile foot chase of Fulks by members of the Goshen Police Department, the Elkhart County Sheriff's Department, and the Bristol Police Department ensued. TT, Vol. VIII, pp. 34, 40, 47, 54, 59. Other law enforcement units, with sirens blasting, were approaching the area to assist. Id. at 65. Fulks attempted to evade, but when officers saw him after about fifteen minutes and shouted several times for him to "halt," Fulks, very-winded, but calm, stopped his flight. Id. at 51, 65, 72.

As Fulks attempted to evade law enforcement in Indiana, South Carolina law enforcement officers searched Tina Severance's van for evidence related to the disappearance of

Samantha Burns in West Virginia, or the robbery in Horry County. TT, Vol. VIII, pp. 102-105, 116. Special Agent Joe Leatherman of the South Carolina Law Enforcement Division observed and photographed similar amounts of dirt and mud on the floorboards of both the driver's side and the passenger's side of the van. Id. at 99, 115-116. Leatherman also seized boots, camouflage jackets, ski masks, caps, trousers, black gloves, and a steak knife. Id. at 120-122. On the bottom of one of the boots, he discovered an orange fiber caked in the mud. Samantha Burns was wearing an orange sweater on the night she disappeared. Id. at 123.

South Carolina law enforcement officers also continued to investigate the disappearance of Alice Donovan. Based on transactions made using Alice Donovan's ATM card, the Conway Police Department contacted the Brunswick County, North Carolina Sheriff's Department on November 17, 2002. TT, Vol. VI, pp 8-9. Brunswick County detectives went to a BP gas station and viewed its security video taken about 3:59 p.m. on November 14, 2002. Id. at 10-11. The video showed Alice Donovan's car. It also showed Fulks walking into the store, purchasing three drinks, pumping gas, and getting into the car and driving away. Id. at 12-15. Several days later, the detective and an FBI investigator went back to the store to talk to the woman who had been the cashier the day Fulks stopped there. Id. She remembered that Fulks had purchased masking tape and black hose repair tape, which resembles electrical tape. Id. at 16.

After Basham was arrested in Kentucky, an FBI agent in Ashland, Kentucky faxed a hand-drawn map to South Carolina FBI Agent Jeff Long on November 20, 2002. TT, Vol. X, p. 173. Utilizing the map, law enforcement agencies, hoping to find Alice Donovan alive, launched an exhaustive search of the Savannah Bluff area of Conway, South Carolina. Id. at 174-180. The next day, based on an Amoco station video, cell phone records, and information provided by

hunters, another search, covering the Bee Tree Farm area of Winnabow, North Carolina, in Brunswick County, was launched. Id. at 180, 184-185. On November 28, Basham was brought to the hunt club at Bee Tree Farm and given an opportunity to locate Alice Donovan. Id. at 196. Nothing was discovered. Id. at 197.

As a result of information the FBI received from Basham's attorney on November 27, 2002, the FBI began searching around the Guyandotte River, a small tributary of the Ohio River. TT, Vol. X, pp. 22-29. The search lasted three days and included manpower, boats, underwater cameras, and various other devices, but nothing was found. Id. at 28. In September of 2003, approximately ten months after the disappearance of Samantha Burns, Fulks provided information which resulted in another search of the Guyandotte and Ohio Rivers. TT, Vol. X, pp. 48, 79. Members of the FBI dive team participated in the search. Id. at 85.

On April 21, 2003, Agent Long interviewed Fulks in the presence of his attorneys and the defense investigator.[12] TT, Vol. X, p. 202-203. The interview was limited, due to restrictions placed on it by Fulks' counsel, to events occurring after Fulks and Basham stole the white truck in Myrtle Beach. Id. The stated reason Fulks' counsel agreed to this interview was "to see if there might be something to be done to find the remains to give the family some kind of closure." Id. at 208-209. Fulks essentially confirmed what investigators had already discovered. TT, Vol X, pp. 214-227. He said that after Alice Donovan drove out of the Wal-Mart parking lot, she

---

[12] On January 15, 2003, slightly more than three months prior to this interview, when Fulks and Basham were still co-defendants in the same case, there was a status conference at which both defendants were present, during which there was a discussion of Basham's trip to the Bee Tree Farm area with law enforcement. TT, Vol. X, pp. 254-256. Consequently, prior to his interview with Agent Long, Fulks had already heard Basham's version of Alice Donovan's abduction and murder. Id.

was told to stop her car in a parking lot and to move to the back seat.  Id. at 215-216.  Fulks

began driving.  Id. at 216.   Fulks claimed that he did not have a gun, and that Basham had a .22

revolver.  Id.  Fulks admitted attempting to use Alice Donovan's ATM card at the Little River

Pantry convenience store and to obtaining money from a bank ATM machine using Alice

Donovan's card.  Id.  at 222.

Fulks admitted purchasing  black tape and radiator tape, but claimed Basham had told

him to buy the tape.  Id. at 223.  Fulks said he purchased gas for the car and then continued

driving north on Highway 17 until he saw a state trooper, after which he made several turns and

ended up at a dead-end road where a hunting cabin was located.  Id. at 224-227.  He made a U-

turn and drove to a driveway where a small cemetery was located.  Id. at 227.

Fulks said that when they reached the cemetery, Basham was forcibly removing Alice

Donovan's clothes.  TT, Vol. X, p. 227.  Fulks sat on the hood of the car while Basham raped

her, and then Fulks raped Alice Donovan.[13]   Afterwards, he got out of the car and noticed a truck

pull into the cemetery drive, so he ducked in front of the car.  Id. at 228.  After the truck pulled

away, Fulks re-entered the car and drove the BMW south on Highway 17.  According to Fulks,

Basham would not let Alice Donovan put her clothes on.  Id.  Fulks drove into a convenience

store to get gas.  Id.  After leaving the convenience store, Fulks drove to Highway 90.  Fulks said

that Basham told him to start looking for dirt roads.  Id. at 228-229.  He said he drove down

several dirt roads before he found one that did not have any houses.  Id. at 229.  During this time,

---

[13]  According to Fulks, he did not want to rape Alice Donovan, but he felt pressured to do
so by Basham.  TT, Vol. X, p. 227.  The FBI laboratory in Quantico, Virginia determined that a
stain on the rear seat of Alice Donovan's BMW was semen which probably came from Fulks.
TT, Vol. XII, pp. 25-26.

