person who had been beset by legal, social, and emotional problems throughout his life, finally causing him to explode into violence. Id. at 1419. Fulks' counsel pursued a strategy designed to convince jurors that Basham did the killing and that Fulks' damaged brain, together with his warped childhood, mitigated his lesser role in the killings. Fulks' Appellate Br. at 34-35. Just as in Poyner, testimony by a psychiatrist suggesting Poyner was a "serial killer" compelled by psychological deviancies would not have fit into trial counsel's strategy of showing that Poyner was generally a good person who snapped under the pressures of a very difficult life; expert testimony that Fulks was deceitful, manipulative, and had homicidal thoughts would not have fit into his trial counsels' strategy of showing that Basham, not Fulks, killed Alice Donovan, and that Fulks was a pathetic dupe, who was afraid of and controlled by Basham.

This Court in Fulks' case should reach the same conclusion the Fourth Circuit reached in the Poyner case: given trial counsels' tactical decisions as to the best way to build a case in mitigation, it is not clear that a decision to delve more deeply into "the risky realm of psychological mitigation evidence" would likely have resulted in a different outcome. Id. The mere fact that "a line of defense was not drawn as set out in [the non-testifying expert's] affidavit does not constitute ineffective representation." Id. at 1420.

### 2. Testimony by experts not called to testify may have opened the door for the prosecution to present evidence regarding child abuse by Fulks.

In addition to being contrary to Fulks' trial strategy, Dr. Halleck's Declaration suggests he would have opened the door for the prosecution to destroy what little hope Fulks may have had to avoid the death penalty. When evaluating the prejudice prong of a claim of ineffective assistance of counsel, a court may consider all aspects of the evidence proffered by a petitioner.

51

Huffington v. Nuth, 140 F.3d 572, 578 (4th Cir. 1998). In Whitley v. Bair, 802 F.2d 1487,1492

(4th Cir. 1986), the petitioner complained that he had received ineffective assistance of counsel

because his counsel, during the sentencing phase of his trial, had not investigated and presented

evidence of the petitioner's tragic childhood and of his organic brain dysfunction and antisocial

personality disorder. The Fourth Circuit observed that in addition to the potentially mitigating

information the potential witness could have provided about the defendant's background, her

testimony could also have included very damaging information regarding the defendant's prior

abuse of elderly women. Id. at 1494-95. The court also found that the mitigating effect of

evidence regarding the petitioner's organic brain dysfunction and his antisocial personality

disorder would have been far outweighed by the negative information that would have

accompanied it, including evidence of his sadistic behavior patterns, evidence of his conviction

for rape of a male hitchhiker, allegations of rape of his mother and sexual misconduct with his

eleven-year-old stepdaughter.

Had trial counsel called Dr. Halleck to testify to the findings he has proffered in his

Declaration, the jury may well have heard and seen evidence regarding Fulks' alleged abuse of

his stepson. Dr. Halleck's Declaration states that Fulks' wife, Amber Fowler, gave birth to a

child named "Devon," whom Fulks considered as his son. Declr. at ¶ 21. Fulks told Dr. Halleck

that the child died when he was six-months-old from blunt trauma to his abdomen when his

cousin jumped on him. Id. According to Dr. Halleck, Fulks was extremely distressed at the loss

of Devon, and that there may have been long-term effects of this loss, including an increasing use

of alcohol and drugs. Dr. Halleck states that Fulks was very fond of the son of his second wife,

Veronica Evans, and that he tried to recapture the relationship with Evans son, Myles, that he had

lost with the death of Devon. Id.

Testimony by Dr. Halleck regarding Fulks' alleged fondness for Devon and Myles, would have likely "opened the door" to allow the prosecution to present evidence the Court did not allow regarding Fulks' abuse of Veronica Evans' three-year-old child, by striking him in the testicles and burning him in the genital area, causing bruising on the child's back and leaving a choke mark on his neck. Presentence Investigation Report (PSR) at 29. Had Fulks not escaped from Hopkins County Jail on November 4, 2002, he would have been arraigned for this crime on November 13, 2002. Id. The Government had photographs of Myles Evans' neck, face, and groin that it was prepared to submit as evidence. This Court had granted a Motion in Limine to Prohibit Evidence of the Abuse of Myles Evans by Fulks' trial counsel. TT, Vol. II, pp. 8-9. This evidence would have been extremely damaging to Fulks' case and would have outweighed any evidence in mitigation.

As most of the truly mitigating evidence, including evidence of cognitive impairment, drug addiction, depression, low I.Q., and neglectful and abusive parents, was presented by experts at trial, there was no prejudice to Petitioner due to trial counsels' decision not to present the testimony of Halleck, Melikian, Morton, and Hilkey, since much of the testimony they would have provided would have been cumulative, and parts of their assessments would have damaged Fulks' case.

A review of the expert testimony can result in only one conclusion - Fulks' trial counsel, using expert testimony, presented a powerful case in mitigation. Unfortunately for Fulks, even this powerful testimony was not enough to overcome the cruelty, brutality, and heinousness of the crimes.

**C.** **Connecting behavior to observable physical evidence was logical, since Fulks had previously tried to fake symptoms of psychological disorders.**

Defense counsel had an opportunity to observe the jury first-hand for three weeks prior to presenting its case, so trial counsel, better than anyone reviewing the case afterward, understood what kind of testimony might or might not impact the jurors' decision. Choosing to emphasize the behaviors related to Fulks' brain damage evidenced by his CAT scan, PET scan, and EEG was a reasonable choice, as the results of those diagnostic tools cannot be faked. The prosecution could not argue with or contest the black spaces on CAT scans, which experts testified were areas showing fluid where brain cells should have been. However, prosecution attorneys could and did challenge subjective observations by the experts, referencing past attempts by Fulks to fake symptoms. Highly experienced and skillful prosecution attorneys took advantage of every opportunity to challenge the bases of opinions by expert witnesses. They pointed out that while Fulks was at Columbia Care, the medical detention facility, doctors, nurses, and security staff had observed Fulks requiring the use of a wheelchair, requiring the assistance of a wall when he was walking, and making facial expressions indicative of pain. TT, Vol. XVIII, p. 43. Yet, when he became involved in a physical altercation, five "rather large" security guards were required to restrain him. Id. More defense experts, while adding little, if any, new mitigation information, would have provided more opportunities and opened more doors for cross examination and more damaging information.

**D.** **The facts of the cases Fulks discusses to support his claims are significantly different from the facts of Fulks' case.**

Fulks offers several cases to support his contention that the Court should vacate his death penalty based on his claim that his trial counsel were ineffective for failing to present a

54

meaningful mental health case in mitigation. (Amended Mot. to Vacate at 29.) These cases differ from Fulks' case and do not support his claim.

For instance, Fulks asserts that <u>Gray v. Branker</u>, 529 F.3d 220 (4th Cir. 2008), is instructive. (Amended Mot. to Vacate at 31.) However, there are significant differences between the current case and <u>Gray</u>. Neither of Gray's attorneys had handled a capital case. <u>Id.</u> at 225-226. The performance inquiry pursuant to <u>Strickland</u> centered on the nature of counsel's duty to investigate mitigating evidence for sentencing in a capital case. 529 F.3d at 229. From the very beginning of Gray's case, his attorneys discounted any information regarding his mental condition. <u>Id.</u> at 225. They never discussed with each other the possibility of presenting mental health evidence, even though they were aware of information indicating Gray suffered from mental illness. <u>Id.</u> at 225-226. At trial, the defense attorneys presented no mental health evidence. <u>Id.</u> at 226. The presentation of evidence during the sentencing phase of the trial required less than a day. <u>Id.</u> Six character witnesses testified for Gray. However, even though Gray's counsel had been confronted repeatedly with indications of Gray's mental illness, **Gray's counsel introduced no mental health evidence** through either lay or expert testimony. <u>Id.</u> at 227, 229. The Fourth Circuit found that there was no indication that Gray's counsel understood that such evidence could be an important factor in the jury's determination at sentencing. <u>Id.</u> at 231. The Fourth Circuit concluded: "We simply recognize the inescapable fact that defense counsel made *no* strategic choices about whether to introduce mental health evidence because they failed to undertake a reasonable investigation in that area, notwithstanding the clear indications that such an investigation was warranted." <u>Id.</u> at 233.

55

Similarly, in <u>Belmontes v. Ayers</u>, 528 F.3d 834, 859 (2008), quoted extensively by Fulks, trial counsel failed to consult with experts and investigate mitigating evidence for the penalty phase. Even though counsel had hired a mental health expert to evaluate the defendant for the guilt phase, he did not ask this expert to comment on any issues relevant to the penalty phase. Nor did Belmontes' counsel consult with any other psychiatrist or psychologist regarding the possibility of developing mitigating evidence relating to Belmontes' troubled youth or mental state. <u>Id.</u>

Fulks apparently did not closely read the case he describes as presenting "a scenario of ineffectiveness and prejudice very similar to what Mr. Fulks experienced" - <u>Smith v. Mullin</u>, 379 F.3d 919 (10th Cir. 2004). In that case, trial counsel "was unaware Mr. Smith's 'mental state or mental illness could be introduced as mitigation in the [penalty] stage' of trial." <u>Id.</u> at 939. Smith's trial counsel had never been involved in death-penalty litigation, had never attended any seminars or continuing legal education courses dedicated to capital defense, and had never even handled a case in which psychiatric issues were presented. <u>Id.</u>

Fulks' trial counsel were the polar opposite of the defense counsel in <u>Smith v. Mullin</u>. Fulks' counsel have not only litigated other death-penalty cases; they have taught law students and attorneys how to present effective cases in mitigation. John Blume and Sheri Lynn Johnson are law professors at Cornell University Law School. Blume is Director of the Cornell Death Penalty Project, which was formed to foster empirical scholarship on the death penalty. Exhibit A. He teaches criminal procedure, evidence and "the Death Penalty in America," and supervises several capital clinics. Johnson is the Assistant Director of the Cornell Death Penalty Project. Exhibit B. She teaches constitutional and criminal law and supervises post-conviction litigation

and capital trial clinics. Blume and Johnson have authored numerous law journal articles regarding death penalty litigation. They are well-aware of the need for expert witnesses when presenting a case in mitigation during capital litigation. They have instructed other attorneys: "First, the defense team must secure appropriate expert assistance, primarily from mental health experts." John H. Blume, Sheri Lynn Johnson & Scott E. Sunby, Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation, 36 Hofstra L. Rev. 1035, 1041 (2008). Additionally, Assistant Federal Public Defender Bill Nettles is an experienced federal court criminal defense lawyer with over twenty years experience.

