Basham's intent to kill Jordan. Id.

Fulks eventually pulled the van into Cooper Metal Works where he was seen by a couple of workers there. The van became stuck in a field. Fulks and Basham ran across a corn field. They knocked on the door of Ms. Margaret Moore and told her that their car had broken down. She refused to let them in. They then crossed the street and stole a white pick-up from Oleita Hyman's yard. This pick-up was used by her farm help and the keys had been left in it. This is the pick-up that Fulks drove into the Wal-Mart parking lot in Conway. Id. at 122.

At the same time, Alice Donovan pulled into a Wal-Mart parking lot. Driving up behind her was the white pick-up truck. Id. The prosecution described what happened next: "She pulls into an aisle–and all of this is on videotape–and before the white pickup truck stops, a person you can see jumping out of the white pickup truck right when Ms. Donovan pulls her BMW into the slot." Id. at 122-23. The government further described what the videotape showed:

> You can't see what is going on inside the BMW, but you can see the white pickup truck pull around and park in front of the BMW. Because when Ms. Donovan pulls in, there was not another car in that space. You see that the BMW pull out and go towards the back part of the parking lot where it abuts [Highway] 501, and you see the pickup truck then follow the car.

Id. at 123.

The government continued:

> The car-jacking and kidnapping of Ms. Donovan has begun at that point. It is approximately 2:40 on Thursday, November the 14th. Mr. Basham was armed with a .22, and . . . it's the government's position that at least the other .45 that was stolen was in the possession of Mr. Fulks. For the record, one of the .45s–when they [Fulks and Basham] got to Ms. Moore's residence, before they

101

> stole Ms. Hyman's pickup truck–later on, a couple of weeks later, a duffel bag and clothes and a pistol, a .45 pistol was found at the wood line behind Ms. Moore's residence; clothing items in the duffel bag that is identified as the clothes of one of the two defendants.

Id. at 123-24. The government also noted: "Also when the van got stuck, inside the van were rifles, shotguns, other items . . . belonging to Mr. Jordan's son . . . as was a .45 caliber revolver in the van. The two guns that were unaccounted for at the time were a .22 revolver and .45 revolver." Id. at 124.

The government then described several videos that confirmed the attempted use of Alice Donovan's ATM card in the Conway area. Next, a video showed the BMW "pulling into a BP Amaco convenience store in Shallotte, North Carolina. . . And the ATM receipts show around 3:45 the money being gotten out of the ATM machine." Id. at 125. The government then summarized the videotape: "The video is very clear that Mr. Fulks pulls the car up, gets out of the car, standing there, he's pumping gas . . . The inside video has Mr. Fulks . . . purchasing three Mountain Dews, as well as some electrical tape and some other tape. The Brunswick County Sheriff's Department also got the receipt matching up to that time. They got the receipt for the three Mountain Dews and the tape on it as well." Id. Cell phone records demonstrated that the last cell phone call Ms. Donovan made to one of her daughters at approximately 4:30 was "pinging off of . . the cell tower off of Lewis Swamp Road in Shallotte, North Carolina." Id. at 126.

The government then noted that the "next sighting" was at "Bee Tree Farm, sometime between 5 and 5:30." Id. Several individuals who are cleaning the hunt club and preparing for a barbeque see the BMW driving down the dirt road to the hunt club.

102

Four of these folks "describe the driver as having blond hair, a short military type." They described "the male in the back seat as having brown hair, short military type, and they describe a female in the back seat." Id. at 127. The BMW turned around in the field and started "going back on the dirt road, about nine-tenths of a mile from the hunt club on the left-hand side, there is a small family cemetery." Id. at 127. The government then noted that "Ronald Purdue, a witness who lives near there, is driving down the road and . . . he notices and he identified the BMW. And he knows somebody is in [the BMW] because the engine is running and the brake lights keep going on. . . The engine is running and the brake lights keep going on and off. There is nobody on the hood" and "nobody on the outside of the car. He doesn't think much about it and he ends up driving away." Id. at 128.

After the presentation of the government's factual basis for the guilty plea , the prosecutor noted:

> And so the government wants the record to reflect at this point that even though we are offering–we would also offer the 302 and intend on offering that testimony, I want the record to reflect that the government is not necessarily implying or indicating or agreeing with the defense counsel that this is merely a Pinkerton theory on guilt. Because the evidence–the court is aware that there is–that the co-defendant in this case denies being the actual killer.

Id. at 129.

The government next proffered that on November 15, in Huntington, West Virginia, Fulks attempted to "either trade or sell one of the firearms to the brother of [Beth] McGuffin." He also tried to "trade or sell the BMW to a friend of Ms. McGuffin's brother." Id. at 133.

The government next proffered facts of the attempted carjacking of Andrea

Francis at the Ashland[35] mall:

> Anna Francis is a 15 year old girl. . . [she] and her mom had gone to a movie at a
> mall in Ashland, Kentucky. After the movie, they went to purchase some items at
> the local Wal-Mart. As they were walking back to their car, Andrea Francis was
> on her cell phone talking to a friend of hers. Mr. Basham approaches her with a
> gun, attempts to carjack this 15 year old girl. The mother comes up on the scene,
> they say something to Mr. Basham that spooked him. Mr. Fulks is driving around
> the parking lot area.

Id. at 134.

The government noted that Ronnie Fulks told the FBI that Fulks admitted to him

that he "carjacked the lady in South Carolina." Id. at 138. The government also noted

"[a]n FBI serologist and DNA analyst [was] able to determine that a semen stain on the

back seat of Ms. Donovan's BMW is in fact the DNA of Chad Fulks." Id. at 142.

After this presentation, the government noted:

> As to element 5 [of carjacking resulting in death], I know the court
> indicated it would allow the government to expand on its position with regard to
> "In doing so the defendant intended to cause death or serious bodily injury."
> We agree or we acknowledge that Pinkerton versus United States would
> be applicable. However, Your Honor, I can't stress enough how the government
> does not–and disagrees with any position or premise that only his guilt on that
> element would only be applicable based on the Pinkerton theory.

Id. at 152-53. The government later stated that the government has "a responsibility to

put as much on the record–so if anybody collaterally attacks defense counsel's advice to

plead guilty even under Pinkerton." Id. at 153. The government concluded: "[I]t's the

government's position that it is a reasonable inference that a jury, had this case gone to

trial, that a jury would find that both Mr. Basham and Mr. Fulks had the intent to cause

---

[35]Ashland, Kentucky is across the Ohio River from Huntington, West Virginia.

death and serious bodily harm." Id. at 154.

The trial court then had the follow exchange with the government regarding the government's position on the factual basis for the guilty plea to count 1:

> THE COURT: All right, as I understand your position then, you say, number 1, there is enough of a factual record established by Mr. Fulks' 302 to establish the intent requirement without reference to Pinkerton?
> MR. GASSER: Absolutely, Your Honor, that's the government's position.
> THE COURT: All right. As a fallback position, you say if it's not enough, Pinkerton will come to the rescue, and through a Pinkerton vicarious liability theory for the acts of Mr. Basham, there's a factual basis for the plea?
> MR. GASSER: That's the government's position.
> THE COURT: And then your third position is, you have what you say is a wealth of other evidence showing intent and actual commission of the murder that bears on the reasonableness of his decision to plead guilty today in case there is a later challenge over the decision to plead guilty?
> MR. GASSER: That's the government's position, and that's why we wanted to clearly state that on the record and have the proceedings reflect that.

Id. At 155.

Defense counsel continued to pursue their trial strategy to admit guilt to count 1 in the most limited way possible so to preserve the ability to dispute that Fulks personally intended to cause death or serious bodily injury to Alice Donovan: "In terms of [element] 5 . . . we intend to plead under the Pinkerton vicarious liability, and we don't dispute the death as a result thereof." Id. at 161. The trial court summarized this approach near the end of the change of plea hearing:

> So let's be very clear now, the defendant takes the position that there is an adequate basis for taking a plea the plea to count 1, the car-jacking resulting in death, based on Pinkerton, and you concede that is enough for acceptance of a guilty plea; you reserve the right to take issue with the government's contention that your client had the requisite intent to receive the death penalty, which will be a question for the jury in the penalty phase?

Id. at 173. Defense counsel agreed with this summary. Id.

105

Fulks agreed to plead guilty to count 1 and all the other counts, as well. The court asked Fulks, "Having been through all of that, do you still want to plead guilty to all eight counts of the indictment against you?" Fulks responded, "Yes, sir." Fulks understood that the jury could impose the death penalty under either of counts 1 and 2. The trial court asked Fulks: "Have you given serious thought to the question of whether you should plead guilty?" Fulks responded, "Yes, sir." The court asked, "Do you think it is in your best interest?" Fulks responded, "Yes, sir." Id. at 190.

After this exhaustive hearing, the trial court made the following findings:

> I find that [Fulks] has admitted to an adequate factual basis to support a finding of guilt as to each of the eight counts of the indictment.
> As I said, count 1 creates the most difficulty, but I am persuaded that the Pinkerton doctrine can be applied to allow the plea to go forward based on the statements contained in the 302 report of interview provided by the FBI. No party has raised any due process challenge or other challenge to the application of Pinkerton to count 1 of this case.

Id. at 192

**B.      Fulks' arguments attacking his guilty plea to count 1 are without merit.**

**1.      Fulks' direct challenge and attacks to his guilty plea are procedurally defaulted.**

First, as an initial matter, because Fulks could have raised the ninth and twelfth[36] claims on direct appeal, see United States v. Mastrapa, 509 F.3d 652 (4th Cir. 2007) (vacating plea on direct appeal for lack of sufficient factual basis), he has procedurally defaulted these claims. United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir.

---

[36]The trial court noted on at least two occasions that neither party had raised any due process challenge to Fulks pleading guilty to count 1 pursuant to Pinkerton liability. Guilty Plea hearing transcript, May 4 and 7, 2004, at pp. 100-01, 192.

1999). In order to bring these claims, Fulks must assert that his trial counsel was ineffective for allowing Fulks to plead guilty. Id. at 493 ("The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel."). As noted below, Fulks' attempt to make such ineffective assistance claims regarding his guilty plea to count 1 must fail because his guilty plea was done as a central component of his counsel's strategy to avoid a death sentence.

