> Sometimes, Ladies and Gentlemen, it is not only what people say that matters, it is what people don't say that is every bit as important. [Fulks] had an opportunity to spill his guts to his brother, and he says nothing. And, I submit to you, because he is in it up to his neck. That is the truth.

TT, Vol. XXI, p. 91.

This statement was not a comment on Fulks' failure to testify at trial. In fact, Fulks admits in his Amended Mot. to Vacate at 182, "this statement was made during a discussion of Petitioner's interaction with his family during the events of November 2002."

"The Fifth Amendment precludes a prosecutor from commenting to a jury on the failure of an accused to testify in his own defense." United States v. Ollivierre, 378 F.3d 412, 419 (4th Cir. 2004). In considering whether a prosecutor's words constitute a comment on the defendant's failure to testify, this court asks, "Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?" United States. Francis, 82 F.3d 77, 78 (4th Cir.1996) (quoting United States v. Anderson, 481 F.2d 685, 701 (4th Cir.1973)). To answer these questions, the court evaluates the comment "in the context in which it was made." United States v. Percy, 765 F.2d 1199, 1204 (4th Cir.1985).

Viewed in the context in which the statement was made, the prosecutor's statement was not improper. A common sense reading of the statement reveals, as Fulks even admits, that the prosecutor's statement was made during a discussion of Fulk's "interaction with his family during the events of November 2002." It had nothing to do with Fulk's failure to testify. A jury would not naturally take the argument to be a comment on Fulk's failure to testify, nor is it obvious that the remark was so intended.

152

Finally, Fulks contends that the prosecutor improperly told the jury that imposing the death penalty would be an "act of self-defense." Defense counsel objected to this comment and the Court did not allow the prosecution to continue this line of argument. TT, Vol. XXI, pp. 114-15. This argument must fail because the argument was not improper. Additionally, trial counsel objected and the trial court prevented the prosecution from continuing this line of argument.

Towards the end of the closing argument, the prosecutor focused on future dangerousness:

> One last point on future dangerousness. Ladies and Gentlemen, you can decide for whatever reason, obviously, the 12 of you can decide that the death penalty is the appropriate punishment. But the facts of this case . . Are so egregious, are so horrific, that Chad Fulks deserves to die. It will, obviously, be your decision. That retribution is appropriate in this case. The government submits to you, when it comes to future dangerousness, when it comes to all of these factors, when it comes to all of the evidence that I have just discussed with you, the government submits to you, Ladies and Gentlemen, that, in essence, in essence, it will be an act of self-defense.

TT, Vol. XXI, p. 114. Trial defense counsel objected and the court sustained the objection. Id. at 115.

Despite the trial court's ruling, the prosecutor's comment was not improper. See Simmons v. South Carolina, 512 U.S. 154 (1994) (noting that prosecutor's "act of self-defense" on behalf of society argument was improper only because jury was not informed that defendant faced life imprisonment without possibility of parole thus "creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration")[49]; United

---

[49]In opening statements, Defense counsel told the jury, "As the prosecutors told you during voir dire, as the judge told you all individually and collectively, life without parole means just that. It means life without parole. It means the person will die in prison." TT, Vol. XXI, p. 129. In closing arguments, Defense counsel argued that if Fulks was sentenced to life imprisonment, "the evidence is clear that he won't" ever get out of prison . . . "He is never getting out of prison." TT, Vol XXI, pp.157-58, 161. Later, he argued, "life without parole is

153

States v. Chandler, 996 F2d 1073, 1095 (11th Cir. 1993) (finding that prosecutor's comment that "recommending the death penalty is a form of self defense for society" was not improper); State v. Forrest, 183 S.W.3d 218, 228 (Mo. 2006); Ingram v. State, 779 So.2d 1225, 1267 (Ala.Crim.App.1999) (prosecutor's argument that capital punishment "was a form of 'self-defense' and was imposed for the sake of society" was not error); State v. Kreutzer, 928 S.W.2d 854, 876 (Mo.banc 1996).

Furthermore, even if the prosecutor's comment were improper, trial counsel objected to the comment, the trial court sustained the objection and the prosecutor was not allowed to further argue this point. This "self defense" comment was very brief and part of the larger issue of Fulks' future dangerousness. The brevity of the comment makes it certain that it did not deprive Fulks of a fair trial.

Trial counsel were not ineffective. The comments that Fulks now complains of were not improper. Furthermore, trial counsel objected to all but one of the prosecutor's comments in closing arguments about which Fulks now complains. Finally, none of the comments rendered the proceedings "fundamentally unfair." Bennett, 92 F.3d at 1345. None of the remarks even approach the kind that could be said to "so prejudice[] the defendant's substantial rights that the defendant was denied a fair trial." Morsley, 64 F.3d at 913.

### Response to Claims XXIV and XXV

**The Prosecutor's statements regarding guns during closing were based on reliable evidence presented at trial.**

Fulks complains that the Government engaged in "serious misconduct" by asserting

---

merciful and just. . . He will spend the rest of his life in a maximum security prison." Id. at p. 173.

during closing arguments that he had been armed with a .45 caliber revolver. (Amended Mot. to Vacate at 184.) He further complains that trial counsel were ineffective for failing to question Ronnie Fulks about a .45 caliber revolver Fulks allegedly gave Ronnie prior to the commission of the crimes. (Amended Mot. to Vacate at 186.)

