IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION NO. 4:02-992-JFA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DECLARATION OF |
| | ) | SCOTT N. SCHOOLS |
| CHADRICK E. FULKS | ) | |
| | ) | |
| Defendant. | ) | |

This Declaration is prepared, pursuant to 28 U.S.C. § 1746, under penalty of perjury and I declare that the following is true and correct.

1.     At all times relevant to this affidavit, I was the First Assistant United States Attorney (FAUSA) in the United States Attorney's Office for the District of South Carolina. I have been with the Department of Justice in various capacities for over 14 years, and I am currently an Associate Deputy Attorney General.

2.     While serving as FAUSA, I was assigned as one of the prosecutors in *United States v. Chadrick Evan Fulks and Brandon Leon Basham*. Fulks and Basham were alleged to have been involved in the carjacking, kidnapping, and murder of Alice Donovan in Conway, South Carolina, and of Samantha Burns in Huntington, West Virginia. Basham was arrested on November 17, 2002, in Ashland, Kentucky. Fulks was arrested on November 20, 2002, in Goshen, Indiana.

3.     At the time of the arrests of Fulks and Basham, the whereabouts of Alice Donovan and Samantha Burns were unknown. Shortly after Basham's arrest, the United States

EXHIBIT C

District Court in Kentucky appointed counsel to represent him. Counsel in Kentucky explored the possibility of Basham's providing information about the crimes and the whereabouts of Alice Donovan or her remains pursuant to a proffer or Rule 11 letter. While these negotiations occurred primarily with Assistant United States Attorney (AUSA) Rose Mary Parham, I consulted AUSA Parham regarding the requests for a proffer letter and advised her that she should deny any request for cooperation pursuant to a proffer letter and should advise counsel for Basham that the government would be willing to provide Basham an opportunity to cooperate with the government only if the government could use whatever he said against him. In other words, the government was not interested in and did not pursue obtaining statements from Basham that were protected from direct or derivative use.

4.      At this same time–late November 2002–Fulks was in custody in Indiana and he invoked his right to counsel prior to providing any substantive information about the case. Fulks was ultimately transferred to South Carolina, and John Blume and Bill Nettles were appointed to represent him.

5.      The investigation quickly developed independent evidence implicating Fulks and Basham in both murders, and the evidence regarding the South Carolina murder was particularly strong. In particular, the government developed evidence that, on the day of the Donovan carjacking, Fulks and Basham left the Beachwalk Hotel in Myrtle Beach, South Carolina, in a green van that belonged to Tina Severance. They then committed a burglary at the residence of Sam Jordan, and were caught in the act of the burglary by Jordan's father Carl. Fulks and Basham shot at Carl Jordan when he came upon them in the course of the burglary, and then Carl Jordan pursued them when they fled his son's residence in the van. They then abandoned the van

2

and stole a white pickup truck from the residence of Oleta Hyman in Conway. The government also obtained surveillance video from the WalMart store in Conway, that showed a white truck follow a car matching the description of Alice Donovan's BMW into the WalMart parking lot, and showed an individual consistent with Basham's appearance exit the passenger side of the truck and approach the BMW. The video shows that several seconds after the person exited the white truck, the BMW pulled forward out of the parking space and drove toward the back of the parking lot where the white truck was later found abandoned. Surveillance video at a convenience store in Shallotte, North Carolina, clearly showed Fulks purchasing items in the store and putting gasoline in the BMW. Records reflected that Alice Donovan's credit card was used to purchase the gas. Individuals at the Bee Tree Farm, a hunt club in North Carolina, also observed two males and a female drive into the farm in the BMW, and then park temporarily at a cemetery located adjacent to Bee Tree Farm Road. Witnesses Tina Severance and Andrea Roddy confirmed that later that same day, Basham and Fulks arrived back at the Beachwalk Hotel, advised they had lost the van, and left in a hurry. Fulks and Basham then drove to Huntington, West Virginia where they stayed with Beth McGuffin. McGuffin advised that they arrived driving a blue BMW. On November 17, 2002, Basham and Fulks left McGuffin's residence and drove to Ashland, Kentucky, where Basham was arrested after trying to get into the car of a sixteen year old girl and her mother. The next day, an Ohio Highway Patrol officer encountered Fulks, who was sitting in the blue BMW in a rest area. Fulks engaged the officer in a high speed chase, captured on video, and then went to Indiana. On the morning of November 20, 2002, law enforcement surveilled the residence of Fulks' brother, where they observed Fulks and his brother leave the residence and drive to Goshen, Indiana. Fulks was arrested in Goshen and

3

Alice Donovan's BMW was located in a silo. All of the information discussed above was obtained prior to Fulks' first approach to the government regarding the possibility of his providing information to locate the remains of Alice Donovan. That approach first occurred in early April 2003.

6.     At the time that Fulks, through counsel, first approached the government about providing information about the whereabouts of Ms. Donovan's remains, the government had no interest in receiving that information under conditions that would not allow the use of the information directly or derivatively. The government's insistence that information be provided without restriction was based on several realities. First, the evidence against Fulks at that time was already overwhelming, as reflected in the preceding paragraph. Second, by April 2003, the government was interested in facilitating the location of Ms. Donovan's primarily as a means to secure some closure for her family. Whatever evidentiary value her remains may have had in November 2002, was likely lost or considerably dissipated by April 2003. For both of these reasons, the government was willing to forego receipt of any information from Fulks unless the information could be used against him. Third, the government had determined that Fulks and Basham were the only witnesses to the actual murders and expected that they would predictably accuse each other of committing the murders. Based on the evidence available at that point, the government reasoned 1) that such cross-allegations were unverifiable, and 2) such allegations were inconsistent with a crime spree in which Fulks and Basham acted as partners from the outset. While Fulks' attorneys had advised that Fulks had passed privately-administered polygraphs with respect to whether he had actually killed either victim, the government was aware that it would not call Fulks as a witness against Basham, and that Fulks' participation in

4

the crime spree was extensive regardless of who delivered the fatal blow. Fourth, the government had declined to execute a proffer letter with Basham in November 2002 when the information known to the government was less extensive and the evidentiary value of locating the remains was greater. The government saw no reason in April 2003 to treat Fulks more favorably than Basham.

7.     I am aware that post-conviction relief counsel have suggested that trial counsel were ineffective for failing to request a proffer letter. For all of the reasons set forth in the above paragraph, the government would not have entertained a request for a proffer letter prior to any interviews with Fulks, and I can state with certainty that the government would have foregone any interview of Fulks rather than receive information from him that could not be used against him. Counsel's willingness to permit the interview ultimately facilitated the government's presenting evidence to the jury that Fulks identified Basham as Alice Donovan's killer. Thus, counsel's strategy permitted the jury to hear Fulks' accusations without Fulks' being subject to cross-examination. In addition, the strategy included the effort to convince the Court to admit supportive polygraph examinations. This effort had two possible benefits. In the best case, the polygraphs would support Fulks' assertion that Basham was the killer. In the worst case, the strategy preserved an issue for appeal for which there was some legal support while also assuring that the jury would at least be aware that Fulks had accused Basham of being the killer. While the strategy ultimately failed to spare Fulks a death verdict, I believe that the strategy was well within the bounds of competent representation given the facts of the case, the overwhelming

5

evidence of Fulks' guilt, and the government's insistence that it be able to use any information Fulks provided against him.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March ___11___, 2009.

SCOTT N. SCHOOLS
Associate Deputy Attorney General

Washington, DC

6