**CLAIM XXXIII:  MR. FULKS'S FIFTH AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED BECAUSE THE JURY WAS ALLOWED TO CONSIDER MATERIALLY FALSE INFORMATION IN SENTENCING HIM TO DEATH**

## I.     INTRODUCTION

For nearly six years, Mr. Fulks has diligently attempted to assist law enforcement in locating Alice Donovan's remains by continuously and consistently directing them to the correct area in Horry County, South Carolina.  Although numerous searches of this area have been conducted over the years, it was not until recently that his unrelenting persistence finally paid off.  On January 18, 2009, a search team, relying on information provided by Mr. Fulks, recovered human remains from the same area identified by Mr. Fulks in early 2003.

Despite Mr. Fulks having provided law enforcement with the same information prior to his capital trial, the government was unable to locate Ms. Donovan's remains.  Consequently, the government – through both witnesses and argument – argued to the jury that Mr. Fulks had purposefully obstructed its search efforts by providing the government with false information.  Indeed, one of the central arguments the government relied on in urging the jury to sentence Mr. Fulks to death was that he was a remorseless and cruel person who delighted in leading the government on a wild goose chase and callously tormenting Ms. Donovan's family by preventing them from giving their loved one a proper burial.

However, this line of argument, as well as the "evidence" upon which the government relied, was incorrect.  We now know, based on newly discovered evidence, that the government was wrong and that Mr. Fulks did, in fact, provide law enforcement with accurate information about where Ms. Donovan's remains were located.  Mr. Fulks did not obstruct law enforcement's

efforts to find Ms. Donovan's remains, nor was he playing a game with the government or Ms. Donovan's family as the government alleged.[1]

Unfortunately, the jury that sentenced Mr. Fulks was never provided with accurate information about this highly sensitive and emotionally charged topic. Although we now know that Mr. Fulks did, in fact, provide law enforcement with honest information about the location of Ms. Donovan's remains in both an effort to cooperate with its investigation, as well as to provide Ms. Donovan's family with some sense of closure, the information which the jury received at trial, and which it was allowed to consider in deliberating over whether or not to execute Mr. Fulks, presented a starkly different picture: That Mr. Fulks not only lacked remorse for his actions and failed to accept responsibility for the offense, but also that the crime was particularly aggravated by the "fact" that Mr. Fulks actively sabotaged efforts to locate Ms. Donovan's remains.

The fact that the sentencing jury was allowed to consider such materially inaccurate evidence violated Mr. Fulks's constitutional rights in two important ways. First, Mr. Fulks's Fifth Amendment rights were violated because "due process protects the right not to be sentenced on the basis of false information." Shukwit v. United States, 973 F.2d 903, 904 (11th Cir. 1992); see United States v. Tucker, 404 U.S. 443, 448 (1972) (holding that due process is implicated if the sentencer's decision "*might have been different*" had it not considered false information (emphasis added)). Second, Mr. Fulks's Eighth Amendment rights were violated because the consideration of false information in sentencing fails to meet the Eighth Amendment's requirement of heightened reliability in capital cases. See Caldwell v.

---

[1] Mr. Fulks does not suggest that the government intentionally misled the jury. The claim alleged here is that Mr. Fulks was sentenced on the basis of false information, in violation of both the Fifth and Eighth Amendments.

Mississippi, 472 U.S. 320, 329 (1985) (explaining that in death penalty cases heightened reliability is required in the sentencing process); see also Johnson v. Mississippi, 486 U.S. 578, 590 (1988) (finding an Eighth Amendment violation where the capital jury "was *allowed* to consider evidence that has been revealed to be materially inaccurate" (emphasis added)). The gravity of these constitutional violations demands that Mr. Fulks's death sentence be vacated and a life sentence imposed or in the alternative, that the matter be retried before a jury that is given accurate information regarding Mr. Fulks's efforts to locate Ms. Donovan's remains.

## II.    STATEMENT OF FACTS

On January 18, 24, and 27, 2009, a search team led by Monica Caison with the CUE Center for Missing Persons (www.cuecenter.org), recovered human remains near the intersection of Water Tower Road and Long Bay Road in Horry County, South Carolina ("area" or "location"). Mr. Fulks directed Ms. Caison to this location through a highlighted map, color photographs and an explanatory letter. Although previous search efforts based on this same information had not been successful, Ms. Caison's systematic grid search finally resulted in the recovery of the remains. For nearly six years now, Mr. Fulks has been directing search efforts to the area where Ms. Caison ultimately recovered the remains. Although the results of DNA testing remain pending, it is widely believed that the remains are those of Alice Donovan. See Tonya Root, Donovan Remains Sent to Texas University for Further Testing, The Sun News, Apr. 6, 2009 (reporting Ms. Caison as saying, "They're [Ms. Donovan's family] anxious to know [the DNA results], but they're trying to be patient. They know it's her in their heart. We all know its her, it's just a matter of them telling [us] it is her.") (PA #42).[2]

---

[2] It is possible that, given the age and condition of the remains, it will not be possible to positively confirm that the remains are those of Alice Donovan. In light the overwhelming evidence that the remains are those of Ms. Donovan, Mr. Fulks respectfully requests that the Court accept that the remains are hers even if DNA testing is

A satellite image of the search area is included below and attached hereto as PA #43. The road appearing at the top of the map running east to west is Highway 90. The red "A" in the center of the map marks the intersection of Water Tower and Long Bay Roads. These roads cross in an "X" shape pattern with Water Tower Road connecting with Highway 90 to the east of Long Bay Road and then appearing to the west of Long Bay Road after the two roads cross at the intersection.



