# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### FLORENCE DIVISION

United States of America,

        Respondent,

vs.

Chadrick E. Fulks,

        Petitioner.

Case No. 4:02-992

---

**REPLY IN SUPPORT OF
AMENDED MOTION OF CHADRICK E. FULKS TO VACATE CONVICTION AND
SENTENCE AND FOR A NEW TRIAL PURSUANT TO 28 U.S.C.A. § 2255 AND RULE
33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

Beattie B. Ashmore*
BEATTIE B. ASHMORE, P.A.
Attorney at Law
650 E. Washington Street
Greenville, SC 29601
(864) 467-1001

Kirsten E. Small*
NEXSEN PRUET, LLC
55 E. Camperdown Way, 4th Floor (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
(864) 370-2211

<u>Pro Bono Counsel</u>
Amy Laurendeau
David Dalke
Danielle Oakley
Kymberleigh Damron-Hsiao
Stephanie Noble
O'MELVENY & MYERS, LLP
610 Newport Center Drive, Suite 1700
Newport Beach, CA 92660
(949) 760-9600

*Counsel of Record*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 5

STATEMENT OF ADDITIONAL FACTS ............................................................... 5

    A.    Mr. Fulks's Pretrial Efforts to Assist in the Recovery of Ms. Donovan's Remains. ........................................................................................... 6

    B.    Mr. Fulks's Post-Conviction Efforts. ............................................................ 8

ARGUMENT ........................................................................................................... 10

I.    CLAIM I: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT A MEANINGFUL MENTAL HEALTH CASE IN MITIGATION. ............................................................ 10

    A.    The Experts Who Testified At Mr. Fulks's Trial Did Not Discuss His Mental Illnesses. ........................................................................................... 11

    B.    The Experts Whom Mr. Fulks's Trial Counsel Failed To Present Would Have Testified That Mr. Fulks Suffers From Numerous Diagnosed Illnesses. ...... 12

    C.    Pulling The Mental-Illness Evidence Did Not Result From A Reasonable Trial Strategy. ....................................................................................... 13

II.    CLAIM II: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO REALIZE THAT THE WARD/BRUNING TESTIMONY COULD COME IN AS REBUTTAL TESTIMONY ...................... 17

III.    CLAIM III: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO UNDERTAKE AN ADEQUATE AND MEANINGFUL MITIGATION INVESTIGATION ........................................ 19

    A.    The Government Admits That Trial Counsel Failed to Investigate Evidence of the Sexual Deviance That Pervaded Mr. Fulks's Childhood. .................... 19

    B.    The Evidence Trial Counsel Failed to Investigate Would Not Have Been Cumulative. ........................................................................................ 20

    C.    Trial Counsel's Inadequate Investigation Is Not Cured By The Fact That Several Witnesses Trial Counsel Failed to Locate Would Have Testified That Mr. Fulks Is A Follower. ...................................................................... 21

IV.    CLAIM IV: TRIAL COUNSEL WERE INEFFECTIVE FOR USING UNTRAINED AND UNSUPERVISED LAW SCHOOL STUDENTS TO CONDUCT KEY ASPECTS OF THE INVESTIGATION ...................................................................................... 22

V.    CLAIM V: APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO APPEAL THE DISTRICT COURT'S IMPROPER "TWO-STEP" MITIGATION INSTRUCTION ....................... 25

VI.    CLAIM VI: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE GOVERNMENT'S IMPOSITION OF A NEXUS REQUIREMENT ON THE JURY'S MITIGATION FINDINGS ................................................................................................ 27

VII.    CLAIM VII: TRIAL COUNSEL WERE INEFFECTIVE IN ADVISING MR. FULKS TO GIVE A STATEMENT TO THE FBI WHEN NO PROFFER LETTER OR PLEA AGREEMENT WAS IN PLACE 29

    A.    The Government's No Prejudice Arguments Are Illogical And Incorrect. .... 30

    B.    The Government's Attempts To Characterize Counsel's Advice As

Reasonable Fall Far Short.......................................................................... 32

VIII. CLAIM VIII: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO ENSURE THAT JURORS WOULD BE ABLE TO CONSIDER AND GIVE EFFECT TO ALL RELEVANT MITIGATING EVIDENCE ......................................................................................................... 33

IX. CLAIMS IX, X, XI, XII: MR. FULKS'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN BOTH TRIAL COUNSEL AND THE COURT INCORRECTLY RELIED ON PINKERTON TO ATTACH LIABILITY FOR CARJACKING UNDER 18 U.S.C. § 2119.................................................... 39

    A. Trial Counsel and the Government Gravely Misinterpreted the Intent Element Under the Carjacking Statute. ...................................................... 41

    B. Ms. Donovan's Death was Not Reasonably Foreseeable to Mr. Fulks, Thus Rendering *Pinkerton* Inapplicable. ............................................................ 43

X. CLAIM XIII: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OFFER ADDITIONAL AND READILY DISCOVERABLE EVIDENCE OF BASHAM'S LEADERSHIP AND MANIPULATION THAT WOULD HAVE FIRMLY ESTABLISHED MR. FULKS'S MINOR PARTICIPATION ........... 46

XI. CLAIM XIV: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MEANINGFUL EVIDENCE THAT MR. FULKS WOULD NOT BE DANGEROUS IN THE FUTURE TO FELLOW INMATES OR TO BOP PERSONNEL ................................................................ 50

XII. CLAIM XV: TRIAL COUNSEL WERE INEFFECTIVE IN THEIR CONDUCT OF VOIR DIRE .... 60

XIII. CLAIM XVI: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO READ JUROR QUESTIONNAIRES AND TO EXAMINE PROSPECTIVE JURORS.......................................... 62

XIV. CLAIM XVII: TRIAL COUNSEL WERE INEFFECTIVE FOR CHOOSING TO SEAT AUTOMATIC DEATH VENIRE MEMBERS INSTEAD OF MOVING FOR ADDITIONAL PEREMPTORY STRIKES 63

XV. CLAIM XVIII: APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO APPEAL THE DISTRICT COURT'S REFUSAL TO ADMIT STATEMENTS BY BASHAM TENDING TO SHOW THAT BASHAM KILLED ALICE DONOVAN (AMENDED MOTION CLAIM XVIII). ................... 64

XVI. CLAIM XIX: MR. FULKS'S DUE PROCESS RIGHTS WERE VIOLATED BY THE GOVERNMENT'S PRESENTATION OF INCONSISTENT THEORIES ....................................... 65

XVII. CLAIMS XX, XXI: THE GOVERNMENT'S ATTEMPTS TO INFLUENCE WITNESS TESTIMONY WERE INAPPROPRIATE AND RENDERED THE RESULTING DEATH SENTENCE A DENIAL OF DUE PROCESS; THE GOVERNMENT VIOLATED ITS OBLIGATIONS UNDER BRADY V. MARYLAND BY FAILING TO DISCLOSE INFORMATION MATERIAL TO MR. FULKS'S ABILITY TO PRESENT HIS DEFENSE ............................................................................. 70

XVIII. CLAIMS XXII, XXIII: THE GOVERNMENT'S MISCONDUCT DURING CLOSING ARGUMENT, AND TRIAL COUNSEL'S FAILURE TO OBJECT TO THE IMPROPER ARGUMENT, VIOLATED MR. FULKS'S CONSTITUTIONAL RIGHTS....................................................... 71

    A. Life without parole is not a free pass............................................................ 73
    B. There was no evidence that Mr. Fulks raped Samantha Burns..................... 74
    C. The prosecutor engaged in misconduct by referring to Mr. Fulks as a "zoo animal".......................................................................................................... 76
    D. The prosecution improperly impugned Mr. Fulks's silence ......................... 78

E. The prosecutor engaged in misconduct by telling the jury that giving Mr. Fulks the death penalty would be "an act of self-defense"............................ 80

F. Conclusion ................................................................................................. 81

XIX. CLAIMS XXIV, XXV: THE GOVERNMENT ENGAGED IN SERIOUS MISCONDUCT BY ASSERTING THAT MR. FULKS HAD BEEN ARMED WITH A .45 CALIBER REVOLVER, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO QUESTION RONNIE FULKS ABOUT THE REVOLVER ..................................................................................................... 82

XX. CLAIM XXVI: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PREPARE KEY WITNESSES FOR TRIAL TESTIMONY ............................................................ 84

XXI. CLAIM XXVII: TRIAL COUNSEL WERE INEFFECTIVE FOR ADVISING MR. FULKS TO PLEAD GUILTY BECAUSE THIS ALLOWED THE PROSECUTION TO PRESENT MR. FULKS'S PRIOR BAD ACTS IN CONJUNCTION WITH THE EVIDENCE RELATED TO THE OFFENSE CHARGED ....................................................................................................... 85

A. Trial Counsel's Advice That Mr. Fulks Plead Guilty Was Not Part Of A Reasonable Trial Strategy. ............................................................................ 85

B. Mr. Fulks Clearly Was Prejudiced By Trial Counsel's Advice. .................. 87

XXII. CLAIM XXVIII: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO EXPLAIN TO THE JURY THE CONCEPT OF ACCEPTANCE OF RESPONSIBILITY ............................. 88

XXIII. CLAIM XXIX: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE GOVERNMENT'S INSERTION OF RELIGION INTO THE TRIAL ........................... 89

XXIV. CLAIM XXX: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INTRODUCE EVIDENCE OF MR. FULKS'S ARTISTIC TALENT AS A MITIGATING FACTOR...................... 90

XXV. CLAIM XXXI: EVEN IF THIS COURT FINDS THE ABOVE ERRORS HARMLESS, THE CUMULATIVE EFFECT OF THOSE ERRORS, COMBINED WITH THE KNOWLEDGE THAT MR. FULKS WAS TELLING THE TRUTH ABOUT THE LOCATION OF ALICE DONOVAN'S BODY, MEAN THAT MR. FULKS'S SENTENCE MUST BE VACATED AND THE CASE RETRIED ......... 91

XXVI. CLAIM XXXII: THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT MR. FULKS'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT................................. 93

**CONCLUSION** ........................................................................................................... **94**

## INTRODUCTION

COMES NOW Mr. Fulks Chadrick E. Fulks ("Mr. Fulks"), by and through his undersigned counsel, and files this Reply in support of the *Amended Motion of Chadrick E. Fulks to Vacate Conviction and Sentence and for a New Trial Pursuant to 28 U.S.C.A. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure* ("Amended Motion").

## STATEMENT OF ADDITIONAL FACTS

At the time of trial, the body of Alice Donovan had not been recovered, despite Mr. Fulks's efforts to help authorities locate Ms. Donovan's remains. Throughout the penalty-phase proceedings, the government argued that it was because of Mr. Fulks's "successful actions" that Ms. Donovan's remains were not recovered. Furthermore, the government specifically argued that the crime was aggravated by Mr. Fulks's alleged conduct in leading authorities away from the true location of the body:

> And to add insult to injury, they dispose of her body. Think of the thousands and thousands of man hours in North Carolina and South Carolina trying to find Alice Donovan's body to bring her home to her final resting place …
>
> Let's talk about the searches. First, with regard to the searches, Chad Fulks knew in April of 2003, he knew they had been searching the Savannah Bluff area, didn't find the body in November. Knew they had been searching Bee Tree Farm area up in North Carolina, no body found. So he sends them to another location. Does that make it true? No.

TT 6/29/04 at 119, 126.

On January 18, 2009, a search team led by Monica Caison of the CUE Center for Missing Persons ([www.cuecenter.org](http://www.cuecenter.org)) recovered human remains near the intersection of Long Bay and Water Tower Roads in Horry County, South Carolina. Mr. Fulks had directed Ms. Caison to this location through photographs, a map, and a letter. PA #46. The remains were found in the same area identified by Mr. Fulks in early 2003, and to which he has directed search efforts ever since.

5

While DNA testing is ongoing, it is widely believed the remains to be those of Alice Donovan.[1] PA #42.

### A. Mr. Fulks's Pretrial Efforts to Assist in the Recovery of Ms. Donovan's Remains.

For nearly six years, Mr. Fulks has been directing search efforts to the area where Ms. Caison ultimately recovered the remains. He first identified this area for the government on April 21, 2003, when at his request he met with FBI Special Agent Jeffrey Long and a representative of the Conway, South Carolina Police Department. During this meeting, Mr. Fulks described an area off of highway 90 where he saw a wildlife sign and a "long, wooden dock," among other indicators of the location. FBI 302 04/28/2003 (dated 4/28/2003) at 3-4 (PA #41). Based upon this information, defense investigators identified the area surrounding the intersection of Water Tower Road and Long Bay Road in Horry County and provided this information to the government. See TT 06/25/2004 at 42; TT 06/15/2004 at 19. A map of this intersection is attached hereto as PA #43. As can be seen from the map, Long Bay and Water Tower Roads lead roughly southward from Highway 90, meeting in an "X."

On May 1, 2003, the government commenced a formal search. TT 06/15/2004 at 20. This search, and initial search efforts by the defense, focused primarily but not exclusively on Long Bay Road. See TT 06/25/2004 at 43. The defense had identified the Long Bay side based upon its interpretation of Mr. Fulks's recollection, though at the time Mr. Fulks had not been back to the area. See TT 06/15/2004 at 84.

On March 23, 2004, Mr. Fulks was transported to the location to assist in the search efforts. This was the first time that he had been back to the area since his arrest. Upon being

---

[1] It is possible that, given the age and condition of the remains, it will not be possible to positively confirm that the remains are those of Alice Donovan. In light of the overwhelming evidence that the remains are Ms. Donovan's, Mr. Fulks respectfully requests that the Court

back on the ground, he identified Water Tower Road as the primary area to be searched. Agent Long recounted this event for the jury:

> [Traveling on Highway 90,] [w]e came up to a dirt road called … Water Tower Road. We turned right at Mr. Fulks's request. We came down a dirt road, and you come to a four-way intersection, a four-way stop sign, and it is dirt. If you turned left at that intersection, you would go down Long Bay Road …. And, at that point, I expected that we were going to turn left. However, Mr. Fulks said no, go straight. And so, we went straight on Water Tower Road.

TT 6/15/2004 at 62. When the government drove Mr. Fulks back to the other side of the road, based upon Mr. Fulks's instruction, the search team "went back to that curve in the road that I was telling you about that he looked at and said this could possibly be the place." Id. at 82; see also id. at 81 (noting that Mr. Fulks identified a curve in the road and stated that he thought that could be the location.).

In addition to searches by the government and by volunteers, defense counsel also conducted searches. Defense investigator Pete Skidmore was involved in these efforts. Defense counsel arranged for an aerial search by helicopter. The defense also engaged Heather Roche, a specialist in human remains recovery. Ms. Roche searched the area on two separate trips, on February 13-14, 2004 and on April 30-May 1, 2004. She produced a hand-drawn map and reports documenting her search. PA #47. As a result of Mr. Fulks's instructions, Ms. Roche's latter search efforts concentrated "mainly just past the four-way stop on Water Tower Road in the bend." TT 06/25/2004 at 12. Unfortunately, even though we now know that this was the correct location, the remains were not recovered. In June 2004, the penalty-phase proceedings took place and the government told the jury, as fact, that Mr. Fulks had purposefully obstructed the efforts and had inflicted further harm on the family because the remains were not recovered.

_____

accept that the remains are hers even if DNA testing is inconclusive.

**B.      Mr. Fulks's Post-Conviction Efforts.**

Even after receiving a death sentence, Mr. Fulks continued to reach out to numerous people, including the prosecution, the court and his attorneys steadfastly maintaining that he was telling the truth and begging them to continue searching for Ms. Donovan's remains.  On January 25, 2006, Mr. Fulks sent one such letter to the prosecution in the form of a "Notice to Drop Appeal."  PA #48.  He wrote:

> However I do wish you would listen to me about what truly happend [sic] and that you will give me the *chance to prove to you that I told you the truth about the location of Alice Donavan* [sic] I know that is the location where Brandon Basham walked her in to the woods.  To this day Basham laughs about me takeing [sic] the FBI to the right location and still not locating Mrs Donavan [sic]…*I want to help these familys [sic] find there [sic] loved ones but I can't do it without your help* so I am asking you to help these familys [sic] recover ther [sic] loved ones.

(emphasis added).

On August 8, 2006, Mr. Fulks sent another "Notice to Drop Appeal" to the prosecution and his defense counsel.  PA #49.  Mr. Fulks expressed his frustration that he was not believed about the location of Ms. Donovan's remains and begged the government to continue looking:

> Ive [sic] done all I knoww [sic] to do to help you find these women but *you dont belive [sic] me* or just dont want to find them because you are afraid it will prove your theory that happen wrong, I dont know which one it is but its one of theme [sic].

> Here is the info that you need to find these womens [sic] remains, this is where Brandon [sic] Basham walked Mrs Donavan [sic] into the woods at so I know thats where she is at and noone [sic] wants to listen or belive [sic] me because I have lied in my past.  Well that doesn't mean I am lieing [sic] now and Im not…

> *Please take the time to search* and see I am telling the truth its a small price to pay to *bring some closure to Alice Donavans [sic] family* and I know you have the time and resource to do it so why not?

> I am not trying to hurt this family any worse yhan there [sic] already hurt, *I only want to do what I can to bring theme [sic] some closure.*

> You dont even have to tell thems [sic] until after you have looked and seen that I am telling the truth…

*Im not asking for you to help me I am asking for you to help the familys* [sic]…to have some kind of closure in this tragedy.

(emphasis added).

Not only did Mr. Fulks reach out to the prosecution and his own counsel, but he sent a map to the Conway Police Department in late 2006, asking them to look for the remains. See Jody Barr, Sources: Convicted Alice Donovan killer sent map to Conway Police in late 2006, SC Now, Jan. 29, 2009. PA #50. According to the media's account of this event, Mr. Fulks was not believed: "Several members of law enforcement felt Fulks was trying to bluff investigators with the map, according to the source who also participated in searches for Donovan following her disappearance." Id.

On April 15, 2008, newly appointed post-conviction counsel William Watkins searched the area. In conjunction with his search, he took numerous photographs of the area and sent them to Mr. Fulks. This search was also unsuccessful.

On October 28, 2008, Mr. Fulks responded to a letter from Issac Bailey with THE SUN NEWS. PA #51. Again, Mr. Fulks expressed frustration that the government did not believe him and reiterated how much he wanted to help the families recover the remains.

> I want more than anything for Alice Donavans [sic] and Samantha Burns [sic] familys [sic] to recover their loved ones so they can have a proper burial and Ive [sic] done every thing [sic] I could to make this happen but no one wants to give me the time of day…All they need is a grit [sic] search done on these areas and if that is done I have no doubt both of these women could be recovered…Im [sic] willing to give them all of the maps, pictures and directions to the locations of Alice and Samantha…I will even submit to a polygraph test by anyone they choose about there [sic] locations and anything else they would like to know about what happen [sic].

A month later, the events that precipitated the discovery of the remains were put into motion. Mrs. Donovan's "daughters invited [Monica] Caison to a memorial for Donovan and gave Caison a letter from Fulks." David Reynolds, Death Row Inmate Guided Searchers to

Woman's Remains, STAR-NEWS, Jan. 27, 2009. PA #52. Ms. Caison followed up with Mr. Fulks by writing him a letter, to which he responded by sending her a package containing detailed instructions, a map of the location indicating where the remains were located, and color photographs. Id. When Ms. Caison opened it, "she recognized the letter from Chadrick Evan Fulks as the real thing," and it "convinced Caison the body of Alice Donovan … could be found." Id.

Ms. Caison immediately gathered a search team and conducted a systematic search. On January 18, 2009, the day after she received Mr. Fulks's letter and information, Ms. Caison performed a grid search of the area identified by Mr. Fulks—the same area to which he had directed authorities since early 2003—and recovered human remains. Two subsequent searches resulted in the discovery of additional human remains. All of the remains were found near the intersection of Long Bay Road and Water Tower Road, in and near the bend in the curve of Water Tower Road. Following the searches, Ms. Caison generated a map of the area, which sets out her search grid and identifies the locations of the remains. PA #44. Ms. Caison has credited Mr. Fulks with the discovery. After locating the remains she said, "It was in his wording, that's what helped get me there…" PA #52. Without question, it was due to Mr. Fulks's unrelenting diligence that Ms. Donovan's remains were eventually recovered.

## ARGUMENT

**I. CLAIM I: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT A MEANINGFUL MENTAL HEALTH CASE IN MITIGATION**

As the government highlighted in its closing argument, the jury in Mr. Fulks's penalty-phase proceeding did not hear one word about the diagnosed mental illnesses from which Mr. Fulks suffered at the time of the offenses giving rise to his death sentence. TT 06/29/2004 at 229-30. While the jury heard expert testimony regarding Mr. Fulks's brain damage stemming from his

prenatal exposure to alcohol, not one expert witness was called to testify to Mr. Fulks's numerous diagnosed mental illnesses. Trial counsel's decision to refrain from presenting evidence of Mr. Fulks's mental illness was not the result of a reasonable, strategic consideration. The decision defies explanation. As a result of trial counsel's failure, the jury missed out on a crucial piece of Mr. Fulks's life story without which the jury was incapable of making an informed decision regarding his sentence.

