Westlaw.

452 S.W.2d 169

452 S.W.2d 169

**(Cite as: 452 S.W.2d 169)**

Page 1

Supreme Court of Missouri, Division No. 1.
STATE of Missouri, Respondent,
v.
Benny Louis RASPBERRY, Appellant.
**No. 54255.**

April 13, 1970.

Defendant was convicted in the Circuit Court, Jackson County, Division Number Fourteen, Robert A. Meyers, J., of first-degree murder and he appealed. The Supreme Court, Kenneth R. Lewis, Special Judge, held that trial court did not abuse discretion in not granting new trial on ground that when juror in authorized telephone call to his family during trial heard that Senator Robert Kennedy had been assassinated, juror became prejudiced against defendant who was on trial for killing a man in a similar manner.

Affirmed.

West Headnotes

**[1] Criminal Law 110 €═1064(6)**

110 Criminal Law
    110XXIV Review
        110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
            110XXIV(E)3 Motions for New Trial or in Arrest
                110k1064 Statement of Grounds for New Trial or in Arrest
                    110k1064(6) k. Proceedings at Trial in General. Most Cited Cases
The Supreme Court was precluded from considering that part of prosecutor's closing argument not included in defendant's motion for new trial, regardless of objections made at the trial. V.A.M.R. Crim. Rule 27.20.

**[2] Criminal Law 110 €═2146**

110 Criminal Law
    110XXXI Counsel
        110XXXI(F) Arguments and Statements by Counsel
            110k2145 Appeals to Sympathy or Prejudice
                110k2146 k. In General. Most Cited Cases
    (Formerly 110k713)
Prosecutor may not personalize his argument to the jury.

**[3] Criminal Law 110 €═857(1)**

110 Criminal Law
    110XX Trial
        110XX(J) Issues Relating to Jury Trial
            110k857 Deliberations in General
                110k857(1) k. In General. Most Cited Cases
Jury must act objectively, without fear or prejudice.

**[4] Criminal Law 110 €═2155**

110 Criminal Law
    110XXXI Counsel
        110XXXI(F) Arguments and Statements by Counsel
            110k2145 Appeals to Sympathy or Prejudice
                110k2155 k. Appeals to Fears of Jury. Most Cited Cases
    (Formerly 110k723(4))
Jury must determine guilt or innocence of defendant from evidence and it is improper for prosecutor to taint jurors' judgment with suggestions of personal danger to them or their families if defendant is acquitted.

**[5] Criminal Law 110 €═2143**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

452 S.W.2d 169                                                    Page 2
452 S.W.2d 169
**(Cite as: 452 S.W.2d 169)**

110 Criminal Law
    110XXXI Counsel
        110XXXI(F) Arguments and Statements by
Counsel
          110k2140 Comments on Character or
Conduct
           110k2143 k. Character, Conduct, or
Appearance of Accused. Most Cited Cases
    (Formerly 110k722.3, 110k722(2))
It is improper for prosecutor to argue with respect
to defendant's character or criminal proclivities or
as to necessity of deterring him from committing
further crimes.

**[6] Criminal Law 110 ☞2150**

110 Criminal Law
    110XXXI Counsel
        110XXXI(F) Arguments and Statements by
Counsel
          110k2145 Appeals to Sympathy or Preju-
dice
           110k2150 k. Comments on Frequency
of Offenses, and Appeals for Law Enforcement.
Most Cited Cases
    (Formerly 110k723(3))
Prosecutor may argue necessity of law enforcement
and ask for severe penalty as deterrent to others.

**[7] Criminal Law 110 ☞2192**

110 Criminal Law
    110XXXI Counsel
        110XXXI(F) Arguments and Statements by
Counsel
          110k2191 Action of Court in Response to
Comments or Conduct
           110k2192 k. In General. Most Cited
Cases
    (Formerly 110k867)
Every instance of prosecutor exceeding limits of le-
gitimate argument is not cause for declaring a mis-
trial.

**[8] Criminal Law 110 ☞867.1**

110 Criminal Law
    110XX Trial
        110XX(J) Issues Relating to Jury Trial
          110k867 Discharge of Jury Without Ver-
dict; Mistrial
           110k867.1 k. In General. Most Cited
Cases
    (Formerly 110k867)

**Criminal Law 110 ☞867.5**

110 Criminal Law
    110XX Trial
        110XX(J) Issues Relating to Jury Trial
          110k867 Discharge of Jury Without Ver-
dict; Mistrial
           110k867.5 k. Otherwise Irreparable Er-
ror or Prejudice in General. Most Cited Cases
    (Formerly 110k867)
Declaration of mistrial is drastic remedy and should
be exercised only in extraordinary circumstances
where prejudicial effect can be removed in no other
way.

**[9] Criminal Law 110 ☞1152.19(7)**

110 Criminal Law
    110XXIV Review
        110XXIV(N) Discretion of Lower Court
          110k1152 Conduct of Trial in General
           110k1152.19 Counsel
            110k1152.19(7) k. Arguments and
Statements by Counsel. Most Cited Cases
    (Formerly 110k1154, 110k154)
Determination of whether to call mistrial as result
of prosecutor exceeding limits of legitimate argu-
ment rests largely within discretion of trial judge
who observed incident and can best gauge its preju-
dicial effect upon jury.

**[10] Criminal Law 110 ☞1152.19(7)**

110 Criminal Law

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

452 S.W.2d 169
452 S.W.2d 169
(Cite as: 452 S.W.2d 169)

Page 3

110XXIV Review
    110XXIV(N) Discretion of Lower Court
      110k1152 Conduct of Trial in General
        110k1152.19 Counsel
          110k1152.19(7) k. Arguments and Statements by Counsel. Most Cited Cases
    (Formerly 110k1154, 110k154)
Function of Supreme Court on denial of mistrial on ground of alleged prejudicial argument of prosecutor is to determine whether, as matter of law, trial court abused its discretion in refusing to declare a mistrial.

**[11] Criminal Law 110 ⚷2150**

110 Criminal Law
    110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
        110k2145 Appeals to Sympathy or Prejudice
        110k2150 k. Comments on Frequency of Offenses, and Appeals for Law Enforcement. Most Cited Cases
    (Formerly 110k723(3))

**Criminal Law 110 ⚷2155**

110 Criminal Law
    110XXXI Counsel
      110XXXI(F) Arguments and Statements by Counsel
        110k2145 Appeals to Sympathy or Prejudice
        110k2155 k. Appeals to Fears of Jury. Most Cited Cases
    (Formerly 110k723(4))
Statements in prosecutor's closing argument in murder case "Let us make believers out of these vicious murderers. Let's put a stop to it * * * for the sake of your children, and for your wives, and for your families," and that "I hope you give him sixty, or seventy, or eighty or ninety years, so he can't do this again" were improper, but trial court did not abuse its discretion in not declaring a mistrial.

**[12] Criminal Law 110 ⚷1178**

110 Criminal Law
    110XXIV Review
      110XXIV(R) Error Waived in Appellate Court
        110k1178 k. In General. Most Cited Cases
Alleged errors complained of in motion for new trial but not pursued on appeal would be considered abandoned.

**[13] Criminal Law 110 ⚷855(8)**

110 Criminal Law
    110XX Trial
      110XX(J) Issues Relating to Jury Trial
        110k855 Misconduct of or Affecting Jurors
        110k855(8) k. Communication Between Jurors and Third Persons. Most Cited Cases
General rule against jurors' using telephone during trial of felony case does not apply when telephone calls are authorized by court and made under supervision of court nor when defendant acquiesces in allowance of such telephone use.

**[14] Criminal Law 110 ⚷855(8)**

110 Criminal Law
    110XX Trial
      110XX(J) Issues Relating to Jury Trial
        110k855 Misconduct of or Affecting Jurors
        110k855(8) k. Communication Between Jurors and Third Persons. Most Cited Cases
Where defendant's counsel did not object at time jurors requested to call their families and agreed that calls might be allowed, a telephone call by one juror was not, in and of itself, improper.

**[15] Criminal Law 110 ⚷928**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

452 S.W.2d 169
452 S.W.2d 169
**(Cite as: 452 S.W.2d 169)**

Page 4

110 Criminal Law
   110XXI Motions for New Trial
      110k924 Misconduct of or Affecting Jurors
         110k928 k. Communications by or with
Jurors. Most Cited Cases
Receipt by juror of possibly prejudicial information during trial of felony case requires that verdict be set aside unless state affirmatively shows that juror was not subject to improper influence.

**[16] Criminal Law 110 &#10150;925(1)**

110 Criminal Law
   110XXI Motions for New Trial
      110k924 Misconduct of or Affecting Jurors
         110k925 In General
            110k925(1) k. In General. Most Cited
Cases
Allowance of new trial for alleged misconduct of juror is largely within discretion of trial court.

**[17] Criminal Law 110 &#10150;855(8)**

110 Criminal Law
   110XX Trial
      110XX(J) Issues Relating to Jury Trial
         110k855 Misconduct of or Affecting Jurors
            110k855(8) k. Communication
Between Jurors and Third Persons. Most Cited Cases
Purpose of rule against unauthorized communication between jurors and third persons during trial of felony case is to prevent jury from receiving information about the case under consideration not part of the evidence.

**[18] Criminal Law 110 &#10150;928**

110 Criminal Law
   110XXI Motions for New Trial
      110k924 Misconduct of or Affecting Jurors
         110k928 k. Communications by or with
Jurors. Most Cited Cases
Trial court did not abuse discretion in not granting new trial on ground that, when juror in authorized telephone call to his family during trial heard that Senator Robert Kennedy had been assassinated, juror became prejudiced against defendant who was on trial for killing a man in a similar manner.

**[19] Criminal Law 110 &#10150;656(8)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k654 Remarks and Conduct of Judge
            110k656 Comments on Evidence or
Witnesses
               110k656(8) k. Expression of Opinion as to Facts in Issue. Most Cited Cases

**Criminal Law 110 &#10150;865(1.5)**

110 Criminal Law
   110XX Trial
      110XX(J) Issues Relating to Jury Trial
         110k865 Urging or Coercing Agreement
            110k865(1.5) k. "Allen," "Dynamite,"
or "Hammer," Etc., Charge. Most Cited Cases
   (Formerly 110k865(1))
It is improper for trial judge to intimate his opinion of the merits, but he may in stressing importance of verdict detail to jury the ills attendant on a disagreement and unless remarks amount to coercion they are permissible.

**[20] Criminal Law 110 &#10150;656(1)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k654 Remarks and Conduct of Judge
            110k656 Comments on Evidence or
Witnesses
               110k656(1) k. In General. Most Cited Cases

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

452 S.W.2d 169                                Page 5
452 S.W.2d 169
(Cite as: 452 S.W.2d 169)

**Criminal Law 110 ☞865(2)**

110 Criminal Law
    110XX Trial
        110XX(J) Issues Relating to Jury Trial
            110k865 Urging or Coercing Agreement
                110k865(2) k. Time of Keeping Jury
Together. Most Cited Cases
Statements of trial judge to jury at 8:35 p. m. to effect that there were a large number of witnesses that had testified in the case and that jury had been deliberating since 11:30 a. m. were permissible and not prejudicial on theory that they were comments on the evidence and that jury could have inferred that judge felt jury was taking unreasonable length of time in arriving at verdict when all of testimony, except that of the defendant, had been in support of state's case.

*171 John C. Danforth, Atty. Gen., Michael L. Boicourt, Asst. Atty. Gen., Jefferson City, for respondent.

J. Arnot Hill, Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellant.

KENNETH R. LEWIS, Special Judge.

Defendant, Benny Louis Raspberry, was charged by indictment with murder in the first degree for allegedly inflicting upon one James Willie Graham fatal gunshot wounds on February 3, 1968, in Jackson County, Missouri. Defendant was found guilty by a jury as charged and sentenced to life imprisonment.

It is not contended on this appeal that the evidence was insufficient to sustain a conviction. Therefore, the statement of the facts need only be in a summary form. The evidence on behalf of the state was that on the evening of February 2, 1968, at approximately nine o'clock, the deceased, James Willie Graham, and a companion, one Ulysses Stewart, entered a bar known as the Last Roundup on Twelfth Street in Kansas City, Missouri. At about eleven o'clock that evening the defendant appeared outside the bar and was seen looking in the window. On one occasion when Graham went outside to talk to a female acquaintance, the defendant was overheard saying that he was 'going to kick James' ass.' A brief argument ensued, the nature of which is not disclosed by the record, and then Graham went back into the tavern. The defendant was seen outside the bar by several witnesses at various times later that evening and, in view of subsequent events, the jury could have reasonably concluded that the defendant was keeping Graham under surveillance. Graham and Stewart remained at The Last Roundup until it closed at about 1:30 a.m. on the following morning. They then proceeded on foot to a nearby restaurant called the Chicken Shack. The defendant apparently followed as he was next seen standing on the sidewalk outside the Chicken Shack. After placing an order, Graham walked out on the sidewalk and approached a young boy identified in the evidence only as Tomcat. The defendant was standing just a few feet away as Graham talked to this boy. Without any words passing between them, the defendant suddenly pulled a handgun and shot Graham in the face from a distance*172 of about five feet. Graham turned and made an effort to get back into the Chicken Shack when he was shot a second time in the back of the head. Graham fell mortally wounded in the doorway of the restaurant and died the following morning. The motive for the killing is not reflected by the evidence.

