1

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

------------------------------------

CHADRICK FULKS,                    CV NO.: 2:06-980
                                   Columbia, SC
        Plaintiff                  February 25, 2009

    -vs-


James Metts, Sheriff, Lexington
County; Bernice Mitchell, Deputy
Sheriff; Paula Lybrand, Deputy
Sheriff; Valerie Allen, Deputy
Sheriff; Cain Mayrant, Deputy
Sheriff,

        Defendants

------------------------------------

BEFORE HON. PATRICK MICHAEL DUFFY
UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL

APPEARANCES:

FOR PLAINTIFF:        J. CHRISTOPHER MILLS LAW OFFICE
                     BY:  J. CHRISTOPHER MILLS, ESQ.
                     P.O. Box 5717
                     Columbia, SC   29250

FOR DEFENDANTS       DAVIDSON & LINDEMANN
METTS, MITCHELL,     BY:  WILLIAM H. DAVIDSON, II, ESQ.
ALLEN & MAYRANT:          DANIEL C. PLYLER, ESQ.
                     P.O. Box 8568
                     Columbia, SC   29202

FOR DEFENDANT        VINTON D. LIDE & ASSOCIATES
LYBRAND:             BY:  MICHAEL S. PAULEY, ESQ.
                     P.O. Box 2198
                     Lexington, SC   29071

*Exhibit B*

65

this time I move all plaintiff's exhibits into evidence.

THE COURT: They are admitted.

MR. MILLS: Thank you, your Honor.

THE COURT: All right.

MR. DAVIDSON: Your Honor, to help him out I move all defendants' exhibits be introduced. They run from Defendants' Exhibit 1 to I believe Exhibit 40, your Honor, and they are consecutively numbered.

MR. PAULEY: I'll join in that motion.

THE COURT: That motion is granted. They are admitted, as well.

MR. MILLS: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. MILLS:

Q. Miss Glass, good afternoon.

A. Good afternoon.

Q. Could you let the jury know who you are?

A. My name is Drucy Glass.

Q. And where do you live?

A. Ithaca, New York.

Q. Ithaca, New York?

A. Yes.

Q. Do you live there exclusively?

A. No. We live there most of the year and we still have our house in Lexington, South Carolina.

Glass – Direct                    66

Q.   When you say we, who are you talking about?

A.   My husband and I.

Q.   And who is your husband?

A.   His name is John Blume.

Q.   And Mr. Blume actually represented Mr. Fulks in his criminal trial, is that correct?

A.   He did.

Q.   And where is Mr. Blume currently employed?

A.   He's employed at Cornell Law School as a law professor.

Q.   All right.  And so you split your time between Cornell Law School and Columbia?

A.   Yes.

Q.   Your children are up and out?

A.   One is at Cornell now, sophomore, and one just finished Cornell last year, he graduated.

Q.   Okay.  Miss Glass, I'm going to ask a little bit about your background, educational background.  Could you tell the jury kind of where you went to school?

A.   I went to high school in Tyler, Texas and I went to University of South Carolina.

Q.   And what was your major when you were at the University of South Carolina?

A.   Sociology.

Q.   After your graduation did you have any particular area of sociology you were going to go into?

A.   Not really.  I ended up working on a grant after graduation for the Law Enforcement Assistance Administration, and it was a federal grant that evaluated youth bureaus at the time, which were part of the Department of Youth Services at the time, which is now called Department of Juvenile Justice.

Q.   That's where they house adjudicated juveniles for rehabilitation.

A.   Correct.  But the youth bureau served kids that were in the community.

Q.   Okay.  And after that grant what did you do?

A.   It was a two-year grant, and after that I went to work at Lexington Department of Social Services as a caseworker in child protective services and foster care.

Q.   And how long did you work in that capacity?

A.   I worked there for I think about four years.  And then I went to work for the Continuum of Care for emotionally disturbed children.  Which was, is an agency, I assume it's still around, it was funded by the Educational Opportunity Act, I think is what they called it, or EOA.  But, anyway, it was a consortium of four counties, Lexington, Richland, Kershaw, and Edgefield, and it served high risk children that all were labeled emotionally disturbed by the schools.

Q.   Is this under a general rubric of social work, for lack of a better term?

A.   Correct.

Glass - Direct.                          68

Q.   So would it be fair to call you a social worker at that time?

A.   Yes, a caseworker and social worker.

Q.   All right.  And how long did you continue work for the government?

A.   I was at Continuum of Care for I think two years, and then I had a child in 1986 so I stayed home for a year.  And then I went back part-time at Lexington County Department of Social Services again as a caseworker.  And then I was there about a year and then I went to the state office of Department of Social Services in a part-time position in the foster care unit.

Q.   And that's located here in Columbia.

A.   Correct.

Q.   All right.  How long did you stay with the statewide Department of Social Services?

A.   I think a couple of years.

Q.   How long do you think your tenure was in the -- working as a social worker either at Continuum or DSS, or in some related agency post-graduation?  When did you graduate from Carolina?

A.   I graduated Carolina in 1976.

Q.   Okay.

A.   And so those jobs took me through basically 1999.

Q.   Okay.  I think we should stop kind of at the birth of your first child in '86, I believe you indicated.

Glass – Direct                                   69

A.   Right.

Q.   And then from '86 until '99 you continued to work in that capacity.

A.   Yes.

Q.   All right.  And that capacity would have been as a social worker with the state office of social services.

A.   And the county for a while, and then with the state, yes.

Q.   Obviously there came a time that you left the Department of Social Services.

A.   Yes.  And then I started in around 1990 doing work as a mitigation investigator.

Q.   Okay.  When you say mitigation investigator, the jury may not be familiar with that, so if you could explain to them what is a mitigation investigator?

