## INDEX OF UNPUBLISHED DECISIONS

AG Equip. Co. v. AIG Life Ins. Co., 2008 WL 5205192 (N.D. Okla. Dec. 10, 2008) .................. 1

Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc., 240 F.R.D. 401 (N.D. Ill. 2007) ................... 10

Buttler v. Benson, 193 F.R.D. 664 (D. Colo. 2000) .................................................................. 26

Glesenkamp v. Nationwide Mut. Ins. Co., 71 F.R.D. 1 (N.D. Cal. 1974) ................................... 30

Rafano v. Patchogue-Medford Sch. Dist., 2009 WL 789440 (E.D.N.Y. Mar. 20, 2009) ............. 35

Wakehouse v. Goodyear Tire & Rubber Co., 2007 WL 1340788 (D. Neb. Apr. 5, 2007) .......... 49

In re Zyprexa Prods. Liability Litig., 2009 WL 1310890 (E.D.N.Y. May 8, 2009) .................... 58

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 5205192 (N.D.Okla.)
**(Cite as: 2008 WL 5205192 (N.D.Okla.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Oklahoma.
AG EQUIPMENT COMPANY, et al., Plaintiff,
v.
AIG LIFE INSURANCE COMPANY, et al., Defendant.
**No. 07-CV-556-CVE-PJC.**

Dec. 10, 2008.

West KeySummary
**Federal Civil Procedure 170A ☞1451**

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(C) Depositions of Parties and Others Pending Action
         170AX(C)6 Failure to Appear or Testify; Sanctions
            170Ak1451 k. In General. Most Cited Cases
Attorneys' abusive conduct at depositions and violation of deposition rule warranted sanction $250 against each side's counsel. Both lawyers made inappropriate speaking objections to deposition questions and improperly instructed witnesses not to answer questions. Plaintiff's counsel chose to take video depositions, but apparently did not disclose that the videographer was her husband. When plaintiff's counsel adjourned a deposition in order to catch an airplane home to Illinois, defense counsel chose to continue cross-examination of the witness in her absence. Fed.Rules Civ.Proc.Rule 30, 28 U.S.C.A.

Brian Jay Rayment, Kivell Rayment & Francis, Tulsa, OK, Dana Louann Kurtz, Kurtz Law Office LLC, Lockport, IL, for Plaintiff.

Michael Lee Carr, Steven Ernest Holden, Holden Carr & Skeens, Walter Dewey Haskins, III, Atkinson Haskins Nellis Brittingham Gladd & Carwile, Tulsa, OK, for Defendant.

### *OPINION AND ORDER*

PAUL J. CLEARY, United States Magistrate Judge.

**\*1** This matter came before the Court for hearing on Dec. 3, 2008, on numerous motions by the parties stemming from on-going discovery disputes.[FN1] The parties have resolved many of the matters addressed in their motions and the Court took under advisement specific remaining issues set forth in Dkt. Nos. 124, 126, 145, and 148.These motions are addressed below.

> FN1. The motions addressed included Docket Nos. 121, 124, 126, 145, 148,156, 173, 175, 177 and 181.At the hearing the Court found Dkt. Nos. 121, 156 and 173 MOOT, GRANTED Nos. 175 & 177, and DENIED No. 181.

### I.

### BACKGROUND

This is a lawsuit over a stop-loss insurance policy issued by AIG Insurance ("AIG") to AG Equipment ("AG").[FN2] The specific issue is AG's right to reimbursement under the AIG policy for medical expenses incurred by Suzanne Ash-Kurtz ("Ash-Kurtz").[FN3] Prior to her death in November 2008, Ash-Kurtz performed legal work for AG. The exact nature of her employment relationship with AG, including whether she was a full time employee and whether she was entitled to receive health

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 5205192 (N.D.Okla.)
(Cite as: 2008 WL 5205192 (N.D.Okla.))

insurance benefits under the AIG stop-loss policy, are key issues in the lawsuit. AIG initially reimbursed AG for Ash-Kurtz' medical expenses, but stopped payment on a $467,000 check after being notified that Ash-Kurtz was not a full-time employee of AG. Plaintiff has sued for breach of contract and bad faith; AIG has counter-claimed on breach of contract, fraud, and related theories. A companion lawsuit, brought by AG and Ash-Kurtz against Mark Heidenreiter-the source of the contention that Ash-Kurtz was not a full-time AG employee-was consolidated with this action in June 2008 [Dkt. # 67].

> FN2. Stop-loss insurance pays employees' medical expenses beyond a certain predetermined amount that is paid by the employer. In this case AG was self-insured and paid employees' medical expenses up to $40,000. The AIG policy was apparently meant to reimburse AG for an employee's medical expenses beyond $40,000

> FN3. AG and Ash-Kurtz are represented in this action by attorney Dana Kurtz, who is Ash-Kurtz' step-daughter. Thus, the Plaintiff will be referred to herein as "Ash-Kurtz." Where necessary, Plaintiffs' attorney will be referred to as "Dana Kur- tz."

The AG-AIG lawsuit was filed in Tulsa County District Court in September 2007 and removed to federal court a month later [Dkt. No. 2]. Four Scheduling Orders have since been entered [Dkt. Nos. 14, 21, 37 & 71]. Discovery was originally to have been concluded by February 29, 2008, but was subsequently extended to Oct. 31, 2008. Expert discovery has been extended to Dec. 15, 2008 [Dkt. # 99 & 100]. Discovery is now complete save for expert discovery and the issues addressed herein.

## II.

## APPLICABLE LEGAL STANDARD

### A. General Discovery Principles

It is well-established that discovery under the Federal Rules is limited only by relevance and burdensomeness. *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 343 (10th Cir.1975). Trial courts have broad discretion in managing discovery matters and are subject to review only for abuse of discretion. *In re Multi-Piece Rim Products Liability Litigation,* 653 F.2d 671, 679 (D.C.Cir.1981).

Rule 26(b)(1) provides that parties may obtain discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party.... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."Fed.R .Civ.P. 26(b)(1). At the discovery phase of litigation "relevancy" is broadly construed and a request for discovery should be considered relevant if there is "any possibility" that the information sought may be relevant to the claim or defense of any party. *Owens v. Sprint/United Mgmt. Co.,* 221 F.R.D. 649, 652 (D.Kan.2004) (citation omitted). A discovery request should be allowed "unless it is clear that the information sought can have no possible bearing" on the claim or defense of a party. *Id.*

*2 When the requested discovery appears relevant, the party opposing discovery has the burden of establishing the lack of relevance by demonstrating that the requested discovery does not come within the scope of relevance set forth in Rule 26(b)(1), or that it is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure. *Gen. Elec. Cap. Corp. v. Lear Corp.,* 215 F.R.D. 637, 640 (D.Kan.2003) (citation omitted).

Discovery motions under Rule 37 must be timely filed or the movant risks a finding of waiver. *Con-*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 5205192 (N.D.Okla.)
(Cite as: 2008 WL 5205192 (N.D.Okla.))

*tinental Indus., Inc. v. Integrated Logistics Solutions LLC,* 211 F.R.D. 442 (N.D.Okla.2002); *Buttler v. Benson,* 193 F.R.D. 664, 666 (D.Colo.2000) ("A party cannot ignore available discovery remedies for months and then, on the eve of trial, move the court for an order compelling production.").

**B. Principles Governing Depositions**

Rule 30 governs conduct at depositions. Deposition testimony may be recorded "by audio, audiovisual, or stenographic means."Fed.R.Civ.P. 30(b)(3)(A).Rule 30 further provides in pertinent part:

(1) Examination and Cross-Examination. The examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence, except Rules 103 and 615. After putting the deponent under oath or affirmation, the officer must record the testimony by the method designated under Rule 30(b)(3)(A). The testimony must be recorded by the officer personally or by a person acting in the presence and under the direction of the officer.

(2) Objections. An objection at the time of the examination-whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition-must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection. An objection must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).

Fed.R.Civ.P. 30(c)(1) and (2).

So-called "speaking objections" are not permitted. *See Damaj v. Farmers Ins. Co., Inc.,* 164 F.R.D. 559, 560 (N.D.Okla.1995) (noting that "[f]requent and suggestive objections" by counsel can frustrate the goal of deposition discovery).Rule 30(d)(3) permits a deponent or party to move to terminate or limit a deposition because it is being conducted in bad faith or that the deposition is being conducted in a manner that "unreasonably annoys, embarrasses, or oppresses the deponent or party."The Rule further provides: "If the objecting deponent or party so demands, the deposition must be suspended for the time necessary to obtain an order."Fed.R.Civ .P. 30(d)(3)(A). In all cases, Rule 30 must be construed to secure the just, speedy, and inexpensive determination of action. *Babcock & Wilcox Co. v. North Carolina Pulp Co.,* 25 F.Supp. 596, 597 (D.Del.1938).

**III.**

**DISCUSSION**

**A. Plaintiffs' Discovery Motions [Dkt. Nos. 124 & 126]**

**(1) Attorneys' Conduct at Depositions.**

*3 Both sides have complained about opposing counsel's conduct during depositions and have submitted reams of deposition transcript pages to support their outrage. The Court's extensive review of these pages serves as a useful reminder that loaded guns, sharp objects and law degrees should be kept out of the reach of children. Attorneys in these depositions-primarily Dana Kurtz for Plaintiffs and Steven E. Holden ("Holden") for Defendant-both demonstrated little knowledge or regard for Fed.R.Civ.P. 30. Both lawyers made inappropriate speaking objections to deposition questions [FN4] and improperly instructed witnesses not to answer questions.[FN5]Both engaged in conduct that viol-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 5205192 (N.D.Okla.)
(Cite as: 2008 WL 5205192 (N.D.Okla.))

ated the Local Rules of this Court [FN6] and the Federal Rules of Civil Procedure.[FN7]As if this did not make for already contentious depositions, the attorneys added spice to the mix: Plaintiff's counsel chose to take video depositions, but apparently did not disclose that the videographer was her husband. When Plaintiff's counsel adjourned a deposition in order to catch an airplane home to Illinois, Defense counsel chose to continue cross-examination of the witness in her absence.

> FN4.*Damaj,* 164 F.R.D. at 560.

> FN5. In violation of Fed.R.Civ.P. 30(c)(2).

> FN6.*Eg.,* Depositions extended beyond the seven-hour limit of LCvR30.1(b) and Fed.R.Civ.P. 30(d)(1).

> FN7.*Eg.,* the manner of examination and cross-examination set forth in Fed.R.Civ.P. 30(c)(1).

The depositions that are the subject of these motions-those of witnesses Linda Subbiondo and David Friedly-were apparently reconvened after the instant motions were filed and have now been concluded. Thus, many of the objections set forth in the pleadings are now moot. Both sides, however, have asked the Court to impose sanctions on opposing counsel for his/her conduct.[FN8]

> FN8. Of course, much time and paper would have been saved had either attorney made good on the frequent threat to "call the judge." *See* LCvR 37.2(b). Alas, neither side utilized this lifeline.

