Westlaw.

71 F.R.D. 1
71 F.R.D. 1
(Cite as: 71 F.R.D. 1)

United States District Court, N. D. California.
Hazel L. GLESENKAMP, Plaintiff,
v.
NATIONWIDE MUTUAL INSURANCE COM-
PANY, a corporation, Defendant.
**Civ. No. C-70-1727-CBR.**

April 11, 1974.

An insured under a group travel accident insurance policy brought an action against the insurer asserting, inter alia, that the insurer committed fraud in amending the coverage of its policy. The District Court, Renfrew, J., held, inter alia, that allowing plaintiff additional discovery would not serve the interest of justice.

Complaint dismissed.

West Headnotes

**[1] Federal Civil Procedure 170A ☞1332**

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(C) Depositions of Parties and Others Pending Action
         170AX(C)1 In General
            170Ak1332 k. Objections to Taking and Grounds for Refusal. Most Cited Cases
Further discovery by deposition in action by insured against insurer for alleged fraud in amending coverage to group travel accident insurance policy would be denied where identities of proposed deponents had been known to insured for some one and one-half years and where insured had filed certificate of readiness for trial prior to noticing such further depositions.

**[2] Insurance 217 ☞3424**

217 Insurance

217XXVIII Miscellaneous Duties and Liabilities
   217k3416 Of Insurers
      217k3424 k. Fraud or Misrepresentation. Most Cited Cases
   (Formerly 217k3424(1), 217k92.1)
Legal definition of "passenger" did not so clearly govern boarding and alighting from ship that insurer's action in amending group travel accident insurance policy, before its issuance to insured, so as to omit injuries sustained while boarding and alighting evidenced fraudulent intent.

**[3] Federal Civil Procedure 170A ☞824**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak824 k. Time for Amendment in General. Most Cited Cases
Parties' desire to avoid effect of opponent's motion for summary judgment was insufficient reason to permit such party to amend complaint so as to infuse life into case when party had been unable for three years to establish any genuine issue of fact therein.

**[4] Federal Civil Procedure 170A ☞2559**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2559 k. Subsequent Proceedings. Most Cited Cases
In action by insured under group travel accident insurance policy against insurer, in which insured claimed that insurer acted fraudulently in amending policy so as to exclude injuries occurring while boarding or alighting from ship, insured would not be permitted to avoid effects of entry of summary judgment in insured's favor by amending complaint so as to add fraud claim against travel club which

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

71 F.R.D. 1
71 F.R.D. 1
(Cite as: 71 F.R.D. 1)

had procured such group insurance. Fed.Rules Civ.Proc. rule 15(a, c), 28 U.S.C.A.

*1 Ernest M. Thayer, Carroll, Burdick & McDonough, San Francisco, Cal., for plaintiff.

Pettit, Evers & Martin, San Francisco, Cal., for defendant.

MEMORANDUM OF OPINION AND ORDER
RENFREW, District Judge.

This case arose out of a dispute as to the extent of coverage afforded under a group travel accident insurance policy issued to plaintiff by defendant Nationwide Mutual Insurance Company on May 27, 1967. On August 14, 1967, plaintiff was injured while boarding a boat. She subsequently filed a claim, explaining:

'The accident occurred while I was attempting to board a motorboat, the Lucerne, at Lake Lucerne, Switzerland. When I arrived at the top of the gang plank, I stumbled over an extremely high threshhold [sic], which was unattended, and fell heavily fracturing my left femur.'(Exhibits L-2-3 to Defendant's Memorandum in Support of Motion for Summary Judgment filed October 30, 1973.)

Defendant denied benefits on the ground that the policy afforded coverage only while she was riding as a passenger on a boat, not while she was in the act of boarding. Plaintiff's attorney then wrote to defendant with a new version of how the accident had occurred:

*2 'Mrs. Glesenkamp was not entering the boat in the sense of boarding it initially. She had arrived on the boat and was in the process of entering the lounge in order to be seated as a passenger prior to the boat's departure.'(Exhibit S to Defendant's Memorandum filed October 30, 1973.)

Because of the conflicting statements about where the accident had occurred, defendant continued to deny the claim and asked that the conflict be resolved. After unsuccessful efforts to resolve the conflict to defendant's satisfaction, plaintiff instituted this lawsuit on August 13, 1970, alleging causes of action based on fraud, breach of contract, and constructive trust. The breach of contract and constructive trust claims were disposed of on March 19, 1971, when this Court granted plaintiff's motion for summary judgment on the issue of defendant's liability to her under the policy. Thereafter, on May 4, 1972, this Court denied defendant's motion to dismiss the remaining fraud claim on the ground that satisfaction of the claims under the contract did not bar further action on the fraud claim since the claims arose out of separate and distinct facts.[FN1]

> FN1. The opinion is reported at 344 F.Supp. 517.

There are now three motions before the Court. Defendant has moved for summary judgment on the ground that there are no genuine issues of material fact; plaintiff has moved for leave to amend her complaint to allege that defendant breached the implied covenant of good faith and fair dealing and that it intentionally inflicted emotional distress when it denied her claim for injuries; and plaintiff has also moved for leave to amend her complaint to add a cause of action for fraud against National Travel Club, Inc., the organization through which plaintiff received her insurance policy.

In the year and a half since the Court's order denying defendant's motion to dismiss, plaintiff has failed to establish any facts which would support her fraud claim. Plaintiff claims that defendant's fraudulent scheme began prior to the issuance of her policy when the defendant changed the definition of 'injury' in its travel accident insurance policy. Prior to January, 1967, the policy covered any injury sustained 'while riding as a passenger * * * in or on (including boarding and alighting from) any land or water conveyance * * *.' On January 2,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

71 F.R.D. 1                                  Page 3
71 F.R.D. 1
(Cite as: 71 F.R.D. 1)

1967, the policy was amended and the 'boarding and alighting' language was deleted.[FN2] Plaintiff argues that when defendant issued her insurance policy it intended to rely on the altered language to deny any claims from persons injured in the act of boarding or alighting, in spite of its knowledge that such claims were covered by the amended policy. Defendant's denial of her claim is said to be further evidence of this fraudulent scheme.

> FN2. While not relevant here, the policy was also amended to specify the particular types of conveyance covered.

In its motion for summary judgment defendant presents affidavits of three of the persons involved in amending the policy and of five other employees who were involved in processing plaintiff's claim. These uniformly support defendant's contention that it acted in good faith both in amending the policy and in handling plaintiff's claim. Plaintiff, on the other hand, has failed to present any counter affidavits or to depose any of defendant's employees. She filed a notice of deposition and an overly broad request for production of documents on October 2, 1972, covering the eleven employees who were consulted in connection with the amendment to the policy. On December 14, 1972, following the Court's denial of her motion to compel production of documents, plaintiff stipulated to a continuance of the date for the depositions until a 'mutually convenient date sometime in the future.' No further action is reflected in the file for almost one year when on September 27, 1973, plaintiff filed a certificate of readiness certifying that all depositions and discovery were completed. Defendant's motion for summary judgment followed on October 30, 1973. In a tardy effort to find any facts to support her claim, and contrary *3 to the representations to the Court contained in the certificate of readiness, plaintiff noticed depositions of the eight persons whose affidavits were attached to the motion for summary judgment and also of five other persons who were involved in the policy amendment. Aside from the burden presented by the number of depositions, they were to be held in Ohio, New York, Florida, and Oregon. This notice was vacated by the Court on December 27, 1973, after a hearing on the motion for summary judgment.

[1] Plaintiff now urges the Court not to grant summary judgment without giving her another chance to depose defendant's affiants and other persons involved in amending the policy. Plaintiff has known the names of all eleven people involved in amending the policy since June of 1971. (*See* Answer No. 32, Defendant's Further Answers to Interrogatories filed June 4, 1971.) Three of the eight affiants are included in this group and the rest are easily identifiable employees of defendant who were involved in handling plaintiff's claim. Indeed, the names of all but two appeared repeatedly in the extensive correspondence between plaintiff and defendant with respect to her claim. Her failure to depose them until after filing a certificate of readiness and until after a motion for summary judgment was filed was a factor considered by the Court in declining her request for further discovery. *See Schneider v. McKesson & Robbins, Incorporated*, 254 F.2d 827, 831 (2 Cir. 1958). Although summary procedures should be used sparingly where questions of motive or intent are involved, *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), plaintiff's failure to discover any facts in support of her claim for fraud in a year and a half, especially in light of this Court's prior warning that 'plaintiff may well have a significant problem of proof as to the factual basis underlying her claim of fraud' (*Glesenkamp, supra*, 344 F.Supp. at 519), convinces the Court that allowing additional discovery would not serve the interests of justice. *See First Nat. Bank v. Cities Service*, 391 U.S. 253, 296-299, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

[2] Plaintiff also argues that, even in the absence of evidence in the form of affidavits or depositions, the legal definition of passenger so clearly covers

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

71 F.R.D. 1
71 F.R.D. 1
(Cite as: 71 F.R.D. 1)

Page 4

boarding and alighting that amending the policy and denying her claim are, in themselves, evidence of fraudulent intent. While it is true that, in general, the cases have said that a person in the process of boarding is included within the definition of the term passenger, 10 Couch on Insurance 250 (1962); 1A J. Appleman, Insurance Law & Practice 431-433 (1965), these same cases point out that the precise facts of the particular situation are critical to the determination.*See, e. g., Grier v. Ferrant,* 62 Cal.App.2d 306, 310-312, 144 P.2d 631, 633-634 (1944). It is possible that defendant, in amending the policy, wished to avoid the possibility of having the 'boarding and alighting' language interpreted so as to further extend coverage beyond the mere definition of passenger, e. g., a person injured while in a terminal in an area not under the control or dominion of the public conveyance which the insured was seeking to board. As to plaintiff's contention that the exact location of her fall was unimportant because she was within the scope of the term 'passenger' whichever version of the accident was correct, both the Ohio and California Departments of Insurance evidenced great interest in ascertaining exactly where and under what circumstances the accident occurred, and whether the plaintiff was already aboard the boat or not. (Exhibits X and AA-1 to Defendant's Memorandum filed October 30, 1973.)[FN3]Furthermore, nowhere in all the correspondence between plaintiff's attorney and defendant during the three years preceding the filing of this complaint did plaintiff's attorney argue that it was unimportant whether plaintiff was boarding or already on board the boat. Indeed, plaintiff's letters to defendant and *4 to the California and Ohio Insurance Departments stressed that the claim should be paid because, notwithstanding her original version of how the accident occurred, she had in fact been on board at the time. (Exhibits S and U-2 to Defendant's Memorandum filed October 30, 1973.)

FN3. Implicit in the correspondence was

the understanding of both Departments that were the original version of the facts correct, plaintiff would not have been covered.

In the absence of any evidence to support a claim of fraud or to suggest that further discovery at this late date would be appropriate, defendant's motion for summary judgment is granted.

[3] Plaintiff has moved for leave to amend her complaint to charge defendant with a breach of the covenants of good faith and fair dealing and with an intentional infliction of emotional distress in its refusal to honor her claim. She argues that this amendment will relate back to the date of filing of the original complaint, thus avoiding the bar of the statute of limitations, because it arises out of the same transaction or occurrence as does the rest of the complaint. In fact, however, the complaint as it now stands only alleges fraud arising out of the issuance of a policy to plaintiff; the causes of action involving defendant's refusal to honor her claim were disposed of by summary judgment on March 19, 1971. To the extent that the new causes of action arise out of transactions common to the fraud claim, plaintiff has failed to establish any facts to support the necessary allegations of intent and further discovery would not be appropriate, in light of all the circumstances.

