IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,       )       Cr. No. 4:02-992
                                )
     Respondent,                )
                                )
VERSUS                          )       Columbia, SC
                                )       August 11, 2009
CHADRICK E. FULKS,              )
                                )
     Petitioner.                )
                                )
 --------------------------)


TRANSCRIPT OF STATUS CONFERENCE/MOTION HEARING

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
UNITED STATES DISTRICT JUDGE


Appearances:

For the Respondent:       ROBERT F. DALEY, Jr., ESQ.
                          JIMMIE EWING, ESQ.
                          ROBERT JENDRON, JR., ESQ.
                          Assistant U.S. Attorneys
                          1441 Main Street, Suite 500
                          Columbia, SC  29201

For the Petioner:         BEATTIE B. ASHMORE, ESQ.
                          644 E. Washington Street
                          Greenville, SC  29601

                          KIRSTEN E. SMALL, ESQ.
                          P.O. Box 10648
                          Greenville, SC  29603

                          DAVID P. DALKE, ESQ.
                          610 Newport Center Drive, Suite 1700
                          Newport Beach, CA  92660-6429

Court Reporter:        Gary N. Smith, CM
                       901 Richland Street
                       Columbia, SC  29201
                       (803) 256-7743

          Stenotype/Computer-aided Transciption

* * * * * * * * * * * * * * * * * * * * * * * * * *

THE COURT:  All right.  This is the matter styled Chadrick E. Fulks, petitioner, versus the United States of America, respondent.  It is civil docket number -- help me with the civil number, everything I look at has a criminal number on it.

THE CLERK:  It follows it.

THE COURT:  Oh, it follows the criminal number -- 4:02-992.  We have counsel present this morning for a status conference to discuss the upcoming evidentiary hearing in this case and to go over some procedural and housekeeping matters.

The first matter I would like to address is the pro hac vice applications of the lawyers from California.  Let me ask, what function will they perform at the hearing?

MR. ASHMORE:  Your Honor, good morning, Beattie Ashmore on behalf of Mr. Fulks, and Kirstan Small.  With me this morning is Kim Damron-Hsioao and David Dalke, they are both with the firm of O'Melveny and Myers.

That firm has been working with us pro bono, Your Honor, since the inception.  They have spent hundreds if not thousands of hours, well over $100,000 in expenses.  They have

worked with us at every step of the way, Your Honor. And in terms of a hearing itself, I would expect one or more of the O'Melveny and Myers' attorneys to handle some of the legal arguments.

THE COURT: So, they will be on their feet performing in the courtroom?

MR. ASHMORE: Yes, sir.

THE COURT: Well, I don't have a problem with it, but -- the reason I haven't acted on the motion before today is, are they going to submit a claim for reimbursement for expenses?

MR. ASHMORE: No, sir.

THE COURT: All right. So, it will be purely pro bono straight down the line for the duration of this case?

MR. ASHMORE: For the duration and from its inception, Your Honor.

THE COURT: All right. Well, then, I will grant the motions of those four lawyers and we are glad to have them in the case.

MR. ASHMORE: Thank you very much, Your Honor.

THE COURT: All right. I guess the next issue before we get to the issue of how many witnesses will be called and so forth, is this attorney-client privilege issue. It has been fully briefed, I guess I should hear from the government first, it's the government's motion.

MR. DALEY:  Your Honor, Robert Daley.

THE COURT:  Let me say, I see you want to interview trial counsel, you don't want to take a deposition.  How long do you think the interview might take?

MR. DALEY:  Your Honor --

THE COURT:  No way to tell?

MR. DALEY:  No way to tell.  The practice has always been -- when I was in the state attorney general's office doing capital litigation cases, we would go over, talk to the trial counsel before the hearing.  And sometimes it would take an hour.  Quite honestly, Your Honor, with the exhaustive petition, it may take a little while longer.  But there are just some broad areas that we would at least like to jog the attorneys' memories in.

And we have no intention of going outside the scope of the petition.  Quite honestly, Your Honor, I think it would be hard for us to go outside the scope, but we are not going to go into areas that are not covered by the petition.

So, as an officer of the court I can tell you that if I ever even approach that, I would stop.  I mean, I'm just not going to go there.

The one area that seems to always be of some concern is, is the government, is the state going to try to find out from the attorney, did he admit he killed her, or something to that effect.  I don't think that's going to be a concern in

that case.

THE COURT: You won't ask that ultimate question?

MR. DALEY: I'm not going to ask that ultimate --

THE COURT: You won't ask that at the interview?

MR. DALEY: I won't ask that at the interview. And the truth is, the approach they took, it seems pretty clear that that conversation didn't happen. But I'm not going to go there anyway, Your Honor, because I think instead of getting into whether that is or isn't allowed, we are just not going to approach that.

THE COURT: All right. Now, what about documents? I read a footnote that indicates that present counsel is in possession of all Mr. Blume's records.

MR. DALEY: All of Mr. Blume's records. I don't know, I believe Mr. Nettles has some records, obviously not very many, relative to the -- I believe Mr. Blume has had nearly all of the critical files, and those are now in the possession of Ms. Small.

We will bear all the burden in that regard, Your Honor, and I think as we have said in our -- in our reply, we are not going to try to take any -- if we found a document that said he did it, we are not going to use that. We are not going to try to use that, we are not going to -- if the case were ever to be retried, we are not going to take advantage of that, Your Honor. And so --

THE COURT:  Ms. Small, the records you have, are they in hard copy form or are they on a disc or what do you have?

MS. SMALL:  They are in hard copy form, Your Honor. There are approximately 44 boxes of records in various forms.

THE COURT:  Will you be able to get through all of those before the end of September?

MR. DALEY:  Your Honor, the government is going to do what it takes, yes, sir.

THE COURT:  All right.  Well, let me hear from the defendant.  Who is going --

MR. ASHMORE:  Your Honor, if I may again, Beattie Ashmore.  Judge, we certainly think that he's entitled to interviews.  We think he's entitled to interview trial counsel, Your Honor, we would like to be there to protect our client's rights during that interview.

The more difficult problem, Your Honor, lies in the boxes themselves, Judge --

THE COURT:  I'm sorry, you said you do agree they are entitled to interview counsel?

MR. ASHMORE:  Yes, sir.

THE COURT:  Which is different from your memoranda.

MR. ASHMORE:  Your Honor, as we have looked through it, we will concede that point, that they are -- while we raised the objection, to be candid with the court, I think it's certainly well within your discretion and I think it might be

frankly normal practice, and so we would concede that point.

The problem, Your Honor, is with the records themselves. Judge, they have had 14 months or so to do this. Before we throw them the keys to the room and say, "Have at it, any of those boxes," Judge, we -- it's been almost two years since I have looked through all those boxes.

I think it is incumbent upon us to protect our client, for us to first go through all of those boxes, Judge, and determine what is work product, determine what is attorney-client privilege. And that, Your Honor, is where --

THE COURT: Well, all of it is attorney-client privilege, pretty much.

