Westlaw.

153 F.3d 724, 1998 WL 469176 (C.A.4 (Md.))
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 153 F.3d 724, 1998 WL 469176 (C.A.4 (Md.)))

NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. See CTA4 Rule 32.1.

United States Court of Appeals, Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Ap-
pellee,
v.
Ramesh Kumar VAID, a/k/a Larry Johnson, De-
fendant-Appellant.
**No. 97-4157.**

Submitted June 9, 1998.
Decided Aug. 4, 1998.

Appeal from the United States District Court for the
District of Maryland, at Baltimore. Marvin J. Gar-
bis, District Judge. (CR-96-196-MJG)
James J. Nolan, PIERSON, PIERSON & NOLAN,
Baltimore, Maryland, for Appellant.

Lynne A. Battaglia, United States Attorney, Joyce
K. McDonald, Assistant United States Attorney,
Baltimore, Maryland, for Appellee.

Before NIEMEYER and MICHAEL, Circuit
Judges, and HALL, Senior Circuit Judge.

OPINION

PER CURIAM:

*1 Ramesh Kumar Vaid pled guilty to eleven
counts of fraud by interstate commercial carrier in
violation of 18 U.S.C.A. § 1341F (West
Supp.1998), and the court sentenced him to a thirty-
three-month prison sentence to be followed by three
years of supervised release. Vaid appeals, claiming
that the district court's violation of Fed. R. Crim P.

11(d) was not harmless error, the district court ab-
used its discretion by denying his motions to with-
draw his guilty plea and to substitute counsel, and
the prosecutor withheld exculpatory information in
violation of *Brady v. Maryland,* 373 U.S. 83, 83
S.Ct. 1194, 10 L.Ed.2d 215 (1963). Finding no er-
ror, we affirm.

I.

Vaid was charged in an eleven-count superseding
indictment alleging that he and Youdh Gyani com-
mitted fraud by interstate commercial carrier. On
September 26, 1996, Vaid's counsel, an Assistant
Federal Public Defender, filed a motion to substi-
tute counsel. On September 30 (the day Vaid's trial
was scheduled to begin), the district court conduc-
ted an *ex parte* hearing, at which Vaid, his attorney,
and an independent attorney the court appointed to
advise Vaid were present. Vaid informed the court
that he wanted a new attorney because he did not
trust the public defender, who Vaid claimed was
pressuring him to plead guilty. The public defender
stated that he advised Vaid to plead guilty after the
government outlined its case against Vaid, that
Vaid understood their communications, but that
Vaid disagreed with his assessment of the evidence.
After reviewing the evidence, the independent at-
torney agreed with the public defender that Vaid
likely would be convicted. The district court denied
the motion, finding that it was not timely made and
that the independent attorney was available to Vaid
throughout trial.

After the *ex parte* hearing, Vaid proceeded to trial.
The court prepared to empanel a jury as Gyani's
counsel conferred with Vaid's public defender. At
Vaid's counsel's request, the court permitted Vaid
and Gyani to speak with their attorneys. Gyani had
agreed to plead guilty to one count in the supersed-
ing indictment. After the meeting, Vaid agreed to
plead guilty to all eleven counts in the superseding
indictment, with no written plea agreement.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 F.3d 724, 1998 WL 469176 (C.A.4 (Md.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 153 F.3d 724, 1998 WL 469176 (C.A.4 (Md.)))**

During the plea colloquy, the district court addressed Vaid personally and informed him that he had the right to plead not guilty but that if he pled guilty, the case would be over without a trial. Vaid stated that he understood. The court also reviewed the other rights Vaid was giving up by pleading guilty, and Vaid stated that he understood. The court summarized the superseding indictment, explained the maximum sentence on each count, and reviewed the possible effect of the sentencing guidelines, including that Vaid's conviction may affect his permanent resident alien status. Vaid stated that he understood.

Vaid informed the court that he was a high school graduate, was educated in the English language, and had no problem understanding the proceedings. Vaid also stated that he had never been treated for a mental illness nor had he taken narcotics, medicine, or alcohol in the past week. The court reiterated that there was no plea agreement in the case, "[a]nd there ha[ve] been no promises made." (J.A. at 71). Vaid stated that he understood. At the government's request, the court ensured that Vaid understood Gyani was not acting as an agent for the government when Gyani spoke to Vaid before the trial began.

*2 The court asked Vaid whether he committed the offenses charged in the superseding indictment, and Vaid said that he did. The government presented the evidence it would have produced at trial. Specifically, Vaid and Gyani operated the Costco Sales business and identified themselves as Larry Johnson and Harry Stevens, respectively, to other business owners in the shopping center. Costco Sales had no regular business hours, and Vaid and Gyani posted no prices on merchandise received from manufacturers of perfume and electronics and were not interested in making consumer sales. Rather, they faxed credit applications to the victim companies, misrepresenting their identities, the length of time the business had been open, and the business' credit history. Once they received credit, Vaid and Gyani placed small orders and paid for them. As the Christmas season approached, however, Vaid

and Gyani placed larger orders for merchandise, which Vaid paid for with company checks drawn on accounts with insufficient funds. When the merchandise was delivered to the store, Vaid and Gyani loaded the goods directly into a Ryder truck to sell elsewhere. At the conclusion of the government's recitation of facts, Vaid acknowledged that the government accurately summarized and could prove what had transpired.

The court then accepted Vaid's guilty plea, finding that Vaid understood his rights and that he "made a decision as to what [he] wish[ed] to do in this case ... facing a charge and facing a trial and facing a realistic appraisal of the outcome of the trial ... [and] that it is in [Vaid's] best interest to plead guilty[ ] and not go to trial." (J.A. at 86). Finally, the court found that a factual basis supported the plea.

On October 8, 1996, Vaid's counsel filed a motion to withdraw Vaid's guilty plea but did not state the grounds on which Vaid relied. The court summarily denied the motion. On October 22, Vaid moved for the second time to withdraw his plea, claiming that after he pled guilty, Gyani and a person named "Varma" told him they would testify at trial that Vaid was an employee of Costco who had no knowledge of, and did not participate in, the fraudulent scheme. The court applied the six-factor test set forth in *United States v. Moore,* 931 F.2d 245, 248 (4th Cir.1991), and denied the motion.

Before the sentencing hearing began, Vaid moved for a third time to withdraw his guilty plea. He claimed that Gyani coerced him into pleading guilty during their meeting before Vaid's trial was scheduled to begin. Vaid testified that the day after he entered his guilty plea, a witness named "Varma" contacted him and said that, pursuant to a subpoena from the government, he planned on telling the court the truth. The truth, according to Varma, was that Vaid only worked in the fraudulent scheme as a driver and that he took orders from Varma and Stevens. Vaid also claimed that the government had discovered that there was a "real" Harry Stevens for

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 F.3d 724, 1998 WL 469176 (C.A.4 (Md.))
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 153 F.3d 724, 1998 WL 469176 (C.A.4 (Md.)))

whom Gyani and Vaid allegedly worked and that the government planned a sting operation to apprehend Stevens. According to Vaid, the Federal Bureau of Investigation taped the conversation during which Stevens asked Gyani to hire Vaid as a driver in the operation.

*3 The district court denied Vaid's third motion to withdraw the guilty plea, finding that the Rule 11 colloquy was adequate. The court then sentenced Vaid to a thirty-three-month prison term and imposed three years of supervised release. Vaid timely appeals.

## II.

On appeal, Vaid first claims that the district court erred by denying his motion to substitute counsel where he repeatedly expressed dissatisfaction with the public defender. In determining whether to grant or deny a motion to substitute counsel, a district court must consider: "(1) whether the motion for substitute counsel was timely; (2) whether the district court's inquiry into the defendant's complaint was sufficient; and (3) whether the conflict between attorney and client was so great as to amount to a 'total lack of communication,' thereby preventing an adequate defense." *United States v. Morsley,* 64 F.3d 907, 918 (4th Cir.1995) (quoting *United States v. Hanley,* 974 F.2d 14, 17 (4th Cir.1992)). Our review of the district court's denial is for an abuse of discretion. *See United States v. Corporan-Cuevas,* 35 F.3d 953, 956 (4th Cir.1994).

Vaid's request for new counsel was not timely made, coming four days before Vaid's trial was scheduled to begin. Moreover, the district court explored at length Vaid's claim that he did not trust counsel to represent him and appointed special counsel to advise Vaid at the hearing and to review the evidence in the case. Finally, there is no evidence that the conflict between Vaid and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense. *See Morsley,* 64 F.3d at 918. On these facts, we find

that the district court did not abuse its discretion in denying Vaid's motion to substitute counsel. *See Corporan-Cuevas,* 35 F.3d at 956.

## III.

Vaid also contends that the district court violated Fed.R.Crim.P. 11(d), by failing to determine that his guilty plea was voluntary and not the result of force or threats or of promises not contained in a plea agreement. We accord great deference to the district court's "decision as to how best to conduct the [Rule 11] colloquy." *United States v. DeFusco,* 949 F.2d 114, 116 (4th Cir.1991).

Rule 11(d) requires the court to address the defendant personally to determine that the guilty plea is voluntary and is not the result of force or threats or of promises apart from a plea agreement. *See* Fed.R.Crim.P. 11(d); *DeFusco,* 949 F.2d at 119. A guilty plea must be "a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). The government acknowledges that during the plea hearing, the district court did not use the terms "threats" or "force." Compliance with Rule 11, however, is evaluated under a harmless error standard. *See DeFusco,* 949 F.2d at 117. We will vacate a conviction resulting from a guilty plea only if the trial court's violation of Rule 11 affected a defendant's substantial rights. *See id.*

*4 Our review of the record discloses that the district court fully discussed the nature and elements of the charges against Vaid, the applicable penalties he faced, including the effect of supervised release, and ensured that he consulted with and was satisfied with his counsel. The court also addressed the rights Vaid forfeited by virtue of his plea. Specifically, Vaid stated that he understood that he did not have to plead guilty, could proceed to trial, and no promises were made. The court also reviewed the impact of the sentencing guidelines and ascertained that there was a factual basis for the plea. Although

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 F.3d 724, 1998 WL 469176 (C.A.4 (Md.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 153 F.3d 724, 1998 WL 469176 (C.A.4 (Md.)))**

the district court did not explicitly find that Vaid's plea was voluntary and not the result of threats or force, the court found that Vaid decided to plead guilty in the face of ample evidence of his guilt. We therefore find that the district court's technical violation of Rule 11 was harmless error because the violation did not affect Vaid's substantial rights. FN*
*See id.* ----

> FN* We note that the cases on which Vaid relies to support his assertion that the district court's failure to comply with Rule 11(d) affected his substantial rights are factually distinguishable and do not convince us that the district court's omission was not harmless error.

### IV.

Next, Vaid asserts that the district court abused its discretion in denying his motions to withdraw his guilty plea. *See United States v. Wilson,* 81 F.3d 1300, 1305 (4th Cir.1996) (stating standard of review). Withdrawal of a guilty plea is not a matter of right. *See Moore,* 931 F.2d at 248. The defendant bears the burden of showing a "fair and just reason" for the withdrawal of his guilty plea. *See* Fed.R.Crim.P. 32(e); *United States v. Hyde,* 520 U.S. 670, 117 S.Ct. 1630, 137 L.Ed.2d 935, 65 U.S.L.W. 4369 (U.S. May 27, 1997) (No. 96-667). "[A]'fair and just' reason ... is one that essentially challenges ... the fairness of the [Fed.R.Crim.P.] 11 proceeding." *United States v. Lambey,* 974 F.2d 1389, 1394 (4th Cir.1992) (en banc). An appropriately conducted Rule 11 proceeding, however, raises a strong presumption that the guilty plea is final and binding. *See id.*

Courts consider six factors in determining whether to permit the withdrawal of a guilty plea: (1) whether defendant offered credible evidence that the plea was not knowing or voluntary; (2) whether defendant credibly asserted his legal innocence; (3) the length of delay between the entry of the plea and the filing of the motion to withdraw; (4) wheth-

er defendant had close assistance of effective counsel; (5) whether withdrawal would prejudice the government; and (6) whether withdrawal would inconvenience the court or waste judicial resources. *See Moore,* 931 F.2d at 248. The defendant carries the burden of establishing a fair and just reason for withdrawal, even if the government has not shown prejudice. *See Lambey,* 974 F.2d at 1393-94.

