IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Chadrick Evans Fulks, | ) | C/A No.: 4:08-70072-JFA |
| | ) | CR No.: 4:02-992-JFA |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ORDER DENYING PETITION FOR |
| | ) | RELIEF UNDER 28 U.S.C. § 2255 |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## INTRODUCTION

Chadrick Evans Fulks was sentenced to death by a South Carolina federal jury for the 2002 carjacking and kidnapping resulting in the death of Alice Donovan. After an unsuccessful appeal to the United States Court of Appeals for the Fourth Circuit[1] and the United States Supreme Court,[2] Fulks returns to this court with a petition pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his federal death sentence.

Contending that his trial counsel was constitutionally ineffective in a variety of ways, and that other violations of his constitutional rights render his death sentence infirm, Fulks asserts thirty-three claims in his § 2255 petition, as amended. Because the court finds no merit to any of the grounds of error asserted, the petition is denied for the reasons that follow.

---

[1] Fulks v. United States, 454 F.3d 410 (4th Cir. 2006)

[2] Fulks v. United States, 551 U.S. 1147 (2007)

1

PROCEDURAL HISTORY OF THE UNDERLYING CRIMINAL CASE

*Facts Relating to the Criminal Acts*

The facts surrounding the abduction, rape, and murder of Alice Donovan were set out

at length by the Fourth Circuit Court of Appeals in Fulks's direct appeal of this case. The

undersigned hereby incorporates the following facts in this order:

> Fulks, who grew up in the tri-state area around Huntington, West Virginia, began dating an exotic dancer named Veronica Evans in April 2002. Shortly thereafter, Fulks, who was then twenty-five years old, began living with Evans and her three-year-old son Miles in the eastern Kentucky community of Lewisburg. On June 11, 2002, Fulks and Evans were married. Fulks supported his new family in the same way he had supported himself for years—by breaking into cars and stealing. And as he had with other women, Fulks often became violent with Evans, sometimes beating her severely and assaulting her sexually.

> On August 25, 2002, Fulks directed Evans to use a stolen credit card to buy a necklace at a Wal-Mart in Madisonville, Kentucky. Upon entering the store, Evans reported to police that Fulks was in the parking lot with a gun and that she was afraid he would kill her. The police responded and searched Evans's car, discovering, among other things, stolen credit cards and a pistol. The officers subsequently arrested Evans and Fulks and transported them to the Hopkins County Detention Center (the "HCDC"). Three-year-old Miles was placed in foster care. On August 27, 2002, Evans agreed to cooperate with the government and was released from the detention center. On the basis of evidence seized from their home, Fulks was ultimately charged with twelve counts of credit card fraud in Hopkins County, Kentucky.

> Brandon Basham had been housed at the HCDC on bad check charges for over a year when Fulks arrived in late August 2002. According to guards at the prison, Basham was disruptive and annoying, often pestering his fellow inmates. In order to protect him from other prisoners, Basham was frequently reassigned cell mates, and, in mid-October 2002, he was placed in a cell with Fulks. On November 3, 2002, after about two months in custody, the Kentucky State Police served Fulks with an indictment charging him with first degree

2

abuse of a child aged twelve years or younger (Miles).[3] The next evening, at approximately 6:30 p.m., a jailer released Fulks and Basham, at Basham's request, into an outdoor recreation area. The jailer became diverted administering medication to other inmates, and when she returned at about 8:00 p.m. to check on Fulks and Basham, they were gone. They had escaped from the HCDC through the ceiling of the recreation area by using a makeshift rope made of blankets and sheets.

By the following day, November 5, 2002, Fulks and Basham had made their way on foot to the residence of James Hawkins, about eight to twelve miles from the HCDC. Basham approached the residence and, after using the phone, persuaded Hawkins to drive him and Fulks to a nearby convenience store. Shortly after departing from the house, Hawkins agreed to drive Fulks and Basham to their car, which they claimed to be located about forty miles away in Robards, Kentucky. At some point, Basham pulled a knife on Hawkins, and Fulks ordered Hawkins to pull to the side of the highway so that Fulks could drive. Soon thereafter, Fulks stopped the truck on a remote state road, intending to abandon Hawkins. Basham started to tie Hawkins to a tree, but Fulks, dissatisfied with Basham's effort, soon took over the job. Once Fulks was convinced that Hawkins would be unable to escape, he and Basham departed in Hawkins's truck. Hawkins freed himself some fifteen hours later, hailed a passing motorist, and called the police. According to Hawkins's testimony at trial, although Basham held him at knifepoint throughout the carjacking incident, Fulks remained in charge, with Basham merely following Fulks's orders.

After leaving Hawkins, Fulks and Basham drove to Portage, Indiana, where, on November 6, 2002, they abandoned Hawkins's truck at a hotel and proceeded on foot to a trailer shared by Tina Severance and Andrea Roddy. Fulks had met Severance at the Westville (Indiana) Correctional Institute in 2001, while he was serving time there and she was working as a correctional officer. After a few hours in the trailer, Fulks and Basham became very nervous, and the four of them (Fulks, Basham, Severance, and Roddy) travelled in Severance's van to the Sands Motel in northern Indiana, where they spent the next two nights. At some point while at the Sands Motel, Fulks told Severance that he had escaped from prison because he feared a lengthy prison sentence on the pending child abuse charges. During their second night

---

[3] The government had photographs of the child to support its allegation that Fulks abused the child by striking his testicles, burning his genital area, bruising his back, and leaving a choke mark on his neck. (Presentence Investigation Report "PSR" at 29.)

at the Sands Motel, Fulks asked Severance if she knew where they could obtain firearms. She replied that a friend, Robert Talsma, kept firearms at his home in nearby Michigan City, Indiana. On the morning of November 8, 2002, in accordance with a preconceived plan, Severance and Roddy lured Talsma away while Fulks and Basham broke into his home and stole several firearms, as well as a ring and some checks.

The four of them then drove Severance's van to Sturgis, Michigan, where they rented a motel room. Basham and Roddy spent the night of November 8, 2002, at the motel, while Fulks and Severance spent that night in Goshen, Indiana, smoking marijuana and methamphetamine with Fulks's brother, Ronnie Fulks. The next day, Fulks and Severance returned to the Sturgis motel to find Basham crouched on the floor holding a gun. Apparently convinced that the authorities had caught up with them, Basham was highly agitated, repeatedly asserting that he was going to shoot a police officer. He eventually calmed down, and the four then drove to the Indiana home of Ronnie Fulks, where they spent the night.

On November 10, 2002, Fulks, Basham, Severance, and Roddy, with Fulks driving Severance's van, travelled to Piketon, Ohio, where they checked into a Town and Country Motel. They then drove to a nearby Wal-Mart, where Basham wrote bad checks for items that Roddy later returned for cash. Also on November 10, 2002, at a K-Mart in Piketon, Ohio, Fulks met a young woman with a butterfly tattoo (later determined to be Heather Jacobi) with whom he used drugs. On that same date, Fulks stole a purse and cell phone belonging to nineteen-year-old Amy Ward from a vehicle parked at a Wal-Mart in Waverly, Ohio. On the following day, Fulks, Basham, Severance, and Roddy drove to Kenova, West Virginia, and rented a room at the Hollywood Motel. Fulks and Basham then left the motel, not to return until the early morning hours of November 12, 2002.

According to statements Fulks made to the FBI in 2003, after he and Basham left the Hollywood Motel on November 11, 2002, they smoked methamphetamine and then drove to the Barboursville Mall, near Huntington, West Virginia, intending to break into cars and steal purses. When they arrived at the mall, they split up. The next time Fulks saw Basham, he was driving a car up and down the rows of the parking lot and yelling Fulks's name. In the passenger seat was the owner of the car, a nineteen-year-old Marshall University student named Samantha Burns. After spotting Basham, Fulks returned to Severance's van and followed Basham and Burns to a Foodland grocery store, where Fulks left the van and began driving Burns's car. They

4

then visited several automatic teller machines and withdrew cash from Burns's account. They later returned to the Foodland to retrieve the van, at which point Basham announced that he wanted to find a place to rape Burns. Fulks then followed Basham in Severance's van to a secluded area by the Ohio River. Fulks parked some distance from Burns's car, and in such a way that his view of the passenger side of the car was obstructed. He observed Basham exit the driver's side of the car and walk around to the passenger's side. He saw nothing else until about twenty minutes later when Basham-alone-drove Burns's car to where Fulks was parked and informed Fulks that he wanted to burn the vehicle in order to remove any fingerprints. After buying gasoline, Basham set fire to Burns's car on a rural road near Lavalette, West Virginia, and he and Fulks returned to the Kenova motel. From that point forward, Basham wore, on a chain around his neck, a heart-shaped ring that was later determined to belong to Burns. Although both Fulks and Basham have admitted that Burns is dead, her body has never been recovered.[4]

On November 12, 2002, Fulks, Basham, Severance, and Roddy drove the van to Little River, South Carolina, where Fulks had lived during the late 1990s. During their trip to Little River, Basham repeatedly taunted Severance by asking whether she wanted to go "swimming" in the Ohio River. Fulks eventually ordered Basham to stop teasing Severance, and Basham complied. When the four of them arrived at Little River, they checked in at the Lake Shore Motel. Fulks and Basham spent the following day, November 13, 2002, breaking into cars and stealing purses. On November 14, the four left Little River for the Beach Walk Hotel in Myrtle Beach, South Carolina. After checking in, Fulks and Basham left the hotel in Severance's van.

At around 2:00 p.m. on November 14, 2002, Carl Jordan stumbled upon Fulks and Basham burglarizing his son's residence outside Conway, South Carolina. According to Jordan, both Fulks and Basham fired gunshots at him, with Fulks shooting out the back window of Jordan's truck.[5] Jordan then attempted to retreat in his truck, with Fulks and Basham following in Severance's van. Fulks and Basham eventually gave up the chase, abandoned Severance's van, and stole a white pickup truck. They then made their way to

---

[4] In connection with Burns's death, Basham and Fulks each received sentences of life imprisonment in the Southern District of West Virginia, after pleading guilty to the federal offense of carjacking resulting in death, in violation of 18 U.S.C. § 2119.

[5] A defense expert testified at trial that the trajectory of the bullet that shattered the window of Jordan's truck belied Jordan's belief that Fulks had fired the shot.

a Wal-Mart store in Conway, South Carolina, where, according to Fulks's 2003 statements to the FBI, they planned to steal a car.

At 2:37 p.m. that same day, a Wal-Mart surveillance camera recorded a blue BMW driven by Alice Donovan enter the Wal-Mart parking lot, with Fulks and Basham following closely behind. As Donovan parked, Basham exited the truck and approached the BMW while Fulks circled the row of vehicles and parked opposite the BMW. Both vehicles then began moving again, travelling outside the range of the cameras. Fulks soon abandoned the pickup truck and began driving the BMW, with Basham and Donovan in the back seat. After leaving the Wal-Mart parking lot, Fulks and Basham made several (some successful) attempts to withdraw money from Donovan's account at various automatic teller machines. At some point, they crossed into North Carolina and stopped at a cemetery, where first Basham and then Fulks raped Donovan. According to Fulks's statements to the FBI, he did not want to rape Donovan but felt pressure from Basham to do so. They then reentered South Carolina and, according to Fulks, Basham ordered him to stop along a dirt road so that they could leave Donovan tied up, in order to prevent her from contacting the authorities. Fulks complied with this request and Basham, carrying a gun but no rope or tape that Fulks could see, began leading Donovan away from the car. Donovan implored Fulks to convince Basham to leave the gun in the car, but Basham refused to do so. Basham then led Donovan into the woods and out of Fulks's sight. He returned twenty minutes later, alone. As with Burns, both Fulks and Basham have admitted that Donovan was killed, but her body has never been found.[6]

Fulks and Basham then returned to the Beach Walk Hotel in Myrtle Beach, where they informed Severance and Roddy that the police were in possession of the van, and that Fulks and Basham needed to return to West Virginia alone. According to Fulks, it was on their return journey to West Virginia that Basham first informed him that he had killed Burns and Donovan. On November 15, 2002, Fulks and Basham arrived in Huntington, West Virginia, and spent the next two nights smoking crack cocaine at the residence of Beth McGuffin, a friend of Fulks. McGuffin testified that, during the time she spent with Fulks and Basham, Fulks controlled what he and Basham did.

---

[6] As noted in this order, Donovan's remains were found subsequent to the Fourth Circuit's decision on the direct appeal of Fulks's conviction.

Two days after arriving at McGuffin's home, on November 17, 2002, Fulks and Basham drove to the Ashland Mall in nearby Ashland, Kentucky, where they planned to break into cars. At around 7:30 p.m., in the Ashland Mall parking lot, Basham attempted to carjack Deanna Francis and her fifteen-year-old daughter. After Francis reported the incident, a police officer spotted Basham and began to pursue him on foot. Basham initially eluded the officer by running behind some railcars, but he was apprehended at around 9:00 p.m. that evening, hiding across the railroad tracks in the Ohio River.

Fulks returned to McGuffin's home late that same evening and was there when the television stations reported Basham's arrest. The following day, November 18, 2002, Fulks left Huntington in Donovan's BMW for his brother's home in Goshen, Indiana. That evening, an Ohio State Trooper, having observed the BMW and ascertained that it was stolen, attempted to apprehend Fulks at a rest area near Marion, Ohio. Following a highway chase reaching speeds of 130 miles per hour, Fulks narrowly escaped. He arrived at his brother's home in Indiana on the evening of November 19, 2002, and, on the morning of November 20, 2002, hid the BMW in a barn near Bristol, Indiana. Police officers had earlier set up a surveillance operation at Fulks's brother's home and, on the afternoon of November 20, 2002, after a brief foot chase, Fulks was finally apprehended.

Fulks, 454 F.3d at 413–17.

*The Criminal Indictment and Notice to Seek the Death Penalty*

Fulks and Basham were indicted in the District of South Carolina on December 17, 2002. The Grand Jury returned a Superseding Indictment on April 23, 2003, charging Fulks and Basham with eight separate offenses and setting forth special findings supporting the imposition of the Death Penalty on the first two Counts: (1) carjacking resulting in Alice Donovan's death (18 U.S.C. § 2119); and (2) kidnapping resulting in Alice Donovan's death (18 U.S.C. § 3571).

The notice of intent to seek the death penalty was filed on September 13, 2003, pursuant to 18 U.S.C.A. § 3593(a) and the Federal Death Penalty Act ("FDPA").

*Appointment of Defense Counsel*

Pursuant to the Federal Death Penalty Act,[7] this court initially appointed two attorneys to represent Fulks: John H. Blume and William F. Nettles IV. Attorney Sheri Lynn Johnson also began working on the case from the beginning (HT Vol. 4 at 10), and the court subsequently admitted her pro hac vice. These lawyers were joined by an array of pro bono lawyers and law students from Blume and Johnson's clinic at Cornell Law School to provide an experienced defense team to represent Fulks.

*Counsel's Qualifications*

Blume graduated from Yale Law School in 1984, and served as a law clerk to the Honorable Thomas A. Clark of the United States Court of Appeals for the Eleventh Circuit. After several years in private criminal defense practice, he became the Executive Director of the South Carolina Death Penalty Resource Center in 1988, where he remained until 1996. He joined Cornell Law School as a professor in 1993, and, in conjunction with Cornell professors Sheri Lynn Johnson and Stephen Garvey, formed the Cornell Death Penalty Project to "foster empirical scholarship on the death penalty, offer students an opportunity to work on death penalty cases, and provide information and assistance to death penalty lawyers."[8] Blume teaches courses on criminal procedure, evidence law, the Death Penalty in America, and also supervises several capital clinics at Cornell Law School. Additionally,

---

[7] The Federal Death Penalty Act of 1994 was enacted as Title VI of the Violent Crime Control and Law Enforcement Act of 1994 and became effective on September 13, 1994. See Pub. L. No. 103-322, Title VI, §§ 60001-26, Sept. 13, 1994, 108 Stat. 1959 (codified at 18 U.S.C. § 3591-3598).

[8] See http://www.lawschool.cornell.edu/faculty/bio.cfm?id=5; last checked July 29, 2010.

since 1996 Blume has served on the Habeas Assistance and Training Project Counsel which consults with the Defender Services Committee of the Administrative Office of the United States Courts.

In addition to his noteworthy scholarly activity,[9] Blume has been an active presenter at related educational seminars.[10] In recent years, Blume has been involved as counsel of

---

[9] According to Blume's CV, which is available on the Cornell Law School website, Blume has recently authored the following publications: *In Defense of Non-Capital Habeas: A Reply to Hoffman and King*, with Sheri Johnson, and Keir Weyble, Cornell L. Rev. (forthcoming, Fall 2010); *When Lightning Strikes Back: South Carolina's Return to the Unconstitutional, Standardless, Capital Sentencing Regime of the Pre-Furman Era*, Charleston L. Rev., (forthcoming, Fall 2010); *The Dance of Death or (Almost) "No One Gets Out of Here Alive": The Fourth Circuit's Capital Punishment Jurisprudence*, with Sheri Johnson, Emily Paavola, and Keir Weyble, 61 S.C. L. Rev. 465 (2010); FEDERAL HABEAS CORPUS UPDATE, with Mark Olive, Denise Young & Keir Weyble (Administrative Office of the U.S. Courts, 20th Ed., August 2009); *Unstacking the Deck: A Handbook for Capital Defense Attorneys Challenging the State's Case in Aggravation*, with Emily Paavola (Death Penalty Defense and Resource Center, December 2009); *Statement Handbook: Questions to Ask About the Admissibility of a Criminal Defendant's Statements*, with Emily Paavola (Death Penalty Defense and Resource Center, August 2009); *Gilmore v. Utah: The Persistent Problem of Volunteers*, in Blume & Steiker, DEATH PENALTY STORIES (Foundation Press 2009); *Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, with Sheri Johnson and Christopher Seeds, 18 Cornell J.L. & Pub. Pol'y 689 (2009); *An Empirical Look at Atkins v. Virginia and its Application in Capital Cases*, with Sheri Johnson and Christoper Seeds, 76 Tenn. L. Rev. 625 (2009); *Back to the Future: Reversing Keith Simpson's Death Sentence and Making Peace with the Victim's Family Through Post-Conviction Investigation*, 77 UMKC L. Rev. 963 (2009); *Mental Retardation and the Death Penalty Five Years After Atkins*, with Sheri Johnson and Christopher Seeds, in THE FUTURE OF AMERICA'S DEATH PENALTY (Carolina Academic Press 2009); *Crime Labs and Prison Guards: A Comment on Melendez-Diaz and its Potential Impact on Capital Sentencing*, with Emily Paavola, 3 Charleston L. Rev. 205 (2009).

[10] In 2009 alone, Blume made the following presentations: "*'Volunteers:' The Relationship between Suicide and Death Row Inmates who Waive their Appeals*," American Academy of Psychiatry and the Law Annual Meeting, November 2009, Baltimore, MD; .*"New Hope for an Old Punishment? What will the Future Bring: The Death Penalty in Thailand and China*," Clarke East Asia Speaker Series, Cornell Law School, October, 2009, Ithaca, NY; "*The Fourth Circuit's Capital Punishment Jurisprudence*," Fourth Circuit Symposium, University of South Carolina School of Law, October 2009, Columbia, SC; *"Criminal Cases Pending before the Supreme Court," Supreme Court Preview*, William & Mary School of Law, October 2009, Williamsburg, VA; "*Supreme Court Update,"* National Habeas Corpus Seminar, August 2009, Pittsburgh, PA; "*Protecting Relief: Strategies for Getting Certiorari Denied*," Supreme Court Advocacy Institute, New York University School of Law, June 2009, New York, NY; "*An Empirical Analysis of Post-Atkins Mental Retardation Claims in Capital Litigation*," National Seminar on the Development and Presentation of Mitigating Evidence in Capital Cases, April 2009, Philadelphia, PA; "*The Death Penalty: What Will the Future Bring?*" Charleston Law School, March 2009, Charleston, SC. From 2001 to 2008,

record in eighteen cases in which the federal death penalty was sought.  He was successful in securing a verdict of life without parole, either by way of a jury verdict or a negotiated plea, in all eighteen cases.  Further, he has been involved in approximately twenty habeas actions brought pursuant to § 2254 challenging state death penalty convictions, and an additional twenty federal proceedings under § 2255.

Recently, Blume served as the featured speaker at a symposium in Columbia, South Carolina, sponsored by the South Carolina Law Review.  The symposium focused on Fourth Circuit appellate procedures and jurisprudence.  As an outgrowth of that project, Blume has authored an article published in the South Carolina Law Review dealing with the Fourth Circuit's death penalty jurisprudence.  61 S.C. L. Rev. 3 (2010).  He is also the coauthor of an article that appeared in the March 2010 issue of the South Carolina Lawyer magazine, a publication of the South Carolina Bar.  John H. Blume and Emily C. Paavola, *Is It Admissible?  Tips for Criminal Defense Attorneys on Assessing the Admissibility of a Criminal Defendant's Statements*, South Carolina Lawyer, March 2010, at 28.

William F. Nettles IV has been an Assistant Public Defender with the Federal Public Defender's Office in Florence, South Carolina, for the past fifteen years.  After graduating from the University of South Carolina School of Law in 1988, Nettles served as a law clerk to the Honorable John Hamilton Smith of the South Carolina Circuit Court before becoming an Assistant Solicitor.  Thereafter, he worked for five years in private practice before joining the Federal Public Defender's Office.

---

Blume made at least twenty-one other presentations.

Assisting Blume and Nettles on a pro bono basis was Sheri Lynn Johnson, also a Professor of Law at Cornell Law School, where she has served as the Assistant Director of the Cornell Death Penalty Project since 1996. Johnson graduated from Yale Law School in 1979, and worked for a year in the Criminal Appeals Bureau of the New York Legal Aid Society before joining the Cornell Law School faculty in 1981. She currently teaches constitutional and criminal law, and supervises the Post-Conviction Litigation and Capital Trial Clinics.

Like Blume, Johnson balances her academic work with courtroom participation in capital criminal cases. She has worked on two death penalty trials and has also been involved, directly or as second chair, with eight additional capital cases that were resolved short of a trial. Significantly, of the ten capital cases she was involved with prior to this case (two trials and eight pleas), all of the defendants received a life sentence rather than the death penalty. Johnson has also worked on approximately thirty capital post-conviction relief petitions over the last fifteen years.

Blume and Johnson utilized the services of several Cornell law students primarily to perform basic legal research and locate witnesses. Additionally, the trial team included the assistance of Blume's associate in his South Carolina office, Keir Weyble. Further, pursuant to the provisions of the FDPA, this court authorized the defense team to enlist the assistance of various professionals including social workers, mitigation specialists, investigators, physicians, and mental health experts. Numerous submissions for compensation of these necessary adjuncts were submitted to the court and none was declined. It appeared to the

court that because the crime spree involved in this case spanned seventeen days and covered seven states, with thirteen identifiable victims (including two women who were raped and killed, and several other individuals who narrowly escaped death), the defense team would need a full panoply of resources to mount a proper defense to what promised to be a vigorous prosecution by the United States government.

*The Guilty Plea*

In January 2004, the court determined that it would be necessary to sever Basham and Fulks for separate trials. On May 4, 2004, six days before the scheduled commencement of jury selection, Fulks decided to tender pleas of guilty to all eight counts of the superseding indictment and the court began the colloquy required by Rule 11 of the Federal Rules of Criminal Procedure. With regard to the carjacking and kidnapping counts on which the prosecution was seeking the death penalty, Fulks admitted to raping Donovan, but disclaimed any knowledge or participation in her murder.

Near the end of the Rule 11 colloquy, the court asked Fulks to detail his involvement in the crimes for which he was pleading guilty. Fulks responded, through Blume, his attorney, that he would rely on his Rule 302 Statement (the "302") given to the Federal Bureau of Investigation during the investigatory stage of the case. When the court expressed its concern about the propriety of accepting a guilty plea to an offense carrying a potential death sentence without a clear admission by the defendant that he participated in the conduct

at issue, defense counsel suggested that, for Count One at least, a guilty plea could be tendered pursuant to the <u>Pinkerton</u> theory of liability.[11]

After the court expressed its continued concern regarding the validity of the tendered plea, the court adjourned the Rule 11 colloquy for four days and invited counsel for both the government and the defendant to research the issue and submit memoranda on the viability of a guilty plea to a capital case under <u>Pinkerton</u>.

Both the government and the defense responded with memoranda arguing that a plea pursuant to <u>Pinkerton</u> was appropriate under the circumstances presented in this case. The court thereupon accepted Fulks's guilty plea as to Count One, premised upon a <u>Pinkerton</u> theory of liability, and then accepted Fulks's plea to Counts Two through Eight as well, with no reliance on <u>Pinkerton</u>.

Upon Fulks's guilty plea, the court proceeded with the penalty phase to select jurors who would determine Fulks's sentence. Jury selection on the penalty phase of the case required two weeks beginning May 10, 2004. The five-week trial commenced on June 1, 2004, and on June 30, 2004, the jury deliberated and returned a verdict of death on Counts One and Two. The jury convicted Fulks on the remaining noncapital counts as well.[12]

---

[11] Under the <u>Pinkerton</u> doctrine, a conspirator may be held liable for an act committed by a fellow conspirator when the act is committed in furtherance of the conspiracy, falls within the scope of the conspiracy, or is reasonably foreseeable as a natural consequence of the conspiracy. <u>Pinkerton v. United States</u>, 328 U.S. 640, 647–48 (1946).

[12] The remaining noncapital counts to which Fulks pled guilty, in addition to the carjacking and kidnapping offenses, were: (1) interstate transportation of a stolen motor vehicle (18 U.S.C. § 2312); (2) conspiracy to commit numerous offenses, including carjacking and kidnapping (18 U.S.C. § 371); (3) conspiracy to use firearms in furtherance of a crime of violence (18 U.S.C. § 924( o)); (4) use of a firearm during and in relation to a crime of violence (18 U.S.C. § 924(c)(1)(A)); (5) being felons in possession of

*Direct Appeal of Fulks's Conviction*

*Direct Appeal of Fulks's Conviction*

Fulks thereafter appealed to the United States Court of Appeals for the Fourth Circuit, raising seven appellate issues. Fulks's trial counsel (Blume, Nettles, and Blume's law partner, Keir Weyble) were also appointed to represented Fulks on direct appeal.

The seven contentions of error raised by Fulks on direct appeal were that: (1) the district court erroneously permitted the prosecution to present testimony from two witnesses not included on its pretrial witness list; (2) the court abused its discretion in qualifying three jurors who were unconstitutionally prone to impose the death penalty; (3) the court abused its discretion in denying Fulks a new trial on the basis of a juror's failure to disclose during voir dire that her first husband had been murdered; (4) the court abused its discretion in qualifying two jurors whose life experiences rendered them incapable of impartially deciding Fulks's case; (5) the court abused its discretion in excluding testimony concerning three polygraph examinations of Fulks; (6) the court abused its discretion in permitting Donovan's sister to read the jury a 1990 letter that Donovan had written her; and (7) the court erred in concluding that the relaxed evidentiary standard applicable to capital sentencing proceedings is constitutional. Fulks, 454 F.3d at 410.

On July 27, 2006, the Fourth Circuit issued its decision rejecting all seven grounds for appeal and affirming the sentence of death on both Counts One and Two. Fulks, 454 F.3d at 410. Fulks then petitioned the United States Supreme Court for a writ of certiorari. The

---

firearms (18 U.S.C. § 922(g)(1)); and (6) possession of stolen firearms (18 U.S.C. § 922(j)). Fulks, 454 F.3d at 415 n.3.

14

Supreme Court denied the petition on June 25, 2007. <u>Fulks v. United States</u>, 551 U.S. 1147 (2007).

<p style="text-align:center">*Appointment of Counsel for the §2255 Petition*</p>

Following the refusal of the Supreme Court to hear the case, this court appointed counsel to represent Fulks in his yet-to-be-filed § 2255 petition. Rather than appoint one attorney as allowed by the Federal Death Penalty Act, this court appointed two attorneys to represent Fulks on his collateral review: Beattie B. Ashmore and William W. Watkins, Jr.

Ashmore graduated from the University of South Carolina School of Law and was admitted to the South Carolina Bar in 1987. He was admitted to the United States District Court for the District of South Carolina in 1990 and to the United States Court of Appeals for the Fourth Circuit in 1992. Ashmore worked as an Assistant United States Attorney for the District of South Carolina from 1990 until 1996. He was a partner in the law firm of Ashmore and Yarborough, P.A., in Greenville, South Carolina, from 1996 until 2000, and since 2000, he has been a partner with Price, Ashmore & Beasley, P.A. Ashmore was appointed by the South Carolina Supreme Court in 2005 to the Commission on Lawyer Conduct. He has had significant indigent criminal defense experience, including handling both appellate matters and general criminal defense in both state and federal court. His trial experience includes serving as lead counsel in numerous criminal trials. His appellate experience, covering more than a dozen appeals at the Fourth Circuit, includes several criminal appeals.

<p style="text-align:center">15</p>

Watkins graduated from the University of South Carolina School of Law in 1999 and served as a law clerk for two years to the Honorable William B. Traxler, Jr., on the United States Court of Appeals for the Fourth Circuit. He was admitted to the United States District Court for the District of South Carolina and to the United States Court of Appeals for the Fourth Circuit in 2001. After his federal clerkship, Watkins worked at the law firm of Womble Carlyle Sandridge & Rice, PLLC, in Greenville, South Carolina. He has substantial experience on issues of federal jurisdiction and appellate procedure, and as a member of his firm's appellate litigation team, he devoted a considerable amount of his time to appellate work in the state and federal systems. Watkins also serves as a pro bono Special Prosecutor for the South Carolina Attorney General's Office and is a Section Counsel Officer for the South Carolina Bar's Trial and Appellate Advocacy Committee.

As with trial counsel, this court was receptive to repeated requests by Fulks's new team of lawyers for compensation for expert and investigatory assistance. The court was informed that the new attorneys representing Fulks in his § 2255 petition would necessarily have to retrace the steps taken by trial counsel in an effort to ascertain if trial counsel had properly interviewed witnesses, pursued available defenses, and adequately researched Fulks's life story. This necessitated a renewed sweep by § 2255 counsel of the seven states involved in the seventeen-day crime spree, review of the voluminous record assembled thus far in this case, and interviews with Fulks's original trial lawyers.

In the Fall of 2008, one of Fulks's appointed § 2255 attorneys, Watkins, accepted an offer to become an Assistant United States Attorney for the District of South Carolina. When

the court was informed of this development, it issued a stern warning to Watkins that a "Chinese wall" would have to be erected between him and any other employee of the United States Attorneys Office. Although the investigation had been completed and the initial briefs filed, out of an abundance of caution, the court appointed attorney Kirsten E. Small of Greenville, South Carolina, as substitute counsel to replace Watkins.

Small graduated from Georgetown University Law Center in 1994 and is admitted to the bars of Maryland, North Carolina, and South Carolina, and to the United States District Court for the District of South Carolina, the United States Court of Appeals for the Fourth Circuit, and the United States Supreme Court. She served as a law clerk to the Honorable William W. Wilkins of the United States Court of Appeals for the Fourth Circuit from 1994 until 2007, when she began working at Nexsen Pruet, LLC, in Greenville, South Carolina. She has been appointed to serve on the United States Court of Appeal's Criminal Justice Appellate Panel Committee for the Fourth Circuit and has substantial experience on issues of federal jurisdiction and appellate procedure. As a member of her firm's appellate litigation team, she devotes a considerable amount of her time to appellate work in the state and federal systems. The court found that Small was qualified to handle this matter in conjunction with Ashmore.

The court-appointed attorneys selected by this court were assisted on a pro bono basis by at least six lawyers from the San Francisco, California, firm of O'Melveny & Myers, LLP. That firm has been involved in this litigation from the outset of post-conviction proceedings, including attorneys David P. Dalke, Kymberleigh Damron-Hsiao, Amy J. Laurendeau,

Stephanie L. Noble, Danielle N. Oakley, and Amy J. Longo. Dalke, Damron-Hsiao, Noble, and Oakley participated in the evidentiary hearing on the § 2255 petition. Suffice it to say that the pro bono lawyers from O'Melveny & Myers, each of whom demonstrated superior intellect and excellent writing and debating skills, contributed measurably to the efforts of the court-appointed counsel in this case.

*Fulks's § 2255 Petition*

Section 2255 provides federal prisoners with the statutory vehicle for collaterally challenging the lawfulness of their convictions. That section states in relevant part as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.
>
> * * *
>
> If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. § 2255.

As a general rule, relief under § 2255 is limited to errors which were jurisdictional, rose to the level of a constitutional violation, resulted in a "complete miscarriage of justice," or led to proceedings which were "inconsistent with the rudimentary demands of fair

18

procedure." <u>United States v. Timmreck</u>, 441 U.S. 780, 783–84 (1979) (citing <u>Hill v. United States</u>, 368 U.S. 424 (1962)).

Fulks's initial § 2255 petition[13] (ECF No. 1090) was filed on June 23, 2008, just before the one-year statutory deadline established by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Contemporaneously with the filing of the § 2255 petition, Fulks's counsel filed a motion requesting 120 days to file a memorandum of law in support of the § 2255 petition, which extension the court granted, rendering the memorandum due by October 21, 2008. Fulks timely filed an amended § 2255 petition and memorandum which supplemented the original petition, but did not add new grounds.[14]

### The Interlocutory Appeal on Production of Attorney Records

The court originally scheduled an evidentiary hearing on the § 2255 petition for September 28, 2009. In the weeks leading up to the scheduled hearing, the government moved, successfully, for an order of this court requiring Fulks's original trial team to turn

---

[13] The matter before the court is, technically speaking, a motion under 28 U.S.C. § 2255. All parties have, however, referred to the motion as a "petition," and Fulks as the "Petitioner." For consistency, the court will adopt this nomenclature.

