IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION


UNITED STATES OF AMERICA,       )       Cr. No. 4:02-992
                                )
    Respondent,                 )
                                )
versus                          )       Columbia, SC
                                )       February 22, 2010
CHADRICK E. FULKS,              )
                                )
    Petitioner.                 )
 ----------------------------)


TRANSCRIPT OF 2255 HEARING
VOLUME I
BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
UNITED STATES DISTRICT JUDGE


Appearances:

| | |
|---|---|
| For the Government: | ROBERT F. DALEY, JR., ESQ. |
| | JIMMIE EWING, ESQ. |
| | ROBERT JENDRON, JR., ESQ. |
| | Assistant U.S. Attorneys |
| | 1441 Main Street, Suite 500 |
| | Columbia, SC  29201 |
| | |
| For the Petitioner: | BEATTIE B. ASHMORE, ESQ. |
| | 650 E. Washington Street |
| | Greenville, SC  29601 |
| | |
| | KIRSTEN E. SMALL, ESQ. |
| | P.O. Box 10648 |
| | Greenville, SC  29603 |
| | |
| | DAVID P. DALKE, ESQ. |
| | KYMBERLEIGH DAMRON-HSIAO, ESQ. |
| | STEPHANIE L. NOBLE, ESQ. |
| | DANIELLE OAKLEY, ESQ. |
| | 610 Newport Center Dr., Suite 1700 |
| | Newport Beach, CA  92660 |

Court Reporter:        Gary N. Smith, CM
                       901 Richland Street
                       Columbia, SC  29201
                       (803) 256-7743

          Stenotype/Computer-aided Transcription

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

          THE COURT:  This is the case of United States of America versus Chad Fulks, before me this morning for an evidentiary hearing on a Section 2255 petition filed by Mr. Fulks.  The issues have been extensively briefed and there have been amendments to the petition, and withdrawals and reassertions of various issues.  Let me say at the outset that --

          THE CLERK:  Can you make sure Mr. Fulks can hear?

          THE COURT:  Mr. Fulks, can you hear us?

          THE DEFENDANT:  Yes, I can hear you.

          THE COURT:  All right.  I'm going to get to that issue in just a moment.  Let me just say by way of procedure first, there is a one-year time bar on 2255 petitions.  In this case a petition was filed within the one-year bar and then an amended petition filed after the one year had run.

          I'm going to go ahead and consider the amended petition, because counsel were not appointed until three months into the year and I think it's a fair thing to do.

          Now, the Fourth Circuit may disagree and say the petitioner is stuck with what was alleged initially.  But for

purposes of this hearing I would like to go forward and hear all issues, including those raised in the amended petition and including the location of the body of Ms. Donovan. That was an issue recently added when the remains were found -- what, late last year I guess?

Let me just say, this is a proceeding under Section 2255 which means that the Federal Rules of Evidence apply. We will be marching along under the rules of evidence as we go through the hearing. Because of that, if either party requested the witnesses to be sequestered I am required to sequester the witnesses. Does either side want to invoke the sequestration rule?

MR. ASHMORE: Not from the petitioner, Your Honor.

MR. DALEY: Not from the government, Your Honor. I think we've got an FBI Agent who may be a witness, but other than that I don't know of any other witnesses to sequester anyway.

THE COURT: All right. Ms. Floyd tells me that all exhibits have been agreed upon except one perhaps, and you may be able to work that one out.

MR. DALEY: That's correct, Your Honor. That is the declaration of Heather Roche. I just want to have the opportunity to speak with the FBI agent about a few matters. Maybe we can --

THE COURT: We will take that up when we come to it.

MR. DALEY:  Yes, sir, we are in agreement.

THE COURT:  All right.  But both sides will concede on the record that except for the Roche statement or affidavit, all exhibits that have been tabbed and marked and handed up are in without objection?

MR. ASHMORE:  Your Honor, we have reserved the right to object on the grounds of relevance.  Frankly, we don't know that either one of us will voice such an objection, but with that reservation everything is admitted, Your Honor.

THE COURT:  I just want to keep a clean record for the court of appeals.  Then if we don't hear a relevance issue raised about a point, then at the conclusion of the hearing everything is in to which relevance has not been raised, right?

MR. ASHMORE:  Absolutely.

MR. DALEY:  Yes, Your Honor.

THE COURT:  And then finally, Ms. Floyd said we have an issue with Mr. Fulks on the satellite about an officer being present in the room with him; is that correct?  The arrangement we had was, if Mr. Fulks wishes to confer with counsel the officer has to step out of the room so that he can have a private counsel with his attorney -- private conference with his attorney.

MS. SMALL:  Yes, Your Honor, our concern is that it may be very disruptive to the hearing if the officer has to step out.  We had hoped that the situation would be that the

officer would not need to be in the room so that it would be easier for Mr. Fulks to talk confidentially with us.

THE COURT:  If he were here -- this is a public hearing, if Mr. Fulks were here present there would be two or three officers seated within two feet behind him for custody reasons, for security reasons.

MS. SMALL:  Yes, sir.

THE COURT:  I mean, why would it be any different with him out there?

MS. SMALL:  Well, he can't whisper on the phone, I think, is the issue, Judge.  If an officer is right behind him, he can lean over and talk behind his hand to one of us.  He is not in that situation where he is, he can only talk on the phone loud enough to be heard through the receiver.

THE COURT:  Was the phone contact going to be maintained constantly throughout the hearing?  I thought he was going to call when he wanted to talk with you.

MS. SMALL:  Yes, sir.  Give us the high sign so we can call him, which we can do.  So, it is disruptive for the officer to have to get up and leave the room so that Chad can talk.  By that time the point may be lost that he was trying to make to us.

THE COURT:  Well, it looks like he has writing material and notepads there.  I don't -- does the officer want to weigh in?  The officer who is on the screen in Terre Haute,

do you want to talk about whether there is a need for you to be in the room?

OFFICER ENGLISH:  We need to have somebody in the room so we can control the remote and stuff.  As far as the court, if the court wants to talk to us or talk to Fulks, we have to have control of the remote.  That is really the main issue for us, is having control of this hand --

THE COURT:  What type of room are you in there, is it a secured cell or in an office?  What is it?

OFFICER ENGLISH:  It's a secured kind of like conference area.  I mean, it's a secured room.

THE COURT:  Tell me again, Ms. Small, now --

MS. SMALL:  What we are asking for is the officer to step out, unless the court does need to talk to the officer or Mr. Fulks, neither of which should be an issue.  You can see on the screen, Your Honor, there is a window right behind next to the door.

The officer could be out there, which would give Mr. Fulks an opportunity to be able to talk to us as he needs without having to disrupt the proceedings by having the officer walk out of the room first.

THE COURT:  Let me say, up until now, when we've had our conferences and all, I was not fully apprised of all the issues.  I read the briefs for both sides three times and looked at almost all the attachments, I'm familiar with the

issues in this case.

I don't see a need for a whole lot of discussion between attorney and client on these legal issues. I might be wrong, but I really don't think there is going to be a need for constant communication between the petitioner and his lawyers as we go through this evidentiary hearing.

I'm going to overrule the objection and allow the officer there at Terre Haute to remain in the room with Mr. Fulks, with the clear understanding that when he does wish to speak with his attorney the officer will have to step out of the room so he can have a private conversation, and not violate the attorney-client privilege.

All right?

OFFICER ENGLISH: We understand that.

THE COURT: Give us your name, if you would, sir, for the record.

OFFICER ENGLISH: My name is Brian English. I am the case manager.

THE COURT: Say your last name again?

OFFICER ENGLISH: Brian English.

THE COURT: English. All right. Officer English, when Ms. Fulks indicates that he wishes to speak with his attorney, you need to step outside the room.

OFFICER ENGLISH: Yes, sir, Your Honor.

THE COURT: Let's make sure, there are no recording

devices in that room that would make a recording of what is being said; is that correct?

OFFICER ENGLISH: There are no audio recordings, recording devices. There's video surveillance, that's going to be it.

THE COURT: There's silent video?

OFFICER ENGLISH: Yes, silent video, no audio recording.

(Off record discussion)

THE COURT: He said there is a video but no audio in the room.

MS. SMALL: And, Your Honor, to clarify, is it all right for Mr. Fulks to simply keep the phone line open as the hearing goes on?

THE COURT: Well, I thought the arrangement we had was, he would make an indication, he would give us a signal that he wished to talk and we would stop the hearing --

MS. SMALL: Okay.

THE COURT: -- stop the proceedings, and let him make a phone call, or y'all call him or him call y'all. So, I don't think we need a constant phone line open. I mean, if it develops -- I'm open minded about it, if it develops as the hearing goes along that he does need constant communication, we can always change it.

But as we begin now -- I mean, I assume y'all are

going to make opening statements.  I would like to have a little bit of a three-minute opening statement.  He doesn't need to tell you what to say in the opening statements.  Y'all are all good lawyers, you don't need constant feedback from him.

If he was sitting here present in the courtroom you wouldn't be conferring with him about what to say in your opening statement, or what questions to ask Mr. Blume as the first witness, I don't think.

So, let's say he can -- the phone conversation can be initiated whenever Mr. Fulks wants to talk with his lawyers or vice versa, but we won't have a running open phone line for the whole duration of the hearing.

MS. SMALL:  Yes, sir.

THE COURT: All right.  Anything else?  The phone line is open now.  I guess we need to hang it up at this time.

Now, Mr. Daley.

Mr. DALEY:  Yes, Your Honor.  What I would like to do at this point is -- I believe it doesn't need to be done but I'm going to do it in an abundance of caution, that we would move that everything below at the trial, the trial exhibits, the jury selection, the trial transcripts, those are matters that you have before you, Your Honor, and you are able to use those however you deem appropriate in ruling on this --

THE COURT:  I think that's a fair request.  I mean,

actually this bears the same case caption number as the original criminal case and so I think everything that was put in the record and admitted before the jury, or put in the record and to which objection was sustained and it was left in the record as an offer of proof, all of that is before me.

MR. DALEY: Great.

THE COURT: I think the court can take judicial notice of its own records anyway. So, I think that's a fair request. Any problem with that?

MR. ASHMORE: We would agree to that, Your Honor.

THE COURT: Do you want to make a brief opening statement, kind of give me a preview of what to expect, who is going to be called, how many live witnesses I am going to hear and so forth?

MR. ASHMORE: Your Honor, Beattie Ashmore on behalf of the petitioner. I will briefly address the court. Obviously Kirsten Small has been working with me for quite some time on this, Judge.

First and foremost, we want to acknowledge the other attorneys who worked with us on this case: Danielle Oakley, David Dalke, Stephanie Noble and Kim Damron-Hsiao, are all with the firm of O'Melveny & Myers out of California, Judge, just a fantastic firm.

They have been working in this case in a pro bono capacity. They have spent thousands of hours and well over

$100,000 in costs and expenses, working on behalf of Mr. Fulks for what has now been some years.

We could not have done this case without them, Judge. They are excellent lawyers, they have brought so very much to the table, and again I wanted to note for the record their outstanding work in this case.

Judge, we appreciate your rulings. As you know, we have filed a petition, an amended petition, and then the supplemental claim with the discovery of the remains of Ms. Donovan and we appreciate your entertaining our arguments.

We would start, Judge, with John Blume who will be our witness. Mr. Daley and I suspect he will take most of the day today. If not, we will make more progress than we suspect. We would call Bill Nettles from the Florence Public Defender's Office to the stand. Andrea Lyon, Your Honor, is an expert witness. We anticipate, weather permitting in Chicago, she will be here this evening to testify first thing in the morning.

We have a couple of mental health experts, Margaret Melikian and James Hilkey, that will be testifying as well. Sheri Johnson, as you know, Your Honor, thank you for accommodating her testimony. I believe we have that set for Thursday morning. She was another member of the trial team, and you are aware of her circumstances. She won't be here live but she will be testifying via video conference. And those

would be our witnesses.

Your Honor, we raised 33 different claims.  I'm not going to address all of those --

THE COURT:  Before you go, you think three experts are going to be called?  I was thinking it might be more.

MR. ASHMORE:  I think, Your Honor, we have decided not to call Dr. Halleck.  You had authorized his testimony, and I don't believe we will be calling Dr. Halleck, Dr. Seymour Halleck to the stand.

THE COURT:  All right.  So, as I will recall, there were four experts that you challenged the defense team for not calling them, now you are going to back off on Mr. Halleck?

MR. ASHMORE:  Dr. Halleck, yes, sir.

THE COURT:  Dr. Halleck.  The fact he was not called is no longer an issue or is it still an issue and I'm just not going to hear from him live?

MR. ASHMORE:  Yes, we would still take the position that they probably should have called some mental health witnesses.

THE COURT:  And the other three will testify live?

MR. ASHMORE:  Yes, sir.

THE COURT:  Tell me again -- I think it's on the record -- you insist that I need to hear these people live rather than looking at their affidavit of what they would have testified about?

MR. ASHMORE:  That's correct, Your Honor.

THE COURT:  Because I need to see how impressive they would have been to somehow formulate an impression -- a decision as to how damaging the failure to call them was?

MR. ASHMORE:  Yes, sir, and with all due respect, we would take the position that part of what would be required of you is to judge the credibility of all these witnesses, for that reason we think the live testimony is necessary.

THE COURT:  But we are not going to hear from Ms. Sheri Johnson live, and her conduct is every bit as important as the doctors who weren't called, I think.

MR. ASHMORE:  As I understand it, she will be presented via video conference.  You will be able to judge her --

THE COURT:  I thought there was a request that she just be on a telephone.

MR. ASHMORE:  I think we have worked through that with Ms. Floyd, Judge.  I think we now have her on video conference.

THE COURT:  All right.

MR. ASHMORE:  And, Your Honor, just very briefly, I don't want to go through all 33 complaints, but I do want to bring to your attention the claims we are going to focus on, and that is the two-step mitigation process.  We take the position that a factor is either mitigating or not, and that

the instructions as given to the jury actually required a second step; number one, is it mitigating and, number two, what weight might it have? We think that was an error.

The plea itself, Your Honor, that Mr. Fulks went through and rendered. As you know, it was based simply on the 302, his statement to the FBI, which did not go towards the intent to commit serious bodily harm or death in a car-jacking.

And actually in the 302 it actually says that Fulks assumed that Basham was going to steal an unoccupied vehicle. So we think there was no admission of intent for the plea itself.

THE COURT: Let me stop you right there. I was going to ask this question when we got to it in the testimony but let me ask you now, by raising the court's acceptance of the guilty plea to count 1 under a Pinkerton theory -- which, as you know, both sides urged me to do.

And I had great misgivings about it, great misgivings about it, to the extent I adjourned the plea colloquy and took, what, a two-day recess or something such as that to allow both sides to brief it, came back and still had misgivings.

Both sides urged me to accept it, and at some point during that process I said, "I don't want to set up an issue for appeal here." Is that in the record somewhere? I know I said it somewhere.

MR. ASHMORE: Yes, sir.

THE COURT: "I don't want to see this issue coming back to haunt me later on." Well, here it is haunting me. But aside from that, if I had rejected the effort to plead guilty under Pinkerton, we need to think about the consequences of that.

I would have forced the defendant to go to trial, denying his guilt in front of the jury. And that's what you say I should have done, forced him to say "not guilty" and let the government prove its case on phase 1 on guilt or innocence.

I mean, you can imagine the issue that would be before me if I had gone that route. If I had forced him to plead not guilty and if the jury convicted him, we would be back here today and the issue would be the big bad trial judge ignored the legal advise of both parties, it was unanimously agreed that Pinkerton applies, and the court erred in not accepting that submission.

MR. ASHMORE: Well, Judge, you know, it's our position that -- again, in order for there to be a valid plea you have to admit all the elements of the offense. He never even admitted intent. So, it was error, we would argue, Your Honor, for the plea to have been taken.

The remedy would have been a plea on the -- on the guilt phase, Your Honor, you are correct about that. That's the only possible remedy. It doesn't mean that Fulks has to say, "I'm not guilty," however. He can essentially admit his

guilt during the guilt phase of the trial. But it still -- it's just a matter of law that a plea could not have been accepted because it wasn't factually supported.

THE COURT: All right. Go ahead.

MR. ASHMORE: And then lastly, Your Honor, the Brady claim/ineffective assistance of counsel. Your Honor, there was a Sheriff, Sheriff Hewett that was the Sheriff of Brunswick County. As you recall, Mr. Basham went on Thanksgiving day to search for the remains of Alice Donovan.

Sheriff Hewett wrote a written report, an interview to a D. A. Crocker. In that he talks about the deer statement, more importantly he talks about the purse strap. Then in Sheriff Hewett's statement, as memorialized by Lieutenant D. A. Crocker, it indicates that a purse strap was used to strangle Ms. Donovan. Sheriff Hewett was not called at the Fulks trial, Sheriff Hewett was called during the Basham trial, which was a year, year and-a-half later, Your Honor.

And in the Basham trial Sheriff Hewett testified that Branden Basham demonstrated how he, Branden Basham, strangled Alice Donovan with her purse strap. An admission, Your Honor, a confession. That was never revealed to the trial team.

As you will hear the evidence play out, what was told to the trial team was that Basham indicated that it was Fulks that actually strangled Ms. Donovan. But it is clear in the record and clear from Sheriff Hewett's testimony that Branden

Basham confessed to actually strangling Alice Donovan. That wasn't brought to the attention of the trial team.

Your Honor, we think they are serious Brady violations. It's hard to believe -- the trial team should have discovered that, so it's also an ineffective assistance of counsel argument. Those are our primary areas of focus.

THE COURT: What you are saying, out of 33 grounds of error those are the three predominant issues? I'm not trying to put words in your mouth. Those are the three you mentioned so far.

MR. ASHMORE: Those are the three, and lack of any mental health testimony. So, that's where we are going to focus this hearing, Your Honor.

THE COURT: Are any claims abandoned?

MR. ASHMORE: No, sir, Your Honor.

THE COURT: Well, there were some, one or two at least, I think, since the brief was filed in the parallel case, the Basham case, the Fourth Circuit addressed a couple of them. I'm not trying to talk you into withdrawing them, but I don't think I am going to spend much time on them because I have got to follow Fourth Circuit law.

MR. ASHMORE: I wouldn't expect you to, Your Honor. But we don not abandon any claims. We will certainly acknowledge, Your Honor, the developments since these claims have been raised.

THE COURT: Very good. Mr. Daley.

MR. DALEY: Good morning, Your Honor. The issues that Mr. Ashmore has set forth, I will just go through those, maybe make one short mention of another issue or two. First, Your Honor, the decision on whether to call the mental health experts --

THE COURT: Yes, sir.

MR. DALEY: -- if you listen closely to the testimony that you will hear, it's clear that Mr. Blume had a rational reason for not calling them.

He had set forth a theory of the case that Fulks was not a leader. He did not take initiative. And the Donna Ward phone call in which Mr. Fulks called that phone number that he had when he had stolen Amy Ward's purse, in that phone call -- which was after Basham had the encounter where he had tried to car-jack, kidnap that young lady, Francis is her last name, Your Honor -- Fulks called. He is clearly doing it on his own, on his own accord.

And I believe you will hear that that piece of evidence was one in which Mr. Blume, who may have been at least on the fence as to whether to call these mental health experts anyway, decided he was not going to call them.

Separate you will hear, and you will see at least one e-mail in which, five weeks before trial, a couple of weeks before jury selection, Mr. Blume actually says, "I'm thinking

about cutting the shrinks loose and just going with bad brain, bad background, leads to bad results."

Your Honor, if you look at the opening statement, Mr. Blume clearly left that option open. He only talks about fetal alcohol syndrome or fetal alcohol spectrum disorder and Mr. Fulks' bad background.

He makes a fleeting reference to mental health experts, but never names any, doesn't call up any diagnoses. The only person that is mentioned expert-wise in the opening is Dr. Bookstein who dealt with the bad brain issue.

And so it's the government's position that he made a rational decision. He was thinking he might call mental health experts, but he was leaving his options open and ended up deciding not to call them.

A separate reason not to call them would have been because Dr. Halleck, Dr. Melikian, and even Dr. Hilkey talk about antisocial personality disorder. Now, Melikian and Halleck both actually give -- say that he meets the diagnostic criteria in the DSM IV, which is the handbook that psychiatrists use to evaluate somebody's mental disorders.

Mr. Blume has written that such a diagnosis can often be the kiss of death. Now, the way those experts were going to attempt to get around this is: "Oh, well, that's his diagnosis, that just sort of looks to action and it's circular."

But the reality is, antisocial personality disorder is not something that a trial attorney in a death penalty case typically wants before a jury.

You will actually see an e-mail from Mr. Blume to Dr. Melikian in which he says back in December, just to show how much preparation went into this case, December before the June hearing he's talking to Dr. Melikian and saying, "We are going to have to deal with an antisocial personality disorder."

In that same e-mail, earlier in the e-mail, he actually talks about why he thinks fetal alcohol spectrum disorder is an appropriate diagnosis. That e-mail reveals a tremendous amount of research and knowledge about that issue.

Some other things may come out, about a concern about malingering as well. But bottom line, Your Honor, a very reasonable decision not to call those mental health experts.

THE COURT: All right.

MR. DALEY: The decision to plead guilty, Your Honor, again, a strategy tied up with the decision to give the statements to the FBI. What you will hear from Mr. Blume and Mr. Nettles and Ms. Johnson is, that they had to get Chad Fulks' version out there somehow, but he wasn't someone they thought could take the stand because he couldn't hold up to the cross-examination that would have been thrown at him.

He had a horrible record, there was too much for him to have to explain, and so what they decided was, "We are going

to give a statement." They tried to get the government to say, "We will give you a life sentence in exchange for this statement, pleading guilty," the government would have none of it. They hadn't done it with Basham six months earlier, they weren't going to do it for Chad Fulks.

THE COURT: Refresh my memory -- with Basham there was a different team of lawyers representing him at the time he gave a statement, searched for the body -- on this case, Chad Fulks' case, were the same lawyers representing him from the very beginning?

MR. DALEY: From the very beginning Mr. Nettles, and shortly thereafter Mr. Blume, and Ms. Johnson came on as well.

So, they make the strategic decision, in order to get Fulks' version out there, to give the statement. And actually to give the statement without a proffer, without a plea agreement, for the strategic reason that it shows some level of acceptance of responsibility, some amount of remorse, accepting the role he had in the crimes, and perhaps most importantly, to get his version out.

It may be that you will hear testimony that -- maybe one or more of the counsel will say, "The government just can't resist when a defendant gives a statement." It was a calculated decision, but they figured the government was going to just not be able to not put it in. And, of course, that is exactly what played out in this case.

Now, Your Honor, you had a peculiar situation where both sides are trying to get the guilty plea through. And the defense wants to get a guilty plea but still reserve the intent element that would qualify him for the death penalty. So, that's why you have this long discussion about the Pinkerton liability.

The truth is, the government's position is car-jacking is a continuing offense. Now, the law is very close. I don't think it's really fully developed yet, Your Honor, but car-jacking is a continuing offense. But for certain, when Chad Fulks finally got into the car and was part of the car-jacking, Branden Basham was on top of Ms. Donovan and he had a gun. There's evidence that he had a gun.

There is a concept called "conditional intent" that applies to car-jacking cases. If you have the conditional intent to do something, that's enough. But more importantly, Your Honor, if car-jacking is a continuing offense and the intent doesn't just apply at the instance that the car-jacking occurs, if it's a continuing offense, Your Honor, there is plenty in the record to show that he at a minimum intended great bodily injury to Alice Donovan. Raping her would certainly be enough.

A separate ground, Your Honor, an independent ground would be the fact that there were two verdict forms nearly identical for count 1 and count 2. It is the government's

position that the same case would have been tried if he had only been tried under kidnapping and not car-jacking.

And because they found, the jury found the death penalty appropriate in the kidnapping count, then even if you were to determine that the car-jacking count, somehow the plea was inappropriate, even though it was invited error at least, and it was clearly done in an attempt for Fulks to get a guilty plea on all eight counts, but if you found that that shouldn't have been the case, you shouldn't have accepted that guilty plea on count 1, count 2 is a free and independent standing count on which he is serving a death sentence, Your Honor.

And you actually made a comment at one point that you were going to do these two separate verdict forms for each count because -- I think you must have had that same concern, maybe. I'm not sure. But I remember afterwards you said that that was probably a very good idea. I can't remember if it was suggested by one of the parties or not --

THE COURT: Let me ask -- of course, I read the briefs where you make this point, and the reply brief by the petitioner on this argument that "You can forget about count 1 because count 2 independently supports the death penalty," the reply brief just addressed that in a footnote. It just says something like, "It ignores the totality of the circumstances." I really didn't understand that argument.

Can we just dispense with count 1 and just deal with

count 2 in this case, rather than mess up the law with Pinkerton and all?

MR. DALEY:  It's an independent ground.  I don't want to concede, though, Your Honor, that count 1 is defective.

