IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 4:02-992 |
| | ) | |
|    Respondent, | ) | |
| | ) | |
| VERSUS | ) | Columbia, SC |
| | ) | February 23, 2010 |
| CHADRICK E. FULKS, | ) | |
| | ) | |
|    Petitioner. | ) | |
| | ) | |
| ----------------------------) | | |

TRANSCRIPT OF 2255 HEARING
(EXCLUDING EX PARTE HEARING)
VOLUME II
BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
UNITED STATES DISTRICT JUDGE


Appearances:

For the Government:     ROBERT F. DALEY, JR., ESQ.
                             JIMMIE EWING, ESQ.
                             ROBERT JENDRON, JR., ESQ.
                             Assistant U.S. Attorneys
                             1441 Main Street, Suite 500
                             Columbia, SC  29201

For the Petitioner:     BEATTIE B. ASHMORE, ESQ.
                             650 E. Washington Street
                             Greenville, SC  29601

                             KIRSTEN E. SMALL, ESQ.
                             P.O. Box 10648
                             Greenville, SC  29603


                             DAVID P. DALKE, ESQ.
                             KYMBERLEIGH DAMRON-HSIAO, ESQ.
                             STEPHANIE L. NOBLE, ESQ.
                             DANIELLE OAKLEY, ESQ.
                             610 Newport Center Dr., Suite 1700
                             Newport Beach, CA  92660

Court Reporter:          Gary N. Smith, CM
                         901 Richland Street
                         Columbia, SC  29201
                         (803) 256-7743

          Stenotype/Computer-aided Transcription

* * * * * * * * * * * * * * * * * * * * * * * * * * *

          THE COURT:  All right.  We are ready to resume.  Let me say to Mr. Basham, are you still able to see us and hear us with no difficulties?  I'm sorry, Mr. Fulks.

          THE DEFENDANT:  Yes, sir.

          THE COURT:  Very good.  Do you want to resume your cross-examination?

          MR. DALEY:  May it please the court, Your Honor.

                    JOHN BLUME, RESUMED

               CROSS-EXAMINATION - CONTINUED

BY MR. DALEY:

Q.  Good morning, Mr. Blume.

A.  Good morning.

Q.  I would like to take one step back and go over a few exhibits that in my rush to try to finish yesterday we overlooked.  Exhibit 10 -- which I think I have given you?

A.  Yes, you have.

Q.  Tell me what exhibit 10 is.

A.  In this exhibit, Government's Exhibit 10, is the defendant's summary of testimony that counsel intends to use at trial.  This is, I think, intended to provide the government

with notice of what are the range of issues and experts there

might be so they can potentially exercise their rebuttal right.

Q. And this was served on the U. S. Attorney May 18th, 2004;

correct?

A. Correct. I haven't actually done the research on this but

I think we were required to do this at the conclusion of the

guilt or innocence phase, so this would have been given to them

after the plea.

Q. And this is a list of all the experts that you had ready to

go, potentially, to testify at trial, correct, expert-wise?

A. Yes.

Q. And Arlene Andrews, we talked about her for a moment or two

both on direct and cross, but tell me again what her role was.

A. Arlene Andrews is a Ph.D., MSW. Her role was to try and

tell Chad's life history.

Q. In doing that -- she has done this a lot; correct?

A. She has done it, yes, on a number of occasions.

Q. And she in fact was tasked with some of the more sensitive

investigative matters, particularly trying to find out about

any family sexual abuse; isn't that correct?

A. Yes. I mean, I don't know that she was initially tasked

with that. In a number of cases, because of special training,

it's been my experience she is better at getting sometimes

people to admit things they don't want to admit or talk about,

not easy to talk about.

Q.  And she wasn't able to ferret any of that out?

A.  Well, I don't know what "any of that+ is.  She was able to get information which I thought was useful, so I don't know specifically what you are speaking of.

Q.  I'm sorry.  She wasn't able to ferret out or find any reports of sexual abuse within the family?

A.  Not that I'm aware of.

Q.  Let's go to page 7 of Government's Exhibit 10.  Just at the bottom of the page I think there is one expert we haven't talked about, Karen Li Simpkins.  Tell me -- she is an anthropologist?  What was she going to be called for, potentially?

A.  She was someone we retained.  Chad's family in many respects in my opinion were Appalachian people.  Although they had sort of, I guess you would say, moved to the city of Huntington, in many respects many of them still were, you know, sort of West Virginia mountain people, Appalachian people.

So, Ms. Simpkins was consulted for the purpose of trying to give us some information about Appalachian culture, what it might mean to be raised in that environment, and so that was at least the potential purpose of her testimony.

Q.  And why did you end up deciding not to call her?

A.  You know, I just didn't -- in the end I didn't know whether -- I think in the end I just concluded it wouldn't be persuasive and I, you know, just didn't do it.  It wasn't that

I didn't believe her or didn't have confidence, I just wasn't sure it was going to be persuasive.

THE COURT:  Mr. Daley, my real time is locked up. The decision was not to call Arlene Andrews or someone else?  I got lost there.

MR. DALEY:  The next expert we are talking about is Karen Li Simpkins.

THE COURT:  That's who he was just talking about?

MR. DALEY:  That's on page 7 of Exhibit 10 down at the bottom here.  She is an anthropologist.  I think she is at Marshall --

THE WITNESS:  Yes.

THE COURT:  All right.

BY THE COURT:

Q.  Let's turn to Exhibit E of Government's 10, which --

A.  It's where you put the --

Q.  It's tabbed, because it's not really -- it is a -- well, tell me what it is.

A.  This is a report by Dr. James Hilkey.

Q.  And in his preliminary results, isn't it true that he found that Chad had a significant elevation of a Scale 4 psychopathic deviant antisocial personality scale; is that correct?

A.  Correct.

Q.  So, even Dr. Hilkey found at least some evidence of antisocial personality disorder; is that correct?

A.  Yes.  I think this is what we talked about a little bit yesterday, sort of the whole floating profile.  He was prepared to explain it and why he didn't think Chad actually, I think, had any social personality disorder.  But the observation that you make about what he said in his report is correct.

Q.  Let's go to Government's Exhibit 19.  Blow it up a little bit.  What is this?

A.  This is an e-mail from me to -- I'm sorry -- Bill Nettles.

Q.  And in particular the third paragraph starting, "If you see Chad," and would you read that paragraph for me?

A.  "If you see Chad, you should tell him the stuff we talked about, and also tell him that I've seen the letter he wrote to Dwayne and what his plans were.  And I am hot, as he sat there and looked me in the eye and lied.  You should mention what Tina told us and that if it is true, he needs to get rid of it."

Q.  Do you recall what was going on at that moment in time or what that might have involved?

A.  You know, honestly, I'm not 100 percent sure what this is about.  Chad wrote a lot of letters.  I had told him not to write letters to people, and he wrote a lot of letters to Tina, he wrote a lot of letters to Dwayne, he wrote a lot of letters to people.  As you probably remember from the transcript, there was a fight about the admission of a lot of these letters and a lot of things that he said in them.

So, I don't recall what this particular -- you know, it's probably something, in my mind, something stupid he and Dwayne were talking about; which would have been a lot of their conversations.

Q.  Do you remember what you were referring to when you say he sat there and looked you in the eye and lied?

A.  No, I don't really.  I don't recall specifically what this is about.

Q.  Okay.  Let's go to Government's Exhibit 40, what is this?

A.  This is a memorandum which would have been written to the file by Jill Rider, who was a paralegal and still is a paralegal.  It's recounting a conversation that she had with Chad.  The date of the memo is August 6, 2003.  I don't know if that's the date she actually saw him or the date she wrote, you know, the memo.  It would obviously have been somewhere right around there.

Q.  Let go to page 3, the bottom of page 3 of that memo.  When these memos would come in, would you -- when it went to the file, would that be something that you would have reviewed at some point?

A.  Protocol would be that the memo would be e-mailed to me and a hard copy placed in the file, and a memo would have gone in a -- yeah, a memo, essentially a directory on the server.

Q.  So, down at the bottom of page 3 -- if you would, you can read it to yourself or read it into the record -- but do you

recall this, hearing this information?

A.  This is -- you are talking about the paragraph that begins, "He then went into the Donovan rape," is that the part you are talking about?

Q.  And in particular, I guess, down at the very bottom it says, "He says he knows it was stupid to lie but he felt it was the only way to get John to believe him.  John kept telling him that it was BS, that Basham did it all.  Chad felt that he had to admit to something or John would think that he was lying."

THE COURT:  I think you need to scroll up the screen, don't you?

MR. DALEY:  I'm sorry, bottom of page 3, top of page 4.

BY MR. DALEY:

Q.  Do you recall what was going on at that time?

A.  I think this was after the government admission, when he talked to Jill he -- after all this he denied that he -- that he -- he denied that he -- I hate to talk about it, but he denied that he had raped Ms. Donovan.  He participated in the rape of Ms. Donovan, is what he was saying there.  He said he only did it because he felt like he had to admit it because I was badgering him, saying that nobody was going to believe that Basham did it all.

THE COURT:  So what -- let me be sure I understand this.  The sentence says, "He says he knows it was stupid to

lie but felt that was the only way to get John to believe

him."  Tell me what that relates to again.

THE WITNESS:  It relates to the fact he's saying that he lied when he admitted that he raped Ms. Donovan, and that he only admitted that he did it because he felt like if he didn't admit it I wouldn't believe him, because I had been basically badgering him saying that I didn't think anybody would believe that he didn't participate in any of it.

THE COURT:  All right.

BY MR. DALEY:

Q.  Of course, when he said that he lied about raping her he actually was lying then, so he flip flopped, obviously?

A.  In his defense I think some of this was, he was -- it was harder for him to fess up to this when there were women out there sort of talking to him.  So, I think that was part of what it was about, but that is what happened.

Q.  Let's go to Government's Exhibit 32.  Can you tell me what this is?

A.  This is an internal document which I would have asked to be prepared and would have worked on called, "Facts to Prove." It's a trial -- it's a tool for trial.

Q.  And the handwriting on the left-hand side in certain places, is that your handwriting?

A.  No, I believe this is Mr. Nettles' handwriting.  It might be Mr. Weyble's, but it's not -- it's too precise for mine.

Q.  Did you use this document, though, during trial?  When was it used?  When was it prepared and then when was it used?

A.  The purpose of the document is to try and -- you know, we are trying to elicit the facts that we are going to try to prove at trial.  So, that's the column on the left.

The column on the right is the source of the information.  So, this would have been used to prepare for direct examinations, to try and make sure that, you know, we were getting all these facts proved and who we were going to get them proved from.

So, this is a tool I think primarily to structure the examinations, the direct and the cross -- I'm sorry, all the examinations, to try and sort of do it.  I don't know what normally somebody would -- I would have probably tasked Jill or somebody to check this off during the trial to make sure of admissions.  That would have been the usual practice.  I don't know if I did it here or not.

Q.  Let's go to Government's Exhibit 34, this seems to be another -- tell me what this is.

A.  This is another time line of events.  I don't know if this is -- I don't know how far it goes in time, so I'm not sure. This looks like what I probably would have done about the time that they were -- essentially the time of the events in question.  So, I don't know --

Q.  I think it actually goes through the end of 2003?

A.  Right.  So, this would have just been, you know, an internal document.

Q.  And its use?

A.  It's used to just try and structure and organize, you know, what the information is and how you are going to think about it.  It's just -- it's a tool.

Q.  Okay.  Let's go to Government's Exhibit 39, what is this document?

A.  This is a good-facts, sort of, bad-facts list or chart. Again, this is just an internal tool.  I would have probably prepared -- normally I would have asked that one of these be prepared for a brainstorming session, kind of anticipating we are going to get together and sort of brainstorm the case.

I would often ask people to prepare lists of good facts and bad facts so we can just work through them and talk about them, and decide if we are even in agreement on what is good and what is bad.

Q.  When do you think this was prepared?

A.  This probably would have been relatively early on, I think, for, you know, a brainstorming session.  I'm not sure but just, you know -- I don't remember exactly, but based on sort of how I normally work, this would have been something done relatively early on in the representation.

Q.  And the numbers on the right-hand side?

A.  Those probably, I would have to check it, but they probably

correspond to the page number of the discovery provided to us by the government on the CD.

Q.  Okay.  Let's get back to the claims that we were on.  Claim number 6 which claims ineffective assistance of counsel for failing to object to the prosecution's imposition of a nexus requirement.  Do you remember that argument that Mr. Gasser made?

A.  No.

Q.  It did not stand out?  You didn't object to it, no particular memory of that at all?

A.  No.  I mean, I don't remember sitting there thinking, "Okay, he's making a nexus argument, I need to object."  So, I don't remember making a decision not to object to it.

Q.  Claim number 7, which has been gone over a little bit on direct, just giving the statement without the benefit of a proffer or plea agreement.

Let's put up Government's Exhibit 1.  Government's Exhibit 1, what is Government's Exhibit 1?

A.  Government's Exhibit 1 is a letter from then U.S. Attorney -- it's actually -- it's signed -- I mean, it indicates it's from Strom Thurmond, Jr.  It's actually signed by Mr. Schools and Mr. Gasser.

Q.  And what is it doing?  I mean, what is it saying?  What is it memorializing?

A.  Memorializing that they are providing us with 813 pages of

discovery.

Q.  And video as well?

A.  Yes.  I mean, that's -- yes, also on the disk are four video files.

Q.  So, this is dated on March '03, the statement was April 21st, '03, isn't that correct, when the statement was made?

A.  It sounds right.  I don't remember the exact dates.

Q.  Prior to Mr. Fulks giving his statement to the FBI, had y'all reviewed the discovery?  I mean, how much about the case did you know at that point?

A.  Well, we -- yes, I had reviewed the discovery.  One of the things we wanted to try and make sure of is that -- like I said, Chad told a pretty consistent story and I personally believed him, but we also wanted to make sure that nothing he said was clearly contradicted by some other piece of discovery.

Q.  Okay.  Let's look at Government's Exhibit 2, what is Government's Exhibit 2?

A.  This was a document which I prepared for Chad to sign accepting responsibility for his role in the crimes, and indicating his willingness to plead guilty and cooperate with law enforcement.

Q.  And in exchange for a life sentence?

A.  Uh-huh.

Q.  So, at this point on April 8, 2003, did you communicate to the government that you would -- that Mr. Fulks would plead

guilty in exchange for a life sentence?

A.  Yes.

Q.  Okay.  Let's look at Government's Exhibit 3.

If you would, take -- read it to yourself, Government's 3 and 4, to see if that helps you remember some events right after this.

A.  Okay.

Q.  Government's 3, what is that?

A.  Government's 3 is a letter prepared and sent by then U. S. Attorney J. Strom Thurmond, Jr., to myself and Bill.  It's in response to a meeting that Mr. Nettles and I had with Mr. Thurmond, Mr. Gasser, and Mr. Schools in which we relayed Mr. Fulks' willingness to essentially participate, accept responsibility for his actions.  And I'm assuming at that meeting we provided them with the previous exhibit that you gave me, that we gave them that at that time, and this is their response to what we suggested.

Q.  In this response, isn't it true they rejected the request, I guess, for a life sentence?

A.  Yes, they rejected the offer that we made at that point.

Q.  And then we look at Government's Exhibit 4, what is this? Explain what this letter is.

A.  Government's Exhibit 4 is my response back to then U. S. Attorney, Strom Thurmond, Jr., saying, "Okay, this is what we will do."

Q. And as a result of that letter back, what then transpired?

A. As I recall, I don't think there were anymore back and forth. There may have been a phone call or two. As a result of that Chad gave the statement at the FBI headquarters here in Columbia several weeks later, I think it must have been.

Q. Was it clear to you that the government was not going to give a life sentence? They weren't going to enter into a plea agreement?

A. Well, it was clear to us at that time the government wasn't going to enter into one. You know, part of the purpose of having him give the statement and then continue to take polygraphs, provide the information, hopefully find the body, was not only to try and create -- Chad wanted to help, that was one thing.

So, we were trying to facilitate his desire to try to help find her remains. We were trying to see if this ongoing cooperation and maybe the assistance of this might create a situation in which a plea bargain might eventually happen.

And three, if that didn't, to try and create a situation where he could maybe take advantage of responsibility and remorse as mitigating factors.

Q. You needed to get his version out. Were you at that point pretty certain -- or what was your state of certainty that he was not going to be able to testify because of his --

A. Well, I would say it was way more than 50/50. I mean, to

have any client testify under any circumstances is, you know, always a dicey proposition.  Having one who is as low functioning as Chad, and he also had some additional baggage, probably unlikely.  But I wasn't willing to rule it out, but I thought that giving a statement to law enforcement might assure him of at least having a manner in which to get his story before the jury.

Q.  Let's go to claim 8 of the amended motion to vacate.  The allegation is that it was ineffective assistance of counsel for failing to have the catchall mitigating factor put into the verdict form, and minor participant factor put -- included in the verdict form.  What was your -- what was your view of whether Mr. Fulks would have met in any way the minor participant factor?

A.  You know, honestly, right now it would be speculation.  I don't remember at the time sort of saying, "Okay, we don't, you know, want the benefit of this."  I don't remember saying, "We don't want the catchall aggravating circumstance," so, you know, I don't -- honestly, I just don't remember that.  We submitted a list of mitigating circumstances, you know.  It was what it was.  I don't have any memory right now of going through a thought process on that.

Q.  Okay.  Claims 9, 10, 11, and 12, the pleading guilty under the Pinkerton theory of liability.  Isn't it true your goal was for him to plead guilty to all eight of the counts?

A.  Yes, I mean, to -- right, if not, it would have been through an unsuccessful deal.  We weren't going to get like a jury trial on some and not others.  So, no, he needed to plead guilty on all counts.

Q.  And tell me your thinking, why was it you were trying to plead him this way?  What was the goal as far as trying to reserve some -- something for the death -- the sentencing offense phase?

A.  I believed, I mean then, and I believe now, but I don't claim to be an expert on the Pinkerton doctrine, his 302 made him -- he was guilty.  If you accepted his version of the events as true, that he was guilty of the charged offenses under the Pinkerton doctrine.  So, I did not see that there was a viable defense for the first phase of the trial.

So, had we not pled guilty, it would have been what sometimes is called a slow plea, you know, in that, with us sort of doing it.

So, given his statement and the fact that we were trying to indicate honestly that he accepted responsibility, was willing to do life without parole, he was remorseful, I thought it was in his best interest to not -- to plead guilty and, again, to sort of, as with the statement, as with the plea, that he was accepting responsibility and agreed to serve the rest of his life in prison for that.  So, since he was guilty, I thought it was in his best interest to do it and that

it might, hopefully, would help save his life.

Q.  And why did you not proceed on the slow plea, sort of going through the guilt phase?

A.  Well, I mean, I -- I just didn't believe there was any likelihood that he was not going to be found not guilty.  And I thought we might -- the hope was we would get more mitigating value out of pleading.  Rather than putting the jury through the hoops at the first phase, with us basically standing up at the end and saying, "He's guilty and you are going to find him guilty."

Q.  And in pleading him under the Pinkerton theory, did you feel like you were able to reserve the ability to argue about whether he met the gateway intent factors to qualify for the death penalty?

A.  That's what I believed, yes, that we were -- that by doing this we were -- pleading guilty but, nevertheless, leaving open the issue of whether he had the requisite intent under either -- any of the four gateway factors.

Q.  All right.  Let's move to claim 13 of the amended motion to vacate in which the allegation is ineffective assistance of counsel for failing to present evidence of Mr. Basham's leadership and manipulation.  In other words, Basham's greater relative culpability.

I think we went through a fair amount of efforts you went through to dig up what you could about Mr. Basham and

investigate him.  Tell me what -- what more efforts could you have done that you can think of now to try to present more?  I mean, wasn't that your whole goal?

A.  Well, I mean, it was -- certainly it was a part of the goal to try and -- well, the main goal at the -- one of the main goals at trial was to try and demonstrate that Chad was not the person who actually killed Ms. Donovan or Ms. Burns.

So, we did try and develop information about Mr. Basham by talking to people who knew him in Kentucky.  I think we interviewed some people who he was incarcerated with at the Richland County Detention Center.

Q.  And were you making every effort you could to present everything you could to show that Basham was more culpable?

A.  Well, you know, it's a problem when you state it like that.  Sure, I mean, there were probably additional people we could have talked to, additional things that we could have done but, you know, we -- we talked -- we exhausted the sources that I was aware of at the time.

Q.  And what about -- there was an allegation in the petition that maybe you should have focused on Basham's attempted escape from Columbia Care.  Isn't it true that you said if you focused on that that might also have focused the jury on Mr. Fulks' attempt to at least try to escape from Columbia Care as well?

A.  Well, I don't know that I thought of it like that.  I knew that the government was probably going to -- the government was

definitely going to try to get in Chad's quite pitiful attempt to -- I don't know if you would call it an escape attempt, but it was doomed.  It seems to me once that happened, that became what I would call a wash transaction.

THE COURT:  If I may comment on that.  I remember Basham's famous rope he made.  Mr. Gasser had stretched it out across the courtroom many times throughout the trial, but I don't remember much about Mr. Fulks' attempt to escape.

BY MR. DALEY:

Q.  Mr. Blume, do you recall the testimony about the attempted escape -- the escape attempt?

A.  Yes.

Q.  Attempt to escape?

A.  Yes.

Q.  Isn't it true that Mr. Fulks tried to take out the screen, I think, at one point in his room?

A.  Yes.  I mean, it was -- he threw some things out of the window.  It was -- you know, I still don't know what he was thinking.  I don't know whether he was, you know, high or whatever and -- or just another manifestation of how limited he is, because it was physically impossible to get out the window.

I think at trial we actually demonstrated.  We created sort of a recreation of the window and tried to have one of my students, who was much, much smaller than Mr. Fulks, to go through the opening to demonstrate that it was

impossible.  So, that's what happened.

Q.  Were you concerned as well that if you tried to focus on how Basham had been -- what kind of prisoner he had been, there might be even more focus on what kind of prisoner Mr. Fulks had been?

A.  Yeah.  I mean, I don't remember whether that's what I thought about, you know, or not, in not doing it.  I knew there was going to be evidence that was going to come in of several incidents in the jail with Mr. Fulks.  I -- you know, I don't remember whether I went through and did some of "If we do this, they are going to put more emphasis on that."

Q.  Let's go to claim 14 -- well, let's step back for one second.  Isn't it true, though, that in addition to what we have talked about with the escape attempt that Mr. Fulks had hoarded five bed sheets that he had torn into at least somewhat of a rope-like configuration?

A.  I think that's right.

Q.  He had at least done that.  And he had actually hoarded some black pepper packets to do whatever he was going to do?

A.  Uh-huh.

Q.  And he removed a secured screen from the window?

A.  That all sounds right.

Q.  And attempted to pass a note after the escape was discovered telling another inmate to say that he had actually opened the window to smoke.  Do you remember that?

A.  Yes.

Q.  Claim 14, ineffective assistance of counsel for failing to call both -- I think we already talked about Dr. Mark Cunningham, but also a Mr. James Aiken.  This is the future dangerousness-prison issue.  Do you remember why you didn't call James Aiken?

A.  Yes.  I mean, it was -- I mean, I think at the end of the day I just felt we were going to get on this point by Don Romine, who was a former warden.  The main thrust of the testimony, I think, was not necessarily that Chad was going to be a good inmate in prison.  I felt like if we sort of tried to do too much with that, there was enough recent sort of evidence to the contrary.

        So, the point we were trying to make is that you can put him in prison for life and not have to worry about it, because nobody has ever escaped from a federal maximum security prison.  So, it was more of a "You can be confident that incapacitation will serve the requisite goal."  So, we had one person I thought was good on that.

        He hadn't really evaluated Chad to sort of speak objectively, so I didn't see the need for Jim Aiken to testify.  I think Jim is a very good witness, a very competent person, but I was a little worried if you have two people up there that might contradict each other on the small points.  I felt we got what we needed out of Mr. Romine.

Q.  Mr. Romine was a former BOP warden?

A.  Former marine, former -- yeah, warden.

Q.  Had he ever testified for the defense before?

A.  I don't know.  He didn't have the history of testifying that Mr. Aiken did.  Maybe he had testified one or two times. I don't know whether he ever had, but he had not testified much.

Q.  And Mr. Romine actually had extensive and, I think, in fact exclusive experience with federal BOP facilities; correct?

A.  Correct.

Q.  Mr. Aiken was more in the state system for his career?

A.  I think.  I think he had also been commissioned in the Virgin Islands, maybe, which was a federal, you know, sort of jurisdiction, and he had been commissioner in Indiana, but --

Q.  Okay.  Let's go to claims 15 and 16 about the voir dire. You have written at least a couple of articles about voir dire in capital cases; isn't that correct?

A.  Yes.

Q.  And, in fact, one of them is called "Probing Life's Qualifications Through Expanded Voir Dire" and it's in the Oxford Law Review?

A.  That's correct.

Q.  Of 2001?

A.  Yes.

Q.  Have you actually lectured on conducting voir dire in

capital cases?

A.   Yes.  More on the sort of analytical basis on why you should be allowed to do certain things, but yes.

Q.   And in this case did you hire Jeff Bloom at some point to conduct a mock voir dire session for your team?

A.   Yes.

Q.   Explain what that -- when that happened and what happened at that.

A.   This would have been primarily for Mr. Nettles, who had never done voir dire in capital cases.  We asked Mr. Blume to put together a voir dire session, which we did at the University of South Carolina, and so he would bring in people from the community, and we would conduct voir dire using sort of the out line we had developed for the purposes of him to try and, you know, get some practice -- not inexperienced.  We would then sort of talk about it, and then I did some as well. We kind of critiqued each other and talked about what we were going to try to accomplish.

Q.   Who was there besides you, Mr. Blume, and Mr. Nettles, and obviously the mock jurors?

A.   At that session?

Q.   Yes.

A.   You know, I don't remember whether there was anybody else there.  I don't remember -- probably I had Mr. Weyble come over.  I don't remember if Ms. Johnson was there for that or

not.  But it definitely would have been Mr. Nettles, myself, Jeff Bloom, and the jurors.

Q.  Let's look at Exhibit 26.  Government's Exhibit 26, the first page down in the section that is entitled "Jury Selection."  In this e-mail to your team, down in the jury selection part, two things; one, "Let's do a motion for additional strikes per our conversation."  That's actually an issue later on.  At that time, were you at least contemplating doing a motion for additional strikes?

A.  Well, I think the e-mail speaks for itself.

Q.  Do you recall now that y'all at least were contemplating doing that?

A.  Yes.

Q.  And did you actually end up making such a motion?

A.  No.

Q.  Do you recall why y'all didn't make a motion?

A.  Yes.

Q.  Why did you not make a motion for additional strikes?

A.  Really for the reasons that I discussed yesterday.  I believed, as it turned out at least incorrectly according to the court of appeals, but I believed that at the end of the jury selection procedure, as we did it, that there were several potential, or what I thought very likely reversible errors in the qualification of certain jurors.

        I believed that the only way to preserve that issue

for appeal was to actually seat the jurors as opposed to excuse them.  So, you know, I made the decision to seat -- to not ask for additional strikes and to seat the jurors, and to preserve the issue for appeal.

Q.  Have you ever known of such a motion being successful in South Carolina?

A.  In a federal capital case?

Q.  Okay, let's go Fourth Circuit.

A.  Honestly, I don't know.  I know that people have filed them in other federal capital cases.  I'm sure this idea probably came, you know, from talking to Mr. Bruck about what people were doing in jury selection in federal capital cases.  You know, right or wrong, I decided to seat the jurors and take the issue.

Q.  And then in the second part of this jury selection it says, "Jill, go ahead and put the first five panels of jurors in the notebooks."  What were y'all doing if she was -- it says, "Go ahead and put the first five panels of jurors in the notebooks."  What were these notebooks and what did they consist of?

A.  This was a notebook which would have been done by juror -- probably by juror number.  They probably had been done by juror number, which would have contained the questionnaires that we got on the jurors, and then we would all -- everyone was asked to go through these beforehand and see what you could about the

jurors and to rate them pre-voir dire.

Q.  Did you review any questionnaires to try to determine their sort of rank?

A.  Yes, their sort of pro deathness or lack thereof.

Q.  And then it says you are going to do a worksheet on each one.  So, you -- I assume that you must have then looked at each individual juror, somebody did.  Do you know who would have done that?

A.  Would have looked at each juror?

Q.  Tell me what --

A.  This is an instruction to Jill, who is the paralegal, so what I'm asking her to do is, we are going to all look through them.  We are going to give her our comments and I'm asking her to consolidate them on one sheet so we don't have to sort of flip through five sheets of paper.  So, that's what I'm asking her, I think, to do at that point.

Q.  So, clearly what I'm getting at, you reviewed the questionnaires or had a paralegal reviewing the questionnaires of each juror pre-voir dire?

A.  Yes.

Q.  And down just a little bit further you are addressing Bill, and that's Bill Nettles, I assume?

A.  Yes.

Q.  And you say, "You should try and read Wymore's info which I think we sent you."  Tell us what that is, what is Wymore's

information?

A.   David Wymore is a lawyer in Boulder, Colorado who developed something along with a woman by the name of Sun Wolf called the "Colorado Method of Jury Selection," and it's for capital cases.  So, I was here sending Bill a Power Point presentation from Mr. Wymore to review prior to the practice session.

Q.   Let's pull up Government's Exhibit 52.

A.   I'm familiar with it.

Q.   Can you tell me what Government's Exhibit 52 is?

A.   This is a document which lays out the rating system which is, again, part of the system developed by Mr. Wymore and -- so this captures the 1 through 7 rating system.

Q.   And if we would go to Government's Exhibit 53, what is Government's Exhibit 53?

A.   Government's Exhibit 53 is a -- this would have been prepared after jury selection and before we struck the jury, which is intended to contain a composite of the information from the juror.  So, it would have their name, their race, the status of whether they were qualified over our objection or not, and then a rating, their rating.

Q.   And so -- for example, the rating at the top of the first page for Ms. Stella Mason, which was a 2, what does that correlate to as far as -- would you have wanted her to be seated or not wanted her to be seated?

A.   We would have wanted her to be seated.

Q.  So, this rating corresponded to the list in the rating system in Government's Exhibit 52 then?

A.  Correct.  The jurors are sort of ranged from lowest to highest.

Q.  Okay.  If you go to the third page you will see jurors who are almost to 7, which I guess is the highest they can go. Those would be what you consider to be the most likely to impose the death penalty?

