IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,      )      Cr. No. 4:02-992
                               )
      Respondent,              )
                               )
VERSUS                         )      Columbia, SC
                               )      February 24, 2010
CHADRICK E. FULKS,             )
                               )
      Petitioner.              )
  ----------------------------)

TRANSCRIPT OF 2255 HEARING
(EXCLUDING EX PARTE HEARING)
VOLUME III
BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:      ROBERT F. DALEY, JR., ESQ.
                         JIMMIE EWING, ESQ.
                         ROBERT JENDRON, JR., ESQ.
                         Assistant U.S. Attorneys
                         1441 Main Street, Suite 500
                         Columbia, SC  29201

For the Petitioner:      BEATTIE B. ASHMORE, ESQ.
                         650 E. Washington Street
                         Greenville, SC  29601

                         KIRSTEN E. SMALL, ESQ.
                         P.O. Box 10648
                         Greenville, SC  29603


                         DAVID P. DALKE, ESQ.
                         KYMBERLEIGH DAMRON-HSIAO, ESQ.
                         STEPHANIE L. NOBLE, ESQ.
                         DANIELLE OAKLEY, ESQ.
                         610 Newport Center Dr., Suite 1700
                         Newport Beach, CA  92660

Court Reporter:        Gary N. Smith, CM
                       901 Richland Street
                       Columbia, SC  29201
                       (803) 256-7743

          Stenotype/Computer-aided Transcription

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

          THE COURT:  All right, ready to resume?

          MS. SMALL:  Yes, Your Honor.  May I take up a matter first, Your Honor?

          THE COURT:  Yes.

          MS. SMALL:  Good morning, Your Honor, Kirsten Small for Mr. Fulks.

          I have this morning handed up to the court and to counsel for the government a document.  As we discussed yesterday, we will have closing arguments on Friday of all the 33 claims that Mr. Fulks' attorneys have gone through, that list, and we would like to sort of separate those into three groups.

          The first list that you see on the page before you are the claims that we would like to present argument on.  I don't think those come as any surprise to the court, those are the ones we have focused on this week.

          THE COURT:  All right.

          Ms. SMALL:  Below that there is a shorter list of claims, claim 2, claim 4, claim 15, and claim 17.  As to those claims, we would request an opportunity to submit a

supplemental briefing based on the evidence and testimony presented at trial this week. This is not intended to be a reargument of those claims, they have been fully briefed, but there are items in the testimony like the --

THE COURT: I'm okay with that, but we need a kind of short turnaround time because I'm going to lose my law clerk at the end of March.

MS. SMALL: Yes, sir. I mean, this is brief enough we could probably get a fairly short turnaround.

THE COURT: All right.

MS. SMALL: Let me confer with counsel. My guess is 20 days. Is that sufficiently short for the court?

THE COURT: What is today, the 24th of February?

MS. SMALL: The 24th of February, Your Honor.

THE COURT: Let me think about it. All right, y'all consult --

MS. SMALL: And the final page is a list of claims that we are simply going to rest on the current record at the end of the hearing.

THE COURT: Very good.

MS. SMALL: The other matter, Your Honor --

THE COURT: It sounds good to me. Do you want to come back Friday? I know we talked one time about maybe taking a day off and coming back next week when we are fresh. Either way is fine with me, is that --

MS. SMALL:  I think the preference is to go ahead and get this done --

THE COURT:  All right, that's fine.

MS. SMALL:  -- and get it done on Friday.

THE COURT:  That will be fine.

MS. SMALL:  That way the lawyers from California don't have to travel all the way back.

THE COURT:  All right.

MS. SMALL:  The second housekeeping matter, Your Honor -- and I don't mean to steal Mr. Daley's thunder -- I understand the government is going to withdraw its objection to the declaration of Heather Roche.

THE COURT:  All right.

MS. SMALL:  And is that --

MR. DALEY:  That's correct, Your Honor.

THE COURT:  That's good, that eliminates that issue. All right.

MS. SMALL:  All right.

THE COURT:  So, all of the evidence is in without objection then?  All the exhibits?

MS. SMALL:  That's correct, Your Honor.

THE COURT:  All right.

MS. SMALL:  And as to that one affidavit, we would simply renew our motion to have her live testimony.  I know you have not seen the affidavit yet, so I'm happy to argue that now

or to let you look at the affidavit and come back to it at some future point, possibly on Friday. But we do believe her live testimony is relevant to the issue of the government's claim that Mr. Fulks is at fault in whole or in part --

THE COURT: Well, let me look at the affidavit over lunch and I can understand your argument better after I have read it.

MS. SMALL: Yes, sir.

THE COURT: I've honestly not read it yet.

MS. SMALL: All right, thank you.

THE COURT: All right. All right, anything else before we resume? All right, the witness could come back up to the stand.

Oh, I'm sorry, Mr. Daley, did you have something?

MR. DALEY: I just was going to say, Your Honor, I'm happy to brief any or all of the issues that they have noted. The only thing I would say of the four issues, at the bottom, to the extent you want briefing, maybe you would look at them and determine beforehand whether you really think there needs to be further briefing.

THE COURT: All right.

MR. DALEY: But we are happy to brief or argue, whatever you desire.

THE COURT: I will look at this. All right.

All right, Dr. Hilkey, you are still under oath in

these proceedings.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Mr. Fulks, can you still hear and see us adequately?

THE DEFENDANT:  Yes, sir, I can hear, but I just want it made clear that I'm unable to see any of the exhibits that is being placed on the screens in the court.  I'm not able to follow up with none of that.

THE COURT:  All right.  I'm not sure that is feasible with a satellite hookup.  All right, let's move forward. Please continue your direct examination.

MR. DALKE:  May it please the court, Your Honor.  And just for the record --

THE COURT:  Hold on one second.

MR. DALKE:  Yes, sir.

(Off record discussion)

MR. DALKE:  Thank you, Your Honor.

JAMES H. HILKEY, RESUMED

DIRECT EXAMINATION - CONTINUED

BY MR. DALKE:

Q.  Just to clarify the record or make sure there is no misunderstanding, in light of the fact that we had a break over the evening, nobody from petitioner's counsel had any contact or any conversation with Dr. Hilkey substantively about his testimony?

A.  That is correct.

Q.  Dr. Hilkey, yesterday when we broke, right before we broke, you were discussing the tests that you had administered to Mr. Fulks?

A.  That's correct.

Q.  And did you also -- among those tests, did you administer the wide range achievement test?

A.  Yes, sir, I did.

Q.  And what does this test measure?

A.  The intellectual testing is a test of ability.  The wide range test is a test of achievement, measuring how well a person actually does in academically related topics.  It's different than the abilities that are reflected on the Wechsler scales.

Q.  So, in other words, is it like an application of how -- how that IQ is manifest in real life situations?

A.  That is correct.  The test that I administered looked at three specific areas of academic functioning.  It went to Mr. Fulks' ability to read, his ability to spell, and his ability to do arithmetic calculations.

Q.  And what were the results of those tests?

A.  Mr. Fulks was able to read at the eighth grade level, which places him in the 14th percentile of his peers.  He was able to spell at the fifth grade level, at the fifth percentile, and to complete arithmetic problems at the sixth grade level, at the

sixth percentile.

Q.  How would you expect a person with this level of academic achievement to interact with the world around him?

A.  Well, there -- for his age, they are low.  They are consistent with his intellectual abilities, and also reflects his academic difficulties that he had in school.

Mr. Fulks struggled in school.  He repeated grades, he ended up dropping out I believe in the ninth grade.  And these scores are consistent with someone who is functioning at the lower levels of academic performance.

Q.  Did you also administer the Bender Gestalt visual motor test?

A.  I did.

Q.  And what does that test measure?

A.  This is a very crude measure.  It is a neuropsychological instrument that looks at gross impairments of cognitive functioning brain disorders.  It is a test that I no longer use, but there are more sophisticated neurological tests, but this is a screening test that does reflect in extreme cases neurological problems.

His reproduction of the designs were generally intact.  There was some slight tremor noted in his designs, but the integrity of the designs were essentially intact, and it didn't reflect, based on that particular test, any gross neurological impairments based on his ability to reproduce

designs.

Q.  Were the results -- were his results on that test clinically significant?

A.  Not to me they weren't.

Q.  But do results that are not clinically significant on that type of test rule out brain damage and any other --

A.  Not at all.  This test only tapped a very specific area of neurological functioning, there are much more sophisticated neuropsychological tests.

Just for the record, I am not a neuropsychologist, that is not my expertise.  Mr. Fulks was given extensive neuropsychological testings during later assessments that did reveal significant cognitive impairments.

Q.  Did you administer any personality tests?

A.  Yes, sir, I did.  I administered actually four personality tests to Mr. Fulks.

Q.  And why four?

A.  Well, I think it's important to look at personality functions across a number of different domains, different personality tests.  Some of them are instructive in different ways.  It assesses different approaches to look at personality functioning.

It is also helpful to have more than just one personality test, because it allows the clinician to compare and contrast similarities or differences that are reflected on

these particular tests.  I think it's -- it goes to being more

thorough and more detailed in terms of doing a personality

assessment.

Q.  Were one of those the Millon Clinical Multiaxial Inventory?

A.  Yes, the Millon.  We will call it the MCMI-III for short.

Q.  Thank you.  And when did you administer that test?

A.  If I could see, perhaps, an exhibit.

Q.  Maybe this will help.  I'm going to put up what has

previously been marked as Exhibit P 21.  Do you recognize this

document, Doctor?

A.  Yes, sir, I do.

Q.  And explain to the court what it is, please.

A.  This is a -- the profile sheet of Mr. Fulks' results from

my administration of this personality test of Mr. Fulks, which

was administered August 12th of 2003.

Q.  And can you explain what these results are showing?

A.  The Millon is a 175 item true/false test.  It was developed

by Theodore Millon.  And his intent in designing this test was

really to look at primarily Axis II diagnoses.  It focuses more

on personality disorders, but it also has clinical scales for

more severe psychopathology.

        This test is a relatively short -- again, 175 items.

The subject is asked to respond to these items in a true or

false manner.  Those results are then compared with a clinical

sample on which this test was normed.  The sample included

approximately 1,500 people from different demographic backgrounds who had no diagnoses.  And the subject's scores were then compared with people who -- on which this test was normed.

The results of this test have -- would you like me to go ahead and talk --

Q.  Yes, please, that was my next question.  I'm going to move this up and blow it up a little bit, maybe it will be easier to see.

A.  Thank you.

Q.  Is that better?

A.  That's fine.  And with all personality tests, the first thing that is important to look at is what is the response style?  Is this test actually a valid representation of the person?

We talked yesterday about the tendency to malinger or to overendorse test results, whether a person is presenting accurate information that reflects genuine diagnostic impressions.

The first three scores, the modifying and the indices, are considered the validity indexes for this particular test.  As you can see, Mr. Fulks has high scores on X and Z scores.  The X scale is disclosure, and this talks about how willing a person is to talk about their psychological disorders.

The Z score, the debasement is an indication of how the person is seeing himself.  People who score high tend to diminish their self worth, they tend to see themselves in a negative light.

The low score that you see in the middle, the Y score, is the desirability score, the social desirability scale.  People who score low tend to minimize and not see themselves as particularly desirable.  This profile suggests that Mr. Fulks is endorsing a number of psychological problems, seeing himself with very little self worth.

If we had -- if the scales were reversed, if we had a Y scale, high desirability, and low X and Z scores, we would think that the person is trying to present a very positive picture of himself and minimizing any psychological problems.

So, before we interpret the clinical result of this particular inventory, we know that Mr. Fulks is endorsing a number of psychological problems.

In fact, he may be endorsing to a level where he tends to magnify or maybe even overendorse some of the psychological problems that he has.  The question then arises, is this a valid profile or just a malingered profile?

The answer to that question is, it is magnified, but it is not malingered, it is not -- it's not an invalid profile.  And there are statistical adjustments that are made in interpreting the scores to account for the fact that he has

endorsed a number of symptoms.  And he --

Q.  I'm sorry.  Those statistical modifications or analyses that you do, that's common for everybody, or just in this particular case?

A.  Well, it's people who have a certain profile type here. There is mechanisms within the scoring of the scales that account for certain excessive endorsement to account for that, essentially a correction factor that brings those scores more in line.

Q.  Thank you.

A.  People who score like this oftentimes are people who may be maximizing it or overendorsing for secondary gain.  But it's also very consistent with people who are in turmoil or who are feeling psychologically vulnerable, or who are in a turmoil at the time of taking the test.

Based on those scores, it allows for the clinical interpretations.  And it might be helpful just to look at some of the elevations on the clinical scales for this particular scale.

What you see on this -- in this scale is that you have high scales on depression, dependency, schizotypal borderline personality, anxiety, dysthymia, which is a chronic depressive condition, post traumatic stress, and major depression.

It's also helpful to look at what scores on this

particular test are low.  There is not high scores on histrionic or narcissim, anti-socialism in moderate range, sadistic and compulsive are relatively low.

So, looking both at the high scores and the low scores allows for a clinician to make some assessments about personality functioning of the particular individual that is being tested.

Q.  You mentioned a few terms there that I would like to get a little clarification on.

A.  Certainly.

Q.  What is a dependent personality?

A.  A dependent personality is a person who is excessively in need of looking to others for guidance.  They tend to see themselves as lacking in terms of social and interpersonal confidence.

They are oftentimes childlike in their presentations, have an excessive need to be taken care of.  Will oftentimes seek out others to validate their perceptions.  People with this profile are oftentimes easily led, easily manipulated, easily influenced.

Theoretically, people who develop this type of personality oftentimes are people who had major interruptions in early childhood, who have not learned to develop the internal self-confidence that is important in the development of a human being.

And so people who have this type of personality have either suffered from disruptions in early bonding, in early attachment, and continue to seek out those kinds of relationships that were never met at an earlier stage of their life.

Q.  And can you also explain what the schizoid scale refers to?

A.  The -- which scale, the schizotypal?

Q.  Yes.

A.  The schizotypal is actually a personality disorder.  It is a term that has been -- it's a relatively recent term in the history of psychological diagnoses.  It used to be called a borderline schizophrenia, but it is a continuum of people who fit in that schizophrenic spectrum disorder.

It is not schizophrenia, but it has some of the same positive and negative features that a schizophrenic disorder has, such as estrangement from others, difficulties with close personal relationships, oftentimes feeling socially alienated.

People with this may have odd or strange presentations, thinking may be disorganized or tangential.  I mean, they have circumstantial thinking.  A lot of the things that you see with people who are schizophrenic may include magical thinking or attributing sort of childlike logic to explain events that are going on around them.

Q.  Back here in the clinical personality pattern section, can you explain the level of antisocial scale?

A.  Well, in comparison to the other scales, Mr. Fulks' antisocial scale is relatively low.  Which means to me that certainly he has -- he's endorsing features of antisocial behaviors on this test.  He's answering questions that relate to antisocial behaviors, hence the elevation.

But this is not the only explanation, there are certainly other very significant clinical elevations on this personality test which suggest a more malignant personality functioning style, in addition to an antisocial personality disorder.

Q.  Could you also explain what the level of analysis is in association with the narcicisstic scale?

A.  Well, people who are narcicisstic tend to be grandiose, they tend to be overly impressed with their own abilities, they tend to present as having a bravado.  Probably most of us, if we took the scale, we would be high on that, on that scale, because we feel pretty good about ourselves, or we have had some confidences in areas.

The idea behind a narcicisstic personality really is an overcompensation.  It tends to be a defensive mechanism for feelings of low self esteem.  But the way the person protects that is by being grandiose, overstating their worth, being full of themselves, I guess.

And again, what this tells us about Mr. Fulks is that's certainly not the description that he's endorsing on

this personality profile.

Q.  And how about sadistic, can you explain what the score is on that scale?

A.  People who are sadistic tend to get pleasure out of inflicting harm and pain on other people.  They tend to have an orientation of wanting to derive some kind of morbid pleasure out of inflicting pain and harm and -- people who are sadistic tend to have a complete lack of empathy, no regard for human conditions.

Q.  And Mr. Fulks is low on that scale?

A.  He did score quite low on that scale, yes, sir.

Q.  If we can move down to the next section here that reads, "Severe personality pathology"?

A.  Yes.

Q.  Would you explain that, please?

A.  These are scales that suggest -- and again, as I said earlier, the design of the Millon scales is really to look more at the axis to a personality scale, but it also does provide information about more severe Axis I diagnoses.

        Major depression is scored high and that correlates very highly with the scale of dysthymia.  Major depression and dysthymia are alike in many ways.  They have some of the same features of depression.  Dysthymic disorders tend to be long term, long standing chronic depressive situations that are pervasive for a significant period of times, usually in excess

of two years.

Q.  And down in the clinical syndrome, that section?

A.  Yes.

Q.  Could you explain what those show?

A.  Again, these are things that manifest in terms of behavior with Mr. Fulks.  Dysthymia, certainly scores very high.  On alcohol and drug dependance, we certainly know he was honest in terms of endorsing those items which reflect his actual history, as I understand it, of an extensive period of substance abuse, dating back to age 10 and continuing to the date of the offense.

So, he's endorsing -- he's admitting to those items which are consistent with what we know about his history.  He's saying, "Yes, that is a problem."

He also has symptoms of post traumatic stress disorder.  I didn't diagnose that, but he endorsed items that are consistent with people who tend to have troubling thoughts about past traumatic events, and he did endorse items which are consistent with people who also endorse post traumatic stress disorder symptoms.

Q.  And then the last row there, the severe clinical syndrome, could you explain that?

A.  Yes.  Again, the highest elevation is a major depression. He is not endorsing items on this test that are consistent with a formal thought disorder, by that I mean a psychotic disorder,

such as schizophrenia, or a bipolar illness.

Q.  I believe you testified that Mr. Fulks, based on this one test, you testified that he would perhaps have an inability to effectively manage his feelings, thinking, and behavior; is that accurate?

A.  That is the general description of how a personality disorder can affect a person, and based on -- if I looked at just this test blindly, I would suggest this person has major problems with -- in the affective realm in terms of managing his feelings, impulse controls are very much a problem for him, levels of interpersonal relationships are a major problem certainly.

You can opine that because with the elevations of the depression and the anxiety scales that people who have elevations of depression and anxiety oftentimes engage in substance abuse as a way of self-medicating or dealing with those issues in an analytic substance abuse pattern.

Those profiles oftentimes go hand in hand; high levels of depression, high levels of anxiety, and substance abuse has a way of self-medicating.  That would be based on -- with this test I would suggest that is operative in Mr. Fulks.

Q.  How would you expect somebody who displayed this type of profile to interact with the world around them?

A.  He is coming into the world with very severe doubts about his worth.  He has -- again, because of his low feelings of

self-esteem he is going to look to others for guidance.  He is troubled by anxious feelings, depressed moods.

He tends to deal with a lot of those things by engaging in substance abuse behavior as a way of quieting the anxiety, dealing with the depression, and blocking out painful memories or painful experiences.

Again, this profile is suggestive of people who had a moderate to severe psychopathology.  These people don't have internal regulations in which to manage their impulses.  They tend to be impulsive, not think through things.  May feel depressed or anxious after the fact, but those -- the feelings, these don't seem to affect change in behaviors.

Oftentimes if you feel anxious about something, you use that anxiety to modify behaviors later on.  That is not the case with Mr. Fulks.  He doesn't have the ability to put all of this together in a meaningful way.

Q.  Did you also administer a test called the personality assessment inventory?

A.  Yes, I did.

Q.  I will show you what has been marked as Petitioner's 22, do you recognize this document?

A.  Yes, sir, I do.  This is also a self-report, or some people would refer to it as an objective personality test.  It is constructed in a similar way as the other self-report, or objective personality test, in that a person is presented in

this case with 344 items.

Rather than marking simply true, false on this particular test, Mr. Fulks has an option of giving four responses.  He could endorse the item as false, slightly true, mainly true, or very true.  So there is a scale or continuum which respond to this test, which again contains 344 items.  Again, there is a lot of similar patterns in all three of the personality tests that I administered.

Again, looking at the first area, look at validity.  Validity scales on this particular test are again valid.  He is -- there is a slight endorsement.  He tends to see himself in a negative light.  His low score, positive impression management, is quite low, so he is not presenting himself in any kind of positive way.  This is consistent with low self-esteem.  He is endorsing a number of pathological items.

You look at these scores, which are the validity scales, compared to the scales here, which are the clinical scales, and you see that the elevations significantly are higher than the validity scores.  When you see profiles like this, it suggests Mr. Fulks is presenting with a variety of clinical symptoms which have diagnostic relevance for the clinician.

Q.  I just want to clarify something, I want to make sure it is clear for the record.  I believe you testified that when you were talking about the validity scale you used the words, "on

this test it is again valid" -- as opposed to invalid?

A.  It is valid, yes.  It is valid.  It provides valid interpretive results.

Q.  So there is a malingering component to this test; is that correct?

A.  Each of the three objective or self-report have built in validity scales.  Why that is important is in addition to the malingering assessment that we talked about yesterday, each of the scales has built in validity components to help the clinician interpret the response file.  Is the person over-endorsing, under-endorsing?  So, those factor into the clinician's interpretation of these clinical scales.

Q.  Could you explain what these clinical scales are showing?

A.  Well, the first thing I looked at is the level.  Again, they are very, very high elevations on the -- on these scales.  The highest scale is on substance abuse.  Did I just mess up something?

          MR. DALKE:  Mary, help?

          THE WITNESS:  I'm technologically challenged.

          THE CLERK:  See where it says "exit?"

BY MR. DALKE:

Q.  Let me clear this.

A.  Thank you.  I never used this.  The highest scale -- the highest scale is on drug abuse, and again consistent with the MCMI-III.  Mr. Fulks is endorsing that he has abused a number

of substances, and he is telling us on his responses to this that his abuse and dependence on these drugs have affected his life in some major ways.

Oftentimes people who have substance abuse problems may want to minimize that.  They may tend to not endorse that. What we know is that what he is telling us on this particular personality test is consistent with the history that we obtained from Mr. Fulks.  Likewise, he is endorsing high use of alcohol.

The second highest score is -- are on the areas of somatization and anxiety.  Consistent with both the -- the PAI and also later on in the MMPI, we will see that Mr. Fulks has a lot of somatization.  What this means is he is endorsing a lot of physical symptoms.

He is also endorsing elements of clinical anxiety, and the profile constellation that Mr. Fulks produces is a person who may not have the ability to express his feelings, especially when it comes to anxious or depressed feelings, in a way that may be typical of persons that has better communication skills.

So what he does is a lot of these physical -- the anxiety symptoms get converted into physical symptoms.  He is telling us that he has a lot of physical pain.

Now, there are some things to think about when -- with the elevation of the score.  At the time that he was

tested, he also was having genuine physical symptoms that were the results of an injury that he sustained while incarcerated. So, the elevation there is in part attributed to the fact he was having physical pain.

