IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION


UNITED STATES OF AMERICA,   )   Cr. No. 4:02-992
   )
   Respondent,   )
   )
VERSUS   )   Columbia, SC
   )   February 25, 2010
CHADRICK E. FULKS,   )
   )
   Petitioner.   )
   )
----------------------------)


TRANSCRIPT OF 2255 HEARING
VOLUME IV
BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
UNITED STATES DISTRICT JUDGE


Appearances:

For the Government:   ROBERT F. DALEY, JR., ESQ.
   JIMMIE EWING, ESQ.
   ROBERT JENDRON, JR., ESQ.
   Assistant U.S. Attorneys
   1441 Main Street, Suite 500
   Columbia, SC  29201

For the Petitioner:   BEATTIE B. ASHMORE, ESQ.
   650 E. Washington Street
   Greenville, SC  29601

   KIRSTEN E. SMALL, ESQ.
   P.O. Box 10648
   Greenville, SC  29603


   DAVID P. DALKE, ESQ.
   KYMBERLEIGH DAMRON-HSIAO, ESQ.
   STEPHANIE L. NOBLE, ESQ.
   DANIELLE OAKLEY, ESQ.
   610 Newport Center Dr., Suite 1700
   Newport Beach, CA  92660

Court Reporter:          Gary N. Smith, CM
                         901 Richland Street
                         Columbia, SC  29201
                         (803) 256-7743

                 Stenotype/Computer-aided Transcription

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

THE COURT:  All right, I'm informed that we have a problem in that the next witness, Sheri Johnson, who was going to appear by satellite feed live as a witness is not able to get to the satellite because of the blizzard in Syracuse.

MS. DAMRON-HSIAO:  That's right, Your Honor.  In all honesty, she called me at 6:15 this morning and informed me that the schools had been closed.  The roads at that point had not been closed and she did represent that she would be willing to try but it would probably be unsafe.  So she did make the call but we just didn't want to compromise her safety.

THE COURT:  We would have the satellite problem even if she could get there.  The courthouse is not open.

MS. DAMRON-HSIAO:  Oh, okay.

THE COURT:  So what are we going to do?

MS. DAMRON-HSIAO:  Well, I checked with Ms. Johnson regarding her availability for next week.  She is available any time next week.  We would propose, you know --

THE COURT:  What about putting her on the telephone today?

MS. DAMRON-HSIAO:  I didn't know if you would be

willing to do that but --

THE COURT:  Telephone is fine with me.

MS. DAMRON-HSIAO:  It is fine?

THE COURT:  Is the government satisfied to have the voice without the --

MR. DALEY:  Absolutely fine, Your Honor.  I know at one point that might have been what we were going to do anyway.  Fine with us.

THE COURT:  I would prefer that rather than delay things until next week.

MS. DAMRON-HSIAO:  Okay.  We were going to propose that she go on Monday since Heather Roach and Agent Jeff Long was going to go on as well.

THE COURT:  Can anybody go on the telephone today?

MR. ASHMORE:  No, sir, Your Honor.

THE COURT:  Why can't Ms. Johnson get on the telephone today?

MR. ASHMORE:  I am not saying that she can't.  I'm saying that -- I think that we certainly can get her on the telephone.  I guess we can have a conference call here such that Mr. Fulks could hear the conversation, Your Honor.

THE COURT:  Well, let me just say -- let me just put this on the record.  It was at the defendant's request that Ms. Johnson was allowed not to come down here.  If she had gotten on a plane and come to South Carolina like everybody

else had yesterday, we wouldn't be in this problem.

I was told I needed to hear firsthand from the medical experts, which I did, because their credibility is important and live testimony was critical to that issue. Then the defendant turns right around and said that Ms. Johnson has adopted two children and doesn't want to come down here or can't come down here. So, this is not a problem that the court created. I was just trying to accommodate counsel.

MR. ASHMORE: Yes, sir --

THE COURT: I mean, the easiest thing for me to do was tell Ms. Johnson to get a babysitter and come down here. With that having been said, I am reluctant to postpone this hearing any further, if she is available by telephone and the government is agreeable to a telephone version of the testimony rather than a satellite.

MS. DAMRON-HSIAO: Could we take about an hour recess, Your Honor?

THE COURT: We can take a recess to set it all up.

MS. DAMRON-HSIAO: All right. I would need to contact her. I'm assuming she's at home. There is no place else.

THE COURT: All right. Let's take a recess and set it up and let us know when it's ready. It shouldn't take an hour, though, to set it up.

MS. DAMRON-HSIAO: Frankly, Your Honor, I fall on the

sword on this one. I wasn't prepared that we would potentially call her by phone. I just need to go and grab my exhibits, as well as contact her.

THE COURT: Get the exhibits and get the phone set up. Tell us when you are ready.

MS. DAMRON-HSIAO: Your Honor, with respect to the technical capabilities of Mr. Fulks being able to hear her testimony, are we pretty confident?

THE COURT: I'm told that can be set up.

MS. DAMRON-HSIAO: Okay. All right.

THE COURT: I mean, the way it works is, the conference call is set up running through the P.A. system here in the courtroom and we hear it through the speakers in the courtroom. I'm assuming that the speakers will pick it up for Mr. Fulks out there where he is. All right. We will be in recess.

(Short recess)

THE COURT: Ms. Floyd tells me that Mr. Fulks may be having some difficulty hearing what Ms. Johnson is saying on the telephone; is that correct?

Mr. Fulks, are you there?

THE DEFENDANT: Yes.

THE COURT: Can you hear Ms. Johnson when she talks on the telephone?

THE DEFENDANT: No. We couldn't understand what she

was saying.

THE CLERK:  I got the volume up really high.

THE COURT:  Ms. Johnson, are you there?

Ms. Johnson:  Yes, I'm here.

THE COURT:  Let me ask you to speak slowly and distinctly in answering these questions.  We have Mr. Fulks hooked into the courtroom by way of satellite, and your voice is being projected over the speakers in the courtroom.  That sound has to be picked up by the satellite and sent to Terre Haute to Mr. Fulks, so you need to speak very slowly and distinctly, if you will.

MS. JOHNSON:  If I speak too loud, please let me know.

THE COURT:  All right.  Let me just say on the record, just to make it clear, this hearing has been noticed for quite some time, and I received a request from counsel for Ms. Fulks that Ms. Sheri Johnson not be required to travel to South Carolina for live testimony because of her personal situation and I agreed to that.  It was understood that she would be put on a satellite so that we could not only hear Ms. Johnson but view her demeanor, for whatever that would be worth, in terms of deciding this case.

This morning there was a bad snowstorm in Syracuse and Ms. Johnson is not able to get to a satellite broadcast station, and so as a backup we are going to receive her

testimony telephonically, or audibly, rather than on a satellite.

We will just go -- we will go slowly, take it one question at a time, and try to speak slowly and distinctly, and we will move forward and receive her testimony that way.

Mr. Daley.

MR. DALEY: Your Honor, the government wants to put one thing on the record.

THE COURT: All right.

MR. DALEY: We are getting daily transcripts, as Your Honor knows. We requested those and the other side, Mr. Fulks' counsel, did as well. Yesterday morning we received the daily transcript from Tuesday's proceeding. When we received those, we were working with the court reporter, Mr. Smith, and he thought those did not have the ex parte portion at the end of the day on them.

One of our paralegals in our office, Gayle George, took those back and copied those yesterday, and I did not see these transcripts until this morning. It turns out that those transcripts actually did have the ex parte portion on them.

This morning, when I went to get the transcript, I saw it said the ex parte hearing was included on the title page. I asked her whether she had seen whether there was material that included the ex parte hearing at the end of the day Tuesday.

She said yes, and that she had at least gone about a page into that, but hadn't gone any further, and didn't know anything more, before I said, "Well, I don't want to know anything about it. And we need to take those pages and put them in an envelope and return those to Mr. Smith and give him back the flash drive that he had given us."

