IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION


UNITED STATES OF AMERICA,   )    Cr. No. 4:02-992
   )
   Respondent,   )
   )
VERSUS   )    Columbia, SC
   )    February 26, 2010
CHADRICK E. FULKS,   )
   )
   Petitioner.   )
   )
----------------------------)


TRANSCRIPT OF 2255 HEARING
VOLUME V
BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
UNITED STATES DISTRICT JUDGE


Appearances:

For the Government:    ROBERT F. DALEY, JR., ESQ.
    JIMMIE EWING, ESQ.
    ROBERT JENDRON, JR., ESQ.
    Assistant U.S. Attorneys
    1441 Main Street, Suite 500
    Columbia, SC  29201

For the Petitioner:    BEATTIE B. ASHMORE, ESQ.
    650 E. Washington Street
    Greenville, SC  29601

    KIRSTEN E. SMALL, ESQ.
    P.O. Box 10648
    Greenville, SC  29603


    DAVID P. DALKE, ESQ.
    KYMBERLEIGH DAMRON-HSIAO, ESQ.
    STEPHANIE L. NOBLE, ESQ.
    DANIELLE OAKLEY, ESQ.
    610 Newport Center Dr., Suite 1700
    Newport Beach, CA  92660

Court Reporter:        Gary N. Smith, CM
                       901 Richland Street
                       Columbia, SC  29201
                       (803) 256-7743

          Stenotype/Computer-aided Transcription

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

          THE COURT:  All right, Mr. Fulks are you able to see and hear us adequately?

          THE DEFENDANT:  Yes, sir.

          THE COURT:  Did you receive the transcript that I directed to be sent to you yesterday?

          THE DEFENDANT:  Yes, sir, I got them today.

          THE COURT:  All right.  All right, how are we going to handle this?

          MR. DALEY:  Your Honor, a couple of housekeeping matters, if we can finish up with those first?

          THE COURT:  All right.

          MR. DALEY:  First of all, I think with consent -- with the consent of the government, the petitioner is withdrawing P 4 and P 56.  P 4, which is a one page handwritten note with the date 5-12-03 on top, and then a two page e-mail is -- P 56 is a two page e-mail with the date 5-13-2003, with 6:30 a.m. on the top.

          The second housekeeping, I believe, Your Honor, we have reached an agreement that Ms. Roche's affidavit will be -- a declaration will be submitted, and the government will submit

a declaration from Special Agent Long as well.

And that once we are able to do that, which we will try to do before -- we will try to get it done before the end of the weakened, we would certainly have it filed before Monday, then we would argue claim 33 on Monday --

THE COURT: And both sides waive any hearsay objection to the affidavits coming in of your opponent?

MS. SMALL: We waive, Your Honor.

MR. DALEY: Yes, Your Honor.

THE COURT: All right, very good. With that clear understanding then I will receive the affidavit in lieu of live testimony.

MR. DALEY: Thank you, Your Honor.

THE COURT: All right, anything else preliminarily, before we get into the arguments?

MR. DALEY: Nothing from the government, except I would ask Your Honor whether you had received a supplemental authority regarding claim 5 --

THE COURT: We did.

MR. DALEY: -- yesterday about 5 o'clock we filed that.

THE COURT: Yes.

MR. DALEY: Thank you.

THE COURT: All right, Ms. Small, are you going to go first?

MS. SMALL:  Yes, Your Honor.

THE COURT:  All right.  I think we agreed we would try to do it issue by issue, or at least in groups of issues that are somewhat related, so that one lawyer is not on your feet for an hour and-a-half, or whatever.

MS. SMALL:  That's correct.

THE COURT:  All right.

MS. SMALL:  And what I'm going to do is start out with a couple of cleanup matters and then we -- I will tell you the order in which we plan to present the issues that we would like to present argument on, so that everyone sort of has a road map for the day.

THE COURT:  All right.

MS. SMALL:  Your Honor, I would like to begin by identifying the issues on which we intend to argue today, and giving the court an opportunity to ask any questions it may have about the remaining claims.

Today we intend to argue in the following order, we will argue first claim 17, that trial counsel was ineffective for deliberating seating automatic death veniremen, that will be presented by me.

Next, we will argue claim 7, which combines with claim 28, those claims are related to the giving of a statement to the FBI without a proffer agreement and the entry of a guilty plea without a plea agreement.  Those arguments will be

presented by Ms. Noble.

Our next argument will be claim 1, which relates to an allegation of ineffective assistance of counsel for failing to present a meaningful mental health case in mitigation. That claim will be argued by Mr. Dalke.

As part of my initial presentation here, I will make a brief proffer of the evidence regarding the sex abuse aspects of that claim.

THE COURT: That will be included in that argument?

MS. SMALL: Yes. Next, Your Honor, we will -- Mr. Ashmore will argue claims 18 and 19 relating to the self-incriminatory statements of Mr. Basham and the government's failure to reveal those statements, as well as trial counsel's failure to appeal your exclusion of the so-called deer statement from the brief on appeal.

And then finally, Your Honor, I will be arguing claim 5, ineffective assistance of counsel for failing to appeal the so-called two-step mitigation instruction, that will be the last claim we argue.

THE COURT: And that was claim number 5?

MS. SMALL: Claim number 5, Your Honor. And it's the understanding, as Mr. Daley just mentioned, that we will argue claim 33 on Monday. Following that argument, I will finish up with sort of a brief summation by way of arguing the cumulative error claim, which is -- I believe it's claim 31, not claim 32.

MR. DALEY: Excuse me, Your Honor, I just wanted to make sure that I caught it all. Claim 17 first, then 7 and 28?

MS. SMALL: Yes.

MR. DALEY: Then claim 1, and then 18 and 19, and then claim 5?

MS. SMALL: That's correct.

MR. DALEY: That's the --

MS. SMALL: That's the universe we are arguing today, if that's --

THE COURT: That's good. And just for the record, Monday is claim what? What is that?

MS. SMALL: Monday is claim 33, that's the due process claim related to the recovery of Alice Donovan. And then I will turn and just briefly close with a discussion of cumulative error and sort of wrapping up all of the arguments.

THE COURT: All right. But we will just go straight into argument Monday with no additional testimony. I will read the declaration, or over the weekend -- and will I get Agent Long's first thing Monday, I guess?

MR. DALEY: Excuse me, Your Honor?

THE COURT: Agent Long's affidavit that you were going to get for me, when will it be ready?

MR. DALEY: I'm going to try to get it to you before Monday, but at the latest Monday morning. I will try to file

it over the weekend --

THE COURT: Well, if you e-mail it over the weekend, I can get it.

MR. DALEY: Yes, I mean, I will get it as quickly as I can speak with him and --

THE COURT: All right. It will be short, won't it?

MR. DALEY: I'm going to try to keep it much shorter than Ms. Roche's, yes, sir.

THE COURT: All right, very good. What time do you want to start Monday?

MS. SMALL: Whatever suits Your Honor. 9 o'clock or 9:30 suits us fine.

THE COURT: Any out-of-town people we need to work around their plane schedules --

MS. SMALL: Ms. Noble will be arguing claim 33, she is going to, I believe, stay in town this weekend, so she will be here. I will drive down Sunday night to avoid any traffic problems.

THE COURT: Right.

MS. SMALL: So we will certainly be in town ready to go Monday morning at your convenience.

THE COURT: Okay. Well, 9:30?

MS. SMALL: Yes, sir.

THE COURT: Very good. All right.

MS. SMALL: Your Honor --

THE COURT: Hold on one second.

All right.

MS. SMALL: In that event, I will ask Your Honor if you have any questions regarding any of the claims on which we are resting at this point in time?

THE COURT: No, not at this point. I don't rule out the possibility I might have some.

MS. SMALL: And we will be ready to answer them at any time you wish.

THE COURT: All right.

MS. SMALL: Next, I will turn to a proffer on the sex abuse claim. And by way of this proffer, I will simply identify some potential witnesses and some potential incidents of abuse that we would investigate, were we able to have the time and the funding for that.

The witnesses are Mike Kazee, K-a-z-e-e, I believe is the spelling. We have seen it spelled different ways. He was a friend of Mr. Fulks. His father molested Chad when Chad was, I believe, a young teenager. Larry Tomlin can speak to abuse suffered by Mr. Fulks at the hand of a second grade teacher at Mr. Fulks' school.

THE COURT: That was not brought out?

MS. SMALL: That is not in the record, that's why I'm proffering this, Your Honor.

THE COURT: I thought that was. That was not?

MS. SMALL: He would confirm, he would have evidence corroborating the statement that appears in the record, is my understanding.

THE COURT: All right. The jury did not hear about the second grade teacher?

MS. SMALL: It was in Ms. Andrews' reports. There was anecdotal evidence in the report, I don't believe there was any direct testimony as to that.

THE COURT: All right. Okay.

MS. SMALL: There would be evidence that Mr. Fulks was abused by his stepfather, Dean Thompson. There would be evidence that Mr. Fulks was abused by his sister, Sherrie Fulks, in conjunction with Rhonda Lawhon, who was mentioned at the trial. She is the older woman who was involved with Mr. Fulks when he was about 14 or so.

THE COURT: Now, you talked to these people and have supporting information from them?

MS. SMALL: No, Your Honor, we have not talked to most of these folks.

THE COURT: You would propose --

MS. SMALL: We would propose that we would investigate this further.

MR. DALEY: Excuse me, Your Honor, the government would like to put on the record, at least with regard to this older woman, there was some evidence testified to at trial

Arlene Andrews about that.

MS. SMALL:  That is correct, Your Honor.

THE COURT:  The 28-year-old when he was 15?

MR. DALEY:  She was 28 or 29 and he was 14 or 15, yes, sir.

MS. SMALL:  Yes, sir.  And there would be -- the evidence would be sort of an additional allegation that his sister was involved in some of that in some way.

THE COURT:  But the good faith belief that these would be legitimate witnesses came from Mr. Fulks, I guess --

MS. SMALL:  Yes, sir.

THE COURT:  -- primarily?

MS. SMALL:  Yes, sir.

THE COURT:  All right.  Anybody else you need to make a proffer --

MS. SMALL:  I don't believe so, sir.  If Mr. Fulks reminds that I have missed anyone over the break, I will put that in later.

THE COURT:  All right.

MS. SMALL:  One or two more brief housekeeping matters.  We have discussed this before, I don't see any need for any further discussion really, but we just want to put on the record that the court has reserved the question of whether he needs to have live testimony from the fact witnesses.  It's still your decision whether you want to bring them down or not,

we just wanted to have it on the record.

THE COURT: Which ones would those be? Do you want to give me the names?

MS. SMALL: Those would be -- their declarations are all in the petitioner's exhibits, Your Honor.

THE COURT: Right.

MS. SMALL: I believe Monica Wolowinski is one, is primarily the -- quite honestly, Your Honor, I'm sort of blanking on all of the names. I can give you a list of the names at a later point, if you like.

THE COURT: All right.

MS. SMALL: But the affidavits are all in the petitioner's exhibits, and those would be the ones we would be seeking.

THE COURT: Well, again, I don't want to leave the record open with a hearsay problem with those affidavits coming in. Does the government challenge the factual statements of those affidavits? That's how we got off on the possibility of using them, right?

MR. DALEY: We agreed that if they came in, they would say what is in those affidavits. We don't agree that they are true, obviously, or that they are credible, that was where we got into the hiccup on it. But that's what they would --

THE COURT: I don't want to create -- I think I might

have created a problem for us here. It's one thing to say that the medical experts who were not called, that their testimony that they would have given could be submitted to me by way of affidavits so that I could see what would have been said.

And the government suggested, I think, we didn't need to sit through that live testimony, and the defendant insisted that I needed to hear them live so that I could better focus on how helpful their testimony would have been.

But once you get beyond that as to affidavits about disputed facts, we've got a hearsay problem, and the government just stipulating that they would have said that if they were called doesn't cure the hearsay problem.

MR. DALEY: Your Honor, that's -- I mean, that's what our position has been all along, and you ruled that that's how you would take --

THE COURT: I know I did, I'm just saying I might have created a problem for us. How many are we talking about?

MR. DALEY: They have got about 12, 15, 18 people that would come in and say his horrible background, family background -- I mean, Your Honor, it's in -- most of it is described in claim number 3. They have a list of folks that would -- many of whom would testify --

THE COURT: I think -- I now think I see it. I think that the idea was that the argument is the jurors heard a lot of background information about his upbringing, and this

additional information, even if true and fully accepted by the jury, would not have changed anything. I think that's the argument the government makes, right?

MR. DALEY: It does. But also there is material in those affidavits that is double hearsay, sometimes triple hearsay. One woman says that in 2007 she received a letter from Mr. Fulks saying -- I can't remember -- that his sister abused him. The letter was never produced, the lady just -- that's what her declaration said. So, I'm not -- I mean, and that's my whole --

THE COURT: When I came to Columbia I inherited a case that Judge Karen Henderson got reversed in, and it came to me because she had gone to the court of appeals. And what happened, they were at the tail end of a civil case and it was a damage computation issue.

And Judge Henderson said, "Well, y'all just crunch the numbers and submit me a table and make it into an affidavit, and I will crunch the numbers and decide the damages just on the affidavit."

Of course, the losing side then goes up and says, "She decided it on hearsay," and the Fourth Circuit agreed, and back it came.

And I don't want to paint myself in a corner and get the same situation here, if you see what I'm saying. So, I think with the affidavits, I'm going to have to assume that

they would testify exactly as contained in the affidavits, and assume for purposes of this motion that the testimony is truthful, and decide whether it would have made a difference had the testimony been presented at trial.

MS. SMALL:  I think that's correct, Your Honor.

THE COURT:  I'm not conceding it's truthful but --

MR. DALEY:  If Your Honor has found that that was the case --

THE COURT:  Right.

MR. DALEY:  -- clearly we would want to have the opportunity to have those witnesses called.

THE COURT:  Well, maybe we just need to leave that possibility open.

MR. DALEY:  With that understanding --

THE COURT:  I guess my point is, if it was not brought out at trial that Mr. Fulks was expelled from the fifth grade -- just making up a wild hypothetical -- and Mr. Blume should have brought that point out, because he missed a critical fifth grade in school --

MR. DALEY:  That's right.

THE COURT:  -- and you had a teacher who was going to say, "He was kicked out of the fifth grade," an affidavit of the teacher to that effect, for purposes of this hearing, is just as good as the teacher coming down here from West Virginia and getting on the stand and saying it.

MR. DALEY: Yes, sir.

THE COURT: I mean, I assume he was kicked out in the fifth grade and the jury just wasn't told about that, and the question is, would it have made a difference? And I think that's what I was thinking.

MS. SMALL: And I think you are correct about that, Your Honor. I think the difference between our contention and the government's contention is, we say that this is what these folks would say and it's credible, and it would make a difference.

The government says, "This is what these folks would say and it wouldn't make a difference." I think they skipped a creditability step. I think ultimately it's for you to determine --

THE COURT: I think I see now why I said we don't need live testimony. In looking at what Mr. Blume should have done and who he should have called -- and all he could go on would be affidavits and information, he didn't get a chance to do a dry run under oath in a courtroom to decide whether to call them -- and so that's why I said I thought the affidavits would be okay.

MR. DALEY: I'm pretty sure that was, Your Honor. I don't think I was very --

THE COURT: I feel better. I don't think I painted myself into a Karen Henderson situation necessarily now.

MR. DALEY: And for example, Your Honor, with regard to this declaration, perhaps, of this woman who supposedly got a letter from Mr. Fulks, that we don't have the letter of, but she's now talking about the letter in her declaration in 2007. You could possibly say, "Well, this was only received in 2007, obviously we can't hold Mr. Blume to that if Mr. Fulks only told somebody in 2007," for example.

THE COURT: Right. All right, very good. I think we are good to go now.

MS. SMALL: All right, thank you, Your Honor.

Your Honor, the constitution imposes upon you the solemn duty to insure that Mr. Fulks' conviction and sentence of death were imposed consistent with the laws and constitution of this country.

It is our contention on behalf of Mr. Fulks that in numerous respects the system failed Mr. Fulks, he was not guaranteed his constitutional rights. And to put him to death under these circumstances would be a violation of the very principles on which this country was founded.

While we will explore the legal tenets in more detail with respect to particular claims, since many of our claims do focus on the ineffective assistance of trial counsel, I will just summarize briefly a standard I know you are quite familiar with, Strickland versus Washington is the seminal case, and provides that a capital defendant, or any defendant for that

matter, has been deprived of his Sixth Amendment right to counsel when the performance of counsel was objectively unreasonable and when the petitioner was prejudiced as a result.

We contend that in several respects Mr. Blume's performance, the trial team's performance, fell below that objective standard of reasonableness and we will detail some of those ways for you today, and that there can be no question that Mr. Fulks was prejudiced and should not have been sentenced to death under these circumstances. And we request that you vacate his sentence and hold a new trial.

Your Honor, I'm going to begin by arguing what is enumerated as claim 17. Claim 17 alleges that trial counsel was ineffective for deliberately choosing to seat five jurors whom he believed were automatic death jurors whom he had challenged for cause, and you rejected those challenges.

He made the decision to, rather than strike those jurors with peremptory challenges, keep them on the jury in the hopes of manufacturing an issue for appeal.

Your Honor, we contend that this strategic -- quote-unquote, "strategic choice" is entirely unreasonable. The standard for a choice made between two alternatives, that it must be a strategic choice between two rational and legitimate alternatives.

We contend, Your Honor, that it is never rational and

legitimate to stack your own defendant's jury with jurors who are inclined to impose the death penalty.

In this respect, Your Honor, it is irrelevant that the Fourth Circuit determined that your challenge -- that your rejection of those cause challenges was not an abuse of discretion, that is not the gravamen of this claim.  It is not a reargument of the claim raised in the Fourth Circuit.

What the claim is, is that assuming the validity of those rulings on your part, Mr. Blume is then faced with a choice, "Do I let these jurors go on the jury, thus increasing by more than one-third the possibility that my client will be sentenced to death?  Or do I get rid of them," and have what would be in his view a more fair and balanced jury?

THE COURT:  Mr. Blume did seem to be pretty passionate in his belief that I was in error in qualifying them.

MS. SMALL:  He's certainly very strong on the belief --

THE COURT:  At one time his voice kind of raised a little bit during the testimony.  I seemed to feel from his body language, he thought that was the most egregious error that I made, in qualifying those jurors.

MS. SMALL:  I think that's accurate, Your Honor.  I think he felt very strongly about that, I think he felt that he had a good issue for appeal.  I don't dispute that.

THE COURT: He could have used peremptories on them. Of course, if he had used peremptories, then that issue would have gone away, I guess --

MS. SMALL: Well --

THE COURT: -- if he had run out of peremptories.

MS. SMALL: The rule is, Your Honor, if he used all his peremptories to challenge those jurors, and the jury that was ultimately seated was fair and impartial and in compliance with the Sixth Amendment, you are correct, he would not have a claim. But then Mr. Fulks would have been sentenced by what Mr. Blume would believe to be a fair and impartial jury, he would have gotten what Mr. Blume wanted him to have.

THE COURT: Right.

MS. SMALL: Instead, Mr. Blume elected to put these jurors on the jury in hopes of overturning your ruling. And I think one of the key aspects of the unreasonableness of this decision is the very lenient standard for reviewing challenges for cause in the Fourth Circuit.

It's an abuse of discretion standard. The court has said repeatedly that it defers to the judgments of the district court judge, who is able to view the demeanor of these witnesses, who is able to take the whole circumstances into account.

