IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    Cr. No. 4:02-992
    )
    Respondent,    )
    )
VERSUS    )    Columbia, SC
    )    March 1, 2010
CHADRICK E. FULKS,    )
    )
    Petitioner.    )
    )
----------------------------)

TRANSCRIPT OF 2255 HEARING
VOLUME VI
BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:    ROBERT F. DALEY, JR., ESQ.
    JIMMIE EWING, ESQ.
    ROBERT JENDRON, JR., ESQ.
    Assistant U.S. Attorneys
    1441 Main Street, Suite 500
    Columbia, SC  29201

For the Petitioner:    BEATTIE B. ASHMORE, ESQ.
    650 E. Washington Street
    Greenville, SC  29601

    KIRSTEN E. SMALL, ESQ.
    P.O. Box 10648
    Greenville, SC  29603

    DAVID P. DALKE, ESQ.
    STEPHANIE L. NOBLE, ESQ.
    610 Newport Center Dr., Suite 1700
    Newport Beach, CA  92660

Court Reporter:          Gary N. Smith, CM
                         901 Richland Street
                         Columbia, SC  29201
                         (803) 256-7743

                  Stenotype/Computer-aided Transciption

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

THE COURT:  All right, we are back here in the case of United States versus Chad Fulks, Criminal Docket 4:02-992. We have one bit of evidentiary development to do in the case concerning the search for the body.  Affidavits have been handed up by Heather Roche and Jeffrey Long.  Ms. Roche's is not signed, do we have an original signed somewhere?

MS. SMALL:  Your Honor, we do.  That's my oversight. We do have an original signed affidavit that I will provide to the court.

THE COURT:  All right.  Mr. Fulks, can you see us and hear us adequately where you are?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Now, when I read the Heather Roche declaration over the weekend, I became somewhat concerned because she took a swipe at Mr. Blume actually about his involvement and his sincerity in finding the body.

And I know Mr. Blume was asked about that when he was on the stand.  And the other thing I remember, and y'all can straighten me out is, I'm pretty certain back during the trial Mr. Blume said he paid for some cadaver dogs out of his own

pocket, I think, through his investigators. That's not these dogs, but another set of dogs; is that right?

MS. SMALL: I believe that's correct, Your Honor.

THE COURT: So, I really hadn't had any questions about the sincerity of Mr. Blume in finding the body. Now, Ms. Roche seems to, as I said, take a swipe at him.

Of course I do -- as my law clerk just pointed out, that the relevant time period she is talking about was about 10 days before trial began. And I'm sure Mr. Blume had a whole lot more on his plate than just finding the body, after these multiple searches had been unsuccessful up until then.

MS. SMALL: And Your Honor, I don't think Ms. Roche intended it to be a swipe at Mr. Blume's sincerity in the search, I think he did generally desire to find the body. I think it was -- I think she was speaking to his understanding of what was needed to be done rather than his sincerity in the search.

THE COURT: About the need to have law enforcement there in case there was a --

MS. SMALL: Yes, Your Honor, and --

THE COURT: -- location and chain of custody purposes?

MS. SMALL: Yes, sir, and the degree to which the body would be scattered by scavengers and decomposed.

THE COURT: All right. Well, when I read the

affidavit of Ms. Roche over the weekend, I became concerned that I had agreed and signed off on the affidavits in lieu of live testimony.  And I thought, "We are going to have to get these people in here on the stand."

But now that I've put it in perspective and I have Mr. Long's declaration, I think I'm comfortable going forward with affidavits, but I just want to reiterate on the record that both sides are waiving the hearsay objection, so that I can consider the affidavits in lieu of live testimony.

MS. SMALL:  Yes, Your Honor.

MR. DALEY:  Yes, Your Honor.

THE COURT:  I'm perfectly happy to come back in a week, two weeks, if you want to bring these people in live and put them up.

MR. DALEY:  I think we are fine with that, to put the declarations and the affidavits up.

MS. SMALL:  I think that's correct, Your Honor.

THE COURT:  All right.  Well, then, who's going to argue for the defendants?

MS. SMALL:  That would be Ms. Noble.

THE COURT:  All right.  Before we do that, let me ask Mr. Fulks if he's now had a chance to review Sheri Johnson's trial testimony and if he has any additional questions or anything to add to the case after his review of that document.

Mr. Fulks, did you read the Sheri Johnson testimony

that we sent you?

THE DEFENDANT:  Yes, sir, I did.

THE COURT:  Did you have anything that you want to bring up at this time?

THE DEFENDANT:  Not at this time, Your Honor.  I just haven't had a chance to be able to look at the exhibits that was included in her testimony to know what we're kind of talking about, but I know that Ms. Small is going to help me with that, so --

THE COURT:  All right, very good.

All right, yes, ma'am.

MS. NOBLE:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. NOBLE:  If it pleases the court, I'm going to go ahead and step over to my computer and show this visually today.

Is everyone's monitor working?  Great.  Okay.  Your Honor, this morning I'm here to talk about Mr. Fulks' Fifth and Eighth amendment rights with respect to the recent discovery of Ms. Donovan's remains in the same general location where he led search teams to prior to the penalty phase proceedings.

Now, before I go into the substance of the claims, one thing I would like to say is that I'm acknowledging the government has stipulated that Mr. Fulks led them to the same general location prior to the penalty phase proceedings.

So, in light of that, I am going to truncate the factual history of Mr. Fulks' involvement pre-penalty phase. But I will be adding some detail to add on to what the government has stipulated to, because it is our contention that it wasn't just the same general location, but it was actually much more specific than that.

THE COURT: Well, let me ask you this --

MS. NOBLE: Yes, sir.

THE COURT: -- let's suppose they had found the body 10 days before trial.

MS. NOBLE: Pardon me?

THE COURT: Let suppose the body had been located 10 days before trial, what does that do to the earlier ruling of keeping out the directions given by the Indiana lawyer under a, hypothetically speaking, proffer I guess it was, that was in an entirely different area?

I mean, do I give the defendant free rein to go with that without opening the door to what was said earlier?

MS. NOBLE: Your Honor, I think if the body had been found, as you said, 10 days before trial, Ms. Roche's search is actually -- I mean, the time line here -- and I will go through this in a minute. I think it would be useful to explain to the court exactly when the searches were conducted so that we can see that it was actually farther back in time than 10 days when the remains -- when the location of the --

THE COURT: Well, whenever. The government is going to argue, I'm sure, in just a moment, that immediately after they were apprehended, the Indiana lawyer gave them directions to an entirely different location. And I kept that out because the Indiana lawyer -- what was the word? Did he say, "hypothetically speaking," or "not to be attributed to my client" or something like that.

Obviously want to have it both ways, because you know if the body had been located where he said it was going to be, the defendant would have wanted to avail himself of the fact that his Indiana lawyer directed them to the body.

But since the lawyer said, "Don't attribute this to my client, but you might want to look over here," and the body wasn't over here, and later on -- not 10 days before trial but later on, Mr. Fulks directed them to a different location where the body was found -- let's say it was found well in advance of trial -- it seems to me I would be hard pressed to keep out that Indiana lawyer's statement initially that sent them in a different direction.

Do you see what I'm saying? I'm not arguing with you, I'm just wanting you to help me with this.

MS. NOBLE: Your Honor, I do understand what you are saying. And in response to that, I would say that my understanding of what happened during that time was that Mr. Fulks was -- it was immediately after he was apprehended

and he had Indiana counsel appointed to him.

Now, we have no direct statements from Mr. Fulks about anything related to those searches. But what we do have is, my understanding of the facts, and please correct me if I'm wrong, but my understanding of the facts, that Mr. Basham was the person who said, "Go look in this area."

It was not Mr. Fulks, he did not say on his own volition, "Here you go, this is where the remains are going to be recovered."

THE COURT: Am I recalling it wrong and it wasn't Mr. Fulks' Indiana lawyer that sent them in a different direction initially?

MS. NOBLE: Can you repeat the question, please?

THE COURT: Am I recalling the testimony wrong? I thought that I kept out a statement by Mr. Fulks' lawyer from Indiana that said, "Don't attribute this to my client, this is a proffer," or whatever, "but go look over here."

And you said, "Basham said, 'Look over here.'" Is it not correct that his Indiana lawyer said, "Look over here"?

MS. NOBLE: What happened, Your Honor, was that Mr. Basham hand drew a map and said, "This is where you need to go search."

THE COURT: Right.

MS. NOBLE: That map was then faxed to Mr. Fulks' Indiana counsel.

THE COURT:  Right.

MS. NOBLE:  And Mr. Fulks is asked to look at that hand drawn map and see if that could be the location.

THE COURT:  Right.

MS. NOBLE:  Now, my understanding is that Mr. Fulks looked at it, may have said something to the effect of, "That could be the location" -- and again, I'm going based off of the trial transcript records, that's my understanding -- at the same time counsel said, "Under no circumstances should this be attributed to my client."

So, on those grounds the non-attribution grounds, you excluded it, as you well know, from the trial, from the penalty phase proceedings.  This claim, what is relevant to this claim, is what the jury actually heard and considered.

This claim does not hinge upon whether or not the Savannah Bluff searches and Mr. Fulks' alleged confirmation of what Mr. Basham -- where Mr. Basham directed them to.  Because this claim is predicated upon what did the jury actually hear and consider.

THE COURT:  I understand that.  But I'm saying, if we had found the body, if we had a body located some time prior to trial and Mr. Fulks got credit for directing the authorities to where the body was located, it seems like it would have opened the door that back when the evidence was real fresh and maybe even a chance to locate Ms. Donovan alive, he concurred with

Mr. Basham's wrong direction.

I'm just thinking the door might have been opened.  I mean, I guess obviously I don't have to decide that question, because it didn't happen that way.  But anyway, let's move ahead.  Give me the time line of what happened.

MS. NOBLE:  Okay.  Yes, Your Honor.  So, claim 33, as we all know, alleges, and we say absolutely proven, that Ms. Fulks' Fifth and Eighth Amendment rights were violated because the jury was allowed to consider materially false information in sentencing him to death.

Now, the Fifth Amendment, I'm not going to read these to the court, but here are some of the Fifth Amendment protections.  The due process clause under the Fifth Amendment affords the criminal defendant the right not to be sentenced on materially false information.

Now, the Eleventh Circuit has interpreted this to mean that you can't be sentenced on the basis of false information, and other courts have said, even goes so far as on the basis of assumptions concerning a defendant's criminal record.

Now, it doesn't necessarily mean that the sentencing results must have necessarily been different, the relevant question is whether it might have been different.

So, courts have looked at whether due process -- well, they have said that due process is implicated if the

sentencer's decision might have been different had that false information not been before the jury.

