**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**FLORENCE DIVISION**

| | |
|---|---|
| United States of America,<br><br>      Respondent,<br><br>vs.<br><br>Chadrick E. Fulks,<br><br>      Petitioner. | Case No. 4:02-cr-992-JFA<br><br>**MOTION TO ALTER OR AMEND JUDGMENT AND MEMORANDUM IN SUPPORT** |

COMES NOW Petitioner Chadrick E. Fulks and hereby moves this Court, pursuant to Federal Rule of Civil Procedure 59(e), to alter or amend its Order and Judgment issued August 20, 2010 (as amended on August 25, 2010), denying Mr. Fulks' *Amended Motion of Chadrick E. Fulks to Vacate Conviction and Sentence and For a New Trial Pursuant to 28 U.S.C.A. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure and Memorandum in Support* ("Amended Petition"). In support of this Motion, Mr. Fulks states the following grounds and relies upon the exhibits attached hereto.

**INTRODUCTION**

The history of this case is well known to this Court. In May 2004, Mr. Fulks pleaded guilty to eight charges, including two death-eligible offenses, arising from the November 2002 abduction and death of Alice Donovan and related events. On June 30, 2004, a jury sentenced Mr. Fulks to death. His convictions and sentence were affirmed by the United States Court of Appeals for the Fourth Circuit. *See United States v. Fulks*, 454 F.3d 410 (4th Cir. 2010).

Mr. Fulks thereafter moved to vacate his convictions and sentence pursuant to 28 U.S.C. § 2255. This Court conducted an evidentiary hearing on the claims in the Amended Petition from February 22 through March 1, 2010. On August 3, 2010, this Court entered an order denying relief as to all claims in the Amended Petition; the Court re-entered the Order on August 20, 2010, following completion of the transcript of the evidentiary hearing, and clarified the Order on August 25, 2010. On September 3, 2010, the Court granted Mr. Fulks' Motion for Substitution, allowing the withdrawal of appointed counsel Beattie B. Ashmore and the substitution of Billy H. Nolas, Senior Litigator for the Capital Habeas Unit of the Federal Community Defender for the Eastern District of Pennsylvania ("Philadelphia CHU").[1]

## ARGUMENT

Rule 59(e) "was adopted to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment. *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 450 (1982) (internal quotation marks & alteration omitted). "Rule 59(e) provides that a court may alter or amend the judgment if the movant shows either (1) an intervening change in the controlling law, (2) new evidence that was not available at trial, or (3) that there has been a clear error of law or a manifest injustice." *Robinson v. Wix Filtration Corp.*, 599 F.3d 403, 407 (4th Cir. 2010). Mr. Fulks herein describes evidence that was not available to this Court when it rendered its decision, demonstrating that relief is appropriate under Rule 59(e).

---

[1] References to the transcript of the 2004 penalty-phase proceedings are in the form "TT m/d/y at ___." References to the transcript of the 2010 evidentiary hearing are in the form "HT m/d/y at ___."

**I.** **In Testimony To This Court, Lead Trial Counsel John Blume Omitted Critical Information About His Lack Of Jury Trial Experience And Made Grave Errors As A Result Of This Lack Of Experience**

When questioned by the government during the evidentiary hearing, Mr. Blume said he had taken two capital cases to jury trial in South Carolina: *State v. Hunter* and *State v. Delacruz*. HT 2/22/10 at 125, 127. Subsequent investigation indicates that Mr. Blume's involvement in these cases was far less extensive than suggested by his testimony. The attached declarations show that Mr. Blume was not counsel appointed to represent the defendant in court, nor was he lead trial counsel in either case. Instead, in each case the defendant was already represented by counsel with trial experience that dwarfed Mr. Blume's, and Mr. Blume was recruited late in trial preparation to assist with limited and specific aspects of the case. Declaration of H.F. Pete Partee ¶¶ 4-5 (Exhibit A);[2] Declaration of Lesley Coggiola ¶¶ 8-12 (Exhibit B). In both trials, Mr. Blume's participation in witness examination was minor and neither attorney recalls Blume conducting any of the jury voir dire. Thus, Mr. Blume simply did not have significant capital jury trial experience.

