**Declaration of Lesley Coggiola, Esq.**
**Pursuant to 28 U.S.C. §1746**

I, Lesley Coggiola, being of full age, do hereby declare the following:

1.      I am an attorney practicing in South Carolina and have been licensed to practice since 1988. I was trial counsel in State v. Lino Delacruz, a capital murder case that commenced in Richland County, South Carolina in the late 1990's and went to trial in the early 2000's. After a jury trial, Mr. Delacruz was found guilty of murder, but acquitted of the sexual assault charges that accompanied the murder charge. After the penalty phase presentation, the jury sentenced Mr. Delacruz to life imprisonment and declined to impose a death sentence. Because of the favorable outcome at trial, no appeal was ever taken in this case. Thus, no transcript was ever prepared. However, I recall the trial and the events surrounding it fairly well.

2.      I graduated from the University of South Carolina School of Law in 1988. From 1989 to 2003, with the exception of 7 months spent in private practice, my practice consisted entirely of indigent criminal defense. During that time, I alternated between trial practice at the Richland County Public Defender's Office in South Carolina and appellate practice at South Carolina's Office of Appellate Defense. I spent approximately 9 years as a trial attorney. From 1998 to 2003, I was the Chief Public Defender for Richland County. From 2003 to 2007, I was the Chief Staff Attorney for the South Carolina Court of Appeals. I am currently Disciplinary Counsel for the Supreme Court of South Carolina. I have held my current position since 2007.

3.      Since 2004, I have been an adjunct professor at the University of South Carolina Law School, where I teach Criminal Trial Practice, a trial advocacy course that focuses on criminal cases. I have spoken at 20-30 conferences that focus on the practice of criminal defense law. I also co-authored the revision of The Criminal Law of South Carolina, 5th Edition.

4.    Upon being charged, Mr. Delacruz' case was assigned to the Richland County Public Defender's Office. I was the Chief Public Defender for Richland County at that time. Prior to trying Mr. Delacruz' case, I had tried approximately 25 jury trials. These 25 jury trials included 2 capital homicide trials and approximately 4 or 5 non-capital homicide trials. As the Chief Public Defender for Richland County, I supervised every attorney at the Richland County Public Defender's Office, including those handling capital homicide cases.

5.    John Delgado, a private practitioner, was appointed to represent Mr. Delacruz as well.

6.    At the time of Mr. Delacruz' trial, Mr. Delgado and I were both certified to be lead counsel in a capital trial. Pursuant to Rule 421 of the South Carolina Appellate Court Rules, certification can only be granted to an attorney who has been licensed for five years and has at least three years of experience in the actual trial of felony cases.

7.    Although neither Mr. Delgado nor I was designated as the lead attorney, Mr. Delgado functioned as the lead counsel in Mr. Delacruz' case.

8.    At some point prior to trial, Mr. Delgado and I contacted John Blume and asked him to assist us in the aspects of Mr. Delacruz' case that related to Mr. Delacruz' mental health and medical issues. I do not recall exactly when we contacted Mr. Blume, but I believe it was late in our trial preparation.

9.    As trial counsel, I was, of course, present for all portions of the voir dire, the guilt-innocence phase and the penalty phase.

10.   Prior to trial, Mr. Delgado and I hired a jury consultant to compile a juror questionnaire which we then submitted to the court. The trial court revised it and had potential jurors complete it prior to voir dire. Mr. Blume played no role in generating it. He similarly

played no role in developing the questions that were asked during individual voir dire.

11.     Mr. Delgado and I examined the potential jurors during jury selection. We alternated, meaning that he would question one potential juror and I would question the next. Our follow-up questions were based on the potential jurors' responses to the questionnaires. I cannot categorically state that Mr. Blume did not question any potential jurors, but I certainly do not remember Mr. Blume conducting any examinations during voir dire. If Mr. Blume did question any potential jurors, he questioned very few of them.

12.     Mr. Delacruz' trial lasted at least 14 days. This period of time included jury selection, the guilt-innocence phase and the penalty phase. Mr. Delgado and I examined the vast majority of the witnesses during the guilt-innocence phase of the trial. Mr. Blume's main contribution during the trial was the presentation of two expert witnesses relating to Mr. Delacruz' neurological, medical and mental health issues: a forensic psychiatrist and a neurologist. I do not specifically remember if Mr. Blume presented these witnesses during the guilt-innocence phase or the penalty phase of the trial, but it would have been logical for him to have presented the psychiatrist during the guilt-innocence phase and the neurologist during the penalty phase. Aside from the experts, Mr. Blume may have cross-examined one or two of the prosecution's witnesses during the guilt-innocence phase of the trial.

13.     During my career as a criminal defense attorney, I have represented criminal defendants who, with my consent, agreed to cooperate with the prosecution and give statements to law enforcement. I would only permit this to occur if I had reached an agreement with the prosecutor that my client's statements would not be used against him in his own criminal matter. Additionally, I would only allow my client to cooperate if the prosecutor had offered some form of leniency to my client in exchange for his cooperation - whether it be a reduction in charges, a

reduction in sentence or a promise of leniency in the future. If there were no realistic possibility that a client of mine would garner leniency as a result of speaking to law enforcement, I would never allow such a discussion to take place.

14.     When I defended capital cases and when, as Chief Public Defender, I supervised attorneys who were defending capital cases, I would never allow a client to plead guilty without a plea agreement for a sentence that was less than death. Even in a case where the evidence of guilt is overwhelming and conviction is essentially assured, there are significant benefits for a capital defendant to contest guilt.

15.     Capital jurors may convict a defendant of capital murder, but still harbor residual doubt as to his guilt. This residual doubt, combined with other evidence of mitigation or on its own, can cause jurors to choose a life sentence. Put simply, a juror may be certain enough of guilt to convict a defendant, but not certain enough to want him executed.

16.     With these considerations in mind, I cannot imagine a situation where I would permit a capital client to plead guilty without a plea agreement to life.

17.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

*Lesley M. Coggiola*
Lesley Coggiola, Esq.

Dated: Sept. 10, 2010
Columbia, SC