**Declaration of Mary Lou Newberger, Federal Defender, State of West Virginia
Pursuant to 28 U.S.C. Sec. 1746**

I, Mary Lou Newberger, being of full age, make the following declaration:

1.     My name is Mary Lou Newberger. I have been the Federal Public Defender for the Southern District of West Virginia, having served as the Acting Federal Public Defender from the death of my predecessor in July 2000 until my appointment as Federal Public Defender in November, 2001. I had served as an Assistant Federal Public Defender for the 13 years prior to my appointment as Defender. By late spring of 2003 I had represented hundreds of clients in federal court, had tried many felony cases, had obtained not only acquittals, but judgment s of acquittal (in three cases) and dismissal for insufficiency of evidence *prior to trial* in one case.

2.     Chadrick Fulks was indicted for federal crimes in West Virginia in June 2003, including kidnapping and carjacking resulting in the death of nineteen year old Samantha Burns. Although I was formally appointed to represent Mr. Fulks in August 2003, and our office had gotten involved in the case months earlier as Mr. Fulks was arrested in November 2002.

3.     The United States Attorney's Office in West Virginia gave notice that it intended to seek a death sentence for Mr. Fulks. West Virginia does not have a state death penalty so there was no ready pool of experienced capital trial attorneys in West Virginia. I, therefore, agreed to undertake Mr. Fulks' representation as second chair, along with John Blume, the lawyer appointed as head counsel in Mr. Fulks' South Carolina case, serving in that same capacity in the Southern District of West Virginia. It was clear from an early stage in the proceedings that the case would be tried in South Carolina and that, therefore, the West Virginia team would serve in a more limited capacity than the team operating out of South Carolina.

4.     According to my time records, I had my first phone conversation with Mr. Blume

on June 13, , 2003. My office joined the South Carolina team in the already on-going investigation of the criminal episodes alleged to have occurred in the State of West Virginia, including the alleged abduction and disappearance of Samantha Burns. Since Mr. Fulks had been raised in West Virginia, much of the evidence, and any number of potential mitigation witnesses, were located in West Virginia.

5.     From the beginning, I had some serious concerns about the approach Mr. Blume was taking in this case. Because he was such an experienced capital habeas attorney, I assumed he would have at least a mental checklist of things to do and classic mistakes not to make . That, however, was not my experience with Mr. Blume.

6.     First and foremost, I was appalled that Mr. Blume arranged to have Mr. Fulks speak to law enforcement without the protection of a proffer agreement and/or without the benefit of a plea agreement containing an immunity provision, or without at least stating at the beginning of the session that the discussions were pursuant to Fed. R. Crim. P.11(f). As a federal trial attorney, I am very familiar with the process of having clients proffer information to federal authorities. Indeed, as a federal defender, a substantial portion of my practice involves representing clients who are or are considering cooperating with law enforcement. With now more than 21 years of federal practice, I have represented more clients in this situation than I can even estimate. I have no objections to having a client provide information to law enforcement, and in many cases, I encourage such cooperation, so long as the client is protected and obtains a significant benefit. Mr. Blume, however, allowed Mr. Fulks to give his statements in South Carolina and West Virginia with neither protection nor a promise of benefit. In federal practice, it is so unheard of to not, *at the very least,* invoke the protections of Fed. R. Crim. P. 11(f) (and thereby the protections of Fed. R. Evid. 410) , that I cannot think of any situation in which Mr.

Blume's actions could be considered anything other than ineffective assistance of counsel. There could be no strategic reason for leaving Mr. Fulks totally vulnerable to the use of his counseled, non-immunized statement to law enforcement.

7.    There were a number of reasons I thought Mr. Blume's proposed course of action was unreasonable under these particular circumstances. Mr. Fulks was arrested in late November 2002, and gave the first of his two unprotected statements in South Carolina in April 2003, just five months later. Mr. Fulks gave his statement in West Virginia in early September 2003. Trial attorneys, including me, will on occasion advise their clients to proffer information to law enforcement early in an investigation if that will enable the client to be the first of the co-defendants to offer such information and increase the likelihood of obtaining a favorable plea agreement. This strategy does not, however, preclude counsel from utilizing the Rule 11/Rule 410 protections.

8.    That was not the situation here, however. Mr. Fulks' co-defendant, Brandon Basham, had already spoken to the FBI shortly after he was arrested, which was several months before Mr. Fulks made his statements in South Carolina and West Virginia.

9.    Since time was not of the essence, having Mr. Fulks provide statements so long before trial, without benefit of a plea or proffer agreement, could only work to his serious disadvantage. We were still far from completing our investigation of this extensive criminal episode which spanned 17 days and six states. Nor did we yet have all of the discovery we were likely to get from the Government. Thus, we did not yet have enough facts to decide what Mr. Fulks' best avenue of defense was. By having Mr. Fulks make his statements to law enforcement, Mr. Blume was locking us into only those theories that Mr. Fulks' statements supported and setting up a disaster if any part of Mr. Fulks' statement wound up being

inconsistent with facts uncovered in the investigation. Moreover, we had been locked in without Mr. Fulks getting anything of value in exchange.

10.     Mr. Fulks' statements provided the Government with a complete blueprint of "facts" the defense intended to put forward at trial. As a result, the Government was able to spend the next year finding ways to give the lie to every statement Mr. Fulks made, particularly any statement that appeared to paint Mr. Fulks in a more sympathetic or less culpable light than his co-defendant. In fact, this is what happened the day after Mr. Fulks gave his statement in September 2003 regarding the abduction of Samantha Burns. He described in detail certain physical locations and events that occurred. Subsequent to the interview session with law enforcement, officers and members of the defense team, including me, traveled to those locations looking for the body of Samantha Burns. Investigators found nothing that corroborated Mr. Fulks' statements that morning.

