## DECLARATION OF HENDERSON HILL

I, Henderson Hill, declare under penalty of perjury that the following is true:

### *Background of Declarant*

1. I am an attorney licensed to practice in North Carolina and Washington, D.C. I have been continuously engaged in the practice of law, focusing on criminal litigation and appeals, for almost thirty years. I am admitted to the bars of the United States Supreme Court, the Courts of Appeals for the Fourth Circuit and the District of Columbia, and the District Courts for the District of Columbia and the Eastern, Middle and Western Districts of North Carolina.

2. I received my Bachelor of Arts degree from Lehman College, City University of New York in 1977. I then received my J.D. from Harvard Law School in 1981.

3. Following law school, I joined the office of the Public Defender Service for the District of Columbia. I remained there for almost ten years as trial lawyer, deputy chief of the appellate division, special litigation counsel, and training chief of the 50-plus lawyer office.

4. In 1991, I became the director of the North Carolina Resource Center, a state agency that provided defense litigation support for death penalty trials in North Carolina and served as North Carolina's federal capital post-conviction defender organization.

5. In 1995, I helped found the Center for Death Penalty Litigation ("CDPL"), a non-profit trial and post-conviction support office for capital litigators in North Carolina. I currently am on CDPL's Board of Directors.

6. In 1996, I joined the law firm of Ferguson Stein Chambers Gresham & Sumter, P.A., in Charlotte, North Carolina. At the firm, I have continued my criminal defense practice and I additionally practice in the areas of civil rights, medical malpractice, and personal injury litigation.

1

7.    For twenty years, I have been a presenter or program chair for Continuing Legal Education programs related to trial advocacy and death penalty litigation throughout the United States. I was a regular faculty member of the trial advocacy program at Harvard Law School (1986-90) and an adjunct assistant professor at UNC-Chapel Hill (1991-97). I have served as a faculty member in trial advocacy programs across the country, including the National Criminal Defense College in Macon, Georgia, and programs sponsored by the National Institute of Trial Advocacy, the New York State Defender Association, and the Bryan R. Schechmeister Death Penalty College at Santa Clara University. In 1998, I served as a Lecturer at Duke Law School, where I taught a seminar on the death penalty. In 2007, I was the keynote speaker at the NAACP-Legal Defense & Education Fund's annual death penalty conference at The Airlie Center in Virginia. I have been recognized for both my trial practice and work in the area of capital litigation. For example, I have been inducted into the American College of Trial Lawyers, and in 2008, I was awarded the Outstanding Legal Service Award by the National Coalition to Abolish the Death Penalty.

8.    In my nearly thirty years of law practice, I have tried scores felony cases to juries, including homicide and capital cases. Additionally, I have tried more than a handful of significant civil jury trials.

9.    In addition to trying capital cases, I have also advised other defense lawyers defending capital cases. From 1991 until 2006, I would consult with, on average, three or four trial teams per week on other capital cases on which I was not counsel. At times during this period, North Carolina had approximately sixty or more capital trials per year. I would consult on the vast majority of all capital cases in North Carolina during that period, and on virtually all cases that actually went to trial. This consultation would include all phases of the capital trials,

2

from pre-trial consultations, to assisting in developing expert and lay witnesses, to consultation during trial. I estimate that I have consulted on at least several hundred capital cases over the years. During this same time period, I also was involved in the capital post-conviction process, both in selecting counsel for post-conviction proceedings and in consultating with post-conviction counsel.

10.     Since late 2008, I have served on the Commission on Indigent Defender Services, which is responsible for the provision of indigent services for all criminal cases in North Carolina. The Commission sets and monitors performance standards for appointed attorneys and defender agencies.

11.     I was also a member of the American Bar Association Advisory Committee on the Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.

### *Purpose of this Declaration*

12.     I submit this declaration in conjunction with a Motion to Alter or Amend Judgment, being filed pursuant to Rule 59 of the Fed.R.Civ.P. in the matter of *United States v. Fulks*, Case No. 4:02-992-JFA (D. S.C.). I was asked to provide my views on three specific issues which I discuss in this declaration: (1) trial counsel's decision not to exercise peremptory strikes against certain jurors counsel believed to be so biased in favor of the death penalty as to be excusable for cause; (2) trial counsel's decision to have Mr. Fulks make a statement to authorities without the benefit of a proffer agreement; and (3) trial counsel's subsequent decision to have Mr. Fulks enter a guilty plea, foregoing guilt-phase proceedings, without the benefit of a plea agreement. I have reviewed numerous materials in drafting this declaration.

