## Declaration of Harry Krop, Ph.D.
## Pursuant to 28 U.S.C. Sec. 1746

**I, Harry Krop, being of full age, do hereby depose and declare as follows:**

1.      I previously submitted a pro bono Declaration to this Court, prepared for the purpose of explaining to the Court the necessity in a capital case for having an expert in the specific area of sexual abuse consult with counsel and evaluate the Defendant in a case where it is suspected that the Defendant may have been the victim of sexual abuse. A copy of my earlier declaration is attached hereto, along with a copy of my curriculum vita.

2.      It is my understanding that my earlier Declaration was submitted to assist the Court in understanding why Chadrick Fulks might not have disclosed to his trial counsel the nature and extent of the sexual abuse he suffered as a child and that Mr. Fulks' disclosure pattern was consistent with other victims of sexual abuse, particularly in cases wherein that abuse occurred on multiple occasions and/or was perpetrated by someone of the same sex and/or involved a close family member.

3.      It is also my understanding that my earlier Declaration was submitted by counsel in an effort to convince the Court of the benefit to this litigation of hiring a mental health professional with qualifications such as mine to interview Mr. Fulks, review relevant documents and gather information from family members and/or other individuals familiar with Mr. Fulks as a child.  In this way, counsel hoped to demonstrate to this Court that with certain suspected victims of sexual misconduct, it is necessary that a trained professional with an expertise in sexual abuse evaluate that individual, conduct a forensic analysis to determine the validity of the accounts of alleged sexual misconduct and, if determined to be valid, to explain the ramifications of such abuse on the development of the victim's personality and future behavior patterns.

4.      In my earlier Declaration, I explained that my qualifications included not only interviewing suspected victims of child sexual abuse but also evaluating for the Florida court system perpetrators of child sexual abuse. I have also provided opinions regarding sexual abuse issues in Federal cases and Court Martial cases.

5.      My only involvement in this case prior to being contacted by counsel on August 30, 2010 was the preparation of a prior Declaration on February 2, 2010.  Counsel has now, however, provided for my review a number of documents, including trial

transcripts, Declarations from witnesses, Declarations from various mental health professionals, prepared in conjunction with these post-conviction proceedings, and the Fourth Circuit's opinion on direct appeal in this case.

6.      In addition, I have now evaluated Mr. Fulks, having conducted an in-depth interview on September 13, 2010 for approximately three and a half hours at USP-Terre Haute.

7.      I provide below a summary of facts upon which I have based the opinions with which I conclude this declaration.  Because of time constraints, the summary is not exhaustive of the facts I learned from the records and my interview with Mr. Fulks.  All of the opinions I express herein are made to a reasonable degree of psychological certainty.

8.      Although I provide more detailed conclusions following my discussion below of Mr. Fulks' sexual history, at the outset, let me summarize by saying that, in my thirty years of working with victims and perpetrators of sexual abuse (many of whom were themselves first victims), I do not recall ever having seen anyone who was sexually victimized as often and by so many different adults as Mr. Fulks was.  Having conducted a forensic analysis, I believe the reports of abuse to be valid and credible. Given the types of abuse Mr. Fulks suffered – including assaults by people in positions of authority, family members, adult men, perpetrators who threatened him if he "told," – and the response of disbelief or punishment he got from adults who should have protected him, I do not find it surprising that Mr. Fulks was reluctant to disclose this sexual abuse. However, the extent and the nature of the sexual assaults and misconduct that adults perpetrated on Mr. Fulks would, I believe, have appalled jurors, even without further explanation from experts.  I also believe that, had the psychological ramifications of this abuse been explained to a jury, the jury would have had a framework within which to understand Mr. Fulks' adult behavior towards women, including his sexually assaultive behavior, and his inability to form normal relationships.  Moreover, an expert could have explained that these behaviors were the natural, albeit horrific, consequence of the sexual assaults committed against Mr. Fulks as a child.

9.  Through my review of the records, declarations and my interview with Mr. Fulks, I have learned the following:

**<u>Legal Status</u>**

Chadrick Evan Fulks is a 32-year-old, white male under sentence of death.  He

pled guilty to the 2004 kidnapping and carjacking, resulting in death, of a middle-aged white woman named Alice Donovan in Myrtle Beach, South Carolina. Mr. Fulks committed these crimes with a co-defendant, Brandon Basham. Mr. Fulks has acknowledged that both he and Basham raped Ms. Donovan.

