**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **C/A No. 4:02-cr-992-JFA** |
| | ) | |
| **Respondent,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **MEMORANDUM IN OPPOSITION** |
| **CHADRICK E. FULKS,** | ) | **TO MOTION TO ALTER OR** |
| | ) | **AMEND JUDGMENT** |
| **Petitioner.** | ) | |
| _____ | ) | |

The United States opposes the motion to alter/amend judgment for the following reasons.

**I.      The first argument in support of the motion to alter or amend is without merit and based upon information that was readily available prior to this Court's judgment.**

Initially, Fulks argues that trial counsel John Blume, in his testimony during the evidentiary hearing on Fulks's § 2255 motion, "omitted critical information about his lack of jury trial experience."  Motion to Alter or Amend, at 3.  Fulks submits declarations from four attorneys, two of whom state that Blume's involvement in two capital trials was limited and all of whom opine that Blume committed strategic errors in Fulks's case.  This first argument should be rejected and the Court should strike all of these attorney declarations because Fulks has not shown that this information was unavailable at the time of the evidentiary hearing.

A.      Relief under Rule 59(e) may be based on new evidence only when the movant can show that the evidence was unavailable for the original hearing.

Rule 59(e) provides for amendment of an earlier judgment "to account for new evidence *not available at trial*[.]"  Hutchinson v. Staton, 994 F.2d 1076, 1081 (4th Cir. 1993) (emphasis

1

added).[1]  In considering a Rule 59(e) motion, "the court, of necessity, has some discretion to determine whether additional evidence should be considered or further argument heard." Zinkand v. Brown, 478 F.3d 634, 637 (4th Cir. 2007).  Even so, "[i]f the court elects to look at additional evidence represented as having been unavailable at the prior hearing, the court must satisfy itself as to the unavailability of the evidence and likewise examine the justification for its omission."  Id.; see also Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 197 (4th Cir. 2006) ("If relying on new evidence, 'a party must produce a legitimate justification for not presenting the evidence during the earlier proceeding.'" (citation omitted)).  "Zinkand presupposes as a threshold matter the determination that the reasons for noncompliance are compelling." Robinson v. Wix Filtration Corp., LLC, 599 F.3d 403, 410 n.9 (4th Cir. 2010).  It is thus improper to submit in support of a Rule 59(e) motion evidence that was readily available at the time of the initial hearing.  The attorney declarations here fall into this category because Fulks could have called these individuals to testify at the § 2255 evidentiary hearing.  See Yelton, 439 F.3d at 198 (rejecting Rule 59(e) motion based on affidavit where "all of the events alleged in the [] affidavit occurred *before* the district court entered summary judgment.  Thus, this evidence, to the extent it was evidence, was available at the time the district court ruled.").

    B.    <u>Fulks has not shown that Pardee and Coggiola were unavailable, and their declarations do not rebut any of Blume's testimony.</u>

Fulks contends that Blume's involvement in the cases of State v. Hunter and State v. Delacruz was "far less extensive than suggested by his testimony," given that Blume "was not counsel appointed to represent the defendant in court, nor was he lead trial counsel in either

---

[1]The "trial" relevant for Rule 59(e) purposes here is the civil evidentiary hearing on Fulks's § 2255 motion, not the underlying criminal trial.

case." Motion at 3. Fulks submits declarations from H. F. Pete Partee, the lead attorney appointed to represent Hunter, and Lesley Coggiola, an attorney appointed on behalf of Delacruz. Partee states that in Hunter's case (and in every capital case he handled) he consulted with Blume for his "expertise in death penalty law." Pardee Declaration, Docket Entry 1356-2, at 2. Partee notes that although Blume "was physically present in court . . . during the proceedings," he does not recall Blume "conducting any juror examinations," and any participation by Blume in witness examinations or argument to the jury was "minor." Id. Pardee concludes by stating that he never advised a defendant in a capital case "to plead guilty without a plea agreement for a life sentence." Id. Coggiola states that she and fellow counsel John Delgado recruited Blume in Delacruz to assist them with issues related to the defendant's "mental health and medical issues." Coggiola Declaration, Docket Entry 1356-3, at 2. Coggiola points out that Blume played no role in generating the juror questionnaire, questioned few or no potential jurors, and had limited involvement in questioning witnesses. Id. at 2-3. Finally, Coggiola states that she would never allow a capital defendant to give an unprotected statement to law enforcement or plead guilty "without a plea agreement for a sentence that was less than death." Id. at 3-4.

These declarations offer no evidence that was previously unavailable. Fulks could have called Pardee and Coggiola to testify at the § 2255 hearing. One of Fulks's main contentions at the hearing was that Blume had inadequate capital trial experience. Fulks could have consulted these attorneys prior to the hearing to obtain their accounts of the capital trials they conducted with Blume, and to learn their opinions about Blume's decisions in the Fulks trial; Fulks offers no explanation why he did not do so. See Moro v. Shell Oil Co., 91 F.3d 872, 876 (7th Cir. 1996) (rejecting appeal of district court's denial of Rule 59(e) motion where "[t]he plaintiffs

3

failed to offer any explanation at all as to why the information contained in the affidavits was not available to them when they opposed Shell's summary judgment motion.").

Moreover, the Pardee and Coggiola declarations do not rebut any of Blume's testimony. Blume never testified that he was appointed or lead counsel in Hunter or Delacruz, nor did he suggest that he played a key role in conducting voir dire or witness examination in those trials. At the § 2255 hearing, Government counsel asked Blume about the result of each capital trial in which he was involved. As to Hunter, Blume testified that he "was co-counsel in that case and it resulted in a life sentence." H'rg Tr. 02/22/10 at 1-123. As to Delacruz, Blume testified: "We conceded guilt on the murder . . . . We conceded that he did in fact commit the homicide, but contested . . . that he sexually assaulted the victim." Id. at 1-125. Blume then confirmed that Delacruz was acquitted of the sexual assault charge and sentenced to life. Id.

Everything Blume said about those two trials was true. Blume did not omit any information, as neither counsel asked him to provide details about his involvement in those trials. And this Court in its Order and Judgment did not place any special significance on those two trials in evaluating Blume's vast experience in capital cases. Accordingly, this Court should strike the Pardee and Coggiola declarations because they were available prior to the hearing and do not rebut any of Blume's testimony. Additionally, they provide no basis for this Court to alter or amend its judgment.

