UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA,                    CR NO.: 4:02-992
                                             Columbia, SC
            Respondent                       December 8, 2010

      -vs-

CHADRICK E. FULKS,

            Petitioner

------------------------------


                 BEFORE HON. JOSEPH F. ANDERSON, JR.
                UNITED STATES DISTRICT COURT JUDGE
                         MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                     UNITED STATES ATTORNEY
                     BY:  ROBERT F. DALEY, JR.
                          JEFFREY M. JOHNSON
                          NANCY C. WICKER
                     Assistant United States Attorneys
                     1441 Main Street
                     Columbia, SC  29201

FOR PETITIONER:      KIRSTEN E. SMALL, ESQ.
                     NEXSEN PRUET
                     P.O. Box 10648
                     Greenville, SC  29063

                     BILLY NOLAS, ESQ.
                     AMY GERSHENFELD DONNELLA, ESQ.
                     Federal Community Defender Office
                     Capital Habeas Unit
                     601 Walnut Street
                     Suite 545 West
                     Philadelphia, PA  19106

COURT REPORTER:        DANIEL E. MAYO, RDR
                       Certified Realtime Reporter
                       901 Richland Street
                       Columbia, SC  29201


                STENOTYPE/COMPUTER-AIDED TRANSCRIPTION



                       *  *  *  *  *  *  *  *  *



          THE COURT:  All right.  We are here this morning for the case of United States versus Chadrick Evan Fulks on the motion to alter or amend this court's judgment of August 20th of this year.  I believe Mr. Fulks is present by way of a video conference.  Mr. Fulks, can you hear me?

          DEFENDANT:  Yes, sir.

          THE COURT:  All right.  Miss Small, you have some out-of-state admissions to take care of?

          MS. SMALL:  I'm sorry.

          THE COURT:  Do you want to admit the attorneys or has that been taken care?

          MS. SMALL:  That's already been taken care of.

          THE COURT:  All right.  Let me just put a few things on the record.  I issued my order on August 20th and amended it on August 25th to clarify what issues were certified for appeal.  Then came the motion to appoint new counsel to substitute for Mr. Ashmore who I previously appointed.  That motion was filed on August 27th.  I believe I gave Miss Small

verbal assurance on the phone that day that it would be granted. And then through a glitch that was my fault, not my secretary's fault but my fault, the order was not entered until one week later on September 3.

And then on September 17th, which was the very last day under the rules, a motion to alter or amend was filed. The motion indicates it was based on evidence that was not available to this court when it rendered its August 20 decision.

I have a certain order I would like to go in. Did you want to say something before we get starred?

MS. SMALL: No, your Honor. I wanted to introduce Mr. Nolas and Miss Donnella of the Philadelphia Capital Habeas Unit who will be presenting argument on these issues this morning.

THE COURT: All right. I'm going to waive the $250 filing fear for the out-of-state lawyers, which I have done for others lawyers in this case, as well.

MS. SMALL: Thank you, your Honor.

THE COURT: Nice to have you both here.

MR. NOLAS: Thank you very much, your Honor.

MS. DONNELLA: Thank you, your Honor.

THE COURT: As you know, this case started in 2004, and under the Fourth Circuit procedures I was supposed to have on order out within 450 days, which after an extension would

have meant last September of '09. But then the interlocutory appeal to the Supreme Court slowed us down, obviously. I did issue my order August 20th of this year and we're now back on the motion to alter or amend.

I guess my first question to counsel is was all of this information developed during the three-week period after Philadelphia counsel got in the case? Is all this new information that was obtained by you after my August 20 order?

MR. NOLAS: Well, that's -- yes, the actual affidavits were obtained after.

THE COURT: I know the affidavits were all signed in September, but was all this information garnered and assimilated and prepared during this three week window after you got the case?

MR. NOLAS: Yes, your Honor.

THE COURT: All right. Now, I would like to kind of take the issues in groups because I think they can be categorized. The first one I would like to discuss is the decision to admit guilt and not have a guilt phase and the decision to make a proffer or an FBI 302 statement without anything in return from the government. To me that's the easiest issue to address today, because that was thoroughly debated and discussed at the first hearing and addressed in my order. I even let the defendant call Miss Andrea Lyon down from Chicago to give an expert opinion about those issues.

And I conscientiously and carefully considered it and actually rejected it in my order. The discussion of the FBI 302 statement begins on page 76, the discussion of the guilty plea begins on page 92.

MR. McKAUGHAN: I'm sorry, your Honor. The call was dropped.

THE COURT: Let's hold on. Let's see if we can get Mr. Fulks back.

(There was a pause in the proceedings)

MR. NOLAS: Your Honor, while we're waiting, can I --

THE COURT: Sure, just go ahead and set up. Bear with us just a minute.

(There was a pause in the proceedings)

MR. McKAUGHAN: Your Honor, we're back on line.

THE COURT: Mr. Fulks, can you hear us now?

DEFENDANT: Yes, sir.

THE COURT: All right. As to this first issue, which I've considered to be related to this decision to plead guilty and also to make a proffer without any concession in return from the government you would have to concede was thoroughly debated on the first hearing and discussed in my order and I just rejected it.

MR. NOLAS: You did, your Honor, you ruled on --

THE COURT: Now we have affidavits from Lesley Coggiola and Peter Partee, both South Carolina lawyers, and

Henderson Hill from North Carolina and Mary Lou Newberger from West Virginia that just reiterate what I was told by Miss Lyon that you should also contest guilt in a death penalty case.

MR. NOLAS: If I may suggest, your Honor, and thank you for hearing from us this morning. May it please the court, if your Honor would just give me ten minutes to tell you why I believe that matter is something that's properly before you, and then Miss Donnella will address the issues related to Brady and to Dr. Krop. But one of the thrusts of the Rule 59 motion, as your Honor has observed, is that we're asking is that your Honor reconsider the matter related to Mr. Blume's experience as a trial lawyer. And I have to tell your Honor --

THE COURT: That was going to be the next issue I got to, but let's focus on the decision to plead guilty and the decision to make a proffer first.

MR. NOLAS: Yes, your Honor.

THE COURT: You say they're related.

MR. NOLAS: They are related.

THE COURT: The second issue is Mr. Blume's experience and he -- the thrust of your second argument is that his death penalty experience in terms of actual trials in state court was less extensive than was believed. And you've got affidavits from his lead counsel in those two cases that he played a minor role, second chair, so to speak. Of course,

this was the first federal death penalty case tried in South Carolina so there was by definition no one with federal death penalty experience.

And unlike many habeas corpus actions in this court where I'm called upon to review the conduct of state counsel who represented a defendant in a state trial, here I saw Mr. Blume in action in this courtroom. And I reviewed his extensive pretrial preparation in the 2255 hearing, which I categorized as exceptional in terms of his organization. So I have firsthand knowledge of Mr. Blume's ability, notwithstanding the fact that he didn't do much in those two state trials.

MR. NOLAS: And here's our argument, your Honor, and what we would ask your Honor to consider. Specifically -- and let me just take a step back. I have known Mr. Blume for 20 years, as has Mr. Hill. When I learned that he actually had tried a federal death penalty case I was surprised, because all of us who do this kind of work do not know Mr. Blume as a trial lawyer. Mr. Blume has never conducted a federal felony trial, Mr. Blume has never been lead counsel in a state jury trial. And when your Honor appointed us and I read your Honor's order and there was a comment based on suggestions made by Mr. Blume's testimony that he actually had capital jury trial experience I was very surprised to see that, knowing that Mr. Blume does not, in fact, have that

experience. So I contacted Mr. Hill just to check on whether my impressions were accurate, and your Honor has reviewed the affidavit from Henderson Hill.

The reason Mr. Blume's lack of experience is significant is because the issues that have been raised in this court, such as the proffer statements, the guilty plea, the jury selection issues, the decision by Mr. Blume to not take the three-day continuance and to instead remove expert witnesses from the case, our submission is that's a very, very different analysis that's required as to those issues. If you look at those issues through the lens of Mr. Blume's inexperience there's a very different perspective that's brought to bear as opposed to looking at it through the perspective of somebody who's got actual jury trial experience.

So for example, your Honor, Mr. Blume has post-conviction experience. Post-conviction work is very different. In post-conviction evidence is gathered, a lot of work is done, and you saw Mr. Blume gather a lot of evidence.

THE COURT: But in post-conviction work you're always reviewing the work of trial counsel. You gain experience vicariously, don't you, by looking at what's done and not done in the trial?

MR. NOLAS: You're right, your Honor.

THE COURT: Like an appellate judge reviewing what a

trial judge does. You wouldn't suggest an appellate judge couldn't try a case because they'd never done it before.

MR. NOLAS: But the focus there is on law and the focus there is on what legal issues comes from the evidence. In terms of trial experience before a jury the focus is very different. The jury is the audience. The critical things there are the rapport with the jury, the feel from the jury, the visceral reaction of the jurors to what counsel is presenting and to how counsel and defendant are perceived by the jury.

And as Mr. Blume himself has said in an article that your Honor quoted in your opinion, no one should try a capital felony jury trial with less than five years of felony jury trial experience, which Mr. Blume did not have. Mr. Blume, quote, hands-on training is absolutely indispensable. Nowhere is the adage practice makes perfect more true. And that's Mr. Blume himself in that Hofstra Law Review article discussing the experience that must be brought to bear by a capital trial counsel.

What I do when I give lectures and CLE courses and the like I analogize it to combat. There's a difference between somebody who's been a soldier, who's been a Marine, who have been involved in combat and any simulations you can have in the training process. Somebody who's been in it knows it. And somebody who has jury trial experience knows what it

is like to be before a jury. And if Mr. Blume's deficiencies, what we submitted are his deficiencies in this case, are viewed through the perspective of somebody who does not have the trial experience it sheds a different light on it.

