# Exhibit 1

**Declaration of Kimmberly Taylor**

I, Kimmberly Taylor, declare under penalty of perjury pursuant to the laws of the State of Arizona and of the United States of America:

1.    I am a paralegal in the Office of the Federal Public Defender. I am assigned to Brandon Basham's case. The Office of the Federal Public Defender has represented Brandon Basham since September 18, 2009.

2.    On December 10, 2009, I sent an email to Mary Floyd, courtroom deputy for Judge Anderson, specifically asking why there were gaps in the docket numbers. At this time, we could view all pleadings except for sealed pleadings, including those before November 2004. Ms. Floyd's response was, "The document numbers are skipped due to more than one defendant in the case. Some of the skipped numbers maybe on the co-defendants docket. Sometimes a docket number was deleted for an incorrect entry and the corrected entry would get a new number." I replied and explained that the gaps I was referring to appear in the combined docket of Fulks and Basham and already accounted for corrected entries.

3.    On December 11, 2009, Mary Floyd replied to my email. "Those documents are sealed ex parte motions by Basham. You need to file a motion requesting copies of the sealed documents." Seeking further clarification, I replied, "You did inform me about filing a motion to get sealed documents, which we will do, but I wasn't aware that some sealed motions don't even appear on the docket as you stated below. Is there a reason why the sealed ex parte motions you referenced (108-114) don't show on the docket and 135, for example (which shows as "Ex Parte Motion [sealed]..."), does?" Ms. Floyd responded, "It is case participant sensitive. The system and our procedures changed from when this case started to when it ended."

4.    In the first half of 2010, our access to PACER pleadings filed before November 2004 was revoked.

5.    On June 1, 2010, the Supreme Court of the United States denied the petition for writ of certiorari in Mr. Basham's direct appeal.

6.    On June 2, 2010, I called Mary Floyd to inquire about regaining access to the entire electronic record and obtaining copies of the sealed documents. She spoke with the Judge and a telephonic conference was arranged to discuss. From this conference, we learned that Ms. Floyd would have to manually copy the record prior to November 2004 (800+ documents) to send to us.

Initials _____

Page 1 of 3

7.     On July 20, 2010, our office filed a motion for Michael L. Burke and Sarah E. Stone to appear *pro hac vice*. The Court granted that motion on July 27, 2010.

8.     On August 6, 2010, I called and emailed Mary Floyd regarding getting the record.

9.     On August 10, 2010, Mary Floyd notified us that the Judge and the Clerk of Court had granted us access to the electronic docket sheet for both Fulks and Basham, and that it should happen within two weeks.

10.     On August 23, 2010, we were advised that we should now file the motion for ECF access.

11.     On August 30, 2010, we filed a Motion for ECF Access to Case File. The Court granted that motion on September 16, 2010.

12.     Mary Floyd was on medical leave for two weeks in September 2010. After she returned, we emailed back and forth about why we still could not access the record. It was discovered that Michael L. Burke and Sarah E. Stone needed to register for a S.C. ECF login ID. This was done and resolved on September 22, 2010.

13.     On May 6, 2011, I sent the following email to Mary Floyd:

> This email is a follow up to the telephone message I left earlier.
>
> 1)     I've attached a list of sealed documents that we need to get copies of. How soon can we obtain these documents and what is the process?
>
> 2)     Also attached is a list of missing docket entries.[1] These represent a gap in the numerical sequence of the docket that we have no explanation for. This list excludes any corrected entries. Are there documents attached to any of these numbers? If not, what do the gaps represent?
>
> 3)     While we have been appointed local counsel, we are the ones actually doing the work involved in investigating and drafting the petition. It would be very cumbersome for the team to have to travel to South Carolina to facilitate the filing...do the rules

---

[1] A copy of the list is attached as Appendix A to this declaration.

Initials _____

permit Mike and Sarah to file the petition electronically from Arizona now that they have been granted ECF accounts?

4)     As you may or may not be aware, we are planning to file the habeas petition by June 1st, so time is of the essence. If there is any way that I can assist in expediting this request, including travel, please advise.

14.     On May 11, 2011, I sent to Michael Burke and Sarah E. Stone the following email summarizing phone calls I had with Mary Floyd:

> I spoke with Mary Floyd today. She explained that the court requires them to assign docket numbers to every entry they make, including administrative and utility entries that go unseen to the public. She assured me that every document related to the Fulks and Basham case is visible to us on PACER, so we can ignore the missing numbers. While we are authorized to receive Basham's sealed pleadings, we do not have access to Fulks'. She is sending a disc with some of the missing sealed pleadings to me. It may arrive while I am on leave, so if you are looking for a sealed pleading that is not in the binders, please check my inbox for a disc from the court and it should be there.

