UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:02-992-JFA |
| Plaintiff, | Judge Joseph F. Anderson, Jr. |
| -v- | |
| BRANDON LEON BASHAM, | DEATH PENALTY CASE |
| Defendant. | |

---

DEFENDANT'S MOTION FOR COLLATERAL RELIEF

PURSUANT TO 28 U.S.C. § 2255

---

TABLE OF CONTENTS

I.     Preliminary matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       A.     Form of citations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

       B.     Form of motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       C.     Request for ruling on statute of limitations. . . . . . . . . . . . . . . . . . . 2

II.    Statement of the case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.   Introductory comments regarding claims raised in this motion. . . . . . . . . . 8

IV.    Claims for relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Claim 1
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his lawyers permitted him to speak with law enforcement officers outside of their presence and failed to advise him that his statements could be used against him. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Claim  2
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to prepare for and/or effectively litigate the *Jackson v. Denno* hearing in his case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Claim 3
The Court deprived Mr. Basham of his right to an impartial jury by erroneously excluding potential jurors whose concerns about the death penalty would not have substantially impaired the performance of their duties.  In addition, by failing to raise this issue on appeal, appellate counsel rendered ineffective assistance of counsel within the meaning of the Fifth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A.    The trial court excluded jurors based on their general opinions on the death penalty rather than their inability to follow the law. . . . . . . . . 25

B.    Appellate Counsel was ineffective for failing to raise this issue on appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Claim 4
Mr. Basham was tried and sentenced while legally incompetent in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution.. . . . . . . 37

Claim 5
Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to request that the Court determine Mr. Basham's competency to stand trial, despite numerous indications prior to and during trial that Mr. Basham was incapable of properly assisting in his own defense.   In the alternative, defense counsel was ineffective in failing to request that Mr. Basham's trial be delayed or postponed until such time as he was competent to assist in his own defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Claim 6
The Court abdicated its obligation under 18 U.S.C. § 4241(a) to ascertain whether Mr. Basham was competent to stand trial, despite the fact that considerable evidence was presented to the Court that Mr. Basham was in fact unable to assist properly in his defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Claim 7
Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of his incompetency as a basis for reversal on direct appeal.. . . . . . . . . . . . . . . . . . . . . . . 44

Claim 8

Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by permitting their psychiatric expert to medicate Mr. Basham with a potent combination of drugs that rendered him incapable of properly assisting in his own defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Claim 9

Mr. Basham's trial attorney rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when he conceded before the jury in opening statements all indictment allegations against Mr. Basham except for Mr. Basham's "intent to cause death or serious bodily harm" in connection with the alleged carjacking... . . . . . 47

Claim 10

Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by ignoring their client's repeated requests to exit the courtroom immediately before an altercation between Mr. Basham and United States Marshal officers.  In the alternative, the Court violated Mr. Basham's right under Rule 43(c) of the Federal Rules of Criminal Procedure to voluntarily absent himself from his trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Claim 11

The Government engaged in misconduct when it failed to correct testimony of Sheriff Ronald Hewett that it knew to be false, in violation of its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972).  The Government compounded this misconduct by relying on Sheriff Hewett;s false testimony in its closing argument... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Claim 12

Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of the Government's misconduct as a basis for reversal on direct appeal.. . . . . . . . . . . . 57

Claim 13
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to argue to the jury that Mr. Basham's post-arrest statements to law enforcement officers were involuntary.. . . . . . . . . . 57

Claim 14
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorney, Jack Swerling, was hindered by a personal conflict of interest.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Claim 15
Mr. Basham's trial attorneys rendered ineffective assistance of counsel in violation of 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when they failed properly to object to the admission of unfairly prejudicial prior act evidence during the guilt phase of Mr. Basham's trial. Appellate counsel similarly rendered ineffective assistance of counsel, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they not only failed to raise this issue on appeal, but in fact conceded the admissibility of evidence concerning the Burns kidnapping... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Claim 16
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to request that this Court admit at the penalty phase of Mr. Basham's trial comments made by the Government at his co-defendant's trial concerning Mr. Basham's lesser culpability.. . . . . . . . . . . . . 67

Claim 17
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel (a) failed effectively to cross-examine a key Government witness; (b) failed to call rebuttal witnesses to challenge the Government witness's testimony; and (c) failed to respond to the Government's argument concerning the witness's testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Claim 18
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel failed effectively to cross-examine Sheriff Ronald Hewett, in fact elicited damaging testimony from Hewett, and then failed to mitigate the damage caused by his deficient cross-examination of Hewett.. . . . . . . . . . . . 75

Claim 19
Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when they failed adequately to investigate, develop, and present mitigating evidence at the penalty phase of Mr. Basham's trial.. . . . . . . . . . . . . 81

    A.    Mental retardation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

    B.    Fetal Alcohol Spectrum Disorder (FASD).. . . . . . . . . . . . . . . . . . . . 85

    C.    Other mitigating evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Claim 20
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorneys failed to assemble a competent capital defense team. In the alternative, Mr. Basham was denied the effective assistance of counsel under the above provisions because his attorneys failed adequately to supervise the team they had assembled.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    A.    The bias of defense investigator Carlisle McNair created a conflict of interest within the defense team. . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    B.    Mitigation Specialist Paige Tarr rendered deficient performance in her investigation in Mr. Basham's case, and defense counsel failed adequately to supervise her.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

Claim 21
Counsel provided ineffective assistance of counsel in failing to request that the Court trifurcate Mr. Basham's trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Claim 22

The Government violated its obligations under *Brady v. Maryland* and its progeny by failing to disclose information material to Mr. Basham's ability to prepare and present a defense at trial and sentencing. As a result of the Government's misconduct, Mr. Basham was denied his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Claim 23

The Government violated Mr. Basham's right to due process when it presented a theory of the case that was inconsistent with the theory it presented at Mr. Fulks's trial. Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories. In addition, Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this issue on appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Claim 24

Mr. Basham's rights under the Eighth Amendment to the United States Constitution were violated when the Government engaged in misconduct by arguing, contrary to controlling precedent, a causal nexus requirement to persuade the jury not to give effect to Mr. Basham's mitigating evidence. By failing to object to the Government's misconduct, trial counsel rendered ineffective assistance of counsel, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. Mr. Basham's appellate attorneys were similarly ineffective for failing to raise this issue on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

      A.    The Government's improper questioning and argument constituted prosecutorial misconduct.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

      B.    Defense counsel was ineffective in failing to object to the Government's cross-examination and closing argument on the basis of *Tennard*.. 112

      C.    Appellate counsel rendered ineffective assistance in failing to raise a *Tennard* claim.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Claim 25

The Court's instruction to the jury on mitigating evidence violated Mr. Basham's Eighth Amendment rights because it created a substantial risk that the jury would screen out statutory mitigating factors, and thus fail to give effect to evidence that was, by law, mitigating. Trial counsel was ineffective for failing to object to this charge, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599; and appellate counsel was ineffective for failing to raise this issue on direct appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Claim 26

The Court's instructions to the jury violated Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments because the jury was not required to find that death was an appropriate punishment beyond a reasonable doubt. Appellate counsel violated Mr. Basham's right to the effective assistance of counsel guaranteed by the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they unreasonably failed to raise this issue on appeal.. . . . . . . . . . . . . . . . . . . . . . . . 119

Claim 27

Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when, upon learning that Juror Cynthia Wilson had engaged in misconduct, they failed to investigate easily identifiable instances of Wilson's untruthful statements to the Court that likely would have persuaded the Court that further investigation into claims of juror misconduct was warranted.. . . . . . . . . 124

Claim 28

Newly discovered evidence suggests that Juror Wilson was untruthful in her testimony to the Court concerning her contact with other jurors. Accordingly, this Court should vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on the issue of premature juror deliberations.. . . . . . . . . . . . . . . . . . . . . . 133

Claim 29

Mr. Basham is entitled to a new trial in light of newly discovered evidence profoundly undermining the credibility of the Government's witness, Sheriff Ronald Hewett.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

Claim 30

Trial counsel's failure to provide appellate counsel all files produced in the course of representing Mr. Basham necessarily resulted in Mr. Basham being denied effective assistance of counsel on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.  In addition, trial counsel's failure to provide the record to his successor constituted ineffective assistance of counsel within the meaning of the Fifth and Sixth Amendments, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Claim 31

Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments were violated due to the Government's failure to include necessary charges in the Indictment.  Mr. Basham's Due Process Rights, as well as his rights under 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, were violated by appellate counsel's unreasonable failure to raise this issue on appeal... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

Claim 32

A system, such as the federal death penalty, in which capital punishment is sought on both the invidious basis of race and the irrational basis of geography should not be enforced.  This Court should vacate Mr. Basham's sentence on this basis alone.. . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

    A.    Eighth amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

    B.    Statutory right to justice without discrimination. . . . . . . . . . . . . . . 151

    C.    Supervisory powers.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

    D.    The FPDA's omission of "plain-error" review.. . . . . . . . . . . . . . . . 153

Claim 33

The absence of a principled basis for distinguishing cases in which the federal death penalty is imposed from those in which it is not imposed renders the FDPA unconstitutional.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

Claim 34
Mr. Basham's Conviction and Sentence Must be Vacated Due to the Cumulative
Prejudicial Effect of the Errors in this Case... . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

V.      Reservation of Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

VI.     Prayer for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

COMES NOW Defendant BRANDON LEON BASHAM, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rules 2 and 3 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct his sentences.

## I.     PRELIMINARY MATTERS

### A.     Form of citations

This pleading will be referred to herein as the "Motion."  Citations to pleadings, transcripts, and other documents will be as follows:

(1)    Documents on the official court docket, including pleadings, motions, and orders, will be cited by their docket number:  Dkt *xxx*.

(2)    Documents on the official court docket of the United States Court of Appeals for the Fourth Circuit, including briefs and motions, will be cited by their docket number: App. Dkt. *xxx*.

(2)    Transcripts will by cited by date and page number: Tr. *xx/xx/xx* at *xx*.

(3)    Exhibits to this Motion will be consecutively numbered and cited accordingly: Exh. *xxx*.

(4)    All other citations will be self-explanatory or based on the Blue Book.

**B.     Form of motion**

Pursuant to Rule 2(c) of the Rules Governing Section 2255 Proceedings, this Motion attempts to comply with Form AO 243, available through this Court's official website.  Pursuant to Form AO 243, to the extent feasible, this Motion will not cite or argue case law, but will instead solely state the specific facts supporting each claim.  Because of the complexity of the issues presented in this capital case, however, and to clarify the precise nature and scope of Mr. Basham's claims, minimal citation to legal authority will be unavoidable.  Mr. Basham will file a separate motion seeking this Court's permission to file a legal memorandum in support of the claims raised in this Motion.

**C.     Request for ruling on statute of limitations**

Pursuant to 28 U.S.C. § 2255(f), the statute of limitations on a motion brought pursuant to § 2255(a) begins to run from the latest of:

(1)     the date on which the judgment of conviction becomes final; [or]

(2)     the date on which the impediment to making a motion created by governmental action in violation of the Constitution or law of the United States is removed, if the movant was prevented from making a motion by such governmental actions.[1]

---

[1]The statute provides alternative commencement dates for the running of the statute of limitations that are not relevant for purposes of this argument.  *See* 28 U.S.C. § 2255(f)(3) and (4).

2

To guarantee Mr. Basham's right to post-conviction review of his convictions and sentences, counsel for Mr. Basham have filed this Motion within one year of the United State Supreme Court's denial of Mr. Basham's petition for writ of certiorari on June 1, 2010, thereby satisfying the most stringent statute of limitations deadline established by 28 U.S.C. § 2255(f)(1).  Counsel for Mr. Basham, however, respectfully submit that, because of an impediment created by the Office of the Clerk of the Court for the United States District Court for the District of South Carolina (the "Clerk's Office") in violation of the Constitution and laws of the United States, the statute of limitations in this case in fact did not begin to run until, at the earliest, May 19, 2011.  As is explained below, until May 19, 2011, despite diligent efforts on the part of the Office of the Federal Public Defender for the District of Arizona ("Arizona FPD"), counsel for Mr. Basham had been unable to access significant portions of the official court record in this case.

This Court appointed the Arizona FPD to represent Mr. Basham for purposes of his § 2255 proceedings.  (Dkt. 1247 and 1323.)  This Court's appointment of the Arizona FPD resulted in substantial financial savings to the United States District Court for the District of South Carolina and the United States Court of Appeals for the Fourth Circuit because virtually all costs associated with investigating, researching, and preparing the § 2255 motion in Mr. Basham's case were borne by

the Arizona FPD, which paid for these expenses from its internal budget.

The more than 2000 mile distance between the federal districts of Arizona and South Carolina, however, necessitated that the Arizona FPD have ready online access to the official court record, both sealed and unsealed, in this case. Immediately upon its appointment to this case, the Arizona FPD assigned a paralegal to obtain and organize the official court record in this case. That record contains more than 1,300 documents on more than 12,000 pages. The Arizona FPD attorneys and the paralegal assigned to Mr. Basham's case experienced difficulties in accessing numerous documents noted on this Court's docket for this case. Attachment A to Exhibit 1 to this Motion is a document, created by an Arizona FPD paralegal, Kimmberly Taylor, listing over 200 pleadings and orders (many of them sealed) that the Arizona FPD was unable to access either via Pacer or via other internal links provided by the Clerk's Office. Ongoing discussions occurred between the Arizona FPD paralegal and the Clerk's Office in a good-faith attempt by all parties to clarify the nature of the pleadings that the Arizona FPD was unable to access and to facilitate access to those documents. (*See* Exh. 1 (Declaration of Kimmberly Taylor).) Ultimately, on May 16, 2011, the Clerk's Office sent Ms. Taylor the final remaining documents to which the Arizona FPD had been denied access. (*See* Exh. 1.)

A federal prisoner has the right to reasonable access to the official court record in his case for purposes of preparing a motion pursuant to 28 U.S.C. § 2255, and denial of that right is violative of his First Amendment right of access to the courts. *See, e.g., Rush v. United States*, 559 F.2d 455, 458 (7th Cir. 1977) ("It is now settled beyond doubt that prisoners have a substantive constitutional right of access to the courts and that inmate access must be 'adequate, effective and meaningful.'") (*quoting Bounds v. Smith*, 430 U.S. 817 (1977)). "Moreover, when the prosecuting sovereignty is the federal government . . . , the federal courts may also draw on their inherent supervisory powers to establish more liberal access than that mandated by the Constitution." *Rush*, 559 F.2d at 459.

Counsel for Mr. Basham respectfully submit that, because of the Clerk's Office's difficulties in providing access to the entire official court record in this case, that office unintentionally created an impediment to Mr. Basham's "making a motion" for collateral relief. *See* 28 U.S.C. § 2255(f)(2). Because that impediment was not remedied until May 6, 2011, when the Clerk's office sent the final portions of the record to which the Arizona FPD had been denied access, counsel for Mr. Basham submit that the statute of limitations for Mr. Basham's § 2255 motion did not begin to run until that date. Accordingly, the statute of limitations in this case does not expire until May 6, 2012.

Counsel for Mr. Basham have filed this preliminary Motion in order to preserve Mr. Basham's right to collateral relief. By filing this Motion, however, Mr. Basham does not concede that his attorneys' lack of access to the official record in his case was not an impediment to filing a comprehensive petition. Rather, this Motion is filed solely as a precautionary measure, in the event that this Court, or an appellate court on review, were to reject Mr. Basham's claim of statutory tolling of the statute of limitations.

For the foregoing reasons, counsel for Mr. Basham respectfully request that this Court issue an order holding that, pursuant to 28 U.S.C. § 2255(f)(2), the statute of limitations in this case did not begin to run until May 6, 2011.

## II.    Statement of the case

On September 30, 2004, a jury convicted Mr. Basham of the following federal crimes:

(1)    carjacking resulting in death, in violation of 18 U.S.C. § 2119;

(2)    kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a);

(3)    interstate transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312;

(4)    conspiracy to commit (a) carjacking, (b) kidnapping, (c) interstate transportation of a stolen vehicle, (d) possession of firearms by a convicted felon, and (e) possession of stolen firearms, in violation of 18 U.S.C. § 371;

6

(5)    conspiracy to use, carry, and possess firearms during and in relation to, and in furtherance of, crimes of violence, in violation of 18 U.S.C. § 924(o);

(6)    carrying, using, and possessing firearms during and in relation to, and in furtherance of, crimes of violence, in violation of 18 U.S.C. § 924(c);

(7)     being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and

(8)    possession of stolen firearms, in violation of 18 U.S.C. § 922(j).

(Tr. 9/30/04 at 56-58.)

On November 2, 2004, the same jury returned verdicts imposing death on Counts 1 and 2 of the Superceding Indictment. (Tr. 11/2/04 at 4-14.) This Court subsequently sentenced Mr. Basham to death by lethal injection on Counts 1 and 2 and to various terms of years totaling 55 years (660 months) on the remaining counts. (Tr. 2/14/05 at 57-64.)

Mr. Basham appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed his convictions and sentences. *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009). The Supreme Court of the United States denied Mr. Basham's subsequent petition for writ of certiorari on June 1, 2010. *Basham v. United States*, 130 S. Ct. 3353 (2010).

Mr. Basham, through his undersigned counsel, now files this Motion pursuant to 28 U.S.C. § 2255, and asks this Court to grant him a new trial, vacate the judgment

entered against him, and/or vacate, set aside or correct his sentences.[2] *See* 28 U.S.C. § 2255(a).

### III.     INTRODUCTORY COMMENTS REGARDING CLAIMS RAISED IN THIS MOTION

The Government's prosecution of Mr. Basham was lengthy, complex, and costly. Throughout the course of the proceedings, this Court demonstrated a heightened awareness of the financial, temporal, and emotional consequences that

---

[2]On May 19, 2011, Mr. Basham, assisted by "an Inmate Legal Aid (sic)," filed a *pro se* pleading entitled "Defendant's Waiver of Any and All Proceedings Pursuant to 28 U.S.C. § 2255." (Dkt. 1391.) The statute of limitations for this proceeding may run on June 1, 2011, the one-year anniversary of the United States Supreme Court's denial of Mr. Basham's petition for writ of certiorari. *See* 28 U.S.C. § 2255(f)(1). For reasons set forth elsewhere in this Motion (*see* Section I(c)), counsel for Mr. Basham maintain that, because of a governmental impediment created by the Clerk of the Court for United States District Court for the District of South Carolina, the statute of limitations in this case in fact did not begin to run until May 19, 2011. *See* 28 U.S.C. 2255(f)(2). In any event, to preserve Mr. Basham's right to review of his post-conviction claims, undersigned counsel are filing this preliminary Motion in an abundance of caution. Because the effect of Mr. Basham's *pro se* pleading purportedly "waiving" his right to pursue relief under 28 U.S.C. § 2255 is not likely to be resolved before June 1, 2011, the possible statute of limitations deadline, counsel for Mr. Basham are filing this Motion despite Mr. Basham's claim that he "had informed his lawyers that he does not want any such petition to be filed on his behalf." (Dkt. 1391 at 2.) Undersigned counsel take this action to preserve their client's rights in the event that (a) this Court exercises its discretion to disregard Mr. Basham's *pro se* pleading, *see, e.g., United States v. Ayesh*, 2011 WL 590608 *3 (E.D. Va., February 9, 2011) (defendant represented by counsel is generally not permitted to file *pro se* pleadings); (b) Mr. Basham later decides to pursue relief under 28 U.S.C. § 2255; or (c) this Court determines that Mr. Basham has not made a knowing, voluntary, and intelligent waiver of his right to pursue post-conviction relief.

could result from the introduction of reversible error into the case.  Even a cursory review of the record reveals that the Court conscientiously attempted to protect Mr. Basham's constitutional right to a fair trial, while endeavoring to see the case through to completion.

The claims raised in this Motion are a reflection of the enormity of the task facing the Court in this particular case, rather than the Court's response to that task. There is no doubt that the Court willingly authorized the expenditure of the extraordinary amount of financial resources necessary to provide Mr. Basham with due process of law.  Yet, from the outset, the Court was presented with novel legal and practical issues, any one of which threatened to derail the case.

Counsel for Mr. Basham present numerous claims for relief in this Motion. Remarkably, despite their diversity, almost all of these claims share a common thread: they pertain to violations of Mr. Basham's constitutional and statutory rights that were beyond this Court's ability to control.  They concern errant jurors; an incompetent defendant; a prosecution that, in its zeal to convict Mr. Basham, may have overlooked its foremost obligation to ensure that justice was obtained; and defense attorneys who, despite their experience and apparent dedication, committed grievously prejudicial errors in their representation of Mr. Basham.

9

To place into perspective the claims of ineffective assistance of counsel raised in this Motion, counsel for Mr. Basham ask this Court to consider as a cautionary tale another example of grievous error committed by a seemingly competent professional. Although upon first reading this example might appear incongruous, it in fact aptly reflects the dilemma presented to Mr. Basham in this Motion: namely, alleging error on the part of highly respected and unquestionably experienced professionals.

On March 27, 1977, two Boeing 747 passenger jets collided on the runway of the airport on Tenerife in the Canary Islands, killing 583 people in what remains to this day the worst airline disaster in history. The cause of the disaster was ultimately attributed to error on the part of KLM Royal Dutch Airlines Captain Jacob van Zanten, the pilot of one of the jets. Captain van Zanten, a pilot with 30 years of experience and over 11,000 flight hours, was the head of KLM's flight training department. Despite his unparalleled expertise, or ironically, perhaps because of it, Captain van Zanten made erroneous decisions that day in March 1977 that resulted in tragedy.

In its order of August 3, 2010, denying the § 2255 motion of Mr. Basham's co-defendant, Chadrick Fulks, this Court recited at length the qualifications and experience of the attorneys appointed to represent Mr. Fulks. (Dkt. 1326 at 8-11.) Without question, a similar litany of the experience and qualifications of Mr.

10

Basham's trial attorneys, Jack Swerling and Greg Harris, could fill numerous pages of an order in Mr. Basham's case. The general abilities and commitment of these two lawyers, however, is not at issue, and in filing this Motion counsel for Mr. Basham in no way mean to impugn the reputation of these respected attorneys.

Nevertheless, as the story of Captain Jacob van Zanten tragically demonstrates, even the most talented and experienced professionals can err. In the pages of this Motion, counsel for Mr. Basham set forth claims of ineffective assistance of counsel by Mr. Basham's trial attorneys. These good faith claims are supported by the facts of this case, and are entitled to serious and impartial consideration by this Court. Regardless of the outcome of this proceeding, the reputations of Messrs. Swerling and Harris will remain deservedly intact. The professional standing of these two lawyers does not depend on this Court's imprimatur. The continuing validity of the Constitution and laws of the United States, however, *does* depend on this Court's impartial protection. Accordingly, this Court must resolve the claims of ineffective assistance of counsel raised in this Motion based on the particular acts or omissions of Mr. Basham's trial attorneys in this case, not on their resumes.

In addition, in examining Mr. Basham's allegations of ineffective assistance of trial counsel, this Court should note that two legal principles apply to the claims as a group. First, the alleged Sixth Amendment violations are subject to the two-part

11

standard established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), under which "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (*citing Strickland*).   Counsel's performance falls below *Strickland*'s "objective standard of reasonableness" if it is outside the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690.  "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins*,  539 U.S. at 534 (*quoting Strickland*, 466 U.S. at 694).   Second, when assessing counsel's conduct, and more particularly the impact of that conduct on the reliability of the proceedings, counsel's deficiencies must be considered cumulatively as opposed to item-by-item.  *See*, *e.g.*, *Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.").

With these factual and legal perspectives in mind, counsel for Mr. Basham present the following claims for relief.[3]

---

[3]To the extent possible, the claims in this Motion are presented in the order in which they arose in Mr. Basham's prosecution.

## IV.  CLAIMS FOR RELIEF

### CLAIM 1

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his lawyers permitted him to speak with law enforcement officers outside of their presence and failed to advise him that his statements could be used against him.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

On November 28, 2002, Mr. Basham and the two attorneys originally appointed to his case, Cameron Littlejohn and William Monckton IV, assisted in a search for Alice Donovan's body in the area of the Bee Tree Farms Hunt Club, in Brunswick, North Carolina.  Mr. Basham and his attorneys were joined by Federal Bureau of Investigation officers, the Conway, South Carolina Police Department, and the Brunswick County Sheriff's Department.  (Tr. 9/27/04 at 13.)  Near the end of the search, defense counsel inexplicably allowed Mr. Basham to walk off alone with law enforcement officers.  This objectively unreasonable action of counsel fell below the prevailing professional norms of practice, and without the damaging evidence that resulted, it is likely that Mr. Basham would have gained a more favorable result at his trial.  *See Strickland*, 466 U.S. 688; *Rompilla v. Beard*, 545 U.S. 374 (2005).

