# Exhibit 9

# SURVEY OF THE FEDERAL DEATH PENALTY SYSTEM
## (1988-2000)

U.S. Department of Justice
Washington, D.C.
September 12, 2000

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| TABLE OF CONTENTS | | i |
| INTRODUCTION | | 1 |
| PART I: | STATISTICAL OVERVIEW | 6 |
| | A. Racial/Ethnic Distribution of Defendants Submitted by the United States Attorneys | 6 |
| | B. Rates at Which Each Participant Recommended/Authorized the Death Penalty with Respect to Each Racial/Ethnic Group | 6 |
| | C. Rates at which the Department of Justice Sought the Death Penalty With Respect to Each Racial/Ethnic Group | 7 |
| PART II: | THE UNITED STATES ATTORNEYS | 9 |
| | A. Background | 9 |
| | B. Statistical Highlights | 11 |
| | 1. Defendants | 11 |
| | a. Recommendations in favor of seeking the death penalty | 11 |
| | b. Recommendations against seeking the death penalty | 12 |

i

2.   Offenses ................................................ 12

3.   Victims ................................................ 14

　　 a.   Victims' race/ethnicity ............................. 14

　　 b.   Intraracial and interracial homicides .................... 15

　　 c.   Single- and multiple-victim cases ...................... 16

PART III:   THE REVIEW COMMITTEE ............................ 18

A.   Background ............................................ 18

B.   Statistical Highlights ...................................... 18

1.   Defendants ............................................ 18

2.   Offenses .............................................. 19

3.   Victims ............................................... 19

　　 a.   Victims' race/ethnicity ............................. 19

　　 b.   Intraracial and interracial homicides .................... 20

　　 c.   Single- and multiple-victim cases ...................... 21

PART IV:   THE ATTORNEY GENERAL ............................ 23

A.   Background ............................................ 23

B.   Statistical Highlights ...................................... 23

1.   Defendants ............................................ 23

2.   Offenses .............................................. 24

ii

3.    Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   a.    Victims' race/ethnicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   b.    Intraracial and interracial homicides . . . . . . . . . . . . . . . . . . . . . . 25

   c.    Single- and multiple-victim cases . . . . . . . . . . . . . . . . . . . . . . . . 26

PART V:    POST-AUTHORIZATION ACTIVITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

   A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

   B.    Statistical Highlights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      1.    Plea Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

         a.    Pre-protocol cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

         b.    Post-protocol cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      2.    Trial Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

         a.    Pre-protocol cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

         b.    Post-protocol cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      3.    Federal Defendants Sentenced to Death . . . . . . . . . . . . . . . . . . . . . . 34

PART VI:    AGREEMENTS AND DISAGREEMENTS IN THE
           FEDERAL DECISION-MAKING PROCESS . . . . . . . . . . . . . . . . . . . . . . . . 38

   A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

   B.    Statistical Highlights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      1.    Three-party comparisons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      2.    Two-party comparisons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

         a.    The United States Attorneys and the
               Attorney General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

iii



b.    The United States Attorneys and the
Review Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

c.    The Review Committee and the
Attorney General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

# THE FEDERAL DEATH PENALTY SYSTEM:
## A STATISTICAL SURVEY
## (1988-2000)

### United States Department of Justice
### Washington, D.C.
### September 12, 2000

## INTRODUCTION

This Survey provides information regarding the federal death penalty system since the enactment of the first modern capital punishment statute in 1988. The Survey explains the Department of Justice's internal decision-making process for deciding whether to seek the death penalty in individual cases, and presents statistical information focusing on the racial/ethnic and geographic distribution of defendants and their victims at particular stages of that decision-making process.

The Supreme Court issued a ruling in 1972 that had the effect of invalidating capital punishment throughout the United States – both in the federal criminal justice system and in all of the states that then provided for the death penalty. While many state legislatures revised their procedures relatively quickly to withstand constitutional scrutiny, the federal government did not do so until November 18, 1988, when the President signed the Anti-Drug Abuse Act of 1988. A part of this law, known as the Drug Kingpin Act (DKA), made the death penalty available as a possible punishment for certain drug-related offenses. The availability of capital punishment in federal criminal cases expanded significantly further on September 13, 1994, when the President signed into law the Violent Crime Control and Law Enforcement Act. A part of this law, known as the Federal Death Penalty Act (FDPA), provided that over 40 federal offenses could be punished as capital crimes. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which went into effect on April 24, 1996, added another four federal offenses to the list of capital crimes.[1]

As the law governing the federal death penalty has changed, the Department of Justice has modified its internal decision-making processes in capital cases. With the enactment of the

---

[1] The FDPA promulgated capital sentencing procedures and made them applicable to over 40 separately numbered sections of the United States Code. However, because many of these sections define multiple offenses (either in separately designated subsections or by listing different types of prohibited conduct in a single provision), the precise number of "offenses" to which the FDPA applies depends on the definition of "offense." A list of the 59 separate sections of the United States Code that define offenses currently subject to the death penalty (including the offenses added by the AEDPA) is set forth in Table 6 (page T-23).



DKA in 1988, the Department instituted a policy that required United States Attorneys in the 94 federal districts across the country[2] to submit to the Attorney General for review and approval any case in which the United States Attorney affirmatively wished to seek the death penalty. Under this policy, the decision not to seek the death penalty was left to the United States Attorneys' discretion. From 1988 until the end of 1994, United States Attorneys sought approval from Attorneys General to seek the death penalty 52 times and received it 47 times.

On January 27, 1995, the Department adopted the policy still in effect today – commonly known as the death penalty "protocol" – under which United States Attorneys are required to submit for review all cases in which a defendant is charged with a capital-eligible offense, regardless whether the United States Attorney actually desires to seek the death penalty in that case. The United States Attorneys' submissions are initially considered by a committee of senior Department attorneys in Washington, D.C. known as the Attorney General's Review Committee on Capital Cases (Review Committee), which makes an independent recommendation to the Attorney General. From January 27, 1995 to July 20, 2000 – the close of the reporting period for this Survey – United States Attorneys submitted a total of 682 cases for review and the Attorney General ultimately authorized seeking the death penalty for 159 of those defendants.

While a case progresses through the Department's review process, it simultaneously continues in the United States Attorney's Office and in the court system. Some cases submitted by United States Attorney for review are subsequently withdrawn due to events outside the review process. For example, the defendant and the United States Attorney may enter into a plea agreement that disposes of the case and results in the imposition of a prison term. In other cases, a judicial decision may result in the dismissal of either the entire case or the specific charges that are punishable by death. As a result, the total number of cases considered by the Review Committee is smaller than the total number submitted by the United States Attorneys, and the total number of defendants considered by the Attorney General is smaller still. Furthermore, not all defendants who proceed to trial receive the death penalty. As discussed below, since 1988, federal juries returned death verdicts against fewer than half of the defendants they found guilty of capital crimes. As of the date of this Survey, five defendants who were authorized for the death penalty during the "pre-protocol" period (1988-1994) were subject to a pending sentence of death; fourteen defendants authorized during the "post-protocol" period (1995-2000) were also subject to a pending sentence of death.

---

[2] There are 94 separate federal judicial districts in the United States. Twenty-six states, as well as the District of Columbia, Puerto Rico, the Virgin Islands, Guam, and the Northern Mariana Islands, each comprise a single federal district, while each of the remaining 24 states is divided into two or more federal districts. Each district has a United States Attorney who is appointed by the President with the advice and consent of the Senate, with the exception that the District of Guam and the District of the Northern Mariana Islands share a single United States Attorney. Accordingly, there are total of 93 United States Attorneys. A list of the United States Attorneys' Offices showing the locations of the principal offices in each district is provided in Table 4 (page T-10).

2

Current Department policy provides that bias based on characteristics such as an individual's race/ethnicity must play no role in a United States Attorney's decision to recommend the death penalty. Also, in some districts, the United States Attorney (as opposed to the particular prosecutors handling a case) is likewise not informed of the defendant's race/ethnicity. Moreover, the United States Attorney's Office may not provide information about the race/ethnicity of the defendant to Review Committee members, to attorneys from the Criminal Division's Capital Case Unit (CCU) who assist the Review Committee, or to the Attorney General. As explained below, the only individuals in Washington, D.C. who are ordinarily privy to race/ethnicity information are paralegal assistants in the CCU who collect these statistics under separate cover from the United States Attorneys.[3] This information forms the pool from which most of the federal data on race/ethnicity reported below are drawn.

This Survey presents a series of statistics regarding the federal death penalty process that are broken down by time period (pre-protocol and post-protocol),[4] by participants in the decision-making process (the United States Attorneys, the Review Committee, and the Attorney General), and by the racial/ethnic groups of defendants and victims.[5] Part I presents highlights of a statistical overview of the Department's decision-making process. Parts II to V each presents highlights of data regarding particular stages of the process. In particular, Part II presents highlights regarding recommendations made by United States Attorneys; Part III presents highlights regarding recommendations made by the Review Committee; Part IV presents highlights regarding decisions made by Attorneys General; and Part V presents highlights regarding post-authorization activity (*e.g.*, plea agreements, jury trials) in all cases in which Attorneys General made decisions to seek the death penalty, with additional case-specific

---

[3]In presenting reasons why the death penalty should not be sought, defense counsel on occasion explicitly provide information about the race/ethnicity of defendants or victims to the United States Attorneys, the Review Committee, and the Attorney General.

[4]As noted above, on January 27, 1995, the Attorney General revised the Department of Justice procedures for deciding whether to seek the death penalty against defendants charged with capital offenses. This change in policy was made by means of a formal amendment to the United States Attorneys' Manual. For ease of reference, the "pre-protocol" period, when United States Attorneys submitted for review only recommendations to seek the death penalty against defendants charged with violations of the DKA, is discussed as having lasted from 1988 to 1994, despite the fact that the first 26 days of 1995 were also, strictly speaking within that period. Likewise, the "post-protocol" period is described, during which United States Attorneys submitted recommendations both for and against seeking the death penalty against defendants charged with a variety of capital offenses, is often described in this Survey as encompassing the years 1995 to 2000.

[5]This Survey refers to defendants and victims as "White," "Black," "Hispanic," or "Other," due in large part to the way in which data regarding the federal death penalty has been collected. The last category – "Other" – includes any person whose race is Asian, Pacific Islander, Native American, Aleut, Indian, or unknown. The Survey uses "Hispanic" as a separate category to refer to persons of Hispanic ethnicity, regardless of race. As a result, the terms "White," "Black," and "Other" as used in this Survey refer only to non-Hispanic members of those racial groups.

3

information about the 19 defendants now under a federal death sentence. Finally, Part VI presents highlights of data regarding the degree of consensus among United States Attorneys, the Review Committee, and the Attorney General.

The statistical information presented in the narrative of the Survey is based on the data contained in the tables set forth at pages T-1 to T-355. For the reader's convenience, those tables have been grouped together at the end of the Survey rather than interspersed within it. There are a number of important notes accompanying those tables that explain the methods and terms used in compiling the data, as well as the way in which anomalous cases have been treated in presenting overall characterizations of the statistics. Those notes are set out at the beginning of the tables (pages T-xi to T-xvii).

In evaluating the data presented in this Survey, the reader should bear in mind that the vast majority of homicides in the Untied States, like most violent crimes, are investigated exclusively by local police officers working hand-in-hand with local prosecutors, who file charges against defendants in state courts, either as a capital case or non-capital case.[6] When a homicide is prosecuted federally – either as a capital or non-capital case – it is often because of the availability of certain federal laws or because of a federal initiative to address a particular crime problem. Criminal organizations often operate in multiple jurisdictions, making it difficult for any single local prosecutor to investigate or prosecute a case. Additionally, many states lack the equivalent of the federal witness protection program and the ability to conduct complex long-term investigations using resource intensive investigative techniques such as court-ordered wiretaps and undercover operations.

Apart from these differences in laws and resources, which often affect whether a particular homicide is prosecuted in state or federal court – either as a capital or non-capital case – state and federal law enforcement officials often work cooperatively to maximize their overall ability to prevent and prosecute violent criminal activity in their respective communities. Such cooperation is a central feature of current federal law enforcement policy. In some areas, these cooperative efforts lead to agreements that certain kinds of offenses, particularly violent crimes, will be handled by federal authorities. In Puerto Rico, for example, the United States Attorney has agreed with his local counterpart that the federal government will prosecute carjackings involving death, which has led to a large number of homicides being handled by that particular United States Attorney's Office. In some cities, a large number of cases involving multiple

---

[6]Prior to 1972, capital punishment was available and carried out in both the federal and state systems for acts of murder and a variety of other crimes, such as rape, kidnaping, and treason. Today, while the vast majority of crimes subject to the death penalty under federal law involve homicides, a few do not. *See* 18 U.S.C. §§ 794 (espionage); 2381 (treason); 3591(b)(1) (certain aggravated narcotics trafficking offenses). Nonetheless, the federal government has not sought the death penalty in any such case since 1988 and all defendants now under a sentence of death in the states were convicted of crimes specifically related to homicides.

4

murders by drug and other criminal organizations are investigated by joint federal and local task forces and prosecuted federally due to some of the factors cited above, such as the geographic reach of the organization and the availability of a witness protection program. In other areas, by contrast, these cooperative efforts lead to a federal emphasis on crimes other than homicides. These decisions are not, however, static ones. A given homicide that appears to be of purely local interest may, upon further investigation months or years after the offense, prove to be related to organized multi-jurisdictional criminal activity that is being investigated by federal law enforcement officials, who may seek to transfer the case from state prosecutors to federal prosecutors. For these and other reasons, the factors that determine whether a particular homicide will enter the state or federal criminal justice systems are complex and difficult to quantify.

Overall, however, the federal government continues to play a relatively small role in administering the death penalty in this country. From 1930 to 1999, state governments executed over 4,400 defendants.[7] During the same time period, the federal government executed 33 defendants and has not carried out any executions since 1963.[8] Furthermore, the Department of Justice's Bureau of Justice Statistics (BJS) reports that by the end of 1998 (the most recent year for which this statistic is available), there were 3,433 defendants with pending death sentences in the States, compared to 19 defendants with currently pending death sentences in the federal system. Thus, despite the expansion of the availability of the federal death penalty since 1988, federal defendants account for approximately one-half of one percent of all the defendants on death row in the United States.

---

[7] *See* Bureau of Justice Statistics, U.S. Department of Justice, Number of Persons Executed in the United States, 1930 – 99, <http://www.ojp.usdoj.gov/bjs/glance/exe.txt>.

[8] *See* Federal Death Penalty Information Center, Executions of Federal Prisoners 1927-1999, <http://www.deathpenaltyinfo.org/fedexec.html>.

# PART I:  STATISTICAL OVERVIEW

Table Set I (pages T-1 to T-7) provides statistical summaries of the decision-making process at the Department of Justice by its primary participants – the United States Attorneys, the Review Committee, and the Attorney General – and how the decisions of those participants affect members of four different racial/ethnic groups.  Highlights of these summary tables are presented below.

A.    RACIAL/ETHNIC DISTRIBUTION OF DEFENDANTS
      SUBMITTED BY THE UNITED STATES ATTORNEYS

- From 1988 to 1994, a total of 52 defendants were submitted by the United States Attorneys under the Department's former decision-making procedures.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 52 | 7 | 39 | 5 | 1 |
| Percent | 100% | 13% | 75% | 10% | 2% |

- From 1995 to 2000, a total of 682 defendants were reviewed under the Department's current death penalty decision-making procedures.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 682 | 134 | 324 | 195 | 29 |
| Percent | 100% | 20% | 48% | 29% | 4% |

B.    RATES AT WHICH EACH PARTICIPANT RECOMMENDED/AUTHORIZED
      THE DEATH PENALTY WITH RESPECT TO EACH RACIAL/ETHNIC GROUP

Because cases continue to be litigated while the death-penalty decision-making process is proceeding at the Department of Justice, not all of the defendants who are the subject of a recommendation by a United States Attorney are considered by the Review Committee and the Attorney General.  The following highlights – which serve to allow a comparison of the rate at which each participant in the decision-making process recommends or authorizes seeking the death penalty – take that attrition into account by showing, for each racial/ethnic group, the rate

6

at which *each* participant recommended or authorized seeking the death penalty as a percentage of the total number of defendants considered by *that* participant. Thus, the percentages below reflect the number of defendants in a particular racial/ethnic group for which each participant in the death penalty process recommended/authorized the death penalty, divided by the total number of defendants of that racial/ethnic group that were considered by that participant.

- From 1988 to 1994, the Attorney General agreed with the United States Attorneys in most cases. (The Review Committee was not yet in existence).

| RATES AT WHICH EACH PARTICIPANT RECOMMENDED/ AUTHORIZED SEEKING THE DEATH PENALTY (1988-1994) | | | | | |
|---|---|---|---|---|---|
| | Overall | White | Black | Hispanic | Other |
| U.S. Attorneys | 100% | 100% | 100% | 100% | 100% |
| Attorney General | 90% | 100% | 87% | 100% | 100% |

- From 1995 to 2000, when United States Attorneys submitted defendants with recommendations both for and against seeking the death penalty, each participant in the decision-making process (including the Review Committee) recommended/authorized the death penalty against slightly less than one third of the defendants that each participant considered.

| RATES AT WHICH EACH PARTICIPANT RECOMMENDED/ AUTHORIZED SEEKING THE DEATH PENALTY (1995-2000) | | | | | |
|---|---|---|---|---|---|
| | Overall | White | Black | Hispanic | Other |
| U.S. Attorneys | 27% | 36% | 25% | 20% | 52% |
| Review Comm. | 30% | 40% | 27% | 25% | 50% |
| Attorney General | 27% | 38% | 25% | 20% | 46% |

C.    RATES AT WHICH THE DEPARTMENT OF JUSTICE SOUGHT THE
      DEATH PENALTY WITH RESPECT TO EACH RACIAL/ETHNIC GROUP

The percentages below reflect the number of defendants in each racial/ethnic group that the Attorney General authorized the death penalty, divided by the total number of defendants in that particular racial/ethnic group that initially entered the Department's review process.

- From 1988 to 1994, the Department of Justice sought the death penalty against 90 percent of the defendants submitted for review by United States Attorneys with recommendations exclusively in favor of seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Total submitted | 52 | 7 | 39 | 5 | 1 |
| Decision to seek DP | 47 | 7 | 34 | 5 | 1 |
| Percent | 90% | 100% | 87% | 100% | 100% |

- From 1995 to 2000, the Department of Justice sought the death penalty against 23 percent of the defendants charged with crimes punishable by death and submitted for review by United States Attorneys with recommendations for or against seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Total submitted | 682 | 134 | 324 | 195 | 29 |
| Decision to seek DP | 159 | 44 | 71 | 32 | 12 |
| Percent | 23% | 33% | 22% | 16% | 41% |

# PART II: THE UNITED STATES ATTORNEYS

## A.     BACKGROUND

As discussed above, with the enactment of the DKA in 1988, the United States Attorneys were required to submit to the Attorney General for review and approval only those cases in which the United States Attorney affirmatively wished to seek the death penalty. With the enactment of the new death penalty protocol on January 27, 1995, United States Attorneys were required to submit to the Attorney General for review "all Federal cases in which a defendant is charged with an offense subject to the death penalty, regardless of whether the United States Attorney intends to request authorization to seek the death penalty." For the reasons set forth below, this protocol does not require United States Attorneys to submit to the Attorney General *all* potentially capital-eligible defendants in the federal system.

First, United States Attorneys are not required to submit to the Attorney General for review cases in which the United States Attorney initially considered the case for federal prosecution, but ultimately decided to defer prosecution to state authorities. For example, a federal agent might arrest a defendant for committing a street robbery in which a homicide occurred, but the prosecution might be turned over to the local district attorney because of the lack of a substantial federal interest.[9]

Second, United States Attorneys retain the discretion not to charge defendants facing federal prosecution for a homicide with a capital-eligible offenses if they do not believe such a charge could be sustained. For example, a United States Attorney might decide at the outset of a particular case (*e.g.*, a vehicular homicide on federal land) that he or she simply could not prove to a jury beyond a reasonable doubt that the defendant had the requisite level of intent to be charged with a capital-eligible offense.

Third, at any time, either before or after indictment, United States Attorneys have the discretion to conclude a plea agreement with a defendant, which has the effect of foreclosing the death penalty. For example, either before or after indicting several defendants for capital-eligible offenses, a United States Attorney may decide to enter into a cooperation agreement with one of the defendants, under which that defendant agrees to plead guilty to certain crimes and testify

---

[9]Under general Department policy, United States Attorneys must determine, in deciding whether to accept a capital or non-capital case for federal prosecution, if there is a "substantial federal interest" in doing so. In making this determination, United States Attorneys weigh a number of factors, including federal law enforcement priorities, the seriousness of the particular offense, and issues specific to the individual defendant, such as his or her willingness to cooperate in the investigation or prosecution of others.

