IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA      ) Cr. No. 4:02-992-JFA
                                     )

            v.                              )

                                      )

BRANDON L. BASHAM,             )

MEMORANDUM OF LAW OF THE UNITED STATES IN OPPOSITION TO
PETITIONERS MOTION PURSUANT TO 28 U.S.C. § 2255

**TABLE OF CONTENTS**

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Response to Claim 1: Basham's initial trial counsel acted reasonably in allowing him to accompany officers in an attempt to find Alice Donovan's body.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Response to Claim 2: Basham's trial counsel adopted a reasonable strategy at the Jackson v. Denno hearing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Response to Claim 3: The Court did not err in excluding jurors whose opposition to the death penalty would substantially impair the performance of their duties.. . . . . . . . . . . . . . . . 16

Response to Claims 4, 5, 6 & 7: Basham is not, and has never been, mentally incompetent. . . .25
    Response to Claim 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    Response to Claim 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    Response to Claim 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Response to Claim 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Response to Claim 8: Basham's trial counsel were not required to second-guess the medical decisions of Basham's treating physician.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Response to Claim 9: Basham's trial counsel adopted a reasonable strategy by conceding certain allegations and focusing on Basham's intent.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Response to Claim 10: There was no reason to excuse Basham from the courtroom prior to his altercation with the Marshals.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Response to Claims 11 and 12:  There is nothing on the record to suggest that Sheriff Hewett testified falsely;  the prosecutor's argument was consistent with its overarching argument that both Basham and Fulks killed Alice Donovan. . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Response to Claim 13: Pursuant to a reasonable trial strategy, Basham's counsel chose not to argue that Basham's statements to law enforcement were involuntary.. . . . . . . . . . . . . 59

Response to Claim 14: Jack Swerling did not have a conflict of interest.. . . . . . . . . . . . . . . . . . 60

Response to Claim 15: The Samantha Burns evidence was admissible. . . . . . . . . . . . . . . . . . .61

Response to Claim 16: There was no basis to admit isolated parts of the Government's closing argument from the Fulks trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Response to Claim 17: Basham's trial counsel decided not to call impeachment witnesses based on valid strategic reasons.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Response to Claim 18:   Basham's trial counsel did not  ineffectively cross examine Sheriff Hewett and Agent Long.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Response to Claim 19: Basham's trial counsel conducted an exhaustive investigation of Basham's background and developed an extensive mitigation case.. . . . . . . . . . . . . . . . . . . . . . . . . 79

Response to Claim 20: Basham's counsel have failed to show that trial counsel failed to assemble a competent capital defense team or that he was prejudiced by any alleged failure of his counsel to supervise the defense team.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Response to Claim 21: There was no basis to trifurcate Basham's trial.. . . . . . . . . . . . . . . . . 101

Response to Claim 22: The Government did not violate its Brady obligations.. . . . . . . . . . . .  112

Response to Claim 23: The Government did not present inconsistent theories at Fulks's and Basham's trials.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Response to Claim 24: The Government did not commit misconduct in its closing argument.. 128

Response to Claim 25: The Court correctly instructed the jury on mitigating evidence. . . . . . .135

Response to Claim 26:  The Court correctly instructed the jury regarding the finding of aggravating and mitigating factors.  Appellate counsel could not have prevailed had he challenged the instruction on appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Response to Claim 27: Basham's trial counsel were not ineffective for failing to investigate Cynthia Wilson's statements to the Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .143

Response to Claim 28: There is no basis to grant a new trial based on Cynthia Wilson's alleged contact with other jurors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .152

Response to Claim 29: There is no basis to grant a new trial based on newly discovered evidence concerning Sheriff Ronald Hewett.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

Response to Claim 30: Basham's trial counsel did not fail to provide necessary files to Basham's appellate counsel.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

Response to Claim 31:  The Superseding Indictment charged an aggravating factor, along with the citation to the statutory authority, which is part of the Federal Death Penalty Act, required for a capital offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

Response to Claim 32: The Federal Death Penalty Act is constitutional. . . . . . . . . . . . . . . . . .162

Response to Claim 33:  Basham has failed to show that the process mandated by the FDPA operates in an arbitrary and capricious manner; therefore, "the extraordinary step of finding a federal statute facially unconstitutional is not warranted.".. . . . . . . . . . . . .  167

Response to Claim 34: There is no cumulative error.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA   ) Cr. No. 4:02-992-JFA
             )
   v.          )
             )
BRANDON L. BASHAM,     )

## INTRODUCTION

COMES NOW the United States of America, by and through the undersigned counsel, in response to the Motion to Vacate under 28 U.S.C. § 2255 purportedly brought on behalf of Brandon Leon Basham.  Because Basham has preemptively filed two motions to waive any further appeals or § 2255 proceedings in his case, the Government respectfully submits that the present § 2255 motion is not properly filed on Basham's behalf.  In any event, the claims presented in the motion lack merit, and the Government requests that the motion be denied.

At this stage of the proceedings, this Court is, of course, well aware of the facts and procedural history of Basham's case.  A summary of the facts underlying Basham's conviction and sentence is set forth in the published opinion of the United States Court of Appeals for the Fourth Circuit in United States v. Basham, 561 F.3d 302, 308-14 (4th Cir. 2009).  The Government will recount additional facts as necessary in response to each of the claims raised in the § 2255 motion brought by habeas counsel.

As for the procedural history, the Government highlights the following events relevant to the § 2255 motion and Basham's requests to waive further appellate and collateral relief.  On September 18, 2009, this Court appointed Julia Grace Mimms as local counsel to represent Basham in the preparation of a motion under 28 U.S.C. § 2255.  Dkt. # 1247.  On June 14, 2010, Basham filed a

-1-

*pro se* motion to drop all further appeals and to request a "speedy execution." Dkt. # 1317.  On July 27, 2010, the Court granted Federal Public Defenders Michael L. Burke and Sarah Stone leave to appear *pro hac vice* on Basham's behalf.  Dkt. # 1323.  On May 19, 2011, Basham filed an additional *pro se* motion to waive any and all proceedings under § 2255.  Dkt.# 1391.  In this motion, Basham states that he "had informed his lawyers that he does not want any such motion to be filed on his behalf."  Dkt. # 1391 at 2.  Even so, on May 31, 2011, Basham's habeas counsel (Mimms, Burke, and Stone) filed a § 2255 motion on Basham's behalf.  Dkt. # 1393.

On June 29, 2011, the Court held a status conference regarding the § 2255 motion and Basham's waiver requests.[1]  Dkt. # 1397; transcript filed at Dkt. # 1400.  The Court questioned Basham, who appeared at the conference via satellite video, about his desire to waive further proceedings.  Basham affirmed that he indeed wanted to have his death sentence carried out and that he was "not going to change [his] mind."  06/29/11 Status Hearing Tr at 12-13.  The Court announced that it would appoint a forensic psychiatrist to examine Basham to determine his competency.  06/29/11 Status Hearing Tr at 14.  The Court stated, however, that it would not suspend the briefing schedule; the competency determination and briefing schedule would proceed on "parallel tracks."  06/29/11 Status Hearing Tr at 19.  On July 29, 2011, the Court appointed Dr. George F. Parker to conduct a mental evaluation of Basham.  Dkt. # 1401.  As of the date of this response, Dr. Parker has not yet completed his evaluation.

Because this Court has ordered the briefing schedule in this case to proceed, the Government

---

[1]In the introduction to their § 2255 motion, habeas counsel argued that an impediment created by the clerk's office tolled the beginning of the statute of limitations period to May 19, 2011.  Motion, at 3.  At the outset of the June 29 hearing, habeas counsel all but abandoned that argument, stating that they did not "believe that the Court needs to make any ruling regarding the statute of limitations."  06/29/11 Status Hearing Tr at 5.

hereby submits its response to the claims raised in the § 2255 motion brought by habeas counsel. The Government does not concede, however, that the motion is properly brought on Basham's behalf. As the Government noted in the status conference on June 29, 2011, Basham has never been adjudicated incompetent at any time. 06/29/11 Status Hearing Tr at 19-20. Basham has been clear and unwavering in his desire to waive further collateral and appellate proceedings. If Dr. Parker's evaluation confirms that Basham is competent, the § 2255 motion should be dismissed as having been filed without Basham's authorization.

In any event, the Court should deny the § 2255 motion because the claims raised in it are without merit. There was no error committed by the Court, no misconduct by the Government, and no ineffective assistance on the part of defense counsel. As to the ineffective-assistance claims brought by habeas counsel, not only have Basham's trial counsel earned sterling reputations in general, the merit of those reputations was on display in Basham's case. Trial counsel were zealous and strategic in their efforts to defend Basham. They did not act unreasonably in any of the respects alleged in the § 2255 motion, and Basham suffered no prejudice.

**Response to Claim 1**: **Basham's initial trial counsel acted reasonably in allowing him to accompany officers in an attempt to find Alice Donovan's body.**

Trial counsel was not ineffective for accompanying Basham on the Thanksgiving Day search and Basham was not prejudiced by any alleged ineffective assistance of counsel.

A.    Standard of Review

Under Strickland v. Washington, 466 U.S. 668, 687 (1984), in order to establish a violation of his Sixth Amendment rights, a petitioner must show that his counsel's performance was deficient and that the deficiency so prejudiced his defense as to deprive him of a fair trial. The performance

of counsel is measured in terms of "reasonableness under prevailing professional norms." Id. at 688.

A court's evaluation of performance "must be highly deferential," judged "on the facts of the particular case," and considered "from counsel's perspective at the time." Id. at 689, 690. A criminal defendant is entitled to a fair trial, not a perfect one. United States v. Lighty, 616 F.3d 321, 336 (4th Cir. 2010)(citing United States v. Hastings, 461 U.S. 499, 508-09 (1983)("Given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial.")). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991)(citing Strickland, 466 U.S. at 686).

B.    Analysis

1.    Trial counsel was not ineffective in allowing Basham to be a part of the Thanksgiving Day search and in accompanying Basham during the search

Basham's habeas counsel complain that his initial trial counsel provided ineffective assistance because they allowed him to speak with law enforcement officers outside of their presence and failed to advise him that his statements could be used against him. §2255 Mot. at 13-14. They state that he was prejudiced due to his demonstration of how Alice Donovan was killed with a purse strap. §2255 Mot. at 16. Basham cites no legal authority to support his claim.

Basham's counsel were not ineffective for failing to literally "hold his hand" during the day-long search for Alice Donovan's body on Thanksgiving Day 2002. This first claim presupposes that counsel is required to stay within a few feet of a client during any cooperation with law enforcement

— including a search for a body, a debriefing, or any other interaction with officers after a defendant has decided to cooperate. No such requirement exists for effective representation.

In this particular case, it is clear that counsel were effective because they attempted to help Basham obtain some credit by convincing law enforcement to allow Basham to help attempt to locate the body of Alice Donovan. To be sure, the sole purpose of Basham's visit to the Bee Tree Farms area was to provide directions to Donovan's body. This cooperation was inherently inculpatory, indicating that Basham had knowledge of the crimes committed against Donovan. Of course, that fact was hardly in dispute at the time investigators began the Thanksgiving Day search: Basham's participation in Donovan's abduction had been captured on video, and Basham had already given police information about his role in the crimes. Based on the inculpatory nature of Basham's effort to locate the body and the incriminating statements already made by Basham, effective representation did not require counsel to intervene to stop Basham from continuing to cooperate. See United States v. Heatley, 39 F.Supp.2d 287, 315 -316 (S.D.N.Y. 1998).

As noted below, Basham had already made numerous statements admitting to his active participation in the abduction and death of Alice Donovan. Prior to the Thanksgiving Day search, Basham had already told FBI agents about a cemetery where they could find Alice Donovan's body, noting that "this is where they did their thing." TT 9:216-17. The fact that Basham later went to this same location on the Thanksgiving Day search and demonstrated where Donovan was strangled and where a purse strap was thrown simply confirms what he had earlier said. Moreover, Basham had already told officers that they should be looking for a purse strap in the vicinity of the cemetery. Basham first mentioned the purse strap to officers as they traveled together in the van. Basham leaned over to confer with his counsel Cameron Littlejohn; after this confidential conversation with

Littlejohn, Basham announced to the officers that they needed to look for a purse strap near the cemetery. Officers were dispatched to that location to look for the strap, but they did not find it. Later in the day, the group returned to the cemetery. It was there that Basham walked over with Sheriff Hewett and demonstrated how he had disposed of the strap. This demonstration was designed to further pinpoint the location of the strap, a matter that Littlejohn had already authorized Basham to discuss with the officers.

> 2. Basham was not prejudiced by any alleged ineffective assistance of counsel.

Additionally, Basham could not have been prejudiced by the demonstration because he had already admitted his involvement in the murder. In fact, Basham, through his counsel in Kentucky, had asked to be transported as quickly as possible to South Carolina and to the area he had identified as the place Alice Donovan's body was located so he could help find her. 2/25/04 Hearing Tr at 155. The purpose of the Thanksgiving-day search was to find Alice Donovan's body. Id. at 60. Basham's counsel in South Carolina, Cam Littlejohn, recognized the dilemma Basham faced. At the Jackson v. Denno hearing he testified: "Now, the fact that he was going to attempt to point out the location where Ms. Donovan's body was, obviously there was no way to keep this from being evidence later on, and hopefully it would be evidence in Brandon's favor." Id. at 137. By admitting that he knew where the body was located, Basham had to admit that he was present when Alice Donovan was killed. Basham's counsel also knew Basham's kidnapping of Alice Donovan was on videotape, Id. at 95, so Basham could not deny his involvement in the abduction. Basham's attorneys reasonably hoped that if he helped find Alice Donovan's body, he would receive a benefit. Id. at 136. They hoped that if Basham helped locate the body, the Government would not seek the death penalty, Id. at 97, or that they could use it as evidence in mitigation, Id. at 136. His attorney

-6-

explained: "We really felt like we were going to find her that day." Id. at 127.

So, with his attorney's approval, and in what at that time appeared to be an effort to help locate the body,[2] Basham had advised officers that they needed to look for a purse strap which was used to kill Alice Donovan. Id. at 64, 17-18. As his attorney testified: "[T]he thing about the purse strap was that we were trying to assist them in giving them directions and honing in on the location where Ms. Donovan might be found." Id. at 141. Basham also advised that he and Fulks had drug Alice Donovan's body about 50 feet and had covered it with leaves. Id. at 76, 79. Thus, when Basham momentarily walked to the cemetery with officers, he revealed nothing more to them than had already been provided in the presence of his counsel. Thus, nothing Basham said or did while he was outside the presence of his counsel during the search was prejudicial.

Further, Basham could not have been prejudiced by his indication during the search at the Bee Tree Farms area that he knew how Alice Donovan was killed. Within days of being arrested in Kentucky, Basham admitted to participating in the kidnapping and murder of Alice Donovan. TT 9: 247, 218. When Basham admitted his involvement in the murder, he was well aware that anything he said could be used against him. He had been advised at least four times during the days prior to coming to South Carolina that anything he said could be used against him.

On November 19, 2002, F.B.I. Agent Vito advised Basham of his constitutional rights prior to interviewing him. TT 9: 134-135, 223-224, 240, 255; 2/25/04 Hearing Tr at. 3. Basham agreed to waive his rights and to speak with the agent. TT 9: 135. At that time, Basham said that he and

---

[2] After Basham was convicted, a fragment of Alice Donovan's bone was discovered in the Savannah Bluff area. Based on information Basham provided after he was arrested, he was aware of the difference between the Savannah Bluff area in the Myrtle Beach area and the Bee Tree Farms area in North Carolina.

Fulks had kidnapped Alice Donovan, and that she was now with Fulks, driving back to South Carolina. TT 9: 148-149.

Agent Vito again interviewed Basham later during the morning of November 19. TT 9: 159. He showed Basham the "Advice and [sic] Rights Form" he had read and signed prior to the first interview. TT 9: 160. Basham said he would like to talk and initialed the form. TT 9: 60. Basham gave a similar account of events. After taking a break, Agent Vito told Basham that he did not believe he was being truthful. TT 9: 176-177. Basham then told Agent Vito that Fulks had left him in a Myrtle Beach parking lot for about an hour while Fulks took Alice Donovan to tie her up. Basham said that when Fulks returned, Basham asked him what he had done with the woman, and Fulks told him: "not to worry about it, that it was over." TT 9: 177. Basham said he believed the woman was dead. TT 9: 177. On November 20, 2002, Agent Vito interviewed Basham a third time because he believed Basham had more information. Vito again advised Basham of his rights, and Basham waived his rights. TT 9: 188. Basham added some details and assisted in developing a hand-drawn map of where he believed Fulks had left Alice Donovan. TT 9: 206-209. The map was of an area similar to what was identified as the Savannah Bluff area. TT 9: 198.

Agent Vito did not speak with Basham again until November 25, 2002. His supervisor, Pat Maley, had received voice mail from Basham that he wanted to talk. TT 10: 71. Agent Maley contacted Basham's attorney, Mr. Hughes, who indicated he would provide details of the location of Alice Donovan's body. TT 9: 211; TT 10: 71. Prior to the interview, "out of an abundance of caution,"Agent Maley read Basham his rights because "whenever I interview somebody in jail, I want to be sure it is very clear to them that whatever they say can be used against them." TT 10: 74. During the interview, a map was drawn with an Amoco station in Shallotte, North Carolina as a

reference point. TT 9: 212. As Agent Vito and his supervisor received the information, they relayed

it to agents in South Carolina. TT 9: 213. Basham told agents that Alice Donovan's body was

within dragging distance off the road. TT 9: 218; TT 10: 80. He indicated the location of a small

run-down cemetery on the map, and stated: "that is where they did their thing." TT 9: 216. At trial,

Agent Vito testified:

> A.    . . . . Mr. Hughes was standing beside Mr. Basham, and Mr. Maley [agent] was standing beside Mr. Basham. They were working on the map. And Mr. Basham turned and said that, at that point.
>
> Q.    Said it in whose direction?
>
> A.    In Mr. Hughes' direction.
>
> Q.    His comment again is what?
>
> A.    "That is where they did their thing."
>
> Q.    Do you recall having any reaction to that?
>
> A.    I recall looking at Mr. Maley and him looking at me, and I felt that was very significant.
>
> Q.    Why?
>
> A.    It indicated that he had done something, "their thing."

TT 9: 217.

Basham's statement that they had done "their thing" when they were at the cemetery

demonstrates that even when counsel was present with Basham, counsel could not prevent him from

making statements potentially detrimental to his case. Cam Littlejohn, Basham's attorney during

the search, had told Basham "that we were going to only be giving directions, that we weren't going

to give any statements, and we would have to talk at a later time and determine whether it would be

in his best interest to make any further statements." 2/25/04 Hearing Tr at 139. Even after providing this admonition, Basham's attorney had to stop him mid-sentence when he started saying that he could never kill a deer. Further, counsel could not be with Basham at all times. Basham had a strong desire to talk, and in doing so, he incriminated himself and engaged in behavior which likely prevented jurors from feeling much sympathy for him.

For example, Basham called his former teacher's aide, Clifford Jay, on December 24, 2002, and admitted: "We killed them." TT 10: 228. **"Yes sir, we killed them."** Id. at 229. While he was incarcerated at Butner FCI, he told the nurse: "I am going to fuck you up the ass, Ms. Miosi. I am going to kill you, psych bitch." TT 18: 91. He scuffled with officers at Butner, threatened correctional Lt. Ledford, and told officers: "I will show you mother fuckers how to cause pain. You don't know how to cause pain." TT 18: 14-15. He also bragged to prison personnel that a jury would never find him guilty, and that "[t]he worst they can do is give me life." TT 17: 206; 18: 21. These statements and others were arguably as much or more damaging to his case as the statement of which Basham complains.

Basham's habeas counsel incorrectly state: "Considering that Sheriff Hewett's testimony was the only evidence suggesting that Mr. Basham was the actual killer of Alice Donovan, it was unquestionably damaging. . . ." §2255 Mot. at 18. As noted above, Basham confessed to Clifford Jay: "We killed them." Further, the Government never argued that Basham was the only killer. The Government's closing argument was consistent with Basham's admission, discussed further under Claim 11, that both Fulks and Basham, working together, killed Alice Donovan, and that one was as culpable as the other. The Government told the jury:

If Brandon Basham was alone, or if Chad Fulks were alone on November 11, 2002

-10-

and November 14, 2002, Samantha Burns would be alive today. . . . Brandon Basham and Chad Fulks were acting together in unison as a team, a death squad . . . the two of them, together, aiding and abetting each other when they kidnaped, and carjacked, and killed Alice Donovan, the two of them.

TT 12:12.  As Tina Severance, who was with Basham and Fulks from the day after they kidnapped James Hawkins until the night they killed Alice Donovan, testified, Basham and Fulks "were always talking amongst themselves"; they drank together, smoked together, and ate together.  TT 2: 249. And it was the Government's theory that they killed together, not that Basham, alone, killed Alice Donovan with a purse strap.

Basham's habeas counsel complain that the importance of his demonstration of how the purse strap was used is evidenced by the prosecutor's closing argument that the testimony of Clifford Jay that Basham admitted: "We killed them," and the testimony of Sheriff Hewett that Basham demonstrated how the purse strap was used "alone seals the deal." §2255 Mot. at 17.  However, any number of other pieces of evidence could have "sealed the deal."  The videotape of Basham kidnapping Alice Donovan from the Wal-Mart parking lot and Basham's admission to Clifford Jay that "[w]e killed them," would have certainly "sealed the deal."  Basham's statement to the FBI indicating that they "did their thing" in the cemetery would have "sealed the deal."  The videotape plus Basham's claim a few days after his arrest that Alice Donovan's body was within dragging distance of the road could have "sealed the deal." Carl Jordan's testimony that Basham and Fulks stole his guns and shot at him, TT 4: 33, Margaret Moore's testimony that Basham, with Fulks in tow, attempted to convince her to give him a ride to the store or allow him into her house to use the telephone, TT 4: 87-87,  and Olieta Hyman's testimony that the two men [Basham and Fulks] stole her truck, the one seen on the videotape from which Basham exited at the Wal-Mart parking lot in

-11-

order to kidnap Alice Donovan, TT 4: 99-102, could have "sealed the deal." The testimony of Tina Severance, the burned car, the camouflage gear, and all of the other evidence regarding the death of Samantha Burns, plus the video of Basham kidnapping Alice Donovan could have "sealed the deal."

While the purse strap demonstration may have provided a bit of drama, it clearly was not necessary in order for the jury to find Basham guilty. It was one piece of evidence on the mountain of evidence showing Basham kidnapped Alice Donovan, knowing that she would be, and was, killed. Thus, even if counsel was ineffective for failing to constantly be by Basham's side, there was no prejudice.

**Response to Claim 2: Basham's trial counsel adopted a reasonable strategy at the Jackson v. Denno hearing.**

In Claim 2, Basham habeas counsel argue that his trial attorneys were ineffective for failing to "prepare for and/or effectively litigate" the Jackson v. Denno hearing. §2255 Mot. at 19. They contend that his attorneys should have elicited evidence of his "intellectual, psychological, and emotional difficulties" and should have cross-examined witnesses more vigorously in an attempt to argue that his statements to police and his waiver of his Miranda rights were involuntary. Id. at 19-23. This argument misses the mark because his trial counsel proceeded strategically at the Jackson v. Denno hearing: They preserved the voluntariness issue while retaining their ability to argue to the jury that Basham's statements to police were indicative of his cooperation in the investigation into Alice Donovan's abduction and murder.

As Basham's habeas counsel acknowledge, "At defense counsel's request, the Court conducted a hearing pursuant to Jackson v. Denno, 378 U.S. 368 (1964), to determine the admissibility of various statements made by Mr. Basham following his capture and arrest." §2255

-12-

Mot. at 19. On the morning of the scheduled date for this hearing, defense counsel informed the

Court that Basham appeared to be ill and incoherent, and defense counsel questioned Basham's

ability to assist them during the hearing. 02/24/04 (a.m.) Tr at 2-3. The Court then held a colloquy

with both sides to determine if it was necessary for Basham to assist in his defense at the hearing.

Id. at 6-9, 11-12. The Government argued that it would depend on what was at issue in the hearing:

If the only issue was whether Miranda warnings were given, then Basham's participation would be

less important; if, however, defense counsel's contention was that Basham's statements were

involuntary, then his participation would be more critical. Id. at 7-8.

The Government noted:

> They filed a very generic motion to dismiss. And as we noted,
> if what they are suggesting is that the statements weren't voluntary,
> then they may be boxing themselves into a position that they can't
> claim later that he was attempting to assist law enforcement when he
> provided those statements.

Id. at 8. The Court agreed that this was a "good point," stating:

> It's a two edged sword to raise a voluntariness issue in a death penalty
> case, because if I hear the testimony and determine the statements
> were voluntary, they come in. . . . Then if he gets convicted and we
> move into the penalty phase — I don't know, I never thought about
> it — but I probably would disallow the defendants from trying to
> suggest to the jury that he should get some credit for his statements
> if he tried to keep them out.

Id. at 8-9.

In response, defense counsel attempted to clarify their position:

> [T]here are nine or 10 statements that the government intends to try
> and offer. Because of Mr. Basham's history, his mental history, and
> his low intellectual and intelligence capacity, what we are asking the
> court to do is to make a threshold determination as to whether or not
> he was given his rights and whether or not he waived his rights. . . .

> We are not necessarily contending that the statements were voluntary, but we think it is prudent to go ahead and make the determination under 104 that the statements are in fact admissible. We . . . do not intend, as I told you, to present testimony at this point, so I don't think we are making — raising inconsistent positions.

Id. at 11. Defense counsel further explained:

> [W]e think it's prudent to go ahead and have the court pass on the voluntariness of the statements without us necessarily arguing vigorously that they are not voluntary. . . . This is a unique situation, it's a death penalty case. He has had many, many commitments to different institutions, he has low intellectual capacity. And I just think the record ought to reflect whether or not the court thinks the statements are voluntary before they are admitted and played before the jury.

Id. at 11-12. Ultimately, the Court was able to have Basham examined and found competent that day, and the hearing moved forward with Basham at counsel's table. 2/24/04 (p.m.) Tr at 3.

Basham's habeas counsel contend that "no reasonable strategy" could have justified counsel's decision not to present evidence and vigorous argument that Basham's statements to police were involuntary. §2255 Mot. at 23-24. But the Court perfectly summarized the quandary that counsel was in: If counsel took the position that Basham's statements were involuntary, they might later be precluded from arguing to the jury at sentencing that Basham's statements were indicative of voluntary cooperation with law enforcement, thus depriving them of a potential mitigating factor. Defense counsel were able to take a middle ground: They asked the Court to rule on the voluntariness of Basham's statements, thereby establishing a record and preserving the issue for appeal; but they also maintained their ability to argue to the jury that Basham willingly cooperated with police.

Basham's counsel followed this strategic approach in their cross-examination of the

-14-

Government's witnesses in the <u>Jackson v. Denno</u> hearing. The witnesses' testimony did not suggest that Basham's statements were involuntary, so defense counsel used their cross-examination to lay a foundation that Basham was cooperative with investigating officers.

For example, Detective Dan Mooney testified that Basham provided a statement regarding his shooting at a police officer on November 17, 2002. 02/24/04 (p.m.) Tr at 29. Detective Mooney also testified that Basham admitted having used marijuana and cocaine on the day of the statement. <u>Id.</u> at 30. Mooney arrived at the hospital to speak with Basham at 9:48 p.m.; Basham said that he had used cocaine at approximately noon that day and had smoked marijuana at approximately 4:00 p.m. that day. <u>Id.</u> Mooney affirmed, however, that Basham was coherent and did not appear to be under the influence of drugs at the time of his statement. <u>Id.</u> at 28; <u>see</u> <u>also</u>, TT 6: 255-256. In keeping with their overall strategy, defense counsel did not argue that Basham was "under the influence at that time" but contended that Basham's statement concerning drug use was an "admi[ssion] to other crimes." <u>Id.</u> at 41; <u>see</u> <u>also</u>, TT 6: 274 (confirming during cross examination that Basham was not aggressive or combative). In any event, there was no evidence that Basham's statement was involuntary, as it had been several hours since he last ingested drugs and there was no indication that he was suffering from diminished capacity.

FBI Agent Scott Vito testified about his interviews of Basham on November 19, 2002. Agent Vito testified that the first interview began at 1:58 a.m. 02/24/04 (p.m.) Tr at 47. In his §2255 Motion to Vacate, Basham argues that his trial counsel should have questioned "the necessity for this nighttime interrogation of a mentally and emotionally challenged young man[.]" §2255 Mot. at 21. The necessity of the late hour was obvious, however, as Agent Vito and other investigators were under the impression that Alice Donovan was still alive and being held captive by Chad Fulks.

-15-

02/24/04 (p.m.) Tr at 52; see also TT 9: 148. With no indication that Basham's statements were involuntary, defense counsel thus focused on the fact that Basham was "very cooperative" in answering questions about Donovan's location. Id. at 68; see also TT 9: 224.

In summary, Basham's habeas counsel cannot point to any evidence that he was coerced or that his statements to police were involuntary. Basham's trial counsel were able to raise the issue of Basham's voluntariness while preserving their ability to argue to the jury that Basham had freely cooperated with police. Thus, trial counsel acted with a reasonable strategy in an effort to secure the best outcome for Basham.

**Response to Claim 3: The Court did not err in excluding jurors whose opposition to the death penalty would substantially impair the performance of their duties.**

In Claim 3, Basham's habeas counsel claim that the Court violated "his right to an impartial jury by erroneously excluding potential jurors whose concerns about the death penalty would not have substantially impaired the performance of their duties." §2255 Mot. at 25. Specifically, they argue that the Court erred in excluding venire members Cathy Roberts and Michael Williams for cause and that the Court erred in dismissing venire members Rubina Khan and Susan Jackson without allowing defense counsel an opportunity to rehabilitate them in voir dire. Id. They also argue that his appellate counsel was ineffective for failing to raise this issue on appeal. Id.

The record, however, supports the Court's finding that all four of these prospective jurors harbored concerns about the death penalty that would substantially impair their ability to abide by the Court's instructions and their oath as jurors. The Court was in a position not only to judge the substance of their answers on voir dire but also to observe their demeanor and assess their credibility. Faced with ambiguous and often contradictory answers from these venire members, the Court validly

-16-

exercised its discretion to remove these individuals for cause. Accordingly, appellate counsel had ample reason not to raise this issue in Basham's appeal.

    A.    <u>The Court validly exercised its discretion to remove venire members whose views on the death penalty would substantially impair their ability to abide by their instructions and oath.</u>

In <u>Witherspoon v. Illinois</u>, 391 U.S. 510, 522 (1968), the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." As the Court put it in subsequent cases, "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." <u>Wainwright v. Witt</u>, 469 U.S. 412, 419 (1985) (quoting <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980)). The prosecution "may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." <u>Id.</u> Accordingly, a prospective juror in a capital case "must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to [render a verdict] without conscious distortion or bias." <u>Adams</u>, 448 U.S. at 46. The prosecution "does not violate the <u>Witherspoon</u> doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality." <u>Id.</u>

Whether a venire member's reservations concerning the death penalty amount to a "'substantial impairment' is perforce committed in the first instance to trial court discretion based upon the voir dire inquiry." <u>United States v. Tipton</u>, 90 F.3d 861, 880 (4th Cir. 1996). "[W]hat is being inquired into is a state of mind whose determination turns largely on assessments of demeanor

-17-

and credibility, matters peculiarly within the province of trial judges[.]" Id.

        1.     Cathy Roberts

The district court excused Cathy Roberts for cause because her answers to the juror questionnaire and to voir dire questioning, although inconsistent at times, indicated that her opposition to the death penalty would substantially impair her ability to abide by her oath and the Court's instructions.

On the supplemental juror questionnaire, Roberts indicated that the death penalty was used "too seldom" while affirming that she was "strongly opposed to the death penalty" and "would have a difficult time voting to impose it, regardless of the facts and law in the case." 08/30/04 Jury Selection Tr at 105-06. Roberts attributed this apparent inconsistency to her being "confused" or "nervous." Id. at 108. When the Court asked her if she could put aside her personal beliefs and "follow the law as the judge announces," Roberts replied: "I believe I can." Id. at 109.

But when the Court asked Roberts whether she could "consider the possibility of imposing the death penalty against someone, even if that person didn't strike the fatal blow if it was supported by the facts and the law of the case," Roberts twice announced: "I'm not 100 percent sure if I could." Id. at 112-13. When the Court rephrased the question, Roberts equivocated: "I don't know. If it was my civic duty, I would. I mean, [if] selected I would follow the law." Id. at 113. The Court noted that it observed by Roberts's "hesitancy" and "body language" that she seemed "to have some difficulty with this idea[.]" Id. at 114. Roberts affirmed that was true "to a degree." Id.

In its voir dire, the Government asked Roberts: "[I]s it fair to say, ma'am, that given your pretty strong opposition to the death penalty in general, that as you sit there today you couldn't sentence somebody to die if they didn't actually take another person's life; isn't that true, Ms.

Roberts?" Id. at 125.  Roberts answered: "Yeah, that's true." Id.  Likewise, Roberts said that it was

"a fair statement" that "in every single case, if life in prison without parole was one of the options,

[she] would feel that that would be the appropriate sentence in every case where somebody didn't

actually kill someone[.]" Id. at 128.  Finally, she affirmed that although she "could give the death

penalty under a certain set of circumstances . . . [she] would draw the line when the person did not

even kill someone[.]" Id. at 128-29.

Viewed in their overall context, Roberts's statements indicated that her views on the death

penalty would substantially impair her duties as a juror. True, Roberts's answers were contradictory

at times.  But jurors "cannot be expected invariably to express themselves carefully or even

consistently.  Every trial judge understands this, and under our system it is that judge who is best

situated to determine competency to serve impartially." Patton v. Yount, 467 U.S. 1025, 1039,

(1984).  Thus, "where the prospective juror's response, as captured in the transcripts, reflects some

ambiguity in the state of mind of the juror, then the determination made by the trial court, based on

its eyeing the juror, is presumed to be consistent with the applicable standard." Maynard v. Dixon,

943 F.2d 407, 415 (4th Cir. 1991).   Despite her inconsistencies, Roberts "expressed reservations,

never retracted, sufficient to warrant the district court's determination that they would substantially

impair [her] performance of duty to vote for the death penalty if the evidence and law so dictated."

Tipton, 90 F.3d at 880.

2.    Michael Williams

As it did with Ms. Roberts, the district court excused Michael Williams for cause based on

contradictory answers he provided regarding his ability to render a fair verdict on the death penalty.

