UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  4:02-992-JFA |
| Plaintiff, | Judge Joseph F. Anderson, Jr. |
| -v- | |
| BRANDON LEON BASHAM, | DEATH PENALTY CASE |
| Defendant. | |

_____

DEFENDANT'S REPLY TO MEMORANDUM OF LAW OF
THE UNITED STATES IN OPPOSITION TO DEFENDANT'S MOTION
FOR COLLATERAL RELIEF PURSUANT TO  28 U.S.C. § 2255

_____

TABLE OF CONTENTS

Claim 1
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his lawyers permitted him to speak with law enforcement officers outside of their presence and failed to advise him that his statements could be used against him.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Claim 2
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to prepare for and/or effectively litigate the *Jackson v. Denno* hearing in his case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Claim 3
The Court deprived Mr. Basham of his right to an impartial jury by erroneously excluding potential jurors whose concerns about the death penalty would not have substantially impaired the performance of their duties. In addition, by failing to raise this issue on appeal, appellate counsel rendered ineffective assistance of counsel within the meaning of the Fifth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Claim 4
Mr. Basham was tried and sentenced while legally incompetent in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution.. . . . . . . 28

Claim 5
Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to request that the Court determine Mr. Basham's competency to stand trial, despite numerous indications prior to and during trial that Mr. Basham was incapable of properly assisting in his own defense. In the alternative, defense counsel was ineffective in failing to request that Mr. Basham's trial be delayed or postponed until such time as he was competent to assist in his own defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Claim 6
The Court abdicated its obligation under 18 U.S.C. § 4241(a) to ascertain whether Mr. Basham was competent to stand trial, despite the fact that considerable evidence was presented to the Court that Mr. Basham was in fact unable to assist properly in his defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Claim 7
Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of his incompetency as a basis for reversal on direct appeal.. . . . . . . . . . . . . . . . . . . . . . . 48

Claim 8
Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by permitting their psychiatric expert to medicate Mr. Basham with a potent combination of drugs that rendered him incapable of properly assisting in his own defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Claim 9
Mr. Basham's trial attorney rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when he conceded before the jury in opening statements all indictment allegations against Mr. Basham except for Mr. Basham's "intent to cause death or serious bodily harm" in connection with the alleged carjacking.. . . . . . . 51

Claim 10
Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by ignoring their client's repeated requests to exit the courtroom immediately before an altercation between Mr. Basham and United States Marshal officers. In the alternative, the Court violated Mr. Basham's right under Rule 43(c) of the Federal Rules of Criminal Procedure to voluntarily absent himself from his trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Claim 11
The Government engaged in misconduct when it failed to correct testimony of Sheriff Ronald Hewett that it knew to be false, in violation of its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The Government compounded this misconduct by relying on Sheriff Hewett's false testimony in its closing argument... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Claim 12
Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of the Government's misconduct as a basis for reversal on direct appeal.. . . . . . . . . . . 72

Claim 13
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to argue to the jury that Mr. Basham's post-arrest statements to law enforcement officers were involuntary.. . . . . . . . . . 75

Claim 14
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorney, Jack Swerling, was hindered by a personal conflict of interest.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Claim 15
Mr. Basham's trial attorneys rendered ineffective assistance of counsel in violation of 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when they failed properly to object to the admission of unfairly prejudicial prior act evidence during the guilt phase of Mr. Basham's trial. Appellate counsel similarly rendered ineffective assistance of counsel, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they not only failed to raise this issue on appeal, but in fact conceded the admissibility of evidence concerning the Burns kidnapping... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Claim 16
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to request that this Court admit at the penalty phase of Mr. Basham's trial comments made by the Government at his co-defendant's trial concerning Mr. Basham's lesser culpability.. . . . . . . . . . . . . 88

Claim 17
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel (a) failed effectively to cross-examine a key Government witness; (b) failed to call rebuttal witnesses to challenge the Government witness's testimony; and (c) failed to respond to the Government's argument concerning the witness's testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Claim 18
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel failed effectively to cross-examine Sheriff Ronald Hewett, in fact elicited damaging testimony from Hewett, and then failed to mitigate the damage caused by his deficient cross-examination of Hewett.. . . . . . . . . . . 100

Claim 19
Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when they failed adequately to investigate, develop, and present mitigating evidence at the penalty phase of Mr. Basham's trial.. . . . . . . . . . . . . 106

Claim 20
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorneys failed to assemble a competent capital defense team. In the alternative, Mr. Basham was denied the effective assistance of counsel under the above provisions because his attorneys failed adequately to supervise the team they had assembled.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

A.    The bias of defense investigator Carlisle McNair created a conflict of interest within the defense team. . . . . . . . . . . . . . . . . . . . . . . . . . . 114

B.    Mitigation Specialist Paige Tarr rendered deficient performance in her investigation in Mr. Basham's case, and defense counsel failed adequately to supervise her.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Claim 21
Counsel provided ineffective assistance of counsel in failing to request that the Court trifurcate Mr. Basham's trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Claim 22
The Government violated its obligations under *Brady v. Maryland* and its progeny by failing to disclose information material to Mr. Basham's ability to prepare and present a defense at trial and sentencing.  As a result of the Government's misconduct, Mr. Basham was denied his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Claim 23
The Government violated Mr. Basham's right to due process when it presented a theory of the case that was inconsistent with the theory it presented at Mr. Fulks's trial.  Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories.  In addition, Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this issue on appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Claim 24
Mr. Basham's rights under the Eighth Amendment to the United States Constitution were violated when the Government engaged in misconduct by arguing, contrary to controlling precedent, a causal nexus requirement to persuade the jury not to give effect to Mr. Basham's mitigating evidence.  By failing to object to the Government's misconduct, trial counsel rendered ineffective assistance of counsel, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.  Mr. Basham's appellate attorneys were similarly ineffective for failing to raise this issue on appeal,

in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Claim 25
The Court's instruction to the jury on mitigating evidence violated Mr. Basham's
Eighth Amendment rights because it created a substantial risk that the jury would
screen out statutory mitigating factors, and thus fail to give effect to evidence that
was, by law, mitigating.  Trial counsel was ineffective for failing to object to this
charge, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C.
§ 3599; and appellate counsel was ineffective for failing to raise this issue on direct
appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C.
§ 3599.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Claim 26
The Court's instructions to the jury violated Mr. Basham's rights under the Fifth,
Sixth and Eighth Amendments because the jury was not required to find that death
was an appropriate punishment beyond a reasonable doubt.  Appellate counsel
violated Mr. Basham's right to the effective assistance of counsel guaranteed by the
Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they
unreasonably failed to raise this issue on appeal.. . . . . . . . . . . . . . . . . . . . . . . 148

Claim 27
Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the
Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18
U.S.C. § 3599, when, upon learning that Juror Cynthia Wilson had engaged in
misconduct, they failed to investigate easily identifiable instances of Wilson's
untruthful statements to the Court that likely would have persuaded the Court that
further investigation into claims of juror misconduct was warranted.. . . . . . . . . 157

Claim 28
Newly discovered evidence suggests that Juror Wilson was untruthful in her
testimony to the Court concerning her contact with other jurors.  Accordingly, this
Court should vacate its previous order denying a new trial and vacate Mr. Basham's
convictions and sentences.  In the alternative, this Court should order an evidentiary
hearing on the issue of premature juror deliberations.. . . . . . . . . . . . . . . . . . . . 165

Claim 29

Mr. Basham is entitled to a new trial in light of newly discovered evidence profoundly undermining the credibility of the Government's witness, Sheriff Ronald Hewett.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

Claim 30

Trial counsel's failure to provide appellate counsel all files produced in the course of representing Mr. Basham necessarily resulted in Mr. Basham being denied effective assistance of counsel on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. In addition, trial counsel's failure to provide the record to his successor constituted ineffective assistance of counsel within the meaning of the Fifth and Sixth Amendments, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Claim 31

Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments were violated due to the Government's failure to include necessary charges in the Indictment. Mr. Basham's Due Process Rights, as well as his rights under 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, were violated by appellate counsel's unreasonable failure to raise this issue on appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Claim 32

A system, such as the federal death penalty, in which capital punishment is sought on both the invidious basis of race and the irrational basis of geography should not be enforced. This Court should vacate Mr. Basham's sentence on this basis alone.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Claim 33

The absence of a principled basis for distinguishing cases in which the federal death penalty is imposed from those in which it is not imposed renders the FDPA unconstitutional.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

Claim 34

Mr. Basham's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

COMES NOW Defendant BRANDON LEON BASHAM, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Rule 5(d) of the Rules Governing Section 2255 Proceedings, and this Court's order of January 11, 2012 (Dkt. 1431), and replies to the "Memorandum of Law of the United States in Opposition to Petitioners [sic] Motion Pursuant to 28 U.S.C. § 2255."  (Dkt. 1416.)

## I.     FORMS OF CITATION

Throughout this Reply, "Defendant's Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255" (Dkt. 1394) will be referred to as the "Motion" or the "§ 2255 Motion," and cited as "Motion at *xxx*."  The "Memorandum of Law of the United States in Opposition to Petitioners [sic] Motion Pursuant to 28 U.S.C. § 2255" (Dkt. 1416) will be referred to as the "Answer" or the "Opposition" and cited as "Opp. at *xxx*." Citations to other pleadings, transcripts, and other documents in this Reply will be as follows:

(1)     Documents on the official court docket, including pleadings, motions, and orders, will be cited by their docket number:  Dkt *xxx*.

(2)     Transcripts will by cited by date and page number: Tr. *xx/xx/xx* at *xx*.

(3)     Exhibits to this Reply will be consecutively numbered and cited accordingly: Rep. Exh. *xxx*.

(4)     All other citations will be self-explanatory or based on the Blue Book.

## II.    CLAIMS FOR RELIEF

### CLAIM 1

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his lawyers permitted him to speak with law enforcement officers outside of their presence and failed to advise him that his statements could be used against him.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham's counsel were ineffective for allowing Mr. Basham, a man charged with capital murder, to walk off, unaccompanied, with law enforcement. This objectively unreasonable action fell below the prevailing professional norms of practice, and without the damaging evidence that resulted, it is likely that Mr. Basham would have gained a more favorable result at his trial. *See Strickland v. Washington*, 466 U.S. 688 (1984); *Rompilla v. Beard*, 545 U.S. 374 (2005).

"[W]henever important interests of a defendant are at stake, the defendant is entitled to be represented by a lawyer." *United States v. Herrera-Figeroa*, 918 F.2d 1430,1436 (9th Cir. 1990) (emphasis omitted). Unquestionably, Mr. Basham had important interests at stake on the day of the search for Alice Donovan. Although the Government disputes that an agreement or proffer was in place, there is no dispute

2

that the purpose of the search that day was for Mr. Basham to cooperate with the government in the hopes of finding Donovan's body and, accordingly, benefit Mr. Basham's potential sentence. (Opp. at 6; Tr. 9/27/04 at 169, 202.) Accordingly, Mr. Basham, had a right to assistance of his counsel throughout the day. *See Patterson v. Illinois*, 487 U.S. 285, 290 (1988) ("[t]here can be no doubt" that right to counsel exists in post-indictment interviews with law enforcement).

"Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." *Patterson*, 487 U.S. at 290 n. 3. Mr. Basham and the two attorneys originally appointed to his case, Cameron Littlejohn and William Monckton IV, assisted in a search for Donovan's body. Mr. Basham and his attorneys were joined by Federal Bureau of Investigation officers, the Conway, South Carolina Police Department, and the Brunswick County Sheriff's Department. (Tr. 9/27/04 at 13.) The Government argues that counsel was not ineffective for failing to "literally hold [Mr. Basham's] hand" during the search. (Opp. at 4). Despite the Government's attempt to trivialize the issue, Mr. Basham's counsel had the absolute obligation to stay with him, observe, and intercede in any statements Mr. Basham made to law enforcement, and protect Mr. Basham from any attempts by law enforcement to get incriminating

statements.[1]  The Sixth Amendment guaranteed Mr. Basham "the right to rely on counsel as a 'medium' between him and the State." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).  Contrary to the government's assertion that counsel could not be with Mr. Basham at all times, great care was taken to ensure that they in fact were.  One of Mr. Basham's attorneys rode with him in the transport from the jail to meet up with law enforcement for the search.  (Tr. 2/25/04 at 30, 98.)  Seating in the van was carefully arranged so that Mr. Basham had counsel close at hand.  Counsel were given times alone in the van to consult with Mr. Basham in private.  (Tr. 9/27/04 at 14; Tr. 2/25/04 at 44, 68, 85.)

The search lasted for several hours and several hundred miles.  (Tr. 2/25/04 at 65.)  Eventually, after much frustration, the van stopped and everyone exited the vehicle.  While Mr. Monckton and Mr. Littlejohn were talking with the remainder of the group, Mr. Basham was shockingly left alone to walk to the edge of the cemetery with Sheriff Hewett and two Conway Police Officers (neither of whom testified at trial).  (Tr. 2/25/04 at 67, 83.)  Left alone, Mr. Basham was at the mercy of Sheriff

---

[1]When the government and their agents took advantage of counsel's abandonment of Mr. Basham, they breached their obligations under the Sixth Amendment.  "[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is . . . a breach of the State's obligation not to circumvent the right to assistance of counsel." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

4

Hewett. "Once an uncounselled, targeted individual meets with prosecutors or law enforcement, his fate will depend entirely upon the integrity of his adversary." Pamela R. Metzger, *Beyond the Bright Line: A Contemporary Right-to-Counsel Doctrine*, 97 Nw.U.L.R. 1635, 1666 (2003). As addressed in Claim 29, *infra*, Sheriff Hewett's integrity was an unfortunate choice for Mr. Basham to hang his fate upon. Sheriff Hewett took advantage of the time alone with Mr. Basham, violated his Sixth Amendment right to counsel, and elicited (or fabricated) extremely prejudical statements that proved to be some of the most damning evidence against Mr. Basham at trial and penalty phase.

Mr. Basham's right to counsel guaranteed that he be given advice and protection from "falling into traps" devised by opposing parties. *United States v. Ming He*, 94 F.3d 782, 789 (2nd Cir. 1996) (internal citations omitted) ("We guarantee the right to counsel to save the defendant from falling into traps devised by a lawyer on the other side and to see to it that all available defenses are proffered."). While it may be true that the questions here were designed to find Ms. Donovan's body, "the potential obviously exists for the statements to be used later against the defendant. Thus, counsel has a role to play, even in interviews covering essentially factual matters." *Id.*

The role of counsel in such a situation is tri-fold. A lawyer can help their client

understand the questions and keep them calm. "Some defendants are not sophisticated or intelligent enough to grasp a question's purport and may blurt out unthinking answers because the interview process intimidates them." *Id.* at 789. Next, a lawyer can keep the client focused on the fact that the opposing party does not share his interests. Third, "a defense attorney might help resolve the potential disagreements between the government and defendant and assist the defendant in clarifying his answers to ensure they are complete and accurate." *Id.* at 790.

Here, Mr. Basham was certainly not intelligent or sophisticated enough to understand that Sheriff Hewett was attempting to elicit damaging information, and that Sheriff Hewett did not share his interests, despite Hewett's efforts throughout the day to create a rapport with Mr. Basham (Tr. 9/27/04 at 42).[2] Even after having only spent only one day with him, defense counsel had to be aware that they had a client likely to blurt out damaging statements. (Tr. 9/27/04 at 24-25). Considering that the government first took the position that Mr. Basham's statement was that Fulks

---

[2] Sheriff Hewett's attempts to befriend Mr. Basham compounded the likelihood that Basham would make incriminating statements in his presence. "The cooperating defendant has a complex and confusing relationship with prosecutors and law enforcement. On the one hand, the government seems to be offering him a place, of sorts, on the government team. On the other hand, the defendant and the government have fundamentally adverse interests and, if negotiations break down, the government can withdraw its promised help and protection." *Beyond the Bright Line: A Contemporary Right-to-Counsel Doctrine.* 97 N.W.U.L.R. 1635, 1667-68 (2003).

strangled Mrs. Donovan, and then that it was Mr. Basham, (*see* Claim 23 *infra*) had counsel been present the truth would not have been so muddied and counsel could have ensured that the statement was complete and accurate. Due to counsel's abandonment of their client, Mr. Basham was denied such assistance.

Counsel utterly failed in their duties when they allowed Mr. Basham to walk off, without counsel, with law enforcement. As a result, Mr. Basham was severely prejudiced. "If pre-charge bargaining fails, the defendant may well have sealed his fate at trial by providing statements and evidence that will guarantee his conviction." Metzger, *supra*, at 1666. Because the search failed to disclose the location of Mrs. Donovan's body, Mr. Basham was left with no benefit for his actions and indeed sealed his fate with his statements to Sheriff Hewett. "Cooperation and full disclosure carry sentencing risks that may be hidden from the unrepresented individual." *Id.* at 1667. Left alone, temporarily abandoned by counsel, Mr. Basham made what the government themselves characterized as the statements that "seal[ed] the deal." (Tr. 9/29/04 at 81-82.) The attempt by the government to now downplay the damaging impact of that evidence, and say that numerous other pieces of evidence could have "sealed the deal," is disingenuous. The record and the Government's own words speak for themselves:

> Ladies and Gentlemen, I wanted to finish with that because how would
> you go back in your jury room after listening to Sheriff Hewitt [sic] and

7

after seeing Sheriff Hewitt [sic] demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled, how do you listen to Clifford Jay when Brandon Basham told you jurors . . . we killed them and find him not guilty of carjacking, resulting in death? And find him not guilty of kidnapping, resulting in death? I have been up here for two hours, and *the government submits those two witnesses and that limited testimony, alone, seals the deal.*

(Tr. 9/29/04 at 81-82, (emphasis added).)

Unsurprisingly, the government only addresses the potential impact of the statement on the guilt phase of Mr. Basham's trial, whereas the penalty phase was where the most significant damage was done. The Government maintains that Mr. Basham could not have been prejudiced by his statements during the search because he had made several other statements to law enforcement. However in *none* of those previous statements did he implicate himself as the actual hand that dealt the fatal blow. The government characterizes the "We killed them" statement to Clifford Jay as showing that Basham was the killer. This argument simply does not hold water. "We killed them" is not "I strangled her." And, in summation at the guilt phase, that is exactly what the government argued Mr. Basham meant when he showed Sheriff Hewett how Ms. Donovan died. "Sheriff Hewitt [sic] says he [Mr. Basham] didn't *say* I killed Alice Donovan. Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it." (Tr. 9/29/04 at 80 (emphasis added).) The purse strap did more than "provide[] a bit of drama." (Opp. at 12). It was the sole

8

piece of evidence that allowed the Government to argue that Mr. Basham was the hand that took Ms. Donovan's life. By allowing Mr. Basham to walk off unaccompanied with law enforcement, counsel's actions fell far below the the prevailing professional norms of practice. The result of this failure resulted in either the elicitation or fabrication of one of two pieces of evidence that "sealed the deal" for Mr. Basham's conviction and death sentence, and the only piece of evidence that allowed the government to argue that Mr. Basham was the killer. Unquestionably, Mr. Basham was prejudiced by this result.

## CLAIM 2

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to prepare for and/or effectively litigate the *Jackson v. Denno* hearing in his case.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

In its Opposition, the Government argues that, in failing to present any evidence or put forth any meaningful argument in support of Mr. Basham's motion to suppress his post-arrest statements (*see* Dkt. 232), trial counsel "proceeded strategically." (Opp. at 12.) Specifically, the Government maintains that counsel

9

took a reasonable "middle ground" between (1) challenging the voluntariness of their client's statements (statements that were at the heart of the Government's case against both Mr. Basham and Mr. Fulks); and (2) preserving their ability to later argue to the jury as a mitigating circumstance at sentencing that Mr. Basham's statements "were indicative of voluntary cooperation with law enforcement." (Opp. at 14.) The Government's position, however, is contrary to both constitutional law and common sense, and is not supported by the facts in this case.

The Government attempts to implicate the Court in trial counsel's failings by suggesting that, if counsel had actively challenged the constitutional admissibility of the statements elicited from Mr. Basham by law enforcement, the Court would have precluded counsel from arguing at sentencing that Mr. Basham's statements could be considered by the jury in assessing his cooperation with police as a mitigating factor. (Opp. at 13.) The Government makes this charge by focusing on a passing observation made by the Court at the *Jackson v. Denno* hearing that, although he had "never thought about it" before, he "probably would disallow the defendants from trying to suggest to the jury that he should get some credit for his statements if he tried to keep them out." (Tr. 2/24/04 (a.m.) at 8-9.) What the Government fails to note in its Opposition, however, is that the Court immediately clarified, *"That's not a ruling,* I'm just saying that's something we have to think about . . . ." (*Id.* at 9)

10

(emphasis added.)

Of course, what defense counsel should have known, and what the Court ultimately would have considered before making a ruling on this issue, is that the United States Supreme Court has long held that it is "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968). Thus, for example, a criminal defendant cannot be forced to waive his Fifth Amendment right against self-incrimination in order to assert his Fourth Amendment right against unreasonable searches and seizures. *Id.* Similarly, a defendant cannot be forced to choose between his right to challenge the voluntariness of his statements to the police and his right under the Eighth Amendment to have the sentencer in a capital case consider and give effect to all relevant mitigating evidence.

What the Government asks the Court to now conclude is that it would have committed constitutional error in precluding Mr. Basham from arguing to the jury at sentencing that it could consider his statements to law enforcement officers as mitigating evidence in the form of cooperation. Presuming that a judge will not follow the law, however, is "speculation that is never appropriate." *Correll v. Ryan*, 539 F.3d 938, 951 (9th Cir. 2008).

There is no legitimate reason to believe that the Court would have violated Mr.

11

Basham's Eighth Amendment rights in this case in the way that the Government suggests. Fear on trial counsel's part that the court will make an improper ruling, especially when counsel makes no effort to inform the court of the controlling law, is not "strategy," it is ineffectiveness.

Moreover, even if there were some basis to believe that the Court would have improperly precluded Mr. Basham from presenting relevant mitigating evidence to the jury, the action on counsel's part that would have precipitated such a ruling by the Court happened long before the *Jackson v. Denno* hearing in February 2004. The Court observed at the hearing:

> It's a two edged sword to raise a voluntariness issue in a death penalty case, because if I hear the testimony and determine the statements were voluntary, they come in . . . . Then if he gets convicted and we move into the penalty phase – I don't know, I never thought about it – but I probably would disallow the defendants from trying to suggest to the jury that he should get some credit for his statements if he tried to keep them out.

(Tr. 2/24/04 (a.m.) at 8-9.)

By the time the Court made these observations, trial counsel had already "tried to keep [Mr. Basham's statements] out." Specifically, they filed a motion to suppress those statements on December 31, 2003, and expressly requested an evidentiary hearing on the matter. (Dkt. 232.) In other words, trial counsel had already "raise[d] a voluntariness issue." Accordingly, if the Court had been intent on improperly

12

punishing Mr. Basham for exercising his constitutional right to challenge the voluntariness of his statements by precluding him from presenting mitigating evidence at sentencing, it would have done so regardless of counsel's efforts (or lack thereof) to suppress Mr. Basham's statements at the *Jackson v. Denno* hearing itself. Counsel had already "raise[d] a voluntariness issue" in their December 2003 motion. Applying the Government's reasoning, the damage had already been done. No further damage – but certainly a great deal of benefit – could have resulted from a meaningful presentation of the considerable evidence that Mr. Basham's post-arrest statements were constitutionally inadmissible.

The Government also argues that, because "[t]he witnesses' testimony did not suggest that Basham's statements were involuntary," trial counsel reasonably used the *Jackson v. Denno* hearing "to lay a foundation that Basham was cooperative with investigating officers." (Opp. at 15.) Trial counsel, however, called no witnesses at the hearing. Rather, they relied solely on cross-examination of the Government's witnesses. It is no surprise that the law enforcement officers called by the Government provided no evidence of coercion, and it constitutes deficient performance on trial counsel's part to rely solely on cross-examination of such witnesses to develop evidence of coercion. *Bynum v. Lemmon*, 560 F.3d 678, 684 (7th Cir. 2009) ("Graddick testified at the post-conviction hearing that he intended

13

to elicit evidence of coercion through the officers' testimony. But this plan, as the district court aptly observed, is 'not trial strategy; it is television fantasy.'").

Further, the Government's argument that trial counsel strategically chose to forego Mr. Basham's constitutional challenge to the voluntariness of his statements in favor of arguing cooperation as a mitigating factor overlooks the critical fact that, even after abandoning his viable argument for suppression of his statements, defense counsel never offered Mr. Basham's cooperation with law enforcement as a mitigating factor in this case. (*See* Dkt. 805 and 806 (special verdict forms).) The reason for this is evident: trial counsel had long known (and certainly before the *Jackson v. Denno* hearing) that the Government intended to argue that Mr. Basham had in fact intentionally misled law enforcement with his post-arrest statements. (*See, e.g.,* Dkt. 69 at 5("[A]ccording to the government, Basham's misleading statements about the location of the body could be used to prove that, instead of attempting to help investigators locate the body, Basham actually intended to divert them away from the body's true location with the hope that the passage of time would render forensic details of the murder less reliable.").)

Accordingly, the Government's post-hoc justification of trial counsel's failings at the *Jackson v. Denno* hearing do not withstand factual scrutiny. Moreover, even if the Government were correct that trial counsel intentionally choose to forego a

14

viable challenge to the admissibility of Mr. Basham's statements in favor of preserving their ability to argue at sentencing that Mr. Basham had cooperated with law enforcement, such a strategy would have been objectively unreasonable in light of the Government's expressed intention to argue that Mr. Basham had not cooperated with law enforcement, but had instead sent them on "a deliberately false, wild-goose chase."   (Tr. 3/4/04 at 13 (trial court summarizing Government's position).)

Finally, in its only discussion of the prejudice requirement of *Strickland*, the Government states that "Basham's habeas counsel cannot point to any evidence that he was coerced or that he statements to police were involuntary." (Opp. at 16.)  The Government misses the point.   There is no "evidence" in the record of the involuntariness of Mr. Basham's post-arrest statements because his trial attorneys rendered deficient performance in failing to present any.  At an evidentiary hearing on this claim, however, Mr. Basham will demonstrate *Strickland* prejudice by presenting, among other things, the evidence of his "mental history, and his low intellectual and intelligence capacity" (Tr. 2/24/04 (a.m.) at 11) to which trial counsel alluded but failed to demonstrate, as well as the coercive conditions of his interrogations.

15

## CLAIM 3

**The Court deprived Mr. Basham of his right to an impartial jury by erroneously excluding potential jurors whose concerns about the death penalty would not have substantially impaired the performance of their duties. In addition, by failing to raise this issue on appeal, appellate counsel rendered ineffective assistance of counsel within the meaning of the Fifth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham's convictions, sentences, and death verdict violate the Fifth, Sixth, and Eighth Amendments because the Court erroneously excluded for cause at least two prospective jurors who were actually qualified to serve, thereby depriving Mr. Basham of his right to an impartial jury. *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *see Gray v. Mississippi*, 481 U.S. 648, 668 (1987).

Contrary to the Government's assertion, the Court did not validly exercise its discretion when it removed the jurors for cause. While the Government is correct that whether or not a venireperson's reservations amount to a "substantial impairment" is based upon the voir dire inquiry, *see United States v. Tipton*, 90 F.3d 861, 880 (4th Cir. 1996), a court cannot exclude jurors based on their general opinions rather than an inability to follow the law. *Witherspoon*, 391 U.S. at 522. Indeed, "those who

16

firmly believe the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986).

The Court committed prejudicial error by granting the Government's motion to exclude venirepersons Cathy Roberts and Michael Williams for cause. Neither of these potential jurors expressed views regarding the death penalty that justified their exclusion under *Witherspoon*, 391 U.S. 510, or *Wainwright v. Witt*, 469 U.S. 412 (1985). The Court also erred when it dismissed venirepersons Rubina Khan and Susan Jackson without allowing the defense an opportunity to rehabilitate the jurors in voir dire. The statements by the jurors at issue are discussed at length in both Mr. Basham's § 2255 Motion and the Government's Response. Thus, they will only be briefly summarized here.

Venireperson Cathy Roberts initially expressed concern about the death penalty in a case where a defendant did not inflict the fatal blow (Tr. 8/30/04 at 112), but she ultimately stated that "[if] selected [she] would follow the law." (Tr. 8/30/04 at 113.) Ms. Roberts unequivocally stated she could put aside her beliefs "and follow the law as the judge announces." (Tr. 8/30/04 at 109). Venireperson Michael Williams also expressed initial hesitation, but stated that although he might have personal issues

17

with the death penalty, "the judge says you got to go by what the law says."  (Tr. 9/7/04 at 207, 218.)  He ultimately said he was "very, very uncomfortable signing the document" for death, but still felt there were some cases, like the Susan Smith case, where it was appropriate.  (Tr. 9/7/04 at 230.)

