# Reply Exhibit 18



## Sheriff
James R. Metts, Ed. D.

# LEXINGTON COUNTY SHERIFF'S DEPARTMENT

### INTERNAL AFFAIRS INVESTIGATIVE REPORT

Report # 01IA079
Date Initiated: Nov. 30, 2001
Investigator: Insp. Joel Huggins

Complainant: John Tate
Address:    LCSD

### SYNOPSIS

Major John Tate stated that he received a telephone call from Captain Carlisle McNair asking whether or not a search warrant was needed to enter a residence where a murder/suicide occurred. The crime scene had been established and McNair was inquiring as to whether a search warrant was needed to search the residence. Tate informed McNair a search warrant was needed. Tate received information that McNair entered the residence and began the search before obtaining the warrant. As a result, this investigation was begun.

### INVESTIGATIVE FINDINGS

Tate stated that Sergeant Nathaniel Collins told him McNair and Sergeant PC Faglie entered the residence in question before a search warrant was obtained. Tate also relayed additional information he obtained from Collins. IO will obtain that information directly from Collins. According to Tate's written statement (EXHIBIT A), he told McNair to obtain a search warrant before entering the crime scene.

Collins stated (EXHIBIT B) that he was dispatched to 1545 Old Charleston Rd. in reference to case number 0183697. After arriving, a discussion took place as to whether a search warrant was necessary. McNair called Tate and then it was decided that a search warrant was needed. He remembers McNair making the statement that as far as he (McNair) was concerned, the search warrant was already signed. Sergeant PC Faglie instructed Detective Oscar McIntosh to get the warrant signed by Judge Whittle. Coroner Todd Caughman arrived and they spoke for a couple of minutes. They started looking around and noticed that some lights were on inside the residence. When they got to the front door, Faglie and McNair were already inside. McNair instructed ID Investigator Glenn Oxendine to start processing the scene and they would fudge the times later. McIntosh returned prior to the evidence being collected. Collins stated verbally that McNair's order for Oxendine to start processing the scene was before McIntosh had time to get a search warrant signed.

IO called Caughman. He did not hear any of the comments allegedly made by McNair, but knows that everyone was inside the residence before the search warrant was at the scene. He is unsure when and if anyone was notified by radio that the search warrant was signed.



B-00417

A Nationally Accredited Law Enforcement Agency
P.O. Box 639/Lexington, South Carolina 29071 (803) 359-8230, Fax # (803) 359-1162

A_42193

Oxendine stated (EXHIBIT C) that he arrived at the scene and was briefed by Sgt. Jim Crawford. During the evening, McNair made some telephone calls and it was determined that a search warrant would be needed before processing the scene. He heard McNair make the statement that as far as he (McNair) was concerned, the search warrant had already been signed. He believes this statement was made before McIntosh left to get the search warrant. He was instructed by McNair to start processing the scene before McIntosh's return. Sometime while inside the residence and while processing the scene, he remembers a radio transmission that the search warrant had been signed. As he was finishing processing the scene, McNair told him that he would get with Oxendine on the times for the search warrant. McNair never mentioned anything about the times after that. On the return (EXHIBIT L), Oxendine put the time of 0415 hours. He stated that he was not instructed to use that time. When asked where that time came from, he stated that that was either the time they started processing the scene, or that was the time they were notified that the search warrant was signed.

IO spoke to Detective Neil Rainwater. He was called to the scene for Emergency Protective Custody of the suspect and victim's children. He arrived at the scene and was told that the children were across the street at the Abel's residence. He went to talk to the children. When he returned, he asked McNair if he could enter the residence to obtain some clothing for the children because he was taking them to meet with DSS. McNair told him that he could enter the residence. When he entered, so did McNair, Faglie, and others (he believes ID). He was in the residence for several minutes because it took him a while to locate the clothes and shoes. He left and went back to where the children were located. Victim Assistance Officer Andrea Arnold had arrived and was with the children. He had Mr. Abel write a statement. He and Arnold then loaded the children and there luggage. McNair came over and spoke to the children for couple of minutes. He and Arnold then left the residence to take the children to the Children's Center. He prepared a written statement (EXHIBIT D).

Arnold stated (EXHIBIT E) that she arrived at the Abel's residence approximately 0415 hours. The Call Card (EXHIBIT F) shows that she arrived at 0418 hours. When she arrived, she met Mr. Abel and the two children. She inquired as to the whereabouts of the Detective. Mr. Abel told her that the Detective went to the incident location to retrieve some clothing for the children. She remained with the children until Rainwater returned. Rainwater returned. McNair, along with her and Rainwater, loaded the children and clothes in her car. Her and Rainwater left at approximately 0500 hours (Call Card shows 0501 hours) with the children in route to the Children's Center.

IO spoke to McIntosh. He stated that he arrived at the incident location and was given the crime scene log by a road deputy. There was some discussion as to whether a search warrant was needed and McNair called Tate to ascertain his opinion. It was decided that a search warrant was needed and Faglie instructed him to go to Judge Whittle's residence to get one. Rainwater arrived from across the street. He left the incident location (Call Card shows 0420 hours) and went to Whittle's residence. After the search warrant was signed, he called on channel 2 to inform those at the incident location that he was on the way with a signed search warrant. According to the CAD, this radio transmission was made at 0445 hours (an audio recording was made of this transmission (EXHIBIT G). When he returned, Rainwater was not at the incident location and the others were in the house at the incident location. He provided a written statement (EXHIBIT H).

