# Reply Exhibit 19

GENERAL COUNSEL

INVESTIGATIVE REPORT

Complainant: N/A (see below)
Address: LCSD

Report #: 02IA032
Date Initiated: June 20, 2002

### SYNOPSIS

As the result of comments made during a training session, I began to investigate the alleged display of an obscene/improper video clip in the Headquarters Region. Two distinct allegations emerged. The first is that Capt. Carlisle McNair displayed an obscene video clip to other employees without a business necessity. The second is that McNair violated policy and instructions subsequent to the initiation of this investigation.

As outlined above, this investigation did not arise out of a "complaint" of specific activity by a deputy; hence, no complainant is listed. This investigation was undertaken based on remarks made during a training session and investigated by John W. Tate, General Counsel.

### BACKGROUND

On July 18th at 1700 hrs. of this year I instructed a regularly scheduled Sexual Harassment Policy and Procedure training class for non-sworn and other personnel of the Department who would not have otherwise attended either Jail Legal Update or annual Block Training. Present were eighteen department members to include the members of the administrative staff, Nicole Howland (C.D.V. attorney), and the Code Enforcement Officers.

During the training class members were encouraged to participate, ask questions, and share comments on the material presented. Howland explained, in general terms, that she believed that women did not feel that they could come forward and report incidents that may arise to policy violations and to do so would be to commit "professional and personal suicide". I explained the mandatory reporting procedures, addressed confidentiality concerns and discussion arose. During that discussion, Howland eluded to three incidents with some degree of factual specificity that had not been reported. One included the display of a computer video image (hereinafter "video") of a bald headed man inserting his head into a woman's vagina.

Given the specificity of the examples, I believed that there was underlying material that would need to be addressed. I made Chief James aware of my concerns that evening. On July 20th[1] Chief James directed that I look into the matter.

I arranged a meeting with Howland immediately. Upon her arrival at my office I explained to her that an official inquiry was being undertaken, that she was compelled to answer my questions, and she must do so truthfully. She, in turn, reiterated her

---

[1] I was out of town on the 19th.

B-00425    1

A_42201

comments from the class and stated that she understood she must answer my questions truthfully. I then explored each of the three incidents mentioned previously and a fourth that arose during discussion. This report deals with the computer video, above described, shown by Capt. McNair in his office. The other incidents are addressed separately in 02IA034, 02IA035 and the IA General Miscellaneous memorandum to file.

At the conclusion of my interview, I instructed Howland to prepare at written statement that was returned to me June 26th and is included in this file. The gist of Howland's statement, as it pertains to this particular allegation was that "within the last two weeks Capt. Carlisle McNair had people looking at a video of a bald man inserting his head into a woman's vagina".

Sheriff Metts, Chief James, Col. Seboe, Major Harris and myself then met with Capt. McNair. McNair was provided with a written Garrity advisement. He then admitted having shown the video[2] and explained that it had come to the department as part of an investigation. He could not articulate what case it was related to but that he thought it was Oscar McIntosh's[3] investigation. Further, he could not explain what, if any, business necessity was being fulfilled by the display of the tape. He did offer that he was "curious" as to whether or not the portrayed sexual act was "for real". McNair remembers that McIntosh, Howland, Faglie, Milton, Prichard, and maybe Stout or Oxendine[4] were in his office at the time the video clip was played. In addition to the written Garrity warning, Sheriff Metts explicitly explained to Capt. McNair that he was not to further discuss the matter, nor indicate that his conduct was under investigation; and that he should not intimidate or attempt to improperly influence any potential witnesses. McNair submitted a written statement which I received June 21, 02.

During the above interview conducted in Chief James' conference room, Capt. McNair's computer, a Dell laptop, was removed from its docking station and submitted for forensic examination. The results of that examination are contained in the investigative findings section of this report.

I then began interviewing other persons who had been alleged to have knowledge of the making, transmission, dissemination, or viewing of this video file. The results of those interviewed are set out below. I maintained handwritten notes of each interview. Eleven persons were interviewed[5] in addition to Howland and McNair. Four deputies[6] received written Garrity warnings based upon their immediately perceived degree of culpability based upon the information available at the time. Each deputy/employee was instructed to prepare and return a written statement. All have been returned. When any statement was returned which required further explanation, the appropriate question was

---

[2] The video has been described as a 15 to 20 second clip which was contained on a 3.5 floppy disk as an mpeg file.

