Filed:  June 28, 2012

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 11-3
(4:02-cr-00992-JFA-1; 4:08-cv-70072-JFA)

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CHADRICK EVAN FULKS,

Defendant – Appellant.

O R D E R

The Court amends its opinion filed June 26, 2012, as follows:

On page 5, third line of text -- "South Carolina" is corrected to read "North Carolina."

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

### FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 11-3

CHADRICK EVAN FULKS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Joseph F. Anderson, Jr., District Judge.
(4:02-cr-00992-JFA-1; 4:08-cv-70072-JFA)

Argued: March 20, 2012

Decided: June 26, 2012

Before WILKINSON, KING, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Wilkinson and Judge Agee joined.

**COUNSEL**

**ARGUED:** Billy Horatio Nolas, Amy Gershenfeld Donnella, FEDERAL COMMUNITY DEFENDER OFFICE, Philadelphia, Pennsylvania, for Appellant. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** William N. Nettles,

2                    UNITED STATES V. FULKS

United States Attorney, Robert F. Daley, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina; Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, Scott N. Schools, Associate Deputy Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

KING, Circuit Judge:

Having pleaded guilty in the District of South Carolina to all eight counts of a superseding indictment, Chadrick Evan Fulks was, on the recommendation of a jury, sentenced to the death penalty. The capital sentence was imposed on Fulks's convictions of Counts One and Two of the superseding indictment, respectively, carjacking resulting in death, in contravention of 18 U.S.C. § 2119(3), and kidnapping resulting in death, as proscribed by 18 U.S.C. § 1201. The federal charges in South Carolina related to the abduction and murder of Alice Donovan on November 14, 2002, in the course of a multistate crime spree engineered by Fulks and his cohort, Brandon Basham, following their escape from a Kentucky jail. Three days prior to Donovan being carjacked, kidnapped, and killed, Samantha Burns suffered the same fate in West Virginia at the hands of Fulks and Basham.

The district court sentenced Fulks on December 20, 2004, and, on appeal, we affirmed his sentence in all respects. *See United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006).[1] The Supreme Court, on June 25, 2007, denied Fulks's petition for certiorari. On June 23, 2008, in accordance with 28 U.S.C.

---

[1]Our prior opinion on direct appeal detailed the grim events culminating in the demise of the two women, and, except as necessary to provide context for the proceeding now before us, we will not repeat them here.

§ 2255, Fulks filed a motion in the district court seeking to vacate his conviction and sentence, and thereupon to be tried anew.[2] The motion, as amended, encompassed thirty-three discrete claims for relief, with respect to which the court conducted an evidentiary hearing beginning on February 22, 2010, and concluding on March 1, 2010. *See* 28 U.S.C. § 2255(b).

Upon due consideration, the district court issued an exhaustive memorandum opinion and order rejecting each proffered claim. *See United States v. Fulks*, No. 4:02-cr-00992 (D.S.C. Aug. 20, 2010) (the "Opinion").[3] The court nonetheless granted a certificate of appealability as to Claims 1 through 29 and Claim 33.[4] From that order and a subsequent one entered on January 13, 2011, denying his motion to alter or amend the judgment, *see* Fed. R. Civ. P. 59(e), Fulks timely filed a notice of appeal on March 2, 2011, maintaining that the dis-

---

[2]A federal prisoner may move to "vacate, set aside or correct" a sentence that is, inter alia, "not authorized by law or otherwise open to collateral attack," or to request appropriate relief if "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment [of conviction] vulnerable to collateral attack." 28 U.S.C. § 2255(a), (b). In the typical proceeding, of which Fulks's is one, the motion is required to be made within one year of "the date on which the judgment of conviction becomes final." § 2255(f)(1). Having been filed two days prior to the first anniversary of the date on which the Supreme Court declined review of his direct appeal, Fulks's § 2255 motion was timely.

[3]The unpublished Opinion is found at J.A. 100123-297 (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.)

