1

,UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
    -vs-                                    October 10 & 11, 2012

BRANDON LEON BASHAM,

          Defendant

------------------------------

              BEFORE HON. JOSEPH F. ANDERSON, JR.
                UNITED STATES DISTRICT COURT JUDGE
                        MOTION HEARING
                     TESTMONY OF GREG HARRIS


APPEARANCES:


FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                     UNITED STATES ATTORNEY
                     BY:  ROBERT F. DALEY, JR.
                          JIMMIE EWING
                          JEFFREY M. JOHNSON
                          WILLIAM K. WITHERSPOON
                     Assistant United States Attorneys
                     1441 Main Street
                     Columbia, SC  29201

FOR DEFENDANT:       JULIA G. MIMMS, ESQ.
                     JULIA G. MIMMS LAW OFFICE
                     1001 Elizabeth Avenue, Suite 1A
                     Charleston, NC  28204

                     ARIZONA FEDERAL PUBLIC DEFENDER
                     BY:  MICHAEL L. BURKE
                          SARAH E. STONE
                     Assistant Federal Public Defenders
                     850 W. Adams, #201
                     Phoenix, AZ  85007

COURT REPORTER:      DANIEL E. MAYO, RDR
                     Certified Realtime Reporter
                     901 Richland Street
                     Columbia, SC   29201


            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

THE COURT:  It's little bit after 5:00.  Do you have a witness we can start on?

MS. STONE:  We do, your honor.  Mr. Greg Harris is here and we can go ahead and start with him.

THE COURT:  Go ahead and start with him.

(Greg Harris duly sworn)

MS. STONE:  Your Honor, as a preliminary matter, I just spoke to the government about this but I want to let you and Mr. Harris know, to try and speed things along, I had originally intended to go through larger sections of transcripts.  I am going to briefly summarize in my question what those transcripts are.  If at any time the government or Mr. Harris or the court would like to see that actual transcript we do have them loaded and we can bring up the pages.  But to try and speed things along I'm not --

THE COURT:  Let me emphasize we're a little bit behind schedule but I'm not rushing anybody.  We can take all the time necessary to hear this case.

MS. STONE:  I think we can get everything, I want everybody to know, I don't want to mischaracterize anything and we have the transcripts if people need to see them.

THE COURT:  Very good.

MS. STONE:  Thank you.

DIRECT EXAMINATION

BY MS. STONE:

Harris – Direct                                    4

Q.  Good afternoon, Mr. Harris.

A.  Good afternoon.

Q.  Thank you for being here and being here yesterday and being willing to miss your daughter's tennis match.  I know it's been a bit of an ordeal, so thank you for your patience.

A.  Not a problem.  I actually got to go, thank you very much.

Q.  Good.  Can you give us a little bit of information about your background, where you went to law school?

A.  My background, I went to Irmo High School here in the Columbia area.  I attended The Citadel from 1979 through 1983. I immediately entered into the University of South Carolina School of Law and graduated 1986.

Q.  And what did you do when you graduated?

A.  After graduation I worked for a circuit court judge, Marion Kinon, for a year.  After that I went into what we have here, the solicitor's office, which is the district attorney's office where you are, and prosecuted any number of crimes. The end of my tenure there I was prosecuting violent crimes.

     After that I was employed at the United States Attorney's Office here in the District of South Carolina.  I was there for approximately four years, where I served as a deputy chief of the criminal division under United States Attorney Bart Daniel.

Q.  And did you go into private practice at some point?

A.  Yes, I did.  Sometime I think March, it was March 3, 1993

I went to private practice.

Q.  And did you share office space with Jack Swerling?

A.  Yes, I did.

Q.  And how long did you do that for?

A.  I was sharing office space with Jack Swerling until five years ago in September, so I think it would have been 14 years.

Q.  You were sharing office space with Mr. Swerling at the time you were appointed on Mr. Basham's case, is that correct?

A.  That is correct.

Q.  And you were appointed in April of 2003?

A.  That's correct.

Q.  And is it correct that you were not the original lawyers appointed on Mr. Basham's case?

A.  Yes, it is.

Q.  Can you explain the circumstances of your appointment a little bit?

A.  Well, obviously, I believe Jack Swerling is on the top of everybody's list when it comes to appointing someone to a death penalty case.  I recall that Jack would have been contacted first.  I was contacted sometime thereafter, I can not remember by whom.  I know that I spoke with a number of death lawyers in the state.  I spoke with John Delgado, I spoke with Bill Nettles, I spoke with David Bruck.  I remember David Bruck called me and asked me would I be willing to be

involved in the case.  And at some point I obviously spoke with Jack, and I believe that I was requested -- the court asked me to be involved in the case.

Q.  Thank you.  And would you agree with the characterization that the Basham case was a massive undertaking?

A.  Oh, absolutely.

Q.  Can you expand on that little bit?  Can you describe maybe the scope of the case?

A.  It involved many states, it involved many witnesses.  And when I say many states, North Carolina, South Carolina, West Virginia, Kentucky, Indiana, Massachusetts.  I don't think we ever got to Florida, I don't think that we ever went into Tennessee.  But the states that I mentioned involved all those states and a lot of time in each of those states, with the exception of Massachusetts, where I think that we only had one appointment.

In terms of witnesses, it was probably one of the largest cases that I've ever seen anyone be involved in, much less myself having been involved in.  And certainly in terms of witnesses and amount of discovery that was created by not only the government but also by the defense team, it was one of the largest cases I've ever seen anyone involved in.  So when you say -- your adjective was accurate in terms of describing this case.

Q.  And can you talk a little bit about the division of labor

between you and Mr. Swerling to try and tackle this massive undertaking?

A.   Jack was in charge, and I think it was clear from the very beginning, as it should have been, that in terms of division of labor I certainly had my own ideas about how things should be divided and about who should be doing what.  But at the end of the day I was -- you know, Jack and I have a very good relationship, so I'm not here to say I deferred to Jack on anything, but at end of day I respected Jack's opinion enough, his expertise enough, and his involvement in other matters such as this enough to most of the time that if Jack had an opinion about something that's how it was going to be done, including the division of labor.

Q.   And were there also steps taken to keep track of the information gathered or things that had been done?  Specifically, was there a policy to write a memo for everything in this case?

A.   You know, I mean, Jack and I wanted memos when someone was interviewed, because Jack and I wanted to know as soon as someone was interviewed, or as close as possible to when they were interviewed, what they had to say about a particular topic or subject, no matter what it was.  Whether it was a doctor at Rivendell or whether it was a nurse at Cardinal, or whether it was a caregiver at one of the facilities that Brandon had visited when he was 12.  You know, obviously we

wanted to stay on top of the interviews, we wanted to stay --
to know what everybody was saying and what information that
they could give to us.  So, yes, in terms of keeping a memo,
we wanted memos if we weren't involved in the interview so we
would know what people were saying.

Q.   And who was responsible for signing the vouchers in this
case?

A.   Jack.

Q.   And who put the Basham team together?

A.   I think it was a collaborative effort in many respects.  I
think, again, as the person most knowledgeable, the leader in
this case, I think that certainly it could be fairly said that
Jack had a very large role in putting that team together.

Q.   And at this point my understanding is that Mr. Basham and
Mr. Fulks were the first federal death penalty case in South
Carolina, is that correct, to your knowledge?

A.   Certainly in the last 50 to 70 years.  I cannot speak to
what happened in the '40s, the '30s, the '20s, but certainly
in my lifetime, yes, that is correct.

Q.   Did you have any state experience in death penalty cases
at that point?

A.   I did not.

Q.   I want to go back to the team, and I want to focus on two
team members and ask you some questions about Paige Tarr and
then Carlisle McNair.  First Paige Tarr.  Would you agree that

Paige Tarr fairly quickly built a relationship with Brandon Basham and some of the folks in Kentucky?

A.   Yes, she did.

Q.   And was she the lead litigation specialist?

A.   Initially she was.

Q.   And is it fair to say she was responsible for a fairly large number of interviews?

A.   You mean -- if you are looking at it now from when she started to where -- when she ended in her body of work, whether she participated in a large number of interviews, is that the question?

Q.   Whether she was responsible for finding a large number of individuals or taking a large chunk of that litigation investigation.

A.   Absolutely, I agree with that.

Q.   Was there an issue at some point in the case with Paige Tarr getting memos done in a timely manner?

A.   Yes.

Q.   And did Mr. Swerling have to speak with her about that issue?

A.   Yes.

Q.   At some point was Lisa Kimbrough brought in to replace some of Miss Tarr's hours?

A.   Yes, she was.

Q.   And did Miss Kimbrough have the same relationship with

Mr. Basham as Miss Tarr did?

A.   I really can't speak to that.  I would guess yes, no, she wouldn't have, because I know Miss Tarr had really spent a good number of hours with Brandon's family and with Brandon. So probably not.

Q.   Okay.  And I want to move on now to Mr. McNair.  Who hired Mr. McNair?  Who found him as a possible person --

A.   Jack.

Q.   And did you know Mr. McNair from his work when he was a law enforcement officer?

A.   You know, I thought about that.  I think someone asked me that question, you know, when we were preparing for this, maybe not that specific question, but I have given that some thought.  I do not think that I ever had a case with Carlisle McNair before he worked with us in Basham.

Q.   Okay.  And we have had a chance to speak prior to this hearing.  Is it a fair characterization of your words to say that you believe Mr. McNair was good at finding folks?

A.   Yes.

Q.   And folks, not Fulks.  I apologize.

A.   That's -- he was good at finding folks, yes.

Q.   And his purpose on the team was to be a fact investigator, is that correct?

A.   I mean, I would -- I don't want to say that was his singular purpose, but that was his role on the team was to --

that was one of his roles, yes.

Q.  Okay.  But I think, going into that thought, he also did interviews of witnesses who were potential mitigation witnesses?

A.  Correct.

Q.  Do you know if Mr. McNair had any training in mitigation work?

A.  I do not.

Q.  Another positive that's been said about Mr. McNair is he was good with interviewing law enforcement officers.  Would you agree with that?

A.  Yes.

Q.  Did Mr. McNair still view himself as a law enforcement officer?

A.  Did he?

Q.  Yes.

A.  I do not believe that he did.

Q.  Susie, can you bring up Exhibit 44?  And can -- the text part.  Thank you.  And just so you know, Mr. Harris, all of these have already been admitted in evidence by stipulation.  So this is an e-mail from Mr. McNair to the team.  Do you see there, once a cop always a cop?

A.  I see that, and that is Carlisle McNair.  When you said did he believe himself to be a cop, I want to make sure I'm clear.  He's a cop at heart.  I mean, you didn't have to show

me this e-mail, my answer to you had you said, you know, did he believe to be a cop in the sense that he is always a cop, is he a cop at heart, I would have said yes.  Once a cop always a cop, I think that's probably the best description of Mr. McNair, yes.

Q.  So you think his description of himself there is accurate with your interactions with him?

A.  Yes, that is correct.

Q.  You are now aware Mr. McNair resigned from his job as a law enforcement officer after some issues, is that correct?

A.  Yes.

Q.  Do you recall what some of those reasons were?

A.  It's a long time ago, I have not looked at those reports, but I think they had something to do with the inappropriate contact with an informant.  It may have had something to do with inappropriate contact with young -- a young female, but --

Q.  Do you recall?

A.  It might have also had something to do with, and I don't want to say evidence tampering, but it might have had to do with a report or something that he pulled from a file that wasn't provided to defense during discovery.

Q.  Do you recall anything about an obscene videotape, being disciplined for showing staff an obscene videotape?

A.  No, I don't know that.

Q.   You don't recall that.  If it was in -- Susie, can you bring up 2255 exhibit -- I'm sorry, reply Exhibit 15.  I'm sorry, 17.  I apologize.

A.   I don't deny that this document was provided to me.  I'm just telling you, I don't recall it today as I sit here.  But if you tell me that that was part of the investigative summary that was provided to us in discovery and that it was part of it, I accept that.

Q.   Okay.  One of the issues that shows up in the e-mail between McNair and the team is that Mr. McNair was trying to run down a sex tape of Veronica Evans.  Who was Veronica Evans?

A.   Veronica Evans was the girlfriend, lover slash part-time wife, maybe, of Chadrick Fulks.  I don't know that they ever got married but they had a relationship.

Q.   Do you recall her profession?

A.   Her profession?  I think she may have had a number of professions.  She may have at some time been a dancer, if that's the question.

Q.   Was he seeking out --  was Mr. McNair seeking out this sex tape at your direction?

A.   No.

Q.   Susie, can you bring up reply Exhibit 20?  And I apologize, there's a lot of text here.  If you look close to the bottom you can see that there's a sentence, asked if he

had any videos of Veronica.  He advised he did, which he gave to us.  This particular video shows Veronica performing oral sex on Jones.  Did you ever see that video?

A.  Have not seen it.

Q.  Is it fair to say that was not an important part of the case, mitigation case for Brandon Basham, from your point of view?

A.  You know, whether it's important or not, I don't know that I would have ever used it in a trial because she was never going to testify in our trial against us.  It was, no, it was of no importance to me.  It is –– as sit here today.

Q.  Another theme in Mr. McNair's e-mails was considerable references to Brandon Basham's homosexual friends.  Do you recall that at all?

A.  I really –– you know, again, you mention –– we talked about it the other day.  I have no recollection that there was an inordinate amount of references to Mr. Basham's orientation.

Q.  If the e-mail showed that, you wouldn't dispute it.

A.  No.  No, ma'am.  I just don't remember it.

Q.  Was Mr. Basham's sexual orientation a theme of the case, to your knowledge?

A.  No.

Q.  Was Mr. Basham gay, to your knowledge?

A.  I have no idea.

Q.   Okay.  And, again, if those questions were asked by Mr. McNair were those at your direction?

A.   No.

Q.   And back to the issue with the discovery that you received from the government about Mr. McNair's termination.  Did you know about those issues with Mr. McNair prior to receiving that discovery?

A.   No, ma'am.

Q.   And I think you already mentioned this, but do you recall that some of the issues with his firing may have been issues with dishonesty regarding disclosure?

A.   I don't know that I'd use the word dishonesty, because I can't remember the specifics.  I don't think it was anything -- no, I wouldn't use the word dishonesty.  I remember something about -- again, this is me remembering something from eight years ago, I do remember something about a piece of evidence that was in evidence when -- when discovery needed to be turned over to the defendant and it was later determined he may have had a role in it being taken out of the file or some way secreted out of the police department.

Q.   And one last question about Mr. McNair.  Have you hired him since?

A.   I may have been involved with cases with Jack after Brandon's case where Carlisle worked on the case.  I know, I know that I have hired Carolyn Graham in Carlisle's firm.  I

cannot tell you that I've had any direct contact with
Carlisle, outside of something I may have done with Jack.

Q.  Okay.  So cases where it was at your direction you have
not hired Mr. McNair, his firm --

A.  I can't recall a time where I have called Carlisle up
since this case and asked him to work on one of my cases.

Q.  Now I want to move on to some questions about the Jackson
v. Denno hearing in this case.  At that point you all had been
on this case just under a year, does that sound accurate?

A.  Sounds right.

Q.  And you had several statements to deal with in the Jackson
v. Denno hearing, correct?

A.  Yes, ma'am.

Q.  Today I just want to focus in on the statements with
Sheriff Hewitt.  At one point later in the case the government
characterized that Hewitt statement, not the government here,
the government at trial, as one of the most damaging.  Would
you agree with that assessment?  And let me -- I'm referring
specifically to the purse strap statement.

A.  Oh, I would agree that was an impactful statement.

Q.  And at the Jackson v. Denno hearing did Mr. Hewitt
testify?

A.  Yes, he did.

Q.  And his testimony at that point, would you agree that it
was ambiguous as to who used the strap?

A.   Yes.

Q.   Specifically, his language was Mr. Basham showed how the strap was used.

Jumping ahead, you sat through much of the Chad Fulks trial, correct?

A.   Fact witnesses.

Q.   Fact witnesses.  Were you present when the government discussed how -- who used the purse strap at the Chad Fulks trial?

A.   I don't think that I was.  I think I had access to the transcript so I'm aware of what references were made about that.  But no, I can't say that I was at the trial for that portion.

Q.   So through the transcript you were aware that the government characterized that Chad Fulks used the strap to strangle Alice Donovan.  And that's a yes, for the record?

A.   Yes.

Q.   Thank you.  What was your and Mr. Swerling's strategy at the Jackson v. Denno hearing?

A.   The strategy was to elicit as much information as we could from the officers to prove that Brandon Basham, from the moment that he was fished out of the river by law enforcement officers, began to attempt to assist law enforcement in the location of the body of Alice Donovan.

Q.   Was one of the strategies also to nail down witnesses on

their statements?

A.   That's part of it, yes, ma'am.

Q.   And did you all call any witnesses at that hearing?

A.   I don't think that we did.

Q.   At this point, at the point of the Jackson v. Denno hearing you had several medical records on Mr. Basham, is that correct?

A.   Yes, ma'am.

Q.   And I realize it's been a long time, but if you had to estimate, how many placements and facilities had Mr. Basham been in as a juvenile?

A.   I have reviewed -- you know, I reviewed something I said in court, and is it 50 to 60 facilities that he had been shuffled between through his young life.  Mr. Daley?

        MR. DALEY:  Excuse me, your Honor.  I just wasn't sure.  Is she asking how many records he had in his possession at the time of the Jackson v. Denno hearing or when they finally got to trial.

        MS. STONE:  I apologize.  I'm asking at Jackson v. Denno.

        THE WITNESS:  Oh, I don't recall at that time.  I'm sorry.

Q.   But eight, nine months in you all had gathered a substantial amount of records.

A.   Yes, we would have had a substantial amount of records by

that time.

Q. Did you know at that point that Mr. Basham had had several mental health evaluations done at some of these facilities?

A. I can't tell you whether I did or did not know at that time.

Q. Had you hired mental health experts at this point?

A. Yes.

Q. But a decision was made -- is it fair to say that a decision was made not to challenge the statements under any competency --

A. Yes.

Q. -- challenge?

A. Absolutely.

Q. Did Mr. Basham handle the Jackson v. Denno hearing well?

A. That's a difficult question. And I'm not trying to be difficult with you, but when you ask if Brandon handled something well, tell me exactly what you mean by that.

Q. I'll get to the point. Susie, can you bring in, I believe it's Exhibit 83. Can you look, please, at the -- again, this is -- these are already admitted. These are not your notes.

A. That's fine.

Q. These are Mr. Swerling's. But can you look at the last entry. Can you read Jack's writing?

A. I'm probably better than anyone at reading his writing.

Q. And does it reflect on the date of the Jackson v. Denno

hearing defendant is incoherent?