Fulks noticed that Donovan's wrists were taped.  Id.  Fulks stopped the car, and Basham took

Alice Donovan out of the car and, holding a gun to her side, took her into the woods.  Id. At 238-

239.  Fulks said that approximately twenty minutes later, Basham returned to the car, holding

Alice Donovan's panties and tennis shoes.  Id. at 239.

Fulks told Agent Long that, as he was driving through North Carolina or Virginia,

Basham told him he had killed Alice Donovan by strangling her and taping her to a tree, and that

he had killed a female two years previously in Madison, Kentucky, and that her body had never

been found.  Id. at 241-242.  Agent Long investigated this claim and found no record of a

missing woman during that time frame in Madison County or Madisonville, Kentucky.  Id. at

243.  Fulks claimed that he had been unaware that Alice Donovan and Samantha Burns had been

killed until he and Basham were traveling back to West Virginia.  TT, Vol. XI, p. 144.  Fulks also

said that he stole a license plate somewhere in West Virginia and put the tag on Alice Donovan's

BMW.[14]  TT, Vol. X, p.  247.  He then disposed of Donovan's tag.  Id.

Fulks said that after he and Basham departed from Beth McGuffin's house in Huntington,

West Virginia, Basham wanted Fulks to take him to his mother's house in Kentucky, but that

Fulks did not want to go because he believed police would be looking for them.  TT, Vol. X, p.

250.  Fulks claimed that while he was driving, Basham aimed a gun at Fulks' head, demanding

that Fulks drive him to Kentucky, and that he and Basham fought for control of the gun.  Id.  At

some point, Basham put the gun away and acted like it was a joke.  Id.  Fulks alleged he drove

---

[14]  During the highway patrol's pursuit of Fulks near Marion, Ohio, Alice Donovan's
BMW had West Virginia license plates on it.  TT, Vol. XI, p. 165.  Two days later, when Fulks
was arrested and the BMW was recovered, it had Ohio license plates on it.  Id. at 165-166.

into a mall parking lot in Kentucky where Basham had arranged to meet his mother.[15] Id. Fulks, noticing that there was a police officer in the area, dropped Basham off near a pay phone in front of a movie theater and drove away. Id. As Fulks drove away, he saw a police officer chasing Basham. Id.

### III. Standard of Review

Under Strickland v. Washington, 466 U.S. 668, 687 (1984), in order to establish a violation of his Sixth Amendment rights, a petitioner must show that his counsel's performance was deficient and that the deficiency so prejudiced his defense as to deprive him of a fair trial. The performance of counsel is measured in terms of "reasonableness under prevailing professional norms." Id. at 688. A court's evaluation of performance "must be highly deferential," judged "on the facts of the particular case," and considered "from counsel's perspective at the time." Id. 689, 690. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991)(citing Strickland, 466 U.S. at 686). "Although counsel should conduct a reasonable investigation into potential defenses, Strickland does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client." Green v. French, 143 F.3d 865, 892 (4th Cir. 1998), *abrogated on other grounds by* William v. Taylor, 529 U.S. 362 (2000).

---

[15] The mall where Fulks allegedly took Basham to meet his mother is in Ashland, Kentucky, which is approximately 400 miles from Madisonville, Kentucky, where Basham lived. TT, Vol. X, pp. 251-252.

**Response to Claim I**

**Fulks trial counsel presented a compelling mental health case in mitigation after extensive and thorough research**

Fulks argues that his trial counsel were ineffective for failing to present a meaningful mental health case in mitigation because they did not present certain expert witnesses who were prepared to educate the jury on Fulks' multiple impairments.  (Amended Mot. to Vacate at 29.) He erroneously asserts that "trial counsel focused exclusively on fetal alcohol spectrum disorder ('FASD')," and that FASD experts were the only experts presented to the jury.  (Amended Mot. to Vacate at 38.)  Fulks complains that trial counsel should have presented the testimony of Seymour Halleck, Margaret Melikian, James Hilkey, and William Morton, mental health experts who were prepared to testify at his trial, but were not called to do so.  He opines that the experts not called could have told the jury of his various drug addictions and mental disorders resulting from the neglect and abuse he suffered as a child.[16]  (Amended Mot. to Vacate at 51-64.)

> **A.     Fulks' trial counsel presented extensive expert testimony regarding the effects of  Fulks' brain damage, cognitive impairment, abused and neglected childhood, substance abuse, and depression.**

Trial counsel found themselves on the horns of a dilemma as to how much and which mental health information to present.  Much of the information mental health experts discovered about Fulks could have produced more fear than sympathy in jurors.  As the Fourth Circuit has recognized, "[t]rial counsel is too frequently placed in a no-win situation with respect to possible mitigating evidence at the sentencing phase of a capital case." Truesdale v. Moore, 142 F.3d 749,

---

[16]  Ten of the jurors found that Fulks was diagnosed with depression, substance abuse, and possible sociopathic tendencies at age fourteen.  Verdict Form at 8.

754 -755 (4th Cir. 1998)(citing <u>Bunch v. Thompson</u>, 949 F.2d 1354, 1364 (4th Cir.1991)). Failure to present particular mitigating evidence often leads to claims that counsel should have introduced such evidence or investigated further.  <u>Id.</u>  On the other hand, the introduction of evidence that the jury does not credit or that the prosecution turns to its advantage leads to ineffectiveness claims also. Mental health evidence, such as evidence of organic brain dysfunction, is a double-edged sword that might as easily condemn a defendant to death as excuse his actions.  <u>Truesdale</u>, 142 F.3d. at 755; <u>see</u> <u>also</u> <u>Satcher v. Pruett</u>, 126 F.3d 561, 572 (4th Cir. 1997)(finding that trial counsel was not ineffective for not presenting testimony by a psychologist and a psychiatrist who examined the defendant for the purpose of developing mitigating evidence, found no psychiatric or neurological disorders, but found that the defendant had an antisocial personality disorder that might make him a "future danger").  Fulks' trial counsel were, indeed, faced with the unenviable and herculean task of determining what details of Fulks' mental and emotional makeup would make him a more sympathetic defendant to the jurors, and which details might condemn him to death.   Counsel sought input from at least ten mental health experts, but, ultimately, selected six of the experts to present Fulks' mental health case in mitigation.

> **1.      Defense counsel presented testimony by experts specializing in psychiatry, psychology, neurology, radiology, and child development, as well as fetal alcohol spectrum disorder (FASD).**

Fulks erroneously implies that all of the experts called by his trial counsel were experts only in FASD.  (Amended Mot. to Vacate at 41.)  In addition to presenting the testimony of an expert in fetal alcohol spectrum disorder, trial counsel presented the testimony of experts in cognitive neuroscience, behavioral neuroscience, and neuropsychology.