In stark contrast to the cases cited by Fulks, his counsel consulted with ten experts with specialized knowledge in psychology, psychiatry, and pharmacology. Most of these experts spent significant amounts of time evaluating Fulks' mental health. In addition, psychologist/social worker Arlene Andrews interviewed family members and others who could provide information regarding Fulks' upbringing. TT, Vol. XVIII, pp. 137-138. As discussed above, Fulks' counsel decided to use six of the experts whose testimony supported Fulks' defense strategy. Thus, the case presented by Fulks' counsel more than satisfies the performance prong of Strickland.

## Response to Claim II

**Fulks was not prejudiced by counsels' failure to anticipate testimony by Donna Ward and Jeff Bruning.**

Fulks complains that his trial counsel were ineffective for failing to recognize that Donna Ward and Jeff Bruning could have been called as rebuttal witnesses by the prosecution.

(Amended Mot. to Vacate at 66.) He claims that he was prejudiced by this lack of knowledge on the part of his counsel because they decided not to present testimony by some experts as a result of the testimony by Ward and Bruning. Id. at 69.

Trial counsel should not be found to be ineffective for failing to anticipate the unexpected. See Dutton v. Brown, 812 F.2d 593, 598 (10th Cir. 1987)(counsel who did not anticipate the trial court's sua sponte exclusion of an important defense witness was not ineffective). "A perfect lawyer might have anticipated what happened, but there are no perfect lawyers." Ramos v. McNeil, 5:06cv48, 2009 WL 36599, 15 (N.D.Fla.Jan. 5, 2009)(trial counsel was not ineffective for failing to anticipate prosecution and trial scene animation). Fulks' counsel presented a logically cohesive case on Fulks' behalf and counsel's failure to anticipate the testimony by Ward and Bruning did not prejudice Fulks' case.

Trial counsel could not say with certainty that they would have pursued a different strategy had they been aware Ms. Ward and Agent Bruning would be called as witnesses. Fulks'Appellate Br. at 48.    Fulks' trial counsel structured its case around two themes: "first, that Basham, rather than [Fulks] killed both victims: and second, that [Fulks'] damaged brain together with his warped childhood, mitigated his lesser role in those crimes." Fulks' Appellate Br. at 34-35. The Fourth Circuit has recognized: "It is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Meyer v. Branker, 506 F.3d 358, 371 (4th Cir. 2007). This standard is necessary to avoid second-guessing of "perfectly reasonable judgments," and to "eliminate the distorting effects of hindsight" after an adverse decision. Id. (citing Strickland, 466 U.S. at 689.) Fulks' trial counsel stated that their decision to

structure Fulks' defense around two themes was a "plausible strategy" "given the discovery counsel had obtained before the trial, and the witness list supplied by the government prior to trial." Fulks' Appellant's Br. at 35. As discussed above, the testimony of the experts not called would have been counter to themes of Fulks' trial strategy. While trial counsel may not have anticipated the testimony of Ms. Ward and Agent Bruning, counsel used their testimony to support their strategy that Fulks' mental capabilities were so limited by his damaged brain that he was easily manipulated by Basham. At closing, trial counsel argued:

> But, let's assume for the sake of argument, that Chad was trying to lure Amy Ward. Does it prove how limited and stupid he is? You tell them that they have applied for a job at a hardware store where they know they didn't apply, their child didn't apply, they want to meet you at 10:30 at night for a job interview? . . . you have to be brain damaged to even say it.

TT, Vol XXI, p. 153. Fulks' trial counsel turned testimony by the Government's witnesses into support for Fulks' case. Consequently, even if defense counsel may have failed to anticipate the testimony of Donna Ward and Jeff Bruning, any failure did not diminish or prejudice Fulks' case.

### Response to Claim III

**Witnesses provided a detailed view of Fulks' early life.**

Fulks next claims that his trial counsel were ineffective for failing to undertake an adequate and meaningful mitigation investigation painting an empathetic and accurate picture of his life. (Amended Mot. to Vacate at 70.) He argues that trial counsel's representation was unreasonable because counsel did not conduct an investigation whereby the jury could have "walked in Petitioner's shoes" from the time of his birth until he walked into the courtroom. Id. at 73. It is the responsibility of counsel to adequately investigate and present evidence in mitigation of guilt. Byram v. Ozmint, 339 F.3d 203, 209 -210 (4th Cir. 2003). However, counsel

59

is only required to make a reasonable investigation for possible mitigating evidence. Id. (citing

Matthews v. Evatt, 105 F.3d 907, 919 (4th Cir.1997)). Moreover, review of counsel's strategic

decisions as to which evidence to present at trial is "highly deferential," and there is a

presumption that "counsel's conduct falls within the wide range of reasonable professional

assistance." Id. (citing Strickland, 466 U.S. at 689). The standard of prejudice set out in

Strickland requires more than a mere possibility that the allegedly deficient performance may

have prejudiced the defendant in some way. Poyner v. Murray, 964 F.2d 1404, 1420-1421 (4th

Cir. 1992). To the contrary, the constitutional guarantee of effective assistance of counsel is

violated only when an attorney's unprofessional errors were of such magnitude as to create a

reasonable probability that the outcome of the proceeding in question would have been different.

Id. Trial counsel's failure to present merely cumulative mitigating evidence does not prejudice

a defendant's case. Buckner v. Polk, 453 F.3d 195, 206 (4th Cir. 2006).

A.    **Testimony Fulks claims should have been presented would have lacked credibility or would have been cumulative.**

As discussed above, Dr. Andrews presented a detailed and compelling view of Fulks'

early life. Fulks references several declarations which provide the same information which was

presented at his trial, add nothing of significance, or contain unreliable and unverified hearsay.

For instance, one of the people Fulks claims should have been called as a witness is Monica

Wolowinski. (Amended Mot. to Vacate, Doc. 13.) Fulks twice states Wolowinski had seen him

"sleeping under bridges." (Amended Mot. To Vacate at 74, 83.) Ms. Wolowinski's Declaration

does not make that statement. She states that she had seen Fulks sleeping under trees, which is

hardly an unusual activity for a child. Fulks asserts that Ms. Wolowinski could have testified

that his mother did not care that he was gone from his home for extended periods, that he was often hungry, that the residence was filthy, and that his mother cursed at him and hit him. Id. Such testimony would have been cumulative, as other witnesses, most with a much better opportunity to observe the conditions of Fulks' life, testified, as discussed below, to all of these horrendous conditions.

Other witnesses Fulks claims should have been called would have also provided mostly cumulative testimony about the filthy living conditions, the household violence, the verbal abuse, the use of alcohol and marijuana in the house, and the pornography to which Fulks was continuously exposed as a young child. New, non-hearsay information would have included testimony by Nathan Fulks that the parents of Fulks did not change the children's diapers, that Fulks' father ran "sex trains" on women, and that he once observed that Fulks' shirt was sticking to his back due to dried-up blood, presumably due to injuries inflicted by his parents (Amended Mot. to Vacate, Doc. 18); and testimony by Christina Kirkman that she was raped by Fulks' uncle and that when she was spending the night with Fulks' sister, Fulks' brothers came into their room and fondled them and attempted to remove their underwear (Amended Mot. to Vacate, Doc. 40). Some of these revelations are not relevant to Fulks. None of them would have been shocking to the jurors given all of the testimony they had heard about the violent, filthy, and depraved environment in which Fulks spent the first thirteen years of his life.

Other allegations which Fulks claims the declarants should have been called to testify about include Nathan Fulks' statement that in 1989 or 1990, Fulks' father told him that an "incident" had occurred with Fulks, and that Fulks' father appeared embarrassed. Nathan Fulks states that "some years later" he learned that Fulks had been sexually abused by a man.

61

(Amended Mot. to Vacate at 77.) The jurors heard that there had been an incident of sexual abuse by a man, so this testimony would have been cumulative. Further, such testimony by Nathan Fulks would have been hearsay. Additionally, he does not indicate when or how he became aware of the alleged incident, so Fulks may have recently informed him of it. At the time of Fulks' trial, Tracy Graybeal was not aware of the information in her Declaration. Fulks claims that he disclosed to Graybeal "a dark family secret: Petitioner's older sister had molested him when he was a small boy." Id. The problem with this revelation is that **Fulks did not make this important revelation to Graybeal until 2007** - three years **after** his trial. (Amended Mot. to Vacate, Doc. 12, ¶ 7.) The fact that Fulks apparently did not disclose this information to his counsel, or anyone else, until long after his trial raises a question regarding the veracity of Fulks' revelation to Graybeal, especially given Fulks' history of prevarication and manipulation. Further, trial counsel is not ineffective for failing to discover information from others which the defendant himself could have provided.

**B.      Fulks' counsel presented believable and touching testimony regarding Fulks' difficult childhood.**

The record clearly reveals that Fulks' trial counsel presented compelling testimony of multi-generational family neglect and abuse, which resulted in a childhood permeated with filth, violence, alcohol and substance abuse, and sexual depravity. Fulks' aunt, Gayle Beatty, told jurors about Fulks' mother's childhood in a poverty-stricken home with an alcoholic father who beat her. TT, Vol. XVI, p. 149. Ms. Beatty provided a touching first-hand look into Fulks' early childhood, and his desperation to leave his home. TT, Vol. XVI, pp. 152-159. She described the poverty in which Fulks lived, providing details that someone like Ms. Wolowinski could not

provide. For example, Ms. Beatty described going into the bathroom when she was staying at Fulks' house overnight: "I go in, and there is, literally, a hole in the floor in front of the toilet. And the toilet is moving back and forth. . . . When I looked down, you can see the basement in the hole." Id. at 152.

Ms. Beatty painted a picture of the hunger experienced by Fulks and his brothers. She told the jury about arriving at the Fulks' house early one morning when Fulks' parents were still asleep, but the children had gotten up:

> They told me they were hungry. So, we went into the kitchen, and I could only find one bowl. . . . I poured some cereal into the bowl and milk. There was a chip broke out of the top of the bowl. . . Chad was having to tilt the bowl back a little bit so the milk wouldn't pour out. Ronnie Dale was telling him to hurry because he wanted some cereal.