> **2.    Because the jury imposed the death penalty pursuant to the kidnapping count any alleged infirmity of the guilty plea to carjacking would be harmless and moot.**

Second, Fulks' various belated attacks on his guilty plea to count 1 are both moot and harmless. Even if Fulks were able to convince this Court that his guilty plea to carjacking resulting in death was infirm, any error would be harmless. In his various attacks in his habeas petition, Fulks fails to recognize the significance of his guilty plea to count 2, kidnapping resulting in death. Fulks pled guilty to kidnapping resulting in death and the jury also imposed the death penalty pursuant to this count. See Special Verdict Form as to Count 2, filed June 30, 2004. (Attached hereto as Exhibit D). Fulks has not attacked the validity of his guilty plea to count 2, kidnapping resulting in death. Nor has Fulks attacked the death sentence imposed pursuant to that conviction.[37] There is no doubt that the same evidence and information would have been introduced even if Fulks

---

[37]Fulks' plea to count 2, kidnapping resulting in death, was not done pursuant to Pinkerton. In his Amended Motion, Fulks admits "Both parties also agreed that resort to Pinkerton was unnecessary on the kidnapping count, as there was no intent element to satisfy, and the statements in the 302 sufficed to establish a guilty plea on that count." Amended Mot. to Vacate at 115 n.11.

had pled guilty only to kidnapping resulting in death. The trial court wisely had the jury complete separate verdict forms for both counts, counts 1 and 2, either of which carried the possibility of the death penalty. See TT, June 25, 2004, Vol XIX, at pp. 144-45 (trial court: "I think, out of an abundance of caution, I will require them [the jury] to do it [fill out a verdict form] on both counts.") In short, even if the guilty plea to count 1 were invalidated, the imposition of the death penalty would still be valid pursuant to count 2. See Brown v. Sanders, 546 U.S. 212 (2006) (holding that fact that two of four eligibility factors found by the jury, any one of which would have rendered defendant eligible for death penalty, were determined to be invalid did not affect constitutionality of death sentence ultimately imposed); United States v. Higgs 353 F.3d 281, 319-20 (4th Cir. 2003). Therefore, even if the guilty plea to count 1 were somehow to be found invalid, the death sentence would still be valid and constitutional because of Fulks' guilty plea to count 2 and the jury's imposition of the death penalty for Fulks' role in the kidnapping of Alice Donovan.

### 3. Fulks' guilty plea was done as part of a valid trial strategy.

A third reason Fulks' various attacks must fail is because his guilty plea was a valid and recognized strategy in death penalty cases. Any attempt to make an ineffective assistance claim must fail because counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. Strickland, 466 U.S. at 690. Fulks must also overcome the presumption that the challenged action was sound trial strategy. Id. at 689.

The guilty plea was done as a central component of his counsel's strategy to avoid

108

a death sentence. Fulks was undoubtedly seeking to show the jury that he was remorseful and accepted responsibility for his role in the death of Alice Donovan, but that he did not deserve to die even if the jury found a number of aggravating factors. See Meyer v. Branker, 506 F.3d 358, 369-70 (4th Cir. 2007) ("A guilty plea demonstrates remorse, and, since the same jury sits during the guilt and penalty phases of a capital trial . . . it also lessens the exposure of jurors to the often dramatic evidence of the crime."); Simpson v. Polk, 129 Fed.Appx. 782, 797 (4th Cir. 2005) (defense strategy was by entering the guilty plea "maybe the jury would have some mercy and sentence [defendant] to life in prison). Jones v. Page, 76 F.3d 831, 844-45 (7th Cir. 1996).[38]

Clearly, Fulks pled guilty to carjacking resulting in death pursuant to Pinkerton in order to preserve his ability to contest that he had the requisite mental state to make the carjacking offense a death penalty-eligible offense and his ability to contest the existence of an aggravating factor. Fulks' effort to enter a plea to all eight counts was clearly a central component of his counsel's strategy to avoid a death sentence. Fulks was seeking to plead guilty to enhance his argument to the jury that he was remorseful for his crimes and did not deserve to die even if the jury found a number of aggravating factors. In particular, Fulks' entry of a guilty plea as to the carjacking count (count I) pursuant to Pinkerton (in conjunction with his statement given to the FBI) in which he disclaimed any knowledge of or personal participation in Donovan's murder was perfectly in line with a

---

[38]See also People v. Fuller, 205 Ill.2d 308, 793 N.E.2d 526, 543 (2002) (pleading guilty to felony-murder count for which defendant was subsequently received death penalty did not show ignorance of culpable mental state required for death penalty eligibility based on felony-murder aggravating factor, but reflected strategy to have defendant accept responsibility and thus show remorse to jury in hopes of avoiding death penalty in sentencing phase of trial).

strategy that his trial counsel recommend in a recent law review article they authored:

> The value of actively contesting guilt, however, must be weighed against the frequency with which jurors are angry at defendants who deny their involvement when evidence of guilt is strong. A denial defense at the guilt or innocence phase is more than twice as likely to result in a death sentence as compared to cases where the defendant acknowledges his guilt from the start . . . In the juror's eyes, the defense team tried to fool them at the first phase by denying guilt, and now he is trying to fool them again with the mitigation evidence to cheat the executioner. . . . Sometimes the tension between contesting guilt and acknowledging responsibility can be bridged by partial defenses; a defendant may contest his mental state, or his role in a multi-defendant crime without necessarily incurring the jury's wrath . . . . [A] defense that acknowledges involvement in the killing but denies that the defendant was guilty of capital murder appears to escape this backlash . . .

John H. Blume, Sheri Lynn Johnson & Scott E. Sundby, Competent Capital

Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About

Mitigation, 36 Hofstra L. Rev. 1035, 1044-45 (2008).[39]

Fulks' plea to the carjacking under Pinkerton preserved his ability to contest the

fact that he harbored the requisite mental state to make the offense a death-eligible

offense and his ability to contest the existence of an aggravating fact.

Additionally, in the sentencing phase, trial counsel used Fulks' guilty plea to

---

[39]See also, Scott E. Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L.Rev. 1557, 1558, 1586 (1998) (noting that a defendant's lack of remorse is often a significant factor precipitating the jury's decision to impose the death penalty); Barry J. Fisher, Judicial Suicide or Constitutional Autonomy? A Capital Defendant's Right to Plead Guilty, 65 Alb. L.Rev. 181, 201-02 (2001) (recognizing the capital defendant's interest in avoiding trial by entering a guilty plea: "[U]nder a system in which a capital conviction leaves a jury or judge with a choice of punishment . . . a defendant also has an interest in focusing the sentencer's attention on the issue of punishment and evidence relevant to sentencing and degree of guilt, rather than advancing a meritless, even frivolous, defense to the charge. The defendant also has an interest in demonstrating that he has taken responsibility for his conduct, is remorseful, and is seeking to spare the victim's family and the court system unnecessary time and expense. As the continuing resort to this practice by some capital defendants attests, in certain cases there is arguably no better way to accomplish these legitimate goals than by pleading guilty").

demonstrate that he had accepted responsibility for his role in the carjacking and

kidnapping of Alice Donovan. In his opening statement, Fulks' trial counsel explained

that Fulks had accepted responsibility for his actions by pleading guilty:

> Chad Fulks has pled guilty to kidnapping and carjacking Alice Donovan. By doing that, he has accepted responsibility for his role in the deaths of these two women. And has insured that he will never be released from prison and that he will die there. . . .That is not gently confessing. That is stepping up and saying there are only one of two things that could happen: I am going to plead guilty, my life will either be taken by lethal injection, or I will spend the rest of my life in a federal prison.

TT, Vol. I, p. 129. Likewise, in closing argument, trial counsel continued this theme

when he argued to the jury that Fulks deserved life without parole, in part, because he had

pleaded guilty:

> Chad pled guilty to these offenses, ensuring he will never be released. He will spend the rest of his life in a maximum security prison. Sending him to prison for the rest of his life is not excusing what he did. It is not giving him a pass. Life without parole is not only severe punishment, it is a just punishment. And it is the appropriate punishment for Chad Fulks. Choose life.

TT, Vol XXI, p. 173. Based on Fulks' guilty plea and trial counsel's argument, the jury

found as a mitigating factor that "Chadrick Evan Fulks pleaded guilty to kidnapping and

carjacking resulting in death." Special Verdict Form, filed June 30, 2004, at p. 8 ; TT,

Vol. XXII, at p. 25.

Consistent with Fulks' overall strategy,[40] trial counsel took full advantage of

---

[40]Fulks now claims in his eleventh claim that the distinction between the intent required under Pinkerton and the gateway intent to be eligible for the death penalty was too fine for a lay juror to appreciate. (Amended Mot .to Vacate, at 134-36). This is simply a bald assertion without a single reference to a case that stands for such a proposition. Additionally, Fulks points to no place in the record to support this contention. This assertion is simply an after-the-fact criticism of a valid trial strategy. No place in the record is there a mention to the jury that Fulks pled guilty pursuant to Pinkerton. Pursuant to a valid trial strategy, the jury was told by Fulks'

Fulks' guilty plea and used it to argue for a life sentence instead of a death sentence. Having received the benefit of pleading guilty and using this fact at his original trial, Fulks should not now be allowed to "whip-saw" the trial court after the fact and complain that the court improperly allowed him, at **his** insistence pursuant to a valid trial strategy, to plead guilty. See generally Wheat v. United States, 486 U.S. 153, 161-162 (1988) ("trial courts confronted with multiple representations face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule"). Fulks got the benefit of his plea, but now wants to revisit the issue because he did not get the life sentence he pursued.

### 4. Fulks and his counsel were fully aware of the possibility that **Pinkerton** required a co-conspirator's actions to be reasonably foreseeable.

Fourth, despite Fulks' assertion to the contrary, Fulks and his counsel were fully aware of the issue of whether Pinkerton required a co-conspirator's acts to be reasonably foreseeable. See Fulks' Memorandum at pp. 6-7, filed May 6, 2004. This issue was a primary concern. The trial court suspended the guilty plea hearing to have the parties brief the Pinkerton issue. See Fulks' Guilty plea hearing transcript, May 4, 2004, at pp. 67-73. After researching and briefing the issue, Fulks continued to vigorously pursue a guilty plea based on Pinkerton liability. See Amended Mot., filed May 6, 2004. In Fulks' amended motion regarding the propriety of his proposed guilty plea to Count 1, he admitted that "although the Fourth Circuit's decisional law is not clear on the question

---

counsel that he had pled guilty, had accepted responsibility for his role, and that he did not deserve the death penalty. When the trial court gave its jury instruction there was no mention of the intent required for Fulks to be guilty of carjacking. This claim is without merit.

112

whether a co-conspirator's acts must have been 'reasonably foreseen as a necessary or natural consequence of the unlawful agreement, . . . in order for Pinkerton liability to attach, **defendant further submits that, under the circumstances he has admitted, this requirement would likewise be satisfied.**" Id. at 6-7 (emphasis added). Fulks and his counsel not only knew that Pinkerton might require that a co-conspirator's acts must be reasonably foreseen as a necessary or natural consequence of the unlawful agreement in order for Pinkerton liability to attach, but he **conceded** that "this [reasonable foreseeability] requirement would likewise be satisfied." Any argument that Fulks did not know about the question of the "reasonable foreseeability" requirement for a plea pursuant to Pinkerton is without merit.[41]

> **5.     There was a sufficient factual basis for Fulks' guilty plea to the carjacking count.**

Fifth, even if this Court were to reach the substantive issue of whether there was a sufficient factual basis for Fulks' guilty plea to count 1, carjacking resulting in death, it is clear that such a factual basis existed.