The prosecution did not engage in misconduct for the same reason that trial counsel was not ineffective for not asking Ronnie about the alleged gun - there was reliable evidence that Fulks had a gun during the crime spree. Fulks claims that the prosecutor's statement during closing that "Chad Fulks is armed with these two .45's that Friday" was "improper." (Amended Mot. to Vacate at 185.) The argument was not improper. The prosecutor's statement related to the events on the day Fulks and Severance went to Goshen, Indiana to see Fulks' brothers. TT, Vol. XXI, p. 38. The prosecutor was pointing out evidence to refute Fulks' trial counsel's implication that Fulks did not have a gun during the crime spree. Id. The testimony by Robert Talsma and Tina Severence show that Fulks and Basham stole Talsma's .45's on Friday, November 8, 2002. TT, Vol. III, pp. 84-87; TT, Vol. II, pp. 217-219. Dewayne Fulks admitted he told FBI agents who came to his father's house the day before Fulks was arrested that he saw Fulks with two revolvers. TT, Vol. IV, pp. 124-125.

Fulks further asserts that the prosecutor improperly asserted that Fulks used a .45 to shoot at Carl Jordan. (Amended Mot. to Vacate at 185.) Again, Fulks is incorrect and takes the record out of context. The prosecutor told the jury the Government did not know with certainty whether the gun Fulks used to shoot at Carl Jordan was a .45 or a .22, because it did not have the gun, but that it did not matter. TT, Vol. XXI, pp. 57-58. The prosecutor argued that what was important is that Fulks attempted to kill Jordan. Id. at 59. This argument was not improper, as Jordan

155

testified that Fulks shot at him. TT, Vol. V, p. 49.

Fulks complains that "[d]espite being put on notice that Petitioner gave a .45 caliber revolver to his brother, the government argued at trial that Fulks was in possession of this weapon." The prosecution had no obligation to accept the claims of Fulks' brother, especially when Ronnie Fulks never mentioned it to the Government. The allegation made by Ronnie to Fulks' counsel was likely no more than an attempt to help Fulks. Given the testimony by witnesses, the Government had good reason to believe Fulks was in possession of a gun or guns during the crime spree. Tina Severance testified that when they were staying at the Lake Shore Motel, Fulks became "frantic" because he could not find a revolver, and thought that Severance or Basham had taken it. TT, Vol. III, p. 138. On another occasion at the Lake Shore Motel, Fulks became angry at Severance and pointed a gun at her head. Id. at 177-178. Beth McGuffin testified that she noticed a gun in the glove box, and that Fulks said the gun belonged to him. TT, Vol. VI, pp. 113-114. Che McCoy testified that Fulks wanted to sell a .22 caliber revolver to McCoy or to trade it for McCoy's gun. TT, Vol. VII, p. 214.

Fulks asserts that "whether Petitioner was armed was important to the jury as they determined such matters as who was the leader and who was the trigger-man in this case." The Government always maintained that nobody, other than Fulks and Basham, really know who did the actual killing. What the evidence showed jurors, and what the prosecution properly argued, was that Fulks possessed and used guns during the crime spree. Thus, Fulks' claim of prosecutorial misconduct is nothing more than a red herring.

**Response to Claim XXVI**

**Trial counsel was not ineffective in preparation of numerous mitigation witnesses.  Trial counsel prepared a thorough mitigation presentation which included various lay witnesses testifying regarding Fulks' childhood.**

In his twenty-sixth claim (Amended Mot. to Vacate, at 187-189), Fulks argues that his trial counsel were ineffective because they allegedly failed to adequately prepare three lay mitigation witnesses for their testimony.  This argument fails because Fulks has failed to show that his trial counsel's performance fell outside the wide range of reasonable professional assistance.  Additionally, Fulks fails to point any prejudice that resulted from counsel's supposed failure.

This claim must fail because Fulks' counsel presented as complete and exhaustive mitigation defense as one could reasonably expect.  Fulks presented four days of mitigation testimony.  Trial counsel presented friends and relatives of Chad Fulks to describe his horrible childhood,  various mental health and other experts experts, and his own private investigator and mitigation investigator.  Counsel presented testimony by: (1) Kevin Holbrook, Fulk's uncle (his mother's brother); (2) Gayle Beatty, Fulks' aunt (mother's sister); (3) Mark Fulks, Fulks' uncle (his father's brother); (4) Kelly Fite, a firearms expert; (5) Brian Messinger, a friend of the Fulks' family who lived with them for about six months when Fulks was about eleven years old; (6) Lorie Messinger, a Fulks' family friend who dated Fulks' brother Dewaye; (7) Linda Atkins, a neighbor of the Fulks in Huntington; (8) Dr. James Evans, a clinical neuro- psychologist at the University of South Carolina who examined Fulks and performed a battery of tests on Fulks; (9) Cindy Harper, Fulks' kindergarten teacher; (10) Gayle Wolfe, Fulks' fifth grade special