Ms. Caison recovered remains from in and around the curve of Water Tower Road appearing just south of the intersection, the *same* area identified by Mr. Fulks as the correct location. Ms. Caison's map identifying the location of the recovered remains (PA #44) follows:

---

inconclusive. Further, Mr. Fulks does not believe that it is necessary to await results of DNA testing before proceeding to adjudicate Claim XXXIII.



The map Mr. Fulks sent Ms. Caison identifying the location of the remains (PA #45) follows:



A comparison of Ms. Caison's map and Mr. Fulks's map demonstrates that Mr. Fulks directed Ms. Caison to the location where the remains were recovered. Not only had Mr. Fulks identified the correct general area of the remains for law enforcement in early 2003, but in 2004 when he was transported to the location to assist in the recovery efforts, he directed law

6

enforcement's attention specifically to the curve in Water Tower Road.  See, e.g., Jody Barr, Search ends for possible Alice Donovan remains, SC Now, January 28, 2009 ("[FBI Agent Jeff Bruning] and the FBI took Fulks to the same area where skeletal remains were found before his trial in 2004 after Fulks told investigators he would lead them to Donovan's body, according to Bruning.") (PA #46).  Ms. Caison's discovery proves that Mr. Fulks had consistently led law enforcement to the correct location and that the government's penalty-phase arguments that he had "successfully" concealed the remains for his own devious, selfish and malicious reasons were *wrong*.

### A.     Mr. Fulks's Pre-Trial Efforts To Locate Ms. Donovan's Remains.

Mr. Fulks first identified this area for the government on April 21, 2003, when, at his request, he met with the FBI and the Conway Police Department.  During this meeting, Mr. Fulks described an area off of Highway 90 where he saw a wildlife sign and a "long, wooden dock," among other indicators of the location.  FBI 302 04/28/2003 (date dictated) at 3-4 (PA #41).  Based upon the information supplied by Mr. Fulks, defense investigators identified the area surrounding the intersection of Water Tower Road and Long Bay Road and provided this information to the government.  See TT 06/25/2004 at 42; TT 06/15/2004 at 19.  Shortly after this meeting, on May 1, 2003, the government conducted a formal search.  TT 06/15/2004 at 20.  According to Special Agent Jeffrey Long, there no was "no doubt" that they were searching the area described by Mr. Fulks.  See id. at 28.

Both the initial search efforts conducted by the defense and the formal search conducted by the government focused primarily on Long Bay Road.  See TT 06/25/2004 at 43.  The defense had identified the Long Bay side based upon its interpretation of Mr. Fulks's recollection.  See TT 06/15/2004 at 84.  In addition to law enforcement's searches, trial counsel had been

conducting their own.  Trial counsel hired a helicopter, two investigators and had volunteers on the ground.  Unfortunately, none of these early search efforts yielded any results.

On March 23, 2004, a few months before the penalty-phase proceedings began, Mr. Fulks was transported to the location to assist in the search efforts.  This was the first time that he had been back to the area since his incarceration.  Upon being back on the ground, he identified Water Tower Road as the primary area to be searched.  FBI Agent Jeffrey Long explained that they wanted Mr. Fulks to lead law enforcement to the location without being directed in any way.  Agent Long recounted this event for the jury:

> We came up to … Water Tower Road.  We turned right at Mr. Fulks's request. We came down a dirt road, and you come to a four-way intersection, a four-way stop sign, and it is dirt.  If you turned left at that intersection, you would go down Long Bay Road, and you would go to the boat dock that I showed you, that I described on the screen there.  *And, at that point, I expected that we were going to turn left.  However, Mr. Fulks said no, go straight.  And so, we went straight on Water Tower Road.*  We went around a curve, and then we went around another curve, and this is all dirt road, very similar to Long Bay Road.

TT 6/15/2004 at 62 (emphasis added).  See also TT 06/15/2004 at 81 (noting that Mr. Fulks identified a curve in the road and stated that he thought that could be the location.).

Even though the government's search efforts had ended, the defense continued to look. Heather Roche, a specialist in human remains recovery hired by the defense, searched the area in early 2004 both before and after Mr. Fulks had been transported to the location.  TT 06/25/2005 at 6, 8.  She produced two reports of her search efforts and a handwritten map identifying the locations searched (PA #47), and she recommended that more systematic searches be conducted. Ms. Roche's later search efforts focused precisely on the area where the remains were ultimately recovered.   She specifically focused on the curve in Water Tower Road near the four-way

intersection.  See TT 06/25/2004 at 12. Tragically, the remains were not discovered through any of these search efforts.[3]

Shortly after these searches, the penalty-phase proceedings commenced and the government told the jury, as fact, that Mr. Fulks had purposefully obstructed the efforts and had inflicted further harm on the family in so doing.