A. **The Experts Who Testified At Mr. Fulks's Trial Did Not Discuss His Mental Illnesses.**

Though Mr. Fulks's trial counsel presented testimony by several expert witnesses, *not one* of them testified to the numerous diagnosed mental illnesses from which Mr. Fulks suffers. On this crucial point, the jury heard ***no*** evidence. The government puts much weight on the areas of expertise of the testifying experts in order to make it sound as though the experts presented a thorough diagnosis of Mr. Fulks's mental health. Not so. Regardless of how the government phrases their areas of expertise, four of the five testifying medical experts testified exclusively about fetal alcohol spectrum disorder. The fifth testified only to Mr. Fulks's brain damage.

- Dr. Howard Becker never met with Mr. Fulks and offered no diagnosis of him. TT 6/23/2004 at 114. Rather, Dr. Becker's role was simply to educate the jury on *fetal alcohol spectrum disorder* generally. Id. at 115.

- Dr. Fred Bookstein never met with Mr. Fulks, though he testified that Mr. Fulks suffered from *fetal alcohol spectrum disorder*. TT 6/24/2004 at 91-92.

- Dr. Ruben Gur met with Mr. Fulks for an hour-and-a-half. He was not asked to offer any diagnoses of Mr. Fulks's mental health. Rather, Dr. Gur testified only that Mr. Fulks's brain is damaged in a way consistent with *fetal alcohol exposure*. TT 6/16/2004 at 134, 201-202.

- Dr. David Bachman similarly testified that Mr. Fulks has *fetal alcohol spectrum disorder*. TT 6/24/2004 at 31.

11

- Dr. James Evans was specifically not looking for evidence of mental illnesses; rather, he assessed strictly whether, objectively speaking, Mr. Fulks suffered *brain damage*. TT 6/23/2004 at 32.

The only other expert who testified on Mr. Fulks's behalf was Dr. Arlene Andrews, a social worker who performed Mr. Fulks's his family-history assessment. TT 6/24/2004 at 127. Dr. Andrews's role was to chronicle "a list of the facts of the life events that occurred" in Mr. Fulks's life. Id. She did not evaluate him for mental illness. Though she testified about her factual findings, Dr. Andrews did not testify regarding a single diagnosed mental illness that Mr. Fulks has. Accordingly, she did not and could not correlate any of the events in his life to his mental impairments.

**B. The Experts Whom Mr. Fulks's Trial Counsel Failed To Present Would Have Testified That Mr. Fulks Suffers From Numerous Diagnosed Illnesses.**

In contrast to the fetal alcohol spectrum disorder experts who testified on Mr. Fulks's behalf about the damage to his brain, the experts trial counsel refused to call would have presented a fulsome picture of the host of mental illnesses from which Mr. Fulks suffers.

Dr. Seymour Halleck interviewed Mr. Fulks for eight hours and diagnosed him with the following mental illnesses (PA #2):

- Cognitive Impairment

- Polysubstance Dependence

- Major Depressive Disorder

- Dysthymic Disorder

- Antisocial Personality Disorder

Dr. Margaret Melikian diagnosed Mr. Fulks with the following mental illnesses (PA #3):

- Cognitive Disorder

- Major Depressive Disorder

- Adjustment Disorder with Anxiety

- Amphetamine Dependence

- Cannibis Dependence

- Alcohol Dependence

- Antisocial Personality Disorder

Dr. James Hilkey interviewed Mr. Fulks for fourteen hours and diagnosed him with the following mental illnesses (PA #4):

- Polysubstance Dependence

- Dysthymic Disorder

- Cognitive Disorder

Dr. William Alexander Morton diagnosed Mr. Fulks with methamphetamine dependence (PA #5).

Despite the copious evidence of Mr. Fulks's diagnosed mental impairments, the jury did not hear about a single one of them or the effect that the impairments have on Mr. Fulks's ability to make decisions or process information. Though the government notes that evidence was presented that Mr. Fulks was depressed and had attempted suicide at the age of 14 (opposition at 39 n.19) the jury did not hear a single shred of evidence about the serious depression and mental illnesses of which Mr. Fulks suffered at the time of his trial.

### C.      Pulling The Mental-Illness Evidence Did Not Result From A Reasonable Trial Strategy.

In order to frame trial counsel's failure to present a mental-health case as the result of a strategic quandary regarding "how much and which mental health information to present," the government offers an entirely hypothetical justification for why someone *might* decide to forego presenting mental-health evidence. Opposition at 27, 44-53. Such speculation is inappropriate

here because there is no question about why trial counsel refused to put on a mental-health case. Mr. Fulks's trial counsel has told the Fourth Circuit precisely why they pulled the mental-health experts they had intended to have testify: Trial counsel decided not to put on evidence of Mr. Fulks's mental health solely because Donna Ward and Agent Bruning were permitted to testify in violation of 18 U.S.C. § 3432, the three-day rule. Appellant's Br. at 64-65. The government quite rightly questions the propriety of trial counsel's decision. Opposition at 46. That does not, however, justify the government's attempt to impute to trial counsel ex post facto some other strategic basis for their decision, which we *know* simply was not in trial counsel's minds at the time of trial.

Putting aside the fact that there is no question regarding the *actual* reason trial counsel pulled the mental-health experts at the last minute, even the government's *hypothetical* reasons do not justify trial counsel's failure to present a mental-health case.

1. The Mental-Health Experts' Opinions Did Not Contradict Mr. Fulks's Trial Strategy.

The government suggests the failure to present a mental-health case was justified because it prevented the jury from hearing that Mr. Fulks had been diagnosed as having antisocial personality disorder, which is sometimes viewed as a double-edged sword. Opposition at 46-50. The government's argument is without merit for three reasons. First, the day *before* the Court ruled that Donna Ward and Agent Bruning would be permitted to testify and trial counsel consequently decided to forego putting on a mental-health case, the government had already elicited through cross-examination testimony of Dr. Ruben Gur that Mr. Fulks met the DSM-IV criteria for anti-social personality disorder. Moreover, the government had already read into the record the definition of antisocial personality disorder. TT 6/16/2004 at 195. Second, one of the mental-health experts was prepared to undermine the validity of any diagnosis of antisocial

personality disorder by explaining that it is a circular, essentially meaningless diagnosis. PA #2 ¶ 30 (declaration of S. Halleck). Finally, even if trial counsel had indeed wished to avoid any further testimony regarding antisocial personality disorder, trial counsel would not have had to pull their entire mental-health case. Two of the four mental-health experts did not diagnose Mr. Fulks with the disorder. *See* PA #4 (declaration of J. Hilkey); PA #5 (declaration of W. Morton). In fact, Dr. Hilkey expressly disclaimed that Mr. Fulks met the criteria for the disorder. PA #4.

The government further suggests that evidence of Mr. Fulks's methamphetamine dependence, which sometimes causes irritability, aggressiveness, impulsivity, anxiousness, and paranoia, would have been inconsistent with Mr. Fulks's position that he was not the triggerman. Opposition at 48. Putting aside the fact that one need not necessarily have been the triggerman simply because he was addicted to methamphetamines, the government's argument ignores the fact that, as the government acknowledged at trial, *both* Mr. Fulks *and* Branden Basham were under the influence of methamphetamines almost constantly after escaping from Hopkins County Jail.

Similarly flawed is the government's claim that trial counsel failed to present mental-health evidence in order to avoid testimony that the sexual abuse Mr. Fulks suffered throughout his childhood may have made him more likely to commit acts such as rape. Opposition at 48. Such testimony would not have been damaging to Mr. Fulks in light of the fact that he admitted to committing rape and the experts' testimony would have helped the jury understand the connection between Mr. Fulks's criminal conduct and the abuse he endured as a child.

The Fourth Circuit's opinion in <u>Poyner v. Murray</u>, 964 F.2d 1404 (4th Cir. 1992), on which the government relies for its argument that evidence of Mr. Fulks's mental illnesses would have been aggravating as opposed to mitigating, does not apply here. In <u>Poyner</u>, the defendant's

apparent motive for the killing of which he was accused was to prevent his robbery victims from identifying him. 964 F.2d at 1418. He argued that his trial counsel should have presented supposedly mitigating evidence that he was a "serial killer" known as either a "Psychopathic Sexual Sadist," characterized by his "repeated intentional infliction of psychological or physical suffering in order to produce sexual excitement," a "Crime Spree Killer," who kills "repeatedly during a series of crimes motivated by the search for excitement, money, and valuables," or a "Supposed Psychotic, one who claims to be acting at the direction of command hallucinations or under the influence of compelling delusions." Id. at 1417-18. In that case, presenting the defendant as a serial killer who killed for excitement would have contradicted the supposed motive of wishing to prevent his robbery victims from identifying him. Similarly, in Truesdale v. Moore, 142 F.3d 749, 754 (4th Cir. 1998), on which the government relies, the court found that evidence of mental illness would have been inconsistent with the defendant's strategic presentation of his character at trial as that of a "normal, happy person."

In Mr. Fulks's case, by contrast, there is nothing inconsistent about suffering from mental illnesses such as major depression, addiction, and cognitive impairments and being a follower as opposed to a natural leader. In fact, as Mr. Fulks's mental-health experts would have testified, Mr. Fulks's mental illnesses actually made it more likely for Mr. Fulks to have been a follower than a leader. PA #2 ¶¶ 27, 31 (declaration of S. Halleck).

2. Presenting Evidence of Mr. Fulks's Mental Illnesses Would Not Have "Opened The Door" To Testimony About Myles Evans.

That Dr. Seymour Halleck was aware when he diagnosed Mr. Fulks's mental illnesses of his relationship with his stepson, Myles Evans, does not justify trial counsel's failure to present-mental-health evidence. First, the Court had already ruled that evidence of alleged child abuse of Myles Evans was inadmissible, so any such testimony by Dr. Halleck would have been

inadmissible. Second, if trial counsel was concerned that any testimony by Dr. Halleck may cause the Court to reconsider its ruling on the motion in limine, trial counsel could have alleviated any danger by simply not presenting testimony from Dr. Halleck. There is no logical connection between any testimony about Myles Evans and trial counsel's decision to pull all four mental-health experts.

Trial counsel's decision to refrain from presenting evidence of Mr. Fulks's mental illnesses defies explanation. Neither the actual reason trial counsel pulled the evidence nor the hypothetical reasons the government offers justifies trial counsel's gross deficiency. Without evidence of this important piece of Mr. Fulks's life story, the jury was unable to render an informed verdict. Had the jury heard this compelling evidence, at least one juror would have voted for life.

## II. CLAIM II: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO REALIZE THAT THE WARD/BRUNING TESTIMONY COULD COME IN AS REBUTTAL TESTIMONY

The government admits that counsel's failure to investigate relevant governing law falls below an objective standard of reasonableness. The government likewise concedes that Mr. Fulks's trial counsel failed to familiarize themselves with the law governing rebuttal witnesses—specifically, that rebuttal witnesses are not subject to the three-day rule of 18 U.S.C. § 3432. The government contends only that (1) the potential for Donna Ward and Agent Bruning to testify on rebuttal was "unexpected," thereby imposing no obligation on Mr. Fulks's trial counsel to familiarize themselves with the law of rebuttal as it related to Ms. Ward and Agent Bruning, and (2) trial counsel's failure to familiarize themselves with the governing law did not prejudice Mr. Fulks. The government is wrong on both points.

Trial counsel's failure to anticipate potential rebuttal testimony from Donna Ward and Agent Bruning was hardly a "fail[ure] to anticipate the unexpected." As the Fourth Circuit

found, Mr. Fulks's trial counsel had notice of Ms. Ward's and Agent Bruning's existence and of the testimony each could potentially provide. United States v. Fulks, 454 F.3d 410, 427 (4th Cir. 2006) ("[T]he fact that the defense team had notice, as early as May 21, 2004, of the November 17, 2002 phone call, further undermines Fulks's claim of prejudicial surprise."); see also Fulks's App. Br. at 50 (describing the Ward and Bruning testimony as a "bullet" to be "dodged"). Moreover, counsel knew that Mr. Fulks's case would focus in part on the fact that Mr. Basham, and not Mr. Fulks, was the leader of the offenses. Thus, trial counsel knew there existed witnesses with potentially damaging testimony that directly contradicted the testimony Mr. Fulks intended to present. Yet trial counsel chose not to research whether those witnesses would be able to testify in rebuttal.

This is not an instance in which trial counsel made a strategic decision not to prepare for the potential rebuttal testimony of Ms. Ward and Agent Bruning "after thorough investigation of the law and facts." See Meyer v. Branker, 506 F.3d 358, 371 (4th Cir. 2007). Rather, counsel's failure to realize that Ms. Ward and Agent Bruning could testify in rebuttal notwithstanding their absence from the witness list was the product of counsel's failure to familiarize themselves with hornbook law regarding the law of rebuttal.[2] *See* 2 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 254.3 n.1 (3d ed. 2000) ("The requirement [of 18 U.S.C. § 3432] does not apply to rebuttal witnesses."); see also Fulks, 454 F.3d at 422 n.5. Trial counsel's failure is perhaps not surprising given that, although he enjoys a national reputation as a habeas expert, he

---

[2] In contrast to the settled rule of law that rebuttal witnesses are not subject to the three-day rule, in both of the cases the government cites for the proposition that "[t]rial counsel should not be found to be ineffective for failing to anticipate the unexpected," the law of which the defendants in those cases claimed their counsel should have been aware was obscure and unsettled. See Dutton v. Brown, 812 F.2d 593, 598 n.4 (10th Cir. 1987) (declaring the law on the relevant point "virtually nonexistent"); Ramos v. McNeil, No. 5:06cv48, 2009 WL 36599, at *13 (N.D. Fla. Jan. 5, 2009) (noting that there existed "little precedent on the [relevant] issue").

has very limited trial experience.

As explained more fully with respect to Claim I, *supra*, Mr. Fulks's trial counsel's failure to familiarize themselves with the governing law prejudiced Mr. Fulks by causing counsel to withhold from the jury all evidence of Mr. Fulks's diagnosed mental illnesses. As previously explained, trial counsel withdrew the mental-health evidence solely because the Court permitted Ms. Ward and Agent Bruning to testify. Contrary to the government's assertion, Mr. Fulks's trial counsel did not remedy the absence of mental-health evidence by substituting during closing argument his own opinion that Ms. Ward's and Agent Bruning's testimony only demonstrates "how stupid [Mr. Fulks] is." Opposition at 59. Accordingly, Mr. Fulks was denied effective assistance of counsel and was prejudiced by the constitutional infirmities of the representation he received.

## III. CLAIM III: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO UNDERTAKE AN ADEQUATE AND MEANINGFUL MITIGATION INVESTIGATION

### A. The Government Admits That Trial Counsel Failed to Investigate Evidence of the Sexual Deviance That Pervaded Mr. Fulks's Childhood.

The government concedes that the testimony of two of Mr. Fulks's family members whom trial counsel failed to locate or interview in its mitigation investigation was "new" and "non-hearsay." Opposition at 61. Specifically, Mr. Fulks's first cousin once removed, Nathan Fulks, if interviewed by trial counsel, would have revealed that Mr. Fulks's father was a "sexual deviant." PA # 18 ¶ 3. Additionally, when Mr. Fulks was ten years old, one of Mr. Fulks's childhood role models, an uncle who was a gang member, raped Mr. Fulks's first cousin who sometimes lived with Mr. Fulks, Christina Kirkman. That same first cousin suffered a sexual assault in Mr. Fulks's childhood home at the hands of Mr. Fulks's brothers. PA # 40 ¶ 12. The jury never heard of the sexual deviance that permeated Mr. Fulks's childhood because trial

counsel failed to investigate and discover this evidence—despite the fact that Nathan Fulks and Christina Kirkman are members of Mr. Fulks's family.

Though the government acknowledges that trial counsel failed to discover this evidence, the government claims that the revelations "are not relevant to Fulks." Opposition at 61. Hardly. Evidence that Mr. Fulks's childhood was laden with sexual impropriety by his father, brothers, and an uncle whom he admired is directly relevant mitigation evidence.

The government's plea to the Court to disregard this neglected evidence because it would not "have been shocking to the jurors" is misguided. Opposition at 61. Mitigation evidence need not "shock" the jurors. Rather, trial counsel's failure to investigate and discover relevant mitigating evidence constitutes ineffective assistance of counsel when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland v. Washington, 466 U.S. 668, 694 (1984).

**B. The Evidence Trial Counsel Failed to Investigate Would Not Have Been Cumulative.**

Contrary to the government's assertion, Nathan Fulks's testimony that Roger Fulks told him that Mr. Fulks had been molested, as well as Monica Wolowinski's testimony, would not have been cumulative. Nathan Fulks's testimony regarding the molestation Mr. Fulks suffered as a child would not have been cumulative of the evidence that was presented to the jury because not a single juror found that Mr. Fulks had suffered sexual abuse as a child. PA # 27 at 8. For the same reason, Ms. Wolowinski's revelation that Mr. Fulks's brother reported to her that he had witnessed Mr. Fulks's father molest Mr. Fulks would not have been cumulative. PA #13 ¶ 8. As a result of trial counsel's failure to locate Ms. Wolowinski, the jury in Mr. Fulks's penalty-phase proceedings never once heard the allegations that Mr. Fulks was sexually victimized by the one person he should have been able to trust most—his father. Ms. Wolowinski also

20

witnessed first-hand Mr. Fulks behaving in a way she interpreted to be consistent with someone who had been sexually victimized.  PA #13 ¶ 9.

Ms. Wolowinski's testimony regarding other aspects of Mr. Fulks's deplorable childhood would not have been cumulative because she could have testified to the manifestation of deprivation in Mr. Fulks's life that only she experienced.  Specifically, only Ms. Wolowinski could describe that Mr. Fulks's home life was so depraved that she felt compelled to adopt him.  PA #13 ¶ 6.  And only Ms. Wolowinski knew that Mr. Fulks's mother kept Mr. Fulks only because she was not willing to risk losing public assistance—her state-provided alcohol funding.  PA #13 ¶ 6.  Additionally, only Ms. Wolowinski could testify that Mr. Fulks behaved completely differently in Ms. Wolowinski's home, where he had limits and order, than he did in the Fulks family household.  PA #13 ¶ 13.

The case on which the government relies for the proposition that the failure to present cumulative mitigation evidence does not prejudice a defendant's case, Buckner v. Polk, 453 F.3d 195 (4th Cir. 2006), is inapposite.  There, the "new" evidence consisted of declarations based on additional information from the defendant's family members who had previously testified.  Here, by contrast, trial counsel's inadequate mitigation investigation failed to reveal even the existence of witnesses close to Mr. Fulks who could have provided first-hand testimony about the harrowing childhood he endured and distinct perspective on his life.

### C. Trial Counsel's Inadequate Investigation Is Not Cured By The Fact That Several Witnesses Trial Counsel Failed to Locate Would Have Testified That Mr. Fulks Is A Follower.

The government suggests that the Court should excuse trial counsel's failure to perform an adequate mitigation investigation because some of those witnesses trial counsel failed to locate may have revealed facts the government claims are harmful to Mr. Fulks.  Opposition at 67-68.  Specifically, the government contends that the potential testimony of three witnesses,

who would have testified that Mr. Fulks has always been a follower and not a leader, would have been harmful to Mr. Fulks's case. Putting aside the fact that establishing Mr. Fulks as a follower, not a leader, was a primary goal in Mr. Fulks's case, trial counsel's failure here was not one of strategy—i.e., determining which evidence to present to the jury. It was a failure to investigate adequately and to discover that these witnesses even existed.

The government's reliance on Moody v. Polk, 408 F.3d 141 (4th Cir. 2005), is misplaced. In that case, the petitioner alleged that his trial counsel was ineffective for failing to present additional evidence in mitigation. There was no allegation that trial counsel failed to locate or interview key mitigation witnesses, as is the case here. Id. at 149-150, 154.

Mr. Fulks's trial counsel failed to undertake a reasonable mitigation investigation and missed several key witnesses who could have testified in great detail about Mr. Fulks's heinous childhood, the abuse he suffered, and the fact that he conducts himself appropriately when in a structured environment. This failing prejudiced Mr. Fulks by ensuring that the jury did not hear Mr. Fulks's complete story. Had they heard the compelling evidence Monica Wolowinski, Nathan Fulks, Tracy Graybeal, Beth McGuffin, Mark Thompson, Harry Tyree, and Elvin Taylor would have provided if asked, Mr. Fulks would likely have received a sentence of life.

## IV.  CLAIM IV:  TRIAL COUNSEL WERE INEFFECTIVE FOR USING UNTRAINED AND UNSUPERVISED LAW SCHOOL STUDENTS TO CONDUCT KEY ASPECTS OF THE INVESTIGATION

The government concedes that using untrained and unsupervised law students to investigate key aspects of Mr. Fulks's case—including performing Mr. Fulks's mitigation investigation—falls short of competent assistance of counsel. The government contends only that Mr. Fulks was not prejudiced by having large portions of his mitigation investigation performed by untrained law students. The government is wrong.