The only testimony for the defense was that of the defendant. He testified that he was standing outside the Chicken Shack when Graham came out and asked the boy called Tomcat for money to buy a drink. The defendant claimed that Graham then poked Tomcat with a club he was carrying. Thereupon, according to the defendant, Tomcat backed off, put his hand in his pocket and said, 'I am not going to give you no more money.' The defendant testified that he then heard two shots and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

452 S.W.2d 169                                Page 6
452 S.W.2d 169
**(Cite as: 452 S.W.2d 169)**

Graham fell to the sidewalk. It was denied by the defendant that he had thereatened the deceased.

[1] The defendant's first contention is that the court erred in overruling his motion to discharge the jury because of alleged prejudicial statements of the prosecuting attorney in his closing argument. The defendant attacks several portions of the prosecutor's closing argument, but in only two instances did the defendant properly preserve the alleged errors for appellate review by including them in his motion for new trial. We are precluded from considering that part of the prosecutor's closing argument which was not included in the motion for new trial regardless of objections made at the trial. Supreme Court Rule 27.20, V.A.M.R.; State v. Laster, 365 Mo. 1076, 293 S.W.2d 300.

The first portion of the prosecutor's closing argument for which the alleged error of the trial court was properly preserved in the motion for new trial was as follows: 'Let us make believers out of these vicious murderers. Let's put a stop to it. Not for a feather in my cap; for the sake of your children, and for your wives, and for your families, for the sake of the people of the community.'Counsel for defendant objected for the reason that the argument was an attempt to personalize the case with the jury. He moved that the jury be instructed to disregard the statement and further moved for a mistrial. The trial judge sustained the objection, instructed the jury to disregard the statement, but overruled the motion to declare a mistrial and discharge the jury.

The second portion of the state's closing argument complained of and preserved in the defendant's motion for new trial was: '* * * I hope you don't put him back on the streets. I hope you give him sixty, or seventy, or eighty or ninety years, so he can't do this again.'The defendant objected to this argument on the ground that the statement 'so he can't do this again' was a comment on the character of the defendant when his character had not been put at is-

sue. Defendant did not place his character at issue when he testified. Defendant's objection was sustained and the jury was instructed to disregard the prosecutor's statement. The motion to declare a mistrial was overruled.

[2][3][4][5][6] At the outset we must agree that the prosecutor's argument was improper in the two instances recited. It is well settled that the prosecutor may not personalize his argument to the jury. The jury must act objectively, without fear or prejudice. They must determine the guilt or innocence of the defendant from the evidence and it is improper for the prosecutor to taint their judgment with suggestions of personal danger to them or their families if the defendant is acquitted. See State v. Groves, Mo., 295 S.W.2d 169. It has likewise been held improper for the prosecutor to argue with respect to the defendant's character or criminal proclivities and the necessity of deterring him, not as an example to others, but to prevent the defendant on trial from committing further crimes. See State v. Mobley, Mo., 369 S.W.2d 576. In other words, a defendant is on trial for what he has or has not done and not for what he might do. This is not to say that the *173 prosecutor may not argue the necessity of law enforcement and ask for a severe penalty as a deterrent to others. See State v. Laster cited above.

[7][8][9][10][11] While the prosecutor in this case in some degree exceeded the bounds of legitimate argument, what we are called upon by defendant to hold is that the trial court erred in not declaring a mistrial because of these statements of the prosecutor. In examining the cases cited to us by the defendant we find them to be distinguishable. See State v. Groves and State v. Mobley cited above and also State v. Tiedt, 357 Mo. 115, 206 S.W.2d 524. These cases involved situations wherein the trial court overruled the objections and failed to instruct the jury to disregard the objectionable argument. In other words, the court took no affirmative action in the cases cited to purge from the minds of the jurors the improper argument. That is not the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

452 S.W.2d 169
452 S.W.2d 169
**(Cite as: 452 S.W.2d 169)**

Page 7

case before us. Here, the court properly sustained the objections and in each instance instructed the jury to disregard the argument. As was stated by this court in the Mobley case (369 S.W.2d 582(7)):'We would have a somewhat different question here if the court had taken some action in connection with the erroneous parts of the argument; we might then need to determine whether the drastic remedy of a mistrial was required.'Every instance of a prosecutor exceeding the limits of legitimate argument is not a cause for declaring a mistrial. The declaration of a mistrial is, as stated, a drastic remedy and should be exercised only in extraordinary circumstances where the prejudicial effect can be removed in no other way. See State v. Smith, Mo., 431 S.W.2d 74;State v. James, Mo., 347 S.W.2d 211;State v. Camper, Mo., 391 S.W.2d 926. This determination rests largely within the discretion of the trial judge who observed the incident and can best gauge its prejudicial effect upon the jury. See State v. Simth cited above. The function of this court is to determine whether as a matter of law the trial court abused its discretion in refusing to declare a mistrial. The portions of the prosecutot's closing argument complained of on this appeal, while improper, were certainly not extreme. Much stronger language has been allowed by this court in a closing argument. See State v. Laster, 365 Mo. 1076, 293 S.W.2d 300, 306. We cannot under the circumstances presented hold as a matter of law that the trial court abused its discretion in not declaring a mistrial.

We shall consider next the contention that the trial court erred in not sustaining defendant's motion for new trial on the ground that a member of the jury received information from his wife during the trial which was calculated to prejudice the juror against the defendant.

The trial of this cause commenced on June 4, 1968, and the jury returned a verdict on the evening of June 6, 1968. This being a capital case the jury was not allowed to separate. The incident giving rise to the defendant's claim of error occurred at the conclusion of the second day of trial. Before recessing for the night, the court properly admonished the jury not to discuss the case during the recess among themselves or with third persons. The jury was then taken from the courtroom in charge of the bailiff to be conducted to a hotel for the night. In the hallway outside the courtroom one or two jurors approached the trial judge and asked permission to telephone their homes for the purpose of advising their families that they would not be home again that night. Upon receiving these requests, the court conferred with the attorneys for both sides. Defendant's counsel did not object at this time to the allowance of these telephone calls and in fact the record indicates that he agreed that they be allowed. The jurors were permitted to use the telephone in the clerk's office with the bailiff present.

[12] At the hearing held on defendant's motion for new trial, the defendant called as a witness Mrs. Robert Gattenby, the wife of the foreman of the jury. Mrs. *174 Gattenby testified that her husband telephoned her on June 5, 1968, and that during the conversation she had 'probably' told him of the assassination of Senator Robert Kennedy which had taken place earlier that day. The defendant asserts on this appeal that the receipt by juror Gattenby of the news of the Senator Kennedy assassination worked to prejudice the juror against the defendant who was on trial for killing a man in a similar manner. The defendant's reasoning seems to be that the assassination of such a prominent political figure would have given rise to a vindictive attitude on the part of a juror toward all persons accused of like offenses. The defendant's motion for new trial did not specifically refer to the matter of the Kennedy assassination. The portion of the motion concerning the telephone call of juror Gattenby dealt with other allegedly prejudicial information received at the time of the call and the further fact that the call had not been monitored by the court. juror Gattenby did not testify at the hearing on the motion for new tri-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

452 S.W.2d 169

Page 8

452 S.W.2d 169
(Cite as: 452 S.W.2d 169)

al, but by affidavit he denied the allegations in defendant's motion concerning the receipt by him of prejudicial information during the telephone conversation with his wife. He further denied in the affidavit that any prejudicial information had been passed on to the other members of the jury. Since the affidavit was filed in response to only those matters raised in the motion for new trial, it contained no reference to the Kennedy assassination. Supreme Court Rule 27.20(a), V.A.M.R., requires that the specific grounds for a new trial must be 'set forth in detail and with particularity' in the motion for new trial, which the defendant failed to do with reference to the information concerning the Kennedy assassination. The alleged errors actually complained of in the motion for new trial were not pursued on this appeal and are considered abandoned. These facts could be dispositive of this point. However, since the point presented on appeal raises a question of denial of a fair trial, we will consider it on its merits.

[13][14] The defendant states at one point in his brief that he is not complaining about separation as such, but rather that prejudicial information was imparted to one of the jurors. Nonetheless, the defendant has cited several cases as authority for the proposition that unauthorized communications between jurors and third persons during the trial of a felony case are forbidden. See State v. Malone, 333 Mo. 594, 62 S.W.2d 909;State v. Jones, 363 Mo. 998, 255 S.W.2d 801;State v. Quinn, Mo., 405 S.W.2d 895. However, what we are dealing with in the case at bar is a situation wherein the trial court authorized the use of the telephone, without objection by the defendant, prior to the submission of the case to the jury for deliberation. The general rule against telephone use by jurors during the trial of a felony case does not apply when the telephone calls are authorized by the court and made under the supervision of the court.State v. Bayless, 362 Mo. 109, 240 S.W.2d 114. Nor does this rule apply when the defendant acquiesces in the allowance of

such telephone use.State v. Gilmore, 336 Mo. 784, 81 S.W.2d 431. As was aptly stated in the Gilmore case at page 433(5, 6): '* * * If a defendant and his attorneys in such a case sit idly by and do not raise the question until in the motion for a new trial the point must be considered waived. This for the very good reason that a party to a lawsuit may not keep a matter of this kind in the background, gamble on a verdict, and in case it is against him bring forth the question for the first time and obtain a new trial.'Under the facts of the instant case, we hold that the telephone call by juror Gattenby was not, in and of itself, improper.

[15][16][17][18] The receipt by a juror of possibly prejudicial information during the trial of a felony case requires that the verdict be set aside unless the state affirmatively shows that the juror was not subject to improper influences.State v. Jones, 363 Mo. 998, 255 S.W.2d 801. In the case before us the state made this affirmative showing by the affidavit of juror Gattenby *175 which the trial court considered when it denied the defendant's motion for new trial. The matter of allowing a new trial for alleged misconduct of a juror is largely within the discretion of the trial court.State v. McDaniel, Mo., 392 S.W.2d 310. Therefore, what we are called upon to decide is whether the trial court abused its discretion in not granting a new trial. Simply stated, the defendant's contention is that the receipt by a juror during the trial of a felony case of information concerning a totally unrelated crime, standing alone, requires the granting of a new trial. reason dictates otherwise. The purpose of the rule against communications is to prevent the jury from receiving information about the case under consideration which is not part of the evidence. There was certainly no connection between the Kennedy assassination and the instant case. We do not subscribe to the defendant's theory that the hysteria engendered by the assassination would cause a juror to react against a defendant on trial for a totally different offense. If the assassination

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

452 S.W.2d 169
452 S.W.2d 169
**(Cite as: 452 S.W.2d 169)**

Page 9

had occurred the day before the trial commenced and all of the jurors had known of it, could the defendant claim prejudice and gain a new trial? We think not. We cannot hold as a matter of law that the trial court abused its discretion in not granting a new trial on this ground.

The remaining point concerns a comment made by the trial judge to the jury after the case had been submitted and the jury had deliberated for several hours without progress. At approximately 8:35 p.m. the court made the following statement to the jury: 'There were a large number of witnesses that testified in this case, although this case itself was not what you might consider a lengthy one. You have been deliberating since approximately 11:30 this morning, with time out for lunch and supper. I will read you another instruction, gentlemen, at this time.' At this point the court read to the jury an instruction concerning the desirability of reaching a verdict, which instruction the defendant has not questioned on this appeal. The defendant contends that the oral statement by the court prior to giving the instruction was a prohibited comment on the evidence. The defendant points out that eleven witnesses testified for the state and none for the defense other than the defendant. It is asserted by the defendant that the jury could have inferred from the remarks of the court that the judge felt that they were taking an unreasonable length of time in arriving at a verdict when all of the testimony, except that of the defendant, had been in support of the state's case. The alleged inference was that the jury should return a verdict of guilty. We cannot sustain this contention.

[19][20] It is improper for the trial judge to "intimate his opinion of the merits." State v. Keller, Mo., 344 S.W.2d 65, 68. He may, however, in stressing the importance of a verdict "detail to the jury the ills attendant on a disagreement" and 'unless the remarks made by the trial judge amount to coercion' they are permissible. State v. Stegall, Mo., 327 S.W.2d 900, 902. We cannot conclude

that the comments of the court were in any way intended by the court or taken by the jury as comments on the evidence. It is inconceivable that the court's remarks coerced the jurors to act against their wills to arrive at a verdict of guilty. We hold that the comments herein were within the permissible limits of the trial judge's judicial prerogative and that the defendant was not prejudiced thereby.

Judgment affirmed.

HOLMAN, J., and HENLEY, Alternate Judge, concur.
SEILER, P. J., not sitting.
Mo. 1970.
State v. Raspberry
452 S.W.2d 169

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## Westlaw.

Slip Copy                                        Page 1
Slip Copy, 2009 WL 36599 (N.D.Fla.)
**(Cite as: 2009 WL 36599 (N.D.Fla.))**

Only the Westlaw citation is currently available.

United States District Court, N.D. Florida,
Panama City Division.
Javier RAMOS, Petitioner,
v.
Walter A. McNEIL,[FN1] Respondent.

> FN1. Walter A. McNeil succeeded James R. McDonough as Secretary of the Florida Department of Corrections, and is automatically substituted as the respondent. Fed.R.Civ.P. 25(d)(1).

No. 5:06cv48/SPM/MD.

Jan. 5, 2009.

West KeySummary
**Criminal Law 110 ☜1931**

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1931 k. Experts; Opinion Testimony. Most Cited Cases
Defense counsel who did not object to a forensic pathologist's testimony on grounds that the she was unqualified to give her opinion was not ineffective counsel. The pathologist opined that the decedent had been shot in the neck while standing and then shot in the head from behind while the decedent had his head near or in close proximity to the wall and floor. The forensic pathologist was found to have education, knowledge, skill, experience, and training that qualified her to express an opinion. Defendant did not show that had defense counsel objected to the pathologist's testimony on grounds of inadequate qualification that the objection would have been successful. West's F.S.A. § 90.704.