A.   A mitigation investigator is a person that works with attorneys on capital murder trials.  They are usually a social worker, I have a social work background, and they collect information that is presented at the sentencing phase of capital murder trials.  There's two phases to a trial, there's the first phase which is the guilt-innocence phase, and then if the defendant's found guilty they move on to the sentencing phase.  And at the sentencing phase the defendant has an opportunity to present information about his own background, his family, witnesses.  And so a mitigation investigator collects information that can be used at the sentencing phase

Glass – Direct                                70

of the trial.

Q.   So the government is introducing information at that phase of the trial to seek the death penalty and the defense is offering evidence in mitigation of that request, is that fair?

A.   Yes.

Q.   Okay.  And your job is to collect the information that can be used by those attorneys during that mitigation phase of the litigation.

A.   Yes.

Q.   Okay.  You can elaborate if you --

A.   I mean, the basics is to interview the client and to get a thorough social history background, you know, which involves hours and hours.  Because you are sitting there with him to find which schools they attended, where they were born, all the members of their family, what mental health issues he might have, what records he might have out there, what medical records he might have out there, substance abuse, incarceration records.  And I get the client to sign a release and then I start writing to collect all those records.  And then we meet the family and go through the same questions with the family, collect their records.  Collect -- interview school teachers, you know, all education records, employers, neighbors, friends.

Q.   Okay.  What kind of things -- you told me you collected -- I guess you gather an oral history from the family about this individual's life.

Glass - Direct                                        71

A.   And about their life and about the marriage the child was born into, and what family issues surround the parents and their lives.  I mean, it's multi-generational.

Q.   And you gather -- what kind of documents do you gather?

A.   Gather all medical records, mental health records, education records, school records, employment records, arrest records, drug rehab records.  Whatever is out there we try and collect.

Q.   Do you try to gather any pictures?

A.   Collect pictures.  Often go to the family to get photographs which are often used in the sentencing phase of the trial, blown up as exhibits.  And sometimes they are used to document physical disorders.  Or in Chad's case they were used to -- his baby pictures were used to help identify the diagnosis that he has as fetal alcohol spectrum disorder.  And his baby pictures were important, because children that have fetal alcohol spectrum disorder often show signs or symptoms or there's traits, physical traits as a baby.  But as you grow up those traits, you know, disappear as the child develops in age.  And so we used those in Chad's --

Q.   Now, in your role as a mitigation specialist, is that a fair term?

A.   Yes, sir.

Q.   Do you have contact with the client on a regular basis?

A.   After they're first arrested, I mean, it really -- I need

Glass – Direct                                    73

I mean, it's a gradual process.  I got him to sign releases, I explained to him what I -- what my part was in -- of his defense team.  The lawyers were working with him on, you know, all separate issues.  I was just there to gather the family history information.

Q.  Would he discuss any problems he would be having in his life at that time?

A.  He did.  We started usually out by him telling me how it was in the jail, and his likes and dislikes and his complaints and, which is not unusual for inmates but, you know, we listen to that and try and move on with the stuff that I needed to go over with him that day.

Q.  On a complaining scale where would Chad rank there?  Let's say one to ten.

A.  Chad was a great complainer.  He was a bit whiny at times.  He had numerous complaints.

Q.  All right.  So a lot of your visits he would vent to you or discuss what he perceived as problems going on with his incarceration.

A.  Yes.  And, you know, until you get past that I couldn't do, you know, what -- the things I needed to do.  So, yeah, I always knew the first few minutes or ten or 15 minutes would be devoted to listening to Chad, you know, tell me the problems he was having.

Q.  Okay.  Let me first ask some questions about there's a

Glass – Direct                                    82

Q.   All right.

A.   We met often.

Q.   And did the attorneys actually go out to visit Chad, as well?

A.   The attorneys went frequently, because they had a lot to discuss with Chad.

Q.   Okay.  And in these conversations I think you indicated earlier Chad complained a good bit.

A.   He did.

Q.   All right.  And in your role as his mitigation and defense team what did you do in response to those complaints?  What would you do?

A.   My role would just be to tell -- I mean, I did report to the lawyers that, you know, he is still complaining about this or that.  It wasn't my role to take care of this.  My role was just collect the information and social history investigator.  But I did relay information.

Q.   All right.  And do you know whether or not the attorneys would contact the jail and follow up on the information you provided?

A.   I knew they were calling or writing letters.  I mean, I don't know how they were really trying to handle it, truthfully.

Q.   So this letter, which makes reference to Mr. Fulks' swollen and puffy condition, is that the kind of thing you're talking

Glass - Direct                                    87

Q.   Okay.  Did he describe any types of injuries or what happened to him at all?

A.   I mean, he described an altercation with some officers, I didn't recall how many there were, an altercation with officers that resulted in him on the ground and in a restraining chair. And at one point I vividly recall him tell me he was down on the ground on all fours and somebody kicked him from behind.

Q.   Did you have much contact with Chad Fulks throughout that summer and into the fall?

A.   I did not.  And my -- this was April 25, and I saw him -- truthfully, I don't remember.  I saw him a couple of more times in May.  I spent my time going to West Virginia and Indiana interviewing his family and friends and fathers and mothers. And so my time with Chad was less and less.  I gathered the information up front, knew, you know, the places I needed to go.  There was another mitigation investigator doing what I was doing, and she and I were, you know, up in West Virginia a lot.

     And then in that summer I didn't really -- from the first of June until the end of -- almost the end of August I did not even work on Chad's case.  My husband had -- we weren't friends.  I mean, he was teaching -- Cornell has a teaching program at the Sorbonne in Paris, and so we were in Paris and Italy for about five weeks that summer.  And I had kids at home so I really didn't work his case then, the other mitigation worker was carrying on.