After reviewing the submissions of counsel, the Court finds that Plaintiff's Motion for Sanctions [Dkt. # 126] and Defendant's Motion for Sanctions [Dkt. # 145] should be *GRANTED IN PART.*Attorneys Holden and Dana Kurtz are each personally sanctioned $250.00 for violation of Fed.R.Civ.P. 30 and for abusive conduct at these depositions. Each

shall pay this sum to the Tulsa County Bar Association for the purpose of sponsoring a Continuing Legal Education program on proper conduct at depositions. Payment shall be made within two weeks of the date herein.

### 2) Instructions Not to Answer or Witness's Refusal to Answer.

Plaintiffs complain that witnesses have refused to answer or been instructed not to answer critical questions. These are addressed in sequence.

**(a) QUESTION: What other companies have policies with AIG for stop-loss insurance [FN9]? (Subbiondo was instructed not to answer) .**

> FN9. The question is apparently meant to secure information as to what companies have insurance with Medical Excess LLC ("Medical Excess"). Medical Excess is a member company of American International Group.

Plaintiffs contend that an answer to this question is relevant to their bad faith claim herein. The Court disagrees. Plaintiffs brought a very specific bad faith claim dealing with Defendant's alleged "refusing to timely pay Plaintiff's valid claim."*First Amended Complaint,* Dkt. No. 46, ¶¶ 45-51. Plaintiff has not alleged bad faith based on a general pattern or business practice. Significantly, discovery is now closed. Information on other companies doing business with AIG cannot reasonably lead to discovery of admissible evidence since discovery is over. The requested information is of no practical value at this stage in the proceeding. If Plaintiffs truly believed that such information was critical to their bad faith claim, they should have requested and pursued it vigorously long before now.

**(b) QUESTION: Are you aware of any evidence**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 5205192 (N.D.Okla.)
(Cite as: 2008 WL 5205192 (N.D.Okla.))

Page 5

of fraud by Ash-Kurtz or Grady Ash against AIG? (Subbiondo).

*4 AIG has asserted a counterclaim against AG alleging fraud. The essence of this counterclaim is that AG actively misrepresented that Ash-Kurtz was a full-time employee for whom AG could seek medical cost reimbursement under the AIG stop-loss policy. AIG contends that AG fraudulently asserted Ash-Kurtz was a full-time employee and fraudulently concealed his actual status. No fraud claim is alleged against Ash-Kurtz.

Subbiondo testified that she alone made the decision to file the counterclaim against AG Equipment. (Subbiondo dep., vol. I, p. 42, lines 2-5). At subsequent deposition, Subbiondo was asked if she contended that Ash-Kurtz "was participating in some kind of scheme to defraud AIG."(Subbiondo dep., vol. II, pp. 366-67). The witness answered that she did not know. *Id.* After Plaintiffs' counsel made two more attempts to get a fuller answer to the question, Defendant counsel objected that the question had been "asked and answered" and instructed the witness not to answer further. A similar pattern then followed with respect to questions as to whether Subbiondo contended that Grady Ash, owner of AG, participated in a fraud against AIG. (Subbiondo dep., vol. II, p. 368, lines 9-23).

Subbiondo has testified that she alone decided that the counterclaim should be brought against AG. (Subbiondo dep., vol. I, p. 42, lines 2-5). Therefore, it is fair to ask her the nature of the fraud claim she authorized.

Accordingly, Plaintiffs' Motion to Compel an answer to this question is *GRANTED.*Subbiondo must answer whether she contends that either Ash-Kurtz and/or Grady Ash participated in a scheme to defraud AIG and if so, on what she relies for that contention.

**(c) QUESTION: Do you have any evidence that**

**Ash-Kurtz did not normally work 30 hours per week? (Friedly).**

Friedly responded that he had not received evidence that Ash-Kurtz *did* normally work 30 hours per week. Plaintiffs' Motion to Compel is *GRANTED.*Friedly must respond to the question posed by counsel: What evidence, if any, does AIG have that Ash-Kurtz did *not* normally work 30 hours per week.

**(d) QUESTION: Has AIG denied AG's claim for coverage? (Subbiondo and Friedly).**

Subbiondo was asked a simple question: Have you or AIG denied AG's claim for reimbursement for Ash-Kurtz' medical expenses? The witness responded by stating that "we don't have enough evidence to show she worked 30 hours per week."(Subbiondo dep., pp. 251-259). After being asked essentially the same question twenty-nine times, Subbiondo finally responded, "I don't know." *Id.* at p. 259, lines 10-11. Subbiondo has answered the question. However, AG is entitled to know if its claim has been denied. Plaintiffs' Motion is *GRANTED.*AIG is directed to answer whether AG's claim in this matter has been denied and, if so, who made the decision to deny the claim and when.

**(3) Plaintiffs' Document Requests.**

Outstanding document disputes fall into several categories addressed in order below.

**(a) Plaintiffs' Request for Comparative Claim Files.**

*5 In Plaintiffs' First Request for Production Nos. 6, 7 and 8 Plaintiffs sought "every claims file for every claim" that Defendant denied or investigated from 2003 to the present "based upon claims that the medical expense was not for an employee of the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 5205192 (N.D.Okla.)
(Cite as: 2008 WL 5205192 (N.D.Okla.))

Page 6

insured."In January 2008, Defendant responded by objecting on multiple grounds, including overly broad, vague, ambiguous, unduly burdensome and not reasonably calculated to lead to admissible evidence. Plaintiffs had these objections for nine months before filing their Motion to Compel on Oct. 20, 2008.

In Second Request for Production No. 1 Plaintiffs sought "any and all documents pertaining to claims submitted to AIG where the hours or work were the basis for an investigation, initial denial, stop payment, and/or denial of a claim."In May 2008, Defendant responded and objected on the same grounds outlined above.

Plaintiffs Third Request for Production No. 23 requested "All claims files and documents relating thereto wherever located that Defendant has been involved in that are similar to 'this referral' as suggested in Defendant's Production of Documents Bates: Claims0610."Plaintiffs seek comparative files in support of their claim for bad faith-breach of the implied covenant of good faith and fair dealing. Plaintiffs contend that the requested documents will enable them to compare how AIG handled other claims where an employee's full time work status was an issue.

After due consideration of the document requests, the Court hereby *DENIES* the motion to compel as to comparative files. In addition, Plaintiffs' Third Request for Production No. 23 is vague and over-broad. A party responding to discovery must be able to understand the request and determine what documents may be responsive to the request. Plaintiffs' No. 23 fails that test and the motion to compel as to this discovery request is *DENIED* on that basis.

Plaintiffs' other requests for comparative files are denied for several reasons: First, Plaintiffs have offered no foundation from which the Court can conclude that these files are relevant to the claims

and defenses herein or may lead to admissible evidence. Second, the requests are grossly over-broad. For example, there is no geographical limitation in the requests. Since bad faith law is a creature of state law requests for files outside this state are over-broad. Third, at the stage of the proceedings there is no practical way to commence discovery along this line. Discovery cutoff was Oct. 31, 2008. There is no way that this new avenue of discovery can be explored in any rational fashion without re-opening discovery and allowing significant additional discovery time. Comparison of "similar" claims is impossible without deposition testimony to establish (1) that the claims are, in fact, similar, and (2) why they were handled differently than the claim at issue herein. Discovery has already been extended three times for a total of eight months. Opening the door to comparative claims discovery will inevitably derail the schedule in this case, needlessly increase costs and delay resolution of this matter. Thus, permitting this new discovery now cannot lead to discovery of admissible evidence since discovery is closed.

*6 While the Federal Rules of Civil Procedure do not specify a time limit for bringing a motion to compel, the motion must be brought within a reasonable time. 10A Federal Procedure § 26:779. *See Riley v. United Air Lines, Inc.,* 32 F.R.D. 230, 233 (S.D.N.Y.1962) (six-week delay in moving to compel not unreasonable under the circumstances); *Lapenna v. Upjohn Co.,* 110 F.R.D. 15, 18 (E.D.Pa.1986) (16-month delay unreasonable); *Continental Indus.,* 211 F.R.D. at 444 (motion filed six months after discovery cutoff and three weeks before trial unreasonable). Here, Plaintiffs have waited 10 months from service of Defendant's objections to the First Requests for Production to move to compel production. The motion is untimely. Plaintiffs have waited too long to seek the requested discovery.

Plaintiffs rely on two cases in support of their Motion to Compel this information: *Vining v. Enter-*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 5205192 (N.D.Okla.)
**(Cite as: 2008 WL 5205192 (N.D.Okla.))**

Page 7

*prise Financial Group, Inc.,* 148 F.3d 1206 (10th Cir.1998) and *Broadway Park LLC v. The Hartford Cas. Ins. Co.,* 2006 WL 2321410 (W.D.Okla. Aug.9, 2006). Each is distinguishable from the case at hand.

In *Vining* Plaintiff asserted that a credit life insurance company routinely rescinded its policies when a claim was made without determining whether it had a reasonable basis for doing so. Plaintiff sought to prove that Enterprise Financial Group "engaged in a pervasive, consistent pattern of abusive rescissions."*Vining.* 148 F.3d at 1218. Thus, Vining's claim targeted Enterprise's "general business practices." *Id.* That is not the case here. Here it is undisputed that, in fact, AIG began paying on AG's claim and had a $467,000 reimbursement check ready for delivery to AG when an issue arose as to whether Ash-Kurtz was eligible for insurance coverage under AG's Plan. The First Amended Complaint makes no allegations whatsoever of a general business practice by AIG to deny insurance claims and no such evidence has been proffered in support of the requested discovery.

In *Broadway Park* the owner of a business park asserted a bad faith claim against his insurer over the handling of a claim for roof damage to several buildings during a spring hail storm. Plaintiff sought documents related to similar hail losses, and limited its request to "property damage claims caused by rain or hail on April 21, 2004, to buildings located within a radius of 1 mile from Broadway Business Park in Oklahoma City, OK."*Broadway Park,* 2006 WL 2321410 at *2. The court found this request narrowly tailored in time and location in seeking relevant evidence. Here, Plaintiffs' request is not similarly limited and coming on the eve of discovery cutoff, would necessitate a further extension of the Court's schedule.

For these reasons, the Motion to Compel is *DENIED* as to comparative files.

**(b) AIG's Litigation Report.**

Friedly testified that AIG maintains a spreadsheet document listing and summarizing lawsuits brought against the company. Although the Court has similar concerns as to the relevance of this report, since the spreadsheet is readily available, apparently contains information concerning Plaintiffs' claims in this case, and its production would not be overly burdensome, Plaintiffs' Motion to Compel the spreadsheet litigation report is *GRANTED.*

**(c) Original Claims File.**

*7 At the hearing, Defendant agreed, subject to review for privilege, to produce the copy file referred to in deposition testimony as the original claims file within one week.