Plaintiff explains the long delay in bringing this motion on the ground that the claims are based on newly created theories of liability. Both theories, however, antedate this action.*Crisci v. Security Insurance Co. of New Haven, Conn.,* 66 Cal.2d 425, 429, 58 Cal.Rptr. 13, 16, 426 P.2d 173, 176 (1967) (good faith and fair dealing); *State Rubbish Collectors Ass'n v. Siliznoff,* 38 Cal.2d 330, 337-339, 240 P.2d 282, 285-286 (1952) (intentional infliction of emotional distress). The cases cited by plaintiff (Plaintiff's Memorandum in Support of Motion for Leave to File Amendment to Complaint filed December 17, 1973, p. 2) are simply more recent

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

71 F.R.D. 1
71 F.R.D. 1
(Cite as: 71 F.R.D. 1)

decisions applying the existing theories of liability and in fact cite the earlier authorities. Plaintiff's understandable desire to avoid the effect of defendant's motion for summary judgment is insufficient reason for infusing life into a case where plaintiff has been unable for three years to establish any genuine issues of fact.

[4] Regarding plaintiff's final motion to amend her complaint to add a fraud claim against National Travel Club, Inc. (NTC), it is the duty of the Court to decide whether the ends of justice require that leave be granted to amend at this time.Rule 15(a), Federal Rules of Civil Procedure. Plaintiff contends that although this amendment will not qualify under Rule 15(c) for relation back, the claim is not barred by the statute of limitations because the fraud was discovered no earlier than February 26, 1973. Plaintiff cites two letters from NTC to her attorney as the newly discovered evidence of fraud by NTC. (Plaintiff's Closing Memorandum in Support of Motion for Leave to File Amendment to Complaint filed January 18, 1974, pp. 5-6.) The Court finds nothing in these letters or elsewhere in the file which would suggest any different relationship between NTC and defendant or any different involvement by NTC in these matters than was known to plaintiff at the filing of this action. Allowing plaintiff to amend now would serve only to give her another opportunity, at the further expense of defendant and NTC, to search for evidence of fraud which she has been unable to find in the three-year life of this action. The liberal amendment policy of the Federal Rules was not intended to allow a party to circumvent the effects of summary judgment by amending the complaint every time a termination of the action threatens. The time must arrive in every case when the plaintiff must demonstrate that there is a genuine issue for trial or have summary judgment entered against him.

Accordingly, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendant's motion for summary judgment is *5 granted and plaintiff's

motions for leave to amend the complaint are denied.

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED that the complaint is dismissed and that judgment be entered in favor of defendants.

N.D.Cal., 1974
Glesenkamp v. Nationwide Mut. Ins. Co.
71 F.R.D. 1

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                              Page 1
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
(Cite as: 2009 WL 789440 (E.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Christopher RAFANO, Plaintiff,
v.
PATCHOGUE-MEDFORD SCHOOL DISTRICT,
Patchogue-Medford School Board and Michael
Mostow, individually and in his official capacity as
Superintendent, Defendants.
**No. 06-CV-5367 (JFB)(ARL).**

March 20, 2009.

West KeySummary
**Constitutional Law 92 €—4207**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
            92XXVII(G)8 Education
                92k4204 Students
                    92k4207   k.   Academics,   Cur-
riculum, and Instruction. Most Cited Cases

**Schools 345 €—164**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k164 k. Curriculum and Courses of
Study. Most Cited Cases
A student failed to sufficiently allege a violation of
his federally protected rights to support his claim
under Section 1983 against a school district. The
student alleged the district issued a transcript with
incorrect grades because he would have received
straight A's for tenth grade if the school had not im-
properly incorporated zeros into his grades for the
tests he missed due to absence. To the extent that
he was asserting a right to an accurate transcript, he

pointed to no case law finding such a right. Even if
such a right was found to exist, there was no indica-
tion that the student was deprived of due process
regarding the transcript. The lowered grades were a
result of suspensions due to behavioral problems
that the student did not deny, such as using profan-
ities with teachers. U.S.C.A. Const.Amend. 14; 42
U.S.C.A. § 1983.

David Gordon, Esq., Hauppauge, NY, for plaintiff.

Rondiene Erin Novitz, Esq., Gary Edward Dvoskin,
Esq. and Keith V. Tola, Esq., of Cruser Mitchell &
Novitz, LLP, Melville, NY, for defendants.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

***1** Plaintiff, Christopher Rafano ("plaintiff" or
"Rafano") brings the present civil rights action
against the Patchogue-Medford School District (the
"District"), the Patchogue-Medford School Board
(the "School Board") and Michael Mostow
("Mostow"), individually and in his official capa-
city as Superintendent, (collectively, "defendants"),
alleging that (1) plaintiff's academic transcripts is-
sued by defendants reflected incorrect grades, (2)
defendants interfered with plaintiff's ability to take
the SAT Examination, and (3) these actions, in con-
junction with defendants' refusal to release
plaintiff's medical records, resulted in plaintiff's re-
jection from all colleges of his choice. Plaintiff
brings this action under 42 U.S.C. § 1983 ("Section
1983"), the Equal Protection Clause of the Four-
teenth Amendment to the United States Constitu-
tion, the Americans with Disabilities Act ("ADA"),
42 U.S.C. § 12132, the Individuals With Disabilit-
ies Education Act ("IDEA"), 20 U.S.C. §§
1400-1490, and state law.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 2
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
(Cite as: 2009 WL 789440 (E.D.N.Y.))

Defendants move for summary judgment on all claims. For the reasons set forth below, defendants' motion is granted on all federal claims, and the Court declines to exercise supplemental jurisdiction over the state claims.

## I. BACKGROUND

### A. Facts

The Court has taken the facts described below from the parties' affidavits, exhibits and defendants' Local Rule 56.1 Statement of Facts ("Defs' 56.1").[FN1] In ruling on a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York,* 422 F.3d 47, 50 (2d Cir.2005).

> FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504-05 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."*Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see also Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 U.S. Dist. LEXIS 23397, at *4-*5 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements

pursuant to Local Civil Rule 56.1). Accordingly, in the exercise of its broad discretion, the Court will overlook this defect and will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504.

Plaintiff attended the Patchogue-Medford School District for part of the school years between 2001 and 2004. (Defs' 56.1 ¶ 1.) Plaintiff suffers from ADHD and bipolar disorder. (Defendants' Affirmation in Support, Ex. X.) On November 12, 2002, plaintiff's mother requested that plaintiff be evaluated by the District's Committee on Special Education ("CSE"). (Defs' 56.1 ¶ 2.) A CSE meeting was held on January 10, 2003, and resulted in plaintiff's classification as "Other Health Impairment." (*Id.* ¶ 3.) Between February 2003 and March 2003, plaintiff was suspended from school on several occasions for "cutting classes, walking out of classes without permission, and displaying insubordinate behavior, including use of profanities to teachers and other school staff."(*Id.* ¶¶ 4-5.)A meeting was held on April 2, 2003, at which the CSE determined that plaintiff "would benefit from a smaller structured learning environment."(*Id.* ¶ 6.) The CSE recommended a BOCES screening, to which plaintiff's mother consented. (*Id.* ¶ 6.) At a meeting held on June 11, 2003, the CSE and plaintiff's parents approved plaintiff's placement at the Eastern Suffolk BOCES. (*Id.* ¶ 7.)

Plaintiff attended Eastern Suffolk BOCES from May 2003 through November 2003.(*Id.* ¶ 8.) In August of 2003, plaintiff's mother requested a CSE meeting because she no longer approved of plaintiff's placement. (*Id.* ¶ 9.) Such meeting was held on September 10, 2003, and CSE and plaintiff's mother agreed that plaintiff would continue to attend BOCES. (*Id.* ¶ 9.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                              Page 3
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
(Cite as: 2009 WL 789440 (E.D.N.Y.))

**\*2** In December of 2003, at the request of plaintiff's mother, the CSE agreed to place plaintiff back into the Patchogue-Medford High School. (*Id.* ¶ 10.)At a meeting on January 23, 2004, however, the CSE determined that plaintiff's needs were not being met at the high school and plaintiff "continued to 'openly defy authority figures and use inappropriate language.'"(*Id.* ¶ 11.)Plaintiff's mother agreed to another BOCES screening, with home tutoring as the interim placement until an appropriate placement could be arranged. (*Id.* ¶ 11.)On January 26, 2004, plaintiff's mother wrote to the District, informing it that she disagreed with the CSE's determination and she had decided to send plaintiff to a private school, the Sappo School. (*Id.* ¶ 12.)In or about February of 2004, the District agreed to pay for plaintiff to attend the Sappo School. (*Id.* ¶ 13.)Plaintiff finished high school at the Sappo School, receiving a Regents diploma in August of 2004. (*Id.* ¶ 14.)

### 1. Plaintiff's Transcript

On October 22, 2004, plaintiff's mother requested a copy of plaintiff's transcript from the defendant school district. (*Id.* ¶ 15.)That same day, the school district provided plaintiff's mother a transcript containing plaintiff's grades from the Patchogue-Medford School District. (*Id.* ¶ 16.)Plaintiff's mother then requested a new transcript, including the grades plaintiff received at the Sappo School. (*Id.* ¶ 17.)The Sappo School provided the District with plaintiff's grades received from the Sappo School on October 26, 2004. (*Id.* ¶ 17.)On December 10, 2004, the District sent plaintiff's mother a copy of plaintiff's transcript, incorporating the grades provided by the Sappo School. (*Id.* ¶ 19.)

Plaintiff claims that plaintiff's grades from the Sappo School are not accurately reflected in the transcript the District sent. (*Id.* ¶ 20;*but see* Defendants' Affirmation in Support, Ex. C, at 76, in which plaintiff admits that the transcript accurately reflected his grades from the Sappo School.)

Plaintiff's mother alleges that the transcript is also inaccurate in that "Defendants incorporated zeroes into his grades for quizzes he missed on days he was absent from school during grades nine through twelve, while he attended the Patchogue-Medford High School."(*Id.* ¶ 22; Defendants' Affirmation in Support, Ex. W, at 40-41, explaining that plaintiff received zeros for tests missed due to absence caused by suspension from school; *but see* Defendants' Affirmation in Support, Ex. Y, at 37 and 63, in which plaintiff confirmed he had no proof that the grades reflected in the transcript were not correct.) Plaintiff's mother does not dispute the accuracy of plaintiff's ninth grade grades. (Defendants' Affirmation in Support, Ex. X, at 35.) Nor does plaintiff's mother dispute the tenth grade Regents exam scores, which included a 65 in U.S. history, a 56 in math and a 56 in living environment. (*Id.* at 42.)Plaintiff's mother contends, however, that plaintiff would have received straight A's that year if the school had not improperly incorporated zeros into his grades for the tests he missed due to absence. (*Id.* at 81.)

### 2. The SAT Examination

**\*3** Plaintiff took the SAT Examination without accommodations in May of 2003 and scored a 710. (Defs' 56.1 ¶¶ 24-25.) Plaintiff alleges that he took the test at that time as practice and intended to take it again. Plaintiff alleges that defendants removed his name from the list of those eligible for accommodations to take the SAT Examination and/or prevented him from sitting for the examination when he attempted to take the test again in November of 2004. (*Id* . ¶ 24.)Plaintiff concedes he never attempted to take it after that, despite there being no barrier to his doing so.

On February 24, 2004, the College Board-the body responsible for providing test accommodations for the SAT Examination-approved plaintiff's request for testing accommodations and advised plaintiff

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

37

Slip Copy
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
(Cite as: 2009 WL 789440 (E.D.N.Y.))

that such accommodations would expire on August 31, 2004. (*Id.* ¶¶ 27-29.)Plaintiff applied and was scheduled to take the SAT Examination on November 6, 2004, after the testing accommodations were set to expire. (*Id.* ¶ 29.)On or about November 1, 2004, the College Board advised the Director of the Sappo School that plaintiff was not approved for accommodations for the November 2004 examination. (*Id.* ¶ 30.)On November 4, 2004, the defendant District's Assistant Superintendent for Pupil Personnel wrote to the College Board, requesting that plaintiff be allowed testing accommodations for the November 2004 examination. (*Id.* ¶ 31.)The College Board agreed to provide such accommodations, but plaintiff did not take the examination at the scheduled time. (*Id* . ¶ 32.)Plaintiff alleges that the District called the College Board and told them to cancel plaintiff's examination. (Defendants' Affirmation in Support, Ex. Y, at 76; Ex. X, at 45.)