MR. ASHMORE: Well, if it's not something that we have raised in the 2255 --

THE COURT: And they concede they won't use anything they learn that is not raised in the petition. And so why do you need to do a preproduction review if you have the comfort of knowing that whatever is in there that doesn't relate to your claim is not going to be used?

MR. ASHMORE: Well, Your Honor, as much as I have utmost respect and admiration for the entire U.S. Attorney's Office, Your Honor, it's sort of difficult to unring that bell. If there is a document in there, Judge, that is a critical document in those 44 boxes that was not raised in our 2255, Your Honor, that the government could make use of --

maybe not directly but indirectly -- and I'm having to speak in hypotheticals, Your Honor -- but I can't imagine that we are doing our job for Mr. Fulks --

THE COURT: Well, let me say, we have a counterpart to this on the civil side. I'm on the evidence rules committee, and we recently promulgated a new evidence rule, 502, to deal with the expensive preproduction reviews that are required in civil cases.

And what had happened was in the ordinary civil case, there are always thousands if not millions of documents at issue. And the producing party would always have to assign the lawyers to go through and screen out attorney-client letters and attorney-client communications, because to turn it over would waive the privilege. And so you had these enormously expensive preproduction reviews in civil cases.

So, new Rule 502 of the evidence was designed to do something about that. And it provides that in discovery, if you have a court order, the producing party can turn over everything it has got, and then when the receiving party identifies what they want to use at trial, the producing party can look at those -- that smaller disk and then claim the privilege, and the judge rules on the privilege. And if it's deemed to be privileged, it goes back.

Nobody wants to use that rule, make an exact same argument you just made, "Well, even though we are protected

under the rule, it might indirectly lead to something."

MR. ASHMORE:  That --

THE COURT:  I mean, that's a logical argument, but it's hard to apply it to a case.  I mean, how would you --

MR. ASHMORE:  Judge, I must point out, we would not have this problem if we had the time, Judge.  If -- we filed our petition or our petition 14 months ago -- they never looked at these 44 boxes of documents before they even filed their reply brief.

THE COURT:  Well, they point out that they didn't know at any time for sure that I would have an evidentiary hearing, though, that I might just decide it on the papers and the briefs.

MR. ASHMORE:  Well, Your Honor, I think it was logical to assume that at some point Mr. Blume was going to be called to testify.

And again, it's our argument, Your Honor, that they have actually waived their right to review the boxes.  Again, we don't mind them speaking with Mr. Blume, allowing Mr. Blume access to his records as he is being interviewed perhaps, but to just turn over all 44 boxes to them, Your Honor, we would object to that.

THE COURT:  Let me ask this, do you expect there to be a concession of ineffectiveness in any respect?  Anybody going to confess error?

MR. ASHMORE:  I am not aware of that at this moment, Your Honor.  I haven't had those conversations that any of the trial counsel is willing to confess error at this stage.

THE COURT:  The reason I ask is, it happens in a lot of cases.

MR. ASHMORE:  And it may happen in this one, Judge, I just haven't pinned them down on particular points and issues.

THE COURT:  Mr. Daley?

MR. DALEY:  And Your Honor, that's the exact concern we have, that we are going to have a cold witness who hasn't seen or hasn't been reminded of anything.  We have a few things that we think we might be able to use to remind them, to the extent we can.

But clearly, if there were documents that would refresh their memory or -- Your Honor, we are trying to get to the truth of the matter and what the reasons were for certain things, why they were done.

The case is several years old, and if we are going to get to the point where we have to talk about strategy and why certain things were done, the worst thing that could happen would be for counsel to just say, "I just -- I don't remember at this moment in time."

And Your Honor, again, to the extent -- I mean, as you saw, some courts rule without ever having a single witness, including counsel testifying, sometimes they have full-blown

evidentiary hearings.

Quite honestly, Your Honor, we were trying to contain just how much we put in front of the court in trying to respond as best we could.  To the extent we made a strategic decision that wasn't perfect, again, until two weeks, two and-a-half weeks ago, we weren't certain there was going to be a hearing.

And it's unusual, there were some -- because of the issues on appeal, there were some statements made in briefs that actually articulated some of the strategy that was responsive, which we made a decision at that time we were going to brief it the way we did.

Now that we are going to potentially have an evidentiary hearing, not sure what the scope is going to be, but at least with regard the attorneys it makes no sense, it just makes no sense to put somebody up there without having the opportunity to have reviewed documents that would help them remember why they may have done certain things.

THE COURT:  How many boxes do we have in all?

MR. ASHMORE:  44, Your Honor.  And Mr. Daley points out, he's got the documents to refresh recollection.  Out of 44 boxes, one would assume the vast majority of those came from the government themselves.  He's got those documents, Judge, he just wants to go and conduct a fishing expedition and look through the other 44 boxes.  And so he's got the documents, he can refresh the recollection of Mr. Blume.  I don't think he's

entitled to look through our 44 boxes.

THE COURT: Hold on one second.

MR. ASHMORE: Sure.

THE COURT: Let me ask the California counsel, we thought there was something in the history of this case where there was a reference to scanning and imaging all these documents so they could be shared with California counsel; is that not the case? Do the California counsel have anything electronically?

MR. DALKE: Yes, Your Honor, we have some -- David Dalke for the defense.

Your Honor, we do have some subpopulation, it now appears, of the documents that are in Ms. Small's possession, but the compilation of documents that we have is incomplete.

THE COURT: Well, how many -- of the 44 bankers boxes, how many do you have on disk?

MR. DALKE: Your Honor, I don't know, we were trying to figure that out yesterday afternoon. And we surveyed three boxes and, you know, it varied between almost all to certainly less than 10, 15 percent, based on factors that I frankly have no idea, Your Honor. I don't have any explanation for why it is that we don't have what appears to be a complete electronic copy of --

THE COURT: All right.

MR. DALKE: Your Honor, may I make one more question

or one more point?

THE COURT: Yes, sir.

MR. DALKE: You know, perhaps, perhaps one reasonable accommodation would be to -- and we have and can provide electronic copies, you know, a disk drive, for example, of the documents that we already have in our possession. I just toss that out there.

THE COURT: All right. I was about to ask Mr. Daley, would you be satisfied with what's on the disk? Obviously somebody made a decision that that's what's important to the case.

MR. DALEY: Your Honor, without knowing -- I mean, I think we will be able to plow through so much of this -- I don't need to see another copy of the pleading, I don't need to see that --

THE COURT: Well, that's what I'm saying, I would imagine what was screened out and not sent to California was the payment vouchers and things like that that you don't need -- you don't have any concern with. I'm just asking, I'm not trying to hammer you to accept that, I'm just asking.