Consideration of the *Moore* factors weighs against Vaid. As discussed in Part III, Vaid failed to offer credible evidence that his plea was not voluntary, and the district court's technical violation of Rule 11 did not affect Vaid's substantial rights. Vaid made no credible assertion of innocence but rather admitted during the plea hearing that he was guilty of participating in the fraudulent scheme. Further, Vaid did not show that counsel's assistance was not effective. Finally, allowing Vaid to withdraw his plea in light of his admission of guilt may prejudice the government and would waste judicial resources. Although the delay between Vaid's plea and his first motion to withdraw was minimal, that does not outweigh the other factors. We therefore find that the district court did not abuse its discretion in denying Vaid's motions to withdraw his guilty plea. *See Wilson,* 81 F.3d at 1305.

### V.

*5 Finally, Vaid claims that the government withheld information in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose Varma's testimony and the existence of a "real" Harry Stevens. In *Brady,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87. We assume, without deciding, that Vaid's guilty plea does not foreclose him from raising his *Brady* claim.

We find no *Brady* violation here. Even if there was a "real" Harry Stevens, that does not exculpate

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

153 F.3d 724, 1998 WL 469176 (C.A.4 (Md.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 153 F.3d 724, 1998 WL 469176 (C.A.4 (Md.)))**

Vaid because Vaid and Gyani nevertheless misrepresented their identities on credit applications to the victim companies. As for the claim that Varma would testify that Vaid was merely a driver in the operation, Vaid provided no support for his claim. We therefore reject this claim as meritless.

VI.

Accordingly, we affirm Vaid's convictions. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED*

C.A.4 (Md.),1998.
U.S. v. Vaid
153 F.3d 724, 1998 WL 469176 (C.A.4 (Md.))

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

159 F.3d 1154, 98 Cal. Daily Op. Serv. 7359
**(Cite as: 159 F.3d 1154)**

United States Court of Appeals,
Ninth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carl Dexter MOORE, Defendant-Appellant.
**Nos. 92-10026, 97-15412.**

Argued and Submitted April 13, 1998.
Decided Sept. 23, 1998.

Following jury trial, defendant was convicted in the United States District Court for the Eastern District of California, William B. Shubb, J., of intent to distribute cocaine, and defendant's subsequent motion to vacate sentence was denied. Defendant appealed, and appeals were consolidated. The Court of Appeals, Fletcher, Circuit Judge, held that: (1) defendant's threat to sue defense counsel over counsel's handling of government's offer of plea bargain did not create actual conflict of interest, but (2) irreconcilable conflict between defendant and defense counsel resulted in denial of counsel.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Criminal Law 110 ☞1139**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
            110XXIV(L)13 Review De Novo
                110k1139 k. In General. Most Cited Cases
A claim of conflict of interest on the part of trial counsel is a mixed question of law and fact that Court of Appeals reviews de novo.

**[2] Criminal Law 110 ☞1780**

110 Criminal Law
    110XXXI Counsel
        110XXXI(B) Right of Defendant to Counsel
            110XXXI(B)6 Conflict of Interest
                110k1780 k. In General. Most Cited Cases
(Formerly 110k641.5(.5))
Criminal defendant has a right to conflict free representation under the Sixth Amendment. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law 110 ☞1789**

110 Criminal Law
    110XXXI Counsel
        110XXXI(B) Right of Defendant to Counsel
            110XXXI(B)6 Conflict of Interest
                110k1789 k. Presumptions and Burden of Proof. Most Cited Cases
(Formerly 110k641.5(.5))
To establish a Sixth Amendment violation based on counsel's alleged conflict of interest, defendant must show that an actual conflict of interest adversely affected his lawyer's performance; defendant must prove actual conflict, not just a possibility of conflict, through a factual showing on the record. U.S.C.A. Const.Amend. 6.

**[4] Criminal Law 110 ☞1789**

110 Criminal Law
    110XXXI Counsel
        110XXXI(B) Right of Defendant to Counsel
            110XXXI(B)6 Conflict of Interest
                110k1789 k. Presumptions and Burden of Proof. Most Cited Cases
(Formerly 110k641.5(.5))
Once defendant shows actual conflict of interest on part of counsel, prejudice is presumed, and, to establish Sixth Amendment violation, defendant need demonstrate only that some effect on counsel's handling of particular aspects of the trial was likely; if, however, there is only a possibility of conflict, defendant must meet the performance and prejudice standard of *Strickland.* U.S.C.A. Const.Amend. 6.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 1154, 98 Cal. Daily Op. Serv. 7359
**(Cite as: 159 F.3d 1154)**

**[5] Criminal Law 110 1790**

110 Criminal Law
    110XXXI Counsel
        110XXXI(B) Right of Defendant to Counsel
            110XXXI(B)6 Conflict of Interest
                110k1790 k. Advice, Inquiry, and Determination. Most Cited Cases
    (Formerly 110k641.5(.5))
District court did not err in accepting defense counsel's characterization of counsel's relationship with codefendant that counsel knew codefendant "in passing," despite defendant's claim that counsel had actual conflict of interest, absent any additional information at that time to suggest a conflict. U.S.C.A. Const.Amend. 6.

**[6] Criminal Law 110 1784**

110 Criminal Law
    110XXXI Counsel
        110XXXI(B) Right of Defendant to Counsel
            110XXXI(B)6 Conflict of Interest
                110k1782 Particular Cases or Situations
                    110k1784 k. Prejudice and Harm in Particular Cases or Situations. Most Cited Cases
    (Formerly 110k641.5(.5))
Defendant's threat to sue defense counsel over counsel's handling of government's offer of plea bargain did not create actual conflict of interest that would presumptively render counsel ineffective, where threat of malpractice suit never went beyond threat to file claim against counsel. U.S.C.A. Const.Amend. 6.

**[7] Criminal Law 110 1139**

110 Criminal Law
    110XXIV Review
        110XXIV(L) Scope of Review in General
            110XXIV(L)13 Review De Novo
                110k1139 k. In General. Most Cited Cases
Court of Appeals reviews de novo claim that defendant was denied his Sixth Amendment right to

counsel because of an irreconcilable conflict between defendant and counsel. U.S.C.A. Const.Amend. 6.

**[8] Criminal Law 110 1851**

110 Criminal Law
    110XXXI Counsel
        110XXXI(B) Right of Defendant to Counsel
            110XXXI(B)11 Deprivation or Allowance of Counsel
                110k1851 k. Prejudice and Presumptions. Most Cited Cases
    (Formerly 110k641.12(1))
A defendant need not show prejudice to establish violation of Sixth Amendment right to counsel, when the breakdown of a relationship between attorney and client from irreconcilable differences results in the complete denial of counsel. U.S.C.A. Const.Amend. 6.

**[9] Criminal Law 110 1825**

110 Criminal Law
    110XXXI Counsel
        110XXXI(B) Right of Defendant to Counsel
            110XXXI(B)9 Choice of Counsel
                110k1824 Discharge by Accused
                    110k1825 k. In General. Most Cited Cases
    (Formerly 110k641.10(2))
Although defendant is not entitled to a particular lawyer with whom he can, in his view, have a meaningful attorney-client relationship, the refusal to substitute new counsel violates defendant's Sixth Amendment right to effective assistance of counsel if the relationship between lawyer and client completely collapses. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law 110 1790**

110 Criminal Law
    110XXXI Counsel
        110XXXI(B) Right of Defendant to Counsel
            110XXXI(B)6 Conflict of Interest
                110k1790 k. Advice, Inquiry, and De-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 1154, 98 Cal. Daily Op. Serv. 7359
**(Cite as: 159 F.3d 1154)**

termination. Most Cited Cases
(Formerly 110k641.5(.5))
Factors to be considered in determining whether irreconcilable conflict between defendant and counsel amounts to total denial of counsel, in violation of Sixth Amendment, are the same as those used to determine if the district court erred in denying a motion to substitute counsel, and these factors are: (1) the extent of the conflict; (2) the adequacy of the inquiry; and (3) the timeliness of the motion. U.S.C.A. Const.Amend. 6.

**[11] Criminal Law 110 €══1828(1)**

110 Criminal Law
   110XXXI Counsel
      110XXXI(B) Right of Defendant to Counsel
         110XXXI(B)9 Choice of Counsel
            110k1824 Discharge by Accused
               110k1828 Particular Cases
                  110k1828(1) k. In General. Most Cited Cases
(Formerly 110k641.10(2))
Irreconcilable conflict existed between defendant and defense counsel, such that defendant was denied counsel in violation of Sixth Amendment, in view of breakdown in attorney-client relationship, district court's inadequate inquiry into differences between defendant and counsel and willingness to substitute counsel only if counsel or defendant could arrange new counsel in time for trial, and defendant's multiple, timely attempts to substitute counsel. U.S.C.A. Const.Amend. 6.

**[12] Criminal Law 110 €══1829**

110 Criminal Law
   110XXXI Counsel
      110XXXI(B) Right of Defendant to Counsel
         110XXXI(B)9 Choice of Counsel
            110k1824 Discharge by Accused
               110k1829 k. Time for Motion. Most Cited Cases
(Formerly 110k641.10(2))
In evaluating the timeliness of defendant's motion for substitution of counsel, on claim that irreconcil-

able conflict between defendant and defense counsel amounted to total denial of counsel, Court of Appeals balances the resulting inconvenience and delay against the defendant's important constitutional right to counsel of his choice. U.S.C.A. Const.Amend. 6.

**\*1155** Michael Bradley Bigelow, Sacramento, CA, for defendant-appellant.

Christopher A. Nuechterlein, Assistant United States Attorney, Sacramento, CA, for plaintiff-appellee.

Appeals from the United States District Court for the Eastern District of California; William B. Shubb, District Judge, Presiding. D.C. Nos. CR-90-00117-WBS, CV-93-00795-WBS.

Before: FLETCHER, D.W. NELSON and BEEZER, Circuit Judges.

FLETCHER, Circuit Judge:

Carl Dexter Moore ("Moore") challenges his conviction for conspiring to distribute cocaine and possession of cocaine with intent to distribute, and his sentence of 30 years. Moore claims (1) that his trial counsel, Philip Cozens, had an actual conflict of interest because of Cozens' relationship with Moore's codefendant Kimbel LeMaux; and (2) that there was an irreconcilable conflict between Moore and his attorney, Cozens, that denied Moore his Sixth Amendment right to counsel.[FN1]

> FN1. Moore presents four additional claims that we need not address given our decision: (1) that the district court failed to inquire about the conflict and abused its discretion in not substituting counsel; (2) that Cozens failed to keep him informed of his plea bargaining negotiations and failed to pursue properly Moore's defense thus rendering ineffective assistance of counsel; (3) that the district court erred in not giving a specific unanimity instruction to the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 1154, 98 Cal. Daily Op. Serv. 7359
(Cite as: 159 F.3d 1154)

jury; and (4) that the district court erred in not granting him an evidentiary hearing on habeas review. We do not reach the merits of these claims. We are reversing and remanding the case because we hold that an irreconcilable conflict existed between Moore and Cozens.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This court has jurisdiction pursuant to 28 U.S.C. § 1291 and § 2255. Although we do not find sufficient evidence of an actual conflict of interest, we find that Moore had an irreconcilable conflict with Cozens that denied Moore his Sixth Amendment right to counsel, and reverse and remand for a new trial.

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

Between 1982 and 1987, codefendant Kimbel LeMaux operated a criminal enterprise for the purchase and distribution of cocaine and marijuana throughout Northern California. Associated with LeMaux's enterprise were Moore, John-John Moore ("John-John"), Dennis O'Brien, Jerry Silva, and Tom D'Anna. Silva and D'Anna were among LeMaux's principal distributors. Moore was *1156 LeMaux's debt collector, enforcer, and one of his drug distributors. Between 1983 and 1985, Moore and O'Brien would go two to three times a week to collect LeMaux's drug money, frequently using violence to collect the debts. In 1983, Moore got his son, John-John, involved in LeMaux's drug operations doing distributions and collections. John-John continued to work for LeMaux until 1987.

While extensive evidence links Moore to LeMaux's operation from 1982 until 1985, Moore disputes that he was involved in the conspiracy after April of 1985. The applicable statute of limitations bars prosecution for activities occurring prior to April, 1985. However, the testimony of Teacia Opperman that Moore, Vega and others met frequently at Silva's residence after April of 1985, where they

either discussed or engaged in drug transactions, weighs against Moore's claim of withdrawal. Opperman also testified that in late 1987, Moore went to Silva's and informed him that cocaine deliveries would be discontinued because of Moore's fears that they were under investigation and that Moore's deliveries to Silva subsequently slowed and eventually stopped.