[14] For ease of reference, citations to the Amended Petition in the order that follows will be "Pet. at ___," it being understood that it is the Amended Petition from which the court is working. Additionally, because it will be necessary for the court to cite from Fulks's trial, Basham's trial, and several pre and post trial hearings in both cases, the court will adopt the following abbreviations for references to testimony and exhibits in this case: TT = trial transcript of Fulks's Penalty Phase Trial in June 2004; HT = transcript of evidentiary hearing on Fulks's § 2255 petition in February 2010; Basham TT = trial transcript of co-defendant Brandon Basham's trial in November 2004; Govt. Ex. ___ = Government's Exhibits introduced at the § 2255 evidentiary hearing; Pet. Ex. ___ = Petitioner's Exhibits introduced at the § 2255 evidentiary hearing; and Pet. App. Ex.___ = Exhibits from Petitioner's Appendix attached to his § 2255 petition, as amended. In addition, Claim 33 is the subject of a separate document and referred to herein as Supp. Pet. at ___.

over its records pertaining to the case, contending that Fulks had waived the attorney-client privilege by asserting ineffective assistance of counsel. After the court entered its order requiring Blume, Nettles, and Johnson to turn over their files and records, Fulks took an interlocutory appeal on September 15, 2009, to the Fourth Circuit for a stay pending appeal and to place the case in abeyance, which motions the Fourth Circuit denied by order filed September 28, 2009. The court necessarily cancelled the evidentiary hearing on the § 2255 petition, and rescheduled the hearing for October 5, 2009.

Prior to the § 2255 evidentiary hearing, Fulks appealed to the United States Supreme Court on the question of whether trial counsel's records had to be produced. By order dated October 19, 2009, the Supreme Court stayed this court's orders compelling production to the government of materials pertaining to communications and advice between Fulks and his trial counsel pending further order. The court necessarily cancelled the evidentiary hearing on the § 2255 petition scheduled for October 5, 2009.

The Supreme Court subsequently issued a decision bearing on the issues in Fulks's appeal in an unrelated case, Mohawk Indus., Inc. v. Carpenter, ____U.S. ____, 130 S. Ct. 599 (2009). The Court in Mohawk held that disclosure orders adverse to the attorney-client privilege do not qualify for immediate appeal under the collateral order doctrine. Id. As a result of the Mohawk decision, the Supreme Court dissolved its stay on Fulks's appeal and the case was ultimately returned to this court for a hearing on the merits. After discussions

with counsel, the court rescheduled the evidentiary hearing on the § 2255 petition for February 22, 2010.[15]

*Discovery of Donovan's Remains and Amendment to § 2255 Petition*

Approximately three months after Fulks's amended § 2255 petition was filed, bone fragments were found in the area of Horry County, South Carolina, near the intersection of Water Tower and Long Bay Roads. This was one of the three areas to which Fulks had directed authorities during the search for Donovan's body following Fulks's arrest and prior to his federal criminal trial. The other geographic area suggested by Fulks, an area known generally as Savannah Bluff, was some fifteen miles away from the Water Tower and Long Bay Roads area. The bone fragments were eventually identified by DNA testing as those of Alice Donovan.

The location of Alice Donovan's bone fragments prompted Fulks to file an additional ground to his § 2255 petition (referred to in this order as Claim 33). Therein Fulks contends that the prosecution used false information by suggesting to the jury that Fulks had misled law enforcement authorities who were searching for the Donovan remains in the months between Donovan's murder and Fulks's trial. The government did not object on timeliness grounds to the amended motion to vacate nor the addition of Claim 33 regarding the location

---

[15] During the pendency of this § 2255 proceeding, Fulks filed several motions to dismiss his appeal and expedite his execution, and subsequently withdrew them. See ECF No. 1009 filed Dec. 14, 2006 (withdrawn by ECF No. 1015 filed Apr. 5, 2007); ECF No. 1114 filed Sept. 9, 2008 (supplemented by ECF No. 1119 filed Sept. 26, 2008); and ECF No. 1126 filed Oct. 27, 2008—all motions to dismiss were withdrawn by ECF No. 1151 filed Feb. 25, 2009.

of the Donovan remains. Accordingly, the court deemed all issues properly before the court and the matter ripe for the court's review.

*Necessity for an Evidentiary Hearing*

"If [a § 2255] motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted . . . to determine whether an evidentiary hearing is warranted." Rule 8, Rules Governing Section 2255 Proceedings for the United States District Courts.

"Section 2255 of Title 28 U.S.C. provides that unless the record conclusively shows that the prisoner is entitled to no relief, the district court should conduct an evidentiary hearing and state its findings and conclusions." United States v. Young, 644 F.2d 1008, 1013 (4th Cir. 1981). "A hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed material facts and a credibility determination is necessary to resolve the issue." United States v. Coon, 205 Fed. Appx. 972, 973 (4th Cir. 2006) (citing United States v. Witherspoon, 231 F.3d 923, 925–27 (4th Cir. 2000)). Finding that some issues presented in the § 2255 petition contained a few disputes of material facts, this court held an evidentiary hearing on the matters.

After the noted procedural delays, the court commenced the § 2255 evidentiary hearing on February 22, 2010. Arrangements were made to allow Fulks to participate in the hearing via satellite from his place of incarceration, the Federal Correctional Institution in Terra Haute, Indiana. Fulks was able to view the witnesses, the court, and the attorneys in real-time video conference, and was also provided a private telephone line through which he

could conduct confidential communications with his counsel as the evidentiary hearing progressed.

Following the six-day evidentiary hearing, during which the court heard from a total of eight witnesses, the court took the matter under advisement. This order serves to announce the court's ruling on all thirty-three claims for relief.

As noted above, the court determined that an evidentiary hearing was necessary because factual disputes were present in at least some of the thirty-three claims for relief asserted by Fulks. At the evidentiary hearing, the court heard from a total of eight witnesses. Additionally, with the express consent of the parties,[16] the court received affidavits from several other witnesses.

Although the court heard from more than a dozen witnesses, either in person or by way of affidavit, the testimony of those witnesses, for the most part, did not involve disputed factual matters. In fact, there were few factual issues presented amongst the thirty-three claims raised by Fulks in § his 2255 petition. In large measure, the issues raised by Fulks's petition involve conclusions of law.

Because of the predominance of legal questions in this case, the court has determined that it would serve no useful purpose, and would more likely be counterproductive, for this court to set out its factual findings separate and apart from its conclusions of law. A more practical means for the court to comply with the mandates of 28 U.S.C. § 2255 is for the

---

[16] The parties agreed to waive their hearsay objections to the affidavits and allow the court to consider the information contained therein as if the witness had testified from the witness stand.

court to proceed through the claims asserted by Fulks in the order in which they are raised in the petition. Where a factual issue is squarely presented by one of Fulks's claims, the court will resolve that factual dispute with a factual finding imbedded within the discussion of the claim at issue. All other aspects of this court's order constitute this court's conclusions of law.[17] Because of the myriad claims asserted in this case, a separate recitation of findings of fact, followed by a recitation of the court's conclusions of law would, be more confusing than helpful to the reader.

<div align="center">§ 2255 CLAIMS</div>

<div align="center">*Standard of Review for Ineffective Assistance of Counsel Claims*</div>

The court will first address Fulks's claims of ineffective assistance of counsel. The Supreme Court has held that to establish a claim of ineffective assistance a petitioner must show that his attorneys' performance was objectively deficient and such deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Specifically, the Supreme Court stated:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or . . . sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or . . .

---

[17] Although the Fourth Circuit has never squarely addressed the issue, several other circuits have concluded that a separate listing of findings of facts followed by a separate listing of conclusions of law is not required. See, e.g., United States v. Perera, 932 F.2d 973, 1991 WL 73709 (9th Cir. 1991) (unpublished).

> sentence resulted from a breakdown in the adversary process that renders the
> result unreliable.

Id.  It is axiomatic that if the claim or claims that counsel failed to raise are devoid of legal

merit, a defendant suffers no prejudice and cannot establish a claim of ineffective assistance

of counsel. Id.  In a case where a defendant enters a plea of guilty, the defendant in order to

obtain § 2255 relief must show that (1) his or her counsel's representation fell below an

objective standard of reasonableness demanded of attorneys in criminal cases;  and (2) there

is a reasonable probability that, but for counsel's errors, he or she would have proceeded to

trial instead of pleading guilty.  See Hill v. Lockhart, 474 U.S. 52, 56–59 (1985).

The defendant bears the burden of proof as to both prongs of the Strickland standard.

First, the defendant must show that counsel's representation "fell below an objective standard

of reasonableness" as measured by "prevailing professional norms." Id. at 688.  Courts

should be deferential in this inquiry, and have "a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance." Id. at 689. The defendant

must therefore overcome the presumption that the representation "might be considered sound

trial strategy." Id. (citation and internal quotation marks omitted).

Second, the defendant must demonstrate that counsel's inadequate performance

prejudiced him. Id. at 687. Thus, the defendant must show "a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different."

Id. at 694. A reasonable probability, in turn, is defined as "a probability sufficient to

undermine confidence in the outcome." Id.  Additionally, courts may bypass the performance

prong and proceed directly to the prejudice prong when it is easier to dispose of the case for lack of prejudice. Strickland, 466 U.S. at 697.

<div align="center">CLAIM 1:<br>MENTAL HEALTH MITIGATION</div>

In Claim 1, Petitioner argues that trial counsel were ineffective for failing to present a meaningful mental health case in mitigation. Specifically, Petitioner claims that trial counsel should have presented the testimony of Drs. Seymour Halleck, Margaret Melikian, James Hilkey, and William Morton. These mental health experts had been retained by trial counsel and were prepared to testify at Fulks's trial, but trial counsel did not call them to testify.

A review of the trial record reveals that trial counsel presented a substantial mental health case. Trial counsel had to make difficult strategic decisions concerning the amount and type of mental health testimony to present—sufficient to convince the jury, but not of the type that would open the door to some type of counter-attack by the government. Mental health evidence is a "double-edged sword that might as easily condemn a defendant to death as excuse his actions." Truesdale v. Moore, 142 F.3d. 749, 755 (4th Cir. 1998); Byram v. Ozmint, 339 F.3d 203, 210 (4th Cir. 2003) (counsel were not ineffective for failing to present testimony by a psychiatrist and a psychologist because the suggestions of antisocial behavior which the experts found could have been harmful to the defense).

In developing its mental health case in mitigation, Fulks's trial team hired or consulted with many experts, including the following individuals: Drs. Jonathan Venn, David

<div align="center">26</div>

Bachman, Ruben Gur, Christos Davatzikos, Fred Bookstein, James Evans, Margaret Melikian, Seymour Halleck, James Hilkey, Arlene Andrews, and Howard Becker.

Trial counsel initially retained Dr. Venn to complete a neuropsychological battery of evaluations on Fulks, including Halstead-Reitan testing. According to Dr. Venn's seventeen-page neuropsychological evaluation report dated March 30, 2004 (Gov't Ex. 10G), he examined Petitioner on at least eight occasions, and also interviewed several individuals in preparing his report. Specifically, Dr. Venn interviewed Dr. Elin Berg, a psychiatrist who treated Fulks during his pretrial detention; Betty Burroughs, a mental health social worker who saw Fulks during his pretrial detention; Lieutenant Bob Garrison of the Lexington County Detention Center; and Dr. Oliver P. Harden, a physician who treated Fulks during his pretrial detention. Because Dr. Venn's neuropsychological battery indicated that Fulks was low functioning and that he had brain damage, trial counsel asked neurologist Dr. Bachman to also conduct a neurological evaluation of Fulks. Dr. Bachman believed based on his neurological exam, brain imaging tests, and patient history that Fulks most likely had a fetal alcohol spectrum disorder ("FASD").

Thereafter, the trial team retained Dr. Fred Bookstein, who conducted brain imaging studies to help confirm the FASD diagnosis. Dr. Bookstein prepared a report for trial counsel (Gov't Ex. 10A). Dr. Christos Davatzikos examined Fulks's quantitative brain imaging and prepared a report for trial counsel (Gov't Ex. 10B). The trial team also retained Dr. James R. Evans, a licensed clinical psychologist, to conduct a neurophysiological

27

evaluation report (Gov't Ex. 10C), which indicated that Fulks had brain damage and neuropsychological impairment, and other mental illnesses.

In determining the range of potential mental health issues involved in Fulks's case, trial counsel consulted with psychologist Dr. James Hilkey (Gov't Ex. 16), and forensic psychiatrist Dr. Seymour Halleck (Gov't Ex. 15). Trial counsel also retained psychologist Dr. Ruben Gur, forensic psychiatrist Dr. Margaret Melikian, and Dr. Howard Becker, a teaching expert with academic expertise in FASD. Trial counsel conducted multiple focus groups and also retained attorney Jeff Bloom, a jury/litigation consultant, to conduct a mock trial and record the mock jury's deliberations and comments (Gov't Exs. 6–8). Bloom's efforts resulted in a recommendation that FASD evidence was the strongest mitigator for trial counsel to pursue.

After conducting a thorough mental health investigation, including input from at least ten mental health experts, trial counsel decided to call six experts to present Fulks's mental health case in mitigation. Contrary to Petitioner's contentions, trial counsel presented a substantial mental health case that did not rest singularly on a FASD diagnosis. Trial counsel presented testimony of the following experts in FASD, cognitive neuroscience, behavioral neuroscience, and neuropsychology: Dr. Ruben Gur testified as an expert in cognitive neuroscience; Dr. David Bachman testified as an expert in behavioral neurology; Dr. Howard Becker testified as an expert in FASD; Dr. James Evans testified to the battery of neuropsychological tests he administered to Fulks and to his review of tests administered by others; Dr. Fred Bookstein was qualified as an expert in biostatistics and morphometrics and

testified regarding the anatomical abnormalities of Fulks's brain and their significance; and Dr. Arlene Andrews testified as an expert in child development and conducting family history assessments. Dr. Andrews presented her research regarding Fulks's childhood and explained the significance of Fulks's childhood experiences.

Before addressing the alleged deficiencies of trial counsel, the court notes for the record Petitioner's emphasis on the ABA Guidelines, rather than the prevailing professional practice, at the time of the trial. The Supreme Court has made clear that the ABA Guidelines do not set the standard for effective representation, and the court refuses to recognize them as the constitutional standard here.[18]

Petitioner claims trial counsel did not present the jury with evidence of his mental illness and his resulting diminished capacity to conform his conduct to the requirements of the law. Fulks claims that trial counsel should have presented evidence of a litany of Fulks's mental illnesses and psychological issues.

According to Dr. Halleck's diagnosis, Fulks has Cognitive Impairment, Polysubstance Dependence, Major Depressive Disorder, Dysthymic Disorder, and Antisocial Personality Disorder. According to Dr. Melikian's diagnosis, Fulks has Cognitive Disorder, Major Depressive Disorder, Adjustment Disorder with Anxiety, Amphetamine Dependence, Cannabis Dependence, Alcohol Dependence, and Antisocial Personality Disorder.

---

[18] As Justice Alito noted in his concurring opinion, the ABA is a private organization with limited membership, and that "[i]t is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution, and I see no reason why the ABA Guidelines should be given a privileged position in making that determination." Bobby v. Van Hook, ___ U.S. ___, 130 S.Ct. 13 (2009) (Alito, J. concurring).

According to Dr. Hilkey's diagnosis, Fulks has Polysubstance Dependence, Dysthymic Disorder, and Cognitive Disorder. According to Dr. Morton's diagnosis, Fulks has Methamphetamine Dependence.

Petitioner argues that Drs. Melikian, Hilkey, Halleck, and Morton could have explained the significance of the evidence presented at trial regarding his upbringing to allow the jury to gain insight into the psychological impairments and mental illness that elucidate Petitioner's behaviors.[19]

However, a review of the trial record reveals similar testimony on these matters by the experts who were, in fact, called. Specifically, Dr. Bachman explained that Fulks suffers from FASD, a condition exacerbated by Fulks's life of alcohol and drug abuse starting from a young age, which, together with his multiple head injuries, significantly impacted his cognitive ability. (TT Vol. 18 at 31.) Dr. Gur testified that Fulks has "a highly abnormal brain," and that "the abnormality in the brain structure and function explain a lot of the behaviors, and the cognitive and emotional deficits that have been documented in his case," especially the frontal lobe portion which is the "executive that decides what to do with all that information that comes from the back of the brain. . . . [t]he one that tells you to stop, think about alternatives, particularly in relation to emotional situations." (TT Vol. 12 at 40, 47, and 79.) Dr. Gur testified that because of his abnormal brain, Fulks makes poor decisions. Dr. Bachman confirmed Dr. Gur's assessment that Fulks has an abnormal brain, and testified

---

[19] Petitioner claims that the failure to present the available mental health evidence was due to trial counsel's alleged apoplexy over the Ward/Bruning testimony, which is a separate ineffective assistance of counsel claim addressed in Claim 2.

that Fulks consistently failed to perform the tasks on the inhibition testing and the tasks requiring frontal lobe involvement. (TT Vol. 18 at 47–48.) Dr. Evans testified that his psychological testing showed Fulks had a damaged frontal lobe, which causes him to act impulsively, learn slowly, fail to plan ahead, and puts him at higher risk for criminal behavior. (TT Vol. 17 at 14–15, 34.) He explained the reasons for Fulks's diminished capacity to properly interact with others, based on visual perception impairments. Id. at 22–23. Dr. Becker testified that persons with FASD have difficulty communicating with others and picking up on social cues, they do not learn from experience, they are impulsive, and they act before thinking. Id. at 142–145.

Petitioner next claims that trial counsel failed to call experts who could have better explained "the significance of the evidence presented regarding the beatings received by Petitioner, his chaotic family environment, drug and alcohol abuse, sexual abuse, deprivations, etcetera." A review of the trial record reveals compelling testimony by Dr. Gur about the effect of one's family background on behavior:

> But behavior is, to a large extent shaped by your upbringing. It is not all biology. You can take the same kid and use the environment in order to give him a better executive. . . . They like structure, and they realize there is something wrong in their own executive, so they are looking for guidance. If you guide them well, they can turn out being fine. If they are guided otherwise, they can turn out to be very difficult.

(TT Vol. 12 at 140.)

Additionally. Dr. Andrews testified at length to the negative influences and absent parenting in Fulks's childhood development. She testified that Fulks's father did not

31

remember him at all before the age of twelve: "He doesn't remember when he was born. He doesn't remember he was in special classes at school. He doesn't remember that he tried to commit suicide." (TT Vol. 18 at 151–52.) Likewise, Dr. Andrews testified that Fulks's mother did not remember his birth or whether he went to kindergarten. (Id. at 151–152.) As explained in detail in Claim 3, Dr. Andrews explained Fulks's miserable childhood full of chaos. (Id. at 172.) Dr. Andrews testified that the lack of consistency in Fulks's life impeded his social development and made him insecure and confused. Although Petitioner claims his experts did not inform jurors about his emotional problems and substance abuse, Dr. Andrews described Fulks's substance abuse, depression, and suicide attempt, which Dr. Becker explained are secondary disabilities often arising as a result of the brain dysfunction caused by FASD. (Id. at 146–147.)

Petitioner also claims that trial counsel should have called Dr. Hilkey and Dr. Melikian to explain his borderline range of intelligence—a topic that the experts at trial fully explained. Dr. Evans testified that Fulks suffers from borderline intelligence, ranging from 75–79, moderate brain impairment, and cognitive impairment. (TT Vol. 17 at 10, 13.) Dr. Gur explained that Fulks "is clearly not a bright individual" and that his I.Q. test "comes up on the borderline, slightly above the cut of retardation. But a lot of the measures that go into that fruit salad [that make up I.Q.] are below that, well below that threshold." (TT Vol. 12 at 139.) Dr. Andrews testified that having an I.Q. above 70 actually makes people with brain damage from prenatal exposure more susceptible to breaking the law, being unemployable, being kicked out of school, and other problems. (TT Vol. 18 at 124.)

The court finds that it was not ineffective for counsel not to call additional experts to explain the possible connection between Fulks's childhood, his drug abuse, the true effects of powerful stimulants such as methamphetamine, his alleged cognitive problems and the crimes he was charged with committing. The court finds that the experts presented by trial counsel testified to such connection, as recited above.

Next, Petitioner claims that the jury was never told that his propensity for abusive conduct towards women was related to his psychological impairments and the alleged sexual abuse he experienced as a child and teen. Specifically, Petitioner claims that a teenage babysitter performed oral sex on him at age eight or nine, that around age thirteen he was molested by a friend's father, and that at age fifteen he moved in with a twenty-eight-year-old woman. However, the trial record is replete with witness testimony that Fulks's childhood environment was filled with inappropriate sexual activity including graphic pornography on the walls and ceilings; that Fulks was molested by an older man when he was a child; and that he had a sexual relationship with a "twenty-something" year old woman when he was fifteen.

As trial counsel testified during the § 2255 hearing, the trial team tried to obtain additional evidence of Fulks having been sexually abused as a child, but were unable to ferret out any. Trial counsel thought that it was very likely that Fulks had been sexually abused, but when multiple members of the trial team asked Fulks about it, he denied any sexual abuse at the hands of his family members.

The additional information which Petitioner now claims should have been presented includes Monica Wolowinski's report of Ronnie Fulks telling her the story of Chad Fulks allegedly sitting on his father's lap begging his father to stop rubbing his groin and thighs. Further, Petitioner complains that the jury did not hear of his teenage babysitter pulling down his pants when he was eight years old and performing fellatio, a story he apparently reported during his interview by Dr. Halleck. The court finds that this additional information was inherently unreliable because it came either by hearsay or by the Petitioner's self-serving statements.

Petitioner also claims that trial counsel should have called Dr. Morton to testify how heavy methamphetamine use, such as the kind Fulks participated in after escaping from jail in Hopkins County, Kentucky, can lead to confusion, paranoia, hallucinations, and homicidal thoughts. This, in turn, is said to explain the events leading to the death of Alice Donovan.

The court notes the inherent danger of the admission of the proposed testimony of the uncalled experts to explain that Fulks learned the behaviors that he later perpetrated. Testimony that Fulks was predisposed to "violent sexuality such as rape" would have tended to show Fulks had a motive to kidnap Samantha Burns and Alice Donovan, and would not have aligned with his claim that he did not want to rape Alice Donovan, but felt pressured to do so by Basham. See St. Pierre v. Walls, 297 F.3d 617, 633 (7th Cir. 2002) (facts that show a defendant has a condition or proclivity toward violence are often aggravating, not redeeming or mitigating factors). Such expert testimony would have conflicted with the themes of Fulks's defense that he did not intend to kidnap and rape Samantha Burns and

34

Alice Donovan. See Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997) (finding that trial counsel was not ineffective for not presenting testimony by a psychologist and a psychiatrist who examined the defendant for the purpose of developing mitigating evidence where the psychologist and the psychiatrist found no psychiatric or neurological disorders, but also finding that the defendant had an antisocial personality disorder that might make him a "future danger").

The additional mitigation evidence that Petitioner argues should have been presented would have also opened the door for the government to present very damaging evidence against Fulks. Such evidence might have included evidence that Fulks had physically abused his three-year-old step son and that Fulks escaped from prison because he knew he was about to be arraigned on child abuse charges. In light of the testimony by many witnesses concerning Fulks's childhood and background, any potential humanizing additional evidence would have offered an insignificant benefit compared to the potentially devastating evidence the prosecution would have offered in rebuttal. Detective Scott Smith testified that Fulks escaped from the Kentucky prison after being served with the indictment from criminal child abuse. (See TT Vol. 14 at 42–45, 52.)

After reviewing the record, the court finds that Petitioner has failed to demonstrate prejudice under Strickland for failing to present additional expert testimony on cumulative humanizing evidence. See Wong v. Belmontes, 558 U.S. ___, 130 S. Ct. 383, 387–88 (2009) (when a substantial mitigation case was presented, evidence that is merely cumulative to the humanizing evidence actually presented fails to demonstrate the prejudice necessary to meet

the prejudice prong of <u>Strickland</u>).  In evaluating whether there is reasonable probability the additional mitigation evidence would have resulted in a different verdict, this court is charged with considering all of the relevant evidence that the jury would have had before it, not just the mitigation evidence.  The court finds that trial counsel pursued a reasonable trial strategy that would have been undermined by the expert testimony that Petitioner argues should have been presented. Trial counsel carefully investigated and considered all possible mitigation evidence before making a strategic decision not to present the testimony of Drs. Halleck, Morton, Melikian, and Hilkey.

The cases that Petitioner cites for support of his claim that trial counsel were ineffective for failing to present a meaningful mental health case in mitigation are inapposite. To describe Fulks's trial counsel's death penalty experience as significant is an understatement. <u>Cf</u>. <u>Gray v. Branker</u>, 529 F.2d 220 (4th Cir. 2008) (counsel lacked any capital experience, discounted all mental condition information, never discussed nor presented any mental health evidence); <u>Belmontes v. Ayers</u>, 527 F.3d 834, 859 (9th Cir. 2008), <u>overruled by</u> <u>Wong v. Belmontes</u>, ____ U.S. ____, 130 S. Ct. 383 (2009) (trial counsel failed to consult with experts and investigate mitigating evidence for penalty phase); <u>Smith v. Mullin</u>, 379 F.3d 919 (10th Cir. 2004) (trial counsel lacked any capital experience and was unaware defendant's mental state or mental illness could be introduced as mitigation in penalty stage).

Trial counsel were well-aware of the need for expert witnesses in mitigation in a capital case.[20]  However, trial counsel did not want the jury to hear that Fulks had met the diagnostic measures of antisocial personality disorder, even if the experts did not believe that he was, in fact, antisocial.  As attorney Johnson explained, if trial counsel had put up Dr. Hilkey, then that would also open the door to the government putting up experts who would have found that his own experts' testing showed him high on the antisocial personality disorder scale, a diagnosis that counsel did not want the jury to hear.[21]  Also, trial counsel did not think it was beneficial to inject into trial a debate about whether Fulks did or did not have antisocial personality disorder, especially coming immediately after the jury heard testimony tending to show that Fulks planned and attempted to lure another victim, Ward, without Basham's help.  Trial counsel was worried it would end up impeaching its own experts' theory, such that the jury would end up believing as true the government's antisocial personality disorder diagnosis and detracting from trial counsels' theory that Basham was the instigator of the crimes.

Instead of presenting additional mental health experts to discuss the hodgepodge mix of mental illnesses that Fulks may have had, trial counsel reasonably utilized suggestions

---

[20] See John H. Blume, Sheri Lynn Johnson & Scott E. Sunby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 Hofstra L. Rev. 1035, 1041 (2008) ("First, the defense team must secure appropriate expert assistance, primarily from mental health experts.").

[21] Blume has written several articles discussing that antisocial personality disorder is a diagnosis to be avoided. See John H. Blume & David P. Voisin, *Avoiding or Challenging a Diagnosis of Antisocial Personality Disorder*, 24 Champion 69 (Apr. 2000) (antisocial personality disorder diagnosis "can be the kiss of death, because to many people, and most judges, this means that the defendant is little more than a remorseless sociopath.").

from its jury consultant and mock jury deliberations to emphasize that the criminal acts related to Fulks's brain damage, as evidenced by hard evidence such as diagnostic tests including CAT scans, PET scans, and EEGs. The court finds that trial counsels' decision not to present the testimony of Drs. Halleck, Melikian, Morton, and Hilkey was a reasonable strategic decision made after a thorough mental health investigation and in light of the risks of opening doors to damaging evidence. Therefore, the court rejects Petitioner's claim that his trial counsel were ineffective in their presentation of the mental health case in mitigation.

CLAIM 2:
REBUTTAL WITNESSES

Petitioner's second claim alleges that trial counsel were ineffective for allegedly failing to recognize that Donna Ward and Jeff Bruning could have been called as rebuttal witnesses by the prosecution.

Pursuant to 18 U.S.C.A. § 3432, the prosecution in a capital case must provide the defendant with a list of potential witnesses at least three days prior to trial.[22] The statute does not apply to witnesses called to rebut or disprove the defendant's defense. See Goldsby v. United States, 160 U.S. 70, 76 (1895); United States v. Hessler, 469 F.2d 1294 (7th Cir. 1972). The facts on this issue were summarized by the Fourth Circuit as follows:

> On May 10, 2004, the prosecution, as required by 18 U.S.C. § 3432, provided Fulks with a list of the names and addresses of 181 potential trial witnesses.

---

[22] "A person charged with treason or other capital offense shall at least three entire days before commencement of trial [] be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireperson and witness, except that such list of the venirepersons and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person." 18 U.S.C. § 3432.

Among those potential witnesses was Amy Ward, whose purse and cell phone Fulks had stolen on November 10, 2002, in Waverly, Ohio. On May 21, 2004, defense investigator Pete Skidmore met with Amy Ward and her mother, Donna Ward, seeking to determine whether Amy was the young woman with the butterfly tattoo with whom Fulks had used drugs during the escapade. At this meeting, Donna advised Skidmore that she had received a phone call on November 17, 2002, from a man purportedly seeking to meet with Amy at a local hardware store that evening at 10:30 p.m. to discuss her recent job application with the store. Donna, knowing that Amy had submitted no such job application, became suspicious, but when she attempted to ascertain the caller's identity, he hung up. Donna also told Skidmore at the May 21, 2004 meeting that she believed the caller to be the same person who had stolen Amy's purse and cell phone. Although Skidmore claims he notified Fulks's lawyers of the November 17, 2002 phone call to Donna Ward, they have no such recollection.

* * *

Amy Ward, who was scheduled to testify on June 11, 2004, arrived in South Carolina on June 10, accompanied by her father Byron Ward. Just prior to Amy's testimony, Byron, while engaged in small talk with FBI Agent Jeff Bruning, mentioned the November 17, 2002 phone call his wife Donna had received regarding Amy's purported job application at the hardware store. Agent Bruning soon began investigating whether the call could be traced to Fulks, and, with the assistance of the Sprint telephone company, discovered that the phone call had been placed using a prepaid phone card found in Fulks's possession at his arrest. With further investigation, it was established that the call had been placed at 8:38 p.m. on November 17, 2002. Because Basham was hiding from the police in the Ohio River at that very moment, the timing of the call appeared to conclusively establish that Fulks, acting alone, had placed the call. On June 17, 2004, the court ruled that Donna Ward and Agent Bruning could testify regarding the call even though they had not been included on the prosecution's pre-trial witness list. The court then offered Fulks a three-day trial hiatus so that he could prepare to meet their testimony, but Fulks's counsel declined the offer, stating that a three-day recess would be useless at that point in the trial.

United States v. Fulks, 454 F.3d 410, 418–19 (4th Cir. 2006).

Specifically, Petitioner claims that he was prejudiced because his trial counsel decided to present some, but not all, of the testimony by mental health experts, allegedly as a result of the unexpected testimony by Donna Ward and Agent Bruning.

At trial, Fulks's counsel argued that he was not the leader during the events of November 2002. Because the testimony of Donna Ward would rebut this argument, the prosecution could have called her as a rebuttal witness without violating § 3432. On appeal, the Fourth Circuit found no error in the court allowing Donna Ward and Agent Bruning to testify on behalf of the prosecution at trial, during the government's case-in-chief, even though they were not listed on the pretrial witness list.

Petitioner now argues that his trial counsel failed to familiarize themselves with the law of rebuttal, because had they done so, they would have realized that Ward and Bruning could have been called as a rebuttal witnesses whether they were on the prosecution's pretrial witness list or not. Petitioner claims that had his trial counsel recognized that Ward and Bruning could testify as rebuttal witness, they would have prepared their mental health experts in advance and not have pulled them from testifying.

The government responds that Petitioner's trial counsel were not ineffective "for failing to anticipate the unexpected." See Dutton v. Brown, 812 F.2d 593, 598 (10th Cir. 1987) (counsel who did not anticipate the trial court's sua sponte exclusion of an important defense witness was not ineffective). The government further contends that Fulks's trial counsel presented a logically cohesive case on Fulks's behalf in accordance with counsel's

trial strategy and that counsel's failure to anticipate the testimony by Ward and Bruning did

not prejudice Fulks's case.

During the § 2255 hearing, trial counsel would not admit that they would have

pursued a different strategy had they been aware Ward and Bruning would be called as

witnesses, but merely stated that "it had an effect on the ultimate decision, the final decision

that was made." (HT Vol. 1 at 166.)   In fact, when asked if he had known about the call to

Donna Ward, defense counsel Blume candidly stated:

> I don't know what I would have done, I can't—it's unlikely that I would have
> pursued it to the extent of trying to get the card and have it analyzed to
> determine, you know, if it was in fact true.  I mean, maybe some other lawyer
> would have, maybe some other lawyer should have. I can't imagine that I
> would have done that.

(Id. at 166.)

Further, as the Fourth Circuit noted on appeal, "[t]he testimony concerning the

November 17, 2002 call to Donna Ward was certainly damaging to Fulks's case, but viewed

in the context of the trial evidence suggesting Fulks's leading role in the crime spree, it was

hardly the silver bullet Fulks makes it out to be."  Fulks, 454 F.3d  at 426.

Petitioner's claim that Blume "has very limited trial experience" is simply false.