THE COURT:  I will hear the defendant's argument at the end of the hearing about why count 2 --

MR. DALEY:  We cite some cases that I think support that very argument, and they just did not address them at all, Your Honor.  I think the reason why they can't address them, they are Supreme Court cases and they are not distinguishable.

Your Honor, the Brady claim -- actually it's the Hewett claim.  I'm not --

THE COURT:  That is the Brady claim.

MR. DALEY:  It is one of the Brady claims, I guess. Your Honor, the Hewett issue comes down to the fact that on cross-examination in the Basham case defense counsel asked one last question, the question was:  "Did he admit that he killed her?" I think was the question.

Sheriff Hewett simply said, "No, he demonstrated." If you look at that statement, it doesn't say that he demonstrated that he did it, he showed how it was done.  But to pluck out that answer on cross-examination in a co-defendant's trial when the evidence was clear beforehand that that whole day Basham is blaming the killing on Fulks -- I understand we have to be advocates but, Your Honor, I would just ask you to

look at the totality of the record and you will see that it is not that Basham said, "I did it and here is how I did it."

He simply demonstrated how she -- he says she was killed. But you can't pluck that out and say, "Oh, we just want to get this one little sentence or two, but we are going to ignore the whole context in which it happened."

And we know that they did not want, we know that defense counsel did not want a bunch of Basham statements in about what Fulks did.

Your Honor, the two-step mitigation process instruction I think is a purely legal one. The government's position would be that you gave instructions regarding mitigation that allowed for all sorts of mitigation. They had an exhaustive list of mitigating factors that you allowed them to present, and we believe that it was not an inappropriate instruction.

THE COURT: Well, their argument is that I said, "You have got to see if a fact has been proved, and then you've got to take step two and decide it is in fact mitigating." And the argument is, if it's been proved it is a mitigating factor. I shouldn't have put that second step in there, in the jury instructions.

MR. DALEY: And, Your Honor, the legal standard is pretty simple, is there a reasonable likelihood the jury applied it in such a way to keep out that evidence? That's not

really what happened here.  Everybody --

THE COURT:  They found a number of mitigating factors in both cases.  Many, many factors found by all 12 jurors, I think.

MR. DALEY:  Yes, Your Honor.  This is not one where they rejected almost all the mitigating factors.  In fact, I think the strategy was -- I think you will hear trial counsel say at the time what you want to put in is as many mitigating factors as you can think of to try to load up the number, that the jury might say, "Well, golly, there are all these mitigating factors and there are only a few aggravating factors."

So, if you look at the totality of your instruction, including this comment, this instruction, and what actually was found to be mitigating, I just don't -- the government's position is that the instruction was fine.  At most, if there was some potential problem with it, it would be harmless.

And if you have any other questions about the issues, Your Honor -- the search issue, which a lot of it is going to be stipulated to --

THE COURT:  Well, let's ask, is the government prepared to stipulate that the remains were found reasonably near where Mr. Fulks had directed the authorities?

MR. DALEY:  We have agreed that that is the case, yes, Your Honor.  Counsel was trying his darndest to find the

remains.  Did everything he could.  They accuse, the defense accuses us of saying he was misleading, he was sending them on wild goose chases.

Well, Your Honor, if you remember, at the beginning of the case, Fulks, through his counsel in Indiana, his attorney says, "Savannah Bluffs, yeah, that's the area, basically."  Which is about 15 miles from where the actual remains end up being found off of highway 90.  That was what we were going to try to prove.

And if you look at the notice of intent to seek the death penalty, it was -- the initial efforts were being -- I can't remember the term we actually used -- but were being thwarted.  If you look at that initial effort, well, that's what it is, and you didn't charge that --

THE COURT:  You are saying that initially he told you to go near Savannah Bluffs?

MR. DALEY:  Correct.

THE COURT:  And that's not where the body was found?

MR. DALEY:  Correct.  But you didn't let that in, Your Honor, because it was through counsel and counsel gave a caveat, his Indiana counsel, "You can't attribute this to Mr. Fulks."  So, in the end you said, "Well, I'm not going to let it in."

THE COURT:  But that was a misleading direction, Savannah Bluffs.

MR. DALEY:  Yes, Your Honor, it was not -- they had been there, I think they had tried to rob some cars there, but that was not, that wasn't anywhere near --

THE COURT:  And then later on -- I'm a little bit confused.  Then when did he give them the directions to the correct place?

MR. DALEY:  The first time that the government was on notice of the general area where eventually the bones were found was in the April 21st statement to the FBI, April 21st, 2003, which is over five months after the killing.

And so what happened is we had to sort of pull back on that because you wouldn't let it in.  And so again we tried in exhaustive detail to show --

THE COURT:  If I didn't let it in I'm sure it was because the defendant objected to it.

MR. DALEY:  Excuse me?

THE COURT:  What the first lawyer said about -- the lawyer in Indiana said about Savannah Bluffs, I assume the defendant didn't want that to come in.

MR. DALEY:  Oh, no, he didn't want that to come in.

THE COURT:  I was agreeing with the defendant when I did that.

MR. DALEY:  You absolutely were.  Your Honor, we haven't gotten to this issue, I don't know that you have to reach it, but if they had gone and tried to say how helpful he

had been, "Oh, he's helpful, helpful --" well, he wasn't helpful at the beginning.

And it's an open question whether you might have changed your ruling if suddenly he was trying to argue, "I'm so helpful, I'm so helpful," in keeping out the fact that initially he wasn't. Because, Your Honor, five months, more than five months later the evidentiary value is probably completely gone. And obviously we know now, having discovered a few of Alice Donovan's remains, there are just a few bones, Your Honor.

THE COURT: Tell me about the remains. No way to tell if she was tied to a tree or not, because the logging company had come through or something?

MR. DALEY: Your Honor, there were some miscellaneous bones, there was no --

THE COURT: The crime scene had been disturbed?

MR. DALEY: Correct. This was a wetlands area, water comes in and out, that's why there is this dock there was testimony about. There was some logging that I guess had eventually been done, and there was testimony that there was probably scavenging by animals.

THE COURT: The only point I want to clear up in the record is now that the remains have been identified, the scene was such that there is no way for forensics to go back and determine who struck the fatal blow?

MR. DALEY:  No, it took a good long while to determine the DNA.

THE COURT:  Do you agree with that?

MR. ASHMORE:  We agree with that, Your Honor.  Your Honor, we will make it evident to you throughout the hearing about the Savannah Bluffs.  I will address that as the week goes by.  The point that we will make is undisputed and that is Chad Fulks attempted to lead authorities to the location of Ms. Donovan before the trial.  And we can talk ad nauseam about that to you maybe on Friday.

THE COURT:  All right.  I think that will be argument better suited after I hear what the evidence is.

MR. ASHMORE:  Yes, sir.

THE COURT:  But there is not a need for a whole lot of firsthand accounts from witnesses about where the body was found and so forth, is there?  I mean, the government stipulates it was found reasonably near where he directed them when he told them five months after the murder.

MR. DALEY:  We do stipulate to that, Your Honor.  In fact, we did in our response to the proposed claim 33.

THE COURT:  Anything else?

MR. DALEY:  Not at this time, Your Honor.

THE COURT:  All right.  Mr. Ashmore, please call your first witness.

MR. ASHMORE:  Thank you, Your Honor.  May it please

the court, we call John Blume to the stand.

THE COURT:  And before we start, Mr. Fulks, have you been able to see and hear what is happening here in the courtroom so far?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  You may proceed.

MR. ASHMORE:  Thank you, Your Honor.

JOHN BLUME, SWORN

DIRECT EXAMINATION

BY MR. ASHMORE:

Q.  State your name for the record, please.

A.  John Blume.

Q.  Where do you live, Mr. Blume?

A.  I currently reside most of the year in Ithaca, New York, and I also retain a home in Lexington County.

Q.  Can you give us a brief background on your work history, educational history, employment history?

A.  Do you want to go from now backwards or from backwards forward, or does it matter?

Q.  Whichever you prefer.

A.  I am currently a professor of law in the Cornell Death Penalty Project.  I also maintain a law office here in Columbia.  Prior to starting at Cornell in 1997, I was a lawyer in private practice for several years.  And then prior to that, I was the director of what was then known as the South Carolina

Death Penalty Resource Center.

Prior to that I practiced law in the law firm -- I was a partner in the firm of Bruck and Blume.  And prior to that, I was an associate in the firm of Derfner and McClain in Charleston, South Carolina.  And prior to that, I was a law clerk for the Honorable Thomas A. Clark of the United States Court of appeals for the Eleventh Circuit.  And prior to that, I was a law school student and graduated in 1984 from Yale Law School.

Prior to that I was a divinity student and graduated from Yale Divinity School.  In 1982 and prior to that, I was an undergraduate and graduated from the University of North Carolina.  I assume that's probably going back far enough.

Q.  You are currently a professor of law at Cornell?

A.  Yes.

Q.  You are teaching this semester, I take it?

A.  Yes, I am.

Q.  Can you give the court an idea of your level of experience in death penalty cases, both trial and appellate work?

A.  For most -- most of my professional career, certainly as a practicing lawyer, was devoted to the representation of persons sentenced to death or facing the death penalty in capital trials.

And I did some other sort of criminal work when I was a very young lawyer.  I did some civil work, but I think it's

fair to say the bulk of it has been involving capital

litigation.  The ratio of post conviction to trials is --

certainly falls substantially more heavily on the post

conviction federal habeas side.

I think -- I don't have an exact number, I don't keep

statistics on this, but on the trial side I've probably been

involved in, you know, 15 capital trial level cases, more or

less, ballpark.

Q.  Out of those, and realizing the figure 15 is an estimate,

out of the 15, how many would be federal capital trials?

A.  The only federal capital trial I have ever done is this

case.

Q.  Now, you have yourself brought 2255 petitions on behalf of

defendants; is that correct?

A.  Actually, I haven't.  I have never brought a 2255.  I have

done a number of 2254s, which involve state inmates, but I have

never -- to the best of my knowledge, I don't think I have ever

done a 2255.  I may have been local counsel with somebody in a

2255, but never litigated one.  No, I don't think so.

Q.  Let's talk about Mr. Fulks' case.  Do you remember when you

might have been appointed, approximately, to undertake

representing Mr. Fulks?

A.  No, not exactly.  I mean, it was pretty shortly there

afterwards as I think it became at least a strong possibility

that the government would seek the death penalty, Mr. Nettles

was appointed, Mr. Bill Nettles from the Federal Public Defender's Office in Florence as counsel, and I was asked by a lawyer I was then sharing space with, who was formerly my law partner, David Bruck, if I would be willing to accept the appointment as "learned counsel," quote-unquote, in Mr. Fulks' case.

Q. And, of course, you were appointed to represent Mr. Fulks?

A. Yes.

Q. Is it fair to say that throughout the entire process, Mr. Blume, that you were the lead counsel?

A. Yes, I think that's certainly fair to say.

Q. And with you as lead, you had Bill Nettles from the Florence Public Defender's Office?

A. That's true, yes.

Q. And who else was involved in the case representing Mr. Fulks?

A. Well, the lawyers or everyone? Now, the lawyers -- let me just answer for the lawyers and you can ask whatever you want. The lawyers were myself and Mr. Nettles, and then I also asked one of my colleagues at Cornell, Sheri Johnson, if she would be willing to assist in the representation. And then Keir Weyble, who was then an associate in my South Carolina office, he also had some involvement in the case.

His involvement was not -- he didn't actually participate in the trial except maybe a few spots and legal

arguments.  He was more the -- he was more the law guy, I guess is what I would say.

Q.  And the next question, was there a division of responsibilities amongst the trial team?

A.  Well, I mean, not initially.  I mean, initially we were just sort of trying to gather information and develop theories, prepare for trial.

Certainly as we got closer to trial and actually did it, yes.  I mean, we divided it up as far as who was going to take witnesses in that regard.  Or I made the assignments essentially.

Q.  Now, you were teaching at Cornell during this time period, correct?

A.  Yes, that's correct.

Q.  Which is in Ithaca, New York?

A.  Yes.

Q.  Was Ms. Johnson in Ithaca as well?

A.  Yes.

Q.  Mr. Nettles would be in Florence?

A.  Correct.

Q.  And then Keir here in Columbia?

A.  Correct.

Q.  As you undertook to represent Mr. Fulks, did a theory or theories develop in terms of the defense of the case?

A.  Well, yes.  I mean, the very early stages of course we

didn't have a theory, initial point, we were just trying to get information about the case.

As we began to do -- do more investigation and gather information and review the discovery, which was provided incrementally by the government at various times, and through discussions with Mr. Fulks, our primary theory on the crime was that Mr. Fulks was not the perpetrator, Mr. Fulks did not kill either Alice Donovan or Samantha Burns, but which was obviously going to be a part of the government's case.  So, that was our primary theory on that.

And then as information came in about Mr. Fulks' life and background, at least at some point, relatively early on, I developed a working hypothesis that Mr. Fulks suffered from fetal alcohol syndrome, or actually fetal alcohol -- something in the fetal alcohol spectrum disorder range.

And that was based upon, one, the history that we were able to develop of alcohol abuse in the home.  And two, the results on neuropsychological testing.  And three, based upon what I knew about Fetal Alcohol Spectrum Disorder, I thought it was an explanation for his sort of life history.

Q.  Fetal Alcohol Spectrum Disorder or FASD, have you ever used that as a defense or mitigator in any other death penalty cases?

A.  You know, I honestly don't know.  I know that -- this is the -- this certainly was the first case in which it was the

feature of the mitigation phase at a capital trial.  Whether it had ever been sort of a secondary issue in another case, I don't know.  This is certainly the first trial case in which this was -- that was the main focus of the presentation.

Q.  Have you ever written a paper on Fetal Alcohol Spectrum Disorder?

A.  No.

Q.  Now, you have lectured on FASD; is that correct?

A.  Yes.  I mean, I have given presentations about it.

Q.  Where did you -- where did you learn about Fetal Alcohol Spectrum Disorder?

A.  I learned about it just from going to conferences, talking to people.  I had read actually several books about it prior to this, and so that was I guess how I gained my knowledge, through a variety of -- I mean, whatever knowledge I had, through a variety of sort of informal sources.

Q.  You indicated that discovery came to you incrementally. Did you have a particular contact in the U.S. Attorney's Office that you dealt with?

A.  I think primarily -- I mean, it was Mr. Schools and Mr. Gasser.  As I recall it, Mr. Schools was the primary person who I would deal with on something like, you know, discovery or who would sign the letters.  I think he was maybe the first assistant even at the time, I don't recall.

Q.  Did you file the standard and routine discovery motions

that you would file in -- actually, in any federal criminal case?

A.  I mean, the record will reveal whether we did or not.  I would imagine that we did, I don't -- you know, I don't recall at this point.

Q.  What was your understanding of the government's policy in terms of -- did they represent to you that they had an open file policy?

A.  My understanding was they were providing us with everything and things were not being withheld.

Q.  Your understanding is that you got everything in the government's possession?

A.  Well, I mean, I'm -- everything from a documentary nature. I wasn't assuming that we were like getting Jencks Act material they didn't have to give us until later, although I think they may have made some representations about that, or that we were getting their confidential work product.

But from a document perspective, I didn't -- it was not my understanding that -- it was my understanding that we were being provided with what they had.

Q.  It was provided to you on disks?

A.  Yes, it was provided to us usually on a CD ROM.

Q.  Do you know if you or anyone from the trial team actually went to the U. S. Attorney's Office to physically review their files?

A.  I -- I don't know -- I do not have any recollection of myself doing that or of anyone else doing that.  You would have to ask Bill if he did it.  I'm confident I did not do that.

Q.  Is it fair to say that a primary or the primary theme throughout the representation of Mr. Fulks was that it was Branden Basham --

MR. DALEY:  Your Honor, objection.  At this point he's just leading him a whole lot.  I'm willing to --

THE COURT:  Well, that's one thing I should have straightened out at the beginning.  Is this a hostile witness or not a hostile witness?

MR. DALEY:  He doesn't sound very hostile to me, Your Honor.

THE COURT:  Well, so far he doesn't, but --

MR. ASHMORE:  No, sir, I can't characterize him at this moment as a hostile witness.

THE COURT:  Well, then refrain from asking leading questions.

MR. ASHMORE:  Yes, sir, Your Honor.

THE COURT:  All right, sustain the objection.

MR. ASHMORE:  Yes, sir.

BY MR. ASHMORE:

Q.  What was your primary theme, Mr. Blume, in terms of your representation of Chad Fulks?

A.  By the time at trial?

Q.  Yes.

A.  Our primary emphasis at trial, I mean, looking backwards, I mean, what we put on at trial was to try and emphasize the fact through cross-examination and witnesses that Mr. Basham was the actual killer and not Mr. Fulks.

That Mr. Fulks was intellectually challenged and was slow, that he had an abusive -- really tragic, abusive background, raised in an environment that I don't think anyone would want anyone to be raised in, and that his brain was damaged by his mother's prenatal abuse of alcohol, and it just had permanent consequences for his -- how he turned out in life.

Q.  Did the government ever provide you any evidence that Branden Basham was the actual killer of Alice Donovan?

A.  No.  I mean, the only -- there was this statement that we were made aware of, which we attempted to admit at trial, which went to the effect of, "I couldn't even kill a deer and now I've --"

And we wanted to admit that as a statement against penal interest, because in our view the logical inference of that was, you know, "Now I've --" after "I couldn't even kill a deer" was that "and now I have killed someone."

And the government objected to that I think on the basis of ambiguity, that the statement was ambiguous, and the judge sustained the objection.

Q.  You are aware that Mr. Fulks gave a statement to the FBI?

A.  Yes.  I was present when he gave the statement to the -- it was actually the FBI, and there was an agent from Conway, I believe, a Conway police officer present.

Q.  We call that an FBI 302?

A.  Correct.

Q.  Can you talk me through the process in making the decision for Mr. Fulks to submit to a 302 statement?

A.  Certainly.  I had spoken with Mr. Fulks on a number of occasions.  He told in my mind a consistent story, I mean, more or less consistent story about what had happened.

        Personally, I believed him.  I believe he did not kill -- I still believe him, that he did not kill Alice Donovan or Samantha Burns.  I think Chad is a lot of things, but I just don't make him as a killer.  And so -- but I -- so I felt like, okay, he can tell a pretty good story, I think it might help to have him talk to the government.

        At that point we had not made any progress in plea negotiations.  We had attempted -- we made several attempts not to have Mr. Fulks -- I mean, to arrange for the government to withdraw death unsuccessfully.

        And I felt like Mr. Fulks could probably tell the story to the police, he could get out his version of the events, which was that he was not the actual killer, and then the government would hopefully admit this at trial as

Mr. Fulks' version of the offense.

And then I also hoped through -- maybe if we could help use this to find the body, if we could find the body, with the combination of giving the statement and finding the body, with the polygraph that he was able to pass, the numerous polygraphs might result in the government withdrawing death.

So, on balance, you know, although we talked about this a lot, and there was some trepidation -- there's always, of course, a lot of trepidation about having your client go and talk to the police -- that I felt like it was in Mr. Fulks' best interest to go and talk to the government.

Q.  His FBI 302 that he gave to the government, was it consistent with your conversations with Mr. Fulks?

A.  Yes.  I mean, you know, maybe there's a minor detail or two, but the general gist of it was what he had told us pretty consistently in our conversations.

Q.  Did you ask the government for a proffer agreement prior to Mr. Fulks submitting to the FBI interview?

A.  No.

Q.  Did you know their position on whether or not a proffer would be offered to your client?

A.  You know, I don't even know if we discussed it.  I didn't want a proffer.  You know, a proffer -- we wanted the statement to be used.

I mean, the purpose of having him give the

statement -- we wanted to do two things:  Number one, is have him show some acceptance of responsibility by not asking for anything, by going to the government and giving a statement, which effectively meant he was going to be convicted of these crimes.

So, we wanted it to demonstrate, A, acceptance of responsibility, B, hopefully some true indicia of remorse. Because I believed then and I believe now he was remorseful for his responsibility in this.

And so a proffer in my mind would have been self-defeating.  I wanted the statement to come in.  I mean, my main concern wasn't that the statement would come in, but the government might not use it on the basis of they thought it might be self-serving and then -- I didn't know.

You know, I did know about a proffer, but I didn't -- you know, right or wrong, it's not my decision to say whether this is the right decision or the wrong decision, but my decision was that I didn't want a proffer and I didn't think it was in Mr. Fulks' interest to ask for one.

Q.  Let me show you Petitioner's Exhibit P 7.

THE COURT:  Are you going to be putting these on the screen so that I don't need to look at my notebook?

MR. ASHMORE:  Yes, sir, Your Honor.  We just now conquered the technology.

BY MR. ASHMORE:

Q.  You see that, Mr. Blume?

A.  Yes.

Q.  I will represent to you that this is P 7.  This is -- well, tell the court what this is.

A.  Well, this appears to me to be page 1 of the 302 prepared by Agent Jeff Long, who was the primary -- he's the lead agent on this case.  That was prepared subsequent to Mr. Fulks' -- whatever you want to call it -- interrogation, communication with law enforcement.

MR. ASHMORE:  I'm going to beg the court's indulgence, I'm going to try and enlarge this just a bit.

BY MR. ASHMORE:

Q.  Let me direct your attention here to the 302, Mr. Blume, it indicates Fulks assumed that Basham was going to steal an unoccupied vehicle?

A.  Uh-huh.

Q.  Is that what Fulks had indicated to you previously?

A.  Yes, and subsequently.  I mean, what Chad said -- told me, and I think what he told them, is that they knew they had to get rid of the truck, they had -- this was subsequent to the incident at Carl Jordan's house, and they were in a stolen truck and they needed to get rid of that.

And so they went to the Wal-Mart parking lot.  And that Mr. Basham got out of the car while it was still moving, abducted -- took the BMW, and they met at the other side of the

parking lot.  So, Chad said that he didn't know he was going to snatch a car with someone in it.

And at least looking at the video, it does appear as if Basham gets out while it's moving, but I -- you can't -- I couldn't sort of tell that.  So, that -- I'm sorry, that's a long way of saying yes, that's consistent with what he had told me previously.

Q.  Did there come a point in time when the decision was made for Mr. Fulks to plead guilty?

A.  Yes.

Q.  And can you walk us through that thought process?

A.  Well, in many respects it follows -- I mean, "inexorably" is probably not the right word, but it follows, at least in my mind, it followed from the statement, that the statement -- my understanding was essentially an admission of guilt.

The purpose of giving the statement was to not only get Chad's version out there, but to demonstrate some acceptance of responsibility and expression of remorse.  And that those might be the factors which persuade the government to drop death, or it could be used in mitigation of punishment at the sentencing phase of Mr. Fulks' trial.

I believed that he would be found guilty, I didn't see any credible defense or issue which he would be found not guilty of the offenses.  And so given that, I felt like that it was in Mr. Fulks' best interest to plead guilty.

Q.  Did the judge, Judge Anderson, express any reservations about accepting Mr. Fulks' plea?

A.  Yes.  I can honestly say I have never had more difficulty pleading a client guilty.

Q.  Can you elaborate on that, Mr. Blume?

A.  Well, I mean, you know, the government and Mr. Fulks' team were apparently in agreement that Mr. Fulks -- that the 302 met the criteria or essentially established the element of guilt. But when we attempted to do the plea, Judge Anderson, as was discussed this morning, he expressed reservations about that.

        And we -- as I recall, there was a recess.  I recall it being one day, but apparently it was longer than that, maybe -- but so -- and then we prepared memoranda, and then we came back into court.  And eventually, after a fairly lengthy colloquy, I think back and forth between us and the government, the judge accepted the plea.

Q.  Just to refresh everyone's recollection, I'm pulling page 67 from Petitioner's Exhibit P 70, and I want to draw your attention to this paragraph here.  And tell me about -- if you could take a brief moment to read that paragraph, does that refresh your recollection as to what the issue was at the time?

A.  Yes.  I mean -- I don't know that my recollection was inconsistent with this, but it's -- I mean, the judge had reservations about whether the 302 contained enough -- sufficient admissions to constitute a guilty plea.  I mean, I

think it speaks for itself.

Q.  And then the next page, page 68 of the same colloquy --

MR. DALEY:  Your Honor, I mean, I think Mr. Blume needs to first testify to what he remembers, and then if we need to refresh his recollection, I think that would be fine. But I don't believe this is the most appropriate way to be presenting this testimony.

MR. ASHMORE:  I think he has done that, Judge, he has already said that they were --

THE COURT:  I think he has.

MR. DALEY:  Okay.

THE COURT:  Overruled.  Go ahead.

BY MR. ASHMORE:

Q.  Again, this paragraph here, Judge Anderson was concerned about what Mr. Blume --

A.  Again, I think his primary concern was whether the -- Mr. Fulks' admissions in the 302 -- or if you want to say it conversely, you can -- whether his lack of admissions, that he knew -- that he knew that Mr. Basham was going to abduct a woman was sufficient to satisfy liability for these offenses under the Pinkerton doctrine.