A.  Yes.  Those are people who I would refer to, if we weren't here in court, as the stone cold killer.

Q.  Let's go to Government's Exhibit 54.  I think it's a document -- except if we go further back there are some strike lists.  This is not your next page -- next page, please.  Whose handwriting is that?  Can you tell whose handwriting that is?

A.  I think -- this is probably Bill's.

Q.  Bill Nettles?

A.  Yes, I'm sorry, Mr. Nettles, yes.

Q.  Go back just a little bit further to the next page -- I'm sorry -- further down on the document -- the first strike list.  Go to the second one, please.  The next.  Keep going. This strike list here -- back one page.

These are the last three pages of Exhibit 54.  We have got -- it is entitled "U.S. versus Fulks strike list."  Is this -- whose handwriting is this?

A.  I don't know.  It doesn't really look like mine.

Q.  Okay.  Under, for example, down at number 8 you have Richard Goehring, who I think we talked about previously.  What does ADP stand for in death penalty parlance?

A.  Automatic death penalty.

          THE COURT:  What?

          THE WITNESS:  Automatic death penalty.

BY MR. DALEY:

Q.  Somebody on your team or you determined that he fit that category?

A.  I think we all were in agreement he fit that category.

Q.  And then if we go to the last page we have some folks that are starred -- that page there -- if you look at 62, for example, "Colleen Turner, save her for --" is this your handwriting, I'm sorry?

A.  I think this is actually -- you can -- this is Professor Johnson's handwriting, I'm pretty sure.

Q.  Okay.

A.  I don't think this is mine.  This looks like Sheri's handwriting.

Q.  And let's go to Government's Exhibit 54A, whose handwriting is that?

A.  This looks like mine.

Q.  The "killer answer"?

A.  Yes.

Q.  Was that ironic or was that actually --

A.   No.   What I'm saying is -- you know, my internal belief is that when anybody says I believe it is the appropriate punishment if the circumstances warrant its use."  That to me is a red flag for somebody who means they are going to give them the death penalty.  So, I'm noting that my reaction to that is, that is the kind of answer that someone who is very pro death gives.

Q.  Oh, okay.  It's not that it was a good answer, like it was the right answer --

A.   No.  It was the answer of someone who -- you know, in shorthand I mean a killer is someone that you don't want, someone who would give the death penalty.

Q.  Then there's a few pages, the last four pages of document 54A, Government's Exhibit 54A -- one more page, please -- there are four of these pages entitled "Juror Rating Form?"

A.  Yes.

Q.  Tell me what these are.

A.  This is the form which would have been filled out.  We would have had three or four people filling this out at the time of trial during voir dire.  So, this is people writing down what they are saying.  Then at the end they are going to rate them.  So, the people that were sort of helping -- that were rating jurors, each one would fill one of these out.

Q.  And these 1 through 7 numbers, those correspond again with the rating system that --

A.   Which you previously --

Q.   Government's Exhibit 52.  Now, who is filling these out?

A.   It would have been -- whoever does the voir dire does not fill it out on the theory that they are the least objective, because they have sort of been doing the voir dire.  So, if Mr. Nettles were here and I was doing voir dire, the other lawyer.

Ms. Rider would have been here, I would have asked her to participate in this.  I think Matthew Jury, who was a British lawyer we had, we asked him to help rate jurors, and I think we had two students that were helping.  So, there would have been four or five people doing this.

Q.   So, you would then take these juror rating forms that the people would fill out, consolidate the scores, and then that's what created this list that is Government's Exhibit 53?

A.   That's where that score would come from.  It would be an average of the ratings given by the different people.

Q.   Let's look at Government's Exhibit 50.  What is this?

A.   This is an outline which I prepared for the actual voir dire in the case.

Q.   And the handwriting on this document is yours?

A.   That's mine.

Q.   And this was prepared to be used in your voir dire, or as a reference in your voir dire?

A.   It's an outline, yes.  It's a tool.

Q. And if we look at Government's Exhibit 51, what is that?

A. That's a longer version of the same thing. The one you saw previously is sort of a consolidated version of -- I would have probably taken that to the podium, or Mr. Nettles would take it to the podium. This is just sort of a longer version of it.

Q. Tell me -- just tell me what your approach to voir dire is in death penalty cases.

A. Normally -- I mean, in most cases -- I think this is the example, is -- I don't -- the proof is always in the pudding, of course, whether we were successful in achieving this, so I think the voir dire itself is the best evidence.

But the goal is to try and identify jurors who are likely to give the death penalty, to do what you can to get them excused for cause, to -- and then to try and identify jurors who might be receptive to your case in mitigation or your case for life, and to try and give them the tools to get out of the jury room with a life verdict, if they want to vote for life.

Q. In this specific case what were you hoping to be able to expose the jurors to in voir dire regarding the facts of the case, for example, or the theory of your case?

A. Well, I mean, I guess what -- I mean, more than -- was to try to see if -- I mean, the goal was to see what the juror would do, if they truly understood at what point in the process they were going to decide, whether Mr. Fulks should be

sentenced to life or death.

Q.  And were you trying to at least introduce the concepts of non-trigger man, trigger man, that distinction?

A.  Yes.  Well, there was some dispute, I think, about this through discussion, but there were two things that every -- that the different sides were concerned about.  The government was concerned about whether -- about seating jurors who would not give the death penalty to the non-killer.  And we were concerned about jurors who could not consider life in a case involving two homicides.

So, we agreed that they could question on non-trigger man and we could question on two killers, so that was -- that was sort of the fact specific aspects of the voir dire that the judge allowed.

Q.  How many practice voir dires -- death penalty voir dires have you done?

A.  Total in my life?

Q.  Yes.

A.  I don't know, 20 -- 15, 20.

Q.  And how many actual voir dires have you done in trial?

A.  Only -- I think I have only done -- I've probably done three.

Q.  As far as your other experiences, how much leeway were the attorneys given in this voir dire process?  How much involvement were they allowed?

A.   We were -- we were given, I don't know, a fair amount of leeway.  I think as the transcript reveals, the judge and I had some ongoing debates about his participation in sort of the voir dire thing, and we sort of went back and forth about that.  I'm not sure that was ever resolved to anyone's satisfaction, but at least on that -- those issues it was, you know, we were given leeway.

Q.   The questionnaire, reading the questionnaires, do you have any doubt that you -- that your team reviewed all the questionnaires that came in?

A.   I mean, I -- I don't know.  I don't have any reason to know whether we did.  We read, I'm pretty sure, what we were given.  I mean, we did miss the thing on Ms. Allison.  We clearly looked at it.  I don't know how we -- we missed it, but somehow we did.  But that's my recollection, we looked at the questionnaires that we had.

Q.   Claim 17, failing to move for additional strikes.  I think we have already covered.

Claim 18, I think has already been covered in -- in pretty great detail on -- detail on direct, but I guess my question would be, in reviewing the record for the appeal, what was the process that you sort of went through?

How did you pick out the issues that you thought were the strongest, the ones you would lead with, and what -- what process did you go through to decide, "Okay, we have enough, or

these are the best issues, or there aren't issues that are going to be successful on appeal"?

A.  You know, I mean, normally what we do is go through the record and try to identify what the range of potential issues are and whether they potentially have merit or not, and then think about what your story for the appeal is, or what your theory of the case on appeal is, and then try and organize the brief accordingly.

Q.  And in this case what -- did you have a theme for your appeal that you were sort of building in your head that you ended up presenting?

A.  Well, I think our main theme is stated actually in the brief, which was that this was a finger pointer.  It was going to be a fight to the death over who was the killer, and in order for Mr. Fulks to have a shot at life he needed a fair jury, a legitimate opportunity to present his theory of the case, and not to sort of have his theory undermined.

So, I think -- I think the main issues on appeal that we focused on were the qualification of the jurors, the exclusion of the multiple polygraphs that Mr. Fulks passed indicating that he was telling the truth about not being the killer, and then the credibility of counsel undermined by the three-day rule evidence.  There were some other, I think, issues as well, but that was the focus.

Q.  With regard to this deer statement, do you recall why that

was not included as one of the issues?

A.  No, honestly I don't.  But I don't have any recollection of saying, "Okay, this is not a good issue, we are not going to raise it."  I just don't have -- I don't -- to me -- in my mind if the issue is meritorious, it should have been raised, it's more of a legal issue.

I'm not a Jones v. Barnes appellate lawyer.  I mean, Jones v. Barnes, of course, the lawyer was ineffective because he decided to, you know, winnow out and drop some to focus on some others.  If there was an argument which I thought was potentially meritorious, I would have raised it.  But I don't remember this, so I can't tell you, you know, what -- did I have a thought process.

Q.  Let's go to claim 19, inconsistent theories, has already been covered on direct.  As has Claims 20 and 21.

Claims 22 and 23, the allegations are that there was prosecutorial misconduct in the closing arguments.  You objected a few times, but most of the comments that they point out in their amended motion to vacate, you didn't -- do you remember seeing any potentially meritorious issues in the closing arguments to raise?

A.  You mean on appeal --

Q.  Correct.

A.  -- or at the time?

Q.  Well, both.  First --

A.  You know, I would have objected to things which I thought were objectionable.  I don't remember saying, "Okay, this is improper, I'm not going to object."

It is true that sometimes at trial things kind of happen quickly and they get by you, you know, and then you think, "I should have objected to that."  But I don't have any -- I don't have any recollection of making a decision not to object or feeling something had gotten by.

Again, I think to me this is one of those things where the proof is in the pudding.  If there were objectionable things, then I should have objected to them, and if there weren't, there weren't.  I think that's a legal issue rather than for me to comment on.

Q.  Claims 24 and 25 talk about the gun issue, the prosecutorial misconduct supposedly for the -- asserting that the petitioner was armed with a .45 caliber revolver.  Do you remember this whole issue coming up about Chad Fulks supposedly giving a gun to his brother Ronnie?

A.  Yes.

Q.  Can you tell me -- actually let's pull up Government's Exhibit 56.  What is this here?

A.  This is a -- an e-mail from Bill Nettles to myself and Professor Johnson on what we are going to say about sort of the missing gun and bullets.

Q.  And what did you think about -- I mean, you said, "We need

Ronnie" -- he says, "We need Ronnie," it's circled down toward the end of the e-mail, and then you actually -- well, whose handwriting is that?  It's circled and then there's handwriting, "I agree."

A.  It looks like mine.

Q.  Okay.  What was the issue and what were you trying to get around, or trying to deal with?

A.  Well, there was a missing gun.  The government's theory was that Chad must have -- when he was apprehended in Indiana, there was a chase where they -- he was chased for, you know, I don't know, some -- he was chased.  I don't remember how far -- several hundred yards, several miles.  And their theory was that he must have gotten rid of the gun while he was running from them and that's why they couldn't find it.

Chad denied that and, again, you know, I believed him on that.  Because with all these police, if he would have thrown the gun, there were a bunch of cops right after him, they did an extensive search, they would have found it.

But the reason that Chad denied it and we had reason to believe it was that he told us he had given the gun to his brother Ronnie when he had been in Indiana, and so when we were pretty sure that was true.

In fact, Ronnie had sort of acknowledged that, but he was also a felon and so he would have been a felon in possession of a weapon.  And so we didn't want to, I guess --

Ronnie was not willing to come forward with the gun because he, you know, understood that this would expose him to mandatory criminal exposure.

So, this is saying that we were trying to get Ronnie to -- we were seeing if we could work Ronnie into actually either giving us the gun or agreeing that he had the gun.  He wasn't really willing to do it.

We ultimately decided not to push it because Ronnie had some helpful things to say to us for -- about his life and background when he was going to be called by the government, and so we chose not to alienate him, sort of suck it up on the gun, and that was the analysis.

Q.  And there was obviously other evidence, though, that Mr. Fulks had guns throughout this 17-day time frame; isn't that true?

A.  I think there were some -- yeah, there was a bag -- I don't remember how many.  There were some guns.  There were some guns taken from Talsma, but there were definitely guns around.

Q.  And at least some testimony that there was a gun in the glove box?

A.  I mean, if you say so.  I don't actually recall.

Q.  Do you remember why you did not object to the prosecution's closing argument with regard to the gun issue?

A.  No, I don't.

Q.  Okay.  Claim 26, preparation of some mitigation witnesses.

In particular, let's focus on the two that are brought up most.  Martha Floyd -- let's look at 57, Government's Exhibit 57.  Martha Floyd, can you tell me who she was -- is?

A.  Yeah.  She was one of Mr. Fulks' teachers.

Q.  And what was her testimony?

A.  Her testimony is that he was, you know, a quiet kid, that she had him in the behavior disorder class.  And she has talked about basically he was a poor kid from a poor family and had problems, basically.

Q.  The allegation is that y'all didn't prepare her.  She submitted a declaration that said she wished she had been better prepared.  What is this, Government's Exhibit 57?

A.  This is an interview that was conducted with Ms. Floyd, prepared by Tracey Dean, who is one of the mitigation specialists.

Q.  And let's go to -- and was this standard procedure?  If they interviewed somebody, the mitigation specialist, they would then send a memorandum to the file memorializing that?

A.  They were supposed to, yes.

Q.  Let's go to Government's Exhibit 57 -- I'm sorry -- Government's Exhibit 58.  Tell me what this is here.

A.  These are my handwritten notes so I -- this is an interview which I did with Ms. Floyd in West Virginia.

Q.  So, you spoke with her at least enough to -- let's see, have you look at Government's Exhibit 58, the hard copy, just

for a moment.

A.   Okay.

Q.   Spoke to her long enough to take four or five pages of notes.  Do you recall the time you spent with her?

A.   Yes.

Q.   Where was it?

A.   It was I think at a -- it was in West Virginia; it was in Huntington.  I believe it was at a Shoney's in Huntington, West Virginia.

Q.   And you were preparing her for her testimony?  Did you know you were going to call her at this point?

A.   I'm not sure if I had made a -- I mean, I had obviously identified her as someone we, you know, might call or would want to call, and so I was meeting with her before trial to make the final decision -- I assume to make the final decision about whether to call her, and sort of talk to her and try to size her up.

Q.   Did you have any reservations that you hadn't talked with her enough or prepared her well enough?

A.   I mean, I don't recall having any questions about it.  It seems relatively noncontroversial what she was going to, you know, say.  She was just going to describe Chad's -- what he was like as a student, and I didn't think there would be any major contesting of the facts that she was going to relay.

Q.   Let's go to Government's Exhibit 59.  Another witness they

complain about you not preparing well enough is Mark Fulks. Who is Mark Fulks?

A. Mark Fulks is Chad Fulks' uncle and he's -- so he is his father's brother.

THE COURT: Hold on a second.

All right. Please continue.

BY MR. DALEY:

Q. Government's Exhibit 59, what is that?

A. This is a direct examination outline for Mark Fulks.

Q. And was this prepared for you?

A. You know, I don't know whether -- it looks like the format which I would use. This is sort of -- but I could be wrong. If I recall, Ms. Johnson put him up, but I could be wrong about that. I met with Mr. Fulks. I saw him up -- I went to see him in Indiana.

Q. Let's go to Government's Exhibit 60, I think maybe that will relate to that. It's two pages. Is that your handwriting?

A. That is my handwriting.

Q. And is that -- take a look at it for a second.

A. Okay.

Q. When did you meet with him in Indiana?

A. It would have been -- I don't remember the date, it would be on the memo. I remember it was in the summertime, I remember that.

Q. All right. Let's go to Government's 61. What is Government's 61?

A. Government's 61 is an interview that Tracey Dean did with Mark Fulks. So, she had already -- she went up -- she was the initial person that went to sort of Indiana, Michigan, where that side of the family was. So, she had gone in April of 2003, so that would mean that I would have gone in the summer of 2003.

Q. And then Government's Exhibit 62. I think this is Government's 62. If you would go to the third page --

A. Okay.

Q. Particularly if you go to the handwritten notes, which I think start on the third page of this exhibit.

A. Okey-doke.

Q. Is this -- do these notes line up with your memory of interviewing him, speaking with him in Indiana?

A. Yes. This is -- apparently it was August 21st of 2003, so these are the notes of that conversation.

Q. And these aren't your notes?

A. No. This is Ms. Glass's handwriting. I assume that it would have been -- normally I would -- I would have taken notes if she was -- I don't think I took notes. Probably I allowed her -- she took the notes and we just talked.

Q. And so, again, you all did all this in preparation for potentially having him testify on behalf of Mr. Fulks, correct?

A.  Yeah.  We were trying to see what information he had.  I mean, part for his own testimony and part related to the -- any relevant other witnesses.

Q.  I think one other witness that they bring up in this claim is Ronnie Fulks; can you tell me who interviewed Ronnie?

A.  Yeah.  You will need to talk to Ms. Johnson about that. She was primary -- most of my conversation with Ronnie Fulks was fairly cursory.  She was the primary person, I think, that dealt with him.

Q.  But you don't have any doubt that you all spoke with him on a number of occasions?

A.  He was spoke with more than once.  Exactly how many times, I honestly don't remember.

Q.  Okay.  Claim No. 27, ineffective assistance of counsel for allowing Mr. Fulks to plead guilty.  I think we have covered that well enough.

Claim 28 --

THE COURT:  Mr. Daley?

MR. DALEY.  Yes?

THE COURT:  It's about time for our morning break.

MR. DALEY:  Okay.

THE COURT:  How are we doing on time?

MR. DALEY:  I have got five or ten more.

THE COURT:  You have got five more minutes, did you say?

MR. DALEY:  Five or ten tops, probably five.

MR. ASHMORE:  Your Honor, on redirect I might be, I think, 20 minutes or so.

THE COURT:  Okay.

MR. ASHMORE:  We are in good shape.

And my witness Andrea Lyon, our next witness, Your Honor, I believe she's backed her flight up.  So we're --

THE COURT:  Okay.  So she moved the flight back?

MR. ASHMORE:  Yes, Your Honor.

THE COURT:  Very good.  Well, let's break.

I've got to ask you one question.  It's not critical to the outcome to this trial, but during jury selection, if you remember, we ran through a string of prison guards who happened to be selected to serve on the jury venire, and they all answered the questions properly and I had -- I felt I had no choice but to seat them, even though they were prison guards.

And I made the comment, we could hit a string of ministers who might be -- you know, superficially you might think they'd be less inclined to give the death penalty, but if they answered the questions properly I would have to seat them as well.

And then the very next person out of the box was a minister who had a mail order law degree and a mail order medical degree who answered all the questions properly, and I qualified him.  And then we broke for lunch and my conscious

bothered me so much over lunch, I came back and we struck him because he almost literally was -- literally almost licking his lips and rubbing his hands together, as if he wanted to get on the jury.  I'm just curious if he was a 7 -- off the top of the charts as a 7, if you remember?

THE WITNESS:  I don't remember.  I would have to see his name.  I don't remember his name.

THE COURT:  You remember that episode?

THE WITNESS:  I do remember that episode, Your Honor.

THE COURT:  The body -- it would never appear in the transcript, but his body language was such that he was just aching to get on that jury, and so he went out.

All right.  Let's take -- let's just break for ten minutes.  Is that enough?

MR. DALEY:  That would be fine.

THE COURT:  Take a 10-minute recess.

(Short recess)

THE COURT:  Please continue.

MR. DALEY:  A couple of housekeeping matters.  Your Honor, the government would withdraw, with the consent of Mr. Fulks' counsel, Exhibit 38.  It's not going to be necessary, so we are just going to withdraw that.

THE COURT:  All right.

BY MR. DALEY:

Q.  And one other exhibit that I don't think we actually

covered, Mr. Blume, Government's Exhibit 55.  Let you look at this.  What is Government's Exhibit 55?

A.  This is a memorandum which was prepared by Matthew Jury, giving a summary of the jurors.  I believe this is a summary of the jurors who were actually seated, including the alternates.

Q.  What was the purpose of him preparing that for y'all?

A.  Just so we would have -- it was a tool, just something so we would have sort of -- you know, remember who the jurors were and trying to decide whether there was anything to make of that during the examinations.

Q.  The next claim to cover is claim number 28, "Ineffective assistance for failing to explain acceptance of responsibility."  Isn't it true that you actually covered acceptance of responsibility in both your opening and closing?

A.  I mean, I think the record will reveal whether I did or not.  I thought we did, but the transcript will show whether we covered this.

Q.  And in fact, acceptance of responsibility was one of the things you were trying to get across to the jury; isn't that correct?

A.  Yes.  I mean, whether we did or not, of course, I don't know.  But it was certainly that he was basically accepting responsibility, willing to accept life without parole.  That he gave a statement when he didn't have to, and pled guilty when he didn't have to, was part of our main theme on acceptance of

responsibility.

Q.  The 29th claim in the amended motion to vacate deals with a comment made by the prosecution about washing -- Mr. Fulks' habit of washing himself, showering several times a day, where they allege that this is a religious comment.  Do you remember that statement?

A.  No.

Q.  Okay.  Do you recall the -- Ms. Johnson's closing argument?

A.  I mean, in -- you know, in broad strokes, yes.

Q.  Even in broad strokes, do you remember it having a significant amount of religious material in it?

A.  You know, that's my memory.  Again, I think the -- you know, the transcript of the closing argument is going to be the best evidence of whether it did or not.

Q.  Claim 30, "Mr. Fulks' artistic talent as mitigation evidence."  Did you ever see this as a piece of mitigation evidence to present?

A.  I mean, I don't have any -- I mean, I have some recollection of Chad doing some, you know, drawings and that kind of thing.  I don't have any recollection of considering that as something to present in mitigation of punishment.

Q.  Didn't you previously say they were more, though, cartoon-like than --

A.  I mean, that's my, you know, recollection.  I haven't gone back and actually looked at any of his art.  He would, you

know, frequently do like little things for members of the team,
notes and stuff.  That was part of his, you know, things that
he did.  So, I do recall seeing it, but I don't remember
considering presenting it as mitigation.

Q.  Proposed claim 33.  Was there anything more -- I mean,
let's go through the efforts.  I mean, how much time and energy
did you expend searching for Ms. Donovan's body?

A.  You mean, like we the team, not necessarily me?

Q.  Right.  Right.

A.  Well, I have already I think described some of this in
detail.  Mr. Skidmore spent a lot of time.  He took photographs
and videos and showed them to Mr. Fulks, and that was how we
narrowed down the scene.  We did one search in the summer with
a number of students where we used the helicopter and the
anthropologist and we looked with them.

          Then we did two searches with Heather Roche; one
search where she was involved with several other handlers.
Then we did another search after that with just Ms. Roche and
her team of dogs.  And then there was the search that Mr. Fulks
participated in with the government.  Those are the --
Mr. Skidmore additionally spent some time himself, you know,
looking down there, but those were, I'd say, probably the main
efforts.

Q.  And the last search done, dog search, on April 30th and May
1st, right before trial.  Do you recall any further

conversations you had with anybody at that point?

A.   You mean about additional --

Q.   About additional searches or --

A.   No.

MR. DALEY:  Beg the court's indulgence for one moment, Your Honor.

Nothing further.

THE COURT:  All right, redirect.

MR. ASHMORE:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. ASHMORE:

Q.   Mr. Blume, how would your presentation at trial have been different had Ms. Donovan's remains been found before the Fulks' trial?

MR. DALEY:  Objection, that's outside the scope of redirect.

THE COURT:  I think it's proper, I will overrule the objection.

A.   How would the presentation have been different?

BY MR. ASHMORE:

Q.   Yes.

A.   Well, we would have presented the evidence that the remains were found.  And I think it would have bolstered Mr. Fulks' at least credibility to the degree that he was in fact being genuine, and would have minimized the government's ability to

emphasize that he was jerking them around, I guess, throughout this.

Q.  Would it not also help establish remorse on Mr. Fulks' part?

A.  I think -- yeah, it would have gone with the general themes and of acceptance of responsibility, remorse.  It would have been additional evidence in that capacity.

Q.  You were present when the government actually did a search for Ms. Donovan's remains?

A.  Yes.

Q.  How many -- can you tell the court about that, how many agents were involved?

A.  No, I don't remember how many agents were involved.  They were -- as I recall, there were FBI agents and officers maybe from Horry County, the sheriff's department, or maybe the Conway Police Department.  I don't recall how many there were.

Q.  How long did that search last?

A.  I think -- the whole thing -- it didn't last very long.  I mean, there was a search at sort of an initial place.  And then Chad was driven around.  I was in the van with him.  I don't remember who else.

         Mr. Skidmore and I were in a van, I think, with Mr. Fulks, and maybe Mr. Schools and several other agents, and that's when he pointed to this other location.  And then there was, you know, a search in there for -- I don't know, maybe an

hour or so.

Q.  On cross-examination you mentioned that quite obviously you never really know what witnesses out there may be quote-unquote "important"?

A.  That's true.

Q.  And a number of law students interviewed a number of witnesses, is that your recollection?

A.  Yes.  I mean, there were four or five main ones but, yes, the law students did interview witnesses, unquestionably.

Q.  And is it possible that law students could have missed a critical fact or facts during their work on this case?

A.  Oh, sure, it's possible that any of us, you know, could have; that either me, the students, the investigators could have missed critical facts.  Yes, it's always possible.

Q.  Was there any mechanism that you had in place to review the work of the law students' interview of witnesses?

A.  Well, I mean, the main mechanism would have been that they would have produced, you know, some documentation, either a memorandum or something that would memorialize what they did. So, that would have been the -- I guess the main -- the main way we would have known, you know, sort of what they did and what the substance of the conversation was, at least from their perception.

Q.  Do you recall any instance where you followed up on a witness interview that was conducted by law students?

A.  Yes.

Q.  Can you describe that to the court?

A.  Well, I mean, there would have been -- there are several interviews with -- for example, Mr. Kane was the law student who had previously been an investigator.  He had interviewed Mr. Fulks' aunt, the one that lived in Hickory, North Carolina.  Wrote that interview up, and then one of us went and followed up with the aunt in order to prepare, you know, her for trial.  That's sort of one instance.

The main people that the -- as I recall this, I mean, there were some people that -- and then Mr. Kane also was tasked to find some of Chad's old friends and girlfriends and sort of to interview them.

But I think the other group of witnesses that the law students interviewed were people that were -- was the trip, I believe.  You can ask Mr. Nettles.  He took a trip to Kentucky with Mr. Skidmore and Ms. Hinkle and Ms. Mulhern, and they were doing interviews about Basham.

THE COURT:  Let me interrupt.  I want to be sure I follow this.  Now, I thought you said earlier in your testimony that a lot of law students were involved in this case, but only two were given the assignment to go out and interview on their own, by themselves, and both those law students had backgrounds.  One was a former investigator before going to law school and the other was an ordained minister who was from the

area.

THE WITNESS:  That's correct.

THE COURT:  So, those are the only two that went out by themselves?

THE WITNESS:  By themselves, correct.

THE COURT:  But the law students accompanied other lawyers or investigators?

THE WITNESS:  No, there were several times where law students went with another law student.  By that, I meant -- I meant that Mr. Kane, I had confidence in letting him go by himself in some situations because he had previous -- substantial previous experience as an investigator. Mr. Rawlings did some interviews.  He was alone, not much, but a little bit.  But he was the one who had been the minister.

So, there were -- the main situation I can think of is, I think Ms. Mulhern and Ms. Hinkle did some interviews in Kentucky.  But then there were other law students who would go with me and Ms. Glass or Ms. Dean or Mr. Skidmore, and accompanied them on interviews.

THE COURT:  So I'm still confused.  Those two went out on their own?

THE WITNESS:  At times.

THE COURT:  I was about to say, I thought you said either accompanied by a lawyer or investigator, but did some of the law students go out in teams?

THE WITNESS:  That's correct, Your Honor.

THE COURT:  Law students without someone --

THE WITNESS:  That's correct.

THE COURT:  -- without a lawyer or investigator?

THE WITNESS:  Yes, that's correct.

THE COURT:  All right.  Can you give some approximate figures?

THE WITNESS:  You mean how many?

THE COURT:  Yes.

THE WITNESS:  The main ones that I recall doing this, it was Ms. Hinkle and Ms. Mulhern, and they did it in Kentucky.  I don't really recall other law students that went out in teams of two by themselves.

There were law students that accompanied me and Ms. Johnson and Ms. Glass and maybe Mr. Nettles -- I don't remember if he went or not -- to West Virginia once or twice. But they generally almost always went with us, you know, one of us.

I mean, there might have been a time when we sent them out to sort of gather records or do something, yes, but that wasn't the general sort of protocol.

THE COURT:  All right, very good.

BY MR. ASHMORE:

Q.  Did any law students review the jury questionnaires?

A.  Probably.

Q.  Do you have any specific recollection of --

A.  There were two law students here that summer and, you know, so they -- and they sat through most of the trial and did things.

I know they were in here when we were rating jurors, so I mean, I would have asked multiple people to look at the questionnaires.  So, I would imagine that I did ask them to look at the questionnaires.

Q.  I believe you testified previously that you began discussing with Mr. Fulks the location of Ms. Donovan's remains very early in your involvement in the case?

A.  Yes.

Q.  It was not until, I think, April of '03 that Mr. Fulks revealed that information to the government, correct?

A.  That's correct.

Q.  And who made the decision to reveal that information, and when was it made?

A.  Well, it -- I would have made the decision in the case to do it and -- so, I mean, the decision was made, I think, prior to -- shortly probably prior to the time of the first letter that Mr. Daley showed me indicating that we -- as I recall, Bill -- Mr. Nettles and I went and met with the -- Mr. Thurmond, Mr. Gasser, Mr. Schools.  We discussed the possibilities of Mr. Fulks giving a statement.

There was the letter exchange that you saw, and then

the statement.  So, the decision would have been made probably sometime relatively prior to that.

Q.  And that letter of Government 3 was dated April 10, 2003?

A.  That's what I recall.

Q.  Did Mr. Fulks want to disclose the location of Ms. Donovan's remains prior to that time?

A.  Yes, I mean, I believe he did.  He was interested in trying to cooperate in this regard.

Q.  Can you give us a time frame?

A.  You know, I think pretty early on -- and I don't remember exactly -- but pretty early on Mr. Fulks and I had discussions about it and how -- I mean, I think I would have told him that it was -- that it was in his interest, if we could, to give the family closure and for his legal status to provide the government with the location of the body.