However, if you look at the history and you look at the elements, there has always been a tendency for Mr. Fulks to somatize, to report distress in physical symptoms.  This is typically what happens with people who are less psychologically sophisticated, and so hence the elevations on both the somatization and anxiety scales.

High elevations on depression, paranoia.  Borderline features are low, schizo features are -- excuse me, borderline features are high -- I just covered up my mark.

Q.  Here.

A.  Okay.  This is a scale that looks at schizophrenic symptoms, both positive and negative symptoms of schizophrenia.  Those are moderately elevated.

Again, looking at the low scores mania, he is not endorsing signs consistent with people who are manic, that the sign -- high energized responses.  His scores comparatively on the scale for antisocial personality disorder are -- tend to be, in comparison to the other scales, relatively low.

Q.  Were you able to interpret this data to generate a diagnostic hypothesis?

A.  Well, there are several diagnostic hypothesis that are

generated from this -- from the -- just looking at the data without considering anything else.  A somatoform disorder, ruling out possible schizophrenic disorder, is indicated by this profile; borderline personality is indicated; I believe are some of the diagnostic criteria that is generated from the interpretation of the clinical scales for Mr. Fulks.

Q.  Could you explain what somatoform would be?

A.  Somatoform disorder is a person who has physical symptoms that may not have a basis in organic tests.  Again, people who are highly anxious, who tend to convert anxiety into physical symptoms, would be a person who -- some people talk about going to the doctor and having an organ recital, repeating a number of physical symptoms.

There may be some secondary gain in terms of attempting to elicit the support of the caregiver to help them feel sorry for them.  It's not inconsistent with people who also have features of dependent personalities, who may present with physical symptoms as an attempt to elicit the care and support that they are seeking.

Q.  Can you also explain what you mean by borderline personality?

A.  Borderline personality is a very malignant personality disorder that stems from very poor attachments in early childhood.  These people tend to make an initially good impression, but they have remarkable inability to sustain

meaningful relationships over time.

They tend to initially, when they meet people, to idealize them, people put them on a pedestal.  In a short period of time they may diminish them, the sort of Madonna/Whore Complex, of putting a person on a very high pedestal and demeaning them.

Their interpersonal relationships tend to be very chaotic.  These people are very impulsive, they tend to be self-destructive in their behavior.  Oftentimes they will lacerate themselves, cut themselves to attempt to elicit pain.

People who have this disorder report feelings of emptiness, hollowness inside.  They are not able to sustain meaningful relationships.  It's a fairly malignant disorder fraught with very destructive interpersonal relationships and impulsive and excessively angry outbursts, a number of them. They are not pleasant people to be around.

Q.  Does this test speak to cognitive disorders at all?

A.  No, it doesn't.  It's not -- this is looking more at personality functions.  Certainly with people who have cognitive disorders may report elevations on some of the scales that are sensitive to physiological symptoms, such as maybe tingling or numbness in bodies, but this test is not particularly designed to look at cognitive disorders.

Q.  Based on this profile, how would you expect someone with these symptoms, I guess for lack of a better word, to interact

with the world around them?

A.  Well, again, these people present -- if you saw a person like this in a clinical setting, you would see a number of clinical syndromes.  You would see -- it would be -- a treating psychiatrist or psychologist would have marked problems finding out which problem needed to be addressed first, because they present with depression, anxiety, some disturbance in thought. They present with a dual diagnosis of significant polysubstance abuse, alcohol, and drugs.  They will also tend to be hard people to establish meaningful relationships, because they tend to see the world as a hostile place, they tend to be suspicious of motivations of others.

Again, diagnostically there is a number of diagnostic features that would fit this clinical profile that are beyond the scope of simply someone with a cognitive disorder.

Q.  Did you also administer the Minnesota Multiphasic Personality Inventory?

A.  Yes, sir, I did.

Q.  Does that have an acronym?

A.  The MMPI-II.  This is actually the second -- it is the revision.  There is actually a third revision, which I personally do not use.  There is a third revision of the -- it's essentially a shorter form of this test.

This test was originally published by the University of Minnesota in 1942.  It's a very -- it's probably the most

frequently used personality test and probably the best

researched personality test available to a psychologist.

Q.  Let me just introduce it for the record.  This is Exhibit P 20?

A.  That's correct.

Q.  And you recognize this?

A.  Yes, I do.

Q.  When did you administer this test?

A.  This test was administered January the 5th, 2004.

Q.  And could you explain what these tables show?  Let me know if you want me to make this --

A.  No, I think I can see this.  Thank you.

Again, like the other tests we talked about so far, the first section here addresses the validity of the respondent.

The traditional validity scales of L, F, and K are the primary validity scales.  These have been part of the MMPI from its inception, and they look at how the person responds.

The L scale is -- used to be -- let me back up just a little bit.  The originators of the MMPI thought that they could simply interview a number of patients who had known diagnoses, then develop items that capped those items, and simply make a diagnosis based on the similarity of a person's response to these items.

The original scales talk about depression, paranoia,

schizophrenia, thinking that simply a high scale on a particular -- a high score on a particular scale would merit the diagnosis of that particular disorder.

As the research developed and the test authors looked at this, they found that methodology didn't really fully explain the diagnostic classifications of people.

What is known today is that people who have particular diagnoses usually have combinations of different scales. Simply looking at scale 2, depression, an elevation -- if that person has an elevation on scale 2 depression doesn't necessarily mean that they are depressed. It requires a bit more sophisticated interpretation, rather than the original design of the test.

The L scale looks at whether the person -- it's not really lined, but people who respond to the L items are things like "I read the newspaper editorial every day. I sometimes feel like swearing," things that most any of us would acknowledge.

But people who tend to be less sophisticated or who are trying to make a positive impression will have very high scales. People from lower socio-economic class reporting to a hospital for treatment, thinking that a doctor would read the newspaper editorial every day, will try to respond in like manner.

The L scale is really a social desirability scale.

So unsophisticated people often have a higher score on L,

lower -- less sophisticated people may have -- I mean, more

sophisticated people are probably more honest in saying,

"Sometimes I do feel like swearing," that most any of us would

admit to.

The F scale is referred to as kind of a pathological

barometer.  The higher the F self esteem, to a certain point,

indicates more severe psychopathology.  If the scale gets

exceedingly high, the interpretation would be that the profile

is not valid, the person is over-endorsing pathological items

and so clinical interpretation has little or no meaning.

But in Mr. Fulks, again, the validity profile was

produced on the F, the K, which is a correction factor really

just to -- how many items he is endorsing in a certain way,

oftentimes associated with self esteem.  The combination of

those scores suggest this is a valid and interpretive response

to this test.

You see a very high elevation on the F -- the FV back

scale.  This, the MMPI, has what is referred to as a front and

back.  This is very long.  It's 565 items of true/false

questions.  It's a tedious test.  The score -- the responses

from the back of the last half of the test refer to

supplemental, or used to be called experimental scales.

What happens, his elevation, Mr. Fulks' elevation on

this scale suggests that as he got to the second half of the

test he was inattentive, he started answering questions inconsistently.  The supplemental or the research scales really should not be interpreted because of the elevation.

However, the clinical scales in this area are consisting of the items from the front half, and the scores on the L, F, and K indicate that this was a valid response to the first half on which these scales here are based.

So long answer, this is a valid interpretation.  The experimental or supplemental scales should not be interpreted because there was an inconsistent or invalid response to those.

But the scales I'm primarily interested in terms of looking at personality functions are valid based on the profiles, and we can talk about the clinical scales.

Can I get rid of the blue lines?

Q.  Yeah.  Move on then to the personality scales which you did interpret.

A.  Yes.  Again, the profile that is produced by Mr. Fulks on the MMPI-II is highly consistent with the results that we see on the PAI and also on the Millon.

Again, some people refer to this as a floating profile, and by floating that means that the clinical scales are all above, or essentially all above, a T score of around 75, with a valid validity scales.

People who have this type of floating profile, consistent with the PAI, are people who endorse a number of

psychiatric problems.  Again, it's not just one diagnosis.

Mr. Fulks is endorsing a number of symptoms, which are

consistent with many different diagnoses.

Again, the first -- the way the MMPI is interpreted

is to look at what are the two highest scales.  What we see

with Mr. Fulks is the two highest scales are on scale 3, which

is the hysteria scales, which is to tend to be overly dramatic,

impulsive, rather naive presentation and schizophrenic.

Again, because he has the high scale on scale 8,

which is the schizophrenia scale, does not mean that he carries

a diagnosis of schizophrenia.  That would be an incorrect

interpretation.  So, I want to be very clear that I'm not

saying that Mr. Fulks has a schizophrenic disorder.

What I am saying is, based on his profile, he is a

person who tends to, again, have a tremendous amount of

problems personally.  He tends to be socially estranged from

people, he does not have the ability to relate in very

meaningful ways, he tends to be impulsive and rather naive, and

becomes rather dramatic and hysterical in his relationships

with other people.  He tends to be over-reactive, reactive,

impulsive, childlike, and independent in his presentation,

based on these scores.

So, the first thing we look at is, what are the two

highest scores?  Again, if I were looking at this blindly

without knowing anything about Mr. Fulks, I would wonder

whether or not he may have features of a hysterical psychoses. That means temporarily under acute stress he becomes psychotic, or his thinking would become disordered and his perceptions of reality would break down.

Again, if I could maybe erase those two blue circles.

Looking at other scales he also has the -- what is called the conversion V. People who have scores on 1 and 3 with a comparatively low score on depression is referred to as conversion V. This is, again, consistent with a PAI conversion disorder where people tend to convert anxiety into physical symptoms, and that's what these scales said.

It's important to look -- and, again, if I could erase the blue.

He also has -- it's important in looking at -- he also has a high elevation on scale 4, which is psychopathic deviant. These are scales -- people who have antisocial personality disorders, oftentimes this would be a scale that you would see as a spiked scale singularly elevated, along with scale 9.

If you look at the combinations of what goes into scale 4, psychopathic deviant, and scale 9, mania, you have a person who is rebellious, has disrespect for authority, family discord, problems adjusting to the rules and regulations of society, with a person who is highly charged and has a lot of

energy.

If you follow that 4-9 profile, that is a prototype of what you would see with a person who fits the antisocial personality disorder. Spending 25 or 30 years in prison, I certainly saw a lot of people who we would refer to as 4-9 types. When a psychologist hears 4-9, they know exactly what to look for in terms of personality characteristics. It's a very recognizable and easily identified personality profile.

Q. Just to clarify, where does Mr. Fulks fall in that 4-9?

A. He does not fit the classic profile for an antisocial personality disorder. He certainly has a lot of features. He is endorsing a lot of things that elevate scale 4, the psychopathic deviant scale.

But these scales are also high in combination with other clinical scales, which is not prototypic for a person who is diagnosed with antisocial personality disorder. It may be part of the diagnosis, but it is not the whole picture.

The last thing I want to say about the MMPI-II is it is also important to look at the combination of scale 3, hysteria, and scale 4.

When you see a scale 3 that is elevated over a scale 4, the way that the antisocial personality behaviors are discharged are typically different. People who have a little higher elevation on scale 3 tend to discharge their energy or their emotions or behavior in a more passive aggressive way,

oftentimes not direct.

People who have an elevation of 4 over 3 tend to be much more impulsive, vicious in their attacks.  So, there is a modifying element in Mr. Chad's -- Mr. Fulks' configuration of scales 3 and 4 on this instrument.

But, again, generally speaking, if I looked at this blindly it suggests that there is a very significant personality disorder, psychopathology, based on this profile. It is a malignant personality profile.

Q.  Anything more that you need to address on this?

A.  Probably more than Your Honor wants to hear.

Q.  Did you administer any other personality tests?

A.  Yes, sir, I did.  The last test that I gave was the Rorschach, and I don't have an exhibit to talk about the Rorschach, but just maybe talk about it very generally.

The reason I use the Rorschach is that it is constructed in a significantly different way than self-report measures.  Self-report personality indices are asking a person to identify responses to verbal items, questions.  So there is a tendency to be able to respond based on the way that the question is phrased, which provides the examinee with perhaps guidance, or some handrails on which to shape their responses, if they choose to.

The Rorschach, on the other hand, is constructed in a radically different manner.  The Rorschach is what people

oftentimes think of as the ink blot test, and it consists of 10 ambiguous reproductions of designs.  Some of them are chromatic, some of them have color, and the task is to present each of the cards to the individual and then ask the subject to respond to what they see.

The theory behind this test is the perceptions that are generated from this test are then statistically compared with other individuals who have known diagnoses.  Similar with the other personality tests, there is a large pool of individuals who share personality features on which the individuals' responses are compared.  From those responses they are scored and personality interpretations are generated.

So, the value of the Rorschach is that it is a projective technique which really doesn't have any guidance. The person is simply having to look at these and generate responses.  How they generate the responses is a reflection of their cognitive processes, how they deal with affect, how they perceive reality, and from that personality indices are drawn.

Q.  What were the results of the tests?

A.  Again, Mr. Fulks' responses were -- he did not generate a large number of responses.  This is not atypical for people who are functioning at the cognitive level that Mr. Fulks is doing. People at the lower IQ range tend to have fewer responses. They tend to see things in a simplistic manner.

The scoring of Mr. Fulks' Rorschach suggest

elevations on two particular clinical constellations.  He had a significant elevation on depression, and he also had a significant clinical relevant constellation on the coping deficit index.

This is an index that looks at a number of different variables that are contained in the scoring of the Rorschach. It reflects the ineffectiveness of a person to deal cognitively interpersonally and effectively with the world.

People who have cognitive deficit index at the level of Mr. Fulks have a hard time dealing with the world in accurate or real ways.  They have interpersonal difficulties, problems following conventions of society.

The depression is a scale that reflects, in Mr. Fulks' case, I believe, a chronic longstanding tendency to see the world in very gloomy ways, see himself in relationships to the world in very depressed -- he is not -- he is not a happy person, as reflected based on his Rorschach responses. Again, the results from this projective test again confirm the results that we see from other objective personality tests also.

Q.  We have been through a battery of psychological tests that you administered to Mr. Fulks?

A.  Yes.

Q.  Are there scientifically recognized factors that you use then to reach diagnoses?

A.  Well, the Rorschach and the MMPI-II are the most frequently used indices in forensic evaluations.  All of the tests that I have used are well normed, they are well researched, and they are among the more reliable personality tests available for personality assessments.  So, they are well recognized, they are well constructed.

Again, I guess the reason I use a number of tests is not to rely or not to base findings simply on one instrument, but to look at multiple instruments and look for similarities or differences among those.

Q.  You used a couple of terms that I think would be useful to clarify.  You, in the course of your testimony, have referred to the DSM.  Could you explain what that is, please?

A.  Yes.  This battered book is -- it is a compendium of mental disorders that have been compiled by researchers of -- clinicians, psychologists, psychiatrists, mental health experts in the respective fields.

It is a diagnostic manual that is used to help clinicians make diagnostic impressions of people.  You may not believe this but mental health is not an exact science, and this is an attempt to bring some consistency to making diagnostic impressions and giving clinicians guidance as to what constitutes particular disorders.

Q.  And you discuss various diagnoses or test results in terms of various axes.  Can you explain what those axes mean?

A.  Yes, sir.  There are five components that go into a psychological assessment of the person.  The structure of the diagnostic statistical manual looks at five particular areas.

Axis I is referred to as clinical syndromes.  These are severe, significant mental illnesses that are oftentimes responsive to treatment.  They would be the acute presenting problems that a treating professional would look at; things like schizophrenic disorders, depression, anxiety disorders would be included on these scales.

This is a thing when a person walks into the clinician's office or assessment center they would be labeled as things present with clinical relevance that would require direct and immediate attention.

Q.  Axis II?

A.  Axis II, there are two issues contained in Axis II.  The first I will refer to are personality disorders.  A personality disorder is a longstanding enduring personality trait that a person has developed over time that affects the person's ability to deal effectively with their feelings, their thinking, and their interpersonal relationships.

Axis II personality disorders are viewed by many as an adaptive, a learned maladaptive way of coping with their environment.  When the method of adapting becomes out of the norm, they are considered disordered.  They become pathological because they interfere with a person's ability to relate, but

these are longstanding.  They are typically quite resistant to change.  And they talk -- more personality traits, used to be called character disorders or disorder of the character.  The term that is in vogue now is more of a personality disorder -- but a set of behaviors that affect a person's ability to work effectively with the world.

Mental retardation is also included.  If a person is mentally retarded, he would be included on Axis II impression.

Q.  Axis III?

A.  Axis III would be where an assessment individual would put medical conditions, medical conditions that may in fact impact psychiatric, psychological diagnosis.

For instance, if a person has a serious cancer, that would be important to consider because it may affect an Axis I diagnosis, perhaps depression.  Looking at what medical conditions may impact on Axis I or Axis II diagnosis are listed there, because they factor into a global assessment of how a person is functioning.

Q.  And Axis IV?

A.  Axis IV looks at what are the social or environmental factors that may be affecting a person's condition.  Things like if a person is in combat, that would be a stressor that would be listed under an Axis IV diagnosis.

If a person is facing serious criminal charges, that would certainly be listed because a person may -- the

conditions of the defendant facing serious criminal charges certainly could affect diagnostic impressions.  So, it would be important to list what are the factors that are environmental or social that are impacting that person's behavior at the time, and may provide some explanation for the issues listed on Axis I and II.

Q.  Axis V is the last.

A.  Axis V is referred to as the global assessment of functioning.  This is a scale that ranges from zero to 100.  A person at zero is probably clinically dead.  A person at 100 is -- I'm sorry, I have not met those people, but would be fully functioning at a very high level.

Most of us fall somewhere on the continuum between zero to 100, but there are certainly behavioral components and conditions that are attributed to each of those different numbers on a scale that are published in this manual.  So, that's an overview of what the multiaxial nomenclature.

Q.  Based on that framework and against that backdrop, were you able to make any diagnoses of Mr. Fulks based on the tests that you had given him?

A.  Yes, I did.

Q.  What were those results?

A.  On Axis I it was very clear.  I did not list the variety of different chemicals that Mr. Fulks had either abused or had been dependent upon.  I included under the more general

category of polysubstance dependence.

Certainly he began drinking moonshine at the age of 10. He was exposed from that point on to petrochemicals at an early age, when he was inhaling those, up to most recently methamphetamines. So, he has had a variety of very serious substance abuse throughout his formative and later years.

I did diagnose him with dysthymic disorder. Dysthymic disorder, as I testified earlier, is depression over a long period of time. I saw evidence both on the psychological testing -- each of the psychological tests that I gave had clear indications of depression.

I did not give him a diagnosis of major depressive disorder. Major depressive disorder and dysthymic are very similar. The dysthymic has many of the features of major depression but I did not believe that the level of depression was at the level of severity that would merit a diagnosis in a major depression.

I gave him a diagnosis of cognitive disorder not otherwise specified. There were a number of evidence, based on his history of head trauma, his cognitive functioning, based on the Wechsler Intelligence Scales that suggested that he had cognitive disorders.

I listed, although I don't have clear evidence, that he may have had attention deficit hyperactivity disorder. At an early age there were signs of his inability to perform in

school.  It's not uncommon for individuals with Mr. Fulks'

background to exhibit symptoms of hyperactivity attention

disorder.  I listed that.  I did not give that a formal

diagnosis.

Q.  Were you able to make any other diagnoses?

A.  On Axis II -- and, again, as I testified earlier, there are

a number of multiple diagnoses that fit, in my opinion, under

Axis II, impressions for Mr. Fulks.

In previous editions of the DSM-III we would call

personality disorder, not otherwise specified, a mixed

personality disorder, which I think is a more descriptive

term.  But when there are more than one prominent personality

disorder, the appropriate term would be personal disorder not

otherwise specified.

The diagnoses that I thought were most descriptive

for Mr. Fulks was dependent schizotypal and antisocial

personality disorder.  He has certainly strong features of each

one of those particular disorders.

Q.  So you met with Mr. Fulks over a span of 14 hours, based on

all your interview time together and in addition to the tests

that you administered, were you able to reach any conclusions

about his personality?

A.  Well, again, I think that Mr. Fulks is a very impaired

individual, based on a number of issues.  Certainly he has the

problems with his cognitive functioning.

I think there is strong evidence that he has been exposed to a number of very traumatic effects that would affect cognitive functioning. He has had head injuries. There is reports of possible alcohol, possible drug abuse, prior to his birth that would have affected cognitive abilities. Closed head injuries, he was subject to extensive physical violence in the home. These, in addition to a long history of very serious substance abuse, all of which would have affected his cognitive functioning.

There are also -- there's current bodies of literature that suggest in addition to the traumatic injuries that a person suffers, literature supports that children who are raised in types of environments that Mr. Fulks was raised also show neurological signs of disorder.

The term that is used in the literature is called complex post traumatic stress disorder. The term that will probably be seen in DSM V is called developmental traumatic disorder.

But these are a description of what types of problems -- with emotional neglect, physical abuse -- prolonged exposure to these types of experiences are shown to have profound effects on the development of the cognitive development of the brain.

The brain of a young child is very plastic. There are certain things that need to be in place. In addition to

good nutrition, healthy diet, environmentally supportive environment, the importance of good consistent attachment to caregivers.

Those not only are important in terms of development of a healthy personality but also in terms of developing a healthy brain.  People who have been exposed to the type of trauma that Mr. Fulks has been exposed to show problems in terms of development of frontal lobe functions which regulate judgment, decision-making.

So, not only do we have the psychological manifestations of chronic abuse and neglect, exposure to violence, but we also have the connection of brain development to these elements as well.

So, there are a number of explanations to why I believe that cognitive disorder is an accurate description of Mr. Fulks' functioning.

Q.  I would like to show you what has been marked as Exhibit P 65, do you recognize this document?

A.  Yes, sir, I do.

Q.  Would you explain what it is, please?

A.  This is a forensic evaluation that was completed at the mental health division of the medical center at Butner, North Carolina.

Q.  Did you consider this report in your -- I guess I should say, you have seen this report before?

A.  Yes, sir, I have.

Q.  And did you look at this report in reaching your own diagnoses that you just described?

A.  Yes, sir, I -- well, I'm not sure how to answer that question.  I'm not sure that I -- I'm not sure exactly when I saw this report.  I may have already authored my report before seeing this.  I certainly looked at it after submitting my report.

Q.  Do you have an opinion with respect to this report?

A.  I do.

Q.  And what is that opinion?

A.  Well, I think it's a very thorough report.  I think it's a very comprehensive report.  Knowing the clinicians who completed this and having worked at this facility, I'm very aware of the work and I think it's a well done document.  It's quite thorough and --

Q.  For the record, this is page 16 of that report.  Do you agree with the diagnoses in the Butner report?

A.  Many of them I do.  Certainly the Axis I diagnoses are accurate in my opinion.  They are consistent with what I would diagnose.  As I testified earlier, I used the nomenclature of polysubstance abuse rather than listing the particular substances that Mr. Fulks has used.