THE COURT: This was your paralegal telling you this?

MR. DALEY: Yes, paralegal Gayle George in our office. Nobody but Ms. George knows whatever was said in the first page or page and a half of that. I just want to put that on the record, Your Honor. I didn't know if there was anything else that needed to be done.

THE COURT: I don't think anything else can be done. Anything from the defendant?

MS. DAMRON-HSIAO: (Shakes head in the negative.)

MR. ASHMORE: No, sir. Your Honor, we don't have any concern about that. Thank you.

THE COURT: Go ahead and call your next witness, please.

MS. DAMRON-HSIAO: May it please the court.

Good morning, Ms. Johnson. Ms. Johnson, can you come to the stand?

THE COURT: This is Ms. Sheri Johnson. Go ahead and administer the oath to Ms. Johnson.

SHERI JOHNSON, SWORN

DIRECT EXAMINATION

BY MS. DAMRON-HSIAO:

Q.  Can you please state your name for the record?

A.  Sheri Johnson.

Q.  What is your current occupation?

A.  I am a professor of law at Cornell Law School.

Q.  Can you briefly describe for the court your educational and professional background?

A.  I received my BA from the University of Minnesota in sociology and psychology.  I spent a year under an NSF fellowship doing graduate work in sociology, and then I received my JD from Yale Law School in 1979.

Q.  And what classes do you teach at Cornell?

A.  I teach constitutional law and both death penalty clinics, trial clinic and post conviction clinic, and at times I also teach criminal procedure and criminal law.

Q.  Do you practice law currently?

A.  Yes, I practice law only in death penalty cases.

Q.  Can you describe your death penalty case experience?  Approximately how many trials have you had?

A.  Full-fledged trials, only two.  Cases that were pretrial cases, probably something like eight.  And then if I were to talk about post conviction cases, I would have, oh, I'm thinking probably 30 of those over the last 15 years, at least

30 of them in which I played a major role.  And some other cases in which I would have written an amicus brief or did some sort of consulting.

MS. DAMRON-HSIAO:  Your Honor, I just received a note that Mr. Fulks cannot understand Ms. Johnson's testimony.

THE COURT:  Well, we will mail him a transcript of her testimony as soon as it is prepared today.  We will electronically send him through the Bureau of Prisons in Terre Haute an electronic transcript of the testimony.

If there's anything that he can point out that should have been asked that was not asked, we will get Ms. Johnson back on the telephone to clear that up.  That's the best I can do.  As I said, I didn't create this problem.  Please proceed.

BY MS. DAMRON-HSIAO:

Q.  Ms. Johnson, so of the two full-fledged trials and the eight pretrial cases that you had, those were all death penalty?

A.  Yes.

Q.  How many of those actually resulted in a death sentence?

A.  Only Mr. Fulks.

Q.  Okay.  How many of those were federal death penalty cases?

A.  No other cases.

Q.  Ms. Johnson, when were you appointed to this case?

A.  When was I appointed?  You know, I don't really remember the answer to that, in the sense that John and Bill were

appointed very shortly after the crime occurred.  I worked on the case quite -- sort of from the beginning.  But when I was actually admitted pro hac vice, I do not recall.

Q.  Okay.  Can you tell me the team dynamics?  What role did you play in the case?

A.  Well, John Blume was lead counsel.  He has much more death penalty experience than either I do or Bill Nettles, so he certainly called the shots, and that would be true generally of the cases in which I had worked with him.

And Mr. Nettles had significant federal experience.  So, on any kind of federal question, he was the authority.  Then I have some experience with mental health issues and legal issues, and so I did some of that.

So, I ended up -- talking about what I ended up doing, what I ended up doing was probably a lot of mostly mitigation work of various sorts.  I'm not the expert, although we discussed all of those things as a team.  I would say virtually on any issue, John would have made the decision.

THE COURT:  Let me interrupt, I just want to clear up one thing.  Ms. Johnson, you said you worked on two death penalty trials and approximately eight pretrial cases?

THE WITNESS:  Yes.

THE COURT:  What do you mean by pretrial cases?

THE WITNESS:  Cases in which the defendant was charged, capitally charged, and either they -- they were

resolved by a plea or something like that.

THE COURT:  Resolved short of a trial?

THE WITNESS:  Short of a trial.

THE COURT:  With a life sentence rather than death penalty?

THE WITNESS:  Yes.

THE COURT:  I follow you.  Very good.

BY MS. DAMRON-HSIAO:

Q.  Ms. Johnson, what were your initial thoughts of the case?

A.  Well, I mean, I think we were concerned about the number of crimes with which Mr. Fulks had been charged.  That is obviously the biggest issue.  Our thoughts were pretty scattered.  In some sense we thought about what was his relative culpability with respect to Mr. Basham and we started to prepare a mitigation case.

Q.  Would it be fair to say this was one of the more difficult cases you had taken on?

A.  It is the most difficult case I have worked on.

Q.  At some point, did the team devise some sort of theory for the case?

A.  Yes.  I think the primary theory was to pin the responsibility for the killings themselves and to the extent possible the other events on Mr. Basham.  This was both because of the account of the crimes that Mr. Fulks had given us, but also the evidence, as we saw it, suggested that Mr. Basham was

indeed the killer of both Ms. Burns and Ms. Donovan.  So, that was our theory of what happened.  Then, I think, we later developed theories that might explain or rather mitigate Mr. Fulks' role.

Q.  About how many times would you say you met with Mr. Fulks prior to the trial?

A.  Oh, my.  I would say maybe -- not more than a dozen, but it would probably be close to that.

Q.  Did you meet with Mr. Fulks prior to him giving a 302 statement?

A.  Yes.

Q.  At what point did the team decide that, you know, giving a 302 statement was in Chad's interest?

A.  It would not have been long before he actually gave it.  It had to be arranged with the government, whether they were interested in taking it and all that, but it would not have been long before that.

Q.  What was the rationale behind Chad giving a statement?

A.  Primarily that would be the only way to present an exculpatory -- well, a lesser inculpatory view of the crimes that made Basham the trigger person for those offenses.  I think we did not think that we were likely to have Mr. Fulks testify, and so the best way of expressing both a lesser role and remorse for that role was by making a statement.

Q.  Did Mr. Fulks ever admit that he had any part in the

murders of Alice Donovan and Samantha Burns?

A.   No.

Q.   At any time did Mr. Fulks admit to having knowledge of Ms. Burns' death prior to the car-jacking of Ms. Donovan?

A.   No.   When I say no, I mean never to me and never that I heard relayed from any member of the team.

Q.   And did Mr. Fulks ever admit that he --

MR. DALEY:   Your Honor, I'm going to have to object. She has led up to now.   I think at this point I think she needs to ask more direct questions and not lead.

THE COURT:   I prefer you not lead the witness.

MS. DAMRON-HSIAO:   Fair enough, Your Honor.

BY MS. DAMRON-HSIAO:

Q.   Did Mr. Fulks -- let's see, where was I?   All right.   Let's talk a little bit about the decision to plead guilty.   At what point did you decide to have Mr. Fulks plead guilty?

A.   That decision was made really at the same time that we made the decision about the 302.   We concluded that we wanted him to make the 302, understanding that was in our view tantamount to a guilty plea, so we made that decision at the same time.

Q.   And when did you first discuss the decision to plead guilty with Mr. Fulks?

A.   I would not have been the first one to discuss that.   That undoubtedly was Mr. Blume.   In fact, I'm not sure that I personally discussed that decision with him.   I did speak to

him before the 302, but I don't remember discussing with him

whether he should do that.

Q.  Did you -- did you ever -- so you don't recall ever

discussing his decision to plead guilty with Mr. Fulks?