So, the likelihood of reversal was slim to begin with. And Mr. Blume, of all people, Your Honor, should have

known that.  He himself said in 1999, "The Fourth Circuit is the black hole of death penalty cases.  The Fourth Circuit is renown for not granting relief."

          For him to assume and roll the dice with his client's life --

          THE COURT:  He actually wrote that?

          MS. SMALL:  He said that.  I don't have the article handy, but it was said in the article about the conservative nature of the Fourth Circuit, he was quoted.

          THE COURT:  He spoke recently here at the law school about the Fourth Circuit death penalty jurisprudence, but this was something earlier?

          MS. SMALL:  This was in 1999, Your Honor.

          THE COURT:  Okay.

          MS. SMALL:  But nevertheless, I don't think Mr. Blume even would contend that the Fourth Circuit has changed substantially since that time.  Certainly in 2004, when this case was tried, for him to think that there was a substantial likelihood of getting a reversal of a death sentence based on a challenge for cause that was thoroughly vetted at this court, that you and he discussed at length in colloquy, was simply an unreasonable choice.

          And the result was that of the 12 jurors, fully -- five of them, nearly half, were jurors who were, Mr. Blume believed, so disposed toward the death penalty that they ought

not to be on there as a matter of constitutional law.  For him to make that choice was absolutely unreasonable.

At the very least, Your Honor, he should have, as his -- one of the exhibits indicates, they contemplated filing a motion for additional peremptory strikes.

THE COURT:  How many did they get, 20?

MS. SMALL:  23, Your Honor.  20 for the jurors and three for the alternates.

THE COURT:  And the government had 10, I believe?

MS. SMALL:  I believe it was the same number for both.  I read the transcript last night, Your Honor, I believe it's the same for both.

THE COURT:  Both side had equal strikes?

MS. SMALL:  Yes, sir.

THE COURT:  All right.

MS. SMALL:  And Mr. Blume used all of his strikes, but he did not strike those five jurors.  And there was nothing prohibiting him from doing that, as far as I can tell, from the record.

Motions for additional peremptory strikes are not unheard of.  They have been granted in the past and approved. That was certainly an option that he had.  It would have given him an additional basis for appeal, or an alternative basis if he had taken the reasonable course, the only reasonable course, and struck those jurors by peremptory challenge.

Your Honor, if you have any questions --

THE COURT:  No, I don't think so.  He did use all 23 strikes?

MS. SMALL:  Yes, Your Honor, he did.  And he deliberately did not challenge those five jurors.

THE COURT:  But arguably -- I guess we won't really know, some of those he struck might have been worse than the five he seated.  Of course, he didn't make that contention, did he?

MS. SMALL:  There is no evidence in the record of that, Your Honor.  Absolutely none.  It's clear from the record that he thought these were the five worst possible jurors for Mr. Fulks.

THE COURT:  Did I -- I guess I just heard it by way of war story, but I do know that in death penalty litigation that there is a school of thought that planting error to get a second trial is not a bad strategy sometimes.  Did I just dream that up or is that documented anywhere?  I mean --

MS. SMALL:  Quite frankly, Your Honor, I don't know, it may well be.

THE COURT:  Right.

MS. SMALL:  And it may be the case that in some circumstances that might be a strategy.  But I would argue, Your Honor, that in these circumstances, when you are having five people -- 12 people go into a room to deliberate

privately, under circumstances that cannot ever be looked at by the court, and five of those are weighted heavily on the scales toward death, that that simply cannot be a reasonable way of preserving error and that it certainly cannot be reasonable to manufacture that kind of error.

THE COURT: All right. I don't think I have any other questions on that ground. All right, thank you, Ms. Small.

Mr. Daley -- Ms. Ewing.

MR. DALEY: Ms. Ewing is going to take this issue, Your Honor.

MS. EWING: Your Honor, may it please the court, I will be very brief on this one.

But by the way, I will start out by saying that my esteemed co-counsel has told me that in his practice in state court that, yes, there was a school of thought that you do save some of your issues on appeal. So, no, Your Honor, I don't think that -- you dreamed that up.

First off, as an initial matter, the government does believe that Mr. Fulks is precluded from raising these issues now because he did raise the issues on appeal. I understand where Mr. Fulks is trying to split hairs, nonetheless he raised the issue of the jurors.

The court found that this court did not abuse its discretion. Mr. Fulks had objected to Mr. Goehring. This

court found that Mr. Goehring and all of the other jurors were not biased, that they could serve, that they could consider mitigation factors, all of these jurors were questioned extensively.

THE COURT: I'm sure y'all know from reading the transcript, this case was -- the voir dire was heavily complicated by virtue of the fact that the parties agreed to ask those two fact specific questions, which I later determined I really did not have to ask, I don't think. But there was an agreement struck.

The government desperately wanted to know how the jurors felt if they couldn't prove who struck the fatal blow, and the defense desperately wanted to know how the jurors felt if they learned there were two murders instead of one. And I swallowed it without even thinking, and so we lost a fair number of jurors on those two hot button questions, I think, didn't we?

MS. EWING: Yes, Your Honor, I think so.

THE COURT: And so that kind of -- that overlay was there, it made the questioning so much more protracted, I guess you might say. I remember several jurors we went through the whole drill and they said they could be fair.

And then I said, "Now, what if I told you that there may be evidence that there were two women who were abducted and raped and murdered?" And boy, the lights went out right away,

said, "Nope, no way I can be fair, I'm out of here."  And I think we lost a good many because of that.

MS. EWING:  Yes, Your Honor.

THE COURT:  And if I had it to do over, I'm not sure I would ask those questions.  It was an agreement by both sides that was presented to me to ask them, and so I did.

And then when the second trial came up, I had done my research by then and decided I didn't have to ask it, but I let them talk me into it again then too in the second trial.  All right.

MS. EWING:  Yes, Your Honor.  Should Your Honor decide that Mr. Fulks is not precluded from raising these issues again, then it is the government's belief that Mr. Fulks has failed to prove any prejudice.

The burden is on him to show that the jurors who would have been selected would have come up with a different verdict, and they have totally failed --

MR. DALEY:  Beg the court's indulgence.

MS. SMALL:  Your Honor, I'm sorry, I don't like to interrupt closing argument, but I have to object.  There is one counsel making the argument --

THE COURT:  All right, I think that's a good point.  Let's move forward without consultation.

MS. EWING:  Your Honor, boiling it down, they have not shown that the jurors selected were unfair, that there was

a verdict that was undoubtedly unfair because of the seating of these jurors.

Mr. Fulks exercised all of his peremptory strikes, I'm not aware of a Fourth Circuit case, death penalty case, where a request for additional strikes has been granted.

He objected to Juror Goehring. The court found that Juror Goehring could be objective, that he could consider mitigation evidence. And again, he's failed to show that the jurors were unfair.

THE COURT: I'm just trying to figure if Mr. Blume could have hedged his bet, so to speak. If he had struck these five, is there a possibility there were five more who would have then gone on the jury who would have been just as bad, they would have scored up at the higher end of his scale of 1 to 7?

MS. EWING: Exactly.

THE COURT: Was there testimony that these were the worst ones on his grading scale? I just don't remember.

MS. SMALL: Your Honor, the grading scale is in the -- I believe is in the exhibits. In fact, he confirmed that for me.

THE COURT: But my point is, let's assume hypothetically that these five we are talking about all scored, you know, 4, 5, and 6 on each scale, and he put them on there. But if he had used five strikes on these five people, there

were some other jurors who would have scored 4, 5, or 6 who would have gone on the jury and we would have same argument. I'm just groping in the dark here. But it is in record, I guess we can dig it out.

MS. EWING: Yes, Your Honor. And there were some who ranked in the lower numbers who were on there who nonetheless voted in favor of the death penalty.

THE COURT: All right. Anything else?

MS. SMALL: May I respond briefly, Your Honor?

THE COURT: Yes.

MS. SMALL: Your Honor, regarding Ms. Ewing's claim that this -- the argument that this claim is precluded, Your Honor can rule on this claim without ever reconsidering the qualifications of these jurors. Because that is not the gravamen of this claim. This claim assumes that your rejection of Mr. Blume's challenge for cause was valid and proper and correct.

The argument is that notwithstanding that ruling, Your Honor, Mr. Blume chose to seat on the jury jurors that he believed were harmful to his client and significantly so.

That is the gravamen of this claim, not anything to do with the validity of your ruling or the validity of the Fourth Circuit's ruling. So, it is not a situation where we are trying to clothe in habeas clothing a direct appeal claim.

Third, Your Honor, Ms. Ewing argued that there is no

prejudice. And this is an issue that one of your questions was directed to. I have a couple of responses to that. First of all, of course, we were never able to speak with the jurors and interview them, and to know how their deliberations went forward, that --

THE COURT: Well, the rules of evidence says you can't really go --

MS. SMALL: I understand that, and we don't dispute that, Your Honor. I mean, the jury room is in many respects closed off, we cannot look into there. And there are good and valid, legitimate reasons for that. That means that the standard for Mr. Fulks establishing prejudice has got necessarily to be lower because he cannot bring forth direct evidence of the prejudice that he suffered.

I think, Your Honor, that this is virtually one of those situations where there is almost per se prejudice. I won't go quite that far to argue that, but certainly the situation here has got to cause grave concern for the court, when you have got five of the 12 jurors were deliberately seated.

I would add, Your Honor, that there is no school of thought that you should preserve error, it's simply not trained on by --

THE COURT: I might have just heard that anecdotally. Please don't read anything into what I said, I'm

just saying -- I could envision a scenario where if you were representing a defendant where it is just overwhelming evidence of death penalty material, and there could be some thought of sort of throwing a Hail Mary, of raising an issue and backing off of it, hoping to get a good result.

If you don't get a good result with the jury, taking it up on appeal. If you loose on appeal, then fall on the sword later to say it was ineffective to put them on there. I mean, you could kind of -- and I'm not saying there would be anything unethical about doing that really, I'm just thinking out loud.

MS. SMALL: I certainly don't think though that Mr. Blume fell on his sword. I mean, it's not a situation where we have -- or said, "Oh, yes, I was ineffective." He simply never said that.

THE COURT: No, there were no swords fallen on in this trial, that I can remember.

MS. SMALL: No. And so I really don't think that issue is quite before you. It does not appear from the record that he manufactured error.

Secondly, Your Honor, as to the point of other jurors and their rating numbers, ultimately the numbers are the numbers, but they are not the whole story about a juror. You gave an example yourself of the juror who gave all the right answers, but who seemed to be itching to get on the jury and

impose the death penalty.

THE COURT:  He was almost wringing his -- wiping his hands, like he was just excited about --

MS. SMALL:  Exactly, Your Honor.  And so my point there is that there can be 50 jurors, Mr. Blume can identify 10 of them, who had this exact same unfavorable rating.  "And so you know what?  I know what the ratings are, but looking at these jurors I think the rating does not reflect the reality."

And there is certainly no evidence in this record that Mr. Blume was faced with the Hobson's choice of "Okay, I'm going to get rid of these five really bad jurors, but keep these five and appeal that."  There's nothing in the record to indicate that.  All the record shows you is that these are the five that he thought were the absolute worst for his client, and he put them on the jury.

THE COURT:  All right.

MS. SMALL:  Thank you.

THE COURT:  What's next?

MS. SMALL:  Your Honor, next I believe is Ms. Noble will argue claims 7 and 28.

THE COURT:  All right, Ms. Noble.

MS. NOBLE:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. NOBLE:  May it please the court.  My name is Stephanie Noble, I'm with the law firm of O'Melveny & Myers,

and I'm part of the team representing the petitioner, Mr. Fulks. And if I drop anything, fumble anything, make any noise, please excuse it. Mary just witnessed I dropped my water and I'm quite the klutz.

But today on a serious note, I'm here to discuss two related claims, here to discuss claims 7 and 28 of petitioner's motion to vacate, set aside, or correct the sentence. Together these two claims assert two basic things. First, that Mr. Fulks' trial counsel were ineffective in advising him to give an unprotected statement to the FBI, meaning a statement without a proffer or without a plea agreement in place in advance. That's the essence of claim number 7.

The second claim, related claim, and that is Mr. Fulks' trial counsel advised him to plead guilty, and in so doing, did so without a plea agreement.

Now, as Ms. Small already articulated just a moment ago -- and I don't want to rehash it and inconvenience the court, but I will briefly mention it. The test to be employed here, as we all are very well aware, is Strickland versus Washington.

Now, first with respect to these two claims, as with all ineffective assistance of counsel claims, the petitioner must show that his counsel's representation fell below an objective standard of reasonableness.

Now, what does that mean in this context? I think it

means a couple of things, which I will elaborate in greater detail later. But first let me begin by saying, we heard compelling testimony from Ms. Lyon. Ms. Lyon is a renowned expert and practitioner in the field of capital defense.

And Ms. Lyon stated, quite unequivocally, that giving a statement to the prosecution without a proffer in place falls below an objective standard of reasonableness.

Second, she testified that experience has taught capital defenders that the open plea of guilty when the death penalty is a possible punishment, when death is on the line, particularly in jury trials -- now, there's a distinction to be drawn between bench trials and jury trials -- but particularly in jury trials it is objectively unreasonable.

Second, the petitioner must show prejudice, again, as Ms. Small just stated. Now, here when we are talking about prejudice, I think it's important to note that Ms. Lyon testified that the strategy simply doesn't work. Of course it's prejudicial, it does not work.

Pleading guilty, waiving all of your constitutional rights that you would be afforded if you were to go forth to the guilt and innocent phase and proceed directly to the penalty phase does not result in life sentences; it is objectively unreasonable.

THE COURT: Let me ask you this --

MS. NOBLE: Yes, sir.

THE COURT: -- the Basham case is trailing along behind this one. If it ever gets here on a 2255 motion, I would warrant, I would predict that at least in the top three issues challenged in that case is going to be the decision to go to trial on the guilt phase and force a jury to make that determination.

And then the government will switch hats and I guess call Ms. Lyon back down here from Illinois to support them that it was a reasonable theory there.

I mean, the fact that two different teams of very experienced lawyers went in different directions, it seems to me argues that it was not objectively unreasonable to go either direction.

Plus, Mr. Blume had written on the subject. I mean, he would have really been on a hot seat here if he hadn't pled guilty. And Mr. Ashmore would have had a field day, he would have just done a tap dance on top of Mr. Blume quoting his own book back to him about the desirability of pleading guilty and trying to curry some favor with the jurors.

I have some more concerns about the 302, but I'm not as concerned about the decision to forego a guilt phase.

MS. NOBLE: Would you like me to address then each separately?

THE COURT: Right. Well, let me go back. I think in fairness to the lawyers in the Basham case, I think that could

qualify as a -- what she called a slow plea. Because as we went along, Mr. Swerling pretty much conceded guilt in the first phase, but we still had a phase 1. So what about that?

MS. NOBLE: Well, I think that my response to that would simply be -- without knowing much details about Mr. Basham's trial -- my response would have to be that Ms. Lyon testified that since -- I mean, I think her exact testimony was something like five or six years after the death penalty was reinstated in 1976 that it had become commonly known among capital defense attorneys that this strategy does not work. It just doesn't work.

So, whether or not Mr. Basham's trial counsel proceeded down that path I think -- and putting forth that as a separate question from whether foregoing constitutional rights and then at the same time having right before the jurors -- when you are doing this all in a penalty phase, you have got it fresh, all the facts fresh in the jurors' minds of what happened during the alleged 17-day crime spree.

It is all right before them as they are entering into deliberations to decide -- there are only two options, whether Mr. Fulks should receive a life sentence or whether to come back with a sentence of death. So, that is the most thing that is freshest in their mind.

Had you had a guilt/innocence phase, you can first start off by going through -- forcing the government to prove

beyond a reasonable doubt that Mr. Fulks was guilty of each of the offenses, putting up evidence that perhaps would -- as Ms. Lyon explained, present some of the predicates to the mitigation case in the penalty phase, were the guilt/innocence phase to be unsuccessful for Mr. Fulks.

So, I think that is a long way of saying that as Ms. Lyon testified what we are really dealing with here is, it just doesn't work.  That's what the practice has shown, is it doesn't work.

THE COURT:  Well, Mr. Blume and Ms. Johnson in other cases found strategies that would work, because if I understood the testimony correctly, they had a perfect batting average on life versus death in the cases that they had handled.

He was 18 out of 18 and she was eight out of eight, or something, if I followed it correctly.  I'm not saying that they pled guilty in all of those, but I'm just saying their track record would imply that they had good instincts, at least in some other cases.

MS. NOBLE:  Yes.  And I think I would draw out a couple of points.  One, this was Mr. Blume's first capital case, federal capital case.

THE COURT:  Right.

MS. NOBLE:  And the other --

THE COURT:  He's done many on the state level, and done many post conviction relief type cases.

MS. NOBLE: He had. And I would need to consult the record because I don't want to say this affirmatively, but my belief is when they were guilty pleas they were bench trials.

THE COURT: Right.

MS. NOBLE: So, I definitely need to go back and confirm that.

THE COURT: The strategy works better there?

MS. NOBLE: Yes. And as Ms. Lyon testified, I think that what she said and which I found to be particularly persuasive in this context, is that when you are dealing with a bench trial and -- you have Your Honor, who has been educated in the law, who teaches classes, who does everything that everyone is expected to do and knows the law inside and out -- I think it's easy for attorneys and members of the court to understand the concept of acceptance of guilt. It is easy for us to parse those issues and say, "Well, you know, there could be something to accepting guilt."

When Ms. Lyon testified that -- I think it was the capital defense project, I could be getting that wrong -- but that they did a study of 1400 to 1500 jurors, nationally, and what they found is jurors did not appreciate that distinction. Jurors did not find persuasive, when defendants pled guilty, that that was going to have any impact on whether they would then impose a life sentence. In fact, they found that it did not.

THE COURT: Could it be sometimes case specific, though? I have said several times, this was a very unusual death penalty case in terms of the complexity, the 17-day crime spree, all the different -- over 100 witnesses. If you have a 7-11 robbery that goes bad and someone is killed and it's a one-day trial on guilt or innocence, followed by a three-day trial on penalty, you are not inconveniencing the jury.

But to bring in a jury and put them through four weeks of trial on guilt or innocence, and if they find guilt, and then to come back and say, "Well, we deny we struck the fatal blow, we deny we knew she was going to be killed, but put that aside, now let me give you three or four more weeks on my bad upbringing and my fetal alcohol spectrum disorder," I could see how a reasonable attorney could reasonably conclude that you could pay a price with the jury by putting them through a four-week guilt phase trial. I'm not arguing with you, I'm just trying to frame the issue.

MS. NOBLE: Right. And I certainly appreciate and understand the point.

THE COURT: I heard Judge Alex Sanders give a speech last year, he's one of our former chief judges of our court of appeals and probably our state's best lecturer on trial advocacy, and he was talking about in a civil context, when you are worried about a punitive damages verdict, very often the best thing you can do is confess that you were negligent and

ask the jury to award actual damages, and then go to the mat on the punitive verdict, which is a similar concept to what we are talking about here, I think.

MS. NOBLE:  Let me try this and see if this addresses the concern, and if it doesn't please let me know and I will be happy to try again.

I think that one thing that we are talking about here, and when we are talking about what you just said -- if I paraphrase this inaccurately, please let me know -- but that jurors might be frustrated or hold it against the attorneys for first forcing them to go through a guilt-innocence phase when it is, let's say, extremely unlikely that anything other than a guilty verdict is going to be returned.  And then have to come back and go through a penalty phase proceeding.  Is that -- am I correctly understanding?

THE COURT:  That's correct.