Now, the Eighth Amendment --

THE COURT: That's the proper test under the Supreme Court guidance, whether the results might have been different?

MS. NOBLE: Yes. We've got a number of -- I can go through each one of these, if you would prefer. So, the first is, it starts with Townsend versus Burke, 1948, which is where this right was first articulated by the United States Supreme Court.

And there they said, "The prisoner was sentenced on the basis of assumptions concerning his criminal record, which were materially untrue. Such a result, whether caused by carelessness or design, is inconsistent with due process of law, and such a conviction cannot stand."

Since that time, other courts, including the United States Supreme Court in United States versus Tucker have looked at this standard. And importantly, in this context it doesn't matter that the prosecution knew that it was false testimony, this isn't about prosecutorial misconduct, the relevant inquiry is whether we now know that the jury was allowed to consider false information.

It doesn't necessarily mean it was false at the time that it was presented, but is it false now such that due process is implicated?

The Eighth Amendment has what I would call a parallel line of thinking.  And the Eighth Amendment prohibition requires, given the gravity of the sentence of death, the Eighth Amendment says there's a special need for reliability, of a heightened reliability standard in any capital case.

And that means that if a jury is allowed to consider evidence, again, that has been revealed to be materially inaccurate, then the Eighth Amendment is required and need for heightened reliability is implicated.

Now, I would like, as I mentioned at the beginning, go through some of the specifics.  I'm going to give you a very abbreviated version, being mindful of the court's time --

THE COURT:  Well, I'm not in any hurry, don't worry about my time.  I haven't got any other court today, so take your time.

MS. NOBLE:  Oh, thank you, Your Honor.  So, I'm going to go through -- and I may add on to this then in light of what you just said.

So, first what I would like to do is go through Mr. Fulks' pre-penalty phase efforts to locate the remains.  As we heard from Mr. Blume, his testimony, immediately after he was represented by Mr. Fulks, Mr. Fulks started explaining to him the general location.  And Mr. Skidmore was out there, he was taking pictures, he was bringing video back to Mr. Fulks, because Mr. Fulks wanted very much so to locate the remains of

Ms. Donovan.

So, in early '03, between February and April, we have got some searches conducted by the defense.  Now, among other areas they identified an intersection of Water Tower Road and Long Bay Road.  This is Petitioner's Exhibit Number 9.  This is a map of the area and it shows -- can I --

(Off record discussion)

MS. NOBLE:  So, we have got Highway 90 at the top. You can see, we have got Water Tower Road, comes down here, a curve in Water Tower Road here, Long Bay Road crosses here and four blocks down there -- this is the relevant area that we are going to be talking about today.

How do we get rid of that?

(Off record discussion)

MS. NOBLE:  Thank you.  Okay.  So, as we heard testimony about, and as we know on April 21st, 2003 Mr. Fulks sits down with the government and he provides details to the government about the location of the remains.

This is an excerpt of Petitioner's Number 7.  This is an excerpt from the FBI 302 executed by Agent Long dated April 21st, 2003.

Now, Mr. Fulks is identifying, and I didn't put all the details in here, but Mr. Fulks is identifying Highway 90, the wildlife sign, the IGA store, dirt road, long wooden dock. And he says turned around after the dock and pulled off to the

right side.  This is his recollection based on his memory at the time without having been back to the site.

And we advance.  Now we get to -- so after this time Mr. Long, Agent Long meets with Mr. Skidmore and Mr. Blume and they go down to search -- to the site and provide Agent Long with information about the area and said, "This is the area where Mr. Fulks has said that Ms. Donovan's remains are located."  So, on May 1st, 2003, well in advance of a year before the penalty phase proceedings, law enforcement conducts a search of the area.

Then four months later, four and-a-half months later, the notice of intent to seek the death penalty is filed by the government.  Then in '04 the defense is still searching.  You heard Mr. Blume testify that the defense is continuing to search on a number of times.

So then in mid February of '04, Heather Roche, we obviously heard a lot about Heather Roche, Heather Roche goes out there and searches.  And here is the expert --

THE COURT:  Let's go back one slide, what was it, 2-12 to --

MS. NOBLE:  To 2-13, 2004.

THE COURT:  All right.

MR. DALEY:  Your Honor, I think it's 2-13 and 2-14, actually.  The record will, I think, reveal that.

THE COURT:  All right.

MS. NOBLE:  I may be correct, the report actually says 2-13 to 2-15.  So, this is an excerpt from Petitioner's Exhibit 71.  This is Ms. Roche's report.

"After lunch, Red," which is one of her dogs, "worked in the woods along Water Tower Road before the bend past the four-way stop."

As we know, the bend in Water Tower Road before the four-way stop is exactly where the remains were recovered this past January in 2009.

Now, Ms. Roche wrote, "The area was at times a bog and had thick patches of vegetation."  And Red, one of her cadaver dogs, had a large area of interest but didn't locate anything.  But her dog was indicating the presence of human remains.

This is a map attached to Petitioner's Exhibit Number 1, Exhibit C.  This is the map that Ms. Roche generated.  By highlighting we can see here it's indicating where she searched.  We can see here she is searching right around the four-way intersection between Water Tower and Long Bay Roads, right in the curve.

Now, at Mr. Fulks' request, he traveled down to the area to try and help further refine the precise location.  And when he travels down to this area, he specifically identifies the curve in Water Tower Road.

Here is an excerpt from Agent Long's testimony during

the penalty phase proceedings. This is Petitioner's Exhibit Number 53. "We identified that area. There is another curve in the road and Mr. Fulks took a look at it and said, 'I think this could be it.' There was still the telephone poles on the left-hand side of the road."

Now if you look at the FBI 302 executed by Agent Long it's a little more specific than that even. "Fulks was driven down the same road next to the curve approximately one-quarter mile away from the first stop. As we approached the four-way stop at Water Tower Road and Long Bay Road, Fulks told the agent that this is the place," end quotes.

Bottom of that area. "Fulks stated to the agent, 'This is definitely it.'"

Now, the defense continues to search, even after this. So, that search, they didn't find anything, even though we now know they were in the correct location. So, then in April of '04, Ms. Roche and others, they come back to the area, they were again concentrating on the area just past the four-way stop in the bend of the road.

Here is an excerpt from Petitioner's Exhibit 71. This is Ms. Roche's report. "We worked along the high probability areas along Water Tower Road. On Friday night, a hasty was done" -- presuming she means a hasty search was done -- "along the north side of Water Tower Road in the bend of the road after the four-way stop and near the utility power

lines with nothing found."

Now, this is a map -- Petitioner's Exhibit Number 1, Exhibit E -- this is a map that she has generated off these searches. You can see here, it's a little difficult to see. She's is indicating here which dogs are indicating, Alley and Red, her two cadaver dogs at the time. And you can see this is where they indicated interest, right in that area on the curve of Water Tower Road.

Excuse me for a moment.

THE COURT: All right.

MS. NOBLE: Okay, then in June of 2004, as we all know, the penalty phase proceedings commenced. And now one thing I would like to talk about before I go into what happened at the penalty phase proceedings, was that there's much to be made, both at the time of the penalty phase proceedings, during the evidentiary hearing that we've had thus far, and the government's briefing, why is it that Mr. Fulks waited so long to identify the location of the remains?

They make a lot about this. We've heard from Mr. Blume this week, we've heard him testify that it was his decision, it was not Mr. Fulks' decision, and he said, "Hopefully my disregard didn't hurt Mr. Fulks, but I didn't initially want to go to the government about this," meaning the location of the remains.

MR. DALEY: Your Honor, I would like to state an

objection, please.

THE COURT: All right.

MR. DALEY: Your Honor, we seem to be having these floating theories, and it looks like they -- you know, they argue that, apparently, if they make any assertion and I don't object quickly --

THE COURT: Right.

MR. DALEY: -- and it relates back. There is no allegation of ineffective assistance of counsel regarding Mr. Blume's searches, how he conducted the searches, his determination on the timing of when the statement was to be given.

Ironically, they are attacking the fact that Mr. Fulks ever gave a statement, and so now I guess we are going to have the flip side that he was not -- didn't do it in the appropriate time.

So, I just want to state for the record, the government objects to any attempt at any point now for them to bring up a new theory or to bring in new facts that would suddenly state a new claim regarding ineffective assistance of counsel as to the timing of the statement and/or Mr. Blume's efforts in trying to locate the body.

THE COURT: Well, let's stop and talk right now about the one-year bar. I would like to clear up the record on that.

We had a petition, a 2255 petition, filed within the

one year, and then a supplemental or an amended petition filed subsequent to that before the body was located.

And I said at the outset I was going to operate off the supplemental petition or the amended petition, because it didn't look like it added any new claims per se, it just was a different gloss or a different slant on the claims that had been asserted earlier. Is that a fair statement?

MR. DALEY: I believe that is, Your Honor.

THE COURT: All right. So, I didn't have a problem with the amended petition violating the one-year bar. Now, this information is clearly a new claim that did come in after one year, and I guess we need to address that at some point, whether it can be asserted.

And even if I were to determine that the one-year bar would apply to this claim, I would certainly, certainly still allow counsel to make an offer of proof for purposes of appeal in case I'm wrong on -- and probably give a ruling on it in case I'm wrong on the one-year bar. But do you want to talk about that now? Is there a basis for excusing the one-year bar?

MS. NOBLE: We can certainly talk about that now.

THE COURT: All right.

MS. NOBLE: If it's all right with Your Honor, I would first like to respond to Mr. Daley's objection.

THE COURT: All right.

MS. NOBLE: At no time have we alleged, and we do not so now, an ineffective assistance counsel claim or a prosecutorial misconduct claim.

THE COURT: All right.

MS. NOBLE: We are very clear on the papers exactly what violations we are talking about here. We are talking about violations of Mr. Fulks' Fifth and Eighth Amendment rights.

What we are talking about with Mr. Blume's decision here responds directly to the papers that the government filed in response, directly to the papers. So it is absolutely permissible argument to respond to what they have said.

And furthermore, it is just bringing back to the court full circle exactly what the government tried to elicit out of Mr. Blume during the course of this evidentiary proceeding. So to make the record abundantly clear, we are not alleging ineffective assistance of counsel, we are not alleging prosecutorial misconduct, we are alleging a violation of due process and the Eighth Amendment.

THE COURT: All right, very good. Now, what about the one-year bar?

MS. NOBLE: Certainly. Give me a moment please, Your Honor.

THE COURT: I mean, I was going to get into this at some point, I don't want to interrupt your presentation. If

you had rather wait and take it up at the end, you can. I just raised it now since Mr. Daley questioned this thing about ineffective assistance regarding Mr. Blume.