Mr. Blume's lack of experience directly resulted in numerous errors amounting, individually and collectively, to prejudicial ineffective assistance of counsel:

**Unprotected Interviews with Law Enforcement.** Claim 7 of the Amended Petition alleges that Mr. Blume ineffectively allowed Mr. Fulks to participate in multiple interviews with law enforcement without the protection of a proffer agreement, without invoking the protection of Federal Rule of Evidence 410, and without a promise of any benefit. This decision was made against the advice of West Virginia co-counsel, a highly experienced federal public defender. Declaration of Mary Lou Newberger ¶ 13 (Exhibit C). These statements were then used by the

---

[2] Mr. Fulks has obtained the transcript of the guilt-phase proceedings in *Hunter* and will file the transcript as an exhibit if the Court so desires.

Government to procure Mr. Fulks' death sentence, as counsel acting reasonably would have expected. A trial attorney acting reasonably would not have allowed a capital client to make such statements—without protection, without benefit, and without in-depth knowledge of the client and the circumstances of the crime—at a stage in the proceedings at which the government could use these statements to its own maximum benefit. Declaration of Henderson Hill ¶¶ 19, 21-29 (Exhibit D); Coggiola Dec. ¶ 13; Newberger Dec. ¶¶ 9-10. Mr. Blume's decision to allow the interviews was both objectively unreasonable and prejudicial.

**Guilty Plea.** Claims 9-12 of the Amended Petition allege that Mr. Blume ineffectively advised Mr. Fulks to plead guilty and proceed directly to the penalty phase. The attached declarations, augmenting the testimony of Andrea Lyon, Esq., confirm that Mr. Blume acted unreasonably in this regard. See Hill Dec. ¶¶ 20, 30-26; Coggiola Dec. ¶¶ 14-16; Partee Dec. ¶¶ 6-7; Newberger Dec. ¶¶ 21-22.

**Seating Automatic Death Veniremen.** Claim 17 of the Amended Petition alleges that when confronted with five death-prone venire members during voir dire, Mr. Blume first challenged them for cause. When the Court denied those challenges, Mr. Blume allowed the five to be seated as jurors; he says he did so in order to preserve an issue for appeal. Order at 119-20. Mr. Blume's decision was unreasonable, and demonstrates that his lack of trial experience undermined his ability to effectively represent Mr. Fulks. Hill Dec. ¶¶ 13-18.

**Failure to Visit Crime Scenes.** During the evidentiary hearing, Mr. Blume testified vaguely that he went to West Virginia "six or eight times," HT 2/22/10 at 137, and that West Virginia was a "reference point" for information about Mr. Fulks' family, *id.* at 58. However Mr. Blume ignored Ms. Newberger's suggestion that he personally visit the locations at which

4

the various activities were alleged to have taken place, despite the importance to effective representation of doing so. Newberger Dec. ¶¶ 15-20.

While Mr. Blume has experience at the post-conviction and appellate level, defending cases at a jury trial requires a very different skill set. Experience with capital post-conviction proceedings does not qualify an attorney to try a capital case. Hill Dec. ¶ 38. Contrary to the impression left by Mr. Blume's testimony at the evidentiary hearing, it is now clear that Mr. Blume cannot take sole—or even primary—credit for "securing a verdict of life" in the only two capital jury trials in which he has ever been involved. Order at 10. Given the new evidence of Mr. Blume's inexperience and resulting errors, this Court should reconsider its rulings on the ineffective assistance of counsel claims.

**II.      Investigation Made Possible By The Appointment Of The Philadelphia CHU Has Revealed Additional, Meaningful Evidence Of The Extensive And Repeated Sexual Abuse Suffered By Mr. Fulks**

On December 31, 2009, Mr. Fulks moved for appointment of the Philadelphia CHU as supplemental counsel. As Mr. Fulks explained in that motion, the Philadelphia CHU would have been able to provide investigative staff and funding to hire experts to explore, inter alia, childhood sexual abuse that § 2255 counsel believed had been inadequately investigated by trial counsel. Following the denial of this motion, Mr. Fulks sought for funding for the same purposes and for a brief continuance to investigate such evidence. The Court denied that motion as well. As a result, Mr. Fulks was unable to develop the evidence necessary to prove trial counsel's ineffectiveness for failure to investigate and present evidence and expert testimony regarding the extensive sexual abuse Mr. Fulks suffered as a child.