11.     Equally problematic, we had no reason yet to know how good an historian Mr. Fulks was about this seventeen-day period. We did know that Mr. Fulks had used a substantial amount of drugs during that period, including alcohol, marijuana and methamphetamine. His drug use alone was likely to have affected his memory of events even if he had no mental impairments, and we did not yet know anything about his mental condition. Further, at the time Mr. Fulks made his statements, we had not yet interviewed an important potential witness who had been with Mr. Fulks and Mr. Basham during at least some part of those 17 days. We did not know whether and to what extent she would corroborate his drug use and his mental health during those days.

12.     Over my years of practice as a criminal defense attorney, I have represented clients who suffered from mental illnesses as well as clients who were under the influence of

drugs or alcohol during the commission of a crime. In my experience, many of these clients make good faith efforts to recount the events surrounding their cases accurately but are unable to provide a reliable history because of their drug use or otherwise altered perceptions. This was a significant risk with Mr. Fulks, as well.

13. It was my opinion, and one I expressed to Mr. Blume, that we should not allow Mr. Fulks to be questioned by law enforcement with no protections, or at least wait to make the decision to do this until we knew more. Mr. Blume did not leave me with the impression that he was taking my advice seriously or giving it due regard. He was rather dismissive of my opinions.

15. A second point of departure between me and Mr. Blume was my inability to convince him to view the locations at which various activities had taken place during the time Mr. Fulks and Mr. Basham were in West Virginia and nearby environs. This could have been accomplished in just a few hours.

16. At an early stage in the investigation, investigators from my office and South Carolina and I drove to locations around West Virginia and neighboring states we believed to have been the sites of Mr. Fulks' and Mr. Basham's travels. It has been my experience as a trial attorney that viewing locations relevant to a case greatly enhances an attorney's ability to be effective in court. As a trial attorney, I have always found great value to having an exact mental picture of relevant places in a case. A witness, for example, is much less confident lying to a lawyer on cross-examination when the lawyer can incorporate exact details from a location into his or her questions.

17. In this case, however, there was additional reason for Mr. Blume to view these places with his own eyes. Mr. Fulks grew up in the area of West Virginia where these events allegedly occurred. Mr. Basham was not from West Virginia and would not have had knowledge

of the state's roads and landmarks. West Virginia FBI agents and other local West Virginia law enforcement personnel who undoubtedly knew this area well were involved in the investigation of the case. Mr. Blume was not from West Virginia, nor was he familiar with the roads and the terrain.

18. I believed the remoteness of some of the locations and the relationship of some of the relevant locations in this case to each other and to Mr. Fulks' childhood homes provided a framework for evaluating the information that Mr. Fulks had provided to law enforcement and other information provided confidentially to his counsel. It was also likely to affect how prosecutors and ultimately a jury would view Mr. Fulks' role in the crime. At the very least, I believed that learning the lay of the land was a critical piece of the investigation and necessary to developing a reasonable trial strategy, given the facts of this case.

19. In particular, I was aware that Mr. Blume was planning to argue that a significant factor in mitigation was that Mr. Fulks was a follower and that Brandon Basham had orchestrated the entire crime. This notion was seriously undercut by the knowledge that someone would have had to have of backroads, routes, and other relevant locations the pair had traveled in West Virginia. Under the circumstances, I thought Mr. Blume's portrayal of Mr. Fulks as the hapless follower was unconvincing and unreasonable. Even if Mr. Blume thought it was the best strategy to place all blame for the prison break, kidnappings and murders on Mr. Basham, he needed to account for the significant role Mr. Fulks clearly had to have played in choosing where he and Basham went in West Virginia. A failure to do this could only result in a complete loss of credibility, given the evidence in this case.

20. Nevertheless, I could not convince Mr. Blume to see these locations firsthand.

6

21.     I was shocked at Mr. Blume's decision to plead Mr. Fulks guilty to all of these crimes with no promise of benefit. The jury is a proxy for the community. As someone who has tried many serious felony cases to juries, albeit at that time not capital juries, it seemed to me a jury, hearing the facts of the crimes Mr. Fulks was charged with, would need an outlet to express its anger. Faced with only the choice between sentencing Mr. Fulks to life or to death, the only way a jury could do this was to vote for death. Based on my experience with juries, a vote for life would have been viewed by the Fulks jury as an act of leniency.

22.     By contrast, had a jury been able to express its outrage by finding Mr. Fulks guilty of these crimes, one or more jurors might have been able to extend a measure of sympathy and vote for a life sentence after hearing about Mr. Fulks' truly chaotic upbringing and emotionally deprived childhood or based on a belief that he was not the person who physically caused the death of either victim. In fact, in the spring of 2007, I tried a capital case in the Southern District of West Virginia, again sitting as second chair. Prior to and during trial of the guilt/innocence phase, including jury selection, co-counsel and I, the attorneys for the co-defendant, and the jury consultants for each defendant, discussed this phenomenon extensively. It was a factor we considered during jury selection: who might insist on a life verdict in the penalty phase in exchange for a guilty verdict in the guilt/innocence phase.

23.     I declare under penalty of perjury that the foegoing is true and correct, pursuant to 28 U.S.C. § 1746.

September 16, 2010
Charleston, West Virginia

Mary Lou Newberger