3

***Trial Counsel's Decision not to Exercise Peremptory Strikes Against Certain Jurors***

13.     It is my understanding from reviewing the 2255 Motion and the hearing transcript that, during the course of jury selection, counsel identified three jurors whom they believed were so biased in favor of the death penalty that those jurors should be excused for cause.  It is my further understanding that after the trial court denied those challenges for cause, trial counsel did not exercise peremptory challenges to strike those jurors from serving on Mr. Fulks's capital sentencing jury.  In his hearing testimony, lead trial counsel John Blume explained that, although he still had peremptory challenges available, he left these jurors on the jury so he could challenge on appeal the trial court's refusal to dismiss these jurors for cause.  It is my opinion that trial counsel's failure to exercise peremptory challenges against those jurors was unreasonable, constituted deficient performance, and fell below the standard of care in a capital case.

14.     Where, as here, the defendant has pled guilty and the trial will address only the issue of punishment, the overriding goal for defense counsel can only be to avoid a death sentence.  Given the jury's role in determining the sentence to be imposed, voir dire is always a critical stage in a capital trial.  Failure to identify and remove jurors who have a strong bias in favor of the death penalty, or who seem unable to understand, or unwilling to consider, the role of mitigating evidence in determining an appropriate sentence, will almost certainly result in a death sentence.  Not only are such strongly biased individuals virtually certain to vote for death, in my experience, they are also jurors who exert great pressure during jury deliberations on less certain jurors.  In this case, where the only issue to be determined was whether to impose life or death, jury selection was perhaps *the* most critical stage of trial.

15.     Jury selection in any criminal case can be a complex process that requires not just knowledge of the rules and theoretical principles, but also experience and practice.  Jury

selections is vastly more difficult in the context of a capital case, where it is critical to assess a venireperson's attitudes toward the death penalty and ability to understand the value of, and be willing to consider, mitigating evidence. Competent capital trial counsel must be adept at eliciting from potential jurors accurate information about those jurors' views on the death penalty, must be able to identify those potential jurors who are so biased in favor of the death penalty that they are likely to automatically vote for the death penalty if the client is found guilty of the offense, and must also be able to identify jurors who are likely to be unwilling to consider, or unable to understand, the purpose and role of mitigation evidence in determining the appropriate sentence.

16.    If such an impaired or biased venireperson is identified during the course of voir dire, the first course of action for competent capital counsel is to move to have that venireperson excused for cause. To his credit, Mr. Blume did this with the three jurors in question. However, if the for-cause challenge is denied by the trial court, counsel must then exercise a peremptory challenge, if one is available, to strike that impaired or biased venireperson from serving on the jury. Mr. Blume failed to do this. (Even if counsel has no more peremptory challenges available, counsel can and should ask to be given additional peremptory challenges so as to do everything possible to get a jury that is not skewed towards death.) Trial counsel's failure in this case to strike these jurors, all of whom were clearly identified by trial counsel as impaired or biased and almost certain to impose death, was objectively unreasonable. That trial counsel determined that these three jurors were so biased as to be worthy of for-cause challenges clearly highlights the unreasonableness of trial counsel's decision not to strike them.

17.    In my opinion, the rationale put forth by trial counsel – that they were seeking to preserve this issue for appeal – is inexplicable and objectively unreasonable. Attorneys Blume

5

and Johnson's justifications for not using available peremptory strikes against these three jurors suggest an unreasonable focus on the intricacies of perfecting an appellate challenge which blinded them to their obligation to carry out the most critical task during capital voir dire: remove those venirepersons with a clear bias in favor of a death sentence. Trading the most important issue at trial—who will sit in judgment of the defendant—for a potential appellate argument cuts against fundamental trial strategy, particularly where the necessary predicate for the appellate argument would be a death sentence for the client. Moreover, trial counsel's stated reason for not exercising peremptory challenges against these jurors does not even make tactical sense from the standpoint of the relief that might later be possible on appeal; at best, a winning claim that the trial court erred by denying a for-cause challenge only would have resulted in a new sentencing proceeding, not an automatic life sentence. Thus, trial counsel were willing to risk receiving a death verdict merely to get another chance to do what counsel should have done in the first place: strike any biased jurors during voir dire. That decision was objectively unreasonable, constituted deficient performance, and fell below the standard of practice in a capital case.