The Donovan incident occurred following Mr. Fulks' escape from prison with Basham and was part of the pair's seventeen-day flight across several states, during which Fulks and Basham carjacked and kidnapped another woman, 19-year-old Samantha Burns, in West Virginia, and committed multiple other crimes. Ms. Burns' body has never been found. During this seventeen day period, Mr. Fulks and Basham drank a substantial amount of alcohol and used drugs, including marijuana and methamphetamines.

Mr. Fulks consistently denies having killed either woman and denies knowing that either had been killed until Basham told him after the fact that he (Basham) had killed them both.

Mr. Fulks pled guilty to the charges of kidnapping and carjacking resulting in the death of Alice Donovan, and was sentenced to death after a penalty-phase proceeding in South Carolina. Mr. Fulks also pled guilty in West Virginia to the kidnapping and carjacking resulting in the death of Samantha Burns. In exchange for his plea in the Burns case, he received a sentence of life imprisonment without the possibility of parole.

## **Childhood History**

Chadrick Fulks is the son of Diane and Roger Fulks and the second youngest of their five children. His older siblings, from oldest to youngest, are Sherri, Dewayne, and Ronnie. Shannon Fulks is Chadrick's's younger brother. Dewayne Fulks committed suicide in 2009; he hanged himself in jail several days after being arrested for a domestic incident.

During Chadrick Fulks' childhood, Diane and Roger Fulks were both alcoholics who daily drank to excess and, while drunk, regularly became violent. While drunk, they frequently fought physically with each other and beat their children. Diane drank while she was pregnant with Chadrick and Ronnie, and perhaps the other children. The downstairs room of their house had a pool table in it and Roger had the walls of the room covered with all manner of sexually explicit pictures from magazines. Roger is reported to have had a large collection of pornographic videos, which he watched regularly with his children in the room.

This room was also the site of almost daily "parties" at which Diane, Roger and other adults would get drunk and use illegal drugs. The police were dispatched to the house on such a regular basis that the police radio would simply direct patrol cars to the "yellow house on the corner." While drunk, Diane on occasion would appear in front of the children with few or no clothes on and would pass out naked in the home. One declarant, a childhood friend of Dewayne Fulks, reports that a drunken Diane made sexual advances to him when he was a teenager.

Lack of food and chaos were constants in the Fulks' household. The house and the family have both been described by friends and neighbors as "gross" and dirty. Other than Chadrick, who became obsessively clean in his teenage years, none of the Fulks bathed regularly. Acquaintances report that the children always wore dirty, shabby, ill-fitting clothes. Diane and Roger frequently were in the front yard, screaming and yelling. Both parents frequently called Chadrick Fulks a son of a bitch and other similarly unsuitable names. Diane Rogers is reported to have thrown things at the children like flower pots and coffee pots and frequently to have hit them with these thrown objects.

Chadrick Fulks' parents were very poor and would spend the little money they had on alcohol, not food. As a result, Chadrick and his siblings spent much of their time scrounging for food from neighbors and friends. This has been confirmed by numerous people. Ronnie Fulks reports that older friends of their brother, Dewayne, taught Chadrick how to break into cars, and that Roger was pleased that Chadrick had that skill that was lucrative for the family. It has also been reported by a family friend that Diane and Roger Fulks would send Chadrick out to rob gas stations and restaurants to obtain food, drinks, and cigarettes. They would not let Chadrick return home until he got the goods they had sent him for.

When Chadrick was about twelve years old, his mother (unexpectedly and suddenly in the eyes of the rest of the family) became very religious. She went "cold turkey" and stopped drinking alcohol altogether, seemingly overnight. She started attending church for a large portion of every day. Several witnesses confirm Chadrick's comments that his mother became even less available to the children once she stopped drinking because she was never at home, choosing to spend her time at church instead. Chadrick's parents divorced shortly thereafter and the children split between the parents. Chadrick Fulks stayed with his mother. While people have generally attributed the break-up of the parents' marriage to Diane Fulks' new sobriety and change of outlook, Chadrick recently explained that he believes he caused the divorce, noting that his parents separated shortly after he told his mother about an episode of his father's infidelity.