C.      Fulks has not shown that Newberger was unavailable, and her statements regarding Blume's failure to visit crime scenes are irrelevant.

In support of his first argument, Fulks submits the declaration of Mary Lou Newberger, Federal Public Defender for the Southern District of West Virginia and appointed co-counsel to

John Blume in Fulks's trial in the S.D.W.Va. Newberger details several supposed mistakes that she believes Blume made in representing Fulks. First, Newberger states that Blume should not have allowed Fulks to speak with law enforcement officers when his defense team was "still far from completing [their] investigation" and "did [not] yet have all of the discovery [they] were likely to get from the Government." Newberger Declaration, Docket Entry 1356-4, at 3. Second, Newberger states she tried unsuccessfully to convince Blume to see the West Virginia crime scenes firsthand, which she felt was important in assessing whether Brandon Basham could have been the leader of the activity there. Id. at 6. Third, Newberger states that Blume should not have allowed Fulks to plead guilty because it "seemed to [her]" that a guilt-phase trial would have allowed the jury to express their anger by returning a guilty verdict, making it more likely that they would show leniency during sentencing. Id. at 7.

None of these facts are new. Newberger possessed this information since the time of Fulks's guilty plea, and she could have provided this testimony at the evidentiary hearing. Because all of the events alleged in Newberger's declaration "occurred *before* the district court entered [its] judgment . . . this evidence, to the extent it was evidence, was available at the time the district court ruled." Yelton, 439 F.3d at 198. Moreover, Fulks never claimed in his initial or amended § 2255 motion that Blume was ineffective for failing to visit the crime scenes. Newberger's declaration on this point is irrelevant to any fact at issue, and Fulks's inclusion of these statements is an attempt to smuggle in an untimely claim. See Bannister v. Armontrout, 4 F.3d 1434, 1440 (8th Cir. 1993) ("A Rule 59(e) motion cannot be used to raise arguments which could, and should, have been made before the trial court entered final judgment."); Moro, 91 F.3d at 876 (noting that Rule 59(e) "certainly does not allow a party to introduce new evidence or

advance arguments that could and should have been presented to the district court prior to the judgment."). For these reasons, this Court should strike the Newberger declaration and reject any argument based upon this declaration..

D. The Hill declaration does not offer any "facts" at all other than Hill's opinion that Blume was ineffective, and in any event these "facts" were available to Fulks prior to the § 2255 evidentiary hearing.

Finally, Fulks submits the declaration of Henderson Hill, a defense attorney who offers his opinion that Blume erred in allowing Fulks to speak with law enforcement without a proffer agreement, advising Fulks to plead guilty without a plea agreement, and seating jurors he had unsuccessfully challenged for cause. Hill Declaration, Docket Entry 1356-5, at 3. Hill had no involvement in representing Fulks, and he does not claim to have any direct knowledge of the facts of this case. Instead, he bases his opinions on his review of the case materials and court records. Id. at 4, 7, 13.

In submitting the Hill declaration, Fulks merely offers the opinions of a defense attorney who thinks Blume was ineffective. Hill alleges no facts that are not already found in the court record. Fulks could have elicited Hill's opinions and attempted to call Hill as a witness at the § 2255 hearing. It is no answer to say that Hill's statements are "new" in the sense that they rebut Blume's testimony about why he made certain strategic decisions. No matter how many hearings a court has on the matter, a party will always be able to find someone who has reviewed the most recent transcripts and who thinks that the offered explanations for counsel's performance are insufficient. The Government moves to strike the Hill declaration because it offers no new evidence and is unhelpful in resolving any issue in dispute.

**II.      The second argument is without merit and based upon information that was readily available prior to this Court's judgment.**

In his second argument in support of his motion, Fulks complains that because the Court denied his motion for a continuance and for funding to hire experts to explore his childhood sexual abuse[2], he was unable "to develop the evidence necessary to prove trial counsel's ineffectiveness for failure to investigate and present evidence and expert testimony regarding the extensive sexual abuse Mr. Fulks suffered as a child." Fulks implies that had the Court granted appointment of the Philadelphia CHU as supplemental counsel, they would have been able to provide investigative staff and the funding to hire experts to explore his childhood sexual abuse.[3]

      A.      <u>Fulks' second argument in support of his motion to alter or amend does not satisfy the requirements of a Rule 59(e) motion.</u>

"Rule 59(e) motions can be successful in only three situations: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent a manifest injustice." <u>Zinkand v. Brown</u>, 478 F.3d at 637. Rule 59(e) gives the district court a chance to correct its own mistake if it believes one has been made. <u>Id.</u> However, Rule 59(e) does not "provide a vehicle for a party to undo its own procedural failures" and "to introduce new evidence or advance arguments that should have been presented to the district court prior to the judgment." <u>Moro v. Shell Oil Co.</u>, 91 F.3d at 876.

---

[2] The Government has no knowledge of this funding request, since it was made and reviewed *ex parte*.

[3] Fulks has failed to cite any authority to support his suggestion that the Court erred in denying his request for appointment of the Philadelphia CHU as supplemental counsel. Fulks was represented by two court-appointed counsel plus five pro bono attorneys, with impressive credentials, who played an active role in his § 2255 case. Thus, he had more legal assistance than statutorily required.

Fulks' second argument appears to rely on the second situation-- the discovery of new evidence not available at trial. Fulks claims that his motion "describes evidence that was not available to this Court when it rendered its decision . . . ." See Mot. to Alter or Amend, at p. 2 . However, he presents no new evidence unavailable at trial. All of the "evidence" he has submitted was either previously presented or was available to Fulks prior to his evidentiary hearing. For example, Fulks supports his claims of childhood sexual abuse with recently-acquired declarations by Lewis Lambert, Jr., Lewis Lambert, Sr., Kenneth Maynard, Oddie Starks, and Mike Kaasee. Mot. to Alter or Amend, at p. 6. The information was discovered or could have been discovered by § 2255 counsel during the approximately 29 months between appointment of habeas counsel and the § 2255 evidentiary hearing, just as Fulks acquired declarations from many other people prior to his hearing. Therefore, the declarations do not constitute new evidence not available at his § 2255 evidentiary hearing. See Fleming v. Olson, 1999 WL 33644526 (S.D.W.Va. July 7, 1999)(affidavits executed by co-conspirators almost two years after petitioner's conviction not new evidence; petitioner presented no plausible reason why affiants not called in defense if they would have testified as they attested to in their affidavits).