And let me talk about the jury selection for a minute, just to give you an example in that regard. In this case Mr. Blume allowed at least three jurors to sit who he himself had rated in the jury developments that he had done with Jeff Blume, he had himself found sure votes for death. As your Honor recalls, there were cause challenges as to those jurors. Your Honor found -- you said the question is close but your Honor denied the cause challenge. And then Mr. Blume did not exercise peremptory challenges on those jurors. In fact he exercised peremptory challenges on jurors that in his own view and in the view of his own jury consultant were perceived as much less pro-death than these three. And they are Harvey, Gerigg, and Allison. And your Honor will recall --

THE COURT: I addressed those and said those were all qualified jurors.

MR. NOLAS: As a cause issue, but not as an issue of ineffective assistance of counsel for failing to exercise peremptories on those jurors. Now, in that regard Mr. Blume said all things -- at the hearing all things being equal those folks should not have been on the jury. I did not want those

folks on the jury. And yet he kept those folks on the jury in order to, his view, preserve an issue for appeal.

Our submission to your Honor, and Mr. Hill's affidavit lays this out in great detail, is an experienced trial lawyer would under no circumstances make that kind of decision. An experienced trial lawyer who's been before a jury, who's picked juries and tried cases before juries would not allow three individuals to sit on the jury who would poison that jury well.

Mr. Blume, from the perspective of an appellate lawyer coming in with appellate experience testified at the hearing that he was seeking to reserve an issue for appellate review. And therefore did what? Therefore subjected his client to a position where an appeal would be taken after imposition of death by a jury. If Mr. Blume had been successful on that issue on appeal the remedy would have been a jury without those jurors, the very remedy he had available to him in the trial court. And as Mr. Hill explains, that kind of unreasonable decision-making, our submission, is the kind of decision-making that somebody with inexperience in front of juries would make.

Similarly in terms of allowing the client to, and your Honor did discuss this in your order, but allowing the client to give statements to law enforcement early on without any protection. And as Miss Newberger and Mr. Hill explains,

that's the kind of thing before you've had your client assessed, before you know your client's mental health background, before you know what your client is like as a historian, to put your client in the position where the client is giving information to the government that the government will then have months to use to develop a case challenging those very statements is again something that in the post-conviction setting it doesn't matter because everything comes out ultimately anyway. In a jury trial setting that's devastating, devastating to have that heard by a jury at the trial.

Again, in terms of the guilty plea, another example. We have laid out through Mr. Henderson's affidavit and the other submissions in the Rule 59 motion that one of the things that capital defense lawyers know who have experience trying cases before juries is that a guilty plea does not give the jury the opportunity to express its outrage at the defendant.

THE COURT: That argument was made to me, and didn't I cite the Supreme Court as authority that sometimes there's something to be gained by fessing up and pleading guilty and trying to curry favor with a jury by not putting them through a contentious three or four week trial? Had he pled guilty, had he gone to trial, had he gone to trial I've just got to believe we would be sitting here today challenging that decision and saying he should have pled guilty. There was a

mountain of evidence against him, they had him on the video with the abduction in the Wal-Mart parking lot, 17-day crime spree, two dead women, two raped women, two bodies never discovered. And we put them through a three-week trial on guilt and we would be flyspecking it from the opposite perspective if he had gone to trial. I've just got to believe that.

MR. NOLAS: And in that regard your Honor cited Florida versus Nixon in your order. And Nixon is a case where there was a jury trial at the guilt phase and counsel did not present a defense at the guilt phase. What I find significant about Nixon is Nixon actually supports our submission on behalf of Mr. Fulks in the Rule 59 motion. Because the lawyer in Nixon did exactly what lawyers in capital cases with jury trial experience do, you go through the guilt phase, you allow the jury to express its outrage at the guilt phase, and then you conduct the penalty phase. It doesn't mean through the guilt phase playing some kind of game with the jury, but capital --

THE COURT: I'm sorry. If I'm a typical juror and a defendant puts me through a three-week trial I think I'm going to hold it against him at the penalty phase, if the evidence is overwhelming. I understand the academic argument that the jury gets to express its outrage by finding him guilty and saying there, we showed you, and then at the penalty phase

they lighten up and give him life. But I don't know that automatically follows in every case. I think it depends on the case.

MR. NOLAS: And our argument is that capital defense lawyers with jury trial experience know that that's the appropriate step to take in a capital case. When you assess Mr. Blume's actions in this case for purposes of a Rule 59 motion our argument is that he is not an experienced capital defense lawyer. So it's one thing to have somebody -- I'm an experienced capital jury trial lawyer and I've made the decision that your Honor, Judge Anderson, has just articulated. That's a different perspective if that decision is made by somebody who hasn't been in front of a jury, somebody who doesn't have that feel, that rapport historically with juries. And the lawyers who have rapport, such as Mr. Hill and Miss Newberger, have made it clear that the appropriate thing to do is to have a guilt phase trial so the jury can express outrage. It doesn't mean you insult them, it doesn't you play games, if doesn't mean you raise frivolous defenses. But it's giving the jury the opportunity to express its outrage.

Another example, your Honor, is Mr. Blume's releasing the mental health expert in this case. And that's -- if you look at that decision-making from the perspective of somebody who does not have jury trial experience you can see that that

was a point of panic for Mr. Blume at the trial. That was a point when the Amy Ward statement was going to be admitted. And when -- if you are looking at it from the perspective of this is somebody who hasn't been through the combat of jury trial historically you can see the panic in that and that Mr. Blume released the three experts who would make the connection for the jury between the difficulties that Mr. Fulks had had in his life and between the actual mitigation in the case.

THE COURT: Will, let me jump back in and go back to the timeliness question. All of these people, Mr. Blume, Miss Coggiola, Miss Newberger, Mr. Partee and Mr. Hill, they have got shingles hanging out, they're in the phone book, they're in the bar directory. How was this new information developed? All this was available before my August 20 order.

MR. NOLAS: And let's take them a step the time. Mr. Partee, Miss Coggiola and Mr. Hill, in that regard what Mr. Blume had indicated to the government in his pretrial statement is he had indicated that he had jury trial experience. Miss Small and Mr. Ashmore heard that. There's no -- and he said that at the hearing and your Honor heard that at the hearing. They don't know Mr. Blume, they have no reason to think that there was an issue in that regard.

When your Honor appointed us, when -- when I actually took a look at this case the first thing that leaped out to me

was Mr. Blume does not have jury trial experience, and it leaped out to me because I know Mr. Blume. I have -- I brought a certain knowledge to bear that the predecessor counsel, they would not have had a reason --

THE COURT: But we were counting up before I walked out, I think Mr. Fulks has had 15 to 18 lawyers in this case. He had two -- is this the case where I picked off the first two lawyers? That was the other case. He had two that were appointed by the magistrate, then he had appellate counsel, which was different, then he had the first habeas counsel I appointed, including Mr. Watkins and then he had to get out, and I appointed Miss Small. And then they had six pro bono lawyers from California, and so then the two now from Philadelphia. So it's been a lot of lawyers in the case. I mean, where does it end?

MR. NOLAS: And the point, your Honor, of a rule --

THE CLERK: The call was dropped.

THE COURT: Lost it again. Okay.

(There was a pause in the proceedings)

THE COURT: All right. My erstwhile secretary just walked down and handed me the order appointing Mr. Blume. And that was done by the magistrate, wasn't it? Yes, it was done by the magistrate judge. Well, this is the order appointing him in West Virginia, but it says consulting with the Federal Public Defender in this district and upon being advised of the

qualifications of John Blume, he qualifies as learned counsel.

And the same thing was done here. Consultation was made with the Public Defender as required by law. So we're challenging the judgment and wisdom of the Public Defender if we say Mr. Blume didn't have the qualifications.

MR. NOLAS: Well, it's not that he didn't have qualifications. He certainly had, you know, qualifications in terms of his Supreme Court practice and in terms of post-conviction practice. He does not have, however, lead counsel or even substantial co-counsel experience --

THE COURT: Co-counsel was the federal public defender. You can't say he didn't have federal trial experience.

MR. NOLAS: Yes, Mr. Nettles did have federal jury trial experience but he did not have capital jury trial experience. And Mr. Blume himself testified at the hearing that Mr. Nettles' role was "the law guy."

THE COURT: It looks like to me he had the best of both worlds. He had a scholar who had written and published and studied and reviewed the conduct of capital lawyers, and then you had a courtroom lawyer, a public defender. You don't get more experienced than a public defender. They're probably on their feet in the courtroom more than any other lawyer in the country in terms of being in front of juries.

MR. NOLAS: That's very true normally.

THE COURT: It was the best of both worlds, wasn't it?

MR. NOLAS: I'm sorry to speak over you. I apologize --

THE COURT: All right.

MR. NOLAS: But Mr. Nettles did not have capital jury trial experience. And as Mr. Blume testified at the hearing, his role was limited to that of the law guy. That's what Mr. Blume limited Mr. Nettles to. Mr. Blume took upon himself the tasks of making the critical decisions as to the jury in a case where he had not dealt with juries, not as lead counsel in felony cases, not as sole counsel.

And let me talk about the Rule 59 issue that your Honor mentioned. A Rule 59 motion, and our submission is a Rule 59 motion, is a motion addressing a nonfinal judgment. In other words, your Honor's judgment is not final at this point. A Rule 59 motion does not seek to reopen a final judgment, it's not a collateral attack on a final judgment. So your Honor does have discretion at this point to say there's this evidence brought before me about Mr. Blume's lack of experience, I will give it due consideration, I will incorporate it into my decision-making and I'll rule on it. You can do that at this point.

And that's what we're asking your Honor to do is take this submission that we have made as to Mr. Blume's

inexperience and to look at the deficiencies that have been submitted by the petitioner as issues in this case through the lens of an understanding that the case was tried by a lawyer without capital jury trial experience, indeed without jury trial experience.