15.     On May 16, 2011, I received discs with internal versions of the docket in Fulks and Basham, which has some entries we are not able to view online. We also received hard copies of all of the sealed pleadings in Basham, most of which are ex parte motions regarding funding. However, there are still gaps in the record for which we have no explanation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 31, 2011, in Phoenix, Arizona.

Kimmberly Taylor

# Appendix A

# MISSING DOCKET ENTRIES
## (DOCKET OF BASHAM AND FULKS)

| | | | | | |
|---|---|---|---|---|---|
| ☐ | 2 | ☐ | 1018 | ☐ | 1229 |
| ☐ | 3 | ☐ | 1020 | ☐ | 1232 |
| ☐ | 15 | ☐ | 1021 | ☐ | 1233 |
| ☐ | 33 | ☐ | 1023 | ☐ | 1239 |
| ☐ | 34 (See 01/27/03 | ☐ | 1024 | ☐ | 1246 |
| | sealed order) | ☐ | 1030 | ☐ | 1257 |
| ☐ | 51 | ☐ | 1037 (SEE 1038) | ☐ | 1260-1264 |
| ☐ | 52 | ☐ | 1039-1041 | ☐ | 1279 |
| ☐ | 54-63 | ☐ | 1047 | ☐ | 1283 |
| ☐ | 66-69 | ☐ | 1051 | ☐ | 1285-1287 |
| ☐ | 71-73 | ☐ | 1052 | ☐ | 1289-1290 |
| ☐ | 75 | ☐ | 1055-1060 | ☐ | 1293-1294 |
| ☐ | 76 | ☐ | 1062 | ☐ | 1298 |
| ☐ | 78-84 | ☐ | 1067 | ☐ | 1301 |
| ☐ | 87 | ☐ | 1070-1074 | ☐ | 1310 |
| ☐ | 88 | ☐ | 1076-1089 | ☐ | 1311 |
| ☐ | 95-100 | ☐ | 1092 | ☐ | 1313 |
| ☐ | 104-105 | ☐ | 1093 | ☐ | 1316 |
| ☐ | 108-114 | ☐ | 1095 | ☐ | 1324 |
| ☐ | 120 | ☐ | 1098 | ☐ | 1325 |
| ☐ | 174 | ☐ | 1102 | ☐ | 1328 |
| ☐ | 190-193 | ☐ | 1106 | ☐ | 1333 |
| ☐ | 369 | ☐ | 1108 | ☐ | 1335 |
| ☐ | 440 | ☐ | 1111-1113 | ☐ | 1340-1342 |
| ☐ | 825 | ☐ | 1119 | ☐ | 1346 |
| ☐ | 828 | ☐ | 1124 | ☐ | 1352-1354 |
| ☐ | 834 | ☐ | 1125 | ☐ | 1361 |
| ☐ | 837 | ☐ | 1129-1134 | ☐ | 1366-1367 |
| ☐ | 859 | ☐ | 1136-1139 | ☐ | 1370 |
| ☐ | 860 | ☐ | 1148 | | |
| ☐ | 870 | ☐ | 1154 | | |
| ☐ | 876 | ☐ | 1158 | | |
| ☐ | 877 | ☐ | 1167 | | |
| ☐ | 923-925 | ☐ | 1174 | | |
| ☐ | 934-943 | ☐ | 1179 | | |
| ☐ | 973 | ☐ | 1180 | | |
| ☐ | 974 | ☐ | 1184-1186 | | |
| ☐ | 976-979 | ☐ | 1212 | | |
| ☐ | 1005 | ☐ | 1215 | | |
| ☐ | 1007 | ☐ | 1219 | | |
| ☐ | 1017 | ☐ | 1223 | | |

# Exhibit 2

# BRUNSWICK COUNTY SHERIFF OFFICE
## INTERVIEW REPORT
## LT DA CROCKER

PERSON INTERVIEWED: **SHERIFF RONALD E HEWETT**
ADDRESS: PO BOX 09 BOLIVIA NC, BCSO
TELEPHONE: 910 253 2736
DATE: 12/03/02
LOCATION: BCSO
CASE NUMBER: 02-3758

The case is reference the abduction of Alice Donovan (statements / actions made by Brandon Basham)

On November 28, 2002, Sheriff Hewett met with Brandon Basham as pre-arranged with FBI agt Jeff Long (case agt), Basham's two attorneys, Two Conway Officer assigned to security on Basham (Sgt Parker and Sgt Sarvis).

Basham was transported from Florence SC to Brunswick County NC for the purpose of showing the location of Alice Donovan. Basham was at all times in the presence of his attorneys; he was afforded consultation to same attorneys prior to any action or statement made by Basham.

The above arrived into Brunswick County at (approx) 0830 hrs on Hwy 211 from Hwy 74/76. Basham and company were in a private white ford van and followed Sheriff Hewett to Hwy 17 to which they turned south on 17 and went directly to the Dodge City Amoco in Shallotte NC.