Although counsel had been appointed only the previous day by the presiding magistrate judge, multiple steps were taken to ensure that Mr. Basham was constantly accompanied by, and had access to, his attorneys. Although not yet privy to any police or FBI reports, Mr. Monckton was present for a law enforcement briefing with FBI Agent Jeffrey Long the morning of the search, while Mr. Littlejohn traveled with Mr. Basham from a nearby jail facility. (Tr. 2/25/04 at 30, 98.) Mr. Basham did not have a proffer agreement with the Government, and the Government's position was that any statement Mr. Basham made that day could be used against him. (Tr. 9/27/04 at 169, 202.) Accordingly, it was of the upmost importance that Mr. Basham have constant attorney supervision during his interactions with law enforcement officers.

Mr. Basham rode in a van with his lawyers and other law enforcement officers, including Sheriff Ronald Hewett of Brunswick County, who knew the area well. (Tr. 9/27/04 at 14.) The purpose of the excursion was to locate Ms. Donovan's body, not to interrogate Mr. Basham. Neither Mr. Monckton nor Mr. Littlejohn gave permission for Mr. Basham to be interviewed, and in fact, they specifically informed FBI Agent Long that Mr. Basham was not to be questioned. (Tr. 2/25/04 at 72, 99, 112). After his lawyers first viewed and approved them, Mr. Basham was shown pictures to assist in the search. Mr. Basham gave directional information to the officers in the van, specifically to Sheriff Hewett. (Tr. 9/27/04 at 16-17.)

14

Throughout the day, questions posed to Mr. Basham were given in the presence of his attorneys. (Tr. 2/25/04 at 48.) Mr. Basham was allowed to consult privately with his attorneys while riding in the van (Tr. 9/27/04 at 26; Tr. 2/25/04 at 49, 81); he was prevented by his lawyers from completing potentially damaging statements (Tr. 9/27/04 at 24-25); and at one point, he was permitted to confer alone with his attorneys in the van. (Tr. 2/25/04 at 44, 68, 85.)[4]

The group spent several hours and covered over one hundred miles driving around the area surrounding Bee Tree Farms attempting to locate Ms. Donovan's remains. (Tr. 2/25/04 at 65.) Eventually, after much frustration, the van stopped at a cemetery where Mr. Basham and Chad Fulks had been observed by witnesses on the day of the crime. While the remainder of the group, including Mr. Monckton and Mr. Littlejohn, were talking amongst themselves, Mr. Basham walked to the edge of the cemetery with Sheriff Hewett and two Conway Police Officers (neither of whom testified at trial). (Tr. 2/25/04 at 67, 83.) Mr. Basham had not been advised by his

---

[4]The ultimate result of Mr. Basham's private conference with his attorneys was the lawyers' disqualification from the case. When the attorneys emerged from the van, Mr. Littlejohn shared with law enforcement officers a "hypothetical" scenario about the circumstances of Ms. Donovan's death, which the Government later unsuccessfully sought to introduce at trial. The Government was successful, however, in their motion to disqualify Messrs. Monckton and Littlejohn from representing Mr. Basham. This Court subsequently appointed Jack Swerling and Greg Harris to replace Monckton and Littlejohn.

attorneys that day that his statements could be used against him. (Tr. 2/25/04 at 100, 104.) According to Sheriff Hewett, during their conversation outside the presence of counsel, Mr. Basham demonstrated for him how Ms. Donovan was killed with a purse strap and how he threw the strap into the woods.[5] (Tr. 9/27/04 at 53; Tr. 2/25/04 at 66.)

At trial, the Government seized on the statements Mr. Basham allegedly made outside the presence of his attorneys, and emphasized them during closing arguments at both the guilt and penalty phases. In summation at the guilt phase, the Government argued, "Sheriff Hewitt [sic] says he [Mr. Basham] didn't *say* I killed Alice Donovan. Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it." (Tr. 9/29/04 at 80 (emphasis added).) The importance of this evidence is revealed by the Government's closing argument at the guilt phase:

> Ladies and Gentlemen, I wanted to finish with that because how would you go back in your jury room after listening to Sheriff Hewitt

---

[5]Sheriff Hewett did not write a report of the events of that day, but rather was interviewed by Lt. Crocker of Brunswick County, who then prepared a report about the events. Nowhere in Lt. Crocker's report does it state that Mr. Basham indicated how *he* killed Ms. Donovan. In fact, the report states only that "Basham demonstrates (visually) how he afterwards threw the strap into the wood line at the cemetery," and that Mr. Basham responded, "It is," in response to Hewett's question, "Is this where it happened?" (Exh. 2 at 00818.) Similarly, in his testimony at the hearing on the motion to disqualify counsel, Sheriff Hewett stated only that Mr. Basham described the length of the strap and demonstrated how he threw it into the woods. (Tr. 2/25/04 at 66.)

[sic] and after seeing Sheriff Hewitt [sic] demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled, how do you listen to Clifford Jay when Brandon Basham told you jurors . . . we killed them and find him not guilty of carjacking, resulting in death? And find him not guilty of kidnapping, resulting in death? I have been up here for two hours, and *the government submits those two witnesses and that limited testimony, alone, seals the deal.*

(Tr. 9/29/04 at 81-82.) (emphasis added.)

In response to the Government's statements, defense counsel Jack Swerling argued, "The Government is automatically asking you to consider that Brandon Basham was the one that did the act with the strap. That is what they are asking, at the conclusion, they are asking you to draw." (Tr. 9/29/04 at 160.) Mr. Swerling tried to soften the blow of Sheriff Hewett's damaging testimony by arguing that it was "far more likely that Chad Fulks was the one that did the strangulation with the strap, if that is what happened." (Tr. 9/29/04 at 160.) In rebuttal closing argument, however, the Government argued that, to conclude that Mr. Basham himself did not kill Alice Donovan, the jury would have to "disregard Sheriff Hewitt [sic] and disregard Mr. Jay." (Tr. 9/29/04 at 173.)

The Government continued to emphasize this damaging testimony during the penalty phase of Mr. Basham's trial:

What does Mr. Basham say in the presence of Sheriff Hewitt [sic]? It is not really what he says, it is what he does. He is shackled, he describes a purse strap, and he demonstrates, he demonstrates to

17

> Sheriff Hewitt [sic] how Alice Donovan was strangled. And then he tells Sheriff Hewitt [sic], "I threw the purse strap into the woods" . . . . You saw Sheriff Hewitt [sic] stand up there and show.

(Tr. 11/1/04 at 57.) The Government referred to "Brandon Basham's strangling of Alice Donovan" in its closing argument, (Tr. 11/1/04 at 57), going so far as to state that "he [Basham] killed Alice Donovan." (Tr. 11/1/04 at 62.) Considering that Sheriff Hewett's testimony was the *only* evidence suggesting that Mr. Basham was the actual killer of Alice Donovan, it was unquestionably damaging, and it is therefore unsurprising that the Government took as many opportunities as it did to remind the jury of Hewett's testimony.

Permitting a client to walk off alone with law enforcement officers would be objectively unreasonable under any circumstance. Littlejohn and Monckton rendered deficient performance when they inexplicably allowed Mr. Basham to walk off with Sheriff Hewett while at the cemetery near Bee Tree Farm. Given the importance of Sheriff Hewett's subsequent testimony at Mr. Basham's trial concerning Mr. Basham's alleged demonstration of how he killed Alice Donovan with the purse strap, there can be no doubt that Mr. Basham was prejudiced by his attorneys' deficient performance.

18

## CLAIM 2

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to prepare for and/or effectively litigate the *Jackson v. Denno* hearing in his case.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

At defense counsel's request, the Court conducted a hearing pursuant to *Jackson v. Denno*, 378 U.S. 368 (1964), to determine the admissibility of various statements made by Mr. Basham following his capture and arrest. (Tr. 2/24/04.) As evidenced by comments made by counsel at the *Jackson v. Denno* hearing, by the date of the hearing, Mr. Basham's attorneys were well aware of his extensively documented history of intellectual, psychological, and emotional difficulties. As Mr. Swerling explained to the Court:

> [T]here are nine or 10 statements that the government intends to try and offer. Because of Mr. Basham's history, his mental history, and his low intellectual and intelligence capacity, what we are asking the court to do is make a threshold determination as to whether or not he was given his rights and whether or not he waived his rights.

(Tr. 2/24/04 (a.m.) at 11.)

19

Swerling continued:

> This is a unique situation, it's a death penalty case.  He has had many, many commitments to different institutions, he has low intellectual capacity.  And I just think the record ought to reflect whether or not the court thinks the statements are voluntary before they are admitted and played before the jury.

(Tr. 2/24/04 (a.m.) at 12.)

Remarkably, however, despite recognizing the gravity of the consequences at issue in this capital case and acknowledging Mr. Basham's obvious deficits, Mr. Swerling essentially informed the Court that he did not intend to advocate on his client's behalf with regard to seeking preclusion of Mr. Basham's statements: "[W]e think it's prudent to go ahead and have the court pass on the voluntariness of the statements without us necessarily arguing vigorously that they are not voluntary." (Tr. 2/24/04 (a.m.) at 11-12.)

True to his word, neither Mr. Swerling nor Mr. Harris "argu[ed] vigorously" that Mr. Basham's statements were involuntary.  For example, Detective Dan Mooney of the Ashland Kentucky Police Department testified that Mr. Basham informed him that he had ingested both marijuana and cocaine earlier on the day of his arrest.  (Tr. 2/24/04 (p.m.) at 29-30.)  In his "argument" to the Court at the conclusion of Detective Mooney's testimony, however, Mr. Swerling made no reference to Mr. Basham's drug use and its possible effect on the knowing, intelligent, and voluntary

nature of his waiver of his *Miranda* rights and his statements to the police. Rather, Mr. Swerling again only referred vaguely to "Mr. Basham's, I think, limited intellectual ability and mental capacity." (Tr. 2/24/04 (p.m.) at 40.) Mr. Swerling's failure to pursue this potentially relevant issue prompted the Court to ask the parties about the significance of Mr. Basham's drug use: "Well, we have a little bit of testimony for the first time about some marijuana use and cocaine use in the hospitalization. What about it[?]" (Tr. 2/24/04 (p.m.) at 40.) Mr. Swerling offered no response to this inquiry.

In ruling that Mr. Basham's statements to Detective Mooney were admissible, the Court acknowledged that Mr. Basham "may have been under the lingering effects of cocaine and marijuana." (Tr. 2/24/04 (p.m.) at 41.) Remarkably, however, Mr. Swerling informed the Court that the defense was "[n]ot necessarily [arguing] that he was using it or that he was under the influence at that time." (*Id.*)

FBI agent Scott Vito testified about his interrogation of Mr. Basham, which began at 1:58 a.m. on November 19, 2002. In his cross-examination of Agent Vito, rather than challenge the necessity for this nighttime interrogation of a mentally and emotionally challenged young man, defense counsel Greg Harris *confirmed* that his client was "alert and coherent" throughout the entire two-hour interview. (Tr. 2/24/04 (p.m.) at 52-53.)

21

Other portions of Mr. Harris's cross-examination of Agent Vito are similarly perplexing. For example, although the following colloquy would appear to have been conducted by the Government on direct examination of the FBI agent, it is in fact part of Mr. Harris's cross-examination:

Q.     At any time during this interview did Mr. Basham ask for a lawyer?

A.     No, sir.

Q.     At any time during this interview did he say he didn't want to answer a question?

A.     No, sir.

Q.     At any time during this interview did he not agree to supplement the earlier interview?

A.     No, sir, he was very cooperative.

Q.     Okay.  You gave him Cokes?

A.     Yes, sir.

Q.     You gave him cigarettes?

A.     We did.

Q.     Did you talk to him about anything other than this case, your investigation?  Personal matters, football games?

A.     Certainly.  Certainly.  I'm sure that we did.

Q.     So, you had a pleasant conversation with Mr. Basham?

A.     We did.

Q.     Was he in any way aggressive towards you during this interview?

A.     Not at all.

Q.     Were you aggressive towards him?

A.     Not at all.

(Tr. 2/24/04 (p.m.) at 68.)

Moreover, despite having had access to psychiatric, neuropsychological, and neurological experts for months, defense counsel presented no witnesses to testify about Mr. Basham's deficits and how those deficits reflected on his ability to knowingly, intelligently, and voluntarily waive his constitutional rights. Indeed, defense counsel offered no witnesses whatsoever. Extensive evidence was available to defense counsel, both before the *Jackson v. Denno* hearing and from the testimony elicited by the Government during the hearing, to suggest that Mr. Basham's post-arrest statements were coerced, or at the very least, were not knowingly and intelligently made. Similarly, substantial evidence existed from which counsel could have argued that Mr. Basham's waivers of his *Miranda* rights were not knowingly, voluntary, and intelligent. Defense counsel made absolutely no effort to argue these issues on their client's behalf. Indeed, the totality of their failure would seem to suggest a strategy on the part of Swerling and Harris were it not for the fact that no

23

reasonable strategy could justify their inaction.

Defense counsel rendered deficient performance in their representation of Mr. Basham in both their preparation for and their presentation during the *Jackson v. Denno* hearing. Because Mr. Basham's own statements were the centerpiece of the Government's case against him, he was profoundly prejudiced by his attorneys' failure to advocate on his behalf at this critical stage of the proceeding. Had defense counsel reviewed the discovery provided to them by the Government, they would also have been aware of the disturbing facts surrounding law enforcement's interrogations of Mr. Basham. These facts include, but are not limited to, Mr. Basham's lengthy and nighttime interrogations. Upon information and belief, defense counsel were also aware of other factors demonstrating the coercive nature of the interrogations to which Mr. Basham was submitted, including the denial of food and medicine. Defense counsel were also aware that Mr. Basham suffered from an anxiety disorder that was triggered by being enclosed in confined areas, such as an interrogation room.

Despite the considerable evidence supporting a claim of suppression of Mr. Basham's statements to law enforcement, defense counsel entirely failed to make an effort to press that claim on Mr. Basham's behalf. Counsel's performance fell below the minimal standards of practice and unquestionably prejudiced Mr. Basham.

24

## CLAIM 3

**The Court deprived Mr. Basham of his right to an impartial jury by erroneously excluding potential jurors whose concerns about the death penalty would not have substantially impaired the performance of their duties. In addition, by failing to raise this issue on appeal, appellate counsel rendered ineffective assistance of counsel within the meaning of the Fifth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

**A.     The trial court excluded jurors based on their general opinions on the death penalty rather than their inability to follow the law.**

Mr. Basham's convictions, sentences, and death verdict violate the Fifth, Sixth, and Eighth Amendments because the Court erroneously excluded for cause at least two prospective jurors who were actually qualified to serve, thereby depriving Mr. Basham of his right to an impartial jury. *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *see Gray v. Mississippi*, 481 U.S. 648, 668 (1987).

The Court committed prejudicial error by granting the Government's motion to exclude venirepersons Cathy Roberts and Michael Williams for cause. Neither of these potential jurors expressed views regarding the death penalty that justified their exclusion under *Witherspoon*, 391 U.S. 510, or *Wainwright v. Witt*, 469 U.S. 412 (1985). The trial Court also erred when it dismissed venirepersons Rubina Khan and Susan Jackson without allowing the defense an opportunity to rehabilitate the jurors in voir dire.

25

In *Witherspoon*, the United States Supreme Court held that the government in a capital case may challenge a juror for cause on the basis of opposition to death only when the juror makes it unmistakably clear that he or she "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial." 391 U.S. at 523 n. 21. The Supreme Court explained in *Witherspoon* that "a sentence of death cannot be carried out if the jury that imposed it or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or conscientious or religious scruples against its infliction." *Id.* at 522.

The Court has never retreated from the central constitutional point it made in *Witherspoon*, that "[a] man who opposes the death penalty, no less than one who favors it can make the discretionary judgment entrusted to him by the [government] and can thus obey the oath he takes as juror." 391 U.S. at 519. Indeed, "those who firmly believe the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). A challenge for cause is warranted only when a juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424

26

(internal citations omitted).

Accordingly, prospective jurors are not excusable under *Witherspoon* and *Witt* merely because they (1) express general or religious concerns regarding imposition of the death penalty," *Witherspoon*, 391 U.S. at 522; (2) express nervousness or emotion stemming from the "potentially lethal consequences of their decision," *Adams v. Texas*, 448 U.S. 38, 49 (1980); or (3) are otherwise "hesitant in their ability to sentence a defendant to death," *see Morgan v. Illinois*, 504 U.S. 719, 732 (1992). This is because "even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror." *Witherspoon*, 391 U.S. at 515 n. 7.

"[I]t is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." *Witt*, 469 U.S. at 423. The Supreme Court has recognized that prospective jurors who express concerns about the death penalty may "clarif[y] their positions upon further questioning and reveal[] that their concerns about the death penalty [are] weaker than they originally stated." *Gray v. Mississippi*, 481 U.S. 648, 662-63 (1987). Improper exclusion of jurors in violation of *Witt* is harmful *per se* and no prejudice need be shown. *Id.* at 659-60.

27

Because of the automatic exclusion of any juror who marked that he or she would never impose a sentence of death, several potential jurors were lost before voir dire even began. (Tr. 9/1/04 at 51, 56). "If the [Government] had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to penalty. But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the [Government] crossed the line of neutrality ." *Witherspoon*, 391 U.S. at 520. Here, the Court erred because, "[i]n its quest for a jury capable of imposing the death penalty . . . [it] produced a jury uncommonly willing to condemn a man to die." *Id.* at 520-21.

Prospective juror Cathy Roberts permissibly expressed concerns about the death penalty. Ms. Roberts's questionnaire contained contradictory positions on the death penalty. She wrote that she believed "the death penalty is imposed too seldom," but also circled "I'm strongly opposed to the death penalty and I would have a difficult time voting to impose it." (Tr. 8/30/04 at 108). In explaining these opposing statements, Ms. Roberts stated that she was simply confused or nervous. (Tr. 8/30/04 at 108).

When the Court asked Ms. Roberts directly if she thought she could put aside her beliefs "and follow the law as the judge announces," she unequivocally stated she could do so. (Tr. 8/30/04 at 109). Although she initially expressed some concern about whether she could impose death in a case where the defendant did not "strike the fatal blow" (Tr. 8/30/04 at 112), she ultimately stated that "[if] selected [she] would follow the law." (Tr. 8/30/04 at 113.) In voir dire from the Government, Ms. Roberts agreed that she could not impose death upon someone if they did not actually take another person's life (Tr. 8/30/04 at 125), and that life without parole "would be the appropriate sentence in every case where somebody didn't actually kill someone." (Tr. 8/30/04 at 128.) However, when given a hypothetical in which the defendant did not inflict the fatal blow, she agreed that she could probably impose death even in that circumstance. (Tr. 8/30/04 at 120.) The Court excused Ms. Roberts "over the defendant's strong objection." (Tr. 8/30/04 at 132.)[6]

The Court's decision that Ms. Roberts was not qualified to serve was

---

[6]The exclusion of Ms. Roberts and other jurors based on the "fatal blow" grounds is especially troubling given that the Government ultimately argued that Mr. Basham in fact did inflict the fatal blow: The Government argued in closing: "What does Mr. Basham say in the presence of Sheriff Hewitt [sic]? It is not really what he says, it is what he does. He is shackled, he describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt [sic] how Alice Donovan was strangled. . . . You saw Sheriff Hewitt [sic] stand up there and show." (11/1/04 at 57.) Additionally, the Government unequivocally stated "he [Basham] killed Alice Donovan." (11/1/04 at 62.)

erroneous. The Court excused her based on the mistaken belief that she had stated "she would always vote for the death penalty if the defendant didn't strike the fatal blow." (Tr. 8/30/04 at 129.) The record reflects, however, that, when given a hypothetical in which a defendant did not inflict the fatal blow, Ms. Roberts said she could impose death in such a scenario. Although the Court "deliberately told something that wasn't this case" (Tr. 8/30/04 at 132), it was a scenario in which she could impose death. Accordingly, the claim that "she would always vote for death penalty if the defendant didn't strike the fatal blow" (Tr. 8/30/04 at 129) was entirely contradicted by Ms. Roberts' statements, which were unequivocally that she would obey her "civic duty" and follow the law. (Tr. 8/30/04 at 113.)

Potential juror Michael Williams also expressed concerns about the death penalty. He initially voiced hesitation, stating, "I really am not sure about the death penalty part." (Tr. 9/7/04 at 207). He agreed, however, that he could put that opinion aside and "conscientiously follow the law." (Tr. 9/7/04 at 208). He also agreed that, although he was generally opposed to the death penalty, there were situations in which it was appropriate. (Tr. 9/7/04 at 213.) The Government asked Mr. Williams about his religious beliefs, and whether he had a problem with the death penalty personally. (Tr. 9/7/04 at 218.) Mr. Williams responded, "But the judge says you got to go by what the law says." (Tr. 9/7/04 at 218.) Trying to back him into a corner,

30

the Government asked if imposing a sentence of death would "create[] stress . . . because to do so would violate a religious principle you believe in." (Tr. 9/7/04 at 219.) Mr. Williams agreed, but did not retreat from his original statement he would follow the law. When asked whether, "given your feelings about the death penalty [could you] ever come out of that balancing test and decide that the death penalty is the appropriate sentence," he responded, "I really am not sure." (Tr. 9/7/04 at 220.) Finally, the Government questioned whether that decision would be even more difficult where the defendant did not strike the fatal blow. (Tr. 9/7/04 at 221.) The Court did not allow defense counsel to attempt to rehabilitate Mr. Williams, but continued to ask questions itself. Mr. Williams stated that he was "uncomfortable knowing [he would] be signing [his] name on something for someone to die." (Tr. 9/7/04 at 223.)

The Government argued that Mr. Williams was "clearly not qualified. I don't think he is comfortable." (Tr. 9/7/04 at 224.) Defense counsel responded that Williams "has his personal opinions about [the death penalty]. But he also understands what the law is that your honor gave him." (Tr. 9/7/04 at 226.) The Court brought Mr. Williams back to the courtroom and questioned him further. Mr. Williams candidly admitted that he was "really not sure" whether having to stand up and sign his name to a death verdict would affect his ability to be fair, but said that

31

in certain cases the death penalty was appropriate and cited the Susan Smith case as an example, although he would still feel "very, very uncomfortable signing the document." (Tr. 9/7/04 at 230.) At that statement, without further argument or questioning from the parties, the Court excused Mr. Williams for cause. (Tr. 9/7/04 at 230.)

Additional prospective jurors expressed stronger reservations about serving on a death penalty case and did not give the unequivocal statements of Mr. Williams and Ms. Roberts that they could subvert their personal beliefs to the law. Yet rather than allow counsel to inquire whether the jurors could set aside their beliefs and follow the law, the Court erroneously dismissed the jurors from service because of their views on capital punishment.

First, potential juror Rubina Khan stated that she strongly opposed the death penalty, but added, "I guess I could be able to put aside my views." (Tr. 8/31/04 at 271.) She disagreed that she would fall into the category of people who "could never see [themselves] voting for it under any circumstances." (Tr. 8/31/04 at 271.) Like prospective juror Williams, Ms. Khan expressed unease with signing her name to the verdict form. (Tr. 8/31/04 at 276.) She expressed concerns about pressures from the fact that a jury verdict had to be unanimous. (Tr. 8/31/04 at 276.) The Court asked Ms. Khan to step outside. The Government argued that she was not qualified to

32

serve. (Tr. 8/31/04 at 277.) Defense counsel responded that she "answered all the questions that she was willing to keep an open mind and consider the death penalty," and that counsel should be given an opportunity to explore the concerns about the verdict form. (Tr. 8/31/04 at 278.) Although the Court brought Ms. Khan back in, he did not allow counsel to question her. Based on her statement, "I don't think I can vote for capital punishment, I don't think I can," the Court excluded her without giving defense counsel the opportunity to attempt to rehabilitate her. (Tr. 8/31/04 at 280-81.)

The next prospective juror of concern is Susan H. Jackson. Before she was even brought into court, the Government moved to disqualify her based on an answer in her questionnaire. (Tr. 9/3/04 at 67). Ms. Jackson checked on her questionnaire that she was "strongly opposed to the death penalty and would have a difficult time voting for it, regardless of the facts and law in the case." She also wrote, "Taking a life under any circumstances is reprehensible." (Tr. 9/3/04 at 67). Under questioning from the Court, she stated that she did not think she could conscientiously follow the law. (Tr. 9/3/04 at 73.) Defense counsel requested an opportunity to question whether there were some circumstances where she could impose the death penalty. (Tr. 9/3/04 at 73.) Although the Court brought her back and questioned her again, the Court did not allow counsel to ask that question, nor did the Court ask the questions

defense counsel requested.  Ms. Jackson was disqualified for cause.  (Tr. 9/3/04 at 75.)