9



against his co-defendants in exchange for consideration – including the dismissal of certain charges and a promise to inform the sentencing judge about the cooperation – that has the effect of rendering the defendant ineligible for the death penalty. Likewise, United States Attorneys have the discretion to enter plea agreements with a defendant before or after he has been charged with capital-eligible offenses that do not require the defendants' cooperation. Such decisions may be made for a variety of reasons, including eliminating the risk of an acquittal in a difficult case, the unavailability of one or more key witnesses, or an unfavorable evidentiary ruling by the court that significantly weakens the case. If any such plea agreement is reached before a case has been submitted for review, the United States Attorney need not submit it thereafter [10]

There has been no centralized data collection process in place regarding these three categories of potential capital-eligible cases. As a result, the data regarding submissions by United States Attorneys that are reported in this Survey do not include information regarding the entire pool of potential capital-eligible defendants in the federal system since 1988.

There are, nonetheless, a significant number of cases that United States Attorneys have submitted to the Attorney General for review under the current protocol, namely, all cases in which a United States Attorney charges a capital-eligible offense and does not enter into a plea with the defendant before making a submission to the Attorney General. In submitting these cases, the United States Attorney must recommend to the Attorney General whether he or she believes that the death penalty should be authorized in that case. Prior to doing so, however, the United States Attorney or his or her designee will meet with the defendant's attorneys and allow them to make written and oral presentation as to why the death penalty should not be sought in the case.[11] In addition, many United States Attorneys employ additional decision-making procedures within their own offices; several have standing committees of senior prosecutors to

---

[10]Even when an offender commits an offense punishable by death, there are statutory limits on the categories of persons who can be executed. Specifically, in expanding the scope of offenses for which the death penalty is available, the FDPA added a provision prohibiting the execution of a pregnant woman or any person who is mentally retarded. The same statute also prohibits the execution of any person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person, and further prohibits the imposition of the death sentence on any person who was less than 18 years of age at the time of the offense. *See* 18 U.S.C. §§ 3591, 3596.

[11]Since 1988, federal law has expressly required that, upon the request of an indigent capital defendant, a federal judge shall appoint two attorneys to represent the defendant and make available sufficient funds for reasonable investigative and expert services. The attorneys appointed to represent an indigent defendant must have the "background, knowledge, or experience [that] would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation." *See* 21 U.S.C. § 848(q). Furthermore, a separate provision in effect since 1994 requires that at least one defense attorney be "learned in the law of capital cases" (a prior version of that statute, in effect from 1948 to 1994, provided for all capital defendants to be represented by "learned counsel"). *See* 18 U.S.C. § 3005.

 

review all potential capital cases, and others appoint such internal review committees on an ad hoc basis.[12]

Once a United States Attorney decides whether to seek authorization from the Attorney General to pursue the death penalty, he or she is required to submit detailed information about the case to the Criminal Division's CCU. In particular, the United States Attorney must submit a comprehensive discussion of the theory of liability; the facts and evidence relating to the issue of guilt or innocence; the facts and evidence relating to any aggravating factors (including victim impact) or mitigating factors; the defendant's background and criminal history; the basis for federal prosecution; and any other relevant information. The United States Attorney is also required to submit any material received from defense counsel in opposition to the death penalty, and other significant documents such as confessions, key witness statements, and autopsy and crime scene reports.

## B.     STATISTICAL HIGHLIGHTS

The United States Attorneys submitted 52 cases for review during the pre-protocol period and 682 cases during the post-protocol period. Detailed information about these submissions are set forth in Table Set II (pages T-8 to T-126). This section provides highlights of the statistical data regarding these submissions and is divided into three parts. First, drawing on the statistics in Table Set II.A (pages T-9 to T-21), the cases are analyzed in terms of the defendants who were charged by the United States Attorneys and submitted for review. Second, using statistics from Table Set II.B (pages T-22 to T-56), the cases are analyzed in terms of the types of offenses charged. Third, the cases are examined with an emphasis on the race/ethnicity of the victims of the crimes charged against defendants, using the statistical compilations from Table Set II.C (pages T-57 to T-126).

### 1.     Defendants

#### a.     Recommendations in favor of seeking the death penalty

- From 1995 to 2000, United States Attorneys recommended seeking the death penalty for 183 defendants, out of a total of 682 submitted for review by the Attorney General (27 percent).

---

[12]In some United States Attorneys' Offices, the United States Attorney, as well as members of the Office's internal committee that advises the United States Attorney on whether to recommend seeking the death penalty, are not informed by the prosecutors handling the case of the defendants' race/ethnicity.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 183 | 48 | 81 | 39 | 15 |
| Percent | 100% | 26% | 44% | 21% | 8% |

- The 183 recommendations to seek the death penalty were made by the United States Attorneys in 49 of the Nation's 94 districts.

- 10 of these 49 districts submitted only recommendations in favor of seeking the death penalty. These 10 districts accounted for 31 of the 183 recommendations against the death penalty in the post-protocol period (17 percent).

b.    Recommendations against seeking the death penalty

- From 1995 to 2000, United States Attorneys recommended against seeking the death penalty with respect to 494 defendants, out of 682 submitted for review by the Attorney General (72 percent).

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 494 | 85 | 242 | 153 | 14 |
| Percent | 100% | 17% | 49% | 31% | 3% |

- The 494 recommendations not to seek the death penalty were submitted by the United States Attorneys in 62 of the Nation's 94 districts.

- 23 of the 62 districts submitted only recommendations against seeking the death penalty.[13] These districts accounted for 87 of the 494 recommendations against the death penalty in the post-protocol period (18 percent).

- Including the 21 districts that have never submitted a case for review by the Attorney General, with a recommendation for or against the death penalty, there are a total of 40 districts out of 94 that have never recommended seeking the death penalty for any defendant.

---

[13]Of these 23 districts that submitted only recommendations against seeking the death penalty during the post-protocol period, four submitted at least one recommendation in favor of seeking the death penalty during the pre-protocol period.

2.     Offenses

During the pre-protocol period, defendants were charged exclusively under the DKA. With the enactment of the FDPA in late 1994, many other federal criminal offenses were punishable by death. The following highlights therefore refer exclusively to the post-protocol period. In considering statistics about the most frequently charged offenses, the reader should bear in mind that a single defendant may be charged with more than one statutory offense punishable by death.

The most frequently charged capital offenses were different for different racial/ethnic groups, although there were some constants. In particular, the use of a gun to commit homicide during and in relation to a crime of violence or drug trafficking crime, 18 U.S.C. § 924(j) ("firearms murder"), was always among the three most frequently charged capital offenses against each group, and both murder in aid of racketeering activity, 18 U.S.C. § 1959(a) ("racketeering murder") and murder in furtherance of a continuing criminal narcotics enterprise, 21 U.S.C. § 848(e)(1)(A) ("CCE murder"), were generally among the most frequently charged. Each of these crimes, and particularly firearms murder, can be charged in a wide array of circumstances, and is therefore more likely to be available as a charging option in a given case than more narrowly defined offenses such as kidnaping-related murder.

- Among the 134 White defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

  – Murder within federal jurisdiction, 18 U.S.C. § 1111, which was charged against 28 of the 134 submitted White defendants (21 percent);

  – Firearms murder, which was charged against 22 of the 134 submitted White defendants (16 percent); and

  – Racketeering murder, which was charged against 20 of the 134 submitted White defendants (15 percent).

- Among the 324 Black defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

  – Firearms murder, which was charged against 105 of the 324 submitted Black defendants (32 percent);

  – CCE murder, which was charged against 85 of the 324 submitted Black defendants (26 percent); and

13

- Racketeering murder, which was charged against 70 of the 324 submitted Black defendants (22 percent).

- Among the 195 Hispanic defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

  - Racketeering murder, which was charged against 60 of the 195 submitted Hispanic defendants (31 percent);

  - Firearms murder, which was charged against 53 of the 195 submitted Hispanic defendants (27 percent); and

  - Carjacking murder, 18 U.S.C. § 2119(3), which was charged against 34 of the 195 submitted Hispanic defendants (17 percent).

- Among the 29 Other defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

  - Firearms murder, which was charged against 6 of the 29 submitted Other defendants (21 percent);

  - Murder within federal jurisdiction, 18 U.S.C. § 1111, which was charged against 5 of the 29 submitted Other defendants (17 percent); and

  - Kidnaping murder, 18 U.S.C. § 1203(a), which was charged against 5 of the 29 submitted Other defendants (17 percent).

- As a general matter, the offenses most frequently charged against a given racial/ethnic group were also the most frequently charged against the members of that racial/ethnic group for whom United States Attorneys recommended seeking the death penalty.

3. Victims

   a. Victims' race/ethnicity

- From 1988 to 1994, there were a total of 65 identified victims of the capital offenses charged against defendants submitted for review by United States Attorneys (as to whom the recommendation was to seek the death penalty).

14

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 65 | 6 | 49 | 9 | 1 |
| Percent | 100% | 9% | 75% | 14% | 2% |

● From 1995 to 2000, there were a total of 894 identified victims of the capital offenses charged against defendants submitted for review by United States Attorneys.[14]

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 894 | 278 | 474 | 118 | 24 |
| Percent | 100% | 31% | 53% | 13% | 3% |

● Of these 894 victims, 590 (66 percent) were victims of defendants for whom United States Attorneys recommended seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 590 | 202 | 345 | 29 | 14 |
| Percent | 100% | 34% | 58% | 5% | 2% |

● Of the 894 victims, 302 (34 percent) were victims of defendants as to whom United States Attorneys recommended against seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 302 | 75 | 129 | 88 | 10 |
| Percent | 100% | 25% | 43% | 29% | 3% |

---

[14]All of the victim-related statistics in this Survey are skewed to some degree by the large number of victims involved in the bombing of the American embassies in Tanzania and Kenya, which resulted in the indictment of several defendants in the Southern District of New York, and the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, which resulted in the indictment of two defendants in the Western District of Oklahoma. A discussion of how the statistics are affected is set forth in the general explanatory notes to the statistical tables (*see* page T-57)

15

b.    Intraracial and interracial homicides

- Of the 677 homicide defendants submitted for review from 1995 to 2000,[15] 500 (74 percent) were charged with intraracial homicides (*i.e.*, each was of the same race/ethnicity as all victims).

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 500   | 109   | 227   | 150      | 14    |
| Percent | 100%  | 22%   | 45%   | 30%      | 3%    |

- United States Attorneys recommended seeking the death penalty for 24 percent of the defendants charged with intraracial homicides (121 out of 500 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 38 percent of White defendants (41 out of 109 defendants);
  - 20 percent of Black defendants (46 out of 227 defendants);
  - 17 percent of Hispanic defendants (26 out of 150 defendants); and
  - 57 percent of Other defendants (8 out of 14 defendants).

- Of the 677 homicide defendants submitted for review from 1995 to 2000, 177 (26 percent) were charged with interracial homicides (*i.e.*, each was of a different race/ethnicity than at least one victim).[16]

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 177   | 20    | 97    | 45       | 15    |
| Percent | 100%  | 11%   | 55%   | 25%      | 8%    |

- United States Attorneys recommended seeking the death penalty for 35 percent of the defendants charged with interracial homicides (62 out of 177 defendants). The

---

[15]Five defendants (all of them White) submitted for review during the post-protocol period were charged with espionage offenses that did not involve any homicide.

[16]Of the 177 defendants charged in interracial homicide cases, 33 (19 percent) were charged with killing more than one victim. In each of those cases, at least one victim was of the same race/ethnicity as the defendant. Accordingly, if the definition of "intraracial" homicides included those in which at least one victim was of the same race/ethnicity as the defendant, 33 defendants would be reported in the intraracial rather than interracial category.

16

rats at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

—     35 percent of White defendants (7 out of 20 defendants);
—     36 percent of Black defendants (35 out of 97 defendants);
—     29 percent of Hispanic defendants (13 out of 45 defendants); and
—     47 percent of Other defendants (7 out of 15 defendants).

c.     Single- and multiple-victim cases

Of the 677 homicide defendants submitted for review from 1995 to 2000, 520 (77 percent) faced capital charges involving only one victim.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 520 | 103 | 240 | 153 | 24 |
| Percent | 100% | 20% | 46% | 29% | 5% |

United States Attorneys recommended seeking the death penalty for 23 percent of the defendants charged in single-victim cases (117 out of 520 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

—     31 percent of White defendants (32 out of 103 defendants);
—     20 percent of Black defendants (49 out of 240 defendants);
—     16 percent of Hispanic defendants (25 out of 153 defendants); and
—     46 percent of Other defendants (11 out of 24 defendants).

Of the 677 homicide defendants submitted for review from 1995 to 2000, 157 (23 percent) faced capital charges involving more than one victim.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 157 | 26 | 84 | 42 | 5 |
| Percent | 100% | 17% | 54% | 27% | 3% |

United States Attorneys recommended seeking the death penalty for 43 percent of the defendants charged in multiple-victim cases (66 out of 157 defendants). The

17

rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

- 62 percent of White defendants (16 out of 26 defendants);
- 38 percent of Black defendants (32 out of 84 defendants);
- 33 percent of Hispanic defendants (14 out of 42 defendants); and
- 80 percent of Other defendants (4 out of 5 defendants).

## PART III:  THE REVIEW COMMITTEE

### A.    BACKGROUND

With the issuance of the new death penalty protocol on January 27, 1995, the Attorney General created a permanent advisory panel, the Review Committee, to assist her in determining whether to seek capital punishment in cases submitted for review by United States Attorneys. The Review Committee currently has five members appointed by the Attorney General (with three members required for a quorum), and includes, as a matter of practice, at least one designee of the Deputy Attorney General and at least one designee of the Assistant Attorney General for the Criminal Division.

For each case submitted by a United States Attorney, the Review Committee receives all of the underlying materials that have been submitted by the United States Attorney, including the materials from defense counsel.  The Review Committee then meets with defense counsel either in person or on video conference, along with attorneys from the United States Attorney's Office and the CCU.  During this meeting, defense counsel are invited to make an oral presentation to the Review Committee as to why the Attorney General should not authorize the United States Attorney to seek the death penalty.   Thereafter, the Review Committee makes its recommendation to the Attorney General (noting any dissenting views) as to why the death penalty should, or should not, be sought in that case.

### B.    STATISTICAL HIGHLIGHTS

From the time of its establishment in 1995 until the close of the reporting period, the Review Committee considered a total of 618 defendants.  Detailed information about the results of this consideration is set forth in Table Set III (pages T-127 to T-197).  This section provides highlights of the statistical data regarding these cases and is organized in the same manner as the preceding Section concerning the United States Attorneys. The analysis of the pool of defendants is based on the statistics in Table Set III.A (pages T-128 to T-132).  The analysis of offense data

18

is set forth in Table Set III.B (pages T-133 to T-162). Victim-related statistics are set forth in Table Set III.C (pages T-163 to T-197).

1.     Defendants

● Of the 682 defendants submitted for review by United States Attorneys from 1995 to 2000, 15 were still under review as of July 20, 2000, and 49 others had been withdrawn. The Review Committee considered the remaining 618.

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 618   | 120   | 300   | 172      | 26    |
| Percent | 100%  | 19%   | 49%   | 28%      | 4%    |

● From 1995 to 2000, the Review Committee recommended seeking the death penalty for 183 defendants, out of a total of 618 it reviewed (30 percent).[17]

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 183   | 47    | 80    | 43       | 13    |
| Percent | 100%  | 26%   | 44%   | 23%      | 7%    |

2.     Offenses

The Review Committee's practices with respect to charging practices were virtually identical to the trends reported above with respect to the recommendations of the United States Attorneys. Accordingly, highlights of the statistical tables presenting information on this topic are not discussed further here.

---

[17]There were also 15 defendants as to whom the Review Committee completed its review but did not recommend either for or against seeking the death penalty. In some of these cases, the Review Committee recommended that the Attorney General defer a decision (either because of the pendency of a state prosecution of the same defendant or because the defendant was a fugitive), and in others the Review Committee was evenly divided as to a recommendation.

19

3.     Victims

    a.     Victims' race/ethnicity

● From 1995 to 2000, there were a total of 853 identified victims of the capital offenses charged against defendants considered by the Review Committee.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 853 | 258 | 468 | 104 | 23 |
| Percent | 100% | 30% | 55% | 12% | 3% |

● Of these 853 victims, 600 (70 percent) were victims of defendants for whom the Review Committee recommended seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 600 | 193 | 346 | 46 | 15 |
| Percent | 100% | 32% | 58% | 8% | 3% |

● Of the 853 victims, 246 (29 percent) were victims of defendants as to whom the Review Committee recommended against seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 246 | 61 | 120 | 57 | 8 |
| Percent | 100% | 25% | 49% | 23% | 3% |

    b.     Intraracial and interracial homicides

● Of the 613 homicide defendants the Review Committee considered from 1995 to 2000, 449 (73 percent) were charged with intraracial homicides (*i.e.*, each was of the same race/ethnicity as all victims).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 449 | 94 | 211 | 131 | 13 |
| Percent | 100% | 21% | 47% | 29% | 3% |

- The Review Committee recommended seeking the death penalty for 29 percent of the defendants charged with intraracial homicides (129 out of 449 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  — 43 percent of White defendants (40 out of 94 defendants);
  — 23 percent of Black defendants (48 out of 211 defendants);
  — 25 percent of Hispanic defendants (33 out of 131 defendants); and
  — 63 percent of Other defendants (8 out of 13 defendants).

- Of the 613 homicide defendants the Review Committee considered from 1995 to 2000, 164 (27 percent) were charged with interracial homicides (i.e., each was of a different race/ethnicity than at least one victim).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 164 | 20 | 90 | 41 | 13 |
| Percent | 100% | 12% | 55% | 25% | 8% |

- The Review Committee recommended seeking the death penalty for 33 percent of the defendants charged with interracial homicides (54 out of 164 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  — 35 percent of White defendants (7 out of 20 defendants);
  — 36 percent of Black defendants (32 out of 90 defendants);
  — 24 percent of Hispanic defendants (10 out of 41 defendants); and
  — 38 percent of Other defendants (5 out of 13 defendants).

c.    Single- and multiple-victim cases

- From 1995 to 2000, 468 of the 613 homicide defendants considered by the Review Committee (76 percent) faced capital charges involving only one victim.

21

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 468 | 90 | 221 | 136 | 21 |
| Percent | 100% | 19% | 47% | 29% | 4% |

- The Review Committee recommended seeking the death penalty for 25 percent of the defendants charged in single-victim cases (115 out of 468 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 36 percent of White defendants (32 out of 90 defendants);
  - 20 percent of Black defendants (45 out of 221 defendants);
  - 21 percent of Hispanic defendants (28 out of 136 defendants); and
  - 48 percent of Other defendants (10 out of 21 defendants).

- From 1995 to 2000, 145 of the 613 homicide defendants considered by the Review Committee (24 percent) faced capital charges involving more than one victim.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 145 | 24 | 80 | 36 | 5 |
| Percent | 100% | 17% | 55% | 25% | 3% |

- The Review Committee recommended seeking the death penalty for 47 percent of the defendants charged in multiple-victim cases (68 out of 145 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 63 percent of White defendants (15 out of 24 defendants);
  - 44 percent of Black defendants (35 out of 80 defendants);
  - 42 percent of Hispanic defendants (15 out of 36 defendants); and
  - 60 percent of Other defendants (3 out of 5 defendants).

# PART IV: THE ATTORNEY GENERAL

## A.     BACKGROUND

Before considering a particular case, the Attorney General receives the recommendation of the United States Attorney, the recommendation of the Review Committee, and all of the underlying materials that have been submitted by the United States Attorney, including the materials from defense counsel. After discussing the case with the Review Committee and the CCU attorneys (and with the United States Attorney for the case when he or she disagrees with the recommendation of the Review Committee), and after careful review of all of the relevant material (including, at times, additional information gathered at the Attorney General's request), the Attorney General signs a letter to the United States Attorney either authorizing the filing of a notice of intent to seek the death penalty or authorizing the United States Attorney not to file such a notice.[18]

## B.     STATISTICAL HIGHLIGHTS

The Attorney General completed the review of 52 defendants submitted during the pre-protocol period and 588 defendants submitted during the post-protocol period. Detailed information about the results of the consideration of those defendants is set forth in Table Set IV (pages T-198 to T-304). This section provides highlights of the statistical data regarding these cases and is organized in the same manner as the preceding sections concerning the United States Attorneys and the Review Committee. The analysis of the pool of defendants is based on the statistics in Table Set IV.A (pages T-199 to T107). The analysis of offense data is set forth in Table Set IV.B (pages T-108 to T-235). Victim-related statistics are set forth in Table Set IV.C (pages T-236 to T-304).

### 1.     Defendants

●     In the pre-protocol period from 1988 to 1994, the United States Attorneys submitted 52 defendants for review. Attorneys General decided to seek the death penalty for 47 of these defendants (90 percent).

---

[18]In some instances, the Attorney General does not make a decision on a case submitted for review by a United States Attorney. For example, the United States Attorney may enter into a plea agreement with a defendant while the case is under consideration by the Attorney General (or the Review Committee). In other cases, consideration of a given defendant may be indefinitely suspended if the defendant is a fugitive.



| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 47 | 7 | 34 | 5 | 1 |
| Percent | 100% | 15% | 72% | 11% | 2% |

- In the post-protocol period from 1995 to 2000, the United States Attorneys submitted 682 defendants for review. Of these, 31 were still pending review at the close of the reporting period; and 63 had been withdrawn by the United States Attorney. The Attorney General considered the remaining 588 defendants (86 percent).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 588 | 115 | 287 | 160 | 26 |
| Percent | 100% | 20% | 49% | 27% | 4% |

- From 1995 to 2000, the Attorney General decided to seek the death penalty for 159 defendants, out of a total of 588 considered (27 percent).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 159 | 44 | 71 | 32 | 12 |
| Percent | 100% | 28% | 45% | 20% | 8% |

2.    Offenses

The Attorney General's practices with respect to charging practices were virtually identical to the trends reported above with respect to the recommendations of the United States Attorneys. Accordingly, highlights of the statistical tables presenting information on this topic are not discussed further here.