During voir dire from the Court, Williams initially affirmed that he could decide the case

"based solely on the evidence produced at trial and in the context of the rules of law[.]" 09/07/04 Jury Selection Tr at 201-02. He agreed that he fell in the "middle category" of potential jurors who were not pre-committed to impose or reject the death penalty. Id. at 202-03. He likewise affirmed that he understood that someone could be eligible for the death penalty even if he did not personally strike the fatal blow. Id. at 206-07. When the Court asked if there was any reason why he could not be fair and impartial, Williams answered: "I really am not sure about the death penalty part, but other than that, I could be fair." Id. at 207. Williams affirmed, however, that he could set aside his opinion on the death penalty and conscientiously follow the law as pronounced by the court. Id. at 207-08.

Upon questioning by Government counsel, Williams articulated a different position. When asked what he had meant when he said he could be fair "except for the death penalty part," Williams explained: "I am not really sure I could do it. I guess after the judge explained the law, I would have to do it, what the law says to impose the death penalty." Id. at 217-18. He acknowledged that he had "some problems emotionally or personally because of some of [his] previously-held beliefs about the death penalty[.]" Id. at 218. Williams stated that it was a "difficult situation" to sign one's name to a death penalty verdict "[b]ut the judge says you got to go by what the law says." Id.

The Assistant United States Attorney then explained to Williams that even if he found that the Government had proved its case, he would not be required to impose the death penalty; he would still have to make a "personal judgment" about whether the death penalty was appropriate in the case. Id. at 220. The AUSA then asked Williams if he "could ever come out of that balancing test and decide that the death penalty is the appropriate sentence[.]" Id. Williams answered: "I really am not sure." Id. Williams affirmed that the balancing process would be even more difficult if the

defendant did not strike the fatal blow. Id. at 220-21. The AUSA then asked if Williams could "meaningful[ly] consider and have that balancing test come out in favor of the death penalty" in such a case. Id. at 221. "I don't think I would," Williams replied. Id.

The district court followed up and clarified that determining the sentence was not a "mathematical calculation" in which the jurors were required to impose the death penalty if the Government proved certain facts. Id. at 222. The Court emphasized that it needed to know whether Williams fell into an "extreme category" of jurors – whether he was "so strongly opposed to the death penalty he couldn't vote for it under any circumstance[.]" Id. at 223. Williams again answered: "I am really not sure, Your Honor. I guess I feel uncomfortable knowing I will be signing my name on something for somebody to die." Id. After hearing argument from the attorneys on whether Williams should be excused for cause, the Court called Williams back and asked if his discomfort with signing a death verdict would "impede [his] ability to be fair to both sides[.]" Id. at 230. Williams responded:

> I am really not sure, Your Honor. In certain cases, in the Susan Smith case, you know, to me, there is no doubt what she did to her two boys, she should have gotten the death penalty. And maybe it is because kids were involved, I don't know. But I feel, you know, I would have to be honest, I would still feel very, very uncomfortable signing the document saying the death penalty.

Id. The Court then excused Williams for cause. Id.

Thus, at both the beginning and the end of voir dire, Williams expressed that he was "not sure" he could be impartial in light of his reluctance to hand down a verdict of death. He did state that he could follow the law as explained by the Court. The totality of his answers, however, indicated that he initially thought he would be required to impose the death penalty in certain

situations. Once it was explained to him that he would never be required to reach a death verdict but would instead have to make a personal judgment on the propriety of the sentence, Williams expressed uncertainty about whether he could ever impose the death penalty. In light of these answers, the district court did not abuse its discretion in finding that Williams's views on the death penalty would substantially impair his ability to follow his oath and the Court's instructions.

   3.  Rubina Khan

When the district court explained to venire member Rubina Khan that the Court was looking for jurors who were not pre-committed to impose or reject the death penalty, Khan stated: "Well, I do strongly oppose it, but I guess I could be able to put aside my views." 08/31/04 Tr at 271. When asked if she was "so strongly opposed" to the death penalty that she could never vote for it under any circumstances, Khan answered: "No, I don't think I fall in that category." Id. Later, the Court explained to Khan that, if the jury returned a verdict of death, all the jurors would have to sign their names to the verdict. Id. at 275. Upon learning this, Khan stated: "I don't know if I would be too easy about that." Id. at 276. Khan expressed a concern that she might be pressured into reaching a verdict with which she did not agree. Id. at 276-77.

After momentarily excusing Khan and hearing argument from counsel, the Court asked some follow-up questions of her. Id. at 279. The Court reiterated that if the jury decided upon the death penalty, all of the jurors (not just Khan) would have to sign their names to the verdict. Id. at 280. The Court asked Khan if she "had some problems" with that requirement. Id. "I don't think I can

vote for capital punishment, I don't think I can," Khan replied. The Court then excused her for cause. Id.

Basham's habeas counsel argue that the district court erred in dismissing Khan without giving defense counsel the opportunity to rehabilitate her. §2255 Mot. at 33. Basham's habeas counsel point to no authority suggesting that a court must provide an opportunity to rehabilitate a potential juror who has given disqualifying answers. In fact, the Fourth Circuit has expressly declined to create such a rule. Boggs v. Bair, 892 F.2d 1193, 1201 (4th Cir. 1989) ("[W]e decline to introduce into the law the rule argued for by Boggs which would say that a trial judge has a constitutional duty to try to rehabilitate by his personal questioning any juror who has been shown to be disqualified[.]").

Moreover, Basham's habeas counsel can only speculate whether Khan, upon questioning from defense counsel, would have retracted her statement that she did not think she could vote for capital punishment. If the Court had allowed defense counsel to ask rehabilitative questions, it presumably would have allowed the Government to ask questions as well. The Government's questions likely would not have been geared towards "rehabilitation" and may well have shown Khan's reservations to be even more pronounced. In any event, even if the Court had allowed rehabilitation by the defense, and even if Khan retracted her earlier statements, the Court would be left with a venire member who had given contradictory responses. As it did with other potential jurors, the Court would have been justified in excusing Khan in the face of such contradictions. The Court was in the best position to determine whether further questioning of Khan would be beneficial or whether (as it decided here) Khan's answers and demeanor had already demonstrated a "substantial impairment."

      4.    Susan Jackson

Susan Jackson stated in her written questionnaire that she was "strongly opposed to the death

penalty and would have a difficult time voting for it, regardless of the facts and law in the case."

09/03/04 Jury Selection Tr at 72. She also wrote: "Taking a life under any circumstances is

reprehensible." Id. During voir dire, the district court asked Jackson whether she could "set those

beliefs aside and conscientiously follow the law as announced by the trial judge[.]" Id. at 73.

Jackson replied: "I don't think I can, sir." Id.

After some discussion with the attorneys, the Court called Jackson back in for further

questioning. Id. at 74. At that time Jackson informed the Court that she "probably" should have

checked the questionnaire box which indicated that she was "personally morally or religiously

opposed to the death penalty and would never vote to impose it, regardless of the facts and law[.]"

Id. at 74-75. "After sleeping on it," Jackson concluded that she actually fell in the disqualifying

category. Id. at 75. The Court then disqualified her. Id.

Basham's habeas counsel argue that the district court should have allowed defense counsel

an opportunity to rehabilitate Jackson. §2255 Mot. at 33. But as explained above, there is no

requirement that the Court grant such an opportunity. And Jackson was forceful and direct in

explaining that her opposition to the death penalty would hinder her ability to follow her oath and

instructions. In fact, the more she thought about it, the stronger her opinion became that she could

never impose the death penalty, regardless of the circumstances. There is no indication that

additional questioning would have led Jackson to recant her position or, even if that occurred,

satisfied the Court that Jackson could be a fair and impartial juror.

B.    Basham's appellate counsel was not ineffective for failing to challenge the exclusion of these jurors, as counsel could have reasonably determined that this was a weak argument that would undermine the overall force of Basham's appeal.

As explained above, the district court validly exercised its discretion to remove the

challenged jurors for cause. Accordingly, any appellate challenge to their removal would have been weak. Basham recognizes that "weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy[.]" §2255 Mot. at 36. Basham's habeas counsel maintain, however, that the "weeding" principle "has little or no applicability in capital cases, for appellate counsel in a capital case has a duty to consider all potentially available claims . . . ." Id. at 36-37. They offer no support for this proposition. To be sure, it would be practically (if not theoretically) impossible for appellate counsel to include every conceivable issue in a capital appeal, even if there were no word or page limits. If perceived errors in the trial proceedings are not filtered by the merits of challenges to those errors, there will always be one more challenge to raise.

Because an appellate challenge to the exclusion of the challenged jurors would have been without merit, appellate counsel was not deficient for declining to raise this issue. For the same reason, Basham cannot demonstrate any prejudice; even if his appellate lawyers had raised the issue, there is no reasonable probability that doing so would have changed the outcome of his appeal.

**Response to Claims 4, 5, 6 & 7**: **Basham is not, and has never been, mentally incompetent.**

In Claims 4-7, Basham's habeas counsel make various claims centered around the unsupported claim that Basham was supposedly "tried, convicted, and sentenced to death when he was mentally incompetent to stand trial." §2255 Mot. at 37. These claims include direct appeal issues and ineffective assistance of trial and appellate counsel claims. These claims all fail for a number of reasons.

Most importantly, despite numerous evaluations by various mental health professionals throughout Basham's life, Basham has never been found incompetent. Tellingly, the psychiatrists retained by Basham's trial counsel never made a finding that he was incompetent. Nothing in the

record indicates that Basham was incompetent to stand trial.  Instead, even after a tussle with Deputy

U.S. Marshals, Basham's psychiatrist testified the next morning that Basham was competent. As

noted by the Fourth Circuit on direct appeal, the record indicates that Basham was a manipulative

individual, not one who was incompetent.  See Basham, 561 F.3d at 333 ("Basham's actions and

manipulation . . . point to a manipulative individual.").  Apparently because of this lack of medical

support for an incompetency defense, trial counsel decided that they did not have a good faith basis

to raise a competency defense and affirmatively decided to not pursue a competency evaluation for

strategic reasons.  Appellate counsel was certainly wise to not raise an issue that had no support.

Likewise, the trial court had no reason to order a competency evaluation, particularly when Basham's

trial counsel objected to any such order and informed the Court that Basham was not incompetent.

These claims must fail.

> A.     Brief Factual Background relating to Claims 4, 5, 6 & 7

Basham has received mental health treatment since childhood.  The Fourth Circuit

summarized how this evidence was presented in the mitigation/penalty phase of his trial:

> Basham also put forth mitigation evidence regarding his mental condition  Basham
> showed that he was diagnosed with learning disabilities at a young age and eventually placed
> into youth homes following his expulsion from school. Basham also put forth evidence
> suggesting that he had a deteriorating mental condition—to wit, Basham's IQ had declined
> from 100 as a youth to approximately 68 due to illegal drug abuse and other factors. Experts
> testifying on Basham's behalf diagnosed him as suffering from a brain impairment,
> multiple-cause dementia, drug-inhalant psychosis and anxiety. His psychiatrist admitted
> under oath, however, that these problems did not contribute to his offenses or keep him from
> distinguishing between right and wrong.  Finally, Basham put forth evidence of his ability
> to adapt to prison life through the testimony of prison officials.

Basham, 561 F.3d at 315.  Despite this detailed mental health evidence, at no point did any mental

health care expert indicate that Basham was incompetent.

It is true that Basham's initial trial counsel, Cameron Littlejohn and William Monckton, filed what can be described as a "pro forma" motion for a mental competency evaluation on December 11, 2002, just a few weeks after Basham was arrested. See Docket # 22. However, this one-page motion provided no specific details to justify the ordering of a mental competency evaluation. Littlejohn and Monckton were disqualified on April 9, 2003. Trial counsel Jack Swerling and Greg Harris were appointed to replace Basham's original trial counsel.

Basham's trial counsel retained numerous mental health experts to treat Basham and evaluate Basham's mental health. Some of these experts included forensic psychiatrists Donna Schwartz-Watts and Donald Morgan, neuropsychiatrist Tora Brawley and neurologist William Brannon. Dr. Schwartz-Watts alone interviewed Basham forty (40) times.[3] Neither Dr. Schwartz-Watts nor any other expert ever made a finding that Basham was incompetent.

While examinations and evaluations by defense experts began, on June 9, 2003, trial counsel Swerling and Harris requested that Basham be moved out of the Richland County Detention Center and transferred to Columbia Care Center. Counsel stated that Dr. Schwartz-Watts "suggests Basham be moved from the detention center to the Columbia Care Center for more appropriate treatment and monitoring." Docket # 95, at p. 2. In response to this request, the Government requested that Basham undergo a competency evaluation. Trial counsel opposed this request. Docket # 99. Trial counsel stated that Basham was not incompetent: "With the necessary therapy, Defendant Basham has been able to assist in his defense and to understand the gravity of the charges he faces." Id. at 2. At a hearing on Basham's motion to transfer to Columbia Care Center, the defense noted that

---

[3] In addition, BOP Psychiatrist Bruce Capehart examined Basham and produced a 120-page report. 10-27-04 TT Transcript Vol. 26, at p. 106

Dr. Schwartz-Watts was examining Basham "for the purpose of establishing his competency" and a transfer to Columbia Care Center "would allow her to complete her evaluation and to make a determination so that she [could] properly advise [defense counsel]as to his competency and his ability to stand trial." 6/18/03 Hearing Tr at 3. At the same hearing, the prosecution made the following uncontradicted observations:

> In their response . . . it states that there is no current intention on their part to suggest that [Basham] is not competent to stand trial . . . We have reviewed discovery pertaining to the Defendant. We have reviewed statements that he made. We have gotten correspondence that he sent to third parties and there is nothing in there to suggest that he is not competent to stand trial.

6/18/03 Hearing Tr, at 5. Based on the defense's affirmation that Basham was not raising competency as an issue at that time, the Government withdrew its request for a competency determination and agreed to have Basham transferred to Columbia Care Center. The Court ordered that Basham be transferred to Columbia Care Center for 30 days. Docket # 110. The Court subsequently continued Basham's stay at Columbia Care Center until October 15, 2003. Docket # 147.

As noted above, Dr. Schwartz-Watts interviewed Basham at least 40 times. TT 26: 114-117, 264.[4] There is nothing to suggest that Dr. Schwartz-Watts found Basham to be incompetent. In fact, at a Jackson v. Denno hearing on February 24, 2004, the Court had Dr. Schwartz-Watts examine Basham and she found him to be competent. 2/24/04 (p.m.) Tr at 3.

On September 20, 2004, during the guilt phase of the trial, Basham "refused to comply with the district court's instruction to take his seat" and "a tussle ensued in the courtroom between the

---

[4]Dr. Schwartz-Watts testified that she had "reviewed more medical records in this case than I ever have on any other case, period." TT 26:103.

defendant and the marshals." Basham, 561 F.3d at 333; TT 5: 149-53. After the situation was under control and Basham was sent to a holding cell, trial counsel asked for a continuance to allow Dr. Schwartz-Watts to examine Basham to determine his competency. Id. at 153-54 ("We would ask for a delay . . . We have a doctor on the way . . . We are concerned about the competency."). The Court granted this delay.

Dr. Schwartz-Watts examined Basham both that afternoon and the next morning. On September 20, after examining Basham for "about 15 or 20 minutes," Dr. Schwartz-Watts testified that she had "concerns about his competency." Id. at 162. However, she noted that "with a little time, perhaps by tomorrow, there would be no reason that I can foresee that he wouldn't be calm enough that we can proceed." Id.

The next morning, at the start of court, Mr. Swerling announced that Basham "is competent this morning according to Dr. Watts." TT 6: 6. Dr. Schwartz-Watts testified that she "spent about 45 to 50 minutes with Mr. Basham" and determined he was "back to his baseline this morning. . . . He is able to make decisions." Id. The Court then asked counsel: "You are satisfied your client is competent to go forward?" Mr. Swerling answered that "[t]here is no question about competency." Id.

A month later, Dr. Schwartz-Watts testified for two days at the mitigation phase of the trial. TT 26: 81-274 & TT 27: 4-151. Dr. Schwartz-Watts testified extensively about Basham's mental state, including his conduct at trial, but never hinted that Basham was incompetent. In fact, Dr. Schwartz-Watts testified that although Basham had major mental illnesses, "none of these illnesses affected his ability to distinguish right from wrong." TT 27: 97. Dr. Schwartz-Watts also testified regarding Basham's altercation with the U.S. Marshal's officers in the courtroom, that it was "not

at all" the result of a panic attack. TT 27: 98. At no point during her testimony did Dr. Schwartz-Watts suggest that Basham was incompetent.

### B.    <u>Response to Claim 4</u>

In Claim 4, Basham's habeas counsel claim that he was tried and sentenced while legally incompetent in violation of the Fifth, Sixth and Eighth Amendments. They claim that "at the time of trial, he lacked the 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" (§2255 Motion, at p. 39, citing <u>Dusky v. United States</u>, 362 U.S. 402 (1960)).

This issue must be dismissed because it is procedurally barred. This is a direct appeal issue which is not an appropriate claim in a § 2255 motion. This issue was not raised on direct appeal; hence, Basham has procedurally defaulted on this issue and is barred from raising this issue. <u>Haynes v. United States</u>, 451 F.Supp.2d 713, 722-23 (D.Md. 2006); <u>Ludwig v. United States</u>, 162 F.3d 456, 458 (6th Cir.1998) (petitioner who procedurally defaulted a competency claim was procedurally barred from raising the claim in post-conviction proceedings unless he could show cause and prejudice or actual innocence); <u>Coleman v. United States</u>, 188 F.3d 506, *2-3 (6th Cir.1999) (unpublished); <u>Lewal v. United States</u>, 152 F.3d 919, *1-2 (2d Cir. 1998) (unpublished).

### C.    <u>Response to Claim 5</u>

In Claim 5, Basham's habeas counsel claim that his trial attorneys rendered ineffective assistance of counsel by failing to request that the trial court determine Basham's competency to stand trial. Alternatively, they argue that trial counsel was ineffective for failing to request a delay in trial until such time that Basham became competent. This claim must fail for several reasons.

First, there is nothing in the record to support Basham's habeas counsel's assertions that

Basham was incompetent to be tried.  As recounted above, trial counsel resisted the Government's

motion for a determination of mental competency to stand trial.  Docket # 99.  Trial counsel noted

that "[w]ith the necessary therapy, Basham has been able to assist in his defense and to understand

the gravity of the charges he faces."  Id. at 2.  Even in the middle of trial, after the tussle with the

marshals, Dr. Schwartz-Watts determined that Basham was competent to stand trial.    TT  6: 6.

Mr. Swerling assured the Court that "[t]here is no question about competency."  Id.  To argue that

trial counsel was ineffective for failing to mount a competency defense flies in the face of the record

developed before and during Basham's trial.  It also would have required trial counsel to challenge

the findings of their primary psychiatric witness, Dr. Schwartz-Watts.

Second, as the Fourth Circuit noted, defense counsel did not challenge Basham's competency

for strategic reasons.  See  Basham, 561 F.3d at 325 (noting that "Swerling later withdrew

[previously filed competency motion], indicating that [they] were pursuing a different strategy").

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options

are virtually unchallengeable."  Strickland, 466 U.S. at 690, 104 S.Ct. 2052.  The choice whether to

pursue an incompetency defense turns in part on defense counsel's choice of strategy, and for obvious

reasons counsel's strategy judgments are ordinarily given special deference. See id. at 689, 104 S.Ct.

2052.

"Competency" in this context is a comparatively narrow concept and must not be confused

with broader or different uses of the term. It is not the same as whether the defendant has an insanity

or diminished capacity defense on the merits or whether his ideas about how to live or what to

believe are common in the community or seem sensible to others. Rather the competency insisted

on by the courts is a functional concept focusing on the defendant's part in the trial.  Robidoux v.

O'Brien, 643 F.3d 334, 339 (1st Cir. 2011).

The two settled requisites of competency are that the defendant understand the nature of the proceedings against him and that he be able to cooperate with counsel in his defense. Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Drope v. Missouri, 420 U.S. 162, 171–72 (1975). The "understanding" required is of the essentials—for example, the charges, basic procedure, possible defenses—but not of legal sophistication. One of the jobs of counsel—and, in limited respects, the judge—is to explain matters to the defendant, and it is that understanding that is required.

Basham's habeas counsel claim that "this case is replete with instances of Mr. Basham's inability to communicate or work productively with his attorneys; his suicide attempts; his inability to remain awake during court proceedings . . .; his inability to focus on the proceedings; and his inability to control his behavior in court." §2255 Motion, at p. 38. However, these assertions are not well supported by the record and do not contradict the fact that the record is barren of support for Basham's alleged incompetency. Furthermore, even if the Court were to accept Basham's habeas counsel's assertions at face value, none of these asserted facts required Basham's counsel to assert what would have been, at best, an extremely weak competency defense.

It is clear that "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." Walton v. Angelone, 321 F.3d 442, 460 (4th Cir. 2003). Similarly, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." Id. Needless to say, trial counsel "is in the best position to evaluate a client's comprehension of the proceedings." Hernandez v. Ylst, 930 F.2d 714, 718 (9th Cir. 1991).

The question is not whether a court or some other attorney thinks that counsel should have raised the competency issue but whether the trial counsel was "unreasonable" in concluding that under the circumstances they should not raise such a defense. This Court cannot conclude that trial counsel's strategic decision to not pursue a competency defense was unreasonable when there is no evidence that Basham failed to understand the proceedings and that he was unable to cooperate with counsel. See Robidoux v. O'Brien, 643 F.3d at 340.

Finally, Basham's ineffective assistance of counsel claim must fail because he can show no prejudice. As described above, even if counsel challenged his competency there is not a reasonable probability that Basham would have been found incompetent.

D.     Response to Claim 6

In Claim 6, Basham's habeas counsel argue that the trial court's failure to hold a competency hearing despite supposed indicia of his incompetence was an abdication of the court's obligation under 18 U.S.C. § 4241(a) and violated his procedural due process rights under Drope, 420 U.S. at 171-72, 95 S.Ct. This challenge is unavailing and fails because: (1) this is a direct appeal issue that Basham procedurally defaulted; (2) there was not reasonable cause to believe that Basham was incompetent and (3) Basham's trial counsel resisted such an order for strategic reasons and affirmatively told the Court that Basham was not incompetent.

A trial court is required to order a competency hearing only when the court finds "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. §4241(a). Similarly, a trial court's failure to inquire into competency, *sua sponte*, where there is

-33-

reason to doubt a defendant's competency, violates due process because it deprives the defendant of his right to a fair trial. Drope, 420 U.S. at 172, 95 S.Ct. 896; Pate, 383 U.S. at 385-86, 86 S.Ct. 836. But barring indicia of incompetence, due process does not require that a competency hearing be held. Godinez v. Moran, 509 U.S. 389, 402 n. 13, 113 S.Ct. 2680 (1993).

Because evidence of a defendant's demeanor at trial is relevant in determining competency, a district court may determine informally whether reasonable cause exists by observing the defendant's demeanor and assessing his statements during colloquies and other interactions with the court. United States v. Jones, 642 F.3d 1151, 1161 (D.C. Cir. 2011); United States v. Weathington, 507 F.3d 1068, 1073 (7th Cir. 2007); United States v. Grimes, 173 F.3d 634, 636 (7th Cir. 1999). If the preliminary inquiry does not establish reasonable cause to believe the defendant is incompetent, a hearing is not mandatory. United States v. Graves, 98 F.3d 258, 261 (7th Cir.1996).

Basham did not challenge the district court's failure to order a competency hearing pursuant to 18 U.S.C. § 4241 during trial. Moreover, Basham did not raise this issue on direct appeal. Basham brings this challenge for the first time in this §2255 proceeding. Alleged violations of 18 U.S.C. § 4241 are not cognizable under section 2255. See United States v. Williams, 819 F.2d 605, 607 (5th Cir. 1987) If a defendant fails to raise an issue at trial or on direct appeal, he must show cause excusing the procedural default and actual prejudice resulting from the alleged error to prevail under section 2255. United States v. Frady, 456 U.S. 152, 167-68 (1982); United States v. Dunham, 767 F.2d 1395, 1397 (9th Cir.1985). Basham cannot show cause or prejudice. Therefore, this claim is barred.

Even it this claim were not defaulted, the district court did not err or abuse its discretion in refusing to order a competency evaluation or hold an evidentiary hearing to determine Basham's

-34-

competence to stand trial. As noted above, Basham's behavior did not suggest that he was incompetent. Trial counsel and Dr. Schwartz-Watts informed the Court at different times that Basham was competent. See United States v. Clark, 617 F.2d 180, 186 (9th Cir.1980)(fact that defendant's attorney considered defendant competent to stand trial was significant evidence that defendant was competent). Furthermore, Basham's trial counsel affirmatively sought to prevent the Court from ordering a competency evaluation and hearing.[5]   Hernandez, 930 F.2d at 718 (trial counsel in best position to evaluate client's comprehension of the proceedings). Under such circumstances, the Court cannot be held to abuse its discretion in failing to *sua sponte*, order a competency hearing. See e.g., Jermyn v. Horn, 266 F.3d 257, 298 (3d Cir. 2001)(no competency hearing required "where there were no medical opinions on competency submitted to the trial court, no signs from trial counsel that the defendant's competence was in doubt in his view, and the defendant's behavior, while strange, was not sufficiently indicative of a individual who was incapable of understanding the nature of the proceedings, communicating with counsel or assisting in his defense"). Accordingly, the trial court did not err in refusing to order a competency hearing *sua sponte.*

> E.     Response to Claim 7

In Claim 7, Basham's habeas counsel argue that Basham's appellate counsel were ineffective for failing to raise the issues of his supposed incompetency and "this court's failure to fulfill its *sua sponte* obligation under 18 U.S.C. §4241(a)" by asserting that the "record in this case plainly reflects

---

[5]Having pursued this approach at trial at his counsel's insistence for strategic purposes, Basham should not now be allowed to "whip-saw" the trial court and claim incompetence. See generally Wheat v. United States, 486 U.S. 153, 161-62 (1988) (trial courts confronted with multiple representations "face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule").

[Basham's] in competency."  §2255 Mot. at 45.  This claim should be summarily dismissed.

The selection of which issues to present on appeal is, almost by its very nature, a strategic decision. See Burket v. Angelone, 208 F.3d 172, 189 (4th Cir.2000) ("[A]ppellate counsel is given significant latitude to develop a strategy that may omit meritorious claims in order to avoid burying issues in a legal jungle."); Haynes v. United States, 451 F.Supp.2d 713, 722 (D.Md.2006) ("Limiting the issues to the stronger or strongest ones while winnowing out the weaker is sound appellate strategy."). "Effective assistance of appellate counsel does not require the presentation of all issues on appeal that may have merit, and [the Court] must accord counsel the presumption that he decided which issues were most likely to afford relief on appeal." Lawrence v. Branker, 517 F.3d 700, 709 (4th Cir.2008) (quotation marks, brackets, and citations omitted). "Winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy," and "counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims." Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (alteration, citations, and internal quotation marks omitted).  Consequently, while it is conceivably possible to bring an ineffective assistance claim premised on an appellate counsel's failure to raise an issue, "it will be difficult." Id., 236 F.3d 149, 164 (4th Cir.2000) (quotation marks and brackets omitted). An ineffective assistance claim based on an ignored issue generally will only succeed "when ignored issues are clearly stronger than those presented." Lawrence, 517 F.3d at 709.

This case does not present an instance of ineffective assistance of appellate counsel. Appellate counsel submitted a thorough and well reasoned 164-page opening brief which set forth sixth issues and a subsequent 64-page reply brief.  The appeal of Basham's trial and sentencing

resulted in a lengthy opinion.  See Basham, 561 F.3d at 302-339.  As noted above, and contrary to Basham's habeas counsel's assertion, the record in this case plainly did not reflect Basham's incompetency.  The present case presents a textbook case of [w]innowing out weaker arguments on appeal and focusing on those more likely to prevail."  Bell, at 164.  Competence was not asserted at trial and could not have been viewed by appellate counsel as stronger than the issues that were presented.  In these circumstances, appellate counsel was not ineffective for failing to raise competency as an issue on appeal and Basham was not prejudiced by this decision to not raise the issue.

**Response to Claim 8: Basham's trial counsel were not required to second-guess the medical decisions of Basham's treating physician.**

In Claim 8, Basham's habeas counsel claim that Basham's trial counsel were constitutionally ineffective because they permitted treating physician psychiatrist Donald Morgan "to prescribe a series of contradictory and contraindicated medications that rendered Mr. Basham incompetent and often incoherent."   §2255 Mot. at  46.  This allegation, which would place a criminal defense attorney in the position of supervising a medical doctor in the prescription of medication to a defendant, should be summarily dismissed.

At  its heart, this claim centers around Dr. Morgan's prescribing of certain medications to treat Basham during the time period of June 2003 through the end of the 2004.  Basham's habeas counsel complain that the combination of medications caused Basham to vacillate between "uncontrollable agitation and drowsiness."   Id.  While conceding that Basham's trial counsel "were not medical professionals," Basham's habeas counsel assert that trial counsel were ineffective because "Dr. Morgan acted at their direction [and] they assumed responsibility for Dr. Morgan's

treatment plan for Mr. Basham." Id.

This claim suffers from a number of fatal defects.   First, this assertion is a complaint that trial counsel were not able to better supervise a psychiatrist in the very specialized field of psychiatry.  It presupposes that trial counsel would be at least equal to the psychiatrist in knowledge of psychiatry and the effectiveness of medications that are used to treat mental health issues.  This is not required of criminal defense attorneys.  As the Fourth Circuit has noted:  "An attorney is not required to be so expert in psychiatry."  Pruett v. Thompson, 996 F.2d 1560, 1574 (4th Cir. 1993).  To require what Basham's habeas counsel suggest would require trial counsel to delve into the unauthorized practice of medicine.

Second, this argument is really a claim that Dr. Morgan was ineffective as a treating expert psychiatrist.  The claim must fail.  The Fourth Circuit has consistently "rejected the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of counsel."  Wilson v. Greene, 155 F.3d 396, 401 (4th Cir. 1998); Pruett, 996 F.2d at 1573 n.12; Poyner v. Murray, 964 F.2d 1404, 1418 (4th Cir. 1992); Waye v. Murray, 884 F.2d 765, 766-67 (4th Cir. 1989).

Finally, there is no indication that Dr. Morgan was somehow "ineffective" in his treatment of Basham.  Although habeas counsel claims that Basham's conduct at trial was caused by the medications that Basham was prescribed by Dr. Morgan, there is no support for this claim.  In fact, the Fourth Circuit found that Basham's conduct was more likely "points to a manipulative individual."  Basham, 561 F.3d at 333.  For the forgoing reasons, Claim 8 should be dismissed.

**Response to Claim 9: Basham's trial counsel adopted a reasonable strategy by conceding certain allegations and focusing on Basham's intent.**

In Claim 9, Basham's habeas counsel claim that Basham's trial counsel, in particular, Jack Swerling, rendered ineffective assistance of counsel when he conceded in opening statements all the indictment allegations against Basham except for Basham's "intent to cause death or serious bodily harm" in connection with the carjacking and kidnapping. §2255 Mot. at 47-50. This claim is without merit. Mr. Swerling's comments in opening statements were done for valid strategic reasons. Basham was fully informed of the approach Mr. Swerling proposed to pursue and Basham consented to this approach. Additionally, case law and experts in the field of capital litigation confirm that Mr. Swerling's comments in opening statements were done pursuant to a valid trial strategy and clearly did not constitute ineffective assistance of counsel.

As noted above, Mr. Swerling is an experienced defense attorney with vast experience in defending murder cases and death penalty cases. See Basham, 561 F.3d at 325 (citing Sims v. Brown, 425 F.3d 560, 582 n. 14 (9th Cir. 2005) (noting Swerling's experience at the time included 100 homicide cases, four of which involved the death penalty)). Swerling used his experience, along with co-counsel Greg Harris, to craft a strong trial strategy in an attempt to spare Basham from a death sentence.

During trial, Basham admitted culpability in the carjacking and kidnapping, but argued that Fulks committed Donovan's murder and was the instigator throughout the crime spree. To that end, during Basham's opening statement, Mr. Swerling argued that the only "issue in controversy" was Basham's intent to cause death or commit serious bodily harm to Donovan at the time of the abduction. TT 1: 65-69. Counsel attempted to gain credibility by noting that "I am not going to

stand here and tell you that he did nothing." Id. at 61.    In framing the issue, Basham's counsel

brought out that Basham could not drive a car and had never been outside of Kentucky prior to the

prison escape, that all of the places Fulks and Basham visited on their crime spree were places from

Fulks's past, and that Fulks was the dominant and intelligent leader while Basham was limited

intellectually and a passive follower.  Id. at 64-66, 57-58.

Initially, it is clear from the record that trial counsel's statements in opening statements were

made as part of a valid trial strategy after consultation with and obtaining the consent of Basham.

In an *ex parte* hearing before the opening statements, Mr. Swerling explained his discussions with

Basham and the fact that his concessions in the opening statements were strategic and with Basham's

consent:

> I want the record to reflect following this procedure that there is no question later about any strategy that we follow and that I have discussed this with Mr. Basham.  Mr. Harris and I discussed it with him Friday.  Actually, discussed it with him on several occasions particularly again on Friday and again this morning.  Mr. Harris was present on Friday, was present for a few moments this morning as well as Dr. Watts who was also present this morning.
>
> Judge, essentially what I am going to do with Mr. Basham's consent is, as far as the allegations of the indictment, we are going to tell the jury that most of the allegations in the indictment are not in controversy.  Most of the charges in the indictment are not in controversy.  What will be in controversy for the jury to decide will be with respect to Count 1, and I believe it is the conspiracy count as it related to carjacking, as well.  That would be Count 4, part of the conspiracy count there, conspiracy to carjack, there are other crimes as well.
>
> What I am prepared to tell the jury that is under controversy under the carjacking statute is whether there was an intent on the part of Mr. Basham, at the time the car was taken, to either kill Ms. Donovan or cause her serious bodily harm.  Mr. Basham has always maintained, although he did participate in the abduction of Ms. Donovan, there was never any intent to hurt or kill her. So, basically, we are going to be conceding many of the issues in the opening statement that are in the indictment, and I have explained that to him.  I have explained his right to have all of it contested.  We are prepared to do all of it if that is what he wants.  But, as a matter of strategy, we think this is the best approach.

-40-

9/13/04 Ex Parte Hearing before Opening Statements at 2-3. A few moments later, trial counsel also explained:

> Judge, the only other thing I would like to put on the record with respect to that is that, generally, I am going to probably concede to the jury–not probably, I will concede to the jury that I fully expect we will be going into a sentencing phase on this trial. And explain to them what is going to happen in that phase, but not go into any great detail, but at least concede that as probably where this case is going.