Venirepersons Rubina Kahn and Susan Jackson expressed stronger reservations. Ms. Kahn gave conflicting statements of "I don't think I can vote for capital punishment, I don't think I can" (Tr. 8/31/04 at 280-81), and "I guess I could be able to put aside my views" (Tr. 8/31/04 at 271).  She stated she was not someone who could never vote for death under circumstances.  (Tr. 8/31/04 at 271.)  Yet the Court dismissed her without any giving the defense any attempt to rehabilitate or clarify her answers.  (Tr. 8/31/04 at 281).  Ms. Jackson was disqualified for cause based on her statements in the questionnaire that  she was "strongly opposed to the death penalty and would have a difficult time voting for it, regardless of the facts and law in the case."  She also wrote, "Taking a life under any circumstances is reprehensible."  (Tr. 9/3/04 at 67).  The government moved to dismiss her immediately.  (Tr. 9/3/04 at 67).  Although the Court brought her in and questioned her, the Court denied defense counsel the opportunity to do so.  (Tr. 9/3/04 at 73-75.)

Turnabout was not fair play in this courtroom.  The Court reacted much differently when pro-death penalty jurors gave conflicting answers to their positions

18

on the death penalty.  When venirepersons gave answers that showed they were predisposed to death, the Court went out of its way to rehabilitate them and refused to strike them over strenuous defense objections.  As a result, the jury pool was stacked with death-leaning jurors.

Venireperson Lisa McCormick stated in her questionnaire that she would have a hard time voting against the death penalty regardless of the facts of the case.  (Tr. 8/31/04 at 62).  On voir dire she stated that if the government can prove the murder, then the defendant should get the death penalty.  (Tr. 8/31/04 at 60-62.)  At this point the Court interrupted the Government's voir dire and said, "you are telling [defense counsel] something different from what you told me."  (Tr. 8/31/04 at 62.)  McCormick, admonished by the judge for her inconsistency, then backpedaled on her answer.  The Court and defense counsel both gave lengthy speeches on how the penalty phase worked.  (Tr. 8/31/04 at 63-66.)  McCormick stated that, despite her strong leanings towards the death penalty, she would not automatically vote death.  (Tr. 8/31/04 at 66.)  Under questioning by the government McCormick stated that she could envision a scenario where death was not appropriate.  (Tr. 8/31/04 at 74).

McCormick's answers were nothing more than the answers of venirepersons Roberts and Williams in reverse.  Both Roberts and Williams stated that they had strong objections to the death penalty but ultimately stated that they could follow the

19

law.  Yet they were stricken.  Defense counsel moved to strike McCormick based on her answer that if Mr. Basham was found guilty, she would vote for death.  (Tr. 8/31/04 at 77.)  The Government argued that, because McCormick said she would follow the law, so she was qualified.  (Tr. 8/31/04 at 80.)  The Court left McCormick on the panel over defendant's "strenuous objection."  (Tr. 8/31/04 at 80.)  Thus, the argument that a juror is qualified to serve when they state they will follow the law despite strong leanings to one side was successful for jurors predisposed to death, but failed for those predisposed to life.

The trend continued with other venirepersons.  Billy Small hesitated when asked if he could remain open-minded in a case with two homicides.  He stated that he had some concern that he could not be open minded in such a situation.  He agreed that he "might be inclined" to say mitigation did not matter at that point.  (Tr. 9/1/04 at 79.)  Once again, the Court intervened in defense questioning and admonished the juror, "[Y]ou understand you are changing what you told me and what you are telling Mr. Swerling."  Like McCormick, Small backpedaled and said "I would *want* to –I would be open-minded" on both.  (Tr. 9/1/04 at 79-80.)  Defense counsel moved to strike the juror for cause because he was "mitigation impaired."  (Tr. 9/1/04 at 89.)  Despite his conflicting answers, and concern over ability to be fair in a case with two murders, Smalls was retained over the defense objection.  (Tr. 9/1/04 at 90-91.)

20

Venireperson Gregory Brown stated in his questionnaire and in voir dire that death should be given in robbery and rape of a minor, that he generally favored it, and that it was used too seldom. (Tr. 9/1/04 at 232, 243, 246.) Under questioning in voir dire, he stated it would be hard to say if he could consider mitigation in a case with a second death. Defense counsel explained that he could consider the second death but would have to hear the mitigation. Brown said he thought he could do that and then, when told that answer sounded "iffy," corrected to say he could do that. (Tr. 9/1/04 at 228-229.) Brown was aware that Fulks had pled guilty but stated it would not affect his judgment. (Tr. 9/1/04 at 236-37.) Defense counsel objected to Brown's qualification. He asked the record to reflect that Brown shook his head during the questions about the two homicides. The impression was "that he did not want to tell the Court he couldn't be fair." (Tr. 9/1/04 at 250-51.) His body language was that he could not consider mitigation. Finally, with robbery and rape of a minor at issue, it was very close to the factual situation of this case. (Tr. 9/1/04 at 251.) The Government argued that Brown was simply nervous and the Court qualified Brown over the defense objection. (Tr. 9/1/04 at 252-53.) This juror is another perfect example of the double standard applied by this Court that stacked the jury in favor of death. While the Court found that the "body language" and "hesitancy" and the feeling that venireperson Roberts "seemed to have some trouble with the idea [of the

21

death penalty]" (Tr. 8/30/04 at 114) was sufficient to dismiss her for cause, despite her unequivocal statement that if "selected I will follow the law" (Tr. 8/30/04 at 113), the same concerns about body language, hesitancy, and conflicting statements did not pass muster to strike Brown for cause.

Venireperson Laurie Hogan also expressed concern about ability to be fair when the defendant was alleged to have committed two murders. She stated she could not give a definite yes or no answer but would try her "best" to lay everything out and follow instructions and wait to form an opinion, if that is what she was told to do. (Tr. 9/2/04 at 17-18.) She also wrote in her questionnaire that death should be applied in cases of rape and child abuse. (Tr. 9/2/04 at 24.) Defense counsel moved to strike for cause. (Tr. 9/2/04 at 21-22.) The Court allowed questioning to continue. Under leading questions, Hogan agreed that she could follow instructions, put her opinions aside, and listen to the evidence. (Tr. 9/2/04 at 25.) Hogan stated that she had very strong opinions on rape, especially when it is done to a child, and that no woman or child should be abused. (Tr. 9/2/04 at 36, 44.) As to the death penalty, she said her convictions are very strong, but she could go into a jury room and discuss them, but if there was no doubt in her mind, her position would not change. (Tr. 9/2/04 at 42.) Defense counsel objected to Hogan's qualification, arguing that she was "mitigation impaired." Over the objection, despite strong leanings towards

death, and conflicting answers, the Court found Hogan qualified.  (Tr. 9/2/04 at 49.)

Venireperson, and ultimately juror, Joyce Hartsoe, was another who expressed hesitation about whether or not she could be fair and open-minded with two homicides.  (Tr. 9/2/04 at 230-31.)  Ultimately, after further questioning she responded affirmatively to the leading question that she would have an open mind. (Tr. 9/2/04 at 233.)  Defense counsel moved to strike, noting that she really hesitated with the second homicide question and would be "mitigation impaired."  (Tr. 9/2/04 at 239-240.)  Again, although concerned with the hesitation by venireperson Roberts, *see supra*, here the Court defended the juror's hesitancy as just confusion and qualified Hartsoe over defense counsel's objection.  (Tr. 9/2/04 at 240).[3]

Venireperson Marcus Holston was yet another juror that hesitated regarding ability to be fair in a case with two murders.  Holsten gave numerous conflicting answers as to this issue.  First he stated he thought he could remain open.  Then, that he could, but qualifying it with, "I'm not going to say I would be tempted [to decide right away upon hearing about second death] but I would listen to the evidence." (Tr. 9/2/04 at 325.)  When asked by defense counsel about sitting on a case with two homicides, Holston stated he would "*try* to have an open mind,"  but that he might be

---

[3]It is of note that Hartsoe was one of the jurors that had significant phone contact with foreperson Cynthia Wilson, later held in contempt of court for her misconduct as a juror in this case.  (Tr. 4/12/28 at 22 generally).

tempted to make a decision right away. Nonetheless, he affirmed he could give meaningful consideration to mitigation. (Tr. 9/2/04 at 339-40 (emphasis added).) Defense counsel objected, expressing concern that Holsten was "mitigation impaired." The Court again defended the death-leaning juror's conflicting answers, stating, "he's just being brutally honest," and qualified Holsten over the defenses objection. (Tr. 9/2/04 at 341.)

The response of venireperson Julia Balsiger were "picture perfect," consistantly stating that she could be fair and impartial under the circumstances of the case. (Tr. 9/3/04 at 180.) However, twenty years prior, her fourteen-year-old daughter was raped by four men. They took her away in a car, took her out into the wildnerness, and raped her. Three of the men wanted to kill her. (Tr. 9/3/04 at 159-60). Defense counsel objected. Although the Court initially expressed concern about the fact that Balsiger's daughter's rape was so close to the factual scenario here, he ultimately qualified her. (Tr. 9/3/04 at 177-78; 9/9/04 at 271.)

Venireperson Vicki Jackson had a daughter close in age to Samantha Burns. (Tr. 9/7/04 at 173.) She first stated that she was "not sure" whether or not that closeness in age would affect her, but that she thought she could put it aside, and then later stated that she could put it aside. (Tr. 9/7/04 at 173-74, 182.) She stated that she felt like a defendant should try to prove themselves innocent one way or another,

although she could follow the judge's instruction and not hold it against a defendant who did not come forward. (Tr. 9/7/04 at 180-82.) She stated that she was "not so sure" if she could consider mitigation in the absence of a presentation by the defendant, she would want to hear from the defendant; before she could consider a life sentence. (Tr. 9/7/04 at 189.) Based on that answer, defense challenged Jackson for cause. The Government argued that Jackson's use of the phrase "prove his innocence" was simply a term of art and she was not aware of the ramifications. (Tr. 9/7/04 at 192.)

Like venirepersons Kahn and Susan Jackson, both of whom expressed strong opinions that death was not appropriate, Vicki Jackson was unambiguous that she would require evidence from a defendant before considering life. Yet unlike Kahn and Susan Jackson, the Court allowed Jackson to return and be rehabilitated. The Court lectured Jackson that a defendant does not have to prove anything, that death was not automatic, and explained aggravation and mitigation, all the while asking leading questions to which Vicki Jackson replied little more than, "Yes, sir." (Tr. 9/7/04 at 192-195.) Responding to the leading question from the Court that it "want[ed] to make sure that is not your position" that death would be automatic if no mitigation was put forth, Jackson assured the Court it was not. (Tr. 9/7/04 at 195.) Defense counsel renewed their objection, and the Court overruled it and qualified

25

Jackson. (Tr. 9/7/04 at 196.)

Venireperson Kenneth Caldwell also expressed hesitancy over his ability to fairly hear case with a second murder. He candidly stated that it would be hard to know how much it would "sway you" without knowing the facts of what would be presented. (Tr. 9/8/04 at 169.) Defense counsel objected to Caldwell, stating that he gave "the worst long pause . . . in two weeks" with the two death question. (Tr. 9/8/04 at 178.) The Court agreed that Caldwell "struggled with the death question" but felt that "once he understood it . . . he came out ok." (Tr. 9/8/04 at 178.) The Court qualified Caldwell over the defendant's objection. (Tr. 9/8/04 at 183.)

As the recitation of the facts above makes clear, Mr. Basham was deprived of an impartial jury when the Court granted the Government's strikes for cause based on general opinions about the death penalty rather than ability to follow the law, but then denied similar arguments to strike venirepersons by the defense. This inconsistent and unconstitutional application of the law violated Mr. Basham's rights to a fair trial. As stated in Mr. Basham's § 2255 Motion, the foregoing violations of Mr. Basham's constitutional rights, taken alone or in combination with other errors alleged in the Motion, constitute structural error and warrant the granting of this Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahmson*, 507 U.S. 619, 637-38, n. 9

26

(1993). However, even assuming that the harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Mr. Basham's rights had a serious and injurious effect or influence on Mr. Basham's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

Appellate counsel was ineffective for failing to raise this claim on appeal. As the record above demonstrates, the inconsistent application of *Witherspoon* was a non-frivolous issue. Although weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy, exclusion of jurors because of their views against capital punishment, but who could nevertheless follow the law, is not a weak issue. Moreover, the "weeding" principle has little or no applicability in capital cases, for appellate counsel in a capital case has a duty to consider all potentially available claims in light of the unique nature of the death penalty and the possibility of preclusion or a change in the law in later courts.

As a result of the Court's removal of otherwise eligible jurors, the jury (including alternates) was composed of thirteen individuals who responded that they "generally favored the death penalty." *See* Supp. juror questionnaires for jurors 51,

27

93, 143, 171, 302, 314, 325, 328, 352, 466, 562, 575, 584, 593, 621, 677, 776.

Appellate counsel rendered ineffective assistance in not raising this claim on direct

appeal, and the Court should consider the claim on the merits. *Coleman v. Thompson*,

501 U.S. 722, 753-54 (1991); *Strickland*, 466 U.S. 668.

**CLAIM 4**

**Mr. Basham was tried and sentenced while legally incompetent in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution.**

Mr. Basham incorporates by specific reference all facts, allegations, and

arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this

Reply.

In Claim 4 of the Motion, Mr. Basham argued that his convictions and

sentences were rendered in violation of his constitutional rights to due process, to a

fair and reliable determination of guilt and penalty, to present a defense, and to the

effective assistance of counsel because he was tried, convicted, and sentenced to

death when he was mentally incompetent to stand trial.  The Government responds

that this claim is procedurally barred because it was not raised on direct appeal.

(Opp. at 30.)  The Government, however, misstates the law.

In Claim 4, Mr. Basham raised a "substantive competency claim," *i.e.*, a claim

that he was tried and convicted while he was actually incompetent. *See United States*

28

*v. General*, 278 F.2d 389, 396 (4th Cir. 2002); *see also Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). "[T]his kind of claim 'is not subject to procedural default and must be considered on the merits.'" *Battle*, 419 F.3d at 1298 (*quoting Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995)). *Accord Vogt v. United States*, 88 F.3d 587, 590 (11th Cir. 1996).

"The conviction of an accused person while he is legally incompetent violates due process." *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995). The test for whether a defendant is competent to stand trial "seeks to ascertain whether a criminal defendant 'has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'" *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (*quoting Dusky v. United States*, 362 U.S. 402 (1960)). As the Supreme Court has emphasized:

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (*quoting Riggins v. Nevada*, 504 U.S. 127, 139-40 (1992) (opinion of Kennedy, J.)).

29

Where a preponderance of the evidence demonstrates that a defendant lacks the requisite understanding and ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper*, 517 U.S. 348. This preponderance of the evidence standard applies in a § 2255 proceeding. *See Battle*, 419 F.3d at 1298 (*citing Medina*, 59 F.3d 1292). To satisfy this standard, Mr. Basham need only prove that it is more likely than not that he was incompetent within the meaning of *Drope* and *Dusky* during his trial. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (discussing preponderance of evidence standard).

Contrary to the Government's assertion that "at no point did any mental health care expert indicate that Basham was incompetent," (Opp. at 26), Dr. Donna Schwartz-Watts told the Court on September 20, 2004, immediately follow an in-court altercation between Mr. Basham and United States marshals, that Mr. Basham *was* incompetent:

> I do have concerns about his competency. It is my opinion right now that because of his mental defect that he can't assist his attorneys. Now, the problem with that, and the good news probably is, his mental state fluctuates, and there is going to be times in this trial where he has competence fluctuation.

(Tr. 09/20/04 at 162.) The Government presented no testimony or other evidence to contradict Dr. Schwartz-Watts's expert opinion.

30

Moreover, contemporaneous handwritten notes created by Jack Swerling on September 20, 2004, appear to indicate that he spoke with Dr. Schwartz-Watts and she informed him that Mr. Basham was "incompetent." Rep. Exh. 1. Co-counsel Greg Harris also expressed concerns about Mr. Basham's competence on September 20:

> To respond to Mr. Schools, to get back on this issue about whether or not this is manipulation or whether he is competent, what I just saw in the courtroom didn't look like any attempt to manipulate I had ever seen. Looked like someone who didn't have the ability to control the simple function of sitting down in a seat. That is why we have a concern about the competence today. The 20th of September.

(Tr. 9/20/04 at 157-58.)

Accordingly, the record plainly establishes by a preponderance of the evidence that, *at the very least*, on September 20, 2004, Mr. Basham was incompetent during his trial. Although the Court did not proceed with the trial immediately following Mr. Basham's demonstrated incompetency on the afternoon of September 20, remarkably, it later allowed both a videotape and an audiotape of an incompetent Mr. Basham struggling with United States marshals to be shown to the jury at the penalty phase in support of the Government's request for a death sentence. (Tr. 10/18/04 at 45, 47; Trial Exh. at 469-A & 469-B.) The record in this case indicates by a preponderance of the evidence, at the very least, that Mr. Basham was incompetent when the videotape and audiotape were made of his struggle with the United States marshals,

31

and the Court deprived him of his right not to be tried while incompetent when it allowed the Government to use his incompetence to its own advantage.

The afternoon of September 20, however, was not the only occasion on which Mr. Basham's incompetence was evident. The record itself demonstrates numerous occasions on which Mr. Basham was unable to stay awake or was otherwise unable to assistant his attorneys.[4] (Tr. 9/7/04 at 231-32 (discussing Mr. Basham's inability to stay awake); 9/8/04 at 184 ("MR. SWERLING: "Apparently he just can't keep his head up. I am getting frustrated. I am trying to do the job here, I don't want the jury to see him in this fashion."); Tr. 9/17/04 (*Ex Parte* hearing) at 7 ("THE COURT: If you can sit there and stay awake today, we will have you some chewing tobacco Monday when we come back, I promise you. Work with us and try to stay awake today."); Tr. 9/20/04 at 88 ("THE COURT: Last Friday there were two issues: Your stress that you were almost having a panic attack, supposedly, and then, you were sleepy."); Tr. 10/12/04 at 69 (Greg Harris Opening Statement in Penalty Phase: "Why would someone, after having been charged, and arrested, and confronted with death penalty offenses, sleep in his trial and during his jury selection? Why would someone

---

[4]The Government's contrary claims that "there is nothing in the record to support Basham's habeas counsel's assertions that Basham was incompetent to be tried," (Opp. at 31), or that "the record is barren of support for Basham's alleged incompetency" (Opp. 32), are patently erroneous.

argue with his lawyers during the trial?); Tr. 10/12/04 at 69-70 (Greg Harris Opening Statement in Penalty Phase: "We see someone sleeping in a courtroom during his death penalty trial, and we logically conclude that he is uninterested.  And that is very rational decision.  We see someone arguing with his lawyers and we think to ourselves, how can he choose to argue with the same – with the only people that are trying to save his life?"); Tr. 10/15/04 at 225 (the Court discussing its decision to give Mr. Basham dip: "And at some point, he appeared to be dozing again, and that is when we got into the question about dip . . . .  I said, if that is what it takes to keep the Defendant awake and active in this proceedings, it is the thing to do."); and Tr. 10/18/04 at 53 (Jack Swerling: "There were a couple of occasions where, in the courtroom, there was an expression by either Mr. Harris or I about Mr. Basham's apparently being drowsy and sleeping at inappropriate times?").)

In addition, Mr. Basham will present evidence at the evidentiary hearing in this case that Mr. Basham's attorneys were well aware of their client's inability to assist them.  For example, on September 17, 2004, Jack Swerling wrote the following note to himself:

> *Brandon will not sit up.  He has his head down.  Then he sits back and sleeps back in chair.  He has refused my request, Greg's request and Paige's request.  He said "they can give him the D/P when I tell him the jury is looking at him[.]"*

(Rep. Exh. 2 )

During the morning session on September 20, 2004, Swerling noted: *"[Defendant] is obsessing the whole time re 'dip.'"* (Rep. Exh. 3. ) On September 22, 2004, two days after the episode with the U.S. Marshals, Swerling wrote:

*Starts right off about Dip.*

*Before break   Dip*

*During Trial – Dip*

*After Break   Dip*

*Before lunch – Dip*

(Rep. Exh. 4.)  On September 29, 2004, Swerling wrote: *"After Johnny's closing, [Defendant] just wanted some 'dip.'"* (Rep. Exh. 5.)  The next day Swerling wrote: *"* During this difficult discussion [Defendant] is driving me crazy about Dip – what the jail told the Marshall [sic] about a Valium."* (Rep. Exh. 5.)

Moreover, as both the record and Jack Swerling's notes attest, Mr. Basham's ability to "consult with his attorney with a reasonable degree of rational understanding" did not improve during the penalty phase of his trial.  *See Drope*, 420 U.S. at 172.  For example, on October 22, 2004, the transcript reflects that, because of Mr. Basham's psychological state, trial counsel Greg Harris had to interrupt the court proceedings while Jack Swerling was conducting direct examination of a mitigation witness.  (Tr. 10/22/04 at 212 ("THE COURT: Your colleague says we

34

need a recess. Let's take about a 10-minute recess. Please go to your jury room.").)

After the jury left the courtroom, Greg Harris informed the Court that "Mr. Basham

has progressively worsened his condition over the course of the afternoon." (Tr.

10/22/04 at 212.) The transcript of the proceeding then reflects the following:

| | |
|---|---|
| THE DEFENDANT: | I am trying, Jack. I can't take it. I cannot. I'm ready. |
| THE COURT: | What is the Government's position to adjourn early? |
| MR. SCHOOLS: | It is fine, Judge. |
| THE COURT: | You agree to it? |
| MR. SCHOOLS: | Whatever they want. |
| THE DEFENDANT: | I do, too. I don't care. I can't take it no more. |
| THE COURT: | Mr. Basham, we will go ahead and recess. |
| THE DEFENDANT: | I'm sorry, man. I'm out of emotions. I don't even know how to express it. |
| THE COURT: | All right. Please bring in the jury. |
| THE DEFENDANT: | I want to see my family, man. |
| MR. SWERLING: | Before the jury come in, may he be taken out? |
| THE COURT: | Yeah, go ahead and take him out. |
| THE DEFENDANT: | Yeah, take me out after it is over. |
| MR. SWERLING: | Can you sit there? |

35

THE DEFENDANT:     Yeah.

MR. SWERLING:     I was anticipating a problem.

THE DEFENDANT:     I ain't trying.

(Tr. 10/22/04 at 212-13.)

On October 26, 2004, trial counsel informed the Court that Mr. Basham had not been given his antipsychotic medication and was in a "very agitated state."  (Tr. 10/26/04 at 6.)  When the Court ordered Mr. Basham take his medication, Basham responded, "I can't stay awake.  I think it is nighttime.  That is not why I am agitated. It is, but it is because of things that happen at the jail.  Nobody will listen to me." (Tr. 10/26/04 at 7.)  When asked its position by the Court, the Government stated that the defense "need[s] someone here to see if he is competent to go forward before we proceed with the trial."  (Tr. 10/26/04 at 8.)  The Court then recessed until 1:00 p.m.

While the Court was in recess, it held an *ex parte* hearing with Mr. Basham and his counsel.  During the hearing, the Court told Mr. Basham that his lawyers had convinced the Court that he was "not competent to go forward in front of a jury." (Tr. 10/26/04 (*Ex Parte*) at 3-4.)  At 1:00 p.m., however, Mr. Basham apparently was still not sufficiently competent to assist his attorneys, who asked for and received an additional 15 minutes.  (Tr. 10/26/04 at 14.)  When the Court returned, trial counsel expressed concern about Mr. Basham's ability to participate in his own defense:

36

MR. HARRIS:        My observation of Mr. Basham is that he is not going to be able to sit in the courtroom and pay attention to the testimony, remain silent. And I am concerned that he will - - that this jury will not look favorably upon the way he is appearing to me to be acting this afternoon.

THE COURT:         Mr. Schools.

MR. SCHOOLS:       Our position is, we need to go, Judge. We have rearranged everybody's schedule to accommodate Mr. Basham's feelings from moment to moment. I think we have done that enough. I think we now are to the point where he thought he would get this if he did this by habit. So, if we are there, I think we should bring the jury. At some point, he is going to have to suffer the consequences of his own behavior. And this is as good a time to start now as any.

THE COURT:         Well, I agree with everything you said, except the failure to take the medicine was not really his fault.

MR. SCHOOLS:       Once again, Judge, if it is a medical problem, Dr. Schwartz-Watts should be here to testify about it. I mean, that is why they are paying all of these doctors all of this money to treat him. I don't know where she is, but she is not here. So now, we go to Mr. Harris to opine about whether his own client is competent or not, rather than have a doctor here who might actually know.

THE COURT:         Mr. Harris, I have tried to bend over backwards to do everything possible to keep the defendant on an even keel and a good frame of mind, and especially so that he won't show out in front of the jury. But the jury is really worn out. They have sent signals indirectly to me. They really want to see this case move along. I think there is a danger to be balanced

37

against what you say. These continued delays are going to be held against the Defendant, I think. I think the jury will figure out that it is the Defendant that is causing these delays. So, I think I have got to weigh in the balance of the aspect of it, versus the danger of going forward with him appearing to be a little bit disheveled over there.

(Tr. 10/26/04 at 14-16.) Although trial counsel objected that Mr. Basham was not "in a state, frame of mind to go forward," the Court called the jury in and proceeded with testimony.[5] (*Id.* at 16-18.) When the Court took its afternoon break, however, trial counsel informed the Court, "Mr. Basham is slurring his words. He seems to be groggy and just out of it. That is for lack of a better word. He was sleeping when Mr. Harris was doing the direct examination of Dr. Brawley." (Tr. 10/26/04 at 92-93.) Despite counsel's concerns about Mr. Basham's ability to assist in his own defense, the Court concluded, "I think we need to at least make an effort to go forward. I understand your request, Mr. Swerling, but I just respectfully disagree." (*Id.* at 95.)

The improper administration of psychiatric medication can render a defendant incompetent. *United States v. Quintieri*, 306 F.3d 1217, 1233 (2nd Cir. 2002)

---

[5]Mr. Harris furthered stated: "And I will point out that as I am addressing the Court right now, the record should reflect that my client is discussing over my shoulder, loud enough that I can hear, and certainly loud enough for the jury could hear, having discussions with Mr. Swerling about that the fact that he will be good. The fact that his audibly saying, 'I will be good,' that is the kind –." (Tr. 10/26/04 at 16.)

38

("Certainly, the improper administration of psychiatric medicine can render an

individual temporarily incompetent."). As the Supreme Court has observed, "It is

clearly possible that such side effects [of psychiatric medication] had an impact upon

not just [the defendant's] outward appearance, but also . . . his ability to follow the

proceedings, or the substance of his communication with counsel." *Riggins*, 504 U.S.

at 137. Justice Kennedy's observations in his concurring opinion in *Riggins* are

particularly relevant to this case:

> As any trial attorney will attest, serious prejudice could result if
> medication inhibits the defendant's capacity to react and respond to the
> proceedings and to demonstrate remorse or compassion. The prejudice
> can be acute during the sentencing phase of the proceedings, when the
> sentencer must attempt to know the heart and mind of the offender and
> judge his character, his contrition or its absence, or his future
> dangerousness. In a capital sentencing proceeding, assessments of
> character and remorse may carry great weight and, perhaps, be
> determinative of whether the offender lives or dies.

504 U.S. at 143-44 (Kennedy, J., concurring).

The Court violated Mr. Basham's right to due process in this case when it

proceeded with his trial while he was incompetent.[6] It also violated his due process

---

[6]Whenever information that is made known to the trial court raises a doubt that a defendant is mentally incompetent to stand trial, the minimal guarantees of due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough, and reliable mental health evaluation. *See Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990).

rights when it allowed the Government to use a videotape and audiotape of him in an incompetent state as part of its case for a death penalty.

Even if Mr. Basham were required to show prejudice for the violation of is "fundamental right" not to be tried while incompetent, *see Cooper*, 517 U.S. at 354, a requirement Mr. Basham does not concede, there can be no doubt that he was profoundly prejudiced by the Court's failure to protect his right to due process of law. Nevertheless, the trial and sentencing of Mr. Basham while he was mentally incompetent constitutes a deprivation of due process necessitating the granting of relief by this Court without a showing of prejudice. *Pate*, 383 U.S. at 386-87. The error deprived Mr. Basham of a fair and reliable determination of his guilt and of the appropriate penalty in this case.

### CLAIM 5

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to request that the Court determine Mr. Basham's competency to stand trial, despite numerous indications prior to and during trial that Mr. Basham was incapable of properly assisting in his own defense. In the alternative, defense counsel was ineffective in failing to request that Mr. Basham's trial be delayed or postponed until such time as he was competent to assist in his own defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this

40

Reply.