B-00418

A_42194

IO spoke to Faglie. He stated (EXHIBIT I) that he responded to the incident location. Shortly after, there was a conversation about the necessity of a search warrant. He knew McNair made a telephone call inquiring whether the search warrant needed. He thought the call was made to Assistant Solicitor Dayton Riddle. It was determined that a search warrant was needed. He sent McIntosh to Whittle's residence to obtain the search warrant. He and others walked around the yard for a while and then Rainwater arrived and asked if he could enter the incident location to get some clothes for the children. He stated that that would be OK and went in with him. He is unsure who went in at that time, but McNair, Collins, Oxendine, and Caughman ended up inside. They spent time looking at the body and discussing possible scenarios for the sequence of events during the shooting, bullet trajectory, etc. At some point, Oxendine asked if he could start photographing the scene and McNair decided he could start. He concurred with McNair. He remembers McNair making a comment about the time of the search warrant, but does not remember what was exactly said or why the subject came up. As far as he knows, nothing was searched or disturbed other than looking in plain view until the search warrant was signed.

IO spoke to McNair on December 10, 2001 with Sgt. Rusty Manley present. He stated verbally that he did not enter the residence until McIntosh arrived at the incident location with the search warrant. He stated that he has been doing "this" for a long time and he knew a search warrant was needed. When asked if he knew a search warrant was needed, why call Tate, and, he stated to "CYA". After IO explained that all the others had admitted to being in the residence before McIntosh arrived with the search warrant, he admitted to going inside the residence, but only after he was notified by radio that the search warrant had been signed. He stated that he went in when he allowed Rainwater to enter to obtain clothes for the children. He was adamant about only entering the residence one time. He did state that he entered an outer building before the search warrant was signed. On December 12, IO asked McNair if he had prepared a written statement. He asked what needed to be in the statement. IO explained to write what he told IO two days before. IO explained that IO understood McNair to state that he entered the residence before McIntosh returned with the search warrant. McNair denied making those statements and again stated that he did not enter the residence until McIntosh returned with the warrant. IO asked him about entering with Rainwater and he stated that he did, but McIntosh had returned with the warrant. IO told McNair to put that in writing. McNair gave IO a written statement (EXHIBIT J). He stated that he responded to the incident location. After arriving, they questioned whether a search warrant was needed. He contacted Tate and was told to be on the safe side, get a search warrant. Faglie instructed McIntosh to contact Whittle for the search warrant. While waiting for the search warrant, he walked around and looked in a garage on the property. McIntosh advised by radio that the warrant had been signed. He entered the residence at this point. He denies making the statements that he would adjust the times on the search warrant, and that as far as he was concerned, the search warrant was already signed. After he submitted his written statement, IO asked McNair if he went to the Abel's residence to see the children. He stated that he did. IO then asked what he did next and he stated he went to the incident location and entered the residence.

Manley gave a written statement (EXHIBIT K) that McNair initially advised that he only entered the residence on one occasion and that was after McIntosh returned to the incident location with the search warrant. McNair then advised the he entered the residence after McIntosh advised him via radio that the search warrant was obtained. McNair also stated that he entered a storage shed that was located in the curtilage of the residence. McNair stated that he entered the residence along with Rainwater to locate clothing for the children of the residence.

B-00419

A_42195

## CONCLUSION

McNair admits to looking in a garage without the search warrant. He states that he entered the residence with Rainwater, but the search warrant had been signed. He also stated that he did not enter the residence until McIntosh returned with the warrant. According to Arnold, Rainwater was already at the incident location when she arrived at approximately 0415 hours. According to Rainwater, he went over to the incident location and immediately asked about retrieving the children's clothes. McNair gave him the OK and went in with him. This would have had to be around the 0415 hours because Rainwater left the children just before the arrival of Arnold. According to Oxendine, he put 0415 as the time on the search warrant. He stated that that time was either the time he started processing the scene, or the time the search warrant was signed. McIntosh called with the signed search warrant at 0445 hours, therefore, the time on the search warrant was the time the scene was processed. Again, the time matches the approximate time Rainwater would have arrived at the incident location asking to enter the residence, and the time Arnold arrived at the Abel's residence. Rainwater is unsure if McIntosh had even left when he went to retrieve the clothes, however, McIntosh remembers Rainwater being there before he left to get the search warrant. McIntosh left to get the search warrant at 0420 hours. The times would suggest that everyone entered the residence around the time McIntosh left the get the search warrant.

As far as Collins' accusation that McNair stated they would go ahead and get started and fudge the times later, no one remembers that exact statement. However, Oxendine stated McNair said he would get with Oxendine later on the times and Faglie remembers McNair mentioning the times on the search warrant. McNair denies making any statement about the times on the search warrant. Collins' accusation that McNair stated that as far as he (McNair) was concerned the search warrant was already signed was backed up by Oxendine. McNair also denied making that statement.

McNair told IO that he only entered the residence one time. That was when he went in with Rainwater. He also states that he entered the residence after seeing the children when Rainwater and Arnold were leaving. He could not have only entered the residence one time if he went in with Rainwater and then after Rainwater left with the children.

The Supreme Court has ruled that a "murder scene" exception to the 4th Amendment warrant requirement exists. However, the exigent circumstances that existed when the road deputies responded failed to exist when McNair, Faglie, Rainwater, Collins, McIntosh, and Oxendine arrived. McNair was told by Tate to get a search warrant. He gave Rainwater permission to enter the residence before the search warrant was signed and he also entered. While inside, he instructed Oxendine to begin taking pictures. All this being done before the search warrant was signed.

McNair lied during this internal investigation, violated the 4th Amendment warrant requirement, and was insubordinate by not following Tate's instruction. Therefore, this complaint is **SUSTAINED**.

B-00420

A_42196

Joel B. Huggins
Inspector, PSD
December 13, 2001

Concur ☐          Non-Concur ☐

Mel Seboe
COL, Law Enforcement Services
Commanding

B-00421

A_42197