[3] Further investigation revealed that it was Investigator Pritchard's case.

[4] Later investigation revealed Oxendine to be at SLED for training and was not present.

[5] These were McIntosh, Milton, Sims, Peake, Pritchard, Stout, Aiken, Oxendine, T. Collins, Faglie, and Frier.

[6] McNair, Oxendine, Stout, and Peake

B-00426                          2

A_42202

handwritten and the deputy asked to answer and initial his response. This was attached to the previously provided statement.

As the investigation progressed, I became aware of additional information not having to do the original incident but directly related to alleged violations of the written Garrity warning and specific instructions of Sheriff Metts to Capt. McNair. Those are set out herein.

## INVESTIGATIVE FINDING

As to Display of the Obscene/Improper Video Clip:

On June the 10th of 2002, Deputy Stoner responded to 717 Greenwood Drive and met with Tamara Upchurch[7]. The gist of her complaint, as it relates to this inquiry, was that her husband may have child pornography on their home computer, digital camera, and related computer disks[8]. Inv. Stout responded to the scene where Ms. Upchurch turned over the items upon signing a consent form. Stout returned to LCSD and logged the items into evidence. Inv. Pritchard was assigned to the matter and during the course of his investigation obtained "Consent to Search" forms from both Mr. and Ms. Upchurch for the computer, camera, and disks.

On June 12th Pritchard and Stout met and reviewed the computer, disks, and camera searching for any evidence of child pornography. They located multiple images of nude persons but did not locate any evidence of a criminal violation. One image did raise questions as to the age of the subject[9]. Pritchard and Stout notified Sgt. Faglie who came to Stout's work area, viewed the image, and concurred that the female was most likely an adult. During this visit, Faglie was made aware of and viewed the video clip previously described[10]. Faglie then informed McNair and Aiken of what he had seen. Faglie then asked Pritchard to take the disk to McNair based upon McNair's request.

Pritchard and Stout then went to McNair's office with the disk containing the video clip. Statements vary as to exact individuals present in McNair's office during the multiple playing. All or parts of the video were displayed to Aiken (who walked out upon seeing what was playing), Pritchard (who reported that he left after the first playing), Milton, Howland, Stout, Faglie, and McIntosh. Other persons may or may not have been present during one or more of the exhibitions. In McNair's written statement, he admits to playing the video two times.

Neither McNair nor anyone else could explain what, if any, crime was being investigated as to the video clip. The photograph of the individual ("Beth") whose age was in dispute was neither viewed nor discussed. There was no issue discussed as to the

---

[7] LCSD Case No. 0242849
[8] Twenty-one computer disks were turned over to Stout.
[9] This image was labeled "Beth" and was a still photograph of a nude woman who "looked young".
[10] All statements are consistent in describing the video as a "bald man inserting his head into the vagina of a woman". One witness noted that the video was accompanied by audio of "moaning and music".

3

B-00427

A_42203

relative age of the participants in the video or its value as evidence in any investigation. In McNair's oral interview he repeatedly stated that he was watching the video out of "curiosity" and that his interest was if the act displayed was possible. Conversations in the room generally centered on whether the individuals viewing the video thought that this act was "real" or animated. No one interviewed could explain the nexus of this video to any criminal act nor provide any explanation related to any business necessity of its viewing.

Stout then returned the computer disk to the evidence locker along with the computer, camera, and other disks. All items, to include the disk containing the video image described, were returned to the owner, Ms. Upchurch.[11] No criminal prosecution was initiated. Pritchard exceptionally cleared the case on June 20, 2002. There is no evidence to indicate that the disk was ever copied, duplicated, or viewed elsewhere.

McNair's laptop[12] was submitted for forensic examination. The examination revealed:

> The Dell Latitude laptop was previewed on 06/21/02. A file named "giving-head.lnk" was identified. This file was created on 06/12/02 at 3:45 p.m. and last accessed on 06/20/02. There was no further information as to the contents of this file.

The computer analysis was not able to discern how many times the file had been accessed or played. The .lnk file suffix is consistent with a disk having been inserted into the "A" drive and the file accessed. This is also consistent with the account of McNair and others interviewed. Also, Stout, in his written statement recalls "getting head" was the name of the file on the disk containing the video.