[4]*See* 28 U.S.C. § 2253(c)(1)(B), -(c)(2) (confining § 2255 appeals to issues certified by federal justice or judge as presenting "a substantial showing of the denial of a constitutional right"). The August 20, 2010 "Order Denying Petition for Relief Under 28 U.S.C. § 2255" replaced the court's August 3, 2010 order, which was vacated pending filing of the official transcript memorializing the evidentiary hearing. On August 25, 2010, the district court entered a one-page clarifying order with respect to its ruling on the certificate of appealability.

trict court erred in denying him relief on seven of his claims. We possess appellate jurisdiction over the judgment against Fulks pursuant to 28 U.S.C. §§ 1291, 2253(a), and 2255(d). For the reasons that follow, we reject his assignments of error and affirm.

## I.

Six of Fulks's seven live claims allege that his lawyers at the sentencing proceeding and on direct appeal were constitutionally ineffective. At the outset, Claim 7 criticizes counsel's decision to have Fulks give an inculpatory statement to the FBI, with no prior stipulation of use or negotiated plea agreement in place. Fulks subsequently entered a guilty plea, likewise without reservation, and he contends, through Claim 28, that the tactic unreasonably ceded valuable rights with no commensurate benefit. Though it was hoped that his plea would indicate that Fulks had accepted responsibility for his actions, he argues that counsel should have deemed such hope forlorn, unlikely to carry any weight with the sentencing jury.

That jury, according to Fulks, was unconstitutionally predisposed to recommend death. The jury's predisposition, the argument goes, was the result of counsel botching the voir dire (Claim 15), neglecting to discover and follow up on a juror's failure to answer an important part of her questionnaire (Claim 16), and choosing to seat three venirepersons the defense perceived hostile to Fulks, rather than exercising peremptory challenges (Claim 17).

Insofar as the jurors were willing to keep an open mind and consider evidence in mitigation of the death penalty, Claim 5 asserts that they were impermissibly hindered in that task by one of the district court's instructions on that topic. Though counsel objected to the given instruction and preserved the putative error for potential review, Fulks maintains that not pursuing the issue on direct appeal constituted ineffective assistance.

Finally, in Claim 19, Fulks mounts a due process challenge against the government's use of statements uttered by Basham to the Brunswick County, North Carolina, Sheriff. Basham made the statements while assisting the Sheriff and others in locating Donovan's remains, and the government referred to them in both Fulks's and Basham's proceedings. Fulks accuses the government of conducting itself in a fundamentally unfair fashion by portraying the statements in different and inherently inconsistent ways, depending on which defendant was under jury scrutiny.

## II.

We address each of the above contentions in turn, reviewing de novo the district court's conclusions of law underlying its denial of Fulks's § 2255 motion. *See United States v. Stitt*, 552 F.3d 345, 350 (4th Cir. 2008). The court's findings of fact derived from the evidence adduced at its hearing are reviewed for clear error. *Id.*

## III.

## A.

The Sixth Amendment to the Constitution secures to all criminal defendants "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citation omitted). A prisoner seeking collateral relief from his conviction or sentence under *Strickland* "must demonstrate both that counsel's performance was deficient, and that the defense was thereby prejudiced." *Tice v. Johnson*, 647 F.3d 87, 102 (4th Cir. 2011). In view of the latitude customarily afforded criminal defense lawyers in formulating strategy, deficient performance will not be adjudged unless, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. We are thereby con-

6                UNITED STATES v. FULKS

strained to "indulge a strong presumption" that counsel performed reasonably. *Id.* at 689.

In the event that the presumption of reasonable performance is successfully rebutted, relief remains unavailable "if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The defendant must therefore demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The analysis "requires the court deciding the ineffectiveness claim to 'consider the totality of the evidence before the judge or jury.'" *Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011) (quoting *Strickland* at 695). In evaluating the evidence, however, "[w]e are not bound . . . to view the facts in the light most favorable to the prosecution," *Tice*, 647 F.3d at 111, and the requisite prejudice may be established short of showing that adequate performance "would have resulted ultimately in the defendant's acquittal," *id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434). As dictated by *Kyles* and *Tice*, then, Fulks may prevail on the prejudice prong though he be unable to show that competent counsel would have secured for him a life sentence, rather than death.