A.   Well, it reflects at some point during that hearing he may have been having a difficulty with either the evidence that he was listening to or circumstances just surrounding that day.

Q.   And, Susie, can you bring up Exhibit 84?  And this is an e-mail a few days after that hearing showing that it appears that Brandon had some sort of suicide attempt.  Do you recall that?

A.   Yeah, I do recall this.

Q.   And that, again, was in close proximity to the Jackson v. Denno hearing.

A.   I just don't have the date.  I accept if you say it was, I accept that.  Was this after or before?

Q.   A few days after.

A.   Okay.

        THE COURT:  Miss stone, we're past 5:30, it's been a long day, especially for the court reporter.  Unless you think you are close to finishing?

        MS. STONE:  I'm not.

        THE COURT:  Let's go ahead and break for the day. Doesn't look like we're to get to a good breaking point, this is as good as any.

        MS. STONE:  Thank you, your Honor.

        THE COURT:  Thank you.  Mr. Harris, you need to be back at 9:30 tomorrow morning.

Anything before we adjourn?

MR. BURKE:  Your Honor, may I speak about -- given the unexpected events of the last few days is it still your Honor's position we will not go on Friday morning?

THE COURT:  Unless y'all want to.

MR. BURKE:  I certainly don't, but --

THE COURT:  We will be off Friday.

MR. DALEY:  And, your Honor, we may be able to stipulate to the South Carolina Department of Revenue guy.

MR. BURKE:  Yeah, we will be able to stipulate.

THE COURT:  Very good.  We won't hold court on Friday, and try to go maybe not quite this late tomorrow, and --

MR. DALEY:  It may be Mr. Swerling might have to testify on Monday, your Honor.

MS. STONE:  I'm not close to done, but I don't think I will be too terribly long.  I would imagine we will at least get --

MR. DALEY:  We will get started with Mr. Swerling.

THE COURT:  All right.  We will see you at 9:30 tomorrow morning.  We'll be in recess.

(Recess, 5:35 p.m.)

October 11, 2012

THE COURT: Miss Floyd says we have something to take up first?

MR. DALEY: Your Honor, it's going to be very brief. As the questioning came out late yesterday afternoon it appeared to me that, and this happened in the Fulks case and so I'm a little more on high alert than I have been previously, claim two, if you look at claim two in the petitioner's motion and then even in their reply, it appears to only focus on the statements made after his -- after Basham's arrest and those three, four days before he was transported down to South Carolina.

If you look at page 19 of their motion, in fact they only cite in their first paragraph to transcript 2-24-04. And then if you look in the substance of their claim two, the only two interviews that they are talking about are the interview of Detective Dan Mooney of the Ashland, Kentucky Police Department and then FBI Agent Scott Vito, who I think was also out of the Ashland office of the FBI.

It appeared yesterday that they were, I don't want to say shifting, but just they were now suddenly focusing on one statement made on Thanksgiving day and in South Carolina. And so I would just like to put on the record that I believe that this is an attempt to amend the motion, and I just would ask that the court -- I don't think Miss Stone is going to elicit

any more testimony from Mr. Harris, but I do think that later on they will --

THE COURT:  We have got Mr. Littlejohn coming on later in December, I guess.  To be honest with you, I read the briefs, I thought that the statement of Sheriff Hewitt was at play.

MR. DALEY:  No, it's at play, but if you look at -- it wasn't at play in claim two, your Honor.  It is definitely at play in some other claims, but if --

THE COURT:  I thought it was in play in claim two. But, anyway, I think no matter what, I need to allow the testimony to come in, then we will argue later whether it's properly before me.

MR. DALEY:  Thank you, your Honor.

MR. BURKE:  Thank you, your Honor.  Your Honor, may I briefly make a record of Mr. Basham and his absence today?

THE COURT:  All right.

MR. BURKE:  I think the court is aware Mr. Basham will not come out of his cell.  Our colleague Mr. Murray went to the prison this morning to attempt to meet with him and he would not come out of his cell to talk with him.  We accept your Honor's order yesterday.  We disagree with it.  We believe that we have a client who is unable to assist us in this proceeding.

And we will today be questioning trial counsel about

specific conversations that they had with Mr. Basham. If I had a client who was capable I would be referring to him and conferring with him about those conversations. So short of a request that we would ask court to stay these proceedings so we could be -- get our client into a state where he could assist us, we would just simply note for the record that we do have a continuing objection to going forward without him. And we don't want to have him physically forced to sit in that room because it will just lead to more disruption.

THE COURT: All right. But I understand you don't have access to him today but you have had free access him to him in the prison leading up to this hearing to question him about his version of his conversations with counsel.

MR. BURKE: Your Honor, we had access to the extent that he was capable of conversing with us, as we talked about yesterday.

THE COURT: All right. Very good.

MR. BURKE: Thank you.

THE COURT: If Mr. Harris could resume the stand. Mr. Harris, you are still under oath.

THE WITNESS: Thank you, Judge.

BY MS. STONE:

Q. Good morning, Mr. Harris.

A. Good morning.

Q. Yesterday we finished up talking about the Jackson v.

Denno hearing and not using competency as a potential challenge to those statements.  I would like to now talk to you about competency in general in this case.  Were you aware that the original trial attorneys, Mr. Monckton and Mr. Littlejohn, had filed a motion for a competency evaluation for Mr. Basham?

A.  Yes.

Q.  And was that withdrawn at some point by you and Mr. Swerling?

A.  Yes, it was.

Q.  And was that a strategy decision?

A.  Yes.

Q.  And is it a fair summary of that strategy decision to say there was concern about letting the government speak to Mr. Basham an additional time?

A.  Yes.

Q.  Any additional strategy to withdrawing that competency motion?

A.  Well, I would add to that we wanted our doctors to discuss Brandon with Brandon before the government doctors.  So it was a little more than not having their -- them have a crack at it first.  It was as much we wanted to get to know Brandon with our doctors before they did.

Q.  And were there points leading up to trial and during trial where you were concerned about Mr. Basham's mental state?

A.  There were points during particular days at times during the days that I was concerned, yes.

Q.  Mr. Harris, can you take a look at this?  This is a memo that you wrote after jury selection.  Can you look at header number one?

A.  Yes.

Q.  And that basically says that Brandon started out the trial on a high note, he was in good spirits.

A.  Just -- this is one of my memos?

Q.  I'm sorry, Susie.  For a moment, can you go back to page one.  I apologize.  This is exhibit -- Defense 22.  Can you see there?

A.  Yeah, let me --

Q.  And now you can go back to page two.  And then header number two, by the third day Mr. Basham started to deteriorate, he was distracted?

A.  Yes.

Q.  And the third heading, he had intermittent outbursts with the marshals, with you, and with Jack?

A.  Yes.

Q.  And is that consistent with your memory?

A.  Yes, it is.

Q.  And things were given to keep Mr. Basham busy and occupied during the trial so that he wasn't a distraction to counsel and to the jury?

A.  We wanted to keep Brandon, yes, we wanted to keep Brandon busy.

Q.  And then number five, there was an issue with Brandon sleeping through some of the voir dire?

A.  That's correct.

Q.  And, Susie, can you bring up Defense Exhibit 91?  Go to the last page.  And can you highlight the last three small paragraphs?

A.  And this is media coverage?

Q.  This is media coverage.  And again it discusses Mr. Basham's sleeping and drawing with markers.  And that's consistent -- is that consistent with your recollection of Mr. Basham's behavior during jury selection?

A.  Yes, it is.

Q.  And, Susie, can you bring up Defense Exhibit 87?  And I'm going to have -- ask Susie to scroll through Defense Exhibit 87 through 90 and have you take a look at those.  And do you recognize any of these drawings?

A.  No, I do not.

Q.  Are these consistent with what you recall Mr. Basham doing?  And the last one is a coloring book that Mr. Basham had to work on during trial?

A.  I don't deny that that's his artwork, I just have no recollection of specifics.

Q.  You don't remember the specific drawings?

A.    Correct.

Q.    But fair to say you do remember that --

A.    Absolutely.

Q.    -- is what he was doing during trial?

A.    Yes, ma'am.

Q.    Did you have concerns about Brandon controlling his behavior even leading up to trial?

A.    Yes.

Q.    Were there some incidents in the jail where he had trouble with arguing and fighting with guards and had his family visits suspended?

A.    Absolutely.

Q.    And do you recall advising him he had to control his behavior?

A.    I remember doing that on numerous occasions.

Q.    Numerous occasions you had to tell Brandon that.  And did it work?

A.    Well, yeah.  I mean, did it work is -- it worked sometimes.  But, obviously, the record is I think clear in this case that it didn't work all the time.

Q.    And during trial at some point Mr. Basham had an altercation with the marshals.  Do you recall that?

A.    Oh, yes.

Q.    Can you give us a little background on that incident?

A.    Brandon on Monday the 20th, I think, was expecting that

Harris - Direct                               29

during a break he would receive a reward of sorts for not acting out. And that's -- that's an oversimplification of what happened, but at lunch or sometime around lunch break he learned that he was not going to get dip, I think, and he wanted to leave. And he got up to leave and it led to what everyone has now seen a videotape.

Q. And after -- after that incident was he removed from the courtroom?

A. Yes, ma'am.

Q. Was he evaluated by Dr. Schwartz-Watts shortly thereafter?

A. And the next morning.

Q. And do you recall shortly after that incident with the marshals that --

MR. DALEY: Your Honor, at this point I would object to the leading. I think at this point I would like to hear --

THE COURT: I agree. This is important testimony so don't lead your witness.

Q. (MS. STONE) Do you recall what Dr. Schwartz-Watts' diagnosis or opinion of Mr. Basham's competency was the day immediately preceding the argument with the marshals?

A. Dr. Schwartz-Watts informed us, the defense, as well as the court, in a hearing that he was not competent to continue that day.

Q. And did you have any reason to doubt that that was Dr. Schwartz-Watts' honest opinion?

A.   No, that was her honest opinion.

Q.   And did you or Mr. Swerling ask her to give that opinion as any part of a strategy to the court?

A.   I asked her to render her best opinion, whatever it was. I just asked her opinion.

Q.   And, Susie, I'm going to bring up one transcript here. Can you bring up September 20, 2004, pages 157 to 158.

MS. STONE:  Your Honor, we did not mark the transcripts as exhibits because they are already part of the record.

THE COURT:  All right.

Q.   (MS. STONE) Susie is going to be highlighting a section of your statement to the court.  Can I ask you to read that?

A.   To respond to Mr. Schools, to get back on the issue about whether or not this is manipulation or whether he is competent, what I just saw in the courtroom didn't look like any attempt to manipulate anything I had ever seen.  Looked like someone who didn't have the ability to control the simple function of sitting down in a seat.

Q.   And do you have the bottom, as well?

A.   That is why we have a concern about the competence today, the 20th of September.

Q.   And, Mr. Harris, do you have a duty of candor to the court?

A.   Um-hmm.

Q.  And were you honoring that duty when you made that statement?

A.  Absolutely.

Q.  Is it a fair statement you had an honest concern at that point at that day about Mr. Basham's competency?

A.  On the 20th of September at 2:00 o'clock in the afternoon, whenever I said this, I believed at that moment he was not competent to assist us in his defense.

Q.  And you expressed that concern to the court.

A.  Yes, I did.

Q.  Did Mr. Basham continue to have problems throughout the trial, especially with sleeping?

A.  Those are two questions.

Q.  First, did he continue to have problems throughout the trial?

A.  He had problems, Brandon always has problems focusing and paying attention.  So, yes, he had problems focusing and paying attention.  He also had -- there were situations where he did -- he was drowsy, and I don't know that he fell asleep during the trial but I know there were periods where he was drowsy.

THE COURT:  Let me jump in here.  You know, lawyers go to seminars on how to try death penalty cases.  We judges go to seminars on how to preside over death penalty cases.  And one thing we're taught, don't let a capital defendant

build up a record at your expense by sleeping or appearing to sleep during the trial. So during this trial I obviously did not have my eye trained on the defendant all of the time, but periodically I would look to the defendant and any time I saw him appear to be sleeping I stopped and told him to wake up and offered to get him coffee, caffeine, gum, whatever it took to keep him awake. I guess I'm becoming a witness in the case almost, but I don't want this record to go unchallenged that he slept through the trial and I did nothing about it.

THE WITNESS: And I may add to that, Judge, I think the record is fairly clear that -- and this is responsive to your question -- that I would think almost every occasion where we did see him sleeping we made that known to the court at least to the extent that we could.

Q. (MS. STONE) I guess my question is was Mr. Basham falling asleep something you were concerned with?

A. Yes.

Q. Something you were fairly constantly concerned with throughout trial?

A. I wouldn't say fairly constantly, I would say it was a concern. I would agree with that characterization.

Q. Were there days that Mr. Basham did not get his appropriate medication?

A. I remember one time, if you say there were two occasions I wouldn't dispute that, I do remember one occasion where he

didn't get his medication, he received it when he got to court, and there was an issue as to whether that was causing him to be drowsy. And that's just, again that is my vague recollection. I don't recall another instance where he didn't receive his medication.

Q. And any time you had that kind of information you brought it to the attention of the court.

A. Yes, ma'am.

Q. So the record would be -- speak to that?

A. Yes.

Q. Do you remember addressing the issue of Mr. Basham sleeping with the jury in your opening of the penalty phase?

A. Yes, I do.

Q. Why did you do that?

A. I think I needed in some way to explain why he may have looked disinterested. I didn't need to, I wanted to.

Q. I'm sorry?

A. I wanted to explain to the jury why he may have appeared disinterested.

Q. Is it a fair statement you felt that was something that was important to address with them?

A. Yes.

Q. We talked about a little bit already with the incident. Do you recall asking the court to allow Mr. Basham dip?

A. Yes.

Q.   And was one of the reasons for the dip to help Mr. Basham stay awake?

A.   Mr. Basham wanted dip very badly, it was a very important -- it was very important to Brandon for whatever reason.  I discussed it with my experts.  As a lay person I know that there is some property or there's something in dip that, it's not caffeine, I don't know what it does, but it helps people stay awake.  So, yes, I thought it would help him.  I thought it would do a number of things to get him through the trial.

Q.   Do you recall if your expert opined that it would help him stay awake?

A.   Yes, she did.

Q.   Do you recall if the marshals objected to Mr. Basham getting that dip?

A.   They objected.

Q.   And do you recall that the judge overruled that objection and allowed him to have it?

A.   Yes.

Q.   Was part of that reason because Mr. Basham sleeping was such an issue?

A.   You would have to ask the judge, but I would suggest that the doctor came in, said it would help, and I would imagine that was part of the of the judge's reasoning to overrule the marshals service, because I know that that is -- it's a rare

Harris - Direct                                    35

occasion where a judge overrules the marshals service.

Q.  Do you recall Mr. Basham getting emotional during certain testimony?

A.  Yes.

Q.  Was that -- what times do you recall that?

A.  I remember when one of his teachers, and I don't know if it was Penny Pitsford (ph.) or whether it was Miss Mumford, but I remember he was upset, became upset when she was testifying.  I know what it was, it was a witness that was testifying that he had been abused in his childhood.  And I can't remember who that was.

Q.  And how did Mr. Basham react?

A.  He was upset, he cried.

Q.  Was it difficult to try a case with Mr. Basham sitting at counsel table?

A.  Was it difficult?  It was trying.

Q.  Explain that a little bit.

A.  Brandon is -- you know, Brandon communicates, communicated a lot with us about matters sometimes not related to the case. And I find it trying when I have a client in any case, whether it's, you know, a death penalty case or a fraud case, when my client is talking to me while I'm trying to listen to a witness examination.  So, yes, that sometimes was difficult.

Q.  And when you say matters not related to the case, was Brandon trying to communicate -- let me rephrase that

question, strike that.  Do you recall any of the things that Mr. Basham --

A.  Yes.

Q.  -- would communicate about?

A.  You know, we previously discussed this dip issue.  Before Mr. Basham, before Brandon got his dip there was a lot of discussion at that table about dip.  After he got his dip it was much better.  And but, you know, an hour or 30 minutes leading up to his dip break in the morning, 30 minutes leading up to his dip break in the afternoon there was a lot of conversation at the table not related to the trial.

Q.  We had testimony yesterday from a court-appointed doctor.  He indicated that Mr. Basham had the ability to control his behavior for short periods of time?

        MR. DALEY:  Your Honor, I'm not really sure she needs to preface her remarks with information about testimony yesterday.  I don't think that's relevant to what she's going to ask.  I think she's sort of giving away, suggesting an answer.

        THE COURT:  Do you see a need to preface your question?

        MS. STONE:  Your Honor, I think it's appropriate to the questions on whether or not Mr. Basham was able to control his behavior for large -- longer periods of time.

        THE COURT:  All right, I'll allow it.  Go ahead.

Q.    (MS. STONE) As I was stating, Mr. Harris, there was testimony yesterday from a court-appointed doctor that Mr. Basham can control his behavior in court and assist counsel for short periods of time, I believe the testimony was 20, 30 minutes.  Would that be consistent with your observations of Mr. Basham?

A.    No.

Q.    Would Mr. -- Susie, can you bring back up Exhibit 22?

A.    Let me understand the question.  You are saying that he can only assist us for 30 minutes at a time?  Is that your question?  Is that what the doctor opined?

Q.    Did Mr. -- let me rephrase.

      MR. DALEY:  Your Honor, I think I would object because now we're --

      THE COURT:  You seem like you are asking him to agree or disagree with what the expert said yesterday.

      MS. STONE:  I'm asking him if that is consistent with his recollection.

      THE COURT:  Ask him what he recalls about the trial process.

Q.    (MS. STONE) Did you observe Mr. Basham becoming increasingly distractible during long periods of testimony?

A.    On occasions, yes.

Q.    Was Mr. Basham able to sit still and control his behavior for long periods of time?

A.   On occasions, yes.

Q.   Were you required or did you ask the judge to take breaks, for Mr. Basham to take a break and collect himself?

A.   I'm sure I did on a number of occasions.  Probably, the record is -- again, I would imagine the record reflects that. Yes, I would certainly have thought that was a good idea.

Q.   And why would you think that was a good idea for Mr. Basham in particular?

A.   Brandon wanted breaks so I asked the court for breaks. It's not unlike calling a time out in a football game. Sometimes Brandon needed a break so I would imagine we asked for a lot of breaks.