### a. Ruben Gur

Ruben Gur earned his master's and doctorate degrees in clinical psychology from Michigan State University. He did post-doctorate work at Stanford University and the University of Pennsylvania. TT, Vol. XII, p. 34. At the time of trial, Dr. Gur was a professor in the Departments of Psychiatry, Neurology, and Radiology at the University of Pennsylvania. He had had more than 200 articles and studies published and directed the Brain Behavior Laboratory, which uses imagery in order to understand the way the brain regulates behavior, and performs clinical research on how brain damage can influence "what we can do, how we think, and how we feel." TT, Vol. XII, pp. 31, 36. Additionally, Dr. Gur had received several awards for his work in the field of neuroscience, including an award from the families of people who suffer from severe mental illness. Id. at 38. Dr. Gur was qualified as an expert in cognitive neuroscience. Id. at 39. Cognitive neuroscience is the study of the link between the brain and cognition, how people think and feel. It looks at the brain changes that occur with complex behavior. Id. at 33. Dr. Gur evaluated Fulks and reviewed tests of Fulks performed by others. Id. at 39-40.

### b. David Bachman

David Bachman received his undergraduate degree from Cornell University and went to medical school at Emory University. He received two years of training in internal medicine and three years of training in neurology at Emory University. He then did a fellowship in behavioral neurology at Boston University.[17] At the time of trial, he was a professor of medicine neurology

---

[17] Behavioral neurology is the study of intellectual, cognitive, and behavioral changes that occur as a result of brain injury or disease Id. at 6.

and psychiatry at the Medical University of South Carolina.  TT, Vol. XVIII, p. 5.  Dr. Bachman had published articles on aggressive behavior in patients with brain injuries.  Id. at 7.  Dr. Bachman was qualified as an expert in behavioral neurology.  Id.  at 8.  Dr. Bachman performed a neurological evaluation of Fulks, which included a history, physical examination, and mental status examination.  Id. at 8-9.

### c.      Howard Becker

Howard Becker received his master's and doctorate degrees in biopsychology  from Rutgers University.  He did post-doctoral work at the Medical University of South Carolina.  TT, Vol. XVII, p. 111.  He worked primarily in the area of neuroscience, specifically, psychopharmacology.  Id.  He had performed research to understand how alcohol influences the brain in developing organisms, young animals, and adults.  Id.  He testified as an expert in fetal alcohol spectrum disorder.  Id. at 114.

### d.      Arlene Andrews

Arlene Andrews, who holds a master's degree in social work and a doctoral degree in clinical community psychology, was the founding executive director of the Counsel on Child Abuse and Neglect, a state-wide child abuse prevention organization, and was also the founding executive director of Sister Care, a program for abused women and their children.  TT, Vol. XVIII, p. 125.  She co-founded the Nurturing Center, which is a treatment program for very young children who have been abused and neglected.  Dr. Andrews had taught courses in victimization and child abuse, and had consulted with organizations trying to promote healthy families.  Id. at 125-126.  She edited a book related to an international convention for standards of living for healthy child development in the areas of physical, emotional, moral, social, and

mental development.  Id. at 126.  Dr. Andrews was qualified as an expert in child development and conducting family history assessments.  Id. at 132.  Dr. Andrews prepared a family history of Fulks.  She evaluated records, including school records, juvenile offense records, medical records, and psychiatric evaluations, and she interviewed Fulks, a number of family members, and a childhood neighbor.  Id. at 133-134, 137.  After describing her research regarding Fulks' childhood, she explained the significance of Fulks' childhood experiences.[18]

### e. James Evans

James Evans received his master's degree in psychology from Kansas State University and his doctorate degree from Peabody College, which is part of Vanderbilt University.  TT, Vol. XVII, p. 6.  He taught clinical psychology at the University of South Carolina Department of Psychology for thirty years and was in private practice at the time of Fulks' trial.  Dr. Evans taught Abnormal Psychology, Psychology of Consciousness, Neuropsychology of Learning Disabilities, and Child Development.  TT, Vol. XVII, p. 5.  Dr. Evans was qualified as an expert in neuropsychology.  Id. at 8.  Dr. Evans spent approximately eight or nine hours with Fulks in order to evaluate his mental condition.  Id. at 41.  He administered a battery of neuropsychological tests to Fulks and reviewed tests administered by others.  Id. at 8.

### f. Fred Bookstein

Fred Bookstein received a master's degree in sociology from Harvard University and a Ph.D. in statistics and zoology from the University of Michigan.  He was a professor and

---

[18]  It is clear from the record that Fulks' defense counsel had a carefully planned strategy regarding the presentation of Fulks' family history and its significance.  Ms. Johnson, during a sidebar discussion regarding an objection by the prosecution, explained the requirements of Wiggins v. Smith, 539  U.S. 510 (2003), and explained that Dr. Andrews would describe Fulks' family history and explain its significance.  TT, Vol. XVIII, pp. 144-145.

researcher who worked extensively on projects and with hospitals on issues regarding fetal

alcohol syndrome.  TT, Vol. XVIII, pp. 88-89.  At trial, he was admitted as an expert in

biostatistics and morphometrics.  Id. at 91.  Dr. Bookstein testified regarding the anatomical

abnormalities of Fulks' brain and their significance.  Id. at 101-112.

2. **Experts integrated information regarding Fulks' damaged brain, his childhood of abuse and neglect, and his extensive substance abuse to present a compelling case in mitigation.**

a. **Cognitive and Communication Deficiencies**

Fulks makes the incredible claim that his trial experts did not inform the jury about his

cognitive disorder.  (Amended Mot. to Vacate at 42-43, 50.)  He asserts that his trial counsel

should have called Seymour Halleck to testify because he could have explained that "cognitive

impairment and drug use made it difficult for [Fulks] to undertake a benefit-risk analysis in the

situations where he was at risk of engaging in criminal acts. . . .  The many insults to his brain

caused impairment to his executive functions." (Amended Mot. to Vacate at 40-41.)  At best, Dr.

Halleck's testimony would have been cumulative.  Fulks defines cognition as "the ability of the

brain to think, process information, store information, and solve problems,"  (Amended Mot. to

Vacate at  50). The inability, or defective ability, of Fulks' brain to think, process information,

store information, and solve problems, was a large part of what his experts explained to the jury.

Dr. Bachman, Dr. Evans, Dr. Gur, and Dr. Becker described the damage to Fulks' brain and

carefully explained its impact on his thinking and behavior.