Id. at 154-155. Ms. Beatty humanized Fulks, and provided a picture of some sweetness that may have existed in his character at one time when she told how she took Chad and Ronnie Fulks and her two children to a gas station and gave each one of the children money to buy candy. She told the jurors: "And Chad came out, and he said, smiling, 'Aunt Gayle, I got you something.' And he has this little pair of earrings, had a tag said 99 cents on it. He said 'here, I want you to have these.' and I remember he just looked so sweet."[24] Id. at 155. Ms. Beatty told jurors that when she had taken the children with her to their grandmother's house, "I remember Chad sitting real close to me on the couch. I can remember Chad saying, 'can I go home with you?' And he asked me how many bedrooms I had. And he told me he could sleep on the couch." Id. at 156. The

---

[24] The stories about Fulks by his aunt resonate the advice his trial attorneys have given other attorneys regarding the presentation of a case in mitigation: "This process must include the gathering of 'stories' or 'vignettes' for the purpose of making the mitigation real." 36 Hofstra L. Rev. at 1040.

kind of vignettes provided by Fulks' aunt's testimony, not the hearsay and speculation found in Ms. Wolowinski's Declaration, gave the insight into Fulks' childhood that provided the greatest hope of presenting a powerful case in mitigation.

Fulks' uncle, Kevin Holbrook, gave jurors another first-hand, detail-rich view of Fulks' early life and the abuse and chaos that existed at Fulks' house. He testified that his sister, Fulks' mother, drank a lot of whiskey while she was pregnant with Fulks, and that she had been at the bars the night Fulks was born. TT, Vol. XVI, pp 129-130. He described the "bare-knuckle fist fighting" between Fulks' parents, which usually resulted in Fulks' mother having a black eye and busted lip. Id. at 132. According to Holbrook, the violence extended to the Fulks children. He saw Fulks' father hit Fulks and his brothers with his fist and, occasionally, a belt, and kick them in their butts with his foot. Id. at 135. Holbrook said the Fulks children were out on the street at all hours of the day and night. Id. at 136. Holbrook said Fulks' parents would sell their food stamps and use the money to buy beer. Id. at 134-135. According to him, their house was always "nasty," and "had rats, and mice, and roaches, and cats, and dogs, and everything." Id. at 137. Holbrook heard Fulks' parents call their children "sons-of -bitches, fuckers, mother fuckers, cocksuckers." Id. at 137-138. Holbrook told jurors: "There isn't a name they haven't been called." Id. at 138. He described the all-night parties with drinking and fighting Fulks' parents had in the basement of their house, and he recalled: "I never remember them having the kids a birthday party." Id. at 140.

Holbrook, like other witnesses, testified that the Fulks children regularly stole various items, such as televisions, bicycles, and lawn mowers, and that the parents did nothing to discourage the stealing. TT, Vol. XVI, p. 143. He recalled that the parents showed no interest in

64

the children's education and that Fulks' father had all of the children tattooed. Id. at 142. Holbrook said that Fulks' father liked to watch pornographic movies, and that he thought it was funny to let the children watch the pornographic movies. Id. at 141.

Another uncle of Fulks, Mark Fulks, told jurors that 90 percent of the time he saw Fulks' parents, they were drinking, and that they were alcoholics. TT, Vol. XVI, pp. 160-161. He said that he had seen Fulks' mother passed out several times, sometimes partially clothed. Id. at 162. He testified that Fulks' parents, in addition to fighting with their fists, also threw things at each other, and that Fulks' mother had once pulled out a shotgun and pointed it at Fulks' father's face. Id. at 163. Mark Fulks also talked about the physical and verbal abuse of the Fulks children by their parents, the filthy, bug-infested house, and the lack of food in the house. Id. at 168-169. He said he had seen Fulks' father hit him in his head and the middle of his back, and had seen him throw things at him. Id. at 167.

Brian Messinger, who lived in the Fulks' house for approximately six months when Fulks was about eleven-years-old, also testified to the deplorable condition of the Fulks' household. TT, Vol. XVI, pp. 211-214. He told jurors that the children were totally unsupervised, doing whatever they wanted to do, and that the parents thought it was funny when the children stole or got into trouble with law enforcement. Id. Messinger said the Fulks boys slept anywhere they could find - in their parents' bedroom, on the couch, on the floor. Id. at 213. He recalled that one of the boys, probably Chad Fulks, said he wanted to kill himself. Id. at 217.

Lorie Messinger testified that she dated Fulks' brother, Dewayne, when she was twelve or thirteen. TT, Vol. XVI, p. 223. She said the Fulks boys fought with each other and anybody. Id. at 224-225. Ms. Messinger said she always felt uncomfortable around Fulks' father because he

would make suggestive comments regarding things like the size of her breasts. Id. at 225. She said Fulks' father had tried to touch her breasts. Id. Messinger recalled the sexually graphic pictures on the walls and ceilings in the basement of the Fulks' house. Id. She testified that Dewayne had confided to her more than once that he wanted to kill himself. Id. at 228.

Linda Adkins, a former friend of Fulks' mother, who lived in the neighborhood where Fulks grew up, offered insightful testimony. TT, Vol. XVI, pp. 228-229. She said the Fulks children had a "pretty rough childhood," never having opportunities to participate in sports or to have birthday parties. Id. at 231. She said Fulks' mother asked her for money for food, but then would use it to buy beer. When Ms. Adkins started giving Fulks' mother food instead of money, she stopped asking for help. Id. at 232-233. Ms. Adkins said that one morning, about 3:00 o'clock, the Fulks children came running to her house, telling her that their mother had a two by four and was threatening to hit their father's van with it. Id. at 234-235. They said "if she hits the van, daddy will kill her." Id. at 235. Ms. Adkins said she went out of her house and told Fulks' parents: "You are tearing these kids apart." Id. She said that lots of times when Fulks' parents fought, the children would come to her house. Id. Ms. Adkins recalled a specific time when Fulks was three or four-years-old and no one could find him. They eventually found him asleep on a pile of leaves in a corner of Ms. Adkins' garage. Id. at 235. Ms. Adkins said that as the Fulks boys grew older, they stopped coming to her house. Id. at 237. Ms. Adkins said when Fulks was fourteen or fifteen-years-old, he was seeing a woman in her late twenties. Id. at 230. Ms. Adkins described some trouble the Fulks boys caused in the neighborhood, but explained that almost all of the children in the neighborhood, with the exception of her three daughters, had been in trouble with the law. Id. at 240. She added that two of the neighborhood boys were in

jail for murder. Id.

In addition to presenting the testimony of family, neighbors, and friends, Fulks' trial counsel also presented testimony from teachers and a former probation officer. Martha Floyd, Fulks' sixth grade teacher, described him as a follower, and recalled that he did not have a coat, even though the winters in West Virginia were harsh. TT, Vol. XVII, p. 85. She said she had seen bruises on him. Id. at 91. Cindy Harper, Fulks' kindergarten teacher, recalled an incident when she went to the rest room to check on Fulks after he had been out of the classroom too long. She discovered that he "had had a very bad case of diarrhea. He had on jeans and a pair of cowboy boots, and it was a mess." Id. at 74. Ms. Harper recalled that no parent picked him up. Id. Ms. Harper said that Fulks missed 35 days of school that year. Id. Sue Hatcher, a probation officer, told the jury about the lack of responsiveness when she contacted Fulks' mother to discuss some of her concerns about Fulks. Id. at 95, 99. Ms. Hatcher said she recommended that Fulks be removed from his home, but her recommendation was not followed. Id. at 103.

### C. Some of the testimony Fulks claims should have been presented would have been harmful.

Fulks argues that his trial counsel should have presented testimony by Mark Thompson, who could have testified that Fulks is a follower, not a leader; by Harry Tyree, who would have told the jury that Fulks behaves well and is not dangerous in a structured environment; and by Elvin Taylor, who would have revealed that Fulks "was a follower and **went along with others even when he knew their actions were wrong**." (Amended Mot. to Vacate, pp. 79-80, 82.)

Failure to present evidence that could be as damaging as helpful does not constitute ineffective assistance of counsel. See Moody v. Polk, 408 F.3d 141, 154 (4th Cir. 2005)(to the

extent affidavits presented new information, they were "double-edged"). Evidence that Fulks is likely to go along with others, even when he knows their actions are wrong, would have been as likely to harm him as help him. This characteristic would make him dangerous, even in a prison environment. Further, the general impressions of Thompson and Taylor that Fulks as a follower were counter to the evidence of Fulks' individual crimes and manipulation of others.

As discussed above, when Fulks impersonated an FBI agent and robbed the two college students at gun point, he was acting alone. When he gave an academy-award-deserving performance in order to defraud Nell Lee out of $200 and her vehicle, he wasn't following anyone. When he attempted to escape from Just Care, he was acting alone, and was in a structured environment. When he had to be restrained by five prison personnel, he was in a structured environment. Even if jurors believed Fulks to be a follower, and that he was simply doing what Basham wanted him to do when they carjacked and kidnapped Alice Donovan and Samantha Burns, that would hardly have given jurors much comfort, knowing that two innocent women are dead because Fulks was a follower.

### D. Fulks' counsel presented an effective mitigation case regarding Fulks' early life, as evidenced by the jury's Findings.

Finally, Fulks' claim that his counsel should have presented more witnesses to testify about his background is belied by the jury's findings of a number of mitigating factors. Twelve jurors found:

> Mitigating Factor Number 1, Chadrick Evan Fulks' mother abused alcohol while she was pregnant with him.

> Number 9, Chadrick Evan Fulks suffered from learning disabilities as a child.

> Number 12, Chadrick Evan Fulks was neglected by both of his parents.

Number 13, Chadrick Evan Fulks lived in a house that was often filthy and infested with roaches and ants.

Number 14, Chadrick Evan Fulks' parents did not provide him with adequate clothing or school supplies.

Number 16, Chadrick Evan Fulks' parents sold food stamps to get money for beer.

Number 18, Chadrick Evan Fulks was often left without supervision.

Number 19, Chadrick Evan Fulks was permitted to roam the streets as a young child.

Number 20, A principal, a police officer, and a probation officer all recommended Chadrick Evan Fulks be removed from the home at the age of nine, but he was not removed.

Number 21, Chadrick Evan Fulks' parents gave him little attention or affection.

Number 22, Chadrick Fulks was subjected to emotional abuse as a child.

Number 23, Chadrick Evan Fulks was subjected to physical abuse as a child.

Number 24, Chadrick Evan Fulks grew up seeing his parents frequently fighting each other.

Number 25, Chadrick Evan Fulks grew up seeing heavy drinking and frequent fighting by other adults in his own house.

Number 27, Chadrick Evan Fulks grew up seeing graphic photographs of naked women papering the walls and ceiling of his basement.