Before a court may enter judgment on a guilty plea, it must find a factual basis to support the plea. Fed.R.Crim.P. 11(b)(3). In determining whether a guilty plea has a factual basis, the district court need not rely only on the Rule 11 plea colloquy; the factual basis may be supported by "anything that appears in the record." United States v. Mastrapa, 509 F.3d 652, 660 (4th Cir. 2007) United States v. DeFusco, 949 F.2d 114, 120

---

[41]Both the defense and prosecution noted that Fourth Circuit law was unclear on whether a co-conspirator's acts must have been "reasonably foreseen as a necessary or natural consequences of the unlawful agreement" in order for Pinkerton liability to attach. See Amended Mot., at pp. 6-7, filed May 6, 2004; United States' Memorandum at pp. 11-12, filed May 5, 2004.

(4th Cir. 1991). In order to find a factual basis, the court need not establish that a jury

would find the defendant guilty. The court need only be subjectively satisfied that there

is a sufficient factual basis for a conclusion that the defendant committed all the elements

of the offense. A lower court's determination is reviewed for abuse of discretion and no

abuse of discretion will be found so long as the district court could reasonably have

determined that there was a sufficient factual basis based on the record before it. United

States v. Mitchell, 104 F.3d 649, 652 (4th Cir. 1997).

Fulks seems to believe that the factual basis determination can be based only upon

the facts as set forth in the FBI 302. This is not a correct reading of the law. As noted

above, in determining whether a guilty plea has a factual basis, the district court need not

rely only on defendant's Rule 11 plea colloquy. Mastrapa, 509 F.3d at 660. The Fourth

Circuit has explained:

> The question that really matters, however, and the one that appears to have
> escaped so many courts in the pursuit of pure procedural perfection, is
> whether appellant believed, at the time of the taking of the plea, that there
> was a substantial risk that a jury could find that he possessed the requisite
> intent. A defendant, in pleading guilty, does not have to believe that he
> committed all of the acts and possessed the statutorily-prescribed intent for
> the crime charged. The purpose of the plea hearing is to guarantee that the
> defendant understands the nature of the charges against him so that he can
> knowingly and voluntarily agree to plead guilty, rather than face the risk of
> a reasonable jury finding that he possessed the necessary "mens rea" and
> committed the "actus reus."

United States v. Wilson, 81 F.3d 1300, 1309 (4th Cir. 1996); United States v. Maher, 108

F.3d 1513, 1524-25 (2nd Cir. 1997) ("In making the factual-basis determination, the court

is not required to rely solely on the defendant's own admission." "[S]o long as the facts

relied on are placed on the record at the time of the plea, the district court, in determining

114

whether there was a factual basis for the plea, is free to rely on any facts at its disposal--not just the admissions of the defendant."); United States v. Tunning, 69 F.3d 107, 114 (6th Cir. 1995).

The trial court had a sufficient factual basis to accept Fulks' guilty plea to count 1 and Fulks' trial counsel was not ineffective for having Fulks plead guilty to count 1.

Even if the trial court was limited to the facts as set forth in the FBI 302, Fulks' statements as summarized in the FBI 302 provided sufficient facts to support a plea under count 1 pursuant to Pinkerton. As noted above, Fulks admitted as much in his memorandum in support of his Pinkerton plea:

> Under the facts as set forth in defendant's statement to the FBI, his liability under Pinkerton for carjacking resulting in death is clear. The carjacking statute provides as follows:
>
> > Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall
> >
> > (3)     if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.
>
> 18 U.S.C. § 2119. Defendant has admitted the facts necessary to establish his membership in a conspiracy with Mr. Basham, and submits that a reasonable jury would conclude both that the carjacking--which was initiated by Basham--and the subsequent murder of Mrs. Donovan--which was committed by Basham without defendant's prior knowledge--were accomplished in furtherance of that conspiracy. **Moreover, although the Fourth Circuit's decisional law is not clear on the question whether a co-conspirator's acts must have been "reasonably foreseen as a necessary or natural consequence of the unlawful agreement," Pinkerton, 328 U.S. at 648, in order for Pinkerton liability to attach, defendant further submits that, under the circumstances he has admitted, this requirement would likewise be satisfied.**

Fulks Memorandum re: guilty plea, at 6-7, filed May 6, 2004 (emphasis added).

115

It is clear from Fulks' statement memorialized in the FBI 302 and admitted to in the guilty plea hearing that Fulks admitted to facts that would show the requisite intent for him to plead guilty to count 1, carjacking resulting in death. Fulks pulled into the Wal-Mart parking lot in Conway knowing that he and Basham were going to steal a car just like they did in West Virginia when they carjacked Samantha Burns. In the Wal-Mart parking lot, Fulks pulled behind Alice Donovan's BMW as she drove it down a lane. Fulks drove the pick-up truck behind the BMW and as the BMW pulled into a space, Basham got out. Fulks circled around and came back to the BMW where "Basham was leaning into the driver's side of the BMW sitting on the female driver." According to the FBI 302, when Fulks first saw Basham in the BMW Basham was already sitting on top of Alice Donovan. Fulks admits that Basham "was armed with a .22 revolver" when Basham was in the BMW. These facts are sufficient for a guilty plea to carjacking resulting in death.

The intent requirement for carjacking resulting in death is satisfied when the government proves that the defendant "was conditionally prepared to act if the person failed to relinquish the vehicle." United States v. Foster, 507 F.3d 233, 247 (4th Cir. 2007). It is not necessary to prove that "the defendant actually intended to cause the harm." Id. In this case, Fulks admitted to facts to satisfy the intent requirement. According to Fulks' 302, Fulks saw Basham was sitting on Donovan when Fulks first saw that Basham had entered the BMW. Basham, armed with a .22 revolver, forced Donovan into the back of the BMW so Fulks could drive. The physical sitting on top of Donovan, the ordering that she drive to the back of the parking lot, the ordering Donovan into the back seat of the BMW and the use of the .22 revolver were sufficient to infer that Basham, with Fulks' help, possessed the intent to seriously harm or kill Donovan if

116

necessary to obtain control of the BMW. Foster, 507 F.3d at 247 (Using a gun and ordering

driver of vehicle out of vehicle "allowed the jury to infer that . . . [defendant] possessed the intent

to seriously harm or kill [the driver] if necessary to obtain control of the car").[42]

Later, both Basham and Fulks raped Donovan[43]. It should go without saying that

participating in a gang rape of a woman causes serious bodily injury. See e.g., United States v.

Gonzalez-Mercado, 402 F.3d 294, 296-97 (1st Cir. 2005) (rape qualifies as serious bodily injury

under 18 U.S.C. 2119). This admitted fact, participation in a gang rape of a woman, alone

supports intent to cause serious bodily injury. Additionally, after taking over the driving of the

BMW, Fulks purchased black tape and radiator tape with the stolen money from use of

Donovan's ATM card. Fulks drove the stolen BMW until he found a secluded isolated area for

Basham to tie Alice Donovan naked to a tree, presumably to die or suffer the effects of exposure

---

[42]A number of circuits have expressly held that the use of a firearm in the carjacking is sufficient to establish the conditional intent necessary to satisfy § 2119. See United States v. Adams, 265 F.3d 420, 425 (6th Cir.2001); United States v. Williams, 136 F.3d 547, 552 (8th Cir.1998); United States v. Lake, 150 F.3d 269, 272 (3d Cir.1998). The presence of a gun establishes that "the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car. Holloway, 526 U.S. at 3, 119 S.Ct. 966.

[43]Fulks claims that Holloway v. United States, 526 U.S. 1 (1999) calls for an assessment of his *mens rea* at the inception of the carjacking. However, Holloway and United States v. Foster, 507 F.3d 233 (4th Cir. 2007) should not be read to limit the focus to the commencement of the carjacking in cases like this one which involve "takings that occur over some period of time." United States v. Lebron-Cepeda, 324 F.3d 52, 63 (1st Cir. 2003) (concurring opinion). Many carjackings are entirely committed in the usually brief and frequently instantaneous period of time that it takes to initiate and complete the demand and taking of the vehicle. Both the carjackings at issue in Holloway and Foster were of this kind. In the present case, however, Fulks and Basham kidnapped Donovan and, thus, committed the crime of carjacking over an extended period of time. "There is thus no reason to suppose that, in those cases where the carjacking occurs over a period of time, Holloway circumscribes the fact-finder's entitlement to assess appellant's *mens rea* at any point during the commission of the *actus rea.*" Lebron-Cepeda, 324 F.3d at 64 (concurring).

117

to November evening weather[44] until she could free herself or was found by someone. This, too, evidences an intent to cause serious bodily injury or death. Furthermore, from the facts summarized in the FBI 302, it was certainly, at a minimum, foreseeable to Fulks that Basham would kill Donovan when Basham refused to leave his gun behind (but did not appear to have any tape with him) when he took Donovan into the woods to supposedly simply tie her to a tree. A close reading of Fulks' statements summarized in the FBI 302 and his adoption of the FBI 302 in the plea hearing demonstrate that there was more than a sufficient factual basis for the guilty plea to count 1. Fulks admitted to facts sufficient to find that he had the requisite intent to cause death or serious bodily injury to Alice Donovan or, at a minimum, Fulks admitted facts sufficient to find that it was reasonably foreseeable that Basham would cause serious bodily injury or death to Alice Donovan.

> **6.     The jury's finding of the gateway intent to qualify Fulks to receive the death penalty renders his attacks on his guilty plea to be without merit.**

Finally, Fulks' claims that the factual basis for the guilty plea to count 1 was insufficient and that the Pinkerton plea to count 1 violated due process[45] are moot because the jury found in imposing the death penalty pursuant to count 1 that the government had proven **beyond a reasonable doubt** that "CHADRICK EVAN FULKS intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Alice Donovan, such that

---

[44]According to the Old Farmer's Almanac, on November 14, 2002, the minimum and maximum temperatures in Lumberton, NC were 33.8°F and 62.6°F and the minimum and maximum temperatures in North Myrtle Beach, SC were 37.4°F and 59.0°F. See www.almanac.com/weatherhistory/oneday.

[45]Trial counsel twice refused the opportunity to raise a due process argument regarding the Pinkerton plea to Count 1. See Guilty Plea Transcript at 101, 192.

118

participation in the act constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act." See Special Verdict Form as to Count 1, filed June 30, 2004, at p. 2. Therefore, any complaint that Fulks had not provided a sufficient factual basis for his plea to count 1 pursuant to Pinkerton or that the plea violated due process, was rendered moot when the jury found in the sentencing phase that Fulks acted with the necessary intent to impose the death penalty and support a conviction under count 1. See Tison v. Arizona, 481 U.S. 137, 158 (1987).