157

education teacher; (11) Martha Floyd, Fulks' sixth grade teacher; (12) Sue Hatcher, a probation officer assigned to Fulks when he was nine years old because he committed battery on an elderly lady and pulled down the pants of a 4 or 5 years old girl on a playground; (13) Dr. Howard Becker, a psychiatrist who specializes in psychopharmacology and alcohol research, particularly, fetal alcohol exposure; (14) Joseph Jones, a former boyfriend of Fulks' ex-wife Veronica Evans; (15) Dina Jones, the aunt of Fulks' ex-wife Veronica Evans; (16) Heather Jacobi, a young woman whom Fulks met in Portsmith, Ohio and used drugs with; (17) Dr. David Bachman, a board-certified neurologist who was Professor of Neurology and Psychiatry at the Medical University of South Carolina; (18) Dr. Fred Bookstein, a research professor at the University of Michigan specializing in Morphometices and Biomathematics in the Department of Anbthropology, who also did work of fetal alcohol syndrome in the Childrens' Hospital in Vienna, Austria; (19) Dr. Arlene Andrews, a clinical psychologist and professor of social work, who conducted an exhaustive family history assessment[50] of Chad Fulks' family; (20) Heather Roche, a "K-9" handler who conducted searches for the remains of Alice Donovan on February 13-14, 2004 and April 30-May 1, 2004; (21) Jeff O'Neill, a Cornell Law School student; (22) Pete Skidmore, Fulks' private investigator; and (23) Don Romine, a former warden at several federal correctional institutions, who testified as an expert in prison management and prison security. It is clear from this brief listing of the witnesses and the further summary of the exhaustive mitigation presentation above that trial counsel presented a more than reasonable mitigation case. This presentation included testimony of multi-generational neglect and abuse.

---

[50]Fulks' trial counsel noted that under "Wiggins, a family history assessment needs to be done." TT, Vol. XVIII, June 24, 2002, at p. 144.

The lay witnesses described Fulks' childhood as being filled with filthy physical conditions, consistent violence, alcohol and substance abuse and many instances of sexual depravity. See, pp.62-67 above.

Fulks complains that his trial counsel did not adequately prepare Mark Fulks (Fulks' uncle) and Martha Floyd (Fulks' sixth grade teacher) for their direct testimony and failed to meet with Ronnie Fulks prior to his testifying for the government. He makes the blanket, unsupported statement that "had counsel prepared these witnesses, their testimony would have been much more compelling and could have changed the outcome of the proceeding." (Amended Mot. to Vacate, at 189).

It is clear from the declarations of both Mark Fulks and Martha Floyd that defense counsel did meet with them prior to their testimony. Mark Fulks states that he met with the defense counsel the night before his testimony. Martha Floyd admits in her declaration that she met with Mr. Blume at a Shoney's restaurant prior to trial and with the defense team the night before she testified. With regard to Ronnie Fulks, he was actually called **by the government**. There is no requirement that an attorney prepare a witness who he will cross examine.

It is clear that defense counsel spoke to each mitigation witness before he or she testified. It is also clear from the testimony presented that this was not an instance where counsel "failed to consult with experts and adequately investigate obvious leads in the record that would have led him to mitigating evidence about [Fulks'] mental state, humanizing evidence about his traumatic childhood, and positive character evidence." Belmontes v. Ayers, 529 F.3d 834, 859 (9th Cir. 2008). Instead, this was a case where Fulks' counsel presented numerous witnesses to support a sympathetic portrayal of his childhood. Hendricks v. True, 443 F.3d 342, 353-54 (4th Cir. 2006)

159

(trial counsel had family members provide testimony about defendant). This is not one of those cases where counsel failed to meet with important witnesses or failed to subpoena them to testify at trial. Hendricks, 443 F.3d at 354.

Additionally, it is difficult to speculate how the witnesses' testimony would have changed with supposed better preparation. Fulks suggests no specifics. The clear picture of Fulks' childhood could hardly have been clearer. Because Fulks "has not shown how the character witnesses' testimony could have been stronger with additional preparation, he has failed to show prejudice. Hendricks, 443 F.3d at 354; Coble v. Quarterman, 496 F.3d 430, 436 (5th Cir. 2007) ("Coble only argues that these witnesses would have been 'more effective' if they had been better prepared, which does not come close to suggesting that 'but for counsel's errors, the result would have been different.'"). For the forgoing reasons, this argument must fail because trial counsel's performance did not fall outside the wide range of reasonable professional assistance and Fulks can not show any prejudice that resulted from counsel's supposed failure.

## Response to Claim XXVII

**Trial counsel was not ineffective for advising Fulks to plead guilty.**

Fulks complains that his trial counsel were ineffective in advising him to plead guilty because it allowed the prosecution to present Fulks' prior bad acts in conjunction with evidence related to the charged offenses. (Amended Mot. to Vacate at 190.) While, as discussed below, it is probable that most of the evidence of Fulks' prior bad acts would have been admissible during the guilt phase, this issue is irrelevant, since there can be little doubt that the jury would have found Fulks guilty, and since pleading guilty was part of a reasonable trial strategy.