**B.     The government told the jury that the reason the remains were not recovered was because Mr. Fulks had successfully concealed them**

During the penalty-phase proceedings, the government told the jury that the reason Ms. Donovan's remains had not been recovered was because Mr. Fulks had "successfully disposed of her body so that the victims will not be able to bury her" and so that the government could not prove manner of death.  See TT 06/29/2004 at 220-21.  The government used the failed search evidence as proof that Mr. Fulks was a remorseless and callous person who intended to do whatever it took to conceal the remains of Alice Donovan, even if doing so meant toying with the Donovan family by leading them to an incorrect location.

The government used this evidence as both a sword and a shield.  It used the evidence offensively as key evidence in support of the death penalty.  During closing arguments, the government told the jury:

> I submit to you, that that is what makes this crime *more aggravating*.  More aggravating.  The fact that they successfully disposed of her body so *that the victims will not be able to bury her and so that the government is barred from providing you, jurors, a total picture...*That is what makes this crime worse.

---

[3] It is important to note that the area surrounding these roads looks remarkably similar, and as previously discussed, the roads actually cross in an "X" shape with each road running diagonally and crossing through one another.  By viewing the maps and still photographs of this area it is easy to understand how search efforts could have focused on one road versus the other.  That being said, Mr. Fulks's description of the area has remained consistent and he has continuously directed search teams to this precise area.

TT 06/29/2004 at 221 (emphasis added).  The government also used this evidence defensively, to undermine defense arguments that Mr. Fulks was remorseful.  The defense argued that Mr. Fulks had accepted responsibility for his involvement in the crimes by pleading guilty.   The defense further tried to show Mr. Fulks's remorse to the jury by demonstrating how he tried to help lead law enforcement to Ms. Donovan's remains.  The government successfully undercut this defense strategy by telling the jury *the reason* Ms. Donovan's remains were not recovered was because of the successful actions of Mr. Fulks.

The government's use of this information permeated the proceedings.  It was listed as two of the three reasons used to support the "Victim Impact Evidence" non-statutory aggravating factor in the Notice of Intent to Seek the Death Penalty:

> 1.    **CHADRICK EVAN FULKS** engaged in a series of lies and deceit during law enforcement's initial efforts to locate Alice Donovan's body which resulted in *obstructing the search efforts* and gave Alice Donovan's family a false sense of hope during a period of intense despair.
>
> 2.    **CHADRICK EVAN FULKS** engaged in a *premeditated plan to dispose of Alice Donovan's body in such a manner that recovery of the remains has not been achieved*.  This action by the defendant, **CHADRICK EVAN FULKS**, has *caused significant emotional and psychological* pain to Alice Donovan's family beyond the expected grief associated in homicide cases and has caused a tremendous burden on law enforcement which has expended a large amount of time and resources in the search efforts.[4]

Not only did the government allege that Mr. Fulks had obstructed the search efforts and engaged in a premeditated plan to do so, but it further supported its decision to seek the death penalty specifically on the grounds that this alleged obstruction had caused "*significant emotional and psychological pain to Alice Donovan's family beyond the expected grief associated in homicide cases*."  Id. (emphasis added).

---

[4] Notice of Intent to Seek Death Penalty as to Defendant Chadrick Evan Fulks, at 5-6, United States v. Chadrick Evan Fulks, No. 4:08-992 (D.S.C. Sept. 12, 2003) (emphasis added).

The government highlighted this evidence for the jury in its opening statement by explaining to the jury that Mr. Fulks had "successfully concealed the remains." In the government's words:

> On April 21, 2003, six months and a week after Alice Donovan disappeared, Chadrick Evan Fulks directed law enforcement to a location *where he claimed* Alice Donovan's remains would be. His investigators looked, law enforcement officers looked, they found nothing…
>
> You see, Ladies and Gentlemen, if we had been able to locate the remains of Alice Donovan and Samantha Burns, we might have an idea about what happened. But the fact that they *successfully concealed the remains* allows Fulks to blame Basham.

TT 06/01/2004 at 56-57 (emphasis added).

This theme continued throughout the proceedings. Testimony regarding the search failed search efforts for Ms. Donovan's remains spanned the entire trial. Witness after witness was called to testify about the search efforts in order to drive home the point that the remains were not recovered notwithstanding Mr. Fulks's insistence that they were located in a particular area. Indeed, either through testimony or argument this topic was presented to the jury on no fewer than *eight* separate days - from the very beginning with opening statements, through numerous witnesses interspersed throughout the proceedings, to the very end with closing arguments.