Mr. Fulks was prejudiced by the unqualified students' inabilities because they resulted in the

jury not hearing critical mitigation evidence. Specifically, the students were unable to locate some key witnesses and were unable to elicit sensitive information from others. The students who performed Mr. Fulks's mitigation investigation were responsible in many instances for locating witnesses whom they would later interview as part of Mr. Fulks's mitigation investigation. PA #11 ¶3. Not surprisingly, the inexperienced law students missed many witnesses and, as a result, trial counsel never discovered a tragic piece of Mr. Fulks's childhood—that he suffered sexual abuse at the hands of not one, but two, of his immediate family members. PA #12 ¶ 7 (declaration of Tracy Graybeal, stating that Mr. Fulks had previously reported to her that he was sexually molested by his sister);[3] PA #13 ¶¶ 8-9 (declaration of Monica Wolowinski, stating that one of Mr. Fulks's family members told her that Mr. Fulks's father had sexually molested him and further declaring that Mr. Fulks's behavior led her to believe he had been sexually victimized). As a result, trial counsel never investigated these claims of early sexual abuse by Mr. Fulks's father and sister. PA #11 ¶7 (declaration of Tim Kane, a former law student who worked on Mr. Fulks's investigation, stating that he believed Mr. Fulks was a victim of sexual abuse and that trial counsel should have investigated the possibility). Accordingly, the jury *never* heard evidence that Mr. Fulks was sexually violated by two of the most influential people in his life. There is a reasonable probability that such compelling mitigation evidence would have evoked enough sympathy from at least one juror to result in Mr. Fulks's life being spared.

In addition to missing a number of witnesses with key mitigation evidence, the students who conducted much of Mr. Fulks's mitigation investigation were unable to elicit from the witnesses they did find the extremely private and sensitive information that might have resulted in a life sentence, had the jury heard the evidence. The ABA guidelines for effective representation in capital cases recognize that mitigation specialists are crucial to a defendant facing a possible death sentence

---

[3] The government downplays the importance of Tracy Graybeal as a witness because Mr. Fulks disclosed to her the abuse by his older sister after his trial. Nevertheless, Mr. Fulks's trial counsel failed to discover the underlying

because "[t]hey have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed." Commentary to 2003 ABA guideline 4.1 at 33, http://www.abanet.org/moratorium/DPGuidelines4-2003.pdf. The untrained, Ivy League law students were unqualified to interject themselves into the lives of Mr. Fulks's family members and acquaintances in impoverished, rural West Virginia and elicit extremely sensitive information from them. One student responsible for obtaining this private and sometimes shameful information recounts that students were sometimes "apprehensive about knocking on doors and conducting witness interviews." PA #11 ¶ 4. Not surprisingly, those same students were entirely incapable of creating the rapport necessary to obtain information about Mr. Fulks's past that the witnesses often haven't shared with anyone, let alone a total stranger. An example of one such witness was Beth McGuffin, who would have testified, if asked by trial counsel, that Mr. Fulks was sexually abused by yet another person when he was an adolescent boy. PA #22 ¶ 8. However, because the sexual abuse was never discovered, and the students who interviewed Ms. McGuffin were unable to elicit such sensitive information from her, the jury never heard this critical piece of mitigation evidence from a witness who experienced it first hand.

That trial counsel employed a mitigation specialist and investigators, in addition to relying on law students, fails to cure the prejudice Mr. Fulks has suffered. The fact that trained professionals performed *some* parts of the investigation does not change the fact that inexperienced students often located (or attempted to locate) and interviewed numerous witnesses on their own without professional assistance. The result of these untrained, inexperienced, and largely unsupervised students' investigation was that the jury did not get an entire picture of Mr. Fulks's childhood and, specifically, the sexual abuse he suffered at the hands of those closest to him. This undiscovered evidence is particularly critical in light of the

information.

sexual nature of Mr. Fulks's offense. Had the jury heard this devastating evidence, there is a reasonable probability that at least one juror would have voted for a sentence of life imprisonment as opposed to death.

## V. CLAIM V: APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO APPEAL THE DISTRICT COURT'S IMPROPER "TWO-STEP" MITIGATION INSTRUCTION

It is axiomatic that, just as a juror may not be precluded from considering constitutionally relevant mitigating evidence, "neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." Eddings v. Oklahoma, 455 U.S. 104, 114 (1982); see Mills v. Maryland, 486 U.S. 367, 374-75 (1988) ("It is beyond dispute that in a capital case the sentencer may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. The corollary that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence is equally well established." (citations, internal quotation marks, and alterations omitted)). In other words, when a capital defendant presents evidence in mitigation, a juror may give the evidence much weight or little weight, but the juror may not make an independent conclusion that the evidence is not mitigating *at all*. See Eddings, 455 U.S. at 114-15, 117 (reversing capital sentence on the basis of the trial court's refusal to consider the defendant's family history as a mitigating factor). Unfortunately, the District Court's instruction regarding the jury's duty to consider mitigating evidence allowed the jurors to engage in precisely the kind of unconstitutional rejection of mitigating evidence that the Supreme Court clearly condemned in Eddings. See Amended Motion at 92-94.

The government argues, first, that the mitigation charge was proper because it correctly instructed the jury with respect to certain aspects of the duty to consider mitigating evidence, namely, that each juror was required to consider every mitigating factor that juror found to exist

and that there was no limit on the number of mitigating factors the jury could consider. TT Vol. 6/29/2004 at 274, 275. These correct statements of the law do nothing to cure the fundamental flaw in the District Court's instruction, namely, that the jurors were allowed to screen out, and therefore refuse to consider and give effect to, constitutionally relevant mitigating evidence.

Second, the government argues that there is no difference between refusing to consider evidence altogether and considering it but giving it little weight. Opposition at 73. To the contrary, this is *precisely* the constitutional line drawn by the Eddings Court: "The sentencer … may determine the weight to be given relevant mitigating evidence. *But [the sentencer] may not give it no weight by excluding such evidence from … consideration.*" Eddings, 455 U.S. at 114-15 (emphasis added). In Eddings, the trial court acknowledged the existence of the defendant's troubled family history, but concluded that the evidence was not mitigating as a matter of law, and so refused to consider it. Eddings, 455 U.S. at 109-10. The Supreme Court reversed, concluding that this refusal to consider mitigating evidence violated the bedrock principle set forth in Lockett v. Ohio, 438 U.S. 586, 604 (1978), that the Eighth Amendment *requires* considering of all mitigating factors proved by the defendant by a preponderance of the evidence. See Eddings, 455 U.S. at 113.

Appellate counsel's failure to challenge the jury instruction on appeal cannot be excused on the basis of strategy. While appellate counsel have a duty to sift through potential issues for appeal, see Smith v. Murray, 477 U.S. 527, 536 (1986), there is no excuse for failing to raise a clearly meritorious claim. Furthermore, there is a reasonable probability that the Fourth Circuit would have granted relief on the claim. The "two-step" mitigation instruction is flatly contrary to the clear and specific holding of Eddings and is *per se* reversible error.[4] See Eddings, 455

---

[4] Even if a showing of prejudice were required for success on the Eddings claim, such prejudice

U.S. at 117 (reversing death sentence for refusal to consider relevant mitigating evidence without conducting harmless error analysis); see also, e.g., Mills v. Maryland, 486 U.S. 367, 384 (1988) (reversing death sentence on basis of erroneous unanimity requirement without conducting harmless error analysis); Mills, 494 U.S. at 444 (same). There is a strong likelihood—one sufficient to undermine confidence in the outcome of the appeal—that the Fourth Circuit would have vacated Mr. Fulks's sentence on the basis of the Eddings violation.

## VI. CLAIM VI: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE GOVERNMENT'S IMPOSITION OF A NEXUS REQUIREMENT ON THE JURY'S MITIGATION FINDINGS

"'[T]he fundamental respect for humanity underlying the Eighth Amendment … requires consideration of the character and record of the individual offender … as a constitutionally indispensable part of the process of inflicting the penalty of death.'" Eddings, 455 U.S. at 112 (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976)). For this reason, the Supreme Court has "never countenanced" and has "unequivocally rejected" any requirement that the defendant in a capital case establish a causal nexus between the offense and evidence offered in mitigation. Smith v. Texas, 543 U.S. 37, 45 (2004); see, e.g., Tennard v. Dretke, 542 U.S. 274, 287 (2004) (holding that a nexus requirement "has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context"). In light of the clear state of the law at the time of Mr. Fulks's penalty-phase proceedings, trial counsel were constitutionally ineffective for failing to object to the government's imposition of a

---

appears in black and white on the verdict form, which reveals that some or all of the jurors refused to acknowledge the existence of several mitigating factors that were established by uncontroverted evidence. PA #27 at 6-8. The *only* explanation for the verdict form is that those jurors who refused to find those factors did so on the basis of their view that those factors were not mitigating. The refusal to consider this evidence creates an unacceptable risk that the death sentence was erroneously imposed. See McKoy v. North Carolina, 494 U.S. 433, 442 ("*Whatever the cause*, … the … failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence." (emphasis added)).

requirement of a causal nexus between Mr. Fulks's mitigating evidence and the offenses.  See Amended Motion at 97-104.

In response to this claim, the government first denies making the argument at all. Opposition at 74.  Notably, the government does not support this assertion by referencing its own argument, but rather by engaging in a lengthy discourse on the facts of Tennard and the content of the District Court's jury charge.  However, the impropriety of the government's argument is plain from the transcript:

> Every one of the defense experts admitted there is no cause-and-effect.  That whatever issues Chad Fulks has, there is no cause-and-effect.  What does that mean?  That means, despite the fact that Chad Fulks might have a cyst on his brain, might have an IQ of 79, or might have had a bad upbringing, the fact that those causes exist, does not make people commit violent crimes.  There is no evidence of that.  Anyone to come into the courtroom and claim that, that is junk science.  Even their experts acknowledge that.  There is no cause-and-effect.

TT 6/29/2004 at 129; see also Amended Motion at 97-98 (quoting additional portions of improper argument).  The government clearly and repeatedly urged the jury to disregard relevant mitigating evidence on the basis that the evidence bore no causal nexus to the crime.  See Boyde v. California, 494 U.S. 370, 384 (1990) (recognizing that prosecutorial argument may "have a decisive effect on a jury").

Contrary to the government's second argument, it was not enough for trial counsel simply to argue against the government's erroneous nexus requirement.  This "strategy" left the jury to decide whose version of the law to adopt, instead of providing the jury with a clear instruction from the District Court that evidence need not bear a causal nexus to the offense in order for it to be mitigating.  At the very least, constitutionally effective counsel would be expected to object to the improper argument *in addition to* pointing out the impropriety to the jury during defense closing.  Certainly, trial counsel had nothing to lose, and everything to gain, by objecting to the government's improper argument.  Counsel's failure to object left the jury free to reject proven

mitigating factors on the constitutionally forbidden basis that those factors—such as Mr. Fulks's horrific childhood and his brain damage, both of which were established by uncontroverted evidence—were not causally related to the offense.

Finally, there can be little question that trial counsel's failure to object to the improper "nexus" argument prejudiced Mr. Fulks. The government's argument that evidence does not mitigate an offense unless it is causally related to the crime, in light of the District Court's instruction that jurors were entitled to disregard evidence they personally deemed not to have mitigating value, allowed the jury to refuse to weigh substantial portions of Mr. Fulks's case in mitigation. The government particularly urged the jury to disregard Mr. Fulks's evidence of his low I.Q., his brain damage, and the terrible abuse and neglect he suffered as a child. And, as shown by the jury form, many of the jurors accepted this invitation and disregarded those factors. Thus, Mr. Fulks was prejudiced by trial counsel's failure to object to the Government's improper closing argument. Reversal on this basis is required in order to ensure that Mr. Fulks is sentenced in conformity with the "fundamental respect for humanity underlying the Eighth Amendment." Eddings, 455 U.S. at 112 (internal quotation marks omitted).

## VII. CLAIM VII: TRIAL COUNSEL WERE INEFFECTIVE IN ADVISING MR. FULKS TO GIVE A STATEMENT TO THE FBI WHEN NO PROFFER LETTER OR PLEA AGREEMENT WAS IN PLACE

The government does not argue with the fact that a criminal defendant who enters a proffer session gives up valuable constitutional rights – including the right to be free from self-incrimination. See Opposition at 78-80; see also Amended Motion at 104-07. The government also does not contest the general rule that "[a]llowing [someone charged with capital offenses] to cooperate with law enforcement without either a plea agreement or proffer letter falls below accepted capital defense practices." See id.; see also Lyon Decl. ¶ 21 (PA #1). Nonetheless, the government urges the Court to conclude that Mr. Fulks – who, on counsel's advice, voluntarily

gave an incriminating statement to the FBI for nothing in return – gave up nothing of value and that trial counsel's advice somehow was reasonable.  See Opposition at 78-80.  The government's arguments are not persuasive.

**A.  The Government's No Prejudice Arguments Are Illogical And Incorrect.**

The government apparently contends that Mr. Fulks was not prejudiced by his counsel's advice because the government would not have entered into a proffer or plea agreement with Mr. Fulks.  See Opposition at 78-79.  As support, the government submits a declaration from former First Assistant United States Attorney, Scott Schools, in which Mr. Schools asserts "the government would not have entertained a request for a proffer letter prior to any interviews with Fulks, and . . . the government would have forgone any interview of Fulks rather than receive information from him that could not be used against him."  Schools Decl. ¶ 7.  Aside from the fact that Mr. Schools's testimony makes clear trial counsel *did not even ask* for a proffer letter – conduct, which, unmistakably was unreasonable (see Lyon Decl. ¶ 21 (PA#1)) – the government misses the point.  Mr. Fulks had the inalienable right to avoid self-incrimination.  It does not follow that Mr. Fulks should have given that right for nothing in return, merely because the government now claims[5] it would not have given Mr. Fulks a proffer or plea agreement.  If the government truly was not willing to give Mr. Fulks a plea or proffer agreement, trial counsel should not have advised Mr. Fulks to provide a statement.

Next, the government apparently contends that Mr. Fulks was not prejudiced by counsel's advice because "Fulks provided no significant information not already discovered by the government."  See Opposition at 79-80.  The government offers no support for this after-the-fact conclusion and, moreover, it simply is not true.  Mr. Fulks submitted to nearly three and a half

---

[5] As Mr. Fulks will explain in his forthcoming Motion for Evidentiary Hearing, Mr. Fulks is entitled to an evidentiary hearing for, among other reasons, the purpose of cross-examining Mr.

hours of questioning and gave the government detailed information that the government could, and ultimately did, use against him. PA #56 (Conway Police Department's Investigative Summary of its April 21, 2003, interview with Mr. Fulks); see also PA #41. As explained in the Amended Motion, less than a week before Mr. Fulks gave his statement, the government admitted to the grand jury that it had very little evidence establishing a capital case against Mr. Fulks. See Amended Motion at 106; PTT 04/22/2003 at 94. Many of the holes in the government's case were filled in by Mr. Fulks. For example, the government admitted it had "no evidence" that Alice Donovan was killed in North Carolina or South Carolina. PTT 04/22/2003 at 94. Mr. Fulks told the FBI that she was killed in South Carolina. See PA #56 at 04130-04133. The government also admitted that it had not located Mrs. Donovan's body, which it described as "the most critical evidence" in a homicide case. PTT 01/20/2004 at 36. Mr. Fulks gave the government a detailed description of the area where Mrs. Donovan's body was left (see PA #56 at 04130-04133), and, although the government did not locate her body at the time, in early 2009 a search team located her remains in the very area Mr. Fulks described to the government. See PA #46 ("Bruning and the FBI took Fulks to the same area where skeletal remains were found before his trial in 2004 after Fulks told investigators he would lead them to Donovan's body, according to Bruning."); PA #50 ("Before Fulks' 2004 trial, FBI agents took the convicted killer out to the area in hopes he would lead investigators to Donovan's body, but after a full day of searches on foot, FBI agent Jeff Bruning said investigators didn't find anything and returned Fulks to jail."); see also PA #56 at 04133. Thus, there can be no question that Mr. Fulks gave the government significant information that it did not previously have.

Finally, even assuming that the government learned nothing new or "significant" from its

_____

Schools on his statements about what the government allegedly would have done in 2003.

interview of Mr. Fulks (and it clearly did), Mr. Fulks gave the government incriminating evidence that it did not have: a very detailed confession by Mr. Fulks of his involvement in the crimes with which he was charged. Even the government cannot dispute the persuasive value of this evidence and it is disingenuous to suggest that this was insignificant or without value.

**B.     The Government's Attempts To Characterize Counsel's Advice As Reasonable Fall Far Short.**

The government also apparently argues trial counsel's advice was reasonable because trial counsel introduced evidence in response the government's evidence of Mr. Fulks's statement – including the fact that Mr. Fulks told the FBI that Basham and not Mr. Fulks actually killed Alice Donovan and Samantha Burns – through the FBI agent who interviewed him, and because counsel ultimately attempted, unsuccessfully, to introduce the results of polygraph tests in which Mr. Fulks truthfully stated that Basham killed Mrs. Donovan and Ms. Burns. See Opposition at 80. From this, Mr. Schools speculates that trial counsel advised Mr. Fulks to cooperate with the government as part of an overall strategy to introduce evidence that Mr. Fulks did not kill Alice Donovan and Samantha Burns. Schools Decl. ¶ 7. But the government offers no evidence that this supposed "reasonable trial strategy" is what led trial counsel to advise Mr. Fulks to give his April 21, 2003 statement. Perhaps more importantly, the government offers no explanation of how such a strategy could be construed to be reasonable. It could not. As explained above, Mr. Fulks allowed the FBI to interview him for nearly three and a half hours and, during that time, he admitted his involvement in the carjacking, kidnapping and rape of Mrs. Donovan, and he gave a very detailed account of the crime-spree he embarked on with Basham. See PA #56 at 04130-04133; see also PA #41. As the government previously acknowledged – but now refutes – the government was missing critical evidence prior to Mr. Fulks's statement. PTT 04/22/2003 at 94. Mr. Fulks, on trial counsel's advice, provided the government with

everything it needed to ensure that Mr. Fulks would be convicted and he substantially bolstered the government's capital case against him.

As explained by Andrea Lyon, a preeminent attorney who has been defending death penalty cases for three decades, advice of the sort trial counsel gave to Mr. Fulks was unreasonable and unacceptable. <u>See</u> Lyon Decl. ¶ 21; <u>see</u> <u>also</u> <u>id</u>. ¶ 3. The government fails to offer any – and there were no – extenuating circumstances that could somehow justify trial counsel's patently unreasonable advice.

**VIII.** <u>CLAIM VIII</u>: **TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO ENSURE THAT JURORS WOULD BE ABLE TO CONSIDER AND GIVE EFFECT TO ALL RELEVANT MITIGATING EVIDENCE**

The government asserts that Mr. Fulks's trial counsel was not ineffective for failing to request the statutory catch-all mitigating factor and the minor participation factor because the instructions given by the trial court were constitutionally adequate under the Eighth Amendment. Opposition at 81. The government contends that "a constitutional violation occurs only if there is a reasonable likelihood that the jurors believed themselves precluded from considering mitigating evidence." <u>Id.</u> (citing <u>Ayers v. Belmontes</u>, 549 U.S. 7, 13-14 (2006)). Pointing to the hearing, including the Court's oral instructions to the jury and the closing arguments of both parties, the government urges that the jurors could not have believed that they were precluded from considering evidence of Mr. Fulks's minor participation in the crime. <u>Id.</u> at 83.

According to the government, the mere instruction to the jury to "base its decision on all of the evidence" is constitutionally sufficient. Opposition at 81 (citing <u>Eaton v. Angelone</u>, 139 F.3d 990 (4th Cir. 1998)). But, the government's reliance on <u>Eaton</u> is misplaced because the facts of this case compel a different conclusion. In <u>Eaton</u>, the charge to the jury consisted of a total of three short paragraphs. In such a straightforward situation, a simple instruction to consider all of the evidence may be adequate. Here, however, the jury charge was 28 pages long.

33

And, it is reasonable to believe that a juror may not have given the same weight to an instruction buried within 28 pages of text, as opposed to the specifically enumerated factors listed on the special verdict forms.

Moreover, the Supreme Court has never held that "mere mention of 'mitigating circumstances' to a capital sentencing jury" or even "inform[ing] the jury that it may 'consider' mitigating circumstances in deciding the appropriate sentence" is sufficient under the Eighth Amendment. Penry v. Johnson, 532 U.S. 782, 797 (2001). Rather, the jury must "be able to consider and give effect to [a defendant's mitigating] evidence in imposing the sentence." Id. (alteration in original). Although it is true that the trial court informed the jury that they were not restricted to the factors listed on the verdict forms and could consider any evidence they wished in mitigation, that specific instruction was not included on the either of the verdict forms and was only given during the course of a lengthy charge to the jury. These are not the circumstances under which a jury could reasonably be expected to consider and give effect to important mitigating evidence.