Benjamin Samuel Waxman, Robbins Tunkey Ross, et al, Miami, FL, for Petitioner.

Edward C. Hill, Jr.,, Attorney General, Tallahassee, FL, for Respondent.

*ORDER and REPORT AND RECOMMENDATION*

MILES DAVIS, United States Magistrate Judge.

*1 Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1). Respondent has filed a response (doc. 21) to which Mr. Ramos has replied (doc. 40). The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). After careful consideration of all issues raised by Mr. Ramos, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Mr. Ramos is not entitled to relief, and that the petition is without merit and should be denied.

BACKGROUND AND PROCEDURAL HISTORY[FN2]

> FN2. The facts stated herein are those presented at trial and viewed in the light most favorable to the prosecution. Due process requires a state to prove each element of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When a federal court examines the sufficiency of the evidence on review, the role

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Page 2
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

of the court is not to reweigh the evidence or to determine whether the evidence established guilt beyond a reasonable doubt. *Id.* at 319.The proper inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, the federal court believes that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* Where there are conflicting inferences and disputes exist, this court must presume that the jury resolved such conflicts in favor of the prosecution, and must defer to that resolution. *Martin v. State of Alabama,* 730 F.2d 721,724 (11th Cir.1984). Although this court is not called on to address directly the sufficiency of the evidence, the evidence presented to the jury plays a major part in the court's analysis.

Petitioner, Javier Ramos, a Miami, Florida native, moved to the Panama City, Florida area when he left the Air Force in the early 1990's. There he befriended Allen Johnson, the owner of two exotic dance clubs, the Show and Tail and the Toy Box, both in Panama City. Mr. Ramos went to work at the Show and Tail as doorman, and was ultimately promoted to manager of the Toy Box. Chris McConnell was the general manager of the two clubs. In the autumn of 1994 Mr. Ramos decided to leave, and found work at a club in Miami. He was living at the time with Joe Clark, a doorman at the Toy Box, and two dancers, Cheryl Mason and Lisa Wilcox. Mr. Ramos planned to take some of the clubs' dancers to Miami, and two, Christine Ingersol and Dianne Steel, went with him. Mr. Ramos managed a club in Miami for a short time, and on October 2, 1994 returned to Panama City. Shortly before he left he told one of his dancers, Candace Fandrie, that he had to take care of some people in Panama City. Ms. Fandrie asked what he meant-did he mean to kill somebody? Mr. Ramos responded that he would if he had to.

Mr. Ramos drove to Panama City, arriving at his prior residence on the afternoon of Sunday, October 2, 1994. He awoke the next morning at around 6:00 and went to breakfast with Mr. Clark and Ms. Mason. After breakfast Mr. Ramos and Mr. Clark dropped Ms. Mason at home and drove around for a while. Mr. Ramos gave Mr. Clark a .22 caliber pistol. The two of them intended to talk to the general manager, Chris McConnell. Mr. Clark said Mr. McConnell had done him wrong, and Mr. Ramos said Mr. McConnell had been saying bad things about Mr. Ramos. Mr. Ramos wanted to intimidate Mr. McConnell. They drove to the Show and Tail, watching for Mr. McConnell to show up. Mr. McConnell received a telephone call at home, and told his girlfriend, Carla Delatory, that Mr. Ramos and Mr. Clark were waiting to talk to him at the Show and Tail. Shortly thereafter Mr. Ramos and Mr. Clark saw Mr. McConnell drive into the back lot of the club, so they went in the front door.[FN3] Inside they found John LaForge, a bartender at the club who cleaned up on Monday mornings, and Eron Ayers, who had given Mr. LaForge a ride to the club that morning.

> FN3. Due to conflicts in the testimony, the sequence of events leading up to Mr. Ramos and Mr. Clark entering the Show and Tail is unclear. The differences are not material.

*2 What happened next is not altogether clear (as will be explained in more detail below), but when the shooting stopped, Mr. LaForge, Mr. Ayers, Tony Lands, a maintenance man at the club who had come to pick up his paycheck, and Mr. McConnell were dead. The four men suffered sixteen gunshot wounds between them, and all four had been shot twice in the head. Jewelry was removed from the bodies of two of the men, Mr. McConnell's pockets were left turned outward, the office door was kicked open, and security video tapes were removed. The take for the week-end from both of Mr. Johnson's clubs, roughly $1500 to $2000, which

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy

Slip Copy, 2009 WL 36599 (N.D.Fla.)

**(Cite as: 2009 WL 36599 (N.D.Fla.))**

should have been at the Show and Tail, was missing. Mr. Ramos wiped his fingerprints off the doorknob and he and Mr. Clark left. Mr. Ramos disassembled two semi-automatic pistols, a .380 caliber "FI," and a .380 caliber Beretta. He gave the parts to Mr. Clark, who disposed of them at various spots in the general vicinity.

Mr. Ramos took Mr. Clark home and drove to Miami. He was arrested approximately fifteen minutes after he arrived there. At police headquarters he asked for a lawyer, so he was not questioned. Officers from Panama City flew to Miami to pick him up, and took him back in a small plane. Mr. Ramos sat alone in the back seat. During the flight Detective Nolin told Mr. Ramos that Mr. Clark had fingered him as the shooter of all four victims, and had shown the police where all the gun parts and other items had been thrown.

At Panama City police headquarters Mr. Ramos was asked if he wanted to talk. He said he wanted a lawyer, but was told it would be some time before one could be appointed, so he gave a statement. His version of the incident was that he and Mr. Clark went to the club to talk to Mr. McConnell. When they went in only Mr. LaForge and Mr. Ayers were present. They talked for a while, and Mr. Clark suddenly shot LaForge and Ayers without warning or Mr. Ramos' foreknowledge. A moment later Mr. McConnell came in through the back door and Mr. Clark shot him. Mr. Ramos suddenly sensed that Mr. Lands was behind or beside him, saw Mr. Lands move his hands as if he were going for a gun (which Mr. Ramos knew he carried), and in self-defense pulled his .380 Beretta and shot Mr. Lands, once in the chest and twice more as he fell.

Both Mr. Ramos and Mr. Clark were charged with four counts of first degree murder in the Circuit Court of Bay County, Florida. The state sought the death penalty. Both defense counsel asked for separate trials, but were unsuccessful. The case was finally tried to two separate juries simultaneously.

Mr. Clark was acquitted by his jury on all counts. Mr. Ramos' jury found him guilty of first degree murder of Mr. Lands, second degree murder of Mr. McConnell, and manslaughter of Mr. LaForge and Mr. Ayers. After the penalty phase the jury recommended life imprisonment, and Mr. Ramos was sentenced to life on the first degree murder count and to lengthy concurrent terms on the other three counts. Mr. Ramos' convictions and sentences were affirmed without opinion on direct appeal. *Ramos v. State,* 706 So.2d 292 (Fla. 1st DCA 1998) (Table).

**\*3** Mr. Ramos then filed a motion for post-conviction relief pursuant to Rule 3.850, Fla.R.Crim.P. The Rule 3.850 court heard evidence on most of Mr. Ramos' current claims of ineffective assistance of counsel, and denied relief in a written decision. The appellate court affirmed. *Ramos v. State,* 914 So.2d 958 (Fla. 1st DCA 2005) (Table). The instant timely federal habeas petition followed.[FN4]

> FN4. Respondent concedes timeliness (doc. 21, p. 4).

### STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                           Page 4
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2008).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[FN5] The appropriate test was described by Justice O'Connor as follows:

> FN5. Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and-except as to the footnote-Scalia) in part II (529 U.S. at 403-13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied-the state court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Su-

preme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*4 *Id.,* 529 U.S. at 412-13 (O'Connor, J., concurring); *Ramdass v. Angelone,* 530 U.S. 156, 120 S.Ct. 2113, 2119-20, 147 L.Ed.2d 125 (2000). In employing this test, the Supreme Court has instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."*Lockyer v. Andrade,* 538 U.S. 63, 71-72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."*Neelley v. Nagle,* 138 F.3d 917, 923 (11th Cir.1998), *overruled on other grounds by Parker v. Head,* 244 F.3d 813, 835 (11th Cir.2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because " 'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                   Page 5
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.' " *Lockyer,* 538 U.S. at 73 (quoting *Williams,* 529 U.S. at 405-06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases-indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (quoting *Williams,* 529 U.S. at 405-06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."*Williams,* 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. *Holland v. Jackson,* 542 U.S. 649, 652, 124 S.Ct. 2736, 2737-38, 159 L.Ed.2d 683 (2004) (per curiam); *cf. Bell v. Cone,* 535 U.S. 685, 697 n. 4, 122 S.Ct. 1843, 1851 n. 4, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."*Putman v. Head,* 268 F.3d 1223, 1241 (11th Cir.2001). The

State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." *Williams,* 529 U.S. at 410-12.

**\*5** Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."*Miller-El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."28 U.S.C. § 2254(e) (1); *see e.g. Miller-El,* 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); *Jones v. Walker,* 469 F.3d 1216, 1226-27 (11th Cir.2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                              Page 6
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti v. Quarterman,* 551 U.S. 930 127 S.Ct. 2842, 2858, 168 L.Ed.2d 662 (2007); *Jones,* 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."28 U.S.C. § 2254(a).

PETITIONER'S GROUNDS FOR RELIEF

A. INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Ramos' first five claims for relief in this court are grounded on his contention that he was denied his constitutional right to the effective assistance of counsel. In order to prevail upon a claim of ineffective assistance of counsel, Mr. Ramos must prove that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."*Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"The purpose of ineffectiveness review is not to grade counsel's performance."*Chandler v. United States,* 218 F.3d 1305, 1313 (11th Cir.2000) (citing *Strickland* ). In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance. *Chandler* at 1314."Therefore, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."*Rogers v. Zant,* 13 F.3d 384, 386 (11th Cir.1994). In evaluating the reasonableness of counsel's actions, a court must make "every effort ... to eliminate the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time."*Strickland,* 466 U.S. at 689, 104 S.Ct. at

2065. As the Eleventh Circuit has emphasized:

**\*6** We must avoid second-guessing counsel's performance: "[I]t does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance."*Waters [v. Thomas,* 46 F.3d 1506], 1522 (en banc). Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness. *Chandler* at 1314 (footnote omitted). Moreover, an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation. Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment.

*Chandler* at 1314 n. 15.

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding."466 U.S. at 693, 104 S.Ct. at 2067. Instead, petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."*Id.,* at 694, 104 S.Ct. at 2068. Without support in the record, bare allegations that petitioner was prejudiced by counsel's performance are not sufficient. *Smith v. White,* 815 F.2d 1401, 1406-07 (11th Cir.1987). In applying *Strickland* the court may dispose of an ineffective assistance claim if petitioner fails to carry his burden on either of the two prongs. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070;*Collier v. Turpin,*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 7
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

177 F.3d 1184, 1197 (11th Cir.1999).

1. *Failure to object to medical examiner's testimony.*

For his first ground for relief, Mr. Ramos faults his attorney for not objecting to the admission of the medical examiner's testimony on the grounds that: (1) it was not based on reliable scientific principles, (2) it was beyond the scope of her expertise, and (3) it was speculative and therefore not useful to the jury. The witness, Dr. Marie Herrmann, had recently been appointed to the position of medical examiner in Bay County, and was not the person who performed the autopsies on the four victims. She testified that she spent approximately twelve hours reviewing the case file and numerous photographs, but did not view the scene of the crimes, and did not participate in the autopsies.

*State Court Decision*

The Rule 3.850 court rejected this ground, holding that counsel did in fact object to the medical examiner's testimony (ex. H, p. 2176).[FN6]

> FN6. Hereafter, all references to exhibits will be to those provided at Doc. 21, unless otherwise noted.

*Federal Review of State Court Decision*

*7 Without question, the testimony of Dr. Herrmann, and her demonstrative computer animation (discussed in the next section) were devastating to Mr. Ramos' self-defense claim. The thrust of the state's theory against Mr. Ramos was that he was guilty of the premeditated murder of Mr. Lands, and was guilty of felony murder of the other three victims, who were shot by Mr. Clark. To prove premeditation, the state presented Dr. Herrmann. She testified at length about the various wounds on the victims. She did not offer an opinion on the timing or sequence of the shots, but confirmed that Mr. Lands was shot once in the front of his neck and twice in the back of his head. The head shots entered on the right side of the back of the head and were one-half inch apart. There was gunpowder tattooing on the back of the neck, indicating that the shots had been fired from a distance of 18 to 24 inches. One of the bullets remained in the brain; the other exited at the front and slightly higher, above the hairline. Dr. Herrmann also noted a hole in a wall 57 inches above the floor near where Mr. Lands' body was found, and another hole 23.5 inches above the floor. There was also an abrasion above the right eye. Based on her observations, Dr. Herrmann opined that Mr. Lands was shot in the neck while standing. That bullet exited at the upper portion of the back and made the hole 57 inches above the floor. She further opined that Mr. Lands was shot in the head from behind, and the bullet that exited made the hole 23.5 inches above the floor. Therefore, the head shot that exited Mr. Lands' body was made when his head was near or in close proximity to the wall and the floor (ex. B, vol.10, pp. 43-57). The bullets that made the two holes in the wall were recovered. There was no evidence that the bullets had blood on them. A firearms expert confirmed that they were fired from the .380 Beretta owned by Mr. Ramos (ex. B, vol.9, pp. 56-95). The obvious conclusion the state wanted the jury to make from this evidence was that Mr. Lands was shot from the front, fell, and was then shot twice in the back of the head, execution style. The general idea of execution style murders was buttressed by the testimony of a blood spatter expert, who opined that Mr. Ayers was shot twice in the face after he had fallen to the floor (*id.* at 78).