**(d) Other Bad Faith Claims Files.**

Plaintiff's motion is *DENIED* for the reasons set forth above with respect to comparative claims files. There is no assurance that other bad faith claims would have any relevance to the claim asserted herein and investigation of any such bad faith claims would require significant new discovery.

**(e) Insurance Coverage for Bad Faith.**

Plaintiffs seek information as to whether AIG has insurance coverage for the bad faith claim asserted herein. Rule 26 provides that as part of initial disclosures the parties are to provide:

(iv) for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

Fed.R.Civ.P. 26(a)(1)(A)(iv).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 5205192 (N.D.Okla.)
(Cite as: 2008 WL 5205192 (N.D.Okla.))

AIG shall produce for inspection any insurance policies it holds that could provide coverage for AG's bad faith claim.

**B. Defendant's Discovery Motions [Dkt. Nos. 145 & 148].**

### 1. Motion to Bar Plaintiffs' Use of Deposition Video

Defendant seeks to bar Plaintiffs from using video of the depositions of Subbiondo and Friedly because the videographer left the depositions without recording Defense counsel's cross-examination.

A brief summary of events is necessary to understand the basis of this motion. Plaintiffs took the depositions of Subbiondo and Friedly. All depositions in this case apparently were videoed.[FN10] The first installment of Subbiondo's deposition took place in California on August 26, 2008, beginning at 8:30 a.m. After four hours of questioning, attorney Dana Kurtz stated that she had to leave to catch a flight and that the deposition would have to be reconvened. Holden sought to conduct brief cross-examination of the witness, but Dana Kurtz said Holden could not conduct any cross-examination until she had completed her direct exam. Dana Kurtz and her husband then left the deposition, whereupon Holden proceeded to cross-examine Subbiondo before the court reporter but outside the presence of Dana Kurtz. Holden's cross-examination lasted about 10 minutes.

> FN10. Curtis Kmiecek, the husband of Plaintiffs' attorney, conducted the video recording of these depositions. A court reporter was also present to make a stenographic record. Apparently, the relationship between Plaintiffs' counsel and the videographer was not disclosed to Defendant.

Subbiondo's deposition was reconvened on two subsequent occasions, but Holden did not revisit the cross-examination he had conducted on August 26 after Dana Kurtz' departure.

Similarly, David Friedly's deposition in California began at 11 a .m. on Oct. 9, 2008. At 4 p.m., Dana Kurtz announced that she had a flight to catch to return to Chicago and that Holden could cross-examine the witness for no more than 20 minutes. When Holden began his cross-examination by asking the witness to describe his background "for the ladies and gentlemen of the jury", Dana Kurtz objected to Holden conducting a "trial deposition." (Friedly dep. pp. 191-200). A protracted argument ensued until Dana Kurtz and her husband left the deposition. Holden then cross-examined the witness before the court reporter for approximately 50 minutes. Friedly's deposition was subsequently reconvened; however, Holden apparently did not revisit the cross-examination he had conducted outside Dan Kurtz' presence.

*8 The Court would have sympathy for Defendant's position if the depositions at issue had *not* been reconvened. In that case, Defendant would have been denied the opportunity for video cross-examination; however, in this case both depositions were reconvened with videographers present. Thus, Defendant cannot complain that it was denied an opportunity to have cross-examination of these witnesses videotaped. Holden could easily have repeated his prior cross-examination when the depositions reconvened. Furthermore, it should have been obvious to Defense counsel that the cross-examination conducted when Plaintiffs' counsel was absent was improper. Rule 30 states that "examination and cross-examination of a deponent proceed as they would at trial...."Fed.R.Civ.P. 30(c)(1). Witnesses are not questioned at trial without counsel for all parties being present. Whatever the propriety of Dana Kurtz and her husband/videographer unilaterally adjourning these depositions, it is clear that Holden's cross-examination *in absentia* was impermissible,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2008 WL 5205192 (N.D.Okla.)
(Cite as: 2008 WL 5205192 (N.D.Okla.))

and could have been corrected when the depositions reconvened. Accordingly, the Motion to bar Plaintiffs' use of these videos is *DENIED WITHOUT PREJUDICE.*To the extent that Defendant objects to the use of Curtis Kmiecek as the videographer because of his relationship to Dana Kurtz, the objection may be reasserted at trial after Defendant has reviewed the video taken by Kmiecek to see if Defendant has been prejudiced in any way by his handling of the video. Furthermore, if Subbiondo and Friedly both testify live at trial, questions of the deposition videos may well become moot.

### 2. Motion for Sanctions

Defendant seeks sanctions for deposition conduct described above in section III(A)(1), For the reasons set forth in that section, the motion is *GRANTED IN PART.*Both Holden and Dana Kurtz are sanctioned $250.00 for deposition misconduct. Each lawyer shall make the $250 payment to the Tulsa County Bar Association's Continuing Legal Education fund to be used for a program on deposition etiquette and behavior.

### IV.

### SUMMARY

For the reasons set forth above, Plaintiffs' Motion to Compel [Dkt. No. 124] and Plaintiffs' Emergency Motion for Protective Order and Sanctions [Dkt. No. 126] are **GRANTED IN PART AND DENIED IN PART.**Defendant's Motion for Exclusion of Plaintiff's Use of Video and for Sanctions [Dkt. Nos. 145] is **DENIED WITHOUT PREJU-DICE** and Defendant's Motion for Sanctions [Dkt. No. 148] is **GRANTED IN PART AND DENIED IN PART.**

IT IS SO ORDERED.

N.D.Okla.,2008.
AG Equipment Co. v. AIG Life Ins. Co.
Not Reported in F.Supp.2d, 2008 WL 5205192 (N.D.Okla.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

240 F.R.D. 401
240 F.R.D. 401
**(Cite as: 240 F.R.D. 401)**

United States District Court,
N.D. Illinois,
Eastern Division.
AMERICAN INTERNATIONAL SPECIALTY
LINES INSURANCE COMPANY, Plaintiff,
v.
NWI-I, INC. (f/k/a Fruit of the Loom Inc.), Lepetomane II, Inc., as Trustee of the Fruit of the Loom Successor Liquidation Trust, and Lepetomane III, Inc., as Trustee of the Fruit of the Loom Custodial Trust., Defendants.
**No. 05 C 6386.**

Jan. 16, 2007.

**Background:** Insurer brought action seeking a declaration that successor entities to insured were not entitled to coverage under policy for remediation costs associated with seven properties. Defendants filed a counterclaim alleging that insurer was obligated to pay the full policy limit for remediation costs. Defendants filed a motion to compel responses to insurer's document requests and interrogatories. Insurer filed a motion for protective order and to determine the attorney-client privilege.

**Holdings:** The District Court, Mason, United States Magistrate Judge, held that:
(1) after corporate debtor's assets were transferred in bankruptcy proceedings to multiple successor entities, only the new entity, which purchased substantially all of debtor's business operations and continued to operate debtor's business, acquired the right to assert or waive the pre-confirmation attorney-client privilege after bankruptcy, and
(2) it would be unduly burdensome and expensive to require either the defendants or insurer to review all of the documents in order to produce only those documents that were responsive to insurer's requests for production, and therefore parties would be required to share the cost, and be encouraged to

come up with a discovery plan that was both time and cost efficient.

Motions granted in part and denied in part.

West Headnotes

**[1] Privileged Communications and Confidentiality 311H ⟐123**

311H Privileged Communications and Confidentiality
   311HIII Attorney-Client Privilege
      311Hk120 Parties and Interests Represented by Attorney
         311Hk123 k. Corporations, Partnerships, Associations, and Other Entities. Most Cited Cases
      (Formerly 410k217)
A transfer of a corporation's assets, without more, is not sufficient to effect a transfer of its attorney-client privilege; control of the entity possessing the privilege must also pass for the privilege to pass.

**[2] Privileged Communications and Confidentiality 311H ⟐123**

311H Privileged Communications and Confidentiality
   311HIII Attorney-Client Privilege
      311Hk120 Parties and Interests Represented by Attorney
         311Hk123 k. Corporations, Partnerships, Associations, and Other Entities. Most Cited Cases
      (Formerly 410k217)

**Privileged Communications and Confidentiality 311H ⟐168**

311H Privileged Communications and Confidentiality
   311HIII Attorney-Client Privilege
      311Hk168 k. Waiver of Privilege. Most Cited Cases

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

(Formerly 410k219(3))
Right to assert or waive a corporation's attorney-client privilege is an incident of control of the corporation.

**[3] Bankruptcy 51 ⊙⇝3047(2)**

51 Bankruptcy
    51IX Administration
        51IX(A) In General
            51k3040 Examination and Discovery
                51k3047 Scope and Extent of Inquiry
                    51k3047(2) k. Privilege. Most Cited Cases
    (Formerly 410k217)

**Privileged Communications and Confidentiality 311H ⊙⇝123**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk123 k. Corporations, Partnerships, Associations, and Other Entities. Most Cited Cases
    (Formerly 410k217)

**Privileged Communications and Confidentiality 311H ⊙⇝168**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk168 k. Waiver of Privilege. Most Cited Cases
    (Formerly 410k219(3))
After corporate debtor's assets were transferred in bankruptcy proceedings to multiple successor entities, only the new entity, which purchased substantially all of debtor's business operations and continued to operate debtor's business, acquired the right to assert or waive the pre-confirmation attorney-client privilege after bankruptcy; neither custodial trust, to which debtor's properties were transferred, nor successor liquidation trust, which acquired the stock of a successor entity, emerged from bankruptcy with control of debtor's business, and therefore had no right to assert or waive debtor's attorney-client privilege with respect to documents or communications, both pre-bankruptcy or during the bankruptcy, notwithstanding an agreement to transfer the attorney-client privilege to them.

**[4] Courts 106 ⊙⇝96(5)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k88 Previous Decisions as Controlling or as Precedents
                106k96 Decisions of United States Courts as Authority in Other United States Courts
                    106k96(5) k. Decisions in Other Circuits. Most Cited Cases
Out-of-circuit case law is not binding precedent.