### 3. College Admission

Plaintiff alleges that defendants prevented him from attending college by refusing to provide colleges with his medical immunization records. The District, however, is "not authorized to release medical records of its students."(Defs' 56.1 ¶ 34.) Plaintiff also alleges that inaccuracies in his transcript and denial of accommodations for and/or entrance to the SAT Examination have caused his rejection from the colleges of his choice. Defendants contend that plaintiff was accepted to Palm Beach Community College, but refused to attend because they required him to take remedial classes, (*Id.* ¶ 36; Defendants' Affirmation in Support, Ex. G, at 50, 52 (plaintiff testifying that Palm Beach Community College "send[s] [plaintiff] mail all the time ... offering [him] to go to school ... [and he] can't wait to go")) but plaintiff denies that contention. (*See* Defendants' Affirmation in Support, Ex. Y, at 13.) Plaintiff was accepted to Dowling College, which he attended for two months in the Spring of 2007. (Defs' 56.1 ¶ 37.) Plaintiff withdrew, however, be-

fore completing the first semester. (*Id.* ¶ 37;*see* Defendants' Affirmation in Support, Ex. Y, at 18.)

### B. Procedural History

**\*4** Plaintiff filed the complaint in this action on October 2, 2006. Defendants filed their answer on December 1, 2006. Defendants filed this motion for summary judgment on August 25, 2008. Plaintiff filed his response in opposition to defendants' motion for summary judgment on February 16, 2009.[FN2] Defendants filed their reply on February 27, 2009. The Court has considered all of the parties' submissions.

> FN2. The plaintiff's opposition to the motion for summary judgment was due by September 25, 2008. However, no opposition was filed by that date or for over 30 days following that date. Instead, by motion filed October 31, 2008, counsel for plaintiff sought to withdraw because of various difficulties with plaintiff and plaintiff's mother. In a written letter to the Court, dated November 13, 2008, plaintiff (and plaintiff's mother) opposed that motion and, despite the differences between counsel and plaintiff regarding various matters, plaintiff (and plaintiff's mother) wished current counsel to continue as plaintiff's attorney. During the course of this motion to withdraw, plaintiff's counsel represented to the Court that he could not ethically and in good faith oppose the summary judgment motion generally given the record in this case, but believed there was a narrow ground he could assert in opposition on his client's behalf in good faith and consistent with his ethical obligations. As seen from the opposition papers, that narrow argument relates to the purported lack of certain discovery. Before counsel for plaintiff filed his opposition papers, the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
(Cite as: 2009 WL 789440 (E.D.N.Y.))

Page 5

Court held an on-the-record conference with plaintiff (and plaintiff's mother) to ensure that he understood that his counsel was only going to defend the motion on that narrow procedural ground and that he wanted to continue nevertheless with current counsel. Plaintiff indicated that he understood and wanted to proceed with that counsel, rather than proceed with new counsel or proceed *pro se.*

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."*Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the non-moving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."*Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."*Anderson,* 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."*Id.* at 247-48.Thus, the non-moving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts."*BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

## III. DISCUSSION

### A. Federal Claims

**\*5** Defendants argue that plaintiff has not (and cannot) establish a *prima facie* case against defendants under any cause of action asserted in the complaint. Counsel for plaintiff does not appear to challenge this contention, but rather argues that any absence of evidence is due to the Magistrate Judge's refusal to allow plaintiff to extend or reopen discovery to conduct additional depositions. For the reasons set forth below, this Court finds that plaintiff has not put forth sufficient evidence upon which a reasonable juror could find in his favor on any of his federal claims. Further, the Court finds that plaintiff's request for review of the Magistrate Judge's discov-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
**(Cite as: 2009 WL 789440 (E.D.N.Y.))**

Page 6

ery ruling is untimely and would be unsuccessful in any event. Similarly, to the extent that plaintiff is attempting to make a Rule 56(f) motion because of the failure to obtain certain discovery, the Court finds plaintiff's arguments completely unpersuas- ive.

### 1. Equal Protection

Plaintiff asserts violations of his rights under the Equal Protection Clause of the Fourteenth Amend-ment, which provides that "no State shall ... deny to any person within its jurisdiction the equal protec-tion of the laws."U.S. Const. amend. XIV, § 1. The Equal Protection Clause of the Fourteenth Amend-ment is "essentially a direction that all persons sim-ilarly situated be treated alike."*Latrieste Rest. v. Village of Port Chester,* 188 F.3d 65, 69 (2d Cir.1999) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). An individual not al-leging invidious discrimination on the basis of membership in some group may nevertheless pre-vail on an equal protection claim provided he shows that (1) "[he] has been intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference in treat-ment ."*Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); *see also Giordano v. City of New York,* 274 F.3d 740, 743 (2d Cir.2000). Such a claim "requires a showing that the level of similarity between the plaintiff and the person(s) with whom she compares herself is extremely high-so high (1) that no ration-al person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy, and (2) that the similarity in circumstances and differ-ence in treatment are sufficient to exclude the pos-sibility that the defendant acted on the basis of a mistake. The plaintiff must also show that the de-fendant intentionally treated her differently, with no

rational basis."*Prestopnik v. Whelan,* No. 06-3186-cv, 2007 U.S.App. LEXIS 19612, at *4-*5, 2007 WL 2389678 (2d Cir. Aug. 16, 2007) (internal citations and quotations omitted); *see also Price v. City of New York,* No. 06-3481-cv, 264 Fed. Appx. 66, 68, 2008 U.S.App. LEXIS 3133, 2008 WL 399757 (2d Cir. Feb.13, 2008); *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006); *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) ("the level of similarity between [such] plaintiffs and the persons with whom they compare themselves must be extremely high.").[FN3]

> FN3. The Second Circuit has not yet de-cided whether such a claim also requires "the plaintiff to demonstrate the differen-tial treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of consti-tutional rights, or malicious or bad faith in-tent to injure a person."*See Price v. City of New York,* 264 Fed. Appx. 66, 68 (2d Cir.2008). This Court need not address this question as plaintiff's claim is deficient for other reasons.

*6 Plaintiff has put forth no evidence that others, similarly situated, were treated differently from plaintiff. Plaintiff simply states that he "has the right to accurate academic transcripts just as those other disabled students who are similarly situated in a public school setting."(Defendants' Affirmation in Support, Ex. FF, at 7.) He does not identify a single such "similarly situated" person, nor does he provide any other evidentiary support to his con-clusory statement. No reasonable juror could find that plaintiff's burden was met based on such a showing. Such an omission is fatal to plaintiff's equal protection claim and, therefore, it cannot sur-vive summary judgment. *See Prestopnik* U .S.App. LEXIS 19612, at *4, 2007 WL 2389678; *see also King v. New York State Div. of Parole,* No. 05-1860-pr, 260 Fed. Appx. 375, 380, U.S.App. LEXIS 875, 2008 WL 145504 (2d Cir. Jan. 16,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
(Cite as: 2009 WL 789440 (E.D.N.Y.))

2008) (dismissing claim for failure "to identify a single individual with whom he can be compared for Equal Protection purposes").

### 2. Section 1983 Claim

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."*Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). Plaintiff alleges that defendants' actions have deprived plaintiff "of his rights, equal protection, privileges and immunities secured by the Constitution including the 14th Amendment in violation of 42 U.S.C. § 1983."(Compl.¶ 45.) In response to an interrogatory from defendants asking plaintiff to "[d]escribe with specificity the manner in which Defendants have deprived Plaintiff of federally- and state-protected Constitutional rights," plaintiff stated that "[t]he Plaintiff has the right to accurate academic transcripts just as those other disabled students who are similarly situated in a public school setting."(Defendants' Affirmation in Support, Ex. FF, at 7.) Defendants now move for summary judgment on plaintiff's claim pursuant to Section 1983 on grounds that (1) plaintiff has offered no evidence to support a finding that he has been deprived of any right secured by federal statute or the United States Constitution, and (2) plaintiff has provided no support for a finding that the alleged constitutional violations occurred as a result of a government policy or custom as required by *Monell v. Dep't of Social Servs. of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). (Defendants' Memorandum of Law, at 10-13.)

First, this Court agrees with defendants that plaintiff has not put forth any evidence to support a finding of a violation of his federally-protected rights by defendants. It appears that plaintiff means to assert that the alleged violation of his equal protection rights provides support for his Section 1983 claim. For the reasons stated *supra,* however, plaintiff has not sufficiently made out an equal protection claim and, for that reason, plaintiff's Section 1983 claim on the same grounds must also fail. To the extent that plaintiff alleges violation of his due process rights under the Fourteenth Amendment, such a claim also fails as a matter of law.

*7 To make out a substantive due process claim, plaintiff must demonstrate a violation of a liberty or property interest protected by the Due Process Clause. It is well-settled, however, that education is " 'not among the rights afforded explicit protection under our Federal Constitution,' [and t]hus, 'the Fourteenth Amendment does not protect a public education as a substantive fundamental right.'"*Smith v. Guilford Bd. of Educ.,* No. 06-1094-cv, 2007 U.S.App. LEXIS 14132, at *5, 2007 WL 1725512 (2d Cir. June 14, 2007) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) and *Handberry v. Thompson,* 436 F.3d 52, 70 (2d Cir.2006)). Therefore, no substantive due process claim exists on the facts alleged.

To determine whether a procedural due process claim can survive summary judgment, the Court must first determine whether plaintiff has plausibly alleged a "legitimate claim of entitlement to the benefit [at issue], rather than a mere unilateral expectation of it."*Smith,* 2007 U.S.App. LEXIS 14132, at *7, 2007 WL 172551 (citations and quotations omitted). If plaintiff was not deprived of a liberty or property interest, then no due process is owed.*Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Plaintiff's claim here would be that defendants' actions deprived him of his property interest in higher education. New York's Constitution and education laws do provide a right to elementary and secondary education for

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                   Page 8
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
**(Cite as: 2009 WL 789440 (E.D.N.Y.))**

children up to the age of eighteen. N.Y. Const. Art. 8 § 1 and N.Y. Educ. L. § 3202(1). They do not, however, provide a right to higher education, such as college. Therefore, plaintiff has no right to higher education pursuant to state law. Nor does plaintiff provide any other basis upon which it can be found that plaintiff had a legitimate claim to a college education. While New York law does provide that there may be a basis for a student to assert such a property interest where the student is already enrolled in a college and is then discontinued, *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991) ("in stating that [plaintiff] had no property interest in continuing his education, the court did not mention New York law's recognition of an 'implied contract' between [a college or university] and its students, requiring the academic institution [to] act in good faith in its dealing with its students. Such an implied contract, recognized under state law, provides the basis for a property interest that would be entitled to constitutional protection.") (internal citations and quotations omitted), there is no case law to support a finding that a plaintiff has a property interest in a college education program to which the plaintiff has not been accepted. *See, e.g., Brands v. Sheldon Community School,* 671 F.Supp. 627, 631 (N.D.Iowa 1987) ("Once awarded, a college scholarship may give rise to a property interest in its continuation. But there is not automatic entitlement to a college education. When scholarships are awarded at the discretion of a college coach, and such discretion has not yet been exercised, no property interest in the receipt of a scholarship can exist, and the plaintiff cannot invoke his expectation that he would earn a scholarship at the state tournament in order to claim a property interest in wrestling there.") (internal citations and quotations omitted).

**\*8** To the extent that plaintiff is asserting a right to an accurate transcript, plaintiff has pointed to no case law finding such a right. Further, even if the Court found such a right to exist, there is no indica-

tion that plaintiff was deprived of due process regarding the transcript. The lowered grades were a result of suspensions due to behavioral problems that plaintiff does not deny, such as using profanities with teachers. Plaintiff does not allege that any further process was owed and/or denied.

Second, even assuming *arguendo* that plaintiff were able to support his equal protection claim or due process claims, plaintiff's claim under Section 1983 must still be dismissed for failure to allege a practice or policy of the School District and/or School Board as an underlying cause of the alleged violation.