MR. DALEY: Here's what I'm looking for, Your Honor, and it's pretty simple. Attorney notes. If there's a memo that -- you know, "Here's why we should plead guilty." I mean, it's a fundamental issue in the case, "Here is why we should do

a statement without a proffer, without a plea agreement."

I mean, there are some very simple things that I'm looking for, that if they are in there, it just sort of takes care of that issue. And if they are not, then we just ask the attorney.

But without knowing -- I mean, if they admit it's some subset, I just want to look at those 44 boxes, Your Honor.

THE COURT: Let me ask this, are the scanned documents organized in some fashion? I mean, is there a way to -- are they indexed or broken down by category or something?

MR. DALKE: Your Honor, there is an index, they are scanned -- to the extent that I have been able to figure it out, they are scanned in some form of how the boxes themselves are organized. But I'm not trying to be coy with Your Honor by any means, it's an imperfect match between what is on my index and what is actually in those documents, and I have no explanation, Your Honor.

THE COURT: All right, I'm going to put this in a written order. I'm persuaded by the authorities cited by the government, that there is a waiver to the attorney-client privilege in this case in view of the claims that have been asserted in the 2255 action, such that the documents need to be produced for counsel's review prior to the hearing.

I just don't want to get in a situation where Mr. Blume is on the stand and he's asked the question and then

he doesn't remember and we have to then take a recess and go to the documents and let the government look through them and Mr. Blume look through them. I think we would be better served by having that produced in advance.

What I would like to suggest is, I would like to require the immediate production of the scanned documents. Mr. Blume, you look through that and see if -- I'm sorry, Mr. Daley, I'm sorry, I apologize.

You look through the electronic form of what you get and see if you can make some sense out of it. And then we might have another hearing prior to the trial, prior to the evidentiary hearing to see if you are satisfied with what you got, or if you think you need to see some more.

Without you having looked at it, it may be that you are satisfied. You know, boxes 1 through 5 are Mr. Blume's notes of the trial from opening statement to the verdict, and boxes 5 through 10 are the interviews of all of the witnesses, and you are comfortable that you have pretty much got what you need, you might be happy with what you have.

MR. DALEY: You are right, Your Honor.

THE COURT: And that would relieve the defendants of having to go through and figure out what was not scanned and why it wasn't scanned and providing an index of what wasn't scanned for me to look at. And so I would like to sort of have it on that basis.

MR. ASHMORE:  Understand your ruling, Your Honor.  I just wanted to inform the court the attorneys' notes weren't scanned, so it will be necessary for him -- and we will work with him in that regard, Your Honor.

THE COURT:  Well, I think they need to be produced.

MR. ASHMORE:  Yes, sir.

THE COURT:  They need to be produced.

MR. ASHMORE:  I understand your ruling.  And we will just -- and unfortunately, they are not in one little discrete spot, but we will welcome Mr. Daley and whomever he brings with him, and we'll get --

THE COURT:  I think any and all notes by Mr. Blume, pretrial and trial, need to be produced, whether they have been scanned or not, plus what has been scanned.  All right.  And then we may pick a date for another little final pretrial conference.

MR. DALEY:  And I will work with Mr. Ashmore and Ms. Small to do that, Your Honor.

THE COURT:  All right.  And the scanned documents need to be produced in their native form, some way they can be searched or whatever in the best method possible.

MR. DALKE:  Absolutely, Your Honor, we will give them precisely the condition that we have them in.  They are in PDFs and TIFs, I mean, absolutely.

MR. DALEY:  And Your Honor, we are also going to talk

Ms. Johnson and to Mr. Nettles: I don't know that Ms. Johnson has any files that I -- because I believe they all were with Mr. Blume and then it was transferred to Mr. Watkins and Ms. Small. I do think Mr. Nettles may have a -- I don't know what he has.

THE COURT: Well, his notes need to be produced -- well, he was an active participant in the trial.

MR. DALEY: Oh --

THE COURT: Well, Ms. Johnson was too, but I thought she was with Mr. Blume.

MR. DALEY: Yes -- I'm almost certain that her notes would probably be captured in there, if not a hundred percent, very --

THE COURT: Well, all attorney notes, pretrial and trial, need to be produced, plus the scanned documents, with some type of index or some type of search capacity. That's my ruling on that motion. I will put it in a written order.

MR. DALEY: Thank you, Your Honor.

THE COURT: All right, now we have got to talk about the scope of the testimony received at trial. I assume there will be no objection to testimony by all the trial counsel, Mr. Blume, Ms. Johnson, Mr. Nettles, and Mr. Gasser. Now, you didn't list Mr. Scott Schools?

MR. DALEY: Yes, we did, Your Honor.

THE COURT: Oh, you did? I'm sorry. All right. I

assume that neither side objects to the trial counsel on both sides of the case being called; is that right?

MR. DALEY:  We do not object, Your Honor.

THE COURT:  Well, let's go through the government's list first because it's shorter.  Mr. Bruning and Mr. Long, they are both FBI agents?

MR. DALEY:  Yes, Your Honor.

THE COURT:  And what would their testimony relate to?

MR. DALEY:  Your Honor, Ms. Ewing is going to handle this, Your Honor.

MS. EWING:  Mr. Bruning would testify, if it's necessary, regarding the location of the remains of Ms. Donovan and the attempts to find her remains.  And again, this may not be necessary, depending on the scope of the testimony that Mr. Fulks is allowed.

THE COURT:  Well, let me stop there.  My law clerks and I were discussing it this morning.  You know, there's a one-year statute of limitations on 2255 actions, and this action was initiated within that one year.  And then there was an amended petition filed that added some new claims, and there's a motion pending to add another claim, and that is the discovery of the remains.

The discovery of the remains is truly a new event that could not have really been raised earlier.  I do have some question -- I don't know, and we will have to look at the

law -- about whether that first effort to amend the petition has some jurisdictional problem with it.  It may be that you are stuck with whatever you allege within the one year, I don't know.  We will have to take that up later.

But put that aside for now, the location of the remains, do we need a lot of testimony about that?  I understand they have been identified as the remains of the victim in this case, and will the government concede that it was generally in the area where Mr. Fulks has pointed to?

MR. DALEY:  Your Honor, we still have to get the exact location.  There's a challenge in the testimony and the maps and what have you.  Clearly, if I can just take a moment --

THE COURT:  All right.

MR. DALEY:  -- to explain where we are in the process.  Because we want to respond and we want to have the court -- Mr. Fulks gives the initial interview in April and provides an area that the defense actually goes to and has a dog alert in some areas.

It turns out that's not the area, clearly not.  Maybe it was because Mr. Fulks gave information that didn't -- wasn't clear enough.  Not sure, at least not yet, Your Honor.

He then goes to the scene some time later, several months later, maybe even almost a year later.  They then go the opposite direction, they go right instead of left on these two

roads.

THE COURT: This is pretrial still?

MR. DALEY: Correct, Your Honor. Correct, Your Honor.