In September of 1990, the government filed a superceding indictment charging Moore and eleven codefendants with three counts: count one charged all defendants with intent to distribute cocaine from July 1984 to June 1988 in violation of 21 U.S.C. §§ 841(a)(1) & 846; count two charged Kimbel LeMaux alone with conducting a continuing criminal enterprise; count three charged Moore, LeMaux, Ingrid, and John-John with conspiracy to collect extensions of credit by extortion.

On four separate occasions before trial, Moore, in person or through Cozens, informed the district court that he could not communicate with Cozens and that he was dissatisfied with Cozens' investigations and preparations. The district court refused to order substitution of counsel but agreed to allow substitution if Moore could find an attorney that could be ready by the scheduled trial date. Moore was unable to secure a substitute and went to trial with Cozens as his attorney. The jury convicted Moore on count one, intent to distribute cocaine, but acquitted on count three, conspiracy to collect extensions of credit by extortion.

As part of his motion for a new trial in June 1991, Moore again informed the district court that he was dissatisfied with Cozens' performance for failing to present a withdrawal defense and that Cozens had a conflict of interest in the case because of his relationship with Moore's codefendant, LeMaux. The district court put over the issue until July of 1991. In July, the district court determined that it was inappropriate to argue ineffective assistance of counsel in a new trial motion, stating that the appropriate means to challenge counsel's representation is pursuant to 28 U.S.C. § 2255. The district court

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 1154, 98 Cal. Daily Op. Serv. 7359
**(Cite as: 159 F.3d 1154)**

then denied Moore's new trial motion but without prejudice to Moore's right to raise the issue by way of a § 2255 petition. Before sentencing, the district court again gave Moore the option of representation by new counsel but declined to extend any extra time to allow new counsel to prepare for sentencing. The district court strongly advised Moore to retain Cozens. Moore again protested Cozens' failure to present the withdrawal defense but followed the advice of the district court and retained Cozens for sentencing. Moore received a 30-year sentence on November 8, 1991. The sentence was pursuant to pre-guidelines law because the district court found that Moore's criminal activities had ended by November 1, 1987.

Following the filing of Moore's Notice of Appeal, we granted a limited remand, enabling the district court to entertain a 28 U.S.C. § 2255 petition before we reviewed Moore's direct appeal. Moore filed an initial § 2255 petition alleging that he was denied his constitutional right to testify at trial and that he was denied effective assistance of counsel.[FN2] Following withdrawal of his appellate counsel, Moore was permitted to file a pro se supplemental § 2255 petition in June of 1996, in which he added an allegation that *1157 Cozens had a conflict of interest that denied him effective assistance of counsel.

> FN2. Moore alleged that Cozens failed to investigate adequately and present Moore's withdrawal defense, failed to communicate to Moore a written plea offer, failed to file a motion to sever, and advised Moore that he had no right to testify.

The district court denied Moore an evidentiary hearing on his § 2255 petition and denied him relief on his claims. Specifically, the district court found that Moore was not denied his right to testify and that he received effective assistance of counsel. Moore's direct appeal and his appeal from denial of his § 2255 petition are consolidated before this court.

## ANALYSIS

### I. Conflict of Interest

[1] Moore claims that an actual conflict of interest adversely affected Cozens' performance. A claim of conflict of interest on the part of trial counsel is a mixed question of law and fact that we review de novo. *See Garcia v. Bunnell,* 33 F.3d 1193, 1195 (9th Cir.1994).

[2][3][4] Moore has a right to conflict free representation under the Sixth Amendment. *See id.* To establish a Sixth Amendment violation, Moore must show "that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 1198 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). Moore must prove actual conflict, not just a possibility of conflict, "through a factual showing on the record." *Morris v. California,* 966 F.2d 448, 455 (9th Cir.1991). Once an actual conflict is shown, Moore need demonstrate only "that some effect on counsel's handling of particular aspects of the trial was 'likely.' " *United States v. Miskinis,* 966 F.2d 1263, 1268 (9th Cir.1992). Prejudice is presumed. *Id.* If, however, there is only a possibility of conflict, Moore must meet the "performance and prejudice" standard of *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Miskinis,* 966 F.2d at 1268.

Moore presents two sources of the actual conflict of interest between himself and Cozens-Cozens' relationship with Moore's codefendant, LeMaux, and Moore's threat to sue Cozens over Cozens' handling of the plea bargain. Moore's first claim is that Cozens had loyalties to LeMaux that were in conflict with Cozens' duty to Moore since Moore wanted to pursue a withdrawal defense that would have undermined LeMaux's defense that the conspiracy never happened. Given the conflict between the two defenses, proof of Cozens' loyalty to LeMaux would establish an actual conflict of interest between Cozens and Moore.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 1154, 98 Cal. Daily Op. Serv. 7359
**(Cite as: 159 F.3d 1154)**

In a pretrial proceeding, Cozens told the district court that he knew LeMaux "in passing" but that he did not find himself conflicted in this case. On appeal, Moore argues that Cozens had a much closer relationship to LeMaux than he admitted to the district court. Although not presented before the district court, we now know that Cozens' "in passing" relationship stems from his living next door to LeMaux for approximately 8 to 10 months. Further, Moore claims that Cozens told him that "he [Cozens] and Kimbel LeMaux had 'wined and dined' together during the course of the trial" and that when they were neighbors "LeMaux had offered [Cozens] the use of a spare bedroom in LeMaux's home as a 'hideout,' and the use of a shotgun for Cozens' defense of his own home."

[5] If true, these statements evidence a stronger relationship between Cozens and LeMaux than Cozens represented to the district court in pretrial proceedings. Presumably relying on Cozens' claim that he only knew LeMaux "in passing," the district court found, without further inquiry, that there was no conflict in Cozens' representation. Although at that time there was insufficient evidence before the district court to establish an actual conflict of interest, the district court's failure to inquire further is troubling. However, since there was no additional information at that time to suggest a conflict, the district court did not err in accepting Cozens' characterization of his relationship with LeMaux. Nor do we find sufficient evidence in the record before us to sustain Moore's allegation of an actual conflict of interest. An evidentiary hearing is in order, however, as we are ordering a new trial based on an irreconcilable conflict between Moore and Cozens, there is no need to remand for an evidentiary hearing to resolve this issue.

*1158 [6] Moore's next claim of conflict stems from Cozens' handling of the plea bargain offered by the government. The government conditioned its offer on Moore's acceptance by the close of business on January 3, 1991. Moore had countered the government's offer requesting absolute immunity

for himself and his son. Cozens failed to advise Moore before the deadline that the government had rejected his counter offer or that Moore's son, John-John, had accepted the plea agreement. In fact it was not until January 4, 1991, that he met with Moore. Moore was enraged by Cozens' failure to keep him informed and threatened to sue Cozens for malpractice.

Moore now claims that his threat of a lawsuit created an actual conflict of interest with Cozens. Moore relies on *Douglas v. United States,* 488 A.2d 121 (D.C.App.1985), and *United States v. Hurt,* 543 F.2d 162 (D.C.Cir.1976), for the proposition that a lawsuit between defendant and counsel creates an actual conflict of interest under *Cuyler.* Cozens echoed Moore's concern during a hearing regarding Moore's request for substitution of counsel claiming Cozens had an actual conflict of interest along the lines of *Hurt* because of Moore's threat. The district court found no actual conflict because Moore's threat to sue Cozens' for ineffective assistance was not inconsistent with Cozens' goal of rendering effective assistance. We agree.

Although a lawsuit between defendant and counsel can potentially create an actual conflict of interest, we do not find that Moore's threat actually resulted in a conflict in this case. Unlike in *Douglas* and *Hurt,* Moore's threat of a malpractice suit never went beyond the threat to file a claim against Cozens. Despite Moore's assurances that he had a valid claim for malpractice, finding an actual conflict from a mere threat would allow defendants to manufacture a conflict in any case. We decline to adopt such an unbounded rule. While Moore's threat is evidence of the breakdown of the attorney-client relationship, we agree with the district court that it was insufficient to create an actual conflict of interest.

## II. Irreconcilable Conflict

[7][8][9][10] Moore claims that he was denied his Sixth Amendment right to counsel because of an ir-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 1154, 98 Cal. Daily Op. Serv. 7359
**(Cite as: 159 F.3d 1154)**

reconcilable conflict between himself and Cozens. We review de novo a claim of denial of counsel. *See Frazer v. United States,* 18 F.3d 778, 781 (9th Cir.1994). Although Moore's counsel does not distinguish between conflict of interest (the existence of competing interests potentially affecting counsel's capacity to give undivided loyalty to his client's interests-a *Cuyler* claim) and irreconcilable conflict between client and lawyer (a *Frazer* claim), we view the allegations essentially as assertions of the latter. A defendant need not show prejudice when the breakdown of a relationship between attorney and client from irreconcilable differences results in the complete denial of counsel. *See Frazer,* 18 F.3d at 785 (attorney verbally assaulted defendant with racial epithets); *Tucker v. Day,* 969 F.2d 155, 159 (5th Cir.1992) (attorney merely "stood in" during sentencing); *United States v. Williams,* 594 F.2d 1258, 1260 (9th Cir.1979) (attorney-client relationship so bad that defendant elected to proceed pro se). Although Moore is not entitled to a particular lawyer with whom he can, in his view, have a "meaningful attorney-client relationship," *Morris v. Slappy,* 461 U.S. 1, 3-4, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983), if the relationship between lawyer and client completely collapses, the refusal to substitute new counsel violates Moore's Sixth Amendment right to effective assistance of counsel, *Brown v. Craven,* 424 F.2d 1166, 1170 (9th Cir.1970). The factors we consider are the same as those we apply to determine if the district court erred in denying a motion to substitute counsel.[FN3] These factors are: (1) the extent of the conflict; (2) the adequacy of the inquiry; and (3) *1159 the timeliness of the motion. We find all three factors weigh in favor of our finding that an irreconcilable conflict existed between Moore and Cozens.

> FN3. Moore also claims that the district court abused its discretion in not substituting counsel. We apply the same test for assessing whether the district court erred in failing to substitute counsel as we do in evaluating whether an irreconcilable con-

flict exists. *Compare United States v. D'Amore,* 56 F.3d 1202, 1204-05 (9th Cir.1995), *with United States v. McClendon,* 782 F.2d 785, 789 (9th Cir.1986). Since we find that an irreconcilable conflict existed and remand for a new trial, it goes without saying that new counsel should have been substituted.

## A. Extent of Conflict

[11] Moore describes his relationship with Cozens as one clouded by "an atmosphere of mistrust, misgivings and irreconcilable differences" resulting from claims of conflicting interests, ineffective assistance, and a breakdown of the attorney-client relationship. The breakdown of Moore's relationship with Cozens began with Cozens' failure to inform Moore timely of the government's rejection of Moore's counter offer to the government. In the January 4th meeting, Moore and Cozens had a "serious argument" over Cozens' handling of the case. Moore was enraged at Cozens' failure to inform him that John-John had taken the plea offer and at Cozens' failure to meet with him before the plea offer had expired. Moore was also upset over what he perceived to be Cozens' failure to investigate and his inadequate preparation for trial generally. During the meeting, Moore threatened to sue Cozens for malpractice. Also Cozens testified that, on that occasion, he felt physically threatened by Moore. The January 4th argument was serious enough that on January 8, 1991, Cozens, at the request of Moore, moved to be relieved as counsel and to be replaced by James Dremann. Moore told the court:

"I asked Mr. Cozens, sir, what he had done for me, how many papers that he had filed, and Mr. Cozens informed me that he had interviewed my son and one other witness. That he had filed no papers for me. So Mr. Cozens has done absolutely nothing in 60 some odd days."

On January 9, 1991, the district court agreed to re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 1154, 98 Cal. Daily Op. Serv. 7359
(Cite as: 159 F.3d 1154)

lieve Cozens if Dremann, as substitute counsel, could be ready for the February 5th trial date. On January 14, 1991, Cozens informed the court that Dremann had a conflict of interest and could not represent Moore. On January 16, 1991, the district court again addressed the conflict between Moore and Cozens. Cozens testified about his January 4th meeting, noting that Moore had threatened to sue him and that he felt apprehension of physical harm at the time. Moore then testified that he and Cozens "don't have any communication at all" and related Cozens' failure to keep him apprised of the plea bargaining negotiations. Moore claimed that he was denied an opportunity to review the proposed plea bargain because Cozens would not read it to him when in jail and that Cozens did not have his "best interest at heart." Moore explained that Cozens admitted to having done nothing but interview Moore's son in the prior 68 days. As a result, Moore testified that he had threatened to sue Cozens saying to him: "I know how to fix you, you son of a bitch. I'll sue you for malpractice because I happen to know a little something, buddy. If I sue you for malpractice, they will raise your insurance so high you'll go back to washing cars." Moore related to the court Cozens' failure to inform Moore of a problem with his doctor bills to further illustrate the lack of communication between them. The district court was unsympathetic to Moore's request but offered to substitute counsel if new counsel could be found and be ready by the February 5th trial date. That failing, the court refused to order substitution.