Aside from representing Fulks, Blume has been involved in some fourteen state capital cases,

all of which resulted in sentences less than death (i.e., life imprisonment or a term of years).[23]

---

[23] At the § 2255 hearing, Blume briefly related his capital trial experience in the following South
Carolina cases: State v. Telus Edwards (1986) (pled to manslaughter); State v. William Looper Hunter, Jr.
(1988) (received life verdict in jury trial); State v. Leonard Gardner (1980s) (pled to life with a thirty-year
parole eligibility); State v. Ronnie Skipper (late 1980s) (received a life sentence before Judge Baggett in a
resentencing case); State v. Limmie Arthur (pled to life sentence after death sentence was reversed on
appeal); State v. Michael Preston (late 1980s or early 1990s) (pled to life); State v. James Russell Cain (pled

Additionally, Blume has handled approximately twenty state post-conviction relief (PCR) evidentiary hearings in death penalty cases, another twenty to thirty appeals of PCR hearing decisions, fifteen to twenty federal habeas cases filed pursuant to 28 U.S.C. § 2254 attacking state death penalty cases, and fifteen to twenty appeals of § 2254 petitions. (HT Vol. 1 at 127–28; Gov't Ex. 1.) Blume has argued eight cases before the United States Supreme Court and has been co-counsel in another ten to fifteen appeals. (HT Vol. 1 at 128.) He has had years of private criminal defense practice, served as the Executive Director of the South Carolina Death Penalty Resource Center for eight years, and for the past seventeen years he has worked with the Cornell Death Penalty Project advising criminal defense trial lawyers. In addition, Blume teaches criminal procedure, evidence, the Death Penalty in America, and also supervises several capital clinics at Cornell Law School. To label Blume's experience as "very limited" falls wide of the mark.

Likewise, Petitioner's claim that trial counsel was somehow unfamiliar with the law of rebuttal, is not supported by the record. There is simply no evidence that supports the allegation. Aside from the fact that Blume teaches evidence law, Petitioner has submitted no affidavit by Blume, Johnson or Nettles that they did not know the law of rebuttal, and Petitioner elicited no testimony at the § 2255 hearing that trial counsel did not know the law of rebuttal. Furthermore, Petitioner's argument that trial counsel's alleged unfamiliarity with

to life); State v. Shannon Ardis (pled guilty and received a life sentence after a bench trial); State v. Sterling Spann (pled to life after resentencing and served 14 years); State v. Lino Delacruz (2001) (conceded guilt and received a life sentence from a jury); State v. Danny Han (pled to life); State v. Chavis Miller (pled to life); State v. Terrion Warren (2006) (pled guilty and was then sentenced to life in front of a judge); State v. Ringo Pearson (found to have mentally retardation and subsequently sentenced to a term of years). (HT Vol. 1 at 122–126). Blume's trial experience is also listed in Government's Exhibit 1.

the law of rebuttal, even if true, does not constitute lack of knowledge about the "relevant law" about which courts have found counsel ineffective. Cf. Saranchak v. Beard, 538 F. Supp. 2d 847, 881–84 (M.D. Pa. 2008) (finding an attorney's performance to fall below the objective standard of reasonableness where the attorney had a "clear  misunderstanding of the law regarding a general guilty plea" and failed to litigate a suppression issue once his client decided to plead guilty).

Rather, the court finds that trial counsel made a strategic decision not to call Drs. Hilkey, Halleck and Melikian.  Their testimony was not consistent with the trial strategy first, that Basham, rather than Fulks killed both victims; and second, that Fulks's damaged brain, together with his warped childhood, mitigated his lesser role in those crimes.  Trial counsel was on the fence about calling these mental health experts at any rate, "long before trial," (HT Vol. 4 at 36).  As Blume stated in an email to the trial team on April 23, 2004:  "I am still torn on whether to just go ahead and cut the shrinks loose and just go with bad brain/bad family leads to bad things."  (Gov't Ex. 26)  Ultimately, Blume made the decision to not call these experts at trial.  The court finds that the strategic decision not to call the additional mental health experts at trial cannot be said to have been the result of trial counsel's unfamiliarity with the law of rebuttal.

Further, while trial counsel may not have anticipated the testimony of Ward and Bruning, counsel used the witnesses's testimony to support their strategy that Fulks's mental capabilities were so limited by his damaged brain that he was easily manipulated by Basham. At closing, trial counsel argued:

43

"But, let's assume for the sake of argument, that Chad was trying to lure Amy Ward. Does it prove how limited and stupid he is? . . . You tell them that they have applied for a job at a hardware store where they know they didn't apply, their child didn't apply, they want to meet you at 10:30 at night for a job interview? . . . you have to be brain damaged to even say it."

(TT Vol. 21 at 153.) Fulks's trial counsel turned testimony by the government's witnesses into support for Fulks's case. Consequently, even if defense counsel may have failed to anticipate the testimony of Donna Ward and Agent Jeff Bruning, any failure did not diminish or prejudice Fulks's case.

<div align="center">

CLAIM 3:<br>
MITIGATION REGARDING PETITIONER'S EARLY LIFE

</div>

Petitioner's third claim alleges that trial counsel were ineffective for allegedly failing to undertake an adequate and meaningful mitigation investigation that would have painted an empathetic and accurate picture of Petitioner's life. Petitioner claims that the primary mitigation witnesses called at trial did not "convey the true depth of the despair of Petitioner's life," and that trial counsel should have discovered and called other witnesses.

The court reviews trial counsel's mitigation investigation in light of the Strickland standard. Counsel has the responsibility to adequately investigate and present evidence in mitigation of guilt. Byram v. Ozmint, 339 F.3d 203, 209–210 (4th Cir. 2003). However, counsel is only required to make a reasonable investigation for possible mitigating evidence. Id. (citing Matthews v. Evatt, 105 F.3d 907, 919 (4th Cir. 1997)). This court is to review counsel's strategic decisions concerning the evidence to present at trial according to a "highly deferential" standard, with a presumption that "counsel's conduct falls within the wide range

<div align="center">44</div>

of reasonable professional assistance." Id. (citing Strickland, 466 U.S. at 689). That is to say, Strickland requires more than a mere possibility that the allegedly deficient performance may have prejudiced the defendant in some way. Poyner v. Murray, 964 F.2d 1404, 1420–1421 (4th Cir. 1992).

*Investigation Strategy*

In explaining trial counsel's strategy for conducting the mitigation investigation, Johnson explained that they attempted to "investigate everything," starting with the people closest to Fulks. (HT Vol. 4 at 16.) Because the trial team did not know precisely what to look for, the mitigation investigation started as very broad, with trial counsel asking a lot of questions. (Id. at 16.) The mitigation investigation primarily started with a series of meetings with Fulks about his life and background, family, school history, people with whom he had various relationships. It progressed to interviews of significant people in Fulks's life and in the neighborhood where he grew up, including exploration of his marital and romantic relationships, and interviews with his teachers and social workers. There were several reference points for the mitigation investigation: on the West Virginia/Ohio border, where Fulks spent most of his life; on the Indiana/Michigan border, where many of Fulks's family members lived; in the Kentucky/Indiana area where Basham grew up; and other areas where the seven-state crime spree occurred.

Trial counsel used two primary mitigation investigators: social worker Drucie Glass, and mitigation specialist Tracey Dean of the Center for Capital Litigation. Blume, Johnson, and Nettles, with the assistance of several law students, conducted some of the interviews,

45

but Glass and Dean had the primary responsibility for interviewing witnesses. Trial counsel retained Dr. Arlene Andrews, Ph.D., MSW, to tell Fulks's life history. Dr. Andrews also interviewed some witnesses, as Blume testified "because of special training . . . she is better at getting sometimes people to admit things they don't want to admit or talk about, not easy to talk about." (HT Vol. 2 at 3.) Collectively, the attorneys, paralegals, and mitigation investigators are referred to in this order as the "trial team" or the "team." The trial team, primarily through Blume's paralegal Jill Ryder, along with Glass and Dean, also obtained releases from Fulks and his family for school/education records, employment records, health records, information related to Fulks's prior criminal activity, and a great deal of information concerning Basham.

The investigation in Indiana/Michigan included members of the trial team visiting the Hopkins County Detention Center in Kentucky from which Fulks and Basham escaped and talking to the jail administrator and the correctional officer who was fired as a result of the escape. The team also talked with Fulks's drug counselor Mr. Taylor at Westville (Indiana) Correctional Institute where Fulks had been imprisoned in 2001, and Fulks's Probation Officer Mariann Pough.

The investigation in Kentucky and Indiana included going to the neighborhood where Basham grew up and talking with people who knew him then and those with whom that he had contact as he became older; DSS workers involved in the investigation into Fulks's alleged abuse of his son Miles; and James Hawkins, the man that Fulks and Basham kidnapped and tied naked to a tree.

The investigation in West Virginia/Ohio included attempts to discover favorable information from Heather Goodman; Beth McGuffin; Amber Fowler; Donnie Carroll; Amy Ward; former probation officers Sue Hatcher (who recommended Fulks be taken from his childhood home), Jon Kincaid, and Trina Robinez, as well as former juvenile referee Tom Woelful; former teachers Kay McComus, Mike Sheets, Ray Sandridge; former neighbors Charles Vaughn, James and Linda Smith, and Sue Adkins; retired mailman Richard Beckner; former friend Brad Scarberry; Kimmie Royal of the group home in Iron, Ohio where Fulks lived for some time; former youth minister at Israel Tabernacle Church Chris Parsons; Callaher Elementary Principal Adams; Officer Alan Meek and social worker Denise Sayre of the West Virginia Division of Human Services, among others. The trial team also consulted with anthropologist Karen Lee Simpkins, an expert on Appalachian culture.

The investigation in South Carolina included attempts to discover favorable information from J.D. Brooks of Conway, witnesses to the shoot-out, and inmates in Columbia who may have heard information from Basham—Mike Sumpter, Melvin Gore, Travis Robinson, and Henry Hardy.

*Investigation Charts*

As a result of the wide-ranging mitigation investigation, the trial team developed numerous charts to consolidate, share, and track the collected information. The charts organized the information gathered, identified the areas of additional facts needed to be developed, identified themes for trial, and served as checklists at trial.

For example, the trial team created a comprehensive eighty-one page compendium, which included a genogram of Fulks's family members, including grandparents, parents, siblings, uncles and aunts on both maternal and paternal sides of his family. (Gov't Ex. 31.) The compendium described in extensive detail the family environment into which Fulks was born, created from records that the trial team obtained, together with information gathered from interviews with family members and people who knew Fulks, including the following: paternal grandmother Nancy Fulks, father Roger Fulks, mother Diana Thompson, sister Sherry Fulks, brothers Dewayne, Ronnie, and Shannon Fulks, maternal uncle Kevin Holbrook, maternal aunt Gail Beatty, paternal uncle Mark Fulks, neighbors Linda Adkins and Harriet and David Kiser, teacher Dottie Thompson, friend and neighbor Laurie Messinger, former girlfriend Heather Goodman, and Brian Messinger, who dated Fulks's sister Sherry and lived in the Fulks house for a year.

The trial team also created a seven-page chart of "Facts to Prove" that was a tool used "primarily to structure the examinations" of witnesses at trial, mainly including the issues to present to the jury as facts in mitigation. (HT Vol. 2 at 10; Gov't Ex. 32.) The chart served as a blueprint for the trial team's mitigation case, describing in detail Fulks's childhood environment; the relationships he had; his behavior while on the run; his post-arrest behavior showing honesty and remorse; his ability to adapt to prison life and lack of future dangerousness; and his mental impairments. As well, the chart included facts to prove at trial concerning Basham's mental instability, violence, leadership, lies, and evidence that Basham was the killer—facts to support Fulks's argument that he had a relatively less culpable role

in the crimes. The trial team gathered information that went into the compendium from interviews with the following individuals: Beth McGuffin, Linda Adkins, Sue Hatcher, Larry Browning, Andrea Roddy, and Marianne Paugh, in addition to interviews with family members Ronnie, Dwayne (and his ex-wife Carla), Sherry and Mark Fulks, and Wilda Mae Holbrooke.

The trial team also created a twelve-page "Time Line of Events" which described in detail the events beginning the day before Fulks's escape from the Kentucky jail until the day that prosecutors announced their intent to seek the death penalty. (Gov't Ex. 34.) The trial team also created a sixteen-page comprehensive "Chronology of Events" which described the events between Fulks's release from Westville Correctional Institution on March 23, 2002 and the day of Fulks's arrest in this case. (Gov't Ex. 35.) The trial team gathered this information from the following individuals: Tina Severance, Veronica Evans, James Hawkins, Hawkins' son, Andrea Roddy, Kandi Burns, Missy Jeffers, Sonya Johnson, Brandon Basham, Anna Puskas, and police/FBI records.

The trial team created a four-page chart of Fulks's "Mental Health History" (Gov't Ex. 36); a ten-page chart of Fulks's "Criminal History Chart" (Gov't Ex. 37); a 163-item chart of the favorable and unfavorable facts for Fulks and Basham (Gov't Ex. 39); and a comprehensive file on Basham, including charts on his criminal record, DSS reports, jail behavior, jail records, mental health records, and social services records (Gov't Ex. 49). Additionally, the team prepared charts of the historical arrests of all members of Fulks's

49

family, Fulks's progress in school, his IQ scores, and a head injury chart.  As Blume testified

at the § 2255 hearing:

> I'm a list compiler by nature. I don't know if it's a positive trait or a negative
> trait, but you know, I do to-do lists like this so I can keep track of—it's a way
> of me sort of ordering my thoughts, laying out what I think need to be done
> and being able to hopefully try and manage the investigation and make sure
> that things get done that—hopefully things get done that need to be done.

(HT Vol. 1 at 168.)

As early as December 21, 2003, Blume had "two-week work plans" of tasks to be

accomplished in preparation for trial. (See email, Gov't Ex. 23.)  Aside from the mitigation

investigation concerning Fulks's background, the crime spree, and his relative culpability vis-

a-vis Basham, the team also conducted four large searches for Alice Donovan's body, in

addition to investigator Skidmore's independent searches in his helicopter.  The trial team

thought that if Fulks's information could lead to the discovery of Alice Donovan's body,

perhaps the government would withdraw the death penalty notice. Some of the trial team's

searches utilized cadaver dogs, law students, and even an anthropologist to determine if any

bones found were human remains rather than the more common find of deer bones.

Blume estimates that the trial team spoke with approximately 100 individuals during

the mitigation investigation. While there were individuals that the trial team wanted to find,

some individuals, such as former girlfriend Tracy Graybeal, could not be located, despite the

trial team's efforts.[24]   As Blume explained, many of the individuals were simply difficult to

find:

---

[24] Blume talked to Tracy's parents several times, but they would not disclose her whereabouts.

Some of them were homeless, some of them were prostitutes, some of them were drug addicts. So, there were some people that we did not, could not find. But, I mean, we attempted to find the people that we believed to be important and relevant and we found the ones we could.

(HT Vol. 1 at 178.)

According to trial counsel, the team started its investigation without assuming a theory of the case, but after gathering information, theories eventually emerged. As a result of the foregoing thorough mitigation investigation of law and facts relevant to plausible options, see Strickland at 690, trial counsel pursued a two-fold trial strategy: "to cast Basham as the instigator and sole murderer, and to present a strong case of mitigation based on Fulks's mental problems and troubled childhood." Fulks, 454 F.3d at 426. That trial strategy resulted in the presentation of the following synopsis of evidence to the jury.

*Mitigation Testimony at Trial*

The trial record reveals as complete and exhaustive a mitigation defense as one could reasonably expect in capital cases. Trial counsel painted a compelling and empathetic picture of a young Chad Fulks growing up in poor, crowded, filthy, and deplorable living conditions, raised by violently abusive, sexually deviant, emotionally neglectful, and alcoholic parents who did not appear to care at all about their children's well being.

The mitigation testimony spanned four days, including testimony by Fulks's friends and relatives who described his horrible childhood, as well as various mental health and other experts, including his private investigator and mitigation investigator. Trial counsel presented testimony from: (1) Kevin Holbrook, Fulks's maternal uncle; (2) Gayle Beatty, Fulks's

maternal aunt; (3) Mark Fulks, Fulks's paternal uncle; (4) Kelly Fite, a firearms expert; (5) Brian Messinger, a friend of the Fulks family who lived with them for approximately six months when Fulks was about eleven years old; (6) Lorie Messinger, a friend of the Fulks family who dated Fulks's brother Dewayne; (7) Linda Atkins, a neighbor in Huntington, West Virginia; (8) Cindy Harper, Fulks's kindergarten teacher; (9) Gayle Wolfe, Fulks's fifth grade special education teacher; (10) Martha Floyd, Fulks's sixth grade teacher; (11) Sue Hatcher, a probation officer assigned to Fulks when he was nine years old because he committed battery on an elderly lady and pulled down the pants of a four or five-year-old girl on a playground; (12) Joseph Jones, a former boyfriend of Fulks's ex-wife Veronica Evans; (13) Dina Jones, the aunt of Fulks's ex-wife Veronica Evans; (14) Heather Jacobi, a young woman whom Fulks met in Portsmith, Ohio and used drugs with; (15) Heather Roche, a dog handler who conducted searches for the remains of Alice Donovan on February 13–14, 2004 and April 30–May 1, 2004; (16) Jeff O'Neill, a Cornell Law School student; (17) Pete Skidmore, Fulks's private investigator; (18) Don Romine, a former warden at several federal correctional institutions, who testified as an expert in prison management and prison security. These witnesses testified in addition to the six aforementioned mental health experts, Drs. Evans, Gur, Becker, Bachman, Bookstein, and Andrews.

Fulks's uncle, Kevin Holbrook, testified that Fulks's mother drank a lot of whiskey while she was pregnant with Fulks and had been at the bars the night Fulks was born; that Fulks's parents would "bare-knuckle fist fight" which usually resulted in Fulks's mother having a black eye and busted lip; that Fulks's father abused him and his brothers by hitting

52

them, beating them with a belt, and kicking them; that Fulks's parents would sell their food stamps to buy beer; and that the Fulks's house as always "nasty," with "rats, and mice, and roaches, and cats, and dogs, and everything." Holbrook testified to hearing Fulks's parents call their children "sons-of -bitches, fuckers, mother fuckers, . . . cocksuckers," noting that "there isn't a name they haven't been called." He also said that while Fulks's parents regularly partied in their basement, he could not recall them having a birthday party for the kids. He testified that Fulks's father had all the children tattooed; that the parents showed no interest in the children's education; that Fulks's father liked to watch pornographic movies and thought it was funny to let the children watch too. (TT Vol. 16 at 129–42.)

Fulks's aunt, Gayle Beatty, testified about Fulks's alcoholic grandfather beating his mother in their poverty-stricken home, and described the poverty, hunger, and filth that she personally observed in the Fulks home, holes in the floor in front of the toilet looking down to the basement below, and Fulks's desperation to leave his parents and live with his aunt. (TT Vol. 16 at 149–59.) She told the story of arriving early one morning while Fulks's parents were still asleep, and going to the kitchen to feed the hungry Fulks children:

> I could only find one bowl. . . . I poured some cereal into the bowl and milk. There was a chip broke out of the top of the bowl . . . Chad was having to tilt the bowl back a little bit so the milk wouldn't pour out. Ronnie Dale was telling him to hurry because he wanted some cereal."

(Id. at 154–155.) She told of Fulks's sweetness in purchasing earrings from the gas station for her instead of buying himself candy with the money she gave him. (Id. at 155.)

Fulks's Uncle Mark estimated that ninety percent of the time he saw Fulks's parents, they were drinking, and that they were alcoholics. (TT Vol. 16 at 161–62.) He testified to Fulks's mother passing out several times, sometimes partially clothed. (Id. at 162.) He said Fulks's parents would bare-knuckle fight, throw things at each other, and that Fulks's mother had once pulled out a shotgun and pointed it at Fulks's father's face. (Id. at 163.) He described the physical and verbal abuse of the Fulks children by their parents, the filthy, bug-infested house, and the lack of food in the house. (Id. at 167–170.)

Brian Messinger testified that the Fulks children were totally unsupervised; that the parents thought it was funny when the children stole or got into trouble with law enforcement; that the Fulks boys slept anywhere they could find; and that one of the boys, probably Chad Fulks, said he wanted to kill himself. (Id. at 211–17.)

Lorie Messinger testified that the Fulks boys fought with each other and anybody; that Fulks's father made her uncomfortable and made suggestive comments about the size of her breasts and attempted to touch them; and she described the sexually graphic pictures on the walls and ceilings in the basement of the Fulks's house. (Id. at 223–25.)

Linda Adkins testified that Fulks's mother asked her for money for food, but then would use it to buy beer, and when she started giving Fulks's mother food instead of money, she stopped asking for help; that many times when Fulks's parents fought, the children would come to her house, including one morning, about 3:00 o'clock, when the Fulks children came running to her house, telling her that their mother had a two by four and was threatening to hit their father's van with it. They said "if she hits the van, daddy will kill her." She testified

that once when Fulks was three or four-years-old, no one could find him, and they eventually found him asleep on a pile of leaves in a corner of her garage. (Id. at 232–35.) Cindy Harper, Fulks's kindergarten teacher, testified to Fulks once having bad diarrhea that soiled his jeans and shoes, but she testified that no parent picked him up, and that he missed thirty-five days of school that year. (Id. at 74.)

Martha Floyd described Fulks as a follower, and recalled that he did not have a coat, even though the winters in West Virginia were harsh. (TT Vol. 17 at 85.) She said she had seen bruises on him. (Id. at 91.)

Sue Hatcher, a probation officer, told the jury about the lack of responsiveness when she contacted Fulks's mother to discuss some of her concerns about Fulks, and that she recommended that Fulks be removed from his home, but her recommendation was not followed. (TT Vol. 17 at 95–103.)

Fulks's trial counsel also presented the testimony of Dr. Andrews as an expert in conducting a family history assessment. (TT Vol. 18 at 132.) Dr. Andrews found the major theme in Fulks's life to be chaos, with his parents constantly drinking and fighting and his lacking any proper supervision and care givers. Dr. Andrews based her findings on a family history that she prepared using records from Fulks's childhood, a genogram, and various interviews that she conducted. (Id. at 133–38.) She presented the jury with a comprehensive description of Fulks's history and child development (id. at 133, 152–71), describing his problems in school and subsequent mental health assessments. She described Fulks being placed in a behavioral disorder classroom because he was emotionally and behaviorally

disturbed, bullying children, being disrespectful, and needing supervision. She testified that the school principal, a police officer, and a probation officer recommended Fulks be removed from his home because he was not receiving adequate adult supervision. (Id. at 160–61.)

Dr. Andrews testified that Fulks was beaten by his father, that his mother walked around the house, while neighbors were present, in see-through gowns, and, on one occasion, naked, and sometimes she completely passed out from drinking. (Id. ) She presented the jury with testimony that Fulks's mother did not provide for him emotionally, even after she stopped drinking when she became "saved" when Fulks was twelve or thirteen years old, as she was away from home for long hours. (Id. at 163–64.) She also testified that this caused an escalation in the fighting between Fulks's parents, and Fulks's father left the home. (Id.) During this time, Fulks got into more trouble at school, both behaviorally and academically and that just before he turned fourteen, Fulks took a large quantity of acetaminophen in an apparent suicide attempt. (Id. at 166.) He lost consciousness and was taken to the hospital, and a subsequent psychiatric evaluation resulted in the hospital's offer to admit him to the adolescent treatment unit, which Fulks and his mother refused. (Id.) Subsequent to his parents' divorce, Fulks moved to Indiana to live with his father and his step-mother (id. at 167), at a time when Fulks was drinking alcohol, smoking marijuana, and huffing gas on "a very regular basis." (Id. at 168.) Fulks's school psychologist noted that he had been molested by an older man and that he had a sociopathic pattern. (Id.) After the school psychologist's referral for Fulks to see a psychiatrist, he was diagnosed with major depression and prescribed an antidepressant. (Id. at 169.) There is no record of any follow-

56

up care, and Fulks's troubles continued. (Id. at 170.) Fulks was charged with arson for setting fire to a wooden plaque hanging on a school wall (id.), referred for alcohol and drug counseling, and sent to a group home around the age of fifteen. (Id.) Fulks began living with a woman in her late twenties, and never returned home to live. (Id. at 170–71.) He lived in group homes, was incarcerated, or stayed with different family members. (Id. at 171.)

Dr. Andrews explained the impact on Fulks of having two alcoholic parents, explaining that they do not learn about the things a responsible parent teaches children:

> They don't want responsibility, they don't want respect for [sic] others, they don't learn to solve problems well. They don't learn to effectively communicate their needs or feelings. They don't learn impulse control. They don't learn to have hopes and aspirations for the future. They live day-by-day, sometimes hour-by-hour. And they don't learn to cope with difficult situations with stress or trauma that may happen in their lives.

(TT Vol. 18 at 175.)

Dr. Andrews testified as to the "profound," "constant," and "extreme" exposure Fulks had to the violence between his parents. (Id. at 179.) Dr. Andrews testified that Fulks never learned to control his anger and developed low self-esteem and depression as a result of the exposure to domestic violence. Dr. Andrews surmised that Fulks was inflicted with multiple stressors and deprived of emotional attention, that he did not have the resiliency or intellect to handle them, so he turned to alcohol, drugs, and other negative behavior to cope with the anxiety. (Id. at 185–187.)

*Witnesses Not Called to Testify*

Petitioner complains that the trial team should have called the following nine witnesses to testify: (1) Monica Wolowinski, the mother of Fulks's best friend, who could have testified to having seen Fulks sleeping under trees; that his mother did not care that he was gone from his home for extended periods; that he was often hungry; that the residence was filthy; and that his mother cursed at and abused him; (2) Nathan Fulks, Petitioner's cousin, who could have testified as to the abuse and filth in the Fulks household; that Fulks's parents did not change the children's diapers; that the family was so poor that one of Fulks's brothers, with Diane's approval, stole from Nathan to buy food; that Fulks's father was a sexual deviant who "ran sex trains" on various women; "was a very violent man and would look for any excuse to fight;" would beat Diane and the children, including one beating that Fulks suffered where his back was so badly scourged that dried blood caused Fulks's shirt to stick to his back. Fulks also claims Nathan could have testified that his father's friends would congregate in their basement, where alcohol and drug consumption and fighting with firearms was the norm, and that Fulks's father Roger told him that something that led him to believe that Fulks had been sexually abused by one of Roger's contemporaries; (3) Tracy Graybeal, Petitioner's friend and sometimes girlfriend, who could have testified that Fulks used alcohol to cope with abuse by his parents and that his older sister had allegedly molested him when he was a small boy; (4) Christina Kirkman, who lived at the Fulks residence one summer and was allegedly raped by one of Fulks's uncles and assaulted by one of his brothers, could have testified to the abuse Fulks suffered, and that the Fulks children were

58

used to seeing their parents passed out; (5) Beth McGuffin, who grew up with Fulks, who testified at trial, but whose testimony Petitioner now alleges trial counsel did not adequately develop. Allegedly, McGuffin could have testified about seeing Petitioner's mother with black eyes, about a man named Ed who used to pick up her and Petitioner off the street and take them to drink alcohol and smoke at the age of ten or eleven-years-old, that she and Petitioner used drugs when they were twelve-years-old, and that Fulks had sex with an older woman named Rhonda. Petitioner now claims that evidence of his sexual abuse would have mitigated his admission to raping Alice Donovan; (6) Harry Tyree, deacon at the Abundant Life Baptist Church in Proctorville, Ohio, could have testified that the Fulks's house was very dirty, with beer cans on the floor and the ashtrays overflowed with cigarette butts, and that Petitioner, his mother, and his brother attended the church for several years, where Petitioner behaved well; (7) Mark Thompson, a neighbor, could have testified that after Petitioner's mother stopped drinking, that she was consumed with church, but provided no better care for her children and let them roam the streets. He could have testified that Fulks would hang out around his house and eat because Fulks's mother did not cook meals for Fulks and that Fulks was a follower and not a leader; (8) Sharon Dotson, Petitioner's maternal aunt, could have testified about Fulks's mother's poor and abusive upbringing, that she often contemplated suicide, that the children were abused and subjected to a sexually inappropriate environment with "pictures up on the wall of naked women with their legs spread;" and (9) Elvin Taylor, counselor at the Westville Correctional Institution when Petitioner was an inmate, could have testified that Fulks completed a long-term substance

abuse program; that Fulks would complain that he was susceptible to being influenced by others using drugs and was influenced by others engaging in criminal activity. He could have also testified that Fulks adapted well to a structured prison environment, was a model inmate, completed his seminar presentations, was eventually was put in charge of the dorm maintenance department, and was actively involved in resolving disputes between inmates through conflict resolution training.

The court finds that most of these nine witnesses's testimony would have been cumulative to the testimony of other witnesses who gave compelling descriptions of the depravity of the conditions in the Fulks home, including the violence, verbal abuse, alcohol and drug abuse, and pornography that surrounded Fulks as a child. Trial counsel's failure to present merely cumulative mitigating evidence does not prejudice a defendant's case. Buckner v. Polk, 453 F.3d 195, 206 (4th Cir. 2006). As the Supreme Court has observed, "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distracts from more important duties." Bobby v. Van Hook, 558 U.S. ___, 130 S.Ct. 13, 19 (2009). Given the evidence trial counsel had already unearthed from those closest to Fulks's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other relative of a friend or friend of a relative. See id.

As to the non-cumulative evidence proffered by the uncalled witnesses, the evidence is either not relevant to Fulks's upbringing (e.g., sexual abuse of Kirkman) or has questionable reliability, or the probative value of the evidence is far surpassed by the

prejudicial impact of other evidence that would enter as a result of the doors that would open

by presenting such evidence. See Moody v. Polk, 408 F.3d 141, 154 (4th Cir. 2005) (to the

extent affidavits presented new information, they were "double-edged").

As to Graybeal's information that Fulks revealed to her that his older sister had

molested him when he was a small boy, the record reveals that Fulks did not make the

revelation to Graybeal until 2007, three years after his trial. The court cannot deem trial

counsel ineffective for failing to discover information from witnesses which Petitioner

himself could have provided to his counsel, but chose not to, even assuming it was true.

The record reflects, and the jury found,[25] that trial counsel effectively presented

---

[25] Twelve jurors found: Mitigating Factor Number 1, Chadrick Evan Fulks's mother abused alcohol while she was pregnant with him. Number 9, Chadrick Evan Fulks suffered from learning disabilities as a child. Number 12, Chadrick Evan Fulks was neglected by both of his parents. Number 13, Chadrick Evan Fulks lived in a house that was often filthy and infested with roaches and ants. Number 14, Chadrick Evan Fulks's parents did not provide him with adequate clothing or school supplies. Number 16, Chadrick Evan Fulks's parents sold food stamps to get money for beer. Number 18, Chadrick Evan Fulks was often left without supervision. Number 19, Chadrick Evan Fulks was permitted to roam the streets as a young child. Number 20, A principal, a police officer, and a probation officer all recommended Chadrick Evan Fulks be removed from the home at the age of nine, but he was not removed. Number 21, Chadrick Evan Fulks's parents gave him little attention or affection. Number 22, Chadrick Fulks was subjected to emotional abuse as a child. Number 23, Chadrick Evan Fulks was subjected to physical abuse as a child. Number 24, Chadrick Evan Fulks grew up seeing his parents frequently fighting each other. Number 25, Chadrick Evan Fulks grew up seeing heavy drinking and frequent fighting by other adults in his own house. Number 27, Chadrick Evan Fulks grew up seeing graphic photographs of naked women papering the walls and ceiling of his basement. Number 28, Chadrick Evan Fulks's father showed him pornographic movies as a young child. Number 31, Chadrick Evan Fulks started drinking at the age of 9 and using marijuana at 11 or 12, and his parents made no effort to stop him. Number 32, Chadrick Evan Fulks's brother taught him to inhale gasoline and paint as a young teenager. Number 34, Chadrick Evan Fulks's mother ignored his stealing. Number 35, Chadrick Evan Fulks's brother taught him to steal, fight, and break into cars. Number 36, Chadrick Evan Fulks attempted suicide at age 13. (TT Vol. 22 at 20–25.) Eleven jurors found Mitigating Factor Number 15, that Fulks frequently went hungry or was uncertain whether he would get food as a child. (Id. at 21.) Ten jurors found: Number 11, Chadrick Evan Fulks's parents cared so little for his education that they never helped him with homework and even left him at school with soiled pants. Number 37, Chadrick Evan Fulks was diagnosed with depression, substance abuse, and possible sociopathic tendencies at age 14. (Id. at 21, 24.) Nine jurors found Mitigating Factor 2, Chadrick Fulks's brain was permanently damaged by his mother's drinking during her pregnancy. (Id. at 20.)

evidence that Petitioner's childhood was one of physical abuse, emotional neglect, sexual abuse, and self-medication with drugs and alcohol.  See United States v. Roane, 378 F.3d 382, 407 (4th Cir. 2004) (in light of the compelling mitigation case presented by defendant's counsel during the penalty phase which resulted in the jury finding twelve mitigating factors, the court correctly concluded that their performance was not constitutionally deficient and that defendant was not prejudiced by the absence of additional witnesses).

The court rejects Petitioner's allegation that trial counsel's failure to present certain witnesses was not one of strategy, but of a failure to investigate adequately and to discover that these witnesses even existed. To the contrary, the foregoing recitation of trial counsel's mitigation efforts reveals that Fulks was the beneficiary of a dream team of attorneys who afforded him the constitutional guarantee of effective assistance of trial counsel. Petitioner's complaints about his trial counsel's mitigation efforts fall well short of demonstrating his "attorney's unprofessional errors were of such magnitude as to create a reasonable probability that the outcome of the proceeding in question would have been different." Poyner v. Murray, 964 F.2d, 1404, 1421 (4th Cir. 1992).