Q.  Did anyone on the trial team disagree with the decision for Mr. Fulks to plead guilty?

A.  I don't think that anyone disagreed with the decision to plead guilty.  There was more, I think, disagreement about

whether he should give the statement initially.  And again, that ultimately was my decision that he should do that.

I think as for the guilty plea, that everyone more or less agreed.  I mean, you can ask them, but my recollection is that everyone more or less agreed that after he gave the statement, that he should probably plead guilty.

Q.  And did you have meaningful conversations with Mr. Fulks about pleading guilty?

A.  Well, you know, meaningful is a question I guess that poets have been trying to answer for generations.  I discussed this with Mr. Fulks.  Obviously, as you can imagine, he certainly had some reservations about it.

I was essentially asking him to go into court and plead guilty to a crime which would under the best case scenario result in incarceration for the remainder of his natural life.  And so, you know, that's never an easy conversation to have with a client.

But I felt like, you know, Chad and I had talked about it, we talked about it on a number of occasions before he entered the plea, and you know, although it was not something clearly that he was jumping up and down to do, he eventually agreed with me that it was in his best interest to do it.

Q.  Did you ever talk to him about the intent element of the car-jacking statute?

A.  You know, I think the answer to that is, you know -- may I

have mentioned it?  Yes.  Did I discuss this with him in detail?  I doubt it.  I wouldn't have really felt like -- you know, Chad had an IQ in the high 70s, or just above the range for mental retardation.

And my general experiences with Chad were that he actually in many respects kind of appeared to be smarter than he actually was, because his verbal skills were sort of higher than his problem solving and other skills.

So, I don't remember sort of marching down each element, you know, of the offense with him.  I don't remember discussing this, going into this issue where there was this whole thing about, you know, Pinkerton, which is a federal sort of aiding and abetting doctrine, and explaining it to him.

I just think what I told him was, "You know, Chad, they are going to find you guilty.  And even if they accept everything you say is true in your 302, you are guilty of the charged offenses.  And I think the best chance to try and save your life is for you to plead guilty."  That was, I think, in various forms, was more the discussion that I had with him.

Q.  During the plea, Judge Anderson called for a recess.  He took a recess, correct?

A.  Yes.

Q.  A day or two, correct?

A.  Yes.

Q.  Did you speak with Mr. Fulks during the recess concerning

the hesitation of the judge to take the plea?

A.  You know, I may have talked with him briefly outside the courthouse -- room afterwards.  I mean, he may have expressed some questions about, you know, what happened.  And a lot of times he wouldn't fully kind of understand what was going on, you know, in court.  So, you know, we may have talked about it afterwards.

I didn't consider that to be the primary obstacle to getting the plea accepted.  To me, the primary obstacle to getting the plea accepted was to convince the court that the admissions in the 302 were sufficient to satisfy legal responsibility under the Pinkerton doctrine.

So, I think our primary effort in that doctrine was we went back, we wrote a memorandum, did some additional research, and filed that in preparation of resuming the plea hearing.

Q.  Did Chad Fulks ever admit to you that he intended to violate the car-jacking statute?

A.  Well, I mean -- I'm not trying to be evasive.  I wouldn't have asked it to him in that way.  Let me answer it this way, and then if you have further questions, you can ask me.  He never said anything more incriminating than what you see in that 302.

In other words, he never admitted having any knowledge beyond the fact that they were going to steal a car.

He never admitted knowing that Basham was going to steal the car with Ms. Donovan in it.

Q.  What was Mr. Fulks' IQ?

A.  His IQ -- he was tested, as I recall, three different times in connection with -- through these evaluations.  He was tested by Dr. Venn, who I believe got an IQ of 78 or 79.  Dr. Hilkey, who got either -- one got the 78 and one got the 79, I don't recall which one.

These were both, as I recall, on the WIAS-III, the Western Intelligence Adult Scales Revised.  And then he was also tested at Butner during the government's mental health examination.

There he was given a different IQ test.  To the best of my recollection, I believe it was a Kaufmann.  But it's a similar instrument, it measures IQ in a similar way, and Mr. Fulks' IQ there was also in the high 70s.

Q.  There was testimony at trial concerning his IQ?

A.  Yes.

Q.  Do you recall what that testimony might have been?

A.  It was that he had an IQ in the high 70s.

MR. DALEY:  Your Honor, I'm going to object at this time.  If they are heading toward some argument that he somehow was not capable of pleading guilty, then that was not raised in the petition and it is outside the scope of this hearing.

THE COURT:  I think I agree.  Is that where you are

going, Mr. Ashmore?

MR. ASHMORE:  No, sir, Your Honor, I was just finishing up that line of questioning.

THE COURT:  All right, go ahead.  let me just say, we need to recess at 11 o'clock sharp.  I have got a conference call just giving some instructions to some attorneys on additional briefing.  And normally I break for 10 minutes, but let's say 15 just to be safe.

It ought to be a short call, but I have got Richard Harpootlian on one side and an out-of-state lawyer on the other side, and I'm scared that 10 minutes might not do it.

MR. ASHMORE:  Good luck.

THE COURT:  But I did promise them we would do it 11 o'clock sharp.

MR. ASHMORE:  Yes, sir.  Happy to break now or --

THE COURT:  No, let's go right up until 11 o'clock sharp.

MR. ASHMORE:  Yes, sir.

BY MR. ASHMORE:

Q.  Let me show you what is marked as Government's Exhibit 6, ask you if you can identify this cover page?

A.  Yes, this is the cover page of a report which was prepared for the -- let's just say the trial team, for simplicity's sake, by Jeff Bloom -- no relation -- about the focus group report -- a report on the focus group which we conducted in

Columbia.

Q.   The focus group was conducted before the plea was entered; is that correct?

A.   Yes.

Q.   Let me show you what's marked as --

THE CLERK:  What exhibit number was this right here?

MR. ASHMORE:  I'm sorry.  I believe it is Government's Exhibit 6.

THE CLERK:  Okay.

BY MR. ASHMORE:

Q.   Let me show you what is the second page of this exhibit, and I'm looking here.  What were some of the concerns of the focus group?

A.   I'm not sure I understand.  You mean, what did I deduce from this or what does this reveal about what the focus group said?

Q.   I guess what you deduced from their findings?

A.   Well, what -- I mean, what I drew from this was that there was some salience to our primary theory, which was that Mr. Fulks didn't actually kill anyone, and so that was our theory going in.

I think this helped confirm, at least with, you know, a number of jurors -- you know, it's hard to convince 12 people of anything, or in this case 24 -- but that Chad did not have -- didn't kill anyone, and that there wasn't strong

evidence of intent to kill.

Q.  And one of the quotes is actually, "We still don't know who did what;" is that correct?

A.  "Who, yeah, pulled the trigger in this case.  And you can't sentence him to death if he didn't do it."

THE COURT:  All right, it's 11:00 o'clock.

MR. ASHMORE:  Yes, sir.

THE COURT:  Let's go ahead and take a 15-minute recess.

MR. ASHMORE:  Thank you, Your Honor.

(Short recess)

THE COURT:  Ready to proceed?

MR. ASHMORE:  Yes, sir, Your Honor.  May it please the Court.

BY MR. ASHMORE:

Q.  Moving on, Mr. Blume, I have put on the screen P-66, the defendant's memorandum of law regarding the propriety of the guilty plea; do you remember this particular memorandum?

A.  I do, but this screen is not working here.

Q.  Give us one moment.

A.  Mine is blank.  I didn't touch anything, so it's not me. Although it normally could have been, but not in this case, it's not.

MR. ASHMORE:  Judge, we can hand the witness a hard copy.

THE COURT:  Just have to hand the witness a hard copy.

While we were on the break let me ask, Mr. Fulks, have you been able to see and hear the testimony so far?

THE DEFENDANT:  Excuse me?

THE COURT:  Have you been able to see the witness and hear the testimony so far this morning?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Please continue.

BY MR. ASHMORE:

Q.  Now, Mr. Blume, you see Exhibit P 66, correct?

A.  Yes.

Q.  And that's the memo filed in support of the guilty plea, correct?

A.  Yes.

Q.  Can you tell me what you recollect about that?  Did you author this memo?

A.  I -- probably not.  I mean, most likely this would have been something that Mr. Weyble wrote and that I did the final edit and -- I think actually Mr. Weyble signed this, to the best of my recollection.  It would have been something that we talked about and did, but I think he had the primary drafting responsibility.

Q.  The next exhibit is P 67, and this would be the government's memorandum; do you recognize this?

A.  I mean, this -- I mean, I haven't like gone through and done any -- a line-by-line comparison, but this appears to me to be the memorandum which was filed by the government during the same time frame, after the initial attempt to plead Mr. Fulks guilty and before the plea was accepted, in an effort to convince Judge Anderson to accept the plea.

Q.  Let me turn your attention to page 5 of this exhibit and this particular line.  The government actually admitted that the defendant denied the intent element in this memorandum; is that correct?

A.  Yes.  I mean, this indicates the government -- yes, "The government's evidence strongly contradicts the defendant's denial of the intent element."

Q.  And then on page 8 of this same document, this line, "The only element of the offense Fulks failed expressly to admit was that he intended to cause death or serious bodily harm."

Again, the government admits that in their memorandum, correct?

A.  Yes, that's what it says.

Q.  Did there come a time when you began to reassess whether or not a guilty plea should be entered?

A.  No.

Q.  Who led your mitigation investigation?

A.  The -- well, there were two primary mitigation investigators.  There was Drucy Glass and Tracey Dean, were the

two primary mitigation investigators.  Then the person who actually did most of the family history testimony at trial was Arlene Andrews.

Q.  And for the record who is Drucy Glass?

A.  Drucy Glass is my wife.

Q.  Did they all begin -- those individuals -- well, when did they begin work on the case?

A.  Oh, pretty shortly after I was appointed we put together -- we began to try and assemble a team and obtain funding for the various people on the team.  So, I asked Ms. Glass, with whom I've worked with on other cases, if she would be willing to assist in this.

I don't know -- and she said yes, but I also felt like there was sufficient -- there were a large number of witnesses and a large number of places, and so I wanted someone else.  And Tracey Dean was a mitigation specialist at what was then called the Center for Capital Litigation.  And so I also asked her if she would be willing to assist in this, and so we obtained funding for both.

Q.  Can you describe for the court how the mitigation investigation was conducted?

A.  Well, the mitigation investigation primarily started with a series of meetings with the client, some of which I would have been present for, some of which I wouldn't, talking to Chad about his life and background, who his mother was, who his

father was, what schools he went to, who his siblings were, people with whom he had various relationships with, and then it normally just sort of, you know, builds from there.

And then you go out and collect records and documents, such as his school records, employment records, prior -- in this case there would have been prior incarceration records.

So, you try and gather all the information that you can about both the family and the siblings. And in this case there were two primary, sort of, reference points, one was in West Virginia, which is where Mr. Fulks spent most of his life, actually West Virginia and Ohio. It was right there on the border. That, and then there were -- many of his family members were in Indiana and Michigan, sort of the Indiana and Michigan line.

And so documents were gathered, people were interviewed. Some of the interviews done by Ms. Glass, some of the interviews were done by Ms. Dean. A number of them were done by me. I interviewed a number of the people myself, and as did Professor Johnson and I'm sure Mr. Nettles. But the primary people whose responsibility this was, was Ms. Glass and Ms. Dean.

Q. You mentioned Ohio, West Virginia, the State of North Carolina, was there any mitigation or investigation done in North Carolina?

A.  I don't recall any mitigation investigation.  There was some crime investigation, because at some point during the period in which Ms. Donovan was abducted they went into North Carolina, just across the sort of South Carolina-North Carolina line.  Maybe my memory is faulty, but I don't remember any mitigation -- any life-history mitigation surrounding North Carolina.

Q.  Do you know who Chris Baker is or was?  That name ring a bell?

A.  The name did not ring a bell.  You showed me a document which had Mr. Baker's name on it.  Prior to that it did not -- I mean, it didn't -- when you just first mentioned Chris Baker it had no meaning to me.

Q.  And do you now know who Chris Baker might be?

A.  Well, based upon the document that you showed me, Mr. Baker is someone who was incarcerated with Mr. Fulks and Mr. Basham, and at least according to a statement by another individual --

MR. DALEY:  Objection, Your Honor.  We are going into hearsay.  I'm not sure how it is relevant to this proceeding either.

THE COURT:  I'm not sure where you are going either. I think it sounds like you are headed towards hearsay, probably.

MR. ASHMORE:  Yes, sir.  Let me take one more stab at it, if I could, please.

BY MR. ASHMORE:

Q.  Chris Baker, did you interview Chris Baker?

A.  To the best of my -- I personally -- I'm sure I never interviewed Mr. Baker.  I have never seen -- to the best of my recollection there is no interview in our file with Mr. Baker, so I would assume that we did not interview him.

Q.  Based on your understanding, what relevant testimony might had Mr. Baker --

MR. DALEY:  Objection, Your Honor.  It calls for hearsay.

THE COURT:  This is an issue I'm not familiar with.  Is this somebody who would have given exculpatory testimony?  A fellow inmate, a fellow prisoner?

MR. ASHMORE:  No, sir, Your Honor.  It deals with the actual escape from the Kentucky jail.  It deals primarily with Mr. Blume's theme of who was the leader, who was the follower.  We take the position that it was Mr. Basham that actually first planned and conducted the escape --

THE COURT:  And Mr. Baker had some information about that?

MR. ASHMORE:  Yes, sir, Your Honor.  I think the point has been made, Your Honor.  I'm happy to move on.

THE COURT:  All right.  Let's move on.

BY MR. ASHMORE:

Q.  Did you find during your investigation, or actually

throughout this entire process, Mr. Blume, any evidence of sexual abuse of Chad Fulks?

A.  No.  I mean, I always -- I strongly believed that Mr. Fulks had been sexually abused and I believe that primarily because of the circumstances under which he was raised -- he was raised would -- were ripe for the potential for sexual abuse.

The evidence which we discovered and presented was that Mr. Fulks' parents were both severe alcoholics, that there were frequently parties in which numerous adults would be there and everyone would be grossly intoxicated, is probably an understatement.  The father had at least -- I mean, had a number of different pornographic magazines and books and he was known to have shown these to other children in the area.

So, I did -- I believed that he had been, and it was certainly something that we wanted to establish, it was something that several of us quizzed Mr. Fulks about in detail, and we were never able to uncover any evidence to that effect.

Q.  You talked to witnesses, family members about sexual abuse?

A.  Yes.  I mean, it's -- I mean, I don't want to overstate it.  I mean, it's not as if you could go in to his mother and father and go, "You know, look, we just want to know, did you ever have sex with your son?"  So, you know, the question is, did I put that question to them directly or anyone else on the team, I think the honest answer is no.

We did attempt to talk to Chad about it and --

several people did -- and we asked -- and we felt like we

weren't getting anywhere, so one of the -- we asked Arlene

Andrews, who has more expertise in this area than we do, if she

could try and talk to him about it to try and, you know, see if

we can facilitate it.

It doesn't, you know -- like I said, I believed it

then, I'm not surprised if there is evidence of that now.  It

would have almost been astonishing to me if he wasn't sexually

abused.  But we were never able to get that.

Q.  Exhibit P 46, can you identify this for the record?

A.  Yes, this is a memorandum which was done -- it was to me

and Professor Johnson by Carrie Davenport on fetal alcohol

spectrum disorders.  Ms. Davenport was a student in our -- in

the clinic when she prepared this.

Q.  Turn your attention to page 26 of this report and in her

conclusion she indicates that Chad must be tentatively

diagnosed with an FASD; is that correct?

A.  That's her conclusion, yes.

Q.  At the time this was written was there any expert testimony

that had concluded whether he did or did not suffer from fetal

alcohol spectrum disorder?

A.  You know, I don't remember truthfully where this November

2003 date falls with the evaluation by Dr. Bachman, Dr. Gur,

and Dr. Bookstein, so I don't know if at this point they had

seen him or not, or whether at this point this was a working

hypothesis in what we were going towards.  So, honestly, I don't know the answer to that, whether at this particular point if somebody diagnosed him with it.

Q.  And fetal alcohol spectrum disorder, obviously the key fact there is that you have to establish that the mother drank alcohol during the pregnancy?

A.  Maternal ingestion of alcohol, yes.

Q.  Were you ever able to establish that?

A.  We were able to establish that to my satisfaction through different witnesses.  His mother would never admit it, but I felt like the other -- for -- I did not believe her, you know, in that -- when she said that.  But there were enough collateral witnesses who confirmed not only that she was a chronic alcoholic, it would have been astonishing if she did not drink.  I mean, it would have been like the only nine-month period in her life during that period in which, you know, she was not snookered most of the time.

But given that and the fact that her own brother said that she drank throughout this period, as well as you had basically the maternal uncle and actually a maternal sister, and people on the other side, so I was confident that there was no question in my mind that his mother drank during pregnancy.

Q.  Can you run through the list of witnesses that would have established that Chad Fulks' mother did drink during her pregnancy?

A. You mean the ones that we did call or could have called?

Q. Let's say could have called.

A. The main ones that -- that I knew of that could nail it down to in that time frame were -- there was a brother and sister, his mother's brother and sister who were present a great deal then. They are the main ones that I remember. That would have been Kevin Holcolm and the sister's name actually escapes me. And they talked about it and how they -- she was basically drinking throughout that period.

There was evidence that she attempted to sort of conceal the pregnancy. Chad was at one point called the tumor baby because she acted like she had a tumor instead of the fact that she was pregnant. That was sort of the family lore.

Whether some -- and then as I recall there was also Mark Fulks, who was an uncle, and I think he was actually present in and out of the home throughout this period as well.

Q. This is Exhibit P 45, Mr. Blume, a memo to you from Matthew Jury. Who is Matthew Jury?

A. Matthew Jury was a British lawyer who was working as a -- doing -- I don't remember exactly how long he was here, one- or two-year internship at the Center for Capital Litigation, again which is -- was a non-profit corporation that represented death row inmates, and Mr. Jury did some work, not a lot, but he did some work on this case. So obviously, he prepared this memo and he was present during jury selection.

Q.  Next is Petitioner's P 47, a memo to you from Keith Palumbo.  Can you tell us who he might be?

A.  Yes.  Keith -- Keith Palumbo at the time that he wrote this was also a Cornell student.  He's now an attorney at a large firm in New York City.

Q.  So, he was a Cornell law student at the time this was authored?

A.  Yes, he would have been.

Q.  And you had a number of law students assisting you in this case; is that correct?

A.  Yes.

Q.  Both on legal issues and on mitigation issues?

A.  Probably.  I mean, there were -- they did legal research and writing, as you see -- or, I guess this would be non -- research and writing.  I don't know if this would qualify as legal research, some of it might have been case-wise.

We used them to assist in the investigation, and so some of that might have been on the mitigation front, some of it also could have been what I would call a fact witness, the witness who we believe had information about some incident germane or relevant to the case.

Q.  There are handwritten notes on this exhibit, Mr. Blume, do you see those?

A.  Yes.

Q.  Are those yours -- is that your handwriting?  Do you

recognize that?

A.  Yes, that is my handwriting.

Q.  Can you read to us all what those notes might say?

A.  The one at the top, "Just go ahead and call Bachman and get him in."  And then one at the bottom says, "Is there an expert at USC or, colon, MUSC on FAS/FAE," which would be fetal alcohol syndrome and fetal alcohol effect.

Q.  Let's take the top one, "call Bachman and get him in," explain that to us.

A.  Yes.  David Bachman is a neurologist at the Medical University of South Carolina.  I have used him on several cases.  I think he is a very competent neurologist and so I wanted him to evaluate Mr. Fulks to see if he could find evidence of fetal alcohol syndrome during the neurological evaluation.

And then the second one is a note.  I'm asking myself a question, is there someone at USC or MUSC that has expertise in this area?

Q.  This is dated 5-9-2003, correct?

A.  Yes.  Yes, I see.  That would be correct, sure.

Q.  And in relation to that date, did you -- did you make a decision at any point -- when did you make the decision to pursue fetal alcohol spectrum disorder as a mitigating factor?

A.  Well, probably by this time I was -- you know, I would say at this time I was fairly well -- I was convinced, you know,

right or wrong, that this was most likely the explanation for much of Chad's lifetime behavior.

So, we had been doing multiple research memos, going through the records trying to cull relevant facts.  So, I think it was the combination of the neuropsychological testing, which had been done, which indicated not only the low IQ but brain damage.  I think he -- he scored in the mild to -- in the moderate range on Halstead-Reitan, which is an impairment index for a neurological dysfunction.

So, I felt we had evidence, in my mind, of maternal ingestion of alcohol, raised by an alcoholic mother.  Two, we had psychological testing of bad brain.  So, I was at -- I was on the train, I guess, at that point, and so a lot of this was to try and develop evidence, get the diagnostic criteria to make sure that we -- when we were investigating and talking to witnesses we sort of knew what we are looking for, so we can try to put together the most persuasive case possible for this.  And then, I guess, at this point I hadn't -- clear, I did not have an expert at this time but I wanted to take the next step and bring David Bachman in.

Q.  Show you next Government's 14, and in speaking with you this morning, Mr. Blume, is that your handwriting?  Are those your notes?

A.  That is not my handwriting, so these are not my notes.

Q.  Do you suspect -- do you know whose notes those may be?

A.  I think this is Mr. Nettles' handwriting, but you can confirm this with him.  But it's not -- I know it's not my handwriting, I know it's not Ms. Glass's handwriting, and I don't think that it's Ms. Dean's, so I would guess it is Mr. Nettles'.

Q.  So, I'm not going to ask you about the notes, but who is Margaret Melikian?

A.  Well, not to quibble, but I'm pretty sure it's "Melikian." But Margaret Melikian is a psychiatrist at the Medical University of South Carolina.  I think at that point she might have been head of their forensic psychiatric unit.

Q.  Have you worked with her on other cases?

A.  Yes, I have.

Q.  Can you give us an idea of your work relationship with Ms. Melikian over the years?

A.  I can't tell you in how many cases that I exactly -- you know, that I have used her in.  I found her to be a very competent psychiatrist, someone who I think she, you know, makes a good witness, and so I have used her in other cases both, I guess, before and after this.

Q.  Government's 13 is an e-mail from you to Margaret Melikian; is that fair to say?

A.  Yes, that is fair to say.

Q.  And you wanted to lay out why Chad has fetal alcohol spectrum disorder, correct?

A.   Correct.

Q.   What is the date of that, Mr. Blume?

A.   That is December of 2003.

Q.   Do you know whether or not she ever found that Chad suffered from fetal alcohol spectrum disorder?

A.   Yes, I believe so.

Q.   Let me show you what's marked as Government's 17 and ask you if you can identify this document?

A.   Well, what this appears to be is -- I believe Mr. Nettles would have prepared this, and it has to do with the request approval to expend funds for services, so that the funding -- most of the funding was done through -- from Mr. Nettles through his boss, the federal defender, Mr. Small, and so he had -- he would basically go to him with the various budget and budget requests.

So, I assume this is what his list -- his internal working document preparing what he was asking Mr. Small for.

Q.   So, you did not prepare this particular document?

A.   No.

Q.   Well, there is a notation on here that Mark --

MR. DALEY:  Objection, Your Honor.  We are about to have testimony about some writing, a document that Mr. Blume had no involvement in.

THE COURT:  Where are you going with this?  Is it something that can't be stipulated?

MR. ASHMORE:  Your Honor, I wanted to ask him about what he might know, and he might know nothing.  But as to No. 5 it indicates "Margaret Melikian, parens, replaces Dr. Halleck."  I would like to know if he has any information related to that notation.

THE COURT:  I think it's a fair --

MR. DALEY:  All right.

THE COURT:  Overruled.

THE WITNESS:  You know, I have been asked about this by everybody on numerous occasions and, you know, with the caveat that this was years ago, my recollection is not that I asked Margaret to come into the case for the purpose of taking Dr. Halleck's place in this.  So, I don't know if this has to do with -- this is funding.

We funded the cases from three primary sources.  The overwhelming amount of the money was funded through the Federal Defender's Office, so that was the big chunk.  But then some of it was funded through our project at Cornell and then some of it was funded out of my own pocket.

And so I don't know if this notes funding, you know, or not, I honestly can't say.  Mr. Nettles would have to answer that.  But we did have Dr. Melikian, we did have Dr. Halleck. It is not my recollection that I brought Melikian into the case for the purpose of replacing Dr. Halleck.

Q.  Did any of your -- well, strike that.

Did all of your experts find that Chad suffered from fetal alcohol spectrum disorder?

A.  I mean, to the best of my recollection there was no one who rejected that as a diagnosis.

Q.  How many experts did you hire on this case?

A.  In the mental health category --

Q.  Yes.

A.  -- Not sort of related to other things?  To the -- again, the file would probably be a better indicator of this than me. To the best of my recollection we hired Dr. Venn, Dr. Bachman, Dr. Ruben Gur from the University of Pennsylvania, Dr. Fred Bookstein, who at that point was at the University of Michigan, Dr. Jim Evans, who is a neuropsychologist in Columbia at that time.  I don't think he moved to Greenville then.