He appeared to be genuinely interested in doing that, not only to help himself, but also because, like I said, I thought he was remorseful for what happened, and he did want to help and give the family some sense of closure.

And so, you know, then at that point, once we were all in agreement that we wanted to do that, we began the process of trying to identify the location.

Q.  You indicated on cross that you had two guilty pleas that were followed by life sentences, I presume in state court?

A.  Yes.

Q.  Was that in South Carolina or --

A.  In South Carolina.

Q.  Now, were those jury trials or bench trials?

A.  They would have been all bench trials.  In South Carolina if you plead guilty, you are not -- you don't get a jury for sentencing.

Q.  Did you have any discussions with the state or the trial judge concerning what I will call plea negotiations?  In those two instances?

A.  Oh, in those two instances.  No, those -- yes, there had been plea negotiations in both of those cases which -- in those cases, which were unsuccessful.

Q.  But when you pled guilty -- I'm sorry -- when your client pled guilty --

A.  Not yet, at least, I haven't.

Q.  -- on those two occasions, what I'm trying to determine, was it predetermined what his sentence may be?

A.  No.  I mean, in -- there were -- in one case, the judge strongly indicated what he was going to do.  In another case the judge would not sort of tip his hand.

Q.  You also indicated on cross that the government was very concerned at jury selection as to what a juror's views would be on imposing the death penalty if the individual or the defendant was not the triggerman?

A.  Yes.

Q.  That was a concern of the government?

A.  Yes.

Q.  And that was a theme of your case, to establish that Chad Fulks was not the triggerman?

A.  Yes.

Q.  You indicated this case was essentially a finger pointer; can you elaborate on that?

A.  Well, all I -- what I meant to say was that Mr. Fulks placed the primary responsibility on Mr. Basham for being the person that took the lives of Ms. Burns and Ms. Donovan.  And at least to the extent that I was aware of it, Mr. Basham's statements all implicated Mr. Fulks as being the one that took the lives of Ms. Donovan and Ms. Burns.  So, they were pointing the finger at each other as being the primary actor.

Q.  And we now know from the Basham trial transcript that there was some testimony from Sheriff Hewett that in fact Brandon Basham was the triggerman?

A.  Well, I guess he would have been the -- the purse strap wielder, but that he was the actual killer.

Q.  You indicated on cross-examination that your team found no evidence of sexual abuse within the Fulks' immediate family?

A.  Yes.  As I said, it was something that we believed, and I always believed was very likely, but we were not able to obtain evidence in that regard.

Q.  Did you ask Mr. Fulks about being sexually abused by his

family members?

A.  Yes.  He was asked by multiple members of the team.

Q.  And I think it's fair to conclude that he denied any sexual abuse at the hands of his family members?

A.  He did.

Q.  Is it not, Mr. Blume, well -- is it not recognized that many times a defendant would do just that, would deny sexual abuse in these circumstances?

A.  Oh, yes.  I'm not suggesting that Mr. Fulks is lying now about being sexually abused.  I thought I said during your -- maybe during your examination, if not, that it would have been astonishing to me if he wasn't.

And if he wasn't sexually abused, given the circumstances under which he was raised, I'm just saying that he, you know, for whatever reason, whether he wasn't prepared to talk about it or whether we didn't set an environment in which he felt comfortable disclosing it, the information never came to light.

Q.  Did you ever engage an expert in the area of sexual abuse to interview Mr. Fulks?

A.  No.  Dr. Andrews does have a fair amount of experience in that area, and we asked her to sort of cover it with him when we were unsuccessful, you know, in doing it.  But no, I didn't -- I never retained someone who that was sort of their, you know, primary area of expertise.

Q. Does Dr. Andrews hold herself out to be an expert in the area of sexual abuse?

A. No, I think she's -- no, not that I'm aware of.

Q. Did you -- you recall whether or not you or any of your team interviewed Mike Kazee, K-a-z-e-e?

A. You know, I don't -- I remember his name, I think he was a friend of Chad's, and so he was somebody that maybe lived around the -- I think he lived up the hill and around the block from where Chad grew up, sort of in Huntington.

And so I think we talked with Mike Kazee's father. I'm pretty sure that Ms. Glass did, and that I went to the house one time, but I was not able to talk to him.

But I think the father was talked to; whether we talked to Mike Kazee or not, I don't recall. There should be -- if we did, there's an interview note in the file.

Q. Did the father deny that he had molested Chad Fulks?

A. Yeah, that's my recollection.

Q. Larry Tomlin, do you recall whether or not you interviewed Larry Tomlin?

A. No, I don't.

Q. Did you ever uncover any evidence that Mr. Fulks was molested by his second grade teacher?

A. No.

Q. David Woodyard, do you know whether or not the trial team ever interviewed --

MR. DALEY:  Objection, Your Honor, it's beyond the scope of redirect.  It's also -- this is all stuff that -- this is not in their petition.

THE COURT:  I thought I was hearing some names for the first time.

MR. DALEY:  Yes, these are names -- some of these names are names that appear nowhere that I know of, Your Honor.

THE COURT:  I don't remember anything about a second grade teacher being raised in the petition.

MR. ASHMORE:  Your Honor, I believe we have got a declaration that Larry Tomlin would indicate that Mr. Fulks was molested by a second grade teacher.  It's in the petition.  It also goes to mitigation and investigation, Your Honor, sort of a larger subject --

THE COURT:  All right, I will allow it.  I overrule the objection.  Go ahead.

MR. ASHMORE:  I'm almost finished, in any event, Your Honor.

BY MR. ASHMORE:

Q.  Lastly, let's go with Rhonda Lawhon, L-a-w-h-o-n?

MR. DALEY:  Same objection, Your Honor.

THE COURT:  All right, same ruling.

A.  Okay, is the question, did we ever uncover any evidence that Ms. Lawhon had sexually abused Mr. Fulks?

BY MR. ASHMORE:

Q.  Correct.

A.  No.  I mean, I -- as I recall, she was a woman who lived across the street, or something like that from Chad, or maybe -- and so, no, I don't recall any evidence that -- I don't recall this, I guess is the -- I will just stop with that.

MR. ASHMORE:  I may be finished, Your Honor.  May I confer with co-counsel?

That's all we have, Your Honor.  Thank you, Mr. Blume.  Thank you.

THE COURT:  Hold on one second.

MR. ASHMORE:  No further questions.

THE COURT:  Mr. Ashmore, just a quick question.  The amended petition mentions several names and suggests that these witnesses were either not interviewed or were not fully interviewed and prepared, and we didn't hear much testimony about it.

One was Monica Willowinsky and Tracy Grayfield and Nathan Fulks.  I think we did hear a little bit of testimony about the brother.  Beth McGuffin, Mark Thompson, Sharon Dodson, Alvin Taylor, I don't -- if we heard about those people, I don't remember.

MR. ASHMORE:  No, sir, I don't believe I asked Mr. Blume specifically about those particular ones.

THE COURT:  All right.  And that's fine with me, I

just want to make sure I didn't miss something.  All right, very good.

I don't have any questions.  Thank you, sir, you may step down.  Unless there is an objection, he's excused from his subpoena.

MR. DALEY:  Your Honor, could I ask one follow-up here?

THE COURT:  All right, I will allow it.  Go ahead.

MR. DALEY:  Thank you, Your Honor.

RECROSS-EXAMINATION

BY MR. DALEY:

Q.  Just an issue about the search.  You were, of course, aware that there was information that had been relayed from Mr. Fulks' Indiana attorney the first day or two after he was arrested that led the police --

MS. SMALL:  Objection, Your Honor.  This was excluded from the trial.  It's not relevant to these proceedings.

THE COURT:  Where are you going with this?

MR. DALEY:  I'm just simply going to ask him whether -- whether there would have been the possibility of opening the door up to then having that information come in regarding Mr. Fulks, providing information early on that actually led the law enforcement to search in the Savannah Bluffs area, which was not anywhere near --

THE COURT:  Yes, this gets into the part that I kept

out --

MR. DALEY:  Correct, sir.

THE COURT:  -- the early directions to Savannah Bluffs.  But then later on the directions to the proper place came in, and it was argued that it was not the right location when it really was.  So, I think for the sake of completeness of the record I'm going to allow that.  I understand the objection, I'm going to allow it.

BY MR. DALEY:

Q.  Mr. Blume, isn't it true that you knew that Mr. -- excuse me, Your Honor -- that through Mr. Fulks' Indiana attorney the police were told that they were searching in the right area when they were searching in the Savannah Bluffs area, did you know about that information?

A.  I wasn't involved in that.  So -- and I never talked, I think, to the Indiana attorney about it.  I knew there were -- there was that evidence out there, which -- and the judge excluded from the trial.

Q.  And you were obviously fighting hard to keep that out, I believe?

A.  We objected to it and the judge ruled that it was not admissible.

Q.  And the reason why you did that is, you certainly didn't want to have evidence that Mr. Fulks had pointed them in more than one location to search for the body; isn't that true?

A.  Well, that, and in addition to the fact that I think it was made under circumstances which were supposed to be non-attributable to Mr. Fulks, as I recall.

MR. DALEY:  Nothing further, Your Honor.

MR. ASHMORE:  May I follow up?

THE COURT:  Yes, sir.

MR. ASHMORE:  Thank you.

REDIRECT EXAMINATION

BY MR. ASHMORE:

Q.  That information on Savannah Bluffs actually came originally from Brandon Basham, did it not?

A.  You know, again, the record is going to -- I think Basham gave him a location, maybe Chad's attorney showed him the information that Mr. Basham gave.  And according to the attorney, although he said it's not to be attributed to Fulks, he concurred, as I recall, is how it went.  But, I mean, there are documents on this that say what it says.

Q.  And nowhere in the record is it going to say that Chad Fulks went to the government and said, "You need to look right here at Savannah Bluffs"?

A.  Not that I recall.

Q.  And the Basham's Thanksgiving Day search was actually conducted 52 miles away from where Ms. Donovan was ultimately found?

A.  I mean, I don't know the mileage, but I'm assuming it

wasn't in the location where she was found.

MR. ASHMORE:  Nothing further, Your Honor.

THE COURT:  Thank you, sir, you are excused.  Have a nice trip back.

Next witness.

MR. ASHMORE:  Your Honor, the next witness is Andrea Lyon, and she will be handled by Ms. Danielle Oakley, O'Melveny and Myers firm.

MR. DALEY:  Your Honor, as she is coming in, I might want to point the court to the ruling that you made about the scope of her testimony, which I think is in your order dated 9-11-09, which says that she will be permitted to testify regarding the nature of strategic decisions faced by counsel in capital cases generally and petitioner's case specifically.  I just wanted to put that on the record.

THE COURT:  All right.

THE CLERK:  Ms. Lyon, stop right here to be sworn.

THE WITNESS:  Sure.

THE CLERK:  Place your left hand on the Bible and raise your right hand, and state your name for the record.

MS. LYON:  My name is Andrea Lyon, A-n-d-r-e-a, L-y-o-n.

ANDREA LYON, SWORN

THE WITNESS:  May I go ahead and sit down now?

THE CLERK:  Yes.

MR. DALEY:  Your Honor, Ms. Oakley has asked me to put on the record what I just said, she wasn't in the courtroom when I said it.

THE COURT:  All right, say it again.

MR. DALEY:  Your Honor, I just wanted to put on the record your ruling from September 11th, '09, in which you said that the court will permit Andrea Lyon to testify regarding the nature of the strategic decisions faced by trial counsel in capital cases generally and in petitioner's case specifically. The court will not receive testimony from Ms. Lyon concerning the ABA guidelines for the appointment and performance of defense counsel in death penalty cases.

THE COURT:  All right.  And since then, the Supreme Court has somewhat minimized or marginalized the ABA guidelines.  I'm not saying I'm not going to look at them.  And if want to, you can put them in the record, the guidelines, but I don't see the need for a lot of testimony, for this witness just to read the guidelines to me.

MS. OAKLEY:  Your Honor, our intention is not to elicit any such testimony from Ms. Lyon.

THE COURT:  All right, very good.  You may proceed.

MS. OAKLEY:  Thank you.

DIRECT EXAMINATION

BY MS. OAKLEY:

Q.  Ms. Lyon, would you state your full name for the record,

please?

A.  My name is Andrea Lyon, L-y-o-n.

Q.  And what is your profession, Ms. Lyon?

A.  I'm a clinical professor of law at DePaul University College of Law in Chicago.

Q.  How long have you held that position?

A.  I have been at DePaul -- it will be 10 years this summer.

Q.  Have you held any academic positions prior to working at DePaul?

A.  Yes.  I was an assistant clinical professor at the University of Michigan for five years.

Q.  And any prior to the University of Michigan?

A.  As and adjunct, I did teach at Loyola Law School, but not full-time, no.

Q.  And in addition to working at various universities, you were also a practicing attorney; is that right?

A.  I was and I am.

Q.  How long have you been a practicing attorney?

A.  A long time.  Since 1976.

Q.  And what is your area of practice, specifically?

A.  It's criminal defense, and particularly, almost exclusively, homicides and capital cases.

Q.  Has that been your area of practice since 1976?

A.  No.  I joined the public defender's office then.  I didn't join the homicide division until 1979.

Q.  And since 1979, have you been working primarily in homicide cases?

A.  Primarily, yes.

Q.  How much of your practice focuses specifically on capital cases?

A.  Now?  I don't know if I can give a percentage, but most of it, I think would be fair to say.

Q.  Do you have any idea how many murder cases you have had -- handled in your practice?

A.  I know how many I have tried.  I can't tell you how many I have pled, but I have tried 136 homicide cases.

Q.  How many voir dires would you say you have conducted in homicide cases?

A.  Well, all of those cases were not jury, some were benches, but I'm certain I have conducted 100 voir dires.

I couldn't count them exactly for you, Your Honor.

Q.  Do you know how many voir dires you have conducted in cases that were potential death penalty cases?

A.  Again, I can't give you an exact number, but certainly more than 12, probably -- more -- significantly more than that.

Q.  And how many -- I'm sorry, how many cases have you served as counsel that were potential death penalty cases, regardless of whether they were tried?

A.  Including cases that were pled?

Q.  (Nods head in the affirmative).

A.  I would say somewhere between 30 and 40 of the cases were potential death cases.

        The reason I have to say that, Your Honor, is that until 2001 Illinois did not require that we get notice of when they were going to request the death penalty, so we sort of had to guess.  So, that's why I can't give you an exact number.

Q.  And how many of the potential death penalty cases have you tried that your client received a sentence less than death?

A.  All of them, so far.

Q.  How many of the potential death penalty cases that you have tried was your client found guilty of the death penalty?

A.  I have had 19 cases go through the penalty phase.

Q.  And were you counsel in the penalty phase of each of those 19 cases?

A.  Yes, counsel all the way through, yes.

Q.  And how many cases have you served as counsel in a federal death penalty eligible case?

A.  Four, only one of which went to trial.

Q.  Of those 19, 18 were state cases and one was federal?

A.  Correct.

Q.  Have you published any articles about capital defense work?

A.  I have.

Q.  Do you know about how many articles you have published?

A.  More than 20.

Q.  Do you know how -- of those articles, how many address voir

dire in capital cases?

A.  Well, there's a few of them where voir dire is a central issue.  But I would say that I certainly discuss it in probably half of those articles.

Q.  And why is that?

A.  Jury selection is probably the most important thing -- I mean, leaving aside preparation for trial, which of course is the most important thing, but it's probably the most important moment in trial, especially in a capital case.

Q.  You have held a number of leadership positions in organizations of your peers, can you tell us about some of the positions that you hold or have held?

A.  Sure.  I was on the board of the Women's Bar Association of Illinois.  I have been both chair and co-chair of the death penalty committee of the National Association of Criminal Defense Lawyers.  I have been on the board and president of the Illinois Association of Criminal Defense Lawyers.  I have been on various committees and some Supreme Court committees in Illinois as well, like jury -- pattern jury instruction committee, that sort of thing.

Q.  And have you received any awards or honors for your capital defense work?

A.  I have.

Q.  Can you tell us a few of those?

A.  I received the National Legal Aid and Defender Association,

Reginald Hebert Smith Award, which is an award they give for the best advocate for the poor in the country.

I have received one for -- called the Justice For All Award from the National -- Northwestern Law School, I don't remember the exact body that gave it to me. A lifetime achievement award from the Illinois Association of Criminal Defense Lawyers, which I was way too young to get in my view, and a couple of other awards, yes.

Q. Have you previously testified as an expert?

A. I have.

Q. Do you know how many times you have testified as an expert?

A. I'm not sure of the exact number, probably a dozen.

Q. And before which tribunals have you testified as an expert?

A. I have testified in state courts in Indiana, Florida, and Illinois. I testified in federal court in Illinois. I have testified as an expert for the attorney registration and disciplinary commission of Illinois. I think that's every place.

Q. In what field have you been qualified as an expert?

A. Generally it's in capital defense work. Sometimes it goes to trial matters as well, but usually primarily having to do with death penalty defense.

Q. Has your work as an expert witness ever been cited by any of the courts in which you testified?

A. Yes. There was a case in the Illinois Supreme Court called

People versus Perez where they cited my testimony with approval.

Q.  Has your work been testified by -- I'm sorry, been cited by any other courts, aside from your testimony provided as an expert?

A.  The United States Supreme Court did cite one of my articles in the case of Florida versus Nixon.

MS. OAKLEY:  Your Honor, at this time I would like to offer Professor Lyon as an expert in the field of capital criminal defense.

THE COURT:  Any additional voir dire by the government?

MR. DALEY:  No, Your Honor.

THE COURT:  All right.  You may examine the witness as provided under Rule 702 of the rules of evidence.

MS. OAKLEY:  Thank you, Your Honor.

BY MS. OAKLEY:

Q.  Ms. Lyon, are you familiar with proffer agreements?

A.  I am.

Q.  Can you describe for us what a proffer agreement is?

A.  That's what usually occurs in the federal system where a defendant makes a statement to the government by way of a proffer, which is a protected piece of testimony or interview, generally as a part of a plea negotiation.

Q.  What do you mean when you say it's a protected interview?

A.  The agreement usually contains language that makes it so that the government cannot use the statement that the defendant gives against him at trial.  They are free generally -- there are variations, but they are generally free to use information they gained from the proffer to do further investigation.

        And were the defendant to testify in -- differently than what he or she said during the proffer session, they would be able to use it as impeachment.

Q.  You mentioned that that's a tool that is used in federal practice, does the state practice with which you are familiar have an analogue to a proffer agreement?

A.  Not usually.  Sometimes, though, you do enter into an agreement with a prosecution in state court where you lay out what -- you know, what the offer would be in return for truthful testimony, or what it might be.

        There are similar ways to protect testimony in state court, at least in the courts I have been -- I've practiced in, but they just -- they just aren't called a proffer agreement and they are not as common, at least not in Illinois.

        THE COURT:  Would you hold up for one second?

        MS. OAKLEY:  Yes.

        THE COURT:  All right, please continue.

        MS. OAKLEY:  Thank you.

BY MS. OAKLEY:

Q.  I should have asked before we go further, do you know John

Blume personally?

A.   I do.

Q.   What is your professional opinion of him?

A.   He is one of the finest habeas attorneys in the United States, a brilliant, educated man.  Not a trial lawyer though, in my view.

Q.   Have you personally in your practice obtained proffer agreements, or the equivalent, in whatever court you are practicing for your clients?

A.   I have.

Q.   Is there a standard practice among criminal defense lawyers regarding obtaining proffer agreements?

A.   Well, before you would let someone facing charges, let alone death penalty charges --

          MR. DALEY:  Objection, Your Honor.  She is going to go to the ultimate question of whether this was ineffective assistance of counsel or not.  I don't think it's an appropriate opinion to render.

          MS. OAKLEY:  It's not my intention to question Ms. Lyon about the ultimate issue, which is whether John Blume rendered ineffective assistance of counsel in this case, rather she is establishing the industry standard, which is a proper subject of expert testimony.

          THE COURT:  Well, there is a rule of evidence that says that evidence is not otherwise objectionable simply

because it goes to the ultimate issue.  But you are not going to get to the specific question of ineffective assistance of counsel, you are going to deal with things leading up to that, in other words, the standard?

MS. OAKLEY:  Yes, Your Honor, it's my intention to explore the parameters of --

THE COURT:  With that understanding, I will permit you to go forward.

MS. OAKLEY:  Thank you.

BY MS. OAKLEY:

Q.  I'm sorry.  So, you said the industry standard regarding obtaining a proffer agreement is what?

A.  Is that before you would allow your client to speak to the prosecution or the police, that you would get some kind of protection for him or her, especially if the defendant is facing the death penalty.

Q.  Have you ever permitted one of your clients to speak with the government without securing a proffer agreement or equivalent protection?

A.  No, not -- not a client charged with a crime, no.  Of course not.

Q.  Ms. Lyon, is there ever a time -- could you imagine any circumstance in which it would be the standard in the industry to encourage a client to speak with the government without securing a proffer agreement irrelevant -- or, I'm sorry,

equivalent protection?

A.   No.

Q.   Are you aware of any instances, other than Mr. Fulks' trial attorneys, who have encouraged a client to talk with the government without securing a proffer agreement or equivalent protection?

A.   I'm not aware of any but, of course, it's possible.  But I just don't know.

Q.   If the government were absolutely opposed and not willing to provide a proffer agreement in exchange for a defendant's statement, how would that affect your analysis of whether encouraging a client to give that statement would be proper?

A.   I wouldn't do it.

Q.   Can you explain to us the reasoning why, why you wouldn't consider it to be proper, regardless of whether the government was not offering a proffer agreement?

A.   I'm afraid I'm not following your question.

Q.   Well, you stated that you -- regardless of whether the government adamantly opposed offering a proffer agreement in exchange for a defendant's statement, can you explain to us the reasoning why, why you wouldn't do that?

A.   Well, there's nothing to gain for the defendant.  There are huge risks always involved in talking to the prosecution.  And if you -- I mean, that's just the way that the system works, is you offer something and you get something in return.

And at the very minimum, you want the conversation itself to be protected.  And as a general rule this is the first step, at least in federal court, towards having a negotiated settlement to plead.  That's generally how they work.

Q.  Do you see as a benefit of encouraging a client to speak with the government without a proffer agreement?  Do you consider getting his version of the story out there without having had him testify as a benefit of encouraging the client to speak with the government without a proffer?

A.  It's not enough of a benefit to take the huge risk that's involved, because you are then creating evidence against your own client, and where you are getting nothing in return.  There are other ways to accomplish the same thing, if that's your concern.

Q.  What are some of those other ways to accomplish the same thing?

A.  If you -- at penalty phase, if you are putting on a mental health expert, you have your client talk with the mental health expert, that version -- his version of the events would be part of that testimony.  I mean, there are other ways.

Q.  Would you consider the fact that a defendant's story had been consistent to his own attorney as justification for that attorney encouraging the client to speak to the government without a proffer agreement?

A.  I don't really see how that would be relevant, one way or the other.

Q.  Would you consider -- well, let me ask it this way.  Does a jury -- in your experience, does a jury give a defendant credit for speaking to the government without asking for a proffer agreement, or some equivalent protection in exchange?

A.  No.

Q.  And why is that?

A.  I think this is one of the places where lawyers, those of us who do this work, and judges and prosecutors, do things a little differently than jurors do.  We consider -- and the fact it's in the sentencing guidelines, that acceptance of responsibility or, you know, coming forward or talking to the prosecution is in itself a mitigating factor, whereas jurors do not.

If you look at what we have learned from the capital jury project, which has interviewed, Your Honor, I think something like 14 or 1500, jurors who actually sat on capital cases in many jurisdictions, including, I believe, South Carolina, you will see that whether the defendant spoke with the police or not is not something that they consider to be mitigating at all.

Q.  Is the research that you just testified to, is that the research that she just testified about, is that widely known among capital defense attorneys?

A.  It is.

Q.  And is it actually standard in your industry to get a proffer for a defendant who is talking to the government, even after he has confessed in a previous instance?

A.  Yes.

Q.  Why is that?

A.  Generally a defendant has given a statement, say, to the arresting authorities or something like that.  That statement may be incomplete, there may be other matters that the defendant is able to tell the authorities about that they might not otherwise be able to solve.  There might be other information, or specifics about evidence, or other matters that could be added that would encourage, hopefully, the prosecution to negotiate a settlement.

Q.  In your experience would giving a statement without a proffer agreement generally strengthen or weaken a defendant's plea negotiation leverage?

A.  I don't know that it would do either one.  It certainly wouldn't strengthen it.  And there is really very little motivation on the part of the prosecution to -- to give very much to a defendant who gives an unprotected statement in that way.

Q.  Have you ever met Mr. Fulks?

A.  I have not.

Q.  Can you describe for us what -- what preparation -- what

materials you looked at in preparing your testimony today?

A.  Sure.  I read a lot.  I read all of the police reports and lab reports, I read your petition and the accompanying affidavits and reports.  I read the government's response, but I honestly don't think I read your reply.

I have read some transcripts, not all the trial transcripts.  I concentrated looking at the voir dire transcripts.  Read the appellate opinion.  I think that's everything.

Q.  Do you have an understanding as to what happened in this case regarding Mr. Fulks' providing a 302 to the FBI?

A.  I do.

Q.  What is your understanding?

A.  That he gave a statement to the FBI with his attorney present, I believe, with no protection of any kind.

Q.  Do you have an opinion as to trial counsel's decision in this case to encourage Mr. Fulks to talk to the government without obtaining a proffer agreement?

A.  I do.

Q.  What is your opinion?

A.  It fell below the standards of reasonable care.

Q.  I would like to talk now about the guilty plea in this case.  Can you tell me if it's standard practice among capital defense lawyers to plead their clients guilty?

A.  In return for a negotiated settlement it absolutely is.

In fact, the ABA guidelines, Your Honor, required that we seek a disposition that way, if we can.

Q.  Have you ever pled a death-eligible client guilty without the government having taken the death penalty off the table as a possible punishment?

A.  No, neither in state or federal court.

Q.  Have there been instances in your practice when you felt certain that you would lose the guilt-innocence phase of the trial?

A.  Yes, there certainly have been.

Q.  And in any of those instances were you unable to negotiate a plea to life?

A.  Yes.

Q.  What did you do when that was the case?

A.  Tried the case.

Q.  Would you consider that to be the standard practice in your industry in that situation?

A.  Yes, I would.

Q.  Is there a reason -- what would be your reasoning behind your decision as to why you would feel compelled to try the case in that instance?

A.  Well, first of all, if you plead you give up an enormous number of issues.  There might be good motions-related issues, Fourth or Fifth Amendment issues that would be waived by a plea.  So, there is a cost to a plea when you are not getting

anything in return.

Secondly, while there might not be a defense -- like, for example, suppose it's a felony murder case, right, and the question becomes, who is the person who actually did the shooting?  There's two or three defendants that are involved.

You can defend the case on the ground that your client didn't commit an intentional murder or wasn't the triggerman, or there was no plan to kill, or those kinds of defenses.  Which are, of course, technically not a defense to a guilty verdict because a felony murder doctrine would require that the jury find the defendant guilty, but they are a good way of paving the way for mitigation.

And it's very important, studies tell us, that juries do care who did what act, and it's important that they make that decision and that they have that conversation.

Q.  Are the studies you are referring to widely known among capital defense attorneys?

A.  They are.

Q.  Are you familiar with the concept of residual doubt?

A.  I am.

Q.  Can you describe to us what that means?

A.  Well, that is a concept that has to do with whether there might be residual doubt as to whether the defendant actually committed the crime or not, or whether he or she is guilty of being the actor, the triggerman, for the lack of a better word,

that may inure to the defendant's benefit at the penalty phase.

In fact, that language that I just used, "that may inure to the benefit of the defendant," is the language that -- of Justice Rehnquist in his opinion in Lockhart v. McCree.

Q. How long has residual --

THE COURT: Let me interrupt here. Let me be sure I understand you. You say you would never plead guilty no matter how strong the government's case is on guilt?

THE WITNESS: Oh, no. Of course, I would plead guilty for a negotiated settlement, Your Honor.

THE COURT: Let's just take a wild hypothetical that has nothing to do with this case.

THE WITNESS: Sure.

THE COURT: A convenience store robbery, and the defendant, your client, is on the videotape clearly shooting the store clerk at point-blank range, and it's no doubt who the identity of the defendant, the perpetrator, is, and so you have no real defense on guilt or innocence, but you have got a lot of mitigating evidence on all kinds of things. Even in that case you would go to trial; you would force the prosecution to try the guilt phase?

THE WITNESS: Well, you end up trying the guilt phase anyway in the penalty because they would put all the guilt evidence on anyway.

THE COURT: I understand that, but you would still

plead not guilty?

THE WITNESS:  Because I would be concerned about trying to explain the circumstances of it.  If there is some way to mitigate the actual action itself, to cast some doubt on the intent of the defendant, I would want to do that at a guilt-and-innocence phase.  But also if you plead, if there were any issues regarding the interrogation of the defendant, perhaps --

THE COURT:  Waive all this constitutional --

THE WITNESS:  You waive all those things as well.  So I mean, are you asking me would I try to plead that case?  You bet.  In fact, I did plead that case.  A couple of years ago I did have a case with my client on video shooting the convenience store owner, so I did plead but for a term of years.

THE COURT:  All right.  Thank you.

BY MS. OAKLEY:

Q.  Is it safe to say residual doubt, that is a concept that is well known among capital defense attorneys?

A.  Sure.

Q.  Has it been for some time?

A.  It has been.

Q.  How long has it been?

A.  Well, I believe Lockhart was decided in 1984, I think, so I don't swear -- but I'm pretty sure.

Q.  In your opinion would pleading a client guilty without, at a minimum, the death sentence being removed as a possible punishment ever be consistent with industry standards?

A.  No.

Q.  I believe that Your Honor already spoke to this issue, but just to clarify, there -- are there any circumstances that you can imagine under which it would be appropriate to plead out if the government hadn't removed death as a possible punishment?

A.  No.  Of course, there are times when you have a client who will plead against advice.  I know of some cases like that, but that would not be the industry standard in terms of advice to give a client.

Q.  I think Your Honor also preempted my next question, which is, have you ever been certain that a jury would return a guilt verdict?

A.  Pretty certain, yes.

Q.  And in your opinion does that change whether it would be appropriate to plead guilty and proceed to the penalty phase, with death still an option?