        I do think that there is evidence of other Axis I diagnoses that are not included in this report.  I do believe

that there is clear evidence of an affective component, either major depression or dysthymic. I also believe there is evidence of an anxiety disorder that can be added to this report.

Regarding Axis II, I certainly agree that Mr. Fulks meets the criteria for antisocial personality disorder. My opinion is that there are other elements that should have been added to this diagnosis in connection -- in addition with the antisocial personality. I don't deny that he meets criteria for that, I would certainly agree, and it's consistent with the diagnosis that I gave him, but I think there are other factors that I would probably have included.

Q. Okay. Among the questions I asked you today, I asked you one that was particularly inartful. I want go back and clarify. You reached your conclusions in your report independent of what is presented in the Butner report; is that correct?

A. That is -- yes, sir.

Q. So the Butner report uses a term, it's called the principal diagnosis, do you have an understanding of what that term means?

A. I understand what it means, yes, sir.

Q. And what is your understanding?

A. Well, it is a practice that some clinicians use that underscores the clinician's impression that is the most

descriptive term that applies to this person.  It is used for emphasis, usually.

It is not a -- in my report I do not identify, and a number of clinicians that I work with, do not use the term principal diagnosis.  It is a state of art.  I think there are certainly acceptable -- a number of clinicians will do it in different ways.  I personally do not identify things as primary.

The reason for that is because all of the factors that are listed under the diagnostic impression are descriptive and factor into an understanding of the individual.  To simply highlight one, I think, misses the larger picture.

Q.  Do you agree where the Butner reports document -- or where it says that the principal diagnosis is antisocial personality disorder?

A.  I do not agree with that, no, sir.

Q.  And why not?

A.  Because there are a number of other factors which have to be accounted for.  Again, Mr. Chad -- Mr. Fulks presents with a number of features throughout his life that support depressive disorder.  There is evidence of anxiety disorders, there is clear evidence of other personality disorders that go beyond the description of antisocial.

Mr. Fulks is -- does not fit, in my experience, with people who are antisocial.  There are additions that you see in

his presentation that are inconsistent with a sole antisocial personality disorder.

Q.   What are those?

A.   Well, the presence of chronic depression, the capacity -- there is some limited capacity for empathy, although Mr. Fulks' abilities are quite limited and consistent with someone who is developmentally very, very young.  The level of capacity for empathy is limited consistent with, in my opinion, his developmental age, which is probably adolescent, or in that range.  There is tremendous amounts of anxiety that is presented in his clinical features.

The other thing that I guess that troubles me a little bit is that the Butner report has used -- has gone into detail in describing features that are described in their administration of the personality assessment inventory.

Those are listed in the body of the report, however those are not accounted for in the diagnostic formulation.  I think it leaves part of Mr. Fulks out of the diagnostic picture, in my opinion.

Q.   I show you the first page of what has been previously marked as Government's Exhibit 10 --

A.   Yes, sir.

Q.   This is just the first page, just for the record, to show what we are talking about here.  More specifically I wanted to go into one of the appendices to this exhibit.

A.  Yes, sir.

Q.  In particular appendix E.  Do you recognize this document?

A.  Yes, sir, I do.

Q.  And what is it?

A.  This is a note that I had given, that I had sent to Messrs. Blume and Nettles dated January the 5th, and they were the -- some very preliminary work product that gave some very preliminary impressions of the MMPI and the SIRS, the structured interview of clinical symptoms test.

Q.  Was this your final report?

A.  Absolutely not.  I think I typed at the end of my heading "confidential and privileged work product," and that was communication to the defending attorneys.

Q.  Would you read the last two sentences here at the bottom of the first paragraph, please?

A.  Yes, I will.  "While Chad has significant elevation on scale IV, in parens, psychopathic deviant, antisocial personality disorder is his primary problem, although he has engaged in a number of antisocial behaviors.  In addition to Chad's cognitive deficits, he has a number of significant problems in the personality domain."

Q.  I also would like to show you what has previously been marked as exhibit P 85, do you recognize this document?

A.  Yes, sir, I do.

Q.  What is this document?

A.   I'm sorry?

Q.   What is it?

A.   This is my declaration that was given in response to this motion.

Q.   In particular, I would like to draw your attention to paragraph 17 of this declaration.  Do you see that?

A.   Yes.

Q.   So, my reading of paragraph 17 is, "Mr. Fulks did not present with indicators of antisocial personality disorder on objective personality testing."

A.   That is correct.

Q.   Now, this seems, based on my understanding, seems to contradict what you wrote in the report dated January 5th, 2004?

A.   It does to me, too.  As I look back over the original, the previous document, there is a typo in it.  It reads correctly if you insert the words "is not the primary diagnosis."  And I think that is my error in terms of communicating.

What I was attempting to communicate to Mr. Blume and to Mr. Nettles was that there was an elevation there, but that was the -- the antisocial personality was not the predominant, was not the only issue that Mr. Fulks was experiencing or troubled by.

THE CLERK:  What exhibit number was that?

MR. DALKE:  That was 85.

THE CLERK:  Government's 85?

MR. DALKE:  No, Petitioner's 85, I'm sorry.

BY MR. DALKE:

Q.  Is antisocial personality disorder the same as criminality, in your opinion?

A.  No.  There are many who carry the diagnosis or who would qualify for a diagnosis of antisocial personality who have never been in trouble with the law.  Many people -- retrospectively, many people, most -- many people who do end up in the criminal justice system are diagnosed with antisocial personality disorder, or have the traits.

Q.  Are there any underlying factors that go into a diagnosis of antisocial personality disorders?

A.  Well, the whole diagnosis of antisocial personality disorder is somewhat controversial.  Controversial because it is simply a description of behaviors without much emphasis in the diagnostic nomenclature as to the ideology of this particular disorder.

A person, for instance, who is a drug seeking substance abuser may commit criminal acts to sustain primarily their substance dependence of the -- the criminality is driven by the attempts to obtain drugs.

Oftentimes the diagnosis of antisocial personality is seen as a pejorative term, because people equate that as someone who is inherently evil.  The old idea of a psychopath,

of a person who has absolutely no conscience, who is dangerous and should be locked up forever, is the image that is conjured up.

So, there is some stigma to that diagnosis, and in my opinion there is a need to fully -- to more fully develop the ideology of particular behavior patterns that are seen in the dependence. So, there is some controversy, I guess, associated with this diagnosis.

Q. In your opinion, is Mr. Fulks a psychopath?

A. No.

Q. And why not?

A. First of all, it's not a term that is used, but -- a person who is truly psychopathic is a very rare entity in -- in this field. I certainly have seen people who I consider psychopathic and you don't forget those people. They elicit a visceral response. If they are big people, they tend to be very frightening in their presentation.

I remember during my work in the Federal Bureau of Prisons I saw two or three people which I thought were truly psychopathic and I will not forget my encounter. A very piercing gaze -- they are scary.

I was not frightened of Mr. Fulks. He, if anything, was clingy, dependent, inadequate person with very primitive coping skills. Psychopathic would not be a term I would apply to Mr. Fulks.

Q.  Switching gears a little bit, during, or at the -- at Mr. Fulks' sentencing hearing, were you prepared to testify?

A.  I was.

Q.  Did you testify?

A.  I did not.

Q.  Did you have an opportunity to review the Donna Ward testimony which was presented to the court?

A.  Yes, I have.

Q.  What is your understanding of that testimony?

A.  I'm not sure I understand.

Q.  I mean, do you recall what transpired in her testimony?

A.  I do.

Q.  And the substance of that is --

A.  Yes, sir.

Q.  What was the substance?

A.  The substance was that in the absence of Mr. Basham, Mr. Fulks had arranged a rendezvous with the intended victim to meet at a place at 10:30 in the evening for apparently a job interview as a guise to lure her into an illicit contact of some sort.

Q.  Do you have an understanding of how the prosecution portrayed those events?

A.  Well, I'm not sure exactly how it was, but the -- my understanding was that it was designed as a manipulative, a rather sophisticated attempt on his own to lure someone into

harm's way.

Q.  Would the Donna Ward testimony have altered the opinions that you were prepared to give?

A.  It would not.

Q.  And why not?

A.  First of all, it seems to be a very ill-conceived plan.  It is not a sophisticated plan.  The idea of telling someone that they are going to meet at 10:30 at night for a job interview seems to be exceedingly ill-conceived and not realistic or tangible or believable; be consistent with behaviors that I believe would be consistent with Mr. Fulks' cognitive style.

Q.  So, there are lots of people in the world who, unfortunately, have grown up in similar socio-economic backgrounds as Mr. Fulks and there are lots of people who have had similar personality profiles.  But most of those people, thankfully, don't rape and are not accused of car-jacking and murdering; so why is Mr. Fulks different?

A.  Well, in answer to the last part of your question, many of the people who do end up in the criminal justice system do have very similar experiences like Mr. Fulks.  The Department of Justice and delinquency prevention has done tremendous amounts of research in the area of predicting juvenile violence, and they have found oftentimes people who have similar patterns to Mr. Fulks are at a great -- a significantly more frequent likelihood of offending.

When you look at all the risk factors that are confronting Mr. Fulks, each risk factor adds a greater potential that he is going to end up in serious trouble.  Risk factors include a brain that is compromised by significant abuses of substances, some of them prenatal.  So, he is coming into the world with some cognitive limitations due to exposure to chemicals.

I talked in my testimony about effects of complex or sustained abuse and the effects on the brain, so that Mr. Fulks' brain, his ability to function cognizably like other people from the beginning is significantly compromised.

Other risk factors.  He came from a family with tremendously poor models.  He reports to me that his parents encouraged him to steal.  He lived in a neighborhood where violence and antisocial behaviors were rampant.

So, we look at the models, what kinds of teachers did Mr. Fulks have?  Again, as a person who is eager and wanting to please, but the way you please are designed to get you in trouble.  I mean, the behaviors that he was exposed to were certainly not things that we would want for our children.

The fact that he had significant problems in school, the fact that -- and, again, research generated from the office of juvenile delinquency prevention talk about the failure in school as being a significant risk factor.

Mr. Fulks had cognitive limitations.  He didn't do

well in school, he was held back, he had speech problems which resulted in peer rejection.  His peers didn't like him, made fun of him.  He was raised in abject poverty, which again isolated him.  So, he was estranged from a group of people that would be appropriately good models for him.

There was never a real attachment to school.  His attachment to his family was disruptive.  He was exposed to inappropriate and overwhelming sexual stimulation at a very young age.  Again, all these shaped Mr. Fulks into the person that we -- that I saw when I examined him.

He, in response to many of those traumas, has got very maladaptive behavior problems.  Some of those are personality traits, others are consistent with serious psychiatric disorders.  All of those in combination, each one of those risk factors, make him increasingly more vulnerable. So, when you put those risk factors on top of each other, you have a very compromised individual who is a product of his environment.

I think we all like to think that we are products of free will, but who we are today is not unencumbered by the experiences we had during our developmental years, and is certainly true for who I am today and certainly true for Mr. Fulks.  I would wager that my upbringing was significantly different than Mr. Fulks.

MR. DALKE:  Beg the court's indulgence.

Please answer any questions that the government may have.

THE COURT: Let's take our morning recess now. Let's take a 15-minute recess.

(Short recess)

THE COURT: All right. Cross-examination, Mr. Jendron.

MR. JENDRON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. JENDRON:

Q. Dr. Hilkey --

A. Yes, sir.

Q. -- my name is Bob Jendron, I'm an Assistant U. S. Attorney here in Columbia. I'm going to ask you a few questions.

Is it my understanding that when you look at the BOP exam from 2004, the Axis II diagnosis that was made of antisocial personality disorder, that you agreed with that?

A. Yes, I do.

Q. Okay. So, there is no question in your mind that he has antisocial personality disorder?

A. There is no doubt in my mind --

Q. No doubt --

A. -- that he has that --

THE COURT: Hold on one second.

(Off record discussion)

THE COURT: Please proceed. I'm sorry.

BY MR. JENDRON:

Q. Dr. Hilkey --

MR. DALKE: Your Honor, before the interruption, it sounded like Dr. Hilkey was cut off in the middle of his answer, I just want to make sure he has given a complete answer to that last question.

THE COURT: All right. Do you remember the question, Doctor?

THE WITNESS: Yes, sir, I do.

THE COURT: All right. Go ahead and finish your answer.

A. I believe the question, as I understood it was, do I agree with the diagnosis of antisocial personality disorder, and my answer to that question was yes. What I was -- it is my opinion that there are other diagnoses that are applicable, as well as that.

Q. Right. I think my question was, there is no doubt in your mind that he has antisocial personality disorder?

A. And my answer to that is yes.

Q. Correct. Now, I looked at your various diagnoses and I think you had --

(Off record discussion)

THE COURT: I'm sorry, Mr. Jendron.

BY MR. JENDRON:

Q. Do you see this summary that I have put up on the screen? This is a summary of your diagnoses on the occasions that you met with Mr. Fulks: August 14th, January 5th, May 7th?

A. Yes. Let -- let me -- to answer that question will take some explanation. Yes, those are diagnoses, these are diagnoses that are generated from the psychological tests that I administered.

And again, the task of a psychologist is to use those testings in helping frame accurately what the person's diagnosis is. These are -- these are hypotheses on which to base a final diagnosis. So, those are generated from the test profiles that I administered to Mr. Fulks.

Q. From the test profiles alone?

A. Yes, sir. Those are not -- they have no -- the diagnoses that you have listed there are generated from the testing alone and they do not have -- do not reflect the input of my clinical judgments and other outside information.

Q. So, nowhere in any of these diagnoses is antisocial personality mentioned?

A. Again, as I testified earlier, the psychological testing administered to Mr. Fulks was not significant for antisocial personality disorder. There are some vague references, but those were not the prominent diagnostic impressions referenced in the psychological testing profiles. He did not generate psychological profiles on testing that were consistent with the

diagnosis of antisocial personality disorder.

Q. As I recall, yesterday your testimony was that a psychologist likes to look at four primary areas; is that correct?

A. Generally speaking that is correct.

Q. A direct exam, which would mean an interview and background and ideation? How he interacts?

A. I'm --

Q. A direct exam?

A. Yeah, sitting down, talking across -- talking to the person, asking him questions, interacting, hearing his responses to various questions posed to him, yes, sir.

Q. Which you had with him?

A. Yes, sir.

Q. And a battery of tests which you performed?

A. That is correct.

Q. You also said that you would like to compare the direct interview with family background, other socio-evidence, looking for patterns?

A. Certainly. In looking at what -- what were the factors that a defendant would experience certainly shapes what we see in terms of presentation during the interview.

Q. And you also would like to look at the discovery materials?

A. That's correct.

Q. Okay. Now, you didn't look at the discovery materials in

this case?

A.  I did not.

Q.  And you didn't have much history regarding his family,
other than what he self-reported to you; is that correct?

A.  A lot of the -- that is correct.  I had some documents
that -- affidavits from family members, I did not have an
extensive psycho-social history that would have -- I did not
have an extensive history, no.

(Off record discussion)

THE COURT:  Do you want to take an early lunch break?
I know it's disrupting.  I'm hungry.

Do you have a plane to catch, Doctor?

THE WITNESS:  No, sir.

THE COURT:  Let's do that.  I feel like we are
putting a lot of pressure on Mr. Smith here, and the realtime
is very helpful to us.

Do you want to come back -- well, it's not quite --
do you want to come back at 1:15?  An hour and 20 minutes?
Let's do that.  We will be in recess then until 1:15.

(Lunch recess)

THE COURT:  All right, if the witness could resume
the stand.  Mr. Jendron, we will try to keep from interrupting
you like we did before lunch now.

BY MR. JENDRON:

Q.  Do you know why you were not asked to do a full evaluation

on Chad Fulks?

A. I'm not sure I understand the question. I did a full -- I did -- what I was asked to do was provide essentially a psychological profile.

Q. Based on testing alone?

A. Testing and interview. That was my understanding of my instructions.

Q. Have you seen Chad Fulks' criminal history?

A. Yes, sir, I have.

Q. And what do you make of his criminal history?

A. It is extensive.

Q. It's extensive. Before someone can be found with a diagnosis of antisocial personality disorder, you must also be found with a diagnosis of conduct disorder prior to age 15; correct?

A. 16, yes.

Q. 16?

A. Yes.

Q. I'm going to show you what is marked Government's Exhibit Number 7, have you seen this before?

A. This chart?

Q. This chart.

A. No, sir, I have not.

Q. Chad Fulks was born in 1977; is that correct?

A. That is correct. I am aware of his history, I have not

seen this particular chart.

Q.  So you are aware of the fact that he struck an older woman with a stick when he was nine years old?

A.  Yes, sir, I am.

Q.  And you are aware -- didn't I say 37?  I mean Exhibit 37, if I didn't say 37.  You are aware that he pulled down the pants of a little girl when he was 10 years old?

A.  Yes, sir, I am.

Q.  You are aware of the fact that he put a gun to another child's head when he was 12 years old?

A.  Yes, sir, I am.

Q.  You are aware that he destroyed property with his brother when they entered and broke a window out of an automobile when he was 13 years old?

A.  I know.

Q.  You are.  You are aware of his guilty plea to the pulling down of pants?  I think he was charged with assault and battery?

A.  I believe that's correct, yes, sir, I'm aware of it.

Q.  You are aware of his truancy?

A.  I am.

Q.  You are aware that in 1992 he committed an act of arson?

A.  I am.

Q.  Also in 1992 when he was 15, his probation was revoked?

A.  That's correct.

Q. In 1993 he was adjudged a delinquent as a result of an aggravated burglary charge?

A. I am aware.

Q. You are aware of that?

A. Yes, sir.

Q. Are you aware in 1993 he had a probation violation and actually an escape from the juvenile home that he was being detained at?

A. Yes, sir, I am.

Q. And in 1994 he had a conviction for transferring and receiving stolen property, which he was sent to another juvenile center, are you aware of that?

A. Yes, sir.

Q. And also in 1994 he was in possession of another stolen automobile, are you aware of that?

A. Yes, sir, I am.

Q. And I think there's a minor violation there of operating a vehicle without a license in 1996, are you aware of that?

A. I am.

Q. In 1996, another probation violation for failure to appear, are you aware of that?

A. Yes, sir, I am.

Q. '97, simple possession of marijuana, you are aware of that?

A. I am.

Q. 1997, fraud, he stole checks, you are aware of that?

A.  Yes, sir, I am.

Q.  He received a sentence on that?

A.  Yes, sir.

Q.  1997, he also received a sentence for passing worthless checks?

A.  That is correct.

Q.  In 1998 he received a sentence for burglary?

A.  That is correct.

Q.  In 1998 he received another sentence for burglary, you are aware of those two convictions?

A.  Yes, sir, I am.

Q.  In 1998 he received now -- he received a sentence for forgery -- no, this one was dismissed.  He was arrested for forgery, you are aware of that?

A.  Yes, sir, I am.

Q.  He was arrested for financial fraud, receiving stolen goods.  That was nol prossed.  False credit card -- or he had credit cards that had been stolen, are you aware of that?

A.  Yes, sir, I am.

Q.  1998, he was convicted of use of a vehicle without permission.  Are you familiar how that incident came about?

A.  Not specifically.

Q.  You don't know that when he was in prison he convinced an inmate that he had a sick child that was dying and he needed to go see that sick child?

A. I have some -- I don't know the specifics. I have some vague recollection of that.

Q. And that inmate got his mother to lend him the car so he could go see the sick child?

A. That is vaguely familiar --

Q. That was totally bogus; right? That was totally bogus, it was false?

A. Oh, the --

Q. The story?

A. Yes, I believe so.

Q. In 1998 you are aware of the grand larceny charge where he broke into a car and stole a purse?

A. Yes, I am.

Q. And in 1998 there was a transportation of stolen vehicle, that was a federal charge in the Eastern District of Tennessee. I believe he was sent for an evaluation as a result of that charge?

A. Yes, sir, I think it was taking a car across state lines. I believe he was evaluated. I believe -- I'm not sure exactly where the evaluation was done, but there was an evaluation.

Q. Have you seen that evaluation?

A. If you are referring to the one in the federal medical center in Lexington, Kentucky --

Q. Yes.

A. Yes, I am aware of that evaluation.

Q.  In 1998 he has a charge of larceny of a vehicle, are you aware of that?

A.  Yes, I am.

Q.  In 1998, charged with non-sufficient funds, are you aware of that?

A.  Yes, sir, I am.

Q.  1999, burglary, fraud, worthless checks, he received a sentence for that, are you aware of that?

A.  Yes, sir, I am.

Q.  Are you aware that he became a fugitive in 1999?

A.  Yes, sir, I am.

Q.  In 2002 has involvement in a high speed chase with police in Indiana and is charged with felony fleeing, false registration, speeding, are you aware of that?

A.  Yes, sir, I am.

Q.  He was also charged with criminal domestic violence of high and aggravated nature involving his wife, are you aware of that in 2002?

A.  I am.

Q.  In 2002 he's also charged with 12 counts of fraudulent use of a credit card, are you aware of that?

A.  Yes, sir.

Q.  That's as a result of breaking into cars and stealing purses.  He received a sentence for that?

A.  Yes, sir.

Q.  He also failed to appear on charges in Kentucky on burglary charges, are you aware of that?

A.  Yes, sir, I am.

Q.  And 2002 he was charged with possessing drug paraphernalia and possession of marijuana, first degree child abuse, receiving stolen property.  All of these offenses were indictments that were issued after he had escaped from Kentucky, are you aware of that?

A.  Yes, sir, I am.

Q.  Are you aware of the child abuse charge where he is alleged to have abused Veronica Evans' child named Miles?

A.  I'm aware of the allegation, yes, sir.

Q.  And he was married to Veronica Evans at the time?

A.  That's my understanding, yes, sir.

Q.  The next one was robbery while using a gun.  That was in Kentucky.  That he was also indicted while he was on escape?

A.  Yes, sir.

Q.  How did you become aware of all this criminal history?

A.  Some came from Mr. Fulks himself.  It was also documented in the Butner report.  I had some background records I received from Mr. Blume.

Q.  Did you report any of that in your evaluation?

A.  No, I didn't.  My evaluation is really a cursory outline of the personality profiles that I rendered.

Q.  You didn't think that was important to put in your

evaluation?

A.   Certainly there are a lot of things I could have put in the report that I didn't, but it is subsumed under the diagnosis of antisocial personality disorder.  It certainly fits the criteria for that diagnosis.