A.  I don't recall doing that personally, no.

Q.  Did you agree with the decision to plead guilty?

A.  Yes.

Q.  Why is that?

A.  Because I believed that the only chance, and even that was a slim chance, was to pin the actual killing on Mr. Basham.  I did not see any way that we would be able to do that without a 302, and the 302 then, in my mind made -- not -- made a plea to guilty really a foregone conclusion.  Once you have the 302, to put a jury through a guilt phase and a sentencing phase, I believed, would make them angry and nothing more.

Q.  Ms. Johnson, did you attend the plea colloquy on May 4th and May 7th?

A.  I don't believe so.

Q.  Were you aware that --

A.  No.  Actually, maybe I was there for one of the days but not the other.

Q.  Were you ever apprised of Judge Anderson's concern with Mr. Fulks' plea?

A.  Oh, yes.

Q.  What was your understanding of Judge Anderson's concern?

A.   My understanding was that he was not certain whether the mental state that he has ascribed himself to have was one that was sufficient to satisfy the statutory requirements.

Q.   Had Mr. Fulks ever -- had Mr. Fulks ever informed you in any conversations that he had any intent to steal an unoccupied car?

A.   We are talking now about Donovan?

Q.   Right.

A.   Yes, he has.

Q.   Did he ever waiver from that position?

A.   I never heard him waiver, no.

Q.   You mentioned earlier that you played a significant part in the mitigation investigation, can you describe the team strategy for conducting a mitigation investigation?

A.   Well, in mitigating you will investigate everything, and that would have been true in this case as well as in every other case I have been involved in, post conviction or pretrial.  You start with the people closest to the defendant. We started with the defendant about his own background, but that is not always reliable information.

        THE COURT:  Hold on, Ms. Johnson.  Ms. Johnson, slow down just a little bit and go back over your last response. The court reporter did not quite get it.

        THE WITNESS:  Sorry.

A.   So as in other mitigation investigations you start very

broad.  You don't know what you are looking for so you ask lots of questions.  You usually begin with, and we did begin with Chad himself, and then speak to family members.

As you get more information from them about other significant people in his life or where he grew up, then we went and spoke to people in the neighborhood.  We learned of his marriage and romantic relationships, and then went and spoke to the women with whom he had been involved.

So, a broadening inquiry in terms of the people we talked to, starting with Chad and sort of moving out.  And also teachers and, you know, other sorts of people, social workers, like that.  That would be on the front of who we spoke to and the records that we got.

Then I would say you start without any real theory, and you begin to have ideas of what probably really influenced the client and also what things a jury would be interested in hearing.  So you focus a little more on those things as time goes on.

BY MS. DAMRON-HSIAO:

Q.  Where did you specifically go as part of the mitigation investigation?

A.  I went -- I did go to the jail, and I don't know if you want -- whether you think of that as mitigation or not, but in some sense, since part of our strategy was that this was Mr. Basham's doing, I went and saw the jail, spoke to the jail

administrator and spoke to the woman who was fired as a result of the escape.

I went and spoke to the man that he kidnapped, not terribly successfully, but I did see him several times.

I went to Mr. Basham's neighborhood where he grew up in and talked to a number of people in his neighborhood, and then also to people that he had contact with as he became older.

On Chad's own family front, I spoke to his mother on numerous occasions, and his sister, Sherrie.  I went and saw his aunt in North Carolina.  And saw the people on the street -- I don't know if I said that -- on which Chad grew up.  Tried to find additional teachers.

I went to speak to the people who were at the party with Beth McGuffin after both of the murders and -- oh, I also went and talked on two occasions to an expert on Appalachian culture.

Oh, I'm sorry, the other thing that I did, which is not exactly investigation, but I was the one who worked with Arlene Andrews, the psychologist, to sort of coordinate theories that she would talk about and witnesses she would interview.

Q.  Okay.  Can you turn to Exhibit P 57?  It will be in your white binder, Ms. Johnson.

A.  Yes.  I'm at P 57.

Q.  Can you turn to the second page of P 57?

A.  Yes.

Q.  Can you tell me what this document is?

A.  Well, these are interviews.

Q.  Do you know who drafted these notes?

A.  It says Casey and I, so -- let's see if -- I don't know.  I would think that would have been possibly Drucy or Mary Mulhern, but I don't see a name on them, and I don't recall who wrote the interview notes.

Q.  Do you recall having ever seen these notes before?

A.  Yes.

Q.  In the middle of page 2 it states, "Importantly, Joe T. was at the Hopkins County Jail when Chad and Branden escaped."  Do you see that line?

A.  I'm wondering if I'm on the right page -- oh, yes, I see that line.

Q.  The notes mention a man by the name of Chris Baker, does that name sound familiar?

A.  Yes.

Q.  And how does it sound familiar?

A.  I know that we discussed finding him.

Q.  And did you ever successfully locate him?

A.  I don't believe so.  And that's not something that I had any role in attempting to find him.

Q.  Okay.  Would you be able to comment on the efforts you made

to attempt to find Mr. Baker?

A.  I did not make those efforts myself.  I remember talking about that someone was going to look for him, and I believe it was Drucy but, you know, truthfully I don't really remember.  I don't think I had any discussion about what was actually done at any point, other than shortly after this memo was written.

Q.  Okay, thank you.  Can you please turn to exhibit 46?

A.  Yes.

Q.  Forgive me, it will be P 46.

A.  Right.  I'm there.

Q.  Ms. Johnson, can you tell me what this document is?

A.  This is a memo written by a student of ours, Kerry Davenport, on FASD.

Q.  Can you tell me who asked Ms. Davenport to draft this memo?

A.  I would be quite sure that we, John and I, had talked with her.  Both of us had talked with her before sending her out on a research assignment.

Q.  Can you please read the first sentence of the memo?

A.  "The purpose of this memo is to describe current literature detailing the effects of prenatal alcohol exposure with an eye to presenting mitigation evidence at the sentencing phase."

Q.  Do you know who would have informed Ms. Davenport that a memo was needed to present evidence for FASD and to -- for mitigation evidence at the trial?

A.  John and I would have done so.

Q.  At any point did FASD become a focus of your mitigation efforts?

A.  Well, I think my own personal mitigation efforts mostly -- not -- although there is one exception to that -- it certainly was something that we spent a lot of time on, both in terms of investigating the evidence that he had been exposed prenatally, and in terms of John focusing on a brain expert who would establish that.

Q.  In conversations you had with Mr. Blume, did he inform you that he was interested in exploring FASD for the case?

A.  Well, that's such an understatement.  I could say yes, but I think the right answer would be, we talked at great lengths on numerous occasions about FASD as one of the themes of our mitigation.

Q.  And did you -- I know you said it wasn't the primary focus of your mitigation efforts, but did you speak to any witnesses regarding, you know, any alcohol in the home or FASD evidence?

A.  Oh, yes.  I spoke to his mother on several occasions. Drucy Glass and I went, made a special trip to West Virginia for the sole purpose of talking to her about her alcohol use prior to his birth.

She was not -- she was not cooperative, although she admitted to much heavy drinking, she did not admit to that. And we talked -- I talked to family members about her heavy drinking during his pregnancy.  So, I spent a fair amount of

time gathering facts establishing that he had been prenatally exposed.

Then actually I also -- when I think about it, it may be relevant too, I also spoke at some length to his aunt about the amount of alcohol in the home later on, which bears some relevance to whether he was exposed prenatally too.

Q.  Ms. Johnson, did you have any role in working with the experts on this case?

A.  Yes.

Q.  What was your role?

A.  If you include Ms. Andrews as an expert, which I would, I had virtually sole responsibility for preparing Ms. Andrews and for working with her.  Didn't have responsibility for all the factors that we would feed her, but as far as dealing with her, preparing her testimony, themes of the case, those sort of things, themes of his childhood, I did that.

But with respect to the other experts, I had -- I never -- I believe I met with Dr. Halleck on one occasion. Although it may be that I was present by telephone, I cannot recall for sure.  I read certainly all of the memos and reports from the meetings with respect to Halleck and Halleck's report.