MS. NOBLE:  Okay.  Now, I think that the issue is a little more nuanced in this situation, because what we are dealing with here is, we are not dealing with eyewitness testimony, we are not dealing with direct culpability, we are dealing with a theory that was presented in Mr. Basham's case, as I understand it, and what happened in Mr. Fulks' trial, or in his penalty phase proceedings, and that is relative culpability.

And so for the jurors to have gone through a guilt or

innocence phase, they would have been asked to determine the relative culpability of Mr. Fulks and whether he met each of the predicates for each of the charged offenses.

Now, there could have been residual doubt about whether Mr. Fulks was or was not the actual perpetrator of the offenses. There could have been residual doubt, and that could have caused the members of the jury to have paused about whether he in fact deserved the death penalty.

But by pleading guilty and giving a statement to the FBI without a proffer, the jurors did not engage in that thought process. They did not engage in those deliberations. Instead, what the jurors were told --

THE COURT: By this Pinkerton theory I think they probably preserved the residual doubt, didn't they?

MS. NOBLE: On Pinkerton I would have to defer to my co-counsel, Ms. Damron-Hsiao, if I may. May I continue on this for a moment?

THE COURT: Yes.

MS. NOBLE: So, in this situation what you have, is you have the jurors walking into the penalty phase proceedings, they are impaneled, counsel is giving their opening arguments, Mr. Blume is giving his, we have got Mr. Scott Schools and Mr. Johnny Gasser giving theirs.

What they are saying is, "Mr. Fulks has pled guilty to kidnapping and car-jacking resulting in death." That's what

they are saying.  Then they spend a day going through the litany of a 17-day crime spree and painting a picture for the jury of all the things that happened and saying, "And he pled guilty to these things."

So, if you are a juror, even though Mr. Blume absolutely argued residual doubt, relative culpability, argued those things, you still think, "But he pled guilty, gave a statement."

And I think it's different from the situation where you have, you know, it's caught on camera and you have got absolute proof.  Here we didn't have forensic evidence, we didn't have even knowledge of where Ms. Donovan's remains were located, and in which state they were located in.

THE COURT:  But in response to my hypothetical, Ms. Lyon said even if you got it on video camera, absolute proven, still plead not guilty.

MS. NOBLE:  Absolutely, and I understand that point.  I was trying to address your specific example.  What she says --

THE COURT:  She wouldn't budge an inch on that.

MS. NOBLE:  No.

THE COURT:  Said there is no case ever where you should plead guilty and hope that you score some points with the jury by doing that.

MS. NOBLE:  No, and the reason being is that she said

you can pave the way for mitigation during the guilt/innocent phase, you can pave that path as long as it's where you have got a situation where you are presenting relatively consistent theories.

You do not impugn your credibility in the eyes of the jurors.  That's what her experience and classes have taught her.  So you can go through the guilt/innocence phase, even if it results in a verdict of guilty and still use -- you have now laid the path, you have stated what you need to state, and then you can go into the penalty phase and argue all of the things you articulated.

THE COURT:  I think we covered the plea, now let's talk about the 302.

MS. NOBLE:  Thank you, Your Honor.  So with respect to the 302, we heard testimony from Mr. Blume on this very topic.  And we saw exhibits from the government on this topic, that Mr. Blume decided that Mr. Fulks was going to give an unprotected statement to the FBI recounting various events that happened during the 17-day time period, and that they -- he was going to do so without any protection at all.

Without any protection whatsoever he was going to walk in and give an unprotected statement without a plea being in place, without a proffer being in place.

Now, I submit that it is virtually unheard of for an individual accused of a crime, when death is on the line, to

engage in such conduct.  And for trial counsel, again, this is about whether Mr. Blume rendered effective assistance of counsel, and the rest of his trial team, in so advising the client to do so.

THE COURT:  Didn't the co-defendant eventually do the same thing, Mr. Basham?  According to Blume the theory was, that was the way to get your version out there without taking the stand at trial.

MS. NOBLE:  Yes, and I heard Mr. Blume --

THE COURT:  Dovetail with the guilty plea, to plead guilty, not take the stand, get your version out that Basham was the puppeteer rather than the puppet.  And the question is, is that unreasonable -- unreasonable or deficient -- objectively unreasonable, I guess.

MS. NOBLE:  I think it is objectively unreasonable, given the gravity of what you are waiving by doing that.  Given that you going in, knowing that everything you say in there can be used against you, filling in all of the holes that were in the government's case.

Now, the government undoubtedly is going to argue that they had an ironclad case.  That's what they put -- or that's what Mr. Scott Schools put in his declaration, that's what they put in their opposition to our amended petition with respect to this claim.  So they are going to say, "We had everything."  But they didn't.  They simply did not.

THE COURT: Now, we have got another affidavit problem here. Mr. Schools has given an affidavit that they would not have under any circumstances allowed a proffer with a promise that it wouldn't be used.

MS. NOBLE: Correct.

THE COURT: I think that might be in the record already in some of the pretrial hearings we had.

MR. DALEY: I think it's probably in the record --

THE COURT: But if it's not, again, I don't want to have a hearsay problem.

MR. DALEY: Your Honor, I think the record -- I mean, I think from the stand you have heard all three of the defense counsel -- certainly at least Mr. Nettles and Mr. Blume say that there wasn't going to be a plea agreement. I'm almost certain that was their testimony --

THE COURT: I think you are right.

MR. DALEY: We certainly wouldn't rely just on Mr. Schools' declaration, Your Honor.

THE COURT: All right. Please continue.

MS. NOBLE: Okay. Now, I think where I would like to go from here is address a few points that I think that the government is likely to raise, so that we can have a discussion about this in a moment.

First I think they are going to make a few points -- first, that Mr. Blume made a reasonable trial strategy. So, as

Ms. Small previewed just a moment ago, a reasonable trial strategy has got to be between -- a choice between two legitimate and rational alternatives.  Legitimate and rational.

It's not about whether, you know, he simply thought about it, it's not about whether they discussed it.  The choice between an unrational and a rational decision is no choice at all.

This standard was recently articulated -- or reaffirmed in Wood versus Allen by the United States Supreme Court in January of this year.  It was reaffirming a prior holding, and I will note that it was in the dissenting opinion that they discussed this, reaffirming what had been already articulated in Wiggins and what had already been articulated in Strickland itself.

Now, as Ms. Lyon testified, neither of these options is ever reasonable, ever.  Whenever the death penalty is still an option and the case is being presented to a jury, it is unreasonable to plead guilty or provide a statement without any protection whatsoever.

And as I mentioned before, the reason -- one of the reasons that Ms. Lyon testified as an expert to that, to those very statements, is that their experience since -- I'm going to guess 1984, based on her testimony, since we are talking about five or six years, maybe sooner than that, that after the study of 1400 to 1500 jurors they saw that all those people who sat

in capital cases across many jurisdictions, that it just simply didn't work, the strategy did not work.

She further testified that even if the government were absolutely opposed to giving a proffer or plea agreement, absolutely opposed, said absolutely they would not do it, that she still would never do it when it's going before a jury, that she still would never advise her client to speak with the government without any protection in place, or plead guilty when death is still on the line.

Moreover, she testified that pleading guilty without, at a minimum, the death sentence being removed as a possible punishment is never consistent with industry standards. Now, she was here testifying about what is objectively reasonable consistent with custom and practice and industry standards in capital criminal defense as an expert.

And I would like to point out that the government did not call a rebuttal expert to say that that wasn't the case. Her testimony remains uncontroverted before this court that that is the standard.

Second, I would like to note that there are a couple of cases where different issues have been presented, but I think that as Mr. Daley previewed when he was crossing Ms. Lyon, he mentioned a Fourth Circuit case from 2007. And he said, "Are you aware of this Fourth Circuit case from 2007?" So, I would like to address that with you this morning.

This case is Meyer versus Branker, it was decided November 13th, 2007.

THE COURT:  Meyer versus what?

MS. NOBLE:  Branker.  M-e-y-e-r, B-r-a-n-k-e-r.  The cite is 506 F. 3d 358, Fourth Circuit, 2007.

Now, in this case there was overwhelming evidence that linked the defendants to the crime.  There was forensic evidence, there was witness testimony, there were footprints, there was human blood consistent with the type of blood of the victim present at the scene.

Now, also in this case I would like to point out that no fewer than four capital juries, four different times, were impaneled to sentence Mr. Myer to death.  Because each time it was raised, there were many appeals raised that were meritorious, it would come back down and then they would reimpose the death sentence.

This was a 2254 action when it finally came up.  And in the case Mr. Meyer pled guilty to two counts of first degree murder under state law.  And in open court he stated that he discussed his plea with counsel, he understood them, he understood every element under the state codified law.

But then when it comes up on appeal in the 2254, he says that his trial counsel failed to inform him of the consequences of his plea, specifically that it would serve as an admission of the fact that he acted with premeditation and

deliberation, and that it would automatically make his underlying felonies available as aggravating factors.

So, he said the fact that counsel failed to inform him of this violated his Sixth Amendment right to the effective assistance of counsel. Now, that is a distinctly different issue than what we are talking about here.

Counsel's decision or indecision to fully inform him of the ramifications of that plea is not the same thing as giving an unprotected statement to the government, nor is it the same thing in advising a client to plead guilty when death is on the line without any protection whatsoever, without an exchange for a life sentence, without the possibility of parole.

Now, in that case the state had overwhelming evidence of his guilt, as I mentioned. They had forensic evidence, they had witness testimony that he acted with premeditation. And the court found that it is unlikely that the defendant would have gone to trial even if he was aware that during his plea he would have conceded premeditation and deliberation. That again is different from what we are talking about here.

Now, the Fourth Circuit in this case did not address the performance prong of the Strickland test, its focus was exclusively on the prejudice prong. So, this case does not fully inform us of what the proper standard is in deciding the instant matter.

Furthermore, as I just explained, this is also not directly on point. The issue that the court was confronted with is a distinct and different issue.

Now, one thing that makes the facts, I think, sufficiently different between what happened in Meyer and what happened in Mr. Fulks' case is that there Mr. Meyer would have had to argue, "I didn't do it," if he went the trail. "I just didn't do it," and then when it came back you would have to say, "but I'm sorry for it."

That's not what we are talking about here. We are talking about something that is completely different. So, both factually and legally the case is not directly on point. The --

THE COURT: I agree with you it's not on point, but this is getting back to the guilty plea again, but in his argument, in his closing argument Mr. Blume stood right there and looked those 16 jurors in the eye and said, "My client has accepted responsibility of his conduct."

Now, if he had gone to trial, he couldn't -- he couldn't have uttered those words. I probably would have sustained an objection to that type of argument, if he had gone to trial on guilt.

I mean, acceptance of responsibility, at least in the federal sentencing guideline regime, is a pretty important factor in terms of the penalty that is imposed in a garden

variety case.  It is always -- usually a three-level reduction in the criminal offense score, which means it counts for something.  Right?

MS. NOBLE:  With running the risk of being repetitive, all I would have to say -- or the primary thing that I would have to say in response to that is that the studies have demonstrated it simply doesn't work.

So, even if you are saying, "Yes, I accepted responsibility for the instant crimes," it doesn't mean that then the jury is going to impose a life sentence.  In fact, they didn't.  This jury did not find that persuasive.  So, they did not find, you know --

THE COURT:  Basham went to trial and the jury didn't find that persuasive either.  I mean, we've got our own little laboratory experiment here where -- I guess -- I was telling my law clerk the other day, the 2255 issues or hearings are unique animals because the government at trial, the underlying trial, there are many forks in the road the defendant has to take.

The government has no input on which fork he takes, knowing all the while that eventually, if there is a conviction, they are going to be in here defending the choice that was made, whichever it was.

As I said earlier, in the next go around, I don't know, but I will predict that the decision to plead guilty and to go to trial is going to be an issue, and I guess the

government lawyers wrote down Ms. Lyon's address so they can subpoena her back down here as their witness in response to that issue by Mr. Basham's new counsel.

I'm not being facetious, I'm just pointing out how difficult these issues are, when we have to go back and do a postmortem examination of the choices that were made.

MS. NOBLE:  Understood, Your Honor.

THE COURT:  All right, go ahead.

MS. NOBLE:  The next case I would like to talk about is Florida v Nixon.  It is a United States Supreme Court case. I can get the case cite, give me up moment here for you. Okay.  543 U.S. 175, decided December 13th, 2004.

Now, in this case again, both the facts and the law are distinguishable from the instant matter, quite distinguishable in fact.  First the defendant confessed, confessed to the crime.  In fact, he described what the court referred to as graphic detail of his involvement in the crimes.  Graphic detail.

And then after committing the murder, the defendant in this case went back and told his brother and girlfriend exactly what he had done.  Admitted everything.  He said, "This is exactly what happened, this is what I did," exactly what he had done.  So, the state in that case had overwhelming evidence.

Now, the attorney in that case thought his guilt was

not subject to any reasonable dispute.  They had his confession, they had his description in graphic detail of the crime, they had corroborating evidence, they had, you know, his admissions through his brother and his girlfriend of exactly what he had done.

So, the attorney decided that the best course to -- was to concede guilt and try and preserve credibility again. Now, one thing I would like to point out is when these crimes in this case were committed and when this was initially going before -- when this case was being tried, I believe we are in the 1984, 1985 range, which is right around the time when Ms. Lyon testified that that is when it became commonly known that this wouldn't work.

So, perhaps, I would submit, that the attorney in this matter was still laboring under the old classic theory that you could show remorse and you could show acceptance of guilt by pleading guilty and somehow convince the jury to impose something less than death, in this case a life sentence without the possibility of parole.

Now, the precise issue in this case was whether the attorney rendered ineffective assistance of counsel by conceding his guilt without his express consent.  So, again, we are talking about something completely different.

There, I believe, if I have got my facts straight, that on multiple occasions his attorney went to him, tried to

talk with him about trial strategy. The defendant in that case was not cooperative. He didn't say one way or the other, as I understand it.

Eventually counsel proceeded, the defendant wasn't even present for most of the proceedings, he elected not to be, so counsel proceeded. So, the issue presented before the court, before the U.S. Supreme Court, was whether conceding guilt without obtaining his express consent was ineffective assistance of counsel. Again, a different issues.

Now, the court did note a couple of things. First the court mentioned by entering a guilty plea a defendant waives many constitutional rights, right to a trial by jury, protection against self-incrimination, and the right to confront one's accusers.

So, the court further stated that while a guilty plea may be tactically advantageous to the defendant, it's not simply a strategic choice. In fact, the court referred to it as a conviction.

Now, in that case the court further stated that counsel, under those precise facts, could have reasonably decided that the best thing to do would be just go straight to the penalty phase, again where you have a confession that meets the statutory requirements, where you have admissions to other people that is right after he had done it, that he had done it, and you have powerful secondary evidence.

Now, I think that it's really important to note that the court expressed concern about the strategy. So, in a footnote the court noted that -- well, first of all it cited to the ABA guidelines and said that "If there is no written guarantee that can be obtained that death will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights."

The court said that going forward with pleading guilty without a guarantee that the prosecution will not -- will recommend a sentence of life holds little if any benefit for the defendant. Little if any. Because it not only relinquishes trial rights, it increases the likelihood that the state will introduce aggressive evidence of guilt during the sentencing phase, and I'm quoting here, "So that the gruesome details of the crime are fresh in the jurors' mind as they deliberate on the sentence." The court expressly noted these concerns in this case.

Now, I would like to further point out that Nixon is only applicable to certain types of cases. So, it is a concede-guilt strategy case because of the nature of the factors presented.

The defense counsel there couldn't have very well argued he didn't do it -- he confessed, there was all this other evidence, he said it to other people -- and then come

back and say, "Yep, he confessed, but he's sorry for doing so."  That would have been inconsistent.

So, here, trial counsel could have presented consistent theories.  This case was about relative culpability, right, and it was not about direct actor liability.  Here they could have argued remorse, here they could have argued a diminished capacity and lingering doubt and residual doubt during the penalty phase of the proceedings.

The precise issue faced during the penalty phase proceedings would have been, among others, Mr. Fulks' relative culpability to Mr. Basham.  It would have also brought in the mental health evidence, both the FASD evidence and the evidence that Mr. Dalke will talk about when we get to his section of the oral argument.

But it would have shown that Mr. Fulks -- well, trial counsel -- let me back up -- trial counsel could have still argued that Mr. Fulks was not the ringleader, Mr. Fulks was not the direct actor, and those would have been consistent theories with pleading not guilty.

THE COURT:  But here is the unique issue of this case, didn't trial counsel get to make the precise argument at the penalty phase?

MS. NOBLE:  They did, they did.  And what the U.S. Supreme Court said in Florida v. Nixon is, in footnote number 6, is the concern with doing so in the penalty phase

proceedings is that everything about the crime is so fresh in the jurors' minds that it really matters not. That is the concern.

The concern is about the timing of the admission of guilt, and the studies that Ms. Lyon pointed out that this does not effectively result in anything less than a sentence of death. And the Supreme Court, even in this case, under these sets of facts, highlighted that concern in that footnote.

THE COURT: All right. So your theory, had you been trial counsel, would have been not to plead guilty and not give a 302 and go to a guilt phase trial, see if the government can meet its burden of proof beyond a reasonable doubt, without any vehicle for getting the defendant's version of what happened before the jury? In other words -- I guess we would assume the defendant probably wouldn't take the stand -- but I mean, the jury wouldn't hear anything about his denial of the complicity?

MS. NOBLE: I think there were other ways --

THE COURT: The theory that Mr. Blume employed at least got the notion to the jury that Mr. Fulks did not strike the fatal blow. At least he preserved that issue I think, which to me was a pivotal issue in this case, I think.

MS. NOBLE: That is a pivotal issue, and I would respectfully suggest that at the same time had the deer statement and Sheriff Hewett's testimony that Mr. Ashmore is

going to talk about had come in, it would have had the same effect. It would have also proven that Mr. Fulks did not strike the fatal blow.

So, there was other evidence that could have been used. It could have been done through mental health testimony, it could have been done through other witness testimony. There was no direct evidence linking Mr. Fulks to what eventually happened to Ms. Donovan.

And to this day Mr. Fulks denies any, any, whatsoever, unequivocally, no involvement in Ms. Donovan's death. None. And furthermore, as we heard during the course of the trial, as Mr. Blume testified, as Ms. Johnson testified, and I believe as Mr. Nettles testified, Mr. Fulks has never wavered that he thought that Mr. Basham was intending to take an unoccupied vehicle. Never wavered from that point.

So, I think that in this situation we are dealing with something where he could have got his version out through all -- I'm just saying some of the ways, I'm not representing that that is the complete universe of the ways that his story could have been presented during the sentencing phase and during the guilt and the innocence phase.

May I continue? Did I answer?

THE COURT: Very good.

MS. NOBLE: Okay. So, I think that the next thing that the prosecution may argue is that -- something that we've

already discussed briefly, that because there was no way that the government was going to enter into a proffer, no way that they were going to give a plea -- that's what they said. They said that, you know, Mr. Scott Schools said there was no way he was going to do it, Mr. Blume said that he didn't think it was going to happen.

And I would like to point out that Mr. Blume did testify that when he advised Mr. Fulks to give a statement to the FBI, that he thought that still somehow they would entertain the idea of a plea agreement. He still thought that, even after he gave them all of this evidence.

So, I would submit to the court that when the choice is either to force the prosecution to prove the elements of the offense beyond a reasonable doubt, proceed to the guilt -- to the penalty phase if necessary, if the guilt/innocent phase does not resolve in the defendant's favor, that option on one hand; option number two being, providing the government with an unprotected statement, with no assurances to the defendant, waiving constitutional rights in the process of doing so, giving a statement recounting various events, filling in the holes in the government's evidence, and then deciding to plead guilty without taking the death penalty off the table -- I don't think that is a rational choice between -- a choice between two rational alternatives, as we learned from Wood v. Allen, reiterating the standard in Wiggins.