Why don't you go ahead and finish and let's talk about the one-year bar at the end. Let's do that.

MS. NOBLE: Okay, whatever you like.

THE COURT: All right.

MS. NOBLE: Okay. So to continue, as I was saying, it was Mr. Blume's decision to wait. So, the reason I bring this up is to refute the government's contention over and over and over again that it was Mr. Fulks' fault, he waited until there was no evidentiary value, which I'm not conceding the truth of that statement either.

But that Mr. Blume clearly testified, it was his decision. When asked by Mr. Ashmore, "Can you give us a time frame?" Now, this was regarding when Mr. Fulks wanted to disclose this information to the Government.

Mr. Blume said, "You know, I think it was pretty early on. He appeared genuinely interested in doing that. Not only to help himself, but also because, like I said, I thought he was remorseful for what happened and he did want to help and give the family a sense of closure."

Now, I would like to talk about what happened during the penalty phase proceeding. This is directly germane to whether or not Mr. Fulks' Fifth and Eighth amendment rights

were violated by the subsequent discovery of Ms. Donovan's remains and the exact location where he said they would be.

Now, this is volume 1 of the trial transcripts, first day. This is an excerpt from the preliminary instructions to the jury, being submitted by the government that the court read into the record to the jurors.

"First, Defendant Fulks engaged in a series of lies and deceit during law enforcement's initial efforts to locate Alice Donovan's body, which resulted in obstructing search efforts, and gave Alice Donovan's family a false sense of hope during a period of intense despair.

"Second --"

THE COURT: Wait a minute now, this is opening -- this was preliminary instructions --

MS. NOBLE: To the jury.

THE COURT: -- given by the government. Was this before the government knew I was going to keep out the Indiana lawyer's proffer?

MS. NOBLE: It is.

THE COURT: All right.

MS. NOBLE: But what this is relevant to is, again, the claims hinge upon what the jurors knew. And at the time this is -- this is the beginning of the case. This is what the jurors are being told about Mr. Fulks' involvement in the search efforts for Alice Donovan's remains. So, it goes

directly to claims -- claim 33 and the Fifth Amendment and the Eighth Amendment.

"Second, Defendant Fulks engaged in a premeditated plan to dispose of Alice Donovan's body in such a manner that the recovery of the remains has not been achieved. The government alleges that this action by the defendant has caused significant emotional and psychological pain to Alice Donovan's family, beyond the expected grief associated in homicide cases."

And I would also like to point out at this time that the jurors were provided a copy of these preliminary instructions in a binder that they kept with them throughout the proceedings.

So, if we are talking about, which we are talking about with respect to the Fifth and Eighth Amendment claims, it's about what the jurors considered and what the jurors knew, and this is what they were told at the outset of the penalty phase proceedings. Now --

THE COURT: I had forgotten, the preliminary instructions gave them the aggravating factors and so forth?

MS. NOBLE: Yes, sir.

THE COURT: All right. At the end of the case, did we talk about these same two points at the closing instructions?

MS. NOBLE: We did not. At the end of the case, we

talked about the victim impact evidence, but these two specific points were not reiterated.

THE COURT: So, those two points about a series of lies and a premeditated plan to dispose of the body were in the preliminary instructions, but for some reason or other were dropped in the final?

My law clerk was pointing out that in the preliminary instructions I was setting out the allegations, which included the aggravating factors in these two points we have just talked about, came under the victim impact components, these were subsidiary parts of the victim impact.

MS. NOBLE: That is absolutely correct.

THE COURT: And then at the concluding instructions, we did talk about victim impact again, but not these two points. Now, I don't know why I dropped them. It could be because the Indiana lawyer's proffer was kept out or -- I'm not sure. Go ahead.

MS. NOBLE: Right. So, now I would like to go to an excerpt from Mr. Scott Schools' opening statements to the jurors. This is Petitioner's Exhibit 59.

"You see, ladies and gentlemen, if we had been able to locate the remains of Alice Donovan and Samantha Burns, we might have had an idea about what happened. But the fact that they successfully concealed the remains allows Fulks to blame Basham. To confess error gently, and in this case, to confess

big faults in order to suggest that he does not -- that he doesn't have the biggest."

So, what does conceal mean?  Now, what I wanted to look at was what "conceal" would mean to the jurors.  Because this claim is about what the jurors considered, what the jurors knew.

THE COURT:  So, he used the words "concealed the remains" instead of "misled us to the location of the body," in other words?

MS. NOBLE:  Oh, I will get to that later.

THE COURT:  All right.

MS. NOBLE:  But at this point the excerpts that I used here is "concealed the remains."  I mean, the preliminary instructions here, as we said, premeditated plan to dispose such that the recovery and the remains have not been achieved, obstructed the initial search efforts.

So, "conceal" means "to prevent disclosure or recognition of,"  I'm quoting from Merriam-Webster, so what the jurors would think.

In other words, as Merriam-Webster says, "to conceal the truth."  To conceal the truth.  And that's interesting, because what we are talking about here is whether Mr. Fulks was truthful.

Now, we have heard throughout the entire penalty phase proceeding, we have heard throughout all of last week's

evidentiary hearing, the primary theme, if not the major theme, is that Mr. Fulks isn't truthful.

So, this goes to precisely was Mr. Fulks truthful in his assertions that he was telling the truth about the location of Ms. Donovan's remains?  And that has a number of implications, which I will get to later.

But let me suffice it to say at the beginning, some of those implications are, did he have something to hide?  Was he purposefully not revealing the location of the body, because this case is about who did it?

You know, we talked about inconsistent theories, we talked about Mr. Fulks laying the blame directly on Mr. Basham, and Mr. Basham blaming the actual killing in the inverse.  So, what we are talking about here is Mr. Fulks' predilection to tell the truth.

We are also talking about whether Mr. Fulks was, you know, trying to inflict further harm on the family by not revealing, by giving them a false sense of hope in a period of intense despair, as was told to the jurors in the preliminary instructions.

Now, many witnesses testified during the course of the penalty phase proceedings about the search efforts, many witnesses.  But I want to get to what was left with the jurors in closing arguments, because this is what they were thinking about right before they went into the room to decide whether to

sentence Mr. Fulks death.

"And to add insult to injury they dispose of her body.  Think of the thousands and thousands of man hours in North Carolina and South Carolina trying to find Alice Donovan's body, to bring her home to her final resting place.

"What possibly could Chad Fulks and Brandon Basham have done to the bodies of Samantha Burns and Alice Donovan? What could they have possibly done with those two women that they wanted to dispose of them so that we would never know what they did and how they died?"

Again, concealed.  Mr. Fulks, they are alleging, was trying to conceal what actually happened.

Another excerpt.  "Why is Chad Fulks' -- why is Chad Fulks' credibility important?  Why is that important to you jurors who will be making this decision"?

"Chad Fulks says he had nothing do with disposing of their bodies.  One of the questions you will have to decide on is, do you believe Chad Fulks?  Do you believe Chad Fulks, this man who has spun a web of deceit his entire life.  He has lied, he has deceived, he has manipulated people, particularly women, in his entire life."

This is the theme that they were going on:  "He's lying.  He's lying about the location of the remains.  He's lying that he's sincere about locating the remains of Alice Donovan."

Now, let's talk about the searches, more from the closing argument, Petitioner's Exhibit 58. "First, with regard to searches, Chad Fulks knew in April of 2003, he knew they had been searching the Savannah Bluff area, didn't find the body in November. Knew that they had been searching the Bee Tree Farm area up in North Carolina, no body found. So, he sends them to another location. Does that make it true?"

THE COURT: All right, stop. So stop. Even though the Indiana lawyer's proffer about Savannah Bluff didn't come in, evidence did come in that Mr. Fulks knew they were searching in that area?

MS. NOBLE: Absolutely. So, during the course of the penalty phase proceedings, as I understand it, significant testimony was presented to the jury on the Savannah Bluff searches.

Now, they -- you permitted them to say that it was on Mr. Brandon Basham's direction that they searched Savannah Bluff, and that searches were intensified as a result of other information.

Now, those were not attributed to Mr. Fulks, but the jurors heard a lot of information about the Savannah Bluff searches. So, they heard about the Savannah Bluff searches --

THE COURT: The Folks' jurors heard that Basham sent them, the authorities, to Savannah Bluff.

MS. NOBLE: Yes, Your Honor.

THE COURT: And then Mr. Gasser is arguing here that Fulks knew that the searches were going on up there?

MS. NOBLE: That's correct. So, what he's saying here is, he knew they searched Savannah Bluff and they didn't find the body. He knew they searched Bee Tree Farms, didn't find the body. So, he sends them to this other location, and this other location is where the remains were eventually found.

And he asked the jury, "So does that make it true? Does it make it true that he's sending you to the correct location now? No." That's what he tells the jury. "No, it does not make it true."

Another excerpt from closing argument.

"Why is it the government has no body? Whose fault -- at whose conduct is it that the government has no body?

"The reason, the reason, I will emphasize, the government doesn't have Alice Donovan's body, the reason why we can't put her and take her to a morgue and have a pathologist autopsy her and come in and take that witness stand and tell you jurors that she was raped, that her throat was cut or that she was shot, is because of the actions, the successful actions of Chad Fulks and Brandon Basham."

More from Petitioner's Exhibit 58. Again, they are talking about "were successfully able to conceal the body of Alice Donovan." And this is what they tell the jurors.

"I submit to you that that is what makes this crime more aggravating, more aggravating. The fact that they successfully disposed of her body so that the victims will not be able to bury her and so that the government is barred from providing you jurors a total picture, the government should not be held accountable for that."

That is what makes this crime worse. That is what they are telling the jury. Even if it wasn't the delineated statutory aggravator, we have got a victim impact, an unstatutory victim impact aggravator.

No, it doesn't say, "Yes, they led them on, you know, this wild goose chase," it doesn't say that. But this is what they are telling them. They are telling them right before you give the instructions on the jury charge what aggravation is, what mitigation is. They are telling the jurors, "This is what makes the crime more aggravating, that they successfully disposed of her body --"

THE COURT: Well, the best case scenario for Mr. Fulks is if they had found the body in April of '03 when he first sent them out there, Mr. Gasser could still have argued to the jury, "He waited five months before he sent us to where the body was. He waited until the decomposition occurred, forensics were gone, there is no body to be buried, it's just some bones," he still could have make a pretty strong argument with a five-month delay.