With the appointment of the Philadelphia CHU on September 3, 2010, Mr. Fulks was able for the first time to secure the services of an expert in the detection, evaluation, and analysis

of the effects of child sexual abuse: Harry Krop, Ph.D.[3] Mr. Fulks attaches hereto the declaration of Dr. Krop, describing the horrific sexual abuse to which Mr. Fulks was subjected as a child and the devastating effect of that abuse on his emotional and psychological development. Declaration of Harry Krop, Ph.D. (Exhibit E).

Dr. Krop, a clinical psychologist who is an expert in the field of sexual abuse, evaluated Mr. Fulks on September 13, 2010. Krop Dec. ¶ 6. Dr. Krop opines that Mr. Fulks is one of the most sexually victimized individuals he has come across in over thirty years of working with both victims and perpetrators of sexual abuse. *Id.* ¶ 8. Dr. Krop reports Mr. Fulks' descriptions of being sexually abused by numerous teenagers and adults starting when he was just eight years old. The abusers included adult men and women, including family members, school personnel and neighbors. Dr. Krop also performed a forensic analysis and determined that the reports of this abuse were valid. Moreover, several lay witnesses provide extensive corroboration of the sexual abuse suffered by Mr. Fulks. Declaration of Lewis Lambert, Jr. (Exhibit F); Declaration of Lewis Lambert, Sr. (Exhibit G); Declaration of Kenneth Maynard (Exhibit H); Declaration of Oddie Starks (Exhibit I); Declaration of Mike Kaasee (Exhibit J).

Mr. Fulks has obtained supplemental declarations from Margaret Melikian, D.O. (Exhibit K), James H. Hilkey, Ph.D. (Exhibit L), and Seymour Halleck, M.D. (Exhibit M), each of whom evaluated Mr. Fulks prior to trial in 2004. In these supplemental declarations, each doctor identifies the effect this new information about sexual abuse would have had upon his or her original assessment of Mr. Fulks. Each doctor reports that Dr. Krop's declaration provides information that would have been critical to his/her own evaluation of Mr. Fulks' psychological

---

[3] Dr. Krop previously provided, *pro bono*, a declaration in support of Mr. Fulks' reinstatement of his claim that trial counsel provided ineffective assistance of counsel in failing to discover and present evidence of sexual abuse of Mr. Fulks.

make-up. They further discuss how this information would have proved vital in explaining to a jury that Mr. Fulks' emotional development had been arrested at an early age; why Mr. Fulks was unable to form healthy relationships despite his desire to do so; and why he harbored anger toward women. They also explain that a child whose adult role models are sexually abusive to him, leaving the child no safe harbor, will almost invariably learn to deal with people deceitfully and to engage in inappropriate and often criminal sexual conduct.

### III. Investigation Made Possible By The Appointment Of The Philadelphia CHU Has Revealed Additional Evidence Of Prosecutorial Misconduct And The Suppression Of Exculpatory Evidence

Due process requires the prosecution to disclose to the defense favorable information that is material either to guilt or to sentencing. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also, e.g.*, *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995); *United States v. Bagley*, 473 U.S. 667, 674-75 (1985); *Giglio v. United States*, 405 U.S. 150, 153-54 (1972). The need for full disclosure is particularly acute in a capital case, as is this Court's duty to review claims of non-disclosure. *Kyles*, 514 U.S. at 422. Information possessed by others acting on the government's behalf in the case, including the FBI, the police and other investigative agencies, is encompassed within the duty to disclose. *Id.* at 437-38. The Due Process Clause likewise imposes upon the prosecution a constitutional duty to correct false testimony, regardless of whether the prosecutor elicited that testimony. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).

#### A. New Evidence

As set forth in Claims 20 and 21 of the Amended Petition, Mr. Fulks's due process rights under *Brady*, *Napue*, and their progeny were violated by the prosecution's attempts to influence witness testimony through intimidation tactics and improper deal-making, none of which was

disclosed to defense counsel. Prior to the § 2255 hearing, Mr. Fulks requested funding for an investigator and a brief continuance for the purpose of further investigating such prosecutorial misconduct. The Court denied both requests. Following its appointment, the Philadelphia CHU conducted such investigation, resulting in the following new evidence of prosecutorial misconduct.