18.     None of my personal or professional admiration for Mr. Blume changes my opinion that the aforementioned decisions during jury selection were unreasonable and constituted ineffective assistance of counsel. I have selected many juries, both capital and non-capital. I have also taught countless numbers of attorneys about jury selection strategies and technique. The fundamental issue presented to Mr. Fulks' trial team—whether to use available peremptory strikes against jurors whom the team firmly believe were impaired or biased—was straightforward and clear. The explanation given by trial counsel about why they did not use

those available strikes, instead opting for a misguided "appellate strategy," was as confusing as it was wrong.

### Trial Counsel's Decisions to Have Mr. Fulks Make a Statement to Authorities Without the Benefit of a Proffer Agreement and to Plead Guilty Without the Benefit of Plea Agreement

19. It is my understanding from reviewing the records that trial counsel arranged for Mr. Fulks to make pre-trial statements to law enforcement authorities regarding his involvement in the charged capital crimes without the benefit of a proffer agreement limiting the government's use of Mr. Fulks's statements at trial. It is also my understanding that trial counsel permitted Mr. Fulks to make these statements before completing their own investigation into the charged crimes, and before Mr. Fulks's mental health status was evaluated by defense experts. It is my opinion that trial counsel's decision to have Mr. Fulks make statements to authorities without the benefit of a proffer agreement, and before trial counsel had thoroughly investigated the facts themselves, and before having Mr. Fulks' mental health status evaluated, was unreasonable, constituted deficient performance, and fell below the standard of care in a capital case.

20. It is also my understanding that Mr. Fulks pled guilty to these crimes without any plea agreement in place. As a general matter, it is difficult to conceive of a situation in which it would be reasonable to have the client enter a guilty plea in capital case if the government will not agree to, in turn, take the death penalty off the table. Here, however, it was clearly unreasonable to forego a guilt phase proceeding in this capital case where the death penalty was still an option and where trial counsel could have presented compelling evidence concerning the defendant's *mens rea*, including that he suffered from brain damage.

### Statements to Law Enforcement

21.     In my experience, it is a standard practice of criminal defense lawyers, particularly in federal cases, not to allow the client to provide a statement to authorities unless there is a proffer agreement in place or without, at the very least, invoking the provisions of Fed.R.Evid. 410. Such proffer agreements typically state that any statements made by the client cannot be used against the client at a subsequent trial, except under very limited circumstances (for example, as impeachment material if the client subsequently testifies in a manner that is inconsistent with the statements made during the proffer session). The existence of a formal proffer agreement can thus allow counsel to explore the possibility of a plea agreement with the government, or an offer to cooperate, while at the same time minimizing the risk that the client's statements will be used against him or her.

22.     In my opinion, it is objectively unreasonable for capital trial counsel to advise their client to make a statement to authorities about the client's involvement in a capital crime without the benefit of a proffer agreement. Absent a proffer agreement, a client who makes a statement to the authorities is essentially making a confession without any conditions on its use by the authorities. There is no benefit to pursuing such a course of action, whereas there is an obvious disadvantage: the client is providing the authorities with highly damning evidence to prove an offense that carries with it the penalty of death. Thus, if the authorities will not agree to a proffer agreement, there is no objectively reasonable reason for competent capital trial counsel to advise their client to make a statement to the authorities about the client's involvement in the capital crimes.

23.     Obtaining a proffer agreement would not have been inconsistent with arguing to the jury that Mr. Fulks accepted his responsibility for the crime. Indeed, it is highly unlikely that

8

evidence of the existence of a proffer agreement would have been admissible, except under the very limited circumstances mentioned above regarding impeaching the client's testimony.

24.     Trial counsel's decision to have their client meet with law enforcement agents without a formal agreement and absent any other conditions that might inure to his benefit was also objectively unreasonable because at the time that Mr. Fulks made his statement to authorities, counsel had not undertaken the requisite reasonable investigations necessary to verify whether Mr. Fulks's account of the relevant events could even be corroborated. If the stated goal of proffering without an agreement was to demonstrate Mr. Fulks's sincere effort to cooperate and accept responsibility for his actions, such a goal would have obviously been significantly undermined if Mr. Fulks's statement could be proven to be false or otherwise shown to be lacking in credibility. Indeed, in circumstances where proffer agreements are in place, defense counsel must have reasonable confidence, based on independent investigation, that his or her client will proffer truthful information, since veracity of any proffer is a prerequisite to gaining any benefit.