Chadrick's mother began dating Dean Thompson not long after she and Roger divorced and married Dean when Chadrick was about fourteen. Diane moved with Dean, Chadrick and several of their siblings into a two-bedroom apartment in Chesapeake, Ohio. (Please see additional information about this under "Sexual History.") Chadrick frequently stayed away from home, preferring to be on the streets to being in the apartment.

Chadrick and his brother, Dewayne, each attempted suicide when they were teenagers. Dewayne set himself on fire and Chadrick took an overdose of pills. A counselor at the hospital to which Chadrick was taken recommended that Chadrick get psychological counseling. Diane took Chadrick to a single meeting with a counselor but never followed up after that. Chadrick was sent to live with his father for a period of time and saw a school counselor there but, again, there was no follow-up.

Chadrick was very close to his two older brothers, Dewayne and Ronnie, and spent a lot of time with them as a child. The three of them adopted a phrase, "True Soldiers For Life," to describe their loyalty to each other. (To this day, Chadrick's signature on letters is always followed by the initials, T.S.F.L.) Chadrick's childhood peers, older friends, and adults who knew Chadrick as a child describe him as being very quiet, and they often talk about their perceived need to protect him because he was often in the company of boys who were bigger and older than he was. This probably had something to do with the fact that Chadrick often spent time with his older brothers and their friends.

As noted in the sexual history below, Chadrick was introduced to sexual activity at a very young age and suffered sexual abuse at the hands of numerous adults. Several declarants, both family friends and neighbors with no particular attachment to the Fulks family, report seeing a marked change in Chadrick that they believe corresponds with sexual episodes from his childhood.

## Adult History

In general, Mr. Fulks' adulthood has been as chaotic as his childhood was. He has held jobs only briefly, he has been in trouble repeatedly with the law, he has supported himself largely through breaking into cars, and he has been involved repeatedly with drugs.

When Mr. Fulks was 18 years old he began a two-year marriage to Amber Fowler. During trial, Ms. Fowler testified that Mr. Fulks had physically abused her throughout their marriage. In 1995, one month before she married Mr. Fulks, Amber gave birth to a

son named Devon.  Devon died when he was five months old.  Mr. Fulks reports having been devastated by Devon's death and turning to drugs for relief from his emotional distress over the death.

Mr. Fulks had a series of relationships with women after his marriage to Ms. Fowler ended.  During this penalty-phase trial, several of these women testified for the prosecution that Mr. Fulks had physically and sexually abused them repeatedly throughout their relationships.

It is my understanding that Mr. Fulks has had several periods of incarceration for crimes involving drugs and various forms of theft.  In 2002, he was in prison in Indiana for relatively minor charges when he was told that he was about to be indicted for physically abusing Miles, the 9-year-old son of Veronica Evans, to whom he had been married for a few months.  Shortly after hearing about these new charges, which could have resulted in a substantial prison term, Mr. Fulks escaped from prison with Basham. The criminal episodes that culminated in the death of Samantha Burns and Alison Donovan followed this escape.

Dewayne Fulks committed suicide in July 2009.  Dewayne had always told Chadrick Fulks that he could never stand to be in jail again and would rather take his own life than be there.  Mr. Fulks tried to warn family members of this when he learned Dewayne had been arrested but was unable to reach them.  Dewayne hanged himself in his cell days after he was incarcerated.  Mr. Fulks became deeply depressed after learning of Dewayne's death.

## Sexual History

1.     Mr. Fulks provided a detailed sexual history wherein he described numerous scenarios of sexual abuse and/or inappropriate sexual conduct.  He had no formal sex education but prematurely learned about sex when he was about eight from an older teenage girl (Shelly Adkins).  Over the next year, this girl taught Mr. Fulks to engage in oral sex and other sexual acts on numerous occasions until she began dating boys her own age.  Mr. Fulks recalls being devastated when she "broke it off" and rejected him for boys her own age.