Further, the only sexual abuse claim the declarations of Maynard, Kaasee, and the Lamberts support is that Gary Kaasee attempted to sexually assault Fulks. Evidence that Fulks was sexually abused by an adult male was presented during his trial and in his § 2255 motion. During Fulks' § 2255 evidentiary hearing, habeas counsel asked John Blume if Make Kaasee's father had denied molesting Fulks, Evid. Hrng. Tr. at 2-61, so habeas counsel was obviously aware of the allegation. Fulks' habeas counsel also asked Blume if he had uncovered evidence that Fulks had been molested by his second grade teacher. Id. at 2-62. Clearly, habeas counsel

was informed of the allegations Fulks now attempts to classify as "new evidence."

Additionally, based on all of the information presented at Fulks' trial and § 2255 evidentiary hearing and in affidavits and motions, Fulks had not repressed the alleged incidents of sexual abuse. Oddie Starks' declaration states that Fulks told him that Kaasee had "tried to get him alone, pull his pants down and touch him" when Fulks was around 12 or 13 years old.[4] Declr. of Oddie Starks at ¶ 11. Starks also states: "When Chad was about 19 or 20 years old, he told me about a time several years earlier when his older sister Sherri and Rhonda had taken him into the Fulks' basement and Sherri and Rhonda both did sex stuff with him." Declr. of Oddie Starks at ¶ 10. According to Starks, an older girl "started being sexual" with Fulks when he was "real young," and an older woman who lived across the street from Fulks, "Rhonda Lahon," began having sex with him when he was "just a kid." Id. at ¶ 10. Evidence that Fulks was sexually abused by an adult female neighbor, "Rhonda Lawson," was presented during his trial and in his § 2255 motion. Thus, this information is neither new nor previously repressed.

Neither is the claim that Fulks' older sister sexually molested him new. Fulks' amended § 2255 motion claimed that he disclosed to Tracey Graybeal "a dark family secret: Petitioner's older sister had molested him when he was a small boy." (Amended Mot. to Vacate at 77.) Fulks supposedly revealed this information to Graybeal in 2007. (Aff. of Tracey Graybeal, Doc. 12, ¶ 7.) Thus, these alleged incidents of sexual abuse are not new and were not repressed.

Similarly, most of the sexual abuse information reported by Dr. Krop was discussed in Fulks' § 2255 Memorandum. Krop states that Fulks "prematurely learned about sex when he

---

[4] It is unclear from the affidavit when Fulks informed Starks of this incident, but, based on the preceding paragraph, it appears that Fulks would have been 19 or 20.

was about eight from an older teenage girl (Shelly Adkins), who taught Mr. Fulks to engage in oral sex and other sexual acts on numerous occasions." Declr. of Harry Krop at 6. This sounds very similar to Fulks' § 2255 argument that "no one painted a picture of a teenage babysitter pulling down the pants of an eight-year-old Chad and performing fellatio." See Amended Mot. to Vacate at 59. The source of this information was Fulks, himself, when he was being interviewed by Dr. Halleck. Halleck Declr. Attached to § 2255 Mem. at ¶ 19. Clearly, Fulks had not repressed all of the memories of his alleged childhood sexual abuse prior to being interviewed by Dr. Krop. Rather he appears to have simply modified his story after it was pointed out that the suggestion that Fulks' parents hired a babysitter was not credible.

Fulks apparently also informed Dr. Krop that he was sexually abused by a teacher and his step-father, and that he was forced to have sexual intercourse with a girl he considered to be a close friend. This does not constitute new evidence previously unavailable. It is supported by nothing more than Fulks' self-serving report to Dr. Krop. Since the record shows that Fulks has been untruthful about many things, and he has a strong motivation to find a reason for the Court to vacate his sentence, Fulks' statements are inherently unreliable.[5]

Finally, some of the conclusions Dr. Krop draws from the evidence of childhood sexual abuse are the same ones presented by other experts who provided declarations attached to Fulks'

___

[5] To support his conclusion that Fulks was not malingering, Dr. Krop states that "Mr. Fulks demonstrated appropriate effect (including crying at times) while describing his sexual history . . . ." Declr. of Harry Krop, Ph.D. at ¶ 4. As the Court will recall, there was ample testimony at trial about Fulks' excellent acting ability, including testimony by a fellow inmate at the Myrtle Beach jail, who told of an incident in which Fulks cried day and night, soaking his bed sheets with tears after he received a call that his wife and child were in critical condition and not expected to live, after being in a car accident with a tractor trailer rig in West Virginia. As was brought out, this was a total lie, apparently designed to garner assistance from his fellow inmate and the inmate's mother to obtain money for bond and a vehicle.

amended § 2255 motion. For example, Dr. Krop states: "[H]ad the psychological ramifications of this abuse been explained to a jury, the jury would have had a framework within which to understand Mr. Fulks' adult behavior towards women, including his sexually assaultive behavior . . . ." Aff. of Harry Krop at ¶ 8. The affidavit of Dr. Seymour Halleck, attached to Fulks' § 2255 motion, explained that Fulks' experiences at a young age could lead to "an increased likelihood of aberrant sexual activity in the future, including violent sexuality such as rape." Declr. of Seymour L. Halleck at ¶ 19. Thus, the opinion of Dr. Krop, like the information provided by other affiants, is not new and was not previously unavailable. Consequently, Fulks' motion does not satisfy the requirements for a Rule 59(e) motion.

B.      Fulks cannot use a Rule 59(e) to undo the decisions he made prior to his trial and while his § 2255 motion was pending.

Rule 59(e) should not "provide a vehicle for a party to undo its own procedural failures" and "to introduce new evidence or advance arguments that should have been presented to the district court prior to the judgment." Moro v. Shell Oil Co., 91 F.3d at 876. A Rule 59 motion may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment. Stewart v. United States, 2008 WL 4980388 (W.D.N.C. Nov. 24, 2008).

The information offered in the recently-written affidavits by friends, neighbors, and experts, could have been presented by Fulks during his § 2255 hearing. The fact that Fulks declined to reveal information regarding any childhood sexual abuse, for whatever reason, after trial counsel made a diligent effort to discover such information does not qualify it as being unavailable. Trial counsel could not be found ineffective for not spending "valuable time

11

pursuing what appeared to be an unfruitful line of investigation." See Wilson v. Greene, 155 F.3d 396 (4th Cir. 1998)(defendant's attempt to challenge trial counsel's decision not to investigate mental health issues more fully after defendant refused to cooperate with psychiatrist and insisted that someone else committed the murder was "a product of hindsight").