And I'll give your Honor one more example and I'll close. The very argument that Mr. Blume hinged the defense on in this case, namely that Mr. Fulks was a follower, your Honor addressed in the order and the Fourth Circuit addressed, and this is the footnote 26 of your Honor's order. Counsel, quote, chose to pursue his trial strategy in the face of an abundance of evidence casting Fulks as an equal if not leading partner in the crime spree.

We have a set of exhibits that include the affidavits that were proffered with the Rule 59 motion, and one of those, Exhibit number 120, is a letter written to Mr. Blume by the United States Attorney's office months prior to this trial that lays out the government will prove in this jury trial exactly what the Fourth Circuit articulated later as evidence that undermined the follower theory. If you are an experienced trial counsel with jury trial experience you do not go into a trial and you have evidence that you can present, you do not go into the trial making an argument that you know in advance will fall apart. Especially when knowledgeable trial lawyers know that when you assert that the

defendant is a follower the government will spend its time using every example that it can to try to take that down and to show ultimately the impression to the jury a person that you assert is a follower appears to be more culpable because of the government's efforts to show that the person acted on their own behalf.

So what we're asking your Honor to do for purposes of this Rule 59 motion on this issue is pretty straightforward, I think. It's to put on a hat that says I recognize that Mr. Blume does not have significant jury trial experience and then to consider your Honor's rulings as to his decision-making from that perspective, from that lens.

THE COURT: All right.

MR. NOLAS: That's what we're asking.

THE COURT: I think we spent enough on these two issues. Let me see if the government wants to say anything briefly in response. The decision to plead guilty, the decision to make a proffer, and Mr. Blume's trial experience.

MR. NOLAS: Thank you, your Honor.

THE COURT: Thank you, sir.

MR. DALEY: Your Honor, I want to make clear what counsel is attempting to do is have you do the very thing that Rule 59(e) does not -- is not supposed to be used for, and that is to literally re-litigate the claims that have already been thoroughly litigated. And they are not going to be able

to get around the fact that every one of the declarations, every one of the declarations states facts that were in existence at the time you entered the judgment and/or are opinions that could have easily been obtained. He tries to weave a very fine line and compartmentalize the fact that somehow Mr. Blume didn't have extensive capital jury experience even though he was in 16 or 18 capital trials, many of which eventually pled or were tried to judgment.

THE COURT: We lost them again. I apologize.

(There was a pause in the proceedings)

THE COURT: All right. We're back on. Please continue.

MR. DALEY: Your Honor, and let me just step back. I'm not sure whether I made the point. I mean Rule 59, three reasons that you can consider a Rule 59 motion, one is accommodating intervening change in the law. That's not what's here. Account for new evidence not available at trial. That's what they are under. The third would be correct a clear error of law. So the second one, the basis that I guess they are going to try to go under is that somehow they are accounting for new evidence not available at trial.

Well, your Honor, all of this evidence was available and basically what they are trying to argue is that it was -- I don't know if it's ineffective assistance of 2255 counsel but they make this claim that oh, amazing, you appointed the

Philadelphia capital habeas unit and look at all the extra stuff that came in that we found in 16 days.

Well, your Honor, this -- there may be a case where a judge erred by not giving a capital defendant the resources he requests at trial or in a 2255 proceeding. This is not one of those cases. You actually said in your order the fact that you were very receptive to repeated requests by Fulks' 2255 lawyers for compensation for expert investigative assistance. And that's at your order at page 16. And, more importantly, this is one of those instances where there was also the O'Melveny & Myers law firm, six lawyers working on the case. And if you remember at the beginning of the evidentiary hearing, Mr. Ashmore actually introduces them and then notes they spent over a hundred thousand dollars additionally in expenses and in costs. I'm pretty sure they are the ones that paid for the capital lawyer from Chicago, Andrea Lyon, they paid for her to come testify, if I'm not mistaken.

Your Honor, there's no basis for them to introduce all this evidence that could have been introduced. So I mean as I listened to the argument just a few minutes ago, we're just rehashing, we are rehashing, and what we have got is a couple of additional capital lawyers who want to opine as I guess experts on what is and isn't the appropriate approach to take. And the reality is you've looked at the substance of the argument they are trying to now make again in their

affidavits and you found there was a legitimate trial strategy.

And with regard to Miss Coggiola and the other gentleman who, Mr. Pardee, who tried capital cases, interestingly, both of them reached out and got ahold of Mr. Blume their declarations say because of his experience. And both of them talk about the fact that he was involved in the trial. Was he lead counsel, no. But according to apparently the standard that's articulated here it would require somebody to be -- I mean, there would be like ten lawyers in the whole country who have vast trial experience, who have tried numerous capital cases to a jury. And that's just not the standard, your Honor.

I mean, there are literally dozens of capital cases that get tried by folks, competently, where they don't have the kind of experience Mr. Blume has. Mr. Blume may be more focused on the appellate matters but the funny thing is he also had Bill Nettles, Mr. Nettles, a public defender over in Florence, he also had Miss Johnson who has some capital trial experience, if you remember her testimony, most of it I think with Mr. Blume. They also had another lawyer at the Cornell Capital Law Clinic who helped out. And then they had this vast number of folks.

I mean, you have to look at what he did in the context in which he was working and you need to determine

whether he was ineffective or not.  You've already done that.  And nothing they are now presenting is even appropriate to be considered under a 59(e).  And to the extent you have discretion the government would strongly urge you to exercise that discretion and say this is just not appropriate for a 59(e) motion.

We can go through the various issues.  You looked at the issues that he's talking about and you made findings.  And the fact that two more lawyers want to come in and repeat what Andrea Lyon said isn't going to change the matter.  And the fact that two state court lawyers who each tried one case with Mr. Blume who confirmed that he was involved, Mr. Blume never said he was lead counsel, Mr. Blume said he was involved as co-counsel in those cases.  There's nothing -- there's been nothing refuted, there has been nothing contradicted.  And, more importantly, all of this, all of this was either in existence or could have been brought to this court.

You gave us -- you said you'd stay here, I can't remember.  We ended up going six days.  You said I have all this week if you want.  You were giving us as much time as we needed.  And this is not an instance where you have 2255 counsel who didn't do an enormous pre-petition, pre-motion investigation.  The government has not been given access to all the requests, the details of it.  But it is clear from entries in the record that there were repeated requests and

the court clearly gave enormous resources to the 2255 counsel. And for them to now come in and want to sort of rehash it, it's just not an appropriate thing to do in a 59(e) motion, your Honor.

THE COURT: Thank you, Mr. Daley. Let's next move on to what I have as a third issue, which is the sexual abuse of Mr. Fulks and the related expert testimony. Let me say, come on up, let me say before you start speaking, I'd like to just put on the record that sexual abuse was dealt with in some respects in my order of August 20. But it was also the subject of a full frontal claim in the original petition. And then in a conference we held sometime early this year, Mr. Fulks on the satellite through his own lips told me he wanted to drop the sexual abuse claim. And I looked at counsel and I said what about that. And I believe it was Mr. Ashmore that said, your Honor, we were just about to file a motion to drop that claim. So the claim was dropped.

We rocked along awhile and the hearing was set, and then came the motion I believe at that time by Philadelphia counsel to enter the case, postpone the hearing, and conduct additional investigation into sexual abuse. And at that time I said basically enough is enough. You have to put it against a backdrop that on three occasions while this case has been pending Mr. Fulks has filed a pro se motion to drop his appeal and be executed. And each time those motions came in I had to

stop, start the machinery in process to appoint new counsel and appoint mental health experts to see if he's competent and then he withdrew his request to drop the appeal. Three times.

And so here we go with a request to drop the sexual abuse. Counsel conferred, confirmed it, and then I think it was like ten or 11 days before the hearing, wasn't it, in comes a motion to add it back, postpone the hearing, and we're already beyond the 350 days or 450 days allowed by the Fourth Circuit. So the motion is couched in terms of this court being unfair to the defendant and not allowing a full investigation. But I wanted to put it against that backdrop as to how we got to where we are today.

And then the second thing I would like to say is I know we have this affidavit of Harry Krop that I read, and then I read the affidavits from the people in West Virginia, but a lot of them are very cryptic. Something bad happened, Mr. Fulks came back home and was terrified and something bad happens. But before you get into the legal argument lay out the groundwork for what's the new information about sexual abuse, if you would.

MS. DONNELLA: I would be happy to, your Honor. And I'm aware of the background that you have just explained about this claim. And I think that the framework that you now -- you want me to explain the new evidence of sexual abuse and I will certainly discuss that. But I think it's important to

understand that one of the huge issues in the realm of child sexual abuse is that someone who has been sexually abused, especially someone whose been sexually abused as often and by as many people as Mr. Fulks has, becomes impaired. We've lost the signal.

THE COURT: All right. Bear with us.

(There was a pause in the proceedings)

THE COURT: Does Mr. Fulks need to be present for this argument? Y'all want to --

MS. DONNELLA: I think he probably should be.

THE COURT: He's been present for everything so far. No use to stop now.

MS. DONNELLA: I'm sorry?

THE COURT: All right. Go ahead.

MS. DONNELLA: Your Honor, if I might, I realize that you asked a specific question about the new evidence, your Honor, but there's something that I would like to explain that -- just taking a step backwards from that for just a moment. And that is that it became clear beginning in about the early 1980s when the publication by Roland Summit of an article describing what happens to a child when a child is sexually abused. It's called the Child Sexual Abuse Accommodations Syndrome, and that was in Child Abuse and Neglect 7, 1983, and pages 177 to 193. What Dr. Summit describes in that article is a pattern of disclosure that a

child who is sexually abused often engages in, which is vastly delayed disclosure, often situations that are counterintuitive.