On arrival, Basham was allowed to use the restroom and given cigarette and drink. Waiting at the Amoco station was Chief Hendricks (Conway SC Police Dept) and other SC officers. Sheriff Hewett then lead Basham and company to hwy 17 and straight to Bee Tree Farm road off Green Hill road (Winnabow area of Brunswick County)

00814

Once there, formal introductions were made by all to include Sheriff Hewett to Basham and his Attorneys. Attorney Littlejohn agreed that a local officer was needed to aid in the directions given by Basham and that Sheriff Hewett was agreed upon by Attorney Littlejohn and Agent Long.

Seated in the van was a Conway Officer driving and Sheriff Hewett in the front passenger seat, behind the driver was Basham and to his right was attorney Littlejohn, in the rear seat was Basham's other attorney, Agt Long and the other Conway Officer.

Again introductions were made and as they rode Sheriff Hewett showed Basham 8x10 digital photos of the local area. Several pictures Basham indicated of no knowledge of the area and other he made comments as to seeing before. Attorney Littlejohn also observed the all the photos during the process, and approved.

Basham was shown pictures (now marked 1,2&3) and Basham indicated that the picture of the Bee Tree Hunting Club was familiar, but not the sign. Basham stated that the sign that he saw before was either 4x6 or 4x8 and was green with white letters, stated it had "animal" on the sign.

Basham was shown pictures (now marked 4&5) and Basham stated it was the same hunting camp and that he remembered they turned around as there were men standing on the porch.

Basham was shown pictures (now marked 6,7&8) and Basham stated he recognized the cemetery shown as "that's the cemetery", stated he thought there was more of a broken down fence but that it looks like it. (NOTED: There was an older broken down fence, approx 10ft in front the current fence at the cemetery)

Basham showed sheriff Hewett where he did not remember the turn around on the photo and stated, "we pulled right in there and we cut to the left behind a fence" indicating on the photo the area discussed. (later Basham illustrates to the Sheriff at the actual location and states "I think this is it" as they drive by the cemetery)

00815

Sheriff Hewett states that as they rode in the van a left was taken out of Bee Tree Farm road onto Green Hill road and they follow the road for several miles to which at one point Basham points out a house and claims, "I remember that place".

The route taken continued onto Zion church road to Hwy 17 and turned north to the Gregory Poole (Industrial Area near Leland NC) business and Basham indicated that nothing meant anything to him there. They road back to Green Hill road area to the CC road going to the Prosper Community in Columbus County NC with still no indications of knowing the areas.

Sheriff Hewett states that once on the "CC" road there were several hunters lined up and down the road. At one point while riding along a Doe (female deer) jumped on the hwy and ran in front of the van, in view of all of those riding in the van. Basham at this time states, "you know, I could never kill a deer and here I have…." Sheriff Hewett states he observes attorney Littlejohn (sitting next to Basham) then touch Basham and shake his head left to right (in a negative nod) to Basham. Sheriff Hewett states that Basham never completed the statement he started. Sheriff Hewett states that throughout the day this was the only time attorney Littlejohn corrected Basham in any action or statement.

Sheriff Hewett states that at one point Basham motioned at his attorney to come closer so he could whisper and Attorney Littlejohn gets closer to which Basham is heard saying, "should I tell them about, ? (Sheriff Hewett could here no more, as they whispered) Then Attorney Littlejohn stated "go Ahead, that would be OK" to Basham. Then Basham describes with his hands 16' to 20' inches long (with fingers extended in shackles) it's a leather strap. You need to back to the cemetery and look for the leather strap. Basham further described it with possibly a Liz Claiborne tag on it. At this time Sheriff Hewett instructed Deputy's and other personnel to return to the cemetery and further look for the purse strap. (Note: search revealed no strap)

Sheriff Hewett states that once on Lewis Swamp road off Green Hill road, Basham stated "I think this could be it" and started obviously trembling. Sheriff Hewett states that at one time they located a stake near the road and again Basham became emotional. Basham further added that the trees (along the road) were closer together. Basham then states that, "Fulks was the leader that whatever Chad wanted to do, we did, Chad was driving".

Basham stated of remembering a Park and that Chad wanted to take her (victim) to the park and he (Basham) agreed to which Chad said to Basham, No there will be too many people around the park. Basham stated he remembered the park was on the right and just past the Park was the green Animal sign, further that the sign was on the left side of the road. Basham stated to Sheriff Hewett that he and Chad once had passed the park they turned around and traveled back to a road to which they drove down for a distance, a long way (maybe 20 minutes).