A juror, although opposed to capital punishment, is fit to serve if he is able and willing to "temporarily set aside his own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986); *see also Witherspoon*, 391 U.S. at 515 n. 7.  A juror obviously is not required to abandon his beliefs.  Yet the Court excluded venirepersons based on their beliefs, rather than their ability to consider both life and death sentences.

When asked directly whether her beliefs would interfere with her ability to serve, prospective juror Roberts unequivocally stated she could put her beliefs aside and follow the law.  It was clearly erroneous to exclude her from service in light of her answers.  Prospective juror Williams expressed discomfort with signing the verdict, but also said he could put his opinions aside and "conscientiously follow the law." (Tr. 9/7/04 at 207-08).  Although he candidly admitted his discomfort, he never said it would impede his ability to follow the law.  Yet the Court seemed to rest its determination upon this discomfort, rather than the response that he could put his beliefs aside and follow the law.  "As *Witt* makes clear, however, our inquiry does not end with a mechanical recitation of a single question and answer."  *Darden v. Wainwright*, 477 U.S. 168, 176 (1986).  It is necessary to "examine the context

34

surrounding [the venireperson's] exclusion." *Id.* Both Roberts and Williams stated that they would follow the law and consider the death penalty despite their personal beliefs or discomfort about the penalty.

The final prospective jurors, Ms. Khan and Ms. Jackson were removed without further questioning to determine if there was any circumstance where they could consider the death penalty. "[I]f prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out." *Adams*, 448 U.S. at 48 (*quoting Witherspoon*, 391 U.S. at 522 n. 21). The government "may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon*, 391 U.S. at 522. Considering the context of the exclusion of prospective jurors Roberts, Williams, Khan and Jackson, it is clear that the Court did precisely that, and the exclusions were therefore improper.

The foregoing violations of Mr. Basham's constitutional rights, taken alone or in combination with other errors alleged in the Motion, constitute structural error and warrant the granting of this Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahmson*, 507 U.S. 619, 637-38, n. 9 (1993). However, even assuming the

35

harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Mr. Basham's rights had a serious and injurious effect or influence on Mr. Basham's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

B.     **Appellate counsel was ineffective for failing to raise this issue on appeal.**

Appellate counsel performs ineffectively when he or she fails to discover and brief non-frivolous issues. *Delgado v. Lewis*, 223 F.3d 976, 980-81 (9th Cir. 2000). To demonstrate prejudice, a petitioner must show a reasonable probability that, but for appellate counsel's failure to brief the non-frivolous issue, he would have prevailed on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). Although weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy, exclusion of jurors because of their views against capital punishment, but who could nevertheless follow the law, is not a weak issue. Moreover, the "weeding" principle has little or no applicability in capital cases, for appellate counsel in a capital case has a duty to consider all potentially available claims in light of the unique nature of the death penalty and the possibility of

36

preclusion or a change in the law in later courts.

As a result of the Court's removal of otherwise eligible jurors, the jury (including alternates) was composed of thirteen individuals who responded that they "generally favored the death penalty." *See* Supp. juror questionnaires for jurors 51, 93, 143, 171, 302, 314, 325, 328, 352, 466, 562, 575, 584, 593, 621, 677, 776. Appellate counsel rendered ineffective assistance in not raising this claim on direct appeal, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland*, 466 U.S. 668.

## CLAIM 4

**Mr. Basham was tried and sentenced while legally incompetent in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham's convictions and sentences were rendered in violation of his constitutional rights to due process, to a fair and reliable determination of guilt and penalty, to present a defense, and to the effective assistance of counsel because he was tried, convicted, and sentenced to death when he was mentally incompetent to stand trial.

37

"The conviction of an accused person while he is legally incompetent violates due process." *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995). The test for whether a defendant is competent to stand trial "seeks to ascertain whether a criminal defendant has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (*quoting Dusky v. United States*, 362 U.S. 402 (1960)). Where a preponderance of the evidence demonstrates that a defendant lacks the requisite understanding and ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, 517 U.S.348 (1996).

The record in this case is replete with instances of Mr. Basham's inability to communicate or work productively with his attorneys; his suicide attempts; his inability to remain awake during court proceedings after having received heavy, inappropriate, or delayed doses of medication; his inability to focus on the proceedings; and his inability to control his behavior in court. Mr. Basham's severe mental difficulties were the subject of numerous *ex parte* hearings before the Court, many of which were requested by defense counsel out of frustration with their inability to communicate with or control their client. Mr. Basham will demonstrate

38

in the course of these proceedings that at critical times during his prosecution he was legally incompetent. Specifically, Mr. Basham will demonstrate that, at the time of his trial, he lacked the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky*, 362 U.S. 402.

The trial and sentencing of Mr. Basham while he was mentally incompetent constitutes a deprivation of due process necessitating the granting of relief by this Court without a further showing of prejudice. *Pate*, 383 U.S. at 386-87. The error deprived Mr. Basham of a fair and reliable determination of his guilt and of the appropriate penalty in this case.

**CLAIM 5**

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to request that the Court determine Mr. Basham's competency to stand trial, despite numerous indications prior to and during trial that Mr. Basham was incapable of properly assisting in his own defense. In the alternative, defense counsel was ineffective in failing to request that Mr. Basham's trial be delayed or postponed until such time as he was competent to assist in his own defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Soon after their appointment to the case, Mr. Basham's original attorneys, Cameron Littlejohn and William Monckton, filed a motion pursuant to 18 U.S.C. §

39

4241(a) and Rule 12.1(c)(1)(A) of the Federal Rules of Criminal Procedure, requesting that Mr. Basham be evaluated to determine his mental competency. (Dkt. 22.)  No action was taken on the motion for determination of competency before Messrs. Littlejohn and Monckton were disqualified by this Court for unrelated reasons on April 9, 2003.  (*See* Dkt. 69.)  Later that month, the Court appointed attorneys Swerling and Harris to represent Mr. Basham.  (Dkt. 71.)

On May 13, 2003, Mr. Basham attempted suicide.  (*See* Dkt. 95.)  Almost one month later, citing the attempted suicide as cause,  Mr. Basham's new attorneys filed a motion to have Mr. Basham transferred to the Columbia Care Center.  (*Id.*)  Attached to that motion was the affidavit of Donna Schwartz-Watts, M.D., a psychiatrist.  Dr. Schwartz-Watts observed in her affidavit that Mr. Basham suffered from "severe mental illness" that had been "exacerbated" by his confinement, and she noted that Mr. Basham had "decompensated greatly" since her earlier evaluations of him.  (Dkt. 95, attached Affidavit of Donna M. Schwartz-Watts, M.D.)

On June 17, 2003, the Government filed is own motion pursuant to 18 U.S.C. § 4241, requesting a determination of Mr. Basham's competency.  Despite earlier counsel's specific request for a determination of competency, Mr. Basham's new attorneys *opposed* such an evaluation, dismissing any suggestion that Mr. Basham was incompetent within the meaning of the federal statute.  (Dkt. 99.)  At a hearing

conducted on June 18, 2003, the Government withdrew its request for a determination of competency based on defense counsel's avowal that they were not presently raising an issue as to Mr. Basham's competency to stand trial.[7]  (Tr. 6/18/03 at 4-5.) Accordingly, the Government agreed to have Mr. Basham transferred to Columbia Care Center.  (*Id.* at 4-7.)  This Court subsequently ordered that Mr. Basham be transferred to that facility.  (Dkt. 110.)

In a motion filed September 25, 2003, defense counsel requested that Mr. Basham's stay at Columbia Care be extended until October 15, 2003.  (Dkt. 146.) Attached to that motion was a letter from Dr. Schwartz-Watts indicating that she had been unable to evaluate Mr. Basham because he had not been receiving his prescribed medications and, as a result, his "mental state [was not] conducive for any interviewing."  (Dkt. 145, attachment (September 24, 2003, letter to Jack Swerling from Donna Schwartz-Watts).)

The record is devoid of any evidence that, between September 2003 and the commencement of Mr. Basham's trial in September 2004, defense counsel took any further steps to confirm Mr. Basham's competency to stand trial.  At an evidentiary

---

[7]Greg Harris informed the Court at that hearing that Dr. Schwartz-Watts had not rendered an opinion as to Mr. Basham's competency, and that she could not do so under the circumstances of his confinement at the time.  (Tr. 6/18/03 at 3.)

hearing on this claim, Mr. Basham will demonstrate that his defense attorneys were aware that he was unable to communicate with them about his case in a rational manner. Defense counsel nevertheless took no steps to bring their client's incompetence to the Court's attention.

On September 20, 2004, during the guilt phase of his trial, Mr. Basham had a lengthy altercation with U.S. Marshal's officers while in the courtroom. The Court was witness to this altercation, and the jury was later made aware of the altercation as part of the Government's case at the penalty phase of trial. Upon information and belief, Jack Swerling consulted Dr. Donna Schwartz-Watts that same day and was informed by her that Mr. Basham was incompetent. Nevertheless, defense counsel failed to inform the Court of their concerns about Mr. Basham's competency, and took no steps to delay or terminate Mr. Basham's trial because of his incompetency. At a hearing on this claim, Mr. Basham will demonstrate that, even after the events of September 20, 2004, his attorneys were aware of his ongoing incapacity to assist in his defense, yet took no steps to protect his due process right to a fair trial at which he could be a knowing and active participant.

In guaranteeing a defendant's due process right not to be tried or sentenced while mentally incompetent, "judges must depend to some extent on counsel to bring [competence] issues into focus." *Drope*, 420 U.S. 176-77. Whenever information

42

that is made known to the trial court raises a doubt that a defendant is mentally incompetent to stand trial, the minimal guarantees of due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough, and reliable mental health evaluation. *See Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990).

In this case, trial counsel's actions, or more accurately, their inactions, with regard to Mr. Basham's incompetency at trial fell below any minimal standard of competent representation. Moreover, because Mr. Basham was tried while he was legally incompetent, he was unquestionably prejudiced by his attorneys' deficient performance.

**CLAIM 6**

**The Court abdicated its obligation under 18 U.S.C. § 4241(a) to ascertain whether Mr. Basham was competent to stand trial, despite the fact that considerable evidence was presented to the Court that Mr. Basham was in fact unable to assist properly in his defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Throughout both the guilt and penalty phases of Mr. Basham's trial, the Court was witness to, or informed of, numerous instances giving rise to reasonable cause to believe that Mr. Basham was not sufficiently mentally competent to assist properly

43

in his own defense. These instances include, but are not limited to, (1) numerous *ex parte* conferences with defense counsel (both with and without Mr. Basham's presence), concerning counsel's difficulties in communicating with and controlling their client because of his mental impairments; and (2) Mr. Basham's altercation with U.S. Marshal officers in the presence of the Court on September 20, 2004.

Pursuant to 18 U.S.C. § 4241(a), a court "shall order" a competency hearing on its motion "if there is reasonable cause to believe that the defendant may be presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable . . . to assist properly in his defense." *See United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995) ("The district court must *sua sponte* order a competency hearing if reasonable cause is demonstrated."). Mr. Basham submits that, in light of the considerable evidence presented to the Court of his inability to assist properly in his own defense, the Court denied him due process of law when it failed to order *sua sponte* a hearing to determine his competency.

### CLAIM 7

**Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of his incompetency as a basis for reversal on direct appeal.**

44

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham's appellate attorneys negligently failed to raise the issue of his incompetency, as well as this Court's failure to fulfill its *sua sponte* obligation under 18 U.S.C. § 4241(a), in his direct appeal. Because the record in this case plainly reflects his incompetency, Mr. Basham was prejudiced by his appellate attorneys' failure to raise this meritorious claim on direct appeal.

## CLAIM 8

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by permitting their psychiatric expert to medicate Mr. Basham with a potent combination of drugs that rendered him incapable of properly assisting in his own defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Trial counsel retained Donald Morgan, M.D., a psychiatrist, to treat Mr. Basham while he was incarcerated in South Carolina. (Dkt. 181 at 2.) Upon information and belief, between June 2003 and December 2004, Dr. Morgan prescribed a series of antipsychotic, narcotic, and other medications for Mr. Basham that included, but were not limited to, Concerta (a psychostimulant for ADHD),

45

Seroquel (an antipsychotic), Neurontin (a bipolar disorder/seizure disorder medication), and Zoloft and Remeron (both antidepressants). These medications, either alone or in combination, rendered Mr. Basham, at different times and in varying degrees, incoherent, agitated, suicidal, violent, and heavily sedated. Throughout Mr. Basham's trial, these medications caused him to vacillate between uncontrollable agitation and drowsiness so severe that he could not remain awake, even when he was in the presence of the jury.

Upon information and belief, Dr. Morgan, who was hired by and under the control of defense counsel, was the sole physician permitted to prescribe medication for Mr. Basham during this time period. Mr. Basham alleges that his attorneys rendered ineffective assistance of counsel in violation of the Constitution and laws of the United States when, during the eighteen-month period between June 2003 and December 2004, they permitted Dr. Morgan to continue to prescribe a series of contradictory and contraindicated medications that rendered Mr. Basham incompetent and often incoherent. Although defense counsel were not medical professionals, because Dr. Morgan acted at their direction, they assumed responsibility for Dr. Morgan's treatment plan for Mr. Basham. "The failure of a defense attorney to . . . supervise . . . his expert can amount to the ineffective assistance of counsel." *Couch v. Booker*, 650 F. Supp.2d 683, 695 (E.D. Mich. 2009).

46

## CLAIM 9

**Mr. Basham's trial attorney rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when he conceded before the jury in opening statements all indictment allegations against Mr. Basham except for Mr. Basham's "intent to cause death or serious bodily harm" in connection with the alleged carjacking.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

At some point prior to opening statements, defense counsel Jack Swerling decided that he would concede all allegations against his client, save one. Specifically, Mr. Swerling decided that, at the outset of trial, he would inform the jury that all of the Government's charges against Mr. Basham were true except for the allegation that he committed the carjacking of Alice Donovan with the "intent to cause death or serious bodily harm." (*See, e.g.*, Tr. 9/13/04 at 65-69.)

In a move that could have served no other purpose but as an attempt to immunize himself from a later claim of ineffective assistance of counsel, Mr. Swerling requested an *ex parte* hearing be held immediately before opening statements at which he would put his (incompetent) client's verbal consent to his trial strategy on the record. Mr. Swerling explained:

47

I want the record to reflect following this procedure that there is no question later about any strategy that we follow and that I have discussed this with Mr. Basham. Mr. Harris and I discussed it with him Friday. Actually, discussed it with him on several occasions particularly again on Friday and again this morning. Mr. Harris was present on Friday, was present for a few moments this morning as well as Dr. Watts who was also present this morning.

Judge, essentially what I am going to do with Mr. Basham's consent is, as far as the allegations of the indictment, we are going to tell the jury that most of the allegations in the indictment are not in controversy. Most of the charges in the indictment are not in controversy. What will be in controversy for the jury to decide will be with respect to Count 1, and I believe it is the conspiracy count as it related to carjacking, as well. That would be Count 4, part of the conspiracy count there, conspiracy to carjack, there are other crimes, as well.

What I am prepared to tell the jury that is under controversy under the carjacking statute is whether there was an intent on the part of Mr. Basham, at the time the car was taken, to either kill Ms. Donovan or cause her serious bodily harm. [. . . .] So, basically, we are going to be conceding many of the issues in the opening statement that are in the indictment, and I have explained that to him. I have explained his right to have all of it contested. We are prepared to do all of it if that is what he wants. But, as a matter of strategy, we think this is the best approach.

(Tr. 9/13/04 (Ex Parte Hrg.) at 2-3.)

Fortunately for Mr. Basham, Mr. Swerling's apparent attempt to protect himself from future questioning of his "strategy" was of no legal significance. As a threshold matter, as is argued elsewhere in this Motion, Mr. Basham was not competent to stand trial, much less competent to weigh the relative merits of Mr. Swerling's proposed

"strategy." More importantly, however, as a legal matter, a criminal defendant cannot be forced to waive a claim of ineffective assistance of counsel. *See United States v. Craig*, 985 F.2d 175 (4th Cir. 1993).[8]  Thus, Mr. Swerling's attempts to protect himself were a legal nullity.[9]

Defense counsel for Mr. Basham rendered ineffective assistance of counsel within the meaning of federal constitutional and statutory law when they conceded their client's guilt to virtually all of the charges against him, including the capital offense of kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a).  No reasonable strategy justified the concessions made by counsel.  For example, if counsel believed that they were engendering goodwill with the jurors by conceding the client's guilt to a capital offense at the outset of the guilt phase, they were

---

[8]Mr. Basham also notes that Mr. Swerling's own statements at the *ex parte* hearing on September 13, 2004, reveal another act of ineffective assistance of counsel on his part.  Specifically, Mr. Swerling stated at the hearing that he discussed privileged trial strategy with Mr. Basham in the presence of a trial witness, Dr. Schwartz-Watts.  (Tr. 9/13/04 (Ex Parte Hrg.) at 2.)  By doing so, Mr. Swerling rendered deficient performance by waiving the attorney-client privilege.

[9]In any event, even if the defense attorneys' attempt to obtain Mr. Basham's "consent" to their trial strategy had any legal significance, it was too late.  Counsel had already revealed during voir dire that, in their opinion, Mr. Basham had no defense to most of the charges against him, including the capital offenses.  For example, Greg Harris stated in voir dire, "You are most likely going to get to the second part of the trial [the penalty phase], I will tell you that right now."  (Tr. 9/08/04 at 89.)

mistaken. Perhaps if, as in Mr. Basham's co-defendant's case, counsel had advised their client to plead guilty, the jury would at least have been spared an approximately three-week trial, involving the testimony of more than 90 witnesses. As it was, defense counsel told the jurors that their client was guilty, but then necessarily implied that Mr. Basham was nevertheless going to require them to sit through weeks of a trial on what was actually a *fait accompli*. There is no reasonable possibility that this "strategy" worked to Mr. Basham's advantage.

Moreover, by conceding their client's guilt to almost all of the charges against him, including the offense of kidnapping resulting in death, defense counsel also unintentionally conceded to the jury, at the very least, that Mr. Basham was guilty of intentionally and specifically engaging in an act of violence, knowing that the act created a grave risk of death to a person, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act. *See* 18 U.S.C. § 3591(a)(2)(D). In other words, by informing the jurors at the outset of the guilt phase of trial that Mr. Basham was guilty of kidnapping resulting in death, defense counsel also conceded that their client was death-eligible. Defense counsel's deficient performance severely prejudiced Mr. Basham, and requires that this Court vacate his convictions and sentences.

## CLAIM 10

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by ignoring their client's repeated requests to exit the courtroom immediately before an altercation between Mr. Basham and United States Marshal officers.  In the alternative, the Court violated Mr. Basham's right under Rule 43(c) of the Federal Rules of Criminal Procedure to voluntarily absent himself from his trial.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

When court resumed after a lunch break on September 20, 2004, on the fifth day of testimony in the guilt phase of his trial, the Court informed Mr. Basham that, contrary to its earlier decision, it would not permit him to use "dip" in the courtroom "to either keep him awake or to calm his nerves."  (Tr. 9/20/04 at 148.)  In response, Mr. Basham immediately informed the Court, "I would like to go back downstairs, if I may.  Go back.  I don't feel good."  (Tr. 9/20/04 at 148.)  The Court informed Mr. Basham that is was "not possible" for him to go back to the holding cell because he "need[ed] to be here to help your lawyers defend this case."[10]

The record reflects that, while the Court took up an administrative matter with

---

[10]In light of the fact that Mr. Basham was both legally incompetent to assist his attorneys, and that his attorneys had already conceded his guilt to almost every charge against him, the Court's assertion is subject to challenge.

51

the prosecution, Mr. Basham must have been advising his attorney of his need to leave the courtroom, because Mr. Swerling then stated, "Judge, he is not going to be here. It will be a problem. It is against my judgment, my wishes." (Tr. 9/20/04 at 149.) In response, the Court informed Mr. Swerling, "I will not let him leave here. He will stay right here." (*Id.*) Mr. Basham continued to plead with the Court, stating that all that he was asking was to be able to go downstairs so he could lay down. (Tr. 9/20/04 at 149-50.) As Mr. Basham spoke to the Court, several U.S. Marshal officers grabbed Mr. Basham.[11] The ensuing struggle, which was videotaped and later shown to the jury, lasted for several minutes.

Both the Court and defense counsel violated Mr. Basham's constitutional and statutory rights when they refused to permit Mr. Basham to leave the courtroom. Federal criminal rule 43(c)(1)(A) contemplates that a defendant may voluntarily absent himself from his trial, "regardless of whether the court informed the defendant of an obligation to remain during trial." Moreover, defense counsel rendered deficient performance when they refused to accede to their client's wish to absent himself from the courtroom. Counsel were well aware of Mr. Basham's emotional,

---

[11]A videotape of the encounter reveals that at no time did Mr. Basham attempt to leave the courtroom on his own accord. Rather, throughout the incident, he stood still, respectfully addressing the Court. The motives of the U.S. Marshal officers in grabbing Mr. Basham is unclear, given that the Court had instructed the Mr. Basham would be remaining in the courtroom.

intellectual, and psychological deficits, which had already been the subject of several *ex parte* hearings during the course of the case. In addition, upon information and belief, defense counsel were not communicating with the client during courtroom proceedings (despite Mr. Basham's efforts to do so), so counsel could not reasonably argue that they needed Mr. Basham by their side to defend his case. And, finally, as alleged elsewhere in this Motion, Mr. Basham was not legally competent to assist his attorneys anyway. No strategic or practical purpose justified counsel's refusal to argue on their client's behalf when he expressed the need to absent himself from the courtroom.

The prejudice that resulted to Mr. Basham from this episode is unquestionable. As a result of the Court's refusal to permit Mr. Basham to leave, and his attorneys' failure to advocate on his behalf, the jury eventually was shown a lengthy videotape portraying Mr. Basham, at least in the minds of U.S. Marshal officers, as a violent criminal. Mr. Basham is entitled to relief from his convictions and sentences because of this violation of his constitutional and federal statutory rights.

CLAIM 11

**The Government engaged in misconduct when it failed to correct testimony of Sheriff Ronald Hewett that it knew to be false, in violation of its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The Government compounded this misconduct by relying on Sheriff Hewett's false testimony in its closing argument.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

On April 22, 2003, the Government presented the testimony of FBI Agent Jeffrey Long to the Grand Jury in its attempt to obtain a superceding indictment against Mr. Basham. (Tr. 4/22/03 at 19-106.) In his testimony before the Grand Jury, Agent Long testified that, during the search of the Bee Tree Farms area on November 28, 2002, Mr. Basham indicated, among other things, that Chadrick Fulks strangled Alice Donovan by the use of a purse strap. (Tr. 4/22/03 at 71-72.) Agent Long's testimony before the Grand Jury was consistent with the report he prepared immediately after the events of November 28, 2002. In that report, Agent Long wrote, "After FULKS raped her, FULKS used a purse strap, which was approximately 18 inches long, and strangled Donovan." (Exh. 3 (FBI 302 report prepared by Jeffrey Long, transcribed on December 4, 2002).)

54

At Mr. Basham's trial, the Government presented the testimony of both Agent Long and Sheriff Hewett. On cross-examination, Sheriff Hewett testified for the first time, and contrary to all other evidence in the case, that Mr. Basham had demonstrated for him how he (Basham), rather than Fulks, had used the purse strap to strangle Ms. Donovan. (Tr. 9/27/04 at 53-54.) Specifically, Sheriff Hewett gave the following responses to defense attorney Jack Swerling's questions on cross-examination:

Q.   There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?

A.   No, sir. He did not tell me he used the strap. He demonstrated, though.

Q.   He demonstrated?

A.   Yes, sir.

Q.   Your notes [sic], nor Lieutenant Crocker's notes say that he did that; isn't that true?

A.   That is true because he didn't say. He showed.

(Tr. 9/27/04 at 53-54.)

Upon information and belief, Mr. Basham submits that, in light of the reports previously prepared by both the FBI and the Brunswick County Sheriff's Office, the Government knew that Sheriff Hewett's testimony during cross-examination,

indicating that Mr. Basham had been the actual killer of Ms. Donovan, was false. By failing to correct this false testimony, the Government violated its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). Standing alone, this misconduct on the part of the Government entitles Mr. Basham to a new trial.

At Mr. Fulks's earlier trial, at a colloquy outside the presence of the jury, the Government stated, "Remember Sheriff Hewitt [sic] demonstrating how Brandon Basham said that Chad Fulks took the purse strap and strangled." [Fulks Tr. 6/22/04 at 255]. This statement by the prosecutor removes any doubt that the Government knew that Sheriff's Hewett's testimony at Mr. Basham's trial was false.