3.    Victims

a.    Victims' race/ethnicity

- From 1995 to 2000, there were a total of 833 identified victims of the capital offenses charged against defendants who were considered by the Attorney General.

24



| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 833 | 254 | 462 | 95 | 22 |
| Percent | 100% | 30% | 55% | 11% | 3% |

- Of these 833 victims, 578 (69 percent) were victims of defendants for whom the Attorney General decided to seek the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 578 | 190 | 340 | 35 | 13 |
| Percent | 100% | 33% | 59% | 6% | 2% |

- Of the 833 victims, 252 (30 percent) were victims of defendants as to whom the Attorney General decided not to seek the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 252 | 62 | 122 | 59 | 9 |
| Percent | 100% | 25% | 48% | 23% | 4% |

b.    <u>Intraracial and interracial homicides</u>

- Of the 583 homicide defendants whom the Attorney General considered from 1995 to 2000, 424 (73 percent) were charged with intraracial homicides (*i.e.*, each was of the same race/ethnicity as all victims).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 424 | 90 | 200 | 121 | 13 |
| Percent | 100% | 21% | 47% | 29% | 3% |

- The Attorney General decided to seek the death penalty for 25 percent of the defendants charged with intraracial homicides (108 out of 424 defendants). The rates at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

25

-      41 percent of White defendants (37 out of 90 defendants);
-      21 percent of Black defendants (41 out of 200 defendants);
-      19 percent of Hispanic defendants (23 out of 121 defendants); and
-      54 percent of Other defendants (7 out of 13 defendants).

- Of the 583 homicide defendants whom the Attorney General considered from 1995 to 2000, 159 (28 percent) were charged with interracial homicides (*i.e.*, each was of a different race/ethnicity than at least one victim).[19]

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 159 | 20 | 87 | 39 | 13 |
| Percent | 100% | 13% | 55% | 25% | 8% |

- The Attorney General decided to seek the death penalty for 32 percent of the defendants charged with interracial homicides (51 out of 159 defendants). The rates at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

-      35 percent of White defendants (7 out of 20 defendants);
-      34 percent of Black defendants (30 out of 87 defendants);
-      23 percent of Hispanic defendants (9 out of 39 defendants); and
-      38 percent of Other defendants (5 out of 13 defendants).

c.      <u>Single- and multiple-victim cases</u>

- From 1995 to 2000, 448 out of the 583 homicide defendants considered by the Attorney General (77 percent) faced capital charges involving only one victim.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 448 | 86 | 210 | 131 | 21 |
| Percent | 100% | 19% | 47% | 29% | 5% |

---

[19]Of the 159 defendants charged in interracial homicide cases, 33 (21 percent) were charged with killing more than one victim. In each of those cases, at least one victim was of the same race/ethnicity as the defendant. Accordingly, if the definition of "intraracial" homicides included those in which at least one victim was of the same race/ethnicity as the defendant, 33 defendants would be reported in the intraracial rather than interracial category.

26

- The Attorney General decided to seek the death penalty for 22 percent of the defendants charged in single-victim cases (97 out of 448 defendants). The rates at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

  - 34 percent of White defendants (29 out of 86 defendants);
  - 19 percent of Black defendants (40 out of 210 defendants);
  - 14 percent of Hispanic defendants (18 out of 131 defendants); and
  - 48 percent of Other defendants (10 out of 21 defendants).

- From 1995 to 2000, 135 out of the 583 homicide defendants considered by the Attorney General (23 percent) faced capital charges involving more than one victim.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 135 | 24 | 77 | 29 | 5 |
| Percent | 100% | 18% | 57% | 21% | 4% |

- The Attorney General decided to seek the death penalty for 46 percent of the defendants charged in multiple-victim cases (62 out of 135 defendants). The rates at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

  - 63 percent of White defendants (15 out of 24 defendants);
  - 40 percent of Black defendants (31 out of 77 defendants);
  - 48 percent of Hispanic defendants (14 out of 29 defendants); and
  - 40 percent of Other defendants (2 out of 5 defendants).

27

# PART V:  POST-AUTHORIZATION ACTIVITY

A.     BACKGROUND

A decision by the Attorney General to seek the death penalty is always subject to reconsideration until the jury has returned a sentencing verdict.  Thus, even after such a decision to seek the death penalty has been made, additional facts or arguments may always be brought to the Attorney General's attention in support of a request to withdraw a notice of intent to seek the death penalty.  Such reconsideration can be sought by defense counsel, the United States Attorney, the Review Committee, or the Attorney General herself.  As explained above, the Attorney General's decision to authorize the seeking of the death penalty can also be changed by means of a cooperation or non-cooperation plea agreement between the United States Attorney and the defendant that forecloses the possibility of capital punishment.  Under Department policy, such agreements do not require the Attorney General's prior authorization.

For those defendants who proceed to trial, there are two phases to the case.  In the "guilt phase," the jury must decide unanimously whether the prosecution proved beyond a reasonable doubt that the defendant has committed the underlying death-eligible offense.  If the jury finds the defendant guilty, the case proceeds to the "sentencing phase."  At the sentencing phase, in order to meet legal requirements for the imposition of the death penalty, the prosecution must prove beyond a reasonable doubt that the defendant committed the capital offense with a certain level of intent.  In addition, the prosecution must prove any aggravating factors beyond a reasonable doubt, and must prove at least one from a list of specific factors set out in the applicable statute.[20]  In recommending a sentence, the jury may only consider aggravating factors that it unanimously finds to have been proven beyond a reasonable doubt.  Mitigating factors can include any of several specific factors listed in the statute, as well as anything else "in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence."[21]  Mitigating factors need only be proven by a

---

[20]Although the exact list of aggravating factors varies depending on the nature of the offense, the statutory list of factors generally includes: killing multiple victims; committing the capital offense against particularly vulnerable victims or high-level public officials; paying someone else to commit the murder; committing the murder for pecuniary gain; committing the murder while committing other serious crimes; causing a grave risk of death to persons other than the actual victims; committing the offense in a particularly heinous manner; engaging in substantial planning or premeditation in committing the murder; or having previous convictions for other serious offenses.  *See* 18 U.S.C. § 3592(b)-(d); 21 U.S.C. § 848(n).

[21]The specific mitigating factors listed in the FDPA are impaired capacity, duress, minor participation, equally culpable defendants who will not be punished by death, lack of a prior criminal record, mental or emotional disturbance, and consent by the victim.  18 U.S.C. § 3592(a); *see also* 21 U.S.C. § 848(m) (similar list of mitigating factors under DKA).

28



preponderance of the evidence, and each juror can make an individual decision as to which factors have been proven to his or her satisfaction. Both the prosecution and defense may, in the judge's discretion, present information that might not be admissible as evidence in the guilt phase of the trial (such as hearsay, for example); and may also rely on all of the evidence submitted during the guilt phase without having to present it anew during the penalty phase.

At the end of the sentencing phase, the federal judge instructs the jurors that they must each weigh the aggravating and mitigating factors and decide upon a sentence. The judge also instructs the jury that they may not in any way consider the race, national origin, sex, or religious beliefs of the defendant or the victim in reaching a verdict. Jurors are then given at least two sentencing options: death or life in prison without any possibility of release. With respect to certain offenses, jurors are also given a third option – to have the judge impose a lesser sentence authorized by statute. Jurors are never required to return a verdict of death. In reaching a verdict, which must be unanimous, each juror must certify that he or she did not, in fact, consider the race, national origin, sex, or religious beliefs of the defendant or the victim in reaching his or her determination and that his or her determination would have been the same regardless of those factors. In all cases, the jury's decision is binding upon the judge.[22]

After sentencing, a defendant subject to the death penalty is entitled to several forms of review. As with all federal criminal defendants, a defendant subject to a sentence of death may seek direct review of his or her conviction and sentence in the United States Court of Appeals for the circuit in which he or she was convicted. In capital cases, however, federal law explicitly requires the appellate court, in reviewing the case, to review the entire record and to address certain specific issues, including whether the sentence of death "was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the finding of the existence of an aggravating factor . . . ." 18 U.S.C. § 3595(c)(1). If the Court of Appeals affirms the conviction and sentence, the defendant may seek review in the United States Supreme Court by filing a petition for a writ of certiorari (and the government may likewise petition for a writ of certiorari if the conviction or sentence is reversed or vacated on appeal). Although the defendant is entitled to review in the Court of Appeals, the Supreme Court has discretion to decide whether to grant the petition for certiorari and review the case.

If the defendant fails to obtain relief on direct appeal, he or she may also seek collateral review by filing a motion to vacate, set aside or correct the sentence pursuant to 28 U.S.C. § 2255 (which is sometimes described as a petition for a writ of habeas corpus). As with the proceedings in the underlying criminal case, such collateral review goes through three levels of the federal judiciary: the motion is made in the district court in which the defendant was

---

[22]Although federal law requires a judge to impose a sentence recommended by the jury in a capital case, the relevant statutes refer to the jury's sentencing decision as a recommendation. For ease of reference, this Survey refers to the determination made by a jury after a sentencing hearing as a "verdict."

29



convicted. Regardless of whether the conviction is upheld or vacated, the district court's resolution of the § 2255 motion is subject to direct appeal by the losing party. And, as with direct review, the judgment by the Court of Appeals concerning the § 2255 motion is subject to discretionary review by the Supreme Court.

If the defendant's sentence of death is upheld on both direct and collateral review, an execution date is set.[23] Under current policy, the Department will provide the defendant at least 120 days' notice of the scheduled execution date. *See* 65 Fed. Reg. 48379, 48380 (Aug. 8, 2000). Once judicial proceedings have ended and the defendant has received notification of the scheduled execution date, he or she may petition the President for a grant of executive clemency. *See* 28 C.F.R. § 1.10 (advisory regulations concerning clemency in capital cases). The Department reviews the case and makes a recommendation as to how it should be decided, but pursuant to the Constitution, the decision to grant or deny clemency or to stay the execution while a petition is under review is committed entirely to the discretion of the President.[24]

### B.    STATISTICAL HIGHLIGHTS

This Survey does not include separate tables for specific decision-making stages that occur after the Attorney General has authorized seeking the death penalty. However, information about those stages is set forth in Table Set I (pages T-1 to T-7).

### 1.    Plea Agreements

The statistical highlights regarding plea agreements reported in this Part reflect only those cases in which defendants actually entered into an agreement resulting in a guilty plea after the Attorney General authorized seeking the death penalty. They do not reflect the number of times that United States Attorneys offered to enter into such agreements but were refused or, conversely, the number of times that United States Attorneys declined to enter into agreements offered by defendants and their counsel.

Moreover, because the decision to offer and accept a plea agreement may be affected by many factors other than the Attorney General's decision about authorizing capital prosecution,

---

[23]While there are additional avenues of potential relief available under federal law, direct appeal and § 2255 review are the two most commonly used, and current Department policy is to await the completion of these two forms of review, but not others, to set an execution date in a case in which a defendant has been sentenced to death. A defendant seeking other forms of judicial relief once an execution date has been scheduled may also seek a judicial order staying the execution to allow consideration of the merits of the pending claim.

[24]Federal law provides that indigent defendants are entitled to appointed counsel throughout the appeal, collateral review, and clemency processes.

United States Attorneys and defendants can also decide to enter into plea agreements *before* the Attorney General makes a decision, either before the case is indicted, or after indictment but before the Department's decision-making process has been completed. Statistics that focus only on plea agreements after the Attorney General authorizes seeking the death penalty thus may not accurately reflect the degree to which defendants charged with offenses punishable by death avoid such punishment as the result of guilty pleas.[25]

a.      Pre-protocol cases

- From 1988 to 1994, the Attorney General authorized United States Attorneys to seek the death penalty for a total of 47 defendants. Of these, 14 defendants (30 percent) entered into plea agreements as a result of which the government withdrew the notice of intent to seek the death penalty.

|            | Total | White | Black | Hispanic | Other |
|------------|-------|-------|-------|----------|-------|
| Number     | 14    | 3     | 10    | 1        | 0     |
| Percent    | 100%  | 21%   | 71%   | 7%       | 0%    |

- The rate at which defendants authorized for the death penalty entered plea agreements was 30 percent. The rates for individual racial ethnic groups were as follows:

  —      43 percent for White defendants (3 out of 7 authorized);
  —      29 percent for Black defendants (10 out of 34 authorized);
  —      20 percent for Hispanic defendants (1 out of 5 authorized); and
  —      100 percent for Other defendants (1 out of 1 authorized).

b.      Post-protocol cases

- From 1995 to 2000, the Attorney General authorized United States Attorneys to seek the death penalty for a total of 159 defendants. Of these, 51 defendants (32

---

[25]The statistics compiled for this Survey do not include the number of plea agreements that occurred in cases after the Attorney General decided *not* to seek the death penalty. Further, as noted above in Part II, this Survey does not account for plea agreements reached before submission by United States Attorneys.

percent) entered into plea agreements as a result of which the government withdrew the notice of intent to seek the death penalty.[26]

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 51 | 21 | 18 | 9 | 3 |
| Percent | 100% | 41% | 35% | 18% | 6% |

- The rate at which defendants authorized for the death penalty entered plea agreements was 32 percent. The rates for individual racial ethnic groups were as follows:

  - 48 percent for White defendants (21 out of 44 authorized);
  - 25 percent for Black defendants (18 out of 71 authorized);
  - 28 percent for Hispanic defendants (9 out of 32 authorized); and
  - 25 percent for Other defendants (3 out of 12 authorized).

2.    Trial Results

a.    Pre-protocol cases

- Of the 47 defendants as to whom the Attorney General authorized capital prosecution from 1988 to 1994, 20 (43 percent) proceeded to trial. The notice of intent to seek the death penalty was withdrawn as to 25 defendants, as the result of either a plea agreement (14 defendants) or reconsideration by the Attorney General (11 defendants). There were 2 defendants as to whom the notice to seek the death penalty was dismissed or the prosecution otherwise terminated by judicial action.

- Of the 20 defendants whose cases were tried, 16 (80 percent) were found guilty beyond a reasonable doubt of at least one offense subject to the death penalty.

---

[26]Of the 682 defendants submitted by United States Attorneys for review from 1995 to 2000, a total of 58 entered into plea agreements before the Attorney General made a decision, including 8 (14 percent) who were White, 27 (47 percent) who were Black, 20 (34 percent) who were Hispanic, and 3 (5 percent) who were Other. None of the defendants submitted for review during the pre-protocol period entered into plea-agreements before the Attorney General decided whether to seek the death penalty.

32

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 20 | 3 | 8 | 4 | 1 |
| Percent | 100% | 19% | 50% | 25% | 6% |

- Of the 16 defendants convicted of capital offenses, juries returned non-death penalty verdicts (or no verdicts) for 10 (65 percent).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 10 | 1 | 5 | 3 | 1 |
| Percent | 100% | 10% | 50% | 30% | 10% |

- Of the 16 defendants convicted of capital offenses, juries returned death penalty verdicts for 6 (35 percent).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 6 | 2 | 3 | 1 | 0 |
| Percent | 100% | 33% | 50% | 17% | 0% |

- The rate at which juries returned death penalty verdicts was 35 percent for all defendants. The rates for individual racial/ethnic groups were as follows:

    – 67 percent for White defendants (2 out of 3 decided);
    – 38 percent for Black defendants (3 out of 8 decided);
    – 25 percent for Hispanic defendants (1 out of 4 decided); and
    – 0 percent for Other defendants (0 out of 1 decided).

- At the close of the reporting period, one of the six defendants for whom juries returned death penalty verdicts had his sentence vacated and was subsequently re-sentenced to life in prison.

b.    Post-protocol cases

- Of the 159 defendants as to whom the Attorney General authorized capital prosecution from 1995 to 2000, 42 (26 percent) had been tried at the close of the reporting period. The notice of intent to seek the death penalty was withdrawn as

33



to 62 defendants, as the result of either a plea agreement (51 defendants) or reconsideration by the Attorney General (11 defendants). There were 4 defendants as to whom the notice to seek the death penalty was dismissed or the prosecution otherwise terminated by judicial action. The remaining 51 defendants were awaiting trial as of July 20, 2000.

● Of the 42 defendants whose trials had been completed at the end of the reporting period, 41 (98 percent) were found guilty beyond a reasonable doubt of at least one offense subject to the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 41 | 11 | 25 | 2 | 3 |
| Percent | 100% | 27% | 61% | 5% | 7% |

● Of the 41 defendants convicted of capital offenses, juries returned non-death penalty verdicts (or no verdicts) for 21 (51 percent).

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 21 | 7 | 12 | 0 | 2 |
| Percent | 100% | 33% | 57% | 0% | 10% |

● Of the 41 defendants convicted of capital offenses, juries returned death penalty verdicts for 20 (49 percent).

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 20 | 4 | 13 | 2 | 1 |
| Percent | 100% | 20% | 65% | 10% | 5% |

● The rate at which juries returned death penalty verdicts was 49 percent for all defendants. The rates for individual racial/ethnic groups were as follows:

— 44 percent for White defendants (4 out of 11 decided);
— 52 percent for Black defendants (13 out of 25 decided);
— 100 percent for Hispanic defendants (2 out of 2 decided); and

34

—     33 percent for Other defendants (1 out of 3 decided).

•     At the close of the reporting period, four of the 20 defendants for whom juries returned death verdicts had their sentences vacated and were awaiting further judicial proceedings (which may or may not result in the reinstatement of the death sentence in each case); and two were awaiting the formal imposition of sentence by the trial court.

3.     Federal Defendants Sentenced to Death

Since 1988, federal juries have recommended the death sentence for a total of 26 defendants, of whom six were initially indicted before the protocol took effect on January 27, 1995. The sentences of four of these 26 defendants (one of whom is White, three of whom are Black, and all of whom were indicted under the Department's current protocol) were vacated in subsequent judicial proceedings; they are awaiting further proceedings in which their death sentences may or may not be reinstated. The sentence of one additional White defendant indicted in the pre-protocol period was vacated; this defendant was subsequently re-sentenced to life in prison. In addition, two Hispanic defendants are currently awaiting formal sentencing following the jury's recommendation of death. Thus, as of July 20, 2000, there were 19 defendants with pending federal death sentences, including eight who were litigating direct appeals, ten who were litigating collateral claims pursuant to 28 U.S.C. § 2255, and one who had completed both forms of post-verdict litigation and had been scheduled for execution.[27]

---

[27]In the case of the one defendant who had completed litigation of both direct appeal and the initial collateral review (Juan Raul Garza), the President granted a reprieve and set a new execution date after the close of the reporting period. Also, after the close of the reporting period, one defendant whose case had pending on direct appeal as on July 20, 2000 (David Paul Hammer), successfully petitioned the appellate court to dismiss the appeal and remand the case to the district court for the setting of an execution date.

Information about the federal defendants who have been sentenced to death is set forth in Table Set V (pages T-305 to T-309). This section provides highlights of the statistical data regarding these defendants.[28]

- As of July 20, 2000, 19 defendants were under a federal sentence of death.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 19 | 4 | 13 | 1 | 1 |
| Percent | 100% | 21% | 68% | 5% | 5% |

- These 19 defendants were prosecuted in 14 separate cases – 10 cases had one defendant convicted of capital charges and sentenced to death, while 4 cases had two or more capital defendants sentenced to death. The 14 cases were prosecuted in 12 different judicial districts in 10 different states. Only two United States

---

[28]This Survey generally does not attempt to document comparable state statistics regarding the death penalty decision-making process. Nevertheless, to allow a very general comparison of the relative size of the state and federal populations of death row, the following information compiled elsewhere by BJS is provided. As of December 31, 1998, BJS reports that there were 3,433 state defendants awaiting execution after being sentenced to death.

|  | Total | White | Black | Other |
|---|---|---|---|---|
| Number | 3,433 | 1,900 | 1,473 | 60 |
| Percent | 100% | 55% | 43% | 2% |

Significantly, these state statistics do *not* distinguish between persons of Hispanic ethnicity and non-Hispanic defendants in counting the total number of White, Black, and Other defendants. However, BJS also reports that 314 defendants of all races (9 percent of the total population of 3,433) were of Hispanics ethnicity.

Furthermore, BJS reports that the states executed a total of 505 defendants from 1988 to 1999.

|  | Total | White | Black | Other |
|---|---|---|---|---|
| Number | 505 | 317 | 177 | 11 |
| Percent | 100% | 63% | 35% | 2% |

BJS reports that 27 executed defendants of all races (7 percent of the total population of 505) were of Hispanic ethnicity.

36



Attorneys' Offices have prosecuted more than one capital case resulting in a death sentence, and none has prosecuted more than two such cases.