Id. at 4. After these statements and explanations by Basham's trial counsel, this Court had a short colloquy with Basham to confirm that he agreed with his counsel's strategy:

The Court: You heard what your lawyer Mr. Swerling just told me, correct?

The Defendant: Yes, Sir.

The Court: He basically says, in his opening statement to the jury, he is going to not contest many of the elements of the charges against you. And that means that the jury will probably assume those matters to be proved from the very beginning of this case. Apparently Mr. Swerling thinks that, on a strategic point of view, it will gain you some goodwill with the jury to not contest certain matters and only contest and fight about the things that he thinks are important to us. That is a strategy matter. It is not my business. But I just want to find out if that meets with your approval.

The Defendant: Yes, Sir.

The Court: Have you discussed it thoroughly with Mr. Harris and Mr. Swerling?

The Defendant: Yes.

The Court: You agree with Mr. Swerling on what he proposes he told me he would do?

The Defendant: Yes, Sir.

Id. at 5.

Trial counsel's own words before his opening statement reveal that his concessions made in his opening statement were strategic and pursuant to a valid trial strategy. The Fourth Circuit has

-41-

found:

> In considering a Sixth Amendment ineffectiveness claim, a reviewing court does not "grade" the lawyer's trial performance; it examines only whether his conduct was reasonable "under prevailing professional norms," and in light of the circumstances. Strickland, at 697, 688, 104 S.Ct. 2052. Because it may be tempting to find an unsuccessful trial strategy to be unreasonable, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

Carter v. Lee, 283 F.3d 240, 248-49 (4th Cir. 2002).

It is clear that this approach trial counsel settled upon is a well recognized strategy in capital cases. A strategy in which a defendant acknowledges his involvement in the killing but denies that he was guilty of capital murder because he lacked the requisite mental state or intent may prevent the backlash that can occur when a defendant denies guilt and then asks for mercy after conviction:

> Contesting guilt has an obvious value at the guilt phase, but it also has potential value at the penalty phase, because residual doubt about guilt is a strong predictor of life sentences. The value of actively contesting guilt, however, must be weighed against the frequency with which jurors are angry at defendants who deny their involvement when evidence of guilt is strong. A denial defense at the guilt or innocence phase is more than twice as likely to result in a death sentence as compared to cases where the defendant acknowledges his guilt from the start, particularly when the defendant has taken the stand and testified to his innocence. In such cases, jurors frequently dismiss the case in mitigation as just another attempt by the defendant to avoid responsibility for his actions. In the juror's eyes, the defense team tried to fool them at the first phase by denying his guilt, and now he is trying to fool them again with the mitigation evidence to cheat the executioner.
>
> Sometimes the tension between contesting guilt and acknowledging responsibility can be bridged by partial defenses; a defendant may contest his mental state, or his role in a multi-defendant crime without necessarily incurring the jury's wrath when he "switches" to a focus on mitigation in the penalty phase. **Likewise, a defense that acknowledges involvement in the killing but denies that the defendant was guilty of capital murder appears to escape this backlash**, at least where the defense is plausible on the facts.

John H. Blume, Sheri Lynn Johnson & Scott F. Sundby, Competent Capital Representation: The

-42-

Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation, 36 Hofstra L.Rev. 1035, 1044-45 (2008) (emphasis added); See also Scott E. Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L. Rev. 1557, 1593-94 (1998) (noting that jurors are likely to perceive the defendant who fails to take any responsibility in the guilt phase as continuing to deny responsibility in the sentencing phase if he then offers mitigation focusing on child abuse, substance abuse, or other impairments).

The case law likewise confirms that a strategy of essentially conceding guilt in the guilt phases of a capital case is a valid strategy that certainly is not ineffective assistance. See e.g. Bell v. Evatt, 72 F.3d 421, 429 (4th Cir.1995) (concluding counsel reasonably conceded defendant's guilt of kidnapping to retain credibility for penalty phase); State v. Elmore, 111 Ohio St. 3d 515, 857 N.E.2d 547 (2006) (counsel's decision to concede capital murder defendant's guilt on kidnapping charge during guilt phase closing arguments was a tactical one, and was not ineffective assistance; decision to concede guilt maintained defense credibility and allowed defense to focus jury's attention on defense counsel's argument that defendant was guilty of murder rather than aggravated murder, the former of which would have rendered defendant ineligible for the death penalty).

In Florida v. Nixon, 543 U.S. 175 (2004), the Supreme Court held that counsel has the authority to concede the defendant's guilt in the guilt/innocence phase of a death penalty trial **even without receiving consent from his client**. Id. at 175 (emphasis added). The Court's decision in that case turned, in part, on its assessment that skilled criminal defense lawyers employ the strategy of conceding guilt in capital trials. Id. at 191-92. After all, the Court pointed out, the decision by Nixon's lawyer to concede guilt, although ultimately not successful, was a strategy once employed by none other than Clarence Darrow. Id. at 192 ("Renowned advocate Clarence Darrow, we note,

famously employed a similar strategy as counsel for the youthful, cold-blooded killers Richard Loeb and Nathan Leopold.").

Furthermore, it is clear that Basham's trial counsel's decision was made only after extensive discussions with Basham and only after Basham consented to this approach. See Strickland, 466 U.S. at 690, 104 S.Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable ...."); Lawrence v. Branker, 517 F.3d 700, 716 (4th Cir. 2008) ("Lawrence was fully apprised of his trial counsel's defense strategy before closing arguments, and he consented to the plan of attack. He cannot now claim error in the very strategy that he authorized"); see also Lobosco v. Thomas, 928 F.2d 1054, 1057 (11th Cir.1991) (holding that, largely because the defendant concurred in the strategy, it was not ineffective assistance under Strickland for defense counsel to use his closing argument at the guilt stage of the trial to concede the defendant's guilt and begin building a case for mercy based on his contrition); United States v. Weaver, 882 F.2d 1128, 1140 (7th Cir.1989) ("Where a defendant, fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel [under Strickland]."); United States v. Williams, 631 F.2d 198, 204 (3d Cir.1980) (no ineffective assistance existed because the defendant ultimately concurred in his trial counsel's tactical decision).

Trial counsel's concession in opening statements was done for valid strategic reasons. Basham was fully informed of the approach Mr. Swerling proposed to pursue and Basham consented to this approach. Case law and experts in capital litigation confirm that Mr. Swerling's comments in opening statements were done pursuant to a valid trial strategy and clearly did not constitute ineffective assistance of counsel.

-44-

**Response to Claim 10: There was no reason to excuse Basham from the courtroom prior to his altercation with the Marshals.**

In Claim 10, Basham's habeas counsel claim that Basham's trial counsel were ineffective in refusing to comply with Basham's request to exit the courtroom immediately before a tussle with the Deputy U.S. Marshals. Trial counsel was not ineffective when they insisted that Basham be present in the courtroom. It is clear that trial counsel wanted Basham to be present in the courtroom to assist them in his defense and were concerned that his absence would have an adverse impact on the jury. TT 5: 180-81. Additionally, according to Dr. Schwartz-Watts after her examination of Basham immediately after the tussle with the marshals, she was "not sure that [absenting the courtroom] was what [Basham] really wants. He is reacting to situations . . . in his limited capacity at this point. . . . I don't think he can hold on to a decision, he is quite impulsive." TT 5: 163.

At the end of the first week of trial, Basham negotiated with the Court to be allowed to use chewing tobacco to help him stay awake. Basham, 561 F.3d at 332-33. The following Monday, September 20, however, the Court withdrew its promise on the advice of the United States Marshal because Basham had a history of flinging fluids. Id. at 333. After the lunch recess on September 20, the Court read a note that stated that Basham had told another marshal that he did not actually care about having chewing tobacco, but that he just wanted to make U.S. Deputy Marshal Riley, an African-American, mad. TT 5: 146; Basham, 561 F.3d at 333. Basham then told of the alleged causes for his inability to "get along" with Deputy Marshal Riley. Id. at 146-48.

When the Court told Basham, "you are not adding anything to the discussion here" and ruled that Basham would not be allowed to use dip in the court room, Basham asked to "go back downstairs." Id. at 148. The Court told Basham that it was not possible because he "need[ed] to be

-45-

[in the courtroom] to help his lawyers defend this case."     Id. at 148-49.  Trial counsel Swerling noted that if Basham left the courtroom "it will be a problem" and against Swerling's "judgment" and "wishes."  Id. at 149.  See also Basham, 561 F.3d at 333 ("Basham's counsel had previously indicated opposition to him leaving the courtroom").  Basham then refused to comply with the Court's instruction to "be seated."  Marshals approached Basham to "assist him to his seat."  Id. at 149-50; Basham, 561 F.3d at 333.  Basham refused.  A seven or eight minute scuffle then ensued between Basham and Deputy U.S. Marshals.  In the end, eight marshals and security officers were needed to subdue Basham.   TT 5:,150-53, 158.

Dr. Schwartz-Watts examined Basham that afternoon.  After examining Basham for "about 15 or 20 minutes," Dr. Schwartz-Watts testified that she had "concerns about his competency."  Id. at 162.  However, she noted that "with a little time, perhaps by tomorrow, there would be no reason that I can foresee that he wouldn't be calm enough that we can proceed."  Id.   Additionally, Dr. Schwartz-Watts said that she was "not sure that [absenting the courtroom] was what [Basham] really wants.  He is reacting to situations . . . in his limited capacity at this point. . . . I don't think he can hold on to a decision, he is quite impulsive.  I don't know how knowingly and intelligent that would be . . .  with the mental state he is in."  Id. at 163.  Counsel reiterated that they were adamant that Basham be present in the courtroom to assist them in his defense and were concerned that his absence would have an adverse impact on the jury. Id. at 180-81.   Court was adjourned for the day.

The next morning, at the start of court, Dr. Schwartz-Watts advised that Basham was competent and the trial proceeded.  As the Fourth Circuit noted: "Thereafter, the district court permitted Basham to have dip during breaks , and Basham behaved himself."  Basham, 561 F.3d at 333.

The Sixth Amendment guarantees a defendant's right to be present in the courtroom during the trial of his case. See Lewis v. United States, 146 U.S. 370, 372 (1892). But, there are recognized limitations to this right. "A defendant can lose his right to be present at trial if, after he has been warned by the trial judge that he will be removed if he continues his disruptive behavior, he nevertheless insists upon conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." Illinois v. Allen, 397 U.S. 337, 343 (1970).

Interestingly, habeas counsel seem to assert that a defendant has the opposite right–the right to absent oneself from a capital trial. Although habeas counsel cite to Rule 43 of the Federal Rules of Criminal Procedure to support their argument, they overlook the fact that this rule may actually *require* a capital defendant's presence in a capital case, at least during sentencing proceedings. See Fed.R.Crim.P. 43(c)(1)(B) ("a criminal defendant who was initially present at trial waives the right to be present . . . in a noncapital case, when the defendant is voluntarily absent during sentencing"). Furthermore, it is unsettled in the Fourth Circuit whether a capital defendant can waive his presence at trial except when he is purposefully disruptive. See Near v. Cunningham, 313 F.2d 929, 931 (4th Cir. 1963) (capital defendant cannot waive presence at trial); United States v. Tipton, 90 F.3d 861, 873-74 (4th Cir. 1996) (reserving decision on question of whether capital defendant could waive his right to presence at trial); But see Bell v. Evatt, 72 F.3d 421, (4th Cir. 1995) (upholding the removal of defendant from closing argument in capital case after defendant continually disrupted his own counsel's closing argument and refused to remain quiet when instructed to do so by judge). See L'Abbe v. DiPaolo, 311 F.3d 93, 97 (1st Cir.2002) (observing that "the Supreme Court has never directly ruled on the issue of whether a criminal defendant can waive his right to presence in a capital

-47-

case"). Because the law was and still is unsettled regarding this issue, it is nearly impossible for trial counsel to have been ineffective in insisting that Basham be present for his capital trial.

Basham's habeas counsel's claim that trial counsel was ineffective for refusing to comply with Basham's request to exit the courtroom immediately before the tussle with the marshals must fail for several other reasons. This claim relies upon the 20/20 vision of hindsight, refuses to credit counsel's strategic reasons for Basham to be present at the trial and ignores the manipulative aspect of Basham's request.

It is well settled that "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. In other words, the challenged conduct is to be evaluated in light of the circumstances surrounding the decision, not with the 20/20 vision of hindsight.

Basham's habeas counsel seem to claim that trial counsel should have known that Basham would have a tussle and that if they had supported Basham's claim to absent himself, the tussle would never have occurred. See §2255 Mot. at 53. This claim would require the Court to view counsel's actions and decision with the 20/20 vision of hindsight. However, the Court is charged with evaluating the conduct from counsel's perspective at the time.

It is clear that trial counsel had solid strategic reasons for Basham to stay in the courtroom during the trial. As Mr. Swerling explained: "There is no way I can agree to [Basham watching the trial from a holding cell]. I am representing somebody in a death penalty case. I have to insist that he be in the courtroom to assist us and not have an adverse impact on the jury if he were not here." TT 5: 180. This considered strategic decision to have Basham remain present in the courtroom to

-48-

assist counsel and so that there would be no adverse impact caused by his absence is nearly unassailable.

Finally, Basham's conduct before, during and after his tussle with the marshals and his "negotiations" with the Court regarding his need for chewing tobacco shows an individual who was manipulating the Court. See Basham, 561 F.3d at 333. After the Court agreed to allow Basham to dip during breaks, he behaved himself the rest of the trial. The Government agrees with Dr. Schwartz-Watts's statement that she was "not sure that [absenting the courtroom] was what [Basham] really wants." The more likely truth was that he simply wanted to manipulate the courtroom and the Court to get what he wanted – chewing tobacco.

Trial counsel was not ineffective when they insisted that Basham be present in the courtroom. This claim would require the Court to take an inappropriate approach and employ the 20/20 vision of hindsight in evaluating counsel's actions. The law is not clear that a capital defendant can waive his presence at trial except when he is purposefully disruptive. However, it is clear that trial counsel had a strategic reason for wanting Basham to be present in the courtroom to assist them in his defense and that they were concerned that his absence would have an adverse impact on the jury. TT 5: 180-81. This claim should be dismissed.

**Response to Claims 11 and 12: There is nothing on the record to suggest that Sheriff Hewett testified falsely; the prosecutor's argument was consistent with its overarching argument that both Basham and Fulks killed Alice Donovan.**

Basham's habeas counsel allege that Sheriff Ronald Hewett testified falsely, and that the Government committed misconduct by not correcting the allegedly false testimony and then using the testimony during its closing argument. §2255 Mot. at 54-56. Basham did not raise this issue on appeal. An error can be attacked on collateral review only if first challenged on direct review.

United States v. Harris, 183 F.3d 313, 317 (4ᵗʰ Cir. 1999). Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in a federal habeas proceeding only if the defendant can show both cause for and actual prejudice from the default, or that he is actually innocent. Id. (internal citations omitted). If appellate counsel were constitutionally ineffective under the standard established in Strickland, cause is established for the procedural default. Williams v. French, 146 F.3d 203, 215 (4ᵗʰ Cir. 1998). As Basham cannot show ineffective assistance of appellate counsel, his claim of witness and prosecutorial misconduct should be dismissed.

Reviewing courts must accord appellate counsel the "presumption that he decided which issues were most likely to afford relief on appeal." Bell v. Jarvis, 236 F.3d 149 (4ᵗʰ Cir. 2000)(quoting Pruett v. Thompson, 996 F.2d 1560 (4ᵗʰ Cir. 1993)). Counsel is not obligated to raise all nonfrivolous issues on appeal. Id. (citing Jones v. Barnes, 463 U.S. 745, 752 (1983)). Winnowing out weaker arguments and focusing on issues more likely to prevail is the hallmark of effective appellate advocacy. Id. (citing Smith v. Murray, 477 U.S. 527, 536 (1986)). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Id. Basham's appellate counsel raised six issues. See United States v. Basham, 561 F.3d 302, 308 (4ᵗʰ Cir. 2009). Basham has failed to show that the issues of witness perjury and prosecutorial misconduct are "**clearly** stronger than the ones presented." In order for Basham to have prevailed on appeal on a claim that the prosecutor's closing argument violated his right to due process, it would have been necessary for him to convince the Court of Appeals that the prosecutor's remarks were improper, and that "the proceeding . . . was rendered fundamentally unfair by the improper argument." See Boyd v. French, 147 F.3d 319, 329 (4ᵗʰ Cir.

-50-

1998).

Basham has failed to show a denial of due process. Due process is denied if the Government knowingly uses perjured testimony against the defendant to obtain a conviction. United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987)(citing Napue v. Illinois, 360 U.S. 264, 269 (1959)). A defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was perjured. Id. Mere inconsistencies in testimony by government witnesses do not establish the Government's knowing use of false testimony. Id. Basham has failed to show that Sheriff Hewett's testimony was perjured.

Sheriff Hewett's testimony at Basham's trial was consistent with his testimony during the Jackson v. Denno hearing that Basham demonstrated how the purse strap was used. At Basham's trial, he testified:

> Q.     There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?
>
> A.     No, Sir.  He did not tell me he used the strap.  He demonstrated, though.
>
> Q.     He demonstrated?
>
> A.     Yes, sir.
>
> Q.     Your notes, nor Lieutenant Crocker's notes say that he did that; isn't that true?
>
> A.     That is true because he didn't say.  He showed.

TT 10: 53-54.  While this testimony was ambiguous, there is nothing to suggest that it was untruthful. It was consistent with his testimony at the Jackson v. Denno hearing:

> A.     . . . He [Basham] walked down to the cemetery, he got tears in his eyes and tears rolled down his cheek.  He showed me the length of the strap - -

-51-

Q.    How did he do that?

A.    May I demonstrate?

Q.    Certainly.

A.    Like this.  Because he couldn't pull his hands very - - very far apart, he was shackled.  He showed me the length of the strap.  Says that he believed it to be a Liz Claiborne strap, and that he had thrown it into the woods.  He then demonstrated the manner in which he threw it in the woods.

Q.    Would you stand up and do that for the court so the record is complete as   well.?

A.    Yes, sir, I will.  We were standing at the corner of the cemetery, Branden Basham is chained.  I said, **"Branden, how did you do that?"  And he said, "Like that.  And I threw it over there."**

A.    Basham described the Liz Claiborne 16 to 20 inch strap.

Q.    Okay.

A.    And indicated by this motion that it was used to strangle Alice Donovan.

Q.    Okay.  It wasn't said, it wasn't verbalized, it was just used in - -

A.    Yes, sir.

2/25/04  Hearing Tr at 66-67, 77-78.  The context - Basham was emotional and crying when he demonstrated - strongly suggests that he was involved in strangling Alice Donovan.[6]  The prosecutor argued during the closing for the guilt phase of the trial:

> What does he tell the sheriff?  He tells the sheriff that it was right there at that gate.  He tells -
>  he not only tells, he demonstrates.  He demonstrates for that sheriff a Liz Claiborne purse
> strap was used to kill Alice Donovan.  Then what does he say? I threw it in the woodline.
> Mr. Swerling asks Sheriff Hewett says he didn't say I killed Alice Donovan.  Sheriff Hewett
> said to you in this courtroom in front of you . . . . No, he demonstrated it.

---

[6]  It appears Basham may have been caught in his own web of deceit, since a piece of Alice Donovan's remains was found several years later at the Savannah Bluff area, many miles from the  Bee Tree Farms area.

TT 12 at 80.

During the closing for the penalty phase, the prosecutor argued:

> What does Brandon Basham say in the presence of Sheriff Hewett? It is not really what he says, it is what he does. He is shackled. He describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewett how Alice Donovan was strangled. And then he tells Sheriff Hewett, "I threw the purse strap into the woods." He has demonstrated. He even has his arms down. You saw Sheriff Hewett stand up there and show.

TT 29: 57.

Basham's habeas counsel suggest that since Basham told officers during the trip to the Bee Tree Farms area that Fulks strangled Alice Donovan, that he could not have subsequently demonstrated to Sheriff Hewett how the purse strap was used to kill Alice Donovan. §2255 Mot. at 54-56. Obviously, he could have done both. They are not mutually exclusive. Even if they were in conflict, one could not reach the conclusion that Agent Long or Sheriff Hewett was being dishonest. Basham made several conflicting statements about what happened to Alice Donovan within the same time period. For example, on November 19, 2003, Basham said Alice Donovan was with Fulks, driving to South Carolina. TT 9: 148-149. Several hours later, on the same day, Basham said Fulks had left him in a Myrtle Beach parking lot for about an hour while Fulks took Alice Donovan to tie her up. TT 9: 177. The next day, November 20, Basham described an area and drew a map of what was determined to be the Savannah Bluff area. TT 9: 198. He said there was a big sign with "inn" or "hotel" near the road they had taken, and that they had tied Alice Donovan with silver-colored duct tape near a lake with a boat ramp. TT 9: 198-199. Five days later, he described a totally different area and implied that Alice Donovan had been killed. TT 9: 218; TT 10: 80. Thus, it would not have seemed unusual for Basham to say one thing during the morning of the search and another thing in the afternoon, and reports and statements in conflict with each other reflect on the

veracity of Basham, not the officer reporting them.

Just as Sheriff Hewett did not perjure himself, the prosecutor did not commit prosecutorial misconduct during his closing characterization of the evidence. In assessing alleged prosecutorial misconduct, the Court asks "whether the [misconduct] so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Caro, 597 F.3d 608, 624 (4th Cir. 2010)(quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)). To prove reversible error, the defendant must show (1) "that the prosecutor's remarks or conduct were improper" and (2) "that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." Id. at 624-625 (quoting United States v. Sheetz, 293 F.3d 175, 185 (4th Cir. 2002)). An assessment of prejudice requires the court to consider (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury. Sheetz, 293 F.3d at 185-186 (citing United States v. Wilson, 135 F.3d 291, 299 (4th Cir. 1998)). Isolated passages which are part of a prosecutor's closing argument, billed to the jury in advance as a matter of opinion, not of evidence, do not constitute prosecutorial misconduct amounting to a denial of constitutional due process. See Donnelly v. DeChristoforo, 416 U.S. 637, 646-648 (1974). While a prosecutor must limit his closing argument to the evidence and reasonable inferences that may be drawn from it, he may argue his personal interpretation of the evidence. United States v. White, 241 F.3d 1015, 1023 (8th Cir. 2001).

The prosecutor's remark during closing could not have misled jurors. There was no attempt to convince jurors that Basham alone was the one who actually killed Alice Donovan. From start to finish, the Government argued that Basham and Fulks, together, killed Alice Donovan. The themes of the opening statement were choices and teamwork. The prosecutor defined "team," and discussed the characteristics of a team. TT 1: 29. He told jurors: "Brandon Basham and Chad Fulks chose each other. And then **the team of Fulks and Basham** chose to escape from the prison . . . and **they** chose to kidnap, carjack, burglarize, kidnap, carjack, kill, burglarize, kidnap, carjack and kill again." TT 1: 30. The prosecutor explained that Fulks and Basham "played different roles on their **team**, but their participation, their success . . . was entirely dependant on their **joint participation**." TT 1: 30. The Government's theory from start to finish, during both trials, was that the hand of Fulks was the hand of Basham and vice versa. At the beginning of his opening statement, the prosecutor told jurors: "Brandon Leon Basham . . . and Chadrick Fulks had been making their own choices. . . . **They** chose Alice . . . . Chose to carjack her; chose to kidnap her; chose to kill her." TT 1: 26. Throughout the opening, when he spoke of the crimes, including the killing, he referred to "he and Chad Fulks." TT 1: 27. The prosecutor stated: "Alice Donovan was not the first victim of **the team of Fulks and Basham,**" TT 1: 27; "it took 48 seconds for them to choose Alice," TT 1: 37; "**Fulks and Basham** having kidnapped, carjacked, and killed two women went back to Huntington," TT 1: 39; "Seventeen days, 2,275 miles, three carjackings, three kidnappings, two killings, two attempted killings, all committed by two **teammates, Chad Fulks and Brandon Basham**," TT 1: 42; "**Brandon Basham and Chad Fulks** planned these crimes **together**, executed them **together**, and they prepared for them **together**," TT1: 47; "the evidence will show **they** took Alice Donovan from Conway, South Carolina into North Carolina, and death resulted," TT 1: 48.

At the conclusion of the guilt phase of Basham's trial, the prosecutor reiterated the teamwork theme:

> If Brandon Basham was alone, or if Chad Fulks was alone on November 11, 2002 and November 14, 2002, Samantha Burns and Alice Donovan would be alive today. . . . **Brandon Basham and Chad Fulks were acting together in unison as a team**, a death squad. . . . the two of them together, aiding and abetting each other when **they** kidnapped and carjacked Samantha Burns, when **they** kidnapped, and carjacked, and killed Alice Donovan, the two of them.
>
> . . .
>
> The Government does not have to prove, and, more importantly, you jurors do not have to find who, specifically, killed Alice Donovan in order to convict Brandon Basham of carjacking, resulting in death or kidnaping resulting in death. . . . The evidence shows **they acted together and killed Alice Donovan**.

TT 12: 12-13. The Government told the jury that it was not claiming that Basham was more culpable or that Fulks was more culpable, because it took both of them to kill Alice Donovan. TT 12: 13. The prosecutor argued:

> Looking at the actions and conduct of Chad and Brandon as a whole, can come to only one conclusion, but for the actions of Brandon Basham, Alice Donovan would be alive today. But for the actions of Chad Fulks, Alice Donovan would be alive today. **The two of them are responsible for the death of Alice Donovan**.

TT 12: 13. The Government reiterated this theme throughout its closing. See TT 12: 20 ("it was a **two-man team**," "**it took two**"); 12-22 (each was more aggressive at different times); 12-40 (there was mud on both sides of the car, both Fulks and Basham dumped Samantha Burn's body in a river); 12-41 ("**they** killed her [Samantha], and **they** were disguised"); 12-47 ("**they** targeted Alice. . . . It took the actions of Chad Fulks and the actions of Brandon Basham to carry out that kidnaping, to carry out that carjacking."); 12-52 ("took two of them to get them to the isolated area. Chad Fulks to drive, Brandon Basham to make sure she didn't get away. **Both of them together acting as a team**."); 12-62 ("seventeen days in November of 2002, seventeen days of carnage. Two murders,

two attempted murders, three kidnappings, three carjackings, an attempted kidnaping and carjacking of a 15-year-old girl committed by **Brandon Basham and Chad Fulks acting as a team in unison.**") 12-69 ("he [Basham] participated directly in her death"); 12-70 ("Brandon Basham, himself, participated in the killing of Alice Donovan").

Finally, the Government summed up its argument using Tina Severance's analogy: "Like two peas in a pod. Brandon Basham could not have carjacked, kidnapped, and killed Alice Donovan without Chad Fulks; Chad Fulks could not have carjacked, kidnapped, and killed Alice Donovan without Brandon Basham." Id. at 12-82. Thus the Government did not ask the jury to find Basham guilty because his action was the final one that caused Alice Donovan to die. The Government always contended that it, ultimately, did not matter. Sheriff Hewett testified to what Basham did, the Government referred to this testimony during its closing, and the Government argued that it was part of the evidence that showed Basham was one member of the two-man team that killed Alice Donovan.

The purse-strap comment of which Basham complains was one remark made during the summation of the evidence when the prosecutor was describing the Thanksgiving-day search at the Bee Tree Farms area. TT 12: 80. Thus, the comment was an isolated remark taking up less than three lines in a 76-page closing which constantly reiterated the theme of teamwork between Fulks and Basham. The evidence was so strong against Basham, that this one remark could not have affected the jurors' decision. During the two-and-a-half weeks prior to the guilt-phase closing, the jurors heard 89 witnesses and reviewed hundreds of exhibits. TT 12: 8. Jurors saw Basham on videotape kidnapping Alice Donovan. They heard the testimony of agents who interviewed Basham during the first few days after he was arrested talk about his various statements incriminating

himself.  Ultimately, Basham claimed he could show agents where he and Fulks had drug Alice Donovan's body from the car and into the woods and covered her body with leaves and sticks.

On top of this evidence, jurors heard Clifford Jay's testimony that Basham had admitted: "We killed them."  In addition to the video of Basham jumping into Alice Donovan's car as she attempted to park at Wal-Mart, and his own admissions regarding his participation in the kidnapping and killing of Alice Donovan, there was testimony that Basham shot at a police officer when the officer was attempting to arrest him, and that he threatened to kill police officers in Indiana, and that he possessed a knife belonging to Alice Donovan when he was arrested.  James Hawkins testified how Basham talked him into giving him and Fulks a ride, and then held him at knifepoint.  Beth McGuffin testified that Basham wore a ring, later determined to belong to Samantha Burns, around his neck.   Andrea Frances testified that as she and her mother were leaving Wal-Mart, Basham pointed a gun at her and attempted to get into the car on top of her.  TT 10: 252.  Thus, there could be no doubt that Basham kidnapped Alice Donovan, knowing that she would be killed.

As to the fourth factor, there is no reason to believe the prosecutor was attempting to divert jurors' attention to extraneous matters. Regarding the fifth factor, the Government does not contend that defense counsel's conduct at trial was improper.  The sixth factor favors the Government's position.  The Court, both prior to closing arguments and afterwards, when charging the jury, instructed jurors that what attorneys say during closing is not evidence, and that jurors must rely on their own recollections and interpretations of the evidence. See TT 12: 7 ("If your memory of the evidence differs from what the lawyers say, you must base your decision on what you remember."); TT 12: 190 ("Remember that anything the lawyers say is not evidence in the case.  It is your own recollections and interpretation of the evidence that controls.") Thus, after analysis of the six factors

-58-

set forth by the Fourth Circuit, the Court should determine that, even if the prosecutor's remark were improper, the remark did not prejudicially affect Basham's substantial rights so as to deprive him of a fair trial.

**Response to Claim 13**: **Pursuant to a reasonable trial strategy, Basham's counsel chose not to argue that Basham's statements to law enforcement were involuntary.**

In Claim 13, a claim very similar to Claim 2,[7] Basham's habeas counsel argue that his trial attorneys were ineffective for failing to argue to the jury that his post-arrest statements to law enforcement officers were involuntary. §2255 Mot. at 57-58.

This claim fails for the same reason Claim 2 fails. First, there is no evidence that Basham's statements were involuntary. Basham's habeas counsel point only to his alleged mental deficits, the fact that he had used cocaine and marijuana on the day of one of the statements, and that some of the statements were taken late at night. However, the officers who took the statements all testified that Basham was alert, coherent, and clear when he made the statements, and there is no evidence indicating otherwise. Second, and perhaps more important, Basham's trial counsel risked presenting contradictory theories if they argued to the jury that the statements were involuntary. If they had argued that the statements were involuntary, and the jury nonetheless convicted Basham, the district court might have precluded defense counsel from arguing at sentencing that Basham voluntarily cooperated with the police. But even if the district court did not preclude defense counsel from arguing at sentencing that the statements were voluntary, they still would have had a credibility problem before the jury — having made contradictory claims at the guilt and sentencing phases. Basham's trial counsel could reasonably have determined that the risk of presenting contradictory

---

[7]In Claim 2, Basham argues that his attorneys were ineffective for failing to adequately challenge the admission of these statements. §2255 Mot. at 19.

theories was greater than any chance they had of persuading the jury that the statements were involuntary. Thus, trial counsel was not ineffective on this point.

**Response to Claim 14: Jack Swerling did not have a conflict of interest.**

In Claim 14, Basham's habeas counsel claim that Basham's trial counsel Jack Swerling was ineffective because he was hindered by a supposed personal conflict of interest. This alleged conflict of interest is based upon the fact that Swerling and his family were victims of an armed robbery in their home in 2002. This claim should be summarily dismissed.

A conflict of interest exists when a defense attorney owes duties to a party whose interests are adverse to those of the defendant in the context of a particular representation. In this case, the burden is on Basham to demonstrate, from the record, that an actual conflict of interest adversely affected his attorney's performance. Mickens v. Taylor, 535 U.S. 162, 173–74 (2002). Even where a defendant has demonstrated the possibility that his attorney was representing conflicting interests, the claim fails when the defendant fails to establish an actual conflict and when he does not demonstrate how his attorney's conflict of interest affected his attorney's performance at trial. Although a defendant need not demonstrate that the outcome of the trial would have been different but for the conflict, the defendant must show that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. See Mickens v. Taylor, 240 F.3d 348, 361 (4th Cir. 2001) (en banc), aff'd without consideration of this point, 535 U.S. 162 (2002). Tellingly, Basham's habeas counsel has not even suggested an alternative strategy or tactic that might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to Mr. Swerling's supposed other loyalties or interests.

-60-

Mr. Swerling has spent his entire career defending criminal defendants. He has vast experience representing those who have been accused of murder, rape, kidnaping, robbery and other violent crimes. See http://www.jackswerling.com/representative-cases/. Mr. Swerling has represented literally hundreds of clients accused of violent crimes both before and after he and his family were the victims of a home invasion and robbery.

Basham has failed to demonstrate that he was in any way deprived of an alternate defense because Mr. Swerling was laboring under a conflict of interest. Additionally, Basham fails to even acknowledge that co-counsel Mr. Harris was a full partner in the defense of Mr. Basham and did not labor under any supposed conflict of interest. This claim should be summarily dismissed as failing to state a claim and failing to have any basis in law or fact.

**Response to Claim 15: The Samantha Burns evidence was admissible.**

In Claim 15, Basham's habeas counsel argue that his trial and appellate attorneys were ineffective for failing to challenge the admission of evidence concerning Samantha Burns's kidnaping and murder during the guilt phase of Basham's trial. §2255 Mot. at 60. Specifically, they raise four arguments along this front. First, they argue that his trial attorneys should have objected to the Samantha Burns evidence under Federal Rule of Evidence 404(b). Id. at 65. Second, they contend that his trial attorneys should have objected to the Samantha Burns evidence under Federal Rule of Evidence 403. Id. Third, they contend that his trial attorneys should have at least objected under Rules 404(b) and 403 to the *extent* of the evidence concerning Samantha Burns's disappearance. Id. Fourth, they argue that his appellate attorneys should have raised these issues in his direct appeal. Id.

These arguments are without merit. The evidence concerning Basham's involvement in

Samantha Burns's kidnaping and murder was intrinsic to the crimes for which Basham was charged. To the extent that the Samantha Burns evidence was not intrinsic but was prior act evidence, it was admissible under Rule 404(b) to show intent.  And it was not unduly prejudicial under Rule 403 given the mountain of similarly damning evidence surrounding Basham's involvement in Alice Donovan's kidnaping and murder.  Moreover, Basham's trial attorneys adopted a reasonable strategy of not objecting to the Samantha Burns evidence because they used that evidence to support their theory that Chad Fulks was the dominant figure in Fulks and Basham's multi-state crime spree. Finally, appellate counsel reasonably decided not to raise these issues on appeal because of their lack of merit.