The Government advances three arguments in response to Mr. Basham's claim that his attorneys rendered constitutionally ineffective assistance of counsel in failing to protect his due process right not to be tried while incompetent. First, it argues that the record does not indicate that Mr. Basham was incompetent. (*See, e.g.*, Opp. at 32 ("the record is barren of support for Basham's alleged incompetency").) Second, it argues that "trial counsel's strategic decision to not pursue a competency defense" was not unreasonable because "there is no evidence that Basham failed to understand the proceedings and that he was unable to cooperate with counsel." (Opp. at 33.) Third, it maintains that, even if trial counsel rendered deficient performance, Mr. Basham cannot establish prejudice because "there is not a reasonable probability that Basham would have been found incompetent." (*Id.*) The Government is wrong on each of these points.[7]

Most critically, the Government appears to misunderstand the constitutional right at issue here. Specifically, it discusses trial counsel's "strategy" not to pursue a "competency defense." (Opp. at 33.) Competency to stand trial is not a "defense;" it is a "rudimentary" and "fundamental" constitutional aspect of due process of law.

---

[7]Mr. Basham addressed this mischaracterization of the record by the Government in Claim 4, *supra*.

41

*Cooper*, 517 U.S. at 354.  No "strategy" to deprive a client of his fundamental right to be tried only if he is competent could ever be considered "reasonable."  Indeed, the very case the Government cites in support of its argument *contradicts* its position. In *Robidoux v. O'Brien*, 643 F.3d 334 (1st Cir. 2011), the court emphasized the distinction between a strategic decision to pursue an insanity or diminished capacity defense and the obligation of counsel to protect his or her client's right to be tried only while competent:

> By contrast, where there are substantial indications that the defendant is not competent to stand trial, counsel is not faced with a strategy choice but has a settled obligation under [state] law and under federal law as well to raise the issue with the trial judge and ordinarily to seek a competency examination.
>
> This is perhaps surprising, if stated as an invariable rule, because that course could sometimes be adverse to the client's interest; the obvious instance is the case of an incompetent defendant with an excellent merits defense.  Nevertheless, this obligation has been deemed necessary to the dignity interests of defendants and the integrity of the trial process.

*Robidoux*, 643 F.3d at 339.

Applying the restrictive relief provisions of the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. §2254, to its review of the state court's adjudication of the defendant's claim that his attorney was ineffective in failing to raise the issue of his competence to stand trial, the federal court in *Robidoux* held only that, given the paucity of evidence that the defendant was incompetent, it could not conclude that the

42

state court unreasonably applied clearly established federal law. 643 F.3d at 340. *Robidoux* thus does not advance the Government's argument; it support's Mr. Basham's.

Tellingly, other than its inapt "strategy" argument, the Government offers no defense of trial counsel's failure to fulfill their obligation to ensure that Mr. Basham was not tried while incompetent. It has therefore waived any other argument that counsel did not render deficient performance. *See McCalvin v. Yukins*, 444 F.3d 713, 723 (6th Cir. 2006) (Cole, J., dissenting) ("The government may not depend on this Court to assume that it is advancing every available argument; the petitioner certainly enjoys no such benefit.").

The Government's final argument is that Mr. Basham is not entitled to relief because "he can show no prejudice" because "there is not a reasonable probability that [he] would have been found incompetent." (Opp. at 33.) It is unclear upon what evidence the Government bases this broad assertion. Because his attorneys failed to challenge his competency, Mr. Basham was never permitted to create a record on this issue. Moreover, even absent this opportunity, as discussed with regard to Claim 4, *supra*, the record in this case is replete with references to Mr. Basham's obvious incompetence during his trial. And certainly Mr. Basham was prejudiced when his attorneys failed to argue his uncontested incompetence as a basis for excluding the

43

Government's use of the videotape and audiotape of his struggle with the United States marshals.

Most importantly for current purposes, Mr. Basham has alleged a colorable claim of ineffective assistance of counsel, and he is entitled to an evidentiary hearing at which he can develop the factual basis of his claim. *Vogt*, 88 F.3d at 589 (court held evidentiary hearing on claim of ineffective assistance for failing to raise competency); *Speedy v. Wyrick*, 702 F.2d 723 (8th Cir. 1983) (remanding for evidentiary hearing on ineffective assistance claim concerning petitioner's competency); *accord Becton v. Barnett*, 920 F.2d 1190, 1194 (4th Cir.1990) (discussing "colorable claim" of ineffective assistance based on the failure to investigate competence). At an evidentiary hearing on this claim, Mr. Basham will demonstrate, among other things, that his defense attorneys were aware that he was unable to communicate with them about his case in a rational manner. Defense counsel nevertheless failed to advocate on his behalf concerning his competency to be tried and failed to argue that evidence of his incompetence (in the form of the videotape and audiotape) could not constitutionally be admitted to the jury as evidence supporting a death sentence.

44

CLAIM 6

**The Court abdicated its obligation under 18 U.S.C. § 4241(a) to ascertain whether Mr. Basham was competent to stand trial, despite the fact that considerable evidence was presented to the Court that Mr. Basham was in fact unable to assist properly in his defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government argues that Mr. Basham is not entitled to relief on Claim 6 because (1) the claim is procedurally defaulted; (2) "there was not reasonable cause to believe that Basham was incompetent;" and (3) trial counsel resisted a competency evaluation "for strategic reasons and affirmatively told the Court that Basham was not incompetent." (Opp. at 33.)  In his discussion of Claims 4 and 5, *supra*, Mr. Basham has already addressed the Government's unfounded assertion that there was no basis to be concerned about Mr. Basham's competency and its erroneous assertion that a trial attorney can permit his or her client to be tried while incompetent as part of a trial "strategy."  Mr. Basham will therefore address the Government's argument that the claim is procedurally defaulted because he did not raise the claim in his direct appeal and that the Court was relieved of its independent duty to monitor Mr. Basham's competency because Jack Swerling, his trial attorney, informed the Court that Mr. Basham was competent.  (*See* Opp. at 34-35.)

45

The Government relies on *United States v. Williams*, 819 F.2d 605 (5th Cir. 1987), in arguing that Claim 6 is procedurally defaulted. Mr. Basham concedes that, to the extent Claim 6 invokes 18 U.S.C. §4241, it could be found to be procedurally defaulted under *Williams*. Of course, as the Government concedes, a court may adjudicate a procedurally defaulted claim in a § 2255 proceeding if, among other things, a petitioner can demonstrate cause and prejudice. In Claim 7, Mr. Basham alleged that his appellate counsel rendered ineffective assistance of counsel when they failed to raise on direct appeal the argument that the Court failed to fulfill its obligation under 18 U.S.C. § 4241. (*See* Motion at 44-45.) The ineffective assistance of Mr. Basham's appellate counsel constitutes "cause" for his failure to raise the § 4241 claim earlier, and because Mr. Basham can demonstrate at an evidentiary hearing in this case that he was prejudiced by his appellate counsel's failure to raise the claim, this Court can adjudicate the claim on its merits.

More importantly, however, *Williams* makes clear that, even if a petitioner's § 4241 claim is barred, he may raise in a § 2255 proceeding that "closely related" claim, premised on *Pate v. Robinson*, 383 U.S. 375 (1966), that "the evidence before the trial court presented a 'bona fide doubt' as to his competency and therefore the court was required to hold a competency hearing before proceeding with trial[.]" *Williams*, 819 F.2d at 607; *accord Floyd v. United States*, 365 F.2d 368, 376 (5th Cir.

46

1966), *and cases cited therein*.

Accordingly, to the extent that Mr. Basham's failure to raise his § 4241 claim on direct appeal is not excused by his appellate counsel's ineffective assistance, he hereby expands Claim 6 to include the constitutional argument that, regardless of § 4241, the Court was obligated under *Pate* to conduct a competency evaluation in his case. Because the Government addressed the merits of such a claim in its Opposition (Opp. at 34-35), it cannot reasonably argue that it is prejudiced by this expansion of Claim 6.

To prevail on a *Pate* claim, a petitioner "must establish that the trial court ignored facts raising a 'bona fide doubt' regarding [his] competency to stand trial." *Walton v. Angelone*, 321 F.3d 442, 459 (4th Cir. 2003) (*quoting Pate*, 383 U.S. at 384-86). "Even if a defendant is mentally competent at the beginning of a trial, the trial court must continually be alert for changes which would suggest that he is no longer competent." *Id.*

The record in this case plainly demonstrates that the Court "ignored facts raising a 'bona fide doubt'" as to Mr. Basham's competency. For example, on October 26, 2004, disregarding facts that raised a bona fide doubt as to Mr. Basham's competency to proceed with the penalty phase of his capital trial, the Court, because of scheduling concerns, elected to proceed despite Mr. Basham's obvious, erratic

47

behavior and his attorney's expressed concern about his competency to proceed. (*See* Tr. 10/26/04 at 14-17.)  The Court's actions deprived Mr. Basham of his procedural and substantive due process rights, and he is entitled to relief.

**CLAIM 7**

**Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of his incompetency as a basis for reversal on direct appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government's sole argument in response to Claim 7 is that Mr. Basham's appellate attorneys made a "strategic decision" to exclude from the issues they raised on appeal the issue of Mr. Basham's competency and the Court's failure to fulfill its obligations under 18 U.S.C. § 4241.  As the Fourth Circuit has noted, "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (*quoting Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

48

In this case, Mr. Basham has demonstrated the merits of his claims that he was incompetent during his trial and that the Court ignored facts raising a bona fide doubt as to his competence. Mr. Basham submits as an exhibit to this Reply an undated memorandum from Erik Haren, one of his appellate attorneys at the Washington, D.C. law firm Jenner & Block, to Melissa Meister, another attorney at the firm, discussing in detail the merits of an argument that the district court erred in failing to order that Mr. Basham's competency be evaluated either pursuant to *Pate v. Robinson* or 18 U.S.C. § 4241. (Rep. Exh. 6.) For reasons that Mr. Basham will develop at the evidentiary hearing in this case, appellate counsel unreasonably chose to forego this meritorious argument in favor of other, much weaker, arguments, including evidentiary arguments which the Fourth Circuit could review only for plain error – or not at all – because of trial counsel's failures to raise timely objections. *See United States v. Basham*, 561 F.3d 302, 334-35 (4th Cir. 2009).

Mr. Basham has alleged a colorable claim of ineffective assistance of appellate counsel and he is entitled to an evidentiary hearing on that claim.

## Claim 8

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by permitting their psychiatric expert to medicate Mr. Basham with a potent combination of drugs that rendered him incapable of properly assisting in his own defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Further investigation of Claim 8 by undersigned counsel has revealed that Mr. Basham's incompetency at his trial apparently was not the result of the medications prescribed by Dr. Morgan, but rather errors in the proper administration of those medications by employees of the various facilities at which Mr. Basham was incarcerated prior to and during his trial. Because trial counsel did not have authority to monitor or control the actions of those employees, Mr. Basham hereby withdraws Claim 8.

**CLAIM 9**

**Mr. Basham's trial attorney rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when he conceded before the jury in opening statements all indictment allegations against Mr. Basham except for Mr. Basham's "intent to cause death or serious bodily harm" in connection with the alleged carjacking.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham's trial attorney rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when he conceded Mr. Basham's guilt to virtually all of the charges against him, including the capital offense of kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a).

The Government argues that defense counsel's admission of guilt to a death eligible offense was done for "valid strategic reasons." (Opp. at 39). Further, the Government argues that "case law and experts in the field of capital litigation confirm that Mr. Swerling's comments in opening statement" were part of a valid legal strategy. *Id.* Contrary to the Government's assertion, however, trial counsel's strategy was not just unsuccessful, it was unreasonable. *See Carter v. Lee*, 283 F.3d

51

240, 248-49 (4th Cir 2002). No reasonable strategy justified the concessions made by counsel.

The Government attempts to validate defense counsel's strategy by arguing that "this approach is . . . a well recognized strategy in capital cases. A strategy in which a defendant acknowledges his involvement in the killing but denies that he was guilty of capital murder because he lacked the requisite mental state or intent." (Opp. at 42). However, this is precisely the problem. Had Mr. Basham's only death-eligible offense been the carjacking charge, counsel's challenge to Mr. Basham's mental state would have been a textbook example of the strategy the Government would like the Court to believe was at play here. Mr. Basham, however, was also charged with the capital offense of kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a). Here, defense counsel engaged in an unreasonable strategy and conceded *all elements*.

Mr. Basham's counsel did not employ the "well recognized strategy" in which counsel "denied that [the defendant] was guilty of capital murder because he lacked the requisite mental state or intent." (Opp. at 42). By conceding Mr. Basham's guilt to almost all of the charges against him, including the offense of kidnapping resulting in death, defense counsel also unintentionally conceded to the jury, at the very least, that Mr. Basham was guilty of intentionally and specifically engaging in an act of

violence, knowing that the act created a grave risk of death to a person, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.  *See* 18 U.S.C. § 3591(a)(2)(D).

In other words, by informing the jurors at the outset of the guilt phase of trial that Mr. Basham was guilty of kidnapping resulting in death, defense counsel also conceded that their client was death-eligible.  "Once [Basham's] court appointed attorney told the jury that there was no reasonable doubt" regarding Mr. Basham's guilt on the kidnapping charge, and thus death eligibility, he "ceased to function as defense counsel." *United States v. Swanson*, 943 F.2d 1070, 1075 (9th Cir. 1991).  "An effective attorney 'must play the role of an active advocate, rather than a mere friend of the court.'" *Id.* (*citing Osborn v. Schillinger*, 861 F.2d 612, 624 (10th Cir. 1088)).  "[E]ven when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond a reasonable doubt.  *United States v. Cronic*, 466 U.S. 648, 656-57 n.19 (1984).  Counsel for Basham presented an unreasonable strategy that rendered defense counsel's representation of Mr. Basham "a tenuous and unacceptable legal fiction." *Faretta v. California*, 422 U.S. 806, 821 (1975).  Defense counsel's deficient performance severely prejudiced Mr. Basham, and requires that this Court vacate his convictions and sentences.

The cases cited by the Government either actually support Mr. Basham's position or are irrelevant. In *State v. Elmore*, 857 N.E.2d 547, 524-25 (2006), the court found trial counsel's decision to concede guilt on a kidnapping charge a tactical one. The concession allowed trial counsel to argue "vigorously" that the defendant was guilty "only of murder and not aggravated murder." *Id.* Success with this tactic would have rendered the defendant ineligible for the death penalty, thus the strategy could not be found ineffective. *Id.* Similarly, in *Lawrence v. Branker*, 517 F.3d 700 (4th Cir. 2008), defense counsel conceded defendant's guilt on second-degree murder but "*denied* his guilt for first-degree murder" and other crimes based on voluntary intoxication. *Id.* at 716. There was no such argument in Mr. Basham's case, the concession to kidnapping *was* a concession to death eligibility. *Bell v. Evatt*, 72 F.3d 421, 426 (4th Cir 1995), is a case where guilt was conceded in order to present a guilty but mentally ill defense and thus is not relevant to the facts before this Court. Likewise, *Lobosco v. Thomas*, 928 F.2d 1054 (11th Cir. 1991), is irrelevant to the case at hand because it is not a capital case. In *Florida v. Nixon*, 543 U.S. 175 (2004), the Government got closer to the mark. In that case, however, defense counsel conceded that his client caused the victim's death, but not facts making his claim death eligible. In contrast, Mr. Basham's counsel not only conceded guilt to the underlying offenses, but in regard to the kidnapping charge, conceded at least one

54

threshold factor, thus conceding Mr. Basham's eligibility for a death sentence. (Tr. 9/13/04 (ex parte hearing) at 2-3.)

The Government cites an article written by Basham's co-defendant's counsel, John Blume, for the proposition that contesting guilt must be weighed against the anger jurors may feel towards a defendant who denies involvement and then asks for mercy at the penalty phase. (Opp. at 42, *citing* John H. Blume, Sheri Lynn Johnson & Scott F. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding what Jurors Tell Us About Mitigation*, 36 Hofstra L.Rev, 1035, 1044-45 (2008).) In this case, however, if counsel believed that they were engendering goodwill with the jurors by conceding the client's guilt to a capital offense at the outset of the guilt phase, they were mistaken. Perhaps if, as in Mr. Basham's co-defendant's case, counsel had advised their client to plead guilty, the jury would at least have been spared an approximately three-week trial, involving the testimony of more than 90 witnesses. As it was, defense counsel told the jurors that their client was guilty, but then necessarily implied that Mr. Basham was nevertheless going to require them to sit through weeks of a trial. There is no reasonable possibility that this "strategy" worked to Mr. Basham's advantage.

The Government's attempts to justify the strategy based on defense counsel's consultation with Mr. Basham is of no consequence. Mr. Swerling made sure that the

record reflected that he had spoken to Mr. Basham, and that he agreed with the strategy. Such a statement on the record served no purpose other than to attempt to protect himself from an ineffective assistance of counsel claim. However, this apparent attempt to protect himself from future questioning of his "strategy" was of no legal significance. As a threshold matter, as is argued elsewhere in this Motion, Mr. Basham was not competent to stand trial, much less competent to weigh the relative merits of Mr. Swerling's proposed "strategy." More importantly, a criminal defendant cannot be forced to waive a claim of ineffective assistance of counsel. *See United States v. Craig*, 985 F.2d 175 (4th Cir. 1993). Finally, even if Mr. Basham disagreed with the strategy, it was too late. Counsel had already revealed during voir dire that, in their opinion, Mr. Basham had no defense to most of the charges against him, including the capital offenses. For example, Greg Harris stated in voir dire, "You are most likely going to get to the second part of the trial [the penalty phase], I will tell you that right now." (Tr. 9/08/04 at 89.) Thus, Mr. Swerling's attempts to protect himself were a legal nullity and irrelevant to the argument before this Court.

56

## CLAIM 10

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by ignoring their client's repeated requests to exit the courtroom immediately before an altercation between Mr. Basham and United States Marshal officers. In the alternative, the Court violated Mr. Basham's right under Rule 43(c) of the Federal Rules of Criminal Procedure to voluntarily absent himself from his trial.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham's trial attorneys rendered ineffective assistance of counsel when they ignored Mr. Basham's repeated requests to exit the courtroom immediately before an altercation with the United States Marshal officers, resulted in damaging penalty-phase testimony and evidence. Further, the Court violated Mr. Basham's right under Rule 43(c) of the Federal Rules of Criminal Procedure to voluntarily absent himself from his trial.

During trial, despite the fact that defense counsel had already conceded almost every charge against him, the Court ordered that Mr. Basham remain in the courtroom despite his requests to leave and watch the proceedings from a satellite monitor downstairs. Mr. Basham informed the Court that he did not feel good and pleaded with the Court to let him go lie down. (Tr. 9/20/04 at 148-50.) Defense counsel,

without asking for a moment to confer with his client and assess the situation, stated that he did not want Mr. Basham to leave the courtroom.[8]  (Tr. 9/20/04 at 149.)

As Mr. Basham spoke with the Court, he became agitated and began to rock side to side.  Although he made no aggressive movements towards the Court, his counsel,  or the United States Marshals, several Marshals grabbed Mr. Basham and forced him to the floor.  Once on the floor, Mr. Basham struggled with the Marshals for several minutes.  The altercation was videotaped and audiotaped and ultimately played for the jury in the penalty phase of Mr. Basham's case.  (Tr. 10/18/04 at 45; Trial Ex. 469B).  During closing the Government argued very negative inferences from the videotape.  They stated "it took six officers . . . to control Mr. Basham.  To . . . make sure he doesn't hurt himself or anybody else.  Six officers."  (Tr. 11/1/04 at 81).  Further, the Government argued that what was important about the incident was that it showed that Mr. Basham, rather than lacking the ability to control himself, planned the incident.  They argued that the altercation "demonstrate[d] lack of remorse."  (Tr. 11/1/04 at 81.)

Both the Court and defense counsel violated Mr. Basham's constitutional and statutory rights when they refused to permit Mr. Basham to leave the courtroom.  The

---

[8]*See* Claim 14, *infra*, for discussion of another incident in which Mr. Swirling called a defendant a "coward" for wanting to absent himself from the courtroom.

Government argues that this claim lacks merit because it requires 20/20 hindsight and ignores Mr. Basham's manipulation of events. The Government also argues that defense counsel had strategic reasons to want to keep Mr. Basham in the courtroom and that Rule 43 of the Federal Rules of Criminal Procedure may actually require a defendant's presence in a capital case. (Opp. at 47-49.) However, as illuminated below, these arguments lack support in caselaw or statute.

Federal criminal rule 43(c)(1)(A) contemplates that a defendant may voluntarily absent himself from his trial, "regardless of whether the court informed the defendant of an obligation to remain during trial." The Government concedes that the issue of whether a defendant may voluntarily absent himself from trial is unsettled. However, the Government fails to cite a single case to challenge the plain meaning of this rule or holding that a defendant (not the attorney purportedly acting on defendant's behalf) is barred from voluntarily absenting himself from court.

In *Near v. Cunningham*, 313 F.2d 929, 931-32 (4th Cir. 1963), the issue was whether absence at two in-chambers conferences violated petitioner's right to be present at every stage of the trial. The case does not state that petitioner himself waived his presence at that hearing and thus does not apply. Further, in *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), as the Government noted, the Fourth Circuit dodged the issue of whether a capital defendant could waive his presence at trial.

However, the Court acknowledged that "[a]t least one circuit has flatly held that intervening Supreme Court decision have established that waiver is possible in such cases. *See Campbell v. Wood*, 18 F.3d 662, 671-72 (9th Cir. 1994) (concluding that *Snyder*, 291 U.S. at 106, 117, and *Allen*, 397 U.S. at 342, by rejecting as 'mere dicta' earlier statements of non-waivability in, e.g., *Hopt* [*v. Utah*, 110 U.S. 574 (1884)] and *Lewis v. United States*, 146 U.S. 370 (1982), have rejected any such rule." *Id.* at 873 n. 3. Further, the Fourth Circuit has held that a petitioner was not denied his right to be present after he was removed for disrupting proceedings. *Bell v. Evatt*, 72 F.3d 421, 432 (4th Cir. 1995), *citing Illinois v. Allen*, 397 U.S. 337, 343 (1970). It defies logic that a Court can order a defendant from the courtroom and not violate their rights, but a defendant cannot voluntarily absent himself.

Defense counsel rendered deficient performance when they refused to advocate for their client's need to absent himself from the courtroom. Contrary to the Government's assertion that this claim relies on 20/20 hindsight, counsel and the Court were well aware of Mr. Basham's emotional, intellectual, and psychological deficits, as well as overriding competency issues. (Opp. at 48). It was not, as the Government claims, manipulation that drove Mr. Basham's altercation with the Marshals, but his "limited capacity" and incompetency interfering with his ability to "be calm enough to proceed." (Tr. 9/20/04 at 162.) Following the altercation, Dr.

60

Donna Schwartz-Watts examined Mr. Basham briefly and testified that she had "concerns about his competency." (Tr. 9/20/04 at 162-63.)  Due to Mr. Basham's state, and concerns for his competency, court was adjourned for the day, but only after the Government now had damaging evidence for the penalty phase.

Counsel, knowing that Mr. Basham's competency had been at issue at other points in the trial could have asked for a brief recess to speak with, or allow Dr. Schwartz-Watts to examine, Mr. Basham and determine his fitness and ability to remain in the courtroom.  However, they failed to do so and ignored Mr. Basham's pleas. Further, upon information and belief, defense counsel were not communicating with the client during courtroom proceedings (despite Mr. Basham's efforts to do so), so counsel could not reasonably argue that they needed Mr. Basham by their side to assist in his defense.  Accordingly, contrary to the Government's argument otherwise, there was no strategic or practical purpose that justified counsel's refusal to advocate their client's need to absent himself from the courtroom.

Counsel's and this Court's failure to listen to Mr. Basham's needs resulted in unquestionable prejudice.  Due to the failure to allow Mr. Basham to absent himself from the courtroom when he was not well, the jury was shown a damaging videotape at penalty phase, portraying Mr. Basham, at least in the minds of U.S. Marshal officers, as a violent criminal. Mr. Basham's rights were violated and grave prejudice

61

resulted.

<b>CLAIM 11</b>

**The Government engaged in misconduct when it failed to correct testimony of Sheriff Ronald Hewett that it knew to be false, in violation of its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The Government compounded this misconduct by relying on Sheriff Hewett's false testimony in its closing argument.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government engaged in misconduct when it failed to correct testimony of Sheriff Ronald Hewett that it knew or should have known to be false, in violation of its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The Government compounded this misconduct by seizing on Sheriff Hewett's false testimony to bolster its closing argument.

As a threshold matter, the Government argues that this claim should be dismissed because it is procedurally defaulted. However, they acknowledge that where a petitioner can show cause for, and actual prejudice from the default, he may raise the claim in federal habeas. *See United States v. Harris*, 183 F.3d 313, 317 (4th Cir. 1999). Here, because, as argued in Claim Twelve, *infra*, appellate counsel's performance fell below *Strickland*'s "objective standard of reasonableness,"

*Strickland*, 466 U.S. at 690, and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Wiggins*, 539 U.S. at 534 (*quoting Strickland*, 466 U.S. at 694), cause is established and the Court must review the merits of this claim. Mr. Basham is entitled to relief because the Government's use of Hewett's false testimony was not only improper, it prejudiced Mr. Basham "to such an extent as to deprive him of a fair trial." *United States v. Golding*, 168 F.3d 700, 702 (4th Cir. 2007).

The dual obligation of a federal prosecutor in our justice system is to "strike hard blows" but refrain from striking "foul ones;" to use legitimate means to attempt to secure a conviction without employing improper methods to do so. *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also United States v. Lamarr*, 75 F.3d 964, 968-69 (4th Cir. 1996). Their job is not "just to win, but to win fairly, staying well within the rules." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). Unfortunately, that did not happen here.

Prior to trial, the information that the Government had about the purse strap purportedly used to strangle Alice Donovan consisted of a Lieutenant Crocker's report documenting his interview with Sheriff Hewett (Exh. 2), a 302 report written by Agent Long, as well as the Grand Jury testimony of Agent Long. Agent Long's testimony was consistent with his 302 report that stated, "After FULKS raped her,

63

FULKS used a purse strap, which was approximately 18 inches long, and strangled Donovan." (Exh. 3). Crocker's report was more vague. It simply stated, "Basham indicated how the (victim's) pocketbook strap was used. (Sheriff Hewitt was able to determine that this meant the pocketbook strap was used to strangle the victim to death)." (Exh. 2). The report is specific however that Basham "demonstrate[d] visually how *he* threw the strap into the wood line at the cemetery." (Exh. 2). Finally, Hewett himself testified at the *Jackson v. Denno* hearing that Mr. Basham showed him the length of the purse strap, and how he threw it into the woods. Basham indicated by his motions that the strap was used to strangle Alice Donovan. (Tr. 2/25/04 at 66-67, 77-78).

The Government today argues that Hewett's testimony at the *Denno* hearing was "ambiguous," and that Basham's statements to other officers and Hewett were not mutually exclusive. (Opp. at 51, 53.) However, during the trial of Mr. Basham's co-defendant, Chad Fulks, the Government was decidedly unambiguous in their position on what Hewett's evidence showed. In Fulks's case, the defense sought to introduce Mr. Basham's "deer statement" as evidence that Fulks was not the actual killer. The Government vehemently argued against the statement's admission. In doing so, it specifically and clearly told the Court that Mr. Basham's use of the purse strap was to show that Fulks strangled Donovan. Specifically, the Government said

64

"[r]emember Sheriff Hewitt [sic] demonstrating how Brandon Basham said that Chad Fulks took the purse strap and strangled." (Fulks Tr. 6/22/04 at 255.) On the basis of this assertion, Fulks was precluded from using the deer statement at his trial. Inarguably, the Government's position at this point was not that Basham had made one statement to Hewett and another to other officers, as they now argue, but that Hewett's testimony, like Agent Long's, was that Basham said Fulks strangled Donovan. Tellingly, the Government makes no attempt to even address their characterization of Hewett's testimony at Fulks's trial in their Response to this claim.

The Government continues the "foul blows" to Mr. Basham's case by attempting to justify the its failure to correct Sheriff Hewett's trial testimony that Mr. Basham demonstrated how *he* used the purse strap to strangle Mrs. Donovan by arguing that it was consistent with the *Denno* hearing testimony. (Opp. at 51.) The Government cannot have it both ways. Either the Government misrepresented Sheriff Hewett's testimony to the Court at Fulks's trial, or they misrepresent it here. Agent Long's testimony and 302 report, and Hewett's *Denno* hearing testimony, all support the position the Government took in the Fulks trial, that Fulks, not Basham was the strangler. Only upon Hewett's incompatible testimony at Mr. Basham's trial did the Government change their position.