Policy and Procedure as to the Video:

Lexington County Sheriff's Department Policy and Procedure No. 300, Non-Discrimination / Anti-Harassment provides in III (B):

> The Lexington County Sheriff's Department has taken special steps to prevent employees from being subjected to inappropriate conduct in the workplace. The department believes that all employees desire a professional, productive, and pleasant work environment. Providing such a work environment requires the cooperation of all employees.
>
> > 1. Sexual harassment includes but is not limited to any inappropriate behavior, which because of an individual's gender has the effect of creating a hostile, intimidating, or otherwise unpleasant work environment. The following, in no particular order, are some of the more obvious types of behavior that the Lexington County Sheriff's Department considers to be highly inappropriate in the workplace:

---

[11]  All evidence handling to include the return of the items to the owner was documented in material provided by Sgt. Collins.
[12]  CPU Model: Dell Latitude CPt, Serial No.: 24766330609

B-00428

4

A_42204

. Displays of sexually explicit pictures or objects;
. Demands or requests for sexual favors;
. Sexually oriented jokes;
. Sexually oriented talk or commentary not associated with official business;
. Compliments of a sexual or suggestive nature.

and; in III.(B)(5)

Employees, including supervisors, who are determined to have violated this policy, will
be subject to serious disciplinary action up to and including termination, commensurate
with the seriousness of the conduct.

Lexington County Sheriff's Department Policy and Procedure No. 205,
Information Technology provides in III (D):

Employees are reminded that computers and other equipment are to be used for official
business. The employee has **no expectation of privacy** for any data stored or transmitted
from a departmentally owned computer.

As to Events Occurring after McNair's Interview:

During his interview and meeting with Sheriff Metts as above described, McNair,
prior to being questioned, was provided with a written Garrity advisement entitled
"Memorandum of Garrity Rights and Employee Responsibilities" which he signed. In
part, the memorandum provides:

Further, you are not to discuss this investigation and / or the underlying facts with
members of this department or anyone else who is now or may become a subject in this
matter as such would likely jeopardize this investigation.

Further, Sheriff Metts explicitly explained to Capt. McNair that he was not to
further discuss the matter, nor indicate that his conduct was under investigation; and that
he should not intimidate or attempt to improperly influence any potential witnesses.
Based upon McNair's agreement that he follows the instructions, he was not suspended
pending the outcome of this investigation.

On the day immediately following McNair held a meeting of Headquarters'
Region personnel in the squad room. In that meeting he read the Policy and Procedure
No. 300 to those assembled asking if everyone understood or had questions after each
paragraph. Prior to beginning the policy review, McNair produced a micro-cassette
recorder and explained that he was going to record what he said as he felt previous
comments of his had been taken out of context and reported to Major Harris.[13] He further

---

[13] During the course of this investigation Major Harris directed McNair to turn over the tape. McNair told
Harris that he had hit "Play" instead of "Record" and no tape of the meeting was made. See Statement of
Major Harris, June 26, 2002

B-00429                5

explained that he would recommend termination of anyone he caught using profanity and that he was in the middle of some "pooh – pooh".[14] Several attending indicated the tone of the meeting was hostile and intimidating. Sgt. Faglie described it as "one of Carlisle's regular rants and raves".[15]

After this meeting McNair invited Peake, Sims, Aiken, Frier, and Faglie to breakfast at Lizard's Thicket. Aiken, also interviewed and asked to provide a supplemental statement, writes:

> ...Capt. McNair invited several individuals to join him for breakfast at the Lizard[s] Thicket. Before entering the restaurant Capt. McNair stated to me that a Sexual Harassment complaint had been filed against him. This comment was made in the presence of Inv. D. Peake. Capt. McNair stated that his computer had been seized along with those of Inv. Peake and Inv. B. Sims[16]. It was at this point that McNair and Peake mentioned they shouldn't talk about what was going on because there was an internal investigation underway.
>
> Capt. McNair, Inv. D. Peake, Inv. S. Frier, Inv. B. Sims, Sgt. Faglie and myself attended the breakfast. During this time McNair stated that if any investigator had sexually explicit images or files on their computer they should erase or destroy them immediately....