1.

Fulks's statement to the FBI on April 21, 2003, about five months after his arrest, was made ostensibly because he "wanted to tell the truth and help . . . locate the body of Alice Donovan." J.A. 201893. The statement related, in pertinent part: (1) Basham carjacked Donovan's BMW and kidnapped her in a parking lot while Fulks circled in another stolen vehicle; (2) Basham carried a revolver, but Fulks was unarmed; (3) Basham raped Donovan in the car's backseat and pressured a reluctant Fulks to do the same; (4) Basham taped Donovan's wrists afterward; (5) upon stopping at a secluded area, Basham led Donovan into the woods while Fulks

waited; (6) at Donovan's request, Fulks tried to dissuade Basham from taking the gun into the woods, to no avail; (7) Basham returned about twenty minutes later, carrying Donovan's few remaining clothes; (8) Basham initially said that Donovan had been tied up, but later that day admitted that he had strangled her; (9) Basham talked about murdering another woman two years prior and asked Fulks whether he had ever killed anyone, to which Fulks responded in the negative; and (10) during a later disagreement, Basham pointed the revolver at Fulks's head. *See id.* at 201893-98.

Fulks's statement had no strings attached. It was not exchanged for the promise of a reduced sentence; nor was it given in the form of a limited-use proffer, as is sometimes done in the course of negotiating a plea agreement. An expert for Fulks, Andrea Lyon, opined at the § 2255 hearing that the gratuitous statement was an unreasonable choice without first "get[ting] some kind of protection for him," J.A. 200951, or "at the very minimum . . . the conversation itself [being] protected," *id.* at 200953. Lyon testified that, otherwise, "there's nothing to gain for the defendant." *Id.* at 200952.

John Blume, the lead defense counsel, retorted that he did not wish to subject Fulks to cross-examination by having him testify at the sentencing trial, and that, through the statement, Fulks "could get out his version of the events, which was that he was not the actual killer, and then the government would hopefully admit this at trial as Mr. Fulks' version of the offense." J.A. 200725-26. Blume insisted that he "didn't want a proffer . . . we wanted the statement to be used" at trial, *id.* at 200726, clarifying that "we wanted it to demonstrate . . . acceptance of responsibility [and] . . . some true indicia of remorse." *Id.* at 200727.

Blume acknowledged that having Fulks go through with the statement committed the defense to the entry of a guilty plea about one year later, on May 7, 2004, but that both decisions were intended to achieve the "best case scenario" of avoiding

the death penalty. J.A. 200732. Blume "didn't see any credible defense or issue" that would lead to a verdict of not guilty. *Id.* at 200729. Consistent with that view, Blume confronted his client with the unvarnished truth, as he saw it: "You know, Chad, they are going to find you guilty. And even if they accept everything you say is true in your [statement], you are guilty of the charged offenses. And I think the best chance to try and save your life is for you to plead guilty." *Id.* at 200733.

The facts establishing Fulks's involvement in the events leading to Donovan's death were, as Blume astutely surmised, beyond peradventure. Although there were no eyewitnesses to the murder other than the principals, one of the prosecutors submitted a sworn declaration that "[t]he investigation quickly developed independent evidence implicating Fulks and Basham in both murders [South Carolina and West Virginia], and the evidence regarding the South Carolina murder was particularly strong." J.A. 201956; *see also* Opinion 81 ("Independently of his statement, Fulks's guilt was not subject to any reasonable dispute."). The evidence was provided by members of the culprits' entourage who accompanied them during portions of their escapades, police officers and ordinary citizens who encountered them along the way, and physical items such as surveillance videos and credit card records. *See* J.A. 201956-58.

The compelling case against Fulks left his lawyers with little leverage for negotiation. Defense counsel engaged in ongoing discussions with the government concerning Fulks's willingness to cooperate, and, in particular, to assist the authorities in locating Ms. Donovan's body. The government made clear at the outset that it "had no interest in receiving that information under conditions that would not allow the use of the information directly or derivatively," and it "insist[ed] that information be provided without restriction." J.A. 201958.