Q.   And if Mr. Basham did not get a break would he have trouble concentrating?

A.   I'm not sure we didn't get the breaks.  And, again, I'd have to look at the record, but we took a lot of breaks in this case.  I know that the court I think gave us a long break every morning and I know the court gave us a long break every afternoon.  And I would imagine the record is fairly -- I would imagine there were a lot of breaks.

Q.   Have you ever asked for breaks with this frequency with other cases?

A.   No.

Q.   Did you ever have concerns that Mr. Basham did not appreciate the gravity of the situation he was facing?

A.   No.

Q.   Susie, can you bring up Exhibit 23?  And can you highlight on number one.  I'm sorry, that was the wrong -- prior to number one, the first paragraph.  And, again, this is a memo from you to the Brandon Basham file.  When you visited him and told him about the Fulks verdict you noted he appeared alarmingly unaffected.  Why did you choose "alarmingly"?

A.   I was shocked, I'm sure.  That's an interesting use of the word alarmingly.  I don't recall this memo, but if I said that, which I obviously did, then I was shocked that he was unaffected by a death verdict.

Q.   And Mr. Fulks is his codefendant in this case?

A.   Yes.

Q.   Do you recall at a point during sentencing phase advising the court Mr. Basham was not competent to continue that day?

A.   Can you direct me --

Q.   Would you like that transcript?

A.   Let me say this:  I'm sure I did.  Would you direct me --

Q.   Sure.

A.   -- to where I said that?

Q.   Susie, transcript of October 26, 2004.  There are two from that.  The first one is the ex parte transcript at page four.

A.   This may be the day I was talking about where there was a witness on the stand that.  I don't know, let me look at it.

Q.   And, Susie, can you highlight the very top?  And can you

see there that court is talking about whether or not Mr.

Basham was competent to go forward in front of a jury and

having a colloquy with the defendant?

A.  Is that the judge?

Q.  Yes.  I apologize.  That's the court at the top speaking.

A.  And that's -- of course.  What's the question?

Q.  And then I'm going to -- Susie, can you also bring up the

non-ex parte transcript at 14, starting at page 14?

A.  Is this when Brandon said he used drugs?

Q.  Yes.  That's what I'm trying to get to.

A.  Right.  And didn't Mr. Harasheff (ph. come in and drug

test him?

Q.  Yes.  But did you immediately -- do you recall if you

immediately knew the results of that?

A.  I think we did.  He was negative.

Q.  You don't recall at this point advising the court you

weren't able to go forward?

A.  If Brandon Basham had -- I think he came in and said he

used cocaine and I think we brought that to the court's

attention, but I need to see the transcript.  I don't dispute

that happened.

Q.  And about a little more than halfway down you can see, Mr.

Harris, the first indication of your name.

A.  That's what I said.

Q.  And the same question I had before.  Were you honoring

your duty of candor to the court there?

A. Yes, I was.

Q. So if you said that, at that point on that day you had legitimate concerns about going forward.

A. At that point on that day I did.

THE COURT: Help me put this in context. October 28th, that was after the scuffle that broke out?

MS. STONE: Correct, your Honor. And this was the 26th. I apologize if I said --

THE COURT: The scuffle was on the 26th?

MS. STONE: The scuffle was on the 20th, I believe.

MR. DALEY: Of September. This was October 26 right before Brawley's testimony, your Honor.

MS. STONE: Yes, this is the penalty phase.and just one more question on competency. No court-appointed evaluation was ever requested by you or Mr. Swerling, is that correct?

A. When?

Q. Ever during -- you never asked to have a competency evaluation -- is it a true statement you never asked to have a competency evaluation by anyone but your hired doctors?

A. That's correct.

Q. You never asked to have Brandon shipped off to Springfield or Butner. I understand he went to Butner, but that was not at yours or Mr. Swerling's request, for a competency

evaluation?

A.   That's correct.

Q.   Next I want to talk to you about Mr. Basham's IQ.  Who did IQ testing for you?

A.   Dr. Brawley.

Q.   And were you responsible for coordinating with Dr. Brawley?

A.   Yes.

Q.   Do you recall what Mr. Basham's IQ was?

A.   68?

Q.   Good job.  Did that raise concerns for you?

A.   Yes.

Q.   And what did you do with those concerns?

A.   I discussed them with Jack and with our doctors.

Q.   Susie, can you bring up Exhibit 27, Defense Exhibit 27?  This is a memo from you and Mr. Swerling to the file regarding meeting with the death penalty review in Washington.  And it indicates they had inquired about your mental retardation testing and that you would get back with them.

     Was it your understanding that if you could make a strong case that death might come off the table?

A.   We had hoped that.  That was the purpose of our meeting with that organization, to see if they would recommend to the district, to this district, that they not seek the death penalty.

Q.  And, obviously, because we're here that ultimately did not happen.

A.  That is correct.

Q.  Are you familiar with the Atkins case?

A.  Not sitting here today off the top of my head, I'm sorry, I can not -- is that the case having to do, can't execute individuals that are mentally retarded?

Q.  That's correct.

A.  Then, yes, I am familiar with that case.

Q.  In preparing for Mr. Basham's case did you attend any continuing legal education or seminars on mental retardation or Atkins litigation?

A.  I went to a week-long death penalty seminar, and I can't tell you whether that was one of the topics addressed or not.

Q.  If Mr. Swerling had said I think we need to have an Atkins hearing in this case would you have supported that decision?

A.  Not based on our doctors' evaluation of Brandon.

Q.  Did you --

A.  Because I don't think we would have had any testimony to put on the record.

Q.  Did you recover -- did the Basham team, not necessarily you personally, recover any anecdotal evidence that Mr. Basham might be mentally retarded?

A.  I mean, we had thousands and thousands and thousands of pages of medical documents about his entire lifetime.  By

anecdotal do you mean had he done crazy things or had he done things that would indicate that he doesn't function at a high level in his lifetime?  If we had -- we had a lot of that type of evidence.

Q.  Bring up some examples.  Susie, Defense Exhibit 46.  This is not your memo, this is from Paige Tarr.  Would you have seen this memo?

A.  Oh, yes.  And that's kind of what I'm saying when I'm trying to figure out what you mean by anecdotal.  Yes, we interviewed a lot of people, we looked at a lot of documents, and there were a lot of people that would tell you that Brandon was slow.

Q.  So is it a fair statement that -- or would you disagree with me that the Basham file contains a lot of memos that have similar statements to this?

A.  Not -- I wouldn't say there are a lot of people that say he was mentally retarded, okay?  First of all, this is an opinion of a neighbor, I think is who this was --

Q.  I'm not asking doctors' opinions and medical testing, I'm asking about anecdotal evidence.

A.  A lot of people say that he was slow, a lot of people said -- you know, everybody has an opinion.  Not a lot of people said that Brandon was very, very, very smart.

Q.  Susie, can you bring up Defense Exhibit 59?  And can you highlight the very bottom two paragraphs of text?  Was fetal

alcohol syndrome looked into in this case?

A.   We discussed that with our expert.

Q.   But that was also not pursued?

A.   It was not.

Q.   And, Susie, can you bring up Defense Exhibit 80.  And can you highlight, kind of hard to see, just do the bottom half.  That's fine.  And is this Mr. Swerling's writing?

A.   Yes, it is.

Q.   Do you see where it says retardation out.  It's in the -- in 12-5-03?

A.   Yes, I see that.  And --

Q.   At some point was a decision made not to pursue mental retardation?

A.   Yes.

Q.   And why was that?

A.   We didn't have an opinion to support it.

Q.   Are you familiar with the Flynn effect?

A.   No, I am not.

Q.   Susie, can you bring up Exhibit 65?  Defense Exhibit 65, I apologize.  Stop there, first paragraph on the page.  Did the Basham team in their investigation receive information there was a possibility that Mr. Basham -- well, let me back up.  Was one of the problems with making a case for mental retardation that Mr. Basham had some IQ tests that were higher?

A.  I remember three other IQ tests ranging anywhere from a hundred to the lowest being the test that we gave him.  I think there was one in the 80s.  So, yes, I remember more than two IQ tests.

Q.  And in the course of the mitigation investigation did you and the team recover information that it's possible Mr. Basham's IQ may have been inflated by some facilities so that he could be admitted into them?

A.  Yes.

Q.  Was any effort made to rule those tests out as invalid, that you recall?

A.  I know that they were provided -- if I received them they would have been provided to Dr. Brawley for her evaluation.  And but I can't tell you today whether -- what impact those tests had on her evaluation and her opinion.

Q.  And no -- was an Atkins hearing ever asked for in this case?

A.  No.

Q.  Was an independent mental retardation expert hired in this case?

A.  Dr. Brawley made that determination.  By independent do you mean --

Q.  Someone who specifically specializes in MR.

A.  No.

Q.  Susie, can you bring up defense Exhibit 98?  Mr. Harris,

that was something from your file.  Were these questions that you typed up or -- can you tell us what the purpose of this was?

A.  It's kind of fuzzy on my screen.  I don't think it's my eyes.  Maybe --

Q.  We will highlight a section.  Voir dire questions on MR.

A.  No, that would not have been something I typed up.  That's probably something I may have gotten at a seminar I attended, or it might have been something I pulled up or Dr. Brawley may have provided me something like this.  I can't at the time tell you where I got this.  This was probably something I was just looking into when I was looking into the MR issue.

Q.  Okay.  And were you aware that in federal court the issue of mental retardation is submitted to the judge?

A.  Um-hmm.

Q.  Was that ever submitted to the court here?

A.  It was not.

Q.  Now I'm going to move on, and this will be very brief, the issue of conceding guilt in opening statement.  And I understand you did not make those opening statements, which is why the section will be brief.

A.  I understand.

Q.  Do you recall Mr. Swerling conceding guilt on almost everything in Mr. Basham's case?

A.  Yes.

Q.   Were you on board with that strategy?

A.   100 percent.

Q.   Did you and Mr. Swerling discuss that conceding everything accept intent on the carjacking would also be an admission that Mr. Basham was death eligible?

A.   Yes.

Q.   And you were still on board with that strategy?

A.   Yes, I was.

Q.   Okay.  The next topic I want to move to is the intrinsic evidence or the Samantha Burns evidence.

A.   Okay.

Q.   Was the government successful in getting that evidence in front -- that Samantha Burns evidence in front of the jury?

A.   Yes, they were.

Q.   And just for some context, Miss Burns was not technically the victim in this case before the South Carolina federal court, is that correct?

A.   That is correct.

Q.   Do you recall the judge's ruling on how the evidence was allowed in?

A.   Yes, I do.

Q.   Can you explain it?

A.   The judge ruled after, I don't remember when the hearing was, that everything between the escape and Brandon's arrest was admissible and intrinsic to the charged conduct.

Q.   And you had a chance to look at the briefs filed by Mr. Basham and the government in this 2255 case, is that correct?

A.   I have.

Q.   One of the arguments the government makes, if you will recall, is that one of the reasons this evidence was important was to show that Miss Burns did not simply run off or run away.  Anywhere in the trial did you or Mr. Swerling ever argue that Samantha Burns was not dead?

A.   No.

Q.   Was there any discussion between you and Mr. Swerling after the court's ruling the evidence was intrinsic and would come in about an attempt to limit the scope of this evidence?

A.   The court had already ruled on that issue so I don't think on the record we objected.  Well, actually, I take that back.  There are some objections that we made on the record, I don't know if they were about any of the Burns testimony.  But we did not revisit on the record, I don't believe we revisited the issue that the court had ruled on regarding the intrinsic nature of that evidence.

Q.   And my question is more -- was there a discussion between you and Mr. Swerling to limit from whom or how many witnesses brought that intrinsic evidence in?

A.   I'm sure we discussed it because it was a damaging -- those are damaging pieces of evidence.  But the court had ruled and us discussing it really wasn't -- we were going to

focus how we were going to address it more than we were going to keep it out, because the court had ruled it in. So, yes, we did discuss it. I don't know whether the record reflects we continuously objected to what the court had ruled on or not. Yes, we did discuss it.

Q. And was there any attempt to limit of testimony of Miss Burns' numerous family members as improper victim impact statements in the guilt phase?

A. No.

Q. And, Susie, can you bring up Defendant's Exhibit 101? And can you highlight the whole section? This is an e-mail from Mr. Swerling to the team discussing you and him speaking with the jurors after the trial and that they were overcome with the death of two women. Is that consistent with your recollection speaking to the jury, as well?

A. I stayed in that room 15 minutes. I shook everybody's hand and I left. I don't have -- didn't have any conversation with any jurors about this case.

Q. So it would have just been a conversation Jack had with the jurors?

THE COURT: Wait a minute. Why wouldn't this be barred by the evidence rule on juror deliberations and what effect evidence had on their mental process? Seems to me like it does.

MS. STONE: Your Honor, I'm just trying to establish

if this was --

MR. BURKE:  May I respond?

THE COURT:  Yes, sir.

MR. BURKE:  We're not offing this evidence to attack the jury's verdict.

THE COURT:  I understand.

MR. BURKE:  We're offering it for evidence of prejudice resulting from a claim of ineffective assistance of counsel.

THE COURT:  If it's not admissible it's not admissible for any purpose.  And the rule says a juror is not competent to testify as to the effect of anything on that juror or another juror's vote.  What caused the juror to vote for the death sentence is incompetent testimony.

MR. BURKE:  If your Honor --

THE COURT:  If it's incompetent I don't think it can be used for impeachment or anything else, it does not come in. I might be wrong, I'm just asking you.

MR. BURKE:  It's my understanding, your Honor, that the case law, and I will research it and perhaps we can address it later, I will be -- I will be attempting to discuss this with Mr. Swerling so I can discuss it then, as well.  But it's my understanding that Rule 606 applies for purposes of any attempt to attack the verdict.

THE COURT:  That's what you are doing.  This 2255

proceeding attacks the verdict.

MR. BURKE:  But we're not offering this statement by -- in the first place, this is not a statement by a juror, this is a statement by Mr. Swerling.  It's not being --

THE COURT:  It's a statement by Mr. Swerling quoting hearsay from a juror.

MR. BURKE:  Yes, it is, your Honor.  There has been no objection.  In fact, it's already been admitted.

THE COURT:  Well, so, for example, if a lawyer interviews a juror after a verdict and the juror says the foreman bullied us into a guilty verdict or we misunderstood the burden of proof, we thought it was preponderance rather than reasonable doubt, or anything that the court felt is off limits, and you can convert that to ineffective assistance of counsel argument by arguing that the lawyer should have done a better job of explaining the burden of proof or a better job of telling the juror not letting one bully them.  I mean, you could -- you open a giant loophole to the bar on juror testimony to impeach a verdict.

MR. BURKE:  Your Honor, my first response, I understand that you --

THE COURT:  It's already in.  We can debate this, it's already in.  Even if I sustain the objection I would allow a proffer to be made in any event, so let's move forward.

MR. BURKE:  Thank you.

THE COURT:  All right.

BY MS. STONE:

Q.  Were you concerned about this evidence coming in to Mr. Basham's trial because it was such powerful evidence?

A.  Yes.  And we objected to it.

Q.  And do you recall the judge offering a limiting instruction on this evidence?

A.  Yes.

Q.  And do you recall if you and Mr. Swerling accepted that limiting instruction?

A.  We decided that it would only highlight the testimony and therefore we did not ask for any instruction from the court.

Q.  Thank you.  We talked about the Samantha Burns testimony and how -- and that was a concern that that was damaging.  I want to now move on to two statements that at trial the government argued were some of the most damaging, and that's Clifford Jay and Sheriff Hewitt's.

First I want to talk to you about Mr. Jay, and specifically the issue is we killed her, we killed them.  Were you present for the interviews with Mr. Jay?

A.  Yes, I was.

Q.  And do you recall how many interviews there were?

A.  I think I met with Clifford Jay, I know I met with him in his home and I know that I had -- I think I interviewed him

over the phone a second time.  I may have met with him three times.  I know that I met with him either telephonically or in person at least twice.

Q.  And the in-person interviews with Mr. Jay, you were present for all of them, is that correct?

A.  I think.  I just -- I can't tell you.  I know one time I was in his home sitting on his sofa discussing the case with him.  So I know that I can tell you that.  I know that for a fact.

Q.  And can you explain this we killed her, we killed them issue a little bit?

A.  He said in his house that Brandon had told him that we killed her.  It's in my notes, it's in Jack's notes, it's in our investigator's notes.  And, you know, while that's not a good statement for a client to make, it's a lot better than we killed them, which is what it later morphed into when he was interviewed by law enforcement.

Q.  And that was my next question.  At some point you became aware that that statement had morphed?

A.  Yes.

Q.  And when was that?

A.  I can't --

Q.  Not time-wise, but --

A.  I would guess I found that out through discovery that was provided by the government.  And I can't tell you when, but I

think that's how I found that out.

Q. And was -- was the statement then changed to we killed them?

A. I mean, I found out that he had changed the statement he made to us. Again, he changed it, I didn't change it.

Q. Right. I'm sorry, I was not clear on my question. You became aware that Mr. Jay's statement had changed.

A. Yes.

Q. To we killed them?

A. Yes.

Q. Did you or the team go back and speak to him?

A. I did.

Q. And tell us about that.

A. You know, I saw, working with you guys, again, I saw a memorandum I know I think I created. I can't remember if I went and saw him face-to-face or if I called him. But it's clear to me looking at memos that my purpose was only to ask that one question, but I asked a series of questions leading up to that and I tried to pin him back down why it had changed. And his position was that it hadn't changed, that what Brandon told him was that we killed them.

Q. And do you recall a Detective Addison who spoke to Clifford Jay before Detective Long? Do you remember any of that?

A. I remember that Clifford Jay had been interviewed by local

law enforcement.  I can't tell you sitting here today who interviewed him or the names of the investigators.

Q.  Susie, can you bring up Defendant's Exhibit 36?  And can you highlight the memo portion, or actually, all of it so we can see who it's from.  This is a memo from Mr. McNair to the Basham file.  And, again, if it was in the Basham file you would have seen this memo?

A.  Oh, yes.

Q.  And did either you or Mr. Swerling direct Mr. McNair to speak with Detective Addison about his conversations with Mr. Jay?

A.  Yes.

Q.  And what does Mr. McNair report here?

A.  I don't know what you are asking.  Is it -- I'm reading it.  What is the question, whether I saw this memo?

Q.  Yeah, did you see --

A.  Yeah, I saw this memo.

Q.  And the memo informed you that if Mr. Jay had told Detective Addison something like we killed them he would have included it in his report?

A.  Yes.

Q.  Is your recollection that was not included in Detective Addison's report and that was the purpose of sending McNair to talk to him?