In order to diagnose Fulks' mental condition,  Dr. Bachman obtained Fulks' history,

ordered CAT scans, a PET scan, and an EEG, performed physical, mental, and behavioral

evaluations of Fulks, reviewed neuropsychological tests administered several times during 2003

and 2004, and consulted with other experts. TT, Vol. XVIII, p. 20-26, 33.  He explained how, using these tools, he reached the conclusion that Fulks suffers from fetal alcohol spectrum disorder.  Dr. Bachman explained how this disorder was exacerbated by Fulks' life.  TT, Vol. XVIII, p. 31.  He told jurors "if you are already starting life with a bad brain," and then you superimpose other factors that place the brain at risk, then you will have even more difficulties than the person who started life with a normal brain."  Id. at 32.  Dr. Bachman pointed out that Fulks had numerous risks on top of his fetal alcohol syndrome, including drinking alcohol and using drugs at a young age, especially using inhalants, such as gasoline and glue.  Id. at 31.  He added that Fulks had had multiple head injuries that "could certainly be an additive or on top of fetal alcohol exposure."  Id.

Dr. Gur provided jurors with in-depth information which could help them understand the pervasive effect of Fulks' brain injuries on his behavior.  He explained that brain abnormalities are at the heart of the most severe forms of mental illnesses.  TT, Vol. XII, p. 32.  He testified that Fulks has "a highly abnormal brain," and that "the abnormality in the brain structure and function explain a lot of the behaviors, and the cognitive and emotional deficits that have been documented in his case."  TT, Vol. XII, p. 40.  He explained that one of the parts of Fulks' brain most damaged is the frontal part, which is the "executive that decides what to do with all that information that comes from the back of the brain. . . . [t]he one that tells you to stop, think about alternatives, particularly in relation to emotional situations."  TT, Vol. XII, pp. 47, 79.  Later during Dr. Gur's testimony, he reiterated that the executive function in the brain is the one that controls impulses, affects judgment and decision-making, and tells you to "think about your long-term goals, and act in accordance with what is good for you."  Id. at 137.  Dr. Gur explained

that Fulks has a defective thalamus, which is the "switchboard" for the brain, controlling where in the brain information goes. Id. at 137-238. Thus, information goes to the wrong areas of Fulks' brain instead of being relayed to the executive, and he makes bad decisions. Id. Dr. Bachman confirmed Dr. Gur's analysis. He reported that during his functional testing of Fulks, he consistently failed to perform the tasks on the inhibition testing and the tasks requiring frontal lobe involvement. TT, Vol. XVIII, p. 47.

Dr. Evans, through psychological testing, confirmed that Fulks has a damaged frontal lobe, which impairs the executive functions, thus causing him to act impulsively, learn slowly, and fail to plan ahead. TT, Vol. XVII, pp. 14-15. He stated that brain damage puts a person at a higher risk for criminal behavior. TT, Vol. XVII, p. 34. Fulks' poor judgment caused by brain damage is exacerbated by stress and the consumption of alcohol. Id. at 16. Dr. Evans confirmed the information from Fulks' psychological tests by administering a quantitative EEG (QEEG). TT, Vol. XVII, p. 22.

Contrary to Fulks' assertion that experts failed to explain why he has a diminished capacity to communicate and to understand the reactions of others (Amended Mot. to Vacate at 63-64), Dr. Evans used the results of Fulks' QEEG to address the deficiency. Dr. Evans explained that the test detected problems with the occipital part of Fulks' brain, indicating an impairment in visual perception and the ability of Fulks to perceive emotions, such as anger, happiness, sadness, expressed on the faces of others. Id. at 22-23. Dr. Evans gave examples of how this lack of visual perception could have disastrous results during the commission of a crime, explaining how one criminal perceived a store clerk's expression as indicating he was about to draw a gun, when the expression was actually one of terror. Id. at 51. Dr. Evans said

that prior to receiving the results of the QEEG, he had observed that what Fulks saw on the ink blots during the Rorschach test did not match the actual ink blot characteristics. Id. at 64. He discovered that Dr. Gur had also noted Fulks had a problem with visual perception. Id. at 50. Dr. Evans testified that this lack of ability to decipher facial expressions would be made even worse by drug or alcohol use. Id. at 53. Dr. Becker, supporting the conclusions of Dr. Gur and Dr. Evans, opined that individuals suffering from FASD have difficulty communicating with others and picking up on social cues. TT, Vol. XVII, p. 145.

In addition to testifying regarding the communications difficulties experienced by individuals with FASD, Dr. Becker explained that the frontal part of the brain sequences events and makes cause-and-effect relationships. TT, Vol. XVII, p. 142, 144. Individuals, like Fulks, with such brain damage have poor short-term memory, do not learn from experience, have difficulty predicting outcomes, and exhibit poor judgment. Id. Dr. Becker explained that, due to their information processing deficits, such individuals don't understand that what they are doing now might have some impact on what might occur later, they are impulsive, and they act before they think. Id. at 145.

> **b.    Childhood Neglect and Abuse, Substance Abuse, Anxiety and Attempted Suicide**

Like his claims regarding counsels' failure to present expert testimony regarding cognitive and communication deficiencies, Fulks' claims that his counsel did not present testimony to explain his mental illness and behavior in the context of his entire life are erroneous. Fulks claims other experts could have explained "the significance of the evidence presented regarding the beatings received by Petitioner, the chaotic family environment, drug and alcohol

abuse, sexual abuse, deprivations, etcetera." (Amended Mot. to Vacate at 41.) Yet, Dr. Gur very articulately explained the effect a person's family background has on his behavior:

> But behavior is, too [sic], a large extent shaped by your upbringing. It is not all biology. You can take the same kid and use the environment in order to give him a better executive. . . . They like structure, and they realize there is something wrong in their own executive, so they are looking for guidance. If you guide them well, they can turn out being fine. If they are guided otherwise, they can turn out to be very difficult.

TT, Vol. XII, p. 140. Dr. Becker subsequently testified to the importance of early intervention and a stable home life for individuals suffering from FASD. TT, Vol. XVII, p. 148. He explained that such individuals can have related secondary disabilities - disabilities that they are not necessarily born with, but which arise as a function of the brain dysfunction caused by FASD. Id. at 146. These include affective disorders like anxiety and depression, suicide attempts, alcohol and drug problems, trouble with the law, and inappropriate sexual behavior. Id. at 146-147. Dr. Becker told the jury that the "greatest protective factor" against these secondary disabilities is having an early diagnosis, receiving eligibility for state-supported programs, living in a stable home, and being protected from witnessing or being victimized by violence. Id. at 148.