Number 28, Chadrick Evan Fulks' father showed him pornographic movies as a young child.

Number 31, Chadrick Evan Fulks started drinking at the age of 9 and using marijuana at 11 or 12, and his parents made no effort to stop him.

Number 32, Chadrick Evan Fulks' brother taught him to inhale gasoline and paint as a young teenager.

Number 34, Chadrick Evan Fulks' mother ignored his stealing.

Number 35, Chadrick Evan Fulks' brother taught him to steal, fight, and break into cars.

Number 36, Chadrick Evan Fulks attempted suicide at age 13.

TT, Vol. XXII, pp. 20-25. Eleven jurors found Mitigating Factor Number 15, that Fulks

frequently went hungry or was uncertain whether he would get food as a child. Id. at 21. Ten

jurors found:

> Number 11, Chadrick Evan Fulks' parents cared so little for his education that they never
> helped him with homework and even left him at school with soiled pants.

> Number 37, Chadrick Evan Fulks was diagnosed with depression, substance abuse, and
> possible sociopathic tendencies at age 14.

Id. at 21, 24. Nine jurors found Mitigating Factor 2, Chadrick Fulks' brain was permanently

damaged by his mother's drinking during her pregnancy. Id. at 20.

The trial record leaves no doubt - Fulks' trial counsel made more than a reasonable

investigation for possible mitigating evidence. See United States. v. Roane, 378 F.3d 382, 407

(4th Cir. 2004)(in light of the compelling mitigation case presented by defendant's counsel during

the penalty phase which resulted in the jury finding twelve mitigating factors, the court correctly

concluded that their performance was not constitutionally deficient and that defendant was not

prejudiced by the absence of additional witnesses).

### Response to Claim IV

**Fulks was not prejudiced by the use of law students to assist with investigation.**

In Fulks' fourth claim (Amended Mot. to Vacate at 84-91), he asserts that his trial counsel

was ineffective for employing law students in addition to professional investigators and

mitigation specialists.[25] This argument fails because Fulks can not demonstrate how this use of

---

[25]Fulks had access to Cornell Law School law students to do additional investigative
work because Defense counsel Blume and Johnson are Cornell law professors who specialize in
death penalty litigation. They are Director and Assistant Director of the Cornell Death Penalty

additional resources somehow harmed or prejudiced him.

Tellingly, Fulks reveals the weakness of this argument when he admits "that defense counsel did hire trained investigators and mitigation specialists to conduct certain aspects of the mitigation investigation." Memo in Support at p. 89. Remarkably, Fulks contends that "many important investigation tasks were left to law students." Id. Fulks fails to describe what those tasks were. As noted in great detail above, Fulks' mitigation team of experts included **Medical Doctors, Forensic Psychologists, Forensic Psychiatrists, Social Workers, and other experts in mental health. In addition, Fulks had a private investigator and an investigator employed by the Federal Public Defender.**

Fulks' complaint boils down to a mere assertion that better trained law students would have located additional witnesses who would have been, at best, cumulative to what was presented in Fulks' mitigation case or, at worst, would have provided the opportunity for cross examination that likely would have been extremely harmful.

**Response to Claim V**

**Appellate counsel was not ineffective for failing to appeal the Court's jury instructions regarding mitigation evidence.**

In his fifth claim (pp. 91-97), Fulks' complains that his appellate counsel were ineffective for failing to appeal the jury charge on mitigation. This claim must fail because appellate counsel was not ineffective for failing to raise an issue that would have failed on appeal. Fulks claims that the charge violated the Eighth Amendment because it created a substantial risk that the jury would screen out and fail to consider factors that were "unquestionably mitigating." (Amended Mot. to Vacate at 91-92.) The Eighth Amendment requires that the jury be able to

---

Project. See www.lawschool.cornell.edu/faculty/bio.

consider and give effect to all relevant mitigating evidence offered by a defendant. <u>Boyde v. California</u>, 494 U.S. 370, 377-378 (1990). In assessing the effect of a challenged jury instruction, the court "accept[s] at the outset the well-established proposition that a single instruction to a jury may not be judged in isolation, but must be viewed in the context of the overall charge." <u>Id.</u> at 378 (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141 (1973)). The legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. <u>Id.</u> at 380. A capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility that the jury was impermissibly inhibited by the instruction. <u>Id.</u> Where the context of the proceedings would lead reasonable jurors to believe that evidence of a defendant's background could be considered in mitigation, even the absence of an instruction on the concept of mitigation and of instructions on particular statutorily-defined mitigating factors does not violate the Eighth Amendment. <u>Buchanan v. Angelone</u>, 522 U.S. 269, 278-279 (1998); <u>see also Lyons v. Lee</u>, 316 F.3d 528, 534 n.6 (4th Cir. 2003). A jury instruction that directs the jury to "base its decision on all the evidence" satisfies the constitutional requirement that the sentencing jury have a full opportunity to consider mitigating evidence. <u>Eaton v. Angelone</u>, 139 F.3d 990 (4th Cir. 1998).

The Court instructed the jurors:

As to the mitigating factors asserted by the defendant, Mr. Fulks, . . . **the law provides that there is, essentially, no limit on the number of factors or the things the jury may consider in mitigation.** As to each of the factors submitted by the defendant, and which I am about to list, you must, essentially, engage in a two-step process in determining whether any one or more of them have been proven. Specifically, you must first

72

determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence. Secondly, if you determine that the factor has been proven, you must determine whether the fact is mitigating, as I have defined the term for you. That is, it tends to suggest that life in prison without parole and not death is the appropriate punishment.

TT, Vol. XXI, p. 274. The Court further explained: "The law does not require unanimous agreement with regard to mitigating factors. **Any juror persuaded that a mitigating factor exists, must consider it** in this case." TT, Vol. XXI, p. 275. The Court added: "It is up to each individual juror to determine how much weight should be given to any particular mitigating circumstance." Id.

Fulks argues that a mitigating factor either exists or does not exist, and, therefore, the Court's instruction that the jury must determine, after it finds a factor to exist, if it is mitigating improperly screens out the mitigating evidence. (Amended Mot. to Vacate at 92.) Fulks is engaging in technical hairsplitting. The second part of the Court's instruction essentially involved the weight given to the finding of a particular mitigating circumstance. While a juror may find a particular factor to exist, if the juror gives it .01% weight as to all other considerations, it likely has no practical significance, though the juror has technically found the mitigating factor.

It is clear from the Court's instructions to the jury and the context of the proceedings that the jury had a full opportunity to consider mitigating evidence, and that the jury instructions did not impermissibly inhibit the jury's consideration of relevant mitigation evidence. Fulks' trial counsel spent more than four days presenting testimony regarding Fulks' background of deprivation and abuse, his psychological condition, and his substance abuse. See Boyde, 494 U.S. at 383 ("All of the defense evidence presented at the penalty phase - four days of testimony

73

consuming over 400 pages of trial transcript - related to petitioner's background and character, and we think it unlikely that reasonable jurors would believe the court's instructions transformed all of this 'favorable testimony into a virtual charade.'") For the jury to have believed it could not consider Fulks' mitigating evidence, it would have had to believe that the penalty phase served virtually no purpose. See Brown v. Payton, 544 U.S. 133, 144 (2004). Given the Court's instruction and the extensive trial time devoted to mitigating evidence, there is no possibility jurors screened out mitigating factors based on a belief that the jury instructions limited such consideration..

## Response to Claim VI

**The prosecution's closing argument did not impose a nexus requirement in order for the jury to consider evidence in mitigation.**

Fulks complains that his trial counsel were ineffective for failing to object to "the Government's imposition of a nexus requirement on the jury's mitigation finding" during its closing remarks. (Amended Mot. to Vacate at 97-98.) This claim fails because the prosecutor did not tell the jury it was required to find a causal nexus between the evidence offered as mitigating and the crime in order for the evidence to be taken into account by the jury in arriving at its sentencing decision. Fulks relies on the holding of Tennard v. Dretke, 542 U.S. 274 (2004), to support his argument. The facts of the Tennard case are easily distinguishable from those of Fulks' case. In Tenard, the jury was instructed to consider the appropriate punishment by answering two "special issues" used at the time in Texas to establish whether a sentence of life imprisonment or death would be imposed: (1) "Was the conduct of the defendant that caused the death of the deceased committed deliberately and with reasonable expectation that the death

of the deceased or another would result?" and (2) "Is there a probability that the defendant . . .would commit criminal acts of violence that would constitute a continuing threat to society?" 542 U.S. at 277. During the penalty phase of the trial, Tenard's counsel called one witness - Tennard's parole officer - who testified that Tennard's prison record indicated he had an IQ of 67. Id. The prosecution argued during closing that the evidence of low IQ was irrelevant. Id. at 278. The jury answered both of the "special issues" questions affirmatively and sentenced Tennard to death. Id.

Eventually, Tennard sought federal habeas corpus relief. Id. at 280. The Fifth Circuit found that mitigating evidence at trial must be "conditionally relevant," meaning that "the evidence must show (1) a uniquely severe permanent handicap with which the defendant was burdened through no fault of his own . . . and "2) that the criminal act was attributable to this severe permanent condition." Id. at 283. The Fifth Circuit denied Tennard's claim because his low IQ evidence bore no nexus to the crime. Id. at 284. The Supreme Court struck down this decision, noting its previous holding that the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. Id. at 285(citing Boyde v. California, 494 U.S. 370, 377-378 (1990)).

Unlike the trial court in Tennard, this Court instructed jurors they could consider any factor to be mitigating if the factor tended to suggest life in prison without parole and not death should be the appropriate sentence. TT, Vol. XXI, p. 274. The Court's instruction, both before and after closing arguments, made no mention of a requirement that there be a causal connection between the mitigating factor and the crime. Prior to closing arguments, the Court explained to the jurors that the lawyers' closing arguments would be their summaries of the evidence and how

it should be interpreted. TT, Vol. XXII, p. 17. After closing arguments and prior to jury

deliberations, the Court reviewed the verdict form with the jurors. TT, Vol. XXII, pp.3-11. The

Court quoted the instruction: "Any member of the jury who finds the existence of a mitigating

factor must consider such a factor in considering whether to impose a sentence of death or a

sentence of life imprisonment without parole, regardless of the number of jurors who agree."