In conclusion, Fulks' belated attacks on his guilty plea to Count 1 must fail. Any supposed error in accepting Fulks' guilty plea to carjacking resulting in death would be harmless because Fulks also pled guilty to count 2, kidnapping resulting in death, and the jury imposed the death penalty against Fulks, in a separate special verdict form, for the kidnapping of Alice Donovan. Fulks' guilty plea to carjacking resulting in death was done pursuant to a sound trial strategy. There was a factual basis to accept his guilty plea to Count 1. Fulks knew that any guilty plea pursuant to Pinkerton might require that Fulks reasonably foresaw that Basham had the intent to cause serious bodily injury or death to Alice Donovan. Finally, the jury's determination beyond a reasonable doubt in the sentencing phase that Fulks "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Alice Donovan, such that participation in the act constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act" renders this issue moot.

### Response to Claim XIII

**Fulks was at least an equal participant with Basham in their crimes.**

Fulks claims that his trial counsel were ineffective for failing to offer evidence of

119

Basham's leadership and manipulation that would have firmly established Fulks' minor participation. (Amended Mot. to Vacate at 138.) He argues that his trial counsel should have presented evidence that Basham, while at Columbia Care, constructed a 40 foot-long rope made of bed sheets, and that this would have been evidence of Basham's leadership in the Hopkins County escape. Fulks asserts that his counsel should have called a nurse at Columbia Care to tell the jurors that Basham was manipulative, a guard at Alvin S. Glenn to tell jurors that Basham was "very observant," "intelligent," and "crafty," another guard to tell jurors that Basham was aggressive, and a third guard to testify that Basham "can lead." Id. at 142-143.

A.      **Fulks was not a "minor participant."**

Evidence that makes one defendant look worse does not necessarily help another defendant in the case. See Howard v. Moore, 131 F.3d 399, 420 (4th Cir. 1997)(co-conspirator's intent to kill victim was not mitigating evidence in favor of defendant). A co-conspirator's state of mind is not relevant to the jury's determination of the proper punishment of another defendant because the Eighth Amendment requires an individualized determination of sentencing in death penalty cases. Id. (citing Lockett v. Ohio, 438 U.S. 586, 604 (1978)). Fulks fails to show how testimony by prison personnel generally characterizing Basham as manipulative, observant, aggressive, and crafty would have resulted in a different decision by the jury. In fact, jurors at Fulks' trial heard testimony that Basham could be aggressive, crafty, and manipulative.

Fulks' counsel took every opportunity to portray Basham as the more aggressive, and the leader of the two, as that was one of the themes of Fulks' defense. Fulks' counsel elicited testimony from Tina Severance that Basham had a quick temper and was paranoid. TT, Vol. IV, p. 21. Fulks' trial counsel stressed, through questioning of Severance, that Basham wore

120

Samantha Burns' ring around his neck, and Basham threatened Severance. Id. at 15-17.

Severance admitted she believed that having a weapon gave Basham a sense of empowerment,

and that he was a time bomb ready to explode. Id. at 22. During cross examination of Andrea

Roddy, Fulks' counsel focused the jury on Basham's possessiveness of the stolen guns and his

threats to kill police officers and a teenage boy. Id. at 103-106. This kind of testimony regarding

specific behavior by Basham during the crime spree was far more impressive than subsequent

general impressions by prison personnel would have been. However, each time Fulks' counsel

elicited testimony about Basham's culpability, the prosecutor re-focused jurors on Fulks'

behavior. For example, on re-direct of Tina Severance:

> Q. Ms. Severance, the closest you came to dying during this eight days that you were with Brandon Basham and Chad Fulks was when?
>
> A. At the Lake Shore Hotel when Chad swung the gun at me.
>
> Q. At the Lake Shore Hotel when Chad Fulks pointed the gun at your head, that is the closest you came to dying?
>
> A. Yes.

Id. at 44.

Fulks was clearly not a minor participant in the murders. There was ample evidence of

Fulks' own aggressiveness and craftiness. As discussed below, Fulks initiated physical

confrontations with personnel at Lexington County Detention Center and Columbia Care. Fulks,

too, constructed a rope from bed sheets and planned an escape while he was at Columbia Care;

Fulks, too, as discussed below and under Claim XIV, could be very manipulative, crafty, and

highly aggressive. However, the greater problem for Fulks was that evidence showed he played a

major and decisive role in the kidnapping and carjacking, and there is no credible evidence that

121

he was under the influence of Basham. Basham had been in the Hopkins County Jail for a year-and-a-half, and had not figured out how to escape. TT, Vol. II, p. 18. Within two or three months after Fulks arrived at the Hopkins County Jail, he and Basham escaped. Id. Fulks was the driver during the commission of all three kidnappings committed by the two. Fulks ordered James Hawkins to put his arms around a tree, ordered Basham to tape Hawkins' hands, then complained Basham was not doing it right, took over the task, and tightly taped Hawkins' hands, tied his legs together, and duct-taped his mouth. Id. at 133-146. Fulks chose where he and Basham traveled, where they stayed, and when they departed. Fulks asked Tina Severance where they could get guns. Id. at 78-79. Fulks and Basham both had guns. Fulks and Basham both shot at Carl Jordan. TT, Vol. V, pp. 49-61. Fulks drove Olieta Hyman's pickup truck into the Wal-Mart parking lot behind Alice Donovan and then drove himself, Basham and Alice Donovan away from the parking lot in Alice Donovan's car. Id. at 123-155. Fulks purchased electrical/radiator tape. TT, Vol. VI, p 16. Fulks drove to an isolated area where he and Basham raped Alice Donovan. TT, Vol. VI, pp.29-32, 43-45, 56. Fulks drove to where he or Basham, or both, killed Alice Donovan. There is no way, based on these facts, general testimony by a few prison personnel that Basham was aggressive, crafty, manipulative and intelligent could have convinced jurors that Fulks played a minor role in the crimes. Fulks' counsel did attempt to show that Basham was the more aggressive and was the leader, but, ultimately, the Government's argument that the two were equally culpable prevailed.

Contrary to Fulks' claim, the Government did not argue that Basham played a lesser role or that Fulks was the leader. The theme of the prosecution's argument to jurors was that Fulks and Basham acted in unison to kill Alice Donovan and Samantha Burns. Throughout his closing

122

argument, the government prosecutor argued that it took both Petitioner and Basham to commit

the murders:

> They were a two-man death squad. Two men, forming a team. They could not
> have done things that they did to Samantha, and they could not have done things
> they did to Alice without acting in unison, without acting as one. The
> Government is not saying Chad Fulks is more culpable than Brandon Basham.
> And the Government is not saying that Brandon Basham is more culpable than
> Chad Fulks. They are equally culpable.

TT, Vol. XXI at 24.

### B.    Fulks was a "master manipulator."

Fulks complains that his counsel "neglected to introduce readily discoverable evidence

that Basham was a master manipulator," yet he fails to point out any specific evidence, that was

not introduced, showing Basham is a "master manipulator." He claims his counsel, like

Basham's, should have presented a comparative analysis of the two to the jury. (Amended Mot.

to Vacate at 138.) Fulks has not made such a comparative analysis in his motion. Indeed, it

would be difficult for him to do so and maintain this argument because the record is replete with

evidence that Fulks truly is a "master manipulator." For instance, as discussed previously in the

"Factaul Background," after Fulks stole a shirt with the FBI emblem, he impersonated an FBI

agent in order to rob two young men. During the commission of the crimes, he pretended to

place phone calls to other law enforcement agencies. TT, Vol. XIV, pp. 72, 97. Also, as

previously discussed, Fulks convinced Columbia Care personnel that he was sickly and in pain,

yet he was able to attempt to escape and to fight five guards, badly wounding one. Fulks was

also able to convince Tina Severance to help steal guns from her friend, Robert Talsma.

Fulks' ability to manipulate others was most vividly demonstrated when he defrauded the

123

mother of a fellow jail inmate in Myrtle Beach of money for his bond and her car. In an act worthy of an academy award, Fulks, in the presence of a jailhouse prayer group, pretended to receive a telephone call, after which he began to cry. TT, Vol. XIV, p. 258. Fulks went back to his cell and cried constantly for a day and a half. Id. at 259. Fulks cried so much that his bed linens were wet with tears. Id. at 260. The jail guards and nurses became concerned, and the nurses gave Fulks Tylenol PM to help sedate him. Id. at 260. The prayer group "shared fellowship with him," during which Fulks, told them that his wife, mother-in-law, and newborn baby girl had been hit by an eighteen-wheeler, and none of them were expected to survive. Id. at 258. The prayer group "joined hands and shared prayer with him." Id. at 161. Fulks' fellow inmate, Robert Lee, explained that he had two small children, and he thought it must be pretty unbearable for Fulks to be away from his family and child "during this time of crisis."

After Fulks was apparently able to convince a judge to lower his sentence to allow Fulks to get out on bail, Mr. Lee told his mother about Fulks situation. She went to the jail and paid a bondsman $200.00 to gain Fulks' release. Id. at 260-262, 278. Nell Lee took Fulks to her house and ordered pizza for him. Fulks told Ms. Lee that his mother-in-law had died, his wife was injured, and that his little girl was in critical condition. Id. at 282. Ms. Lee spent about two hours on the telephone in an attempt to help him find the hospital where his alleged daughter was located. Id. at 281. The next day, Fulks called Nell Lee and asked her to take him to the airport so he could rent a car to go take care of his child. Id. at 280. When Fulks was unable to rent a car, Ms. Lee loaned him a car and gave him money for gas. Id. at 281. Additionally, she gave him a note indicating he had her permission to use the car for five days. Id. at 283. Fulks called Ms. Lee each day for five days and reported on how his baby girl was doing. Id. at 284. On the

124

fifth day, Fulks told Ms. Lee he would be back with her car in about two hours. Id. at 285. Ms. Lee did not hear from Fulks again. Id. Robert Lee, who had been released from jail, began to look for Fulks, and, eventually, went to West Virginia and found Fulks' mother, brother, and ex-wife, but not Fulks. Id. at 263.

Thus, testimony by James Hawkins, Columbia Care personnel, Robert and Nell Lee, and two college students revealed Fulks' own ability, without the assistance or encouragement of anyone else, to plan and execute crimes, act aggressively, and manipulate others. Fulks has failed to show any evidence that could have been presented by his trial counsel that would have overcome the powerful and detailed testimony presented by the prosecution.

### Response to Claim XIV

**The additional evidence Fulks claims his trial counsel should have presented would have shown him to be a future danger to prison inmates and personnel.**

Fulks complains that his trial counsel were ineffective for failing to present meaningful evidence that Fulks would not be dangerous in the future to prison inmates or Bureau of Prisons (BOP) personnel. (Amended Mot. to Vacate at 144.) Fulks bases his argument on the post-trial statements by jurors that they were concerned that Fulks would attempt to escape again and that he was dangerous. He argues that his counsel "needed to explain to the jury that Petitioner did not have a high likelihood of engaging in serious violence while incarcerated with the BOP." Id. at 145. Fulks complains that his counsel should have called experts Dr. Mark Cunningham and James Aiken to testify. Id. at 146. Fulks' counsel chose not to present the testimony of these experts. There can be no doubt, based on the declarations of these experts, which Fulks attached to his Petition, that jurors would have found the testimony of Dr. Cunningham to be alarming,

125

and the testimony of Mr. Aiken to lack credibility.