## A.    Fulks' decision was part of a reasonable trial strategy.

"Because it may be tempting to find an unsuccessful trial strategy to be unreasonable, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;  that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Carter v. Lee, 283 F.3d 240, 249 (4th Cir. 2002). In a recent article, Fulks' trial counsel, based on their academic research and experience in capital cases, have instructed:

> The value of actively contesting guilt . . . must be weighed against the frequency with which jurors are angry at defendants who deny their involvement when evidence of guilt is strong. **A denial defense at the guilt or innocence phase is more than twice as likely to result in a death sentence** compared to cases where the defendant acknowledges his guilt from the start.

36 Hofstra L. Rev. 1035, 1044 (emphasis provided).  The evidence of Fulks' guilt, as discussed previously and below, was strong.  Fulks' trial counsel knew he would have a better chance of receiving a life sentence if he pled guilty.[51]  Consequently, the advice of Fulks' trial counsel to plead guilty was  strategically reasonable, and should not serve as a basis for vacating his sentence.

## B.    Fulks cannot show prejudice.

While it is evident from the record that trial counsel was not ineffective in advising Fulks to plead guilty, and that this was part of a carefully-crafted strategy, it is not necessary to make this determination because Fulks has failed to satisfy the prejudice prong of Strickland.  In the plea context, deficient performance by counsel is prejudicial only if "there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and

---

[51] See arguments regarding how counsel used Fulks' guilty plea to argue acceptance of responsibility at pp. 108-111, 165-66.

would have insisted on going to trial." Meyer v. Branker, 506 F.3d 358, 369 (4th Cir. 2007)(citing Hill v. Lockhart, 474 U.S. 52 (1985)). Fulks claims that, but for counsels' errors, he would not have pled guilty, and would have insisted on going to trial. (Amended Mot. to Vacate at 191.) However, whether a prisoner would have actually opted to plead not-guilty is an objective inquiry and dependent on the likely outcome of a trial had the defendant not pleaded guilty. Id. (citing Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir. 1988); Hill, 474 U.S. at 59-60).

The evidence of Fulks' guilt was overwhelming. Approximately forty minutes before Fulks kidnapped and carjacked Alice Donovan, Carl Jordan saw Fulks stealing guns from his son's house. TT, Vol. V, pp. 46-48. Jordan testified Fulks shot at him and chased him. Id. at 49, 57-58. Margaret Moore testified that approximately half-an-hour before they kidnapped Alice Donovan, Fulks, along with Basham, tried to convince her to drive them to the store or to let them into her house. Id. at 112-116. Olieta Hyman, who lived across the street from Margaret Moore, testified that at approximately 2:15 p.m., she saw two men driving away with her white pickup truck. Id. at 121-125. Wal-Mart video showed, at 2:37 p.m., Olieta Hyman's pickup truck enter the parking lot behind Alice Donovan, Basham jumping into the car, and the pickup truck following Alice Donovan's blue BMW to the far side of the parking lot. Id. at 140-155. The pickup truck was later discovered in the Wal-Mart parking lot. Since evidence showed Basham couldn't drive, Fulks obviously drove the truck into the parking lot, and, later, drove Alice Donovan and Basham to where they raped her, and to where she was killed. Witnesses testified to seeing the blue BMW, with two men and a woman, driving in the secluded Bee Tree Farm area. TT, Vol. VI, pp. 34, 65. The video at a BP gas station showed Fulks walking into the

162

store, pumping gas, and getting into the BMW at 3:59 p.m. The cashier at the store recalled that Fulks purchased black hose repair tape and masking tape. TT, Vol. VI, pp. 10-16. After Fulks fled to Ohio in the BMW, he led law enforcement on a high-speed chase. When Fulks was arrested after hiding the BMW, his semen was on the backseat of Alice Donovan's BMW.

In addition to the overwhelming evidence surrounding the kidnapping, carjacking, and rape of Alice Donovan, there was evidence of Fulks' involvement in the kidnapping of Samantha Burns - her I.D., the fund-raising candy box, the ATM video, and the mud. Samantha Burns' badly burned-out car was found immediately after it was set on fire in an isolated area where Fulks and his first wife used to park. Since Basham couldn't drive, the jury could deduce that Fulks drove himself and Basham away from the burning car. Further, there was testimony by James Hawkins, the victim of the first kidnapping after Fulks and Basham escaped. There was no question of Fulks' significant involvement in the crimes. As the Fourth Circuit Court of Appeals observed:

> [B]oth Hawkins and McGuffin testified that Basham took orders from Fulks and that Fulks was continually in charge of what the two of them did. . . . Tina Severance testified that Fulks, not Basham, approached her about obtaining firearms shortly after their escape. . . . [T]hroughout the crime spree, Fulks and Basham only travelled to places with which Fulks was familiar.

454 F.3d at 426. Alice Donovan and Samantha Burns could not have been murdered without Fulks' participation in the crimes. Fulks makes much of the fact that the prosecution did not have a body. The only additional information Alice Donovan's body might have provided was how she was killed. Thus, Fulks was not prejudiced by his counsels' advice that he plead guilty.