One of the witnesses called to discuss the failed search efforts for Alice Donovan's remains was Agent Jeffrey Long. The government called Agent Long to drive home the point to the jury that Mr. Fulks must have purposefully obstructed the search efforts. The government emphasized through his testimony that despite "thorough and exhaustive searches," the remains were not recovered. Towards the conclusion of his direct examination, the government asked: "Despite these thorough and exhaustive efforts by law enforcement, as you sit there in this witness box today, can you tell this jury how Alice Donovan died?" He replied, "No, I can't."

11

He was then asked, "Can you tell this jury where the remains of Alice Donovan are?" He stated, "No, I can't." TT 06/15/2004 at 86.

The government also made its intent perfectly clear during a bench conference. The government told the Court, "[m]y argument is that you can't believe anything that either of these two guys have said." TT 06/15/2004 at 119. When asked by the Court whether the "[w]ild goose chase issue is one factor, among many, that would justify the death penalty," the government responded, "No question about it…" TT 06/15/2004 at 122-23.

Not only did the government argue that Mr. Fulks was a liar, but it then solicited devastating testimony from Ms. Donovan's family about the inability to bury Alice's remains. This testimony was meant to demonstrate to the jury that despite Mr. Fulks's claims that he was remorseful by pleading guilty, his actions related to the obstruction of the search efforts demonstrated otherwise.

One of Ms. Donovan's daughters was asked, "[w]hat impact has that had on you, emotionally, the fact that you can't even take your mother's remains, her body, and do what your family's plans were?" TT 06/21/2004 at 265. She replied, "I am not the same person I was a year and a half ago." Id. Ms. Donovan's husband was asked a similar question, to which he replied, "I have tried to carry Alice in my heart all the time. And if it ever happens that we can find her remains, it will put some sort of resolution to it, but definitely not closure." TT 06/22/2004 at 82. The jury was informed that it was because of Mr. Fulks's successful obstruction that Ms. Donovan's family could not lay her to rest. Left believing that it was Mr. Fulks's fault that Ms. Donovan's family could not lay her to rest or that the government could not determine cause of death, the government told the jury during closing arguments that this is what made the crime even more aggravating. See TT 06/29/2004 at 221.

12

The government also took this last opportunity to reiterate its conclusion that Mr. Fulks had purposefully obstructed the investigation.

> And the defense lawyers want you to believe, and Chad Fulks wants you to believe that, for the first time in his entire life, for the first time, that he is telling you the truth. I didn't rape Samantha Burns. I didn't kill Samantha Burns. I didn't kill Alice Donovan. *And I had nothing to do with getting rid of their bodies. Do you believe that? Are you going to accept that?* TT 6/29/2004 at 125 (emphasis added).

> First, with regard to the searches, Chad Fulks knew in April of 2003, he knew they had been searching the Savannah Bluff Area, didn't find the body in November. Knew they had been searching Bee Tree Farm Area up in North Carolina, no body found. So he sends them to another location. *Does that make it true? No.* TT 06/29/2004 at 126.

> The reason the government doesn't have Alice Donovan's body, the reason why we can't put her and take her to a morgue and have a pathologist autopsy her and come in and take that witness stand and tell you jurors that she was raped, that her throat was cut, or that she was shot, is *because of the actions, the successful actions, of Chad Fulks* and Brandon Basham.

TT 06/29/2009 at 220 (emphasis added).

Not only did the government tell the jury that it was Mr. Fulks's fault that the remains had not been recovered, but it argued to the jury that Mr. Fulks should not be "rewarded" with a life sentence, because he had successfully concealed the body. See TT 06/29/2004 at 220-21 ("Should Chad Fulks and Brandon Basham be rewarded because they successfully were able to conceal the body of Alice Donovan?"). We know now that all of this powerfully material information was wrong—wholly and completely wrong.

## C.     Mr. Fulks's Post-Sentencing Efforts.

Even after receiving a death sentence, Mr. Fulks continued to reach out to numerous people, including the government, his counsel, and the media proclaiming that he was telling the truth and begging them to continue searching. He desperately desired to bring closure to the Donovan family and was devastated that the searched efforts thus far had failed to do so. On

13

January 25, 2006, Mr. Fulks sent one such letter, titled "Notice to Drop Appeal," to the prosecution. (PA #48). He wrote:

> However, I do wish you would listen to me about what truly happend [sic] and that you will give me the chance to prove to you that *I told you the truth about the location of Alice Donovan I know that is the location where Brandon Basham walked her in to the woods.* To this day Basham laughs about me takeing [sic] the FBI to the right location and still not locating Mrs. Donovan…*I want to help these familys [sic] find there [sic] loved ones but I can't do it without your help so I am asking you to help these familys recover ther [sic] loved ones.*

(emphasis added).

Later that year, on August 8, 2006, Mr. Fulks sent another letter to the government and his defense counsel in the form of another Notice to Drop Appeal. (PA #49). Mr. Fulks expressed his frustration that he was not believed about the location of Ms. Donovan's remains and begged the government to continue looking:

> Ive [sic] done all I knoww [sic] to do to help you find these women but you dont [sic] believe me…

> Please take the time to search and see I am telling the truth its [sic] a small price to pay to bring some closure to Alice Donovans [sic] family and I know you have the time and resource to do it so why not?