The adequacy of a particular set of instructions is closely related to whether reasonably effective counsel would have requested better instructions. Thus, whether a particular set of instructions is so lacking as to violate the Eighth Amendment is relevant in determining whether counsel's performance fell below an objective standard of reasonableness under a proper Strickland Sixth Amendment analysis. Similarly, the degree to which the instructions were flawed is relevant to the question of whether there exists a reasonable probability that the outcome of the proceedings would have been different if better instructions had been given. Accordingly, the Eighth Amendment analysis is also relevant to determining prejudice under the Strickland Sixth Amendment standard.

34

An Eighth Amendment violation is not a necessary prerequisite for finding ineffective assistance of counsel under the Sixth Amendment. Indeed, if counsel could only be found ineffective for not preventing the occurrence of independent constitutional violations, there would be no need for a separate category of claims for ineffective assistance of counsel; a petitioner would already have access to appropriate relief. In fact, the Fourth Circuit has recognized that "an erroneous jury charge may form the basis of a habeas petition, *either* independently *or in conjunction with an ineffective assistance of counsel claim*[.]" Luchenburg v. Smith, 79 F.3d 388, 391 (4th Cir. 1996) (emphasis added). That is, claims of Sixth and Eighth Amendment violations, while related and often brought together, are separate claims.

To succeed on a Sixth Amendment claim, Mr. Fulks need only show that reasonably competent counsel would have requested the better (and statutorily mandated) instructions and that, had he done so, there is a reasonable probability that Mr. Fulks would not have been sentenced to death. Importantly, Mr. Fulks need not show that the jury likely believed itself precluded from considering the mitigating evidence at issue.

Although this Court suggested in Peterson v. Murray, 904 F.2d 882, 888 (4th Cir. 1990), that counsel could not be ineffective for failing to object to an instruction that was itself constitutional, that analysis has not been followed in subsequent cases analyzing claims of ineffective assistance for failure to object to or request instructions. See, e.g., Luchenberg, 79 F.3d at 391-393; Williams v. Ozmint, 494 F.3d 478, 483-487 (4th Cir. 2007) (upholding state court's focus on whether the absence of a particular instruction *affected* the jury's consideration of the mitigating evidence presented). This is not surprising, given that it essentially collapses the Eighth Amendment and Sixth Amendment inquiries into one, thereby inappropriately and illogically eliminating the need for Sixth Amendment claims at all. See *supra*.

The Luchenberg case is noteworthy. In that case, the court granted the petitioner relief on his claim of ineffective assistance for failure to request a better instruction than the one given by the court. 79 F.3d at 388. In Luchenberg, the defendant was charged with several violent crimes, including rape and sexual assault, as well as the use of a handgun during the commission of a violent crime. Id. Under state law, the jury was first required to find the defendant guilty of a predicate crime of violence in order to convict him of the handgun charge. Id. The court's instruction on this point was ambiguous. Id. The court told the jury that if it found the defendant guilty of the rape or sexual assault charge, then it could convict him of the handgun charge, and "vice versa." Id. The government asserted that the "vice versa" language was intended to convey the idea that if the jury did not convict on the sexual assault or rape charge, it could not convict on the handgun charge. Id. However, the court held that that was not the "only, or even the most, reasonable interpretation." Id. at 392. It found that the jury may have interpreted the instruction to mean that if they convicted on the handgun charge, they could also convict on the sexual assault and rape charges. Id. The jury acquitted on the sexual assault and rape charges, but convicted on the handgun charge. Id.

The court's analysis of the ineffectivness claim in Luchenberg is instructive. First, with respect to deficient performance, the court noted that under state law, the trial court was required to give a requested instruction if it was an accurate statement of the applicable law. Id. Therefore, the court found that, had counsel requested the instruction clarifying the requirement that the jury must convict on the predicate violent crimes in order to convict on the handgun charge, the court would have been required to give it. Id. The court also found that the instruction given did not fairly cover the applicable law and that counsel's decision was not a tactical one, because he simply believed that the instruction was an accurate statement of the law.

Id.  As to prejudice, the court concluded that there was a reasonable probability that, but for counsel's failure, the result of the trial would have been different.  Id.  Because the jury acquitted the defendant on the predicate violent crimes, there was a reasonable probability that the jury would have acquitted on the gun charge as well, had they been given proper instructions.

A similar situation existed during the Fulks trial.  The particular instructions that trial counsel failed to request—both the specific minor participation mitigating factor and the proper catch-all factor—were statutorily mandated by Congress in the Federal Death Penalty Act.  See 18 U.S.C.A. § 3592(a)(3), (a)(8).  When a defendant's right to a particular instruction is so "well entrenched," trial counsel's failure to request it constitutes performance below the objective standard of reasonable assistance to which defendants are entitled under the Sixth Amendment.  Ozmint, 494 F.3d at 484.

Further, trial counsel is expected to "request jury instructions and verdict forms that *ensure* that jurors will be able to consider and *give effect* to all relevant mitigating evidence."  Guideline 10.11 K, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, American Bar Association, revised edition, February 2003[6] (emphasis added).  A significant portion of the mitigating evidence introduced at trial concerned Mr. Fulks's relatively minor role in the crime.  Indeed, Mr. Fulks's trial counsel spent a large part of his closing argument discussing that evidence.  By failing to request the inclusion of either a specific minor participation mitigating factor or at least the correct statutory catch-all factor, trial counsel failed to ensure that the jurors could give proper effect to that evidence using the verdict form.  Trial counsel's failure to request an instruction on such a central part of Mr. Fulks's case,

---

[6] The Supreme Court has cited these ABA Guidelines as "guides to determining what is reasonable" performance by capital counsel.  Wiggins v. Smith, 539 U.S. 510, 522 (2003) (citing Strickland and Williams v. Taylor, 529 U.S. 362 (2000)).

and thus to ensure that the jurors were educated regarding the permissible ways in which they could use the mitigating evidence produced at trial in making their determination, did not meet the standard set forth in ABA Guideline 10.11 K. Accordingly, trial counsel's performance fell below an objective standard of reasonableness.

For prejudice to attach to trial counsel's deficient conduct, Fulks need only show that there is a reasonable probability, sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different but for counsel's errors. See Strickland, 466 U.S. at 694. Given the importance of the issue in question, the jury's lack of guidance on the relevance and permitted use of key mitigating evidence very likely affected the outcome of the case. Even if the jurors did not feel that they were precluded from considering the evidence (the standard for Eighth Amendment analysis), they may not have known *how* to make use of the evidence. When presented with a defendant whose guilt is not at issue, the significance of evidence regarding the role Mr. Fulks played in the crimes is not entirely self-evident. Having never been instructed on the legal relevance of such evidence, it is likely that the jury either misused it or simply ignored it. This is especially probable given the magnitude of the evidence introduced during the five-week trial and the 28 pages of instructions detailing the factors that the jurors could consider and for what purposes. Even though the jurors were told during the Court's lengthy charge that they were not limited to considering only the factors listed on the special verdict form, there can be no question that the factors that were included on that form were much more likely to be considered, and considered appropriately, during the deliberations. Thus, there is at least a reasonable probability that the outcome of the proceeding would have been different if the jurors had received appropriate instructions describing the mitigating relevance of Mr. Fulks's minor participation in the crime. Accordingly, Mr. Fulks was

prejudiced by trial counsel's failure to request that instruction.

Although the government spends almost half of its Opposition to this Claim discussing the evidence that could have led the jury to believe that Mr. Fulks was *not* a minor participant, the relevant point is that the evidence is conflicting on the issue. There was ample evidence for the jury to decide the issue either way. But, given the absence of an instruction explaining the relevance of that issue, we cannot know whether the jury believed Mr. Fulks's evidence and merely didn't know what effect to give it or rather simply disbelieved the evidence. The possibility that it was the former requires that the sentence be vacated so as to avoid "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." Lockett v. Ohio, 438 U.S. 586, 605 (1978). "When the choice is between life and death, that risk is unacceptable…." Id.

IX.    **CLAIMS IX, X, XI, XII: MR. FULKS'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN BOTH TRIAL COUNSEL AND THE COURT INCORRECTLY RELIED ON PINKERTON TO ATTACH LIABILITY FOR CARJACKING UNDER 18 U.S.C. § 2119**

The Court was rightly concerned about the validity of Mr. Fulks's guilty plea with respect to the carjacking count resulting in Ms. Donovan's death. Indeed, the Court stated that "there was no acknowledgment in the 302 by Mr. Fulks that he had the requisite intent…to support a guilty plea to either car-jacking resulting in death or kidnapping resulting in death." PPT 05/07/2004 at 79 (emphasis added). Nonetheless, both the prosecution and trial counsel, erroneously argued that Pinkerton liability attached thereby resulting in a guilty plea to a death-eligible offense that the government should have been forced to try.

Pinkerton applies in two circumstances, neither of which is relevant to Mr. Fulks's guilty plea as to the carjacking count (18 U.S.C. § 2119). First, Pinkerton applies when the defendant possesses the intent necessary for the substantive offense committed by the co-conspirator. See

United States v. Chorman, 910 F.2d 102, 110-11 (4th Cir. 1990) (stating that in applying Pinkerton, a co-conspirator's intent is not imputed to the defendant); United States v. Carrington, 301 F.3d 204, 211 (4th Cir. 2002) (finding defendant liable for conduct of co-conspirators when the jury found a conspiracy existed). In essence, the facts must demonstrate that Mr. Fulks had the requisite intent to cause death or serious bodily injury to Ms. Donovan at the time Basham seized her vehicle. See United States v. Holloway, 526 U.S. 1, 7-8 (1999) (stating that the intent element in Section 2119 modifies the act of "taking" and thus "directs the factfinder's attention to the defendant's state of mind at the precise moment he took or took control over the car") (emphasis added). The Court repeatedly expressed its apprehension regarding the absence of facts in the 302 demonstrating Mr. Fulks's intent. Second, Pinkerton liability attaches when the substantive offense was reasonably foreseeable to the defendant as a necessary part or natural consequence of the conspiracy. See United States v. Pinkerton, 328 U.S. 640, 647-48 (1946); see also United States v. Aramony, 88 F.3d 1369, 1379 (4th Cir. 1996) (looking to the whether the substantive offense was reasonably foreseeable to the defendant as a necessary part or natural consequence of the conspiracy). Even the government acknowledges that the 302 admits that Mr. Fulks agreed that Basham would steal an *unoccupied* car.

The Court's extreme hesitation in applying Pinkerton should have signaled to any competent counsel that Mr. Fulks should not plead guilty to a death-eligible offense when the basis for such plea was completely devoid of requisite support. Moreover, such a guilty plea was not knowing nor intelligent because had Mr. Fulks been adequately apprised of the elements of Pinkerton (i.e. that Ms. Donovan's death was reasonably foreseeable), Mr. Fulks would have not have waived his constitutional rights and put the government's evidence to the test.[7]

---

[7] The government argues that any attack on the guilty plea to count 1 is moot because Mr. Fulks

40

**A.** **Trial Counsel and the Government Gravely Misinterpreted the Intent Element Under the Carjacking Statute.**

The Court expressed grave doubt about the validity of Mr. Fulks's guilty plea under Pinkerton primarily because Mr. Fulks's 302 lacked sufficient facts to support the elements of both the substantive offense and Pinkerton. Specifically, the Court was troubled by the fact that the 302 lacked any facts that would support a finding of intent to cause death or serious bodily harm. PPT 05/04/04 at 68; id. 05/07/2004 at 81. This intent, however, was a prerequisite in determining whether liability could attach under the Pinkerton doctrine. Pinkerton, 328 U.S. at 647. Despite the Court's critical and valid concerns, both trial counsel and the government persuaded the Court that Mr. Fulks's 302 contained the sufficient facts to support liability for carjacking under Pinkerton. The Court was misguided, and, as a result, Mr. Fulks suffered a miscarriage of justice.

Anxious to move forward with the sentencing phase of the trial, when afforded the opportunity to address the Court's concerns, trial counsel advocated that Mr. Fulks had admitted sufficient facts to form the requisite intent under Pinkerton. Trial counsels' memo focused on the *mens rea* requirements of the Federal Death Penalty Act ("FDPA"). Defendant's Memo. of Law Regarding the Propriety of a Guilty Plea at 1-5, 7. When trial counsel turned its attention to the issue at hand, i.e. whether the 302 adequately supported Pinkerton liability, trial counsel wrote, "[Mr. Fulks] has admitted the facts necessary to establish his membership in a conspiracy with Mr. Basham, and submits that a reasonable jury would conclude both that the carjacking — which was initiated by Basham — and the subsequent murder of Mrs. Donovan — which was committed by Basham without [Mr. Fulks's ] prior knowledge — were accomplished in

---

nonetheless received the death penalty for count 2. This argument is without merit. In essence, it ignores the totality of the circumstances and presupposes that the jury would have come to the same conclusion if it only had to determine death-penalty eligibility for one offense and despite

furtherance of that conspiracy." This circular reasoning is fatally flawed. Trial counsel merely reiterated the very facts in the 302 that were questioned by the Court. These facts, if anything, demonstrate that Mr. Fulks did not possess the requisite intent as required by Pinkerton. Mr. Fulks admits only that he possessed the intent to steal an unoccupied vehicle.

Similarly, the government's memorandum of law addressing the Court's concerns regarding liability under Pinkerton made untenable assertions. Indeed, the government readily admitted that "the only element of the offense that [Mr.] Fulks fails expressly to admit in his interview with the FBI is that he intended to cause death or serious bodily harm." Gov't Memo. of Law at 8. The government alleged, however, that despite the absence of an express admission of intent, the fact that Mr. Fulks admitted in his 302 to raping Ms. Donovan is sufficient evidence to form the requisite intent. The government was mistaken.

Mr. Fulks's alleged intent should either be measured at the moment of the formation of a conspiracy in furtherance of which the substantive offense is later committed, which was neither charged nor proven, or at the moment Basham took control over Ms. Donovan's vehicle. Pinkerton, 328 U.S. at 647; see also Holloway, 526 U.S. at 8. The government argued that Pinkerton applied primarily by citing admissions in the 302 that occurred *after* Ms. Donovan's car was seized by Basham. Gov't Memo. of Law at 12 (stating Mr. Fulks "admitted to membership in a conspiracy" with Basham by "driving Donovan's car after she was forced into the back seat," and "driving to the location where Donovan was abandoned") (emphasis added). The only relevant admission the government cited was that Mr. Fulks drove Basham to Wal-Mart to steal a car. Even that admission only acknowledged that Mr. Fulks thought Basham was going to steal an unoccupied car. Id.

---

Mr. Fulks's persistent and successful efforts to assist in the recovery of Ms. Donovan's remains.

The government continues to misinterpret the intent element of <u>Pinkerton</u>. Indeed, the government's opposition is replete with details about what the prosecution <u>would have</u> proven if its evidence was put to the test. Opposition at 116-118 ("It should go without saying that participating in a gang rape of a woman causes serious bodily injury;" "Fulks purchased black tape and radiator tape with the stolen money from use of Donovan's ATM card;" "Fulks drove the stolen vehicle until he found a secluded isolated area for Basham to tie Alice Donovan naked to a tree"). Nearly all the evidence to which the government cites is moot for two reasons. First, the Court explicitly stated in no uncertain terms that the guilty plea was predicated <u>only</u> on the facts admitted by Mr. Fulks in his 302. PTT 05/04/04 at 67 (stating that the Court had been "agonizing over whether [the] 302 form says enough factually for [the Court] to determine that Mr. Fulks has admitted his guilt"). Trial counsel affirmatively stated that Mr. Fulks would not admit to additional facts supporting the elements of the carjacking count. Second, the facts that the prosecution proffered at the plea colloquy do not address Mr. Fulks's mental state at the relevant time.

**B. Ms. Donovan's Death was Not Reasonably Foreseeable to Mr. Fulks, Thus Rendering *Pinkerton* Inapplicable.**

In addition to misconstruing the intent element under the carjacking statute, both the Court and trial counsel failed to inform Mr. Fulks of the elements of <u>Pinkerton</u> in their entirety. In order to be held liable under <u>Pinkerton</u>, a defendant must have reasonably foreseen the acts of his/her co-conspirator or the acts must have been a necessary part or natural consequence of the conspiracy. <u>See</u> <u>United States v. Pinkerton</u>, 328 U.S. 640, 647-48 (1946). Contrary to the government's contention, "reasonable foreseeability" was never of "primary concern" at the guilty plea hearing. Opposition at 112, 113; <u>see</u> <u>generally</u> PTT 05/04/2007 and 05/07/2007. The Court's primary concern, and what was ultimately communicated to Mr. Fulks, was whether the

43

intent element of the carjacking statute had been met based on the admissions contained in the 302. PTT 05/07/2007 at 162. In fact, both the Amended Petition and Opposition spend pages debating whether the "reasonable foreseeability" language — that the Court omitted from its explanation of the <u>Pinkerton</u> doctrine — is required at all. The government argues that Mr. Fulks's counsel was keenly aware of the reasonable foreseeability requirement and nonetheless conceded, but makes no representation that Mr. Fulks was educated by trial counsel or the Court that reasonable foreseeability was a requisite to attaching <u>Pinkerton</u> liability. This only buttresses the claim that Mr. Fulks was denied effective assistance of counsel. Had Mr. Fulks been apprised of the true nature of his guilty plea and the "reasonably foreseeable" requirement of <u>Pinkerton</u>, there is more than a reasonable probability that Mr. Fulks would not have agreed to plead guilty to count 1.

1. The facts do not support a finding that Ms. Donovan's death was reasonably foreseeable.

The government's opposition ignores Basham and Mr. Fulks's short history together. It was not until *after* Basham killed Ms. Donovan did Mr. Fulks learn that Basham had killed both Samantha Burns and Ms. Donovan. The day the duo drove into the Wal-Mart parking lot, Mr. Fulks had the understanding that Basham intended to steal an unoccupied car. The white truck Mr. Fulks was driving at the time Basham seized Ms. Donovan's vehicle had been stolen from its owner's yard, and without any injury or involvement of its owner. Furthermore, just two days prior, Mr. Fulks admitted that he and Basham stole Mr. Hawkins's truck and left him alive and duct taped to a tree. Basham's ultimate behavior that deviated significantly from Mr. Fulks's then-understanding and experience with Basham was completely unforeseeable.

2. Failure to apprise Mr. Fulks of the reasonably foreseeable element in <u>Pinkerton</u> constituted prejudicial error.

Knowledge of the reasonable foreseeability element in <u>Pinkerton</u> cannot and should not

be imputed to Mr. Fulks, *especially* when it applies to a death-eligible offense.  The government cites Aramony to support the proposition that the exclusion of reasonable foreseeability language in jury instruction has been upheld.  That same instruction, however, requires the jury to "find that the [g]overnment has proven a defendant guilty of conspiracy as charged" before it finds him guilty under Pinkerton.  Aramony, 88 F.3d at 1380; see also Chorman, 910 F.2d at 107 (requiring evidence of a conspiracy before reasonable foreseeability language can be omitted); cf. United States v. Carrington, 301 F.3d 204, 211 (4th Cir. 2002) (interpreting Pinkerton to include a reasonably foreseeable requirement in the determination of liability of co-conspirators). It is no surprise, therefore, that the Court clearly articulated its concerns that Pinkerton apply to Mr. Fulks's guilty plea for carjacking when an intent element must be satisfied and no conspiracy has been charged.  PTT 05/04/07 at 68 (emphasis added).

The Court's minimal and overly-simplistic explanation of the Pinkerton doctrine led Mr. Fulks to believe that any act committed by Basham could be imputed to Mr. Fulks as a member of that conspiracy.  PTT 05/07/2004 at 162.  The Court failed to inform Mr. Fulks that it had to be reasonably foreseeable to Mr. Fulks that, at the time Basham seized Ms. Donovan's vehicle, Basham would cause the death of or serious bodily injury to Ms. Donovan.

Simply stated, Mr. Fulks was denied effective assistance of counsel when trial counsel misinterpreted the intent element under carjacking statute, 18 U.S.C. section 2119, and the Pinkerton doctrine.  See Strader v. Garrison, 611 F.2d 61, 64 (4th Cir. 1979) ("The judgment of conviction must be vacated when it appears…that the guilty plea would never have been tendered if defendant had been properly advised by his lawyer").  The harm, however, did not stop there.  Despite the Court's repeated reservations regarding the applicability of Pinkerton, the Court accepted the trial counsels' (and the government's) erroneous interpretation.  Finally, Mr.

Fulks was never properly educated by his trial counsel or the Court that he had to have reasonably foreseen that Basham was going to kill or cause serious bodily injury to Ms. Donovan. Accordingly, Mr. Fulks's constitutional rights were violated and his plea with respect to count 1 should be vacated.