None of this testimony was meaningfully objected to by defense counsel. Indeed, counsel did not *voir dire* Dr. Herrmann when the state tendered her as an expert forensic pathologist for purposes of interpreting the mode, manner and cause of death, and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 8
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

without objection the court found that she was a "qualified forensic pathologist capable of giving her opinion."(Ex. B, vol.10, pp. 40-41). Here Mr. Ramos contends that Dr. Herrmann was not qualified to offer some of the opinions she gave, and that counsel should have objected on that basis.

a. *Was the state court's finding that counsel objected reasonable?*

*8 As noted above, the Rule 3.850 court denied relief on the sole basis that counsel objected to Dr. Herrmann's testimony, citing to the record at ex. B, vol. 10, pp. 28-33, 93-96, 112-120, and 122-138. The first question for this court is whether the state court was unreasonable in determining that counsel objected on the bases petitioner proffers (lack of scientific reliability, lack of qualifications to render opinion, and lack of usefulness). After reviewing the state court record, including the citations to the trial transcript relied upon by the Rule 3.850 court to support its finding, the undersigned concludes that the state court's determination that counsel objected was objectively unreasonable.

The first objection cited by the state court was made before Dr. Herrmann testified (*id.* at 28-33.)Counsel challenged the use of the computer animation, arguing that it had been changed since it was disclosed before trial, and that because the animation showed the positions of the victims as they were shot, the animation was more than a simple photograph or other demonstrative evidence. The court reserved ruling until Dr. Herrmann could proffer the foundation for the animation outside the presence of the jury.

Counsel's second series of objections was to several allegedly leading, cumulative and inflammatory questions posed by the prosecution (*id.* at 93-96). The objection was sustained as to the leading questions. Counsel's third objection came after Dr. Herrmann testified by proffer concerning the computer animation (*id.* at 112-120). Counsel repeated his argument about the state's delay in producing the animation and that changes had been made to it since it was last disclosed before trial. Counsel had filed a written motion making the same arguments. The trial court resolved the issue by holding that the animation would not be introduced in evidence but could be used as demonstrative evidence, with the jury instructed accordingly.

The fourth objection cited by the Rule 3.850 court was actually a motion for mistrial based on the state's providing late discovery and changing the computer animation without disclosing the change until after trial started, on counsel's inability to find a forensic expert on short notice when the state changed experts, and on the court's having denied counsel's motion for continuance (*id.* at 121-138).

None of the objections outlined above were germane to Mr. Ramos' present claims. Therefore, the Rule 3.850 court's denial of relief on the ground that counsel objected was "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."28 U.S.C. § 2254(d)(2). This court must therefore review the claim *de novo* and determine whether counsel was ineffective in failing to raise the objections that Mr. Ramos contends would have had merit had they been raised.

b. *Merits review.*

Looking first to *Strickland'* s prejudice prong, petitioner must establish a reasonable probability that had counsel objected on the grounds of lack of scientific reliability, lack of qualification or lack of usefulness, Dr. Herrmann's testimony would have been excluded, or if not excluded, that the case would have been reversed on appeal. In support of his claim, Mr. Ramos relies on the testimony of an expert witness, Stuart James, who testified at the Rule 3.850 hearing. In essence, Mr. James, who de-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 9
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

scribed himself as a consulting forensic scientist (but was not tendered or accepted as an expert), opined that Dr. Herrmann's opinion and the computer animation were not scientifically based, because Dr. Herrmann did not consider some of the evidence, particularly blood spatter patterns (and the absence thereof), and because there was no evidence of blood on the bullet that made the 23.5 inch high hole, or around that hole, among other things (ex. H, p. 2414-16). He testified that Dr. Herrmann's admission that there were other possibilities on Mr. Lands' position when he received the head shots proved that she had ignored other possibilities. Mr. Ramos says that this proves that counsel should have objected, because if he had done so, he could have argued successfully that Dr. Herrmann's opinion was nothing more than speculation, and was not scientific.

*9 With regard to the scientific reliability issue, petitioner argues that "the state failed to elicit any testimony that an expert opinion about the body position of a decedent at the time he sustained a fatal gunshot is supported by a reliable, body of scientific or other specialized knowledge."(Doc. 1, p. 18). This standard is commonly referred to as the "*Frye* test." *See Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923). Under this test, when a party is seeking to admit into evidence expert opinion testimony concerning a new or novel scientific principle, the proponent has the burden of proving "the general acceptance of both the underlying scientific principle and the testing procedures used to apply that principle to the facts of the case at hand."*Ramirez v. State,* 651 So.2d 1164, 1168 (Fla.1995).

The problem with petitioner's argument is that petitioner has not established that Dr. Herrmann's opinion was based on a new or novel scientific theory such that it was subject to the *Frye* test. *See Marsh v. Valyou,* 977 So.2d 543, 547 (Fla.2007) (holding that the *Frye* standard for determining the admissibility of expert testimony only applies when an ex-

pert attempts to render an opinion that is based upon new or novel scientific techniques); *Rickgauer v. Sarkar,* 804 So.2d 502, 504 (Fla. 5th DCA 2001) ("Pure opinion testimony does not have to meet the *Frye* test because it is based on the expert's personal opinion."). Dr. Herrmann testified that her opinion was based on her training and experience, as well as her review of the photographs taken during the autopsy examinations, the crime scene drawings, the crime scene photographs, the firearms examiner's report, and a briefing on the findings of the blood spatter expert's report. (Ex. B, vol.10, p. 42). Dr. Herrmann did not base her opinion on new or novel scientific tests or procedures, and petitioner has not shown that Dr. Herrmann's methodology departed from that generally accepted in the scientific community. Nor has petitioner provided case law holding that expert opinion testimony on the position of the decedent's body at or near the time of death is subject to the *Frye* test. Forensic pathologists routinely form opinions concerning the mode, manner and cause of death based on their experience and training. *See, e.g., Terry v. State,* 668 So.2d 954, 960 (Fla.1996) (holding that trial court did not err in admitting expert testimony of medical examiner concerning position of victim's body before she died; expert had employed a similar method of analyzing "photos, the bleeding, the position of the body, the blood spatter, lack of bruises, trajectory, the damage to the ear, the damage to the nose, among a number of factors," and had based his opinion on his training and experience).

As the Florida Supreme Court has explained:

[P]ure opinion testimony ... does not have to meet *Frye,* because this type of testimony is based on the expert's personal experience and training. While cloaked with the credibility of the expert, this testimony is analyzed by the jury as it analyzes any other personal opinion or factual testimony by a witness.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 10
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

**\*10** *Flanagan v. State,* 625 So.2d 827, 828 (Fla.1993); *see also Herlihy v. State,* 927 So.2d 146, 148 (Fla. 1st DCA 2006) ("[A] diagnosis based on an expert's opinion and experience, versus a specific scientific test, would not be subject to a *Frye* hearing ."); *Gelsthorpe v. Weinstein,* 897 So.2d 504, 510-11 (Fla. 2d DCA 2005) (finding *Frye* inapplicable to "pure opinion testimony based upon clinical experience" where the "testimony did not rely on any study, test, procedure, or methodology that constituted new or novel scientific evidence," but instead was based on an analysis of medical records and differential diagnosis).

Although Mr. James may have had a difference of opinion regarding the weight to be given Dr. Herrmann's testimony, that does not transform an ordinary expert opinion into a new or novel principle subject to *Frye.*Mr. Ramos has failed to establish a reasonable probability that had counsel objected to Dr. Herrmann's testimony on the grounds that it failed to meet the standard of scientific reliability required by *Frye,* the objection would have been sustained, or if overruled, that the case would have been reversed on appeal.

With regard to Dr. Herrmann's qualifications, petitioner asserts that counsel should have objected on the grounds that Dr. Herrmann was not qualified to render her opinion concerning the position of the decedents. The Florida Supreme Court has summarized the standard governing the admissibility of expert opinion:

> An expert is permitted to express an opinion on matters in which the witness has expertise when the opinion is in response to facts disclosed to the expert at or before the trial. § 90.704, Fla. Stat. (1993). Section 90.702 requires that before an expert may testify in the form of an opinion, two preliminary factual determinations must be made by the court under section 90.105. First, the court must determine whether the subject matter is proper for expert testimony, i.e., that it will assist the trier of fact in understanding the evidence or in determining a fact in issue. Second, the court must determine whether the witness is adequately qualified to express an opinion on the matter. Charles W. Ehrhardt, Florida Evidence § 702.1 (1994 ed.).

*Terry v. State,* 668 So.2d at 960.

In support of Mr. Ramos' claim that Dr. Herrmann's opinions were beyond her expertise, he relies on *Wright v. State,* 348 So.2d 26 (Fla. 1st DCA 1977). In that case, the medical examiner, a qualified physician offered as an expert in the field of forensic pathology, testified that the deceased had been seriously injured prior to her ultimate death by suffocation (burial by a bulldozer). The court found the opinion to be "beyond the competence of the medical examiner to give,"348 So.2d at 31, apparently finding that neither the examiner's knowledge, skill, experience, training or education qualified him to express that opinion.[FN7]The court went on to discuss Florida's rule on the exclusion of every reasonable hypothesis of innocence where guilt is proven only by circumstantial evidence. The court concluded that because the testimony of the medical examiner was the only evidence inconsistent with innocence, and because that evidence was not competent, the accused's version of events had to be accepted, and the first degree murder conviction reversed. Mr. Ramos argues that this is basically the same case-the state presented only circumstantial evidence, and that Dr. Herrmann's testimony (which was not competent) was the only evidence inconsistent with Mr. Ramos' innocence; therefore, the reasoning of *Wright* should apply.

> FN7. The court described the thrust of the medical examiner's opinion as follows:
>
> > that the deceased's injuries were consistent with being bulldozed in the hole after injury[;] that many of her injuries had not come from being run over by the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

Page 11

bulldozer after burial or during the effort to dig her out, nor had they been inflicted by the treads of the machine[;] that the pattern of injuries was inconsistent with [the accused's] story of the events culminating in her death.

*Wright,* 348 So.2d at 29 and n. 5.

**\*11** Respondent cites *Terry v. State, supra,* in opposition to Mr. Ramos' claim. There, the Florida Supreme Court held that a medical examiner qualified as a forensic pathologist was competent to testify on the position of the decedent's body before she died. The medical examiner was the associate county medical examiner who was testifying in lieu of the county medical examiner because the county examiner was ill at the time of trial. The court found that it was within the expertise of a forensic pathologist to testify to the cause of death and circumstances surrounding the death, including the position of the decedent. The medical examiner's methodology in making his body position determination included analyzing various factors, including photographs, blood spatter, lack of bruises, bullet trajectory, and damage to the specific areas of the body. Although the medical examiner was not qualified as a blood spatter expert, he possessed working knowledge of blood spatters and commonly used that as a factor in his analysis, thereby rendering his testimony on that point not inadmissible on the ground that he was not qualified as a blood spatter expert. The Florida Supreme Court rejected the defendant's contention that the medical examiner was not qualified to give an opinion on the victim's position before death. The court stated, "[t]he determination of a witness's qualifications to express an expert opinion is peculiarly within the discretion of the trial judge whose decision will not be reversed absent a clear showing of error."668 So.2d at 960. The court concluded that the real issue was not admissibility of the evidence, but its weight, which was left to the jury. 668 So.2d at 960-61.

In the instant case, the trial judge found that Dr. Herrmann's education, knowledge, skill, experience, and training, which are detailed in the record, qualified her as a forensic pathologist capable of expressing an opinion on the position of the decedents at the time they were shot. (Ex. B, vol.10, pp. 34-41). Forensic pathologists routinely testify to that issue based on analysis of factors such as those used by Dr. Herrmann. *See Terry, supra.*Petitioner has not shown a reasonable probability that had counsel objected to Dr. Herrmann's testimony on the grounds of inadequate qualification to render an opinion on the position of the body, the objection would have been successful, or if overruled, that the appellate court would have reversed.

Petitioner's remaining issue, that counsel should have objected on the grounds that Dr. Herrmann's testimony was speculative and unhelpful to the jury, is equally unavailing. He emphasizes her use of the words "either ... or", "may have," "could have," arguing that this demonstrates her opinion was mere speculation. As shown above, however, Dr. Herrmann's opinion was not speculation-it was based on her education, experience, training and expertise, including her having conducted 75 autopsies of homicide victims who were shot to death. Her opinion concerning the position of the decedents assisted the jurors in determining the mode and manner of the shootings. The fact that she acknowledged that other conclusions were possible does not mean her opinion was not useful. Petitioner has not established a reasonable probability that an objection to Dr. Herrmann's testimony on this basis would have been granted.

**\*12** In sum, the decision to admit expert testimony in Florida is left to the trial court's discretion, to be reversed only on a showing of clear error.*Terry,* 668 So.2d at 960 (citing *Ramirez v. State,* 542 So.2d 352, 355 (Fla.1989)). Mr. Ramos has not shown that it is more likely than not that an objection to Dr. Herrmann's qualifications or testimony, if made, would have been sustained, or if overruled,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 36599 (N.D.Fla.)
**(Cite as: 2009 WL 36599 (N.D.Fla.))**

Page 12

that the case would have been reversed on appeal. Therefore, he has not met *Strickland'* s prejudice prong. Nor has petitioner established that no reasonable attorney would have failed to object on his proffered bases. Mr. Ramos is not entitled to federal habeas relief on this issue.