**[5] Federal Civil Procedure 170A ⊙⇝1634**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)5 Compliance; Failure to Comply
                170Ak1634 k. Sufficiency of Compliance. Most Cited Cases
It was not proper under discovery rule to simply provide plaintiff with access to the master index and 19,000 boxes of warehoused documents where defendants did not review the documents and provided no evidence that the documents were kept in the usual course of business within meaning of discovery rule. Fed.Rules Civ.Proc.Rule 34(b), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ⊙⇝1271.5**

170A Federal Civil Procedure

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

Page 3

170AX Depositions and Discovery
170AX(A) In General
170Ak1271.5 k. Protective Orders. Most Cited Cases

**Federal Civil Procedure 170A ⬅1272.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(A) In General
170Ak1272 Scope
170Ak1272.1 k. In General. Most Cited Cases
While discovery is often broad, Federal Rules of Civil Procedure authorize district courts to protect targets of discovery from annoyance, embarrassment, oppression, or undue burden or expense; furthermore, a court may limit discovery if it determines that the burden of the discovery outweighs its likely benefit. Fed.Rules Civ.Proc.Rules 26(b)(2)(iii), 26(c), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⬅1272.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(A) In General
170Ak1272 Scope
170Ak1272.1 k. In General. Most Cited Cases
In determining whether burden of the discovery outweighs its likely benefit, courts consider: (1) the needs of the case, (2) the amount in controversy, (3) the resources of the parties, (4) the importance of the issues at stake in the litigation, (5) and the importance of the proposed discovery in resolving the issues. Fed.Rules Civ.Proc.Rule 26(b)(2)(iii), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ⬅1551**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(E) Discovery and Production of Documents and Other Tangible Things

170AX(E)1 In General
170Ak1551 k. In General. Most Cited Cases
In light of the resources of the parties, the limited issues in the case and the fact that there were more than 19,000 boxes of documents in storage, it would be unduly burdensome and expensive to require the defendants to review all of the documents in order to produce only those documents that were responsive to plaintiff's requests for production; however, it would be equally burdensome, expensive and unfair plaintiff was required to shoulder the entire cost, and therefore, parties would be required to share the cost, and be encouraged to come up with a discovery plan that was both time and cost efficient. Fed.Rules Civ.Proc.Rule 26(b)(2)(iii), (c)(2), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A ⬅1534**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(D) Written Interrogatories to Parties
170AX(D)3 Answers; Failure to Answer
170Ak1534 k. Sufficiency. Most Cited Cases
A responding party is required to provide full answers to interrogatories, which includes all information within that party's knowledge and control. Fed.Rules Civ.Proc.Rule 33, 28 U.S.C.A.

**[10] Federal Civil Procedure 170A ⬅1533**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(D) Written Interrogatories to Parties
170AX(D)3 Answers; Failure to Answer
170Ak1532 Duty to Answer
170Ak1533 k. Inability to Answer. Most Cited Cases
Because the defendants had no control over the former officers, directors or employees of former insured or any other successor of former insured or trustee of successor liquidation trust, they could not

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

be compelled to interview third parties not within their control in order to provide answers to interrogatories. Fed.Rules Civ.Proc.Rule 33, 28 U.S.C.A.

**\*402** Brian M. Reid, Litchfield Cavo, Chicago, IL, David G. Januszewski, Edward P. Krugman, Joel L Kurtzberg, Cahill Gordon & Reindel LLP, New York City, for Plaintiff.

Anna-Katrina Saranti Christakis, Jeffrey D. Pilgrim, John L. Ropiequet, Thadford A. Felton, Arnstein & Lehr, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

MASON, United States Magistrate Judge.

This matter comes before the Court on two discovery motions. Plaintiff, American International**\*403** Specialty Lines Insurance Company ("AISLIC"), filed a motion to compel responses to plaintiff's first set of document requests and interrogatories. Defendants, NWI-I, LePetomane II, Inc., as Trustee of the Fruit of the Loom Successor Liquidation Trust ("SLT") and LePetomane III, Inc., as Trustee of the Fruit of the Loom Custodial Trust ("CT"), filed a motion for protective order and to determine the attorney-client privilege. For the reasons set forth below, defendants' motion for protective order and to determine the attorney-client privilege is granted in part and denied in part and plaintiff's motion to compel is granted in part and denied in part.

## Background

This case involves a $100,000,000 pollution legal liability insurance policy ("the Policy") issued by AISLIC to Fruit of the Loom, Inc. ("Old FTL") in 1998. The Policy covers seven contaminated properties (the "Seven Properties") formerly owned by Old FTL or other affiliated corporations that have gone through Chapter 11 bankruptcy reorganization. Plaintiff seeks a declaration that defendants are not entitled to coverage under the Policy. Defendants filed a counterclaim alleging that plaintiff is obligated to pay the full policy limit for remediation costs associated with the Seven Properties.

On December 29, 1999, Old FTL, NWI Land Management Corp. ("NWI") and thirty affiliates (collectively, "the FTL debtors") filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware ("the FTL Bankruptcy"). The United States Environmental Protection Agency ("EPA") and several state environmental agencies filed proofs of claim in the bankruptcy proceedings, alleging that Old FTL owed them money for clean-up work conducted at several sites covered by the Policy.

The defendants in this action are among several successors of Old FTL to emerge from the FTL Bankruptcy. On March 19, 2002, the bankruptcy court confirmed the Third Amended Plan of Joint Reorganization ("the Joint Plan"). According to the Joint Plan, the successors of Old FTL after bankruptcy were: (1) the FTL Liquidation Trust, a/k/a the FOL Liquidation Trust; (2) the Unsecured Creditors Trust; (3) the NWI Successor, now known as the Successor Liquidation Trust ("SLT"); (4) the Custodial Trust ("CT"); (5) Reorganized Fruit of the Loom, which consisted of Reorganized Debtors, Newco and any successor; and (6) Newco, to which the Apparel Business Assets were transferred (referred to herein as "New FTL").[FN1]

> FN1. The Apparel Business Assets were transferred to Berkshire Hathaway, Inc. pursuant to an Asset Purchase Agreement dated November 1, 2001. The Apparel Business Assets consisted of substantially all of FTL's business operations, including the FTL name and equity interests in FTL. Berkshire Hathaway, Inc. created a new wholly-owned subsidiary named "Fruit of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

the Loom" ("New FTL"). New FTL continues to operate Old FTL's business operations.

In or around April 2002, Old FTL and NWI entered into a settlement agreement ("the Environmental Settlement Agreement") in the FTL Bankruptcy that resolved certain environmental claims. The Environmental Settlement Agreement provided that the Seven Properties would be transferred to the CT. The CT was created pursuant to the Joint Plan and the Custodial Trust Agreement to own the Seven Properties, carry out administrative functions regarding the Seven Properties and to manage and/or fund remedial actions on those properties. The SLT was created pursuant to the Joint Plan and the Successor Liquidation Trust Agreement to hold certain assets of NWI and Old FTL and to distribute its assets to provide funding to the CT. Old FTL changed its name to NWI-I and became a wholly-owned subsidiary of the SLT. The assets currently held by NWI-I consist of equity interests in NWI and certain insurance policies, including the Policy at issue in this litigation.

According to the Environmental Settlement Agreement, the SLT is the legal successor in interest to certain rights under the Policy. Furthermore, pursuant to the Successor Liquidation Trust Agreement, the assets transferred to the SLT include both the stock of NWI-I and the rights, claims, or interests of Old FTL or NWI under the contracts to be assumed and/or assumed and assigned by NWI and Old FTL to the SLT *404 (consisting of, among other insurance policies, the Policy at issue here).

Both the Custodial Trust Agreement and the Successor Liquidation Trust Agreement include a section entitled "Preservation of Privilege." This section provides:

In connection with the rights, claims and causes of action that constitute the [Successor Liquidation Trust Assets or the Custodial Trust Assets], any

attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the [SLT or CT] shall vest in the [SLT or CT] and its representatives, and the Parties are authorized to take all necessary actions to effectuate the transfer of such privileges.

During the FTL Bankruptcy, the FTL debtors were represented by Milbank, Tweed, Hadley & McCloy LLP ("Milbank"). Saul Ewing LLP ("Saul Ewing") served as local counsel. After confirmation, Milbank represented the FOL Liquidation Trust. Milbank did not represent NWI-I or the SLT, except for a brief engagement representing the SLT, with permission of its client, for the limited purpose of clarifying a portion of the Joint Plan that Milbank had drafted.

**Motion for Protective Order**

In June 2006, plaintiff served subpoenas on the law firms that represented the FTL debtors in the bankruptcy proceedings. The subpoenas requested thirty-eight categories of documents. In early August 2006, Milbank contacted counsel for defendant NWI-I to advise her that Milbank had already produced some documents in response to plaintiff's subpoena but that it had withheld others on attorney-client privilege grounds. Counsel for NWI-I instructed Milbank to continue to assert all applicable privileges on behalf of NWI-I.

Counsel for defendants subsequently informed Milbank that based on the terms of the Joint Plan and the minimal assets that were transferred to NWI-I, she did not believe that NWI-I had "succeeded" to the attorney-client privilege between the FTL debtors and Milbank. However, while defense counsel did not believe that the pre-confirmation attorney-client privilege between Milbank and the FTL debtors belonged to NWI-I after confirmation, she advised that it was possible that a privilege may belong to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
**(Cite as: 240 F.R.D. 401)**

the SLT and the CT with respect to the assets transferred to them under the Successor Liquidation Trust Agreement and the Custodial Trust Agreement. Accordingly, defense counsel requested that Milbank continue to assert all applicable privileges for any documents that relate to Successor Liquidation Trust Assets and Custodial Trust Assets.

Defendants argue that it is unclear what attorney-client privilege, if any, exists between any of the defendants and Old FTL's attorneys, both prebankruptcy and during the bankruptcy, specifically with respect to the Policy, the Seven Properties, the Environmental Settlement Agreement and the August 9, 2002 Order that are at issue in this litigation.[FN2] Furthermore, defendants contend that it is not clear who holds the attorney-client privilege when, as was the case in the FTL Bankruptcy, a debtor's assets are transferred to multiple successor entities. Therefore, defendants ask this Court to determine the extent of any attorney-client privilege held by the defendants, individually or collectively.

> FN2. Defendants fail to explain the August 9, 2002 Order in their motion for protective order. However, according to the complaint, attached as Exhibit 1 to Joel Kurtzberg's affidavit, on or about April 5, 2002, FTL and NWI filed a motion in the bankruptcy court for approval of the terms of the Environmental Settlement Agreement ("the Approval Motion"). The bankruptcy court granted the Approval Motion on August 9, 2002. We assume that this is the August 9, 2002 Order referred to in defendants' motion for protective order.

Defendants argue that this determination is pivotal to a proper evaluation of their ongoing obligations to respond to plaintiff's other discovery requests. A privilege issue such as this one typically arises in the context of a motion to quash brought by either the defendants or the law firm or a motion to compel brought by the plaintiff. Plaintiff argues that defendants' motion for protective order is unnecessary and unwarranted because no one has moved to quash the subpoenas*405 and because defendants have not identified any specific documents over which they are asserting a claim of privilege. Both contentions are true. However, this Court finds that plaintiff's motion to compel brings the attorney-client issue to the forefront. Indeed, as plaintiff states in the motion to compel, plaintiff's document requests call for defendants to search for and produce responsive documents from outside counsel to Old FTL during the bankruptcy because such documents are in defendant NWI-I's control. Even if the motion to compel did not raise the attorney-client privilege issue, clearly this is an issue that must be resolved in order to streamline discovery in this case. Therefore, we find it appropriate to address defendants' motion for protective order at this time.