Under *Monell,* a municipal entity may only be held liable where the entity itself commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."*Monell,* 436 U.S. at 691. It is well established that "[a] plaintiff stating a ... claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the [violation] was the result of municipal custom, policy, or practice."*Fitzgerald v. Barnstable Sch. Comm. .,* --- U.S. ----, ----, 129 S.Ct. 788, 797, 172 L.Ed.2d 582 (2009) (citing *Monell,* 436 U.S. at 694);*see also Monell,* 426 U.S. at 692-96 (finding the same for a school board); *Beattie v. Madison County Sch. Dist.,* 254 F.3d 595, 600 (5th Cir.2001) ( "Under § 1983, [plaintiff] may sue a local governing body, such as the school district, or the school board as policymaker for the district, for monetary, declaratory, or injunctive relief if the challenged action implements or executes a policy officially adopted by that body's officers. Neither the school board nor the school district can be liable for the actions ... under a respondeat superior theory.")."The policy or custom need not be memorialized in a specific rule or regulation."*Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.1996) (citing *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 870 (2d Cir.1992)). A policy, custom, or practice of the municipal entity may be inferred where " 'the muni-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
(Cite as: 2009 WL 789440 (E.D.N.Y.))

cipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' " *Patterson v. County of Oneida,* 375 F.3d 206, 226 (2d Cir.2004) (quoting *Kern,* 93 F.3d at 44). "A municipality's failure to train or supervise its officers can rise to the level of an actionable policy or custom where it amounts to 'deliberate indifference' to the constitutional rights of its citizens." *Hall v. Marshall,* 479 F.Supp.2d 304, 315-16 (E.D.N.Y.2007) (citing *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) and *Thomas v. Roach,* 165 F.3d 137, 145 (2d Cir.1999) ("A municipality may be liable under § 1983... where the City's failure to supervise or discipline its officers amounts to a policy of deliberate indifference.")). "For purposes of § 1983, school districts are considered to be local governments and are subject to similar liability as local governments under Monell." *Booker v. Bd. of Educ.,* 238 F.Supp.2d 469, 475 (N.D.N.Y.2002) (citing *Monell,* 436 U.S. at 696-97);*see also Irene P. v. Phila. Acad. Charter Sch.,* No. 02-1716, 2003 U.S. Dist. LEXIS 3020, at *30-*32, 2003 WL 24052009 (E.D.Pa. Jan. 29, 2003) (treating charter school as municipal entity for *Monell* purposes). Plaintiff does not allege, or have any evidence of, a custom or policy of the School District or School Board responsible for the alleged violations of plaintiff's rights.

**\*9** As to the allegations that plaintiff's transcript included inaccurate grades from the Sappo School, plaintiff has put forth no evidence to counter defendants' evidence that the grades on his transcript accurately reflect the grades sent to defendants by the Sappo School. (*See* Defendants' Affirmation in Support, Ex. GG.) Therefore, there is no evidence to support a finding that any alleged error was made by defendants. Rather, any error would have been the fault of the private Sappo School, which is not a party to this action. To the extent that plaintiff alleges that defendants were somehow responsible for this error, plaintiff has put forward no evidence to

support such a claim, nor has plaintiff identified any custom or policy of defendants responsible for such an error.

As for the grades from Patchogue-Medford, plaintiff has not alleged that it was a School District or School Board custom or policy to lower grades for tests missed due to absence. In fact, plaintiff alleges that some teachers did not do this.

Next, plaintiff's claims about the SAT Examination do not assert that the alleged violation was a result of a School District or School Board custom or policy either. The College Board-not defendants-is responsible for administering the SAT Examination and for providing accommodations to students during the examination. Plaintiff has offered no evidence to counter the evidence put forward by defendants indicating that defendants in no way barred plaintiff from taking the SAT Examination or limited plaintiff's testing accommodations in any way. (*See* Defendants' Affirmation in Support, Ex. Z, Ex. AA, Ex. Y, Ex. CC and Ex. GG.) Further, plaintiff has not identified any municipal custom or policy under which any such action was conducted.

In sum, plaintiff has failed to sufficiently allege, or provide evidence of, a violation of his federally-protected rights to support his claim under Section 1983. Further, even if plaintiff had sufficiently alleged a violation of his federally-protected rights, he has not identified a School District or School Board custom or policy responsible for the alleged violations, and, therefore, neither the School District nor the School Board can be held liable.[FN4]

> FN4. As for the claims against Mostow, in his official capacity, "[t]he Supreme Court has explained that in an official-capacity suit, however, the real party in interest is not the named official but rather the governmental entity itself. *Monell,* 436 U.S. at 691. As such, in an official-capacity suit we require 'the entity's 'policy or custom'

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                          Page 10
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
(Cite as: 2009 WL 789440 (E.D.N.Y.))

[to have] played a part in the violation of federal law.'*Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (quoting *Monell,* 436 U.S. at 694)."*Douglas v. Beaver County Sch. Dist. Bd.,* No. 03-4004, 82 Fed. Appx. 200, 203, 2003 U.S.App. LEXIS 24537, at *3, 2003 WL 22872699 (10th Cir. Dec. 5, 2003). Therefore, as no policy or custom has been alleged, as discussed *supra,* the claim against Mostow in his official capacity cannot stand.

Moreover, this Court finds that the Section 1983 claim against Mostow in his individual capacity also fails to survive summary judgment because, as is the case with the District and School Board, there is no evidence of a violation of a federally-protected right that could form the basis for a Section 1983 violation. In any event, even if plaintiff had sufficiently alleged or provided evidence of a violation of a federally-protected right, there is no allegation (or evidence) of any personal involvement by Mostow in the District's decisions being challenged to support individual liability. *See, e.g., Loret v. Selsky,* No. 07-CV-6392L, 2009 WL 204814, at *4 (W.D.N.Y. Jan.27, 2009) (granting summary judgment on Section 1983 claim against superintendent of correctional facility in his individual capacity because of lack of any evidence of personal involvement in the relevant events).

### 3. The IDEA and the ADA Claims

The purpose of IDEA is to provide children with disabilities with access to a "free appropriate public education." 20 U.S.C. §§ 1400(c), (d). In passing IDEA, "Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education."*Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley,* 458 U.S. 176, 200, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The primary mechanism of the statute is the design and implementation of an Individualized Education Plan ("IEP") to address each student's particular disabilities. 20 U.S.C. § 1414. The IEP sets forth (1) a statement of the child's present levels of academic achievement and functional performance; (2) a statement of measurable annual goals; (3) a description of how the child's progress toward meeting the annual goals will be measured; (4) a statement of the educational services to be provided; (5) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class; (6) a statement of any individual accommodations necessary to measure the child's performance on standardized assessments (or an explanation of why the child cannot participate in the assessments); (7) the projected date for the implementation of services, as well as the anticipated frequency, location, and duration of the services; and (8) a plan for achieving post-secondary school goals and provisions for transitional services. 20 U.S.C. § 1414(d)(1)(A).

*10 It is well-settled that, prior to bringing a suit in federal court under IDEA, plaintiffs must exhaust all available administrative procedures. 20 U.S.C. § 1415(*l* ) (2006). In the State of New York, these include an impartial hearing and an appeal of the hearing officer's decision to a state review officer. 20 U.S .C. §§ 1415(f), (g); 8 N.Y.C.R.R. § 200.5. Parents may request a hearing to present complaints relating to the "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."20 U.S. C. § 1415(b)(6)."Failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction."*Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist.,* 288 F.3d 478, 483 (2d Cir.2002) (citing *Hope v. Cortines,* 69

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
(Cite as: 2009 WL 789440 (E.D.N.Y.))

F.3d 687, 688 (2d Cir.1995)).

Furthermore, the IDEA statute requires plaintiffs with *any* claims related to the education of disabled children, whether brought under IDEA or another statute (*i.e.,* the ADA), to exhaust the administrative remedies available under IDEA prior to initiating a federal lawsuit. 20 U.S.C. § 1415(*l* ) (2006) ( "Nothing in this title shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this part, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this part.") (citations omitted); *Polera,* 288 F.3d at 481 ("[P]otential plaintiffs with grievances related to the education of disabled children generally must exhaust their administrative remedies before filing suit in federal court, even if their claims are formulated under a statute other than the IDEA (such as the ADA or the Rehabilitation Act)."); *Hope v. Cortines,* 872 F.Supp. 14, 17 (E.D.N.Y.), *aff'd,*69 F.3d 687 (2d Cir.1995) (holding that ADA, Section 1983 and Section 2000d claims are subject to IDEA's exhaustion requirement).

Plaintiff does not allege that he has exhausted his claims or that such claims should be exempt from the exhaustion requirements. In any event, no evidence has been presented indicating that there is factual support for either of those claims. Accordingly, the IDEA and the ADA claims cannot survive summary judgment.

### B. Plaintiff's Discovery Arguments

In his opposition to defendants' motion for summary judgment, plaintiff's counsel does not contest that plaintiff lacks sufficient evidence to support his claims on the merits. Instead, plaintiff's counsel argues that "(1) summary judgment should not be granted where there [sic] the moving party is in sole possession of facts which are in dispute, and (2) that summary judgment should not be granted where the opposing party has been denied relevant discovery."(Plaintiff's Affirmation in Opposition ¶ 1.) Specifically, plaintiff's counsel alleges that he "did not have the opportunity to depose defendant Michael Mostow, superintendent of the Patchogue-Medford School district [or Joseph LoSchiavo, a school board member] about the facts surrounding a letter he wrote to Plaintiff's mother on July 12, 2006 which is at the heart of this case."(*Id.* ¶ 3.) Plaintiff's counsel argues that this letter supports plaintiff's argument that there were discrepancies in plaintiff's transcript. Plaintiff's counsel states that he would have deposed these two individuals, but his "motion to extend the discovery period in order to obtain these depositions was denied in an order dated March 28, 2008."(*Id.* ¶ 7.) The referenced letter states, in relevant part, the following:

**\*11** I have reviewed your son Christopher's transcript and folder. I have found three (3) instances where there appears to be a discrepancy in the grades sent to us by the Sappo School and those listed on the Patchogue-Medford School transcript. There is also a letter dated May 8, 2005, in your son's file from Ms. Joanne Sappo. This letter, which I am sure you have read, indicates that there were two (2) changes in the grades. It goes on to say that Christopher was given a deadline date to complete assignments in English and Astronomy. The letter states, "when the work was completed it was applied to his grades."However, I cannot determine from this letter whether his grades were increased or decreased and I am going to attempt to contact Ms. Sappo to determine what, in fact, happened. In addition, I have a copy of your son's high school diploma dated August 21, 2004. This graduation date is during the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 12
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
(Cite as: 2009 WL 789440 (E.D.N.Y.))

2004-2005 school year. Your son's transcript indicates that he graduated in June 2005.

(*Id.,* Ex. 1.)

To the extent that plaintiff is seeking review of Magistrate Judge Lindsay's refusal to reopen discovery, the Court finds that contention to be without merit. As a threshold matter, plaintiff never appealed Judge Lindsay's order denying plaintiff's request to reopen or extend discovery to allow for these additional depositions. The District Court need not reconsider a motion that has been ruled upon by a Magistrate Judge, but not appealed. *See, e.g., Maslanka v. Johnson & Johnson, Inc.,* No. 08-2329, 2008 U.S.App. LEXIS 26269, at *14, 2008 WL 5351799 (3d Cir. Dec. 23, 2008) (affirming a district court's grant of summary judgment where the non-moving party "did not seek timely District Court review of the Magistrate Judge's decisions to deny the motion to compel or to reopen discovery. Instead, in his sur-reply to the defendants' summary judgment motion, ... [the party] renewed his request to reopen discovery, long after discovery had closed and well into the summary judgment proceedings."); *see also*Fed.R.Civ.P. 72(a) ("A party may serve and file objections to the order within 10 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.")