They look in one area -- and actually this was testified to by Mr. Long, Agent Long, Mr. Skidmore, Investigator Skidmore, and Heather Roche.

They look in one area -- the second group where Mr. Fulks is with them -- they don't find anything, so they go off away further. Now, is this all -- the first area, back right after he gives the information in April, is about, I don't know, eight-tenths of a mile or a mile further away from the other, the second area. And there's a third area.

I am told --

THE COURT: You are talking about whether defense counsel looked, I thought the relevant question is where he directed law enforcement back when they were doing the investigating -- when they were early in the case, in other words.

MR. DALEY: Correct. I'm sorry, this is the testimony that was at trial of that, Your Honor.

THE COURT: All right.

MR. DALEY: When he first gives them information, they go up and go left, and they look in this general area. They don't find anything. He then goes later -- either later

that year or the next year, and with them he says, "Oh, no, don't go left, go right."

So, they go right, and they don't find anything in one area. And then has them go up aways, further up the road and looked at the second area.

Now, I don't yet have clear in my mind in trying to get that information where exactly these two bones were found.

THE COURT: So, you don't know if it was the left or the right or the further out --

MR. DALEY: Well, I believe it's on the right-hand side, Your Honor, it's just I'm not certain exactly where it's located. It's just a very difficult thing to look at the transcript and then look at -- and I haven't -- quite frankly, I haven't been able to get Mr. Bruning and Mr. Long, I mean, they have been scrambling, just finally had gotten the test results. So, it's probably going to take --

THE COURT: Well, you will concede that Mr. Gasser did argue and the government did suggest that the defendant had purposely misled authorities so they wouldn't find a body?

MR. DALEY: Your Honor, we argued that he concealed -- he picked the location where she was going to end up dying --

THE COURT: Right.

MR. DALEY: -- he was the driver.

THE COURT: Right.

MR. DALEY:  We argued that he concealed the body and disposed of the body.  A very close examination of the record, of the evidence produced and the arguments made, we never argued obstruction in the search.  If you look very closely at that proposed claim 33, they do a very nice job of presenting the argument.  But look at what got testified to and what --

THE COURT:  Maybe I need to go back and look at what was actually said then before I decide whether Mr. Bruning needs to be called then, because this may be a non-issue.

MR. DALEY:  We are going to be providing a response within the next few days, Your Honor.

THE COURT:  Well, all right, we will just hold that in abeyance then.  But now, that's Mr. Browning.  Anything else he would talk about besides the location of the remains?

MR. DALEY:  The only reason that we have those agents otherwise, Your Honor, is to potentially respond to something that --

THE COURT:  All right, they won't be primary witnesses with a lot of testimony?

MR. DALEY:  And quite honestly, have them here because they remember the trial too --

THE COURT:  Right.  And then your other -- you have two others, Mr. Newman --

MS. EWING:  Yes, Your Honor.

THE COURT:  -- and Mr. Landis.

MS. EWING: Yes, Your Honor. And we would not anticipate either one of those being primary witnesses. We have listed them in case we need them to respond to Mr. Fulks' testimony. But quite honestly, it's doubtful that we would need them because we don't believe that there are any material facts or issues that are really contested as far as what their experts will say that we need them for.

THE COURT: So, they are just potential rebuttal witnesses?

MS. EWING: Yes, Your Honor.

THE COURT: Out of an abundance of caution?

MS. EWING: Yes, Your Honor.

THE COURT: All right. And then I kind of glossed over Mr. Long, he's also with the FBI, his is the same as Mr. Bruning --

MS. EWING: Yes, Your Honor.

THE COURT: -- just general testimony and any unforeseen events?

MS. EWING: Yes, Your Honor.

MR. DALEY: And he actually was more involved in the search than Agent Bruning on the front end, pretrial.

THE COURT: All right. And that does it for the government, right?

MS. EWING: Yes, Your Honor.

THE COURT: All right, now, let's turn to the more

problematic list of defense witnesses.  Who is going to speak for the defendant here?

MR. ASHMORE:  Your Honor --

THE COURT:  Let's decide, are we going to call Mr. Fulks the defendant or the petitioner?  He really is the petitioner.

MR. ASHMORE:  Yes, I think that would be more accurate, petitioner.

THE COURT:  All right.  I think we can take -- ought to take it up in groups, probably.

MR. ASHMORE:  Yes, sir, I think that's a great idea.

THE COURT:  All right.

MR. ASHMORE:  Your Honor -- and Mr. Daley and I have been talking, trying to do all we can to be as efficient as we can at this hearing, Your Honor.

I would suggest maybe what I call the fact witnesses -- I have got these -- I have got these witnesses grouped in my mind in three different areas: trial counsel -- now we have already talked about them -- expert witnesses is problematic, and then the third group is what I call fact witnesses or lay witnesses.

THE COURT:  All right, trial counsel we have already dealt with.

MR. ASHMORE:  Yes, sir.

THE COURT:  All right.

MR. ASHMORE:  And then our fact witnesses, Your Honor.  Mr. Daley, I think certainly in general terms, is willing to stipulate that if called these fact witnesses would have testified as set forth in their affidavits.  And that gets us part of the way there, Judge.

THE COURT:  All right.

MR. ASHMORE:  The rest of the way would be that I would ask the government to also stipulate that the testimony -- or that their affidavits, I should say, are credible.

Sort of the key point and the reason we need live testimony is for you to sit in judgment, Your Honor, as to whether of not these witnesses are credible.  We are not asking that you accept their testimony as fact, simply that the testimony as given would be credible, would be believable.

And if they would stipulate as to that, I think --

THE COURT:  I'm trying to think out loud, what does that mean?  If I say it's credible, I determine that there is enough there that a jury could believe it if they wanted to?

MR. ASHMORE:  Yes, sir.

THE COURT:  I mean, it's not so far flung that it would be rejected by the jury?

MR. ASHMORE:  Right.  And perhaps the converse of that is that -- and there is an Eighth Circuit case that we have cited that says, Your Honor, that -- with all due respect,

I think it would be inappropriate for you to find one of our affidavits not to be credible, unless you have live testimony from that particular witness. You can't simply discard that affidavit, that's what I would ask you, Your Honor, based on lack of credibility.

THE COURT: All right. And how many fall into this category?

MR. ASHMORE: Well, Your Honor, it's what I would say are all of our fact witnesses listed, and I might could do even better than that, Your Honor, it would include -- it would include in there Mark Cunningham and James Aiken that are technically experts, Your Honor, on future dangerousness.

And the two students of John Blume, I would submit within the next day or so all affidavits that we would intend to introduce to Mr. Daley and make sure that he understands -- and to the court -- make sure you understand which ones we are talking about.

THE COURT: Well, so far you are only talking about Cunningham and Aiken and students of John Blume so, I mean --

MR. ASHMORE: Your Honor, we have listed them all, we have enumerated them on pages 4 and 5.