On February 5th, Moore, Cozens, and the district court again met to discuss a letter sent by Moore that further expressed his dissatisfaction with Cozens' representation. The court again renewed its offer to allow substitute counsel if one could be prepared by the new trial date, two and a half weeks away. Cozens related that he and Moore continued to disagree about what to do in the case and that communication between them was sometimes difficult.

In consistent, persistent representations to the court, Moore presented strong evidence of an irreconcilable conflict. In *Brown,* we found sufficient conflict when a defendant "was forced into a trial with the assistance of a particular lawyer with whom he was dissatisfied, with whom he would not cooperate, and with whom he would not, in any manner whatsoever, communicate." 424 F.2d at 1169. Similarly, in *Williams,* we found sufficient conflict where the "client-attorney relationship had been a stormy one with quarrels,*1160 bad language, threats, and counter-threats." 594 F.2d at 1260. The testimony of both Moore and Cozens demonstrate a similar breakdown in the attorney-client relationship.[FN4]

> FN4. In addition, Moore claims that the district court exacerbated the conflict through its questioning of Moore and Cozens and by inviting Cozens to contradict Moore's account of their argument. *See United States v. Gonzalez,* 113 F.3d 1026, 1029 (9th Cir.1997) (finding that a district court created a conflict of interest by questioning that attorney and defendant in open court about their conflict). Moore also relies on *United States v. Wadsworth,* 830 F.2d 1500, 1510-11 (9th Cir.1987), for the proposition that an attorney's antagonistic position toward a defendant's request for substitution of counsel violates his Sixth Amendment right to effective assistance of counsel.

> Although we conclude that an irreconcilable conflict existed, we reject Moore's reliance on *Gonzalez* and *Wadsworth.* In *Gonzalez,* the district court questioned the attorney "in open court with Gonzalez present." 113 F.3d at 1029. Here, the district court questioned Moore and Cozens in camera excluding government counsel. Applying *Gonzalez* to an in camera proceeding without opposing counsel present would eliminate the ability of the district court to inquire into the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 1154, 98 Cal. Daily Op. Serv. 7359
(Cite as: 159 F.3d 1154)

nature of an attorney-client dispute without creating a conflict that would then require substitution-effectively creating a de facto substitution requirement for all conflicts. With respect to *Wadsworth,* Moore is not similarly situated. Cozens did not oppose Moore's position but rather he supported it. Moore wanted new counsel and Cozens argued that he was entitled to substitute counsel, even to the point of warning the court that failure to substitute would violate Moore's Sixth Amendment rights.

We conclude that an irreconcilable conflict existed between Moore and Cozens, and that it rose to the level of breakdown described in *Brown,* 424 F.2d at 1169, and *Williams,* 594 F.2d at 1260.

B. Adequacy of Inquiry

In spite of the conflict, the district court did not find any "indication that there [was] any breakdown or inability to defend [Moore]." Instead, the district court encouraged Moore and Cozens "to bury the hatchet here, sit down and establish a working relationship." Other than allowing Cozens and Moore to express their disagreements, the court failed to question either Cozens or Moore privately and in depth.

The district court's inquiry into the irreconcilable differences between Moore and Cozens was minimal. On three occasions, January 8th, 9th and 14th, the irreconcilable difference issue was raised before the court. It was willing to substitute counsel at the request of Moore but only if substitute counsel could be ready, at first, by the February 5th trial date. The court made no inquiry until the January 16th in camera hearing.

On January 16th, Cozens again related that he had a conflict of interest with Moore stating, "it seems to me that if Mr. Moore is forced to go to trial now with me as his attorney, that he will be denied a

fundamental right; that is, to have counsel, effective, a zealous counsel." In this hearing, Cozens warned the court that failure to replace him would be a violation of Moore's Sixth Amendment right to counsel. The court then dismissed the government in order to conduct an in camera hearing to address Cozens' conflict of interest and the breakdown of the attorney-client relationship.

Once in camera, without the government present, Cozens related that he was conflicted because Moore had threatened to sue him and had physically threatened him. Moore then related his inability to communicate with Cozens and Cozens' ineffectiveness in handling the plea bargain. The court did give both parties a chance to speak and made limited inquires to clarify what was said. However, the court made no inquiries to help it understand the extent of the breakdown. For example, when Moore related Cozens' failure to communicate the plea bargain, the court stated "I don't know the facts, Mr. Moore, as to when Cozens got it or what efforts he made to get it to you, and I can't speculate on that." The court was wrong, these facts are highly relevant to the existence and extent of conflict between Cozens and Moore, and the court had a duty to make further inquiries. The court seemed above all to be determined not to disturb its trial schedule, evidenced by the court's willingness to substitute counsel only if Cozens or Moore could arrange new counsel in time for trial. Although worded as if Moore had a choice, the terms imposed by the court essentially *1161 forced Moore to continue with Cozens as his attorney.

Finally, on February 5th, after receiving a letter from Moore detailing the conflict between Moore and Cozens, the district court held another in camera hearing. The ensuing discussion among Moore, Cozens, and the court revealed Moore's continued dissatisfaction with Cozens' performance and investigation. In response, the court renewed its offer to substitute counsel if the substitution would not disturb the trial date now scheduled two weeks hence but again refused to order substitution. In this

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 1154, 98 Cal. Daily Op. Serv. 7359
**(Cite as: 159 F.3d 1154)**

hearing, the court made more extensive inquiries into the nature of the dispute and, as a result, appointed a paralegal and an investigator to assist Cozens. Here, the court made specific inquiries as to the conflicts between Moore and Cozens. And to the extent those inquiries allowed Moore and Cozens to air their disagreements, the court sought at last to understand them and to ameliorate them, but its efforts were at bottom geared towards forcing the parties to meet the trial schedule. The court's inquiry is comparable to the inquiry we found inadequate in *D'Amore,* 56 F.3d at 1205. In *D'Amore,* we noted that the district court (1) did not inquire into how long a continuance would be needed for new counsel; (2) made no attempt to gauge the inconvenience caused by such a delay; (3) did not question the attorney or defendant as to the degree that their animosity prevented adequate preparation; and (4) did not ask why the motion had not been made earlier. *Id.* Each of these criticisms applies with equal force to the district court's inquiry into Moore and Cozens' conflict.

C. Timeliness

[12] In evaluating the timeliness of Moore's motion for substitution of counsel, we balance "the resulting inconvenience and delay against the defendant's important constitutional right to counsel of his choice." *D'Amore,* 56 F.3d at 1206. In *D'Amore,* we found a motion on the eve of his hearing timely because the defendant had attempted to contact the court ten days before his hearing. *Id.* at 1206.

Moore made multiple attempts to substitute counsel, the first attempts, in January, were over a month before the start of the trial (the trial was initially scheduled for February then was moved out approximately two and a half weeks). His last attempt, on February 5th, was still over two weeks before the start of trial. We find both motions timely. The district court acknowledged as much by offering substitution if Moore or Cozens could find substitute counsel that could be ready in time for the trial. We are not persuaded by the court's claim that none of the requests were timely because all would have required a continuance. In *United States v. Walker,* 915 F.2d 480, 482 (9th Cir.1990), we held that a district court has discretion to deny motions to substitute on the eve of trial that would require a continuance. Moore's efforts supported by Cozens came well before the eve of trial.

Weighing all of the factors, we find an irreconcilable conflict existed between Moore and Cozens. An irreconcilable conflict undermines confidence in trial proceedings and is reversible error. We reverse and remand to the district court for a new trial.

CONCLUSION

The decision of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for a new trial.

C.A.9 (Cal.),1998.
U.S. v. Moore
159 F.3d 1154, 98 Cal. Daily Op. Serv. 7359

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
(Cite as: 2000 WL 1847608 (N.D.Ill.))

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
Mitchell BOGDAN, Plaintiff,
v.
Jerry R. EGGERS, Star # 15548, et al., Defendants.
Laura BARR-CARR, Plaintiff,
v.
Jerry R. EGGERS, Star # 15548, et al., Defendants.
**Nos. 96 C 1609, 96 C 1611.**

Dec. 14, 2000.

*MEMORANDUM OPINION AND ORDER*

KEYS, Magistrate J.

*1 This matter is before the Court on Defendant City of Chicago's ("City") and Defendants Angel Perez and Renee Kalinowski's FN1 Motion to Dismiss and for Fees and Costs Pursuant to Rule 11 of the Federal Rules of Civil Procedure. Plaintiffs Mitchell Bogdan and Laura Barr-Carr allege various civil rights violations against two Chicago police officers, the City of Chicago, and the operator of a service station.FN2 Because the Court finds that Plaintiffs brought this case for an improper purpose, and, in fact, concocted this litigation, the Court grants Defendants' Motion to Dismiss and awards Defendants their fees and costs.

> FN1. Defendant Jerry R. Eggers died in an automobile accident on December 2, 1999. Consequently, Defendants filed a Rule 25 Motion to dismiss Mr. Eggers as a party. Because Plaintiffs did not timely move to substitute parties, on September 14, 2000, the Court dismissed Mr. Eggers as a party to this litigation.

> FN2. On October 10, 1999, the Court dismissed Plaintiffs' Section 1983 claim

against the City. Additionally, on July 11, 2000, the Court dismissed the operator of the service station as a Defendant in this litigation. Consequently, the present case is against Officers Angel Perez and Renee Kalinowski (and the City if it is found vicariously liable). (Officer Perez is only implicated in Mr. Bogdan's Complaint.)

*BACKGROUND*

Because of the drastic Rule 11 sanction imposed in this case (*e .g.,* dismissal and awarding of fees and costs), an extensive narrative of the facts is warranted. *See Insurance Benefit Administrators, Inc. v. Martin,* No. 84 C 10355, 1989 WL 157722, at *3 (N.D.Ill.Dec. 18, 1989) ("Determining the appropriateness of Rule 11 sanctions is a fact intensive inquiry ...") (citation omitted).

A. Plaintiffs' Allegations of Police Misconduct.

On March 20, 1995, Plaintiff Ms. Barr-Carr accompanied Plaintiff Mr. Bogdan to the Citgo Service Station at 5200 West Addison St. in Chicago, Illinois ostensibly to learn the identity of a witness to Mr. Bogdan's earlier arrest at that station on October 19, 1994. During their pursuit of this supposed witness, Ms. Barr-Carr allegedly identified herself to the Citgo station manager as a member of the Chicago Police Department's Office of Professional Standards ("OPS"). After Ms. Barr-Carr refused to produce identification, the station manager called 911 and Officers Eggers and Kalinowski responded to the scene. Although Ms. Barr-Carr informed these officers that she was from OPS, she, again, refused to produce identification. Consequently, Officers Eggers and Kalinowski arrested both Plaintiffs, transported them to the 25th District police station, and charged them with impersonating police officers.

According to Ms. Barr-Carr and Mr. Bogdan, at

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
(Cite as: 2000 WL 1847608 (N.D.Ill.))

their March 20th arrest at the Citgo station, the police officers exerted excessive force, without provocation. Ms. Barr-Carr also maintains that she was ultimately strip searched at the 25th District. In their respective Complaints (which were consolidated), Plaintiffs allege assault, battery, excessive force, conspiracy, false arrest, and malicious prosecution stemming from their March 20th arrest at the Citgo station.

On July 6, 1995, Plaintiffs failed to appear in a timely manner for their hearing (dealing with the charges stemming from the March 20th incident) at the Cook County Circuit Court located at 13th Street and Michigan Avenue. As a result, the judge issued a bond forfeiture warrant and dismissed the officers. As the Defendant officers were leaving the courthouse, they encountered Plaintiffs, and advised them to hurry to the courtroom to speak with the judge. Two of the officers accompanied Plaintiffs in the elevator to the courtroom. According to Ms. Barr-Carr, Officer Kalinowski and another officer forcibly pulled her and Mr. Bogdan into the elevator, called her a "smart-ass nigger", and ultimately paraded them into the courtroom. Ms. Barr-Carr maintains that these incidents were observed by many people, including one witness, Mr. Kelly Ofoma,[FN3] who gave her his name and address. Plaintiffs allege this incident as an additional false arrest claim.