The court finds significant the dictate in Strickland that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91.  In this case, trial counsel fulfilled its duty

to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. Petitioner's claims to the contrary are without merit.

CLAIM 4:
ASSIGNMENT OF TASKS TO LAW CLERKS

Petitioner's Claim 4 alleges that trial counsel was ineffective for allegedly assigning law students critical aspects of the mitigation investigation. Specifically, Petitioner alleges that the law students were not given proper training or guidance, and the mitigation investigation that resulted was inadequate because key testimony and witnesses were overlooked. Petitioner claims that trial counsel should have used trained investigators for all aspects of the mitigation investigation and that the failure to do so was unreasonable.

Because trial counsel assessed the investigation as "overwhelming both because of the geographic spread of the crimes and the number of crimes" (HT Vol. 4 at 27), they reasoned that using law students would be helpful. The law students were primarily from the Cornell Law School Death Penalty Clinic where Blume and Johnson teach.

After Blume's appointment to the case, it was his initial impression that the government was not investigating, so Blume "wanted to try and get out in front of them with a lot of these different witnesses and different locations." (HT Vol. 1 at 115.) As Blume described it: "[t]here were a lot of different jurisdictions and lot of different incidents. [Fulks] and Mr. Basham escaped from an institution in Kentucky, went sort of north through the heartland and then back down to West Virginia, to South Carolina and then sort of back up where Mr. Fulks was apprehended." (Id. at 115.) By using mainly four or five law

63

students to assist in the investigation in addition to two professional, retained investigators, trial counsel "covered more ground than any one investigator would cover." (HT Vol. 4 at 28.)

Blume, Johnson, and Glass took some students with them to conduct investigations in Indiana, West Virginia, Ohio, and South Carolina. (HT Vol. 1 at 115, 131.) Nettles traveled to Kentucky with retained investigator Skidmore and law students Casey Hinkle and Mary Mulhern to "dig up dirt" on Basham to support their theory that "Basham was violent and unpredictable and that he was most likely the perpetrator." (Id. at 131, 177.)

Another reason trial counsel chose to use law students, according to Johnson, was "that students often are very good at being unintimidating and can sometimes get people to initially speak who might slam a door in an attorney's face." (HT Vol. 4 at 28.) Johnson stated that the law students primarily located individuals pursuant to trial counsel's instruction. (Id.) As to individuals who were not deemed "significant witnesses," such as people in the neighborhood, trial counsel had the law students speak to some of them initially and then trial counsel went back and re-interviewed them. (Id.) However, trial counsel did not send law students to interview powerful material witnesses or Fulks's relatives. (HT Vol. 1 at 180–81.) Trial counsel also used law students to collect school records and mental health records. (HT Vol. 4 at 28.)

Prior to using the law students, Johnson and Blume trained them on interviewing, complete with handouts (Gov't Ex. 44), with an eye towards the law students trying to find individuals who knew Fulks or had information to assist in the mitigation aspect of the case.

(HT Vol. 4 at 39–40.) Blume had the law students do mock interviewing with role playing exercises before sending them out to conduct any interviews. (HT Vol. 1 at 179.)

The law students were instructed to write up everything that the witness told them, and trial counsel would review the memos and make a judgment about following up with an interview by one of the trial counsel. (HT Vol. 4 at 28–29.) Johnson stated that "if anyone had anything that looked like it was promising to say, virtually anyone, we—one of us would have gone to see that person afterwards." (Id. at 29.) Fulks's § 2255 counsel could not identify a single individual with whom the law students spoke with who had relevant information, but whom trial counsel did not follow up with themselves. (Id. at 40.) Trial counsel did not follow up on the individuals who responded to the law students' inquiries that they never knew the Fulks family. (Id. at 29.)

Significantly, Blume did not send any law students alone to interview anyone, with two exceptions. These two exceptions were due to the training and background of the two interviewers: (1) Tim Cane worked for several years as an investigator for a capital defense unit in San Francisco prior to attending Cornell Law School; and (2) Matthew Rawlings was an ordained minister from Huntington, West Virginia, whom Blume felt was mature and comfortable enough to talk to people on his own, and whom Johnson testified persuaded a witness to talk to trial counsel. (HT Vol. 1 at 179–80.) Among the other law students Petitioner complains were not trained or otherwise competent to aid in the mitigation investigation were Matthew Jury, a British lawyer on an internship at the Center For Capital Litigation, a non-profit corporation that represented death row inmates.

Although law students were not used to draft any of the pleadings, they did draft internal memos on legal issues which contained preliminary research. (HT Vol. 4 at 29.) Trial counsel would read the cases cited, and did not submit any memoranda to the court "without having done the research, rechecked the research." (Id. at 30.) Matthew Jury prepared a memo, (Pet. Ex. 45), and was present during jury selection. (HT Vol. 1 at 63.) Keith Palumbo, a Cornell law student prepared a memo on Fetal Alcohol Syndrome. (Pet. Ex. 47; HT Vol. 1 at 63.) Kerry Davenport, also a Cornell law student, prepared a separate memo on Fetal Alcohol Spectrum Disorders. (Pet. Ex. 46.) Another student, Casey Hinkle, prepared a memo regarding the admissibility of evidence to show consciousness of guilt in the penalty phase of Fulks's trial. (Pet. Ex. 43.)

The court finds that trial counsel's use of law students to assist in the mitigation investigation does not constitute ineffective assistance of counsel. As Petitioner concedes, trial counsel hired trained investigators and mitigation specialists to conduct the bulk of the mitigation investigation, including a private investigator, Pete Skidmore, and an investigator employed by Southeastern Professional Investigations, an organization regularly retained by the Federal Public Defender. Petitioner's allegation that many important investigation tasks were left to law students, without describing those tasks, is without support in the record.

As discussed supra in Claim 3, Fulks's mitigation team of experts included medical doctors, forensic psychologists, forensic psychiatrists, social workers, and other experts in mental health. The use of law students to assist initially in order to cover as broad an investigation as possible was a reasonable strategic decision. By his own testimony and as

evidenced in the record, Blume and trial counsel trained the law students and conducted mock interviews before sending them to knock on doors. The law students reported their findings in writing to trial counsel, and trial counsel followed up on every contact that appeared the least bit promising. The court finds that trial counsel provided the students with effective training, development, and education that allowed them to effectively use law students in their mitigation investigation. Trial counsel's use of the law students was limited, of a cumulative nature, and was highly supervised by Johnson, Blume, and Nettles. While this court does not recognize the ABA Guidelines as the constitutional standard for effective representation, Petitioner was the beneficiary of a comprehensive pretrial investigation, with a pretrial team that far surpassed the "minimum" assistance of a professional investigator and a mitigation specialist suggested by the 2003 ABA Guideline 4.1 that Petitioner cites. The court rejects Petitioner's claims that trial counsel was ineffective for assigning law students to some aspects of the mitigation investigation.

## CLAIM 5:
### COURT'S INSTRUCTIONS ON MITIGATING FACTORS

In Claim 5, Petitioner contends that his appellate counsel was ineffective for failing to appeal the format employed by this court in explaining the role of mitigating factors during deliberations. The disputed instruction was as follows:

> As to the mitigating factors asserted by the defendant, Mr. Fulks, in this case, the law provides that there is, essentially, no limit on the number of factors or things that the jury may consider in mitigation. As to each of the factors submitted by the defendant, and which I am about to list, *you must, essentially, engage in a two-step process in determining whether any one or more of them have been proven.*

> Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence.
>
> Secondly, if you determine that the factor has been proven, *you must determine whether the fact is mitigating, as I have defined that term for you. That is, it tends to suggest that life in prison without parole and not death is the appropriate punishment.*

(TT Vol. 21 at 274 (emphasis added).)

Petitioner argues that rather than advising the jury that it could give whatever weight it deemed appropriate to a particular mitigating factor, the court's instruction asked the jury, once it has already found that a particular fact exists, to further screen that factor to determine whether it is, in fact, mitigating. Fulks argues that this violates the Eighth Amendment because it created a substantial risk that the jury would screen out, and therefore fail to consider, facts that are unquestionably mitigating. (Pet. at 92.)

During the colloquy between the court and counsel regarding the content of the jury instructions at the end of the case, an issue arose regarding the relatively large number of allegedly mitigating factors the defendant proposed to be included in the jury charge and on the verdict form. The government was concerned that Fulks's trial counsel were attempting to "sand bag" the government's case by listing a large number of somewhat duplicative, and potentially irrelevant, factors for the jury to consider as mitigators. The court had earlier expressed its own concern that there appeared to be a degree of duplication in some of the mitigators proposed by the defendant. Shortly before the jury charge was finalized, the government attorneys suggested that the jury should be told that, with regard to mitigators, there were two issues: "(1) is it proved; and (2) is it mitigating?" (TT Vol. 20 at 217.)

68

The prosecutor continued:

> I want the jury to be instructed that if they find, as a fact, that Chad Fulks's mother ignored his stealing, for example, they can find that that was proved by the defendant. That is not the end of the jury assessment . . . . The jury must also find that . . . it weighs in favor of imposition of a life without parole sentence.

(Id. at 217–18.)

After an extended colloquy, this court responded:

> That might eliminate my dilemma [regarding the need] to consolidate some of these [mitigators]. I can leave a fairly long number and tell them they don't have to take a vote and tally it on the vote sheet unless they determine that it has been proved and it is a mitigating factor.

(Id. at 218.)

Fulks's trial counsel objected to the court's reformulated instruction on mitigating factors, but did not appeal the adverse ruling. Fulks contends that the failure to appeal this issue was ineffective assistance of counsel because, he argues, Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982), requires that in a death penalty sentencing regime, sentencers "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."

In Eddings, the trial court, acting as the sentencing judge, refused, as a matter of law, to consider in mitigation the circumstances of the defendant's unhappy upbringing and emotional disturbance. Id. at 109. Relying upon Lockett v. Ohio, 438 U.S. 586 (1978), the Court held that the sentencing judge had erred. In Lockett, the Ohio death penalty statute permitted consideration of only three mitigating circumstances. The Supreme Court had little

69

trouble in finding that it was unconstitutional for a state to place limits on mitigating factors

that a death penalty sentencer may consider.  Eddings was an extension of Lockett.  There,

the state did not limit, by statute, the mitigators that a sentencer could consider, but the trial

judge indicated at sentencing that he was precluded "as a matter of law" from considering

the suggested mitigators.

It can easily be seen that both Eddings and Lockett dealt with situations where the

state affirmatively placed limitations on the sentencing body even *considering* certain

potentially mitigating factors.  In Fulks's case, the court's instructions did nothing to

preclude the jury from considering the array of mitigators suggested by Fulks in the proposed

verdict form.  Rather, the court instructed the jury to first determine if the mitigator was

proved, and, secondly, if so, to determine whether it was in fact mitigating.

Circuit courts dealing with this question after Eddings have undercut Petitioner's

contention that Eddings requires a reversal of the death sentence in this case.  In United

States v. Jackson, 549 F.3d 963 (5th Cir. 2008), the defendant contended that the verdict

form was inconsistent because the jury failed to find several mitigators that were essentially

undisputed, including one (that a co-defendant did not receive the death penalty) that the

prosecution stipulated.  The Fifth Circuit logically concluded that by not checking the

mitigator on the verdict form provided, the jury was merely signaling its decision that even

if the factor existed, it was not mitigating.  The court said:

> [T]he jury was not required to find that a factor was mitigating, even if it
> believed the factor's factual predicate to be true.  All the law requires is that
> jurors be aware that they can consider a factor to be mitigating.  For example,

no juror found that Jackson, "experienced persistent falling when trying to walk until he was 5 years old and this factor is mitigating." In reaching that conclusion, the jurors could have believed Jackson experienced problems walking but that the factor did not weigh against a sentence of death.

Id. at 983.

The Fourth Circuit Court of Appeals was faced with an identical situation in United States v. Higgs, 353 F.3d 281 (4th Cir. 2003). In Higgs, the defendant argued that his death sentence was flawed because the jurors failed to find as a mitigating factor that a co-defendant did not receive a death sentence. On appeal, Higgs argued that the jury's failure to find this undisputed factor "reflect[ed] an arbitrary and unreliable decision requiring [the court] to vacate the sentence." Id. at 327. Writing for the court, then-judge (now Chief Judge) Traxler observed that the appellant's argument failed, because:

> [T]he Constitution only requires that the jury be allowed to *consider* evidence that is proffered as mitigating. There is no constitutional requirement that the jury find a mitigating factor even when it is supported by uncontradicted evidence. In addition, the jury's failure to find that [the co-defendant's] life sentence was a mitigating factor for Higgs was supported by the evidence. Although it was undisputed that [the co-defendant] was the triggerman, a rational juror could well have found that Higgs had the dominant role in the murders and therefore that Higgs and [the co-defendant] were not equally culpable in the crime.

Id. at 327 (emphasis in original).

Viewed in the light of Higgs and Jackson, this court's jury instruction (and the accompanying verdict form), did no more than allow the jurors to do what the jury did in those cases, which is to determine whether a factor is not "mitigating" even though there may have been overwhelming evidence to support the existence of the particular factor.

Moreover, the verdict indicates that the Fulks jury did not rubber stamp the government's case. Of the forty-three mitigators the court included on the verdict form at Fulks's urging, the jury unanimously found that over half (twenty-two) of the mitigators were proved. Nine or more jurors found that an additional four mitigators were proved.

At trial, the jury heard four days of testimony regarding Fulks's mitigators. This included testimony regarding his background of deprivation and abuse, his psychological condition, and his substance abuse. At the conclusion of the penalty phase trial, the court instructed the jury:

> A mitigating factor is simply information about a defendant's background, record, or character or about the circumstances surrounding the offense or any other information that you deem relevant that would suggest, in fairness and mercy, that a sentence of death is not the most appropriate punishment, or that a sentence of life in prison without any possibility of release is the more appropriate punishment.
>
> As to the mitigating factors asserted by the defendant, Mr. Fulks, in this case, the law provides that there is, essentially, no limit on the number of factors or things that the jury may consider in mitigation.

(TT Vol. 21 at 273–74.)

There then followed the court's disputed instruction on the two-step process the jury was to employ. The court continued:

> Unlike aggravating factors, which you must unanimously find proved beyond a reasonable doubt in order to consider them in your deliberations, the law does not require unanimous agreement with regard to mitigating factors. *Any juror persuaded that a mitigating factor exists, must consider it in this case.*
>
> Further, you may consider a mitigating factor found by another juror, even if you do not find that factor to be mitigating. *It is up to each individual juror*

72

*to determine how much weight should be given to any particular mitigating circumstance.*

(Id. at 275 (emphasis added).)

In short, unlike the sentencing regimes that were involved in Eddings and Lockett—which forbade, as a matter of statutory or state common law, the consideration of certain mitigators—here the court listed on the verdict form virtually every mitigator suggested by the defendant, placed no restrictions on the amount of trial testimony received regarding mitigation, and instructed the jury there was "no limit" on the number of mitigators that it could consider.

Finally, the court told the jury that if any juror was persuaded that a mitigating factor existed, the juror "must consider it" in the deliberations. In sum, the court finds no constitutional error in Fulks's trial counsel's failure to appeal the jury charge on mitigation.

CLAIM 6:
CAUSAL NEXUS

In this claim, Petitioner contends that the prosecutor, in his closing argument, encouraged the jury to think about mitigation in terms of a causal nexus between the mitigating evidence and the crimes committed . Such a nexus test had been rejected by the Supreme Court in Tennard v. Dretke, 542 U.S. 274 (2004), a case handed down while Fulks's trial was in progress and five days before the allegedly improper closing argument. Trial counsel did not object to the argument nor move for a mistrial based upon the prosecutor's comments which were as follows:

Now the defendant's mitigation. . . . Two points I want to make, reminders, and, again, I will discuss with you in reply. One is this, this whole idea of cause-and-effect. You heard that phrase used in some of the questions. Every one of the defense experts admitted there is no cause-and-effect. That whatever issues that Chad Fulks has, there is no cause-and-effect. What does that mean? That means, despite the fact that Chad Fulks might have a cyst on his brain, might have an IQ of 79, or might have had a bad upbringing, the fact that those causes exist, does not make people commit violent crimes. There is no evidence of that. Anyone to come in the courtroom and claim that, that is junk science. Even their experts acknowledge that. There is no cause-and-effect.

Ladies and gentlemen, think about, think about all of the millions of Americans that suffer, that have significant brain injuries, that have cysts and tumors on their brain, that have damaged brains from gunshot wounds, epilepsy, from all kinds of diseases and accidents. Think about the millions of Americans who have damaged brains but don't carjack women. And think about the millions of Americans with IQs of 79 or lower that don't rape women. And think of all the citizens in this country throughout the years from the—even before the Great Depression . . . all the struggles that people have faced, all of the prejudice, all of the biases, all of the poverty, all of the horrible upbringings, but the overwhelming majority of people that grow up in crack-infested households, with alcoholic parents and abusive situations that have a terrible upbringing, the overwhelming majority of these people, they don't kill women. There is no cause-and-effect.

(TT Vol. 21 at 129–30.)

Relying upon Tennard, as well as Eddings (discussed earlier in regard to Claim 5), and Smith v. Texas, 543 U.S. 47 (2004) (decided after Fulks's trial had concluded), Petitioner argues that the prosecutor set forth a "legally flawed argument that the jury must find some causal nexus between the evidence offered as mitigating and the crime committed before such evidence can be taken into account by the jury . . . ."  (Pet. at 98.)

The court is constrained to deny relief on this claim.  As an initial proposition, close examination of the prosecutor's summation, in context, reveals that it did not suggest to the

74

jury that a rigid nexus requirement had to be shown between a mitigator and the murder in question. Viewed as a whole, the prosecutor made the point that "every one of the defense experts admitted there was no cause-and-effect." In other words, none of the experts testified as to a direct correlation between the deficiencies they had identified regarding Fulks's background and physical and mental well-being and the murder of Alice Donovan. In this sense, the prosecutor was commenting on the evidence the jury had heard. He also told the jury that "millions of Americans" suffer from brain injuries, and other maladies, or suffer from a low I.Q., and do not rape and kill women.

In Tennard, the jury was instructed to determine the appropriate punishment by considering only two "special issues," which inquired into whether the crime was committed deliberately and whether the defendant posed a risk of future dangerousness. 542 U.S. at 277. Earlier, in Penry v. Lynaugh, 492 U.S. 302 (1989), the Supreme Court held that a rigid application of three special issues did not allow the jury to give effect to Penry's mitigating mental retardation and childhood abuse evidence. Notwithstanding Penry, the Fifth Circuit had developed the concept of "constitutional relevance" and focused on whether the mitigating evidence was evidence of a "uniquely severe permanent handicap . . . []that the criminal act was attributable to this severe permanent condition." Tennard, 542 U.S. at 283. The Supreme Court squarely rejected the Texas court's nexus test. Id. at 289.

It can readily be seen that what was at issue in Tennard was the same sort of problem first addressed in Eddings, which is some type of statutory or common law bar to the jury giving full consideration to the mitigating factors produced at trial. Unlike the trial court in

75

Tennard, this court instructed the jurors that they could consider any factors to be mitigating if the factor tended to suggest life in prison without parole, and not death, should be the appropriate sentence. (TT Vol. 21 at 274.)

The court's instruction, both before and after closing arguments, made no mention of a requirement that there be a causal connection between the mitigating factor and the death of Donovan. Further, the court instructed the jury that arguments of the attorneys were not evidence. (TT Vol. 22 at 250–51.) As the government observes in its brief, in order for the jurors not to have considered the numerous mitigating factors they found (the jury unanimously found twenty-two of the forty-three mitigators advanced by Fulks), they would have had to blatantly ignore this court's oral and written instructions.

In sum, Fulks's counsel was not ineffective for failing to object to the prosecutor's argument. Assuming, without deciding, that the law announced by Tennard was clear at the time the challenged summation was made, the prosecutor's argument did not imply a strict causal nexus was required, and to the extent the prosecutor might have suggested this indirectly, the court's omnibus jury charge clearly explained to the jury the proper role of mitigating factors in this case. Hence, there was no error by the court or counsel.

CLAIM 7:
FBI 302 STATEMENT

In Claim 7, Petitioner alleges that trial counsel were ineffective in advising him to give a statement to the FBI when no proffer letter or plea agreement was in place. Upon being arrested on November 20, 2002 and for the five months that followed, Petitioner gave

no statement to the police. On April 28, 2003, pursuant to the advice of trial counsel, Fulks admitted to being involved in the abduction and rape of Alice Donovan. Petitioner argues that absent his voluntary statement, the government would have had difficulty proving either Petitioner's or Basham's guilt beyond a reasonable doubt. Thus, Petitioner argues, his willingness to provide a statement was of great value to the government, and counsel's advice that Petitioner take nothing in exchange for his statement was objectively unreasonable.

The government contends, however, that at the time that Fulks, through counsel, first approached the government about providing information regarding the whereabouts of Alice Donovan's remains, the government had no interest in receiving that information under conditions that would not allow the use of the information directly or derivatively. (See Gov't Ex. C, Decl. of AUSA Scott N. Schools at 4.) The government's insistence that information be provided without restriction was based on several realities. First, the evidence against Fulks at that time was already overwhelming. (Id.) Second, even though the government was interested in facilitating the location of Alice Donovan's remains to secure some closure for her family, whatever evidentiary value her remains may have had in November 2002, was likely lost or considerably dissipated by April 2003. (Id.) For both of these reasons, the government was willing to forego receipt of any information from Fulks unless the information could be used against him. (Id.) Third, the government had determined that Fulks and Basham were the only witnesses to the actual murders and expected that they would accuse each other of committing the murders. (Id.) Finally, the government had declined to

execute a proffer letter with Basham (when he had sought to cooperate with the government in late-November 2002) when the information known to the government was less extensive. Therefore, the government saw no reason to treat Fulks more favorably in April 2003, after it had overwhelming evidence of Fulks's guilt. (Id. at 2, 5.) The government prosecutor stated that, for all of the reasons set forth above, "I can state with certainty that the government would have foregone any interview of Fulks rather than receive information from him that could not be used against him." (Id.)

Independently, trial counsel concluded on the basis of the strength of the government's case, that Fulks's guilt was not subject to any reasonable dispute.[26] Trial counsel was knowledgeable about proffers and had attempted to engage in plea negotiations to convince the government to drop the death penalty notice in exchange for Fulks's guilty pleas to all charges.[27] However, prosecutors systematically indicated their unwillingness to recommend a sentence other than death. (See Gov't Ex. C, supra at 4–6.) With the

---

[26] At the § 2255 hearing, Blume said, "I believed that he would be found guilty, I didn't see any credible defense or issue which he would be found not guilty of the offenses. And so given that, I felt like that it was in Mr. Fulks's best interest to plead guilty." (HT Vol. 1 at 44.) Every court to consider this case agreed with trial counsel's assessment of the evidence. For example, according to the Fourth Circuit, "Fulks chose to pursue his trial strategy in the face of an abundance of evidence casting Fulks as an equal, if not leading, partner in the crime spree." Fulks, 454 F.3d at 410, 426. In fact, after the verdict was returned, all four alternate jurors requested an audience with the undersigned so that they could inform the court that they, too, would have unanimously voted in favor of the death penalty.

[27] "Because I believe [sic] then and I believe now he was remorseful for his responsibility in this. And so a proffer in my mind would have been self-defeating. I wanted the statement to come in. I mean, my main concern wasn't that the statement would come in, but the government might not use it on the basis of they thought it might be self-serving, and then I didn't know. You know, I did know about a proffer, but I didn't—you know, right or wrong, it's not my decision to say whether this is the right decision or the wrong decision, but my decision was that I didn't want a proffer and I didn't think it was in Mr. Fulks's interest to ask for one." (HT Vol. 1 at 42.)

inevitability of trial on two capital charges, trial counsel focused on the penalty phase as the only way to save Fulks's life by presenting a well-thought-out case in mitigation during the sentencing phase.

Having substantial experience in capital defense as detailed in this court's findings, and in light of the government's unwillingness to withdraw the death penalty notice, Blume made the strategic decision to have Fulks make a 302 statement to the FBI.

According to Blume, Nettles, and Johnson, they reasoned that the only way to get into evidence Fulks's version of the crime spree without subjecting Fulks to cross-examination, was through a 302 statement. Fulks's version claimed that he had a less culpable role in the crimes, specifically pinning the murder of Alice Donovan on Basham. Because trial counsel wanted the government to admit the 302 statement in the trial, Blume believed a proffer would be self-defeating. Further, trial counsel determined that if Fulks gave a statement without a proffer or a plea agreement, that would demonstrate his acceptance of responsibility and remorse for acknowledging his role in the crimes, especially without asking for anything in exchange. See Meyer v. Branker, 506 F.3d 358, 369–70 (4th Cir. 2007) ("A guilty plea demonstrates remorse, and, since the same jury sits during the guilt and penalty phases of a capital trial, . . . it also lessens the exposure of jurors to the often dramatic evidence of the crime."); Simpson v. Polk, 129 Fed. Appx. 782, 797 (4th Cir. 2005) (defense strategy was that by entering the guilty plea "maybe the jury would have some mercy and sentence [defendant] to life in prison"); Jones v. Page, 76 F.3d 831,844–45 (7th Cir. 1996). As Blume testified:

The purpose of giving the [302] statement was to not only get Chad's version out there, but to demonstrate some acceptance of responsibility and expression of remorse. And that those might be the factors which persuade the government to drop death or it could be used in mitigation of punishment at the sentencing phase of Mr. Fulks's trial.

(HT Vol. 1 at 44.) Blume also testified:

Well, it was clear to us at the time the government wasn't going to enter into one. You know, part of the purpose of having him give the statement and then continue to take polygraphs, provide the information, hopefully find the body was not only to try and create—Chad wanted to help, that was one thing. So, we were trying to facilitate his desire to try to help find her remains. We were trying to see if this ongoing cooperation and maybe the assistance of this might create a situation in which a plea bargain might eventually happen. And three, if that didn't to try and create a situation where he could maybe take advantage of responsibility and remorse as mitigating factors.

(HT Vol. 1 at 15.)

Additionally, as the government points out, the 302 statement to the FBI buttressed Fulks's attempt to admit supportive private polygraph examinations. As noted by the government, "[i]n the best case, the polygraphs would support Fulks's assertion that Basham was the killer. In the worst case, the strategy preserved an issue for appeal for which there was some legal support while also assuring that the jury would at least be aware that Fulks had accused Basham of being the killer." (Gov't Mem. Opp'n at 80, citing Gov't Ex. 3, supra, at 5).

To the extent that Petitioner claims his 302 statement allowed the government "to fill in the gaps in its evidence," the court finds that any information he provided was cumulative or not critical to the case. That is to say, Petitioner has failed to show that the outcome of his trial would have been different had he not given a 302 statement to the FBI.

80

The fact that trial counsel advised Fulks to speak with the FBI, and Fulks told the FBI that Alice Donovan was killed in South Carolina and that he provided details of his involvement in the crimes with which he was charged cannot automatically be said to have been ineffective assistance of counsel. Independently of his statement, Fulks's guilt was not subject to any reasonable dispute. As the Fourth Circuit summarized:

> [B]oth Hawkins and McGuffin testified that Basham took orders from Fulks and that Fulks was continually in charge of what the two of them did. Furthermore, the prosecution presented evidence suggesting that Fulks instigated the Kentucky prison break because he was afraid of being sentenced to a lengthy term of imprisonment on child abuse charges that he learned of the day before the escape. And Tina Severance testified that Fulks, not Basham, approached her about obtaining firearms shortly after their escape. Although Basham also fired shots when Jordan discovered the two of them burglarizing his son's home, Jordan testified that Fulks fired at him as well. Finally, throughout the crime spree, Fulks and Basham only travelled to places with which Fulks was familiar, and they did so with Fulks behind the wheel.

Fulks, 454 F.3d at 426.

Petitioner next contests as speculative the suggestion that trial counsel advised him to cooperate with the government as part of an overall strategy to introduce evidence that he did not kill Alice Donovan and Samantha Burns. The evidence at the § 2255 hearing, however, repeatedly demonstrated that such was precisely the strategy:

> I felt like Mr. Fulks could probably tell the story to the police, he could get out his version of the events, which was that he was not the actual killer. And then the government would hopefully admit this at trial as Mr. Fulks's version of the offense. And then I also hoped through maybe if we could help use this to find the body, if we could find the body, with the combination of giving the statement and finding the body, with the polygraph that he was able to pass, the numerous polygraphs might result in the government withdrawing death. So, on balance, you know, although we talked about this a lot, and there was some trepidation, there's always, of course, a lot of trepidation about having

your client go and talk to the police, that I felt like it was in Mr. Fulks's best interest to go and talk to the government. (HT Vol. 1 at 40–41.)

* * *

[T]he purpose of having him give the statement, we wanted to do two things. Number one, is have him show some acceptance of responsibility by not asking for anything. By going to the government and giving a statement which effectively meant he was going to be convicted of these crimes. So, we wanted it to demonstrate, A, acceptance of responsibility, B, hopefully some true indicia of remorse.

(Id.) Blume also testified: "I thought that our main chance to save Chad's life was to convince the jury that he wasn't the killer." (HT Vol. 1 at 134.)

The court finds that trial counsel's decision to have Fulks give a 302 statement was a reasonable trial strategy, especially in light of the multitude of witnesses and physical evidence of Fulks's participation in the seventeen-day crime spree. The decision to give the 302 statement was part and parcel of the decision to plead guilty—to get Fulks's version out without exposing him to the microscope of cross-examination given his lengthy criminal record. It was reasonable for trial counsel to advise Fulks to give the statement without a proffer or plea agreement for the strategic reason that it showed some level of acceptance of responsibility and remorse for accepting the role he had in the crimes, while most significantly, establishing his position that he was not the killer. Trial counsel believed Fulks was not the killer, and reasonably believed that he could convey the same information to the government to convince the government to drop death against Fulks and pursue it against Basham as the actual killer. Although the government ultimately did not remove the death penalty notice, but the court finds that trial counsel's decision to allow Fulks to discuss the

82

case with the FBI was a reasonable trial strategy, and, therefore, does not constitute ineffective assistance of trial counsel.

<div align="center">CLAIM 8:<br>CATCH-ALL MITIGATING FACTOR</div>

Petitioner alleges in Claim 8 that trial counsel were ineffective for failing to insist that additional, or more favorable, mitigating factors be included on the verdict form.

First, Petitioner argues that what is sometimes referred to as the "catch-all mitigation instruction" on the verdict form did not include the exact language found in 18 U.S.C. § 3592(a)(8), namely, "other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against the imposition of the death sentence." Absent this language, Petitioner argues the sentencing process was "fatally flawed."

At Fulks's request, the court instructed the jury on a total of forty-three potentially mitigating factors. The verdict form on which the jury recorded its verdict listed these factors. Mitigator No. 41 read as follows: "Other factors in Chadrick Evan Fulks's childhood, background, or character weigh against imposition of the sentence of death." In Claim 8, Petitioner alleges that catch-all Mitigator No. 41 did not track exactly the language of § 3592(a)(8) and is therefore defective.

After the § 2255 petition was filed in this case, the United States Court of Appeals for the Fourth Circuit issued its opinion in the direct appeal of Fulks's co-defendant, Brandon Basham. The verdict form in the Basham trial did not include even a "watered-down" catch-all mitigator, such as Mitigator No. 41 in the Fulks trial. Basham had objected, at trial, to this

court's refusal to include a blank line on the verdict form on which a juror could record some type of catch-all mitigating factor. The Fourth Circuit Court of Appeals rejected Basham's claim. United States v. Basham, 561 F.3d 302, 337 (4th Cir. 2009).

Basham argued that although this court's oral instructions followed the precise language of § 3592(a)(8), the absence of such a mitigating factor from the special verdict form created a reasonable likelihood that the jurors believed that they were precluded from considering "other factors" in mitigation. Relying upon Jones v. United States, 527 U.S. 373, 393 (1999), the Fourth Circuit concluded that this court's "explicit instruction" could overcome any ambiguity or confusion caused by the verdict form in Basham's case.

In Fulks's case, as in Basham, this court explained to the jury the law regarding aggravating and mitigating factors. With regard to aggravating factors, the court instructed the jury that the statutory and non-statutory aggravating factors contained in the jury instructions and included on the verdict form were the "only . . . aggravating factors that you may consider. You *may not* consider any other facts in aggravation which you may think of on your own." (TT Vol. 21 at 273 (emphasis added).)

As to mitigating factors, however, the court told the jury "the law provides that there is, essentially, *no limit* on the number of factors or things that the jury may consider in mitigation." (TT Vol. 21 at 274 (emphasis added).)

The court continued:

Unlike aggravating factors, the law does not limit your consideration of mitigating factors to those that are listed for you. Therefore, if there are any mitigating factors not argued by the attorneys for the defendant, but which any

juror finds to be established, by a preponderance of the evidence, that juror is free to consider them in his or her sentencing decision.

(TT Vol. 21 at 279.)