Then Dr. Margaret Melikian from the Medical University of South Carolina, Dr. Seymour Halleck from the University of North Carolina, and then Dr. Jim Hilkey, who was a psychologist from North Carolina were the -- I think the -- and then Dr. Arlene Andrews.

I wouldn't really know that she's a mental health -- well, I guess she is a mental professional.  She's a doctor of social work.  Dr. Christos Davatzikos testified -- I didn't actually -- Dr. Christos Davatzikos, D-a-v-a-t-z-i-k-o-s, testified, he actually was not someone that we hired.  He worked in Dr. Gur's lab and did the quantitative brain imaging,

so he testified at trial as well.  I think that's it, but I might be wrong.

Q.  Did you ask your experts to focus on fetal alcohol spectrum disorder?

A.  Well, certainly.  I think I can break them up into categories and maybe answer it better.  I mean, Dr. Bookstein, his expertise was fetal alcohol spectrum disorder -- fetal alcohol disorder and doing certain type of brain imaging.  So, the only reason to have him involved was to confirm -- to help confirm the issue of fetal alcohol syndrome.  He had no sort of, you know, relevance to the case other than that.

Dr. Bachman actually early on, I wanted him just to do a neurological evaluation.  Dr. Venn I gave no instructions other than do a psychological battery of Mr. Fulks.  With the -- Dr. Melikian, Dr. Halleck, and Dr. Hilkey, I'm sure that I probably, you know, told them that I believed that Mr. Fulks likely had fetal alcohol syndrome, that was my opinion.

So, it was certainly something that I wanted them to pursue with him -- I mean, to try and figure out if they could be helpful with.  I -- so, I guess that answers your question.

Q.  Did you meet with Dr. Hilkey?

A.  Yes.

Q.  Let me show you what's marked as Petitioner's 68.  Are these your notes or do you know?

A.  That -- I think these are Mr. Nettles' notes.  They would

have been taking notes at a meeting which I was present at with
Dr. Hilkey.  He would not have met with Dr. Hilkey without me
being present.

MR. DALEY:  Excuse me, Your Honor.  What is this
exhibit -- I'm sorry -- Mr. Ashmore?

MR. ASHMORE:  P 68.

BY MR. ASHMORE:

Q.  Do you know how much time Dr. Hilkey spent with Chad Fulks?

A.  I don't remember at this time.

Q.  The Donna Ward testimony, can you refresh everyone's
recollection about how that came to be and what possible
problems that might have caused for you?

A.  You mean how the government developed this?

Q.  Sure.

A.  Well, Ms. Ward -- Mr. Fulks and Mr. Basham, with the
assistance of Ms. Severance and Ms. Roddy, I think had broken
into a number of cars along the way, sort of in the -- in the
Ohio area.  And so in the van -- I think as it was recovered,
the van that they were in for a substantial period of time,
traveling, there were a number of different I.D.s found from
different people.

And one of those was of a young female by the name of
Amy Ward, and so they had stolen, I think, her purse.  I think
they had broken into an SUV driven by Ms. Ward's boyfriend.
So -- I might have that wrong, but that's my recollection of

it.

But so after Mr. Fulks and Mr. Basham separated -- well, I guess I'm jumping around here.  Ms. Ward's mother, Amy -- was it Donna Ward? -- I guess Donna Ward relayed a conversation to Agent Bruning, I think, and Mr. Gasser, that came back to me that at some point in time she had gotten a call from someone that she didn't know, telling her that her daughter had applied for a job.  I think it was maybe at a Sears or something at a mall in Kentucky.  And that she was to report in for the interview at, I think, at some unusual time, maybe 9 o'clock, 10 o'clock at night.

And so she talked to her daughter.  She never applied for a job and also it made no intuitive sense to her either, that somehow would be requested to come to a job interview at that point in time.

So, that conversation was relayed to Agent Bruning. It previously actually had been told to Mr. Skidmore, who is an investigator working for us, and I -- truthfully I didn't think anything about it.  It just seemed like some kind of weird, freaky coincidence.

And Mr. Gasser and I remember talking about it during the trial.  He was telling me the story about his conversation with Ms. Ward.  And we both said, "Boy, isn't that -- you know, isn't that weird?"

And then after that, as I recall, during the trial

Agent Bruning took a calling card that was in Mr. Fulks' wallet and began to trace the calls that were made from that calling card, it was like a prepaid phone card.

And from that he was able to determine that the calls were made -- I don't remember if it was traced to some phone that Fulks had or he could trace the calls to cell towers along the route that Fulks was -- Mr. Fulks was driving, but it was after Mr. Basham had been apprehended.

And so the theory that -- Ms. Ward's testimony together with the cell phone tower person or somebody from Verizon or Sprint or some other -- calls, was that Mr. Fulks made this call at a point after Mr. Basham had been apprehended.

Q.  Tell us about the three-day rule again.  What exactly is the three-day rule?

A.  Well, the three-day rule is a federal statute which requires that the government disclose to the defense a list of its witnesses three days prior to trial.

Q.  You objected to the testimony related to the Wards' situation, correct?

A.  Yes.

Q.  And what was the court's ruling?

A.  Well, the court allowed the testimony over our objection.

Q.  Correct.  Did the court offer you three days at that point in time?

A.  Yes, that's what, I mean, the transcript will say, but this is what I recall.

Q.  And you denied the court's offer of a three-day break in the trial?

A.  That's true.  That's correct.

Q.  Can you explain the thinking at that time?  Do you recall?

A.  I mean, I just felt like to me that three days wasn't going to cure the fundamental problem.  As I said at the trial and still my opinion, that -- that that evidence really undermined our credibility in front of the jury.

We had taken the position, really, from opening statement throughout that the evidence would reveal that in any incidents involving confrontation with third parties, that Mr. Basham was the instigator.

When they -- when Mr. Hawkins had been abducted, Mr. Basham was the one that sort of brandished the weapon, and the implication was that Mr. Fulks had to keep Mr. Basham from killing, you know, Mr. Hawkins.

That during the videotape, it appeared to reveal that Mr. Basham was the one who actually abducted Ms. Donovan.  Then during the incident in which Mr. Basham was apprehend in the Kentucky parking lot, he was the one with the gun.  The collateral witnesses always indicated that Mr. Basham was always armed and that Mr. Fulks was not.

And so our position had been that, "Look, you know,

Chad was --" it was, "Chad's stupid, Chad's slow.  He wouldn't have really perceived that -- it might not seem logical to you, but if you take somebody with this -- this low functioning, with his sort of brain, that he might not have put together that Basham was actually really killing these people and that he wasn't the primary actor."

So, in my mind the devastating effect of this and I think -- I mean, you will see what I said in the transcript and what I believed, it was essentially directing a verdict of death.  And the case was that it showed, if believed, that Mr. Fulks attempted to lure another individual, female, out after he was separated from Mr. Basham.

Q.  To refresh your recollection, Exhibit P 99, this is page 218 from that particular transcript and you relayed those concerns to the court, correct?

A.  Yes.

Q.  Contrary to your entire theme of defense; is that correct?

A.  If -- yes.  I mean, the evidence, if believed by -- the government's theory of this evidence was believed by the jury, certainly.

Q.  Did that ruling -- did that development influence your decision on whether or not to use mental health experts?

A.  Well, yes.  It had an effect on the ultimate decision, the final decision that was made.

And I just didn't feel like, you know, maybe -- I

don't know.  I mean, yeah, I'm not really a second guesser in life.  Maybe I should be more of -- at least my wife tells me that I should be -- but I don't usually have a lot of sort of remorse after the fact about decisions.  And so, you know, this one, I really don't know whether I made the right decision or not.

But my decision was that I didn't feel like I could bring these experts in, have them sort of talk to Chad about this, try and figure out what had happened, and switch sort of theories, you know, with them and have them explain why Chad might have tried, you know, to actually abduct a woman.

And I was sort of worried about them getting caught up and cross-examined about this, and the government just sort of hammering away at it, on Chad being a liar about it. Because he hadn't sort of gone into this and I think he might have actually told some inconsistent stories about it.

So, you know, right or wrong -- and, again, I -- what I -- I just felt like, "I can't -- okay, I've got to let that go now," and what we tried to do was to find -- what Chad said -- you know, it may sound incredible, but truthfully it's another instance in which I believe him, is that he really wasn't trying to lure this girl out, like he wasn't even trying to find this girl.

He was actually interested in trying to find this girl named Heather Jacobi, who was a girl that he had sex with

in a van in a parking lot outside of a K-mart somewhere in Ohio, and that he was trying find her.

And so he -- the only thing that we knew about her was she was a girl that had some type of marine animal tattooed around her naval, which made the identification a little bit on the difficult side.

But so -- but what he said, "I was trying to find her because I didn't know what else to do. I thought maybe she could help me get drugs. And so when I got this mother, this is just sort of this -- you know, this was all I could sort of think of to say."

So, you know, it may sound, you know, incredible but, you know, I think in Chad's world it sort of all made, you know, kind of sense.

So, what we attempted to do was try and find Ms. Jacobi and bring her in to sort of testify about that she had really met Chad and all this, so hopefully we could try and argue that, you know, "Look, it looks bad, but it's not really what they say it is."

And so to the best of my recollection we did find Heather Jacobi and she did, in fact, have the requisite marine animals tattooed on the appropriate portion of her body and we flew her back in and she testified. And so that was -- you know, that was the decision I made. I don't know if it was right, I don't know if it was wrong, but that was the decision.

Q.  Did you talk to your mental health experts about the Donna Ward testimony?

A.  No.  No.  I didn't.  I didn't.  I mean, I don't have any recollection of sort of going over that with them.

Q.  You did not speak with them before you decided not to call them as witnesses?

A.  No.  I mean, I didn't call them about this.  I didn't ask them if they, you know, wanted to come down, you know, and interview him and take -- and take the three days for them to do it.  I just, you know, my -- again, my rough-cut assessment of it at the time was that that would involve sort of trying to switch horses in the stream and go with a different sort of position about it, and I just didn't -- you know, I didn't feel like I could do that at that point.

You know, I -- it was a killer, it was a killer fact but I, again, right or wrong chose to fight out on the position of, "It looks bad, but it was not really what he was trying to do."

Q.  There was no mental health testimony presented at the Fulks trial or the penalty phase trial; is that correct?

A.  You know, I don't want to quibble.  There was no psychiatric testimony presented.  There was -- we presented neuropsychological evidence resulting in his brain damage -- we presented the results of brain imaging tests which had been done, and presented Dr. Bachman who is a neurologist to testify

about that.  But there was no psychiatric evidence above and beyond the evidence about his fetal alcohol spectrum disorder.

Q.  I want to shift gears a bit and talk about witnesses.  Tina Severance; you remember Ms. Severance?

A.  Yes, I do.

Q.  Did you ever personally interview her?

A.  On a number of occasions.

Q.  And what was her relationship to Chad Fulks?

A.  She was his girlfriend throughout most of the relevant time frame, the relevant time frame being, I mean, the time the two incidents in question occurred.

Q.  In your interviews with Ms. Severance, prior to the evidentiary -- or the hearing on the penalty phase, how did your discussions with her go?

A.  I mean, they were generally, I think, cordial.  I mean, that might be a little bit of a stretch.  They varied somewhat.  Ms. Severance -- there were some strain -- because Ms. Severance had been Chad Fulks' girlfriend throughout this period.  By this time that we were involved in the case, she was living with and romantically involved with his brother, Dwayne, so that created some problems.

Obviously Mr. Fulks was not happy about this initially.  Actually, I don't know that he was ever happy about it.  But he -- so that was somewhat of a problem.

She also had -- you know, there were pending charges

against her involving a break into a house, and they broke into a house with a friend of hers, a man by name of Mr. Tasalma or Talsma and had stolen weapons from him.  So, she had pending charges -- I'm pretty sure that was in Indiana or, you know, it may have been Ohio.  Someplace in the great Midwest she had those pending charges.

And then I don't know if she actually had federal charges or the potential of federal charges, I don't know.  But anyway, she certainly at any rate had some criminal exposure.

Q.  Did her trial testimony differ from the interviews you conducted with her?

A.  It -- her trial testimony differed -- there -- well, differ may not be the right word, but there were two -- the main important fact, I think you suggested, known -- but the main thing that I remember is I had talked to her on numerous occasions and she had never said one particular thing.

But after she came down here she had a meeting -- I believe she met alone with Agent Bruning, and I think he was handling a lot of these, sort of these interviews.  And after she talked to him, and the night before she testified at trial, for the first time she said that Chad told her that -- she said she was trying to get Chad to get rid of Basham because Basham was bad news and she thought Basham would get him into trouble.  And she said, "Why you keep him around?"

And according to Ms. Severance Chad said, "Because

he's stupid and he will do anything I tell him to do, or anything I want him to do," or something to that effect.

Again, I mean, I quizzed her -- met with her extensively and she never said this before.  So, you know, I personally didn't believe that he actually said that, didn't actually -- and also didn't ring true, didn't sound to me like something, you know, Chad would say.

So, that is the main fact that I -- the main enhancement in her testimony that I remember prior -- that came immediately before trial, and to which she testified to at trial.

Q.  Did the government ever indicate to you that they would help Ms. Severance with some of her pending criminal charges?

A.  I don't have any recollection of that.

Q.  I will ask you the same question of Beth McGuffin; did the government ever indicate to you that they would help Ms. McGuffin with her criminal difficulties at any point?

A.  I have no recollection of that.

Q.  Was Bill Nettles the first attorney to -- in South Carolina -- to begin to represent Mr. Fulks?

A.  The best of my knowledge.  He was certainly on the case before I was.

Q.  Did you yourself ever have any conversations with Assistant U.S. Attorney Rose Mary Parham?

A.  No.

Q.  Let me turn now to Exhibit P 30, we talked about this a bit this morning.  Do you recognize this particular exhibit?

A.  It's a summary of an interview by a district attorney with Sheriff Ronald E. Hewett.

Q.  Well, I'm looking at the top, you mentioned a district attorney, could that be Lieutenant D.A. Crocker?

A.  I'm sorry.  It could be, yes.  I'm sorry.  I was thinking district attorney, but yes.  It's by somebody named Crocker, whether they are a police officer or a D.A., I don't know.

Q.  Fair enough.  Do you recall getting this document during the thousands of pages that you received?

A.  I don't, you know, personally recollect reviewing this document prior to trial, but a lot of the substance of this, yes, I recall.

Q.  And just to summarize a bit, it's Hewett's accounting of the Basham -- a Thanksgiving Day search --

        THE COURT:  Mr. Basham is raising his hand, so -- I'm sorry, Mr. Fulks is raising his hand, so let's take a short break.

        (Short recess)

        MR. ASHMORE:  Thank you, Your Honor.

        I believe we are ready to proceed, Your Honor.

        THE COURT:  Go ahead.

BY MR. ASHMORE:

Q.  If I can back up ever so briefly and make one additional

point.  Tina Severance, she testified at trial that Chad put a gun to her head and threatened to kill her; is that correct?

A.  Yes.

Q.  And she never -- she never said that until after she had talked with the FBI; is that correct?

A.  That -- yes.  I had talked to her on numerous points.  We had been trying to sort of figure out, was there any -- you know, what were the downsides of her testimony and I don't recall that.

Q.  Let's move forward -- and, again, this is, essentially -- to summarize, this is the Thanksgiving Day search involving Branden Basham and Sheriff Hewett; is that correct?

A.  Yes.

Q.  Now, this report indicates that a number of people were there.  You see the date November 28, 2002, correct?

A.  Yes.

Q.  Sheriff Hewett was there, Basham was there, Jeff Long -- he's the FBI case agent, correct?

A.  Yes, Mr. Long was the case agent.

Q.  And at the time Mr. Basham, I believe, was represented by Mr. Littlejohn and Mr. Monckton, Basham's two attorneys; is that your recollection?

A.  That's my recollection, yes.

Q.  And then there are two Conway officers identified as Sergeant Parker and Sergeant Sarvis, correct?

A.  Yes.

Q.  The individuals that we just discussed, Mr. Blume, did you ever interview any of them?

A.  No.  I mean, I -- I spoke with Agent Long about the case on several occasions, as did Mr. Nettles.  I mean, I would say that, you know, we never formally interviewed Agent Long.  I didn't -- I don't think we ever talked to Mr. Monckton and Mr. Littlejohn on the theory, right or wrong, to anything -- either it would be in this memo or anything else, it would be protected by the attorney-client privilege even after they are discharged.  But no, I never talked to -- I don't think -- have any recollection of us talking to Parker and Sarvis.  I certainly did not.

Q.  And when I say you, I mean collectively did anyone from the Fulks trial team personally interview any of those witnesses, with the exception of FBI Agent Long?

          MR. DALEY:  Your Honor, objection.  Again, going outside the scope of the allegations within the petition.

          THE COURT:  What does this relate to?

          MR. ASHMORE:  It relates to the heart of the matter as to how the confession was not revealed to us, the Branden Basham confession.  I want to know what these men would have said about it.  Sheriff Hewett testified that he confessed.  He testified during the Basham trial that he confessed.  How does a confession not make it into this document?  What would those

men have said about that document?

MR. DALEY:  The government's point is, is that there is no allegation of failure to investigate that statement, which is what he's going towards right now.

THE COURT:  Well, I think it's close enough to the issue that was raised to allow it, so I will overrule the objection.

BY MR. ASHMORE:

Q.  Did anyone on the trial team talk to any of those individuals, other than FBI Agent Long that you just outlined?

A.  I know that I did not.  I don't have any recollection of ever seeing any memo that was done of any interviews with any of these two, and I don't recall that I personally instructed, for example, Mr. Skidmore to go talk to Parker or Sarvis. So -- I mean, you can ask Mr. Nettles and he will have a recollection, he talked to some of these people too.  But I don't have any recollection of us having pursued this.

Q.  Sheriff Ronald Hewett, did you make any effort to interview Sheriff Hewett, you or anyone on the trial team?

A.  Not that I -- I don't have any recollection of trying to talk to Sheriff Hewett.

Q.  Let me turn to -- within this exhibit there are Bates stamp numbers at the bottom right hand and I'm turning to 00816, and here is the deer statement that we have already discussed contained within this paragraph here, correct?

A.  Yes.

Q.  And we touched on it briefly.  I don't want to replow the ground, Mr. Blume, but what was the importance of the deer statement in your mind during the Fulks trial?

A.  My interpretation of the statement, or certainly what I thought was a reasonable interpretation and what the jury might draw from this and the reason I wanted to admit this, was that, "I could never kill a deer and here I have," with the logical -- or at least to me the logical implication was, "Here I have killed someone," put it into context.  So we moved to have this admitted as a statement against penal interest.

Q.  And what was the court's ruling?

A.  The court sustained the government's objection to the elicitation of this admission.

Q.  And that should have been my first question.  What was the government's objection to the admissibility of this statement?

A.  The government's objection -- again, the record will reveal this, but my recollection is the government argued that the statement was ambiguous and thus because it was ambiguous it was not a statement against penal interest.

Q.  On the same page, at the bottom -- bottom paragraph, you see, Mr. Blume, talk of a Liz Claiborne purse strap, correct?

A.  Correct.

Q.  What was your understanding from this report of the importance or significance of the purse strap?

A.  Well, there -- I mean, the strap -- I guess, based on this memo, there's maybe not a lot to sort of deduce from it.  The only additional -- I mean, it was somehow used in this incident.  The only additional piece of information that I had about this was not information which I obtained directly, but Mr. Nettles had indicated to me that Ms. Parham had indicated to him --

MR. DALEY:  Objection, Your Honor.  Mr. Nettles can certainly testify to that, perhaps, but this is double hearsay.  And I'm not sure he has any personal knowledge of this -- even this memo, Your Honor.  I think we are just --

THE COURT:  It's not hearsay if it's offered to show the effect it had on the person that heard the statement and what action they took.  Isn't that what we're dealing with here?

MR. DALEY:  I don't think that was what the question -- how the question was asked.  I may be mistaken. He's about to say --

THE COURT:  "What was your understanding of this report, the importance or significance of the purse strap?" That was his question.

MR. DALEY:  And his response is going to be hearsay.

THE COURT:  What about that?

MR. ASHMORE:  He can still state what his understanding was.  I don't know that we need to attribute a

statement to any individual.  He can tell us what his

understanding was.

THE COURT:  I think I'm going to allow this.  If we had a jury here I would be a lot more concerned about it, but I'm going to allow it for what it is worth.

BY MR. ASHMORE:

Q.  So what was your understanding?

A.  My understanding was that Mr. Basham had implicated Mr. Fulks, I guess, as the -- I don't know how the exact phrase -- the wielder of the purse strap.

Q.  And that was your understanding, that at what -- what relevant points in time?

A.  It would have been prior to trial.

Q.  How about during the trial?

A.  Well -- yeah, I mean, I guess that's right, during the trial as well.

Q.  In other words, nobody disclosed to you during -- either prior to or during the Fulks trial that Mr. Basham was, in fact, the person that actually strangled Alice Donovan?

A.  No.

Q.  Let me show you the same document, Bates-stamped 818, middle paragraph.  Sheriff Hewett states that while at the cemetery Basham indicated how the victim's pocketbook was used.  Sheriff Hewett was able to determine the pocketbook strap was used to strangle the victim to death.  You obviously

read this report, correct?

A.   Yes.

Q.   And what -- well, Sheriff Hewett testified in a pretrial setting, correct?

A.   Uh-huh.  Yes.  Sorry.  Yes.

Q.   And he testified on February 25th, 2004; is that correct? Does that sound right?

A.   If that's what a transcript says.  I mean, I don't remember when -- I don't really remember when.

Q.   Looking at P 98, this is the excerpts from the motions hearing, February 25th, 2004.  Who does it indicate -- well, it indicates those in attendance were Strom Thurmond, John Blume, Sheri Johnson, Bill Nettles, Jack Swerling, and Greg Harris. That's what -- that's what it indicates on this transcript, correct?

A.   Yes, but that's not correct.

Q.   In speaking with you this morning you think that is not correct?

A.   I'm sure that's not correct.

Q.   Tell us -- tell us your thoughts on that.  Who was in attendance?

A.   Well, I know that Mr. Weyble was not present and I know that Ms. Johnson was not present.  I was present for part of this hearing but not all.  I mean, my recollection of this hearing, and I think the germane parts that we -- Mr. Nettles

and I did go to part of this, and my main recollection of this hearing is that the issue is whether Mr. Littlejohn and whether Mr. Monckton were going to be disqualified.

The government had moved that they be disqualified on the basis that they might be potential witnesses in relationship to whether Mr. Basham -- I guess the proper phrase would be jerking the government around in attempting to take them to the body.  So that's my recollection of the hearing.

I don't remember whether I stayed for, you know, all the hearing or not, but I know that Mr. Weyble was not present and I know that Mr. -- Ms. Johnson was not present.  I don't know if this -- the court reporter just listed every lawyer who was involved in the case, but that's what happened.

I do not remember whether Mr. Thurmond, Mr. Schools, and Mr. Gasser were all present, but I do know from our side who was there and who wasn't.

Q.  Let me turn to -- it's hard to read, but --

THE COURT:  Before you move on, is that significant that the transcript lists some attorneys who were actually not present?  I want to make sure I'm not missing something.

MR. ASHMORE:  Yes, sir, Your Honor.  I think that matters.  We would take the position that the Fulks trial team should have asked questions of Sheriff Hewett.

MR. DALEY:  Your Honor, that's a new allegation, that's out of time, and the government would strenuously object

to that.  We have been around this issue literally dozens of times.

THE COURT:  Well, Sheriff Hewett's statement has been an issue, but failure to ask him questions at this hearing on disqualification, I don't think has really been raised.  Before we get there, still, assuming that the transcript incorrectly indicates that Mr. Weyble and several others were there, is that -- I just want to make sure I'm not missing something.

MR. ASHMORE:  I don't think you are, Your Honor.  I think that's just --

THE COURT:  Mr. Blume was there; is that right?

THE WITNESS:  I was there for part or all of this. We didn't -- maybe -- I haven't been asked a question, so I will just shut up until I'm asked a question.

MR. ASHMORE:  I'm not sure I want to ask.

THE COURT:  I'm going to allow the question.  I'm not sure -- if it raises a new issue that is time-barred, I'm not going to consider it, but go ahead, I will allow the question.

MR. ASHMORE:  Thank you, Your Honor.

BY MR. ASHMORE:

Q.  What looks to be page 62 of this exhibit, that's where Branden Basham -- that's where Sheriff Hewett recounts the deer statement, correct?

A.  Correct.

Q.  Do you remember the government's position as to the deer

statement at the Fulks trial?

A.  Yes.  I already related that it was ambiguous.

Q.  And do you recall --

THE COURT:  Let's just make sure I'm not recalling incorrectly, the statement was ambiguous, but also Mr. Basham, in addition to making the deer statement, he had also given many other statements in which he said Mr. Fulks struck the fatal blow, or actually killed the victim.