A.  Not with death still an option, no.

Q.  Would your opinion change if you thought that there was a possibility that the jury might give your client some credit for pleading guilty?

A.  It's possible that a juror or two might give the defendant some credit for that, but that's not what we have learned over

the years.  I have attended a lot of conferences, I have spoken at them, I have talked to capital lawyers all over the country, and -- in the beginning of the modern death penalty, there was some thought that this might be a good way to smooth the way for a non-death sentence.  But I don't know of a single case where -- where that has happened with a jury, where they haven't returned a death verdict and often executed the defendant, most often.

Q.  As a result of what -- what the practical application of that thinking has shown, has that school of thought been abandoned as to whether the jury might give some credit to a defendant for pleading guilty?

A.  It has been.

Q.  How long ago would you say that that's happened?

A.  Gosh, I don't know.  Most of the -- in the modern death penalty, which I'm saying sort of post 1976, I don't know, maybe five or six years into practice, something like that.  I couldn't put an exact date.

Q.  You have written in an article before that you think -- it's not a good idea to put on a "he didn't do it" defense and then switch to a "he did it but he's very sorry about it" mitigation strategy at the penalty phase.  Can you explain what you meant by that?

A.  What I meant is, you don't want to present inconsistent defenses.  I mean, if you're putting on a -- let's say it's an

eyewitness identification case and you are saying that the eyewitness or the two eyewitnesses have picked the wrong person and the jury rejects that defense, which with a death-qualified jury they usually do, you have to face the fact that the jury has rejected your defense and you have to explain why you are presenting mitigation, that it's out of some respect for the jury's need to choose between punishments.  They are choosing now between life without parole and death, usually that is the choice -- I mean, in some states it varies, but that's usually the choice -- and that they need to know who the defendant is.

But you have to -- you just have to face that they have rejected your defense.  You can't say, "Oh, oops, you know, actually I didn't mean it when I said I didn't do it.  I did do it and I'm really, really sorry."

If your defense is, "I did it but there were some elements of self-defense," or, "I did it," but I had a mental health defense of some kind, then the way you make that transition is different.

If your defense is that they have the wrong person, then you just have to face the jury and accept that they rejected your defense and then tell them that they need to know who your client is, and you tell them who he is by presenting a good, vigorous mitigation case.

Q.  Do you consider it to be inconsistent to put on a guilt-phase trial that you feel is certain to result in a

guilty verdict with a strong mitigation case at the penalty

phase?

A.   No, that's often what you are doing.

Q.   Would the thinking that you can't put up a "he didn't do

it" defense at the guilt phase and a "he's sorry he did it"

mitigation defense at the penalty phase, would such thinking

ever justify pleading someone out and going directly to the

penalty phase trial?

A.   No.  I think I've answered that question already.

Q.   I would like to talk to you a little bit about voir dire.

A.   Okay.

Q.   Can you describe for us the importance of voir dire in

capital cases?

A.   Well, it's kind of the whole thing, as I'm sure His Honor

knows, that you are eliminating from the pool of potential

jurors anyone who is opposed to the death penalty and

supposedly anyone who would automatically give the death

penalty as well.

So, you are talking to people who believe that in

some circumstances the death penalty is correct, there is an

appropriate punishment.  And you have to find out who these

people are, what matters to them, what their life experiences

have taught them, whether they can give actual effect to

mitigation.

That doesn't mean whether they can say, "Yes, if a

judge tells me I have to think about it, I will," but whether that matters to them at all. How someone grew up, what influenced their life, mental health issues, all those kinds of things, and there's really kind of only one way to find that out and that is to ask open-ended questions and find out what the jurors think.

Q. Given the importance of voir dire in these cases, has there been much literature written about it?

A. There's a fair amount that has been written about it. There are seminars that are taught, sometimes three or four days, just on capital jury selection.

I run at DePaul, Your Honor, a -- the Clarence Darrow Death Penalty Defense College, and we spend an enormous amount of time on jury selection. Where lawyers come from all over the country and work on their cases. We all sign a confidentiality agreement, and we train investigators and mitigation specialists as well.

Q. Are the principles that you just articulated about the importance of voir dire in these cases widely known among capital defense attorneys?

A. Absolutely, yes.

Q. You have written on several instances that the most important thing that a capital defense attorney can do during voir dire is listen; is that accurate?

A. Yes. It's not what we lawyers are best at, but yes.

Q.  Can you explain the importance of that, listening to the jurors?

A.  A lot of times when I talk to capital defense lawyers, I tell them, you know, the jury doesn't -- you don't need to know what you think, you already think that you should save your client.  I mean, that's what you think, that's why you are there.  What you need to know is what they think and what matters to them, and it requires some really careful listening.

Sometimes someone will use a word that is -- has a subjective meeting, like difficult or emotional, and what might be difficult for me or for Your Honor, might not be difficult for you or for the members of the prosecution team.

And so you have to really pay attention to the language and then try to get specifics from the juror as to what they mean when they use language like that.

Q.  Are you familiar with the voir dire method called the Colorado Method?

A.  I am.

Q.  Can you explain for us what that method teaches?

MR. DALEY:  I didn't catch that.  Would you repeat that?

MS. OAKLEY:  The Colorado Method.

A.  The Colorado Method is a method by which you attempt to ascertain whether a juror could really actually listen to

mitigation.  Its primary feature is what is called -- and I don't mean anything X-rated by this, Judge -- it's called stripping.

It means that you strip away from your question any chance that there is a defense in the case.  In other words, you say to the jurors, "Assuming that the defendant is absolutely 100 percent guilty, it's not an accident, it's not self-defense, it's not insanity, and he were to present mitigation evidence like --" and you give an example -- "what would you think of that?  What would matter to you," et cetera.

The reason that it's important to do that in the questioning, which doesn't take very long to do, is that there -- studies do tell us some capital jurors will say they can give effective mitigation, but what they are thinking is if it was an accident.

When you ask under what circumstances would they not give the death penalty, the answer will be an accident, which, of course, as we all know, is an actual defense in the case. Or they wouldn't give the death penalty if it's self-defense or they wouldn't give the death penalty if the defendant was insane, all of which are actual defenses to the case.

So, you have to sort of strip away those defenses and then find out what they would care about in making a choice in punishment, which is, of course, what a penalty phase is.

BY MS. OAKLEY:

Q.  Do you personally have concerns about the efficacy of the Colorado Method?

A.  Well, it's not enough by itself.  It's a very good method to get at that particular issue I just spoke about, but you still need to ask questions about some of the issues in your case.

For example, studies tell us that people that are in favor of the death penalty sometimes, not all the time, are hostile to mental health testimony.  So, you need to find that out by asking -- if that's in your case -- you know, by asking open-ended questions about what they think of mental health professionals, whether they think that people who have mental health problems are faking it or that sort of thing.  So, you have to ask a lot of other questions that might be issues in your case that the Colorado Method doesn't reach.

Q.  Nevertheless, the Colorado Method is a widely accepted method for conducting voir dire at least in part of the capital trial?

A.  Yes, it is.  Yes.

Q.  After having reviewed voir dire transcripts in this case, is it your interpretation that the method followed in this case was the Colorado Method?

A.  No.

Q.  Why is that?

A.  Because first of all -- I mean no disrespect to John

Blume -- but some of the worst voir dire I have ever read in my life.  It is just -- there's just pages and pages of him speeching -- making speeches at the jurors, and then asking for the juror to say yes or no to a question that gets lost in the middle.

I mean, there's a couple of times when I know that the judge interceded to try to turn it into a question.  He got no information about what the jurors thought, that I could see, most of the time.  And it was bad.

Q.  Do you have an opinion as to whether the voir dire that occurred in this case met applicable industry standards?

A.  I do.

Q.  What is your opinion?

A.  It did not.

Q.  Are you familiar with the term automatic death penalty juror?

A.  Yeah.  Yes, I am.  Sorry.  I'm not supposed to say yeah.

Q.  Can you tell us what that term means?

A.  It means someone who -- who would be excludable under *Morgan v. Illinois* because they would be unable to give effect to mitigation, that is, there are some people who believe that if you kill, you should be killed, and the circumstances of the defendant's life or the offense don't matter at all.

Q.  Have you encountered ADP jurors in your practice?

A.  I have.

Q.  Are there any circumstances, based on your experience, in which it would be appropriate to intentionally seat an ADP juror?

A.  None.  I mean, I suppose if you can't get the cause challenge and you ran out of peremptory challenges and the judge won't give you any more, then you might get stuck with one, but that's the only circumstance.

Q.  If an attorney has remaining peremptory challenges, what would be a standard course of action in that case?

A.  You have to excuse them.  I mean, first you ask the judge to excuse them.  If the judge won't do that, then you have to use the peremptory challenge.

THE COURT:  Did the defense use up all of its preemptories?  They were -- I don't know.

MS. OAKLEY:  I believe that they eventually did, Your Honor.  But they did not file a motion for additional peremptory challenges, which is what the claim --

THE COURT:  I know they didn't request additional, but they did use every one they had?

MS. OAKLEY:  Eventually, Your Honor, yes.

BY MS. OAKLEY:

Q.  Would it justify, in your opinion, putting an ADP juror intentionally on the jury to preserve the issue for appeal?

A.  No --

Q.  Let me clarify.  I don't believe I provided enough

information.

If an ADP juror had been challenged for cause and that challenge had been overruled, would preserving that ruling be sufficient reason -- would preserving that ruling for appeal be sufficient reason to put an ADP juror on the jury intentionally?

A.  When you excuse that juror using a peremptory challenge, assuming you use all of your peremptory challenges in the course of the jury selection, that would preserve the issue. You do not have to seat a juror who you have good-faith basis to believe is -- should not have been qualified.

MS. OAKLEY:  I have nothing further, Your Honor.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. DALEY:

Q.  Good morning.

A.  Good morning.

Q.  I'm Bob Daley.  I'm with the U.S. Attorney's Office.

A.  Nice to meet you, Bob.

Q.  Nice to meet you.  I spent a few years in Chicago --

A.  Did you?

Q.  -- funny our paths didn't cross, right after law school, yes, ma'am.

A.  Did you work with -- under Mr. Fitzgerald or under somebody --

Q.  No.  No.  I was -- I was private.

A.  Oh, okay.

Q.  Is antisocial personality disorder something that you would want to have come out in a mitigation case?

A.  That's a big question --

MS. OAKLEY:  Your Honor, objection.  That is beyond the scope.

THE COURT:  It is beyond the scope.

MR. DALEY:  She's been qualified as an expert.

THE COURT:  I have the authority to allow cross-examination to exceed the scope.  I have the discretion to allow it.  Is that what you want to do here?

MR. DALEY:  Yes, sir.  She's been qualified as an expert and I think it's a valid question.

THE COURT:  Normally we follow the American Rule which says that cross is limited to the scope of direct, but the rule does give me a little bit of wiggle room to open it up and to allow cross as if on direct.  You can't ask leading questions when you do that.

MR. DALEY:  Okay.

THE COURT:  What are you going to ask about?

MR. DALEY:  Just antisocial personality disorder.

THE COURT:  Is that the extent of it?

MR. DALEY:  Yes, sir.

THE COURT:  All right.  Yes, ma'am?

MS. OAKLEY:  I'd just like to add, Your Honor, that to the extent that Mr. Daley intends to question her about some of the -- something that would be in the province of a mental health expert, I think that in addition to being beyond the scope of direct, it's beyond the scope of this expert, her area of expertise.  To the extent that it's limited to decisions she may make as a capital defense counsel relating to antisocial personality disorder, my objection is limited to relevance -- I'm sorry -- beyond the scope of direct.

THE COURT:  I'm going to exercise the discretion I have and allow expanded cross, but I don't -- I do think the point is well taken, it needs to be in terms of trial strategy from an attorney's perspective, not medical testimony.

MS. OAKLEY:  Thank you, Your Honor.

MR. DALEY:  I don't think I will go there, Your Honor.

BY MR. DALEY:

Q.  Ms. Lyon, you are adamantly against the death penalty; isn't that correct?

A.  I'm absolutely and pragmatically opposed to the death penalty, yes.

Q.  You call it a barbaric institution, right?

A.  That's my view of it as a moral matter.  I also have pragmatic concerns.

Q.  And it's just never appropriate in your way of thinking; is

that correct?

A.   That's correct.

Q.   That's not the law in the United States, correct?

A.   In some parts of the United States -- in the federal jurisdiction, of course --

Q.   Isn't -- sorry --

A.   Yes, that's correct.

Q.   Isn't it true that you have said in publications that "Sometimes you should just file motions to cause trouble"?

A.   That's everybody's favorite quote.  I have said in an article that -- people tend to read it out of context -- that a lot of times when you file motions you get viewed as a pariah for making trouble, and sometimes you just have to be willing to make trouble by filing motions.  Sometimes you have to say things first.  Sometimes, Bob --

          May I use your first name?  Or would you rather I said Mr. Daley?

          Mr. Daley, sometimes you have to be the first person to say something.  For example, the whole issue in *Morgan v. Illinois* was first said in the homicide division of the Public Defender's Office at my behest when I was supervisor there, even though the law was against us at that time.

Q.   Sometimes, though, you just make motions to cause trouble just to fill up the business of the court, right?

A.   No.  You have to have a good-faith basis for filing a

motion.

Q. Borderline good-faith basis, and that, of course, is in the eye of the beholder, correct?

A. I would say that you have to have a good-faith basis for making a motion.

Q. And is it possible, though, in making trouble that you could actually harm your client's best interests if you were to antagonize the judge, or the jury were to see some of this making of trouble as not being helpful, not being beneficial to the process?

A. I'm an advocate, sir, of doing a lot of the motions practice pretrial, so that I'm in a position to know what objections will be sustained or overruled by the judge, and I'm not in a position of having to do as much of that in front of the jury.

Whenever you are a zealous advocate there is a risk that someone will become upset with you for that. I've occasionally had judges who have. Most of my experience, particularly in the federal judiciary, is that good advocacy is appreciated.

Q. Let's go to the proffer issue. Let's assume that you want to get in your client's version of the facts.

A. Uh-huh.

Q. And your codefendant is blabbing away and putting it all on you and the government is not going to give you a proffer, and

you have concerns that you are not going to be able to get that version in because of some issues with mental health experts, so even in that instance you would say, don't ever give a statement without a proffer?

A.  If I'm following your question, which I think I am --

Q.  Uh-huh.

A.  -- my answer would remain the same.  Yes, it would remain the same.

Q.  You, in effect are saying, never give a statement without a proffer, ever, in a capital case?

A.  In a capital case if you have no protection at all for the statement, it is far too dangerous to your client to do.

Q.  In your -- in your estimation, correct?

A.  In everybody's I -- I have ever talked to about it, estimation as well.  Now, there could be somebody who disagrees with me in the country, Mr. Daley, of course.

Q.  Capital jury project, Mr. Blume worked extensively on that as well, hasn't he, on that?

A.  We both have.

Q.  He has access to that, doesn't he?  He, in fact, has conducted tremendous amounts of the work in that because South Carolina is a place where the death penalty is often carried out, correct?

A.  I couldn't speak to how much --

        MS. OAKLEY:  Objection, Your Honor.  Lack of

foundation for this line of testimony.

THE COURT:  I'm sorry?

MS. OAKLEY:  Lack of foundation as to Mr. Blume's access and knowledge of --

THE COURT:  All right.  South Carolina being more predominantly -- give the death penalty?

MS. OAKLEY:  No.  With respect to Mr. Blume's access to this particular research and his contributions to it.

THE COURT:  Well, it's cross-examination.  Do you have a good-faith belief for asking the question?

MR. DALEY:  Yes, Your Honor.

THE COURT:  Well, I will overrule.  Let's see what she says.

BY MR. DALEY:

Q.  You know that Mr. Blume is involved in that?

A.  I know that he was in the original 1998 set of studies, I'm not sure of what his level of involvement is anymore.

Q.  You say that pleading guilty -- but really should never plead guilty -- and you said that that's basically since 1982, I guess, from 1976 you said six years, since that point it's just never plead guilty in a capital case without getting something -- a life sentence in exchange; is that correct?

A.  I couldn't give you a year, but I would say five or six years into the modern death penalty, it -- it -- we all learned the hard way that pleading guilty without anything in exchange

is a poor idea.

Q. So even if the Fourth Circuit is saying -- in 2007 says it's a valid trial strategy, that doesn't matter?

A. I'm unfamiliar with the Fourth Circuit's decision, but I would disagree with it, if you are characterizing it correctly.

Q. Okay. Has any court actually set for such a categorical ruling, that pleading guilty without getting a life sentence is ineffective, is -- falls below the industry standards, as you put it?

A. Well, that is an interesting question. I do know that a district court in Illinois held in a particular case that it was ineffective in that case, but I -- and then -- I believe that the Seventh Circuit reversed on other grounds. That's the only case with which I'm familiar. I think the defendant's name was Edwards -- something with -- like an E-d. I could look it up for you, but I don't remember. I'm sorry.

Q. So the only one you know of that would be --

A. And that was a district court opinion which, of course, doesn't carry the same force as an appellate court opinion. But if you are asking me if there is a state supreme court or a U.S. Court of Appeals decision that makes such a categorical statement, I would say that the answer is no.

Q. Voir dire, how much of the voir dire did you read?

A. I believe I read most of it, maybe not all of it.

Q. So, you are criticizing Mr. Blume but, of course, you know

that Mr. Nettles and Professor Johnson did a fair amount of

questioning too; did you know that?

A.   They did read some -- did ask some questions, yes.

Q.   In fact, they did a number of the jurors, correct?

A.   That's my memory.

Q.   You can't really remember their questioning very well, or

you remember their questioning as well now?

A.   I don't remember their questioning as well as I remember

Mr. Blume's.

Q.   Okay.  There is a school of thought that you want to put

forth your theory of the case and sometimes take a little bit

of time to educate jurors in voir dire; isn't that a valid

approach in voir dire?

A.   Not in my view, and not in the view of most of the people

that have studied jury selection -- Dr. Sunwolf, Dr. Sandiesen

(phonetic) and Dr. Bowers -- all of them believe that --

lawyers will conflate the idea of educating a jury as to the

issues in your case with speechifying at them.

        Educating them as to issues means asking questions to

find out what their opinions are about the issues that might be

in your case.  That might include, for example, child sexual

abuse or something like that where you need to find out how the

juror feels about that, what experiences, if any, they may have

had in their own life, that sort of thing.  That is not the

same thing as saying -- you know, making a speech about it.

Q.  How many volumes of the voir dire do you think you reviewed?  There's 11 or 12 or 13.

A.  I know I did not review all of them.

Q.  Oh, okay.  Do you have any idea how many you reviewed, or did you just review select portions that the defense gave -- that Mr. Fulks' team gave you?

A.  I reviewed several volumes.  But I can't tell you that I reviewed them all, and it was a couple of years ago as well.

Q.  The discovery in this case, how much of the discovery in this case did you read?  There's 11,000 pages, just so you know.

A.  That I read all of it.

Q.  You read all 11,000 --

A.  I read -- I read all of the police reports, lab reports, correspondence, arrest warrants, a lot of things.

Q.  The fact that the semen, the DNA testing, turned out that Mr. Fulks' semen was on the back seat of the BMW; did you read that -- that lab report as well?

A.  I did.

Q.  In the end, whether you are ineffective or not really comes down to whether jurors get seated that should have been struck for cause, correct, under the law?

A.  I'm sorry.  Ineffective as to jury selection you mean?  You asked a broader question.  I want to make sure I'm answering the question that you want.

Q.  In order to end up being ineffective and having a reversal in the case, you have to have a juror who is seated who should have been struck for cause; is that correct?

A.  Ineffective as to jury selection you mean?

Q.  Yes.

A.  Yes.  That's usually how the courts come out.  There are not a lot of decisions where someone will look at the jury selection and say, "This was just done so badly, this is, you know -- I'm just finding per se, without any showing of prejudice, ineffective assistance of counsel."

Q.  Have you ever -- I mean, are there courts that have ruled that only -- if you don't ask open-ended questions in a capital case, then it's reversal; it should be reversed?

A.  By itself, no.  Sometimes it's part and parcel of looking at the whole level of representation, but by itself, no.

Q.  Guilty plea, you pleading guilty, you don't get a life sentence, that's always, you say, per se ineffective, per se falls below industry standard?

A.  It falls below the industry standard.

Q.  You should never do it?

A.  Correct.

Q.  Even in the face of overwhelming evidence, even if you are trying to get some level of acceptance of responsibility from the jury, a belief that you are being remorseful, that is not enough either?

A.  That's been my testimony, yes.

Q.  And that is the case despite the fact that there is --
there are any number of courts that have found it as a valid
trial strategy?

A.  That is my testimony regarding what capital defenders --
what the standards are among capital defenders.

Q.  You said Mr. -- you've got a lot of respect for Mr. Blume,
but he's no trial lawyer; do you know how many capital trials
he's been involved in?

A.  Involved in or tried?

Q.  Involved in or tried or pled; do you know?

A.  I know he's pled a number of cases, especially on remand,
when he's been successful on habeas petitions.  I do not know
how many cases he's tried.  I believe this was his first
federal one, but I can't swear to you I'm right about that.

Q.  And you have actually only tried one federal death penalty
case as well, right?  You pled three, but you have only tried
one; is that correct?

A.  That's correct.  Well, actually I pled two of them.  One of
them the death penalty was taken off the table and then I was
excused from the representation going forward, if that makes
sense.

Q.  You said that the Colorado Method is an accepted,
appropriate method to use, correct?

A.  Yes, in conjunction with lot of other methods, yes.

Q. And part and parcel of that is, you will rate the jurors as to their death qualifications, whether they are more or less likely to impose the death penalty; do you know about the rating system?

A. I do know about the rating system. I'm not so sure how useful the rating system is but, of course, you're always judging that. I'm sure you do the same when you are picking a jury.

Q. You say that there is nobody that would ever want to seat an automatic death penalty juror if they can strike them, that is -- you should never do that?

A. There's a lot of reasons why.

Q. Would you agree that voir dire is a very difficult thing to do?

A. It is far more art than science, I would agree.

Q. And doesn't voir dire depend a lot on the context in which it is done through the judges, how much he or she wants to participate in it?

A. Well, voir dire conditions are quite idiosyncratic with various judges, I would agree with that. It doesn't mean that you don't need to ask open-ended questions. If you only get to talk for five minutes, you need to spend the five minutes asking open-ended questions.

Q. Do you have -- so you really don't really remember the other two attorneys, their questioning style and how it turned

out?

A.  I don't have clear enough memory that I feel comfortable testifying about it, Mr. Daley.

Q.  You ever see a case like this 17-day crime spree, with -- spanning seven jurisdictions, with the FBI investigating, you know, three kidnappings, two car-jackings, two killings; you ever been involved in a case with that geographic spread?

A.  Would I personally have been involved?

Q.  Yes.

A.  Not at the trial level.  We had a couple of cases when I ran the Death Penalty Resource Center in Illinois that had multijurisdictional involvement.  I certainly had cases with a lot -- sadly, more people than two dead as well.

Q.  But ever had one that spanned seven different states with evidence --

A.  At the trial?

Q.  Yes.

A.  I think three states.  I think three states is the most that I have had, Mr. Daley, in one case.

        MR. DALEY:  Beg the Court's indulgence.

BY MR. DALEY:

Q.  Did you review the video in this case, of the actual kidnapping video?

A.  No, I did not.

        MR. DALEY:  Nothing further, Your Honor.

THE COURT:  Redirect.

MS. OAKLEY:  I have a few things, Your Honor.

REDIRECT EXAMINATION

BY MS. OAKLEY:

Q.  Ms. Lyon, does the fact that you do not believe in the death penalty affect your opinion with respect to what is the industry standard governing effective capital defense practice?

A.  No.

Q.  Mr. Daley asked you about a statement regarding filing motions to cause trouble and you mentioned that the motions have to be accompanied by a good-faith basis.  Would one of those good-faith bases be to preserve an issue on appeal in the event that governing law is overturned?

A.  Yes, that would be a good-faith basis.

Q.  In fact, you were involved and wrote an amicus briefing in one such case; is that right?

A.  In *Morgan v. Illinois,* and then I retried the case and won -- or retried the penalty phase, I should say.

Q.  So would that be one of the motions you might have referred to as, quote, causing trouble, because you knew it was going to be denied?

A.  Well, that was the view of some of the judges in Cook County when we kept filing motions asking to be allowed to ask those sorts of questions.

Q.  And did the same type of situation happen with respect to

the reverse-Witherspoon objection of the case you are referring to?

A.  Yes.

Q.  As a result of that objection having been preserved, the Supreme Court has now ruled that reverse-Witherspoon objections are an adequate basis for removing jurors from a jury?

A.  They have.  We would file a motion asking for the -- didn't call it that, but for the ability to identify automatic death penalty imposers.

Q.  And had trial counsel not in that case preserved that objection, filed that motion, notwithstanding knowing that it would be denied, that might not be the case today; is that right?

A.  That's correct.  In fact, some lawyers who didn't file that motion whose cases were on direct appeal in Illinois that I know of were unable to take advantage of the decision in *Morgan v. Illinois,* and their clients did not get new sentencing hearings.

Q.  You mentioned that you reviewed voir dire questioning by not only John Blume, but also by his cocounsel Bill Nettles and Sheri Johnson.  Taking into account everything that you recall about the voir dire that you reviewed --

MR. DALEY:  Objection, Your Honor.  She is misstating what Ms. Lyon actually testified to.  She testified that she could not recall the other two juror -- attorneys questioning

well enough to testify.

MS. OAKLEY:  Your Honor, there were -- there were two questions by Mr. Daley on this issue.  The first was whether she also reviewed some testimony by the other two trial counsel.  She said that she did.  She said she didn't recall whether she had reviewed all of it.  And then she later testified that she couldn't recall specifics of their testimony but she did testify that she reviewed some --

THE COURT:  I agree.  I agree.  So what is your question now?

BY MS. OAKLEY:

Q.  My question is, taking into account all of the voir dire testimony that you have reviewed, all of it that you recall, does any of that change your opinion as to whether the voir dire in this case was effective?

A.  No.

Q.  And your opinion as to whether voir dire in this case was effective is what?

A.  It was not.

Q.  You mentioned in response to one of Mr. Daley's questions that there are a lot of reasons to never seat an automatic death penalty juror, can you explain to us what those reasons are?

A.  I can.  People who espouse those views -- and, again, I'm painting with a broad brush -- tend to be particularly hostile

to mental health testimony, tend to belittle -- tend to belittle people who consider abject poverty or child abuse as a reason to choose a punishment other than death and often are -- have very strong personalities and can push around jurors who might have some hesitancy to sentence someone to death.

In the federal sentence where, you know, one or two jurors who choose not to impose the death penalty would then result in a life sentence, that can be quite devastating.

Q.  Is the fact that this case involved or reached into seven different jurisdictions, as to opposed to, for example, three --

MR. DALEY:  Objection.  She's been leading the whole time.  I've been giving her a lot of leeway, but that's -- that's leading.

THE COURT:  Don't lead the witness.

MS. OAKLEY:  Okay.  I will rephrase the question, Your Honor.

BY MS. OAKLEY:

Q.  How might the number of jurisdictions in which a case reaches affect at all any of the testimony you gave today?

A.  Not at all.  I mean, it would make it much harder to investigate, of course, and be very difficult work to do, but it wouldn't affect any of the opinions I have given today.

MS. OAKLEY:  I have nothing further, Your Honor.

EXAMINATION

BY THE COURT:

Q.   Ms. Lyon, let me ask you just some questions.

A.   Sure.

Q.   Is there any possibility that regional or cultural differences around the country might affect your testimony?  In other words, I can't take judicial note of it, I don't think, but I think generally speaking the consensus is it's easier to get a death penalty in the South than maybe in Illinois.  Does your testimony account for anything -- for any regional differences?

A.   There are regional differences, actually, within Illinois too and so there's big differences.  For example, if you are trying a case in what is -- you must pronounce as Cairo, Illinois, not Cairo.  You will get in lot of trouble if you say that -- which is a much more southern and rural jurisdiction, and so the ability of the prosecution to get a death sentence is greater there than in some of the more, you know, urban areas.

       So, I think that I'm aware that there are geographic and cultural differences, but I don't believe that the fact that we are in South Carolina takes away from what the national standards are for representation in capital cases.  Does that answer your question?

Q.   Is the government's moratorium still in place in Illinois or not?  I have to catch up on that.

A.   Moratoriums on executions is still there, but we do have 14 people on death row, and the state is seeking it all the time still.  It's not succeeding quite as often.

THE COURT:  Let me ask counsel this question.  Did the other two lawyers -- trial counsel, Ms. Johnson and Mr. Nettles, ask more open-ended questions?  Was that your point?

MR. DALEY:  Yes, they were.  At least Ms. Johnson did ask some shorter and open-ended questions, I think, Your Honor, the record will reflect.  But, I mean, the record is what it is.  They each had different styles, obviously.

THE COURT:  Do we have a tally as to how many jurors made it on the jury that were voir dired by the different lawyers?  Has anybody done a table on that?

MR. DALEY:  I haven't done a table on that.

MS. OAKLEY:  I haven't either, Your Honor.  We can create one if you like.

THE COURT:  I'm not sure how -- any follow-up to what I said?

All right.  Thank you very much.

THE WITNESS:  Very nice meeting you, sir.

THE COURT:  Me too.

Unless there's objection, she's excused.

All right.  Next witness.

MR. ASHMORE:  Your Honor, we will call Bill Nettles

to the stand.

WILLIAM F. NETTLES, IV, SWORN

DIRECT EXAMINATION

BY MR. ASHMORE:

Q.  Can you state your name for the record, please, Mr. Nettles?

A.  William Fletcher Nettles, IV.

THE COURT:  Let me interrupt.  Just so you know, I would like to go until about 12:45 and then come back at 2. Can we do that?

MR. ASHMORE:  Absolutely.  Yes, sir.

THE COURT:  It means you won't finish this witness, I guess, but that will give me time for my 1:30 conference call with the other two judges.

MR. ASHMORE:  Yes, sir.