Q.   Have you seen Government's Exhibit Number 31?  It is a chronology of events that was prepared by the defense team.

A.   I have not seen this document.

Q.   81 pages, you have not seen that?

A.   I have not seen this document.

Q.   Go to page 23, if you would.

A.   Of this Exhibit 31, sir?

Q.   Yes.

A.   And, again, page number, please?

Q.   23.  Do you see the incident involving battery on the elderly lady with a stick?

A.   Which paragraph, sir?

Q.   The date would be 11-30-86.

A.   Yes.

Q.   Okay.  On the next page, the date being 1-6-87, his third grade teacher recommends him for multi-disciplinary assessment. He has no self-discipline and needs to be in a controlled situation at all times.  Do you see that?

A.   Yes, sir.

Q.   All right.  Now, the criminal history that we have on

Mr. Fulks up to the age of 16, does that fit -- or is that consistent with a finding of symptoms of conduct disorder?

A.   It is.

Q.   How about the fact he has no self-discipline?

A.   That is certainly part.  It can be subsumed under that diagnosis.  It's also typical of people who have attention deficit hyperactivity disorder and other affective disturbances.  It is certainly subsumed under a conduct disorder diagnosis.

Q.   Page 25 is the incident involving pulling down the pants of the little girl, is that consistent with conduct disorder?

A.   It certainly fits the diagnostic category.  Again, like many of these descriptions, there are other reasons that could also be subsumed under those behaviors.

Q.   On that same page, February 11th, he's referred for academic assessment due to his behavior.  His teacher again says he needs guidance, to be in a controlled situation at all times.  He has no self-discipline or self-directing.  Do you see that?

A.   I do.

Q.   Okay.  And then on page 28, as a result of the battery committed on the little girl there was an evaluation made of him.  Do you see that on page 28?

A.   I do.

Q.   And the diagnosis was conduct disorder, socialized

aggressive -- what does that mean?

A.  Which one?  Which diagnosis?

Q.  Number 1, socialized aggressive.

A.  Well, it means that he's acting in an inappropriate way in an aggressive manner.

Q.  Axis IV, psycho-social stressors, what does that mean?

A.  Psycho-social stressors would be things such as disruption in the home or poor role model, exposure to poverty.  These are things that, again, I testified on direct about that may contribute to the diagnostic impressions on Axis I and II.

Q.  During that evaluation a Ms. Hatcher, who is apparently involved in it, said she received many reports from neighbors that Chad was constantly roaming the streets and frequently taunting and swears at adults in the neighborhood.

"She said school personnel are concerned about his behavior and the possibility of Prestera in-home intervention team was discussed.  Crisis intervention may not be appropriate at the present time."  Do you see that?

A.  I do.

Q.  And also on page 28 there was a discussion about the incident about pulling the little girl's pants down.  Apparently there were two boys involved.  One of the boys said he wanted to stop but Mr. Fulks wanted to keep going.  Do you see that?

A.  I do.

Q.  And then his version of the offense is that he simply wanted to tag her and had touched her pants and they just fell down.  Do you see that?

A.  I do.

Q.  That's a lie; right?

A.  That -- I think it's certainly more than -- that's his account, yes.

Q.  And someone with conduct disorder lies, frequently?

A.  Yes.

Q.  Page 30, "He hits other kids and curses mothers of these kids"?

A.  I'm sorry, the second part of your sentence?

Q.  "He hits other kids and curses mothers of these kids"? It's on page 30.

A.  Yes.

Q.  And another neighbor said Chad bothers her son at school and home.  Chad has hit and punched her sons.  The oldest is 8 the other 7.  One boy came home with bruises on his back and a bruised eye from Chad.  Many of the neighbors are scared of these kids.  Chad is always hitting and picking at the boy when they are allowed to go to the bathroom."  Consistent with conduct disorder?

A.  Yes.

Q.  Also on page 30.  Ms. Thompson says that she thinks he may have severe behavioral disorders?

A.  Yes.

Q.  "There have been numerous problems with Chad fighting at the school, and he," I believe this is the principal, "has had to keep him in detention after school for this; and he has a set plan for how Chad is to leave school so he doesn't get in any more fights."  Do you see that?

A.  Yes, I do.

Q.  "Because he's verbally abusive to children and adults, as well as physically assaultive with other children."  That's from school records when he was attending school at age 10?

A.  That's right.

Q.  Page 35, there's a school psychologist recommendation that says, "It appears that Chad has behavioral problems that would suggest placement in the behavioral disorder program"?

A.  That is correct.

Q.  Page 37, "On his 13th birthday he missed approximately 12 days of school"?

A.  That is correct.

Q.  Also on page 35, "He committed the offense of destruction of private property," and that's the Chevrolet Nova we mentioned in his criminal history.  That's consistent with conduct disorder?

A.  It is.

Q.  Page 38, "He initially denied the allegations in the petition about breaking into the car."  Pages 38 through 39,

"Then he admitted the allegations and he was adjudicated a juvenile delinquent with -- the judge ordered probation."  Do you see that?

A.  I do.

Q.  On page 40 there was a hearing on the allegations of truancy.  It says, "The court finds that the respondent child is so unmanageable, ungovernable and antisocial that no other reasonable alternative exists for treatment or restraint other than placement in a non-secured facility.  He's committed to Pressley Ridge School at Grant Garden, Ona, West Virginia for a year."  That sentence was suspended and he was put on probation.  Do you see that?

A.  Yes, sir.

Q.  And also consistent with conduct disorder?

A.  It is.

Q.  He moved to Indiana, page 43, see the notation of August 28th, '91?  He is still fighting with children and he's cutting classes in a different school in Indiana.  Consistent with conduct disorder?

A.  Yes, it is.

Q.  Page 43, he admits that his brother Dwayne and he stole a car together.  Also on page 43, Chad's teacher made a referral for him to receive an educational evaluation.  He had academic problems and social problems, few friends, and being involved in two fights in the past week.  Do you see that?

A.  I do.

Q.  More fighting?

A.  And more estrangement from peers and more social and behavioral problems, yes, sir.

Q.  All behavioral problems that are consistent with conduct disorder?

A.  Yes, sir.

Q.  Then page 44, on 10-10-91, there's a report by his principal, Mr. Shopa, that "Chad is blowing his nose in his hands and wiping his hands on other students.  He initially denied the incidents and became surly and defensive.  Another student reported that Chad has pushed, intimidated, and threatened him.  Chad denied even seeing that student.  He was put on the bus and the bus driver reported that he threatened several students and physically blocked another student from exiting the bus.  As a result he was suspended for five days."  Do you see that?

A.  I do.

Q.  All right.  And the principal writes in a memo in the school records, "It's my feeling that Chad Fulks is a highly disturbed and lethally disturbed young man."

A.  I do see that.

Q.  "He goes from person to person with the intent of intimidating and frightening each of his victims.  He is very quick to anger and becomes verbally and physically abusive.  I

would hope that he could be tested immediately for EH placement before he seriously hurts someone."

A.  I do see that.

Q.  Show me where in any of this that we've discussed that he's dependent on somebody.

A.  Well, you are certainly pointing out a lot of behaviors that are consistent, and I would agree that he fits the diagnosis of a conduct disorder, later an antisocial personality disorder.

This is a child who has come from a highly disruptive home that is -- he's seeking some consistency, someone who is going to intervene and monitor his behavior.  He continues to act out hoping that someone is going to effectively restrain and care for him.

Q.  This is a child who has been told repeatedly by authorities how to behave and refuses to behave the way they have asked him to behave.  He's totally independent, he is without fear of anyone; isn't that correct?

A.  That is not my interpretation, that is your interpretation.  But I think that this is a kid who is highly disturbed, who is acting out in some very aggressive and dangerous ways, who is looking for some kind of consistent monitoring, which really, unfortunately, failed to contain his disturbances.

Q.  Page 44, he is suspended from school for five days because

of threatening, intimidating, and initiating a fight with students the day before.

And on page 45 there's a memo placed in the school file from the school psychologist, Ms. Joy Krug. The memo reads, "We just placed Chad in LD and grade skipped him to grade 9. His father regained custody.

"3. Chad came from West Virginia where he is a ward of the state.

"He has a history of being molested by an older man.

"5. He has a sociopathic pattern."

Do you see that?

A. I do.

Q. Sociopathic. What does sociopathic mean?

A. It is not a term -- it's not a term that is currently used, but a sociopathic pattern, as I previously talked about, is a person who has no conscience --

Q. No remorse?

A. No remorse.

Q. Lies all the time?

A. Those are characteristics, yes, sir.

Q. Does what he has to do in order to gain what he wants? Manipulates people?

A. Has to do what he has to do to survive, as he sees it, in his environment, based on his upbringing and training.

Q. Malingers?

A. Malingers?

Q. Malingers.

A. I don't see the evidence of malingering.

Q. Sociopathics don't malinger?

A. Well, I don't understand the -- he's not presenting with symptoms or behaviors here that I see that are -- not for secondary gain. Lying, yes. I don't see the -- I don't see the evidence of malingering and your question.

Q. Well, there's a consistent pattern of lying?

A. Well, lying is not malingering. That's a different entity.

Q. Lying is -- lying is part of malingering?

A. It can be. Malingering and lying are not the same thing necessarily, but malingering is an expressed endorsement of the symptom for some secondary gain. I don't see the evidence of malingering there. Lying, yes, I see that.

Q. Page 47, it again mentions his sociopathic pattern of behavior that was observed, and they take -- I'm not sure what tests they gave him, but they find a verbal IQ of 85, a performance IQ of 105, and full scale IQ of 93?

A. That is correct.

Q. Now, that's much higher than what you found?

A. It is.

Q. Page 49, there is a diagnosis here, apparently part of the court records from Dr. Klassen where he is diagnosed, Axis I, major depressive, remain alert to the possibility of

development of addictive disorder?

A.  Highlight that, please.

Q.  Page 49.

A.  Highlight it.

Q.  See that, Axis I, Axis II?

A.  I don't think -- yeah, I think you --

Q.  48, I'm sorry.  Do you see that?

A.  Yes, I do.

Q.  71.09, what is that classification?

A.  I can look at -- I'm not familiar with that diagnosis off the top of my head.  I don't know the -- I don't know the answer to that question.

Q.  We will go on.  "But remain alert for the possibility of developing sociopathic traits."  Do you see that?

A.  Yes.

Q.  Next page talks about the theft of the Chevrolet S10 pickup truck and it was stolen in West Virginia.  I think we've already mentioned that.

        Also he is arrested for bringing a stolen car into the state, and he was a fugitive from justice from Virginia for that stolen vehicle mentioned above.

        The next page -- I'm sorry, page 50, he admits the allegations and he's adjudicated a juvenile delinquent.  He is sent to the custody of the Department of Corrections for a period not to exceed the maximum term for which an adult would

have been sentenced, and he's put in the West Virginia Industrial Home for Youth in Salem, West Virginia.

Page 55, there is a report of him running from the police and being tackled by the police and winding up in the hospital as a result, and complains that the police assaulted him. During that stay in the hospital he reported he drank only occasionally, and this episode was the first time he drank in seven months. That was a lie, wasn't it?

A. I don't know if it was or not. "Drinking occasionally," I don't know the frequency of his drinking at that time.

Q. Do you know that he admitted that he drank all the time until November --

A. There are reports. But, again, I don't know that there were periods that he did stop. I'm not familiar with exactly the chronology of the frequency of the drinking.

Q. '97 he -- well, we went through the simple possession of marijuana. We went through the passing of worthless checks. We went through attempted forgery. We went through attempted aggravated criminal trespass. We went through burglary in '98. We went through another receiving stolen goods in 1998.

We went through the incident where he lied to the co-inmate about trying to borrow his mother's car so he could go see his sick child. Said he was going to return in five days and he abandoned the car somewhere.

But he was arrested -- no, he was arrested on the

road in the national forest and that's where the federal

charges came about, where he was given a psychiatric evaluation

at Lexington?

A.   That's my understanding, yes, sir.

Q.   Can you give me the Elmo.  This is P 28, page 7, this is

from the evaluation at Lexington.  Got done in 1994 -- no, I'm

sorry, 1998.  Have you seen this?

A.   I have seen the raw data from the testing that Dr. Simcox

did, I'm not sure I have seen a copy of this particular report.

Q.   Okay.  This page, have you seen this page?

A.   I don't know that I have.

Q.   What was the diagnosis in -- that was --

A.   Dr. Simcox diagnosed Axis I, diagnosis of malingering; and

Axis II, diagnosis of antisocial personality disorder.

Q.   And he said malingering is not a mental illness, rather it

defines the intentional production of false or grossly

exaggerated physical and psychological symptoms motivated by

obvious internal incentives, such as avoiding criminal

prosecution?

A.   That is the diagnosis that is contained in the DSM report,

yes, sir.

Q.   He also found that he had antisocial personality disorder?

A.   That is correct.

Q.   And you have already told us that when you examined him, he

had antisocial personality disorder?

A.   It is one of my diagnoses, yes, sir.

Q.   That is not something that is cured, is it?

A.   Well, the jury is out on that.  The more we understand about the development of antisocial personality disorder, we know that there are certainly cognitive behavioral techniques and therapies that can -- conventional wisdom often is that if you give a person this diagnosis you don't have to afford treatment.  So there's some political-laden assessments that go along with this diagnosis.

Some people would like to believe that it's untreatable and that people are essentially evil.  That is not my opinion.  I've certainly worked with and treated a number of people who had this disorder in my 25 or 30 years working in the Federal Bureau of Prisons.

Q.   What are the symptoms that would require a finding of antisocial personality disorder?

A.   I can -- you want me to read from the chart?

Q.   Read from the DSM manual, you can read from the chart, whatever.

A.   I will certainly read from the chart.  The DSM IV describes antisocial personalities, pervasive pattern, "Disregard for the violation of the rights of others occurring since the age of 15, as indicated by three or more of the following:

"Failure to conform to social norms with respect to lawful behavior as indicated by repeated -- performing acts

that are grounds for arrest, deceitfulness, impulsivity, irritability, reckless disregard for the safety of others, consistent irresponsibility, and lack of remorse."

And to justify a diagnosis there are conditions that have to be met on a category -- the second prong of that, and one is to have conduct disorder before the age of 15, 16 --

Q. And we have agreed that he had conduct disorder?

A. Yes, we do. I don't question the diagnosis at all of antisocial personality disorder.

Q. All right.

A. Clearly a part of who he is.

Q. Now, you also said that you were not given any of the discovery in this case; is that right?

A. That's correct.

Q. So, you don't know anything about the events?

A. I know some general things about it. I know the general scope of what happened. I know the chronology, but as far as reviewing all the investigative reports, I have not had privy to all of that information. I'm certainly familiar with the --

Q. Do you know that in June 2002 he posed as an FBI agent? Held up two college students with a pistol pretending that he was an FBI agent?

A. I am aware of that, yes, sir.

Q. Who made you aware of that?

A. Through discussions with attorneys. I think it's

referenced throughout the materials that I read.

Q.  Were you aware of that at the time you made your diagnosis?

A.  I was.

Q.  You were?

A.  Yes.

Q.  Were you aware that he also identified himself as being an FBI agent and robbed a truck driver by the name of Billy Newton at gunpoint?

A.  Yes, sir, I was.

Q.  That was June 19th of 2002?

A.  Yes, sir.

Q.  And when were you made aware of that?

A.  Again, prior to the -- prior to completing the evaluation.

Q.  Which evaluation?

A.  My final, my psychological report.

Q.  Were you aware of his arrest in the parking lot of Madison, Kentucky when his wife called 911?

A.  Yes, sir, I was.

Q.  Because she was going to go into the Wal-Mart with a false credit card that he had given her to use in the Wal-Mart and he was on parole at that time?  Were you aware of that incident?

A.  Yes, sir, I was.

Q.  And a search warrant for the mobile home where they were living discovered an AK-47, a shotgun, some pistols, and thousands of dollars worth of stolen goods?

A.  I don't recall that.  It would be consistent with what I know, but I don't remember that specific incident.

Q.  All right.  He was jailed, and as a result of taking -- well, Miles was present at that time, a child belonging to Veronica Evans.

A.  Yes, sir.

Q.  He in fact helped the police locate the gun that was found in the car that they were driving in the parking lot at that time, and Miles is found to have bruises, burns, and evidence of child abuse as a result of this incident --

MR. DALKE:  Objection, Your Honor, this evidence about Miles has been excluded by your previous rulings.

THE COURT:  I didn't include evidence at the trial about the alleged abuse of the stepchild.  Where are you going with this, Mr. Jendron?

MR. JENDRON:  On the antisocial personality disorder.

MR. DALKE:  That's not disputed, Your Honor.  We stipulate to the fact and Dr. Hilkey has not testified to the contrary, that many people, including himself, have diagnosed Mr. Fulks with antisocial personality disorder.

THE COURT:  Right, but the question was going to whether any alleged abuse of the stepson might contribute to the diagnosis; right?

MR. JENDRON:  Correct.

THE COURT:  We are not trying the case to a jury

here.  The question before me today -- the question presented in this case is the effectiveness of trial counsel, and that gets into whether this witness should have been called, and anything that bears on his opinion he was given I think is relevant, so I will overrule the objection.

MR. DALKE:  Thank you, Your Honor.

BY MR. DALKE:

Q.  And are you aware that while he was in jail, as a result of that charge, he said to a detective, "Y'all want to put me away for the rest of my life and I'm not going to stick around to be here"?

A.  I was not aware of that specific statement.

Q.  You are not aware of that?

A.  No.

Q.  You are aware of the fact that he blames Mr. Basham for the escape from the jail?

A.  I believe that's my understanding.

Q.  And that his story was that Mr. Basham told him where Miles could be found and Mr. Fulks wanted to be able to go see Miles?

A.  Certainly he was intent on seeing his son, yes, sir.

Q.  In spite of the fact that he had been charged with child abuse?

A.  That's correct.

Q.  Does that make sense to you?

A.  Logic sense, no, but understanding the personality of

Mr. Fulks, it does make sense.  There's a tremendous amount of inconsistencies with both approach and avoidance of things.

There's a lot of things about Mr. Fulks that does not make sense to you or I.  But the fact -- the fact that someone has abused their child does not negate the fact that there is an expressed love and concern.  I know it sounds contradictory, but that is the dynamics that is oftentimes seen with parents of abused children.

Q.  It could also be a lie because he wants to blame the escape on Basham, as opposed to him not wanting to have to serve a very lengthy jail sentence if he was convicted of child abuse?

A.  That's a possibility, certainly.  I don't know which it was.  I think the question I was responding to was the contradiction between alleged abuse and actual care, or wanting to see a child.

Q.  Are you aware of the -- Mr. James Hawkins incident?

A.  Yes, I am.

Q.  And when were you made aware of that?

A.  Sometime during the course of my evaluation.

Q.  And what is your understanding of that incident?

A.  That Mr. Hawkins was robbed and tied to a tree, left in some cold weather.

Q.  And who tied him to the tree?

A.  I'm not sure exactly who.  I believe Mr. Basham and Mr. Fulks were together at that time.

Q.  Did you know that Mr. Basham attempted to tie him to the tree first and Mr. Fulks got upset because he thought it was too loose?

A.  That's -- I'm aware of that.

Q.  And that he subsequently tied up Mr. Hawkins more tightly so he couldn't get loose?

A.  I'm aware of that statement, yes, sir.

Q.  Are you aware that he also tied Mr. Hawkins' legs together around the tree and duct taped his mouth?

        MR. DALKE:  Your Honor, Mr. Jendron is testifying. Is he going to ask questions or going to read into the record a litany of events that have already been part of the record?

        THE COURT:  It is cross-examination and leading questions are permitted on cross, and he is just going down evidence that was produced at trial to see if the witness knows about it.  I think it is a proper question.

        MR. DALKE:  Thank you, Your Honor.

        THE COURT:  I will overrule the objection.

BY MR. JENDRON:

Q.  Do you know who Tina Severance is?

A.  I do.

Q.  Okay.  Did you know that Mr. Fulks had befriended Severance while he was at prison while she was a correctional officer?

A.  They had developed a romantic liaison while she was an employee at the Department of Corrections.

Q. A sexual relationship?

A. A romantic relationship. I don't think they had sex. I don't know that they had sex while he was incarcerated. I don't know that. There was certainly attraction between the two.

Q. You don't know that it was alleged that she was performing oral sex on Mr. Fulks?

A. I think there was an allegation. I don't know -- I only know it's an allegation. I don't know.

Q. And did you know that Mr. Fulks told Ms. Severance that he and Mr. Basham needed guns?

A. I am aware of that, yes, sir.

Q. Mr. Fulks is the one --

A. I'm aware of the statement.

Q. They needed guns. And he also said that he knew a gentleman by the name of Robert Talsma was teaching Severance to shoot?

A. I'm sorry, I didn't hear.

Q. Robert Talsma was teaching Tina Severance to shoot and that he had guns at his house, Mr. Fulks knew that?

A. I'm aware of that.

Q. So, Tina Severance lured Mr. Talsma away while Mr. Fulks and Mr. Basham stole four guns?

A. That is my understanding, yes, sir.

Q. That wasn't Mr. Basham's idea, that was Mr. Fulks' idea;

wasn't it?

A.  Again, I don't know how to attribute responsibility between the two defendants in this case or the two convicted individuals.

Q.  Well --

A.  I know what the allegations are, that -- one allegation is that one person led.  I don't know who was responsible for what.  I've heard and certainly read statements that contradict each other as to the responsibility of the two individuals --

Q.  Did you read a statement that contradicted that?

A.  Well, again, throughout the record there is -- there are behaviors attributed to different --

Q.  Tell me where you heard a statement that contradicts that it was Mr. Fulks' idea to steal the guns from Mr. Talsma?

A.  Not in reference to that specific incident.  But throughout the record there are various allegations about who was responsible for certain behaviors.  I don't -- not in reference to this specific incident.

Q.  That's what I'm asking about, this?

A.  No, I don't know which -- I know what the statement says.

Q.  Are you aware that after they stole the guns they drove to Indiana to visit Mr. Fulks' brother, Ronnie?

A.  I'm aware of that.

Q.  Okay.  Now, Mr. Basham didn't drive, to your understanding; is that correct?

A. My understanding is, yes, I think Mr. Fulks did a lot of the driving, or most of the driving.

Q. And Mr. Fulks made the decisions where they were going to go?

A. I don't know that.

Q. Well, have you read the record?

A. I'm not sure that I have information regarding that question, about who made the decisions on where to go.

Q. Do you have information that Mr. Basham ever told --

A. I don't know.

MR. DALKE: Objection, Your Honor. I mean, Dr. Hilkey has already testified that this -- purpose of his evaluation was to perform a psychological evaluation. Whether or not he recounts every exact detail, he's already said that he's aware of competing allegations in the record.

He hasn't testified that he has read the entire record. In fact, to the contrary, he has already told you yesterday when we started off with this exercise that he hadn't read the entire record because he hadn't read any of the mental health --

THE COURT: I know this is cross-examination, but it does look like you are going to just play out all the major events in the trial and ask the witness if he knows about them. He pretty well conceded that he does not.