I also met -- read memos relating to Dr. Melikian, and I met with Dr. Melikian and John Blume and Bill Nettles on at least one occasion, actually at the courthouse, so this would have been during trial.

I do not recall much about Hilkey.  I would have -- I undoubtedly would have read those memos, but I don't really remember doing so.  I read the memos related to Dr. Venn.  Then we all discussed the FASD experts and their testimony, and I would have commented on the Q and A's that John drafted.

Q.  Let's go back to Ms. Andrews first.  You said you were the primary attorney who worked with her; correct?

A.  Yes.

Q.  Can you describe Ms. Andrews' qualifications?

A.  Well, I think her C.V. is actually in the record.  She has expertise in family systems and she has expertise in child abuse and in clinical psychology.  She has a Ph.D. in community psychology and a Master's in social work, and then a BA in sociology, and she has -- she both teaches and she has a practice in Columbia.

Q.  At what point in the investigation did you retain Ms. Andrews?

A.  Yes -- oh, at what point?

Q.  Yes.

A.  Oh, I would -- you know, there probably is a record of that.  I should have looked it up.  I didn't know you would want to know.  I would think maybe about six months in.

Q.  Is Ms. Andrews a qualified expert in sexual abuse?

A.  I would say that her expertise includes sexual abuse because she's an expert on family dysfunction, but -- and I

certainly had her testify about abuse, sexual abuse in other cases, but it is not a -- to my knowledge at least it is not a primary expertise that she has, and I did not qualify her as specifically having that expertise.

Q. During the course of your mitigation investigation did you find any evidence of sexual abuse that Mr. Fulks had been subjected to?

A. By evidence, if you mean someone who says that he had been sexually abused or Chad saying that he had been sexually abused, no. I would say that my discussions with Arlene, as well as what I know about capital defendants, made me believe he had been sexually abused, but I did not find anyone who said that they knew it.

Q. Ms. Johnson, why did you say you believed that Mr. Fulks had been sexually abused as a child?

A. Because he behaved like someone who has been sexually abused as a child. I think his relationships with women, which were quite violent relationships and yet contained significant love aspects, look a lot like someone who has been sexually abused.

I also thought that his relationship with his mother was extremely strange that -- I mean, I would actually have suspected that she sexually abused him. Then there was also so much sexually charged material in the home and so much drinking that I would also have said the situation was one in which

sexual abuse quite frequently does occur.

Q. Did you ever confront Mr. Fulks about your thoughts, that he might have been a victim of sexual abuse?

A. Yes.

Q. And what were your discussions?

A. I mean, I asked him. I believe I asked him on more than one occasion, and I know that Arlene asked him. But I -- I cannot recall what the discussion was like, other than him saying that it had not occurred, and it may not have been a long discussion. I can't remember that either.

Q. And just to clarify, he said he had never been sexually abused by anybody?

A. To me, yes.

Q. Ms. Johnson, were you involved in voir dire?

A. Yes.

Q. Can you describe the strategy that the team took to conduct voir dire?

A. I will say first of all, we always had two lawyers present, two of the three of us, so I was not there for all of it. I don't think actually anyone was there for all of it. One person would be looking at the questionnaire while the other person -- or the second person who was present actually questioned.

I think -- it was not in some ways terribly different than any capital case. You look for people who are -- are not

qualified to serve by virtue of the automatic death penalty jurors. You look to rehabilitate people who initially say that they could not impose the death penalty, who may really mean that they don't want to but they could.

And then you are also looking for things that are case specific that would suggest something about this particular person and their -- what would matter to them.

In this case there were kind of two prongs to that. One was, would the person be able to impose -- to impose a life sentence if there had been two killings, and so that was sort of the bad fact that we were interested in a response to. The good fact was how a person would feel about imposing the death penalty on someone who had not been the trigger person. Those are the themes I recall.

Q. Do you recall a juror by the name of Sylvia Allison?

A. I certainly know what happened with Ms. Allison later on. I was not present when Ms. Allison was voir dired, and I don't remember any discussion of Ms. Allison when we were sort of going through who we would peremptorily strike.

Q. So, I'm sorry, you said you were not present?

A. I was not in the courtroom when she was voir dired. Actually I was not even in Columbia at that time.

Q. When did you -- you are familiar with the situation. When did you find out the questionnaire was inadequate?

A. This was after the death sentence had been imposed, quite

some time after that.

Q.  Had you known that Ms. Allison had been the victim of a crime, would you have seated her on the jury?

A.  Oh, certainly not.  Certainly not.

Q.  Ms. Johnson, were you part of the team that put together the direct appeal?

A.  Yes.

Q.  How did you determine what issues to appeal?

A.  I think we started with things that we knew we wished to appeal, from our experiences as trial counsel.  I believe that each of us read the entire transcript looking for additional issues.

I believe Keir Weyble also went through the transcript.  And then we actually also asked students who did not have any involvement in the case to read the transcript in case there was something -- to amass everything that was objected to, as well as things that struck them as wrong, and then we discussed this.

Q.  Were there any issues that you weeded out because you thought other issues were better or more meritorious?

A.  No.

Q.  You mentioned earlier that you used law students, is this a practice of yours?

A.  Well, it's not on every case.  We do work with law students.  We run the death penalty clinic so, yes, we often

work with law students.

Q.  Why did you decide to use law students on this particular case?

A.  Are we talking about the investigation now?

Q.  Right, I'm sorry.  I'm switching gears.

A.  Well, the investigation was overwhelming, both because of the geographic spread of the crimes and the number of crimes, and because of the different places that -- that Mr. Fulks and Mr. Basham had been prior to the crime.

So one reason is, we covered more ground than any one investigator would cover, although we had investigators as well.  And the other reason is that students often are very good at being unintimidating and can sometimes get people to initially speak, who might slam a door in an attorney's face.

Q.  So, what roles did you have the law students play?  You just mentioned interviews, any other roles?

A.  Well, I mean, primarily they found people for us.  So, if we are looking for significant witnesses, we did send some of them out literally to find someone, who those people were.

With some other people, so maybe like people in the neighborhood, they spoke to some of them initially, and then I went back and re-interviewed them, people that have any promise.  In one case we used a former minister to basically persuade a witness to talk to us.

Q.  How did you come to the conclusion that --

A.  As witnesses -- also went and gathered records.  You know, literally went places and got school records and got mental health records, those kind of things, too.

Q.  How did you come to the conclusion, Ms. Johnson, that after the law students had initially conducted interviews that witnesses had promise?

A.  Well, some of that would be their judgment.  But mostly they are instructed to write up everything that the witness tells them, and we read what the witness has to say, and then make a judgment about going to speak with them.

Actually, I think if anyone had anything that looked like it was promising, to say, virtually anyone, we -- one of us would have gone to see that person afterwards.  There would be -- have been many people that they, you know, knocked on doors and the person said, "I never knew the Fulks' family," I would not have gone back to see any of those.

Q.  Did you also have law students draft memos on legal issues?

A.  Oh, yes.  On issues like -- I'm trying to think, legal issues on -- certainly the FASD memo, there probably would have been a couple of other memos that they at least started on or did some preliminary research on.  I don't believe they drafted any pleadings.

Q.  Can you turn to Exhibit P 43?

A.  I'm not seeing where P 43 is.  Is that in the beginning?

Q.  Yes, it's in the white binder.

A.  Yes.  We are not talking about -- oh, the P was covered, now I see.  Yes.

Q.  Do you recognize this memo?

A.  I'm sure I read it.  I certainly know Cayce Hinkle, but I don't remember it.

Q.  Would the students write memos like this as part of their participation in the case?

A.  It doesn't surprise me to see that.  I don't remember how many there would have been.  They undoubtedly are all in the file.  I cannot imagine that we had such a memo and it wouldn't have been there, but they did write memos, or some memos like this, and they do in other cases we do.