So, the strategy of pleading guilty -- and I will wrap it up here in just a moment -- the strategy of pleading guilty or giving an unprotected statement to the government with the hope that somehow this is going to result in a sentence less than death, or with the hope that the government, as Mr. Blume testified, is going to come back and say, "Yeah, we have that statement now, let's go ahead and give your client to plead, without hope," that is just not reasonable, that is not reasonable trial counsel behavior. In fact, I think it's dangerous.

Now, as Ms. Lyon explained, we have known that this quote-unquote strategy isn't a strategy, hasn't worked since the early 1980s, it is not a strategy that should be employed in capital defense practice.

And I will wrap it up by reminding the court of what the Supreme Court said in Florida v. Nixon, that you are pleading guilty -- and I will quote -- "Pleading guilty not only relinquishes trial rights, increases the likelihood that the state will introduce aggressive evidence of guilt during the sentencing phase so that the gruesome details of the crime are fresh in the jurors' minds as they deliberate on the sentence." And with that I will conclude --

THE COURT: That statement may be true in a short three-day trial, but here we had the evidence regarding the perpetration of the crime and then we had weeks of mitigation

testimony. The jury was somewhat insulated from that incendiary-type testimony because of the extensive -- well, I guess y'all wouldn't agree with extensive, but a protracted, more than a one-day mitigation case, in other words. There was a little bit of a buffer there, if you see what I mean.

MS. NOBLE: I --

THE COURT: Most death penalty cases, as I said, are three-day trials, a lot of times, and the jury hears the really gory stuff on day one and hears the mitigation on day two and deliberates on day three. And I understand the basis for that comment, I'm just saying it's a little more attenuated here, is all I'm saying.

MS. NOBLE: I understand the point. But I also believe that the prosecution in the case was able to call rebuttal witnesses at the very end, so the last witnesses who were actually before the court were prosecution witnesses, so it was right back before the court again.

THE COURT: Okay.

MS. NOBLE: So, any additional questions, Your Honor?

THE COURT: I think you covered it very well. Thank you very much.

MS. NOBLE: Thank you.

THE COURT: Let me hear from the government and we will take our morning recess.

MR. DALEY: I will be short, Your Honor, and I will

approach.

THE COURT: All right, yes, sir.

MR. DALEY: Your Honor, I will start with the proffer and then move to the guilty plea, unless you desire me to do it in reverse order.

THE COURT: That's fine.

MR. DALEY: We have got three experienced -- two experienced capital litigators and one very experienced federal litigator, each of whom looked at this case and said, "This is a horrible case." Mr. Nettles said, "It really had no holes, I have never seen a case like it. I pored over the discovery to try to find a hole and I can't find it." And they were stuck in a dilemma. There was video. "We knew the line -- we knew the time line of events."

The government's case started with the escape and ended with just after the 130 mile per hour high speed chase. In between that time there was evidence throughout. Everywhere they went, the government had evidence.

They had evidence that Mr. Hawkins lived, they had evidence of Mr. Fulks' actions. They had testimony and more testimony that Mr. Fulks was the driver. They went to the places Mr. Fulks knew about. They had the video at the Wal-Mart. I mean, I could recount the whole thing. You sat through the trial, Your Honor, you know.

At the very end of her argument, opposing counsel

said "Mr. Fulks denies any involvement with Ms. Donovan's death." If they had made that argument in the guilt phase and he hadn't given any sort of statement when there was his semen on the back seat of that BMW of Ms. Donovan's that Mr. Fulks was driving?

Your Honor, they had to get out his version. They had to get out his version. And I heard sort of these floating ideas of how to get out the versions, his version. Guess what, there wasn't a way to get out his version.

You've got Basham blaming it all on him, you've got evidence accumulating every month, the government is sending another disk with 1,000 pages of materials showing more and more things, things are getting sent to the lab, more people being interviewed.

"What to do? What to do? We have got to get our version out. This is really bad. This is the kind of crime that plays on jurors' fears. A 17-day crime spree through seven states, and we can't -- we can't deny he's there the whole time. How do we get his version out?"

Sometimes cases are just really bad cases and attorneys have to do things to do the best they can. So, what's Mr. Blume to say? "Well, I talked to him a bunch of times." This is volume 1 starting at pages 40 and going forward.

He thought it might help the government -- it might

help Mr. Fulks if he talked to the government. They weren't going to do a plea. That's clear from the testimony of all three of the trial counsel.

Now, did he have some hope that perhaps, if he cooperated and certain other things happened, he might get a plea, they might take the death penalty off? He certainly thought that might be a possibility, but that wasn't going to happen if he did not talk.

I mean, the irony here is, apparently all the attorneys in this case then are ineffective. Because Mr. Basham did a whole lot of talking at the beginning of the case without a proffer.

I mean, to find per se that giving a proffer -- I mean, giving a statement without a proffer is per se ineffective? That's not the case. People sometimes do give statements without proffers. And in this case it would have been, as Mr. Blume said, self-defeating to give a statement under proffer.

They wanted to entice the government to put his statement in so that he would have his version in there that, "Yes, I was involved, I did some horrible things but --" they want to talk about relative culpability, that's how they were able to argue relative culpability in Mr. Fulks' sentencing case.

They have not presented how in the world they would

have gotten Fulks' version of the case out in the guilt phase unless he gave a statement.  You are not going to get a mental health expert to testify in the guilt phase.

So, they need to get his version out and they are trying to figure out how.  There is no progress going on in the plea negotiations, there is not going to be a proffer, the letters -- exhibits -- I think it's Exhibits 3, 3 and 4, I think, they are the letters back and forth from the U.S. Attorney's Office and Mr. Blume that make it clear that there is not going to be any deals and no proffers.

So, he wants to get the version out.  He talked, all of them talked with Mr. Fulks, to make sure that his version stays consistent.  And they say from the stand he stayed consistent and he has stayed consistent throughout.

And why did they want to do that?  Well, they wanted to get his version out.  But they also wanted to show some acceptance of responsibility, and by giving the statement without anything in return, Mr. Blume could argue and he did argue that "Mr. Fulks gave a statement straight up, didn't have any promises.  And then later on -- and he pled guilty to that, his involvement in the case."  They also hoped it would show remorse, this statement, and the guilty plea.

Mr. Blume said from the stand very clearly he knew about proffers, but it was his decision, in consultation with the other attorneys, that they weren't going to do it that

way.  First of all, they couldn't have anyway, but they weren't going to be able to get Mr. Fulks' version out otherwise.

And it was clear from all three of the trial counsel, Mr. Fulks was not going to testify.  They had -- they were pretty certain of that fact, because he just couldn't.  Couldn't because of his record, couldn't because of the amount of actions that he took during the 17-day crime spree.

Sheri Johnson may have put it best yesterday, this is at transcript 4-13, "Primarily that would be the only way to present an exculpatory -- well, a lesser inculpatory view of the crime that made Basham the trigger man for those offenses.  I think we did not think that we were likely to have Mr. Fulks testify, and so the best way of expressing both a lesser role and remorse for that role was by making the statement."

Ms. Johnson agreed with the decision to make the statement, Mr. Nettles did too.  All three of them, although with some trepidation, all three of them agreed that was the correct approach to take, Your Honor.

And to just sort of have this blanket statement that it can never happen, that you should ever give a statement in any case ever -- one thing I learned in law school is when somebody says never, ever, it's probably not the law.

Was this an exceptional case where there was probably an exceptional approach?  Yes.  Nobody has ever dealt, at least in this district, and I would say in almost any district, with

a case of this geographic and just the numerous crimes involved.

This was something that would make a movie, or some mini series on TV. And Mr. Fulks was the star. But he wanted a lesser role, he wanted second billing. He wanted to be a supporting actor, and to do that he had to put out his statement somehow.

Decision to plead guilty -- I don't mean to move on unless -- if you have --

THE COURT: Go ahead.

MR. DALEY: Decision to plead guilty. It clearly flowed from giving the statement, it clearly was something that they contemplated they would probably end up doing after having given the statement.

All three of them were in agreement that they had -- he had to plead guilty. All three said they had absolutely no doubt that if he went to trial he was going to be found guilty. There was no way around it.

Again, Sheri Johnson at 4-15 in the transcript, 4-15 says, "I believe that the only chance, and even that was a slim one, was to pin the actual killing on Mr. Basham. I did not see any way that we would be able to do that without a 302, and the 302 then in my mind made the plea to guilty really a foregone conclusion. Once you have the 302, to put a jury through a guilt phase and a sentencing phase, I believe would

make them angry and nothing more."

All three of them talked about it and determined that it was in his best interest. By the time they finally determined he would plead guilty -- I have the four or five bankers boxes of discovery, I think there was 11,000 pages of paper discovery, let alone the videos and the laboratory report and the other testimony that was going to come in.

They knew what was about to happen. And you saw it here in court, Your Honor, an avalanche, an avalanche of evidence. A slow plea? You saw it with Basham, it didn't work either. Now, they have different roles, no doubt about it --

THE COURT: I mean, isn't that a summary of what happened? I remember Mr. Swerling standing up in his closing argument and saying, "I've pretty much concluded we are going to have a phase 2 in this trial and you probably have as well," or something like that.

MR. DALEY: Right --

THE COURT: I just remember thinking, "If I was a juror, I think I might be offended by that statement. Why have we been here for three weeks then, Mr. Swerling?"

MR. DALEY: Correct. I mean, even though they want to talk about, "Well, you slow plead and the jurors won't hold it against you," if you end up basically saying, "Well, he's guilty," they don't realize maybe -- some or a lot of that evidence might come in in the sentencing phase if he had pled

guilty, that jury knows "This guy is saying that he's guilty and we had to sit here for three weeks?"

Your Honor, this is not an inexperienced lawyer or lawyers with the death penalty. Yes, it was -- this was their first federal death penalty. Your Honor, this was the first death penalty in South Carolina. I mean, somebody has to be the first. And it probably makes sense that somebody who has had over -- golly, I think it was 25 or 30 years of experience in death penalty work, might be one of the people that you would want to have representing you.

And needless to say, this is not an instance where they didn't sort of cover the waterfront and figure out what this case was about. I'm not going to rehearse and go through all the documents we went through.

I mean, Mr. Blume and his team, this was like -- if businesses were run this way, I'm not sure we would have the economic crisis that we have gone through the last couple of years. It was remarkable going through these documents, seeing what they did.

THE COURT: He was a prolific list maker, wasn't he?

MR. DALEY: I was shocked, I had never had the opportunity to review trial counsel's notes in this detail. I think it was 72 bankers boxes in total between Mr. Blume and Mr. Nettles, but -- just for example, let's pull up Exhibit 6, Government's Exhibit 6, this is page 3 or 4. Again, they

covered the waterfront.  They went and test drove this case.

And Mr. Jeff Blume, who by the way, an experienced capital litigator who did this focus group, one of his comments was, and I will just read it, "Several pro life jurors, the ones that were going to vote for life in the focus group, did find in fact that Chad's guilty plea was mitigating and remorseful.

"They viewed this evidence of remorse in mainly two ways, first, as Chad trying to set things right and, second, as an indication of clear thinking, showing that he does have a conscience, now that he is not under the influence of drugs."

This is not an instance where they just sort of made a knee-jerk decision.  And it's in the record, they didn't just do one focus group, they did a focus group in the fall as well in Ithaca.

Your Honor, this sort of goes to the bigger picture at some level.  Mr. Fulks got remarkable representation.  I don't know whether -- you are going to have to determine whether it was ineffective or not, but it was a remarkable -- a remarkable amount of work that was done.  I think you heard testimony --

THE COURT:  Lots of reported decisions, as you know, deal with state cases where the court appointed lawyer, A, didn't practice criminal law or, B, slept through the trial --

MR. DALEY:  Fell asleep or was disbarred or was drunk

during the trial. And I don't want to say just because somebody spends an enormous amount of time -- but here we have folks that run a death penalty clinic, have been doing death penalty work for literally their whole adult lives, and this is not -- this is not a decision that they entered into lightly. This is not one where you go, "Oh, wow, they should really have thought through this."

The cases -- ironically, the cases that opposing counsel cited are ones where they say that guilty pleas can be legitimate. I mean, ironically that sort of goes against their own expert's testimony. She didn't even know that the Fourth Circuit has cases -- there's another case, as least that I know of, just in the last few years, Simpson versus Polk, which we cited in our brief, it's actually I think a federal appendix case out of -- in 2005. But, again, there are -- this is not -- Ms. Lyon can testify that she thinks that no one should ever plead guilty ever, ever.

And that certainly is her opinion. But at least in the Fourth Circuit, and we have cited a number of other cases, we didn't cite all of the cases, but that's not the law. The law in capital cases is not that you can never plead guilty.

Your Honor, I don't want to beat a dead horse --

THE COURT: I think you have covered it. Let me hear -- do you want to reply or do you want to take our morning recess now and come back and hear the reply?

MS. NOBLE:  Your Honor, whatever you prefer.  I'm fine either way.

THE COURT:  Let's go ahead and break.  Let's go ahead and take a 15-minute recess.  Be in recess for 15 minutes.

(Short recess)

THE COURT:  All right.  Ms. Noble.

MS. NOBLE:  Thank you, Your Honor.

THE COURT:  Let me ask you one quick question, did -- Ms. Lyon referred to the standard or the -- I think she referred to the literature shows that guilty pleas -- I mean, that a guilty plea doesn't work, but did she ever cite us to a peer-reviewed journal that studied both types of cases, guilty pleas and going to trial on guilt, that reached that conclusion?

MS. NOBLE:  You know, I do not know the answer to that off the top of my head.  I can --

THE COURT:  I think she referred generically to the literature, but I just don't know that she actually cited us to any -- I don't know.  I don't think she was going just on her personal experience.

MS. NOBLE:  No.

THE COURT:  It was broader than that, but I don't know if she gave us chapter and verse on anything.

MS. NOBLE:  That's my recollection, but I can certainly look at it and get back with you, if you would like

me to do so.  Would the court like that?

THE COURT:  Yes.

MS. NOBLE:  Okay.

THE COURT:  I don't want to reopen the record for new evidence, I just want to see if she gave us any citations, is what I'm saying.

MS. NOBLE:  Absolutely.  So, I promise to be very brief.

THE COURT:  All right.

MS. NOBLE:  I want to clarify a couple of things that I said.

First, I think that I might have said that what she testified to with respect to the proffer was objectively unreasonable, and I got her transcript right here, volume 2, page 82, and she said that -- her exact words were, "It fell below the standard of reasonable care."  So I wanted to clarify that for the record.

Now, I would also like to talk about a couple of just very brief points.  Now, Mr. Daley mentioned a couple of things.  One that -- I believe he said that Mr. Blume testified that it was clear that Mr. Fulks was not going to testify. There is another excerpt from Mr. Blume's testimony where he said that it was a 50/50 chance whether Mr. Fulks was going to testify.

The second thing I would like to say, or I guess I'm

now on the third, is that although it is true perhaps that Mr. Blume had, as Mr. Daley characterized it, 30 years of experience, he had only gone to trial two times in state court and one time in federal court. And as Ms. Lyon testified, "Simply because he may be a great academic," and I'm paraphrasing, these are not her exact words, "does not make him a trial lawyer."

Lastly, I will say that -- beg the court's indulgence, please. Okay. My apologies.

Your Honor, one other thing that Ms. Lyon testified to that I want to clarify, is she, her exact words were, "If you look at what we have learned from the capital jury project --" and I couldn't recall the name before, the capital jury project, "which has interviewed," and I'm quoting, Your Honor, "I think something like 14 or 1500 jurors who actually sat on capital cases in many jurisdictions, including I believe South Carolina, you will see that whether the defendant spoke with the police or not is not something that they considered to be mitigating at all." That was the exact quote.

THE COURT: Somebody forgot to tell that to the students of the -- mock jurors that Mr. John Blume -- the other Mr. Blume talked to, Jeff Blume. Because he had some mock jurors where the pro life jurors did account for that, or did give some weight to that. So, we had our own in-house South Carolina empirical study where jurors did think it was of some

importance.

MS. NOBLE:  May I ask a question?

THE COURT:  All right.  Go ahead.

MS. NOBLE:  In those cases did it result, in that study, would it have resulted in an imposition of life imprisonment?

THE COURT:  I'm just going by the slide that counsel put up when he was up a moment ago where he put up Jeff Blume's study.  I don't know -- I don't know how detailed they questioned, but it was a fact, at least.  All go -- but you say it was a capital jury project that concluded whether --

MS. NOBLE:  Yes, Your Honor.

THE COURT:  All right.  Go ahead.

MS. NOBLE:  Lastly, Mr. Fulks never admitted intent. He could not -- so had he gone through the guilt and innocent phase, he could not have been found guilty on the car-jacking intent charge, he just couldn't have been, without the requisite intent, and that is something that the government would have had to have proven.  And the government couldn't have proved it.

And that's all I would like to say, unless you have any additional questions?

THE COURT:  I don't have any other additional questions.  Thank you very much.

MS. NOBLE:  Thank you.

MR. DALEY:  Your Honor?

THE COURT:  Just one second.

All right.

MR. DALEY:  I don't need to argue this necessarily, but that last question sort of brought up the whole Pinkerton plea.  I don't need to address it unless you feel a desire for us to get into --

THE COURT:  Well, it's not one of the ones they listed that they were going to argue, but let me just ask while we are on that point, I have been wanting to ask this and I think I did bring it up, if I had just, after getting those two briefs and taken a four-day recess, concluded that Pinkerton would not fit the situation before me and rejected the guilty plea, I would have forced the defendant to go to trial and deny guilt, and that would have been a huge issue here.

MR. DALEY:  And it would have completely impeded their trial strategy.

THE COURT:  Right.  I would have turned everything upside down if I had rejected the plea.  And I had lawyers for both sides begging me to do it, begging me to do it.  And I don't use that term loosely.  It was very clear both sides really wanted it.

MR. DALEY:  And can I just -- I'm going to speak to it for a minute.  Claims 9 and 12 are not appropriate for ineffective -- on 2255.  We argued that, it's in our brief, I

don't need to go into it, they are direct appeal issues.

And I know the other side is going to now want to respond, which is fine. Claim 11, if you look at page 111 of our response in a footnote, we talk about why that doesn't matter.

The only real issue about Pinkerton is whether it's ineffective assistance of counsel to actually have convinced you to allow them to plead guilty under the Pinkerton theory so that it allowed them to reserve the intent requirement. And that's exactly what they got.

And it's not ineffective assistance of counsel to get more than really you are allowed under the law potentially. Basically what they are saying is, you shouldn't have allowed them to get more than they should have gotten under the law.

We think the Pinkerton plea was okay in this instance, but their theory is somehow that by him being so effective in getting this Pinkerton plea, that he was ineffective.

MS. DAMRON-HSIAO: Your Honor --

THE COURT: I know it wasn't down for argument but I will be glad to hear from you.

MS. DAMRON-HSIAO: I would just like to address a few points.

THE COURT: All right.

MS. DAMRON-HSIAO: First, I think they have

misconstrued our IAC claim --

THE COURT: You can come up here so you don't have to lean over.