MS. NOBLE:  He could.  And then Mr. Blume --

THE COURT:  I think the argument you are making would be much more compelling if the directions to the location had come immediately after the murder --

MS. NOBLE:  And Your Honor --

THE COURT:   -- because Mr. Gasser is talking about victim impact, no funeral, no body, no closure, and to wait five months to direct them to the -- again, I sound like I'm arguing with you, and I might be stealing the thunder of the government, but I'm just interested in your response to this.

MS. NOBLE:  Your Honor, what I would say in response to that is, why should Mr. Fulks be penalized for his counsel's decision to wait?  It was his counsel's decision.  Mr. Blume took the stand in here under the penalty of perjury and said it was his decision.

THE COURT:  Well, then, we are getting into ineffective assistance through the back door.

MS. NOBLE:  No, we're not.  I'm not alleging ineffective assistance, I'm not saying that this claim hinges upon ineffective assistance.  All I'm saying is, the reason why Mr. Fulks is prejudiced, the reason why is because the jurors were told it was his fault that Ms. Donovan's remains were not recovered.

He tried.  He tried.  He gave them directions early on.  He gave -- his counsel, Mr. Blume, testified that he gave

his counsel directions right away.  They were out there searching.  They wanted to find the body on their own, that's what Mr. Blume testified to.

He said, "We wanted to find it."  So, he waited to speak to the government.  He waited.  That was his choice, not Mr. Fulks' choice.  Then even after Mr. Fulks is sentenced to death, even after, he starts writing Mr. Gasser, he starts writing his counsel, he starts writing the press, he writes to everybody he can think of saying, "Please, I was telling you the truth.  I told you the truth about the location of the remains, please go out and keep looking."

And finally those results paid off.  Mr. Fulks sends a map, photos, and instructions to Monica Caison.  Monica Caison is the person who eventually recovered the remains.

So, he sends it out in December of '08, returned for insufficient postage.  He ends up sending it back out.  January 17th, Ms. Caison receives a map, color photographs, and instructions from Mr. Fulks.

This is Petitioner's Exhibit Number 11, this is the map that Mr. Fulks sent to Monica Caison.  You can see here this is where -- part of where Heather Roche is searching.  He identified that area, and he identified this area, the curve in Water Tower Road.  Right here.

Now again, we know that that is where the remains were recovered.  So, this is Ms. Roche's map, Petitioner's

Exhibit 1, Exhibit 7 -- or F to Petitioner's 1.

She's showing here, she did an overlay of Ms. Caison's map where the remains were recovered showing that here, here, here, were where her dogs indicated before the penalty phase proceedings. They indicated here. So again, here is Ms. Caison's map identifying -- this is the official map she did.

Now, I would like to point out also that she recovered remains the day after she received the map from Mr. Fulks showing this location. She's trained professionally in searches, she brought out a full team, conducted a complete grid search, and was able to recover the remains.

THE COURT: My law clerk just sent me a note, I had forgotten this. Mr. Blume did say he wanted to find the body himself because -- he wasn't seeking glory for himself, he was accused of being -- he was concerned about being accused of leading the authorities on a wild goose chase. I guess he presumably already knew about the Indiana lawyer's statement to look in Savannah Bluff. Now he has Mr. Fulks saying, "Look at Water Tower Road," two different areas altogether.

And I don't think it's too illogical to say, "I need to find the body, then we can go to the authorities," versus telling the authorities where to look and maybe not finding anything. I mean, you know, we can quibble with it now, but that's not an altogether unreasonable strategy, is it?

MS. NOBLE:  No.  And again I'm not alleging ineffective assistance of counsel, what I'm saying is, it was his decision so Mr. Fulks shouldn't be penalized waiting for five months.  I'm not speaking to the propriety or the wisdom of Mr. Blume's decision at all, I'm saying the fact is, is he did wait.

So, this is again Ms. Caison's map, P-10, identifying the location where the remains were recovered.  This is where Mr. Fulks took them in 2004, the same area where the remains were recovered.

Now, Mr. Basham, he led them to two places, as you have heard, he led them to Savannah Bluff and he led them to Bee Tree Farms in North Carolina.  So, he leads them to Bee Tree Farms.  Where is Bee Tree Farms?  It's right there, across the state line.  Where is that in relation to where the remains were recovered?  52 miles away.

Now, when Mr. Fulks spoke to the authorities, when Mr. Fulks provided information on April 21st, 2003 and then when he went down there in March of 2004, and from the very beginning when he started speaking with his counsel about where the remains were located, where was his search?  Same spot.

Now, we submit to the court, had Mr. Fulks had something to hide, had he wanted to conceal the remains, had he wanted to obstruct the search efforts, had he wanted to do any of those things, wouldn't he have done what Mr. Basham did and

lead them 52 miles away where it is impossible for the remains to be recovered?  Impossible, because they simply weren't there?  Why would he lead them to the same general location?

Now I ask, what difference would it have made?  We heard from all three of Mr. Fulks' defense counsel during this week of the evidentiary hearing on how they would have used this evidence.  Had they recovered the remains what would they have done with it?  So Mr. Blume said it was his main focus, was to try and show that Basham and not Mr. Fulks killed Alice Donovan.

Now, again I submit, if Mr. Fulks had been the actual perpetrator, he wouldn't very well want to lead them to the body.  And he was trying to get his counsel to take them to the body immediately.

So, he said, "We were trying to facilitate his desire to try and help find her remains.  We were trying to see if this ongoing cooperation might create a situation where a plea bargain might eventually happen.  I think our main theme is over who was the killer."

THE COURT:  Can you go back to your aerial photographs and show me where Savannah Bluff is located?

MS. NOBLE:  Sure.  My understanding is that Conway, which is the same area as Savannah Bluff, is 15 miles, roughly, from what I can gauge from the trial testimony.  15 miles away, which would be -- I think it's off this map.  I could actually

go back to the first map to show it to you.  But it's 15 miles away, up I believe, to the -- my cardinal directions aren't that great, but northwest side.

THE COURT:  15 miles from Water Tower Road?

MS. NOBLE:  Approximately 15 miles.

THE COURT:  Did you say 15 or 50?

MS. NOBLE:  1-5.

THE COURT:  1-5, okay.

MS. NOBLE:  So, here is something else Mr. Blume had to say.  "Had the remains been found --" this was in response to a question by Mr. Ashmore -- "it would have bolstered Mr. Fulks' credibility to the degree he was in fact being genuine, and would have minimized the government's ability to emphasize that he was jerking them around, and it would have gone to the themes of remorse and responsibility."

MR. DALEY:  Your Honor, I would like to lodge another objection --

THE COURT:  All right.

MR. DALEY:  -- just to protect the record.  This is not a new trial motion, this is not a motion in which they are claiming that they should get a new trial because of this evidence and somehow it would have changed the outcome of the case under the new trial theory.  This is whether there was false information presented.  And so I just want to again note for the record that this is not a new trial motion, they have

not made a new trial motion.  Thank you.

MS. NOBLE:  May I respond, Your Honor?

THE COURT:  Yes.

MS. NOBLE:  Under these cases, this line of jurisprudence from the Fifth Amendment and the Eighth Amendment, doesn't necessarily have to be that we are making a motion for a new trial.  The relief being sought is either that the death sentence be vacated and a life sentence imposed, or that a new penalty phase proceeding be conducted so that the jury can consider the accurate information regarding Mr. Fulks' involvement in the search efforts for Ms. Donovan's remains. It's clearly stated in our brief.

THE COURT:  All right.

MS. NOBLE:  We also heard from Mr. Nettles.  He said, "It would have gone to show that Chad was making a good faith effort to help the family locate the body, that he wasn't jerking anybody around.  It would have given him some credibility that he otherwise lacked.  It would have helped -- it would have prevented the government from arguing to the jury that he was -- that he was not sincere in his efforts."

Testimony from Ms. Sheri Johnson.  She clearly articulated the way this would have helped in three different ways.  First, she said, "The family was clearly suffering from the fact that her remains had not been found.  And so for them to know and for the jury to know, that is what is critical

here.  For the jury to know that Chad had been part of bringing them a small piece of mind would have been helpful, perhaps as a sign of remorse, but also as a sign of doing what he could at this point in time.  In a sense, not furthering their suffering, because I think the government did sort of pursue that theme, you know, they are still suffering.  So it would have lessened that.  That's one thing.

"The second thing would have been Chad's credibility generally was enormously important.  Do we believe or not believe that he was not the trigger person?  And so if he were truthful about the location of the remains, that would have been some corroboration of his truthfulness.

"If Chad had not revealed where they," the remains, "were, would that have been because he thought finding the body would show him to be the killer?  Well, a jury might well think that.  So, we wanted to find the remains because we did not believe that the body would show Chad to be the killer.  So it would have been useful to say to the jury, 'He's not hiding anything.  It is where he said it was and he is sorry.'"

So with that, I would like to open it to any questions that Your Honor may have or turn it over to Mr. Daley.

THE COURT:  Well, I want to talk about the one-year issue.

MS. NOBLE:  Certainly.

THE COURT: Why don't we go ahead and talk about that now?

MS. NOBLE: Okay. So, we filed a motion to supplement the proceedings pursuant to Federal Rules of Civil Procedure 15(b). That provides, and I'm going to paraphrase, "That on motion and reasonable notice, the court on just terms may permit a party to serve a supplemental pleading setting forth current transactions or events that occurred after the filing of the motion."

Now, the Federal Civil Procedure Rules are governed in part -- well, supplemented by the habeas rules, 28 U.S. 2255. Provision (f)(4) of that states -- and again I'm paraphrasing -- "The claim must be filed within one year of the date upon which the facts supporting the claim could have been discovered through the exercise of due diligence."

So, that is a way --

THE COURT: So, that takes care of it right there.

MS. NOBLE: That takes care of it. Mr. Fulks --

MR. DALEY: Your Honor, I can cut this off. We looked at the issue, I tried to find a way to assert the one-year bar, and quite honestly and in all candor I determined that I didn't feel like the government, it was in their best interest to make an argument that wouldn't win. And I don't think it will, Your Honor.

THE COURT: Very good. That takes care of that

issue.  So, the government is not asserting the one-year bar bars any of these claims, this one or any of the modified claims in the amended petition?

MR. DALEY:  Your Honor, we do not assert that.

THE COURT:  All right --

MR. DALEY:  So, I --

THE COURT:  -- very good.  Well, then before you sit down, you said the test is whether this might have resulted in an acquittal or a different result.

MS. NOBLE:  Yes, Your Honor.  And I think that --

THE COURT:  You know, oftentimes the question is whether it was harmless beyond a reasonable doubt.  But that is not what we are looking at here, it might have resulted in a different verdict.