**Veronica Evans.** Ms. Evans, Mr. Fulks' second wife, testified at trial that Mr. Fulks physically and sexually abused her during their relationship. Order at 99. During its direct examination, the government elicited testimony from Ms. Evans the following testimony regarding her August 2002 arrest in Madisonville, Kentucky:

Q. You pled guilty to wanton endangerment second degree and receiving stolen property, correct?

A. Yes, I did.

Q. Received a three-month jail sentence, five years probation, and you were released after successfully completing five months of probation?

A. Yes.

Q. When I say "released," you were released from probation?

A. Yes.

Q. You are not currently under probation?

A. No.

…

Q. You freely admitted you were involved or were a recipient of all of these burglaries or car breakings that Chad was involved in?

A. Yes.

Q. You did that without having a lawyer present, didn't you?

A. Yes.

Q. No deals were made with you, were they?

A. No.

TT 6/17/04 at 160-61. Ms. Evans now admits this testimony was false. Declaration of Veronica Evans (Exhibit Q). First, Ms. Evans was given consideration for her testimony. At the time of

her trial testimony, Ms. Evans had been promised that her record would be expunged of convictions for child endangerment and receiving stolen property in exchange for her testimony against Mr. Fulks. She had also been threatened that, should she fail to testify against Mr. Fulks, she would be violated on her probation and returned to prison to serve a 15-year sentence. *Id.*

Second, the government elicited false testimony from Ms. Evans that she was no longer under supervision for the Kentucky offenses. Ms. Evans' court file for those charges proves the contrary. Per the order signed by the Honorable Tyler L. Gill on December 23, 2003, although Ms. Evans' probation was placed on inactive status *she remained under supervision until the expiration of her probation in 2008*. Exhibit R at 1. Moreover, the file contains a bench warrant, signed by Judge Gill on March 31, 2004, based on Ms. Evans' failure to appear for a hearing. Exhibit R at 2. The warrant was not recalled until October 20, 2004. In short, not only was Ms. Evans beholden to the government by virtue of her status as a probationer, it appears that she actually had an open bench warrant at the time of her trial testimony.

**Tina Severance.** Ms. Severance accompanied Mr. Fulks for much of the 17-day period in question and testified for the government during Mr. Fulks' trial. During her testimony, she admitted to participating in the burglary of Robert Talsma's house, abandoning her daughter as she accompanied Mr. Fulks across several states, involving herself in numerous instances of credit card and check fraud, and lying repeatedly to the FBI. Despite this litany of criminal behavior, Ms. Severance was only convicted of theft, a class D felony. TT 6/3/04 at 180-81. Although Ms. Severance could have been sentenced to up to 3 years of imprisonment, *see* Ind. Code § 35-50-2-7,[4] she was in fact sentenced only to 18 months *probation*, TT 6/3/04 at 181.

---

[4] In November 2002, § 35-50-2-7 set forth a presumptive sentence of one and one-half years imprisonment, to which another one and one-half years could be added for aggravating circumstances. *See* Ind. Code § 35-50-2-7, historical & statutory notes.

Incredibly, Ms. Severance and the government have claimed that she was offered nothing in exchange for her testimony. TT 6/3/04 at 184-85.

In Claims 20 and 21, Mr. Fulks maintains that Ms. Severance received consideration from the prosecution in exchange for her testimony against Mr. Fulks. Prior to the § 2255 hearing, Mr. Fulks supported this allegation by producing a letter from the Myrtle Beach police department confirming the dismissal of some South Carolina charges in exchange for her testimony in Mr. Fulks' and Mr. Basham's case. This Court, without hearing testimony, dismissed this letter as inconclusive. Order at 132-33.