25.     Not only did trial counsel have no way of independently verifying Mr. Fulks's statement given their own incomplete investigation, but trial counsel had several reasons to believe that Mr. Fulks was not in a position to provide accurate information at the time of the proffer session. First, Mr. Fulks had an extensive history of drug and alcohol abuse, including excessive substance abuse including his memory of the period of the charged crimes. Counsel acting competently would have realized that there was a high probability that such substance abuse likely could have impaired Mr. Fulks's ability to accurately perceive and recollect the events in question. Objectively reasonable counsel would not, under these circumstances, have allowed their client to make a statement to authorities without first ascertaining to what extent

Mr. Fulks's memory was impaired by his years of substance abuse, including during the period of the charged crimes.

26.     Second, competent capital trial counsel recognize that mental health issues are ubiquitous in death penalty cases, and therefore every capital client must be screened for potential neurological and psychiatric impairments.  (Indeed, Mr. Fulks's extensive history of substance abuse from an early age would have been a red flag for competent capital trial counsel, as such drug abuse is frequently the result of a client's attempt to self-medicate in the absence of proper mental health treatment.)  Such mental health concerns pervade every aspect of the case, not just the penalty phase mitigation investigation, as they implicate issues of competency to stand trial, *mens rea* at the guilt-phase, competency to waive constitutional rights, the ability to comprehend *Miranda* warnings, and more.  In this instance, the existence of any mental health impairments would have obviously impacted Mr. Fulks's ability to participate in a proffer session with authorities.

27.     Although not directly speaking to the issue of permitting a client to give an unprotected statement to law enforcement, Guideline 10.5 of the ABA Guidelines highlights just how unusual, damaging, and unreasonable this course of action was.  Guideline 10.5, which focuses on counsel's relationship with the client, directs that counsel "should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case[.]"  ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES, GUIDELINE 10.5 (2003).  The ABA Guidelines then provide a non-exhaustive list:

1.  the progress of and prospects for the factual investigation, and what assistance the client might provide to it;
2.  current or potential legal issues;
3.  the development of a defense theory;

4. presentation of the defense;
5. potential agreed-upon dispositions of the case;
6. litigation deadlines and the projected schedule of case-related events; and
7. relevant aspects of the client's relationship with correctional, parole, or governmental agents (*e.g.*, prison medical providers or state psychiatrists).

In the Commentary to Guideline 10.5, the need for counsel to learn about a client's mental illnesses or personality disorders so as to inform the important decisions identified in the guideline is described, in pertinent part, as follows:

> Many capital defendants are, in addition, severely impaired in ways that make effective communication difficult: they may have mental illnesses or personality disorders that make them highly distrustful or impair their reasoning and perception of reality; they may be mentally retarded or have other cognitive impairments that affect their judgment and understanding; they may be depressed and even suicidal; or they may be in complete denial in the face of overwhelming evidence. In fact, the prevalence of mental illness and impaired reasoning is so high in the capital defendant population that "it must be assumed that the client is emotionally and intellectually impaired."

28. Trial counsel's decision to have their client provide a highly damaging statement that was both incriminating and open to attack as incredible and self-serving flies in the face of the purpose of Guideline 10.5. Developing a relationship with a client is, in large measure, about gathering information that will ultimately have "a material impact" on critical aspects of a capital trial. The unprotected statement by the defendant, which was neither reasonably vetted or investigated by trial counsel, undermined "the progress of and prospects for the factual investigation," significantly impaired both "the development of a defense theory" and any future "presentation of the defense," and did nothing to effectuate any "potential agreed-upon dispositions of the case.

29. Moreover, and surprisingly, given Mr. Blume's extensive academic writing about the significant role that a defendant's mental health can play in a capital case, it is inexcusable

11

that the defendant was, in effect, assessed by law enforcement agents prior to any defense mental health expert (who may well have concluded that the defendant's ability to recall events or process questions was significantly impaired).

**Pleading Guilty**

30.     As with proffer agreements, in my experience, it is a standard practice of criminal defense lawyers not to allow the client to enter a guilty plea without a plea agreement in a capital case.