2.     Subsequent to this experience, Mr. Fulks describes other instances of sexual abuse involving a female teacher and an adult female neighbor, all during his prepubescent years.  As an adolescent, he represents that he was molested by an adult male who both fondled him and forced him to engage in sexual intercourse with a girl whom he considered to be a close friend.  In addition, he relates being manipulated into

engaging in sexual activity with his sister by an older female neighbor who also joined in the activity. Although he believes he was too drunk to fully appreciate the deviancy of this activity at the time, he maintains that he still feels "dirty" and guilt-ridden regarding his participation in the activity. Mr. Fulks contends that he was sexually abused by a close friend's father and reports that his stepfather repeatedly sexually abused him, unbeknownst to his mother, so that he felt compelled to move out of his mother's home.

3.      Mr. Fulks describes some of his earlier sexual experiences with attractive older females as enjoyable at the time, but in retrospect he recognizes that he was not sufficiently mature at the time to fully understand the inappropriateness of those encounters. He now recognizes how those encounters shaped and influenced his personality and future behavior patterns. Mr. Fulks appreciates the impact his sexual encounters (i.e., abuse) have had on his life. In this regard, he recognizes that his early sexual experiences led to his "sexual addiction" and his dysfunctional relationships as he felt a need to choose a "partner" who had a sexual appetite as strong as his own. Mr. Fulks described, in detail, an adult pattern of over-sexualized behavior involving frequenting strip clubs and excessive masturbation.

4.      Although I cannot verify that the sexual history provided by Mr. Fulks is entirely accurate, there is no evidence from the psychological/psychiatric evaluations I conducted that Mr. Fulks was malingering. In addition, Mr. Fulks demonstrated appropriate affect (including crying at times) while describing his sexual history, and his accounts contained both peripheral and contextual details consistent with a valid depiction of sexual abuse. I have also reviewed a number of Declarations from friends and neighbors of the Fulks family which corroborate or are otherwise consistent with many of the instances of sexual abuse Mr. Fulks himself has reported. A forensic analysis (i.e. a review of the totality of Mr. Fulks' reported history and collateral materials) strongly suggests that Mr. Fulks' allegations of sexual misconduct are credible.

5.      Although sexual abuse victims react differently to their experiences, research has shown that victims who are most traumatized or adversely affected by their abuse are those who experienced same sex activity (particularly males), those who were abused by familial perpetrators, and those who were not believed when they attempted to disclose the abuse. Based on the history provided by Mr. Fulks, he experienced all of these scenarios and was made to feel that he was to blame for the activity. Not only did Mr. Fulks not have a male role model who might be in a position to mitigate the potential detrimental sequence of his victimization, to the contrary, his father and stepfather contributed to his distorted perception of sexuality.

6.      As noted in my earlier (February, 2010) Declaration, many sexual abuse

victims, especially males, are hesitant to disclose their abusive activity and either never disclose, partially disclose or gradually disclose. During my evaluation, rapport was readily established, as Counsel had assured Mr. Fulks of my expertise.  Accordingly, he was able to explain the shame, humiliation, guilt and embarrassment he experienced related to the abuse.  He also described being manipulated by a perpetrator into believing he would not be believed if he reported the sexual activity or that he would be blamed for it.  Mr. Fulks was in fact disbelieved and essentially punished by his mother and stepfather when he reported having been molested by his friend's father. In this regard, his mother and stepfather refused to report the incident to the police and sent Mr. Fulks away from the family home for the summer to live with his grandparents.  Mr. Fulks also explained how difficult it has been for him to talk about his experiences unless he is comfortable with an individual.  He described the fact that people from his original defense team would ask him questions about sexual abuse over the phone, and that he was questioned by people he was meeting for the first time with whom he was ill at ease. He noted also that some interviewers seemed intent on eliciting instances of having been abused by his father or mother, and seemed uninterested in anything "less" than that. This made him highly wary of their intentions.  Consequently, he was reticent to disclose what he considered to be extremely shameful experiences that he still believes (as do many child victims of abuse) he was responsible for causing.

7.     In my extensive experience in working with sex abuse victims and sexual offenders (many of whom were victims themselves), I have come across very few, if any, who were victimized as frequently and by as many people as Mr. Fulks was.  I am of the opinion to a reasonable degree of psychological certainty that, given the nature and extent of his reported abuse, that these early experiences shaped and adversely impacted Mr. Fulks' personality and maladaptive behavior pattern.