Trial counsel John Blume, testified that he "strongly believed" Fulks had been sexually abused, and several members of the defense team tried to talk with Fulks about it, but "we felt like we weren't getting anywhere." Evid. Hrng. Tr. at 1-60. Multiple members of the trial team asked Fulks if he had been sexually abused by family members, and he denied any sexual abuse. Evid. Hrng. Tr. at 2-60. They asked psychologist and social worker, Dr. Arlene Andrews, to try to talk to Fulks. Evid. Hrng. Tr. at 1-60; 2-61. These efforts proved to be unsuccessful.

Even after habeas counsel raised a claim that trial counsel was ineffective for failing to investigate and present evidence at trial that Fulks was the victim of childhood sexual abuse, Fulks hindered this line of investigation. On September 8, 2009, he filed a pro se motion with the Court (Docket Entry No. 1231) in which he referred to "the lies of sexual abuse and also the wrongful representation of the counsel in this case." On October 5, 2009, Fulks, during a hearing at which he was present through video conferencing, informed the Court that he was abandoning his claim regarding sexual abuse. On February 12, 2010, just ten days before the § 2255 evidentiary hearing was to begin, Fulks moved to reinstate his claim that "trial counsel were constitutionally ineffective for failing to adequately investigate and present evidence that Mr. Fulks suffered extensive sexual abuse as a child." (Entry No. 1292.) Therefore, it was Fulks' own behavior, not a lack of availability of the information or a decision by the Court, that prevented Fulks' his habeas counsel from presenting additional information about alleged childhood sexual

12

abuse. Fulks has decided, in hindsight, that he would like to pursue this line of argument more fully. However, Rule 59(e) does not permit consideration of information that could have been presented prior to judgment. Fulks has had two opportunities to present the information he now wants the Court to consider. He should not be allowed a third bite at the apple.

C.     <u>Even if Fulks could show the information is new evidence he could not, through due diligence, have obtained prior to the evidentiary hearing, he cannot meet the prejudice prong of the Strickland test.</u>

A Rule 59(e) motion is not intended to allow for re-argument of the very issues that the court has previously decided. <u>Delong v. Thompson</u>, 790 F.Supp. 594, 618 (E.D.Va. 1991). Mere disagreement with a district court's ruling does support a Rule 59(e) motion. <u>Rivas v. United States</u>, 2009 WL 4800722 (W.D.N.C. 2009)(citing <u>Hutchinson v. Staton</u>, 994 F.2d 1076 (4th Cir. 1993)). The Court has already ruled that Fulks' trial counsel was not ineffective for failing to more fully investigate and present evidence and expert testimony regarding Mr. Fulks' alleged childhood sexual abuse.

Ten days before his evidentiary hearing was to begin, Fulks asked the Court to grant a 60-day continuance in order to conduct a complete investigation, with expert assistance, of the childhood sexual abuse he had suffered. This Court did not grant an extension because, even if additional information were developed, Fulks could not show that his trial counsel was ineffective. As the Court explained during Fulks' § 2255 evidentiary hearing: "[I]f it takes this defense team, which is a very fine world-class team of defense attorneys, 29 months and [it] still has not been able to ferret out any information about sexual abuse, especially when it is information that Mr. Fulks would presumably be in possession of, . . . I think it's a real uphill battle to argue Mr. Blume was ineffective in not developing it in the 16 months he had." Evid.

Hrng.Tr. at 3-177, 178.

Further, the declarations submitted by Fulks with his current motion do not show that the absence of this information at his trial resulted in a deficiency that so prejudiced his defense as to deprive him of a fair trial, as required by Strickland v. Washington, 466 U.S. 668, 687 (1984). As pointed out in the Government's Response to Fulks' amended § 2255 Motion, the experts' opinions regarding the effect of Fulks' alleged childhood sexual abuse could have been more harmful than helpful, since they tended to discredit his claim that he did not want to rape Alice Donovan, but did so only because Basham pressured him to do so. Response of Gov't. at 48. In fact, the opinions of the experts, including Dr. Krop, make it more likely that Fulks, contrary to his claims, tortured and killed Samantha Burns and Alice Donovan. This would have been directly opposed to one of the two main themes of Fulks' defense - that "Chad Fulks didn't kill anybody." Evid. Hrng.Tr at 1-162; 1-139 ("our main focus on the crime itself was to try to show that Mr. Basham and not Mr. Fulks killed Alice Donovan and Samantha Burns"). Additionally, Dr. Krop's opinion would have also hurt Fulks' attempt to discredit the testimony of Veronica Evans regarding the horrendous physical and sexual abuse he inflicted upon her.

Now, as previously, Fulks cannot show that he was prejudiced by his trial counsel's failure to develop the type of argument proposed by Drs. Krop and Halleck. As the Seventh Circuit has observed regarding a petitioner's claim that evidence of his damaged brain should have been presented:

> [J]urors may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that, when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate. Counsel avoided this potential pitfall.

14

Burris v. Parke, 130 F.3d 782, 784-785 (7ᵗʰ Cir. 1997). Fulks assumes that had jurors known

why he inflicted violence upon women, and understood that he had no control of his anger and

violence toward women, they would have elected not to recommend the death penalty. There is

nothing to support Fulks' assertion. However, the Court need not make this determination. It

was Fulks' burden to show that trial counsel's ineffectiveness deprived him of a fair trial, and

that the outcome would have been different had trial counsel presented more evidence to explain

why he was angry and violent toward women. Fulks has failed to carry his burden.

      D.       The Court does not have jurisdiction over Fulks' motion because
                it is, in part, a successive motion pursuant to 28 U.S.C. § 2255.

Fulks' claim is, in part, a successive motion pursuant to 28 U.S.C. § 2255. A successive

motion must be certified by a panel of the court of appeals to contain:

    (1) newly discovered evidence that, if proven and viewed in light of the evidence   as a
whole, would be sufficient to establish by clear and convincing evidence that no reasonable
factfinder would have found the movant guilty of the offense; or

    (2) a new rule of constitutional law made retroactive to cases on collateral review  by the
Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h). "In the absence of pre-filing authorization, the district court lacks

jurisdiction to consider an application containing abusive or repetitive claims." United States v.