THE COURT: I'm familiar with that, and I'll concede that. I'll concede that. But remember, Mr. Fulks told me himself he wanted to drop that. And I think in one of his submissions to drop his appeal and be executed, I think it was raised in one of those submissions that he did not want to go to his death with a lie on his lips about his parents abusing him and they didn't abuse him. His conscience was bothering him. So I mean I've got to weigh that into the equation, as well.

MS. DONNELLA: And I completely understand that, your Honor. But the whole issue of going to his death with a lie on his lips gets to the very problem that we have with disclosures of this sort. When a child has been sexually abused as -- one of the concerns Mr. Fulks had and that he raised when Dr. Krop went to speak with him was that trial counsel and the many people on their team who spoke to him at various points seemed to accept nothing less from him about his sexual abuse history than that one of his parents had sexually abused him. And --

THE COURT: Wasn't there something about -- it was more than just his parents. Didn't my order address an episode of sexual abuse by another woman, he had sex with an

older woman when he was a teenager?

MS. DONNELLA: Yes. But the problem and the reason he was so concerned about these claims is because there were also allegations that his father had sexually abused him and he did not want those claims raised.

THE COURT: But let me ask the question I asked Miss Small or one of the other counterparts earlier. This team has had two-and-a-half years to develop this evidence of sexual abuse. Mr. Blume had less time than that. How can you fault Mr. Blume for not developing in two years what it took the 2255 team three years to find out about?

MS. DONNELLA: Because the very -- the one thing that Mr. Blume never did, and inexplicably never did given the scores of expert witnesses that he asked this court to authorize and which this court did authorize, was he never had the court authorize someone early enough in the evidence to make any difference who had expertise in sexual abuse. And the reason I say it's inexplicable is because Mr. Blume testified at the 2255 hearing, quote, I strongly believed that Mr. Fulks had been sexually abused. Quote, it would have been almost astonishing to me if he wasn't sexually abused. Quote, it was certainly something we wanted to establish. And, in fact, counsel tried to establish it and put up some lay witnesses who testified about Mr. Fulks having been sexually abused.

The one thing that is clear from, you know, from all of the research that has been done into the area of sexual abuse is that it is the most difficult area to investigate and to probe with a client because there are so many factors working against it. Someone who's been sexually abused fears being punished or has in their past been punished for making an accusation of abuse. That happened to Mr. Fulks. They aren't believed so they assume they won't be believed again. That happened to Mr. Fulks. They fear consequences that will result if the abuser is a family member or someone in a position of authority, the rift it will cause in the family, the possible criminal ramifications for someone to whom they have a relationship and who has a relationship with the rest of their family. That was present in these accusations that Mr. Fulks ultimately revealed to Dr. Krop. They feel raging humiliation and guilt because they feel as if they are to blame for the sexual abuse. They feel that they must have brought it on themselves.

Again, it has a profound psychological impact because a child needs and craves attention and there's no one who, given their background, you can imagine needing or craving attention more than Mr. Fulks would have in the situation and circumstances in which he was raised.

And so there's every reason to believe, as Dr. Krop came to believe, that Mr. Fulks craved attention and believed

he had brought some of the sexual abuse on himself. And in those circumstances a child or an older person who has been abused as a child delays disclosure. It's not that they are repressing disclosure or that they are repressing the memories as the government has argued, but they are fearful of making disclosures. They know they have been punished in the past for making disclosures.

Mr. Fulks, Mr. Fulks told his mother and stepfather about having been sexually abused by Mr. Kaasee when he was a child and he was sent away from home for it. The abuse wasn't reported to the police. It was a criminal assault on him, nobody reported that, and he was sent away from his family for the summer. Had he told anybody that his stepfather was sexually abusing him one can only imagine the ramifications for his family for that. We know that Mr. Fulks felt that it would crush his mother if it turned out or if he made an accusation against his stepfather.

THE COURT: Let me jump in here. Tell me what evidence there is right now on the record of sexual abuse that was not on the record, not known earlier. I did read the affidavits, and I didn't read them recently last night or anything but several of them were childhood friends that said Mr. Fulks came running home upset, never seen him so upset, but it didn't give any details about what happened. Tell me what the details are of what happened.

MS. DONNELLA: Okay. First of all, there were numerous accounts of child sexual abuse. One that was established was the sexual abuse by a teacher that was reported to the school and nothing was ever done about that. By Mr. Fulks' parents.

THE COURT: That's in one of the affidavits?

MS. DONNELLA: That is one of the new affidavits. That was already in evidence.

THE COURT: That's already in evidence. All right.

MS. DONNELLA: There was a claim in the original 2255 petition that Mike Kaasee's father had sexually abused --

THE COURT: How do you spell Kaasee?

MS. DONNELLA: KASEE, I believe.

THE COURT: All right. So both of those were known about earlier.

MS. DONNELLA: They were known earlier but it was -- it was something that there was no evidence supporting that.

THE COURT: All right. So we've got those two now. Keep going, what's next?

MS. DONNELLA: Then there was -- there is additional evidence that -- that Mr. Fulks' older sister sexually abused him.

THE COURT: That was not present with my earlier order.

MS. DONNELLA: That was not present earlier, no. And

I need to also point out, your Honor, that some of these things, even though they were raised as general claims in the 2255 proceedings, that the details that come in as a result of the new information that make it clear what it was that actually happened and how the age at which these things happened to Mr. Fulks and the consequences of them, the changes that people saw in Mr. Fulks following these events is something that -- and Mr. Fulks' discussion himself with Dr. Krop about what the impact of these things were and why the disclosure was impossible to him, all of these things are part of this picture that come out in these affidavits and declarations.

And I think, you know, I think that's critical for the court to understand is that it's one thing for there to be a bald claim made about something, it's another to be able to fill all of that in with all of the details that are available.

Now, you had asked specifically about people saying that Mr. Fulks was -- they saw Mr. Fulks upset, he had called them and he was -- he was highly agitated. And I think the reason that it's important to look at those things is because in a case of sexual abuse it rarely happens in the public eye. And Mr. Fulks has been accused by many people of being a liar. Dr. Krop went in and spoke to Mr. Fulks at length and Mr. Fulks finally was able to reveal to him some of these very

painful details of his childhood. Now, when --

THE COURT: Revealed it to who?

MS. DONNELLA: Mr. Fulks revealed it to Dr. Krop. And the question that would invariably come up with a situation like that is is Mr. Fulks telling the truth. And so no, there was nobody else there when Mike Kaasee's father sexually abused Mr. Fulks when he was a child. But there are people who have submitted affidavits now saying well, wait a second. You know, the situation that Mr. Fulks describes as being at a Value City parking lot and this happening with Mr. Kaasee's -- with Mr. Kaazee, you know, I remember getting a panic call from Mr. Fulks and racing over to a Value City parking lot and Mr. Fulks being there trembling, throwing melons on the ground and, you know, state that this person Louis Lambert, Jr. had never seen him.

Mr. Kaasee's son testified that Chad had told him that his father had sexually abused him and he believed it because his father had done many, many sexually -- to say inappropriate is such a vast understatement it's hard to imagine, but Chris Kaasee talks about his father taking him himself, Chris, into his home with his stepmother and pulling covers off of her naked body and telling Chris as a child to have sex with the naked stepmother who's drunk and asleep in the bed, passed out on the bed. And so these are the kind of details that when someone's doing a forensic analysis of

whether or not someone making claims of having been sexually abused actually is telling the truth, this is what makes those stories critical.

THE COURT: All right. I'm trying to -- I'm trying to make a laundry list of the hard evidence of sexual abuse. The first two, you mention sexual abuse by a teacher, we already knew about. The Kaasee episode we knew about to some extent but not the follow-up details. And then you say that in the interview with Dr. Krop Fulks revealed that his older sister abused him and his father abused him. Is that right?

MS. DONNELLA: His stepfather.

THE COURT: Stepfather.

MS. DONNELLA: His stepfather.

THE COURT: Older sister and stepfather abused him and that is new information, not before me when my order was issued earlier. Right?

MS. DONNELLA: Yes.

THE COURT: And is that the extent of it now?

MS. DONNELLA: Let me make sure --

THE COURT: I'm not talking about argument, I'm talking about hard facts.

MS. DONNELLA: Yes, I believe so.

THE COURT: All right. So we have two episodes I knew about, two episodes I didn't know about. And the two -- the third and fourth episodes I don't have an affidavit from

Mr. --

MS. DONNELLA: Excuse me. There's one other piece of evidence, information in here, which is that, again, this is substantiated by one of the affidavits, and that is that Mr. Fulks was forced by an older man to have sex with one of his very close female friends while this other man watched.

THE COURT: That was different from the drunk stepmother on the bed?

MS. DONNELLA: Yes.

THE COURT: That was a -- that's another, too, the drunk stepmother on the bed.

MS. DONNELLA: The drunk stepmother on the bed was something happened to Mr. Kaasee's son. Mr. Kaasee's son was confirming the fact that his father, his biological father was a sexual deviant.

THE COURT: So that was just an episode of deviancy by Mr. Kaazee but not direct towards Mr. Fulks.

MS. DONNELLA: Right.

THE COURT: All right. I'm sorry. The other one was he was forced to have sex with who?

MS. DONNELLA: He was forced to have sex with one of his close female friends.

THE COURT: Didn't my order refer to him having sex with an older woman in her 20s and when he was a --

MS. DONNELLA: Yes, that was already -- some of that

was already in evidence.  That was a woman who lived across the street from him, Rhonda Lowan, who from a very young age Mr. Fulks would go over to her house to get food and she would give him food in exchange for taking him into a back room and having sex with him when he was seven and eight years old.

THE COURT:  All right.

MS. DONNELLA:  Also someone who was described as being a baby-sitter in earlier submissions.  And I know the court was a little -- little found a little incredible Mr. Fulks' parents had actually ever hired a baby-sitter for him.  And it was an older girl who lived on his block.  And but that also was confirmed by I believe it was the declaration of Oddie Starks.