Basham stated that once on the road the trees got closer together and they stopped and pulled her out to the right side of the car, cut his (Bashams) leg, then they took her into the woods. Sheriff Hewett states at this point Basham is pulling on his leg irons in an attempt to show where he was cut by the stake, stating it scraped his leg. Basham states that after dragging her out, they got back in the vehicle. Basham states that the road was wide enough to do a turn around and go back the way they came. (maybe backed up one time).

Sheriff Hewett states they returned in the van onto Lewis Swamp road and Basham stated, "it's like this, but I don't think it's it"(referring to Lewis Swamp road). Sheriff Hewett states he observes Basham to be physically shaking and has red eyes. At one point the van is stopped in a possible area where there is a stake on the left hand side (ditch area of Lewis Swamp road) and Basham stated that that it won't (Donovan's body) be far from the road.

Sheriff Hewett showed Basham photo (now marked #9) and Basham states that he remembered the intersection that they turned right onto the road. (photo was of cherry tree and green hill road intersection)

Photos (now marked as 10&11) and Basham states, " that's the place where Chad paid for the gas and I was sitting in the back with her (victim)" (The photos was of Dodge City Amoco in Shallotte NC)

00817

Sheriff states they continued to check numerous areas to include Hwy 17, Governor's road and Funston road. States that over 50 to 60 miles were driven throughout the day and that at one time gas was obtained at the hwy 17 / hwy 87 Exxon station. (Basham again was given cigarette and a drink)

Sheriff Hewett states that at the end of the day (November 28 2002) the van and other officers gathered at the cemetery on Bee tree Farm road. States that at one point Basham was being descriptive to Sheriff Hewett as to what had happened and stated in response to Sheriff Hewett, " I'm trying sir (to help), but all the roads, pine trees and dirt look alike. Sheriff Hewett states that while talking at the cemetery Basham stated, "we parked right there", Basham pointing at an older fence and current fence (which is a location that was consistent to a witness had earlier observed the vehicle at the cemetery).

Sheriff Hewett states that while at the cemetery, Basham indicated how the (victims) pocketbook was used. (Sheriff Hewett was able to determine this meant, the pocketbook strap was **used** to strangle the victim to death)

Basham then walks to the left front edge of the cemetery (along with Sheriff Hewett and Conway Officers Sgt Parker and Sgt Sarvis. Basham demonstrates (visually) how he afterwards threw the strap into the wood line at the cemetery. Basham indicated that the strap was 16 to 20 inches in length and was a leather type. Basham also showed an area to the left of the cemetery and again stating "check in those trees and over there. Basham appeared to be breathing heavy and stated it was "a Liz Claiborne pocketbook". Sheriff Hewett asked Basham directly, is this where it happened and Basham replied, "yes, this is it". (Sheriff Hewett observes Basham again get emotional) Sgt Parker and Sgt Sarvis during this conversation had walked into the woodline to the left of the Cemetery looking for the purse strap.

Sheriff Hewett observed that all through the day, Basham never denied participating in the crime.

After this Basham and his attorneys conferred privately in the van in an effort to grant time to discuss anything that had been missed throughout the day. Basham was with Sheriff Hewett from approx 0830 to 1500 hrs on November 28, 2002

00818

# Exhibit 3

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/04/2002

On November 28, 2002, Agents of the Federal Bureau of Investigation (FBI), North Carolina State Bureau of Investigation (SBI), Brunswick County Sheriff's Department and Conway, South Carolina Police Department conducted a search in the Winabow area of Brunswick County, North Carolina. The search was conducted with the assistance of BRANDEN BASHAM and his two appointed attorneys, William (Billy) Monckton and Cam Littlejohn.

BASHAM was transported from the Darlington County Detention Center, Darlington, South Carolina, to the Bee Tree Hunting Club in Brunswick County, North Carolina. The hunting club was used as a starting point since BASHAM recognized the club and was aware that several witnesses observed the dark blue BMW with two males and a female making a turn in front of the club on November 7, 2002, just before dark.

BASHAM traveled in a Ford van with both his attorneys, Sheriff Hewitt, Agent Jeffrey Long and two Conway Police Officers. FBI Agents Clyde Merryman and Maurice Kelliher and Conway Police Chief Sam Hendricks followed the van in a trail vehicle.

After leaving the hunting camp, which is located at the end of a fairly long, windy, dirt road, the van traveled down the road stopping at a small cemetery. The cemetery is just off the dirt road prior to getting to a paved road. Witnesses observed the BMW parked in the cemetery shortly after it had been observed at the hunting club.

BASHAM looked at the cemetery from inside the van and indicated that he did not recognize it as being the same cemetery he, FULKS and Donovan had stopped at.

BASHAM attempted to re-create his direction of travel after leaving the cemetery. BASHAM was fairly precise in his directions, however, after he realized that the first turn he recalled making off the paved road did not exist, BASHAM began to show doubt in his ability to locate the dirt road where he and FULKS disposed of Donovan's body.