The Government's misconduct regarding Sheriff Hewett did not stop with its passive failure to correct his false testimony. Instead, as discussed in Claim 1, the prosecution repeatedly used Hewett's false testimony to its advantage in its closing arguments at both the guilt and penalty phases of Mr. Basham's trial. (Tr. 9/29/04 at 81-82; Tr. 11/1/04 at 57, 62.)

Upon information and belief, Mr. Basham alleges that the Government obtained his conviction through the use of false testimony. Sheriff Hewett's false statements were directly material to issues of both guilt and punishment in this case, a fact that is demonstrated by the Government's use of those statements in its closing

arguments at both the guilt and penalty phases.  The due process requirements enunciated in *Napue* and *Giglio* mandate that Mr. Basham's convictions and sentences be vacated and that he be afforded a new trial.

**CLAIM 12**

**Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of the Government's misconduct as a basis for reversal on direct appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham's appellate attorneys negligently failed to raise the issue of the Government's misconduct under *Napue*, 360 U.S. 264 (1959), and *Giglio*, 405 U.S. 150, in his direct appeal.  Mr. Basham was prejudiced by his appellate attorneys' failure to raise this meritorious claim on direct appeal.

**CLAIM 13**

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to argue to the jury that Mr. Basham's post-arrest statements to law enforcement officers were involuntary.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

57

As discussed in Claim 2, considerable evidence existed that Mr. Basham's waiver of his *Miranda* rights and his statements to law enforcement officers were neither knowing, intelligent, or voluntary. In addition to extensive evidence documenting Mr. Basham's medical, intellectual, emotional, and psychological disabilities, defense counsel were provided Government discovery and heard the testimony of law enforcement officers who interrogated Mr. Basham. That discovery and testimony revealed, among other things, that Mr. Basham was interrogated in the middle of the night, while under the possible effects of cocaine and marijuana. Defense counsel were also aware that Mr. Basham suffered from an anxiety disorder that was triggered by being enclosed in confined areas, such as interrogation rooms.

Defense counsel rendered deficient performance in failing to argue to the jury the involuntariness of Mr. Basham's statements to law enforcement, and Mr. Basham was prejudiced by this failure.

### CLAIM 14

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorney, Jack Swerling, was hindered by a personal conflict of interest.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

58

Upon information and belief, in 2002, defense counsel Jack Swerling and members of his family were victims of a violent and harrowing home invasion. Undersigned counsel recognize that Mr. Swerling's status as a victim of a violent crime does not, standing alone, reflect on his ability to serve effectively as a criminal defense attorney. Nor do counsel wish to add to the trauma Mr. Swerling and his family suffered as a result of the crime against them. Facts discovered by counsel during their investigation of this case, however, have given rise to a good faith belief that Mr. Swerling had a personal conflict of interest during his representation of Mr. Basham that prevented him from rendering effective assistance of counsel. These facts include: (1) the temporal overlap between Mr. Swerling's representation of Mr. Basham and his testimony as a victim in the trial of Jimmy Causey, who was not only convicted of kidnapping Mr. Swerling and his family, but who was also a former client of Mr. Swerling; (2) similarities between the charges against Mr. Basham and Mr. Causey; and (3) evidence that Mr. Swerling's behavior and statements to the defendant and defense counsel during the Causey trial reflected upon his ability to act as a zealous advocate for Mr. Basham.

In light of the evidence discovered by Mr. Basham, he alleges that Mr. Swerling's personal conflict of interested prevented him from rendering constitutionally sufficient performance on Mr. Basham's behalf, and that Mr. Basham

59

was prejudiced thereby.

## CLAIM 15

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel in violation of 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when they failed properly to object to the admission of unfairly prejudicial prior act evidence during the guilt phase of Mr. Basham's trial. Appellate counsel similarly rendered ineffective assistance of counsel, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they not only failed to raise this issue on appeal, but in fact conceded the admissibility of evidence concerning the Burns kidnapping.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

At a pretrial conference on August 4, 2004, the Government informed both the Court and defense counsel that it intended "to offer evidence of the Samantha Burns' [sic] murder during the guilt of phase of this case." (Tr. 8/4/04 at 37.) Citing *United States v. Chin*, 83 F.3d 83 (4th Cir. 1996), the Government maintained that evidence of the crimes against Samantha Burns was "intrinsic" to the Donovan case and therefore was not subject to exclusion on Rule 404(b) of the Federal Rules of Evidence. The following exchange then occurred:

60

| Mr. Swerling: | [The prosecutor] told us about that this morning. We would like an opportunity to think about that. I understand what their position is. We certainly can let them know and let the Court know whether we object under 404. Take the position we don't think it is. |
| --- | --- |
| The Court: | If you object, that is fine. But I need some authority from both sides. Just the fact that it hurts my client or it helps the Government's case is not persuasive. I need some authority on what the Rules provide at a guilt phase where the Rules of Evidence do apply. In other words, I guess the big question is, is it intrinsic to the crime charged here? |
| The Prosecutor: | I think our obligation is to put them on notice that we intend to offer. If they want to file a motion in limine to exclude it, they can do it. We have to respond in writing. |

(Tr. 8/4/04 at 38.)

Defense counsel never filed a motion in limine. At a subsequent pre-trial hearing three weeks later, Greg Harris appeared to concede that the facts of the Samantha Burns crimes "were all intrinsic to this case." (Tr. 8/25/04 at 78.) Later in the same hearing, however, Jack Swerling returned to the issue, although Swerling did not take a firm position on the matter: "[T]he government's position is going to be that's intrinsic in the guilt phase, and therefore is admissible, we understand that we need to probably cover that, but I don't want the court to think the record is reflecting we are waiving an objection." (Tr. 8/25/04 at 114.) Swerling reiterated,

61

"I just didn't want Your Honor to think that – or the government to think that we were not objecting to the Samantha Burns' evidence coming in during the guilt phase." (*Id.* at 115.)  The Court assured defense counsel that they had not waived their right to object to the evidence.  (*Id.*)

Early in the guilt phase of Mr. Basham's trial, the Government began to present evidence of the crimes against Samantha Burns.  Defense counsel failed to object to the admission of this evidence, and the Government proceeded to call several witnesses, including several members of Samantha Burns's family to testify not only about her disappearance, but about her characteristics and the impact of her disappearance on her family and friends.  Defense counsel offered no objection during any of this extended testimony.[12]  At the adjournment of proceedings on September 15, 2004, the Court finally raised the issue for the defense, offering to give the jury a cautionary instruction concerning the evidence:

| The Court: | I had one question before we adjourn.  The Defendant has – the jury has heard about the Samantha Burns's [sic] incident.  Does the Defendant want any cautionary instruction, any 404(b)-type instruction, opportunity, common scheme and plan?  You don't have to tell me now, you can think about it overnight.  I need to offer that |
|---|---|

---

[12]Defense counsel also offered no objection to the admission of detailed testimony concerning the kidnapping of James Hawkins, which occurred shortly after Mr. Basham and Fulks escaped from jail.

instruction, if you wanted it. The Government will say it is all intrinsic to the crime. There is no cautionary instruction needed, right?

The Prosecutor:   That's right.

The Court:   Expound on that a little bit. Intrinsic to what crime now. There are eight different counts.

The Prosecutor:   Intrinsic to all of the crimes. Certainly intrinsic to the conspiracy count, which spans the time from the time of the escape to the time of Mr. Basham and Mr. Fulks's arrest. We also think it is because it is intrinsic to conspiracy. The other alleged crimes occurred within the course of the conspiracy. We think it is intrinsic to all of that. Certainly puts all of the evidence in context.

The Court:   Wait a minute now. Let's think about it. The conspiracy to carjacking and kidnapping Ms. Donovan, you are saying it occurred – that they formulated the plan to do that up in West Virginia?

The Prosecutor:   Multi-objective conspiracy. One of its objects to steal firearms, have in possession firearms by felons, to transport a vehicle across state lines, carjack and kidnap Ms. Donovan. We think at the very least the conspiracy to have firearms began the night Mr. Fulks approached Ms. Severance and got acquisition of the firearms.

The Court:   I will find out what the defendants want tomorrow. Most of the time the defendant doesn't want a cautionary instruction, it sometimes hones it in for the jury, makes it worse. We will see what the defendant wants tomorrow and then decide.

63

(Tr. 9/15/04 at 291-93.)

Defense counsel did not engage in this colloquy, but rather stood by mute. Two days later, however, Mr. Swerling informed the Court, "We are not looking for a limiting instruction until possibly your final charge.  We will discuss it at that time.  Not now."  (Tr. 9/17/04 at 10.)

By this time, however, damage that could not be undone by a limiting instruction had already occurred.  Without any objection from defense counsel, the Government had turned the trial of Alice Donovan's murder into the trial of the murders of both Ms. Donovan and Samantha Burns.  The Government not only told the jury that Samantha Burns's disappearance had occurred and that Mr. Basham had been involved, it provided powerful and sympathetic witnesses who testified at length about the tragic disappearance of a nineteen-year-old college student and the effect that disappearance had on their lives.

No rational trial strategy could justify defense counsel's failure to attempt to preclude this testimony in its entirety or, failing that, to limit the extent and scope of the testimony offered about Samantha Burns's disappearance.  Instead, defense counsel simply stood idly by while the Government transformed the case from a single-homicide to a double-homicide prosecution.

64

Defense counsel rendered deficient performance in several ways with regard to the Samantha Burns evidence. First, they made no effort to challenge the Government's dubious claim that every crime committed between Mr. Basham's escape from jail and his arrest more than two weeks later was "intrinsic" to the charges for which he was on trial. The Government relied on the Fourth Circuit's ruling in *United States v. Chin*, 83 F.3d 83, but its broad reliance on this case was questionable. *Chin* does not stand for the broad rule that the Government suggested, but because defense counsel made no effort whatsoever to challenge the Government's interpretation of *Chin*, the prosecution was able to use that case as a gateway to admit extensive amounts of damaging—and arguably inadmissible—evidence against Mr. Basham.

Defense counsel further rendered deficient performance in failing to request that the Court determine whether, even if the evidence of the Samantha Burns kidnapping were admissible as evidence "intrinsic" to the Alice Donovan kidnapping, its unfairly prejudicial effect on Mr. Basham's case rendered the evidence nevertheless subject to preclusion under Rule 403 of the Federal Rules of Evidence. Given the particularly damaging effect of the substantial evidence about Mr. Basham's role in the disappearance of Samantha Burn on his ability to defend the charges against him related to Alice Donovan's disappearance, it is not improbable

that the Court would have determined that the evidence of Ms. Burns's disappearance should be precluded or truncated.

Even if the Court had ruled that evidence of Samantha Burns's disappearance was admissible (either as intrinsic evidence or under Rule 404(b)) at Mr. Basham's trial in the Donovan case, defense counsel nevertheless could have made sustainable objections to the extent to which the Government elicited testimony about Ms. Burns's disappearance. It would be one thing to inform the jury of Ms. Burns's kidnapping; it was quite another thing to treat the Donovan trial as an opportunity to try the case of the disappearance of Samantha Burns. Yet, defense counsel made no effort whatsoever to limit the Government in its presentation of this evidence. No reasonable strategy could possibly have justified this inaction on the part of defense counsel. Their performance in this regard was plainly deficient, and the prejudice to Mr. Basham as a result of the admission of the extensive evidence concerning the Samantha Burns kidnapping is unquestionable. Mr. Basham is entitled to relief on this claim.

Finally, Mr. Basham was denied the effective assistance of appellate counsel guaranteed him by the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when his appellate counsel failed to raise on appeal the issue of the admission of the extensive evidence concerning Samantha Burns's disappearance. Not only did

66

counsel fail to request that the Fourth Circuit conduct a plain error review of the admission of this evidence, they in fact conceded that "the Burns kidnapping was properly admitted as similar act evidence."  (App. Dkt. 181 at 116.)  Appellate counsel rendered deficient performance in this regard and Mr. Basham was prejudiced as a result.

**CLAIM 16**

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to request that this Court admit at the penalty phase of Mr. Basham's trial comments made by the Government at his co-defendant's trial concerning Mr. Basham's lesser culpability.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Trial counsel filed a motion placing the Government on notice that they intended to introduce "relevant factual assertions from the government's closing argument" in the Fulks case pursuant to Federal Rule of Evidence 801(d)(2)(D). (Dkt. No. 724 at 1.)  Of particular importance was the statement that "he [Fulks) is the leader . . . .  Brandon Basham was a puppet, and Chad Fulks was pulling his strings throughout a lot of this crime spree." (Dkt. No. 724 at 9.)  In response, the Government argued that the Court "should consider the admissibility of the

67

government's prior closing argument only after the government has presented its case and Basham has identified which government assertions, if any, are allegedly inconsistent." (Dkt. No. 745 at 3.)  The Court agreed, stating, "I think the thing to do is, just once the Government's evidence is in, take a time out, see if the defense attorneys can show me in some way that the prosecutors have been inconsistent or taken contrary position in this case from the first case.  So that is how I would like to handle that one."  (Tr. 9/10/04 at 11.)  Mr. Swerling responded, "Judge, that works for us."  (*Id.*)  Despite being given the permission by the Court to do so, however, counsel never renewed the argument at any point during Mr. Basham's trial.  There is no indication that Mr. Basham's counsel decided to abandon the motion to admit the statements for any strategic reason.

On direct appeal, Mr. Basham argued that the District Court abused its discretion by preventing Mr. Basham from offering the Government's statement in Fulks's trial that Fulks was the leader of the crime spree and Mr. Basham merely his puppet. (App. Dkt. 181 at 77.)  Counsel argued that the evidence was "obviously admissible under the FDPA's permissive standard" pursuant to 18 U.S.C. § 3593(c). (App. Dkt. 193 at 54.)  The Government responded that, because Mr. Basham's trial counsel never renewed the motion despite the Court's statement that it would "take a time out" after the completion of the Government's case to consider the issue, Mr.

Basham's attorneys failed to preserve the claim for appellate review. (App. Dkt. 180 at 114.)  The Fourth Circuit agreed, holding that because defense counsel "never moved for admission of the statements," and thus failed to request that the Court rule on the admissibility of the evidence, the argument was waived, and not even plain error review was available to Mr. Basham on appeal.  *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009).

Had trial counsel re-urged the issue of admission of the Government statements during the Fulks closing argument, the result undoubtedly would have been different. First, as a result of the Government's arguments that "he [Basham] killed Alice Donovan," the Court may have agreed with defense counsel and allowed the Government's statements to come before the jury.  (Tr. 11/1/04 at 62.)  For example, hearing that even the prosecution characterized Mr. Basham as a "puppet" would likely have caused jurors to give more credence to the argument that Mr. Basham played a minor role in the crimes.  Absent this characterization, not a single juror found the Minor Participant statutory mitigator.  (Dkt. 805 at 6).  Under the circumstances discussed above, there is a reasonable likelihood that, absent trial counsel's error, the result would have been different. *See Strickland*, 466 U.S. at 694.

Even if the Court had ruled against Mr. Basham, the issue would have been preserved for appellate review.  Trial counsel's failure to re-urge the motion meant

69

that even plain error review was unavailable. *Basham*, 561 F.3d at 335. Thus, it is unambiguous that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "*Strickland* is not always fastened to the forum in which counsel performs deficiently; even when it is *trial* counsel who represents a client ineffectively in the *trial court*, the relevant focus in assessing prejudice may be the client's appeal." *Davis v. Secretary for Department of Corrections*, 341 F.3d 1310, 1315 (11th Cir. 2003) (finding ineffective assistance of counsel where trial counsel raised, but failed to re-urge the issue at the close of voir dire as required by Florida law, and thus failed to preserve the issue for appeal).

## CLAIM 17

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel (a) failed effectively to cross-examine a key Government witness; (b) failed to call rebuttal witnesses to challenge the Government witness's testimony; and (c) failed to respond to the Government's argument concerning the witness's testimony.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

At trial, Mr. Basham's former teacher's aide, Clifford Jay, testified on direct examination that, on Christmas Eve, 2002, Mr. Basham called him from jail after

70

being arrested for Alice Donovan's murder. (Tr. 9/27/04 at 224.) According to Mr. Jay, Mr. Basham told him that he was "in a lot of trouble." (Tr. 9/27/04 at 228.) Mr. Jay asked, "Did you do – I just want to know if you did what they said you did?," to which Mr. Basham allegedly replied, "Yes, sir. We killed them." (Tr. 9/27/04 at 228.) Mr. Jay testified that he "specifically remember[ed] [Basham] saying 'them' because it struck [him] by complete and utter surprise," as he was only aware of the Alice Donovan case. (Tr. 9/27/04 at 228-29.) Mr. Jay subsequently reported the conversation to someone at the sheriff's department in Madisonville, Kentucky. (Tr. 9/27/04 at 229.) Although Mr. Jay claimed that he and the officer with whom he spoke had been "good friends throughout the years" and that he had "known him [his] whole life," Jay could not remember the officer's name. (Tr. 9/27/04 at 235.)

On cross-examination, Mr. Swerling questioned whether Mr. Basham in fact told Mr. Jay, "We killed *her*." (Tr. 9/27/04 at 238 (emphasis added).) Mr. Jay adamantly denied that this was the case. Mr. Swerling refreshed Mr. Jay's memory that the person he spoke with from the sheriff's department was David Morris. Mr. Swerling also questioned whether Mr. Jay had spoken with a Detective Addison from Myrtle Beach. Mr. Jay affirmed that he had spoken with a Myrtle Beach officer, but could not recall his name. (Tr. 9/27/04 at 239.) Although Mr. Jay agreed that he asked Mr. Basham questions about Alice Donovan, and not Samantha Burns, he was

71

adamant that Mr. Basham had said, "We killed *them*."   (Tr. 9/27/04 at 239-40 (emphasis added).)

The next day, during oral argument concerning the Rule 20 motion, the Government relied on Mr. Jay's testimony to challenge the motion.  The Court asked defense counsel, "What about the statement he made to Clifford Jay, 'we killed them'?"   Defense counsel Greg Harris conceded that the testimony was "problematic," but countered that Mr. Swerling probed that statement.  (Tr. 9/28/04 at 6.)  The Court responded that the testimony was "essentially unchallenged," and that there was no evidence to support the cross-examination question about whether Mr. Basham had in fact said "her" instead of "them."  (Tr. 9/28/04 at 7.)  The Court observed that he "wondered at the time if we were going to hear from those police officers," and he questioned whether there was "a good-faith basis for asking a question like that."  (Tr. 9/28/04 at 8.)

Mr. Swerling argued that he did have a good faith basis for the question, indicating that the defense team had checked with both of the officers and confirmed that Mr. Jay never told them about Mr. Basham's supposed reference to "them" in his statement to Jay.  Mr. Swerling stated, however, that the defense had "opted not to present it at this stage of the trial," but left open the possibility that it might present testimony from the officers at the penalty phase.  (Tr. 9/29/04 at 9.)  Mr. Swerling

72

informed the Court that, when he and Greg Harris interviewed Mr. Jay, Jay had conveyed that Mr. Basham had said, "We killed her." (Tr. 9/29/04 at 9-10.) The Court responded that, nevertheless, Mr. Jay did not retreat from his testimony while on the stand, and it denied the Rule 20 motion. (Tr. 9/28/04 at 10.) Despite asserting that he "wanted to set it up in case we wanted to try to get into it later," defense counsel never called David Morris or Detective Addison to impeach Clifford Jay's damaging testimony.

The failure to impeach a key government witness with prior inconsistent statements constituted ineffective assistance of counsel. The effect of this failure was devastating to Mr. Basham's defense, and the Government seized upon this failing. In guilt phase closing argument, the Government revisited Jay's testimony with the jury. The prosecutor argued,

> I wanted to finish with that because how would you go back in your jury room after listing to Sheriff Hewitt (sic) . . . [and] Clifford Jay when Brandon Basham told you jurors through Clifford Jay, we killed them and find him not guilty of carjacking, resulting in death? And find him not guilty of kidnapping, resulting in death? I have been up here for two hours, and the government submits *those two witnesses and that limited testimony, alone, seals the deal*. "We killed them."

(Tr. 9/29/04 at 81-82 (emphasis added).) Despite the Government's argument that Clifford Jay's comment was one of the two most damaging statements against Mr. Basham, Mr. Swerling did not address or attempt to challenge the Jay statement in his

73

closing argument.

In penalty phase closing argument, the Government again emphasized the importance of the unchallenged testimony, arguing, "'We killed them.' The words of Brandon Basham. The defendant intentionally killed the victim. 'We killed them.' 'We tied the woman to a tree in North Carolina.' That is what he tells Mr. Jay." (Tr. 11/1/04 at 59.) In his penalty phase closing argument, Mr. Swerling once again did not discuss or attempt to discredit the Jay testimony. And in its rebuttal closing argument, the Government seized upon this failure: "And as far as who the actual killer is . . . . [w]hat didn't Mr. Swerling talk to you about? . . . . He didn't mention anything about Brandon Basham reaching out to Mr. C.J., to Clifford Jay on Christmas Eve, December 2003 [sic], saying, 'We killed them.'" (Tr. 11/1/04 at 170.) The Government continued, "'We killed them.' What more do you need as far as his involvement. His own words . . . ." (Tr. 11/1/04 at 171.)

As the Government recognized, Clifford Jay's testimony was devastating to Mr. Basham's case. Had it not been, the Government would not have argued that it, along with the Hewett testimony, was enough to convict Mr. Basham. Yet, defense counsel, despite having the ability to rebut this testimony with the testimony of Officer Morris and Detective Addison, failed to do so. Given how important Mr. Jay's testimony was to the Government's case against Mr. Basham, there was simply

74

no strategic or objectively reasonable basis to fail to call the rebuttal witnesses, or in any way challenge Jay's statement. Even if defense counsel had not realized how damaging the testimony would be in the guilt phase, after hearing Mr. Jay testify, and hearing its central role in the Government's guilt phase closing argument, the failure to call the officers during penalty phase, as Mr. Swerling had discussed doing at hearing on the September 28, 2004, was inexcusable and fell below accepted standards of performance of counsel.

The record plainly shows prejudice. The verdict form indicates that not a single juror found the Minor Participation mitigating factor. (Dkt. 805 at 6.) Defense counsel's failure to call witnesses to rebut Clifford Jay's testimony or even to address Jay's testimony in closing argument was a failure that tipped the balance in favor of a death verdict, and thus was undeniably prejudicial.

### CLAIM 18

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel failed effectively to cross-examine Sheriff Ronald Hewett, in fact elicited damaging testimony from Hewett, and then failed to mitigate the damage caused by his deficient cross-examination of Hewett.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

75

At trial, Mr. Basham's counsel elicited damaging testimony from Sheriff Ronald Hewett. Defense counsel's anemic cross-examination of Sheriff Hewett, and his failure to impeach the witness with information previously available to the defense, constituted deficient performance and greatly prejudiced Mr. Basham.

Sheriff Hewett testified at the *Jackson v. Denno* hearing in Mr. Basham's case. As discussed in more detail in Claim 1, *supra*, Hewett testified that he walked off alone with Mr. Basham and that Mr. Basham then demonstrated how Alice Donovan was killed with the purse strap, as well as how he threw the strap into the woods. (Tr. 9/27/04 at 53; Tr. 2/25/04 at 66.)

Sheriff Hewett did not author a report, but rather had Lieutenant Crocker interview him and write a report based on that interview. The report never states that Mr. Basham killed Alice Donovan, or that he demonstrated to Hewett how he had done so. The report states only that "Basham demonstrates (visually) how he afterwards threw the strap into the wood line at the cemetery," and that when Hewett asked, "Is this where it happened?," Basham responded, "It is." (Exh. 2.)

Defense counsel also had, as part of discovery, an FBI "302" report prepared by Agent Jeffrey Long. The FBI 302 report notes that Mr. Basham had a conversation with his attorney, Cameron Littlejohn, and that Mr. Littlejohn conveyed to law enforcement that "[a] purse strap was used by FULKS to strangle DONOVAN.

76

BASHAM threw the purse strap out of the window of the BMW as they left the cemetery."[13] (Exh. 3.) Sheriff Hewett testified about this conversation at the *Jackson v. Denno* hearing, stating only that Mr. Basham discussed the leather strap used to kill Alice Donovan, but not that he had indicated who had wielded it. (Tr. 2/25/04 at 63-64.)