- 10 of these 19 defendants (53 percent) had capital convictions related to only one victim. 9 of the 19 defendants (47 percent) had capital convictions related to two or more victims.

- 18 of these 19 defendants were sentenced to death for crimes involving a total of 27 victims.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 27 | 7 | 16 | 3 | 1 |
| Percent | 100% | 26% | 59% | 11% | 4% |

- The remaining defendant, Timothy McVeigh, was found responsible for the deaths of 160 individuals of various races/ethnicities in connection with the 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma.[29]

- 13 of these 19 defendants (68 percent) were sentenced to death for crimes against victims exclusively of the same race/ethnicity.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 13 | 3 | 8 | 1 | 1 |
| Percent | 100% | 23% | 62% | 8% | 8% |

---

[29]The victim-related data in this Survey is based exclusively on the number of victims set forth in the indictment against each defendant, which in some cases understates the actual number of victims who died as a result of a defendant's crimes. Thus, for example, although there were a total of 168 victims who died as a result of the bombing in Oklahoma City, the victim statistics in this survey include only 160 victims of that offense who at the time of the indictment were known to have died inside the building.

37

- 6 of these 19 defendants (32 percent) were sentenced to death for crimes against at least one victim of a different race/ethnicity. One of these 6 defendants was White and five were Black.[30]

---

[30]This Survey reports statistics only relating to implementation of the federal death penalty since its re-introduction in 1988. Prior to that year, the federal government had not executed any person since 1963. Information about federal executions before 1963 has been published by the Death Penalty Information Center (DPIC). Specifically, DPIC reports that there 34 federal defendants were executed between 1927 and 1963. Of these, 28 (82 percent) were White, 3 (9 percent) were Black, 2 (6 percent) were Other, 1 (3 percent) was of unknown race. DPIC does not separately report the number of executed federal defendants who were Hispanic. DPIC further reports that 19 (56 percent) of these defendants were executed for murder, 6 (18 percent) for sabotage, 4 (12 percent) for kidnapping, 2 (6 percent) for espionage, 2 (6 percent) for bank robbery, and 2 (6 percent) for rape. The total exceeds 34 because some defendants were convicted of multiple capital offenses. *See* Federal Death Penalty Information Center, Executions of Federal Prisoners 1927-1999, <http://www.deathpenaltyinfo.org/fedexec.html>.

38

# PART VI:  AGREEMENTS AND DISAGREEMENTS
# IN THE FEDERAL DECISION-MAKING PROCESS

### A.    BACKGROUND

As suggested by the general similarity of the statistics reported about the recommendations and decisions made by each participant in the Department's death penalty review process, the United States Attorneys, the Review Committee, and the Attorney General often come to the same conclusion about whether or not the government should seek the death penalty for a given defendant.  This Section provides information about the extent to which such agreement has and has not occurred under the Department's review procedures.

### B.    STATISTICAL HIGHLIGHTS

Detailed information about the degree to which different participants in the federal decision-making process agreed and disagreed with one another is set forth in Table Set VI (pages T-310 to T-355).  The tables first analyze agreements and disagreements among all three participants in the decision-making process, *i.e.*, the United States Attorneys, the Review Committee, and the Attorney General (pages T-311 to T-327); and then focus on the extent to which specific pairs of those participants agreed and disagreed with one another (pages T-328 to T-355).

1.    Three-party comparisons

- From 1995 to 2000, there were a total of 571 defendants who were considered by all three participants in the decision-making process.  The Attorney General, the Review Committee and the United States Attorney all agreed with respect to 501 of these defendants (88 percent),

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 497 | 95 | 250 | 130 | 22 |
| Percent | 100% | 19% | 50% | 26% | 4% |

- The rate of agreement was 88 percent (501 of 571 defendants as to whom the Attorney General made a decision upon recommendations from both of the other participants), including both decisions to seek the death penalty and decisions not



to seek it. With respect to specific racial/ethnic groups, the rates of agreement were:

- — 86 percent for White defendants (95 of 110 defendants);
- — 89 percent for Black defendants (250 of 280 defendants);
- — 83 percent for Hispanic defendants (130 of 156 defendants); and
- — 88 percent for Other defendants (22 of 25 defendants).

- The rate of agreement specifically for decisions to seek the death penalty was 84 percent (133 of 159 defendants for whom the Attorney General decided to seek the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:
  - — 82 percent for White defendants (36 of 44 defendants);
  - — 89 percent for Black defendants (63 of 71 defendants);
  - — 69 percent for Hispanic defendants (22 of 32 defendants); and
  - — 100 percent for Other defendants (12 of 12 defendants).

- The rate of agreement specifically for decisions against seeking the death penalty was 88 percent (368 of 417 defendants for whom the Attorney General decided not to seek the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:
  - — 87 percent for White defendants (59 of 68 defendants);
  - — 90 percent for Black defendants (191 of 212 defendants);
  - — 87 percent for Hispanic defendants (108 of 124 defendants); and
  - — 77 percent for Other defendants (10 of 13 defendants).

- In the 70 instances in which there was not overall agreement, the dissenting view was most often held by the United States Attorney and least often by the Attorney General.

- The United States Attorney held the dissenting view as to 50 defendants out of 70 as to whom there was a lack of consensus (71 percent), including 25 recommendations by United States Attorneys in favor of seeking the death penalty and 25 recommendations against doing so. Of these 50 defendants:

|        | Total | White | Black | Hispanic | Other |
|--------|-------|-------|-------|----------|-------|
| Number | 50    | 13    | 17    | 18       | 2     |
| Percent | 100% | 26%   | 34%   | 36%      | 4%    |

40



- The Review Committee held the dissenting view as to 18 defendants out of 70 as to whom there was a lack of consensus (26 percent), all of which were recommendations by the Review Committee in favor of seeking the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 18 | 2 | 7 | 8 | 1 |
| Percent | 100% | 11% | 39% | 44% | 6% |

- The Attorney General held the dissenting view as to 2 defendants out of 70 as to whom there was a lack of consensus (3 percent), and decided in both cases against seeking the death penalty. Both of these defendants were Black.

2.    Two-party comparisons

a.    The United States Attorneys and the Attorney General

- From 1995 to 2000, a total of 575 defendants facing capital-eligible charges were the subjects of both a recommendation either for or against seeking the death penalty by a United States Attorney and a decision by the Attorney General. With respect to 522 of these defendants (91 percent), the United States Attorney and the Attorney General agreed as to whether or not the death penalty should be sought.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 522 | 98 | 263 | 138 | 23 |
| Percent | 100% | 19% | 50% | 26% | 4% |

- The overall rate of agreement was 87 percent (522 of 575 defendants), including both decision to seek the death penalty and decisions not to seek it. With respect to specific racial/ethnic groups, the overall rates of agreement were:
  - 88 percent for White defendants (98 of 111 defendants);
  - 93 percent for Black defendants (263 of 283 defendants);
  - 88 percent for Hispanic defendants (138 of 156 defendants); and
  - 92 percent for Other defendants (23 of 25 defendants).

- The rate of agreement specifically for decisions to seek the death penalty was 83 percent (133 of 160 defendants for whom the United States Attorney

41

recommended seeking the death penalty).  With respect to specific racial/ethnic groups, the rates of agreement were:

- 88 percent for White defendants (36 of 41 defendants);
- 84 percent for Black defendants (63 of 75 defendants);
- 73 percent for Hispanic defendants (22 of 30 defendants); and
- 86 percent for Other defendants (12 of 14 defendants).

● The rate of agreement specifically for decisions against seeking the death penalty was 94 percent (389 of 415 defendants for whom the United States Attorney recommended against seeking the death penalty).  With respect to specific racial/ethnic groups, the rates of agreement were:

- 89 percent for White defendants (62 of 70 defendants);
- 96 percent for Black defendants (200 of 208 defendants);
- 92 percent for Hispanic defendants (116 of 126 defendants); and
- 100 percent for Other defendants (11 of 11 defendants).

● The rate of agreement between the Attorney General and the United States Attorneys as to cases in which the latter recommended seeking the death penalty did not substantially change as a result of the adoption of the review protocol in 1995.  In the pre-protocol period (when the United States Attorneys submitted only recommendations in favor of seeking the death penalty), the cases of 51 defendants facing capital-eligible charges were submitted by the United States Attorneys and decided by the Attorney General.[31]  With respect to 47 of these defendants (92 percent), the Attorney General and the United States Attorney agreed that the death penalty should be sought.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 47 | 7 | 34 | 5 | 1 |
| Percent | 100% | 15% | 72% | 11% | 2% |

b.    The United States Attorneys and the Review Committee

● From 1995 to 2000, a total of 602 defendants facing capital-eligible charges were the subjects of recommendations either for or against seeking the death penalty by both a United States Attorney and the Review Committee.  With respect to 529 of

---

[31]The Attorney General deferred decision on one defendant, a fugitive who subsequently died.

these defendants (88 percent), the United States Attorney and the Review Committee agreed as to whether or not the death penalty should be sought.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 529 | 98 | 268 | 141 | 22 |
| Percent | 100% | 19% | 51% | 27% | 4% |

- The overall rate of agreement was 88 percent (529 of 602 defendants), including both decision to seek the death penalty and decisions not to seek it. With respect to specific racial/ethnic groups, the overall rates of agreement were:

  - 86 percent for White defendants (98 of 114 defendants);
  - 91 percent for Black defendants (268 of 295 defendants);
  - 84 percent for Hispanic defendants (141 of 168 defendants); and
  - 88 percent for Other defendants (22 of 25 defendants).

- The rate of agreement specifically for decisions to seek the death penalty was 84 percent (137 of 164 defendants for whom the United States Attorney recommended seeking the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:

  - 88 percent for White defendants (36 of 41 defendants);
  - 84 percent for Black defendants (65 of 77 defendants);
  - 75 percent for Hispanic defendants (24 of 32 defendants); and
  - 86 percent for Other defendants (12 of 14 defendants).

- The rate of agreement specifically for decisions against seeking the death penalty was 89 percent (392 of 438 defendants for whom the United States Attorney recommended against seeking the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:

  - 85 percent for White defendants (63 of 73 defendants);
  - 93 percent for Black defendants (203 of 218 defendants);
  - 86 percent for Hispanic defendants (117 of 136 defendants); and
  - 91 percent for Other defendants (10 of 11 defendants).

43

c.     The Review Committee and the Attorney General

From 1995 to 2000, a total of 572 defendants facing capital-eligible charges were the subjects of recommendations either for or against seeking the death penalty by the Review Committee as well as a decision by the Attorney General. With respect to 552 of these defendants (97 percent), the Attorney General and the Review Committee agreed as to whether or not the death penalty should be sought.

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 552   | 109   | 271   | 148      | 24    |
| Percent | 100%  | 20%   | 49%   | 27%      | 4%    |

The overall rate of agreement was 97 percent (552 of 572 defendants), including both decision to seek the death penalty and decisions not to seek it. With respect to specific racial/ethnic groups, the overall rates of agreement were:

- 98 percent for White defendants (109 of 111 defendants);
- 97 percent for Black defendants (271 of 280 defendants);
- 95 percent for Hispanic defendants (148 of 156 defendants); and
- 96 percent for Other defendants (24 of 25 defendants).

The rate of agreement specifically for decisions to seek the death penalty was 89 percent (158 of 178 defendants for whom the Review Committee recommended seeking the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:

- 96 percent for White defendants (44 of 46 defendants);
- 89 percent for Black defendants (70 of 79 defendants);
- 80 percent for Hispanic defendants (32 of 40 defendants); and
- 92 percent for Other defendants (12 of 13 defendants).

The rate of agreement specifically for decisions against seeking the death penalty was 100 percent (394 of 394 defendants for whom the Review Committee recommended against seeking the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:

- 100 percent for White defendants (65 of 65 defendants);
- 100 percent for Black defendants (201 of 201 defendants);

44

- — 100 percent for Hispanic defendants (116 of 116 defendants); and
- — 100 percent for Other defendants (12 of 12 defendants).

- The Attorney General has never disagreed with a recommendation by the Review Committee that the death penalty should not be sought in a given case.

45

# SURVEY OF THE FEDERAL DEATH PENALTY SYSTEM
# (1988-2000)

## LIST OF STATISTICAL TABLES

Page

LIST OF STATISTICAL TABLES ................................... T-i

GENERAL EXPLANATORY NOTES ON TERMS AND METHODS ......... T-xi

TABLE SET I:     STATISTICAL OVERVIEW ......................... T-1

   Explanatory Notes to Table Set I ............................... T-1

      Table 1A:   Distribution of Defendants Within Each Stage of
                  the Federal Death Penalty Process (1995-2000) ...... T-2

      Table 1B:   Distribution of Defendants Within Each Stage of
                  the Federal Death Penalty Process (1988-1994) ...... T-3

      Table 2A:   Decision-making Rates Within Specific Stages
                  of the Federal Death Penalty Process (1995-2000) .... T-4

      Table 2B:   Decision-making Rates Within Specific Stages
                  of the Federal Death Penalty Process (1988-1994) .... T-5

      Table 3A:   Decision-making Rates Across All Stages of
                  the Federal Death Penalty Process (1995-2000) ...... T-6

      Table 3B:   Decision-making Rates Across All Stages of
                  the Federal Death Penalty Process (1988-1994) ...... T-7

TABLE SET II:　　THE UNITED STATES ATTORNEYS ................ T-8

   A.　　Defendants: Explanatory Notes to Table Set II.A ............... T-9

      Table 4:　　Locations of United States Attorneys' Offices ....... T-10

      Table 5A:　　U.S. Attorney Recommendations by District
               and Race/Ethnicity of Defendant (1995-2000) ...... T-14

      Table 5B:　　U.S. Attorney Recommendations by District
               and Race/Ethnicity of Defendant (1988-1994) ...... T-18

   B.　　Offenses: Explanatory Notes to Table Set II.B ................ T-22

      Table 6:　　Federal Offenses Punishable by Death ............ T-23

      Table 7:　　U.S. Attorney Recommendations by
               Capital Offense and Race/Ethnicity of Defendant
               (1995-2000) ................................ T-28

      Table 8-1:　　U.S. Attorney Recommendations to Seek by
               District, Capital Offense, and Race/Ethnicity of
               Defendant (1995-2000) ....................... T-30

      Table 8-2:　　U.S. Attorney Recommendations Not to Seek by
               District, Capital Offense, and Race/Ethnicity of
               Defendant (1995-2000) ....................... T-43

   C.　　Victims: Explanatory Notes to Table Set II.C ................. T-57

      Table 9A:　　U.S. Attorney Recommendations by District
               and Race/Ethnicity of Victim (1995-2000) ......... T-59

      Table 9B:　　U.S. Attorney Recommendations by District
               and Race/Ethnicity of Victim (1988-1994) ......... T-63

      Table 10A:　　Overall U.S. Attorney Recommendations by
               Race/Ethnicity of Victim and Race/Ethnicity
               of Defendant (1995-2000) ..................... T-67



Table 10A-1:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively White Victim(s) (1995-2000) . . . . . . . . . . T-68

Table 10A-2:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively Black Victim(s) (1995-2000) . . . . . . . . . . T-72

Table 10A-3:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively Hispanic Victim(s) (1995-2000) . . . . . . . T-76

Table 10A-4:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively Other Victim(s) (1995-2000) . . . . . . . . . . T-80

Table 10A-5:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Multiple Victims of Different Races/
Ethnicities (1995-2000) . . . . . . . . . . . . . . . . . . . . . . . T-84

Table 10B:    Overall U.S. Attorney Recommendations by
Race/Ethnicity of Victim and Race/Ethnicity
of Defendant (1988-1994) . . . . . . . . . . . . . . . . . . . . . . T-88

Table 10B-1:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively White Victim(s) (1988-1994) . . . . . . . . . . T-89

Table 10B-2:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively Black Victim(s) (1988-1994) . . . . . . . . . . T-93

Table 10B-3:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively Hispanic Victim(s) (1988-1994) . . . . . . . T-97

Table 10B-4:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively Other Victim(s) (1988-1994) . . . . . . . . . T-101

Table 10B-5:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Multiple Victims of Different Races/
Ethnicities (1988-1994) ....................... T-105

Table 11A:  Overall U.S. Attorney Recommendations
by Race/Ethnicity of Defendant and Number
of Victims (1995-2000) ....................... T-109

Table 11A-1:  U.S. Attorney Recommendations by
District and Race/Ethnicity of Defendant –
Single Victim (1995-2000) ................... T-110

Table 11A-2:  U.S. Attorney Recommendations by
District and Race/Ethnicity of Defendant –
Multiple Victims (1995-2000) ................ T-114

Table 11B:  Overall U.S. Attorney Recommendations
by Race/Ethnicity of Defendant and Number
of Victims (1988-1994) ...................... T-118

Table 11B-1:  U.S. Attorney Recommendations by
District and Race/Ethnicity of Defendant –
Single Victim (1988-1994) ................... T-119

Table 11B-2:  U.S. Attorney Recommendations by
District and Race/Ethnicity of Defendant –
Multiple Victims (1988-1994) ................ T-123

TABLE SET III:    THE REVIEW COMMITTEE ...................... T-127

A.    Defendants: Explanatory Notes to Table Set III.A ............ T-128

Table 12:  Review Committee Recommendations by
District and Race/Ethnicity of Defendant
(1995-2000) ................................ T-129

B.    Offenses: Explanatory Notes to Table Set III.B ............... T-133

    Table 13:    Review Committee Recommendations by
                  Capital Offense and Race/Ethnicity of
                  Defendant (1995-2000) ....................... T-134

    Table14-1:    Review Committee Recommendations to
                  Seek by District, Capital Offense, and Race/
                  Ethnicity of Defendant (1995-2000) ............. T-136

    Table 14-2:    Review Committee Recommendations Not to
                  Seek by District, Capital Offense, and Race/
                  Ethnicity of Defendant (1995-2000) ............. T-149

C.    Victims: Explanatory Notes to Table Set III.C ................ T-163

    Table 15:    Review Committee Recommendations by
                  District and Race/Ethnicity of Victim (1995-2000) .. T-164

    Table 16:    Overall Review Committee Recommendations
                  by Race/Ethnicity of Victim and Race/Ethnicity
                  of Defendant (1995-2000) ..................... T-168

    Table 16-1:    Review Committee Recommendations by
                  District and Race/Ethnicity of Defendant –
                  Exclusively White Victim(s) (1995-2000) ......... T-169

    Table 16-2:    Review Committee Recommendations by
                  District and Race/Ethnicity of Defendant –
                  Exclusively Black Victim(s) (1995-2000) ......... T-173

    Table 16-3:    Review Committee Recommendations by
                  District and Race/Ethnicity of Defendant –
                  Exclusively Hispanic Victim(s) (1995-2000) ...... T-177

    Table 16-4:    Review Committee Recommendations by
                  District and Race/Ethnicity of Defendant –
                  Exclusively Other Victim(s) (1995-2000) ......... T-181

    Table16-5:    Review Committee Recommendations by
                  District and Race/Ethnicity of Defendant –

Multiple Victims of Different Races/
Ethnicities (1995-2000) ........................ T-185

Table 17:     Overall Review Committee Recommendations
by Race/Ethnicity of Defendant and Number
of Victims (1995-2000) ........................ T-189

Table 17-1:   Review Committee Recommendations by
District and Race/Ethnicity of Defendant –
Single Victim (1995-2000) ..................... T-190

Table 17-2:   Review Committee Recommendations by
District and Race/Ethnicity of Defendant –
Multiple Victims (1995-2000) ................. T-194

TABLE SET IV:     THE ATTORNEY GENERAL ...................... T-198

A.     Defendants: Explanatory Notes to Table Set IV.A ............. T-199

Table 18A:    Attorney General Decisions by District and
Race/Ethnicity of Defendant (1995-2000) ......... T-200

Table 18B:    Attorney General Decisions by District and
Race/Ethnicity of Defendant (1988-1994) ......... T-204

B.     Offenses: Explanatory Notes to Table Set IV.B ............... T-208

Table 19:     Attorney General Decisions by Capital Offense
and Race/Ethnicity of Defendant (1995-2000) ..... T-209

Table 20-1:   Attorney General Decisions to Seek by
District, Capital Offense, and Race/Ethnicity
of Defendant (1995-2000) ..................... T-211

Table 20-2:   Attorney General Decisions Not to Seek by
District, Capital Offense, and Race/Ethnicity
of Defendant (1995-2000) ..................... T-223




C.     **Victims: Explanatory Notes to Table Set IV.C** ................. T-236

      Table 21A:   Attorney General Decisions by District and
                      Race/Ethnicity of Victim (1995-2000) ........... T-237

      Table 21B:   Attorney General Decisions by District and
                      Race/Ethnicity of Victim (1988-1994) ........... T-241

      Table 22A:   Overall Attorney General Decisions by
                      Race/Ethnicity of Victim and Race/
                      Ethnicity of Defendant (1995-2000) ............. T-245

      Table 22A-1:  Attorney General Decisions by District
                      and Race/Ethnicity of Defendant –
                      Exclusively White Victim(s) (1995-2000) ......... T-246

      Table 22A-2:  Attorney General Decisions by District
                      and Race/Ethnicity of Defendant –
                      Exclusively Black Victim(s) (1995-2000) ......... T-250