> A.      The evidence concerning Samantha Burns's kidnaping and murder was intrinsic to the crimes charged.

Federal Rule of Evidence 404(b) states, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

By its terms, Rule 404(b) applies only to "[e]vidence of *other* crimes, wrongs, or acts."  It does not limit evidence concerning "acts intrinsic to the crime charged[.]" United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996). "Other criminal acts are intrinsic when they are 'inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged.'" Id. (quoting United States v. Lambert, 995 F.2d 1006, 1007 (10th Cir. 1993). "Evidence of uncharged conduct is not 'other crimes' evidence subject to Rule 404 if the uncharged conduct 'arose out of the same series of transactions as the charged offense, or if [evidence of the uncharged

-62-

conduct] is necessary to complete the story of the crime on trial.'" <u>United States v. Basham</u>, 561 F.3d 302, 326 (4th Cir. 2009) (quoting <u>United States v. Siegel</u>, 536 F.3d 306, 316 (4th Cir. 2008)); <u>see also</u> <u>United States v. Cooper</u>, 482 F.3d 658, 663 (4th Cir. 2007) (noting that evidence is intrinsic if it is necessary to "provide context relevant to the criminal charges").

The Samantha Burns evidence was intrinsic because it was integral to several of the charges against Basham. During the guilt phase of Basham's trial, the story unfolded of how Basham and Chad Fulks together escaped from jail in Kentucky and embarked on a multi-state crime spree. From the early stages of this violent escapade until their captures, Basham and Fulks were armed with stolen firearms. Their efforts to stay on the run and evade capture included a bevy of "bad acts" including burglaries, carjackings, shootings, high-speed chases, and two murders. Although Basham would like to characterize most of these acts as unrelated to the charges for which he was indicted and convicted, they in fact comprised the basis for several of those charges. These included Basham's convictions for: being a felon in possession of a firearm; possessing a stolen firearm; carrying, using, and possessing firearms during and in relation to, and in furtherance of, crimes of violence; conspiring to possess stolen firearms; and conspiring to carry, use, and possess firearms during and in relation to, and in furtherance of, crimes of violence. Basham cannot escape the fact that the evidence of his crimes prior to Alice Donovan's carjacking — including his participation in the carjacking and murder of Samantha Burns — was directly related to his conspiracy and gun charges.

Moreover, the Samantha Burns evidence was intrinsic to the charges related to Alice Donovan because it "arose out of the same series of transactions as the charged offense" and was "necessary to complete the story of the crime on trial." As stated above, Basham and Fulks's

carjacking and murder of Alice Donovan was one link in a chain of criminal acts designed to further the transient lifestyle of these two fugitives. It was thus necessary for the jury to learn what happened before and after Alice Donovan was forcefully abducted from that Wal-Mart parking lot in Conway, South Carolina. It was necessary for them to learn, as the Government emphasized during closing argument in the guilt phase, that Basham and Fulks employed "the same plan" in Alice Donovan's carjacking as they did in the carjacking of Samantha Burns and the attempted carjacking of Deanna and Andrea Francis. TT 12: 57. Basham's crimes against Alice Donovan arose from one series of transactions and were part of one story.

B.      Even if the Samantha Burns evidence was not intrinsic to the charged crimes, it was admissible under Rule 404(b).

Even if it was not intrinsic, the Samantha Burns evidence was admissible under Rule 404(b) to prove Basham's intent in carjacking and murdering Alice Donovan. As the Fourth Circuit noted in denying Basham's direct appeal, "Basham's specific intent to kill Donovan or cause her serious harm was the crucial issue at trial; Basham admitted to carjacking and kidnapping Donovan during his opening statement and contended only that he lacked that specific intent." Basham, 561 F.3d at 328. And the Fourth Circuit held that the Government did not make an impermissible propensity argument based on the Samantha Burns evidence but made a permissible argument that the Samantha Burns evidence was proof of Basham's intent in carjacking Alice Donovan. Id. at 329-30. The Government presented evidence that just a few days before Alice Donovan's carjacking, Basham participated in the carjacking and murder of Samantha Burns. This evidence was relevant to show that at the time he carjacked Alice Donovan, Basham had the intent to murder her. As the Fourth Circuit held, it was not introduced to show that Basham had bad character or a propensity to commit

carjacking or murder.

      C.      <u>The Samantha Burns evidence was not unduly prejudicial under Rule 403.</u>

Federal Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Basham argues: "Given the particularly damaging effect of the substantial evidence about Mr. Basham's role in the disappearance of Samantha Burns on his ability to defend the charges against him related to Alice Donovan's disappearance, it is not improbable that the Court would have determined that the evidence of Ms. Burns's disappearance should be precluded or truncated." §2255 Mot. at 75-76.

Contrary to Basham's habeas counsel's argument, the admission of the Samantha Burns evidence was not unfairly prejudicial to Basham's defense in the guilt phase of his trial. Basham conceded to the jury that he was involved in Alice Donovan's carjacking. This was a reasonable strategy to adopt in light of the overwhelming evidence against him (which included video footage of the carjacking, as well as Basham's own statements and efforts to locate Donovan's body). So there was no danger that the jury would unfairly identify Basham as being involved in Donovan's abduction based simply on his involvement in Burns's carjacking; Basham's identity as one of Donovan's abductors was not at issue. Rather, Basham's theory at trial was that at the time he carjacked Donovan from the Wal-Mart parking lot, he did not know she was going to be killed. And it was on this point that the Samantha Burns evidence was most probative. The fact that — just three days prior to Alice Donovan's abduction — Basham participated in the carjacking and murder of

Samantha Burns under similar circumstances, was powerful evidence that Basham intended to cause death or serious bodily injury at the time of Donovan's carjacking. Thus, the Samantha Burns evidence was certainly damaging to Basham's case, but it was damaging because it was probative of the key issue at trial.

Basham's habeas counsel argue that even if the Samantha Burns evidence was admissible, his trial counsel should have objected to the extent of that evidence. §2255 Mot. at 66. Basham does not identify which facts concerning Samantha Burns were outside the scope of admissibility or what principle the Court should have used in determining the scope. Basham does note that the Government introduced witnesses who testified not only about Burns's disappearance but also "about her characteristics and the impact of her disappearance on her family and friends." Motion to Vacate, at 62. Several of Samantha Burns's friends and family members did testify in the guilt phase about such matters as Samantha's personality, relationships, and future plans. See, e.g., TT 3: 161-64 (testimony of Melissa Jeffers, Samantha's aunt); id. at 171-73 (testimony of Kandi Burns, Samantha's mother); id. at 249-52 (testimony of Whitney Collins, a friend); id. at 257-61 (testimony of Kristen Pritchard, a friend); id. at 266-67 (testimony of Wesley Burns, Samantha's brother); id. at 279-81 (testimony of John Burns, Samantha's father). In context, however, this testimony was not introduced as impermissible victim impact evidence. Instead, it was relevant to show that Samantha had a stable life involving her family, friends, school, and job. These facts tended to prove that she would not have voluntarily disappeared without telling her family and friends. This was an important point, as the Government sought to establish that Samantha Burns was forcefully abducted by Basham and Fulks against her will.

In any event, the testimony concerning Samantha Burns's personal life did not make up a

substantial part of the Government's overall case.[8]  There is no reason to think the jury gave it undue

weight, especially in light of similar evidence concerning Alice Donovan's personal life, which

Basham does not challenge.  See, e.g., TT 9: 17-29 (testimony of Angie Warner, Alice's daughter);

id. at 29-36 (testimony of Barry Donovan, Alice's husband).  And there is no indication that the jury

would have relied on this evidence in determining whether Basham intended to cause death or

serious bodily injury to Donovan at the time of her carjacking.

> D.     Basham's trial counsel had a valid strategic reason not to contest the
>        admission of the Samantha Burns evidence.

Again, the Fourth Circuit noted in Basham's direct appeal that "during the guilt phase,

Basham focused on his lack of specific intent to kill Alice Donovan or cause her serious bodily harm.

To that end, Basham repeatedly contended that Fulks was the leader during the crime spree, the

driving force behind the violence."  Basham, 561 F.3d at 328.  Basham's trial attorneys thus had a

valid strategic reason not to contest the Samantha Burns evidence: They used that evidence to

advance their theory that Chad Fulks was the dominant figure in the pair's criminal activity.  Basham

and Fulks's activity in West Virginia, where Samantha Burns was abducted and murdered, centered

around locales with which Fulks was familiar.  The evidence showed that Fulks made key decisions

during this portion of the crime spree.  This allowed the defense to argue that Fulks was leading the

way, a fact that would support their contention that Basham lacked the intent to kill or seriously harm

Alice Donovan — because he wasn't in charge of what was happening.  True, as mentioned above,

the Samantha Burns evidence did support the contrary inference that Basham in fact had specific

intent.  But the fact that the evidence cut both ways did not make it unreasonable for defense counsel

---

[8]Out of 87 witnesses and 10 volumes of guilt-phase trial testimony, only 6 witnesses offered a total of roughly 20 pages of testimony concerning Samantha's personal life.

-67-

to try to use the evidence to their advantage. Without it, it would have been more difficult for the defense to paint a picture of Chad Fulks as the more violent, dominant individual during the crimes.

E.     Basham's appellate counsel did not raise these issues because they lacked merit.

For all the reasons stated above, there was no basis for Basham's appellate counsel to argue that this Court committed plain error in admitting the Government's evidence concerning Basham's involvement in Samantha Burns's kidnaping and murder.

**Response to Claim 16: There was no basis to admit isolated parts of the Government's closing argument from the Fulks trial.**

In Claim 16, Basham's habeas counsel argue that his trial attorneys were ineffective for failing to request that the Court admit at the penalty phase of Basham's trial certain comments the Government made during its closing argument in Fulks's trial. §2255 Mot. at 67. Specifically, Basham contends that his lawyers should have moved to introduce the Government's statement that "he [Fulks] is the leader . . . . Brandon Basham was a puppet, and Chad Fulks was pulling his strings throughout a lot of this crime spree." Id. Basham argues that this information could have led the jury to find that he was a minor participant in the charged crimes. Id. at 69.

Prior to the guilt phase of Basham's trial, his attorneys filed a notice that they intended to introduce certain assertions from the Government's closing arguments in Chad Fulks's trial. Docket # 724. The Court deferred the issue, indicating that defense counsel should make a motion after the Government had presented its case, if the defense could show that the Government had taken a contrary position in Basham's case. 09/10/04 Tr at 11. Basham's trial counsel did not subsequently move to admit the statements. On direct appeal, Basham's appellate counsel argued that the Court had abused its discretion by not admitting the statements. The Fourth Circuit held that Basham had

-68-

waived that argument. United States v. Basham, 561 F.3d 302, 335 (4th Cir. 2009). Basham now contends that the jury's verdict would have been different had the statements been introduced and that he at least would have preserved the issue for appellate review.

Basham's habeas counsel's argument must fail for several reasons. First, there was no evidentiary basis for the Court to admit any of the Government's closing argument from Fulks's trial. Second, to the extent that the Court could have admitted the closing argument, it would have been inequitable to admit only isolated portions of it. Third, there is no reasonable probability that admission of the argument would have changed the result, either at trial or on appeal.

A.    There was no evidentiary basis for the Court to admit any of the Government's closing argument from Fulks's trial.

Even under the liberal evidentiary standard applicable to the penalty phase of a capital case, there was no basis for admitting any of the Government's closing argument from Fulks's trial. As courts so often explain to juries, what lawyers say during closing argument is not evidence. See United States v. Lopez, 219 F.3d 343, 347 (4th Cir. 2000) (holding that a defendant who delivered the closing argument in his own trial did not offer testimony inconsistent with his proffer statement because, as the district court instructed, "[t]he statements, objections, arguments by the defendant and by the attorney for the government [are] not evidence."). There are, of course, sound reasons for this rule. The trial attorneys are not under oath, do not have first-hand knowledge of the facts, and are not subject to cross-examination. So while AUSA Gasser's closing argument in the Fulks trial provided commentary on the evidence, the argument itself was not evidence. To be sure, the jury in the Fulks trial could not have based their verdict (either in whole or in part) on Gasser's statements. The jury could have found Gasser's characterizations of the evidence persuasive, but

they had to base their verdict solely on the evidence presented at trial. It makes little sense to say that Gasser's statements could not have served as a basis for the verdict in Fulks's trial but could have served as a basis for the verdict in Basham's trial.

Basham's habeas counsel contend that the Government's argument at Fulks's trial that Fulks was "the leader" and Basham "a puppet" was an admission by a party-opponent's agent under Federal Rule of Evidence 801(d)(2)(D). "Generally, statements by an attorney concerning a matter within his employment may be admissible against the retaining client." United States v. Blood, 806 F.2d 1218, 1221 (4th Cir. 1986) (citing United States v. McKeon, 738 F.2d 26, 30 (2nd Cir. 1984)). "Further, a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party." Id. Accordingly, courts have allowed the admission of a party's prior jury argument if "the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial." See, e.g., McKeon, 738 F.2d at 33. However, "[s]peculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the [opponent's] case or invitations to a jury to draw certain inferences should not be admitted." Id.

The general rule set forth in Blood and McKeon does not apply here. In arguing at Fulks's trial that Fulks was the leader and Basham a puppet, the Government did not make "a clear and unambiguous admission of fact." Rather, the Government offered a characterization of the evidence and invited the jury to draw certain inferences from the evidence. Moreover, as explained below, even if the Government's argument in Fulks's trial could be considered a factual assertion, it was not inconsistent with the assertions made by the Government in Basham's trial.

B.     <u>It would have been inequitable to admit only isolated portions of the Government's closing argument from the Fulks trial.</u>

To the extent that the Court could have admitted any of the Government's closing argument from the Fulks trial, it would have been inequitable to admit only isolated portions favorable to Basham. In other words, had Basham's trial counsel moved to admit statements such as "[Fulks] was the leader" and "Basham was a puppet," the Government should have had a corresponding opportunity to admit portions of its closing argument indicating that Fulks and Basham were equally culpable in the charged crimes. As explored more fully in the Government's response to Claim 23, the Government did not present contradictory theories at the two trials but presented a consistent theme of equal culpability between the two defendants. The Court stated that it would entertain Basham's motion following the Government's case if Basham could identify any evidence in the Basham trial that contradicted evidence from the Fulks trial. There was no contradictory evidence, and defense counsel did not bring the motion. Even now, Basham does not identify any contradictory evidence adduced at the two trials. If Basham had been given the opportunity to introduce certain portions of the Government's argument in the Fulks trial suggesting that Fulks was the dominant aggressor in the crimes, then the Government presumably would also have been able to introduce portions of the argument that highlighted Basham's equal responsibility.

C.     <u>There is no reasonable probability that admission of the statements would have changed the result, either at trial or on appeal.</u>

Brandon Basham had ample opportunity during both the guilt and penalty phases of his trial to present his theory that Chad Fulks was the dominant aggressor and that he was a minor participant in the charged crimes. But no jury member found the "Minor Participant" statutory mitigating factor to be present. Introduction of the Government's statements from the Fulks trial would not have

changed the jury's minds.  The Government never suggested at either trial that Basham was a minor participant.  In fact, as highlighted in the Government's response to Claim 23, the Government consistently argued to both juries that Fulks and Basham were a team and could not have accomplished the crimes without each other's help.  Even if one were to accept that Fulks was the leader, it does not follow that Basham had only a minor role in the crimes.  The jury in Basham's trial had before it considerable evidence that Basham displayed aggression and initiative throughout the crime spree, regardless of whether Fulks was present at the time.  When taken in context with other statements made by the Government and in light of the evidence, there is no reasonable probability that the jury would have been swayed by the admission of the contested statements.  And as noted above, because there was no basis for the Court to admit the statements at all, there is no reasonable probability that Basham's appeal would have succeeded had his trial counsel preserved the issue.

### Response to Claim 17: Basham's trial counsel decided not to call impeachment witnesses based on valid strategic reasons.

In Claim 17, Basham's habeas counsel claim that trial counsel were ineffective for failing to call witnesses who might partially impeach Clifford Jay's testimony that Basham had told Mr. Jay on Christmas Eve 2002 that "We killed them."  §2255 Mot. at 70-75.  This claims fails.  The decision to not call these witnesses was made for strategic reasons and clearly was not the result of oversight or a failure to contemplate the possible approaches of dealing with Mr. Jay's clear and unequivocal testimony.

In assessing this ineffective assistance of counsel claim, the Court must consider whether habeas counsel have demonstrated that trial counsel's performance was objectively unreasonable.

-72-

Strickland, 466 U.S. at 688, 104 S.Ct. 2052. In doing so, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. at 689, 104 S.Ct. 2052.

Clifford Jay, who had been Basham's counselor and teacher's aide for three or four years during Basham's middle school years,[9] testified at the end of the guilt phase. He testified that on Christmas Eve of 2002, Basham called him from jail after being arrested for the murder of Alice Donovan. TT 10: 224, 227. Mr. Jay testified that Basham told him: "I am in a lot of trouble." Id. at 228. Mr. Jay then asked Basham, "Did you do–I just want to know if you did what they said you did?" Id. Mr. Jay testified that Basham answered, "Yes, sir. We killed them." Id. Mr. Jay testified:

> I specifically remember him say 'them,' because it struck me by complete and utter surprise because I had seen the name Alice Donovan, and I knew the report had–the paper had told reports of one female, but in his conversation he said that "We killed them."

Id. at 228-29. See also Id. at 231-32. Mr. Jay also testified that he told Basham that he needed "to cooperate with the authorities and tell them everything that they need to know about finding this body." Id. at 232. Mr. Jay then asked Basham, "Do you know where the bodies are?" Id. at 232-33. Mr. Jay testified that Basham responded, "We tied her to a tree." Id. at 233. After the phone call ended, Mr. Jay reported the phone call to the Madisonville, KY Sheriff's Department. Id. at 229, 235. Later, Mr. Jay spoke with a Myrtle Beach Police officer. Id. at 235, 239.

On cross examination, Mr. Swerling asked Mr. Jay, "Have you ever stated ever, in the past, to anyone he states 'We killed her?'" Id. at 238 (emphasis added). Mr. Jay responded emphatically,

---

[9]Mr.Jay testified that Basham looked up to him and that Mr. Jay "dealt with [Basham] and kept [Basham] probably as much as his parents because [Mr. Jay] had him in school." Id. at 231, 237.

"No, sir.  Not that I remember that.  I specifically remember that.  It caught me completely off guard, and I have never stated the other."  Id.  Mr. Swerling then had Mr. Jay confirm that he had spoken with Deputy David Morris of the Madisonville Sheriff's Office and an officer from the Myrtle Beach Police Department.  Id. at 239.  In response to Mr. Swerling's questioning, Mr. Jay continued to confirm that he had told both police officers that Basham had told him, "We killed them."  Id. at 239-40.

The next day, trial counsel Jack Swerling explained the basis for his cross examination of Clifford Jay.  He explained that he had spoken with those two officers and they had told him that Mr. Jay had not told them about Basham's reference to "them" in his statement to Mr. Jay.  TT 11: 9.  Mr. Swerling then noted, revealing that trial counsel had made a knowing decision to not attempt to present testimony from the officers, that "we opted not to present it [testimony from the officers] at this stage of the trial."  Id.  He further noted that the strategic decision on whether to present any testimony by the police officers at the mitigation phase had not yet been finally determined: "The question is whether or not we are going to go ahead and present that later on. . . .  That is just a decision we have to make."  Id.   In the end, defense counsel opted to not call the police officers.

The decision to not call the police officers to potentially partially impeach Mr. Jay was a clear strategic decision.  United States v. Terry, 366 F.3d 312, 317 (4ᵗʰ Cir. 2004) ("decision whether to call a defense witness is a strategic decision" demanding the assessment and balancing of perceived benefits against perceived risks, and one to which "[w]e must afford ... enormous deference"); Byram v. Ozmint, 339 F.3d 203, 209 (4ᵗʰ Cir. 2003) (review of counsel's strategic decisions as to which evidence to present at trial is "highly deferential," and there is a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance").  It was not the result of

oversight or a failure to contemplate the possible approaches of dealing with this damaging testimony. Defense counsel "opted not to present it [testimony from the officers] at [the guilt] stage of the trial." TT 11: 9. Defense counsel contemplated introducing the evidence in the mitigation phase. Id. However, in the end, they did not attempt to introduce the evidence. Such a strategic decision to not call the officers is not ineffective assistance of counsel. See Gustave v. United States, 627 F.2d 901, 905 (9th Cir. 1980) (addressing counsel's failure "to utilize prior sworn testimony of various witnesses in an effort to destroy their in-court identification with alleged inconsistencies" and concluding failure was "obviously a matter of trial tactics and falls far short of ineffective counsel"). It is clear that trial counsel had not stopped "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052.

There are several obvious reasons why trial counsel were not ineffective for deciding to not attempt to introduce testimony from the two police officers. Even in the light most favorable to Basham, the officers' testimony would have, at best, resulted in some question about whether Basham admitted to Mr. Jay that "We killed them" or "We killed her." In either version, Basham admitted that Basham and Fulks ("we") killed. It is not clear that this would have been helpful. Introducing testimony from two police officers who would confirm that Clifford Jay was told by Basham that "We killed" "her" or "them" would highlight the fact that Basham was a full participant in the killing of Alice Donovan and/or Samantha Burns. This would have undercut the defense theory that Fulks was the leader and Basham was just a passive follower. See Basham, 561 F.3d at 315 ("During trial, Basham admitted culpability in the carjacking and kidnapping, but argued that Fulks committed Donovan's murder and was the instigator throughout the crime spree.").

Additionally, the police officers apparently would have confirmed Mr. Jay's testimony that

Basham told him, "We tied her to a tree." Id. at 233. If anything, the police officers' testimony would have confirmed this fact and emphasized the teamwork employed by Basham and Fulks ("we") in their commission of their heinous crimes. Sometimes, as in this case, the hallmark of effective advocacy is to know when to "leave well enough alone." United States v. Knox, 287 F.3d 667, 671 (7th Cir. 2002); Carr v. Rowland, 927 F.2d 608 (9th Cir. 1991) ("Counsel might have felt that the safest strategy was to leave well enough alone rather than risking introduction of even more damaging material.").

There was yet another possible reason that counsel was wise to hesitate in calling the police officer. The police officers with whom Clifford Jay spoke may not have had as clear a memory of the conversation as Jay had. As noted above, Jay was emphatic that he specifically remembered that Basham said "We killed them" because "it struck [Jay] by complete and utter surprise" as Jay was only aware of the Alice Donovan case. Needless to say, it would have been dangerous to introduce evidence that might have been less emphatic than the testimony of Mr. Jay. To attack Mr. Jay's credibility would have been quite risky. Mr. Jay was a father-figure to Basham and had absolutely no reason or motive to be anything but truthful about the conversation that he had with Basham.

For all the forgoing reasons, it is clear that trial counsel were not ineffective. The decision to not call the officers to testify was done for strategic reasons and clearly was not the result of oversight or a failure to contemplate the possible approaches of dealing with this damaging testimony. This claim should be dismissed.

**Response to Claim 18:   Basham's trial counsel did not  ineffectively cross examine Sheriff Hewett and Agent Long.**

Basham's habeas counsel complain that his trial counsel elicited damaging testimony from

Sheriff Hewett on cross examination, and then failed to mitigate the damage. §2255 Mot. at 75-76. Basham incorrectly states that Sheriff Hewett, during cross examination, stated that Basham demonstrated how he strangled Alice Donovan with the purse strap. As discussed in Claim 11, Sheriff Hewett's statement was ambiguous. Neither the Government nor Basham's counsel chose to delve further into the meaning of Sheriff Hewett's statement. Under the Government's theory, it did not matter, because Fulks and Basham were both so intimately involved in the murder that the hand of one was the hand of both. As far as Basham's counsel's actions, any attempt to mitigate could have been highly damaging, because Hewett may have clarified his testimony by testifying that Basham was demonstrating how he pulled the purse strap around Alice Donovan's neck. Basham's counsel reasonably responded by moving to a different line of questioning.

Basham's suggestion that his counsel should have questioned Agent Long about a statement in his 302 report that Cam Littlejohn had told him that Basham had told him that Fulks had used the purse strap to strangle Alice Donovan would have been double hearsay. It would not have refuted Sheriff Hewett's testimony that Basham demonstrated how the purse strap was used. Basham could have done both, and, as pointed out in the Government's responses to Basham's other claims, Basham had frequently changed parts of his story. So, testimony by Agent Long about what Basham told his former attorney would likely have done no more than emphasize one more instance where Basham changed his story within a short period of time, and would have imprinted in jurors' minds the involvement of Basham in Alice Donovan's murder.

Furthermore, even if the Court were to find that Basham's trial counsel was ineffective in cross examining Sheriff Hewett or Agent Long, the Court must dispose of this issue under the second prong of Strickland, because Basham suffered no prejudice as a result of his counsel's alleged

"anemic cross-examination of Sheriff Hewett."  Under Strickland:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.  When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer -including an appellate court, to the extent that it reweighs the evidence - would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

466 U.S. 668 at 695.  Basham's own statements admitted all the facts required for a conviction.  See Young v. Catoe, 205 F.3d 750, 762 (4th Cir. 2000).  As for the sentence, the evidence showed that Basham had participated in the kidnappings of three randomly-selected people, the killings of the two female victims, that he was apprehended after he attempted to kidnap a third female victim, that the crimes were committed in a particularly vile and cruel manner, and that Basham's behavior even after he was arrested was in conformity with his actions in committing the crimes.  Jurors heard how Basham had fired a gun at a police officer who was attempting to arrest him after his unsuccessful attempt to kidnap a fourth victim, and that he had threatened to kill other police officers.  Thus, it is simply unreasonable to suggest that jurors would not have convicted Basham, and would have recommended a life sentence, but for Hewett's ambiguous statement during cross examination or his counsel's failure to cross examine Sheriff Hewett and an F.B.I. agent vigorously enough.

As the Fourth Circuit found when Basham appealed his conviction and sentence:

> "The Constitution entitles a criminal defendant to a fair trial, not a perfect one." Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Brandon Basham's capital trial may not have been a perfect one, but a review of the proceedings below and the district court's cautious and thorough handling of them convinces us that he did receive a fair one.

561 F.3d at 339.  Thus, Basham has failed to show that he was denied due process during his trial.

**Response to Claim 19: Basham's trial counsel conducted an exhaustive investigation of Basham's background and developed an extensive mitigation case.**

Basham's habeas counsel complain his attorneys were constitutionally ineffective for failing to investigate, develop, and present powerful mitigating evidence at the penalty phase of his trial. §2255 Mot. at 82. "[B]y way of example," they discuss two areas -mental retardation and fetal alcohol spectrum disorder - which trial counsel allegedly failed to investigate and develop as mitigating evidence at the penalty phase.

"Although counsel should conduct a reasonable investigation into potential defenses, Strickland does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client." Green v. French, 143 F.3d 865, 892 (4th Cir. 1998), *abrogated on other grounds by* William v. Taylor, 529 U.S. 362 (2000). "In the end, 'a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.'" Tucker v. Ozmint, 350 F.3d 433, 440 (4th Cir. 2003)(quoting Wiggins v. Smith, 539 U.S. 510 (2003)). "It is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" Meyer v. Branker, 506 F.3d 358, 371 (4th Cir. 2007)(quoting Strickland, 466 U.S. at 690).

A.     Mental Retardation

Basham's habeas counsel claim that at the time of trial he had a full scale IQ of 68, and that "[t]ypically, an Full Scale IQ of 70 or lower fulfills the 'significant deficits in intellectual functioning' prong of a diagnosis of mental retardation." §2255 Mot. at 83. They complain that if trial counsel had retained and consulted with an expert on mental retardation, the expert would have

-79-

been able to explain why Basham should be diagnosed as being mentally retarded, thus rendering

him constitutionally ineligible for a death sentence. §2255 Mot at 84-85. The problem with this

argument is there was no real evidence to suggest that Basham is mentally retarded. "[T]he

touchstone of effective representation must be sound, evidence-based judgment." Meyer v. Branker,

506 F.3d at 371.

In Green v. Johnson, 515 F.3d 290 (4th Cir. 2008), the Fourth Circuit found that the state

supreme court's determination that the petitioner had not established his claim of mental retardation,

in spite of the fact that one of the four intelligence tests he had taken resulted in a score of 55, was

not unreasonable. Id. at 300. The state supreme court had noted that three of the scores were higher

than 70, and that a person can fake a lower score, but not a higher score. Id. The Fourth Circuit

concluded that the court had properly applied the factors set forth in Atkins v. Virginia, 536 U.S. 304

(2002). Id. In Atkins, the Supreme Court found that the clinical definitions of mental retardation

require not only sub-average intellectual functioning, but also significant limitations in adaptive

skills such as communication, self-care, and self-direction, that became manifest before age 18. Id.

at 318. It quoted the definition of mental retardation used by the American Association on Mental

Retardation (AAMR):

> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work. Mental retardation manifests before age 18.

Atkins, 536 U.S. at 309 n.3 (citing *Mental Retardation: Definition, Classification, and Systems of*

*Supports* 5 (9th ed.1992)). It also quoted a similar definition by the American Psychiatric

Association:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

Id.  Thus, a showing of borderline or below-average intelligence does not alone constitute an adequate showing of mental retardation.  United States v. Webster, 421 F.3d 308, 313 (5th Cir. 2005).[10]

Basham has failed to show that he is mentally retarded under the definitions used by the Supreme Court and appellate courts.  Clearly, he did not suffer from "subaverage general intellectual functioning" prior to age 18.  When Basham was "almost 18," his IQ was 89.  TT 25: 66.  The only evidence offered by Basham to support his claim that he was mentally retarded at the time of trial is the result of one IQ test conducted shortly before trial which indicated a full-scale IQ of 68.  TT 25: 53.  At that time, Basham had a strong motivation to appear to have low intelligence.

Additionally, Basham's habeas counsel have failed to show he has significant limitations in adaptive skills such as communication, self-care, and self-direction, that became manifest before age 18.  Id. at 318.  There has never been any suggestion that Basham cannot take care of his daily needs.  Further, observation of his behavior prior to and during the commission of his current crimes and during his trial show that Basham possessed communication and self-direction skills.  For example, the Fourth Circuit, in addressing Basham's claim on appeal regarding the admissibility of  video of

---

[10]  It does not appear the Fourth Circuit has extensively addressed this issue post-Atkins in a federal death penalty case.  In addressing the issue in state death-penalty cases, it has generally referred to definitions of "mentally retarded," similar to those quoted in Atkins, developed by state general assemblies.  See Walker v. Kelly, 593 F.3d 319, 321 (4th Cir. 2010).

-81-

a courtroom scuffle at the sentencing stage of his hearing, observed: "Basham's actions and manipulation during the episode . . ., coupled with the fact that he remained calm during the remainder of the trial once he was permitted to have his chewing tobacco during breaks, point to a manipulative individual."  Basham, 561 F.3d at 333.

Furthermore, after Basham and Fulks escaped from prison, Basham was the one who went to James Hawkins' door at night and convinced Hawkins to give him a ride to his non-existent broken-down vehicle, thus demonstrating an impressive ability to communicate persuasively with another person.  When Basham stole a book of checks from Robert Talsma's box of checkbooks, he did not take the checkbook from the top.  TT 2: 99.  Rather, he stole a checkbook from the middle of the box - another example of Basham's reasoning ability.  Margaret Moore's testimony of Basham's attempt to convince her to take him to the store to get gas or to allow him into her house to use the telephone, revealed Basham's planning and communication skills.  TT 4: 87.  More recently, in writing about himself on the web site for Death Row Speaks, Basham states that he reads books by Stephen King and John Grisham.  See www.deathrowspeaks.info/profiles/brandonbasham. Basham's actions clearly show that he operates at a level exceeding the ceiling abilities for mental retardation, giving credence to Dr. Capehart's belief that Basham's IQ score of 75 on the test he gave him represented the minimum level of his cognitive functioning and potential.  Forensic Eval., p. 114.

Basham's habeas counsel complain that his trial counsel, during the direct examination of Tora Brawley, Ph.D., a neuropsychologist, asked: "that [mental retardation] is not an issue here, correct?".  §2255 Mot at 83.  When the statement is placed in the context of the entire direct testimony, it is obvious there was no ineffectiveness.  Dr. Brawley testified that she performed a

-82-

neuropsychological assessment of Basham. TT 25: 26. She administered a battery of tests in May 2003 and August 2004. TT 25: 27, 57. Dr. Brawley explained each type of test administered. TT 25: 34-52. She described the intellectual functioning test, the Wechsler Adult Intelligence Scale, third edition. TT 25: 34-35. Dr. Brawley stated: "If you are 69 or below, then you are in the extremely low or mentally retarded range in the bottom one to two percent of the population." TT 25: 38. Defense counsel asked: "If I have 69, does that mean I am retarded. Mentally retarded?" Dr. Brawley replied:

> Not necessarily. You need to look at why the IQ is down. For example, I have Alzheimer's patients that score at the 69 or below because of their disease process, it is not because they are mentally retarded, it is because they have Alzheimer's disease. So, in that case, their low IQ is accounted for by dementia. [11]

TT 25: 38. When Dr. Brawley was discussing the results of the tests administered to Basham, she stated he had a full-scale IQ of 68. TT 25: 53. Counsel then asked: "Now, you talked earlier about mentally retarded. That is not the issue here, correct?" Id. Dr. Brawley responded: "That's correct." Id.

Dr. Brawley went on to explain that, based on the results of all of the tests she administered, she determined that Basham "had some real brain problems," so she asked for records, consulted with other professionals, and interviewed Basham's family and long-term acquaintances to try to figure out the source of the problems. TT 25: 58. She discovered that there had been seven previous IQ tests administered through schools Basham had attended or psychiatric centers which had treated Basham. TT 25: 59. Dr. Brawley testified that at age seven, Basham had an IQ of 101; at age eight

---

[11] According to definitions by the American Association on Mental Retardation and the American Psychiatric Association, mental retardation manifests before age 18. Adkins, 536 U.S. at 308 n. 3. When Basham was "almost 18," his IQ was 89. TT 25: 66.

years, seven months, an IQ of 100; at age ten, an IQ of 88; at age 10.8, an IQ of 100; at age 13.8, an IQ of 77; at age 14. 8, an IQ of 86; and at "almost age 18," an IQ of 89. TT 25: 59-66.