The Government had a duty to correct Hewett's false testimony. The United

65

States Supreme Court has long held that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio*, 405 U.S. 153 (*quoting Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). The jury depends on the truthfulness and reliability of witnesses to determine guilty or innocence of a defendant in any given case. *Napue*, 360 U.S. at 269. When a prosecutor allows false testimony to be presented to the court, either by encouraging it or by allowing the presentation of such testimony to go unchecked, it is a violation of due process. *Id.*

Hewett's testimony that Basham demonstrated how he strangled Alice Donovan was contradictory to his previous testimony at the *Jackson v. Denno* hearing. Further it was contrary to the Government's characterization of that testimony. This triggered a duty on the part of the Government. "When a prosecutor suspects perjury, the prosecutor has a duty to at least investigate. The duty to act 'is not discharged by attempting to finesse the problem by pressing ahead without a diligent and good faith attempt to resolve it.'" *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) (*quoting Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001)). A prosecutor cannot avoid their obligation to the truth by remaining "willfully ignorant." *Id*.

Counsel does not assert that the Government solicited the false testimony, and

66

it is unnecessary to prove that they did to support this claim. Simply allowing false testimony on a relevant issue to go uncorrected is sufficient to violate a defendant's rights. "A lie is a lie, not matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." *Napue*, 360 U.S. at 269-270.

It is also unnecessary to prove that the prosecutor knew the testimony was false. Rather, it is enough if the prosecutor "should have known." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994). If this standard is met, the conviction must be reversed if there is *any probability* that the evidence impacted the jury verdict. *Napue*, 360 U.S. at 269-272; *Giglio*, 405 U.S. at 154; *Agurs*, 427 U.S. at 103; *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Due process claims based on *Napue* are a subset of *Brady* violations. *Agurs*, 427 U.S. at 103-04. The false evidence must still be material to be reversible error, however the required showing of materiality is lower than a standard *Brady* claim because "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair." *Agurs*, 427 U.S. at 103. The Government, having previously argued that Sheriff Hewett's testimony was that "Brandon Basham said that Chad Fulks took the purse strap and strangled," cannot now feign that they should or could not have known the testimony was false. (Fulks Tr. 6/22/04 at 255). At a bare

67

minimum, the prosecution had a duty to resolve the conflict in the Hewett testimony.

The Government's reliance on Hewett's false testimony furthers the showing of prosecutorial misconduct. Failure to call the Court's attention to false testimony, and exploitation of that testimony in closing argument, is grounds for reversal. *See Brown v. Wainwright*, 785 F.2d 1457, 1458 (11th Cir. 1986) (granting habeas relief where prosecutor referenced false testimony in closing argument). Prosecutors are prohibited from actively participating in misleading jurors by capitalizing on false testimony. *See Tassin v. Cain*, 482 F.Supp. 2d 764, 773 (E.D. La. 2007) (noting that prosecutor's active participation in misleading jury following witnesses's testimony that gave jurors a false impression of the time witness was facing is the "sort of capitalization upon misleading testimony by the State [that] clearly runs afoul of *Napue* and *Giglio*"), *aff'd* 517 F.3d 770 (5th Cir. 2008).

The prosecutors in Mr. Basham's case engaged in prosecutorial misconduct and violated his due process rights as defined in *Napue*. However, rather than correct or attempt to resolve the false testimony presented, they exacerbated the error by seizing upon and using it to emphasize that Mr. Basham was the actual killer in closing argument. A prosecutor's knowing use of false testimony involves not "just" prosecutorial misconduct, but "more importantly . . . corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104. The standard for materiality

of false testimony is not onerous; only if there is "no reasonable likelihood" that the false evidence could "have affected the judgment of the jury" can error be denied. *Napue*, 360 U.S. at 271. Considering that the Government repeatedly used Hewett's trial testimony in closing argument, there can be no doubt it was material to both the guilt and penalty phases. (Tr. 9/29/04 at 81-82; Tr. 11/1/04 at 57, 62.) The Government's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Caro*, 597 F.3d 608, 624 (4th Cir. 2010).

The Government's conduct was not only improper, but it denied Mr. Basham a fair trial. The Government's assertion that the prosecutor's closing remarks were not intended to convince jurors that Basham alone killed Donovan defies logic, as does the contention that it was simply an "isolated remark taking up less than three lines in a 76-page closing." (Opp. at 54, 57). Although the closing argument passages are cited in both the § 2255 motion, and the Government's Response, they bear repeating here.

In summation at the guilt phase, the Government argued, "Sheriff Hewitt [sic] says he [Mr. Basham] didn't *say* I killed Alice Donovan. Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it." (Tr. 9/29/04 at 80) (emphasis added).) The importance of this evidence is revealed by the

69

Government's closing argument at the guilt phase:

> Ladies and Gentlemen, I wanted to finish with that because how would you go back in your jury room after listening to Sheriff Hewitt [sic] and after seeing Sheriff Hewitt [sic] demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled, how do you listen to Clifford Jay when Brandon Basham told you jurors . . . we killed them and find him not guilty of carjacking, resulting in death? And find him not guilty of kidnapping, resulting in death? I have been up here for two hours, and *the government submits those two witnesses and that limited testimony, alone, seals the deal.*

(Tr. 9/29/04 at 81-82 (emphasis added).)

In rebuttal closing argument the Government argued that, to conclude that Mr. Basham himself did not kill Alice Donovan, the jury would have to "disregard Sheriff Hewitt [sic] and disregard Mr. Jay." (Tr. 9/29/04 at 173.)

The Government continued to emphasize this damaging testimony during the penalty phase of Mr. Basham's trial:

> What does Mr. Basham say in the presence of Sheriff Hewitt [sic]? It is not really what he says, it is what he does. He is shackled, he describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt [sic] how Alice Donovan was strangled. And then he tells Sheriff Hewitt [sic], "I threw the purse strap into the woods" . . . . You saw Sheriff Hewitt [sic] stand up there and show.

(Tr. 11/1/04 at 57.) The Government referred to "Brandon Basham's strangling of Alice Donovan" in its closing argument (Tr. 11/1/04 at 57), going so far as to state that "he [Basham] killed Alice Donovan." (Tr. 11/1/04 at 62.)

There is no mention of Chad Fulks in these passages. There is no mention of

70

teamwork. Instead, there is the clear, unambiguous argument that Basham himself was the killer.[9] That argument relies *solely* on the testimony of Hewett that is in direct contradiction to the Government's position at Fulks's trial that Hewett testified that Basham showed how Fulks strangled Donovan. (Fulks Tr. 6/22/04 at 255.) At a bare minimum, the Government had a duty to reconcile the issue that Hewett's testimony was in direct conflict with not only his previous testimony, but their own characterization of it. Instead, the Government seized upon an opportunity to present damning evidence that "sealed the deal" to Mr. Basham's conviction and death sentence.

"[T]he duty of the United States Attorney [is] 'not simply to prosecute, but to do justice." *United States v. Smith*, 55 F.3d 157, 158 (4th Cir. 1995) (*quoting United States v. Weber*, 721 F.2d 266, 268 (9th Cir. 1983)). Upon information and belief, Mr. Basham alleges that the Government violated those responsibilities when they obtained his conviction through the use of false testimony. Sheriff Hewett's false statements were directly material to issues of both guilt and punishment in this case,

---

[9]Basham does not dispute the Government's statement that throughout closing argument there were various references to teamwork. However, these references were not with respect to the Sheriff Hewett testimony. The clear purpose of the Hewett testimony as the argument above makes clear, was to show that Mr. Basham was the hand that dealt the fatal blow. Without Hewett's testimony, the Government had no other evidence to support this element of their argument.

a fact that is demonstrated by the Government's use of those statements in its closing arguments at both the guilt and penalty phases. The due process requirements enunciated in *Napue* and *Giglio* mandate that Mr. Basham's convictions and sentences be vacated and that he be afforded a new trial.

## CLAIM 12

**Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of the Government's misconduct as a basis for reversal on direct appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys negligently failed to raise the issue of the Government's misconduct under *Napue*, 360 U.S. 264, and *Giglio*, 405 U.S. 150, in his direct appeal. Mr. Basham was prejudiced by his appellate attorneys' failure to raise this meritorious claim on direct appeal.

Mr. Basham was entitled to the effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 395-96 (1985) ("A first appeal as of right . . . is not

adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."). When assessing appellant counsel's performance, the *Strickland* standard applies. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). The Government argues that reviewing courts must give appellate counsel the "presumption that he decided which issues were more likely to afford relief on appeal." *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000). However, "[w]hile appellate attorneys should always attempt to winnow out their best issues for presentation to the courts, in a capital case, which by definition involves the ultimate society sanction, appellate attorneys must err on the side of inclusion, particularly when, as here, there exist a significant number of facts to support the claim." *Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001). Appellate counsel performs ineffectively when he or she fails to discover and brief non-frivolous issues. *Delgado v. Lewis*, 223 F.3d 976, 980-81 (9th Cir. 2000).

To demonstrate prejudice, a petitioner must show a reasonable probability that, but for appellate counsel's failure to brief the non-frivolous issue, he would have prevailed on appeal. *See Smith*, 528 U.S. at 285-86. Here, appellate counsel failed to raise an issue regarding evidence that the Government qualified as some of the strongest against Mr. Basham, both at guilt and penalty phase. This omitted issue was stronger than other issues presented and there was no reasonable justification for the

issues omission. *Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999) (analyzing whether omitted issues were "'significant and obvious'"); *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985) (noting that if "appellate counsel failed to raise a significant and obvious issue, the failure could be viewed as deficient performance").

As discussed *supra*, the testimony of Sheriff Hewett was not only contrary to all other reports and testimony previously in the record, it was also diametrically opposed to the Government's characterization of Hewett's prior testimony in a hearing to exclude evidence in Fulks's case. (Fulks Tr. 6/22/04 at 255). The testimony was characterized as "seal[ing] the deal" in Mr. Basham's case. (Tr. 9/29/04 at 81-82.) Appellate counsel should have been on notice that this testimony was of great import, and the contradictions in the record regarding Hewett's testimony were significant and obvious. There was no legal basis or strategic reason to fail to challenge this issue. *See Mapes*, 171 F.3d at 427-28*; Howard v. Gramley*, 225 F.3d 784, 790 (7th Cir. 2000) ("We deem performance insufficient when counsel omits a 'significant and obvious issue' without a legitimate strategic reason for doing so."). Accordingly, appellate counsel rendered ineffective assistance in not raising this claim on direct appeal, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. at 753-54; *Strickland*, 466 U.S. 668.

CLAIM 13

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to argue to the jury that Mr. Basham's post-arrest statements to law enforcement officers were involuntary.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

As Mr. Basham alleged in Claim 2 of the Motion, considerable evidence existed that his waiver of his *Miranda* rights and his statements to law enforcement officers were neither knowing, intelligent, nor voluntary. In Claim 13 of the Motion, Mr. Basham alleged that trial counsel rendered deficient performance in failing to argue to the jury the involuntariness of his statements to law enforcement. He further alleged that he was prejudiced by this failure.

In response, the Government advances essentially the same arguments that it made in opposing Claim 2, including its claim that, had trial counsel urged the unconstitutionality of Mr. Basham's post-arrest interrogation, the Court, in violation of Mr. Basham's Eighth Amendment rights, would have precluded them from arguing cooperation with law enforcement as a mitigating factor in the penalty phase. (*See* Opp. at 59-60.) Mr. Basham has already addressed the error in the Government's

75

reasoning in his reply to Claim 2, and will not restate the argument here.

The Government argues in the alternative that, even if the Court had permitted trial counsel to argue cooperation with law enforcement as a mitigating factor, they would have faced a "credibility problem" with the jury, "having made contradictory claims at the guilt and sentencing phases." (Opp. at 59.)  Once again, however, the Government overlooks the fact that, even though trial counsel failed to argue voluntariness to either the Court or the jury, they actually did *not* present cooperation with law enforcement as a mitigating factor at sentencing.  As Mr. Basham explained with regard to Claim 2,  trial counsel had long known that the Government intended to argue that Mr. Basham had in fact intentionally misled law enforcement with his post-arrest statements.  Accordingly, any attempt to argue cooperation as a mitigating factor would have been futile.  To suggest that trial counsel followed a reasonable "strategy" of not challenging the voluntariness of Mr. Basham's post-arrest statements in order to preserve the opportunity to make a penalty-phase argument they never intended to make defies common sense.

As it did with regard to Claim 2, the Government also argues that, even if trial counsel were deficient, Mr. Basham was not prejudiced because "there is no evidence that Basham's statements were involuntary."  (Opp. at 59.)  Of course, the Government's argument merely begs the question.  There is no evidence *in the record*

76

because trial counsel improperly failed to present it.  That is the essence of both Claim 2 and Claim 13.  Mr. Basham has raised a colorable claim of ineffective assistance of counsel and, at an evidentiary hearing on this claim, will present evidence of prejudice, specifically, evidence that a reasonably probability exists that, had trial counsel effectively represented Mr. Basham with regard to admission of his post-arrest statements, those statements would either have been precluded by the trial court or disregarded by the jury.

## CLAIM 14

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorney, Jack Swerling, was hindered by a personal conflict of interest.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government mistakenly assumes that, in alleging that Jack Swerling's representation of him was adversely affected by a personal conflict of interest, Mr. Basham is raising a claim akin to *Cuyler v. Sullivan*, 446 U.S. 335 (1980), or *Mickens v. Taylor*, 535 U.S. 162 (2002).  (*See* Opp. at 60.)  He is not.  *Sullivan* and its progeny concern situations in which an attorney has a conflict of interest stemming from joint representation of another criminal defendant.  In Claim 14, however, Mr.

77

Basham alleges that Mr. Swerling was rendered ineffective because of his personal conflict of interest arising from his role as a testifying victim in the trial of Jimmy Causey, a man who held Mr. Swerling and his family captive during a 2002 home invasion. Mr. Basham's claim must be adjudicated under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *See, e.g., Joiner v. Sec'y, Dept. of Corrections*, 2011 WL 5081145 at *5-6 (N.D. Fla. 2011) (discussing conflict of interest claims that do not involve dual representation). To succeed on this claim, Mr. Basham must – and can – demonstrate both deficient performance and prejudice.

In 2002, the same year of the crimes at issue in this case, Mr. Swerling and his family were held at gunpoint in their home by two masked men.[10] One of those men, Jimmy Causey, was a former client of Mr. Swerling. (Rep. Exh. 7 (Clif LeBlanc, *Swerling Tells of Being Terrorized*, The State, February 11, 2004).) Mr. Swerling began representing Mr. Basham in late April 2003. Less than one month later, Mr. Causey and his co-defendant where charged with the kidnapping of the Swerling family. (Rep. Exh. 8 (Clif LeBlanc, *2 Charged in Break-in at Area Lawyer's Home*, The State, May 15, 2003.).) Swerling spoke with a reporter for The State after the charges were announced. The article that followed conveyed the following:

---

[10]Apparently, the masks consisted of pantyhose the men had purchased from Wal-mart.

Swerling said he and his family are relieved by the arrests.

But the Swerlings don't live the same way anymore.

The lawyer who once sat at defense tables next to the most reviled killers in the state and the Midlands now carries a concealed gun.

The doors are locked, and no one goes outside alone.

"I have never felt vulnerable in my life before," Swerling said. "Now I have that sense that whenever I get out of the car, someone could be there. When I leave the house, someone could be there."

"That's not a good way to live."

(Rep. Exh. 8.)

The State of South Carolina's case against Jimmy Causey proceeded contemporaneously with the Government's case against Brandon Basham. As Mr. Swerling, the victim, prepared for the trial of his kidnapper, Mr. Swerling, the attorney, prepared for Mr. Basham's trial for kidnapping. On January 17, 2004, Swerling met with Mr. Basham at the jail. (Rep. Exh. 9.) At that meeting, Swerling wrote the following notes:

*[Defendant] now says statements are not voluntary*

1. *No medicine*

2. *Cigarettes – have to sign*

3. *Snacks – " " "*

4. *If you want to [eligible] – " " "*

79

> 5. *Help him if he told everything*
>    *Knew Chad was leader*
>
> 6. *He was coerced.*
>
> 7. *Admits he knew right to lawyer*
>
> 8. *Told him if you told the truth*
>    *would not be held against him,*
>    *only Chad – no charges*

(Rep. Exh. 10.) Especially when viewed in light of his intellectual disabilities and his history of psychological and emotional difficulties, Mr. Basham's statements to Swerling at the January 17 meeting would have lead a reasonable attorney to give serious consideration to a fully contested *Jackson v. Denno* hearing. Given that Swerling had moved for such a hearing only 18 days earlier (Dkt. 232), a reasonable attorney would have developed this evidence for the February 24 hearing. Swerling, however, had other matters with which to contend before the *Jackson v. Denno* hearing: On February 10, 2004, he testified as the victim in the state court kidnapping trial of Jimmy Causey. (Rep. Exh. 7.) Apparently, the crimes against Mr. Swerling and his family had received considerable press attention. The start of Mr. Causey's trial was delayed because more than half of the jury pool was already aware of the crime. (Rep. Exh. 11 (*Publicity Hinders Swerling Jury Choices*, The State, February 10, 2004.).)

On the same day that he spent more than two hours on the stand testifying about, among other things, being "terrorized" by the intruders during the kidnapping, Mr. Swerling billed 3.6 hours to Mr. Basham's kidnapping case. (Rep. Exh. 7 at 1; Rep. Exh. 9(Out-of Court Hourly Worksheet – Jack B. Swerling – February 2004).) On February 11, 2004, the second day of Mr. Causey's trial, and apparently the day that Mr. Swerling's wife testified about the home invasion, (*see* Rep. Exh. 7 at 2), Mr. Swerling logged 1.5 hours to Mr. Basham's case. (Rep. Exh. 9.) Mr. Swerling's attention, however, appears to have been on record review, rather than preparation for the *Jackson v. Denno* hearing. (Rep. Exh. 9.)

The jury reached its verdict in Mr. Causey's case on February 12, 2002. (Re. Exh. 12 (Clif LeBlanc, *Causey is Sentenced to Life Without Parole*, The State, February 13, 2004).) Not unlike Mr. Basham would do at various points during his trial, Mr. Causey attempted to absent himself from the courtroom that day. (*Id.*) A reporter for The State recounted what transpired next:

> The four-day trial ended unusually and dramatically.
>
> In a twist, Causey refused to stay in the courtroom to hear the verdict or be sentenced. He waited in a holding cell just outside Courtroom 2-A in the county courthouse.
>
> That triggered a courtroom eruption from Swerling, a defense attorney for 30 years.
>
> He called Causey a coward unwilling to face the consequences of his

81

crime.

Shouting and pointing a finger, Swering also berated the three public defenders who constituted Causey's team of lawyers.

He said the cross-examination of his 26-year-old daughter Wednesday was "disgraceful" and "gratuitous" because it implied [she] might have been involved by leaving doors unlocked, not being bound as tightly as her parents and other details of the crime, her father said.

"That defendant, Jimmy Causey, and his lawyers terrorized my family again," Swerling said loudly. As his anger grew, he began shouting, "You ought to be embarrassed."

The judge stopped him.

(Rep. Exh. 12.)   After Mr. Swerling's outburst, a family member of the defendant spoke about Mr. Causey's difficult life and his belief that "Causey was out of his mind when he committed the crime." (Rep. Exh. 12.)

The following day, February 13, 2004, Swerling received a stern order from the Court in this case rebuking the defense for failing to disclose medical and mental health records to Government doctors who were evaluating Mr. Basham pursuant to Rule 12.2 of the Federal Rules of Criminal Procedure. (Dkt. 307). Among other things, the Court order defense counsel to file a memorandum within 24 hours "explaining their failure to comply with the court's [previous] order" requiring that the records be disclosed. (Dkt. 307 at 2.) Swerling and Harris filed their response to the judge's order later that day. (Dkt. 310.) The next day, February 14, 2004,

82

Swerling met with Mr. Basham's family members and mitigation specialist, Paige Tarr, for 2.3 hours.  (Rep. Exh. 9.)

As noted previously, Mr. Basham's *Jackson v. Denno* hearing was scheduled to commence February 24, 2004.  Defense counsel met with the prosecution for approximately one hour on February 16, 2004, to discuss the hearing.  (Rep. Exh. 9.)  On the Friday before the hearing, the Government filed a 15-page memorandum arguing why Mr. Basham's statements were admissible.  (Dkt.   317.)   Defense counsel filed nothing.  The only evidence that Swerling gave any thought to the upcoming *Jackson* hearing was an email he sent to a federal trials listserve the Thursday proceeding the hearing.  The email read:

> has anyone every heard of this.?
> a lawyer challenges the voluntariness of a statement  in a jackson v denno- no allegation of coercion.the lawyer does not argue voluntariness before the jury.  does anyone think that the defense would be estopped from arguing later in the trial that the defendant tried to help law enforcement in mitigation ?

(Rep. Exh. 13.)

The *Jackson v. Denno* hearing in Mr. Basham's case took place twelve days after Swerling's outburst at the Causey trial in which he called the defendant "a coward unwilling to face the consequences of his crime."[11]  (Rep. Exh. 12.)  As is

---

[11]The media attention surrounding Mr. Swerling's testimony as a victim in the Causey trial continued throughout this period.  On February 25, 2004, The State ran

discussed in the Motion and previously in this Reply, defense counsel presented no evidence at the hearing in support of the suppression of Mr. Basham's post-arrest statements.

Mr. Basham has presented a colorable claim that Jack Swerling's personal conflict of interest rendered him ineffective in his representation of Mr. Basham and that Mr. Basham was prejudiced as a result. He is entitled to an evidentiary hearing on this claim.

-------

a letter to the editor, captioned "Swerling Walking in Victims' Shoes." The letter read:

> Not that I wish bad things to happen to people, but it's quite humorous to read that Jack Swerling, the trial lawyer who has spent the past 30 years defending criminals, is now having to where the shoes of a victim.

> One of his former clients is on trial for breaking into his house, holding his family at gunpoint and ransacking his Spring Valley home. Why didn't Mr. Swerling defend Jimmy Causey, the accused, this time? Maybe its because Mr. Swerling has a personal interest in this case and wants the guilty actually to be convicted instead of trying to get him off as he's done for 30 years. Mr. Swerling said, "I have a lot of anxiety about going through the trial." What about the anguish and anxiety all the victims and family members have suffered at the hands of his past criminal clients?

(Rep. Exh. 14.)

84

## CLAIM 15

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel in violation of 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when they failed properly to object to the admission of unfairly prejudicial prior act evidence during the guilt phase of Mr. Basham's trial. Appellate counsel similarly rendered ineffective assistance of counsel, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they not only failed to raise this issue on appeal, but in fact conceded the admissibility of evidence concerning the Burns kidnapping.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

At Mr. Basham's trial for the crimes against Alice Donovan, the Government presented, without objection, the testimony of eleven witnesses who testified solely about the disappearance of Samantha Burns. These witnesses included Ms. Burns's mother, father, brother, aunt, and two close friends. (*See generally* Tr. 9/17/04.) The witnesses testified, without objection, about their relationships with Ms. Burns, about Ms. Burns's personality, and about her plans for the future.

In his § 2255 Motion, Mr. Basham argued that no rational trial strategy could have justified trial counsel's failure to attempt to preclude or limit this highly prejudicial testimony. (Motion at 64.) The Government responds, however, that trial counsel "had a valid strategic reason" not to challenge the admission of the evidence:

85

"They used that evidence to advance their theory that Chad Fulks was the dominant figure in the pair's criminal activity." (Opp. at 67.) The Government fails to explain, however, how Ms. Burns's close relationships with her parents and her brother, her desire to have children by the time she was 25 years old, her "happy go lucky" personality, the "kinds of things that made her happy," or the fact that she never had the opportunity to live in the house her family had been building "advance[d] [the defense] theory that Chad Fulks was the dominant figure" in the crimes involving Alice Donovan.

In fact, the evidence discussed above could have had only one purpose: to impress upon the jury the tragedy of Samantha Burns's death and the devastating loss experienced by those who loved her. To whatever extent such evidence might have been relevant in a trial concerning Ms. Burns's disappearance, it was wholly irrelevant in a trial concerning Alice Donovan's disappearance. Yet, Mr. Basham's attorneys took no steps to preclude or limit the admission of this evidence, nor did they request that the jury be instructed about the very limited purpose for which evidence of Ms. Burns's disappearance was permissibly admitted.

Even if the Court had ruled that evidence of Samantha Burns's disappearance was admissible (either as intrinsic evidence or under Rule 404(b)) at Mr. Basham's trial in the Donovan case (a ruling which the Court was never called upon to make),

defense counsel nevertheless could have argued that the evidence be excluded or limited pursuant to Rule 403 of the Federal Rules of Evidence to avoid undue prejudice to Mr. Basham. *See United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992) (even intrinsic evidence may be excluded pursuant to Rule 403); *see also United States v. Davidson*, 449 F.3d 849, 853-54 (8th Cir. 2006) ("it certainly would have been reasonable for the district court to limit further the scope of the 'background' testimony based on the balancing test of Rule 403").

The Government argues that this evidence was not "unduly prejudicial" under Rule 403. (Opp. at 65-66.) This argument misses the mark, however. Although Mr. Basham disagrees with the Government's Rule 403 analysis, the issue now is not whether the evidence could have survived a Rule 403 balancing test, but rather whether Mr. Basham was prejudiced under *Strickland* by his attorneys' failure to ask the Court to conduct such a balancing test. To establish prejudice under *Strickland*, Mr. Basham need only establish a reasonable probability of different outcome. *See United States v. Higgs*, 663 F.3d 726, 740 (4th Cir. 2011). A "reasonable probability" is less than a preponderance of the evidence standard. *Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006). Mr. Basham submits that, had his attorneys presented the Court with an argument that Rule 403 warranted exclusion of much of the Samantha Burns evidence presented by the Government, a "reasonable probability" exists that the

87

Court would have agreed and limited the scope of the evidence. Moreover, given that the Court expressly asked trial counsel if they wanted a limiting instruction to be given to the jury (Tr. 9/15/04 at 291-92), it is almost a certainty that the Court would have given such an instruction.

**CLAIM 16**

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to request that this Court admit at the penalty phase of Mr. Basham's trial comments made by the Government at his co-defendant's trial concerning Mr. Basham's lesser culpability.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham was denied the effective assistance of counsel when his trial attorneys failed to request that this Court admit comments made by the Government at the co-defendant's trial concerning Mr. Basham's lesser culpability. But for counsel's errors, the result of Mr. Basham's trial would have been different.

There is no question that trial counsel recognized that the Government's statements in closing argument at the Fulks trial were helpful to their trial theme that Fulks was the leader and Mr. Basham was the follower. Counsel filed a notice that they intended to introduce "relevant factual assertions from the government's closing

argument" in the Fulks case pursuant to Federal Rule of Evidence 801(d)(2)(D). (Dkt. No. 724 at 1.) Of particular importance were statements that showed the division of leadership, such as "he [Fulks] is the leader . . . . Brandon Basham was a puppet, and Chad Fulks was pulling his strings throughout a lot of this crime spree." (Dkt. No. 724 at 9.) The Court agreed with the Government argument that it was not an appropriate time to rule and deferred the issue but the court made clear that defense counsel could re-urge the issue if it became clear that the Government had taken contrary position in Mr. Basham's and Fulks's cases. (Tr. 9/10/04 at 11.) Despite the explicit permission by the Court to do so, counsel never renewed the argument at any point during Mr. Basham's trial. There is no indication that Mr. Basham's counsel decided to abandon the motion to admit the statements for any strategic reason.

On direct appeal, Mr. Basham argued that this Court abused its discretion by preventing Mr. Basham from offering the Government's "puppet" statement. (App. Dkt. 181 at 77.) Counsel argued that the statement was "obviously admissible under the FDPA's permissive standard" pursuant to 18 U.S.C. § 3593(c). (App. Dkt. 193 at 54.) The Government responded that, because Mr. Basham's trial counsel never renewed the motion despite the Court's statement that it would "take a time out" after the completion of the Government's case to consider the issue, Mr. Basham's

attorneys failed to preserve the claim for appellate review. (App. Dkt. 180 at 114.) The Fourth Circuit held that the argument was waived because defense counsel never actually moved for the statements' admission, and thus failed to request that the Court rule on the admissibility of the evidence. *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009).