On Monday June 24th, Howland came to my office visibly upset. As she relates in her written statement:

> On Monday, June 24, 2002, Scottie Frier was in my office when Captain McNair walked by and yelled from down the hall that if Scottie was not talking about a case he needed to leave my office. That kind of conduct is exactly the fallout I was afraid would happen. If Capt. McNair thinks it is appropriate to yell across investigations that [a] person needs to stay out of my office unless discussing a case, my co-workers may feel like they cannot talk to me, thus creating a hostile environment. Capt. McNair's conduct on Friday and Monday are exactly the reasons people are afraid to speak. After McNair' comments, I went to Major Tate in tears because of the fear of retaliation I had expressed to him on Thursday appeared, to me, to be occurring. I am afraid of losing my job and being treated as an outcast for speaking out at the sexual harassment class, and the way Capt. McNair has behaved has reinforced that fear.

Frier also provided a written account similar to the above. He further explained that the angry tone and public pronouncement concerned him. He reports that he later

---

[14]  Written statement of Milton, Frier used the exact expression in his oral interview.
[15]  Oral Interview of Faglie
[16]  Sims computer was never seized. He was interviewed as a witness and was at SCLEOA's annual conference in Myrtle Beach at the time of the viewing of the video.

A_42206

met with McNair and McNair apologized for "snapping" at him. McNair further explained that the comment was not directed at Frier but he "needed to stay away from her".[17]

While interviewing Aiken, he explained that McNair had attempted to show him a copy of his (McNair's) statement. The implication is that McNair was attempting to influence Aiken as to his reporting of the investigation. Aiken refused to read the paper and returned it to McNair. I instructed Aiken to prepare a supplement to his original statement and forward it to me. In its entirety it reads:

> This memo is a supplement to my original statement of June 21, 2002.
>
> On this date [June 24, 2002] I was speaking to Capt. McNair in his office pursuant to the investigators morning roll call. During this conversation about general investigative issues Capt. McNair handed me a single piece of paper from his desk drawer. Looking down at the paper I noticed some wording in the text body that referred to a video. At the same time Capt. McNair stated, "you haven't seen this." I immediately turned the paper over handed it back to him without reading anything further.
>
> Capt. McNair indicated that this was his statement about the video. We did not discuss any content of the statement nor was there any discussion about the pending inquiry. The document handed to me was a single piece of paper with type written text that covered approximately three quarters of the page. A signature was affixed at the bottom of the text and it was void of any logo at the top. End.

Aiken's description of McNair's statement is consistent with the statement provided to me during this investigation.

Policy and Procedure As to Events Occurring after McNair's Interview:

LCSD Policy and Procedure 405 III, entitled Employee Code of Conduct, provides:

> E. Employees shall diligently, completely, and without delay or question, carry out all lawful orders of a supervisor that pertain to the performance of their duty....
>
> and
>
> Y. All employees shall cooperate with and assist in any administrative internal investigation.

---

[17]  Written statement of Frier.

B-00431

7

## CONCLUSION

McNair violated Policy and Procedure 300 in that he, on at least two occasions, displayed a video clip containing obscene material, to wit a bald headed man attempting to insert his head into a woman's vagina, to other employees with no criminal investigative or business necessity of doing so. (Sustained)

McNair violated Policy and Procedure 405, the instructions contained in the "Memorandum of Garrity Rights and Employee Responsibilities", and the instructions of Sheriff Metts by attempting to provide a copy of his written statement to Aiken, in instructing other employees to destroy images on their computers, alerting other employees of this ongoing investigation and telling them his computer had been seized. (Sustained)

In addition to any punitive measures taken, I believe it is in the best interest of the department that McNair be specifically instructed not to harass or retaliate, either directly or indirectly, against anyone involved in this investigation; and should be administratively and physically moved out of the headquarters complex. **I simply cannot overemphasize the necessity of this instruction and separation should he be retained.** His contact with anyone involved in this investigation should be limited to absolute business necessity with no supervisory responsibility. In the same vein, those employees affected by his conduct should be instructed to report any suspected retaliation or improper conduct.

John W. Tate
General Counsel

Concur ____    Non-concur____

_Col. Mul Soloe_ 6/28/02
Title

B-00432

8