The government's position was based in large part on the strength of the case against Fulks and Basham, and it was consistent with the prior rejection of Basham's proffer of cooperation in exchange for a life sentence. Of note here, the government turned down Basham at a time when the information derived from its investigation "was less extensive and the evidentiary value of locating the remains was greater." J.A. 201959. There was, therefore, "no reason in April 2003 to treat Fulks more favorably." *Id.* The uncontroverted evidence in the record shows that the government had informed Fulks that it would not negotiate a protected statement and, indeed, that the government "would have foregone any interview of Fulks rather than receive information from him that could not be used against him." *Id.*

Nonetheless, according to defense expert Lyon, Fulks should not have volunteered any statement, nor should Blume have arranged for a guilty plea, regardless of the strength of the government's case. Lyon testified that a competent defense attorney would never do either absent an appropriate concession from the prosecution, and she suggested that the benefits cited by Blume supporting his strategy were largely illusory. Lyon indicated that Fulks could have gotten his story before the jurors through the mental health experts retained by the defense, and she was dubious that a sentencing jury, on the whole, would ever give a capital defendant any credit in mitigation for pleading guilty. *See* J.A. 200951-64.

Lyon's opinion as to the latter point appears to run counter to a simulation conducted on Fulks's behalf by a jury consultant, the results of which were memorialized in a memorandum dated March 9, 2004. Therein, the consultant recorded that several jurors in the mock proceeding "did find in fact that Chad's guilty plea was mitigating and remorseful." J.A. 201964. And, at the close of the actual sentencing trial, held throughout June 2004, the jury unanimously found — as a mitigating factor — that Fulks had pleaded guilty to the capital charges. *See id.* at 201816. Moreover, Lyon's suggestion

10                    UNITED STATES v. FULKS

that Fulks "testify" through his own witnesses ignores the likelihood that the jurors would give his version of events more attention and credence if relayed to them by a prosecution witness. Indeed, the government responded as Blume predicted, by calling one of the FBI agents who interviewed Fulks to present his statement to the jury.

We conclude that, given the unpalatable hand the defense team was dealt, having Fulks speak to the authorities and then plead guilty were reasonable litigation tactics, though Blume obtained no palpable quid pro quo from the government. Further, counsel's approach engendered no prejudice at sentencing, there being little, if any, chance that the jury would have made a different recommendation had Fulks instead stood silent or if his guilt had been found instead of admitted. Insofar as Fulks ventures beyond sentencing prejudice to argue that an acquittal was reasonably probable had the capital charges gone to trial with no inculpatory statement in the record, we readily reject that contention. In view of the totality of the evidence, we are confident that, under either strategy, the outcome of the guilt phase would have been the same.

2.

a.

The parties engaged in jury selection from May 10-21, 2004, with Blume examining eight of the twelve jurors eventually seated. Lyon took strong issue with Blume's questioning, calling it "some of the worst voir dire I have ever read in my life." J.A. 200969. Lyon scoffed that "there's just pages and pages of him . . . making speeches at the jurors, and then asking the juror to say yes or no to a question that gets lost in the middle." *Id.* On August 4, 2004, at the outset of voir dire in the Basham sentencing, the district court cautioned the defense lawyers against taking the same tack as Blume had several weeks previously:

4:02-cr-00992-JFA    Filed 09/13/12    Entry Number 1526-2    Page 12 of 22

UNITED STATES V. FULKS                              11

You know from what you saw in the first go-round that . . . I asked a juror the standard questions under the Supreme Court decisions on death-qualified jurors[,] . . . ["]Do you have such strongly held beliefs about the death penalty that you could not set-aside those beliefs and conscientiously follow the law as announced by the judge?["]

* * *

And, so, after I went through all of that, then Mr. Blume got up and on several witness jurors, ["]Mr. Juror, let's say you have a case where someone is over 18, not under a mental disability, not acting under duress, not acting in self-defense who commits a murder. Would you give that person the death penalty?["] The juror said, ["]Yes, I would.["] And every time I would have to then go back and say, ["]Now, Mr. Juror, you told me one thing, and you told Mr. Blume something else, have you changed your answer?["] And the juror would be confused . . . [,] and almost every time the juror said, ["]Oh, no, no, no, I didn't mean to tell Mr. Blume that. I didn't understand him to ask me that question.["]

The result was, I think Mr. Blume really paid a price with the jurors because it looked like he was trying to trick them, to be honest with you. And I just say that for [your] benefit. You need to decide whether you are going to go down that same road or not.