A.  I would agree with that.

THE COURT: Wait a minute.

THE WITNESS: I don't have his report, but if his report didn't have it in there that's why I would have sent Carlisle to go interview anyone that had had contact with Mr. Jay.

THE COURT: I thought, I didn't look at all the exhibits, I'll confess I have not looked at all the exhibits but I did read the briefs from each side three times, and I thought y'all said that the 302 statements or the statements of witnesses in this case by the investigators indicated that Mr. Clifford Jay told them he heard a conversation that said we killed her. That's what this memo says.

MS. STONE: The 302, your Honor, Agent Long's 302 statement, and I apologize if -- Agent Long's 302 statement indicates we killed them. So that was --

THE COURT: You are coming to that later, in other words.

MS. STONE: Well, I guess I glossed over that. That was information that Mr. Harris and Mr. Swerling received that made them go say, oh, this statement has changed from what he said to us and go back and reinterview him. Mr. Addison's -- Detective Addison's report didn't have either, it was silent --

THE COURT: All right.

MS. STONE: -- as to that. Does that clear that up?

I apologize for confusing the issue.

THE COURT:  Which exhibit number is this?

MS. STONE:  This is Defendant's Exhibit 36.

THE COURT:  All right.

BY MS. STONE:

Q.  Do you recall who questioned Mr. Jay -- who cross-examined Mr. Jay at trial?

A.  Jack.

Q.  And do you recall how Mr. Jay testified regarding we killed her, we killed them at trial?

A.  He stated -- he testified that Brandon had told him that we killed them.

Q.  Did you and Mr. Swerling call anyone to rebut that testimony?

A.  No, we did not.

Q.  You did not call Detective Addison?  And that's a no?

A.  I'm sorry, no, because I don't think Addison -- I mean, my recollection is and this memo suggests that he didn't say one way or the other, that Mr. Jay had not told him one way or the other what Brandon had said.

Q.  And you did not call Paige Tarr who was present for the interviews --

A.  No, we did not.

Q.  -- of Mr. Jay either.  Do you recall Mr. Swerling putting his strategic reasons for not doing that on the record?

A.    No.  I know there was a decision not to do that, but we didn't put that on the record, no.

Q.    Do you recall what that reason was?

A.    Well, I mean, that's not good testimony, usually, to put a witness on the stand to say that your client admitted killing anybody.  And, quite frankly, we wanted to move past that statement as quickly as we could, and to re-ring the bell, to put Paige Tarr on the stand to say that our client actually admitted to killing somebody is generally not something that I would think is a good idea.

Q.    Susie, can you bring up the transcript, September 29, 2004, at page nine?

THE COURT:  Hold on one second.

(There was a pause in the proceedings)

THE COURT:  All right.  Go ahead.

MS. STONE:  Thank you, your Honor.

Q.    (MS. STONE) Do you recall discussing with Mr. Swerling you wanted to keep Clifford Jay as a friendly witness for the penalty phase?

A.    Yes.

Q.    Was Clifford Jay ultimately called in the penalty phase?

A.    He was not.

Q.    Now I'm going to move to the Hewett statements specifically dealing with the purse strap.

A.    And you just reminded me of something, if I may?

Q.  Sure.

A.  There was also a discussion about not attacking him because we did want to use him, we might want to use him again.  And I do remember that now that --

Q.  Remember talking about trying to --

A.  But we did, there was also a discussion about not attacking Clifford Jay because Clifford Jay actually had a lot of nice things to say about Brandon.

Q.  Do you recall what some of those nice things were?

A.  You know, he had been a caregiver during part of Brandon's life and felt bad about Brandon's home life and things like that.  So I can't tell you what the specifics are, but I do know that I briefly looked at the memo the other day y'all had and I do know there was at least a page-and-a-half of my notes that -- things that he had kind things that he had to say and he felt empathy for Brandon and those things, so we had considered him as part of our presentation at the penalty phase.

Q.  Thank you.  Do you recall the government arguing that the Hewitt statement about the purse straps sealed the deal in their closing argument or similar testimony?

A.  I'm sorry?

Q.  That the purse strap statement sealed the deal in the case against Brandon?

A.  Did I say that?

Q.  Do you recall the government arguing that?

A.  No, I don't.

Q.  Who crossed Sheriff Hewitt?

A.  I did.

Q.  And we have already discussed the Jackson v. Denno hearing and his previous testimony and that it was ambiguous on who used the strap.  We have also discussed that you sat through some of and got all of the transcripts from the Fulks case, is that correct?

A.  Yes.

Q.  And remind us again, how did the government characterize that statement in the Fulks case?

A.  They -- I can't verbatim tell you how they characterized it, but it was ambiguous as to who actually strangled Alice Donovan with that strap.

Q.  In the Fulks case it was ambiguous?

A.  No, not in the Fulks, in --

Q.  That was my question.  Do you recall --

A.  In the Fulks case, Chad Fulks, one of the government lawyers told the court at a hearing that law enforcement had indicated to him that Fulks actually used the strap.

Q.  And did they argue to the court that Fulks strangled Alice Donovan at any point, that you recall?

A.  I think they did.  But, you know, you would have to show me a transcript.  I believe that their position was that Fulks

was the actor when it came to committing that act.  Is that a fair answer?

Q.  Sure.  And, Susie, can you bring up the Fulks transcript 6-22-04 at 255?

MR. DALEY:  Your Honor, for the record, I believe this is in a bench conference outside the presence of the jury.  I want that on the record.

MS. STONE:  That's correct, your Honor.  To give it some context, there was an argument over the admissibility of evidence, and this is discussed in the inconsistent theories claim more thoroughly.  The government was, excuse me, Mr. Fulks' lawyers were seeking to admit Mr. Basham's deer statement, I couldn't kill a deer and here I have -- they were stopped from doing that ultimately, and one of the reasons they were stopped from doing that was the government's argument here.

Q.  And you can see here, Mr. Harris, does that refresh your recollection on what the government said about the Hewitt statement?

A.  Brandon had said Chad, yes, that Chad Fulks was the one that strangled Miss Donovan.

Q.  And in preparing for your cross-examination of Mr. Hewitt would you have reviewed the Fulks transcripts --

A.  Yes.

Q.  -- that referenced him?

A.   Um-hmm.

Q.   In his cross-examination with you did Mr. Hewitt's testimony evolve?

A.   Tell me in what way.

Q.   Did he say that Mr. Basham showed how Fulks strangled Miss Donovan?

A.   I asked Sheriff Hewitt a direct question, which was isn't it true, and we know what the question was, his response was not responsive, he said he showed me.

Q.   And he meaning who?

A.   He said Brandon showed me how she was strangled.

Q.   Were you --

A.   He did not tell me, he showed me, I think was something to the effect of his answer.

Q.   Were you at all surprised by his answer?

A.   Well, yes.  It was, A, not responsive, so anytime someone gives you a non-responsive answer you are surprised because that's not what you are trying to elicit.  And, yeah, I was surprised that he would have -- it was ambiguous as to what he was saying.  But, you know, it was open to -- well, it was open to the way his answer allowed Mr. Gasser, I think, to argue to the jury somewhat inconsistently with this.  I would agree with that.

Q.   And on that point do you recall if Mr. Gasser did any redirect of Sheriff Hewitt after your cross-examination?

A.  I don't know if he did or he didn't.  I don't think that he did.  It's been suggested to me the other day in meeting for these that there was no redirect.

Q.  And you alluded to it a little bit already, do you recall how the government used Sheriff Hewitt's statements to you on cross-examination in their closing?

A.  I think I looked at it and there was a comment made that it was real close to suggesting that Brandon had actually had some role with the strangling, which would be inconsistent with this, with this statement here.  But without looking at the transcript I can't tell you exactly what was said.

Q.  And is it a fair statement that in yours and Mr. Swerling's case, mitigation case, it was important to show that Brandon had less culpability than Mr. Fulks?

A.  Absolutely.

Q.  Was there any attempt after Mr. Hewitt's testimony with you on cross-examination to estop the government from taking a different position than they did in Mr. Fulks' case, filing any motions or anything like that?

A.  No.  I don't know that they did at all, first of all, even in closing.  But there wasn't anything inconsistent between the testimony of Hewitt and closing.

Q.  And, out of curiosity, are you aware what happened with Mr. Hewitt since the trial?

A.  You know, I was told that he was taken out of office for

some impropriety.  I don't know the specifics.

Q.  And now I would like to move to what we have been calling the puppet statement from Mr. Fulks' trial.  Do you recall seeking to admit statements from Chad Fulks' trial by the government into Mr. Basham's case?

A.  I do.

Q.  And can you talk about that a little bit.

A.  Well, we believed that it was, as you suggested earlier, important to demonstrate to the jury relative culpability, who was the leader, who was the follower, who was the puppeteer, who was the puppet.  When you read the Fulks transcript it was clear, crystal clear, that Fulks was the leader of this 13-day odyssey, that they went where Fulks wanted to go, they snatched individuals that Fulks wanted to snatch, they committed acts that Fulks wanted them to commit, and Brandon was reactive almost on every occasion to Chad Fulks.

We wanted to put in evidence that the government had that belief and had demonstrated that clearly to a jury some two months before we were given the opportunity, and we filed a motion asking for the evidence to come in, as well as the comments by the assistant united states attorney in his closing statement.

Q.  And that was my next question.  You and Mr. Swerling did file a motion on this issue?

A.  Yes.

Q.   And do you recall the court's ruling on that motion?

A.   The court at the conclusion of the hearing decided that it would hear how the government put -- how the government treated the evidence in the guilt phase and it would make a determination, if we decided to raise the issue, as to whether the government's theory of the case was inconsistent in the Basham trial and the Fulks trial.

Q.   And was that issue renewed at the close --

A.   It was not.

Q.   And in reviewing your notes and e-mails and memos to come here and testify, did you find any on this strategy for abandoning that motion?

A.   No, I did not.

Q.   Okay.  That's my last question for you on the puppet statement.  Very briefly I want to talk to you about the causal nexus issue.  Again, you had a chance to review the briefs in this case?

A.   Yes.

Q.   And do you recall the testimony, I'm sorry, the argument by the government at trial about no cause and effect?

A.   I remember the cross-examination of numerous witnesses. Is that what you mean by argument?

Q.   There was also -- that's part of it.  You do remember the government crossing -- who were they cross-examining?

A.   I think a lot of witnesses.  You know, certainly the

experts.  I remember they examined Dr. Brannon, Dr. Brawley, Dr. Jan Vogelsang on whether those -- Vogelsang, for instance, people with his background, do they always kill, do people with bad brains, you know, is that --

Q.  Exactly.  Do you remember the government arguing that cause and effect issue in their closing statements?

A.  I mean, I don't know that I call it a cause and effect argument.  You would have to ask either Mr. Gasser or Mr. Schools what their intent was.  I know that they argued that people -- just because somebody has a bad brain doesn't mean they are going to go kill someone or carjack someone.  So I do remember -- I do remember them making those points.  I don't know that I would call them cause and effect arguments.

Q.  And were you concerned about those statements or arguments?

A.  I did not think they were improper.

Q.  Were you familiar with the Tennard case?

A.  Yes.

Q.  And --

A.  I don't want to say right now I can tell you exactly what Tennard says.  I know that you can't tell a jury what you have -- as you have suggested in your brief, you can't tell a jury that the cause and effect issue and problems with that.  But I don't know that they violated that.

Q.  And was there a strategy on not objecting to those

statements?

A.   I can't tell you there was a -- no, I cannot tell you that we discussed not objecting to those statements.

Q.   And now I want to move on to your favorite issue, Miss Cynthia Wilson.

A.   Yeah.

Q.   Is it fair to say that you took the lead in the post-trial hearings regarding the jury misconduct?

A.   Yeah, I had a large role in that matter.

Q.   Can you give us some context and describe what happened with the forewoman of the jury in this case?

A.   The forewoman in this jury I believe contacted numerous media outlets during the trial, didn't tell anybody about it. The government was contacted within one or two days of the verdict by one of the media outlets who informed the government that Miss Wilson had, for whatever reason, contacted them trying to drum up some type of media attention to this case.  They notified immediately the defense and they notified the court, and the court had a hearing, numerous hearings, but initially had a hearing to ask Miss Wilson what she had done, if she had done anything, and why she had done it.

Q.   You went to my next question.  Were there several times that you recall Backford hearings on this juror misconduct issue?

A.   Numerous.

Q.   Do you recall Miss Wilson's excuse for contacting the media?

A.   Yes.  I think her excuse was that she thought this case should get more attention as a public service to the public, so that people know this can actually happen.

Q.   What was your opinion of --

A.   I don't think she is a truthful person.

Q.   And was part of your strategy in these numerous hearings to attack her credibility?

A.   Absolutely.

Q.   Were there numerous calls to other jurors -- during the course of your investigation did you discover numerous calls to other jurors?

A.   Yes.

Q.   And can you talk about that a little bit?

A.   The court allowed us the latitude of subpoenaing Miss Wilson's cell phone records.  When we received her cell phone records we were able to identify numerous calls to numerous jurors as well as other media outlets, I might add, that she had not admitted to in previous hearings.  As a result of that we cross-referenced -- I spent a little bit of time cross-referencing the calls, length of calls, with particular days of the trial when impactful evidence might have been viewed by the jury or something interesting happened

Harris – Direct                    70

in the court, and I believe that there was a correlation.  We tried to explain that to the court the best that we could to try to show when she is saying they are not talking about the case, which she did, it just didn't -- it didn't seem believable to me in light of the -- when the calls were made, the length of the calls and things like that.

Q.  When the results of the subpoena for those calls came in, was that before or after the jurors besides Cynthia Wilson had been called back to speak to the court?

A.  I think after.  Maybe.  I don't know.  You would have to -- you have --

Q.  Let me ask it this way:  Were you permitted by the court to specifically confront or question those individual jurors who she had calls with about those calls?

A.  We weren't able to confront them.  But to be clear about this, we had as many hearings as we needed, the court gave us as many hearings as we needed to flesh out, to try to flesh out the truth.  We were not allowed to directly confront any particular juror.

Q.  Do you recall if the jurors were brought back and questioned by the court about those individual calls?

A.  Absolutely.

Q.  About the calls?

A.  About the calls?  I don't remember.

Q.  But Miss Wilson was questioned about the calls.

A.   Um-hmm.

MR. DALEY:  Your Honor, again, I just want to be protective of the record.  I'm not sure that this falls within the scope of any of the claims, and I certainly don't want to suddenly have a new claim that you abused your discretion in failing to order more hearings or -- anyway, so I would object to the extent they are trying to expand --

MS. STONE:  And, your Honor, I'm not trying to expand the claim.  Where I'm going with this is I think Mr. Harris would agree that they were limited in what they could do with the jurors themselves, they were able to gather evidence and so what evidence was -- just trying to set the stage for that.  And now I want to go into what evidence was gathered and what was presented to the court.  I'm not attempting to amend any claims.

THE COURT:  Go ahead.

BY MS. STONE:

Q.   In preparing for your strategy to attack Miss Wilson's credibility you looked at these calls, you looked at the times they were made.  Did you look at her testimony for why she spoke to individual jurors?

A.   Yes.

Q.   Do you recall --

A.   I was there when she testified.

Q.   And do you recall her testimony regarding a juror named

Harris – Direct                          72

Shannon Burnett?

A.   I don't have any recollection, but you informed me last week what they talked about, sod, I think.

Q.   Correct.   And have you had a chance to -- Susie, can you bring up Exhibit 21?   Have you had a chance to see this declaration by a woman named Shannon Burnett?

A.   No.

Q.   Can you take a moment and read it over?

          (There was a pause in the proceedings)

          THE WITNESS:   Um-hmm, okay.

Q.    (MS. STONE) You don't have the benefit of your records now, but to give you some background, that 587 number was the number that your investigation showed Miss Wilson called.

     Susie, can you bring up Defendant's Exhibit 30?   This a memo from Carolyn Graham to you and Mr. Swerling.   Do you recall the issue with Mr. Burnett's non-matching phone numbers to your attention?

A.   I mean, I'm sure I would have seen this memo.   I don't have any independent recollection of this memo.   It's eight years ago.

Q.   Was there any effort to call and see if that was the correct Shannon Burnett?

A.   I don't think I was calling jurors directly.   So, I mean, I can't say that I would have called a juror directly to ask if it was the Shannon Burnett that was in my trial.

Q.   If you had information that Miss Wilson had called a Shannon Burnett that was not the juror she testified if I spoke to him it was about sod work, would you have brought that to the court's attention?

A.   I just -- I really don't know.  I will say this, if I had information that she had been untruthful to the court about anything I assure you I would have brought that to the court's attention.  Does that answer your question?

Q.   It does.  What about information that appeared to show she was seeking out people with the jurors' names to speak with?

A.   I would have brought that to the court's attention.

Q.   Do you believe Miss Wilson -- today do you believe Miss Wilson was honest with the court?

A.   No.

Q.   Do you believe she was seeking out jurors to speak with about this case?

A.   Yes.

Q.   Did you in fact recommend her for prosecution for perjury?

A.   Yes, I did.

Q.   And is it fair to say you would have presented any evidence to the court you had to show that?

A.   Yes.

Q.   The last thing I want to talk to you about, and then we are done, it's very brief, and it's about the claim on the appellate file.  You were briefly appointed as appellate

counsel, is that correct?

A. That is correct.

Q. And we spoke about it previously. What was the purpose of your appointment?

A. I believe the purpose was primarily to act as part of the transition team to make sure that the appellate lawyers, to the extent they needed some historical background or where we had been for the past year-and-a-half, to help them get up to speed, to transition the files. I thought my role was to help them create the best appellate brief they could for Brandon.

Q. And who kept the master file in this case?

A. Jack.

Q. Did you ever have that file in your office?

A. No, I did not.

Q. Did you have any involvement with the discussions between -- or let me ask you -- strike that. Were you ultimately withdrawn from the case and new appellate counsel appointed?

A. Yes.

Q. Do you recall who that counsel was?

A. No earthly idea. I know Tim Sullivan was lead counsel, and whatever conversations I would have had about that transition would have been between Tim and myself. I just don't have any recollection of how that occurred.

Q. So did you have any involvement with the discussions

between Jack Swerling and a law firm called Jenner & Block regarding acquiring Mr. Basham's file?

A.   No, ma'am.

Q.   My last question.  Thank you very much for your patience.

A.   Thank you very much.

THE COURT:  It's time for our morning recess.  How long do you think your cross-examination will take?

MR. DALEY:  A couple of hours, probably, because it's sort of a direct, too, your Honor.