Building on this testimony, Fulks' trial counsel presented a compelling case that Fulks never received the "protective factor" of early intervention. Psychologist and social worker Dr. Arlene Andrews testified that she saw a lot of threats, things that are harmful, to child development in Fulks' life. She said what was even more powerful, however, is "what was missing that should have been there." Id. at 152. Dr. Andrews provided the emotionally powerful and humanizing testimony that when she interviewed Fulks' father, he did not

remember Fulks at all before Fulks was around the age of twelve. TT, Vol. VIII, p. 151. She offered: "He doesn't remember when he was born. He doesn't remember he was in special classes at school. He doesn't remember that he tried to commit suicide." Id. at 151-152. Dr. Andrews said that Fulks' mother remembered very little. She did not remember his birth or whether he went to kindergarten. Id. at 152.

Dr. Andrews opined that Fulks was "a lost child," because neither of his parents really paid much attention to him. Id. at 177. Dr. Andrews described how Fulks' father was affected from war trauma during his service in Vietnam. TT, Vol. XVIII, pp. 153-154. Fulks' parents began to have conflicts after his return, and Fulks' mother drank throughout her pregnancies with all of her sons. Id. at 154. Fulks started kindergarten at age five, but missed 35 days of school that year. Id. at 155. About the time Fulks started the first grade, his father acquired a pool table and the neighbors started "hanging out" at Fulks' house. Id. Dr. Andrews testified that Fulks' parents were drinking, fighting a lot, and viewing pornographic videos and magazines, which the parents allowed Fulks and his siblings to view. Id. at 156, 161. She said Fulks parents "despised each other," and fought with their fists, shoved and strangled each other, hit each other with objects, fought other adults, and threatened to kill each other in front of Fulks and his siblings. Id. at 156. Dr. Andrews told the jurors that Fulks heard his mother and father calling each other and the children names like "mother fucker" and "bastard." Id.

Dr. Andrews testified that during his middle childhood, the ages from seven to eleven, Fulks and his brothers were, virtually, unsupervised. TT, Vol. XVIII, pp. 157-158. At age nine, Fulks, with his older brother, Ronnie, committed his first offense - he hit an elderly woman with a stick. Id. at 158. While he was in the third grade, he received his first psychological evaluation

because his teacher said that he lacked self-discipline and needed to be in a controlled environment. Id. at 159. The school staff observed that Fulks had little regard for social convention and school rules when he was not directly subject to adult supervision. Id. Fulks subsequently had a second criminal infraction - he and another child grabbed the pants of a very little girl and pulled her pants down. Id. After this incident, Fulks was referred to the mental health center. Id. at 159. Fulks and his mother went for an assessment and one other appointment, but then discontinued the counseling. Id. at 159-160. Fulks was placed in a behavioral disorder classroom. Id. at 160. According to Dr. Andrews, there were clear signs at this point that Fulks was becoming emotionally and behaviorally disturbed. Id. Fulks was bullying, showing disrespect and exhibiting other problems. According to Dr. Andrews, the persistent theme running through all of the assessments she reviewed was that Fulks needed supervision. Id. She said three people, the school principal, a police officer, and a probation officer, recommended Fulks be removed from his home because he was not receiving adequate adult supervision. Id. At 161.

Even though there was no adult supervision, according to Dr. Andrews, there was plenty of hitting and beating of the Fulks children by their father. TT, Vol. XVIII, p. 161. Fulks' father often hit him on the head very hard with his knuckles. Id. Additionally, Fulks mother sometimes walked around the house, while neighbors were present, in see-through gowns, and, on one occasion, naked. Id. at 161-162. Sometimes she completely passed out. Id. at 161. Dr. Andrews said that Fulks' mother made some attempts to care for him, like cooking and making sure he had food, but was not there emotionally, probably because she was often drunk. Id. at 162. Dr. Andrews opined that even though Fulks' mother suddenly stopped drinking because she

became "saved" when Fulks was twelve or thirteen-years-of-age, this did not help Fulks. TT, Vol. XVIII, p. 163. Dr. Andrews said that Fulks' mother was now away from home for long hours because she was at church. Id. at 164. This caused the fights between Fulks' father and mother to escalate, and Fulks' father left the home. Id.

Dr. Andrews testified that during the period of time that Fulks' mother was spending all of her time at church and his father was leaving the home, a series of problems occurred with Fulks. TT, Vol. XVIII, p. 164. In one incident, Fulks pulled a gun on an eleven-year-old boy. Id. at 164-165. Another incident involved the destruction of private property, and, another, a fight at school, during which he was injured. Id. at 165. According to Dr. Andrews, the record shows that Fulks' condition was deteriorating. Id. He was starting to fail everything in school. Id. at 166. A school psychological evaluation said Fulks had a need for attention and that he was aggressive. Id. at 164. The teacher's notes said that Fulks was a loner and not socially accepted by others. Id. at 164-165.

Dr. Andrews testified that, about a month before he turned fourteen-years-of-age, Fulks took a large quantity of acetaminophen in an apparent suicide attempt.[19] TT, Vol. XVIII, p. 166. He was unconscious and taken to the hospital. Id. A psychiatric evaluation was done and the hospital offered to admit Fulks to the adolescent treatment unit, but that Fulks did not want to be

---

[19]Fulks claims that Dr. Halleck "could have told the jury that data regarding mental illnesses, as risk factors indicate that depression, substance abuse, and severe anxiety increase the probability of suicide attempts and completions." (Amended Mot to Vacate at 52). Dr. Andrews, as discussed, herein told the jury about Fulks' depression and suicide attempt. Additionally, Dr. Becker explained that disorders like anxiety and depression, suicide attempts, and drug problems are secondary disabilities which often arise as a result of the brain dysfunction caused by FASD. TT, Vol. XVIII, pp. 146-147. Thus, jurors heard experts testify about the emtional problems Fulks experienced, the reasons for them, and the lack of any efforts by Fulks' parents to remedy them.

admitted and his mother did not place him in treatment.  Id.  After his parents were divorced, Fulks was required to move to Indiana to live with his father and his step-mother.  TT, Vol. XVIII, p. 167.  Dr. Andrews said that by this point in his life, Fulks was drinking alcohol, smoking marijuana, and huffing gas on "a very regular basis."  Id. at 168.  After threatening others on the school bus, Fulks was suspended from school.  Id. at 168.  The school psychologist noted that Fulks had been molested by an older man and that he had a sociopathic pattern.  Id.  The school psychologist referred Fulks for a psychiatric evaluation.  Id. .