TT, Vol. XXII, p. 7. The Court charged the jury:

> The arguments of the attorneys and the comments and rulings of the court are not
> evidence. You may consider both direct and circumstantial evidence. And you may use
> your common sense, good judgment, and life experiences in determining whether the
> threshold intent, aggravating, or mitigating factors are established. . . . If you find the
> threshold intent, aggravating, and mitigating factors, you must use your experience,
> judgment, and common sense in weighing the aggravating and mitigating factors to arrive
> at your ultimate determination in this case.

Id. at 250-251.

The Court also instructed the jury: "You must consider whether any one or more of you,

individually, find that the defendant has proven any mitigating factor or factors by a

preponderance of the evidence." Id. at 256. The Court did not suggest to the jury that there had

to be any causal connection between the mitigating factor and the crime, and no reasonable

person would believe there was such a requirement. In order for the jurors not to have

considered the numerous mitigating factors they found, they would have had to blatantly ignore

the Court's verbal instructions and the written instructions. Fulks has failed to show such error

by the jury.

In addition to the Court providing clear instructions to the jury regarding its findings of

mitigating factors, Fulks' trial counsel spoke to the jury extensively in order to ensure the jurors

were aware they could find and give effect to mitigating factors without finding that those factors

76

caused Fulks to commit the crimes. They explained: "No, it is not cause and effect." TT, Vol. XXI, p. 207. Fulks' counsel proceeded to explain to the jury why all of the information about his brain mattered and why it should be taken into account during deliberations. Fulks' counsel argued at length and with fervor that the jury should show compassion by sentencing him to life imprisonment because so many forces in Fulks' life had worked against him. TT, Vol. XXI, pp. 207-216.

Besides the logical disconnect that would have been required, the jury's decision, itself, shows that it is unlikely jurors believed they had to find a causal connection. Nine jurors found that "Fulks's brain was permanently damaged by his mother's drinking during her pregnancy" (TT, Vol. XXII, p. 20), in spite of the prosecution's argument of which Fulks complains that "millions of Americans . . . have significant brain injuries. . . . damaged brains but don't carjack women" (Amended Mot. to Vacate at 98). Fulks argues that the prosecution's argument that "the overwhelming majority of people that grow up in crack-infested households, with alcoholic parents and abusive situations that have a terrible upbringing, the overwhelming majority of these people, they don't kill women" set forth a legal argument that the jury must find "some causal nexus between the evidence offered as mitigating and the crime committed before such evidence can be taken into account by the jury." (Amended Mot. to Vacate at 98.) He complains that the prosecution's comments were "an attempt to convince the jury that if it found Petitioner's background did not cause him to commit the crimes he was accused of, the jury could not consider Petitioner's background for its mitigating effect at all." Yet, twelve jurors found 21 of the mitigating factors regarding Fulks' horrible childhood to exist. See pp. 68-70 above.

The Eighth Amendment requires that the jury be able to consider and give effect to all

77

relevant mitigating evidence offered by a defendant.  <u>Boyde v. California</u>, 494 U.S. 370, 377-378

(1990).  The Court and Fulks' trial counsel made sure the jurors had the understanding and

knowledge to fulfill that requirement, and it is clear the jury did so.  Consequently, Fulks did not

suffer from ineffective assistance of counsel regarding this issue.

**Response to Claim VII**

**Trial counsel was not ineffective for allowing Fulks to give a statement to the FBI.**

Fulks claims that his counsel were ineffective for advising him to give a statement to the

FBI when he did not have a proffer letter or a plea agreement.  Amended Mot. to Vacate at 104.

Fulks claims that he "strenuously objected at first," but ultimately followed his counsels' advice.

<u>Id.</u> at 106.  Fulks has provided no support for his claim, and given Fulks' history of self-serving

prevarication and manipulation, any statement by him is inherently unreliable.  Fulks incorrectly

claims that prior to his statement, the Government had very little evidence establishing a capital

case against him.  <u>Id.</u>  He further incorrectly claims that, "had trial counsel not provided

unreasonable advice, there is a reasonable probability that . . .Petitioner could have obtained an

agreement from the government that would have spared his life in exchange for missing

information."  <u>Id.</u> at 107.

**A.    The Government would not have entered into a proffer agreement.**

At the time that Fulks, through counsel, first approached the Government about providing

information regarding the whereabouts of Ms. Donovan's remains, the Government had no

interest in receiving that information under conditions that would not allow the use of the

information directly or derivatively.  <u>See</u> Exhibit C, Declaration of Scott N. Schools, p. 4.  The

Government's insistence that information be provided without restriction was based on several

78

realities. First, the evidence against Fulks at that time was already overwhelming. Id. Second, even though the Government was interested in facilitating the location of Alice Donovan's remains to secure some closure for her family, whatever evidentiary value her remains may have had in November 2002, was likely lost or considerably dissipated by April 2003. Id. For both of these reasons, the Government was willing to forego receipt of any information from Fulks unless the information could be used against him. Id. Third, the Government had determined that Fulks and Basham were the only witnesses to the actual murders and expected that they would accuse each other of committing the murders. Id. Finally, the Government had declined to execute a proffer letter with Basham, when he had sought to cooperate with the Government in late-November, 2002, when the information known to the Government was less extensive, so the Government saw no reason to treat Fulks more favorably in April 2003, after it had overwhelming evidence of Fulks' guilt. Id. at 2, 5. The government prosecutor, in his attached declaration states that, for all of the reasons set forth above, "I can state with certainty that the Government would have foregone any interview of Fulks rather than receive information from him that could not be used against him." Id.

**B.      Fulks provided no significant information not already discovered by the Government.**

Fulks' claim that his statement allowed the Government to fill in the gaps in its evidence has no basis in fact, which is evidenced by Fulks' failure to point to any specific information provided by him which the Government did not already have or which was not a purely self-serving, exculpatory statement. See Amended Mot. to Vacate at 107. Consequently, Fulks has failed to show that the outcome of his trial would have been different had he not been

interviewed by the FBI..

**C. Fulks' statement to the Government provided benefits to the defense.**

Counsels' strategy to allow Fulks to give a statement to the government provided at least

two possible benefits. First, allowing the Government to interview Fulks permitted the jury,

through the testimony of the FBI agent, to hear Fulks' accusations that Basham actually killed

Alice Donovan and Samantha Burns, without Fulks being subject to cross-examination. Exhibit

C, p.5-6, ¶ 7; see TT, Vol. X, pp. 218, 223, 227-231, 238-239, 241-242; Vol. XI, pp. 38, 44-54.

Second, this buttressed Fulks' attempt to admit supportive private polygraph examinations. As

noted by the government trial prosecutor: "In the best case, the polygraphs would support Fulks'

assertion that Basham was the killer. In the worst case, the strategy preserved an issue for appeal

for which there was some legal support while also assuring that the jury would at least be aware

that Fulks had accused Basham of being the killer." Id. at ¶7. Thus, counsels' decision was a

reasonable trial strategy, and, therefore, does not constitute ineffective assistance of trial

counsel.[26]

**Response to Claim VIII**

**The catch-all factor used by the jurors allowed jurors to consider all mitigating evidence, including any evidence that Fulks was a minor participant in the crimes.**

**A. Jurors understood they could consider any mitigating factors.**

Fulks complains that his trial counsel were ineffective because they "failed to request that

the statutory catch-all factor or the statutory minor participation factor be included on the verdict

---

[26]It also aligned with the strategy to plead guilty and take advantage of this show of
remorse and acceptance of responsibility.

form." (Amended Mot. to Vacate at 108.) He contends that because the catch-all instruction on the verdict form did not have the exact language found in 18 U.S.C. § 3592(a)(8), that being: "other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against the imposition of the death sentence," the sentencing process was "fatally flawed," since the jury had no place on the verdict form to consider Basham's greater culpability.[27] Id. at 109-110.

The Eighth Amendment requires that a defendant be allowed to present, and a jury be allowed to consider, all relevant mitigating evidence of the defendant's character and background that does not relate to the crime. See Tennard v. Dretke, 542 U.S. 274, 285 (2004). The Federal Death Penalty Act (FDPA) mirrors that standard. 18 U.S.C. § 3592(a)(8). A constitutional violation occurs only if there is a reasonable likelihood that the jurors believed themselves precluded from considering mitigating evidence. See Ayers v. Belmontes, 549 U.S. 7, 13-14 (2006)(finding that a jury instruction to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime," did not prevent the jury from considering forward-looking mitigation evidence that the defendant would lead a constructive life if incarcerated instead of executed). A jury instruction that directs the jury to "base its decision on all the evidence" satisfies the constitutional requirement that the sentencing jury have a full opportunity to consider mitigating evidence. Eaton v. Angelone, 139 F.3d 990 (4th Cir. 1998).

Fulks' citation of Abdul-Kabir v. Quarterman, 550 U.S. 233, 127 S.Ct. 1654 (2007), to

---

[27]Mitigating Factor 41 states: "Other factors in Chadrick Evan Fulks childhood, background, or character weigh against imposition of a sentence of death." TT, Vol. XXII, p. 25

81

support his contention that the Court's instructions regarding mitigating factors inhibited the jury from giving meaningful effect to mitigation evidence, is a strong indication that there is no authority to lend credence to his argument, as the facts of that case are diametrically opposed to the facts of Fulks' case.[28] In <u>Abdul-Kabir</u>, the judge's instructions to the jury made no reference to mitigating evidence. 127 S.Ct. at 1660. The jury in that case was given only two statutorily-prescribed special issues to decide: (1) whether the defendant could reasonably expect his conduct would result in the death of the victims and (2) whether it was probable the defendant would commit acts of violence which would constitute a continuing threat to society. <u>Id.</u> The prosecutor in <u>Abdul-Kabir</u> began his closing argument by reminding the jury that during voir dire they had promised to answer "yes" to these questions if the state met its burden of proof. <u>Id.</u> at 1662. The trial judge refused to give any of the instructions requested by the defendant that would have allowed a negative response to the two special issues on the basis of any evidence that mitigated against the imposition of the death penalty. <u>Id.</u> The Supreme Court concluded that the jury was not permitted to give meaningful effect or a reasoned moral response to the defendant's mitigating defense because it was forbidden to do so by statute or by the trial court's interpretation of the statute, and, thus, the sentencing process was "fatally flawed." <u>Id.</u> at 1674.

Unlike the trial court in <u>Abdul-Kabir</u>, the Court in Fulks' case ensured that jurors understood they could consider any aspect of the evidence as mitigating and choose to sentence

---

[28] The trial and sentencing of Abdul-Kabir occurred prior to the Supreme Court's decision in <u>Penry v. Lynaugh</u>, 492 U.S. 302, 328 (1989), which held that, in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, the jury was not provided with a vehicle for expressing its "reasoned moral response" to that evidence in rendering its sentencing decision.