The choice of what type of expert to use is one of trial strategy and deserves "a heavy measure of deference." Turner v. Calderon, 281 F.3d 851, 875 -876 (9th Cir. 2002)(citing Strickland, 466 U.S. at 691 (discussing particular decisions not to investigate)). According to Dr. Cunningham, he was asked by Fulks' trial counsel to evaluate the likelihood that Fulks would engage in serious violence while incarcerated in a federal prison, but that he was not called to testify. (Amended Mot. to Vacate, PA Doc. #6, ¶ 6.) It is obvious from a review of Dr. Cunningham's Declaration why trial counsel did not call him to testify - Dr. Cunningham's testimony would have supported, not diminished, concerns about Fulks' future dangerousness. According to Dr. Cunningham's Declaration, there is a 20-30 percent likelihood of a capital offender committing an act of violence at some time across his capital prison term, and an 8% - 10% likelihood that a capital offender will present a chronic violence problem. (Amended Mot. to Vacate, PA Doc. #6, ¶ 11.) He estimates that there is a **26.2% - 31.5% probability that Fulks would commit a "serious assault"** during his incarceration. Id. Given Fulks' proven capacity for violence, his prior escape and escape attempts, the results of his successful escape attempt, and his lack of remorse for the results of his previous violent acts, it is unlikely that the jurors would have been comforted by this statistic.

In addition to giving testimony that jurors may well have found alarming, Dr. Cunningham's credibility would have been called into question regarding his proffered testimony that "Mr. Fulks' prior prison incarceration and incarceration pre-trial records reveals that he has no serious violence in his past prison confinement, and has exhibited no serious violence in past extended jail incarcerations." (Amended Mot. to Vacate, PA Doc. #6, ¶9.) Jurors had heard

126

testimony, during the prosecution's case, to the contrary. Lexington County Sheriff's Department Officer Paula Lybrand testified that on April 24, 2003, she was preparing to transport Fulks to another facility when he became angry because he was not allowed to carry personal photographs with him.[46] TT, Vol. XV, pp. 81-84. Even though shackled, he went into a defensive stance and told officers they would have to fight him to get the photographs. Id. at 86. Three of the officers testified that when they attempted to obtain the photographs from Fulks, he kicked them, attempted to bite them, and spit on them. Id. at 94, 99, 106-108. When Fulks continued to fight them, the officers placed Fulks in a holding cell. He began kicking the cell door and "acting wildly," so a supervisor attempted to talk to Fulks in order to calm him down, but Fulks tried to spit on her. Id. at 100-101. During this struggle, Fulks was growling, yelling he was being harassed, and threatening to sue the county. Id. at 86, 94, 107-108.

In addition to hearing about this incident, jurors heard that on May 3, 2004, a month before his trial began, while at Columbia Care, a medical facility for inmates, Fulks attempted to escape. TT, Vol. XV, pp. 117, 130. During a search of Fulks' room, officers discovered sheets and pillowcases torn into a rope-type configuration and stashed into a pillowcase, even though inmates were only allowed to have the set of sheets on their beds. Id. at 163, 123. Within the pockets of the jacket Fulks had thrown from the room of his window, was an accumulation of black pepper, apparently acquired from saving the tiny packs of pepper inmates received and pouring them together. Id. at 148. Chief Pledger believed Fulks planned to use the pepper to throw dogs off his scent. Id. at 126, 139-140.

---

[46] Officer Lybrand explained that policy required prisoners to mail personal papers to themselves or to a family member, rather than personally transporting them during a move. TT, Vol. XV, p. 84.

127

After Fulks' unsuccessful escape attempt, his doctor at Columbia Care placed Fulks on suicide watch, which required that he wear a paper gown rather than the usual scrubs. TT, Vol. XV, p. 180. Fulks became very agitated and refused to put on the paper gown, telling the officers they would have to " kick his ass and fight him." Id. at 180, 195, 214. After repeated attempts to convince Fulks to comply, the officers attempted to restrain Fulks in order to change his clothes. Id. at 181. Fulks bit one officer and kicked another. Id. at 198. After this altercation ended, the officers left the room and went to attend to the officer Fulks had bitten, as he was bleeding through his shirt and his shoulder was wounded.[47] Id. at 199. When officers returned to Fulks' room, he had removed the gauze packing and the bandage from the wound for which he was being treated and said he did not want to live anymore. Id. at 183. A nurse arrived to administer a sedative, which had been ordered by the doctor. Id. at 184. Fulks again began to swing, kick, spit, yell, and bite. Id. at 172, 185, 201. Five correctional officers eventually managed to restrain Fulks long enough for the nurse to administer a shot. Id. at 185. The officers involved in restraining Fulks were very surprised at his strength, because he had appeared to be very weak and sickly, could barely walk, was usually in a wheel chair, and appeared to be in pain prior to the incident. Id. at 132, 172-173,186, 197.

After the nurse administered a sedative, the officers left Fulks' room, and Officer Jeremiah Bush was assigned to check on Fulks every three to four minutes. TT, Vol. XV, p. 203. When Officer Bush was performing a check 45 minutes later, Fulks ripped off his paper gown, wet it, and stuck it to the window in the door so Officer Bush could not see him. Id. at 204.

---

[47] Chad Forrester, the officer Fulks bit, had pictures of the wound showing teeth marks ten or eleven days after the incident. TT, Vol. XV, p. 219. The bite marks continued to be visible in a photograph taken three weeks later. Id. at 220.

When Officer Bush opened the door to remove the paper from the window, Fulks charged at him with a closed fist and began shouting obscenities. When Officer Bush closed the door, Fulks began screaming and hitting his head against the window. Id. at 206. The incidents at Columbia Care and the incident at Lexington County Detention Center would have undermined the credibility of Dr. Cunningham and his opinion that Fulks would not pose a risk of serious violence if incarcerated for the remainder of his life.

The same incidents which would have destroyed the credibility of Dr. Cunningham also would have diminished the credibility of James Aiken. Aiken's Affidavit states that "it is apparent that Mr. Fulks' criminal history and confinement record do not reflect a pattern of a prison predator nor is there evidence of his continual, methodical use of violence to gain control over inmates, staff or the operation of the prison." (Amended Mot., PA Doc. #7, ¶8.) Testimony showed that, while confined, Fulks had been predatory, manipulative, and violent. He had inflicted a serious wound on a corrections officer a month before his trial commenced.

Besides hearing about the incidents at Columbia Care and at the Lexington County Jail, jurors had also heard how Fulks could be quite persuasive and creative in pursuing his objective of avoiding prison. Fulks had befriended and manipulated Tina Severance when she was a prison guard, and then used her to facilitate his flight and spree of lawlessness and violence after he escaped from Hopkins County Jail. As discussed above, he had convinced the mother of a fellow inmate in Myrtle Beach to provide him with bond money and a vehicle. Further revealing the extent to which Fulks would go to control his situation was circumstantial evidence suggesting that Fulks had actually inflicted minor wounds on himself so that he would be sent to Columbia Care, and that, after arriving at Columbia Care, he aggravated the wound so he would

not be sent back to the detention center. The internal affairs investigator for the Richland County Detention Center testified that when he was called to investigate an alleged assault in December 2003, Fulks gave him a piece of metal appearing to be a safety pin with the head broken off and claimed that ten to fifteen individuals had stabbed him with it. TT, Vol. XX, p. 61, 63. The only evidence of an assault was nine small pin holes on Fulks' abdomen. Id. at 61, 42. After a visit to the emergency room, Fulks was taken to Columbia Care. TT, Vol. XX, p. 39. The doctor at Columbia Care characterized the wounds as "superficial," "no deeper than abrasions," and opined that there were no foreign objects in the wound when Fulks was admitted to Columbia Care on December 10, 2003. TT, Vol. XX, p. 40, 48. A CAT scan of Fulks' abdomen taken on December 9, 2003, did not reveal any abnormalities. Id. at 69-70. However, a CAT scan of the same area on March 6, 2004, revealed a metallic object surrounded by inflamed tissue. Id. at 70-71. The radiologist testified that he was "100%" certain the metallic object was not present in the 2003 CAT scan. Id. at 71. Further, medical reports made while Fulks was temporarily at the Butner FCI indicated that Fulks was manipulating the wound by removing the dressing and inserting toilet paper into the wound. Id. at 59. After the jury heard about Fulks' violence in prison and his attempts to manipulate others in order to facilitate escapes, testimony by an "expert" that Fulks' criminal history and confinement record do not reflect a predatory pattern would have been patently incredible.

Apparently recognizing the problems Dr. Cunningham's and Mr. Aiken's testimony could entail, trial counsel made a decision not to call them as witnesses, but to present testimony by Don Romine, whose testimony regarding federal prison security was virtually unassailable. Romine was a former Marine with 31 years of experience working for the BOP. TT, Vol. XIX,

130

pp. 63-64. Mr. Romine had begun his career with the BOP as a correctional officer and had worked in a number of capacities, eventually reaching senior executive level and serving as the warden at two federal prisons, including a high-security prison. Id. at 65, 72. He had been responsible for formulating and implementing security policies at federal prisons. Id. at 66-67. While working in Washington, D.C., Mr. Romine directed Inmate Transportation. Id. at 68. He worked in United States penitentiaries, receiving an award for heroism while at the penitentiary in Marion, Illinois. Id. at 69-70. Because he had spent many years working at all levels within the BOP, Mr. Romine was a highly-credible witness with first-hand knowledge, and one whose background the prosecution could not attack. Based on his first-hand knowledge of federal high-security prisons, Mr. Romine described the numerous security safeguards existing at such prisons. TT, Vol. XIX, pp. 72-106. But for Fulks' record of escape and attempted escape, and his violence during his pre-trial incarceration, Mr. Romine's testimony might have been very effective.

Fulks' trial counsel obviously explored and considered the options available for making a case that Fulks would not be dangerous to others if incarcerated for life. They made a decision to present expert testimony by Mr. Romine, but not by Dr. Cunningham or Mr. Aiken. Under the Strickland standard, this decision is entitled to deference. Fulks has failed to show the decision by his trial counsel was unreasonable. Consequently, he is entitled to no relief.

### Response to Claims XV and XVII

**Trial counsel was not ineffective in performing jury selection. Fulks has not shown that any selected juror failed to perform his or her duties in accordance with the Court's instructions or failed to give meaningful consideration to mitigating evidence.**

Fulks complains that his trial counsel "utterly failed at gathering useful information,

131

educating the prospective jurors, or establishing a rapport." (Amended Mot. at 152.) He claims that his counsel "was ineffective by failing to ask open-ended questions, to listen to the answers, and to show the jurors respect and honesty," and that "because of counsel's gaffes, Petitioner was behind the eight ball with the jury before trial ever started and was denied a fair trial." Id. at 155-156. Fulks also complains that trial counsel were ineffective for "choosing to seat automatic death veniremen." He summarily claims that his counsel should have struck jurors Goehring, Harvey, Allison, Novinger and Plyer.