163

### C.     Evidence of Fulks' prior bad acts may have been admissible during the guilt phase.

Even if Fulks had not pled, much of the evidence of his prior acts would have been admissible at a trial to determine his guilt. Rule 404(b) of the Federal Rules of Evidence prohibits the introduction of "evidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." However, such evidence may be admissible for other purposes, including, but not limited to, "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." United States v. Van Metre, 150 F.3d 339, 349 (4th Cir. 1998)(citing Fed.R.Evid. 404(b)). Rule 404(b) is an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition. United States v. Powers, 59 F.3d 1460, 1464 (4th Cir. 1995)(citing United States v. Russell, 971 F.2d 1098, 1106 (4th Cir. 1992)). Evidence of prior bad acts is admissible if it is (1) relevant to an issue other than character, (2) necessary to show an essential part of the crime or the context of the crime, and (3) reliable. Id. (citing United States v. Rawle, 845 F.2d 1244, 1247 & n. 4 (4th Cir. 1988)). If these criteria are met, the evidence is admissible unless its "probative value is *substantially* outweighed by its prejudicial effect." Id. (quoting Morgan v. Foretich, 846 F.2d 941, 944 (4th Cir. 1988)). Relevant evidence is that "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," though under Rule 404(b), it must be sufficiently related to the charged offenses. Id. at 1465. A district court's decision to admit evidence under Rule 404(b) is discretionary, and will not be overturned unless it is arbitrary or irrational. Id. at 1464.

Had Fulks denied that he kidnapped or carjacked Alice Donovan, testimony by his two ex-wives and a girlfriend would have been admissible to show knowledge, motive or intent, as it

would have tended to show that Fulks kidnapped Alice Donovan for the purpose of raping her. Rape is an act of violence. Powers, 59 F.3d at 1465. Heather Goodman testified that Fulks beat her and raped her "when he got the urge up to." TT, Vol. XIV, pp. 180-185. When she tried to resist, Fulks hit her. Id. at 182. Amber Fowler testified that after she and Fulks were married, he began hitting her and dragging her through their house by her hair, and that she eventually obtained a restraining order against him. TT, Vol. XV, pp. 37, 46, 48, 51. Veronica Evans, Fulks' second wife, testified that Fulks punched her, drug her by her hair, and raped her. TT, Vol. XIII, pp. 115-118. Evans described Fulks as being "sexually motivated," "very physical," and "very mean." Id. at 118-119. She testified that he once drove her to a field, led her into a wooded area, forced her to her knees, and held a knife to her throat. Id. at 121. On another occasion, Fulks poked an arrow into Evans, handcuffed her, punched her in the face, and raped her. Id. at 149.

Had Fulks insisted that a jury determine his guilt, the testimony of Fowler, Goodman, and Evans would have been used to prove that Fulks intended to rape Alice Donovan when he forced her to drive out of the Wal-Mart parking lot. The testimony would have also shown modus operandi, since it tended to show that physical violence and force often accompanied Fulks' sexual activity. The evidence would have been necessary to show the context of the crime, since Fulks claimed that Basham was the perpetrator of the crime, and that Fulks was simply a mindless, frightened dupe with no clue of what was happening. Further, as three different witnesses testified to similar behavior by Fulks, it was reliable. Consequently, this testimony would have been admissible during the guilt phase, had Fulks not pled.

165

## Response to Claim XXVIII

**Trial counsel effectively utilized Fulks' guilty plea to argue acceptance of responsibility as a mitigating factor.**

In his twenty-eighth claim, Fulks complains that his trial counsel were ineffective because Fulks "received no benefit from the entry of his guilty plea." (Amended Mot. to Vacate at 191-92). He claims that his trial counsel never talked about his "acceptance of responsibility." This argument is without merit. As an initial matter, Fulk's argument is not supported by the mitigating factors found by the jury. All twelve jurors found as a mitigating factor that "Chadrick Evan Fulks pleaded guilty to kidnapping and carjacking resulting in death." Special Verdict Form, filed June 30, 2004, at p. 8 ; TT, Vol. XXII p. 25. Clearly, Fulks benefitted from his entry of his guilty plea. The jury unanimously found this guilty plea to be a mitigating factor.

Furthermore, Fulks' argument is not supported by the facts of the case. In his opening statement, Fulks trial counsel explained that Fulks had accepted responsibility for his actions by pleading guilty:

> Chad Fulks has pled guilty to kidnapping and carjacking Alice Donovan. By doing that, he has accepted responsibility for his role in the deaths of these two women. And has insured that he will never be released from prison and that he will die there. . . .That is not gently confessing. That is stepping up and saying there are only one of two things that could happen: I am going to plead guilty, my life will either be taken by lethal injection, or I will spend the rest of my life in a federal prison.

TT, Vol.I p. 129. In his closing argument, trial counsel continued this theme when he argued to the jury that Fulks deserved life without parole, in part, because he had pleaded guilty:

> Chad pled guilty to these offenses, ensuring he will never be released. He will spend the rest of his life in a maximum security prison. Sending him to prison for the rest of his life is not excusing what he did. It is not giving him a pass. Life without parole is not only severe punishment, it is a just punishment. And it is the appropriate punishment for Chad Fulks. Choose life.

166

TT, Vol XXI, p. 173. Contrary to Fulks' assertion, trial counsel took advantage of Fulks' guilty plea and used it to argue for a life sentence instead of a death sentence.