Not only did Mr. Fulks reach out to the prosecution and his own counsel, but he sent a map to the Conway Police Department in late 2006, asking them to look for the remains. See Jody Barr, Sources: Convicted Alice Donovan killer sent map to Conway Police in late 2006, SC Now, January 29, 2009 (PA #50). According to the media's account of this event, Mr. Fulks was not believed: "Several members of law enforcement felt Fulks was trying to bluff investigators with the map, according to the source who also participated in searches for Donovan following her disappearance." Id.

14

On October 28, 2008, Mr. Fulks responded to a letter from Issac Bailey, a reporter with the Sun News. (PA #51). Again, Mr. Fulks expressed frustration that the government did not believe him and reiterated how much he wanted to help the families recover the remains:

> I want more than anything for Alice Donovans [sic] and Samantha Burns [sic] familys [sic] to recover their loved ones so they can have a proper burial and Ive [sic] done every thing [sic] I could to make this happen but no one wants to give me the time of day…All they need is a grit [sic]search done on these areas and if that is done I have no doubt both of these women could be recovered…Im [sic] willing to give them all of the maps, pictures and directions to the locations of Alice and Samantha…I will even submit to a polygraph test by anyone they choose about there [sic] locations and anything else they would like to know about what happen [sic].

A month later, the events that precipitated the discovery of the remains were put into motion. Ms. Donovan's "daughters invited [Monica] Caison to a memorial for Donovan and gave Caison a letter from Fulks." David Reynolds, <u>Death row inmate guided searchers to woman's remains</u>, Star-News, Jan. 27, 2009 (PA #52). Ms. Caison followed up with Mr. Fulks by writing him a letter, to which he responded by sending her a package containing detailed instructions, a map of the location indicating where the remains were located, and color photographs. When Ms. Caison opened it, "…she recognized the letter from Chadrick Evan Fulks as the real thing," and it "convinced Caison the body of Alice Donovan…could be found." Id. In this letter, Mr. Fulks implored Ms. Caison to go "into this brush and weeds and search." The letter Mr. Fulks sent to Ms. Caison is attached as PA #53.

The next day Ms. Caison performed a systematic grid search and recovered remains. Ms. Caison has credited Mr. Fulks with the discovery. After locating the remains she said, "It was in his wording, that's what helped get me there…. Go deep and get cut, go into the thicket and that's where you'll find her." Id. Without question, it was due to Mr. Fulks's unrelenting diligence that the remains were eventually recovered.

15

III.    ARGUMENT

A.    **The Due Process Clause Prohibits The Consideration Of False Information In Sentencing Determinations.**

At least early as 1948, the United States Supreme Court has recognized that sentences based upon materially false information and assumptions give rise to due process violations. See Townsend v. Burke, 334 U.S. 736, 740-41 (1948) ("Consequently, on this record we conclude that, while disadvantaged by lack of counsel, this prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue.   Such a result, whether caused by carelessness or design, is inconsistent with due process of law, and such a conviction cannot stand.").   Since Townsend, numerous courts have articulated the maxim that the Due Process Clause prohibits the consideration of materially false information in sentencing. See United States v. Deluca, 203 F.3d 823, 2000 WL 1291, at *7 (4th Cir. Dec. 30, 1999) (unpublished opinion)   (internal reference omitted)   ("The Fifth Amendment's Due Process Clause affords a criminal defendant the right not to be sentenced on materially false information."); Stewart v. Erwin, 503 F.3d 488, 498 (6th Cir. 2007) (citing Townsend for the proposition that "'clearly established,' due process protection against sentencing determinations that *rest in part* upon materially false information" (emphasis added)); id. at 491 (emphasis is original) ("…there *is* a clearly established federal due process protection against a trial court's reliance on materially false information at sentencing."); cf. United States v. Carroll, 3 F.3d 98, 101 n.7 (4th Cir. 1993) (internal citing reference omitted) (explaining that while judges enjoy broad discretion in sentencing there are some limitations including the requirement that "only accurate information may be considered.").

In the seminal case, United States v. Tucker, the district court sentenced the defendant after having considered the defendant's three prior convictions.  404 U.S. 443 (1972).  Several