## X. CLAIM XIII: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OFFER ADDITIONAL AND READILY DISCOVERABLE EVIDENCE OF BASHAM'S LEADERSHIP AND MANIPULATION THAT WOULD HAVE FIRMLY ESTABLISHED MR. FULKS'S MINOR PARTICIPATION

The government argues that Mr. Fulks was not a minor participant in the crimes that were committed and that Mr. Fulks's trial counsel took every opportunity to characterize Basham as the dominant figure in the events that occurred during the seventeen-day period. Opposition at 119-20. Trial counsel, however, failed to take advantage of number of opportunities to fully reveal the extent of Basham's craftiness, leadership, and manipulative abilities. Without eliciting the testimony from the additional witnesses in order to conduct a complete comparative analysis between Mr. Fulks and Basham, the jury was deprived of the opportunity to make a fully informed decision in a capital case. Testimony from the additional witnesses would have been important because under 18 U.S.C. § 3592, minor participation is a statutory mitigating factor.

The Supreme Court has held that the Eighth and Fourteenth Amendments require admission of relevant mitigating evidence in the penalty phase of a defendant's capital trial. Skipper v. South Carolina, 476 U.S. 1, 4 (1986). Additionally, Caro v. Woodford mandates that "'all relevant mitigating information [must] be unearthed for consideration at the capital sentencing phase.'" Caro, 280 F.3d 1247, 1256 (9th Cir. 2002). The government contends that Mr. Fulks has failed "to show how testimony by prison personnel generally characterizing Basham as manipulative, observant, aggressive, and crafty would have resulted in a different decision by the jury." Opposition at 120. But, the government's argument ignores the relevance

this testimony would have had on the jury considering Mr. Fulks was a "minor participant" in the crimes.

The Supreme Court has recognized the importance of comparative analysis of two defendants when making a proper determination of the level of criminal responsibility. See Summer v. Shuman, 483 U.S. 66, 79 (1987) ("[T]he level of criminal responsibility of a person convicted of murder may vary according to the extent of that individual's participation in the crime.") In fact, the government harnessed the power of this type of comparative analysis during Basham's trial:

> We intend on putting up a case that involves comparative analysis. We believe that this is an *integral part of assisting this jury* in making that comparative analysis. So that they can determine who was the major participant and who the minor participant.

Basham TT 10/8/2004 at 14-57 (emphasis added.)

In addition, the government contends that the specific testimony of Andrea Roddy and Tina Severance was "far more impressive than subsequent general impressions by prison personnel would have been." Opposition at 121. This is simply not the case. While the specific testimony from those two women is useful in describing some of the defendants' actions during those seventeen days, the "general impressions" of prison personnel who had protracted interaction with Mr. Fulks and Basham was likely more probative in describing their respective character and tendencies.

As Mr. Fulks previously argued, Buttrum v. Black, where prejudicial error was found when testimony from a social worker was excluded at trial as being "no more relevant than the personal history of any other person on death row," is instructive in this instance. Buttrum, 721 F. Supp. 1268, 1314-1315 (N.D. Ga. 1989). A husband and wife had raped and murdered a nineteen-year-old woman and Janice Buttrum was sentenced to death at her trial. Id. at 1272.

On appeal, the social worker's testimony, which described the husband's nature and aggressiveness, was considered relevant to finding the co-defendant husband as "the initiator" and the wife as under "his dominion and influence." Id. at 1315. During Janice Buttrum's trial, the state portrayed her as the primary perpetrator, which made the admission of the social worker's testimony that much more important in order to help "prove the defendant's theory of the case." Id. Similarly, because the government here portrayed Mr. Fulks as the person "pulling [Basham's] strings throughout a lot of this crime spree," TT 6/29/2004 at 66, the testimony of the prison personnel is highly relevant to determining whether Mr. Fulks or Basham was the leader during the seventeen days.

The government cites Howard v. Moore, 131 F.3d 399 (4th Cir. 1997), for the proposition that the co-conspirator's intent to kill the victim was not mitigating evidence in favor of the defendant. That case is inapposite to Mr. Fulks's relationship with Basham. Unlike Howard, where the defendant was the person who actually carjacked the victim and held her at gunpoint, Mr. Fulks instigated neither the carjacking nor the kidnapping. There is no dispute that Basham, not Mr. Fulks, approached Donovan and carjacked her. In contrast to Howard, where the defendant actively participated in the suffocation of the victim, Mr. Fulks has steadfastly asserted that he did not directly participate in the Donovan killing and did not learn about the victim's death until after it had occurred. And, in contrast to Howard, where the codefendants worked together to wash and hide the victim's body, Basham, not Mr. Fulks, took Donovan into the woods out of Mr. Fulks's sight and claimed he took her shoes and undergarments so that she would be slowed in her attempts to contact the authorities.

In Howard, the purportedly mitigating evidence was part of a confession that would have had little impact because both defendants were unequivocally involved in the murder. In

contrast, the unelicited testimony of the prison personnel would have served as a basis for directly correlating who was the major and minor participant in the crimes. Thus, while "[e]vidence that makes one defendant look worse does not necessarily help another defendant in the case," such evidence, had it been brought out in court, would have helped Mr. Fulks. Opposition at 120.

Testimony elicited from prison personnel regarding how Basham acted while in prison would also have been relevant in comparing Mr. Fulks's and Basham's differing experiences with authority while in the prison system. Basham was described as "non-compliant" and a "problematic type of guy that you moved constantly." TT 06/02/2004 at 19. Additional testimony from Jeremiah Bush, a detention officer at Columbia Care Center, would have shown not only Basham's disdain of authority, but also that Basham had previously constructed a similar escape rope prior to the one actually used in the escape. The government's assertion that Basham had been in the Hopkins County Jail for a year-and-a-half and had not figured out how to escape, Opposition at 122, is misleading because Basham did escape from the jail but was apprehended after eluding authorities for almost an hour. Basham TT 09/13/2004 at 1-132 to 1-133.

While the government points to shameful instances in Mr. Fulks's past and claims that he played a major and decisive role in the kidnapping and carjacking, the government simply ignores Basham's criminal past and the role that he played throughout the seventeen-day period. Immediately after escaping from prison, Basham led Mr. Fulks to a nearby bus for safety. TT 06/02/2004. Basham pulled a knife on Mr. Hawkins after tricking Hawkins into driving them to a supposedly broken-down vehicle. TT 06/02/2004. Basham abducted Samantha Burns and stole her car when he and Mr. Fulks were separated. Fulks, 454 F.3d at 415. Basham drove Ms.

Burns to a secluded area with the intent of raping her while Mr. Fulks parked some distance away. Id. at 416. Basham entered Alice Donovan's vehicle and abducted her. TT 06/14/2004 at 215. Basham ordered Mr. Fulks to stop driving along a dirt road so that he could tie up Ms. Donovan. Fulks, 454 F.3d at 416. Basham continued the crime spree on his own after Mr. Fulks left him at the Ashland Mall by attempting to carjack a mother and daughter in the parking lot. Id. at 417. Although the government asserts that general testimony by a few prison personnel could not have convinced the jurors that Mr. Fulks played a minor role in the crimes, their testimony coupled with the major role that Basham did, in fact, play in the crimes could have made a difference in the outcome of Mr. Fulks's trial.

## XI. CLAIM XIV: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT MEANINGFUL EVIDENCE THAT MR. FULKS WOULD NOT BE DANGEROUS IN THE FUTURE TO FELLOW INMATES OR TO BOP PERSONNEL

In its Opposition, the government disputes Mr. Fulks's claim that trial counsel were ineffective in failing to present a meaningful future dangerousness mitigation case. In support of its contention, the government asserts that counsel acted wisely in refusing to call certain expert witnesses. The government goes so far as to claim that "*[t]here can be no doubt*, based on the declarations of these experts…that jurors would have found the testimony of Dr. Cunningham to be alarming, and the testimony of Mr. Aiken to lack credibility." Opposition at 125-26 (emphasis added). Such a bald and conclusory statement cannot serve as a valid basis for claiming that Mr. Fulks's trial counsel rendered effective assistance, even when tenably supported by cherry-picking certain aspects of the declarations that *could*—but certainly *with* doubt—be viewed as harmful when taken out of context. The real issue is not whether trial counsel were ineffective *solely* because they failed to call these expert witnesses, but whether trial counsel were ineffective because they failed to present a meaningful future dangerousness

by limiting its case to one expert who did not present *any* testimony particular to Mr. Fulks's record or background.

Whether the jury perceived Mr. Fulks to be a future danger "to the lives and safety of other persons, including*, but not limited to*, inmates and correctional officers" was a key—and perhaps, determinative—issue for the jury. <u>See</u> Verdict Form at 5 (emphasis added) (PA #27). One juror characterized the importance of this issue — the fact that the jury believed him to be a future danger as the "clincher" in the jury's sentencing recommendation. Amended Motion at 144. In fact, jurors believed that Mr. Fulks posed a danger both within the confines of a prison setting, and *even* to members of the general public. <u>See</u> Amended Motion at 144-45. This issue of future dangerousness—the issue that one juror subsequently identified as the "clincher"—was given prejudicially deficient attention by Mr. Fulks's trial counsel.

Contrary to the government's assertions, trial counsel were ineffective because they failed to present a meaningful future dangerousness mitigation case by limiting their case to *one* expert who did not speak to Mr. Fulks's record or his likelihood of danger in the future, but rather, spoke *only* to safety issues and the type of facility Mr. Fulks might be assigned. This expert—Mr. Don Romine—did not offer <u>any</u> testimony specific to Mr. Fulks's record or background. He did not testify about Mr. Fulks's past experiences in confinement. He did not inform the jury that Mr. Fulks had generally adapted well to confinement. He did not explain to the jury how Mr. Fulks had been involved in educational programs. He did not mention Mr. Fulks's successful involvement in work programs while confined. In fact, there is no indication that he even reviewed Mr. Fulks's prison records. Instead of providing testimony tailored to Mr. Fulks's record and background, Mr. Romine provided a generic account of security measures in federal prisons generally and where Mr. Fulks might be placed. By failing to present a

mitigation case that included, *at a minimum*, testimony and evidence (1) specific to Mr. Fulks's record and background and (2) which would have provided an analytical framework for the jury to understand the statistical risks associated with the risk of future violence in prison, trial counsel's performance was deficient.

Although courts do generally afford a "'heavy measure of deference to counsel's judgments,'" Rompilla v. Beard, 545 U.S. 374, 381 (2005) (internal citation omitted), when counsel is put on notice that the prosecution will use certain evidence to argue that a defendant poses a future danger, it is unreasonable for counsel to fail to offer meaningful testimony to refute such evidence. In the instant case, future dangerousness was not an ancillary issue. The prosecution called witness after witness in order to demonstrate that Mr. Fulks posed a future danger. Not only did the theme of future dangerousness permeate most aspects of the proceedings, but it was also specifically listed as one of the non-statutory aggravating factors to be weighed by the jury against the mitigation case in deciding the sentence.

Given the abundant notice trial counsel possessed regarding the prosecution's intent to vigorously pursue this argument, they were duty-bound to present adequate and meaningful testimony that would have cast doubt in the jurors' minds that Mr. Fulks would pose a future danger. See e.g., Rompilla, 545 U.S. at 377 ("[E]ven when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."). And yet trial counsel failed to do this.

Recognizing the vital importance of presenting mitigating evidence during sentencing proceedings, the United States Supreme Court has held that "[] evidence that the defendant

would not pose a danger if spared (but incarcerated) *must* be considered potentially mitigating." Skipper v. South Carolina, 476 U.S. 1, 5 (1986) (emphasis added). In Skipper, the Supreme Court vacated the petitioner's death sentence where the trial court refused to admit the testimony of two jailers and a regular visitor on relevancy grounds. Id. at 3. These individuals had planned to testify that the petitioner "had 'made a good adjustment' during his time spent in jail." Id. (internal reference omitted). During closing arguments, the prosecution argued that the petitioner should be sentenced to death "in part because petitioner could not be trusted to behave if he were simply returned to prison." Id. at 5 n.1. The Supreme Court held that the exclusion of this testimony "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." Id. at 4. Instructively, the Court noted:

> [u]nder these circumstances, *it appears reasonably likely that the exclusion of the evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence*…under any standard, the exclusion of the evidence was sufficiently prejudicial to constitute reversible error.

Id. at 8 (emphasis added).

Although Skipper specifically addressed the trial court's error in refusing to admit mitigating evidence that may have impacted the jury's determination of future dangerousness, its import in the instant matter lies not in the specific error addressed by the Court, but in the impact a meaningful mitigation case would have had on the jury's deliberations. Specifically, the Court found it important that evidence bearing upon the petitioner's "behavior in jail" be admitted. Indeed the exclusion of such evidence in Skipper constituted reversible error. Here, we do not deal with the trial court's error in reversing to admit this sort of evidence, but trial counsel's deficient and prejudicial performance in failing to present such evidence. Notwithstanding the differences regarding how the failure to present a meaningful mitigation case was presented in Skipper and in the present matter, the fact that the Skipper Court placed great emphasis on the

importance of presentation in a meaningful mitigation case is instructive in the present matter.

The Supreme Court applied similar reasoning in 2000. In <u>Williams v. Taylor</u>, the Supreme Court held that a petitioner was denied the effective assistance of counsel when his attorneys failed to present an adequate mitigation case to refute the government's arguments that the petitioner posed a future danger. 529 U.S. 362 (2000). The petitioner wrote a letter to the police claiming that he had killed two people. The petitioner admitted that he had "brutally assaulted an elderly woman" and had "started a fire outside one victim's residence before attacking and robbing him." <u>Id</u>. at 368. Two expert witnesses testified for the prosecution that "there was a 'high probability' that Williams would pose a serious continuing threat to society." <u>Id.</u> at 368-69 (internal reference omitted). The defense responded by offering the testimony of the petitioner's mother, two neighbors and the taped testimony of a psychiatrist. Based upon this evidence, and the defense's closing argument in which he stated that "it was difficult to find a reason why the jury should spare Williams' life," the jury "found a probability of future dangerousness and unanimously" sentenced the petitioner to death. <u>Id.</u> at 369-70.

The Supreme Court reversed the death sentence and remanded the case for further proceedings. It began its analysis by noting that "the <u>Strickland</u> test 'of necessity requires a case-by-case examination of the evidence.'" <u>Id.</u> at 391 (internal citation omitted). The Court held that "it is undisputed that Williams had a right-indeed, a constitutionally protected right-to provide the jury with the mitigating evidence that his trial counsel either failed to discover *or failed to offer*." <u>Id.</u> at 393 (emphasis added). As in <u>Williams,</u> the issue presented in Mr. Fulks's case is whether trial counsel "failed to offer" sufficient mitigation evidence that Mr. Fulks would not be a danger to prison inmates or personnel. This is precisely what trial counsel failed to do.

The government attempts to shift the focus of the argument away from where it should

be—on whether trial counsel presented a meaningful mitigation case by failing to offer certain testimony and evidence—by pointing to specific incidents that it claims would have made the testimony of certain experts unreliable and lacking in credibility. To support its argument, the government primarily relies on events involving Tina Severance, an inmate in Myrtle Beach, an altercation at Lexington County and an incident at Columbia Care. The former two events have *absolutely no bearing on future dangerousness* because there was even the slightest suggestion that Mr. Fulks used violence in either of these two events, and the latter two events were not adequately placed into context for the jury due to trial counsel's failure to present testimony which could have provided a framework for the jury to understand these events. The government's use of these events to support its arguments that these experts would not have assisted Mr. Fulks's case, *because* the jury had already heard myriad alleged acts of violence, precisely underscores the reason why counsel acted deficiently in refusing to present testimony and evidence to explain and/or contradict this evidence.

The government uses the fact that Tina Severance helped facilitate Mr. Fulks's flight after he escaped from Hopkins County Jail and the incident involving the fellow inmate in Myrtle Beach to portray Mr. Fulks as a "predatory, manipulative, and *violent*" person. Opposition at 129 (emphasis added). But neither of the events has anything to do with future dangerousness. As to the latter event, there is absolutely no evidence that Mr. Fulks ever threatened the inmate or employed any violence when the fellow inmate agreed to provide him with bond money and a vehicle. And the same applies to the Tina Severance issue.

Mr. Fulks did not employ any violence in coercing Tina Severance to "facilitate his flight and spree of lawlessness and violence after he escaped from Hopkins County Jail." Opposition at 129. This is a gross distortion of the facts. Quite the contrary is true. Ms. Severance assisted

Mr. Fulks of her own volition. Neither of these events has any bearing on future dangerousness. Alas, the government's use of these events to support its contention that Mr. Fulks's trial counsel acted effectively because any "testimony by an 'expert' that Fulks' criminal history and confinement record do not reflect a predatory pattern would have been patently incredible," is simply unconvincing. Opposition at 130.

The government mischaracterized the events at Lexington County and Columbia Care. Not only does testimony from a recent civil trial cast doubt on the veracity of certain statements made at the penalty-phase proceedings by employees of Lexington County in support of the government's future dangerousness argument, but the fact that these events were described in detail at the penalty-phase proceedings only highlights trial counsel's deficiencies in failing to present a meaningful mitigation case.

After Mr. Fulks filed his Amended Motion, Mr. Fulks filed a civil suit against the officers involved in the Lexington County incident for injuries he sustained during that altercation. See Fulks v. Metts, D.S.C. No. 2:06-cv-0980-PMD. He alleged that the officers employed excessive force in violation of his civil rights. Although Mr. Fulks did not prevail in this proceeding, the testimony of certain officers differed in material ways from their testimony in the penalty-phase proceedings, which casts doubt on the credibility of these witnesses.

During the civil trial, Officer Paula Lybrand significantly downplayed the "danger" that she had so vividly described to the jury during the penalty-phase proceedings, by referring to the events as a "tussle." Transcript, Fulks v. Metts at 90 (PA #55). In stark contrast to her relatively benign account of these events during the civil trial, in the penalty-phase proceedings she told the jury that she had heard Mr. Fulks say "that he was just looking for a reason to sue Lexington County" and that "[h]e was kicking at the officers. He was trying to bite Officer Mayrant. He

kicked Officer Allen twice in her leg." TT 06/21/2004 at 86. Noticeably absent from her civil trial testimony was any mention of the alleged violence that she had earlier described.

Other key testimony differed as well. Officer Myrant stated in an affidavit that Mr. Fulks tried to bite him again and "tried to kick Officer Allen again." Transcript, Fulks v. Metts at 28. But during the civil trial testimony, Officer Myrant did not repeat this testimony. When asked whether it was a fair characterization that this testimony was noticeably absent from his current testimony, Officer Myrant replied, "That's fair." Transcript, Fulks v. Metts at 28.

Office Mitchell also provided inconsistent testimony. First, Officer Mitchell could not state affirmatively whether she had written her affidavit. Shortly thereafter, she admitted that she "didn't write it, sir, but I swore to it." Transcript, Fulks v. Metts at 46-47. She stated that Mr. Fulks was placed in a cell and kicked the door, but did not state that in her affidavit, did not state it in her testimony and did not state it in her deposition. See Transcript, Fulks v. Metts at 47-48. When asked, "[y]ou're just now admitting it because I'm asking you for the first time on cross-examination," she replied, "[y]es, sir." Even more troubling is her testimony that she responded affirmatively when asked whether she would "do what's necessary to help and *protect* [her] fellow officers." Transcript, Fulks v. Metts at 49 (emphasis added).

Tellingly, some of the officers alleged during Mr. Fulks's penalty-phase proceedings that Mr. Fulks had physically harmed them and yet they did not seek any redress for these alleged injuries. Ms. Allen testified that even though she got kicked in the leg, she did not file a worker's compensation claim. See Transcript, Fulks v. Metts at 68. And Officer Myrant testified that even though spitting or attempting to spit on an officer is a felony punishable by about fifteen years, no warrant was sworn against Mr. Fulks for allegedly doing so. See Transcript, Fulks v. Metts at 23. The failure of these officers to seek redress for injuries that they

supposedly sustained at the hands of Mr. Fulks calls into question the veracity of their allegations.

Coincidentally, there is no way to confirm or deny whether Mr. Fulks's or the officers' account of the event is accurate because the surveillance system that was supposed to record these events was allegedly malfunctioning on the day in question and as a result, despite the defense's subpoena to obtain these tapes, none were produced. TT 06/21/2004 at 97. Even without the knowledge of the recent inconsistencies in the officer's testimony, the fact that these events were *supposedly* not captured on video should have compelled trial counsel to present a more meaningful mitigation investigation case to counteract testimony that could not be proven otherwise. But counsel failed to do this.

Notwithstanding the foregoing rebuttal to the government's characterization of these facts as proof-positive that Mr. Fulks posed a future danger, the crux of the issue is whether trial counsel rendered prejudicially defective assistance of counsel by failing to present a meaningful mitigation case. Indeed, a more thorough discussion of these events only detracts from the real issue at hand—that trial counsel were ineffective in failing to present a meaningful mitigation case. Instead of responding to whether Mr. Fulks did receive adequate representation on this front, the government merely attacks the credibility of the potential experts and states that trial counsel were wise to call Mr. Don Romine as their expert. This response entirely misses the mark.