2. *Failure to object to admission of the computer animation.*

Mr. Ramos next contends that counsel was ineffective in failing to make the following specific objections to use of the computer animation as demonstrative evidence: (1) the animation was not helpful to the jury; (2) Dr. Herrmann was not qualified to render her opinion; (3) the animation's probative value was far outweighed by its prejudicial effect; (4) there was no testimony that the data upon which Dr. Herrmann relied in forming her opinion was of a type reasonably relied upon by experts in the field; and (5) the animation did not depict a fair and accurate application of Dr. Herrmann's opinion to the evidence offered at trial. (Doc. 1, pp. 45-47).

*State Court Decision*

The Rule 3.850 court rejected this ground, holding that counsel did in fact object to the computer animation (ex. H, p. 2176).

*Federal Review of State Court Decision*

The objections cited by the Rule 3.850 court were the same objections cited in the first issue, above. As above, the court failed to address Mr. Ramos' argument that any objections at trial concerned the late appearance of the animation, not its lack of foundation on the specific grounds outlined above. Therefore, the state court did not properly address the issue raised, and its finding that counsel objected was "a decision that was based on an unreasonable determination of the facts in light of the evid-

ence presented in the State court proceeding."28 U.S.C. § 2254(d)(2). This court must therefore review the claim *de novo* and determine whether counsel was ineffective in failing to raise the objections that Mr. Ramos favors would have had merit had they been raised.

The computer animation was not introduced in evidence, but was allowed only as demonstrative evidence, and the jury was instructed that the animation must be considered by the jurors as a demonstrative aid to assist Dr. Herrmann in explaining her opinion. (ex. B, vol.9, pp. 130-138). Dr. Herrmann used it in the form of a video to illustrate her opinion on the positions of the victims as they were shot. Of critical importance to Mr. Ramos was the depiction of Mr. Lands as he was shot in the head. The animation apparently showed him with his head against or near a wall, and about two feet off the floor.[FN8]The obvious import of this illustration was to emphasize the state's claim that he was shot execution style. Mr. Ramos contends that the animation improperly stripped him of his self-defense claim because it showed only one possible position of the victim, and was therefore overly prejudicial. Counsel, he argues, should have made several specific objections, as outlined above.

> FN8. The court has not been favored with a copy of the animation, but accepts Mr. Ramos' description of what it showed.

**\*13** In forming his proposed objections, Mr. Ramos has relied on *Pierce v. State,* 718 So.2d 806 (Fla. 4th DCA 1997), in which the court considered the admissibility, as a demonstrative aid, of a computer animation of a motor vehicle accident. The court noted that the issue had been "addressed by no appellate court in Florida and by few in other jurisdictions."718 So.2d at 807. The court found that admissibility of such materials required: helpfulness to the jury, a qualified expert, the opinion being applied to evidence adduced at trial, prejudice not outweighing probative value, acceptance in the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                      Page 13
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

field of expertise, and accuracy in depicting the facts upon which it is based. Mr. Ramos argues that defense counsel failed to require the state to meet these requirements. However, *Pierce* is not particularly helpful. It was decided two years after this case was tried, and, as noted in *Pierce,* there was little precedent on the issue even then, yet counsel is supposed to have anticipated its holding in the middle of this trial.

As the Eleventh Circuit has stated, "we have held many times that reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop."*Spaziano v. Singletary,* 36 F.3d 1028, 1039 (11th Cir.1994) (quotations and alterations omitted); *see also Reutter v. Secretary for Dep't of Corrections,* 2007 WL 1379967, at *3 (11th Cir. May 11, 2007) (unpublished opinion) (holding that petitioner failed to establish deficient performance where petitioner faulted appellate counsel for failing to raise issue based on cases which purportedly foreshadowed a subsequent appellate court ruling supporting petitioner's argument). The law on the admissibility of computer-generated exhibits as demonstrative evidence was not settled when this case was tried, so this court cannot say that counsel was objectively unreasonable in failing to demand that the state lay the type of evidentiary foundation later deemed necessary in *Pierce.*Because Mr. Ramos fails to establish deficient performance under *Strickland,* he is not entitled to federal habeas relief on this issue.

### 3. *Failure to retain expert.*

Mr. Ramos next faults his attorney for being unprepared for trial. He contends that counsel should have retained a forensic scientist and used his own computer animation.

*State Court Decision*

This claim was raised in Mr. Ramos' motion for post-conviction relief. At the Rule 3.850 hearing, Stuart James testified that he could have been retained by defense counsel, could have testified, and could have prepared a "defense-oriented animation ... consistent with the crime scene evidence, the autopsy of Lands, and the theory of defense presented in [the] case."(Ex. H, p. 2420). On cross-examination he conceded that he could not have helped given only 24 to 48 hours notice (*id.* at 2424). The Rule 3.850 court rejected the claim, holding that the problem was time. The state did not disclose that Dr. Herrmann (who was a new medical examiner) would testify until very shortly before trial, and counsel could not take her deposition until four days before trial. Counsel asked for a continuance, which was denied, and he vigorously attacked Dr. Herrmann's opinions. The court found further that additional time would not have made a difference (ex. H, p. 2176).

*Federal Review of State Court Decision*

**\*14** Mr. Ramos relies on *Troedel v. Wainwright,* 667 F.Supp. 1456 (S.D.Fla.1986), where the court granted habeas relief for failure by counsel to obtain his own expert in a case similar to this one. However, *Troedel* is not persuasive because it was decided long before the AEDPA's 1996 amendments to the habeas statute, discussed above, which placed new constraints on the federal courts' ability to afford habeas relief. *Wiliams v. Taylor,* 529 U.S. at 412, 120 S.Ct. at 1523 (O'Connor, J., concurring). The *Troedel* court noted at the outset that it held a hearing, as required by *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), because none had been held in the state court. The court's decision was therefore based on a *de novo* review, and gave no deference to any ruling by the state court. That approach does not apply here. Rather, as discussed in detail above, this court owes deference to the state courts' rulings, and cannot disturb them so long as there was a "satisfactory

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                   Page 14
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

conclusion." *Williams, supra,* 529 U.S. at 410-412, 120 S.Ct. at 1522-23. *See also, Crawford v. Head,* 311 F.3d 1288 (11th Cir.2002) (explaining that the new statute provides for a "highly deferential standard of review" for factual determinations made by a state court).

Moreover, the essential finding in *Troedel* was that the state, through a firearms expert, presented *false* evidence to the jury, which counsel should have discovered through better investigation. There is no such allegation here. Mr. Ramos argues that Dr. Herrmann's testimony was incorrect or otherwise subject to criticism on scientific grounds, but he does not claim that she testified *falsely* as the expert in *Troedel* did. Moreover, the evidence against the defendant in *Troedel* was entirely circumstantial absent the expert's false testimony concerning gunpowder residue. That is not the case here.

Mr. Ramos also relies on *Pavel v. Hollins,* 261 F.3d 210 (2nd Cir.2001), where the court found ineffective assistance of counsel in a sexual abuse case for failure to present testimony (1) by the defendant's mother, who could have testified that she was present during crucial times and could deny that the crimes occurred, (2) a psychiatrist, who could have testified adversely to the accusing mother's credibility, and (3) an expert, who could interpret the inconsistency between the physical evidence and the accusations. Here, the first two kinds of witnesses do not exist, which leaves the expert. The weakness in Mr. Ramos' case in that regard is the failure to offer persuasive evidence that another expert would have made a difference.

The Rule 3.850 court held that it would not. There are several items that support the reasonableness of this finding. First, as the court noted, the fact that Dr. Herrmann was going to offer an opinion on Mr. Lands' position when he was shot in the head was not known until just before trial, and counsel's motion for continuance was denied. The original medical examiner, who had performed the autopsies, had testified at deposition that she could not give an opinion on the position of the bodies before the shooting (ex. H, pp. 2416-17). Counsel was therefore not on reasonable notice that he had a problem in that regard. His client had admitted shooting Mr. Lands, and until just before trial, counsel did not know that the state would come up with a witness who would effectively say that the killing was an execution.

*15 Second, Mr. Ramos' expert at the Rule 3.850 hearing testified that if he had been called when counsel was put on notice of the problem, he could not have done the preparation necessary to be of assistance in the short time available (*id.* at 2424). Furthermore, Mr. Ramos presented no evidence that any other expert was available. Thus, this court is presented with a lot of supposition but few hard facts. Mr. Ramos wants this court to accept his argument that an expert should have been retained when there was no obvious need for one, but his own expert conceded that when the need for an expert became apparent, and the court denied counsel's motion for continuance, none would have been available. This court will not " 'blindly accept speculative and inconcrete claims ....' "*Raulerson v. Wainwright,* 753 F.2d 869, 876 (11th Cir.1985) (quoting *Baldwin v. Blackburn,* 653 F.2d 942, 947 (5th Cir.1981)). Absent evidence in the record, a court cannot consider a habeas petitioners' bald assertions on a critical issue in his petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value. *Woodard v. Beto,* 447 F.2d 103 (5th Cir.1971).[FN9] Thus, "mere conclusory allegations do not raise a constitutional issue in a habeas proceeding. *United States v. Jones,* 614 F.2d 80 (5th Cir.1980).[FN10]

> FN9. Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. Pritchard,* 661 F.2d 1206, 1207 (11th

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                     Page 15
Slip Copy, 2009 WL 36599 (N.D.Fla.)
**(Cite as: 2009 WL 36599 (N.D.Fla.))**

Cir.1981) (en banc).

FN10. Respondent argues that Mr. James agreed with another expert, Mr. Newt, who opined that there was only one shooter. If that were so, Mr. Ramos loses, because he admitted being a shooter. If there was only one shooter, Mr. Ramos shot all four victims. However, this is a red herring, because respondent takes Mr. James' testimony out of context. At the Rule 3.850 hearing Mr. James was asked if he agreed with Mr. Newt's opinion that the lack of blood on one of the bullets supported his belief that Mr. Lands was near the wall when he was shot in the back of the head. With that Mr. James agreed. He was not asked if he agreed that there was only one shooter, nor did he say so. Respondent should be careful in making factually unsupported claims on such important matters. *See* Rule 11, Fed. R. Civ. Proc.

It is uncontested that the state revealed Dr. Herrmann as a witness at the last moment, and disclosed the computer animation in the middle of trial. The Rule 3.850 court held that under the circumstances counsel was not ineffective for failing to anticipate the worst. This is not an unreasonable application of *Strickland.* Counsel's performance is not deficient merely because it is not perfect.

"[J]udicial scrutiny of counsel's performance must be highly deferential." Because retrospective evaluation of a lawyer's performance can be difficult, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance .... In light of the "strong presumption in favor of competence," we have held that in order to prove deficient performance, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take."

*Brownlee v. Haley,* 306 F.3d 1043, 1059 (11th Cir.2002) (quoting *Strickland,* 466 U.S. at 687, 689-90, 104 S.Ct. at 2064-66 and *Chandler v. United States,* 218 F.3d at 1315).

In the context of this case, Mr. Ramos must convince this court that *no other competent lawyer* would have failed to anticipate the state's tardy disclosure of critical evidence and the court's refusal to grant a continuance. He cannot do so. A perfect lawyer might have anticipated what happened, but there are no perfect lawyers. The state court's ruling did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1); *Williams, supra.* Mr. Ramos is not entitled to federal habeas relief, and the writ should not issue.

4. *Failure to suppress Mr. Ramos' statement.*

**\*16** Mr. Ramos next faults his attorney for failing to take any action to suppress his statement to Det. Nolin. He asserts that the statement could have been suppressed easily because Mr. Ramos asked for a lawyer in Miami, and any questioning was properly ended, but Det. Nolin improperly persuaded him to talk by telling him what Mr. Clark had said, and at police headquarters told Mr. Ramos he could have a lawyer but none was immediately available, thereby improperly inducing him to give an involuntary statement.

*State Court Decision*

Mr. Ramos raised this claim in his motion for post-conviction relief, and the court held an evidentiary hearing. At the hearing defense counsel testified that he did not move to suppress the statement because it was consistent with Mr. Ramos' claim of self defense, and because if he had succeeded in suppressing the statement, he ran the risk of the state making a deal with Mr. Clark and having him testify that Mr. Ramos murdered all four victims.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                  Page 16
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

The Rule 3.850 court rejected Mr. Ramos' claim, holding that counsel's decision not to move to suppress the statement was a "well reasoned strategic choice." (Ex. H, p. 2175). The court noted that the statement was not totally incriminating, and counsel "beat the possibility of the Co-Defendant, Clark testifying against Ramos, if the state had chosen to make some sort of plea deal with Clark."*Id.* Furthermore, Mr. Ramos' testimony was entirely consistent with his statement-that he shot Mr. Lands in self defense.

*Federal Review of State Court Decision*

The Rule 3.850 court did not address the underlying issue of whether the motion to suppress would have been successful, apparently assuming that it would have been. Therefore, for purposes of this discussion, success of a motion to suppress will be assumed.