Defendants ask this Court to find that: (1) NWI-I retains the attorney-client privilege as it pertains to the Policy; (2) the SLT and the CT retain the attorney-client privilege as it pertains to the environmental condition and remediation of the Seven Properties; and (3) NWI-I, the SLT and the CT retain the attorney-client privilege as it pertains to the Environmental Settlement Agreement and the August 9, 2002 Order.

We begin our analysis with the United States Supreme Court's decision in *Commodity Futures Trading Comm'n. v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). The issue in *Weintraub* was whether the trustee of a corporation in bankruptcy had the power to waive the debtor corporation's attorney-client privilege with respect to communications that took place before the filing of the petition in bankruptcy. The Court noted that "for solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Id.* at 348, 105 S.Ct. 1986. Furthermore, the Court stated that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

"when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id.* at 349, 105 S.Ct. 1986. Indeed, "new managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors." *Id.*

The Court found that because the attorney-client privilege is controlled, outside of bankruptcy, by a corporation's management, the person whose duties most closely resemble those of management should control the privilege in bankruptcy. *Id.* at 351-52, 105 S.Ct. 1986. The *Weintraub* court noted that the Bankruptcy Code gives the trustee wide-ranging management authority over the debtor while the debtor's directors retain virtually no management power during bankruptcy. *Id.* at 352, 105 S.Ct. 1986. Therefore, the Court found that the "trustee plays the role most closely analogous to that of a solvent corporation's management." *Id.* at 353, 105 S.Ct. 1986. Accordingly, the *Weintraub* court held that "the trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege with respect to pre-bankruptcy communications." *Id.* at 358, 105 S.Ct. 1986.

Following the rationale of *Weintraub,* several courts have found that the power to invoke or waive a corporation's attorney-client privilege is an incident of control of the corporation. *In re Grand Jury Subpoenas,* 734 F.Supp. 1207, 1211 (E.D.Va.1990), aff'd in relevant part, 902 F.2d 244 (4th Cir.1990) (finding that "the principle that emerges from *Weintraub* and the subsequent decisions is that 'when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well.'"); *Glidden Co. v. Jandernoa,* 173 F.R.D. 459, 472 (W.D.Mich.1997) (recognizing that invoking or waiving the corporation's privilege is an incident of control of the corporation); *NCL Corp. v. Lone Star*

*Bldg. Ctrs., Inc.,* 144 B.R. 170, 174 (S.D.Fla.1992) (noting that the right to assert the attorney client privilege is an incident of control of the corporation and remains with the corporation as it undergoes mergers, takeovers, and name changes); *Graco Children's Prods. v. Regalo Int'l LLC,* 1999 WL 553478, *3, 1999 U.S. Dist. LEXIS 11392, *10-11 (E.D.Pa.1999) (stating that the authority to invoke or waive the corporation's attorney-client privilege follows the passage **406** of control of the corporation); *In re In-Store Advertising Sec. Litig.,* 163 F.R.D. 452, 458 (S.D.N.Y.1995).[FN3]

> FN3. In the absence of binding Seventh Circuit precedent, we look to out-of-circuit decisions. We are mindful that these out-of-circuit decisions are not binding on this Court. *See Al Marine Adjusters, Inc. v. Forwarding Sys. Int'l,* 1999 WL 199588, 1999 U.S. Dist. LEXIS 4659 (N.D.Ill.1999). However, we find these post-*Weintraub* decisions to be persuasive authority.

In the same regard, after *Weintraub,* several courts have recognized that assignees or transferees of most, if not all, of a corporation's assets will have the authority to assert or waive the attorney-client privilege. *See In re Financial Corp. of Am.,* 119 B.R. 728 (Bankr.C.D.Cal.1990) (holding that the authority to assert the corporation's attorney-client privilege passes with the transfer of substantially all of the corporation's assets and liabilities); *In re Crescent Beach Inn,* 37 B.R. 894 (Bankr.D.Me.), reconsid. denied, 40 B.R. 56 (1984) (holding that the transferee of all the assets of a reorganized company was the debtor's successor for purposes of the attorney-client privilege and was therefore entitled to assert the privilege formerly held by the debtor); *Ramada Franchise Sys. v. Hotel of Gainesville Assocs.,* 988 F.Supp. 1460, 1463 (N.D.Ga.1997) (finding that the authority to assert or waive the old company's attorney-client privilege passed to the new company when it acquired all of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

the assets and control of the old company during bankruptcy).

[1] However, "[a] transfer of assets, without more, is not sufficient to effect a transfer of the privileges; control of the entity possessing the privileges must also pass for the privileges to pass." *In re Grand Jury Subpoenas,* 734 F.Supp. at 1211 n. 3; *see also, NCL Corp. v. Lone Star Bldg. Ctrs., Inc.,* 144 B.R. at 174 (transfer of a lease did not transfer the attorney-client privilege); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.,* 2003 WL 21911066, 2003 U.S. Dist. LEXIS 13816 (N.D.Ill.2003) (sale of certain assets did not transfer the right to invoke the attorney-client privilege despite contract provision stating that the privilege transferred with the sale); *Pilates, Inc. v. Georgetown Bodyworks Deep Muscle Massage Ctrs., Inc.,* 201 F.R.D. 261 (D.D.C.2000) (assignee of trademarks had no right to assert the attorney-client privilege where there was no transfer of control of the corporation); *SMI Industries Canada, Ltd. v. Caelter Industries, Inc.,* 586 F.Supp. 808 (N.D.N.Y.1984) (assignment of trademarks and goodwill did not assign attorney-client privilege); *see also, In re In-Store Advertising Sec. Litig.,* 163 F.R.D. at 458; *Sobol v. E.P. Dutton, Inc.,* 112 F.R.D. 99, 103 (S.D.N.Y.1986).

In *Soverain Software LLC v. Gap, Inc.,* 340 F.Supp.2d 760, 763 (E.D.Tex.2004), the court found that the mere transfer of some assets does not transfer the attorney-client privilege. However, the court noted that such a "bright-line rule does not apply equally to the myriad ways control of a corporation or a portion of corporation can change hands." *Id.* Therefore, the court found "the more appropriate rule to be 'whether the attorney-client relationship transfers ... to the new owners turns on the practical consequences rather than the formalities of the particular transaction.' "*Id.,* citing *Tekni-Plex, Inc. v. Meyner and Landis,* 89 N.Y.2d 123, 651 N.Y.S.2d 954, 674 N.E.2d 663, 668 (N.Y.1996). The *Soverain* court stated that:

If the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management, the authority to assert or waive the attorney-client privilege will follow as well.

Because the plaintiff in *Soverain* not only acquired certain assets but also continued to operate the particular enterprise it purchased, the court found that control of the enterprise, and with it the right to assert the attorney-client privilege, passed to the plaintiff. *Id.; see also, Coffin v. Bowater Inc.,* 2005 U.S. Dist. LEXIS 9395, *7-8 (D.Me.2005).

[2][3] Based on the case law provided by the defendants and this Court's extensive research, we see no reason to deviate from the well-established principle that the right to assert or waive a corporation's attorney-client privilege is an incident of control of the corporation. If we examine the practical consequences of the transaction or multiple *407 transactions at issue here, this Court concludes that New FTL is the only entity that acquired the right to assert or waive the attorney-client privilege after bankruptcy. New FTL purchased substantially all of Old FTL's business operations and continues to operate Old FTL's business. Therefore, because the practical consequences of the Asset Purchase Agreement resulted in the transfer of control of Old FTL's business and the continuation of that business under new management, the authority to assert or waive the attorney-client privilege transferred to New FTL. *Soverain,* 340 F.Supp.2d at 763.

In contrast, neither the CT nor the SLT emerged from bankruptcy with control of Old FTL's business. As a result of the Joint Plan and the Environmental Settlement Agreement, the Seven Properties were transferred to the CT. Therefore, the CT acquired some of Old FTL's assets but control of Old FTL did not pass to the CT. Similarly, the SLT acquired the stock of NWI-I and purportedly acquired certain rights under the Policy. However, once again, control of Old FTL did not pass to the SLT.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

While the CT and the SLT control the remediation of the Seven Properties and assets in connection with that remediation, the CT and the SLT simply do not control Old FTL's business. Indeed, defendants concede that they are entities that have no connection to the business operations of the pre-bankruptcy Old FTL or its affiliates. Only New FTL controls Old FTL's business operations. Consequently, only New FTL has the right to assert or waive the corporation's attorney-client privilege.*Soverain*, 340 F.Supp.2d at 763.

Furthermore, this Court is not persuaded by the fact that both the Custodial Trust Agreement and the Successor Liquidation Trust Agreement include a section that purportedly "vests" the attorney-client privilege in the CT and the SLT with respect to documents and communications transferred to them. Indeed, in *Zenith*, an agreement to transfer the attorney-client privilege was not dispositive. *Zenith*, 2003 WL 21911066, *1-2, 2003 U.S. Dist. LEXIS 13816, *6-7.Instead, in reliance on *Weintraub*, the *Zenith* court noted that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id.* at 2003 WL 21911066, *1, 2003 U.S. Dist. LEXIS 13816, *5, quoting *Weintraub*, 471 U.S. at 349, 105 S.Ct. 1986. Therefore, the court found that the purchaser of some assets did not acquire the right to assert the attorney-client privilege despite a contract provision stating that the privilege transferred with the sale. *Id.* at 2003 WL 21911066, *1-2, 2003 U.S. Dist. LEXIS 13816, *6-7.

In short, defendants are asking this Court to divide up the attorney-client privilege based on the assets that the multiple successors of Old FTL acquired as a result of the FTL Bankruptcy. Specifically, they argue that the SLT and the CT retain the attorney-client privilege as it pertains to the environmental condition and remediation of the Seven Properties and that all three defendants retain the attorney-client privilege as it pertains to the Environmental

Settlement Agreement and the August 9, 2002 Order. However, defendants have not provided any case law nor has our research revealed any that supports allocating the attorney-client privilege based on the division of a debtor's assets to multiple successor entities. Absent control of the corporation, this Court finds that the attorney-client privilege does not pass to a successor entity, even with respect to the assets that were transferred to that successor. *See Soverain*, 340 F.Supp.2d at 763. Accordingly, the CT and the SLT are not entitled to assert or waive the attorney-client privilege as it pertains to documents or communications, both pre-bankruptcy or during the bankruptcy, between Old FTL or the FTL debtors and their attorneys. *See Zenith*, 2003 WL 21911066, *1-2, 2003 U.S. Dist. LEXIS 13816, *6-7; *Soverain*, 340 F.Supp.2d at 763.