In any event, even assuming *arguendo* there was a timely appeal of Judge Lindsay's ruling on the motion to reopen discovery, this Court find that there is no basis for reversing such decision. Under Rule 72(a) of the Federal Rules of Civil Procedure, "[t]he district judge in the case must consider timely objections [to non-dispositive pretrial matters determined by a Magistrate Judge] and modify or set aside any part of the order that is clearly erroneous or is contrary to law.""Matters concerning

discovery generally are considered 'nondispositive' of the litigation."*Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir.1990); *see also Federal Ins. Co. v. Kingsbury Properties, Ltd .,* Nos. 90 Civ. 6211(JMC), 90 Civ. 6357(JMC), 1992 WL 380980, at *2 (S.D.N.Y. Dec. 7, 1992)."In deciding discovery disputes, a magistrate judge is entitled to broad discretion, which will be overruled only if abused. Magistrate judges receive substantial deference, particularly where they have been deeply involved in discovery matters in the case for years."*Grand River Enters. Six Nations, Ltd. v. King,* No. 02 Civ. 5068(JFK), 2009 U.S. Dist. LEXIS 11504, at *25, 2009 WL 222160 (S.D.N.Y. Jan. 30, 2009) (internal quotations and citations omitted).

*12 "Under Rule 72(a), '[a] finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Burgie v. Euro Brokers, Inc.,* No. 05 Civ. 0968(CPS)(KAM), 2008 U.S. Dist. LEXIS 71386, *18 (E.D.N.Y. Sept. 5, 2008) (quoting *Concrete Pipe and Products of Cal., Inc. v. Constr. Laborers Pension Trust for South. Cal.,* 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Id.*

After a careful review of the record, there is no indication that Magistrate Judge Lindsay's ruling was based on clearly erroneous findings of fact or was contrary to law. Fed.R.Civ.P. 26(b)(2) (C)(ii) requires that a "court must limit the frequency or extent of discovery otherwise allowed by these rules if it determines that ... the party seeking discovery has had ample opportunity to obtain the information by discovery in the action."*Id.* Plaintiff had over a year to conduct discovery, including multiple extensions of the discovery period. Plaintiff's counsel concedes in his opposition that he always intended to depose Mostow and LoSchiavo, but that he

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                 Page 13
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
**(Cite as: 2009 WL 789440 (E.D.N.Y.))**

simply "did not depose either Mostow or LoSchiavo by the time the discovery period terminated in this case."He does not provide any explanation for this failure. Nor did he offer any such explanation to Magistrate Judge Lindsay. On these facts, this Court cannot conclude that Magistrate Judge Lindsay's order was clearly erroneous or contrary to law.

Finally, to the extent that plaintiff's opposition to the summary judgment motion also could be construed as an application under Rule 56(f) of the Federal Rules of Civil Procedure, that application is without merit for several reasons. First, plaintiff has failed to comply with the requirements set forth in Rule 56(f) of the Federal Rules of Civil Procedure. The Second Circuit has held that "Rule 56(f) requires the opponent of a motion for summary judgment who seeks discovery to file an affidavit explaining: (1) the information sought and how it is to be obtained; (2) how a genuine issue of material fact will be raised by that information; (3) what efforts the affiant has made to obtain the information; and (4) why those efforts were unsuccessful."*Sage Realty Corp. v. Ins. Co. of N. Am.,* 34 F.3d 124, 128 (2d Cir.1994). Where these requirements are not met, a request pursuant to Rule 56(f) may be denied. *Id.* Plaintiff has filed no such affidavit here and denial, therefore, is appropriate. Second, relief under Rule 56(f)"is not available when summary judgment motions are made after the close of discovery, as in the instant case."*Espada v. Schneider,* 522 F.Supp.2d 544, 549 (S.D.N.Y.2007). Third, even if such relief were timely sought, such application would still be denied because plaintiff clearly had ample opportunity to pursue the discovery it now contends was necessary to gather sufficient evidence to survive summary judgment. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 927-28 (2d Cir.1985) (denying 56(f) motion where party had "ample time to pursue the discovery that it now claims is essential" and holding that "[a] party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need"). As discussed above, there is no question that plaintiff had sufficient time for discovery, took insufficient steps to seek more time, and has failed to show a need for further discovery. *See, e.g., Vargas v. Midtown Air Condition and Ventilation, Ltd.,* No. 07 Civ. 3343(RMB), 2008 WL 5062611, at *8 (S.D.N.Y. Nov.24, 2008); *Espada v. Schneider,* 522 F.Supp.2d at 550.

**\*13** In sum, plaintiff has not pointed to sufficient evidence for a reasonable jury to find in its favor on any of the federal claims. Moreover, although plaintiff attempts to explain such failure, plaintiff offers no explanation for his failure to obtain this information before the close of discovery or his failure to seek review of any discovery orders issued by the Magistrate Judge. Moreover, the contention that the additional discovery would have produced evidence to overcome the summary judgment motion is completely speculative and easily refuted by the other fundamental defects in the federal claims identified in this Memorandum and Order. Thus, any purported application under Rule 56(f) is entirely without merit. Accordingly, summary judgment on all federal claims is warranted.

### C. State Law Claims

Having determined that none of plaintiff's federal claims survive summary judgment, the Court concludes that retaining jurisdiction over the state law claims is unwarranted. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)."In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdic-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                   Page 14
Slip Copy, 2009 WL 789440 (E.D.N.Y.)
(Cite as: 2009 WL 789440 (E.D.N.Y.))

tion.' "*Birch v. Pioneer Credit Recovery, Inc.,* No. 06-CV-6497T, 2007 U .S. Dist. LEXIS 41834, 2007 WL 1703914, at *15 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

Therefore, in the instant case, the Court, in its discretion, " 'decline[s] to exercise supplemental jurisdiction' " over plaintiff's state law claims because "it 'has dismissed all claims over which it has original jurisdiction.' " *Kolari v. N.Y.-Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir.2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.,* 514 F.3d 240, 250 (2d Cir.2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Liz Claiborne, Inc.,* No. 99 Civ. 3608(WK), 2002 U.S. Dist. LEXIS 12842, 2002 WL 1561126, at *4 (S.D.N.Y. July 12, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 42 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state law claims given the absence of any federal claims that survive dismissal, and dismisses such state claims without prejudice.

## IV. CONCLUSION

*14 For the foregoing reasons, defendants' motion for summary judgment is granted granted on all federal claims. The Court declines to retain juris-

diction over plaintiff's remaining state law claims and dismisses such claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

E.D.N.Y.,2009.
Rafano v. Patchogue-Medford School Dist.
Slip Copy, 2009 WL 789440 (E.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&... 8/9/2009

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2007 WL 1340788 (D.Neb.)
**(Cite as: 2007 WL 1340788 (D.Neb.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Nebraska.
Becky S. WAKEHOUSE, Plaintiff,
v.
The GOODYEAR TIRE & RUBBER CO., Caterpillar, Inc., Titan International, Inc., Titan Wheel Corporation of Virginia, Titan Wheel Corporation a/k/a Titan Marketing Services, Inc., and Titan Wheel Corporation of Illinois, Defendants.
**No. 8:05CV422.**

April 5, 2007.

C. Marshall Friedman, Daniel D. Bennett, Kenneth E. Rudd, Paul A. Burnett, Friedman Law Firm, St. Louis, MO, John J. Higgins, Omaha, NE, for Plaintiff.

Brenda G. Hamilton, Christopher S. Shank, David L. Heinemann, Shank, Hamilton Law Firm, Kansas City, MO, Joseph K. Meusey, Fraser, Stryker Law Firm, William R. Johnson, William M. Lamson, Jr., Lamson, Dugan Law Firm, J. Scott Paul, Michaela A. Smith, McGrath, North Law Firm, Omaha, NE, Michael B. Hunter, Paul E. Petruska, Steven P. Sanders, Williams, Venker Law Firm, St. Louis, MO, Brett K. Gorman, James A. Hansen, Schmiedeskamp, Robertson Law Firm, Quincy, IL, for Defendants.

### ORDER

THOMAS D. THALKEN, United States Magistrate Judge.

*1 This matter is before the court on the plaintiff's motions to compel discovery (Filing Nos. 175, 178 and 181). The plaintiff filed separate briefs (Filing Nos. 176, 179 and 182) and indexes of evidence (Filing Nos. 177, 180 and 183) for each motion. The plaintiff's motions each seek supplemental responses to requests for production related to three identical discovery requests sent to each of the defendants.

The defendant Caterpillar, Inc. (Caterpillar) filed a brief (Filing No. 191) and an index of evidence (Filing No. 192) opposing the plaintiff's motion (Filing No. 181). The defendants Titan Marketing Services, Inc., Titan International, Inc., Titan Wheel Corporation of Virginia and Titan Wheel Corporation of Illinois (collectively the Titan defendants) filed a brief (Filing No. 204) and an index of evidence (Filing No. 205) in opposition to the plaintiff's motion (Filing No. 178). The defendant The Goodyear Tire & Rubber Co. (Goodyear) filed a brief (Filing No. 206) and an index of evidence (Filing No. 207) opposing the plaintiff's motion (Filing No. 175). Finally, the plaintiff filed separate briefs (Filing Nos. 208, 211 and 213) and a single index of evidence (Filing No. 212) in reply. For the reasons stated below, the court finds the plaintiff's motions to compel should be denied.

### BACKGROUND

The plaintiff alleges the defendants are liable for the untimely death of her husband under theories of strict liability and/or negligence. See Filing No. 1, Exhibit A. Gary Wakehouse was killed on February 6, 1997, while he was changing a tire on a Caterpillar road grader. See *id.* ¶ 15, 24. While the tire was being installed and mounted, the multi-piece wheel rim separated causing the side-ring to strike Mr. Wakehouse resulting in fatal injuries. *Id.* Relevant to the instant motions, the Titan defendants state this case involved "one particular size 3 piece wheel assembly for a specific application. The assembly consists of a rim base, side flange, and a lock ring for a 24" x 10" wheel mounted on a Cater-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1340788 (D.Neb.)
(Cite as: 2007 WL 1340788 (D.Neb.))

Page 2

pillar road grader."See Filing No. 204, p. 1. Certain of the Titan defendants

produce multi-piece wheel components in 3 piece and 5 piece configurations for various types of earthmoving, mining, military and construction equipment, including skid steers, aerial lifts, cranes, graders and levelers, scrapers, self-propelled shovel loaders, load transporters, haul trucks, and backhoe loaders, among others. [These defendants] manufacture in excess of 100 multi-piece wheel applications for use in the construction/earthmoving industry. These applications include over 60 different sizes of multi-piece rims ranging from 20" diameter rims to 63" diameter rims, ranging in width from 8" to 60", and ranging in weight from 125 pounds to 7,000 pounds. These multi-piece wheel applications are used on equipment ranging from the smallest wheel loaders on up to giant 400 ton rigid frame rear dump trucks.

*Id.* p. 1-2 (internal citations omitted).

**\*2** On August 15, 1997, the plaintiff filed the action in the Circuit Court of St. Clair County, Illinois. After some legal proceedings in Illinois, on August 2, 2005, the plaintiff filed her complaint against the defendants in the District Court of Douglas County, Nebraska. See Filing No. 1, Exhibit A. On August 31, 2005, the action was removed to the United States District Court for the District of Nebraska. See Filing No. 1.

On March 2, 2006, the plaintiff served each of the defendants with the plaintiff's First Request for Production. See Filing No. 54 (Certificate of Service). The plaintiff seeks the following production from each of the defendants:

Request for Production No. 2

Any and all documents or other items of a tangible nature, including information contained in computer files, in any manner recording, con-

taining, memorializing, referencing or otherwise relating to any notice received by this Defendant, at any time and from any source, of any alleged injury or other claim in any manner involving or otherwise pertaining to a multi-piece wheel rim, or injuries or damages allegedly resulting therefrom.

Request for Production No. 3

Any and all documents ... relating to any investigation, study, evaluation, testing, or other form of inquiry conducted by or on behalf of this Defendant in any manner relating to the relative safety or danger, or potential risk of harm, associated with multi-piece wheel rim design, manufacture, distribution or use.