THE COURT: All right, these go to the statute -- to the upbringing in West Virginia and so forth? Early childhood witnesses --

MR. ASHMORE: That's exactly right, Your Honor. And

again, they are enumerated. If you have our witness list and memorandum filed --

THE COURT: I have it right in front of me.

MR. ASHMORE: Yes, sir. Beginning with Thompson and ending with Kirkman.

THE COURT: Some of them arguably have a motive to help the defendant, right? Some of those early childhood witnesses, right?

MR. ASHMORE: That could be argued, Your Honor. Their affidavit is what it is.

THE COURT: All right, let me hear from Mr. Daley.

MR. DALEY: I mean, Your Honor, you know, we are willing to stipulate that if called, that's what they would testify. But for example, one of the law students says, "I think he was -- you know, suffered great sexual abuse and we should have spent more time focusing on that than focusing on the search." I mean, I can't -- we can't stipulate that that's credible or even admissible testimony.

Do I think that arguably you could have that law student testify to that in a 2255 evidentiary hearing? It's within your discretion I guess to. I mean, I'm not going to say you wouldn't have that ability.

The testimony of James Aiken, who ended up testifying in Basham's trial, basically saying how safe and how wonderful the prisons are.

Well, Your Honor, you have gotten a motion from Chad Fulks saying that on death row Basham beat him up. So, I'm not sure that I could stipulate that Mr. Aiken's testimony is credible or that it is not subject to attack.

THE COURT: So, Mr. Aiken is going to talk about a life sentence in a jail is a secure place?

MR. DALEY: Right.

THE COURT: Well, didn't we have testimony about that at trial?

MR. DALEY: We did, Your Honor. I mean, separate and apart from that, there is, you know, cumulative evidence issues as well. But I just -- I don't see how the government -- and I don't think we have to. And quite honestly, Your Honor, I think you can you accept their affidavits that this is what they would have testified to, but you are certainly allowed to go, "Well, you know, this is a little bit of a problem, because of X, Y, and Z that came out, or other facts that I know of."

Your Honor, this is why when we get so far afield that we literally have 30 or 35 witnesses, many of whom are cumulative and would be subject to some significant cross-examination and attack, that's why they leave it in the court's discretion as to just how far afield you are going to allow the evidentiary hearing.

THE COURT: Mr. Ashmore, I can see why if a student, for example, just to take the example Mr. Daley gave us, if the

student says, "It is obvious that the petitioner suffered great sexual abuse and the defense team should have focused more on the sexual abuse than the escape, or something."  I mean, should I say that's credible?  I mean, would I even say that's credible?

MR. ASHMORE:  That would be his testimony, Your Honor, that's what he would testify to.

THE COURT:  Let me just throw this out, what if we just proceed with the hearing on the affidavits?  And after I get into the affidavits and hear the arguments -- y'all have lived and breathed this case for years, I'm still scratching the surface in terms of what I have got to get into, but I will get into it, I promise you.

MR. ASHMORE:  Yes, sir.

THE COURT:  But once I review the affidavits, it may well be that I prefer to have somebody here live to see and hear and have cross-examined.  But we could adjourn the hearing and come back a week later, or try to get that witness down here before the conclusion of the initial hearing.  We could kind of leave it open ended, in other words.

We could start with affidavits with the understanding that if a good compelling case can be made for having someone here in person, or if I decide on my own motion that I want them here in person, we always have that option.

MR. ASHMORE:  Yes, sir.

THE COURT: How about that? No, I wouldn't shut the door at all on calling any of these fact witnesses live.

MR. ASHMORE: I appreciate that. And Your Honor, to facilitate again, we will provide the court and Mr. Daley within the next coming days the affidavits we propose to introduce.

THE COURT: All right. You are okay with that, aren't you, Mr. Daley?

MR. DALEY: I am, Your Honor. I'm just confirming that I haven't conceded or stipulated to anybody's credibility.

THE COURT: Right.

MR. DALEY: Yes.

THE COURT: So, let's just assume we are going to start the hearing with the affidavits of the fact witnesses. Once we get into them one by one, at any point petitioner's counsel can suggest that we really need the witness here, or the government can suggest we really need the witness here, or I might on my own motion decide to bring in a warm body, so to speak. All right?

MR. ASHMORE: Yes, sir.

THE COURT: All right, what's next?

MR. ASHMORE: Your Honor, I think that the last group we would need to tackle are the mental health experts. Your Honor, again it's essentially the same issue, we would ask you to consider live testimony from these experts.

THE COURT: How many are we talking about here, just approximately?

MR. ASHMORE: Your Honor, I'm going to say two or three. We -- I think Dr. Melikian is sailing, Your Honor, the high seas. I don't know of her availability. I doubt that we will use Dr. Morton as a live witness, I think we could commit to that right now.

THE COURT: So who does that leave?

MR. ASHMORE: That leaves Dr. Hilkey, Dr. Halleck, and we -- well, if we could concentrate on those two, Your Honor.

THE COURT: Hilkey -- spell those two for me.

MR. ASHMORE: H-i-l-k-e-y, and Halleck, H-a-l-l-e-c-k.

THE COURT: All right.

MR. ASHMORE: Your Honor, both of those have submitted affidavits. And Your Honor, frankly we would never intend to submit affidavits as a substitute for live testimony. I think these are very extraordinarily intelligent, well-trained, experienced titans in their field. I think they would have made tremendously compelling witnesses, and I --

THE COURT: And they will testify live as to what they would have said had they been called?

MR. ASHMORE: Yes, sir.

THE COURT: Having reviewed the petitioner's

background?

MR. ASHMORE: Yes, sir. And I'll be honest with the court, I think it's -- it's certainly, obviously is going to track the language in their affidavits. But again, I would argue to Your Honor it would be -- it would be our position that you just need to see these witnesses live for you to judge on their credibility, judge on their presentation, and judge what kind of impact they would have had on this jury. Because it's strong. I have interviewed them, Judge, and they are great witnesses.

THE COURT: All right, Mr. Daley.

MR. DALEY: Your Honor, we have briefed it. The cases they talk about suggest that you have to have live testimony, the three Supreme Court cases. The difference in that is there was basically no litigation investigation.

This is the exact opposite of that. As we attached to our motion to limit the testimony, we have pretrial -- and the court obviously would know in reviewing the vouchers -- that it had signed to pay for all these experts, literally over a dozen experts, all of whom are subsumed within the experts that they presumed to call. We have --

THE COURT: I thought you said -- over a dozen were called?

MR. DALEY: A lot over a dozen were called but those were -- a dozen were submitted to us as potential witnesses,

with the summary of their testimony, often with attachments that were significant evaluations.

We attached Dr. Hilkey and -- let's see. We attached Dr. Hilkey and Dr. Melikian's opinions that were submitted to Mr. Blume pretrial that he attached to his summary of testimony of expert witnesses that they proposed to call at trial.