> FN3. Ms. Barr-Carr initially implied in her deposition (and to her lawyers at Seyfarth Shaw Fairweather & Geraldson) that she had not previously known Mr. Ofoma and that he randomly, and voluntarily, came up to her at the courthouse and said that he would be a witness to her alleged abuse by the officers. As explained in more detail *supra*, however, Ms. Barr-Carr had, in fact, previously known Mr. Ofoma, who had dated her sister and had lived in her mother's house in 1995.

B. The Appointment of Attorneys from Seyfarth

Shaw Fairweather & Geraldson to Represent Ms. Barr-Carr.

*2 Ms. Barr-Carr has had at least three sets of attorneys who have all withdrawn from her case. Although Ms. Barr-Carr initially filed her Complaint *pro se,* she retained counsel, who filed their appearances on May 8, 1996, and filed an Amended Complaint on July 16, 1996. On September 10, 1996, Ms. Barr-Carr's first set of attorneys filed a motion to withdraw, citing disagreements with Ms. Barr-Carr regarding litigation strategy and, on September 27, 1996, Ms. Barr-Carr filed a motion for appointment of new counsel. On September 30, 1996, Ms. Barr-Carr's attorneys' motion to withdraw was granted. On February 10, 1997, Ms. Barr-Carr renewed her motion for appointment of new counsel and, on March 24, 1997, counsel from Seyfarth Shaw Fairweather & Geraldson ("Seyfarth Shaw") filed their appearance on behalf of Ms. Barr-Carr pursuant to their appointment by the Court on February 27, 1997.

Counsel from Seyfarth Shaw diligently propounded and answered discovery, took and defended numerous depositions and filed a motion to compel discovery and a final pre-trial order. Seyfarth Shaw spent thousands of dollars of its own resources investigating and preparing Ms. Barr-Carr's case, which was set for trial on November 8, 1999. However, on October 13, 1999, counsel at Seyfarth Shaw sought to be relieved of their February 27, 1997 appointment as Ms. Barr-Carr's counsel on the basis that they had recently received information which had caused them to seriously question their ability to continue to vigorously represent Ms. Barr-Carr consistent with their ethical obligations. Because of the sensitive nature of this issue (involving attorney-client and work product privileged information), on October 20, 1999, this Court conducted an ex parte, on the record, hearing with Ms. Barr-Carr and her attorneys. The tape recording of the hearing and privileged documents tendered to the Court by counsel were, at that time, placed under seal.[FN4]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
**(Cite as: 2000 WL 1847608 (N.D.Ill.))**

> FN4. The in-office notes and memoranda of Seyfarth Shaw counsel regarding their investigation, conversations with Ms. Barr-Carr and others and their mental impressions derived therefrom, were initially protected from disclosure by both the attorney-client privilege and work product doctrine.

However, on September 12, 2000, this Court, finding that the attorney-client and work product privileges were outweighed by the potential fraud on the Court and abuse of the judicial process, and in the interests of justice, ordered the unsealing of the evidence and documentation adduced at the October 20, 1999 hearing, and directed that the audio tape of the hearing be unsealed and transcribed. The present motion before the Court, arguing that Plaintiffs concocted this litigation, is largely based on information derived from Seyfarth Shaw's investigation of Ms. Barr-Carr's allegations.

**C. Seyfarth Shaw's Investigation (Unsealed)**

On October 5, 1999, Noah Finkel, an attorney at Seyfarth Shaw, prepared a memorandum (which has been unsealed) describing his pretrial investigation of Ms. Barr-Carr's claims of police brutality. The following facts are relayed in this memorandum:

According to Mr. Finkel, Mr. Ofoma, whom Ms. Barr-Carr identified as a witness to the alleged July 6th courthouse incident, told Mr. Finkel, in no uncertain terms, that (1) he was not at the 13th and Michigan courthouse on July 6th, and in fact, had never been to that courthouse; (2) he knew Ms. Barr-Carr [FN5] because he had previously dated her sister and had lived with Ms. Barr-Carr's mother-not because he had observed an incident on July 6th; and (3) on March 21, 1995, Ms. Barr-Carr and Mr. Bogdan had arrived at the McClerking residence (where Mr. Ofoma was living) and informed Ms. Barr-Carr's mother, Ms. Barr-Carr's sister, Jacqueline, and Mr. Ofoma, that she and Mr. Bogdan

had been arrested the previous night and, while not hurt, she was going to the hospital anyway so that she could sue the police officers.

> FN5. Mr. Ofoma, actually, did not know a Laura Barr-Carr but knew a Laura McClerking, because he had dated her sister, Jacqueline McClerking. McClerking is Laura's step father's name, and is the same person as Laura Barr-Carr.

*3 Mr. Ofoma also told Mr. Finkel that Ms. Barr-Carr had asked him, on more than one occasion, to testify for her in her police brutality case, but that he had refused, saying that he had not witnessed anything, and therefore, would not lie. According to Mr. Ofoma, Ms. Barr-Carr had responded that he should lie for her because he was dating her sister, and that, if he got some of his friends to testify that they had witnessed the March 20, 1995 incident, then she would give them a portion of her winnings. Ms. Barr-Carr also told Mr. Ofoma that she was planning on getting some people from the "projects" to testify for her. Additionally, Mr. Ofoma informed Mr. Finkel that Mr. Bogdan-who at some point had called Mr. Ofoma-was afraid of Ms. Barr-Carr, did everything she said, was afraid to "cross her", and that Ms. Barr-Carr had convinced him to file a suit against the officers. Finally, Mr. Ofoma warned Mr. Finkel that he should not involve himself in Ms. Barr-Carr's case because he could lose his license.

After speaking with Mr. Ofoma, Mr. Finkel called Ms. Barr-Carr's mother to corroborate either Mr. Ofoma or Ms. Barr-Carr's version of events. Ms. Barr-Carr's mother, however, refused to speak with Mr. Finkel, saying that her daughter could take care of herself. Mr. Finkel then spoke to Ms. Barr-Carr to inform her that Mr. Ofoma, her own witness, had contradicted her version of events, and, moreover, had implied that she was concocting this litigation. Ms. Barr-Carr, then, admitted that she had known Mr. Ofoma before their "chance" meeting at the courthouse, because he had worked with a friend of hers, "or something like that." When Mr. Finkel in-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
(Cite as: 2000 WL 1847608 (N.D.Ill.))

formed Ms. Barr-Carr that Mr. Ofoma had said that he was not at the courthouse on July 6, 1995, and, indeed, had not witnessed anything, Ms. Barr-Carr responded that Mr. Ofoma was a liar. When Mr. Finkel queried Ms. Barr-Carr as to whether Mr. Ofoma had any reason to lie and whether he had dated her sister, she stated that she did not know why he would lie (but would find out), and that her sister had dated lots of people, so it was possible that her sister, in fact, had dated Mr. Ofoma. Mr. Finkel told Ms. Barr-Carr that he would like to talk with her mother and her sister about some of the things that Mr. Ofoma had told him, whereupon, Ms. Barr-Carr replied that she did not know where her sister lived and that her mother was too ill to talk to him. When Mr. Finkel informed Ms. Barr-Carr that he had already attempted to talk with her mother, who would not answer any questions without Ms. Barr-Carr's permission, Ms. Barr-Carr refused Mr. Finkel's request to tell her mother that she could answer his questions, stating that her mother's doctor had ordered her to avoid "stressful situations."

On October 13, 1999, Mr. Finkel prepared a second memorandum, describing his efforts to investigate, and corroborate, Ms. Barr-Carr's version of events, and to try to determine why Mr. Ofoma would lie. In this regard, Mr. Finkel spoke to Mr. Ofoma again, who provided more details about his past relationship with Jacqueline McClerking (Ms. Barr-Carr's sister), Ms. Barr-Carr, and their mother. According to Mr. Ofoma, he had lived at the McClerking residence for about a year before Ms. Barr-Carr's arrest in March 1995, and then for another six months after her arrest. He said that Ms. Barr-Carr often slept on the couch at the residence, and that she had been in Florida and Georgia for extended periods of time before the arrest, but, he believed, was living in Chicago at the time of her March 1995 arrest. He also informed Mr. Finkel that, during this time, he grew increasingly uncomfortable as Ms. Barr-Carr continually asked him to lie for her regarding this lawsuit.

*4 Mr. Ofoma further explained that, while he lived at the McClerking residence, he was running a business, in a moonlighting capacity, out of the McClerking home, and that he had installed a fax machine at the residence. While he had initially paid the phone (and fax) bill, after his relationship ended with Jacqueline, he, admittedly, did not pay a phone bill estimated at about $1500-2000. (Mr. Ofoma explained that Jacqueline had refused to return his belongings, worth thousands of dollars, and that was why he had not paid the phone bill.) Mr. Ofoma further noted that he had not heard about the unpaid phone bill for at least three years, and that he had never been contacted by a lawyer, or threatened with legal action.

When asked about his contact with Ms. Barr-Carr since 1995, Mr. Ofoma explained that he had talked to Ms. Barr-Carr approximately three times since 1995. First, he had seen her several years earlier in downtown Chicago, where she, again, asked him to testify for her regarding this lawsuit. He also said that he had seen Ms. Barr-Carr about a year earlier, and that she had asked him if he would at least talk to her lawyer. At this meeting, he did give her his phone number. Mr. Ofoma then stated that Ms. Barr-Carr had called him the prior evening, after Mr. Finkel had spoken to him, and had informed him that he owed her mother at least $10,000 for the unpaid phone bill, that he was lying, and that she was going to sue her lawyers for not contacting him until a year after she had provided his address to them. Mr. Ofoma informed her that she had no case, no right to sue anyone, and that she should get a job if she wanted money.

During this second conversation with Mr. Finkel, Mr. Ofoma reiterated that he was not at the courthouse on 13th and Michigan on July 6, 1995, and that he did not even know there was a courthouse there. Furthermore, he stated that he had been working at a nursing home between 7 a.m. and 3 p.m. during this time period, and therefore, would not have been at a courthouse during business hours. He also offered more details about Ms. Barr-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
(Cite as: 2000 WL 1847608 (N.D.Ill.))

Carr's arrest on March 20, 1995, saying that she had never mentioned, on March 21, 1995 at the McClerking residence, that she had been strip searched, but had merely remarked that a female officer had aggressively patted her down looking for weapons. Mr. Ofoma also informed Mr. Finkel that Mr. Bogdan had called him, complaining that Ms. Barr-Carr was verbally insulting and threatening him.

During his investigation, Mr. Finkel also spoke to Jacqueline McClerking on October 6, 1999. According to Mr. Finkel, Jacqueline was short on the phone, and apparently, reluctant to talk with him, especially about her past relationship with Mr. Ofoma. While she admitted knowing him, she would not explain how or in what context. She did, however, admit that he had spent the night with her at her mother's house on occasion, and that he had, indeed, ran up a phone bill. Jacqueline further stated that Ms. Barr-Carr was hurt when she had returned to the residence on March 21, 1995, and that she had to go to the hospital because some officers had beaten her up. Finally, Jacqueline stated that she was in frequent communication with Ms. Barr-Carr, and had, indeed, spoken to her about four or five days earlier.

*5 Mr. Finkel then spoke to Attorney Maurice Liebman, who was Ms. Barr-Carr's mother's attorney, to verify whether litigation had been threatened (or at least considered) against Mr. Ofoma for not paying the phone bill. While Mr. Liebman confirmed that he represents Ms. Barr-Carr's mother, he stated that he had never heard of Mr. Ofoma, and that no phone bill litigation had been contemplated.

On October 19, 1999, William Skalitzky, another attorney at Seyfarth Shaw, prepared a memorandum describing his meeting with Ms. Barr-Carr on October 8, 1999. At this meeting, Mr. Skalitzky informed Ms. Barr-Carr that he wanted to confirm that her mother was, indeed, suing Mr. Ofoma for the unpaid phone bill. (Apparently, Ms. Barr-Carr's "new" theory, that she had articulated to Mr. Finkel on October 6, 1999, was that Mr. Ofoma was lying

in his October 1999 conversations with Mr. Finkel, because he was upset about litigation over the 1995 unpaid phone bill.) Ms. Barr-Carr insisted that Attorney Liebman was representing her mother in a bankruptcy case and in the case against Mr. Ofoma. When Mr. Skalitzky informed her that Mr. Liebman had never heard of Mr. Ofoma, Ms. Barr-Carr responded that Mr. Liebman might be lying because of the attorney-client privilege. After informing Ms. Barr-Carr that Mr. Liebman had not asserted the privilege, and that it would not have applied anyway, Ms. Barr-Carr said that Mr. Liebman should "open his ninety-year old eyes" and see Mr. Ofoma's name.