In Fulks's case, unlike in <u>Basham</u>, the court *did* include a modified catch-all mitigator in the form of Mitigation Factor No. 41. At Fulks's § 2255 hearing, Blume explained that in his view, Fulks would be best served by "as many [mitigators] as possible . . . a lot of very short mitigators." (HT Vol. 2 at 183.) He wanted "short declarative sentences which no one can disagree with." (HT Vol. 1 at 171.) Mitigator 41 conveyed the essence of § 3592(a)(8) in the form desired by Blume: short, to-the-point, and unencumbered by compound phrases and repetition that quite possibly could have confused the jury.

Because the Fourth Circuit has already determined that the court's failure to include *any* catch-all mitigating factor on the verdict form was not error, or was, in any event, cured by the court's explicit instructions regarding § 3592(a)(8), and because in the present case, the court gave at least a watered-down version of this concept, the court finds no error in counsel's decision not to request the precise words of the statute be read to the jury.

The second portion of Claim 8 challenges trial counsel's failure to request the statutory mitigating factor provided in 18 U.S.C. § 3592(a)(3):

> [t]he finder of fact shall consider . . . (3) Minor Participation. The defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge."

In this court's view, for Fulks's trial team to have suggested to the jury that Fulks's participation in the crime was "relatively minor" might well have been counterproductive.

85

As set forth earlier in this order detailing the chronology of events, Basham and Fulks were partners in crime in an extensive seventeen-day spree that spanned seven states and affected at least thirteen identifiable victims. Fulks drove the automobile, as Basham could not drive. The Wal-Mart video clearly depicts both defendants participating in the abduction and carjacking of Alice Donovan. There was strong evidence that Fulks raped Alice Donovan as evidenced by his semen on the back seat of her automobile.

On this record, trial counsel risked the possibility of a strong adverse reaction from the jury to suggest that Fulks's participation was "minor." To be sure, counsel could, and did, argue that Fulks was "less culpable" than Basham, a strategy that strikes this court as reasonable under the circumstances. The court is not convinced, however, that trial counsel were ineffective for failing to insist on a Minor Participation mitigating factor in this case.

## CLAIMS 9, 10, 11, 12 & 27:
### GUILTY PLEA

Shortly before trial, the court was informed that Fulks had decided to plead guilty to all eight counts of the superseding indictment and proceed to trial on the penalty phase only. A guilty plea hearing was scheduled for May 4, 2004. At the hearing, the court followed its standard procedure for accepting a guilty plea in compliance with the requirements of Rule 11 of the Federal Rules of Criminal Procedure. Mindful of the serious consequences attendant to a guilty plea, and of the possibility of a later challenge to the validity of the plea, the court was especially careful to strictly comply with each and every aspect of Rule 11.

Near the end of the Rule 11 colloquy, the court attempted to determine if there was a factual basis for the guilty plea as required by Rule 11(b)(3). It is this court's standard practice with regard to Rule 11(b)(3) to first ask the defendant to advise the court, under oath, exactly what he or she did to become guilty of the crime. This is traditionally followed by a recitation by the prosecutor, or sometimes the investigating law enforcement officer, of the facts the government has developed as a result of its investigation and what evidence the government would be prepared to go forward on and prove if a trial were held. Following this, the court asks the defendant if he agrees with the government's recitation of his involvement in criminal activity.

When the court asked Fulks to explain exactly what he did to become guilty of the facts charged in all eight counts, Fulks responded, through trial counsel John Blume, that instead of making a statement in the courtroom he would rely upon the information contained in the statement he made to the investigating FBI agent as summarized in the agent's 302 report. The court immediately expressed its surprise and concern regarding this development. The court had not been apprised prior to the hearing that Fulks would not make a statement in court, but would instead rely upon the 302 statement to support his guilty plea. Defense counsel further informed the court that the government had agreed to accept the 302 in lieu of Fulks's oral confession at the Rule 11 hearing and that the government also believed the 302 formed a sufficient factual basis to support Fulks's plea on all counts.

The court took a recess to read the 302 to see, in particular, whether all of the elements of the two capital offenses were supported by the facts admitted. After reviewing

87

the 302, the court was not convinced that the statement contained an admission of specific intent relating to the death of Alice Donovan. The court then expressed its concern to counsel that Fulks was attempting to plead guilty to capital crimes without admitting any direct or indirect participation in the death of the victim. Counsel for the defendant and the government all stated that Fulks could plead guilty to the capital offenses, without admitting any specific intent to cause death, under the doctrine set forth in United States v. Pinkerton, 328 U.S. 640 (1946).

Generally speaking, "[t]he Pinkerton doctrine imposes vicarious liability on a co-conspirator for the substantive offenses committed by the members of the conspiracy when the offenses are committed during and in furtherance of the conspiracy." United States v. Carrington, 301 F.3d 204, 211 (4th Cir. 2002) (quoting United States v. Aramony, 88 F.3d 1369, 1379 (4th Cir. 1996)). Because Fulks admitted in the 302 that he and co-defendant, Brandon Basham, conspired to kidnap and carjack Donovan, counsel argued that Fulks could be held liable for Donovan's death even if he had not intended it, under a Pinkerton theory of criminal responsibility.

As the hearing continued, the court expressed its concern about the propriety of accepting a guilty plea to carjacking resulting in death under a Pinkerton theory of liability:

> So, on the state of the record here, we have to look at either aiding and abetting liability or Pinkerton liability. Aiding and abetting requires some type of specific intent to help bring about the crime.
>
> I don't think [aiding and abetting] fits the facts set out in his 302 form, because, as I said, Mr. Fulks does not admit that he knew that she was going to be killed, and he does not admit that he wanted to help bring it about.

Then we are left with so-called Pinkerton liability, which was established by the Supreme Court in the case of Pinkerton versus United States back in 1946. In that case the Supreme Court held that a conspirator may be convicted of substantive offenses committed by co-conspirators in the course of and in furtherance of the conspiracy.

But what I have been agonizing over is, counts 1 and 2, two counts that carry the death penalty, do not charge a conspiracy . . . .

So, I'm not sure that we need to—I think the thing to do is to just stop right here and resume tomorrow and let me hit the books and y'all hit the books tonight to see if the law is that Pinkerton can apply to a murder case where a conspiracy is not charged.

(Plea HT, May 4, 2004 at 68–69.)

At the conclusion of that hearing, this court again reiterated its concerns:

My concern is, I did not know when I walked out here that all I was going to have for a factual statement was his 302 that really admits kidnapping and admits car-jacking, but does not admit any complicity in death.

And so the two options we have I think are looking at aiding and abetting, which I don't think fits. . . .

Then we have Pinkerton liability, the co-conspirator theory of imputing liability. But I'm just not sure of my authority to apply that doctrine to counts 1 and 2 which do not charge a conspiracy, and that's my precise question that I would like for y'all to take a look at.

(Id. at 72–73.)

The court then adjourned the hearing for three days to allow counsel to brief the question of whether a Pinkerton theory of liability could support a guilty plea for carjacking resulting in death. The briefs submitted by both the government and the defendant argued that a Pinkerton theory was viable under the circumstances presented in this case.

When the hearing resumed, the court reiterated its tentative concern regarding the Pinkerton theory, noted that both parties had urged upon the court that Pinkerton was viable, and agreed to accept the plea on this basis. In doing so, the court was trying to steer between the Scylla of accepting a potentially defective guilty plea and the Charybdis of forcing the defendant to go to trial, thereby denying his guilt in front of the jury and possibly compromising his case in mitigation during the penalty phase, if one ensued. Recognizing that the issue might arise again during the course of this litigation, the court entered a memorandum opinion reciting the events leading up to the guilty plea and the court's basis for accepting the plea. United States v. Chadrick Evans Fulks, CR No. 4:02-992 [D.S.C.] (order entered July 2, 2004). As the court noted in that order:

> The court . . . must balance its own due process concerns about Pinkerton against Fulks's right to chose a strategy that he believes gives him the best chance that the jury will spare his life, pleading guilty, but not admitting intent.

Id.

The court noted in that same order that if it were later determined that the guilty plea was improvidently accepted, the error could well prove to be harmless. This was because Count Two, charging Kidnapping resulting in death, has no mens rea requirement as does Count One, and so if the jury found that the defendant should receive the death penalty on Count Two, any deficiency in the guilty plea to Count One would be harmless. As noted previously, the jury was required to render separate verdicts on both Count One and Count Two and imposed the death penalty on both counts.

As the court supposed at the time the guilty plea was accepted, Fulks has now returned to this court suggesting that notwithstanding his earlier position and the strong urging he made at the time to have the court accept his guilty plea by way of his admission to the 302 as part of a valid trial strategy, his plea should be set aside and a new trial ordered. With this background, the court now turns to the issues raised in these five claims (9, 10, 11, 12, and 27).

Petitioner asserts the following five claims challenging his guilty plea: (a) Claim 9: that there was not a sufficient factual basis for the guilty plea to Count One because Fulks did not possess the requisite intent to plead guilty to the carjacking count; (b) Claim 10: that trial counsel was ineffective for advising him to plead guilty to the carjacking count; (c) Claim 11: that trial counsel was ineffective for allowing Fulks to plead guilty to the carjacking count because the distinction between the intent required under Pinkerton and the gateway intent factors of the Federal Death Penalty Act was too fine for a lay juror to appreciate; (d) Claim 12: that the Eighth Amendment precludes the application of Pinkerton in a capital case; and (e) Claim 27: that trial counsel was ineffective in advising Petitioner to plead guilty because this allowed the prosecution to introduce evidence of Petitioner's bad acts that would have been inadmissible in a guilt phase trial to which the Federal Rules of Evidence would apply.

*Claims 9 & 12*

Because Fulks had the opportunity to raise Claims 9 and 12 on direct appeal and did not, see United States v. Mastrapa, 509 F.3d 652 (4th Cir. 2007) (vacating plea on direct

appeal for lack of sufficient factual basis), he has procedurally defaulted these claims. <u>See</u> <u>United States v. Mikalajunas</u>, 186 F.3d 490, 492–93 (4th Cir. 1999). As a result, the court determines Claims 9 and 12 to be procedurally defaulted. Therefore, the only basis for Fulks to maintain any claims challenging his guilty plea is to argue that his trial counsel was ineffective for allowing him to plead guilty, as raised in Claims 10, 11, and 27.

*Claim 10*

Claim 10 is an assertion that Fulks was denied the effective assistance of counsel when his trial counsel improperly advised him to plead guilty. In this argument, petitioner asserts that he was prejudiced by trial counsel's incomplete and inaccurate assessment of <u>Pinkerton</u> which formed the basis for his decision to accept counsel's advice to plead guilty. As a secondary proposition, Petitioner contends that he suffered prejudice by acting in reliance on his counsel's erroneous advice that he plead guilty when the plea lacked a legally sufficient factual basis. In essence, both of these arguments derive from the very same issue that concerned this court when the guilty plea was proffered. For the reasons that follow, the court concludes that counsel was not ineffective with regard to Fulks's plea and, perhaps more importantly, any error committed by trial counsel with regard to the guilty plea was unquestionably cured when the jury returned a verdict of death on Count Two (Kidnapping resulting in death) to which the defendant pled guilty without reliance upon <u>Pinkerton</u>.

All of the arguments asserted in support of Claim 10 parrot the court's concern expressed on May 4 and May 7, 2004 when the court was urged by defense counsel and the government to accept the guilty plea. In essence, Petitioner's § 2255 attorneys contend that

Fulks's statements contained in the 302 report were not sufficient to support a guilty plea to Count One, and the conviction and resulting death sentence on Count One must therefore be set aside.

The court's basic rationale for accepting the plea to Count One under <u>Pinkerton</u> is set out at length in the court's July 2, 2004 order. As the court noted in that order, there is sufficient evidence in the record from which the court could have concluded that Fulks intended serious harm or death, at the moment he took control of Donovan's automobile, to support his plea.

According to Fulks's own 302 statement, at the time Donovan was carjacked, Fulks and Basham were fleeing the scene of an attempted murder and first-degree burglary in a stolen white pickup truck; Fulks and Basham abandoned the pickup truck immediately after they carjacked Mrs. Donovan in her blue BMW from the Wal-Mart parking lot in Conway, South Carolina; and Donovan was subsequently raped and killed. Fulks further admits that he and Basham had previously carjacked and kidnaped Samantha Burns from a mall parking lot in Huntington, West Virginia, just a few days before Donovan's abduction. Burns was also raped and killed. Accordingly, the court could have logically inferred from the 302 that Fulks intended death or serious bodily harm at the moment he carjacked Donovan.[28]

---

[28] As the government observes in its brief, the court is authorized to determine if a guilty plea is supported by "anything that appears in the record." <u>United States v. Mastrapa</u>, 509 F.3d at 660. In this case, the government orally supplemented Fulks's 302 statement at the guilty plea hearing with an extensive rendition of Basham and Fulks acting as partners during their seventeen-day crime spree, a period that included the abduction, rape, and murder of two women, the abduction and leaving for dead a third individual (Hawkins), and the potential abduction of yet two other women. Fulks's trial counsel protested the rendition of matters outside the 302, and indicated that the only concessions Fulks would make were those contained in the 302. This court is reluctant, therefore, to rely upon the government's rendition at the guilty plea

93

Moreover, as pointed out by the government, the intent requirement for carjacking resulting in death is satisfied when the government proves that the defendant "was conditionally prepared to act if the person failed to relinquish the vehicle." United States v. Foster, 507 F.3d 233, 247 (4th Cir. 2007). It is not necessary to prove, as the Petitioner apparently contends, that the defendant actually intended to cause the harm. According to Fulks's 302 comment, Fulks saw that Basham was sitting on Donovan when Fulks first saw that Basham had entered the BMW. Basham, armed with a .22 revolver, forced Donovan into the back of the BMW so Fulks could drive. The physical sitting on Donovan, the ordering that she drive to the back of the parking lot, the ordering of Donovan into the back seat of the BMW, and the use of the .22 revolver were sufficient to infer that Basham, with Fulks's help, possessed the intent to seriously harm or kill Donovan if necessary to obtain control of her vehicle.

Because the record demonstrates that Fulks's trial counsel were correct in their assessment of Pinkerton liability, and because Petitioner's plea was supported by an adequate factual basis, the court concludes that there is no merit to Claim 10.[29]

hearing, for, although it "appears in the record," it was disputed by Fulks.

[29] In Holloway v. United States, 502 U.S. 1 (1999), the Court required an assessment of the mens rea requirement at the inception of the carjacking. In this case, the government asserts that because Fulks and Basham kidnaped Donovan, the crime of carjacking occurred over an extended period of time. Accordingly, the argument goes, the court is authorized to determine Fulks's mens rea at any point during the commission of the actus rea. Because Fulks and Basham, among other things, both raped Donovan while the carjacking was in progress, the government contends that the concurring opinion in United States v. LeBrown-Cepeda, 324 F.3d 52, 63 (1st Cir. 2003) leads to the conclusion that even if the requisite mental state was not demonstrated at the precise moment the carjacking began, it was unquestionably shown while the carjacking was in progress. Because the court did not rely on this theory in accepting Fulks's plea, and because counsel for the government offered only a lukewarm argument at the hearing, the court declines to rely upon this theory.

*Claim 11*

In Claim 11, Petitioner contends that, assuming arguendo that the guilty plea pursuant to <u>Pinkerton</u> was valid, trial counsel was nevertheless ineffective in advising Petitioner to plead guilty because the distinction between intent under <u>Pinkerton</u> and the gateway intent factors under the Federal Death Penalty Act is "far too fine a line for a lay jury to appreciate." As the government observes in its response to the petition, no authority is offered for this proposition. Instead, Petitioner simply asserts that the distinction between the intent required for <u>Pinkerton</u> liability and the gateway intent factors of the Federal Death Penalty Act is a filament too fine to be disentangled by a jury composed of ordinary citizens.

Initially, it should be noted that such an assertion bespeaks a distrust of the common law jury trial. Frequently, jurors are required to compartmentalize their thinking, draw fine distinctions, and, in some cases, even ignore evidence that was produced in the courtroom. Jurors are sometimes instructed that an item of evidence is admitted against one defendant, but not against another, and jurors are occasionally instructed to consider certain evidence for one purpose (e.g., notice), but not another (e.g., liability). Moreover, it is sometimes necessary for the trial judge to instruct the jury to disregard testimony that it has already heard when a judge later determines it was improvidently admitted. Although this case was, and remains, a serious case to those involved, it was not an unusually complex or intellectually challenging one such as anti-trust cases, securities fraud cases, and a variety of other complex, highly technical disputes that are put before juries across the United States on a daily basis.

Petitioner contends that once a defendant has pled guilty to a crime that has "intent to cause death or serious bodily harm" as an element of the offense, a lay jury will view that as a concession that the defendant did act with the requisite gateway intent set forth in 18 U.S.C. § 3591(a)(2)(D) of "intentionally and specifically engag[ing] in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constitutes a reckless disregard for human life."

Importantly, Claim 11 suffers from a faulty premise, namely, the assertion that "the jury was instructed" that Petitioner had pled guilty to carjacking "with intent to cause death or serious bodily harm." (Pet. at 134.) Contrary to this assertion, when the court instructed the jury, there was no mention of the intent element required for Fulks to be guilty of carjacking. At the commencement of the trial, the court instructed the jury as follows:

\* \* \*

> Let me stop here and clarify something you may wonder about. As I have said, Mr. Fulks has pled guilty to Kidnapping, resulting in death, and carjacking, resulting death. In pleading guilty to these two charges, Mr. Fulks has admitted that he participated in the Kidnapping of Ms. Alice Donovan and that he participated in the carjacking of Ms. Alice Donovan. He also admits that the Kidnapping and carjacking ultimately resulted in the death of Ms. Donovan. *He denies, however, any direct involvement in the actual death of Ms. Donovan; therefore, the question of whether Mr. Fulks was directly involved in the actual death of Ms. Donovan is a fact that you will have to consider in reaching your verdict in this case.* The statutory intent factors I have just outlined for you relate to the question of whether Mr. Fulks had any direct involvement in Ms. Donovan's death.

(TT Vol. 1 at 35–36 (emphasis added).)

Then, at the penalty phase trial's conclusion, the court instructed the jury:

The defendant's guilty pleas before this trial began ensure that he will be punished with one of the two most severe punishments available under law.

As you know, the defendant has pleaded guilty to two offenses: carjacking, resulting in death, and kidnapping, resulting in death.

(TT Vol. 21 at 249.)

\* \* \*

The law does not decide which is the appropriate sentence. The law does not assume that every defendant who is found guilty of committing a capital crime should be sentenced to death. Nor does the law presume that this defendant, in particular, should be sentenced to death.

(Id. at 249.)

\* \* \*

Let me now turn and discuss with you the deliberative steps that you should follow in considering as to both of the offenses for which death is a possible punishment. That is, carjacking, resulting in death, and Kidnapping, resulting in death. There are a total of six possible steps. I will first outline for you the steps you may be required to go through, and then I will address each of these steps in more detail later in these instructions.

(Id. at 255.)

\* \* \*

Second, you must consider whether the government has proven, beyond a reasonable doubt and to your unanimous agreement, one of four threshold intent factors.

(Id.)

\* \* \*

Next, before you may consider the imposition of the death penalty, you must also unanimously find, beyond a reasonable doubt, that the defendant acted with one of four potential mental states, called threshold intent factors, described below.

(Id. at 257–58.)

The court then gave detailed instructions on the four potential mental states that the jury would have to consider, and then concluded:

> You must find at least one of these threshold intent factors has been proven beyond a reasonable doubt, before you may continue your deliberations.

(Id. at 261.)

<div align="center">* * *</div>

> If you do not find that the defendant acted with one of the described mental states, your deliberations end.

(Id.)

It can readily be seen, then, that the jury was merely instructed that Fulks had pled guilty to "carjacking resulting in death," with no reference whatsoever to the mental state that accompanied the guilty plea. The jury was then thoroughly and carefully instructed on the gateway intent factors the government was required to prove, beyond a reasonable doubt, in order to support a verdict of death.

Claim 11 essentially seeks to capitalize on this court's concern over the propriety of Fulks's guilty plea when the court expressed its reservations during the guilty plea phase about whether Fulks had acknowledged enough facts to support a guilty plea under Pinkerton. Here, the jury was not confronted with the dilemma that the trial court faced during the guilty plea phase. Accordingly, there is no merit to Claim 11.

<div align="center"><em>Claim 27</em></div>

In Claim 27, Petitioner contends that had he not pled guilty and gone through a guilt phase trial, the Federal Rules of Evidence would have applied and would have prohibited the admission of Fulks's alleged other bad acts, such as violence towards his wives and former

<div align="center">98</div>

girlfriends. At the sentencing hearing in this case, the jury heard testimony about Fulks beating and raping Heather Goodman, hitting and dragging Amber Fowler, his wife, through the house by her hair, and punching, dragging by the hair, and raping his second wife, Veronica Evans. Evans even testified that on one occasion, Fulks poked an arrow into her, handcuffed her, punched her in the face, and raped her. (See generally, TT Vol. 14 at 37–185.)

The government responds that had Fulks opted to plead not guilty and demand a jury trial to determine his guilt, much of the testimony cited above would have come in as evidence of other bad acts offered to show motive or intent under Rule 404(b) of the Federal Rules of Evidence.

The court does not have to reach the argument made by the government because Claim 27 suffers from a fatal analytical flaw. Even assuming, had Fulks opted for a trial on guilt, that the court kept out evidence of violence towards other women, if Fulks had been convicted at the guilt phase trial, evidence of the violence towards other women would still have come in at the penalty phase, just as it did in the trial that was conducted. In other words, reasonable counsel would have concluded that evidence of violence towards women would be admissible in a penalty phase regardless of whether the penalty phase was occasioned by a guilty plea or a verdict of guilty by a jury following a trial. This fact has nothing to do with whether it was reasonable for Fulks to plead guilty based on the evidence the government had collected against him in this case.

At the § 2255 evidentiary hearing, Fulks advanced an argument not directly made in his petition, which is that Pinkerton and other considerations aside, it was bad trial strategy to plead guilty to the death-eligible counts.  Rather, the argument goes, Fulks should have pleaded not guilty and required the government to prove guilt beyond a reasonable doubt.  In support of this argument, Petitioner submitted the testimony of Andrea Lyon, a clinical professor of law at DePaul University College of Law in Chicago, and also an experienced capital litigator.  Lyon has practiced since 1976 and specializes in criminal defense, almost exclusively homicides and capital offenses.

Lyon testified to the remarkable proposition that there are *never* any circumstances imaginable under which it would be appropriate to plead guilty to a capital crime without the government's concession for a sentence of life.  In fact, Lyon contended that such a position is the "standard practice in [the] industry."  (HT Vol. 2 at 83 (emphasis added).)  This court rejects Lyon's opinion on the categorical illegitimacy of pleading guilty when death remains on the line.

Some six months after Fulks's trial, the United States Supreme Court decided Florida v. Nixon, 543 U.S. 175 (2004), in which the Court determined that counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial does not automatically render counsel's performance deficient.  In Nixon, the Court noted that a guilty plea "may be tactically advantageous for the defendant," citing to its ruling in Boykin v. Alabama, 395 U.S. 238, 240 (1969), and also noted that where counsel is unable to negotiate a guilty plea for a life sentence, defense counsel "must strive at the guilt phase to avoid a

counterproductive course." 543 U.S. at 191(citing Sundby, <u>The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty</u>, 83 Cornell L. Rev. 1557, 1597 (1998) (explaining that "in capital cases, a 'run-of-the-mill strategy of challenging the prosecution's case for failing to prove guilt beyond a reasonable doubt' can have dire implications for the sentencing phase.").

In fact, immediately after referencing one of Lyon's law review articles, the <u>Nixon</u> court stated, "[i]n this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a 'useless charade.'" 543 U.S. at 192 (quoting <u>United States v. Cronic</u>, 466 U.S. 648, 656–657 n.19 (1984).

In light of the overwhelming evidence against Fulks, the court finds that trial counsel employed a valid and reasonable trial strategy in anticipatorily heeding the dictate in <u>Nixon</u> that "in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed." 543 U.S. at 192. In advising Fulks to plead guilty and proceed directly to the sentencing phase in an effort to avoid a death sentence, trial counsel reasonably determined that it was in Fulks's best interest to concede guilt as a way of showing remorse and accepting responsibility. Counsel's performance in allowing the guilty plea cannot be said to have fallen below an objective standard of reasonableness under <u>Strickland</u>.

In sum, trial counsel was not ineffective for advising Fulks to plead guilty to carjacking because it was done pursuant to a reasonable legal trial strategy.

CLAIM 13:
MINOR PARTICIPATION

Among the mitigating factors that the jury is required to consider in determining whether a sentence of death is to be imposed on a defendant under the Federal Death Penalty Act is the defendant's role in the offense. Specifically, 18 U.S.C. § 3592(a)(3) provides: "Minor participation. The defendant is punishable as a principal in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge." "In other words, if a defendant is guilty of an offense, *but played a small part in it*, the jury (or, in a bench trial, the judge) could find that he was not sufficiently culpable to warrant the imposition of the death penalty." <u>United States v. Moussaoui</u>, 382 F.3d 453, 486 (4th Cir. 2003) (Gregory, J., concurring in part, dissenting in part) (emphasis added).

As Blume testified, one of trial counsel's main goals at trial was to demonstrate that Fulks was not the person who actually killed Donovan or Burns. In that effort, the trial team assembled information about Basham to prove that he was more culpable for the crimes than Fulks. Blume stated, "we exhausted the sources that I was aware of at the time." (HT Vol. 2 at 19.)

Petitioner claims that trial counsel neglected to introduce evidence that Basham was a master manipulator and the leader for the purpose of a comparative analysis between Basham and Fulks to differentiate their degrees of culpability. Petitioner goes to great lengths to claim that the government portrayed Fulks as the leader during his sentencing trial.

102

However, a review of the record shows that the government's argument was that Fulks and Basham were equally culpable:

> They were a two-man death squad. Two men, forming one team. They could not have done things that they did to Samantha, and they could not have done things they did to Alice without acting in unison, without acting as one.

> The government is not saying Chad Fulks is more culpable than Brandon Basham. And the government is not saying that Brandon Basham is more culpable than Chad Fulks. They are equally culpable.

(TT Vol. 21 at 24.)

Specifically, Petitioner claims trial counsel should have obtained testimony from staff of Columbia Care Center ("CCC") and from prison guards at the Alvin S. Glenn Detention Center (AGDC"). As to the CCC staff, Petitioner argues that trial counsel should have called detention officer Jeremiah Bush to testify about Basham's construction of a rope made of bed sheets for a planned escape at the facility. Petitioner suggests that because a similar rope was constructed for the escape at the Hopkins County Detention Center ("HCDC") in Kentucky, the jury could have concluded that Basham's role in constructing the rope was some evidence of his leadership in the HCDC escape and the later incidents of the crime spree.

However, this argument ignores the evidence pointing to Fulks's own attempt to escape from CCC while awaiting trial. That escape attempt involved Fulks having hoarded five bed sheets torn into a rope-like configuration, having removed the screen from his room window, having collected pepper packets to throw off police from his scent, and having attempted to persuade another inmate provide an alibi for him. (HT Vol. 2 at 21.)

Petitioner next argues that trial counsel should have called CCC nurse supervisor

103

Celia Bowman to testify that Basham was a very manipulative inmate who skillfully manipulated the staff to obtain medication and other items. (Basham TT Vol. 10/12/2004 at 15–227.) Likewise, Petitioner argues that trial counsel should have called prison guard Robert McEachern to describe Basham as "very observant," "intelligent," and "crafty," (Basham TT Vol. 10/13/2004 at 16–102); and prison guard Francis Kirkland to describe Basham as ". . . very aggressive. Aggressive-type individual. He likes to have things his way or no way at all. He wants to take control." (Basham TT Vol. 10/13/2004 at 16–62. Petitioner complains that trial counsel should have called prison guard Lee James to describe Basham's leadership qualities: "He is a leader. He can lead. He can get the dorm in an uproar when he wants to," (Basham TT Vol. 10/14/2004 at 17–57); and prison guard Erick Dash to comment on Basham's volatility: "He is manipulative. He can go off at anytime. You never know. He can just go off." (Basham TT Vol. 10/14/2004 at 17–65).

Petitioner's claim that trial counsel was ineffective in failing to introduce testimony by CCC staff and AGDC prison guards on Basham's leadership and manipulation is unavailing. The reality is that trial counsel did present substantial evidence of Basham's leadership and manipulation, to consider in conjunction with Petitioner's self-serving statement to the FBI disclaiming any direct part in the death of Alice Donovan. It is not reasonable to suggest that evidence from the foregoing additional witnesses would have established evidence of Petitioner's role as a follower and not a leader such that Petitioner would have not been sentenced to death.

Evidence that makes one defendant look more culpable does not necessarily help another defendant in the case. See Howard v. Moore, 131 F.3d 399, 420 (4th Cir. 1997) (co-conspirator's intent to kill victim was not mitigating evidence in favor of defendant). Furthermore, a co-conspirator's state of mind is not relevant to the jury's determination of the proper punishment of another defendant because the Eighth Amendment requires an individualized determination of sentencing in death penalty cases. Id. (citing Lockett v. Ohio, 438 U.S. at 604).

Contrary to Petitioner's argument, trial counsel effectively portrayed Basham as the leader and more aggressive than Fulks, including testimony from Tina Severance that Basham had a quick temper and was paranoid (TT Vol. 4 at 21); that Basham wore Samantha Burns's ring around his neck and that he threatened Severance (id. at 15–17); and that Basham was a time bomb ready to explode. (Id. at 22.) Through Andrea Roddy, trial counsel focused the jury on Basham's possessiveness of the stolen guns and his threats to kill police officers and a teenage boy. (Id. at 103–106.) However, the evidence of Fulks's own actions cut against Petitioner's argument that he had a minor participation in the crime spree.

Fulks's actions could not be described as lesser such that he could reasonably be considered to have been a minor participant in the crime spree. When asked by the government, "Did you see Mr. Fulks as a minor participant in this case?" Blume testified pithily, "No." (HT Vol. 2 at 182.) Moreover, the trial record reflected abundant evidence of Fulks's own aggressiveness, craftiness, and manipulation. More problematically, witnesses who had observed both Fulks and Basham provided devastating testimony of

Fulks's leadership and ordering Basham around. The uncontradicted testimony was that Fulks, not Basham, drove the vehicles during the commission of all three kidnappings. James Hawkins testified that it was Fulks who ordered him to put his arms around a tree; who ordered Basham to tape Hawkins's hands; who cursed at Basham that he wasn't "doing it fucking right;" who taped Hawkins's hands more tightly; who tied his legs together; and who duct-taped his mouth shut. (TT Vol. 2 at 133–46.)

It was Fulks who chose to travel to Tina Severance's home; who convinced her to occupy her friend, Robert Talsma, while Fulks and Basham stole his guns (id. at 78–79); and who later pointed a gun at her head at the Lake Shore Hotel, which she testified was "the closest she came to dying." It was Fulks who drove to visit his family; who Carl Jordan testified shot at him, along with Basham. (TT Vol. 5 at 49–61.) Fulks stole and drove Olieta Hyman's pickup truck into the Wal-Mart parking lot. Fulks chose to leave the pickup truck and get into the driver's seat of Alice Donovan's car, while Basham sat on top of her with a gun in his lap. Fulks drove himself, Basham, and Donovan away from the Wal-Mart parking lot. (Id. at 123-155.) It was Fulks who purchased electrical tape from the gas station (TT Vol. 6 at 16), who then drove to an isolated area where he and Basham raped Alice Donovan. (TT Vol. 6 at 29–32, 43–45, 56.)

Fulks's trial counsel attempted to portray Basham as the more aggressive and the leader of the two. It is speculative to suggest that any additional evidence in the form of testimony from the CCC staff and prison guards would have convinced the jury that Basham was more of a "master manipulator" than was Fulks. It was Fulks who, after stealing a shirt

emblazoned with the FBI emblem, impersonated an FBI agent to rob two young men, and afterwards laughed at his cunning play. (TT Vol. 14 at 72, 97.) It was Fulks who convinced CCC staff of his terrible pain, but who was able to attempt an escape, fight five guards, and badly wound one. Perhaps most notable was Fulks's pretending, in the presence of a jailhouse prayer group, to receive a telephone call informing him that his wife, mother-in-law, and newborn baby girl had been hit by an eighteen-wheeler, and none of them was expected to survive. He cried in his cell for a day and a half (TT Vol. 14 at 259), so much so that his bed linens were wet with tears. (Id. at 260.) So convincing was his pretense that the nurses gave Fulks Tylenol PM to help sedate him (id. at 260).

While at another place of incarceration, Fulks persuaded his fellow jail inmate's mother, Nell Lee, to bond him out. After he told Nell Lee that his mother-in-law had died, his wife was injured, and that his little girl was in critical condition (id. at 282), Nell Lee spent about two hours on the telephone in an attempt to help him find the hospital where his alleged daughter was located. (Id. at 281.) The next day, Fulks had Nell Lee take him to the airport to rent a car to go take care of his child. (Id. at 280.) When Fulks was unable to rent a car, Nell Lee loaned him a car, gave him money for gas (id. at 281), and gave him a note indicating her permission for Fulks to use the car for five days. (Id. at 283.) Each day for five days, Fulks called Nell Lee to report his baby girl's condition. (Id. at 284.) On the fifth day, Fulks told Nell Lee that he would be back with her car in about two hours. (Id. at 285.) Nell Lee did not hear from Fulks again, but later discovered the truth: that there had been no accident, and in fact, that Fulks had no wife, mother-in-law, or baby.