And I ruled that it was not proper to let the defense team pick and choose which statements of the codefendant could be used, you had to swallow the whole thing or none at all; wasn't that part of the basis?

MR. ASHMORE:  Well, the government argues, Judge, that the statement had no meaning in the Fulks case.  The problem for the government is this, the Fulks case they say that the deer statement has no meaning.  In the Basham case they argued to you it was an admission by the --

THE COURT:  But in the Basham -- but you have to look at it from what was being litigated in Basham.  Basham said he didn't do it; Fulks did it.  So, the statement, "I never killed anybody but here I have, dot, dot, dot," came in along with Fulks' other statement, I think, that Basham -- Basham's other statements that Mr. Fulks was the killer.  So, it all came in then.

And all I did in this case, in the Fulks case, was

rule that you can't pick and choose which statements of the codefendants you want to offer and which ones you don't want the jury to hear about. I think. I might be wrong. I mean, the transcript will certainly speak to what was the basis for the ruling.

MR. DALEY: Your Honor, I'd like to also make the point, though, that we are now far afield from what the allegations were. The allegations were that they wanted to appeal. They said that it was ineffective assistance of appellate counsel to appeal this ruling -- to not appeal the ruling, and now we are into a whole new realm of whether it's ineffective assistance of counsel to have not -- it looks like -- the government needs to be adamant about it because otherwise the case law allows that if they amend basically by putting in facts, then they can sort of come and tack it on. And I --

THE COURT: Well, let's talk about that. Maybe we need to break for lunch now and let's look at the petition real carefully. I'm just not sure this was properly raised, this point that Mr. Davis is talking about.

MR. ASHMORE: Judge, I'm getting there and our -- our position is this: The government said in the Fulks case the deer statement had no meaning, and I can point you to that, I can quote that in the transcript. In the Basham case they said --

THE COURT:  I remember -- I remember we discussed it and we -- hypothetically speaking, we said he could have been about to say, you know, "I never killed a deer, but here I helped my best friend kill somebody," or "Here I held the victim down while my friend strangled her."  It was just speculative as to how the sentence was finished.

Then you couple that with his -- his statements, repeated statements that Fulks was the perpetrator, Fulks struck the fatal blow, to me it seemed unfair to let the defense team, as I said, pick and choose which statements came in and which stayed out.

MR. ASHMORE:  And I agree with you totally.  But then, Judge, you have got to go 18 months down the road to the Basham trial, and at the Basham trial they say that Basham was the actual strangler of Ms. Donovan.  That's -- and I will show you that.  We are getting there too.

So, the problem for -- and the point I'm trying to make is, when you -- when you read that, that statement totally becomes perfectly relevant and clear, it's no longer ambiguous when you have a confession on top of that.  Then you know -- then you know what Branden Basham meant by that.  And that's what Johnny Gasser argued to the Basham -- in his closing.

THE COURT:  He argued that Basham admitted strangling Ms. Donovan?

MR. ASHMORE:  In fairness to Mr. Gasser, he says, "'I

never killed a deer and here I have --' what do you think he was going to say?  'Here I have smoked a joint?  Here I have stolen a car?'"  He argues clearly by implication that the end of that sentence was, "Here I have killed a person."  And that wasn't raised on appeal, Judge.

THE COURT:  Well, here we go again.  I ordered separate trials at the insistence of the defendants and over the strong opposition of the government.  I'm a little bit rusty on all the reasons that I ordered the trial separately, but I think some of the predictions that the defendants gave me for needing separate trials did not ultimately play out.  Some of their concerns weren't -- turned out not to be an issue in the case after all.

Like I say, I'm a little rusty on that, but in any event, it just demonstrates the difficulty of trying to give both sides a fair trial when both sides demand a separate trial, and then you have got evidence that comes in in one trial but not in the other trial.

MR. DALEY:  Your Honor, the government's whole point is, to the extent these facts came up, they were in the context of one of two things -- and I will have to go back and look at the petition again -- but they came up in ineffective assistance of counsel for failing to appeal your ruling on the deer statement --

THE COURT:  All right.  Now it seems to be getting

into a failure to do a more thorough investigation of the deer statement and the purse strap statement.

Well, let's break for lunch.  Now is a good time to break.  Why don't we come back at 2:15?  That's a little bit longer than I would normally break.  That will give us all time to look at the petition and see if it helps a little bit.

MR. ASHMORE:  Thank you very much, Your Honor.

THE COURT:  All right.  We'll be in recess until 2:15.

(Lunch recess)

THE COURT:  All right.  Ready to resume?

MR. ASHMORE:  Yes, sir, Your Honor.

THE COURT:  Mr. Ashmore.

MR. ASHMORE:  May it please the court.

BY MR. ASHMORE:

Q.  Before lunch, Mr. Blume, we were looking at Exhibit P 68, again the transcript of a pretrial hearing involving Sheriff Hewett.  Obviously there was some talk of the deer statement as well as some talk of the purse statement.  Now, earlier you thought that perhaps you were not present at this particular hearing, Mr. Blume, or for a portion of it?

A.  Yes.  To the best of my recollection we did not participate in this hearing.  We didn't view that we could participate in this hearing.  The purpose of this hearing -- unless I'm thinking of another hearing.  I was in one hearing and one

hearing only in Mr. Basham's case, and that was a hearing on the government's motion to disqualify.

So, we didn't participate.  We actually sat in the spectators part behind the bar, as we thought this was a hearing in relationship to -- it involved their counsel.  So, that was -- but I was there for at least part of this.

Q.  Let me turn now to what's been marked as page 66 of the transcript.  You see Sheriff Hewett obviously gave some testimony concerning the purse strap as well?

A.  Correct.

Q.  And on the next page apparently he gave some type of demonstration, correct?

A.  Yes.

Q.  Now, do you recall -- do you have any recollection of any of that?

A.  No.

Q.  Do you have any recollection whatsoever at any time of Sheriff Hewett or anyone from the government demonstrating how Ms. Donovan expired?

MR. DALEY:  Objection, Your Honor, this goes outside the scope of the petition.  I think it goes towards claiming ineffective assistance of counsel.  I would like to put on the record what I believe the appropriate scope would be, Your Honor.

THE COURT:  All right.

MR. DALEY:  Claim 18 in the petitioner's amended motion to vacate, pages 162 to 165, that allegation is appellate counsel was ineffective for failing to appeal the deer statement.  That's a purely legal argument.

And then claim 19, Your Honor, sub point B only, claim 19 is violation of due process for arguing inconsistent theories.  In the second part of that argument, sub point B, they talk about the purse strap.  But, Your Honor, where we are headed now is apparently down a road that doesn't have anything to do with either of those two claims.

THE COURT:  What is the response?

MR. ASHMORE:  Your Honor, I don't understand the objection.  Your Honor, throughout our petition and in the petition in reply we make the point repeatedly that the government failed to disclose to the Fulks trial team that Sheriff Hewett would have testified that it was Branden Basham that actually strangled Alice Donovan, as he did in the Basham trial.

MR. DALEY:  Your Honor, I go back to what the amended motion to vacate actually articulates as their claim.

THE COURT:  Well, Mr. Ashmore, I have been very liberal in allowing -- in not enforcing the one year time bar. I am not even sure that I can.  I'm not even sure it's -- not jurisdictional, but I have allowed the amended petition to be the operative document for today's hearing.

I have allowed the new evidence about finding the body to come in because that truly is newly discovered evidence, and allowed, you know, several post filing amendments.  But I do think today we are going just a bit too far to get into what I perceive to be ineffective assistance of counsel in not ferreting out in advance this purse strap issue and deer statement issue.  I think we need to stick to the claims as pled in the amended petition, so I'm going to sustain the objection.

MR. ASHMORE:  Your Honor, so I understand, I'm making the point that it's a Brady violation for the government not to turn that over to the trial team.

THE COURT:  Well, I think that point has been made.

MR. ASHMORE:  Yes, sir.

MR. DALEY:  Your Honor, our point would be that that is not a claim that was made in their amended motion to vacate.  There is not --

THE COURT:  There is no Brady claim relating to this?

MR. DALEY:  That's correct.

MR. ASHMORE:  That's where we sharply disagree, Your Honor.

THE COURT:  Show me where in the petition there is a Brady claim, then.  They say there is not, so point out where they are wrong.

MR. ASHMORE:  In the amended petition, as well as in the reply, in the preliminary statements we talk repeatedly throughout, and the government has obviously been on notice of this, Your Honor, but we raised the claim repeatedly that this was not turned over --

THE COURT:  Just give me a page number, that's all I need.

MR. ASHMORE:  All right.  Your Honor, if I may, open to page 174 of the amended petition, under the caption of inconsistent theories, subsection D, see intentional killing of Alice Donovan -- correction, page 171, Your Honor, subsection B, Basham demonstrated how he, not Fulks, killed Alice Donovan.

THE COURT:  What page are you on now?

MR. ASHMORE:  Page 171.

THE COURT:  Oh, my law clerk just pointed out the same day that Mr. Basham made the deer statement he also told authorities that Chad Fulks put Ms. Donovan in the trunk and slit her throat.  The same day.  So, that's why I didn't let the deer -- I said, "If the deer statement comes in, how can you keep out the statement that the defendant on trial slit her throat?"  I mean, to me it was letting the defense pick and choose, as I said, but we have already been through that.

MR. DALEY:  May I be heard, Your Honor?

THE COURT:  Yes, sir.

MR. DALEY:  If you would look at -- and I invite the

court to look at the entire claim.  Nowhere is Brady mentioned, nowhere is there a Brady claim made.

THE COURT:  I thought it was raised in terms of the government presenting inconsistent theories at the two trials.

MR. DALEY:  That is exactly what was briefed.  And, Your Honor, they know how to raise a Brady claim because claim 21 --

THE COURT:  There is a Brady claim in the case.

MR. DALEY:  There is a Brady claim, but it has to do with supposedly the help given to a couple --

THE COURT:  All right.  I'm going to stick with my ruling and sustain the objection.  Now, actually I've got to let you make an offer of proof under the rules of evidence, if you want to, so you can make a proffer of what the evidence would have been.

MR. ASHMORE:  Your Honor, can I argue that to you on Friday and give me a bit of a chance to --

THE COURT:  Let's just do that then.  Let's leave it up in the air and you go ahead and put it on the record at least in terms of an offer of proof if I decide to keep it out.  Don't let me forget that we need to get a ruling on it one way or the other on Friday, or whenever -- you are talking about the last day?

MR. ASHMORE:  Whenever we do legal arguments, Your Honor.

THE COURT:  All right.

MR. ASHMORE:  Beg the court's indulgence, Your Honor, we are making progress.

BY MR. ASHMORE:

Q.  The issue of jury selection, Mr. Blume, who conducted the voir dire of the jurors?

A.  Voir dire was conducted by myself, Ms. Johnson, and Mr. Nettles.  The way that we did it was that I was present throughout the entire voir dire and Mr. Nettles and Ms. Johnson rotated half days.  During the other half day they would be doing some type of trial preparation.

Q.  And how did -- what was your impressions of the jury selection?

A.  Of the process?

Q.  Yes.

A.  Well, it was -- I think the record reflects that Judge Anderson and I had a disagreement about the scope of the voir dire and about the questions that could be asked and, you know, how the jurors could be questioned.  This was an ongoing -- I think "skirmish" may be too strong a word, but it went on throughout the jury selection process.

Q.  Did you have a rating system for potential jurors?

A.  Yes.

Q.  Tell us about that.

A.  It was a rating system developed by a man by the name --

that we used -- developed by a man named David Wymore who is a lawyer in Colorado. The method we attempted to use was called the Colorado method of voir dire. We used a rating system devised by that which basically rates jurors from 1 to 7 based on their views on the death penalty, with 1 being a juror who would never under any circumstances give death and 7 being a juror who would always give death and be happy about it.

Q. And did there come a point in time when you objected to the qualification of particular jurors?

A. There were a number of jurors that we believed were erroneously qualified and objected to the Judge's decision to qualify.

Q. And what if anything did you do in terms of seating those particular individuals?

A. Well, some of them we did not seat, some of them we struck. I think one or two of them were struck maybe by agreement after the jury selection. There were some disputes about people who had been working in correctional settings and whether they should be on the jury.

But for several of the jurors -- there were several jurors who I believed were unqualified, who I believed were sure votes for death, who I elected to put on the jury.

Q. And why was that?

A. Because it was my understanding then, it's my understanding now, that the only way to preserve the issue for appeal was to

seat the juror.  That if we struck the jurors, then the issue would be lost for appeal.  And so I made the decision that I thought the legal error was sufficiently, in my opinion at the time, was sufficiently egregious that I was going to preserve the error for appeal and seat the jurors.

Q.  Do you remember how many jurors fall into that category that were seated?

A.  I believe it's three.  The ones that I remember the most vividly are a juror by the name Goehring, aptly named, and another juror by the name of Lisa Harvey, are the two that are -- that stick most -- I'm pretty sure there was another one, the name I don't recall at the moment, but clearly those two I do recall.

Q.  And you raised that at the Fourth Circuit?

A.  Yes.

Q.  And what was the ruling?

A.  Well, the -- we are here, obviously, so the Fourth Circuit rejected our arguments and affirmed Mr. Fulks' death sentence.

Q.  Do you remember a juror by the name of Sylvia Allison?

A.  Yes.

Q.  Who was she?

A.  Well, Sylvia -- juror -- Sylvia Allison was a juror in this case.  She was a female, white female juror.  She was the juror that after the trial, after the death verdict was entered by the jury, the next day in the newspaper we read comments by her

to the effect that her husband had previously been murdered,

and so that it indicated that she had special empathy I think

with the victims because of her experiences being a victim.

Q.  And jurors filled out written questionnaires; is that

correct?

A.  Yes, sir.

Q.  Did she disclose that in her questionnaire?

A.  No.

Q.  Did you note that she had not made that disclosure?

A.  Well, I mean, I didn't know about it at the time.  I

learned about it -- like I said, I learned about it when I read

her comments in the paper.  I then went back and looked at her

juror questionnaire and discovered that it -- I think that

particular question had not been answered.  And obviously I

didn't see that at the time of the voir dire or I would have

asked her about it.

Q.  Looking at Exhibit P 55, does this appear to be the Sylvia

Allison questionnaire?

A.  Yes.  It is a little difficult to read because of the

shading but, yes, that's her name under there.  I assume this

is a copy of a form which has been highlighted.

THE COURT:  Let me jump in here.  There are all kinds

of technical rules about redacting personal identifying

information from the official record, or filing it under seal,

and it looks like this has a lot of that.  So, can we get

agreement on both sides that this document will be filed under seal rather than trying to go through and redact all of this?

MR. DALEY: Yes, Your Honor. And in fact I think -- I have talked to opposing counsel, we will have a number of those same types of documents --

THE COURT: In terms of juror questionnaires or --

MR. DALEY: Just personal information that I think needs to be kept out.

THE COURT: Well, I think sealing is easier than redacting it, I think.

MR. DALEY: Yes, sir.

THE COURT: Unless it's going to be a fight with the news media, I don't know.

(Off record discussion)

THE COURT: Go ahead. We will seal this one because it does have like her home phone number and things that that by federal law are not supposed to be put in the official record, other personal identification as well.

MR. ASHMORE: Yes, sir, and that's Exhibit Number P 55.

BY MR. ASHMORE:

Q. Turning your attention -- it's hard to read -- but page 6 of 9, there is a scribbling on the left side there, that's where normally a juror would disclose that her husband had been murdered previously?

A.   Yes.

Q.   And that was not filled out?

A.   No.

Q.   And the trial team simply didn't raise that?

A.   Yes -- we didn't -- I still don't know how we missed it but we missed it.

Q.   You missed it.  Would you have put her on the jury knowing that information?

A.   The default answer would be no.  I think it probably would have depended on what she said during voir dire, what the government's response was, and whether the judge qualified her.

In other words, I could imagine a scenario under which I might have put her on the jury for the same reasons that I put Goehring -- Mr. Goehring on the jury and Ms. Harvey, if I felt like the Judge should have excluded her, that her answers revealed bias, then it is possible I may have put her on, but not because I would have thought she could be a fair and impartial juror.

As I recall, she was fairly high on our rating scales on her death views anyway.  So, obviously it would have been a matter of concern.  It would have been something that I would have voir dired her about.  I'm sure I would have attempted to exclude her for cause based on that.

Whether I would have seated her I think is -- without knowing how it would have played out, I honestly can't say, but

it would only have been for the purpose of trying to preserve the error.

Q. Who -- tell me about the appellate process, who handled the appeal?

A. The appeal was handled -- the four of us remained involved in the case. Mr. Nettles, I think, to a lesser extent, primarily because I think he didn't have -- this is not my estimation -- I don't think he had the confidence that he was ready for this type of appeal. That's not my view of it, I think that was his own view, so he didn't want to take a large role.

He also probably had actually the most real work to do of all of us. Professor Johnson and I have a little bit more flexible schedules because of our academic -- because we are academics.

But the appeal was primarily drafted by myself, Mr. Weyble, and Ms. Johnson, with me sort of as the final overseer of what got in, what got out, you know, what was raised, what was emphasized, and how.

Q. Did you or any member of the Fulks trial team attend the Basham trial?

A. I -- you know, I can only speak for myself. I did not attend. I know that Ms. Johnson and Mr. Weyble did not attend. Whether Mr. Nettles dropped in for parts of it just -- if he was around the courthouse to see what was going on. I

mean, I would suggest he needs to be asked.  But not on my instructions anyway.

Q.  Is it fair then to conclude that you did not review the Basham trial transcripts before the appeal was concluded?

A.  I think that's -- I don't -- I did not view the Basham transcript as relevant to what we were doing on the appeals. No, I did not review it.

Q.  Did you ever have any discussions with Mr. Swirling or Mr. Harris about the Basham trial?

A.  You know, maybe what I would call cocktail talk, you know, maybe if I saw him at something and we might have had some casual conversation about, you know, the case and how it's going.  There were never any substantive interactions between us about trial strategy or trial approaches.  We were, I think, pretty much in an adversarial mode.  Not that we are adversarial to each other, but in this particular case it was a finger pointer of the first magnitude.

Q.  You had preserved the objections on Judge Anderson's ruling concerning the deer statement -- the deer statement; is that correct?

A.  Well, I believe I did.

Q.  And you did not raise that at the Fourth Circuit, is that also correct?

A.  That is correct, based on reviewing the brief.

Q.  Did you -- do you now realize that in the Basham trial the

government took quite a different position as to the meaning of the deer statement?

A. That's my reading of the record, the part of the record which I have reviewed.

Q. In other words, in the Basham trial they treated the deer statement as a meaningful statement, quite in contrast to how they treated it in the Fulks case?

A. My recollection in the Fulks trial their primary objection, the government, was that the meaning of the phrase was ambiguous. And then it appears -- again, I have not read the entire Basham record but based on the parts of the record which you have demonstrated to me it indicates that they took the position that Basham was the killer.

This is -- well, I don't know if it's relevant but during Mr. Fulks' trial I had a conversation with Mr. Schools. I just asked him -- we were waiting for the judge to come in the courtroom one morning and I said, "You guys going to drop the death penalty against Basham?" And he said --

MR. DALEY: Objection, Your Honor, I'm pretty sure this is hearsay.

THE COURT: Well, the government is a party opponent in this case. Does that exception come into play?

MR. ASHMORE: I think so, Your Honor.

THE COURT: I will overrule the objection. Go ahead.

A. Anyway, I asked him, "Are you going to drop the death

penalty against Mr. Basham?"

And he said, "Well, why?"

"Well, the position you are taking in this case, going so hard after Chad as being the perpetrator, would seem to me to make it impossible for you to get the death sentence on Mr. Basham."  Because I was a little surprised by that at trial, by the emphasis on Mr. Fulks being -- going hard after Mr. Fulks as the actual killer.

I anticipated -- I don't know that it affected anything that we did, but I anticipated they would be more, I guess -- drawing on my theological training -- agnostic as far as who was the actual perpetrator.  So, that was just the course of the discussion.  He basically said, "Well, we haven't decided anything yet."

Q.  The two-step mitigation instructions, that issue was preserved for appeal, correct?

A.  Based on the part -- I have read the part of the record which you showed me where I objected to the way that it was phrased.

Q.  And that was not raised on appeal, correct?

A.  I haven't gone back and looked at the brief today but based on my recollection, that's correct, it was not raised.

Q.  Do you have any particular thoughts or insight on that?

A.  I don't have -- honestly, I don't recall in either case why the issue was not raised.  I cannot sit here and say that, you

know, I looked at these and made some type of strategic decision not to raise them.  I don't remember at this moment. I honestly don't remember why these issues weren't raised.

Q.  Exhibit P 31 is the special verdict form and related documents.  You and I have had a chance to go over that a little bit, correct?

A.  Yes, we have discussed it.

Q.  What -- did you recall what your objection was concerning the two-step mitigation instruction?

A.  Well, I mean, I don't actually independently recall it.  I recall from reading the transcript that my objection was that it allowed -- it set up the possibility that a juror could find mitigating circumstances but nevertheless refuse to give it any weight whatsoever.

Q.  And is it not your understanding of the law that either a fact is mitigating or it is not?

A.  Yes.  I think the jury is still entitled to decide how much weight to give it as a mitigating factor, but they can't refuse to give it -- they cannot refuse to consider it as a mitigating circumstance.

Q.  And on page 6 of this particular exhibit, let's look at number 3, Fulks has an IQ between 77 and 79, is that -- again, you see four jurors found that fact, correct?

A.  Yes.

Q.  Was there any other testimony at trial other than Chad

Fulks has an IQ between 77 and 79?

A.  I think the record will speak for itself.  I don't recall any, but I haven't gone back and reviewed the transcript for the purposes of being able to answer that definitively.

Q.  So, it looks like eight people for whatever reason didn't find that as a mitigating factor, is that fair to say?

A.  It's what the document says, yes.

Q.  And you see these next few entries dealing with fetal alcohol spectrum disorder, it looks like the jury largely rejected that?

A.  Largely rejected that?

Q.  I'm looking at numbers 6 and 7 and 5.  And, again as to number 6, no juror found that fetal alcohol spectrum disorder affected his ability to make his decisions, correct?

A.  Correct.

Q.  And again number 7, that his ability to understand cause and effect is impaired by fetal alcohol spectrum disorder. Zero jurors found that to be the case?

A.  That's what the findings reveal.

Q.  Strangely number 5, one juror apparently found as a mitigating circumstance that Chad's ability to -- number 5, Chad Fulks' ability to control his impulses is impaired because he has fetal alcohol spectrum disorder.  Only one juror found that as a mitigating circumstance?

A.  Based on these findings, yes.

Q.  And then page 8, same document, number 40, Chad Fulks was under the influence of alcohol and drugs at the time of his offenses, that scored a zero, correct?

A.  Yes.

Q.  Did the government not concede in the Fulks case that throughout this 20-day crime spree that he was under the influence of drugs and alcohol?

A.  Again, I think the record will say whether he is or not. That's my recollection, but I have not personally gone back and read the record for that, but that's how I recall the testimony.

Q.  And then number 42.  No one has escaped from a high security federal prison since 1993.  That was the testimony, was it not?

A.  That was the testimony of Mr. Romine, I believe, Don Romine.

Q.  And he was an expert that you called?

A.  (Nods head in the affirmative.)

Q.  And did anyone testify contrary to that fact?

A.  Not that I recall.

Q.  You have four jurors who did not find that to be a mitigating circumstance?

A.  That's what this reveals.

Q.  Did you use law students, Mr. Blume, throughout the preparation for this case?

A.  Yes.

Q.  And they were Cornell law students; is that correct?

A.  I think they were -- they were overwhelmingly Cornell students.  We might have had a summer law school student or two from somewhere else -- University of South Carolina, yes -- but they were predominantly students in our clinic.

Q.  Did you give them any training -- well, let me back up. Did they ever interview witnesses?

A.  Some of them did, yes.

Q.  Can you describe the circumstances for the court?

A.  Sure.  Yeah, I probably actually used law students a little more aggressively here than I would have in another type of case.  Part of that was the case, at least to me -- I mean -- I'm not -- it was big.  There were a lot of different jurisdictions and a lot of different incidents.

He and Mr. Basham escaped from an institution in Kentucky, went sort of north through the heartland, and then back down to West Virginia, to South Carolina, and then sort of back up where Mr. Fulks was apprehended.  So, there were a number of different incidents.

When we got -- when I was appointed initially, it was my impression that the government had not actually done -- wasn't out really investigating.  So, we wanted to try and get out in front of them with a lot of these different witnesses and different locations.

So, you know, I sent some students to Kentucky with Bill Nettles to do some investigation.  I, myself, took some students and went to West Virginia, as well as, you know, used students down here.  So, I have used -- and then, of course, we used them to help go through the discovery, to do legal research and writing, and that kind of thing.

Q.  Did you discuss with Mr. Fulks the location of Alice Donovan?

A.  Yes.

Q.  Can you tell the court about that, please?

A.  Well, I mean, I explained it to Chad that -- and he may have known this anyway, but at least I had several conversations with him in which I explained to him that I thought it was in his best interest, his legal interest, to try and find Ms. Donovan's body and Ms. Burns' body, for that matter, in order to, one, try and give the victims' families some closure.