BY MR. ASHMORE:

Q.  What is your current occupation, Mr. Nettles?

A.  Assistant Federal Public Defender.

Q.  And is that in the Florence office?

A.  Yes, it is.

Q.  How long have you been with the Federal Public Defender's Office?

A.  In June of this year will be 15 years.

Q.  Did you have any experience in private practice prior to joining the Federal Public Defender's Office?

A.  Yes.  When I got out of law school, I clerked for a state court judge named John Hamilton Smith, and then was an assistant solicitor for a short period of time in Charleston.

And then went back to my hometown of Camden and was first an associate and then a partner at Savage, Royal, and Sheheen in Camden, South Carolina.

Q.  How long did you practice at the Camden firm?

A.  Five years.

Q.  So, you have been practicing law for approximately how long?

A.  This -- I think 22 years this coming November.

Q.  Quite obviously you have a good bit of federal criminal experience.  When did you get appointed to represent Mr. Fulks, approximately?

A.  I was appointed to represent Mr. Fulks in November of 2002, I believe.  Late November.

Q.  Were you the first South Carolina counsel to be appointed?

A.  I believe so.

Q.  Did he have other attorneys that were already representing him when you were appointed?

A.  He had been -- he was arrested in Indiana, and they had proceedings there pursuant to the Federal Rules of Criminal Procedure to have him transferred back to South Carolina, and he had an attorney for that purpose.

Q.  Was this the first federal capital trial in South Carolina?

A.  I believe so, yeah -- I think so.

Q.  And can we conclude that you don't -- didn't -- prior to this case you had no federal capital experience?

A.  I had no federal capital experience and had no state court capital experience.

Q.  What, if anything, did you do in terms of requesting assistance on this case?

A.  Upon my appointment, I consulted with David Bruck about getting another lawyer involved in the case, who was I guess under the statute learned in the law regarding capital offenses.  And ultimately as a result of those conversations, John Blume agreed to take the case.

I had known John previously when I was in undergraduate school in South Carolina.  I paged at the house of representatives judiciary committee when John was a law clerk there, and I knew him there.  And I sort of followed his career as he gained -- as he became more and more noteworthy as a capital litigator.  And so I was really aiming for John to begin with the whole time.

Q.  And his reputation as a capital litigator was primarily in the appellate courts; is that correct?

A.  You know, I knew John had done work in state court too, and I'm -- I know that his federal capital work had to be in the appellate court.  As far as I know, he hadn't done any federal capital trials.

Q.  Sheri Johnson, do you know the circumstances under which she was -- under which she joined the trial team?

A.  I'm not exactly sure.  She and John are involved in the Cornell Capital Punishment Project, and I'm sure that she became involved in the case at John's behest.

Q.  Can you describe for Judge Anderson the dynamics of the Fulks' trial team, who was the leader?

A.  Oh, John was the leader.

Q.  What was your role?

A.  I would -- I did very little legal research; I did some.  I mostly did field work regarding matters related to the case, such as the other bad acts involved in the case, and tried to get the experts coordinated.  And by that, I mean not discussing everything with them but, you know, trying to get their paper work straight so we could get them paid, and doing what we needed to do to do that, getting subpoenas out, that kind of thing.

Q.  Please tell us about the team's communications during the pretrial efforts.  Mr. Blume and Ms. Johnson were in New York at least part of the time; is that correct?

A.  That's correct.  We communicated by e-mail, telephone calls, and we had meetings in South Carolina, I think in one semester.  And it may have been the semester that the case was tried, I think -- which would have been in the spring, the '04 semester, I think John was here.  I don't think he went back

and forth.  I think he had some type of sabbatical or something that allowed him to do that.

Q.  What were the trial team's initial thoughts about the case?

A.  Well, it was a very difficult case.  It had a lot of -- it was a very sad case.  It had two unknown females that were obviously dead, nobody had found their bodies.  And there were circumstances that -- you know, that made it even more difficult, such as your client escaping from jail, that kind of thing.

Q.  Did you develop a working theory or theories for the defense of the case?

A.  Based on our conversations with Chad and based on the way the discovery developed, we did develop, I guess, a strategy of -- yes, I would say yes.

Q.  And what were those strategies or theories?

A.  Well, like every case, I think you want to try to find holes in the government's case as best you could.  But in our situation I think we were going to try to explain to a sentencing jury or to a jury that, you know, Chad had accepted responsibility by pleading guilty, but that he was not the person responsible for the deaths of Ms. Donovan and Ms. Burns.

Q.  Did you ever develop any alternative theories?

A.  Not that I'm aware of.

Q.  At some point Mr. Fulks met with the FBI and submitted to

questioning by him -- by them --

A.   Right.

Q.   -- is that correct?  Can you walk us through that process? What were your thoughts concerning his meeting with the FBI?

A.   Well, we knew by that point that the government was not willing to allow Chad to cooperate in the sort of traditional federal court way in which you would testify against your co-defendant or somebody else and receive some type of leniency.

And the government was not willing to give us a proffer that allowed Chad to say things that would not be used against him as long as he told the truth.  In other words, they made it clear that whatever he said was going to be used against him.

We thought in these circumstances our best shot in this case was to get his version of the events out there. There were certainly many statements by Basham in which Basham had claimed that Chad was the killer.

Q.   His statement in the 302, were they consistent with your private conversations with Mr. Fulks prior to his submitting to the 302 interview?

A.   Yes.

Q.   Any material differences?

A.   No, not in my conversations with him, no.

Q.   And in the 302, Mr. Fulks indicated that he thought that

Brandon Basham was going to steal an unoccupied car; is that your recollection?

A. That's correct.

Q. Did he ever differ from that particular statement?

A. Chad was consistent on that from beginning to end, that that was what Mr. Basham -- that was what Mr. Basham was supposed to do, steal a car.

Q. At the time the decision was made for Mr. Fulks to plead guilty, the remains of Ms. Burns and Ms. Donovan were still missing?

A. That's correct.

Q. Who led the mitigation investigation?

A. John would have been the one that was ultimately responsible for the mitigation investigation. Now, are you talking about from a legal standpoint or are you talking about Ms. Glass or --

Q. Well, just -- I think you have answered the question. Ultimately Mr. Blume was the decision maker --

A. Yes.

Q. -- throughout this entire process?

A. Yes.

Q. As to mitigation, I think previous testimony is established that it was divvied up amongst various individuals?

A. That's correct.

Q. What was your role? Did you have a specific role?

A.  I really didn't -- my recollection is I really didn't do much in terms of mitigation, in terms of interviewing family members, school teachers, neighbors, those types of people, which would have been mitigation witnesses.  I didn't do any of -- I didn't interview those people.

Q.  Who --

A.  I went with John and Pete one time where we talked to his mother and stepfather, but I don't necessarily know that that was a mitigation interview.

Q.  You traveled to various states --

A.  Right.

Q.  -- can you recount those travels?  What was the purpose?

A.  I went to West Virginia on two occasions.  The first time was to meet with the prosecutors in West Virginia.  I think John had also been appointed as counsel in West Virginia because they were seeking -- the government there was thinking about seeking the death penalty too.  And went to West Virginia again later to meet with Chad while he was up there, and spoke with him.

Then went to Kentucky on two occasions.  The first occasion was to try to find information that related to Brandon Basham that we might be able to use.  And there were law clerks there, accompanying me there.

And the second time was to investigate more fully some of the other bad acts that Chad was charged with in the

indictment and try to see what we could discover on the ground.

I also went to Tennessee to try to speak with Beth McGuffin's boyfriend, who I believed to be in jail.  And as I recall, they wouldn't let me go see him that afternoon because I got there too late.  And I think I got there the next morning, they had already let him go.  But I talked to Ms. McGuffin's mother and stepfather, or father and stepmother, I can't remember, that day.

I also interviewed several people that were in jail that might have information about the case, and I just -- and I talked with several experts in the case.

Q.  Speaking of jails, did you ever go to the Hopkins County Detention Center?

A.  I went by there, I never went in it.

Q.  Did you or any member of the trial team investigate the circumstances under which Mr. Basham and Mr. Fulks actually escaped from that jail?

A.  I think Sheri Johnson did that.  I think she was -- to the best of my recollection, she was the one that went into the jails.

Q.  Do you have any knowledge concerning that investigation, in particular who actually orchestrated that escape?

A.  The only knowledge that I have comes from Chad about that, and his statements to me were that Brandon had done that.

Q.  Did you ever interview Mr. Fulks concerning sexual abuse?

A.  I did not, not that I recall.

Q.  Did you ever talk to any witnesses that indicated that Mr. Fulks may have been sexually abused?

A.  Not that I recall.

Q.  Did you have any role in working with the experts in this case?

A.  Yes.

Q.  What was that?

A.  Well, I -- there were some experts that if the case were called for trial that I would have been primarily responsible for.  And in addition to getting information to get them paid and stuff like that, there were a couple of other experts that I spoke with that I wasn't responsible for.  But based on the notes that I have been shown, I apparently spoke with them.

MR. ASHMORE:  Your Honor, this might be a good point to break, if it suits --

THE COURT:  Let's come back at 2 o'clock.  An hour and 15 minutes.  We will be in recess.

(Lunch recess)

THE COURT:  Before you begin, Mr. Nettles, the witness leaned over to me as the court reporter was setting up, he said he would like to revisit an answer he gave earlier.  So, unless there is a problem with somebody, we will let him do that.

MR. ASHMORE:  No problem here.

A.   Thank you.  You asked a question about whether Chad had differed in his 302 and that kind of thing.  When I answered the question I said, yes.  I haven't gone back and reread the 302 and committed it to memory or anything else.

I will say when I answered that question I meant to say that he was entirely consistent that Brandon was supposed to steal a car, and that he never intended to kill or did not kill Ms. Donovan.

BY MR. ASHMORE:

Q.   Thank you for that clarification.  Let's also put on the record, Mr. Nettles, that my entire team ended up in the same restaurant with you for lunch, as well as a couple of the members of the government team.  Is it fair to assume that nobody talked to you about your testimony during the lunch period?

A.   No one did.

Q.   Thank you.  Let me show you what has been marked -- is your screen working?

A.   It's not right now.

Q.   Give us one minute.  Good, this is Government's 17, and obviously it's labeled request for approval to expend funds for services.  Have you ever seen this document, Mr. Nettles?

A.   Yes, I have.

Q.   Can you tell me what you know about this particular document?

A.  It was probably produced by my legal assistant at the time.  It's just a list of the experts or -- that we had approved, or had made requests to get approved.

Q.  And I think you testified earlier that was one of your functions in the case; is that correct?

A.  Right, right.

Q.  Let's -- there's been some discussion concerning entry number 5, Margaret Melikian, MD, and then there's a parenthetical statement "Replaces Dr. Halleck;" does that mean anything to you?

A.  Other than what it says, no.

Q.  Well, can you elaborate on that?

A.  Well, I know at one time we had considered hiring Dr. Halleck and may have consulted Dr. Halleck, and then -- then Dr. Melikian came on board.  That's the extent of my memory about that.

Q.  Who --

A.  I'm sure the "replacing Dr. Halleck" means that Dr. Halleck is not going to get any more money.

Q.  So this is a budgetary matter?

A.  Yes, probably just a record keeping thing.

Q.  Very well.  Who would have been the primary attorney on the Fulks trial team that dealt with mental health experts?

A.  That would be Mr. Blume.

Q.  Did you on occasion accompany Mr. Blume or anyone in

interviewing the mental health expert witnesses?

A.  I went with Mr. Blume one time to Charleston and spoke with Dr. Melikian, and I believe it was Mr. Becker on one occasion, and I -- based on the notes that have been shown to me by your team and the government team, had obviously sat in or had some conversation with some of the mental health experts.

Q.  Let me show you what's been marked, I believe, as Government's 14, and ask you if you can identify this document?

A.  That's a document that I made that -- that's my handwriting and I -- I have no independent recollection of making this document or what the -- whether I talked to her or whether I talked to Mr. Blume.  I probably talked to her.

Q.  Could you decipher some of those words, starting with 1 with a circle around it?  What is this line here?

A.  It says, "meet criterion for dependence marijuana, alcohol, cocaine."

Q.  Number 2?

A.  "Depression."

Q.  And number 3?

A.  "Cognitive disorder NOS," not otherwise specified. "Impairment due to neuro psyche."

Q.  And then here, what is this notation?

A.  "Fetal alcohol spectrum disorder," FASD.

Q.  Tell me about fetal alcohol spectrum disorder.  What was Mr. Blume's theory on fetal alcohol spectrum disorder?

A.   That Chad had suffered brain damage as a result of his mother's consumption of alcohol while he was en utero.

Q.   Was that a secondary theme, a primary theme?  What was Mr. Blume's emphasis on that particular mitigating circumstance?

A.   Well, obviously it's an impairment that is caused by someone else, and that he suffered brain damage through no fault of his own.  As a result of that brain damage, he did things that were bad, and lacked executive functioning, the ability to reason, that type of thing.  Is that what you are asking me?

Q.   Let me ask you this, did Mr. Blume place enough emphasis on fetal alcohol spectrum disorder or too much emphasis?  What would your assessment be?

A.   I wouldn't have any assessment of that.

Q.   There's been some testimony about whether or not Mr. Fulks may have lied to you on -- or the trial team on particular occasions?

A.   That is correct.

Q.   Has that ever happened to you before in your representation of a defendant in a federal criminal case?

A.   Yes, it has.

Q.   And just can you elaborate on that?  Are there any particular instances where you recall that Mr. Fulks made misrepresentations to you during your representation?

A.  You are recalling -- you are talking about specific instances?

Q.  Well, let me ask you about one particular instance, and it dealt with the rape of Alice Donovan.

A.  Right.

Q.  Can you tell me what you know about that?

A.  Well, he admitted fairly early on that he did in fact rape Ms. Donovan.  Now, I saw a memo that I did immediately upon being appointed to represent Chad.  I was on my own discussing, having conversations with David Bruck, and they were -- Mr. Bruck and I were going back and forth.

There was an all out sort of effort by the government to try to find the bodies.  I remember going down and speaking with Mr. Fulks about -- speaking with Mr. Fulks about -- if the body was found, would there be any DNA or be any DNA evidence.  He told me no, and I think that's what I wrote in my memo.

You know, my question may not have been -- my question may not have been specific enough or whatever, but I took that to mean at the time that he denied having sexual relations with her.  But fairly early after that he -- fairly soon after that he admitted raping her.

Q.  Do you know whether or not he --

A.  Now, let me just say that when you are appointed to represent somebody in a case like this, you know, if at all possible you like to develop some type of relationship with

your client so that your client can trust you before you go into a lot of these meaty matters.  Sometimes you can, sometimes you can't.

In this particular case because of the sort of all out effort to find the body, I went down there and talked to him about this stuff.  Ordinarily I would not have done that that quickly.

So, he didn't know me, I didn't know him, so it's understandable in that situation where somebody might hold back.  I mean, that's happened before.  It's common that early on clients can tell you one thing and then change their story later on as they get to know you.

Q.  Do you know whether or not he denied the rape when talking to a female member of the trial team?

A.  Yeah.  I wasn't there, but apparently he did.

Q.  Do you have any independent knowledge as to what might have transpired?

A.  No, I don't have any independent knowledge of what might have transpired, and I don't ever remember him denying it to me.  Maybe he did.  I just don't recall it.

Q.  Did you talk to Chad Fulks about why he would deny it?

A.  I don't think I did.  I don't think I did.  There --

Q.  You said what?  Is there follow up?

A.  I remember that incident comes up and I remember talking to John about it.  And I think John said something like he

probably doesn't like making that admission to females, and there were a lot of law students, and Jill Rider was his paralegal.  So, that denial may have been sort of very audience specific for that.  That's my guess.

Q.  Do you -- you know, obviously, Rose Mary Parham?

A.  Yes.

Q.  And who is she?

A.  She is an Assistant United States Attorney who is in the Florence office.

Q.  Is it fair to say she handled this case in the very early stages?

A.  Yes, she handled the initial appearance and communicated with the lawyers who represented Basham, and with me, early on.

Q.  Did she -- did she stay involved in the prosecution of Mr. Fulks?

A.  No, she did not.

Q.  Did you have conversations with her concerning the case --

A.  Yes, I did.

Q.  You are both in the Florence federal building?

A.  Right.  She had been there for a number of years.  I had been there, you know, since before she was there, so we handled enough -- a number of cases to have a pretty long history between us.

She, you know, told me that sort of, you know, Basham says that Chad killed her and, you know -- I mean -- yeah,

Basham said that Chad strangled her, put her in the trunk and then stabbed her, I think, with Basham's knife.  I mean, early on that was what I was working off of, based on what she had told me.

Q.  And again, what was your belief as to what Mr. Basham's version was of the events on the day that Ms. Donovan was abducted?

A.  Generally that -- well, I'm sorry --

MR. DALEY:  Objection, I'm not sure where we are going with this, what relevance it has to the actual allegations in the petition.

THE COURT:  What claim does this relate to?

MR. ASHMORE:  Just the overall theory of the case. What they were proceeding under, in terms of what the government had relayed to the trial team, in developing their theories of the case.

MR. DALEY:  Your Honor, all I think Mr. Nettles is going to talk about was sort of his belief, I guess, of Basham's story.  I don't know what the basis of it would be.

THE COURT:  I still don't know what claim it relates to.

MR. DALEY:  I don't know what claim at all it relates to.

MR. ASHMORE:  Your Honor, obviously inconsistent theories.  I'm getting into that, as well as the Brady

violation.

THE COURT:  All right.  Well, I will let it in.
Overruled.  Go ahead.

A.  Could you repeat your question again?

BY MR. ASHMORE:

Q.  Let me move forward.  Let me withdraw that question.  Do you recognize this particular exhibit --

A.  Can you pull it up some more so I can see the bottom?

Q.  I'm sorry.  I don't know if I can get it all on one page.

A.  The other way, the other way.  A little bit higher.  I was looking for the Bates stamp number.  That would have been a document that the government would have provided us in discovery.

MR. DALEY:  Your Honor, can I say for the record, again, Mr. Ashmore just mentioned this is some sort of Brady violation.  I think we went over that yesterday.  There is not a Brady violation regarding this statement, at least not in a claim in the amended motion.  I want to make it clear for the record.

MR. ASHMORE:  Obviously, I disagree.  We will take that up later.

THE COURT:  I will let it in.

MR. ASHMORE:  Thank you.

THE COURT:  By letting it in, I'm not saying it's a new claim that I'm allowing to come in late, I'm just letting

the testimony in.  We will sort it out later.

THE CLERK:  What exhibit number is this?

MR. ASHMORE:  This is P 30.

BY MR. ASHMORE:

Q.  Do you recognize this particular document?

A.  Yeah, I recognize it.

Q.  What is it?

A.  It was a document that discovery -- that the government gave us during the discovery process that purports to be an interview of Sheriff Hewett conducted by someone with the government, or local law enforcement, either North Carolina or South Carolina.

Q.  And you are confident from the Bates stamp you received this in discovery?

A.  Yes.

Q.  Now, Sheriff Ronald Hewett, he is the sheriff of Brunswick County, North Carolina; is that correct?

A.  He was.

Q.  Was, that's correct.  What was his role in the case?  What does this report relate to?

A.  This report relates to an incident wherein over the course of Thanksgiving of 2002 when Sheriff Hewett met with Mr. Basham and his two lawyers and an FBI agent, and probably several other law enforcement officers, when Mr. Basham was attempting to show law enforcement officers where Ms. Burns' body was.

Q.  And to expedite matters, I believe this document contains within it the deer statement?

A.  I don't know, I haven't read it.  If you can point it out to me.

Q.  I am going to direct your attention to this paragraph that is found on Bates stamp 00816?

A.  Yes, this document does contain that.

Q.  Does this refresh your recollection?

A.  As to that particular matter, yes.

Q.  As to the deer statement?

A.  Yes.

Q.  What do you recall about the deer statement?

A.  You know, I may have my times off on this particular thing, but I recall Agent Long testifying, or some law enforcement officers, that they were out there.  They were riding down a dirt road and Mr. Basham blurted out this statement, you know, "I could never kill a deer and here I have --"

Q.  This statement was the subject of some controversy at the Fulks trial, correct?

A.  Yeah -- yeah -- I'm having a hard time recalling that, but, yes, it was -- I'm trying to figure out -- I can't remember. The record would reflect.

        THE COURT:  If you don't remember, just say you don't remember.

A.  I don't remember how --

BY MR. ASHMORE:

Q.  Did the Fulks trial team attempt to introduce this statement into evidence?

A.  We pursued that to some extent, I do recall, and the record would reflect whether -- what we did in court and what we didn't do in court.

Q.  Absolutely.  Do you recall what the government's response was when you attempted to introduce this particular statement into evidence?

A.  Oh, I'm sure they objected, but I don't recall specifically, no.  I mean, the record would reflect that.  I have no independent recollection of that.

Q.  Did you attend the Basham trial?

A.  The only part of the Basham trial I saw was the part of the opening statements and that was it.

Q.  Have you reviewed any of the Basham trial transcripts?

A.  I have not.

Q.  Do you know -- then you would not know what position the government took at the Basham trial on this particular statement?

A.  No.

Q.  This statement and the judge's ruling was not appealed, do you recall that?

A.  By -- by the Fulks --

Q.  By the Fulks team?

A.  If you say so, I will agree with you.

Q.  Well, I just want your recollection.  What was your role in the appellate process?

A.  My role was secondary.  I went through the record and developed sort of an extensive factual sort of record of what went on and factually and stuff, but I did not develop or write any of the arguments or claims on appeal.

Q.  It would not have been your task to raise legal issues?

A.  No, no.  I mean, John and Sheri were the appellate lawyers.  I recall being in meetings when they discussed the appeal, but that specific claim I don't recall.

Q.  Let me direct your attention to this particular paragraph here, Mr. Nettles.  Take a moment just to read that.

A.  Uh-huh.

Q.  At the time you received this document, what was your understanding?  What is meant by that paragraph?

A.  I thought that meant that Chad strangled her.

Q.  Was it ever disclosed to you that Sheriff Hewett would testify that it was Brandon Basham that actually strangled Ms. Donovan?

A.  Nobody ever told me that Sheriff Hewett would say that.

Q.  Sheriff Hewett was not called as a witness in the Fulks trial?

A.  Right.

Q.  Can you walk me through your analysis of that at the time?

Why did you decide not to call Sheriff Hewett?

A.  Because we thought based on documents that we received from the government in discovery and my recollection in some of the pleadings, that Sheriff Hewett would say that Chad Fulks -- that Brandon Basham said that Chad Fulks killed Alice Donovan. We wouldn't have called him for that purpose.

Q.  The discovery of Ms. Donovan's remains, had she been discovered before the Fulks trial, how would that have affected your defense of Mr. Fulks?

A.  Well, I think it would have shown that Chad was making a good faith effort to help the family locate the body, that he wasn't jerking anybody around.  It may have given him some credibility that he otherwise lacked.  It would have helped -- it would have prevented the government from arguing to the jury that he was -- that he was not sincere in his efforts.

Q.  Would that have had any impact on the mental health experts' analysis of Mr. Fulks?

A.  I don't know.

Q.  How did the team select jurors?

A.  You mean -- well, there was sort of a worksheet that you had that you tried to go through.  You tried -- you know, you rated jurors to determine, you know, whether they were pro death penalty or anti-death penalty or what type of juror you thought they would be in general terms.

Q.  And you had active involvement in the voir dire of jurors?

A.  In some of them, yes.

Q.  Can you hazard a guess as to how many jurors you may have voir dired?

A.  No, I don't know.  It was not as many as Mr. Blume or Ms. Johnson.

Q.  And out of those two, who would have done -- did they do an even amount, or one do more than the other?

A.  When she was here, I generally was not here, so I couldn't tell you how they split it up.  When John was here, he generally did more than I did.  He was much better at it than I was.

Q.  You recall the Sylvia Allison questionnaire?

A.  I have seen it, recently.

Q.  And if I can show you what's marked as Exhibit P 55, you have seen this recently, you say?

A.  Yes.

Q.  And obviously there's a portion of the questionnaire that apparently the trial team missed, is that fair to say?

A.  Right.  I -- right.  I don't know if we missed it or it just wasn't there, but somehow it wasn't accounted for.

Q.  Well, she didn't answer --

A.  Okay.

Q.  Pull up for your benefit -- let me show you --

A.  Okay.

Q.  Within this document?

A.  Okay.

Q.  I think it's labeled page 6 of 9, and I'm looking at question 42 here?

A.  I understand what the issue is with her, right.

Q.  And, for the record, what was that issue?

A.  That she did not disclose that her husband had been the victim of a murder.

Q.  And would that not be normally disclosed here in question 42 of the written questionnaire?

A.  I think that was the purpose of that question.

Q.  And you don't have any independent recollection of reviewing or not reviewing this questionnaire?

A.  No, I do not.

        MR. ASHMORE:  Your Honor, may I have just a moment?

        THE COURT:  Yes, sir.

        MR. ASHMORE:  Thank you very much, Your Honor.

        THE COURT:  Cross-examination.

                    CROSS-EXAMINATION

BY MR. DALEY:

Q.  Let's start with actually this page from P 55.  The way they do the questionnaires in federal court -- you deal with those a lot?

A.  Right.

Q.  They are front and back?

A.  Yes.

Q.  And so this, if it was page 6, would actually be on the back of the third page?

A.  I take your word for it.

Q.  Well, if you've got --

A.  Oh, yes, sure, right.

Q.  It would be on the back of the third page.  So as you opened it up it would be up toward the top.  If it was stapled right here, I guess, then this space is actually going to be sort of at the back corner, I guess, when you are turning the page; is that correct?  Do you see what I'm saying?

A.  (Shakes head in the negative).

Q.  Where the yes/no is, as you turn the page, it's going to be in the far corner of that page, as you are flipping the page?

A.  If you are flipping the pages, it's going to be over here; is that what you are saying?  I really don't know what you are trying to say.

Q.  It's up in the corner, is my only point?

A.  Yes.

Q.  But your testimony is -- don't know?  Just missed it, didn't see it?

A.  Yeah.

        THE COURT:  It might be good to put on the record here too a little more about this questionnaire.  Y'all might not be aware, I think it's in the record, but there was a snafu in the clerk's office when the questionnaires were first sent

out.  The copying company that handled -- had the contract to copy, only copied every other side of a two-page document, a document copied on both sides.

A whole set of questionnaires went out flawed, and they came back, and then the clerk's office had to send them out a second time.  I didn't know about any of this until after Juror Allison came to light.  But I think that might have -- well, arguably, I'm just putting on the record for what it is worth.

Any time you fill out something the second time that you have already done one time, and you didn't want to do it the first time, there's a tendency to get in a hurry.  That was a factor that I relied upon in determining she had not intentionally omitted an answer to this question.

MR. DALEY:  I think that's all on the record on the front end.

THE COURT:  I was not sure.

MR. DALEY:  I recall reading that.  I don't --

BY MR. DALEY:

Q.  Mr. Nettles, let's just go through a few cases, murder cases and car-jacking cases that you have been involved in, murder cases or cases that involved murders: Gary Boone, can you tell me a little bit about that case?

A.  He was convicted of blowing up his wife's lover with a remote control pipe bomb in Cheraw, South Carolina.

Q.  And were you the primary defense attorney on that case?

A.  I was.

Q.  And did a lot of the investigation in the matter?

A.  All of it.

Q.  The Singletary case, what is that case about?

A.  Steven Singletary robbed a convenience store and during the course of that robbery shot the clerk with a shotgun and killed him.  He actually pled guilty to being a felon in possession of a firearm.  In the sentencing we sort of retried the murder case, retried the murder case that had already been tried in state court, because the state sought the death for Mr. Singletary and was unsuccessful.

Q.  Freddie Sellers case, what did that involve?

A.  Mr. Sellers was a low level drug dealer in Dillon, South Carolina who liked to shoot people.

Q.  And it was a felon in possession case?

A.  It was a drug conspiracy and felon in possession, a number of different counts.

Q.  You had to investigate those shootings, as well as the killings, I guess, as part of that case?

A.  Yeah.  Well, see, the killing part of that -- now I recall, the killing part of that was when, as part of the drug conspiracy, Freddie was convicted of going to North Carolina and picking up a guy who was a crack addict and bringing him back across the state line into Dillon County and have his

girlfriend shoot him.

Q.  Treadway Manning, another case?

A.  Right.

Q.  What did that involve?

A.  Manning robbed a liquor store and shot a clerk.  And there were also allegations that he was the shoot -- was the shooter in a robbery of a short order grill in Dillon, killing the short order cook.

Q.  So, those are the primary cases that you had when you defended folks that were either accused of killing, murder, or you had to deal with that on sentencing?

A.  Certainly, certainly at that point, yeah.  Certainly up to --

Q.  Up until when you represented Mr. Fulks?

A.  Yes.

Q.  Car-jacking cases, how many car-jacking cases have you --

A.  I thought when I started this job I had more of them than I did -- than I have had later.  I mean, I have had a number of car-jacking cases.

Q.  When you say a number, how many do you think?

A.  I couldn't hazard a guess.

Q.  More than 10?

A.  Around that number.  I mean --

Q.  So you were somewhat familiar with the car-jacking statute?  You were at this time at least?

A. Yes.

Q. As this case came up?

A. Right.

Q. You have reviewed the video of the abduction from the Wal-Mart parking lot?

A. I remember it. I didn't need to review that.

Q. Clear from the video there is a lady in the car as they pull up to the car; is that correct?

A. Yes.

Q. And in the --

A. Well, there's somebody driving a car. It's not clear it's a lady.

Q. There is a person?

A. Right.

Q. So it is clear that when they pull up to the car there is a person in the car; correct?

A. As the car pulls into the -- yeah, somebody has to be in it to be driving it when Mr. Basham gets out of the car.

Q. And so in Mr. Fulks' statement, his 302, it is clear when they pull up, there is somebody in the car?

A. Yeah.

Q. In that statement, if they are following behind a moving vehicle that is pulling into a space, there must be someone in the car; correct?

A. Yes.

Q.  And did you ever have a discussion with Mr. Fulks about how they were going to steal an unoccupied car in a parking lot in a Wal-Mart since -- did one of them have some sort of an ability to jump start cars or hot wire them?  Had you ever heard of any testimony about that?

A.  Chad -- I mean, Mr. Daley, I think Chad could steal anything.

Q.  Is there any evidence, anything you ever heard about he or Basham, particularly Mr. Basham, being able to hot wire a car? How are they going to steal an unoccupied car if his theory was they were going to steal an unoccupied car?