MR. JENDRON: I think it does go to his diagnosis as

to whether Mr. Fulks was a dependent personality or whether Mr. Fulks made his own decisions.

THE COURT: The fact that he may not have known about some of the events that were testified about at trial goes to the weight of his opinion.

MR. JENDRON: Exactly.

THE COURT: And the credibility and the weight that should be given his opinion.

MR. JENDRON: Exactly.

THE COURT: Well, I'm inclined to allow it. I mean, it was, you know -- I think the government and the court suggested that we could receive this testimony by way of affidavit, but it was the petitioner's counsel who pushed hard for live testimony. And so now that we have the live testimony, I'm a little reluctant to tie the government down to -- on cross-examination, so I will overrule it. I reserve the right to come in at some point and say we have done this enough, but overruled for now.

MR. JENDRON: I'm going to try to skip ahead, Your Honor.

MR. DALKE: Thank you, Your Honor.

BY MR. JENDRON:

Q. At some point in time they were in West Virginia, and left and went to Virginia, and went to Myrtle Beach, South Carolina. Are you aware that Severence -- Tina Severence was

going through the stolen identification cards that they -- that

Mr. Basham and Mr. Fulks had stolen and they found one -- she

found one with a name on it, Samantha, and when she mentioned

that Mr. Fulks said, "No, not that one"?  Are you aware of

that?

A.  No, I'm not.

Q.  Are you aware of shortly after that she attempted to leave

the room and Fulks pointed a revolver at her head, telling her

not to leave the room?

A.  I'm not aware of that incident, no.

Q.  Are you aware of the incident where they committed a

burglary at a man named Jordan's home and that Mr. Fulks shot

at him?

A.  I remember the name Jordan, I don't remember the specific

shooting incident.  I'm not -- just don't recall.

Q.  Mr. Jordan at that time believed that Mr. Fulks was trying

to kill him, are you aware of that testimony?

A.  No, I'm not.

Q.  What is your understanding of how they carjacked

Ms. Donovan?

A.  Again, I'm not sure that I can give you the -- I am not --

I'm generally aware there was an interaction in a Wal-Mart

parking lot where the intention was to take a car.  I don't

remember, I don't recall all the specific -- how -- I can't

tell you from memory what the specific operations were.  I knew

that there was an interaction where eventually Mr. Fulks and Mr. Basham left with Ms. Donovan in her BMW.

Q.  Are you aware that the video showed Ms. Donovan's car turning into a Wal-Mart followed by a white pickup truck which had been stolen?

A.  I believe, that part, yes, sir.

Q.  The white truck slowed down behind her car and a passenger of the white truck jumped out and jumped into her car and that the white truck and the -- Ms. Donovan's car went to a far section of the parking lot and they pulled up beside it.

MR. DALKE:  Your Honor, he just said he didn't know, not aware of those circumstances, not aware of that part of the record.

THE COURT:  Let's move on.  I agree.  Let's move on.

BY MR. JENDRON:

Q.  Are you aware of the testimony that Heather Goodwin testified that Mr. Fulks beat and raped her when he got the urge to?

A.  I'm not aware of that testimony.

Q.  Are you aware that Amber Fowler testified that after she and Fulks were married he began hitting her and dragging her through the house by her hair?

A.  I am aware of that incident, yes, sir.

Q.  Are you aware that Veronica Evans, his second wife, testified that Fulks punched her, drug her by her hair, and

raped her?

A.  I'm aware of that statement.

Q.  Are you aware that she said he once drove her to a field, led her to a wooden area, and held a knife to her throat?

A.  I'm not aware of that incident.

Q.  On another occasion he poked an arrow into her side, handcuffed her, punched her in the face, and raped her?

A.  I'm not aware of that.

Q.  On the MCMI-II --

        MR. JENDRON:  Do you have that exhibit?

        MR. DALKE:  Do I have the exhibit?

        MR. JENDRON:  The MCM-II.

        (Off record discussion.)

        MR. JENDRON:  Okay.  This is 221?

        MR. DALKE:  Yes.

BY MR. JENDRON:

Q.  You were talking about validity scales?

A.  Yes, sir.

Q.  There's a scale here called debasement?

A.  Yes, sir.

Q.  Do you know that the recommendations as to how to read the MCM-II states that if a debasement scale is over 90 the test is invalid?

A.  That is not -- that is not the -- this is -- this profile was -- did generate a valid clinical scale with precautions.

And, again, there's -- there's clear evidence that the elevations on the score are high, which I testified, they are magnified. But there are adjustments which allow for the interpretation of this -- of this profile. If this were not the case then a -- a clinical profile would not have been generated, it would have come out as an invalid and uninterpreted profile.

Q. I believe you said that at some point in time he had schizoaffective disorder?

A. I have not testified to that.

Q. Pardon?

A. I have not testified that he suffers from schizoaffective disorder.

Q. He does not?

A. He does not. It has not been part of my testimony.

Q. Schizotypal personality?

A. Yes, I have testified to that.

Q. You have testified to that? A schizotypal personality may be an individual who might say, "I need to consider only my views, I must not be influenced by anyone else;" is that fair to say?

A. I -- that -- I don't know if that would be necessarily descriptive. I guess, certainly, certainly a person who has this particular disorder has a lot of social alienation. They may not consider or they might not be aware of the feelings of

others.

I think that is an isolated statement.  I don't know that I would necessarily identify that with schizotypal.  It could be.  I don't understand the question, I guess.

Q.  The question is that in -- can that be considered as a statement that a person with schizotypal personality disorder might make or might feel?

A.  They might make it, yes, sir.

Q.  Well, that's not somebody who is dependent, is it?

A.  Well, again, many of these diagnoses coexist.  I mean, just -- Mr. Fulks, again, is -- has a combination of a number of different disorders that coexist.

Q.  And let's talk about personality orders -- disorders in general.  My understanding is that there are three clusters of personality disorders?

A.  That's correct.

Q.  Cluster A might involve major depression, schizotypal personality disorder, schizoid personality disorder -- have you diagnosed any of those?

A.  That's correct.

Q.  Cluster B: antisocial personality disorder, substance abuse, traumatized disorder, borderline personality disorder. Have you diagnosed Mr. Fulks with any of those?

A.  Certainly diagnosed him with antisocial personality disorder, which fits in that Cluster B.

Q.  Borderline personality disorder, you diagnosed him with that?

A.  I did not.

Q.  You did not?

A.  No.  I don't believe I -- let me check in my --

Q.  You want to look at your January 5th report?

A.  No.  That isn't -- that is a diagnosis that is generated from the psychological test profiles and, again, those are not my diagnoses.  Those are hypotheses generated from a psychological test.  I did not -- I don't believe I included borderline personality disorder as a diagnosis, an Axis II, in my report.

Q.  All right.

A.  If I'm wrong, you certainly can show me a copy of my report.  I will double-check that, but I don't believe that was a diagnosis that I had made.

No.  I did not.  I diagnosed him with a personality disorder, not otherwise specified, and I included dependent schizotype and antisocial.

Q.  Cluster C is dependent personality disorder?

A.  That's correct.  That is included in that category, yes, sir.

Q.  So you have diagnosed him with personality disorder in all three clusters?

A.  That is correct.

Q.   Is that unusual?

A.   No.

Q.   That's not unusual?

A.   It is not unusual.

Q.   Does that also show that someone is trying to endorse disorders, that to the highest degree that he possibly could, claiming everything under the world?

A.   He's not claiming everything under the world.  He is claiming a number of -- he certainly has a test profile that is consistent with multiple diagnoses.  It is not unusual for people to -- it's common in my practice and in the practice of psychiatrists and psychologists to diagnose people with personality disorder not otherwise specified that includes a number of features that describe their temperament, their cognitive and affective abilities.

Q.   People with Cluster B disorders, substance abuse, may be a common comorbidity; is that correct?

A.   That is correct.

Q.   A hostile attitude is typical of patients with antisocial personality disorder.

A.   That is correct.

Q.   In some instances they may become homicidal?

A.   They may.

Q.   People with antisocial personality may have some kind of cognitive impairment?

A.   Oftentimes they do.  It's a mounting research of evidence that people with antisocial personality have some very specific brain abnormalities that -- that we may learn helps explain this disorder.

Things that are typically described as impulsive acts, hyper-activities, attention deficits are oftentimes comorbid with people with conduct and antisocial personality disorders.

And the more we learn about the way the brain functions, the more we learn about the genetic factors that influence what we now call antisocial personality disorder. The science in this area is -- is developing rapidly.

Q.   Let's talk about the MMPI-II scale.  I believe you wrote this letter to Mr. Blume on January 5th.  "While Chad has a significant elevation of Scale 4," and you have parens, "psychopathic deviant" and I believe you corrected your statement to say, "antisocial personality disorder is not his primary problem," although it says, "is his primary problem." Psychopathic deviant, what's a psychopathic deviant?

A.   Again, a psychopathic deviant is a term that was originally ascribed to the MMPI in its early days.

We don't refer typically to the scales by those names, we refer to those as Scales 1, 2, 3, 4, but as I originally described, the intent of the --

(Off record discussion.)

BY MR. JENDRON:

Q.  And what is the score on Scale 4?

A.  The score is the corrective -- the K corrective score is 40.

Q.  Scale 4?

A.  Yes, sir.

Q.  What is -- 40 would indicate a psychopathic deviant?

A.  Scale 4 measures things that are considered -- are described with people who have antisocial personality disorder behaviors and traits.  There are a number of components that go into that scale.  There are issues of family discord, alienation from self, rebellious, anti-authoritarian attitudes, all of those factor into the score that makes up scale 4.

These are things -- these are behaviors or temperaments that are oftentimes seen with people who are diagnosed with antisocial personality disorder.

Q.  And what number on the scale would be reached in order to be psychopathic deviant?

A.  The numbers, per se, are not --

Q.  Well, you say there's a significant elevation of scale 4?

A.  Well, it's high.  But, again, as I testified earlier, this test was originally designed to show that if a person had a particular elevation on a single scale, that you could simply diagnose that person.  That is not how that worked -- what we look at when we -- we look at profile types and we look at the

combination of elevations in concert with each other.

He certainly has, you know -- he's got a clinical or clinically significant elevation on scale 4, along with a number of other scales. So we need to look at those combinations of scores to distill a description of a person's temperament.

Q. I'm just asking about scale 4.

A. I understand that.

Q. On this particular chart, where is scale 4?

A. He's endorsed a number of items that are consistent with people who carry the diagnosis of antisocial personality disorder.

Q. Fine. If it's higher than 75 they are likely to take part in asocial, antisocial, and criminal activities?

A. They may.

Q. They will rebel against authority figures and have poor relationships with their families, usually blaming others for their problem?

A. They may. Certainly characteristic.

Q. Underachievement in school is common.

A. It is.

Q. And childish behavior that is often exhibitionist?

A. That is true.

Q. Narcissistic, selfish, poor judgment, antagonistic, and aggressive?

A.   Those are all characteristics that are ascribed to that scale.

Q.   Fits Chad Fulks to a T, doesn't it?

A.   Part of them, yes.

THE COURT:  Mr. Jendron, we need to take an afternoon break somewhere along here; is this a good place?

MR. JENDRON:  We're getting close, Your Honor.

THE COURT:  Tell me when you get to a good stopping point.

BY MR. JENDRON:

Q.   How many times have you administered the SIRS evaluation?

A.   I don't use the SIRS a great deal.  Probably administered it 30 or 40 times, but it's not something that I typically use.  It's -- I do use it but it's not -- it's not part of the routine battery that I administer.

(Off record discussion.)

BY MR. JENDRON:

Q.   Government's Exhibit 16 --

A.   Yes, sir.

Q.   You see that e-mail?

A.   Yes, sir, I do.

Q.   This is an e-mail from you to John Blume on May the 6th; is that correct?

A.   That is correct.

Q.   You say, "I have not used the SIRS much"?

A.   That is correct.

Q.   "And had a colleague look over it with me this morning"?

A.   That's correct.

Q.   So, you have not used the SIRS much?

A.   At the time that I did the evaluation on Mr. Fulks I had not -- I was not terribly familiar with that, that's why I invited a colleague to go over the scoring.  I have used it much more since that time, but at the time that I completed this evaluation I was -- I had not used it a great deal.

Q.   One of the H scales was in the questionable range for malingering, blatant symptoms.

A.   Yes, sir.

Q.   Is that true?

A.   It's actually in -- in the probable range.  It's in that -- in that borderline range of --

Q.   Well, that's what it says, "questionable range"?

A.   Right.  It's -- both the actual -- the actual category that falls in the probable range.

Q.   Questionable range or probable range?

A.   Well, the publishers of the test use the word "probable," that's why I used --

Q.   Well, you say "questionable range" here?

A.   Well, "questionable, probable," it's --

Q.   They are two different words?

A.   Technically it's -- it's in a gray area.

Q. Statistically his score on that scale would have yielded a 50-percent chance that he was malingering?

A. On that particular scale. But, again, if you look at the -- the manual of that manual, to diagnose malingering there are a number of factors that go into the diagnosis of malingering, and that is scores that are exceedingly high on a number of those scales. This is the only scale that falls in that 50-percent range, and there are a number of scales that go into the SIRS.

The manual also states that you also need validity scales under the psychological test which suggest an invalidity or malingering, and that was not the case in Mr. Fulks' case.

Q. "I did make an incorrect scoring decision and with rescoring, his score dropped to the indeterminate range for malingering"?

A. On that one scale, yes, sir, on the blatant score. That was the scale that was in question.

Q. So, according to the SIRS, which is developed specifically to determine whether someone is malingering, it was indeterminate whether he was malingering?

A. In the -- on the one scale. Now, you don't take an isolated scale from this instrument and make it a -- diagnosis or assessment of malingering based on one scale. This is a scale that is designed to look at malingering on a number of different domains.

Q.  I'm just reading what you wrote here.

A.  I understand, but let me -- I'm trying to explain, you know, the content of my opinion.

Q.  Test results for PAI, MMPI-II, Rorschach, WAIS-III are all valid with acceptable scores in the non-malingering range?

A.  That is correct.

Q.  The only interpretation for magnification of symptoms came from the MCMI-III?

A.  That is correct.

Q.  Magnifications.  That was because the debasement score was so high, right?

A.  Well, because of the way he responded to those items.  As I previously testified, there was magnification of the -- of the scores.

Q.  And the debasement score is a validity scale?

A.  It is one of three validity scales, yes, sir.

Q.  Which if it was high enough would invalidate the entire test?

A.  That is not my opinion.

Q.  Well, what are validity scores supposed to do?

A.  Well, again, it gives the clinician an idea about how a person responds.  If a person's score gets above a certain point, then the scale -- then the test should not be --

Q.  Valid?

A.  -- valid.  There are still valid interpretations that can

be made from this test even though, again -- one of the reasons I give a number of tests is to make sure that you have a good representation of a person's temperament over a number of different instruments.  This is the one instrument that is somewhat -- that you have to be cautious in assessing interpretations to that.

The clinical printouts from the MCMI suggested some -- many more pathological diagnoses which I have not diagnosed, I haven't endorsed, for the very reasons -- because there is some exaggeration or some magnifications of those clinical scales.

THE COURT:  Mr. Jendron, we have been going about an hour and a half since lunch, which is normally my outer limit. So let's go ahead and take our afternoon break.

MR. JENDRON:  Thank you.

THE COURT:  Let's take a 15-minute recess.

(Short recess)

BY MR. JENDRON:

Q.  Dr. Hilkey, knowing about the prior BOP report that was done in 1998, did you take that into consideration, that he had previously taken the SIRS and the MMPI exam?

A.  I was certainly aware that he had -- had taken that.  I did ask him about the examination.  I did talk to Mr. Fulks about the fact that he had clearly not cooperated with Dr. Simcox in the evaluation, and that the scores on the SIRS, on the

WAIS-III, on the Wechsler Memory Scale, and on the MMPI were clearly malingered.  I talked to Mr. Fulks about that, I was aware of that, and I certainly factored that into my opinions.

Q.  So, if someone knows that he malingered previously, he may not -- he may know how not to malinger when he takes it again, does he?

A.  Well, malingering is -- the definition of malingering is intentional feigning of problems for some external gain.  So, the emphasis is on intentional, is a volitional choice.  It is not something that a person is -- they don't do it unconsciously.

If they do it unconsciously, we call that a different disorder, we call that factitious disorder.  But this is an intentional malingering.

Q.  But there have been studies that people can be coached on these exams, correct?

A.  Can they be coached?

Q.  Yes.

A.  I suppose people could be coached.  But again, I think that's the reason why it's important to give a variety of psychological tests.  You don't rely on just one, and you look at personality from a number of different dimensions.

You look at it in terms of self report, through clinical interview, you also use projective testing, which are less prone to know how to skew the answers.  The Rorschach is

exceedingly difficult to fake.

But when you look at the test responses of Mr. Fulks, there is a remarkable consistency among a number of different domains.

Q. Could you put up Exhibit 16, page 7.

This is -- these are notes of Mr. Blume. You consulted with Mr. Sanislaw about the MMPI, correct?

A. I did not consult with him.

Q. You did not?

A. I was asked by Mr. Blume to forward my raw data to Dr. Sanislaw, who I do not know. I believe that he wanted to, I assume, double check or review my findings. I have never talked to Dr. Sanislaw. I know the name because I was ordered or asked to send my data to this individual.

Q. Down towards the middle of that, there's a little box out to the left, 8 comma 3?

A. Yes, sir.

Q. "Psychotic symptoms," is that what it says?

A. Yes.

Q. And did you tell Mr. Blume that? Did you give him that information?

A. I don't recall whether I told him or not. I mean, it is -- it is the two-point profile that I've testified earlier on direct examination --

MR. DALKE: Objection, Your Honor, he's asking the

witness to testify to notes that aren't his own.  These are Mr. Blume's notes.  Dr. Hilkey testified -- I mean, these notes reflect a conversation.

MR. JENDRON:  I'm not attributing the notes, I'm asking if he gave information to the effect that was put on these notes by Mr. Blume.

THE COURT:  Do you want to ask if these notes correctly reflect the information he gained --

MR. JENDRON:  Exactly.  Yes.

THE COURT:  Well, I will allow it for what it's worth, so let's establish that and then move on.

MR. JENDRON:  Okay.

MR. DALKE:  Thank you, Your Honor.

BY MR. JENDRON:

Q.  And did you tell him "That as a result of the APD profile, Mr. Fulks had a serious mental illness probably in the psychotic spectrum"?

A.  Yeah, I don't remember the -- I can only -- how Mr. Blume got this, I do not specifically remember that conversation.  I would not contest the fact that he got that from me, but I have no specific memory of that telephone conversation or the origin of these notes.  But the statements that you make are certainly within the realm of possibility, based on those profile scores.

Q.  I think I asked you if you had a diagnosis that he had been -- had schizoaffective disorder, and I think you said you

did not --

A.  I did not formally diagnose that disorder.

Q.  Did the MCMI-II indicate he had schizoaffective disorder?

A.  The MCMI-III, you mean?

Q.  III.  MCMI, Axis I.

A.  I -- that is not a --

Q.  Would you like to see your report?

A.  That -- no.  That -- the diagnosis of schizoaffective disorder is one of the possible hypotheses that were generated from the MCMI-III.  This is a computer generated report.  Those are only given to the clinician to consider it as a possible diagnosis.  I have never given Mr. Fulks a diagnosis of a schizoaffective disorder.

Q.  But the test indicated that --

A.  The test --

Q.  -- he may have had it?

A.  The test suggested that it ought to be considered.  But again, I'm aware that the way that Mr. Fulks responded to this instrument would have made the diagnosis of that very serious disorder unlikely, given the level of -- the way that he responded to it.

        And again, there was a cautionary note because of the magnification not to place as much emphasis on the more serious diagnoses because they probably were not an accurate reflection.

Q.  That's because men with schizoaffective disorder tend to exhibit antisocial personality traits, don't they?

A.  Pardon me?

Q.  Men with schizoaffective disorder tend to exhibit antisocial personality traits, don't they?

A.  Well, antisocial personality traits cross a number of different diagnostic categories.  And again, people with schizoaffective order, it's a very, very -- it is probably among the most serious of the psychotic disorders that has features of both schizophrenia and bipolar disorder.  It's a very serious mental illness.

So, within that spectrum, people can certainly act in impulsive ways that look antisocial, but again, the behavioral classifications of antisocial are subsumed under a number of different diagnoses.

Q.  Did Mr. Fulks exhibit those?

A.  Which one?

Q.  Those behaviors that you just talked about?

A.  Which behaviors, Mr. Jendron?

Q.  About the schizoaffective behaviors that are so serious?

A.  I -- I did not see evidence to support that diagnosis in my interviews with him.  And I did not diagnose him with that disorder.

Q.  But the test said he probably did?

A.  No, the test said I should consider that.  It would be a

direction to the clinician. But as I've earlier testified, given the way that he responded to that, I am -- those were not within the realm of my consideration because I don't -- I didn't see evidence on it clinically. I didn't see evidence on other -- other assessment instruments that I administered.

Q. Would that be some evidence that the test was invalid?

A. No, it would not. A ruleout is simply a hypothesis. It is something that if there is not sufficient evidence, it directs the clinician to do further investigation, further testing, further examination to see if in fact that is a possibility. I do not believe that Mr. Fulks suffers from schizoaffective disorder, nor have I diagnosed it.

Q. Now, we were talking about some of the events that had occurred during the crime spree, and you said that you got some of those -- that information from Mr. Fulks?

A. Many -- some of the information I got from Mr. Fulks.

Q. Okay. Did he talk to you about the Donna Ward situation?

A. I don't remember specifically him talking about that. Again, I did not ask him a great deal about the -- the crime. Again, my role in Mr. Fulks' case was to do a psychological evaluation, to do the psychological testing, to interview him to see if in fact he had the presence of some diagnostic disorders.

I did not spend a great deal of time looking at discovery or talking to him about the -- at the time of the

alleged offenses.

Q. So, he didn't talk to you about trying to lure Donna Ward out in some --

A. Again, I did not --

Q. -- on some job interview?

A. I did not ask him a lot of questions related to the specific crime.

Q. When did you find out about that information?

A. I don't recall. There's some -- I'm not sure of when I became aware of certain facts in the case. I certainly was aware of it before I generated my final report.

Q. So, you were aware of it during the trial?

A. Prior to the trial you mean?

Q. Right.

A. Yes.

Q. Prior and during the trial?

A. I was not present during the trial.

Q. Okay, I'm sorry. But you were aware of it when the trial was being conducted?

A. Yes.

Q. And did you talk to Mr. Blume about that, as to whether that might have some significance as to your diagnosis?

A. I did not.

Q. You did not. Did he call you and ask you about it?

A. Let me correct my -- I think I got confused about the Donna

Ward situation.  I'm not sure that I was -- I think I misspoke.  I don't know that I was aware of the Donna Ward situation prior to trial.  I don't recall.  I'm sorry, I'm confused about that.