Q.  When you received these memos, did you go back and double check any of the legal work, or did you rely on what they presented?

A.  Well, I'm not quite sure what you mean by "rely on them." Before I would write anything, I would always read the cases. Sometimes the -- sometimes the answer is not as important as if they found the cases, and that's an easy way to sort of start. Some of what they do in the writing of the memo is pedagogically valuable for them.  I can't think of anything that we have submitted without -- without having done the research, rechecked the research.  Sometimes some paragraphs that they wrote might find its way into a pleading, I'm sure that's true.

Q.  Ms. Johnson, were you ever involved in any search for Ms. Donovan's remains?

A.  I'm trying to remember.  I think I went once, but not one of the more extended searches, no.

Q.  Did you ever speak with Mr. Fulks about the location of Ms. Donovan's remains?

A.  I know that I was present when he spoke about it.  Whether I was the only person present, I don't believe that is the case.  I'm not familiar with a lot of the geography there.  So, I'm pretty sure that I was present when he was speaking to Pete Skidmore about the location, but I wouldn't have had sort of a separate conversation with him about that.

Q.  To your knowledge, was Mr. Fulks consistent in where he told you the remains were located?

A.  Yes.  I don't think he always gave the same details but there was never a point where he said, "No, it's really over here."  The descriptions were not always very clear.

So, at one point I remember Pete thinking it was a different -- he made a wrong turn at some point, but there was not a point in which he changed what he said so much as he struggled to tell us more things, trying to find where the location was, or at least that's how I interpreted it.

Q.  If you had located Ms. Donovan's remains, how would you have used them at trial?

A.  I think that would have been helpful in several ways.

First of all, I think the family clearly was suffering from the fact that her remains had not been found, and so for them to know and for the jury to know that Chad had been part of bringing them a small peace of mind, that would have been helpful; perhaps as a sign of remorse, but also as a sign of doing what he could do at this point in time.

In a sense not furthering their suffering, because I think the government did sort of pursue the theme of, you know, they still are suffering. So it would have lessened that. That's one thing.

The second thing would have been Chad's credibility generally was enormously important. Do we believe or not believe that he was not the trigger person? And so if he were truthful about the location of the remains, that would be some corroboration of his truthfulness.

And then I think the last way in which it would have been helpful, since this area was more Chad's area than Brandon's, it would seem more likely that Chad could find the remains than Brandon could.

If Chad had not revealed where they were, would that have been because he thought finding the body would show him to be the killer? A jury might well think that. So, we wanted to find the remains because we did not believe that the body would show Chad to be the killer. So, it would have been useful to say to the jury, "He's not hiding anything. It is where he

said it was and he is sorry."

MS. DAMRON-HSIAO:  I have nothing further, Your Honor.

THE COURT:  All right.  Cross-examination.

MR. DALEY:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DALEY:

Q.  Good morning, Ms. Johnson.  This is Bob Daley.

A.  Good morning.

Q.  Nice to speak with you again.  Thank you for being able to talk with us this morning.

A.  Well, I'm grateful to be doing it from a distance.

Q.  Do you have the government's exhibits?  They should probably be in one three-ring binder.  I don't know if I will actually --

A.  Yes, I have a three-ring binder that says "Government's Exhibits" on it.

Q.  And are there tabs 1 through 62 in that three-ring binder?

A.  Yes.

Q.  Okay.  I don't know if we will go through them, but I just wanted to make sure that you have those available.

A.  Yes.

Q.  I'm not going to plow any new ground if I can help it.  If I go over a few things, it's just because I'm trying to be thorough, but this shouldn't take long.

The decision to not call the mental health experts, Drs. Hilkey, Halleck, and Melikian, do you remember that decision?

A.  I'm not sure that I remember the exact moment that we made a final decision.  I remember that it was -- I believe it was not until after the trial had resumed about the -- after the surprise witness.  I cannot recall.

I don't -- we started talking about it -- we talked about it at many points, what the benefits of the mental health experts would be.  But we made a final decision -- I think it was not even -- it was after the trial had resumed, after the surprise.  I actually remember speaking to Melikian during the trial in the courthouse, but that was not -- that was before the three-day rule issued.

Q.  So, you don't believe you actually talked to Dr. Melikian about the Donna Ward testimony then?

A.  No, I don't have any recollection of doing that, and I am actually pretty sure we did not do that.

Q.  Okay.  Would you turn in the notebook to Government's Exhibit 26?  It's a two-page e-mail.

A.  Yes, I'm there.

Q.  It has "Sheri Johnson" on the "to" line, it's obviously you at the law school?

A.  Yes.

Q.  Tell me something, how often did you talk with Mr. Blume

about this case, or about the issues around this case, once y'all started working on it?

A.  Oh, daily would underestimate it.  I mean, it would be multiple times each day.  When we were in different places -- sometimes I would be here and he would be in South Carolina, it might be that we would only talk once a day and exchange e-mails.  When he was in Ithaca and I was in South Carolina, it would be numerous times during the day.

Q.  Was it the primary focus of sort of both your law clinic and your practice of law during that time then?

A.  Oh, absolutely.  I would say it was the primary -- it was the primary focus of my life during that time.

Q.  So you didn't have a bunch of other cases, obviously, impinging upon your time preparing and talking about and strategizing about the case?

A.  No, there probably was something happening in some other case, but we were almost entirely focused on this case.  You always have something else that might be happening, but there would not have been something else significant that I was doing.

Q.  So, would it be fair to say that you spent probably over 1,000 hours on this case?

A.  I'm sure.

Q.  And Mr. Blume as well?

A.  I don't know what he billed for.  Since I was admitted pro

hac, I wasn't billing anything, so I didn't keep records.  I'm
sure you have his records.

Q.  I'm not asking -- I just want -- do you think he spent at
least as much time as you on --

A.  Oh, I'm sure he spent more.

Q.  Let's go to Government's Exhibit 26.  Would it be fair to
say that y'all were on the fence about whether to call these
mental health experts?  And I am speaking --

A.  I will have to say about Hilkey, I simply don't remember
any discussions about Hilkey.  And I can't tell you why I don't
remember, I just don't remember.

Q.  Okay.

A.  I remember talking about Halleck and about Melikian, and we
certainly weighed pros and cons before trial, long before
trial.  And as I recall we were leaning toward the idea that
Melikian would be the better witness.  So, for a long time we
had -- we had been talking about sort of the pros and cons and
what we wanted to go with.

Q.  And let me draw your attention to the second page, actually
the last sentence of this e-mail.  I mean, do you recall this
e-mail?

A.  You know, I -- the first part of it -- I mean, I know I
have seen this, as I'm sort of reading this.  I remember it
because it covered so much territory and -- let me read this.

Q.  The last part, the last paragraph -- actually the last

sentence is what I'm most focused on.

A.  I don't remember that but, you know, that would have been consistent with our discussion.  We -- we had not made a decision and there were downsides.  And so that early on we were talking about it.  But I can say I'm virtually certain that we had -- I am certain we had not cut the shrinks loose, as he puts it, at the start of trial, but we had talked about it.

Q.  Understood.  What was your reasoning then -- what impact -- or if you don't remember, maybe you don't remember -- the impact of the Donna Ward testimony, you thought, or thought through about why that would be one of the reasons you would decide not to call Drs. Hilkey, Halleck, and Melikian?

A.  Well, our main theory, of course, was that Chad was not the instigator and Chad was not a killer.  And that is frankly the story that he told our experts.

Not so much Arlene, our psychologist, because she wasn't really that interested in the story of the crime itself and we sort of didn't have her focus on that.

But the psychiatrists, that was the story that he told them and was -- for the part of their analysis of what had happened.  And we felt that if we -- if they came back and were asked, "So, actually -- actually he was the leader because he instigated this other thing after Brandon was already arrested.  What do you think about that?  And actually he lied

to you, and so are you going to change your mind about whether he was malingering?"