MS. DAMRON-HSIAO: With respect to our IAC claim, it actually focuses on the knowing and voluntariness of Mr. Fulks' plea and with respect to the fact that he was never actually informed and educated to the elements of the Pinkerton liability that attaches. And Pinkerton liability requires --

THE COURT: Wait a minute now, I have a hard time understanding Pinkerton. He has supposedly an IQ of 70. Is it going to matter --

MS. DAMRON-HSIAO: I concur, Your Honor, I mean, we have heard extensive testimony about his level of intelligence and comprehension, but at a minimum what you heard repeatedly is that Mr. Fulks was unequivocal about his lack of intent to steal an occupied car, and at the time of the taking of the car, actually cause any death or serious bodily injury.

So, our IAC claim actually focuses on Mr. Blume's failure to fully inform his client. And while I do understand the complexity of the Pinkerton doctrine and that there is a reasonable foreseeability requirement and an intent element, at a minimum counsel has represented that Mr. Fulks does comprehend the intent, and he did not have it -- and he -- you know, he would have not pled guilty to car-jacking if it had required him to admit he knew and intended to cause death or

serious bodily injury to Ms. Donovan.  He's been adamant about that.

THE COURT:  All right.  Very good.  Thank you very much.

All right, who is next?

MR. DALKE:  I am, Your Honor.

THE COURT:  All right.  Mr. Dalke.

MR. DALKE:  Yes, sir.

THE COURT:  One more question, I guess I should have asked this earlier, is the argument -- back on the guilty plea, is the argument that counsel was ineffective for pleading guilty to all counts or just to the car-jacking?

Because the government -- I think the government said it had to be an all or nothing plea.  They would not allow a plea to -- wait a minute, I don't think the government can do that, I don't think the government can refuse to take a plea to one count and go to trial on the other, so I don't -- Mr. Blume was saying it was an all or nothing plea.

MS. DAMRON-HSIAO:  I apologize, Your Honor, I was talking with my counsel at the time you started the sentence --

THE COURT:  Is the argument that counsel is ineffective for pleading guilty to all the counts or just the car-jacking count?

MS. DAMRON-HSIAO:  The car-jacking.

THE COURT:  Just the car-jacking.

MS. DAMRON-HSIAO: Right. And at a minimum we would have expected, and I think a reasonable counsel would have made the decision, when you expressed your concern, rightly so, that there was potentially a problem with the plea, reasonable counsel should have gone back to Mr. Fulks and said, "Hey, there's an issue with this plea, there's one element that is still pending, you know, are you willing to plead to it?"

THE COURT: All right. Now, while we are on it, I know you didn't come prepared to argument it, what about the government's response that it's all academic because count 2 would support a death verdict and there was no Pinkerton issue on count 2? What about that? I read what y'all said in the brief, but I just did not understand it. It was in a footnote.

MS. DAMRON-HSIAO: Your Honor, there is no case law on point, but there are two cases that the government cites relating to the failure to prove aggravating factors, not complete charges. What you are basically -- what you are basically talking about right here is cumulative error.

If you are presented with two counts that are death penalty eligible, the chances are just -- just mere statistics, more likely than not you are going to find for a death sentence, is greatly increased.

If only one was before the jury, then whether or not they would have had, you know, in their deliberations, if they would have actually found for the death penalty, it might have

been completely different.

We can't rewrite history, we can't be the trier of fact in this case. We can't just predict what the jury would have done just because one went away and one still existed, you can't make that prediction.

THE COURT: All right, very good. All right. Let's move on to the next issue.

MR. DALKE: The issue, Your Honor, is ineffectiveness for failure to call a mental health expert, which is claim 1 in the amended petition.

Trial counsel was ineffective for failing to put up the extensive important mitigating evidence relating to the state of Chad Fulks' mental health. Petitioner is not arguing that trial counsel failed to investigate, instead the petitioner is arguing that the decision not to call mental health experts in light of the Ward testimony was incompetent trial strategy, because it prevented the jury from hearing important mitigating evidence.

Under any interpretation, trial counsel's decision not to call the mental health experts cannot properly be construed as strategic. It cannot be fairly categorized as a choice between two legitimate and rational alternatives.

Capital jurisprudence is replete with references to the mitigating power of mental health evidence. The Supreme Court has stated that mental health evidence is literally a

life or death matter.

The Fourth Circuit is in accord with that statement. The Fourth Circuit has said that mental health mitigating factors were the best hope of convincing a jury that a defendant did not deserve the death penalty.

The record is replete with prejudice that Mr. Fulks suffered as a result of trial counsel's ineffective decision. The government took full advantage of trial counsel's failure to put up mental health evidence.

The prosecutor, during his closing argument stated, and I quote, "There is absolutely no evidence, none, that he suffers from a diagnosed mental illness," unquote. Not one juror found any one of the following mitigating factors:

Number 38, that Mr. Fulks' capacity to conform his conduct to the requirements of law was impaired;

Number 39, that Chad Fulks took part in these offenses under mental and/or emotional disturbance;

And number 40, that Chad Fulks was under the influence of drugs or alcohol at the time of his offenses.

No juror heard that as a result of the massive amounts of drug and alcohol abuse during that 17-day time period that Mr. Fulks was likely experiencing impulsiveness, aggressiveness, anxiousness, restlessness, paranoia, and delusional thinking, because Mr. Blume failed to call any of the mental health experts who could have explained these facts

to the jury.  Instead, the jury was left with the incorrect impression that Mr. Fulks was out on a 17-day giant joy ride.

The experts who did in fact testify did not opine on mental health or mental health illnesses.  Specifically, the mental experts who would have testified would have testified to what they testified, as you heard.

The jury was precluded from hearing about Mr. Fulks' mental illnesses, specifically his cognitive disorder, his major depression, his adjustment disorders with anxiety, polysubstance abuse, alcohol, cannabis, and amphetamine dependence.  The jury was prevented from hearing about how these effects of mental illnesses impacted Mr. Fulks' life.

Contrary to what the government has argued, the mental health experts would not have opened the door with respect to antisocial personality disorder.  By the time the mental health experts would have been called, the jury would have already heard, via Dr. Gur, that Chad Fulks was diagnosed with antisocial personality disorder.

By that time the government had already read into the record the DSM-IV definition for the criteria for antisocial personality disorder.  So, contrary to the government's argument, had the mental health experts been called, they would have explained, just as the Butner report found, that Chad Fulks does not meet the full symptomatic picture for antisocial personality disorder.  The mental health experts would have

been able to explain this to the jury.

In addition, contrary to the government's argument, the mental health evidence would have been mitigating and not aggravating, as the government suggests. The two cases that the government cites in support of their argument are clearly distinguishable.

The government cites Poyner and Truesdale. In both those situations there was a situation where the defendant was presenting evidence during his trial that would have been completely inconsistent with the imposition of the mental health evidence.

For example, the defendants in both those trials were portrayed as nice, normal, happy-go-lucky people, so evidence of mental health illness would have been at odds and would have been contrary to that theme that was woven throughout those trials. That is not the case here.

The Devon and Miles information, the government concluded, the government avers that calling a mental health expert would have allowed evidence of Miles and Devon to come into the record. The Miles -- the allegations of child abuse against Miles had already been excluded by Your Honor, and so provided that mental health experts did not open the door through proper questioning, that evidence would have remained -- would have remained --

THE COURT: I kept out the evidence of child abuse I

think on hearsay grounds, didn't I?  And it actually preceded the Crawford decision, which it clearly would have been reversible error if I let it in, so I was glad I kept it out when Crawford came down.

MR. DALKE:  Yes, Your Honor.

THE COURT:  So it never came in at all.  Now tell me why it wouldn't have opened the door?  The government -- well, I guess I need to ask the government why it would have opened the door.

MR. DALKE:  I think you are right, that's a better question for them.

THE COURT:  All right.

MR. DALKE:  The same with the evidence about Devon, had the evidence -- had the Devon situation arisen, there were objections that trial counsel could have raised that would have gone a long way to keeping information that Mr. Fulks allegedly was involved in the death of his son out of the record as well.

And I thank Your Honor for your time.

THE COURT:  All right.  Let's hear what the government has to say.

MS. EWING:  Your Honor, just to start off with, with the standard, the government does not believe that Mr. Fulks has come close to meeting the standard that it would have to meet to show ineffective assistance of counsel.  I would also point out that under Strickland you cannot view in hindsight

what would have happened. We would have a lot of cases overturned if hindsight could be considered.

But counsel has failed to show that trial counsel's failure to call Drs. Hilkey, Halleck, and Melikian so undermined the proper functioning of the adversarial process that the trial did not produce a fair result.

I would like to look at what trial counsel did. Looking at what they testified to the past few days, there is no doubt that Mr. Blume was very methodical, very thorough in his approach to this case, and how he came down to a decision as to which experts to call and which experts not to call.

He sought input from numerous sources. Jeff Blume's group indicated that fetal alcohol effect was the strongest mitigator. Dr. Gur, who was seeing Mr. Fulks on a regular basis, opined that fetal alcohol syndrome would be the strength of the case.

And looking at how Blume approached this, Mr. Blume said that his practice is to first get a neuropsychologist to do a battery of tests to determine if there is brain damage. And then if it shows up low functioning, as he said Mr. Fulks' case did, that he gets a neurologist to do a neurological examination.

He didn't ignore the mental health information, he sought the opinions of Halleck, Hilkey, and Melikian. And five weeks prior to trial he was thinking about not calling them.

He hadn't made a --

THE COURT:  The memo said he was thinking about cutting the shrinks loose?

MS. EWING:  Yes, it did.

THE COURT:  Five weeks before trial?

MS. EWING:  Five weeks before trial.  Now, he had not closed the door to it, he was still considering it, but I think it's telling that in his opening statement he did not talk about that.  I think he may have made one fleeting reference.  He did not mention any of the psychiatrists, the psychologists by name, so I think he left the door open in his opening statement.  So, we believe that the final straw for him in making the decision was the Ward testimony.

And I think Ms. Johnson articulated the reason for this probably as well as anybody.  Ms. Johnson -- and this was around page 4-37, fourth volume, page 37 -- Ms. Johnson said that there was fear the experts would end up saying things that were ultimately more damaging than helpful, and that their testimony would open the door for the government to put up its mental health expert.

They were afraid, after the Ward testimony, that the government would come back and ask, "He was actually the leader because he instigated this after Brandon was arrested.  And he lied to you," because he did not tell these mental health experts about his telephone call to Ms. Ward.

Ms. Johnson said this would have opened the debate about whether he was antisocial, and she said, "That's a debate that we didn't want to have in front of the jurors."

So, valid reasoning for what he did, valid reasoning for that decision.  They decided to pursue the bad brain, the fetal alcohol syndrome disorder.  They could say, "It wasn't Chad's fault that he had a bad brain.  It wasn't his fault that his mother used alcohol during her pregnancy."

THE COURT:  He said -- I don't know if he concluded or a study showed that when you have a brain scan, I remember that color coded brain scan that went up, that was something that the jury might grasp onto, more so than testimony about mental problems and so forth.

MS. EWING:  Yes, Your Honor, it was objective, where I think Dr. Hilkey's testimony showed that the mental health tests that he testified to, and their opinion from -- their clinical opinion from talking with the defendant was pretty squishy.

And I think all of them ultimately said, or Dr. Halleck -- or Dr. Hilkey and Dr. Melikian, that "We had to go on what Mr. Fulks told us."  They all agreed, I believe, that, yes, he lies a lot, that is part of antisocial personality disorder.

They both agreed that he -- he met the diagnostic criteria for antisocial personality disorder, and the notes

that went back and forth between Mr. Blume, Mr. Blume's paralegals, and the mental health expert showed that, "Yes, he lied to us all of the time."

The only thing they said he wasn't lying about, they kept saying, "Well, we believe his story about what happened." But when --

THE COURT: What about the argument that the Ward testimony could come in in rebuttal, in the government's case in rebuttal, and so Mr. Blume should have been prepared for that anyway, that the surprise at trial should not have been a surprise?

MS. EWING: I think that's a red herring, because he had -- he knew about this telephone call, kind of -- they knew a telephone call had been made, I believe is what he said, but it's not something he would pursue. Because he didn't want that information and he -- it wouldn't have helped him. And so if it came out, it came out, but he still had to deal with the problem.

Even if he hadn't been surprised, it certainly -- I don't see how making the decision not to call them hurts your case. In fact, it would have hurt their case to call these experts. And I believe if we good through a few things that were testified to, that it does indeed show that it hurts their case.

Starting with Dr. Hilkey, Your Honor, it's the

government's impression that he started unraveling on direct. He testified that Fulks suffered from antisocial personality disorder. He was making reference to -- he had a very malignant personality disorder, fraught -- and this is a quotation-- "fraught with very distinctive interpersonal or destructive interpersonal relationships and impulsive and excessively angry outbursts. They are not pleasant people to be around."

He also testified that Mr. Fulks had the high elevation on scale 4, which is psychopathic deviancy. Now granted, he did waiver on that, he went back and forth a little bit --

THE COURT: Talk to me just a minute about Dr. Halleck's report where he said there was a typographical error where the word "not" was dropped from it.

I guess it's a question for the defense team. If that's the case, how could Mr. Blume be faulted for relying on the thing as it was typed? He can't be clairvoyant to know that it was a typographical error in that report. How about that?

MR. DALKE: Your Honor, it was Dr. Hilkey, not --

THE COURT: I'm sorry, Dr. Hilkey. I have been saying Halleck each time. I'm sorry, go ahead.

MR. DALKE: What Dr. Halleck was testifying to was that in that preliminary report he said that Mr. Fulks did not

meet a primary diagnosis of antisocial personality disorder.

In essence what he was saying in his preliminary report --

THE COURT: But the "not" was dropped from that preliminary report --

MR. DALKE: That's correct.

THE COURT: -- giving the wrong impression to Mr. Blume. But my question is, how does that make Mr. Blume ineffective?

MR. DALKE: How did it affect Mr. Blume? Mr. Blume had already heard -- there was Dr. Halleck and Dr. Melikian, had both concluded that, you know, Mr. -- as well as Dr. Hilkey -- I mean, at the end of the day each of the three mental health experts that were not called reached the same conclusion, that he does in fact meet the criteria for antisocial personality disorder.

But like the Butner report, they all three agreed and opined, and the testimony that you heard from the two of them, was that Mr. Fulks does not meet the full clinical symptomolgy for antisocial personality disorder.

THE COURT: But the issue of antisocial personality disorder would at least have crept into the case?

MR. DALKE: It was already in, Your Honor.

THE COURT: Right. Right. You are right, it was in. But it would have been more of an issue, I guess -- they

would have denied that he was suffering from it --

MR. DALKE: No, sir, they would not have denied that he suffered from it, they never have denied that he suffered from it. Instead they would have said exactly what the Butner folks say, which was he did not meet the full clinical spectrum of what that diagnosis means.

And they would have been able to explain that, and therefore taking some of the sting out of what Mr. Blume has gone on record and what his papers have said, you want to at all costs, to the extent possible, avoid that diagnosis.

But if you have the diagnosis, those experts would have been able to explain what that diagnosis means. And there are some, as I understand it, there are arguments for the definition of antisocial personality disorder set forth in the DSM is circular, it's just nothing more than a list of behaviors and things of that nature.

That would have come out, that would have explained to the jury -- at least help the jury understand what it means to have that diagnosis per the DSM.

THE COURT: While you are on your feet let me -- maybe I should have explored this earlier, but when I read the briefs, the initial brief that came in, I thought the thrust of the argument was that Mr. Blume essentially panicked when the Donna Ward issue arose in mid trial and decided to jettison the mental health experts without reflecting on it.

Now we know from the discovery in his box of material that he was thinking about it in advance of trial.  You will at least concede that, won't you?  I mean, made a bad call, made a bad judgment call, but it's not something he did totally out of blue at trial, in other words?

MR. DALKE:  Your Honor, that's exactly right.  My point is not that he panicked and shouldn't have panicked with respect to the Donna Ward testimony coming in or not coming in, I guess I'm taking a more expansive view.

Under any circumstances, failing to call mental health experts to put evidence of mental illness on the record has been supported by the Supreme Court and the Fourth Circuit as just being, you know, not a decision -- not a strategic reason.  It's not born of a rational and legitimate alternative.

He had the information there, he was aware of the opportunity to present that to the jury and the powerful mitigating effect that has had on juries in the past, and that decision, whether it was going to Donna Ward's testimony or deliberation -- the so-called "pull the shrinks" five weeks prior -- was in our opinion an ineffective decision because it was not strategic.

THE COURT:  All right.

MS. EWING:  Your Honor, the cases that the courts have decided have expressed concern and recognized that counsel

is on the horns of a dilemma as far as mitigation evidence.

The Delmontes case that they cited from the Ninth Circuit was reversed by the Supreme Court recently, and it noted that the mitigation evidence in that case would have opened the door for damaging information.

The Fourth Circuit has recognized the dilemma. Counsel is not required to call experts just because they are there, counsel is required to consider everything and make a strategic decision, which is what Mr. Fulks' counsel surely did.

Let's take a look at what happened with Dr. Hilkey. First of all, on cross he admitted that he had not looked at any of the discovery, that most of what he based his opinion on was the self reports of Mr. Fulks. And I believe he admitted, and certainly there were a number of people who said Mr. Fulks is a liar.

And it also gave the government an opportunity to rehash and put right back in front of the jury all of the bad things that Mr. Fulks had done, and in this case more information.

I recall when I was going through the trial transcript being really kind of touched by the testimony of Gayle Beatty, the aunt of Mr. Fulks, because he sounded like such a sweet child. This evidence, the experts gave the government an opportunity to turn around and say, "Okay, did

you see these reports from the school about how he was assaulting other children?"

The principal even said, "He's going to seriously injure somebody if --" it was something to the effect, "if we don't get this behavior under control."

He was hitting elderly women, he was cursing adults, and he was beating up on other kids. He was a bully. So, it would totally destroy this nice evidence that Ms. Beattie had testified to.

Also, these experts were contradicting each other. Dr. Hilkey testified about how Mr. Fulks was so dependent, that he had this dependent personality disorder. Dr. Melikian got up and said, "No, I didn't diagnose him as being dependent."

Beg the court's indulgence.

Also there was cumulative evidence -- or the information was cumulative in a lot of areas, the cognitive problems, well, there was evidence on top of evidence at trial about Mr. Fulks' cognitive problems, about his low IQ, or low average IQ, about the frontal lobe development problems, the problem with his executive function.

Further, Dr. Hilkey's testimony that Fulks was dependent was almost laughable. Fulks was making all the decisions during this crime spree.

There was plenty of evidence that Fulks was not dependent:

The evidence when he was in jail at Myrtle Beach and pretended that his wife and his baby girl and his mother had been hit by a semi and were on the brink of death; where he conned a prayer group and one of the prisoners into getting his mother to put up bond money, and then she gave him his car; the testimony about him pretending to be an FBI agent and conning two young college students.

It was just evidence on top of evidence. So, to say that he was dependent was laughable.

And again, much of the evidence was harmful to his case. The Fourth Circuit has also recognized, and Mr. Blume recognized, that too much information on drug abuse can also be harmful.

There was evidence at trial regarding his use of drugs, but Dr. Melikian went on and on about it and talked about how Mr. Fulks and Mr. Basham had bought all these batteries and made methamphetamine and how bad -- how badly it affected them. Between her testimony about how crazed he was on drugs and Dr. Hilkey's testimony about his high psychopathic scale, it left this picture of a drug crazed psychopath.

And the mental picture that Dr. Melikian painted with her cat analogy was so incredible and applicable to the Donna Ward testimony. I don't know whether you recall --

THE COURT: I don't remember the cat analogy, tell me about that.

MS. EWING:  She said -- she was explaining her diagnosis of his high anxiety disorder, how he was just constantly in a state of anxiety, and she compared it to a cat.  And she said there's a passive aggressiveness that results from this high anxiety state, and there can be a more predatory type of aggressiveness.