Let me just say this, one thing I think the transcript will reflect about jury selection, it was a very painstaking process and, as you know, we discussed last week the parties convinced me or talked me into asking two fact specific questions that I don't think were required, but I did because there was unanimous agreement.

One related to the fact that the government couldn't prove who actually struck the fatal blow, so to speak.  The government was interested in asking that question to see if it would flesh out any jurors who would not vote for death based on that.

And then the defense was concerned about the two death problems that we had, Ms. Donovan and Ms. Burns.  And I don't know how many it was, but it was many a juror that when we went through the idea of staying neutral about death and, you know, weighing both side's evidence and being open-minded and following the law, no problem with any of that.

But when I then said, "Now, what if you learned that Mr. Fulks was involved in not one death but two deaths?"  A lot of minds slammed shut right then.  I mean, a lot of jurors said, "That's it, I'm out of here.  I can't say that I would not impose the death penalty."

Which leads me to then ask this question, that it would seem to me the pivotal question is, and we have been through this litany several times, but just to put it on the record, we have a 17-day crime spree, seven states, two carjackings, two kidnappings, two rapes, two deaths, Ms. Donovan and Ms. Burns.  Mr. Hawkins might have been a third death if he hadn't been able to get away from the duct tape before it got so cold.  We could have had two other deaths possibly in Donna Ward and Deanna Francis, two more women possibly.

Going through the factual rendition, I counted 13 named victims, either murders or assorted crimes, and then miscellaneous other unnamed victims who were the victims of pocketbook thefts, I.D. thefts, license plate thefts, and so

forth.

Your argument is, if the jury heard all that, they would still be inclined -- or that there would be a possibility they would vote for life as opposed to a death penalty.

But the failure, the misdirection on the remains of the body or the alleged deception about the remains of the body was the tipping point that caused this case to go to the death penalty? I mean, that's the argument you have got to make.

MS. NOBLE: What I'm suggesting, Your Honor, is that there is a reasonable probability that that is the case. And at this point, I would like to say that all it would have taken was one juror to feel that way. One juror to think, "Had the remains been recovered then Mr. Fulks was telling the truth."

THE COURT: It's been five months after the death, now November of '02 to April of '03 --

MS. NOBLE: Right.

THE COURT: -- when the first direction came. A lot of forensics are gone by then, it's not much of a body to have a funeral with after five months. I'm not arguing with you, because the government is going to raise these issues, and I just want to ask you about them while you are on your feet.

MS. NOBLE: No, understood, Your Honor, and I appreciate that.

What I would say is, the jurors also would have heard, as they heard from testimony through Agent Long, through

Heather Roche, and through Pete Skidmore, that the defense had been conducting searches from the very beginning. They were on the ground looking from the very beginning, so the jurors would have learned that Mr. Fulks wanted the remains to be recovered from the very beginning.

It wasn't that he just waited to speak to the government, again, that was Mr. Blume's decision. But from Mr. Fulks' perspective, he was out there saying, "Go look here, go look here," which would have said a few things to the jurors. It would have said, "He didn't have anything to hide, he wanted it to be found."

It wasn't like the situation with Mr. Basham, where he sent them 52 miles away. He wanted the remains to be found. It would have undermined the government's ability to argue that that's what made this crime more aggravating.

That's what they told the jurors. It made it more aggravating, the fact that the victims or the families could not bury Ms. Donovan's remains, the fact that they couldn't tell the jurors exactly how Ms. Donovan died.

Now, again, Mr. Fulks should not be prejudiced by his counsel's decision. To make it perfectly clear, I am not raising an IAC claim. I want to make that abundantly clear.

THE COURT: That's the fourth time you have said that.

MS. NOBLE: I know, I just -- I want it to be clear

on the record.

THE COURT:  I think we are real clear on that.

MS. NOBLE:  What I am saying is that the due process clause is clear on this point.  The due process clause says that sentences that may rest, even in part, on materially false information are in contravention to the due process clause of the constitution.

Similarly, the Eighth Amendment requires heightened reliability in capital sentencing proceedings, and heightened reliability requires that there not be materially false information in the record.

And so one thing that I guess I would also say is that when we are talking about the standard or we are talking about whether the results might have been different or whether Your Honor would have more comfort in a more heightened pleading requirement, I submit that the test is that it might have been different.

But I think we can also fairly analogize to the Sixth Amendment Strickland prejudice standard, where you could say that there is a reasonable probability that had the jurors not considered this information, that the outcome might have been different.  So, to undermine the confidence in the outcome.

Now, that was similarly articulated in one of the cases that the government cites in its opposition, Hernandez, I believe that was a Fifth Circuit case, and there they said the

Supreme Court hasn't defined the test of materiality in the Eighth Amendment context, but they said maybe it's close to a reasonable probability of a different result.

THE COURT: All right. I would like to take a quick morning recess before hearing from the government, and then we'll come back and hear additional arguments from the petitioner.

MS. NOBLE: Thank you.

THE COURT: Let me say, in the order that I do, I would like to put a few paragraphs about the credentials of Mr. Fulks' 2255 counsel. There was an issue made of that, and I would just like to put on the record the credentials.

I already have the credentials of the two court-appointed lawyers, but I don't have the credentials of the California lawyers. And I would like for you all to get those for me, if you would, which are very impressive, obviously. And if sometime during today or tomorrow, if you could get those to me -- and I assume the government would have no problem with those being submitted in writing?

MR. DALEY: Absolutely fine, Your Honor, with that.

MS. NOBLE: How would you prefer that information to be communicated, I mean, written, orally?

THE COURT: Just a written CV or -- I don't need five pages, but just your background, your education and background.

MR. DALEY: Excuse me. If you look on their firm web

site, as I have done, they could probably just print off those sheets. They are very impressive.

THE COURT: All right, that will be fine. Can y'all pull that up and print it for me?

MR. DALKE: Yes, sir, we can get that for you right off the internet.

THE COURT: All right, very good. I just -- since there was concern expressed at various stages about the adequacy of habeas counsel's representation, I just want to put it on the record.

We already have it. We already have it. Good.

All right, let's take a 15-minute recess.

MS. NOBLE: Thank you, Your Honor.

(Short recess)

THE COURT: All right, Mr. Daley.

MR. DALEY: May it please the court, Your Honor.

I would like to focus the court on what claim 33 actually alleges. It says that there is a Fifth and Eighth Amendment violation because there was materially false information presented to the jury.

There wasn't any. If you noticed during their presentation, they did not point you to any testimony that was false. What they have tried to do is say that the argument that the government made inferred certain things.

I think it's important to note what their claim first

stated. Their proposed claim 33 started off with some remarkably, what I would --

THE COURT: So, you say to begin with, the initial proposition, that there was no false testimony. There may have been arguably false argument -- I tell the jury that the argument of the lawyers is not evidence.

MR. DALEY: Absolutely, Your Honor. You said it more than one time, that it was the prosecution and the defense's gloss or their take on it, but that it was the testimony from the stand and the exhibits that were introduced, that is what they were to consider.

THE COURT: All right.

MR. DALEY: Your Honor, during -- in their initial claim 33, you will see language that says things like, "The government argued, quote, 'That he purposefully obstructed search efforts,'" and quote, "'That he actively sabotaged the efforts to locate Ms. Donovan's remains, and that Fulks led them on a wild goose chase."

Now, Your Honor, in our memo in opposition we pointed out that that conversation, that language was done during the colloquy regarding, in particular, the Savannah Bluff search.

And, Your Honor, I would like to just remind the court that there were three or four days of argument about that issue. In particular, on June 10th at pages 187 to 201, and June 11th, pages 4 to 29, in particular. But there also were

some on June 15th, pages 123 to 125.

And that's important, Your Honor, because, you know, they pointed out the initial instructions in which there were two things said. One was, obstructed the initial efforts to locate the body, and that related to the Savannah Bluff search. You kept that out. And in the colloquy with Mr. Schools he said, "Well, we are not going to pursue that wild goose chase issue."

THE COURT: Well, I don't understand, we didn't know at the time that Savannah Bluff was a wild goose chase, did we, when the trial took place?

MR. DALEY: But in the context, if you send them to Savannah Bluff and then you send them 15 miles away to the Long Bay and Water Tower, one of those can't be correct, so --

But obviously when that as taken away -- and you had some reservations about --

THE COURT: So, you are saying when I took away the -- I denied admissibility for the Savannah Bluff statement made by the Indiana lawyer, the government backed off the misdirection argument?

MR. DALEY: We had to, Your Honor, yes, sir.

THE COURT: Okay.

MR. DALEY: If you will look now at their reply on page 9, they are now trying to conflate and say that the term "successfully concealed," somehow there is no difference

between that and "purposefully obstruct" or "wild goose chase."

Well, Your Honor, I went to the dictionary too before we got here, and the one thing they didn't put in there that you will see in every dictionary, either the primary -- and in fact almost every time, I looked at about 20 dictionaries, the primary definition of "conceal" is to hide. And Mr. Fulks, Mr. Basham hid Ms. Donovan's body.

That was true then and it's true now. Ironically it's even truer now. Because we know where they put the body. They put it in a secluded, rural area, swampy, out where water came in and out. I went out there, Your Honor, because I wanted to make sure I knew where the body was relative to where the searches had been.

Back to the argument about the fact that there was no materially false information. You can look long and hard for cases under the Fifth and Eighth Amendments, under the Tucker, Johnson line of cases. You are not going to find a case that says argument somehow satisfies. It just isn't the case.

Nearly all the cases under Tucker and Johnson, you are looking at convictions that are later found to be invalid. That's what the lion's share of cases are. There are some cases that talk about false testimony. The Hernandez case actually involved false expert testimony, and the court found that it wasn't material because of other evidence.

So, this court could certainly say, if it wanted

to -- well, first, there was no false information. But second, even if there was somehow, if you got to the false information prong, it still has to be material.

And what you will see in Johnson and Tucker and these cases, is in Johnson in particular, one of the aggravating factors relied solely on this conviction that was later found to be invalid.

In Tucker, it was a non-capital case. Two of the three convictions that the sentencing judge relied upon were overturned because of a failure to have counsel present, a Gideon violation.

This is a different case. Victim impact evidence, which we pointed out in our memo in opposition, the fact that the body wasn't found was a very brief portion of the victim impact.

So, what did the government do at trial? Well, they presented the efforts to find the body. As you noted more than once, and as counsel for the government noted more than once, we had a challenge here, because without a body, we had to explain why we didn't have it. And one of the ways to show that it wasn't because we were resting on our laurels, was to go and give a full and complete and truthful description of the various searches.