Further investigation has revealed that there was, in fact, an agreement between Ms. Severance and the government. Amanda Oswalt, Ms. Severance's roommate for a period of time beginning in June 2008, reports that in August or September 2008 she and Ms. Severance spoke of the latter's involvement in this case. Declaration of Amanda Oswalt ¶¶ 1, 3 (Exhibit P). During this conversation, Ms. Severance revealed that she "had a deal with the FBI and the government": She would testify against Mr. Fulks and would receive a probationary sentence for her open cases. *Id.* ¶ 4. Ms. Severance admitted she lied in her trial testimony. *Id.* Ms. Severance

> said that the FBI told her to say certain things about Chad. She didn't say what those things were. However, she did say that the FBI wanted her to lie about what Chad did in order to make him look worse than he already did.

*Id.* ¶ 5.

**Beth McGuffin.** Beth McGuffin was another government witness. The government failed to disclose to trial counsel that it considered Ms. McGuffin a prime suspect in its investigation of Samantha Burns' death. In a declaration obtained after the § 2255 hearing, Ms. McGuffin reveals that from the time of Mr. Fulks' arrest, she was subject to multiple confrontational interviews with the West Virginia FBI in which agents repeatedly accused her of

10

complicity in the death of Samantha Burns.  Declaration of Beth McGuffin (Exhibit N).  Ms. McGuffin describe the agents' conduct as follows:

> The agents from West Virginia were horrible to me.  Before Chad's trial, they came to see me all the time.  They yelled at me and kept accusing me of having something to do with Samantha Burns' death. They said that I helped hide Samantha Burns' body.  They told me I had to tell them where the body was.
>
> I had nothing to do with Samantha Burns' death and I had no idea where her body was.  When the West Virginia agents came around before Chad's trial, I told this to them every time they'd accuse me of being involved, but they wouldn't listen.  They just kept telling me to stop lying to them.  They even offered me immunity if I told them where Samantha Burns' body was.  I didn't know where her body was, so I said I didn't want the immunity.  I was so scared of the West Virginia FBI guys - I thought for sure they were going to arrest me because I couldn't give them what they wanted.  I didn't know what else I could do.

McGuffin Dec. ¶¶ 4-5.

The message from the West Virginia FBI was clear:  it had the means and the will to charge Ms. McGuffin with murder and put her on trial for her life.  This message was coupled with another from Agent Jeff Bruning and other South Carolina FBI agents, who "were initially very nice," *id.* ¶ 2, but who ultimately made clear that if Ms. McGuffin did not help them and give them what they wanted, they would let the West Virginia FBI have her:

> … Agent Bruning and other agents from South Carolina wound up telling me if I didn't testify against Chad, everyone in West Virginia would think that I was a murderer.  They said the Burns family, all of Huntington and the West Virginia FBI would all think that I helped kill Samantha Burns.  They said what are you going to do then?  After they told me this, I felt I had no choice but to testify.

*Id.* ¶ 8.

Exacerbating the situation, once Ms. McGuffin had agreed to testify she was rewarded with favorable treatment during her incarceration for a probation violation.  She and Stacy

Workman[5] were moved from state to federal prison and kept in protective custody, away from the dangers of general population. *Id.* ¶ 9. The women were specifically informed that their statuses as witnesses for the government kept them there. *Id.* Moreover, FBI agents would regularly visit them in federal prison, *remove them from the prison and take them out to lunch.* *Id.* ¶¶ 11-12. Ms. McGuffin describes one particularly memorable visit:

> One day when we were in federal prison before we testified in Chad's trial, Agent Bruning came and took us out for a picnic. After he took us out of prison, he bought us some fast food, drove us to an FBI building and he spread a blanket on the ground outside. He even took our handcuffs off so that we would be more comfortable. That was the best day I'd had in all the time I was locked up.

*Id.* ¶ 12.

It is thus apparent that Ms. McGuffin had significant motivation to alter her testimony in order to meet the needs of the government. Mr. Fulks' due process rights were violated both by the agents' conduct and by the government's failure to disclose this information.