31.     If the government will not agree to a plea agreement in which death is taken off the table, it is difficult to conceive of a situation in which it would be advisable to have the client enter a guilty plea in a capital case rather than proceed to trial.  More critically, however, it is objectively unreasonable to forego a guilt-phase proceeding in a capital case when the death penalty is still an option where, as here, there is strong evidence that the defendant suffers from brain damage and/or other potential *mens rea* issues are present.  While there is no *per se* rule requiring a guilt phase in every capital case, there is a heavy default in favor of a guilt phase.  In this case, that presumptive rule should have been followed, and the failure to do so demonstrates counsel's ineffectiveness.

32.     Objectively reasonable trial counsel should use the two phases of the capital trial to give the jury an opportunity to pass judgment without the need to sentence the defendant to death.  Indeed, in my experience, if the determination regarding culpability and punishment is not clearly separated into two separate stages, there is a risk that the jury will conflate the two.  That is, if the jury is not given an opportunity to express its decision that the defendant is guilty as part of the guilt-phase proceedings, and is only asked to participate in the penalty phase proceedings, there is a significant risk that the jury will vote for death as a consequence of not

12

having an outlet to express its opinion that the defendant is guilty; otherwise, a life verdict might perhaps be viewed as "letting the defendant off," since there was no prior opportunity for the jury to convict the defendant.

33.     In this case, trial counsel attempted to convince the jury of Mr. Fulks's acceptance of responsibility, and a decision not to plead guilty certainly could have been consistent with that strategy.  In a case involving mental health issues, such as this one, trial counsel can use the guilt phase to educate the jury about brain impairments or other mental health issues, starting as early as voir dire.  Trial counsel could have established credibility by telling the jury that this is not a "whodunit" mystery, but rather an issue of *mens rea*, which would have given the jury an explanation for Mr. Fulks's involvement in the events for which he was being tried and given the jury an additional opportunity to consider his impairments in the context of his participation.

34.     It is my experience that it takes time to explain to a jury about brain damage and mental health issues, and that the guilt phase is the appropriate place to start with that discussion. Similarly, competent capital trial counsel would have used the guilt-phase proceedings to explore other issues that would have been relevant both to culpability and punishment, such as relative culpability (*i.e.*, whether the co-defendant was acting in a leadership role) and residual doubt. Such themes would have been consistent with the penalty-phase presentation.

35.     Based on my review of case materials, it appears that trial counsel could have, and should have, presented a guilt phase defense to these charges that addressed the defendant's mental health impairments and relative role in these crimes.  Failure to do so was unreasonable.

36.     Ironically, trial counsel's error in permitting the defendant to make an unprotected pretrial statement to law enforcement made their subsequent error in having him plead guilty more unreasonable.  The defendant's statement, problems and all, should have been addressed by

13

the defense during the guilt phase through the testimony concerning the defendant's mental health. I have had the experience of a client giving a confession to law enforcement *prior* to receiving representation, and then using that confession as support for my client's guilt phase defense, either because it was consistent with lesser or no culpability, or, more often, it was evidence of my client's mental health issues.

37.    These decisions, independently but especially taken together, were unsupportable. I believe that viewed separately or together, counsel's decisions were unreasonable, constituted deficient performance, and fell below the standard of care required in a capital case.

## **Conclusion**

38.    In the final analysis, a fundamental and overarching shortcoming in the Fulks case was the composition of the trial team. Capital cases need at least one experienced capital *trial* lawyer, with experience trying cases to juries. Here, there was no experienced capital trial lawyer. Mr. Blume, who took on the role of lead counsel, had significant postconviction and habeas litigation experience, but nothing close to equivalent capital trial experience. I have known Mr. Blume since 1991 and I have been generally familiar with the scope of his legal practice and was not aware of any prior lead counsel experience he had in capital trials. Substantial post-conviction and habeas experience does not equip one to be a competent lead counsel in a capital trial. Nor did any other member of the team have any experience as lead or even second chair capital trial experience. This inexperience may explain the unreasonable, strange and indefensible decisions made in the three areas I have been asked to consider.

In accordance with 28 U.S.C.A. § 1746, I declare that under penalty of perjury that the foregoing is true and accurate.

Henderson Hill, Esq.

Dated: September 16, 2010
Charlotte, North Carolina

15