8.     Even if one assumes a child might be able to cope with a single instance of sexual abuse, the extensiveness of Mr. Fulks' victimization likely left him feeling that he had no control over his own body and that no one respected the physical boundaries of his body.  His model of adult male behavior included a father who exposed him to sexual images, beat him during drunken rages and encouraged him to engage in thievery, beginning at a young age; a man who forced him to have intercourse with a young female friend so he could watch them; the father of a friend who attempted to force Mr. Fulks into performing oral sex on him and a stepfather who videotaped and fondled him when he thought Mr. Fulks was asleep.  His model of adult female behavior included a mother who, when drunk, threw objects at her children and tried to seduce a friend of her teenage son; a teenage girl who taught him (as a child) to perform sexual acts;  a school teacher who repeatedly molested him;  a married female neighbor who not only had intercourse with him when he was barely pubescent but who orchestrated a sexual encounter between

a drunk, teenage Mr. Fulks and his own older sister, who appears to have participated voluntarily in these activities.

9. The emotional development of any child subjected to this kind of modeling and abuse is bound to be arrested and the child's ability to engage in normal relationships terribly damaged. The emotional development of a child subjected to this kind of abuse who additionally finds no adult support from any source, lives in poverty, and is exposed to constant chaos as was true of Mr. Fulks, has virtually no chance of progressing or recovering.

10. It is my opinion, which I hold to a reasonable degree of psychological certainty, that the information related to Mr. Fulks' victimization was critical to an understanding of the full range of Mr. Fulks' mental and emotional states throughout his life and during the period of time he was on the run, when these crimes were committed. Neither a full psychiatric evaluation nor an accurate social history could be complete without access to the information that Mr. Fulks' sexual history provides.

11. It is my understanding that trial counsel had concerns that Mr. Fulks had suffered sexual abuse as a child given the various "red flags." Given the amount of easily accessed forensic literature that discusses the patterns of disclosure among victims of child sexual abuse, and the fact that experts in sexual abuse are generally well-known around the criminal justice system, it is extremely surprising to me that capital trial counsel did not seek the help or advice of a mental health expert in child sexual abuse during the investigative or trial stages of Mr. Fulks' case.

12. It is also likely that testimony by an expert in sexual abuse in this particular case could have countered several important arguments I understand the prosecution to have made during Mr. Fulks' trial, particularly witnesses who testified that Mr. Fulks manifested sexual violence towards women. I also understand that the prosecution ridiculed the suggestion by defense witnesses that Mr. Fulks very much wanted a family of his own, after having suffered emotional deprivation as a child. The prosecution responded, as I understand it, by suggesting that Mr. Fulks' siblings had grown up with similar deprivations but had not grown up to sexually abuse women or to commit crimes of violence. By fairly direct implication, this would have suggested to the jury that it was Mr. Fulks' own inborn miscreant tendencies that propelled him into his life a sexual violence against women, rather than a behavior pattern Mr. Fulks developed as the result of the extensive sexual assaults perpetrated upon him (and not his siblings) during childhood periods of great emotional and psychological vulnerability.

13. Evidence of the extent and nature of the sexual abuse Mr. Fulks had suffered

as a child would likely have been mitigating in and of itself.  Additional testimony explaining how such abuse interferes with a child's normal development could likely be considered powerful mitigating evidence.  It would have explained why Mr. Fulks was unable to form normal relationships with women and how his childhood was different from that of his brothers.  Thus, it would have explained why he was more psychologically prone to committing crimes of violence, particularly against women. Expert testimony about the way sexual abuse leaves a child feeling helpless and prevents a child from developing a sense that he can exert any control over people, except through the use of deceit or brute force, would also likely have helped the jury understand Mr. Fulks' criminal behavior as an outgrowth of the terrible wrongs people committed against him when he was a child.

I offer all of the opinions I have expressed in this Declaration, on the strength of my expertise as a psychologist who has spent over three decades working with victims of sex abuse and with sexual offenders. I offer all of the aforementioned opinions to a reasonable degree of psychological certainty.

I declare under penalty of perjury that the foregoing declaration is true and accurate to the best of my knowledge, information and belief.

September 16, 2010
Gainesville, Florida

Harry Krop, Ph.D.
Licensed Psychologist
FL License No.: PY0002364