Winestock, 340 F.3d 200, 205 (4ᵗʰ Cir. 2003).[6] District courts must treat motions for

reconsideration as successive collateral review applications when failing to do so would allow

the applicant to "evade the bar against relitigation of claims presented in a prior application or

the bar against litigation of claims not presented in a prior application." Id. at 206 (quoting

---

    [6] Even though Winestock involved a motion pursuant to Fed.R.Civ.P. 60, the court made
it clear that its ruling covered all motions for reconsideration, including Rule 59(e) motions and
motions for rehearing or to recall the mandate. 340 F.3d at 203 n.1.

United States v. Calderon 523 U.S. 538, 553, 118 S.Ct. 1489, 140 L.Ed.2d 738 (1998)). The court must either dismiss the motion for lack of jurisdiction or transfer it to the court of appeals. Id.; see also United States v. Lambros, 404 F.3d 1034 (8th Cir. 2005)(when a defendant, through a motion pursuant to Rule 59(e), seeks to resurrect an issue raised in a previously-filed § 2255 motion, he must first obtain authorization for the court of appeals to do so).

A motion for reconsideration of judgment that presents newly discovered evidence in rearguing the merits of a previously-litigated habeas claim is properly classified as a second or successive habeas petition. See Cook v. United States, 2006 WL 1699952 (W.D.Va. June 14, 2006)(an affidavit from defense counsel stating that the prosecutor had promised defendant a second substantial assistance motion after sentencing was not new evidence because it was being used it to reargue the merits of his claim); United States v. Mouzon, 354 Fed.Appx. 739, 740 (4th Cir. Dec. 3, 2009)(district court lacked jurisdiction to deny defendant's Rule 60(b) motion on the merits because the claim challenged the validity of his sentence and should have been construed as a successive § 2255 motion). The Fourth Circuit, acknowledging that there is no infallible test for distinguishing between a successive motion under § 2255 and an actual motion for reconsideration, has provided the following guidance:

> [A] motion directly attacking the prisoner's conviction or sentence will usually amount to a successive application, while a motion seeking a remedy for some defect in the collateral review process will generally be deemed a proper motion to reconsider. Thus, a brand new, free-standing allegation of constitutional error in the underlying criminal judgment will virtually always implicate the rules governing successive applications. Similarly, new legal arguments or proffers of additional evidence will usually signify that the prisoner is not seeking relief under Rule 60(b) but is instead continuing his collateral attack on his conviction or sentence.

Winestock, 340 F.3d at207.

16

Fulks appears to assert two different claims within his second argument. He implies that the Court's denial of his motions for appointment of additional counsel, funding for additional experts to explore the possibility of childhood sexual abuse, and a continuance was procedural error because the denial prevented him from developing "the evidence necessary to prove trial counsel's ineffectiveness for failure to investigate and present evidence and expert testimony regarding the extensive sexual abuse Mr. Fulks suffered as a child." He then attempts to bootstrap onto the implied claim of procedural error, a successive § 2255 claim by discussing and attaching the affidavits of Dr. Krop and several lay witnesses regarding incidents of childhood sexual abuse.

Fulks raised the issue of trial counsel's alleged failure to present evidence of childhood sexual abuse in his amended § 2255 motion. See Order Denying Petition for Relief under 28 U.S.C. § 2255 at p. 33 ("Petitioner claims that the jury was never told that his propensity for abusive conduct towards women was related to . . . alleged sexual abuse he experienced as a child and teen.")[7] Thus, he is simply trying to re-litigate the issue with the aid of more evidence, in violation of the bar against relitigation of claims presented in a prior application. See Burris v. Parke, 130 F.3d at 785 (defendant's motion to recall mandate was an attempt to relitigate, with the aid of better evidence, an issue he had already raised and lost in his ineffective assistance of counsel claim, and was, therefore, a successive claim under §2254 and should be dismissed).

---

[7] The Court noted in its decision that the trial record is replete with testimony that Fulks' childhood environment was filled with inappropriate sexual activity, that he was molested by an older man when he was a child, and that he had a sexual relationship with a twenty-something-year-old woman when he was fifteen. The Court further found that his additional claims of sexual abuse in his § 2255 motion were inherently unreliable because they came by way of hearsay or by Fulks' self-serving statements. Order at 33-34.

17

Nonetheless, if the Court addresses Fulks' implied claim of procedural error, the Court should find that it has no merit. Fulks' trial counsel, John Blume, testified that he "strongly believed" that Fulks had been sexually abused. Several members of the defense team tried to talk with Fulks about it, but they "weren't getting anywhere." Evid. Hrng. Tr. at 1-60. He denied any sexual abuse. Evid. Hrng. Tr. at 2-60. They then asked psychologist and social worker, Dr. Arlene Andrews, to try to talk to Fulks regarding any sexual abuse because she "has more expertise in this area.". Evid. Hrng. Tr. at 1-60; 2-61. Fulks was not forthcoming regarding sexual abuse. In denying Fulks' request for a 60-day extension, the Court pointed out that the issue of childhood sexual abuse "was raised in the original petition, so it's been an issue in the case for quite some time," and that "[o]ne time Mr. Fulks wanted to drop it and counsel agreed." Evid. Hrng. Tr. at 3-178. The Court pointed out: "[H]abeas counsel was appointed . . . on September the 10, 2007, which was 29 months ago, almost two and a half years. In contrast, Mr. Blume had only 16 months for his full investigation before trial." Evid. Hrng. Tr. at 3-177.

Fulks denied his alleged childhood sexual abuse to trial counsel, habeas counsel, and the Court until approximately two weeks before his § 2255 hearing. As discussed above, most of these alleged incidents had been mentioned by Fulks to others after he became an adult, so Fulks had obviously not repressed them. Whatever the reason Fulks did not want the alleged incidents raised at trial or at his § 2255 hearing does not now provide a basis for having it considered pursuant to a Rule 59(e) motion.

E.    This Court did not err in refusing to provide additional resources to Fulks.

District courts are given discretionary authority in death penalty cases to provide for

18

expert and investigative services:

> Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor . . . .

18 U.S.C. § 3599(f).  In <u>Muhammad v. Kelly</u>, 575 F.3d 359, 366-367 (4th Cir. 2009), Muhammad requested funding for a neuropsychiatrist on the last day on which he could file his amended federal habeas petition.  The district court denied Muhammad's request because Muhammad would not "be able to win on the merits regardless of the experts' findings." <u>Id.</u> at 367, 375.  The Fourth Circuit held that the district court did not abuse its discretion. 575 F.3d at 375.

Such was the situation in Fulks' case.  As the Court observed, Fulks could not show that his trial counsel were ineffective for failing to discover additional evidence of the alleged childhood sexual abuse when § 2255 counsel had almost twice the amount of time prior to the evidentiary hearing and had not been able to discover additional evidence of sexual abuse.  Thus, this Court did not abuse its discretion in denying additional expenditures for an additional expert to discover something that would have made no difference to the outcome of Fulks' § 2255 proceeding.

**III.** **The third argument in support of the motion to alter or amend attempts to present new claims that are untimely and successive.  Additionally, they are completely unbelievable and without factual basis.**

In his third argument in his motion to alter or amend (pp. 7-14), Fulks raises new claims that the Government committed misconduct and suppressed exculpatory evidence in Fulks's criminal trial.  All but one of these claims are completely untethered to any matters Fulks raised in his original or amended § 2255 petition.  These new allegations are untimely and should not be

considered at this late stage of the litigation. Furthermore, the Court should strike all the declarations Fulks submits in support of these claims because they do not contain previously unavailable evidence: All of the information in these declarations was available before Fulks filed his petition. In any event, none of these declarations provide any evidence that is materially exculpatory or impeaching.

      A.     <u>The alleged prosecutorial misconduct and Brady claims raised in Fulks's Motion to Alter or Amend Judgment are new and untimely.</u>

With the exception of Fulks's allegations regarding Tina Severance, the prosecutorial misconduct and <u>Brady</u> claims Fulks raises in his Motion to Alter or Amend Judgment are not linked to any claims presented in his original or amended § 2255 petition. These are new, untimely claims, and Fulks's attempt to raise them in the Motion to Alter or Amend constitutes an unauthorized second or subsequent § 2255 petition.

Federal courts have held that Rule 59(e) motions are subject to a threshold review for whether they contain second or successive collateral attacks. <u>Williams v. Norris</u>, 461 F.3d 999, 1004 (8th Cir. 2006); <u>see</u> <u>also</u> <u>United States v. Pedraza</u>, 466 F.3d 932, 934 (10th Cir. 2006). "A Rule 59(e) motion cannot be used to raise arguments which could, and should, have been made before the trial court entered final judgment." <u>Bannister</u>, 4 F.3d at 1440 (internal quotations omitted).

Claim 20 of Fulks's amended § 2255 petition sets out a prosecutorial misconduct claim. <u>See</u> Amended Petition, Docket Entry 1123, at 175-78. Specifically, Fulks claims: (1) FBI agents pressured Andrea Roddy to testify falsely that Fulks had threatened her and Tina Severance; and (2) a post-trial letter from the Myrtle Beach police department was evidence of an improper deal

20

between Severance and the Government. Id. Claim 21 of the amended petition states a related Brady claim, in which Fulks argues that the Government suppressed information about its pressuring Roddy and striking a deal with Severance. Id. at 179. This Court has rejected all those claims.

Although Fulks claims to have "new evidence" relating to Claims 20 and 21 of his amended petition, most of the arguments in his Motion to Alter or Amend and the statements in the accompanying declarations have nothing to do with the claims raised in his amended petition. This "new evidence" consists of: (1) allegations that Veronica Evans lied about her probationary status at the time of Fulks's trial; (2) a claim by Amanda Oswalt that Tina Severance told her about having a deal with the FBI to lie about Fulks at trial; (3) a statement from Beth McGuffin that FBI agents on one hand improperly pressured her by accusing her of complicity in Samantha Burns's murder, and on the other hand, gave her favorable prison treatment because of her status as a witness in Fulks's trial; and (4) allegations from Amber Fowler that FBI Agent Jeff Bruning paid her off and told her to show some emotion in testifying against Fulks. Motion to Alter or Amend, Docket Entry 1356, at 7-14.

None of the people from whom Fulks now submits declarations are mentioned in Claims 20 or 21 of his amended petition. Before now, Fulks has never suggested any impropriety regarding the testimony of Evans, McGuffin, or Fowler. Raising certain allegations of prosecutorial conduct or Brady violations in a § 2255 petition does not toll the limitations period or open the door for subsequent, unrelated claims. The claims concerning Evans, McGuffin, and Fowler allege new bases for relief and should be treated as an untimely, unauthorized second or subsequent § 2255 petition.

21

Fulks did claim in his amended petition that a Myrtle Beach police department letter suggested an undisclosed deal with the Government resulting in the dismissal of Severance's charges for filing false police reports. Oswalt's declaration addresses a different allegation—that the FBI supposedly offered probation to Severance if she would lie about Fulks's conduct. Oswalt does not mention the Myrtle Beach police or offer any information that would suggest a link between the Myrtle Beach police and the FBI's alleged offer of probation. Her declaration does, however, pertain to the more general allegation that the Government had some sort of quid-pro-quo arrangement with Severance regarding her testimony. But even if Oswalt's declaration is not seen as raising a new claim, her declaration should be stricken along with the others because, like the other declarations, Oswalt's statement contains no evidence that was previously unavailable. It cannot serve as a basis for a motion to alter or amend.

B.    <u>The declarations submitted in support of Fulks's prosecutorial misconduct and Brady claims do not contain previously unavailable evidence.</u>

The declarations of Veronica Evans, Amanda Oswalt, Beth McGuffin, and Amber Fowler are not new evidence. Evans, McGuffin, and Fowler describe events that allegedly occurred during Fulks's criminal trial in 2004. Oswalt's declaration centers on her alleged conversation with Tina Severance in 2008. Thus, the information in these declarations was available long before this Court issued its ruling on Fulks's amended § 2255 petition. Post-judgment declarations cannot serve as the basis for a Rule 59(e) motion when all of the events alleged therein occurred *before* the court entered judgment. <u>Yelton</u>, 439 F.3d at 198. Moreover, a party relying on additional evidence "must produce a legitimate justification for not presenting the evidence during the earlier proceeding." <u>Id.</u> at 197. The reasons for noncompliance must be

"compelling." <u>Robinson</u>, 599 F.3d at 410 n.9. Fulks does not point to *any* reason why these

declarations were previously unavailable, much less a compelling reason.[8] <u>See Moro</u>, 91 F.3d at

876 (rejecting appeal of district court's denial of Rule 59(e) motion where "[t]he plaintiffs failed

to offer any explanation at all as to why the information contained in the affidavits was not

available to them when they opposed Shell's summary judgment motion.").