THE COURT:  All right.  And then we have the experts who have taken off from the Krop report who I've heard from before.

MS. DONNELLA:  Right.

THE COURT:  At the urging of defense counsel I authorized, is it Mr. Melikian or Miss Melikian?

MS. DONNELLA:  Dr. Melikian and Dr. Hilkey.

THE COURT:  Dr. Melikian and Dr. Hilkey.  And also Dr. Halleck, I think I authorized him, as well.  He didn't come, but Melikian and Hilkey, the defense team or the 2255 team actually convinced me to hear from him live from this witness box --

MS. DONNELLA: Right.

THE COURT: -- on the argument that I really need to look him in the eye and see how strong their opinion would have been. And at great expense to the taxpayers I went along with it. I think he billed us something like $20,000 for coming down here. And so now with this bit of new information about additional sexual abuse, not entirely new sexual abuse but additional sexual abuse, these witnesses have come back with another affidavit that says well, golly, if we had known this we would have really given a cross-my-heart strong opinion. I don't think they could have given a stronger opinion than they gave the first time. I really don't.

MS. DONNELLA: Well, I'll tell you what. I mean, given the fact that Dr. Krop, who --

THE COURT: And we have two episodes of sexual abuse, we have potentially -- lost them again. Okay. Hold on.

Want to take a little recess?

MS. DONNELLA: If you would like to.

THE COURT: Let's go until it drops again, then we'll take a recess.

All right. We're back on the record. Let's go ahead, I was about to say we have at least two episodes of sexual abuse the court was aware of and the experts were aware of. Now we have got potentially three more. Doctors Melikian, Hilkey, and Halleck all say if we had known about

these three other it would have really impacted our decision, our opinion, it would have so much more strong than it was. As I was just saying before the break, I don't think it could have been much stronger in terms of exculpatory testimony. Mitigating testimony, I mean.

MS. DONNELLA: I think -- I think the thing that is --

THE COURT: And the related argument, I'm -- Mr. Daley is going to get up in a minute and say that evidence could cut both ways. Someone who's abused as a child sexually might have had a propensity to rape women. And it could have damaged his case, as well. You've got a judgment call there, as well, as to how far to go with this sexual abuse, how to run with it.

MS. DONNELLA: Let me take your first question first and I will address your second question. You know, I think it's important to understand Dr. Krop's expertise in the area of sexual abuse. He not only works with victims of sexual abuse, but he has worked for many years for the State of Florida assessing people for the state to determine whether or not they are sexual abusers and whether or not they are recidivist abusers, and whether or not they are people who are able to be rehabilitated. So he's got -- he's got tremendous experience with people on both sides of the aisle, both defense witnesses and both people who have been victims and

people who are abusers.

And when he finished talking to Mr. Fulks and then was given the various affidavits once our investigators went out to try and confirm all of these things, it was his reaction that Mr. Fulks, even though you've set this out as being five instances of sexual abuse, that the nature of the sexual abuse and the span of Mr. Fulks' childhood which this sexual abuse spanned put him in a category of being one of the most, if not the most, sexually traumatized people that Dr. Krop had ever -- had ever interviewed and investigated. And that opinion is expressed in -- he says in paragraph seven on page eight of his declaration, in my extensive experience in working with sex abuse victims and sexual offenders, many of whom were victims themselves, I have come across very few, if any, who are victimized as frequently and by as many people as Mr. Fulks was.

And so to have someone like Dr. Krop reaching that conclusion and then having, you know, and then for people like Dr. Halleck Dr. Melikian, and Dr. Hilkey to get that information, we wanted to make sure that the court understood that this was not some low level of child sexual abuse, not that any of it is ever good or ever works, inures to the benefit of a victim, but that this was so extensive that to formulate an opinion, a mental health evaluation of Mr. Fulks not knowing this, was something that left open a huge area

that they needed -- that affected their opinion and made it all the more critical -- we have lost the signal again.

THE COURT: Let's take a 15 minute recess. Y'all might want to wait 15 minutes to dial it back up. Take a 15 minute recess.

(A recess transpired)

THE COURT: All right. Please continue.

MS. DONNELLA: Your Honor, I'm not sure exactly at what point we stopped, but you had asked a second question that I wanted to get to which was about evidence of sexual abuse being a double-edged sword. And I think there are at least two responses to that. One is that looking at what John Blume had to say about his reasons for -- when questioned about investigating this further, he first of all believed strongly Mr. Fulks had been sexually abused, as I mentioned before, and he said that it was something that they wanted to establish. This was not something that he considered to be something that they wanted to avoid for any reason. So if we're looking at strategy reasons, Mr. Blume certainly indicated that this was something that he and his defense team wanted to establish.

THE COURT: So Mr. Blume strongly believed it occurred but he couldn't ferret it out, he couldn't develop it, right?

MS. DONNELLA: Right. But he --

THE COURT: They had plenty of resources to do it. They didn't have your expert here, but once again there was no holding back on resources for investigation and mitigation and social scientists and all that.

MS. DONNELLA: And that's why we believe this what was ineffective assistance on Mr. Blume's part. You know, sexual abuse is something that is very difficult to ferret out and to talk to a client about, talk to a client's family about. When he was asked about it Mr. Blume indicated that several of them quizzed Mr. Fulks about sexual abuse. That's in the transcript, February 22, 2010, at page 60. They quizzed him about it. When asked if he talked to witnesses and family members about sexual abuse he said well, it's not as if you could go to his mother and father and go, you know, look, we just want to know did you ever have sex with your son. You know, again, that indicates a very heavy-handed approach to an investigation into sexual abuse. One doesn't ask those questions. And, moreover, one doesn't assume from the question that I believe it was Mr. Beattie -- Mr. Ashmore asking Mr. Blume that talking to witnesses and family members about sexual abuse meant going in and saying did you sexually abuse your son. It may have been, you know, are you aware of any instances where your son was sexually abused by someone else, which would elicit a very different response.

And Mr. Fulks described for Dr. Krop the fact that

although people from the defense team asked him about sexual abuse, each time it was someone else, often it was over the phone. There was no rapport established, it was done in a very insensitive fashion. And this is the very reason people hire experts in sexual abuse to speak to clients about these issues. And to speak not only to clients about these issues, but often to speak to family members about the issues. And I think in Dr. Krop's pro bono affidavit submitted to this court prior to the 2255 hearing he explains exactly why that's appropriate and some of the successes he's had in speaking to family members. Doesn't mean necessarily eliciting that a family member him or herself that has committed the abuse, it helps establish people or things that happened in the child's past where the parent or the other family member has become aware of changes in behavior, changes in patterns, and in actual -- actual disclosures the child may have made to the parent but the parent didn't take seriously at the time.

And what you said about the fact that Mr. Blume had all these other experts, it's true. I mean, he asked for a slew of experts, you authorized that slew of experts. Why he didn't ask for an expert in child abuse is a -- the fact that he didn't is an indication that he did something that in the context of this case where he believed it occurred and he wanted to establish it was simply unreasonable and ineffective on his part.

So I think that's what this court has to look at in terms of assessing the ineffectiveness in terms of the child sex abuse claim.

THE COURT: All right. I think we have pretty well covered this subject. Let me hear from the government.

MS. DONNELLA: Thank you, your Honor.

THE COURT: Mr. Daley?

MS. DONNELLA: I'm sorry, your Honor. Let me make one --

THE COURT: Go ahead.

MS. DONNELLA: And this is a very important point. I just -- and I apologize for neglecting to mention this. The other thing in terms of the double-edged sword I think is very important to mention is that, you know, in the Supreme Court cases that have examined effective assistance of counsel, one thing that they have always said is that the most fundamental element of ineffectiveness is failure to investigate some part of a claim. And it is -- and that someone can't make a decision about how to go forward until someone knows what the investigation will yield. And so Mr. Blume was making trial decisions without having this information, and that also was a critical factor here. Thank you.

THE COURT: All right, thank you. Mr. Daley?

MR. DALEY: Page 61 of your order, you say the court cannot deem trial counsel ineffective for failing to discover

information from witnesses which petitioner himself could have provided to his counsel but chose not to, even assuming it was true.

You made the point, your Honor, that Mr. Fulks was back and forth on this issue. Trial counsel you found was not ineffective for not being able to ferret it out. It's not a question of whether they tried to, they did try to. Apparently she's trying to characterize Mr. Blume's testimony where he was being sort of I guess a smart aleck about you obviously don't just go in there and say did you abuse your son. I mean, he clearly didn't do that. And if you look at the testimony, they did try to develop a rapport with him, met with Mr. Fulks dozens of times. And then they had Miss Johnson question and meet with him a bunch.

So the fact that Mr. Fulks I guess maybe now wants to characterize it as insensitive, I would characterize that a remarkable statement. The government would have welcomed Mr. -- Dr. Krop's testimony and his analysis saying he exhibited the right kind of emotions when he was talking to him for three-and-a-half hours. Remember this was based on three-and-a-half hours, three-and-a-half hours interview. This is all they had that they are now bringing before you from this doctor. And apparently in three-and-a-half hours he was able to decide that Mr. Fulks was telling the truth, probably by some very vague corroborating supposedly

affidavits, but also because he cried.

Well, your Honor, that would have completely opened the door to the government having the opportunity to go over and over and over all of the incidents of manipulation that Mr. Fulks exhibited. And Mr. Blume clearly would have understood the peril he put himself in. And then, of course, as you said, it goes contrary to the whole idea, wait a minute, if we go too far down the road then we turn him into a sexual predator because he was supposedly abused as a child, as well.