00125

Investigation on    11/28/2002    at    Brunswick County, NC

File #    7A-CO-27964, 7A-IP-92394, 7A-PG-71366    Date dictated    12/04/2002

by    SA Jeffrey M. Long :jml

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

7A-CO-27964, 7A-IP-92394, 7A-PG-71366

Continuation of FD-302 of _____ , On _11/28/2002_ , Page ___2___

      Several hours were spent driving randomly around the area attempting to locate a single dirt road which would be recognizable to BASHAM. A stop was made at a second cemetery which was located in the same general area as where the first cemetery was located. BASHAM walked the area and came to the conclusion that the second cemetery was also not the cemetery where they had stopped at. BASHAM recalled specific details about a shiny fence and small headstones resembling an animal cemetery. A second stop was made at the first cemetery, allowing BASHAM to walk around the area. BASHAM concluded that it was not the same cemetery which they had stopped at. BASHAM had a conversation with Attorney Littlejohn resulting in information being passed to this agent that BASHAM would be positive on the location of the cemetery if BASHAM located a purse strap in the area. A purse strap was used by FULKS to strangle DONOVAN. BASHAM threw the strap out of the window of the BMW as they left the cemetery.

      Efforts continued to identify the dirt road where the Donovan's body was dumped. While driving down one of the dirt roads in the area, BASHAM became visibly upset and stated that he believed that this was the road. The van was stopped and a short search was conducted in the area of a metal stake which was observed on the side of the roadway. Nothing was found and Sheriff Hewitt agreed that efforts had been made earlier in the week to search that area and nothing was located.

      As the van traveled back to the hunting camp to conclude the search efforts, a decision was made to stop at the first cemetery for a third time. A request was made of the attorneys to ask BASHAM several questions about specific details as to what had happened to Donovan in the cemetery. The attorneys met with BASHAM inside the van, outside of a law enforcement presence, and then provided the following information:

      The cemetery where we were currently located was in fact the cemetery where BASHAM and FULKS had stopped at. Donovan was not taken outside the vehicle and remained in the back seat of the BMW. FULKS raped Donovan in the back seat. Donovan was only wearing a top. After FULKS raped her, FULKS used a purse strap, which was approximately 18 inches long, and strangled Donovan. FULKS and BASHAM took Donovan out of the back seat and placed her in the trunk. FULKS also took Donovan's panties and threw them in the trunk. As FULKS drove the BMW out of the cemetery, BASHAM threw the purse strap out the window. FULKS drove around the area for what seemed to BASHAM to be as much as an hour. FULKS became

00126

FD-302a (Rev. 10-6-95)

7A-CO-27964, 7A-IP-92394, 7A-PG-71366

Continuation of FD-302 of _____ , On 11/28/2002 , Page 3

concerned that if Donovan was still alive in the trunk, she may punch out the tail light or pull the wires out. FULKS found a dirt road in the area of what BASHAM believed was an animal park or some type of wildlife area. BASHAM recalled FULKS using the word "park" and asked BASHAM if the "park" would be okay. BASHAM agreed and FULKS turned onto a wide, smooth dirt road. FULKS drove down the road for approximately five to ten minutes before coming to a stop in the road. Both FULKS and BASHAM took Donovan's body out of the trunk. As BASHAM was moving around the outside of the BMW, he stepped in a hole and cut his leg on a metal stake. At some point between leaving the cemetery and dumping Donovan's body, FULKS stabbed Donovan and slit her throat. BASHAM recalled FULKS taking the knife and placing it between FULKS' thigh and driver's seat of the BMW.

Both FULKS and BASHAM dragged Donovan's body approximately fifty feet into the tree line. They covered her body with leaves, sticks and light brush. Shortly after leaving the area where they dumped Donovan's body, FULKS threw the knife out of the car window. Donovan's pants and panties were disposed of after leaving the area where they dumped her body. BASHAM did not know the location where the clothing could be found.

A search team was sent to the cemetery to search for the purse strap allegedly used to strangle Donovan. The purse strap was not located. Sheriff Hewitt received information that the cemetery had been recently cleaned of leaves and debris. It was decided that Sheriff Hewitt would check into the crew who cleaned the cemetery and attempt to interview the cleaning crew.

BASHAM recalled seeing a sign, described as being green with white writing, with the word "park" and or "animal" on it. The dirt road where FULKS and BASHAM dumped Donovan's body was located approximately fifteen feet past the "park" sign. During the search, no street signs matching the description given by BASHAM were located.

BASHAM and the search team participants returned to the hunting club where it was determined that there were no further areas in Brunswick County to search. BASHAM was taken back to the Darlington County Detention Center. All search team participants cleared from the area and the search was terminated.

00127

# Exhibit 4



*Sheriff*

James R. Metts, Ed. D.