As noted *supra*, Claim 1, the Government's position at the Fulks trial was that Sheriff Hewett's *Jackson v. Denno* testimony was that Mr. Basham had told Hewett that *Fulks* strangled Ms. Donovan with the purse strap. At Basham's trial, Sheriff Hewett testified on direct that Mr. Littlejohn told them that they "needed to be looking for a purse strap." (Tr. 9/27/04 at 27.) As noted above, Hewett also testified during cross examination, and contrary to all other evidence in the case, that Mr. Basham had demonstrated how *Basham* had strangled Donovan. (Tr. 9/27/04 at 53-54). In response to Hewett's testimony that Mr. Basham had demonstrated how *he* had used the purse strap, defense counsel responded only:

---

[13]Agent Long's report also contains a second reference to Fulks using the purse strap to strangle Donovan. Although not noted in the report, this statement was part of the hypothetical used by Mr. Littlejohn that ultimately resulted in his and co-counsel Monckton's disqualification. This Court ruled that the statement was not admissible. Thus, counsel wishes to make clear that it is the first reference, and not that which was part of the hypothetical, that defense counsel should have elicited through either Long himself, or through Sheriff Hewett.

Q.    Your notes [sic], nor Lieutenant Crocker's notes say that he did that; isn't that true?

A.    That is true because he didn't say.  He showed.

(Tr. 9/27/04 at 53-54.)

Counsel did not attempt to impeach Sheriff Hewett with his *Jackson v. Denno* testimony that he was present when Littlejohn provided the information about Fulks using the purse strap.  Counsel also did not ask Hewett if he was aware that Agent Long's report indicated that the statement from Littlejohn was that Fulks used the purse strap to strangle Ms. Donovan, not Mr. Basham.  Nor did counsel question whether Hewett had testified at previous hearings, and whether in those hearings he had not indicated that Mr. Basham had shown him how *he* (Basham) strangled Alice Donovan.  In fact, counsel did not ask any further questions about the purse strap.  Instead, appearing rattled, he asked a disjointed, rambling question about an entirely different matter: "Now, did you go – let me rephrase this.  During the six hours that you were out there, isn't it a fair statement to say that it is approximately – you tell me, how fair is it from the Amoco on Highway 17 until you turn off on Green Hill Road?"  (Tr. 9/27/04 at 54.)  Counsel never returned to the topic of the purse strap, leaving the damaging testimony to stand unchallenged.

78

Exacerbating his deficient performance in his cross examination of Sheriff Hewett, defense counsel failed to elicit testimony from Agent Long, consistent with his report, that would have called Hewett's testimony into question. Cross examination of Agent Long contained the following exchange:

Q.    Also the information about the purse strap. Now, Brandon Basham provided that information to y'all, didn't he? You didn't give that information?

A.    I personally received that information from attorney Littlejohn. I wasn't – I did not hear the Sheriff get that information from Brandon. Attorney Littlejohn told me what the deal was with the purse strap and that we would be sure we were in the right location if we could find it.

(Tr. 9/27/04 at 206.)

Counsel failed to ask Agent Long any questions about the notation in his 302 report that Fulks, not Basham, had wielded the purse strap. Nor did he ask Long whether Sheriff Hewitt was present when Attorney Littlejohn conveyed this information. Had defense counsel asked these simple questions, with which Agent Long either would have had to agree, or acknowledge a gross error in his report, the damage from Sheriff Hewett's testimony would have been minimized. The unchallenged testimony would not have been allowed to stand. Defense counsel would have had testimony to argue in closing argument to contradict the damaging closing statements by the Government discussed in Claim 1 of this Motion. The

79

failure to engage in any meaningful cross-examination of either witness fell far below the accepted standards of competency and resulted in prejudice to Mr. Basham.

The damaging testimony that it was Mr. Basham who strangled Alice Donovan was elicited by defense counsel. Eliciting damaging evidence without sound strategy "falls well below an objective standard of reasonableness." *See White v. McAninch*, 235 F.3d 988, 997-98 (6th Cir. 2000). No sound strategy existed for asking Sheriff Hewett the question that resulted in the damaging testimony. The Government had not elicited any testimony that Mr. Basham was the actual killer. The statement that Fulks strangled Ms. Donovan could have been elicited from Agent Long, who had already confirmed this in his report.

Moreover, the excuse that counsel did not know what Hewett was going to say does not remove the error. In fact this "argument violates a cardinal rule of examination - if defense counsel did not know what [Hewett] would say, he should not have asked." *Chatmon v. United States*, 801 A.2d 92, 109 (D.C. 2002). "A person charged with a crime has the right to expect his lawyer's questioning will not help the [Government] prove its accusation." *People v. Orta*, 836 N.E. 2d 811, 813 (Ill. App. 2005). Unfortunately, that is precisely what counsel did here, and there is no possible strategy that could support such a decision. Accordingly, counsel's performance was deficient. For the reasons outlined in Claim 1, *supra*, this deficient

performance clearly prejudiced Mr. Basham, as even the Government acknowledged it was one of the most important pieces of evidence against him.

**CLAIM 19**

**Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when they failed adequately to investigate, develop, and present mitigating evidence at the penalty phase of Mr. Basham's trial.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham had a constitutionally protected right to have his trial counsel investigate, develop, and present mitigating evidence related to his background and character, as well as to the circumstances of the crime. *Williams v. Taylor*, 529 U.S. 362, 393 (2000). Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice. *See Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005).

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. In a capital case, this standard is met if "there is a reasonable probability that a least one juror would have struck a different balance" in the penalty phase of the trial. *Wiggins*, 539 U.S. at 537. In sum, the Sixth Amendment is violated in a

81

capital sentencing proceeding when defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant and offer an explanation for his conduct. "Where it is apparent from the evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).

Mr. Basham alleges that his attorneys rendered constitutionally ineffective assistance of counsel in failing to investigate, develop, and present powerful mitigating evidence at the penalty phase of his trial. Indeed, at least some of the evidence defense counsel unreasonably failed to pursue (namely, evidence of mental retardation) would have categorically removed Mr. Basham from the class of defendants eligible for a death sentence. *See Atkins v. Virginia*, 536 U.S. 304 (2002).

In this Motion, Mr. Basham discusses, by way of example, two substantive areas in which defense counsel failed to investigate and develop powerful mitigating evidence, despite obvious and repeated indications that these areas of investigation would have proved fertile in developing a mitigation case or, as noted above, completely exempted Mr. Basham from the possibility of a death sentence. Mr.

Basham's claim of ineffective assistance of counsel in failing to investigate, develop, and present mitigating evidence, however, is not limited to these two areas. Counsel for Mr. Basham submit that their client's mental incompetency, which continues to this day, both prevents them for alleging all instances in which trial counsel rendered deficient performance in this area and suggests that additional areas of mitigation remain unexplored.[14] With that proviso, counsel for Mr. Basham allege the following specific examples of deficient performance by counsel with regard to the investigation, development, and presentation of relevant mitigating evidence.

### A.      Mental Retardation

At the time of trial, Mr. Basham had a Full Scale IQ of 68. Typically, an Full Scale IQ of 70 or lower fulfills the "significant deficits in intellectual functioning" prong of a diagnosis of mental retardation. Despite Mr. Basham's low IQ, at trial, his attorney informed the jury that mental retardation was "not an issue here." (Tr. 10/26/04 at 53.)

Mr. Basham submits that his defense counsel rendered constitutionally

---

[14]For example, upon information and belief, defense counsel may have failed to investigate the issue of Mr. Basham's vision, whether he was wearing corrective lenses at the time of the crimes, and if not, whether his uncorrected vision might have affected his ability to assist law enforcement officials in searching for Alice Donovan's remains during the search conducted on Thanksgiving Day, 2002. Because of Mr. Basham's current incompetency, counsel are unable to confirm additional specific information concerning this issue at this time.

ineffective assistance of counsel in failing to investigate, develop, and present evidence that would have shown that mental retardation *was* "an issue" in Mr. Basham's case. Mr. Basham anticipates that defense counsel's explanation for not pursuing the critical issue of his mental retardation will be that earlier IQ tests administered before Mr. Basham turned 18 placed him above the IQ range typically associated with mental retardation.

Mr. Basham submits that, had his attorneys fulfilled their obligation to adequately investigate this issue, they would have discovered compelling evidence of the invalidity of the earlier IQ scores assigned to him. In fact, upon information and belief, Mr. Basham submits that defense counsel ignored evidence that his earlier IQ testing had been skewed by seemingly well-meaning professionals to reflect a higher IQ so that Mr. Basham could be admitted to juvenile care facilities that set minimum IQ requirements for patients. Upon information and belief, defense counsel also failed to obtain the raw data associated with the earlier IQ tests to determine the validity of the administration and scoring of those tests. Most significantly, despite the tens of thousands of dollars they spent on mitigation investigators and psychological and psychiatric experts, defense counsel failed to retain and consult an expert on mental retardation. Such an expert would have been able to explain the intricacies of a mental retardation diagnosis, and upon information and belief, would

have been able to explain to counsel, the Court, and the jury why Mr. Basham should be diagnosed as a person with mental retardation—a critical diagnosis that would have rendered him constitutionally ineligible for a death sentence.

### B.    Fetal Alcohol Spectrum Disorder (FASD)

Another example of defense counsel's failure to fulfill their obligation to investigate, develop, and present mitigating evidence on behalf of their client is seen in their complete failure to pursue evidence of Mr. Basham's exposure to drugs and alcohol *in utero* and to seek expert advice on the intellectual, neurological, and neuropsychological effects of that exposure on Mr. Basham.  Upon information and belief, Mr. Basham submits that an adequate investigation into this issue would have revealed compelling mitigating evidence and that the failure to conduct such an investigation prejudiced him.

### C.    Other mitigating evidence

Counsel for Mr. Basham submit that, because of Mr. Basham's ongoing incompetency, he is unable to assist his current attorneys in discovering and investigating other areas of mitigation that trial counsel failed to pursue.  His attorneys reserve the right to amend this Motion after such time that Mr. Basham has regained sufficient competency to meaningfully assist his attorneys in these proceedings.

# CLAIM 20

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorneys failed to assemble a competent capital defense team. In the alternative, Mr. Basham was denied the effective assistance of counsel under the above provisions because his attorneys failed adequately to supervise the team they had assembled.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

"It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla*, 545 U.S. at 387; *see also Buckner v. Polk*, 453 F.3d 195, 215 (4th Cir. 2006) (Gregory, J., concurring in part and dissenting in part). Defense counsel were obligated to collect as much information as possible to use on Mr. Basham's behalf at trial. *See Antwine v. Delo*, 54 F.3d 1357, 1367 (8th Cir. 1995). The current ABA standards indicate that, at the very least, a capital defense team should be comprised of two attorneys, a mitigation expert, and investigator. American Bar Association, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 4.1 (2003).

Rule 5.3 of the ABA Model Rules of Professional Conduct attributes to the attorney responsibility for the conduct of an investigator or other non-lawyer working with the lawyer. The lawyer must ensure that the non-lawyer's work and conduct are "compatible with the professional obligations of the lawyer." ABA Model Rule 5.3(b). The lawyer has a duty to supervise, and is responsible for the conduct of those working for him. ABA Model Rule 5.3 (c). Although defense counsel in this case did assemble a defense team, the team was one riddled with personal problems, conflicts of interest, and ineffective performance. Counsel failed to recognize these issues and failed in their duties properly to supervise and manage their capital defense team. Accordingly, their performance fell below the professional norm in violation of Mr. Basham's rights.

### A. The bias of defense investigator Carlisle McNair created a conflict of interest within the defense team.

Soon after their appointment to Mr. Basham's case, defense counsel identified Carlisle McNair, a "retired" former captain from the Lexington County Sheriff's Office, to be the "overall coordinator of the investigation." (Tr. 8/28/03 at 3.) Unfortunately for Mr. Basham, McNair was a woefully inappropriate choice for the job of assisting in the defense of this capital defendant.

87

The record is bare regarding McNair's experience or training in the investigation of capital cases. Upon information and belief, Mr. Basham alleges that McNair was both professionally and personally biased against him, and that his bias, which was evident to the entire defense team, grossly compromised his investigation of Mr. Basham's case.

Upon information and belief, Mr. McNair, who professed to be a retired law enforcement officer, had in fact resigned from his prior post following several instances of misconduct, as well as inappropriate behavior of a sexual nature. As a result of internal affairs investigations involving him, McNair was relieved from his position as Headquarters' Region Commander at the Lexington County Sheriff's Department and demoted to the rank of lieutenant. He also was placed on probation for six months and suspended from duty for one pay period. (Exh. 4.) On October 14, 2002, McNair resigned from Lexington County. (Exh. 5.) Less than one year later, defense counsel retained him as the lead investigator in Mr. Basham's case.

Upon information and belief, McNair had a personal bias against Mr. Basham, based on McNair's belief that Basham was homosexual. Further, upon information and belief, McNair, because of his lengthy and recent law enforcement experience, had a professional bias against Mr. Basham that was known by, or easily discovered by, Mr. Basham's attorneys. At a hearing on this claim, Mr. Basham will demonstrate

88

that, during his investigation of this case, McNair directed an inordinate amount of time and resources towards irrelevant (and often prurient) matters at the expense of investigating issues that had direct and critical significance to the case against Mr. Basham. For example, McNair seems to have been extremely focused on Chad Fulks's ex-wife, Veronica; the fact that she was a stripper; and the possibility that tapes existed that portrayed her performing sexual acts. Mr. McNair spent a substantial amount of time interviewing Ms. Evans and her associates. In fact, upon information and belief, in his role as investigator, McNair convinced an associate of Evans to turn over a videotape showing Evans engaging in a sex act with the individual. It is difficult to see how this material was in any way relevant to Mr. Basham's trial. McNair's focus on Veronica Evans was inexplicable, as she neither knew Mr. Basham, nor testified at his trial.

Due to McNair's focus on collateral and unimportant matters, he failed to spend adequate time investigating areas that in fact did affect Mr. Basham's case. A prime example of this deficiency became apparent at penalty phase when the Government called several guards from Butner FCI to testify that Mr. Basham bragged that he would never get the death penalty. (Tr. 10/14/04 at 177, 182.) Defense counsel was taken by surprise by this testimony, asked for a sidebar and argued, "We have never been put on notice that our client has made this statement."

89

(Tr. 10/14/04 at 179.)  The Government responded that every one of the witnesses were interviewed by the defense team before the prosecution.  [*Id.*]  The Government argued that it was not the prosecution's "problem" if defense counsel did not identify the appropriate issues when they interviewed the witnesses.  (Tr. 10/14/04 at 180.)  When defense counsel continued to argue that the evidence was not disclosed, the Government responded,

> What is incredible to me, Mr. Harris had access to all of these witnesses for a much longer period of time . . . than the government did . . . . I assume they were asking the same questions we were asking.  What are the positive things about Brandon Basham?  What are the negative things?  What kind of inmate is he?

(Tr. 10/14/04 at 181.)

Every one of the witnesses who testified that Mr. Basham bragged about not getting the death penalty was interviewed by Carlisle McNair.  (Tr. 10/14/04 at 188.)  One of the witnesses, Eddie Ledford, III, testified that he was interviewed by McNair, and that McNair only asked him approximately eleven questions and spent fifteen minutes with him.  (Tr. 10/14/04 at 223, 240.)  Ledford testified that, had Mr. Swerling or Mr. Harris met with him, he would have answered their questions.  He also testified that, had McNair asked him if Mr. Basham was boastful or bragging, he would have responded to him the same way he did to the Government's questions.  (Tr. 10/14/04 at 239-40.)

90

Unlike Veronica Evans or her former lovers, Ledford was an important government witness whose testimony covers eighty-three pages of the penalty phase transcript, and who was the supervisor in the mental health unit where Mr. Basham was housed at Butner. McNair, however, spent only minimal time interviewing him and asked a mere eleven questions.

McNair's personal and professional bias against Mr. Basham violated the duty of loyalty that is one of the paramount duties that counsel, and those working at their direction, owe to a client. Defense counsel's reliance upon and failure to supervise a biased, unqualified investigator fell below the accepted standard of effective assistance of counsel. McNair's failure to investigate and discover both positive and negative facts about Mr. Basham caused counsel to be unprepared for damaging testimony at his trial, and prejudiced his case.

### B. Mitigation Specialist Paige Tarr rendered deficient performance in her investigation in Mr. Basham's case, and defense counsel failed adequately to supervise her.

Very little information exists in the record regarding Paige Tarr. At the same *ex parte* hearing where Mr. McNair was identified as the coordinator of the investigation, the Court indicated it had approved Ms. Tarr as a mitigation specialist. (Tr. 8/28/03 at 2). It is clear that Ms. Tarr was given substantial responsibility for investigating and developing mitigating evidence in Mr. Basham's case. When Dr.

Schwartz-Watts was asked on cross-examination by the Government if she was the head of the mitigation team, she replied "Ms. Tarr is the head, she is a mitigation specialist." (Tr. 10/28/04 at 41). During trial, Ms. Tarr was brought in to sit at counsel table to help Mr. Basham understand what was going on and to attempt to keep him awake. (Tr. 9/17/04 (Ex Parte Hrg) at 4; Tr. 9/17/04 at 143.)

Upon information and belief, Mr. Basham alleges that Ms. Tarr provided grossly deficient performance in her role as director of mitigation efforts in his case, and that his attorneys failed adequately to supervise Ms. Tarr and failed to take prompt remedial steps when her deficiencies came to their attention.[15] Because the "mitigation function is of utmost importance in the defense of capital cases . . . all members of the defense team [must] perform in accordance with prevailing national norms when representing a client who may be facing execution." *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 677 (2008). Considering the important role mitigation was to play in Mr. Basham's case, the fact that the head of the mitigation team was either unable to devote her attention to the case or was deficient in her efforts was prejudicial to Mr. Basham. Ms. Tarr's performance, and counsel's inability to

---

[15]Upon information and belief, Mr. Basham also alleges that Ms. Tarr was instructed by another South Carolina court to no longer practice on capital cases as a result of her deficient performance.

adequately supervise her fell below the well-defined norms of capital defense and resulted in deficient performance and prejudice.

**CLAIM 21**

**Counsel provided ineffective assistance of counsel in failing to request that the Court trifurcate Mr. Basham's trial.**

The Federal Death Penalty Act of 1994 ("FDPA") provides that, if the defendant has been found guilty of a capital offense, the trial judge "shall conduct a separate sentencing hearing to determine the punishment to be imposed."  18 U.S.C. § 3593(b).  At this hearing, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor," regardless of its admissibility under the Federal Rules of Evidence § 3593 (c).  The Government must prove, beyond a reasonable doubt, the existence of at least one of sixteen aggravating factors before the defendant is considered eligible for the death penalty.  The defendant has the burden of proving, by a preponderance of the evidence, any mitigating factor. *Id.*  The jury then considers all of the information presented during the hearing.

If the jury finds true any aggravating factor, it must return "special findings" identifying the statutory and non-statutory aggravating factors it has unanimously found to exist, and also the mitigating factors that one or more jurors have found to

93

exist.  If no statutory aggravating factor is found beyond a reasonable doubt, "the court shall impose a sentence other than death."  18 U.S.C. § 3593(d).  If, however, the jury finds the requisite mental state and at least one statutory aggravating factor, then it "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death" and, based upon this consideration, recommend by unanimous vote "whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence."  18 U.S.C. § 3593(e).

The United State's Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), raises serious questions about the constitutionality of the unitary sentencing hearing, where the jury makes, in a single deliberative process, its "eligibility" decision and its "selection" decision.

To the extent that FDPA's single sentencing hearing provisions survive constitutional challenge under *Ring*, it is nonetheless necessary that courts structure the jury's deliberations so as to avoid the myriad problems associated with admitting information on one issue, such as a nonstatutory aggravating factor like victim impact, that is not relevant to another issue, such as a statutory aggravating factor related to the circumstances of the offense.  Several courts have ordered trifurcated proceedings for these reasons.  *See, e.g.*, *United States v. Natson*, 444 F. Supp. 2d

94

1296, 1309 (M.D. Ga. 2006); *United States v. Johnson*, 362 F. Supp. 2d 1043, 1110-11 (N.D. Iowa 2005); *United States v. Mayhew*, 380 F. Supp. 2d 936, 955-57 (S.D. Ohio 2005); *cf. United States v. Jordan*, 357 F. Supp. 2d 889, 903-04 (E.D. Va. 2005).

Mr. Basham's trial attorneys failed to request a trifurcated proceeding, thus subjecting him to an overly prejudicial sentencing hearing that violated his constitutional rights and resulted in his death sentence. In the first phase of a trifurcated proceeding, the "merits" phase, the jury deliberates on the defendant's guilt or innocence of the charged offenses. In the second phase, the "eligibility" phase, the jury determines whether the Government has proven the mental state factors and the statutory aggravating factors beyond a reasonable doubt. In the third phase, the "penalty" or "selection" phase, the jury decides on the nonstatutory aggravating factors and the mitigating factors, undertakes the process of weighing, and determines the sentence.

Absent a trifurcated capital proceeding under the FDPA, a defendant is forced to have a jury decide whether the government has proven the remaining elements of a capital offense, *i.e.*, the defendant's eligibility for the death penalty, at the same proceeding where the jury ultimately decides whether to in fact impose such a punishment. By allowing the jury's determination regarding death eligibility under

95

the FDPA to be potentially tainted by evidence that relates to nonstatutory aggravating factors and the process of weighing the aggravating and mitigating factors, the FDPA commingles two fundamentally different decisions which must be kept separate: (1) whether the government has proven all elements of a capital offense beyond a reasonable doubt; and (2) if so, whether death or life without the possibility of release is the appropriate sentence.

Statutory aggravating factors and the intent requirements of 18 U.S.C. § 3592 are elements of a charged capital offense because those factors serve to raise the lawful maximum penalty from life imprisonment to death. *Ring v. Arizona*, 536 U.S. 584 (2002); *see United States v. Higgs*, 353 F.3d 281, 299 (4th Cir. 2003). In light of *Ring*, and to properly meet the requirements of the Fifth, Sixth and Eighth Amendments, proceedings under the FDPA must be trifurcated.

Mr. Basham's trial attorneys failed to object to the single sentencing proceeding to which he was subjected. This omission on the part of trial counsel was objectively unreasonable, and Mr. Basham was prejudiced as a result.

## CLAIM 22

**The Government violated its obligations under *Brady v. Maryland* and its progeny by failing to disclose information material to Mr. Basham's ability to prepare and present a defense at trial and sentencing. As a result of the Government's misconduct, Mr. Basham was denied his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Upon information and believe, Mr. Basham alleges that the Government violated its obligations under *Brady v. Maryland* and its progeny by failing to disclose material exculpatory or impeachment evidence to Mr. Basham that was necessary to his ability to prepare and present a defense. The non-disclosed *Brady* evidence includes, but is not limited to, (1) information concerning federal, state, and local investigations of Ronald Hewett; (2) information concerning the Government's investigation of juror misconduct in Mr. Basham's case, including interviews of jurors or any person with information concerning possible extrajudicial contact with the jurors or premature deliberations by the jurors; and (3) any agreements or promises made by the Government or any governmental agency with or to witnesses who testified at either Mr. Basham's or Mr. Fulks's trial.

97

## CLAIM 23

**The Government violated Mr. Basham's right to due process when it presented a theory of the case that was inconsistent with the theory it presented at Mr. Fulks's trial. Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories. In addition, Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this issue on appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The Government took diametrically opposed positions in the Fulks and Basham trials, arguing in each defendant's trial that *that* defendant wielded the purse strap used to strangled Alice Donovan. This "manipulation of the evidence," which allowed the Government at the separate trials to identify both Mr. Fulks and Mr. Basham as the actual killer, "deprived [Mr. Basham] of due process and rendered his trial fundamentally unfair." *Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir. 2000).

At Mr. Basham's trial, the Government argued in closing:

What does Mr. Basham say in the presence of Sheriff Hewitt [sic]? It is not really what he says, it is what he does. He is shackled, he describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt [sic] how Alice Donovan was strangled . . . . You saw Sheriff Hewitt [sic] stand up there and show.

98

(Tr. 11/1/04 at 57.)     Additionally, the Government unequivocally stated, "He [Basham] killed Alice Donovan".     (Tr. 11/1/04 at 62.)     The Government acknowledged that this testimony was one of the most important pieces of evidence in the case.  (Tr. 9/29/04 at 81-82.)

Previously, however, at Mr. Fulks's trial, in a colloquy outside the presence of the jury, the Government put a very different spin on the Hewett statement, arguing, "Remember Sheriff Hewitt [sic] demonstrating how Brandon Basham said that Chad Fulks took the purse strap and strangled."  (Fulks Tr. 6/22/04 at 255).     The Government argued to the jury that Fulks "intentionally killed Alice Donovan." (Fulks Tr. 6/22/04 at 171).