      Table 22A-3:  Attorney General Decisions by District
                      and Race/Ethnicity of Defendant –
                      Exclusively Hispanic Victim(s) (1995-2000) ...... T-254

      Table 22A-4:  Attorney General Decisions by District
                      and Race/Ethnicity of Defendant –
                      Exclusively Other Victim(s) (1995-2000) ......... T-258

      Table 22A-5:  Attorney General Decisions by District
                      and Race/Ethnicity of Defendant –
                      Multiple Victims of Different Races/
                      Ethnicities (1995-2000) ...................... T-262

      Table 22B:   Attorney General Decisions by Race/
                      Ethnicity of Victim and Race/Ethnicity
                      of Defendant (1988-1994) ................... T-266

      Table 22B-1:  Attorney General Decisions by District
                      and Race/Ethnicity of Defendant –
                      Exclusively White Victim(s) (1988-1994) ......... T-267



Table 22B-2:    Attorney General Decisions by District
                and Race/Ethnicity of Defendant –
                Exclusively Black Victim(s) (1988-1994) ......... T-271

Table 22B-3:    Attorney General Decisions by District
                and Race/Ethnicity of Defendant –
                Exclusively Hispanic Victim(s) (1988-1994) ...... T-275

Table 22B-4:    Attorney General Decisions by District
                and Race/Ethnicity of Defendant –
                Exclusively Other Victim(s) (1988-1994) ......... T-279

Table 22B-5:    Attorney General Decisions by District
                and Race/Ethnicity of Defendant –
                Multiple Victims of Different Races/
                Ethnicities (1988-1994) ........................ T-283

Table 23A:      Overall Attorney General Decisions
                by Race/Ethnicity of Defendant and
                Number of Victims (1995-2000) ................. T-287

Table 23A-1:    Attorney General Decisions by District
                and Race/Ethnicity of Defendant –
                Single Victim (1995-2000) .................... T-288

Table 23A-2:    Attorney General Decisions by District
                and Race/Ethnicity of Defendant –
                Multiple Victims (1995-2000) ................. T-292

Table 23B:      Overall Attorney General Decisions
                by Race/Ethnicity of Defendant and
                Number of Victims (1988-1994) ................ T-296

Table 23B-1:    Attorney General Decisions by District
                and Race/Ethnicity of Defendant –
                Single Victim (1988-1994) .................... T-297

Table 23B-2:    Attorney General Decisions by District
                and Race/Ethnicity of Defendant –
                Multiple Victims (1988-1994) ................. T-301

TABLE SET V:     FEDERAL DEFENDANTS SENTENCED TO DEATH .. T-305

Explanatory Notes to Table Set V ........................... T-305

Table 24-1:     Summary of Federal Cases in Which a
Jury Has Recommended Imposition of the
Death Sentence (1988-2000) .................. T-306

Table 24-2:     Description of Federal Cases in Which a
Jury Has Recommended Imposition of the
Death Sentence (1988-2000) .................. T-307

TABLE SET VI:     AGREEMENTS AND DISAGREEMENTS IN
THE FEDERAL DECISION-MAKING PROCESS ...... T-310

Explanatory Notes to Table Set VI ............................... T-310

Table 25:     Overall Agreement and Disagreement
Among U.S. Attorneys, the Review
Committee, and the Attorney General
by Race/Ethnicity of Defendant (1995-2000) ...... T-311

Table 25-1:     Agreement Among U.S. Attorneys, the
Review Committee, and the Attorney
General by District and Race/Ethnicity
of Defendant (1995-2000) .................... T-312

Table 25-2:     U.S. Attorney Disagreement with the
Review Committee and Attorney General
by District and Race/Ethnicity of Defendant
(1995-2000) ............................... T-316

Table 25-3:     Review Committee Disagreement with
U.S. Attorneys and the Attorney General
by District and Race/Ethnicity of Defendant
(1995-2000) ............................... T-320

Table 25-4:     Attorney General Disagreement with U.S.
Attorneys and the Review Committee
by District and Race/Ethnicity of Defendant
(1995-2000) ............................... T-324

Table 26A-1:   Agreement Between U.S. Attorneys and
the Attorney General by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-328

Table 26A-2:   Disagreement Between U.S. Attorneys and
the Attorney General by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-332

Table 26B:     Agreement and Disagreement Between U.S.
Attorneys and the Attorney General by District
and Race/Ethnicity of Defendant (1988-1994)  . . . . . T-336

Table 27-1:    Agreement Between U.S. Attorneys and
the Review Committee by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-340

Table 27-2:    Disagreement Between U.S. Attorneys and
the Review Committee by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-344

Table 28-1:    Agreement Between the Review Committee
and the Attorney General by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-348

Table 28-2:    Disagreement Between the Review Committee
and the Attorney General by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-352



## GENERAL EXPLANATORY NOTES ON TERMS AND METHODS

The statistics presented in the following tables are based on a number of assumptions and employ a number of conventions that the reader should bear in mind. These general explanatory notes present items that are common to most or all of the statistical tables in this Survey. Section A addresses terminology, and Section B provides notes on the methods generally used in compiling the data in this Survey. Additional notes that apply only to particular sets of tables are set forth at the beginning of each table set.

### A.    METHODOLOGY

1.    How the statistical tables were compiled

As a general matter, the statistical tables in this Survey were compiled from information maintained by the Capital Crimes Unit (CCU) of the Criminal Division. As noted in the text of the Survey, when a United States Attorney submits a case for review, the prosecutors responsible for the case also submit information about the race/ethnicity of the defendant and any victim(s). That information is maintained in a database for statistical purposes only by paralegal assistants in the CCU and is kept apart from the information that is provided to the Review Committee and the Attorney General for use in the decision-making process.

In addition to the information described above, some of the statistical tables – particularly tables providing information about the charges against defendants – were compiled through a case-by-case review of memoranda submitted by United States Attorneys since 1988. That information, like the information on race/ethnicity drawn from the CCU database, was in some instances incomplete, and was supplemented by information provided by individual United States Attorneys' Offices in response to inquiries made specifically for purposes of preparing this Survey.

Although extensive efforts have been made to present accurate information in this Survey, some errors may remain as the result of incomplete information or as the result of data entry mistakes.

2.    Cases excluded from the statistical tables

a.    "Straddle" cases

In addition to the 682 post-protocol cases and 52 pre-protocol cases that are analyzed in this Survey, there were seven cases that cannot properly be considered either

T-xi

pre-protocol or post-protocol. Six of the seven cases involved offenses under the DKA, and the seventh was charged under a racketeering provision, 18 U.S.C. § 1959(a). In each of these seven cases, arising during the transition from the former procedures to the current ones, the United States Attorney submitted to the Attorney General a recommendation not to seek the death penalty in a case that had been indicted prior to the adoption of the protocol, even though no such submission was in fact required. Because these cases were not in fact reviewed under the new protocol, and need not have been submitted under the former policy, they are essentially indistinguishable from an uncounted number of cases from the 1988-1994 period (during which a United States Attorney's decision not to seek the death penalty was not submitted for the Attorney General's approval) that are not accounted for in this Survey. Accordingly, these seven cases are excluded from the statistical compilations in this Survey.

   b.  Incomplete submissions

On occasion, United States Attorneys submit the information required by the protocol over a period of time, rather than all at once. The statistical tables in this Survey do not include cases in which United States Attorneys had submitted only partial information relating to a case as of July 20, 2000. Further, in one case, a United States Attorney entered into a plea agreement with a defendant after sending a submission to the CCU, but before that submission was received and processed. The statistical tables in this Survey do not include that case.

   c.  Cases charging offenses other than violations of the DKA prior to September 13, 1994

Before the enactment of the FDPA in 1994, there were a number of federal criminal statutes that defined offenses punishable by death (*e.g.*, mail bombing, in violation of 18 U.S.C. § 844(d)), albeit without providing procedures under which such a sentence could be imposed. For some time between the enactment of the DKA in 1988 (which set forth certain procedures for capital cases but did not explicitly apply them to all federal offenses which by their terms were punishable by death) and the enactment on September 13, 1994 of the FDPA (which set forth procedures that apply in any federal capital case), it was unclear whether the death penalty could be imposed for non-DKA offenses that, by the terms of the applicable statutes, were capital crimes. As a result, there were some cases prior to the enactment of the FDPA in which the government sought the death penalty for non-DKA offenses. Because the courts ultimately ruled that

the death penalty could not constitutionally be applied in such circumstances, the few non-DKA cases from the pre-protocol period are not counted in this Survey.[32]

### 3.     Counting methods

#### a.     Offense-related statistics.

In some cases, a defendant was charged with multiple offenses under different criminal statutes, each of which was potentially punishable by death. Often in such cases, each decision-maker in the Department's process recommended the same outcome as to all offenses – either to seek the death penalty for all counts or for none. But in some instances, the United States Attorneys, the Review Committee, or the Attorney General reached different conclusions about different statutory offenses committed by the same defendant. Attempting to account for those relatively few cases proved to be very difficult, and risked causing more confusion in the presentation of statistics than was warranted. Accordingly, in compiling the offense-related statistics reported in this Survey, a recommendation or decision to seek the death penalty against a defendant with respect to *any* offense was treated as a recommendation or decision to seek the death penalty with respect to *all* offenses charged against that defendant.

#### b.     Victim-related statistics

Several defendants were accused of crimes resulting in the deaths of multiple victims. In many such cases, each decision-maker in the Department's process recommended the same outcome with respect to all victims – either to seek the death penalty for all the offenses resulting in the victims' deaths or not to seek the death penalty at all. But in some instances, a participant in the review process reached different conclusions with respect to crimes against different victims committed by the same defendant. Here again, in compiling the victim-related statistics reported in this Survey, a recommendation or decision to seek the death penalty against a defendant as punishment for causing the death of *any* victim was treated as a recommendation or decision to seek the death penalty with respect to *all* victims associated with that defendant.

Moreover, in several cases, multiple defendants were accused of crimes resulting in the death of the same victim. In many such cases, each decision-maker in the Department's process recommended the same outcome with respect to all defendants

---

[32]A related issue, but distinct from that decided in the pre-FDPA cases, is whether the Constitution would preclude the use of the procedures now available under the FDPA to impose the death penalty in a non-DKA case in which the offense was committed prior to September 13, 1994. The latter question has not yet been decided in any judicial opinion.



accused of causing the death of the same victim – either to seek the death penalty for all defendants or not to seek the death penalty for any of them. But in some instances, a participant in the review process reached different conclusions with respect to different defendants accused of causing the death of the same victim. In tables that report statistics about the race/ethnicity of victims *without* reference to the race/ethnicity of defendants, each victim is counted only once. In these tables, where a participant in the review process recommended or authorized seeking the death penalty for at least one defendant, the victim was counted as a victim of a crime for which the death penalty was recommended or authorized.

    c.    <u>Recommendations</u>

Both the United States Attorneys and the Review Committee occasionally altered their initial recommendations about whether the death penalty should be sought. While in some instances such reconsideration resulted from the discovery of new evidence or the presentation of additional information by the defendant, there were also cases in which it was the result of a frank exchange of views among the various participants in the decision-making process rather than the gathering of additional facts. For purposes of uniformity in reporting the statistics in this Survey, the tables in this Survey generally report only the *initial* recommendation of the United States Attorney and the Review Committee in each case. Exceptions to this practice in specific anomalous cases are noted below.

    c.    <u>Anomalous cases</u>

Certain cases involved anomalous circumstances that made it possible to count them in a number of different ways for purposes of this Survey. Each of those instances, and the choices made for how to count them, are described below.

- <u>New information leading to reconsideration in favor of seeking death</u>. In the case of one Asian defendant (categorized in the "Other" racial group) in the Eastern District of California, the United States Attorney initially recommended that the death penalty not be sought, and the Review Committee and the Attorney General both concurred. After additional information about the case was discovered, the United States Attorney, the Review Committee and the Attorney General all favored seeking the death penalty. Throughout this Survey, this defendant is reported as having had recommendations in favor of seeking the death penalty by both the United States Attorney and the Review Committee, and as having had a decision by the Attorney General to seek the death

T-xiv



penalty. As a result, the initial recommendations and decision against seeking the death penalty are not reported in the statistical tables.

- Fugitives. Two defendants in separate cases (one Black defendant in the Eastern District of Virginia and one Hispanic defendant in the District of Puerto Rico) were fugitives at the time the respective United States Attorneys made the submissions required under the protocol. Both the Review Committee and the Attorney General reviewed each case and decided to defer taking final action. In each case, after the defendant was apprehended, but before the case was submitted for renewed consideration, the defendant entered into a plea agreement. Each of these cases is reported as having been the subject of a plea agreement after submission by the United States Attorney but prior to consideration by the Review Committee and the Attorney General. As a result, the initial decisions to defer are not reported in the statistical tables.

- Overlapping prosecution: With one exception, all of the 682 post-protocol defendants and 52 pre-protocol defendants are different individuals, each of whom was charged with federal offenses subject to the death penalty in only one district. The one exception is Theodore Kaczynski, a White defendant who was charged with capital offenses in both the Eastern District of California and the District of New Jersey. The recommendations by each United States Attorney are reported separately. As a result, although there were 681 individuals charged with federal offenses subject to the death penalty in the post-protocol period, the statistical tables report information about a total of 682 defendants.

4.    Information about specific Attorneys General.

The statistical tables in this Survey do not distinguish among the four Attorneys General who have made decisions about whether to seek the death penalty since the re-introduction of capital punishment in the federal criminal justice system in 1988. Limited information about the decisions of specific Attorneys General is therefore provided here.

All of the defendants considered during the post-protocol period were considered by Attorney General Reno. With respect to the pre-protocol cases, which were all submitted with recommendations by United States Attorneys in favor of seeking the death

T-xv

penalty, Attorney General Thornburgh decided to seek the death penalty against all of the eight defendants submitted to him for consideration; Attorney General Barr decided to seek the death penalty against all of the 20 defendants submitted to him for consideration; Acting Attorney General Gerson decided to seek the death penalty against all of the four defendants submitted to him for consideration; and Attorney General Reno decided to seek the death penalty against 15 of 20 defendants submitted to her for consideration. Of the remaining five pre-protocol defendants, Attorney General Reno decided not to seek the death penalty against four defendants; and she considered but did not make a death penalty decision with regard to one defendant who was a fugitive and who subsequently died.

B.    TERMINOLOGY

1.    Differences between state and federal data due to different methods of accounting for Hispanic ethnicity

In presenting information about the federal government's implementation of the death penalty, this Survey uses the term "Hispanic" as a separate category to refer to persons of Hispanic ethnicity regardless of race. As a result (with the exception of state statistics obtained from other sources as noted), the terms "White," "Black," and "Other" as used in this Survey refer only to non-Hispanic members of those racial groups. In contrast, several compilations of state statistics, including some cited in this Survey, include persons of Hispanic ethnicity within the racial categories of "White," "Black," and "Other." As a result of these different uses of terminology, the reader should use care in comparing state and federal statistics concerning race and ethnicity.

According to the U.S. Census Bureau, approximately 91 percent of the Hispanic population would, if described by race, be categorized as "White," while approximately six percent would be categorized as "Black" and approximately three percent would be categorized as Other.[33] A reader seeking to compare the relative proportions of "White" and non-"White" individuals in a given group may thus draw very different conclusions based on the terminology used in presenting the data. For example, among the statistics reported in this Survey is the following:  from 1995 to 2000, the Attorney General

---

[33] See Department of Commerce, U.S. Census Bureau, Population Division, Publication NP-D1-A, Projections of the Population by Age, Sex, Race, and Hispanic Origin for the United States: 1999 to 2100 (Jan. 13, 2000) <<http://www.census.gov/population/projections/nation/detail/d1999_00.pdf>>. Similarly, the Department of Justice's Bureau of Justice Statistics (BJS) reports that of the 314 Hispanic persons under sentence of death in the United States at the end of 1998, 285 (91 percent) were White, 14 (4 percent) were Black, and 15 (5 percent) were of other races. See Department of Justice, Bureau of Justice Statistics, Capital Punishment 1998 (rev. Jan. 6, 2000) <<http://www.ojp.usdoj.gov/bjs/pub/pdf/cp98.pdf>>.

T-xvi

decided to seek the death penalty against a total of 159 defendants. Using "Hispanic" as a separate category that includes persons of any race whose ethnicity is Hispanic (and therefore using "White," "Black" and "Other" to refer only to non-Hispanic members of those respective racial groups), the racial/ethnic distribution of these 159 defendants are categorized as follows:

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 159   | 44    | 71    | 32       | 12    |
| Percent | 100%  | 28%   | 45%   | 20%      | 8%    |

But if only racial categories were used, and if the Census Bureau statistics about the racial distribution of persons of Hispanic ethnicity were assumed to be applicable, the racial distribution of this same group of 159 defendants would likely appear as follows:

|         | Total | White | Black | Other |
|---------|-------|-------|-------|-------|
| Number  | 159   | 73    | 73    | 13    |
| Percent | 100%  | 46%   | 46%   | 8%    |

The difference made by the use of terminology does not necessarily explain all the apparent differences between the state and federal data. Nevertheless, the reader should exercise care in attempting to compare state and federal statistics.

2.      "Intraracial and "interracial"

In reporting information about the racial/ethnic characteristics of the victims of capital offenses, this Survey uses the terms "intraracial" and "interracial" to describe offenses. As used in this Survey, "intraracial" refers to a crime in which the offender and *all* victims are within the same racial/ethnic category, and "interracial" refers to a crime in which the racial/ethnic category of the offender differs from the category of at least one victim of the offense. With respect to individuals in the category of "Other" races, an offense is described as intraracial only if the defendant and victim(s) are members of the same specific racial group within the "Other" category (*e.g.*, if the defendant and victims are all Asian). In the single case where the defendant and victim were members of different racial groups within the "Other" category, the offense is described as an interracial homicide for purposes of the discussion below.

3.      Table numbering

T-xvii

a.    "A" and "B" Tables

A number of the tables in this Survey have numbers that include an "A" or a "B." "A" is used for tables reporting statistics about the post-protocol period from 1995 to 2000, and "B" is used for tables concerning the pre-protocol period from 1988 to 1994. No such suffixes are used with respect to tables concerning the Review Committee, because the Committee did not exist in the pre-protocol period.

b.    Number suffixes. There are several tables that provide statistics about specific subsets of cases. In each of these cases, a numbered suffix is used for each subset. Thus, for example, in reporting statistics about cases involving intraracial and interracial homicides, Table 10A reports on all cases in the post-protocol period, and is then followed by five separate tables, numbered 10A-1 through 10A-5, that provide more specific information about cases involving, respectively, White victims, Black victims, Hispanic victims, Other victims, and multiple victims of varied race/ethnicity.

# TABLE SET I:  STATISTICAL OVERVIEW

### Explanatory Notes

Table Set I reports overall trends for the death penalty decision-making process at the Department of Justice. The tables in this set analyze the statistics in three separate ways.  First, Tables 1A and 1B examine the racial/ethnic distribution of defendants within the total number of defendants at a given stage of the process.  Thus, for example, the reader can compare the racial/ethnic breakdown of defendants submitted for review by United States Attorneys against the breakdown for the smaller group as to whom the Attorney General authorized capital prosecution.  Table 1A examines the post-protocol period of 1995 to 2000, and Table 1B examines the pre-protocol period of 1988 to 1994.

In addition to examining the racial/ethnic breakdown of defendants *within* any given stage of the decision-making process, the data can be analyzed to learn how different racial groups fare as they proceed *through* the various stages of the decision-making process.  In other words, aside from asking about the relative proportion of racial/ethnic groups at any given stage of review, the statistics can also be examined to see whether defendants in one racial/ethnic group get authorized for capital prosecution at a different *rate* than other defendants. This set presents information about the latter question in two ways.

Tables 2A and 2B show the rates at which decisions were made for defendants within a given racial/ethnic group by each of the three primary participants, as a percentage of the total number of defendants in that racial/ethnic group that was considered by that participant at each stage.

Tables 3A and 3B present the rate at which defendants in a given racial/ethnic group reach each stage of the process, as a percentage of all defendants in that racial/ethnic group who entered the Department's decision-making process.