When Dr. Brawley interviewed Basham's sixth-through-eighth-grade special education teacher, the teacher told her that Basham had described to her how he huffed gas. TT 25: 72. Basham's mother admitted to Dr. Brawley that she used marijuana while she was pregnant with Basham. TT 25: 76. His sister told Brawley that Basham started huffing gas at age eight and smoking crack at age twelve. TT 25: 77. Based on the testing and the interviews, Dr. Brawley diagnosed Basham as having "dementia due to multiple etiologies," including head injuries and drug abuse. TT 25: 81, 85-88. Defense counsel are not required to second-guess their experts' examinations or opinions. Goines v. Angelone, 52 F.Supp.2d 638, 664 (E.D.Va. 1999)(citing Pruett v. Thompson, 996 F.2d 1560, 1573-74 (4th Cir. 1993); Poyner v. Murray, 964 F.2d 1404, 1418 (4th Cir. 1992)(holding that there was no right to effective assistance of expert witnesses distinct from the right to effective assistance of counsel and the deficiencies in the performance of experts are not automatically imputed to the performance of counsel)).

Had Basham's counsel not pointed out that Basham's alleged low IQ was a recent occurrence, rather than the result of mental retardation, counsel would have risked losing credibility with the jurors. All but one of Basham's prior IQ scores indicated average intellect. Dr. Brawley's explanation regarding Basham's recent low IQ offered jurors an explanation, other than malingering, for Basham's low IQ. Indeed, during cross examination of Dr. Brawley, the prosecution noted that in July of 1999, Basham had a full-scale IQ score of 89. The prosecutor questioned Dr. Brawley:

> Q.     And then, so, having been in custody after scoring this 89 on the IQ test, for
> all but 130 days, during a three-and-a-half year period, he goes on his crime spree,
> he gets arrested, he gets indicted, he gets served with his death penalty notice, and

then you are hired to do these neuropsychological testing, which includes the IQ tests, on him?

A.     Right.

Q.     And lo and behold, he has got a 68 full-scale IQ?

TT 25: 176.  Instead of Basham's counsel being ineffective by raising the phenomena of Basham's recent alleged decline in IQ, it is obvious he was employing the widely-used tactic of preemptive questioning regarding a possibly damaging fact that would undoubtedly be raised by the prosecution.

Dr. Brawley's opinion contradicted much of the opinion of Dr. Bruce Capehart, a staff psychiatrist at the Federal Medical Facility, who conducted a court-requested evaluation of Basham. Dr. Capehart administered the Wechsler Adult Intelligence Scale - III, which indicated a full-scale IQ of 75.  See Forensic Evaluation, p. 108.  Basham scored in the average range when tested for his ability to demonstrate reasoning and knowledge about practical and social problems.  Id. at 112. Importantly, he scored in the range of possible malingering on a test designed to measure effort and motivation.  Id. at 113.  Dr. Capehart opined: "Given Mr. Basham's questionable motivation and his current legal circumstances, the current results are considered a minimum estimate of his cognitive functioning and potential."  Id. at 114.  Dr. Capehart pointed out that Basham had exhibited a high degree of variability over time.  He noted that Basham's most recent evaluation prior to his arrest on the current charges was conducted in July 1999 and resulted in a full-scale IQ in the average range, with scores on nine of the twelve sub-tests being in the average range.  Id. at 114.

Considering that Basham scored above the mental retardation level on all of the many IQ tests he took prior to his arrest for murder, and that he scored in the average range on the last IQ test taken prior to Alice Donovan's murder; and considering that Basham was quite capable of taking

-85-

care of himself and was highly manipulative when he wanted to accomplish a self-serving goal, it is highly unlikely that Basham's counsel could have succeeded in pursuing a claim of mental retardation. Therefore, his counsel did not err by not pursuing such a claim.

B.     Fetal Alcohol Spectrum Disorder

Basham's habeas counsel complain that his counsel were ineffective for failing to pursue evidence of his exposure to drugs and alcohol *in utero*, and to seek expert advice on the effects of this exposure. §2255 Mot at 85. Other than a general claim that this would have revealed "compelling mitigating evidence," Basham fails to explain how evidence of fetal alcohol spectrum disorder would have caused the jury to reach a different conclusion.[12] "[T]he reasonableness of an investigation, or a decision by counsel that forecloses the need for an investigation, must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing and the reality that counsel must concentrate his efforts on the strongest arguments in favor of mitigation." Byram v. Ozmint, 339 F.3d 203, 210 (4th Cir. 2003)(quoting McWee v. Weldon, 283 F.3d 179, 188 (4th Cir. 2002)).

At the time of trial, an MRI was the tool used to determine whether a person had brain injury due to his mother's ingestion of alcohol. TT 20:197. Basham's MRI was normal. TT 20: 198. Jan Vogelsang, a social worker who conducted numerous interviews with Basham's family, friends, teachers, and neighbors, and who reviewed thousands of pages of records, admitted that though she suspected that Basham had suffered brain injury due to his mother's alcohol consumption, she could find no physical evidence of such injury. TT 20: 198. This was consistent with a neurological

---

[12] Basham's trial counsel had seen co-conspirator Chad Fulks present an extensive case for mitigation based on fetal alcohol spectrum disorder relying on stronger evidence than in Basham's case. Yet the jury recommended the death penalty.

examination performed when Basham was a child. The neurologist had administered a series of tests, but had found no neurological abnormality. TT 23: 143. Thus, there was no reason for counsel to allocate time and resources to further pursue an argument based on fetal alcohol spectrum disorder.[13]

Moreover, Basham has failed to show that he was prejudiced by counsel's decision not to further pursue a fetal alcohol spectrum disorder defense. The jury found that Basham had participated in the murder of a South Carolina woman with whom he had never had contact until he jumped into her car and kidnapped her from a Wal-Mart parking lot. Evidence was presented that only a few days prior to this murder, Basham had participated in the kidnapping and murder of a college student in West Virginia. The night Basham was arrested, he had attempted to kidnap another young woman from a mall parking lot. Assuring the jury that Basham could not control his behavior because his mother had consumed alcohol during her pregnancy would probably would not have helped Basham significantly, as it may have created greater concerns about his future dangerousness. See Schiro v. Landrigan, 550 U.S. 465, 481 (2007)(given the defendant's record of violence and lack of remorse, "assuring the court that genetics made him the way he is could not have been very helpful").

C.      Mitigation Investigation

Counsel has a responsibility to adequately investigate and present evidence in mitigation of guilt. Byram, 339 F.3d at 209-210. However, counsel is only required to make a reasonable

---

[13] Nonetheless, Basham's counsel presented evidence of the use of alcohol and drugs by Basham's mother during her pregnancy. TT 20: 74. Ms. Vogelsang further testified that Basham's mother would smoke marijuana while she was nursing him, and blow marijuana into his face to calm him. TT 20:41.

investigation for possible mitigating evidence. Id. (citing Matthews v. Evatt, 105 F.3d 907, 919 (4th Cir. 1997)). Basham's habeas counsel's claim that his trial counsel failed to adequately investigate, develop, and present mitigating evidence completely fails based on the record. If Basham's counsel did not uncover "every scrap of evidence that could conceivably help" him, they undoubtedly came close, as summarized below.

Basham's trial counsel conducted an exhaustive mitigation investigation and presented a compelling mitigation case. Jan Vogelsang, a highly-respected clinical social worker who has helped hundreds of crime victims and treated 50-100 offenders, and who has testified as an expert in 30-35 death penalty cases, conducted an extensive biopsychosocial assessment of Basham. TT 20: 6-21. During the assessment, Ms. Vogelsang visited Madisonville, Kentucky three times to interview more than forty people, including Basham's parents, sister, teachers, relatives, psychologist, psychiatrists, social workers, childhood acquaintances, neighbors, probation officers, psychiatric hospital staff, and jail employees. TT 20:22-24. She reviewed approximately 8,000 pages of records, including medical and mental health records of Basham and his family, school records, his mother's military records, social services records, and jail records. TT 20: 18, 24-25. Ms. Vogelsang developed a chart, called a genogram, to show patterns of behavior that run in Basham's family. TT 20: 26. She explained the chart to jurors, showing that many members of Basham's family, going as far back as the 1930's, had suffered from severe mental illnesses with characteristics including auditory hallucinations, paranoia, irritability, restlessness, hyperactivity, suicide-attempts, depression, aggression, and violence. TT 20: 27-35. Ms. Vogelsang emphasized that the histories of Basham's parents were characterized by family violence, substance abuse, learning difficulties, and mental, emotional, and behavioral impairments. TT 20-36. She pointed out that Basham was

a special-needs child, was physically abused, and "was completely corrupted and mis-socialized" and "taught all of the wrong things." TT 20-36. Ms. Vogelsang explained that Basham had responded to this negative home environment by developing "protective survival strategies," such as "drug use, lying, manipulation, aggression, and running away." TT 20: 37.

Ms. Vogelsang testified in detail about the numerous mental and physical health problems Basham experienced as a child. TT 20: 48-55. At age ten, Basham was diagnosed with intermittent explosive and oppositional defiant disorders and seizure disorder. TT 20:107. However, his mother refused to give him the prescribed medication. TT 20: 107-108. Ms. Vogelsang told jurors about the numerous institutions where Basham had been treated, and stated that Basham's mother would try to remove him from an institution prior to Basham's Social Security check being discontinued, because she used the check for drugs. TT 20: 75. She discovered that there had been no continuity of care, and that medical recommendations were not followed. TT 20: 126-127.

In addition to pointing out the problems with Basham's treatment, Ms. Vogelsang testified about Basham's dysfunctional home life. His mother shoplifted, grew marijuana in the back yard, and allowed drug users and dealers to infest the house. Violence was commonplace. TT 20: 60. Ms. Vogelsang described one particular incident when Basham's aunt shot his father, after which his father grabbed his aunt by the jaw and ripped the flesh from her face. TT 20: 60-61. Other incidents involved a fifteen-year-old cousin who was killed by a group of boys after his father forced him to confront the boys who were bullying him; and an incident in which his mother's boyfriend held a knife to her throat. TT 20: 71-72. Ms. Vogelsang said that Basham rarely saw any consequences resulting from the bad and illegal behavior. TT 20: 61.

Ms. Vogelsang testified that when Basham was in the first or second grade, tests indicated

he had a learning disability and poor social skills, judgment, and insight, and that he needed structure. TT 20: 81. Basham's aggressiveness became progressively worse with age. TT 20: 82. Basham's mother hit him with coat hangers, frying pans, and anything else she could get her hands on. TT 20:87, 96. She could not control him, and so, when Basham was twelve-years-old, she sent him to live with a twenty-year-old, mentally-handicapped, former drug user. TT 20: 98. At age fifteen, he was sent to a group home, where he was molested by a man. TT 20: 74.

After Ms. Vogelsang provided a detailed look into Basham's mental and physical problems and how they affected him, Charlotte Basham Morris, Basham's sister, testified about their family. She said that their mother could not hold a job and was on anti-psychotic medication. TT 21: 21. Ms. Morris testified that for as long as she could remember, her father failed to communicate with her. TT 22: 21. She described him as being "almost like an inanimate object. You could talk to him, but you didn't get [a] response." TT 22: 21. Ms. Morris testified that her parents provided the basic necessities, but never provided any guidance or affection. TT 21: 23-24. She said they never did anything as a family. TT 21-25. Their mother sometimes became enraged for no apparent reason and began beating the children or their father. Ms. Morris testified that when their mother attacked their father, Basham would try to get between them, and that he once was kicked in the stomach when he was a young child trying to break up a scuffle. TT 21: 32. Ms. Morris testified that her mother grew marijuana, dried it in Basham's room, and sold it from their house. TT 21: 39-40. When Basham was about eight-years-old, his mother began giving him marijuana to use. TT 21: 52. Ms. Morris said that when she and her brother could not get marijuana, they would inhale gas, paint, or liquid cement. TT 21: 67-68. When Basham was approximately thirteen-years-old, he, Ms. Morris, and their mother used crack cocaine openly in their house. TT 21: 77-78, 81.

Ms. Morris testified that when Basham was a child, he told his parents that an acquaintance tried to fondle his genitals. His mother was angry, but his father said the man was just playing and had done the same thing to him and his brother when they were children. TT 21: 58. Ms. Morris said that their parents did not report the incident, but the man was serving a prison sentence at the time of trial for sexually abusing children. TT 21: 58-59. Ms. Morris said that investigators from Child Protective Services came to their house numerous times because teachers could see that something was wrong with the Basham children. However, usually nothing happened because their mother instructed them to lie, and they did not want to upset her. TT 21: 59-60. Finally, after Charlotte's mother stabbed her in the head with scissors when she jumped on Charlotte and tried to cut her hair as punishment for driving the car when she was fourteen, Protective Services awarded custody to their father. TT 21: 61-62.

Other family members confirmed Ms. Morris's testimony and added more details. Jerome McKetchnie, a cousin, in addition to testifying about the daily drug use and violence in Basham's household, testified about numerous men - both boyfriends and drug users - frequenting the house. TT 21: 129. Summer Ruley, a second cousin who was in school with Basham, testified that he was "slower than normal children." TT 21: 173. She said that other children did not want to associate with him because they looked at him as being lower class and because he was annoying - constantly touching or moving. TT 21: 174-175. Another cousin testified that he saw Basham and his mother using crack together. TT 21: 186. Beverly Basham, a "cousin by marriage," testified that Basham's mother smoked marijuana from the time she got up in the morning until she went to bed. TT 21: 189, 196. She said Basham was loud and obnoxious, and that his mother would "shotgun" marijuana into his face to calm him. TT 21: 194-195. She testified when Basham was older, his mother

encouraged him to steal in order to get drugs. TT 21: 201.

Another cousin, Thomas Basham, told about the time Basham fell out of a tree and wounded his head. TT 21: 225. He said that Basham was not the same after the injury - "He acted like he was slower." TT 21: 225. Thomas Basham testified that even though he had once lived with his uncle, Brandon Basham's father, and was close to him, he stopped visiting at their house because Basham's mother was selling drugs from the house, and he was afraid law enforcement would come there and arrest him based on the drug activity. TT 21: 238-239. He said that once when Basham returned from a stay at a psychiatric institution, he looked healthier and he confided that he wanted to go back to school, and he believed he would be fine if he could stay away from his mother. TT 21: 239. So, Basham's father got him a trailer, and he stayed away from his mother for two months. TT 21: 239. However, Basham and his mother got back together after two months, and Basham began to steal and get into trouble. TT 21: 239-240. As a result, Basham was arrested. TT 21: 240.

Joyce Tapp, a school bus driver when Basham was in the first grade, testified that Basham stayed at her house as their son's guest for five days the summer before school started. TT 21: 259-260. She said he was not used to eating at a table, washing his hands, bathing before bed, or going to bed at a regular time. TT 21: 261. When it came time to leave, he cried and wanted to live with the Tapps. TT 21: 260. Ms. Tapp testified that other children teased Basham when he was on the school bus, and that he would fight them. TT 21: 264. She said some mornings when Basham got on the bus he was crying and upset. TT 21: 266.

Sharon Watkins, Basham's first grade teacher, testified that Basham was the most impulsive child she had ever taught, and that he clearly had a learning disability. TT 22: 18. Suzanne Mayes, Basham's second grade teacher, also testified that Basham was a difficult child to teach because he

was constantly talking, moving around, and demanding attention. TT 22: 42. She said that he couldn't focus on anything, so he had trouble comprehending things. TT 22: 42. Ms. Mayes testified that it appeared Basham had never been exposed to a structured environment and that he did not interact with other children well. TT 22: 43. When Ms. Mayes asked the students what they would like to be when they grew up, Basham responded that he would like to be a male stripper, because his dad would have him dance on the table, and his friends would give him quarters. TT 22: 45-46. Ms. Mayes said Basham's parents never showed any interest in his education. TT 22: 46. Monte Mefford, a teacher for children with emotional and behavior problems, taught Basham for two years. TT 23: 106-109. She testified that Basham had major deficits in social and behavior skills. TT 23: 117-118. She said that even though he was obnoxious and aggravating to other children, he had a lot of good qualities. Ms. Mefford testified that Basham had "a very good heart," mentioning that he worried about the disabled children in wheelchairs, and would cover them with his own jacket if they were outside during cold weather. TT 23: 119. Ms. Mefford said that she made medical appointments for Basham and took him to the appointments. TT 23: 126-127. She testified that he loved animals and had a ferret, which he loved, but he was allergic to it, so she obtained medication for him. TT 23: 127-128. Ms. Mefford said she had a mentally retarded sister, whom Basham was fond of and often expressed concern about.

Lynn Coy, the mother of a mentally-retarded child with a behavior disorder, testified that her son was in special needs classes with Basham. TT 22: 53. She said that Basham would take up for her son when other children picked on him, and that he once helped her son clean up a light bulb after her son had thrown it during a temper tantrum. TT 22: 57-59. Brenda Shaner, treatment and academic program coordinator, at the Methodist Home, testified that Basham was referred to the

Methodist Home by the Department of Social Services. TT 22: 126, 124. Kellie Mullins, a cottage supervisor at the Methodist Home, testified that Basham was impulsive, loud, hyper, and had low self esteem, and that most of his misbehavior involved food, confinement to his room, or taking of personal belongings. TT 22: 62, 68, 76-78. She said that Basham "had a good heart," and that she considered him to be one of the special-needs children Kentucky had failed. TT 22: 94-95.

Penny Titzer, unit manager for Charter Hospital, a locked psychiatric hospital, in Evansville, Indiana, where Basham was admitted by his probation officer for residential treatment on January 28, 1997, testified that Basham was sent there because he had run away from the Methodist Home. TT 23: 177, 183-185. Basham was fifteen-years-old at the time. He came up to her and, with a big smile and an energetic manner, introduced himself. TT 23: TT 23: 185-186. He was personable and polite. TT 23: 186. She testified that Basham received very few visitors or telephone calls, and had no support system. TT 23: 192. Ms. Titzer had once-a-month counseling sessions with Basham and his family. TT 23: 207-209. During one of those sessions, Basham discovered that his mother had sold some of his personal belongings because she claimed she needed the money. TT 23: 209. Ms. Titzer testified extensively about her attempts to work with Basham regarding two alleged incidents of sexual abuse. TT 23: 210 - 24: 18. Basham reported sexual abuse at age fourteen by a man in their neighborhood. TT 24: 15. Investigators interviewed Basham regarding the incident. TT 24:15. However, Basham's mother refused to cooperate because she was afraid the neighbor would hurt them or burn down their house, so law enforcement could not prosecute the abuser.[14] TT 24: 17-18. Ms. Titzer testified that her employment with Charter Hospital ended on June 9, 1997.

---

[14] During cross examination, Ms. Titzer admitted that she was not aware that on the date of the alleged sexual assault at the neighbor's house, Basham was residing at the Methodist Home. TT 24: 40.

TT 24: 18. On September 11, 1997, Basham was released to Cardinal Treatment Center.[15] TT 24: 65.

Susan Davenport, the vocational counselor at Cardinal Treatment Center, where Basham was referred by the Department of Juvenile Justice at age sixteen, testified that Basham was always respectful toward her, but that he had problems with peers, who would tease him because his family never visited him. TT 22: 185- 197. She said he wanted to be a mechanic, like his father. TT 22: 189. Danny Stringfield, chairman of the treatment team while Basham was at Cardinal Treatment Center, testified that on several occasions, Basham's peers acted aggressively toward him. TT 23: 29. He also testified that there was a time when Basham and another resident left without permission, but that Basham was later picked up after he became lost and disoriented subsequent to the other resident abandoning him. TT 23: 64-65.

Regina Moore testified that she first met Basham when he was a child and attempted to steal video tapes and music cd's from the store at which Ms. Moore worked. TT 24:92. She said he was small and dirty. TT 24: 92. Basham told her he wanted to sell the items to get money for food. TT 24: 92. Moore said she had previously seen Basham getting food out of dumpsters. TT 24: 93. After the theft attempt, Ms. Moore bought Basham food every night for approximately a year and a half. TT 24: 93. Several years later, when Ms. Moore was working at the jail, she saw Basham on his eighteenth birthday, when he was transferred from a juvenile facility to the jail. TT 24: 96. Ms. Moore testified that during the ten months Basham was at the "old" jail, he never caused her any problems. TT 24: 98. Ms. Moore testified that after they were transferred to the "new" jail, she functioned only as the booking officer, and she did not have an opportunity to see Basham regularly.

---

[15] Basham's discharge diagnosis was conduct disorder and dysthymia. TT 24: 70.

TT 24: 99-100. Ms. Moore said that she was surprised when she discovered that Basham had escaped, because she did not think he would know how to get out of town, since he had never been outside of Madisonville. TT 24: 103.

Paul Arison, deputy jailer at Hopkins County Jail, testified that when Basham was an inmate, he wanted to acquire his GED. TT 24: 115. He said that Basham's pre-GED test indicated he had the equivalent of less than a third-grade education. TT 24: 115. Mr. Arison told the jury that Basham was like an eight or nine-year-old child, and that, even though he came to class regularly, his attention span was so poor that he could not stay focused. TT 24: 117-118. Former Hopkins County Jail Captain Jewel Dickerson testified that Basham was a follower and a "gofor" for the other inmates, and that he acted like a six-year-old. TT 24: 124-125. Captain Marvin Phillips testified that Basham was "on the slow side." TT 24: 139. He said that when Basham was not on his medication that he was agitated and nervous, and would talk to the walls. TT 24: 140. Lt. Kathy Terrell, who worked at the Hopkins County Jail, testified that Basham was a follower. TT 24: 176. Several officers from Alvin Glenn Detention Center, where Basham was jailed during his trial, testified that they treated Basham with respect and talked with him, and that he had not caused them any problems. TT 24: 193, 206-207, 210-211. One officer testified that Basham "is a good person." TT 24: 218.

After numerous witnesses testified to Basham's unfortunate childhood, inability to learn, and child-like mentality, Basham's counsel presented the testimony of Dr. William Brannon, a neurologist. TT 24: 223. Dr. Brannon testified that Basham has a brain impairment which affects his reasoning and judgment, making him impulsive and easily manipulated. TT 24: 250-252. After Dr. Brannon testified, James Aiken, an expert on prison and institution management, told jurors

-96-

about the extensive security measures that are part of a maximum-security prison.  TT 26: 21-32.

Basham concluded his mitigation case with the testimony of Donna Schwartz-Watts, a forensic psychiatrist, who worked on Basham's case for "probably 250 hours." TT 26: 81, 264. Dr. Schwartz-Watts testified that she had interviewed Basham about forty times and in different settings over a year-and-a-half, reviewed his medical records and discovery, consulted with Dr. Brannon and Dr. Brawley, read transcripts of the guilt and first part of the penalty phase of Basham's trial, and worked with investigators and mitigation specialists on Basham's defense team.  TT 26:102-107, 264. Dr. Schwartz-Watts said that she had also reviewed Chad Fulks' entire case because "you can't understand Mr. Basham without understanding his relationship with his codefendant." TT 26: 107. Additionally, Dr. Schwartz-Watts interviewed members of Basham's family, correctional officers, teachers, psychologists and psychiatrists who had previously treated Basham, social workers, and witnesses, such as Andrea Roddy and Ronald Perdue.  TT 26: 108-112.

Dr. Schwartz-Watts testified regarding Basham's developmental history.  TT 26: 122-150. She said that his mother beat him with a coat hanger when he was five-years-old, and that Basham, at a young age, saw his mother banging his sister's head against a brick wall.  TT 26: 133.  Dr. Schwartz-Watts testified that records indicated that when Basham was between the ages of eight and twelve, he was sodomized by a homeless man his father had brought into the home.  TT 26: 144. She said that Basham's drug use, physical and sexual abuse, and head trauma had likely affected his brain and his social development, and that he had one of the worst developmental histories she had seen.  TT 26: 150.  Dr. Schwartz-Watts said that one of the psychiatrists where Basham had been hospitalized opined that Basham did not have any control over his behavior, and that he was easily manipulated by others.  TT 26: 172-173.  Dr. Schwartz-Watts discussed the significance of the

-97-

numerous evaluations performed at the various institutions which had treated Basham, and the medications prescribed. TT 26:167-216. Ultimately, she concluded that Basham has "dementia due to multiple etiologies" and "inhalant-induced psychosis." TT 26: 250, 266. Dr. Schwartz-Watts said that Basham also suffers from auditory hallucinations, anxiety disorder, and paranoia. TT 26: 267-270. However, she stated that her primary diagnosis would be dementia due to multiple etiologies. TT 26: 250.

It is clear Basham's sentence was not due to a weak mitigation case. It is difficult to imagine what else trial counsel could have done. The mitigation evidence simply could not overcome the convincing evidence of Basham's guilt and the cruelty inflicted upon his victim, plus the evidence that Basham was attempting to kidnap another victim when he was finally captured. See Gardner v. Ozmint, 511 F.3d 420, 427-428 (4th Cir. 2007)(since the sentence in a death penalty trial depends in large part on what occurred during the guilt phase, the strength of this evidence likely provided the critical reason for the jury's conclusion that the defendant's conduct warranted a death sentence). The final attempted kidnapping revealed Basham had no remorse for the prior two murders and that he would continue to murder. Further, not all of the information about Basham's life prior to the murders was cause for sympathy. For example, the prosecution, during cross examination of Dr. Brawley, questioned her regarding a 1997 psychological assessment stating:

> Brandon has little ability to empathize with others and shows little or no remorse for his misbehaviors. He may be assaultive or very aggressive as he reports considerable problems with controlling his anger. Brandon may appear charming, intent to make a good first impression; however, his interpersonal relationships are likely to be very shallow. He is interested only in his own pleasure and is insensitive to the needs of others. He seems unable to experience guilt while causing others trouble.

TT 25: 141. The prosecution questioned Dr. Brawley about another evaluation, done when Basham

was almost eighteen-years-old, in which the neuropsychologist observed: "Women were seen as objects of sexual gratification. And there was no indication of emotional or relational involvement when they appeared in his stories." TT 25: 133. Thus, even if Basham's trial counsel had somehow been ineffective, Basham's current counsel cannot show prejudice, because there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Moody v. Polk, 408 F.3d 141, 152 (4th Cir. 2005)(quoting Wiggins v. Smith, 539 U.S. 510, 534 (2003)).

**Response to Claim 20: Basham's counsel have failed to show that trial counsel failed to assemble a competent capital defense team or that he was prejudiced by any alleged failure of his counsel to supervise the defense team.**

Basham's habeas counsel complain that his trial counsel "failed to recognize" the "personal problems, conflicts of interest, and ineffective performance" of the defense team and "failed in their duties properly to supervise and manage their capital defense team." §2255 Mot at 87. Specifically, they complain of the performance of Carlisle McNair, an investigator working on his case and Paige Tarr, a mitigation specialist.

A.    Investigator Carlisle McNair

Basham's counsel complain that Investigator McNair was "both professionally and personally biased against him, and that his bias . . . grossly compromised his investigation." §2255 Mot at 88. He claims that McNair's biases caused him to fail to discover that Government witnesses, guards from Butner FCI, would testify that Basham bragged that he would never receive the death penalty. §2255 Mot. at 89. Other than making the general allegation that his counsel were caught off guard and unprepared to respond, Basham has failed to show how he was prejudiced. See Byram, 339 F.3d at 211 ("Byram offers no evidence to support his claim that greater supervision of [the mitigation

expert] or better communication between the members of his defense team would have produced a different result in his case."). Basham's counsel attempted to prevent the testimony. They argued to the Court that it would be more prejudicial than probative. TT 17: 180. However, the Government pointed out that, according to their opening statement, Basham's counsel intended to present significant testimony regarding Basham's impaired mental state, and, therefore, Basham's boasting that he would never get the death penalty due to his mental illness was relevant. TT 17: 191. The Court agreed. Id. The Government also pointed out that if the testimony of the guards was not allowed during the Government's presentation, it would certainly be allowed during the rebuttal case, making it some of the last evidence the jurors would hear prior to deliberations. TT 17: 193.

Thus, Basham has failed to show how prior knowledge of Basham's bragging would have allowed counsel to prevent the testimony or to mitigate the damage. Further, Basham's counsel has failed to suggest what Investigator McNair could have found to prevent the jury from finding Basham guilty. As discussed previously, the evidence of Basham's guilt was overwhelming. In addition to his own admissions, a witness testified to seeing Basham shoot a gun, as he was stealing the witness's guns shortly before he was seen on video kidnapping Alice Donovan from the Wal-Mart parking lot. There was also evidence, including testimony that Basham wore Samantha Burns' ring around his neck, indicating that Basham was involved with the murder of Samantha Burns. TT 5: 94-95. Basham's counsel has suggested nothing that Investigator could have found that would have countered this and other evidence of Basham's guilt. Consequently, Basham's counsel have failed to satisfy the prejudice prong of the Strickland test.

B.    Mitigation Specialist Paige Tarr

Basham's counsel make the unsupported allegation that mitigation specialist Paige Tarr was

-100-

"either unable to devote her attention to the case or was deficient in her efforts." §2255 Mot at 92.

Basham has failed to show how Ms. Tarr's performance was deficient or how he was prejudiced by the alleged deficient performance. As discussed above regarding Claim 19, Jan Vogelsang, a social worker and mitigation specialist, plus numerous others, testified extensively regarding Basham's difficult childhood, and his family, educational, and mental health problems. The jury heard mitigation evidence for seven days. Basham's counsel have not pointed to any essential stone that was left unturned.

**Response to Claim 21: There was no basis to trifurcate Basham's trial.**

In Claim 21, Basham's habeas counsel argue that his trial attorneys were ineffective for failing to request a trifurcated trial. §2255 Mot. at 93. More specifically, they contend that his attorneys should have asked the district court to divide the sentencing hearing into two separate phases: (1) an "eligibility phase" in which the jury would hear the Government's evidence regarding threshold intent factors and the statutory aggravating factor in determining whether Basham was eligible for the death penalty; and (2) a "penalty" or "selection" phase in which the jury would consider non-statutory aggravating factors and all mitigating factors, and in which the jury would weigh the aggravating and mitigating factors in deciding whether to impose the death penalty. Id. at 95. Basham's habeas counsel claim that a trifurcated trial was necessary to ensure that the jury was not swayed by evidence of non-statutory aggravating factors (such as victim impact evidence) in deciding whether the Government had first proven Basham's eligibility for the death penalty beyond a reasonable doubt. Id. at 95-96.

This argument fails for several reasons. First, the Federal Death Penalty Act contemplates a single sentencing hearing encompassing all information relevant to the sentence — including both

aggravating and mitigating factors. Second, the district court clearly instructed the jury that it must reach a unanimous verdict on the threshold intent factors and the statutory aggravating factor before it could consider non-statutory aggravating factors and mitigating factors. Third, to the extent that the single sentencing hearing employed by the district court allowed the jury to consider "penalty" or "selection" information in determining Basham's eligibility for the death penalty, such a procedure had potential to work in Basham's favor. For example, mitigating information regarding Basham's mental health might have kept a juror from finding a threshold intent factor. Finally, in any event, Basham was not prejudiced by the bifurcated trial proceeding; the information regarding the threshold intent factor and statutory aggravating factor found by the jury was overwhelming.

A.     The FDPA contemplates a single sentencing hearing encompassing all aggravating and mitigating evidence.

Under 18 U.S.C. § 3593(b), if a defendant is convicted of an offense for which the death penalty may be imposed and for which the Government has provided proper notice of its intent to seek the death penalty, the district court "shall conduct a separate sentencing hearing to determine the punishment to be imposed." Section 3593© provides: "At the sentencing hearing, information may be presented as to *any* matter relevant to the sentence, including *any* mitigating or aggravating factor *permitted or required* to be considered under section 3592." (Emphasis added). Thus, by its express terms, the FDPA contemplates a single sentencing hearing at which information is presented on both statutory and non-statutory aggravating factors and mitigating factors. See United States v. Bolden, 545 F.3d 609, 618 (4th Cir. 2008) ("As the plain language of §§ 3593(b)-(e) . . . makes clear, the FDPA contemplates a single penalty phase hearing at which all relevant evidence is admitted and, if the defendant is found eligible for the death penalty, ultimately weighed by the jury.").

Even so, the federal appellate courts to have considered the issue have held that although the FDPA contemplates a single sentencing hearing, it does not prohibit a district court from bifurcating the sentencing hearing (and thus trifurcating the trial) to avoid confusion of the issues before the jury. Bolden, 545 F.3d at 618; United States v. Fells, 531 F.3d 197, 240 n.28 (2nd Cir. 2008). The appellate courts, however, have not held that trifurcation is mandatory but have left the matter to the discretion of the district courts. See Bolden, 545 F.3d at 618-19.

Basham' habeas counsel cannot demonstrate that Basham's trial attorneys were constitutionally ineffective for failing to request a trifurcated proceeding. Although it would have been within the discretion of the district court to grant a trifurcated trial if requested, Basham's habeas counsel have not shown that the only reasonable course was for his trial attorneys to make such a request. The statutory default procedure under the FDPA is for the district court to conduct a single sentencing hearing, and, as explained further below, the hearing conducted in this case did not prejudice Basham and in fact had potential to work in his favor. Basham cannot now argue that his attorneys should have taken a different approach simply because the jury's verdict was against him.

B.     The district court clearly instructed the jury that it must determine Basham's eligibility for the death penalty before it could consider non-statutory aggravating factors and mitigating factors.

The district court issued a thorough and careful jury charge at the conclusion of the sentencing hearing. The Court began by outlining "the deliberative steps [the jury] should follow in considering as to both of the offenses for which the death penalty is a possible punishment." TT 29: 199.

First, you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, that the Defendant was at least 18 years of age at the time of his offense.

Second, you must consider whether the Government has proven beyond a reasonable doubt and to your unanimous agreement, one of four threshold intent factors.

Third, you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, the statutory aggravating factor alleged.

Fourth, if you find these first three steps have been proved to your unanimous agreement, then you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, any nonstatutory aggravating factors identified by the Government.

Fifth, you must consider whether any one or more of you individually find that the Defendant has proven any mitigating factor or factors by a preponderance of the evidence. You may find any mitigating factor by considering everything that you have learned during either phase of the trial, regardless of whether or not Mr. Basham's attorneys have asserted that factor.

Sixth, all of you then must weigh the aggravating factors you have unanimously found to exist against any mitigating factor or factors any one of you individually found to exist, to determine the appropriate sentence.

Id. at 199-200. In this way, the district court indicated that the steps were sequential, and that the jury had to find Basham eligible for the death penalty (based on his age, the threshold intent factor, and the statutory aggravating factor) before they could consider other aggravating factors and mitigating factors.