Contrary to the Government's assertion, had defense counsel re-urged admission of the puppet statement, the Court should have admitted it. As argued in Claim 23, *infra*, the Government argued inconsistent theories at Mr. Basham's and Fulks's trials. While the Government takes the position that they argued consistent theories of teamwork, they also told the jury in Fulks's case that Fulks was the mastermind and Mr. Basham "the puppet." (Fulks Tr. 6/29/04 at 66). Further, they argued, "Brandon Basham is so stupid, he will do anything." (Fulks Tr. 6/29/04 at 66). At Fulks's trial, they argued to the jury that Fulks "intentionally killed Alice Donovan." (Fulks Tr. 6/22/04 at 171). Meanwhile, in Mr. Basham's case, the Government argued that Basham was the hand that dealt the fatal blow, stating, "It is not really what [Basham] says, it is what he does." (Tr. 11/1/04 at 57.) The Government also asserted, "He [Basham] killed Alice Donovan." (Tr. 11/1/04 at 62.)

This was precisely the type of "inconsistent" position this Court indicated would be relevent to its determination of whether or not the statements were

90

admissible. (Tr. 9/10/04 at 11.) At a minimum, the statements that Fulks was a leader and that Mr. Basham was "a puppet" and stupid should have been admitted under Federal Rule of Evidence 801(d)(2)(D). Rule 801 (d)(2)(D) concerns the admissibility of statements of a party opponent. Such statements are not hearsay. They are "excluded from this definition on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions fo the hearsay rule." 117 A.L.R. Fed. 599 § 2. Here, the statements were made and adopted by Mr. Basham's party-opponent, and were subject to admission.

Contrary to the Government's assertion that its statements regarding Mr. Basham's lesser culpability in Fulks's trial were not admissible because what lawyers say in opening statements and closing arguments is not evidence, "a clear and unambigous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party." *United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986). Admissions by defense attorneys in opening statements have been held to eliminate the need for additional proof of an element of the offense. *United States v. McKeon*, 738 F.2d 26, 30 (2nd Cir. 1984) (*citing Dick v. United States*, 40 F.2d 609, 611 (8th Cir. 1930); *Chaffee v. Kraft Gen. Foods*, 886 F. Supp. 1164, 1168 (Dist. N.J. 1995)).

In *McKeon*, the Second Circuit was faced with the question of whether a

criminal defendant's attorney's "seemingly inconsistent statement at an earlier trial [could be used] to prove that fundamental portions of the defendant's case [were] fabricated." *Id.* at 30. The court held that such statements were not *per se* inadmissible. "To hold otherwise would not only invite abuse and sharp practice, but would weaken confidence in the justice system itself by denying the function of trials as truth seeking proceedings. That function cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of facts within their personal knowledge between trials and to conceal these changes from the final trier of fact." *Id.* at 31.

Contrary to the Government's argument, this was not mere "[s]peculation[] of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the [opponent's]case or invitations to a jury to draw certain inferences." (Opp. at 70, *quoting McKeon*, 738 F.2d at 33.) Referring to Mr. Brandon as a puppet in one trial and co-equal in the other was precisely the type of harm admission of party opponent statements seeks to remedy. *See McKeon*, 738 F.2d at 31 (noting that guidance is found in the civil arena where a party may not "advance one version of the facts in its pleadings, conclude that its interest would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief the trier of fact will never learn of the change in stories). As argued more fully in Claim 23, the

Government presented inconsistent theories in Mr. Basham's and Fulks's cases. They exacerbated that harm when, although they said Mr. Basham was a puppet in the Fulks closing argument, they described him as a equal partner in his own case. Here, the Government, deciding that they were better served by denying that Mr. Basham was a follower, advanced a different version of the facts and the trier of fact never knew otherwise, violating Mr. Basham's right to a fair trial.

Contrary to the Government's argument, had trial counsel re-urged the issue of admission of the Government statements during the Fulks closing argument, the result of Mr. Basham's trial undoubtedly would have been different. As a result of the Government's inconsistent theories in the two trials, the statements in the Fulks case should have been admissible. The jury, hearing that even the prosecution characterized Mr. Basham as a "puppet," would likely have given more credence to the argument that Mr. Basham played a minor role in the crimes. Absent this characterization, not a single juror found the Minor Participant statutory mitigator. (Dkt. 805 at 6.) Even if the Government is correct that Fulks's role as a leader does not make Basham a minor participant (Opp. at 72), it was certainly relevant to the non-statutory mitigating factor that Basham played a *lesser* role that Fulks, which no jurors found. (Dkt. 806 at 7, factor 1.) Additionally, because the Government argued about how "stupid" Mr. Basham was in Fulks's trial, additional statutory mitigating

93

factors such as impaired capacity (only four jurors found) and whether Basham committed the offense under severe mental or emotional disturbance (only one juror found) would have been more powerful.  (Dkt. 805 at 6.)  Non-statutory mitigating factors that (1) Basham showed signs of neurological damage that inhibited his ability to process information and inhibit impulses (one juror found); (2) Basham suffered from dementia (one juror found); (3) Basham's IQ scores were in the low 70's (no jurors found); and (4) Basham was easily influenced and led by others (four jurors found), might have been more accepted if the jurors knew that the Government characterized Basham as "stupid" and a "puppet."  (Dkt. 806 at 7-9.)

Under the circumstances discussed above, there is a reasonable likelihood that, absent trial counsel's error, the result would have been different.  *See Strickland*, 466 U.S. at 694.  Even if the Court had ruled against Mr. Basham, the issue would have been preserved for appellate review.  Trial counsel's failure to re-urge the motion meant that even plain error review was unavailable.  *Basham*, 561 F.3d at 335. "*Strickland* is not always fastened to the forum in which counsel performs deficiently; even when it is *trial* counsel who represents a client ineffectively in the *trial court*, the relevant focus in assessing prejudice may be the client's appeal."  *Davis v. Secretary for Department of Corrections*, 341 F.3d 1310, 1315 (11th Cir. 2003) (finding ineffective assistance of counsel where trial counsel raised, but failed to re-

urge the issue at the close of voir dire as required by Florida law, and thus failed to preserve the issue for appeal). Here, due to deficient performance of trial counsel, Mr. Basham was denied his right to effective assistance of counsel.

## CLAIM 17

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel (a) failed effectively to cross-examine a key Government witness; (b) failed to call rebuttal witnesses to challenge the Government witness's testimony; and (c) failed to respond to the Government's argument concerning the witness's testimony.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham was denied the effective assistance of counsel guaranteed by when his trial counsel (a) failed effectively to cross-examine a key Government witness; (b) failed to call rebuttal witnesses to challenge the Government witness's testimony; and (c) failed to respond to the Government's argument concerning the witness's testimony. No sound strategy existed to explain such failures.

Near the close of guilt phase, Clifford Jay, a former teacher's aide, testified on direct examination that, on Christmas Eve, 2002, Mr. Basham called him from jail and told him that he was "in a lot of trouble." (Tr. 9/27/04 at 224-28.) Mr. Jay asked,

95

"Did you do – I just want to know if you did what they said you did?," to which Mr. Basham allegedly replied, "Yes, sir.  We killed them." (Tr. 9/27/04 at 228.)  Mr. Jay subsequently reported the conversation to law enforcement. (Tr. 9/27/04 at 229, 235.)

On cross-examination, Mr. Swerling questioned whether Mr. Basham in fact told Mr. Jay, "We killed *her*." (Tr. 9/27/04 at 238 (emphasis added).)  Mr. Jay adamantly denied that this was the case.  Mr. Jay said the Madisonville officer he reported the statement to had been his good friend over the years, but he then claimed not to remember his name.  (Tr. 9/27/04 at 235.)  Mr. Swerling refreshed Mr. Jay's memory that the person he spoke with from the sheriff's department was David Morris.  Mr. Swerling also questioned whether Mr. Jay had spoken with a Detective Addison from Myrtle Beach.  Mr. Jay affirmed that he had spoken with a Myrtle Beach officer, but Jay could not recall his name.  (Tr. 9/27/04 at 239.)

The next day, during argument on the Rule 20 motion, the Court asked defense counsel, "What about the essentially unchallenged statement 'we killed them'?" The Court charged that there was no evidence to support the cross-examination question about whether Mr. Basham had in fact said "her" instead of "them," "wondered at the time if we were going to hear from those police officers," and questioned whether there was "a good-faith basis for asking a question like that." (Tr. 9/28/04 at 7-8.) Defense counsel argued the good faith basis for the question was that the defense

96

team had confirmed with both of the officers that Mr. Jay never told them about Mr. Basham's supposed reference to "them." however, that the defense had "opted not to present it at this stage of the trial," but possibly would at penalty phase. (Tr. 9/29/04 at 9.) Defense counsel never called David Morris or Detective Addison.

Counsel's failure to impeach a key government witness with prior inconsistent statements denied the jury the ability to "independently judging the merits of the case" and constituted ineffective assistance of counsel. *United States v. Campbell*, 616 F.2d 1151, 1152 (9th Cir. 1980). The Government asserts that failure to impeach Jay and call the officers was the result of a strategic decision, as doing so would have only highlighted Basham's involvement, the officers might not have had as clear a memory as Jay, and Jay had no motivation to harm Basham. However, Jay had more of a history with Mr. Basham than just being a "father figure" as the Government claims. (Opp. at 76). Mr. Basham was expelled from school when Jay was his teacher's aid because when Jay startled him by trying to wake him up, Mr. Basham pulled a knife on him. (Tr. 10/22/04 at 133-34.) Further, Mr. Basham's involvement was already highlighted by the numerous witnesses that testified about his actions in the case. Calling two additional police officers who could have case doubt on one of the most damaging statements in Mr. Basham's case and at worst would have given testimony that was merely cumulative cannot be excused on the basis of any strategy.

97

The failure to impeach a key government witness with prior inconsistent statements constituted ineffective assistance of counsel. *See Driscoll v. Delo*, 71 F.3d 701, 710 (8th Cir. 1996) (finding "no objectively reasonable basis on which competent defense counsel could justify a decision not to impeach a state's eyewitness whose testimony . . . took on such remarkable detail and clarity over time"). Defense counsel failed to call witnesses to rebut Clifford Jay's testimony or even to address Jay's testimony in closing argument. The Government seized upon this failure: "And as far as who the actual killer is . . . . [w]hat didn't Mr. Swerling talk to you about? . . . . He didn't mention anything about Brandon Basham reaching out to Mr. C.J., to Clifford Jay on Christmas Eve, December 2003 [sic], saying, 'We killed them.'" (Tr. 11/1/04 at 170.) The Government continued, "'We killed them.' What more do you need as far as his involvement. His own words . . . ." (Tr. 11/1/04 at 171.) When counsel "fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *United States v. Cronic*, 466 U.S. 648, 659 (1984). Here, counsel inexplicably failed to subject testimony that the Government argued was one of two pieces of evidence that "seal[ed] the deal" on Mr. Basham's guilt to any meaningful adversarial testing. (Tr. 9/29/04 at 82 ).

Reasonably competent defense counsel would have realized how devastating this testimony was to Mr. Basham. Yet, despite having the ability to do so, defense counsel failed to rebut this testimony with the testimony of Officer Morris and Detective Addison. Such questioning is standard practice in challenging a witness's credibility. *See Jenkins v. Anderson*, 447 U.S. 231, 239 (1980) ("Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." (*quoting* 3A J. Wigmore, Evidence § 1042, p. 1056 (Chandborne rev. 1970)). Hearing two law enforcement officers testify that Jay did not tell them what he claimed would have, at a bare minimum, softened the blow of that testimony.

Given how important Mr. Jay's testimony was to the Government's case against Mr. Basham, there was simply no strategic or objectively reasonable basis to fail to call the rebuttal witnesses, or in any way challenge Jay's statement. Even if defense counsel had not realized how damaging the testimony would be in the guilt-phase, after hearing Mr. Jay testify, and hearing its central role in the Government's guilt phase closing argument, the failure to call the officers during penalty phase, as counsel had claimed he might, was inexcusable and fell below accepted standards of performance of counsel.

The record plainly shows prejudice. As the Government recognized, Clifford

99

Jay's testimony was devastating to Mr. Basham's case and argued that it, coupled with the Hewett testimony, was enough to convict Mr. Basham. The verdict form indicates that not a single juror found the Minor Participation mitigating factor. (Dkt. 805 at 6.) Defense counsel's failure to call witnesses to rebut Clifford Jay's testimony or even to address Jay's testimony in closing argument was a failure that tipped the balance in favor of a death verdict, and without such failure "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. Counsel "failed to render reasonably effective assistance" and that failure resulted in the "denial of fundamental fairness." *United States v. Elksnis*, 528 F.2d 236, 337 (9th Cir. 1975).

## CLAIM 18

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel failed effectively to cross-examine Sheriff Ronald Hewett, in fact elicited damaging testimony from Hewett, and then failed to mitigate the damage caused by his deficient cross-examination of Hewett.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

100

Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel failed effectively to cross-examine Sheriff Ronald Hewett. Defense counsel's cross-examination was deficient because it elicited damaging testimony from Hewett, and failed to mitigate the damage.

As discussed *supra*, Sheriff Hewett testified at the *Jackson v. Denno* hearing in Mr. Basham's case. Hewett testified that he walked off alone with Mr. Basham and that Mr. Basham then demonstrated how Alice Donovan was killed with the purse strap, as well as how he threw the strap into the woods. (Tr. 9/27/04 at 53; Tr. 2/25/04 at 66.) Although the Government now claims this testimony is ambiguous, at the Fulks trial they characterized it as Basham demonstrating how Fulks strangled Alice Donovan. (Fulks Tr. 6/22/04 at 255).

The other evidence concerning the purse strap consisted of a report of Lieutenant Crocker's interview with Hewett that contained no reference to who killed Donovan (Exh. 2) and an FBI "302" report prepared by Agent Jeffrey Long noting that Basham's attorney, Littlejohn, conveyed to law enforcement that "[a] purse strap was used by FULKS to strangle DONOVAN. BASHAM threw the purse strap out of the window of the BMW as they left the cemetery." (Exh. 3.)

101

At Basham's trial, Hewett, contrary to all other evidence and his own prior testimony, stated during cross examination that Mr. Basham had demonstrated how *Basham* had strangled Donovan. (Tr. 9/27/04 at 53-54). Defense counsel responded only:

Q.    Your notes [sic], nor Lieutenant Crocker's notes say that he did that; isn't that true?

A.    That is true because he didn't say. He showed.

(Tr. 9/27/04 at 53-54.)

"The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witness against him.'" *Davis v. Alaska*, 415 U.S. 308, 316 (1974). More than just physical confrontation, "our cases 'construing the (confrontation) clause hold that a primary interest secured by it is the right of cross-examination.'" *Id.* at 315. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* Here, counsel failed to meaningfully test Sheriff Hewett's testimony and deprived Mr. Basham of his right to confrontation and effective assistance of counsel. Counsel did not confront Hewett with any of the prior evidence or testimony regarding the purse strap. Exacerbating the deficient performance in his cross examination of Hewett, defense counsel failed to ask Agent Long any questions about the notation in his 302 report that Fulks, not Basham, had wielded the purse strap. (Tr. 9/27/04 at 186-210.)

102

In sum, counsel failed to mount any challenge at all to Hewett's damaging testimony.

Eliciting damaging evidence without sound strategy "falls well below an objective standard of reasonableness." *See White v. McAninch*, 235 F.3d 988, 997-98 (6th Cir. 2000). The Government contends that counsel could not have questioned Long about the statement in his report that Fulks killed Donovan because it would be double hearsay. The Government forgets the basic bright line rule of evidence that hearsay is admissible if one of the Federal Rules of Evidence exceptions applies. Here, there would be an exception for each level of hearsay. Mr. Basham's statement would be deemed an admission against interest, provable against him as an exception of the hearsay rule. Fed. R. Evid. 804(b). Although Basham stated that Fulks killed Donovan, he admitted to his participation in her kidnapping and proximity to her murder. Fulks's statement could be admitted under multiple theories. First, because the Government's position was that Fulks was "a coconspirator of a party during the course and in furtherance of the conspiracy," his statement would be an admission by a party-opponent and thus not hearsay at all. Fed. R. Evid. 801(d)(2)(E). If hearsay, Fulks's statement could be deemed an admission against penal interest. Fed. R. Evid. 804(b). Finally, the United States Supreme Court has recognized that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."

103

*Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). There is no question defense counsel *could* have questioned Long about the statements. Failure to do so compounded the deficient performance of counsel's failure to effectively cross-examine Hewett.

No sound strategy existed for asking Sheriff Hewett the question that resulted in the damaging testimony, nor failing to challenge it with Hewett directly or by calling it into question by asking Long about the statements in his 302 report that Fulks strangled Donovan. Given that Government contends that to do so would have only been more damaging. As the Government took Hewett's testimony and argued that Basham was the actual killer: ("Sheriff Hewitt [sic] says he [Mr. Basham] didn't *say* I killed Alice Donovan. Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it.") it is hard to imagine how anything else Hewett said could have been worse. (Tr. 9/29/04 at 80 (emphasis added).) Hewett's testimony already allowed the Government to argue that Basham was the hand that dealt the final blow. The argument that Long's report would have only emphasized how many times Basham changed his story is also insufficient strategy. At the very least, counsel needed to call into doubt statements that Basham was the killer. Even if the jurors found the statement to be inconsistent, it was better than the only, unchallenged statement before them that Basham was the killer. Such testimony

104

would have been significant to Basham's case because it could have cast doubt on Hewett's unchallenged testimony.

Finally, contrary to the Government's arguments otherwise, Mr. Basham suffered prejudice as a result of counsel's deficient performance. As discussed more fully in Claim 1, *supra*, even the Government acknowledged that the Hewett testimony, elicited and unchallenged by defense counsel, was one of the most important pieces of evidence against Mr. Basham. It was the only item of evidence or piece of testimony that allowed the Government to stray from the "team" argument and persuade the jury that Basham himself was the killer. Due to counsel's failure to effectively cross-examine witnesses, the Hewett testimony remained unchallenged. This unchallenged testimony deprived Mr. Basham of a fair trial because "the actions [or inactions] of his attorney precluded the fact-finder from independently judging the merits of the case." *United States v. Campbell*, 616 F.2d 1151, 1152 (9th Cir. 1980). Without the Hewett testimony, and with Long's testimony that Basham told him Fulks was the killer, there is a reasonable probability the result would have been different. *Strickland*, 466 U.S. at 694.

CLAIM 19

**Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when they failed adequately to investigate, develop, and present mitigating evidence at the penalty phase of Mr. Basham's trial.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Counsel for Mr. Basham filed his § 2255 Motion on May 31, 2011. (Dkt. 1393.)  As the Court is aware, since that time the parties have been involved in litigating issues surrounding Mr. Basham's competency to waive this proceeding. Defense resources and time have been devoted almost exclusively to that critical issue since the Motion was filed.  Counsel anticipate that the matter of Mr. Basham's *pro se* attempt to terminate this proceeding will be resolved by the pleading ordered by this Court to be filed no later than March 10, 2012 (*see* Dkt. 1460), and that this proceeding will proceed unabated.  Nevertheless, at this time, counsel for Mr. Basham are unable to provide more factual information in reply to the Government's opposition to Claim 19.  Counsel stand by the arguments raised in the § 2255 Motion and will supplement those arguments as soon as is practicable.

Mr. Basham, however, does address the following aspects of Claim 19 and the

106

Government's response to that claim. First, although Claim 19 asserts ineffective assistance of counsel for failure to investigate and present evidence of mental retardation, the broad language of 18 U.S.C. § 3596(c) plainly indicates that, regardless of whether Mr. Basham is able to satisfy the deficient performance prong of *Strickland* with regard to trial counsel's failure adequately to pursue mental retardation as a constitutional bar to Mr. Basham's death sentence, if he can now prove that he is mentally retarded, the Government may not execute him. The statute's proscription is clear: "A sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c).

Second, the Government misconstrues the standard for demonstrating significant impairment in adaptive skills, one of the three prongs of an MR diagnosis. Specifically, the Government erroneously focuses on random skills allegedly demonstrated by Mr. Basham as proof that he does not have deficits in adaptive behavior. (*See* Opp. at 82.) The American Association on Intellectual and Developmental Disabilities (AAIDD), formerly known as the American Association on Mental Retardation (AAMR),[12] which is the principal professional organization in the field of mental retardation, has propounded and refined the definition of mental

---

[12]Because the AAIDD was known as the AAMR during the period in which it published the materials Mr. Basham references in this Reply, he will refer to the organization as the AAMR.

retardation for many decades. *See* James W. Ellis, *Mental Retardation and the Death Penalty: A Guide to State Legislative Issues*, 5 (2002) (hereinafter "Ellis"). In 2002, the AAMR refined its definition of mental retardation to read: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports*, at 1 (10th ed. 2002).[13]

The AAMR identifies five assumptions that are essential to the application of its definition of mental retardation. One of these five essential assumptions provides that "[w]ithin an individual, limitations often coexist with strengths." *Id. Accord*

---

[13]The American Psychiatric Association's definition of mental retardation is similar:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant *limitations* in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

*Diagnostic and Statistical Manual of Mental Disorders* 39 (4th ed. 2000) (emphasis added).

Caroline Everington & Denis W. Keyes, *Mental Retardation: Diagnosing Mental Retardation in Criminal Proceedings: The Critical Importance of Documenting Adaptive Behavior*, The Forensic Examiner 31, 32 (July/Aug. 1999) ("adaptive limitations often coexist with strengths in other adaptive skills and personal capabilities."). This assumption is critical because mental retardation is concerned with *limitations* in adaptive behavior. The presence of adaptive behavior skills does not preclude a finding of mental retardation. Stated differently, because the definition of mental retardation incorporates strengths as well as limitations, any diagnosis of mental retardation must be confined to the existence of adaptive *limitations*:

> The focus in evaluations (and ultimately adjudications) under the adaptive prong must remain focused on the individual's *limitations* rather than any skills he or she may also possess. AAMR and other clinical experts emphasize that the presence of skills cannot preclude the appropriate diagnosis of mental retardation. In the most recent edition, the definition of mental retardation is prominently accompanied by the admonition that "Within an individual, limitations *often* coexist with strengths." AAMR, *Mental Retardation* (2002), *supra* note 17, at 1 (emphasis supplied). *Accord* AAMR, *Mental Retardation* (1992), *supra* note 16, at 1 ("Specific adaptive limitations often coexist with strengths in other adaptive skills or other personal capabilities."). The skills possessed by individuals with mental retardation vary considerably, and the fact that an individual possesses one or more that might be thought by some laypersons as inconsistent with the diagnosis (such as holding a menial job, or using public transportation) cannot be taken as disqualifying. The sole purpose of the adaptive prong of the definition for the

> criminal justice system is to ascertain that the measured intellectual impairment has had real-life consequences, and thus it is the presence of confirming deficits that must be the diagnostician's focus.

Ellis, *supra*, at 8 n.25 (emphasis in original).

Accordingly, the Government's discussion of Mr. Basham's alleged "skills," (Opp. at 81), is irrelevant to the issue of whether or not he suffers from mental retardation.

Third, concerning the issue of trial counsel's failure adequately to investigate and present evidence that Mr. Basham suffered from Fetal Alcohol Spectrum Disorder (FASD), the Government argues that Mr. Basham cannot demonstrate *Strickland* prejudice because an FASD diagnosis would have convinced the jury that Mr. Basham "could not control his behavior" and that the evidence would have "created greater concerns about his future dangerousness." (Opp. at 87.) The Government, however, minimizes the import of this evidence and ignores the jury's finding that Mr. Basham *did not* present a risk of future dangerousness, despite the Government's heavy focus on this alleged non-statutory aggravating factor at trial. (Dkt. 805 and 806.) It likewise ignores the fact that on Count 1 (Carjacking) half of the jurors found that Mr. Basham's "capacity to appreciate the wrongfulness of his conduct" was impaired, and that on Count 2 (Kidnapping), four jurors made this finding. (*Id.*)

110

The term "Fetal Alcohol Spectrum Disorder" refers to the variety of abnormal features that can occur in children exposed to alcohol *in utero*.[14] "Patients with FASD are often described as having poor judgment, failure to consider consequences, and poor planning and organizational skills as well as poor impulse control and decision-making skills." Ann Streissguth and Kieran O'Malley, *Neuropsychiatric Implications and Long-Term Consequences of Fetal Alcohol Spectrum Disorders*, Seminars in Clinical Neuropsychiatry, Vol. 5, No. 3, July 2000, at 179. These behavioral difficulties are the result of alcohol's toxic effect on the fetus's developing brain. *See id.* at 180. *See also Regina v. J. (T.)*, 1999 Carswell Yukon 99, [1999] Y.J. No. 57 ("The cognitive processes that people use to regulate their conduct and to adapt to their social environment are located primarily in the anterior frontal lobe of the brain. The effect of alcohol on the fetal brain is such that this region does not develop sufficiently to allow the person afflicted with FAS to appropriately control his or her actions.").

As one study of teenagers with FASD found, "[t]he most significant problems were a lack of impulse control and bursts of aggression. The children seemed not to

---

[14]FASD is "an umbrella term that refers to the full range of prenatal alcohol-induced impairments." This term subsumes previous diagnostic categories such as Fetal Alcohol Syndrome ("FAS"). Timothy E. Moore and Melvyn Green, *Fetal Alcohol Spectrum Disorder (FASD): A Need for Closer Examination by the Criminal Justice System*, Criminal Reports, Vol. 19, Pt. 1, July 2004, at 1.

realize the consequences of their own behavior and demanded much more attention than normal children." Streissguth and O'Malley at 181. These issues do not disappear once a person with FASD reaches adulthood. Rather, "[g]estational exposure to alcohol can cause a wide spectrum of disabilities that have lifelong physical, mental, and behavioral implications." *Id.* (internal citation omitted); *see also* Timothy E. Moore and Melvyn Green, *Fetal Alcohol Spectrum Disorder (FASD): A Need for Closer Examination by the Criminal Justice System*, Criminal Reports, Vol. 19, Pt. 1, July 2004, at 1 ("FASD is a lifelong disability; one does not 'outgrow' it.").

Had trial counsel fully investigated and presented the effects of Mr. Basham's *in utero* exposure to drugs and alcohol, a reasonable probability exists that other jurors would have been convinced that his "capacity to appreciate the wrongfulness of his conduct was impaired" and would have weighed this mitigating factor in deciding between life and death.

**CLAIM 20**

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorneys failed to assemble a competent capital defense team.  In the alternative, Mr. Basham was denied the effective assistance of counsel under the above provisions because his attorneys failed adequately to supervise the team they had assembled.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham was denied effective assistance of counsel when his attorneys assembled a defense team riddled with personal problems, conflicts of interest, and ineffective performance.  Counsel failed to recognize these issues and failed in their duties properly to supervise and manage their capital defense team.  Accordingly, their performance fell below the professional norm in violation of Mr. Basham's rights.

Given the "severity and irrevocability of a death sentence, extradordinary obligations are placed on counsel to prepare and try such a case." *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. 1117, 1120 (2003). One of the chief obligations was that Mr. Basham's defense counsel had the duty "to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to

113

facts relevant to the merits of the case and the penalty in the event of conviction."
*Rompilla*, 545 U.S. at 387; *see also Buckner v. Polk*, 453 F.3d 195, 215 (4th Cir. 2006) (Gregory, J., concurring in part and dissenting in part).  In order to do so, counsel had to assemble a competent capital defense team.

Beyond the two attorneys, the other "core members of the defense team are the investigator and mitigation specialist."  *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. at 1123.  Rule 5.3 of the ABA Model Rules of Professional Conduct attributes to the attorney responsibility for the conduct of an investigator, mitigation specialist, or any other non-lawyer working with the lawyer.  The lawyer must ensure that the non-lawyer's work and conduct are "compatible with the professional obligations of the lawyer."  ABA Model Rule 5.3(b).  The lawyer has a duty to supervise, and is responsible for the conduct of those working for him.  ABA Model Rule 5.3 (c).  In this case, counsel failed in their duties to properly choose and supervise core members of the defense team.

### A.     Investigator Carlisle McNair

"A skilled and trained investigator is an essential member of the core team in capital cases." *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. 1125-26, *citing* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.5 (C)(2)(a) (rev. ed. 2003) (hereinafter Guidelines)).  Soon after

114

their appointment to Mr. Basham's case, defense counsel identified Carlisle McNair, a "retired" former captain from the Lexington County Sheriff's Office, to be the "overall coordinator of the investigation." (Tr. 8/28/03 at 3.)  As coordinator of the investigation in Mr Basham's capital case, McNair was required to "thoroughly investigate the charged capital offense and any other offense charged in the case regardless of any statement or admission made by the client or evidence of overwhelming guilt. *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. at 1126. Unfortunately for Mr. Basham, McNair was a woefully inappropriate choice.