*Id.* at 400446-48.

Fulks posits that the jury's recommendation of death manifested its dislike of Blume. Squarely confronted with Fulks's hypothesis, the district court thought the notion invalid, announcing that it was "constrained to disagree with [the]

contention that Blume's questions to prospective jurors were rambling, confusing, intimidating, or otherwise ineffective." Opinion 116. The court continued, "[the] bald allegations that the questions posed by Blume were improper, ineffective, or offensive to jurors [are] unavailing." *Id.* at 116-17.

Having overseen the entirety of the jury selection process, the district court's opportunity to gauge the effect of counsel's questions was unparalleled. The court's determination that Blume's voir dire did not harm his client's case, derived from its contemporaneous perception of the dialogue between the jurors and counsel, is a finding of fact to which we cannot ascribe clear error. *See Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (explaining that presiding court's assessment of juror bias or prejudice at voir dire is entitled to "special deference" as "essentially one of credibility, and therefore largely one of demeanor").

Although the district court appeared to express its disapproval of Blume's technique to Basham's lawyers, we do not perceive its comments on that occasion as fundamentally inconsistent with its finding here. The court's offhand observation that a lawyer was less than optimally effective in no way mandates a conclusion that he was constitutionally ineffective. Furthermore, we highly doubt that the court would have left the door open for Basham's counsel "to go down that same road" if it believed the jury would be impermissibly tainted as a result.

b.

Fulks contends that the jury that determined his fate was not the fair and impartial factfinder mandated by the Constitution. For that, Fulks blames Blume, who allowed three jurors to be seated notwithstanding an assessment that they were unfavorably disposed to Fulks's cause. One of those jurors was selected after neglecting to apprise the parties that her first husband had been the victim of a murder. Fulks main-

tains that counsel's failure to detect the omission was another example of deficient performance substantially increasing the likelihood that the jury would recommend a death sentence.

The defense team employed a common technique known as the "Colorado Method" to rate potential jurors on a scale from 1 to 7, "with 1 being a juror who would never under any circumstances give death, and 7 being a juror who would always give death." Opinion 114. Among the venirepersons examined by Blume, with counsel's composite rating in parentheses, were Lisa Harvey (6.90), Richard Goehring (6.48), and Sylvia Allison (6.10). The defense used their twenty-three peremptory strikes on others, the majority of whom had lower ratings, because Blume ascertained that the three he agreed to seat presented the most promise for challenging on appeal the district court's refusal to dismiss them for cause.

Question 42 of the Juror Questionnaire inquired of each venireperson, "Have you or has any close friend or relative been the victim of a crime, whether it was reported to law enforcement authorities or not." J.A. 201837. An affirmative answer required additional details in follow-up. Allison left the question unanswered, though her newlywed husband had been murdered in 1971. At the evidentiary hearing below, Blume admitted the oversight: "I still don't know how we missed it but we missed it." *Id.* at 200793.

We previously addressed both issues on direct appeal, applying the governing principle that a person is disqualified from a capital jury if voir dire reveals that he "'will fail in good faith to consider the evidence of . . . mitigating circumstances as the instructions require him to do.'" *United States v. Fulks*, 454 F.3d 410, 427 (4th Cir. 2006) (quoting *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)). Put another way, the district court need only have excluded those potential jurors who "would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law." *United States v. Tipton*, 90 F.3d 861, 878 (4th Cir. 1996). In a similar

14                    UNITED STATES V. FULKS

fashion, because the court found that Allison's omission was inadvertent and that she would not in any event have been excused for cause, Fulks was required to demonstrate that she was actually or impliedly biased in favor of imposing the death penalty. *See Fulks*, 454 F.3d at 431-32.