THE COURT:  All right.  We're behind schedule, obviously, but will we still be able to finish next week, do you think?

MR. BURKE:  Certainly, your Honor.  Mr. Daley and I were talking about that.  We will almost certainly Mr. Swerling this afternoon.  I seriously doubt we will finish with Mr. Swerling but we can return to him Monday, and then there will be our standard of care expert, Mr. Hammond.

THE COURT:  Who is the next --

MR. BURKE:  Mr. Hammond, Larry Hammond, is our standard of care expert who will be testifying immediately after Mr. Swerling.

THE COURT:  All right.

MR. BURKE:  That will be the end of the testimony. So you had indicated you might want oral --

THE COURT:  Let's talk about that.  I was wondering

if we could hear argument on any issues that are fully developed at this point.  Is that possible?  I'm amenable to hearing some argument now and the rest later, or hearing it all in December when all the evidence is in, whichever you think would be better.

MR. BURKE:  I always like to put off until tomorrow what I can do today, but we're willing to do either, your Honor, whichever would be of most assistance to you.  We can argue it next week after Mr. Hammond.

THE COURT:  Let me mention one thing, too.  The law school has this mentoring program and every year I am appointed to be a mentor for four, five, freshman law students, and we're supposed so meet with them three times during the year.  I always require them to come to one hearing to watch so they can see some court proceedings, and I try to pick out a good hearing.  Next Monday I think they come in at 3:30 or 4:30 to watch some of this trial.  We will clearly be going forward at that point, we're not going to finish early.

MR. BURKE:  No, your Honor, we will not be finishing early.

THE COURT:  Okay. All right.  Let's take a 15 minute recess.

(Recess, 10:58 a.m.)

THE COURT:  All right.  Who will be handling the cross-examination?  Mr. Daley?

Harris - Cross                          77

MR. DALEY:  Yes, sir.

CROSS-EXAMINATION

BY MR. DALEY:

Q.  Good morning, Mr. Harris.

A.  Good morning, Mr Daley.

Q.  I just want to go to Government's Exhibit 3, if you could pull that up, please, Gail.  It's already been admitted into evidence.  But I just wanted to confirm with you that everything on Government's Exhibit 3 is correct and accurate. It's from your website.

A.  That is my website.

Q.  And --

A.  That's the bio on the website.

Q.  I'm sorry, that's your background, your --

A.  Yes.

Q.  -- biographical information.  One of the things I want to go over was a little bit about what you do besides this case. You have -- how many criminal cases would you say you've taken to trial?

A.  As prosecutor and a defense attorney?

Q.  Altogether, sure.

A.  A hundred.

Q.  A hundred.  Okay.  How many as a criminal defense lawyer at this point?

A.  Forty.

Harris - Cross                    78

Q.   And what kinds of cases?  What's the range of case, just generally?

A.   I've tried DUIs to murders.

Q.   And how many murders have you actually tried, murder trials?

A.   Only three.  I defended only three.  I prosecuted a couple as a state court prosecutor.

Q.   And at this point are you somebody that does presentations for the bar?

A.   Yes.

Q.   What kind of presentations do you do?

A.   I speak at a program, Bridge the Gap program, twice a year until last year I have opted out.  But until last year for the past 15 years I had spoken at the South Carolina Bar convention every year on the federal practice, good federal practice session.

Q.   Covering criminal law?

A.   Yes, exclusively.

Q.   And what about any sort of federal sentencing?  You ever talk --

A.   I've spoken to various organizations, trial lawyers associations, I've spoken at bar functions on sentencing guidelines issues.  And I believe on a couple of occasions I have given presentations on updates, Fourth Circuit updates and Supreme Court updates as to federal issues.

Q.   What about trial practice?

A.   I have been on round table discussions on a bunch of them. I can't sit here and tell you -- you know, I get called often on most things.  I was called to participate in one yesterday at the law school that I was unable to participate in.  So, yes, I have participated in numerous trial advocacy programs at the law school and with the bar.

Q.   I want to go to claim 14.  There was an allegation in claim 14 that Mr. Swerling was under a conflict of interest because he had been a victim of a home invasion and a kidnapping, and the trial went forward I think in January or February of '04.  You worked with Jack for how long?  I mean in the same office.

A.   In the same office we were together 14, 15 years.

Q.   And during this trial how often did you meet with Jack Swerling?

A.   Every day that we were in the office together I think it's safe to say we discussed this matter.

Q.   And did you see any change in how he approached this case compared to any others as a result of during that time frame him being a victim of a crime?

A.   Absolutely not.

Q.   Thank you.  Gail, would you pull up Exhibit 8?  When were you appointed on the case, the Basham case?

A.   April?

Q.   Okay.  And what I would like to do now is just talk through for a moment how -- who was on the defense team and sort of what their role was, how it came together, I guess. So although they're in alphabetical order we will start with the lawyers.  Jack was appointed first and then you were appointed?

A.   I believe that's correct.

Q.   And you believed you were contacted by perhaps David Bruck and/or John Delgado?

A.   I know I was contacted by David Bruck.  I also know that I had had conversations with John Delgado and maybe Bill Nettles about participating in this matter.

Q.   And who at that point was already then on the team, or who quickly became a member of the dense team?

A.   I know that it was very clear from the very beginning that we needed to put together a mitigation team, so my guess would be, and I cannot tell you in what particular order they came on, but I know that we wanted to bring Donna Watts, Schwartz-Watts in, because one of the concerns was that she would be hired by the government.  She is probably the top testifying physician in the state in this area as to these issues.  And normally in state death penalty cases, of which there are many more, the state snaps her up before the defense does.  My guess is she would have been one of the very first ones.  Paige Tarr would have come in early.  Our

investigators --

Q.  Paige Tarr?

A.  Paige Tarr.

Q.  And what was her role going to be?

A.  She was a mitigation specialist.

Q.  Okay.  Who else?

A.  I'm sure that the investigators on the ground came in fairly early, which would have been Carlisle.

Q.  That's Carlisle McNair?

A.  Yes, Carlisle McNair.  My guess is, again, you know, I really don't have any specific recollection about who came first and who came second.  But, generally speaking, I think probably Carolyn Graham would have come in.  She was working for Jack at the time.

Q.  What was her role?

A.  Her role was keeping everything straight in terms of the volume of information that we were getting in, and she also conducted a large number of interviews.  She kind of became an investigator of sorts when we became shorthand and started, interviewed a lot of witnesses, also.

Q.  And what about Lesa Watson?  Who was she and what role did she play?

A.  Lesa Watson would have come in a little later, not much later.  But we had been assigned an expert of sorts, a Kevin McNally.

Q.   Kevin McNally?

A.   McNally.  He was assigned to us as a resource.

Q.   Resource counsel?

A.   Resource counsel.  He had dealt with Lesa Watson who was an investigator in the area, of the target area for our investigation and referred her.  So she would have been brought on fairly early as an investigator.

Q.   She's based out of Kentucky, I think Frankfort, Kentucky?

A.   Yes, that's correct.

Q.   Let me go through a few more of the names of the defense team.  And, by the way, are you and Jack talking about the different defense team members and deciding who to bring on or --

A.   Absolutely.  Absolutely.  Donna Watts would have probably referred Tora Brawley who came in later.  Tora and Donna had worked together.  I believe that --

Q.   Tora Brawley is a psychologist?

A.   She's a psychologist.

Q.   And has she testified in death penalty cases before?

A.   Yes.

Q.   With Dr. Watts?

A.   Yes.  Jan Vogelsang would have been brought in later, also.  And I cannot remember, I think that Donna might have worked, Donna Schwartz-Watts might have worked with her, also. I can't remember.  She is the preeminent expert in her area in

Harris – Cross                    83

the state, so --

Q. Dr. Brawley?  No, Schwartz-Watts.

A. No, Vogelsang, Jan Vogelsang.

Q. Vogelsang, okay.  What is her job, what's her role?

A. I can't remember what her title was, but the best way that I can explain her role was to introduce Brandon's life, the compilation of his life, to the jury.  You know, where he had been, by whom he had been treated, the medications that he had been taking, that he had taken.  She just really explained Brandon to the jury the best that she could, or the best that we could.

Q. Let's go through some other information.  There's a Steve Hisker?

A. Steve was an attorney in Jack's office, and I believe that Steve conducted some interviews and did some computer programming work for us, exhibits, things like that, I think.

Q. What about Harrison Saunders?

A. Harrison had been with Jack forever.  Harrison started with Jack back when he was 16 as a runner, and had attended University of South Carolina, took some time off and worked for Jack in the interim as a something, I don't know what his role was.  Then he went to law school, graduated, and was an attorney in Jack's office I think during this time period.

Q. What about Greg Cook?

A. I think he was an investigator?

Q.   Investigator in West Virginia?

A.   West Virginia.  I think he worked for Mr. Collias.

Q.   Correct.

A.   Who was Brandon's counsel in West Virginia for the Burns matter.

Q.   Were you able to use some of the resources from the West Virginia case then to investigate your case, as well?

A.   Yes.  He was assigned a number of interviews and was assigned to find locations and to find people.

Q.   At some point did you then end up retaining a neurologist?

A.   Bill Brannon.

Q.   And how did you come to hire him?

A.   I feel certain that Bill Brannon came to us, he's been around Columbia forever.  I know Johnny Gasser had actually used Bill Brannon in cases as a prosecutor.  I know that he had testified numerous occasions in federal court.  I don't know if he had ever worked in a death penalty case before, but he would have been referred probably by Dr. Watts.

Q.   I see Diane Follingstad was a team member.

A.   Dr. Follingstad was a jury consultant.

Q.   And then Shealy Boland.  She was a law clerk?

A.   She was my law clerk, very detail orient and was actually a very good law clerk.  She's an attorney now in Columbia.

Q.   What was one of her primary tasks?

A.   Shealy did timelines and was inputting information into a

timeline that I was keeping, that we were keeping.  Again, she was very detail oriented and really did a great job with everything she was given.

Q.  Lisa Kimbrough?

A.  Lisa Kimbrough was brought in probably eight months in, maybe six months in, to assist in mitigation.

Q.  She's actually a lawyer?

A.  Yes, she is.

Q.  But she was brought in as a mitigation person, mitigation investigator?

A.  Yes.

Q.  So by my count you have at least five lawyers, and I guess if you include Mr. -- maybe more.  But then you had it looks like three, four investigators, if you take Mr. McNair, if you include him with Kimbrough, Watson, and Tarr, is that correct?

A.  Yes.

Q.  And then you had a Dr. Donald Morgan, another psychiatrist.  What was his role?

A.  He was treating Brandon.  He was not evaluating Brandon, he was treating Brandon while Brandon was in the custody of the Richland County Detention Center, as well as while Brandon was in the custody of the Just Care Health Center here in Columbia.

Q.  And what about James Aiken?

A.  Jim Aiken was the expert on jails.  And Jack actually

found Mr. Aiken.  I don't know that he had dealt with him before, but I know that Jack did -- looked into that.  We wanted to present that evidence to the jury and Jim Aiken was our expert.

Q.  And then you have David Good and Daniel Goldberg?

A.  David and Daniel spent a lot of time with Brandon reading discovery to him.

Q.  And a few other miscellaneous folks.  One is Jean Strickler.

A.  Jean was in Jack's office, she was a paralegal.  Again, I think Jean's primary function was to maintain order with regard to the files.  She did not participate in interviews, she did not really participate in any of our meetings, substantive meetings, about how the case should be handled or where people would go, conduct interviews or who would be interviewed.

Q.  And Anna Rawl?

A.  Anna was my law clerk during this entire time.  I think I had a couple of them, actually, but Anna was -- she assisted me.

Q.  And then Christina Rampy, who was with Nelson Mullins, I guess?

A.  Christina was working with the Nelson Mullins law firm, that is a law firm all over the country, and she just volunteered her time on a few of the issues as they arose.

Q.   Two of the allegations, claims 19 and 20, talk about the
failure to assemble and supervise the team.  We will get to
that a little bit later, but I thought I'd ask you first,
seems like a team that -- did you feel like you were
assembling everybody you needed?  I mean, was there ever a
time where you thought you needed somebody but we can't get it
either because the judge wouldn't give the money or just for
time purposes?  I don't know, just did you ever feel like you
didn't have what you needed?
A.   As I explained to both lawyers preparing for this, at no
time did Judge Anderson or any court ever deny us access to an
expert or to an investigator, or travel, or anything that we
needed to defend Brandon.
Q.   If you had needed an expert you would have gone to the
judge and tried to get it, right?
A.   Yes, sir.
Q.   As far as the management, again we're going to get to it
in a little more detail later, your and Mr. Swerling's
management and supervision of the team.  How often were y'all
keeping up with what was going on?  Was it every once in a
while, was it every day, was it 24/7?
A.   Every day without question something was done on this
case, someone was managed in this case, someone was
interviewed, discussions were had between myself and Jack and
the team.

Q.  Let's go ahead and start with claim two.  In claim two we have an allegation that you rendered ineffective assistance of counsel because you didn't prepare for and effectively litigate the Jackson v. Denno hearing.  Do you remember the Jackson v. Denno hearing starting February 24 of '04?

A.  Yes.

Q.  And it spanned a number of statements, correct?

A.  Correct.

Q.  And did you and Jack prepare for it?

A.  Yes.

Q.  Did you read all of the reports regarding the various statements that were made by Mr. Basham from the moment he was arrested until he was transported into South Carolina?

A.  Absolutely.

Q.  And when you were doing that were you looking to see if there were ways that you might be able to keep out some of those statements?

A.  Yes.

Q.  And did you at any point find that you had strong evidence that Mr. Basham was coerced?

A.  No.

Q.  Or that food or drink was withheld?

A.  No.

Q.  Or that he was somehow forced to give statements in any way?

A.  No.

Q.  I would like for you to look at Exhibit 12, which we will pull --

MS. STONE:  Your Honor, this is the exhibit we talked about in chambers, and Agent Long is in the courtroom.

THE COURT:  All right.  You want him to step out at this time?

MS. STONE:  Yes, please.

(There was a pause in the proceedings)

BY MR. DALEY:

Q.  Can you tell me what this memorandum is?

A.  It is a memo that I created after having conducted interviews in December of 2003 in West Virginia.

Q.  I think it might have been Kentucky, but --

A.  Was it Kentucky?  Yes, that's where Brandon was arrested, that's correct.

Q.  And who did you interview?

A.  I interviewed Barbara McGuire, who was a -- who was a paralegal in the office, I interviewed Mr. Hewlett, who was a public defender, and I interviewed Richard Hughes, who was an attorney that did federal work Ashland, Kentucky.

Q.  I'll try to speed it --

A.  It's Brian Hewlett, I see it now.

Q.  Did she at some point during the time Mr. Basham was being interviewed get into talk to him?

A.   Yes.

Q.   Could you go to page two, Gail?  Just highlight the part that -- just the middle part, if you would bring that up.  I highlighted some parts, but the bottom line is during her time with Mr. Basham did she have any concerns that he didn't understand his rights?

A.   No.

Q.   And did she, in fact, have any concerns that he didn't understand what was going on?

A.   No.

Q.   In fact, did she say he's not stupid?

A.   Everything in this report is accurate as to what she told me.

Q.   And as a result of what she told you, that gave you a little less concern that he might somehow have been coerced?

A.   Yes.

Q.   Go to page three.  This is a continuation, and just -- the highlighted part, again, she says -- you recount that she said she went so far as to have Brandon sign in writing the fact he was waving his right to an attorney and that he understood his advice of rights?

A.   Correct.

Q.   So she actually separate and apart from the waivers and the Miranda readings that the police, the FBI and folks gave, she actually did one herself, is that correct?

Harris – Cross                                       91

A.   Correct.

Q.   Let's go to the next page.  This is actually the bottom of page three.  It starts that you interviewed Brian Hewlett.  And this is the public defender?

A.   Correct.

Q.   And he went and talked to Brandon at some point, Mr. Basham?

A.   I believe the following day.

Q.   And he, too, tried to keep Mr. Basham from talking, but that Mr. Basham continued to talk, is that correct?

A.   That is correct.

Q.   Page five.  And then you talked with Mr. Hughes, who was appointed by the federal court in Kentucky to represent Mr. Basham in his proceedings in Kentucky?

A.   That's correct.

Q.   And, again, your recounting of what Mr. Hughes said is that he understood his rights and he had decided he was going to go ahead and talk and cooperate with law enforcement and assist them in trying to find the bodies of Samantha Burns and Alice Donovan.

A.   Yes, sir.

Q.   And, in fact, he on a tape that -- did you ever receive a tape from him at some point?

A.   Yes, I had a transcript.

Q.   And in that tape it is Mr. Hughes and Mr. Basham talking?

A.   Yes, sir.

Q.   And in it he advises him of his rights again, Attorney Hughes does?

A.   That is correct.

Q.   And Basham indicates he's not going to -- Mr. Hughes says don't talk and Mr. Basham says, no, I'm going to continue to cooperate with the FBI?

A.   To the best my recollection, that is on the tape.

Q.   And then last page, page six, Mr. Hughes' impression was that he understood all of his rights?

A.   Yes.

Q.   And he -- and Mr. Hughes even had went so far as to say to Mr. Basham how the statements he was making were going to be used against him.

A.   That is how he explained it to me, yes.

Q.   So at a minimum you had investigated well enough that you knew that when he was in Kentucky he was not only being advised of his rights by the law enforcement, but that he had had three different folks who were public defenders or the public defender's investigator telling him his rights, as well.

A.   Yes.

Q.   None of them indicating that he was incompetent, not able to give a statement, not understanding his rights.

A.   That is correct.

Q.   And, in fact -- will you pull up Exhibit 13, please? After the hearing and before trial, because there's an allegation in claim 13 that you should have argued this to the jury, argued that the statements were involuntary, did you and Mr. Swerling go back and reinterview Mr. Hughes and Mrs. -- Miss McGuire?

A.   Yes, we did.

Q.   And they simply confirmed what they had said previously.

A.   That is correct.

Q.   Now, with regard to preparing for the hearing on September 25th, which would have been statements that are given in South Carolina, particularly the statements -- not the 25th, the 28th, Thanksgiving, the hearing was on February 25, about the Thanksgiving day search, did you take time to talk with and interview Mr. Monckton and Mr. Littlejohn?

A.   I can't remember if I interviewed Mr. Monckton.  I know that Mr. Littlejohn and I spoke about these matters.

Q.   If I pulled up a time sheet of Mr. Swerling would that maybe refresh your recollection?

A.   It would.

Q.   Okay.  I think it's Government's Exhibit 162 at pages five and six.  Four, five, and six.  I think if you go to the page six, Gail, I think it's the 2-24, the third one down.  It's already been admitted into evidence.  These are Mr. Swerling's

time records.  On 2-24 this has an entry, prep for motions hearing.  PC with Billy Monckton and Cam Littlejohn and Greg Harris.  I don't know if that a refreshes your recollection.