Dr. Andrews testified that Fulks' father went with him to the psychiatric evaluation.  TT, Vol. XVIII, pp. 168-169.  The psychiatrist diagnosed Fulks as suffering from major depression and prescribed an antidepressant.  Id. at 169.  The psychiatrist noted that Fulks was very needy and distant, and indicated that there was a danger Fulks could develop an addictive disorder and sociopathic traits.  Id.   However, there is no record that there was any follow-up care, and the trouble continued.  Id. at 170. Dr. Andrews said that after Fulks started high school, he quickly got into trouble for setting fire to a wooden plaque hanging on a school wall.  TT, Vol. XVIII, p. 170.  As a result, Fulks was charged with arson, referred for alcohol and drug counseling, and sent to a group home.  Id.  About this time, at age fifteen, Fulks began living with a woman in her late twenties.  Id., at 170-171.  He never returned home permanently, but was in group homes, incarcerated, or staying with different family members.

After Dr. Andrews told the jury about Fulks' miserable early life, she explained the significance of these experiences.  She said the major theme of Fulks' early life was chaos - there was no stability in his life, very little consistency, and very little predictability.  TT, Vol. XVIII, p. 172.  Dr. Andrews explained that consistency is important to social development because the

ability to predict how another person is going to act is the key to developing healthy social relationships.  Id. at 172.  She further elucidated that, during healthy child development, certain responses from parents are predictable:  if a baby cries, a parent responds, if the child falls down, a parent will comfort it, if the baby is hungry, food will be provided, if he is sad, someone hugs him, if a child does something good, he receives praise.  Id.  She contrasted: if Fulks cried when his parents were fighting, he was ignored; if he was hungry, he had to find his own food;  if he was sad, he hid;  if he did something good, no one seemed to notice;  if he did something bad, sometimes people noticed and punished him, sometimes people noticed and didn't do anything; and, "sometimes, just because you are in the wrong place at the wrong time, you got punished, even though you hadn't done anything bad."  Dr. Andrews concluded that such chaos makes a child very insecure and confused.  Id. at 173.

Dr. Andrews explained the debilitating effect on Fulks of having two alcoholic parents. TT, Vol. XVIII, p. 173.  She explained that they do not learn about the things a responsible parent teaches children:

> They don't want responsibility, they don't want respect for [sic] others, they don't learn to solve problems well.  They don't learn to effectively communicate their needs or feelings.  They don't learn impulse control. They don't learn to have hopes and aspirations for the future.  They live day-by-day, sometimes hour-by-hour.  And they don't learn to cope with difficult situations with stress or trauma in their lives.

Dr. Andrews stressed that Fulks' family environment created a large amount of anxiety for him. Id. at 176.  She explained that his parents were emotionally unavailable, and that he yearned to be with his mother, but that she hit him a lot.  Dr. Andrews talked to the jury about the effect of Fulks' exposure to the violence between his parents.  She described it as "profound," "constant," and "extreme."  TT, Vol. XVIII, p. 179.  She said that when boys are exposed to men beating

women, they, initially, feel powerless.  Id.  Dr. Andrews said that in Fulks' case he also felt dependant, since his mother sometimes took them to shelters to escape the violence, but, she added, he also learned that force is the way men control women.  Id.   She opined that Fulks never learned to control his anger because his parents never controlled their anger, or because he learned from his parents that violence is an acceptable way to deal with problems.  Dr. Andrews added, Fulks' low self-esteem and depression are the effects of his exposure to domestic violence.  Id.  Dr. Andrews concluded that Fulks was bombarded with multiple stressors and severely deprived of emotional attention, and he did not have the resiliency or intellect to handle them, so he turned to alcohol, drugs and other negative behavior to cope with the anxiety.  Id. at 185-187.

### c.  Borderline Intellectual Ability

In addition to incorrectly claiming that his experts did not inform jurors about his emotional problems and substance abuse, Fulks claims that he needed Dr. Hilkey's and Dr. Melikian's testimony to explain his borderline range of intelligence (Amended Mot. to Vacate at 50-51).  However, Fulks' experts at trial fully explained Fulks' low I.Q.  Dr. Evans testified that Fulks suffers from borderline intelligence, ranging from 75-79, moderate brain impairment, and cognitive impairment.  TT, Vol. XVII, 10, 13.   Dr. Gur explained that Fulks "is clearly not a bright individual."  TT, Vol. XII, p. 139.  He further discussed the significance of  Fulks' I.Q. tests: "That one number, when you do it with Mr. Fulks, comes up on the borderline, slightly above the cut of retardation.  But a lot of the measures that go into that fruit salad [that make up I.Q.] are below that, well below that threshold."  Id.   Countering the Government's suggestion that Fulks' was intentionally under-performing on his intelligence test, defense counsel presented

testimony by Dr. Bookstein that certain parts of Fulks' brain were missing, underdeveloped, or abnormal, and that those types of physical manifestations correlated with those of patients in his studies involving FAS, who also had I.Q. deficits. TT, Vol. XVIII, pp. 104-106. Dr. Bookstein also testified that having an I.Q. above 70, as opposed to a lower I.Q., actually makes people with brain damage from prenatal exposure more susceptible to breaking the law, being unemployable, being kicked out of school, and other problems. Id. at 124.

### d. Sexual Trauma

Fulks complains that the jury never appreciated the sexual trauma he experienced as a child. (Amended Mot. to Vacate at 58.) Dr. Andrews and other witnesses testified about the pornographic photographs and videos constantly on display in Fulks' home during his childhood. Dr. Andrews also presented information, which appeared to have some credible basis, that Fulks was molested by an older man when he was a child, and that he had a sexual relationship with a woman in her twenties when he was fifteen-years-old. The additional information which Fulks claims should have been presented is inherently unreliable.