Fulks to life in prison without parole. Prior to reviewing the mitigating factors with the jury, including "factor forty-one, other factors in Mr. Fulks's childhood, background, or character weigh against the imposition of death," the Court instructed jurors: **"[T]he law provides that there is, essentially, no limit on the number of factors or the things the jury may consider in mitigation."** TT, Vol. XXI, pp. 274, 279. The Court told the jury that a mitigating factor is one that "tends to suggest that life in prison without parole and not death is the appropriate punishment." Id. at 274. After the Court reviewed the specific mitigating factors, he reiterated: **"[T]he law does not limit your consideration of mitigating factors to those that are listed for you."** Id. at 279. Thus, the Court's subsequent instruction would have dispelled a belief by any juror that he/she could not consider a determination that Fulks had played a lesser role as a mitigating factor. See Brown v. Payton, 544 U.S. 133, 146-147 (2004).

**B.      There is no reasonable likelihood that the jury believed it was required to disregard any evidence intended to show that Basham was more culpable.**

Furthermore, in the context of the proceedings, there is no reasonable likelihood the jury believed it was required to disregard Fulks' mitigating evidence intended to show that Basham was more culpable. Fulks' counsel presented evidence designed to show that Fulks is a follower rather than a leader. Both Fulks' trial counsel and the prosecution devoted large parts of their closing arguments to whether Basham was more culpable than Fulks. This exercise would have been pointless if the jury believed it could not consider the evidence related to Fulks' and Bashams' roles, or the lack thereof, and the attorneys' closing arguments. See Brown v. Payton, 544 U.S. 133, 145 (2004)(rejecting petitioner's argument that prosecutor's remarks mislead the jury and noting that the argument by the prosecutor intimating that the defendant's religious conversion was not sincere would have been pointless if the jury had believed it could not consider the evidence). Viewing the entire trial proceeding, there is no reasonable likelihood that

83

the jury applied factor forty-one, or any other mitigating factor, in a way that prevented

consideration of the constitutionally relevant evidence. As the Supreme Court has recognized:

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of
> meaning in the same way that lawyers might. Differences among them in interpretation
> of instructions may be thrashed out in the deliberative process, with commonsense
> understanding of the instructions in the light of all that has taken place at the trial likely to
> prevail over technical hairsplitting.

Boyde v. California, 494 U.S. 370, 380-381 (1990.)

Commonsense told the jurors that if they considered Fulks to have played a lesser role in

the crimes, that determination could be a mitigating fact. The prosecutor told the jury: "The

Government is not saying that Chad Fulks is more culpable than Brandon Basham. And the

Government is not saying that Brandon Basham is more culpable than Chad Fulks. They are

equally culpable." TT, Vol. XXI, p. 24. If Fulks' role had no impact on the jury's decision, then

there would have been no reason for the prosecutor to talk about relative roles.

Further, the extent to which a defendant participates in a crime goes to the character of

the criminal. Mitigating factor forty-one included character evidence. Had the jurors believed

Fulks' claims that he was afraid of Basham, that he went along with the crimes because he didn't

think he had any other option, and that the only reason he raped Alice Donovan was because he

felt pressured to do so by Basham, then they could easily have seen this as evidence of redeeming

value in Fulks' character. Therefore, Fulks' trial counsel were not ineffective for not requesting

further court instructions regarding the catch-all instruction and a "minor participation"

instruction.

Even if Fulks' counsel were found to be ineffective for not requesting a "minor

participation" instruction, Fulks was not prejudiced by such an omission because the evidence

clearly showed he was far more than a minor participant. As the prosecution argued, Fulks was an equal partner with Basham - part of a "two-man death squad." TT, Vol. XXI, p. 24. Basham had been in the Hopkins County Detention Center for a year and a half and had not escaped. TT, Vol. II, pp. 18. Fulks had been at the detention center approximately two months and ten days prior to the escape. After Basham lured James Hawkins out of his house with a story of a broken-down car, Fulks told Hawkins to pull his truck off the road and Fulks began driving the truck. TT, Vol. II, pp. 96-120. Fulks asked Hawkins if he had guns or money. Id. at 122. Fulks ordered Basham to duct tape Hawkins' hands. Id. at 123. Fulks drove the truck to an isolated area, ordered Basham to tape Hawkins to the tree, told Basham "you ain't fucking doing it right," and took over the taping. Id. at 136, 146. Fulks duct taped Hawkins' legs and his mouth. Id. at 139, 146.

After leaving Hawkins tied to a tree, Fulks drove himself and Basham to where Fulks' friends and family lived. During the entire crime spree, they did not visit with Basham's family and friends. Despite Fulks' claim that he believed Basham merely planned to steal Donovan's car (Amended Mot. to Vacate at 110), the evidence refutes that claim. Fulks asked his friend Tina Severance where they could get guns. TT, Vol. III, p. 78. Fulks and Basham dressed in camouflage gear on the night they killed Samantha Burns. TT, Vol. Vol. III, pp. 112, 116. Wearing such attire simply to break into cars or to steal cars would not make sense, as it is more likely such attire would draw attention. Fulks drove Samantha Burns' car. Basham could not drive. TT, Vol. VI, p. 105. Fulks used Samantha Burns' ATM card to steal money. TT, Vol. X, p. 117. Samantha Burns' car was burned and abandoned in an isolated location where Fulks and Amber Fowler parked when they were dating, and where Amber Fowler's van once broke down

85

when Fulks was driving it. TT, Vol. IV, pp. 229-230; Vol. XV, pp. 55-56. Fulks had to be the one to drive himself and Basham away from Samantha Burns' burning car. Fulks and Basham returned to the motel room with a candy box from Burns' car, Samantha Burns' ID, and mud on themselves and on both sides of the floorboard of Severance's van. There can be no doubt that Fulks fully participated in the crime. Whether Fulks or Basham fired the killing shot, thrust the killing knife, or pulled the cord that strangled, Fulks had to be aware that Samantha Burns had been killed.

After Fulks and Basham kidnapped Samantha Burns, Fulks drove them to South Carolina. In South Carolina, Fulks became "frantic" because he could not find a revolver he had hidden under the bed (TT, Vol. IV, p. 138). Later, Fulks pointed a gun at Tina Severance's head. TT, Vol. IV, pp. 177-178. Fulks drove himself and Basham around the Savannah Bluff area. Fulks shot at Carl Jordan when Jordan caught Fulks and Basham stealing guns from the home of Jordan's son less than an hour before Fulks and Basham kidnapped Alice Donovan. TT, Vol. V, pp. 47-58. Fulks pursued Jordan as he Jordan drove away from his son's house. Id. at 57-58. Fulks stole a white pickup truck. Id. at 123-125. Fulks drove to the Wal-Mart and picked out Alice Donovan in the blue BMW and pulled the pickup truck behind Alice Donovan. Id. at 140, 142-44, 154-55. Fulks followed the BMW to a more isolated area of the Wal-Mart parking lot, where he got into the car with Alice Donovan. Id. at 144, 154-55. After forcing her to exit the parking lot, Fulks began driving. Fulks used Alice Donovan's ATM card to obtain money. Fulks went into the Amoco station and bought electrical tape. TT, Vol. VI, p. 16. Fulks put gas in the BMW. Id. at 12-15. Fulks drove to a cemetery where he and Basham raped Alice Donovan. Fulks drove to where he and Basham eventually disposed of her body.

Only Fulks and Basham know who did the actual killing. However, whether or not Fulks was the actual killer, he knew when he and Basham kidnapped Alice Donovan, that she would be killed, just as he knew Samantha Burns was killed. He had no reason to believe the scenario would be different with Alice Donovan. That is why the jury probably did not believe Fulks' claim that he thought Basham planned to leave Alice Donovan tied to a tree. Jurors did not decide Fulks should receive the death penalty because they were not instructed about a specific "minor participation" mitigating factor. If they had believed Fulks' story that his only intention was to steal, and that he raped Alice Donovan, because he was afraid of Basham, the jurors could have decided that Fulks did not deserve the death penalty. The Court had told them that they could find any fact to be mitigating. The jurors heard the evidence, and the jurors determined Fulks' actions merited the imposition of the death penalty. A specific "minor participation" instruction would not have changed this.

**Response to Claims IX, X, XI & XII**

**Trial counsel was not ineffective for advising Fulks to plead guilty to carjacking because it was done pursuant to well recognized legal trial strategy. Furthermore, this issue was rendered moot when the jury sentenced Fulks to death pursuant to the kidnapping resulting in death count. Finally, there was a sufficient factual basis to support the guilty plea.**

In his ninth, tenth, eleventh and twelfth claims (Amended Mot. to Vacate at 112-138), Fulks makes numerous arguments attacking his guilty plea to count 1, carjacking resulting in death, based upon Pinkerton[29] liability. On May 4 and 7, 2004, Fulks pled guilty to all eight counts in the superseding indictment, including count 1. The factual basis for his guilty plea to count 1 was set forth in an FBI 302 which summarized what Fulks had told FBI agents in an

---

[29]Pinkerton v. United States, 328 U.S. 640 (1946).

interview on April 21, 2003. Additionally, at the guilty plea hearing, the prosecution gave a detailed recitation of the facts, and evidence to prove these facts, upon which it would have relied to prove Fulks guilty of carjacking resulting in death.

Fulks attacks the guilty plea for four reasons. First, Fulks claims that there was not a sufficient factual basis for him to plead guilty because the factual basis showed that he did not possess the requisite intent to plead guilty to carjacking resulting in death. Second, Fulks claims that his trial counsel was ineffective for advising him to plead guilty to carjacking resulting in death. Third, Fulks asserts that trial counsel was ineffective for allowing Fulks to plead guilty because the distinction between the intent required under Pinkerton and the gateway intent factors was too fine for a lay juror to appreciate. Finally, Fulks claims that the Eighth Amendment precludes the application of Pinkerton in a capital case. Fulks' arguments challenging his guilty plea to count 1 are without merit for various reasons.

### A.  The Court conducted an exhaustive and complete guilty plea hearing.

On May 4 and 7, 2004, the trial court conducted an exhaustive guilty plea hearing to allow Fulks to plead guilty to all eights counts in the Superseding Indictment. The trial court was extremely thorough and careful in its conduct of the hearing and in its accepting of the guilty plea. Fulks' desire in pleading guilty was to plead guilty to the eight counts, but still preserve his ability to contest that he had the requisite mental state to make the carjacking offense (count 1) a death penalty-eligible offense.