On appeal, Fulks challenged the seating of all five jurors, and the Fourth Circuit rejected Fulks' challenges. See 454 F.3d 410, 427-435. A defendant will not be allowed to recast, under the guise of collateral attack, issues raised and considered on appeal. Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976). Thus, the Court should dismiss Fulks' claims regarding these jurors.

Trial counsel is not required to exercise clairvoyance, which is essentially what Fulks' is asking the Court to do - to find trial counsel ineffective because they did not succeed in seating jurors who would not vote for the death penalty. The Sixth Amendment guarantee of counsel does not guarantee an ideal or perfect representation. Mickens v. Taylor, 240 F.3d 348, 363 (4th Cir. 2001). "Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation. . . . The purpose is simply to ensure that criminal defendants receive a fair trial." McDougall v. Dixon, 921 F.2d 518, 537-538 (4th Cir. 1990).

The Sixth Amendment "guarantees a defendant on trial for his life the right to an impartial jury." Yeatts v. Angelone, 166 F.3d 255, 265 (4th Cir. 1999)(citing Morgan v. Illinois,

132

504 U.S. 719, 728 (1992)). The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Id. "A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." Id. Thus, a capital defendant must be allowed on voir dire to ascertain whether prospective jurors are unalterably in favor of the death penalty in every case, regardless of the circumstances. Id.

On habeas review, courts generally accord "particular deference" to the judgment of trial counsel during voir dire. Gardner v. Ozmint, 511 F.3d 420, 426 (4th Cir. 2007)(citing Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001)); see also Hovey v. Ayers, 458 F.3d 892, 910 (9th Cir. 2006)(the conduct of voir dire will usually involve the exercise of a judgment which should be left to competent defense counsel). In Fulks' case, each prospective juror was individually subjected to rigorous voir dire by the Court, the prosecutor, and Fulks' trial counsel. The Court was well-aware of the requirements regarding voir dire in a capital case, as stated by the Supreme Court in Morgan and Wainwright v. Witt, 469 U.S. 412 (1985), and by the Fourth Circuit in Yeatts. PTT, Vol. V, pp. 209-210. The Court explained to each juror that he or she must listen to the evidence carefully, then listen to the law as it is explained by the trial judge, and apply the law, whether he or she agrees with the law or not. The Court ensured that each juror understood this requirement and asked if the juror could comply with those instructions and be fair and impartial. PTT, Vol. I, pp. 64-65, 183-184; Vol. II, pp. 6-8, 277-279; Vol. IV, pp. 25-27; Vol. V, pp. 114-115, 260-262, 291-292; Vol. VI, pp. 234-235; Vol. VIII, pp. 104-106, 173-175, 229-232.

133

After the Court questioned each juror to ensure he or she was qualified, Fulks' counsel further explored the prospective juror's beliefs regarding the death penalty and mitigating factors. On review, the Fourth Circuit observed:

> In this case, the court asked each juror whether he or she would automatically impose the death penalty for capital murder, inquired into how each juror would vote when faced with evidence of a double murder, and permitted Fulks to extensively question the prospective jurors concerning their views on the death penalty. Such an examination was plainly sufficient to satisfy Morgan.

United States v. Fulks, 454 F.3d 410, 430 n.7 (4th Cir. 2006).

Twelve jurors were empaneled who had expressed an ability and willingness to listen to all of the evidence, consider mitigating factors, and apply the law as explained by the Court.[48] Some of the jurors had stated that they were "generally opposed to the death penalty." See PTT, Vol. 1, p. 182; Vol. 4, p. 26, Vol. 8, p. 230. Yet all twelve jurors, after hearing all of the evidence and the law to be applied, deemed the death penalty to be the appropriate penalty. Fulks has pointed to no evidence that would indicate any juror did not perform his or her duties as he or she promised to do. Thus, he has failed to carry his burden of showing that he was deprived of any right guaranteed by the Constitution.

### Response to Claim XVI

**Trial counsel was not ineffective in reviewing juror questionnaires. Any attempt to revisit the issue regarding Juror Allison is precluded because the issue was ruled on by this Court and on direct appeal. Even if the Court and counsel had been aware of the murder of Juror Allison's husband more than twenty years earlier the Court would not have excluded her from the jury.**

---

[48] Fulks own argument does not support his position. He has pointed to five jurors he claims were "automatic death viniremen." He argues that "studies . . . show that a group's majority tends to obtain its preferred result." (Amended Mot. to Vacate at 161.) The remaining seven jurors were a majority. Had all of these seven, about whom Fulks has not complained, believed that a life sentence was appropriate, then their view, according to Fulks' argument, would have prevailed.

134

Fulks claims his trial counsel were ineffective because they did not carefully review juror questionnaires. (Amended Mot. to Vacate at 156.) He complains his counsel did not ask juror Sylvia Allison why she left question 42 blank, the answer to which would have revealed that her husband had been murdered in 1971. Id. at 158-159. Fulks, again, misrepresents the record when he claims that Ms. Allison told newspaper reporters "it was 'a good feeling' to sentence him to death." Id. at 159 (citing P.A. Doc. #28). The article referenced by Fulks states that Allison indicated she hoped the jury's decision would lead to closure for the victims' family, and that she understood their pain because her husband had been murdered in 1971 while trying to stop an argument, but that her experience had no bearing on her decision. P.A. Doc. #28, p. 2.

On appeal, Fulks raised the same issue regarding Juror Allison. See 454 F.3d 410, 430. A federal prisoner generally cannot raise on collateral review a claim that was previously decided on direct review. See Withrow v. Williams, 507 U.S. 680,(1993) (Scalia, J., concurring) (collecting cases); United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000); United States v. Perez, 129 F.3d 255, 260 (2d Cir. 1997); Argencourt v. United States, 78 F.3d 14, 16 n.1 (1st Cir. 1996); Olmstead v. United States, 55 F.3d 316, 319 (7th Cir. 1995); Thompson v. United States, 7 F.3d 1377, 1378-79 (8th Cir. 1993) (per curiam); Cabrera v. United States, 972 F.2d 23, 25 (2d Cir. 1992); United States v. DeRewal, 10 F.3d 100, 105 n.4 (3d Cir. 1993); Kastenbaum v. United States, 588 F.2d 138, 139 (5th Cir. 1979) (per curiam); Oliver v. United States, 90 F.3d 177, 180 (6th Cir. 1996); Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir.1976).

In addition to foreclosing Fulks' from having this issue considered on collateral review, the Fourth Circuit's opinion settles the question composing the second part of the Strickland test. Under that prong, a petitioner must show that a reasonable probability exists that "the result of

135

the proceeding would have been different." See Strickland v. Washington, 466 U.S. 668, 687-88 (1984); see Luchenburg v. Smith, 79 F.3d 388, 393 (4th Cir. 1996 ) (requiring the petitioner to show a reasonable probability of prejudice). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." Strickland, at 697; Smith v. Robbins, 528 U.S. 259, 286 n.14 (2000).

Both this Court and the Fourth Circuit have disposed of the fundamental question of prejudice. In response to Fulks' motion for a new trial, this Court held a hearing on July 16, 2004, to ascertain whether Allison had been biased against Fulks or whether the circumstances surrounding her husband's murder and her failure to disclose it warranted a finding of implied bias. 454 F.3d at 431. Allison stated that her failure to answer the question had been inadvertent. Id. When the Court asked Ms. Allison whether there was any possibility that her deliberations had been influenced by her husband's murder, she replied: "None at all." Id. Applying the test set forth in McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984), this Court found that had Allison fully answered Question 42, it would not have excluded her for cause. Id. The Court further found that Juror Allison honestly believed she had disclosed her husband's murder and concluded that Fulks had failed to show that Allison was actually biased. Finally, this Court ruled that the circumstances surrounding the murder of Allison's husband were not extreme enough to warrant a finding of implied bias. Id. On appeal, the Fourth Circuit found that this Court's determination that Allison had honestly believed she had disclosed her husband's murder was not clearly erroneous, and that this Court correctly concluded that the circumstances surrounding the murder of Allison's husband, and her failure to disclose it, did not warrant a finding of implied bias. Id. at 432. The Fourth Circuit noted that

136

this Court was in the best position to view Allison's demeanor and assess her credibility. Id. at 430. As this Court has previously found it would not have excluded Ms. Allison from the jury, and the Fourth Circuit has found no error with this determination, the Court should dismiss Fulks' claim on the basis that it has previously been litigated, or, in the alternative, deny his claim for failure to show prejudice.

## Response to Claim XVIII

**Appellate Counsel was not ineffective because The Fourth Circuit would not have found that this Court abused its discretion in denying the admission of Basham's statement to Sheriff Hewitt.**

Fulks complains that his appellate counsel were ineffective because they did not appeal this Court's ruling that a statement by Sheriff Hewitt regarding Basham's partial statement, "you know, I could never kill a deer and here I have . . . ." was not admissible. Amended Mot., p. 162-163. He claims that the partial statement "was a key piece of evidence showing that Fulks did not strike the fatal blow that killed Alice Donovan," and "would likely have led the jury to a different conclusion about Petitioner's moral responsibility for Donovan's death." Id. at 164.

Had Fulks challenged the Court's ruling, he would not have been successful. A trial court possesses broad discretion in ruling on the admissibility of evidence, and a reviewing court will not overturn an evidentiary ruling absent an abuse of discretion. United States v. Hedgepeth, 418 F.3d 411, 419 (4th Cir. 2005); see also United States v. Singh, 518 F.3d 236, 254 (4th Cir. 2008)(the court reviews a district court's decision to exclude evidence for abuse of discretion). A court abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially-recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law. United States v. Delfino, 510 F.3d 468, 470 (4th Cir.

137

2007).  If an evidentiary ruling is found to be erroneous, the reviewing court reviews the error for harmlessness.  Hedgepeth 418 F.3d at 419.

Fulks has failed to show that the Court abused its discretion by excluding Basham's partial statement.  First, he fails to show why it is a key piece of evidence as to Fulks.  While it tends to show that Basham was involved in the murder of Alice Donovan, it does not show whether he or Fulks struck the blow or pulled the cord that killed Alice Donovan.  The Court speculated that Basham was about to say that he helped Fulks kill Alice Donovan, and that he "could have said any number of things that still inculpated Mr. Fulks."  Id. at 251.  The Court also noted the related problem with the admission of Basham's partial statement:  "[T]he Defendant wants to keep out the rest of Mr. Basham's statements to authorities that it was the Defendant here, Mr. Fulks, who actually killed Ms. Donovan."  TT, Vol. XVI, p. 119.