**Response to Claim XXIX**

**Trial counsel was not ineffective for failing to object to the prosecution's alleged insertion of religion in reply closing argument because any comment was fleeting and was done in response to the numerous religious and biblical arguments made by the defense in its closing argument.**

In his twenty ninth claim, Fulks alleges that his trial counsel were ineffective in failing to object to the prosecution's alleged insertion of religion into his trial. This claim is without merit.[52]

Improper prosecutorial arguments violate due process only where they render the proceedings fundamentally unfair. Bennett v. Angelone, 92 F.3d 1336, 1345 (4th Cir.1996). "In making this determination, [the court] must look at the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." Id. at 1345-46 (internal quotation marks and citation omitted).

In Bennett, the Fourth Circuit addressed Bible-based death penalty arguments made by a prosecutor. The court concluded that, while the prosecutor's comments were inappropriate[53]

---

[52]Fulks' trial counsel are well aware of this issue and have actually authored a law review on the use of religious arguments in capital cases. See John Blume & Sheri L. Johnson, "Religion's Role in the Administration of the Death Penalty–Don't Take His Eye, Don't Take His Tooth, and Don't Cast the First Stone: Limiting Religious Arguments in Capital Cases," 9 WILLIAM & MARY BILL OF RIGHTS JOURNAL 61 (2000).

[53]Unlike the innocuous comments made by the prosecution in the present case, the prosecutor in Bennett argued that, after the flood, God gave the "sword of justice" to Noah and that "Noah is now the Government." 92 F.3d at 1346. He argued that "thou shalt not kill" is a proscription against individuals, not governments. Id. And he quoted the "render unto Caesar" passage, stating that the "moral [is] follow the law and leave the rest to Heaven." Id.

because they "improperly drew on his reading of biblical law to justify the morality of the state's death penalty," the defendant's due process rights were not violated. Id. at 1346. The court reasoned that the prosecutor's comments, viewed in the total context of the trial," were not "sufficiently egregious to render [the defendant's] trial fundamentally unfair," because the evidence as to defendant's guilt was powerful, the murder was undoubtedly vile, and the judge instructed the jury that the lawyers' comments were not to be considered as evidence. Id. at 1346-47. In the present case, the prosecution did not invoke biblical law, Fulks' guilt was powerful, the murder undoubtedly vile, Fulks' trial counsel's use of biblical law was extensive, and the trial judge instructed the jury that the lawyers' comments were not to be considered as evidence.

Fulks first points to the cross-examination of his uncle, Mark Fulks by the prosecution. This cross examination was appropriate. It showed that Fulks feigned a religious conversion to manipulate his own uncle. Fulks did this to prompt his uncle to write a letter requesting that Fulks receive a more lenient sentence for a burglary conviction in Indiana prior to his later crime spree with Basham. It certainly was relevant to counter the defense claim that Fulks was a simpleton and a dupe. See e.g., TT, Vol XXI, p. 142 ("He is a one-note Johnny."), p. 143 (noting Fulks' "his clear limitations"), p. 144 ("It is a manifestation of his limitations, not of his cunning"), p. 153 ("You have to be brain damaged to even say it. To even think about it. . . . It is stupid."), p. 160 ("another example of his mental limitations").

Fulks' uncle, Mark Fulks, testified extensively about Fulks' miserable childhood. TT,

168

Vol XVI, pp.159-172. On cross examination, the prosecution brought out the fact that when Fulks was an adult and was to be sentenced for a 2000 burglary conviction in Indiana, Fulks convinced his Uncle Mark that he (Fulks) had "turned his life around" and started "walking on the path to the Lord." Id. at 177. Uncle Mark believed this so completely that he wrote the sentencing judge a letter requesting that "when you pass sentence on Chad Fulks that you have mercy and understanding." Id. Less than three years later, after escaping from prison, Fulks went on his crime spree with Basham. In closing argument, the prosecution argued that Chad Fulks had manipulated his uncle to receive a reduced sentence. TT, Vol XXI, p. 122.

Contrary to Fulks' assertion, the government did not insert religion into the trial. Instead, it simply brought out facts that were not in dispute that showed Fulks' ability to manipulate people, even his own family, to serve his purposes. The fact Fulks took advantage of his uncle's authentic religious faith to serve Fulks' own selfish purposes was the result of no one's actions but Chad Fulks.

Fulks also claims that the prosecution injected religion into the trial when the prosecutor, in his reply closing argument, in commenting on Fulks' habit of taking multiple showers each day, said: "There are no amount of showers that Chad Fulks could take that could wash his sins away. None." TT, Vol XXI, p. 232. At most, this comment was a veiled reference to biblical language. Fulks attempts to make much out of this very little comment. It must fail. Importantly, the prosecution's one sentence comment in reply closing argument pales in comparison to the numerous direct quotations from the Bible and biblical language used by the defense earlier in its closing arguments. See e.g., TT, Vol XXI, p . 163 (noting that there is no