16

years later, another court determined that two of the convictions were constitutionally infirm. The defendant filed a § 2255 motion "claiming the introduction at the 1953 trial of evidence of his prior invalid convictions had fatally tainted the jury's verdict of guilty." Id. at 445. The prosecution opposed this motion, arguing that it was harmless error "in view of other detrimental information about the respondent possessed at the time of sentencing by the trial judge, it is highly unlikely that a different sentence would have been imposed even if the judge had known that two of the respondent's previous convictions were constitutionally invalid." Id. at 446. The Supreme Court rejected this reasoning, finding that resentencing was appropriate because the district court relied upon misinformation of a constitutional magnitude. The issue for the Court was "whether the sentence in the 1953 federal case *might have been different* if the sentencing judge had known" that the prior convictions were invalid. Id. at 448 (emphasis added). Because "the *factual circumstances of the respondent's background would have appeared in a dramatically different light at the sentencing proceeding*" had the trial judge had correct information, the sentence could not stand. Id. (emphasis added). Pursuant to the Court's reasoning, it is not necessary to prove that the sentencing result *would have* been different, but merely that it "*might have been different.*" See id. at 448; see also United States v. Allen, 556 F.2d 720, 723 (4th Cir. 1977) (emphasis added) (explaining that "[r]econsideration of the sentence [in Tucker] was necessary because the sentencing court *had not known that the prior convictions were unreliable indicators of guilt and might not have imposed the same sentence had it known...*").

The Supreme Court's holding in Tucker is not limited to situations concerning sentencing based upon prior convictions later determined to be invalid or where it was conclusively determined that false information *was* considered. In Shukwit, for example, the appellant had

17

objected to references characterizing him as the "'principal' and 'main distributor' of controlled substances" in the Presentence Investigation Report (PSI). 973 F.2d at 904. The district court sentenced the appellant without making any findings about the contested portions of the PSI in violation of Rule 32(c)(3)(D). Id. The Eleventh Circuit remanded the case for a determination of whether the district court had relied on any of the contested portions of the disputed information. Instructively the Court held:

> If the district court makes an express determination that it did not rely on the disputed factual matter in sentencing, then due process is not implicated and resentencing is unnecessary. Of course, *resentencing will be necessary if* the district court determines that *any of the information upon which it relied in sentencing was materially inaccurate*.

Id. at 905 (emphasis added).

As these courts have explained, it is a violation of the Due Process Clause to allow a sentence to stand where the sentencer "might" have relied on information that is materially inaccurate. The false information regarding the search efforts infected the jury's opinion of Mr. Fulks's involvement in the death of Alice Donovan, his role in the search efforts for her remains, his propensity for telling the truth generally and, most importantly, whether he intended to inflict further harm on the Donovan family. It is highly likely that the jury considered this evidence in sentencing Mr. Fulks to death given the number of times this information was presented to the jury and the emotionally charged nature of the subject matter.

Studies have demonstrated that a jury's perception of the presence or absence of remorse plays a critical, and perhaps, determinative role in deciding whether to sentence a defendant to death. See, e.g., Theodore Eisenberg et al., But Was He Sorry?  The Role of Remorse in Capital Sentencing, 83 Cornell L. Rev. 1599, 1633 (1998) (finding that "if jurors do think the defendant is remorseful, they are more apt to sentence him to life imprisonment than to death."); see also Scott Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and

18

The Death Penalty, 83 Cornell L. Rev. 1557, 1560 (1998) ("Overall, 69% of the death jurors who participated in the study (fifty-four of seventy-eight jurors) pointed to lack of remorse as a reason for their vote in favor of the death penalty. Many of those jurors cited it as the most compelling reason for their decision.").   As a result, what should have been presented to the jury as mitigating evidence, and thus as proof of remorse, actually undermined any likelihood that the jury thought Petitioner was remorseful.  So absent was it from the mitigation case at the end of the proceedings, that it was not even listed on the jury verdict form as a possible delineated mitigating factor.  In fact, there was not a single mitigating factor listed that related to remorse. And the mitigating factor regarding the fact that he had pled guilty did not discuss the acceptance of responsibility or remorse at all.

If Mr. Fulks's death sentence were allowed to stand in the face of newly discovered evidence that demonstrates that the jury might have, and very likely did, consider materially false information in making its sentencing recommendation, justice would be disserved, and the Constitution, offended.  Indeed, if even one juror would have been persuaded that Mr. Fulks should not have been sentenced to death in light of this newly discovered evidence, the result would necessarily have been different.  And unlike the situations in Tucker and Shukwit where the defendants were facing prison time based upon false information, and the courts still held that there were due process violations, here, Mr. Fulks is facing the ultimate punishment—death.

This false evidence was also used to support a key non-statutory aggravating factor when it should have been presented to the jury as powerful mitigating evidence.  In Brown v. Sanders, the Supreme Court held that "[a]n invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process unless one of the other sentencing factors enables the

19

sentencer to give aggravating weight to the same facts and circumstances." 546 U.S. 212, 220 (2006) (emphasis in original). In <u>Sanders</u>, the Court held that the defendant's death sentence was constitutionally rendered where two of the four eligibility factors were later determined to be unconstitutional because the same facts and circumstances could have been used as aggravating weight under the other factors. Justice Scalia, writing for the Court, noted, "[i]f the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal without regard to the rule we apply here." <u>Id.</u> at 220-221. He continued: "As we have explained, such skewing will occur, and give rise to constitutional error, only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." <u>Id.</u> at 221.