According to the government, because Mr. Fulks had been involved in these incidents, Mr. Cunningham's and Mr. Aiken's testimony that Mr. Fulks would not pose a risk of serious violence would have lacked credibility. The government presumably makes these remarks in order to prove that trial counsel acted wisely in failing to call either of these two experts to the

stand. But the fact that the jury heard testimony regarding these events makes it *all the more unreasonable* that an expert was not called by the defense to explain that these events were *not* predatory and were not good indicators of future violence.

These experts could have explained to the jury the difference between predatory and reactionary incidents while confined. In other words, they could have provided the necessary contextual framework for the jury to interpret the import of these two events as they pertain to the risk of future violence. But instead of learning that "Mr. Fulks' criminal history and confinement record do not reflect a pattern of a prison predator," PA #7 ¶8, or that Mr. Fulks's "[v]iolence towards correctional staff has not been predatory, rather it has been restricted to two instances where he resisted," PA #6 ¶9, the jury was left to ponder these events without any of the necessary contextual background. Particularly given the testimony of the guards and officers involved in these two events, it was critically important that trial counsel place these events in context by providing reasoned, statistical analyses through the testimony of expert witnesses.

Furthermore, whether the jury would have thought that these experts lacked credibility, as the government now posits as unquestionable fact, *is a question for the jury*. It is not a sound basis for trial counsel's decision to provide *no* testimony to (1) place these events in context or (2) provide any meaningful future dangerousness mitigation case specific to Mr. Fulks. See United States v. Farrell, 563 F.3d 364, 377 (8th Cir. 2009) (emphasis added) ("While expert testimony may be used to 'assist the trier of fact to understand the evidence or to determine a fact in issue,' Fed.R.Evid. 702, an expert witness may not usurp the ***jury's function to weigh evidence and make credibility determinations***.").

Perceived future dangerousness was a key issue at the proceedings and trial counsel were ineffective in failing to address this issue through expert testimony and exhibits that could have

(1) provided the necessary context for the jury and (2) addressed Mr. Fulks's background and record specifically. Particularly because a finding of future dangerousness required *unanimous* support from the jury, beyond a reasonable doubt, had trial counsel acted within the norms of the profession and presented a meaningful mitigation case, it is exceedingly likely that at least one juror would have chosen life over death. As a result, trial counsel's deficient performance prejudiced Mr. Fulks's rights. See Girts v. Yanai, 501 F.3d 743, 757 (6th Cir. 2007) (internal quotation omitted) ("[T]he prejudice prong is satisfied if there is a reasonable probability that at least one juror would have struck a different balance."); see also Skipper, 476 U.S. at 8 ("it appears reasonably likely that the exclusion of the evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence").

## XII. CLAIM XV: TRIAL COUNSEL WERE INEFFECTIVE IN THEIR CONDUCT OF VOIR DIRE

"Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense." Miller v. Francis, 269 F.3d 609, 615 (6th Cir. 2001); see Declaration of Andrea Lyon ¶ 29 (PA #1) ("[V]oir dire should ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are closed by bias and prejudice such that they cannot fairly apply the law as instructed."); see Mu'Min v. Virginia, 500 U.S. 415, 431 (1991) ("Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges"); Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) (plurality opinion) ("Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored"). Trial counsel's performance of

this most basic duty was constitutionally deficient, and Mr. Fulks suffered prejudice as a result. Reversal is therefore required.

During voir dire, trial counsel repeatedly asked rambling, unfocused "questions" that ran for pages of transcript before resulting in a one-word response from the venire member. See Amended Motion at 152-54 (reciting two sets of questions occupying, respectively two transcript pages and three transcript pages). This is the antithesis of effective voir dire, which requires trial counsel "to ask open-ended questions, to listen to the answers, and to show the juror the respect he or she deserves. If a capital defense attorney is making speeches at potential jurors, he or she is not asking questions, not getting information, and therefore not able to effectively represent the client by making appropriate challenges for cause, nor making good use of peremptory challenges." PA #1 ¶ 30.

There can be no confidence in the impartiality of the jury in light of trial counsel's deficient conduct of voir dire. Trial counsel's inadequate voir dire left counsel ill-equipped to mount successful for-cause challenges to potentially biased jurors. For example, in the case of Juror Harvey, the Fourth Circuit specifically noted the confusion caused by defense counsel's questions before ultimately affirming her selection as a juror. See Fulks, 454 F.3d at 429. The problem was clearly not with the court's initial questioning of Juror Harvey, *see* PTT 5/15/04 at 111-120, but rather with trial counsel's questioning. Instead of asking Juror Harvey questions and listening to her answers, trial counsel repeatedly talked over Juror Harvey as she attempted to answer his questions, see id. at 124-26. It is little wonder that both the District Court, and the Fourth Circuit on appeal, found it nearly impossible to discern whether or not Harvey held views that should have disqualified her from jury service.

In addition to rendering trial counsel and the Court unable to effectively evaluate venire

members for their fitness to serve on the jury, trial counsel's pedantic lectures of jurors, during which counsel cut jurors off as they tried to respond, could only have alienated jurors and left them with the feeling that defense counsel was trying to trick them. Indeed, this Court acknowledged during Branden Basham's trial that trial counsel's conduct of voir dire harmed the defense case. See Basham PTT 8/4/04 at 12-13. Trial counsel's rambling, overbearing, and confusing voir dire permeated Mr. Fulks's entire trial with unfairness.

## XIII. CLAIM XVI: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO READ JUROR QUESTIONNAIRES AND TO EXAMINE PROSPECTIVE JURORS

The government concedes, as it must, that trial counsel's failure to review all of the juror questionnaires, and the resulting failure to question Juror Allison regarding her failure to answer question 42, fell below accepted professional norms. Rather, the government argues that Mr. Fulks suffered no prejudice as a result of counsel's ineffectiveness and, alternatively, that the Fourth Circuit has already ruled on this issue. Neither of these contentions has merit.

Because of trial counsel's ineffectiveness, Mr. Fulks was sentenced to death by a jury that included one member whose husband was murdered and who later told reporters that she understood the Donovan family's pain because of what she had gone through. *See* Kenneth A. Gailliard, *Fulks Sentenced to Death*, MYRTLEBEACHONLINE.COM, Jul. 1, 2004 (PA #28). To suggest that counsel's failure did not prejudice Mr. Fulks flies in the face of simple logic. Had counsel reviewed Allison's questionnaire and asked appropriate questions, knowledge of her husband's murder would have come to light. It is possible—likely, even—that this information would have rendered the District Court more inclined to grant trial counsel's pre-trial challenge to Juror Allison, made at a time when striking Juror Allison would not have resulted in the

undoing of a verdict returned after a month-long trial.[8]  Had a for-cause challenge failed, trial counsel would likely have exercised a peremptory challenge to remove Allison from the jury. See Transcript of Motion Hearing of 7/16/04 at 17 (acknowledging that failure to properly question Juror Allison during voir dire "is clearly a potential issue of ineffective assistance of counsel").

The government's assertion that the Fourth Circuit has already ruled on the propriety of seating Juror Allison is a nonsequitur.  Mr. Fulks is not challenging the refusal of this Court to remove Juror Allison for cause, but rather trial counsel's failure to discover her history and remove her from the jury, either through a challenge for cause based on all the relevant facts or through a peremptory strike.  The question of trial counsel's constitutional deficiency has not yet been ruled on by any court.

## XIV.  CLAIM XVII:  TRIAL COUNSEL WERE INEFFECTIVE FOR CHOOSING TO SEAT AUTOMATIC DEATH VENIRE MEMBERS INSTEAD OF MOVING FOR ADDITIONAL PEREMPTORY STRIKES

Faced with the District Court's refusal to remove jurors Goehring, Harvey, Allison, Novinger, and Plyler for cause, trial counsel elected to allow these jurors to be seated, hoping to win reversal on appeal.  In light of the deference granted the district court in ruling on challenges for cause, see United States v. Barnette, 211 F.3d 803, 812 (4th Cir. 2006), trial counsel should have known that such a strategy was untenable.  Effective counsel would have at least attempted to hedge their bets by moving for additional peremptory strikes, thereby either solving the problem posed by those jurors (if the motion were granted) or creating an additional issue for appeal (if the motion were denied).

---

[8] It is true that Juror Allison, during the post-trial hearing, denied any intentional bias against Mr. Fulks as a result of her husband's murder, going so far as to state that she didn't even remember what her husband looked like.  *See* Transcript of Motion Hearing 7/16/04 at 15.  Ms. Allison also admitted, however, discussing the murder with other jurors, id. at 12, and it appears from the

The proper exercise of peremptory challenges is a vital "means of assuring the selection of a qualified and unbiased jury." Batson v. Kentucky, 476 U.S. 79, 91 (1986). It is well established that the district court has authority to grant additional peremptory strikes when necessary to ensure a fair trial. See, e.g., United States v. Potts, 420 F.2d 964, 964-65 (4th Cir. 1970) (per curiam); United States v. Corbin, ___ F. Supp. 2d ___, 2009 WL 1532021, at *4 (E.D.N.Y. June 1, 2009); United States v. Johnson, 362 F. Supp. 2d 1043, 1071 (N.D. Iowa 2005). Trial counsel had a strong basis for a motion for additional peremptory strikes given the notoriety of the case and its complexity. In light of the circumstances, counsel's failure to make the motion was both ineffective and prejudicial.

Rather than address the substance of this claim, the government mischaracterizes it as an attempt to re-litigate challenges to jurors Goehring, Harvey, Allison, Novinger, and Plyler. Opposition at 132. In fact, Mr. Fulks's claim is that regardless of whether these jurors should have been removed for cause, they certainly should have been struck by a peremptory challenge. Trial counsel failed to be aware of, and to engage in, the complex motions practice required of capital defense counsel. See PA #1 ¶ 24. Instead of seeking a way to remove the problem jurors, trial counsel simply threw up their hands and allowed them to be seated.

## XV. CLAIM XVIII: APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO APPEAL THE DISTRICT COURT'S REFUSAL TO ADMIT STATEMENTS BY BASHAM TENDING TO SHOW THAT BASHAM KILLED ALICE DONOVAN (AMENDED MOTION CLAIM XVIII).

Trial counsel were ineffective for failure to appeal the Court's ruling concerning Branden Basham's "deer" statement. While searching for the remains of Alice Donovan with Brunswick County, North Carolina Sheriff Ronald Hewitt, Basham stated "you know, I could never kill a deer and here I have …." At that point, he was silenced by his attorney.

---

news report that Ms. Allison's experience was in her mind as she deliberated on Mr. Fulks's fate.

Trial counsel attempted to introduce the statement as an excited utterance or declaration against penal interest. TT 6/22/2004 at 247-48. The government argued during the Fulks trial that the statement had "no meaning." TT 6/22/2004 at 250. The government further argued that Basham "could have been talking about anything." TT 6/22/2004 at 253. The Court refused to allow the statement. However, during the Basham trial, the government argued that the statement was essentially an admission by Branden Basham.

Clearly, this is another example of the government's use of inconsistent theories which is addressed in the following section of this Reply. As to this particular section, it was ineffective assistance of appellate counsel not to appeal the denial of the motion to introduce the Basham statement. The Basham trial was held before the Fulks appeal was filed. Appellate counsel should have known that the "meaningless" Basham statement was admitted in the Basham trial and used by the government to argue that the statement was a further admission by Basham. The government cites United States v. Delfino, 510 F.3d 468, 470 (4th Cir. 2007), which held that the Court abuses its discretion when it rules and "relies on erroneous factual or legal premises." Opposition at 137. The government presented the Court with a factually erroneous premise. The Basham deer statement was not "meaningless." It was a key argument in the Basham trial and used by the government as an admission by Basham. It should have been admitted in the Fulks trial as a critical piece of evidence that established that Basham was the actual "triggerman."

It was clearly the government's position at the Basham trial that the "meaningless" statement of Basham had become, in fact, an admission. The outcome of the appeal would have been different had appellate counsel raised this issue.

## XVI. CLAIM XIX: MR. FULKS'S DUE PROCESS RIGHTS WERE VIOLATED BY THE GOVERNMENT'S PRESENTATION OF INCONSISTENT THEORIES

The government contends that it presented consistent arguments during Mr. Fulks's and

Basham's trials because it portrayed each man as equally culpable for the crimes. Opposition at 141. To support its position, the government points to a handful of citations from the record. Id. The government's reply is misplaced. The actual killer of Alice Donovan was Branden Basham and the government knew this but failed to disclose this fact prior to Mr. Fulks's trial. The government presented inconsistent facts as well as theories.

During Mr. Fulks's trial, the government argued that "Chad Fulks took the purse strap and strangled" Alice Donovan. TT 06/22/2004 at 255. However, during Basham's trial, the government used the same evidence to persuade the jury that Basham was demonstrating how *Basham* used the purse strap to strangle Alice Donovan. Basham TT 09/27/2004 at 10-53. The government knew prior to Mr. Fulks's trial that an extremely credible witness, Sheriff Hewitt of Brunswick County, North Carolina, saw Bashman demonstrate how he, not Mr. Fulks, strangled Ms. Donovan. Sheriff Hewitt gave his recount of Basham's demonstration at the Basham trial. He was not called as a witness in Mr. Fulks's earlier trial.

The government failed to explain why, in Mr. Fulks's trial, it portrayed the defendants as equals, working in unison to cause Alice Donovan's death, while in the Basham trial, the government claimed that Basham was the sole killer. Indeed, during Basham's trial the government admitted:

> We think there is evidence to suggest that Branden Basham was the killer. In fact, probably better evidence to suggest that Branden Basham was the killer than that Chad Fulks was the killer.

Basham TT 10/8/2004 at 14-21.

Indeed, Basham actually confessed, without prompting, to strangling Ms. Donovan through his demonstration to Sheriff Hewitt. This can only be deemed to be government misconduct for failure to reveal this to Mr. Fulks's trial team. In the alternative, it was ineffective assistance of counsel to fail to uncover what Hewitt actually saw and what he would

66

say under oath.

The government's duty to disclose exculpatory evidence applies to evidence material either to guilt or to punishment, see Brady v. Maryland, 373 U.S. 83, 87 (1963) (whether the information is in the hands of the prosecutor or the police); Boone v. Paderick, 541 F.2d 447, 450-51 (4th Cir. 1976). An incomplete response by the government to a request for exculpatory evidence violates the duty to disclose: "[A]n incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on a misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." United States v. Bagley, 473 U.S. 667, 682 (1985).

The government contends that it is not improper to argue inconsistent theories as long as no false evidence is presented. Opposition at 140 (citing United States v. Paul, 217 F.3d 989, 998 (8th Cir. 2000)). But, the facts of Paul are not analogous to the facts at issue in this case. In Paul, two defendants robbed and beat an eighty-two-year-old man. Paul, 217 F.3d at 994. After discovering that he was not dead, the pair shot him. Id. Before his capture, Paul had told several acquaintances different renditions of the murder. Id. In some renditions, Paul claimed that he and his codefendant had each personally shot the man once; in other renditions, Paul claimed to have beaten and shot the man himself. Id. at 995. After evading the police for over a year, Paul confessed to the murder but told police that his codefendant actually pulled the trigger. Id. Although his codefendant was found to be equally culpable and did not receive a death sentence, the jury imposed the death sentence upon Paul. Id. After trial, the court concluded that the government had not improperly offered inconsistent theories because the evidence itself was unclear. Id. at 998. Although Paul had admitted to the murder, he inconsistently identified the

triggerman.  Id.  Accordingly, the "prosecution's argument at both trials that the defendant on trial pulled the trigger [was] not factually inconsistent" and the defendant could have been convicted under either theory.  Id. at 998-99.

Unlike Paul, where the defendant admitted to severely beating the man and then claimed to have shot him, Mr. Fulks has never claimed to have had a role in the death of Alice Donovan. On the contrary, Mr. Fulks has always maintained that he did not see Alice Donovan and Basham after they left the car and that he was unaware of her death until later when Basham admitted to killing her.  Thus, it is unclear whether Mr. Fulks would have been sentenced to death but for the government's improper pursuit of inconsistent theories:  both improperly characterizing him as the manipulative leader, and also attributing Basham's portrayal of strangulation with a purse strap to each defendant during their respective trials.  These mutually inconsistent theories based on the same facts, violated Mr. Fulks's right to due process.

The government points to several arguments made during each codefendants' trial in an attempt to show that Basham and Mr. Fulks acted as a team that cooperated to kill Alice Donovan.  While stressing the role of each defendant at his own trial is appropriate, inconsistently describing each codefendants' role is not.

Yet, comparing the way that the government individually described the characteristics of the codefendants in their relationship with one another, and not just the actual acts that they committed, the core of the government's argument was inconsistent.  Contrary to the government's assertion that it "may present inconsistent arguments or theories at separate trials of codefendants as long as it does not present false evidence at any trial," Opposition at 140 (citing United States v. Frye, 489 F.3d 201, 214 (5th Cir. 2007)), the Fourth Circuit has held that due process may also be violated if "an inconsistency… exist[s] at the core of the prosecutor's

68

case against the defendants for the same crime." <u>United States v. Higgs</u>, 353 F.3d 281, 326 (4th Cir. 2003) (citing <u>Smith v. Groose</u>, 205 F.3d 1045, 1052 (8th Cir. 2000)). Thus, because the government characterized the relationship of the codefendants differently during each respective trial, an inconsistency existed at the core of the government's case, in violation of due process.

The government also relies on <u>Higgs</u> to assert that characterizing codefendants differently between cases is not inconsistent. The government's reliance on <u>Higgs</u>, however, is misplaced. In <u>Higgs</u>, Higgs and two friends drove three women to a wildlife refuge where Higgs handed one friend a gun. <u>Id.</u> Higgs's friend Haynes killed each woman. <u>Id.</u>

Upon appeal of a trial conviction and death sentence, Higgs argued that Haynes, the shooter who had not been sentenced to death, was equally culpable. <u>Id.</u> at 326. Higgs argued that the government asserted inconsistent theories in the two trials. <u>Id.</u> At his trial, Higgs argued that the government characterized him as the mastermind behind the murders because he ordered Hayne to kill the women and therefore was more culpable. In Haynes's trial, Higgs asserted, the government argued that Haynes acted of his own free will and decided to murder the women. <u>Id.</u> On appeal, the court found that the government consistently maintained that the codefendant was the sole triggerman in the murders and that the government *did not argue* that one was more culpable than the other, but rather that the codefendant "deserved the death penalty because he was no less *than an equal partner* in crime with Higgs." <u>Id.</u> at 327 (emphasis added).

Unlike <u>Higgs</u>, where the defendant gave the gun to his codefendant with the intention that he murder the women, Mr. Fulks has consistently maintained that he had no direct part in the death of Alice Donovan. Even during his guilty plea he refused to admit that he had any involvement in her actual death. And, unlike <u>Higgs</u>, where the court noted that the government never characterized one of the codefendants as more culpable than the other, the government in

Mr. Fulks's trial and the Basham trial characterized Mr. Fulks as both an undeniable leader in his own trial and later as Basham's unwavering follower during Basham's trial.

The government's <u>Brady</u> violations and inconsistent facts and theories are constitutional violations that cannot stand.

**XVII.** <u>**CLAIMS XX, XXI**</u>**: THE GOVERNMENT'S ATTEMPTS TO INFLUENCE WITNESS TESTIMONY WERE INAPPROPRIATE AND RENDERED THE RESULTING DEATH SENTENCE A DENIAL OF DUE PROCESS; THE GOVERNMENT VIOLATED ITS OBLIGATIONS UNDER <u>BRADY V. MARYLAND</u> BY FAILING TO DISCLOSE INFORMATION MATERIAL TO MR. FULKS'S ABILITY TO PRESENT HIS DEFENSE**

The Amended Motion and related exhibits cast serious doubt on the government's assertion that no deals were made with witnesses. As outlined in the letter to Tina Severance from the Myrtle Beach Police Department, charges were dropped against her ". . . pursuant to her cooperation in a case in 2002 in which she was a witness." Clearly there was an agreement that pending charges against Severance would be dismissed due to her cooperation as a witness against Mr. Fulks. This was never revealed to the trial team. This charge actually stems from Severance's false claim to the Myrtle Beach Police Department that her van had been stolen when in fact it was being driven by Mr. Fulks and Basham.

In addition, in her declaration, dated May 14, 2008, Andrea Roddy made it clear that the FBI agents "put the pressure on me" to testify to facts that were not true.

Most troubling is the Grand Jury testimony that reveals the involvement of Andrea Roddy and Severance with Mr. Fulks and Basham during the crime spree. Roddy and Severance played the key role in luring Robert Talsma away from his home in order that it could be robbed of his guns and other items. Not only did they lure him from his house, prior to leaving they took care to unlock windows in his house knowing that Basham and Mr. Fulks were waiting to commit the robbery. They further assisted Basham and Mr. Fulks in fraudulent activities to

include passing fraudulent checks and incurring fraudulent credit card charges from pocketbooks that were stolen by Mr. Fulks and Basham. Under any normal set of circumstances, these two individuals would have been charged with a number of felony charges. The only logical explanation is that there was an agreement between these two individuals and the government, expressed or implied, that they would not be charged if their testimony was favorably received by the government.