Mr. Ramos attacks the Rule 3.850 court's holding on two fronts. He asserts that counsel's decision was not strategic, and that if it was, it was not reasonable. First, he points to a hearing held in February 1995, six months before trial, when the court was considering whether to sever the cases for trial. The court emphasized that the question of severance would hinge, in part, on the outcome of any motions to suppress, and ordered that any such motions be filed by a date certain. Defense counsel told the court that "I have not found a basis to file one at this time."(Ex. A, p. 1028). Mr. Ramos says this is the "best evidence" of counsel's reason for not moving to suppress, and that counsel's testimony at the Rule 3.850 hearing was an after-the-fact justification for his failure to act (doc. 1, p. 58). That argument fails here.

"Inquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component."*Provenzano v. Singletary,* 148 F.3d 1327, 1330 (11th Cir.1998);

*Jackson v. Herring,* 42 F.3d 1350, 1357 (11th Cir.1995). Whether a particular decision by counsel was a tactical one is a question of fact, *Hardwick v. Crosby,* 320 F.3d 1127, 1163 (11th Cir.2003), and the state court's resolution of that issue enjoys a strong presumption of correctness. *See*28 U.S.C. § 2254(e)(1); *Jackson,* 42 F.3d at 1367;*Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991). Whether a particular tactical decision was a reasonable one, however, is a question of law, *Hardwick* at 1163;*Jackson,* 42 F.3d at 1367;*Horton,* 941 F.2d at 1462, and habeas relief is mandated only where the trial court's decision was either contrary to, or an objectively unreasonable application of, clearly established Supreme Court precedent, 28 U.S.C. § 2254(d)(1).

*17 The Rule 3.850 court held, as fact, that counsel's failure to file a motion to suppress was the product of a tactical decision. The court heard Mr. Ramos' trial counsel's testimony at the Rule 3.850 evidentiary hearing, and made a credibility determination that he was truthful at that hearing. The state court's factual determination is presumptively correct, and Mr. Ramos has not presented clear and convincing evidence that it is unreasonable in light of the evidence presented to the state court, even in light of defense counsel's statement prior to trial. Therefore, this court accepts as fact that defense counsel's decision was a tactical one. The next question is whether the state court unreasonably applied *Strickland* when it concluded that counsel's strategic decision was reasonable.

Counsel's tactical decisions on which defense to pursue are "virtually unchallengeable." *Provenzano,* 148 F.3d at 1332 (quoting *Strickland* );*Waters v. Thomas,* 46 F.3d 1506, 1522 (11th Cir.1995)). As previously emphasized, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                      Page 17
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

strategy."*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (quotation marks and citation omitted); *see also Waters v. Thomas,* 46 F.3d at 1518-19 (observing that "[w]e cannot, and will not, second guess" the "strategic decisions trial counsel are called upon to make")."[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy."*Johnson v. Alabama,* 256 F.3d 1156, 1176 (11th Cir.2001).

After all, "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065;*accord, e.g., Waters v. Thomas,* 46 F.3d at 1522 ("Three different defense attorneys might have defended Waters three different ways, and all of them might have defended him differently from the way the members of this Court would have, but it does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance.").

In fact, "a lawyer can make a reasonable decision that no matter what an investigation might produce, he wants to steer clear of a certain course."*Rogers v. Zant,* 13 F.3d 384, 387 (11th Cir.1994). Accordingly, counsel's decision to curtail investigative efforts is also presumed reasonable, and the exclusion of other viable defenses does not establish ineffective assistance unless it is demonstrated that the course counsel actually chose was itself unreasonable. *Chandler,* 218 F.3d at 1318.

Mr. Ramos attacks the reasonableness of counsel's strategic decision with the testimony of Steven Seliger, Esq., a criminal defense attorney who testified at the Rule 3.850 hearing. He contended that Mr. Ramos' statement was extremely damaging, and that in a death penalty case it is critical for defense counsel to control the evidence and to move to suppress damaging statements. Mr. Seliger fur-

ther testified that defense counsel's reasons for not moving to suppress were inadequate, and his failure to move to suppress was constitutionally ineffective (ex. H, pp. 2478-86). The Rule 3.850 court did not accept Mr. Seliger's opinions. Indeed, it would be improper for this court to consider Seliger's opinions in determining the legal question whether counsel's strategic decision was reasonable. *Freund v. Butterworth,* 165 F.3d 839, 863 n. 34 (11th Cir.1999) (en banc) (holding that permitting expert testimony on legal questions in habeas cases is inappropriate).

**\*18** Upon review of the record, this court cannot say that it was an unreasonable application of *Strickland* to conclude that counsel's decision not to file a motion to suppress was reasonable. At the Rule 3.850 hearing defense counsel testified that he had been a criminal defense lawyer for twenty-six years, and had handled approximately ten death penalty cases. He had been appointed to represent Mr. Ramos in November 1994. He believed, as Mr. Ramos told him, that Mr. Clark was the murderer, but knew that the state was focusing on Mr. Ramos because he was the leader. A matter of critical importance was not allowing Mr. Clark to testify. He knew that Mr. Clark had talked to the police, had helped them locate the murder weapons and other physical evidence, and had told them that Mr. Ramos was the only shooter. He had a grasp of what the strategy would be, and felt he had to avoid allowing the state to make a deal with Mr. Clark. He knew that one of the firearms was registered to Mr. Ramos, that there was gunshot residue on Mr. Ramos' hands, that Mr. Ramos claimed self defense, that Mr. Ramos' statement was consistent with that claim and addressed much of the evidence the state could present, that Mr. Ramos was intelligent and agreed with the strategy, and that counsel always had the option of moving to suppress if it became advantageous to do so (ex. H, pp. 2329-59, 2374-78).

Mr. Ramos says this last reason was untrue, be-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                    Page 18
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

cause the court had set a deadline for filing motions to suppress. The Rule 3.850 court did not address that specific issue, so for purposes of this discussion the court will assume that no late-filed motion would have been heard. That does not affect the other stated reasons, however.

Mr. Ramos' position, and that of Mr. Seliger, is that moving to suppress is a basic "Criminal Law 101" requirement, and that failing to do so is *ipso facto* ineffective. Mr. Ramos also says that there is no proof that the state was interested in making a deal with Mr. Clark, so counsel's reasoning was based on an unsupported premise. Finally, Mr. Ramos asserts that, as Mr. Seliger testified, it would have been much better to confront Mr. Clark as a witness who had made a deal with the state to save himself from the death penalty than to have Mr. Ramos admit he shot Mr. Lands.

In theory and in a vacuum, that makes sense; but defense counsel was not working in a theoretical world. He was a seasoned criminal defense lawyer who obviously had reason to know how the cards lay. It is true that there is no proof that the state was interested in making a deal with Mr. Clark, but that proves nothing. If the case is examined from the state's standpoint, having Mr. Ramos' statement suppressed would not have been a disaster, but it would have cast the possibility of convicting Mr. Ramos in a different light. As noted above, there was circumstantial evidence of Mr. Ramos' guilt, but it was not overwhelming. Without Mr. Ramos' statement, Mr. Clark's testimony could effectively nail the case for the state. It would come as no surprise to any lawyer who represents criminal defendants that the state will deal with one co-defendant to help convict another, and it was not unreasonable for defense counsel here to think the state might do so in this case.

*19 Supposing, then, for the sake of discussion, that counsel had successfully moved to suppress Mr. Ramos' statement, and the state made a deal with Mr. Clark, here is some of the evidence counsel had to consider facing:

1. A witness would testify that Mr. Ramos said he was returning to Panama City to take care of someone, and kill them if necessary.

2. Mr. Ramos was positively identified as being present in the club shortly before the murders, his fingerprints were on the bar, and his motor vehicle was at the scene.

3. Mr. Ramos was known to carry a .380 Beretta pistol, and Mr. Ramos' pistol was positively identified as one of the murder weapons.

4. The other murder weapon was positively identified as belonging to Mr. Johnson, who had refused to loan it to Mr. Ramos. The same weapon was discovered to be missing from Mr. Johnson's collection.

5. Another weapon missing from Mr. Johnson's collection was found at Mr. Ramos' home in Miami.

6. Mr. Clark, a local resident, would testify that his once and future boss wanted him to go to the Show and Tail to talk to Mr. McConnell, that when they got there Mr. Ramos murdered all four of the victims, told Mr. Clark to take Mr. McConnell's jewelry to make it look like a robbery, took apart the guns and gave them to Mr. Clark to dispose of, and left for Miami. When confronted that day, Mr. Clark cooperated with the police and helped them recover the murder weapons and other tangible evidence.

7. All four victims had been shot in the head at least twice.

8. Mr. Ramos had gunshot residue on his hands the next morning.

And behind all this was the ultimate threat-the state was seeking the death penalty (which it did not

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                           Page 19
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

get).

Now, how to confront this evidence? Hire an expert to contest the trajectories of the bullets? Make a computer animation for the same purpose? Given the provable facts, neither of these options held great promise. Mr. Ramos has not suggested any other approach (nor did Mr. Seliger) except to cross-examine Mr. Clark vigorously, something that sometimes works and sometimes does not. But no alternative other than self defense would explain Mr. Ramos' presence, his pistol, the powder residue, the testimony of the Miami witness, or Mr. Clark's accusations.

So Mr. Ramos would be testifying in his own defense and admitting that he was present, but saying he shot Mr. Lands in self defense. Indeed, that is what happened. Mr. Ramos' statement was read to the jury before he testified, but the only thing in the statement that was particularly incriminating, and that Mr. Ramos would not admit absent the statement, was that he gave Mr. Clark a pistol before they went to the club, and that he was going to be a little intimidating. Testifying without the statement would help, but it would not solve the host of problems outlined above. Defense counsel was on the horns of a dilemma, and his choices either way were not promising. It is easy in retrospect to say that he made the wrong choice, but even that may not be true. Consider: the Clark jury believed Mr. Clark. He was acquitted on all counts. By acquitting Mr. Clark, the Clark jury in effect found Mr. Ramos guilty of four murders. Did counsel err in considering that the Ramos jury might do the same thing if Mr. Clark testified? And if Mr. Clark gave testimony to Mr. Ramos' jury, and the jury believed him, what then were the odds of a life sentence?

*20 This is all speculation, of course, but that is what lawyers do when they try to divine the future in difficult cases such as this one. By the same token, Mr. Ramos is speculating in arguing that his approach in suppressing the statement would have changed the outcome of the case. It is not for this court to say which was the correct course for counsel to have taken. Rather, it is for this court to "indulge a strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance."*Brownlee, supra.*Under that standard, this court cannot say that counsel's strategic decision not to challenge Mr. Ramos' statement constituted ineffective assistance of counsel. Therefore, the state court's ruling did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,"28 U.S.C. § 2254(d)(1); *Williams, supra.*Mr. Ramos is not entitled to federal habeas relief, and the writ should not issue.

5. *Failure to object to prosecutorial misconduct.*

Mr. Ramos last contends that counsel was ineffective in failing to object to the prosecutor's following remarks during final argument: the crimes were savage murders, execution-style murders; Mr. Ramos was a liar and a con, who shaded his testimony; the Miami witness had no reason to lie; Mr. Ramos had constructed a jigsaw puzzle; and he was "guilty, guilty, guilty."

*State Court Decision*

The Rule 3.850 court held, without discussion, that the prosecutor's statements were not improper, so there was no basis for objecting (ex. H, p. 2176).

*Federal Review of State Court Decision*

In order to succeed on this claim, petitioner must show, first, that the prosecutor's behavior was improper. If the prosecution's behavior was not improper, there was no basis upon which counsel could object. It is long established Supreme Court law that prosecutors must refrain from improper methods calculated to produce a wrongful convic-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 20
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

tion; they may strike hard blows but are not at liberty to strike foul ones. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 74 L.Ed.2d 1314 (1935)."A lawyer shall not ... state a personal opinion as to ... the credibility of a witness ... or the guilt or innocence of an accused" and shall not "use arguments calculated to inflame the passions or prejudices of the jury."*Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (citing Model Rules of Professional Conduct, Rule 3.4(e) (1984); Code of Professional Responsibility, DR 7-106(C)(4) (1980); ABA Standards for Criminal Justice: 3-5.8(b) (2nd Ed.1980)).

In applying the various professional standards to the conduct of attorneys who appear before them, courts must not lose sight of the reality that "[a] criminal trial does not unfold like a play with actors following a script."*United States v. Young,* 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1 (1985) (quoting *Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976))."[I]n the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused."*Id.* (citing *Dunlop v. United States,* 165 U.S. 486, 498, 17 S.Ct. 375, 379, 41 L.Ed. 799 (1897)).

**\*21** Challenges to allegedly improper prosecutorial comments are not infrequent. However, in evaluating a prosecutorial indiscretion:

it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.

*Darden, supra* (internal citations omitted); *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *United States v.*

*Young, supra.*Inappropriate prosecutorial comments, standing alone, do not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, the remarks must be examined within the context of the trial. *Young,* 470 U.S. at 11, 105 S.Ct. at 1044. And not every remark that stings is improper. "In closing argument, a prosecutor is not prohibited from making 'colorful and perhaps flamboyant' remarks if they relate to the evidence adduced at trial."*United States v. Mock,* 532 F.3d 1299, 1302 (11th Cir.2008) (*quoting United States v. Jacoby,* 955 F.2d 1527, 1541 (11th Cir.1992).

Federal courts have held that it is improper to call a defendant a liar. In *United States v. Mueller,* 74 F.3d 1152 (11th Cir.1996) the government's attorney did exactly that. The court condemned the prosecutor's comments, but affirmed nonetheless. It pointed to the Supreme Court's admonition in *United States v. Young, supra,* that the comments must be viewed in context, and that the test was whether the comments undermined the fundamental fairness of the trial. The prosecution called the defendant a liar and was condemned for it *United States v. Rodriquez-De Jesus,* 202 F.3d 482, 486 (1st Cir.2000), but the court did not reverse, finding that in the context of a charge of submitting a false claim to a federal agency, the use of the term was not inappropriate.