Next, we must determine whether NWI-I has the right to invoke the attorney-client privilege. We find it appropriate to analyze NWI-I separately because unlike the CT and the SLT, NWI-I is not a new entity that emerged from the bankruptcy having acquired some of Old FTL's assets. Rather, NWI-I is what is left of Old FTL. Defendants argue that NWI-I retains the attorney-client**408** t privilege as it pertains to the Policy, the Environmental Settlement Agreement and the August 9, 2002 Order.[FN4]

> FN4. Defendants contend that one of the assets currently held by NWI-I is the Policy. At the same time, defendants also contend that pursuant to the Environmental Settlement Agreement, the SLT is the legal successor in interest to certain rights in the Policy. Thus, it is not entirely clear if the Policy as an asset of NWI-I or the SLT or both. For purposes of this decision, we will assume that the Policy is an asset of defendant NWI-I.

In support of this argument, defendants argue that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

this case is similar to *In re I Successor Corp.,* 321 B.R. 640 (Bankr.S.D.N.Y.2005). We disagree. In that case, after the debtor corporation filed for relief under Chapter 11, it sold substantially all of its assets to another corporation. Pursuant to the asset purchase agreement, the debtor corporation changed its name to I Successor Corporation. As a part of the confirmed plan of liquidation, the Post-Confirmation Committee of Unsecured Creditors of I Successor Corporation ("I Successor" or "plaintiff") was given permission to prosecute preference, fraudulent conveyance and post-petition transfer claims against companies owned by former officers and directors of the debtor corporation. Plaintiff also filed breach of fiduciary duty claims against the former officers and directors. The law firm that had once represented the debtor corporation sought to represent both the companies owned by the former officers and directors as well as the former officers and directors individually. The court granted plaintiff's motion to disqualify the law firm, finding that I Successor was the law firm's former client, albeit renamed.

[4] At the outset, this Court finds that *I Successor* is distinguishable because it involved a conflict of interest. That case is very fact-specific and we decline to extend its limited holding to this case, which involves a completely different fact-specific scenario. *See Occidental Hotels Mgmt. B.V. v. Westbrook Allegro L.L.C.,* 440 F.Supp.2d 303, 312 (S.D.N.Y.2006) (stating that the holding in *I Successor*"is limited to the specific situation of a former counsel of a now-bankrupt corporation seeking to represent an officer or director against his former client, the corporation."). Moreover, the *I Successor* court did not discuss the general principle that the right to assert or waive a corporation's attorney-client privilege is an incident of control of the corporation. Nor did the court address whether I Successor retained such control. As a result, we find that *I Successor* is not persuasive authority. Because we are not bound by out-of-circuit de-

cisions, we decline to follow *I Successor. See Block v. Rockford Pub. Sch. Dist. # 205,* 2001 WL 1195757, *1, 2001 U.S. Dist. LEXIS 16339, *4 (N.D.Ill.2001) (recognizing that out-of-circuit case law is not binding precedent).

Once again, our determination of whether NWI-I has the right to assert or waive the attorney-client privilege hinges on control. Like the CT and the SLT, NWI-I did not emerge from bankruptcy in control of Old FTL's business operations. Moreover, defendants have failed to persuade this Court that NWI-I should be permitted to assert the attorney-client privilege absent control of the corporation. As discussed above, defendants have not provided us with any case law that supports allocating the attorney-client privilege based on the division of a debtor's assets to multiple successor entities. Accordingly, this Court finds that NWI-I is not entitled to assert or waive the attorney-client privilege as it pertains to documents or communications, both pre-bankruptcy or during the bankruptcy, between Old FTL or the FTL debtors and their attorneys. *See Zenith,* 2003 WL 21911066, *1-2, 2003 U.S. Dist. LEXIS 13816, *6-7; *Soverain,* 340 F.Supp.2d at 763.

To the extent that defendants asked this Court to determine who holds the attorney-client privilege in this case, their motion for protective order is granted. However, defendants' motion is denied to the extent that they asked this Court to find that NWI-I retains the attorney-client privilege as it pertains to the Policy, that the SLT and the CT retain the attorney-client privilege as it pertains to the environmental condition and remediation of the Seven Properties and that all three defendants retain the attorney-client privilege as it pertains to the Environmental*409 Settlement Agreement and the August 9, 2002 Order.[FN5]

> FN5. Because this Court has found that no defendant has the right to assert or waive the attorney-client privilege with respect to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

documents and communications between Old FTL or the FTL debtors and their attorneys, there is no need to discuss whether the defendants waived the attorney-client privilege by offering plaintiff unfettered access to documents stored at the Reebie Storage Facility.

**Motion to Compel**

Plaintiff's motion to compel asks this Court to order defendants to review over 19,000 boxes of documents ("the Reebie documents") in order to weed out nonresponsive documents and in order to provide responses to interrogatories issued by plaintiff. Plaintiff also asks this Court to compel defendants to review documents in the possession of Milbank in order to fully respond to the interrogatories. Additionally, plaintiff asks us to compel defendants to interview persons with knowledge of information sought in plaintiff's interrogatories, including Old FTL personnel as well as former counsel at Milbank.

**A. The Reebie Documents**

New FTL acquired the Reebie documents in connection with the purchase of Old FTL's Apparel Business Assets. At some point after the acquisition, New FTL determined that the documents were either not relevant to its current business or were scheduled to be destroyed pursuant to New FTL's document retention policy. When the SLT learned that New FTL planned to destroy the Reebie documents, the SLT agreed to preserve the documents. The SLT did so because it recognized the potential for litigation with plaintiff over the Policy. Accordingly, the SLT arranged for the documents to be shipped from New FTL to the Reebie Storage Facility in Franklin Park, Illinois ("Reebie").

The documents began to arrive at Reebie in the fall of 2003 and continue to arrive as New FTL determ-

ines that documents are to be destroyed pursuant to its document retention policy. To date, a total of 19,068 boxes of documents have arrived at Reebie. New FTL provided the SLT with an index of the documents that it shipped to Reebie. New FTL's index listed the box number, the "FOL Year," the "FOL Department," and the "FOL Description." Based on New FTL's index, the SLT's consultant prepared a Master Index of the documents. According to defendants, the Master Index lists: (1) the number of boxes; (2) the date Reebie received the boxes; (3) the Reebie bar code number; (4) an alternative box number; and (5) the FOL Year, FOL Department and FOL Description.

Defendants admit that they have not reviewed the Reebie documents, nor have their agents or attorneys. Defendants claim they have not reviewed these documents because they have no bearing on the remediation of the Seven Properties-the sole reason defendants exist. However, in response to plaintiff's discovery requests, defendants indicated that some of the Reebie documents may be responsive to plaintiff's requests. Defendants informed plaintiff that they do not have the resources to review the documents. Consequently, defendants offered plaintiff access to the Master Index and the Reebie documents.[FN6]

> FN6. The inconsistency in defendants' positions on the pending motions has not escaped us. Defendants asked this Court to find that they retained the attorney-client privilege with respect to documents that failed to review and that they allowed plaintiff to review. We agree with plaintiff that defendants cannot have it both ways.

Plaintiff reviewed the Master Index and more than 200 boxes of the Reebie documents. Plaintiff contends that the Master Index is vague and misleading, that some descriptions are inaccurate and that 1,778 boxes either have no labels or labels that provide no indicia of their contents. For instance,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

Page 12

counsel for plaintiff reviewed a box described as "NWI Subsidiaries Litigation" but the box did not contain any documents relating to litigation. Instead, the box contained notes and materials relating to annual shareholder meetings in the mid 1990's. Plaintiff provided five additional examples of boxes with inaccurate or misleading descriptions.

**\*410** Furthermore, approximately 1,093 boxes are described as "Vanguard Documents" with no description of the contents of those boxes. Plaintiff believes that this description refers to Vanguard Archive, another storage facility in the Chicago area. These boxes contain no other descriptive or identifying label. Additionally, approximately 533 boxes are labeled "No Description" and 152 boxes are described with an unexplained series of numbers and/or letters *(e.g., 278-5-5).* This Court's review of the Master Index revealed that thousands of entries on the index fail to identify the FOL Department and others fail to identify the FOL Year. Defendants admitted that they have not reviewed the contents of the boxes to verify that the contents match the description provided by New FTL. Plaintiff argues that defendants' document dump has made it impossible for plaintiff to determine whether responsive documents are buried within the thousands of boxes of documents at Reebie.

Defendants claim that they are in no better position than plaintiff to determine the contents of the 19,068 boxes of documents. In particular, defendants argue that: (1) they have met the requirements of Rule 34(b), and (2) forcing them to review the documents would be an undue burden because they do not have the financial resources to do so.

**1. Compliance with Rule 34(b)**

As an initial matter, we note that the SLT clearly has possession of the Reebie documents and therefore, it must comply with Federal Rule of Civil Procedure 34. Under Rule 34(b), a party who produces

documents for inspection must "produce them as they are kept in the usual course of business" or "organize and label them to correspond with the categories in the request." Fed.R.Civ.P. 34(b); *see also, Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp.,* 222 F.R.D. 594, 598 (E.D.Wis.2004). Defendants argue that they have complied with Rule 34(b) despite the fact that they have not reviewed the Reebie documents because the SLT has produced the documents in the form that they are kept and maintained in the usual course of its business. We disagree.

The SLT has failed to demonstrate that the manner in which the documents are currently kept bears any relation to how they were kept at Old FTL or New FTL. One of the reasons for allowing documents to be produced as they are kept in the usual course of business is to preclude artificial shifting of documents. *In re Sulfuric Acid Antitrust Litig.,* 231 F.R.D. 351, 363 (N.D.Ill.2005). As the court noted in *In re Sulfuric Acid,*

A business has an obvious incentive to keep needed documents in a way that maximizes their usefulness in the day-to-day operations of the business. That incentive, which is inconsistent with document tampering, vanishes once documents not used with regularity are sent to a storage facility, for then it is no longer essential that they be kept with any degree of organization.

In that case, the court found that corporate documents that had been sent to a storage facility in no particular order were not kept in the "usual course of business" under Rule 34(b). *Id.* As a result, the defendants were obligated to organize and label the documents to correspond with the document requests. *Id.* The *Sulfuric Acid* court recognized however, that under certain circumstances, the production of documents as they were kept in storage could be proper under the "usual course of business" prong of Rule 34(b). *Id.* The court noted that the producing party would have to demonstrate that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

the way in which the documents are kept in storage has not changed from how they were kept in the usual course of business. *Id.* The producing party could make that showing by offering the testimony of a person with knowledge of how the records were originally kept and how they were maintained in storage. *Id.*

[5] Here, defendants have provided no evidence as to how the Reebie documents were kept in the usual course of Old FTL or New FTL's business. Like the defendants in the *Sulfuric Acid* case, the SLT has made no meaningful attempt to demonstrate that the Reebie documents are currently kept in the same manner as they were kept by Old FTL and/or New FTL. Thus, this Court cannot conclude that the Reebie documents *411 are kept in the usual course of business under Rule 34(b).