Request for Production No. 4

Any and all documents ... relating to any investigation, study, evaluation, testing, or other form of inquiry-not otherwise referenced in request # 3, above-in any manner relating to the relative safety or danger, or potential risk of harm, associated with multi-piece wheel rim design, manufacture, distribution or use.

See Filing Nos. 177, 180 and 183 Exhibit A.

The plaintiff argues the discovery requested is clearly relevant to whether each defendant had notice of a potential danger due to a defect, ability to correct the defect, magnitude of the problem or causation. The plaintiff contends there is no compelling reason to limit the requests in time or to a type of product because the design defects involved in this matter is common to many multi-piece rims over time. Specifically, the plaintiff seeks evidence the defendants knew, through notice of claims or testing, that an inherent risk of multi-piece rims was a danger the components may separate during inflation, projecting the components away from the machinery. The plaintiff denies it seeks either information about the resolution of any claims or

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1340788 (D.Neb.)
**(Cite as: 2007 WL 1340788 (D.Neb.))**

privileged materials.

Goodyear served a response on April 7, 2007 (Filing No. 177, Exhibit A), Caterpillar served a response on April 3, 2006 (Filing No. 183, Exhibit A), and the Titan Defendants response is undated, but the record indicates it was served June 29, 2006 (Filing No. 180, Exhibit A and D). Each of the defendants objected to production of the requested discovery.

**\*3** The plaintiff wrote to counsel for Goodyear and Caterpillar on May 30, 2006, in an attempt to obtain supplemental responses. See Filing Nos. 177 and 183 Exhibit B. Caterpillar responded by letter on June 6, 2006. See Filing No. 192, Exhibit A. Goodyear responded by letter on July 6, 2006. See Filing No. 207, Exhibit A. The plaintiff wrote to counsel for the Titan defendants on January 11, 2007. See Filing No. 180, Exhibit B. The plaintiff then made attempts in late January 2007, to confer with counsel for Caterpillar and Goodyear. See Filing Nos. 177 and 183, Exhibit D. Each of the defendants' counsel indicated their position would remain unchanged or did not respond before the plaintiff's January 30, 2007 motions to compel were filed. See Filing Nos. 180 and 183, Exhibit D.

The defendants' contend the plaintiff's motions to compel should be denied because they were untimely filed, counsel did not comply with NECivR 7.1(i) and based on the merits. First, the defendants' argue the motions are untimely, or the arguments abandoned, because the plaintiff did not pursue the issue after the initial May 30 letter until after the close of discovery. Further Goodyear and Caterpillar assumed the issue had been resolved after their responses in June and July of 2006. Due to the lateness of the motions, not only has discovery closed, but also the deadlines related to expert disclosures and related depositions. Caterpillar contends these deadlines may need to be re-opened if the motions to compel are granted. Second, Goodyear argues the plaintiff's counsel did not make personal or

good faith attempts to resolve the discovery issue prior to filing the motions to compel.

Third, the defendants assert the plaintiff's motions to compel should be denied because the defendants properly responded and/or objected. In summary, the defendants contend the requests are not reasonably calculated to lead to the discovery of admissible evidence because they are not reasonably limited in scope by time, a particular type or size of multi-piece rims, or relevant application. The defendants also objected to the requests on the basis of ambiguity, vagueness and undue burden.

Further, in response to Request for Production No. 2, Goodyear stated,

the multi-piece rim allegedly involved in the accident at issue was designed, manufactured, and sold by Titan or other "Titan Defendants." The only product of Goodyear's allegedly involved in the accident giving rise to this litigation is a 14.00-24 TG 12-ply grader tire manufactured at Goodyear's Topeka, Kansas plant in 1995. Goodyear also objects to this request as vague and ambiguous in that the term "notice" in undefined.

... to its present knowledge, except for the accident giving rise to the present litigation, it has not been given "notice" of an alleged injury claim, or damages allegedly resulting from a Titan multi-piece rim.

See Filing No. 177, Exhibit A. Goodyear gave the same response to Request for Production Nos. 3 and 4, omitting the final sentence. *Id.*

**\*4** Similarly, Caterpillar responded to Request for Prosecution No. 2, in spite of overbreadth and relevance objections, by stating:

Caterpillar will attempt to answer this request with respect to wheels of similar design from any of the Titan defendants.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 4
Not Reported in F.Supp.2d, 2007 WL 1340788 (D.Neb.)
**(Cite as: 2007 WL 1340788 (D.Neb.))**

Caterpillar further specifically objects with respect to that part of the request that seeks information as to the resolution of any litigation that might be identified. Such a request seeks information that is neither relevant nor calculated to lead to relevant information. Further, if there was such litigation that was settled, not only would that information be neither relevant nor calculated to lead to relevant information, but also it would be subject to a confidentiality agreement prohibiting dissemination of information.

Caterpillar further objects for the reason that the information sought here is neither relevant nor calculated to lead to relevant information. As an example, assume that Caterpillar received notice of an alleged injury or claim pertaining to separation of a multi-piece wheel, that no litigation was ever filed and that it was determined that the injured party did not pursue litigation or further pursue a claim because investigation determined that plaintiff had improperly performed some task that directly caused the separation. Under the language of this request, Caterpillar would be obligated to search through its files for every such notice of an alleged injury and yet such information would be neither relevant nor calculated to lead to relevant information and would therefore constitute an expensive and burdensome search on Caterpillar's part with no possible assistance to plaintiff to come of it.

Subject to the forgoing objections and without waiving them Caterpillar states: Caterpillar will provide an incident report dated 6/14/2000, subject to an appropriate protective order.

See Filing No. 183, Exhibit A. Caterpillar states it proposed a protected order related to the June 14, 2000 report, but has never heard any response. See Filing No. 191, p. 4-5. In response to Request for Production Nos. 3 and 4 Caterpillar on grounds of relevance, privilege, and to the extent the request sought expert witness materials, then agreed to

"respond with respect to any items involving wheels of similar design from Titan. Caterpillar states it has been unable to find responsive documents."See Filing No. 183, Exhibit A. Caterpillar reiterates in its brief that "it has no documents of the type sought with respect to multi-piece wheels from Titan."See Filing No. 191, p. 5-6.

Over objections, the Titan defendants responded to Request for Production No. 2 by stating, "other than the instant action, none of the Titan Defendants have received notice of any injury regarding multi-piece rims from a 140H motor grader, or any 24 x 10 three-piece wheel assemblies."See Filing No. 180, Exhibit A. Similarly over objections, the Titan defendants responded to Request for Production No. 3 by stating, "see the applicable OSHA regulations for servicing multi-piece wheels, and the wheel catalog documents produced by the Titan Defendants."*Id.* In response to Request for Production No. 4, the Titan defendants duplicated its response to Request for Production No. 3, then added, "and the standards promulgated by the Tire & Rim Association."*Id.*

**\*5** More generally, the defendants argue the plaintiff fails to justify reasons for seeking documents related to "all types of multi-piece rims." The defendants contend there is no explanation about how multi-piece rims made by other manufacturers, of other types, of other sizes and used in other applications would be relevant in this case. The defendants argue the requests should be limited in time and to those products which are substantially similar to the rims allegedly involved in the subject accident, substantially similar failure modes, substantially similar factual circumstances (i.e., explosive separation of a multi-piece wheel during mounting of a tire) and similar injury (i.e., physical injury).

The plaintiff denies the motions to compel were untimely filed. The plaintiff points out there was no court-imposed deadline for filing motions to com-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                           Page 5
Not Reported in F.Supp.2d, 2007 WL 1340788 (D.Neb.)
**(Cite as: 2007 WL 1340788 (D.Neb.))**

pel. Additionally, the plaintiff notes the trial in this matter was recently continued from March 2007, until October 2007. The plaintiff argues counsel made sincere attempts to resolve the discovery disputes prior to filing the motions as evidenced by the May 30, 2006 letter, and January 26 and 29 telephone messages/correspondence or in person.

## DISCUSSION

### A. Timeliness

Two of the defendants responded with objections to the disputed discovery in April 2007. The plaintiff wrote to these defendants on May 30, 2006, and received responses in June and July indicating no changes in the defendants' willingness to produce the requested documents. The plaintiff did not contact these defendants about the discovery issues again until late January 2007. The Titan defendants responded to the discovery requests on June 29, 2006, with objections. However, the plaintiff did not contact counsel for the Titan defendants about the discovery until January 11, 2007.

Additionally, the plaintiff filed the motions to compel on January 30, 2007, which was two weeks after the close of discovery and less than two months before the scheduled trial. See Filing No. 60. The trial date has since been extended to allow the court sufficient time to resolved the pending motions for summary judgment. The motions for summary judgment were filed in September and November of 2006. See Filing Nos. 86, 94 and 121.The plaintiff filed responses to both motions for summary judgment filed in September. See Filing Nos. 101 and 107.The relevant defendants then filed briefs in reply. See Filing Nos. 110 and 112.Goodyear sought and received an extension of time until November 13, 2006, to file a motion for summary judgment to allow time to depose the plaintiff's expert witnesses. See Filing No. 106. Goodyear filed the motion for summary judgment

on November 13, 2007. On December 1, 2006, the plaintiff filed a motion to compel and a motion for an extension of sixty days to respond to Goodyear's motion for summary judgment for the stated reason to depose the defendants' expert witnesses and obtain discovery from the Titan defendants (unrelated to the instant motions). See Filing Nos. 140 and 143.The court granted the plaintiff's extension until February 5, 2007. See Filing No. 148. The plaintiff sought another extension of the deadline to respond to Goodyear's motion for summary judgment based on the information sought in the December motion to compel and a continuance of the trial date. See Filing No. 189. On the same date, the motion to compel directed at the Titan defendants was denied. See Filing No. 186. By that time the plaintiff had filed the three instant motions to compel and the court granted the plaintiff an additional extension of time to respond to the motion for summary judgment until April 9, 2007. See Filing No. 194. There is no evidence or argument the instant motions to compel are related to the pending motions for summary judgment.

**\*6** "Rule 37 of the Federal Rules of Civil Procedure does not provide a deadline for the filing of a motion to compel; nor did any order of the undersigned, or of the trial court, provide a date by which any motion to compel was to have been filed."*U.S. ex rel. Purcell v. MWI Corp.,* 232 F.R.D. 14, 17 (D.D.C.2005). Where there is no deadline for filing motions to compel, the court will consider factors such as whether "the deadline for the close of discovery had passed when the motion to compel was filed, ... [and whether] any order requiring further discovery would [ ] disturb[ ] either the consideration of a dispositive motion or the conduct of the trial."*Id.* (citing cases).

Once, as here, a party registers a timely objection to requested production, the initiative rests with the party seeking production to move for an order compelling it. Failure to pursue a discovery remedy in timely fashion may constitute a waiver of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                          Page 6
Not Reported in F.Supp.2d, 2007 WL 1340788 (D.Neb.)
**(Cite as: 2007 WL 1340788 (D.Neb.))**

discovery violations. It is especially important that a party file its motion before discovery cutoff. It is also critical that the movant not wait to file its motion until the eve of trial.

*Continental Indus., Inc. v. Integrated Logistics Solutions, LLC.,* 211 F.R.D. 442, 444 (N.D.Okla.2002) (plaintiff waited 18 months after discovery responses and until two weeks before trial to move to compel) (internal citations omitted); see also *Miller v. Baker Implement Co.,* 439 F.3d 407, 414 (8th Cir.2006) (noting the plaintiff failed to avail himself of discovery remedies for nearly six months and until after the discovery has closed and summary judgment was granted).

Here, the plaintiff gives no explanation for the lateness of the motions to compel. The plaintiff indicates that the parties are not prejudiced because of the recently continued trial date. However, given the nature of the discovery sought, if the motions were granted, the defendants could reasonably seek to re-open other deadlines creating further delays of the case. Although the plaintiff does not need the requested information to respond to the pending summary judgment motions, the plaintiff failed to avail herself of discovery remedies in a timely fashion. This is evident particularly where the plaintiff sought extensions of other deadlines due to discovery related disputes and filed an unrelated motion to compel. See *American Motorists Ins. Co. v. General Host Corp.,* 162 F.R.D. 646, 647-48 (D.Kan.1995) (motion to compel denied where defendant made "absolutely no effort" to file motion before discovery deadline). Under the circumstances, the court finds the plaintiff waived the alleged discovery abuses and the motions to compel are untimely. In any event, the plaintiff's motion should also be denied on the merits, as discussed below.