And then, of course, Your Honor, we now have their subsequent affidavits that have been attached to the 2255 petition. And each of those reveals an exhaustive, a far reaching, and in my experience the most full mitigation investigation in a death penalty case, period.

So, Your Honor, now we are going to have them just come in and I guess you are going to eyeball them and decide whether their testimony -- whether they were good witnesses or not. But that's not the question.

All four -- all three or four of the mental health experts at some point diagnosed Chad Fulks with antisocial personality disorder. We cite the law review article that John Blume, Professor Blume, Attorney Blume said, "Antisocial personality disorder is really bad. We don't want jurors misunderstanding."

And in fact Dr. Halleck in his affidavit that he has attached to the 2255 explains how jurors don't understand antisocial personality disorder. So in effect he has sort of supported -- he tries to explain, "Well, so you've got to do

this and that and explain the reasons why somebody is antisocial, why he has an antisocial personality."

Well, that is exactly what was done in this trial. They --

THE COURT: So Mr. Blume obviously made a conscious decision to follow the scholarship of his law review article and not go forward with this?

MR. DALEY: Again, I can't make that leap yet, Your Honor, because I haven't talked to him. He makes a couple of suggestions of why he did it. But it's pretty clear that that had to have been a factor that went in to determining, "We are not going to call these mental health experts," when they had already gotten in his horrible childhood and that he had brain damage.

But Your Honor, I will tell you, it is completely within your discretion whether you want them here. And so as passionate as I am about why I don't think they need to be called, Your Honor, the government is here ready for you to call whomever you want to show that this was a fair, well done, reasonably tried case, and it was done because of significantly thought out strategic decisions by trial counsel.

THE COURT: If these two doctors are called, Hilkey and Halleck, could you get them up and down in two hours apiece, three hours apiece?

MR. ASHMORE: Yes, sir.

THE COURT: Do you have a problem with that? Any problem?

MR. DALEY: Your Honor, if you want them called, we will be happy to cross-examine them.

THE COURT: It would be one less issue in the case if I allowed them to be called. So, since it's only two, I will allow those to be called.

MR. ASHMORE: Thank you, Your Honor.

MR. DALEY: What about Melikian?

MR. ASHMORE: Your Honor, she's simply out of communication. If I can -- if I can contact her, if it appears that we would want to use her, I will contact Mr. Daley and we will contact the court, Your Honor, and ask you to rule on her appearance.

THE COURT: Okay. So, we will just leave that third one undecided as of now?

MR. ASHMORE: Yes, sir.

THE COURT: And so you will call those two.

MR. ASHMORE: Thank you.

THE COURT: To go back to the fact witnesses, as I said, we will start the hearing assuming that I'm going to use the affidavits, but we will keep the door open to bringing them in. If we do have to bring them in, I will give you reasonable latitude to get them down here. I won't penalize you if you can't get a subpoena out and get them here that next day,

obviously.

MR. ASHMORE:  Thank you, Judge.

THE COURT:  And we could take a week recess or do whatever we need to do to get them here.

Hold on one second.

MR. ASHMORE:  Sure.

THE COURT:  What about Morton, expert witness Morton?

MR. ASHMORE:  We would not call him, Your Honor.

THE COURT:  All right, Morton will not be called.

MR. ASHMORE:  I do have another fact witness that I need to bring to the court's attention.  I would ask --

THE COURT:  All right.  Well, we finished your three groups now?

MR. ASHMORE:  Yes, sir.

THE COURT:  All right.  And what's your fact witness?

MR. ASHMORE:  Sheriff Ronald Hewitt, the Brunswick County Sheriff, Your Honor.

THE COURT:  All right.

MR. ASHMORE:  I can't imagine that we can present an effective evidentiary hearing without testimony from him.  I'm happy to get into why we need him, but I don't know what --

THE COURT:  All right, that's the one I did not let you take the deposition but did not rule out his being called as a witness?

MR. ASHMORE:  That's right, Judge.

THE COURT: All right. Well, lay it out for me.

MR. ASHMORE: Judge, it's very basic. Sheriff Hewitt testified at Brandon Basham's trial, which was subsequent to the Fulks trial, that Brandon Basham demonstrated how he took Alice Donovan's purse strap and strangled her. That is a confession, Judge, a confession that the co-defendant was the actual killer of Alice Donovan. That was not communicated to the Fulks trial team prior to the Fulks trial.

How a confession is not communicated to the trial team is beyond me. But I want to eliminate any doubt that that is exactly what we are dealing with here. I don't know --

THE COURT: So he was called in the Fulks trial?

MR. ASHMORE: No, sir, he wasn't called in the Fulks trial. As a matter of fact, the government took an inconsistent position in the Fulks trial, they argued at the Fulks trial that Sheriff Hewitt's statement indicated that it was Fulks that was the actual killer.

I want to know who knew and when they knew that Sheriff Hewitt had knowledge of the Brandon Basham confession.

THE COURT: All right.

MR. DALEY: And Your Honor, we plowed and replowed this ground several times now. And for the same reason that you didn't allow a deposition, this is a legal matter, there is no question what Sheriff Hewitt testified to. I mean, we have had him testify at least twice now under oath.

THE COURT:  Well, my order denying the deposition said he testified twice and those spoke for themselves, but one was at the trial of Basham, where was the other one?

MR. DALEY:  I believe it was in a motion in limine, Your Honor, because you ruled on it.

And here's the larger context.  Basham was cooperating, trying to help find the body, supposedly.  The whole time he's talking that it's Fulks that did it.  He put it on Fulks.  And they wanted to take out, cherry pick one little piece of this information and try to take it out of context and say, "Oh, this shows that Basham is admitting he did it."

Well, Your Honor, again, it must be very hard to -- I mean, there are so many facts floating around in this case -- but you said, "Look here, you are not going to get to cherry pick out this one little piece and try to mislead or sort of take it in a different direction."

THE COURT:  Well, I thought that was in connection with the deer statement.  I said if the deer statement comes in, the whole testimony has got to come in, wherein Basham put all the blame on Fulks.

MR. DALEY:  And that's one of the issues that is in there.  But then the whole demonstration is not -- they want to take that out of context and say that somehow it was Basham admitting he did the crime.  But in the context in which he's there talking, he's putting it all on Fulks, Your Honor.

All I would ask you to do is go back and look at the briefing --

THE COURT:  I was going to say, how quickly can we get our hands on the two versions of his testimony?

MR. DALEY:  Our brief --

THE COURT:  Is it attached to your brief?

MR. DALEY:  -- that responded to their desire to have discovery on that issue --

THE COURT:  Has got both of them?

MR. DALEY:  Yes, Your Honor.

THE COURT:  All right.

MR. DALEY:  I think we attached -- we attached everything.  I think it -- it dealt with the deer statement and the demonstration, Your Honor.

THE COURT:  Let me hold that under advisement.