Mr. Finkel (who was present at this October 8th meeting with Mr. Skalitzky) then informed Ms. Barr-Carr that Mr. Ofoma had admitted that he had not paid a 1995 phone bill for about $1500-2000, but that no one had ever threatened litigation, and therefore, he would have no reason to lie when he said that he was not present at the courthouse on July 6, 1995. Ms. Barr-Carr proceeded to offer various explanations, at this October 8th meeting, as to why Mr. Ofoma would lie: (1) he was married when he was dating Ms. Barr-Carr's sister, Jacqueline, in 1995; (2) he owed a lot of women money and, perhaps, someone was paying him to lie; (3) he was working for the government in an unknown capacity and could not become involved in litigation, and (4) he was upset because Ms. Barr-Carr's mother had called the police on him in 1995 when he had refused to leave her home. Ms. Barr-Carr also stated that Mr. Ofoma, her own witness, was a con artist and was presently being investigated and would be disclosed as a liar, and that Seyfarth Shaw should contact his former employer to confirm that he was a liar.

Jeff Ross, another Seyfarth Shaw attorney present at this meeting, asked Ms. Barr-Carr for her sister Jacqueline's pager number to confirm various allegations. Ms. Barr-Carr responded that she did not remember the number, and added that she had seen her sister at their mother's home on October 6, 1999

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
(Cite as: 2000 WL 1847608 (N.D.Ill.))

but that, other than that, she had not seen or spoken to her sister for several months. When Mr. Finkel informed Ms. Barr-Carr that he had, in fact, spoken to Jacqueline on October 6th, and that Jacqueline had said that she and Ms. Barr-Carr were in frequent contact and had spoken five days earlier, Ms. Barr-Carr replied that her sister was lying and trying to make it appear as if they were closer than they really were.

*6 At the conclusion of the October 8th meeting, Mr. Skalitzky explained to Ms. Barr-Carr that they could not ethically represent her if they reasonably, and in good faith, believed that she was lying and would commit perjury on the witness stand. He further explained that her own witness, Mr. Ofoma, contradicted her claims, and that, based on Seyfarth Shaw's investigation of her explanations (which always proved false upon confirmation), as well as a lack of any corroborating evidence, they believed Mr. Ofoma, who had no discernible motive to lie. Mr. Skalitzky, then, specifically informed Ms. Barr-Carr that there was no corroborating or objective evidence to sustain that, (1) on March 20, 1995, ten officers had jumped on her back while she was handcuffed, and had kicked, kneed, and hit her; (2) that she had hit the back of her head on the door to the station or on the squad door while being arrested;[FN6] (3) that Officer Eggers had slammed her body down onto the bench in the interrogation room, injuring her stomach; (4) that she had been stripped searched at the 25th District (there was no paper work or pre-approval for a strip search, which is required); and (5) that she and Mr. Bogdan had been arrested and forcibly taken to the courtroom on July 6, 1995.[FN7]

> FN6. The emergency room records from Loyola Hospital on March 21, 1995-the day after her alleged violent encounter with the officers-reveal that she had only complained of pain in her left hip and arm, that she had not complained of any stomach pain, that the physician reported that her abdomen was normal upon examina-

tion, and that the physicians concluded that she suffered an anxiety attack and referred her for possible psychiatric care. Mr. Finkel explained to Ms. Barr-Carr that these medical records constituted objective evidence that corroborated Mr. Ofoma's version that Ms. Barr-Carr was lying about her injuries stemming from March 20, 1995. Significantly, the medical records do not mention any bruises or swelling on her face or body.

> FN7. Ms. Barr-Carr had told Mr. Finkel that, when Officers Eggers and Kalinowski dragged her and Mr. Bogdan into the courtroom on July 6th, the bailiff told both officers, in open court, to "get your hands off those people, this is my courtroom." The transcript of the proceedings that day, however, contains no such passage.

After being advised that Seyfarth Shaw felt a legal and ethical obligation to withdraw from her case, Ms. Barr-Carr insisted that she was telling the truth, and that she wanted to proceed with the litigation. She then pulled out a reddish/purplish sweater, which she claimed that she had worn on March 20, 1995, and stated that its bulkiness protected her from "more debilitating injuries." Mr. Skalitzky, while noting that the sweater did not appear thicker than ordinary sweaters, advised Ms. Barr-Carr that Seyfarth Shaw would be filing a motion to withdraw from its appointment as her counsel on two grounds: (1) Rule 11, because there was no good faith basis for the lawsuit; and (2) the ethics rules which disallow attorneys from suborning perjury or eliciting testimony on matters that they believe are not true. Finally, Mr. Skalitzky informed Ms. Barr-Carr that they would be filing the motion to withdraw on October 11, 1999, and that the hearing would be on October 13, 1999. Ms. Barr-Carr indicated that she would be present at the hearing on October 13th.

On October 21, 1999 (after the ex parte hearing on October 20, 1999), this Court recommended to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
(Cite as: 2000 WL 1847608 (N.D.Ill.))

Judge Gottschall that the attorneys from Seyfarth Shaw be relieved of their appointment of representation of Ms. Barr-Carr, and warned that further appointments of counsel would likely encounter the same problems. [FN8] By November 11, 1999, Ms. Barr-Carr had retained her third attorney, Michael Vincent Connolly.

> FN8. Pursuant to Local Rule 73.1, this case was reassigned to this Court on January 26, 2000. On June 6, 2000, this Court granted Seyfarth Shaw's motion and allowed them leave to withdraw their appearance as Ms. Barr-Carr's attorneys.

### D. Mr. Connolly Asks to Withdraw As Counsel

On September 11, 2000, after several failed settlement attempts, and the postponement of trial from July 24, 2000 to September 18, 2000 (because Mr. Bogdan had been involuntarily committed to the Chicago Reed Mental Health Center), the Defendants submitted a motion requesting the unsealing of the October 20, 1999 hearing (where the Seyfarth Shaw lawyers had asked to withdraw), and accompanying documentation, believing that the Plaintiffs were abusing the legal system. On September 15, 2000, after the Court had granted, on September 12, 2000, the Defendant's motion to unseal the October 20, 1999 hearing documents, Defendants filed a Motion to Dismiss this case pursuant to Rule 11. In addition, on September 15, 2000, after having reviewed the unsealed documents concerning Seyfarth Shaw's investigation, Mr. Connolly submitted a motion to withdraw as Ms. Barr-Carr's counsel,[FN9] and Corinth Bishop II, Mr. Bogdan's attorney, similarly filed a motion to withdraw as Mr. Bogdan's counsel. The Court granted both attorneys' motions and, also, granted Mr. Bogdan's motion to continue the trial that was to begin on September 18, 2000.[FN10]

> FN9. In support of his motion to withdraw, Mr. Connolly stated, at the September 15th hearing, "I finally have been convinced, in

the face of what's going on, that this is not something I can present to the Court. I can't ask [Ms. Barr-Carr] to stand up there and tell her story. If I ask her to tell her story and then it turns out later that she's stating things inaccurately, then my license is in jeopardy, and I don't want that to happen." (Transcript of September 15, 2000 hearing ["Tr. of Sept. 15 hearing"] at 10.)

> FN10. Apparently, Mr. Bogdan was in a nursing home, and his attorney, Ms. Bishop, did not know when he would be released. Because Mr. Bogdan was Ms. Barr-Carr's primary witness listed on the pretrial order, the Court felt that the cases should not be severed (and Ms. Barr-Carr's case set for trial), because Ms. Barr-Carr's primary witness, Mr. Bogdan, was incapacitated and would, consequently, not be present to testify. Therefore, the Court continued the trial that was set for September 18, 2000. (The Court did not set a new date for trial, however, because the Court was going to consider the Defendants' Rule 11 Motion to Dismiss.)

### E. Mr. Ofoma's Testimony at the September 15, 2000 Hearing

*7 At the September 15, 2000 hearing, in support of their Rule 11 Motion to Dismiss this case, Defendants brought in Mr. Ofoma to testify about how Ms. Barr-Carr had continually asked him to lie and commit perjury, how Ms. Barr-Carr had indicated that she was not hurt after the March 20, 1995 encounter with the Defendant officers, and how he had not been present at the courthouse on July 6, 1995. At this hearing, the Court was able to carefully observe the testimonial demeanor of Mr. Ofoma and to make credibility assessments. [FN11]

> FN11. Although, at the September 15th hearing, the Court had granted Mr. Connolly's motion to withdraw as Ms. Barr-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
**(Cite as: 2000 WL 1847608 (N.D.Ill.))**

Carr's counsel, the Court appointed him as "shadow counsel" during the in-court testimony of Mr. Ofoma.

During his direct examination by the Defendants, Mr. Ofoma testified that, on March 21, 1995, at the McClerking residence, where he was living, Ms. Barr-Carr-who was accompanied by Mr. Bogdan-claimed that she and Mr. Bogdan had been arrested by police officers the previous night. When asked if she was injured, Mr. Ofoma testified that Ms. Barr-Carr had said no, but that she was going to see a doctor anyway because she "wanted to get paid". (Tr. of Sept. 15th hearing at 31-33.) When asked what he meant by "wanted to get paid," Mr. Ofoma clarified that she was going to "sue the police officer." (*Id.* at 33.) Mr. Ofoma further testified that Ms. Barr-Carr told him that she did, in fact, go to the hospital, but that the doctor told her that there was nothing wrong with her and put a hot pad on her back. (*Id.*) Mr. Ofoma also testified that Ms. Barr-Carr had not mentioned, on March 21st, that she had been strip searched the previous night, but did state that Mr. Bogdan had been searched. (*Id.* at 34.) He further stated that, on March 21st, he had not noticed any bruises on either Ms. Barr-Carr or Mr. Bogdan. (*Id.* at 39.)

With respect to July 6, 1995, Mr. Ofoma testified that he had, unequivocally, never been to the 13th and Michigan courthouse, and was certainly not there on July 6, 1995.[FN12] (*Id.* at 34, 39.) He also testified that, despite his not being there or witnessing anything, Ms. Barr-Carr had repeatedly asked him to provide testimony about the July 6th incident at the courthouse, and also stated that she had enlisted support from people in the projects to testify on her behalf.[FN13] (*Id.* at 35.) Finally, Mr. Ofoma testified that, when he eventually was contacted by Mr. Finkel and an investigator concerning his alleged eye-witness account of the July 6th incident, he told them that Ms. Barr-Carr's case was "bogus", stating " ... number one, I wasn't there. Number two, I don't know which court she's talking about. Number three, she called me harassing me

on the phone, you know, why I didn't testify for her, you know. So I told him [investigator from Seyfarth Shaw] it is bogus, and I don't want to be a part of it." (*Id.* at 37.) Mr. Ofoma also testified that he warned Mr. Finkel not to get involved in this case because he could "lose his license", and that he (Mr. Ofoma) would be willing to speak to the Judge about Ms. Barr-Carr's requests for him to commit perjury. (*Id.* at 40.)

> FN12. Specifically, when asked if he was at 13th and Michigan on July 6th, Mr. Ofoma responded, "Over my dead body, no." (*Id.* at 34.)

> FN13. Specifically, Mr. Ofoma testified: "Well, she [Ms. Barr-Carr] wanted me to state that I was there when they strip searched her, and I explained to her-First of all, I said yes, but later I told her, I said no, because I don't want to come and lie in the court, you know, because it would be perjury." (*Id.* at 35). He further stated: "Well, she [Ms. Barr-Carr] told me she have call some people at the projects to help her out, sisters, aunt, friends that live in the project. And so she asked me if I could help her to state that I was in the court, so I told her, I said, but I don't know where the court is. I've never been there before." (*Id.*)

*8 During his cross-examination by Ms. Barr-Carr,[FN14] Mr. Ofoma freely acknowledged that he had dated her sister, Jacqueline McClerking, in 1995 and was, indeed, living at the McClerking residence in March 1995, and had left the residence months later without paying a phone bill of approximately $2000. (*Id.* at 40-43.) When Ms. Barr-Carr asked him whether he was trying to "sabotage the case" to avoid paying the delinquent phone bill, Mr. Ofoma replied, "Which case? You don't have any case. There is no case. You are a liar." (*Id.* at 43.) When Ms. Barr-Carr suggested that Mr. Ofoma was lying because her mother had thrown him out of the house and had a police report filed against him, Mr.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
(Cite as: 2000 WL 1847608 (N.D.Ill.))

Ofoma responded, "Your mother never, for one day, did anything bad. I'm not going to talk about your ma." [FN15] (*Id.* at 52.)

> FN14. Although Mr. Connolly was present as "shadow counsel," he did not ask Mr. Ofoma any questions during Ms. Barr-Carr's cross-examination of Mr. Ofoma.