107

In sum, the court finds that Petitioner has failed to show any evidence that trial counsel failed to present evidence of Basham's manipulation and leadership that would have overcome the prosecution's compelling exegesis of Fulks's own manipulation and leadership.

<div align="center">

CLAIM 14:
FUTURE DANGEROUSNESS

</div>

In an effort to persuade the jury that Fulks would not pose any future problems to staff or other inmates if allowed to serve a life sentence in prison, Fulks's trial team retained, interviewed, and had on standby three potential witnesses to testify on the issue of future dangerousness. These witnesses were: Don Romine, Dr. Mark Cunningham, and James Aiken. Ultimately, only one of the three, Romine, was called to testify at trial. Romine was a former Marine with thirty-one years of experience working for the Federal Bureau of Prisons. (TT Vol. 19 at 63–64.) He began his career as a correctional officer and worked his way up to a senior executive level position, ultimately serving as warden at two federal prisons, including a high-security facility. (Id. at 65, 72.) Romine had also helped draft security policies for federal prisons. (Id. at 66–67.) He received an award for heroism while working at the federal facility at Marion, Illinois. (Id. at 69–70.)

Romine was called as a witness to testify to the simple proposition that no one escapes from federal maximum security institutions. To this end, Romine described the elaborate security apparatus and procedures in place at the institution at which Fulks would be housed if given a life sentence. In this court's view, Romine was perhaps one of the strongest witnesses the defense team presented in terms of attempting to spare Fulks's life.

<div align="center">108</div>

As for the two witnesses who were not called, if they had testified in accordance with their declarations attached to the petition, they would have said that Fulks was a gentle person who would not constitute an escape risk or threat to prison safety. Among other things, Cunningham would have testified that, in his opinion, an offender's alleged acts of violence in the community have little value in predicting violent behavior in a prison context. (Pet. Ex. 77 at ¶ 8.) Aiken would have gone further, testifying that rather than Fulks being a threat to other inmates, Fulks himself would have been a potential victim: "In fact, the major concern I have of Mr. Fulks is the need to protect him from the predator, more dangerous, violent and disruptive prison population, especially as he grows older." (Pet. Ex. 76 at ¶ 12.) Aiken would have also testified to the somewhat remarkable proposition that Fulks's "criminal history and confinement record do not reflect a pattern of a prison predator nor is there evidence of his continual, methodical use of violence to gain control over inmates, staff or the operation of the prison." (Id. at ¶ 8.)

In discussing the tendency of some attorneys to "overtry" a case, the late Francis Murnaghan of the United States Court of Appeals for the Fourth Circuit once observed,

> Resourceful lawyers . . . often desire to be thorough and to overlook nothing in the commendable zeal to afford first-class representation. Consequently in many cases they tend to excess as they inundate us with a plethora of arguments, some good and some not so good. Sometimes one wonders whether such lack of selectivity is not counterproductive, for a party raising a point of little merit exposes himself to the risk of excessive discount for a better point because of the company it keeps.[30]

---

[30] United States v. Computer Sciences Corp., 689 F.2d 1181, 1183 (4th Cir. 1982), overruled in part by Busby v. Crown Supply, Inc., 896 F.2d 833 (4th Cir. 1990).

What Judge Murnaghan said regarding cumulative and sometimes counterproductive arguments can also be said about trial witnesses. To have added the testimony of Cunningham and Aiken to that of Romine, perhaps the defense's strongest witness in the entire trial, could well have been counterproductive because it would have arguably weakened Romine's testimony.

The choice of what type of expert to use is one of trial strategy and deserves "a heavy measure of deference." Turner v. Calderon, 281 F.3d 851, 875–976 (9th Cir. 2002). On the record in this case, the court is unable to conclude that the decision to call only one of the three potential witnesses for testimony regarding future dangerousness was constitutionally ineffective trial strategy.

As the government observes in its memorandum in opposition to the § 2255 petition, Cunningham would have actually given testimony damaging to the Petitioner. In his declaration, Cunningham conceded that there is a 20 to 30 percent likelihood of a capital offender committing an act of violence at some time during his prison term, and an 8 to 10 percent likelihood that a capital offender will present a chronic violence problem. (Pet. Ex. 77 at ¶ 11.) Moreover, Cunningham estimated that there is between 26.2 and 31.5 percent probability that Fulks would commit a "serious assault" during his incarceration. (Id.)

Nevertheless, Cunningham was apparently prepared to testify that Fulks's "prior prison incarceration and incarceration pretrial records reveals [sic] that he has no serious violence in his past prison confinement, and has exhibited no serious violence in past extended jail incarcerations." (Id. at ¶ 9.)

Cunningham and Aiken would have no doubt been extensively cross-examined about Fulks's behavior while incarcerated. To begin, Fulks successfully escaped from jail in Kentucky, and attempted on two occasions to escape while being held pending trial in this case. One of these attempts included collecting bed sheets to make into a rope, and accumulating small quantities of pepper that could be used to throw off tracking dogs. (TT Vol. 15 at 117–40.)

The record in this case contains several episodes of what could be termed major scuffles with prison guards while Fulks was being held awaiting trial in this case. These included an April 2003 incident where Fulks became angry because he was not allowed to carry personal photographs with him during a prison move. In the ensuing scuffle, Fulks kicked the officers, attempted to bite them, and spit on them. (TT Vol. 15 at 81–108.)

The following month, while at the inmate medical facility CCC, Fulks became agitated and refused to put on a paper gown. Again, a scuffle ensued and Fulks kicked one officer and bit another sufficient to cause blood to ooze through the officer's shirt. (Id. at 195–99.) That same day, when a nurse attempted to administer a sedative to Fulks, which had been ordered by a doctor, Fulks again began swinging, kicking, yelling, and biting. It took five correctional officers to restrain Fulks long enough for the nurse to administer the sedative. (Id. at 185.)

There was ample evidence of an abdominal wound that Fulks administered to himself, and thereafter manipulated by removing the dressing and inserting toilet paper and removing it from the wound. (TT Vol. 20 at 59.) All of these transgressions would have been a fertile

111

field for cross-examination by the government and would have seriously undermined the witnesses's credibility, if not the credibility of the entire defense case.

When questioned at the hearing why Cunningham and Aiken were not called, Blume admitted that although Cunningham had testified at a number of federal capital cases, he had always testified as a defense witness. Blume was therefore concerned that he would be viewed as nothing more than a "hired gun" for the defense. (HT Vol. 1 at 164.) As to Aiken, Blume testified that he believed that he got the same testimony that Aiken would have given from Romine, and he was concerned about having "two people up there that might contradict each other on the small points. I felt we got what we needed out of Mr. Romine." (HT Vol. 2 at 22.) Finally, Aiken's experience was more related to the state prison system, whereas Romine dealt exclusively with the federal correctional facilities.

On this record, the court concludes that Blume's decision not to call Cunningham and Aiken to testify as to Fulks's future dangerousness was part of a reasonable trial strategy.

CLAIM 15:
VOIR DIRE

In Claim 15, Petitioner claims that during voir dire, his trial counsel failed to gather useful information, educate the prospective jurors, or establish a rapport with them. He also contends that counsel was ineffective by failing to ask open-ended questions, to listen to the answers, and to show the jurors respect and honesty. As a result, Petitioner argues that the was denied a fair trial.

Blume was well-familiar with conducting an effective voir dire. In addition to having participated in fifteen to twenty mock death penalty voir dires, and three actual courtroom voir dire proceedings, Blume has written on voir dire in capital cases, including an article entitled "*Probing Life Qualification Through Expanded Voir Dire*," 29 Hofstra L. Rev. 1209, 1220 (2001). Blume has also lectured on conducting voir dire in capital cases. In the instant case, trial counsel retained jury consultant Jeff Bloom to conduct a mock voir dire session for the trial team, during which the trial team members critiqued one another and discussed what to try and accomplish during voir dire. (HT Vol. 2 at 23–24.)

Blume testified that the team's approach to voir dire was to "try and identify jurors who are likely to give the death penalty, to do what you can to get them excused for cause, to—and then to try and identify jurors who might be receptive to your case in mitigation or your case for life and to try and give them the tools to get out of the jury room with a life verdict if they want to vote for life." (HT Vol. 2 at 22–23.) To that end, trial counsel developed a detailed voir dire outline (Gov't Ex. 51), along with a more condensed version (Gov't Ex. 49) to be used at the podium during voir dire.

Prior to jury selection, the trial team compiled a notebook of the juror questionnaires, with each team member tasked to go through the questionnaires and to rate them pre-voir dire as to their "pro deathness or lack thereof" basis (Gov't Ex. 56-14); (HT Vol. 2 at 26). Specifically, the trial team adopted the "Colorado Method of Jury Selection." (Gov't Ex. 52.) Such a method was developed for use capital cases to rate potential jurors on a scale of 1

through 7 based on their views on the death penalty, with 1 being a juror who would never under any circumstances give death, and 7 being a juror who would always give death.

The trial team's pre-voir dire assessments were consolidated together on a single sheet for use during voir dire. During voir dire, trial counsel had four or five members of the team fill out a "Juror Rating Form" on each juror. Trial counsel prepared a chart of the jurors deemed qualified by the court for use in determining its strikes. (Gov't Ex. 53.) The chart contained a composite of information on each juror, including their name, their race, the status of whether they were qualified over an objection or not, and the trial team's rating assessment.

In preparing to select the jury, the trial court, upon defense counsel's motion, summoned a state-wide venire of 800 jurors. Each juror was mailed a standard questionnaire containing a total of fifty-eight questions to be returned to the court in advance of jury selection. These questionnaires were formulated after receiving suggestions from the government and the defendant. Each venireperson was also given a supplemental questionnaire upon arrival at the courthouse to test his death penalty views on paper before one-on-one questioning by the court and counsel. Defense counsel received most of the standard questionnaires several weeks in advance of voir dire.[31]

---

[31] The standard questionnaires that had been returned to the court were released to defense counsel as follows: On March 31, 2004, 299 questionnaires were released; on April 1, 2004, 224 questionnaires were released; on April 15, 2004, thirty questionnaires were released; on April 27, 2004, twenty questionnaires were released; and on May 6, 2004, eleven questionnaires were released. That means defense counsel had access to 523 of 584 total questionnaires by April 1, 2004.

The court conducted jury selection from May 10 to May 21, 2004. At least one assisting defense lawyer (if not two) was present at counsel table at all times to assist the lawyer questioning prospective jurors. Voir dire was conducted by Blume, Johnson, and Nettles.[32] The assisting lawyer routinely pointed out to counsel engaged in questioning additional information (either from the standard questionnaire, the supplemental questionnaire, or just general followup) he or she thought important to ensure that all defense questions had been answered before a juror was excused.

The voir dire of each venireperson commenced with the court explaining that an individual at the extremes, that is, one who would either always or never impose the death penalty, is ineligible to serve on the jury. The court advised each venireperson that the court needed jurors "in the middle" who could base their decision on the law and the facts. The court explained to each juror that he or she must listen to the evidence carefully, then listen to the law as it is explained by the trial judge, and apply the law, whether he or she agrees with the law or not. The court asked each juror if he or she understood this requirement and asked if the juror could comply with those instructions and be fair and impartial. (TT Vol. 1 at 64–65, 183–84; Vol. 2 at 6–8, 277–79; Vol. 4 at 25–27; Vol. 5 at 114–15, 260–62, 291–92; Vol. 6 at 234–35; Vol. 8 at 104–106, 173–75, 229–32.) Each prospective juror was also individually subjected to voir dire by the government and Fulks's trial counsel.

---

[32] Of those jurors seated, Blume conducted the voir dire of Sylvia Allison, Agnes Bryan, Richard Goehring, Lisa Harvey, Mary Ellen Huggins, Timothy Kurzwell, Anne Lee, and Karl Nations; Sheri Johnson conducted the voir dire of Pearl Gordon, Elizabeth Plyler, and Cynthia Steele; and Bill Nettles conducted the voir dire of Joni Novinger.

Additionally, each venireperson was asked if he or she would automatically impose the death penalty for capital murder, how each juror would vote when faced with evidence of a double murder, and permitted Fulks to extensively question the prospective jurors concerning their views on the death penalty. The Fourth Circuit found such an examination plainly sufficient to satisfy Morgan v. Illinois, 504 U.S. 719 (1992); Fulks, 454 F.3d at 430 n.7.

Petitioner complains that trial counsel's questions were rambling, confusing, intimidating, too long, and did not engage the prospective juror in a dialog. He also contends that trial counsel failed to ask open-ended questions, to listen to the answers, and to show the jurors respect and honesty. Petitioner complains that the manner of trial counsel's voir dire denied him a fair trial.

The Sixth Amendment guarantee of counsel does not guarantee an ideal or perfect representation. Mickens v. Taylor, 240 F.3d 348, 363 (4th Cir. 2001). Instead, it "guarantees a defendant on trial for his life the right to an impartial jury." Morgan, 504 U.S. at 728.

This court presided over Blume's voir dire of all the venirepersons, and has reviewed the transcript of the jury selection process. After this review, the court is constrained to disagree with Petitioner's contention that Blume's questions to prospective jurors were rambling, confusing, intimidating, or otherwise ineffective. As the court has noted previously, Blume brought with him to the trial a wealth of experience in the well of the courtroom. Petitioner's bald allegations that the questions posed by Blume were improper,

116

ineffective, or offensive to jurors is unavailing. The court finds no error in trial counsel's conduct of voir dire.

<center>CLAIM 16:
JUROR QUESTIONNAIRES</center>

Petitioner claims that trial counsel were ineffective in their review of juror questionnaires. Prior to jury selection, all prospective jurors were required to complete a written juror questionnaire. Question 42 of the juror questionnaire inquired into whether the juror or any close relatives had been a victim of a crime. Juror Sylvia Allison left blank question 42. Petitioner now alleges that his trial counsel were ineffective in not asking Allison why she left question 42 blank—the answer to which would have revealed that her husband had been murdered in 1971. (Id. at 158–159.) The court qualified Allison over Fulks's objection on other grounds.

Fulks appealed the trial court's rulings concerning Allison, and the Fourth Circuit affirmed, finding no error. Fulks, 454 F.3d at 410. Because Fulks raised this issue on direct appeal, the government argues that Petitioner is foreclosed from asserting it in this § 2255 matter. See Withrow v. Williams, 507 U.S. 680, 715 (1993) (Scalia, J., concurring) (listing cases holding that a federal prisoner generally cannot raise on collateral review a claim that was previously decided on direct review).

Out of an abundance of caution, however, the court has considered the merits of Petitioner's argument, and finds the ineffective assistance claim to be without support. The Strickland test requires that Petitioner show a reasonable probability that "the result of the

<center>117</center>

proceeding would have been different." See Strickland v. Washington, 466 U.S. 668, 687–88 (1984); Luchenburg v. Smith, 79 F.3d 388, 393 (4th Cir. 1996) (requiring the petitioner to show a reasonable probability of prejudice). Because Petitioner cannot demonstrate a reasonable probability of prejudice if trial counsel had questioned Allison on question 42 (which she left blank), his ineffective assistance of counsel claim fails.

At a post-trial hearing to ascertain whether Allison had been actually biased against Fulks or whether the circumstances surrounding her husband's murder and her failure to disclose it warranted a finding of implied bias, Allison testified that her failure to answer Question 42 was inadvertent. When asked by the court whether there was "even any remote possibility" that her husband's murder "had some influence in [her] deliberations," Allison responded: "None at all." Fulks, 454 F.3d at 431.

This court denied Fulks's motion for a new trial and discussed at length its reasoning in an order dated December 23, 2004. Specifically, the court applied the test established by the Supreme Court in McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548 (1984), and found that had Allison actually answered question 42, she would not have been excluded for cause. Further, the court found that Allison honestly believed she had disclosed her husband's murder and that Fulks had failed to show that Allison was actually biased. Finally, the court found the circumstances of Allison's husband's murder and her failure to disclose it did not warrant a finding of implied bias. The Fourth Circuit affirmed this court's ruling on appeal. Fulks, 454 F.3d at 432–33.

Petitioner has failed to show that juror Allison's participation affected the fairness or the reliability of the trial, and that if trial counsel had asked Allison about question 42, the result would have been different.  To the extent that Petitioner contends that he was denied the opportunity to exercise a peremptory challenge on Allison, the Fourth Circuit has explicitly rejected this analysis post-McDonough.[33]  Therefore, his ineffective assistance of counsel claim fails.

<div align="center">

CLAIM 17:
ADDITIONAL PEREMPTORY STRIKES
</div>

In Claim 17, Petitioner alleges that trial counsel were ineffective for choosing to seat automatic death venirepersons, instead of moving for additional peremptory strikes.  After the court refused to excuse jurors Goehring, Harvey, Allison, Novinger, and Plyler for cause, trial counsel elected to seat them, hoping for reversal on appeal.  Fulks challenged the seating of these five jurors on direct appeal, and the Fourth Circuit rejected Fulks's challenges.[34] See Fulks, 454 F.3d at 410, 427–35.

---

[33] In Jones v. Cooper, the Fourth Circuit stated that, to the extent United States v. Bynum, 634 F.2d 768 (4th Cir. 1980), stood for the proposition that a defendant denied the right to exercise intelligently a peremptory challenge is entitled to a new trial, "this reasoning was subsequently rejected by the Supreme Court in McDonough, 464 U.S. at 555; it is no longer good law."  Jones, 311 F.3d 306, 314 n.3 (4th Cir. 2002).

[34] Fulks challenged for cause the following venirepersons:  Richard Goehring, Lisa Harvey, and Sylvia Allison on the ground that the strength of their beliefs in favor of the death penalty rendered each of them unwilling to consider any mitigating evidence that he would offer; and Joni Novinger and Elizabeth Plyler on the ground that their personal experiences rendered them incapable of impartially serving on his jury because Novinger's sister had been the victim of a sexual assault, and because Plyler and her daughter were roughly the same ages that Donovan and Burns had been when they were killed. The court rejected the challenges, qualified the five venirepersons over Fulks's objections, and the Fourth Circuit found no error. Fulks, 454 F.3d at 427–34.

Trial counsel lodged objections to those jurors they believed were erroneously qualified, struck some jurors, and seated three jurors based on trial counsel's understanding that to preserve the issue for appeal, he needed to seat the jurors. Petitioner asserts that lead counsel was unfamiliar with federal jury selection procedures. The evidence in the records proves otherwise. Aside from Blume's extensive familiarity and experience with capital voir dire, Nettles had at least fifteen years of experience in federal jury selection procedures from working in the Federal Public Defender's Office. Furthermore, the records of trial counsel reveal that Blume considered filing a motion for additional strikes, but chose not to based on a reasonable strategy of preserving what he perceived as a strong appealable error.

While Petitioner characterizes the foregoing jurors as "automatic death venirepersons," such was not the court's assessment of the jurors, otherwise the court would have dismissed them for cause. The court's own voir dire of the venirepersons eliminated the individuals "at the extremes"—who would either always or never impose the death penalty—as ineligible to serve on the jury. Therefore, the remaining venirepersons were those "in the middle" who informed the court, either orally or in their written questionnaires, that they could base their decision on the law and the facts.

The court disagrees with Petitioner's claim that trial counsel's decision not to move for additional strikes fell below an objective standard of reasonableness. The court's evaluation of counsel's performance "must be highly deferential," judged "on the facts of the particular case," and considered "from counsel's perspective at the time." Strickland, 466 U.S. 668, 689–690. The court finds trial counsel's decision to seat the foregoing

venirepersons and not to request additional peremptory strikes was based on a reasonable strategy of preserving an issue for possible reversal. In light of the Strickland standard, counsel's decision was reasonable and entitled to deference.

<div align="center">
CLAIM 18:<br>
THE "DEER" STATEMENT
</div>

Petitioner's Claim 18 alleges that appellate counsel were ineffective for not appealing this court's ruling sustaining a government objection to a statement by Sheriff Ronald Hewett regarding a partial "admission" allegedly made by Basham. Petitioner claims that the partial statement "was a key piece of evidence showing that Fulks did not strike the fatal blow that killed Alice Donovan," and "would likely have led the jury to a different conclusion about Petitioner's moral responsibility for Donovan's death." The court disagrees and finds that appellate counsel was not ineffective because the Fourth Circuit would not have found an abuse of discretion by the court in denying the admission into evidence of Basham's statement to Sheriff Hewett.

By way of background, Basham met with law enforcement representatives in Brunswick County, North Carolina, on November 28, 2002, to help search for the remains of Alice Donovan. Accompanying Basham were Sheriff Hewett, FBI Agent Jeff Long, an unidentified police officer, and two of Basham's attorneys. According to Hewett, at some point during their ride, a deer jumped in front of their vehicle and Basham volunteered: "You know, I could never kill a deer and here I have . . . ." Hewett stated that Basham stopped before finishing the sentence. (Pet. Ex. 30).

<div align="center">121</div>

During Fulks's trial, his counsel sought to introduce Basham's so-called "deer statement" as a declaration against penal interest or an excited utterance,[35] as evidence that Basham, and not Fulks, killed Donovan. The government argued against admission of the statement as being taken out of context and as ambiguous. The court agreed with the government and ruled that Basham's deer statement was inadmissible.

Petitioner argues that during the Basham trial a few months later, the government took an inconsistent position when it introduced Basham's deer statement through Sheriff Hewett. He thus contends that his attorney should have raised the issue on appeal.[36]

The court finds that appellate counsel's decision not to appeal the court's exclusion of the Basham's deer statement in Fulks's trial was not ineffective. As Blume testified, "[i]f there was an argument which I thought was potentially meritorious, I would have raised it." (HT Vol. 2 at 36.) Given the broad discretion afforded to trial courts in evidentiary rulings, appellate counsel would have had to demonstrate that the court abused its discretion in

---

[35] During the trial, the court was mindful of the fact that the Federal Rules of Evidence do not technically apply in a capital sentencing trial. Fulks, 454 F.3d at 437. Instead, the Federal Death Penalty Act provides that the court may exclude evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). In spite of this, throughout the trial, the parties made objections and referred to specific evidentiary rules as did the court in ruling on the objections. References to these rules were by analogy only, and the court was aware of the somewhat more flexible standard for admissibility established by § 3593(c). Moreover, the Petitioner has no standing to object to this court's reference to the Rules of Evidence because he contended on appeal that the Federal Death Penalty Act was unconstitutional because the FRE do not apply to the sentencing phase of a FDPA trial. Fulks, 454 F.3d at 437.

[36] In closing argument of the Basham trial, the government stated: "Do you remember what Brandon Basham's comments were? He sees that doe and he says to himself, spontaneously, "here I couldn't even kill a deer, and I have," and his lawyer, Mr. Littlejohn stops him. "Here, I couldn't even kill a deer, and here I have"—what do you think he is thinking about? Here I have smoked a joint? Here I have stolen a car?" (Basham TT Vol. 12 at 79.)

122

excluding Basham's deer statement. <u>United States v. Hedgepeth</u>, 418 F.3d 411, 419 (4th Cir. 2005).

Petitioner fails to show an abuse of discretion. As the court analyzed in detail during argument outside the jury's presence, while Basham's deer statement tends to show that Basham was involved in Donovan's murder, it does not absolve Fulks of involvement in the murder. In discussing the issue at trial, the court noted that second half of Basham's deer statement could have included any number of things such as "here I have helped my co-defendant kill one, I helped bury a dead body, I held the woman down while she was killed. He could have said a number of things that still inculpated [himself]." (TT Vol. 21 at 251.)

Moreover, the court was concerned that if it admitted Basham's partial deer statement, it would have to admit the rest of Basham's statements to authorities—made on multiple occasions—that it was Fulks who actually killed Donovan. For example, during the same day spent searching with Sheriff Hewett, Basham said that Fulks slit Donovan's throat and stuffed her in the trunk of her car.

Ultimately, the court applied the balancing test required by the Federal Death Penalty Act, 18 U.S.C. § 3593(c), and denied the admission of Basham's deer statement because the danger of confusing the issues and misleading the jury substantially outweighed its probative value. To admit the deer statement, which is ambiguous and only partially implicated Basham in the murder of Donovan, while at the same time disallowing the remainder of Basham's recitations of what happened—all of which pinned the blame for the death

squarely on Fulks—would have unquestionably mislead the jury as to the import of Basham's deer statement.

Finally, in light of the fact that the trials of Fulks and Basham were severed on the defendants' motion, the court found that allowing testimony about all of Basham's statements regarding Fulks's culpability would defeat the purpose of having severed the trials.

Petitioner has failed to show that the court abused its discretion in making this evidentiary ruling. Therefore, his Claim 18 that appellate counsel were ineffective for failing to raise this issue on appeal is without merit.

CLAIM 19:
INCONSISTENT THEORIES

In Claim 19, Petitioner alleges that his due process rights were violated by the government's presentation of allegedly inconsistent theories in his trial and his co-defendant Basham's trial concerning the relationship between the co-defendants. Specifically, Petitioner alleges that, depending on the trial, the government averred that either Basham or Fulks acted as mastermind of the crime spree; that either Basham or Fulks was solely responsible for allegedly strangling Alice Donovan; and that either Basham or Fulks deferred decisions of life and death to the other. Neither defendant took the stand in his respective trial, but counsel for each defendant blamed the other defendant for Donovan's murder.

A review of the record does not sustain Petitioner's position that the government presented inconsistent theories going to the core of its case. "[T]he Due Process Clause

prohibits the government from presenting mutually inconsistent theories of the same case against different defendants." United States v. Higgs, 353 F.3d 281, 326 (4th Cir. 2003). However, the law permits the government to focus on the particular role of the defendant on trial. Higgs, 353 F.3d at 326–27.

Petitioner contends that the government took an inconsistent position in the trials regarding Basham's "deer statement" and Basham's demonstration, in the presence of Sheriff Hewett, of how Alice Donovan was allegedly strangled with a purse strap.

As noted in Claim 18, in the Fulks trial, the government argued to the court that Basham's deer statement was ambiguous and the court kept it out of evidence. In Basham's own trial, however, the court admitted his deer statement. In closing argument of the Basham trial, the government stated:

> Do you remember what Brandon Basham's comments were? He sees that doe and he says to himself, spontaneously, 'here I couldn't even kill a deer, and I have,' and his lawyer, Mr. Littlejohn stops him. 'Here, I couldn't even kill a deer, and here I have' —what do you think he is thinking about? Here I have smoked a joint? Here I have stolen a car?

(Basham TT Vol. 12 at 79.) Petitioner now contends that the government's argument to the jury in Basham's trial about the deer statement was inconsistent with its argument to the court in Fulks's trial that the deer statement was without meaning.

Next, Petitioner contends that in Fulks's trial, the government argued that Basham's purse strap demonstration was explaining how "Chad Fulks took the purse strap and strangled" Alice Donovan. (TT Vol. 16 at 255.) Petitioner argues that in Basham's trial, the government took the position that it was Basham demonstrating how he, and not Fulks, used

125

the purse strap to strangle Alice Donovan and that in closing argument the government characterized Basham's demonstrations an admission that Basham killed Alice Donovan with her own purse strap.  Petitioner's contortion of the record cannot go uncorrected.

A review of the record Basham's trial transcript reveals that Sheriff Hewett testified as to how Basham demonstrated the purse strap was used to strangle Alice Donovan.  On cross-examination, Sheriff Hewett testified:

> A.  The only thing that I can state, honestly, that I remember Brandon Basham telling me was that Chadrick Fulks was driving and we did what Chadrick Fulks wanted to do. He was the leader.
>
> * * *
>
> Q.  There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?
>
> A.  No, sir. He did not tell me he used the strap. He demonstrated, though.
>
> Q.  He demonstrated?
>
> A.  Yes, sir.
>
> Q.  Your notes, nor Lieutenant Crocker's notes say that he did that; isn't that true?
>
> A.  That is true because he didn't say. He showed.

(Basham TT Vol. 10 at 53–54.)

In its closing argument in Basham's trial, the prosecutor did not argue that Basham confessed.  Rather the prosecutor told the jury:

> What does Brandon Basham say in the presence of Sheriff Hewitt? It is not really what he says, it is what he does. He is shackled. He describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt how Alice Donovan was strangled. And then he tells Sheriff Hewitt, "I threw the purse

126

strap into the woods." He has demonstrated. He even has his arms down. You saw Sheriff Hewitt stand up there and show.

(Basham TT, Vol. 29 at 57.)

It is a stretch for Petitioner to argue that "[i]ndeed, Basham actually confessed, without prompting, to strangling Alice Donovan through his demonstration to Sheriff Hewett," and that "[t]his can only be deemed to be government misconduct for failure to reveal this to Mr. Fulks's trial team."

A review of Basham's trial record demonstrates that Basham did not confess, Sheriff Hewett did not testify Basham confessed, and the government did not argue Basham confessed to strangling Donovan. As Nettles testified, he understood Hewett's testimony to mean that Fulks strangled Donovan. (HT Vol. 2 at 138.) Hewett's use of the passive tense in describing Basham's strap demonstration leaves to speculation who actually used the strap to strangle Donovan, if that is what happened.[37]

Petitioner argues alternatively that it was ineffective assistance of counsel to fail to uncover what Hewett actually saw and what he would say under oath. In light of the motion for a hearing pursuant to <u>Jackson v. Denno</u> and the evidentiary hearing held prior to trial, Petitioner's claim that his trial counsel failed to investigate Hewett's testimony is without merit. 378 U.S. 368 (1964).

---

[37] It should be noted that Basham's version of when and how Donovan died changed several times as the investigation progressed. At one time, Basham indicated that Fulks, acting alone, had taken Donovan to an undisclosed location and left her there without any involvement by Basham at all. Later, the story changed to indicate that Fulks had taken Donovan to a location with Basham's involvement. Still later, Basham said that Fulks had slit Donovan's throat and put her in the back of the car.

Throughout Fulks's trial, the government maintained a theory that Chad Fulks and Brandon Basham were equally culpable for the crimes committed. The theory was repeated in the government's closing argument to the jury:

> It required the actions and the conduct of both Chad Fulks and Brandon Basham. The two of these men acted together as one in concert with one another. They were a two-man death squad. Two men, forming one team. They could not have done things that they did to Samantha, and they could not have done the things they did to Alice without acting in unison, without acting as one. The government is not saying Chad Fulks is more culpable than Brandon Basham. And the government is not saying that Brandon Basham is more culpable than Chad Fulks. They are equally culpable. Any objective view of the evidence and testimony that you saw, any reasonable juror looking at this objectively, not looking at it from the point of view of Chad Fulks, not looking at it from the point of view of Brandon Basham, if you look at it objectively, there is but one conclusion: these two were acting together as one. But for the conduct of Chad Fulks and but for the conduct of Brandon Basham, Alice Donovan and Samantha Burns would be alive today.

(TT Vol. 21 at 24–25.)

During Basham's trial, the government maintained the same theory that Chad Fulks and Brandon Basham were equally culpable for the crimes committed. In the government's closing argument to the jury in Basham's trial, the same theory was propounded:

> Remember, the evidence and the testimony that you saw during the guilt phase of this case, this was a two-man team. This was Brandon Basham and Chad Fulks acting together as a team. Their actions, their conduct, their choices were made as a team. Brandon Basham could not have carjacked and kidnapped Samantha Burns or Alice Donovan without Chad Fulks. And Chad Fulks could not have carjacked and kidnapped Samantha Burns and Alice Donovan without Brandon Basham. They are equally culpable. But for the actions of Brandon Basham, and but for the actions of Chad Fulks, Samantha Burns would be alive today and Alice Donovan would be alive today. ... But for Brandon Basham and Chad Fulks, not only would Samantha Burns be alive today, not only would Alice Donovan be alive today, but none of us, no one in this courtroom would be here today.

128

(Basham TT Vol. 29 at 43–44.)

While Petitioner claims that the government argued to the Basham jury that Fulks

made all the life and death decisions, the record reveals otherwise:

> No question, Chad Fulks was the leader in many aspects of this seventeen-day spree. Where they were going, there is no question about that, ladies and gentlemen. But there is also no question, the government submits, that Brandon Basham was a willing, eager, and reliable foot soldier. He was eager to please his friend. And he was willing to participate and make choices. You know who summed it up? When Tina Severance was on that witness stand, I think it was in redirect, some innocuous question about how they were getting along. Do you remember what Tina Severance said spontaneously? Like two peas in a pod. They were always together having a good time. That is Brandon Basham and Chad Fulks in November 2002. Like two peas in a pod. Brandon Basham could not have carjacked, kidnapped, and killed Alice Donovan without Chad Fulks; Chad Fulks could not have carjacked, kidnapped, and killed Alice Donovan without Brandon Basham.

(Basham TT Vol. 12 at 82.)

The government did not present mutually inconsistent theories in Fulks's trial and

Basham's trial. As the court in McNeill v. Branker explained:

> The law does not provide that every inconsistency amounts to a due process violation requiring reversal. A due process violation only occurs when the inconsistency exists in the core theory of the prosecutor's case. . . . In Bradshaw v. Stumpf, 545 U.S. 175, 184–87 (2005), the Supreme Court considered a petitioner's challenge to his guilty plea of aggravated murder and attempted aggravated murder. The Court rejected Stumpf's argument that inconsistent arguments about the identity of the triggerman at his trial and the trial of his co-perpetrator required reversal of the convictions. It reasoned that the identity of the triggerman was immaterial because the intent element of the offense did not require the defendant to pull the trigger.