And two, that in the event that this might either help in the plea negotiation process, or if the case went to trial, as a mitigating factor.  At least, you know, during all the interactions I had with him, Mr. Fulks was, I think, genuinely interested in trying to assist in that regard.

Q.  Did you speak with the government concerning that possibility, his cooperation in locating Ms. Donovan?

A.  Yes.  I mean, there were -- I mean, it came up on different

occasions in different contexts, but yes.

Q.  Can you give us sort of a time frame here when you first began having those discussions with Mr. Fulks?

A.  Well, it would have been pretty shortly after I was appointed.  I didn't, you know -- hopefully my disregard didn't hurt Mr. Fulks, but I didn't initially want to go to the government about this until I felt like we had pretty good information about where Ms. Donovan's remains or Ms. Burns' remains might be.

And that was because Mr. Basham had led them on what they perceived to be and what was, I think, in fact a wild goose chase.  I didn't want to create additional bad evidence and say, "We think she is in X," and they couldn't find her in X, we would be in the same position as Basham.  Here goes Mr. Fulks trying to jerk them around about it.

The truth, what I was trying to do in the beginning was to find Ms. Donovan's remains ourselves.  It was complicated by the fact that Mr. Fulks, you know, had some general knowledge of this area, but he didn't really know this area well where they were.

His descriptions of where he saw Mr. Basham take Ms. Donovan into the woods, you know, it wasn't -- it wasn't very specific.  It wasn't like, "If you go to the intersection of this and that and you walk 100 yards and you go into the woods on the right, that's where it is."

So what we did was, Mr. Skidmore, who was an investigator who was working for us, would go down, sort of start looking around, following the general description that he had been given by Mr. Fulks.

He would take photographs and some video, and then he would bring them back and we would show Chad the video and the pictures, and through a process of elimination and back and forth finally got to a point where Chad was fairly confident that this was the right area.

And so at that point I initially -- we did several different searches. We did a search where we used a helicopter and a dog team and a number of my students. And we did a search down there, we searched -- to the best of my recollection that was in the summer. It was a summer month. I don't remember which summer it was. It was hotter than the hinges of Hades, and we were down there sort of looking. And then we -- but that didn't yield anything.

Then we did sort of more photograph work with Chad and sort of learned that we were close, that we were in the general area, but we weren't quite to where he believed that she was. And so then we did several more searches with dogs.

Eventually we weren't able to find anything, but I felt like, you know, we didn't have anything to lose in going ahead and sort of making the information public and asking the government to help. Because I was convinced Chad was telling

the truth about where Ms. Donovan was, but we weren't successful in finding her.

(Off record discussion)

THE COURT:  All right.

MR. ASHMORE:  Thank you, Your Honor.

BY MR. ASHMORE:

Q.  Exhibit P 71.  Mr. Blume, do you recognize this as a report to you from Heather Roche?

A.  Yes, Heather Roche was a cadaver dog handler or research -- or rescue type person which I retained in this case.

Q.  And looking here, she indicated that her canines worked along the high probability areas along Long Bay Road and Water Tower Road?

A.  Yes, that's what it says.

Q.  And was that where Ms. Donovan was ultimately found?

A.  Honestly, I only know on that what I have been told, but that's what I have been told.

Q.  Can you describe for the court the search efforts that were made, please?

A.  Yes.  To the best of my recollection we did -- there were -- we did -- there were four bigger searches.  Now, Mr. Skidmore spent a lot of time down there sort of by himself looking.  But there was an initial search where, again, it was myself, Mr. Skidmore, Mr. Skidmore was in a helicopter, we had a number of different law students.

And we took -- actually we took an anthropologist down with us, because we couldn't tell -- when we had gone down there before, that Mr. Skidmore found a number of bones, we had to take them to somebody to look at.  And it turned out he said they were all deer bones.

So, we discovered from that that we weren't capable of sort of determining what was relevant or not.  So, we took an anthropologist or a bone expert, I guess you can call him, down with us so we would know if what we found had any significance.

And then there was the cadaver dog that day.  The cadaver dog alerted once or twice, but nothing significant.  We found nothing.

That was -- then we did another search with Ms. Roche, and she actually brought in the first time another friend -- two other friends of hers, both of whom had -- all of -- so they had three sets of dogs.

And we did a search that day that was -- I remember that, I think it was in the fall at some point, it was raining very hard on that day when we did that search.  And again, the dogs -- there were several alerts, but nothing as significant.

Then there was a third search with Ms. Roche, and at that point the dogs indicated -- there was a particular location where she was convinced human remains had been.  And that was ultimately in -- very near the area where, at least

it's my recollection, that Ms. Donovan's remains were found.

Then there was the fourth search, the one where I went down, some of my students went down, Mr. Skidmore went down, and they brought Mr. Fulks.  Because what we determined was that, you know, we felt we were close, we believed that we were close, but it was hard working through this veneer of taking photographs.  And Chad was convinced that if he could actually go down there and see it, that he could conclusively show them where Ms. Donovan was.

I had some reservation about it, again, not because I didn't think Mr. Fulks was doing his 100 percent best to be cooperative, but if you have been, you know, down there, it kind of all looks the same.  And if you are off a little bit, you can be off, you know, a lot.

But you know, ultimately, you know, I determined that we didn't -- that we should try it, that the potential upside outweighed the potential downside, and Mr. Fulks very much wanted to try it.  I think not only because he thought it would help him, but because he thought it was the right thing to do.

And so we went down with a number of -- I mean, I remember Mr. Schools was down there, Mr. Long was there, there were some -- I believe some officers from Horry County actually were detailed to this, there may have been some additional FBI agents, and that search happened.  I don't remember exactly when.

Those are the ones -- like I said, Mr. Skidmore, I know, spent numerous other hours.  Those are the main ones that I remember.

Q.  Last few questions.  The mental health experts that were not called to testify in fact found that Chad Fulks suffered from mental illnesses, correct?

A.  Yes.

Q.  Do you recall what those mental illnesses might have been?

A.  Well, the two primary ones that I recall -- again, I haven't reviewed all the reports and files in anticipation of this -- but although they labeled it differently, they both -- I think that they all thought that he had some type of depressive disorder.  I think it ranged from a major depressive disorder to maybe dysthymia.

But my understanding of that is that these were all something in sort of the depression category.  And then I think at least one, if not more than one of them, had given him a PTSD diagnosis, post traumatic stress disorder, arising from the multiple traumas to which he had been subjected as a -- you know, throughout his life.

Q.  And those are often used in death penalty litigation as mitigating factors?

A.  Yes.

Q.  Mental illnesses, correct?

A.  Yes.  I mean, both of them are used in cases.

MR. ASHMORE:  Your Honor, I believe that's all I have on direct of Mr. Blume.  Thank you.

THE COURT:  Thank you.  Cross-examination.

MR. DALEY:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. DALEY:

Q.  Mr. Blume, why don't we go through the trials, capital trials that you have done.  I think we went over it when I interviewed you, but if I can just go through them quickly.

State versus Telus Edwards, back in the 1986 time era, a Charleston case.  Ended up pleading the case to manslaughter; is that correct?

A.  That's correct.

Q.  It started off as a capital case?

A.  Yes, it did.

Q.  Okay.  The next one, State versus William Cooper Hunter, a Greenville case from 1988.  Did that not end in a life verdict in front of a jury?

A.  Yes.  It's actually Looper Hunter, William Looper, with an L.

Q.  Okay.

A.  But, yes, I was co-counsel in that case and it resulted in a life sentence.

Q.  Leonard Gardner from Calhoun County in the '80s, a plea to life; is that correct?

A.   That's correct.

Q.   With a 30-year parole eligibility?

A.   That's correct.

Q.   Ronnie Skipper, an Horry County case, a resentencing case where you got a life sentence in front of Judge Baggett?

A.   That's correct.

Q.   Was it a guilty plea and a life sentence?

A.   No, it was a resentencing, and it was a resentencing with a jury waiver and a trial in front of Judge Baggett on the question of sentence.  A resentencing, the defendant has the right to decide whether to waive.

Q.   And Limmie Arthur, a bench trial.  It looks like it was reversed and sent back, and you ended up doing a guilty plea to life; is that correct?

A.   Correct.  Negotiated for a life sentence.

Q.   State versus Michael Preston, a Newberry case back in the late '80s, early '90s, was a plea to life?

A.   Correct.

Q.   State versus James Russell Cain out of Chesterfield, another plea to life?

A.   Correct.

Q.   All of these are death cases initially, correct?

A.   They were all noticed for death, yes.

Q.   And went to various levels -- how far did the ones that we have talked about, how far did they advance as far as getting

ready for trial?

A.  It varied.  Leonard Gardner pled on the first day of trial.  Limmie Arthur was negotiated following a trial and an appellate reversal.  Mr. Cain was negotiated, you know, somewhere into the process.  Mr. Edwards was actually the Thursday before a Monday trial.

Q.  How about Shannon Ardis out of Lexington, what happened there?

A.  Shannon Ardis was a case in which the defendant, Mr. Ardis, our client, pled guilty.  And then we tried the punishment phase in front of a judge who imposed a life sentence.

Q.  And then we've got Sterling Spann?

A.  That was a negotiated life sentence.

Q.  Lino Delacruz out of Richland County.  Did you concede guilt in that case?

A.  We conceded guilt on the murder.  He was actually charged with murder and criminal sexual assault, and we conceded -- I mean, we didn't plead guilty because you couldn't do that and get a jury.  We conceded that he did in fact commit the homicide, but contested the CSC, that he sexually assaulted the victim.

Q.  And the results of that?

A.  He was found guilty of the murder, he was acquitted of the criminal sexual conduct, and then he was sentenced to life at the end of the penalty phase.

Q.  And that involved the kidnapping and killing of an eight year old; is that right?

A.  It was a young child, I don't remember the exact age of the victim.

Q.  How about Danny Han?

A.  Danny Han was a plea to life.

Q.  Out of Clarendon County, does that sound right?

A.  Yes, it's Clarendon County, yes.

Q.  State versus Chavis Miller?

A.  That would be -- yes, it was Chavis Miller, that was a Kershaw County case, and that was a life plea a few days before the -- I think the trial was supposed to start on Monday, the plea was negotiated that Thursday or Friday.

Q.  We've got the Fulks' case, I guess, in this list.  The next would be State versus Terrion Warner -- Warren.

A.  Terrion Warren, yes.  That was in Richland County.

Q.  That was a guilty plea that resulted in a life sentence?

A.  Yes, it was a guilty plea.  It was not a negotiated guilty plea.

Q.  Okay, so you pled guilty and then --

A.  We pled guilty and then tried the punishment in front of a judge who imposed a life sentence.

Q.  Okay.  And then State versus Ringo Pearson, what happened there?

A.  In that case, the issue was mental retardation.  We had --

the state was seeking the death penalty.  Atkins was decided, we had a pretrial hearing on the question of mental retardation.  The judge concluded that our client had mental retardation and so the death notice was withdrawn and the case was pled to a term of years.

Q.  Any other death penalty trials that you are working on or have worked on that we have left out that you can think of?

A.  No.  After this one, I hung up my trial shoes.

Q.  Okay.  State PCR evidentiary hearings --

THE COURT:  Let me ask, did I follow you, you have an unbroken string of life sentences in every case you had?

THE WITNESS:  Yes.

THE COURT:  There's not a single one except for Fulks that didn't get life that you have handled?

THE WITNESS:  Yes.

THE COURT:  Is that in the resume that is attached to the government's brief?  I don't believe it is.

MR. DALEY:  No, Your Honor.  No, I don't believe it is.

THE COURT:  Well, it's in the transcript.

MR. DALEY:  Yes.

BY MR. DALEY:

Q.  State PCR evidentiary hearings in death penalty cases, approximately 20, does that sound about right?

A.  Yeah.  I don't keep track, but it's a fair number, yes.

Q.  And appeals from PCR hearings, how many of those have you done, approximately?

A.  Probably a few more than I have done the actual hearings. There have been a few cases.  And normally when you do the PCR you would do the appeal.  There have been a few cases in which I have taken the appeal on afterwards.  So, it would be whatever that number is plus some handful of other cases.

Q.  So, 20 plus?

A.  20.

Q.  Okay.  Federal 2254 death cases, petitions from death cases, how many of those?

A.  You know, probably -- about the same number.  Some of these cases, you know, would have -- have worked out in post conviction.  We won, so it didn't go into federal court.

A few others I would have picked up because some lawyer, you know, decided they didn't want to go forward with the case.  But probably in South Carolina, you know, probably 20 or so 2254s.

Q.  And then Supreme Court arguments on death penalty cases, how many have you done?  How many have you personally argued in the Supreme Court?

A.  Eight.

Q.  And have you also been co-counsel on some?

A.  Probably about 15 more.

Q.  All right.  And this is the only federal death penalty case

in South Carolina -- I mean, now we have Basham as well, but there -- there had been none before this, right?

A.   That was my understanding.

Q.   You started working on this case in approximately January, does that sound right, of '03?

A.   It sounds right.  I remember it was not that long, it wasn't right after the crime.  And I remember -- I can mostly remember it was sometime around then because we started working on it with the clinic students that January.  And school starts like the third week, and I know I was in the case by the time school started.

Q.   And how many times do you think you spoke with Mr. Fulks over the -- well, initially, and then just sort of working up to trial, how many times?

A.   I don't know, 25, maybe more.  30.  You know, I mean, there's all kind of things.  Sometimes you go to see him just to see him because he's incarcerated and he's away from his family, he's not getting family visits.

So, you know -- or sometimes you go see him for small purposes, or sometimes the meetings are obviously more substantive and in depth.  So -- I mean, my time records reveal that I would say, you know, 30, 25 or 30 times or so with varying degrees of length.

Q.   Had you ever been involved -- I mean, how many cases have you ever seen that spanned as many jurisdictions as this one?

A. Well, it involved more jurisdictions than any case in which I have been involved.

Q. Have you ever worked on any cases or known of any that spanned this many jurisdictions before?

A. Not that -- I mean, "know of any," of course, you know, I haven't sort of actually done a survey to try and figure that out, but it was a big -- it was a big case with a lot of moving parts.

Q. And your initial evaluation of the case when it first came in, what was your initial evaluation?

A. Well, you know, my initial evaluation is to try not to have an evaluation. You know, my -- initially I try -- at least my working -- I try not to form theories too early. I mean, we are all guilty of that to some degree or other, and I'm sure I am as well. But I think it clouds what the truth might be if you spend a lot of time early on trying to figure it out instead of just trying to get the information, review the information, and see where it leads.

So, you know, initially I knew what he had been charged with. And I had some conversations with Mr. Fulks about, you know, what had happened. And so we were just trying to pursue and trying -- I guess wrap our heads around what the different -- what the evidence and allegations were.

Q. And so how quickly did you then try to get out in front of the government? You said you wanted to try to get out in front

of them quickly, how quickly did you move on that?

A.  Well, we started sometime that semester.

Q.  This is the winter semester of '03?

A.  Yes.

Q.  Okay.

A.  And that was the winter semester of '03 we started trying to get out in front of them.

Q.  And who on your team -- just give me the names of the folks on the team that were out sort of doing this?

A.  Well, Pete Skidmore was -- he was the primary fact investigator on the case, so -- and then Mr. Nettles.  And then I remember that I sent two students, I'm pretty sure it was Casey Hinkle and Mary Mulhern, to Kentucky with Pete and Mr. -- and Mr. Nettles.

And that -- they went there to try and -- we were trying to get information about Mr. Basham at that point, information about him, his -- you know, his proclivity to violence.  But basically we were trying to dig up dirt on Mr. Basham which could be used to support our theory that Mr. Basham was violent and unpredictable and that he was most likely the perpetrator, so they went there.

And I went to West Virginia, along with Ms. Glass, Ms. Johnson, and several other students.  And then we also came here and did -- I mean, I was here a lot.  I was here more then, and we did work here.

Q.  And then what did -- what were Tracey Dean and Drucy Glass doing besides that?  I mean, were they already talking with Mr. Fulks about his background and getting the mitigation evidence witnesses together?

A.  I mean, their own work product should answer this.  But, yes, I mean, they were interviewing Mr. Fulks, they were also -- we were interviewing -- some combination of Ms. Glass, Ms. Dean, Ms. Johnson and myself were seeing his family members in Indiana and West Virginia -- I mean, West Virginia, Ohio.

Q.  And did Jill Ryder, a paralegal in your office, also go and talk with Mr. Fulks from time to time?

A.  Mr. Fulks, yes, definitely.

Q.  And what, just another person to visit, to get information from him?

A.  In part.  I mean, you know, Chad is -- was a little -- I mean, it's not really fair to him to say this.  I guess I would say he's a little on the needy side, but I guess maybe that's not fair.  If I was locked up, you know, in jail away from my family and stuff, I'm sure that I would be perceived as needy, you know, as well.

So, Ms. Ryder went to see him.  Sometimes it was clearly about information, you know, in the case.  She had to get him to sign a release, she needed to get him to do something.  But I tried to set up a procedure where Chad could be seen by somebody on a very regular basis to try and, you

know, help him, and to try and foster the attorney-client

relationship and his cooperation.

Q. Did -- isn't it true that there were times where Mr. Fulks

would tell you things and they were just proven to be false?

A. Yes, that's true. I mean, that -- yes, that's true.

Q. And in fact, isn't it true that you sometimes had

discussions about the wild goose chases he had led you on?

A. Yes. I mean, it's not -- I don't want to get into a debate

with you, that's not that unusual. I mean, sometimes -- you

know, with clients it either -- it takes a while to establish

rapport.

They often tell you things in the representation

that's not true and you have to build up to -- some of it I

think may be even to test you to see if you are actually,

really on their side and you are going to pursue their loose

ends.

So, he did clearly tell us things at times that

weren't true, but I felt like that -- the more we were in the

relationship the less that happened.

Q. Isn't it true that at one point after he had given a

statement in April of 2003 to the FBI, that he recanted to

y'all about him having committed the rape?

A. He -- I don't think he recanted to me, he did -- he did

tell some member of the team that, I think, that it wasn't

true. I don't believe it was me. It may have been Ms. Ryder,

it may have been somebody working on the case, but --

Q. Would you describe your role as sort of the CEO of this operation?

A. I mean, I guess that's a fair characterization.

Q. Tell me if these are some of the places you went to investigate early on --

A. By me, do you mean me? Or by me, do you mean somebody on the team?

Q. I'm sorry. You, John Blume --

A. -- yes.

Q. You went to the beach where the Donovan killing happened? Did you go there at some point fairly early on?

A. Yes, I went there several times.

Q. The hunting club, the Bee Tree Farm place?

A. Yes.

Q. A question for you. Now, if the Basham statement had come in somehow, the strap statement, wouldn't that have undercut the whole premise of your client having confessed and said that the killing happened a good 30, 40 miles away, would that have created some heartburn?

A. You know, I don't -- honestly, I don't know. I don't know that I would agree with that. I'm not sure -- like, for example, I don't even know today was Basham jerking them around when he took them to the hunting club, or did he just really not -- they were all so high, so screwed up, so impaired that

he actually maybe thought that's where she was killed.  So, I'm not inside, you know, his head on that.

But I do think any admission that he was the actual perpetrator would have been very useful to us, as really, you know, our -- I thought that our main chance to save Chad's life was to convince the jury that he wasn't the killer.

Q.  You also went to West Virginia several times?

A.  Actually more than several times.

Q.  Okay.  How many more than several?

A.  I probably went, you know, overall eight times, six or eight times.

Q.  What about the Ohio area, or is that sort of --

A.  That's all in the same -- I mean, this part of Ohio, Kentucky, they are all kind of right there.

Q.  And what about Indiana and Michigan area?

A.  I think I only went there once.  Yeah, I'm pretty sure I only went to Indiana, Michigan one time.  I know Ms. Dean went on another occasion, Ms. Glass may have gone, you know, on another occasion, but I only went once.

Q.  Can you list the people that you actually talked to in categories of -- his father, did you talk to him?

A.  I did talk to his father.

Q.  Did you talk to his mother?

A.  I talked to his mother many times.

Q.  How many is many times?

A.   Probably a total of at least five, six, maybe more.

Q.   And was there a diametrically opposed view expressed by those two?

A.   I think it is fair to say -- again, this is not like unique to Mr. Fulks' case, but that Mr. Fulks believed that all of Chad's problems were attributable to his mother, and that he had been, you know, a wonderful parent.  And Ms. Fulks believed that all of Chad's problems were attributable to his father, and that she had been a wonderful parent.

My perception was that Chad's problems he had, preexisted them, probably because she drank during pregnancy.  But they were exacerbated by what I would call their abysmal failure as parents.

Q.   What about Mr. Fulks' sister?

A.   Yes, she -- I did talk to her probably two or three times.

Q.   What about his grand -- one of his grandmothers?

A.   Well, I met with both of his grandmothers at one point or another.

Q.   Okay.  Uncles?

A.   Several uncles.  He had an Uncle Mark in Indiana, I talked to him.  He had an Uncle Kevin who was in Conway, and I spoke with him.  He actually had another uncle on his father's side who was married to a relative of Samantha Burns, a very ironic sort of small situation, and so I spoke with him.  And I think that's maybe it as far as uncles go.

Q.  What about aunts?

A.  He -- yes, I spoke with several of his aunts that -- they were on his -- the one I remember speaking with was on his mother's side.

Q.  Friends?

A.  People that he knew.  I mean, yes, I talked to some people that he knew from his neighborhood.  A woman by the name of Beth McGuffin, who is also a witness for the prosecution.  She also was in some respect -- in many respects actually a mitigation witness, because she had grown up with Chad in the same neighborhood and was a witness to his parents' debauchery, I guess is what I would call it.

Q.  Teachers?

A.  I spoke to at least -- I personally talked to three or four of his teachers, mainly I think the ones who we perceived that we were going to call as witnesses at trial.  Other people spoke to them as well, but I went -- I think I talked with four of his teachers.

Q.  Probation officers?

A.  Yes.

Q.  How many?

A.  I mean, there was one main one who is a guy -- his name actually escapes me at the moment -- who was Chad's probation officer in -- I think he was a probation officer, maybe he had been a parole officer of juvenile.  He had been involved with

Chad for some period of time in Ohio, and so he would work --
he was still with the department, he worked at the courthouse
in Ohio, and I talked to him.

Chad had also been in a home in Ohio when he was a
juvenile, and I went to that home.  I went to the home, what,
probably I think twice, trying to find people that had worked
there who knew him as a child.

Q.  What about any police officers that had dealings with him
over time?

A.  Yeah, I don't remember whether I talked to any of the
police officers.  I remember that we tried to find and I think
did find one or two of the police officers.  Because what we
were trying -- because Chad had told us -- actually everybody
had told us that the police were frequently called out to what
I think was the little yellow house, as they referred to it,
because of the -- the bottom line is, you know, they would be
there, they would drink, they would play pool, people would
fight.  And the police would be called to sort of break up
the -- break up what had happened.

Q.  Tell me about how you went about getting the records
necessary, for the mitigation investigation in particular.

A.  Well, you know, the reality is, I personally don't do
that.  You know, that's the kind of -- that's at least -- I'm
not saying I'm too good to do it, I'm just saying I don't do
it.  You know, I ask people to do it.  That would have been

primarily done by Ms. Ryder, Ms. Glass, and Ms. Dean.

But I mean, the normal process is that you obtain a release from Mr. Fulks, you would order records, you would ask his family members to sign releases for their school records, education records, work records. And in some instances we would try and obtain information by subpoena, maybe if it was related to prior criminal activity. But that's the basic process.

Q. So, when did you start to develop the theory of the case that you were -- both factually and mitigation-wise, when did it start to take shape?

A. Well, I think, you know, that when it's -- it's kind of hard to say exactly. And I'm not trying to be evasive, but you take like a long period of time -- and I'm trying to sort of look back and go, "When exactly did you figure out what you were going to do?"

I think pretty early on. I mean, when talking to Chad, he always adamantly denied being the killer. He told a pretty consistent story. And, you know, at least from my perspective he told it convincingly.

So, I think it was not long in the representation where we were convinced that, you know, one of our main -- that our main focus on the crime itself was to try to show that Mr. Basham and not Mr. Fulks killed Alice Donovan and Samantha Burns, because that was clearly going to be part of the

government's -- we were under no illusions that it wasn't going to come into evidence that he had killed -- that Ms. Burns, the Burns' incident had been -- was part of this.

So, that was pretty early on. That I think would probably be the first thing that we settled on.

As far as the other, what the mitigation evidence would look like, I don't think we settled on that really, on exactly what we were going to put up until the trial itself.

But it was substantially before that that I became convinced that he had fetal alcohol spectrum disorder. I don't remember exactly where in the process that was.

Q. Who is Dr. Ellen Berg?

A. Dr. Ellen Berg is a psychiatrist in Columbia. And she was retained -- she was someone who I retained not for the purposes of doing an evaluation of Chad for purposes of testimony at trial, she was what I would call a treating physician.