A.  I don't know.  Maybe they had a screwdriver, maybe they knew how to hot wire.  I don't know.

Q.  Why did you want to work with David Bruck to get John Blume assigned and appointed in this case?

A.  Well, in terms of capital experience, I was a lawyer who knew less than nothing.  I had never done that.  And so at one point in the district -- the court can correct me if I'm wrong -- there was a process whereby they tried to get counsel on a list who were death penalty qualified.  They were going to be lead counsel.

And I think Mr. Bruck had some association or some input as to who those lawyers were going to be.  Plus I knew Mr. Bruck by reputation as being an expert in the law regarding the death penalty.  So, I contacted him.  He was the best

resource for me to go to at the time.

Q.  And how quickly after Mr. Blume came on did he become sort of the -- start running the show, I guess, for lack of a better term?

A.  Immediately.  I mean, he started running the show immediately.  I would have deferred at that point to him regarding that.

Q.  And how often would you communicate with Mr. Blume and/or -- and Ms. Johnson?

A.  We had regular communication.  I could get in touch with them whenever I needed them, and they could get in touch with me.  I mostly spoke with Mr. Blume.

Q.  And how often would you say you spoke with Chad Fulks?

A.  We talked to Chad a lot.

Q.  And for what purpose?

A.  Well, we talked to him about the case.  As you represent people, you know, you sometimes talk to them about other things other than the case that are tangentially related to the case -- health, that kind of stuff, you know, discomfort at the jail, that kind of thing.  It could be various things that weren't case specific, for lack of a better term today.

Q.  How many times do you think you spoke with Mr. Fulks?

A.  A lot.  A lot.  It's hard to quantify.  You know, when we spoke last week I gave you a number.  I don't know if that's right or if that's wrong, but I talked to him a lot, and other

people talked to him a lot also.

Q.  And I believe that number was more than 50 times?

A.  Yeah, but that might not be right.  Don't hold me to that.
I'm not going to swear to that.  I don't know.

Q.  And there were a number of instances where he gave you the
wrong information, right?  He led you on wild goose chases?

A.  There were some instances, yes, when he did.

Q.  And it caused you to waste some of your time and go places
that you didn't need to go; correct?

A.  Well, I'm not saying that it -- it was not an efficient way
to use resources.  Perhaps you would go there, but you would
approach it differently, that kind of thing.

Q.  Let's go ahead and go to Exhibit 21, Government's Exhibit
21.  If you would, just take a look at this for a couple of
moments and then we will talk about it.

A.  Okay.

Q.  Whose handwriting is on Exhibit 21?

A.  Mine.

Q.  And did you receive a number of these kinds of memorandums
over the course of the representation from Mr. Blume?

A.  Yeah.  I mean, he would send similar things out.  I don't
know -- when you mean "a number," about how many, do you mean?

Q.  Every once in awhile you would get a memorandum sort of,
"Here is what we need to be doing, here is a list of people to
interview"?

A.  Two or three, something like that.  Yeah, that would not be unusual.

Q.  Let's go through a few of these.  You said you were sort of the street lawyer?

A.  Right.

Q.  What do you mean by that?

A.  Sort of did more of the grunt lawyering work and not the more technical death penalty, mental health related stuff.

Q.  And so the handwriting that is on here, are these all things that you were in charge of doing, or things that you were thinking about you could do to help get ready for the case?  Like the first one is -- what does that say?

A.  Yeah, that's something that -- that "duct tape under couch."

Q.  What is that?

A.  It's just a notation I made.  I think there was some duct tape found under a couch in Ronnie's house.

Q.  Okay.

A.  I think that's what that was.

Q.  What is this "blue bag, Chad wore"?  "Chad wore gloves, type, color"?

A.  I don't know if that was a blue bag in the car, blue bag in the van.  Sometimes I just write things and it meant something then.  I have no sort of specific recollection of what it exactly was now.

Q.  Let's go down to number 8, Tina F, the starred one that you have there at the bottom, what does that say?

A.  "Lost revolver, task force got upset about, found under mattress."

Q.  Do you remember what that referred to?

A.  I can hazard a guess but --

THE COURT:  You have got no signal?  Is it on your screen?

THE WITNESS:  I'm looking at it here.

BY MR. DALEY:

Q.  Down at the bottom, number -- and number 8 down towards the bottom.  I don't want you to hazard a guess if you don't recall.

A.  I don't specifically recall what that notation is for. This is fairly early on.  It's September 18th, 2003, and the trial is still some, you know, seven months away.

Q.  And let's go to page 7 of this memorandum.  Up toward the top it says, "Forensic/gunshot," was that your area of responsibility?

A.  I did handle Mr. Fite who was an expert who testified about the incident at Carl Jordan's house.

Q.  Did you retain any other forensic experts in that regard?

A.  You have a list that -- that Mr. Ashmore showed me, is it his Exhibit 17?  If you can let me --

Q.  Government's Exhibit 17?

A.  Is that what it was?

Q.  Government's Exhibit 17, I think is what it was.  See if you can refresh your recollection, 17.  I think it's actually page 1.  There's a page in front of that that was an expert list.  You may have put it off to the side.  Beg the court's indulgence.

A.  That's it right there.  Okay.

Q.  Starting at the bottom, Mickey Dawson was a handwriting expert, did you actually -- did you actually retain him?

A.  Yeah, I think we did.  I think the purpose of that was regarding the checks that Basham wrote in Ohio.

Q.  Okay.

A.  But I think that's what it was.  Mr. Fite, that we just talked about.  There was another guy -- I don't know if you call him a forensic expert -- Don Romine was a prison expert, former prison warden.

Q.  Who is Skip Graham?

A.  I don't know.  He might have been somebody that was subcontracted out by Mr. Skidmore to help us do something, I'm not sure.  There was someone else -- another private investigator involved for a short period of time in the beginning.  I don't know if that's -- oh, I know exactly who that is.  Mr. Graham was up -- outside of Charlotte, and he tried to help us with a video, I think, of the kidnapping -- the car-jacking and kidnapping.  I think that's what he did.

Southeastern Professional Investigations was another private investigator that we retained for a very brief period of time.  Then Mark Cunningham was another person that I was sort of charged with.  We decided not to use Mr. Cunningham.

Q.  Let's go to Government's Exhibit 25.  Handing you Government's Exhibit 25, the first page is on the screen but sometime it's easier to thumb through when you have got the hard copy.  If you would just take a look through that real quickly.  Whose handwriting is on this memo?

A.  The check marks and the handwriting appear to be mine.

Q.  Okay.  And the initials "BN" at the end of any of these, what do they signify?

A.  Bill Nettles.

Q.  That means you were assigned to do those tasks?

A.  Must be, that must be what that is for.

Q.  And was one of your responsibilities to subpoena records?

A.  Yes.

Q.  And how many -- list out some of the records you were subpoenaing?

A.  We subpoenaed a bunch of them.  Judge Anderson signed every request we had.  Records from prisons, hospitals, courts, whatever we could think of.

Q.  Are we talking dozens?

A.  I would say so.

Q.  Why don't we go to Government's Exhibit 30.  What is

Government's Exhibit 30?  It should be on the screen.

A.  That is a letter that a handwriting -- well -- a professor at USC I engaged to look at Chad's letters to see if she could sort of give me an education level, grade level, age of the writing ability in the letter.

Q.  And if you would go to the third page of that letter down --

A.  Uh-huh, Ms. Zenger --

Q.  Yes.  Dr. Zenger, a Ph.D., I guess?

A.  Uh-huh.

Q.  If we go to the next to the last paragraph, if you would just read that, the one starting, "The writing," where it says, "The writing is full of -- "

A.  Oh, "The writing is also full of references to events happening in the news and in magazines.  The writer seems genuinely interested in world events, such as war in Iraq and NASCAR events.  He relates information accurately and states opinions that are backed up by facts and details."

Q.  As a result of that letter, what did you do -- well, actually, let's go to the last page of this exhibit.  I think there might be some notes.

A.  She had samples of the letters, I think.

Q.  Uh-huh.  Actually the two pages before that.  I'm sorry, the two pages before that.  So there were some sample letters?

A.  Right.  Of course, they weren't -- I think she typed them.

Q.  She typed them up?

A.  They were handwritten.

Q.  But you had sent them in to try to get an idea if she would render some sort of opinion as to what level of writing he had?

A.  Right.

Q.  And she found that he wrote well enough to have passed the South Carolina high school proficiency exam, I think?

A.  I think that's what she wrote.  I mean, it would be clear in her letter.

Q.  Let's see, go back to the first page, third paragraph, first sentence?

A.  "I expect this individual could pass the writing portion of a South Carolina exit exam."

Q.  Okay.  The last page of this exhibit, it appears from this that you spoke with Ms. Zenger after she sent this letter to you, or faxed it to you?

A.  Briefly.  I have those notes, yes, I did.

Q.  The last page, it's going to be some handwritten notes. There we go.  So, you investigated this, but determined that you weren't going to try to pursue it or present it at trial?

A.  That's correct.

Q.  Let's go back now to Exhibit 25, do you still have Exhibit 25 up there, Mr. Nettles?

A.  Yeah, that's right.  I have it in my hand.

Q.  Did you attend -- look at page 2, "Set up jury voir dire

simulation with Jeff Bloom." Did you attend both a focus group, sort of mock jury event with -- where Mr. Bloom was in charge of it?

A. I think that was more of a focus group.

Q. I mean a focus group?

A. Yeah.

Q. And what do you recall about that? What was the purpose of that?

A. Generally a focus group -- I think in this and in other times it's used to get an idea of what a juror might think about certain facts in the case, to give you an idea of how they would respond to certain things.

Q. Do you remember what the results of the focus group was with Mr. Bloom?

A. I don't know that it was result oriented in as much as it was to get ideas from people. In other words, they didn't give him life or death.

Q. Right.

A. It's more to get a sense of how people felt about certain aspects of the case.

Q. Go ahead.

A. I have seen the document --

Q. The memo?

A. Yes, that Mr. Bloom, Jeff Bloom --

Q. Right.

A    -- prepared, yes.

Q.  Government's Exhibit 6.  This is Government's Exhibit 6, is this what you are referring to?  Next page.

A.  Uh-huh.  Yes, sir.

Q.  And from that, from that document did you get feedback that told you that the fetal alcohol defense was the strongest mitigator?  Do you remember that being one of the conclusions?

A.  I don't remember much about this document, Mr. Daley.  If that's what it says, that's what it says.

Q.  Okay.  Was this a document that y'all looked at and considered at least what it said in determining how you were going to proceed at trial?  Was it a factor, something that you talked about?

A.  I mean, I looked at it, and I'm sure it factored in somehow, but I'm not --

Q.  Okay.

A.  I don't feel comfortable saying yes, no, whatever.

Q.  Fair enough.  Okay.  Back to memo, back to document -- Exhibit number 25, Government's Exhibit Number 25.

A.  Uh-huh.

Q.  Let's go to page 10 of exhibit 25.

A.  Last page?

Q.  Last page.  Has handwritten notes.  It's called page 10. It is entitled "Preliminary and Incomplete Division of Witnesses."  Is this your handwriting?

A.  Yes, it is.

Q.  And these were, at least preliminarily, who you might take as witnesses and who Mr. Blume might take as witnesses and who Ms. Johnson might take as witnesses?

A.  That's correct.

Q.  And this is March 15th.  Who is Ray Sandridge?

A.  I don't recall.

Q.  Okay.  What about Dwayne Trent?

A.  Dwayne Trent.  I'm trying to look at the column he is in and see if that refreshes my memory.  I don't know.

Q.  What about the BB snitches?

A.  Brandon Basham snitches.

Q.  What was --

A.  I think we had gotten some information in some 302s that there were some people in the jail that might have some information about some things that Brandon said, may have said that would have helped our case.

Q.  Did you go and try to talk to some of those folks, or had you talked to them?

A.  I think I talked to two and tried to talk to a third, and his lawyer wouldn't let me.  That's my recollection.

Q.  Let's go to Government's Exhibit Number 26.  Tell me, do you recall -- how often would you get e-mails from Mr. Blume?

A.  Oh, I could get multiple e-mails in a day, or go a week without getting an e-mail.

Q.  And this is getting -- April 23rd, 2004?

A.  Two weeks prior to the jury selection.

Q.  Uh-huh.  Let's go down to the polygraph paragraph.

A.  Uh-huh.

Q.  Was there, again, a time I guess where Mr. Fulks was denying his involvement in the Burns situation when he was sent to a polygrapher?

A.  I'm not sure I understand your question.

Q.  Was there a time that you sent him to a polygrapher and he initially denied his involvement with the Burns murder, and he was found to be deceptive?  If you would, read that polygraph paragraph.

A.  Yeah.  Apparently John puts in here, "I think Johnson can say Chad Fulks initially denied involvement in Burns, deception noted."  So apparently there was that.

Q.  Okay.  Let's go to the second page towards the end, actually the last sentence of the whole e-mail.  "I am still torn -- "

A.  Okay.  "I am still torn on whether to go ahead and cut the shrinks loose and just go with bad brain/bad family leads to bad things."

Q.  Do you remember the possibility of cutting loose the shrinks and just going with the brain damage, fetal alcohol syndrome and bad family background as the crux of your case, and just leaving the mental illness issues alone?

A.  Bob, I'm sure John discussed that with me, that would have been his decision.  I don't have any specific recollection of those conversations.

Q.  Thank you.  The last thing about this e-mail, y'all did some -- you did a practice voir dire.  Let's go back to the first page on 26, on Government's Exhibit 26, just down where it says "jury selection."  You remember having -- doing a practice voir dire at the law school at some point prior to trial?

A.  Bob, I don't recall that.  I mean, I just don't recall it.  I remember going to the law school once and I think that was in March, and I don't know if we -- if we had it or not.  I mean, I --

Q.  You just can't remember that?

A.  What did John say?  I mean, I don't remember.

Q.  I said y'all did, but obviously it's your memory that we are talking about.

A.  Yes.

Q.  Let's go through some of your -- I think you covered most of this, but I want to make sure we cover it.  I don't want anything to be left out.  You would go with Pete Skidmore from time to time on some of your investigative trips?

A.  Yes.

Q.  And your trips were more the facts of the case more than mitigation witnesses; is that correct?

A.   Right.   When I say facts of the case, I'm talking about, you know, the whole umbrella sort of crimes involved.

Q.   The whole 17 days?

A.   Right.

Q.   Not just Alice Donovan?  It's from the escape up to the capture?

A.   Right.

Q.   You went up to Indiana to look at the BMW?

A.   Yes.

Q.   Did you look at some other evidence while you were up there?

A.   We -- yeah, we looked at all the evidence.  I think what they had in -- I think most of the physical evidence that was found in the BMW was still there and we looked at that.  We did some other investigation while we were up there.

Q.   And when you were up there, did you go to Mattoon, Illinois?  Was that a separate trip?

A.   That was a separate trip.  I went to Mattoon to try to find some family members or associates of Veronica.

Q.   And what was the purpose of that?

A.   To try to get impeachment information, if we could.

Q.   What about a trip to Sturgis, Michigan?

A.   Yes, that was the same trip to northern -- Sturgis is right across the state line in Michigan.  We went to Mr. Talsma's house to try to speak with him.

Q.  Were you able to speak with him?

A.  Not that I recall.

Q.  You went to Kentucky, how many times did you go to Kentucky?

A.  Twice.

Q.  In the fall you went?

A.  Once in the fall and once in the spring.

Q.  What were you doing in the fall?

A.  In the fall we were trying -- fall of 2003, yeah, we were trying -- I specifically recall trying to locate information about Mr. Basham that we could use from people that grew up in the neighborhood, or family members, that type thing.

Q.  And then in the spring of '04 you went back to Kentucky again?

A.  Yes.

Q.  And I think you talked a little bit about this but what -- I don't know if you mentioned on your direct, did you go to talk about some of the issues around the Miles incident?  I don't even know what --

A.  Yeah, interviewed the foster parents of Miles who got him after he was taken from Veronica and Chad, and also did some investigation as to what was found out in the house where Veronica and Chad were living prior to their arrest.  This investigation related to the robberies on the interstate.

Q.  The robberies where he impersonated or at least came up and

pretended to be some FBI agent?

A.  Right.  I tried to speak with witnesses about that and tried to speak with police officers who were involved in Chad's arrest at the Wal-Mart there in Madisonville.

Q.  Did you then -- at some point did you go to Conway and do any investigation in the Conway area?

A.  Yeah.

Q.  Bee Tree Farms area, that --

A.  I didn't do any investigation at Bee Tree Farms other than going up -- well, I guess I did.  I went up there and went, you know, onto the Bee Tree Farms hunting thing and followed the road down, you know, and located the cemetery that was in question, and talked with someone who lived there that didn't have any -- I don't recall they had any firsthand knowledge of the facts like the people who testified did.

Q.  Did you spend -- did you spend any time trying to retrace the path that they had taken when they were in Conway, when they were stealing the cars and got to the Wal-Mart and that sort of thing?

A.  In general.  I don't -- I couldn't follow in the 302 exactly what they were talking about.  I know in general sort of where they went.

Q.  Did you talk to Carl Jordan?

A.  Yes, we did talk to Carl Jordan.

Q.  What about Oleita Hyman?

A.   I did talk -- no, I did not talk to Ms. Hyman.  I talked to the lady who lived across the street from her who --

Q.   Margaret Moore?

A.   Ms. Moore whose door was -- they knocked on her door.

Q.   And did you talk to any of the Fulks family members, Dwayne --

A.   Talked to Dwayne and Ronnie.

Q.   Did you ever talk to Tina Severance?

A.   Yes.

Q.   Were you ever involved in any of the searches?

A.   Search of what?

Q.   I'm sorry.  Search for Alice Donovan's body?

A.   Yes, I know I went once, in February of '03, I think it was.

Q.   Okay.

A.   In the --

Q.   Let's go back to your talking -- actually move forward to your talking to Mr. Fulks.  Let's go to Exhibit 42, Government's Exhibit 42, the one page e-mail, if you would.

A.   Uh-huh.

Q.   Here is a hard copy of it.

A.   Want that back (handing)?  Yes, sir.

Q.   Again, this is another instance where Mr. Fulks is sending you on wild goose chases, I guess.  Do you remember what this was about, why you were going to this come-to-Jesus meeting, as

you entitled it?

A.  I think Pete and I did, according to the e-mail.  I have a vague recollection of going over there on this occasion and -- I think that we were talking about the Kentucky situation, the robbery -- the robberies on the interstate in Kentucky.  It may have been other things.  I'm just not sure.  I referenced the Kentucky robberies and he said "complete denial," which is not factually correct.

Q.  Right.  And isn't it true that you were a party to any number of e-mails that came in that John Blume wrote, e-mails where he said Chad had lied to him, Mr. Fulks lied to him and he was hot about it; do you remember?

A.  I recall seeing one like that, yes.

Q.  And Ms. Rider, who went to see him with some frequency, a paralegal in Mr. Blume's office, she would often say that he was lying, that he would often lie to her as well; is that right?

A.  That's right.

Q.  It was very hard sometimes to ferret out what was true and what was false in what he was saying; isn't that correct?

A.  As to some things, yes.

Q.  Actually Government's Exhibit 43, I think, is the e-mail from Ms. Rider to you?

A.  Yes, sir.

Q.  So you and Ms. Rider had corresponded back and forth some

about him not being truthful.  What -- and this is where he --
I guess this is where he has recanted regarding the rape,
second paragraph?

A.  That would be my assumption also.

Q.  Okay.  So, based on your multiple conversations with
Mr. Fulks, it's safe to say you had a heightened concern
regarding whether he would sometimes be malingering or not
telling the truth; isn't that correct?

A.  Yes.

Q.  You said that you spent a lot of time looking through this
case and sort of poring through the discovery; isn't that
correct?

A.  Yes.

Q.  And, in fact, I think maybe in an earlier conversation you
had with me you said you were sort of obsessed or really trying
to find the holes in the government's case; is that correct?

A.  That's correct.

Q.  And isn't it true that you said that you have never been in
a case where you couldn't find something wrong with the
government's case, but you really couldn't find a hole in the
government's case in this case?

A.  That's true.

Q.  Let's talk for a moment about the legal research you did in
this case.  Did you do some research regarding a motion to
strike certain aggravating factors?

A.  Yes.

Q.  What was -- what was the aggravating factor or factors you were trying to get struck?

A.  Well, I mean, the government alleged a whole host of aggravating factors, and some that they conceded at the motions hearing stage, and one that -- that Judge Anderson struck -- did not allow the jury to consider, like, I think, for pecuniary gain.

Q.  I think that's right, yeah.

        THE COURT:  Which was ultimately reversed by the Supreme Court in a different case, right?

        MR. DALEY:  I think that's right.  I'm not sure, Your Honor.

        THE COURT:  Not this case.

        MR. DALEY:  About that issue.  I'm sorry.  Yes.

        THE COURT:  I'm pretty sure in a different unrelated case they said on the same facts I had that would be a proper aggravator.

        MR. DALEY:  Finally --

        THE COURT:  Moot point now.

        MR. DALEY:  I was going to say -- yes, sir.

BY MR. DALEY:

Q.  And did you work on the motion to exclude the statement from Mr. Fulks' Indiana attorney regarding the search at Savannah Bluffs?

A.  Yes, I did that.

Q.  Tell me a little bit about that issue.

A.  Well, as I recall, the motion wasn't very lengthy.  It was very short, and the government decided not to pursue that at the motions hearing stage and -- and we never had a hearing on it.  They -- I think -- I think they just decided not to go in that direction.

Q.  Okay.  Let's talk for a minute -- let's go through the claims now in the amended motion to vacate.

Okay.  Do you have any exhibits up there?

Claim 1 involves the decision to not call Drs. Halleck, Hilkey, and Melikian; do you remember those doctors?

A.  I mean, I remember them.  I don't know what you are asking me, what I remember about them.

Q.  Okay.  I just want you to -- I just want to make sure that I have identified -- Exhibit -- Government's Exhibit 14, Dr. Margaret Melikian; are these your notes?

A.  They are.

Q.  And do you recall at some point going to meet with Dr. Melikian with John Blume?

A.  I do, but I don't think those are the notes of that meeting.

Q.  Okay.

A.  I think that we met with her earlier in December.

Q.  Well, the only --

A.  I could be wrong, but I don't think we went to Charleston on New Year's Eve.

Q.  Okay.  Let me show you Government's Exhibit 13.  Let's see if this refreshes your recollection, and if it doesn't, that's fine.

A.  Yeah.  I mean, right.  What I'm saying is, it says, "Before I call tomorrow."  It looks like my notes may have been as a result of a phone call, but not the meeting, the face-to-face meeting in Charleston, that I recall.

Q.  So you actually went down there and met with her live in Charleston at some point and you must have been on this phone call as well, the next day?

A.  I must have been.

Q.  Okay.  And that's what Government's Exhibit 14 would then, you think, be, a memorialization of that phone call?

A.  Yes.

Q.  Okay.  Let's go to the middle of the second page of notes. I think you read part of the first page for Mr. Ashmore.  In the middle of the second page where it's "FASD," can you -- I can't read the second -- "raised" --

A.  "Fetal alcohol spectrum disorder raised in criminal activity, abused."

Q.  And then there's an arrow up to --

A.  Called antisocial personality disorder.

Q.  And then below that, that word in boxes?

A.  "Malingering."

Q.  Okay.  And then if we go to --

A.  Do you want me to -- when I have got "malingering" in a box, I don't know if she said he's malingering or if that was a topic that I wanted to discuss --

Q.  No, it does --

A.  -- and just put --

Q.  Well, in fairness, let's go below.  What does that say?

A.  It says, "Retested SIRS, not malingering."

Q.  And do you know who would have retested or --

A.  No.

Q.  Actually says, "gonna do that," so it could be they were going to retest him, huh?

A.  Yes.

Q.  So, do you recall having some dealings with Dr. Melikian with Mr. Blume?

A.  Based on this I must have.

Q.  But you do remember going to see her as well?

A.  Right.  Right.

Q.  Let's go to Government's Exhibit 17, the first -- actually the first -- yeah, are these your notes as well?

A.  Yes, they are.

Q.  And these involve Dr. Hilkey.  Do you remember meeting with Dr. Hilkey or being on the phone with him on the 29th?

A.  No, I don't.  Obviously I was and took these notes, but as I told you a couple of weeks ago, that date at the top is obviously wrong.  But I don't have any independent recollection of that conversation other than these notes, and these notes demonstrate to me that we did have a conversation.

Q.  Let's go to the very bottom of these notes and tell me if you remember anything -- the last four lines it says "antisocial" -- I can't read --

A.  It says, "antisocial, our test results are pretty" -- and I don't know what that word is.

Q.  Okay.

A.  And then below it says, "elevation, dash, depression, slash, borderline personality, slash, not in good shape."

Q.  So you had some dealings with Dr. Melikian and Dr. Hilkey, at least by phone with Dr. Hilkey.  Did you have any dealings with Dr. Halleck, Seymour Halleck?

A.  If I had to bet, I would say I talked to him on the phone one time, but I don't have any recollection of what we talked about.

Q.  Now, at some point it happened that y'all determined that you were not going to call Drs. Halleck, Hilkey, and Melikian; is that correct?

A.  Yeah.  We didn't call them, so at some point that determination was made.

Q.  What relationship -- what amount did the Donna Ward phone

call play in making that decision?

A.  You know, John made those decisions and he was the expert on all that, and so I want to say, and I'm not really sure, that that may have had something the do with it, but I can't recall in detail, Bob.

Q.  Okay.  Do you remember saying, though, that you had no heartburn when y'all decided not to call them?

A.  Yes.

Q.  And you didn't have any disagreement with that decision, did you?

A.  No.

Q.  And what did you think of the fetal alcohol spectrum disorder presentation?

A.  I thought it went about as well as we were going to get.

Q.  And did you at one point even say that it gave the jury something that they could grab on to?

A.  Yes.  I told you that that's what I said, yes.

Q.  And what about -- there was an expert, a Dr. Morton, who was a pharmacologist?

A.  I never talked to Dr. Morton.

Q.  Okay.

A.  I think he was going to talk about the effects of narcotics, taking drugs, and --

Q.  Do you remember any discussion you had about the fact that you weren't going to call him?

A.  I don't recall that.  I mean, John would have made that decision, but I think it's pretty, you know, commonsensical that that's sort of a double-edged sword.

Q.  Okay.  Talked a lot about the mitigation investigation.  I don't know that we covered the trips you took to West Virginia.  You took a couple of trips to West Virginia with Mr. Skidmore, or at least one with Mr. Skidmore and one without.  Do you remember?

A.  Yes.  Yes.  Early John and Pete and I went up there to meet with the U.S. Attorneys there and talked with people in Chad's family -- talked with Chad's mother and also met with the federal public defender, who was appointed to represent him up there.  We met with the U.S. Attorneys there, and then went back later and met with Chad before he spoke with the authorities, the FBI of West Virginia.

Q.  And when you talked to Mr. Fulks' mother, what was her response to the situation?

A.  Well, she was distressed.  But other than that I don't recall a whole lot about it.  We didn't spend much time with her.  I think it was more in the nature of a courtesy call, but I'm not sure.

Q.  Okay.  Anything else that you can remember you did with regard to the mitigation investigation?

A.  No.

Q.  Involvement with the law students, that is Claim 4 that is

in the amended motion to vacate, did you work with the law students?

A.   Yes.

Q.   And what was your evaluation of them?

A.   Well, I thought they were -- they did a good job.

Q.   Were they -- did they appear -- were they unsupervised, or when they needed something would they come to you or Pete or one of the mitigation investigators?

A.   Yeah.  When they were with me, we -- you know, we were basically canvassing a neighborhood and one of the -- and I didn't realize it until I heard John say it today, and then it dawned on me, yeah, I think they did go in pairs, you know, to go visit people while we were talking around the neighborhood.

I went by myself and then they would also go out and look for documents or things and do that.  And when I interviewed -- I'm not aware of -- I interviewed the Miles' foster parents and they were there, and some other people when they were there.  And when I was there I generally, you know, did most of the questioning.

Q.   Got you.  Did they appear to be in need of any specialized training for what they were doing?

A.   No, I didn't think so.

Q.   Did you ever have a sense that they were not doing a good job?

A.   No.

Q.  Do you think they really needed any specialized training, beyond some initial training in how to interview and make sure to get down the information people gave them?

A.  Based on what I saw, I thought they did a fine job.

Q.  Claim No. 5 involves failure to --

THE COURT:  Why don't we break?  This is a good time to break.  Take a 15-minute recess and resume after that.

(Short recess)

THE COURT:  Please continue.

BY MR. DALEY:

Q.  Mr. Nettles, if you would take a look -- let's put up Government's Exhibit 19.  There's just one follow-up about some of the problems in getting Mr. Fulks to be fully truthful. This e-mail from Mr. Blume to you, if you would read the third paragraph that starts with, "If you see Chad -- "

A.  Okay.

Q.  If you would just read it.

A.  "If you see Chad --"

Q.  No, no, I'm sorry, if you would just read it to yourself. I just want to know if it -- and then I will ask you some questions about that paragraph.

A.  Okay.

Q.  Do you know what he was referring to about what Mr. Fulks had lied to him about?

A.  Not -- not specifically.  I think at one point he may have

written a letter to Dwayne about a possible escape, or something like that, but I really don't recall, Mr. Daley.

Q.  And that next sentence, "And you should mention what Tina told us and that  if it's true, he needs to get rid of it."  Do you know what that was about?

A.  No, I don't have any recollection.

Q.  Thank you.  Let's go to the next claim in the amended motion, which is claim 5, and just talk for a minute.  You sort of covered it, but I want to make sure we got it completely, the appellate process.

All the appeals actually went through your office as far as filing the appeals and the motions for extensions of time and that sort of thing?