Q.  You do know about it now?

A.  I do know about it now, yes, sir.

Q.  And does that not show that he had independent thinking in trying to lure a woman out to do something like what had happened to Samantha Burns and Alice Donovan?

A.  There is some reflex of independent thinking.  The quality of the thinking I think is not particularly good.

Q.  But independent thinking nonetheless?

A.  At a pretty primitive level, yes, sir.

Q.  And dependent personality, a dependent personality would cow tow to authority, would they not?

A.  They may.  They may.  Not always.

Q.  They should, though?

A.  They should?

Q.  They should, if they are a dependent personality?

A.  No.  Again, the dynamics of the dependent personality are rather complicated.  Again, they are not always -- people who have dependent personality features don't always cow tow.  But there's a pervasive tendency to seek nurturing or seek dependance on other people, multiple marriage relationships, seeking people who they perceive can care for them.

The observations that I had of Mr. Fulks during my interview, he seemed to be very concerned about what people thought of him, in particular Mr. Blume; other people who were in the process of having contact with him.

There was also many references to wanting to establish a relationship with his mother and father again. A rather childlike presentation in his demeanor and his discussions of those individuals. And those are some of the bases for the dependent features.

Q. Beating up three women, including one that he was married to, is not indicative of a dependent personality, is it?

A. It is not -- that incident certainly doesn't sound like a dependent personality, no, it does not.

Q. The criminal history that we went through doesn't sound like a dependant personality?

A. There are certainly elements -- and again, as I testified earlier, there are multiple comorbid, coexisting diagnoses. And again, people don't always function in the same way everyday, every hour. There are differences.

Q. Thank you, Mr. Hilkey.

A. Thank you, Mr. Jendron.

THE COURT: Any redirect?

MR. DALKE: Yes, Your Honor.

THE COURT: All right.

REDIRECT EXAMINATION

BY MR. DALKE:

Q.  Dr. Hilkey, showing you again what has previously been marked as Exhibit P 23 --

A.  Yes, sir.

Q.  -- the SIRS summary.  How many variables go into making a determination of validity on this test?

A.  Eight.

Q.  And your conclusion with respect to the validity of this test is that Chad was not malingering; is that correct?

A.  That is my opinion, yes, sir.

MR. JENDRON:  Been asked and answered, Your Honor.

THE COURT:  Well, overruled.  Go ahead.

MR. DALKE:  Oh, I was finished, Your Honor.

BY MR. DALKE:

Q.  Showing you what has previously been marked as Exhibit P 21, do you recognize -- do you recall this document, Doctor?

A.  Yes, sir, I do.

Q.  This is the MCMI-III interpretive report?

A.  That is correct.

Q.  How many variables go into making a determination of validity in this report?

A.  There are essentially three scales.

Q.  You administered a total of four personality -- I'm sorry, four malingering tests to Mr. Fulks?

A.  I administered the SIRS and the Rey 15-item-II.  There are

validity indicators on the other four personality tests that I gave.

Q.  And referring to Mr. Jendron's lengthy chart of the diagnoses that -- the possible diagnoses that you have been using as working hypotheses throughout your time of evaluation with Mr. Fulks, is the generation of multiple working hypotheses something that is unique to Mr. Fulks' situation?

A.  It's certainly commonly seen when you are working on diagnosing or assessing an individual, especially someone who has this complex history as Mr. Fulks.  There are a number of things that go in.  They are working hypotheses that you attempt to support or discard.

Q.  So, you've undergone that type of evaluation with patients in the past?

A.  Absolutely.

Q.  And you will recall the extensive litany of criminal activity that Mr. Jendron recited?

A.  That is correct.

Q.  Even assuming that any and all of those facts are true --

        MR. JENDRON:  Your Honor, I believe counsel is leading.

        THE COURT:  I agree.  Don't lead your witness.

        MR. DALKE:  Well, I'm just trying to set up --

BY MR. DALKE:

Q.  Do you recall the criminal history?

A.  Yes, sir.

Q.  Do you recall that it was lengthy?

A.  Yes.

Q.  Did any of that information that you heard, even if it was true, alter your ultimate opinions?

A.  It does not.

MR. DALKE:  I have no further questions, Your Honor.

THE COURT:  I don't have any questions.  Anything further?

MR. JENDRON:  No, Your Honor.

THE COURT:  Thank you, sir, you may step down. Unless someone objects, you are excused from your subpoena.

Please call your next witness.

MR. DALKE:  We would like to call Dr. Margaret Melikian, please.

MARGARET MELIKIAN, SWORN

MR. DALEY:  Your Honor, beg the court's indulgence for a minute.  I think we have got a few exhibits floating around here.

THE COURT:  All right.

MR. DALEY:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. DALKE:

Q.  State your name for the record, please.

A.  My name is Margaret Melikian.

Q. And what do you do for a living, Doctor?

A. I'm a forensic psychiatrist.

Q. Where?

A. At the Medical University of South Carolina in Charleston. And I also do some private cases outside the university.

Q. How long have you had that position?

A. I began the department of forensic psychiatry at the medical university in 2002, where I was the director until 2007, and I have maintained faculty privileges since then.

Q. Would you give the court a brief description of your educational background?

A. I received a bachelor of science in electrical engineering from the University of Tulsa in 1986. After working as an engineer for six years, I attended medical school at Oklahoma State University College of Osteopathic Medicine, where I graduated in 1997.

MR. JENDRON: We will stipulate to her expertise.

MR. DALKE: Okay. Thank you.

BY MR. DALKE:

Q. At some point, Doctor, did John Blume contact you to conduct an evaluation of Mr. Fulks?

A.  Yes, he did.

Q.  And what did he ask you to do in connection with this request?

A.  He asked me to evaluate Mr. Fulks for psychiatric and cognitive illness.

Q.  Were you prepared to testify regarding your opinions to the jury during the sentencing phase of the proceedings?

A.  Yes, I was.

Q.  Did you testify?

A.  No, I did not.

Q.  How many times did you meet with Mr. Fulks?

A.  I met with Mr. Fulks either two or three times in December of 2003.

Q.  Do you recall where?

A.  At one time I met with him at the Alvin S. Glenn Detention Center, and either one or two times at Columbia Care Center in Columbia.

Q.  And in addition to your one-on-one meetings with Mr. Fulks, did you review any records?

A.  Yes, I did.

Q.  Which records were those?

A.  Those were records provided by Mr. Blume.  Three large notebooks.

Q.  Did they include medical records?

A.  They included medical records, criminal history, juvenile

records, court records from Tennessee, court records from Indiana, police records from Florida, Bureau of Prison records, several police and court records, West Virginia school records, special education records, Ohio school records, Indiana school records, Saint Mary's hospital records, the Federal Bureau of Prison's forensic report, an IQ chart.

I reviewed Dr. David Bachman's summary of findings, Jonathan Venn's report, Otto Klassen's psychiatric consultation.  I had a rap sheet for Mr. Fulks, several other police department records, FBI interview records, two polygraph records, Fred Bookstein's report, Dr. Ralph Newman's memorandum, apparently reports from FBI interviews with Heather Goodman, Andrea Roddy and Tina Severance from several occasions, Columbia Care Center records, a memorandum summarizing Roger Fulks' psychological evaluation, and a chart summarizing Brandon Basham's psychological history.

There may be -- I think that's all of them.

Q.  In addition to those records, did you consult with any other professionals?

A.  I consulted with Dr. David Bachman by telephone.  I also believe I spoke with Dr. Bookstein.

Q.  Did you consult with Dr. Sterling Clarren?

A.  Yes, I did.

Q.  Did part of your evaluation of Mr. Fulks include an assessment of malingering?

A.  My assessment of malingering is more of a clinical assessment, because I'm not a psychologist and I don't give the psychological tests.  But as a forensic psychiatrist, in our training we are taught a lot about malingering and are taught to expect malingering in a legal presentation of psychiatric symptoms.  And it was my clinical impression that Mr. Fulks was not malingering, and that was supported by psychological testing.

Q.  Based on your evaluation of Mr. Fulks, as well as the review of the records and consultation with the other professionals, were you able to reach any conclusions regarding Mr. Fulks' mental health?

A.  Based on my evaluations with Mr. Fulks, I made several psychiatric diagnoses, as well as I guess accidentally making a medical diagnoses, on the first occasion that I met with Mr. Fulks.  That goes back to your question about malingering.

When I met Mr. Fulks in the detention center, he initially presented with a swollen face and looked to be in pain, and had explained to me that he had been stabbed the day before.

I didn't believe him initially because I thought if he had been stabbed, he wouldn't be sitting there talking to me.  As we continued our conversation for a couple of hours. Mr. Fulks continued to look worse and worse, to a point where I was concerned about his health, and asked him more direct

questions about the altercation he had had.

He showed me wounds that had Betadine and a Band-aide over them, and explained that other inmates had sharpened a paper clip and pressed that into a toothbrush handle, dipped that in feces and stabbed him in the abdomen with this.

At that point, I realized that Mr. Fulks had either probably perforated his bowel, meaning that the sharpened paper clip poked a hole in his colon or small intestine, or that the feces that they had dipped that in was inside his abdominal cavity making him very ill.

So, while I didn't diagnose acute peritonitis at the time, I did call his attorneys and say, "He is ill and -- very ill, and needs some additional medical attention that he was not getting at the detention center."  That evaluation ended at that point when I was concerned for his physical health.

Beyond that, I also made psychiatric diagnoses, including major depressive disorder and anxiety disorder, a cognitive disorder not otherwise specified, amphetamine, cannabis, and alcohol dependance.  And on Axis II, I diagnosed him with antisocial personality disorder.

Q.  Going back to your relation of the stabbing incident, how did that relate to malingering?

A.  The way that relates to malingering is that because of my training I was expecting malingering.  And that was an unusual presentation for someone to say they had been stabbed the day

before and sitting and talking to me in an interview the next day. So, I didn't initially believe that -- either the stabbing was minor or not true, and it did turn out be true.

So, while I was expecting malingering, that was not the case. And I didn't get the clinical impression in my other meetings with Mr. Fulks that he was malingering at that time.

Q. You mentioned that one of your diagnoses was cognitive disorder not otherwise specified?

A. That's correct.

Q. Can you explain what that means?

A. Cognitive disorder not otherwise specified is a diagnosis that has to do with someone's limited intelligence or ability to think.

Mr. Fulks has lots of reasons to have decreased intelligence, including prenatal exposure to alcohol, and I believe having fetal alcohol effects. He has had multiple head injuries. He began using drugs at an early age. He grew up in an environment that was not supportive of education. And so cognitive disorder gathers all of those things together to say that his brain doesn't work as well as it could.

Q. And you mentioned that one of those potential causes was multiple head injuries?

A. That's correct.

Q. Are there long-term consequences associated with having suffered multiple head injuries?

A.   Multiple head injuries can cause problems with a drop in IQ.

Q.   How would you expect someone with this illness to interact with the world around him?

A.   Well, Mr. Fulks has an IQ that is down, at this point, in the borderline intelligence range, which is the way he presents.  Regardless of the ideology of how he got to that point, he is down in the bottom eight percent of the population as far as intelligence goes.  He is not able to think and plan very well.  His executive functioning, understanding consequences, making long term plans or goals, is impaired.

Q.   And what do you mean by executive functioning?

A.   Executive functioning is the ability to think and plan and organize.

Q.   And you also diagnosed him with major depressive disorder?

A.   Yes, I did.  I felt he met the criteria for major depressive disorder at the time I saw him, as well as having a history of depression.

Q.   And you seem to be making a distinction between a history and immediate symptoms, can you explain that?

A.   Well, I felt at the time I saw him he was suffering from depression.  And looking back through the records, he also had diagnoses of depression, and made suicide attempts in the past as a teenager.

When a person has major depression, that's not a

lifelong diagnosis.  Those come in discreet episodes.  So, a person could be depressed for six months, get better, have an episode of depression again.  Depression is a recurrent illness.  So, the fact that he had had depression in the past made it more likely that he had depression again when I saw him.

Q.  In your opinion, did Mr. Fulks exhibit a history of major depression?

A.  He had a history of that diagnoses and a history of suicide attempts.  I don't recall off the top of my head other things from childhood or previous incarcerations.

Q.  You mentioned suicide attempts.  Are you aware of the number of times he attempted to commit suicide?

A.  I believe Mr. Fulks attempted suicide on two occasions I can think of off the top of my head.  One time by attempting to hang himself, which was witnessed by one of his brothers and not reported, and another time by overdose on medications where medical treatment was sought and psychiatric care was recommended.  But his mother or family decided that they did not need to seek psychiatric care at that time.

Q.  Is there any psychiatric significance to attempted suicides?

A.  Yes, there is.  A suicide attempt is one of the most serious psychiatric symptoms that we have.

Q.  Given this diagnosis of major depressive disorder, how

would you expect someone with this illness to interact with the world around them?

A.  Major depressive disorder can affect suicidality, obviously, will to live, sad mood, feeling of hopelessness and helplessness.  Ruminative thoughts of guilt can decrease appetite, in some people it increases appetite, but an appetite change.  Can cause difficulty sleeping, and generally slows the person down somewhat, not thinking as clearly.

Q.  Did you also make a diagnosis of some type of anxiety disorder?

A.  Yes.  In my report to Mr. Blume I talk about either an adjustment disorder with anxiety or an anxiety disorder overall.

Mr. Fulks has -- had anxiety throughout his life. Looking back through the records, it appears he had some separation anxiety, trouble going to school.  I was also impressed with the treatment he has received while he's been incarcerated.

Mr. Fulks is on different medications for anxiety, one of those being BuSpar, which can be given sometimes.  But also he was given Klonopin while in an incarcerated setting, which I have never seen used in my review of records or my time treating in prisons.

He's continued to have medication throughout different hospitalizations, and I was impressed with that level

in anxiety.

Q.  And could you explain again why do you think it -- why was it rare in your opinion for him to have been prescribed Klonopin?

A.  Well, it was actually a little rare for either of those medications.  Anxiety is not something that is usually treated in an inmate.  An inmate's comfort is usually not a priority in the prison setting, unless they are unmanageable.

So, not only was he treated with an anti-anxiety medication, he was also then treated with Klonopin, which is a scheduled drug and has an abuse potential.  And that's in the same category as Valium or Ativan, it's longer acting.

And I have not seen that medication prescribed any time, and it's usually -- unless a person is in surgery or an infirmary -- I have not seen an inmate receive any kind of scheduled medication.

Q.  And scheduled medication, is that similar to a controlled substance?

A.  Yes, same thing.

Q.  Could you back up a little bit and explain your diagnosis of adjustment disorder?

A.  He had had diagnoses of adjustment disorder in the past. And adjustment disorder is more anxiety and/or depression than would be expected, given a situation.

But an adjustment disorder is -- the symptoms of the

anxiety are the same, but there is a specific cause for that that you could see, a reason for the person to be that anxious.

Given Mr. Fulks' anxiety throughout his life, I think he probably has an anxiety disorder not otherwise specified, would be a better diagnoses.  Because you are not really sure whether it's just the situation at the time or this is a lifelong pattern.  And there is some evidence that it was a lifelong pattern.

Q.  And what evidence is there of it being a lifelong pattern?

A.  That was the separation anxiety, and his report of other anxiety symptoms that seemed to be in anxiety -- in the whole anxiety spectrum disorder, including, I believe, feeling that others were talking about him a lot of the time, having panic attacks at age 13 and 14.  He had some other previous symptoms of anxiety.

Q.  I think you mentioned difficulty functioning in groups, was that also part of the historical information?

A.  I'm not -- I don't recall if that was historical information or by his report.

Q.  Okay.  How would you expect someone with this illness to interact with the world around them?

A.  Anxiety can be debilitating in several different ways.  In a lot of ways it makes a person shut down, so anxious that they are not able to function.  The worry is so much that they are unable to get things done.  Anxiety also has a correlation with

violence.  That a person who is anxious can be violent because of that, also because of their fear.

Q.  Could you explain that a little bit more?

A.  There can be affective violence.  Whereas if you think people are out to hurt you first, you could misinterpret those cues and be violent.

A good way to think about that is a cat who is anxious and feeling threatened will arch its back and raise its fur and hiss.  And that's actually fear on the cat's part, but it's also an indication that violence may be coming your way.

Q.  And that was affective?

A.  Affective --

Q.  Anxiety, affective violence -- is there another kind of violence?

A.  There is predatory violence.

Q.  And could you explain that?

A.  Using the cat analogy again, if you are about to be scratched by a cat, you probably know that's coming if it's hissing at you and arching it's back and acting in a way that it's afraid.

In terms of predatory violence, that's the cat who is stalking a mouse very quiet, you don't know that that violence is coming.

Q.  Are there any long-term effects associated with this illness?

A. With an anxiety illness?

Q. Yes.

A. Discomfort, substance abuse can be prominent as a way to try and alleviate their feelings of anxiety.

Q. And you also diagnosed him on Axis I with amphetamine dependence?

A. Yes, I did.

Q. What are amphetamines?

A. Amphetamines are stimulants.

Q. Are they addictive?

A. Yes, very addictive.

Q. Can they be -- is there physical addiction?

A. There can be physical and psychological addiction to stimulants. Mr. Fulks used powder cocaine in the past, crystal meth, and crack cocaine, as well as I believe snorting Ritalin, which I believe is another stimulant used to treat ADHD while he was in jail.

Q. So, your diagnosis of amphetamine dependence, that's based on what?

A. That is based on his increased use over time, giving up other activities to use the substances. I can go through the DSM criteria for dependence as opposed to just abuse. "Needing to use more and more of the substance to achieve the same high, withdrawal symptoms, using the substance in larger amounts over a longer period than is intended."

Part of the diagnosis is a desire to cut down, which I'm not sure Mr. Fulks had, but he was unable to control his substance use.

Giving up other activities to obtain the substance. Social, occupational, or recreational activities given up because of a substance abuse. And continuing to use the substance, knowing that there are physical and psychological problems that are caused or exacerbated by its use.

Q. Are there long-term effects of amphetamine abuse?

A. There can be -- well, there is both effects from acute intoxication, which can make you psychotic, there is withdrawal effects, which include dysphoria, feeling bad, wanting to use more medication or more stimulants, which would make -- can make a depression worse.

As well as for Chad, he's using crystal meth a lot, which is an extremely toxic substance, extremely toxic to your brain. His brain already had insults, and to continue using that over the long-term just continues to worsen his brain damage.

Q. How is crystal meth insulting to the brain?

A. Crystal meth is made out of battery acid and horrible type chemicals. I don't know the recipe or how to cook it, but you know, it's in the news often about meth labs and how toxic those are.

And crystal meth is smoked, and that is -- crosses

the blood barrier very quickly and has a significant effect on the brain.  I'm not an expert in crystal meth use, but it is a particularly bad drug to be using.

Q.  And you mentioned Ritalin, can you explain what Ritalin is?

A.  Ritalin is another stimulant that's used to treat attention deficit hypertension disorder.  It's another stimulant as in caffeine is a stimulant, it's in pill form, I believe.  He was snorting Ritalin the day that he and Brandon Basham escaped from the jail initially.

Q.  And snorting Ritalin I'm presuming is not the recommended route of exposure?

A.  No, that's not the way it's prescribed.  And the Ritalin was not prescribed to him.  I'm not sure if it was Brandon's or if they got it in the jail trading for other drugs or how they were able to obtain that substance.

Q.  Are you aware of any other illicit drug use of Mr. Fulks throughout his history to you?

A.  Yes.  It's an extensive enough list, I wouldn't be able to pull it up by memory.

Mr. Fulks reported that he began drinking at age 10, including moonshine.  This is another important thing to note in terms of his cognitive abilities.  Moonshine is to alcohol what crystal meth is to stimulants.  Moonshine can be made with radiators, it often has heavy metals in it, and is a particularly toxic form of alcohol.

He began drinking that at age 10.  He's had blackouts from drinking.  He began drinking daily at age 14.  At age 10, he began smoking marijuana, stating that he smoked about 10 joints a day.  He would lace the marijuana with embalming fluid.  So, it's another toxic chemical used to preserve dead flesh, it can't be too good for your brain.

He began using crystal meth at age 21.  He smoked daily for two years.  He used crack cocaine at age 17 and then used a lot of crack cocaine around the time of the offense.

Began using LSD at age 16.  He was huffing gasoline and paint as an adolescent around 14 years old, another substance that is particularly toxic to your brain.

He was also using Loritabs, which are a pain medication, around the time he was 16.  He has used powder cocaine.  It may be easier to list the things he didn't do, which by his report to me was he had not done Ecstasy, mushrooms, heroin, or shot anything up as far as using I.V. illicit drugs.

Q.  And how would you expect someone with this illness to interact with the world around them?

A.  Well, it would depend on whether he is acutely intoxicated at the time on one or more of these drugs.  He already has a bad brain.  And while using substances, it's only going to make his behavior worse, more erratic, less ability to plan or think or think about consequences.

The rest of the time, when not intoxicated, I would expect someone with this degree of substance use to be preoccupied with getting more substances.

Q.  Another one of your diagnoses was cannabis dependence and alcohol dependence?

A.  That's correct.

Q.  And what information is that diagnosis based on?

A.  Both of those are based on his extensive use of marijuana and alcohol.  As I said, he began drinking daily from age 14, he's had blackouts.  So, he has had -- he's been able to develop a tolerance to the effect of alcohol, the ability to drink more than most people could who hadn't been practicing, and the withdrawal symptoms that he had.  Same thing for the marijuana, began at an early age, able to smoke a lot of marijuana.

Q.  During your evaluations of Mr. Fulks, did you learn about any instances of sexual abuse?

A.  Yes, I did.  I learned from Mr. Fulks, that there was sexual abuse by a babysitter at an early age.  I believe he was also molested by a friend's father.  And at age 14 or 15, he was having a relationship with a 28-year-old woman.

Q.  And are you aware that he was disciplined at around the age of 10 for pulling down the pants of another student at school?

A.  Yes, I was.  And I felt that that could be an indication of acting out from his own sexual abuse.

Q.  Are there any long-term effects on children who are victims of sexual abuse?

A.  Yes, there are.  Sexual abuse, as well as any kind of abuse, can lead to personality difficulties.  Mr. Fulks, you know, has personality problems.  Goes to self-esteem.  Ability to interact with the world, being able to trust other people can be very debilitating in certain individuals.

Q.  In your opinion, did Chad grow up in an environment with appropriate sexual activity?

A.  No, he did not.  Chad grew up in West Virginia in a very -- in a household that was very poor.  His parents were substance abusers, there were inappropriate sexual material adorning the walls.  There was a pool table in the basement where adults often had drinking parties, there was inappropriate sexual activity going on in the home.  It was chaotic and frightening.