And, so, I mean, the whole fear was that we would end up with putting up experts who would say things that were ultimately more damaging than helpful.

And, of course, when we would put up those experts, then that also opens the door to the government putting up experts, so the balance shifts in that respect too.

Q.  You knew that the government's experts would have found that he had antisocial personality disorder, correct?

A.  We certainly expected them to do so, yeah.

Q.  And that is not a diagnosis you would like to have out there, if at all possible, correct?

A.  No, it is not.

Q.  And in fact, didn't at least a couple of your experts find that he at a minimum met the diagnostic criteria for antisocial personality disorder and you were concerned that if you opened the door it would be blown wide open, perhaps by the government's witnesses?

A.  That's not quite how I describe it.  Dr. Halleck in particular found that he met the criteria as described by the DSM-IV, but did not believe he was actually antisocial, believed that he was -- that in substance it was socialized into him, given his family history.

So, there was an answer that Halleck had for that,

that he was not actually antisocial.  But, of course, you have to do the -- worry that the government would say that he was antisocial, that is not a good thing.

So, I think it wasn't that we thought that he was, it's that there would be then that debate, and would it be beneficial to put that debate in front of the jury?

And then once we have the fact that he lied about all this, we then probably end up impeaching our experts' story, so that what they end up with is believing that the antisocial story of the government is right.

Q.  I know you said you don't remember much about Dr. Hilkey, do you recall whether he had initially -- did you have an impression that he was diagnosing or finding that Mr. Fulks met the diagnostic criteria for antisocial personality disorder?

A.  You know, I -- I really don't remember Hilkey at all.  And I feel badly about that and I feel sure that I must have been part of some discussion about him.  I just don't remember.

Q.  And you, of course, know that Mr. Blume has written about how you want to avoid antisocial personality disorder diagnoses whenever possible?

A.  Yes, and I agree with that.

Q.  Okay.  Let's go to the mitigation investigation very briefly, and really more towards the student -- use of the students.  If you wouldn't mind, if you would pull -- if you would go to Government's Exhibit 44?

A.  Did you say 24?

Q.  I'm sorry, 44.  I may not have been clear enough.

A.  Yes.

Q.  Do you recognize this document, this sheet?

A.  I would be pretty sure that this is a handout that we give in the training session we do on interviewing.

Q.  So, in your clinic's course you have a class on interviewing?

A.  Yes.

Q.  And this is obviously done with an eye towards them potentially going out and doing at least some interviews, or at least going out and talking to some people, trying to beat the bushes to find folks?

A.  Yes, we do this every year.

Q.  And is it -- so they were obviously at least trained that much?

A.  Yes.

Q.  And do you know of any witness that a student identified in this case that wasn't -- that was of any significance at all that wasn't followed up by some mitigation investigator or attorney?

A.  Well, no.  I mean, of course, I suppose there could be someone who the student didn't report a fact that had we known it -- that's possible, but I do not know of someone who we -- who we would have been interested in but we did not talk with

ourselves.

Q.  If you would, turn in your notebook to Government's Exhibit 31.

A.  Uh-huh.

Q.  Would you look at the first few pages of that?  And once you had an opportunity to look at it I will ask you a few questions.  I mean, you can look at the whole thing --

A.  Yes, I see it.

Q.  Can you at least go through to page -- the fourth or fifth page of that?

A.  Right.  So, this is -- I mean, I can tell right away that this is a chronology, which usually starts with the family and goes through his life.

Q.  And this was the result of the mitigation investigation that you did?

A.  Yes.

Q.  And now was this a tool that was used by Ms. Andrews, by the mental health experts?  I mean, how was it used during the case?

A.  You know, I think its primary use is informing us, trying to keep everything straight.  I would -- I would be sure that Ms. Andrews saw some form of this chronology, and I would expect that our other experts also saw some form of it, although whether this is the form that she saw I can't tell you.

Q.  Understood.  Do you remember a Dr. Alex Morton?

A.  Yeah.

Q.  He wasn't called; do you know why?  Were you involved in that at all?

A.  I know that we discussed that.  His expertise is drugs, right?

Q.  Right, he's a pharm D.

A.  You know, I think -- all I really recall is we talked about him and decided that he would not be helpful.  Not so much what he said but that -- that the jury would be unlikely to be receptive to that.  But I don't -- that's a really general recollection, I can't tell you anything more than that.

Q.  Okay.  The fetal alcohol spectrum disorder, y'all settled on that at some point as one of the lead areas in your mitigation case, correct?

A.  Yes.

Q.  And was that based at least somewhat -- I think when we talked back a long time ago now there was some school of thought that juries might like brain scans, more objective tests?

A.  There is some mock jury stuff that suggests they like that better -- or at least it is very good to corroborate your case with sort of objective stuff.

Q.  Let me just talk for a moment with you about who you actually spoke with again.  I think you covered most of it but

I want to go back and make sure.  The mother, how many times do you think you talked to his mother?

A.  In person, I would say probably four or five, in person, although it might have been six.  And then I spoke to her on the phone quite a few times.  I can't tell you how many times.

Q.  What about the father?

A.  I did not speak to the father, ever.

Q.  Okay.

A.  John did that.

Q.  How about the brothers and sister?

A.  Well, I talked to the brothers, and I talked to his sister I believe only once.  It might have been twice, I may have spoken to her twice.  And then I talked to the brothers, preparing them to testify.

Q.  Aunts and uncles?

A.  I spoke to his aunt who lives in North Carolina.  I'm blanking on her name -- Gail.  I spoke to her on several occasions.  I went to see her, I think, at her home twice, and then I also met with her before she testified.

And I spoke to Mark Fulks only before putting him up. So, John had actually interviewed him earlier, and I had John's notes.  Or maybe I just had a description from John, I'm not sure, but I believe it would have been notes.  And then I met with him I believe the night before he testified.  I think that's all of the relatives.

Q.  What about neighbors?

A.  Oh, I went -- I went to the old neighborhood and spoke to Linda on a couple of occasions and also to a married couple who came.  I think I only spoke to them once before, when they were home.  And then I spoke to Linda and the couple before she testified.

I talked to the social worker who had recommended that Chad be removed from his family's home.  I did that, I think, at the local courthouse, I believe.  And then I talked to her before I actually put her up.

And I'm trying to think who else I -- and then I also -- I don't know if you want to count this as mitigation or not, it's to answer the aggravation stuff.  I had spoken to Amber and Veronica and the other girlfriend as well, prior to cross-examining them.  I mean "prior" in the sense of before trial started.

Q.  And tell me just briefly how you obtained the various records you obtained in this case?

A.  I did almost none of that, but we first -- you know, you first find out from the people, the witnesses that you have where the client was when he was at various places, and then you go to the local school -- actually, I think I did go to some school board.

I did actually go and try to get names of teachers, or locations of teachers who were then retired.  So, you can go

to the school itself and then you can also call to the school board to get more information.

And then the mental health facilities and jail stuff, we requested those records, some by subpoena and some just by consent, Chad's consent.

Q.  Students, the two students that I guess that are at issue, to the extent that they are, a Matt Rawlings and Tim Kane, do you remember those students and their backgrounds?

A.  Yes.

Q.  Can you tell me what they were?

A.  Matt Rawlings was a minister before he went to law school, and indeed was serving as a minister for a small church in Ithaca while he was a law student.

Q.  And then Tim Kane?

A.  Tim Kane had served as a defense investigator prior to coming to law school.

Q.  Had he been investigating capital cases even?  Some?

A.  I believe so.  Yes.  Yes, he had.

Q.  The decision to plead guilty --

A.  Uh-huh.

Q.  -- did you end up agreeing or disagreeing with the decision?

A.  I --

THE COURT:  Ms. Johnson, are you there?

THE WITNESS:  Yes, I'm sorry.  I said I agreed.