Now, granted, I think she was trying to suggest that he fit into the passive part.  She said it's like a cat.  If a cat is frightened, it will hiss and -- but she said -- and then the other type is the aggressiveness that results from anxiety, and it's more of the cat stalking the mouse, the predatory type.

Well, the evidence that Mr. Fulks called Donna Ward and tried to lure her teenage daughter out of the house after he had stolen her purse, after he had her I.D., certainly would appear to be the predatory type of aggressiveness.

She tried to explain it away by saying that was a pretty pitiful attempt.  And, yes, it was, and Mr. Blume argued that I think to his advantage.  Because it was a stupid attempt.  However, she admitted, nonetheless, yes, it was an attempt to lure Ms. Ward out of her house.

So, I don't see how in the world that testimony would have helped their case.  For the most part their testimony just allowed more and more bad information.

As far as the Miles situation, you had said that --

or instructed that the government could not present anything other than he received an indictment for aggravated child abuse the day prior to his escape, but you would not allow any of the details, unless defense counsel opened the door with further testimony. Because I believe that they wanted to provide testimony about how attached Mr. Fulks was to Miles, because he had been so attached to Devon and Devon had died as a baby.

And so the government had photos of the abuse that Miles suffered, obviously they had reports of investigation, the foster parents who had noticed it, I believe the hospital reports, investigation, that they were chomping at the bits to get in, I believe.

So, I think by Dr. Halleck, who by the way in his affidavit discussed this whole Miles and Devon issue, that was self reported by Mr. Fulks, of course, would have opened the door for the government to rebut his -- the evidence of his attachment to Miles.

THE COURT: The mental health expert had relied on Mr. Fulks' statement about the attachment to the children?

MS. EWING: Yes, Your Honor.

THE COURT: And that would have opened the door to the episodes coming in?

MS. EWING: May have. I think the mental health experts, what they testified to would have -- again, the jury, after they had heard all of the evidence would have just found

them to lack credibility.

Granted, Mr. Blume had argued the remorse, but mental health experts took it a notch higher as far as their discussion of the great deal of remorse and how they believe Mr. Fulks and that he was truly remorseful.

The jury may well have recalled that two days after Mr. Fulks had been involved in kidnapping and the murder of Alice Donovan, he was up in Virginia and partying. But the testimony was that he asked Mr. Cremeans where they could go to get fucked up and get pussy, and that they were discussing going to a biker rally and doing the same, and really excited about this. So, this testimony about -- coming from the psychiatrists and psychologists about remorse, the jurors I think would have found hard to stomach.

Oh, and Dr. Hilkey said that he felt that Fulks showed signs of post traumatic stress disorder. Well, Dr. Halleck had said in his affidavit, I believe, and certainly in the notes or maybe it was the letter, that he had sent to Mr. Blume that he was not impressed with the diagnosis of post traumatic stress disorder that the others had made.

So, here you would have had three mental health experts all contradicting each other, except for the fact that they diagnosed him -- or said that he met the diagnostic criteria for antisocial personality disorder.

And one more thing as to that, Dr. Hilkey may have

opined at some point that "Gee, he doesn't meet all of the criteria." The fact is, on cross-examination the government went down all of the criteria and I believe he ultimately admitted that, "Well, yes, he did this and, yes, he did this," and I believe the government checked right off all of the criteria.

Your Honor, I believe that --

THE COURT: I think you have covered all the points I want to hear argument about.

MS. EWING: I'm not sure whether you wanted to hear anything at this point on the issue of the sexual abuse --

THE COURT: Are you going to go back into that Mr. Dalke?

MR. DALKE: No, sir.

THE COURT: Or is that a later issue?

MR. DALKE: No, sir.

MS. EWING: And I guess a couple of other things. They had put in the affidavit of a Dr. Morton and the prison expert Cunningham, but I don't know whether you want to hear anything on Mr. Cunningham or not. I think that --

THE COURT: That's an issue, but I don't think it was argued.

You didn't argue anything about that, did you?

MR. DALKE: No, sir.

THE COURT: We will leave that on the briefs.

All right, reply argument. Mr. Dalke.

MR. DALKE: Thank you, Your Honor. With respect to the Donna Ward testimony and how that would have somehow caused angst to the mental health expert because of the implication that it was clear evidence that Mr. Fulks was trying to lure Amy Ward out -- sure that information could have been presented to the mental health experts, and they have opined that that information would not have altered their diagnoses.

In fact, what the government failed to mention is that there was a competing explanation for the Donna Ward testimony that is already on the record, and that is that Mr. Fulks was trying to reach Heather Jacobi, he wasn't trying to reach Amy Ward. That information of course would have been relayed to the mental health experts if they were allowed to consider that information to further reach a conclusion.

With respect to the fetal alcohol syndrome disorder, even if that, Your Honor, could have been considered to be the strongest mitigating factor, it doesn't excuse Mr. Blume's failure to put in the powerful mental health illness, which courts have held to be the most powerful mitigating evidence and can oftentimes be the difference between life and death.

I wholeheartedly disagree with the characterization that Dr. Hilkey was coming apart or was starting to unravel under direct. I'm very surprised by that characterization of his testimony.

In fact, what Dr. Hilkey was trying to relay to the court is the fact that Mr. Fulks has very complex behavior and he's riddled with a variety of mental health illnesses. I don't at any particular time find -- found that he was unraveling under the -- certainly at the direct.

Sure he testified, Dr. Hilkey testified that he had not received or reviewed any of the discovery prior to making his decision, and there are two points that are noteworthy there.

First, he wasn't asked to review any of the discovery, he was asked to specifically perform a psychological evaluation. And, secondly, perhaps even more importantly, as we heard through the lengthy recitation of the 81 pages of criminal history that Mr. Jendron was reciting during the cross-examination, Dr. Hilkey had already been aware of the overwhelming majority of the facts that Mr. Jendron was trying to pull out of the -- or put on the record.

With respect to the allegation that the mental health expert would have been cumulative of the evidence that was already presented at trial, I -- the record -- the briefs are clear as to which expert testified to which particular -- FASD versus what I will call the objective brain scans and PET scans and quantitative electrocardiograms and things of that nature. But not one of those experts, Your Honor, testified at all that Mr. Fulks had any kind of mental illness, and that was the best

point there.

My esteemed colleague was walking down the road of confounding lying with malingering and Dr. Hilkey's testimony there I think speaks for itself on the record there.

Begging the court's indulgence, I'm trying to read my chicken scratch here.

Oh, and the final point, we saw that Dr. Hilkey had developed a series of working hypotheses, and so to say that Dr. Hilkey found Mr. Fulks to exhibit some of the signs of post traumatic stress disorder is not equivalent to him rendering that as a diagnosis.  In fact, he did not reach that diagnosis.  So he's not in contrast or juxtaposition with Dr. Halleck or Melikian.

Thank you, Your Honor.

THE COURT:  All right.  I was thinking at first we could finish this argument this morning, but this is coming at me so fast I would like to break for lunch.  I know we have two more issues to argue maybe; is that right?

MR. DALKE:  Yes, sir.

THE COURT:  I think we ought to go on and break for lunch.  Does that mess up anybody's travel plans or anything?

MR. DALKE:  No, sir.

THE COURT:  All right, is it 12:30?

MR. DALKE:  Yes, sir.

THE COURT:  Let's take an hour and 15 minutes.  We

will be in recess for an hour and 15 minutes.

(Lunch recess)

THE COURT:  All right.  Who is up next?

MR. ASHMORE:  That would be me, Your Honor.  May I proceed?

THE COURT:  Yes, sir.

MR. ASHMORE:  Your Honor, thank you very much.  Beattie Ashmore on behalf of the petitioner Chad Fulks.

Your Honor, I'm going to begin with claim 18.  As you recall, that's our assertion that the petitioner's appellate counsel were ineffective for failing to appeal the court's decision relating to the deer statement.

Your Honor, if I can remind you and everyone, the deer statement occurred during the Thanksgiving Day search when Mr. Basham spontaneously uttered, in front of Sheriff Hewett, quote, "You know, I never -- I could never kill a deer and here I have," dot, dot, dot, end of quote.

His attorney at the time, Mr. Littlejohn, apparently interrupted him in completing that sentence.  And during the Fulks trial, obviously that particular sentence came up, came before you, and this is what the government said during the Fulks trial.

The government argued against admission of the deer statement.  They said that that statement was taken out of context, and that is found in the trial transcript of June

22nd, 2004, at page 50.

The government further argued the statement had, quote, "no meaning," end quote. They went on on page 251 to demonstrate to you that that statement could have ended with anything, and their example was, he could have meant, quote, "I helped Chad hide these bodies."

The government went on to say at page 253, quote, "It doesn't say he killed her, it doesn't say that." The government continued to make those arguments, you accepted those arguments, and you decided in the Fulks trial not to let the deer statement in.

Your Honor, three months later the Basham trial occurred --

THE COURT: Didn't I engage with the defense attorneys and tell them -- and ask them how could I let that one isolated statement in and keep out all the other statements of Mr. Basham, where he said that Fulks was the killer?

I think it's the evidence rule of completeness, you let part of a statement in, and the other side can argue that in fairness the rest -- the rest of the statement needs to come in for completeness. And that's where the out of context concept comes into play, I think.

MR. ASHMORE: Yes, sir --

THE COURT: Did I not ventilate that question with the defense lawyers? I don't know.

MR. ASHMORE:  Yes, clearly there is testimony in the transcript about any other statements that may be out there. But I think it's a two-step process.  I think you first decide whether or not that statement can come in.

I don't think Mr. Blume said, "I want that statement and only that statement to come in."  I just don't think that's what the transcript read.

He wanted to get that one particular statement in, and in -- in response to that, again, the government said that statement has no meaning.  And they took quite the opposite position at the Basham trial.

The Basham trial was held three months later and essentially the same issue came up before you, the famous deer statement.  The government, in the Basham trial, was successful in introducing the statement about the deer.

Not only did they introduce the deer statement as an admission made by Mr. Basham, they made that same argument to the jury in closing argument, that the statement about the deer was an admission that Basham killed Alice Donovan.

The importance of all that and the timing of all that, Your Honor, was, again, the Basham trial takes place three months after the Fulks trial.  The attorneys this week for the Fulks' trial team told you that they didn't attend the Basham trial.  They did not review the Basham trial transcript.  Apparently they never spoke with Mr. Swerling,

apparently they never spoke with Mr. Harris, the trial counsel for Mr. Basham.

They did no follow-up whatsoever in terms of the Basham trial, to determine what took place at the Basham trial that could have shed some light on the deer statement and a plethora of issues that might -- that existed at the time.

So, they took no efforts to determine what took place at the Basham trial. And the direct appeal wasn't heard by the Fourth Circuit until 18 months after the Basham trial. So, 18 months went by when they could have discovered Sheriff Hewett's testimony.

They should have raised that issue on appeal, because they properly preserved that issue. Mr. Blume objected to your ruling, so it was properly preserved, they simply did not raise it at the Fourth Circuit.

And let me get to the testimony of Sheriff Hewett. Your Honor, here is the exact language from the transcript from the Basham trial. This is, again, Sheriff Hewett testifying as he's being cross-examined by Greg Harris.

"There is nothing in your notes nor is there anything in Lieutenant Crocker's notes to indicate that Branden Basham told you that he used the strap, is there?

"No, sir, he did not tell me he used the strap, he demonstrated, though.

"He demonstrated?

"Yes, sir.

"The notes indicate -- your notes nor Lieutenant Crocker's notes say that he did that, isn't that true?"

And then turn the page. "That is true because he didn't say, he showed."

And you recall Sheriff Hewett gave a statement to Lieutenant D. A. Crocker, which was one of our exhibits. So, he testified unequivocally, Sheriff Hewett does, that Brandon Basham showed him how he strangled Alice Donovan. And Your Honor, I would point out --

THE COURT: Go back and give me the testimony before that.

MS. EWING: Your Honor, Mr. Fulks did not argue the purse strap -- or argue that the purse strap statement should have been argued on appeal. I think Mr. Beattie is mixing some of these statements up. It's their claim 19.

MR. ASHMORE: Your Honor, the significance is this, the purse strap statement puts the deer statement into proper context. The government said it was taken out of context, the deer statement was taken out of context --

THE COURT: Wait a minute, before you get to the deer statement, I want us to look at the lead-in to what you've got underlined on the purse strap statement, because I thought the sheriff used passive language. "She was strangled this way."

MR. ASHMORE: That's his written report.

THE COURT:  That's his written report?

MR. ASHMORE:  Yes, sir.

THE COURT:  What did he say at trial?

MR. ASHMORE:  He said -- he said essentially that Basham showed him how Alice Donovan was strangled.  The transcript is a little bit unclear.  What I think -- as he demonstrated at trial, and I think on direct it was clear from the demonstration of Sheriff Hewett, that he is showing how Basham indicated to him he strangled Alice Donovan.

Of course, that wasn't in his report, and so Mr. Harris says, "You know, that wasn't anywhere in your report," and here goes Sheriff Hewett saying, "Well, no, it wasn't in my report because he didn't tell me, he showed me." That's --

THE COURT:  So you are leading up to the failure to argue the deer statement on appeal, but you want me to look at the strap statement to put the deer statement in context, or to support the idea behind the deer statement?

MR. ASHMORE:  That's exactly right.  The purse statement, the notion that it was actually Brandon Basham that did strangle Alice Donovan suddenly sheds light on the deer statement.  Then you understand what the end of that deer statement is.  "Here I have never killed a deer and here I have strangled a person, here I have killed Alice Donovan."

That's what he did, that's what Sheriff Hewett says

that he did. So, it's in that context that you look at the deer statement. And that was -- so your refusal to allow the deer statement, Your Honor, that should have been taken up on appeal, that could have changed the entire trial. That is an admission by Brandon Basham that he was the actual strangler, which was the primary theme of the defense.

THE COURT: Did Mr. Blume give us any reason why he didn't appeal it when he was on the stand?

MR. ASHMORE: No, sir.

THE COURT: Was he asked or was it just not addressed?

MR. ASHMORE: I would have to go back and look. I think I asked him, Judge.

THE COURT: I think he said he didn't remember.

MR. ASHMORE: I do know this, he said he raised every meritorious issue that was out there. He certainly didn't weed out any issues.

Again, Your Honor, I think as the government talked about context in the Fulks trial, now you really have to look at context.

THE COURT: Of course, when Mr. Nettles testified, he thought when he looked at the written statement by Hewett that it was saying that Basham showed how Fulks did it.

MR. ASHMORE: Yes, sir, and there's a reason for that, that's what they were told by the government. They were

told by the government that Basham showed Sheriff Hewett how Fulks strangled Alice Donovan.

THE COURT: But I thought Mr. Nettles looked at that statement you have got on the screen -- "I would never want to use that statement because it says that Fulks did it." Isn't that what he said?

MR. ASHMORE: Well, he would have wanted to use this statement here where it was an admission, a confession by Brandon Basham that he was the actual strangler. That's what they didn't know, that's -- that's the import of our argument, Your Honor.

THE COURT: I hate to sound like I'm being argumentative with you, Mr. Ashmore --

MR. ASHMORE: That's fine, Judge.

THE COURT: -- but Mr. Basham also said that Mr. Fulks put her in the trunk and slashed her throat, too.

MR. ASHMORE: Yes, sir. And he told that to the FBI --

THE COURT: If this statement comes in, what do I do with that statement?

MR. ASHMORE: He told that to Agent Long, and I think you let them both in and let the jury conclude it is physically impossible, the other version that Basham might have given, because there was no blood in the trunk. The jury -- you can't buy that with the jury, because there's no physical evidence.

And then in some -- later in the day, some moment of weakness or whatever, Basham, according to Sheriff Hewett, actually gives an admission.

And I will say in fairness to the government, Your Honor, Agent Long's 302, Agent Long was there that same day, and his 302 says that Basham indicated how Fulks strangled Alice Donovan.

THE COURT: I still want to see the page before this that you have got on the screen where he first talked about the purse strap.

MR. ASHMORE: I will have to search for that. The direct, it doesn't say much, but I will get it. Maybe my team can find it in the interim. But I understand you want to see the direct testimony related to that issue and I apologize. I don't have that.

THE COURT: You can find it later.

MR. ASHMORE: I will get it to you. But I can tell you, again, I think it's sort of a demonstration -- and I'm not so sure -- and I think Mr. Harris probably regretted going down this line of questioning because Sheriff Hewett made it abundantly clear what he saw that day.

And it's irreconcilable, Your Honor. I don't know how the government can say that Fulks was the actual strangler in his trial, and then here comes Sheriff Hewett saying that it was Brandon Basham was the actual strangler. I mean, that's

the critical problem that the government has, Your Honor.

Your Honor, that gets me into our inconsistent theories portion of our 2255 related to due process, due process violated when an inconsistency exists at the core of the prosecutor's cases against defendants for the same crime. And we cite Smith v. Groose, G-r-o-o-s-e, 205 F. 3d 1045.

That's where you have -- that's what we have here. We have got identical circumstances but different facts, two totally different theories have been presented to two separate juries as against two separate defendants. And that is grossly unfair, a miscarriage of justice, and a violation of due process.

And to go back, in the Fulks trial, at the trial transcript, June 22nd, 2004 at page 255, the government argued that Basham was explaining how, quote, "Chad Fulks took the purse strap and strangled," end quote, Alice Donovan.

Again, I want to make it clear the government says Chad Fulks was the strangler in the Chad Fulks' case, and then over here in the Basham case they say Basham is the actual strangler. Those are two inconsistent theories, Judge.

THE COURT: Well, the government comes back in their brief and cites other passages from the argument of Mr. Gasser where in both cases he said it took both of these defendants acting together to carry out the crime. He did say words to that effect, I think obviously knowing that this day was

coming.

MR. ASHMORE: And, Judge, nobody is saying that Chad Fulks wasn't there, we are not saying he didn't assist, we are saying he wasn't the actual strangler, which is a tremendous point to be made with the jury. That's what the entire Fulks defense was about. That's the only thing they had, Your Honor.

And so, Your Honor, again, I think we are all together on what our argument is as to the inconsistent theory. It just -- I look forward to the government's response. I don't know how they can take a position that Mr. Fulks was the strangler in his trial and Mr. Basham was the strangler in his trial, but that's what happened, Judge.

THE COURT: All right. Ms. Ewing.

MR. ASHMORE: Your Honor, if I could, I believe -- if I could proffer some argument on the Brady issue that --

THE COURT: Go ahead.

MR. ASHMORE: -- we discussed earlier.

Your Honor, understanding your ruling previously, I would proffer the following as to Brady, government's duty to disclose exculpatory evidence applies to evidence material either to guilt or to punishment, whether the information is in the hands of the prosecutor or the police.

We think clearly Sheriff Hewett must have had information that Brandon Basham confessed to this crime, to the actual strangling of Ms. Donovan, that was never related to the

Fulks trial team.

THE COURT: Flesh that out for me, how did the government -- what did the government not disclose? I mean, they gave the Sheriff Hewett written statement, didn't they?

MR. ASHMORE: Well, Your Honor, the written statement is ambiguous. What they did not disclose was the confession. There was a confession apparently given to Sheriff Hewett, because he says in the Basham trial that Basham demonstrated how he strangled Alice Donovan.

THE COURT: So you say they had oral information they gained orally, somehow, inconsistent with the written statement or supplemental to the written statement that should have been turned over?