Your Honor, there are two things Mr. Fulks cannot run away from. One is, he picked where Alice Donovan was disposed

of.  The testimony is clear that this was Mr. Fulks' area.  In fact, Professor Johnson, at 4-31 and 32 talks about the fact this was his area, he knew the area.

THE COURT:  Tell me again how he knew the area?  I've forgotten.

MR. DALEY:  He had lived there for a while back in like '95 and '96 with his first wife.

He was the driver.  He was the driver the whole time, but in this instance he was clearly the driver.  He cannot run away from the fact that he took Alice Donovan and Basham, and the three of them went to a very rural, secluded area.  And that's concealment.  That would be concealment today if this case was being argued.

The second thing he cannot run away from, Your Honor, is the fact he waited, he waited to tell the government.  And since they are not asserting an ineffective assistance of counsel claim, then he waited more than five months.

Now, even under their theory that he started helping and they started searching in I think they -- I think their chart said February, that's still from November 14th, that's more than two and-a-half months.

So Your Honor, the argument about concealment goes to the heart of what they initially did, where they chose -- I mean, they could have left her right at the Wal-Mart parking lot, that would have been not concealment.  Going into the

boondocks and throwing a body into a swamp is concealment. There is no other purpose but concealment.

The government argued appropriately, and it would be appropriate today, that Fulks picked a secluded place, that he successfully concealed the body because of that. And the reason why they did it, Your Honor -- he can't run away from this either, why do you throw away bodies in secluded places? So nobody can find it.

Now, later on you can have a change of heart. But what is more remarkable about this is he picked such a good place to dispose of the body that he even couldn't remember exactly where it was located.

Professor Johnson actually said in her testimony, "I don't think he always gave the same details, but there was never a point he said, 'No, it's really over there,' but the descriptions were not always very clear." And the reason why they weren't very clear is because he picked an area that was hard to go and find.

So, when the government used the term "conceal," it clearly meant he meant to hide or to place the body out of sight. And he did a very good job.

As I noted a moment ago, Fulks continues to fail to point to one piece of materially false information that was provided to the jury in testimony. And that's what -- that's as far as I have been able to tell that the Tucker and the

Johnson line of cases have gone. It's actual testimony, it's not some argument that was made.

And that's why you see in the case law a number of cases where the argument about concealing a body by putting it into a remote -- sending it to a remote location, it's argued with some regularity in death penalty cases, and these are cases where the body is then found.

With regard to the jury instructions, Your Honor, I would point you to June 29th of '04, in the trial transcript, where you charged the third non-statutory aggravating factor. And in that, here is what you charged the jury at page 272:

"The third non-statutory aggravating factor alleged by the government is the effect of Chadrick Evan Fulks' offenses on Alice Donovan and her family, including the extent and scope of the injuries and losses suffered by Alice Donovan and her family. The effect of the offenses on Alice Donovan and her family means the harm to Alice Donovan and her family caused by the defendant's actions."

That's what you charged the jury about what victim impact evidence was. It doesn't reference the search. In fact, what it primarily focuses on are the injuries that were inflicted upon her.

Your Honor, one of the things that you can look at, if you were to reach the materiality issue, is, "Now, wait a minute, let's assume this was somehow material, well, what

would that have then done in this case?"

And clearly, Your Honor, you anticipated what I was going to argue. It would have opened the door. I mean, what a remarkable thing to do otherwise, to say, "We are going to say he was helpful. We are going to let him get in this evidence now. Oh, he did finally, eventually help find the body."

But the government would somehow be precluded from arguing that the first day or two, when time is of the essence, Mr. Fulks, through his counsel in Indiana, said, "There's a live woman tied to a tree off of Wonderland Road in the Savannah Bluff area of Conway." Again, Mr. Fulks knows this area.

Now, Your Honor, that's a decision you would have had to make, and I know it was a very difficult decision initially. But Your Honor, under the circumstances, if this were to have come in, assuming the body had been found, it has to go into the materiality equation at a minimum.

Your Honor, I don't want to beat a dead horse, but the only other things I would tell you is, when this discovery of the body happened, I thought, "Now, how is this going to play out?"

And what I came to -- I mean, I couldn't find a theory. And the truth is, Your Honor, the defense really couldn't find a theory it fit. And so they have taken some facts and they have marshaled them as best they can, and they

have tried to attach it to a theory that just doesn't fit, Your Honor.

My final point would be that they point to Mr. Gasser's closing argument at the June 29th, '04 trial transcript at pages 220 and 221.

What they left out in that selected quote that they gave you was the introduction in which Mr. Gasser said, "Well, now they have said, 'Well nobody knows how she died because we don't have a body.'"

And so in response, Mr. Gasser said, and you will see this in our memo in opposition, he said, "Well, whose fault is that?  Whose fault is that that there is no body?"

There is nothing inappropriate about that.  That argument is made whenever a defendant conceals a body, throws it somewhere remotely.

And what is interesting is if you look at the arguments that were made, they were often paired together, not just Alice Donovan, but Samantha Burns.  This was their modus operandi.  Carjack women, rob them, rape them, kill them, and dispose of them.  And that was true when this trial happened and it's true today.

Your Honor, I'm happy to answer any questions you might have, otherwise we will rest on our memorandum in opposition.

THE COURT:  Okay, I don't think I have any

questions.  All right, reply argument?

MS. NOBLE:  Yes, Your Honor.

THE COURT:  Let me clear up, if there's any confusion, when I said I wanted credentials of the lawyers, I didn't mean to disparage credentials, I want put in the record that Mr. Fulks has good, quite competent legal counsel, both here in South Carolina and from California.  And I think one of you said that this -- that you were concerned that I was wanting to minimize your experience or something, I wasn't trying to do that at all.  Okay.

MS. NOBLE:  Thank you, Your Honor.

So, what I just heard from what opposing counsel said is a couple of things, I heard the primary focus was on the propriety of what the government did.  Counsel made numerous statements that "Our arguments about concealment were proper. Look at this case law where concealment was proper.

"Our arguments in closing, saying that, 'Yeah, we couldn't find the remains,' proper.  Our arguments about victim impact, proper."

They are focusing on the propriety of their arguments.  Now, again, I don't want to sound like a broken record, even though I'm running the risk of that, we are not alleging a prosecutorial misconduct claim.

The issue that is presented before this court is not what was true then was somehow presenting false testimony then,

the issue is that the subsequent discovery of Ms. Donovan's remains, a landscape altering event, demonstrates that what the jurors considered was false.

Now, they want to say, and they did say, that it wasn't false. "Concealment, conceal, I consulted 20 dictionaries. That's what 'conceal' means."

What we are talking about with the due process claim and we are talking about with the Eighth Amendment claim, we are talking about the impact on the jurors in reaching their sentencing determination.

And they heard argument. They heard witness after witness testify about the search efforts. They heard the witnesses get up there and say, "Mr. Fulks said the location is here. Mr. Fulks directed us here." And they also heard the remains weren't recovered.

Now, that's true, they weren't recovered, we all know that. But the jurors were left with, in closing argument, "That is what makes this crime aggravating, the fact that they successfully concealed the remains, successfully concealed."

And I would also like to point out that what they were doing was -- and again I'm not saying it was improper, I'm not disputing the case law that says those sorts of arguments are proper. I'm saying that the subsequent discovery of the remains in the precise location where Mr. Fulks said they were located is what makes the perception on the jurors and what the

jurors took away from it completely different. It paints it in a completely different picture.

And there are a couple of other things I would like to say. They say that, no, they didn't say wild goose chase. They say, "No, we didn't say 'purposefully obstruct.'" But what did they say?

Now, I can go back to the slides if you would like to. But I would like to be respectful of time, but I certainly can do that if Your Honor would please. To somehow argue --

THE COURT: We have those slides in evidence that you put up, the maps and so forth?

MS. NOBLE: Yes. All of the slides that I used, with the exception of a couple of the demonstratives -- I also have a copy that I could provide the court of the Power Point that I did, if you would like that.

THE COURT: If you would hand that up, I would appreciate it.

MS. NOBLE: Absolutely.

THE COURT: Yes, let's make it an exhibit. Let's make it a court's exhibit or petitioner's exhibit, either one.

MR. DALEY: Court's exhibit would be fine, Your Honor.

MS. NOBLE: Okay. But to argue that "purposefully obstruct" is somehow different from "successfully concealed" -- sure, you can point to, you know, dictionary definitions,

which, you know, as I did with "conceal," it means to conceal the truth.

But what the jurors were told over and over and over again was that Mr. Fulks was the reason, the reason Ms. Donovan's remains were not recovered. The reason.

And I would also like point out that Ms. Caison -- it's beyond tragic the remains were not recovered for so long. Everybody, everybody would agree with that. But Ms. Caison recovered the remains one day after receiving Mr. Fulks' letter, one day. He provided her with the same information that he had been providing for the last six years.

She provided -- she conducted a systematic grid search of the area and was able to locate remains on the first day of that search. Undeniably it is tragic that they were not recovered sooner than that.

But the fact is, contrary to what counsel suggests, it wasn't that they were so successfully concealed that there was no possible way that they could be recovered. Six years later, first day, they were recovered.

Now, I would also like to talk about a couple of other things. They said that they hid Ms. Donovan's body in a rural area. Hid. Now, Mr. Fulks' testimony has been clear all along that he remained in the vehicle. He did not go out of the car with Mr. Basham into the woods, he did not do any such thing. So, he did not actively engage in that.

Now, they say that the Hernandez court, they pointed to the Hernandez decision and said that the court found that the false testimony wasn't material because there was other evidence.

What the Hernandez court found was that the reason it wasn't -- it didn't have an impact and it didn't make -- it didn't question the outcome of the trial was because those witnesses were called and they were crossed by the defense attorneys.

So, the people that were alleged to have presented false testimony, the defense attorneys had every opportunity at the time and did cross-examine them.

In this situation, Mr. Fulks had no meaningful -- and I emphasize the word "meaningful" -- opportunity to refute the arguments that he was the reason Ms. Donovan's remains were not recovered, and more to the point, that he was not truthful.

Because I showed you a slide that said, "So he sends them to Savannah Bluff, so he sends them to Bee Tree Farm, then he sends them to another location, does that make it true? No." That is what the jurors were told. "No, he was not being truthful, he was being deceitful."

Counsel also argues that the victim impact evidence was a very brief portion, very brief. Now, we have put in our motion -- and I won't reiterate it too much -- but the impact on jurors of remorse and demonstrable proof of remorse, very

powerful.  There have been studies conducted on this, of which we included in our papers.

THE COURT:  Would those fly in the face of the argument that he shouldn't have pled guilty and gone to a trial on the guilt phase?  I mean, that's counter productive to showing remorse, if you say remorse -- remorse is a critical factor on a decision to impose death or not.