**Amber Fowler.** Amber Fowler, another government witness, has revealed that Agent Bruning paid her off in a thinly-veiled attempt to influence her testimony. Declaration of Amber Fowler (Exhibit O). Ms. Fowler spent a week in a Columbia, South Carolina hotel waiting to be called to the stand. Fowler Dec. ¶¶ 2-3. On Friday, Agent Bruning summoned her to the lobby to tell her that she would not be called to the stand until the following Monday. *Id.* ¶ 4. During that conversation, Agent Bruning gave Ms. Fowler $400 in cash—far more than necessary to purchase the few items of clothing she had said she needed in order to avoid traveling back to West Virginia for the weekend. *Id.* Immediately thereafter, Agent Bruning took Ms. Fowler to a more secluded place in the lobby and informed her that she "had to show some emotion" to the

---

[5] Ms. Workman was with Ms. McGuffin when Mr. Fulks visited Ms. McGuffin during the events of November 2002.

jury. *Id.* ¶ 5. Agent Bruning instructed her that she "didn't have to cry like Tammy Faye Baker" but she had to be emotional when she testified. *Id.* Although Agent Bruning did not specifically say that he was paying her to add more emotion to her testimony, the proximity of the payment to his instructions made it clear that these were his intentions.

### B.      Materiality

The prosecution's failure to disclose favorable information violates due process when "the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (internal quotation marks omitted).

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* at 434 (quoting *Bagley*, 473 U.S. at 678). Further, this Court should not evaluate the evidence item-by-item, but in terms of its cumulative effect on the fairness of the trial. *Id.* at 436.

Ms. Evans, Ms. Severance, Ms. McGuffin, and Ms. Fowler all provided important testimony in the government's case. Ms. Evans and Ms. Fowler provided damaging aggravating testimony of Mr. Fulks' abusive conduct, while Ms. Severance and Ms. McGuffin provided incriminating factual testimony of the time period in question. Mr. Fulks' ability to discredit these witnesses was thus vital to the success of his defense.

The extent of the incentives is also relevant to the materiality analysis. Of particular note, Ms. Evans was originally charged with receiving stolen property and with Complicity to

Criminal Abuse in the First Degree—a Class C felony with a statutory maximum of 10 years. Exhibit R at 15; Ky. Rev. Stat. Ann. § 502.020 (criminal complicity); *id.* § 508.100 (criminal abuse); *id.* § 532.060(2)(c) (sentencing). Ms. Evans admitted to participating in countless other crimes for which she was never charged. Ms. Evans ultimately pleaded guilty to a misdemeanor—wanton endangerment—and she was sentenced to probation, which was eventually reduced to inactive probation. Moreover, at the time she testified, FBI agents had informed her that they had control over whether her probation would be revoked and that she would go to prison for fifteen years if she failed to cooperate with them. Similarly, Ms. Severance faced a charge punishable by up to 3 years in prison and admitted to multiple acts of credit card fraud, but she escaped with no additional charges and 18 months of probation. Moreover, as she disclosed to Ms. Oswalt, she lied to the FBI and perjured herself to obtain this deal. Ms. Severance changed her testimony to Mr. Fulks' detriment because of her arrangement with the FBI.

Ms. McGuffin faced constant, prolonged pressure from the West Virginia FBI, which had convinced her that she was moments away from being arrested for a capital crime. This pressure was coupled with the South Carolina FBI assuring her that the West Virginia FBI would believe that she was guilty of murder if she did not cooperate testify against Mr. Fulks. After Ms. McGuffin had agreed to cooperate, her time in prison was ameliorated by being placed in federal protective custody and receiving impromptu lunches arranged by the FBI. Ms. Fowler faced no charges, so Agent Bruning just gave her cash.

These attempts to manipulate the testimony of key witnesses clearly constitute material, favorable information that should have been disclosed to Mr. Fulks prior to trial.

# CONCLUSION

For the reasons stated, Mr. Fulks respectfully asks this Court to amend its Order and Judgment and vacate his death sentence, or order further evidentiary proceedings.

s/Kirsten E. Small
_____
Kirsten E. Small, Fed ID No. 10005
NEXSEN PRUET, LLC
55 East Camperdown Way (29601)
Post Office Drawer 10648
Greenville, SC  29603-0648
Phone: 864.370.2211
KSmall@nexsenpruet.com


s/Billy H. Nolas
_____
Billy H. Nolas, *pro hac vice*
Federal Community Defender Office
Capital Habeas Unit
Suite 545 West
Curtis Center
Philadelphia, PA 19106
Phone: 215.926.0520
billy_nolas@fd.org

Attorneys for Petitioner
Chadrick E. Fulks

September 17, 2010
Greenville, South Carolina