    C.    <u>These declarations do not provide any evidence that is materially exculpatory or impeaching.</u>

    1.    <u>Veronica Evans</u>

Fulks claims that the Government shirked its duty to correct the false testimony of

Veronica Evans. Motion to Alter or Amend, at 8-9. At trial, Evans testified that she had been

"released from probation" on charges of wanton endangerment and receiving stolen property.

She also testified that no deals were made with her in exchange for her testimony. Fulks asserts

that this testimony was false on two grounds: (1) Fulks claims that Evans "had been promised

that her record would be expunged of convictions for child endangerment and receiving stolen

---

[8]Although Fulks indicates that these declarations were obtained as a result of the Philadelphia CHU's investigation in this case, he does not argue that the declarations were unavailable prior to the Philadelphia CHU's appointment. Fulks notes that prior to the § 2255 hearing, this Court denied his request for a continuance and the appointment of an investigator to gather additional evidence on Claims 20 and 21 of the amended petition. Motion to Alter or Amend, Docket Entry 1356, at 8. As noted above, those claims dealt only with the testimony of Andrea Roddy and Tina Severance. There is no reason to believe that investigation into those matters would have led to declarations from Veronica Evans, Beth McGuffin, or Amber Fowler concerning their own testimony. Furthermore, Fulks makes no attempt to explain why these declarations, or that of Amanda Oswalt, could not have been obtained by his post-conviction team prior to the substitution of Billy Nolas of the Philadelphia CHU for previously-appointed counsel Beattie Ashmore. In any event, the fact that this Court denied Fulks's prior request for a continuance and the appointment of an investigator as to Claims 20 and 21 militates against any claim that such an appointment was necessary to uncover evidence that was otherwise unavailable.

property in exchange for her testimony against Mr. Fulks"; and (2) Fulks claims that Evans's probation was on inactive status at the time of her trial testimony, that she remained under supervision, and that she actually had an active bench warrant at the time of her testimony.

This information relating to Evans is not material under Brady for several reasons. First, Evans's declaration is too vague to support a finding that the Government made any undisclosed deals with her. Although she claims she "had been promised" an expungement in exchange for her testimony, and "had been threatened" with a probation violation if she refused to testify, she does not identify who made these promises or threats.[9] Her statement regarding these nebulous promises and threats simply is not credible. Second, any incorrect statements Evans made in her trial testimony regarding her probationary status were not material. Whether Evans had been released from probation, as she testified, or was on inactive status with supervision, as indicated in Judge Tyler Gill's order of December 23, 2003, has no bearing on the substance of her testimony about Fulks. Neither does it bear on her credibility unless one accepts the premise that she was testifying under the threat of probation revocation—a premise that is without foundation other than Evans's belated claim that she was threatened with revocation by somebody in the Government's employ. Third, Evans does not state in her declaration that she was aware of the

_____

[9]Evans claims "the FBI" told her she was going to testify against Fulks. According to Evans, she initially declined, and "[t]he FBI told [her] [she] would go to prison to serve out the rest of the probated time . . . if [she] refused to testify in Chad's trial." Evans Declaration, Docket Entry 1356-18, at 1. Evans states that when she received a notification of her scheduled date to testify, she called "either an FBI agent or a prosecutor and told them [she] wasn't coming and that [she] didn't plan to testify." Id. at 2. Evans then states that this unidentified person warned her that she would "go back to jail for what [Evans] believed to be at least 15 years." Id. at 2-3. Evans claims that she can remember only that this person's name started with a "B." Id. at 3. The declaration of FBI Special Agent Jeffrey Bruning, attached hereto as Exhibit 1, rebuts these assertions. Bruning Decl., at ¶ 4.

bench warrant at the time she testified.  She was not asked at trial about any warrants.  In any event, the existence of the bench warrant would not have impacted her credibility.  There is no indication that the Government knew about the bench warrant at the time of Evans's trial testimony or that any Government agent had threatened to turn Evans over on the warrant if she refused to testify.  Finally, it is important to note that Evans does *not* suggest that any of her testimony about Fulks was false.

    2.    <u>Amanda Oswalt</u>

Fulks also claims that Tina Severence had a secret "deal with the FBI and the government" under which she "would receive a probationary sentence for her open cases" in exchange for her testimony against Fulks.  Motion to Alter or Amend, at 10.  As evidence of this deal, Fulks submits the declaration of Amanda Oswalt, a former roommate of Severance's.  Oswalt states that in August or September of 2008, Severance spoke with her about the Fulks trial and admitted that "the FBI told her to say certain things about Chad."  Oswalt Declaration, Docket Entry 1356-17, at 2.  According to Oswalt, Severance "didn't say what those things were" but did say "that the FBI wanted her to lie about what Chad did in order to make him look worse than he already did."[10]  <u>Id.</u>

Oswalt's declaration is insufficient to support a finding that the Government improperly influenced Severance's trial testimony.  Oswalt does not claim to have first-hand knowledge of anything related to the Fulks case.  She claims only to have heard Severance say that "the FBI

---

[10]Oswalt also claims that Severance told her "that she was more involved in the crimes than she had ever admitted, that she had fooled the FBI and that she had gotten paid for it."  Oswalt Declaration, Docket Entry 1356-17, at 1.  Of course, if Severance had indeed "fooled the FBI," the Government could not have suppressed evidence of this deception (because it did not know it was being "fooled").

and the government" offered her probation, "paid her," and instructed her "to lie about what Chad did." Id. at 1-2. Oswalt states that Severance did not reveal what these people from "the FBI and the government" told her to say. In other words, Oswalt's double-hearsay declaration claims that, according to what Severance told Oswalt, some unidentified FBI and Government agent or agents at an unspecified time and place instructed Severance to say something false about Fulks's activities. Fulks does not submit any declaration from Severance corroborating that this secret deal took place, or even confirming that this conversation between Severance and Oswalt occurred. If one were to credit Oswalt's account of her supposed conversation with Severance, there is no way to determine whether Severance was telling the truth.[11] Oswalt's declaration provides no basis for finding a deal existed or that the Government suppressed it.[12]

       3.      <u>Beth McGuffin</u>

Fulks next claims that the Government "failed to disclose to trial counsel that it considered Ms. McGuffin a prime suspect in its investigation of Samantha Burns' death." Motion to Alter or Amend, at 10. In her declaration, McGuffin claims that FBI agents in West Virginia accused her of helping hide Burns's body and offered her immunity if she would disclose the location of the body. McGuffin Declaration, Docket Entry 1356-15, at 1. She also claims that although Jeff Bruning and other FBI agents in South Carolina were nice to her at first, they eventually warned her that if she did not testify against Fulks, "everyone in West Virginia would think [she] was a murderer." Id. at 2. McGuffin also claims that she and fellow witness

---

[11]It is unlikely that Oswalt's statement and its multiple hearsay would even have been admitted into evidence at the § 2255 hearing.