And you know well what an experienced prosecutor would do, as both Mr. Gasser and Mr. Schools would have done, and they would have had an absolute field day. And that would have allowed for even more focus on the sexual aspect of this case. And if that wouldn't have moved a jury I'm not sure what would have.

Your Honor, let's go now back to the first principles this could have brought up. Dr. Krop filed an affidavit ten days beforehand. I don't know what would have prevented them from having him interview Mr. Fulks, certainly for three-and-a-half hours. What we continue to go back to, your Honor, is they want to supplement, basically, the record and either boost their arguments that were rejected by this court or they want to actually sort of submit new information that they could have submitted before.

Some of this isn't even repressed information. I mean, Tracy Graybill back in 2007, right, says that supposedly Mr. Fulks tells her that his sister abused him as a child at some point. So that's obviously before their petition, their motion was even filed. A number of the things that they talk about were actually in the record. Dr. Andrews talks about in her testimony at the trial, she actually talks about the fact that he -- there was in the record information that Mr. Fulks was abused by an adult male, which I think linking that together if that were -- if that were true, if you were to believe that that's probably Gary Kaasee. That information also was brought out at the 2255 hearing. So there's a perfect example.

And how -- I mean, the whole argument is oh, it's so hard to get at this information. Well, exactly. That's the government's point. This is not information that's new or that was not unavailable. Apparently the argument is that you're ineffective unless you think of every possible expert that could possibly be called and you know about it beforehand, so in hindsight after the fact if somebody comes up with an area that wasn't as fully explored then you are ineffective. Which, of course, your Honor, that's not the law. To use the phrase of a former president, I mean, there they go again. It's going to come up again.

The third argument they are going to make is all new

information that's going to come out for the first time supposedly in this hearing, and even though all the information that they are talking about occurred long before, long before the petition was filed. And, again, this is unless you were to say basically there's ineffective assistance of 2255 counsel, which there isn't. There's no such concept. Then you can't -- this court certainly shouldn't go and open the door to all that information. This is literally the quintessential of stuff that should not be considered on a Rule 59(e) motion.

I'm happy to talk about some of the other things. It appears the Oddie Starks declaration, she said or he says, I'm not sure, that Fulks said it when he was 19 or 20. So it wasn't repressed if that's when he revealed this information. Tracy Graybill's affidavit that was submitted in the 2255 hearing, that was done in 2007. I mean, this is not an instance where you have somebody who never revealed anything about some sort of potential alleged sexual abuse. There was clear evidence in the record at trial about the pornography and the loose living that his mother and father engaged in before she had a conversion experience. And you had in evidence at least one instance where apparently there's a report that he was molested by an adult male. So unless you were to determine that there's always a problem when somebody doesn't think of every single avenue to take and that even

when they do take that avenue perhaps they should have gone more thoroughly into it, unless that were the ruling this is not a matter that's appropriate for a Rule 59(e) motion.

THE COURT: All right. Thank you, sir. All right. The last group of -- the last issue that I had in my outline is the four women who testified at trial, either former wives or former girlfriends. Unless I'm mistaken they all testified at trial that there were no deals offered to them as a result of their testimony. Mr. Gasser as an officer the court didn't state under oath, but he did state in open court there were no deals made with any of the government witnesses. And now we have these four women who have all come forward to some extent and said that they admit, essentially admit perjury, admit there were deals offered to them, and so here we are.

And I go back to my initial question. Miss Donnella, am I to understand that these four women testified in June of 2004 and six-and-a-half years later during a 14-day window they all came forward to your office to admit perjury? This is all discovered during that 14-day window after your office got in the case?

MS. DONNELLA: It was discovered in that 14-day period. They did not come forward to our office, we sent investigators out into the field who met with them and had discussions with them about this and questioned them at length about it.

THE COURT: I'll say three of them have directly given affidavits. One is indirect from a roommate.

MS. DONNELLA: I believe we lost the video signal.

THE COURT: Keep going. He's got the audio. We will get him back up momentarily on the video.

MS. DONNELLA: Your Honor, excuse me, before we continue discussing this claim I believe, although I'm not sure, that the two spectators in courtroom are FBI agents.

THE COURT: Right.

MS. DONNELLA: And inasmuch as this claim involves -- and I believe one of them is Agent Bruning, is that correct? Is that right?

THE COURT: Right. One of them.

MS. DONNELLA: Inasmuch as this claim involves Agent Bruning, and he is also a fact witness, I would ask that they be sequestered in the event that they have to testify at some point.

THE COURT: Are you going so suggest an evidentiary hearing is necessary to call these women down here, put them on the stand?

MS. DONNELLA: Well, your Honor, I mean, you know, we have -- we will ask for an evidentiary hearing. We think that in order to -- in order to fully look into this and for you to make a fair credibility determination you would probably want an evidentiary hearing. So we want to protect --

THE COURT: You want me to appoint counsel for them?

MS. DONNELLA: I'm sorry?

THE COURT: For the four women. I mean, they are going to be admitting perjury.

MS. DONNELLA: Yeah, I understand that. Although, you know, your Honor, the claims that we have raised, you know, they are not actually required to assert that they lied to the jury. The issue is whether or not they had deals with the government or whether or not the government knew that there were deals that could have been used by Mr. Blume to impeach the witnesses' testimony when they were here testifying. And whether or not they were testifying truthfully or falsely at that point is something none of us can ever really know for certain.

THE COURT: Let's go back -- let me go back to my timing question first before we get too far. The original 2255 counsel did not contact these four women? I thought they contacted all of the witnesses who testified essentially.

MS. DONNELLA: They -- my understanding is they did contact these women.

THE COURT: They contacted -- I know they contacted the jurors. It looked to me like they left no stone unturned in flyspecking everything that was done. So they did contact these women prior to my June 20 -- August 20 order?

MS. DONNELLA: Yes, they did. But then in --

THE COURT: They recant -- then they recanted after my order came down.

MS. DONNELLA: You know, your Honor, in August of 2004, though, Mr. Gasser got up before this court and in response to your Honor's questions to him were there any deals that the government had with witnesses, was there anything that was not disclosed to trial counsel, Mr. Gasser said this was the most transparent criminal prosecution I was involved in in the 20 years that I was a prosecutor. Everything was provided, everything was transparent. From a discovery perspective every single negative or wart, if you will, or anything potentially negative we brought out on direct examination.

And the reason that I mention this, your Honor, is because the courts have always held, and this has been -- this is in Fourth Circuit opinions as well as Supreme Court decisions, you know, the government cannot come in here and say, you know, we lied about whether or not there were deals, shame on you as counsel for the defendant for not, you know, for not distrusting our representation to the court.

These were officers of the court who said this. And when Mr. Ashmore was here before you for the 2255 proceedings he said that he still felt uneasy in terms of these Brady claims because he believed that there were deals that had been made with a nod and a wink, and --

THE COURT: Didn't Mr. Ashmore or any of your other predecessors, Miss Small or Mr. Watkins, contact these four women before the 2255 hearing?

MS. DONNELLA: They contacted them before they were told by the government that there was no -- that there had been no deals and no disclosures. Now, bear in mind that these women were all people who had criminal backgrounds and who had things in their record which is --

THE COURT: I don't understand that last answer. Whether the government had represented in court that there were no deals or not shouldn't effect whether Mr. Ashmore asked these women whether there were deals made, should it?

MS. DONNELLA: No, your Honor. And -- no, the things that it affects, though, is that, you know, these women were people who had a vested interest in making sure that they stayed in the government's good graces. After we filed the Rule 59 motion with these affidavits, for example, the West Virginia FBI went again to Beth McGuffin and took her out, claiming that she knew where Samantha Burns' body was buried, for example. I mean, these are people who have been scared from day one of having to deal with the government and haven't wanted to have to testify in the first place, and were under great pressure but were also very scared of the ramifications of talking to anybody about these arrangements that they had or the biases that they had or the pressure they felt under.

And then on top of that you get the fact that Mr. Gasser made this representation in open court and said there was nothing of this sort.

Now, we sent an investigator out, we sent a couple of investigators out after we were appointed in the case to talk to these women again and to try and give them as many reassurances as we could that they would be protected by the court if they came forward and told the truth about --

THE COURT: I can't protect them from a perjury charge. I think you might have promised them something you couldn't deliver. I can't protect them if they come down here and they will testify -- every one of these women said there were no deals made to them. And I have looked at the transcript. Every one of these women said there were no deals made to them. They come in here and get on the stand and say there was a deal, you can't guarantee that nothing is going to happen to them. I can't guarantee that.

MS. DONNELLA: And we did not guarantee that.

THE COURT: You just said you told them I would protect them.

MS. DONNELLA: No, no --

THE COURT: That casts suspicion on the credibility of these affidavits if you told them that.

MS. DONNELLA: We did not tell them that you would protect them. We told them we would do whatever was -- was

within the bounds of the law that -- so that they wouldn't get prosecuted for giving these affidavits and telling the truth in these affidavits about the bias and the pressure that existed at the time that they spoke to us. We absolutely did not make any representations that we could protect them against perjury charges.

THE COURT: Held on one second.

(There was a pause in the proceedings)

THE COURT: All right, go ahead.

MS. DONNELLA: But I think, your Honor, it's important that you look at what else was going on here. You know, these women came and made these statements, and yes, they testified in court. But to the extent that the government knew that what they were testifying was false, if indeed it was false, the government was engaged in, you know, in Napue violations. So I think that the focus right now is not on what these women did but was on the fact the government withheld information, the government allowed these women to testify knowing that there was information in their testimony about these deals and that the bias that they might have, that was not -- that had not been disclosed.

THE COURT: All right. I didn't address your question of excluding the witnesses. I didn't address your question of sequestering the witnesses who are sitting back there.

MS. DONNELLA: Right.