# LEXINGTON COUNTY SHERIFF'S DEPARTMENT

## MEMORANDUM OF DISCIPLINE

TO:      Capt. Carlisle J. McNair

FROM:   Col. Mel Seboe

RE:      Notice of Discipline

DATE:    July 1, 2002

The investigation surrounding the allegations made against you has been completed. On June 28, 2002 the results of the Investigation were formalized in an Investigative Report. On June 21, 2002 you provided a written statement in response to the allegations. The June 28th report sustained a finding of your having

> ...violated Policy and Procedure 300 in that he, on at least two occasions, displayed a video clip containing obscene material, to wit a bald headed man attempting to insert his head into a woman's vagina, to other employees with no criminal investigative or business necessity of doing so.

*(2 times close together) gm*

and

> ...violated Policy and Procedure 405, the instructions contained in the "Memorandum of Garrity Rights and Employee Responsibilities", and the instructions of Sheriff Metts.

In September of 2001 Chief James provided you with a "Letter of Caution" which specifically addressed the type of prohibited conduct resulting in this sustained complaint. This type conduct by a manager exposes both you and the department to unacceptable levels of liability. Even after having been explicitly warned of this unacceptable conduct, you elected to continue. Major Harris has, on several occasions, counseled you concerning noted deficiencies in your performance as the Headquarters Region Commander as reflected in his June 25, 2002 memorandum. In a further attempt to assist you in correcting these deficiencies, you were sent to supervisory/managerial training at Midland's Technical College. Unfortunately, deficiencies continued to arise even after this training and counseling. Further, you have also been the subject of other internal affairs investigations with founded allegations of misconduct.

Based upon the collective information available to the Department, the Department has concluded that your actions have demonstrated extremely poor judgment and highly unprofessional conduct. The purposes of this memo are to communicate to



B-00423

A Nationally Accredited Law Enforcement Agency
P.O. Box 639/Lexington, South Carolina 29071 (803) 359-8230, Fax # (803) 359-1162

A_42199

you the Department's deep dissatisfaction with both your conduct and judgment and to advise you of the following disciplinary action:

1. You are immediately relieved from your position as Headquarters' Region Commander and demoted to the rank of Lieutenant;

2. As a Lieutenant, you will serve a six-month probationary period.

3. You are suspended from duty for one pay period to begin immediately.

Upon your return, you are to report to Major Harris for assignment and to affirmatively contact Major Prill, as you are also required to attend anger management training and/or counseling. During your probationary period your undivided attention should be upon your assigned duties.

During this suspension you are to take no law enforcement action for any reason. You must immediately turn over all weapons (primary, backup, and shotgun), your department identification and badge(s), your county vehicle and keys, and your issued radio and/or beeper and cellular telephone to Major James Harris or his designee. You are not to be present on the premises of the Department without a business reason and prior notice to Major Harris.

Most importantly, during this suspension, and when you return to duty, you are not to engage in any retaliatory conduct, either directly or indirectly against anyone in anyway connected with this investigation. Any retaliatory action will result in immediate disciplinary action up to and including termination.

Served this _1st_ day of _July_ at _Lex. Co. S.O._ _6:40 P.M._ _2002_

By _MAjOR SAMES E. HARRIS_

Received by _Curtis Mcth_

_7/1/02_

B-00424

A_42200

# Exhibit 5



James R. Metts, Ed. D.

## LEXINGTON COUNTY SHERIFF'S DEPARTMENT

October 15, 2002

Carlisle J. McNair
812 Haskell Road
Gilbert, SC   29054

Dear Mr. McNair:

This is to acknowledge receipt of your resignation dated October 14, 2002.  Your kind remarks are greatly appreciated.

I hereby accept your resignation and wish you the very best in all your future endeavors.

Sincerely yours
In effective law enforcement,

James R. Metts, Ed.D.
Sheriff

JRM/cst

Cc: Personnel



B-00462

A Nationally Accredited Law Enforcement Agency
P.O. Box 639/Lexington, South Carolina 29071 (803) 359-8230, Fax # (803) 359-1162

A_42238

October 14, 2002

VIA HAND DELIVERY
The Honorable Dr. James R. Metts
Lexington County Sheriff Department
521 Gibson Road
Lexington, SC  29072 .

In Re:  Carlisle J. McNair

Dear Sheriff Metts:.

I have decided to resign as a Deputy at the Lexington County Sheriff Department. As I now have over Twenty-Five years in the Police Officers State Retirement System I feel that it is best for myself and my family to do so. As you know the majority of my time in law enforcement was spent as a Deputy Sheriff for Lexington County.

Thank you for your support over the years and if you have any questions please feel free to contact me.