When "'an inconsistency . . . exist[s] at the *core* of the prosecutor's cases against the defendants for the same crime,'" Due Process "prohibits the government from presenting mutually inconsistent theories." *United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003) (*quoting Smith*, 205 F.3d at 1052).  "Although the prosecutor must prosecute with earnestness and vigor and 'may strike hard blows, he is not at liberty to strike foul ones.'"   *Smith*, 205 F.3d at 1049.     Accordingly, the Government's prime directive in a criminal case is "'not that it shall win a case, but that justice shall be done.'" *Smith*, 205 F.3d at 1049 (*quoting Berger v. United States*, 295 U.S. 78, 88 (1976)).  As part of this pursuit of justice, prosecutors have a duty to

99

ensure integrity and fairness in the legal process. *See Berger*, 295 U.S. at 88. The Government's "duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for the truth." *Smith*, 205 F.3d at 1051.

The argument that Fulks struck the fatal blow was an important part of Mr. Basham's overall mitigation case. The Government recognized the importance of the fatal blow issue, as was shown in its voir dire and in its closing argument, where it argued that Sheriff Hewett's testimony that Mr. Basham demonstrated how he strangled Alice Donovan was one of the most important issues in the case. Despite defense counsel's arguments that Mr. Basham was merely a follower, and Fulks the leader, not a single juror found the Minor Participant statutory mitigator. (Dkt. No. 805 at 6).

Because the Government relied "upon factually inconsistent and irreconcilable evidence at the two trials," Mr. Basham's trial and sentence of death "was fundamentally unfair and he was deprived of due process." *See United States v. Paul*, 217 F.3d 989, 998 (8th Cir. 2000) (*quoting Smith*, 205 F.3d at 1052-53). Given its own statements that the testimony regarding the purse strap was one of the most important pieces of evidence in the case, the Government cannot claim that this is a circumstance in which the inconsistency may be forgiven because it does not go to

100

the core of the case. (*See* Tr. 9/29/04 at 81-82.) "The function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall," but rather to see that justice is done. *Donnelly v. DeChristoforo*, 416 U.S. 637, 648-49 (1974) (Douglas, J., dissenting).

Here, in its pursuit of death verdicts for both Fulks and Basham, the Government manipulated the facts and presented diametrically opposed theories that went to the core of their case against Mr. Basham. As a result, the process was rendered fundamentally unfair.

Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories. Mr. Basham was also denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this issue on appeal.

CLAIM 24

**Mr. Basham's rights under the Eighth Amendment to the United States Constitution were violated when the Government engaged in misconduct by arguing, contrary to controlling precedent, a causal nexus requirement to persuade the jury not to give effect to Mr. Basham's mitigating evidence. By failing to object to the Government's misconduct, trial counsel rendered ineffective assistance of counsel, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. Mr. Basham's appellate attorneys were similarly ineffective for failing to raise this issue on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The prosecutors in Mr. Basham's case repeatedly urged the jury to ignore mitigating evidence presented by the defense because no causal nexus existed between that evidence and the crimes for which Mr. Basham had been convicted. The United States Supreme Court, however, had previously ruled in *Tennard v. Dretke*, 542 U.S. 274 (2004), that such a nexus requirement has never been required by the Eighth Amendment. Trial counsel failed to make any contemporaneous objections to the prosecutors' comments and argument, nor did counsel move for a mistrial based on them. Appellate counsel failed to raise this issue on appeal.

In closing argument, the Government set forth a legally flawed argument that the jury must find some causal nexus between the mitigation evidence presented and

102

the crime committed before the evidence could be considered.

Specifically, counsel for the Government argued:

But generally what did their experts say?  What is the most important thing they said?  Brandon Basham knows right from wrong and there is *no cause-and-effect between whatever issues Brandon Basham is dealing with in the kidnapping and carjacking randomly of two innocent women.  There is no cause and effect.*  It is not like you were born into an alcoholic family, you run the risk of being an alcoholic.  *There is no cause-and-effect* of Brandon Basham's upbringing or any problems Brandon Basham has with the effect of him randomly targeting, and kidnapping, and killing two innocent women.  Every single defense expert took that witness stand and acknowledged that because they had to.  Because that is a fact.  *No cause and effects.*  There are thousands and thousands of kids and adults walking around this country . . . that grew up impoverished, much poorer than Brandon Basham, with physical disabilities he did not have.  With significant, significant mental issues that don't kill, that don't carjack . . . *[a]nd that is absolutely critical.*

(Tr. 11/1/04 at 85 (emphasis added).)

The Government did not stop there.  Rather, the prosecution compounded its

misconduct by specifically attacking the mitigation testimony presented and arguing

that it should be disregarded because there was no nexus:

What does Brandon Basham having a memory problem have to do with targeting Alice Donovan in the Wal-Mart parking lot, and kidnapping and carjacking her?  What does a memory problem have anything to do with the facts and circumstances of this case as to what happened to Samantha Burns and what happened to Alice Donovan?  What does a memory problem have to do with that, if you so find that he has a memory problem?

103

(Tr. 11/1/04 at 86.)

The Government also argued that their expert's testimony should be held in higher regard than that of the defense experts because he had shown a nexus. They argued that this fact should not only go to the weight of the mitigation, but whether it should be considered at all. The Government argued:

> [T]he Government's psychiatrist diagnosed [Mr. Basham] with something that explained his behavior against Samantha Burns and Alice Donovan. And the defense expert opines two problems in which she acknowledges does not explain his behavior. Who got it right? That is for you to decide. You know, deciding on who got it right on that issue clearly only goes to show *what mitigation*, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be . . . the facts speak for themselves . . . and one of the tougher points you can't forget, there is absolutely no question Mr. Basham knew right from wrong. *No question whatever his issues are, there is no cause-and effect*.

(Tr. 11/1/04 at 89 (emphasis added).)

The Government's closing argument was simply a summation of the misconduct that permeated Mr. Basham's penalty phase through an assault on Mr. Basham's constitutional right to have the jury consider all relevant mitigation regardless of causal nexus. With every expert witness the defense called, and even with some of Mr. Basham's family, the Government cross-examined the witnesses regarding whether there was a cause-and effect connection between Mr. Basham's history and deficits and the crimes of which he had been convicted.

104

Beginning with clinical social worker Jan Vogelsang, the Government questioned: "So, because there is a volitional component [to an act of murder], you cannot take these factors and say that they caused Brandon Basham to carjack and kidnap Alice Donovan, you can't say that, can you?" (Tr. 10/20/04 at 205-06.) Ms. Vogelsang attempted to clarify that she was "not providing this information for that purpose." (*Id.* at 206). The Government did not accept that position, however, and continued to push its nexus requirement argument, asking, "The other family members . . . who you indicated may have had issues similar to Mr. Basham's did not go out and carjack and kidnap strangers?" *Id.* at 210.

The Government also questioned Mr. Basham's sister, Charlotte, and his cousin, Jerome McKechnie, about the similarities the backgrounds they shared with Mr. Basham's and their lack of violent criminal histories. The prosecutor questioned Charlotte: "You chose not to steal . . . you chose not to arm yourself with illegal weapons . . . you chose not to rob people . . . you chose not to hurt people . . . . Despite the environment that you have described to the jury, you knew once you reached a certain age of maturity that those things are wrong." (Tr. 10/21/04 at 105 (cross-examination of Charlotte Basham).) The prosecutor questioned Mr. McKechnie: "Any other members on the [maternal] side that you know that ever carjacked anybody . . . kidnapped an innocent woman . . . killed two innocent

women?"  (*Id.* at 151 (cross-examination of Jerome McKechnie).)

Finally the Government challenged the diagnoses of the medical experts based on the lack of nexus.  In the cross-examination of Dr. Brannon, a neurologist, the Government proceeded as follows:

Q:    There is no evidence of – I mean, there are literally tens of thousands of kids diagnosed every year, probably hundreds of thousands of kids that have been diagnosed with ADD and ADHD across the country, have there not?

A:    I suppose so.

Q:    *There is no cause-and-effect between being diagnosed with ADD and ADHD and the likelihood of carjacking and kidnapping strangers, would it?*

A:    I wouldn't know.

Q:    That is something, in the field of neurology, you have never read anything that there is some sort of correlation of being symptomatic of attention deficit disorder that you are more prone to randomly kidnap and kill?

A:    No.  I have never found that and have never looked for it.

(Tr. 10/25/04 at 278 (emphasis added).)

The questioning continued: "[T]here is no cause-and effect between Mr. Basham's deficiencies . . . and major violent criminal conduct, because if there were, you would provide that data or that information to this jury."  Dr. Brannon replied, "Well, I don't know that there is a cause-and-effect . . . his brain doesn't work right.

106

End of the story as far as I am concerned." (*Id.* at 290.)

The Government's questioning of defense neuropsychologist, Dr. Tora Brawley, took a similar path. "There are people who also have bad lives who don't end up like Mr. Basham . . . . In fact, the overwhelming majority of people who grow up in poor families and abusive situations don't kill people?" (Tr. 10/26/04 at 111.) The Government specifically asked, "There is *no cause and effect* with regard to brain damage and being more likely to commit violent crime?" (*Id.* at 159 (emphasis added).) When Dr. Brawley countered that people with head injuries are a high risk population, the Government argued, "[B]ut the point I am trying to make, though, is that just because you have got brain damage, or been injured, or have Alzheimer's or have MS, or have Parkinson's disease, or has [sic] ADHD does not mean you are more likely to commit violent crime? You don't want to scare the hundreds of thousands of parents out there that have kids with ADHD?" (*Id.*)

The final assault on Mr. Basham's right to have his mitigation considered regardless of its nexus to the crimes came with the cross-examination of Dr. Donna Schwartz-Watts, who diagnosed Basham with dementia and inhalant-induced psychosis:

> Q:    He is not – he didn't get out of the car in the Wal-Mart parking lot
>       and jump in Alice Donovan's car because some voice told him to
>       do it?

107

A:    That's correct.  None of these illnesses . . . affected his ability to know right from wrong.

(Tr. 10/28/04 at 96.)

Q:    You have diagnosed Mr. Basham with Attention Deficit Hyperactivity Disorder, correct?

A:    Yes.

Q:    Just to be clear, again, *there is no cause-and-effect* there between the fact he has ADHD and the fact he kidnapped and carjacked Alice Donovan.

A:    None.

(*Id.* at 100-01.)

As if the point had not been driven home to the jury thoroughly enough, in its re-direct examination, the Government engaged in the following exchange with their rebuttal expert, Dr. Bruce Capehart:

Q:    I think there are some things [Dr. Schwartz-Watts] testified about . . . that you may agree with.  Dr. Schwartz-Watts testified that dementia did not cause Mr. Basham to carjack Alice Donovan. Do you agree with that?

A:    Yes.  That is true.  I agree with that.

Q:    She testified that inhalant-induced psychosis did not cause Mr. Basham to carjack Alice Donovan.  Do you agree with that?

A:    I do.

(*Id.* at 330.)

Excluding mitigating evidence from the sentencing decision by means of a causal-nexus test violated Mr. Basham's right to a sentencing decision that allowed the fact-finder to give effect to all relevant mitigating evidence. *See Tennard*, 542 U.S. 274 (2004); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978).

## A. The Government's improper questioning and argument constituted prosecutorial misconduct.

Prosecutorial misconduct provides ground for a new trial when the prosecutor's conduct was improper and sufficiently prejudicial to deprive the defendant of a fair trial. *United States v. Higgs*, 353 F.3d 281, 330 (4th Cir. 2003). The conduct of the Government in this case, both in its cross-examination of experts and its reliance on a legally incorrect argument in summation, satisfies both elements of the *Higgs* test.

The Government's arguments and cross-examination regarding cause-and-effect were plainly an attempt to persuade the jury that, if it found that Mr. Basham's background did not cause him to commit the crimes for which he had been convicted, it could not consider Mr. Basham's background for its mitigating effect at all. Demanding a causal nexus, as the prosecution did in its examinations of every defense expert and multiple times in closing argument, goes against the weight of authority.

The United States Supreme Court issued its opinion in *Tennard* on June 24, 2004. The unconstitutional arguments of the Government took place several months later, in October and November 2004. Accordingly, Government cannot claim ignorance as an excuse for an argument plainly contrary to law and in violation of Mr. Basham's constitutional rights. Besides, in its opinion in *Tennard*, the Supreme Court emphasized that a causal nexus had *never* been required by its interpretations of the Eighth Amendment.

Moreover, the Government's arguments cannot be dismissed as mere attempts to convince the jury to give little weight to mitigating evidence that lacked a causal connection to the crime. To the contrary, the prosecutor specifically stated in summation, "You know, deciding on who got it right on that issue clearly only goes to show *what mitigation* [the jury can consider.]" (TR. 11/1/04 at 89) This statement implied to the jury that Mr. Basham's background had no relevance whatsoever in their weighing of the aggravation and mitigation.

The Government's misconduct in summation was compounded by its improper questioning concerning cause-and-effect. By pushing the experts to concede the absence of cause-and-effect, and then arguing this fact in summation, the Government was not merely commenting on the evidence. Rather, by using defense experts to make its "no cause-and-effect" argument, the Government created the false

110

impression that the evidence presented by the experts had no value whatsoever. It is very likely that as a result of the Government's arguments and cross-examination, the jury did not consider Mr. Basham's mitigating evidence at all, due to the absence of a cause-and-effect. "When . . . jurors have been left the option of relying upon a legally inadequate theory, there is not reason to think that their own intelligence and expertise will save them from that error." *Griffin v. United States*, 502 U.S. 46, 59 (1991). As the Government emphasized in summation, the failure to show cause-and-effect by the defense experts was "absolutely critical." (Tr. 11/1/04 at 85.)

The Government's argument that the mitigating evidence presented was irrelevant because it lacked a cause-and-effect relationship with the crime was "not only a misrepresentation of the law, but it withdrew from the jury one of the most central sentencing considerations . . . most likely to tilt the decision in favor of life." *See Drake v. Kemp*, 762 F.2d 1449, 1460 (11th Cir. 1985) (finding misconduct where prosecutor cited 100-year-old case law implying mercy in a capital case was frowned upon, but did not make clear to the jury the age of the cases). The statements by the Government in this case were consistent and deliberate, and the prejudice to Mr. Basham was great. The conduct here "so polluted" Mr. Basham's trial that it requires relief.

This Court's final instructions were silent as to a causal-nexus requirement. Although the jury instructions did not exacerbate the Government's misleading cross-examination and summation, they failed to correct it. Because the Government's misconduct was not limited to summation, but included the cross-examination of witnesses, the instruction that lawyers' arguments are not evidence was insufficient to curb the effect of the Government's urging of a legally incorrect position.

**B.     Defense counsel was ineffective in failing to object to the Government's cross-examination and closing argument on the basis of *Tennard*.**

Like the prosecution, defense counsel had no excuse for being unaware of *Tennard*. Defense counsel's failure to recognize and object to the improper cross-examination and argument of the Government on the grounds that it was contrary to Supreme Court precedent was gross error, without a strategic purpose, and outside of the range of accepted professional standards. Accordingly, Mr. Basham was deprived of counsel as guaranteed under the Sixth Amendment and 18 U.S.C. §§ 3006(A) and 3599.

This failure to object greatly prejudiced Mr. Basham. In both his opening statement and closing argument in the guilt phase, defense counsel admitted Mr. Basham's guilt. Accordingly, for Mr. Basham to have any hope that his life would be spared, he needed the jury to consider all of the mitigating evidence he proffered.

112

The Government's improper argument, and defense counsel's failure to object to that improper argument, deprived the jury of the required "effective vehicle" through which it could evaluate and give effect to the mitigation evidence. *Smith*, 543 U.S. at 44. As a result, Mr. Basham was deprived of his rights under the Sixth and Eighth Amendments to the United States Constitution. An effective vehicle would have involved sending the jurors into deliberations with the absolute knowledge that they could consider evidence to be mitigating despite the lack of a causal nexus. Both Mr. Basham and the jury were failed in that regard.

Had counsel objected, either in cross-examination or in summation, this Court could have given a curative instruction making clear to the jurors that they could consider *all* relevant mitigation, regardless of nexus. Furthermore, defense counsel failed even to address the issue of cause-and-effect in his closing argument, thus implying to the jury that the Government's argument was unassailable.

Trial counsel's failure to object to the Government's "legally inadequate theory" caused prejudice to Mr. Basham because, had the jurors understood that they could consider any relevant evidence regardless of causal nexus, the range of evidence available to them would have been substantially greater, and could well have spared Mr. Basham's life.

### C.     Appellate counsel rendered ineffective assistance in failing to raise a *Tennard* claim.

Appellate counsel performs ineffectively when he or she fails to discover and brief non-frivolous issues. *Delgado v. Lewis*, 223 F.3d 976, 980-81 (9th Cir. 2000). To show prejudice, a petitioner must show a reasonable probability that, but for appellate counsel's failure to brief the non-frivolous issue, he would have prevailed on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). Although weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy, a jury's miscomprehension of the Eighth Amendment's requirements, and the Government's active role in perpetuating this miscomprehension, are not weak issues. Moreover, the "weeding" principle has little or no applicability in capital cases, for appellate counsel in a capital case has a duty to consider all potentially available claims in light of the unique nature of the death penalty and the possibility of preclusion or a change in the law in later courts.

As a result of the misconduct by the Government in arguing a legally incorrect theory, and the ineffective assistance of trial counsel for failing to challenge the Government's improper questioning and argument, the jury engaged in deliberations without the understanding that it could consider *any* relevant mitigation, regardless of its nexus to the crimes. It is very likely, considering the overwhelming amount of

114

mitigation presented to the jury, that had the jurors understood that they could give effect to mitigating evidence regardless of its nexus to the crimes, Mr. Basham's life would have been spared.

**CLAIM 25**

**The Court's instruction to the jury on mitigating evidence violated Mr. Basham's Eighth Amendment rights because it created a substantial risk that the jury would screen out statutory mitigating factors, and thus fail to give effect to evidence that was, by law, mitigating. Trial counsel was ineffective for failing to object to this charge, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599; and appellate counsel was ineffective for failing to raise this issue on direct appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Section 3592 (a) recognizes certain factors to be mitigating, as a matter of law. The only relevant factor for a juror to decide is whether the factor exists by a preponderance of the evidence. Any juror who finds that a mitigating factor exists, is constitutionally obligated to consider and give effect to that factor. *See Boyde v. California*, 494 U.S. 370, 377-78 (1990).

Here, the Court gave an instruction that told the jury that both for statutory and non-statutory mitigators, a *two-step* process was required. This instruction was incorrect as to the statutory mitigators because there has been a determination by law,

115

codified in the statute, that such factors are necessarily mitigating, and thus the jury

did not need to determine the first step.

The offending portion of the instruction was as follows:

As to the mitigating factors asserted by the defendant, Mr. Basham in this case, the law provides that there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list. You must essentially engage in a *two-step* process in determining whether any one or more of the mitigating factors have been proven.

Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence. Secondly, if you determine the factor has been proven, *you must determine whether the factor is mitigating*, as I have defined that term for you. That is, it tends to suggest that life in prison, without the possibility of release, and not death is the appropriate punishment.

(Tr. 11/1/04 at 220 (emphasis added).)

The instruction was identical to that given in the co-defendant, Fulks's case.

As the Court noted, the instruction came about as a result of a colloquy between the

Court, counsel for Fulks and the Government when the Government, concerned about

the large number of mitigating factors proposed by Fulks's lawyers characterized

them as an attempt to "'sand bag' the government's case by listing a large number of

somewhat duplicative, and potentially irrelevant factors for the jury to consider as

mitigators." *Fulks v. United States*, 2010 WL 3069390 at *35. The Court also

116

expressed its concern about this issue, and ultimately the Government proposed that the jury be instructed that "with regard to mitigators, there were two issues: '(1) is it proved; and (2) is it mitigating?'" *Id.* Fulks's lawyers objected but the Court ruled against them. *Id.*

The same instruction was given, word for word, in Mr. Basham's trial. Unlike Fulks's lawyers, Mr. Basham's attorneys failed to object, although it is clear that they recognized the problem inherent in this instruction.

Prior to the Court finalizing jury instructions, Mr. Basham submitted a forty-two page document of proposed jury instructions. Of note was the request that the court insert after the first paragraph of its mitigation instruction the following language: "Federal law specifically defines several statutory mitigating factors to be considered in determining whether a sentence of death is justified. In determining whether a sentence of death is to be imposed, you *shall* consider any mitigating factor, including the following:" and listed the five statutory mitigators argued in Mr. Basham's case. (Dkt. No. 801 (emphasis added).) This language was consistent with the bright line rule from *Eddings v. Oklahoma*, 455 U.S. 104, 144-15 (1982), that jurors "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."

117

The Court declined to include this language, and Mr. Basham's counsel failed to object to the unconstitutional "two-step" language. This objectively unreasonable performance of counsel fell below the standards set forth in prevailing professional norms.

By following the instructions of this Court, a juror could determine, contrary to *Eddings* and § 3592(a), that a statutory factor was not mitigating, and rather that determining what weight to give it, give it no consideration at all. No jurors found statutory mitigating factors two through four, one juror found factor five, and six jurors found factor one. (Tr. 11/2/04 at 8.) The Court's verdict form did not separate the jury's findings into the two step outlined in the instruction, so it is impossible to determine whether the jurors decided that the factors in question did not exist, or that the factors were not valid mitigators.

This error was especially egregious in light of the fact that the jury had already been misled, through cross-examination and in summation by the Government, by when the Government argued for the requirement of a causal nexus before evidence could be considered as mitigating. *See Tennard*, 542 U.S. 274. Mr. Basham has raised this as a separate claim 24, in this petition. Faced with unconstitutional instructions by the Court, unconstitutional argument by the Government, and defense counsel's objectively unreasonable failure to object, the risk that the jury would

screen out and fail to give effect to facts that were unquestionably mitigating was substantial.

As an additional basis for relief, Mr. Basham alleges that his appellate counsel rendered ineffective assistance of counsel by failing to raise the issue of the improper jury instruction in Mr. Basham's direct appeal.

### CLAIM 26

**The Court's instructions to the jury violated Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments because the jury was not required to find that death was an appropriate punishment beyond a reasonable doubt. Appellate counsel violated Mr. Basham's right to the effective assistance of counsel guaranteed by the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they unreasonably failed to raise this issue on appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and the Cruel and Unusual Punishment Clause of the Eighth Amendment because the Court failed to instruct the jury that the reasonable doubt standard governed the ultimate penalty determination in this case. *See Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

Although this Court instructed the jury that is must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The jury was provided with the following penalty phase instruction regarding the weighing process:

> You must decide, in regard to both offenses [carjacking resulting in death and kidnapping resulting in death], whether the aggravating factors, which you have found to exist, sufficiently outweighs [sic] the mitigating factors found to exist for that offense, so as to justify imposing a sentence of death, rather than a sentence of life without the possibility of release; or, in the absence of any mitigating factors, whether the aggravating factors alone are sufficient to justify imposing a sentence of death, rather than a sentence of life, without the possibility of release.

> The weighing process you are called upon to undertake in this part of the trial is different from the fact-finding process. If you find the threshold intent, aggravating, and mitigating factors, you must use your experience, judgment, and common sense in weighing the aggravating and mitigating factors to arrive at your ultimate determination in this case.

(Tr. 11/1/04 at 201.)

This instruction mirrors the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating

120

factors "sufficiently outweigh" any mitigating factors. *See* 18 U.S.C. § 3593(e).

However, as discussed below, the instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 455. The *Apprendi* principles applies to factfindings necessary to put a capital defendant to death. *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase. These findings include a finding that the aggravating factors outweigh any mitigating factors.

Under the *Apprendi* holding, because additional factual findings are absolutely required in order to impose an increased punishment, they are sentencing factors that

121

must be proved beyond a reasonable doubt. Under the *Apprendi* rationale, petitioner was entitled to a jury instruction that before a death verdict could be returned, the jury was required to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt.[16]

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). This requirement of heightened reliability requires that the jurors making a finding beyond a reasonable doubt that the death penalty is the appropriate punishment for capital defendants.

This Court's failure to provide such an instruction to the jury renders Mr. Basham's death sentence unconstitutional. To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.

---

[16]Here, the Court only instructed the jury that it was required to find that the Government had proven the threshold intent and aggravating "factors" beyond a reasonable doubt. The jury was not instructed that it was required to find beyond a reasonable doubt that the aggravating factors outweighed the mitigating facts before it could impose a sentence of death.