T-1

TABLE 1A
DISTRIBUTION OF DEFENDANTS WITHIN EACH
STAGE OF THE FEDERAL DEATH PENALTY PROCESS
(1995-2000)

| STAGE | TOTAL | | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| **SUBMITTED BY U.S. ATTORNEYS** | **682** | **100.0%** | **134** | **19.6%** | **324** | **47.5%** | **195** | **28.6%** | **29** | **4.3%** |
| No Recommendation | 5 | 100.0% | 1 | 20.0% | 1 | 20.0% | 3 | 60.0% | 0 | 0.0% |
| Recommendation Not to Seek Death Penalty (DP) | 494 | 100.0% | 85 | 17.2% | 242 | 49.0% | 153 | 31.0% | 14 | 2.8% |
| Recommendation to Seek DP | 183 | 100.0% | 48 | 26.2% | 81 | 44.3% | 39 | 21.3% | 15 | 8.2% |
| **CONSIDERED BY REVIEW COMMITTEE** | **618** | **100.0%** | **119** | **19.3%** | **301** | **48.7%** | **172** | **27.8%** | **26** | **4.2%** |
| No Recommendation | 15 | 100.0% | 4 | 26.7% | 6 | 40.0% | 4 | 26.7% | 1 | 6.7% |
| Recommendation Not to Seek DP | 420 | 100.0% | 68 | 16.2% | 215 | 51.2% | 125 | 29.8% | 12 | 2.9% |
| Recommendation to Seek DP | 183 | 100.0% | 47 | 25.7% | 80 | 43.7% | 43 | 23.5% | 13 | 7.1% |
| **CONSIDERED BY ATTORNEY GENERAL (AG)** | **588** | **100.0%** | **115** | **19.6%** | **287** | **48.8%** | **160** | **27.2%** | **26** | **4.4%** |
| Decision Deferred or Pending | 12 | 100.0% | 3 | 25.0% | 4 | 33.3% | 4 | 33.3% | 1 | 8.3% |
| Authorization Not to Seek DP | 417 | 100.0% | 68 | 16.3% | 212 | 50.8% | 124 | 29.7% | 13 | 3.1% |
| Authorization to Seek DP | 159 | 100.0% | 44 | 27.7% | 71 | 44.7% | 32 | 20.1% | 12 | 7.5% |
| **AUTHORIZED BY AG TO SEEK DP** | **159** | **100.0%** | **44** | **27.7%** | **71** | **44.7%** | **32** | **20.1%** | **12** | **7.5%** |
| DP Notice Withdrawn – Plea Agreement | 51 | 100.0% | 21 | 41.2% | 18 | 35.3% | 9 | 17.6% | 3 | 5.9% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 100.0% | 1 | 9.1% | 3 | 27.3% | 5 | 45.5% | 2 | 18.2% |
| DP Notice Dismissed or Trial Terminated | 4 | 100.0% | 0 | 0.0% | 1 | 25.0% | 3 | 75.0% | 0 | 0.0% |
| Pending Trial or Completion of Trial | 51 | 100.0% | 11 | 21.6% | 23 | 45.1% | 13 | 25.5% | 4 | 7.8% |
| Not Convicted of Capital Charge | 1 | 100.0% | 0 | 0.0% | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Convicted of Capital Charge | 41 | 100.0% | 11 | 26.8% | 25 | 61.0% | 2 | 4.9% | 3 | 7.3% |
| **CONVICTED OF CAPITAL CHARGE** | **41** | **100.0%** | **11** | **26.8%** | **25** | **61.0%** | **2** | **4.9%** | **3** | **7.3%** |
| Jury Verdict – DP Not Recommended | 21 | 100.0% | 7 | 33.3% | 12 | 57.1% | 0 | 0.0% | 2 | 9.5% |
| Jury Verdict – DP Recommended | 20 | 100.0% | 4 | 20.0% | 13 | 65.0% | 2 | 10.0% | 1 | 5.0% |
| **SENTENCED TO DEATH** | **20** | **100.0%** | **4** | **20.0%** | **13** | **65.0%** | **2** | **10.0%** | **1** | **5.0%** |
| DP Recommended by Jury But Not Yet Imposed | 2 | 100.0% | 0 | 0.0% | 0 | 0.0% | 2 | 100.0% | 0 | 0.0% |
| DP Vacated by Court, Further Action Pending | 4 | 100.0% | 1 | 25.0% | 3 | 75.0% | 0 | 0.0% | 0 | 0.0% |
| **DEATH SENTENCE PENDING** | **14** | **100.0%** | **3** | **21.4%** | **10** | **71.4%** | **0** | **0.0%** | **1** | **7.1%** |

T-2

4:02-cr-00992-JFA    Date Filed 06/01/11    Entry Number 1394-3    Page 71 of 110

## TABLE 1B
## DISTRIBUTION OF DEFENDANTS WITHIN EACH
## STAGE OF THE FEDERAL DEATH PENALTY PROCESS
## (1988-1994)

| STAGE | TOTAL | | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| SUBMITTED BY U.S. ATTORNEYS | 52 | 100.0% | 7 | 13.5% | 39 | 75.0% | 5 | 9.6% | 1 | 1.8% |
| Recommendation to Seek Death Penalty (DP) | 52 | 100.0% | 7 | 13.5% | 39 | 75.0% | 5 | 9.6% | 1 | 1.8% |
| CONSIDERED BY ATTORNEY GENERAL (AG) | 52 | 100.0% | 7 | 13.5% | 39 | 75.0% | 5 | 9.6% | 1 | 1.8% |
| Decision Deferred or Pending | 1 | 100.0% | 0 | 0.0% | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Authorization Not to Seek DP | 4 | 100.0% | 0 | 0.0% | 4 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Authorization to Seek DP | 47 | 100.0% | 7 | 14.9% | 34 | 72.3% | 5 | 10.6% | 1 | 2.1% |
| AUTHORIZED BY AG TO SEEK DP | 47 | 100.0% | 7 | 14.9% | 34 | 72.3% | 5 | 10.6% | 1 | 2.1% |
| DP Notice Withdrawn – Plea Agreement | 14 | 100.0% | 3 | 21.4% | 10 | 71.4% | 1 | 8.3% | 0 | 0.0% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 100.0% | 1 | 9.1% | 10 | 90.9% | 0 | 0.0% | 0 | 0.0% |
| DP Notice Dismissed or Trial Terminated | 2 | 100.0% | 0 | 0.0% | 2 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Pending Trial or Completion of Trial | 0 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not Convicted of Capital Charge | 4 | 100.0% | 0 | 0.0% | 4 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Convicted of Capital Charge | 16 | 100.0% | 3 | 18.8% | 8 | 50.0% | 4 | 25.0% | 1 | 6.3% |
| CONVICTED OF CAPITAL CHARGE | 16 | 100.0% | 3 | 18.8% | 8 | 50.0% | 4 | 25.0% | 1 | 6.3% |
| Jury Verdict – DP Not Recommended | 10 | 100.0% | 1 | 10.0% | 5 | 50.0% | 3 | 30.0% | 1 | 10.0% |
| Jury Verdict – DP Recommended | 6 | 100.0% | 2 | 33.3% | 3 | 50.0% | 1 | 16.7% | 0 | 0.0% |
| SENTENCED TO DEATH | 6 | 100.0% | 2 | 33.3% | 3 | 50.0% | 1 | 16.7% | 0 | 0.0% |
| DP Recommended by Jury But Not Yet Imposed | 0 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| DP Vacated by Court, Re-sentenced to Life In Prison | 1 | 100.0% | 1 | 100.0% | 0 | 0.0 % | 0 | 0.0% | 0 | 0.0% |
| DEATH SENTENCE PENDING | 5 | 100.0% | 1 | 20.0% | 3 | 60.0% | 1 | 20.0% | 0 | 0.0% |

## TABLE 2A
## DECISION-MAKING RATES WITHIN SPECIFIC
## STAGES OF THE FEDERAL DEATH PENALTY PROCESS
## (1995-2000)

| STAGE | TOTAL # | TOTAL % | White # | White % | Black # | Black % | Hispanic # | Hispanic % | Other # | Other % |
|---|---|---|---|---|---|---|---|---|---|---|
| SUBMITTED BY U.S. ATTORNEYS | 682 | 100.0% | 134 | 100.0% | 324 | 100.0% | 195 | 100.0% | 29 | 100.0% |
| No Recommendation | 5 | 0.7% | 1 | 0.7% | 1 | 0.3% | 3 | 1.5% | 0 | 0.0% |
| Recommendation Not to Seek Death Penalty (DP) | 494 | 72.4% | 85 | 63.4% | 242 | 74.7% | 153 | 78.5% | 14 | 48.3% |
| Recommendation to Seek DP | 183 | 26.8% | 48 | 35.8% | 81 | 25.0% | 39 | 20.0% | 15 | 51.7% |
| CONSIDERED BY REVIEW COMMITTEE | 618 | 100.0% | 119 | 100.0% | 301 | 100.0% | 172 | 100.0% | 26 | 100.0% |
| No Recommendation | 15 | 2.4% | 4 | 3.4% | 6 | 2.0% | 4 | 2.3% | 1 | 3.8% |
| Recommendation Not to Seek DP | 420 | 68.0% | 68 | 57.1% | 215 | 71.4% | 125 | 72.7% | 12 | 46.2% |
| Recommendation to Seek DP | 183 | 29.6% | 47 | 39.5% | 80 | 26.6% | 43 | 25.0% | 13 | 50.0% |
| CONSIDERED BY ATTORNEY GENERAL (AG) | 588 | 100.0% | 115 | 100.0% | 287 | 100.0% | 160 | 100.0% | 26 | 100.0% |
| Decision Deferred or Pending | 12 | 2.0% | 3 | 2.6% | 4 | 1.4% | 4 | 2.5% | 1 | 3.8% |
| Authorization Not to Seek DP | 417 | 70.9% | 68 | 59.1% | 212 | 73.9% | 124 | 77.5% | 13 | 50.0% |
| Authorization to Seek DP | 159 | 27.0% | 44 | 38.3% | 71 | 24.7% | 32 | 20.0% | 12 | 46.2% |
| AUTHORIZED BY AG TO SEEK DP | 159 | 100.0% | 44 | 100.0% | 71 | 100.0% | 32 | 100.0% | 12 | 100.0% |
| DP Notice Withdrawn – Plea Agreement | 51 | 32.1% | 21 | 47.7% | 18 | 25.4% | 9 | 28.1% | 3 | 25.0% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 6.9% | 1 | 2.3% | 3 | 4.2% | 5 | 15.6% | 2 | 16.7% |
| DP Notice Dismissed or Trial Terminated | 4 | 2.5% | 0 | 0.0% | 1 | 1.4% | 3 | 9.4% | 0 | 0.0% |
| Pending Trial or Completion of Trial | 51 | 32.1% | 11 | 25.0% | 23 | 32.4% | 13 | 40.6% | 4 | 33.3% |
| Not Convicted of Capital Charge | 1 | 0.6% | 0 | 0.0% | 1 | 1.4% | 0 | 0.0% | 0 | 0.0% |
| Convicted of Capital Charge | 41 | 25.8% | 11 | 25.0% | 25 | 35.2% | 2 | 6.3% | 3 | 25.0% |
| CONVICTED OF CAPITAL CHARGE | 41 | 100.0% | 11 | 100.0% | 25 | 100.0% | 2 | 100.0% | 3 | 100.0% |
| Jury Verdict – DP Not Recommended | 21 | 51.2% | 7 | 63.6% | 12 | 48.0% | 0 | 0.0% | 2 | 66.7% |
| Jury Verdict – DP Recommended | 20 | 51.2% | 4 | 36.3% | 13 | 52.0% | 2 | 100.0% | 1 | 33.3% |
| SENTENCED TO DEATH | 20 | 100.0% | 4 | 100.0% | 13 | 100.0% | 2 | 100.0% | 1 | 100.0% |
| DP Recommended by Jury But Not Yet Imposed | 2 | 4.9% | 0 | 0.0% | 0 | 0.0% | 2 | 100.0% | 0 | 0.0% |
| DP Vacated by Court, Further Action Pending | 4 | 9.8% | 1 | 9.1% | 3 | 12.0% | 0 | 0.0% | 0 | 0.0% |
| DEATH SENTENCE PENDING | 14 | 34.1% | 3 | 27.3% | 10 | 40.0% | 0 | 0.0% | 1 | 33.3% |

T-4

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-3   Page 73 of 110

TABLE 2B
DECISION-MAKING RATES WITHIN SPECIFIC
STAGES OF THE FEDERAL DEATH PENALTY PROCESS
(1988-1994)

| STAGE | TOTAL | | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| **SUBMITTED BY U.S. ATTORNEYS** | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| Recommendation to Seek Death Penalty (DP) | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| **CONSIDERED BY ATTORNEY GENERAL (AG)** | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| Decision Deferred or Pending | 1 | 1.9% | 0 | 0.0% | 1 | 2.6% | 0 | 0.0% | 0 | 0.0% |
| Authorization Not to Seek DP | 4 | 7.7% | 0 | 0.0% | 4 | 10.3% | 0 | 0.0% | 0 | 0.0% |
| Authorization to Seek DP | 47 | 90.4% | 7 | 100.0% | 34 | 87.2% | 5 | 100.0% | 1 | 100.0% |
| **AUTHORIZED BY AG TO SEEK DP** | 47 | 100.0% | 7 | 100.0% | 34 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| DP Notice Withdrawn – Plea Agreement | 14 | 29.8% | 3 | 42.9% | 10 | 29.4% | 1 | 20.0% | 0 | 0.0% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 23.4% | 1 | 14.3% | 10 | 29.4% | 0 | 0.0% | 0 | 0.0% |
| DP Notice Dismissed or Trial Terminated | 2 | 4.3% | 0 | 0.0% | 2 | 5.9% | 0 | 0.0% | 0 | 0.0% |
| Pending Trial or Completion of Trial | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not Convicted of Capital Charge | 4 | 8.5% | 0 | 0.0% | 4 | 11.8% | 0 | 0.0% | 0 | 0.0% |
| Convicted of Capital Charge | 16 | 34.0% | 3 | 42.9% | 8 | 23.5% | 4 | 80.0% | 1 | 100.0% |
| **CONVICTED OF CAPITAL CHARGE** | 16 | 100.0% | 3 | 100.0% | 8 | 100.0% | 4 | 100.0% | 1 | 100.0% |
| Jury Verdict – DP Not Recommended | 10 | 62.5% | 1 | 33.3% | 5 | 62.5% | 3 | 75.0% | 1 | 100.0% |
| Jury Verdict – DP Recommended | 6 | 37.5% | 2 | 66.7% | 3 | 37.5% | 1 | 25.0% | 0 | 0.0% |
| **SENTENCED TO DEATH** | 6 | 100.0% | 2 | 100.0% | 3 | 100.0% | 1 | 100.0% | 0 | 100.0% |
| DP Recommended by Jury But Not Yet Imposed | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| DP Vacated by Court, Re-sentenced to Life In Prison | 1 | 16.7% | 1 | 50.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| DEATH SENTENCE PENDING | 5 | 83.3% | 1 | 50.0% | 3 | 100.0% | 1 | 100.0% | 0 | 0.0% |

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-3   Page 74 of 110

TABLE 3A
DECISION-MAKING RATES ACROSS ALL STAGES
OF THE FEDERAL DEATH PENALTY PROCESS
(1995-2000)

| STAGE | TOTAL | | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| SUBMITTED BY U.S. ATTORNEYS | 682 | 100.0% | 134 | 100.0% | 324 | 100.0% | 195 | 100.0% | 29 | 100.0% |
| No Recommendation | 5 | 0.7% | 1 | 0.7% | 1 | 0.3% | 3 | 1.5% | 0 | 0.0% |
| Recommendation Not to Seek Death Penalty (DP) | 494 | 72.4% | 85 | 63.4% | 242 | 74.7% | 153 | 78.5% | 14 | 48.3% |
| Recommendation to Seek DP | 183 | 26.8% | 48 | 35.8% | 81 | 25.0% | 39 | 20.0% | 15 | 51.7% |
| CONSIDERED BY REVIEW COMMITTEE | 618 | 90.6% | 119 | 88.8% | 301 | 92.9% | 172 | 88.2% | 26 | 89.7% |
| No Recommendation | 15 | 2.2% | 4 | 3.0% | 6 | 1.9% | 4 | 2.1% | 1 | 3.4% |
| Recommendation Not to Seek DP | 420 | 61.6% | 68 | 50.7% | 215 | 66.4% | 125 | 64.1% | 12 | 41.4% |
| Recommendation to Seek DP | 183 | 26.8% | 47 | 35.1% | 80 | 24.7% | 43 | 22.1% | 13 | 44.8% |
| CONSIDERED BY ATTORNEY GENERAL (AG) | 588 | 86.2% | 115 | 85.8% | 287 | 88.6% | 160 | 82.1% | 26 | 89.7% |
| Decision Deferred or Pending | 12 | 1.8% | 3 | 2.2% | 4 | 1.2% | 4 | 2.1% | 1 | 3.4% |
| Authorization Not to Seek DP | 417 | 61.1% | 68 | 50.7% | 212 | 65.4% | 124 | 63.6% | 13 | 44.8% |
| Authorization to Seek DP | 159 | 23.3% | 44 | 32.8% | 71 | 21.9% | 32 | 16.4% | 12 | 41.4% |
| AUTHORIZED BY AG TO SEEK DP | 159 | 23.3% | 44 | 32.8% | 71 | 21.9% | 32 | 16.4% | 12 | 41.4% |
| DP Notice Withdrawn – Plea Agreement | 51 | 7.5% | 21 | 15.7% | 18 | 5.6% | 9 | 4.6% | 3 | 10.3% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 1.6% | 1 | 0.7% | 3 | 0.9% | 5 | 2.6% | 2 | 6.9% |
| DP Notice Dismissed or Trial Terminated | 4 | 0.6% | 0 | 0.0% | 1 | 0.3% | 3 | 1.5% | 0 | 0.0% |
| Pending Trial or Completion of Trial | 51 | 7.5% | 11 | 8.2% | 23 | 7.1% | 13 | 6.7% | 4 | 13.8% |
| Not Convicted of Capital Charge | 1 | 0.1% | 0 | 0.0% | 1 | 0.3% | 0 | 0.0% | 0 | 0.0% |
| Convicted of Capital Charge | 41 | 6.0% | 11 | 8.2% | 25 | 7.7% | 2 | 1.0% | 3 | 10.3% |
| CONVICTED OF CAPITAL CHARGE | 41 | 6.0% | 11 | 8.2% | 25 | 7.7% | 2 | 1.0% | 3 | 10.3% |
| Jury Verdict – DP Not Recommended | 21 | 3.1% | 7 | 5.2% | 12 | 3.7% | 0 | 0.0% | 2 | 6.9% |
| Jury Verdict – DP Recommended | 20 | 2.9% | 4 | 3.0% | 13 | 4.0% | 2 | 1.0% | 1 | 3.4% |
| SENTENCED TO DEATH | 20 | 2.9% | 4 | 3.0% | 13 | 4.0% | 2 | 1.0% | 1 | 3.4% |
| DP Recommended by Jury But Not Yet Imposed | 2 | 0.3% | 0 | 0.0% | 0 | 0.0% | 2 | 1.0% | 0 | 0.0% |
| DP Vacated by Court, Further Action Pending | 4 | 0.6% | 1 | 0.7% | 3 | 0.9% | 0 | 0.0% | 0 | 0.0% |
| DEATH SENTENCE PENDING | 14 | 2.1% | 3 | 2.2% | 10 | 3.1% | 0 | 0.0% | 1 | 3.4% |

T-6

TABLE 3B
DECISION-MAKING RATES ACROSS ALL STAGES
OF THE FEDERAL DEATH PENALTY PROCESS
(1988-1994)

| STAGE | TOTAL | | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| SUBMITTED BY U.S. ATTORNEYS | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| Recommendation to Seek Death Penalty (DP) | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| CONSIDERED BY ATTORNEY GENERAL (AG) | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| Decision Deferred or Pending | 1 | 1.9% | 0 | 0.0% | 1 | 2.6% | 0 | 0.0% | 0 | 0.0% |
| Authorization Not to Seek DP | 4 | 7.7% | 0 | 0.0% | 4 | 10.3% | 0 | 0.0% | 0 | 0.0% |
| Authorization to Seek DP | 47 | 90.4% | 7 | 100.0% | 34 | 87.2% | 5 | 100.0% | 1 | 100.0% |
| AUTHORIZED BY AG TO SEEK DP | 47 | 90.4% | 7 | 100.0% | 34 | 87.2% | 5 | 100.0% | 1 | 100.0% |
| DP Notice Withdrawn – Plea Agreement | 14 | 26.9% | 3 | 42.9% | 10 | 25.6% | 1 | 20.0% | 0 | 0.0% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 21.2% | 1 | 14.3% | 10 | 25.6% | 0 | 0.0% | 0 | 0.0% |
| DP Notice Dismissed or Trial Terminated | 2 | 3.8% | 0 | 0.0% | 2 | 5.1% | 0 | 0.0% | 0 | 0.0% |
| Pending Trial or Completion of Trial | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not Convicted of Capital Charge | 4 | 7.7% | 0 | 0.0% | 4 | 10.3% | 0 | 0.0% | 0 | 0.0% |
| Convicted of Capital Charge | 16 | 30.8% | 3 | 42.9% | 8 | 20.5% | 4 | 80.0% | 1 | 100.0% |
| CONVICTED OF CAPITAL CHARGE | 16 | 30.8% | 3 | 42.9% | 8 | 20.5% | 4 | 80.0% | 1 | 100.0% |
| Jury Verdict – DP Not Recommended | 10 | 19.2% | 1 | 14.3% | 5 | 12.8% | 3 | 60.0% | 1 | 100.0% |
| Jury Verdict – DP Recommended | 6 | 11.5% | 2 | 28.6% | 3 | 7.7% | 1 | 20.0% | 0 | 0.0% |
| SENTENCED TO DEATH | 6 | 11.5% | 2 | 28.6% | 3 | 7.7% | 1 | 20.0% | 0 | 0.0% |
| DP Recommended by Jury But Not Yet Imposed | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| DP Vacated by Court, Re-sentenced to Life In Prison | 1 | 1.9% | 1 | 14.3% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| DEATH SENTENCE PENDING | 5 | 9.6% | 1 | 14.2% | 3 | 7.7% | 1 | 20.0% | 0 | 0.0% |

# TABLE SET II:  THE UNITED STATES ATTORNEYS

INTRODUCTION

The tables in this set generally provide information about the submissions and recommendations made by United States Attorneys.  In each instance, the total number of submissions is reported for each district, along with a racial/ethnic breakdown of those totals.  In addition, for the post-protocol period only, each of the tables in this set reports for each district the total number of recommendations for and against seeking the death penalty, respectively, again with a racial/ethnic analysis of those totals.  Information regarding recommendations is not separately reported in the tables addressing the pre-protocol period because at that time, United States Attorneys were only required to make submissions when they recommended seeking the death penalty.