The district court further emphasized this point during the jury charge. The Court stated: "[B]efore you may consider the imposition of the death penalty, you must first unanimously agree, beyond a reasonable doubt, that the Defendant was 18 years of age or older at the time of the

-104-

offenses involved in this case[.]" Id. at 202. Then, the Court explained: "[B]efore you may consider the imposition of the death penalty, you must also unanimously find, beyond a reasonable doubt, that the Defendant acted with one of four potential mental states, called threshold intent factors[.]" Id. at 203. The Court emphasized: "You must find one of these threshold intent factors . . . before you may continue your deliberations." Id. at 206. Next, the Court stated: "If and only if you unanimously find beyond a reasonable doubt that the Defendant acted with one of the threshold intent factors. . . you must proceed to determine whether the Government has proved beyond a reasonable doubt the existence of the statutory aggravating factor[.]" Id. at 207. "If you do not unanimously find that the Government has proven the statutory aggravating factor," the Court instructed, "you should so indicate . . . and no further deliberations will be necessary." Id. at 208. The Court thus made it plain that the jury could only proceed to the "penalty" or "selection" deliberations once the Government had proven all of the eligibility requirements (age, threshold intent factor, and statutory aggravating factor). "Jurors are presumed to follow their instructions," and there is no indication in the record that they did not do so here. Bolden, 545 F.3d at 619 (citing Shannon v. United States, 512 U.S. 573, 584-85 (1994)).

      C.     The bifurcated trial proceeding had potential to work in Basham's favor.

As explained above, the district court's jury charge made it abundantly clear that the jury was not to consider nonstatutory aggravating factors or any mitigating factors until the Government had proven beyond a reasonable doubt that Basham was eligible for the death penalty. But assuming (only for the sake of argument) that the jury might have misunderstood or disregarded the Court's instructions on this matter, the jury might have considered information regarding *mitigating factors* as well as information regarding nonstatutory aggravating factors in deciding whether Basham was

eligible for the death penalty.

Basham's trial attorneys submitted six statutory mitigating factors and thirty nonstatutory mitigating factors for the jury's consideration. TT 29: 222-27. Many of these proposed mitigating factors related to Basham's mental or emotional health in general or his mental state at the time of the offense (e.g., Basham's impaired capacity, duress, disturbance, family history of mental illness, drug use, low IQ, learning disability, etc.). As the Court instructed, these factors were not relevant to whether Basham was *eligible* for the death penalty, and the jury was not to consider them until after they had made their eligibility determination. But to the extent that the jury might have intentionally or unintentionally considered these factors in deciding eligibility, this process could have worked in Basham's favor. For example, a juror who found the presence of a mitigating factor related to Basham's mental health might have relied on this factor to find that none of the threshold intent factors were present. Basham's trial counsel could reasonably have concluded that to the extent the bifurcated trial procedure allowed room for impermissible spillover of evidence, this spillover might work to Basham's advantage. There is, of course, no indication that any spillover in fact occurred. But it would not have been unreasonable for Basham's trial counsel to decide not to challenge the bifurcated proceeding based on their determination that any confusion of the issues might be favorable to Basham. After all, to obtain a life sentence they only needed one juror to find that Basham lacked the necessary intent.

> D.     In any event, the bifurcated trial proceeding did not prejudice Basham given the overwhelming evidence of the threshold intent factor and statutory aggravating factor.

In the §2255 Motion, Basham's habeas counsel generally argue that a trifurcated trial proceeding is necessary to allow the jury to reach a determination as to intent and statutory

aggravating factors without any prejudice or confusion that might come from information relating to nonstatutory aggravating factors. They do not, however, specifically identify any information presented at his sentencing hearing that could have swayed the jury's determination that he was eligible for the death penalty. In fact, they get no more specific than saying there are "myriad problems" with a bifurcated trial which admits "information on one issue, such as a nonstatutory aggravating factor like victim impact, that is not relevant to another issue, such as a statutory aggravating factor related to the circumstances of the offense." §2255 Mot. at 94.

Basham's habeas counsel simply cannot show that the bifurcated trial procedure prejudiced Basham. For one thing, the jury was already aware of much of the Government's information on nonstatutory aggravating factors because that information had been presented as evidence in the guilt phase of Basham's trial. It is unlikely that additional information, such as that relating to Basham's conduct in prison or victim impact, would have swayed the jury in light of the heinous facts of this case already adduced at trial. In any event, much of the Government's case on Basham's eligibility for the death penalty was conceded by the defense, and the evidence was overwhelming on those points that were not conceded.

> 1. The jury was already aware of much of the information relating to nonstatutory aggravating factors.

At Basham's sentencing, the Government presented information, and the jury was instructed, regarding three nonstatutory aggravating factors. TT 29: 210. These were: (1) uncharged murder, attempted murders, and other serious acts of violence; (2) future dangerousness; and (3) victim impact. Id. Extensive evidence regarding the first factor (uncharged acts of violence) had been presented to the jury during the guilt phase of Basham's trial because it was intrinsic to the charged

crimes. During the Court's jury instructions at the end of the sentencing hearing, the district court specifically explained that, as to the first nonstatutory factor, the Government was relying on five acts: (1) Basham's escape from a detention facility in Kentucky; (2) Basham's participation in the carjacking and kidnapping resulting in the death of Samantha Burns; (3) Basham's participation in the first degree burglary and other criminal conduct that resulted in the assault with intent to kill Carl Jordan; (4) Basham's participation in the carjacking and kidnapping of James Hawkins; and (5) Basham's participation in the attempted murder of police officer Matt Davis. TT 29: 211-17. Evidence regarding all of these acts had been presented during the guilt phase, so there was no danger of improper spillover of evidence regarding this information during the sentencing hearing.

> 2.     Information relating to future dangerousness and victim impact would not have swayed the jury in light of the heinous facts of this case.

Although Basham's habeas counsel do not specifically identify which information at the sentencing hearing might have "spilled over" into the jury's determination on his eligibility for the death penalty, the only information on nonstatutory aggravating factors that the jury had not already heard during the guilt phase was the information regarding future dangerousness and victim impact. There is little danger that this information would have had an undue impact on the jury's minds as they made their eligibility determination. This is especially true given the graphic and shocking nature of the trial evidence concerning Basham and Fulks's crime spree.

During the trial's guilt phase, the jury heard evidence about how Basham engaged in a violent rampage that crossed several states. As noted above, the jury heard how Basham escaped from jail in Hopkins County, Kentucky. They heard how he carjacked James Hopkins, held him at knifepoint, and helped tie him to a tree. They heard how he burglarized Robert Talsma's house and possessed

stolen firearms.  They heard how he threatened to kill police officers and a group of teenagers.  The jury heard how Basham participated in the carjacking and murder of Samantha Burns, a 19-year-old college student.  They heard how he participated in a burglary near Conway, South Carolina and fired shots at Carl Jordan.  The jury heard how Basham participated in the carjacking and killing of Alice Donovan.  They heard how Basham demonstrated to Sheriff Hewett how Alice had been strangled with a purse strap.  They heard how he tried to force his way into Deanna and Andrea Francis's car.  And the jury heard how he fired shots at Officer Davis in a final attempt to escape capture.

All of this evidence, properly admitted during the guilt phase of the trial, was strong proof that Basham would be a danger to individuals in the future, regardless of whether he was incarcerated.  There was little chance that the additional evidence presented on this issue by the Government during the sentencing hearing (such as Basham's disciplinary record in prison) had an undue influence on the jury's minds as they determined whether the Government had proven the threshold intent factors and the statutory aggravating factor.

The same holds true for information regarding victim impact.  Given the heinous nature of the crimes Basham committed against Samantha Burns and Alice Donovan, it would come as no surprise to the jury that their murders had a devastating impact on their family members.  Basham cannot demonstrate that the testimony of these family members injected passion or prejudice into the jury's deliberations regarding eligibility for the death penalty.

> 3. The proof regarding Basham's eligibility for the death penalty was overwhelming.

As noted above, to find Basham eligible for the death penalty, the jury had to unanimously

find beyond a reasonable doubt one of the four threshold intent factors and the charged statutory

aggravating factor.[16]  Although the primary argument as to Claim 21 seems to be that a bifurcated

trial violates a capital defendant's rights because it allows improper spillover between proof of

statutory and nonstatutory aggravating factors, the statutory aggravating factor in Basham's case was

*conceded*.

The lone statutory aggravating factor was that Alice Donovan's death occurred during

Basham's commission, attempted commission, or immediate flight from his commission of a

kidnapping in violation of federal law.  TT 29: 207-08.  The jury had already found Basham guilty

of kidnapping resulting in death.  Accordingly, Jack Swerling told the jury:

> Now, the statutory and aggravating factors: that death
> occurred during the Defendant's commission of a kidnapping, in
> violation of federal law.  Mr. Gasser has discussed that with you.
> And your finding of guilt, you can use that to support the finding of
> a nonstatutory [sic] aggravating factor beyond a reasonable doubt.
> You must find it again beyond a reasonable doubt.  That is your duty.
> Go ahead and find the death occurred during a kidnapping in
> violation of federal law.

TT 29: 102.

Thus, the only eligibility factor at issue in Basham's sentencing hearing was whether he acted

with one of the four threshold intent factors.  Basham's trial counsel did not concede that any of the

threshold intent factors had been proven.  Rather, Swerling argued to the jury that "the only

conceivable one" was the fourth factor, which was that "the Defendant intentionally and specifically

engaged in an act of violence knowing the act created grave risk of death."  Id. at 102.  Swerling

maintained, however, that Basham "did not know that [Alice Donovan] was going to sustain serious

---

[16]The jury also had to find that Basham was 18 or older at the time of the offense, but that fact was never in dispute.

bodily injury or death." Id.

This fourth factor was the one found by the jury. And under that factor, Basham did not need to know that Donovan was going to die; it was sufficient that he "intentionally and specifically engaged in an act of violence, knowing the act created *grave risk of death* to Alice Donovan, such that participation in the acts constituted a reckless disregard for human life." Id. at 204-05.

The Government's proof on this fourth threshold intent factor was overwhelming. At the time Brandon Basham and Chad Fulks kidnapped Donovan from the Wal-Mart parking lot in Conway, they had already engaged in numerous dangerous and violent acts. Chief among these, Basham and Fulks had similarly kidnapped Samantha Burns from a mall parking lot and murdered her. So at the time of his participation in Donovan's kidnapping, Basham knew what they had done to Burns. He knew that they had restrained or attempted to kill other individuals (James Hawkins, Carl Jordan) in their efforts to avoid capture. He knew that he and Fulks were armed with guns. So when Basham carjacked and kidnapped Alice Donovan, he engaged in an act of violence, knowing the act created a grave risk of death to Donovan.

Basham's trial counsel appeared to recognize the strength of the Government's case on this point. Out of Swerling's entire closing argument, which spans 68 pages of the trial transcript, only one paragraph is devoted to contesting threshold intent. Id. at 101-02; cf. id. at 91-159. Thus, only one paragraph out of 68 pages is devoted to contesting Basham's eligibility for the death penalty, as the other elements were conceded. Given the undeniable evidence that Basham acted with reckless disregard for Alice Donovan's life, it is implausible that the jury's exposure to the Government's nonstatutory aggravating factors would have unduly influenced its decision to find this threshold intent factor. See Fell, 531 F.3d at 240 ("Presented with two uncontested factors, and needing to find

-111-

only one to deem Fell 'death eligible,' the jury, in our view, was unlikely to have been swayed by the additional 'death-selection' evidence-mainly victim impact and character evidence-when deliberating on whether Fell was 'death eligible.'").

**Response to Claim 22: The Government did not violate its Brady obligations.**

In Claim 22, Basham's habeas counsel claim "upon information and belie[f]" that the Government violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963). This claim is completely without factual support and should be summarily dismissed.

Basham's habeas counsel support this claim by speculating that the Government withheld from the defense the following: (1) information concerning investigations of Ronald Hewett; (2) information concerning the government's investigations of juror misconduct in Basham's case and (3) any agreements or promises made by the governments with or to witnesses who testified at either Basham's or Fulk's trials. This claim fails.

In order to establish a Brady violation, a petitioner must demonstrate that the information at issue was "favorable to the accused"; that it was "suppressed by the [Government], either willfully or inadvertently"; and that prejudice to the defense ensued. United States v. Roane, 378 F.3d 382, 402 (4th Cir. 2004) (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). Under Brady and Giglio, the prosecution is required to disclose exculpatory evidence, including evidence that may impeach the credibility of a witness. Giglio v. United States, 405 U.S. 150, 154 (1972). However, the evidence must exist at the time of trial for it to be Brady material. United States v. Robinson, 627 F.3d 941, 951-52 (4th Cir. 2010) (holding that investigating officers' knowledge of their own misconduct, which was unrelated to defendant's case, was not attributable to government, for purposes of defendant's motion for new trial, even though officers were working on government's

behalf, absent evidence government knew of officers' misconduct; Brady's constructive knowledge doctrine does not require prosecutors to conduct full interviews and background checks on everyone involved in case); United States v. Jones, 399 F.3d 640, 647 (6th Cir. 2005) (noting that evidence of misconduct by police discovered after trial "did not exist at the time of trial [and] was not Brady material"); United States v. Erickson, 561 F.3d 1150, 1163 (10th Cir. 2009). Evidence withheld by the Government is "material" and requires reversal of a conviction only if there is a reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceeding would have been different. United States v. Bagley, 473 667, 674-75 (1985). The defendant has the burden of demonstrating that the Government withheld favorable evidence and that the evidence raises a reasonable probability that the defendant would have obtained a different result if he had had the evidence. See Maynard v. Dixon, 943 F.3d 407, 417 (4th Cir. 1991)(citing Bagley, 473 U.S. at 680)).

Basham's habeas counsel present no factual support for these very serious Brady allegations. It is their burden to establish that the evidence exists. This they have not done.

With regard to the investigation of Ronald Hewett, this investigation began in approximately December of 2006 by the United States Attorney's Office in Eastern District of North Carolina. See Docket in Criminal number 7:08-CR-51-BR (E.D.N.C.). See Docket # 18 (Government's Sentencing Memorandum), at p. 3 ("In approximately December of 2006, the Government began investigating {Hewett] in connection with his misuse of office."). Accordingly, this Brady claim fails because no evidence of Hewett's misconduct existed at the time of Basham's trial in 2004. Robinson, 627 F.3d at 951-52 ; Jones, 399 F.3d at 647. There was no Brady material to turn over.

With regard to investigations of alleged juror misconduct, the Government possessed no Brady material that was not turned over. Likewise, the Government did not withhold any agreements

or promises made with or to witnesses who testified in Basham's trial.

This claim is unsupported and should be summarily dismissed

**Response to Claim 23: The Government did not present inconsistent theories at Fulks's and Basham's trials.**

In Claim 23, Basham's habeas counsel argue that the Government violated his right to due process by presenting a theory at his trial that was inconsistent with the theory it presented at Chad Fulks's trial. §2255 Mot at 98. They claim the Government "took diametrically opposed positions" at the two trials, "manipulated the evidence," and "relied upon factually inconsistent and irreconcilable evidence at the two trials." Id. at 98-101. Specifically, they claim that during the Fulks trial the Government argued that Chad Fulks killed Alice Donovan by strangling her with a purse strap, while during the Basham trial the Government argued that Brandon Basham was the one who strangled Donovan with the strap. Id. at 98-99. Basham contends that these conflicting theories rendered his trial fundamentally unfair. Id. at 98.      This argument is without merit.

The Government did not raise inconsistent theories at the two trials. Rather, the record of those trials demonstrates that the Government advanced a consistent theory as to both defendants: Chad Fulks and Brandon Basham were equally involved and equally culpable in the murder of Alice Donovan. Assuming for the sake of argument that an inconsistency did exist between the Fulks and Basham trials, the inconsistency was minor and did not affect the core of the Government's case.

A.      There was no inconsistency in the Government's evidence against Fulks and Basham.

The alleged inconsistency stems from a demonstration that Brandon Basham gave to Sheriff Ronald Hewett on Thanksgiving Day, 2002, when Basham attempted to lead investigators to Alice Donovan's remains. Basham led the investigators to a cemetery near Bee Tree Farms in Brunswick

-114-

County, North Carolina.  Basham had already told the investigators that they should be looking in that area for a leather purse strap.  At the cemetery, Basham demonstrated to Sheriff Hewett (by motioning with his shackled hands) the length of the purse strap, how it had been used to strangle Alice Donovan, and how he (Basham) had thrown the strap into the woods.

Sheriff Hewett did not testify at Chad Fulks's trial.  He did testify at Brandon Basham's trial, and he testified at a joint Jackson v. Denno hearing that occurred before the two defendants' cases were severed.  At that joint hearing, Sheriff Hewett described Basham's demonstration regarding the purse strap:

Q:     You previously indicated to the court that you were having many discussions with Mr. Basham, to include a purse strap?

A:     Yes.

Q:     Do you recall that testimony?

A:     I do.

Q:     And did you want to know more information about that purse strap and how it was used and where it might be located?

A:     I did.

Q:     Wanting that to occur, tell the judge what you did with Mr. Basham.

A:     Mr. Basham and myself and the two Conway sergeants, which were Sergeant Parker and Sarvis, I believe, we walked back down to the cemetery.  Branden [sic] Basham, he was shackled at his hands, belly chained around the waist, and shackled at his feet.  He walked down to the cemetery, he got tears in his eyes and tears rolled down his cheek.  He showed me the length of the strap —

Q:     How did he do that?

-115-

A:      May I demonstrate?

Q:      Certainly.

A:      Like this.  Because he couldn't pull his hands very    — very far apart, he was shackled.  He showed me the length of the strap.  Says that he believed it to be a Liz Claiborne strap, and that he had thrown it in the woods.  He then demonstrated the manner in which he threw it in the woods.

Q:      Would you stand up and do that for the court so the record is complete as well?

A:      Yes, sir, I will.  We were standing at the corner of the cemetery, Branden [sic] Basham is chained.  I said, "Branden [sic], how did you do that?"  And he said, "Like that.  And I threw it over there."

2/25/04 Hearing Tr at 66-67.

During the Fulks trial, the attorneys for Chad Fulks sought to introduce testimony about a statement Brandon Basham made to investigators as they rode in a van looking for Alice Donovan's body.  When a doe darted across the road in front of the van, Basham spontaneously uttered, "You know, I could never kill a deer, and here I have . . . ."  Basham was stopped from completing the statement by Cameron Littlejohn, one of his appointed attorneys.  Fulks's trial counsel wanted to introduce the "deer statement" as evidence that Basham had admitted responsibility for Donovan's murder, but they did not want other statements by Basham to be admitted into evidence.

The Government, on the other hand, argued that the "deer statement" should not be admitted unless the Government were allowed to introduce other statements by Basham that inculpated Fulks.  As an example of a statement made by Basham that arguably inculpated Fulks, the Government cited Sheriff Hewett's testimony from the Jackson v. Denno hearing.  In a colloquy with the district court outside the jury's presence, Assistant United States Attorney Johnny Gasser stated:

-116-

Mr. Gasser:     Your Honor, just factually, Ms. Johnson is incorrect. If you recall the Jackson v. Denno hearing, Sheriff Hewett was my witness. Sheriff Hewett took the witness stand and testified to this court at the suppression hearing. Sheriff Hewett took detailed notes and described the statements of which the court has not ruled on yet.

The Court:     I thought there were some direct statements.

Mr. Gasser:     Talking about leading down the way, showed photographs, talked about the purse strap, talked about Chad. He demonstrated — remember Sheriff Hewett demonstrating, because he was in handshackles, demonstrating how Brandon Basham said that Chad Fulks took the purse strap and strangled. So, this was not the only statement that was provided by Brandon Basham to law enforcement.

Fulks TT 06/22/04 at 255. After hearing argument from the Government and Fulks's counsel, the district court ruled that it would not allow the "deer statement."

Thus, at Fulks's trial, the Government did not present evidence or argue to the jury that Chad Fulks strangled Alice Donovan with a purse strap. The Government did not call Sheriff Hewett as a witness or otherwise seek to introduce Brandon Basham's statement about the strap. Of course, the Government *could not have* introduced Basham's statement as evidence against Fulks, because it would have been inadmissible hearsay and in violation of Fulks's rights under the Confrontation Clause. In fact, the Government's inability to introduce Basham's statements at Fulks's trial was the reason the Government opposed Fulks's counsel's attempt to introduce an isolated statement by Basham. Thus, in context, the Government's interpretation of Sheriff Hewett's testimony concerning the purse strap (that Basham demonstrated how Fulks had strangled Alice Donovan) was part of the Government's argument why another statement made by Basham (the "deer statement") should not be admitted into evidence. And this entire discussion occurred outside the jury's presence; the Government never presented the Fulks jury with evidence or argument regarding this

-117-

issue.

Sheriff Hewett did testify at Brandon Basham's trial. And the Government did question him on Basham's statement about the purse strap. But the Government did not elicit — and Sheriff Hewett did not offer — testimony regarding which of the two men actually strangled Alice Donovan with the strap. Rather, the Government elicited testimony about *how* Donovan was strangled with the strap (with no indication who did the strangling) and how Basham had thrown the strap into the woods.

> Q:    And what did he [Basham] describe to you on Thanksgiving Day, the location that you have just described to the jury, tell this jury what Brandon Basham described to you as to what happened to Alice Donovan.
>
> A:    May I.
>
> Q:    You can demonstrate, if he demonstrated.
>
> A:    Brandon Basham had his hands like this once again. I have explained to you how he was shackled. He took his hands together and did this (indicating), "Then I threw it over there. Check in those trees right over there." Which, if you will look at how I am facing you, I am facing the semicircle. So, we walked to the area right here at the corner, and that is where he did this and did that. He couldn't throw very far because he was shackled. That is when he said, "Check over there." At that time, Sergeant Parker and Sergeant Sarvis, those were the two individuals that were with me, they began to look again, but that area had already been searched, and the strap was not to be found.

TT 10: 40. The Assistant United States Attorney was careful to use the passive voice in asking "what Brandon Basham described to you as to what happened to Alice Donovan." The AUSA did not ask about what Basham said *he* did to Alice Donovan. And Sheriff Hewett testified about Basham's demonstration of *how* Donovan was strangled; he did not testify that Basham indicated

*who* did the strangling.

On cross-examination, Sheriff Hewett affirmed that Basham did not confess to having used the strap to strangle Donovan.

> Q:     Now, at the cemetery, and I would like you to refer  to your notes if that will help you.
>
> A:     Okay.
>
> Q:     There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicated that Brandon Basham told you that he used the strap, is there?
>
> A:     No, sir.  He did not tell me he used the strap.  He demonstrated, though.
>
> Q:     He demonstrated?
>
> A:     Yes, sir.
>
> Q:     Your notes, nor Lieutenant Crocker's notes say that he did that; isn't that true?
>
> A:     That is true because he didn't say.  He showed.

TT 10: 53-54.  This testimony, elicited on cross-examination, left it ambiguous as to who used the strap.  Sheriff Hewett made it clear that Basham did not say that *he* used the strap.  Sheriff Hewett testified that Basham demonstrated how the strap was used and how he disposed of the strap, but Hewett did not testify that Basham intended the demonstration to indicate that *he* (Basham) used the strap to murder Donovan.

True, the jury could have inferred from this testimony that Basham strangled Donovan.  But the jury may also have inferred merely that Basham was present and assisting Fulks during Donovan's murder.  Either theory would have been sufficient to convict Basham; it was not

-119-

necessary for the Government to prove that Basham dealt the fatal blow himself. And regardless of

how the jury may have interpreted it, Sheriff Hewett's testimony does not contradict any evidence

from Fulks's trial because there was no evidence presented at that trial concerning Basham's purse

strap demonstration.

> B.    There was no inconsistency in the Government's closing arguments against Fulks and Basham.

Just as it did not present contradictory evidence at the two trials, the Government did not

argue inconsistent theories about what conclusions should be drawn from the evidence. At both

trials, the Government argued that Fulks and Basham acted as a team throughout their crime spree

and were equally culpable for Alice Donovan's murder.

> 1.    Chad Fulks's Trial

AUSA Johnny Gasser laid out this theme early in his closing argument at the Fulks trial:

> On November 14th, 2002, if Chad Fulks and Brandon Basham had been alone, Alice Donovan would be alive today. Alice Donovan would be enjoying her daughters, and her grandchildren, and her great marriage with Barry. That is an absolute fact. Make no mistake about it. It required the actions and the conduct of both Chad Fulks and Brandon Basham.
>
> The two of these men acted together as one in concert with one another. They were a two-man death squad. Two men, forming one team. They could not have done things that they did to Samantha [Burns], and they could not have done the things they did to Alice [Donovan] without acting in unison, without acting as one.
>
> The Government is not saying Chad Fulks is more culpable than Brandon Basham. And the Government is not saying that Brandon Basham is more culpable than Chad Fulks. They are equally culpable. Any objective view of the evidence and testimony that you saw, any reasonable juror looking at this objectively, not looking at it from the point of view of Chad Fulks, not looking at it from the point of view of Brandon Basham, if you look at it objectively, there

is but one conclusion: These two men were acting together as one. But for the conduct of Chad Fulks and but for the conduct of Brandon Basham, Alice Donovan and Samantha Burns would be alive today.

Fulks Trial Tr. 06/29/04 at 24-25.

AUSA Gasser then emphasized that the jury did not have to make a finding as to which of the two men actually killed Alice Donovan, because that determination was impossible to make.

There is one point that is very important. This is a very important point, ladies and gentlemen. For you jurors to sentence Chad Fulks to death, you do not, you do not have to find, beyond a reasonable doubt, that he actually killed Alice Donovan. Judge Anderson is going to give you the charge on the law. And there is one thing he is not going to tell you. He is not going to tell you, ladies and gentlemen of the jury, if you don't find that it was Chad Fulks's hand that killed Alice Donovan, then you can't sentence him to death. You are not going to hear that from Judge Anderson. Because that is not the law.

And there is a reason for that. There is a reason why Congress has passed the Federal Death Penalty Statute. And it is a situation involving brute violence. When two or more people combine together to kill, to take a human life, and they do so in an isolated area, and they leave no eyewitnesses, and the crime is not caught on videotape or camera, and the person does not confess, in those situations, it is impossible, it is impossible to determine, beyond a shadow of a doubt, who the actual killer is. It is impossible.

***

The fact of the matter is, with no eyewitnesses, when the case isn't caught on videotape, and with no confession, it is, virtually, impossible to, with direct evidence, to prove who the killer is. That is why the Government does not have to prove that. It is common sense. And it is justice.

Id. at 25-27.

Then, near the end of his closing argument at the Fulks trial, AUSA Gasser argued that both Chad Fulks and Brandon Basham intentionally killed Alice Donovan.

-121-

> They needed each other to abduct Alice Donovan. They both carjacked her, both kidnaped her, both raped her. Do you honestly believe that, at one point in time, that the two of them were not going to act together? Circumstantial evidence, both of them, ladies and gentlemen, intentionally killed Alice Donovan, the Government submits to you.

Id. at 107.

2.    Brandon Basham's trial — Guilt Phase

The Government resumed the theme of equal culpability in Basham's trial. During his closing argument in the guilt phase of Basham's trial, in words nearly identical to those he had used at Fulks's trial, AUSA Gasser stressed to the jury that Fulks and Basham had worked as a team to kill Alice Donovan.

> Before I get to those 17 days in November, let me make one thing perfectly clear. The Government submits to you, ladies and gentlemen, if Brandon Basham was alone, of if Chad Fulks were alone on November 11th, 2002 and November 14th, 2002, Samantha Burns and Alice Donovan would be alive today. Think about it. During those events, during those events, Brandon Basham and Chad Fulks were acting together in unison as a team, a death squad, if you will. The two of them, together, aiding and abetting each other when they kidnapped and carjacked Samantha Burns, when they kidnapped, and carjacked, and killed Alice Donovan. The two of them.

> The Government does not have to prove, and more importantly, you jurors do not have to find who, specifically, killed Alice Donovan in order to convict Brandon Basham of carjacking, resulting in death or kidnapping, resulting in death. We don't have to prove definitively that Brandon Basham killed Alice Donovan. We don't have to prove definitively that Chad Fulks, alone, killed Alice Donovan. We don't have to prove definitively, the two of them, although I submit to you the evidence shows they acted together and killed Alice Donovan, but we don't have to prove that. There is a reason for that. When two or more people decide to commit violent acts against innocent people, they decide to kill innocent people and leaving no witnesses, and that is not captured on videotape, it would be an impossible burden for the Government to prove when two or

-122-

> more are involved in a killing of an innocent person with no witnesses. The citizens would not fall for that, neither has Congress, and neither has the rules of law.
>
> The Government is not saying that Brandon Basham is more culpable than Chad Fulks. And the Government is not saying that Chad Fulks is more culpable than Brandon Basham. The Government submits to you, ladies and gentlemen, based on all of the evidence and testimony that you heard, from the escape through the apprehension, that any reasonable, and rational, and objective juror or person, looking at the actions and conduct as a whole, looking at the actions and conduct of Chad and Brandon as a whole, can come to only one conclusion, but for the actions of Brandon Basham, Alice Donovan would be alive today. But for the actions of Chad Fulks, Alice Donovan would be alive today. The two of them are responsible for the death of Alice Donovan. And your charge, I submit to you today, is to hold Brandon Basham responsible and accountable.

TT 12: 14.

Later in his closing in Basham's guilt phase, Gasser argued that Basham's purse strap demonstration was evidence of his participation in Donovan's murder.

> And later on, at the end of that day when they get to that cemetery, he is pulled out of that van and he is in shackles. What does he tell the sheriff? He tells the sheriff that it was right there by that gate. He tells — he not only tells, he demonstrates. He demonstrates for that sheriff a Liz Claiborne purse strap was used to kill Alice Donovan. Then what does he say? I threw it in the woodline. Mr. Swerling asks Sheriff Hewitt [sic] says he didn't say I killed Alice Donovan. Sheriff Hewitt [sic] said to you in this courtroom in front of you, the jury, no, he demonstrated it.

Id. at 79-80.

> 3.    Brandon Basham's Trial — Penalty Phase

And again, AUSA Gasser repeated this equal-culpability theme during his closing argument in the penalty phase of Basham's trial.

-123-

Remember, the evidence and the testimony that you saw during the guilt phase of this case, this was a two-man team. This was Brandon Basham and Chad Fulks acting together as a team. Their actions, their conduct, their choices were made as a team. Brandon Basham could not have carjacked and kidnapped Samantha Burns or Alice Donovan without Chad Fulks. And Chad Fulks could not have carjacked and kidnapped Samantha Burns and Alice Donovan without Brandon Basham. They are equally culpable. But for the actions of Brandon Basham, and but for the actions of Chad Fulks, Samantha Burns would be alive today and Alice Donovan would be alive today.

TT 29: 43-44.

Later in his closing in Basham's penalty phase, Gasser argued that the jury could find that Basham possessed any of the four threshold intent factors required to trigger the death penalty, including that Basham intentionally killed Alice Donovan. In making this point, Gasser referred to Sheriff Hewett's testimony:

What does Brandon Basham say in the presence of Sheriff Hewett? It is not really what he says, it is what he does. He is shackled. He describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewett how Alice Donovan was strangled. And then he tells Sheriff Hewett, "I threw the purse strap into the woods." He has demonstrated. He even has his arms down. You saw Sheriff Hewett stand up there and show.

Now, does that mean Brandon Basham's strangling of Alice Donovan is the only hand that caused Alice Donovan's death? The Government doesn't submit that. The Government submits, and submitted all along, that Chad Fulks is just as responsible. Chad Fulks had every right, as well, to make sure Alice Donovan died. They had guns, knives. Mr. Fulks had every incentive, as well, to make sure that she was dead.

TT 29: 57.

So in the closing arguments in Basham's guilt and penalty phases, just as it had done in the Fulks trial, the Government referred to Basham's purse strap demonstration in the passive voice;

-124-

AUSA Gasser explained that Basham demonstrated how the "purse strap was used to kill Alice Donovan" and "how Alice Donovan was strangled." Gasser did not say that Basham confessed to being the strangler. Gasser did argue, however, that Basham's demonstration to Sheriff Hewett was evidence that Basham participated in strangling Alice Donovan. But when Gasser mentioned "Basham's strangling of Alice Donovan" in his penalty phase closing, it was in a rhetorical question emphasizing that the Government did *not* contend that Basham's was the only hand that caused Donovan's death. The Government's consistent position in both trials was that Fulks and Basham acted together in murdering Donovan.

Thus, at both trials, the Government argued that Fulks and Basham were equally culpable. At both trials, the Government argued that Fulks and Basham acted as a team and could not have accomplished their crimes without one another. At both trials, the Government argued that Fulks and Basham, acting together, intentionally killed Alice Donovan. There simply is no inconsistency.

C.      Even assuming for the sake of argument that there was an inconsistency, it did not go to the core of the Government's case and did not violate Basham's right to due process.

To support the argument that the Government "manipulated the evidence" in the two trials to deprive him of due process, Basham's habeas counsel cite the Eighth Circuit case of Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000). Smith is distinguishable from the present facts.

In Smith, the prosecution tried several individuals separately for the murder of two people killed during a burglary. A key witness gave the police two different accounts of the burglary. In his first statement to police, the witness gave an account that inculpated Defendant Cunningham. In his second statement to police, the witness gave a contrary account that inculpated Defendant Smith. The witness later recanted this second statement. At Smith's trial, the witness testified in

accord with his first statement (inculpating Cunningham). Under a Missouri rule of evidence, the prosecution used the witness's second statement (inculpating Smith) both to impeach the witness's testimony and as substantive evidence against Smith. Smith was convicted. Then, at Cunningham's trial, the prosecution called the witness and elicited testimony in accord with his first statement (and with the testimony he gave at Smith's trial). The prosecution did not introduce evidence concerning the witness's second statement. Cunningham was also convicted.

Smith filed a federal habeas petition raising the issue of "whether the Due Process Clause forbids a state from using inconsistent, irreconcilable theories to secure convictions against two or more defendants in prosecutions for the same offenses arising out of the same event." Smith, 205 F.3d at 1049. Answering the question in the affirmative, the Eighth Circuit noted that the witness's testimony "was *the sole basis* for two different convictions on two contradictory theories." Id. at 1051 (emphasis added). The court further noted that Smith could *not* have been convicted under both theories. Id. The court limited its ruling, stating: "We do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather, we hold only that the use of inherently factually contradictory theories violates the principles of due process." Id. at 1052. "To violate due process," the court explained, "an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime." Id.