Mr. McNair, who professed to be a retired law enforcement officer, had in fact resigned from his prior post following several instances of misconduct, as well as inappropriate behavior of a sexual nature.  As a result of internal affairs investigations, McNair was relieved from his position as Headquarters' Region Commander at the Lexington County Sheriff's Department and demoted to the rank of lieutenant.  He also was placed on probation for six months and suspended from duty for one pay period.  (Exh. 4.)  On October 14, 2002, McNair resigned from Lexington County.  (Exh. 5.)  Less than one year later, defense counsel retained him as the lead investigator in Mr. Basham's case.  It is unclear if defense counsel was aware of Mr. Carlisle's questionable history.  They either failed to properly vet their defense team, or failed to recognize how damaging McNair's history could be to Mr.

115

Basham's case. Under either scenario, their performance fell below acceptable professional norms.

There is no question that the Government discovered the skeletons in McNair's closet. They subpoenaed his Personnel File, Internal Affairs Report, and Discipline from Lexington County Sheriff's Department. (Rep. Exh. 15.) In April 2004, Lexington County complied with the subpoenas and the results were a shocking record of bad judgment, dishonesty and inappropriate behavior.

In 1998, McNair was suspended from duty based on an infraction in violation of the department's policy on handling evidence. (Rep. Exh. 16.) Specifically, McNair removed a piece of evidence (a cassette tape) from another detective's desk without permission, thereby breaking chain of custody. The tape was of allegedly harassing phone calls made by a woman who was also a snitch whom McNair used. (Rep. Exh. 17.) Next, in 2001, McNair was found to have lied in an internal investigation, violated the Fourth Amendment's search warrant requirement, and behaved insubordinately by not following a superior's instruction. Specifically, McNair ignored an order to wait for a search warrant to enter the scene of a murder/suicide. Other officers stated that McNair said that "as far as he (McNair) was concerned, the search warrant was already signed." (Rep. Exh. 18.) Although McNair denied those statements and denied entering the residence improperly, the

116

complaint against him was sustained.  (Rep. Exh. 18.)

In June of 2002, the Sheriff's office began an investigation into McNair's most abhorrent and egregious misbehavior at his job.  Following a training class on Sexual Harassment and Policy Procedure, a female employee stated that "women did not feel that they could come forward and report incidents [of sexual harassment] . . . and to do so would be to commit 'professional and personal suicide.'" (Rep. Exh. 19.)  An investigation commenced regarding McNair and the playing of pornographic videos in the office.  The investigation report sustained a finding that McNair violated procedure when he "on at least two occasions, displayed a video clip containing obscene material, to wit a bald headed man attempting to insert his head into a woman's vagina, to other employees with no criminal investigative or business necessity of doing so." (Rep. Exh. 19; Exh 4.)  McNair attempted to defend his conduct and claimed that the video had come into his hands as part of an investigation.  However he could not say which one, nor explain what need justified showing the tape.  McNair stated that he was "'curious as to whether or not the portrayed sexual act was 'for real.'" (Rep. Exh. 19.)  McNair was given explicit instructions "that he should not intimidate or attempt to improperly influence any potential witnesses." (Rep. Exh. 19.)  McNair ignored these instructions and had several discussions with employees about the investigation, some of which caused the

117

employees to feel uncomfortable. The investigation report found that he violated policy and procedure by trying to provide a copy of his written statement defending himself to one employee, warned other employees to destroy images on their computers, and alerted employees that investigation was underway and that his computer had been seized. (Rep. Exh. 19.)

As a result of his conduct, McNair was counseled on several occasions "concerning noted deficiencies" in his performance. (Exh 4.) He was sent to training to further assist him in "correcting these deficiencies." (Exh 4.) In a "Notice of Discipline" sent to McNair on July 1, 2002, Major James Harris noted that, despite efforts to help McNair understand his inappropriate behavior, "[u]nfortunately, deficiencies continued to arise even after this training and counseling. Further, you have also been the subject of other internal affairs investigations with founded allegations of misconduct." (Exh 4.) The report continued that McNair's actions "demonstrated extremely poor judgment and highly unprofessional conduct." (Exh 4.) McNair was relieved of his position as Headquarters Region Commander and demoted to Lieutenant, to serve a six month probationary period and suspended from duty immediately for one pay period. (Exh 4.) Ultimately, on October 14, 2002, McNair resigned from Lexington County. (Ex. 5).

One of the bright line rules of criminal cases is that counsel cannot act as a

118

witness. Even if counsel themselves conduct interviews, it is necessary to have a third person present, normally an investigator, "should they need to present testimony regarding such matters as conflicting statements, recantations, etc." *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. at 1126, quoting Guideline 4.1, commentary. Considering the shocking and distasteful misconduct that led to McNair's resignation, calling him as a witness was impossible in Mr. Basham's case. Because part of the findings leading to McNair's discipline was that he lied about his conduct while at Lexington County, it likely would have been admissible in court. Had the jury heard the graphic details about McNair that the Government recovered as a result of its subpoenas, McNair would not only have credibility issues, but the jury would have been disgusted with him and could have reflected that disgust on to Mr. Basham's case.

McNair's history was not the only reason he was a grossly inappropriate choice for Mr. Basham's case. Counsel submits upon information and belief that McNair directed an inordinate amount of time and resources towards irrelevant (and often prurient) matters at the expense of investigating issues that had direct and critical significance to the case against Mr. Basham. For example, McNair seems to have been extremely focused on Chad Fulks's ex-wife, Veronica; the fact that she was a stripper; and the possibility that tapes existed that portrayed her performing sexual

acts. Mr. McNair spent a substantial amount of time interviewing Ms. Evans and her associates. In fact, in his role as investigator, McNair convinced an associate of Evans to turn over a videotape showing Evans engaging in a sex act with the individual. (Rep. Exh. 20.) It is difficult to see how this material was in any way relevant to Mr. Basham's trial. Considering Mr. McNair's history of inappropriate behavior with sexually prurient videos, the time spent tracking down an irrelevant pornographic video is concerning. McNair's focus on Veronica Evans was inexplicable, as she neither knew Mr. Basham nor testified at his trial.

Further, upon information and belief, McNair had a personal bias against Mr. Basham, based on McNair's belief that Basham was homosexual. McNair spend a large part of his time questioning witnesses about Mr. Basham's potential homosexual relationships. It was unclear, what, if any relevance this had to the themes and theories of Mr. Basham's case. Although it was known within the defense team that Mr. Basham had been the victim of sexual abuse, McNair spent little time asking witnesses about this rich mitigation theme and intense, focused on whether Mr. Basham engaged in consensual same sex relationships. (Rep. Exh. 21.) It appears McNair may have held a bias against homosexuals. In one email, McNair refers to a witness he intended to locate and talk to as "another homo friend of Branden's Can't wait." [sic] (Rep. Exh. 22.) Due to McNair's bias against what he

believed to be Mr. Basham's sexual orientation, McNair was unable to competently and thoroughly investigate the case.

Upon information and belief, McNair, because of his lengthy and recent law enforcement experience, had a professional bias against Mr. Basham that was known by, or easily discovered by, Mr. Basham's attorneys. For example, in an e-mail to potential law enforcement witnesses McNair stated "I know I am working on the other side, but the 'FACTS DON'T CHANGE.' I am, and always will be, a 'cop' at heart. (Rep. Exh. 23.). "Counsel cannot be expected to challenge the elements of the capital offense, statements by the client or other witnesses, forensic evidence, or the conduct of law enforcement or the prosecution absent a thorough independent investigation by the defense team." *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. at 1126. Due to his professional bias, McNair was incapable of providing counsel with a thorough, independent defense investigation. As McNair himself stated: "Fulks and Basham are in a heap of trouble and I am, in no way, attempting to change those facts." (Rep. Ex. 23.).

As discussed in the § 2255 Motion, due to McNair's focus on collateral and unimportant matters, he failed to spend adequate time investigating areas that in fact did affect Mr. Basham's case. A prime example of this deficiency became apparent when defense counsel was taken by surprise by testimony that Mr. Basham bragged

121

to guards that he would not get the death penalty.  Defense counsel asked for a sidebar and argued, "We have never been put on notice that our client has made this statement." (Tr. 10/14/04 at 179.)  Every one of the witnesses who testified that Mr. Basham bragged about not getting the death penalty was interviewed by Carlisle McNair.  (Tr. 10/14/04 at 188.)   The Government argued that it was not the prosecution's "problem" if defense counsel did not identify the appropriate issues when they interviewed the witnesses.  (Tr. 10/14/04 at 180.)

One of the witnesses, Eddie Ledford, III, testified that he was interviewed by McNair, and that McNair only asked him approximately eleven questions and spent fifteen minutes with him.  (Tr. 10/14/04 at 223, 240.)  Ledford testified that, had Mr. Swerling or Mr. Harris met with him, he would have answered their questions.  He also testified that, had McNair asked him if Mr. Basham was boastful or bragging, he would have responded to him the same way he did to the Government's questions. (Tr. 10/14/04 at 239-40.)  Ledford was an important government witness whose testimony covers eighty-three pages of the penalty phase transcript, and who was the supervisor in the mental health unit where Mr. Basham was housed at Butner. McNair, however, spent only minimal time interviewing him and asked a mere eleven questions.

McNair's personal and professional bias against Mr. Basham, his misspent time

chasing down irrelevant and prurient information, and his overall inability to perform a thorough, unbiased investigation violated the duty of loyalty that is one of the paramount duties that counsel, and those working at their direction, owe to a client. McNair's personal history made it impossible for him to serve as a witness in Mr. Basham's case. Contrary to the Government's assertions, these failures prejudiced Mr. Basham in the preparation of guilt and penalty phase – fundamental to every capital case. Defense counsel's reliance upon and failure to supervise a biased, unqualified investigator fell below the accepted standard of effective assistance of counsel.

**B.     Mitigation Specialist Paige Tarr rendered deficient performance in her investigation in Mr. Basham's case, and defense counsel failed adequately to supervise her.**

Upon information and belief, Mr. Basham alleges that Ms. Tarr provided deficient performance in her role as director of mitigation efforts in his case, and that his attorneys failed adequately to supervise Ms. Tarr and failed to take prompt remedial steps when her deficiencies came to their attention.[15] Upon information and belief, Mr. Basham alleges that defense counsel were required to bring in additional mitigation specialist assistance because Paige Tarr could not meet the substantial

---

[15]Upon information and belief, Mr. Basham also alleges that Ms. Tarr was instructed by another South Carolina court to no longer practice on capital cases as a result of her deficient performance.

responsibility give to her as lead mitigation specialist. Because the "mitigation function is of utmost importance in the defense of capital cases . . . all members of the defense team [must] perform in accordance with prevailing national norms when representing a client who may be facing execution." *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 677 (2008).

"Capital clients present a host of impairments and/or life experiences that affect their development and behavior, including for example: developmental, cognitive, and mental impairments and disorders; histories of physical, sexual, and psychological abuse; histories of neglect, trauma, and maltreatment; and alcohol and drug abuse or dependence." *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. at 1130. Mitigations specialists need to have the expertise to recognize these issues, and the tact to speak with the client, family, and others about these sensitive issues. *Id.* Certainly Mr. Basham presented a host of impairments and life experiences that bordered on overwhelming. Upon information and belief, counsel submits that Ms. Tarr was not an appropriate choice for the task and failed to perform the duties required of a qualified mitigation expert.

Considering the important role mitigation was to play in Mr. Basham's case, the fact that the head of the mitigation team was either unable to devote her attention

to the case or was deficient in her efforts was prejudicial to Mr. Basham. Ms. Tarr's performance, and counsel's inability to adequately supervise her fell below the well-defined norms of capital defense and resulted in deficient performance and prejudice.

**CLAIM 21**

**Counsel provided ineffective assistance of counsel in failing to request that the Court trifurcate Mr. Basham's trial.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government maintains that no reasonable possibility exists that Mr. Basham was prejudiced by his attorneys' failure to request that the penalty phase of his trial be bifurcated. The jury in this case, however, found only one of the four threshold factors to exist: that Mr. Basham "intentionally and specifically engaged in an act of violence, *knowing* that the act created a grave risk of death to Alice Donovan, such that participation in the act constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act." (Dkt. 805 and 806.) This threshold factor required the jury to consider Mr. Basham's mental state *at the time of the crime*. In other words, the jury was required to determine whether the Government had established beyond a reasonable doubt that Mr. Basham knew that his participation with Chad Fulks in the carjacking and kidnapping of Alice Donovan

125

created a "grave risk of death" for Ms. Donovan.  The final witnesses the jury heard

from in the Government's case-in-chief at the penalty phase were the family members

of Alice Donovan, who testified about the impact of Ms. Donovan's death on their

lives.  (Tr. 10/18/04 at 114-170.)  Because trial counsel failed to request that Mr.

Basham's penalty phase proceedings be bifurcated, the jury was exposed to this

undeniably powerful and heartbreaking testimony about *the fact* of Alice Donovan's

death.  It is difficult to imagine that the jurors were able to disregard this testimony,

as they were required to do, in deliberating about the very specific—but

critical—issue of whether Mr. Basham *knew* that his actions on the day of the crime

"created a grave risk of death" to Ms. Donovan.  The Government is therefore

incorrect when it argues that Mr. Basham could not have been prejudiced by the

failure to bifurcate the penalty phase of his trial.

## CLAIM 22

**The Government violated its obligations under *Brady v. Maryland* and its progeny by failing to disclose information material to Mr. Basham's ability to prepare and present a defense at trial and sentencing.  As a result of the Government's misconduct, Mr. Basham was denied his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.**

Mr. Basham incorporates by specific reference all facts, allegations, and

arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this

Reply.

Mr. Basham's investigation into his *Brady* claim is ongoing. At this time, he has nothing to add to this claim beyond what is alleged in the § 2255 Motion.

### CLAIM 23

**The Government violated Mr. Basham's right to due process when it presented a theory of the case that was inconsistent with the theory it presented at Mr. Fulks's trial. Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories. In addition, Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this issue on appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government violated Mr. Basham's right to due process when it presented a theory of the case that was inconsistent with theory presented at Fulks's trial. By failing to object to the inconsistent theories, Mr. Basham's trial attorneys rendered ineffective assistance of counsel. In addition, Mr. Basham was denied the effective assistance of appellate counsel when his appellate attorneys failed to raise this issue on appeal.

The Government maintains that it presented consistent theories at both Fulks's

127

and Mr. Basham's trials. The record makes clear that is simply not the case. At the heart of the inconsistency is the Government's characterization of testimony by Sheriff Hewett regarding who strangled Alice Donovan with a purse strap. Sheriff Hewett testified at a *Jackson v. Denno* hearing for both Fulks and Mr. Basham, and again at Mr. Basham's trial. The positions the Government took regarding that testimony were in fact diametrically opposed.

At a pre-trial hearing in Fulks's case, the Government sought to keep out testimony that was damaging to Mr. Basham and exculpatory as to Fulks, specifically, Mr. Basham's "deer statement." In their successful argument to exclude the statement, the Government stated that if the deer statement came in, they should be able to introduce statements that inculpated Fulks. Specifically, "remember Sheriff Hewett demonstrating . . . how Brandon Basham said that *Chad Fulks* took the purse strap and strangled." (Fulks Tr. 6/22/04 at 255) (emphasis added.)

The Government attempts to justify this discrepancy by arguing that since the argument was only presented at a pre-trial hearing in Fulks's case, and outside the presence of the jury, it should be of no consequence. However, the Government used this inconsistent theory to their advantage, to exclude exculpatory evidence in Fulks's trial, and to argue that Mr. Basham was the actual killer in Mr. Basham's. In fact, the Government seems to concede that they changed their interpretation of Hewett's

128

testimony concerning the purse strap, based on the context of the argument they needed to make. (Opp. at 117 ("Thus, in context, the Government's interpretation of Sheriff Hewett's testimony concerning the purse strap . . . was part of the Government's argument why another statement made by Basham (the "deer statement") should not be admitted into evidence).)

Clearly, at Mr. Basham's trial, the Government put a new spin on their position on the Hewett/purse strap evidence. The Government argued in closing:

> What does Mr. Basham say in the presence of Sheriff Hewitt [sic]? It is not really what he says, it is what he does. He is shackled, he describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt [sic] how Alice Donovan was strangled . . . . You saw Sheriff Hewitt [sic] stand up there and show.

(Tr. 11/1/04 at 57.) Additionally, the Government unequivocally stated, "He [Basham] killed Alice Donovan". (Tr. 11/1/04 at 62.) The Government acknowledged that this testimony was one of the most important pieces of evidence in the case. (Tr. 9/29/04 at 81-82.)

The Government next claims there was no inconsistent theory because it only elicited testimony about *how* Alice Donovan was strangled. Yet at closing the Government took that *how* and argued *who*. "It is not really what [Basham] says, it is what he does." (Tr. 11/1/04 at 57.) They went on to state, "He [Basham] killed Alice Donovan." (Tr. 11/1/04 at 62.) At Fulks's trial, they argued to the jury that

129

Fulks "intentionally killed Alice Donovan." (Fulks Tr. 6/22/04 at 171.) The Government maintains that, when Sheriff Hewett responded on cross-examination to the question, "There is nothing in your notes, not is there anything in Lieutenant Crocker's notes that indicated that Brandon Basham told you that he used the strap," and Hewett responded, "That's is true, because he didn't say. He showed," that testimony was "ambiguous as to who used the strap." (Tr. 9/27/04 at 53-54.) Yet, in closing argument, the Government did not take the position that it was ambiguous. Rather, they argued that "Sheriff Hewitt [sic] says he [Mr. Basham] didn't *say* I killed Alice Donovan. Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it." (Tr. 9/29/04 at 80 (emphasis added).) Contrary to the Government's assertion and this Court's decision in *Fulks v. United States*, 2011 WL 3069390, this was not passive voice. There is nothing ambiguous about that argument. The Government now attempts to hedge its unambiguous statement and claim that the jury *could* have inferred from this that Basham was the killer or that they could have merely inferred that Basham was present and assisted Fulks in disingenuous at best. The clear purpose of the Government's closing argument, however, was to argue that Basham was the hand that dealt the fatal blow.

These inconsistent positions were exacerbated by the conflicting arguments at both Fulks's and Mr. Basham's penalty phases. While the Government takes the

130

position that they argued teamwork, they also told the jury in Fulks's case that Fulks was the mastermind and Mr. Basham "the puppet." (Fulks Tr. 6/29/04 at 66); *see* Claim 16, *supra*. Further they argued, "Brandon Basham is so stupid, he will do anything." (Fulks Tr. 6/29/04 at 66.) At Mr. Basham's trial they argued Basham was equally manipulative, and that he and Fulks were "equally culpable," and at times were both "leaders of the pack." (Tr. 11/1/04 at 44, 168.) The Government's argument that the prosecutors took the position in both trials that Basham and Fulks acted as a team fails to acknowledge that in describing Basham as a "puppet" in one trial and not the other is not only inconsistent, but an inconsistency at the core of their case. *See United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003).

The Government argues that even if it did take contrary positions, it is irrelevant because either theory was sufficient to convict Mr. Basham. Further, the Government argues that any inconsistency, was "minor and did not affect the core of the Government's case." (Opp. at 114). At the very least, this argument fails as to the penalty phase. These were not mere inconsistencies. The argument that Fulks struck the fatal blow and that Basham was the follower were important parts of Mr. Basham's overall mitigation case. The Government recognized the importance of the fatal blow issue, as was shown in its voir dire and in its closing argument, where it argued that Sheriff Hewett's testimony that Mr. Basham demonstrated how he

131

strangled Alice Donovan was one of the most important issues in the case. The Government also recognized that characterizing Basham as a follower was an important part of the defense argument at penalty phase, so rather than use that phrase as they did at Fulks's trial, they took the position both were leaders at times. Despite defense counsel's arguments that Mr. Basham was merely a follower, and Fulks the leader, not a single juror found the Minor Participant statutory mitigator. (Dkt. No. 805 at 6).

Due Process "prohibits the government from presenting mutually inconsistent theories." *Higgs*, 353 F.3d at 326 (*quoting Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000)). The Government's reliance "upon factually inconsistent and irreconcilable evidence at the two trials" to secure convictions and death sentences in the severed trials of Mr. Basham and Fulks "was fundamentally unfair and [Basham] was deprived of due process." *See United States v. Paul*, 217 F.3d 989, 998 (8th Cir. 2000) (*quoting Smith*, 205 F.3d at 1052-53). The "heightened need for reliability in capital cases only underscores the gravity" of the serious questions raised "when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens." *Jacobs v. Scott*, 513 U.S. 1067, 1070 (1995) (Souter, J., concurring).

The Government's reliance on *Paul*, 217 F.3d 989, is misplaced. In *Paul*, co-

defendants were separately tried for the murder where the autopsy revealed the victim had been shot several times. The Eighth Circuit found that the "the theory that either [defendant], or both, shot [the victim] was not factually irreconcilable and was supported by the evidence." *Id.* at 998. However, the Government in the trials of Mr. Basham and Mr. Fulks did rely on factually inconsistent theories. In one case they argued that Basham was Fulks's puppet and in another that they were co-equal. They argued separately, depending on which was more damaging to the case at the time, that either Fulks or Basham wielded the purse strap that strangled Donovan. Without these opposing positions, based on the same facts, there can be no confidence that Mr. Basham would have been sentenced to death.

As argued *supra*, the prime directive of a prosecutor is not to win at any cost, "but that justice shall be done." *Berger*, 295 U.S. at 88. The Government's use of inconsistent theories at the two trials in Mr. Basham's and Mr.s Fulks's cases was "inherently unfair" and rendered the convictions unreliable. *Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring) (the use of inconsistent theories is "inherently unfair"); *Smith*, 205 F.3d 1045 (use of inconsistent theories renders convictions unreliable). The Fourth Circuit has not yet addressed the standard appropriate to adjudicate due process violations arising out of inconsistent theories in separate trials of co-defendants. Mr. Basham submits that error that goes to the

133

fundamental fairness of the trial is structural and should require no separate finding of prejudice.    Absent the Government's constitutionally violative "actions, the outcome of the trial probably would have been different." *Groose*, 205 F.3d at 1052.

Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories.    This failure fell below the "objective standard of reasonableness" as it was outside "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690.  Mr. Basham was also denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this significant and obvious issue on appeal. *Evitts*, 469 U.S. at 395-96; *Mapes*, 171 F.3d at 426.  Because the confidence in the outcome of the trial is undermined, due to these failures, Mr. Basham has established prejudice and is entitled to relief. *Wiggins*, 539 U.S. at 534.

134

CLAIM 24

**Mr. Basham's rights under the Eighth Amendment to the United States Constitution were violated when the Government engaged in misconduct by arguing, contrary to controlling precedent, a causal nexus requirement to persuade the jury not to give effect to Mr. Basham's mitigating evidence.  By failing to object to the Government's misconduct, trial counsel rendered ineffective assistance of counsel, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.  Mr. Basham's appellate attorneys were similarly ineffective for failing to raise this issue on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

As Mr. Basham set forth in his Motion, the Government's overriding theme in its attempt to discredit mitigating evidence offered on Mr. Basham's behalf was that no "cause-and-effect" existed between the proffered mitigation and the crimes with which Basham stood convicted.  Throughout the penalty phase of the trial, the Government returned to this theme.  Mr. Basham identified several of those instances in his Motion, but other, more subtle, examples exist.  For instance, in his cross-examination of social worker Jan Vogelsang, First Assistant United States Attorney Scott Schools asked: "Assume 183 murders in Kentucky.  That would indicate that not all of the people impoverished, not all the people living in single-family homes,

135

not all of the people suffering the consequences that Mr. Basham has suffered *are going out and killing people*?" (Tr. 10/19/04 at 205.)  In response to a later question about the scope of her findings, Ms. Vogelsang stated, "I think the most you could say is that people with these environments are at higher risk to end up in very serious circumstances.  I don't think you can predict what those circumstances are going to be."  Mr. Schools responded, "Vast majority of those people, vast majority, do not kill strangers?"  Ms. Vogelsang agreed, and with that Schools ended his cross-examination.  (Tr. 10/19/04 at 211.)  The import of Schools's questioning was clear, and would become a familiar theme to the jury: Evidence of Mr. Basham's deficits was irrelevant if it did not explain why he committed the crimes.

In his closing argument, Assistant United States Attorney Johnny Gasser took a more direct approach.  Although he statements are set forth in the Motion, they are worth repeating here:

> But generally what did their experts say?  What is the most important thing they said?  Brandon Basham knows right from wrong and there is *no cause-and-effect between whatever issues Brandon Basham is dealing with in the kidnapping and carjacking randomly of two innocent women*.  *There is no cause and effect*.  It is not like you were born into an alcoholic family, you run the risk of being an alcoholic.  *There is no cause-and-effect* of Brandon Basham's upbringing or any problems Brandon Basham has with the effect of him randomly targeting, and kidnapping, and killing two innocent women.  Every single defense expert took that witness stand and acknowledged that because they had to.  Because that is a fact.  *No cause and effects*.  There are thousands and thousands of kids and adults walking around this country . . . that

136

grew up impoverished, much poorer than Brandon Basham, with physical disabilities he did not have.  With significant, significant mental issues that don't kill, that don't carjack . . . *[a]nd that is absolutely critical.*

(Tr. 11/1/04 at 85 (emphasis added).)[16]

In light of these statements to the jury, it is insupportable for the Government to argue that it "never suggested that the mitigating evidence must pass some threshold nexus test before the jury could consider it."  (Opp. at 131.)  The Government told the jurors that "the most important thing" the defense experts said, the fact that was "absolutely critical," was that there was "no cause-and-effect."

The Government further argues that, even if an *Eddings/Tennard* violation occurred, Mr. Basham was not prejudiced by it because "the jury's verdict demonstrates that they did in fact consider the mitigating evidence."  (Opp. at 134.)  As a legal matter, the Government's argument fails because, as the Fifth Circuit has

---

[16] In its Opposition, the Government accuses habeas counsel of "selectively and misleadingly quot[ing] from the Government's closing argument." (Opp. at 129-30.) The Government takes particular issue with counsel's use of bracketed language to complete a quotation. (Opp. at 130.) It was not counsel's intention to mislead the Court, and counsel apologizes if that was the effect. It is important to note, however, that counsel set forth *in full* on page 104 of the § 2255 Motion the quotation the Government states counsel "misleadingly" quoted. In any event, even if the Court were to disregard the argument on page 110 that the Government finds offensive, there are multiple—unedited—instances in the record where the Government emphasizes its "cause-and-effect" theme to remove Mr. Basham's mitigating evidence from the jury's consideration.

137

held, harmless error analysis is inappropriate in the causal nexus context because:

> *Penry* error deprives the jury of a "vehicle for expressing its 'reasoned moral response to the defendant's background, character, and crime,'" which precludes it from making "'a reliable determination that death is the appropriate sentence.'"

*Nelson v. Quarterman*, 472 F.3d 287, 314 -15 (5th Cir. 2006) (*quoting Penry II*, 532 U.S. at 797). Because federal harmless error analysis would be the equivalent of allowing "an appellate court to substitute its own moral judgment for a moral judgment that the [sentencer] was unable to make," it is inappropriate in this context. *Id.* at 315. A review of Supreme Court decisions applying *Eddings* reveals that the Court has never applied a harmless error analysis to this type of Eighth Amendment violation.

The Government's argument also fails as a factual matter. The Government makes much of the fact that some jurors found mitigating evidence to exist, thereby suggesting that those jurors necessarily disregarded the impermissible causal nexus arguments with which the prosecutors bombarded them. (Opp. at 134.) This argument misses the point, however. (In addition, it also demonstrates why harmless error analysis is inappropriate in the *Eddings/Tennard* context.) The fact that *some* of the jurors found mitigating evidence to exist (presumably despite its lack of a causal nexus) does not negate the fact that *other* jurors did not find the evidence to be mitigating. It is impossible to know whether those jurors rejected the evidence

138

because it lacked the "cause-and-effect" to which the prosecution had repeatedly referred or whether some other reason explained their refusal to credit the proffered mitigating evidence. Moreover, if some or all of the jurors who did not find the mitigating factors to exist reached their conclusions because of the Government's impermissible causal nexus argument, it is impossible to know whether the outcome of the jury's sentencing verdict would have been different if they had not been misled by the prosecution's argument.

The Special Verdict Forms provided to the jury, although not incorrect in themselves, would have been insufficient to resolve any juror confusion arising from the prosecution's improper argument. Specifically, the forms stated: "For each of the following Mitigating Factors, indicate in the space provided, the number of jurors, if any, who have found it proved by a preponderance of the evidence *and that it is mitigating*." (Dkt. 805 and 806 (emphasis added).) A juror, having been told by the Government that the "most important thing" and the point that was "absolutely critical" about the proffered mitigating evidence was that it failed to show "cause-and-effect," could well have concluded that the defense proved by a preponderance of the evidence that the facts supporting a mitigating factor existed, but that because no causal nexus existed, it was not "mitigating."