We concluded that the district court had acted within its broad discretion in declining to exclude any of the three jurors for cause, and, in denying Fulks's motion for a new trial, refusing to declare Allison unfit after the fact. Nothing has changed in this § 2255 proceeding, except that Fulks contends that the abuse-of-discretion standard of review we applied to these claims on direct appeal "is more stringent than the *Strickland* 'reasonable probability' standard applicable here." Br. of Appellant 58. Fulks argues that inasmuch as we earlier described the issue of whether Goehring should have been green-lighted as perhaps being "close," *Fulks*, 454 F.3d at 428, the more exacting scrutiny required by *Strickland* tips the scale and necessitates relief at this stage.

Fulks's argument misconstrues the relationship between the direct and the collateral proceedings; the latter is not designed to be a rehash of the former under a more defendant-friendly standard. The inevitable upshot of our holding on direct appeal that the district court had not abused its discretion with respect to juror selection or the post-proceeding attempt at disqualifying Allison was that the process had resulted in a fair and impartial jury. With the Supreme Court's denial of certiorari, that holding became, for all practical purposes, the law of the case. *Cf. Hodge v. Haeberlin*, 579 F.3d 627, 643 (6th Cir. 2009) (noting Kentucky Supreme Court's "straight-forward application of collateral estoppel" where *Strickland* claim "relies on proof of an element already resolved on direct review").

On collateral attack, our task is different. We may consider under *Strickland*'s prejudice prong whether there existed a reasonable probability of a different result on the determina-

tion (or assumption) that counsel rendered deficient performance. *See, e.g., Smith v. Spisak*, 130 S. Ct. 676, 685 (2010) (assuming, without deciding, that counsel's performance was inadequate, but nonetheless rejecting defendant's *Strickland* claim for lack of prejudice). Because we commence, however, with the immutable premise that the jury in this case satisfied the strictures of the Constitution, Fulks can under no circumstances demonstrate the necessary precondition for his claim, i.e., that Blume's actions in selecting the jury strayed beyond the bounds of reasonableness.

The most that Fulks can say is that Blume could have conceivably empaneled a marginally more sympathetic jury by electing to seat different jurors in place of three that actually served. That is not enough, however, to trigger an analysis of whether such a hypothetical jury — comprised in part of nine of the same members who actually voted for death in this case — would have recommended a life sentence. *See Delaware v. Van Arsdall*, 475 U.S. 673, 681 ("[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one."). A conclusion in the affirmative could only be based upon rank speculation, defying calculation of a reasonable probability.

3.

An issue that we did not address on direct appeal, though preserved by objection at sentencing, was the propriety of one of the district court's instructions on mitigation:

> As to the mitigating factors asserted by the defendant, Mr. Fulks, in this case, the law provides that there is, essentially, no limit on the number of factors or things that the jury may consider in mitigation. As to each of the factors submitted by the defendant, and which I am about to list, you must, essentially, engage in a two-step process in determining whether any one or more of them have been proven.

16                    UNITED STATES V. FULKS

> Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence.
>
> Secondly, if you determine that the factor has been proven, you must determine whether the fact is mitigating, as I have defined that term for you. That is, it tends to suggest that life in prison without parole and not death is the appropriate punishment.

J.A. 303943. Fulks maintains that the court's "two-step" instruction, insofar as it directed the jury to "determine whether the fact is mitigating," invited the jurors to disregard evidence that was indisputably mitigating, contrary to the Supreme Court's admonition in *Eddings v. Oklahoma*, 455 U.S. 104 (1982). The Court in *Eddings* ruled that, consistent with the view of the Eighth Amendment it expressed in *Lockett v. Ohio*, 438 U.S. 586 (1978), a capital sentencing entity may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings*, 455 U.S. at 115. In light of what Fulks perceives as the strength of the *Eddings* issue, he contends that counsel was ineffective for not pressing it on appeal.[5]