A.  I really -- I'm not -- this doesn't surprise me.  Like I said, I know that Cam and I spoke a lot about this.  I just don't have any independent recollection of discussing with Billy Monckton these matters.  I'm sure that I did, if Jack says we did on that day I have no reason to -- certainly no reason to doubt that.

Q.  And my point is, though, you were prepared, you did not go into that --

A.  Yes.

Q.  -- by the seat of your pants, correct?

A.  No, that is correct.

Q.  Now, tell me why in the end you ended up making certain arguments that required a finding by the court that the statements should be admissible but that you didn't go full bore and try to argue that there was any coercion or manipulation or --

A.  Well, I didn't believe that there was.  Statements were going to come out based on the facts as I knew them.  Our goal, at least my goal, I can't speak for Jack, although I know this was the plan, my goal was to elicit as much information from the agents that I could as to Brandon's cooperation and assistance and to demonstrate that Brandon was

trying to help from day one, from the moment that he was fished out of the river, trying to help the location of the bodies.

Q.  Now, you did, however, attack as being outside the scope of what was allowed some of the things that were said or done on the Thanksgiving day search, isn't that correct?

A.  Yes, that's correct.

Q.  But, again, you didn't attack those statements based on any police coercion, police withholding of food or making him stay up too late or anything.

A.  No, we didn't.

Q.  And did Mr. Monckton or Mr. Littlejohn give you any information that would have led you to want to pursue that, pursue attacking the statements because he was being coerced, for example?

A.  No.

Q.  Did you want to use the Jackson v. Denno hearing for discovery purposes?

A.  Yes.

Q.  That's a yes?

A.  That was a yes.

Q.  And what about for general, I mean, discovery basically? But then also to lock down testimony by --

A.  I wanted to lock down the agents for questions such as isn't it true that Brandon was trying to help you.  I wanted

Harris – Cross                                    96

that agent on the record to say yes.  Isn't it true that Brandon was not aggressive towards you.  I wanted the agent to say yes, so I had them locked down on that testimony so that when it came time to cross-examine that agent I knew exactly what they were going to say with regard to Brandon's assistance.

Q.  Let's go to claim five.  Actually it's claims four through seven in the petition that talk about competency.  The original attorneys, Mr. Littlejohn and Mr. Monckton, filed a motion on December 11.  You and Mr. Swerling, though, did not want a competency evaluation done, is that correct?

A.  Yes.

Q.  In fact, if you could have avoided it would you like the government to never have examined Mr. Basham?

A.  Absolutely.

Q.  Was there any possible reason you could see that you would want to make a motion to allow the government experts at Butner, for example, to examine Basham, if you could help it?

A.  No, I did not want Brandon -- I wanted to keep Brandon away from the doctors, the government doctors, as long as possible, and if he never got examined that would have been fine with me.

Q.  And, in fact, if you pull up Government's Exhibit 12 again, page four.  Down towards the bottom didn't you in fact ask that Mr. Hewlett withdraw his motion for a competency

evaluation?

A.  I had not remembered this, but, yes, I did.  I did that, yeah, now that this refreshes my recollection.

Q.  And why were you --

A.  I did not want the government to rely on any member -- any legal advice that Brandon was getting from anybody in any jurisdiction.  I didn't want them saying he's being evaluated there, therefore we should be given access to him.

Let me also say another reason, Mr. Daley, we didn't want him evaluated.  And this was a continuing battle that actually the court weighed in on during numerous hearings.  We wanted control over the battery of tests that would be administered if the government got ahold of him.  MMPI, for instance.  I know there was a lot of discussion I remember about we didn't give that test, why should they.  And the government -- I believe the court's ruling was that they were only entitled to similar or like testing.  So there was somewhat of a battleground over what tests would be performed on Brandon. So that was just another reason we just didn't want to turn him over to allow the government to poke and to prod and to do everything that they wanted to do to evaluate Brandon.

Q.  Do you believe there's an ongoing obligation to consider and make sure that your client's competent throughout the proceedings?

A.  Oh, yes.

Harris - Cross                                98

Q.  And, in fact, isn't it true that each time you had a concern about Mr. Basham's competency you would bring it to the court's attention?

A.  I did.

Q.  And at least in two instances, in the February 24th Jackson v. Denno hearing y'all had Dr. Schwartz-Watts come and examine him after getting a break for her to do so?

A.  I believe we did.

Q.  And then, of course, the September 20th incident, same thing happened.  And then I'm not sure whether you asked for it but you certainly brought it to the court's attention in October 26, is that correct?

A.  Is that when he told us he had ingested --

Q.  That was actually the September 21st morning after the altercation.  That's the morning when the cocaine --

A.  Yes.

Q.  When he said he --

A.  I agree there were a number of times I brought to the court's attention that I believed Brandon couldn't go forward for the rest of the day or for whatever reason.

Q.  And so competency becomes an issue.  Why didn't you say well, Judge, we should send him off to Butner then?

A.  Well, I think that on every occasion, given time, he was evaluated by our doctor, who knew him better than anyone, and she rendered an opinion he was competent to assist us, he knew

what was going on in the trial and that he could go forward. I don't know how we would have at that time asked for an evaluation inconsistent with that.

Q. Have you asked for evaluations previously or since that time for other clients?

A. No, I haven't.

Q. And is it the same reason, that you don't want to have the government get ahold of your client?

A. I mean, I've never done it, so -- haven't been put in that position. If given the same choice with a similar set of facts I would certainly have wanted to have my client tested by my doctors before turning him over to the government.

Q. And avoiding the government's doctors as much as possible.

A. Absolutely.

Q. Besides perhaps that night, September 20th, did Dr. Schwartz-Watts ever find Mr. Basham to be incompetent?

A. Not that I recall. She found him to be incompetent that day in court one day.

Q. That's what I am saying, that time period, September 20, you said?

A. Okay, all right.

Q. I'm talking about besides that one time.

A. No. She found him on occasion, to be clear, she found him on occasion when he was at the Alvin S. Glenn, she found -- he was such that he couldn't be evaluated by her. Now, I don't

know that that makes him not competent.  He was uncomfortable in his surroundings, he was having problems with some of the guards and he was in a very agitated state because of environmental issues that were going on.  That's why we had the court -- asked the court to move him so that we could conduct her examination, which occurred at Just Care.  So I want to be clear that while she didn't find him to be -- she found him to be competent, but there were problems associated with Brandon and in her evaluations, even.  So I want to be clear about that.

Q.  Was he helpful to you?  Could he give you information?

A.  Yes.

Q.  So he remembered names?

A.  Yes.

Q.  Could he remember events?

A.  Yes.

Q.  In fact, did he describe a lot of events that had happened?

A.  Yes, he did.

Q.  Did he sometimes lie to you?

A.  Brandon lied.

Q.  Did he sometimes lie to you?

A.  I mean, Brandon told me things that were inconsistent with what other people had told me.  Brandon told me things that were inconsistent with things -- with documents that I had

been presented.  So to the extent that he was untruthful to me, I would say that he on occasion was untruthful.

Q.  And would one of those have been the Exhibit 12 where you interviewed those folks that had all explained to you the circumstances of the questioning?  Did he then give some inconsistent --

A.  Yes.

Q.  -- statements afterwards, because you wanted to check up on that?

A.  Yes.

Q.  Okay.

A.  I believe I -- I remember that I think I did a memo about that conversation.

Q.  Would you mind pulling up Exhibit 160.  160, which has been introduced into evidence, is a summary from your time sheets and Mr. Swerling's time sheets about how much time you spent with certain people.  I wanted to focus in on the time you spent with Mr. Basham.  This is the fourth to the right, Gail, and the first line, if you could highlight that.

    Why don't you take that down, sorry.

A.  I'm fine.  I can see --

Q.  From that can you tell how many times you met with Mr. Basham?

A.  I really can't now.  Can I look at the -- there we go.  It appears I met with, spoke with him on the phone 90 times.

Q.   That actually looks like the total for you and Mr. Swerling.

A.   I'm sorry, 50.

Q.   For how long?

A.   What do you mean, for how long?

Q.   How many hours, total?  The next column.

A.   109.

Q.   Does that seem to you to be about right, is that --

A.   Yes, I met with Brandon a lot.

Q.   Again, he was helpful in giving you information, telling you certain things that helped you track down records and what had happened previously in his life?

A.   I'm not going to sit her and tell you that he was my source or even a really good source, Mr. Daley, because he wasn't.

Q.   Okay.

A.   You know, Brandon and I talked about a lot of things over the year-and-a-half that I spent with him.  And I'm not going to sit here and tell you that I would take him a report and ask him specific questions about his father Jimmy or his uncle Tommy or where did you go after you left Rivendell, things like that.  He really was not all that beneficial in terms of connecting dots.  We did discuss all those matters and he was -- he did know, you know, he had a lot of information about those places.  Had a lot of complaints about those

places.  He had nice things to say about, you know, the people that were kind to him.

So, yes, he understood almost everything we ever talked about, and while he wasn't the greatest historian, I mean he remembered names, he remembered times and places and things like that.  Maybe not as you or I would, but he did have recall for a lot of the information.

Q.  And when he would remember somebody who had been kind to him or had nice feelings about, did that often turn out to be somebody who might be helpful?

A.  Absolutely.

Q.  On the last line, if you go over to the fourth column, you met with or talked with Dr. Schwartz-Watts it looks like ten times for a total of 22 hours?

A.  That would surprise me.  I met with her a lot more than that.  But if that's what I billed for, that's what I billed for.  I met with Donna a bunch.  I can't imagine -- I can't imagine I only -- only ten entries in here.  But, yes, that's what --

Q.  Is it possible, do you think, that all your hours were captured on your time sheets?

A.  No.

Q.  Or think they were low?

A.  They were low.

Q.  Again, so you talked with Dr. Schwartz-Watts numerous

times about Brandon's condition.

A.   Absolutely.

Q.   And about how he was doing.

A.   Yes.

Q.   And if there were problems she would tell you?

A.   Right.

Q.   Or if you saw problems you would tell her.  And then if there was a problem that perhaps could be done with medication or treatment Dr. Morgan would be involved?

A.   I was going to say I didn't deal with Dr. Morgan much at all.  I can't imagine what my -- Jack dealt with Dr. Morgan a lot.  So if there were issues with regard to Brandon's meds, generally speaking Jack and Dr. Morgan would have addressed those issues.

Q.   Why didn't you pursue an incompetency claim in this case?

A.   Didn't have any witnesses to testify that Brandon was not competent to stand trial.

Q.   Let's go to claim nine, the concession of guilt in the guilt phase.  The mostly concession of guilt with -- you knew what y'all were doing.  This didn't surprise you that basically you were pleading guilty to a crime that he was going to be eligible for the death penalty in, correct?

A.   The kidnapping, yes.

Q.   Well, I believe there's going to be a criticism that you gave up too much.

A.   Well, they -- that criticism may exist.  I disagree with it.

Q.   And, again, the strategy for conceding what you did and leaving intent on the table was?

A.   To the extent that the jury felt empathy for Brandon because he had accepted responsibility, and from, again, from the moment he got out of the water tried to make it better, we wanted to engender that.  And we wanted to do it from opening statement.  We didn't want to put a jury through a who done it for a month at the end of which it was obvious who done it, and then turn right around after a week break and say, okay, that didn't work, so how about sparing his life.

We thought a better course of conduct or better strategy, rather, to come in from the very beginning and say this is not a who done it, let me tell you what happened and, you know, start working from first opening bell until the trial end to try to work with the jury towards a good result.

Q.   Did you have any doubt that if you had tried to just defend this case as best you could, do you have any doubt that he was still going to be convicted?

A.   Oh, he was going to be convicted.  There was no doubt in my mind about that.

Q.   And the ex parte order where Mr. Swerling lays out the strategy I think is part of the record already.  But I think it's Government's Exhibit 20.  Did y'all talk about this with

Mr. Basham?

A.   Yes.

Q.   Did you talk about it with each other?

A.   Yes.

Q.   And was there anybody who objected to this approach?

A.   No.

Q.   If you had an opportunity to do this again in a case like this would you do it?

A.   Absolutely.

Q.   Did you then later on try to use the concession that you had made later on in trial to try to explain to the jury that you had conceded because you weren't going to try to say that he didn't do it?

A.   I think Jack did in his arguments.  I don't know if we through the trial through witnesses ever -- that ever was ever really an issue.  I don't know that that would have been relevant to come in through a particular witness.

Q.   That was really talking more just about arguments, closing arguments.

A.   Yes, I think certainly that was addressed in argument.

Q.   Let's go to claim ten -- well, yeah, to claim ten, which is still -- claim ten still --

          MS. STONE:  I'm sorry?

          MR. DALEY:  Claim ten, you are still going forward with claim ten?

MR. BURKE:  We're not waiving it.  I think the record speaks for itself.

MR. DALEY:  Got you.

Q.    (MR. DALEY) Why did you want Brandon to be in the courtroom?

A.    I wanted the jury to see Brandon.  I mean, you always want your client in the courtroom.  I don't know what to say other than that.  Doing what we do, if a client is not in the courtroom there is -- I can't think of a positive inference to be drawn by a juror from your client not sitting beside you.

Q.    And I think you've said in the interviews that we had neither you nor Mr. Swerling saw the altercation with the marshals coming.  This was a surprise?

A.    The level --

Q.    Yeah.

A.    -- was a surprise.  The altercation was a surprise.

Q.    Let's go to 13 just for a minute.  Same thing as claim two about why you didn't argue the involuntariness of the statement to a jury.  And I guess the question, I mean, let me just ask you a leading question:  Did you think it would be inconsistent to suddenly argue that the statements were involuntary if you were trying to get some level of benefit from saying he was helpful from the beginning?

A.    Yes.

Q.    You want to say any more about why you didn't argue that

to the jury, or do you think it covers --

A.   Trial strategy was to -- again, trial strategy was to demonstrate a number of things.  One of the strategies was to demonstrate that from, again, the moment he was arrested he tried to help.

Q.   Claim 15 deals with the 404(b) evidence, in particular the Burns evidence, the Samantha Burns kidnapping evidence.  You did object to it, correct?

A.   Yes.

Q.   And the court found that it was intrinsic, correct?

A.   Yes.

Q.   And this, of course, is in the guilt phase.  They are only objecting to its admission, I guess the extent of it, in the guilt phase.  Do you think that even if it had been kept out that that would have impacted whether the jury convicted him of being guilty?

A.   I think not as to the conviction, not as to guilt or innocence in the guilt phase, no.

Q.   Okay.  And once you knew that the evidence was coming in did you see a potential benefit of that Burns evidence coming in to show the relative roles of Mr. Fulks and Mr. Basham?

A.   Now, I will say I see very little benefit at all in that evidence.

Q.   Okay.

A.   So I want to be clear about that.  For me to sit here and

Harris - Cross                         109

say I got any benefit out of that evidence coming in, that would be a ridiculous statement.  So, no, I saw no benefit at all.  To the extent that we could squeeze any juice out of that at all it would be to try to demonstrate that after they took that young lady that they took her to places that only Chad Fulks knew existed, they took her from places that only Chad Fulks -- took her from places only Chad Fulks had been to.  So to the extent that we could at all receive any benefit of that, from that, we tried to show that, again, as it related to the Burns abduction Chad Fulks was the leader.

Q.  Claim 16, the failing to renew the request to have select portions of the closing argument statements in Fulks put in in your case.  Do you remember whether you had a reason you didn't renew that?

A.  Well, there's a couple of reasons.  First of all, my recollection of the colloquy with the court, we kind of talked about this and I still haven't seen this in the transcript, but the court referred to the rule of completeness.  One of my concerns was that if we put in evidence that Johnny Gasser, who was the prosecutor that we're talking about, had used the word puppet 46 times or however ridiculously large number of times that it was, if we put in that evidence, that his entire closing argument would have come in.  And I don't know if you've read Johnny Gasser's closing argument, but they are generally pretty good and they are generally very impactful.

So I don't know that I would have -- I know that I didn't want that jury to read Johnny Gasser's closing argument in the Fulks case.

The other reason that I don't think we raised it, because I still don't believe that they shifted theories. I thought that we were able to, through cross-examination, demonstrate who was the leader and who was the follower. I also thought, quite frankly, and I've looked at the -- I have looked at the testimony as to this issue, I thought the government fairly well intentionally diffused some of our cross-examinations by bringing out respective roles with their own witnesses, which kind of took the sting away from us when we got up and said isn't it true Chad Fulks was the leader, isn't it true Chad Fulks told Brandon Basham to tie you up and how to tie you up.

The Hawkins testimony was a good example of that, where they went to great lengths to talk about the respective roles of Fulks and Basham before we got to do it on cross-examination. So I never thought their position changed. I know that there was somewhat of a shift in Mr. Gasser's closing argument and I recognized that, but other than that, I don't know that the government ever shifted their positions. Which was the court's ruling, I will look at this if the government shifts their position. That's my recollection.

Q. Let's go to claim 17, the Clifford Jay testimony. Let's pull up Government's Exhibit 23. These are some notes from

Mr. Swerling's file.  I'm wondering if you recognize those --
is that his handwriting?

A.  Oh, yes.

Q.  And could you decipher it?  Because it took me a very long
time to decipher what it said.

A.  Didn't want to impeach him because we might want to keep
him as a favorable witness during the penalty phase.  I mean,
he's basically saying there that we don't want to say liar,
liar, pants on fire to him and then call him later.  Because
he had so many good things to say about Brandon if we chose to
call him later.

Q.  So at the time that he testified in the guilt phase it was
certainly possible that he was going to testify in the penalty
phase?

A.  He was on our list of witnesses that we may present during
the mitigation phase of our presentation.

Q.  Isn't it true, first, you don't want somebody to get up
and testify, whether it be Paige Tarr or whoever else it might
have been, to say oh, he didn't say we killed them, he said we
killed her.  You didn't really want that coming out, correct?

A.  I just didn't think -- that was just not good -- that's no
way to try a case, I don't think.  That would have been a bad
witness.

Q.  And, secondly, if you had impeached him or tried to
impeach him how would that have impacted your ability to call

him as a penalty --

A.   Again, we're saying that that witness was untruthful on the stand, don't believe that, but we want you to believe it when he tells you all these nice things about Brandon.  I just didn't think that that was -- that doesn't make any sense to me.