Fulks complains that no picture was painted of him allegedly sitting on his father's lap begging him to stop rubbing his groin and thighs. (Amended Mot. to Vacate at 59.) As the testimony would have been hearsay, it is unlikely the Court would have allowed it. According to the affidavit of Monica Wolowinski, Ronnie Fulks provided this information, yet Ronnie Fulks' affidavit does not mention the incident. Fulks also complains that "no one painted a picture of a teenage babysitter pulling down the pants of an eight-year old Chad and performing fellatio." Id. It appears that the source of this information was Fulks, himself, when he was being interviewed by Dr. Halleck. Declr. at ¶ 19. This self-serving, self-provided report by a defendant who lacked

credibility and had a motive to lie would likely have done little more than disgust jurors.  Yet

Fulks argues that this information should have been presented at his trial to enable Dr. Seymour

Halleck to testify that these types of childhood experiences could lead to an increased likelihood

of aberrant sexual activity, including violent sexuality such as rape.   (Amended Mot. to Vacate

at 60.)  As discussed below, such expert testimony would have conflicted with the themes of

Fulks' defense, and would have been detrimental to his defense, since it would have tended to

show Fulks, contrary to his statement, intended to kidnap and violently sexually assault

Samantha Burns and Alice Donovan.

> **B.** **Much of the opinions of the experts not presented would have been detrimental and was in conflict with the themes of Fulks' defense.**

The Fourth Circuit has observed that psychological evidence is a "double-edged sword."

See Byram v. Ozmint, 339 F.3d 203, 210 (4th Cir. 2003)(counsel were not ineffective for failing

to present testimony by a psychiatrist and a psychologist because the suggestions of antisocial

behavior which the experts found could have been harmful to the defense); see also Grayson v.

Thompson, 257 F.3d 1194, 257 F.3d 1194 (11th Cir. 2001)(emphasizing defendant's alcoholic

youth and intoxication may have been damaging to the defendant in the eyes of the jurors).  The

Seventh Circuit has noted that "evidence of a rough life, deprived childhood, or mental instability

does not necessarily make it less likely the death sentence will be imposed," and that "facts that

show a defendant has a condition or proclivity toward violence are often aggravating, not

redeeming or mitigating factors."  St. Pierre v. Walls, 297 F.3d 617, 633 (7th Cir. 2002).  Fulks'

trial counsel have recognized this problem and have instructed in a recent law review article:

**"[A]ny witness whose testimony creates fear of the defendant - even if it is in some other**

**way favorable - must be viewed very skeptically."** John H. Blume, Sheri Lynn Johnson &

Scott E. Sunby, Supplementary Guidelines for the Mitigation Function of Defense Teams in

Death Penalty Cases, Presenting Mitigation, <u>Competent Capital Representation: The Necessity of

Knowing and Heeding What Jurors Tell Us About Mitigation</u>, 36 Hofstra L. Rev. 1035, 1052

(2008)(emphasis added).

**1.      Fulks' trial counsel pursued a reasonable trial strategy which would have been undermined by expert testimony that Fulks' antisocial personality disorder, drug use and early experiences pre-disposed him to homicidal thoughts, aggressiveness, deceitfulness, manipulativeness, violent sexuality, and lack of remorse.**

Strategies devised after extensively investigating the law and facts relevant to any and all

probable options are virtually unchallengeable.  <u>Bell v. Evatt</u>  72 F.3d 421, 429 (4th Cir.

1995)(citing <u>Strickland</u>, 466 U.S. at 690.)  A reviewing court may not permit the benefit of

hindsight to impact its review. <u>Id.</u> (citing <u>Strickland</u>, 466 U.S. at 689;  <u>Lockhart v. Fretwell</u>, 506

U.S. 364  (1993)). A decision not to present a particular defense or not to offer particular

mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to discover

the facts that might be relevant to making an informed decision. <u>Wiggins v. Smith</u>, 539 U.S. 510,

522-23 (2003).  To succeed in an ineffective assistance of counsel claim, a defendant must

overcome the presumption that the challenged action may be considered an appropriate and

necessary trial strategy under the circumstances.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Smith v. Moore</u>, 137 F.3d 808, 817

(4th Cir. 1998) (counsel were not ineffective for making a strategic decision not to present

evidence that defendant had a non-violent character, since it would have allowed the state to

introduce damaging evidence to the contrary).   Once trial counsel has thoroughly investigated

potential mitigating evidence, how counsel decides to use the evidence is a strategic decision.

See Cagle v. Branker, 520 F.3d 320, 328 (4th Cir. 2008).

Trial counsel made a strategic decision not to call some experts. See Fulks' Appellate Br. at 62 (trial counsel did not call some experts due to the Court's decision to allow the testimony of Donna Ward). While the Government finds suspect the proffered reason as to why counsel did not call certain experts, the decision was, nonetheless, a reasonable strategic decision. A theme of Fulks' defense was that Basham was the one who "lured" the victims, was the more violent of the two, and was the one who actually killed two of the victims.[20] Fulks' Appellate Br. at 60. The diagnosis and explanation of Fulks' antisocial personality disorder, as discussed below, plus testimony regarding his aggressiveness and homicidal thoughts, coming on the heels of testimony tending to show that Fulks planned and attempted to lure another victim without the help of Basham, may well have been damning, as it would have diminished defense counsels' theory that Basham was the instigator of the crimes.

It is clear from the affidavits Fulks attached to his § 2255 petition that trial counsel carefully investigated and considered all possible mitigation evidence before making a strategic decision not to present the testimony of Drs. Halleck, Morton, Melikian, and Hilkey. Three of the experts stated that Fulks' trial counsel asked them to assess Fulks for cognitive impairment and mental illness in connection with presenting mitigating circumstances at trial. Declrs. of Seymour L. Halleck at ¶ 7, Margaret Melikian at ¶ 4, James H. Hilkey at ¶ 5. Dr. Hilkey states that he spent approximately fourteen hours directly examining and testing Fulks. These experts indicate that Fulks' counsel decided not to call them to testify after the Court allowed Donna

---

[20] "According to Fulks, his trial strategy was twofold: to cast Basham as the instigator and sole murderer, and to present a strong case of mitigation based on Fulks' mental problems and troubled childhood." United States v. Fulks, 454 F.3d 410, 426 (4th Cir. 2006).

Ward to testify, but that Ward's testimony would not have changed their opinions.  Declrs. of

Halleck at ¶ 32, Melikian at ¶¶ 4, 16, Hilkey at ¶ 22, Morton at ¶ 20.  Whether the experts not

called would have changed their opinions regarding Fulks is of no consequence to the question of

whether Fulks received effective assistance of counsel under the Sixth Amendment.  The

pertinent question is, under the first <u>Strickland</u> prong, whether trial counsels' decision not to

present the testimony of certain experts may be considered an appropriate and necessary trial

strategy under the circumstances.