### 1.  May 4, 2004 hearing

Fulks' change of plea hearing began on May 4, 2004. The trial court first determined that Fulks was competent. The court determined Fulks' educational background, literacy and his

88

current medical condition. The court also called a forensic psychiatrist, Dr. Ellen Berg, who testified that Fulks was competent to stand trial/plead guilty. May 4 & 7, 2004, Guilty Plea Transcript at pp. 1- 20.

The trial court then went through a long colloquy with Fulks. Fulks said that he had had ample opportunity to discuss his case with his attorneys, he was satisfied with his attorneys' representation, and his attorneys had done everything he had asked them to do. Id. at 21. Fulks stated that he understood that he had a right to a jury trial and to have two attorneys represent him at trial. Id. at 22. The trial court next explained the bifurcated nature of death penalty cases. The trial court explained to Fulks that "if the government proves you guilty of either count 1 [carjacking resulting in death] **or** count 2 [kidnapping resulting in death], which are the two counts that might involve the death penalty, then we would proceed into a second proceeding, sometimes called a penalty phase." Id. at 23-24. (emphasis added). Fulks noted that he understood this. Id. The trial court explained the presumption of innocence and that the government's burden of proof is beyond a reasonable doubt. Id. at 24-25. Fulks was notified of his right to subpoena, call, confront and cross examine witnesses. Id. at 25-26. He was also informed of his right to testify or not testify. He was told that his decision not to testify could not be held against him. Id. Fulks was informed that a jury would decide the sentence for counts 1 and 2. Id. at 26-27. The trial court then informed Fulks that if he were convicted of count 1 **or** count 2, (emphasis added) the jury would determine whether Fulks received the death penalty or a lesser sentence. Id. at 26-30. As part of his strategy, Fulks wanted to plead guilty to all the counts, particularly both counts 1 and 2. The plea was "all or nothing." He wanted to plead to all the counts in the superseding indictment. Id. at p. 29. The trial court made certain that Fulks

89

understood that in pleading guilty to counts 1 and 2, "the jury could give [Fulks] the death penalty on count 1 or they could give [Fulks] the death penalty on count 2." Id. at 29. At the end of the colloquy, Fulks stated that he wanted to plead guilty to all eight counts. Id. at 30.

The court then went through the superseding indictment and the various counts. Id. at 31-54. The trial court set forth the elements the government would have to prove to convict Fulks of count 1, carjacking resulting in death, and count 2, kidnapping resulting in death. Id. at 31-35. Fulks stated that he understood the charges and the elements of each charge. Id. The trial court summarized the impact of Fulks' proposed guilty plea: "If you plead guilty to counts 1 through 8, you will then have admitted that you are in fact guilty of the crimes charges in counts 1 through 8, each individual count, eight of them. There will be no need for the government to prove that those violations of law occurred." Id. at 55.

The trial court asked both of Fulks' trial counsel whether they were satisfied that he understood the nature of the charges against him, the essential elements that government was required to prove, and the maximum penalty he faced on all the charges. Both counsel answered: "Yes." Id. at 60. The trial court then asked both counsel whether they had "both thoroughly discussed these charges and all the evidence associated with these charges and all the things the government would be required to prove?" They both responded, "Yes." Id. at 60-61.

The trial court concluded "That after conducting an extensive colloquy with Mr. Fulks, I find that [he] fully comprehends and understands the nature of the charges against him generally, and he understands the essential elements of each of the eight counts that the government would have to prove if a trial was held." Id. at 61.

The trial court then asked Fulks if anyone had threatened or forced him to plead guilty.

Fulks answered, "No." Id. at 64. The court then asked him, "Are you pleading guilty of your own free will because you are guilty?" Fulks answered, "Yes." Id.

The court next began the process of determining whether there was a sufficient factual basis for the guilty plea. Id. at 65-66. Trial counsel informed the court that "rather than giving me a narrative of what happened [Fulks] wished to simply concede that the [FBI 302], which is a report of an interview the FBI did with Mr. Fulks, is accurate." Id. at 66. The trial court had great reservations about whether the FBI 302 admitted enough facts for Fulks to plead guilty to count 1, carjacking resulting in death, and count 2, kidnapping resulting in death. Id. at 66-69. The trial court decided that the best course of action was for the parties to brief the issue of whether Fulks could plead to the counts pursuant to Pinkerton liability. Id. at 68-69, 72-73.

### 2. Parties researched/briefed applicability of Pinkerton to counts 1 & 2

Both parties researched the issue and briefed the trial court regarding whether Fulks could plead guilty to counts 1 and 2 pursuant to Pinkerton liability. Both parties agreed that Fulks' guilty plea to count 2, kidnapping resulting in death, was valid under the facts set forth in the FBI 302 without relying upon Pinkerton liability. See Fulks' Memorandum, filed May 6, 2004, at p 5 n. 5 ("Because Count 2 (kidnapping resulting in death) contains no express *mens rea* requirement with respect to the death of the victim, the facts as set forth in defendant's statement to the FBI are sufficient to establish his guilt of that offense without resort to Pinkerton or any other theory of vicarious liability."); United States' Memorandum, filed May 5, 2004, at pp. 14-15 ("The facts the defendant admitted to the FBI establish his guilt of this crime [kidnapping resulting in death] independent of any vicarious liability theories.").

Similarly, after researching and briefing the issue, both Fulks and the government agreed

91

that there were sufficient facts to support Fulks guilty plea to count 1 pursuant to <u>Pinkerton</u> vicarious liability. <u>See</u> Fulks' Memorandum, filed May 6, 2004, at pp. 5-7; United States' Memorandum, filed May 5, 2004, at pp. 8-14. In Fulks' memorandum regarding the propriety of his proposed guilty plea to Count1, he admitted that "although the Fourth Circuit's decisional law is not clear on the question whether a co-conspirator's acts must have been 'reasonably foreseen as a necessary or natural consequence of the unlawful agreement, . . . in order for <u>Pinkerton</u> liability to attach, **defendant further submits that, under the circumstances he has admitted, this requirement would likewise be satisfied.**" <u>Id.</u> at 6-7 (emphasis added). Any argument that Fulks did not know about the question of the "reasonable foreseeability" requirement for a plea pursuant to <u>Pinkerton</u> is without merit.[30]

### 3. Change of Plea hearing continued on May 7, 2004

The trial court continued the plea hearing on May 7, 2004. At this hearing the court first summarized the memoranda submitted by both sides: "[B]oth memoranda suggest that the <u>Pinkerton</u> doctrine . . . could support a theory of vicarious liability imputing guilt to Mr. Fulks on count 1, the car-jacking count, and both memorandums suggested that <u>Pinkerton</u> is not required to support a finding of guilt as to count 2." . May 4 & 7, 2004, Guilty Plea Transcript at p. 79. The trial court agreed with the parties that "Pinkerton is not required . . . to make a finding that there is a factual basis for guilt . . . as to count 2." <u>Id.</u> at 80.

The trial court then turned to count 1, carjacking resulting in death, which "does have a

---

[30]Both the defense and prosecution noted that Fourth Circuit law was unclear on whether a co-conspirator's acts must have been "reasonably foreseen as a necessary or natural consequences of the unlawful agreement" in order for Pinkerton liability to attach. <u>See</u> Amended Mot. to Vacate at 6-7, filed May 6, 2004; United States' Memorandum at pp. 11-12, filed May 5, 2004.

mental state requirement. . . in doing so the defendant intends to cause death or serious bodily harm." Id. at 81. The court noted: [T]hat's where we have a problem with the 302 statement not relating any facts that would support a finding of intent to cause death or intent to cause serious bodily harm. The parties have briefed the question of whether Pinkerton may be applied to that situation and both sides have suggested that it may." Id. Fulks' trial counsel, Mr. Blume, agreed that "there is no constitutional infirmity or legal infirmity in applying Pinkerton to the carjacking resulting in death charged here." Id. at 82.

The trial court then went through the FBI 302 with Fulks to set forth a factual basis for the plea. In the FBI 302, Fulks admitted that on November 14, 2002, on the eleventh day of his crime spree[31] with Basham, Fulks was driving a white pick-up with Basham as the passenger. Fulks stated that "both Fulks and Basham knew that they needed to steal another vehicle, and Fulks drove into the Walmart parking lot" in Conway, South Carolina. Fulk's Guilty Plea Transcript, May 7, 2004, at p. 85. "As Fulks drove the pick-up truck into the parking lot, they noticed a BMW pulling down one of the aisles looking for a space. Fulks drove the pick-up truck behind the BMW and as the BMW pulled into a space, Basham jumped out of the still moving pick-up." Id. Fulks claimed that he "assumed that Basham was going to steal an unoccupied vehicle."[32] Id. After Fulks traveled down the aisle "turned and began traveling down the adjacent aisle," Fulks "noticed that Basham was waving his hand signaling Fulks to drive over to his location." Id. at 85-86. "Basham was leaning into the driver's side of the BMW

---

[31]This was three days after Fulks and Basham carjacked Samantha Burns resulting in death in West Virginia. United States v. Fulks, 454 F.3d 410, 415-16 (4th Cir. 2006).

[32]There are no facts in the record to support the possibility that Basham or Fulks had the ability or skill to steal an unoccupied car unless that car had the keys in it.

sitting on the female driver. Fulks pulled the pick-up in front of the BMW and watched Basham

fall over to the front passenger's seat." Id. at 86. With Fulks following in the pick-up, "Donovan

drove the BMW from the parking space to a location near the rear area of the parking lot." Id.

Fulks "parked the pick-up, and entered the BMW in the rear seat." Id. Donovan drove out of the

parking lot toward Myrtle Beach. She was "ordered to stop the vehicle in an area believed to be

the Conway City maintenance facility." Id. Donovan was moved to the back seat and "Fulks

began driving the BMW." Id. Basham who "was armed with a .22 revolver" sat "on the

passenger's side of the back seat with Donovan sitting behind Fulks." Id.