The prosecutor correctly argued that if Basham's partial statement was allowed, then, under Fed.R.Evid. 806, all of Basham's other statements which would impeach him could be submitted to the jury.  Id. at 119, 253 ("the problem is, the defendant wants to limit to that one single inference, which is taking it out of context").  Applying the balancing test, the Court ruled against the introduction of the statement because the danger of confusing the issues substantially outweighed it probative value.  Id. at 255.  The Court noted that Fulks' case was being tried separately from Basham's case due to a motion by the defendants, and that the Court had tried to divorce the statements by the defendants from each other.  Id. at 256.

Had the Court allowed testimony about all of Basham's statements regarding Fulks' culpability, then the purpose of severing the trials would have been defeated.  Yet, Rule 806 would have required this admission had the Court allowed Hewitt's statement relating Basham's

138

partial remark regarding the deer:

> When a hearsay statement, or a statement defined in Rule 801(d)(2)(C),(D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked, may be supported by any evidence which would be admissible for purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.

Fed.R.Evid. 806. Fulks' counsel wanted to use Basham's partial remark to support its argument that Fulks did not kill Alice Donovan. Therefore, its admission would have required the Court to allow testimony about all of Basham's statements inculpating Fulks. See United States v. Grant, 256 F.3d 1146, 1154-1155 (11th Cir. 2001)(district court erred in disallowing testimony regarding a co-conspirator's affidavit exculpating the defendant, after a government agent testified regarding statements the co-conspirator had made to the agent - even though those statements did not specifically identify the defendant, they circumstantially linked the defendant to the conspiracy, and, therefore, the defendant could introduce contradictory statements to impeach the co-conspirator); see also United States v. Wali, 860 F.2d 588, 589-591 (3rd Cir. 1989)(district court committed reversible error in refusing to admit inconsistent statements of declarant after DEA agent had testified regarding co-conspirator statements inculpating defendant, as the impeaching statements were admissible under Fed.R.Evid. 806). Fulks, obviously, did not want the jurors to hear all of Basham's other statements regarding Fulks' involvement in the murder of Alice Donovan.

After hearing much argument about the issue and applying the balancing test, the Court determined that because it was impossible to know how Basham would have completed the sentence, and because Fulks' counsel did not want all of Basham's statements admitted, the

139

Court would not allow Basham's partial statement, as the danger of confusing the issues substantially outweighed the probative value of the evidence. TT, Vol. XVI, pp. 255-256. Fulks has failed to show that the Court abused its discretion in making this evidentiary ruling. Thus, Fulks' appellate counsel were not ineffective for failing to raise this issue on appeal.

### Response to Claim XIX

**The prosecution did not present inconsistent theories in Fulks' trial and Basham's trial.**

In his nineteenth claim (Amended Mot. to Vacate at 165-176), Fulks claims that the prosecution violated his due process rights by allegedly presenting inconsistent theories in Fulks' trial and his co-defendant Basham's trial. This argument must fail because it is both legally and factually without support.

The Supreme Court has never held that due process prevents the government from prosecuting defendants based on inconsistent theories. See Bradshaw v. Stumpf, 545 U.S. 175, 190 (2005) (Thomas, J., concurring). The government may present inconsistent arguments or theories at separate trials of co-defendants as long as it does not present false evidence at any trial. See e.g., United States v. Frye, 489 F.3d 201, 214 (5th Cir. 2007); United States v. Paul, 217 F.3d 989, 998 (8th Cir. 2000) (government properly argued at co-defendants' separate trials that each defendant was a murder triggerman when evidence was unclear as to the triggerman's identity). Importantly, it is not "inconsistent" for the government to emphasize the role of each defendant at separate trials. See United States v. Higgs, 353 F.3d 281, 326 (4th Cir. 2003); United States v. Hansen, 434 F.3d 92, 106 (1st Cir. 2006). In Higgs, a capital case, the Fourth Circuit held the government did not present inconsistent arguments when it argued at one trial that the defendant had masterminded the murders because he ordered a co-defendant to kill the

victims, but argued at the co-defendant's trial that the co-defendant had acted of his own free will despite orders from the defendant. Higgs, 353 F.3d at 326-27.

The government's arguments in Fulks's case were consistent with its arguments in Basham's case. In both cases, the government argued that Fulks and Basham jointly killed Donovan, and that both men were equally culpable for the crime. Compare Fulks' TT, Vol. XXI, Tr. 22-24 ("equally culpable" "two-man death squad"), id. at 87, id. at 96 ("two man team"), id. at 118, id. at 131-32("equally culpable") with Basham 1 Tr. 27 ("team"), id. at 29 ("team"), id. at 30 ("joint participation"), id. at 41 ("teammates"), id. at 47, id. at 54 (opening statement); and Basham 12 Tr. 12 ("death squad" "aiding and abetting"), id. at 12-13 ("they acted together"; specifically not arguing that each man was more culpable than the other), id. at 22 ("team"); id. at 63 ("team") (closing argument).

Contrary to Fulks' assertions (Amended Mot. to Vacate at 167-170), the government's statements in Fulks' trial that Basham was Fulks' "puppet" and Fulks was the "leader" of their horrific crime spree were not inconsistent with the government's arguments in Basham's trial. It is clear from a full reading of the trial transcripts that the Government maintained the same theory during both trials. Because Fulks and Basham blamed each other for Donovan's murder, the Government properly stressed the particular role of the defendant who was being tried at the time, but always maintained the same overall theory in both. See Higgs, 353 F.3d at 326-27.

During closing arguments at Basham's trial, the Government made the same argument made at Fulks' trial. It argued that Basham and Fulks acted as one, and that, in doing so, each chose to kill Alice Donovan. The Government told the jury:

> If Brandon Basham was alone, or if Chad Fulks were alone on November 11, 2002 and November 14, 2002, Samantha Burns would be alive today. . . . Brandon Basham and Chad Fulks were acting together in unison as a team, a death squad . . . the two of them, together, aiding and abetting each other when they kidnapped, and carjacked, and killed Alice Donovan, the two of them.

See Basham TT, at 12-12. The Government reminded the jurors: "You jurors do not have to find who, specifically, killed Alice Donovan in order to convict Brandon Basham of carjacking, resulting in death or kidnapping resulting in death. . . . The evidence shows they acted together and killed Alice Donovan." Id. at 12-12 -12-13. The Government told the jury that it was not claiming that Basham was more culpable or that Fulks was more culpable, because it took both of them to kill Alice Donovan. Id. at 12-13. The Government reiterated this theme throughout its closing. See Id. at 12-20 ("it was a two-man team," "it took two"); 12-22 (each was more aggressive at different times); 12-40 (there was mud on both sides of the car, both Fulks and Basham dumped Samantha Burn's body in a river); 12-41 ("**they** killed her [Samantha], and **they** were disguised"); 12-47 ("**they** targeted Alice. . . . It took the actions of Chad Fulks and the actions of Brandon Basham to carry out that kidnapping, to carry out that carjacking."); 12-52 ("took two of them to get them to the isolated area. Chad Fulks to drive, Brandon Basham to make sure she didn't get away. Both of them together acting as a team."); 12-62-63 ("seventeen days in November of 2002, seventeen days of carnage. Two murders, two attempted murders, three kidnappings, three carjackings, an attempted kidnapping and carjacking of a 15-year-old girl committed by Brandon Basham and Chad Fulks acting as a team in unison.") 12-69 (he [Basham] participated directly in her death"); 12-70 ("Brandon Basham, himself, participated in the killing of Alice Donovan").

As a last piece of evidence argued in Basham's closing, the Government reminded the

142

jury of Basham's call to his former counselor on Christmas eve, when Basham told his former counselor, and his counselor asked him if he did "what they say you did?" Id. at 12-80 -12-81. Basham responded, **"We killed them."** Id. 12-81.

Contrary to Fulks' argument (Amended Mot. to Vacate at 173-74), the Government did not argue to the Basham jury that Basham made all the life and death decisions. Rather, the Government argued that **Fulks** was the leader of the crime spree and Basham was the foot soldier:

> No question, Chad Fulks was the leader in many aspects of this 17-day spree. . . There is no question about that. . . . But there is also no question . . . that Brandon Basham was a willing, eager, and reliable foot soldier. He was eager to please his friend. And he was willing to participate and make choices.

Id. at 12-82. The Government summed up its argument: "Like two peas in a pod. Brandon Basham could not have carjacked, kidnapped, and killed Alice Donovan without Chad Fulks; Chad Fulks could not have carjacked, kidnapped, and killed Alice Donovan without Brandon Basham." Id. at 12-82. It is clear that the Government did not present mutually inconsistent theories in Fulks' trial and Basham's trial. Furthermore, because Fulks could have been convicted either as a principal or an aider and abetter, any difference in the government's characterization of his role in the crime spree was minor and did not constitute a due process violation. United States v. Frye, 489 F.3d 201, 214 (5th Cir. 2007).

### Response to Claims XX and XXI

**Prosecution did not attempt to improperly influence witness testimony. The Government provided all information relevant to Fulks' case to his trial counsel.**

Fulks alleges that FBI agents attempted to influence witness testimony, and, in so doing, rendered the jury's verdict a denial of due process. (Amended Mot. to Vacate at 176-77.) Fulks

143

also complains that the Government violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963). He bases this claim on accusations that "the government did not disclose that its operatives pressured witnesses to lie or that charges were dropped in exchange for cooperation at trial." Id. at 179.

In order to establish a Brady violation, a petitioner must demonstrate that the information at issue was "favorable to the accused"; that it was "suppressed by the [Government], either willfully or inadvertently"; and that prejudice to the defense ensued. United States v. Roane, 378 F.3d 382, 402 (4th Cir. 2004)(citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). Evidence withheld by the Government is "material" as would require reversal of a conviction only if there is a reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceeding would have been different. United States v. Bagley, 473 U.S. 667, 674-675 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." McHone v. Polk, 392 F.3d 691, 722 (4th Cir. 2004)(citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)). The defendant has the burden of demonstrating that the Government withheld favorable evidence and that the evidence raises a reasonable probability that defendant would have obtained a different result if he had had the evidence. See Maynard v. Dixon, 943 F.2d 407, 417 (4th Cir. 1991)(citing Bagley, 473 U.S. at 680).

What Fulks offers to support his serious allegations is pitifully lacking. He offers a statement by Andrea Roddy that when FBI agents interviewed her, they did not ask her as many questions about Brandon Basham, and that they "put pressure" on her to testify that Fulks

144

threatened her life and the life of Tina Severance.  (Amended Mot. to Vacate 177, PA Doc. #17.) Roddy does not state how the agents allegedly "put pressure" on her.  Roddy does not claim that agents withheld food, deprived her of sleep, prevented her from using the restroom, or threatened to make false accusations or harm her in any way.  It was reasonable that they would have questioned her regarding whether Fulks had threatened her or Severance, since Ms. Severance had told agents about an incident during which Fulks had threatened her with a gun, and since Fulks had a history of violence toward women.  Furthermore, Fulks has failed to show any prejudice, since Roddy did not testify that Fulks threatened her.  In fact, she tried to provide testimony that was helpful to Fulks by telling the jury that there was no mud on the driver's side of Severance's van the morning Fulks and Basham returned to the motel after abducting Samantha Burns, which was contrary to the photograph submitted into evidence.