169

"eye for an eye" under the law),[54] p. 173 (noting that the prophet Micah "encouraged us to love, to do justice, to love mercy, and to walk humbly" and that "life without parole is both merciful and just"),[55] p. 201 ("The Bible says a parent should train a child up in the way he should go."),[56] p. 210 (claims to not be invoking Bible by quoting Bible, including "Let he who is without sin throw the first stone."),[57] p. 210 ("even if they have sinned themselves, which, of course, we all have."),[58] p. 210-12 (over the prosecution's objection, defense was allowed to give a long analysis of the life of the Apostle Paul and quoted him as saying, "Not that I have already obtained this, or am already made perfect.").[59]    The defense counsel's extensive use of the Bible was allowed despite an objection by the prosecution.   TT, Vol XXI, p . 211.  Unlike the prosecution, the defense went so far to suggest that the jury should use the Bible to influence its jury deliberations.  After a long explanation of the Apostle Paul's ministry and his desire to make up for his past sins and seek righteousness, Id. at 212-14, defense counsel stated:

> And there is a second way that what Paul says in Philippians is instructive, and that is as a guide for jury deliberations, the process of deliberation.  It may be that the juror sitting right next to you does not have the same understanding you have.  It may be that he or she can only see the crime and not the brain damage and the avalanche of

---

[54]See Exodus 21:24 ("eye for eye").

[55]See Micah 6:8 (KJV) ("He hath showed thee, O man, what is good; and what doth the LORD require of thee, but to do justly, and to love mercy, and to walk humbly with thy God?)

[56]See Proverbs 22:6 (KJV) ("Train up a child in the way he should go: and when he is old, he will not depart from it.").

[57]See John 8:7 (KJV) ("He that is without sin among you, let him first cast a stone at her.")

[58]See Romans 3:23 (KJV) ("For all have sinned, and come short of the glory of God")

[59]See Philippians 3:12 ("Not that I have already obtained all this, or have already been made perfect, but I press on to take hold of that for which Christ Jesus took hold of me.")

horrible experiences that shape the person who committed it.

\* \* \* \*

Your walk in life may have led you to a place where you see how blessed you, and your parents, and your children are.  Your walk in life may have led you to a place where you say, from your heart, there, but for the grace of God, go I.  Maybe your walk in life hasn't quite brought you there yet.  Maybe you are ahead of other jurors, just like Paul was ahead of other followers, but nevertheless, you press on because that is what Paul said.  I haven't obtained it yet, but I press on.

You press on asking of yourself greater understanding and compassion than you would have imagined before this case.

\* \* \* \*

If, at the end of jury deliberations, your walk in life and your struggle, your struggle has brought you to a place where you can see what Chad Fulks went through and how it shaped him, you must stand there, if that is where it brings you, you must stand there.  It may be hard, very hard.  But as Paul said, 'I press.'  What you all agreed to in voir dire, if you got to a place with a lone juror with a view different of yours, already talked about 11 jurors one way, one the other, you would respect that.

Of course, you are going to deliberate.  But after deliberating, you would respect it.  And we also asked you, if you were the lone juror, the only one, could you hold to your belief?  You all said, yes.  Now is the time to call through on all of those assurances.  Press on.  Press on.

TT, Vol XXI, pp. 215-16.

This extensive use of the Bible by the defense was remarkable both in its length and breadth.  Defense counsel invoked the Bible numerous times, citing both the Old and New Testaments.  Furthermore, defense counsel cited to the Apostle Paul's courage and desire to live a more sanctified and righteous life, like Christ, as an example for any lone juror who sought to not vote for the death penalty to follow.  The prosecution's bare reference to "washing away sin" in reply argument can hardly be seen as "inserting" religion into the trial.  If anyone inserted religion into the trial, it was Fulks' trial counsel.  See Billings v. Polk, 441 F.3d 238, 250 (4th Cir. 2006) (noting that defense counsel "also made Biblical arguments to the jury during the sentencing proceedings" reminding the jury that the Apostle Paul was "a murderer, a persecutor

171

of Christians" before "he was forgiven and he changed his ways.").

Additionally, the court instructed the jury "that what the lawyers say is not evidence." TT, Vol XXI, p. 17. See also Id. at p. 250-51 ("The arguments of the attorneys and the comments and rulings of the court are not evidence."). Billings, 441 F.3d at 250 (noting that the judge instructed the jury that the lawyers' arguments at sentencing were "not to be considered as your instructions on the law."); Bennett v. Angelone, 92 F.3d at 1346-47.

Because the prosecution did not inject religion into the trial, Fulks' guilt was powerful, the murder undoubtedly vile, Fulks' trial counsel's use of biblical law was extensive, and the trial judge instructed the jury that the lawyers' comments were not to be considered as evidence, this claim must be rejected.

### Response to Claim XXX

**Trial counsel was not ineffective for failing to introduce Fulks' alleged artistic talent as a mitigating factor.**

Fulks complains that his trial counsel were ineffective for failing to introduce his artistic talent as a mitigating factor. He has failed to show that he informed his counsel of his alleged talent. Neither has Fulks indicated when the exhibits of his artwork were created. Further, even if Fulks informed his counsel of his "artistic talent" prior to trial, Fulks has failed to show his counsel were ineffective for not informing the jury of this talent. An argument that jurors should spare Fulks' life because he "has the ability to transcend human suffering and bring joy and enlightenment to both himself and those viewing his work," likely would have stirred a great deal of anger in jurors, who were probably more concerned about the suffering Fulks caused the victims and the joy they would never experience. Giving the jury the impression that Fulks would experience "joy" while in prison very well could have made jurors more inclined to vote

172

for the death penalty.  Thus, Fulks has failed to satisfy either prong of the <u>Strickland</u> test.