Here, we are not confronted with the same problem that the <u>Sanders</u> Court faced. The issue is not whether facts and circumstances used to support an invalid aggravating factor could be used to support a valid aggravating factor. Instead, the issue is whether critical information that was used to support a non-statutory aggravating factor based upon *false information* violates the Due Process Clause, where newly discovered evidence proves that it should have been presented to the jury as a mitigating factor. Although the <u>Sanders</u> Court was confronted with an erroneous factor, and here we are confronted with erroneous evidence being used to support a valid factor, the Court's reasoning is instructive.

A chief issue for the Court was whether the sentence was "skewed" by virtue of the erroneous factor. <u>See id</u>. at 223. Here, the use of false information very likely "skewed" the sentence. The facts that were presented to the jury concerning the search for Alice Donovan's remains have since been proven to be false. As such, they could not have been validly used to

20

support any of the aggravating factors. Quite the inverse is true. The cumulative effect of this evidence meant that it was ultimately used by the jury as primary support for the "Victim Impact" non-statutory aggravator.[5]     When the jury went into deliberations to weigh the aggravating factors against the mitigating factors, it utilized this false information to support this non-statutory aggravator when it should have been used as a counterbalance to the aggravation case. Such a "skewing" of the sentencing outcome renders the process unconstitutional, as the reasoning in Sanders demonstrates. For the foregoing reasons, Mr. Fulks's due process rights were violated.

> **B.     A Sentence Of Death Based, In Part, Upon False Information Violates The Eighth Amendment's "Heightened Reliability" Requirement And The Principle That The Jury Must Consider Relevant Mitigating Evidence.**

As the Supreme Court has long recognized, "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case." Johnson v. Mississippi, 486 U.S. 578, 584 (1988) (internal quotation marks and citation omitted); see also Caldwell v. Mississippi, 472 U.S. 320, 329 n.2 (1985) (noting that "concern for assuring heightened reliability in the capital sentencing determination is as firmly established as any in our Eighth Amendment jurisprudence") (internal citation and quotation marks omitted); Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J. concurring) ("[T]his Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, *or mistake*.") (emphasis added)

---

[5] Verdict Form (PA #27) ("Do you, the jury, unanimously find that the government has established beyond a reasonable doubt the effect of the death of Alice Donovan on her family, including the extent and scope of the injuries and losses suffered by Alice Donovan and her family, and that this factor is aggravating?").

(internal quotation marks and citation omitted).  Here, the fact that the jury was allowed to consider evidence that Mr. Fulks obstructed the government's efforts to locate Ms. Donovan's remains — evidence which has been revealed to be materially inaccurate — violated the Eighth Amendment's heightened reliability requirement.

In Johnson v. Mississippi, the Court considered an Eighth Amendment challenge to a death sentence in which the jury was allowed to consider evidence in connection with one of the aggravating factors that was subsequently found to be materially inaccurate.  Specifically, the prosecution relied on a prior state felony conviction to argue that a death sentence was more appropriate than a life sentence.  However, subsequent to the defendant's conviction and death sentence, the prior state felony conviction was reversed.  The Court held that allowing the defendant's death sentence to stand, even though it was only based *in part* on the reversed conviction, violated the Eighth Amendment's principle of heightened reliability in capital sentencing proceedings.  486 U.S. at 585-86.  In reaching this conclusion, the Court noted:

> It is apparent that the [prior state felony] conviction provided no legitimate support for the death sentence imposed on petitioner.  It is equally apparent that the use of that conviction in the sentencing hearing was prejudicial.  The prosecutor repeatedly urged the jury to give it weight in connection with its assigned task of balancing aggravating and mitigating circumstances "one against the other." . . . *Even without that express argument, there would be a possibility that the jury's belief that petitioner had been convicted of a prior felony would be "decisive" in the "choice between a life sentence and a death sentence."*

Id. at 586 (citing Gardner v. Florida, 430 U.S. 349, 359 (1977) (plurality opinion)) (emphasis added).  As the Court further noted, "the error here extended beyond the mere invalidation of an aggravating circumstance supported by evidence that was otherwise admissible.  Here, the jury was *allowed to consider* evidence that has been revealed to be materially inaccurate."  Id. at 590 (emphasis added).

22

As in Johnson, Mr. Fulks's jury was "allowed to consider evidence that has been revealed to be materially inaccurate." Id. Specifically, Mr. Fulks's jury was allowed to consider evidence of his alleged obstruction of the government's efforts to locate Ms. Donovan's remains as a fact that aggravated the crime and warranted a death sentence. As noted above, through witnesses and through argument, the jury essentially heard that Mr. Fulks wasted countless hours of government resources by leading search parties on a wild goose chase for Ms. Donovan's remains, and that in the process of doing so, he tormented Ms. Donovan's family by offering them false hope that her remains would be found and that she could be properly laid to rest. This emotionally charged evidence served at least two purposes: (1) to support the non-statutory "victim impact" aggravating factor – which the jury unanimously found; and (2) to undercut a key part of the defense's mitigation case, which was premised on the notion that by pleading guilty Mr. Fulks had accepted responsibility for his role in the offense, and that his cooperation in the search efforts was an expression of his remorse for his actions and sincere desire to bring closure to the Donovan family.