The failure to disclose an agreement not to prosecute and/or dismiss charges is a violation of Brady v. Maryland, 373 U.S. 83 (1963) Giglio v. United States, 405 U.S. 150, 154-55 (1972) (requiring new trial because of failure to disclose promise of immunity to principal witness).

**XVIII. <u>CLAIMS XXII, XXIII</u>: THE GOVERNMENT'S MISCONDUCT DURING CLOSING ARGUMENT, AND TRIAL COUNSEL'S FAILURE TO OBJECT TO THE IMPROPER ARGUMENT, VIOLATED MR. FULKS'S CONSTITUTIONAL RIGHTS**

In its response to Claims XXII and XXIII, the government refutes Mr. Fulks's contentions that (1) the prosecution made prejudicially improper remarks in closing arguments and (2) that defense counsel rendered ineffective assistance of counsel by failing to object to certain comments. The government claims "the prosecutor did not make improper comments and certainly no comments that rise to the level of prosecutorial misconduct." Opposition at 146. The government's arguments sidestep Fourth Circuit precedent, which when applied to the remarks at issue, establishes that certain critical remarks were in fact improper and did prejudice Mr. Fulks's right to a fair trial.

The Fourth Circuit employs a two-prong test in determining whether a prosecutor's remarks render a trial fundamentally unfair and thus in violation of a defendant's due process rights. A defendant must show first that the prosecutor's remarks "were improper" and second that these remarks "prejudicially affected the defendant's substantial rights so as to deprive [him]

71

of a fair trial." United States v. Wilson, 135 F.3d 291, 297 (4th Cir. 1998) (internal quotations and citations omitted).

Although the determination of whether a remark is improper is a fact-sensitive inquiry, a number of benchmarks have emerged. A remark is improper when it is based on "caprice or emotion," rather than "reason." Gardner v. Florida, 430 U.S. 349, 358 (1977) ("It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."). Similarly, a remark is improper when it is not supported by the facts in evidence or an inference that is not *reasonably* drawn from the facts in evidence." Wilson, 135 F.3d at 298 (emphasis added). When a prosecutor makes remarks during closing arguments that are not based upon facts that are in evidence, such remarks are "clearly improper." See id. ("…the prosecutor asserted something as fact that had not been proved, and that was clearly improper. By going outside the evidence, the prosecutor 'violated a fundamental rule, known to every lawyer, that argument is limited to the facts in evidence.'" (internal quotation omitted)). Upon finding that a remark is improper, a court must determine whether the improper remark prejudicially affected the defendant's right to a fair trial.

The Fourth Circuit utilizes a holistic approach in assessing whether a prosecutor's improper remark results in prejudice, with no one factor being determinative. The Fourth Circuit has identified the following six factors to be applied in making this determination: "the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused;" "whether the remarks were isolated or extensive;" "absent the remarks, the strength of competent proof introduced to establish the guilt of the accused;" "whether the comments were deliberately placed before the jury to divert attention to extraneous matter[;]" "whether the

prosecutor's remarks were invited by improper conduct of defense counsel[; and]" "whether curative instructions were given to the jury." Id. at 299 (internal citations omitted). The application of the two-prong test to the remarks at issue demonstrates that Mr. Fulks's constitutional rights were violated by the prosecutor's improper remarks.

### A. Life without parole is not a free pass

The prosecution told the jury that sentencing Mr. Fulks to life without the possibility of parole would be giving Mr. Fulks a free pass. See TT 06/29/2004 at 30-32. The government submits that these "remarks by the prosecutor were simply a fair comment on the evidence." Opposition at 147. But they were not a fair comment on the evidence. While it is true that Mr. Fulks faced serious charges at the time of the penalty-phase proceedings, he had not entered a plea, had not been appointed counsel and had not been tried before a jury of his peers. And because none of those things had happened, sentencing Mr. Fulks to life without parole would not amount to a free pass.

The government obfuscates the impact of these remarks by claiming that the remark was based on Mr. Fulks's statement that he would probably never get out of prison. The government's argument fails to address the context in which these remarks were made. Although it is true the prosecution stated Mr. Fulks thought he would not get out, it also stated

> It is the government's contention, in essence, that that two-week crime spree, he is not held accountable for. He was looking at serious and significant time before, and now he is looking at life without parole. *So, where is the punishment? Where is the accountability for what he did to these two women*?

TT 06/29/2004 at 31-32 (emphasis added). These comments were intended to make the jurors believe that if they did not sentence Mr. Fulks to death, there would be no punishment and accountability for the instant crimes—in other words, they were meant for the jury to act based on "caprice" or "emotion, rather than "reason" in violation of Mr. Fulks's constitutional rights.

See Gardner, 430 U.S. at 358 (1977).

Additionally, because Mr. Fulks had not been entered a plea, had not been appointed counsel, and had not been tried by a jury of his peers, this comment was not based on facts in evidence or a permissible inference that was "reasonably drawn" from the facts. See Wilson, 135 F.3d at 298 (emphasis added) (a remark is improper when it is not supported by the facts in evidence or an inference that is not *reasonably* drawn from the facts in evidence."). As a result, these comments had a "tendency to mislead the jury and to prejudice the accused," by misleading the jury into believing that Mr. Fulks would receive a free pass, when that was simply untrue. Id. at 299.

In evaluating whether improper remarks are prejudicial, a key factor is whether a proper curative instruction was given to the jury. See id. at 299. In cases where courts hold that a defendant's rights were not prejudiced it is often because the court gave an appropriately curative instruction. See Donnelly v. DeChristoforo, 416 U.S. 637, 644 (1974) (finding the defendant's rights were not prejudiced because the "trial court took special pains to correct any impression that the jury could consider the prosecutor's statements as evidence in the case.").

Although the defense objected to these remarks, the Court did not give a curative instruction to the jury. Instead the Court stated that the "defense will be allowed free rein … to make whatever argument is appropriate on this point." TT 06/29/2004 at 31. In effect, this ruling left the members of jury believing that this line of argument was proper and thus that it was entirely possible that by sentencing Mr. Fulks to life without the possibility of parole, it was akin to giving him a free pass.

**B.      There was no evidence that Mr. Fulks raped Samantha Burns**

The government's response to Mr. Fulks's claim that it was improper for the prosecution to state that "they" raped Samantha Burns wholly fails to address the improper and highly

prejudicial nature of this statement. The government argues that "it was clear that the prosecutor was arguing that both Fulks and Basham were acting jointly and that they were participating as a team in their criminal activities of Monday, November 11, 2002." Opposition at 149. This response is a complete non sequitur. It fails to address the prosecution's remark that "they raped" Samantha Burns. The prosecution's remark does not merely mean that they were "acting jointly," as the government feebly contends. It means that Mr. Fulks and Mr. Basham *each* raped Samantha Burns.

The prosecution made this remark even though there had been <u>no</u> evidence presented during the penalty-phase proceeding to support such an unfounded claim. Mr. Fulks was not charged with the rape of Samantha Burns. No witness testified that Mr. Fulks raped Samantha Burns. And Mr. Fulks has always maintained that he did not rape Samantha Burns. And yet despite the absolute void of supporting evidence, the prosecution told a predominately female jury that "they raped" Samantha Burns. By arguing to the jury that Mr. Fulks had raped Samantha Burns, without any proof or charge, the prosecution's statement was "highly improper."

In <u>Wilson</u>, the Fourth Circuit reversed the defendant's conviction and remanded for a new trial where the prosecution argued in closing that Mr. Fulks had committed murder when there was no evidence to support such an assertion. <u>See</u> 135 F.3d at 299 ("We conclude that the prosecutor's murder argument was highly improper because it was not supported by the evidence and it was sprung at the last minute, when Talley and his lawyer had no chance to investigate the charge or to offer any evidence in defense."). The Fourth Circuit found this line of remarks to be extremely prejudicial. It stated, "it is hard to fathom anything more prejudicial than the unproved assertion that the accused is also guilty of the uncharged crime of murder while he is

on trial for another offense." Id. at 299.

Similarly, it is highly prejudicial to argue to a predominately female jury that Mr. Fulks had raped Samantha Burns when there was no evidence of rape. It is insincere to argue that the comment, "they raped," only meant that Mr. Fulks and Mr. Basham "were acting jointly." It means exactly what the plain meaning of the words conveys. It means that Mr. Fulks and Mr. Basham *each* raped Samantha Burns, even though no evidence supported such an inflammatory statement. This was not a statement that was "based on record evidence or any reasonable inference that could be drawn from it." Id. at 298.

And because the defense failed to object to this outlandish remark, no curative instruction was given. This improper remark was left with the jury as fact. As a result, the prosecution engaged in misconduct by making a remark in closing even though it knew it had no proof supporting such an assertion. And trial counsel rendered ineffective assistance of counsel by allowing such an inflammatory and baseless comment to go without objection.

**C.     The prosecutor engaged in misconduct by referring to Mr. Fulks as a "zoo animal"**

The government argues that by analogizing Mr. Fulks to a "caged lion" which is "lethargic" because it "must be doped up, drugged up" the prosecution only meant to "explain how the medicated Chad Fulks the jurors saw in the courtroom was not the same person the victims saw before they were murdered by he and Mr. Basham." Opposition at 150. If that were indeed what the prosecution had intended by those remarks, the prosecution could have just stated as much. It could have stated, as the government now argues, that Mr. Fulks "looks different than he did when he committed murders." Opposition at 150. But the prosecution did not stop there. The prosecution stated that "zoo animals have to be doped up, drugged up." TT 06/29/2004 at 77. This comment served to cast Mr. Fulks as subhuman, as nothing more than a

wild animal in a zoo that has to be medicated in order to protect children from the zoo animals'
otherwise uncontrollable instincts. The comment also minimized the innate value of Mr. Fulks's
life, thereby affording the jury the opportunity to pass a death sentence on a wild animal, instead
of a human.

Defense counsel objected to these remarks, but the objection was overruled by the Court.
During a bench conference, the Court told the prosecution that it was permitted to make the
argument that "wild animals are drugged or sedated," "as long as that is as far as you are going."
TT 06/29/2004 at 77. This limiting instruction was given outside the presence of the jury and no
curative instruction was given.

The government's reliance on Darden v. Wainwright, 477 U.S. 168 (1986), and United
States v. Allen, 247 F.3d 741 (8th Cir. 2001), in support of its proposition that such a remark,
even if improper, "did not result in Fulks failing to receiving a fair trial" is misplaced.
Opposition at 151. In both cases, the prosecutors made similar animal-like remarks *after* the
defense had opened the door to such remarks. In Darden, the Court held that the prosecution's
statement did not require reversal because it was "invited by or was responsive to the opening
summation of the defense." 477 U.S. at 180-82. There, the prosecutor called the defendant an
animal after the defense had referred to the perpetrator as an animal. Id. Similarly, in Allen, the
Eighth Circuit did not require reversal where the prosecutor remarked that defendant was a
"murderous dog" because it was in response to the defense's actions. 247 F.3d. 741.
Importantly, the court noted that the statement, although improper, did not require reversal
because the jury did not return a verdict of death. See id. at 777. ("[I]f the prosecutor's improper
statement was as emotionally prejudicial as [defendant] claims, we think it likely that the jury
would have returned a sentence of death on both counts."). Here, the jury did return a verdict of

death.

Applying the reasoning of <u>Darden</u> and <u>Allen</u> to the present matter, the prosecutor's reference to Mr. Fulks as a "zoo animal" is improper. Both the <u>Darden</u> and <u>Allen</u> courts found the animal references improper. But unlike the situations in <u>Darden</u> and <u>Allen</u>, the prosecution's statements should be deemed prejudicial because they were not made in response to a statement of the defense. Mr. Fulks's counsel did not say anything that would invite such an inflammatory and inappropriate comment. And because the prosecutor's remarks were not in response to the defense's arguments, they are both improper and prejudicial.

### D. The prosecution improperly impugned Mr. Fulks's silence

According to the government, the prosecution's comment that "it is not only what people say that matter, it is what people don't say that is every bit as important," is not improper because a "common sense reading of the statement reveals…that the prosecutor's statement was made during a discussion of Fulk's 'interaction with his family during the events of November 2002.'" Opposition at 152. The government argues, without any support, that a "jury would not naturally take the argument to be a comment on Fulk's failure to testify, nor is it obvious that the remark was so intended." Opposition at 152.

Instructively, the Sixth Circuit reminds "[i]t only takes a single comment … to remind a jury that the defendant has not testified and to fix in the jurors' minds the impermissible inference that the defendant is guilty merely because of his exercise of that right." <u>Eberhardt v. Brodenkircher</u>, 605 F.2d 275, 279 (6th Cir. 1979). In <u>Eberhardt</u>, the Court held that the prosecutor commented on the defendant's failure to take the stand by asking "Who else could have testified in this case" and pointing in the general direction of the defendant. <u>Id.</u> at 278. After finding the comment to be improper, the court analyzed whether the government had met the "heavy burden" of proving harmless error. Even though the comment was isolated and

78

"relatively brief," the court found that the government had not met its burden where the evidence of guilt was not "overwhelming" and there were other "substantial errors at trial." Id. at 279. The Court explained that "[h]armless error, in the context of a violation of a constitutional right of a defendant, is an extremely narrow standard, permitting the State to avoid the retrial of a defendant *only when* it can demonstrate beyond a reasonable doubt that the error did not contribute in any way to the conviction of the defendant." Id. at 278 (referencing Chapman v. California, 386 U.S. 18 (1967) (emphasis added)).

Here, the jury could have viewed the blanket statement as commentary on Mr. Fulks's decision not to testify. After the prosecution told the jury that Mr. Fulks did not say anything to his brother, the prosecutor stated, "sometimes, ladies and gentlemen, it is not only what people say that matters, it is what people don't say that is every bit as important." TT 06/29/2004 at 91. This broad statement was not limited to Mr. Fulks's conversations with his brother – it was meant as a general proclamation on people's decisions to remain silent. It was meant to remind the jury that the defendant was sitting right there and had not spoken in his own defense. See, e.g., Girts v. Yanai, 501 F.3d 743, 756 (6th Cir. 2007) ("By indicating that Mr. Fulks was the 'only one person' who could explain the crime to the jury, the prosecutor highlighted the fact that Mr. Fulks did not testify, and attached a negative connotation to the exercise of the Fifth Amendment right to remain silent.").

By making a blanket assertion that the "jury would not naturally take the argument to be a comment on Fulk's failure to testify," Opposition at 152, the government has not met its high burden of proving harmless error. The government has not even come close to proving "beyond a reasonable doubt that the error did not contribute in any way to the conviction of the defendant." Eberhardt, 605 F.2d at 278.

**E. The prosecutor engaged in misconduct by telling the jury that giving Mr. Fulks the death penalty would be "an act of self-defense"**

The government's contention that it was proper for the prosecution to tell the jury that the death penalty will "be an act of self defense" ignores the obvious implications of the comment. If the prosecution had intended for the comment to be limited to future dangerousness within the Bureau of Prisons ("BOP") it could have said, "Mr. Fulks will be a future danger to the inmates and staff within the prison system." But the prosecution did not limit its comment to the confines of the prison system. Instead, the prosecution used the phrase "self-defense." In common usage, "self-defense" means the defense of one's own person or something intimately connected with the person. See Merriam Webster, *available at* http://www.merriam-webster.com/dictionary/self-defense, last visited June 28, 2009 (defining self-defense as "the act of defending oneself, one's property, or a close relative").

There are clear indications that the jury considered Mr. Fulks a potential danger to individuals *outside* of the BOP, which could mean to the jurors themselves. Juror Sylvia Allison stated that the jury had "decided no matter what, he would try to escape." Amended Motion at 144. Even the non-statutory aggravator related to future dangerousness contemplated that Mr. Fulks would pose a danger outside of the confines of a prison setting. See Special Verdict Form at 5 ("Do you, the jury unanimously find that the government has established beyond a reasonable doubt that the defendant…would be a danger in the future to the lives and safety of other persons, including, *but not limited to*, inmates and correctional officers") (PA #27).

It was only after the defense objected to this comment, which the Court refused to tell the jury to disregard, did the prosecution state

> You have all of the violence that he has committed against people, against men and women. And you have got the most recent violence that he has committed against correctional officers to support the government's position that he represents a danger, even while he is incarcerated within the BOP.

TT 06/29/2004 at 115-16.  But the damage had been done.  The jury was told that they needed to give Mr. Fulks the death penalty because it would be "an act of self-defense."  The insinuation was that Mr. Fulks was in a position to harm the jury and the jury needed to protect themselves from Mr. Fulks.

Decisions to sentence a defendant to death must be based on "reason rather than caprice or emotion."  Gardner, 430 U.S. at 358.  By stating that a death sentence would be akin to an act of self-defense, the prosecution intended for the jury to act based upon fear and not reason.  This is constitutionally impermissible.  See State v. Raspberry, 452 S.W.2d 169, 172 (Mo. 1970) (citing the "well-settled" rule that a prosecutor may not personalize arguments to the jury); see id. ("They [the jury] must determine the guilt or innocence of the defendant from the evidence and it is improper for the prosecutor to taint their judgment with suggestions of personal danger to them or their families if the defendant is acquitted."); see e.g., People v. Holman, 469 N.E.2d 119, 165 (Ill. 1984) (reversing a death sentence where the prosecutor's improper statements served "no function other than to appeal to the passion and fears of the jury and increase the likelihood that the sentence it would recommend would be based on emotion rather than on reason"); see id. at 184 ("The clear import of the prosecutor's words is that the jury, by sentencing Holman to prison [instead of executing him], would run the risk that he would kill a prison guard or would escape and kill again."); see id. at 165 ("Unsupported predictions as to the kind of crimes the defendant will commit if not executed are even more to be condemned than references to the possibility of parole, for they convey more directly to jurors the vivid, but misleading, message that the death penalty is the only way to protect society from the defendant and forestall his violence.").

**F.    Conclusion**

Individually and collectively, these statements were improper and prejudicial in violation

of Mr. Fulks's constitutional rights. They conjured an inaccurate image of Mr. Fulks as a person who would be getting a free pass by sentencing him to life, as a man who had raped Ms. Burns, as akin to a wild animal that needed to be locked up to protect the public from his animalistic instincts, as a person to personally fear in the future and as someone who must have something to hide by refusing to speak about these events. These comments amount to a denial of due process.

Moreover, trial counsel's repeated failures to properly object to certain comments rendered trial counsel's performance constitutionally deficient. Reasonable and competent counsel would have objected to each of these highly inflammatory and inaccurate remarks and yet counsel failed to do so. As a result, not only were Mr. Fulks's due process rights violated, but his Sixth Amendment right to the effective assistance of counsel, was aggrieved. Had these constitutional errors not occurred, the outcome of the proceedings very likely would have been different.

XIX. **CLAIMS XXIV, XXV**: **THE GOVERNMENT ENGAGED IN SERIOUS MISCONDUCT BY ASSERTING THAT MR. FULKS HAD BEEN ARMED WITH A .45 CALIBER REVOLVER, AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO QUESTION RONNIE FULKS ABOUT THE REVOLVER**

As outlined in the Amended Motion, Mr. Fulks gave a .45 caliber pistol to his brother, Ronnie Fulks. The significance of Ronnie Fulks's proposed testimony is that it would have established that Branden Basham was the only individual with an operational handgun during all relevant times. After the District Court denied the defense motion to grant immunity to Ronnie Fulks in order to testify that Mr. Fulks gave him the .45 caliber prior to the abduction of Alice Donovan, the defense failed to question Ronnie Fulks about this issue. Ronnie Fulks is a convicted felon and cannot possess a firearm pursuant to 18 U.S.C. § 922(g). However, the point could be made to the jury through effective questioning that Mr. Fulks gave the .45 to Ronnie

Fulks. It is permissible to call a witness to the stand knowing that the witness will assert his Fifth Amendment rights.

The District Court is without power to confer immunity to a witness <u>sua</u> <u>sponte</u> but the U.S. Attorney could have been compelled to grant immunity. <u>See</u> <u>United</u> <u>States v. Washington</u>, 398 F.3d 306 (4th Cir. 2005). The U.S. Attorney did not grant immunity to Ronnie Fulks. However, the government was well aware of the testimony Ronnie Fulks would give had he testified. In spite of this, the government argued at trial that Mr. Fulks was armed with the .45 caliber at all relevant times. Therefore, this government argument should not have been made to the jury.