The undersigned has carefully read the entire trial transcript, and cannot disagree that a reasonable jury could find that Mr. Ramos' testimony, when contrasted with all the other evidence, was as described by the prosecutor. That the prosecutor pointed this out to the jury was not improper. That the jury largely agreed is not surprising. In *Portuondo v. Agard,* 529 U.S. 61, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000) the prosecutor told the jury that the defendant was lying, was a smooth slick character who had an answer for everything, that everything the defendant said sounded rehearsed, and that he sat through the entire trial before testifying and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

used the testimony that preceded his to his advantage. The trial court held that these statements were fair comments on the evidence. Defendant argued in his subsequent federal habeas case that the comments prejudiced his constitutional right to be present at trial. The Court disagreed, holding that there had been no constitutional violation, reasoning that when a defendant elects to testify he is subject to cross-examination and his interest in the outcome can be commented on during closing. That is, when a defendant takes the stand, "his credibility may be impeached and his testimony assailed like that of any other witness[,]"529 U.S. at 69, 120 S.Ct. at 1125 (quoting *Brown v. United States,* 356 U.S. 148, 154, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958)). Thus, a testifying defendant can be treated as any other witness. 529 U.S. at 73, 120 S.Ct. at 1127. Although the constitutional claim in *Portuondo* was different from the argument Mr. Ramos makes here, the result is instructive. Mr. Ramos testified, and his testimony was fairly commented on by the prosecutor. Nothing the prosecutor said infected the trial with unfairness. Therefore, the state court's denial of relief on this claim did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,"28 U.S.C. § 2254(d)(1); *Williams, supra.*Mr. Ramos is not entitled to federal habeas relief, and the writ should not issue.

### PROCEDURALLY DEFAULTED CLAIMS

**\*22** In addition to his ineffective assistance of counsel claims, Mr. Ramos asks this court to consider five claims of trial court error, all of which were presented to the state court for review on direct appeal (according to Mr. Ramos). However, as respondent correctly points out, the claims were not fairly presented as federal claims. In the discussion that follows, the court will review each claim as it is presented here and as it was presented to the state court on direct appeal, and then show why the claims were not properly exhausted.

B. PETITIONER WAS DENIED HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS AND A FAIR TRIAL AS A RESULT OF:

1. *Improper Admission of Expert Testimony and Computer Animation Depicting Expert Testimony.*

Here Mr. Ramos raises federal constitutional claims on the admission of evidence. He did not present the issues as federal constitutional claims in the state court. In his appellate brief Mr. Ramos raised two grounds for relief (combined here) arguing fundamental error by the trial court in admitting the testimony of Dr. Herrmann (ex. C, pp. 28-34), and abuse of discretion in admitting the computer animation (*id.* at 41-44).[FN11] After describing Dr. Herrmann's testimony, Mr. Ramos contended that "this evidence was so devastatingly prejudicial that its introduction violated his Florida and *federal constitutional rights* to due process and a fair trial, and the error was fundamental."(*Id.* at 29) (emphasis added). He then argued that the Florida Evidence Code required the court to inquire concerning the expert's scientific, technical or other specialized knowledge and to determine whether the proposed testimony would aid the trier of fact, citing Fla. Stat. §§ 90.702 and 90.104(3). He then outlined the steps the trial court must take in making that determination, citing four Florida cases.[FN12]Next he argued the underlying facts, showed that the state did not elicit any testimony concerning scientific principles or prove that any such principles were generally recognized, and asserted that the testimony was therefore not useful to the jury. He went on to argue that Dr. Herrmann's testimony was nothing more than speculation and explained why, and further explained how the speculative nature of her testimony undermined the basis for admitting her testimony, again citing Florida cases.[FN13]

> FN11. Mr. Ramos worded these two grounds for relief in the state appellate court as follows:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                    Page 22
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

THE TRIAL COURT COMMITTED FUNDAMENTAL ERROR BY ADMITTING THE EXPERT OPINION OF ITS MEDICAL EXAMINER THAT EACH OF THE VICTIMS SUSTAINED AT LEAST ONE GUNSHOT WOUND WHILE LYING ON OR NEAR THE FLOOR, WHERE THIS TESTIMONY WAS BASED ON SPECULATION AND WAS OTHERWISE BEYOND THE SCOPE OF THE WITNESS'S EXPERTISE.

and

THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING, AS DEMONSTRATIVE EVIDENCE, A COMPUTER ANIMATION DEPICTING THE STATE'S THEORY OF THE POSITIONING OF THE VICTIMS AT THE TIME OF THE SHOOTINGS, WHERE THE COMPUTER ANIMATION HAD NOT BEEN DISCLOSED TO DEFENSE COUNSEL UNTIL AFTER THE BEGINNING OF TRIAL, A PROPER FOUNDATION FOR ITS ADMISSION HAD NOT BEEN LAID, IT WAS CUMULATIVE TO OTHER EVIDENCE, AND IT ULTIMATELY UNFAIRLY PREJUDICED MR. RAMOS.

FN12.*Ramirez v. State,* 651 So.2d 1164 (Fla.1995) (holding that the court must determine whether a reliable body of evidence supports the opinion); *Copeland v. State,* 566 So.2d 856 (Fla. 1st DCA 1990) (holding that the burden is on the proponent to prove the underlying principle and related testing); *Gilliam v. State,* 514 So.2d 1098 (Fla.1987) (holding that an opinion may not be based on speculation); *Kelvin v. State,* 610 So.2d 1359 (Fla. 1st

DCA 1992) (holding that the expert's opinion must be within the scope of her expertise).

FN13.*Gilliam, supra; Gurganus v. State,* 451 So.2d 817 (Fla.1984) (holding that psychological expert's testimony was irrelevant when he conceded that there were equal probabilities that the person was sane or insane).

Next Mr. Ramos outlined the alleged paucity of Dr. Herrmann's training and experience, again citing Florida cases.[FN14]Mr. Ramos concluded by showing that a forensic pathologist's improperly admitted testimony, and specifically the opinion of Dr. Herrmann, created fundamental error, citing Florida cases.[FN15]

FN14.*Spradley v. State,* 442 So.2d 1039 (Fla. 2d DCA 1983) (holding that medical examiner cannot testify on all circumstances bearing on a victim's injuries or death); *Wright v. State,* 348 So.2d 348 So.2d 26 (Fla. 1st DCA 1977) (holding that medical examiner cannot testify that pattern of injuries was inconsistent with defendant's story)

FN15.*Wright, supra; Kelvin v. State,* 610 So.2d 1359 (Fla. 1st DCA 1992) (holding that testimony of an evidence technician was beyond the scope of his expertise).

As to the admission of the computer animation, Mr. Ramos argued that the state used it to reinforce Dr. Herrmann's testimony by having her repeat it while the state published the animation. He argued further that the evidence was cumulative and that it undoubtedly left an impression in the minds of the jurors, since they asked to see it while deliberating, such that Mr. Ramos was denied "his constitutional right to a fair trial."(*Id.* at 35). He then cited a single Florida case,[FN16] and showed how the com-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

Page 23

puter animation in this case was inadmissible for the same reasons set out in the cited case, particularly lack of foundation. He concluded by arguing that the trial court erred in not making the requisite findings necessary to support admission of the animation evidence, and that admitting it "violated Mr. Ramos' Florida and federal constitutional rights to due process and a fair trial...."(*Id.* at 40-41).

> FN16.*Pierce v. State,* 718 So.2d 806 (Fla. 4th DCA 1997) (holding that a computer generated demonstrative aid was not admissible where a proper foundation was not laid).

### 2. *The Trial Court Violated Ramos' Right to Due Process by Denying his Motion to Continue.*

**\*23** One of Mr. Ramos' grounds for relief on appeal was based on a claim that the trial court abused its discretion in denying counsel's motion for continuance (ex. C, pp. 41-44).[FN17] Mr. Ramos outlined the time sequence, noting particularly that the state did not produce a final version of the computer animation until the trial had already started. He then argued that while a motion to continue is left to the discretion of the trial court, no deference is due when denial of the motion denies a defense, citing one Florida case, *Smith v. State,* 525 So.2d 477 (Fla. 1st DCA 1988), in which the court noted that having time to prepare a defense is inherent in the right to counsel. He argued that in light of the rule announced in *Smith,* and given the importance of the computer animation in support of the state's premeditation theory and the diligence of defense counsel in trying to depose Dr. Herrmann before trial, the court's denial of the motion for continuance was an abuse of discretion.

> FN17. Mr. Ramos worded this ground for relief in the state appellate court as fol- lows:
>
> THE TRIAL COURT ABUSED ITS

DISCRETION IN DENYING MR. RAMOS'S MOTION FOR CONTINUANCE WHERE THE STATE FAILED TO PRODUCE ITS COMPUTER GENERATED ANIMATION, A CRUCIAL PIECE OF EVIDENCE REGARDING PREMEDITATION, UNTIL THE MIDDLE OF THE STATE'S CASE.

### 3. *The Evidence was Legally Insufficient to Support a Conviction of First Degree Murder.*

In his appellate brief Mr. Ramos argued that the trial court erred in denying his motion for judgment of acquittal because a hypothesis of innocence had not been excluded (ex. C, pp. 21-28).[FN18] He argued that his testimony that he had shot Mr. Lands in self defense had not been disproven by the state, and pointed to seven Florida cases [FN19] dealing with Florida's rule that in circumstantial evidence cases, the state must disprove any reasonable hypothesis of innocence. He asserted that "[t]he rule implicates a defendant's Florida and federal constitutional rights to due process."(Ex. C, p. 24). He then related the facts proven at trial, criticized the state's argument that there had been no proof that Mr. Lands was armed, and explained that this need not be proven, citing two Florida cases.[FN20]Finally, again arguing the facts, he contended that the state's proof that Mr. Lands was shot twice in the back of the head was not inconsistent with Mr. Ramos' testimony that he was frightened and confused, thought Mr. Lands was reaching for a gun, and shot him three times, twice after he had turned away and was falling, and that the state's evidence did not disprove his testimony. In support he cited four Florida cases.[FN21]

> FN18. Mr. Ramos worded this ground for relief in the state appellate court as fol- lows:
>
> THE TRIAL COURT ERRED IN DENYING MR. RAMOS' MOTION

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

Page 24

FOR JUDGMENT OF ACQUITTAL REGARDING COUNT II WHERE THE EVIDENCE OFFERED BY THE STATE, CORROBORATED BY MR. RAMOS' TESTIMONY, ESTABLISHED SELF-DEFENSE AND THE OTHER EVIDENCE ADDUCED BY THE STATE FAILED TO EXCLUDE THIS HYPOTHESIS OF INNOCENCE BEYOND REASONABLE DOUBT.

FN19.*Andrews v. State,* 577 So.2d 650 (Fla. 1st DCA 1991) (holding that the state has the burden of proving the defendant did not act in self defense); *Diaz v. State,* 387 So.2d 978 (Fla. 3rd DCA 1980) (same); *Cox v. State,* 555 So.2d 352 (Fla.1989) (holding that state's proof must be inconsistent with any reasonable hypothesis of innocence); *Wright v. State,* 348 So.2d 26 (Fla. 1st DCA 1977) (same); *Driggers v. State,* 164 So.2d 200 (Fla., 1964) (same); *Keys v. State,* 606 So.2d 669 (Fla. 1st DCA 1992) (holding that the state may not rely on pyramiding inferences); *McCarthur,* 351 So.2d 972 (Fla.1977) (holding that defense version must be believed if not shown to be false); *Jones v. State,* 466 So.2d 301 (Fla. 3rd DCA 1985) (quoting dissent) (explaining why circumstantial evidence is suspect).

FN20.*Harris v. State,* 104 So.2d 739 (Fla. 3d DCA 1980) (holding that in a self defense claim, the danger must be only apparent, not real); *Diaz v. State,* 387 So.2d 978 (Fla. 3rd DCA 1980) (conviction reversed where defendant believed victim was armed)

FN21.*Holton v. State,* 87 Fla. 65, 99 So. 244 (Fla.1924 (conviction reversed even though victim shot in back of head); *Andrews v. State,* 577 So.2d 650 (Fla. 1st

DCA 1991) (holding that physical evidence did not substantially contradict defendant's testimony); *Kelley v. State,* 543 So.2d 286 (Fla. 1st DCA 1989) (conviction confirmed where expert testimony disagreed with defendant's version); *State v. Powell,* 636 So.2d 138 (Fla. 1st DCA 1994) (same)

4. *Denial of Theory of Defense Instruction Violated Ramos' Right to Due Process.*

In his appellate brief Mr. Ramos argued that the trial court erred in denying a requested jury instruction (ex. C, p. 14-21).[FN22] After reviewing the evidence, he noted that Florida's felony murder rule and law of principals proscribed conviction if codefendant Clark acted spontaneously and without any pre-planning involving Mr. Ramos, and that the "independent act" rule serves to exonerate a person who did not participate in any common design, citing three Florida cases.[FN23] He then argued that in Florida a defendant is entitled to an independent act instruction where there is any evidence that supports the theory, no matter how weak the evidence may be, and that failure to give the instruction when appropriate is fundamental error, citing six Florida cases.[FN24] He then stated that "[s]uch a failure denies a defendant his Florida and federal constitutional rights to due process and a fair trial."(Ex. P, p. 16). Mr. Ramos showed how the facts proven at his trial fit the requirements for the requested instruction, and then pointed to Florida cases involving similar facts in which the instruction was required.[FN25] Finally, he distinguished two cases in which the independent act instruction was not appropriate,[FN26] and concluded by asserting that the trial court reversibly erred in refusing to give the requested independent acts instruction.