We recognize that there is some authority for permitting access to warehoused documents of a bankruptcy debtor as being stored in the "usual course of business." *See Hagemeyer,* 222 F.R.D. at 598 (documents placed in storage facility by bankruptcy trustee were kept in the usual course of business as the boxes of documents were neatly stacked and clearly labeled); *In re Adelphia Communications Corp.,* 338 B.R. 546, 551-52 (Bankr.D.N.Y.2005) (where 20,000 boxes of the debtor's corporate records were kept in a separate document archive pursuant to official directives, the court found that they were kept in the "usual course of business.").

However, we find that these cases are distinguishable from the case at hand. In *Hagemeyer,* a corporate debtor's documents were placed in storage by the bankruptcy trustee. *Hagemeyer,* 222 F.R.D. at 598. In *Adelphia,* a corporate debtor's documents were archived pursuant to corporate directives to preserve the records for litigation. *Adelphia,* 338 B.R. at 551-52. The documents in each case were sent from the corporate debtor to the storage facility. In contrast, the Reebie documents were generated by Old FTL, subsequently transferred to New

FTL in connection with its acquisition of the apparel business and ultimately, the documents ended up in the SLT's possession at the storage facility. There is no evidence of how these documents were kept, much less that they were kept in the usual course of business, as they were transferred between multiple entities on multiple occasions.

Moreover, in *Adelphia,* the court qualified its ruling "by explicitly stating that in order to satisfy the requirements of Rule 34(b), any archived documents produced must be thoroughly indexed, the boxes accurately labeled and the depository kept in good order." *Adelphia,* 338 B.R. at 551. Here, plaintiff has provided evidence that some of the boxes are inaccurately labeled and that 1,778 boxes either have no labels or labels that provide no indicia of the contents of those boxes. Furthermore, the SLT did not confirm whether the boxes actually contain documents consistent with the descriptions provided by New FTL. Therefore, plaintiff's concern that there may be responsive documents hidden amidst thousands of boxes of documents is understandable.[FN7] Under these circumstances, we find that it is not proper under Rule 34(b) to simply provide plaintiff with access to the Master Index and the warehoused documents.

> FN7. We note that there is no evidence that any of the defendants intentionally attempted to hide responsive documents. However, the fact that some of the boxes are inaccurately labeled, coupled with defendants' admission that they did not review the boxes, concerns this Court.

**2. Undue Burden**

Thus, at first glance, it appears that SLT's only other option under Rule 34(b) is to review the documents and then organize and label them to correspond with the document requests. Fed.R.Civ.P. 34(b). Obviously, this would be a massive under-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
(Cite as: 240 F.R.D. 401)

taking with over 19,000 boxes of documents to review. Defendants argue that requiring the SLT (or any of them) to review the Reebie documents would place an undue burden on them. Defendants explain that the SLT has had to borrow money from various trusts that were set up to finance the ongoing remediation of the Seven Properties in order to pay attorneys and environmental consultants retained to defend this case. Defendants also contend that the funds available for this litigation are limited to the amount of those loans, which total approximately $466,000. Defendants claim that NWI-I has no cash and any funds derived from its assets, including the Policy at issue here, belong to the SLT pursuant to the Environmental Settlement Agreement. The CT's assets, aside from the Seven Properties, total approximately $2,600. According to defendants, if the Court requires the SLT to review the Reebie documents, it would further deplete funds available to remediate the properties.

Defendants also claim that they have no knowledge of Old FTL or New FTL's business operations and therefore, they have no superior ability to sift through the documents to find relevant information. Defendants argue that they are in no better position that the plaintiff to glean relevant information *412 from the mass amount of documents. Like plaintiff, defendants would have to rely on the flawed Master Index as a starting point for their review of the Reebie documents. Additionally, according to Jay A. Steinberg, president of NWI-I, the SLT and the CT, none of the defendants have any employees-only independent contractors retained by the SLT for the sole purpose of remediating the Seven Properties and consulting in this litigation.

[6][7] "While discovery is often broad, the Federal Rules of Civil Procedure authorize district courts to protect targets of discovery from 'annoyance, embarrassment, oppression, or undue burden or expense.' "*Stagman v. Ryan*, 176 F.3d 986, 993 (7th Cir.1999), quoting Fed.R.Civ.P. 26(c); *Sullivan v. Conway*, 1995 WL 573421, *1, 1995 U.S. Dist.

LEXIS 14113, *2 (N.D.Ill.1995) (recognizing that the policy of broad discovery is counterbalanced by the ability to limit discovery requests that impose undue burden or expense). Furthermore, a court may limit discovery if it determines that the burden of the discovery outweighs its likely benefit. Fed.R.Civ.P. 26(b)(2)(iii); *Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D. 568, 571 (N.D.Ill.2004). To make such a determination, the courts consider what has been dubbed the proportionality test of Rule 26(b)(2)(iii): the needs of the case, the amount in controversy, the resources of the parties, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. *Id.* In this way, parties are protected from unduly burdensome or expensive discovery requests. *Id.*

[8] With respect to the needs of the case and the importance of the issues at stake in the litigation, this case involves the limited issue of whether plaintiff is obligated to pay out benefits under the Policy in connection with the remediation of the Seven Properties. However, the amount in controversy is significant in that this dispute concerns a $100,000,000 policy. While this Court is not entirely convinced that the funds available for this litigation are limited to $466,000, we do consider defendants' resources to be limited in the sense that defendants' assets were allocated to them for the purpose of remediating the Seven Properties.[FN8] Finally, we find that the proposed discovery is important to a resolution of the issues in this case.

> FN8. At the same time, defendants are sorely mistaken if they think they can litigate over $100,000,000 policy without spending significant sums of money.

After considering the foregoing factors and the particular circumstances present here, this Court finds that it would be unduly burdensome and expensive to require the SLT (or any of the defendants) to review all of the Reebie documents in order to pro-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

duce only those documents that are responsive to plaintiff's requests. Accordingly, plaintiff's request for such an order is denied. Nevertheless, this Court finds that plaintiff is entitled to discover whether the Reebie documents contain relevant information. Furthermore, we find that it would be equally burdensome, expensive and unfair if we permitted defendants to rest on their "keys to the warehouse" method of responding to plaintiff's discovery requests. We cannot allow defendants to merely offer plaintiff access to the Reebie documents because doing so shifts the undue burden entirely to the plaintiff. Therefore, in light of the resources of the parties, the limited issues in this case and the fact that there are more than 19,000 boxes of documents in storage, we find it appropriate to place some limits on discovery related to the Reebie documents. Fed.R.Civ.P. 26(b)(2)(iii) and (c)(2).

Based on the foregoing, this Court orders the parties to work together to create a discovery plan with respect to the Reebie documents. The parties must take into consideration the following: (1) from this point forward, all fees and costs associated with discovery related to the Reebie documents will be shared equally between plaintiff and the defendants; (2) the 1,778 boxes with no labels or labels that do not sufficiently describe their contents should be reviewed to determine whether the boxes contain any relevant information; [FN9] and (3) the parties *413 should agree upon what additional discovery related to the Reebie documents is necessary, if any, and how long it will take to complete that discovery. By requiring the parties to share the cost, this Court encourages the parties to come up with a discovery plan that is both time and cost efficient. The parties must provide a copy of their proposed discovery plan to chambers, Room 2206, by 2/7/07.

> FN9. The parties should determine which party will review these boxes. If, upon review of the 1,778 boxes, the reviewing party discovers additional boxes that are

inaccurately labeled, that party should inform the Court.

**B. Remaining Discovery Issues**

Plaintiff also asks this Court for an order compelling defendants to review the Reebie documents in order to provide responses to plaintiff's interrogatories. Again, we find that requiring defendants to do so would be unduly burdensome and expensive. Accordingly, plaintiff's motion to compel defendants to review the Reebie documents in order to fully respond to their interrogatories is denied.

Next, plaintiff asks this Court to compel defendants to interview third parties who might have knowledge of information sought in plaintiff's interrogatories, including Old FTL personnel as well as former counsel at Milbank. Under Rule 33, each interrogatory must be "answered separately and fully in writing under oath, unless it is objected to, in which event the objecting party shall state the reasons for objection and shall answer to the extent the interrogatory is not objectionable." Fed.R.Civ.P. 33(b)(1). Thus, Rule 33 imposes a duty to provide full answers to interrogatories, including all the information within the responding party's knowledge and control. *Bell v. Woodward Governor Co.,* 2005 WL 289963, *2, 2005 U.S. Dist. LEXIS 4451, *6 (N.D.Ill.2005).

Plaintiff argues that a party responding to an interrogatory must make reasonable efforts to obtain information within the knowledge or possession of others. In support of this argument, plaintiff relies on *Hanley v. Como Inn, Inc.,* 2003 WL 1989607, 2003 U.S. Dist. LEXIS 7130 (N.D.Ill.2003). There, the court stated that "personal lack of knowledge does not excuse [a party's] failure to answer the interrogatories, because [the] duty to fully answer implies a duty to make reasonable efforts to obtain information within the knowledge and possession of others." *Id.* at 2003 WL 1989607, *4-5, 2003 U.S.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

240 F.R.D. 401
240 F.R.D. 401
**(Cite as: 240 F.R.D. 401)**

Dist. LEXIS 7130, *12, quoting *Jones v. Syntex Laboratories, Inc.,* 2001 WL 1338987, *3, 2001 U.S. Dist. LEXIS 17926, *9 (N.D.Ill.2001). We disagree that such a broad proposition applies universally. Indeed, in *Jones*, the information at issue was within the possession of the plaintiff's family members. *Jones*, 2001 WL 1338987, *3, 2001 U.S. Dist. LEXIS 17926, *9. In *Hanley*, plaintiff's motion to compel was granted only to the extent that the defendant was required to identify the documents he relied on in answering the interrogatories. *Hanley*, 2003 WL 1989607, *5, 2003 U.S. Dist. LEXIS 7130, *13. The motion to compel had nothing to do with requiring a party to obtain information within the knowledge or possession of others. *Id.* at 2003 WL 1989607, *4-5, 2003 U.S. Dist. LEXIS 7130, *12-13.

[9][10] This Court finds that under Rule 33, a responding party is required to provide full answers to interrogatories, which includes all information within that party's knowledge and control. *See Portis v. City of Chicago,* 2005 WL 991995, *3, 2005 U.S. Dist. LEXIS 7972, *10 (N.D.Ill.2005); *Bell,* 2005 WL 289963, *2, 2005 U.S. Dist. LEXIS 4451, *6 (N.D.Ill.2005). Because the defendants have no control over the former officers, directors or employees of Old FTL or any other successor of Old FTL or NWI, plaintiff's motion to compel defendants to interview third parties not within their control is denied.

Similarly, we will not order defendants to interview former counsel at Milbank or review documents in the possession of Milbank. As discussed above, none of the defendants have the right to assert or waive the attorney-client privilege with respect to documents or communications between Old FTL or the FTL debtors and their attorneys. Therefore, the attorneys at Milbank are not within the defendants' control. Accordingly, plaintiff's motion to compel defendants to *414 review Milbank documents and interview former counsel is denied.