**B. Sincere Attempts to Confer**

Both the federal rules and the local rules require counsel to confer prior to filing discovery related motions. In particular, NECivR 7.1(i) states:

**\*7** To curtail undue delay in the administration of justice, this court will not consider any discovery motion unless counsel for the moving party, as part of the motion, shows in writing that after **personal consultation** with counsel for opposing parties and **sincere attempts** to resolve differences, they are unable to reach an accord. This showing shall also recite the **date, time and place of such conference** and the **names of all persons** participating in them.

See NECivR 7.1(i) (emphasis added); see also NECivR 7.1(i)(1) (defining personal consultation).

It appears the plaintiff did make some attempts to resolve the discovery dispute prior to filing the motions to compel. Counsel were able to air their positions prior to the filing of the motion. While six months passed between the written consultation and the filing of the motions for two of the defendants and it is unclear whether additional consultation could have helped the parties resolve the pending issues, the court finds the plaintiff's attempts at consultation to be sufficient for consideration of the current dispute.

**C. Requests for Production**

Federal Rule of Civil Procedure 34 allows a party to request of another party production of documents for inspection and copying. Fed.R.Civ.P. 34(a). Parties may discover any relevant, unprivileged information that is admissible at trial or is reasonably calculated to lead to admissible evidence. See Fed.R.Civ.P. 26(b)(1). Relevancy is to be broadly construed for discovery issues and is not limited to the precise issues set out in the pleadings. Relevancy, for purposes of discovery, has been defined by the United States Supreme Court as encompassing "any matter that could bear on, or that reas-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 7
Not Reported in F.Supp.2d, 2007 WL 1340788 (D.Neb.)
**(Cite as: 2007 WL 1340788 (D.Neb.))**

onably could lead to other matter that could bear on, any issue that is or may be in the case."*Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978). Discovery requests should be considered relevant if there is any possibility that the information sought is relevant to any issue in the case and should ordinarily be allowed, unless it is clear that the information sought can have no possible bearing on the subject matter of the action. See *Burlington Ins. Co. v. Okie Dokie, Inc.,* 368 F.Supp.2d 83, 86 (D.D.C.2005)."All discovery requests are a burden on the party who must respond thereto. Unless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden."*Continental Illinois Nat'l Bank & Trust Co. of Chicago v. Caton,* 136 F.R.D. 682, 684-85 (D.Kan.1991) (citation omitted). Typically, the burden is on the party resisting discovery to explain why discovery should be limited given that the Federal Rules allow for broad discovery. See *Rubin v. Islamic Republic of Iran,* 349 F.Supp.2d 1108, 1111 (N.D.Ill.2004). However, the proponent of discovery must make a threshold showing of relevance before production of information, which does not reasonably bear on the issues in the case, is required. *Hofer v. Mack Trucks, Inc.,* 981 F.2d 377, 380 (8th Cir.1993). Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe with a reasonable degree of specificity, the information they hope to obtain and its importance to their case. See *Cervantes v. Time, Inc.,* 464 F.2d 986, 994 (8th Cir.1972). The court may issue a protective order to prevent discovery where "justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense."Fed.R.Civ.P. 26(c). The District Court "enjoys considerable discretion over discovery matters" and may limit the scope of discovery, if it has a good reason to do so. *Burlington Ins.,* 368 F.Supp.2d at 86.

*8 The plaintiff relies on the deposition testimony of one of her experts to show the relevance of Request for Production No. 2, which is not limited in scope or time. Specifically, the plaintiff states that "Professor O.J. Hahn, testified that the design defects in the rim that injured the decedent in this case are present on many rims; in fact, it was easier for him to identify and list the few rims that did not incorporate this design defect than it was to identify and list the many rims that do incorporate it."See, e.g., Filing No. 179, p. 3 (**citing** Transcript of the Deposition of O.J. Hahn 100:18-21, 108:4-20, attached as Ex. C to Filing No. 180). In response, Goodyear contends Professor Hahn's testimony is equivocal about defects and no expert has identified any particular design defects. See Filing No. 206, p. 6. Specifically, Professor Hahn testified he has "problems with quite a few multi-piece rims ever since the single-piece rims were developed" and "there is one multi-piece wheel which I know doesn't have any design defects."See Filing No. 180, Exhibit C p. 108; see also p. 100 (stating "the engineer ... should have been fully aware of the problems of that design-of any multi-piece design of this system."). Accordingly, the defendants argue the plaintiff fails to show the relevance of the admittedly broad request for production.

Further, the plaintiff relies on the reasoning in *Lovett ex rel. Lovett v. Union Pac. R. Co.,* 201 F.3d 1074 (8th Cir.2000), to argue the reasonableness and relevance of the information requested to the defendants' notice of defects. The defendants contend *Lovett* supports their position because the plaintiff has failed to show the information requested would be substantially similar to the plaintiff's factual situation.

In *Lovett,* the court excluded evidence at trial of vehicle incidents which were not "substantially similar" to the vehicle/locomotive collision at issue.*Lovett,* 201 F.3d at 1080-81.The court noted that "[e]vidence of similar incidents may be relevant to prove the defendant's notice of defects, the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1340788 (D.Neb.)
**(Cite as: 2007 WL 1340788 (D.Neb.))**

Page 8

defendant's ability to correct known defects, the magnitude of the danger, the product's lack of safety for intended uses, or causation .*"Id.* at 1081.However, in *Lovett,* the incidents were not similar due to differences in the type of vehicle, type of accident, speed, and topographical area, etc. *Id.* at 1080.Under those circumstances, admitting the evidence at trial would confuse the issues and be more prejudicial than probative. *Id.* at 1081.

The standards used by the *Lovett* court to exclude evidence from trial are different from those used for discovery. However, the *Lovett* case helps to define the parameters of relevant information. Under the circumstances of this case, the plaintiff has failed to meet her threshold burden of showing the requests, without limit in time or scope, would lead to the discovery of admissible evidence. The defendants have presented evidence of the diversity of products (by size, weight and use) which correspond with the plaintiff's requests. While it may be possible that additional production beyond the defendants' responses would provide information reasonably calculated to lead to the discovery of admissible evidence, the plaintiff has proposed no reasonable boundary on the requests. Therefore, the court will not required the defendants to supplement their responses to Request for Production Nos. 2, 3 and 4.

**D. Sanctions**

*9 With regard to motions to compel discovery responses, Federal Rule of Civil Procedure 37(a)(4)(B) provides:

If the motion is denied, the court may enter any protective order authorized under Rule 26(c) and shall, after affording an opportunity to be heard, require the moving party or the attorney filing the motion or both of them to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that

the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

Fed.R.Civ.P. 37(a)(4)(A). Upon reviewing the circumstances of this case, the court finds the substance of the motion to compel and the objections were substantially justified.[FN1]Accordingly, the court finds sanctions should not be imposed in this matter. The parties asserted legitimate reasons for several of the arguments, though not all were found to be supportable. Thus, the court finds the plaintiff has shown substantial justification for her position as to the discovery addressed herein. See Fed.R.Civ.P. 37(a)(4)(C). The court does not find the imposition of sanctions to be warranted in this case and will not assess sanctions against any party with regard to the instant discovery dispute. Upon consideration,

> FN1. The provisions of Rule 37(a)(4) provide that sanctions may not be appropriate where a motion was substantially justified. "Making a motion, or opposing a motion, is 'substantially justified' if the motion raised an issue about which reasonable people could genuinely differ on whether a party was bound to comply with a discovery rule."Charles A. Wright, et al., *Federal Practice and Procedure* § 2288 (2d ed.1994).

**IT IS ORDERED:**

1. The plaintiff's motions to compel discovery (Filing Nos. 175, 178 and 181) are denied.

2. The parties shall confer regarding a protective order regarding Caterpillar's production of the June 14, 2000 report such that the whole report or, in the absence of a protective order, a redacted version of the report may be **produced by April 19, 2007,** if the document is desired by the plaintiff.

D.Neb.,2007.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 2007 WL 1340788 (D.Neb.)
**(Cite as: 2007 WL 1340788 (D.Neb.))**


Wakehouse v. Goodyear Tire & Rubber Co.
Not Reported in F.Supp.2d, 2007 WL 1340788
(D.Neb.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                                           Page 1
Slip Copy, 2009 WL 1310890 (E.D.N.Y.)
(Cite as: 2009 WL 1310890 (E.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
In re ZYPREXA PRODUCTS LIABILITY LITIG-
ATION.
The State of Connecticut, Plaintiff,
v.
Eli Lilly & Co., Defendant.
Nos. 04-MD-1596 (JBW), 08-CV-955 (JBW).

May 8, 2009.

.

***MEMORANDUM AND ORDER***

ROANNE L. MANN, United States Magistrate
Judge.

**\*1** By letter dated March 26, 2009, plaintiff State of
Connecticut ("the State") seeks an order compelling
defendant Eli Lilly & Company ("Lilly") to pro-
duce documents in response to the State's Second
Set of Requests for Production.[FN1]*See* 3/26/09 Pl.
Letter, at 1. Lilly opposes the State's motion, con-
tending that the State's requests are overly broad,
untimely, and in violation of this Court's prior or-
ders. *See* Letter from Anthony Vale, Counsel for
Lilly, to the Court (Mar. 30, 2009) ("3/30/09 Def.
Letter"), D.E. # 200, at 1-2. This Court agrees.

> FN1. The State's Second Set of Requests
> for Production is attached as Exhibit A to
> the State's letter dated March 26, 2009. *See*
> Letter from Lauren Guth Barnes, Counsel
> for the State, to the Court (Mar. 26, 2009)
> ("3/26/09 Pl. Letter"), ECF Docket Entry
> ("D.E.") # 196, Ex. A. Unless otherwise
> noted, docket entries refer to those in *State
> of Connecticut v. Eli Lilly & Co.*, No.
> 08-CV-955 (JBW) (E.D.N.Y.).

Accordingly, and for the reasons that follow, the
State's motion is denied, except to the limited ex-
tent described below.

***DISCUSSION***

**I. Requests Outside the Scope of CMO 1**

When discovery commenced in this case, the Court,
after extensive briefing and oral argument, entered
Case Management Order ("CMO") 1, setting forth
the parties' respective discovery obligations. *See*
CMO 1, D.E. # 41. The State is correct that CMO 1
was not intended set absolute limits upon discov-
ery. Nevertheless, CMO 1 did impose certain limit-
ations, which some of the State's document de-
mands blithely ignore.

Specifically, the State has requested (1) documents
produced to the United States Department of Justice
("DOJ") and/or the United States Attorney's Office
in connection with federal investigations into
Lilly's marketing of Zyprexa; and (2) documents re-
flecting communications between Lilly and the
Food and Drug Administration ("FDA") subsequent
to the Zyprexa label change in October 2007. *See*
State's Second Set of Requests for Production Nos.
15 & 16. The Court ruled on these issues in CMO
1, and the States' demands fall well outside the
scope of what was permitted in the Court's prior
ruling. *See* CMO 1, D.E. # 41, at 2.

Furthermore, with respect to documents relating to
the DOJ investigation, this Court on other occa-
sions denied similar requests, both in this case and
in a related Zyprexa case brought by the State of
West Virginia;[FN2] the State's pending request is
not materially distinguishable from those requests.
And with respect to communications between Lilly
and the FDA following the Zyprexa label change in
October 2007, this Court has repeatedly limited dis-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 2
Slip Copy, 2009 WL 1310890 (E.D.N.Y.)
(Cite as: 2009 WL 1310890 (E.D.N.Y.))

covery on that subject to documents dated through October 2007 and/or relating to the October 2007 change.[FN3]Nevertheless, despite this Court's prior rulings, the State continues to relitigate these is- sues.