MR. DALEY:  Okay, Your Honor.

THE COURT:  He's available if he needs to be called, he's still around, right?

MR. DALEY:  Your Honor, I don't know where he -- I don't think he's a sheriff any more.  I'm not certain where he is, but we would try to locate him, yes, sir.

THE COURT:  All right.  I would like to go back and read those two statements.  This could be one of the more important issues in this case and I don't want to make a misstep here that I regret later.

MR. DALEY: Understood.

THE COURT: All right. So, we will hold under advisement the question of Sheriff Hewitt.

All right, what else?

MR. ASHMORE: Your Honor, the last issue, Your Honor, I have been in a good bit of communication with John Blume about his availability and, Your Honor, I understand -- and look forward to appearing before you on September the 28th.

Something that, Your Honor, I would ask you to consider, and I have spoken with Mr. Daley about this and it might frankly help all of us, Mr. Blume's schedule is critically -- it's almost irreconcilable on September the 28th. He would be willing to make himself available in the weeks prior to September 28. And my thinking on this for your consideration, Your Honor, is doing him by video, a live --

THE COURT: Satellite.

MR. ASHMORE: -- satellite.

THE COURT: We can do that.

MR. ASHMORE: September 18th, if Your Honor --

THE COURT: We can do it by satellite, that's not a problem and that would save him from coming down. How long will he be on the stand?

MR. ASHMORE: Well, we don't know, Judge, I would say one full day. I'm guessing one full day.

THE COURT: On direct and cross, or just direct?

MR. DALEY:  You know, it's kind of a peculiar situation, because I'm pretty certain they are going to call him and so, you know, I don't --

THE COURT:  I could see it being -- I could see it running into a day and-a-half, probably.

MR. ASHMORE:  Yes, sir.  Sure.

MR. DALEY:  But I could also see if he says certain things, "Here's what I did," I mean, it could be a lot shorter.

THE COURT:  All right, it could be shorter.  Well, so, you are saying the entire week of the 28th is bad for him?

MR. ASHMORE:  Yes, Your Honor.

THE COURT:  But he's okay the week before?

MR. ASHMORE:  Yes, sir.  And he's okay October the 5th.

THE COURT:  You said September 28th, the week before, is okay, and you said also October what?

MR. ASHMORE:  October 5th is the week following September 28th, Your Honor, and I think he's going to be in Columbia then.

THE COURT:  Well, does he need to be called first?  I mean, is there any reason he has to be early in the case?

MR. ASHMORE:  We would like to call him first, Your Honor.

MR. DALEY:  Your Honor, I just as soon have him live on the 5th, Your Honor, as opposed to having all the mechanics

of trying to get the video and having you video -- I would like to -- you know, I mean, I don't know if he would be live and we would be here, or whether we would go up there --

THE COURT: Well, do you want to push the hearing back a week, in other words?

MR. ASHMORE: Your Honor, we would love the extra week, Judge.

THE COURT: Well, let's take a recess and let me go look at my calendar. Is the government okay with the following week?

MR. DALEY: Your Honor, we are ready, yes, sir.

THE COURT: It looks as though we may be down to -- instead of four weeks as we talked about initially, I'm thinking four to five days.

MR. DALEY: Yes, sir. I think that's correct, Your Honor.

THE COURT: So, if we started the week of October the 5th, we might finish it that week.

All right, let take a 10 minute recess.

MR. DALEY: Yes, sir.

(Short recess)

THE COURT: All right, we have worked out my calendar where I can devote the entire week of October the 5th for this hearing. So, we will postpone the hearing one -- exactly one week and start Monday, October the 5th, at 9:30. I will allow

Mr. Fulks to be transported here or will require him to be transported here for purposes of the hearing.

I'm informed by the marshals that's going to be a great inconvenience, they have not yet found anybody who is willing to keep him, but they will just have to make it happen.

So, October 5th. And then I would like to, if you can, if Wednesday the 21st is available to all of you, hold that as a backup date for any witnesses that I determine or that need to be called live. Wednesday the 21st.

MR. DALEY: October 21st?

THE COURT: Right. It's like two and-a-half weeks after we start. How about that? Just pencil in that day, keep it open in case we have to get back together to hear live testimony. All right.

And tell your witnesses too so they can preserve that day. That's why I want to go ahead pick it out so you can make arrangements with them. If called, they need to be available that day. Don't book any non-refundable tickets anywhere.

MR. ASHMORE: May we approach the bench, Your Honor?

THE COURT: You want this on the record or off the record?

MR. ASHMORE: Off the record.

THE COURT: All right, this will be off the record.

(Off record bench conference.)

THE COURT: All right, Mr. Ashmore, you wanted to put

on the record what we just discussed?

MR. ASHMORE: Yes, sir, Your Honor. And Mr. Daley and I, certainly I think it's a discretionary matter, Your Honor, and given the difficulties in transporting our client, Your Honor, we would understand if he were to appear by video.

And let me tell Your Honor, I have spoken with Chris Mills that did the civil trial, and Mr. Mills indicated to me that frankly it worked extremely well. He was able to communicate effectively with Mr. Fulks at all times.

THE COURT: Did he have a separate telephone line he could go call Mr. Fulks on?

MR. ASHMORE: Yes, sir. And I don't know exactly how all that works, but he had confidential communications with Mr. Fulks. That's the one thing I just want to be sure of out on their end, and their end being Terre Haut. I have reservations about exactly how confidential some of those phone communications are, but if we could be assured of that by the BOP --

THE COURT: I just really fear that if we brought him here it might be a place four hours from Columbia that agrees to house him, and then it would be just a backbreaking task for the marshals to transport him back and forth. It would probably shorten our hearing day each day to a small number of hours.

I think it's within my discretion, and in view of the

fact that it's been represented to me that it worked well in the civil trial that Mr. Fulks had in this courthouse, I think I will then allow his participation by way of satellite, with the clear understanding there will be some direct means of communication to a telephone line.  Obviously we would need to take a recess, but a way to get quick and ready access between the attorney and client at the hearing.  So, let's proceed on that basis then.

MR. ASHMORE:  Very well, Your Honor.  Thank you very much.

THE COURT:  All right, now, my law clerk pointed out during the break that there were some witnesses that we didn't discuss, for example, the ABA representative and a few others.

MR. ASHMORE:  Thinking of Andrea Lyon, Your Honor. And Your Honor, here's where we are, Andrea Lyon is a nationally known death penalty expert.  She has been working with us -- actually, O'Melveny and Myers has been paying her expenses, Your Honor.

And we have met with her and she has provided affidavits in this case which we intend to introduce.  She has recently undertaken to represent the individual in the Caylee Anthony, the highly publicized case out of Florida, and her schedule, Your Honor, as a result is a wreck.