> FN15. While Mr. Ofoma maintained that there was no police report, he did acknowledge that he had had a fight with Jacqueline McClerking, and that she had started to chase him around with a knife. Consequently, Mr. Ofoma testified that he called the police because he feared for his safety. After the police arrived, they told him to leave the residence. (*Id.* at 53-54.)

Similarly, when Ms. Barr-Carr asked him whether there was a reason why he was lying about his testimony, and whether he was getting paid to lie, Mr. Ofoma answered, "No, I will not let you destroy whom (inaudible), no. I'm not going to let you do that. No. You want me to lie for you? I'm not going to do that ... You called me and begged me to lie for you." (*Id.* at 47.) While admitting that, at one point, he had considered lying for Ms. Barr-Carr, Mr. Ofoma testified, "So, she called me and asked me to help her in the case. So I said okay. So after a while I (inaudible) to her, I said, I called her back and I said, I'm not going to lie. These people might lose their job. I say I'm not going to lie." (*Id.* at 48.)

Finally, when Ms. Barr-Carr asked him whether he had told Mr. Finkel that Mr. Bogdan was afraid of her, Mr. Ofoma responded, "Oh, yeah, he was afraid of you. Because he called me. He called me and he told me you were pushing him. Oh, yes. He told me that." (*Id.* at 50.) Mr. Ofoma then explained to the Court that Ms. Barr-Carr was harassing him with phone calls imploring him to commit perjury. (*Id.* at 51.)

After the completion of Ms. Barr-Carr's cross-examination of Mr. Ofoma, the Defendants reques-

ted that they be allowed to amend their Rule 11 Motion to Dismiss based on the in-court testimony of Mr. Ofoma at the September 15th hearing. The Court granted this request, stating that the Amended Motion to Dismiss (the present motion before the Court) was due September 22, 2000, and also informed Ms. Barr-Carr that she needed to respond to the Amended Motion within 21 days (October 13, 2000).[FN16] The Court indicated that no Reply from Defendants would be necessary.[FN17]

> FN16. The Court suggested that Ms. Barr-Carr attempt to obtain another attorney to contest Defendants' Rule 11 Motion to Dismiss, but admonished her that any attorney should familiarize him or herself with the file (including the unsealed documents and the transcript of the September 15th hearing), because the Court was not going to grant any other motions to withdraw. (*Id.* at 66.)

> FN17. Ms. Barr-Carr's Response to Defendants' Motion to Dismiss and for Fees and Costs Pursuant to Rule 11 was only one page long, and merely stated that her former attorneys were incompetent and stretched the truth, and that she was "still reeling over what [she], and other [sic]; believe to be an 'Incredible Conspiracy,' and [she was] still in disbelief as to how far unscrupulous, cold hearted, and devious human beings will go." (Plaintiff Barr-Carr's Motion to Deny Defendants' Motion to Dismiss.)

F. The Court's November 15, 2000 Hearing

At the September 15, 2000 hearing, Ms. Barr-Carr had claimed that she had witnesses who would testify concerning her versions of the incidents of March 20, 1995 and July 6, 1995, but that these witnesses had, erroneously, not been disclosed in the Final Pretrial Order. Because of the seriousness

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
(Cite as: 2000 WL 1847608 (N.D.Ill.))

of the allegations raised in Defendants' Motion to Dismiss, the Court granted both Plaintiffs a hearing where they could bring any witnesses to corroborate their allegations.[FN18] Therefore, although the Pretrial Order had listed Mr. Bogdan as her primary witness, the Court, giving the now *pro se* Plaintiff every opportunity to rebut the Motion to Dismiss, informed her, on October 23, 2000, that there would be another hearing on November 15, 2000, where she (and Mr. Bogdan) could present any witnesses that had personal knowledge of the events of March 20, 1995 and July 6, 1995. The Court also informed Plaintiffs that they needed to inform the Court, in writing, by November 9, 2000, of the names of any witnesses they planned to present at the November 15th hearing, and the substance of their expected testimony.

> FN18. Mr. Bogdan did not respond to Defendants' Motion to Dismiss. The Court notes that all correspondence sent to Mr. Bogdan by the Court at his last known address has been returned, indicating that his Post Office Box has been closed. Mr. Bogdan never informed the Court, or his last attorney of record, of a change in address. At the November 15th hearing, defense counsel indicated that Mr. Bogdan was delusional and probably homeless.

*9 At the November 15th hearing, Ms. Barr-Carr, not surprisingly, brought no witnesses on her behalf (and she also never submitted a list of witnesses by November 9, 2000). Rather, she informed the Court that she "overlooked the 9th as being the deadline" and that she still needed to "subpoena some of the records and some of the witnesses." (Transcript of November 15, 2000 hearing at 3-4.) Instead of bringing witnesses, she brought various pieces of documentation. First, she presented the Court with a letter from Mr. Ofoma's past employer that stated that he had not been at work on July 6, 1995 (thereby implying that Mr. Ofoma was at the courthouse at 13th and Michigan on July 6, 1995). She also presented a portion of the transcript from the

hearing before Judge O'Malley on July 6, 1995.[FN19] She then complained that the attorneys from Seyfarth Shaw had not subpoenaed the bailiff, or other witnesses, who had observed the attack on July 6, 1995, and that the lawyers from Seyfarth Shaw did not otherwise follow-up on information that had been provided to them. (*Id.* at 20-21.)

> FN19. Judge O'Malley was the judge who presided over the criminal charges brought against the Plaintiffs for impersonating OPS officers on March 20, 1995. The portion of the transcript that Ms. Barr-Carr brought to the November 15th hearing does not contain any evidence that she was abused by officers in the courthouse on July 6, 1995. Rather, it only reflects that Plaintiffs were late to court and informed Judge O'Malley that they had been "brutally attacked on the elevator by the police officer" who made them "stay on the elevator." Judge O'Malley, obviously not seeing any blood or bruises, merely responded, "You are lucky, because I did not enter the warrant for your arrest." Significantly, the transcript does not reflect the bailiff, or clerk of the court, saying anything to the effect of "get your hands off those people", which Ms. Barr-Carr alleges occurred.

Ms. Barr-Carr also insisted that her mother was a witness, but did not bring her to Court because she was "not well." (*Id.* at 22, 37.) Ms. Barr-Carr stated that she would, indeed, bring her mother if the Court granted another hearing. The Court explained that it had expected that Ms. Barr-Carr would have brought her mother and her sister to this hearing in order to corroborate her allegations and refute Mr. Ofoma's previous testimony if, indeed, they were able to do so. (*Id.*) Ms. Barr-Carr further insisted that there were people besides her mother, sister and Mr. Ofoma who had observed the conversation on March 21, 1995 and could refute Mr. Ofoma's testimony. When the Court asked Ms. Barr-Carr

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
(Cite as: 2000 WL 1847608 (N.D.Ill.))

why she had not brought her witnesses into Court on November 15, 2000, as specifically ordered by the Court, she responded, "So they could be-go through things that I have been going through for five years." (*Id.* at 38.)

Ms. Barr-Carr explained that she had pictures of bruises from the March 20th attack, but the Court reminded her that the hospital records from the emergency room at Loyola Hospital indicated no bruising or scars. (*Id.* at 28.) Furthermore, the close-up, enlarged mug shot taken of Ms. Barr-Carr on the morning of March 21, 1995, which was presented in open Court, indicated no scars, bruises or swelling on her face, no cuff marks on her hand, and no dirt on her clothes. (*Id.* at 32.) Ms. Barr-Carr explained that she had a jacket, or fur coat on, that prevented her from getting injuries, and that she never said that she had been kicked in the face, but rather only on her body. (*Id.* at 35.)

At the end of the hearing, the Court indicated that it would rule on Defendants' Motion to Dismiss and make credibility determinations, based in part on Mr. Ofoma's previous in-court testimony, about whether Ms. Barr-Carr was concocting this litigation.[FN20]

> FN20. Although the Court indicated, at the November 15th hearing, that Ms. Barr-Carr did not need to submit further documentation, the Court, nevertheless, has accepted her filing of additional documentation. The Court notes that this additional documentation is at best neutral or irrelevant, and that most of it is damaging to her case. First, Ms. Barr-Carr submitted a Georgia business license application and fee, which is irrelevant to her case. Second, she submitted part of the transcript of the July 6, 1995 hearing, before Judge O'Malley, which, importantly, does not mention the bailiff directing the officers to get their hands off Plaintiffs. Third, she submitted police records of Laura Carr (another individual) and Houston Carter. (Apparently, at some point during her criminal prosecution, her records became mixed up with these individuals, but this is clearly irrelevant to the case *sub judice.*) Fourth, she submitted a doctor's report from June 8, 1995-more than two months after the March 20th incidentindicating that she suffered from various ailments based on what she subjectively told the doctor. Significantly, this report does not mention any broken skin, swelling or bruises. (The medical records from the Loyola ER, which were taken one day after the alleged police assault, also indicated no broken skin, swelling, or bruises.) Fifth, she submitted parts of the deposition testimony of Michael Walsdorf, an individual at the Citgo station who, according to Ms. Barr-Carr, had witnessed the police assault against her and Mr. Bogdan on March 20, 1995. His testimony, however, merely confirms that Plaintiffs were impersonating officers from OPS and that Ms. Barr-Carr began screaming and resisting arrest when Officers Eggers and Kalinowski arrived on the scene. He did not say that he observed any assault on Ms. Barr-Carr or Mr. Bogdan. Sixth, Ms. Barr-Carr submitted the sworn statements of Officers Kalinowski and Eggers, which belie her allegations of police brutality. Seventh, she submitted notes from a telephone interview of Ray Scacchitti, the Citgo Manager, who indicated that, after Plaintiffs refused to show identification that they were OPS officers to Officers Eggers and Kalinowski, that Ms. Barr-Carr began swinging her arms and resisting arrest when the officers tried to handcuff her. Significantly, he stated that the officers did not physically abuse Ms. Barr-Carr. Furthermore, he also stated that, at the July 6, 1995 hearing (which he was attending as a witness), he did not observe any officer having any physical contact with Ms. Barr-Carr, and that Officer Eggers was not even on the el-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
**(Cite as: 2000 WL 1847608 (N.D.Ill.))**

evator with Plaintiffs. Finally, Ms. Barr-Carr submitted the sworn testimony of Officer Perez concerning her arrest of Mr. Bogdan in October 1994 (which is clearly irrelevant to the case at bar).

*ANALYSIS*

**\*10** Rule 11 of the Federal Rules of Civil Procedure allows a court to sanction a party on two grounds, namely, the "frivolousness clause" and the "improper purpose" clause.[FN21] *Fred A. Smith Lumber Co. v. Edidin,* 845 F.2d 750, 752 (7th Cir.1988). The frivolousness clause requires that the party, or the attorney, conduct a reasonable inquiry into the facts and the law relevant to the case, while the improper purpose clause ensures that a "motion, pleading or other document may not be interposed for purposes of delay, harassment, or increasing the costs of litigation." *Id.* (citation omitted). The standard for imposing sanctions under either prong of Rule 11 is an "objective determination of whether the sanctioned party's conduct was reasonable under the circumstances." *Id.* (citation omitted). Significantly, Rule 11 "enables the court to protect itself, and the litigants in other cases, from the burdens of frivolous or vexatious filings" *Frantz v. United States Powerlifting Federation,* 836 F.2d 1063, 1066 (7th Cir.1987). "Frivolous litigation injures the judicial system and other litigants, whose day in court is postponed as judges must devote time to needless motions and heedless litigants. Courts may consider these public injuries when fixing penalties." *Id.*

> FN21. Rule 11 provides in pertinent part: "By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief ... (1) it is not being presented for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation ... (3) the allegations and other factual contentions have evidentiary support ..." Fed.R.Civ.P. 11(b).

Dismissal with prejudice, while drastic, is an appropriate remedy under Rule 11, as well as the inherent power of the court to curb abuse of the judicial process. "[T]he most severe in the spectrum of sanctions provided by statute or rule [dismissal] must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643 (1976). Indeed, in a recent Northern District of Illinois case, the court dismissed with prejudice a litigant's case, finding that the litigants had acted wilfully and in bad faith when they coerced an employee to lie about a central issue in the case. *Quela v. Payco-General American Credits, Inc.,* No. 99 C 1904, 2000 WL 656681 (N.D.Ill. March 26, 2000) (granting default judgment under Rule 37 and inherent power of court). While recognizing that default is "an extreme sanction," the court in *Quela,* nonetheless, held that " '[c]ourts should not shrink from imposing harsh sanctions where they are warranted.' " *Id.* at *8 (citation omitted); *see also Pope v. Federal Express Corp.,* 974 F.2d 982, 984 (8th Cir.1992) (citation omitted) (dismissing plaintiff's lawsuit, under court's inherent power, as a sanction for manufactured evidence and perjured testimony, stating that "[w]hen a litigant's conduct abuses the judicial process, the Supreme Court has recognized dismissal of a lawsuit to be a remedy within the inherent power of the court."); *Combs v. Rockwell International Corp.,* 927 F.2d 486, 488 (9th Cir.1991) ("Dismissal is an appropriate sanction for falsifying a deposition. Fed.R.Civ.P. 11, as well as the court's inherent power, can be called upon to redress such mendacity.").