601 F. Supp. 2d 694, 706–707 (E.D.N.C. 2009) (internal citation omitted).

Petitioner has failed to demonstrate that the government adopted an inconsistent position rising to the level of a due process violation. Mere inconsistency in the government's argument does not violate due process, it is "[t]he use of inherently factually contradictory theories" that violates due process. Smith v. Groose, 205 F.3d 1045, 1052 (8th Cir. 2000). Viewing the Petitioner's argument in a generous light shows, at best, an inconsistent argument concerning the vagueness of Basham's statements, but fails to demonstrate that the government relied upon factual theories that were inconsistent at the core of its case. Accordingly, Petitioner's Claim 19 alleging a due process violation fails.

CLAIMS 20 & 21:
WITNESS INTIMIDATION AND BRADY REQUIREMENTS

Petitioner contends that the prosecution inappropriately influenced witness testimony and failed to disclose a deal made with one of the witnesses in violation of the government's obligations under Brady v. Maryland, 373 U.S. 83 (1963).

*Claim 20*

Two of the principal witnesses called by the government were Andrea Roddey and Tina Severance. Roddey was one of the four people who traveled with Fulks from Indiana to Conway, South Carolina, where Donovan was abducted. She participated in the burglary of Robert Talsma's house, witnessed several events where Basham threatened to kill police and other persons, and generally assisted the group in using fraudulent checks and the like. After the trial, Roddey submitted a one-page affidavit which indicates that during her questioning by the FBI agents, the agents "focused on Chad Fulks and asked me very few

130

questions about Brandon Basham." (Pet. App. Ex. 12 at ¶ 3.) When she asked the agents why they were not interested in Basham, the agents responded that she "need not worry about the target of their question." (Id.)

Secondly, Roddey averred that the agents "put pressure on her to testify that during the events of November 2002, Chad Fulks threatened my life and the life of Tina Severance." (Id. at ¶ 5.) Fulks says that she told the agents that this was not true and that she would not lie, but despite her protestations, the agents "continued to push me on these issues." Significantly, the Roddey affidavit does not indicate that she gave in to the pressure by the FBI or that she gave testimony that was in any way untrue at trial.

At trial, Roddey did not testify that Fulks threatened her, and, in some respects, her testimony was adverse to the government. For example, she testified that there was no mud on the driver's side of Severance's van the morning Fulks and Basham returned to the motel after abducting Burns. This was helpful to the Fulks defense because the undisputed testimony was that Fulks did all of the driving.[38]

At most, the Roddey affidavit, if believed, indicates that FBI agents made a thinly-veiled and entirely unsuccessful effort to have her change her testimony so as to harm Fulks more than it did. The court finds that Roddey's post-trial, one-page affidavit indicating that inappropriate pressure was placed upon her to testify against Fulks is not credible. More importantly, even if the court were to find that law enforcement authorities put inappropriate

---

[38] It should be noted that the Roddey testimony regarding mud on the driver's side of the vehicle was contrary to a photograph introduced in evidence which showed mud on both sides of the front of the vehicle.

pressure on Roddey to testify in a certain way, the effort was not successful in that Roddey gave testimony that was, in certain respects, helpful to the Petitioner.

As noted previously, Tina Severance also had extensive knowledge of the misdeeds of Basham and Fulks during their crime spree. Like Roddey, Severance was in the van for many of the events of November 2002. She offered damaging testimony that Fulks put a gun to her head in a Myrtle Beach hotel room. (TT Vol. 3 at 173–74.) She also testified that neither federal or state prosecutors or officials had offered her any "promises or rewards" in exchange for her testimony. (Id. at 184.)[39] At the same time, Severance acknowledged the pendency of the Myrtle Beach misdemeanor warrant against her.

Fulks's § 2255 counsel have now produced for the court a letter from the Myrtle Beach Police Department, dated January 24, 2008 (nearly four years after the trial of this case), which reads in its entirety as follows:

> To Whom It May Concern:
>
> In regards to State v. Tina Severance all charges against her were dismissed. There are currently no active warrants against her. This is pursuant to her cooperation in a case in 2002 in which she was a witness.
>
> If you would like to discuss this any further please contact me.

(Pet. App. Ex. 31.)

The court finds no conflict between the testimony given by Severance at trial that no deals were made with her in return for her testimony and the fact that at some point

---

[39] In fact, the government attorney stated during the trial that no deals, promises, or special provisions were made for *any* of the more than 100 witnesses called by the government.

subsequent to the trial, the Myrtle Beach Police Department dropped relatively minor misdemeanor charges against Severance. Although the letter states that the dismissal of the charges were "pursuant to her cooperation" in the Fulks trial, there is no assertion that federal prosecutors had anything to do with the decision to drop the charges or that the agreement to drop the charges was made by Myrtle Beach Police Department prior to Severance's testimony. The letter from the Myrtle Beach Police Department could be read broadly to indicate that there was some type of pre-testimony agreement with Tina Severance to have her charges dismissed. To reach this conclusion, however, the court will have to determine that this sole, unsworn letter carries more probative value than: (1) Tina Severance's sworn testimony at trial that no deals had been made in return for her testimony; and (2) the statement made during trial by the Assistant United States Attorney handling this case, as an officer of the court, that no deals of any kind had been made with any of the prosecution's witnesses. A more likely reading of the Myrtle Beach Police Department's letter is that the relatively minor charges were dismissed after the Department learned that Ms. Severance had testified for the government in an unrelated case.

After a careful review of all of the evidence relating to Tina Severance's testimony, the court finds that there was no plea agreement or other promise from the government outstanding at the time Severance gave her testimony in the Fulks trial. Any decision by the Myrtle Beach Police Department to drop the charges against her occurred after the trial had concluded and was not made pursuant to the agreement with the prosecutors in this case.

Finally, and most importantly, it should be noted that like Roddey, Severance gave testimony that was, in part, harmful to the government. She testified that Fulks did not carry a gun and she claimed that there was only a little mud on the driver's side of the floorboard when Fulks and Basham returned to the motel after kidnapping Samantha Burns.

*Claim 21*

Claim 21 is a reassertion of those claims asserted in Claim 20 in the context of a Brady violation. Specifically, Petitioner contends that the government was under an obligation to disclose, pursuant to the dictates of Brady v. Maryland, favorable evidence that was material to either guilt or sentencing. 373 U.S. 83 (1963). Petitioner argues that the failure to disclose the pressure put upon Roddey by the FBI and the favorable deal made with Severance were matters that should have been disclosed. Because the court finds no support for the proposition that agents pressured Roddey or that there was a pre-testimony deal with Severance, both the prosecutorial misconduct and the Brady violation claims must fail.

CLAIMS 22 & 23:
PROSECUTORIAL COMMENTS DURING SUMMATION

In Claims 22 and 23, Petitioner asserts that, during his summation, the prosecutor made a total of five statements that were improper and prejudicial. As to some of the statements, Petitioner's counsel objected, and as to one, the court sustained the objection. The defense counsel did not, however, move for a mistrial, nor did they appeal any of these issues. Petitioner argues that, where appropriate, the failure to object, the failure to move for

134

a mistrial, and the failure to appeal the forensic misconduct that he contends occurred during the trial were error.

As noted previously, prior to his escape from the Kentucky prison, Fulks was incarcerated on state child abuse charges that could have subjected him to a life sentence. There was trial testimony that Fulks related to Tina Severance that he "probably would never get out [of jail]." (TT Vol. 3 at 224.) During summation, Assistant U.S. Attorney Jonathan Gasser reminded the jury of these developments and then said: "Those aren't Detective Smith's words. Those are Chad Fulks's words. 'I probably will never get out.'" (TT Vol. 21 at 30–31.)

The prosecutor then noted that Fulks thought he might end up serving a life sentence in Kentucky and "ma[de] a choice, and he escapes, and he participates in the kidnapping, and the rape, and the murder of two women, and he is caught. And you know what he is asking you jurors to do? To give him a pass." (Id. at 30–31.)

Finally, the prosecutor concluded by saying:

So, what is he asking you to do, facing all of that time, commits all of these horrible crimes, kills two women, and he is asking you for a life sentence. It is the government's contention, in essence, that that 2-week crime spree, he is not held accountable for. He was looking at serious and significant time before, and now he is looking at life without parole. So, where is the punishment? Where is the accountability for what he did to these two women?

(Id. at 31–32.)

Fulks's trial counsel objected to this comment in what is generally termed a "speaking objection," stating in the presence of the jury: "Objection . . . He [Fulks] was not facing life

135

without parole before.  Life without parole is not a pass.  It is the second most severe and substantial punishment." (TT Vol. 21 at 31.)  Although the court overruled the objection, the court indicated that "the defense will be allowed free reign to make whatever argument is appropriate on this point."

While it is true that Fulks was not under an existing life sentence at the time he committed the acts for which he was convicted in this case, he was, as revealed by his own words to Tina Severance, potentially subject to a life sentence for the crimes he was being held for in the Kentucky prison.  Because of this, the prosecutor's comment was reasonable in light of the record in this case, and this court properly determined that it was a matter for argument going both ways.

Fulks next contends that the prosecutor improperly claimed that Fulks raped Samantha Burns.  The objectionable comment was as follows:

> What are Brandon Basham and Chad Fulks doing dressed out in camouflage that night? No other night. No evidence or testimony they wore camouflage any other night. They were hunting, the government submits to you. They were hunting down somebody. They were hunting, and they located, and they isolated, and they abducted, and they raped, and they robbed, and they killed their prey. She just happened to be a nineteen-year-old college co-ed named Samantha Burns.

(TT Vol. 21 at 41.)

Contending that the statement that Fulks raped Samantha Burns is "an outright lie" (Pet. at 182), Petitioner contends that the government conveyed false information to the jury. In response, the government points out that the repeated use of the pronoun "they" in the disputed passage clearly suggests that the prosecutor was implying that Fulks and Basham

136

worked as a team throughout their seventeen-day crime spree including the rape of Burns. The government points out that immediately following the sentences quoted above, the prosecutor noted:

> They [Fulks and Basham] did everything together. That night [November 11] before they left, they got camouflage clothing . . . Chad Fulks was stealing money from the ATM machine, and they returned together. Everything they did that night, they did together. The two of them acting as one . . . when they arrived back at the motel room. Not one, both of them were covered in mud.

(TT Vol. 21 at 41).

Viewed in context, the prosecutor's comment about the rape of Samantha Burns was not improper.

The third comment at issue relates to Fulks's demeanor in the courtroom as the trial progressed. During closing argument, the prosecutor argued to the jury that the Fulks they saw at trial was not the same Fulks who committed the alleged crimes. The prosecutor said:

> The Chad Fulks you see sitting in this courtroom here today is not the Chad Fulks Samantha Burns confronted. It is not the Chad Fulks that Alice Donovan saw face-to-face lying on top of her. You know, I refer to this as a caged lion analysis. You take your kids to the zoo. The lions are lethargic. We know zoo animals have to be doped up, drugged up. Lethargic.

(TT Vol. 21 at 76–77.)

Petitioner contends that this comment labels him a "zoo animal" and is a "dehumanizing" comment that violated his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution. The government responds that the reference to zoo animals quoted above is taken out of context and the court agrees.

The prosecutor was making the point that Fulks looked different at trial than when he was committing the significant crimes at issue in this case because he had been medicated in the same way animals are sometimes medicated at zoos. Defense counsel objected and the court held a bench conference. At the conference, defense counsel reiterated his objection to the prosecutor comparing Fulks the defendant to a "wild animal" and the prosecutor responded that all of the experts who testified had confirmed that Fulks was medicated during trial. The court ruled: "The analysis will stop with the fact that wild animals are drugged or sedated. I will overrule the objection as long as that's as far as you are going." (Id. at 77.) After this colloquy, the prosecutor finished the analogy as follows:

> The point is this. That is why I asked all those doctors if they are aware of the medication that Chad Fulks is on, the sedatives, tranquilizers, all the drugs he is on. The point I am trying to make . . . is the picture you see of Chad Fulks, the chalky, pasty skin Chad Fulks, the Chad Fulks that you have seen in this court room looking straight ahead, all benign, all shy, all quiet, that is not the Chad Fulks. That is not the crack-smoking rapist that roamed the streets of Kentucky and West Virginia and South Carolina in November of 2002. And you have to understand that. You have to grasp that. In order for the government to have a fair trial, in order for you to make an informed decision on what the appropriate punishment should be. . . you have to have the ability to close your eyes and attempt to picture, in your mind, the testimony and evidence that you have heard. And picture in your mind what truly happened. What was the true representation of what happened in November of 2002? And the Chad Fulks that these women saw. The Chad Fulks that these women confronted, is that Chad Fulks. That is the Chad. That is a picture of Chad Fulks taken outside the Florence County Courthouse. That muscular Chad Fulks. Not the one you see here in this courtroom.

(TT Vol. 21 at 77–78.)

It is thus apparent that the prosecutor was not using a metaphor to describe Fulks as a wild animal. Rather, he was pointing out that just as animals are sedated in zoos and

appear to be lethargic and benign, Fulks was sedated during the trial and was not the same person who engaged in the seventeen-day crime spree. This court concludes that its ruling on the objection correctly cabined the prosecutor's summation. There was no error in the argument that was given by the prosecutor.

Fulks next contends that the prosecutor violated the Constitution when he made an indirect reference to the defendant's refusal to take the stand and testify. In closing argument, the prosecutor noted that Fulks never told his brother or anyone else that the seventeen-day crime spree was all caused by Basham. The pertinent language is as follows:

> Sometimes, Ladies and Gentlemen, it is not only what people say that matters, it is what people don't say that is every bit as important. [Fulks] had an opportunity to spill his guts to his brother, and he says nothing. And, I submit to you, because he is in it up to his neck. That is the truth.

(TT Vol. 21 at 91.)

The Fifth Amendment precludes a prosecutor from commenting to a jury on the "failure of an accused to testify in his own defense." United States v. Ollivierre, 378 F.3d 412, 419 (4th Cir. 2004). This principle has been extended to statements that the jury would "naturally and necessarily take . . . to be a comment on the failure of the accused to testify." United States v. Francis, 82 F.3d 77, 78 (4th Cir. 1986). In making this determination, the court must examine the statement in context. United States v. Percy, 765 F.2d 1199, 1204 (4th Cir. 1985). Here, viewing the statement in context, it is clear that the statement refers to Fulks's interactions with his family, not his failure to testify at trial.

139

Finally, Petitioner contends that the prosecutor erred when he told the jury that in sentencing Chad Fulks to death, they would be engaging in "an act of self defense." He argues that this statement carries with it the insinuation that Petitioner was in a position to harm the jury and that the jury needed to protect themselves from Petitioner. (Pet. at 183.)

The full argument, in context, was as follows:

[O]ne last point on future dangerousness. Ladies and Gentlemen, you can decide for whatever reason, obviously, the 12 of you can decide that the death penalty is the appropriate punishment. But the facts of this case . . . are so egregious, are so horrific, that Chad Fulks deserves to die. It will, obviously, be your decision. That retribution is appropriate in this case. The government submits to you, when it comes to future dangerousness, when it comes to all of these factors, when it comes to all of the evidence that I have just discussed with you, the government submits to you, Ladies and Gentlemen, that, in essence, in essence, it will be an act of self-defense.

(TT Vol. 21 at 114.)

Trial counsel objected and the court conducted a sidebar conference. At the conference, the Assistant United States Attorney, an experienced prosecutor, stated that he had heard similar comments in closing arguments "a hundred times." (Id. at 115.) The court disagreed, indicating that the argument was "going too far." Although the court did not grant the defense counsel's request that the jury be instructed to disregard the comment, the court made it clear that no further argument along this line would be allowed. (Id.)

Other courts, facing similar statements by prosecutors during summation, have found the "self-defense" analogy to be proper argument. See, e.g., States v. Chandler, 996 F.2d 1073, 1095 (11th Cir. 1993) (finding that prosecutor's comment that "recommending the death penalty is a form of self defense for society" was not improper); Ingram v. State, 779

140

So.2d 1225, 1267 (Ala. Crim. App. 1999) (prosecutor's argument that capital punishment "was a form of 'self defense' and was imposed for the sake of society" was not error).

Moreover, the self-defense comment was brief and was part of a larger discussion of the issue of future dangerousness. The court finds no error in the failure to strike the self-defense remark.

<div align="center">

CLAIMS 24 & 25:
HANDGUN ISSUES

</div>

In Claim 24, Petitioner claims that the government engaged in prosecutorial misconduct by asserting that Fulks had been armed with a .45 caliber revolver. In Claim 25, Petitioner claims that his trial counsel were ineffective for failing to question Ronnie Fulks about the revolver when he took the stand.

At trial, Robert Talsma and Tina Severance testified that Fulks and Basham stole Talsma's .45 caliber revolvers on November 8, 2002. (TT Vol. 3 at 84–87; Vol. 2 at 217–19.) Dewayne Fulks admitted he told FBI agents who came to his father's house the day before Fulks was arrested that he saw Fulks with two revolvers. (TT Vol. 4 at 124–25.) After apprehending Fulks in Indiana, the government did not recover one of the .45 caliber revolvers, and believed that Fulks must have disposed of the gun while he was running from them in the woods. Fulks told his trial counsel that he had given the gun to his brother Ronnie Fulks when he had been in Indiana. Because Ronnie was a felon, if he acknowledged having received the gun, he would have exposed himself to criminal liability for felon in possession of a weapon. Trial counsel attempted to obtain the gun from Ronnie or at least

have him agree that he had the gun, which trial counsel claims Ronnie refused to do. Ultimately, trial counsel "decided not to push it" because Ronnie had helpful things to testify about his life and background when he was going to be called by the government and trial counsel did not want to alienate him.

During closing, the government argued that Fulks was armed with two .45 caliber revolvers the day he and Severance went to Goshen, Indiana, to see Fulks's brothers. (TT Vol. 21 at 38.) The government also asserted that Fulks shot at Carl Jordan, although the prosecutor told the jury that it did not know with certainty whether the gun Fulks used to shoot at Carl Jordan was a .45 caliber revolver or a .22 caliber revolver because it did not have the gun, but that it did not matter. (TT Vol. 21 at 57–58.) This argument was not improper, as Jordan testified that Fulks shot at him. (TT Vol. 5 at 49.)

Petitioner claims that the government should have accepted Fulks's claim that he gave a .45 revolver to his brother Ronnie Fulks and provided Ronnie with immunity for testifying about it. Further, Petitioner asserts that his claim about having given the .45 caliber revolver to Ronnie should have precluded the government from arguing that Fulks was armed with a .45 revolver during the remainder of the crime spree. Petitioner claims that the significance of Ronnie Fulks's proposed testimony is that it would have established Basham as the only individual with an operational handgun during all relevant times.[40]

---

[40] Assuming Fulks's story was true, that Ronnie had one of the .45 revolvers, the other .45 revolver had inoperable ammunition and the .45 automatic had no ammunition clip, thus leaving one operational firearm, the .22 caliber revolver, which witnesses testified Basham always carried.

The prosecution had no obligation to accept Fulks's claims that Ronnie had one of the .45 caliber revolvers, especially when Ronnie did not mention it to the government. In light of the testimony gathered at trial, the government had good reason to believe Fulks was in possession of a gun or guns during the crime spree. Tina Severance testified that when they were staying at the Lake Shore Motel, Fulks became "frantic" because he could not find a revolver, and thought that Severance or Basham had taken it. (TT Vol. 3 at 138.) Another time at the motel, Fulks became angry at Severance and pointed a gun at her head. (Id. at 177–178.) Beth McGuffin testified that she noticed a gun in the glove box, and that Fulks said the gun belonged to him. (TT Vol. 6 at 113–14.) Che McCoy testified that Fulks wanted to sell a .22 caliber revolver to McCoy or to trade it for McCoy's gun. (TT Vol. 7 at 214.) Because there was reliable evidence that Fulks had a gun during the crime spree, it was not improper for the government to so argue during the trial.

Petitioner claims that his trial counsel were ineffective for failing to question Ronnie about the .45 revolver when he took the stand. Petitioner argues that if trial counsel had asked questions about the .45 revolver, Ronnie could have asserted his Fifth Amendment right, and trial counsel could have argued effectively to the jury at closing that Fulks gave Ronnie the only operational .45 revolver. The trial team analyzed this issue in an email (Gov't Ex. 56), and ultimately decided, as Blume testified, that they "needed Ronnie," and did not want to alienate him because of the favorable testimony that he could provide about Fulks's life and background. The court finds that trial counsel's strategic decision to not question Ronnie on the stand about the .45 revolver was a reasonable judgment and does not

constitute ineffective assistance of counsel.  Meyer v. Branker, 506 F.3d 358, 371 (4th Cir. 2007) ("It is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). This standard is "necessary to avoid second-guessing of 'perfectly reasonable judgments,' and to 'eliminate the distorting effects of hindsight' after an adverse decision." Id. (citing Strickland, 466 U.S. at 689).

<div align="center">

CLAIM 26:
PREPARATION OF MITIGATION WITNESSES

</div>

Petitioner's Claim 26 alleges that trial counsel were ineffective for allegedly failing to adequately prepare three lay mitigation witnesses for their testimony.  Specifically, Petitioner complains that his trial counsel did not adequately prepare his uncle Mark Fulks and his sixth grade teacher Martha Floyd for their direct testimony and failed to meet with his brother Ronnie Fulks prior to his testimony.  Petitioner claims that "had counsel prepared these witnesses, their testimony would have been much more compelling and could have changed the outcome of the proceeding."

As detailed in Claim 3, trial counsel's mitigation testimony spanned four days and included some twenty-four witnesses, many of whom testified as to Fulks's deplorable living conditions as a child, surrounded by constant violence, alcohol and drug abuse, and many instances of sexual depravity. As to the three witnesses that Petitioner claims trial counsel did not prepare for trial, the record reveals that trial counsel spoke to each mitigation witness before he or she testified. A review of Mark Fulks's and Martha Floyd's declarations

themselves reveals that trial counsel did meet with them prior to their testimony. As to Ronnie Fulks, he was called by the government, and no requirement exists for an attorney to prepare a witness that he will cross-examine, although both Johnson and Blume interviewed Ronnie Fulks in advance of the trial. (HT Vol. 2 at 44.)

Blume testified that Martha Floyd was prepared by mitigation specialist Tracy Dean before being interviewed by Blume himself in West Virginia. During his interview of Martha Floyd, he took five pages of handwritten notes. (Gov't Ex. 58.) Blume also testified that he did not perceive that the government would contest the facts that she was going to relay. (HT Vol. 2 at 40–42.)

Blume testified that Mark Fulks was interviewed by mitigation specialist Tracy Dean in April of 2003 (Gov't Ex. 61) before being interviewed by Blume himself in Indiana on August 21, 2003. During his interview of Mark Fulks, Drucy Glass took notes. (Gov't Ex. 60.) In preparation for trial, the trial team prepared a direct examination outline for Mark Fulks. (Gov't Ex. 59.)

As recited in Claim 3, Mark Fulks estimated that 90 percent of the time he saw Fulks's parents, that they were drinking; that they were alcoholics; that Fulks's mother regularly passed out, sometimes partially clothed; that Fulks's parents would bare-knuckle fight, throw things at each other, with Fulks's mother pulling out a shotgun and pointed it at Fulks's father's face; that Fulks's parents would physically and verbally abuse him and his siblings; that their house was filthy, bug-infested, and lacked food. (TT Vol. 16 at 159–81.)

145

Martha Floyd testified that she taught Fulks sixth grade in a self-contained behavioral disorder learning disability class. She testified to Fulks's poor upbringing; that she saw bruises on him; that he lacked school supplies and money for book rentals, special treats or snacks; that he did not have a coat in the tough West Virginia winters; that a teacher purchased shoes for him; that he was a follower; that he was a slow learner who tried really hard in school, and would sit in a rocking chair by himself. She testified that his parents were inaccessible, never came to school or responded to notices of meetings, and did not respond to phone calls or notes sent home. (TT Vol. 17 at 85–93.)

Ronnie Fulks testified that he and his brother Chad grew up in the same exact environment and household, one in which their parents drank "every day, all day," until they got staggering drunk and passed out. He testified that his parents grew and used marijuana, that they would fight every day, that his mother broke a ketchup bottle over his fathers head, used coffee pots and ashtrays and whatever was handy to beat his father, that his father beat his mother, that they both beat the children, and that his parents would curse at them. He testified that people were frequently in his parents' basement partying and fighting every night, and that if the police were called, the partygoers would "hear it go over the police scanner. Everybody would break up and go home, and come and do it the next night." Ronnie testified that as a six-year-old child, he would use alcohol and drugs along with the partygoers in the basement, that his brothers Chad and Dewayne would also drink and use drugs as children, that he would get high huffing gasoline and paint, that he would get in a lot of trouble as a kid stealing and beating and cutting people with a knife. He testified that

146

his parents let him and his brothers do anything they wanted, that their parents never helped with their homework and did not care about their schooling. Ronnie told a story of his father smashing the windows of a car and tearing "the whole inside of the car up," and then asking Ronnie, who was then a teenager, to take the blame for it. Ronnie took the blame and left the state. He also testified that he stopped speaking to his mother after she refused to let him be paroled to her house, causing him to serve an additional fourteen months in an Ohio jail. He testified that his best memory of his childhood was leaving home at fourteen. (TT Vol. 8 at 10–23.)

In sum, Petitioner argues that three of 156 total witnesses at trial would have been "more compelling" if they had been better prepared by trial counsel. Petitioner has failed to demonstrate how the witnesses' testimony would have been stronger with any additional preparation by trial counsel. Petitioner argues only that if trial counsel had properly prepared these three witnesses (Mark Fulks, Martha Floyd, and Ronnie Fulks), they "would have been able to testify competently about strong mitigating factors, including Mr. Fulks's tragic upbringing, the child abuse Mr. Fulks suffered, Mr. Fulks's parents' alcoholism, and other unfortunate circumstances." As the record reveals, these three witnesses did testify, compellingly, about these matters.

Petitioner has failed to show that his trial counsel's performance fell outside the wide range of reasonable professional assistance. The allegations contained in Claim 26 do not come close to supporting the contention that but for counsel's errors, the result would have

147

been different. Having failed to do so, Petitioner has failed to show prejudice. Hedrick v. True, 443 F.3d 342, 353–55 (4th Cir. 2006).

## CLAIM 28:
## THE GUILTY PLEA AND ACCEPTANCE OF RESPONSIBILITY

Petitioner's Claim 28 alleges that trial counsel were ineffective in allegedly failing to explain to the jury the concept of acceptance of responsibility. Petitioner claims he "received no benefit from the entry of his guilty plea," and that trial counsel "never made the point" that a defendant who enters a plea of guilty should receive a lesser sentence.

Fulks's argument is not supported by the record. All twelve jurors unanimously found as a mitigating factor that "Chadrick Evan Fulks pleaded guilty to kidnapping and car jacking resulting in death." (Special Verdict Form, ECF No. 649; TT Vol. 22 at 25.)

In his opening statement, trial counsel explained that Fulks had accepted responsibility for his actions by pleading guilty:

> Chad Fulks has pled guilty to kidnapping and carjacking Alice Donovan. By doing that, he has accepted responsibility for his role in the deaths of these two women. And has insured that he will never be released from prison and that he will die there. As the prosecutors told you during voir dire, as the judge told you all individually and collectively, life without parole means just that. It means life without parole. It means the person will die in prison. And that–there is nothing gentle about that. That is not gently confessing. That is stepping up and saying there are only one of two things that could happen: I am going to plead guilty, my life will either be taken by lethal injection, or I will spend the rest of my life in a federal prison.

(TT Vol. 1 at 129.)

Trial counsel continued this theme in his closing argument:

Chad pled guilty to these offenses, ensuring he will never be released. He will spend the rest of his life in a maximum security prison. Sending him to prison for the rest of his life is not excusing what he did. It is not giving him a pass. Life without parole is not only severe punishment, it is a just punishment. And it is the appropriate punishment for Chad Fulks. Choose life.

(TT Vol. 21 at 173.)

Contrary to Petitioner's claim, trial counsel capitalized on Fulks's guilty plea and used it to argue for a life sentence instead of death.

Petitioner's argument that he "received no benefit from the entry of his guilty plea" is a simplistic and incorrect view of the criminal justice system. Petitioner essentially and incorrectly argues that regardless of what crimes a defendant is found to be guilty of, the law requires that the death penalty be removed as an option from the jury's deliberation upon a plea of guilty. Such is clearly not the law.

Petitioner claims that he would not have pled guilty if he had known that counsel would not have introduced evidence of acceptance of responsibility. Instead, Petitioner claims he "would have put the government's evidence to the test and the outcome of the proceeding most likely would have been different." The court finds such a statement to be wholly speculative, and cannot agree with Petitioner's assessment that if he had pled not guilty that it "is very likely that the jury would have recommended life rather than death."

## CLAIM 29:
## REFERENCES TO RELIGION IN CLOSING ARGUMENT

Petitioner's Claim 29 alleges that trial counsel were ineffective in failing to object to the government's alleged insertion of religion in the trial. Petitioner specifically complains

149

about two comments by the government during its closing argument: first, the government's use of the term "born-again" as "an improper powerful religious reference that painted Petitioner as a Godless killer;" and second, the government's reference to Petitioner's habit of taking multiple showers during the day, stating that "There are no amount of showers that Chad Fulks could take that could wash his sins away. None." (TT Vol. 21 at 232.)

In analyzing the effects of improper prosecutorial sentencing phase arguments on due process, courts look to see "whether the proceeding at issue was rendered fundamentally unfair by the improper argument." Bennett v. Angelone, 92 F.3d 1336, 1345 (4th Cir. 1996) (internal citations omitted). Such a determination requires the court to consider "the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." Id.

The first comment originated out of the examination of Fulks's uncle Mark. During his direct examination, Fulks's trial counsel asked Mark if he remembered when Fulks was in prison in Indiana, to which Mark responded affirmatively. During cross-examination, the prosecutor asked about a letter Mark had written on January 31, 2000 to Judge Brown, the Indiana state court judge who was to sentence Fulks after his guilty plea to burglary. In his letter, which was published to the jury (Gov't Trial Ex. 410), Mark asked for leniency on Fulks and stated his belief that Fulks had "turned his life around." (TT Vol. 16 at 177–78.) Mark's letter included the statement that "I watch him start walking on the path to the Lord. I know you hear that a lot, but I see it in him because I gave my life to the Lord a couple of

150

years ago. I know what it takes to change." (Id.) The prosecutor then engaged in the following colloquy:

Q. Now, Mr. Fulks, I guess, prior to January of 2000, you became a born-again Christian?

A. Yes.

Q. And would you, at times, talk to Chad about that?

A. Yes, I have. I would over the telephone.

Q. And with your conversations that you had with your nephew Chad, based on what he was telling you, you believed that Chad Fulks had turned his life over to God, as well?

A. I had no reason not to believe it.

(TT Vol. 16 at 178–79.)

The government's cross examination was appropriate to support its attempt to show that Fulks feigned a religious conversion to manipulate his uncle to write a letter requesting that Fulks receive a more lenient sentence for a burglary conviction in Indiana prior to his later crime spree with Basham. It was relevant to counter trial counsel's repeated claim that Fulks had limited mental capacity. (See TT Vol. 21 at 143 (noting Fulks's "clear limitations"); id. at 144 ("It is a manifestation of his limitations, not of his cunning"); id. at 153 ("You have to be brain damaged to even say it. To even think about it. . . . It is stupid."); id. at 160 ("another example of his mental limitations").)

In his closing argument, the prosecutor made the following statement:

In 2000, in front of the Judge in Indiana, he gets his Uncle Mark, a good and solid man, Mark Fulks. A man that truly has found God. A born-again

151

Christian. Took that witness stand, told you how Chad, Chad comes to him and says Uncle Mark, I am following the path of the Lord. Please write this letter. Please write this letter to the Judge so my sentence is not so bad. Uncle Mark believes him. Uncle Mark writes that letter, and the Judge accepts that letter that Chad Fulks, this man that would go on to rape, and to carjack, and to kill, was a man of God.

(TT Vol. 21 at 122.)

Petitioner claims that trial counsel were ineffective for not objecting and requesting a curative instruction to the prosecutor's "born-again" reference as the government seeking to gain an improper advantage by "invoking Christian doctrine to a Bible-belt jury." The second statement about which Petitioner complains is the prosecutor's comment in his closing argument, referencing Fulks's habit of taking multiple showers each day, stating, "There are no amount of showers that Chad Fulks could take that could wash his sins away. None." (TT Vol. 21 at 232.)

When compared to the defense's extensive use of many direct Bible quotations during its closing arguments earlier, the government's isolated comment during reply closing argument concerning Fulks's repeated washing cannot be considered as the government seeking to gain an improper advantage by "invoking Christian doctrine to a Bible-belt jury." (See, e.g., TT Vol. 21 at 163 (noting that there is no "eye for an eye" under the law)); id. at 173 (noting that the prophet Micah "encouraged us to love, to do justice, to love mercy, and to walk humbly" and that "life without parole is both merciful and just"); id. at 201 ("The Bible says a parent should train a child up in the way he should go."); id. at 210 (claims to not be invoking Bible by quoting Bible, including "Let he who is without sin throw the first

stone."); <u>id.</u> at 210 ("even if they have sinned themselves, which, of course, we all have.");

<u>id.</u> at 210–12 (over the prosecution's objection, defense was allowed to give a long analysis of the life of the Apostle Paul and quoted him as saying, "Not that I have already obtained this, or am already made perfect.").)

The defense itself suggested that the jury should use the Bible to influence its jury deliberations. After a long explanation of the Apostle Paul's ministry and his desire to make up for his past sins and seek righteousness (<u>id.</u> at 212–14), defense counsel stated:

> And there is a second way that what Paul says in Philippians is instructive, and that is as a guide for jury deliberations, the process of deliberation. It may be that the juror sitting right next to you does not have the same understanding you have. It may be that he or she can only see the crime and not the brain damage and the avalanche of horrible experiences that shape the person who committed it.