Chad had some ongoing mental health and physical issues, so we, you know, used her to sort of treat him, to try and monitor his medication regime and to try and, you know, help him out.

Q. Let me put on the screen Exhibit 9. If you would look actually at the second paragraph of this letter, do you recognize this letter? Take a moment to look at it.

A. Yeah, I -- I mean, it's clearly a letter to me from Dr. Berg.

Q.  What is the date on it?

A.  I can't actually see it -- February 24th, 2004.

Q.  And how often would you speak to Dr. Berg?

A.  You know, it was -- I don't think -- I did not have a regular like, you know, time.  I mean, it was mostly around if there was some issue that we needed, you know, her assistance with.

        She would check in on Chad I think from time to time at the various institutions.  So, I mean, I spoke with her, you know, a number of different times, but I don't actually know how many.

Q.  Let's focus on the second paragraph of this letter.  So, at least as early as February of '04 in this one sentence paragraph we see where she is saying to you that fetal alcohol syndrome appears to be the -- "is in my opinion the strength of this case because of the associated impact on various brain structures;" is that correct?

A.  That's what this letter says, yes.

Q.  Let's go ahead and start back, rewind back to sort of how you started to compile these experts and the process by which you ended up where you did with the diagnosis of fetal alcohol spectrum disorder.  Who is the first expert besides Dr. Berg -- I guess she was the first one, kind of, the treating physician, or was that Dr. Venn?

A.  You know, I don't actually honestly remember if I got

Dr. Berg before I got Dr. Venn. The first thing I would have done as far as developing the expert testimony would have been to retain a neuropsychologist, and that is someone who will do essentially testing to determine how the person's brain is functioning. And that's just sort of my practice. That's what I would do in any case and what I did here.

So, the first step would have been to get Dr. Venn -- there were really only two neuropsychologists at that time in the state that I personally had confidence in, and that was Dr. Venn and Dr. Jim Evans. So, I retained Dr. Venn and asked him to do a neuropsychological battery.

Q. Basically I guess you did retain Dr. Evans as well, later on?

A. Yes, later on.

Q. So, after that you started with Dr. Venn, he does some cognitive functioning tests, I guess?

A. Yes, he administered the Halstead-Reitan neuropsychological battery.

Q. And after that then what did you do from there?

A. Well, after that I think the next step was to ask -- because the neuropsychological battery indicated that Mr. Fulks was low functioning and that he had brain damage -- was to ask Dr. Bachman, who was a neurologist at the Medical University of South Carolina, if he would also do a neurological evaluation of Mr. Fulks.

Q. And at some point did he make contact with some folks out at the University of Washington?

A. Yes. He believed, based on his neurological exam and the results of the neurological testing and history, that Mr. Fulks most likely had a fetal alcohol spectrum disorder and so he -- he was doing some research on imaging studies and how to determine that. And he's the one that found Dr. Bookstein and contacted him, who was then -- Dr. Bookstein actually was then at the University of Michigan, but he worked with the people at the University of Washington.

Q. Was there at some point that he actually consulted with a Dr. Sterling Clarren?

A. I don't remember whether, you know, he talked to Dr. Clarren. I had a conversation with Dr. Clarren along the way and I may have gotten his name from Dr. Bachman, I don't --

Q. What was your conversation with Dr. Clarren?

A. We were trying to see if we could get him involved in the case. He was very interested in doing it, but there was a schedule conflict I think which was not -- which could not be resolved.

Q. Okay. So what then -- where did you go from there?

A. Well, we -- eventually we got Dr. Bookstein to do the imaging studies. And then somewhere along the line Dr. Hilkey was retained. I think, to the best of my recollection, and again I could be wrong on this, is that we didn't actually

retain Dr. Hilkey.

He had a North Carolina team of lawyers, because he was initially charged in North Carolina with -- with capital murder, with the murder of Ms. Donovan, because they didn't -- nobody knew exactly where it happened.

And I think his North Carolina lawyers retained Dr. Hilkey, but I'm not positive. He was not someone I knew and had worked with before this, so I thought he came through them, maybe not. And then also at some point Dr. Halleck was also retained.

Q. Let me show you what has been introduced as Government's Exhibit 16. Let me -- if you would, just thumb through those documents. In reviewing your file this was in a folder noted Dr. James Hilkey. If you would look through it and tell me if you recall receiving this material?

A. Okay, yes.

Q. In reviewing that it's fair to say that you were corresponding, talking with, Dr. Hilkey at least from August of '03 through -- and up to the start of the trial in June of '04; is that correct?

A. That's what these documents indicate, yes.

Q. Does that jive with your memory of the situation?

A. Yes, pretty much. I had probably less interactions with Dr. Hilkey than with probably the other people but, yes, that does correspond with my recollection.

Q.  And the notes in Exhibit 16, are those copies of your notes?

A.  You are talking about these --

Q.  Handwritten notes --

A.  -- where following this, where it starts Hilkey file?

Q.  Yes.

A.  Yes, those are my notes.

Q.  And then you said you met -- or you brought Dr. Halleck in?

A.  Yes.

Q.  What was the purpose of getting Drs. Hilkey and Halleck in the case, Mr. Blume?

A.  Well, I mean, at this point we were trying to determine what the range of potential mental health issues were in Mr. Fulks' case.  Dr. Hilkey was a psychologist and he had done some of this testing that you indicate.

        Dr. Halleck is a forensic psychiatrist who I have worked with in several other cases and someone who I had confidence in and felt as if he were a good mental health professional and also a very good witness.

Q.  Let me hand you what has been marked as Government's Exhibit Number 15, yet another folder in your trial files.  I would like you to look at that first letter, opinion letter.  This was done on the verge of trial, actually as trial had started; is that correct?

A.  Yes.

Q.  And isn't it true that Dr. Halleck found that Mr. Fulks met the diagnostic criteria for antisocial personality disorder?  I think if you look on page 7, or perhaps 8?  Down at the bottom of page 7 there?

A.  Yes.

Q.  I think it's on the screen.

A.  Okay, yes.

Q.  So, it was clear if Dr. Halleck was called, he would at a minimum have to admit that Mr. Fulks met the diagnostic criteria for antisocial personality disorder; is that correct?

A.  Yes, that is what he had said in his letter.

Q.  And the notes in that file, those are your handwritten notes as well?

A.  The first set is -- there's some more near the back --

Q.  The one that says "Sey Halleck" at the top, those are your notes, that page?

A.  Yes, that's mine.

Q.  And then the next page --

A.  The next page I have actually is a letter.

Q.  A fax?

A.  A fax.  And then something called table of contents and then another letter, and there's some handwritten notes -- I have four -- three or four pages in the back and that's my writing.

Q.  That is your handwriting?

A.  That is my handwriting.

Q.  And can you tell when you wrote those?  It looks like at the top of that there is a 4 with a slash.  Does that give you any time frame when you talked to Dr. Halleck, or not?

A.  Are you talking about these?

Q.  Yeah, the one with Dr. Halleck --

A.  Yeah, I mean, based on the way I ordinarily do things I would think it meant April, but -- normally I would have put the date, and I don't know why.  I can't explain why I didn't do that.

THE COURT:  Mr. Daley, it's about time for our mid afternoon break.  Is this a good place to stop?

MR. DALEY:  It's a good time to stop.

THE COURT:  Be thinking about this over the break. I'm on a three-judge panel with Judge Shedd and Judge Currie in a case involving a challenge to the election laws, and the March 16th filing date is coming up pretty soon.  We have to do something or else delay the elections.

Judge Shedd wants to have a conference call tomorrow between 10:30 and 11:30 and 1:30 and 4, which chops up this trial no matter how you do it.  I would like to suggest that we consider starting at 9 o'clock tomorrow morning and breaking for lunch at 11:30 and taking an early lunch, and y'all maybe could have an hour and-a-half for lunch, and give me time --

because it might be a 20 or 30-minute conference call.  Is that suitable?  Any problem with that?

MR. ASHMORE:  No, sir, Your Honor.  We will make it work.  I have got a witness coming from Chicago, I will put her up first, but we will get her up and down in an hour and-a-half.

THE COURT:  Well, no, you don't -- you want to finish it in the morning, in other words?

MR. ASHMORE:  She has got a flight to catch.  I think we can get it done --

THE COURT:  I don't want to rush you through her.

MR. ASHMORE:  Thank you, Judge.

THE COURT:  If you put her up at 9, if you put her up at 9, that's two and-a-half hours until 11:30, right?

MR. ASHMORE:  Judge -- yes, sir.

THE COURT:  Is two and-a-half hours enough time?

MR. ASHMORE:  I think that's plenty of time.

THE COURT:  Start at 8:30 if you want to.

THE CLERK:  No, we can't get the satellite dish.

(Off record discussion)

THE COURT:  Was she flying in tonight?  Will she be here first thing tomorrow morning so we can start right at 9 o'clock with her?

MR. ASHMORE:  I'm told two and-a-half hours is plenty of time.

THE COURT:  We can take her out of turn if you want to, if we are in the middle of some other witness.

MR. ASHMORE:  Might have to do that.

THE COURT:  I'm going to tell Judge Shedd then I'm going to be available at 11:30 and we will break from say 11:30 to 1 for lunch, longer than normal.

I should have told you at the start my normal schedule in a case like this would be to start at 9, go to right around 5:15 each day, break an hour and 15 minutes for lunch, and at least one break in the morning and one in the afternoon of about 15 minutes each.  All right.  Well, let's take our 15-minute afternoon recess.  Be in recess.

(Short recess)

THE COURT:  All right.  Let me just suggest a little bit of change of plan.  Over the break I realized a better course of action would be to ask Judge Shedd to set the conference call for 1:30 and let us take a late lunch, and that way we won't paint ourselves into a corner if something doesn't go off as planned and the witness needs to catch a plane.  So, let's say we will start at 9:30, take a late lunch at 1:30. All right.  Please continue.

BY MR. DALEY:

Q.  Mr. Blume, I handed you back what is marked as Government's Exhibit 15, and we are on page 15 of that exhibit, handwritten notes with Dr. Halleck on top and underlined and a 4 slash; do

you see that?

A.  Yes.

Q.  Those reflect some conversation you had with Dr. Halleck? Can you tell from those?

A.  I mean, obviously it does.  What it looks like is Chad had some physical problems as well, and he had a catheter.  And Dr. Halleck is a psychiatrist, but he's also a medical doctor.  So this appears to me he's relating something about Chad's health condition and his difficulties.

Q.  Let's go over to page 3, the third page of these handwritten notes, I'm sorry, which would be 17 in the exhibit overall.

A.  Okeydokey.

Q.  And if you would look down towards the bottom, it says, "PTSD.  Chronic PTSD main diagnosis by some people.  Halleck not that impressed with it"?

A.  Yes.

Q.  So, at least Dr. Halleck apparently told you at some point he wasn't particularly impressed by that diagnosis; is that what those notes reflect?

A.  Yes.

Q.  Okay.  Let's go ahead now, and you had Dr. Bookstein, and I think we were interrupted by -- or not interrupted, but you had Dr. Halleck and Hilkey that you had retained.  Where did you go from there?  What other folks?  You had Bookstein, Bachman, and

I'm just wondering where you went from there?

A.  You know, I may -- I don't remember sort of the chronological order or if one thing necessarily led to another.  At some point in this process I retained Ruben Gur, and at some point then in this process we retained Margaret Melikian.

Q.  And what about Dr. Howard Becker?

A.  Yes, I retained Howard Becker as what I would call a teaching expert.

Q.  To teach a jury, basically?

A.  Yes.  I mean, Dr. Becker was not a clinician.  In other words, he was not somebody who could examine Chad and diagnose him with fetal alcohol syndrome or fetal alcohol spectrum disorder.  But he was -- his area of expertise, academic expertise, was fetal alcohol syndrome.

So, I retained him to try -- and obviously there's a question whether it worked, how good a job we did, but to try and educate the jury about fetal alcohol spectrum disorder. So, he was what I would refer to as a teaching witness, not an evaluating witness.

Q.  Let's go to Exhibit 13, an e-mail that you sent to Dr. Melikian.  It should be on the screen.  Do you see it?

A.  Yes, I can see it.

Q.  And I think we actually -- this was already gone over with by Mr. Ashmore.  You're discussing with her, obviously toward

the end of December, the fetal alcohol spectrum disorder, but I would like to go to the second page.

And isn't it true at that point you were concerned, as you look at the first paragraph -- I mean, the second paragraph -- you were concerned that he was going to be diagnosed with antisocial personality disorder; isn't that correct?

A.  Yes, that's correct.

Q.  And in fact did Dr. Melikian find that he met the diagnostic criteria for antisocial personality disorder?

A.  Yes.  I think both Dr. Melikian and Dr. Halleck, I don't remember about Dr. Hilkey, concluded that he met the criteria. I mean, they both had their own sort of problems with the criteria and their application in this case and whether it was fair or not, but they did both conclude that he at least facially met the criteria.

Q.  And then as you go to the next paragraph, isn't it true that you were concerned and actually had pointed out at trial that there would be an attack on Mr. Fulks for malingering. Was that a concern of yours?

A.  Yes, there was no -- I mean, to the best of my recollection there was never any issue about Chad malingering in any evaluation in this case, any evaluation that anyone did, I mean, that I can recall.

He had been previously at a prior evaluation where he

had been sent for -- I think for a competency evaluation based on charges, prior federal charges, he had been determined to be malingering some four or five years prior to trial.  So, there was the question about whether that was going to come out, and if so how, and what were we going to do about it.

Q.  Would you agree with this statement, that a brain scan would be a lot harder to malinger or cause a bad result with compared to a diagnosis by a psychiatrist?

A.  Well, I mean, I think a good mental health professional can normally figure out if someone is malingering.  But you can't malinger a -- if the brain scan is abnormal, obviously that's not something a defendant has any -- at least to my knowledge -- an ability -- any control over.

Q.  That's objective, correct?  That's an objective test?

A.  Yes.

Q.  Whereas there is an element of subjectivity that a psychiatrist has in coming up with the diagnosis; is that correct?

A.  I think I would have to agree with that, yes.

Q.  Let's pull up Exhibit 12.  Looking at Exhibit Number 12, Government's Exhibit Number 12, the trial notes of yours, do you recognize this as your handwriting?

A.  Yes.

Q.  And does this -- it has a -- it's entitled "Margaret Melikian."  Can you tell from that whether you were speaking to

her at that time?  What do these notes represent?

A.  Well, they appear to me to be a conversation that I had with Margaret Melikian.

Q.  Let's go to the center of the page, down about halfway or a little further, where it says, "Pathological liar.  Catch him in a lie and he still will not admit to it."  Do you recall having a conversation where Dr. Melikian referred to Mr. Fulks as a pathological liar?

A.  I mean, that's what these notes reveal.  It looks like she is saying that "He does lie a lot, but it's in a childlike way and he's low functioning.  And if you catch him in a lie, he still will not admit to it."  I mean, I don't actually remember this conversation, but it looks -- I mean, but clearly that's my handwriting.

Q.  Let's go to Exhibit Number 11, another file of yours entitled Dr. Margaret Melikian -- is it Melikian or Melikian?

A.  It's neither, it's Melikian.

Q.  Melikian.  If you would thumb through those for me, please.  There appear to be handwritten notes dated 12-11-03. Are those Dr. Melikian's handwritten notes?

A.  Yes, I believe these are Dr. Melikian's handwritten notes.

Q.  And towards the end of this document or the C.V., is this a letter that I believe was attached to disclosures to the government in Exhibit Number 10, but is this the letter that she sent to you with her diagnoses?  Are you there?  I'm sorry

if I --

A.  You are talking about it began -- yeah, yeah, yeah.  Yes, I'm there.

Q.  And these are her diagnoses?

A.  Yes.

Q.  And again --

A.  And I don't remember -- it's unsigned, so I don't know if it's a draft or the final or what we provided the government as a summary, but, yes.

Q.  But it's clear that she was going to diagnose him with antisocial personality disorder; is that correct?

A.  Yes.

Q.  Let's go to the Exhibit 6.  I believe you had seen this once before earlier, it's a memo from Jeff Bloom about the focus group that y'all did.  And at that point -- when was it held?  When was the mock jury held?

A.  You know, honestly I don't remember.  It was obviously some time before March 9th of 2004.  It probably wouldn't have been that much beforehand.  So, you know, February, early March.

Q.  Isn't it true that in that mock -- or in that focus group, you actually presented the case as a guilty plea; is that correct?

A.  Yes.

Q.  And so when on direct they were asking you about the fact that the pro life jurors were talking about the lack of

physical evidence, these folks were though looking at the case in the context of a guilty plea; is that correct?

A.   Yes, I'm pretty sure that's correct.

Q.   Okay.  Let's go to page 3, top of the page.  Isn't it true that as a result of the focus group, at least John Bloom's analysis or -- or actually how did he come to some of these conclusions that he has in this memo?

A.   Well, okay, this is Jeff Bloom's memo.

Q.   I'm sorry, Jeff Bloom.

A.   That's all right.

Q.   I apologize.

A.   It happens all the time.  I always tell people, "He's the short Catholic and I'm the tall Jew," and it sometimes helps them keep us apart.

        So, the way this was done was the case was presented to a group of prescreened people.  In other words, Mr. Jeff Bloom had people come in, he would death qualify them in some general way.  Those people who would never give death he didn't want on the focus group.

        The case would be presented, and then they were split into, I don't remember, two or three groups for deliberations.  And those were videotaped, and he would then observe them.  And this memo is the result of his analysis of their deliberations.

Q.   And isn't it true that one factor that you took into account as to whether to pursue the fetal alcohol defense in

mitigation would have been the recommendation at the top of this page 3 that fetal alcohol effect evidence is the strongest mitigator?  Was that at least a factor?

A.  Yes, sure, it was a factor, yes.

Q.  And then if we could go down to the fourth paragraph, starting with "Several pro life jurors."  Again, did this reinforce in your mind that the pleading guilty approach might very well inure to Mr. Fulks' benefit, because it would show at least some level of remorsefulness?

A.  Yes.  I mean, I think, you know, clearly at this point, I mean, I do remember this.  I can't say I remember it vividly.  But we were contemplating, we had not fully decided, but certainly we were contemplating that Mr. Fulks would plead guilty at this point.

And so in this focus group I wanted to try it out, so to speak, and present it as a guilty plea to see what -- you know, how it -- to get some idea of how it worked.  I mean, these things are not completely predictive and you don't use them to predict outcomes, you use them -- it's a tool that you use and put into the -- you know, basically into the decision-making process.

Q.  And if we actually go over to page number -- page 4, to the bottom of page 4, "Special suggestive voir dire strategy slash questioning."  This was in fact what you saw -- well, two things.  One is that you wanted to try to, as best you could,

get them to consider fetal alcohol effect, but the second part about the non-triggerman, that was something that you were trying to deal with, weren't you?

You obviously were hoping that you could find jurors who were not going to give the death penalty because he was potentially not the one who struck the fatal blow; is that correct?

A. That's his recommendation in this memo to us to look for jurors on the sort of the Enmund/Tison question, on basically could you give the death penalty to a non-triggerman.

Q. Let's go to page -- that's Exhibit Number 7. Can you tell me what this document is? Well, first of all, two-thirds of the way down on the left-hand side, is that your handwriting?

A. No. I'm pretty sure that's Mr. Weyble's handwriting.

Q. Okay. What is this document?

A. Well, this is -- the focus group, according to this, would have been on March 6, 2004, which would have been I guess several days before the report. This is the outline of the presentation which we worked on to guide the presentation at the focus group. So, this is the defense presentation, this is a focus on the defense presentation, the outline of the defense presentation.

Q. Let's go to Exhibit Number 8. Can you tell me what this exhibit is? Well, first of all, at some point in the fall of '03, did you hold a focus group at the law school on this case?

A.  Yes, we did one in Ithaca.

Q.  And is this document a compilation of the feedback, the questions that were asked by the various jurors?

A.  Sorry, it's hard to see.  But, yes, what this would have been -- yes, this is the notes that someone took of what happened during the focus group.  This is not an outline of what we were going to present.

I would have asked some of the spectators -- this is probably a memo that a student did -- where I would have asked them to sort of write down what the people were saying and what their questions were so we could think about it afterwards.

Q.  Okay.  Let's now sort of get into the substantive claims. I'm just going to go through them as they are in the motion to vacate.  Claim number 1 is that it's ineffective assistance of counsel for failing to call the three mental health witnesses Halleck, Hilkey, and Melikian.

You have already explained that -- how the Ward testimony impacted that.  I just want to just sort of see if I can get it a little more crystallized.  One of the problems that I took from your testimony that you were going to have was that it was going to come out in their testimony that they weren't told about this phone call to Donna Ward, correct?

A.  Yes.

Q.  And that it was only -- if they had testified, they would have had to testify that it was only given them a few days

before they testified, potentially?

A.   Yes.   Three days probably -- or more.   Actually I believe -- so, it might have been more than that.   This came during the government's case in chief --

Q.   That's right.

A.   -- as I recall, so it was not during the defense case.

Q.   But the bottom line would have been that the experts would have been in the position where they would have had to admit that at a minimum Chad Fulks withheld that information?

A.   Yes.

Q.   And at least one of them has articulated that he had some pathological lying tendencies and that would not have gone well, correct?

A.   Well, I mean --

Q.   I mean, that was your thought process -- I'm sorry.

A.   I mean, I don't know that I actually -- did I think about that Dr. Melikian had previously told me this thing?   You know, I don't recall that.   I mean, I think if -- you know, maybe she can answer that if she is going testify in these proceedings.

So, I mean, I can't say that, yeah, I put that together and did that, but my concern was that I didn't think I had time to get them in, have them sort of evaluate this process, and then, you know, testify about it and/or potentially switch theories that, well, maybe Chad was more involved in this than he said, but you can explain this because

of his psychiatric history.

Q.  Let's go ahead to Exhibit 26.  This is an e-mail -- well, here, you tell me what it is.  Would you blow it up a little bit, please?

A.  Well, this is an e-mail that I sent to the major participants, the major people on the team, Ms. Johnson, Mr. Nettles, Mr. Weyble, Ms. Glass, Ms. Dean, and Jill Ryder, my paralegal.

Q.  And this was Friday, April 23rd of 2004, just a couple of weeks before the guilty plea and then jury selection?

A.  Yes.  I don't remember the exact date for the plea and jury selection, but I know that it was in May, I think at some point.

Q.  There's a lot in here, but what I would focus on right now, let's go to the second page and the very last sentence.  And I'm just -- you tell the group, you tell the team, "I'm still torn on whether to just go ahead and cut the shrinks loose and just go with bad brains with bad family leads to bad things."

So, isn't it true that as of just a few weeks before trial, you were potentially going to go with the very theory that you ended up going with after all?

A.  I mean, I don't want to get -- I think it says what it says.  I don't know that it says -- and it's my recollection, it's not that I had made a decision at this point, but that certainly what it said is, I'm torn.

In other words, you know, one possibility would be not to present the psychiatric evidence, and thus the other possibility would be to present it.  So, it indicates -- I think, fairly read, it indicates at least some ambivalence on my part about it.

Q.  And isn't it true in your opening statement you never mentioned Drs. Hilkey, Halleck, or Melikian in your opening statement to the jury?

A.  I mean, actually I haven't read this.  If it doesn't -- it says what it says, you know, about it.  I haven't gone back and looked at it.  So I mean, I'm not -- if you say that's what it says, that's what it says.

Q.  And if you remember during your opening, do you remember forecasting any testimony regarding a diagnosis of depressive disorders or PTSD or antisocial personality disorder?

A.  No.  I think the main thing I tried to highlight were what I perceived to be the two main themes, which were that Chad didn't kill anybody and that Chad had a damaged brain due to his mother's ingestion of alcohol and his -- and basically his bad luck.

Q.  And isn't it true that you have actually written, at least in one legal publication, that antisocial personality disorder can be the kiss of death?

A.  I don't know if I used that exact phrase, but I certainly have written several pieces where I talk about the -- that is a

diagnosis to be avoided.

Q.   And there was at least some concern early on, wasn't there, about malingering?

A.   You know, I mean, I don't -- I don't recall that there was anybody on our team actually thought he was malingering. Certainly I don't remember that Dr. Venn ever said anything about that.

I think as I recall, Dr. Hilkey may have gotten some results on an MMPI and something he mentioned that was -- I think he might have even referred to it as something like a floating profile or something in that regard.

And Dr. Hilkey did not believe Mr. Fulks was malingering, he believed this was just a result that he was such a traumatized individual by this.  But he may have expressed some concern that someone else might view it as that.  And then I think maybe we ran this by somebody by the name of Chuck Sanislaw, who is a psychologist at Yale who I have worked with in the past on these issues.

Q.   If we would go to Exhibit 28.  Can you tell me what this is?

A.   This is an e-mail.  Again, this is from me to the remainder -- to most of the people on the team.  Apparently this is -- I guess Tracy Dean must have printed this out.

Q.   If you would look down to the last third of this e-mail at the bottom of this page it says, "Motions in limine to do."

And the fourth -- the third one appears to be malingering.

A.  Yes.

Q.  What was that -- what were you worried about, or why were you going to have a motion in limine about malingering?

A.  I assume this would be a motion in limine regarding the malingering diagnosis given by the -- would it have been the Bureau of Prisons?  Is that who -- the BOP, would that have been who had rendered it?

Q.  I believe Dr. Resnick back in '98 at least did.

A.  Yeah.  Or Sinkowski or Simmons.

Q.  Simcox, maybe?

A.  Simcox or somebody like that that -- yes, that was the malingering diagnosis when he had been evaluated by the BOP.

        MR. DALEY:  Begging the court's indulgence.

BY MR. DALEY:

Q.  Let's talk about a couple of more experts that have been put forth in the --

        THE COURT:  Hold on a second.  Please continue.

BY MR. DALEY:

Q.  Some experts that you didn't call and the reason -- they claimed you were ineffective for not calling them.  The first one would be a Dr. Mark Cunningham.  He was going to talk about, I think, maybe several things, but particularly future dangerousness in the prison context.  Why didn't you call Dr. Mark Cunningham?

A.  Dr. Cunningham was released very early on in the process from my point of view.  I think primarily he wanted a bigger role in the case than I wanted to give him.  In other words, he perceived himself as sort of a one person do it all kind of expert.  And I didn't want to sort of put all my eggs in the Cunningham basket.  And it was quite a pricey basket as well.

And so it was that, combined with, you know, I don't know, right or wrong, everybody has their baggage, and I don't mean this -- I think Mark Cunningham is a very smart guy and so I don't mean to be critical of him, but he had testified in a number of federal capital cases, all for the defense.  And so I was a little worried that he would be easily impeached as, you know, a hired gun for the defense.

Q.  In fact, isn't it true that he sometimes will testify as many as 10 to 12 times a year for defendants in capital cases?

A.  Yeah, that may or may not be true.  I know that he has testified in a lot of federal capital cases, so that was why I did that.

Q.  Another expert that you didn't call that you have been criticized for is Dr. Alex Morton who was a pharm D.  Why didn't you call him?

A.  We retained Dr. Morton to -- he provided useful information to us.  The primary thing I had wanted him to look at was, Chad and Mr. Basham had used a lot of methamphetamine throughout this.

Dr. Morton's area of expertise is pharmaceuticals, drugs. And so I asked him to -- to see if he could help us with that. And some of it was that Chad's perception of time was off about things, so -- about that.

In the end, I elected not to pursue that any further because I don't think -- there weren't any toxicology results on the amounts, and his testimony was based solely on what Chad had told him. And I just felt like it would be too easily impeached with -- that, you know, Mr. Fulks would be self-serving. And there didn't seem to be any real dispute from the witnesses that he was using the methamphetamines.

Q. Was there some concern about the fact that drug use is a subject that can go either way?

A. Well, I mean, it certainly is a subject that can go either way. But I mean, I felt like that was -- there wasn't anything I could do about that. You know, the evidence that they abuse drugs and alcohol throughout this was just a fact, you know, that we were going to have to deal with.

Q. The second claim is failing to anticipate the Donna Ward and Agent Bruning testimony. I think you have testified that it -- that the defense knew about it actually earlier than the prosecution; isn't that true? At least -- when I say the defense, at least your defense investigator?

A. Well, I think what Mr. Skidmore knew was that a call had been made to Donna Ward. If he knew that Mr. Fulks made it,

that's news to me.  I did not know that he ever knew that.

Q.  But as a result of that, if you had known, what would you have done?  I think you maybe even testified -- or said something about that, but I mean --

A.  Well, I mean, I -- I mean, I don't know what I would have done.  I can't -- it's unlikely that I would have pursued it to the extent of trying to get the card and have it analyzed to determine, you know, if it was in fact true.

I mean, maybe some other lawyer would have, maybe some other lawyer should have.  I can't imagine that I would have done that.

Q.  Claim number 3, "The alleged failure to conduct an adequate and meaningful mitigation investigation."  We have already talked a good deal about this, but just want to go through a few things.  I want to go to Exhibit 31.  I will hand this up to you, if you could just take a look at it for a moment.

A.  Yes, I'm familiar with this.

Q.  Okay, what is it?

A.  This is what at least in my office or my -- we call a chronology.  And this is essentially a compendium of the information which has been developed during the investigation.  So it begins and starts out with the description of the relevant sort of people, family members, the relevant family members, or at least who we perceive to be the relevant family members.  And then goes through the chronology from

beginning -- in chronological fashion with the citation to events that people -- that we believe are relevant.

Q. And this 81-page document starts with the birth of Fulks' mother and father and goes through, I guess, the whole Fulks' family history. Would that be a fair description of it?

A. Well, it goes through the Fulks' history as we knew it. As we developed it, yes.

Q. And after each paragraph, there is a bracket that appears to be referring to interviews that were done by different people or --

A. Records. This is intended to designate the source of the information.

Q. And what -- this is prepared with an eye towards what?

A. It's a multipurpose document. Its primary -- it has an internal purpose to the team, which is to basically keep track of the information that was gathered, somewhat in a, you know, digested way.

And then in many occasions this document or maybe even some form of this will be provided to mental health experts as essentially that. And so -- and it forms the basis of your witness list, document list, that kind of thing.

Q. Let's pull up Exhibit 18. Do you recognize this?

A. Yes, this is a memorandum that -- that I wrote to what has been designated as the Fulks' team, which would be the people who you keep seeing on these e-mails, would be who this is

given to.

Q.  And what led you to compile this list?

A.  You know, I'm a list compiler by nature.  I don't know if it's a positive trait or a negative trait, but you know, I do to-do lists like this so I can keep track of -- it's a way of me sort of ordering my thoughts, laying out what I think needs to be done and being able to hopefully try and manage the investigation, and make sure that things get done that -- hopefully things get done that need to be done.

Q.  And let's go to page 2 of this document.  Towards the bottom it says, "Chart slash Exhibits."  Down at the bottom of that is number 5, "Case chronology."  Is that where you are telling them to put together this 81-page document, or is there another document that would be a case chron?

A.  No.  I mean, I would not have been telling them to put this together at this point in the proceeding.  This would have been fairly late in the game, they would have been putting this together.

What I'm probably talking about here is that -- I don't know whether if this was actually admitted at trial. Maybe I was talking about we decided that we were going to try to move this in through Dr. Andrews.

Q.  Okay.

A.  So -- but you know, I don't independently remember doing this, but I'm sure what I must have been -- I'm fairly

confident what I was talking about was that document that you are referring to.

Q.  Okay.  Let me show you Exhibit 35.  This is entitled "Fulks' Comprehensive Chronology, Chronology of events."  So that's a different -- this is different than what you are referring to, case chronology?

A.  Yes.  Yes, this is different.

Q.  And what was the purpose of document number 35?

A.  This was an internal document which would have, you know -- which I asked someone to prepare.  And I think the focus of this would have been -- this would have been something that I would frequently ask people to do almost in any case, was to try and get a time line of the actual events -- the criminal -- the events that Mr. Fulks is alleged to have committed -- or any defendant is alleged to have committed.  So, this is more of a time line of the offenses, is what this is designed to be.

Q.  Okay, let's go back to Exhibit 18.  Let's go over to page 3 of that exhibit.  Number 6.  You have what's been -- what you have entitled "Incarceration chart, when in and out," et cetera.  Do you see that?

A.  Yes.

Q.  Let me show you Exhibit Number 37.  Is that -- is Exhibit 37 what you were basically asking them to put together in this memo back in August of '03?

A.  You know, I don't think so.  It may be.  This to me is

just -- but this is something else I would have asked them to compile, which is essentially all his criminal history of -- his prior charges and outcomes and convictions.

I think the document which I would have been referring to -- the others would have been, you know, when is he actually in prison, when is he actually out?  This is a little broader than that, but this would have been another document I would have asked to be prepared.

Q.  Let's go back to Exhibit 18, to the third page again, and look at number 9.  There is something entitled, "Mitigating circumstances list."  And what would have this been or what would you have been trying to get put together?

A.  We would have been trying to put together a list of mitigating circumstances which we could submit to the jury. So, I think what I was looking for here was, you know, everyone's input based upon what they thought this ought to be.

Q.  Okay, let's go to Exhibit Number 24.  And if we could go to pages 7 and 8 of that.  At the bottom there, "Working list of mitigating factors."  Is that the list that you were having -- bottom of page 7, top of page 8 -- that you were having them compile; is that what that would be?

A.  Yes.  This would have probably been -- this is what I'm talking about here.  I think this is probably my initial take at this, which would have been intended to sort of stimulate additional, you know, comment, additional thought, additional

suggestions, and that kind of thing.

Q.  And why are you doing these short declarative sentences which no one can disagree with?  Is this with an eye to put into the jury verdict form, is that what --

A.  Yes.

Q.  And at least at the time, I don't know if it is still true, but isn't it true that at least one theory, one strategy would be to put as many short declarative mitigating circumstances, factors, into the verdict form to sort of create a large number of them; is that true?

A.  Yes.  I mean, we wanted to -- yes, to have as many mitigating factors as possible and based upon the evidence presented.

Q.  Let's go to Exhibit 18 again.  Let's go to page 3, the number 14, "Prior diagnoses chart."  What was that -- what was going to be the purpose of that?

A.  I think just to try and capture for our own internal -- my own internal purposes and thoughts all the prior evaluations and what the results of those evaluations were throughout his life.

Q.  Okay.  Well, I'm handing you what has been marked as Government's Exhibit 36.  Is that the document that ended up being generated?  Is that what you were looking for?

A.  I would -- I mean, it -- I don't recollect that this was given to me when -- an exact point in the proceedings, but I

mean, this would have been what I would have expected as a result of the request that that be done.

Q. And this is basically his mental health history from, you know, as a child up through to the present; is that correct?

A. That's what it appears to be, yes.

Q. Okay. Let's go through a few more of your memos that you sent out as you guided the investigation in the litigation case. Let's go to Exhibit 20.

I think we may have already gone over this once, but this is eight pages, I wanted to go -- I wanted to go to page 8 to begin with, actually. Looking at page 8. Number 4 there is A through H, I just wanted to go through these with you.

This is back in September, you are starting to create a memo identifying themes and mitigation. I want you to look at these themes in mitigation, and did you end up presenting all of these themes in your case?

A. You know, I mean, obviously the record is the best evidence of what we did and didn't present. The only one that I'm not -- that I don't know was mentioned at all is H. I don't remember how much, if anything, was said about his father as -- his father had been pretty traumatized by his experience in Vietnam, but I don't remember, you know, how much that came out and what the evidence of that was. I think at least something was said about the other things.

Q. But in this memo you have broken down sort of the places to

investigate, and at least the first crack at some of the people that need to be interviewed; isn't that correct?

A.   Right.   This would have been a working to-do list, which would have been -- which I would have kept and revised, you know, periodically, depending on either new things I believe needed to be done and things that I think, had they completed, would be removed.

Q.   And as early as at least September 18th, 2003, you have nearly all of the experts that you might have called or ended up calling; isn't that correct?  If you look at page 7.

A.   Yes, I mean, Dr. Bookstein wasn't on there and Dr. Melikian wasn't on there, nor Romine, who ended up sort of calling -- many of the other people that we talked about are already designated.

Q.   Let's go to Exhibit 22, does this e-mail reflect that even as early as October of '03 you are wanting to keep a tight rein and make sure that the social history investigation gets done?

A.   Yes.  I think it reflects that I -- reflects at least some frustration with the pace of the investigation.

Q.   In fact you were even contemplating, if need be, to have yet another investigator hired, if possible?

A.   Uh-huh.  Yeah, I don't know if I actually contemplated that or that was a CEO ploy to try to get the troops moving, so to speak, but the purpose of this was intended to try to motivate and accelerate the pace of the investigation.

Q.  Exhibit 23, let's look at that for a moment.  I want to go to D, that is actually circled.  There's a discussion with -- I guess you are addressing to Tracey and Drucy.  I am wondering, number 1, getting a "sanitized chron" to Melikian and other experts.  What is a sanitized chron?  Is that the big 81-page document that was cut back or --

A.  Yeah, I think it would have been.  There would have been some information in there which would have been covered by the privilege which we didn't intend to come out.  So, this was for our own internal purposes.  So, this would have been intended to try to devise a chronology which didn't contain information that was either not relevant or which contained information which might otherwise be privileged, or not come out.

Q.  Under number 3 you actually say you are trying to get an evaluation for the dad.  Isn't it true that you actually did end up retaining and having a psychiatrist or maybe a psychologist examine Mr. Fulks, Chad Fulks' father?

A.  I actually didn't remember that until you just said it.  I remember trying to get him to do it and I think he may have done it.  I actually don't recall the results of this.  If it was done, it is in the file and should be there.

Q.  Okay.  Let's go to Exhibit 29.  You got records from all sorts of places, did you in fact get records from Westville Correctional facility?

A.  Is that what these are?  We gathered records from a number

of different places.

Q.  I think at the bottom it says Waterville Correctional -- this is in fact Mr. Fulks' GED results?

A.  It appears to be, yes.

Q.  Mr. Blume, the records you obtained, you got school records?

A.  To the best of my recollection we did get school records.

Q.  You got Mr. Fulks' criminal records?

A.  I believe -- I know we got -- you know, we got a number of them.  I can't sit here and say we got every single one, but we gathered a number of records.

Q.  You went and found as many medical records as you could of his?

A.  We tried to obtain all the records that we were aware of.

Q.  So there was -- I mean -- how was this done?  Who were the people that were trying to get these records?

A.  The primary people who -- well, it would have been mostly Ms. Glass and Ms. Dean.  As I recall in this case, I was a little worried about who was going to monitor and stay on top of this.  So, I think I requested that, that any records Ms. Glass and Ms. Dean requested -- actually, Ms. Ryder would be the one to request them because I wanted one person to be accountable, you know, for monitoring this and keeping up, so I would only have to check with one person about the status of the record collection.

Q.  And isn't it true though that where you were subpoenaing records that Mr. Nettles would have --

A.  Yes, that's true.  I think some of the records had to be obtained through subpoena and Mr. Nettles was responsible for doing the federal subpoena.

Q.  And let's go to Exhibit 48.  You said that you investigated Mr. Basham and his background.  I want to show you a group of documents that is marked as Government's Exhibit 48.  Would you just thumb through those for a moment?

A.  Okay.

Q.  So you investigated his criminal record, his DSS records, his jail behavior and records?

A.  Yes.

Q.  And you also investigated his Social Services records, it looks like?  Is that true?

A.  Yes.  These are memos which were done by Mary Mulhern which are summarizing the records which were obtained about Mr. Basham.

Q.  And isn't it true that you actually went -- you didn't go, I guess, did Mr. Nettles go?  Who went, actually went to Mr. Basham's neighborhood and talked with neighbors and tried to talk with family members?

A.  To the best of my recollection it was Mr. Nettles, Mr. Skidmore, Casey Hinkle, who was a law student of ours who was from that area of Kentucky, so she was designated to

participate in that, and then Mary Mulhern, who was another clinic student.  They were the four people who I think went to Kentucky.

Q.  Did you recall not getting anything because you didn't have the money or the resources to get it, as far as records, or interviews?  Did you basically exhaust everyone you could possibly talk to that you could find readily?

A.  Well, I mean -- I mean it's hard to answer at that level. I'm sure there were people that we wanted to find that we didn't, that we looked for and couldn't find.  I can think -- I know that one person I can think of, Chad had a -- I think -- maybe her name was Tracy.

It was a girlfriend he had that he very much wanted us to find and who he believed would have positive, useful information.  I know that we didn't -- we couldn't find her.  I talked to her parents several times.  They would not disclose her whereabouts to me or to anyone else.

So, there were -- some of the people that Chad wanted us to find -- there were a lot of people in this -- who I don't want to project too much middle class values on them, but they were sort of marginal people who were difficult to find.  Some of them were homeless, some of them were prostitutes, some of them were drug addicts.

So, there were some people that we did not, could not find.  But, I mean, we attempted to find the people that we

believed to be important and relevant and we found the ones we could.  The results are what they are.  I mean, the proof is in the pudding, so to speak.

Q.  So, it wasn't for lack of trying, though?

A.  You know, could we have tried more, maybe somebody else would have done more?  I'm not trying to argue with you.  We did what we did.  We tried to find all the people and we put up, you know, what we had.

Q.  Would you estimate how many people you actually spoke with, your team?

A.  Oh, somewhere probably around, you know, 100 or so I would think, all in all.  Some of which had little or nothing to say, some had good things to say, some of it was not helpful.  It's just the way it is.

Q.  Let me hand you what is marked as Government's Exhibit Number 44.  I think we are through for now with the mitigation issue with claim 3.  Let's move on to the use of law students.  Exhibit 44, what is that?

A.  This is a document which would have been prepared for and used -- I mean, actually, I don't know if we prepared it or if I obtained this from -- I think this is something we actually prepared, you know, for this to be used as a -- this is an outline of a presentation that we would have given to students who were going to do investigations.

Q.  So, you would have given them at least a class on

training -- training them on how to interview before they would go out and do any sort of interview?

A.  Yes, we would have had them -- they would have been given a talk or a lecture about interviewing them.  We would have had them do some mock interviewing with role playing exercises before they would have been sent out to do any interviewing.

Q.  And the allegation is that they were unsupervised and untrained.  When they were going out and doing interviews, did they ever go alone for interviews?

A.  I would not have sent any before -- well, I mean, I would not have sent any of them alone as far as like a student to go see somebody -- actually let me put two caveats on that.  There were -- there would have been two exceptions.  One of them would have been Tim Kane, who I would have sent alone, but Mr. Kane --

Q.  Why is that?

A.  He has spent several years as an investigator.  He had worked for a capital defense unit in San Francisco prior to coming to law school.  So, I would have been comfortable sending him because of his training and background.

And then there was another student who I think actually did talk to a few people alone, and that was a gentleman by the name of Matthew Rawlings, who was an ordained minister from, actually, Huntington, West Virginia and the area.

So, I felt like he was mature enough and comfortable enough to talk to people and that -- and he didn't express any reservations about doing it.  So, I think it's probably likely -- I know Mr. Kane and I'm pretty sure Mr. Rawlings I would have been okay with them going out alone in some circumstances.

The other students I would not have sent alone, I might have sent them with another student.  So, I don't want to give the impression I might not have done that.

Q.  If they interviewed someone and it looked like they might be of some help or someone to follow up with, would there then be follow up by either a mitigation investigator or attorney or both?

A.  Yes, that's right.  Normally I would not have sent the student to see anybody who I considered to be, you know, a very likely material, a powerful material witness.  Like I wouldn't have sent a student to interview his mother, father, or one of his uncles, or that kind of thing.  That I wouldn't have done.

On the other hand, you don't necessarily always know ahead of time who is going to be an important witness.  But if they develop information during this that we thought was useful, somebody would have followed up on it.

Q.  Let's go to claim number 5, the charge on mitigation. There was some focus on the fact that jurors, a number of those mitigation factors were rejected by all or nearly all of the

jurors.  Isn't it also true though that those experts faced some fairly strong cross-examination by the prosecution?  Do you recall that?

A.  I mean, they were cross-examined by the prosecution, you know, whether one person's strong is another person's weak, the record is what it is on what their testimony was and what they were cross-examined about.

Q.  And going through the appellate process for just a minute, how much experience have you had in doing appeals over the years?  How many appeals have you done?

A.  Criminal appeals?

Q.  Yes.

A.  Ballpark probably --I don't know, somewhere probably more than 50, less than 100.  From 50 to 100, somewhere in that ballpark.

Q.  Almost all death penalty?

A.  Well, probably almost all death is probably accurate.

Q.  What about Ms. Johnson?

A.  She was an appellate defender in New York and then did not practice for a number of years, but she's done a number of appeals over the last few years --

Q.  And then --

A   -- this decade.

Q.  Mr. Weyble?

A.  He has the least experience I would say of the people

involved, but he's done a number of appellate briefs.

Q.  The claim 6 is the ineffective assistance of counsel supposedly for failing to object to the prosecution's imposition of a nexus requirement.  Do you recall that issue at all?

THE COURT:  Before you move on, have you finished your examination on the charge about mitigation?

MR. DALEY:  Yes, Your Honor.

THE COURT:  You just asked how many appeals he had. I did not write my jury charge out of whole cloth, I had some pattern instructions and transcripts that had been given by other judges in federal death penalty cases.  Has that charge ever been used before to your knowledge?

THE WITNESS:  I know, your Honor, that you got it from another judge.  I don't remember --

THE COURT:  That doesn't mean it's right.

THE WITNESS:  You did get it from another judge. I think we, everybody gave you proposed instructions.  The government probably gave you some that they got from another case that they thought was favorable to them.  I'm sure we gave you some that we got from another case that we thought were more favorable to the defendant.  Then you had your own set.  I think from that there was a discussion back and forth of the charge and what to give and what not to give.

THE COURT:  Did you say earlier that there was error reserved and objection made to my two-step mitigation?

MR. DALEY:  I believe there was one.

THE COURT:  There was one, but not on appeal.

MR. DALEY:  I believe there was one at the trial level but not on appeal.

THE COURT:  Now you are moving on to the next one?

MR. DALEY:  Now, I do remember that I did have a couple of exhibits.

THE COURT:  It's about 5:15.  I don't think you are anywhere close to finishing, are you?

MR. DALEY:  No.  I could finish this issue.  There are just two exhibits I want to show him.

THE COURT:  Let's finish this issue.  How do we stand tomorrow with finishing up Mr. Blume and getting the two and-a-half hour witness up and down by lunch?

MR. DALEY:  I can finish with Mr. Blume in probably an hour tomorrow.

MR. ASHMORE:  I would ask, Your Honor, we've got Andrea Lyon coming in, I know time is a problem for her.  It might be that tomorrow is a terrible day for Mr. Blume, I will let him speak for himself.  Obviously we can't finish with him today, we've got plenty of witnesses we can put up tomorrow. If tomorrow is a bad day for Mr. Blume, we can talk about finishing up with him on Wednesday or Thursday.

THE COURT:  Would you rather come back tomorrow or another day?

THE WITNESS:  Thursday I can't do it, I actually have a medical procedure that day.  I've got to have it in the morning and I will be basically not able to move after that, so it can't be Thursday.  I could conceivably do -- it's like anything else, mainly, I would prefer to go ahead and get this over with and move on.

THE COURT:  We can still start at 9 o'clock tomorrow.

MR. ASHMORE:  If we could do that, I think we might be able to get --

THE COURT:  We can't start earlier than that because of the satellite, but we can start at 9.

MR. ASHMORE:  Yes, sir.  I think we could probably.

THE COURT:  Gives us four and-a-half hours to finish with Mr. Blume and take up --

MR. ASHMORE:  That's got to be enough time.

THE COURT:  Let's go ahead and finish on this point and then we will recess.

BY MR. DALEY:

Q.  Is it true that you consulted with Mr. David Bruck on the jury instructions, both opening instructions and closing instructions?

A.  Yes.

Q.  Let me show you very quickly Exhibit Number 45, can you identify what that is?

A.  Yes.  This is a memo where I think I took the judge's instructions and asked them to be reviewed by David Bruck, because he had much more experience than I did in the federal death penalty context, so I wanted his input on the judge's instructions.

Q.  He is actually a death penalty resource counsel that --

A.  For the federal death penalty project, yes.

Q.  And Exhibit Number 46, can you tell me what that is?

A.  Well, I'm looking at -- 48 actually is on my screen at the moment.  Here we go.  46 is Mr. Bruck's response.  I think this actually was about the government's requested instructions.  I'm sorry, this is not a response to this.

The previous memo was his response to Judge Anderson's instructions.  These are his response to the government's proposed instructions where he is giving us some advice on, you know, objections to make to the instructions.

Q.  And then finally Government's Exhibit 47, can you identify what this document is?

A.  This is a memorandum which it's -- it's really, I would say, more of an outline for oral argument that we were going to have some -- you know, what were our objections to the instructions going to be.

This was mostly, as I recall, hashed out in court during, you know, with the give and take and back and forth.  So, this would have been a memo to guide.

I don't remember whether I did this in court or Mr. Weyble did, or whether we both did it, but it would have been for one or both of us on our points for the problems with the instructions.

MR. DALEY:  I think that would conclude my questioning for the evening.

THE COURT:  Very good.  Then we will recess until 9:30 -- 9 o'clock, I'm sorry, tomorrow morning.  Pick up promptly at 9 o'clock and then move forward.  We will be in recess.

(Thereupon, the proceedings were recessed.)

* * * * * * * * * * * * * * * * * * * * * * * * * * *

EXAMINATION INDEX

JOHN BLUME
    DIRECT BY MR. ASHMORE                          1-31
    CROSS BY MR. DALEY                             1-125

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

s/ Gary N. Smith                    August 16, 2010
_____    _____