A.  Right.  I think I probably did some motions for extension of time, that kind of thing.  And we may have --

Q.  And you also compiled the brief as far as binding it and sending it in, you think?

A.  I don't know.  I don't remember.

Q.  The main thing, though, that you did substantively would have been to sort of compile a factual summary through -- using the --

A.  The record.

Q.  The record?

A.  Yes, sir.

Q.  And then that was given to someone else to import into the

brief maybe --

A.  Well, they didn't import it into the brief, they substantially rewrote it and edited and redid it.

Q.  I got you.

A.  But all of the stuff was in there.

Q.  And do you remember, it was Mr. Blume and Ms. Johnson and then Mr. Weyble as well that were working on it?

A.  I'm not sure who did what part, but you've got the players right.

Q.  And do you recall if -- were there any conference calls to talk about the brief or plans for the brief, the appeal?

A.  Yes.

Q.  Were you in on those?

A.  Yes.

Q.  Okay.  Do you remember how many of those there were?

A.  A couple.  Maybe one, two, I'm not sure.

Q.  Do you remember what the -- I mean, were you going to put in every issue you could think of, or was it going to be sort of five or 10 best, or how was the approach for writing the brief going to be, as far as issue selection?

A.  I don't know.

Q.  Okay.

A.  I don't recall.

Q.  Do you remember what you thought were the strongest issues on appeal?

A.  I thought the juror issue was the strongest issue on appeal, and the three-day rule.

Q.  What about claim 6, talks about ineffective assistance of counsel for failing to object to the prosecution's alleged imposition of a nexus requirement?  Do you have any memory of closing argument where that was done by the prosecution?

A.  I don't even think I know what you are talking about.

Q.  Okay.  All right.  But you don't remember anything -- okay.  Claim number 7, "The decision to advise Mr. Fulks to give a statement to the FBI without a proffer"?

A.  Yes.

Q.  Just walk us through it.  Why did you do it without trying to get a proffer?

A.  We had to do something, is the short answer.

Q.  Yes.

A.  And it -- it -- it was something we did to get Chad's version of the events out there, and perhaps get the jury to accept that he had accepted responsibility, and work from there.

Q.  Did you see any other way to get Chad's version of the facts out in front of the government, and more importantly, hopefully, the jury?

A.  I would not have wanted to call Chad as a witness and that was the only other way.

Q.  Why wouldn't you have wanted to call him?

A.  To call Chad as a witness?

Q.  Yes.

A.  Well, there was -- there was just so many acts involved in this case that -- you know, the government would have given their closing argument on their cross-examination of Mr. Fulks, you know, through that.  It just wasn't --

Q.  And were you hoping that you would build up some credibility perhaps with the jury if he has gone forth and sort of given his version and accepted responsibility for what he did?

A.  Yeah, you could say that.  I mean --

Q.  And were you hopeful that it would show at least some level of remorse that he was trying to show, that he was sorry for what he had done?

A.  Sure, I think that's accurate.

Q.  How long did you talk about whether you were going to do this and under what terms you were going to do it?

A.  I think John brought it up.  I would have -- you know, it's an atypical thing to do in sort of a federal criminal case. And I think John brought it up and we talked about it a little bit.  And, you know, I didn't disagree with him, I mean, you know, in terms of doing it.

Q.  You understood the risks, right?

A.  Yes.

Q.  And you also understood the responsibility that the

government, I guess, might not introduce it, right?

A. Well, yeah, they might not introduce it, yeah. I mean -- but I -- I thought they probably would.

Q. In fact, you talked with some folks that you have a great deal of respect for who said that basically the government can't usually resist if a defendant gives a statement?

A. That's true.

Q. Was the government at any point interested in letting Mr. Fulks give a statement under a proffer agreement?

A. No, sir.

Q. Were they ever interested in having Mr. Fulks plead guilty or give a statement in exchange for a life sentence, make an agreement of sorts?

A. No, sir.

Q. Let me show you Government's Exhibits -- we will run through them quick -- 2, 3, and 4. Would you put up Government's 2, first. Can you identify Government's Exhibit 2?

A. Yeah, that's a statement that Chad signed at our behest.

Q. And did you then go and meet with -- or around this time meet with the U.S. Attorney's Office about Mr. Fulks potentially giving a statement?

A. Yes, on -- John and I initially I think met with Mr. Gasser and Mr. Schools and Mr. Thurmond and discussed the possibility. And then there were some letters that went back

and forth between the parties.  I'm not sure if the meeting came after or before, but that's generally how it happened.

Q.  Let me hand up to you Government's Exhibits 3 and 4.  If you would, just look at those for a moment and see if that refreshes your recollection of what exactly happened.  And when you are ready, I will ask you some questions.

A.  It looks like we had the meeting first and then they wrote us a letter under -- on this April 10th letter, which is Government's Exhibit 3, outlining certain parameters in which they would agree to accept information from Chad, and John's response to that the next day in Government's Exhibit Number 4.

Q.  And as a result of those conversations, that eventually led to the statement on April 21st to the FBI, and I think to the Horry County folks?

A.  Yeah.  We may have had some more logistical sort of conversations, but this is how it ended up.

Q.  Now, before Mr. Fulks gave his statement, did each of the attorneys and perhaps other people on the trial team go over with Mr. Fulks his statement, and have him tell the story of what exactly happened with regard to Ms. Donovan?

A.  I did.

Q.  How many times did you talk with him about that?

A.  I don't know.  We talked about it several times.  I mean, the last big push, of course, was the Thursday -- or I think it may have even been Good Friday when we spent most of the time

with Chad, you know, sort of going over it before the meeting the following Monday.

Q.  Were you comfortable that he was going to be able to hold up if there was some questioning done by the police, the law enforcement folks, and was he going to be able to tell a consistent story, you thought?

A.  Yeah.  I didn't think this was going to be a hostile thing, if that's what you are suggesting.

Q.  But I mean -- but in case they started to ask him questions and like, you know, that just might lead him down a road -- you thought he was telling the same story over and over again, there wasn't going to be a --

A.  Well, I thought -- you know, we could always stop it --

Q.  Right.

A.  -- if we needed to.

Q.  But y'all had gone over the statement with --

A.  Yeah, I had gone over it with Chad, I knew what he was going to say.

Q.  Okay.  Claim number 8, "Ineffective assistance of counsel for failing to have the catchall and the minor participant factor included in the verdict form."  Did you see Mr. Fulks as a minor participant in this case?

A.  No.

Q.  In working on the -- working on the verdict form, do you remember what your strategy was on how you wanted it to be

crafted?

A.  What I specifically recall is that we wanted a number of aggravating factors --

Q.  You mean, mitigating factors?

A.  I'm sorry, yes, number of mitigating factors that -- sort of that was the thinking at the time, if you tried to break down the mitigating factors into as many as possible and have the jury consider a lot of very short mitigators.

Q.  Claim numbers 9, 10, 11, and 12 involve allegations of ineffective assistance of counsel for allowing Mr. Fulks to plead guilty under the Pinkerton theory.

Do you remember the guilty plea on May 4th and 7th of '04 where you were putting -- in fact, I think you were the one who was sort of in charge of --

A.  I remember the guilty plea.

Q.  Okay.  What was the theory?  What were you trying to accomplish by him pleading guilty under the Pinkerton theory?

A.  Well, we were trying to have him plead guilty without having to admit to having the intent himself to kill Ms. Donovan.

Q.  So, you were trying sort of to preserve that intent issue so he didn't automatically qualify for -- or actually meet the intent requirement to get the death penalty?

A.  Yes, I guess you could say that.

Q.  And did you have any reservations about going through with

that?

A.  No, I thought that was something that we needed to do.

Q.  And by doing that, did you -- I mean, at some point there was some concern expressed by the judge, correct?

A.  Yes, yes, there was.  In fact, you know, I was -- I was very, very surprised when that issue arose.

Q.  Because both sides wanted a guilty plea and --

A.  Right.  Right.  I mean -- and I understand what the judge was saying.  I was nonetheless surprised.

Q.  Okay.  You have done a number of car-jacking cases, are you familiar with the concept of conditional intent?

A.  I am.

Q.  And explain to me -- I mean, did you know about conditional intent back then?

A.  Yes.

Q.  I mean, did you sort of know the car-jacking statute?

A.  Yes.

Q.  And what was your thought process and why it -- why it wasn't inappropriate to plead guilty under the Pinkerton theory?

A.  Well, it never occurred to me that at that point that Chad would not be found guilty for their jointly undertaken criminal activity.

Q.  If he went to trial, he was going to be found guilty?

A.  Oh, there's no question in my mind that once you take the

facts from the escape on November the 4th from Madisonville and you bring everything forward up until -- up until the day -- I guess it was November 14th when Ms. Donovan was abducted, there is no question in my mind that he would have been found guilty.

Now, mind you, we were basing the guilty plea solely on the 302.

Q. Right.

A. And I thought that he admitted facts that would allow the Pinkerton Doctrine to impute guilt to him.

Q. And isn't it true that you have articulated that at least once, that by Basham getting in the car with a gun with this woman, that Chad getting in the car, that those facts in combination would be enough to satisfy the conditional intent requirement for the car-jacking statute?

A. Yes, and that -- and the fact that apparently Mr. Basham had somehow, you know, overpowered her in getting in the car. I think he was sitting on her or on top of her or something like that, yes.

Q. Okay. Let's go to claim 13 in the amended motion to vacate, which says -- talks about -- alleges "Ineffective assistance of counsel for failing to present evidence of Basham's leadership and manipulation, or his greater relative culpability." You were involved to a fairly large extent with the Basham investigation, right?

A. Uh-huh.

Q.  You went to his old neighborhood and tried to find folks that would give you information, right?

A.  Yes.

Q.  And you also went and talked to some of the snitches who I guess would say certain things about him?

A.  Yes.  I mean, to the extent they could, I mean --

Q.  What other things did you do to try to paint -- get information that would paint Basham as the --

A.  Well, I think the --

Q.  -- the leader?

A.  -- the record demonstrated that, you know, we tried to pull all the facts that we could from the people that were there that indicated that, you know, Brandon was the more volatile of the two.

Q.  Is there anything that -- I mean, was there anything that you felt like, "Oh, if we had -- if I had only had more time or more money I would have done this," with regard to Basham?

A.  Well, you know, there were some documents that I subpoenaed from a treatment center that Brandon was in that -- that sort -- I dropped the ball on that.  I don't know what we could have done with it because they were his mental health records, and we didn't have a release that would have allowed people to talk to him.

        And so, you know -- you know, perhaps -- you know, I mean, I have been advised that, you know, that Basham may

have -- that there may have been some evidence that we didn't know about in which he -- in which a witness would have testified that Basham said he killed her.  I mean, if we had of known that, we would have put that up.

Q.  But obviously, I mean --

MR. ASHMORE:  Objection, Your Honor, I don't believe he was finished answering that question.

THE COURT:  All right, do you want to finish your answer?

A.  Yeah, I mean, I think I finished it.  Had we known that there was a witness who could say that Brandon Basham admitted killing Alice Donovan, we would have put that up.

BY MR. DALEY:

Q.  Right.  But at the time, I mean, you did everything you could possibly think of to find out everything you could about Basham, right?

A.  I thought so.

Q.  Claim 14, "Ineffective assistance of counsel for failing to present the testimony of --" we have already talked about Mark Cunningham and James Aiken, the prison testimony.  Do you remember James Aiken?

A.  Yes.

Q.  And you decided not to call him; why was that?

A.  Because -- I think Dr. Aiken, maybe, was going to testify that the -- that the best predictor of future prison behavior

was past prison behavior.  And as it developed, you know, during the pretrial stages, that wasn't going to help us, I didn't think.

Q.  And what did you think of the experts you did call, Mr. Romine?

A.  I thought he did -- I thought he did a good job.  He explained to the jury exactly what being in a maximum security federal -- a United States prison was like, what serving a life sentence was like, what the security features were, and that there hadn't been an escape since 1973 from a United States prison.

Q.  I think we talked about voir dire, y'all did -- well, the -- let's put up Government's Exhibit 54.  Y'all compiled a list of the jurors as they were rated.  Do you remember what these ratings indicated?

A.  I think the lower the number the better the anti-death penalty juror they were.  I think that's right.

Q.  Do you remember who compiled this?

A.  It was probably a law clerk.  I mean, I didn't do it.  I don't think John would have taken the time to do it, but he may have.

Q.  Okay.  The handwriting on the Government's Exhibit Number 54 --

A.  That's mine.

Q.  That's your handwriting?

A.  Yes, sir.

Q.  And then if you go to the fourth page, it has the word "strikes" on top, there's some handwriting and circles --

A.  That's my handwriting.

Q.  That's your handwriting?

A.  Yes.

Q.  Is this tracking as the strikes go, is that what this reflects?

A.  Mr. Daley, I can't even -- I don't know if I -- I think that's what that is.  But I don't even recall if I did the strikes or if Mr. Blume did the strikes.

Q.  Okay.  Exhibit 54 A, the last few pages of that, examples of some rating forms?

A.  Uh-huh, yes, sir.

Q.  Do you remember these juror rating forms, going through those at all?

A.  Yeah, I remember using them.

Q.  And when would you use them?

A.  If we were in the courtroom and we were making notes about, you know, the juror being examined.

Q.  While the questioning was going on?

A.  Or immediately thereafter.

Q.  And this would have been used to compile the ratings that we just looked at in Government's Exhibit 54?

A.  I believe so.

Q.  Let's go to Government's Exhibit 49.  Do you recognize this?

A.  Yes.

Q.  And in fact, at the bottom of the first page, end of the second page, this is your handwriting?

A.  Right.

Q.  It says, "Two women killed"?

A.  Uh-huh.

Q.  And then bottom of the second page, what does this say?

A.  "The law leaves it up to each individual juror to decide for themselves if the death penalty is the appropriate punishment."

Q.  Okay.  And this is just an outline for you to use while you were conducting voir dire; is that what this is for?

A.  Right.

Q.  Okay.  Claim 16 is "Ineffective assistance of counsel --" the allegation is "Ineffective assistance for failing to read questionnaires."  In particular, it focuses on Juror Allison. Do you recall the process by which y'all reviewed the questionnaires?

A.  No.

Q.  Do you remember what -- I mean, if you did review the questionnaire --

A.  I don't know that I reviewed -- I mean, in advance there were -- there were a ton of them.  I mean, to try to read those

in advance and then remember them when a witness is called -- I mean, you kind of had to do it as the witness was up there. That's my recollection of it, Mr. Daley.

Q. Okay. Claim 18, "Ineffective assistance of counsel for failing to appeal refusal to admit Basham's statement, the deer statement." In that statement do you -- I mean, with regard to that statement, do you remember why y'all didn't appeal it? You just can't remember if there was any decision made --

A. I don't know what the state of the record -- I can't recall what the state of the record was on that statement, so I don't know.

Q. Okay. There are several allegations about prosecutorial misconduct regarding closing argument statements. Do you recall during the closing arguments any statements that were made that you thought should have been objected to and weren't?

A. No, sir.

Q. Okay. Claims 24 and 25, generally they deal with the gun issue. And if you would, look at Government's Exhibit 56.

A. Uh-huh.

Q. Just take a look at that and read that for a moment.

A. Yes, sir.

Q. Do you recall this e-mail?

A. Yeah -- the one that I wrote?

Q. Yes, sir.

A. Yes, sir. I mean, now that I see it again, I do.

Q.  What were you trying to push for with regard to this whole
gun issue?  I mean, what was the fight about or what were you
trying to get in front of the jury that you weren't able to?
A.  As I recall, there was a gun that was unaccounted for at
the time that Chad and Brandon were sort -- at least at the
time that they left South Carolina, there was a .45 that was
unaccounted for, and I think the government was trying to
allege that Chad had that with him.  And we were trying to show
that, no, he didn't, that Ronnie had the gun.
Q.  And when you couldn't get that testimony in, you were sort
of stuck having to figure out what you were going to do to try
to explain that?
A.  Yes.  This was -- I see the date on it is June the 12th so,
I mean, this is just sort of me thinking out loud at the time.
And, you know, I'm not exactly sure where the government was in
their case, probably halfway through, maybe, Mr. Daley.  And --
and that may have been -- that may have been the substance of
the testimony that day and just trying to figure out a way to
combat it.
Q.  Let's look at Government's Exhibit 33 for a moment.  Can
you tell me what this document is?
A.  This is something that -- that John -- or someone drafted,
it might not have been John -- about things that we needed to
get in the record during the trial.
Q.  And the handwriting on this document, whose handwriting is

that?

A.   That's mine.

Q.   And what -- was this being used during trial or what were you --

A.   I didn't use it during trial.  I think by then everybody sort of knew what -- what the particular witnesses were going to say.  This is probably more in the nature of, you know, trial prep.

Q.   Okay.

A.   Okay.  I mean, I -- I mean, this is very organized.  It's not something that I would normally generate, I mean.

Q.   Okay.  Did y'all feel you had your ducks in a row?  I mean, was this an organized, planned defense, as far as you were concerned?

A.   Yes.

Q.   This was not something that was fly by the seat of your pants?

A.   No.

Q.   I mean, they were full bore ahead, fully engaged, fully looking for whatever they could to gain an advantage and get Mr. Fulks a life sentence?

A.   Yes.

Q.   Let's go to Government's Exhibit 41.  Can you identify what Government's Exhibit 41 is?

A.   That's an e-mail I drafted to other members of the defense

team after I went and talked with Chad about sort of a timetable after Devon's death.

Q. And again, in this, on the second page, midway where it starts, "We all know" --

A. Right.

Q. -- again, we have a situation where both Mr. -- Mr. Fulks is in prison and manipulating -- Tina Severance at that point is a prison guard; is that right?

A. Tina is a prison guard at the correctional institution where Chad was being housed at the time.

Q. Got you. Let's get back to the -- actually the last few claims here -- preparation of mitigation witnesses. Do you recall having any involvement with Martha Floyd, a witness Martha Floyd?

A. There were -- one of the witnesses I met with the day before she testified, when she came into town, I can't remember if it was Ms. Floyd or Ms. Atkins or whatever, but I didn't prep her as such for her testimony.

Q. Were any witnesses put up without prepping them, mitigation --

A. I don't think so. None of the witnesses that I did were. And I find this hard to believe that somebody just would have just been put up cold.

Q. What about Uncle Mark Fulks, do you remember having any involvement in preparing him to testify?

A.  I didn't prepare him to testify, that was John or Sheri.

Q.  Now, Ronnie Fulks, you were involved in questioning some, interviewing some?

A.  Yes.

Q.  But then I think Ms. Johnson actually put him up.  Did you help prepare for his -- I think he was actually called by the government, but Ms. Johnson did the cross, is that -- do you remember that?

A.  I didn't cross him.

Q.  Okay.  But y'all had had a number of conversations and interviews with Mr. Fulks -- with Mr. Ronnie Fulks?

A.  I had had one lengthy interview with him.

Q.  And claim number 27 is again the straight up claim that "Ineffective assistance of counsel for allowing Mr. Fulks to plead guilty without benefit of a plea agreement or a proffer."

     I think we have probably gone through that.  One thing I would ask you is in your conversations with Mr. Fulks, did you determine that it would be in his best interest and tell him so, to plead guilty?

A.  I think -- I think John was the one who probably told him so.  But I mean, I could have, because I definitely thought that.

Q.  Okay.  Claim 28 is an allegation of a failure to explain acceptance of responsibility.  Do you think y'all presented that concept to the jury?

A.   Yeah, I think we did.  I mean, you are not talking about it as a term of art like under the sentencing guidelines, are you?

Q.   No.

A.   No, you are just talking about that, you know, Chad is taking responsibility for what he did in this case, he's owning up to it?

Q.   I mean, there wasn't any question the jury was going to understand that that's one of the things y'all were putting forward --

A.   Right.  No, I think we -- I think we did that as best we could.

Q.   Do you recall -- claim 29 deals with the prosecution's alleged religious comments in closing, particularly I guess a phrase about Mr. Fulks washing himself several times and that no washing could cleanse his sins or something like that.  Do you recall that statement being made in closing?

A.   No.  The record would reflect.  I don't recall.

Q.   And do you recall, though, Ms. Johnson's closings at all, whether they had some religious overtones to them?

A.   I recall Ms. Johnson's closing to this extent, that she asked me to read it before she gave it, and I did.  And my recollection is I told her to watch out for a golden rule objection, and that was it.  I don't recall other -- other than that.

MR. DALEY:  Beg the court's indulgence for one moment.

Nothing further, Your Honor.

THE COURT:  All right, any redirect?

MR. ASHMORE:  Yes, sir, Your Honor, please.

REDIRECT EXAMINATION

BY MR. ASHMORE:

Q.  Mr. Nettles, you spoke in response to questioning of the car-jacking cases that you handled.  You have to have intent to be convicted of car-jacking, correct?

A.  The intent to cause death or serious bodily harm.

Q.  Did Chad Fulks ever admit that?

A.  That he himself had that intent?

Q.  Yes.

A.  No.

Q.  To you or to anyone else, for that matter, to the best of your knowledge?

A.  Did he ever admit it to us?  No, he did not.

Q.  And what was his stated intention on the date of the Alice Donovan --

A.  My recollection is, is that they were going to -- he was going into the parking lot to have Brandon steal a car.  The truck was running out of gas, they needed a car.

Q.  Whose truck was it?

A.  Oleita Hyman -- or it was on her property.

Q.  Part of your duties, many duties in this case, was to subpoena Mr. Fulks' juvenile records?

A.  I --

Q.  I thought you stated that --

A.  We probably did.  We tried to get records -- as many records as we could think of.

Q.  Sure.

A.  If we could think of them, we tried to get them.

Q.  Did you or a member of the trial team review Mr. Fulks' previous criminal history?

A.  Oh, I was aware of his criminal history.

Q.  Sure.  And I think you testified earlier that you thought Chad could steal anything?

A.  Right.

Q.  Are you aware that he was arrested at age 14 for hot wiring a car?

A.  It wouldn't shock me.

Q.  You did some background investigation, you told Mr. Daley, into Brandon Basham's background?

A.  Uh-huh.

Q.  Did you uncover any evidence that Mr. Basham could or could not drive an automobile?

A.  You know, that was something we tried to find, and there was never anything definite on that as I recall, Mr. Ashmore. I seem to want to say somebody said he could, and then other

people said he couldn't.  There was never really anything definite.

Q.  You also --

A.  To my recollection, I mean.

Q.  Sure.  You also testified on cross that you thought that fetal alcohol spectrum disorder was a strong mitigator as it was presented during the trial?

A.  I thought so.

Q.  You had the opportunity to review the findings of the jury on the jury verdict form?

A.  Well, I have looked at them, I don't specifically recall what their findings are.

Q.  Are you aware that the jury rated a zero?  The scoring was a zero on whether or not Mr. Fulks was influenced by the fetal alcohol spectrum disorder?

A.  Right.  I mean, I -- you know, it's one thing to have a strong case, and it's another thing for them to buy into it. And, you know, if they buy into that it's harder to kill him.

Q.  Mr. Daley, in response to one of his questions you indicated you just couldn't find a hole in the government's case; is that correct?

A.  Right.  In terms of the whole factual sort of -- I mean, the sort of avalanche of facts that we were dealing with, it was just very, very hard to find something where you could claim the government had fumbled, the government had overstated

something, the government, you know, was fudging, that kind of

thing, you know, as you went through the discovery.

Q.  Had you known that Sheriff Hewett was going to testify that

it was actually Brandon Basham that strangled Alice Donovan --

MR. DALEY:  Objection, Your Honor, we are going over

this again and again.

THE COURT:  I think you have covered this ground.

MR. ASHMORE:  Your Honor, I'm just going over on what

was covered on cross.  He said it was a hole in the case -- he

couldn't find a hole in the case, and I want to make the point

that that is the one hole that they had in the case, it was

just never made known to the trial team.

MR. DALEY:  Your Honor, the record is what the record

is.  He continues to try to characterize what would have

happened if --

THE COURT:  I understand your point, and I think it

was certainly a valid point for argument, but I'm not sure it's

going to help anything to ask this witness --

MR. ASHMORE:  Very well, Your Honor --

THE COURT:  I'm going to sustain the objection.

Let's move on.

MR. ASHMORE:  Yes, sir.  Yes, sir.

BY MR. ASHMORE:

Q.  The three-day rule, you talked about that on cross, that

was raised at the Fourth Circuit?

A.  Yes.

Q.  And the Fourth Circuit's ruling was actually that that was not an issue because the Ward testimony could have come in in rebuttal; is that your recollection?

A.  I -- I can't remember exactly what the basis of the Fourth Circuit's ruling was, Mr. Ashmore, I'm sorry.  Judge Williams, I think, had a different -- she concurred but had a different way of looking at it.  I just don't recall.  The opinion would say exactly what it was.  I'm sorry.

Q.  Mr. Daley asked you about Government's Exhibit 26 and the polygraphs, do you recall that line of questioning?

A.  Yes, sir.

Q.  And he indicated that at one point that there was some deception noted?

A.  Uh-huh.

Q.  But if you read on in this particular paragraph, it indicates that a problem was straightened out and he passed that particular polygraph.  Was that not the case?

A.  That says what it says.  I don't have any recollection of this other than what that says.

Q.  And this document, the government's document indicates that Mr. Fulks did pass this particular polygraph?

A.  Which particular polygraph are you talking about?  I know he passed a polygraph of Joe Kinney and Tom Williams.  And I think Mr. Capehart, too, yeah.

Q.  The law students that you work with, was there any mechanism to check on the work that they had completed?

A.  You know, they -- they told us what they did, and then they submitted documentation as to what they did.  I'm not -- I think that was it.

MR. ASHMORE:  May I have just one moment, Your Honor?

THE COURT:  Yes, sir.

MR. ASHMORE:  Thank you very much.

I believe that's all we have, Your Honor.

THE COURT:  I don't have any questions.  Thank you, sir.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You may step down and you are excused.

Are you ready to start your next witness?

MR. ASHMORE:  Yes, sir, Your Honor.

Your Honor, the next witness will be called by David Dalke, D-a-l-k-e, with the O'Melveny and Myers firm.

MR. DALKE:  May it please the court, Your Honor.  I would like to call Dr. James Hilkey to the stand.

THE CLERK:  If you would please come forward to be sworn.  Come right up here, please.  Place your left hand on the Bible and raise your right hand, and state your name for the record.

THE WITNESS:  My name is James H. Hilkey, spelled H-i-l-k-e-y.

JAMES H. HILKEY, SWORN

THE COURT:  Let me just ask one generic question before we get into these medical experts.  Have they read the transcript of the medical testimony as heard by the jury at the trial?  These witnesses?

MR. DALKE:  I don't know the answer to that, sir.

DIRECT EXAMINATION

BY MR. DALKE:

Q.  Dr. Hilkey, have you read the mental health -- or any of the health evidence that was already presented during the trial?

A.  I don't believe so.  I'm not --

THE COURT:  I'm just curious.  Go ahead.

BY MR. DALKE:

Q.  Could you state your name again once?

A.  Yes.  My names is James H. Hilkey, and that's spelled H-i-l-k-e-y.

Q.  And what do you do for a living, Doctor?

A.  I am a psychologist.

Q.  Do you have an area of expertise?

A.  I do.  I am trained as a clinical counseling psychologist, and I have a specialty in forensic psychology.

Q.  And how long have you been practicing?

A.  I began practicing as a master's level graduate student in about 1968.  I've been practicing since that time.

Q.  And how long have you been licensed?

A.  I was licensed I believe in 1987, '89.

Q.  And where was that license?

A.  I'm licensed in the State of North Carolina.  I am licensed as a licensed practicing psychologist.  And also I hold a certificate in health service provider.  This is the highest license afforded in the State of North Carolina.

Q.  Have you ever worked for a state prison system?

A.  I have consulted for the North Carolina Department of Corrections, I have been employed for 25 years with the Federal Bureau of Prisons.  Started my federal career in 1971, I believe, or '2.  I retired from federal service in May of 1996.

Q.  Were you ever a staff psychologist with Terre Haute, the bureau of prisons there?

A.  Yes, I started out -- during my doctor studies at Indiana State University, I was first a presidential intern in the federal prison system.  From there, I was hired as a pre-doctoral intern, and then as a staff psychologist at the United States Federal Penitentiary in Terre Haute, Indiana.

Q.  And what were your responsibilities there, sir?

A.  I was the clinical director for a substance abuse program.  This program was a -- congress had mandated special treatment under a drug abuse program bill to provide services for federal prisoners with severe addictive disorders.  And I was the clinical director of that program at Terre Haute, Indiana.

Q.  And do I understand correctly that you also worked for the federal correctional institution in --

A.  Yes, sir.  I was promoted from or transferred from the federal penitentiary at Terre Haute in 1976.  At that time, the Federal Bureau of Prisons was starting a new forensic in-patient psychiatric unit.  I was chosen as the supervisory clinical psychologist to help establish that unit, which was designed to provide in-patient psychiatric care for federal prisoners on the Eastern seaboard, and also to conduct forensic evaluations for the federal bench.

Q.  And from what years did you have that position?

A.  I was there from 1976 until 1996; for 20 years.

Q.  And at some point during your time at Butner, did you receive a promotion?

A.  I did.  In 1980 I was promoted as the chief of psychology services.  Those duties included both supervising 26 other psychologists and treatment specialists in the area of forensic evaluations, mental health treatment, sex offender treatment, and also general psychology services to the inmate population at FCI Butner.

Q.  And did you have a title for your role at Butner?

A.  Yes, sir.  I was the chief of psychology services until my retirement from federal service in 1997 -- '6, I'm sorry.

Q.  In your time serving at Butner, did you ever have occasion to diagnose an inmate with antisocial personality disorder?

A. Many times.

Q. Dr. Hilkey, where did you go to college?

A. My undergraduate degree was awarded from Westmont College. It's a small liberal arts college in Santa Barbara, California. From there, I went to Arizona State University where I obtained a two year master's degree in counseling psychology from Arizona State University. I was admitted to a doctoral program in clinical -- counseling psychology at Indiana State University. That degree was conferred in 1975.

Q. And what was that degree?

A. It was in counseling psychology, a Ph.D.

Q. During your career, have you taught or otherwise held academic positions?

A. I have. Most of my career has been in the area of clinical and administrative psychology, but I have also held positions at Duke. I was the -- an adjunct lecturing psychologist -- faculty member of the Department of Clinical Psychology at Duke University.

I have held a number of teaching positions at the University of North Carolina, specifically in the department of psychiatry, the school of education, and also in the school of medicine in the department of rehab psychology. Those were adjunct positions.

Q. Can you give the court a general -- a rough approximation of the number of years that we are talking? This would span --

A.  Approximately 10 years.  The duties at UNC, at the University of North Carolina Medical School, was primarily to supervise pre-doctoral interns and psychiatric fellows who were both enrolled at the University of North Carolina and in training programs at the federal correctional institution.  So, primarily it was a supervisory position.

I did teach in the school of education, psychological testing, and I also taught in the department of rehab psychology, also in the medical school at the University of North Carolina.

During my doctoral program, I was also an adjunct professor in the department of criminology where I taught personality theory, psychological assessment to criminology students in their master's program there.

Q.  Have you ever served as a consultant?

A.  I have.  I have been a consultant to the North Carolina Department of Corrections, a consultant to attorney generals in the states of North Carolina and also in Florida.  In Florida, I was involved in a class action litigation on the Eighth Amendment, hired by the attorney general of Florida.

I have also conducted evaluations for the attorney general's office in the state of North Carolina.

Q.  And how about any professional committees, have you served on any of those during your career?

A.  I'm sorry?

Q.  Any professional committees or associations?

A.  I was in a number of them during my tenure as a psychologist for the Federal Bureau of Prisons.  I was on a number of task forces, one with an oversight for psychological assessment in the Federal Bureau of Prisons.  Conducted a number of audits of other federal facilities, looking at the quality assurance issues of mental health programs across the federal system, various task forces.

I also worked in the area of critical instant debriefing, which is providing services to employees who were in high risk situations who needed employee's assistance services for involvement in traumatic events.

Q.  Since leaving Butner, have you -- you have been working as a clinical psychologist?

A.  Yes, sir, I have.

Q.  Have you ever been retained as an expert witness?

A.  Many times.

Q.  And have you ever testified as an expert?

A.  Many times.  Testified in many federal courts during my tenure at Butner.  Since my retirement, I have testified probably close to 150 times for the State of North Carolina, in several federal jurisdictions, and also in military court marshals cases.

MR. DALKE:  Your Honor, at this point I would like to offer Dr. James Hilkey as an expert in the field of clinical

psychology, consistent with Federal Rules of Evidence number 702.

MR. DALEY:  No objection.

THE COURT:  All right.  You may examine the witness and he may testify under Rule 702.

MR. DALKE:  Thank you, Your Honor.

BY MR. DALKE:

Q.  Dr. Hilkey, did you ever examine Mr. Fulks?

A.  Yes, sir, I have.

Q.  And who asked you to examine him?

A.  I was originally contacted by two North Carolina attorneys, Michael Raymus and James Pain, who were appointed by the indigent defense services in North Carolina.  At that time, Mr. Fulks, in addition to his federal charges, was also charged in the state of North Carolina on the -- on murder and kidnapping.

When the federal jurisdiction took over, the State of North Carolina dropped their jurisdiction and relinquished to the federal government.  At that time I had -- I believe I had seen Mr. Fulks on one occasion.  I was contacted by Mr. Blume to continue my evaluations of Mr. Fulks.

Q.  And do you have an understanding of why they were asking you to evaluate Mr. Fulks?

A.  I did.

Q.  And what's that understanding?

A.  My understanding was to determine -- first of all, to develop a psychological profile, to see if in fact there was any mental illnesses that might constitute a mental health defense, and also to develop factors that may be considered as mitigating in his capital charges.

Q.  Do you recall how many times you examined or met with Mr. Fulks?

A.  I met with Mr. Fulks on four separate occasions.  I initially saw Mr. Fulks on August the 12th, 2003.  And I believe that evaluation took place at the Glenn Detention Center here in Columbia.  That was actually on August the 12th and 13th, I saw him on two consecutive days.

I again saw Mr. Fulks on January the 5th, 2004.  This was here in Columbia at the Columbia Care Center.  My final examination of Mr. Fulks was conducted on February the 18th, 2004.  That contact was made at the Federal Correctional Medical Center at Butner, North Carolina, where he was being evaluated and treated for some physical problems.

Q.  Overall, how many hours did you spend --

A.  Approximately 14 hours of direct examination.

Q.  So, Doctor, you are a psychologist, and I would like you to explain if you could, please, what the difference is between a psychologist and a psychiatrist.

A.  Yes, sir.  The major difference is that a psychiatrist has medical school, a psychologist does not.  Where a lot of what a

psychiatrist and psychologist does overlaps, the primary difference is that a psychiatrist, with their medical training, can prescribe medications, specifically psychiatric medications, a psychologist does not.

What a psychologist brings to the discipline is the ability to conduct psychological testing. Again, many of our -- our work overlaps. But again, the psychiatrist will bring a medical background to look at the interface of medical conditions that may affect a person's psychiatric status, a psychologist would not have that training.

Q. Dr. Hilkey, could you explain how forensic psychologists typically undergo, undertake the testing that they perform?

A. Yes, sir, I can. They are usually things that typically is the standard care that most forensic psychologists practice. There are four primary areas that I want to look at or are procedures that I would use in terms of forming my assessment.

The first would be a direct examination of a client. That is, interviewing them, sitting across the table, talking to them, asking questions about background, asking questions that are contained in the mental status examinations, standard questions, such as, do you suffer from auditory or visual hallucinations, suicidal ideation.

Some people refer to this as the stethoscope of psychology and psychiatry. It is the way of taking the pulse of the person, getting a sense of how the person looks,

appears, their interactive style.

So, it's many hours of simply talking to the person, interacting, using what the person presents, with your knowledge of how people present with different diagnostic impressions.

So, you are comparing that person with a host of people that you have seen over the years.  Various symptoms emerge that in some cases are different, some cases the same.

The second phase the forensic psychologist would engage would be administering a battery of psychological tests.  These are tests of cognitive ability.  Neuro psychologists would focus on specific tests to assess functions of the brain, things to look at how fast people can do things, their ability to use visual spatial issues, things that tap into various functions of the brain.

Tests of malingering are part of the assessment to determine whether or not the person is feigning or trying to present with symptoms that are designed to avoid some consequence, trying to determine the reliability of what the person is saying.

Also administering a battery of psychological tests. These are tests that are designed to identify different symptoms, patterns, comparing that person's responses with a large sample of people who have similar, or dissimilar traits, so that you can get an actuarial or a statistical base of how

this person compares to other people who may have diagnostic impressions.

Third, part of the evaluation is comparing what you learned from your direct examination of a person, comparing that with people who may have known the defendant or the person in different settings, looking at family background, reading interviews of people who have known the defendant to see if there are things that emerge from that presentation that you don't see in your direct examination, or looking for patterns of behavior.

The fourth part is to looking -- to look at discovery materials. This is probably more important in cases where you are rendering an opinion about criminal responsibility, so that when you are trying to determine whether or not the person suffered from a mental disease or defect that influenced their commission during the alleged offense.

Q. And did you take -- undertake this analysis during your time with him?

A. I did. I did not have excessive discovery in the case. Most of my time was really spent with looking at my examination with my psychological testing. I had some collateral information in terms of school records, family history, interviews from people who had known Mr. Fulks over the course of his developmental history.

Q. You mentioned psychological testing, how do you gauge

whether the answer that you are getting in response to those types of tests are truthful?

A.   Well, there are a number of ways of doing that.  I think the first thing -- whenever you undergo a forensic evaluation, whether it's an issue of personal injury or criminal responsibility or something that has a possible secondary gain, it's important to discern whether or not the person's presentation is trying to enhance that outcome.  In a personal injury case, a person may feign or malinger or present with physical symptoms that are not readily documented in terms of the medical examination.

So, it's important in a forensic evaluation to determine the authenticity of the symptom pictures.  There's a number of ways of doing that.  One is to simply talk to the person.  Is he presenting -- is his behavior consistent with what you know to be true about certain disorders?  Are they presenting with bizarre symptoms or blatant symptoms that are out of the ordinary?

Another way of establishing malingering is by administering published tests that are specifically designed to determine whether a person is feigning or presenting symptoms that are out of the ordinary.

Most of the published personality tests also have built in indicators that give you some idea about the response style.  All of that data helps the clinician decide whether or

not this person is presenting accurately a symptom picture, or trying to over-endorse or in some cases where a person has very serious mental illness people may try to under report and deny a problem.  So, understanding the particular response style is an important part of conducting a forensic psychological evaluation.

Q.  You have used the term "malingering" several times in the short time that we have been conversing?

A.  Yes.

Q.  Can you give a --

A.  Sure.  The DSM IV PR the diagnostic and statistical manual which is the fact book of all of the diagnoses defines malingering as the intentional production of false or grossly exaggerated symptoms motivated by his mind and external stimulus.

        For instance, if a person doesn't want to go into the military, they may present with symptoms that they think will alleviate their duty to serve.  In a criminal case, a person may present with flagrant symptoms that in his mind thinks will minimize the consequences of the -- of their alleged criminal charges.  So, it's an intentional -- it's an intentional endorsement of symptoms for an external gain, a secondary gain.

Q.  During your time with Mr. Fulks, did you specifically administer any tests that would measure his malingering?

A.  Yes, sir, I did.  I gave him the structure interview of

symptoms, the SIRS, which is a -- I guess it's considered the gold standard of malingering tests.

I also administered a -- the Rey 15-Item, which is a relatively simple test, where a person is asked to look at 15 symbols. After you take away the stimulus card, then ask that person to reproduce.

I also had a chance to review the malingering assessments that were conducted as part of the government's evaluation of Mr. Fulks at FMC Butner, so I had a chance to look at the malingering assessments that were done as part of that evaluation.

Q. Okay. Just for the record, SIRS is an acronym, S-I-R-S, is an acronym, when you talk about that?

A. Yes.

Q. I show you what has been marked P, Exhibit P 23?

A. Yes.

Q. Do you recognize this document?

A. I do.

Q. Would you explain what it is, please?

A. This is the actual result of the scoring profile that was produced by Mr. Fulks after I had given him this instrument. This was administered on -- on January 5th, 2004 and it is a recording of his scores.

Q. And can you explain some of what these -- what this chart is showing?

A. Yes, I can. The first score that you see under RS is called rare symptoms, and these are the items that are infrequently -- that are very infrequently seen in bona fide mental illnesses. People who malinger tend to endorse or to admit to symptoms that are not -- that are not part of the bona fide illness. In this score there were no items endorsed under this -- this scale. He obtained a score of zero. If you will look at the left-hand side of this instrument, you will see --

Q. I don't mean to interrupt you, but if you touch the screen, it will give you a little mark there to show. So if you want to highlight a specific thing --

A. On this mark here there are, I guess, four levels of response possibilities. The lowest is honest, the second is the improbable, probable, and definite. And those are levels. The higher of scores the more probable that the person is malingering. That is probably the best way to understand this chart.

The second scale, SC, is identified as symptom combinations. These are looking at symptoms that rarely occur together. They may be symptoms that are probable and then improbable, and the combination of those two together are items that are comprised of that scale.

The third are improbable or absurd items, symptoms having fantastic or preposterous or unlikely to be true questions. They may be things like, "Does pain bounce between

your limbs from one side to the other, going back and forth?"
Again, those three scores all fall in the honest range.

The next is the blatant.  These are symptoms that are -- that non-trained individuals are likely to identify as symptoms of a mental illness.  Some of those symptoms are commonly seen, some of them are not.  But people who are untrained will endorse these items as thinking that they are endorsing items that are consistent with a known mental illness.

Things that are comprised on that are having strangers talk behind your back, having your body move strangely.  Some of those are true.  Some are quite possible, some of them are blatantly wrong.

People who score very high who are malingering will endorse all of those items saying that these are symptoms that are troubling them, trying to over-represent symptoms.  They don't miss anything, they are endorsing essentially everything.

The next is the SU, which refers to a subtle item. If you look at blatant as being overt items, the subtle are subtle signs of mental illness or symptoms that people may not recognize as being illness.

Again, his score there is in the indefinite range. He also has the -- next is the SEL, selectivity of symptoms, and these are a combination of both blatant and subtle items.

The SEV is the severity of symptoms.  A person will

endorse items and then there are areas to check whether these symptoms are unbearable.  People who are malingering tend to say, "Yes, I have this symptom and I can't stand it.  It's -- it drives me crazy all the time."  Again, it's an assessment of the level of severity.

The last is the RO, which is the reported or observed.  They will be asking questions like your eye blinks more than normal people.  So that the person who is malingering tends to say, "Yes, my eye blinks more than ordinarily," but the observed behavior from the clinician doesn't support the statement.  So, people who tend to malinger who say, "Oh, yes, I do that," yet you don't see that in actual behavior.

When you look at this profile in total, Mr. Fulks' scores, with the exception of the "blatant" really do not fit in the area where you typically see people who malinger.  To diagnose malingering you need to have scores that are in the -- in the severe range, with tremendous over-endorsement of symptoms that has to be consistent with malingered or artificial -- malingered responses on validity scales on personality tests, and also behaviors that are reported during interviews, which seem to be out of the ordinary for known symptoms -- patients with these particular disorders.

So this, based on this instrument, the validity scales on the personality tests that I administered and my observations, my clinical assessment, it was not my opinion

that Mr. Fulks was trying to malinger.  Psychological symptoms.

Q.  So just to clarify for my own personal knowledge, you administered the two tests, the SIRS and the Rey 15-item?

A.  Right.

Q.  And were you able to reach a conclusion based on the results of those two?

A.  Yes.  On the Rey 15-item he missed no items, and this was consistent with his responses to the tests of memory, malingering administered at Butner.  Again, his score was well within the acceptable range, suggesting that he was motivated and did not try to feign memory problems.

Q.  Now, are you aware that while Chad was at Lexington in 1998 he was alleged to have malingered?

A.  Yes, I am.

Q.  And what is your understanding of those circumstances?

A.  I was aware that he had been evaluated at the federal medical center at Lexington.  I did request those records.  I obtained those records from Dr. Andy Simcox, who sent me after -- I think an order from court, and I had a chance to look at his SIRS that was completed during that evaluation, also looked at an MMPI profile, and also a Wechsler memory scale, and a Wechsler adult intelligence scale, those four tests.

Q.  In your opinion, is it unusual that somebody would have malingered in 1998 and apparently not malingered several years

later?

A.  It is not unusual.  It's clear that he malingered.  I confronted Mr. Fulks about that.  He admitted that he had tried to fool doctors.  He told me -- I don't know who told him, but he told me that his attorney at the time had instructed him not to cooperate with the evaluation.  I have no way of knowing whether that is an accurate statement.

Clearly the evidence was that he had not cooperated based on his elevated scores on the SIRS conducted at the Lexington facility.  His IQ scores were clearly -- was a very meager attempt.  He did not pass items clearly that he, with his background, should have passed.  The results from the personality testing clearly violated acceptable norms for validity.  So, no doubt about it in my mind that he had malingered.

Q.  Lest there be any confusion in the record, I just want to make clear that your understanding of whoever his attorneys were in 1998 was somebody other than John Blume?

A.  That is correct, it was not John Blume.  I don't know who those attorneys were or if in fact those attorneys actually instructed him.  I know that Mr. Fulks was not happy at that facility and I don't -- I don't believe that he was cooperative.

Q.  Moving off the malingering tests, did you administer any other tests to Mr. Fulks?

A.  Actually I administered a battery of tests in addition to the SIRS, the 15 Rey items, I administered the Wechsler Adult Intelligence Scales, the third edition.  This is the gold standard of intellectual tests.  95 of all IQ tests that are individually administered are the Wechsler scales.  This is the best researched, the most reliable intellectual tests available to psychologists --

Q.  Good -- I'm sorry.

A.  I didn't know if you want me to list all the tests I gave?

Q.  If it's easier for you, we will talk about them as we check off the list here.

A.  That will be fine.

Q.  Do you recall what his scores were?

A.  If I can refer to my report, again, his full scale, IQ score, I believe, was a 78.  That IQ score -- the full scale IQ is a composite of both verbal IQ and performance IQ.

Verbal IQ is an assessment of the person's ability to use verbal process, solve problems, use of language, use of, recognition of, meanings of words, analogies of words, using verbal skills to solve problems.

Performance is looking at non-verbal problem solving and involves manipulations of various objects, being able to use non-verbal tasks to solve problems.

The composite of those scores is the full scale IQ and is considered the most global and full range indication of

general intellectual functioning.

Q.   And his score was 78?

A.   78.

Q.   And where did that place him?

A.   Score 78 places him between the low average and borderline range of intelligence, and about the seventh percentile. Meaning that there are 93 percent of the population are functioning at a higher level.  If my math is right, seven percent are functioning at a lower level.

Q.   In administering this test, were you able to assess a level of confidence in these results?

A.   Yes, I was.  The scores are -- one of the reasons you do a motivation-malingering test is to make sure that the person is putting forth a concerted effort.  His score on the Rey 15-Item, which is considered a motivation test, suggested that he was motivated.  My observation of his performances, he seemed to be invested in the task, appeared to do his best, from my knowledge.

     It was -- later I realized that the IQ that I obtained was within one point of the -- different tests, but still a test of general intellectual ability performed at the federal medical center.  The fact that he obtained a score of one point difference at both, I think that placed him at the eighth percentile, suggests this was a reliable estimate of his current and intellectual functioning.

Q.  How would you expect someone with this level of IQ to interact with the world around them?

A.  About around the seventh percentile, that puts him at a significant disadvantage in terms of cognitive abilities.  He is not mentally retarded, but he would have express difficulties keeping with his peers in academic settings.

His level of judgment, his level of insight, his ability to use sophisticated problem solving activities is again at the seventh percentile.  He may not -- you would not be able to discern a person -- if you lined up 100 people by looking at them, you wouldn't be able to tell who is in the borderline range versus normal population.

They don't look physically different, they don't present with any unique symptoms, but when it comes to executive functioning, that is, the ability to plan, to think about consequences, to use more sophisticated logic, Mr. Fulks is going to have some serious problems consistent with people who are functioning at the seventh percentile.

Q.  Are you aware that Mr. Fulks' IQ was tested higher when he was younger?

A.  I am.

Q.  Can you explain why that might be?

A.  Yes, I can.  There are a number of insults that Mr. Fulks has suffered to his brain.  There is an extensive history of substance abuse.  His substance abuse history dates back to 10

years old when he began drinking moonshine.

There was a number of references to prior head trauma, extensive use of methamphetamines, which is a very toxic drug that affects the central nervous system, the exposure to head trauma, significant amounts of polysubstance abuse. Dependence certainly attributes to a cognitive impairment resulting in a lower IQ.

Q. It did not surprise you that he had --

A. It is not at all surprising, and it's typically seen with people who live the kind of lifestyle that Mr. Fulks had lived, to see decline in their intellectual functioning. Generally IQ is a fairly stable score over time, unless there has been a significant level of insults which could certainly affect cognitive functioning.

THE COURT: Mr. Dalke, it's getting time to break in the day. When you get to a convenient stopping point -- unless you think you are going the finish with him soon?

MR. DALKE: I don't think I will be soon, Your Honor, and I am at a convenient spot if that suits you.

THE COURT: Let's stop at this time.

MR. DALKE: Thank you.

THE COURT: And let's resume at 9:30 tomorrow morning. What kind of progress are we making?

MR. ASHMORE: Very good, Your Honor, exceptionally good. There's a distinct possibility we may run out of

witnesses tomorrow at some point, because we have to do Sheri Johnson Thursday morning.  That's not going to be a problem, but we will finish with Mr. Hilkey, and then Dr. Melikian is here, so I expect to finish early tomorrow.

THE COURT:  How many witnesses does the government anticipate?

MR. DALEY:  Your Honor, there's a possibility that we would call one or two mental health experts in response.  We are leaving that open --

THE COURT:  We should finish this week with the testimony, probably, shouldn't we?

MR. ASHMORE:  Yes, sir.  Could you remind us what our schedule is on Thursday, your court schedule?

THE COURT:  I have to leave about 1:30.

MR. ASHMORE:  All right.

THE COURT:  We can start at 9 if you want to to try to get in a little more testimony that day.

MR. ASHMORE:  May not need to.

MR. DALKE:  I don't think she can -- I don't think Ms. Johnson can start before 9.

(Off record discussion)

MR. DALKE:  I understand she is driving to Syracuse, which is --

THE CLERK:  She would have to go to the federal courthouse, couldn't get in before 9.

THE COURT:  Looks like it's going to be 9:30 when we start on Thursday.  Can you finish her before 1 or 1:30?

MR. ASHMORE:  She has to finish by 12:30.  I don't know if we need to divvy up time or not.  I notice that maybe Mr. Daley is eating up more of the clock than I am, but I would think -- and you may be handling her as well.  Her direct might be an hour, hour and-a-half.

MS. DAMRON-HSIAO:  It's our understanding, Your Honor, that it's actually the district court, we only have the courtroom reserved until 12:30.  It's not Ms. Johnson's --

THE COURT:  Right.  Well, do y'all want to try to come to some agreement to take whatever available time we have and split it right down the middle?

MR. DALEY:  I will be happy to take 50/50.

THE COURT:  Is that direct and redirect?  Or do you want extra time for redirect?  Let's give the moving party, the proponent of the witness, a little bit more time.  If we go from 9 to 12:30, that's three and-a-half hours, right?  So 50/50 would be an hour and 45 minutes apiece, right?

MR. ASHMORE:  Yes, sir.  So two for us and then an hour and-a-half for Mr. Daley?

MR. DALEY:  That would be fine.

THE COURT:  Is that okay?  Two hours for the government -- this is an important case, I don't want this to be an issue on appeal, now.  I'm not imposing a deadline, y'all

are the ones that wanted her on the satellite.  I'm happy to sit here as long as it takes to get her up.

MR. ASHMORE:  I want that to be clear on the record, Your Honor, that's absolutely right, this is our decision and through no influence of yours.  We are in complete agreement with this.

One last housekeeping matter, Judge, at least one. For Friday, if all goes according to plan and we show up Friday for legal arguments, just so we can properly prepare, do you envision this -- is this going to be an interactive questioning and answer or --

THE COURT:  Yes.  I'm sure I will have some questions.

MR. ASHMORE:  Sure.

THE COURT:  I don't know if we want to go one issue at a time back and forth.  It probably would make more sense, wouldn't it?

MR. DALEY:  That would be fine with the government.

MS. SMALL:  There is one issue outstanding, a potential witness, at least.  The affidavit of Heather Roche is a disputed item.  My understanding is, and I will let Mr. Daley clarify, the decision of the government about whether they want to withdraw their objection or not, that may result in presenting that testimony --

MR. DALEY:  Tomorrow morning we will have a final

answer.

THE COURT:  Give them an answer tomorrow morning.

MR. DALEY:  Yes, sir.

THE COURT:  There is also an ex parte matter that the defense lawyers want to take up.

MS. SMALL:  Yes, that shouldn't take very long.

THE COURT:  Is today a good time to do it?

MS. SMALL:  Yes, we can do it right now.

THE COURT:  Do you want to do it here in the courtroom with everybody else gone, or do you want to do it in chambers?

MS. SMALL:  Mr. Fulks would like to be present.

THE COURT:  We will do it here then.  We will ask you to stay.

Now, going back, do you think there's a possibility we may be hearing argument on Friday?

MR. ASHMORE:  Yes, sir.

MR. DALEY:  Yes, sir.

THE COURT:  The government's witnesses will be short witnesses, in other words?

MR. DALEY:  If we call them, we don't plan for them to be long, Your Honor.

THE COURT:  Okay.  Let's plan on taking it one issue at a time, and I think I can frame the issue better and understand the arguments better and follow them better if we go

issue by issue and hear from each side.  Unless when we get towards the end we might want to group them, possibly, just to keep y'all from jumping up and down so much.  There are 35, I believe.

MR. ASHMORE:  Some of our claims, Your Honor, I think we will stand on the record.

THE COURT:  Right.  Some of them probably don't need any argument because it's clear on your papers what your argument is, and verbalizing it won't really help me that much, but certainly some of them we do need to discuss.

MR. ASHMORE:  Yes, sir.

MR. DALEY:  And, Your Honor, I think there might be at least -- I would like not to argue every one of them, I assume we might want two to argue these issues as well?

THE COURT:  Anybody can speak for either side.

One more thing we haven't even talked about is the defendant's motion to extend the -- postpone the hearing on the sexual abuse.  What about that?

MR. DALEY:  We both briefed it.  I'm happy to -- I think it's pretty clear.  If you want further argument, happy to present it, Your Honor.

THE COURT:  I'll let the witness step down.

THE WITNESS:  Thank you.

THE COURT:  Mr. Ashmore, the issue had been raised and briefed and was teed up for a hearing until we had the

conference with Mr. Fulks where he said he wanted to drop that issue. And then after he said that I think Mr. Ashmore said you intended to drop it all along, but were going to drop it later on closer to the hearing.

And now it's been refiled, reasserted, which I don't have a bit of problem with that, I certainly don't mind it being reasserted, but I do have some misgivings about the six-day continuance to explore it and investigate it.

And particularly there was a reference in your motion to sending investigators up to interview neighbors, with multiple visits to develop a comradery and friendship with the neighbors so they would open up.

The neighbors won't have any firsthand information. I mean, you don't molest a child in front of witnesses, and so whatever they have is going to be hearsay.

MS. SMALL: Your Honor, if I could?

THE COURT: All right, Ms. Small.

MS. SMALL: I will try to give a little overview. As far as making this case generally, it has been a difficult issue for Mr. Fulks throughout this litigation.

THE COURT: Right.

MS. SMALL: And there have been a lot of discussions about his comfort level in asserting it. That's one of the reasons we have gone back and forth. One of the things we recently learned from Dr. Krop, whose affidavit is attached to

our motion, is that this is a very typical pattern of victims of this kind of abuse. They come forward a little bit, they back off, they come forward, they back off.

And quite often when they start to come forward it is a long time removed from when it actually happened. What we see is exactly the case playing out for Mr. Fulks in this instance. So, we are really sort of -- our intent is not to delay things or to take longer than it needs to.

But our understanding of that from Dr. Krop is that is really sort of the way these things happen, and that now is a time when it's fruitful for Dr. Krop to interview Mr. Fulks as an expert in sexual abuse, with all his experience with sexual abuse victims, and then based on that information go out and speak to people in the community who may know -- may have been witnesses to abuse, may have talked to Mr. Fulks, and go back and find the perpetrators.

This is not intended, I would clarify, to be sort of wandering from door to door just seeing who might know something. It's going to be a very targeted search based on information that Dr. Krop got from Mr. Fulks. It is not intended to be a reopening of a mitigation investigation.

MR. DALEY: Your Honor, she has just presented why it wasn't ineffective assistance of counsel. They have had over two years to develop this. They presented a 200-page petition, you gave them -- I don't know what all resources you gave

them.  I can tell you gave them a tremendous amount of resources to go out and further investigate the case that had already been investigated.

And here we are literally in the middle of trial -- of this hearing, and obviously it was only 10 days ago, but they had all this time.  Even if you were to say, okay, well, he withdrew it in October, the whole struggle they had with the petitioner, well that's the same challenge Mr. Blume talked about.  It wasn't like they didn't try to get it, it's not like they didn't think there could be something there.  So, if it were to develop --

THE COURT:  Their point is that Mr. Blume didn't go down to Gainsville and get a sex abuse expert, I guess.

MS. SMALL:  That's exactly right, Your Honor.  No doubt she was qualified to do what she did, but she was not qualified, experienced with this kind of interview.

THE COURT:  There is some evidence in the record of sexual abuse from an older woman and --

MR. DALEY:  He had a sexual relationship with an older woman and there were some medical records, psychological records that he was abused by an older man when he was, I don't know, nine or 10.  So there was some.  They did get some in.

THE COURT:  Was that an enumerated mitigation factor on the verdict form?  I don't remember.

MR. ASHMORE:  Yes, sir.  I believe it was, sexual

abuse was one of the factors and I think it scored a zero.

MS. SMALL: And I think part of the issue, Your Honor, is that it was all self-reported at that point in time, whereas with what we know now we can go back and try to find corroborating evidence of what happened.

THE COURT: How far back -- how old is Mr. Fulks? I should know. How many years back will we be going?

MS. SMALL: I believe the first instance reported, at least in the trial record, is when he was eight or nine, and we know that it continued -- but -- we believe it continued -- earlier than that probably and certainly after that there is information --

THE COURT: So how many years back is that, when he was eight or nine?

MR. DALEY: 20 plus years.

MS. SMALL: Yes. Mr. Fulks is in his early 30s right now.

THE COURT: You know, I don't have a general problem with the expert from Gainsville talking to Mr. Fulks, but I just would be worried about going out to interview possible perpetrators and all 20 years after the fact.

MR. DALEY: The government would --

THE COURT: The issue is not, of course, was he in fact subject to sexual abuse, it's was Mr. Blume constitutionally ineffective for not going the extra mile and

pursuing it further?

MR. DALEY: Your Honor, the government would strenuously -- here we are -- this case was set for hearing twice before where this was never -- this was never the issue. And now here we are -- and I just hate to say it, we continue to have, as we get very close, a lot of things seem to come up to cause us to move the time further and further along. And there comes a time, and I think the time is now, to have the issues joined and let's have a decision.

THE COURT: Well, let me take it under advisement. I don't feel like deciding it tonight. Let me consider it some. All right, we will see you back 9:30 tomorrow, then.

Oh, I'm sorry, ex parte, that's right.

Rather than pack everything up, can y'all step out? I think this will be a short meeting, I hate to hold the personnel up.

(Ex parte hearing not included)

(Thereupon, the proceedings were recessed.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

EXAMINATION INDEX

JOHN BLUME, RESUMED
    CROSS (CONTINUED) BY MR. DALEY          2-2
    REDIRECT BY MR. ASHMORE                 2-51
    RECROSS BY MR. DALEY                     2-65
    REDIRECT BY MR. ASHMORE                 2-67

ANDREA LYON
      DIRECT BY MS. OAKLEY                    2-69
      CROSS BY MR. DALEY                      2-98
      REDIRECT BY MS. OAKLEY                  2-112
      BY THE COURT                           2-115

WILLIAM F. NETTLES, IV
      DIRECT BY MR. ASHMORE                   2-118
      CROSS BY MR. DALEY                      2-143
      REDIRECT BY MR. ASHMORE                 2-199

JAMES H. HILKEY
      DIRECT BY MR. DALKE                     2-205

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *


CERTIFICATE OF REPORTER


        I certify that the foregoing is a correct transcript

from my stenographic notes in the above-entitled matter.


s/ Gary N. Smith                      August 16, 2010
_____       _____
Gary N. Smith, CM
Official Court Reporter
United States District Court
District of South Carolina