Q.  And then switch gears a little bit and talk about your consultation with other experts.  You mentioned that you met with Dr. Bachman?

A.  I don't recall if I met with him or talked with him on his phone, but yes, I did.

Q.  In other words, you consulted with him, whether it was in person or --

A.  Correct.

Q.  And did you reach any conclusions after your consultation with Dr. Bachman?

A.   In talking with Dr. Bachman, we discussed fetal --

MR. JENDRON:  Objection, hearsay.

THE COURT:  Well, an expert can rely on hearsay if it is something an expert in the field normally relies on.

MR. DALKE:  That's right, Your Honor, she was consulting with Dr. Bachman in conjunction with forming her own opinions.

MR. DALEY:  Your Honor, facts and data from Rule 703 of the Federal Rules of Evidence say, "Facts and data that are otherwise inadmissible shall not be disclosed."  They certainly can be disclosed to you, Your Honor, but I want to make it clear that Rule 703 -- we actually talked about this some during the trial itself, that underlying stuff would not be coming --

THE COURT:  Ordinarily underlying stuff doesn't come in, but this -- if we had a jury here, I would agree with you. It actually doesn't say it doesn't come in, it says that -- it doesn't come in unless it passes a reverse 403 balancing.

MR. DALEY:  Correct, Your Honor.

THE COURT:  But for purposes of this hearing, it goes to the weight to be given to this witness's opinion, so I'm going to allow it.

MR. DALEY:  Thank you.

THE COURT:  All right.

BY MR. DALKE:

Q.  Dr. Melikian, your conclusions?

A.  Well, not only did I have a chance to speak with Dr. Bachman, I also had his reports.  He also had the history of head injuries during childhood and adolescence, significant alcohol intake, the things that I have spoken of already as far as multiple insults to his brain.

Dr. Bachman noticed neurologic symptoms, including the way Chad moves, being very slow and effortful.  His reflexes were abnormal.  His gait was slow and careful, but otherwise unremarkable.

Dr. Bachman and I discussed Mr. Fulks' low intelligence, the number of insults.  And the neurologic signs, which are ways to measure how well someone's brain is working, by reflexes or ability to move your fingers, do complex tasks, and all of those were decreased.

Q.  And I believe you testified you also consulted with Dr. Sterling Clarren?

A.  Yes, I spoke with Dr. Clarren -- let me get to my notes to be sure I speak correctly.  I spoke with Dr. Clarren regarding fetal alcohol effects, and formed my opinion that Mr. Fulks did suffer from fetal alcohol effects, while he did not meet the criteria for fetal alcohol spectrum disorder.

Q.  And what's the difference between fetal alcohol effects and fetal alcohol spectrum disorder?

A.  To have fetal alcohol spectrum disorder, you have to have

the facial abnormalities that go along with the exposure to alcohol. They have a flattened arch of their nose, they are missing -- their nasolabial folds are slightly different, facial abnormalities and asymmetries, which Mr. Fulks did not have. One of his brothers looked more classically fetal alcohol spectrum disorder.

There are -- according to Dr. Clarren, you evaluate growth, facial abnormalities, brain problems, and alcohol exposure on a scale of 1 to 4, 4 being worst. Chad is a normal size person, so he didn't -- he scored a 1 in my opinion on that. His face is relatively normal as far as not showing the specific alcohol exposure symptoms, so a 1 on that.

His brain structure he's had problems with, and that was part of consulting with Dr. Bachman as well, where he was a 3 or a 4. And alcohol exposure you can get by history, and felt like he was a 3.

With that information about Chad and looking at fetal alcohol syndrome in general, it was my opinion that he did suffer from fetal alcohol effects.

Q. Are there cognitive impairments associated with fetal alcohol effects?

A. Yes. The impairments can be just as severe as a person who meets the full criteria for the disorder. Just because their facial abnormalities didn't show up doesn't mean that the brain damage is not just as severe.

In my research into the fetal alcohol syndrome, I felt that Chad met many of the difficulties that alcohol exposure in utero can cause, including you know, low IQ, dental problems, attention problems, impulsiveness, poor judgment, memory problems, speech and language problems, he did have a speech impediment.

I put down precocious puberty, but I'm -- I don't recall why I had that -- social problems, suicide, reactive outbursts, depression.  So he met a lot of the symptoms that go along with fetal alcohol exposure.

Q.  Would prenatal brain damage have any other effects on him?

A.  Well, he started out with a bad brain and was born into a bad environment where he was hit in the head on several occasions.  And then began using substances that were toxic to his brain at an early age.

To use an analogy from the old commercial about, "This is your brain on drugs," Chad was -- the egg was out of date and maybe hadn't been refrigerated from the alcohol exposure.  It was then put into a rusty, dirty frying pan, and it wasn't much of an environment.  And then he used drugs to make it even worse and fry his brain, as the commercial implied.

Q.  Looking at what you know of his overall life, were you able to discern any overall patterns?

A.  He had -- he had a pattern of starting out with a bad brain

going into a bad environment.  There was very little pro social environment for him at all.

His home was violent, he saw violence between his parents.  His parents were violent towards him.  He was initiated into violence.  His father encouraged him to fight.  He made the statement that, "In his neighborhood, everyone fought."

There was no supervision -- or very little supervision of he and his siblings.  They were left to fend for themselves, for getting to school, food, homework.  The environment was bad enough, he had a history of suicide attempts.

There was poor school achievement, rejection by his peers, he had a speech impediment.  He was extremely poor, even in an area where poverty was the norm, his home and parents were the poorest of the poor.

He had siblings who were also delinquent.  Because of his bad brain he had poor ability to cope with stress.  Very little social support in a poor community in West Virginia.  Began using substances, trouble with anger, not very interested in school.

There's notes through the record about DSS getting involved.  Things were bad enough, as has been testified to today even.  Teachers were concerned, something had to be done because of the environment and the direction he was headed as a

young child.

Q.  Shifting gears again and moving to a different topic. During your interactions with Mr. Fulks, did he recount drug use during the time that he had escaped?

A.  Yes, he did.  He gave an account of significant drug use during that two weeks.  As I said, he told me that he snorted Ritalin just prior to their escape.  Let me see if I have this laid out a little faster.

Just after the escape, he went and was drinking whiskey immediately for three days.  I believe they were in a hotel smoking marijuana and drinking.  He reported that they bought eight eight-balls of crystal meth, which are about three grams apiece.  Continued to drink.  They were using crank, crystal meth, smoking that, continuing to use alcohol, marijuana.

I can go through -- would you like an in general list, or what -- his specific account?

Q.  In your opinion was it extensive drug use?  I'm trying get a feel for whether you --

A.  It was extensive.  It was days on end without sleeping. They were buying batteries to trade for more crystal meth.  He began -- he reported visual hallucinations after smoking for a couple of days.  Stated that he was wired to the max.  At points, he was using so much stimulants his jaw was clamped shut from muscle tension.  Even though it was relatively cold,

he was sweating and hot part of the time, which can be attributed to his use of the crystal meth.

They spent days in hotels drinking and smoking marijuana. They -- let's see. They bought 30 to 40 packs of batteries to make crystal meth with. I believe they got $200 worth of crack cocaine and $100 worth of crank. They had two $20 pieces, I'm assuming that is crack cocaine. They got the crystal meth for half of the batteries they bought. They used $800 worth of crystal meth while they are driving and continuing to smoke crystal meth.

Let's see, on -- when they leave in Ms. Donovan's car and drive through North Carolina, they are smoking crank and weed. They ran out of crank at the Amtrak station in West Virginia. I believe that's when they started buying crack cocaine instead, they couldn't find any more crystal meth.

Let's see. At one point smoked $150 worth of crack cocaine. It looks like $1,400 worth of either crack cocaine or crystal meth between Brandon, Beth, and Chad Fulks. Said no sleep for days on end. Continuing to drink -- oh, I'm sorry, that was his mother. Drinking throughout this as well as smoking marijuana through most of the two weeks that they were escaped.

Q. And what are the consequences of this type of drug use?
A. Well, he reported visual hallucinations. You can get that way just from sleep deprivation. The amount of drug use they

were doing is excessive.  That goes to his diagnosis of

dependence.

The fact that they were even able to do this many

drugs without killing themselves is -- you know, to a novice

user you would not be able to drink that much and smoke that

much without being just completely incapacitated.  Certainly

goes to bad decision-making, impulsiveness, aggression, all

those thing that go along with it.

Q.  And in conducting your evaluation of Mr. Fulks, did you

determine that he meets the clinical criteria for antisocial

personality disorder?

A.  Yes, I did.

Q.  Show you what has previously been marked as Exhibit P 65.

Do you recognize this document, Doctor?

A.  Yes, this is the report from Butner.

Q.  Have you read this report before?

A.  Yes, I have.

Q.  I'm going to switch to -- go to page 15 of this document.

Right here, the last couple of -- the last couple of sentences

is primarily what I'm interested in.  I will just read it to

you.  It says, "It appears that he acknowledged a history of

antisocial behaviors but may not exhibit the full symptom

picture for antisocial personality disorder."  Do you agree

with that statement?

A.  Yes, I do.

Q.  What does it mean not to display the full symptom picture of antisocial personality disorder?

A.  Part of what's been discussed and is usually discussed about antisocial personality disorder is that the diagnosis is made mostly by a list of behaviors, but you are trying to capture a person's traits.  So, for antisocial personality disorder, as has been gone over before, a person had to have had conduct disorder by age 15, which is bad behavior.

In looking at someone's behavior, you have to take that -- their environment into account also.  Chad was taught to steal, lying was the norm, so a lot of those behaviors are survival in the environment that he is in.

I do not dispute the fact that he met the criteria for conduct disorder -- going to school was not important -- so a lot of those behaviors are relatively normal for the environment he was in.

As an adult, to be diagnosed with antisocial personality disorder, once again, you are listing behaviors as opposed to traits, with the exception of the -- I think it's the last criteria for antisocial personality disorder, failure to conform to social norms with respect to lawful behaviors.  That's a behavior which Mr. Fulks meets the criteria for.  Deceitfulness, also a behavior; impulsivity; irritability; reckless disregard for the safety of others; and consistent irresponsibility, these are behaviors.  The last one is lack of

remorse as indicated by being indifferent or rationalizing having hurt, mistreat, or stolen.

This is where I believe the testing that Dr. Hilkey did, why he came up low on that antisocial scale. What you are trying to capture is a person with no remorse, no capacity for shame, and Mr. Fulks doesn't meet that criteria.

Now, you only have to have three of these other criteria to meet the diagnostic criteria, so I do agree that he has the diagnosis of antisocial personality disorder. He is missing one of the more important, in my opinion, indicators, which is the lack of remorse, and Mr. Fulks has shown remorse, in my opinion.

Q. And how has he shown remorse in your opinion?

A. In my initial meetings with him, Mr. Fulks was showing remorse and empathy for what had happened. He very much wanted to assist in recovering the body of Ms. Donovan. This bothered him. He was able to empathize with the family, that they weren't able to have closure and be able to have a body to bury and very much wanted to assist in that, and that bothered him.

Were he to have absolute lack of remorse, no conscience, this would not have caused him any distress at all.

Q. Are you aware that the remains of Ms. Donovan had been found since you authored your report?

A. Yes, I am.

Q. Is that additional evidence of remorse?

A.   The fact that they were found is not additional evidence of remorse.  He spoke to me, I believe, in the -- or maybe our first meeting, if not our second, that he would like to help in that, to be able to help her family.  I would -- that remorse was present then, I have no reason to believe he would not be remorseful now.

Q.   Are you familiar with the term sociopath?

A.   Yes, I am.

Q.   What's your understanding of that term?

A.   That's a term psychiatrists and psychologists don't use very often because -- it was historically a psychiatric term but has become distorted, and so we don't -- we don't use that term, and have gone to antisocial personality disorder as the way to capture it.  And the trait of the lack of conscience and remorse is part of that, and we have the additional behavior, so a lot of people meet antisocial personality disorder who still show remorse.

        Given the, I think, lay public's definition of a sociopath or psychopath being someone who is evil, without conscience, unable to empathize with anyone else, that would be my understanding of that.

        Mental health practitioners don't use that term because it has too many different meanings and is used in the public a lot.  And in the same way that we don't say that a person is insane because that's become a legal term, whereas it

was considered to be a psychiatric term but we no longer use that because its meaning can be distorted in too many ways.

Q.  Is a person who is diagnosed with antisocial personality disorder a sociopath?

A.  Not necessarily.

Q.  Do you have an -- do you believe Mr. Fulks is a sociopath?

A.  No, I do not.

Q.  Are you familiar with what has been referred to as the Donna Ward testimony?

A.  Yes, I am.

Q.  And what is your understanding of that testimony?

A.  It's my understanding that Ms. Ward testified that she received a phone call from Mr. Fulks wanting to meet her daughter at 10:30 at night for a job interview at a hardware store, as I recollect.

Q.  Had you been aware of that testimony before you rendered your opinion, would it have altered your opinion?

A.  No, it would not.  That was, in my opinion, a poor attempt at eliciting a victim and goes to his cognitive difficulties.

          MR. DALKE:  Beg the Court's indulgence.

          Please answer any questions that the government may have for you.

          THE COURT:  How long do you think cross-examination will take?

          MR. JENDRON:  I'm not going to go the way I did

with --

THE COURT:  I'm not trying to rush you.  We can take another -- we have been going an hour and a half.  We can take another little short recess and then go until about 5:15.

MR. JENDRON:  I think we can finish by then.

THE COURT:  If we take a recess?

MR. JENDRON:  Right.

THE COURT:  Let's go ahead -- let's take a 10-minute recess this time.  We'll be in recess for 10 minutes.

(Short recess)

THE COURT:  All right.  Ready to resume.

You may cross-examine, Mr. Jendron.

CROSS-EXAMINATION

BY MR. JENDRON:

Q.  When you talked to Mr. Fulks he told you that at some point in time he denied raping Ms. Donovan, he recanted on that matter, correct?

A.  Yes.

Q.  So he lied about that?

A.  Yes.

Q.  And that was one of the factors that you found that was present when you made your diagnosis of antisocial personality disorder, correct?

A.  Yes.

Q.  Because people with antisocial personality disorder have

lied and conned others?

A.   That's correct.  Deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure.

Q.   Are you aware of the incident when he was in jail and he said that he had a sick child and he needed to borrow a car to go see the sick child?

A.   Yes.

Q.   Okay.  That was a lie, wasn't it?

A.   Yes.

Q.   And he conned somebody out of a car, an old lady?

A.   Yes.

Q.   And let's see, how old did he tell you when he was abused by the babysitter?

A.   I want to say that it was eight or nine.

Q.   Eight or nine?

A.   I'm trying to check and see if I can find out exactly what he had told me.  Eight or nine years old, yes.

Q.   And that was the time he was beating an old lady with a stick, right, when he was nine years old?

A.   I believe that was in the criminal history, yes.

Q.   And running the streets wild?

A.   Yes.

Q.   But you believe he had a babysitter?

A.   I believe there may have been a teenager in the home.

Q.  I didn't ask you that, I asked you, do you believe he had a babysitter?

A.  I could believe he would have a babysitter, yes.  The type of babysitter he had apparently performed oral sex on him, so maybe the choice of babysitter was not the greatest but --

Q.  Prove it.

A.  I can't.  I wasn't there.

Q.  Right.  You have to take it on his word, don't you?

A.  Yes.

Q.  The word of somebody that you have already found in your diagnosis who lies and cons people?

A.  Yes.

Q.  In fact, about everything that you have said on your direct you have to take at his word, don't you?

A.  I not only take his word, as a forensic psychiatrist you try to use collateral information to verify what a person is telling you.  As opposed to a treating psychiatrist, takes a patient where you are, you believe what they say and their symptoms and the rest of that.

As a forensically trained person you try to find other information to back up what people are telling you, and given the other information that was available about the environment he grew up in, that seemed like a reasonable statement.  As I said before, when he said unreasonable things to me, like he had been stabbed the day before, I didn't

believe him.

Q.  You didn't believe him why?

A.  Because he was sitting there talking to me, and when a person has been stabbed they are usually not sitting there carrying on a conversation if they have been stabbed multiple times.

Q.  He claimed that he was beaten up by eight inmates, didn't he?

A.  I'm not sure how many.  He was, when I saw him, had bruising and swelling about his face.  I did believe that there had been an altercation, I just didn't believe he had been stabbed because he was still able to carry on a conversation.

Q.  As far as you know those wounds could have been self-inflicted?

A.  I suppose they could have been.

Q.  13, page 2.  Do you see that second paragraph?  This is an e-mail from John Blume --

A.  Yes.

Q.  -- to you, it says, "Chad, some thoughts before we talk December 30th"?

A.  I don't know if this was a e-mail to me or not.  I don't -- okay.  It has my name on it at the beginning.

Q.  Look at page 1.

A.  Okay.

Q.  Do you see that?

A.  Yes.

Q.  From John Blume to Melikian.  Was that you?

A.  Yes.

Q.  Margaret?

A.  Yes.

Q.  So is this an e-mail to you or not?

A.  It certainly looks like it, yes.  I just don't recall it.

Q.  On page 2, the second paragraph, "We are going to have to deal with antisocial personality disorder"?

A.  Yes.

Q.  "The government will, I think, clearly tag him with APD. I'm not sure that is right since I think most of the antisocial behavior is a result of cognitive impairments and fetal alcohol spectrum disorder"?

A.  That is what Mr. Blume thought.

Q.  Is that what you think too?

A.  No, that is not correct.  I did diagnose Mr. Fulks with antisocial personality disorder also.

Q.  And did you also find that he had cognitive impairments?

A.  Yes, I did.  Those are not mutually exclusive.

Q.  But not fetal alcohol spectrum but fetal alcohol effect?

A.  Correct.

Q.  Did you take this e-mail that Mr. Blume was trying to lead you into a certain diagnosis?

A.  No, I did not.  I felt that Mr. Blume was trying to give me

information as to what diagnoses may come up.  I would have to
read the whole e-mail to comment on that.

Q.  Then the next paragraph says, "Then there's the issue of
malingering, obviously we are going to have to deal with
that"?

A.  Correct.  There was evidence that Mr. Fulks had malingered
in the past and so that would be something to address.

Q.  And did you look at that BOP evaluation where he had
malingered in the past, were you provided that?

A.  I'm not sure what the BOP evaluation is.

Q.  The one that was done in '98 in Kentucky.

A.  I don't recall, but that was six years ago.  If he's
addressing it in the e-mail, I may have had that information.

Q.  Okay.  Mr. Fulks doesn't have dependence disorder, does he?

A.  I'm sorry.  Could you repeat that?

Q.  Mr. Fulks does not have dependence disorder, does he?

A.  He has substance dependence disorders.  I did not diagnose
him with a dependent personality disorder.

Q.  I guess -- I'm sorry.  That's what I meant, he does not
have a dependent personality disorder?

A.  No, he does not.  He does have some of the traits of that
and I can see why that showed up on testing.  But what he meets
the full diagnostic criteria is for antisocial, even though he
has some other personality traits that cause him difficulties
and that's what the -- a personality diagnosis on Axis II has

to deal with are personality traits that impair a person's function.

And the way the DSM is set up, you have to meet a certain number of the criteria to get the diagnosis. That doesn't mean you can't have one or two of those traits that are causing you problems.

Q. Did you mention dependent personality disorder at all in any of your diagnoses or letters to Mr. Blume?

A. I don't recall off the top of my head. If you have any information, I would be happy to look at it.

Q. Well, you remember your affidavit, right?

A. Yes.

Q. Do you have that with you?

A. Yes.

Q. Did you mention anything about dependent personality disorder?

A. No.

Q. There was another letter that you wrote Mr. Blume, it was a two-page letter; do you recall writing that letter?

A. Is that the typed letter --

Q. Typed letter.

A. -- you are referring to?

Q. It starts, "Per our conversation."

A. Yes, I have a copy of that.

Q. I think you talked about fetal alcohol effect.

MR. DALKE:  Excuse me.  Let the record be clear.  Do you want to call that an exhibit or are you talking in the abstract about a letter?

MR. DALEY:  Government's Exhibit 10.

MR. JENDRON:  It's part of Government's Exhibit No. --

MR. DALKE:  I'm not sure if it's 10 or 11.

MR. DALEY:  10.

MR. JENDRON:  11.

MR. DALKE:  It's on the screen now.

BY MR. JENDRON:

Q.  One of the diagnoses that you found was anxiety disorder?

A.  Yes.

Q.  And I believe that if you look down at that letter to the second paragraph on the bottom, "Mr. Fulks has displayed an excessive amount of anxiety given his situation, it is unclear whether Mr. Fulks suffered from an anxiety disorder before incarceration or whether the anxiety is caused by his confinement"?

A.  That's correct.

Q.  Somebody facing a murder -- somebody alleged to have murdered two people and facing the death penalty would have anxiety, would they not?

A.  I would expect someone facing a possible death penalty to have anxiety.  As I testified earlier about the amount of

treatment that Mr. Fulks was receiving, including the Klonopin, the BuSpar, the antidepressants, I felt that his anxiety was excessive.

I have spoken with other inmates who are facing death penalty trials in the past who did not show as much anxiety, and I have worked with inmates, pretrial and in prison, and, you know, I have a good baseline of the amount of anxiety they would show.

Q.  But you say it's unclear?

A.  Yes.  I -- as I said, he's -- whether this is much more because of what he's facing or the fact that -- whether he had an underlying anxiety disorder, as we talked about earlier, with the social anxiety, the separation anxiety.

As well as what I forgot to mention was some symptoms of OCD, people were looking into those type symptoms, with excessive showering and that type of difficulty.  So he did have anxiety symptoms beforehand.

Q.  You don't put that in this letter, though, do you?

A.  I did not list every -- as you can tell, it's a relatively short report on a very extensive case.  I did not list every possible diagnosis or symptom, no.

Q.  Let's go to Government's Exhibit No. 11 -- Exhibit 12, these are some notes made by Mr. Blume.  They have your name at the top.  I believe --

A.  I don't see my name at the top, but okay.

Q.  Margaret Melikian?

A.  Yes.  I was on a different page.

Q.  FBI impersonator, were you aware of that?  Did you talk about that with Mr. Blume?

A.  I knew that Mr. Fulks had impersonated the FBI to rob some college students in an RV, yes.

Q.  That's a con and a lie, right?

A.  Yes.

Q.  Violence against women, did you talk about violence against women with Mr. Blume?

A.  I -- I don't recall this conversation specifically, but I knew that Mr. Fulks had been violent against women in the past, yes.

Q.  About the three women that have claimed that they have been raped and beat up by Mr. Fulks?

A.  Yes.  I knew that information.

Q.  Can we go to the second page?  "Felony child abuse" at the top, did you talk to Mr. Blume about that?

A.  As I said, I don't recall this phone conversation in particular, but I would expect -- either he was writing notes to say something to me or I said something to him that made him write that down.  I can't answer that question.

Q.  There is something about Ward, trying to get another woman?

A.  As I said, I don't know whether he's telling me that or I'm telling him that, and I can't recall when I knew about the Amy

Ward testimony.

Q.  Could it have been before the trial?

MR. DALKE:  Objection, Your Honor.  She doesn't know -- she just testified she doesn't know, she doesn't remember the conversation.  I mean, you are asking her to opine on notes written by somebody other than her and asking her very pointed and specific questions about it.  It's kind of unfair, Your Honor.

THE COURT:  Well, what about it, Mr. Jendron?

MR. JENDRON:  I'm asking her when and where she found out this information.  I think --

THE COURT:  If you don't feel comfortable answering a question, you can say so.  If you don't know, you don't know.

THE WITNESS:  I don't recall.  I don't recall this phone conversation with Mr. Blume, so I don't know.  And I don't recall when I learned about the Amy Ward testimony.

BY MR. JENDRON:

Q.  Who did you learn it from?

A.  I don't recall that either, whether it was from Mr. Blume himself --

Q.  If you go down a little farther it says "pathological liar."  Did you discuss that with Mr. Blume, that Mr. Fulks was a pathological liar?

A.  As I said, I can't recall the phone conversation so I don't know.  That is not something I usually say, but I don't know

whether John wrote that down or I said it.

Q.  You wouldn't deny he was a pathological liar, catch him in a lie and he still will not admit to it?

A.  As I said, that's not something that I would usually say, that's not a term I would use, so I'm -- I would say it was more likely than not I would say, "Catch him in a lie and he still wouldn't admit to it," rather than say pathological liar, just because that's something I wouldn't usually say.  But as I said, I don't recall.

Q.  So you very easily could have said, "Catch him in a lie and still would not admit to it"?

A.  Looking at someone else's notes, that sounds more like something I would say.  I can't say what any of these mean, whether these were things that he wanted to tell me or I told him.  The same as I can't interpret his doodles on there either.  I mean, I just don't know what he was doing.

Q.  Then it goes on to below that at the bottom, "manipulative"?

        MR. DALKE:  Same objection.

        THE COURT:  All right.  If she knows.

BY MR. JENDRON:

Q.  Could you have talked to Mr. Blume about him being a manipulative person?

A.  I certainly could have, but I don't recall this conversation.

Q.  "I need this puppy dog eyes," are you familiar with that, "puppy dog eyes"?

A.  I have no idea what that means.

Q.  You didn't find any difficulty diagnosing him with conduct disorder, did you?

A.  No.  There was records from his childhood.  I believe he was given the diagnosis by other physicians at the time and I felt confident that he met the criteria for conduct disorder, otherwise I would not have diagnosed him with antisocial personality disorder.

Q.  Were you given Government's Exhibit No. 31, the chronology that I went over -- I think you were in the room when I was going through the chronology with Dr. Hilkey?

A.  The criminal history?

Q.  No, the chronology of events.

A.  If you can show that to me.  I believe I know what you are talking about.

Q.  It's 81 pages (handing).

A.  I don't specifically recall this.  I can look at -- I have the table of contents out of the notebooks that were given to me, as far as history.  Do you know what that was called?  Was it just called a chronology?

Q.  I think after it lists the names of a number of relatives, it starts off "list of chronology" and then it starts recording social events.

A.  If I was given that, I don't recall it looking at it right now, but this is six years later.  I'm not as prepared today as I was the day of trial.

Q.  That would have been helpful?

A.  I'm sure it would have.

Q.  You said he's showing remorse?

A.  Correct.

Q.  Because he wanted to assist in recovering the body and bringing some closure to the family; is that --

A.  Yes.

Q.  That's based on self-reporting too, correct?

A.  Yes.

Q.  How do you know he's not conning you?

A.  I don't know that, other than my clinical impression sitting there with him.  He seemed genuinely distressed by what was going on and wanted to help the family.

Q.  Even though he's an antisocial personality disorder who lies and cons people and he has done it in the past and there's plenty of examples of it?

A.  That's correct.  And just because he has lied and conned people in the past doesn't mean that everything he says is a lie or that everything he does is a con.

Q.  Well, if he's attempting to save his life and the strategies of his attorneys is for him to show some kind of remorse and closure for the family, couldn't he lie about that

to you?  Wouldn't that be important to him to establish his

defense with you?

A.  It's always a possibility that a client is lying.

Q.  Particularly in a death penalty case?

A.  As I said, part of my forensic training is to be expecting

people to be manipulative, malingering, deceitful.  There is --

using my experience in dealing with people I felt that his

distress over that incident was genuine.

Q.  These are also some notes, I believe, made by Mr. Blume.

Dramatic Cluster B.

MR. DALKE:  Your Honor, I'm not sure which exhibit we

are talking about.

MR. DALEY:  Exhibit 11, pages 21 and 22.  I think

we're on page 22 right now.

MR. DALKE:  Whose notes do these purport to be?

MR. DALEY:  John Blume's notes.

MR. DALKE:  These are John's notes?

MR. DALEY:  John's notes.  With -- if you look on

page 21, they have Margaret Melikian.

THE COURT:  So it's already in the record that

Mr. Blume said these were his notes?

MR. DALEY:  These were in the Margaret Melikian file

that included not only her handwritten notes but also his

handwritten notes and her opinion letter.  Yes, Your Honor.

MR. DALKE:  I'm trying to clarify whether these are

Mr. Nettles' notes or Mr. Blume's --

THE COURT:  I understand.

BY MR. JENDRON:

Q.  Cluster B, do you agree with that?

A.  Yes.

MR. DALKE:  Do you agree with what?  I'm sorry.  Do you agree with what?  That it says Cluster B?

BY MR. JENDRON:

Q.  Do you believe he had Cluster B personality disorders?

A.  Yes, I believe he had traits from Cluster B personality disorder.

Q.  And the Donna Ward testimony, you stated that you thought it was a poor attempt?

A.  Yes, I did.

Q.  Nonetheless it was an attempt, wasn't it?

A.  It was an attempt.

Q.  And it was an attempt without Mr. Basham being present?

A.  That's correct, and an unsuccessful and poorly thought out attempt, in my opinion.

MR. JENDRON:  One moment, Your Honor.

That's all the questions I have, Your Honor.

THE COURT:  All right.  Any redirect?

MR. DALKE:  Yes, Your Honor.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. DALKE:

Q.  The report that you generated and gave to Mr. Blume, do you recall that exhibit?

A.  Yes.

Q.  Is that intended to be an exhaustive list of all possible diagnoses?

A.  No, not at all.  That was a very short report.

Q.  And how would you have anticipated using that in that context?

A.  I would anticipate that that was information that Mr. Blume could use from me, as I didn't list his social history, his criminal history, the rest that you would write for a report to go to the court, because Mr. Blume should have had all that.

He was the one that gave me all that information, so just to reiterate that to him I didn't feel was necessary and was not -- I'm guessing what he was asking for, since I have seen the other reports of experts.  They were short and, you know, what the gist of your opinion is going to be.

Q.  And would you have expected your testimony, had you been called, to amplify what was there in that report?

A.  Very much so.

MR. DALKE:  I have no further questions, Your Honor.

THE COURT:  I don't have any questions.  Thank you.

MR. JENDRON:  I've got one question.

THE COURT:  All right.

RECROSS EXAMINATION

BY MR. JENDRON:

Q.  Did you know that was the only report that was given to us as far as 702 notice, as far as your being an expert, this two-page diagnosis letter?

A.  That's part of legal strategy that I wasn't involved in.

Q.  Well, were you asked to prepare anything more than this?

A.  No, I was not.

MR. DALKE:  No questions from me, Your Honor.

THE COURT:  All right.

MR. JENDRON:  Thank you, Your Honor.

THE COURT:  Thank you.  You may step down and you are excused.

All right, can we finish the last witness tomorrow if we have a short day?

MR. DALKE:  Well, I'm trying -- perhaps the government should answer that question, because I'm not real certain as to whether they are going to call any additional.

THE COURT:  Ms. Johnson is the next witness?

MR. DALKE:  I'm sorry, yes.  Ms. Johnson is due to testify tomorrow.  Ms. Damron-Hsiao is going to be taking that.

MS. DAMRON-HSIAO:  She will be prepared at 9 o'clock.  She will showing up at 8:45 a.m. at the courthouse.

THE COURT:  We are going to start at 9 o'clock, is

that when you want to start?

MR. DALKE:  Certainly, Your Honor.

THE COURT:  All right.  We will resume at 9 o'clock. We've got to finish her by 12:30 because the courtroom up there is not available after that.  All right.  Then will that be the last witness for the defendant?

MR. DALKE:  Yes, Your Honor, except for the outstanding issue with respect to Heather Roche, whether she is going to come down and testify live or not, as well as the government's mental health experts.

THE COURT:  The government has withdrawn their opposition to the Roche affidavit; right?

MR. DALEY:  Correct, Your Honor.

THE COURT:  And I have got to give you a sign whether I want to hear her live or not?

MS. SMALL:  Yes, Your Honor.

THE COURT:  Tell me what the affidavit relates to in regards to the search?

MS. SMALL:  Your Honor, one of the government's major themes at trial was that the reason Alice Donovan's body had not been recovered was because of Chad Fulks.  Ms. Roche's affidavit responds in part to that allegation in terms of, in part, her relation to statements by Agent Long expressing his disinterest in searching for the body, and also in part based on what she found in her certainty about -- it would tie into

other testimony.  I would presume, Your Honor, that if Ms. Roche testified, the government would want to call Agent Long.  Those two are sort of a matched pair.

THE COURT:  She's going to say Agent Long was not interested in finding the body?

MS. SMALL:  She says in, I believe, paragraph 11 of her affidavit, she related she has asked law enforcement to be present as a standard practice for her when she does research and to have law enforcement present in case remains are found. Agent Long did not attend.  At one point during the morning he drove up.  She spoke to him briefly.

THE COURT:  This is after conviction?

MS. SMALL:  No, sir, this is before conviction.  This is April 30th, May 1st of '04.  Her searches were all pretrial.  Asked if he was going to stay through the search and he said -- let me grab the affidavit so I can quote it for you.

THE COURT:  We have got them up here.

MR. DALEY:  Paragraph 11, Your Honor.  Page 3, paragraph 11.

THE COURT:  I have got it.

MS. SMALL:  Paragraph 11, the last of that paragraph related to this conversation with Agent Long, "While I do not recall his exact words, the gist of his reply was that he didn't need a body because he had a confession, and that he wasn't sending his agents out unless we found something obvious

still laying on the ground."

Your Honor, this is relevant because Agent Long's testimony at trial and the government's assertion in argument, was that they did everything they could to find the body. One of the things that Agent Long testified to is, "If I had some specifics, I would go back." Our contention would be that in fact Agent Long was not as interested, at least after Mr. Fulks' confession, in finding a body.

In fact, he did have specifics. He had Mr. Fulks saying, "This is where it is, right here." And then he had Heather Roche's dog indicating and alerting him to exactly the same place. I can't explain the conditions to you, but in the same area, and yet no searches were gone back to be done.

THE COURT: So the government -- I mean, unlike the medical experts we just heard from, for which I could have received an affidavit as to what they would have testified at trial, this affidavit is different because this goes to something offered for its truth in terms of a substantive issue.

So, it is hearsay but the government has withdrawn its hearsay objection; is that right?

MR. DALEY: I'm sorry, Your Honor, I'm happy for you to receive this in. I mean, I don't think that the gist of his conversation -- that is not even true testimony. But if they put that in, I believe --

THE COURT: So the government does not object to me receiving this affidavit?

MR. DALEY: Correct.

THE COURT: In lieu of live testimony from Heather Roche, as to what she would have said had she been here in person?

MR. DALEY: Certainly that doesn't preclude us --

THE COURT: If they call Agent Long, do you want to get her down here first?

MS. SMALL: Absolutely, Your Honor. It cannot possibly be fair for them to have live testimony with Agent Long to contradict her without her being here.

THE COURT: I agree with you.

MR. DALEY: Ironically at the beginning of the hearing I was asked whether we would stipulate. I said at the beginning of the hearing, I said I might very well, but I also mentioned that Agent Long was likely to testify.

MS. SMALL: I don't recall it that way, Your Honor.

THE COURT: How difficult would it be to get her down here or get her on satellite?

MS. SMALL: Your Honor, I have not talked to her this week. When I spoke with her last week, she was able to come down. She would need some notice, Your Honor, frankly. I can't call her today and ask her to be here tomorrow. I have no knowledge if I can get her here Friday. She does work

full-time.  She has got commitments.

THE COURT:  This is an important case.  Maybe we will just have to come back next week and bring her back next week.

MS. SMALL:  We may have to do that, Your Honor.

THE COURT:  I'm kind of painted in a corner.  I can't stop the government from calling a live witness in response to that; but in fairness to you, if they are going to bring a live witness, I have got to give you a chance to bring her down live as well.

MS. SMALL:  That is absolutely true, Your Honor.

THE COURT:  I think we have to work towards that end, I guess.  Can you see what arrangements you can make to get her down here?

MS. SMALL:  Yes, sir.

MR. DALEY:  Your Honor, I would point out that her two search reports are actually petitioner's exhibits.  In fact, the second exhibit is done -- was done June -- it was actually -- the last search that was done with the dog was done on April 30th and May 1st.  The report that was actually sent to John Blume summarizing this search was done and dated at least June 1st, the start of the trial, Your Honor.

I'm happy to have Agent Long come in and say that he was never notified after he stopped by and told to follow up.  I'm also happy to have her come live, if that would be necessary.

THE COURT:  You see my dilemma?

MR. DALEY:  Absolutely.

THE COURT:  They want to get this in.  You agreed to stipulate and then you still want to call Agent Long live. Lest you do that, I have got to give the defendant an opportunity to bring her in.

MR. DALEY:  I don't know it's really necessary, Your Honor.  They continue to characterize that the government said Mr. Fulks obstructed the search all along.  Again, we did an exhaustive response.  If you look very closely, it's the initial search, the initial time, and that initial -- that word both in the notice to seek the death penalty and in the argument it is clear that it is a fact that when he first talked, right as he was arrested in Indiana, he sent them to Savannah Bluffs.

THE COURT:  That is the one I kept out.

MR. DALEY:  Kept that out.

THE COURT:  Because it was hypothetically.

MR. DALEY:  Right, but now what they would like to do is say he was helpful later, five or six months later.  And then I guess what they would have tried to do is tell the jury, "Oh, he was helpful and always helping all along," which obviously --

THE COURT:  If I had kept out the initial effort through the Indiana lawyers, does that stay on the verdict form

as an aggravating factor?

MR. DALEY: No, it didn't, Your Honor. I think we pointed that out, that was not anywhere on the --

THE COURT: You see what you can do about getting her down here, when she can come.

MS. SMALL: Your Honor, I will certainly do that. I'm still not clear from the government. I heard Mr. Daley is happy to call Agent Long. I never heard him say whether he wants to call Agent Long or not, and that really determines the issue.

MR. DALEY: I don't have to tell you, but I will call him if you put in the -- if you stipulate in the affidavit, yes.

THE COURT: Well, what about the possibility of getting her on satellite?

MS. SMALL: That may be possible, I don't know. I understand that she works for a defense contractor. Her work place is fairly secure. You know, she would have to get to a courthouse.

(Off record discussion)

THE COURT: What about this suggestion, what about we come back Wednesday of next week and hear from Ms. Roche and Agent Long and hear arguments. I assume these will be fairly short witnesses, won't they?

MS. SMALL: I imagine so. Ms. Roche won't be very

long.

MR. DALEY:  I think that's correct, Your Honor.

THE COURT:  It looks like we are not going to finish Friday.  I think it would be better for y'all to take some time off.  I guess the out of town people have to fly back to the West Coast.

MR. DALKE:  To that mix, Your Honor, I would also like to bring to your attention that we have been overly courteous with the government, letting them know who we were going to call, when we were going to call them.

I personally feel we have not been afforded the same kind of courtesy and response with regard to mental health experts.  I have heard Dr. Newman might testify.  I heard Dr. Landis might testify, I heard Dr. Simcox might testify, or two or three, or none of them.  I'm just looking for a little reciprocity, Your Honor.

THE COURT:  Now its none, apparently; right?

MR. DALKE:  That's what I'm trying to ascertain.  I'm asking Mr. Daley, you are not going to call any mental health experts?

MR. DALEY:  We are going to talk this evening about whether we are going to call any mental health experts.  We put them on notice.

THE COURT:  Rebuttal witnesses are always somewhat iffy.

MR. DALEY: I did say at the beginning of this hearing -- I pointed out Agent Long, when we were talking about sequestration, that he might testify.

MS. SMALL: At that time, Your Honor, the government had not withdrawn its objection.

THE COURT: Well, I was just reminded when it became obvious we were not going to need the full two weeks that we set aside for this hearing, I went ahead and scheduled criminal pretrials all day next Wednesday in 25 or 30 criminal cases. Notices have already gone out to all those defense attorneys. We booked things down for Thursday and Friday as well.

Now, we can move Thursday and Friday. They are just civil matters. Is that right, Ms. Floyd? No, it's criminal too?

THE CLERK: Thursday. We can move Thursday. Friday at 3 o'clock I would rather not move.

THE COURT: Do we need all this on the record?

MR. DALEY: I don't know.

MS. SMALL: Perhaps not.

THE COURT: Let's be safe, let's keep everything on the record.

MR. DALEY: Your Honor, I just want to tell you how things developed. I'm not trying to hide the ball at all. I'm just trying to figure out whether we need anybody. I would rather not call anybody. I just had the mental health experts

put up today, so I haven't even had an opportunity --

THE COURT:  I understand you needed to see what they were going to say.

MR. DALEY:  This morning I stipulated that Heather Roche, we would allow her affidavit in.  At that time, when we had the discussion, they didn't ask me, "Are you going to call Agent Long if we put in the affidavit, the declaration?"

MS. SMALL:  Your Honor, I think that what is unfair, is having Agent Long testify and Ms. Roche not.

THE COURT:  I agree with you.

MS. SMALL:  Both have to go the same way.

THE COURT:  You convinced me of that.  If he testifies live, you have the right to put her up live.

MS. SMALL:  If Mr. Daley is not going to call any more, I think we are fine.

THE COURT:  We will be honest, we are now trying to figure out what day we can get her down here.  That's my concern.  So why don't you get on the phone tonight and see what you can find out about when she can be here, and talk about it first thing tomorrow morning, how about that?

MS. SMALL:  Yes, sir.

THE COURT:  I guess the options for her are going to be Friday, Monday or Tuesday?

MS. SMALL:   Friday of this week?

THE COURT:  Right.

MS. SMALL:  Yes, sir, I will check into that.

THE COURT:  See if she can get to -- you said the U.S. Attorney's Office has a satellite also?

MS. BAKER:  We do.

THE COURT:  A courthouse or U. S. Attorney's Office somewhere near her.

MS. SMALL:  I need to check locations on that and relay that information to her.

THE COURT:  I'm not sure if there is a federal courthouse in Annapolis.

MS. SMALL:  I don't recall, Your Honor.  I know they do a lot of admiralty law down there.

THE COURT:  Maryland, I think they have one courthouse for the whole district.  It is kind of unique up there.

MS. SMALL:  You are right.  I'm sorry.  I had in my head Virginia instead of Maryland.  I think you are right.

THE COURT:  Let's just try to get that nailed down as soon as we can tomorrow morning.

MS. SMALL:  Yes, Your Honor.

THE COURT:  Let's go ahead and talk about these issues we've got hanging.

On the request for a 60-day delay to take up sexual abuse information and further explore that, after carefully reflecting upon it over the last 24 hours, I feel constrained

to deny that request.

I would point out that we are here, in this hearing, reviewing the conduct of John Blume in terms of effective assistance of counsel, what he did do and did not do, and what witnesses he chose to call and not call, and what investigations he did and how diligent those investigations were.

Here habeas counsel was appointed in this case on September the 10th, 2007, which was 29 months ago, almost two and-a-half years.  In contrast, Mr. Blume had only 16 months for his full investigation before trial.  In other words, Mr. Blume was appointed on January the 14th, 2003 and jury selection started on June the 5th -- excuse me, June 10th, 2004.

So, what I'm saying is, if it takes this defense team, which is a very fine world class team of defense attorneys, 29 months and still has not been able to ferret out any information about sexual abuse, especially when it is information that Mr. Fulks would presumably be in possession of, I don't think we can say that Mr. -- I think it's a real uphill battle to argue Mr. Blume was ineffective in not developing it in the 16 months that he had.

So, it's an issue in the case, but I'm going to leave it as it is, as it's been briefed, and as the evidence in the record reveals thus far.  I will consider it, but I'm going to

respectfully deny the request for additional time to investigate and brief that issue.

It was raised in the original petition, so it's been an issue in the case for quite some time. One time Mr. Fulks wanted to drop it and counsel agreed. It was dropped. Then it was re-asserted.

I understand the arguments that this is a condition that is repressed, sometimes subconsciously repressed and dodged and avoided at all costs by the recipient of this abuse, but I just think primarily for the timing factors that I announced earlier, I'm going to deny that motion.

Add then I guess we need to go have our ex parte discussion with Mr. Blume about the matter that we left open yesterday as well -- I'm sorry, Mr. Fulks. It has been a long day.

MS. SMALL: When we argue the issues, if I can put in a proffer --

THE COURT: I will let you make a proffer of what you would have done, anything you want to do by way of proffer.

MS. SMALL: Thank you, Your Honor.

THE COURT: Anything else? I would like to finish up this ex parte matter that we took up yesterday. Anything else before y'all leave?

MR. DALEY: Nothing for the government.

THE COURT: Let me ask everyone except the defense

team to go and step out of the courtroom, and we will see you

back 9 o'clock tomorrow morning.

(Ex parte hearing excluded)

(Thereupon, the proceedings were recessed.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

EXAMINATION INDEX

JAMES H. HILKEY, RESUMED
    DIRECT (CONTINUED) BY MR. DALKE    3-6
    CROSS BY MR. JENDRON    3-58
    REDIRECT BY MR. DALKE    3-117

MARGARET MELIKIAN
    DIRECT BY MR. DALKE    3-120
    CROSS BY MR. JENDRON    3-151
    REDIRECT BY MR. DALKE    3-166
    RECROSS BY MR. JENDRON    3-168

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript

from my stenographic notes in the above-entitled matter.

s/ Gary N. Smith    August 16, 2010
_____    _____

Gary N. Smith, CM
Official Court Reporter
United States District Court
District of South Carolina