MR. DALEY:  Oh, okay.

THE COURT:  We lost the second word.

MR. DALEY:  We lost you for a second.

THE WITNESS:  I'm sorry.

BY MR. DALEY:

Q.  It's okay.  And giving the statement, did you agree with that decision?

A.  Yes.

Q.  Did you think in the end it was in Mr. Fulks' best interest to pursue him giving a statement to get his version out?

A.  Well, if "in the end" means by now, I would have to say no.  At the time I believed it was in his interest.

MR. DALEY:  Thank you, Ms. Johnson.  That's all I have.  No further questions.

THE WITNESS:  Okay.

THE COURT:  Redirect.

MS. DAMRON-HSIAO:  A few more questions, please.

REDIRECT EXAMINATION

BY MS. DAMRON-HSIAO:

Q.  Ms. Johnson, had you ever used FASD as a theme for any of the previous capital trials?

A.  Well, the only other case that went -- I mean, no.

Q.  So, for the previous, I guess, one capital trial, you had not tested the FASD theory?

A.  No.

Q. In your opinion was that a theory that was successful with the jury?

A. It was clearly not successful if you look at the forms that they filled out.

MS. DAMRON-HSIAO: I have no further questions, Your Honor.

THE COURT: I don't have any questions.

Ms. Johnson, you might have heard me say, Mr. Fulks says he has not been able to hear you very well, so I'm going to ask the court reporter, if it's possible, to electronically send him a transcript, today hopefully, and give him a chance to look over what you said. And if he can suggest anything to his lawyers that should have been asked that was not asked, we may have to get you back on the telephone. I doubt that will be necessary, but it is possible.

THE WITNESS: And I am happy to do that at any time, and I do want to thank Your Honor for understanding that I really could not get to Syracuse.

THE COURT: All right. Thank you very much. Unless there is an objection, we will hang up with Ms. Johnson now. All right. Thank you very much.

THE WITNESS: Thank you.

THE COURT: All right. What's next?

MR. ASHMORE: Your Honor, I understand from Mr. Daley that he does not intend to call a mental health expert. I

think that's evident at this stage.  And so I think what is next, Your Honor, would be the testimony of Heather Roche and probably FBI Agent Long.  I understand Ms. Roche would be available Monday, and she could get to the courthouse in Baltimore to testify via satellite.

THE COURT:  What about tomorrow?

MS. SMALL:  Your Honor, I can speak to that.  Ms. Roche is -- all the exhibits are here in South Carolina, they are not with her.  We need to get her the exhibits.

THE COURT:  Wait a minute, I can't hear, hold on one second.

All right.  Go ahead.

MS. SMALL:  I'm sorry, Your Honor.  Ms. Roche will need to have exhibits in front of her that she can look at as she's testifying, those exhibits need to be sent to her at her home in Annapolis.  She will not be able to receive those until tomorrow morning sometime, at which point I need to prep her to testify.  I'm not even sure we can get the courtroom --

THE COURT:  Give me a thumbnail sketch of what she's going to testify about so I will know.

MS. SMALL:  Your Honor, would it be better if I go to the podium?

THE COURT:  Yes.

MS. SMALL:  Mr. Smith has said he can hear me better here.  I think that's the first time in my life I've been told

I'm not loud enough.

Your Honor, she would testify consistent with her affidavit. She would testify regarding certainly her conversations with Mr. Blume regarding the need to have law enforcement present, her conversation with Agent Long.

She would also testify regarding what might reasonably be expected in terms of remains to be found at the time that -- in May of 2003 when the FBI was conducting its search of the Water Tower Road area, in terms of sort of linking hands and walking through, and the unlikelihood that that would actually result in any -- finding anything, because there wouldn't be a body laying on the ground. That would be the essence of her testimony.

THE COURT: I haven't had a chance to read her affidavit that you handed up yesterday. And the defense was satisfied to use the affidavit until you found out that the government wants to call Agent Long in person.

The government can't just respond with an affidavit from Mr. Long and we can just receive affidavits from both?

MR. DALEY: Be happy to do that, Your Honor. Be happy to.

THE COURT: I think that's the way to do it. I just don't think live testimony would be helpful on these issues. I mean, we are talking about the search.

MR. DALEY: The truth is, I think the one thing that

concerned me, quite honestly, Your Honor, is paragraph 11. It tends to besmirch Agent Long, and I just didn't want to leave it unanswered.

I don't really think in the end it's going to impact what the real issue is in the case, except I guess the potential that it could be sort of -- it could be used -- I'm happy to do a short declaration. It would be a very brief declaration, I think, from Agent Long. I need to get with him to prepare it, but it wouldn't, I think --

THE COURT: I would like to suggest we just receive these last two witnesses by way of affidavit and come back tomorrow and argue the case.

MS. SMALL: Yes, Your Honor.

THE COURT: I want to make it clear now, it was the defendant's choice to use the affidavit. I mean, the defendant is satisfied with the affidavit.

MS. SMALL: Your Honor --

THE COURT: You became concerned when you found out the government wanted to call Agent Long live. So, if they will back off and just use an affidavit from Agent Long, both sides --

MS. SMALL: If I can clarify the record, Your Honor. We had requested to have her testify live at a hearing we had, I believe, in January. You indicated that you did not want to have her live, so we requested to submit an affidavit in lieu

of live testimony, that is correct.

THE COURT:  And I would decide if live testimony would be helpful?

MS. SMALL:  Yes, it was up to you to decide whether live testimony would have been helpful.  Obviously this issue has been argued, it's a question for your discretion.  There is nothing further I can say to add one way to the conversation.  It's ultimately up to you at this point.  I mean, obviously as I said yesterday, if Agent Long is going to testify live, we would -- we think we would be entitled to have Heather Roche testify live.

THE COURT:  How many exhibits does Ms. Roche need to get ready to testify?

MS. SMALL:  If I may pull her -- I think it's five or six, Your Honor.  It would be some maps that she generated at the time of her searches, it would also be a map that she has generated since her search, plotting the geographical location of where the remains were found versus where she searched.  Those things are attached to her affidavit.  Those would be the exhibits.

THE COURT:  Well, let me say, with Ms. Johnson you heard me say I didn't create the problem with her not being here, it was accommodating defense counsel that I did not require her to come down.

To some extent I did create the problem with

Ms. Roche, because I said I'm not sure I need testimony on that, give me an affidavit, and I will decide if I need it.

But when I said that, I thought that all she was going to say was, you know, "We had dogs with certain pedigrees and they have good experience tracking bodies, and the remains were found reasonably near where Chad Fulks said they were."

And I thought the government would even stipulate the location was reasonably near where it was said to be. I did not realize we were going to get in a swearing contest with Agent Long, if you see what I'm saying.

MS. SMALL: I do see what you are saying.

THE COURT: I was prepared to just say I could just accept as not controverted the fact that the body was located reasonably near where Mr. Fulks said they were in his interview five months after the death, and then we could argue how significant that was and what impact it might have had on the verdict.

MR. DALEY: Your Honor, I would be willing, actually, to take this declaration, if she simply will take out this last sentence, which I don't think is legally significant.

THE COURT: Tell me what it is again?

MR. DALEY: It's paragraph 11, the last sentence in which she says, "While I do not recall his exact words, the gist of his reply," referring to Agent Long, "was that he didn't need a body because he had a confession and that he

wasn't sending his agents out unless we found something obvious, like a skull laying on the ground."  It was May 1st, three days before the --

THE COURT:  But aside from that, the government will stipulate that the remains were found after a search of so many days, as indicated in this affidavit, reasonably near where Mr. Fulks had directed them -- not from the Indiana lawyer but from his later statement five months after the death?

MR. DALEY:  Correct.

MS. SMALL:  Your Honor, I don't think Mr. Daley gets to edit my witness's affidavit.

THE COURT:  You don't think he what?

MS. SMALL:  I'm not sure that Mr. Daley has the liberty to edit my witness's affidavit.

THE COURT:  Right.

MS. SMALL:  Our contention is the government contended at trial that they did everything they could to find Ms. Donovan's remains and that it was Mr. Fulks' fault that they didn't.  Ms. Roche's affidavit goes to that in fact not everything was done.  The FBI elected not to attend the search on April 30th and May 1st.  That is what the affidavit is relevant to and that's what her testimony would be relevant to.

THE COURT:  Why don't we do this, why don't we just accept the affidavit, come back tomorrow and argue the case, everything but this point about the swearing contest between

Agent Long and Ms. Roche.

Let them come in Monday and testify live, and we will wrap it up with a little bit of disputed testimony, post argument, on that one little issue. And then you can have a second round of argument on that little one issue. I'm just trying to keep the case moving forward.

MS. SMALL: I understand that, Your Honor, certainly. And certainly we are prepared to present argument on the issues tomorrow. I think that is -- that statement is part of the argument on claim 33, which is the due process claim relating to Ms. Donovan's remains. I don't think we can argue that claim separately from the issue of --

THE COURT: Well, we will argue that whole issue Monday after we hear --

MS. SMALL: Yes, Your Honor.

THE COURT: Let's plan on having Ms. Roche come down Monday, have Agent Long here Monday. It shouldn't take too long to get that testimony in. And then we will hear argument on the remaining search component of this case following that testimony. Tomorrow -- y'all can have the rest of today off, come back tomorrow bright and early and fresh and argue the whole rest of the case.

MS. SMALL: Yes, Your Honor.

THE COURT: We didn't resolve this thing about post hearing briefing. Tell me why we need additional briefs? I

mean, the briefs were very well done in this case, very thorough, and I just don't know -- unless there is something new that jumped up -- jumped out during the hearing, I don't know that we really need any more briefs.

I do need arguments -- I have questions I want to ask -- and have a good engaging discussion about some of these issues, but I don't know that additional briefing will be helpful to you.

MS. SMALL:  Your Honor, this is your call, obviously. Our thinking was that there are some issues, I believe there are about four of them, as to which there is some testimony that occurred during this hearing, we would like to point that out to Your Honor.

It's not a purpose of rearguing or rebriefing the claim by any stretch, but if you would prefer us to argue those claims briefly tomorrow instead of receiving briefing, that is acceptable as well.  We were trying to sort of curtail the issues that we need to spend arguing --

THE COURT:  I would rather spend tomorrow loaded to fully argue everything, including issues that have been fleshed out or focused on better, or crystallized here at the trial.

MS. SMALL:  Yes, Your Honor.

THE COURT:  If I think additional briefing will help, I will ask for it.  But I just don't think we need to plan for another round of briefing 20 days after this.  I remember -- I

have been a judge 23 years now, I remember they told us at the new judges' school, when you hear a non-jury case, when you put things off to be briefed a month later, you are just asking for trouble because you are going to be cold when those other briefs come in, and you are going to reinvent the wheel, so to speak, in getting back up to speed. And I would like to move forward with argument tomorrow and focus in on this case while I have my full attention devoted to it.

MS. SMALL: Yes, sir.

THE COURT: What time do you want to start back tomorrow? 9:30?

MS. SMALL: 9:30 suits the petitioner fine.

THE COURT: All right. We will have Mr. Fulks back on satellite.

Mr. Court Reporter, do you know if you can e-mail the transcript of this morning's hearing to the facility?

Maybe I need to ask -- yes, sir, give us your name, sir, with Terre Haute.

OFFICER ENGLISH: Brian English.

THE COURT: Mr. English, do you know if there is any way we can e-mail a transcript of this morning's hearing to the prison there?

OFFICER ENGLISH: You can try to e-mail to me at BKEnglish at BOP.gov.

THE COURT: Say that again, slowly.

OFFICER ENGLISH:  BKEnglish at BOP.gov.

THE COURT:  All right.  We will try that sometime today, you should get it, and we might -- give us the phone number where you can be reached so we can see if you got it.

OFFICER ENGLISH:  All right, 812-244-4573.

THE COURT:  Thank you, Mr. English.

I think that will do it then.  We will see you back -- who is going to speak for the various parties?  Are you going to divide up your argument?

MS. SMALL:  I will open and close, and we will have various attorneys arguing each -- my understanding is we are going issue by issue, and we will present arguments by different attorneys as their responsibility --

THE COURT:  Are we going to go back and forth, issue by issue or --

MS. SMALL:  That was our understanding from earlier this week.

MR. DALEY:  That will be fine, Your Honor.  There are going to be some that I think can be grouped.

MS. SMALL:  Yes, for example, the Pinkerton claims can be grouped together, and there might be a couple of others, and we will work on --

THE COURT:  You got their outline of what they want to argue tomorrow, didn't you?

MR. DALEY:  It looks like the first page of their

sheet would be the issues that we would want to be arguing, except claim 33, that we would hold off until Monday.

MS. SMALL: I think that's correct.

MR. DALEY: And I think it's probably going to be me and Ms. Ewing, will be arguing. Just the two of us.

THE COURT: My law clerk just reminded me, Mr. Ashmore, early in the hearing, I think maybe on Monday, we got into a Brady issue and I sustained an objection, but I told you you could make an offer of proof and you said you would do it later, following the hearing or something, so you can do that whenever you want to.

MR. ASHMORE: Yes, sir, I intended on bringing that up with you tomorrow.

THE COURT: All right, very good.

MR. DALEY: Your Honor, it's kind of a housekeeping matter. There are several exhibits in Mr. Fulks' exhibits that quite honestly the government has looked at and can't really fathom how they are relevant, they weren't testified to, they don't appear to go to any particular claim.

THE COURT: That happens a lot in this courtroom. I mean, there's an overdesignation. Parties try to be thorough and don't want to get caught by surprise. But they are in without objection, you want to force them to take them out?

MR. DALEY: We did reserve the right to -- reserved relevance rights.

THE COURT: You did.

MR. DALEY: There's just some --

THE COURT: How many are we talking about?

MR. DALEY: I saw three or four probably, maybe less than that.

MR. ASHMORE: Can we take that up with Mr. Daley?

THE COURT: You discuss it. If it's only three or four we can nail that tomorrow when we come back for arguments.

MR. DALEY: Thank you, Your Honor.

THE COURT: I tried a train crossing death case once and the defense offered up 240 exhibits without objection at the beginning of the trial, and then only referred to like six. And then at the end of the trial -- Ms. Floyd wasn't with me then, it was Ms. Becky Wilson, and she said, "We've got 240 exhibits but they never gave them to me."

And the defense lawyer said, "Well, just forget about them, we won't hand them up." But the point is, if it comes in, it's in unless it's officially withdrawn or an objection is sustained. And here everything is in subject to the relevancy objection.

MR. DALEY: Right.

THE COURT: So, luckily we aren't talking about very many.

MR. DALEY: Yes.

THE COURT:  All right.  Very good, then, we will see you at 9:30 tomorrow morning.

MR. JENDRON:  It looks like Mr. Fulks wants to say something.

THE COURT:  Let's go back on the record.  Mr. Fulks --

THE CLERK:  He wants the phone, I think.

THE COURT:  He wants to get on the phone?

THE DEFENDANT:  Just to the attorneys, just to the attorneys.

(Thereupon, the proceedings were recessed.)

* * * * * * * * * * * * * * * * * * * * * * * * *

EXAMINATION INDEX

SHERI JOHNSON
    DIRECT BY MS. DAMRON-HSIAO          4-9
    CROSS BY MR. DALEY                 4-33
    REDIRECT BY MS. DAMRON-HSIAO        4-46

* * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

s/ Gary N. Smith               August 16, 2010
_____      _____
Gary N. Smith, CM
Official Court Reporter
United States District Court
District of South Carolina