MR. ASHMORE: Absolutely, Your Honor, absolutely. And if I may back up just a little bit, you know, that is just such a stark contrast in the testimony. The government did nothing to come off of Sheriff Hewett's testimony, they actually embraced it.

And this is Johnny Gasser's closing argument: "You remember Sheriff Hewett took that witness stand." He begins by building up the credibility of Sheriff Hewett.

And let me make this point, Your Honor, it is a sheriff that is testifying, not a jailhouse snitch, not a rookie cop. This is a man coming in -- I don't know if he was wearing a badge on his chest. But he's a duly elected sheriff

having served as a sheriff for 10 years, the most credible witness is testifying.

And Johnny Gasser said, "You remember that Sheriff Hewett that took the witness stand and you remember Sheriff Hewett, he was referring to his notes so that he could be exact to you jurors. You remember how fair Sheriff Hewett was? He wrote down any time Brandon Basham trembled or got emotional, as a police officer he looked at his notes, put it down whether it helped Brandon Basham or hurt him."

Then he recounts the "Here, I couldn't even kill a deer" statement. And this is what Mr. Gasser says about that. "You know, how does the deer statement end?" Gasser implies clearly that it should end "Here I have strangled Ms. Donovan."

His examples are, "What do you think he's thinking about? Here I have smoked a joint? Here I have stolen a car?" No, he's arguing the criminality of that statement. He makes it clear to the jury the ending of that statement was, "Here I have killed Alice Donovan."

He tells -- he tells the sheriff -- then we get into the purse strap. This is the next page labeled as 12-80. He tells the sheriff, "It was right there by that gate," talking about the purse strap. "He tells, not only tells, he demonstrates, he demonstrates for that sheriff the Liz Claiborne purse strap was used to kill Alice Donovan."

And he refers to Mr. Swerling, it's actually

Mr. Harris doing the cross. But it says, "Mr. Swerling asked Sheriff Hewett, said, 'He didn't say "I killed Alice Donovan."' Sheriff Hewett said to you in this courtroom in front of you, the jury, 'No, he demonstrated it.'" Basham killed -- strangled Alice Donovan, that's what Johnny Gasser told the jury.

Your Honor, on with my proffer concerning Brady v. Maryland. Your Honor, in claim 21 we raised the Brady v. Maryland case by stating the government violated its obligations under Brady v. Maryland by failing to disclose to petitioner information material to his ability to prepare and present a defense.

I would note within that subsection, Your Honor -- and let me put this on the screen for everyone.

MR. DALEY: Your Honor, if we are going to get into a new claim, claim 21 is a new claim, I might like to address that separate from Ms. Ewing.

MR. ASHMORE: Whatever you prefer, Your Honor.

THE COURT: What is claim 21?

MR. ASHMORE: This is the proffer on the Brady violation.

MR. DALEY: It actually deals with two ladies who he supposedly gave benefits too and he's trying to sort of bring, I guess, in this claim, which was never stated in any way --

THE COURT: I've sided with you and kept it out, he's

just making a proffer now of what he would have showed had I allowed it --

MR. ASHMORE:  That's not where I'm heading with my argument, Judge.  I think it might be beneficial for me to proceed.

THE COURT:  All right.

MR. ASHMORE:  Your Honor, again, in our claim 21, it's Brady v. Maryland, we cite the case.  Everyone understands the proposition for which it stands.  We mention it in our brief, Your Honor, as discussed in the previous section.

So, Your Honor, we certainly take the position that our petition and amended petition should be read as a whole, and that's what we -- that's what we -- that's how we have put our entire 2255 petition together.

Beyond that, Your Honor, here is where we have raised -- here is where we have raised those claims.  Beginning on page 14 of our original petition, 2255, under governmental misconduct -- and obviously Brady, failure to turn over a confession of a co-defendant would fall squarely within this particular subsection.  "Prosecution argued that Brandon" -- I'm sorry -- "that Basham's statements were meaningless or taken out of context --"

THE COURT:  Are you referring -- we are going with the amended petition now or the original --

MR. ASHMORE:  This is the original petition, page 14,

Your Honor.

THE COURT:  All right.  I thought we were working from the amended one.

MR. ASHMORE:  Your Honor, I'm simply making the point that we raised this claim.  To the extent you have got any concern about us not raising -- I'm going to get to my amended petition where we raised it in that as well, but I want it perfectly clear that we think we raised it within the one-year time and then in the amended petition as well.

THE COURT:  All right.  Go ahead.

MR. ASHMORE:  So, we begin on page 14 of the original petition talking about the statements, that's plural, meaning deer and purse strap, that they -- the meaningless statements were introduced successfully in the Basham trial.

The same language you will see on page 17 of our amended motion to vacate, Your Honor, with the additional, that one sentence I have underlined.  "For example, the prosecution in petitioner's trial fought to keep out statements made by Basham wherein he admitted to a North Carolina sheriff that Basham used a purse strap to strangle Alice Donovan," that's squarely under governmental misconduct in our brief, Your Honor.

Further, in our reply, page 66 of our reply, Your Honor, at the bottom of the page, "Indeed, Basham actually confessed, without prompting, to strangling Ms. Donovan through

his demonstration to Sheriff Hewett.  This can only be deemed to be government misconduct for failure to reveal this to Mr. Fulks' trial team.  In the alternative, it was ineffective assistance of counsel to fail to uncover what Hewett actually saw and what he would say under oath."

Again, raised that in our reply.

Your Honor, here is the government's language.  You recall, I filed a motion to take the deposition of Sheriff Hewett, we had a hearing on that, it was ultimately denied.  I had hoped to get to the bottom of Sheriff Hewett's deer statement and purse strap testimony.

The government, in response to my -- our motion to conduct discovery, the government filed their response dated 8-6-2008, and they say this, "Petitioner claims that the government attempted to influence witness testimony and in so doing rendered a verdict, a denial of due process."  That was clearly in our claim 21.

Then they go on to say, "Petitioner also claims the government violated its obligations under Brady v. Maryland by failing to disclose to the petitioner information material to his ability to prepare a defense at trial."

So, secondarily to our witness testimony that's clearly outlined in our subsection 21, they talk about the other Brady obligations and claims that we have referenced.

And then we get, Your Honor, to this week.  And I

have the rough transcript, thanks to Mr. Smith, as to how we have proceeded this week. And here is what was said in opening statement, Your Honor.

Here is where I talk about -- "And then lastly, Your Honor, the Brady claim/ineffective assistance of counsel." I talk about Sheriff Hewett and I talk about the purse strap and I talk about the deer statement. That's what we are here to discuss this week.

And the next page, "In the Basham trial," at the top of the page, "In the Basham trial Sheriff Hewett testified that Branden Basham demonstrated how he, Branden Basham, strangled Alice Donovan with a purse strap, an admission, Your Honor, a confession. That was never revealed to the trial team.

"It's clear on the record and clear from Sheriff Hewett's testimony that Brandon Basham confessed to actually strangling Alice Donovan. This wasn't brought to the attention of the trial team. We think there are serious Brady violations. It's hard to believe the trial team should have to discover that, but it's also an ineffective assistance of counsel argument."

Here is what Mr. Daley says in response to that, labeled as 1-23 -- understanding, Your Honor, this is a rough transcript, not the final transcript.

"Your Honor, the Brady claim, actually it's the Hewett claim. I'm not --" and then you indicate -- "That is

the Brady claim?"  And Mr. Daley, "It is one of the Brady claims."

So, Your Honor, we take the position clearly the government was on notice and actually acquiesced, consented, expressly or impliedly, to treating our 2255 as having successfully raised the Brady claim in relation to their failure, the government's failure, to turn over the purse strap -- I mean, the confession that Basham used the purse strap to strangle Ms. Donovan.

Lastly, Your Honor, the trial team should have discovered what Sheriff Hewett would have ultimately testified to at the Basham trial.  They took no efforts to interview Sheriff Hewett.  As a matter of fact, Your Honor, we got into, including Mr. Blume's testimony concerning the February 25th, 2004 hearing.

And, Your Honor, let me first say, let me point out that those listed on this transcript as being in attendance, Strom Thurmond, Scott Schools, and Johnny Gasser, that makes sense.  For the Defendant Fulks, Mr. Blume, Ms. Johnson, and Mr. Nettles.  And then I'm going to turn the page, for the Defendant Basham, Mr. Swerling and Mr. Harris, and Mr. Smith was the court reporter.

Mr. Blume, I believe, testified that he wasn't there, or if he was there it was only for part of it, and that this was a hearing related to a conflict issue that arose in the

Basham case -- the Basham trial.

That is not what this -- that's not what this hearing is about. This is a Jackson v. Deno hearing, Judge, where Sheriff Hewett did testify and Sheriff Hewett talks throughout this transcript about the deer statement, he talks throughout this transcript about the purse strap.

And Mr. Blume didn't ask a question, Mr. Nettles didn't ask a question, nor did Ms. Johnson ask a question. They never asked Sheriff Hewett, apparently their one opportunity to do so, anything about what his ultimate testimony would be.

"Sheriff Hewett, who killed Alice Donovan?" You've got to ask that question, Judge. They never asked that question. And it came back to haunt them, because as it turned out they missed it. It came out in the Basham trial, it was Basham that strangled Alice Donovan.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Ashmore.

MR. DALEY: Your Honor, if I might respond since my name was brought up about claim 21.

THE COURT: All right. Go ahead.

MR. DALEY: That was done in the context of the opening statements. I think Mr. Ashmore would admit that both of us were surprised that there would be opening statements, and that was actually in response to his opening argument in

which he did, yes, try to state the claim as one under Brady.

I quickly realized after that that was not correct, and I think you will -- the record would reflect that I noted that. And that --

THE COURT: You did come back and say --

MR. DALEY: As quickly as I could.

THE COURT: After you thought about it, you thought it was not raised.

MR. DALEY: Again, it's a question of the statute of limitations at this point. You have claim 18, that is ineffective assistance of counsel as to the deer statement. The deer statement alone doesn't have anything to do with the Basham trial where there was some sort of purse strap demonstration, some sort of -- that's not what the substance for claim 18 is about.

Claim 19 is the different versions, inconsistent theories.

THE COURT: All right.

MR. DALEY: And that one only deals with the purse strap statement. What they are trying to do now is to bring those two together in 18 and 19, and then through some sort of -- "You know, there was something in the introduction, there was something later on in claim 21, we raised the case Brady --" it's about a one-paragraph claim that has to do with simply the supposed favors that were given to two of the ladies

that were with Mr. Basham and Mr. Fulks, and the government would just say that that was not raised.

And if you can cobble together claims the way he's attempting to, the government could never respond to all these things. I mean, imagine if the government had to go, "Okay, well, they raised it in the introduction, something about this, and then two or three claims later they talk about Brady in a different context, we are going to sort of mix and match all those together and shake them up and we've got a Brady claim."

I'm not sure -- where were we supposed to respond to that new Brady claim that is in the ether somewhere? That's the government's point about that.

THE COURT: Okay.

MR. DALEY: Thank you. And I think now Ms. Ewing is going to respond to claims 18 and 19.

THE COURT: All right, Ms. Ewing.

MS. EWING: Your Honor, claim 18 clearly just addressed the deer statement. Your Honor ruled on that, applying a balancing test against introduction of the statement because -- or you ruled against it, applying the balancing test because you felt that the introduction of the statement would confuse the issues, substantially outweighing the probative value.

And, yes, it was argued during that hearing that if the deer statement came in, then all the other statements that

Mr. Basham made inculpating Mr. Fulks would have to come in also.

So, appellate counsel is not ineffective because they wouldn't have prevailed on that. The Fourth Circuit would have based its decision on an abuse of discretion standard, and clearly it was not an abuse of discretion, because we don't know what Mr. Basham was trying to argue.

And trying to import in transcripts from a later trial? It could not have been used in determining whether the court abused its discretion based on what it knew at the time, not that we think that it would have been different. But clearly claim 18 was simply the deer statement.

Claim 19, who are -- brought in as part of this, the purse statement, that the prosecution presented inconsistent theories. Well, there is nothing that requires the government to present consistent theories. However, the government truly did present consistent theories.

It did not argue that Mr. Fulks strangled Ms. Donovan, it did not argue that Mr. Basham did. The government's position the entire time was, it took both of them. It took both of them, and had they not been working together, that Ms. Donovan and Ms. Burns would still be alive.

The government made that plainly clear at Basham's trial. The statements that they introduced or that came out regarding Mr. Basham calling his counselor on Christmas eve,

Mr. Basham had said, "We killed them."

So, it's the government's theory all along that we will probably never know which one actually did the killing, but that it doesn't matter because it took both of them.

And again, I -- the government never argued that one alone killed Ms. Donovan.  I don't believe I --

THE COURT:  All right, very good.  Thank you very much.  Any reply?

MR. ASHMORE:  Yes, sir.  Your Honor, the government did say in the Fulks trial that Chad Fulks strangled Alice Donovan.  Not that he participated, not that he assisted, they said, quote, "Chad Fulks took the purse strap and strangled," end quote, Alice Donovan.  That's the trial transcript 6-22-2004 at page 255.  I can probably find other examples.

But clearly they take the position that Chad Fulks was the actual strangler in Chad Fulks' trial.  They take the position that it was Mr. Basham that strangled her in the Basham trial.

Your Honor, Mr. Daley says as to our Brady claim, it simply was not raised, and I want to make our positions clear for the record.  We say it was.  We say that we properly raised these Brady claims in our petition, amended petition reply.

Number two, our second position is, they knew about it, they had notice about it, and they acquiesced in that.  In our reply brief, we just absolutely clearly spell it out.

They could have filed a surreply and say, "Wait a minute, we don't agree with that, you haven't raised that." We heard nothing from them on that, haven't until this week. Even beyond opening statements they were still well aware of where we were headed.

They say they had no notice, it was somewhere in the ether. Your Honor, just simply, they did have notice, there is no doubt about it.

And Your Honor, if I may, Rule 15 of the Rules of Civil Procedure I would ask -- I would ask, number one, that Your Honor reconsider your previous ruling this week and allow those claims as outlined.

Under Rule 15(b), as you well know, amendments can be made during and after trial. Under 15(b)(1) the court may permit the pleadings to be amended. "The court shall freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails --"

THE COURT: But we have a statutory one-year bar here that I think would trump the rule, wouldn't it? I know that rule gives me authority, and I have used it many times.

MR. ASHMORE: Yes, sir.

THE COURT: To allow a pleading to be amended after the trial is over to conform to what has been produced at trial. I'm familiar with that rule. I think here we need to look at the one-year statute.

MR. ASHMORE: I understand your point, Your Honor.

And my last point, and I will rest, Your Honor, under 15(b)(2), issues tried by consent. Again, Your Honor, we take the position that the government has always known about this Brady claim, it's always been in there, and they consented at the trial.

THE COURT: All right.

MR. ASHMORE: Your Honor, I'm sorry, may I have one more minute?

THE COURT: All right.

MR. ASHMORE: I should have checked with them first.

MS. EWING: Your Honor, the statement that Mr. Ashmore is talking about was part of a colloquy, it was not something that took place in front of the jury.

THE COURT: All right. It was page 600-something?

MS. EWING: Page 265 of the 6-22 transcript.

THE COURT: Of which trial?

MS. EWING: This is in Mr. Fulks' trial.

THE COURT: All right. Anything further, Mr. Ashmore?

MR. ASHMORE: I'm sorry, Your Honor, I was distracted.

I understand that point, that it was argued to you that Chad Fulks was the actual strangler. I believe that's all I have, Your Honor.

THE COURT: Let's move to the final issue to be debated today, the two-step jury charge.

All right. Ms. Small.

MS. SMALL: Your Honor, I have two unenviable tasks, I have to go last and I have to tell you that you messed up. I'm not necessarily looking forward to this.

THE COURT: In my defense, I did check, we were going on the Eighth Circuit pattern jury instructions when we came up with that. I didn't write that myself. I mean, that doesn't make it proper but, I mean, that's where I got it from.

MS. SMALL: Thank you, Your Honor. And I wanted to actually go through a little bit of colloquy, where that came up, as we discuss the claim.

Before I deal with the substance of the instruction and the errors, I want to reiterate the applicable standard for the ineffective assistance of appellate counsel claim, and that is simply that due to counsel's objectively unreasonable behavior as to appeal, there is a reasonable likelihood that the outcome would have been different, i.e., that Mr. Fulks' -- in this allegation, Mr. Fulks' sentence would have been reversed and remanded for resentencing.

THE COURT: Now, this issue was not on appeal in the Basham case, right? The failure to leave a blank catchall blank on mitigation was raised, but this one was not raised; is that right?

MS. SMALL: That's my understanding unless, you may have in Mr. Basham's -- I don't know if you gave the same instruction in Mr. Basham's case.

THE COURT: I think I did, but I'm not sure.

MS. SMALL: Right. Well, one of the standards that applies to an ineffective assistance of appellate counsel claim is found in Lawrence versus Branker, the Fourth Circuit, 517 F. 3d 700.

And the Fourth Circuit has said that the court should presume counsel has weeded out weaker issues and focused on stronger ones. I want to emphasize, based on the testimony in this hearing, that that is not applicable here.

Mr. Blume clearly testified that he raised every claim that he thought had merit. He did not winnow out claims based on one being stronger than the other. If it has got merit in his mind, he raises it.

He further testified clearly he did not have any strategic reason for not raising the claim. So, the issue boils down to, should he have raised it? And that goes to the merits of the claim itself.

Your Honor, the day before the jury was charged there was a colloquy going on between you and trial counsel and counsel for the government regarding mitigating factors. I'm going to put this on the Elmo, if I may.

And Mr. Schools and the court -- in the conclusion of

the discussion of mitigating factors says, "Your Honor," he says, "I think we have two concerns.  I think we need to have -- one, is the mitigating factor proved, two, is it mitigating?"

The government goes on to argue, the following page, the colloquy continues, I don't need to go through it all in detail -- that you really need to instruct the jury not only do they have to find that the mitigating factor has been proved, but they have to find that it is in their view mitigating.

And one of the things you note in the course of discussing that, is that you indicate you had had a dilemma about the number of mitigating factors alleged by the defense and what you were going to do about that number.  And that was I think one of the difficulties you faced in trying to -- in putting this charge in front of the jury.

THE COURT:  Maybe I didn't get this from the Eighth Circuit then.

MS. SMALL:  I don't think you did, Your Honor.  I mean, I don't see it anywhere --

THE COURT:  Somebody asked me to do the two-step process --

MS. SMALL:  And frankly I have looked at every draft instruction I could find both from the government and the defense and never saw it until this colloquy --

THE COURT:  I might have misspoken.  I will go try to

go back and reconstruct from my notes whether I wrote that language myself or borrowed it from somewhere.

MS. SMALL: It seems from argument, it seems Mr. Schools suggested it. And part of the discussion that was had, Your Honor -- look at this paragraph here. You said, "If you are right and you can just list 157 factors, your side could hand me up a sheet, 'The defendant weighs 250 pounds, number 38, he had blue hair --'" you look at a number of factors that are arguably irrelevant.

And based on what appears to be an understanding that anything the defense wanted to hand you you would have to instruct on, this instruction that the jury has to not only find that the factor exists but also it was mitigating was born at the government's suggestion.

When you instructed the jury -- court's indulgence. In your jury instruction you explain the meaning of mitigation to the jury, which is on page 273 of transcript, volume 21, 6-29-04, and then you instruct the jury that "The law provides there is essentially no limits on the number of factors or things the jury may consider in mitigation. As to each of the factors submitted by the defendant and which I'm about to list, you must engage in a two-step process.

"Specifically you must first determine if the evidence that you heard establishes the existence of the factor; secondly, you decide for yourself whether the factor is

mitigating."  You repeated this instruction --

THE COURT:  I think I understand why I did that now. Because what if the defendant did hand up a list of 150 things, some of which were debatable whether they were mitigating or not?

MS. SMALL:  Your Honor, the law is clear that you have discretion to refuse to charge a mitigating circumstance that is not relevant.

THE COURT:  The remedy would be not to charge red hair --

MS. SMALL:  In Tennard versus Dretke the Supreme Court held very clearly that the standard for constitutionally relevant mitigating evidence is the same as the standard for relevant evidence --

THE COURT:  Then I might have to split hairs as to whether something is truly mitigating or not, whereas I went the other way and said, "I will put anything down on the verdict form you want me to put down, but I'm going to let the jury decide, number one, if it's been proved, so there is no need to get into a philosophical debate about whether something is mitigating if it didn't happen.  So, first determine if it happened, then decide if it's mitigating or not."

I think -- reconstructing, I think that was my thought pattern when I did it.  Otherwise, I would have to engage in some very fine hair splitting as to whether something

is mitigating or not, and not put it on the verdict form if I thought it was not, and then run the risk of being wrong on that, if you see my point.

MS. SMALL: I understand that, Your Honor, and it's a difficult position to be in. On the other hand, I think the solution to that is -- Tennard, Buchanan, Eddings -- the Supreme Court cases are very clear that it's your authority to channel the jury's discretion by making those judgment calls.

And the reason for that, Your Honor, is that the jury -- the sentencer generally does not have discretion to refuse to consider evidence on the basis that from its own determination the evidence is not mitigating.

And for that proposition I refer you to Eddings versus Oklahoma, 455 U.S. 104. In Eddings the court was the sentencer, a judge sentenced case, capital murder by a young man who had grown up in a very abusive background.

The judge said, "I will consider the defendant's youth as a mitigating factor," but then he found as a matter of law that the defendant's abusive background was not mitigating. And here is what -- the Supreme Court reversed that ruling. Here is what the court said.

"Just as the state may not by statute preclude the sentencer from considering any mitigating factor --" that's the holding of Lockett versus Ohio -- "neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating

evidence.

"In this instance, it was as if the trial judge had instructed a jury to disregard mitigating evidence Eddings proffered on his behalf.  The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given the evidence."  That was what Mr. Blume argued to you, it was the jury's job to decide the weight.  "But they may not give it no weight by excluding such evidence from their consideration."

Your Honor, this is not -- I'm going to go up and scroll up a little bit here -- the Supreme Court has repeated this, Buchanan versus Angelone, a case that established that the sentencer may not be precluded from considering and may not refuse to consider any constitutionally relevant mitigating evidence.

Again Skipper versus South Carolina.  "There is no disputing that this court's decision in Eddings requires in capital cases the sentencer not be precluded or not refuse to consider --" I'm sort of paraphrasing here.

Then the court goes on to say, "Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence."

Your Honor, the Fourth Circuit in Fulks recognized this when it said on 454 F. 3d 410 at 427, "That in a capital

sentencing proceeding a juror's duties include giving meaningful consideration to any mitigating evidence that the defendant can produce." That's Eddings.

Your Honor, the situation we have here is that it's clear you have the discretion, you had the discretion at that time to leave out as relevant factors, or as you suggested during the colloquy, to cluster factors, if you thought that would reasonably channel the jury's discretion.

As a point of sort of confirmation of this, it is clear that there are factors that courts have said are not relevant mitigating evidence. In Oregon v. Guzek the Supreme Court ruled that residual doubt is not a constitutionally relevant --

THE COURT: That what?

MS. SMALL: That residual doubt is not to be given to the jury as a mitigating factor. And Skipper versus South Carolina, the Supreme Court said, as an example, "How many times a day the defendant -- or how often a defendant would be able to take a shower is not constitutionally relevant mitigating evidence."

In Owens v. Guida, G-u-i-d-a, the Sixth Circuit ruled that the defendant's willingness to plead guilty in a deal that was not accepted by the prosecution is not a mitigating factor.

So, clearly there are factors, and courts have upheld judge -- juries in refusing to charge irrelevant mitigating

factors.

THE COURT: Those are easier calls. Let's take a hypothetical example. What if it's close to the line? In other words, Mr. Fulks tried out for the junior varsity basketball team and was cut from the team and didn't make it, and that led him to a downward spiral of depression and life of crime and all.

And so I'm agonizing, "Is that really a mitigating factor or not, getting kicked off the -- I mean, not making the cut on the junior varsity basketball team." Kind of halfway fits into his life story, nothing went right for him.

So, on the other hand you could say, "Well, he needs to get a life, a lot of people don't make the basketball team, they only have so many players on the team."

So, I'm scratching my head and saying, "Should I draw the line and let it in, or keep it out?" And I say, "Well, the safe thing to do is put it on the verdict form, let the jury decide if it happened, and then decide if it's mitigating or not.

It looks like to me the defendant gets a better deal with that than with the judge arbitrarily with a meat axe saying, "You know, of the 85 you handed up, I'm going to chop off these 20 and let these 65 go in."

I'm just thinking out loud.

MS. SMALL: I understand that, Your Honor, but --

THE COURT: I am just thinking, if I was the defendant I would want the second approach where I could put the Columbia phone book literally on the verdict form with as many possible things mitigating as I could think of, and let the judge charge the jury, "See if it happened, see if it's mitigating," versus the judge just arbitrarily -- well, not arbitrarily, but chopping some off.

MS. SMALL: Well, that's exactly it, Your Honor, it's not arbitrary, and what the message of Eddings and subsequent cases is, that determination --

THE COURT: What about my high school team, what would you argue? If you were the defense lawyer, wouldn't you want that to go in there?

MS. SMALL: Certainly I would, but Your Honor, what you cannot do is pass --

THE COURT: So, I put that on there. If I put on he didn't make the junior varsity basketball team, now we are going to put that he didn't pass the tenderfoot merit badge for the boy scouts? I mean, where do we stop? I would have to then decide the boy scout issue.

MS. SMALL: I understand, Your Honor, my point is, it's your decision. You cannot pass, under Eddings you cannot pass the decision onto the jury. Someone has to make that decision and it's not the sentencer that gets to make that determination. That is the point of Eddings, that is the point

of Buchanan, that is the point of that line of cases.

And that does put the judge, sentencing, the trial judge in a difficult position. But, Your Honor, judges face those difficult positions every day. That's, you know, to use the colloquialism, that's why you get paid the big bucks, you have to make those decisions.

And it's difficult sometimes, and I think it's particularly difficult in capital cases. But if Eddings means anything, it means that you can't hand to the jury a list of circumstances and say, "I don't want to decide this question, you decide it."

And I think one of the reasons for that, Your Honor, is if you recall Ms. Lyon's testimony wherein she indicated that if you simply ask a venire member, "Would you consider mitigating evidence?" And the venire member says, "Yes --" I think she testified and I don't recall verbatim, that studies have shown that juror is probably thinking about things like duress, self defense, not things that are actually what we put in the category of mitigating evidence. That is the reason we have jury instructions and that is the reason why the sentencer's job is only to weigh the mitigating evidence, not to decide whether it's mitigating.

THE COURT: What about this recent authority that the government handed up, this Higgs case out of the Fourth Circuit back in --

MS. SMALL:  I am delighted to discuss those, Your Honor.

Your Honor, I'm actually going to start with Kansas versus Marsh --

THE COURT:  Let me interrupt.  Hold on one second.

All right.  Go ahead.

MS. SMALL:  All right.  Your Honor, as to the cases cited in the government's memorandum of supplemental authority yesterday evening, I'm going to start discussing Kansas versus Marsh, which is the Supreme Court case.

THE COURT:  Kansas versus --

MS. SMALL:  Kansas versus Marsh, M-a-r-s-h, 548 U.S. 163, decided in 2006.  Your Honor, Kansas versus Marsh did not address this issue.  It was about the constitutionality of Kansas' death penalty law that required the jury to impose a capital sentence if the aggravators and mitigators were in equipoise.  The case simply does not address this issue.

What the case does mention is that somewhere along in there the court recites the Kansas pattern jury instruction that said essentially the pattern instruction defines the mitigating circumstance, then goes on to say, "The determination of what are mitigating circumstances is for you as jurors to resolve with the facts and circumstances of the case."

Now that instruction and a number of those

instructions, I looked at them last night, go on in terms that are quite similar to Lockett versus Ohio laying out the rules for mitigating evidence.  What Kansas versus Marsh does not hold is that the jury is the judge of what is mitigating.  And in fact, Your Honor, Kansas versus Marsh is consistent with our position at page 175 --

THE COURT:  What you said is inconsistent with the catchall mitigator when I tell the jury at the very end, "You can consider anything else you think is mitigating, without limitation."  So, we do give them discretion in the catchall to determine that something is mitigating, don't we?

MS. SMALL:  What you are not giving them discretion to do, though, Your Honor -- there discretion is to find something that is mitigating.  What you did was give them discretion to find that something is not mitigating.

You effectively created 12 judges of what the definition of mitigating is, and that -- that's no way to run a railroad, frankly.  You can't -- I mean, as I said, that's your job.

In Kansas versus Marsh the court reiterated the Eddings language and said, "In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and to oblige sentencers to consider that information in determining the appropriate sentence."

Now, these remaining cases that the government cited, that would be United States versus Higgs, H-i-g-g-s, United States versus Jackson, United States versus Bernard, and one more unpublished district court case, all of these cases stand for the proposition -- and they rely on a single Eighth Circuit case prior to that -- in all those cases the defendant argues that a properly instructed jury failed to find mitigating factors as to which the defendant contended there was uncontroverted evidence.

I would note that in Higgs the court actually found that the evidence was highly controverted, and thus the factual premise, defense premise was improper. But more to the point, Your Honor, these cases are not about instructional error. There is no instructional error in any of these cases.

What these cases are about is the consistency of the jury's verdict with the evidence. As the Sixth Circuit noted in both Jackson and in Bernard, it is questionable whether the court even has jurisdiction to consider that claim. It goes directly into the area of meddling in the jury's deliberations, which courts are rightly loath to do. It is simply not the same thing as our situation.

More to the point, Your Honor, I do not see, having read Higgs and Jackson and Bernard, any attempt to wrestle with the clear language of Eddings and the subsequent cases. One of the cases mentions Eddings, but never talked about the

necessary tension between this rule and the clear language in Eddings that says you have to weigh it. You can give it little weight, but you cannot give it no weight.

These cases are both distinguishable, and if they are not distinguishable they are simply flat inconsistent with the Supreme Court precedent.

To close the loop on the claim, as far as -- assuming for the moment there is error, which I have hopefully established, this is a structural error. In any case of error in instructing the jury as to mitigating circumstances, but precluding the jury from considering it, or whether it is, as in the case of Eddings, refusing to consider it, reversal is automatic. The Supreme Court does not re-weigh the evidence and decide whether the error is harmless. The error by definition is harmful and the case is reversed and remanded for sentencing.

That being so, Your Honor, Mr. Blume's failure to raise this claim on appeal is necessarily prejudicial because had the error been correctly determined by the Fourth Circuit, the Fourth Circuit would have been required to remand for resentencing, and that is sufficient to satisfy the prejudice requirement.

If the court has further questions, I would be happy to answer them, otherwise I will --

THE COURT: I think you have covered it. Thank you

very much.

Now, cumulative error will come up Monday?

MS. SMALL:  That will be Monday.

THE COURT:  That will be it for today from the defendant?

MS. SMALL:  Yes, Your Honor.

THE COURT:  All right.  Be glad to hear from the government.

MR. DALEY:  Well, I have the pleasant opportunity to come up last and tell you you were right.  So, I'm glad I'm able to do that, Your Honor.

There is nothing improper about the instruction you gave.  And let's go through the cases.  What does Higgs say?  Higgs actually says, the Fourth Circuit says, "The constitution only requires that the jury be allowed to consider, consider evidence that is proffered as mitigating.  There is no constitutional requirement that the jury find a mitigating factor, even if it is supported by uncontradicted evidence."

Your Honor, your instructions did a very simple thing, and you will see there's actually a few instructions in these cases that I'm going to go through in a minute that are nearly identical to what you did, the instruction you gave.

First you said, "Okay, since we've got these 43 or 47 factors and y'all are fighting like cats and dogs about it, I'm going to just let them all in and I'm going to make you do two

things --"

"One, jury, you are going to have to find, does this exist?  For example, did he soil his pants and go down to the principal's office and the parents didn't come?  Did that happen?

"But then, additionally, you need to consider, are you going -- are you going to consider it mitigating?"  And there is nothing wrong with that process, Your Honor.

The Eighth Amendment does not require that a jury give mitigating effect to some fact or factor that you may list on a verdict form as mitigating factors or potentially mitigating factors.  It just requires that the jury have the opportunity to be able to consider and give effect, if they decide to, to a capital defendant's proposed mitigating evidence.  That's what these cases stand for.  That's what --

THE COURT:  Mitigation is in the eye of the beholder?

MR. DALEY:  Absolutely, and you can tell --

THE COURT:  Whereas, I told the jury in the rest of the charge that a juror could find a mitigating factor that that juror believed to be mitigating, and could hold out for not giving the death penalty even if all the other 11 jurors did not think it was mitigating.

MR. DALEY:  Absolutely.  There could have been a juror that decided -- because not all of them decided that the fact someone had not escaped from the penitentiary since '93,

for example -- I think that maybe got nine votes.

But one person could have said, "That's enough of a reason right there for me to say I'm holding out," but they didn't all 12 find that to be a mitigating factor. There's nothing wrong with that. That's why we -- that's why juries decide the death penalty, Your Honor.

It's sort of strange thing to think that you are going to pick and choose, yet there's a catchall, and then somehow if you don't let hem -- because you know if you hadn't done that, Your Honor, if you hadn't given them all their list, could have been an issue on appeal as well. You get whipsawed.

And so I want to go through a few of the cases. For example, the Jackson case, U.S. versus Jackson, Fifth Circuit, 2008 case. I think it's very instructive and very similar to what you did.

If you look at the -- I don't know if you have the case in front of you, but at 983, at the bottom of the first column, and I want to read it into the record because I want you to see sort of whether -- how it's similar to your case, this case, your instruction.

"Further, and more fundamentally, the jury was not required to find that a factor was mitigating, even if it believed the factor's factual predicate to be true. All the law requires is that the jurors be aware that they can consider a factor to be mitigating," and then the court actually cites

Bernard.

It then goes on and says the court, the Jackson court says, "For example, no juror found that Jackson, quote, 'experienced --' that Jackson 'experienced persistent falling when trying to walk until he was five -- five years old and this factor is mitigating,' end quote. In reaching this conclusion the jurors could have believed that Jackson experienced the problems walking, but that the factor did not weigh against the sentence of death."

So, in that very quote you can see that the jury had to do two things, they had to find whether he had had this persistent falling problem, and whether the factor was mitigating.

Now, U.S. versus Bernard actually has this quote:

"Neither the Federal Death Penalty Act nor Lockett and Eddings require a capital jury to give mitigating effect or weight to any particular evidence, there is only a constitutional violation if there exists a reasonable likelihood that the jurors believed themselves precluded from considering mitigating evidence."

Your Honor, the instruction did not preclude them from considering it. It simply asked them to do two things, "One, does it exist? Did this fact or factor, did it exist? And two, is it mitigating? Do you think it's mitigating, juror? Because we are putting it in your hands to decide."

Your Honor, this Western District of Oklahoma case may be the most on point of all. It actually cites to a Tenth Circuit case. But it deals with a jury instruction, Your Honor, it deals with a jury instruction.

And this jury instruction, if you will look at pinpoint cite page 32, it's talking about in Smith versus Mullin, which is a Tenth Circuit case, 2004, it talks about the instruction that was given in this district court case and it's saying that it is not a problem.

This second instruction that they are talking about is more specific, listing six circumstances which may be mitigating and informing the jury that whether these circumstances existed and were mitigating was for the jury to decide. That's your instruction.

And they found that Smith versus Mullin, this Tenth Circuit case, 379 F. 3d 919, Tenth Circuit, 2004, was controlling and that it was -- and that it was proper.

Your Honor, they haven't come up with any case -- they have sort of a general argument that somehow your instruction created a problem, when the truth is, all you did was give the jury the laundry list the defendant wanted, but with an instruction that is completely appropriate, particularly in context with the whole instruction.

And you did not -- all your jury instruction did was require that the jury find whether a factor existed, and then

determine whether to give it mitigating effect.  There is just no error, Your Honor.

THE COURT:  All right.  Thank you, sir.

MS. SMALL:  Your Honor, if I may briefly?

THE COURT:  Sure.

MS. SMALL:  Thank you, Your Honor.

Your Honor, I heard the government discuss a lot of cases in its argument, the one I didn't hear discussed was Eddings and how it squares your instruction with Eddings.  The government argued that the only limitation the constitution imposes on mitigating evidence is that the jury not be precluded from considering the evidence.

But if that's so, Your Honor, the government just wrote Eddings out of the law.  Because nothing precluded the sentencing judge in Eddings from considering the defendant's abusive background growing up.  What happened in Eddings, as the judge said, "This evidence is before me, I don't think it's mitigating, so I'm not going to weigh it."

The Supreme Court said, "You can't do that Your -- sir.  Reversed, remanded, resentence."  The constitutional light is clear, Eddings is directly on point.  And as regrettable as it is, Your Honor, Mr. Fulks' sentence was imposed in error.  The instruction was wrong, it was not ambiguous, and it was improper as a matter of constitutional law under Eddings.

THE COURT: All right. Thank you very much. I think we have agreed to come back at 9:30 on Monday.

MS. SMALL: That's correct, Your Honor.

THE COURT: And I will sometime between now and next Monday morning, I will get the affidavit of Agent Long.

MR. LONG: Yes, sir.

THE COURT: Is it just going to address that one paragraph or is it going to be more comprehensive?

MR. DALEY: I want to talk to Agent Long, but I don't think it needs to be much more than addressing that one paragraph, in all likelihood.

THE COURT: But I want to make it real clear, both sides are expressly and forever waiving any hearsay objection, or other evidentiary objection or constitutional objection to me considering affidavits in lieu of live testimony, is that that's correct, Ms. Small?

MS. SMALL: That's correct, Your Honor. I mean, assuming Agent Long's testimony is reasonably circumscribed, but that's a whole different issue from the waiving of the hearsay and the having live testimony.

THE COURT: Do you agree with that Mr. Daley?

MR. DALEY: Yes, Your Honor, although their affidavit is five or six pages long and I just -- but, yes, sir, as part of the general principle, yes.

MS. SMALL: I'm reasonably confident it's not going

to be an issue, I just wanted to put it on the record.

THE COURT:  Very good.  Well, we will see you back Monday -- how long do you think we will need Monday?  An hour and-a-half to do the arguments?

MS. SMALL:  I'm going to defer to Ms. Noble on that one.

MS. NOBLE:  Your Honor, I think part of it will depend on what exactly is contained within Mr. Long's declaration.  I obviously need to see it before I can finalize whatever presentation I'm going to give.

I would imagine that we would go no later than lunch, assuming whatever the government puts up is reasonably circumscribed as well.

THE COURT:  Well we will start back at 9:30 on Monday then.  Anything else today?

MR. DALEY:  No, sir.

MS. SMALL:  No, sir.

THE COURT:  Thank you.  We will be in recess.

(Thereupon, the proceedings were recessed.)

* * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER


        I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.


s/ Gary N. Smith                              August 16, 2010
_____        _____

Gary N. Smith, CM
Official Court Reporter
United States District Court
District of South Carolina