MS. NOBLE:  Well, I think, Your Honor, had the remains been recovered, as Mr. Blume testified, part of the reason they were trying to recover the remains is to hopefully find them as proof of remorse.

And Mr. Blume further testified that he thought that it might lead to a plea agreement.  That was part of the reason he waited for five months, as he said.

Now, to argue that the victim impact evidence was very brief, and I think actually in their papers they referred to it as "fleeting testimony," I cannot agree with that assessment.

To have the victims' family members talk about the impact on them of not being able to lay their loved one to rest cannot somehow be characterized as fleeting testimony that perhaps -- and I'm not going to say that counsel suggested this -- but my interpretation of their pleadings was that really didn't have much of an impact on the jury.  I think that would be quite powerful.

Now, they also say that Fulks can't run away from the fact that he picked the location where Ms. Donovan was left. He was the driver, he knew the area, that's what counsel just argued.

Well, one thing that I was thinking about when the remains were first recovered, and we knew that once we learned that they were recovered in the same location that he's been consistently directing search efforts since -- for the past six years, was I thought to myself, "Can I recall in precise detail every stop light, every tree, everything on my commute that I do every single day -- because I often work seven days a week -- from my home to my office?"

At the time I lived a half-a-mile away from work. And I was sitting there, and I was in my office and I was thinking, could I recall with precise detail, could I give somebody landmarks? Of course, I can give the major street because it's one street, but could I recall that? No, I couldn't.

And maybe you can say, "Well, something as eventful as this, something as meaningful as this, you would remember, right? You would remember."

I would say maybe the same would be true for my wedding where I spent a month. I couldn't tell you today how I got there. I spent every day there. I could not give you precise directions.

Not to mention the fact that Mr. Fulks was -- we have heard tons of testimony that he was severely intoxicated on this night, and he is reconstructing from memory the location. So, I think it is not accurate to say that he was disingenuous.

Again, I would emphasize that had he wanted to conceal the remains, had that been his goal, he would have led them 52 miles away. He would not have said, "Here is the area. Search teams get there." Begging his defense counsel to look.

Evan after the penalty phase proceeding, writing letters to Mr. Gasser, writing letters to the press, writing letters to anybody who would listen, writing letters to Monica Caison, who eventually recovered the remains, saying, "Please go look."

And he certainly wouldn't have done it at a time when he was talking to his defense counsel when the likelihood of forensic evidence still would have been present. He wouldn't have done that. He would have done what Mr. Basham did.

Now, yes, my chart did start in February. But again, I prefaced when I started that time line that I was trying to truncate the level of detail that I was providing to the court in light of the stipulation.

THE COURT: When did Mr. Blume say that Mr. Fulks wanted to cooperate and find the body? Did he say --

MS. NOBLE: He just said very early on in his

representation.  He didn't provide -- to my recollection he did not provide an exact date.  He said very early on.

And we also heard that even before -- so, what we do know is it had to be well before the February searches.  Because what Mr. Blume testified was that Pete Skidmore was down there and he was taking pictures, and he was coming back and he was showing them to Mr. Fulks, and he was taking video and he was showing it to Mr. Fulks.  So, we know that it had to be earlier than that.

Now, the government argued also, to try to distinguish the Tucker case, to try to distinguish the Johnson case, they say that those arguments simply don't apply because those dealt with prior convictions that were later invalidated.  Well, those aren't the only times when the courts have held that due process is violated if a sentencer was allowed to consider materially false information.

I draw the court's attention to a couple of such cases which are cited in our brief.  In Shukwit, and I don't know if I'm pronouncing that correctly, so let me give you the spelling.  It's S-h-u-k-w-i-t versus United States.

In that case we dealt with information contained within a presentence investigative report, and there there was some false information.  And the court held that there was no way to ascertain whether or not the sentencer considered that false information when it issued its decision, so they

remanded.

And they said, "Resentencing will be necessary if the district court" -- and again, it was the district court entering the sentence, so it's easier for a judge to determine whether or not the judge did or did not consider that information. And they said, "Resentencing will be necessary if any of that information was relied upon." "Any."

Now in Stewart versus Erwin, which is a Sixth Circuit case from 2007, there we have got a situation where somebody is sentenced to a term of years, and the facts were not a prior conviction that was later invalidated based on Gideon or some similar subsequent United States holding, there there were victim impact statements that were submitted.

And the defendant wanted to review them, the defendant was not allowed to review them. And so the issue there was simply whether or not there could have been false information in there that might have impacted the sentencing determination.

So the court remanded for additional proceedings. And they said that the Supreme Court itself has characterized Gartner as holding that the due process clause does not allow the execution of a person on the basis of information which he has not had the opportunity to deny or explain.

Now, implicit in that is a meaningful opportunity. A meaningful opportunity. Mr. Blume did say in closing argument,

he said, "You know, we told the government that the likelihood of finding the remains was remote.  We told the government that.  We believe Mr. Fulks is sincere in his efforts."

But if you are a juror, you are a juror and you are sitting there and you hear, "Mr. Fulks directed us here, Mr. Fulks told us to go here, we transported Mr. Fulks on the ground, he pointed us to the location where he said, 'This is definitely it,'" you heard Agent Long testify to that, the jurors heard Agent Long testify to that, they search it, they don't find anything, do you think the jurors walked away thinking, "Yep, that Mr. Fulks, he was telling the truth"?  No.  The entire time during sentencing proceedings, evidence after evidence was trotted out before the jurors that he is not truthful.

Even in one of the slides I showed when they were talking about his sincerity or alleged lack thereof in his desire to locate the remains, they asked, "Why is his credibility important?  Why is his credibility important?"

So they said, "You heard Savannah Bluff, you heard Bee Tree Farms, so he leads us to another location, does that make it true?"  The answer was no.

To get back to Stewart.  The issue there was that they said -- give me a moment, please.

It was unclear in that case whether the information was in fact determined to be false.  It was unclear.  And the

court still said remand was necessary to make that determination because of the implications that were involved.

And similarly in Johnson, now we are talking about the Eighth Amendment needs for heightened reliability. There the prosecutor repeatedly urged the jury to give weight to that aggravator that was later invalidated, as Mr. Daley talked about.

And the court said even without that express argument, even without it, there would be a possibility that the jurors -- that the jury's belief that the petitioner had been convicted would be decisive in the choice. The error extended here beyond the mere invalidation of an aggravating circumstance, here the juror was allowed -- the jury was allowed to consider evidence that had been since revealed to be materially inaccurate.

Now, other cases have held that it can be based on assumptions, assumptions that they might have made. It is not limited to cases of just prior convictions that are later invalidated. And our papers discuss that.

And with that, I will be happy to answer any questions -- well, actually, my apologies, give me one more moment.

I would like to address Savannah Bluff one more time. Now, the government argues that in hindsight, had we known the remains would have been located, that Savannah Bluff

should have come in, that it would have come in.

THE COURT:  That's what concerned me most about the decision.

MS. NOBLE:  Right.  But what this claim hinges upon is what actually happened.  What actually happened during the sentencing phase proceedings was that it was discussed, but it was not attributed to Mr. Fulks because of the non-attribution agreement.

So, it matters not whether it was or was not before the jury as to Mr. Fulks, because the consideration before the court under these claims is, given what the jurors heard, given what evidence was presented to them, what arguments were made before them, was the due process clause violated based on the subsequent discovery of Alice Donovan's remains?

THE COURT:  I mean, I'm just struggling with whether I can consider that in a vacuum or whether I have got to -- the government argues it goes off on materiality, that -- you know, as I said earlier, let's just assume the remains had been found shortly after they started looking at the -- I can't remember -- Water Tower Road, shortly after they started looking at Water Tower Road in April of '03 or even in February.

MS. NOBLE:  Yes.

THE COURT:  And so the defense wants to put in before the jury that the defendant successfully led them to the body.

I'm just wondering out loud what would I have done with that Indiana lawyer's statement about going to look at Savannah Bluff 15 miles away? It was made -- it was a proffer or under some condition it not be attributed to the defendant.

But it seems to me I would have had to let that in, and maybe even -- I guess maybe under the rule of evidence that says whenever a statement is admitted the court can require additional portions of the statement which ought in fairness to be considered, to put it in context.

That might be the principle that comes into play, that it's just not fair to let the jury hear Mr. Fulks give one set of directions that successfully found the body, and at the same time to keep from the jury the fact that, as I said earlier, shortly after the death, maybe even while she was still alive, he sent them 15 miles away, which when you are looking in the woods, 15 miles is a long ways.

That could have even been more damaging to the defendant if that earlier statement came in, I think, because then the jury could say, "Well, obviously he knew where the body was because he successfully told them where it was, but he didn't do that until well after she was dead and the remains were somewhat disturbed so that forensics wasn't available."

I mean, if both directions, sets of directions, come in, I think it would have been even worse for the defendant. And that's all hypothetical. I mean, I'm not saying it would

come in, but I just think I would be hard pressed to keep out that Indiana's lawyer statement if the jury had known that he successfully led them to the body in the Water Tower Road area.

MS. NOBLE:  And I certainly --

THE COURT:  This is all hypothetical, because as you say, we have got the record, it is what it is and the jury heard what they heard, and I have got to decide it based on that.

But I'm just thinking out loud, is it a fact of materiality, is that what we are talking about?  Is that the analysis that would bring into play the question of whether that earlier statement about Savannah Bluff would have come in?

MS. NOBLE:  Well, I certainly understand the dilemma that you are posing for us today.  What I would say in response to that, or what I will say in response to that, is that materiality with respect to this claim is whether or not -- and I will even use the case that the government cites -- is that, the touchstone of materiality is a reasonable probability of a different result.

Meaning, what happened, what actually happened during the proceedings, is there a reasonable probability of a different result?  That's the standard -- that's the definition of materiality that was used in the government's case that it cited in its opposition.

Now, I understand your separate point about Savannah Bluff being material.  But again, with all due respect, this claim is about what actually happened.  And I understand, you know, if the remains had been recovered, you might have ruled differently, notwithstanding the non-attribution agreement.

But the due process claim and the Eighth Amendment claim are based upon what happened.  And what happened is that there was testimony that Mr. Basham led them to Savannah Bluff, searches were intensified based on other information that was not attributed to Mr. Fulks because of the attribution agreement.

THE COURT:  Let me jump in here.  The direction to go to Savannah Bluff was on a condition that it not be used against the defendant, the later direction to go to Water Tower Road didn't have such a precondition?

MS. NOBLE:  Correct.

THE COURT:  As I said, if the jury found out about both of those things, I think that would be very damaging to the defendant in that he gave one proffer to the wrong directions with the express requirement it not be used against him, and that was done while the evidence was fresh, and maybe even the victim still alive.

And then later after, as I said, the forensics had dissipated, or the evidence had dissipated I guess I should say, he then leads them to the correct location with no

preconditions, wanting to use that -- knowing that's going to be used and come into evidence.

That would be a powerful argument the government could make, that "He sent us in the wrong direction but said we couldn't use it against him, and then after time had passed, he sent us to the right place with no proffer language, no precondition."

MS. NOBLE: Your Honor, we don't know what Mr. Fulks saw or what he said with respect to Savannah Bluff. We know what his counsel said. And what we know is that Mr. Fulks did not affirmatively say to the government, "Ms. Donovan is located at Savannah Bluff."

He was faxed a map that Brandon Basham had drawn and said, "This is where she is located." Mr. Fulks' counsel supposedly gave a copy of that to Mr. Fulks. It was a hand drawn map. It had water nearby, it had highways nearby.

Now, I'm not saying I know enough about the specifics about it, because I wasn't there. All I can say is that Mr. Fulks did not say, "This is where you should go." He was looking at what Brandon Basham had drawn. And his counsel, and it is true from what I understand, that his counsel then said, "You know, yes, I think you are hot" or "I think you are in the right area," something to that effect.

That is true, I have read that in the record, I read that in Mr. Long's declaration. But I would point out that

Mr. Fulks did not direct them, Brandon Basham did.

THE COURT:  All right, I don't think I have any further questions.

MS. NOBLE:  Thank you, Your Honor.

THE COURT:  Thank you very much.  Anything by the government in response to any matter we just discussed?  Any new matter?

MR. DALEY:  No, Your Honor.

THE COURT:  Well, I guess that will do it then.

MS. SMALL:  Your Honor, if I may close briefly or sum up.

THE COURT:  Yes.  All right.

MS. SMALL:  Thank you, Your Honor.  Your Honor, I think one thing has become clear over the past five and-a-half days of testimony and argument, and that is that when Chad Fulks went on trial for his life, he did so in a proceeding that was fundamentally unfair in numerous ways.

First, Your Honor, before the first words of opening statements were spoken, Mr. Fulks faced the jury stacked against him by trial counsel's incomprehensible decision to place on that jury members of the venire whom counsel thought were automatic death penalty votes.

Counsel did so on the mere chance that Mr. Fulks might somehow escape the black hole of the Fourth Circuit's appellate review.

Second, how Mr. Fulks got to that trial in the first place is further evidence of counsel's ineffectiveness.  They brought him to the FBI and let him make a statement without a proffer agreement, they encouraged him to plead without a plea agreement.

Three, when the trial begins with Mr. Fulks having given a statement that filled in all of the blanks in the government's case and absolved the government of its duty to prove Mr. Fulks guilty beyond a reasonable doubt.

And with that jury stacked against Mr. Fulks, counsel then put all of their eggs into the basket of fetal alcohol syndrome, abandoning any efforts to inform the jury of Mr. Fulks' multiple other mental health issues and cognitive deficits.

In so doing, counsel not only lost the opportunity to present multiple other mitigating factors to the jury, but they also forfeited the ability to have those experts explain to the jury Mr. Fulks' supposed diagnosis of antisocial personality disorder, and to explain to the jury that that wasn't a full and accurate picture of the diagnostic picture of Mr. Fulks.

Fourth, as the trial went on, the government made certain representations regarding the state of the evidence as it pertained to Mr. Fulks.  Of course, we learned when we got to Mr. Basham's trial those facts took on a different tenor, and in some cases were changed altogether.

And finally, Your Honor, the case as ultimately submitted to the jury under instructions that violated the clear rule of Eddings versus Oklahoma, that if evidence is relevant to mitigation, the sentencer may not refuse to consider it, but must give it weight, even if it's little weight, in reaching a verdict.

Your Honor, for all of these reasons, in addition to reasons discussed this morning with respect to discovery of the remains of Alice Donovan, Mr. Fulks is entitled to, at the very least, a new sentencing proceeding and to further relief that the court may deem necessary.

THE COURT: All right, thank you very much. I'm going to take the matter under advisement. Obviously I need to do a written opinion. I can't promise you when it will go out, but will do it as soon as possible. Does the government want to respond?

MS. EWING: Your Honor, maybe just a couple of --

THE COURT: All right, go ahead.

MS. EWING: -- things. Your Honor, strategies devised after extensively investigating the facts and the law in the case relevant to all probable options are virtually unchallengeable.

Your Honor has heard all the evidence from last week, the extensive investigation that Mr. Blume and his associates did, the number of people who were out there interviewing a

hundred or more potential witnesses, sometimes several times.

You heard how they employed experts to evaluate his brain, other experts who interpret the information regarding the brain scans, et cetera. And they employed the mental health experts and had them evaluate Mr. Fulks and studied their conclusions regarding Mr. Fulks. They left no stone unturned.

They used that information, devised a strategy. They used information from focus groups and voir dire, practice voir dire, to come up with a strategy. And they decided on a two-prong strategy.

The first prong being that because Mr. Fulks had a damaged brain, due in part to fetal alcohol syndrome he had cognitive deficits, and due to horrible family background, is one prong. And then that he was not the actual killer. They took those two prongs and that was a reasonable trial strategy, and it should be virtually unchallengeable.

The fact that they decided not to include the testimony of Halleck, Hilkey, and Melikian was based on a couple of reasons. That they didn't want get into a big debate about antisocial personality disorder. They didn't want to give the government an opportunity to present experts regarding the antisocial personality disorder. That again was a reasonable trial strategy.

As far as allowing Mr. Fulks to give statements, they

had a reasonable strategy behind that. They had Mr. Basham putting all of the blame on Mr. Fulks, and this was the only way that they could get his version of the story out there of what actually happened.

There weren't any other people viewing what happened once they got Ms. Donovan by herself. It was only the two of them. So, he needed the statement to get his story out there.

As far as Eddings V. Oklahoma and the infamous what they have dubbed two-part jury instructions, there was nothing wrong under Eddings V. Oklahoma with that instruction. They have read it much more -- or the case of Eddings much more broadly than it really is.

Your Honor, I read that case a couple of times again this weekend. And what happened in that case was the judge said that he could not consider the facts regarding the background of the defendant. Under the law he could not consider it. He didn't say under the facts, he said, "Under the law, I can't consider the background of the 16 year -- the 16-year-old defendant."

The case law is clear, under the Supreme Court case law and the Fourth Circuit case law, that jurors must be allowed to consider anything in mitigation, and that is exactly what happened in this case.

Eddings does not require that jurors decide that everything that the defendant presents in mitigation is

mitigating.  And your question last week of, "Well, what if the defense had put up 40 different mitigation instructions?  Were they required to consider if the defense said, 'Oh, he has blue eyes and blond hair, and so that should be mitigating,' do they have to consider that?"

And 2255 counsel said, "Well, Your Honor, you had to decide what was mitigating and tell the jury what was mitigating."  No.  I believe that, had that happened, may have been error.  The law requires that the jurors be allowed to consider anything in mitigation.  By the same stroke, it doesn't require them to find that everything presented is mitigating.

As far as claim 17, what they have done to automatic death veniremen, they have challenged all five jurors on appeal, and now he's precluded from relitigating this issue.

However, under Morgan v. Illinois, the Supreme Court held that the Sixth Amendment guarantees a defendant on trial for his life the right to an impartial jury.

What the Fourth Circuit found in Mr. Fulks' case, they determined that this court's examination of each juror was plainly sufficient to satisfy Morgan, that Fulks had an impartial jury and there was no prejudice to him.

As far as their inconsistent theories argument, claim 19.  Number one, the government didn't pursue inconsistent theories.  In both trials it said or argued that it took both

Fulks and Basham to accomplish the murders.

In Basham's trial, it said Mr. Fulks was the lieutenant, but Mr. Basham was his willing foot soldier. The government did not present any false evidence at Mr. Fulks' trial. And even had they argued inconsistent theories, there is nothing unconstitutional about that. But again, they did not argue inconsistent theories.

I think I kind of covered the arguments in response to Ms. Small. If the court has no questions, I will sit down.

THE COURT: I don't have any questions.

MS. EWING: Thank you, Your Honor.

THE COURT: Let me say while I was handing out plaudits to the defense team, I didn't mean to overlook the government. The government has been well represented in this case.

I confess I had some misgivings at first when this case first got started and I saw all the lawyers in the U.S. Attorney's Office who were involved in the case leaving. I was really concerned that whoever picked up the case would have a lot of difficulty just because of the sheer volume of the evidence in getting up to speed. But the lawyers here representing the government have done a wonderful job on behalf of their client as well.

MR. DALEY: Thank you, Your Honor.

THE COURT: It was a well tried case on both sides.

MR. DALEY: Thank you on behalf of the government, Your Honor.

MS. SMALL: Thank you, Your Honor.

THE COURT: Anything else?

MR. ASHMORE: Your Honor, may I make one more acknowledgment, please?

Amy Laurendean with O'Melveny & Myers, she began this case with me, she has worked on this case hundreds and hundreds of hours. When I first met her, Your Honor, one morning in Terre Haute, she had flown in that night before and actually totaled her car on ice covered interstates of Indiana. Had gotten a new rental car and still met Mr. Watkins and myself for breakfast that morning. So, at great personal risk and sacrifice, she has worked very hard on this case.

THE COURT: But she's not one that appeared here today in this case?

MR. ASHMORE: No, sir, she has a six-month-old child at home, but she has worked many hundreds of hours on this case.

THE COURT: So, we had a total of -- was it six lawyers from O'Melveny & Myers; is that right?

MR. DALKE: I think that's right.

THE COURT: All right. All right, anything else?

THE CLERK: I need that Power Point.

THE COURT: Oh. You are going to give us the Power

Point on the maps?

MS. NOBLE: Yes, sir, Your Honor.

THE COURT: All right.

MR. DALEY: Your Honor, I guess the one last thing is, we are going to submit the actual affidavit of Special Agent Long. We did an S slash last night, and we are going to make it Exhibit 63, and I think that's with consent --

THE COURT: I think the same thing for Ms. Lyons. You said you had that with you --

MS. SMALL: I'll bring that by later this afternoon before I leave town, Your Honor.

THE COURT: Ms. Roche's affidavit. All right, thank you very much, we will be in recess.

(Thereupon, the proceedings were adjourned.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER


I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.


s/ Gary N. Smith                    August 16, 2010
_____    _____

Gary N. Smith, CM
Official Court Reporter
United States District Court
District of South Carolina