[12]The attached declaration of FBI Special Agent Jeffrey Bruning rebuts any assertion that Severance had a "deal" with the FBI. Bruning Decl., at ¶ 5.

Stacy Workman were kept in protective custody in federal prison and were regularly visited by FBI agents and taken out to lunch, including a fast-food picnic at the FBI building on one occasion. Id. at 2-3. Fulks argues that the information in McGuffin's declaration demonstrates that she "had significant motivation to alter her testimony in order to meet the needs of the government." Motion to Alter or Amend, at 12.

Like the other declarations, McGuffin's statement does not point to improper conduct or any material evidence suppressed by the Government. McGuffin does not identify the West Virginia FBI agents to whom she refers. Even if FBI agents in West Virginia at some point suspected or accused McGuffin of complicity in Samantha Burns's murder, McGuffin does not state that the agents threatened her with charges if she did not testify at Fulks's trial. She states only that they offered her immunity in the Burns case if she revealed the location of the body. Although McGuffin claims that Jeff Bruning said that "everyone in West Virginia" would think she "was a murderer" if she did not testify against Fulks, she does not claim that Bruning threatened her with charges. According to her, he stated only that the West Virginia FBI "would all think" she was involved in Burns's murder. Indeed, those agents could have thought McGuffin was involved in the murder if she did not share what she knew—but that does not mean they were holding charges over her head as a means of inducing her testimony.

As for her description of her treatment by the FBI while she was in custody, McGuffin's declaration does not come close to demonstrating Government misconduct or suppression of material evidence. Fulks notes that McGuffin and Stacey Workman "were moved from state to federal prison and kept in protective custody, away from the dangers of general population." Motion to Alter or Amend, at 12. But this is true of many federal prisoners who are witnesses in

27

pending cases. To be sure, the whole point of protective custody for witnesses is to shield them from other prisoners who might attack them for cooperating with the Government or who might try to intimidate them or influence their testimony. There is no indication that protective custody was provided to McGuffin and Workman as a quid-pro-quo "perk." Also, it is to be expected that FBI agents would occasionally transport McGuffin and Workman to interview them and prepare them for their testimony. And it is not unusual that on those occasions, the agents would make sure these witnesses were fed. See Bruning Decl., at ¶6. In fact, at trial, McGuffin testified that she received a pepperoni pizza lunch during trial preparation just prior to the trial and that Special Agent Bruning had arranged to have $100 deposited into McGuffin's prison account at Lexington County Detention Facility for necessities. TT 6/8/2004, at pp167-68. Any benefit conferred on McGuffin in the form of fast-food lunches during interview sessions was *de minimis* and did not provide "significant motivation" for her testimony. Also, it is important to note that McGuffin does *not* suggest that her testimony in the Fulks trial was false in any way.

4.    Amber Fowler

Finally, Fulks claims that the Government "paid [Amber Fowler] off in a thinly-veiled attempt to influence her testimony." Motion to Alter or Amend, at 12. In her declaration, Fowler states that Jeff Bruning gave her $400 in cash on the Friday before her testimony to keep her from having to travel back to West Virginia for the weekend. Fowler Declaration, Docket Entry 1356-16, at 1. Fowler than claims that Agent Bruning took her to "another part of the hotel lobby" and informed her that she "had to show some emotion" to the jury. Id. Fulks argues that the $400 was "far more than necessary to purchase the few items of clothing [Fowler] had said she needed." Motion to Alter or Amend, at 12. He also argues that "[a]lthough Agent Bruning

28

did not specifically say that he was paying her to add more emotion to her testimony, the proximity of the payment to his instructions made it clear that these were his intentions." Id. at 13. Finally, Fowler claims to have received a check from the Government for $1,500, which she thought was more than enough to cover her expenses. Fowler Declaration, at 2.

Fowler's statement is inherently incredible and completely discredited by Special Agent Bruning's attached declaration and documentation. In his responsive declaration, Agent Bruning states that Assistant United States Attorney Johnnie Gasser was with him when he spoke with Fowler at the hotel on the Friday night before her testimony the next week. Bruning explains that when he informed Fowler that she would not be testifying until the next week, Fowler complained that she did not have enough clothing or personal items to make it through the weekend. In response, Bruning provided her $60 (not $400) for these expenses. Bruning Decl, at ¶ 7. Fowler signed a receipt, which was witnessed by both Agent Bruning and AUSA Gasser. Bruning denies instructing Fowler to "show some emotion" to the jury. Instead, he instructed her to tell the truth. Id. Moreover, the reimbursement check which Ms. Fowler claims was approximately $1,500 was actually for only $826.25 . See copy of United States Marshal's check to Amber Fowler in the amount of $826.25, attached hereto as Exhibit 2.

The receipts and documents kept by the FBI and United States Marshal show that Fowler's statement about her reimbursement amounts is clearly incorrect. These amounts are not excessive for an out-of-state witness from West Virginia who was in Columbia for a week. Fowler's declaration cannot form the basis for a finding that Government agents provided these amounts to induce her testimony. And just like several of the other declarants, Fowler does *not* claim that she lied or embellished her testimony in any way.

# CONCLUSION

For the forgoing reasons, this Court should deny the motion to alter or amend the judgment.

<div style="margin-left:45%">

Respectfully submitted,

WILLIAM N. NETTLES
United States Attorney

s/Robert F. Daley, Jr.
Robert F. Daley, Jr. (ID No. 6460)
Jimmie Ewing (ID No. 7292)
Jeffrey M. Johnson(ID No. 10857)
Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, South Carolina  29201

</div>

October 12, 2010