THE COURT: So you're suggesting an evidentiary hearing is necessary and the women should -- just for the record, we have been referring to the women, for the record they are Beth McGuffin, Amber Fowler, Amanda Oswalt, and Veronica Evans. Miss Oswalt was the roommate of one of the --

MS. DONNELLA: Tina Severance, right.

THE COURT: Well, don't you imagine that the agents have already seen the petition already? I mean, is there any secret about what's being argued here, Mr. Daley?

MR. DALEY: Your Honor, there's absolutely no secret about what -- in fact, Mr. Bruning prepared a declaration in response to this, basically because of the very thing that's now happening. Everything presumed true of these secondhand hearsay after-the-fact declarations, in an abundance of caution I had him prepare a declaration. We think there's not going to be any need for an evidentiary hearing. But, your Honor, if you determine that you would like to be cautious in case there were to be and somehow because they heard any legal argument that would somehow --

THE COURT: Well, out of an abundance of caution -- I want to make clear I'm not committing to an evidentiary hearing at all at this point. I'm not all convinced -- but let me ask the two agents to step outside, out of an abundance of caution.

(There was a pause in the proceedings)

THE COURT: All right. Go ahead.

MS. DONNELLA: Your Honor, I would like to address two principal points in terms of the substantive arguments that the government has made in its opposition to our Rule 59 motion. One is that they have argued that -- we have lost the video again.

THE COURT: All right.

MS. DONNELLA: One is that they have argued that there is nothing in these declarations that indicates that any of these witnesses actually testified falsely at the trial. When one is looking, though, at impeachment materials that is not the standard that is to be used of the standards when impeachment materials have been suppressed, one has to consider what a competent defense attorney could have done with information about the bias -- we may have lost the video, too? The audio, too? We're still on audio?

THE COURT: It's a different line, I think, than the audio.

MS. DONNELLA: Okay. One has to consider what a competent defense attorney would have done with those impeachment materials and raising that bias in front of a jury and then, you know, how the jury might have considered that information. The question is not whether or not they actually testified falsely about anything, although I will point out

that there were things that were testified to at trial by Tina Severance, for example, that was never contained in any of her 302 statements, and whether or not there was bias there or whether or not there was a deal there is something that would have been very effective cross-examination, as it would have been with each one of these witnesses. Establishing that they had a real reason for coming in and testifying in a way that was favorable to the government and that would harm Mr. Fulks.

The second thing is that the government has made much of Agent Bruning's declaration in its opposition. But notice what the declaration does not say. He says that he did not enter into any deal, for example, with Veronica Evans. But he does not say that he was unaware of such a deal having been entered into in connection with the charges against her in state court. Her court records say she was required to testify against Mr. Fulks, her codefendant. Agent Bruning does not deny knowledge of that deal. Nor does Agent Bruning deny knowledge that Beth McGuffin, for example, was under extreme pressure by the FBI which was accusing her of Samantha Burns' murder. And so under holdings in Brady, Bagley, Giglio, Kyles, Strickler, and bias holdings from the Supreme Court that show a bias is an appropriate thing for a defense attorney to be allowed to cross-examine on, Davis versus Alexander, the Van Morrison case, the --

THE COURT: Let me -- I don't want to interrupt you,

but just let's step back and look at the big picture now. How much did these women help the government's case? We had maybe 140 witnesses, 125 witnesses. We're talking about four witnesses who kind of filled in the blanks as to who went where with who at what motel. And a lot of the evidence I let in from these women related to drug use and other crimes that the Fourth Circuit said was improperly admitted, but it was harmless. It was -- what was it, 403, it was other crimes that didn't relate to this case, like drug use and all. Except for one witness who testified there was mud on both the driver's side and the passenger's side. In the big picture what do these women do to help the government?

MS. DONNELLA: Well, first of all, that was a pretty big piece of evidence. Tina Severance was someone who is involved in this crime spree from start to finish. And she testified as to something that was not in any of her 302 statements, which was that when they were in South Carolina Mr. Fulks pulled a gun on her and threatened her and did some -- in the context of something that was very minor comment she made about admiring someone's cabs on television. Making Mr. Fulks look very much like someone who was totally out of control. And Veronica Evans and Amber Fowler both testified about brutal attacks and brutal sexual attacks that Mr. Fulks had perpetrated upon them. People that he claimed that he was -- was actually married to. Again, these -- this

was -- this was incredibly damaging information for a jury to hear. It seemed to constitute additional evidence of Mr. Fulks having committed violent sexual crimes against these two women. And there was information that could have been used to very seriously challenge the credibility of these witnesses.

THE COURT: Which one said that Fulks raped her and put an arrow to her neck as if he was going to cut her throat with an arrow or something?

MS. DONNELLA: I believe that was Veronica Evans.

THE COURT: What kind of deal did she get?

MS. DONNELLA: She had been charged in -- let me see. I've got the -- we have submitted the -- she was charged in Kentucky with complicity in child abuse against her nine-year-old son, and also with receiving stolen property. That was reduced to one endangerment of a child, reducing her potential exposure from 15 years in prison to a period of five years probation, which initially she was released from and at the time that she testified there was a bench warrant out for her failure to appear and her sentence was still hanging over her at that time.

THE COURT: But the criminal offense had been concluded, the criminal case had been concluded and she was on probation. Right?

MS. DONNELLA: She was on --

THE COURT: There was a bench warrant out for her but ultimately the probation was terminated early. Is that the one? Am I remembering that correctly?

MS. DONNELLA: Yeah, she was put on -- what do they call it in Kentucky? I'm sorry. There's a name they have for it. I'm sorry. But the point of the matter -- the fact of the matter is she's originally charged with a felony, which was complicity in criminal abuse.

THE COURT: But my point is, are we to assume someone is going to come in and fabricate evidence about being tied up and raped and assaulted with the point of an arrow at their throat in return for getting the probation terminated early? That's the argument, right?

MS. DONNELLA: Yeah. I mean, you know, the thing about it, your Honor, is that the charges against her in Kentucky, she had also brought charges at one point against Mr. Fulks for these abusive acts against her and those were dropped by the state of Kentucky because they found no evidence to support them. So, you know, it's clear that this woman has some credibility issues. If you add to that the fact that she was facing a reinstatement of the potential 15 year sentence and believed that that's what she was facing, and the way that she could avoid that was by testifying truthfully against Mr. Fulks, I think it's a great incentive to come in here and testify in such a way that she pleases the

government, and --

THE COURT: You said earlier that they don't have to recant their testimony about the sexual assault, rape, tying up and all, they don't have to say that that was incorrect. I understand that, but they are going to have to say that they lied when they said no deals were promised them, aren't they? Aren't they going to have to admit that was not truthful?

MS. DONNELLA: They would have to say that.

THE COURT: Because am I correct, I might be wrong --

MS. DONNELLA: Your Honor, they have already said that. They have already said this and testified --

THE COURT: I'm pretty sure I looked at the transcript of all -- transcript of all the testimony of these four women and they all were asked directly have any promises been made to you as result of your testimony. I think they were all asked that. Do you concede that, or not?

MS. DONNELLA: I believe that they were asked that question, yes.

THE COURT: Mr. Daley?

MR. DALEY: I'm fairly certain they were, your Honor. I'm certain of three or four. I believe that was a question that was asked of all the witnesses, but almost certainly these four ladies.

MS. DONNELLA: But, again, we're not looking right now at potential criminal liability that they face for

perjury, we're looking at whether or not the government engaged in inappropriate and unconstitutional behavior by failing to disclose that to this court and to Mr. Fulks prior to trial -- prior to these women testifying. I think that's where the focus has to remain in this issue.

THE COURT: All right. Anything further? Mr. Daley?

MS. DONNELLA: No. Thank you, your Honor.

MR. DALEY: First, your Honor, I want to put on the record that the government made no deals. Everything I'm about to say is only going to be after I first tell you for certain after these allegations came in, doing the due diligence that I believe I'm required to do, I went back and talked to all the major players in this case, Mr. Schools, Mr. Gasser, I spoke with the agents. Blanket naked assertions of prosecutorial misconduct and government misconduct seem to be bandied about as if it's just proforma, this was just what we do in 2255s. And we just take vague unspecific six, seven years after the fact affidavits, slap them up after a 2255 petition has been denied and then we want to leave them out there twisting in the wind. And so I want to just be firm in my statement that the government made no deals with these four ladies or any other ladies. And, actually, if you look at some of the specifics of the affidavits it doesn't take much to pick some of them apart very quickly.

And this court should obviously look towards the

overwhelming evidence as far as what testimony there was about Mr. Fulks' abusiveness. It was not limited to anybody. Women close to him, women not close to him, men, his codefendant Mr. Basham, how he treated him. The way they dealt with Mr. Harkins. This is evidence that is uncontradicted.

And so to the extent they are now going to allege that Veronica Evans' testimony -- your Honor, you sat through it. I've only had the ability to read it. But the remarkable allegation would be that somehow because she was on probation and apparently had some bench warrant that she -- nothing says that she even knew about it. That she gave this, I mean, detailed account of Mr. Fulks' abuse of her, and she did that, I guess the theory goes, because -- she did all this, made it up so that she will then not potentially have her charges, I guess, be reinstated. I guess that's the way the story would go.

First of all, the declaration is very vague. Can't even remember who supposedly she had this -- who promised this to her. She doesn't state that she new of any bench warrant. And, again, what is probably most important in this context, as well as all the oh, all of this comes up after your judgment. And I take counsel at their word in 14 days they were able to get these four ladies to -- or not four ladies, three women, three ladies who said a little something but not an enormous amount, and the fourth woman who gives double

hearsay about a person who's never recanted her testimony. Best I can tell Miss Severance has never recanted her testimony.

So I will start with the whole idea that this comes too late. They are new claims, they can't be brought, they are time barred, they are well after the year that they should have been brought. They can't smuggle in three new or four new claims, Brady claims under some other Brady claim they made. The fact that Mr. Gasser gave assurances doesn't stop them from having investigated the claims. They have already admitted that these women were interviewed, were contacted by 2255 counsel. At some point the case has to stop and we move on to the appeal.

Now, Amanda Oswalt, the second woman, she's not even involved in this case except that she lived for a couple of months with Tina Severance. And if you would -- if you will focus on that even for a moment you would see some real strange things. Apparently Tina Severance told her, she says, that she fooled the FBI. I can't figure out whether she in the end supposedly said she helped the government or hurt the government. I know that the court made an observation that some of Tina Severance's testimony was harmful to the government. In your order at page 134 you note that, so clearly she wasn't so supposedly in the government's pocket that she didn't give some testimony that was harmful to the

government.

So it's a double hearsay declaration that Miss Oswalt gives. We have never had Miss Severance say that. That is not insignificant for the court to look at. And I guess the point that you made earlier, I do know Miss Severance said there were absolutely no deals of any kind made with her.

Beth McGuffin, there's nothing in there. I'm sorry. There's nothing in there. Even if you take it for what it says, that the West Virginia FBI thought she may have been involved, well, if they hadn't pursued that I think we would be saying they were negligent in their investigation. She obviously knew some things.

And the fact the FBI wants to question witnesses from time to time, even challenge what they say is true, this court well knows perhaps better than anybody in this courtroom that perhaps witnesses don't always tell the truth the first time or the second time or the third time they are questioned by law enforcement.

But there's no mention, no mention in her declaration, in Miss McGuffin's declaration, there were any threats or deals that they would drop charges against her. I think there's a mention that perhaps she could -- if she could help them find the body she would be given some sort of immunity. But that has never come to fruition.

How Miss McGuffin was treated by the FBI, I mean

clearly transporting prisoners and giving them lunch on the way there and back is not something that -- it's amazing what gets blown up. And if you just focus on this declaration, sound and fury signify nothing. Again, nobody of these four ladies ever says that they have said anything false. That's not dispositive, your Honor, but it is not insignificant.

Amber Fowler, wow. There are just some things that are demonstrably false. I was shocked and amazed that the FBI keeps such detailed records that even when they give a witness money over a weekend and it's 8:00 o'clock at night, or whatever it was, in a hotel lobby Friday night because the witness isn't going to testify that week and is I guess threatening to go home all the way back to West Virginia, that even when they give them money they get a receipt and they have it witnessed by the AUSA in the case. But that's what happened. And instead of $400 it was $60. You know, she -- I guess Miss Fowler is going to continue to say that it was $400. But I know both Mr. Bruning and Mr. Gasser know it was $60. They have a receipt.

THE COURT: What does the receipt say?

MR. DALEY: She received $60. It's attached to Agent Bruning's declaration.

THE COURT: It's signed by Fowler?

MR. DALEY: Yes, your Honor. It says I, Amber Fowler, received $60 from Special Agent Jeffrey J. Bruning on

6-18-04 to be used for the purchase of clothing and food while in Columbia as a witness at the trial of Chadrick Fulks. Signed by Amber Fowler, Agent Bruning, and Johnny Gasser. And then --

THE COURT: Did the jury hear about the $60?

MR. DALEY: I don't know if they heard specifically about the $60. They did hear about numerous -- I believe that Miss Fowler is the one that they heard testimony about 100 or $200 being put into her prison account for necessities while she was being held before she testified. I think -- I could be wrong there, your Honor. These witnesses start to blur.

The second item that she says is that she got a $1,500 reimbursement check, which is again demonstrably false. Our victim witness coordinator contacted the Marshals Service and we found the check that she actually received, which was only $826. So, I mean --

THE COURT: Do you have a canceled check? You have the Marshals' record?

MR. DALEY: All I have is the Marshal's record of I think it's the -- it's they give them a check and then there's a carbon, I guess, that has been scanned. That shows that she received $826.25. And so what we're left with is the allegation that Agent Bruning told her that she needed to show more emotion. She didn't have to, I think the term was cry like Tammy Faye Baker, but she needed to show some emotion if

this was really true what Mr. Fulks had done to her. Again, that is what that affidavit says.

THE COURT: Did I address -- didn't I address that allegation in the order, the fact that she was told to show emotion?

MR. DALEY: I don't believe so, your Honor.

THE COURT: All right.

MR. DALEY: I'll doublecheck that, but I'm fairly certain you didn't. So, I mean, what we're left with is after the fact a set of declarations that most of which don't really say a lot, but to the extent they say anything they pale in comparison to what was presented to this court. And as I would say again, the government vigorously contests that any of these ladies received any deal for any of their testimony and we don't believe an evidentiary hearing is necessary.

I could certainly tell you, whether you want to call it proffer or not, if we have an evidentiary hearing you are going to have Mr. Schools and Mr. Gasser and perhaps former U.S. Attorney Strom Thurmond and the agents, they are going to all get up and say that very thing, your Honor. It would be foolish for Mr. Gasser to have been so adamant about the very fact there were no deals for him to say that over and over again if there were.

And I really don't know that there's anything more to be said except that this is -- these are new claims, they

can't smuggle them in under their other Brady claim. They were after the fact, it was evidence to the extent it existed it existed prior to the entry of the judgment. They pale in comparison to the overwhelming evidence, which both goes to materiality and any harmlessness inquiry if you were to get to that point.

And when you look to the affidavits themselves, which we spent about 12 or 15 pages in our memorandum on this so I'm not going to revisit all that analysis, but we strongly urge you to deny this entire motion. As I said at the beginning, all of the information, all of the affidavits deal with events that occurred prior to -- mostly prior to even the filing of the motion, but certainly all the events talked about in the declarations happened prior to the entry of judgment in this case. And then to the extent there's a few opinions out there they clearly could have been brought and they weren't.

So for those reasons we would ask you to deny the motion to alter or amend and to find that all the materials submitted are inappropriate for purposes of a Rule 59 motion.

THE COURT: Thank you, Mr. Daley. Anything briefly in reply?

MR. NOLAS: If I may, a couple of minutes, your Honor. Your Honor, in the overall picture the suggestion that we threw allegations up, and I think the quote was they are twisting in the wind, I would respectfully submit to your

Honor that's utterly inaccurate. In the time since your Honor appointed us we contacted the witnesses and provided to you the information as to the Brady claim that the witnesses gave us.

As to the issue involving Dr. Krop and sexual abuse, Miss Donnella explained what the history is in that regard. As to the issues arising from Mr. Blume's lack of experience, remember that at the hearing Mr. Blume indicated that he had jury trial experience, and he cited two cases, the Hunter case and the Delacruz case. Mr. Partee and Miss Coggiola in those two cases, and Mr. Hill, they were contacted because of what Mr. Blume had said, indicated he had not been involved in the jury selection, he didn't do the witnesses.

We also as an aside have Mr. Gasser's resume, that's one of the exhibits that we're tendering to the court just so your Honor can compare the jury trial experience Mr. Gasser had to the non-experience Mr. Blume had. But the bottom line is this isn't -- by no means did we say let's just throw a bunch of stuff at the court and see if it sticks. Your Honor appointed us, we did what we think your Honor expected, which is to go out, do the work on the case, provide to your Honor what we learned. We reviewed that in the Rule 59 motion.

Under the Fourth Circuit's standards as to Rule 59 and under the Supreme Court's standards a Rule 59 motion suspends the finality of judgment, giving the court the power

to correct matters before judgment is entered. That's the posture of the case before you. And we urge you very strongly to exercise your discretion, hold an evidentiary hearing as to the allegations raised in the Rule 59 motion, at the very least revisit in your own thinking your original order based on what has been raised in the Rule 59 motion and in the reply. You have the authority to do that and we urge that your Honor do that. Bringing the issues forward I can't imagine that your Honor would expect us to do any less than --

THE COURT: Suppose, again, I don't want to get any false hopes up, but suppose I do decide to hold an evidentiary hearing at least as to the women. Are they going to testify or if I appoint counsel are they going to claim the Fifth Amendment?

MR. NOLAS: That would be a matter between them or for their counsel in that regard. That would be inappropriate on my part.

THE COURT: I guess that's not a fair question to you, but I'm just thinking out loud. Is it going to get you anywhere to bring them all down here?

MR. NOLAS: Our hope and our submission is that they would testify in accord with the affidavits that they provided. I mean, that's what the proffer is. They have disclosed these facts, we have tendered the facts to the court. However, I can not speak for another lawyer. Our

allegation is that if testifying this is what they are going to say.

THE COURT: All right. Well, those were all the issues that I have by way of groups. Anything else you want to say on the motion?

MR. NOLAS: The only final thing, your Honor, is we prepared exhibits that include the affidavits that were tendered with the Rule 59 motion. And the memorandum that I referred to, the letter from the U.S. Attorney's office to Mr. Blume that predated the trial, and Mr. Gasser's resume. And what we did is we numbered those sequentially starting with 100, which was the last number at the time of the evidentiary hearing, and I would just tender those to the court.

THE COURT: Good. That's fine.

MR. NOLAS: I think it will make it easier for --

THE COURT: Most of the affidavits are attached to the petition. You want to put them in as Exhibits 100 through --

MR. NOLAS: That's right. I started at 100 because the petitioner list ended with 99 at the hearing. I think it would be easier to refer to one list all the way through. So I'll tender those at this point.

THE COURT: Glad you did that. We always have trouble with lawyers who want to get fancy with 1A through C, and then 2A through F, and makes it confusing. I much prefer

to have it just sequentially all the way through.

MR. NOLAS: We started at 100, end at 121, and it just goes straight through numerically.

THE COURT: All right.

MR. NOLAS: Your Honor, thank you very much.

THE COURT: Thank you very much. We will be in recess. I'll take the matter under advisement.

(Recess, 12:30 p.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date: 1-10-11                    s/  Daniel E. Mayo