Sincerely yours,

Carlisle J. McNair

cjm:aas                                                        B-00463

A_42239

# Exhibit 6

**Declaration of John Castro**

I, John Castro, declare under penalty of perjury the following to be true to the best of my information and belief:

1.  I am an investigator with the Capital Habeas Unit of the Federal Public Defender's Office in Arizona. Our office has been appointed to assist Mr. Brandon Basham in federal court.

2.  Cynthia G. Wilson was a juror during Mr. Basham's trial in federal court in Columbia, South Carolina in 2004 and in fact was selected as the jury foreperson. Cynthia Wilson filled out and signed a juror questionnaire under penalty of perjury prior to being selected as a juror on the case on February 11, 2004. She was found to be in contempt of court for contacting the media prior to the end of trial, and she was sanctioned by the judge.

3.  Question 41 on the questionnaire reads "have you ever sued someone or been sued," to which she checked "NO." Cynthia Wilson had two judgments against her in the Common Pleas Court in Spartanburg County prior to being selected as a juror in 2004.
    1. Case number 1995TR4208826 was filed on November 13, 1995 by the South Carolina Department of Revenue. A judgment against Cynthia Wilson in the amount of $650.18 was awarded and the case was disposed of on February 11, 1996.
    2. Case number 1998TR4211594 was filed on November 13, 1998, again by the South Carolina Department of Revenue. A judgment against Cynthia Wilson in the amount of $ 1,761.59 was awarded and the case was disposed of on March 17, 2000.

4.  Cynthia Wilson testified during her voir dire questioning on September 2, 2004 that she worked as a nurse and had been working in that capacity for four years. Cynthia Wilson received her nursing license in February of 2002. She actually began working under the license on that date and had only been working as a nurse for two years and seven months at the time of her voir dire.

5.  Cynthia Wilson was disciplined on January 6, 2007 by the nursing board for not disclosing the fact that she was put on probation for contempt of court by the judge in Mr. Basham's trial. Cynthia Wilson had earlier been placed on probation by her employer for medication and documentation errors on October 21, 2005.

6.  Cynthia Wilson lied on her nursing license renewal application dated April 28, 2008. She answered "NO" when asked whether she had any prior disciplinary action before any nursing board in any jurisdiction.

7.  Cynthia Wilson again lied on her nursing license renewal application dated April 15, 2010 when asked the same question.

Page 1 of 2
Initials: *JC*

8.  Cynthia Wilson lied on her nursing license renewal application three times when asked whether she had ever been convicted under any federal law. She failed to mention that she had been held in criminal contempt of court by the Federal District Court in Columbia, South Carolina. Cynthia Wilson put "NO" when asked that question on her applications dated April 7, 2006, April 11, 2008, and April 15, 2010.

9.  The information in item 3, the judgments against Cynthia Wilson, is readily available to the public on-line, and was also readily available in 2004 at the time of Mr. Basham's trial. It took me less than fifteen minutes to access and print that information from the South Carolina Judicial website: www.judicial.state.sc.us.

10.  The information in item 4, nursing license information, is also readily available to the public @ www.llr.state.us. I looked up and printed the information on Cynthia Wilson (nee Galloway) in approximately 10 minutes. The information was readily available at the time of Mr. Basham's trial.

11.  I obtained all of the information contained in items 5 through 8 from the website listed in item 9: www.judicial.state.sc.us in less than 15 minutes.

I declare under penalty of perjury that the foregoing is a true and correct statement. Signed this 23rd day of May, 2011.

John Castro

# Exhibit 7

## Declaration of John Castro

I, John Castro, declare under penalty of perjury the following to be true to the best of my information and belief:

1.    My name is John Castro. I am an investigator for the Federal Public Defender's Office in Phoenix, Arizona. I have been assigned to assist the attorneys who were appointed to represent Brandon Basham in his federal appeals in the 4th Circuit.

1.    I interviewed Gregory Lee Wilson in his home on May 18, 2011. Mr. Wilson was married to Cynthia Wilson at the time of Mr. Basham's trial in 2004. Cynthia Wilson served as the foreperson for Mr. Basham's jury during the trial and sentencing phases.

2.    Mr. Wilson told me that he did not follow the proceedings in the Basham trial much. Mr. Wilson traveled extensively for work and he was out of town a lot.

3.    Mr. Wilson was called in as a witness to testify in Cynthia Wilson's misconduct hearing on one occasion during the course of that hearing. Mr. Wilson said that to his knowledge, Cynthia had to go the hearing on other days besides the one he was present at. Mr. Wilson added that he was only aware that Cynthia had contacted one television station.

4.    After the hearing, Cynthia Wilson was upset and told Mr. Wilson that the television news reporter was lying about the substance of their conversation.

5.    To the best of Mr. Wilson's knowledge, Cynthia Wilson did not stay friends or remain in contact with any of the jurors after the trial was over.

6.    The names Joyce Hartsoe and Wendy Doby are not familiar to Mr. Wilson.

8.    Mr. Wilson told me that no one named Shannon Burnett did any work around their house during or after the trial while he and Cynthia were still together. Mr. Wilson was adamant that there would have been no need for them to hire an outside person to do any landscaping or maintenance around the house because Mr. Wilson did all of that type of work himself.

9.    Several years prior to the Basham trial, Gregory and Cynthia Wilson's neighbor, Julie Roe, was convicted of killing her husband John Roe. Julie Roe is currently serving a life sentence in prison. There was a lot of police activity in the street when the incident occurred. Cynthia Wilson was friends with the couple before the incident.

I declare under penalty of perjury that the foregoing is a true and correct statement. Signed this _31st_ day of May, 2011.

_____
John Castro

# Exhibit 8



**U. S. Department of Justice**
*United States Attorney*
*George E. B. Holding*

*Eastern District of North Carolina*

## NEWS RELEASE

<u>FOR IMMEDIATE RELEASE</u>:
MONDAY - October 6, 2008

<u>FORMER BRUNSWICK COUNTY SHERIFF
SENTENCED TO 16 MONTHS IN PRISON</u>

**RALEIGH** - United States Attorney George E.B. Holding announced that **RONALD E. HEWETT**, 45, was sentenced in federal court today by Senior United States District Judge W. Earl Britt to 16 months imprisonment followed by two years of supervised release. **HEWETT** was also ordered to pay a fine of $10,000.

On May 8, 2008, **HEWETT** was charged in a one-count Criminal Information charging corruptly endeavoring to obstruct justice, specifically, a federal grand jury investigation into allegations of corruption of his office as Sheriff of Brunswick County, North Carolina. On June 2, 2008, **HEWETT** pled guilty to the charge. **HEWITT** was elected Sheriff of Brunswick County in 1994 and served in that capacity until he was suspended in late March of 2008. **HEWETT** formally resigned from his office as Sheriff on April 15, 2008.

During the last half of **HEWETT'S** tenure, he repeatedly used his office for his personal benefit, rather than for the protection of the citizens of Brunswick County. In addition to obstructing his office's criminal investigation of a relative, **HEWETT** misused

public funds by ordering deputies, while on duty, to perform manual labor at his house and to work on his political campaigns. On June 7, 2007, state and federal agents served 25 federal grand jury subpoenas on **HEWETT** and numerous deputies for the June and July grand juries. Almost immediately after receiving the subpoenas, **HEWETT** began meeting with his deputies and attempting to tamper with their testimony.

**HEWETT** began instructing his deputies to either assert their Fifth Amendment privilege or to be vague in their answers at grand jury. As **HEWETT** noted to one Captain: "what you don't tell, you don't have to explain." **HEWETT** also arranged for a note to be delivered to a grand jury witness not employed by the Sheriff's Office which contained the words the witness would need to read in grand jury in order to invoke his Fifth Amendment privilege.

As the investigation continued, **HEWETT** resorted to more direct threats of retaliation. For example, **HEWETT** approached a deputy just prior to the federal grand jury meeting dates and inquired as to how the deputy would pay his mortgage without a job and that the deputy had a lot to lose. **HEWETT** also arranged for a Chaplain to attend staff meetings and instruct deputies that they should not cooperate with evil on the witness stand and that while on the witness stand they should not be swayed in their testimony. Finally, **HEWETT** began to retaliate against persons he thought were testifying at grand jury or were cooperating with the federal investigation by taking away their police vehicles and taking away

their authority.

United States Attorney Holding said, **"Ronald Hewett was not only a law enforcement officer, but he was also entrusted by the people of Brunswick County with leadership of their Sheriff's Office. First, he breached that trust by operating the Sheriff's Office for his personal benefit. Then, when that activity came under investigation, he unlawfully obstructed the investigation. The state of North Carolina is seeking to hold him accountable for the former. Today, the federal court has held him accountable for the latter."**

Special Agent in Charge Nathan Gray, head of the FBI in North Carolina, stated, *"People have faith that as members of law enforcement we will protect them from criminals and violence. When the head of an agency is charged with a crime, it chips away at that trust."* SAC Gray went on to say, *"The US Attorney's Office and the agencies that took part in this investigation have proven through diligence and hard work that anyone committing a crime will be held accountable. This case proves that no one is above the law."*

The investigation has been conducted jointly by the North Carolina State Bureau of Investigation, the Federal Bureau of Investigation, and the United States Postal Inspection Service, in conjunction with the United States Attorney's Office. Assistant U.S. Attorney Dennis M. Duffy and First Assistant U. S. Attorney

John Stuart Bruce are prosecuting the case for the United States.

# # #

**News releases are available on the U. S. Attorney's web page at www.usdoj.gov/usao/nce within 48 hours of release.**