The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana*, 508 U.S.275, 281 (1993). It is, therefore, reversible per se. *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668. 686 (1984). Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Basham would not have been sentenced to death. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Basham would have been granted a new penalty trial.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Basham's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

123

## CLAIM 27

**Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when, upon learning that Juror Cynthia Wilson had engaged in misconduct, they failed to investigate easily identifiable instances of Wilson's untruthful statements to the Court that likely would have persuaded the Court that further investigation into claims of juror misconduct was warranted.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The day after Mr. Basham's jury returned a death verdict, a producer for a local television station in Spartanburg, North Carolina, left a voicemail at the United States Attorney's office stating that a juror from the Basham case had contacted her a week prior. The Government notified the Court of this improper contact, and a series of hearings were held, ultimately resulting in a contempt conviction for jury foreperson Cynthia Wilson, but a denial of Mr. Basham's motion for new trial based on Wilson's misconduct. Counsel for Mr. Basham have discovered, however, that Wilson not only violated the Court's orders by contacting media, but also lied on her juror questionnaire and in voir dire. This information was readily available to counsel at the time of Mr. Basham's trial, and trial counsel's failure to independently investigate this information constituted deficient performance that prejudiced Mr. Basham.

124

Because this Court is fully familiar with the facts of these proceedings, only a brief summary of events will be recounted here. WSPA news producer Shannon Mays testified that she was contacted by a female juror who asked why the station was not covering the Basham trial. When Mays responded that the trial was not in WSPA's viewing area, the juror told her it "would be good TV," and added that Mr. Basham was "acting up in court" and "had fallen asleep." (Tr. 11/12/04 at 19.) More importantly, Mays testified that Wilson expressed concern "over whether or not Mr. Basham would be sentenced to death, because there were jurors that were for the death penalty and others that were not." (Tr. 11/12/04 at 19.) Additionally, Mays recounted a brief conversation with the juror in which Mays told her that she had previously lived in Indiana and had covered the case, which she described as "the never ending case." (Tr. 11/12/04 at 19.) Both shared a laugh over this. (Tr. 11/12/04 at 19.)

After narrowing the potential offending juror to three possibilities, the Court called the three jurors in for a hearing and provided counsel for them to consult with if they desired. Although she did not immediately confess to her violations, it was immediately clear that Wilson was the offending juror. (Tr. 1/14/05 at 59.) Eventually, after consulting with her appointed lawyer, Wilson admitted to contacting three television stations. (Tr. 11/12/04 at 70.) She denied that the conversation

125

contained the content recounted by Mays, and testified that she called because she "felt it was important that somebody cover it, and that was it." (Tr. 11/12/04 at 71.) She denied watching other coverage. (Tr. 11/12/04 at 75.) Later, she claimed that her motivation was altruistic, and that she was just concerned with "public safety awareness." (Tr. 11/23/04 at 40.) Wilson stated that her husband had done internet research on the Basham case, but that he had not shared any of it with her. (Tr. 11/12/04 at 75.) She also denied any premature deliberations in the jury room. (Tr. 11/12/04 at 76.)

Eventually all the jurors and alternates were summoned to Court for further hearings to probe the scope of the misconduct. Although none of the jurors was able to state conclusively that he or she heard premature deliberations, several identified Wilson as engaging in questionable conduct. Juror Shelda Richardson stated that Wilson had approached her to try to "feed [her] information to feel [her] out to see where [she was], as far as which way [she was] leaning." (Tr. 11/18/04 at 17.) Richardson said that Wilson made her "uncomfortable" and she sought to avoid her. (Tr. 11/18/04 at 42.) June Robertson also noticed that Wilson would "corner" other jurors, and an alternate juror testified to observing the same thing. (Tr. 11/18/04 at 27.) Wilson, however, denied that any of the conversations were about the trial, although she then seemingly contradicted herself by stating that she had discovered

126

that Richardson had some hesitation about imposing a death sentence. (Tr. 11/23/04 at 10, 12.)

Cynthia Wilson's husband, Greg, was also called before the Court. He testified that Wilson said the trial was a "big opportunity for [her]" and that she had a stack of papers inches thick, but he never reviewed them. (Tr. 11/23/04 at 16, 19.) Mr. Wilson denied sharing any information about the trial with his wife, and he testified that he was unaware that she had contacted the media. (Tr. 11/23/04 at 18, 22.)

Although Wilson was asked whether she recalled "anything else" that she did during Mr. Basham's trial that violated the Court's orders, she failed to disclose that in addition to the three television stations she admitted contacting, she had also contacted two newspapers. (Tr. 12/13/04 at 3; Tr. 12/21/04 at 33.) When confronted with proof of this information, Wilson contended that she simply forgot about that contact. The Court accepted Wilson's excuse. (Tr. 12/21/04 at 33.)

In addition to her calls to media, Wilson also spent a remarkable amount of time during the trial on the phone with fellow jurors. In fact, Wilson called her fellow jurors seventy-one times. As counsel pointed out, many of these conversations happened at key points in the trial. Despite acknowledging that "it's just hard to explain that number of calls," the Court precluded any further questioning regarding premature deliberations. (Tr. 1/14/05 at 10.)

127

Based on Wilson's shocking violation of the Court's instruction, made forty-one times throughout trial, not to contact the media, Mr. Basham was entitled to a rebuttable presumption of prejudice. *Remmer v. United States*, 347 U.S. 227 (1954). Despite acknowledging that Wilson's testimony was inconsistent with the account offered by the news producer, and recognizing the weakness of her excuse that she did not remember contacting newspapers outlets in addition to television stations, the Court concluded that the Government had rebutted the presumption of prejudice and denied Mr. Basham's motion for new trial.

The decision whether to grant a new trial was clearly one over which the Court struggled. The Court observed, "If I go one way, a life is taken, if I go the other way, the Government is put to the expense of several million dollars – and I don't say that with hyperbole." (Tr. 11/12/04 at 92.) After the evidence of Wilson's misconduct increased, the Court mulled, "What about the idea that a juror who is just that determined to violated the judge's instructions, it just stinks so bad that the whole verdict is suspect? That juror such as that should just not be permitted to be one of 12 votes for a death penalty?" (Tr. 12/13/04 at 35.) Finally, the Court stated, "Honestly, from the bottom of my heart, I don't know how I will rule on this. It is the toughest call I have." (Tr. 12/13/04 at 64.)

128

Ultimately, the Court concluded that the Government had "rebutted the presumption of prejudice because the contact did not involve the defendant, the government, or any witnesses in the case, and Wilson reached out to strangers in the suit who would have no information other than what was available in the public arena." *United States v. Basham*, 561 F.3d 302, 318 (2009) (internal citations omitted.)   Furthermore, the Court found that there was no evidence that Wilson informed the other jurors about her phone calls to the media and that the misconduct was merely harmless error. *Id.* at 318-19.  This issue was raised on direct appeal, and the Fourth Circuit held that, although this Court's conclusion was not "inevitable, it plainly was not an abuse of discretion." *Id.* at 321 (internal citations omitted.)

The Court's decision relied heavily on its acceptance of Wilson's testimony. From the outset, the Court acknowledged that "Ms. Wilson's testimony is a little bit suspect." (Tr. 11/18/04 at 47.)  Yet, despite the news producer's testimony that Wilson expressed concern that Mr. Basham would not get death and the Court's acknowledgment that Wilson likely perjured herself as to that issue,[17] the Court accepted Wilson's denial of any premature deliberations.  The Court also accepted Wilson's insistence that all of the seventy-one calls between herself and other jurors

---

[17]Specifically, the Court stated "[i]f I determine she committed perjury, which I essentially have when I say I accepted the station – the TV station's version of what happened . . . ."  (Tr. 12/13/04 at 20.)

were innocuous.  Wilson made all of these denials under oath.

Penalty of perjury also applied to the juror questionnaire.  Apparently unconcerned about the penalty of perjury, Wilson answered at least two items falsely on the questionnaire.  First, Question 41 read, "[H]ave you ever sued someone or been sued?"  Wilson checked "No."  [Juror 776 Questionnaire].  In truth, Wilson had two judgments against her in the Common Pleas Court in Spartanburg County prior to being selected as a juror in Mr. Basham's case.  In the first matter, case number 1995 TR4208826, filed November 13, 1995, by the South Carolina Department of Revenue, a judgment of $650.18  was awarded against Wilson.  The case terminated on February 11, 1996.  In the second matter, case number 1998 TR4211594, filed November 13, 1998, again by the South Carolina Department of Revenue, resulted in a judgment of $ 1,761.59 against Wilson.  The case was closed on March 17, 2000. (Exh. 6.)

Wilson also testified during voir dire on September 2, 2004, that she had been a nurse for four years.  (Tr. 9/2/2004 at 172-73.)  Upon information and belief, however, Wilson did not receive her license until February 2002.  Thus, contrary to her statements on voir dire, Wilson had not been working as a nurse for four years in 2004.  (Exh. 6.)

The information regarding the judgments against Wilson was readily available in 2005. Investigator John Castro, assisting Mr. Basham's appointed § 2255 counsel, was able to access and print the information from the South Carolina Judicial Website www.judicial.state.sc.us in less than fifteen minutes. The information regarding Wilson's nursing license was also readily available. Mr. Castro located and printed the information from www.llr.state.us in less than ten minutes. (Exh. 6.)

Despite the easy accessibility of the information concerning Wilson's untruthfulness in her juror questionnaire and in voir dire, defense counsel did not pursue any independent investigation in an attempt to challenge Wilson's veracity or to show that she had lied under penalty of perjury from the outset.

Defense counsel had great concerns about Wilson's "continuing pattern of untruthfulness." (Tr. 1/14/05 at 17.) As Greg Harris argued,

> This Court has already asked her a series of questions involving her proprieties as a juror. And she has answered yes, I didn't – yes, I didn't prematurely deliberate. Well, that's just not true. Yes, I didn't look at the internet. That's probably not true. Yes, I didn't read the newspapers. That's probably not true. And there's no way that we are ever going find out whether or not those things were untrue.

(Tr. 1/14/05 at 11.) Harris also argued, "A juror, the forelady of Brad [sic] Basham's case, sat on that stand and lied to you." (Tr. 1/14/05 at 22.) Finally, defense counsel pointed out, "the only time she [Wilson] ever admits to something is when she has

131

to." (Tr. 1/14/05 at 50.)

Yet, despite their fervent belief that Wilson was lying, defense counsel failed independently to investigate whether Wilson had made statements at voir dire that were provably false. This failure was unreasonable and fell short of professional standards. Defense counsel had a duty to "make reasonable investigations, or make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691; *see also Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991) ("when evaluating decisions not to investigate further, [the court] must regard counsel's choice with an eye for 'reasonableness in all the circumstances.'" (*quoting Strickland,* 466 U.S. at 691)).

With a jury already having returned a death verdict against their client, the only reasonable strategy to save Mr. Basham's life was to convince the Court that Wilson's misconduct mandated a new trial. To do this, counsel needed to show that Wilson was not impartial and not competent to serve. Evidence of her additional untruthfulness would have done much to convince the Court that this was true. Accordingly, the failure to engage in independent investigation to support their belief that Wilson was not telling the truth was unreasonable.

132

## CLAIM 28

**Newly discovered evidence suggests that Juror Wilson was untruthful in her testimony to the Court concerning her contact with other jurors. Accordingly, this Court should vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on the issue of premature juror deliberations.**

Mr. Basham incorporates by specific reference all facts allegations and arguments made elsewhere in this Motion and the exhibits thereto. Specifically, this claim incorporates the argument and facts in Claim 27.

As stated in the previous claim, information readily available to defense counsel in 2005 would have cast significant doubt on the veracity of Juror Cynthia Wilson. In addition to the information available to counsel at the time, however, newly discovered evidence suggests that Wilson was untruthful in her answers to this Court.

Cynthia Wilson testified before this Court three times in hearings regarding her misconduct. (Tr. 2/14/04 at 2.) She claimed that the jury had not deliberated prematurely. (Tr. 11/12/04 at 74, 76.) She avowed that, if she had engaged in one-on-one conversations, as witnessed and testified to by other jurors, she was only talking about softball or cheerleading. (Tr. 11/23/04 at 10.) At the hearings, Wilson also addressed her numerous calls to fellow juror Shannon Burnett following her calls

133

to the media.  Wilson testified at the contempt hearing that she talked with Burnett about doing sod work in her back yard.  (Tr. 12/21/04 at 35-36.)

The Court did not ask about the content of Wilson's calls to other jurors.  Mr. Harris argued, however, that "Wilson made an incredible amount of phone calls to two particular jurors, both of them from the upstate, one Joyce Hartsoe and one Wendy Doby."  (Tr. 1/14/05 at 3.)  Harris pointed out that on a single day, Wilson and Doby talked for more than three hours and that the calls with Doby and Hartsoe coincided with important dates in the trial.  (Tr. 1/14/05 at 3-7.)  Harris noted that the record showed that "there is a very strong relationship between the day, what happened during that day and a lot of these telephone calls."  (Tr. 12/28/04 at 32.)  Harris argued:

> These records clearly indicate a willingness on this juror's part to reach out and touch other jurors, whether they are talking about cheerleading the entire time during these conversations, whether they are talking about – I think she said they talked about softball games, that is just unimaginable based upon the volume of phone calls of this juror to other jurors, that is just not believable.  I believe this Court needs to determine the magnitude of this witness's discredit when determining whether or not she was faithful to her oath and was a fair juror to Mr. Basham.

(Tr. 12/28/04 at 27-28.)  Despite Harris's argument, the Court precluded any further inquiry on the issue of premature deliberations.  (Tr. 1/14/05 at 56.)

134

Logic would suggest that, if the multiple and lengthy calls between Wilson and her fellow jurors were solely about personal matters, these jurors must have formed substantial friendships and the contact among them would have continued even after the trial.[18] Yet, it appears that the "friendship" among these women ceased after Mr. Basham's trial. An investigator for Mr. Basham interviewed Greg Wilson, Cynthia's ex-husband and a witness at the contempt hearings. Mr. Wilson stated that, to the best of his knowledge, Cynthia Wilson did not remain friends with any of the jurors from the trial. He did not know the names "Wendy Doby" or "Joyce Hartsoe." (Exh. 7.) Apparently, the hours and hours of communications that Wilson claimed to be of a personal nature and not about the trial, ceased when the trial did. Regarding Wilson's testimony that she spoke with Juror Shannon Burnett about doing sod work for her, Mr. Wilson stated this would have been very odd, as he did all the maintenance and landscaping at their house himself. (Exh. 7.)

Unlike the phone calls with fellow jurors, Wilson's lies about her conduct in the Basham trial did not stop when the trial ended. Wilson was disciplined on January 6, 2007, for not disclosing the fact that she was put on probation for contempt

---

[18]As the Government recognized, "The idea that these jurors would develop . . . lifetime friendships, not only is something that's not unusual, I would submit to the Court that that's normal. If you remember the Fulks trial, one of the jurors, Mr. Curswell . . . invited eight of the jurors to his wedding." (Tr. 1/14/05 at 31.)

135

of court in the Basham trial. (Exh. 6.) Wilson's lies continued on her nursing license renewal application in April 28, 2008, on which she falsely stated that she did not have any prior disciplinary action before any nursing board in any jurisdiction. Wilson lied again on her license renewal application in April 15, 2010, when asked the same question. (Exh. 6.)

Finally, Wilson lied three times on her nursing license renewal application when asked whether she had ever been convicted under any federal law. She did not disclose that she had been held in criminal contempt of court by this Court. Wilson answered "no" to that question on her applications dated April 7, 2006, April 11, 2008, and April 5, 2010. (Exh. 6.)

This newly discovered evidence bolsters the position defense counsel took in the contempt hearings: "This is a person that came into this courtroom and lied. And she didn't just lie once or twice or three times or four times, she lied repeatedly." (Tr. 12/13/04 at 39.) Wilson's lies have only continued. Any decision that was based on acceptance of her testimony cannot stand. Accordingly, Mr. Basham respectfully requests that the Court vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on the issue of premature juror deliberations.

## CLAIM 29

**Mr. Basham is entitled to a new trial in light of newly discovered evidence profoundly undermining the credibility of the Government's witness, Sheriff Ronald Hewett.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

On October 6, 2008, following his guilty plea to a one-count indictment charging corruption and obstruction of justice, (Former) Sheriff Ronald Hewett was sentenced to serve sixteen months in federal prison, followed by two-years supervised release with mandatory drug testing provisions, and was fined $10,000.[19]  (Exh. 8.) The indictment against Hewett charged that he "repeatedly used his office for his personal benefit." (*Id.*) "In addition to obstructing his office's criminal investigation of a relative, Hewett misused public funds by ordering deputies, while on duty, to perform manual labor at his house and work on his political campaigns." (*Id.*) When federal agents subpoenaed numerous deputies for grand juries, Sheriff Hewett met with the deputies and instructed them to "plead the Fifth" or be vague in their

---

[19]Hewett also pled guilty to additional charges of embezzlement by a public official in Brunswick County Superior Court, and has been the defendant in numerous civil suits filed against him relating both to his time as sheriff and his criminal convictions. http://www.starnewsonline.com/article/10091016/ARTICLES/9101699 49 (last accessed May 24, 2010). http://starnewsonline.com/article/20100303 (last (last accessed  March 18, 2010.)

137

testimony.  He threatened witnesses, retaliated against those who testified, and even had a chaplain attend staff meetings where the deputies were told that "they should not cooperate with evil on the witness stand."  (*Id.*)

As part of its prosecution of Hewett, the Government obtained hundreds of pages of affidavits detailing a litany of abuses, including allegations that Hewett was repeatedly intoxicated at crime scenes and sexually harassed female co-workers.  As United States Attorney Holding stated, "Ronald Hewett was not only a law enforcement officer, but he was also entrusted by the people of Brunswick County with leadership of their Sheriff's Office.  First, he breached that trust by operating the Sheriff's Office for his personal benefit.  Then, when that activity came under investigation, he unlawfully obstructed the investigation."  (Exh. 8.)

Before his fall from grace, Ronald Hewett played the role of the star witness in Mr. Basham's trial, a role he likely relished.[20]  At trial, the Government went out of its way to emphasize Hewett's damaging testimony to Mr. Basham, even arguing to the jury, "You remember how fair Sheriff Hewett was."  (Tr. 9/29/04 at 79).  Unfortunately, as his own convictions would eventually bear out, "fair" was not the

---

[20]"The sheriff became known around Brunswick County and beyond as 'Hollywood Hewett' because he was so often seen in television newscasts and newspaper photos after a major crime or event."  http://wwwlstarnewsonline.com/section/topic32(last accessed May 24, 2010).  There was even a documentary about him on PBS.  (*Id.*)

best adjective to accurately describe Sheriff Hewett.

Unconcerned about false testimony, and drawn to the spotlight, it is highly possible that Hewett fabricated his testimony when he claimed that Mr. Basham had demonstrated how he (Basham) had strangled Alice Donovan with the purse strap. The possibility of fabrication on this issue is especially strong when considered in light of Hewett's memorialized interview with Lieutenant Crocker immediately after the Thanksgiving Day search, in which Hewett made no reference to Mr. Basham being the actual killer. Without Hewett's testimony, there is legitimate doubt as to whether the results of Mr. Basham's trial, especially the penalty phase, would have been different.

Mr. Basham submits that the post-trial evidence of Ronald Hewett's lack of veracity raises serious questions about whether he was convicted through the use of false testimony. Mr. Basham submits that Hewett's testimony concerning his alleged statements to and physical demonstrations for Hewett were so prejudicial that, in light of the evidence of Hewett's questionable veracity, the Court should vacate the convictions and sentences in this case and order a new trial. At the very least, the Court should conduct an evidentiary hearing on this issue.

## CLAIM 30

**Trial counsel's failure to provide appellate counsel all files produced in the course of representing Mr. Basham necessarily resulted in Mr. Basham being denied effective assistance of counsel on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. In addition, trial counsel's failure to provide the record to his successor constituted ineffective assistance of counsel within the meaning of the Fifth and Sixth Amendments, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

A majority of courts, the Restatement of the Law Governing Lawyers, and the South Carolina Rules of Professional Conduct uniformly require that "a lawyer must deliver to [a] client or former client, at an appropriate time and in any event promptly after the representation ends, such originals and copies of other documents possessed by the lawyer relating to the representation as the client or former client reasonably needs." Restatement (Third) of the Law Governing Lawyers § 46 (2000); *see also Resolution Trust Corp. v. H—, P.C.*, 128 F.R.D. 647, 648 (N.D. Tex. 1989) (noting "the virtually universal practice of former attorneys transferring the entire client file to new counsel"); S.C. Rules of Prof'l Conduct R. 1.16(d) ("Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client

140

is entitled . . . .").

Upon information and belief, despite an ethical obligation to surrender the files to which Mr. Basham was entitled, Mr. Basham's trial lead attorney, Jack Swerling, failed to protect Mr. Basham's interests by repeatedly refusing to surrender or allow appellate counsel reasonable access to the thousands of trial-related documents known to be in his possession. In denying appellate counsel unfettered access to those documents—and whatever claims may have lain therein—Mr. Swerling compromised the underlying appeal to an unknowable extent. That appellate counsel, through no fault of their own, may have erroneously omitted a viable claim, thereby depriving Mr. Basham of his due process right to the effective assistance of appellate counsel, is reason enough to grant this petition.

Upon information and belief, from the outset of the appeal process, Mr. Swerling treated Mr. Basham's files as his own and, in both word and deed, made clear that he alone held the keys. Working from Washington, D.C., without the benefit of an index to the scores of boxes of files in South Carolina, appellate counsel was forced to rely upon the trial docket, supposition, and blind instinct in requesting materials. (*See* Consent Mot. for Extension of Time ¶ 9, April 18, 2008, App. Dkt. 152 (citing number of boxes).)

Appellate counsel were, from the outset, at Mr. Swerling's mercy in attempting to discern meritorious issues. Upon information and belief, despite repeated requests for the trial file, appellate counsel were unable to obtain the file from Mr. Swerling. Instead, appellate counsel was forced, days before filing the opening brief, to travel to South Carolina to obtain necessary documents. Even after this trip, however, appellate counsel lacked most of the trial file in Mr. Basham's case.

To deny a former client, such as Mr. Basham, any documents produced in the course of representation is to "deny the client *the full benefit* of the services for which he paid, *often dearly*." *Resolution Trust Corp. v. H—, P.C.*, 128 F.R.D. 647, 650 (N.D. Tex. 1989) (emphasis added). Mr. Swerling, by not "surrendering papers and property to which [Mr. Basham was] entitled," put appellate counsel in an untenable position, one in which the only answer was denied by the very circumstances of the problem. S.C. Rules of Prof'l Conduct R. 1.16(d). "[T]his case is illustrative that in a complex [appeal] where the file may be voluminous (commensurably increasing the likely usefulness of work product materials to advise the client concerning ongoing rights and obligations), the client's need for access to a particular paper cannot be demonstrated except in the most general terms, in the absence of prior disclosure of the content of the very document to which access is sought." *In re Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP*, 689 N.E.2d 879, 882 (N.Y. 1997). Just

142

as unfettered access to Mr. Basham's files would have "commensurably increas[ed] the likely usefulness of work product materials" in prosecuting his appeal, Mr. Swerling's refusal to surrender Mr. Basham's files or permit appellate counsel reasonable access to those files, immeasurably compromised the usefulness of those documents in prosecuting his appeal and, in turn, ensured that counsel would fall far short of providing Mr. Basham the effective assistance to which he was entitled.

Any one of the dozens of boxes of documents appellate counsel was unable to obtain from Mr. Swerling may have held a claim that, absent the error of its omission, would have demonstrated "a reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt," *Strickland*, 466 U.S. at 695, or for the purpose of this petition, "a reasonable probability that the omitted claim would have resulted in a reversal on appeal," *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001).

Because his trial counsel failed to provide his appellate attorneys with files and records necessary for them to effectively represent him in direct appeal, Mr. Basham was deprived of the effective assistance of both his appellate counsel and his trial counsel. As is demonstrated by the several instances set forth in this Motion detailing appellate counsel's failure to raise meritorious claims in Mr. Basham's direct appeal, it is clear that Mr. Basham was prejudiced by this violation of his federal

143

constitutional and statutory rights.

**CLAIM 31**

**Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments were violated due to the Government's failure to include necessary charges in the Indictment. Mr. Basham's Due Process Rights, as well as his rights under 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, were violated by appellate counsel's unreasonable failure to raise this issue on appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth and Eighth Amendments of the United States Constitution, because the indictment in his case made no mention of the federal death penalty and did not charge the aggravating factors required for a capital offense under 18 U.S.C. § 3592 (C) or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

144

As the Supreme Court has made clear in a line of cases:

"[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).  In direct contravention of these principles, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the government claimed justified Mr. Basham's death sentence in the indictment.  This structural defect in Mr. Basham's capital proceedings requires that his death sentence be vacated.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Moreover, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Basham's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel unreasonably failed to raise this issue on direct appeal. There is a reasonable probability that Mr. Basham would have been granted a new

145

trial if counsel had raised this issue on appeal.

## CLAIM 32

**A system, such as the federal death penalty, in which capital punishment is sought on both the invidious basis of race and the irrational basis of geography should not be enforced. This Court should vacate Mr. Basham's sentence on this basis alone**.

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In support of this claim, Mr. Basham alleges the following facts, among others to be presented after full discovery and an evidentiary hearing.

### A.     Eighth Amendment

In a press conference on June 28, 2000, President Clinton was asked about a highly-publicized execution that had taken place the previous week in Texas and whether he believed it was time "for the American people to stop and reassess where we stand on implementation of the death penalty." Responding to that question, the President had the following to say about the federal death penalty:

> The issues at the federal level relate more to the disturbing racial composition of those who have been convicted and the apparent fact that almost all the convictions are coming out of just a handful of states, which raises the question of whether, even though there is a uniform law across the country, what your prosecution is may turn solely on where you committed the crime. I've got a review underway of both those issues at this time.

146

Partial Transcript of the President's 6/28/2000 press conference.

On September 12, 2000, the Department of Justice released a comprehensive study of how the federal death penalty has been administered from 1988 to mid-2000 (Exh. 9). The Department filed a supplemental report on June 6, 2001, after the change in administration. (Exh. 10.) The essence of the study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis. As reported in the DOJ Study, after 12 years of discriminatory and irrational charging decisions, the federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other." Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at that time had been sentenced to death in the South. Virginia and Texas had contributed four defendants apiece. No other jurisdiction, at the time of the DOJ Study's release, had sentenced more than a single defendant to death.[21]

_____

[21]In 2003, the year the government chose to pursue a death sentence in Mr. Basham's case, federal death row had 38 residents: nine were white and 21 were African-American. In the modern death penalty era, there have been three federal executions: one white man (Timothy McVeigh), one black man (Louis Jones) and one Latino (Juan Garza). As of April 1, 2010, there were 59 inmates on federal death row. The federal districts in three "death friendly" states – Texas, Virginia and Missouri – account for almost half of this population (22 out of 59). Two of the three federal prisoners executed were sentenced to death in Texas.

In terms of which defendants actually faced the federal death penalty, the DOJ Study showed that of the 159 cases in which the Attorney General had authorized a capital prosecution, 44 defendants were white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 26 were categorized as "other" (7.5%). (*See* Exh. 9, Table 1A, at p. T-2.)  Thus, more than 70% of the federal defendants targeted for the death penalty were non-whites.

In addition to the racial disparity in federal death-penalty prosecutions, the study revealed a regional bias to enforcement of the federal death penalty.  The DOJ Study revealed the following on the issue of regional disparity:

1.    From 1995 onward, of the 94 federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution.  (Exh. 9 at 12.)

2.    Twenty-two federal districts had never submitted a case for review at all.[22]  (Exh. 9 at T-59 - 62.)

---

[22]Any murder committed with a gun during a robbery is a potential federal death penalty case.  18 U.S.C. § 924.  In *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), where the government proceeded on a Hobbs Act theory of federal prosecution, the defendant was sentenced to death for a murder committed in the course of the robbery of a restaurant.  That sentence of death was vacated on appeal on other grounds (and the defendant later sentenced to life imprisonment), but the potential number of cases that could be prosecuted on this theory is staggering.

148

3.     Twenty-one federal districts, although submitting one or more cases for review, had never sought permission to seek the death penalty in any case.[23] *Id.*

The release of the report drew the following predictable public reactions from officials at the Justice Department and the White House:

Saying she was 'sorely troubled' by stark racial disparities in the federal death penalty, Attorney General Janet Reno today ordered United States attorneys to help explain why capital punishment is not applied uniformly across ethnic groups.

M. Lacey and R. Bonner, Reno Troubled by Death Penalty Statistics, N.Y. Times, September 13, 2000.  The N.Y. Times also reported the reaction of Deputy Attorney General Eric Holder, at the time the highest-ranking African American at the Justice Department:

'I can't help but be personally and professionally disturbed by the numbers that we discuss today,' Deputy Attorney General Eric Holder said.  'To be sure, many factors contributed to the disproportionate representation of racial and ethnic minorities throughout the federal death penalty process.  Nevertheless, no one reading this report can help but be disturbed, troubled, by this disparity.'

---

[23]The recommendation that accompanies a submission is of great importance. In 89% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General.  (Ex. 9 at 43.)  In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General.  *Id.* These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000.

*Id.* CNN, also reporting on the story, noted that Attorney General Reno wanted "a broader analysis."[24] White House deputy press secretary Jake Siewert responded to the release of the report in the following manner: "'At first glance, those numbers are troubling. We need to know what's behind the numbers.'"[25] During his confirmation hearings, Attorney General John Ashcroft also noted that evidence of racial disparity in the federal death penalty "troubled [him] deeply." *See United States v. Bass*, 266 F.3d at 538 n.1.

"Troubled" and "disturbed" public officials, however, do not cure constitutional violations. Mr. Basham is entitled to know what is "behind the numbers" and that, in the absence of a convincing race-and region-neutral explanation for the Department of Justice's capital-charging practices, his death-sentence must be reversed. Mr. Basham seeks a hearing on this issue.

---

[24]In *United States v. Bass*, 266 F.3d 532 (6th Cir. 2001), *r'vsd*, 536 U.S. 862 (2002) (per curium), the Sixth Circuit quoted at length the public statements of Attorney General Reno and Deputy Attorney General Holder in response to the release of the DOJ Study. *Bass*, 266 F.3d at 538.

[25]Considering the impact of the study, Judge Sand in *United States v. Bin Laden*, 126 F. Supp. 2d 256, 258 (S.D.N.Y. 2000), found the statistical evidence "indeed troubling," but ultimately rejected a challenge to that capital prosecution.

## B.      Statutory right to justice without discrimination

Subsection (f) of 18 U.S.C. § 3593 is entitled "Special precaution to ensure against discrimination," and provides that in any capital sentencing proceeding:

> [T]he court . . . shall instruct the jury that in considering whether the sentence of death is justified, it shall not consider the race . . . of the defendant or of any victim, and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race . . . of the defendant or victim may be.

Moreover, each juror in an FDPA case is required to sign a certificate "that consideration of the race . . . of the defendant or any victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation . . . no matter what the race . . . of the defendant or any victim may be."   While the explicit provisions of this section deal with jury instructions and jury decision making, the purpose of this subsection is broader.  This provision is unique in the Federal Criminal Code.  It demonstrates extreme sensitivity on the part of Congress to the danger of racial discrimination in capital prosecutions, and a commitment to eradicate any such discrimination.

The Congressional debate on the death penalty provisions of § 848(e) – limited as it was – included extended discussion of the problem of racial discrimination, and of the Supreme Court's treatment of racial bias in the then recent opinion in

151

*McCleskey*.  *See, e.g.*, *Congressional Record*, 57484 (June 9, 1988) (Sen. Orrin Hatch, Utah, discussing the requirements for proof of discrimination under *McCleskey*).  In particular, Senator Alphonse D'Amato of New York, the prime sponsor of the § 848(e) bill, emphasized, in conjunction with the enactment of § 848(o), that Congress intended to "take every step possible to eliminate discrimination by the juries, *by the prosecutors*, by the judges." *Congressional Record*, S15753 (Oct. 13, 1988) (emphasis added).  In the context of that debate, Senator D'Amato's comments reflect a clear legislative determination to take stronger measures than those already embodied in *McCleskey* and to eliminate discrimination in capital charging as well as capital sentencing.  They indicate that a federal capital defendant has an affirmative *statutory* right to justice without discrimination.

## C.    Supervisory powers

Moreover, regardless of the text of § 3593(f), this Court has the independent authority to curb charging discrimination and regional caprice by invoking its supervisory powers over the administration of federal criminal justice:

> '[G]uided by considerations of justice,' *McNabb v. United States*, 318 U.S. 332, 341 (1943), and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress. The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights [citations

152

> omitted]; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury [Citations omitted]; and finally, as a remedy designed to deter illegal conduct [citations omitted].

*United States v. Hastings*, 461 U.S. 499, 505 (1983).

A court's supervisory authority to take action "not specifically required by the Constitution" is necessarily broader than its authority to enforce particular constitutional guarantees.  In state prosecutions, state courts exercise this general supervisory power, and federal courts (on *certiorari* in the Supreme Court or in habeas corpus) are restricted to enforcing the Constitution. In federal prosecutions, the federal courts exercise both functions simultaneously.  This is why, as the Sixth Circuit noted in *United States v. Robinson*, 716 F.2d 1095, 1100 (6th Cir. 1983), when a "case is before the court on direct review, not habeas corpus relief, the standard of review is more stringent."  *McCleskey*, of course, was a review of state proceedings in habeas corpus.  The federal discrimination complained of here is subject to a "more stringent" standard of review.

### D.    The FPDA's omission of "plain-error" review

Meaningful appellate review is an indispensable component of a constitutional death penalty scheme.  Such review provides a necessary check on the arbitrary and capricious infliction of the death penalty.  *Parker v. Dugger*, 498 U.S. 308, 321

153

(1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally"); *see also Clemons v. Mississippi*, 494 U.S. 738, 749 ("this Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency").

In enacting the FDPA, however, Congress actually curtailed the scope of appellate review and, thereby, rendered the statute unconstitutional. The relevant section reads as follows:

(b) Review. – The court of appeals shall review the entire record on the case, including –

(1) the evidence submitted during the trial;

(2) the information submitted during the sentencing hearing;

(3) the procedures employed in the sentencing hearing; and

(4) the special findings required under section 3593(d).

(c) Decision and disposition. –

(1) The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports an aggravating factor required to be considered under section 3592.

(2) Whenever the court of appeals finds that –

154

(A)　　The sentence of death was imposed under the influence passion, prejudice, or any other arbitrary factor;

(B)　　the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

(C)　　the proceedings involved any other legal error requiring reversal of the sentence *that was properly preserved for appeal under the rules of criminal procedure*, the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death.

18 U.S.C. § 3595 (emphasis added).

By its plain language, the above-quoted provision precludes plain-error analysis by a court of appeals reviewing a capital case. *See* Fed. R. App. P. 52(b). The doctrine of plain error is available in all criminal appeals, and gives an appellate court the option of noticing obvious errors that were not brought to the attention of the district court. *See*, *e.g.*, *United States v. Frady*, 456 U.S. 152 (1982); *Silber v. United States*, 370 U.S. 717 (1962).

By failing to allow for plain-error review, the FDPA ignores the line of Supreme Court cases requiring meaningful appellate review as a pre-condition to a finding that a death-penalty scheme is constitutional. It also ignores the fact that the Supreme Court has repeatedly recognized that "death is different" and, in recognition of that difference, has required heightened standards of reliability to justify death verdicts.

A statute that requires an appellate court to affirm a death verdict that was returned as a result of plain error in the proceedings below is antithetical to concepts of heightened reliability, meaningful appellate review, and equal protection. The statute is therefore unconstitutional.

**CLAIM 33**

**The absence of a principled basis for distinguishing cases in which the federal death penalty is imposed from those in which it is not imposed renders the FDPA unconstitutional.**

The Supreme Court has held that the Constitution will not tolerate sentences of death that are imposed arbitrarily or capriciously. *Furman v. Georgia*, 408 U.S. 238 (1972). In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court reaffirmed "that capital punishment be imposed fairly, and with reasonable consistency, or not at all."

The reality of the federal death penalty in practice is that there is no consistency or predictability in the manner in which federal courts have imposed the federal death penalty. In fact, there is no consistency in the cases that proceed to trial compared to those that plead out. Included as exhibits to this motion are summaries of the facts and circumstances of the status or resolution of every authorized federal death penalty case from 1988 until 2004, organized as follows: Exh. 11, Federal Capital Prosecutions Awaiting Trial; Exh. 12, Federal Capital Defendants Who Died

Before or During Trial; Exh. 13, Federal Capital Prosecutions Which Were Dismissed by the Judge for Legal Reasons; Exh. 14, Federal Capital Prosecutions in Which the Attorney General Withdrew a Notice of Intent to Seek the Death Penalty; Exh. 15, Federal Capital Prosecutions Ending in Guilty Pleas to a Sentence Other than Death; Exh. 16, Federal Capital Defendants Who Were Found Not Guilty of the Capital Charge or Were Innocent; Exh. 17, Federal Capital Defendants Convicted of a Lesser Offense; Exh. 18, Federal Capital Cases Where the Death Penalty Has Been Rejected by Juries or Judges: Exh. 19, Federal Capital Cases Resulting in a Sentence of Death; Exh. 20, Federal Capital Cases Resulting in Execution; Exh. 21, A Listing of Former Federal Death Row Inmates.

One cannot read the descriptions of these cases without coming to the realization that *all* of the cases are by their own terms horrible, and *all* involved the infliction of agony on victims and survivors. Yet, for indiscernible reasons, some defendants were sentenced to death, but the vast majority were not. If any basis can be distinguished, it is race and region.[26] Fairness and consistency are the opposite of arbitrariness and caprice. In the demonstrated absence of fairness and consistency, the federal death penalty must be set aside.

---

[26]As discussed previously in Mr. Basham's litigation, *See* Claim 32, the invidiousness and irrationality of these factors is an additional reason that the federal death penalty is unconstitutional.

157

This argument is not refuted by simply pointing out the difficulties inherent in comparing cases. Selected summaries of the cases quickly put that overly simplistic argument to rest:

1. *United States v. Timothy McVeigh* (D. Colo.). The Oklahoma City bombing case. 168 dead. Hundreds injured. Tried, convicted, sentenced to death, executed.

2. *United States v. Terry Nichols* (D. Colo.). McVeigh's co-defendant. Tried, convicted, sentenced to life.

3. *United States v. Khalfan Mohamed and Rashed al`-Owhali* (S.D.N.Y.). Two defendants associated with Osama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa. 224 killed, including 12 Americans; thousands injured. Tried, convicted, sentenced to life.

4. *United States v. Theodore Kaczynski* (E.D. Cal.). The Unabomber. Three murders by mailbombs. Plea agreement. Sentenced to life.

5. *United States v. Joseph Minerd* (W.D. Pa.). Arson/pipebomb murder of pregnant girlfriend, her fetus and three-year old daughter. Tried, convicted, sentenced to life.

6. *United States v. Coleman Johnson* (W.D. Va.). Pipe-bomb used to kill pregnant girlfriend and their unborn child to avoid child support. Tried, convicted, sentenced to life.

7. *United States v. Christopher Dean* (D. Vt.). Defendant sent pipebomb through the mail killing victim and disfiguring victim's mother. Plea agreement. Sentenced to life.

8.  *United States v. Billy Cooper* (S.D. Miss.).  Carjacking killing of two victims.  Tried, convicted, sentenced to life.

9.  *United States v. Christopher Vialva and Brandon Bernard* (W.D. Texas).  Carjacking double homicide.  Tried, convicted, sentenced to death.

10. *United States v. David Paul Hammer* (M.D. Pa.).  Prison inmate guilty of strangling to death cellmate at USP-Allenwood.  Sentenced to death.

11. *United States v. Michael O'Driscoll* (M.D. Pa.).  Prison inmate guilty of stabbing to death fellow inmate at USP-Allenwood.  Same judge, same courtroom and same defense attorneys as Hammer.  Sentenced to life.

12. *United States v. Storey* (D. Kansas).  Prison inmate with Aryan Brotherhood ties killed fellow prisoner at USP-Leavenworth.  Plea agreement.  Sentenced to less than life sentence.

13. *United States v. Douglas Black and Steven Riddle* (D. Colo.).  Inmates at USP-Florence attacked two suspected "snitches," one killed, one injured.  Plea agreements.  Substantially less than life sentences.

14. *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng* (E.D.N.Y.).  Chinese gang members who kidnapped, raped, and murdered victims held for ransom.  Fu Xin Chen and Jai Wu Chen entered plea agreements.  Attorney General withdrew death authorization shortly before Peng trial.  Peng convicted after trial.  All three sentenced to life.

15. *United States v. Louis Jones* (N.D. Texas).  Decorated Gulf War veteran with no prior record abducts, rapes and kills young woman soldier.  Tried, convicted, sentenced to death, executed.

159

16. *United States v. Corey Johnson, James Roane, and Richard Tipton* (E.D. Va.). Eleven drug-related murders. Tried, convicted, sentenced to death.

17. *United States v. Dean Anthony Beckford* (E.D. Va.). Six drug-related murders. Tried, convicted, life sentence.

18. *United States v. Clarence Heatley and John Cuff* (S.D.N.Y.). 14 drug-related murders. Plea agreement. Sentenced to life.

19. *United States v. Thomas Pitera* (E.D.N.Y.). Seven drug-related murders in organized crime context. Victims tortured and bodies dismembered. Tried, convicted, sentenced to life.

20. *United States v. German Sinisterra and Arboleda Ortiz* (W.D. Mo.). One drug-related murder and one attempted murder. Tried, convicted, sentenced to death.

21. *United States v. Kevin Grey and Rodney Moore* (D.D.C.). Thirty-one drug-related murders. Tried, convicted, sentenced to life.

22. *United States v. Daryl Johnson* (N.D. Ill.). Two drug-related murders. Tried, convicted, sentenced to death.

23. *United States v. Peter Rollock* (S.D.N.Y.). Eight drug-related murders, including some ordered by defendant while incarcerated. Plea agreement. Sentenced to life.

24. *United States v. Tommy Edelin* (D.D.C.). Fourteen drug-related murders. Tried, convicted, sentenced to life.

25. *United States v. Reynaldo Villarreal and Baldemar Villarreal* (E.D. Texas). Drug-related murder of law enforcement officer. Tried, convicted, sentenced to life.

26. *United States v. Juan Raul Garza* (S.D. Tex.). Three drug-related murders. Tried, convicted, sentenced to death, executed.

160

27. *United States v. Anthony Jones* (D. Md.). Six drug-related murders. Tried, convicted, sentenced to life.

28. *United States v. Chevy Kehoe and Daniel Lee* (D. Ark.). Three murders in connection with activities of white supremacist organization. Tried and convicted together. Kehoe – considered more culpable – sentenced to life. Lee sentenced to death.

29. *United States v. Gurmeet Singh Dhinsa* (E.D.N.Y.). Millionaire Sikh businessman hired killers of two employees cooperating with authorities in criminal investigation of defendant. Tried, convicted, sentenced to life.

30. *United States v. Trinity Ingle and Jeffrey Paul* (W.D. Ark.). Murder of elderly, retired National Parks employee. Victim shot while bound and gagged. At separate trials, Ingle was convicted and sentenced to life; Paul was convicted and sentenced to death.

31. *United States v. Kristen Gilbert* (D. Mass.). VA nurse murdered four patients and attempted to murder three more. Tried, convicted, sentenced to life.

32. *United States v. LaFawn Bobbitt and Rashi Jones* (E.D. Va.). Fatal shooting of bank teller during robbery. Security guard also shot and blinded. Tried, convicted, sentenced to life.

33. *United States v.Bille Allen and Norris Holder* (W.D. Mo.). Fatal shooting of bank teller during robbery. Tried, convicted, and both sentenced to death.

Ultimately, the full force of this argument derives from the cumulative effect of examining, in their entirety, the case-by-case summaries of authorized cases compiled in the Exhibits. By definition, because all of these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or

should be) the worst of the worst cases in the federal system. Indeed, it is likely there is not a crime on the list as to which a prosecutor could not (or would not) argue in summation, "If this case doesn't call for the death penalty, what case does?" And yet, in case after case – indeed, in the overwhelming *majority* of such cases – juries returned life verdicts or plea agreements were offered and accepted. If one cannot discern a principled basis for distinguishing between cases where death is imposed and cases where death is not, the death penalty falls as arbitrary and capricious. If such a principled distinction exists, Mr. Basham challenges the Government to articulate it. Should the Government prove unable to meet their burden of showing a legitimate distinction, then Mr. Basham's sentence must be set aside.

**CLAIM 34**

**Mr. Basham's conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in this case**.

Mr. Basham's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth and Eighth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Basham's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness. *Taylor v. Kentucky*, 436 U.S. 478, 487

162

and n. 15 (1978).

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In addition, Mr. Basham re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process. Each of these errors deprived Mr. Basham of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claims presented in this Motion individually justifies reversal, when considered cumulatively, these errors denied Mr. Basham his constitutional rights.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be

163

deemed harmless. In any event, these violations of Mr. Basham's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

## V.     RESERVATION OF CLAIMS

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Upon information and belief, counsel alleges grave concerns that Mr. Basham's mental state renders him presently incompetent to assist in his appeal, to make appropriate decisions concerning his case, and to communicate rationally with counsel. To protect his rights under this Motion, Mr. Basham reserves the right to amend with claims and information that might later come to light, but are currently unavailable due to Mr. Basham's inability to assist counsel because he is incompetent.

"[F]ederal habeas corpus has a particularly important role in promoting fundamental fairness in the imposition of the death penalty" and "meaningful assistance of counsel is essential to secure federal constitutional rights." *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 813 (9th Cir. 2003). To promote this role of fundamental fairness, a petitioner must be competent to assist counsel, otherwise the right to counsel at this stage is meaningless. Counsel's ability to effectively present

claims "depends in substantial part on the client's ability to communicate rationally and effectively with his counsel." *Id.*

The right to competence is "firmly established" in common law. *Rohan*, 334 F.3d at 807. Furthermore, 18 U.S.C. § 4241, the federal competency statute, applies to federal habeas petitioners. *See Carter v. Bradshaw*, 2011 WL 2039171 at *2, 7 (May 26, 2011) (applying § 4241 to habeas actions and finding inmate incompetent and tolling the AEDPA's limitation period until inmate competent to proceed in § 2254 petition). Encompassed in Mr. Basham's right to pursue this Motion are the rights to due process, effective counsel, freedom from cruel and unusual punishment, and other rights as guaranteed by the Fifth, Sixth, and Eighth Amendments to the United States Constitution. *See e.g. Rohan*, 334 F.3d at 809, 813. Waiver of these rights by Mr. Basham would be akin to waiving any collateral attack on his conviction or sentence, and thus he must at least "(1) understand the nature and consequences of the proceedings against him, and (2) assist properly in his defense." *Carter*, 2011 WL 2039171 at *2; *see also Rees v. Peyton*, 384 U.S. 312, 313-314 (1966). If claims are waived while Mr. Basham is incompetent to proceed, structural error will result. *See Rohan*, 334 F.3d at 818.

Here, counsel has grave concerns about Mr. Basham's current competence. Upon information and belief, counsel submits that, upon his transfer to Terre Haute

165

after his trial in Columbia, South Carolina, Mr. Basham was taken off all medications previously prescribed to him. Mr. Basham has refused to communicate with appointed counsel for several months. Additionally, Mr. Basham, with the help of "an Inmate Legal Aid (sic)," filed a *pro se* pleading seeking to waive any further proceedings in this Court. (Dkt. 1391.) Counsel has been unable to confer with Mr. Basham and seek to develop additional facts relevant to this Motion. Accordingly, counsel reserves the right to amend with additional claims and information that they are currently unable to develop because of Mr. Basham's present condition.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Defendant Brandon Leon Basham asks that this Court provide the following relief:

1.   That Defendant be permitted to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

2.   Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Defendant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations

166

set forth above;

3.  Permit Defendant to file a traverse or reply to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

4.  Permit Defendant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion, and any defenses thereto raised by the Respondent's Answer;

5.  Permit Defendant to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion;

6.  Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Defendant's Response to any Affirmative Defenses raised by the Respondent.  Because Defendant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

7.  Permit oral argument as appropriate and required;

167

8.    Vacate Defendant's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

9.    Grant such further and additional relief as may be just.

## CERTIFICATION

Pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings for the United States District Courts, undersigned counsel declare under penalty of perjury that they are attorneys appointed by the United States District Court for the District of South Carolina to represent Brandon Basham in his proceedings pursuant to 28 U.S.C. § 2255. As such, undersigned counsel are authorized to file this motion pursuant to 28 U.S.C. § 2255 on Mr. Basham's behalf. This Motion is signed by undersigned counsel under penalty of perjury.

Respectfully submitted this 31st day of May, 2011.

s/Julia Grace Mimms
Julia Grace Mimms
Law Office of Julia G. Mimms, P.A.
1001 Elizabeth Avenue, Suite 1A
Charlotte, North Carolina 28204
Telephone: (704) 333-1301
Facsimile: (704) 333-1290

s/Michael L. Burke
Michael L. Burke (Arizona Bar No. 013173)
Sarah Stone (Arizona Bar No. 022713)
Assistant Federal Public Defenders
850 West Adams, Suite 201
Phoenix, Arizona 85007
michael_burke@fd.org
sarah_stone@fd.org
Telephone: (602) 382-2818
Facsimile: (602) 889-3960

Attorneys for Defendant
Brandon Leon Basham