For a variety of reasons, such as the fact that the defendant was a fugitive, the United States Attorneys occasionally submitted defendants for review but did not make a recommendation as to whether the death penalty should be sought.  Again, because United States Attorneys were only required to submit defendants for review in the pre-protocol period if they affirmatively recommended seeking the death penalty, such instances of submission without a recommendation occurred only during the post-protocol period.  Specifically, five defendants were submitted without recommendations:  one Black defendant from the District of Columbia, one White defendant from the District of Nevada, and three Hispanic defendants from the District of Puerto Rico.  As a result, in the tables that report total submissions as well as a breakdown of recommendations, the figures in the "Total" columns do not always represent the sum of the corresponding figures in the two recommendation columns.

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-3   Page 77 of 110

A.   DEFENDANTS: EXPLANATORY NOTES FOR TABLE SET II.A

Table 4 lists the locations of the United States Attorneys Offices that are the subjects of the statistics in this Survey.

Tables 5A and 5B report, on a district-by-district basis and with a racial/ethnic breakdown, information about the submissions made by United States Attorneys, as well as their recommendations about whether to seek the death penalty. Specifically, Table 5A reports on the 682 defendants submitted in the post-protocol period with a mix of recommendations for and against seeking the death penalty; and Table 5B provides information about the 52 defendants submitted in the pre-protocol period, all with recommendations to seek the death penalty.

Because United States Attorneys did not submit defendants for review in the pre-protocol period unless they recommended seeking the death penalty, there is no need to break down the total submissions reported in Table 5B by recommendation. For that reason, the recommendation columns in Table 5A are omitted in Table 5B.

T-9

| DISTRICT | LOCATION |
| --- | --- |
| Alabama, Middle | Montgomery |
| Alabama, Northern | Birmingham |
| Alabama, Southern | Mobile |
| Alaska | Anchorage |
| Arizona | Phoenix |
| Arkansas, Eastern | Little Rock |
| Arkansas, Western | Fort Smith |
| California, Central | Los Angeles |
| California, Eastern | Sacramento |
| California, Northern | San Francisco |
| California, Southern | San Diego |
| Colorado | Denver |
| Connecticut | New Haven |
| Delaware | Wilmington |
| District of Columbia | Washington |
| Florida, Middle | Tampa |
| Florida, Northern | Tallahassee |
| Florida, Southern | Miami |
| Georgia, Middle | Macon |
| Georgia, Northern | Atlanta |
| Georgia, Southern | Savannah |
| Guam | Agana |
| Hawaii | Honolulu |
| Idaho | Boise |

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-3   Page 78 of 110

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-3   Page 79 of 110

| DISTRICT | LOCATION |
| --- | --- |
| Illinois, Central | Springfield |
| Illinois, Northern | Chicago |
| Illinois, Southern | Fairview Heights |
| Indiana, Northern | Dyer |
| Indiana, Southern | Indianapolis |
| Iowa, Northern | Cedar Rapids |
| Iowa, Southern | Des Moines |
| Kansas | Wichita |
| Kentucky, Eastern | Lexington |
| Kentucky, Western | Louisville |
| Louisiana, Eastern | New Orleans |
| Louisiana, Middle | Baton Rouge |
| Louisiana, Western | Shreveport |
| Maine | Portland |
| Maryland | Baltimore |
| Massachusetts | Boston |
| Michigan, Eastern | Detroit |
| Michigan, Western | Grand Rapids |
| Minnesota | Minneapolis |
| Mississippi, Northern | Oxford |
| Mississippi, Southern | Jackson |
| Missouri, Eastern | St. Louis |
| Missouri, Western | Kansas City |
| Montana | Billings |
| Nebraska | Omaha |
| Nevada | Las Vegas |

4:02-cr-00992-JFA    Date Filed 06/01/11    Entry Number 1394-3    Page 80 of 110

| DISTRICT | LOCATION |
| --- | --- |
| New Hampshire | Concord |
| New Jersey | Newark |
| New Mexico | Albuquerque |
| New York, Eastern | New York City (Brooklyn) |
| New York, Northern | Syracuse |
| New York, Southern | New York City (Manhattan) |
| New York, Western | Buffalo |
| North Carolina, Eastern | Raleigh |
| North Carolina, Middle | Greensboro |
| North Carolina, Western | Charlotte |
| North Dakota | Fargo |
| Northern Mariana Islands | Saipan |
| Ohio, Northern | Cleveland |
| Ohio, Southern | Columbus |
| Oklahoma, Eastern | Muskogee |
| Oklahoma, Northern | Tulsa |
| Oklahoma, Western | Oklahoma City |
| Oregon | Portland |
| Pennsylvania, Eastern | Philadelphia |
| Pennsylvania, Middle | Scranton |
| Pennsylvania, Western | Pittsburgh |
| Puerto Rico | San Juan |
| Rhode Island | Providence |
| South Carolina | Columbia |
| South Dakota | Sioux Falls |
| Tennessee, Eastern | Knoxville |

4:02-cr-00992-JFA    Date Filed 06/01/11    Entry Number 1394-3    Page 81 of 110

| DISTRICT | LOCATION |
| --- | --- |
| Tennessee, Middle | Nashville |
| Tennessee, Western | Memphis |
| Texas, Eastern | Beaumont |
| Texas, Northern | Dallas |
| Texas, Southern | Houston |
| Texas, Western | San Antonio |
| Utah | Salt Lake City |
| Vermont | Burlington |
| Virgin Islands | St. Thomas |
| Virginia, Eastern | Alexandria |
| Virginia, Western | Roanoke |
| Washington, Eastern | Spokane |
| Washington, Western | Seattle |
| West Virginia, Northern | Wheeling |
| West Virginia, Southern | Charleston |
| Wisconsin, Eastern | Milwaukee |
| Wisconsin, Western | Madison |
| Wyoming | Cheyenne |

## TABLE 5A:  U.S. ATTORNEY RECOMMENDATIONS
BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT  (1995-2000)

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Arizona | 12 | 1 | 3 | 6 | 2 | 1 | 0 | 0 | 0 | 1 | 11 | 1 | 3 | 6 | 1 |
| Arkansas, Eastern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 15 | 3 | 4 | 6 | 2 | 3 | 1 | 1 | 1 | 0 | 12 | 2 | 3 | 5 | 2 |
| California, Eastern | 10 | 7 | 2 | 0 | 1 | 4 | 2 | 1 | 0 | 1 | 6 | 5 | 1 | 0 | 0 |
| California, Northern | 4 | 3 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 3 | 3 | 0 | 0 | 0 |
| California, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Colorado | 6 | 5 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 5 | 0 | 0 | 1 |
| Connecticut | 11 | 0 | 2 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 2 | 9 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 21 | 1 | 20 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 19 | 1 | 18 | 0 | 0 |
| Florida, Middle | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 5 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 2 | 3 | 0 | 0 |
| Florida, Southern | 9 | 0 | 6 | 3 | 0 | 1 | 0 | 1 | 0 | 0 | 8 | 0 | 5 | 3 | 0 |
| Georgia, Middle | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| Georgia, Northern | 5 | 1 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Georgia, Southern | 5 | 0 | 3 | 2 | 0 | 4 | 0 | 3 | 1 | 0 | 1 | 0 | 0 | 1 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 6 | 1 | 0 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 5 | 1 | 0 | 2 | 2 |

T-14

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 7 | 0 | 2 | 5 | 0 | 2 | 0 | 2 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 4 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 4 | 1 | 0 | 3 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 1 | 0 | 1 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Kansas | 12 | 2 | 8 | 0 | 2 | 3 | 1 | 0 | 0 | 2 | 9 | 1 | 8 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 6 | 3 | 1 | 0 | 2 | 5 | 2 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 0 |
| Louisiana, Eastern | 7 | 0 | 6 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 4 | 0 | 4 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 41 | 4 | 36 | 0 | 1 | 6 | 0 | 5 | 0 | 1 | 35 | 4 | 31 | 0 | 0 |
| Massachusetts | 13 | 3 | 9 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 12 | 2 | 9 | 1 | 0 |
| Michigan, Eastern | 17 | 0 | 14 | 3 | 0 | 4 | 0 | 3 | 1 | 0 | 13 | 0 | 11 | 2 | 0 |
| Michigan, Western | 10 | 4 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 4 | 2 | 4 | 0 |
| Minnesota | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 7 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 5 | 0 | 4 | 0 | 1 | 5 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 8 | 3 | 2 | 3 | 0 | 8 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 9 | 7 | 0 | 0 | 2 | 4 | 4 | 0 | 0 | 0 | 4 | 2 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 4 | 2 | 1 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 0 | 1 | 0 |
| New Mexico | 11 | 2 | 0 | 8 | 1 | 6 | 2 | 0 | 4 | 0 | 5 | 0 | 0 | 4 | 1 |
| New York, Eastern | 58 | 19 | 20 | 12 | 7 | 6 | 1 | 1 | 0 | 4 | 52 | 18 | 19 | 12 | 3 |
| New York, Northern | 6 | 0 | 5 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| New York, Southern | 50 | 4 | 17 | 28 | 1 | 6 | 1 | 5 | 0 | 0 | 44 | 3 | 12 | 28 | 1 |
| New York, Western | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| North Carolina, Eastern | 10 | 2 | 8 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 7 | 0 | 7 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 5 | 1 | 3 | 0 | 1 | 3 | 1 | 1 | 0 | 1 | 2 | 0 | 2 | 0 | 0 |
| North Dakota | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 3 | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 6 | 0 | 3 | 3 | 0 | 4 | 0 | 1 | 3 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 4 | 2 | 0 | 2 | 0 | 3 | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 72 | 0 | 0 | 72 | 0 | 14 | 0 | 0 | 14 | 0 | 55 | 0 | 0 | 55 | 0 |
| Rhode Island | 5 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 4 | 1 | 0 |
| South Carolina | 7 | 1 | 5 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 6 | 0 | 5 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 6 | 3 | 3 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Tennessee, Western | 11 | 1 | 10 | 0 | 0 | 6 | 1 | 5 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Texas, Eastern | 5 | 0 | 5 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 10 | 4 | 4 | 2 | 0 | 6 | 1 | 3 | 2 | 0 | 4 | 3 | 1 | 0 | 0 |
| Texas, Southern | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Texas, Western | 8 | 3 | 3 | 2 | 0 | 4 | 1 | 2 | 1 | 0 | 4 | 2 | 1 | 1 | 0 |
| Utah | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Virgin Islands | 5 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 4 | 1 | 0 |
| Virginia, Eastern | 66 | 5 | 59 | 2 | 0 | 21 | 0 | 20 | 1 | 0 | 45 | 5 | 39 | 1 | 0 |
| Virginia, Western | 6 | 2 | 4 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 11 | 5 | 5 | 1 | 0 | 3 | 3 | 0 | 0 | 0 | 8 | 2 | 5 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 682 | 134 | 324 | 195 | 29 | 183 | 48 | 81 | 39 | 15 | 494 | 85 | 242 | 153 | 14 |

T-17

TABLE 5B:  U.S. ATTORNEY RECOMMENDATIONS
BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1988-1994)

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 5 | 0 | 5 | 0 | 0 |
| Florida, Middle | 1 | 0 | 1 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 3 | 0 | 3 | 0 | 0 |
| Georgia, Middle | | 0 | 4 | 0 | 0 |
| Georgia, Northern | 1 | 0 | 1 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 |

T-18

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 2 | 0 | 2 | 0 | 0 |
| Illinois, Northern | 2 | 0 | 1 | 0 | 1 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 2 | 0 | 2 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 6 | 0 | 6 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 3 | 3 | 0 | 0 | 0 |

T-19

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 1 | 1 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 1 | 0 | 1 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 3 | 2 | 0 | 1 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 3 | 0 | 3 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 |

T-20

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 0 | 3 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 1 | 0 | 0 | 1 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 9 | 0 | 9 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 52 | 7 | 39 | 5 | 1 |

T-21

B.    OFFENSES: EXPLANATORY NOTES FOR TABLE SET II.B

Table Set II.B examines charging practices. As explained in the text of the Survey, when the modern use of the federal death penalty began in 1988, the only offenses subject to capital punishment were narcotics-related offenses under the DKA, and therefore all 52 submissions in the pre-protocol period were in cases where the defendant was charged with committing such offenses. With the enactment of the FDPA in 1994, prosecutors were authorized to seek the death penalty for a variety of offenses. Table 6 lists all of the federal offenses currently punishable by death.

Table 7 reports the extent to which each federal offense punishable by death has been charged against the 682 defendants reviewed in the post-protocol period, providing information about the total number of cases under each statute as well as the United States Attorneys' recommendations for and against seeking the death penalty. The information in Table 7 is reported on a statute-by-statute basis, and does not contain information about particular districts.

Tables 8-1, and 8-2 provide offense-related information about each district. Specifically, Table 8-1 reports on the subset of those cases in which United States Attorneys recommended seeking the death penalty, and Table 8-2 reports on the subset of the overall cases in which United States Attorneys recommended that the death penalty not be sought.

In any given case, the defendant's conduct can violate more than one federal statute that is subject to capital punishment, and many defendants have been charged with more than one capital offense in a single indictment. As a result, the total number of offenses reported in Table Set B.2 exceeds the total number of defendants charged with capital offenses in the post-protocol period.

The fact that defendants can be charged with multiple offenses in a single case also means that the method of counting can affect the statistics. In compiling Table Set II.B, multiple counts in an indictment charging the same statutory violation against the same defendant were counted only once, but different statutory violations charged against the same defendant in a single indictment were counted separately. Thus, for example, assume that in District A, there were capital charges against two defendants: one White defendant charged with five different murders, all in violation of the same statute, and one Black defendant charged with five different statutory offenses punishable by death. The report for that district would show that one offense was charged against White defendants and five offenses were charged against Black defendants. To help account for the effects of this methodology, each entry for a specific district in Tables 8-1, and 8-2 also report the total number of defendants charged in that district.

Table 6 provides information about the 59 sections of the United States Code that define criminal offenses punishable by death, with part 1 of the table listing offenses defined under Title 18 of the United States Code and part 2 listing offense defined under other titles of the United States Code. The description accompanying each citation is drawn from the name of the section as set forth in the United States Code, with additional parenthetical information added where appropriate. With one exception, the procedures set forth in the FDPA, 18 U.S.C. §§ 3591 to 3598, apply to capital prosecutions arising under all of the statutes listed below. The exception is that capital prosecutions arising under 21 U.S.C. § 848(e) (continuing criminal enterprise) are subject to the similar but not identical procedures of the DKA, as set forth in 21 U.S.C. § 848(g)-(r).

All but three of the statutes listed below provide for imposition of the death penalty only for offenses resulting in death. Under the terms of 18 U.S.C. §§ 794 (espionage), 2381 (treason), and 3591 (providing for imposition of the death penalty for violations of 21 U.S.C. § 848(c) involving trafficking in large quantities of narcotics by continuing criminal enterprise; or attempting, authorizing or advising the killing of any officer, juror or witness by a continuing criminal enterprise), the government need not prove that the offense resulted in death in order for capital punishment to be available. The federal government has not sought the death penalty for any offense not resulting in death since the reintroduction of the capital punishment into the federal criminal justice system in 1988.

Offenses under 18 U.S.C. §§ 32 and 33 (Nos. 4 and 5) are eligible for capital punishment by virtue of 18 U.S.C. § 34, which does not itself define a criminal offense, but instead provides that the death penalty may be imposed as punishment for any offense under Chapter 2 of Title 18 (aircraft and motor vehicles) that results in the death of any person. Likewise, offenses under 18 U.S.C. § 2241 (No. 39) are eligible for capital punishment by virtue of 18 U.S.C. § 2245, which does not itself define a criminal offense, but instead provides that the death penalty may be imposed as punishment for any offense under Chapter 109A of Title 18 (sexual abuse) that results in the death of any person.

Some offenses under 21 U.S.C. § 848 (No. 55) are eligible for capital punishment by virtue of 18 U.S.C. § 3591, which does not itself define a criminal offense, but instead provides that the death penalty may be imposed in certain circumstances as punishment for certain violations of 21 U.S.C. § 848(c). When the DKA was enacted in 1988, it provided for imposition of the death penalty for certain specified offenses, codified at 21 U.S.C. § 848(e). The FDPA added a provision, codified at 18 U.S.C. § 3591(b), that a defendant found guilty of engaging in a continuing criminal enterprise (as defined in 21 U.S.C. § 848(c)) could be sentenced to death if (1) the offense involved specified amounts of narcotics, or (2) the defendant was a leader of the enterprise and sought to obstruct an investigation or prosecution by attempting to kill an officer, juror or witness (or a member of any such person's family).

1. OFFENSES UNDER TITLE 18 OF THE UNITED STATES CODE

| No. | Citation | Description |
|---|---|---|
| 1 | 18 U.S.C. § 32 | Destruction of aircraft or aircraft facilities |
| 2 | 18 U.S.C. § 33 | Destruction of motor vehicles or motor vehicle facilities |
| 3 | 18 U.S.C. § 36 | Drive-by shooting |
| 4 | 18 U.S.C. § 37 | Violence at international airports |
| 5 | 18 U.S.C. § 115 | Influencing, impeding, or retaliating against a Federal official by murdering a family member |
| 6 | 18 U.S.C. § 229A | Penalties (crimes relating to chemical weapons) |
| 7 | 18 U.S.C. § 241 | Conspiracy against rights |
| 8 | 18 U.S.C. § 242 | Deprivation of rights under color of law |
| 9 | 18 U.S.C. § 245 | Federally protected activities |
| 10 | 18 U.S.C. § 247 | Damage to religious property; obstruction of the free exercise of religious rights |
| 11 | 18 U.S.C. § 351 | Congressional, Cabinet, and Supreme Court assassination |
| 12 | 18 U.S.C. § 794 | Gathering or delivering defense information to aid foreign government |
| 13 | 18 U.S.C. § 844 | Explosive materials |
| 14 | 18 U.S.C. § 924 | Firearms |
| 15 | 18 U.S.C. § 930 | Possession of firearms and dangerous weapons in Federal facilities |
| 16 | 18 U.S.C. § 1091 | Genocide |
| 17 | 18 U.S.C. § 1111 | Murder |
| 18 | 18 U.S.C. § 1114 | Protection of officers and employees of the United States |
| 19 | 18 U.S.C. § 1116 | Murder of foreign officials, official guests, or internationally protected persons |

T-24

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-3   Page 92 of 110

| No. | Citation | Description |
|---|---|---|
| 20 | 18 U.S.C. § 1118 | Murder by a Federal prisoner |
| 21 | 18 U.S.C. § 1119 | Foreign murder of United States nationals |
| 22 | 18 U.S.C. § 1120 | Murder by escaped prisoners |
| 23 | 18 U.S.C. § 1121 | Killing persons aiding Federal investigations or State correctional officers |
| 24 | 18 U.S.C. § 1201 | Kidnapping |
| 25 | 18 U.S.C. § 1203 | Hostage taking |
| 26 | 18 U.S.C. § 1503 | Influencing or injuring officer or juror generally |
| 27 | 18 U.S.C. § 1512 | Tampering with a witness, victim, or an informant |
| 28 | 18 U.S.C. § 1513 | Retaliating against a witness, victim, or an informant |
| 29 | 18 U.S.C. § 1716 | Injurious articles as nonmailable |
| 30 | 18 U.S.C. § 1751 | Presidential and Presidential staff assassination |
| 31 | 18 U.S.C. § 1958 | Use of interstate commerce facilities in the commission of murder-for-hire |
| 32 | 18 U.S.C. § 1959 | Violent crimes in aid of racketeering activity |
| 33 | 18 U.S.C. § 1992 | Wrecking trains |
| 34 | 18 U.S.C. § 2113 | Bank robbery and incidental crimes |
| 35 | 18 U.S.C. § 2119 | Motor vehicles (carjacking) |
| 36 | 18 U.S.C. § 2241 | Aggravated sexual abuse |
| 37 | 18 U.S.C. § 2242 | Sexual abuse |
| 38 | 18 U.S.C. § 2243 | Sexual abuse of a minor or ward |
| 39 | 18 U.S.C. § 2244 | Abusive sexual contact |
| 40 | 18 U.S.C. § 2251 | Sexual exploitation of children |

| No. | Citation | Description |
|-----|----------|-------------|
| 41 | 18 U.S.C. § 2280 | Violence against maritime navigation |
| 42 | 18 U.S.C. § 2281 | Violence against maritime fixed platforms |
| 43 | 18 U.S.C. § 2332 | Terrorism |
| 44 | 18 U.S.C. § 2332a | Use of weapons of mass destruction |
| 45 | 18 U.S.C. § 2332b | Acts of terrorism transcending national boundaries |
| 46 | 18 U.S.C. § 2332c | Use of chemical weapons |
| 47 | 18 U.S.C. § 2340A | Torture |
| 48 | 18 U.S.C. § 2381 | Treason |
| 49 | 18 U.S.C. § 2441 | War crimes |

| No. | Citation | Description |
|---|---|---|
| 50 | 7 U.S.C. § 2146 | Administration and enforcement by Secretary (murder of officials enforcing laws relating to transportation, sale, and handling of certain animals) |
| 51 | 8 U.S.C. § 1324 | Bringing in and harboring certain aliens |
| 52 | 15 U.S.C. § 1825 | Violations and penalties (murder of officials enforcing laws relating to the protection of horses) |
| 53 | 21 U.S.C. § 461 | Violations and penalties (murder of officials enforcing laws relating to poultry inspection) |
| 54 | 21 U.S.C. § 675 | Violations and penalties (murder of officials enforcing laws relating to meat inspection) |
| 55 | 21 U.S.C. § 848 | Continuing criminal enterprise |
| 56 | 21 U.S.C. § 1041 | Violations and penalties (murder of officials enforcing laws relating to inspection of egg products) |
| 57 | 42 U.S.C. § 2283 | Protection of nuclear inspectors |
| 58 | 49 U.S.C. § 46502 | Aircraft piracy |
| 59 | 49 U.S.C. § 46502 | Application of certain criminal laws to acts on aircraft |

## TABLE 7
## U.S. ATTORNEY RECOMMENDATIONS
## BY CAPITAL OFFENSE AND RACE/ETHNICITY OF DEFENDANT
### (1995-2000)

| CAPITAL OFFENSE | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| 8 U.S.C. 1324(a) | 23 | 3 | 2 | 16 | 2 | 0 | 0 | 0 | 0 | 0 | 23 | 3 | 2 | 16 | 2 |
| 18 U.S.C. 32 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 33 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 36 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| 18 U.S.C. 37 | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 241 | 6 | 2 | 3 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 2 | 1 | 1 | 0 |
| 18 U.S.C. 242 | 9 | 2 | 6 | 1 | 0 | 5 | 0 | 5 | 0 | 0 | 4 | 2 | 1 | 1 | 0 |
| 18 U.S.C. 245(b) | 6 | 4 | 0 | 2 | 0 | 4 | 2 | 0 | 2 | 0 | 2 | 2 | 0 | 0 | 0 |
| 18 U.S.C. 247(d)(1) | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 794 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 0 |
| 18 U.S.C. 844(d) | 4 | 4 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| 18 U.S.C. 844(f) | 5 | 4 | 1 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 844(i) | 20 | 14 | 2 | 1 | 3 | 10 | 6 | 1 | 0 | 3 | 10 | 8 | 1 | 1 | 0 |
| 18 U.S.C. 924(j) | 186 | 22 | 105 | 53 | 6 | 64 | 11 | 29 | 19 | 5 | 122 | 11 | 76 | 34 | 1 |
| 18 U.S.C. 930(c) | 6 | 4 | 2 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 |
| 18 U.S.C. 1111 | 60 | 28 | 27 | 0 | 5 | 15 | 8 | 6 | 0 | 1 | 45 | 20 | 21 | 0 | 4 |
| 18 U.S.C. 1114 | 19 | 8 | 5 | 3 | 3 | 8 | 4 | 2 | 0 | 2 | 11 | 4 | 3 | 3 | 1 |
| 18 U.S.C. 1116(a) | 3 | 2 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 1118 | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 1121(a) | 5 | 0 | 5 | 0 | 0 | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 1201(a) | 35 | 5 | 16 | 13 | 1 | 13 | 3 | 7 | 2 | 1 | 22 | 2 | 9 | 11 | 0 |

T-28

| CAPITAL OFFENSE | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| 18 U.S.C. 1203(a) | 15 | 0 | 0 | 10 | 5 | 3 | 0 | 0 | 0 | 3 | 12 | 0 | 0 | 10 | 2 |
| 18 U.S.C. 1512(a) | 57 | 11 | 32 | 12 | 2 | 22 | 5 | 12 | 4 | 1 | 35 | 6 | 20 | 8 | 1 |
| 18 U.S.C. 1513(a) | 22 | 3 | 10 | 8 | 1 | 7 | 1 | 2 | 4 | 0 | 15 | 2 | 8 | 4 | 1 |
| 18 U.S.C. 1716 | 3 | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 1958(a) | 34 | 13 | 8 | 11 | 2 | 20 | 10 | 2 | 8 | 0 | 14 | 3 | 6 | 3 | 2 |
| 18 U.S.C. 1959(a) | 153 | 20 | 70 | 60 | 3 | 29 | 7 | 9 | 12 | 1 | 123 | 12 | 61 | 48 | 2 |
| 18 U.S.C. 2113(e) | 22 | 0 | 11 | 11 | 0 | 11 | 0 | 10 | 1 | 0 | 11 | 0 | 1 | 10 | 0 |
| 18 U.S.C. 2119(3) | 71 | 3 | 32 | 34 | 2 | 20 | 1 | 12 | 6 | 1 | 50 | 2 | 19 | 28 | 1 |
| 18 U.S.C. 2241(a) | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 2241(c) | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 2332a | 5 | 4 | 1 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 21 U.S.C. 848(c) | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| 21 U.S.C. 848(e)(1)(A) | 130 | 18 | 85 | 27 | 0 | 32 | 7 | 20 | 5 | 0 | 95 | 11 | 65 | 19 | 0 |
| 21 U.S.C. 848(e)(1)(B) | 7 | 0 | 2 | 5 | 0 | 2 | 0 | 0 | 2 | 0 | 5 | 0 | 2 | 3 | 0 |
| 49 U.S.C. 46502 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| TOTAL | 926 | 191 | 432 | 268 | 35 | 296 | 83 | 130 | 65 | 18 | 625 | 107 | 301 | 200 | 17 |

TABLE 8-1
CAPITAL OFFENSES
U.S. ATTORNEY RECOMMENDATIONS TO SEEK THE DEATH PENALTY
BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
(January 1, 1995 - July 20, 2000)

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Alabama, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Alabama, Northern | 21 U.S.C. 848(e)(1)(A) | 2 | | | | 2 |
| 2 of 2 defendants | total | 2 | | | | 2 |
| Alabama, Southern | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| 2 of 2 defendants | 18 U.S.C. 1513(a) | | 2 | | | 2 |
| | total | | 4 | | | 4 |
| Alaska | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Arizona | 18 U.S.C. 1111 | | | | 1 | 1 |
| 1 of 12 defendants | 18 U.S.C. 1114 | | | | 1 | 1 |
| | total | | | | 2 | 2 |
| Arkansas, Eastern | 18 U.S.C. 924(j) | 2 | 1 | | | 3 |
| 3 of 3 defendants | 18 U.S.C. 1959(a) | 2 | | | | 2 |
| | total | 4 | 1 | | | 5 |
| Arkansas, Western | 18 U.S.C. 924(j) | 2 | | | | 2 |
| 3 of 3 defendants | 18 U.S.C. 1111 | 2 | | | | 2 |
| | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | total | 5 | | | | 5 |

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| California, Central<br>3 of 15 defendants | 18 U.S.C. 245(b) | 1 | | | | 1 |
| | 18 U.S.C. 924(j) | 1 | | 1 | | 2 |
| | 18 U.S.C. 1111 | | 1 | | | 1 |
| | 18 U.S.C. 1114 | 1 | 1 | | | 2 |
| | 18 U.S.C. 1959(a) | | | 1 | | 1 |
| | total | 3 | 2 | 2 | | 7 |
| California, Eastern<br>4 of 10 defendants | 18 U.S.C. 844(d) | 1 | | | | 1 |
| | 18 U.S.C. 844(i) | | | | 1 | 1 |
| | 18 U.S.C. 924(j) | | 1 | | | 1 |
| | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | 18 U.S.C. 1716 | 1 | | | | 1 |
| | 18 U.S.C. 2241(a) | 1 | | | | 1 |
| | total | 5 | 1 | | 1 | 7 |
| California, Northern<br>1 of 4 defendants | 18 U.S.C. 924(j) | | | | 1 | 1 |
| | 18 U.S.C. 1512(a) | | | | 1 | 1 |
| | total | | | | 2 | 2 |
| California, Southern<br>0 of 2 defendants | n/a | | | | | 0 |
| | total | | | | | 0 |
| Colorado<br>0 of 6 defendants | n/a | | | | | 0 |
| | total | | | | | 0 |
| Connecticut<br>0 of 11 defendants | n/a | | | | | 0 |
| | total | | | | | 0 |

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Delaware | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| District of Columbia | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| 1 of 21 defendants | total | | 1 | | | 1 |
| Florida, Middle | 18 U.S.C. 924(j) | | | 3 | | 3 |
| 3 of 3 defendants | 18 U.S.C. 1959(a) | | | 3 | | 3 |
| | total | | | 6 | | 6 |
| Florida, Northern | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |
| Florida, Southern | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| 1 of 9 defendants | total | | 1 | | | 1 |
| Georgia, Middle | n/a | | | | | 0 |
| 0 of 4 defendants | total | | | | | 0 |
| Georgia, Northern | 18 U.S.C. 1118 | | 1 | | | 1 |
| 1 of 5 defendants | total | | 1 | | | 1 |
| Georgia, Southern | 18 U.S.C. 924(j) | | 3 | 1 | | 4 |
| 4 of 5 defendants | 18 U.S.C. 1121(a) | | 3 | | | 3 |
| | 18 U.S.C. 1512(a) | | 3 | | | 3 |
| | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | total | | 9 | 2 | | 11 |
| Guam | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Hawaii | 18 U.S.C. 924(j) | | | | 1 | 1 |
| 1 of 6 defendants | total | | | | 1 | 1 |
| Idaho | n/a | | | | | 0 |

T-32

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Central | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Northern | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 2 of 7 defendants | 18 U.S.C. 1121(a) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | | 5 | | | 5 |
| Illinois, Southern | 18 U.S.C. 37 | 2 | 1 | | | 3 |
| 3 of 3 defendants | 18 U.S.C. 924(j) | 2 | 1 | | | 3 |
| | 18 U.S.C. 1958(a) | 2 | 1 | | | 3 |
| | total | 6 | 3 | | | 9 |
| Indiana, Northern | n/a | | | | | 0 |
| 0 of 4 defendants | total | | | | | 0 |
| Indiana, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Iowa, Northern | 18 U.S.C. 924(j) | | | 2 | | 2 |
| 2 of 4 defendants | 18 U.S.C. 1201(a) | | | 2 | | 2 |
| | total | | | 4 | | 4 |
| Iowa, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Kansas | 18 U.S.C. 924(j) | | | | 2 | 2 |
| 3 of 12 defendants | 18 U.S.C. 930(c) | 1 | | | | 1 |

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Kansas | 18 U.S.C. 1111 | 1 | | | | 1 |
| 3 of 12 defendants (cont'd) | total | 2 | | | 2 | 4 |
| Kentucky, Eastern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Kentucky, Western | 18 U.S.C. 844(i) | | 1 | | 2 | 3 |
| 5 of 6 defendants | 18 U.S.C. 1958(a) | 2 | | | | 2 |
| | total | 2 | 1 | | 2 | 5 |
| Louisiana, Eastern | 18 U.S.C. 241 | | 2 | | | 2 |
| 3 of 7 defendants | 18 U.S.C. 242 | | 2 | | | 2 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | | 1 | | 1 |
| | total | | 6 | 1 | | 7 |
| Louisiana, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Louisiana, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Maine | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Maryland | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 6 of 41 defendants | 18 U.S.C. 1111 | | 2 | | | 2 |
| | 18 U.S.C. 1959(a) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | | | 1 | 1 |
| | total | | 5 | | 1 | 6 |

T-34

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Massachusetts | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 13 defendants | total | 1 | | | | 1 |
| Michigan, Eastern | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 4 of 17 defendants | 18 U.S.C. 1959(a) | | | 1 | | 1 |
| | 18 U.S.C. 2113(e) | | 2 | | | 2 |
| | total | | 4 | 1 | | 5 |
| Michigan, Western | n/a | | 0 | | | 0 |
| 0 | total | | 0 | | | 0 |
| Minnesota | n/a | | | | | 0 |
| 0 of 7 defendants | total | | | | | 0 |
| Mississippi, Northern | 18 U.S.C. 924(j) | 1 | | | | 1 |
| 1 of 1 defendant | 18 U.S.C. 1111 | 1 | | | | 1 |
| | total | 2 | | | | 2 |
| Mississippi, Southern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Missouri, Eastern | 18 U.S.C. 924(j) | | 3 | | 1 | 4 |
| 5 of 5 defendants | 18 U.S.C. 1201(a) | | 1 | | 1 | 2 |
| | 18 U.S.C. 2113(e) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | total | | 8 | | 2 | 10 |
| Missouri, Western | 18 U.S.C. 924(j) | | | 3 | | 3 |
| 8 of 8 defendants | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 18 U.S.C. 1958(a) | | | 3 | | 3 |
| Missouri, Western | 18 U.S.C. 2241(c) | 1 | | | | 1 |

T-35

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 8 of 8 defendants (cont'd) | 21 U.S.C. | 2 | | | | 2 |
| | total | 4 | 2 | 6 | | 12 |
| Montana | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nebraska | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nevada | 18 U.S.C. 1959(a) | 4 | | | | 4 |
| 4 of 9 defendants | total | 4 | | | | 4 |
| New Hampshire | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| New Jersey | 18 U.S.C. 844(d) | 1 | | | | 1 |
| 2 of 4 defendants | 18 U.S.C. 924(j) | | 1 | | | 1 |
| | 18 U.S.C. 1716 | 1 | | | | 1 |
| | 18 U.S.C. 2113(e) | | 1 | | | 1 |
| | total | 2 | 2 | | | 4 |
| New Mexico | 18 U.S.C. 1959(a) | | | 4 | | 4 |
| 6 of 11 defendants | 21 U.S.C. 848(e)(I)(A) | 2 | | | | 2 |
| | total | 2 | | 4 | | 6 |
| New York, Eastern | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 6 of 58 defendants | 18 U.S.C. 1203(a) | | | | 3 | 3 |
| | 18 U.S.C. 1959(a) | 1 | | | 1 | 2 |
| | 21 U.S.C. 848(e)(1)(A) | 1 | 1 | | | 2 |
| | total | 2 | 2 | | 4 | 8 |
| New York, Northern | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| 2 of 6 defendants | total | | 2 | | | 2 |

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| New York, Southern | 18 U.S.C. 844(f) | 1 | 1 | | | 2 |
| 6 of 50 defendants | 18 U.S.C. 930(c) | 1 | 1 | | | 2 |
| | 18 U.S.C. 1114 | 1 | 1 | | | 2 |
| | 18 U.S.C. 1116(a) | 1 | 1 | | | 2 |
| | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | 3 | | | 3 |
| | 18 U.S.C. 2332a | 1 | 1 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | 5 | 12 | | | 17 |
| New York, Western | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |
| North Carolina, Eastern | 18 U.S.C. 924(j) | 2 | 1 | | | 3 |
| 3 of 10 defendants | 18 U.S.C. 1512(a) | 2 | | | | 2 |
| | 18 U.S.C. 1958(a) | 2 | | | | 2 |
| | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | 6 | 3 | | | 9 |
| North Carolina, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| North Carolina, Western | 18 U.S.C. 924(j) | 1 | 1 | | | 2 |
| 3 of 5 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| North Carolina, Western | 18 U.S.C. 1114 | | | | 1 | 1 |
| 3 of 5 defendants (cont'd) | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | 2 | 2 | | 1 | |

T-37

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| North Dakota | 18 U.S.C. 844(i) | 1 | | | | 1 |
| 1 of 1 defendant | 18 U.S.C. 1512(a) | 1 | | | | 1 |
| | total | 2 | | | | 2 |
| Northern Mariana Islands | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Ohio, Northern | n/a | | | | | 0 |
| 0 of 4 defendants | total | | | | | 0 |
| Ohio, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Eastern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Oklahoma, Northern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Western | 18 U.S.C. 844(f) | 2 | | | | 2 |
| 2 of 3 defendants | 18 U.S.C. 1114 | 2 | | | | 2 |
| | 18 U.S.C. 2332a | 2 | | | | 2 |
| | total | 6 | | | | 6 |
| Oregon | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Pennsylvania, Eastern | 18 U.S.C. 1958(a) | | | 3 | | 3 |
| 4 of 6 defendants | 18 U.S.C. 1959(a) | | | 3 | | 3 |
| Pennsylvania, Eastern | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| 4 of 6 defendants (cont'd) | total | | 1 | 6 | | 7 |
| Pennsylvania, Middle | 18 U.S.C. 924(j) | | | 2 | | 2 |
| 3 of 4 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| | 18 U.S.C. 1118 | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | | | 2 | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | | 2 | | 2 |
| | total | 2 | | 6 | | 8 |
| Pennsylvania, Western | 18 U.S.C. 844(i) | 1 | | | | 1 |
| 1 of 2 defendants | total | 1 | | | | 1 |
| Puerto Rico | 18 U.S.C. 924(j) | | | 6 | | 6 |
| 14 of 72 defendants | 18 U.S.C. 1512(a) | | | 2 | | 2 |
| | 18 U.S.C. 1513(a) | | | 4 | | 4 |
| | 18 U.S.C. 2113(e) | | | 1 | | 1 |
| | 18 U.S.C. 2119(3) | | | 5 | | 5 |
| | 21 U.S.C. 848(e)(1)(A) | | | 2 | | 2 |
| | 21 U.S.C. 848(e)(1)(B) | | | 2 | | 2 |
| | total | | | 22 | | 22 |
| Rhode Island | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |
| South Carolina | 18 U.S.C. 2119(3) | 1 | | | | 1 |
| 1 of 7 defendants | total | 1 | | | | 1 |
| South Dakota | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Tennessee, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Tennessee, Middle | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 4 of 6 defendants | 18 U.S.C. 1512(a) | 2 | | | | 2 |
| | 18 U.S.C. 1958(a) | 2 | | | | 2 |

T-39

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
|  | 18 U.S.C. 2119(3) |  | 2 |  |  | 2 |
|  | total | 4 | 4 |  |  | 8 |
| Tennessee, Western<br>6 of 11 defendants | 18 U.S.C. 242 |  | 3 |  |  | 3 |
|  | 18 U.S.C. 1512(a) |  | 2 |  |  | 2 |
|  | 18 U.S.C. 1513(a) | 1 |  |  |  | 1 |
|  | 18 U.S.C. 2119(3) |  | 2 |  |  | 2 |
|  | total | 1 | 7 |  |  | 8 |
| Texas, Eastern<br>4 of 5 defendants | 18 U.S.C. 924(j) |  | 2 |  |  | 2 |
|  | 18 U.S.C. 1201(a) |  | 1 |  |  | 1 |
|  | 18 U.S.C. 2113(e) |  | 3 |  |  | 3 |
|  | total |  | 6 |  |  | 6 |
| Texas, Northern<br>6 of 10 defendants | 18 U.S.C. 245(b) | 1 |  | 2 |  | 3 |
|  | 18 U.S.C. 1201(a) |  | 3 |  |  | 3 |
|  | total | 1 | 3 | 2 |  | 6 |
| Texas, Southern<br>0 of 5 defendants | n/a |  |  |  |  | 0 |
|  | total |  |  |  |  | 0 |
| Texas, Western<br>4 of 8 defendants | 18 U.S.C. 1111 |  | 1 |  |  | 1 |
|  | 18 U.S.C. 1958(a) | 1 |  | 1 |  | 2 |

T-40

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Texas, Western | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| 4 of 8 defendants (cont'd) | total | 1 | 3 | 1 | | 5 |
| Utah | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Vermont | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Virgin Islands | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |
| Virginia, Eastern | 18 U.S.C. 924(j) | | 6 | 1 | | 7 |
| 21 of 66 defendants | 18 U.S.C. 1111 | | 2 | | | 2 |
| | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 1958(a) | | 1 | 1 | | 2 |
| | 18 U.S.C. 1959(a) | | 2 | | | 2 |
| | 18 U.S.C. 2113(e) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 10 | | | 10 |
| | total | | 26 | 2 | | 28 |
| Virginia, Western | 18 U.S.C. 844(i) | 1 | | | | 1 |
| 4 of 6 defendants | 18 U.S.C. 924(j) | | 2 | | | 2 |
| | 18 U.S.C. 1958(a) | 1 | | | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| | total | 2 | 3 | | | 5 |
| Washington, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |

T-41

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Washington, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| West Virginia, Northern | 18 U.S.C. 844(i) | 3 | | | | 3 |
| 3 of 11 defendants | total | 3 | | | | 3 |
| West Virginia, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wyoming | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| TOTAL | | | | | | |
| 183 of 682 defendants | | 83 | 130 | 65 | 18 | 296 |