Basham's case is distinguishable from Smith in several key ways. First, the Government did not elicit inconsistent testimony at Fulks's and Basham's trials. The only testimony concerning Basham's demonstration of how the purse strap was used to strangle Alice Donovan was provided by Sheriff Hewett at Basham's trial; Hewett did not testify at Fulks's trial. Second, the Government did not argue irreconcilable or inconsistent theories at the two trials. The Government's consistent

-126-

theory at both trials was that Fulks and Basham acted in concert to murder Donovan and were thus equally culpable. Third, Sheriff Hewett's testimony was not the "sole basis" for Basham's conviction; it was part of a mountain of overwhelming evidence against Basham. Finally, assuming *arguendo* that the Government presented differing accounts in some respect at the two trials, Basham *could* have been convicted and sentenced to death under either account. As the Government emphasized at both trials, neither man acted alone in causing Alice Donovan's death; they aided and abetted one another in the murder; and the federal death penalty statute was intended to cover such situations.

The Eighth Circuit's reasoning in United States v. Paul, 217 F.3d 989 (8th Cir. 2000), decided on the heels of Smith and also cited by Basham, applies here. Paul and a co-defendant, Ingle, were tried separately and convicted for the murder of an elderly man in a national park. The man's body was recovered, and an autopsy revealed that he had been shot several times. On appeal, Paul contended that the Government violated his due process rights when it "argued at both Paul and Ingle's trials that the defendant on trial pulled the trigger." Paul, 217 F.3d at 998. The Eighth Circuit rejected this argument, finding that "the theory that either Paul or Ingle, or both, shot Williams, was not factually irreconcilable and was supported by the evidence." Id. "More importantly," the court observed, "Paul could have been convicted of aiding and abetting in the murder of Sherman Williams under either theory." Id. Finally, the court noted that "Paul only argues that the prosecutor made inconsistent *arguments* at the two trials, but cannot point to the use of evidence at the different trials which was factually inconsistent and irreconcilable." Id. (emphasis in original). The court held: "When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's

-127-

argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent."

Id. at 998-99 (citing Nichols v. Scott, 69 F.3d 1255, 1268–69 (5th Cir. 1995)).

The Eighth Circuit's rationale in Paul applies here.  First, even if the Government prevented

dual theories about who wielded the purse strap, those theories are not factually irreconcilable.  It

certainly is conceivable that both Fulks and Basham acted together, or took turns, in strangling Alice

Donovan with the purse strap.[17]   Second, both men could have been convicted of the murder

regardless of who actually wielded the strap, as they were both charged with aiding and abetting one

another in Donovan's murder.  Finally, Basham cannot point to any inconsistent *evidence* presented

in the two trials.  There was no testimony at Fulks's trial concerning Basham's demonstration with

the purse strap.  And Sheriff Hewett's testimony at the joint Jackson v. Denno hearing concerning

Basham's purse strap demonstration was consistent with his testimony at Basham's trial.  At most,

Basham contends that the Government presented different *arguments* at the two trials about what

inference should be drawn from Hewett's testimony (and the Government's argument on this point

occurred outside the jury's presence in the Fulks trial).  Under the Eighth Circuit's holding in Paul,

the Government's argument that each defendant wielded the strap is not factually inconsistent —

given that it cannot be determined which defendant physically caused Alice Donovan's death, and

either defendant could have been convicted under either theory.

**Response to Claim 24: The Government did not commit misconduct in its closing argument.**

Basham's habeas counsel complain that his trial and appellate counsel were ineffective for

---

[17]For example, consider the testimony of James Hawkins.  Early in their crime spree, Fulks and Basham carjacked Hawkins and duct-taped him to a tree.  Basham started taping Hawkins to the tree when Fulks interrupted and took over the process, insisting that Basham was not doing it correctly.  It is not implausible that something similar occurred with the murder of Alice Donovan.

failing to argue that the Government had imposed an impermissible "nexus requirement" on the jury's mitigation findings. §2255 Mot. at 102. Specifically, they contend that in its cross-examination of certain witnesses and its closing argument, the Government urged the jury "not to give effect to Mr. Basham's mitigating evidence." Id. Basham's habeas counsel argue that his trial attorneys should have objected to this "prosecutorial misconduct" and that his appellate attorneys should have raised this issue on appeal. Id. at 112-15.

This claim fails because the prosecutor did not suggest — either during cross-examination or summation — that the jury was required to find a causal nexus between the mitigating evidence and the crime for the evidence to be considered by the jury in its sentencing decision. Moreover, the Court's instructions made sure the jury was aware it could consider all mitigating evidence without regard to any nexus.

A.    The Government did not argue that the jury could not consider mitigating evidence absent some nexus to the crime.

During the sentencing phase of Basham's trial, the Government did question witnesses on whether Basham's upbringing or mental condition was causally related to the capital crimes for which he was convicted. To be sure, the point of this questioning was to establish the fact that Basham's background did not cause him to carjack and kill Alice Donovan. Without a doubt, the Government's position was that the jury should give little weight to Basham's mitigation evidence, and the Assistant United States Attorney made just this argument in summation. At no point, however, did the AUSA suggest that the jury could not consider the mitigation evidence absent some nexus between that evidence and the crimes.

Basham's habeas counsel selectively and misleadingly quote from the Government's closing

argument at sentencing to create the impression that the AUSA told the jury it could not consider mitigation evidence unless there was a nexus. They contend that "the Government's arguments cannot be dismissed as mere attempts to convince the jury to give little weight to mitigating evidence that lacked a causal connection the crime." §2255 Mot. at 110. They then quote the AUSA as saying:

> You know, deciding on who got it right on that issue clearly only goes to show *what mitigation* [the jury can consider.]

Id. (emphasis and bracketed paraphrase original to Basham's brief). This is an incorrect quote of the AUSA's statement. The AUSA's actual statement was:

> You know, deciding on who got it right on that issue clearly only goes to show what mitigation, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be.

TT 29: 89. Thus, Basham's habeas counsel replace the actual phrase "what weight you will consider" with an incorrect bracketed paraphrase of "the jury can consider." They attempt to gloss over the fact that the AUSA explicitly told the jury that the psychiatric evidence was relevant to Basham's mitigation case and that it was for the jury to determine what weight to give that evidence.

In context, the AUSA was explaining to the jury that they were the ones who would decide which expert witnesses to believe:

> Defense experts opine that he has a self or induced, inhalant-induced psychosis. And that he has got dementia, memory loss. Dr. Watts, on the witness stand in response to Mr. Schools, acknowledged that those two problems don't explain his behavior. So, the Government's psychiatrist diagnosed him with something that explained his behavior against Samantha Burns and Alice Donovan. And the defense expert opines two problems in which she acknowledges does not explain his behavior. Who got it right? That is for you to decide. You know, deciding on who got it right on that

-130-

> issue clearly only goes to show what mitigating, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be. Regardless of all of the yelling, raising voices, and attacking someone for what school they went to, the facts speak for themselves, ladies and gentlemen.
>
> And one of the tougher points you can't forget, there is absolutely no question Mr. Basham knew right from wrong. No question, that whatever his issues are, there is no cause-and-effect.

TT 29: 89. There was nothing improper about this line of argument. The Government was entitled to argue that the jury should give little weight to Basham's mitigating evidence because it did not diminish his culpability. Likewise, defense counsel was entitled to its argument that although Basham's "significant brain damage, significant impairments" were not "an excuse" for or "the cause" of his conduct, they did "help explain" his conduct. TT 29: 131. Obviously, the two sides disagreed about the inferences to be drawn from the mitigating evidence and what import those inferences held. But the Government never suggested that the mitigating evidence must pass some threshold nexus test before the jury could consider it.

Basham's habeas counsel rely on Tennard v. Dretke, 542 U.S. 274 (2004), to support their argument that the Government committed misconduct in arguing a lack of cause and effect. The facts of the Tennard case, however, are easily distinguishable from those of Basham's case. In Tennard, a Texas state capital case, the jury was instructed to answer only two "special issues" used at the time in Texas to establish whether a sentence of life imprisonment or death would be imposed. The two questions submitted to the jury were: (1) "Was the conduct of the defendant that caused the death of the deceased committed deliberately and with reasonable expectation that the death of the deceased or another would result?" and (2) "Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?" 542 U.S. at 277.

During the penalty phase of the trial, Tennard's counsel called one witness — Tennard's parole officer — who testified that Tennard's prison record indicated he had an IQ of 67. Id. The prosecution argued during closing that the evidence of low IQ was irrelevant. Id. at 278. The jury answered both of the "special issues" questions affirmatively and sentenced Tennard to death. Id.

Eventually, Tennard sought federal habeas corpus relief. Id. at 280. The Fifth Circuit found that mitigating evidence at trial must be "conditionally relevant," meaning that "the evidence must show (1) a uniquely severe permanent handicap with which the defendant was burdened through no fault of his own . . . and (2) that the criminal act was attributable to this severe permanent condition." Id. at 283. The Fifth Circuit denied Tennard's claim because his low IQ evidence bore no nexus to the crime and was thus irrelevant to the only two issues put before the jury. Id. at 284. The Supreme Court reversed, noting its previous holding that the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. Id. at 285 (citing Boyde v. California, 494 U.S. 370, 377-78 (1990)).

Unlike the jury in Tennard, Basham's jury was not limited in their consideration of mitigating evidence. In addition to the statutory mitigating factors set forth in the FDPA, Basham's attorneys submitted 31 non-statutory mitigating factors for the jury's consideration. TT 29: 223. The jury was required to consider each mitigating factor and to indicate the number of jurors, if any, who found each mitigating factor. TT 29: 221. So unlike the Texas statutory scheme in Tennard that focused the jury's determination on just two issues, the jury here was specifically required to make findings on each of the mitigating factors submitted by Basham. And unlike the prosecutor in Tennard who argued that the defendant's IQ was irrelevant to the special issues, the prosecutor in Basham's case never argued that Basham's mitigating evidence was irrelevant. To the contrary, the AUSA here

explicitly noted to the jury that Basham's psychiatric evidence was relevant because it "goes to show what mitigating, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be." TT 29: 89.

B.     The Court's instructions clearly informed the jury that they could consider any mitigating evidence regardless of any nexus to the crime.

The Court clearly instructed the jury that they were not limited in their consideration of mitigating evidence. The Court never suggested that there must be some nexus between mitigating evidence and the charged crimes before the jury could consider the mitigating evidence. To the contrary, the Court explained that "[a] mitigating factor is not offered to justify or excuse a defendant's conduct." TT 29: 219. The Court instructed jurors they could consider any factor to be mitigating if the factor tended to suggest life in prison without parole and not death should be the appropriate sentence. TT 29: 220. Moreover, the Court instructed the jury that "there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list." Id. After listing the mitigating factors, the Court emphasized to the jury: "The law does not limit your consideration of mitigating factors to those that are listed for you; therefore, if there are any mitigating factors not listed in these instructions, but which any juror finds to be established by a preponderance of the evidence, that juror is free to consider them in his or her sentencing decision." TT 29: 227.

Thus, the Court did not suggest to the jury that there had to be any causal connection between the mitigating factor and the crime, and no reasonable person would believe there was such a requirement. See United States v. Fell, 531 F.3d 197, 222-23 (2nd Cir. 2008) (holding that the district court's thorough instruction regarding mitigating factors made it "extremely unlikely that the

jury felt constrained in its consideration of Fell's mitigating evidence").

Moreover, the jury's verdict demonstrates that they did in fact consider the mitigating evidence, particularly the evidence of his troubled background and impaired mental faculties. Of the statutory mitigating factors, six jurors found that Basham suffered from an impaired capacity (Statutory Factor No. 1) and one juror found that Basham committed the offense under severe mental or emotional disturbance (Statutory Factor No. 5). TT 30: 8. Of the non-statutory mitigating factors, all twelve jurors found that Basham had a family history of mental illness (Non-statutory Factor No. 2), that Basham grew up in a home filled with domestic violence (Non-statutory Factor No. 7), that Basham's mother encouraged him to steal to support their drug habit (Non-statutory Factor No. 13), and that Basham began using drugs at an early age (Non-statutory Factor No. 14). TT 30: 8-9. One or more jurors found ten other non-statutory mitigating factors (Non-statutory Factors 3, 4, 5, 6, 12, 15, 16, 19, 25, 26). Id. In order for the jurors not to have considered the numerous mitigating factors they found, they would have had to blatantly ignore the Court's verbal instructions and the written instructions. Basham's habeas counsel have failed to show such error by the jury. See Fell, 531 F.3d at 224 (The fact that jurors unanimously found several of the defendant's mitigating factors regarding his background demonstrated that the prosecutor's argument did not confuse jury, as "[n]o juror could have reached such conclusions while believing that to qualify as a mitigating factor, that factor need have a nexus to the crime.").

In addition to the Court providing clear instructions to the jury regarding its findings of mitigating factors, Basham's trial counsel spoke to the jury extensively in order to ensure the jurors were aware they could find and give effect to mitigating factors without finding that those factors caused Basham to commit the crimes. TT 29: 131 ("He has significant brain damage, significant

impairments to help explain his conduct . . . But not the cause.  No one ever said that was the cause of any of these crimes.").  Basham's counsel proceeded to explain to the jury why all of the information about his brain mattered and why it should be taken into account during deliberations.  TT 29: 144 ("It is not a question of minimizing his involvement in the crime.  It is a question to explain Brandon Basham to you . . . .).  Basham's counsel argued at length and with fervor that the jury should show compassion by sentencing him to life imprisonment because so many forces in Basham's life had worked against him.  TT 29:158-59.

In summary, the Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by a defendant.  Boyde v. California, 494 U.S. 370, 377-78 (1990).  The Government never suggested that the jury could not consider all of Basham's mitigating evidence.  Moreover, the Court and Basham's trial counsel made sure the jurors had the understanding and knowledge to consider all mitigating evidence, and it is clear the jury did so.  Consequently, Basham did not suffer from ineffective assistance of counsel regarding this issue.

**Response to Claim 25: The Court correctly instructed the jury on mitigating evidence.**

In Claim 25, Basham's habeas counsel argue that his trial and appellate counsel should have challenged the Court's jury instruction regarding mitigating evidence.  §2255 Mot. at 115.  They contend that the Court's instruction "created a substantial risk that the jury would screen out statutory mitigating factors, and thus fail to give effect to evidence that was, by law, mitigating."  Id.

Specifically, they take issue with the following instruction given by the Court at the conclusion of the sentencing phase:

As to the mitigating factors asserted by the defendant, Mr. Basham in this case, the law provides that there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list. You must essentially engage in a two-step process in determining whether any one or more of the mitigating factors have been proven.

Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence. Secondly, if you determine the factor has been proven, you must determine whether the factor is mitigating, as I have defined the term for you. That is, it tends to suggest that life in prison, without the possibility of release, and not death is the appropriate punishment.

TT 29: 220.

Basham's habeas counsel argue that this instruction was legally deficient because it applied to both statutory and non-statutory mitigating factors. §2255 Mot. at 115-16. According to them, the instruction was faulty as to the statutory mitigating factors because those factors are necessarily mitigating as a matter of law under 18 U.S.C. § 3592(a), which requires the jury to consider them. Id. They contend that the Court's two-step instruction impermissibly allowed the jurors to give statutory mitigating factors no weight, in contradiction to the FDPA's determination that those factors are always to be considered as mitigating. Id.

Contrary to this argument, the FDPA does not require jurors to assign any particular weight to the mitigating factors listed in § 3592(a). That section provides, in relevant part: "In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following . . . ." 18 U.S.C. § 3592(a). The Court instructed the jury on each of the statutory mitigating factors, and the jury rendered specific findings as to each of them. TT 29: 222-23; TT 30: 8. Thus, the Court's instruction complied with the FDPA's mandate that the

-136-

jury "shall consider" these factors.

Basham's habeas counsel nonetheless argue that the Court's two-step instruction violated the Supreme Court's "bright line rule from Eddings v. Oklahoma, 455 U.S. 104, 144-45 (1982), that jurors 'may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.'" §2255 Mot. at 117. They point out that his trial counsel submitted the following proposed language:

> Federal law specifically defines several statutory mitigating factors to be considered in determining whether a sentence of death is justified. In determining whether a sentence of death is to be imposed, you *shall* consider any mitigating factor, including the following . . .

§2255 Mot, at 117 (quoting Dkt. # 801 (emphasis added)). They submit that this proposed language is consistent with Eddings. But the Court did provide a nearly identical instruction:

> Federal law specifically defines several statutory mitigating factors to be considered in determining whether a sentence of death is justified, that is why they are called statutory. They appear in the statute of the laws. The statutory mitigating factors alleged in this case which you must consider are . . . .

TT 29: 222. Basham's proposed instruction provided that the jury "shall" consider the statutory mitigating factors; the actual instruction provided that the jury "must" consider them. If anything, the instruction given by the Court was even more emphatic than the proposed instruction, because the Court's instruction emphasized that the statutory mitigating factors were mandated by law and that the jury "must" consider them.

Once the Court had explicitly instructed the jury to consider the statutory mitigating factors, the demands of Eddings were satisfied. The Fourth Circuit has held: "[T]he Constitution only requires that the jury be allowed to *consider* evidence that is proffered as mitigating. There is no

-137-

constitutional requirement that the jury find a mitigating factor even when it is supported by uncontradicted evidence." United States v. Higgs, 353 F.3d 281, 327 (4th Cir. 2003) (emphasis in original; citations omitted); see also United States v. Paul, 217 F.3d 989, 999 (8th Cir. 2000) ("Neither the FDPA nor . . . Eddings require a capital jury to give mitigating effect or weight to any particular evidence."). And the Fifth Circuit has approved mitigating evidence instructions that required the jury to determine first that the facts established a mitigating factor and second that the factor was mitigating. United States v. Jackson, 549 F.3d 963, 983 (5th Cir. 2008) ("[T]he jury was not required to find that a factor was mitigating, even if it believed the factor's factual predicate to be true. All the law requires is that jurors be aware that they *can* consider a factor to be mitigating.") (emphasis in original).

In assessing the effect of a challenged jury instruction, the court "accept[s] at the outset the well-established proposition that a single instruction to a jury may not be judged in isolation, but must be viewed in the context of the overall charge." Boyd, 494 U.S. at 378 (quoting Cupp v. Naughten, 414 U.S. 141 (1973)). The legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Id. at 380. A capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility that the jury was impermissibly inhibited by the instruction. Id. Where the context of the proceedings would lead reasonable jurors to believe that evidence of a defendant's background could be considered in mitigation, even the absence of an instruction on the concept of mitigation and of instructions on particular statutorily-defined mitigating factors does not violate the Eighth Amendment. Buchanan v. Angelone, 522 U.S. 269,

-138-

278-279 (1998); see also Lyons v. Lee, 316 F.3d 528, 534 n.6 (4th Cir. 2003).  A jury instruction that directs the jury to "base its decision on all the evidence" satisfies the constitutional requirement that the sentencing jury have a full opportunity to consider mitigating evidence.  Eaton v. Angelone, 139 F.3d 990 (4th Cir. 1998).

It is clear from the Court's instructions to the jury and the context of the proceedings that the jury had a full opportunity to consider mitigating evidence, and that the jury instructions did not impermissibly inhibit the jury's consideration of relevant mitigation evidence.  For the jury to have believed it could not consider Basham's mitigating evidence, it would have had to believe that the penalty phase served virtually no purpose.  See Brown v. Payton, 544 U.S. 133, 144 (2004).  Given the Court's instruction and the extensive trial time devoted to mitigating evidence, there is no possibility jurors screened out mitigating factors based on a belief that the jury instructions limited such consideration.

**Response to Claim 26**:  **The Court correctly instructed the jury regarding the finding of aggravating and mitigating factors.  Appellate counsel could not have prevailed had he challenged the instruction on appeal.**

Basham's habeas counsel complain that the Court erred by failing to instruct the jury that the "reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors," thus violating "the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment," and the "Cruel and Unusual Punishment Clause of the Eighth Amendment."   §2255 Mot at 119-120.

The burden of proof regarding aggravating and mitigating factors in a death penalty case is set forth in 18 U.S.C. § 3593©: "The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond

-139-

a reasonable doubt.  The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information."  "The jury . . . shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death.  18 U.S.C. § 3593(e); United States v. Caro, 597 F.3d 608, 612 (4th Cir. 2010); United States v. Lighty, 616 F.3d 321, 343 (4th Cir. 2010).  In the weighing process, jurors may only consider those aggravating factors found unanimously to exist beyond a reasonable doubt, but any juror may consider any mitigating factor found by him to exist by a preponderance of the evidence, without regard to whether it has been found by any other juror.  United States v. Tipton, 90 F.3d 861, 893 (4th Cir. 1996).

The Court's instruction to the jury did not deviate in any manner from the requirements of the law.  The Court told jurors:

> Third, you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, the statutory aggravating factor alleged.

> Fourth, if you find these first three steps have been proved to your unanimous agreement, then you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, any nonstatutory aggravating factors identified by the Government.

> Fifth, You must consider whether any one or more of you individually find that the Defendant has proven any mitigating factor or factors by a preponderance of the evidence. You may find any mitigating factor by considering everything you have learned during either phase of the trial, regardless of whether or not Mr. Basham's attorneys have asserted that factor.

> Sixth, all of you must then weigh the aggravating factors you have unanimously found to exist against any mitigating factor or factors any one of you individually found to exist to determine the appropriate sentence.

> You must decide, in regard to both offenses, whether the aggravating factors, which

you have found to exist, sufficiently outweigh the mitigating factors found to exist for that offense, so as to justify imposing a sentence of death, rather than a sentence of life without the possibility of release . . . .

The weighing process you are called upon to undertake in this part of the trial is different from the fact-finding process. If you find the threshold intent, aggravating and mitigating factors, you must use your experience, judgment, and common sense in weighing the aggravating and mitigating factors to arrive at your ultimate determination in this case.

As to all of the factors that the Government must prove . . .the Government must prove the factor to each and every one of you beyond a reasonable doubt. If the Government fails to prove a factor beyond a reasonable doubt, then you must find that that factor has not been proven.

TT 29: 200-201

Basham's habeas counsel  have cited no case, and the Government could find none, which supports his assertion that the Federal Death Penalty Act is unconstitutional to the extent that it does not require a finding beyond a reasonable doubt that death is the appropriate punishment. See §2255 Mot. at 122. The Tenth Circuit has held that the Sixth Amendment does not require a jury to be instructed that it must find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. United States v. Barrett, 496 F.3d 1079, 1108 (10th Cir. 2007)[18]. Basham's habeas counsel attempt to use the holdings of Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), to support their position.

In Apprendi the Supreme Court held that other than the fact of a prior conviction, **any fact** that increases a defendant's sentence beyond the statutory maximum sentence must be found by a jury and proved beyond a reasonable doubt. In Ring, the Supreme Court reiterated: "If a state makes

---

[18] Barrett observes that Justice Scalia, in his concurring opinion in Kansas v. Marsh, 548 U.S. 163 (2006), recognized that the Constitution does not require a reasonable doubt standard as to the weighing process, and that no member of the Marsh Court disagreed. 496 F.3d at 1108 (citing Marsh, 126 S.Ct. 2516, 2532 n. 2.)

an increase in a defendant's authorized punishment contingent on [a] **finding of fact**, **that fact** - no matter how the state labels it - must be found by a jury beyond a reasonable doubt." 536 U.S. at 602. Apprendi and its progeny indicate that the reasonable doubt standard is appurtenant to the right to a jury trial. United States v. Fields, 483 F.3d 313, 346 (5th Cir.2007). Since the Constitution does not require a jury to do the weighing, it does not require the application of a beyond-a-reasonable doubt standard to the weighing process. Id. The Apprendi and Ring holdings clearly do not reach the weighing aspect of the sentencing process. See Barrett, 496 F.3d at 1107 ("[t]he Apprendi/Ring rule does not extend to the ultimate decision whether to impose the death penalty"); Fields, 483 F.3d at 345; United States v. Smith, 3:07CR433, *2 (E.D.Va. Aug. 8, 2008)(once a jury has found a defendant to be death-eligible, the fact-finding process is concluded)[19]; United States v. Green, No. 5:06CR-19, 2008 WL 4000902, *3 (W.D.Ky. Aug. 26, 2008)(while the Ring Court extended the logic of Apprendi to aggravating factors in capital cases, it does not require the jury to apply the reasonable doubt standard during the weighing process).

A jury's decision that the aggravating factors outweigh the mitigating factors is not a finding of fact. Barrett, 496 F.3d at 1107. Thus, the instruction to consider whether aggravating factors "sufficiently outweigh" mitigating factors does not impose an evidentiary burden on the Government. United States v. Fort, No. CR 05-00167, 2008 WL 5221090, *2 (N.D.Cal. Dec. 12, 2008)(observing that at least four courts of appeals besides the Ninth have reached the same conclusion). It involves a process, not a fact to be found. United States v. Sampson, 486 F.3d 13, 32 (1st Cir. 2007)(district court's instructions, which did not instruct jurors that they must find

---

[19] The district court in Smith announced: "This Court will join other reviewing courts in declining to elevate the weighing process to an essential element requiring proof beyond a reasonable doubt."

beyond a reasonable doubt the aggravating factors outweighed mitigating factors, were free of Apprendi error). At this stage of the proceedings, each juror is to consider the factors already found and to make an individualized judgment whether a death sentence is justified. United States v. Mitchell, 502 F.3d 931, 993 (9th Cir. 2007). The sentence imposed at the penalty phase of a capital case "reflects a reasoned moral response to the defendant's background, character, and crime." Barrett, 496 F.3d at 1107 (citing Penry v. Lynaugh, 492 U.S. 302, 319 (1989)). The Apprendi rule applies only to findings of fact, not to moral judgments. Id. Therefore, the Court did not err in instructing jurors regarding the weighing of aggravating and mitigating factors.

**Response to Claim 27: Basham's trial counsel were not ineffective for failing to investigate Cynthia Wilson's statements to the Court.**

The essence of Claim 27 is that Basham's trial counsel were ineffective because they failed to comb through the juror questionnaire and the juror voir dire and discover that Juror Cynthia Wilson's answers to two questions were untruthful. §2255 Mot. at 130. Habeas counsel assert that had trial counsel pointed out these inconsistencies, they would have "persuaded the Court that further investigation into claims of juror misconduct was warranted." §2255 Mot. at 124.

The first question habeas counsel contend was answered untruthfully is Question 41: "[H]ave you ever sued someone or been sued?" Wilson responded "no," even though she had two prior state tax judgments against her, one which, according to Basham's counsel, was terminated on February 11, 1996, and the other for which the case was closed on March 17, 2000. The other instance in which Basham's counsel claims Wilson was untruthful was during voir dire, when she said she had been a nurse for four years, but she had actually been a registered nurse for only two-and-a-half years. Basham's counsel claim that this evidence "would have done much to convince the court"

-143-

that Wilson's misconduct mandated a new trial, and that trial counsel's failure to engage in independent investigation to support their assertion that Wilson was untruthful was unreasonable. §2255 Mot. at 132. This claim is without merit.

When evaluating decisions not to investigate further, a court must regard counsel's choices "with an eye for 'reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.'" Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991)(quoting Strickland, 466 U.S. at 689). The reasonableness of an investigation is evaluated by the totality of the circumstances facing an attorney at the time. Burt v. Eagleton, CA NO. 3:08-3110-SB, 2009 WL 2997069, 18 (D.S.C. Sept. 17, 2009). Courts recognize limits to investigation based on time, resources, and relevance. Id. "Strickland does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client." Id. (quoting Green v. French, 143 F.3d 865, 892 (4th Cir. 1998) *abrogated on other grounds by* Green v. Taylor, 529 U.S. 362 (1998)).

A.     Basham's trial counsel conducted a more than reasonable investigation regarding juror misconduct.

Basham's counsel cavalierly claim that it took their investigator a total of 25 minutes to locate both pieces of information. §2255 Mot. at 131. They do not state how long he combed through other questions and testimony before he checked the answers to those two particular questions. The investigator for the § 2255 claim, no doubt, had an easier job than the trial team, since the trial team and the Court had already investigated the more material questions regarding juror misconduct and potential bias for weeks. Further, Basham's trial counsel were preparing briefs and preparing for and attending hearings during the investigation. The Court could not delay the

-144-

process indefinitely so that trial counsel could discover every minor discrepancy on the jurors' questionnaires and during their voir dire. Thus, trial counsel had to make tactical decisions about which lines of investigation might be most likely to reveal persuasive evidence to show juror misconduct so prejudicial as to merit a new trial.

Trial counsel reasonably chose to analyze telephone records of calls made during the trial. They culled through Juror Wilson's telephone records in order to discover that she had attempted to contact two newspaper publishers. 12/13/04 Hearing Tr at 3. They used this evidence to support a request for a delay in arguments so that they could look for additional evidence. Id. Trial counsel identified one of the television reporters they believed Juror Wilson had contacted. Id. at 7. They also discovered from telephone records that Juror Wilson had had extensive contact with other jurors. Id. at 8; 12/28/04 Hearing Tr at 21. Basham's trial counsel prepared and discussed diagrams of telephone calls between Juror Wilson and her husband, and suggested that because there were daily calls between the two, they must have been discussing the case. 1/14/05 Hearing Tr at 24. They noted that the longer telephone calls coincided with important events during the trial. Id. They also noted the length of the calls between Juror Wilson and other jurors and correlated them to events during the trial. Id. at 25-26.

Habeas counsel has failed to show that trial counsel's decision as to how to use its investigatory time was unreasonable. It was far more reasonable for trial counsel to investigate the telephone records for calls made during the trial, than to spend their limited time to discover minor irrelevant discrepancies in answers to juror questionnaires and voir dire questions, which likely were not lies, and which had nothing to do with the trial. Even if the responses had been intentional untruths, thus reflecting on Juror Wilson's credibility, habeas counsel has failed to show prejudice,

since the Court heard testimony from the other jurors and alternates, Wilson's husband, and the news media, none of which revealed that there had been outside influence or premature deliberations.

> B. The Court's finding that Basham was not prejudiced by Juror Wilson's contact with the media was made only after all evidence regarding the matter had been heard and extensively analyzed.

The Court did not base its decision primarily on Juror Wilson's testimony regarding the question of whether the jurors had engaged in premature deliberations or whether they had been influenced by outside information. Between November 10, 2004 and February 14, 2005, the Court held nine hearings regarding Juror Wilson's misconduct. Basham, 561 F.3d at 316-318, 321. On November 10, 2004, the Court held a status conference, during which it decided to call the three female jurors from the upstate to court to question them under oath. 561 F.3d at 316. On November 12, the Court heard testimony from Shannon Mays, the news producer who reported the contact by a juror. 561 F.3d at 316-317. Ms. Mays told the Court that around October 27th[20], she received a call from a woman claiming to be a juror in Basham's trial. 11/12/04 Hearing Tr at 17-19. She wanted to know why the television station was not covering the trial. Id. at 19. Ms. Mays responded that the trial was not in the station's viewing area, and they could not take cameras into a federal courtroom. Id. The woman, later determined to be Juror Wilson, told Ms. Mays that Basham was acting up in court and falling asleep, and that the trial would be good tv. Id. Juror Wilson asked Ms. Mays if she was familiar with the case, and Ms. Mays responded that she was, because she had worked in Indiana. Id. Ms. Mays testified that Juror Wilson said she had some concern over whether Mr. Basham would be sentenced to death, because there were jurors that were for the death penalty and others that were not. Id. The juror told Ms. Mays she would call her after the sentencing

---

[20] Telephone records later revealed that the call was actually made on October 29, 2004.

-146-

phase ended.  Id. at 20.

The Court allowed Basham's trial counsel to question Ms. Mays.  11/12/04 Hearing Tr at 22-35.  Trial counsel pressed Ms. Mays for further information in an obvious attempt to get her to answer in a way to show she had imparted information to Juror Wilson about the case or to suggest jurors had begun to deliberate.  Id.  At one point, the Court informed trial counsel: "Mr. Harris, most judges handle issues like this in chambers with no lawyers present.  I want y'all to have some input, but I 'm not going to let you go all afternoon asking every question six different ways."  Id. at 31.  Trial counsel responded that "any piece of information could potentially taint."  Id.  The Court reminded counsel: "I know, but you have asked every question 10 different ways and we don't know one bit more information than when I finished asking my questions."  Id.  Nonetheless, trial counsel persisted with several more questions.  Id. at 31-35.

The Court then questioned the three jurors.  Id. at 31-37.  Juror Wendy Doby said she had not discussed the case with anyone during the trial, and that the jurors had not discussed what the penalty should be before hearing the Judge's instructions on the law.  Id. at 49, 52.  Juror Joyce Hartsoe testified that she had not contacted anyone during the trial to discuss the case, and that she was not aware of any juror discussing the case prior to all of the evidence being presented.  Id. at 58-61.  Juror Wilson admitted calling the television station, but testified that none of the people she spoke with imparted any information.  561 F.3d at 317.  She also testified that the jurors did not begin discussing the penalty portion of the case prior to deliberations.  561 F.3d at 317.  Juror Wilson told the Court that she recalled contacting three television stations close to the end of the penalty phase to tell them someone should cover the case.  Id. at 71-72.  She said she did not discuss what the verdict should be with any other juror, and that she was not aware of such discussions by other

jurors. Id. at 73-74. She said the newsperson with whom she spoke did not reveal any information to her other than the fact that she was aware Basham had escaped from prison in Kentucky because the newsperson had lived in the area. Id. at 72-74. Juror Wilson said she had not acquired outside information about the case during the trial. Id. at 75-77. Juror Wilson denied telling the news media that Basham was acting out or sleeping, or that some jurors were in favor of the death penalty and some were not. Id. at 79.

On November 18, the Court recalled the remaining regular jurors for questioning under oath.[21] 561 F.3d at 318. It held another hearing on November 23, 2004, to question the alternate jurors, Wilson, and her husband, Greg Wilson. Id. No new information was revealed. Order, March 14, 2005, Docket # 890. On December 1, 2004, Basham's trial counsel moved for a new trial, and the Court granted trial counsel's motion to obtain phone records. 561 F.3d at 318. On December 13, 2004, the Court convened to hear arguments regarding the issue of juror misconduct. At the beginning of the hearing, Basham's trial counsel asked the Court to delay arguments so that the record could be more fully developed, because the Government had provided telephone records which revealed Juror Wilson had contacted two newspapers during the trial.[22] 12/13/04 Hearing Tr at 3. The Court informed trial counsel that it would accept Ms. Mays' version of the conversation over the version of Juror Wilson. 12/13/04 Hearing Tr at 4-5. Regarding Juror Wilson, Basham's trial counsel argued "We think her credibility is completely open to question now." Id. at p. 7. The Court responded: "I am saying you win this battle. I am accepting Ms. Mays' version. . . . . [I]f you

---

[21] The Court observed at the hearing on December 28, 2004: We brought [the jurors] in one at a time. We conducted a closed hearing." P. 31.

[22] One of the calls lasted one minute, and the other lasted two minutes. 12/13/04 Hearing Tr at 6.

win the credibility battle right now, I don't know what additional evidence would help in that regard."[23]  Id.

Nonetheless, the Court proposed that counsel argue that day, and that the Court would consider the possibility of further developing the record before ruling on the issue.  Id. at 12.  The Court also agreed to contact the news organizations which had been contacted by Wilson, and to require them to identify anyone who could recall the telephone contacts.  Id. at 13.  The Court noted that, beyond hearing the testimony of anyone from the news organizations who had spoken with Wilson and questioning Wilson about the two telephone calls, it was not sure any further information gathering would be necessary, since all of the jurors had already been called back and questioned. 12/21/04 Hearing Tr at 21-22.  The Court stated that it would assume that prejudice had occurred due to the improper contact, and that it would fall upon the Government to establishment that there was, in fact, no prejudice to Basham as a result of the third-party contacts.  12/13/04 Hearing Tr at 25-26.

On December 21, 2004, the Court had a follow-up hearing, at which time Stephanie Moore, the news researcher for the 11:00 p.m. news at a Greenville television station testified that she recalled a woman calling her and asking why they were not covering the Basham trial, and suggesting that they should cover the closing arguments.   12/21/04 Hearing Tr at 10-14. Joe Loi, the assignments editor with another Greenville television station, testified via teleconference that he had sent an e-mail to employees who might have received the call from Juror Wilson, and

---

[23]  The only possible evidence to support the argument by Basham's trial counsel that jury deliberations had been tainted by Juror Wilson's conduct or that deliberations had begun before the close of evidence came from Ms. Mays, whose version of the contact the court accepted over Juror Wilson's.  Therefore, there could have been no prejudice by counsel's failure to raise the discrepancy on the juror questionnaire or the alleged untruthful answer during voir dire.

that nobody recalled speaking with her. Id. at 4-8.

At a hearing on January 14, 2005, Basham's trial counsel asked the Court to conduct additional hearings to re-question the jurors about conversations they may have had among themselves. 1/14/05 Hearing Tr at 26. After hearing extensive argument, the Court denied trial counsel's motion, finding that the inquiry it had conducted was more than required by the Fourth Circuit in United States v. Barnette, 390 F.3d 775 (4th Cir. 2004), *vacated on other grounds by* Barnette v. United States, 546 U.S. 803 (2005). Id. at 56.

Ultimately, the Court concluded that juror misconduct had occurred, but that the Government had rebutted the presumption of prejudice. Order, March 14, 2005, Docket #. 890. The Court pointed out that it had held nine hearings, heard from nineteen witnesses, authorized the subpoena of hundreds of telephone records, and facilitated the cooperation of five media outlets in an effort to uncover the truth. Id. The Court further observed that the news organization representatives were clear in their assertion that no information had been imparted to Juror Wilson during their conversations, and, thus, the case involved "egregious misbehavior by a juror, but no showing that she learned anything or was influenced in any way." Id. The Court further found that there had been no showing of anything more than harmless error, as there had been no showing that the verdict would have differed had the contact not occurred, or had the Court discovered the juror's indiscretion prior to the verdict and dismissed the juror. Id.

Thus, the Court's decision was not predicated on Juror Wilson's credibility or lack thereof, but on the totality of the evidence. The Court did not ignore or diminish the egregiousness of Juror Wilson's misconduct. Consequently, more information regarding immaterial, and possibly unintentional, misrepresentations on a juror questionnaire and during the answer to a question during

-150-

voir dire, would not have caused the Court to order a new trial. Thus, Basham cannot show that he was prejudiced by the alleged ineffective assistance of counsel.

    C.    <u>Requiring counsel to glean through juror questionnaires and voir dire to discover all minor discrepancies, no matter how immaterial, and then to argue juror misconduct, would place an unacceptable burden on counsel and the court, would do nothing to ensure the fairness of a verdict, and would discourage citizens from serving on juries.</u>

It is not clear that Juror Wilson was being untruthful when she responded that she had not been sued by anyone. Many people likely do not think of themselves as being "sued" by the Government when the Government seeks, through a court judgment, payment of overdue taxes. As to Juror Wilson overstating the amount of time she had been a nurse by a year-and-a-half, it is not clear her answer was incorrect or that Wilson made an intentional misrepresentation. Habeas counsel uses the date Juror Wilson received her license as the sole basis for alleging untruthfulness. It is possible that Juror Wilson worked in some capacity providing nursing care before she became a registered nurse. Further, she could have simply made a mistake. Habeas counsel has provided no conclusive proof that Juror Wilson lied, and have shown absolutely no materiality regarding the one-and-a-half year alleged discrepancy.

Requiring defense attorneys to discover such immaterial minutia would undermine the criminal justice system. It would discourage attorneys from representing criminal defendants due to the overwhelming commitment of time and personnel required to verify the response to every question posed to jurors. In the overwhelming number of cases, the discovery of minor discrepancies would not prevent the juror from being selected for service. It would discourage service on juries because trial counsel and courts could potentially delve into private matters having nothing to do with a citizen's jury service. But most importantly, this requirement would likely do nothing to

improve the administration of justice. Indeed, it would distract counsel from discovering and analyzing more material evidence related to a defendant's guilt or innocence.

**Response to Claim 28: There is no basis to grant a new trial based on Cynthia Wilson's alleged contact with other jurors.**

First, this claim is untimely. Under Rule 33, "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed.R.Crim.P. 33(b)(1). Basham was found guilty on September 30, 2004. Basham was sentenced to death on November 2, 2004. Judgment was entered on February 16, 2005.

Basham's §2255 was filed on May 31, 2011, which is more than six (6) years after the verdict. It is of no help that this "newly discovered evidence" issue is raised in a §2255 motion; it must be timely under the provisions of Rule 33. United States v. Berry, 624 F.3d 1031, 1039 (9th Cir. 2010). This Court must conclude that Claim 29, which is in essence a motion for a new trial under Rule 33, is untimely.

Further, even if habeas counsel's claim were not considered to be untimely, it must fail on the merits because habeas counsel cannot satisfy the stringent multi-stage test used to evaluate a motion for new trial based on newly discovered evidence. See United States v. Gootee, 34 F.3d 475, 479 (7th Cir. 1994). In analyzing such a claim, the Court must consider five factors:

> (a) the evidence must be, in fact, newly discovered, i.e. discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; © the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Robinson, 627 F.3d 941, 948 (4th Cir. 2010)(quoting United States v. Custis, 988 F.2d 1355, 1359 (4th Cir. 1993)). Generally, all five elements must be met. Id. (citing United States

v. Fulcher, 250 F.3d 244, 249 (4th Cir. 2001)).

Habeas counsel have satisfied none of these factors. The answers to the juror questionnaire and the voir dire are not newly discovered evidence. According to habeas counsel, the alleged inconsistencies could have been easily discovered, so habeas counsel obviously was not diligent in discovering these inconsistencies many years after the trial. The alleged new evidence from the interview with Juror Wilson's ex-husband - (1) Wilson did not maintain her friendships with the other jurors, and (2) it was odd Wilson would talk to Juror Shannon Burnett about buying sod, because Wilson's ex-husband did all of the landscaping at their home - is not newly discovered evidence. It is the opinion of Juror Wilson's ex-husband, and any suggestion that it shows Wilson and the other jurors were engaging in premature deliberation is bald speculation. Further, the new information could have been discovered years ago, so counsel has not been diligent in discovering it. Most importantly, it is impeachment information, immaterial to the issues involved, and would certainly not be of the magnitude to produce an acquittal. The information is simply the irrelevant opinion of an ex-spouse and has nothing to do with the guilt or innocence of Brandon Basham. To pursue it would serve only to invade the privacy of the jurors.

The second category of information habeas counsel claim to be newly discovered evidence involves answers by Juror Wilson to questions on her nursing license renewal applications.[24]  §2255 Mot. at 136.  Much of the information is more than three years old, and, according to habeas counsel, could have been discovered, with diligence, sooner. However, it is merely impeachment information, and not material to Basham's case. Since it is immaterial to Basham's guilt or

---

[24]  Habeas counsel have not provided a copy of the applications. The exhibit they reference is an affidavit by an investigator.

innocence, it would not produce an acquittal.

The Fourth Circuit in Robinson quotes the sketch, set forth in United States v. Custis, 988 F.2d 1355, 1359 (4th Cir. 1993) of a situation in which newly discovered impeachment evidence is enough for a retrial:

> If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly untrustworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial.

627 F.3d at 949. As in Robinson, the situation in Basham's case is far removed from the Custis example. The Court did not rely on the testimony of Wilson regarding the issues of outside influence and premature deliberations. The Court heard testimony under oath from every juror and alternate and from persons from the media. There was no evidence that Wilson's misconduct affected juror deliberations.

For the Court to vacate Basham's convictions and sentences on the basis of speculation of jurors' communications, when there has not been one shred of evidence that one juror's misconduct affected her decision or entered into the deliberations of other jurors, would encourage fishing expeditions by trial and habeas counsel in the future, would cause an invasion of the privacy of jurors, and would discourage citizens from serving as jurors. Additionally, it would undermine the finality of a conviction, because it would be necessary for defense counsel to monitor the actions of jurors continuously and indefinitely.

Based on the above, the Court should deny Basham's motion for a new trial as being untimely or, in the alternative, deny the motion because habeas counsel has failed to satisfy all of the five factors necessary to receive a new trial on the basis of newly discovered evidence.

-154-

**Response to Claim 29: There is no basis to grant a new trial based on newly discovered evidence concerning Sheriff Ronald Hewett.**

In Claim 29, Basham's habeas counsel claim that Basham is entitled to a new trial in light of the fact that Sheriff Ronald Hewett pled guilty to obstruction of justice in October 6, 2008. Basham's habeas counsel claim that this impeachment evidence entitles Basham to a new trial pursuant under Federal Rule of Criminal Procedure 33. This claim must fail because it is untimely and also because newly discovered impeachment evidence of one witness which was unrelated to the case does not serve as a basis for a new trial.

First, this claim is untimely. Under Rule 33, "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed.R.Crim.P. 33(b)(1). Basham was found guilty on September 30, 2004. Basham was sentenced to death on November 2, 2004. Judgment was entered on February 16, 2005. Sheriff Hewett pled guilty on October 6, 2008. Basham's habeas counsel filed the §2255 motion on May 31, 2011.

Basham's §2255 motion in which counsel assert a new trial claim in Claim 29, was filed on May 31, 2011, which is more than six (6) years after the verdict and more than two and a half years after Hewett pled guilty. It is of no help that this "newly discovered evidence" issue is raised in a §2255 motion; it must be timely under the provisions of Rule 33. United States v. Berry, 624 F.3d 1031, 1039 (9th Cir. 2010). This Court must conclude that Claim 29 which is in essence a motion for a new trial under Rule 33 is untimely.[25]

---

[25]This claim cannot be smuggled into a § 2255 motion. The Supreme Court has repeatedly stressed the limits of a § 2255 motion. For example, the Court has cautioned that § 2255 may not be used as a chance at a second appeal. See, e.g., United States v. Addonizio, 442 U.S. 178, 184 (1979). Further, short of proof of actual innocence, claims solely based on new evidence are generally not cognizable on habeas. See Conley v. United States, 323 F.3d 7, 14 (1st Cir.2003) (en banc) ("Merely to claim that new evidence casts doubt, even grave doubt, on the

Second, even if this claim were timely, the impeachment evidence related to Sheriff Hewett is unrelated to the case and does not serve as a basis for a new trial. Rule 33 states that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Court of Appeals reviews the district court's Rule 33 decision for abuse of discretion. See, e.g., United States v. Fulcher, 250 F.3d 244, 249 (4th Cir.2001). In analyzing whether newly discovered evidence requires a new trial, the Court must examine five factors:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; © the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Custis, 988 F.2d 1355, 1359 (4th Cir.1993) (quoting United States v. Bales, 813 F.2d 1289, 1295 (4th Cir.1987)). "Without ruling out the possibility that a rare example might exist, [the Fourth Circuit has] never allowed a new trial unless all five elements were established." Fulcher, 250 F.3d at 249.

The Fourth Circuit recently reiterated its extreme reluctance to order retrials because of subsequently discovered impeachment evidence. See United States v. Robinson, 627 F.3d 941, 948-49 (4th Cir. 2010) (Newly discovered impeachment evidence that police officers who investigated

_____

correctness of a conviction is not a ground for relief on collateral attack."). Rather, a motion under § 2255 must be based upon an independent constitutional violation. See Herrera v. Collins, 506 U.S. 390, 400 (1993) ("[N]ewly discovered evidence ... alleged in a habeas application ... must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." (emphasis in original); Turner v. Calderon, 281 F.3d 851, 872 (9th Cir.2002) (rejecting habeas claim based upon newly discovered evidence because the petitioner "neither allege[d] an independent constitutional violation nor present[ed] affirmative proof of his innocence").

defendant and testified against him were engaged in unrelated misconduct did not warrant retrial in prosecution for drug trafficking and firearm offenses because government's case did not rest entirely on uncorroborated testimony of officers, and officers' misconduct, while serious, did not relate to counts for which defendant was convicted or to truth-finding function of proceedings).  It appears that the Fourth Circuit has never found a situation in which a new trial should be granted based on newly discovered impeachment evidence.

The Fourth Circuit has previously noted that newly discovered impeachment evidence would result in a new trial in only the narrowest of circumstances:

> If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial....

Custis, 988 F.2d at 1359 (quoting United States v. Taglia, 922 F.2d 413, 415 (7th Cir.1991)).

It should go without saying that Basham's situation does not resemble the one described in Custis.  The Government's case did not rest entirely on the uncorroborated testimony of Sheriff Hewett.  Sheriff Hewett was just one of eighty-nine witnesses in Basham's guilt phase. Basham, 561 F.3d at 314.  As noted above, his testimony was never contradicted.  In fact, it was corroborated by statements he gave explaining how Basham demonstrated to him how Alice Donovan had allegedly been strangled.  Just as important, the evidence against Basham was "overwhelming," as discussed above and by the Fourth Circuit.  See Basham, 561 F.3d at 328 ("The Government presented an overwhelming case Basham during the guilt phase"), at 329 ("overwhelming evidence against Basham"), at 330 ("overwhelming evidence against Basham").  Under these circumstances, even if this claim were not untimely, such a new trial claim of newly discovered impeachment evidence does

-157-

not present a basis for relief.

**Response to Claim 30: Basham's trial counsel did not fail to provide necessary files to Basham's appellate counsel.**

In Claim 30, Basham's habeas counsel make the remarkable claim that Basham's trial counsel, in particular, Jack Swerling, "failed to protect Mr. Basham's interests by repeatedly refusing to surrender or allow appellate counsel reasonable access to the thousands of trial-related documents known to be in his possession "thereby depriving Basham of effective assistance of appellate counsel. This claim is without merit and should be summarily dismissed.

Basham was represented at trial by Jack Swerling and Greg Harris, two of the best "criminal defense lawyers in the State of South Carolina." TT 17: 184. See Basham, 561 F.3d at 325. After the trial, they both initially represented Basham on appeal. On February 16, 2005, they filed a notice of appeal on behalf of Basham. Docket # 888. On February 24, 2005, Swerling and Harris were appointed as Basham's appellate attorneys. Fourth Circuit Appeal No. 05-5, Docket # 2. More than six months later, on September 8, 2005, Mr. Swerling moved to withdraw as lead appellate counsel and substitute Timothy J. Sullivan, Esq. as lead appellate counsel. Fourth Circuit Appeal No. 05-5, Docket # 60. On September 13, 2005, the Fourth Circuit relieved Mr. Swerling and appointed Mr. Sullivan as new lead appellate counsel for Basham. Id. at Docket #. 63. For the next twenty-three months, Mr. Harris continued to represent Basham on appeal with Mr. Sullivan. Two and a half years after the notice of appeal was filed, on August 13, 2007, Mr. Harris moved to withdraw as appellate counsel. Id. at Docket # 131. On September 1, 2007, the Fourth Circuit relieved Mr. Harris as appellate counsel and suspended the briefing schedule until a second appellate attorney was appointed. Id. at Docket # 133. On November 16, 2007, the Fourth Circuit appointed Melissa A.

-158-

Meister, Esq. as appellate counsel.  Id. at Docket # 138.  The Fourth Circuit set a briefing schedule that required Basham's joint appendix and brief be filed on December 31, 2007.  Id. at Docket # 140.    The Fourth Circuit extended the briefing schedule several times, giving extensions of time that extended the briefing schedule several months.    Id. at Docket #s  144. 150 & 155.  Ultimately, Basham's appellate counsel filed a 164-page initial brief on May 13, 2008.    Id. at Docket # 159.  After the Government filed its initial brief, appellate counsel filed a 63-page reply brief on September 22, 2008. Id. at Docket # 193.

In preparing the appellate briefs, appellate counsel reviewed the entire trial transcript, hearing transcripts and the filings in district court.  Mr. Sullivan served as lead appellate counsel for two and a half years before the filing of Basham's initial appellate brief.  For nearly two years, trial counsel Harris served as Mr. Sullivan's co-counsel on appeal.  Afterwards, Ms. Meister served as appellate counsel for six months prior to the filing of Basham's initial appellate brief.

Appellate counsel came to Columbia in January 2008 to reviewed sealed materials.  Later, appellate counsel reviewed additional sealed materials which they received via email from the District Court Clerk of Court at the beginning of April 2008.  Appellate counsel met with Mr. Swerling to discuss Basham's case and review the files pertaining to trial counsel's representation of Basham.  Appellate counsel met with Mr. Swerling on at least two occasions at his Columbia, SC office in January 2008 and early April 2008.    Fourth Circuit Appeal No. 05-5, Docket #s 146 & 152, at ¶¶ 8-9.  At no time did appellate counsel claim that Mr. Swerling hindered or prevented them from reviewing trial counsel's files.

Contrary to Basham's habeas counsel's assertions, at no time did Mr. Swerling or Mr. Harris "fail to protect Mr. Basham's interests by repeatedly refusing to surrender or allow appellate counsel

reasonable access to the thousands of trial-related documents known to be in [their] possession."

As evidenced by the short recitation of the procedural history of the appellate proceedings prior to

the filing of Basham's appellate brief, Basham was provided with experienced appellate counsel who

were given adequate time and resources to prepare excellent appellate briefs.  The resulting 38-page

published opinion affirming Basham's conviction and sentence demonstrates that appellate counsel

raised strong arguments that were well supported.  Tellingly, Basham's habeas counsel point to no

claim(s) that appellate counsel failed to raise because of Mr. Swerling's supposed recalcitrance.

Accordingly, there would be no resulting prejudice even if this claimed were supported by any

factual basis.  More importantly, however, this claim is completely without factual support.  It should

be summarily dismissed.

**Response to Claim 31**:  **The Superseding Indictment charged an aggravating factor, along with the citation to the statutory authority, which is part of the Federal Death Penalty Act, required for a capital offense.**

In claim 31, Basham's habeas counsel  complain that Basham:

was denied his rights to due process, to a fair trial, the assistance of counsel, to confront the evidence against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence, in contravention of the Fifth, Sixth and Eighth Amendments of the United States Constitution, because the indictment . . .  made no mention of the federal death penalty and did not charge the aggravating factors required for a capital offense under 18 U.S.C. § 3592©, or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase.

§2255 Mot. at 144.

A review of the record shows that counsel's allegation is incorrect    The Superseding

Indictment   cited  the  pertinent  sections  of  the  Federal  Death  Penalty  Act.   The  statute  which

Basham's counsel claim the Government violated, 18 U.S.C. § 3592©, "Aggravating factors for

homicide," states in pertinent part:

> In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury . . .shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:
>
> (1) Death during commission of another crime of another crime. - The death or injury resulting in death, occurred during the commission or attempted commission of, or during the immediate flight from the commission of, an offense under . . . section 1201 (kidnapping). . . .
>
> . . . .
>
> (8) Pecuniary gain. - The defendant committed the offense for consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

18 U.S.C. 3592©. The eight-count Superseding Indictment filed on April 23, 2003, indicated under Counts 1 (carjacking resulting in death) and 2 (kidnapping resulting in death) that the maximum penalty is death. It included a "Notice of Special Findings" as to Counts 1 and 2. Superseding Indictment, p. 14. These special findings included:

> f.     The death of Alice Donovan, and the injury resulting in the death of Alice Donovan, occurred during the [sic] **CHADRIC EVAN FULKS' and BRANDEN LEON BASHAM'S** commission and attempted commission of, an offense under Title 18, United States Code, Section 1201 [Title 18, United States Code Section 3592(c)(1)].

Thus, contrary to Basham's habeas counsel's claim, the Superseding Indictment charged an aggravating factor, along with the citation to the statutory authority, which is part of the Federal Death Penalty Act, required for a capital offense. See United States v. Fulks, 454 F.3d 410, 417 (4th Cir. 2006)("the grand jury returned a superseding indictment charging Fulks and Basham with eight separate offenses and setting forth special findings supporting the imposition of the death penalty on the first two counts").

Moreover, if the statutory aggravating factors had been inadequately alleged in the Superseding Indictment, the deficiency was harmless. See United States v. Barnette, 390 F.3d 775, 786 (4th Cir. 2004), *vacated on other grounds by* Barnette v. United States, 546 U.S. 803 (2005)

-161-

(defendant was not prejudiced where the indictment provided the factual structure from which the aggravating factors could have been found, and where the Government served the defendant with a formal notice of intent to seek the death penalty under 18 U.S.C. § 3593). In addition to including the facts in the Superseding Indictment from which the aggravating factors making Basham eligible for the death penalty could have been found, the Government filed a "Notice of Intent to Seek the Death Penalty" under 18 U.S.C. §§ 3591-3598, on September 12, 2003. See Docket # 144; United States v. Basham, 561 F.3d 302, 314 (4th Cir. 2009). The notice listed the statutory aggravating factors under 18 U.S.C. § 3592©, and the non-statutory factors under § 3593(a) and ©, it intended to prove. Thus, the Government provided adequate notice so that Basham could prepare his defense.

**Response to Claim 32: The Federal Death Penalty Act is constitutional.**

In Claim 32, Basham's habeas counsel argue that the Federal Death Penalty Act ("FDPA") is unconstitutional. §2255 Mot. at 146. More specifically, they contend that the FDPA violates the 8th Amendment because it is enforced disproportionately against racial minorities and against defendants tried in Southern states. Id. at 146-50. They also argue that the FDPA is unconstitutional because it does not allow for plain error review on appeal. Id. at 153-54. Additionally, they argue that capital defendants have a statutory right to justice without discrimination and that federal courts have inherent supervisory authority to "curb charging discrimination and regional caprice." Id. at 151-53. They accordingly request an evidentiary hearing on this claim so he can attempt to prove that this Court should strike down the FDPA. Id. at 150.

These arguments are without merit, and no hearing is necessary on these issues. First, they have produced no authority to suggest that the FDPA violates the 8th Amendment. To the contrary, federal courts have held that the FDPA is not racially or geographically discriminatory. Second, the

Supreme Court has held that the FDPA does not create an exception to plain error review. Third, this Court fully instructed the jury that it was not to consider race or other prohibited factors in making its sentencing determination, and they have pointed to no statutory right that was violated in Basham's case. Finally, the Government respectfully submits that the Court lacks the authority to strike down the FDPA or enjoin its application absent a showing that the FDPA is unconstitutional.

A.    The FDPA does not violate the 8th Amendment based on racial or geographic discrimination.

Basham's habeas counsel claim that the FDPA violates the 8th Amendment due to racial and geographic disparities in its enforcement are nearly identical to those brought by the defendant in United States v. Sampson, 486 F.3d 13 (1st Cir. 2007). Like Basham, the defendant in Sampson was a white man who made no claim that *he* was sentenced to death on the basis of *his* race, the race of *his* victims, or the geographic location of the district in which *he* was tried. Id. at 25. Rather, Sampson (like Basham) attempted to "assert the rights of other capital defendants." Id.

The First Circuit first questioned whether Sampson had standing to raise such a challenge, noting the general rule that "if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations." Sampson, 486 F.3d at 25 (quoting County Court v. Allen, 442 U.S. 140, 155 (1979)).

Assuming for the sake of argument that Sampson did in fact have standing, the First Circuit nonetheless held that the FDPA was not unconstitutionally applied on the basis of race or geography. Just as Basham does, Sampson relied on the 2000 Department of Justice study to make his argument

-163-

that the federal death penalty is unevenly applied to racial minorities and in districts in Southern states.  Sampson, 486 F.3d at 26.  The First Circuit held that the DOJ study did not prove unconstitutional discrimination.

> Apparent disparities in sentencing are an inevitable part of our criminal justice system.... [O]ur consistent rule has been that constitutional guarantees are met when "the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible." Where the discretion that is fundamental
>
> to our criminal process is involved, we decline to assume that what is unexplained is invidious.

Id. (quoting McCleskey v. Kemp, 481 U.S. 279, 312-13 (1987) (further citation omitted)). "The DOJ study," the First Circuit held, "provides no basis for attributing the statistical discrepancies with respect to geography and race in FDPA prosecutions to discrimination rather than to other factors, such as differences in the nature of the crimes involved." Sampson, 486 F.3d at 26; see also United States v. Jones, 287 F.3d 325, 334-35 (5th Cir. 2002) (holding that FDPA did not unconstitutionally discriminate on the basis of race or geography); United States v. Bin Laden, 126 F.Supp.2d 256, 261-63 (S.D.N.Y. 2000) (same).

The reasoning of the First Circuit and the Southern District of New York is persuasive. Basham's habeas counsel do not argue that race or geography played any part in his prosecution or sentence.  Accordingly, Basham lacks standing to bring a challenge on behalf of other defendants. In any event, Basham's habeas counsel have pointed to no evidence that any statistical discrepancies in the application of the federal death penalty are due to race or geography rather than the circumstances of the individual defendants and their crimes.

B.       The FDPA does not eliminate plain error review on appeal.

Basham's habeas counsel argue that by its "plain language," the FDPA precludes plain error

review in a capital case.  §2255 Mot. at 155.  To make this argument, they cite 18 U.S.C. §

3595(c)(2):

> (2) Whenever the court of appeals finds that—
>
> (A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
>
> (B) the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or
>
> (C) the proceedings involved any other legal error requiring reversal of the sentence *that was properly preserved for appeal under the rules of criminal procedure*,
>
> the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death. The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless.

(Emphasis added).  On its face, this section does not eliminate plain error review. Instead, it

references legal errors that were preserved for appeal "under the rules of criminal procedure."  And

Rule 52(b) of the Federal Rules of Criminal Procedure specifically provides for plain error review

of unpreserved errors.

Moreover, Basham's habeas counsel point to no authority holding that § 3595(c)(2)

eliminates plain error review.  To the contrary, the United States Supreme Court has held that the

FDPA "does not explicitly announce an exception to plain-error review, and a congressional intent

to create such an exception cannot be inferred from the overall scheme." Jones v. United States, 527 U.S. 373, 388-89 (1999); see also United States v. Fell, 531 F.3d 197, 210 n.8 (2nd Cir. 2008) (applying plain error review to capital defendant's claims and citing Jones). In fact, the Fourth Circuit applied plain error review to several of Basham's claims in his direct appeal. See United States v. Basham, 561 F.3d 302, 329-30 (4th Cir. 2009). Thus, Basham's habeas counsel's claim that the FDPA does not allow for plain error review is wholly without merit.

> C.     No statutory right was violated in Basham's case.

Basham's habeas counsel contend that Basham has a "statutory right to justice without discrimination." §2255 Mot. at 151. Again, they do not claim that *his* prosecution or sentence was discriminatory. They apparently argue that the death penalty violates federal law by allowing for discrimination in other cases. They quote 18 U.S.C. § 3593(f), which provides that the court must instruct the jury not to consider race in its sentencing determination. This Court fully complied with § 3593(f), which they seem to acknowledge. §2255 Mot. at 151 (arguing that § 3593(f) evinces a "broader purpose" of Congress). They then cite Congressional debate on 21 U.S.C. 848(e), the death penalty provision concerning continuing criminal enterprises. But Basham was not charged or sentenced under § 848(e). It is difficult to discern exactly what their argument is on this point, but just as the federal death penalty does not unconstitutionally discriminate on the basis of race or geography, it does not discriminate in violation of federal statutes. And there certainly is no error in Basham's case, as the Court fulfilled its statutory obligations in instructing the jury. See Sampson, 486 F.3d at 25 n.4 (rejecting Sampson's claim that he was denied his statutory right to "justice without discrimination" when district court instructed jury in keeping with 18 U.S.C. § 3593(f)).

D.    The Court lacks authority to refuse to enforce the FDPA.

Basham's habeas counsel invite the Court to exercise its "supervisory powers" to overturn the FDPA, or to refuse to enforce capital sentences under the FDPA, in the name of eliminating "charging discrimination and regional caprice[.]" §2255 Mot. at 152.  They then cite United States v. Hastings, 461 U.S. 499, 505 (1983), which recognizes the authority of federal courts to formulate certain procedural rules.[26]  Hastings does not, of course, authorize a federal court to overturn a statute that is constitutional, based solely on the court's determination that the statute may be discriminatory in some case not before the court.  See Sampson, 486 F.3d at 25 n.4  (assuming that even if such a supervisory power existed, there is no basis for its use where the defendant is not the victim of discrimination).

**Response to Claim 33**:  **Basham has failed to show that the process mandated by the FDPA operates in an arbitrary and capricious manner; therefore, "the extraordinary step of finding a federal statute facially unconstitutional is not warranted."**

Citing Furman v. Georgia, 408 U.S. 238 (1972), and Eddings v. Oklahoma, 455 U.S. 104, 112 (1982), habeas counsel for Basham argue that the FDPA is unconstitutional because it is not fairly and consistently imposed.  §2255 Mot. at 156.  They conclude their argument with the erroneous assertion: "Should the Government prove unable to meet their burden of showing a legitimate distinction [between cases where the death penalty is imposed and cases where it was not imposed], then Mr. Basham's sentence must be set aside."  §2255 Mot. at 162.

It is Basham's habeas counsel's burden to show that Basham's sentence violates the Constitution.  See United States v. Taylor, 635 F.Supp.2d 1243, 1246 (D.N.M. 2009)(defendant

_____

[26]In Hastings, the Supreme Court held that a court's supervisory power did not include the authority to ignore the doctrine of harmless error in reversing a conviction to punish prosecutors for making inappropriate remarks.  461 U.S. at 506-07.

bears the burden of establishing that the FDPA is unconstitutional)(citing <u>Lujan v. G & G Fire</u> <u>Sprinklers, Inc.</u>, 532 U.S. 189, 198 (2001)).  In order to meet this burden, Basham's counsel "must establish that no set of circumstances exists under which the Act would be valid. . . ."  <u>Id.</u> (quoting <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987)).  Under the canons of statutory construction, a statute must be construed, if possible, to give it constitutional effect.  <u>Id.</u> (citing <u>INS v. St. Cyr</u>, 533 U.S. 289, 299-300 (2001)).

Basham's habeas counsel have failed to meet their burden.  "<u>Furman</u> held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant."  <u>McClesky v. Kemp</u>, 481 U.S. 279, 307 (1987). The sole basis Basham's counsel offer in requesting this Court to declare the FDPA unconstitutional is that more defendants were not sentenced to death.  Their argument focuses on what appear to be inconsistencies in results of federal death penalty cases.  The Supreme Court has made it clear that the focus must be on the procedure and process of a death penalty statute.  Absent a showing that a capital punishment system operates in an arbitrary and capricious manner, a defendant cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty.  <u>McClesky v. Kemp</u>, 481 U.S. 279, 306-307 (1987).

Basham's habeas counsel's superficial review of federal death penalty cases does not reveal why those sentenced to life received more lenient treatment.  Jurors making sentencing decisions must be permitted to focus on the individual characteristics of a defendant and the circumstances of the crime.  <u>United States v. Sampson</u>, 486 F.3d 13, 24 (1st Cir. 1007)(citing <u>Eddings</u>, 455 U.S. at

112). The Supreme Court has observed:

> The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt ... . The capability of the responsible law enforcement agency can vary widely. Also, the strength of the available evidence remains a variable throughout the criminal justice process and may influence a prosecutor's decision to offer a plea bargain or go to trial. Witness availability, credibility, and memory also influence the results of prosecutions. Finally, sentencing in state courts is generally discretionary, so a defendant's ultimate sentence necessarily will vary according to the judgment of the sentencing authority.

McClesky, 481 U.S. at 307 n.28.

Together, Furman and Gregg v. Georgia, 428 U.S. 153 (1976), require that a death-penalty statute "(1) rationally narrow the class of death-eligible defendants and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." United States v. Sampson, 486 F.3d 13, 23-27 (1st Cir. 2007)(quoting Kansas v. Marsh, 548 U.S. 163 (2006); United States v. Green, Cr. No. 5:06CR-19-R, 2008 WL 4000943 (W.D.Ky. Aug. 26, 2008). The FDPA complies with these requirements. Indeed, it was designed for the very purpose of eliminating arbitrariness in capital sentencing. United States v. Caro, 614 F.3d 101 (4th Cir. 2010)(*denying petitioner's motion for rehearing*). Thus, it authorizes the death penalty only for certain crimes. It further requires that the jury find at least one aggravating factor, and that it also consider mitigating factors. Caro, 614 F.3d at 102. This structure "passes constitutional muster," and "the extraordinary step of finding a federal statute facially unconstitutional is not warranted." Id.

**Response to Claim 34: There is no cumulative error.**

In Claim 34, Basham's habeas counsel argue that the cumulative effect of all the errors alleged in his §2255 Motion mandates reversal of his conviction and sentence. §2255 Mot. at 162.

This argument fails because they have not shown any errors. Legitimate cumulative error analysis evaluates only the effect of matters actually determined to be constitutional error. See Fisher v. Angelone, 163 F.3d 835, 852-53 n.9 (4th Cir. 1998); Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir. 1998) (cumulative error analysis applies when there are two or more actual errors; it does not apply to the cumulative effect of non-errors). The present case is not one in which there were a number of constitutional errors or a variety of instances of ineffective assistance of counsel. In short, there were no actual errors. Therefore, there is no cumulative error analysis to be done.

## CONCLUSION

For the foregoing reasons, Basham's §2255 motion should be denied.

Respectfully submitted,

WILLIAM N. NETTLES
United States Attorney

By: s/Robert F. Daley, Jr.
ROBERT F. DALEY, JR. (Fed. ID No. 6460)

By: s/Jimmie Ewing
JIMMIE EWING (Fed. ID No. 7292)

By: s/ Jeffrey Mikell Johnson
JEFFREY MIKELL JOHNSON (Fed. ID No. 10587)