The inability to know what went through the jurors' minds as they attempted

139

to express their "reasoned moral response" to the evidence, *see Penry v. Johnson* (*Penry II*), 532 U.S. 782, 797 (2001) (*quoting Penry I*, 492 U.S. at 328), is precisely the reason *Eddings/Tennard* error cannot be subjected to a harmless error analysis. Accordingly, Mr. Basham is entitled to relief on this claim.

### CLAIM 25

**The Court's instruction to the jury on mitigating evidence violated Mr. Basham's Eighth Amendment rights because it created a substantial risk that the jury would screen out statutory mitigating factors, and thus fail to give effect to evidence that was, by law, mitigating. Trial counsel was ineffective for failing to object to this charge, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599; and appellate counsel was ineffective for failing to raise this issue on direct appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

At penalty phase, the Court instructed Mr. Basham's jury that, in determining both statutory and non-statutory mitigators, a *two-step* process was required. Because § 3592 (a) recognizes certain factors to be mitigating, as a matter of law, this instruction created a substantial risk that the jury would screen out statutory mitigating factors, and thus fail to give effect to evidence that was by law mitigating. Accordingly, this instruction violated Mr. Basham's Eighth Amendment rights. Trial

counsel was ineffective for failing to object to this charge, in violation of the Sixth

Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599; and appellate counsel was

ineffective for failing to raise this issue on direct appeal, in violation of the Fifth

Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.

The offending portion of the jury instruction read as follows:

> As to the mitigating factors asserted by the defendant, Mr. Basham in this case, the law provides that there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list. You must essentially engage in a *two-step* process in determining whether any one or more of the mitigating factors have been proven.

> Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence. Secondly, if you determine the factor has been proven, *you must determine whether the factor is mitigating*, as I have defined that term for you. That is, it tends to suggest that life in prison, without the possibility of release, and not death is the appropriate punishment.

(Tr. 11/1/04 at 220 (emphasis added).) A similar two-step instruction was given on

the verdict form. (Dkt. 805 at 6).

The instruction was proposed by the Government in Fulks's case after it raised

concerns that the large number of mitigating factors proposed by Fulks's lawyers was

an attempt to "'sand bag' the government's case." *Fulks v. United States*, 2010 WL

3069390 at *35. The Court shared this concern and ultimately decided, pursuant to

the Government's proposal and over Fulks's objection, that the jury be instructed that

141

"with regard to mitigators, there were two issues: '(1) is it proved; and (2) is it mitigating?'" *Id.* The same instruction was given, word for word, in Mr. Basham's trial. Unlike Fulks's lawyers, however, Mr. Basham's attorneys failed to object, although it is clear that they recognized the problem inherent in this instruction.

The Eighth Amendment requires that a capital sentencer "may determine the weight to be given relevant mitigating evidence. But [the sentencer] may not give it no weight by excluding such evidence from [its] consideration." *Eddings v. Olklahoma*, 455 U.S. 104, 114-15 (1982). The Government appears to argue that there is no difference between refusing to consider evidence entirely and considering it but giving it little weight. It contends that this instruction did not violate Mr. Basham's rights because the FPDA "does not require jurors to assign any particular weight to the mitigating factors listed in § 3592(a). (Opp. at 136.) The Government failed to recognize that this was in fact *precisely* the constitutional line drawn by the *Eddings* Court. As the Government concedes, § 3592(a) states that "in determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor," and proceeds to list the statutory mitigating factors. Thus, while the Government is correct that the FPDA does not require any particular weight be given to a mitigating factor, it does however require that, if a defendant proves a statutory factor to be true, the sentencer must weight it in deciding the

142

sentence. In other words, the sentencer is *not* permitted to decide "is it mitigating?" Once a statutory factor is found to exist, but simply how much weight to give to that factor. Therefore, contrary to the Court's erroneous instruction, the only relevant factor for a juror to decide is whether the factor exists by a preponderance of the evidence. *See Boyde v. California*, 494 U.S. 370, 377-78 (1990).

Further, the Government argues that any error caused by the two-step instruction was ameliorated, "Federal law specifically defines several statutory mitigating factors to be considered in determining whether a sentence of death is justified, that is why they are called statutory. They appear in the statute of laws. The statutory mitigating factors alleged in this case which you must consider are . . . " (Tr. 11/1/04 at 222). Immediately before that instruction, however, the jury was instructed that it should determine if a statutory mitigating factor was proven by a preponderance of the evidence *and* that the factor was also mitigating. (Tr. 11/1/04 at 222). Simply having one correct statement of law did not cure the fundamental flaw in the two-step instruction that allowed jurors to screen out, and therefore refuse to consider and give effect to, constitutionally relevant mitigating evidence. This two-step instruction told the jurors not to weight the evidence at all, even if they found it to exist, unless the jurors themselves determined that the evidence was mitigating.

143

The cases cited by the Government: *United States v. Higgs,* 353 F.3d 281 (4th Cir. 2003), *United States v. Paul*, 217 F.3d 989 (8th Cir. 2000); and *United States v. Jackson*, 549 F.3d 963 (5th Cir. 2008), all deal with *non-statutory* mitigators. However, even in the case of non-statutory mitigators, the two-step instruction was problematic. Under the Eighth Amendment, "relevant mitigating evidence" is defined in the most expansive terms as any "evidence which tends logically to prove or disprove some fact or circumstance which a fact finder could reasonably deem to have mitigating value. *Tennard v. Dretke*, 542 U.S. 274, 284 (2004). The non-statutory factors presented here were of the type routinely recognized at "relevant mitigating evidence" in a capital case. *See, e.g.*, *Brewer v. Quarterman*, 550 U.S. 286, 290, (2007) (abusive childhood, drug use); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 239-40 (2007) (how unhappy childhood effected defendant's mental health); *Smith v. Texas*, 543 U.S. 37, 44-45 (2004) (low IQ score); *Tennard*, 542 U.S. at 287-88 (impaired intellectual functioning); *Jones v. Polk*, 401 F.3d 257, 263 (4th Cir. 2005) (unhappy and violent childhood). Since, as a matter of Eighth Amendment jurisprudence, the proffered evidence was relevant mitigating evidence, jurors were required to weigh that evidence if it were found to exist. As with the statutory mitigating evidence, the two-step instruction told jurors that even if they found a factor to exist, they could determine for themselves it was mitigating.

144

There is a reasonable likelihood that the jurors applied the two-step instruction in a way that prevented their consideration of constitutionally relevant evidence. *Boyde*, 494 U.S. 370, 378. By following the two-step instruction, a juror could determine, contrary to *Eddings* and § 3592(a), that a statutory factor was not mitigating, and rather that determining what weight to give it, give it no consideration at all.

This error was especially egregious in light of the fact that the jury had already been misled, through cross-examination and in summation by the Government, that a causal nexus was needed before evidence could be considered as mitigating. *See Tennard*, 542 U.S. 274; Claim 24 *supra.* The Government argued that the jury should not credit evidence as mitigating unless they also found a "cause and effect" relationship between the evidence and the offense. The Government urged the jury to unconstitutionally narrow the definition of "relevant mitigating evidence" to situations where there was a causal link. *See* Claim 24, *supra*.

Contrary to the Government's argument, it is not sufficient to assume the jury knew they could give effect to the evidence simply because extensive trial time was devoted to it. (Opp. at 139). Substantial portions of the mitigation "functioned as a 'two-edged sword,' because it 'may diminish the blameworthiness of his crime even as it indicates that there is a probability that he will be dangerous in the future."

145

*Abdul-Kabir*, 550 U.S. at 255 (*quoting Penry*, 492 U.S. at 342). "When the evidence proffered is doubled edged," as it was here, "in the absence of an appropriate instruction directing the jury to consider fully" the evidence as mitigating, one "cannot be sure that [the jury] did so." *Abdul-Kabir*, 550 U.S. at 255.

No jurors found statutory mitigating factors two through four, one juror found factor five, and six jurors found factor one. (Tr. 11/2/04 at 8.) It is impossible to know with any certainty whether jurors failed to credit defense evidence as a factual matter, or if they simply failed to give it any mitigating effect. Faced with unconstitutional instructions by the Court, unconstitutional argument by the Government, and defense counsel's objectively unreasonable failure to object, the risk was substantial that the jury would make an independent conclusion that evidence was not mitigating *at all*, and that as a result, the Eighth Amendment was violated. *See Eddings*, 455 U.S. at 114-15, 117. Accordingly, Basham is entitled to relief. To hold otherwise is to "risk that the death penalty [was] imposed in spite of factors which may call for a less severe penalty." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

Defense counsel had no sound strategy for failing to object to the confusing and unconstitutional two-step instruction. Fulks's lawyers had already brought attention to the problems with this instruction. Reasonably competent counsel should

have been aware of the constitutional rights this instruction threatened. Because "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceedings would have been different," Mr. Basham is entitled to relief. *Strickland*, 466 U.S. at 694.

Furthermore, appellate counsel rendered ineffective assistance of counsel by failing to raise the issue of the improper jury instruction in Mr. Basham's direct appeal. Appellate counsel performs ineffectively when he or she fails to discover and brief non-frivolous issues. *Delgado*, 223 F.3d at 980-81. While appellate counsel must sift through issues on appeal, there is no excuse for failure to raise a clearly meritorious claim. *See Smith v. Murray*, 477 U.S. 527, 536 (1986); *Greer*, 264 F.3d at 678. Here, the two-step mitigation instruction was a "significant and obvious" issue, apparent in the record and contrary to clear and specific United States Supreme Court law. *See Mapes*, 171 F.3d at 426. Because this error is flatly contradictory to the requirement that sentencers be permitted to consider mitigation, it is per se reversible and harmless error analysis should not apply. *See Eddings*, 455 U.S. at 117 (reversing death sentence for refusal to consider relevant mitigating evidence without conducting harmless error analysis); *Mills v. Maryland*, 486 U.S. 367, 384 (1988) (reversing death sentence on basis of erroneous unanimity requirement without applying harmless error analysis). Accordingly, appellate counsel rendered

ineffective assistance in not raising this claim on direct appeal, and the Court should consider the claim on the merits. *Coleman*, 501 U.S. at 753-54; *Strickland*, 466 U.S. 668.

**CLAIM 26**

**The Court's instructions to the jury violated Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments because the jury was not required to find that death was an appropriate punishment beyond a reasonable doubt. Appellate counsel violated Mr. Basham's right to the effective assistance of counsel guaranteed by the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they unreasonably failed to raise this issue on appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Court's instructions to the jury violated Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments because the Court failed to instruct that the reasonable doubt standard governed the ultimate penalty determination in this case. *See Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Trial counsel was ineffective for failing to object to this charge, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599; and appellate counsel violated Mr. Basham's right to the effective assistance of counsel guaranteed by the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they

unreasonably failed to raise this issue on appeal.

Six years after the Federal Death Penalty Act was enacted in 1994, the United States Supreme Court recognized for the first time that, under the Sixth Amendment right to jury trial, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Two years later, the Court applied this principal to fact findings that are a prerequisite for imposing a death sentence. *Ring*, 536 U.S. at 588. In a federal capital proceeding, the determination that aggravating factors outweigh mitigating ones is absolutely required before the jury is permitted to impose a death sentence. *See* 18 U.S.C. § 3593(e).

Here, the Court's instruction fell short of the Constitutional requirement that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that the death penalty is justified.

Specifically, the jurors here were instructed:

> You must decide, in regard to both offenses [carjacking resulting in death and kidnapping resulting in death], whether the aggravating factors, which you have found to exist, sufficiently outweighs [sic] the mitigating factors found to exist for that offense, so as to justify imposing a sentence of death, rather than a sentence of life without the possibility of release; or, in the absence of any mitigating factors,

> whether the aggravating factors alone are sufficient to justify imposing a sentence of death, rather than a sentence of life, without the possibility of release.
>
> The weighing process you are called upon to undertake in this part of the trial is different from the fact-finding process. If you find the threshold intent, aggravating, and mitigating factors, you must use your experience, judgment, and common sense in weighing the aggravating and mitigating factors to arrive at your ultimate determination in this case.

(Tr. 11/1/04 at 201.)

Thus, although this Court instructed the jury that is must determine whether the Government had proven the aggravating factors beyond a reasonable doubt, the Court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). It is, therefore, reversible per se. *Id.* at 281-82.

Under the United States Supreme Court precedent of *Apprendi* and *Ring*, while the determination that aggravating factors do or do not outweigh mitigating ones may be a subjective and moral judgment, it nevertheless qualifies as a fact finding under the Sixth Amendment. The Government cites *United States v. Barrett*, 496 F.3d 1079, 1108 (10th Cir. 2007), to argue to the contrary that "the Sixth Amendment does not require a jury to be instructed that it must find that the aggravating factors

150

outweigh the mitigating factors beyond a reasonable doubt." (Opp. at 141.) Further they argue that the Constitution does not require a jury to do the weighing, and therefore no "beyond a reasonable doubt standard" is applicable to the weighing process. (Opp. at 142) (*citing* to *Barrett*, 469 F.3d at 1107; *United States v. Fields*, 483 F.3d 313, 346 (5th Cir. 2007); *United States v.* Green, 2008 WL 4000902 (E.D. Ky. Aug. 26 2008); United *v. Smith*, 2008 WL 3285911 (E.D. Va. Aug. 8, 2008).) Finally, they argue that a capital jury's weighing decision is not a finding of fact. (Opp. at 142 (*citing United States v. Fort*, 2008 WL 5221090 (N.D. Cal. Dec. 12, 2008); *United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007); *United States v. Mitchell*, 502 F.3d 931, 993 (9th Cir. 2007).

This is an issue of first impression in this Circuit. As the Government notes, and Mr. Basham concedes, several courts have held a reasonable doubt instruction is not required for a capital juries weighing process. However, several courts, and various dissenting judges, have agreed that the weighing of aggravating and mitigating factors at a capital sentencing is a factual finding governed by the constitutional right to a jury trial. *See Woldt v. People*, 64 P.3d 256, 264-67 (Colo. 2003); *State v. Whitfield*, 107 S.W. 3d 253, 256-59 (Mo. 2003); *Mitchell*, 502 F.3d at 1011-13 (Reinhardt J., dissenting); *Duest v. State*, 855 So.2d 33, 53 & n.18 (Fla. 2003) (Anstead, CJ., dissenting); *Evans v. State*, 886 A.2d 562 578, 582-84 (Md.

151

2005) (Raker, Green, JJ. & Bell, C.J., dissenting).

Moreover, the issue is up for review in a sister Circuit in *United States v. Gabrion*, 648 F.3d 307 (6th Cir 2010) (rehearing *en banc* granted, opinion vacated Nov. 17, 2011). In *Gabrion*, petitioner was granted relief on several issues and the Sixth Circuit subsequently granted a hearing *en banc* and vacated the opinion. As the Sixth Circuit did not issue an order clarifying which issues it wished to hear *en banc*, it appears all grounds for relief are up for review. In *Gabrion*, petitioner made an identical argument to Mr. Basham – "that the jury should have been instructed that in order to impose death they need to find 'beyond a reasonable doubt' the element of the death sentence that the aggravating factors outweigh the mitigating factors." *Gabrion*, 648 F.3d at 325. In the now-vacated decision, the court found error holding "a much greater degree of certainty is required when the life of a person is at stake. We therefore hold that a jury's finding that the aggravating factors outweigh the mitigating factors is an element of the death penalty and must be found beyond a reasonable doubt, the same standard constitutionally required for all other findings of fact and mixed questions of law and fact." *Id.* The court noted that, although the Federal Death Penalty Act "styles" the determination of whether death is justified "as a 'recommendation,' it is one that the judge is obligated to follow." *Id.* (*quoting* 18 U.S.C. § 3594). Further, the court noted that 18 U.S.C. § 3593(e) –the provision that

152

both petitioner and Mr. Basham's jury instructions mirrored – left "up in the air the measure of persuasion and the jury's requisite degree of belief on the ultimate element of the offense concerning the comparison of aggravators and mitigators." *Id.* at 325-26. "Mere sufficiency" is all that is impliedly required. *Id.* at 326.

The requirement in "run-of-the-mill" criminal cases that prosecutors must prove every element of an offense beyond a reasonable doubt insures the 'moral force of the criminal law.'" *Id.* (*quoting In re Winship*, 397 U.S. 358, 364 (1970).)  This caveat should be particularly true in death cases. *Gabrion*, 648 F.3d at 326.  The court noted that the recent trends in federal constitutional law confirmed that reasonable doubt should be applied to the weighing process in a capital case. *Id.* at 326-27. Specifically, the court found that the reasoning in *Apprendi* and *Ring* "surely applies to the jury's determination of whether the Government has proven a defendant worthy of society's ultimate punishment, in spite of features in his case that may militate in favor of a life sentence." *Id.* at 327.

The cases, such as those cited by the Government, that have found the Sixth Amendment's reasonable doubt standard inapplicable to the weighing decision in a federal capital case rely on the argument that this weighing is a moral, rather than factual, judgment. *See Gabrion*, 648 F.3d at 327.  However, it has "never been the case that the constitutional requirement of proof beyond a reasonable doubt applies

only when the jury is tasked with the determination of objective truth[s] . . . susceptible to . . . proof or raw facts." *Id.* at 328 (internal quotations omitted). As the court noted, the United States Supreme Court specifically held that the requirement of proof beyond a reasonable doubt extended to "mixed questions of law and fact." *Id.* (*quoting United States v. Gaudin*, 515 U.S. 506, 511 (1995).) "[T]he jury's constitutional responsibility is not merely to determine the facts, but apply the law to those facts and draw the ultimate conclusion of guilt or innocence." *Gaudin*, 515 U.S. at 514. "Surely that responsibility is even more acute where the ultimate conclusion is not just guilt or innocence, but life or death." *Gabrion*, 648 F.3d at 328.

Further, those cases that do not apply the reasonable doubt standard to weighing in capital cases ignore the United States Supreme Court's more recent pronouncements on *Apprendi* that apply a functional test for identifying a fact-finding subject to *Apprendi*, that includes even moral and subjective judgments like the weighing determination in a capital sentencing. In *Blakely v. Washington*, 542 U.S. 296 (2004), the Court invalidated a sentencing statute that allowed a sentence beyond the set range if the judge found "substantial and compelling reasons." The law listed some factors to justify a harsher sentence but was merely illustrative and not exhaustive. *Id.* at 299. In striking down the statute, the Court rejected the state's efforts to get around the required fact-finding for sentence enhancement and made

154

clear that for *Apprendi* purposes, "the relevant statutory maximum is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. *Id.* at 303-04. *Cunningham v. California,* 549 U.S. 270 (2007), further solidified this functional test when it struck down a California sentencing statute that allowed an upward departure when "justified by the circumstances in aggravation or mitigation" not found by the jury beyond a reasonable doubt. 549 U.S. at 278-79. In doing so, the court rejected the argument, and the dissent's view that *Apprendi* did not apply because a circumstance in aggravation could include a policy judgment or even the judge's subjective belief about the appropriate sentence. *Id.* at 862; *id.* at 879 (Alito, Kennedy & Breyer, JJ., dissenting). The "attempt to characterize the weighing step as resulting in something other than an *Apprendi* finding of fact reflects a level of formalism rejected by both *Apprendi* and *Ring*." *Mitchell*, 502 U.S. at 1013 (Reinhardt, J., dissenting). "[T]here is no practical difference between the increase in the punishment due to the finding of an aggravating factor and the increase due to the finding that aggravators outweigh mitigators. Because the Federal Death Penalty Act requires both findings in order for a judge to sentence a defendant to death, the Sixth Amendment requires a jury to make these findings beyond a reasonable doubt." *Id.*

As the cases applying a reasonable doubt standard to the weighing process recognize, because the death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). "We pay mere lip service to the principle that death is different" if a lower level of certainty is imposed in the death penalty cases than in others. *Evans*, 886 A.2d at 584-85 (Raker, Green, JJ. & Bell, C.J., dissenting). This requirement of heightened reliability requires that the jurors making a finding beyond a reasonable doubt that the death penalty is the appropriate punishment for capital defendants.

This Court's failure to provide such an instruction to the jury renders Mr. Basham's death sentence unconstitutional. To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional. Defense counsel's failure to request an appropriate instruction on this issue, constituted constitutionally ineffective assistance of counsel. *Strickland*, 466 U.S. at 686. Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Basham would not

have been sentenced to death.  Further, had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Basham would have been granted a new penalty trial. *See Smith v. Murray*, 477 U.S. at 536; *Greer*, 264 F.3d at 678.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 n. 9.  Erroneous description of the reasonable doubt standard "vitiates all the jury's findings" and is structural error, not subject to harm analysis and requiring automatic reversal.  *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993).  Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Basham's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

## CLAIM 27

**Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when, upon learning that Juror Cynthia Wilson had engaged in misconduct, they failed to investigate easily identifiable instances of Wilson's untruthful statements to the Court that likely would have persuaded the Court that further investigation into claims of juror misconduct was warranted.**

Mr. Basham incorporates by specific reference all facts, allegations, and

157

arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham's attorneys rendered ineffective assistance of counsel, when, upon learning that Juror Cynthia Wilson had engaged in misconduct, they failed to investigate easily identifiable instances of Wilson's untruthful statements to the Court that likely would have persuaded the Court that further investigation into claims of juror misconduct was warranted.

As this Court is well aware, the foreperson of Mr. Basham's jury was held in contempt of court for her outrageous misconduct when she ignored at least forty-one clear instructions by this Court not to talk to anyone about the case. At a bare minimum, it is undisputed that Ms. Wilson called at least three television stations and two newspapers before the jury rendered their death verdict. (Tr. 11/12/04 at 70; Tr. 12/13/04 at 3; Tr. 12/21/04 at 33.) However there was significant evidence that Wilson's misconduct was much more widespread and insidious, including suspicion that deliberations began before the close of evidence, bullying other jurors, and talking with individual jurors outside the presence of the entire jury. Nonetheless, despite grave concern to the contrary, the Court accepted Ms. Wilson's word that her misconduct did not spread beyond that which was irrefutable – the calls to media. Had counsel researched Ms. Wilson, and been able to show a greater pattern of her

158

lies to the Court, the Court may well have determined a different answer to his question "What about the idea that a juror who is just that determined to violated the judge's instructions, it just stinks so bad that the whole verdict is suspect? That juror such as that should just not be permitted to be one of 12 votes for a death penalty?" (Tr. 12/13/04 at 35.)

The Court held several hearings on the issue. In the hearings, Ms. Wilson initially denied any violations of the Court's orders and her oath as a juror, after speaking with an attorney she admitted to calling the television stations. (Tr. 1/14/05 at 59; Tr. 11/12/04 at 70.) Ms. Wilson claimed she only committed such egregious violations of her oath and orders for altruistic reasons. She denied early deliberations and talking to anyone else outside of the jury including her husband. (Tr. 11/12/04 at 71-76.) In one of the most shocking displays of lack of candor with this Court, it was later discovered that Wilson had not only contacted the three television stations but also two newspapers as well. (Tr. 12/21/04 at 33.) Wilson had been specifically asked if she recalled "anything else" that she did during Mr. Basham's trial that violated the Court's orders. (Tr. 12/13/04 at 3.) When confronted with the discovery of the additional media sources, Wilson claimed that she simply had forgotten about the calls. Despite Wilson's egregious misconduct, and dishonesty, the Court accepted this excuse for her lack of candor. (Tr. 12/21/04 at 33.)

159

Despite her claims that she had not talked prematurely with other jurors, both Shelda Richardson and June Robertson had concerns about Wilson's conduct. (Tr. 11/18/04 at 17, 27, 42.) Wilson, who would admit to nothing until squarely confronted with irrefutable evidence of her guilt, denied that any conversations she had alone with jurors were about the case. (Tr. 11/18/04 at 27.) However, she later flatly contradicted herself by stating that she had discovered Shelda Richardson had some hesitancy about imposing the death penalty. (Tr. 11/23/04 at 10, 12.) It was also discovered that Ms. Wilson spent a shocking amount of time on the phone with fellow jurors. Defense counsel pointed out that the lengthy calls would often fall after key points in the trial. (Tr. 1/14/05 at 10.) Wilson denied that anything about the case was discussed during these calls.

This issue was one the Court was candid about struggling with. The Court observed, "If I go one way, a life is taken, if I go the other way, the Government is put to the expense of several million dollars – and I don't say that with hyperbole." (Tr. 11/12/04 at 92.) Despite some evidence that Ms. Wilson had been less than candid with the Court, and even acknowledging that Wilson likely perjured herself on at least one issue before the Court (Tr. 12/13/04 at 20 ( "[i]f I determine she committed perjury, which I essentially have when I say I accepted the station – the TV station's version of what happened . . . ." )), the Court denied Basham a new trial because it

160

accepted Wilson's word that she had not engaged in premature deliberations with other jurors, or told them about her calls with the media. *United States v. Basham*, 561 F.3d 302, 318-19 (2009) (internal citations omitted.)

The Government argues that the Court did not base its decision on Wilson's testimony regarding the question of premature deliberation. (Opp. at 146.) The record contradicts this assertion. Although numerous jurors were called in during the juror misconduct hearings, neither the Government nor the defense were aware of the phone calls between Wilson and the jurors, and they were not questioned about it. (Tr. 12/21/04 at 21-22.) The testimony of the news producer, Ms. Mays, who contacted the prosecution regarding the misconduct was that Wilson said she had concern over whether Basham would be sentenced to death because some jurors were not for the death penalty, testimony Wilson refuted. (Tr. 11/12/04 at 19). The other news sources were contacted and either gave statements or testified, and argument was held. Ultimately, the Court concluded that, although Wilson's acts were misconduct, the Government had successfully rebutted the presumption of prejudice from her misbehavior. (Dkt. 890). Although the Government is correct that there was testimony regarding the contact with media, no jurors were called back to be questioned about the phone calls. The Court's only testimony on that was from Ms. Wilson, who denied any premature deliberations and insisted that all of the seventy-

161

one calls between herself and other jurors were innocuous. Wilson made all of these denials under oath.

Given the Court's struggle when faced with this difficult issue, and suspicion of Ms. Wilson's perjury, anything the defense found to impugn her credibility could have tipped the scales in favor of doubting her testimony and thus entitling Basham to a new trial. At the point that Ms. Wilson's misconduct was discovered, Mr. Basham was already sentenced to death. Ms. Wilson's misconduct was, at that point, the only issue trial counsel had to undo the death sentence. There is no argument it was of utmost importance. Contrary to the Government's argument otherwise, reasonably competent counsel would have recognized that Mr. Basham's life literally hung on the balance of Ms. Wilson's credibility. All efforts should have been made to call it into question. Failure to do so was unreasonable. *See Strickland,* 466 U.S. at 691; *see also Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991) ("when evaluating decisions not to investigate further, [the court] must regard counsel's choice with an eye for 'reasonableness in all the circumstances.'" (*quoting Strickland,* 466 U.S. at 691)).

The Government argues that, because trial counsel analyzed telephone calls and were able to show that Wilson had been dishonest when she admitted only to contacting the three television stations, as well as discovering extensive telephone

162

contact with her husband and other jurors, they were justified in ignoring any further investigation into Ms. Wilson's credibility. (Opp. at 145.) The Government contends that information showing Ms. Wilson made false statements on her juror questionnaire are "immaterial." (Opp. at 150.) However, it is undisputed that the jurors were informed that their answers on the questionnaires were under oath. (Juror 776 Questionnaire.) Evidence that Ms. Wilson gave false responses under oath is anything but immaterial. Evidence, discussed in detail in the § 2255 Motion, calling into question Ms. Wilson's veracity as to at least the questions regarding whether she had been sued (she answered no when in fact she had been sued and had judgments issued against her at least twice) and length of time she had worked as a nurse was readily available in minimal time. (Exh. 6.)

Defense counsel made clear in their argument to the Court that they believed that Wilson was lying and that as such, Basham was entitled to relief.[17] Because so much hung on Wilson's credibility, reasonably competent counsel would have seen the benefit in devoting resources to attacking it. With a death verdict returned, the

---

[17]Counsel argued "This Court has already asked her a series of questions involving her proprieties as a juror. And she has answered yes, I didn't – yes, I didn't prematurely deliberate. Well, that's just not true. Yes, I didn't look at the internet. That's probably not true. Yes, I didn't read the newspapers. That's probably not true. And there's no way that we are ever going find out whether or not those things were untrue."(Tr. 1/14/05 at 11.) Further counsel argued "A juror, the forelady of Brad [sic] Basham's case, sat on that stand and lied to you." (Tr. 1/14/05 at 22.)

163

only reasonable strategy to save Mr. Basham's life was show that Wilson's misconduct mandated a new trial. Evidence of Wilson's additional untruthfulness would have done much to convince the Court that she was not impartial and actively disregarded numerous Court orders and engaged in behavior to ensure Mr. Basham was sentenced to death. Accordingly, the failure to engage in independent investigation to support their belief that Wilson was not telling the truth was unreasonable.

Finally, the Government attempts a policy argument that requiring counsel to comb through juror questionnaires and voir dire for discrepancies would place an unacceptable burden on counsel and the court and would discourage citizens from serving on juries. General policy arguments to not apply to the individual aspects of this trial. Ms. Wilson engaged in what the Court itself characterized as "a flagrant violation of the court's instructions." (Tr. 1/24/05 at 27.) As stated above, as a result of Wilson's misconduct, Mr. Basham made a motion for a new trial, and the *only* reasonable strategy available to defense counsel to save Mr. Basham's life was to uphold the rebuttable presumption that Ms. Wilson's conduct so infected the trial process that it was rendered fundamentally unfair. *See Remmer v. United States*, 347 U.S. 227 (1954). Therefore, under the unique circumstances in this case, combing through Wilson's questionnaire and voir dire was not only appropriate, but necessary,

164

investigation to prepare for the hearing on Mr. Basham's motion for a new trial.

The policy argument that it would discourage citizens from serving on juries is ridiculous. As officers so often like to say to those they interrogate, "If you have nothing to hide, you have nothing to worry about." If Ms. Wilson had not engaged in such outrageous conduct that it resulted in her being convicted of contempt of court, it would have been unnecessary for counsel to delve into her private matters. Because she engaged in conduct that "distresse[d] the court so much" (Tr. 1/24/05 at 20), she made herself and her credibility fair game. Counsel's failure adequately to attack her very questionable veracity and credibility fell below the standard of reasonably competent assistance.

## CLAIM 28

**Newly discovered evidence suggests that Juror Wilson was untruthful in her testimony to the Court concerning her contact with other jurors. Accordingly, this Court should vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on the issue of premature juror deliberations.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply. Specifically, this claim incorporates the argument and facts in Claim 27.

As a preliminary matter, the Government argues that this claim is untimely

165

because under Rule 33 motions for new trial based on newly discovered evidence must be filed within three years of the guilty verdict. (Opp. at 152, *citing* Fed. R. Crim. P. 33(b)(1).) The Government contends that this Court must conclude that Claim 29 [sic], "which is in essence a motion for a new trial under Rule 33, is untimely." (Opp. at 152.) The Government is incorrect. Although there is some overlap, "there are critical differences" between Rule 33 and § 2255. *United States v. Prescott*, 221 F.3d 686, 688 (4th Cir. 2000). "Where a claim for relief based on newly discovered evidence is based on actual innocence, rather than new evidence of a constitutional violation, the claim is not cognizable under § 2255 and, properly construed, is a Rule 33 motion." *Ruiz v. United States*, 221 F.Supp. 2d 66, 72-73 (D. Mass. 2002). Attacks on final judgment related to violations of the Constitution or laws of the United States are properly raised pursuant to 28 U.S.C. § 2255. *Id.* (*citing United States v. Addonizio*, 442 U.S. 178, 184 (1979)); *Hill v. United States*, 368 U.S. 424, 428 (1962). Mr. Basham's § 2255 Motion alleges the latter. Counsel for Mr. Basham filed this Motion within one year of the United State Supreme Court's denial of Mr. Basham's petition for writ of certiorari on June 1, 2010, thereby satisfying the most stringent statute of limitations deadline established by 28 U.S.C. § 2255(f)(1). Accordingly, Claim 28 is timely and this Court must consider it on the merits.

As discussed in detail in Claim 27, the issue of juror Wilson's veracity with the

166

Court was of great import.  In addition to information readily available to counsel at the time, newly discovered evidence suggests that Wilson was untruthful in her answers to this Court.  One of the primary areas of concern was the number of phone calls between Wilson and several other jurors.  (Tr. 1/14/05 at 3.)  Cynthia Wilson testified three times in hearings regarding her misconduct.  (Tr. 2/14/05 at 2.)  She claimed that the jury had not deliberated prematurely.  (Tr. 11/12/04 at 74, 76.)  She avowed that, if she had engaged in one-on-one conversations, as witnessed and testified to by other jurors, she was only talking about softball or cheerleading.  (Tr. 11/23/04 at 10.)  At the hearings, Wilson also addressed her numerous calls to fellow juror Shannon Burnett, which followed her calls to the media.  Wilson testified at the contempt hearing that she talked with Burnett about doing sod work in her backyard. (Tr. 12/21/04 at 35-36.)

As discussed in detail in the § 2255 Motion, logic would suggest that, if the multiple and lengthy calls between Wilson and her fellow jurors were solely about personal matters, these jurors must have formed substantial friendships.  Yet, it appears that when Mr. Basham's trial ended, so did the "friendship."  Wilson's ex-husband could not recall ever meeting any of the jurors Wilson spent so many hours talking to.  He could not recall her talking to them after the trial.  Regarding Wilson's testimony that she spoke with Juror Shannon Burnett about doing sod work for her,

167

Mr. Wilson stated this would have been very odd, as he did all the maintenance and landscaping at their house himself.  (Exh. 7.)

Furthermore, while Wilson's "friendship" with the Basham jurors ended, her lies about her conduct in the Basham trial did not.  Wilson was disciplined on January 6, 2007, for not disclosing the fact that she was put on probation for contempt of court in the Basham trial.  (Exh. 6.)  Wilson's lies continued on her nursing license renewal application in April 28, 2008, on which she falsely stated  that she did not have any prior disciplinary action before any nursing board in any jurisdiction.  Wilson lied again on her license renewal application in April 15, 2010, when asked the same question.  (Exh. 6.)

Finally, Wilson lied three times on her nursing license renewal application when asked whether she had ever been convicted under any federal law.  She did not disclose that she had been held in criminal contempt of court by this Court.  Wilson answered "no" to that question on her applications dated April 7, 2006, April 11, 2008, and April 5, 2010.  (Exh. 6.)

The Government contends that in order to be entitled to a new trial, Mr. Basham must pass a five prong test:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; © [sic] the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the

> issues involved; and (e) it must be such, and of such nature as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

(Opp. at 152, *quoting United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010) (internal citations omitted).)  However, every case the Government cites to support this contention shows that they continue to confuse motions for new trial under Federal Rule of Criminal Procedure 33, with Motions for Collateral Relief Pursuant to U.S.C. § 2255.  *See United States v. Gootee*, 34 F.3d 475, 476 (7th Cir. 1994) ("Gootee also appeals the district court's refusal to hold an evidentiary hearing on his motion for new trial"); *Robinson*, 627 F.3d at 944 ("Robinson seeks retrial"); *United States v. Custis*, 988 F.2d 1355, 1357 (4th Cir. 1993) (petition claimed that he was entitled to new trial); *United States v. Fulcher*, 250 F.3d 244, 246 (4th Cir. 2001) (affirming grant of new trial to defendant).

Even if the Rule 33 standard were applied, however, Mr. Basham would meet every element.  First, the evidence was clearly discovered since Mr. Basham's trial. The evidence that the friendships did not continue, and that Wilson continued to lie about her conduct during the trial, required the passage of time to even occur. Accordingly, Mr. Basham meets the second prong of diligence.  Because the information was not discoverable at the time of trial, or even during the hearings on Wilson's contempt of court and Mr. Basham's motion for new trial, and because

169

direct appeals are limited to issues on the record, this Motion for Relief pursuant to § 2255 is Mr. Basham's first opportunity to timely raise this issue before a court. Upon information and belief, counsel submits that the evidence goes to the issue of Wilson's false statements to the court, and her continued issue with dishonesty regarding her actions during the Basham trial. Because Mr. Basham's motion for new trial hung on the believability of Wilson's claims that she did not talk to other jurors about her conversations with the media, and did not engage in premature deliberations, they are clearly material to the issues involved in Mr. Basham's claim that Ms. Wilson's conduct warrants a new trial. Finally, the material is of such a nature, that had the Court had it at its disposal during the hearings on Mr. Basham's motion for new trial, an issue the Court clearly struggled greatly over,[18] this evidence could have tipped the Court in favor of ruling, even in light of his concern about the enormous cost to retry, that the error in this case was too great and Mr. Basham was entitled to a new trial. *See Sawyer v. Whitley*, 505 U.S. 333, 335-36 (1992) (fundamental justice exception where defendant is actually innocent of the death penalty rather than the offense of conviction).

This newly discovered evidence bolsters the position defense counsel took in

---

[18]"Honestly, from the bottom of my heart, I don't know how I will rule on this. It is the toughest call I have."  (Tr. 12/13/04 at 64.)

170

the contempt hearings: "This is a person that came into this courtroom and lied. And she didn't just lie once or twice or three times or four times, she lied repeatedly." (Tr. 12/13/04 at 39.) Wilson's lies have only continued. Any decision that was based on acceptance of her testimony cannot stand, and any reasonable fact-finder, having the newly discovered information before it, would not find Wilson credible. Accordingly, Mr. Basham respectfully requests that the Court vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on the issue of premature juror deliberations.

## CLAIM 29

**Mr. Basham is entitled to a new trial in light of newly discovered evidence profoundly undermining the credibility of the Government's witness, Sheriff Ronald Hewett.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Newly discovered evidence that an important Government witness, Sheriff Hewett, pled guilty to corruption and obstruction of justice, profoundly undermines his credibility as a witness in Mr. Basham's trial. Accordingly, this Court should vacate its previous order denying a new trial and vacate Mr. Basham's convictions

171

and sentences. In the alternative, this Court should order an evidentiary hearing on this issue.

As in Claim 28, *supra*, the Government argues that this claim is untimely because, under Rule 33 motions for new trial based on newly discovered evidence must be filed within three years of the guilty verdict. (Opp. at 155 citing Fed. R. Crim. P. 33(b)(1).) The Government contends that this Court must conclude that Claim 29, "which is in essence a motion for a new trial under Rule 33, is untimely." (Opp. at 152.) The Government is incorrect. Although there is some overlap, "there are critical differences" between Rule 33 and § 2255. *Prescott*, 221 F.3d at 688. "Where a claim for relief based on newly discovered evidence is based on actual innocence, rather than new evidence of a constitutional violation, the claim is not cognizable under § 2255 and, properly construed, is a Rule 33 motion." *Ruiz*, 221 F.Supp. 2d at 72-73. Attacks on final judgment related to violations of the Constitution or laws of the United States are properly raised pursuant to 28 U.S.C. § 2255. *Id.* (*citing Addonizio*, 442 U.S. at 184); *Hill*, 368 U.S. at 428. Mr. Basham's Motion for Collateral Relief Pursuant to U.S.C. § 2255 alleges the latter. Counsel for Mr. Basham filed this Motion within one year of the United State Supreme Court's denial of Mr. Basham's petition for writ of certiorari on June 1, 2010, thereby satisfying the most stringent statute of limitations deadline established by 28 U.S.C.

172

§ 2255(f)(1). Accordingly, Claim 29 is timely and this Court must consider it on the merits.

As discussed in detail in Claims 1, 11, 12, 18, and 23, *supra*, Sheriff Hewett was the star witness in the Government's case against Mr. Basham. His testimony that Basham indicated how he had strangled Alice Donovan was characterized as one of two pieces of testimony that sealed Mr. Basham's fate. The Government went out of its way to emphasize Hewett's testimony and credibility, even arguing to the jury, "You remember how fair Sheriff Hewett was." (Tr. 9/29/04 at 79). Unfortunately, as his own convictions would eventually bear out, "fair" was not the best adjective to accurately describe Sheriff Hewett.

On October 6, 2008, (former) Sheriff Hewett pled guilty to corruption and obstruction of justice. He was sentenced to prison, supervised release, and fined. (Exh. 8.) As part of its prosecution of Hewett, the Government obtained hundreds of pages of affidavits detailing a litany of abuses, including allegations that Hewett was repeatedly intoxicated at crime scenes and sexually harassed female co-workers. The indictment against Hewett charged that he "repeatedly used his office for his personal benefit," including obstructing an investigation against a relative and misuse of public funds. (*Id.*) He forced deputies to perform manual labor at his house and work on his political campaigns. (*Id.*) He engaged in threats and retaliation against those who

173

testified against him and encouraged employees to be uncooperative with the investigation, even going so far as to have a chaplain attend staff meetings where the deputies were told that "they should not cooperate with evil on the witness stand." (*Id.*)

As United States Attorney Holding stated, "Ronald Hewett was not only a law enforcement officer, but he was also entrusted by the people of Brunswick County with leadership of their Sheriff's Office.  First, he breached that trust by operating the Sheriff's Office for his personal benefit.  Then, when that activity came under investigation, he unlawfully obstructed the investigation." (Exh. 8.)  Due to this newly discovered evidence, Mr. Basham is entitled to a new trial.

The Government contends that in order to be entitled to a new trial, Mr. Basham must pass a five prong test:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b)facts must be alleged from which the court may infer diligence on the part of the movant; © [sic] the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

(Opp. at 156, *quoting Custis*, 988 F.2d at 1359 (internal citations omitted)). However, every case the Government cites to support this contention shows that they continue to confuse motions for new trial under Federal Rule of Criminal Procedure

174

33, with Motions for Collateral Relief Pursuant to U.S.C. § 2255. *See Robinson*, 627 F.3d at 944 ("Robinson seeks retrial"); *Custis*, 988 F.2d at 1357 (petition claimed that he was entitled to new trial); *Fulcher*, 250 F.3d at 246 (affirming grant of new trial to defendant).

However, even if the Rule 33 standard were applied, Mr. Basham would meet every element. First, the evidence was clearly discovered after Mr. Basham's trial. The evidence of Hewett's astounding corruption and misconduct was only borne out after a lengthy government investigation against him which culminated in his guilty plea in 2008. Accordingly, Mr. Basham meets the second prong of diligence. Defense counsel could not have gained access to the information showing Hewett's corruption even if it had existed at the time. It was only after the government investigation became public record that Mr. Basham became aware of the real story behind the Government's star witness.

Because the information was not discoverable at the time of trial, and because direct appeals are limited to issues on the record, this Motion for Relief pursuant to § 2255 is Mr. Basham's first opportunity to timely raise this issue before a court. Upon information and belief, counsel submits that the evidence goes to the issue of Hewett's false statements to the court. Finally, the material is of such a nature that, had the jury been aware of Hewett's corruption, the testimony about Mr. Basham

175

strangling Alice Donovan would have been even more suspect, especially when considered in light of Hewett's memorialized interview with Lieutenant Crocker immediately after the Thanksgiving Day search, in which Hewett made no reference to Mr. Basham being the actual killer.

Without Hewett's testimony, there is legitimate doubt as to whether the results of Mr. Basham's trial, especially the penalty phase, would have been different. Accordingly, Mr. Basham respectfully requests that the Court vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on this issue.

## CLAIM 30

**Trial counsel's failure to provide appellate counsel all files produced in the course of representing Mr. Basham necessarily resulted in Mr. Basham being denied effective assistance of counsel on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. In addition, trial counsel's failure to provide the record to his successor constituted ineffective assistance of counsel within the meaning of the Fifth and Sixth Amendments, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

In Claim 30, Mr. Basham alleged that his appellate attorneys were rendered ineffective by Jack Swerling's improper refusal to turn over to them Mr. Basham's

176

files. He further alleged that Swerling's actions themselves constituted ineffective assistance of counsel. The Government describes this claim as "remarkable" and "completely without factual support." (Opp. at 158, 160.) The Government is correct that the claim is "remarkable;" it is incorrect, however, in asserting that it is without a factual basis.

As Mr. Basham discussed in his § 2255 Motion, an attorney "must deliver to [a] client or former client . . . such originals and copies of other documents possessed by the lawyer relating to the representation as the client or former client reasonably needs." (Motion at 140.)   This rule derives from the fact that a client, not counsel, "owns his file," and therefore counsel, not the client, must "bear the expense of retaining a copy." *Averill v. Cox*, 761 A.2d 1083, 1092 (N.H. 2000); *see also Resolution Trust Corp. v. H—, P.C.*, 128 F.R.D. 647, 648 (N.D. Tex. 1989) ("[A]ny materials which [former counsel] wish to keep are copied at their own expense.").

In this case, Jack Swerling refused to provide Mr. Basham's appellate counsel with the file in his case. Appellate counsel first requested the file in a letter dated January 14, 2008. (*See* Rep. Exh. 24 ("[Y]ou have known of our need for the file since at least January 14, 2008, when Mr. Sullivan wrote you a letter[.]").) Over the next ten weeks, appellate counsel made five more requests, one of them in person. (*Id.*)   None, however, were honored. (*Id.*)   On March 31, 2008, with the filing

177

deadline for the opening brief less than a month away and not one of the requested documents in hand, appellate counsel made a sixth request, prompting Swerling to respond that he "did not understand the urgency" and would "get with staff in am." (*Id.*) The following day, Melissa Meister of Jenner & Block sent Swerling a detailed letter wherein she noted the gravity of the situation and informed him, as she had a week earlier, that he was "welcome to Federal Express all of Basham's trial files to [her]" at her firm's expense so she could "go through them for the relevant materials." (*Id.*) In reply, Swerling simply reiterated that "the files were available to [co-counsel] or anyone else and copies could be made of whatever was wanted." (Rep. Exh. 25.)

Ultimately, it took an ultimatum to put the wheels in motion, an ultimatum delivered by Meister in a manner that Swerling characterized as "totally unnecessary in its tone and content" but that was, viewed objectively, in fact quite appropriate. (Rep. Exh. 25.) To quote: "If I do not receive the files that I requested on Wednesday, March 31st, by 5:00 p.m. on Friday, April 4th, I will file a motion with the United States Court of Appeals for the Fourth Circuit, asking for court-ordered production of the files." (Rep. Exh. 24.) Although Swerling took the unsupportable position "that until last wednesday march 26 [sic], no request was made of me as to any specific document from the file" (Rep. Exh. 26), Meister relented and traveled to South Carolina on April 3, 2008, to spend an afternoon reviewing Mr. Basham's files.

All told, Meister culled two boxes' worth of documents, which she delivered to the local branch of Document Technologies for copying and shipment to her offices in Washington.[19]  (Rep. Exh. 27.)  Yet even this modest foray into Mr. Basham's files exceeded the bounds Swerling had set.  As Meister wrote in an e-mail to Swerling that evening:

> [The] boxes were handed off to Brandon at Document Technologies Inc. to be copied and shipped.  However, after learning that you did not want the boxes to be stored out of your office overnight, I made arrangements to have the boxes returned to your office . . . and to have Document Technologies pick those two boxes back up at 8:30 a.m. from your office to be copied off-site, the originals returned to you, and the copies sent to me in D.C.

(Rep. Exh. 27.)  Swerling responded: "Just so you know i don't let files out my office [sic] without knowing what's going or being copied by me first."  (Rep. Exh. 27.)  Despite the obstacles he had created to appellate counsel's access to the file in Mr. Basham's case, Swerling ironically closed his email to Meister by stating, "If you

---

[19]Three employees of the Office of the Federal Public Defender for the District of Arizona, which experienced similar difficulties with Mr. Swerling in its attempt to obtain Mr. Basham's file, traveled to Swerling's office in Columbia, South Carolina, in February 2011, to review the file.  Even a cursory review of the file, which encompassed 77 boxes of materials, took five days.  (Rep. Exh. 28 (Declaration of Christine Oliver).)  The fact that Ms. Meister, working alone, was afforded only one day to conduct a similar review and was able to cull only two boxes of documents is itself evidence that Swerling's obfuscation rendered Mr. Basham's appellate attorneys ineffective.

179

need anything further just ask and we will try to accommodate."  (*Id.*)[20]

With only two boxes of documents in hand and the filing deadline for the opening brief just twenty-two days away, the guess-and-peck process of locating meritorious claims only intensified.  A brief sampling of the correspondence between Swerling and appellate counsel amply illustrates how inexact and consequently damaging a process it was:

"Jack, were there ever any exhibits regarding Basham's statements, to the FBI, regarding the Burns carjacking and murder?  I have Fulks' statement, but they're rather incriminatory toward Brandon, and I'm guessing he said something different?" (Rep. Exh. 29.)

"There we're [sic] statements.  Are you referring to a physical statement introduced?" (Rep. Exh. 29.)

"Well, I'm bound by whatever is in the record, so the extent [sic] that there were 302s introduced by the Government . . . I'm looking for those . . . . Does that help?"  (Rep. Exh. 29.)

"I  was in trial when you asked and i am off today.  Did I answer you. [sic]"   (Rep. Exh. 29.)

"I have the testimony from Vito and Long re the statements Basham made to authorities about Donovan, but I have no statements regarding Burns, yet he pled guilty in WV.  To your knowledge, is there any

[20]Of course, as a matter of law, Meister, as Mr. Basham's counsel, was perfectly at liberty to tote the boxes containing Mr. Basham's file to Washington, with or without Swerling's permission.  As to why Swerling could not countenance Mr. Basham's file spend an evening off the premises, even when entrusted to the professional care of a nationwide document services firm, his sole explanation was to opaquely remark, "I have had a couple of bad experiences."  (Rep. Exh. ___.)

record of Basham relating the events of the Burns' murder to authorities that would be in the Basham or Fulks' record.  If not I'll go with what I have, but . . . I'd like to insert Basham's account to the extent it's on the record."  (Rep. Exh. 29.)

"Jack, I am quite sure that you have other matters on your plate, but finding a place where you and Harris explicitly challenged the Government's 'intrinsic acts' position is critical to Brandon's appeal. Have you found anything on this issue?  I know that you mentioned a joint motion with Fulks.  We have not found anything, unfortunately. Also, to the extent that you can find anything that was introduced by Basham regarding the Burns matter, that would also be very helpful. *Unfortunately, time is running short for filing this appeal, so the sooner you can get back to me, the better*.  (Rep. Exh. 30 (emphasis added).)[21]

The foregoing is indeed troubling.  But nowhere is the damage wrought by this process more apparent than in an e-mail Ms. Meister sent to Swerling on April 16, 2008.  The message in this case is more of an explanation than a request: "I was wondering if it's possible to get all of the FBI statements (the agent reports) from Basham's file?  I don't recall those when I was down in your office, *but given the amount of paper, I could have easily missed them*."  (Rep. Exh. 31 (emphasis added).) Nothing in the Constitution or the caselaw of any federal or state court guarantees an appellant in a capital case the assistance of doubt-free counsel.  Surely, however, such

---

[21]On April 18, 2008, Appellate counsel filed an unopposed motion for extension of time with the Court of Appeals, in which counsel requested a fourteen-day extension of the filing deadline for the opening brief.  *See* Consent Mot. for Extension of Time, April 18, 2008, ECF No. 152.  The court subsequently granted the motion, extending the deadline to May 13, 2008.

an appellant is entitled to the assistance of counsel who, unlike Meister, would not so readily concede, or confirm in writing, that critical portions of the record "could have easily [been] missed." (*Id*.)

To deny a former client, such as Mr. Basham, any documents produced in the course of representation is to "deny the client *the full benefit* of the services for which he paid, *often dearly*." *Resolution Trust Corp. v. H—, P.C.*, 128 F.R.D. 647, 650 (N.D. Tex. 1989) (emphsis added). Jack Swerling, by not "surrendering papers and property to which [Mr. Basham was] entitled," put appellate counsel in an untenable position, one in which the only answer was denied by the very circumstances of the problem. S.C. Rules of Prof'l Conduct R. 1.16(d). "[T]his case is illustrative that in a complex [appeal] where the file may be voluminous (commensurably increasing the likely usefulness of work product materials to advise the client concerning ongoing rights and obligations), the client's need for access to a particular paper cannot be demonstrated except in the most general terms, in the absence of prior disclosure of the content of the very document to which access is sought." *In re Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP*, 689 N.E.2d 879, 882 (N.Y. 1997). Just as unfettered access to Mr. Basham's files would have "commensurably increas[ed] the likely usefulness of work product materials" in litigating his appeal, Swerling's refusal to surrender Mr. Basham's files, or permit appellate counsel reasonable access

to the files, despite counsel offering every accommodation imaginable, severely compromised the usefulness of those documents in litigating his appeal and, in turn, ensured that counsel would fall far short of providing Mr. Basham the effective assistance to which he was entitled. *Id.*

Any one of the scores of boxes of documents Meister was forced to leave in South Carolina may have held a claim that, absent the error of its omission, would have demonstrated "a reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt," *Strickland*, 466 U.S. at 695, or for the purpose of this Motion, "a reasonable probability that the omitted claim would have resulted in a reversal on appeal," *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001).

As Meister wrote in a letter to Swerling, "I am sure you understand the grave nature of a death penalty appeal and the necessity for a person facing imposition of the death penalty to be represented by able and informed counsel. *Basham's trial files are essential to our ability, as counsel on appeal, to represent Basham ably and effectively*." (Rep. Exh. 24 (emphasis added).) Nevertheless, only a minute portion of Mr. Basham's files came into the hands of his appellate counsel. Impeded by an inadequate record, counsel could not, and therefore did not, provide Mr. Basham effective assistance. *See People v. Barton*, 579 P.2d 1043, 1047–48 (Cal. 1978) (holding that, where the record on appeal was incomplete, "[a]ppellant was denied his

183

right under the Fourteenth Amendment to the competent assistance of counsel on appeal because [appellate] counsel failed to obtain an appellate record adequate for consideration of appellant's claims").

### CLAIM 31

**Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments were violated due to the Government's failure to include necessary charges in the Indictment.  Mr. Basham's Due Process Rights, as well as his rights under 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, were violated by appellate counsel's unreasonable failure to raise this issue on appeal.**

Mr. Basham agrees with the Government's opposition to this claim and therefore withdraws it.

### CLAIM 32

**A system, such as the federal death penalty, in which capital punishment is sought on both the invidious basis of race and the irrational basis of geography should not be enforced.  This Court should vacate Mr. Basham's sentence on this basis alone**.

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply. Mr. Basham relies on the arguments made in his § 2255 Motion in support of this claim.

CLAIM 33

**The absence of a principled basis for distinguishing cases in which the federal death penalty is imposed from those in which it is not imposed renders the FDPA unconstitutional.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply. Mr. Basham relies on the arguments made in his § 2255 Motion in support of this claim.

CLAIM 34

**Mr. Basham's conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in this case**.

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The combination of errors in this case deprived Mr. Basham of his right to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness. *Taylor v. Kentucky*, 436 U.S. 478, 487 n. 15 (1978). As a result of the cumulative effect of the errors in Mr. Basham's guilt and penalty phases, his convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth,

185

Sixth and Eighth Amendments to the United States.

When evaluating cumulative error, while only guilt phase errors are relevant to Mr. Basham's convictions, "*all errors* are relevant to the sentence." *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003) (emphasis added) (*citing Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999); *Coleman v. Saffle*, 869 F.2d 1377, 1396 (10th Cir. 1989); *Alvarez v. Boyd*, 255 F.3d 820, 824 (7th Cir. 2000)). As stated in his § 2255 Motion, Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In addition, Mr. Basham re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

Even if the above errors are deemed harmless when viewed individually, their cumulative effect substantially prejudiced Mr. Basham, and when viewed cumulatively in the totality of the circumstances, it is clear Mr. Basham did not receive a fair trial. As the cases cited by the Government acknowledge, constitutional error found to be harmless standing alone, when analyzed collectively with other individually harmless errors, can create a conclusion that the combined error can no longer be determined to be harmless because together "they created a negative synergistic effect, rendering the degree of overall unfairness to the defendant more

186

than that flowing from the sum of the individual errors." *People v. Hill*, 952 P.2d 673, 699 (Cal. 1998); *see also Fisher v. Angelone*, 163 F.3d 835, 852-53 n.9 (4th Cir. 1998); *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998). In sum, "[t]he cumulative effect of two of more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Darks*, 327 F.3d at 1018 (internal citations omitted).

Here, the cumulative effect of the errors in this case resulted in an abridgment of the fundamental fairness of the trial process during all phases. Each of these errors deprived Mr. Basham of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

The aggregate harm of these constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Basham's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair. Considering all the errors above, this Court must

187

conclude that Mr. Basham was denied a fair trial.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in his § 2255 Motion, Mr. Basham respectfully requests that the Court vacate his convictions and sentences and order that appropriate guilt and/or resentencing proceedings be conducted.

Respectfully submitted this 2nd day of March, 2012.

s/Julia Grace Mimms
Julia Grace Mimms
Law Office of Julia G. Mimms, P.A.
1001 Elizabeth Avenue, Suite 1A
Charlotte, North Carolina 28204
Telephone: (704) 333-1301
Facsimile: (704) 333-1290

s/Michael L. Burke
Michael L. Burke (Arizona Bar No. 013173)
Sarah Stone (Arizona Bar No. 022713)
Assistant Federal Public Defenders
850 West Adams, Suite 201
Phoenix, Arizona 85007
michael_burke@fd.org
sarah_stone@fd.org
Telephone: (602) 382-2818
Facsimile: (602) 889-3960

Attorneys for Defendant
Brandon Leon Basham