The circumstances confronted by the Supreme Court in *Lockett* and *Eddings* are readily distinguishable from those at bar. The statute at issue in *Lockett* permitted consideration of only three mitigating factors, while, in *Eddings*, the trial court

---

[5]Fulks maintains that the government's closing and rebuttal arguments exacerbated the alleged error occasioned by the instruction, in that the prosecutor suggested to the jury that the evidence of Fulks's upbringing was of limited relevance because it did not cause the offense conduct, *see* J.A. 303798-99, and because that conduct was relatively remote in time from and not in direct retaliation for his abuse, *see id.* at 303899-900. We note that no contemporaneous objection was made to the prosecutor's remarks. The remote possibility that we would have discerned plain error in connection with this aspect of Fulks's claim precludes a conclusion under *Strickland* that a different result on appeal was reasonably probable.

sentenced the defendant in the belief that it was barred from considering his family history in mitigation. Plainly, the practical effect of the instruction in Fulks's case was different: before a juror could determine that a proffered factor should be given no mitigating weight, he or she had to at least evaluate it at the threshold. *See United States v. Higgs*, 353 F.3d 281, 327 (4th Cir. 2003) (observing that "the Constitution only requires that the jury be allowed to *consider* evidence that is proffered as mitigating"); *see also United States v. Basham*, 561 F.3d 302, 337 (4th Cir. 2009) (instructing that neither the Constitution nor laws of the United States "require a capital jury to give mitigating effect or weight to any particular evidence" (citation omitted)). Unlike the situations in *Lockett* and *Eddings*, the decisionmakers here were not directed by law or influenced by misapprehension to stick their respective heads in the sand and ignore the defendant's evidence.

Just the opposite is true. The challenged instruction informed the jury that there was "no limit" on what it could consider in mitigation, and the district court specifically directed that "[a]ny juror persuaded that a mitigating factor exists, must consider it in this case." J.A. 303944. That at least one juror found thirty-two of forty-three proffered mitigating factors present in Fulks's case, with twenty-two being found unanimously, bespeaks not of a jury whose discretion and compassion were by any means impermissibly curtailed.

As with his claims pertaining to jury selection at sentencing, Fulks's assertion of ineffective appellate assistance fails for want of a tenable premise. In each instance, counsel's actions or omissions having engendered no significant error, deficient performance cannot be ascribed thereto.

B.

On the trip to locate Donovan's body, a doe jumped in front of the van in which Basham, his counsel, and several law

18                    UNITED STATES V. FULKS

enforcement officers were riding. Basham remarked to Sheriff Ronald Hewett, "You know, I could never even kill a deer and here I have —" before being abruptly stopped mid-sentence by his attorney. J.A. 400543. Later, with the group debarked at a cemetery, Basham showed Hewett through gestures how Donovan had been strangled with a strap Basham said came from a Liz Claiborne purse. Basham did not indicate whether he or Fulks had performed the physical act of strangulation. Basham then demonstrated how he had thrown the strap into the nearby woods. *See id.* at 400210-11, 400572-73.

In the midst of his sentencing trial, after the jury had been dismissed for the day, Fulks moved the district court to have the hearsay "deer statement" admitted on the theory that Basham had been on the verge of confessing he had personally ended Donovan's life. The government opposed the statement's admission on the ground that it was ambiguously incomplete, and the court agreed that Basham could have finished the deer statement by saying "a number of things that still inculpated Mr. Fulks," such as "I helped bury a dead body," or "I held the woman down while she was killed." J.A. 400513. Minutes later during the same colloquy, while arguing provisionally for reciprocal admission of competing statements under the rule of completeness, counsel for the government recalled Sheriff Hewett's suppression hearing testimony concerning the demonstration at the cemetery "how Brandon Basham said that Chad Fulks took the purse strap and strangled [Donovan]." *Id.* at 400517.

Subsequently, at Basham's trial, the government introduced the deer statement and reminded the jury of it at closing, asking rhetorically, "What do you think he is thinking about? Here I have smoked a joint? Here I have stolen a car?" J.A. 400648. On the heels of that argument, the government referred to Sheriff Hewett's testimony concerning the incident at the cemetery, recounting that Basham "didn't say I killed Alice Donovan. No, he demonstrated it." *Id.* at 400649. A moment later, however, the government described the inci-

dent in more general terms, characterizing Basham's demonstration as "how Alice Donovan was strangled." *Id.* at 400650-51.

We have previously acknowledged that, "[i]n some situations, the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants." *Higgs*, 353 F.3d at 326. A due process violation may occur "if 'an inconsistency . . . exist[s] at the *core* of the prosecutor's cases against the defendants for the same crime,'" *id.* (quoting *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000)), or if "the evidence used at the two trials is 'factually inconsistent and irreconcilable,'" *id.* (quoting *United States v. Paul*, 217 F.3d 989, 998 (8th Cir. 2000)). According to Fulks, the government's approach to the two trials was inconsistent at its core, entitling him to relief.

We disagree. Viewed in the context of the entirety of both proceedings, the government's core theory was that Fulks and Basham were equally culpable in Donovan's murder and similarly deserving of the death penalty, regardless of which one physically ended her life. For example, the government told Fulks's jury that he and Basham "acted together as one in concert with one another . . . . They could not have done things that they did . . . without acting in unison." J.A. 303693. The story was the same at Basham's trial: "Their actions, their conduct, their choices were made as a team. Brandon Basham could not have carjacked and kidnapped Samantha Burns or Alice Donovan without Chad Fulks. And Chad Fulks could not have carjacked and kidnapped Samantha Burns and Alice Donovan without Brandon Basham. They are equally culpable." *Id.* at 400682.

In *Higgs*, we discussed the government's approach to the separate trials of the titular defendant and his accomplice in crime, Haynes. It was undisputed that Haynes was the triggerman in a triple homicide, but he argued that he was acting under duress from Higgs. The government responded that

20                    UNITED STATES V. FULKS

Haynes's free will had not been overcome, which Higgs contended was inconsistent with the prosecution's argument at his own trial, namely, that Higgs was the mastermind and therefore more culpable. We rejected Higgs's assertion of core inconsistency:

> The government argued precisely the same factual predicate for Haynes's and Higgs's convictions, i.e., that Higgs retrieved the gun from his apartment, drove the van to the murder scene, and handed the gun to Haynes after the women got out of the vehicle . . . . [T]he argument that Haynes was a "partner in crime" with Higgs because he could have chosen not to murder the women is not inconsistent with the argument that Higgs was more culpable because he brought the murder weapon to the scene and told Haynes to do it. It was certainly not so inconsistent as to amount to a due process violation.

353 F.3d at 327.

Likewise here, there was no material variance in the facts proved to establish Donovan's death at the hands of Fulks and Basham. We are not unmindful that, in joint-action cases where the ultimate perpetrator is in doubt, sentencing juries may be less lenient with the defendant it perceives to have fulfilled that role. Nevertheless, in light of the overall theme of both Fulks's and Basham's trials (of which we have cited only an example or two for illustrative purposes), we cannot conclude that tangential inconsistencies relating to inferences drawn from the undisputed evidence are, in this case, so serious as to constitute a violation of due process. This is particularly so when significant portions of the events resulting in the alleged inconsistencies occurred outside the jury's presence.

We therefore agree with the district court that Fulks has shown, "at best, an inconsistent argument concerning the vagueness of Basham's statements, but [not] that the govern-

ment relied upon factual theories that were inconsistent at the core of its case." Opinion 130. Fulks's sentencing to the death penalty thus comported with due process.

## IV.

Fulks understandably seeks to avoid his death sentence, and, toward that end, counsel has striven to characterize the jury's decision as unduly dismissive of the defense's efforts at trial to portray Fulks's unfortunate upbringing as presenting a good case in mitigation. As it happens, however, Fulks's despicable crimes also presented a mighty case in aggravation, and it cannot be supposed that the jury's recommendation of death was unjust or an anomaly, in light of all the circumstances.

Pursuant to the foregoing, we affirm the judgment of the district court.

*AFFIRMED*