Q.   And you did, in fact, interview everybody you possibly could, the two other officers who Clifford Jay had called?

A.   Yes.

Q.   And did any of them -- was their testimony, did you think, going to be helpful in impeaching him?

A.   No.  Their testimony, here was the question to them, the question to them, and I sent Carlisle out to find out if their notes are correct, if their reports are correct.  Because their reports don't say Clifford Jay called them up, because that's what he did, Clifford Jay picks up the phone and called Conway, South Carolina and says I've got some information about a murder in South Carolina.  I know Brandon Basham, here's what he said.  And he said that there was a murder that occurred.

I can't tell you verbatim what was in the report, but I know that it was a big deal when Clifford Jay all of a sudden said them instead of her and I wanted to know if that was in their report.  And so all they would have said was it's not in the report, we wrote down what's in our report.

Q.   And in his testimony it wasn't just simply he said we -- we killed them, I mean, Clifford Jay says that, but didn't he give some reasons why that stuck in his mind so clearly when he testified?

A.   You know, I can't remember, Mr. Daley.  I'm sorry, I just --

Q.   It's all right.  The --

A.   I know what he told me in his den, and he said that Brandon Basham said we killed her.  And then he had, you know, he had -- it changed.  It morphed into we killed them.  I can't tell you why and, frankly, tell you specifics of his testimony.

Q.   And you followed up, though, after you found out that he was saying that Basham said we killed them, and he confirmed that that's what his memory was when you -- when you reinterviewed him?

A.   And I reminded him what he had told us and he stuck with we killed them.

Q.   Let's go to claim 18.  This is the cross-examination of Ronald Hewitt.

        THE COURT:  Before you move on, I still -- I'm a little confused.  I thought the briefs by the petitioner said that the lawyers had information that two law enforcement officers were prepared to testify that they had talked with Clifford Jay and they would be prepared to say that Clifford

Jay told them that Brandon Basham said, I'm sorry, that Mr. Basham said in a conversation we killed her. Is that not the petitioner's position?

MS. STONE: Your Honor, I don't believe -- I'm not looking at it right now, but I believe our argument was they could have called Addison in rebuttal and he would say that Clifford Jay did not say we killed them, his report was silent as to her or them, but that he had spoken with Clifford Jay prior to Long. Long's report said them. The memos from Paige Tarr --

THE COURT: I know about Paige Tarr. This is yes or no. Is it your position that the defense team had information in its files that would suggest to them they should call two law enforcement officers, put them on the stand to impeach Clifford Jay and say that Jay said the word her and not them?

MS. STONE: No, to impeach Clifford Jay and say I never said them. But not -- not to call him as impeachment to say her. They could have called Paige Tarr with that impeachment. And I apologize if our arguments are not clear on that. Our position is not --

THE COURT: I thought when I read the briefs, I thought that was one of the most critical issues in this motion.

MS. STONE: No, we do not have their -- there are not police reports that say her. There are not. There are notes

from Swerling, there are notes from Paige Tarr and notes from Mr. Harris.  There is a 302 that came across which alerted them to the change in testimony that says them.

THE COURT:  I guess I'm just mistaken looking at page 72 of your motion.  Mr. Swerling argued that he did have a good faith basis for the question, indicating that the defense team had checked with both of the officers and confirmed that Mr. Jay never told them about Mr. Basham's supposed reference to "them", in quote marks, in his statement to Jay.

MS. STONE:  And that's correct, your Honor.  The officers, as I said, the officers' report do not say what Agent Long's report says, them, but in all candor they do not say her either, they are silent.

THE COURT: Okay.  All right.  I understand it.  I was -- I misread this a little bit.  I thought the argument was a little bit more straightforward, that he had direct impeachment 302s or something from the officers who used the word her.

MS. STONE:  No, your Honor.  Simply if that had been such a powerful -- if Jay had that elaboration it really struck me, why it struck him so strongly I think he would have been -- he would have told the officers, too.  But, no, they do not say her or them, they are silent.

THE COURT:  All right.

BY MR. DALEY:

Q.   Claim number 18 is the cross-examination of Sheriff Hewitt.  They criticize you for not -- after the questions were asked of Sheriff Hewitt you decided to turn to another subject very quickly.  And one criticism is you didn't try to come right back at him with a -- with his statement, I guess, or try to potentially impeach him.  What's your response to --

A.   The next question -- had I asked another question of that witness it would have been isn't it true you told Agent Long -- you know, isn't it true that what you are saying today is inconsistent with what you said to Agent Long.  That would have been the next question.  And he would have said the same thing to me that he said, which was non-responsive.  He would have said yeah, but, and then he would have -- he would have said what he said.  He would have said it all over again.

     You know, sometimes we read witnesses and you can tell when somebody just wants to say something and it's not going to respond to your question.  He didn't respond to my question, he said what he wanted to say, and I just tried to get away from it.  Inartful or not, I just wanted to get away from that.

     My intent with Sheriff Hewitt, if you look at his testimony, was there was two things.  I wanted for the jury to understand the miles and miles of pine trees and roads and how confusing it is for somebody, you know, in law enforcement,

much less Brandon Basham.  And the other was to ask a very specific question and to address what he and Mr. Gasser had talked about on direct, which was that Brandon -- he made it sound direct like Brandon was saying this, and I just wanted to point out that's nowhere in your notes, is it, and he didn't say that he did it, did he.  And it's a yes or no answer, really.  There's no explanation.  You know, usually can say yes, explain your answer.  The question is did you write it down and the answer is no, there's really no explanation.  And he you know, he gave me an explanation that was nonresponsive, I believe.

Q.  Let's go to claim 19 and 20.  That's the failure to investigate, develop, present mitigating evidence, and then also the failure to assemble team and supervise it.  I think we can go through this pretty quickly.  The mental retardation issue, that wasn't an issue you ignored, correct?

A.  Correct.

Q.  You had retained Tora Brawley.  One of her purposes was to determine his IQ, and if she found it to be low to potentially say he was mentally retarded if she could, correct?

A.  Correct.

Q.  And her opinion was that he was not mentally retarded.

A.  Correct.

Q.  In fact, there were at least three or four other IQs that were well above the magic 70 number, even though it's not

really a magic number, correct?

A.   Again, I don't remember how many, but I know that there were a number of reports and testing that had been given, tests that have been given to Mr. Basham over the years.

Q.   And did Mr. Basham strike you as someone who was mentally retarded?

A.   No, but I'm no expert.  That's why we hire experts to tell us, to make those evaluations.  I have obviously over my lifetime spent time with families with friends that have children with disabilities.  He did not strike me as someone that has problems that some of my friends' children have.  Again, that's merely a lay opinion.

Q.   Did the defense team, not just you, but did the defense team, you and Jack and Dr. Schwartz-Watts and Dr. Brawley, talk about the IQ issue?

A.   Yes.

Q.   And talked about it in some length, correct?

A.   Yes.

Q.   So, again, you did get out as much as you could, at least from Dr. Brawley, about his low IQ, right?

A.   Yes.

Q.   And his low functioning?

A.   That's correct.

Q.   And all the issues that go with that, and that he was in special ed class, correct?

A.   And all that is on the record.   That was the thrust of her presentation to the jury.

Q.   And do you understand, having sort of looked at the issue, that obviously the IQ score alone is not determinative if somebody's mentally retarded, is that correct?

A.   Correct.

Q.   And were there ways he functioned that would have made it harder to argue that he was mentally retarded?

A.   Yes.

Q.   Separate and apart from the fact that apparently he hadn't been -- his IQs before made him really not able to be mentally retarded under the criteria?

A.   Yeah.  I mean, yes, Brandon could do things, and I don't know if this is responsive, but Brandon could do things that I can't do.  You know, it's -- there was a rope that was introduced in the trial that stretched from that wall to that wall, whatever the distance is.

Q.   The --

A.   It might be 40 or 50 feet.

Q.   The length of the courtroom.

A.   And it was created by Brandon by himself using the -- some type of equipment that was attached to the bed where he was housed at Columbia Care.  And he did it by tearing off tiny 12-inch or 12-inch strips of his bedding and intertwining them into what was a very complex rope.  You know, that doesn't

mean somebody's not retarded, mentally retarded, it means they have some ability to function in some regards at a higher level than me.  And part of that, sad as it is, is because of where he had been all of his life.  He learns things at the facilities where he goes from facility to facility, he learns things that you or I don't learn.  Again, does that mean he's mentally retarded or not?  It doesn't.  But it does mean that he has some ability to function at a level that's higher than others.

Q.  Fetal alcohol spectrum disorder is another portion of this claim.  They say you should have raised that, pursued that. Did you know about this fetal alcohol spectrum disorder defense that's used sometimes in cases?

A.  Yes.  Fulks had, I believe Chad Fulks' team had presented evidence of that to the jury, so we were aware of it.  And our experts just said it did not exist in our case.

Q.  So it was looked at?

A.  Oh, yes.

Q.  And, again, you relied upon your experts --

A.  Yes.

Q.  -- to determine that he didn't have it.

A.  Another reason is there was a lot of family history with Brandon that suggested that that might have been something that -- might have had a factor in what he did and why he did it and how he lived his life.  It just unfortunately, once we

did the testing, and we didn't have it.

Q.  Let's get to the team, to the defense team for a minute.
And although the focus is primarily on Investigator Carlisle
McNair and mitigation investigator Paige Tarr, that was not
the only -- those are not the only two folks that did
investigations of mitigation, is that correct?

A.  Correct.

Q.  There was Lesa Watson, correct?

A.  Yes.

Q.  And I know Lisa Kimbrough did some work, as well.  Carolyn
Graham did interviews, is that correct?

A.  I think it's a fair statement to say that everybody was
part of the mitigation team because this was a mitigation
case.  So from my perspective everybody was a part of the
mitigation team.

Q.  So the lawyers Hisker and --

A.  Everybody.

Q.  -- Saunders, everybody?

A.  Yes.

Q.  And, in fact, you and Mr. Swerling interviewed 60, 70
people yourself?

A.  I was part of the mitigation team.

Q.  And one of the criticisms, and we will go back to, I
guess, a few specifics, one of the criticisms is is that Mr.
McNair was somehow distracted by certain things because of, I

guess, they allege prurient interest in certain things.  Did you see any instance where Mr. McNair was not doing what he needed to do?

A.  No.

Q.  Do you -- I don't know if you've looked at some of the exhibits that we had prepared, I think we had given you some, but do you remember how many interviews, for example, Mr. McNair did?

A.  I was not aware until you -- while we were preparing for this both sides presented me with raw numbers.  I was not aware until then.

Q.  So it didn't surprise you when it ended up being about 200 interviews?

A.  No, it does not surprise me at all.

Q.  And, in fact, did Mr. McNair have a skill for finding certain people that no one else could find?

A.  He could find people.  I'm not -- attribute any special skill to Carlisle McNair, but Carlisle was good at finding people.

Q.  Well, let me give you one example though.  Wasn't there an Andrea Roddy who --

A.  He found Andrea Roddy 50 miles outside of Boston, Massachusetts, on the third floor of a tenement house, which I thought was pretty good.

Q.  And Paige Tarr, there has been some allegation that Paige

Tarr wasn't doing a good job and she wasn't getting her memos in on time. And it sounds like that there was an issue with that at some point, is that correct?

A. Yes.

Q. Did that go unresolved or was it immediately remedied by Mr. Swerling?

A. I'm not going to say it was immediately remedied, but it was remedied and it had no, I don't believe -- well, it didn't have any effect on the way that I defended the case or the way Jack defended the case. We got her memos in time to adequately prepare for trial.

Q. And I guess more globally with both Mr. McNair and Paige Tarr, anything -- I mean, this is one of those cases where -- have you been to Mr. Swerling's office where all those boxes are?

A. Of course.

Q. The 70 --

A. Of course.

Q. I mean, literally how many institutions do you think you got information from?

A. I think I probably myself --

Q. Um-hmm.

A. -- visited at least ten institutions. Eight to ten.

Q. And --

A. Probably obtained information from 30 institutions.

Q.   And I mean --

A.   When I say institutions, I mean clinics all the way up through healthcare facilities where you are an inpatient status.

Q.   Let's talk for just a minute about Jan Vogelsang, too. What was her role?

A.   Again, as I stated earlier, she presented Brandon's history, medical history, family history, criminal history, where he had been, who had seen him, who gave him drugs, what they gave him, how many they gave him, the problems that he had had in his past.  She presented all of that to the jury.

Q.   When --

A.   Sociopsychological expert, something like that.

Q.   And she put in certain charts and --

A.   Right.

Q.   -- and that sort of showed his life history, back to, I can't remember, his mother's birth?  I can't remember.

A.   Well, I know that our charts and some of the timelines we were creating went back to his grandparents.  I think Jan's presentation, I think it began with Cathy and went through Cathy's problems all the way through the arrest.

Q.   Do you see this as a case where y'all missed some large chunk of his life when trying to investigate his background and sort of what happened in his life?

A.   Absolutely not.  In fact, I'm confident sitting here today

that we did not miss one week of Brandon Basham's life.

Q. And I don't think we have to show them, but there's been exhibits, 172 -- well, was there a thing called a cast of characters?

A. Yes.

Q. Exhibit 169.

MR. DALEY: May I approach, your Honor?

THE COURT: Yes, sir.

Q. (MR. DALEY) Just take a look at it for one second, Mr. Harris, and tell me what that is and why you had it in this case.

A. This is order. I mean, this is the only way to keep control over a case like this. With the number of witnesses, the number of facilities, the locations, the only way to have order, any order at all, is to keep up with who needs to be interviewed, who has been interviewed, and what information they have. And that's what a cast of characters is.

Q. And so you had the name of the witnesses in alphabetical order?

A. Um-hmm.

Q. Then you had geographical areas, it looks like?

A. Yes.

Q. Because of the various geographical areas. Then you'd have an address, if you had an address for the person, phone number if you got a phone number. You would note when you had

interviewed somebody and then initials of who did the interview, is that correct?

A.  Yeah.

Q.  And then if there were subpoenas that you had gotten, because I know some of these are actually institutions, you would say when you sent the subpoena and when it was received?

A.  Yes.

Q.  And then if there was information in the discovery you would then have that in a separate column?

A.  Yes.

Q.  Whose idea was this cast of characters concept?

A.  You know, I was actually involved in a case at the same time as this where we had one.  I don't know if it was my idea or Jack's idea, but it -- or Lesa's idea.  Quite frankly, I can't remember whose idea was and I don't know that anybody's claiming authorship over the idea.  It's just something that we all agreed we needed to have.

Q.  Do you now do a cast of characters in basically all your cases of any significance?

A.  Most cases you don't have a cast of characters because you don't have 600 witnesses.  But any time you have a case involving a large -- a lot of discovery, you probably ought to have a to do list, and what this is is a very fancy to do list.

Q.  I'm not going to go through them, but there is also a

Harris - Cross                         127

thing called a geographical index which was more by geography you would be able to track witnesses and what you had done?

A.  Yes.

Q.  And would that then be sent to people in geographic areas, whether it's Lesa Watson in Kentucky or Greg Cook in West Virginia, to help them know who they should be looking --

A.  No, I don't know if -- I don't know that you would send somebody the cast of characters and say Greg, you need to look at pages 13and14and tell me if you've got everything.  I think what would have happened is Jack and we would sit down, we would go through this often and say who do we need to interview and where are they.

And, you know, obviously some witnesses were more significant than others.  So, you know, a list would be generated and I called Lesa or I'd call Carlisle or whoever was going to travel, or even Paige, and we would say okay, you guys need to set up interviews with these five people in this location.  So that's how it would be used, more than just sending them the cast of characters list.

Q.  But everybody would end up with -- this would get updated?

A.  Yeah.

Q.  And it would get updated?

A.  Yes.

Q.  And I guess Lesa was doing most of the --

A.  I think Lesa Watson was in charge of making sure it was

updated and it was accurate and it was orderly.

Q.  Gail, would you go he to Exhibit 31?  When this case first came up you obviously realized it was going to be enormous, correct?

A.  Yes.

Q.  And I just wanted you to look at this e-mail dated September 23, '03.  This is after the Department of Justice has decided to pursue the death penalty and you've gotten funding.  I just wanted to ask you a few questions about that, because the allegation is, again, not great supervision.  In this e-mail isn't it correct that -- and this was sent to -- I mean, all these e-mails are the folks we talked about, basically --

A.  Yes.

Q.  -- is that correct, who were on the team that Jack and you were to see every document and interview?

A.  Yes.

Q.  They were put in a basket.  At this time you and Mr. Swerling had the offices next to each other, sort of --

A.  Fifty feet away from each other.

Q.  And everybody was required to give these memos in a timely fashion, isn't that correct?

A.  Yes.

Q.  And you and Mr. Swerling were going to talk about these things on a daily basis.

A.  We did.

Q.  And that is what happened?

A.  It is.

Q.  And about a week later, Exhibit 35, Mr. Swerling wants to obviously reiterate things, I guess.

A.  Jack does that a lot.

Q.  Is Mr. Swerling a hands off or hands on kind of manager?

A.  Extremely hands on.

Q.  Did anybody work on this case harder than Jack Swerling and Greg Harris?

A.  No.  No, Jack Swerling, leave me out of that equation, nobody worked harder than Jack Swerling.

Q.  Anyone else know more about this case than Jack Swerling?

A.  No.  Jack's not only the hardest worker I know, he's one of the smartest people I've ever known.

Q.  Did he bring all that to bear on this case?

A.  Um-hmm.  Absolutely.

Q.  Let's just pull up for a second Exhibit 166.  Can you see that on the screen?

A.  Yes.

Q.  This is another list.  This is a geographical to do list?

A.  Yes.

Q.  And there's writing in red.  Looks like this is dated July 13, 2004.  Whose handwriting is that?

A.  Jack's.

Q. Go through the pages, Gail.

A. And, you know, while I don't have a specific recollection of that day and those notes, this appears to be an afternoon meeting between Jack and me, or a group of us, where each of us has our own list and we're going through saying okay, where are we on this thing, let's get that on the list, get an update. I would guess Lesa Watson was on the phone us. I would guess -- can you stop it for a second, please?

Q. Yes.

A. Get one that I can look at.

Q. Can we turn it?

A. Thank you. What would happen, we would all have -- Lesa could be in Kentucky, we would have one, Paige might be there, we might have everybody in the room, and we're just going through it line -- person by person.

Q. So page eight of Exhibit 166, you've got the first line it says interview, right?

A. This is -- this is probably the product of a four hour meeting where we're just going through them line by line, witness by witness, finding out where we are on the interviews, where we are on our investigation of every single person on this list.

Q. No stone is going to go unturned.

A. No.

Q. Let's go to Exhibit 51 real quickly. This is an e-mail

from Lesa Watson.  It says contacted/to be contacted.  Who is she sending this to?

A.  It looks like everyone.

Q.  It looks like the whole team.  And she is obviously reporting from the cast of characters and geographical to do list.  I guess she's updating what's going on, saying -- what's she basically telling y'all?

A.  I mean, it's fairly self-explanatory.  At this point in the investigation we had contacted 340 some odd people, but we had a lot more to do.

Q.  And these were the sorts of things that were just getting e-mailed back and forth.  I mean, can you imagine how many e-mails went back and forth in this case?

A.  No.

Q.  How could you tell Jack's e-mails, by the way?

A.  Jack writes in caps.  And Jack -- well, you know, I don't understand the question, really.

Q.  I just wondered if that's how you knew.  It seems like it always jumped out at me when I looked --

A.  Depending on Jack's mood you could -- you'd get e-mails from Jack at 10:30 at night, and I could always tell within two, three -- within two sentences whether he was aggravated or agitated or tired or what have you.  But, generally speaking, he was in all caps when he wanted something done immediately.  And he would write long e-mails, and the longer

usually was not good.

Q. Let's go to Exhibit 172. This is a long document, so we're just going to show you the first page. Do you recognize that?

A. Yes.

Q. What is that?

A. This was the medical chronology, wasn't it?

Q. I think that's actually another one, medical psychiatric chronology.

A. I know Cathy's his mother, so --

Q. I think it was done by Shealy Boland.

A. She took medical records and put them together. Is this the medical record document?

Q. I think it isn't really the medical record document. I do know what you want to get to. Let's go to Exhibit 174. What is this?

A. That's the psychiatric chronology.

Q. I think it's 280 pages. This is -- how was this put together? Where were the sources of information?

A. This was all the information we got from the various facilities, medical facilities.

Q. And y'all put it in one document so it would be a resource and an encyclopedia of his life, I guess?

A. Yes.

Q. His medical life?

A.   Yes.

Q.   Let's go to claim 21.

MR. DALEY:  Your Honor, if we can have until about 1:00 o'clock be should be able to get through Mr. Harris.

THE COURT:  All right.

Q.   (MR. DALEY) The allegation is that you failed to request that the court trifurcate the trial in a guilt phase and then a two-part penalty phase where you first do eligibility and then later a penalty/selection phase.  That's the allegation. Did you think of that issue?

A.   No.

Q.   Okay.  Claim 23, inconsistent theories claim.  You didn't object to presentation of what they say, they allege, are inconsistent theories.  Why did you not?

A.   I don't believe, I didn't believe then and I don't believe now, the government presented inconsistent theories.

Q.   The causal connection argument that there was no nexus between the mitigation evidence and the crime committed, again, do you --

A.   I've read their filings.  I disagree with their interpretation of the -- of why the questions were asked and the impact they had.  And, again, but you would have to ask Mr. Schools why he asked those questions.

Q.   I think some of these, claim 25 is the two-step mitigation jury instruction which I think the Fourth Circuit has actually

rejected that in Mr. Fulks' --

A.   I think Fulks raised that issue.  But we didn't, we didn't address that in our case.

MR. DALEY:  Bear with me for a moment, please, your Honor.

(There was a pause in the proceedings)

Q.   (MR. DALEY) Would you mind putting up Defense Exhibit 44, please?  Yesterday Miss Stone talked about this e-mail that Mr. McNair sent out that says on the part -- do you see who he sent that e-mail to?

A.   Donald Addison.

Q.   Addison, do you remember Addison being one of the --

A.   One of the cops in -- he was one of the police officers, rather, excuse me, in Conway, I think.  He was one of the ones that took the Clifford Jay --

Q.   And there's I guess Sheriff Hendrick or chief -- chief of police out of the City of Conway?  In other words, I guess my question is, or to the extent you are able to tell, at least some of these appear to be law enforcement officers?

A.   Yes.

Q.   And is it your -- having worked with Mr. McNair, does it surprise you that he would be talking to police officers and saying he's a cop at heart when introducing himself?

A.   No.  And let me also say this:  I have a vague recollection, and again this is just coming to me now so I

apologize if we didn't discuss that last week, I have a vague recollection that these people would not talk to me.

Q.   Okay.

A.   That they would not sit for my interview.  And that we had made inquiries previous to this into interviewing them as fact witnesses in the case and they had called Greg Hembry (ph.) --

Q.   The solicitor?

A.   The solicitor, and would not sit for an interview with me. And I'm pretty sure that happened.

Q.   Right.

A.   And that may also understand about Carlisle would be acting like this in an e-mail to them to kind of engender some type of trust between the two of them.  But, no, I stand by everything I told Miss Stone yesterday about this e-mail.  But that's just Carlisle.  I don't disagree with her questions or her suggestions about Carlisle in this regard.

Q.   I think there was -- they asked whether you had ever hired Mr. McNair since this trial.  Is it your practice to hire SLED agents for state investigations, primarily?

A.   I use agents, FBI agents and SLED agents, as my investigators in my current practice of law.

Q.   And that's just what your preference is?

A.   Yes.

Q.   Is that from just experience, you like having them be former --

A.   It's from the kind of cases I primarily have in my office right now.  I'm not saying I wouldn't hire him, let's be clear, I wouldn't say I wouldn't hire him, I haven't hired him.

MR. DALEY:  Beg the court's indulgence.  Your Honor, I think that's the first time ever I finished before I told a judge that I would finish.

THE COURT:  There's a first time for everything.  All right.  Any redirect we can get in before we break for lunch or do you --

MS. STONE:  Yes, your Honor, I believe --

THE COURT:  I'm sorry?

MS. STONE:  I do have redirect and I think I can close up before --

THE COURT:  Okay.

MS. STONE:  But if you feel the need to interrupt me --

THE COURT:  Suits me to keep going.

                    REDIRECT EXAMINATION

BY MR. BURKE:

Q.   Hello again, Mr. Harris.

A.   Good afternoon.

Q.   All right.  Just to reiterate, you have significant trial experience and Mr. Basham was your first capital trial?

A.   Yes, ma'am.

Q. And, accordingly, Mr. Basham's would have been your first penalty phase trial.

A. Yes, ma'am.

Q. And have you ever done an Atkins hearing since Mr. Basham's trial?

A. No, ma'am.

Q. The government discussed with you Miss McGuire and Mr. Hughes and their conversations with Mr. Basham. Are you aware if either of them have any background in mental health?

A. No, ma'am.

Q. Do you know if they had any records or background information on Mr. Basham at the point they spoke with him?

A. I would guess that they didn't.

Q. Did not?

A. Did not. As a matter of fact, I think it is a fair statement to say that they absolutely didn't have any medical background on Brandon before they conducted those interviews.

Q. And just for context, were their interviews, is it your understanding their interviews with Mr. Basham were in close proximity to his arrest?

A. Yes, that's correct.

Q. Jumping to the Jackson v. Denno hearing, you've testified that one of your strategies was cooperation, showing that Mr. Basham was trying to help the law enforcement officers. Is that an accurate statement?

A.  Yes, ma'am.

Q.  Were you concerned about the counter-argument the government raised that Mr. Basham was just leading the government and officers on a wild goose chase?

A.  Yes, I was.

Q.  Were you aware through police reports prior to the Denno hearing Mr. Basham walked off alone with Sheriff Hewitt, according to Sheriff Hewitt, Mr. Basham walked off alone with him and made a statement?

A.  And I believe that didn't come in at trial, the deer statement?

Q.  No, the purse strap statement.

A.  You know, sitting here right now I can't remember exactly where it happened during that Thanksgiving day, so --

MR. DALEY:  Your Honor, I think this is really outside the scope of redirect.

THE COURT:  Well, I'll allow it.  Overruled.  Go ahead.

Q.  Did you speak with Mr. -- you testified you recalled speaking with Mr. Littlejohn and possibly Mr. Monckton.  The government showed an exhibit that indicated that may have happened.  Do you have any independent recollection of speaking with Mr. Monckton and Mr. Littlejohn about Mr. Basham wandering off with Sheriff Hewitt?

A.  I do not.

Q.   Okay.

A.   And again, quite frankly, I don't have an independent recollection of discussing this with Billy Monckton, so I certainly don't have any recollection of discussing that particular issue with Mr. Monckton.

Q.   You also testified that and confirmed with the government that one of your strategies was to lock down the law enforcement officers in their testimony.

A.   Yes, ma'am.

Q.   Was Mr. Hewitt locked down on the purse strap statement?

A.   I thought he was, and I wasn't going to ask him the question because he had -- he testified on direct examination, so, you know, he already said on direct examination that Brandon showed me, he already said that once, I didn't want to ask him, give him the opportunity to say it twice.  And unfortunately I did.

Q.   Moving to competency, would you agree that you and Mr. Swerling made the determination you'd have to use mental health information as mitigation to present a case to save Mr. Basham's life?

A.   Did we make a decision at some point in time that it was going to be necessary to use experts in our -- during the penalty phase?

Q.   That's a much better way to say that.  Thank you.

A.   Yes, yes.

Q.   And that meant that the government would get to examine Mr. Basham, correct?

A.   Yes, that's correct.

Q.   And isn't it true that Mr. Basham's first trip up to Butner was in January 21, 2004, or would you disagree with the records if that's what this showed?

A.   No, I know that's when it was, because I made that drive in a snowstorm and I was there snowed in for a week waiting for those evaluations.  So, yeah, I would agree with that.

Q.   And January 21, 2004 was prior to the Jackson v. Denno hearing, correct?

A.   Yes.

Q.   Did Dr. Schwartz-Watts ever talk with you and Mr. Swerling that Mr. Basham's competency would ebb and flow based on stressful situations?

A.   Not his competency.

Q.   What word would you use, or what word did she use?

A.   I don't know.  And I know that it wouldn't be competency, it would be -- I know this, and I don't know if this is responsive, I know that based on my conversations with our doctors I knew that I needed to ask the court for latitude with breaks, and the court on all occasions except for a few times when the judge said we're going forward, have a seat, Mr. Basham, with all -- the court gave us breaks.

Q.   And leading up to trial do you recall ever being able to

have a long focused conversation with Mr. Basham about the specifics of his case?

A. Yes.

Q. Were you able to keep him focused for several hours at a time?

A. No.

Q. Were his conversations with you frequently interrupted by him for other needs, for things like snacks, dip, new sweatshirts?

A. Absolutely.

Q. I want to turn now very briefly to the confession issue. And I want to be clear about something the government asked you about. Intent was left on the table only for the carjacking, is that correct?

A. Yes.

Q. There was no intent factor for the kidnapping.

A. That is correct.

Q. So is it a correct statement there was a full confession on the kidnapping count?

A. Yes.

Q. And that was -- was this a death eligible count, as well?

A. Yes, it was.

Q. And because that kidnapping resulted in the death of Alice Donovan did that also concede one of the threshold factors to make Mr. Basham death eligible?

A.  Yes.

Q.  Was there any -- one of the strategies for conceding was to get good will with the jury, is that correct?

A.  Yes, I said that.  Maybe that's too strong a term.  It's hard to get good will with a jury in --

Q.  To the extent you could.

A.  To the extent we could, someone would be back there saying, you know, once he was caught he did what he could.  If that's good will, then that's what we were hoping for.

Q.  Were you ever concerned about losing that good will by making a jury sit through an almost month long trial that you conceded was a foregone conclusion?

A.  No.

Q.  Turning to the 404(b), or excuse me, intrinsic evidence about Samantha Burns.  You stated that you didn't think it would affect the guilt phase if that evidence didn't come in?

A.  No, I think what the question was was the guilty verdict.

Q.  The guilty verdict?

A.  There was a difference in his question in the guilt phase. I think it had a pronounced effect on the trial, okay?  I don't think that was his question.  My answer was was Brandon Basham going to be convicted of that offense, even without the Samantha Burns evidence, and my answer to that was yes.

Q.  But do you believe it affected the penalty phase of the trial?

A.  Yes, absolutely.  That is why we attempted to have it excluded in pretrial motions.

Q.  Turning to the puppet statement, did one of the concerns with the rule of completeness and that perhaps Mr. Gasser's closing arguments could come in in their entirety.  Sitting here now can you recall anything from Mr. Gasser's closing argument in the Fulks trial that would have been more damaging to Mr. Basham than Gasser's closing argument in Basham's own trial?

A.  Well, any more damaging?

Q.  Any more damaging to anything that came out in Basham's.

A.  It was a really good closing in the sense that it was very effective, and also in the sense that it portrayed them not as equals, because that was the one we were trying to make.  But he also said things like we're going to be standing in front of a jury in two months asking that Mr. Basham also be put to death.  And he also -- and comments like that.  I haven't looked at it in six years, but I watched it and I have reviewed it for the purposes of the motion we're talking about now.  And while I don't have any specific recollection of things that he said, I do know that I didn't want it read to a jury.

Q.  All right.  And just to confirm, Clifford Jay was not called in the penalty phase for Mr. Basham.

A.  He was not.

Q.  Turning to the mental retardation, you've already testified you weren't familiar with the Flynn effect.  Did you have any discussions with Tora Brawley about the Flynn effect?

A.  I cannot tell if I did or I did not.  I just -- I don't remember.

Q.  Fair answer.  Is it a fair statement that Dr. Brawley could only rely on her testing and the records that she received to diagnose Mr. Basham?

A.  And her interviews.

Q.  And her interviews?

A.  She was given everything I believe she needed to make a proper evaluation.  That included medical records.  I don't have her testimony in front of me, but I know she interviewed a number of people, because she was looking at why his IQ had decreased, and to make that evaluation and determination she looked at drug usage, she looked at head trauma, she looked at a lot of environmental issues in reaching -- rendering her opinion.  So I think her opinion was based not on only records and Brandon's testing but also the universe of information that we had available about Brandon's life.

Q.  And universe of information provided to her by counsel and the team?

A.  Yes, ma'am.

Q.  You mentioned the MMPI.  Was one of the reasons that you all were successful in keeping that out was that Mr. Basham

could not finish the MMPI in accordance with his protocol?

A.   No, it was because I didn't give it to him.

Q.   Didn't the government attempt to give it to him?

A.   They tried and we objected to it.

Q.   And do you recall that one of the reasons that objection was successful was that Mr. Basham could not complete it without having questions read to him?

A.   I recall that we argued that.and let me say this --

Q.   Sure.

A.   Again, it's going -- something coming back to me.  Donna Watts didn't give it to him because she said he will not, after all the testing I've done, all the time I spent with Brandon, he's not going to be able to sit for that test because the way that it is given.  So you're correct.  She may have testified to that in a hearing with the judge when he ruled that like testing meant you can't give him an MMPI if Donna gives him a CAT test, okay?  And so that might have been the testimony.  So I don't dispute that one of our grounds was yes, he couldn't sit for that test.  But we didn't give it to him.

Q.   Did you all hire independent FAFD experts, anybody that specialized in FAFD?

A.   No.

Q.   Do you recall what testing was done to rule out FAFD?

A.   I do not.  Done Schwartz-Watts would, Jack may know.  I do

not.

Q.   Turning very briefly to Mr. McNair.  Would you say that Mr. McNair was just a cop at heart when talking to officers or when dealing with pretty much anyone?

A.   My opinion is that he is a cop at heart when dealing with anyone.

Q.   And the government asked about possibly if you would hire him in the future.  Given the choice, if you had a hypothetical situation, two investigators relatively equal background and experience, would you prefer someone with or without the problems that Mr. McNair's background?

A.   Well, I mean, that's -- I think that question comes along with an obvious answer.

THE COURT:  Let me jump in here.  And I'm sure my ignorance -- did Mr. McNair testify at trial?

THE WITNESS:  No, sir.

MS. STONE:  No.  It's one of our claims, your Honor, is that he --

THE COURT:  Afraid to put him on the stand because of background.

MS. STONE:  He could not properly have been called to rebut anything if he needed to because my argument is because some of his issues regarded truth telling and veracity, that his background may have been relevant, and if that had come out in front of a jury they would not have liked that,

especially the women on the jury.

THE COURT:  All right.

THE WITNESS:  I never conceded it was admissible. okay?

MS. STONE:  I understand, and I apologize --

THE WITNESS:  I just want to make sure I'm clear about that.

MS. STONE:  I don't want to misstate.

THE WITNESS:  I already testified about it.

Q.  You said it's an obvious answer, but what's the obvious --

A.  I would hire someone that hadn't -- didn't have some of the problems that were alleged to have occurred or been the case with Mr. McNair.  Certainly these were not even -- was never charged with anything, these were mere allegations, and we know about what those are worth.  So, you know, it was what it was.  We got a file jacket said somebody said he had done something with really no evidence or no proof.

Q.  Did he make admissions for some of those instances?  Like showing a video?

A.  You know what?  I'm still not -- show the video, I'm sorry, I can't recall.  But, no, I would rather have an investigator that didn't have any problems at all, that had a long history with an agency where he was honored on the way out than somebody that didn't.

Q.  And occasionally do you as a defense attorney, do you have

to call an investigator to the stand?

A.   Yes.   Yes, I have in the past.

MS. STONE:  Your Honor, may I have just a moment to confer with counsel?

THE COURT:  All right.

(There was a pause in the proceedings)

MS. STONE:  I have no further questions.  Thank you.

THE COURT:  All right.  Brief recross, rather.

RECROSS-EXAMINATION

BY MR. DALEY:

Q.   Mr. Harris, did you not call Mr. McNair to the stand because of was there a decision at some point we can't call him, we would like to impeach somebody but we can't because of his background?

A.   No.   The situation never presented itself in the trial.

Q.   And, obviously, you know about the Garrity issues, and a lot of this information potentially would not be allowed anyway, is that correct?

A.   Yeah.   Like I said, I never thought it was admissible after evaluating it personally.

MR. DALEY:  No further questions.

THE COURT:  All right.  Anything further?

MS. STONE:  Your Honor, I just want to clarify, because I think there were two different answers there, if I may.

REDIRECT EXAMINATION

BY MS. STONE:

Q.  Do you not recall a situation where Mr. McNair might have been needed to be called to the stand, or you are certain that there was not?

A.  No, I don't recall.  I don't recall.

MS. STONE:  Thank you.

THE COURT:  Why don't we recess until 2:20 like we did yesterday.  That will be a hour and 20 minutes.  Mr. Swerling will be up next?

* * * * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  10-12-12                    s/  Daniel E. Mayo