Fulks complains that the jurors did not hear from mental health experts how "[h]eavy

methamphetamine use, such as the kind Petitioner participated in after escaping from Hopkins

County, can lead to confusion, paranoia, hallucinations, and **homicidal thoughts**."  (Amended

Mot. to Vacate at 42, emphasis provided.)  Fulks asserts: "Had the jury known about the

impulsiveness, irritability, **aggressiveness**, anxiousness, restlessness, paranoia, and delusional

thinking associated with Petitioner's drug use, which could ultimately result in **homicidal** and/or

suicidal **thoughts**, they could have understood the events **leading to the death of Alice**

**Donovan**."  (Amended Mot. to Vacate at 57.)  He claims Professor Morton should have been

called to testify because he would have provided the jury with the helpful information that "[t]he

<u>paranoia often associated with methamphetamine use can result in **homicidal** as well as suicidal</u>

<u>**thoughts**</u>." (Amended Mot. to Vacate at 57, quoting the Declaration of Professor Morton,

(emphasis added).  Fulks further quotes a part of  Dr. Morton's Declaration summing up the

effects of the drugs Fulks was using during the time he participated in the kidnapping, rape, and

killing of Samantha Burns and Alice Donovan:

There is a **high likelihood** that a person using methamphetamine and/or other stimulants **will inflict damage on himself or others**. Because of his history of use and use of methamphetamine in November, 2002, Chad Fulks most probably experienced one or more of the following: impulsiveness, irritability, **aggressiveness**, anxiousness, restlessness, paranoia, and delusional thinking.

(Amended Mot. To Vacate at 58.) These statements, stressing the homicidal thoughts and aggressiveness that Fulks experienced prior to the murder of Alice Donovan would suggest that Fulks, not Basham, was the killer[21]. Such testimony would not have synchronized with the major theme of his defense and would have made defense counsel appear disingenuous.

Dr. Halleck's testimony, like Dr. Morton's, would have been contrary to Fulks' defense strategy . Dr. Halleck determined that Fulks' experiences at a young age could lead to "an increased likelihood of aberrant sexual activity in the future, including **violent sexuality such as rape**. Rape is an act of violence and anger toward women. Because Mr. Fulks' mother failed to provide a nurturing environment and deprived him of the necessities of life, **anger toward women** was a probable result." Declr. of Seymour L. Halleck, ¶ 19. Testimony that Fulks was predisposed to "violent sexuality such as rape" would not have supported his claim that he did not want to rape Alice Donovan, but felt pressured to do so by Basham. Worse yet, it would have tended to show that Fulks had a motive to kidnap Samantha Burns and Alice Donovan.

The prosecution would have welcomed Dr. Halleck's testimony because, in addition to supporting the prosecution's argument that Fulks was an equal participant with Basham in the murders, it would have supported the prosecution's theory that almost everything Fulks said was

---

[21]The testimony of these experts may have been appropriate had Bulks' strategy been to admit that he actually killed Samantha Burns and Alice Donovan, but to claim that because of his mental and substance abuse problems, he could not control his actions. However, Fulks has provided nothing to show that such a strategy would have been more effective. Furthermore, he has failed to show that his trial counsels' strategy was unreasonable.

a self-serving lie,  that he was highly manipulative, using other people for his own selfish interests, and that he had no remorse for his role in the murders of Alice Donovan and Samantha Burns.  For example, Dr. Halleck's Declaration, states that Fulks "meets the DSM IV criteria for **antisocial personality disorder**," and that "[t]he diagnosis of antisocial personality disorder is based on a description of bad behavior: failure to conform to social norms, **deceitfulness**, impulsivity or failure to plan ahead, irritability and **aggressiveness**, reckless disregard for safety of self and others, consistent irresponsibility, and **lack of remorse**."[22]  Declr. of Seymour L. Halleck, ¶ 30.  Dr. Melikian concurs, stating: "Mr. Fulks meets the diagnostic criteria for Axis II diagnosis of **Anti-Social Personality Disorder**.  Anti-Social Personalty is a condition characterized by a **persistent disregard for, and violation of, the rights of others** that begins in childhood or early adolescence and continues into adulthood.[23]  **Deceit and manipulation are central features of this disorder."** Dclr. of Margaret Melikian, ¶ 12.   An article written by trial defense counsel John Blume explains why he would not have wanted the diagnoses by Drs. Halleck and Melikian to be presented to jurors: "This [diagnosis of antisocial personality disorder] can be the kiss of death, because to many people, and most judges, this means that the defendant is little more than a remorseless sociopath."  John H. Blume and David P. Voisin, Avoiding or Challenging a Diagnosis of Antisocial Personal Disorder, 24 APR Champ 69 (2000).  Blume's article explains that the prosecution will use the diagnosis of antisocial

---

[22]  Dr. Halleck also explains that the jury needs to understand the causes of an antisocial personality, apparently believing such an explanation will make jurors more understanding of a criminal's bad acts.

[23]  Dr. Hilkey, however, disagreed with the diagnoses of his colleagues, finding that Fulks "did not present with indicators of Antisocial Personality Disorder on objective personalty testing."  Declr. of James H. Hilkey, ¶ 17.

personality disorder to argue to the jury that the defendant's life should not be spared because he is dangerous and evil and will commit future acts of violence.

Fulks' claim that trial counsel were ineffective because they did not call additional experts to testify that he suffers from antisocial personality disorder, characterized by deceit and manipulation of others, and that his substance abuse caused homicidal thoughts is similar to the claim of the petitioner in Poyner v. Murray, 964 F.2d 1404 (4th Cir. 1992). In that case, the petitioner argued that his counsel should have presented the testimony of a psychiatrist whose affidavit stated that the petitioner should have been tested to determine if he fit into one of the categories of "serial killers." These categories included "psychopathic sexual sadists," whose members are characterized by the "repeated intentional infliction of psychological or physical suffering in order to produce sexual excitement," and "crime spree killers," who kill repeatedly during a series of crimes motivated by the search for excitement, money, and valuables. Id. at 1417. The petitioner in Poyner theorized that had his psychiatrists and counsel presented such expert testimony, the jury might have believed that he was driven by a motive other than the simple expediency of preventing his robbery victims from identifying him. Id. at 1418. Similarly, Fulks appears to assert that trial counsel should have presented the testimony of other witnesses because they could have explained to the jury that Fulks' mental disorders drove him to kill Alice Donovan and Samantha Burns.

Like Fulks, the petitioner in Poyner proposed to present expert testimony which would have been counter to the strategy pursued by trial counsel. Trial counsel in Poyner used psychological evidence uncovered by their experts, to the extent that they thought it would be helpful, in pursuing a trial strategy aimed at showing that the petitioner was generally a good