Eventually Fulks drove to a bank ATM machine and took out $200 using Donovan's

stolen ATM card. Fulks then drove to a gas station where Fulks purchased soda, gum, black tape

and radiator repair tape. Fulks then drove to a remote area where both he and Basham raped

Donovan. Id. at pp 87-89. Fulks then said:

> Donovan remained naked in the back seat and was told by BASHAM that she could not put any of her clothes back on. At some point Donovan put her panties and tennis shoes on . . BASHAM wanted FULKS to begin looking for dirt roads off of Highway 90. FULKS turned down the first dirt road he came to, but quickly turned around after seeing several houses and barking dogs. FULKS turned down several other dirt roads but found that they all had houses on them. FULKS continued to drive down Highway 90 when he recalled seeing a wildlife sign on the side of the road. FULKS passed the dirt road which the wildlife sign pointed to and turned around at a small grocery store, possibly an IGA. FULKS drove back and turned right onto a dirt road. It was dark at this time and FULKS noticed that Donovan's wrists were tied together . . . .
> FULKS continued driving down the dirt road and recalled seeing a long, wooden dock with a green security fence. FULKS turned the BMW around just after passing the dock and pulled up to the right side of the road . . . .
> BASHAM told Donovan that he did not intend to hurt her, but only tie her up and leave her in the woods. BASHAM got out of the car. While BASHAM was out of the car, Donovan asked BASHAM to leave the gun in the car since he was only going to tape her up. BASHAM would not leave the gun in the car. BASHAM signaled FULKS to back up the BMW and shut the headlights off.

BASHAM took Donovan out of the car and walked to the front of the BMW. BASHAM was holding Donovan by the elbow and had a gun in her side. BASHAM began walking to the right side but for some reason quickly walked back to the left . . . . FULKS did not see BASHAM holding any tape when he got out of the car. . . .FULKS last saw BASHAM and Donovan walking into the woods, possibly to the left side. BASHAM returned approximately twenty minutes later and appeared by the front of the BMW. BASHAM was holding Donovan's panties and tennis shoes. BASHAM . . . told FULKS to get out of there.

. . . BASHAM told FULKS that he had killed Donovan by choking/strangling her and taping her to a tree.

Id. at pp. 90-95.

Fulks admitted that the statement he made to the FBI was accurately summarized in the FBI 302 and was made freely and voluntarily. Id. at 99. The trial court then stated that it was "prepared to accept the plea . . . I'm prepared to conclude that there's a factual basis for the plea as to counts 1 and 2." Id. at 100. The trial court noted that it did not have to rely on the Pinkerton doctrine to accept the plea as to count 2. Id. As to count 1, the trial court noted that "because [carjacking resulting in death] does have an intent requirement in the fifth element, it is necessary to rely on Pinkerton." Id. The court noted that it had "some concerns about the applicability of Pinkerton . . . [b]ut with the concession by the government and the defense counsel that Pinkerton applies, I'm prepared to accept the factual basis for count 1 based on Pinkerton." Id.

The trial court also noted that "one could make a due process argument that although Pinkerton has been applied to ordinary conspiracies and ordinary criminal ventures, that due process would prevent it from applying to a capital case." Id. at 100-01.

The government, however, requested that it be allowed "to provide a thorough and

factual basis for the plea." Id. at 101. The trial court responded, "I understand y'all have agreed to disagree on the intent element on the capital charges, and we need to get a clear record of that. And then we also have got to deal with all these other elements of counts 3 through 8, that I don't have anything in the record about yet. And I'm just thinking . . . should we break it into two parts . . .?" Id. The government responded, "What I propose that we–that I provide the government's position as to the guilty plea. And at the conclusion of my remarks . . . we can then . . . revisit the issue of Pinkerton." Id. at 101-02. The trial court agreed to this and told Fulks: "Now as to counts 1 and 2, the counts for which you can receive the death penalty, they are going to give me some additional facts as to those counts also. . . . to prove that you had a part in the killing and you intended to kill Ms. Donovan; do you understand that?" Id. at 102-03. Fulks answered, "Yes, sir." Id. at 103.

> The government then began its presentation of facts to support the guilty plea:
> It's the government's position that a thorough presentation needs to be provided in the record during this guilty plea for a number of reasons, one of which, if there is any direct challenge after the fact as to this particular guilty plea, as well as any other collateral challenge as to Mr. Fulks' decision, or any advice that he was provided, the government feels that it's important to provide a thorough presentation at this time.

Id. at 103-04. The government noted that "to understand the events that began on November the 4th, 2002, and to put Mr. Fulks' state of mind and his relevant intent factors into context, the actual events prior to November the 4th, 2002 need to be discussed." Id.

The government then described how Mr. Fulks was arrested at a Wal-Mart parking lot in Madisonville, Kentucky on August 25, 2002. Fulks' wife, Veronica Evans, entered the Wal-Mart with her three-year-old son, went to the customer service desk and

told them that she feared for both their lives because her husband was in the parking lot with a gun. The police were called. They arrived and arrested Fulks. The police found a gun inside the car. Fulks was a convicted felon. Fulks was charged with possession of a firearm by a felon, theft of a motor vehicle license plate and giving false information to police. Fulks was placed at the Hopkins County Detention Center. Id. at 104-05.

Defense counsel objected to this presentation of facts. He claimed that the factual presentation was "getting into an area that goes into aggravation" and that "we may run into a situation where potential jurors are contaminated." Id. at 106. The government responded, "we want to provide **a thorough basis for, a factual basis, including his intent** for this plea." Id. (Emphasis added). The government continued,

> Simply because the defense–and we understand you can accept the plea based on Pinkerton, but the government feels that we need to put on the record, a thorough record clearly demonstrating all the evidence indicative of his intent during this crime spree, and his intent involving the car-jacking and kidnapping of Alice Donovan.

Id. at 106-07.

The government continued with its presentation. The government explained that Veronica Evans began to cooperate with police because she had been found with stolen credit cards when Fulks was arrested.[33] As a result of her cooperation, the police were able to obtain a search warrant for the mobile home where Fulks and Evans lived. At the mobile home, police found "an AK 47, a shotgun and some other pistols" and "thousands of dollars worth of stolen goods." Id. at 107.

---

[33]She was arrested at the Wal-Mart parking lot and her 3-year old son, Myles, was taken into protective custody. Id. at 105-06, 107.

The government next detailed charges pending or likely to be brought against Fulks: (1) violation of supervised release in Tennessee; (2) violation of parole in Indiana; (3) resisting arrest in Indiana; and (4) armed robberies on Interstate 65 in Tennessee. Id. at 108. On top of these charges, on August 26, 2002, the foster mother for Miles Evans noticed bruising and other injuries on Miles. As a result of an investigation, Fulks was charged with aggravated child abuse. Id. at 109. "On November the 3rd, the day before [Fulks] escaped, Detective Scott Smith of the KY State Police . . . Served an indictment on Mr. Fulks for aggravated child abuse. [Fulks] had already been interviewed by the FBI and knew he was a suspect for the armed robbery . . . on I-65." Id. The government noted that when Detective Smith served Fulks with the indictment, Fulks stated that "Y'all want to put me away for the rest of my life, and I'm not going to stick around to be here." Id. at 110.

At this point in the government's presentation, the defense noted that "we are not going to agree to anything [the prosecution] says other than what is in the 302 and the elements necessary to establish . . .the factors in counts 3 through 8." Id. at 110. The trial court noted that it could not stop the government from putting these facts on the record. Id. at 111.

The government then explained how Fulks and Basham escaped from the Hopkins County Detention Center on November 4, 2002. Id. at 112-14. The government next explained how on the evening of November 5 Fulks and Basham convinced James Hawkins, a 42-year old man,[34] to drive them to their allegedly broken down car.

---

[34]Hawkins lived 8-10 miles from the Hopkins County Detention Center.

"Eventually during the search for the car, [Basham] pulls out a knife . . . and a car-jacking commences." Id. at 114. Fulks ordered Hawkins to pull over and Fulks began to drive. Id. at 114-15. "Fulks orders Mr. Basham to duct tape Mr. Hawkins' wrists." Fulks drove to a rural farm area and Basham began to duct tape Hawkins to a tree. The government noted that Fulks was not satisfied with Basham's efforts: "As Mr. Basham is duct taping [Hawkins] to a tree, Mr. Hawkins will testify that Mr. Fulks indicated that Mr. Basham is not tying [Hawkins] tight enough, and Mr. Fulks continued to duct tape him to a tree. They also bound and gagged him so that he could not cry out." Id. at 115. The temperatures dropped into the 30s that night and it took Hawkins fifteen hours to untie himself. Id.

The government then presented facts and evidence that on November 8, Fulks, Basham, Tina Severance and Angela Roddy planned and executed a robbery of Robert Talsma's home to steal guns. Id. at 116-17. Fulks and Basham stole four guns. Id. at 117. The government also noted that on November 10, Fulks and Basham purchased camouflage clothing at a Wal-Mart in Piketon, Ohio. Id. at 117.

The government next explained that Fulks, Basham, Tina Severance and Angela Roddy checked into the Hollywood Motel in Huntington, West Virginia on November 11, 200. Fulks and Basham left that afternoon dressed in camouflage clothing and did "not return until sometime between 2 and 4 o'clock in the morning on Tuesday, November the 12th." The government noted that it would "be presenting evidence of the abduction and the murder of Samantha Burns by Mr. Fulks and Mr. Basham" if allowed to by the trial court Id. at 118.

99

The government next proffered that on November 12, Fulks, Basham, Severance and Roddy checked out of the Hollywood Motel and traveled to Little River, South Carolina where they checked into the Lakeshore Motel. Id. at 118-19. The government noted it would produce testimony from various people that Fulks and the others would go to malls, break into cars, and steal purses, credit cards and checks. They would then purchase items, including alcohol. Then they would take items back to get cash. Id. at 119.

The government noted next that on November 14, 2002 at approximately 1:45, Carl Jordan was driving onto his property in the Savannah Bluff area. "He drives up onto that land checking on it, and he notices a green van parked behind one of his son's mobile homes." Id. at 120. When Mr. Jordan pulled up to the van, the sliding door to the van opened and he noticed shotguns and rifles, including his own Remington 1100, and jewelry and clothing as well as other items. Mr. Jordan pulled in front of the van and began to call 911. Before Mr. Jordan could dial 911, "Fulks comes out of the back door of the mobile home." Mr. Jordan can identify Fulks as the person who came out of the mobile home. Fulks ran toward Mr. Jordan and shoots at him. The bullet went through the back window within a foot of Mr. Jordan's head. The government also noted that "Basham [came] around the front of the car ... shooting," too. Id. at 121. Mr. Jordan began to drive away. Fulks and Basham chased after Mr. Jordan, "firing the firearms as they [drove] down the road." Id. The government noted to the court that these facts and Mr. Jordan's testimony were "critical and . . . important for the record ... because of the intent factor." Id. The government noted that Jordan's testimony showed Fulks' and

100