In addition to the one-page declaration signed by Roddy, Fulks also offers a letter written by the Myrtle Beach Police Department on January 24, 2008, stating that pursuant to Tina Severance's "cooperation in a case in 2002 in which she was a witness, charges against her were dismissed."  Fulks claims that the letter "casts serious doubt on the government's conduct and serves as grounds for additional discovery."  Id. at 178.  The Government made no deals with Severance or any other witness.  Fulks' counsel confirmed with Severance during her testimony that she had not been charged with any federal offense.  TT, Vol. IV, p.41.  The fact that the Myrtle Beach Police Department dropped minor charges against Severance a few years after Fulks' trial does not support Fulks' implication that some kind of improper deal was made between the Government and Severance prior to trial.  Further militating against this implication is the fact that Severance provided testimony which was both favorable and unfavorable to Fulks.

145

For instance, she testified that Fulks, unlike Basham, did not carry a gun, and that Basham kept the guns he was not carrying on his person in a bag, and that he was very possessive about the bag with the guns. TT, Vol. IV, pp. 9-10. She claimed the incident in which Fulks pulled a gun on her was an isolated incident. Id. If Severance had had a deal with the Government to provide untruthful or only unfavorable testimony regarding Fulks, she would not have told the jury Fulks did not carry a gun. Severance also claimed that there was only a little mud on the driver's-side floorboard when Fulks and Basham returned to the motel after kidnapping Samantha Burns. Id. at 18. Thus, Fulks' claim that the Government solicited untruthful testimony which was harmful to him does not withstand logical scrutiny.

As Fulks has failed to show both that the Government withheld information favorable to him and that the verdict would have been different if the alleged information had been disclosed, he is entitled to no relief on the basis of his claims of Brady violations and government solicitation of perjured testimony.

### Response to Claims XXII and XXIII

**The prosecution did not make any improper comments in closing arguments and trial counsel was not ineffective for failing to object to some of the purported comments.**

In his twenty-second and twenty-third claims, Fulks asserts that the United States committed prosecutorial misconduct in closing arguments and counsel was ineffective for failing to object to certain comments in closing arguments. Tellingly, Fulks cites to absolutely no case law to support his argument that the prosecutor's comments were improper. This claim must fail because the prosecutor did not make improper comments and certainly no comments that rise to the level of prosecutorial misconduct. Furthermore, counsel did object to some of the comments

146

noted by Fulks. Finally, none of the prosecutor's comments were of the nature that they impacted Fulks' right to a fair trial.

A prosecutor's improper closing argument may constitute a denial of due process only if it renders the proceeding "fundamentally unfair." Bennett v. Angelone, 92 F.3d 1336, 1345 (4th Cir.1996) (internal quotation marks omitted); see Donnelly, 416 U.S. at 643. In determining whether a defendant's due process rights were violated by a prosecutor's closing argument, the court must first determine whether the remarks were, in fact, improper. See United States v. Morsley, 64 F.3d 907, 913 (4th Cir.1995). If so, then the court must decide whether the improper remarks "so prejudiced the defendant's substantial rights that the defendant was denied a fair trial." Id. "This determination requires the court to look to the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." Boyd v. French, 147 F.3d 319, 329 (4th Cir.1998) (internal quotation marks omitted). Fulks' claim fails because none of the prosecutor's comments were improper; and counsel was not ineffective when they failed to object to some of these comments or did not appeal the trial court's rulings on the objections to the prosecutor's comments in closing arguments.

Fulks first contends that the prosecutor improperly claimed that Fulks was already facing a possible life sentence because of the crimes he was charged with in Kentucky and that a life sentence for his two week crime spree would be a "pass" and not an appropriate punishment. (Amended Mot. to Vacate at 180-81). This argument was not improper. Instead, the remarks by the prosecutor were simply a fair comment on the evidence. See Bell v. Evatt, 72 F.3d 421, 437 (4th Cir.1995) (holding that remarks that "were consistent with the record and ... rationally

147

inferred from the ... evidence" were not improper).

The prosecutor noted in his closing argument that prior to his escape from the Kentucky prison, Fulks' "words to Tina Severance [were] 'I probably will never get out.' Those aren't my words. Those aren't Detective Smith's words. Those are Chad Fulks' words. 'I probably will never get out.'" TT, Vol XXI, pp.30-31. The prosecutor noted that Fulks thought he might end up serving a "life sentence" in Kentucky and "ma[de] a choice, and he escapes, and he participates in the kidnapping, and the rape, and the murder of two women, and he is caught. And you know what he is asking you jurors to do? To give him a pass." Id. at 30-31. Because the remarks were not improper and a fair comment on the evidence, trial counsel could not be considered ineffective for failing to object either.

Additionally, this Court has held that it is not improper for the prosecution to argue that a life sentence is not nearly as harsh a punishment as a death sentence. See Ivey v. Catoe, 36 Fed.Appx. 718, 729-31 (4th Cir. 2002) (prosecutor's comments were "let's look at life imprisonment as an alternative [to a death sentence] and decide whether that's an acceptable punishment, whether that's justice for the things this man has done.").

Importantly, defense counsel did object (with a "speaking" objection) to the prosecutor's comment: "Objection. . . . He [Fulks] was not facing life without parole before. Life without parole is not a pass. It is the second most severe and substantial punishment." TT, Vol XXI p. 31. The trial court ruled that he would allow the prosecutor's argument and said, "the Defense will be allowed free rein and to make whatever argument is appropriate on this point." Id. The prosecutor then concluded, "So what is [Fulks] asking you to do, facing all of that time, commits all of these horrible crimes, kills two woman, and he is asking you for a life sentence. It is the

148

government's contention, in essence, that that two-week crime spree, he is not held accountable for. He was looking at serious and significant time before, and now he is looking at life without parole. So, where is the punishment? Where is the accountability for what he did to these two women?" Id. at 31-32.

This comment, in context, is a fair comment on the evidence. It was an appropriate argument that life imprisonment without parole was not the appropriate punishment. Additionally, defense counsel's speaking objection to the prosecutor's comment prevented any claim that the jury would be mistaken about the amount of time Fulks faced in Kentucky prior to his escape and his subsequent murders.

Fulks' next contends that the prosecutor improperly claimed that Fulks raped Samantha Burns. (Amended Mot. to Vacate at 181-82). This argument is without merit. In context, it is clear that the prosecutor was arguing that both Fulks and Basham were acting jointly and that they were participating as a team in their criminal activities of Monday, November 11, 2002: "They were hunting, the government submits to you. They were hunting down somebody. They were hunting, and they located, and they isolated, and they abducted, and they raped, and they robbed, and they killed their prey. She just happened to be a 19 year old college co-ed named Samantha Burns." TT, Vol XXI, p. 41. Later, the prosecutor noted "they [Fulks and Basham] did everything together. That night [November 11] before they left, they got camouflage clothing . . .Chad Fulks was stealing money from the ATM machine, and they returned together. Everything they did that night, they did together. The two of them acting as one. . . when they arrived back at the motel room. Not one, both of them were covered in mud." Id. at 46. This comment was not improper. It was fair comment on the evidence of what Fulks and Basham did

149

to Samantha Burns on November 11, 2002.

Fulk's third contention regarding the prosecutor's closing argument is that the prosecutor improperly referred to Fulks as a "zoo animal." (Amended Mot. to Vacate at 182). This argument takes the comment out of context. The prosecutor did not call Fulks a "zoo animal." The point made by the prosecutor was that Fulks looked different at trial than he did when he was committing the horrible crimes he was on trial for because he had been medicated in the same way animals sometimes are at zoos. As the prosecutor noted (after counsel's objection to this comment and the trial court's limitation of the argument):

> The point is this. That is why I asked all those doctors if they are aware of the medication that Chad Fulks is on, the sedatives, tranquilizers, all the drugs he is on. The point I am trying to make . . . is the picture you see of Chad Fulks, the chalky, pasty skin Chad Fulks, the Chad Fulks that you have seen in this court room looking straight ahead, all benign, all shy, all quiet, that is not the Chad Fulks. That is not the crack smoking rapist that roamed the streets of Kentucky and West Virginia and South Carolina in November of 2002. And you have to understand that. You have to grasp that. In order for the government to have a fair trial, in order for you to make an informed decision on what the appropriate punishment should be . . .you have to have the ability to close your eyes and attempt to picture, in your mind, the testimony and evidence that you have heard. And picture in your mind what truly happened. What was the true representation of what happened in November of 2002? And the Chad Fulks that these womaen saw. The Chad Fulks that these women confronted, is that Chad Fulks. That is the Chad. That is a picture of Chad Fulks taken outside the Florence County Courthouse. That muscular Chad Fulks. Not the one you see here in this courtroom."

TT, Vol XXI, pp. 77-78.

This excerpt from the closing argument demonstrates that the prosecutor was trying to explain how the medicated Chad Fulks the jurors saw in the courtroom was not the same person the victims saw before they were murdered by he and Basham. This is proper argument. It is completely appropriate to argue that a defendant looks different than he did when he committed murders. The fact that Fulks was docile and looked different at trial was not improper to note to

150

the jury.

Furthermore, even if this comment were found to be improper it was one comment in a closing argument that lasted more than two hours and covers over 110 pages in the trial transcript. It certainly did not result in Fulks failing to receive a fair trial. See Darden v. Wainwright, 477 U.S. 168, 180-81 (1986) (finding during habeas review of a death penalty conviction that the defendant was not deprived of his right to a fair trial despite the prosecutor's references to the defendant as an "animal" that "shouldn't be out of his cell unless he has a leash on him"); United States v. Allen, 247 F.3d 741, 777 (8th Cir. 2001) (rejecting argument that "murderous dog" reference, in combination with telling the story through the eyes of the victim, makes the statement unduly prejudicial because no undue prejudice arises from reminding the jury to consider the murder victim's perspective where the defendant has asserted a gentle spirit); Kellogg v. Skon, 176 F.3d 447, 451-52 (8th Cir.1999) (finding in criminal sexual abuse case that defendant did not receive a fundamentally unfair trial even though the prosecutor referred to him as a "monster," "sexual deviant," and "liar"); Pollard v. Delo, 28 F.3d 887, 890 (8th Cir.1994)(finding that repeated references to the defendant as a "predator" were not so prejudicial as to deprive the defendant of a fair trial).

Fulk's fourth contention is that the prosecutor improperly impugned Fulk's decision not to testify at trial. (Amended Mot. to Vacate at 182-83) Fulks takes this comment out of context and is incorrect in this assertion.

In closing argument, the prosecutor noted that Fulks never told his brother or anyone that the crime spree he was involved in was all caused by Basham. The language that Fulks points to as objectionable is:

151