**Response to Claim XXXI**

**There was no cumulative error committed.**

In his thirty-first claim (Amended Mot. to Vacate, at  195-96), Fulks argues that the alleged errors made by his counsel and the trial court rise to the level of cumulative error.  This argument fails because Fulks has failed to show any errors.  He has failed to show or prove that his trial counsel's thorough performance fell outside the wide range of reasonable professional assistance.  Additionally, Fulks fails to point any prejudice that resulted from his counsel's supposed failure.

Fulks cites to cases considering the cumulative effect of matters actually determined to be constitutional error.  In those cases, the courts aggregated all the actual constitutional errors that individually were found to be harmless and not reason to grant relief.  Legitimate cumulative error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all of counsel's actions deemed deficient.  <u>See</u> <u>Fisher v. Angelone</u>, 163 F.3d 835, 852-53 n. 9 (4th Cir. 1998); <u>Moore v. Reynolds</u>, 153 F.3d 1086, 1113 (10th Cir. 1998) (cumulative error analysis applies when there are two or more actual errors; it does not apply to the cumulative effect of non-errors).

The present case is not one in which there were a number of constitutional errors or a variety of instances of ineffective assistance of counsel.  As noted above, trial counsel was prepared, pursued a valid trial strategy, and presented a thorough mitigation case in the sentencing phase.  In short, there were no actual errors.  Therefore, there is no cumulative error analysis to be done.

173

**Response to Claim XXXII**

**Lethal injection does not violate the Eighth Amendment.**

In Fulks' last claim, he summarily asserts that the manner in which the Government would carry out his execution violates the Eighth Amendment. Amended Mot. to Vacate at 196. This argument fails because death by lethal injection is not cruel and unusual.

Fulks fails to present grounds for relief. Fulks cannot show that lethal injection as a means of execution fails to comport with contemporary societal norms or that the three-drug lethal injection protocol is cruel and unusual punishment. "[T]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures. Atkins v. Virginia, 536 U.S. 304, 312 (2002). Nearly every state, and the federal government, have now adopted lethal injection as the primary or exclusive means of implementing the death penalty. Baze v. Rees, 128 S.Ct. 1520, 1526-27 (2008). The Supreme Court has ruled that any risk of the improper administration of the initial drug does not render the three-drug protocol (used by nearly every state) cruel and unusual punishment. Baze v. Rees, 128 S.Ct. 1520, 1526-27. See Evans v. Saar, 412 F.Supp.2d 519, 522 (D.Md. 2006) ("Circuit after Circuit (including the Fourth) has ruled that the [three-drug] protocol does not run afoul of the Eighth Amendment.").

Fulks has failed to even attempt to demonstrate the method of execution will offend his dignity or cause undue pain. Of course, the pain of death cannot be totally averted by any method of execution, and this Court lacks jurisdiction to dictate the method to be used unless the chosen procedure will subject Fulks to objectively cruel and unusual punishment. Walker v. Johnson, 448 F.Supp.2d 719, 722 (E.D. Va. 2006). Fulks has failed to identify any excessive risk

174

of pain. He "cannot rely on the possibility of something going wrong during an execution as the grounds for substantial risk of harm." Id. at 723 (citations omitted).

Fulks' claim also fails because he cannot meet the intent prong of the Eighth Amendment test. A prison official's duty under the Eighth Amendment is to ensure "reasonable safety," and official who act reasonably are not liable under the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 844-45 (1994). Accordingly, an official can only violate the Eighth Amendment if he knew of and disregarded an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837. The Federal Bureau of Prisons has in place a multi-step procedure designed to protect the health and safety of all involved. In fact, the federal protocol compares favorably with other execution protocol that recently survived Eighth Amendment scrutiny. The court in that case noted that the protocol involved "the placing of two working IV lines, the high dosage of lethal drugs to ensure that the drugs cause death quickly, the manner in which the drugs are prepared and handled, the qualifications of the execution team members, and the repetitive training required of them." Walker v. Johnson, 448 F.Supp.2d at 724. As noted by the Tennessee Supreme Court, in an unsuccessful challenge to Tennessee's lethal injection protocol, most protocols are nearly identical: "Tennessee's lethal injection protocol is consistent with the overwhelming majority of lethal injection protocols used by other states and the federal government." Abdur' Rahman v. Bredesen, 181 S.W.3d 292, 307 (Tenn. 2005). Fulks has failed to make any meaningful attempt to demonstrate that his relatively distant execution realistically threatens his Eighth Amendment right. Therefore, his last claim should be denied.

175

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully requests this

Court to dismiss Fulks' Motion to Vacate his conviction and sentence.

Respectfully submitted,

W. WALTER WILKINS
United States Attorney

BY:s/Robert F. Daley, Jr.
ROBERT F. DALEY, JR. (#6460)
Assistant United States Attorney

BY:s/Jimmie Ewing
JIMMIE EWING (#7292)
Assistant United States Attorney

March 20, 2009