As we now know, Mr. Fulks provided the government with honest and truthful information about the location of Ms. Donovan's remains. Thus, it is "apparent that the [evidence of Mr. Fulks's alleged obstruction] provided no legitimate support for the death sentence imposed on [Mr. Fulks]." Johnson, 486 U.S. at 586. It neither supported the government's "victim impact" aggravator, nor did it legitimately rebut the defense argument that Mr. Fulks was remorseful for his actions and was sincere in wanting to provide Ms. Donovan's family with closure. Rather, such information only served to improperly skew the sentencing deliberations in favor of a death sentence by portraying Mr. Fulks as a cruel and remorseless person who derived satisfaction out of wasting the government's time and resources and toying

with the emotions of Ms. Donovan's surviving family members. The fact that the jury "was *allowed to consider* evidence that has been revealed to be materially inaccurate," violated the Eighth Amendment's requirement of heightened reliability in capital sentencing proceedings. Id. at 590 (emphasis added) (for quotation). As in Johnson, Mr. Fulks's death sentence cannot stand given that it was based, in part, on false information regarding his alleged obstruction of the government's search efforts for Ms. Donovan's remains.

Moreover, the fact that the jury was allowed to consider such materially inaccurate information violated Mr. Fulks's Eighth Amendment right that a capital jury *must* consider mitigating circumstances presented for its consideration. See Lockett v. Ohio, 438 U.S. 586, 604 (1978) ("the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original). Indeed, the Supreme Court has repeatedly held that the capital sentencer must give due consideration to all relevant mitigating evidence in order to insure that a reliable verdict is imposed. See e.g., Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982) (sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration").

Here, that fundamental Eighth Amendment principle was violated because the materially inaccurate information about Mr. Fulks's alleged obstruction allowed the jury to incorrectly and improperly disregard mitigating evidence that Mr. Fulks was indeed remorseful for his actions, and that he was truly sincere in his efforts to assist law enforcement in locating Ms. Donovan's remains. As the Supreme Court has made clear, this Eighth Amendment principle is not satisfied

24

by merely giving a capital defendant the opportunity to present mitigating evidence; rather, the

jury must be given a meaningful opportunity to actually consider such mitigating evidence:

> The need for caution is plain: the constitutional concern with mitigating evidence is not satisfied by the mere ability of a defendant to present it. The sentencing body must have a genuine opportunity to consider it and give effect to it. *Penry v. Lynaugh*, *492 U.S., at 320, 109 S.Ct. 2934*. As the Court said in *Boyde*, "[p]resentation of mitigating evidence alone ... does not guarantee that a jury will feel entitled to consider that evidence." *494 U.S., at 384, 110 S.Ct. 1190*. For this reason, the Court has found Eighth Amendment violations in circumstances precluding the sentencing body from considering the defendant's mitigating evidence, even where the evidence was extensive and where it accordingly might have been thought unnatural for the sentencer to disregard it. *See, e.g., Penry v. Johnson, 532 U.S. 782, 788, 803-804, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); Eddings v. Oklahoma, 455 U.S., at 107, 113-114, 102 S.Ct. 869.*

Brown v. Payton, 544 U.S. 133, 162 (2005).

Here, the introduction of the materially inaccurate information regarding Mr. Fulks's

alleged obstruction of the government's search efforts virtually guaranteed that the jury would

not give meaningful consideration to the mitigation evidence that Mr. Fulks accepted

responsibility for his role in the offense, was remorseful for his actions, and sincerely aided the

government in its attempts to locate Ms. Donavan's remains and bring some measure of closure

to the Donovan family.  Indeed, the only function that this materially inaccurate information

served was to rebut and undercut this mitigating evidence.  While a capital jury certainly has a

right to give mitigating evidence whatever weight it deems appropriate, it cannot simply

disregard such mitigating evidence, and it certainly cannot do so on the basis of arguments and

information that are materially inaccurate.

## IV.    CONCLUSION

Mr. Fulks's Fifth and Eighth Amendment rights were violated because the jury was

permitted to consider, and very likely relied upon, materially false information in making its

sentencing recommendation.  Newly discovered evidence proves that Mr. Fulks had not

purposefully obstructed the investigation as the government told the jury. It proves that Mr. Fulks was not trying to conceal the remains for fear of testing for cause and manner of death as the government told the jury. It proves that Mr. Fulks was not inflicting further harm on the Donovan family by leading searchers to a false location as the government told the jury. To the contrary, it proves that Mr. Fulks was actively assisting in the recovery efforts, and was trying to bring some closure to the family. Alas what should have been presented to the jury as further proof of Mr. Fulks's remorse and as powerful mitigating evidence, was instead presented to the jury as one of the primary justifications for sentencing him to death. For this additional reason, the Constitution requires that Mr. Fulks's death sentence be vacated and a life sentence imposed or in the alternative, that the matter be retried before a jury that is given accurate information regarding Mr. Fulks's efforts to locate Ms. Donovan's remains.