Trial counsel was ineffective for failing to question Ronnie Fulks about the .45 caliber. Had questions been asked about the .45 caliber and the Fifth Amendment been asserted, trial counsel could have argued effectively to the jury at closing that Mr. Fulks gave Ronnie Fulks the only operational .45 caliber. This would counter the government's assertion at closing that "Chad Fulks is armed with these two .45s that Friday." TT 06/29/2004 at 38. Moreover, it could have been that Ronnie Fulks may have actually waived his Fifth Amendment rights in defense of his brother had he been asked this question.

As set forth in <u>United</u> <u>States v. Klauber</u>, 611 F.2d 512, 514 (4th Cir. 1979), "Statements of intention are not the same as the actual thing in such circumstances. A witness could well be reluctant to testify and looking for a way to avoid going on the stand, although, … prepared to do his duty in court if actually put on the stand. Such a witness might well state in advance that he would not testify and would invoke the Fifth Amendment in the hopes that he thereby would not be called. Yet, if he were, in fact, summoned and put under oath, he might, indeed, testify." Trial counsel was ineffective for failing to question Ronnie Fulks about this vital issue.

**XX.** **CLAIM XXVI: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PREPARE KEY WITNESSES FOR TRIAL TESTIMONY**

The government's response enumerates the mitigation witnesses called to testify on Mr. Fulks's behalf. However, although the government points out that the trial team did meet with Mark Fulks and Mark Floyd, a mere meeting alone is not tantamount to witness preparation. As outlined in the Amended Motion, both of these individuals specifically stated that although they met with the trial team, the trial team did not prepare them to give testimony. While the directive from the trial team to tell the truth is certainly appropriate, it can hardly be said that such a directive constitutes effective witness preparation for testimony in a capital case. Indeed, both of these individuals would have required information, *at a minimum*, regarding the topics of testimony. See generally, Belmonte v. Ayers, 529 F.3d 834 (9th Cir. 2008); see also Groseclose v. Bell, 895 F. Supp. 935, 954 (M.D. Tenn. 1995) (stating that "A lawyer with ordinary training and skill in criminal law [will take] steps to…determine the statutory and non-statutory mitigating circumstances and prepare witnesses properly before they testify").

More importantly, the trial team did not spend time preparing Ronnie Fulks for his testimony. The government asserts that it was not necessary to prepare a witness for cross-examination, but ignores the nature of Ronnie Fulks's testimony and the fact that Ronnie would have been a favorable witness for the defense as Mr. Fulks's older brother. Ronnie Fulks's proposed testimony concerning the .45 caliber pistol that was given to him by Mr. Fulks is a prime example of the critical nature of his testimony. Simply because he was subpoenaed and called to testify by the government does not mean that the trial counsel should not have made diligent efforts to meet with him and prepare him for his ultimate testimony.

Mark Fulks, Mark Floyd and Ronnie Fulks were among the three most important lay witnesses called to testify in the sentencing hearing. Had these witnesses been properly

prepared, they would have been able to testify competently about strong mitigating factors, including Mr. Fulks's tragic upbringing, the child abuse Mr. Fulks suffered, Mr. Fulks's parents' alcoholism, and other unfortunate circumstances. Instead, these witnesses were thrown into the water without any oars to paddle or life jackets to float. As a result of Mr. Fulks's ineffective assistance of counsel, the testimony presented to the finder of fact was incomplete and inadequate. A reasonable probability exists that the outcome of the sentencing hearing would have been different had the jury been presented with full and complete testimony.

**XXI.** **CLAIM XXVII: TRIAL COUNSEL WERE INEFFECTIVE FOR ADVISING MR. FULKS TO PLEAD GUILTY BECAUSE THIS ALLOWED THE PROSECUTION TO PRESENT MR. FULKS'S PRIOR BAD ACTS IN CONJUNCTION WITH THE EVIDENCE RELATED TO THE OFFENSE CHARGED**

The government argues that trial counsel's advice that Mr. Fulks plead guilty was reasonable and that Mr. Fulks was not prejudiced by the advice. Opposition at 160-65. Neither argument is credible.

**A.** **Trial Counsel's Advice That Mr. Fulks Plead Guilty Was Not Part Of A Reasonable Trial Strategy.**

The government cites an article written by Mr. Fulks's trial counsel to support its argument that trial counsel's "strategy" of advising Mr. Fulks to plead guilty was reasonable. Opposition at 161 (citing 36 Hofstra L. Rev. 1035, 1044). Since it was trial counsel who advised Mr. Fulks to plead guilty, trial counsel should not be looked to for the authoritative view on whether that advice was reasonable. In addition to the fact that trial counsel presumably thought his advice to Mr. Fulks was reasonable at the time he gave it, as explained in the Amended Motion, lead trial counsel had never tried a federal capital jury trial before Mr. Fulks's case. See Amended Motion at 12-13. As Andrea Lyon – who did not represent Mr. Fulks at trial and who undeniably has far more capital trial experience than Mr. Fulks's trial counsel had – explained: "Experience has taught capital defenders that an open plea of guilt is unlikely to result in a

sentence other than death and further waives issues regarding relative culpability and many appellate issues." See Lyon Decl. ¶ 19 (PA#1).

Even if trial counsel's article were authoritative (and it is not), it does not establish that trial counsel's advice to Mr. Fulks was reasonable. In the article, trial counsel stated: "A denial defense at the guilt or innocence phase is more than twice as likely to result in a death sentence *compared to cases where the defendant acknowledges his guilt from the start*." John H. Blume et al., Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation, 36 Hofstra L. Rev. 1035, 1044 (2008) (emphasis added). Here, Mr. Fulks did not acknowledge his guilt from the start. See Amended Motion at 105-106. Rather, he waited nearly five months before talking with the government about the crimes (id.), and the government used this delay against Mr. Fulks at trial. See e.g., TT 06/01/2004 at 57; see also TT 06/24/2004 at 125-126). Moreover, the evidence trial counsel cited to support the statement in his law review article is based on the impact of the defendant's acceptance of responsibility on the jury. See 83 Cornell L. Rev. 1557, 1575. As explained in Claim XXVIII of Mr. Fulks's Amended Motion (see Amended Motion at 191-92), and as discussed in more detail below, trial counsel failed to explain the concept of acceptance of responsibility to the jury. Thus, it does not follow that Mr. Fulks would have been "twice as likely" to receive the death sentence had he not followed trial counsel's advice here, given that: (1) trial counsel did not advise Mr. Fulks to plead guilty "from the start"; and (2) trial counsel failed to capitalize on Mr. Fulks's acceptance of responsibility.

The government also suggests that trial counsel's advice was reasonable because there was "strong" evidence of Mr. Fulks's guilt. See Opposition at 161. This, however, is the government's opinion and it wholly ignores the fact, which the government does not dispute, that

trial counsel's strategy is widely rejected by experienced capital trial counsel as no "residual doubt" can exist in the minds of the jurors. <u>See</u> Amended Motion at 14. In other words, even if the government's guilt evidence were strong, the government would have had the burden of proving its case and, if jurors had any doubts as to whether the government met its burden, those doubts likely would have impacted the sentencing outcome. Trial counsel's advice that Mr. Fulks relieve the government of its burden and forfeit the benefit any residual doubt would provide him – in exchange for nothing from the government – was unjustified, unsound and unreasonable.

**B.      Mr. Fulks Clearly Was Prejudiced By Trial Counsel's Advice.**

The government argues that Mr. Fulks was not prejudiced by counsel's advice to plead guilty because: (1) Mr. Fulks likely would have pled guilty regardless of trial counsel's advice since "[t]he evidence of Fulks' guilt was overwhelming"; and (2) "[e]ven if Fulks had not pled, much of the evidence of his prior acts would have been admissible at a trial to determine his guilt." Opposition at 162, 164.

As purported support for the first argument, the government points to evidence showing that Mr. Fulks and Mr. Basham embarked upon a crime spree (<u>see</u> Opposition at 162-62), but the government's evidence falls far short of establishing the requisite facts to convict Mr. Fulks of kidnapping resulting or carjacking resulting Alice Donovan's death.

On the second point, the government fails to offer any sound rationale for its argument that evidence of Mr. Fulks's prior bad acts would have been admissible even had Mr. Fulks not pled guilty. It is inconceivable that evidence of Mr. Fulks's alleged rape of two former wives and a former girlfriend would have been admitted to show "Fulks kidnapped Alice Donovan for the purpose of raping her" (<u>see</u> Opposition at 164-65), and the government does not even present a theory for admitting the myriad other evidence of alleged prior bad acts that came in at trial.

<u>See</u> Fed. R. Evid. 404(a),(b).

**XXII.** <u>**CLAIM XXVIII**</u>**: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO EXPLAIN TO THE JURY THE CONCEPT OF ACCEPTANCE OF RESPONSIBILITY**

The government does not (nor could it) dispute that the Sentencing Guidelines recognize a defendant who pleads guilty should be "given a lower offense level than a defendant who has demonstrated no acceptance of responsibility." U.S. Sentencing Guidelines § 3E1.1. The government also does not dispute that Mr. Fulks's trial counsel never argued or introduced expert testimony on the sentencing guidelines or the significance of the fact that Mr. Fulks accepted responsibility. Indeed, the only context in which trial counsel even *mentioned* that Mr. Fulks accepted responsibility was in noting that, by pleading guilty, Mr. Fulks ensured he would spend his life in prison without parole. <u>See</u> Opposition at 166 (citing trial transcripts). Although the government argues that was somehow reasonable, the government's argument defies logic.

Although the government notes that the jury unanimously agreed that "'Chadrick Evan Fulks pleaded guilty to kidnapping and carjacking resulting in death'" (<u>see</u> Opposition at 166), this was a stipulated fact and the jury could not have concluded otherwise. The fact that this was included as a potential mitigating factor does not establish that trial counsel "effectively utilized Fulks' guilty plea to argue acceptance of responsibility," however. <u>See</u> Opposition at 166. Indeed, in addition to advising Mr. Fulks to cooperate with the government, give up his right to avoid self-incrimination, plead guilty, relieve the government of its burden of proof and forfeit the benefit any residual doubt may have on the jury's sentencing recommendation, trial counsel failed to even attempt to get Mr. Fulks the credit he deserved for his cooperation and guilty plea. But for trial counsel's unreasonable actions, it is very likely that the jury would have recommended life rather than death.

**XXIII. CLAIM XXIX: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE GOVERNMENT'S INSERTION OF RELIGION INTO THE TRIAL**

Governmental reliance on religion in penalty-phase closing argument "frustrate[s] the purpose of closing argument, which is to explain to the jury what it has to decide and what evidence is relevant to its decision." Sandoval v. Calderon, 241 F.3d 765, 776 (9th Cir. 2001); see Bennett v. Angelone, 92 F.3d 1336, 1346 (4th Cir. 1996) ("Federal and state courts have universally condemned … religiously charged arguments as confusing, unnecessary, and inflammatory."). Such argument deprives the defendant of a fair trial by encouraging the jury to decide the case on something other than the evidence presented at trial. See Sandoval, 241 F.3d at 776 ("In a capital case … the prosecution's invocation of higher law or extra-judicial authority violates the Eighth Amendment principle that the death penalty may be constitutionally imposed only when the jury makes findings under a sentencing scheme that carefully focuses the jury on the specific factors it is to consider in reaching a verdict."). Here, the government argued that Mr. Fulks's frequent showers—no doubt a consequence of the terrible psychological trauma he suffered as a child—were a futile attempt to "wash away his sins." TT 6/29/2004 at 232. Trial counsel's failure to object to this argument was constitutionally unacceptable and prejudicial to Mr. Fulks.

Contrary to the government's contention, this statement was no mere "veiled reference to biblical language." Opposition, at 169. The "washing away," *i.e.*, the forgiveness, of sins is a core tenet of the Christian faith. *See, e.g.*, Psalm 51:1-2, 7 ("Blot out my transgressions. Wash me thoroughly from my iniquity, and cleanse me from my sin…. Purge me with hyssop, and I shall be clean. Wash me, and I shall be whiter than snow."); 1 Rev. 5 (referring to "Jesus Christ, … who loved us and washed us from our sins in His own blood"); 1 Cor. 6:11 ("And such [*i.e.*, unrighteous] were some of you. But you were washed, but you were sanctified, but you were

justified in the name of the Lord Jesus and by the Spirit of our God."). The government's comment informed the jury that Mr. Fulks was not washed, he was not clean, and hence he was deserving of death under the law of God. Romans 6:23 ("For the wages of sin is death …."). The impropriety of this argument could not be clearer.

Neither was the government's statement a fair response to statements by Mr. Fulks's attorneys. See Howard v. Moore, 131 F.3d 399, 421 (4th Cir. 1997). Trial counsel employed biblical references in two carefully cabined ways. First, trial counsel made extremely brief references to "an eye for an eye" and the prophet Michah as part of an overarchingly secular explanation of the jurors' duty to consider mitigating evidence, including references to philosopher Jean Racine, Abraham Lincoln, and Henry Wadsworth Longfellow. See TT 629/2004 at 163, 173. Second, trial counsel used the example of the Apostle Paul—a well-known historical figure who would be familiar to jurors of any background—to illustrate the principle that Mr. Fulks should be judged by his circumstances, not by some artificial standard of perfection. See TT 6/29/2004 at 212-13. The government's "response" was to inform the jury that Mr. Fulks was an unsaved sinner deserving of death according to biblical mandates. This cannot be considered fair comment on the defense argument.

The government's reference to Mr. Fulks's attempts to "wash away his sins," while brief, was devastating to the defense. Trial counsel's failure to object to the improper argument must not be countenanced by this Court.

## XXIV. CLAIM XXX: TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INTRODUCE EVIDENCE OF MR. FULKS'S ARTISTIC TALENT AS A MITIGATING FACTOR

> "Art is the window to man's soul. Without it, he would never be able to see beyond his immediate world; nor could the world see the man within."
> --Claudia "Lady Bird" Johnson

Without any strategic reason for doing so, trial counsel failed to present to the jury mitigating evidence regarding Mr. Fulks's talent as an artist.  <u>See</u> PA #38.  This evidence would have given the jury a window into "the man within" the individual sitting at the defense table.

The government argues that the presentation of such evidence would have angered the jurors.  To the contrary, presentation of such evidence would have demonstrated to the jury, in a way that no other evidence could, that Mr. Fulks was a unique human being worthy of mercy, not the monster the government made him out to be.  Indeed, artistic talent, like Mr. Fulks's, has been recognized as mitigating by numerous courts.  <u>See, e.g.</u>, <u>Davis v. State</u>, 990 So.2d 459, 462 n.2 (Fla. 2008); <u>Scott v. State</u>, 937 So.2d 1065, 1089 (Ala. Crim. App. 2005); <u>Fudge v. State</u>, 120 S.W.3d 600, 602-03 (Ark. 2003).  Trial counsel's failure to present this evidence unquestionably undermines confidence in the outcome of the proceedings.

## XXV. <u>CLAIM XXXI</u>:  EVEN IF THIS COURT FINDS THE ABOVE ERRORS HARMLESS, THE CUMULATIVE EFFECT OF THOSE ERRORS, COMBINED WITH THE KNOWLEDGE THAT MR. FULKS WAS TELLING THE TRUTH ABOUT THE LOCATION OF ALICE DONOVAN'S BODY, MEAN THAT MR. FULKS'S SENTENCE MUST BE VACATED AND THE CASE RETRIED

The cumulative error doctrine recognizes the elemental fact that while an error might be harmless in isolation, in combination with other "harmless" errors, the result can be a trial so permeated with unfairness that the result cannot be allowed to stand.  <u>See United States v. Smith</u>, 502 F.3d 680, 690 (7th Cir. 2007) ("Although any single error by itself may be insufficient to taint a jury, the combined effect of multiple erroneous rulings may result in significant harm necessitating another trial."); <u>United States v. Rivera</u>, 900 F.2d 1462, 1469 (10th Cir. 1990) ("The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. The purpose of a cumulative-error analysis is to address that possibility.").  That is precisely the case here:  there were multiple, serious errors in the conduct of Mr. Fulks's trial.  Even if this Court does not

believe that these errors, individually, mandate reversal, their cumulative effect was devastating. The cumulative effect of these multiple errors is magnified a hundred-fold by the government's insistence that Mr. Fulks had successfully concealed the location of Ms. Donovan's body, a claim that we now know to be completely and utterly incorrect.

The manner in which individual errors combined to deny Mr. Fulks a fair trial is illustrated, but certainly not exhausted, by the manner in which the District Court's instructional errors combined with the government's improper closing argument to encourage the jury to disregard plainly relevant mitigating evidence. See Amended Motion Claims V and VI, discussed *supra*. The District Court instructed the jurors to decide for themselves whether proffered evidence was mitigating; the prosecution, in its closing argument, then told the jurors that evidence of Mr. Fulks's nightmarish childhood was *not* mitigating because it bore no causal nexus to the offense. The instruction opened the door, and the government's argument provided the jury the means to walk through. Individually, these errors might have been excused (although Mr. Fulks certainly does not concede such), but together they ensured that Mr. Fulks was sentenced by a jury utterly unconstrained by the fundamental requirement of individualized consideration of the defendant that is vital to valid imposition of the death penalty.

In addition to the cumulative effect of the numerous errors that infected Mr. Fulks's guilty plea and penalty-phase proceedings, the recent discovery of the remains of Alice Donovan is a landscape-altering event for this litigation. Mr. Fulks's trial was permeated by the government's assertion, now known to be without basis in fact, that Mr. Fulks had misled authorities regarding the location of Ms. Donovan's remains. We now know that Mr. Fulks's efforts to locate Ms. Donovan's body were truthful and sincere. The inescapable fact is that, were it not for Mr. Fulks's persistence, Alice Donovan's remains would never have been

recovered and her family would never have the measure of peace provided by being able to bury their loved one.

Instead of a penalty-phase proceeding in which Mr. Fulks's efforts to assist in the recovery of Ms. Donovan's remains were presented as mitigating evidence, Mr. Fulks was subjected to a proceeding in which he was inaccurately portrayed as a liar on this point and accused of deliberately heightening the pain of a grieving family by his conduct. TT 6/29/2004 at 221 ("I submit to you, that that is what makes this crime *more aggravating*…. The fact that they successfully disposed of her body *so that the victims will not be able to bury her* …." (emphasis added)). The "fact" of Mr. Fulks's alleged falsehoods was presented to the jury as a reason to sentence him to death. See id. at 220-21 ("Should Chad Fulks and Brandon Basham be rewarded [with life sentences] because they successfully were able to conceal the body of Alice Donovan?"). As explained in Claim XXXIII,[9] the recovery of Alice Donovan's remains establishes that the capital sentencing jury was allowed to consider, and very likely relied upon, materially false information in sentencing Mr. Fulks to death in violation of his Fifth and Eighth Amendment rights. As a matter of law, equity, and good conscience, Mr. Fulks is entitled to a sentencing proceeding in which the jury's decision is based on *accurate* information regarding his efforts to help locate the remains of Alice Donovan.

## XXVI. <u>CLAIM XXXII</u>: THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT MR. FULKS'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT

The manner of carrying out Mr. Fulks's execution poses "a substantial risk of serious harm," <u>Baze v. Rees</u>, 128 S. Ct. 1520, 1532 (2008) (plurality opinion) (internal quotation marks omitted), and thus violates the Eighth Amendment prohibition on cruel and unusual punishment.

---

[9] Claim XXXIII is filed contemporaneously herewith as an attachment to Mr. Fulks's Motion to Supplement the Pleadings.

The constitutional violation arises from the combination of drugs used, the protocol governing the execution, which is inadequate to ensure the proper administration of the drugs, and the use of untrained, unqualified, non-medical personnel.  In light of this Eighth Amendment violation, Mr. Fulks's execution cannot be carried out in the manner the government currently intends.

## CONCLUSION

Based upon the foregoing, and upon the entire record of the case, it is clear that Mr. Fulks's guilty plea and sentence violated his constitutional rights in numerous ways.  Mr. Fulks respectfully requests the following relief:

1. That this Court conduct an evidentiary hearing to address all material and disputed issues of fact;

2. That the Court permit oral argument regarding the merits of the Amended Motion;

3. That, at the conclusion of the proceedings, that the Court order the following, as appropriate:

    (a) That Mr. Fulks's guilty plea and death sentence be vacated and the case be retried;
    (b) That Mr. Fulks's death sentence be vacated and a sentence of life imprisonment imposed;
    (c) That Mr. Fulks's death sentence be vacated and the matter set for re-trial.

Respectfully submitted,


/s/ Kirsten E. Small
Kirsten E. Small (Fed ID No. 10005)
NEXSEN PRUET, LLC
55 East Camperdown Way (29601)
Post Office Drawer 10648
Greenville, SC 29603-0648
PHONE: 864.370.2211
FACSIMILE: 864.282.1177
KSmall@nexsenpruet.com

/s/ Beattie B. Ashmore
Beattie B. Ashmore (Fed. ID No. 5215)
BEATTIE B. ASHMORE, P.A.
Attorney at Law
650 E. Washington Street
Greenville, SC 29601
(864) 467-1001
Beattie@beattieashmore.com

Attorneys for Mr. Fulks

July 17, 2009
Greenville, South Carolina