FN22. Mr. Ramos worded this ground for relief in the state appellate court as follows:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                      Page 25
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

THE TRIAL COURT ERRED IN DENYING MR. RAMOS' REQUEST FOR AN "INDEPENDENT ACTS" JURY INSTRUCTION WHERE THE STATE ALLEGED AND ARGUED THAT HE COMMITTED FOUR FELONY MURDERS AND THE EVIDENCE SUPPORTED THE THEORY THAT HIS CO-DEFENDANT SPONTANEOUSLY COMMITTED THREE OF THESE MURDERS.

FN23.*Bryant v. State,* 412 So.2d 347 (Fla.1982) (holding that a person is guilty of felony murder when a homicide is committed during commission of a felony, but not if the felony was not part of the original design); *Lovette v. State,* 636 So.2d 1304 (Fla.1994) (same); *Dell v. State,* 661 So.2d 1305 (Fla. 3d DCA 1995) (stating that the rule is designed to exonerate a defendant when another commits acts outside the original design).

FN24.*Bryant v. State, supra; Lewis v. State,* 591 So.2d 1046 (Fla. 1st DCA 1991); *Solomon v. State,* 436 So.2d 1041 (Fla. 1st DCA 1983); *Holley v. State,* 423 So.2d 562 (Fla. 1st DCA 1982); *Williams v. State,* 247 So.2d 425 (Fla.1990); *Howard v. State.* 561 So.2d 1362 (Fla. 3d DCA 1990)

FN25.*Bryant, supra; Rodriquez v. State,* 571 So.2d 1356 (Fla. 2d DCA 1990).

FN26.*Lovette, supra; Dell v. State,* 661 So.2d 1305 (Fla. 3d DCA 1995).

5. *Petitioner was Denied His Sixth Amendment Right to a Fair and Impartial Jury, Confrontation, and Assistance of Counsel Due to Juror Misconduct During Deliberations That Affected the Verdict.*

*24 Mr. Ramos told the state appellate court that the trial court abused its discretion in denying his motion for new trial based on jury misconduct (ex. C, pp. 45-50).FN27 He outlined the alleged misconduct, recounting that after the guilty verdicts but before the penalty phase two jurors told the court that there were coerced verdicts and that one or more of the other jurors had facts that had not been introduced in evidence. One juror even tried to disavow her verdicts on two counts. Defense counsel's motion for new trial was denied. Mr. Ramos then outlined the law on juror misconduct, citing a series of Florida cases,FN28 and argued that his case fit the facts in the cases he relied on. He stressed that the state had the burden of showing that the misconduct did not affect the verdicts, and that it had failed to do so. He also noted in a footnote that "[j]uror misconduct implicates fundamental Florida and federal constitutional rights including those to a fair and impartial jury, confrontation, cross-examination, and assistance of counsel."(Ex. C, p. 47). Finally, Mr. Ramos argued that the verdicts themselves, being largely at odds with the evidence presented at trial, favored a finding of misconduct, and that the court abused its discretion in denying his motion for new trial.

FN27. Mr. Ramos worded this ground for relief in the state appellate court as fol- lows:

THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING MR. RAMOS' MOTION FOR NEW TRIAL WHERE SEVERAL JURORS ADMITTED JUROR MISCONDUCT DURING DELIBERATIONS THAT UNQUESTIONABLY AFFECTED THE VERDICTS.

FN28.*State v. Hamilton,* 574 So.2d 124 (Fla.1991); *Baptist Hospital of Miami, Inc. V. Maler,* 579 So.2d 97 (Fla.1991) (holding that once there is a demonstration

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                      Page 26
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

of juror misconduct, prejudice is presumed unless the state demonstrates that it had no possible effect on the verdict); *Powell v. Allstate Insurance Co.,* 652 So.2d 354 (Fla.1995) (noting that the court is generally prohibited from inquiring into the deliberative process); *Wilding v. State,* 674 So.2d 114 (Fla.1996) (holding that if facts not in evidence are discussed among the jurors, the misconduct becomes overt)

*These claims were not properly exhausted and are procedurally defaulted.*

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[FN29] thereby giving the State the " 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."*Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. *Duncan, supra,* 513 U.S. at 365-66;*O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Picard,* 404 U.S. at 277-78.

> FN29.Section 2254 provides, in pertinent part:
>
> > (b) (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that-
> >
> > (A) the applicant has exhausted the remedies available in the courts of the State; or

> > (B) (i) there is an absence of available State corrective process; or
> >
> > (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
> >
> > ....
> >
> > (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In *Picard v. Connor, supra,* the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle petitioner to relief. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts,"*id.* at 278, 92 S.Ct. at 513, the Court rejected the contention that petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. In *Anderson v. Harless,* 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. *Id.* 459 U.S. at 7, 103 S.Ct. at 278 (citing *Sandstrom v. Montana,* 442

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

Page 27

U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)). The only manner in which the habeas petitioner had cited federal authority was by referring to a state court decision in which "the defendant ... asserted a broad federal due process right to jury instructions that properly explain state law."*Anderson,* 459 U.S. at 7, 103 S.Ct. at 278 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. 459 U.S. at 7 and n. 3, 103 S.Ct. at 278 and n. 3.

**\*25** Years later, the Supreme Court readdressed the "fair presentation" requirement in *Duncan v. Henry, supra.* The *Duncan* Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[FN30] The Supreme Court explained,"[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Duncan,* 115 S.Ct. at 888. More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."*Baldwin v. Reese,* 541 U.S. 27, 124 S.Ct.

1347, 1351, 158 L.Ed.2d 64 (2004). The *Baldwin* Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.' "*Id* . This language, while not part of the Court's holding, provides an instructive and useful rule of thumb. With regard to this statement, the Eleventh Circuit stated in *McNair v. Campbell,* 416 F.3d 1291 (11th Cir.2005):

> FN30. Petitioner in *Duncan* raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.' " *McNair [v. Campbell],* 315 F.Supp.2d at 1184 (quoting *Vasquez v. Hillery,* 474 U.S. 254, 257, 106 S.Ct. 617, 620, 88 L.Ed.2d 598 (1986)). This is consistent with settled law established by the Supreme Court.... We therefore hold that " '[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.' " *Id.,* 416 F.3d at 1302-03 (citations omitted).[FN31]

> FN31. In his initial brief before the Court of Criminal Appeals, petitioner cited one federal case in a string citation containing other state cases, and in a closing para-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                Page 28
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

graph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth [,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law."*McNair v. Campbell,* 416 F.3d 1291, 1303 (11th Cir.2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

The Eleventh Circuit, prior to *Duncan,* had broadly interpreted the "fair presentation" requirement.[FN32] However, after *Duncan,* the Eleventh Circuit has taken a more restrictive approach. For example, in *Zeigler v. Crosby,* the Circuit Court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the Federal Constitution. 345 F.3d 1300, 1307 (11th Cir.2003). The court specifically noted that the section of petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial....," which could be interpreted as asserting a fair trial claim under the Florida Constitution and Florida's Due Process Clause. *Id.* at 1308 n. 5. The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases. The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), ... did not present to the Florida courts the federal

claim asserted to us."*Id.*

FN32.*See, e.g., Watson v. Dugger,* 945 F.2d 367 (11th Cir.1991) (finding issue to be exhausted when petitioner argued in state court that trial court misapplied state law when it refused to give petitioner' requested jury instruction and thereby allowed the jury to convict without necessary showing of criminal intent, and argued in federal court that this was a due process violation); *Mattox v. Dugger,* 839 F.2d 1523 (11th Cir.1988) (holding that a federal habeas corpus petition should not be dismissed on grounds of procedural default when a petitioner has previously brought an issue before a state court alleging only state law violations, when such a claim is equally supported by federal law, and the state cites such federal law in support of its position); *Hutchins v. Wainwright,* 715 F.2d 512, 518-19 (11th Cir.1983) (petitioner exhausted Sixth Amendment confrontation clause claim in state court by raising hearsay objections, even though petitioner never raised Sixth Amendment claim in state court).

**\*26** To overcome a procedural default, petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. *Tower,* 7 F.3d at 210;*Parker,* 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."*McCleskey v. Zant,* 499 U.S. 467, 497, 111 S.Ct. 1454, 1472, 113 L.Ed.2d 517 (1991) (quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. *Tower v. Phillips, supra.*To satisfy the miscarriage of justice exception, petitioner must

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                  Page 29
Slip Copy, 2009 WL 36599 (N.D.Fla.)
(Cite as: 2009 WL 36599 (N.D.Fla.))

show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."*Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 85, 130 L.Ed.2d 808 (1995)."To establish the requisite probability, petitioner must show that it is more likely than not that no reasonable juror would have convicted him."*Schlup,* 513 U.S. at 327. Further:

a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial.

*Id.*

Here, Mr. Ramos framed his claims in his appellate brief without making any reference to federal law, and in the body of his various arguments he made no specific reference to the United States Constitution or federal law, and he cited no federal cases. He argued Florida law only. He made passing general reference to the federal constitution and rights of due process and a fair trial, to the right to counsel, to "defendant's Florida and federal constitutional rights to due process," and stated in a footnote that "[j]uror misconduct implicates fundamental Florida and federal constitutional rights including those to a fair and impartial jury, confrontation, cross-examination, and assistance of counsel."[FN33]Finally, in the Conclusion of his appellate brief Mr. Ramos asserted that he was denied his rights to due process and a fair trial. This assertion is no more direct than any of his other federal references, and is weaker then most.

> FN33. In Mr. Ramos' fifth ground, as in the others, he made no effort to apprise the appellate court that he was raising a federal constitutional issue. Although his quoted

footnote was slightly more direct than his other passing references to federal rights, Florida law provides that footnoting an issue does not constitute proper briefing, *Coolen v. State,* 696 So.2d 738, 742 n. 2 (Fla.1997), and that a proper challenge to the constitutionality of a statute is not preserved by mere perfunctory argument, *Henderson v. State,* 569 So.2d 925 (Fla. 1st DCA 1990). Thus, under Florida's own briefing requirements, Mr. Ramos' footnote did not make the appellate court aware that he was raising a federal constitutional claim.

There was precious little in Mr. Ramos' appellate brief to put the state court on notice that it was being presented with federal constitutional claims. Individually or taken together, inserting these references was nothing more than "scatter[ing] some makeshift needles in the haystack of the state court record" that the Eleventh Circuit found insufficient in *McNair v. Campbell, supra,* and Mr. Ramos' claims concerning the trial court's alleged errors were not fairly presented to the state court as federal constitutional claims and are therefore unexhausted. *See also, e.g. Pearson v. Secretary, Dep't of Corrections,* 273 Fed. Appx. 847, 850 (11th Cir. April. 15, 2008) (holding that petitioner did not alert the state court to the alleged federal nature of his sufficiency of the evidence claim and therefore failed to exhaust his federal due process claim; even though petitioner moved for a judgment of acquittal in state court, he cited exclusively to state cases, and all of his substantive arguments addressed Florida law, specifically that there was no evidence of reasonable fear on the part of the victim as defined by state law); *Cook v. McNeil,* 266 Fed. Appx. 843, 845-46 (11th Cir. February. 21, 2008) (holding that petitioner did not alert the state court to the alleged federal nature of his sufficiency of the evidence claim and therefore failed to exhaust his federal due process claim; even though

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 30
Slip Copy, 2009 WL 36599 (N.D.Fla.)
**(Cite as: 2009 WL 36599 (N.D.Fla.))**

petitioner moved for judgment of acquittal and although Florida courts assess the sufficiency of the evidence under the standard applied in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2798, 61 L.Ed.2d 560 (1979), petitioner cited exclusively to the state cases and all of his substantive arguments addressed Florida law; "the tenor of [petitioner's] narrow arguments that challenged the characterization of his knife and the sequence of his actions under the Florida statute did not bring a federal claim about due process to the attention of the state appellate court.").[FN34]

> FN34. These cases are cited as persuasive only, not as binding precedent. *See* 11th Cir. R. 36-2.

*27 Now, any further attempt at exhaustion in Florida courts would be futile because Mr. Ramos' claims would be procedurally barred under Florida law. *See Rodriquez v. State,* 919 So.2d 1252, 1262 n. 7 (Fla.2005) (holding that issues were procedurally barred because they should have been, but were not, raised on direct appeal); *Smith v. State,* 445 So.2d 323, 325 (Fla.1983) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack.").

Mr. Ramos has made none of the requisite showings to excuse his default. He has not alleged cause for his default, and has presented no new evidence of his factual innocence. Therefore, these five claims are procedurally defaulted, and will not be considered in this court.

Accordingly, it is ORDERED:

That the clerk change the docket to reflect that Walter A. McNeil is the respondent in this cause.

And it is respectfully RECOMMENDED:

That the 28 U.S.C. § 2254 petition for writ of habeas corpus (doc. 1), challenging the conviction

and sentence in *State of Florida v. Javier Ramos,* in the Circuit Court of Bay County, Florida, case no. 94-1940, be DENIED, that this cause be DISMISSED, and that the clerk be directed to close the file.

N.D.Fla.,2009.
Ramos v. McNeil
Slip Copy, 2009 WL 36599 (N.D.Fla.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.