**Conclusion**

To the extent that defendants asked this Court to determine whether they are entitled to assert or waive the attorney-client privilege in this case, their motion for protective order is granted. However, for the reasons set forth above, we find that none of the defendants are entitled to invoke the attorney-client privilege here. Thus, the remainder of defendants' motion for protective order is denied. Plaintiff's motion to compel is granted to the extent that the parties are ordered to create a discovery plan relating to the Reebie documents. Plaintiff's motion to compel is denied in all other respects. It is so ordered.

N.D.Ill.,2007.
American Intern. Specialty Lines Ins. Co. v. NWI-I, Inc.
240 F.R.D. 401

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

193 F.R.D. 664
193 F.R.D. 664
(Cite as: 193 F.R.D. 664)

United States District Court,
D. Colorado.
Terrence A. BUTTLER, Plaintiffs,
v.
Stuart BENSON; Kelly's Franchising of America,
Inc.; Keri Benson; Gladys Benson; Gladys Benson
as Trustee of the TRS Trust; and Keri Benson as
trustee of the SRT Trust, Defendants.
No. CIV.A. 97-B-609.

June 16, 2000.

Plaintiff filed motion to compel production of documents, motion for sanctions, and certificate of compliance with local rule, and amended motion for leave to endorse expert witness and certificate of compliance. The District Court, Boland, United States Magistrate Judge, held that: (1) plaintiff's motion to compel and associated request for sanctions would be denied, where plaintiff's unexplained delay in seeking court assistance to obtain the documents at issue, coupled with his request for sanctions in the form of an order precluding defendants from opposing his damage claims and from offering evidence at trial, raised inference that plaintiff held alleged discovery violation in abeyance for strategic purpose; (2) plaintiff's request for reimbursement of costs associated with sorting through documents produced by defendants would denied, absent evidence that the records which were kept in the usual course of business were not produced, or that plaintiff actually expended any money to have the documents sorted; and (3) plaintiff did not show good cause to endorse accountant as expert witness on damages after deadline for such designation had passed.

Motions denied.

West Headnotes

[1] Federal Civil Procedure 170A $\mathrel{\Longleftrightarrow}$ 1278

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
Ordinarily, if a failure to make discovery comes to light, the remedy is to order production and to take any other steps necessary to cure any prejudice.

[2] Federal Civil Procedure 170A $\mathrel{\Longleftrightarrow}$ 1278

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
A party cannot ignore available discovery remedies for months and then, on the eve of trial, move the court for an order compelling production.

[3] Federal Civil Procedure 170A $\mathrel{\Longleftrightarrow}$ 1636.1

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)5 Compliance; Failure to Comply
                170Ak1636 Failure to Comply; Sanctions
                    170Ak1636.1 k. In General. Most Cited Cases
Plaintiff's motion to compel and associated request for sanctions would be denied, where plaintiff's unexplained delay in seeking court assistance to obtain the documents at issue, coupled with his request for sanctions in the form of an order precluding defendants from opposing his damage claims and from offering evidence at trial, raised the inference that plaintiff held alleged discovery violation in abeyance for strategic purpose.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

193 F.R.D. 664
193 F.R.D. 664
(Cite as: 193 F.R.D. 664)

**[4] Federal Civil Procedure 170A ⬅1637**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)5 Compliance; Failure to Comply
                170Ak1636 Failure to Comply; Sanctions
                    170Ak1637 k. Payment of Expenses. Most Cited Cases
Plaintiff's request for reimbursement of costs associated with sorting through documents produced by defendants would be denied, absent evidence that the records kept in the usual course of business were not produced, or that the plaintiff actually expended any money to have the documents sorted. Fed.Rules Civ.Proc.Rule 34(b), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⬅1636.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)5 Compliance; Failure to Comply
                170Ak1636 Failure to Comply; Sanctions
                    170Ak1636.1 k. In General. Most Cited Cases
Plaintiff did not show good cause to endorse accountant as expert witness on damages after deadline for such designation had passed, based on defendant's late production of financial records, where plaintiff had discovery remedies available to compel defendants to produce the records earlier, but failed to resort to those remedies. Fed.Rules Civ.Proc.Rule 6(b), 28 U.S.C.A.
*665 Kirk B. Holleyman,Kirk B. Holleyman, P.C., Denver, CO, for Plaintiff.

Harold R. Bruno, III, Smith McCullough, P.C.,

Denver, CO, for Defendant.

### ORDER

BOLAND, United States Magistrate Judge.

This matter is before me on **Plaintiff's Motion to Compel Production of Documents, Motion for Sanctions, and Certificate of Compliance Pursuant to D.C.COLO.LR 7.1** (the "Motion to Compel"), filed April 21, 2000, and **Plaintiff's Amended Motion for Leave to Endorse Expert Witness and Certificate of Compliance Pursuant to D.C.COLO.LR 7.1** (the "Motion to Endorse Expert Witness"), filed April 21, 2000. For the following reasons, the motions are DENIED.

### 1. PLAINTIFF'S MOTION TO COMPEL

The plaintiff served his initial requests for production of documents on defendants Stanley Benson, Gladys Benson, and Gladys Benson as Trustee of the TRS Trust on May 21, 1998. On September 8, 1998, the plaintiff filed his first motion to compel production of certain documents. On October 9, 1998, Magistrate Judge Donald E. Abram issued an Order directing defendants to produce relevant financial records on or before October 20, 1998.

The plaintiff asserts that "in late 1998" defendants made an incomplete production of the records ordered by Judge Abram. The plaintiff then provided defendants with a written list of the documents which defendants failed to produce. More than one year passed. Then, on April 4, 2000, defendants made a second incomplete production. The plaintiff now seeks (1) an order compelling production of the remaining documents, (2) an order prohibiting defendants from opposing his damage claims and from offering evidence at trial, [FN1] and (3) an order requiring defendants to reimburse the plaintiff for monies expended sorting through docu-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

193 F.R.D. 664
193 F.R.D. 664
(Cite as: 193 F.R.D. 664)

ments produced by defendants.

> FN1. Pursuant to Orders dated June 30, 1997, and February 12, 1998, default entered against all defendants. Thus, the only issue for trial is damages.

[1] Ordinarily, if a failure to make discovery comes to light, the remedy is to order production and to take any other steps necessary*666 to cure any prejudice. *DesRosiers v. Moran,* 949 F.2d 15, 22 (1st Cir.1991). In this case, however, the plaintiff has failed to seek judicial relief for an unreasonably long period of time.

Specifically, Judge Abram required defendants to produce the financial records on or before October 20, 1998. After that order, and more than a year ago, the plaintiff identified documents which he believed should be produced but had not been. Discovery closed on March 26, 1999, but the plaintiff did not raise any issue concerning the documents it now seeks. A pretrial conference was held on December 9, 1999, and again there is no record that any discovery issues were raised. Finally, with the trial set to begin on July 6, 2000, the plaintiff in late April filed the instant Motion to Compel.[FN2] There is no explanation for why the plaintiff did not seek further assistance of the court to obtain production of these documents during discovery or why he waited until one and one half years after Judge Abram's Order to file this Motion to Compel.

> FN2. Defendants' Opposition to Motion to Compel Production of Documents and Opposition to Motion for Sanctions was filed May 9, 2000, and defendants' Supplement to Opposition to Motion to Compel Production of Documents was filed May 30, 2000.

[2] A party cannot ignore available discovery remedies for months and then, on the eve of trial, move the court for an order compelling production. The

*DesRosiers* case is illustrative. There, as in this case:

> [T]he plaintiff knew, well in advance of trial, that [requested but unproduced documents] existed. Yet, he failed to bring the matter of non-production to the court's attention at the pretrial hearing or in some other timely fashion. In similar circumstances, courts have often deemed discovery violations waived.

949 F.2d at 22 n. 8. *See also JOM, Inc. v. Adell Plastics, Inc.,* 193 F.3d 47, 51 (1st Cir.1999)(noting a party's obligation to move to compel production "well in advance of trial").

[3] The plaintiff's unexplained delay in seeking court assistance to obtain the documents now at issue, coupled with his request for sanctions in the form of an order precluding defendants from opposing his damage claims and from offering evidence at trial, raises the inference that the plaintiff is not as concerned with obtaining the documents as he is with "hold[ing] in abeyance a putative discovery violation" for the strategic purpose of using it late in the proceedings as a basis to prevent defendants from defending the claims against them. *See id.* at 52. For these reasons, the plaintiff's Motion to Compel and associated request for sanctions are denied.

[4] Plaintiff's request for reimbursement of costs associated with sorting through the documents produced by defendants also is denied. There is no evidence that these records were not produced as they were kept in the usual course of business, *see*Fed.R.Civ.P. 34(b), or that the plaintiff actually expended any money to have the documents sorted.

## 2. PLAINTIFF'S MOTION TO ENDORSE EXPERT WITNESS

[5] The plaintiff seeks to endorse Gregory Taylor, Certified Public Accountant, as an expert witness

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

193 F.R.D. 664
193 F.R.D. 664
(Cite as: 193 F.R.D. 664)

on the damages he claims to have suffered. The plaintiff bases this late request on defendants' failure to produce documents until April 4, 2000. The plaintiff also asserts that a CPA would be of great assistance to the Court in tracing the complex financial transactions undertaken by defendants.

A Scheduling Order "shall not be modified except upon a showing of good cause." Fed.R.Civ.P. 16(a)(6). In addition,

[w]hen ... by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion ... upon *motion made after the expiration of the specified period* permit the act to be done where the failure to act was the result of *excusable neglect....*

Fed.R.Civ.P. 6(b)(emphasis added).

Here, although a CPA might be helpful at trial, the plaintiff's request comes too late. Pursuant to Judge Abram's Order dated *667 February 9, 1999, the plaintiff received an extension of time until March 1, 1999, to designate his expert witnesses. At that time, Judge Abram admonished that "[n]o further extensions of time [would] be granted."

Further, to the extent plaintiff's Motion to Endorse Expert Witness is based upon defendants' late production of financial records, as discussed *supra,* plaintiff had discovery remedies available to compel defendants to produce the records earlier than April 4, 2000. For these reasons, I find that the plaintiff has not shown good cause, and certainly not excusable neglect, to support his request to endorse an expert witness at this late date. Accordingly,

IT IS ORDERED that **Plaintiff's Motion to Compel Production of Documents, Motion for Sanctions, and Certificate of Compliance Pursuant to D.C.COLO.LR 7.1**, filed April 21, 2000, is DENIED.

IT IS FURTHER ORDERED that **Plaintiff's Amended Motion for Leave to Endorse Expert Witness and Certificate of Compliance Pursuant to D.C.COLO.LR 7.1**, filed April 21, 2000, is DENIED.

IT IS FURTHER ORDERED that defendants' request for attorneys' fees and costs is DENIED.

D.Colo.,2000.
Buttler v. Benson
193 F.R.D. 664

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.