> FN2.*See* Memorandum & Order (May 4, 2009), D.E. # 211, at 9-10 (denying the State's motion for an order compelling Lilly to produce for deposition, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Lilly agent or agents most knowledgeable about the scope and extent of discovery produced by Lilly in connection with the DOJ investigation into Lilly's marketing of Zyprexa); Memorandum & Order (Feb. 18, 2009), *State of West Virginia ex rel. McGraw v. Eli Lilly & Co.,* No. 06-CV-5826 (JBW) (E.D.N.Y.), D.E. # 136 (granting Lilly's motion for a protective order precluding West Virginia from deposing, pursuant to Rule 30(b)(6), the Lilly agent or agents most knowledgeable about the terms of a guilty plea that Lilly recently entered into with the United States Attorney's Office for the Eastern District of Pennsylvania), *aff'd,* Order (Apr. 7, 2009), *State of West Virginia ex rel. McGraw v. Eli Lilly & Co.,* No. 06-CV-5826 (JBW) (E.D.N.Y.), D.E. # 153; Memorandum & Order (Feb. 2, 2009), *State of West Virginia ex rel. McGraw v. Eli Lilly & Co.,* No. 06-CV-5826 (JBW) (E.D.N.Y.), D.E. # 128 (denying West Virginia's motion to compel Lilly to respond to interrogatories and document demands related to the DOJ investigation and Lilly's guilty plea); CMO 1, D.E. # 41, at 2 ("Lilly is not required to produce to the States documents simply because such documents were made available to the [DOJ] ....").

> FN3.*See* Tr. of Hearing Held on Sept. 16,

2008, at 24 ("This issue was in fact addressed at the June 13 hearing and at that time, the ruling was that [Lilly] would produce documents up until the [October 2007] label change and any additional ones to the extent that they were produced in prior litigation .... [Lilly was] not obligated otherwise to produce post-October 200[7] documents relating to the previous label change."); CMO 1, D.E. # 41, at 2 ("In response to a request by a State for documents of a type previously produced, Lilly must supplement its MDL production with post-2004 documents *through October 2007."*) (emphasis added); *id.* ("Lilly will produce all communications with the FDA regarding the October 2007 label change.").*Also cf.* Memorandum & Order (Jan. 23, 2009), D.E. # 166, at 7 (limiting production of documents in the possession of Lilly sales representatives to documents dated through October 2007); CMO 1, D.E. # 41, at 1 (limiting production of call notes to notes dated through October 2007).

Accordingly, the State's requests for production numbered 15 and 16 are denied. The State, on pain of sanctions, shall refrain from making any further requests of this nature.

The State has also requested Zyprexa-related marketing materials distributed by Lilly to the United States Department of Health and Human Services ("HHS").*See* State's Second Set of Requests for Production No. 4. In the State's view, "Lilly documents acknowledge that influencing one governmental or public payor program affects many others."Letter from Thomas M. Sobol, Counsel for the State, to the Court (Mar. 31, 2009) ("3/31/09 Pl. Letter"), D.E. # 204, Ex. A, at 3. Following that logic, however, the State would be entitled to discover not only marketing materials distributed to HHS, but marketing materials distributed to analogous

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                           Page 3
Slip Copy, 2009 WL 1310890 (E.D.N.Y.)
**(Cite as: 2009 WL 1310890 (E.D.N.Y.))**

agencies in all 50 states.

*2 The State made a similar request, nearly one year ago, prior to the entry of CMO 1. *See* State's Proposed CMO 1 (May 9, 2008), D.E. # 18, at 4 (requesting "[a]ll documents concerning communications with *any* government offices ....") (emphasis added). As is apparent from CMO 1, the Court, having balanced the interests, rejected that request. *See* CMO 1, D.E # 41, at 1 ("Lilly shall expeditiously identify and produce documents ... that reflect interactions with the P[harmacy] & T[herapeutics] Committee and/or the State's Medicaid agency."). Moreover, the State has already obtained exhaustive discovery on this issue, including call notes and other documents in the possession of Lilly sales representatives, depositions of those representatives, P & T Committee related discovery, and marketing materials directed towards the State-all on top of the millions of pages of documents already produced by Lilly in connection with the Zyprexa MDL.

This case concerns Lilly's alleged illegal marketing activities directed towards agencies of the State of Connecticut, not agencies of the United States. Accordingly, the State's request for production numbered 4 is denied.

## II. Requests Related to Lilly Sales Representatives

Two of the State's requests seek documents relating to Lilly sales representatives. *See* Second Set of Requests for Production Nos. 6 & 10. Like the requests discussed above, these requests largely exceed the scope of that permitted by this Court's prior rulings.

Discovery of Lilly sales representatives has been limited to call notes, depositions, and Zyprexa-related documents in the possession of the sales representatives noticed for deposition. *See* Memorandum & Order (Jan. 23, 2009), D.E. # 166, at 4-7;

Minute Entry & Order (Dec. 22, 2008), D.E. # 154, at 3; Memorandum & Order (Dec. 9, 2008), D.E. # 140, at 1-2; CMO 1, D.E. # 41, at 1-2. To the extent that, as the State claims, Lilly "never searched the files of the fourteen sales representatives originally selected by the State for deposition in this case[,]"[FN4] 3/31/09 Pl. Letter, Ex. A, at 4, Lilly is directed to do so forthwith and produce responsive documents. Other than those documents, additional documentary discovery relating to Lilly sales representatives is not warranted at this late date. *See* Fed.R.Civ.P. 26(b)(2)(C)(i)-(ii) (directing courts to limit the frequency or extent of discovery where, as here, the discovery sought is unreasonably cumulative or duplicative and could have been obtained at an earlier date). Accordingly, the State's requests for production numbered 6 and 10 are denied, except to the limited extent indicated above.

> FN4. The State is reminded that the Court authorized *nine* sales representative depositions. *See* Memorandum & Order (Jan. 23, 2009), D.E # 166, at 6-7; Memorandum & Order (Dec. 9, 2008), D.E. # 140, at 2.

## III. Remaining Requests

The remaining requests in the State's Second Set of Requests for Production are duplicative of, and in some cases literally identical to, requests made in the State's First Set of Requests for Production,[FN5] which was served on June 27, 2008, nearly one year ago. *Compare* Second Set of Requests for Production 1,[FN6] 2, 3, 5, 8, 9-13,[FN7] 14, 16 and 17, *with* First Set of Requests for Production 1, 5, 6, 8, 9, 10, 16, 20, and 22. Lilly represents that, in an attempt to compromise, it asked the State to narrow those requests, but that the State refused to do so. *See* 3/30/09 Def. Letter, at 2. The State counters that it provided Lilly with examples of responsive documents, and characterizes the requests in its Second Set of Requests for Production as *"slightly*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                           Page 4
Slip Copy, 2009 WL 1310890 (E.D.N.Y.)
(Cite as: 2009 WL 1310890 (E.D.N.Y.))

broadened" yet "targeted," *see* 3/26/09 Pl. Letter, at 3 (emphasis added)-a characterization that is belied by the exhaustive scope of those requests.[FN8]

> FN5. The State's First Set of Requests for Production is attached as Exhibit G to Lilly's letter dated March 30, 2009. *See* 3/30/09 Def. Letter, Ex. G.

> FN6. The State has now substantially broadened its first demand, and seeks all communications between Lilly and State representatives, and not just those involving employees of the State's Medicaid agencies.

> FN7. The language employed by the State in its Second Set of Requests for Production makes clear that requests numbered 10, 11, 12, and 13 are in fact subcategories of request numbered 9 in that document.

> FN8. The State's citation to examples of the kind of information that it was demanding, *see* 3/31/09 Pl. Letter, at 1; 3/26/09 Pl. Letter, at 3, was not the functional equivalent of offering to narrow the scope of its demands.

*3 The State had ample opportunity to review Lilly's production in response to its First Set of Requests for Production, but instead waited until near the end of fact discovery to raise its objections with both Lilly and the Court. Notably, the State's Second Set of Requests for Production expressly identifies few, if any, categories of documents that Lilly failed to produce in response to the State's First Set of Requests for Production. To be sure, the State, in its reply to Lilly's letter in opposition, has now narrowed a handful of requests-in "proposed orders" relegated to a column in an attached chart, which identifies specific unproduced documents that the State believes are responsive.[FN9]*See* 3/31/09 Pl. Letter, Ex. A. As the State had not pre-

viously served Lilly with those narrowed requests, it did not satisfy its obligation to meet and confer in good faith with opposing counsel on this issue. Furthermore, as the Court does not allow sur-replies, *see* Order (Mar. 9, 2009), D.E. # 177, Lilly has not had an opportunity to be heard on those issues.

> FN9. To take an example, request numbered 1 in the State's Second Set of Requests for Production seeks "[a]ll communications between Lilly and employees, agents or representatives of the State of Connecticut or its agencies or subdivisions concerning atypical and/or conventional antipsychotics."Second Set of Requests for Production No. 1. In its belatedly proffered proposed order, however, the State requests that this Court order Lilly to produce the custodial files for eight discrete points of contact. *See* 3/31/09 Pl. Letter, Ex. A, at 1. Had the State presented requests of this nature to Lilly, the parties perhaps could have reached a compromise. And even if compromise proved unattainable, the issue would at least have been properly framed for resolution by this Court.

The time for making such broad discovery demands has long since passed. If the State was dissatisfied with Lilly's response to its First Set of Requests for Production, it should have sought supplementation from Lilly (in the form of targeted demands) or relief from this Court at an earlier date.[FN10]*See*Fed.R.Civ.P. 26(b)(2)(C)(ii) ("[T]he court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rules if it determines that ... the party seeking discovery has had ample opportunity to obtain the information by discovery in the action[.]"); *FLOORgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.,* Civil Action No. 04-3500(AET), 2007 WL 1613217, at *3 (D.N.J. June 1, 2007) (granting defendants' motion for a protective order where the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                          Page 5
Slip Copy, 2009 WL 1310890 (E.D.N.Y.)
(Cite as: 2009 WL 1310890 (E.D.N.Y.))

subpoena issued by plaintiff was duplicative, outside the scope of discovery permitted by court, and issued near the end of fact discovery); *Maldonado v. Invensys Bldg. Sys., Inc.,* No. 01-C-50433, 2004 WL 1080191, at *2 (N.D.Ill. May 13, 2004) (denying plaintiff's request for certain documents where defendant had previously responded to a similar request, and plaintiff had "never raised any issue regarding [defendant's] production" despite ample opportunity to do so); *see also Rafano v. Patchogue-Medford Sch. Dist.,* No. 06-CV-5367 (JFB)(ARL), 2009 WL 789440, at *12 (E.D.N.Y. Mar. 20, 2009) (affirming magistrate judge's denial of plaintiff's request to reopen discovery where plaintiff had over a year to conduct discovery, was granted multiple extensions of the discovery period, and failed to explain why the discovery at issue was not sought at an earlier date); *Brown v. James,* Civil No. 4:CV-03-0631, 2009 WL 743321, at *4 (M.D.Pa. Mar.18, 2009) (denying *pro se* plaintiff's request for certain documents where plaintiff "had ample opportunity to obtain th[e] information during the long period of discovery that ha[d] ensued in th[e] action."). To quote the court in *Maldonado:*"This case is in the twilight of discovery. It is now time for the sun to set."2004 WL 1080191, at *1.

> FN10. Significantly, similarly situated State Attorneys General did exactly that. *See* Tr. of Hearing Held on Oct. 15, 2008, D.E. # 125, at 57-78 (discussing challenges by the States of Louisiana, Mississippi, and Montana to Lilly's post-CMO 1 production).

*4 Accordingly, State's remaining requests for production are denied.

## CONCLUSION

For all of the foregoing reasons, the State's motion for a compulsion order is denied, except that Lilly shall forthwith produce the custodial files of those sales representatives that have been or will be produced for deposition.

**SO ORDERED.**

E.D.N.Y.,2009.
In re Zyprexa Products Liability Litigation
Slip Copy, 2009 WL 1310890 (E.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.