To be honest, I fear that we would not have her properly prepared by October the 5th.  What we would -- what we

planned to do is search the country for another reputable expert, ask them if they can get up and running between now and October the 5th. And if they feel like they can, I was going to contact Mr. Daley and then get you on the conference call and let you rule accordingly.

THE COURT: Well, but the ABA standards expected of death penalty counsel, right? And that would be the primary focus of this witness's testimony?

MR. ASHMORE: Well, Your Honor, I think Ms. Lyon has already covered those bases. What she was hesitant to do without looking through all 44 boxes --

THE COURT: Right.

MR. ASHMORE: -- is to specifically identify where Mr. Blume was ineffective. She said she could do it as to voir dire just by looking at the format of the transcript, that being that he did all the talking and the potential jurors answered yes-no questions, which is exactly how not to conduct voir dire. But beyond that --

THE COURT: But she would say that his technique of voir dire was not good?

MR. ASHMORE: Yes, it was ineffective. But I think there would be dozens of other points that she could make had she had the time to go through all 44 boxes and make particular --

THE COURT: I'm going to hear from you, Mr. Daley. I

will come to you in just a minute.

MR. ASHMORE: Make particular points in the transcript where --

THE COURT: Well, let me say, this same type issue comes up about once a year when someone wants to put on an expert on what the law is. And I thought for better or worse, I'm supposed to read the cases and look at the authorities and decide what the law is without hearing from the witness stand. So, I'm just -- I'm just concerned about that.

MR. ASHMORE: Well, Your Honor, it's simply that here is someone that has got 17 not guilties in death penalty trials. She knows what she's talking about. And I think it is compelling for her to come in here and pass judgment on a colleague -- "He should never have done this, he should have done that. By doing this or not doing that, that results in an ineffective assistance of counsel circumstance."

We will certainly --

THE COURT: Well, just going back to that one point, Mr. Blume was successful -- we spent two weeks striking the jury, Mr. Blume was successful in coaxing answers out of a lot of witnesses.

MR. ASHMORE: Yes, sir, Your Honor, she --

THE COURT: I mean, that disqualified them. It wasn't -- we didn't just take the first 12 out of the box, in other words.

MR. ASHMORE:  Oh, I understand that, certainly, Your Honor.  But she -- I remember distinctly in meeting with her just in --

THE COURT:  But anyway, she's out.  If you can get somebody else, give notice, and we will take a look at it and address it when we have to.

All right, Mr. Daley.

MR. DALEY:  I'm sorry that I kept bouncing up.

THE COURT:  All right.

MR. DALEY:  Your Honor, that is so clearly your role.  They present to you why he is supposedly ineffective, and then it's the court's job to do that very thing.  It is a legal question to have a lawyer just come in and say, "Here is what is and isn't ineffective -- "

THE COURT:  Well, see, I thought she was going to testify -- it's a she, right?

MR. ASHMORE:  Yes, sir.

THE COURT:  -- she was going to testify about the ABA standards, and tell me what the ABA standards were.  And I can read those.  But something like the better way to ask voir dire is to ask open-ended questions and get the witness to talk and let them talk and let them ramble, I don't think that would be in the ABA standards, would it?

MR. DALEY:  It would not.  Ironically --

THE COURT:  I mean, that's just a trial strategy.

MR. DALEY: Exactly, Your Honor.

THE COURT: But I guess other people could say if you have got someone that you know, you just know is not going to be a good witness, you might want to ask leading questions to get yes-no answers to get the right yes-no answers to kick them off the case. And so there again, you could have a debate about that.

But I guess my question is, that is not really a witness telling me what the law is, that is a witness telling me what works best in the field in death penalty cases, right?

MR. DALEY: And the Eleventh Circuit and a few other circuits have obviously said it would not matter if petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used was unreasonable, because that's not the question. The question is, in this case was the attorney ineffective? And to line up attorneys to criticize other attorneys that --

THE COURT: All right. Well, it might be an academic point because they don't have an expert right now. If you get one, immediately notify the government and the court, and we will take a look at it.

MR. ASHMORE: Thank you, Judge.

THE COURT: All right. Now what else can we talk about while y'all are here?

I will sign these four pro hac vice applications when

we adjourn this morning.

MR. DALKE:  Thank you, Your Honor.

THE COURT:  My law clerk is still telling me there are some people we haven't discussed, like Ms. Wolowinski and Mr. Taylor.

MR. ASHMORE:  Your Honor, I had those all bunched in my fact witnesses category.  I was going to provide to the court and to Mr. Daley all that --

THE COURT:  So we discussed everybody we need to discuss today?

MR. ASHMORE:  I think we have.

THE COURT:  And so all these names fall in one of three categories, either trial counsel, fact witnesses, or expert witnesses, right?

MR. ASHMORE:  Correct.

THE COURT:  And the trial counsel will be called without objection, trial counsel for both sides.  The two experts, I said I would let you call them with the understanding that it wouldn't be but about three hours of testimony max.  Fact witnesses, we are going to rely on affidavits unless I determine I want to have them live.  And we still have up in the air a possible attorney-expert witness, that we will debate later.

MR. ASHMORE:  And Sheriff --

THE COURT:  And the sheriff I have under advisement.

MR. ASHMORE: Your Honor, I was just informed, by the way, Sheriff Hewitt apparently has been convicted of obstruction of justice, has a 16-month sentence. I don't know if he's incarcerated now or not. I wanted to bring that to your attention, I just found that out.

THE COURT: Okay. So, I just don't want to leave anything uncovered here, unaddressed, when we adjourn. But everybody falls into one of those, either a fact witness or an expert witness, and the government's rebuttal witnesses, the two FBI agents.

We will do an order that outlines what we understand the positions of the parties to be and if there is anything in there that is not right y'all let us know right away.

MR. DALEY: Yes, sir.

THE COURT: Okay? What else? I'm glad -- we saved all day for this hearing if necessary.

MR. DALEY: I think that's it, Your Honor.

MR. ASHMORE: Your Honor, I don't believe you have ruled yet on our supplemental claim, the document claim. I didn't know if you planned to take that up in the future or if that is simply under advisement, but some of the things that we do will be dictated by your ruling on that.

THE COURT: You will have to refresh my memory on what that is, I'm sorry.

MR. ASHMORE: The location of her body --

THE COURT: The location of the remains, right --

MR. ASHMORE: It's essentially a supplemental claim, yes, sir.

MR. DALEY: We plan to respond, Your Honor --

THE COURT: If necessary, we will have argument, if I think it's necessary.

MR. ASHMORE: Thank you, Judge.

THE COURT: Mr. Daley wants to see where the location is and how close it is to where he directed them.

MR. ASHMORE: Understood.

MR. DALEY: Thank you, Judge.

THE COURT: All right. Thank you very much.

(Thereupon, the proceedings were adjourned.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

s/ Gary N. Smith                    August 17, 2009
_____          _____

Gary N. Smith, CM
Official Court Reporter
United States District Court
District of South Carolina