**\*11** While courts are generally more lenient with a *pro se* plaintiff, failure to investigate the factual

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
**(Cite as: 2000 WL 1847608 (N.D.Ill.))**

basis for a lawsuit, or bringing a lawsuit for an improper purpose, still subjects the *pro se* plaintiff to Rule 11 sanctions. As explained in *Schaffer v. Chicago Police Officers,* 120 F.R.D. 514, 516 (N.D.Ill.1988), plaintiffs (including *pro se* plaintiffs) have no due process rights to proceed with litigation which violates Rule 11. *See also Pfeifer v. Valukas,* 117 F.R.D. 420, 423 (N.D.Ill.1987) ("Plaintiff's pro se status does not grant him an unfettered license to wage an endless campaign of harassment against these defendants or to abuse the judicial process. Nor does it relieve him of the duty to conduct the inquiries required by Rule 11.").

Based on these underlying principles, the aforementioned facts and an exhaustive review of the entire record, the Court finds that Plaintiffs [FN22] have been abusing the judicial system since 1996 and have brought this litigation for an improper purpose, namely to harass the City and its officers and to fraudulently obtain a money verdict. The Court bases this determination not only on Seyfarth Shaw's thorough investigation (which showed that Ms. Barr-Carr continually lied, and would then change her story when confronted with the lies),[FN23] but also on the September 15, 2000 hearing where the Court was able to carefully observe the testimonial demeanor of Mr. Ofoma. "While a determination of credibility is generally a factual matter within the province of a jury; the 'fact-dependent legal standard mandated by Rule 11' is an issue for the district court to determine." *Pope, supra,* 974 F.2d at 984 (quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 402 (1990)).

FN22. The Court is dismissing the case against Mr. Bogdan for the same reasons it is dismissing the case against Ms. Barr-Carr: no evidence to substantiate the claims, and evidence that the case is being brought for an improper purpose. The Court further notes that it is dismissing Mr. Bogdan's case for failure to prosecute his case. The Court has been unable to contact Mr. Bogdan since September 2000 (when his counsel withdrew), and all of its correspondence has been returned to the Court. Apparently, Mr. Bogdan closed his P.O. Box and did not give a forwarding address to this Court, which is his responsibility. Ms. Barr-Carr does not know where Mr. Bogdan currently is situated (but believes he is in his sister's care). Defense counsel indicated at the November 15th hearing that he is probably homeless and delusional. The Court also notes that it had to postpone trial on two occasions, because Mr. Bogdan was incapacitated for mental health reasons. Consequently, Mr. Bogdan's case is being dismissed for want of prosecution and failure to give a forwarding address, as well as lack of evidence to substantiate his claims.

FN23. Specifically, Ms. Barr-Carr insinuated to her attorneys at Seyfarth Shaw, and in her deposition testimony (*see* Barr-Carr's Nov. 12, 1997 deposition at 427), that she met Mr. Ofoma, for the first time, when he approached her at the 13th and Michigan courthouse on July 6, 1995 to voluntarily be a witness to the supposed police brutality. After her Seyfarth Shaw lawyers asked her if she had previously known Mr. Ofoma, she admitted that he worked for a friend of hers. When asked if he had previously dated her sister, Ms. Barr-Carr acknowledged that he might have, because her sister dated lots of people. Later on, Ms. Barr-Carr admitted that Mr. Ofoma had, in fact, lived at her mother's residence in 1995, and was at the residence after her supposed police attack on March 20, 1995. Clearly, Ms. Barr-Carr has been misleading this Court, and her own attorneys, since the inception of this litigation, and changes her story accordingly to fit the facts as they emerge.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
(Cite as: 2000 WL 1847608 (N.D.Ill.))

Despite Ms. Barr-Carr's attempt to discredit Mr. Ofoma (by repeatedly calling him a liar, and insinuating that he was lying because he was being paid to lie, or because he held a five year grudge against her mother for allegedly filing a police report or not paying a phone bill), the Court finds that Mr. Ofoma's testimony was credible, and that he was a truthful and forthcoming witness, who was reluctant to testify and who felt genuinely threatened by Ms. Barr-Carr's harassment of him to commit perjury. His testimony in this regard was also consistent with what he had told the Seyfarth Shaw lawyers during their pre-trial investigation. The Court also notes that Mr. Ofoma has no discernible motive to lie,[FN24] and that the objective medical evidence fully corroborates his testimony.

> FN24. Ms. Barr-Carr's assertion that Mr. Ofoma is lying because of an outstanding phone bill belies logic. Mr. Ofoma was never sued, or threatened with litigation, over the phone bill. It makes no sense that he would commit perjury in 2000 because of a disputed 1995 phone bill over which he was never sued. It is significant that, when first queried by Seyfarth Shaw's attorneys as to whether Mr. Ofoma had a motive to lie, Ms. Barr-Carr stated that she knew of no reason, but that she would find out. Thereafter, she came up with several reasons, none of which made sense.

Furthermore, the Court, recognizing that Ms. Barr-Carr was *pro se* since September 15, 2000, gave her ample opportunity to rebut Mr. Ofoma's testimony and to bring in her own witnesses to state their personal knowledge of the events that transpired on either March 20-21, 1995 or July 6, 1995. Despite the Court giving her two months to bring in her witnesses (from September 15, 2000 to November 15, 2000), she brought in no witnesses at the November 15th hearing, claiming that (1) her mother was too ill (but that she would bring her in if the Court granted another hearing; and (2) bringing in her many witnesses would be subjecting them to what

she had been encountering for the last five years. While the Court is not required to fire "a warning shot" before dismissing a case, (*see Halas v. Consumer Servs., Inc.,* 16 F.3d 161, 165 (7th Cir.1994) (citation omitted)) the Court, in the case *sub judice,* indeed, warned Ms. Barr-Carr that she needed to bring witnesses to the November 15th hearing to refute Mr. Ofoma's in-court testimony on September 15, 2000. For example, Mr. Ofoma testified that Ms. Barr-Carr's mother and sister were also witnesses on March 21, 1995, when Ms. Barr-Carr reported that she and Mr. Bogdan had been arrested and that they sustained no injuries, but that she would go to the hospital anyway to support their claims of excessive force. Mr. Ofoma also testified that there were no visible signs of abuse. Not only did Ms. Barr-Carr prevent her former attorneys from interviewing her mother and sister in this regard, she also did not present them as witnesses at the November 15th hearing. Despite the Court's "warning," Ms. Barr-Carr brought in no witnesses to the November 15th hearing, instead relying on her own self-serving assertions that everyone is against her, including her past attorneys and her alleged past witness, Mr. Ofoma.

*12 In sum, the Court fully credits Mr. Ofoma's in-court testimony, which is unrefuted (except for Ms. Barr-Carr's self-serving accusations), and which is consistent with what he had told Ms. Barr-Carr's previous attorneys. There is no evidence whatsoever to substantiate Ms. Barr-Carr's claims [FN25] she has no supporting witnesses (except, allegedly, Mr. Bogdan, who is too sick to prosecute this case and cannot be located) and no objective medical evidence. Indeed, her initial witness, Mr. Ofoma, accuses her of suborning perjury and concocting litigation, and the medical records from Loyola Hospital on March 21, 1995-one day after the alleged attack-indicate no bruises, swelling or broken skin, but rather suggest that she had a panic attack and recommended psychiatric care. Additionally, the close-up, enlarged mug shot, taken on March 21, 1995, shows no signs that she had been abused.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
(Cite as: 2000 WL 1847608 (N.D.Ill.))

FN25. The only evidence that, arguably, rebuts Mr. Ofoma's incourt testimony that he was not at the courthouse on July 6, 1995, is a letter from Mr. Ofoma's former employer, indicating that its records show that Mr. Ofoma was not at work on July 6, 1995. This evidence, however, does not prove that Mr. Ofoma was at the courthouse on July 6th, but rather that he simply was not at work. Despite Ms. Barr-Carr arguing, at the November 15th hearing, that this note indicates that Mr. Ofoma is a liar, it merely indicates, as Mr. Ofoma testified on September 15th, that he was working for that employer in 1995, and believed that he would have been at work in the middle of the day.

Furthermore, with respect to the July 6, 1995 courthouse incident, it belies belief that police officers, who had just been dismissed by Judge O'Malley because Plaintiffs had failed to appear, would, on their way out, abuse Plaintiffs in a public courthouse full of prosecutors, defense attorneys, judges and citizens. The transcript of the July 6th hearing, before Judge O'Malley, merely indicates that Ms. Barr-Carr stated that she had just been attacked by the officers, but significantly, (1) the bailiff, or clerk of court, did not direct the officers, as Ms. Barr-Carr alleges, to get their hands off the Plaintiffs; and (2) Judge O'Malley ignored Ms. Barr-Carr's allegations that she had just been abused in the courthouse, instead focusing on her, and Mr. Bogdan's, apparent tardiness. Clearly, if Ms. Barr-Carr had arrived at court, after just being attacked by the police officers, Judge O'Malley would, at a minimum, have commented on her accusation that she had just been abused in the courthouse. His failure to even acknowledge her allegation of abuse illustrates that Ms. Barr-Carr tends to greatly exaggerate her claims of misconduct.

While dismissal of a lawsuit under Rule 11 is a severe sanction, courts within the Seventh Circuit have held that the court system has "zero tolerance

for parties who seek to intentionally distort the discovery and trial process." *Quela, supra,* 2000 WL 656681 at *7; *see also Brady v. United States,* 877 F.Supp. 444, 453 (C.D.Ill.1994) ("Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence is merely excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means.").

In the case at bar, not only did Plaintiffs file Complaints alleging police brutality on March 20, 1995 and July 6, 1995, but they presented perjured testimony at their respective depositions,[FN26] and manufactured facts to sustain their allegations. In her attempt to defraud the City and Defendant officers, and to abuse the Court's resources, Ms. Barr-Carr suborned perjury from Mr. Ofoma. The Court will not allow such flagrant disrespect for the judicial process.

FN26. Ms. Barr-Carr's deposition, in which she claims that she, as well as Mr. Bogan, were attacked by Defendant officers, was taken on November 12, 1997. Mr. Bogdan's deposition, in which he made similar allegations, was taken on October 7, 1998.

*13 Accordingly, because the Court finds absolutely no objective medical evidence to corroborate Plaintiffs' allegations of police brutality, and because Mr. Ofoma credibly claims that Ms. Barr-Carr is lying and suborned perjury, the Court dismisses this case under Rule 11 and awards fees and costs to Defendants.[FN27]

FN27. Fees and costs are presumptively given to the prevailing party when the Court dismisses a case for abuse of the judicial process. *See Pfeifer, supra,* 117 F.R.D. at 423-24 (sanctioning *pro se* plaintiff with fees and costs against corporate defendant, noting, *inter alia,* that *pro se* plaintiff was obviously able to afford the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)
**(Cite as: 2000 WL 1847608 (N.D.Ill.))**

filing fees and costs). Similarly, in the case at bar, Plaintiffs are *pro se* and, apparently, paid the filing fee and costs. In fact, except for the appointment of Seyfarth Shaw, Ms. Barr-Carr has financed her own attorneys (such as Mr. Connolly) during this litigation. (It is unclear about Mr. Bogdan's current whereabouts and financial situation). In view of Plaintiffs' egregious conduct, the Court believes that requiring Plaintiffs to pay attorneys fees and costs will not only compensate Defendants for their fees and expenses in defending this litigation, but will also deter Plaintiffs and others in the future from instituting baseless litigation and abusing judicial resources.

### *CONCLUSION*

The Court, having carefully considered the matter, and for the reasons set forth above, grants Defendants' Motion in its entirety. Accordingly,

IT IS HEREBY ORDERED that Defendants' Motion To Dismiss and for Fees and Costs Pursuant to Rule 11 be, and the same hereby is, granted.

N.D.Ill.,2000.
Bogdan v. Eggers
Not Reported in F.Supp.2d, 2000 WL 1847608 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.