(TT Vol. 21 at 215.)

The court finds trial counsel's failure to object to the government's alleged improper insertion of religion in its closing argument was not ineffective. The government's two comments were fleeting and were, at most, veiled references to biblical language. In light of the isolated and brief nature of the comments, made in the course of the government's 147-page closing argument, and considering the religious-laden arguments of opposing counsel, and the court's instruction to the jury that the arguments of the attorneys is not evidence,[41] the court finds Petitioner's claim of a due process violation on this issue is without merit.

---

[41] The court instructed the jury that "what the lawyers say is not evidence" (TT Vol. 21at 17), and that "the arguments of the attorneys and the comments and rulings of the court are not evidence." <u>Id.</u>

153

CLAIM 30:
PETITIONER'S ARTISTIC ABILITY

Petitioner's habeas counsel have attached copies of Petitioner's artwork to his petition (Pet. App. Ex. 38), and suggest that these drawings reveal that Petitioner has great artistic talent. Moreover, the artwork is said to show that Petitioner "has the ability to transcend human suffering and bring joy and enlightenment both to himself and those viewing his work." (Pet. at 138.) Petitioner thus argues that Blume and his trial team were constitutionally ineffective for not bringing Petitioner's artistic ability to the attention of the jury. At the evidentiary hearing, Blume testified that he recalled seeing Fulks's artwork, but does not remember "considering presenting it as mitigation."

On the record assembled in this case, the court is constrained to conclude that evidence of Petitioner's artistic ability would have had little positive effect on the jury and most probably would have been counterproductive. The jury heard evidence that Fulks and Basham escaped from jail, engaged in a seventeen-day crime spree that spanned seven states with thirteen identifiable victims, including two whose lives were taken after they were raped. The remains of one of the victims have yet to be found and the remains of the other have only recently been found. With this background, it is difficult for the court to conclude that the jury would have given any weight to the suggestion that Fulks possesses artistic ability. Moreover, to suggest to the jury that this ability enabled him to "transcend human suffering" and "bring joy and enlightenment to both himself and those viewing his work," would quite possibly have angered the jurors. The trial testimony revealed that Blume did

154

not ignore this factor; rather, he concluded that it would not be of help in attempting to spare Fulks's life. This court is not prepared to say that Blume's conclusion was constitutionally unreasonable under the circumstances.

CLAIM 31:
CUMULATIVE EFFECT ALLEGED ERRORS

In Claim 31, Petitioner argues that the alleged errors made by his counsel and this court rise to the level of cumulative error and mandate a setting aside of his sentence. As the government observes in its memorandum in opposition to the § 2255 petition, the cases Petitioner relies upon for this proposition involve matters actually determined to be constitutional error. In those cases, each error, standing alone, was not grounds for relief, but cumulatively the errors compelled the court to order a new trial.

As the Fourth Circuit said in the appeal of Fulks's co-defendant, Basham:

> Generally, . . . if a court determines that none of a defendant's claims warrant reversal individually, it will decline to employ the unusual remedy of reversing for cumulative error. To satisfy this requirement, such errors must so fatally infect the trial that they violated the trial's fundamental fairness. When none of the individual rulings work any cognizable harm it necessarily follows that the cumulative error doctrine finds no foothold.

<u>Basham</u>, 561 F.3d at 330. (internal punctuation and citations omitted).

In this court's view, this case is not one where there were a number of constitutional errors or numerous instances of ineffective assistance of counsel. Accordingly, the cumulative error doctrine does not afford any relief in this case.

155

CLAIM 32:
EXECUTION BY LETHAL INJECTION

In Claim 32, Petitioner asserts that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution which prohibits "cruel and unusual" punishment. (Pet. at 145.) Without citing any authority, Petitioner contends that the combination of drugs used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel, and the physical space in which the execution would be carried out, all combine to result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment. (Id.) The record is devoid of any facts to support these assertions, and death by lethal injection has been upheld by a variety of courts in recent years. See, e.g., Baze v. Rees, 553 U.S. 35 (2008) ("this Court has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment."); Evans v. Saar, 412 F. Supp. 2d 519, 522 (D. Md. 2006) ("Circuit after circuit (including the Fourth) has ruled that the [3-drug] protocol does not run afoul of the Eighth Amendment.").

The government has responded to Claim 32 by also asserting, in its brief, facts that are not in the record. The government suggests that the Bureau of Prisons has a multi-step procedure designed to protect the health and safety of all involved. It is suggested that the federal protocol compares favorably with other execution protocols that have recently passed Eighth Amendment scrutiny.

156

The court is thus faced with deciding this issue on a sparse record, but with ample precedent upholding the use of lethal injection in the United States. Petitioner has failed to carry his burden of showing that the Eighth Amendment would be violated by using the legal injection method to perform his execution. See Baze, 553 U.S. at 47 ("[C]apital punishment is constitutional. It necessarily follows that there must be a means of carrying it out;" there is broad consensus that lethal injection is the most humane method of execution available).

CLAIM 33:
LOCATION OF DONOVAN'S REMAINS

On January 18, 2009, six years after the death of Alice Donovan, a search team located seven pieces of bone that appeared to be part of a human skull in a rural area of northeast Horry County, South Carolina. The search team subsequently found several additional bone fragments, including one that appeared to be a forearm bone. DNA testing confirmed that these partial remains were Alice Donovan's.

This discovery prompted Petitioner to file a motion to add an additional claim (this Claim 33) to his petition for relief, and to expand the record to include facts relating to this claim. The government opposed the motion, not on the grounds of timeliness,[42] but on the grounds of futility. The court grants Petitioner's motion to add Claim 33, expands the record to include all evidence relating to that claim, and addresses the claim on the merits.

---

[42] Collateral attacks on a sentence must be filed within one year from the latest of the date of the final judgment of conviction or "the date on which the facts supporting the claim . . . could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). The government concedes that Claim 33 was asserted within one year from the date the remains were discovered.

Distilled to its essence, Claim 33 is an assertion that Fulks "consistently" directed authorities to the area where Donovan's remains were located, and that the jury that sentenced him to death was incorrectly given the impression that he had misled authorities as to the whereabouts of Donovan's remains. After a careful review of the developments following the death sentence in this case, the record produced at trial regarding efforts to locate the body, and the prosecutor's comment regarding "concealment" of Donovan's body, the court concludes that Petitioner's Fifth and Eighth Amendment rights were not violated.

To place Claim 33 in context, it is necessary to recite, in some detail, the testimony that was, and was not, allowed regarding the unsuccessful efforts to locate Donovan's body. After the jury was excused for the day on June 10, 2004, Fulks's trial counsel asked for a ruling on the evidence that he anticipated the government would offer the following day. The evidence included testimony concerning events that occurred shortly after Fulks was taken into custody in Indiana and while authorities in North Carolina and South Carolina were frantically attempting to locate Alice Donovan in the days following her disappearance. Basham, who was then being held in custody separate from Fulks, gave authorities a map depicting what is known as the Savannah Bluff area of Horry County, and indicated that authorities should search in that area. A search of the Savannah Bluff area was begun, and the Basham map was sent to Indiana for review by Robert Truitt,[43] the lawyer who had been appointed to represent Fulks in Indiana during the early stages of the criminal proceeding.

---

[43] The exact name of the Indiana lawyer does not appear in the record. According to a 302 form attached to the government's memorandum in opposition to Claim 33, however, his name is Robert Truitt.

Apparently Truitt took the map, conferred with Fulks, and responded to an FBI agent in South Bend, Indiana, that Fulks agreed with Basham that the search should be focused on the Savannah Bluff area.[44] Truitt said, however, "I want to be clear that this will not be attributed to my client in any way." (TT Vol. 8 at 188.) As a result of Fulks's confirmation of the Basham map, law enforcement authorities intensified their search of the Savannah Bluff area, and searched for two additional days. The authorities found nothing.

In the discussions following the close of the testimony on June 10, 2004, Fulks's trial counsel made it clear that he wished to enforce the non-attribution condition imposed by Truitt and bar any reference to the fact that Fulks directly or through his lawyer suggested that authorities look in the Savannah Bluff area. (Id. at 189.) The government argued that the jury should be made aware that Fulks's lawyer (as opposed to Fulks himself) confirmed that authorities should look in the Savannah Bluff area.

During the colloquy as to whether and to what extent the court should admit testimony regarding the Savannah Bluff directions, the court learned that the government intended to introduce evidence, without objection, that on April 21, 2003 (some five months after Donovan was abducted), Fulks had directed authorities to a different area—the Water Tower and Long Bay Roads area, some fifteen miles away from the Savannah Bluff area—and was taken to that section of Horry County to assist with the search. As the government explained, Fulks's instructions to look in the Water Tower and Long Bay Roads area actually consisted

---

[44] Exactly what Truitt said to authorities is not clear. According to Fulks's trial counsel, "the lawyer came out and said, 'Well, okay, yeah, he looked at this, and that looks right' or something to that effect." (TT Vol. 8 at 188.) According to the government, Truitt said, "Basically, you are warm." (Id. at 191.)

of two separate locations: one near Long Bay Road (the April 21, 2003 statement) and a second (given on March 23, 2004, the day Fulks was taken to the scene) near Water Tower Road which intersects with Long Bay Road. (TT Vol. 8 at 195.) The court then summarized the state of the record, which was that Fulks had, at one time or another, given authorities directions to three different locations, the latter two being reasonably close to each other, but it was only the first of the three that trial counsel sought to keep from the jury pursuant to the non-attribution agreement insisted upon by Truitt. All parties agreed that this was an accurate assessment of the situation before the court. (Id. at 195.) The court then took the matter under advisement.

The colloquy resumed the following day. After another extended discussion, the court announced that it would side with the defendant and would enforce the non-attribution agreement in all respects. As a result, the jury did not hear that Fulks had initially joined in Basham's suggestion that the remains would be found near the Savannah Bluff area. Instead, the jury heard only that Fulks gave directions to two different locations in the vicinity of Water Tower and Long Bay Roads. This testimony included significant details about the number of searches, the number of man-hours involved, the fact that helicopters and cadaver dogs were used, and the fact that Fulks himself was taken to the area to see if he could assist with the search. The jury also learned that the search efforts were to no avail, and that at the time Fulks's case went to trial, Donovan's remains had not been located.

It is undisputed that in January 2009, more than six years after Donovan's death and four-and-a-half years after the trial, Fulks was put in touch with Monica Caison, a specialist

with The Community United Effort Center for Missing Persons of Wilmington, North Carolina. Fulks provided Caison with a package containing detailed instructions and a map of the location indicating where Donovan's remains were said to be located. Acting upon this information, Caison performed a systematic grid search and recovered the remains that ultimately proved to be Donovan's. That location was reasonably near the area that Fulks had suggested in his third direction to the location of the body (given on March 23, 2004).

In Claim 33, Fulks contends that he was convicted based on materially false information, specifically that the jury was left with the impression that he had misled authorities about the location of the body. As an initial matter, it should be noted that the idea that Fulks was less-than-truthful regarding the location of the body and that he led authorities on a "wild goose chase" was not one of the "central arguments" (Supp. Pet. at 1) of the case.[45] To begin, it is simply not accurate to state that Fulks "consistently" directed authorities to the location of Donovan's remains. Fulks confirmed Basham's suggestion that authorities should search for Donovan in the Savannah Bluff area, some fifteen miles away from where the remains were ultimately found. Fulks did this shortly after he was taken into custody, possibly while Alice Donovan was still alive, and certainly while her remains were still fresh enough to allow a forensic examination to determine the cause of death, and quite possibly the identity of the defendant who "struck the fatal blow." It was not until more than four months later, when Donovan was obviously deceased, and when it was more likely that

---

[45] Claim 33 is contained in a separate filing with its own numbering system. To avoid confusion with the Amended Petition ("Pet.") that is the subject of most of this order, references to the new Claim 33 will be as follows: Supp. Pet. at ____.

her remains, if found, would be helpful to investigators, that Fulks began directing authorities to the Water Tower and Long Bay Road areas. In fact, Fulks initially provided information that caused investigators to look on the Long Bay Road side of the area, and only later, when Fulks was brought to the site, did he direct the searchers to the Water Tower Road area. Thus, the assertion that Fulks "consistently" led law enforcement to the correct location is incorrect.[46]

If Donovan's remains had been found before the trial at the location indicated by Fulks in his second or third set of instructions to authorities, the court would have faced a dilemma regarding Fulks's earlier confirmation, via his Indiana lawyer, that the body would be found near Savannah Bluff. To have kept out the Savannah Bluff statement, yet allow testimony regarding Water Tower and Long Bay areas where the body was actually located, would be to give the court's blessings to manipulation of authorities: While the evidence is fresh, provide information (indirectly through an attorney and carefully worded so as to not be attributed to the defendant) that sends authorities to an area where the perpetrator knows the remains will not be found; then, after passage of sufficient time to render a forensic examination largely irrelevant, direct the authorities to the proper location and receive credit

---

[46] In addition to acquiescing in Basham's suggestion that authorities needed to look in the Savannah Bluff area, Fulks learned that at Basham's direction, law enforcement authorities were also searching the Bee Tree Farms area of North Carolina, some 52 miles distance from where the body was located. Nothing in the record indicates that Fulks did anything to stop authorities from searching this area. There was also evidence accumulated by the government (but note put before the jury) that Fulks actually told authorities that a "live woman [was] taped to a tree" in the woods on "Wonderland Road" near Conway, South Carolina. See FBI 302, date of transcription Nov. 25, 2002 (Fulks, through attorney, said that "live woman taped to a tree" in woods on "Wonderland Road" near Conway, SC) (attached as Ex. 3 to Government's Memorandum in Opposition to Supplement the Pleadings).

for helping the victim's family find their loved one so that a suitable funeral could be arranged. In this case, the court did not have to face this dilemma because, as noted, the remains were not found until some four-and-one-half years after the trial. Suffice it to say, however, that to the extent Petitioner claims that his conviction was based upon "false evidence" in violation of the United States Constitution, the argument that he has, from day one, sincerely attempted to direct authorities to the proper location, rings hollow.

Secondly, the notion that Petitioner misdirected authorities did not "permeate" the trial. Although the notion that Fulks attempted to mislead authorities was initially included as part of the non-statutory aggravating factor of victim impact, the government decided that the better course of action was to abandon any evidence or argument that Fulks had lied to authorities regarding the location of the body. This became clear during the colloquy leading up to the court's ruling excluding Truitt's statement. During that colloquy, the court asked the government whether it sought to introduce evidence regarding Fulks's suggestion to Truitt that authorities look in the Savannah Bluff area, only to later direct authorities to the Water Tower and Long Bay Roads area "to show that the defendant was sending you in two different directions, or jerking you around so to speak?" (TT Vol. 8 at 6.) The prosecutor responded:

> In fact, I actually disclaimed that, because of the non-attribution statement made by the lawyer in Indiana. Said we don't intend to argue. I think the jury, they may make that inference. I don't know that. But we don't intend to say Chad Fulks sent us in the wrong direction in Indiana. One of the tricky arguments is defendant's right to silence.

(Id.)

The trial resumed and the jury heard evidence that the authorities searched in the Bee Tree Farms area of North Carolina, the Savannah Bluff area of Horry County, and the Water Tower and Long Bay Roads area of Horry County.[47] The only testimony the jury heard regarding directions provided by Fulks related to the two locations near Water Tower and Long Bay Roads. Evidence regarding the government's extensive search efforts was a component of the government's case-in-chief because without having Alice Donovan's body upon which to perform tests and present evidence, the government needed to make a strong showing that every effort possible had been made to locate the body. To that end, the government offered, and the court allowed, extensive testimony regarding the search efforts.

*The Court's Introductory Remarks*

The only *direct* reference in the entire trial to Fulks misleading authorities regarding the search for Donovan's remains came on the first day of trial, as the court introduced the jury to the case and explained the statutory and non-statutory aggravating and mitigating factors that had been alleged. Among the non-statutory aggravating factors was victim-impact evidence. The court, in its preliminary remarks to the jury, stated:

> The final non-statutory aggravating factor alleged by the government is victim impact evidence. Under this factor, the government contends that defendant Fulks caused injury, harm, and loss to Alice Donovan, Alice Donovan's family, and Alice Donovan's friends and coworkers as demonstrated by Alice Donovan's personal characteristics as an individual human being and the

---

[47] It should be noted that the jury heard evidence regarding the search at Bee Tree Farms and Savannah Bluff not because of information Fulks provided, but rather because of information provided by his co-defendant, Basham. In producing this evidence, the government was not attempting to lay fault at Basham's feet for giving them bad information; rather, it was merely an effort to convince the jury that all reasonable efforts had been made to locate the body.

impact of the death upon Ms. Donovan's family. The government alleges that the family of Alice Donovan has suffered injury, harm, and loss as a result of Ms. Donovan's death, including, but not limited to, one or more of the following:

*First, defendant Fulks engaged in a series of lies and deceit during law enforcement's initial efforts to locate Alice Donovan's body which resulted in obstructing search efforts and gave Alice Donovan's family a false sense of hope during a period of intense despair.*

Second, defendant Fulks engaged in a premeditated plan to dispose of Alice Donovan's body in such a manner that recovery of the remains has not been achieved. The government alleges that this action by the defendant has caused significant emotional and psychological pain to Alice Donovan's family, beyond the expected grief associated in homicide cases.

(TT Vol. 1 at 40 (emphasis added).)

Petitioner does not challenge these remarks to the jury, but given that they constitute the only direct reference to an allegation that Fulks engaged in "lies and deceit" regarding the efforts to locate the body, the court's introductory remarks merit discussion here. First, the court was merely repeating the language of the indictment, and there was no pretrial effort to remove this language from the indictment or from the court's introductory remarks to the jury.

Second, in opening statements, Assistant U.S. Attorney Scott Schools did not suggest that Fulks had lied as to the location of the remains. Rather, he suggested to the jury that the authorities had conducted an extensive search at the location suggested by Fulks and found nothing. The prosecutor concluded that Basham and Fulks had "successfully concealed [Donovan's] remains." (TT Vol. 1 at 57.)

165

Third, as indicated above, the government rather quickly abandoned this line of attack, and the idea that Fulks engaged in "lies and deceit" to hinder the location of Donovan's body did not arise, directly or indirectly, for the duration of the trial.[48]

Fourth, the court's final instructions contained no mention of the issue in light of the government's abandonment of it early in the case. The court told the jury:

> It again becomes by duty, therefore, to instruct you on the rules of law that you must follow in arriving at your decision as to whether the defendant, Chadrick Evan Fulks, should be sentenced to death or to life in prison without the possibility of release.
>
> <div align="center">* * *</div>
>
> It would be a violation of your oaths, as jurors, to base your verdict upon any other view of the law that what I give you in *these* instructions.

(TT Vol. 21 at 248–49 (emphasis added).)

In addition to the fact that the jury was told to follow the final instructions only, the "lies and deceit" comment made in the introductory remarks occurred on the first day of a

---

[48] The issue of searching the Savannah Bluff area came up four days later when Fulks's trial counsel sought to introduce testimony that Fulks was present at a hearing where the government prosecutors indicated to the judge that one of the reasons that the government sought the death penalty for Basham was that Basham had purposefully given authorities bad information regarding the location of Donovan's remains. (TT Vol. 11 at 113–30.) After a somewhat confusing colloquy, it became clear that the reason Fulks's counsel wanted that information admitted was to raise the inference that Fulks, having heard that misleading authorities as to the location of Donovan's remains was one of the reasons the government sought the death penalty for Basham, would be less likely to produce bad directions himself; hence, Fulks had a motivation to be truthful, and was truthful, when he directed authorities to Water Tower and Long Bay Roads. The government protested that the court had previously sustained an objection to the fact that Fulks himself had directed authorities to the Savannah Bluff area, and suggested that it would not be fair to the government to allow in evidence of Basham's misdirection, and at the same time keep out evidence of Fulks's misdirection. (Id. at 123.) Ultimately, the government sided with Fulks and allowed the testimony that Basham had misled authorities as to the location of the body.

In the somewhat confusing colloquy that led up to this ruling, the government lawyers did seem to indicate, contrary to their earlier assertions, that they would make a "wild goose chase" argument as to Fulks. (Id. at 122–23.) The entire colloquy occurred while the jury was out of the courtroom, and, contrary to the government's statement during this hearing, the government did not, in fact, reverse course and seek to put before the jury the idea that Fulks had lied about the location of the body.

four-and-a-half week trial and comprised five lines out of a transcript that totaled 5,048 pages.

*The Trial Evidence*

Moreover, no false evidence was put before the jury regarding the efforts to locate Donovan's remains. Fulks's directions to Water Tower and Long Bay Roads were admitted without objection, as was testimony regarding the extensive efforts made by law enforcement officers to locate the body, efforts that involved repeated searches, numerous individuals, and even a search effort that was financed, personally, by Fulks's trial counsel. As the court observed during the colloquy on the Savannah Bluff statement, the government had a legitimate need to tell the jury about the extensive and heroic efforts made to locate Donovan's remains prior to trial. As the court analogized at trial, in a typical case, jurors want to see fingerprints or at least hear an explanation of why the fingerprints were not obtained. Here, with no body and no forensics examination associated with the body to produce to the jury, the government quite naturally realized that it needed to make a strong showing for the jury that all reasonable efforts were made to locate the body prior to trial. (TT Vol. 9 at 14.)

The only testimony Petitioner points to with specificity regarding the search for Alice Donovan is the following testimony of FBI Agent Jeff Long:

AUSA Gasser: Despite these thorough and exhaustive efforts by law enforcement, as you sit there in this witness box today, can you tell this jury how Alice Donovan died?

Agent Long: No, I can't.

167

AUSA Gasser: Can you tell this jury where the remains of Alice Donovan are?

Agent Long: No, I can't.

(TT Vol. 11 at 86.)

Fulks argues that Long's testimony "[d]rove home the point to the jury that Mr. Fulks must have purposefully obstructed the search efforts." (Supp. Pet. at 11). The court is not persuaded that Long's testimony presented false or misleading information regarding Fulks's efforts to locate the body.

<div align="center"><em>The Prosecutor's Argument</em></div>

Rather than focus on whether Fulks misled authorities, the government focused on the concept that Fulks had helped conceal the remains. It is undisputed that Donovan's remains were deposited in a secluded, rural, heavily overgrown, and somewhat swampy area. As the government correctly observes, that when Donovan was abducted, it was Fulks who was driving and who had lived in this area of South Carolina in the past and who most probably determined the location for disposal of the body. To conceal a body by placing it in a remote, hard-to-find location is one thing; to lie to authorities who are later searching for the body by directing them to the wrong location, or conflicting locations, is something else. It was the concealment argument, not the misdirection argument, that the government relied upon.

The passages from the government's closing argument related to concealment are as follows:

> On November 14th, 2002, Brandon Basham and Chad Fulks had a plan. Their plan involved Kidnapping and carjacking a woman in order to get her car, at that point. That is what their plan was. And that plan evolved. That plan then

168

included rape and murder. Chad Fulks and Brandon Basham knew there would be no eyewitnesses. They knew they would take Alice Donovan to an isolated spot. Take that body where nobody would know how to find it. They accomplished that very same plan before, 72 hours before, with a 19-year-old girl in Huntington, West Virginia.

And the defense lawyers want you to believe, and Chad Fulks wants you to believe that, for the first time in his entire life, for the first time, that he is telling you the truth. I didn't rape Samantha Burns. I didn't kill Samantha Burns. I didn't kill Alice Donovan. And I had nothing to do with getting rid of their bodies. Do you believe that? Are you going to accept that?

(TT Vol. 21 at 119.)

Fulks characterizes the prosecutor's closing argument as suggesting that Fulks obstructed the search for Alice Donovan and sent the law enforcement officers on a "wild goose chase."[49] In the court's view, the closing argument quoted above did nothing more than describe exactly what the evidence at trial demonstrated: Fulks and Basham disposed of Alice Donovan's body in a remote area where it would be extremely difficult for searchers to find her. The fact that it took over six years to discover a few remains of Alice Donovan's body demonstrates this fact. Additionally, the prosecution appropriately noted that Fulks waited more than five months after the kidnapping to provide accurate information about the possible location of Donovan's body. (TT Vol. 21 at 126.)

After the prosecutor concluded his initial closing argument, defense counsel addressed the jury and suggested that several of the government witnesses "said they had absolutely no

---

[49] The term "wild goose chase" was actually used by Fulks's trial counsel and later by the court during a colloquy while the jury was not in the courtroom. (TT Vol. 11 at 114–30.) The term was never used in front of the jury.

idea how Alice Donovan died." (TT Vol. 21 at 154–55.) In reply, the prosecutor argued the

following:

> Before I even get to some of the defense experts, a couple of points I need to address that [were] brought up by Mr. Blume in his closing argument. Mr. Blume made the statement that one of the reasons why he argues to you jurors to vote for life without parole is that he states that the government has no body. He said that the government has no idea how Alice Donovan died. That the government cannot tell you how Alice Donovan died. And because of that, he asks you and he argues to you that life without parole is the most appropriate punishment. I want you to think about that for a moment, ladies and gentlemen. Why is it that the government has no body? Whose fault–at whose conduct is it that the government has no body? The reason the government doesn't have Alice Donovan's body, the reason why we can't put her and take her to a morgue and have a pathologist autopsy her and come in and take that witness stand and tell you jurors that she was raped, that her throat was cut, or that she was shot, is because of the actions, of Chad Fulks and Brandon Basham. Don't you think it is a little bit unfair? Don't you think it is unfair that somehow the government—it should be held against the government for not producing a body because the actions and the conduct of Chad Fulks and Brandon Basham have been successful? Under that theory, ladies and gentlemen, you could never seek the death penalty in a case in which somebody successfully hid or destroyed the body. Think of the logic there. So much of what we do in life, so much of the law is based on logic, simple logic. Should Chad Fulks and Brandon Basham be rewarded because they successfully were able to conceal the body of Alice Donovan? Should, somehow, you sentencing jurors and Brandon Basham's sentencing jurors go back there and hold that against the government because of the actions and conduct of Brandon Basham and Chad Fulks? Is that fair? Is that just?
>
> I submit to you, that that is what makes this crime more aggravating. More aggravating. The fact that they successfully disposed of her body so that the victims will not be able to bury her and so that the government is barred from providing you, jurors, a total picture. The government should not be held accountable for that.

(TT Vol. 21 at 219–21.)

The court finds nothing in this closing argument to be false or misleading. The prosecutor focused on the defendants' actions in "hid[ing] and destroy[ing]" the body, not on misleading authorities after-the-fact. Indeed, the *only* reference that the prosecution made to the unsuccessful search was that Fulks knew that the officials had been searching in the Savannah Bluff area in November 2004. In order to put the statement in context, it should be noted that the government, midway through its closing argument, began to recite a series of demonstrably false statements and actions taken by Fulks during his lifetime. The prosecutor began: "I am going to end up on two subject matters . . . one is the defendant's credibility." (TT Vol. 21 at 119.) The prosecutor then rhetorically asked:

> Why is Chad Fulks's credibility important? Why is that important to you jurors who will be making that decision? Chad Fulks says he didn't rape Samantha Burns. Chad Fulks says he didn't kill Samantha Burns. Chad Fulks says he didn't kill Alice Donovan. Chad Fulks says he had nothing to do with disposing of their bodies. One of the questions you will have to decide is, do you believe Chad Fulks . . . this man who has spun a web of deceit his entire life. He has lied, he has deceived, he has manipulated people, particularly the women, his entire life.

(Id. at 119–20.) The prosecutor then followed with a carefully constructed chronology of episodes in which Fulks had lied to or deceived other people.

Following this detailed summary, the prosecutor concluded:

> Do you think, with all of those lies I have just gone over from the incident with Nell lee and Robert Lee about his little girl, and all of those lies, in the whole, grand scheme of things, ladies and gentlemen, all of those matters are really not that serious. Lying about your identity, lying about whether you possess a firearm, lying to get out of jail, in the whole, grand scheme of things for which you are getting ready to do, really are not that serious. And the defense lawyers want you to believe, and Chad Fulks wants you to believe that, for the first time in his entire life, for the first time, that he is telling you the truth. I didn't

171

rape Samantha Burns. I didn't kill Samantha Burns. I didn't kill Alice Donovan. And I had nothing to do with getting rid of their bodies. Do you believe that? Are you going to accept that?

What else about his credibility, ladies and gentlemen? What did he tell the police in this case? Well, Ladies and Gentlemen, I submit to you, not much. You can put it in proper context. In April of 2003, five months after Alice Donovan is abducted, he sits down with the police and his Lawyers, and he says where Alice Donovan's body may be, and he talks about the things I have already discussed regarding Alice Donovan, basically, putting it on Brandon Basham.

*Let's talk about the searches. First, with regard to the searches, Chad Fulks knew in April of 2003, he knew they had been searching the Savannah Bluff area, didn't find the body in November. Knew they had been searching Bee Tree farm area up in North Carolina, no body found. So he sends them to another location. Does that make it true? No.*

(Id. at 125–26 (emphasis added).)

The italicized language in the passage quoted above did not contain any untrue statements, nor was it in violation of the court's ruling regarding the search directions given by the Indiana lawyer. Further, when viewed in the light of the prosecutor's entire two-hour summary, it was a relatively insignificant reference to the general proposition that just because Fulks said something, it was not necessarily true. The statement was certainly not a "central argument" (Supp. Pet. at 1) or "theme" (id. at 11) that "permeated the proceedings" (id. at 10) or served as "one of the primary justifications for sentencing [Fulks] to death." (Id. at 26.)

Finally, the cases relied upon by Fulks for the proposition that a sentence of death based in part upon false information violates a "heightened reliability" requirement of the Eighth Amendment (Supp. Pet. at 21) are unavailing. In both United States v. Tucker, 404

172

U.S. 443 (1972), and <u>Johnson v. Mississippi</u>, 486 U.S. 578 (1988), the defendants had been sentenced to death based, in part, upon prior convictions that were invalidated, rendering the government's previous presentation of evidence regarding the convictions to be false. In the case at hand, however, the location of the remains of one of Fulks's victims does nothing to change, invalidate, or falsify the arguments made by the government at trial.

Petitioner also relies upon <u>United States v. Tucker</u>, 404 U.S. 443, 448 (1972), which holds that due process is implicated if a sentencer's decision "might have been different" if it had not considered the false information. But here, no false information was presented to the jury. To the extent that the brief mention of the search efforts in the court's introductory remarks or the prosecutor's reference during the his two-hour summary were considered by the jury in this case, the court is in no way persuaded that the result "might have been different" had these two statements been omitted.

During the four-and-a-half week trial of this case, the jury heard about Fulks and Basham escaping from a new detention facility in Kentucky (where Fulks was being held on charges that might have exposed him to a life sentence) and then engaging in a seventeen-day crime spree that spanned seven states. During this crime spree, two women were abducted, raped, and murdered, and their remains were left in remote areas to be consumed by the elements or wild animals. Four other victims of the crime spree could have been murder victims as well. James Hawkins was duct-taped to a tree and left in the woods during temperatures in the low thirties and escaped with his life only when he was able to free himself fifteen hours later. Ohio State Highway Patrol Trooper Nicholas Malo dove onto a

berm to avoid being struck by the BMW Fulks was driving at speeds of up to 130 miles per hour, and Fulks then drove the BMW onto the berm in an effort to strike him. (TT Vol. 7 at 166–98.) Carl Jordan confronted Fulks when he and Basham were burglarizing Jordan's son's house. Jordan found himself in a high-speed chase with Fulks driving a van directly at him and Basham shooting out the back window of his vehicle. (TT Vol. 5 at 46–58.) Although Fulks offered an explanation for it, Fulks's late night call to young Amy Ward could have been determined by the jury to be an attempt to have a third kidnapping victim. In addition to these victims, or potential victims, of personal violence, the crime spree included numerous people whose homes were burglarized, whose vehicles were stolen, or whose identities, pocket books, or license plates were stolen.

In light of this extensive record of criminal activity, this court cannot conclude that the sentencing jury's decision "might have been different" had the two brief references to the search efforts been omitted from the trial.

CONCLUSION

Chadrick Evan Fulks received world-class representation from a highly skilled, motivated team of four lawyers with death penalty experience, together with innumerable investigators and experts, law students, and others who contributed to mounting a vigorous defense marshaling all the evidence available in the best light to the defendant. Counsels' notes and other documents produced in discovery reveal an exhaustive effort to interview potential witnesses, locate and interview experts (some on multiple occasions), evaluate their potential testimony, and use those that would assist the defense team in its efforts to spare

Fulks's life. In his petition before this court, Fulks has failed to show that his trial counsel were ineffective under Strickland or that any other errors of constitutional magnitude occurred. The petition is therefore denied.

*Certificate of Appealability*

On December 1, 2009, the Rules governing Section 2254 and 2255 cases in the United States District Courts were amended to require that the district court issue or deny a certificate of appealability when a final ruling on a post-conviction petition is issued. See Rule 11(a) of the Rules governing 28 U.S.C. § 2254 and 2255. The court has reviewed its order and pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 cases, issues a certificate of appealability as to Claims 1 through 28, and 32. As to Claims 29, 30, and 31, the Petitioner has not made a substantial showing of a denial of a constitutional right, and therefore, a certificate of appealability is denied as to these Claims. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336–38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

IT IS SO ORDERED.

August 3, 2010
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge