1

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF SOUTH CAROLINA
                        FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                 CR NO.: 4:02-992
                                         Columbia, SC
     -vs-                                October 11, 2012

BRANDON LEON BASHAM,

          Defendant

------------------------------


               BEFORE HON. JOSEPH F. ANDERSON, JR.
                UNITED STATES DISTRICT COURT JUDGE
                         MOTION HEARING
                  TESTMONY OF JACK SWERLING



APPEARANCES:


FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                     UNITED STATES ATTORNEY
                     BY:  ROBERT F. DALEY, JR.
                          JIMMIE EWING
                          JEFFREY M. JOHNSON
                          WILLIAM K. WITHERSPOON
                     Assistant United States Attorneys
                     1441 Main Street
                     Columbia, SC  29201

FOR DEFENDANT:       JULIA G. MIMMS, ESQ.
                     JULIA G. MIMMS LAW OFFICE
                     1001 Elizabeth Avenue, Suite 1A
                     Charleston, NC  28204

                     ARIZONA FEDERAL PUBLIC DEFENDER
                     BY:  MICHAEL L. BURKE
                          SARAH E. STONE
                     Assistant Federal Public Defenders
                     850 W. Adams, #201
                     Phoenix, AZ  85007

2

```
COURT REPORTER:      DANIEL E. MAYO, RDR
                     Certified Realtime Reporter
                     901 Richland Street
                     Columbia, SC  29201


              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
```

THE COURT: All right. Ready to call your next witness?

MR. BURKE: Yes, your Honor, thank you. The defense calls Mr. Jack Swerling.

(Jack Swerling duly sworn)

DIRECT EXAMINATION

BY MR. BURKE:

Q. Good afternoon, Mr. Swerling.

A. Good afternoon. How are you?

Q. Good to see you again. Before we start I wanted to make sure that if there's any misunderstanding or any confusion, but you asked me a moment ago if there was statements made about you receiving or not receiving e-mails. So I just want to make sure that that's on the record, in case you had any questions about that.

A. Well, yeah, I would like to clear that up because I heard it when I walked in. I don't know --

Q. Did you receive -- did you e-mail me last night?

A. Yes, at 8:18. I checked my Blackberry.

Q. Did you receive a response from me?

A. No.

Q. You received an e-mail from me that was sent at 7:48, about a half hour before the e-mail you sent me last night?

A. No.

Q. Did you receive a response from me from your e-mail that

was sent at 8:28?

A.  No.

Q.  Did you receive an e-mail from my co-counsel Miss Sarah Stone?

A.  No.

Q.  Did you receive an e-mail from the Assistant U.S. Attorney Bob Daley?

A.  I can check my Blackberry.  That's what I was basing that on.  In fact, I was wondering why I did not hear back from you.

THE COURT:  What is the problem?  He's here, we haven't had a delay.

MR. BURKE:  Your Honor, I think it's -- I would like to pursue this, if I might.  I think it goes to some of the issues that we're dealing with in this case.

THE COURT:  All right.

MR. BURKE:  Also Mr. Swerling's approach to me about it.  And so I think we need to have a clear record on it.

THE WITNESS:  I want to know where that misunderstanding came about.

(There was a pause in the proceedings)

THE WITNESS:  I sent him one at about the same time and I said will I be reached tomorrow.  And I believe I got one back but I don't see -- well, I must have gotten one back because I said thank you to him at 8:51.  But there is no

e-mail, nothing from you or your co-counsel.  You can look at my Blackberry.

Q.    (MR. BURKE) I think that clarifies the problem.  I mean, we sent three -- I sent three, she sent one and you didn't receive it.

A.  I didn't receive a response, so I thought that was unusual.

Q.  Did you send a follow-up e-mail to me?

A.  No.  I sent one to you and one to Mr. Daley asking if I was up tomorrow.

Q.  Okay.

A.  About 8:00, 8:15 last night.

Q.  Mr. Swerling, as you know, you are here today to testify about your role as the lead counsel in Mr. Basham's trial in 2004.

A.  Yes, sir.

Q.  And as you also know, Mr. Basham through his counsel have raised several issues of ineffective assistance of counsel against you and Mr. Harris, correct?

A.  Yes, sir.

Q.  Okay.  In fact, shortly after Mr. Basham filed his 2255 petition in this case did you contact the U.S. Attorney's Office to request a copy of that motion?

A.  Absolutely.  And I got a chiding letter from you reminding me of my ethical responsibilities not to have any confidential

communications with Mr. Daley.  And I sent you a letter back saying that I know my ethical obligations and I have not had that discussion with him.  And I called Mr. Daley because he was local and I just said can you send me a copy of it.

Q.  Do you have e-mail?  Well, we're not sure, are we?  I mean, it's not -- is it possible in this day and age to send someone an e-mail, is it not correct, with an attachment?

A.  I don't understand your question.

Q.  Isn't it as easy for me to send you an e-mail with the petition attached than --

A.  I saw nothing wrong with asking Mr. Daley to send me a copy of a petition.  You are the one bringing the petition against me with -- I don't see what the problem is.

Q.  Well, the petition is not being brought against you.

A.  It is.  Yes, it is.

Q.  Had we had communications before filing the petition in this case, we filed the petition in this case, other than my letter chiding you?

A.  Yes.

Q.  Okay.  And had we met at your office on a couple of occasions?

A.  Absolutely.

Q.  And, in fact, on one occasion my co-counsel Miss Stone and I and our paralegal came to your office for approximately five days to review and scan the documents in your case.

A.   That's correct.

Q.   Okay.  Now, your statement is that you needed to obtain a copy of the 2255 petition so that you could review it because the claims were against you, is that correct?

A.   I didn't need it, I just -- I heard that it had been filed and so I called Mr. Daley, who I know, and saw absolutely nothing wrong with asking him to send me a copy of the petition.

Q.   And is it safe that say you were -- you would want to see what was in the petition?

A.   Yes.

Q.   Okay.

A.   Yes.

Q.   Do you recall being interviewed by the government in the past several weeks in preparation for this hearing?

A.   Three times.

Q.   Three times.

A.   And you were present on the phone or -- you were present physically or on the phone on one occasion, but it's been three different occasions that I agreed to sit down.

Q.   Okay.  Can you tell us why there were three interviews conducted, why was it necessary to leave the interview and return again and resume it?  Can you --

A.   Because I was reading documents, 77 boxes, probably over a hundred thousand pages of documents.  I wanted to, as we were

going through, I wanted to review things so I could be prepared for the next meeting. So, as I recall, on the first meeting we addressed, you know, I don't know the number, but probably most of the allegations. And there were several that I needed to review the transcript to refresh my memory, or notes or documents, and so we came back the second time.

Q. Okay. And --

A. The third time it was a similar thing. There were some things I still needed to check and review to refresh my memory. It is eight years ago.

Q. That's correct. Okay. And did you feel that you had an ample opportunity to be interviewed or questioned? If you had any questions did you feel you were able to raise them during those interviews?

A. Did I have any questions? No.

Q. Okay. You mentioned the 77 boxes, if that's the number we throw out. Is that a guess we all have?

A. I have seen that number either from you or the government, there were 77. It might have been 74, something like that. I don't know. You all have seen it, and I think the government came by maybe and took a picture of it. And I was -- you know, could have brought 77 boxes with us. I don't know.

         MR. DALEY: And, your Honor, for the record, I do think a couple of the boxes sort of say a certain number of boxes of 77. I am pretty certain, though, that when we did it

there's other miscellaneous boxes that turn out to be more than that. But there's a numbering system, there's two numbering systems, I think, so it's a --

THE COURT: All right.

MR. DALEY: I don't think there's a clear number.

THE WITNESS: There's a lot.

Q. (MR. BURKE) That raises a question. When we reviewed it we did notice that there seemed to be two numbering systems to your boxes, one of 30 some and one of -- do you have any recollection as to why that might be?

A. No. I mean, I had several different paralegals during this period of time and so I don't know how those numbers were assigned to the boxes. What I tell them is I want -- what I would like them to do is have the full total number of boxes and then start labeling the boxes one of 50, two of 50. So I don't know, I don't get involved in the numbering system. But every box that I have has been made available to you and to Mr. Daley.

Q. And when you say made available, what do you mean by that?

A. That you could -- that you looked at them or had the ability to come and look at them. So did Mr. Daley.

Q. So you are saying we had the ability to come to your office and review them?

A. Yes.

Q. Okay. Did we at one time, Mr. Swerling, attempt to make

an entire copy of your file?  Do you recall that?

A.   Well, there have been several things going on about that. When we started off I simply requested -- never, absolutely never said you could not have a copy.  What I said was I thought that I needed to retain a copy because I was trial counsel in the case.  So we tried to work that out, whether or not start copying in the office or send it out to a copy shop. I remember we sent a number of boxes out to the copy shop. The bill was pretty expensive and so you and your office decided not to continue that process.

As I recall, Kelly, Kelly Switzer, who's my paralegal, went ahead and sent you all the disks that were available from the government, every disk that we had, which was a lot of most of the discovery in the case.  Then there was some discussions about transporting the files.  And what I remember, it was, again, just asking that I be able to keep a copy.  There was a question about whether I keep a copy or an original.  I eventually said I'll just keep a copy.

And I suggested on a couple of occasions going to the court to see whether or not there was any funding available to go ahead and do any copying of it.  Because it involves, you know, let's say a minimum of a hundred thousand pages or something in that neighborhood.  And we never got that far. That was in February of '11 when you came there, and I believe it was February '11 you spent five days, you had full access

to my conference room, nobody bothered you.  You know, whatever questions you had I was happy to answer.

Mr. Harris had a file, I don't know if you ever went over there to look at his file.  But we tried to work out, both of us, I think you and I both tried to work out a way to do it.  And after February of '11 I don't recall there was any other effort until this year.

And I think this year we went ahead again proposing that we look, and say I proposed or you proposed, I can't remember, going to the judge and asking for funding to make copies so that I could retain a copy and you could have it.  And I went ahead, you asked me to get an estimate of that.  And I brought in a copy shop and the copy shop did give us an estimate which I furnished you.  And that was basically the last conversation we had about that, I think.

Q.  Do you recall what the estimate was?

A.  It was expensive.  It was like $27,000, I think.

Q.  I believe, I mean, not to testify here, but I remember from our experiences the few boxes we sent over came to $8,000.

A.  It was a different kind of copy.

Q.  Different type of copy?

A.  The first time we were doing it we were taking the paper and making disks out of it.  Then the second time we did it we -- or proposed to do it is just make a hard copy, which was

going to be cheaper.  It wouldn't have been $9,000 for several boxes, whatever it was.

Q.  Right.  Do you remember receiving a request from me personally to allow us to transfer your files to our office and to make a complete copy for you from our office?

A.  We discussed that and I said -- I didn't refuse, I was trying to work out where I could retain -- let me explain something, Mr. Burke.  I've got -- I was lead trial counsel in this case.  I had, let's say, 75 boxes.  I was worried about those boxes or the file in some way some part of it getting lost, some part of it being misplaced.  I'm responsible for it.  I mean, I was the trial counsel.  So I thought a reasonable accommodation was to give you complete access and also to request that I be allowed to retain a copy.  I still think it was a reasonable request.

Q.  And are you suggesting that we -- you do recall me asking if we could receive -- take and pay for transferring your entire files?

A.  Yes.  I said yes.

Q.  And you were not in favor of that, is that correct?

A.  I was not in favor of it going out of my office and me not having a copy, that's the bottom line.  That's correct.

Q.  And is it your opinion that although you have not represented Mr. Basham in eight years that you have the responsibility for retaining his trial file?

A. It is my -- it's my belief that I have an obligation, obligation to retain a copy of the file. Yes, because for exactly this reason here.

Q. Exactly, exactly. But if you were offered, as you were in this case, to have an entire copy prepared for you wouldn't that satisfy whatever obligations you seem to think you had?

A. Mr. Burke, it's just a question of how you want to do it. I thought we could make a copy here and then send you the original. So it was just -- it was just the way we were both looking at it. Nobody ever said you couldn't have a copy or the originals.

Q. Well, we agreed so far, though, that the expense was prohibitive for us to do it in South Carolina, that's correct?

A. I don't think the cost of doing a hard copy would have been prohibitive. It would have been a question of asking the judge for it. I don't know if the judge would have agreed or not agreed. But it never got that far, as far as I understand.

Q. So you retained the 77 boxes and now -- the government may show this, but just so that you know, Mr. Swerling, there are marked and admitted into exhibit photographs from the government of your conference room and the various boxes that are in there. The court will be able to get a visual picture of what it is that we're talking about. It is extensive.

    In the process -- so when my colleagues and I came to your

office in 2011 you said you had made the entire file available to us.

A.    That's correct.  I think there was one we discovered in June or July that my paralegal had a correspondence file somewhere starting, I don't know remember when it was, but most of it was letters between Brandon Basham and I over the last eight years.  And there was some post-trial correspondence between me and West Virginia, because I had originally been appointed up there.  So it was a folder, expando folder, which I sent you a copy of.  And we sent you copies of many other things, as well.  And I told you I was going to give you ten days to see if there was an objection that should be filed and if there was no objection then I was going to turn it over to the government.

Q.    And we did not object, correct?

A.    Correct.  And I gave the government a duplicate copy of that file.  But that file was in another area at the time and actually my paralegal kept it.

Q.    Now, when appellate counsel came to your office in 2008 for a similar purpose were they provided access to the entire file?

A.    Absolutely.

Q.    Absolutely?

A.    Except that, and I've told you this, that office upstairs was not fully rented where the conference room is and where

all the files are.  So they were provided access to the files. It was a file cabinet in an empty office that I put all the vouchers in, as well as my spiral trial notebooks.  They were in a locked cabinet.

Of course, several years after the event I had no recollection that they were in there, and I told you that as soon as I realized when we rented that office and opened up that cabinet that they were in there, explained to you that that's how it happened.  You've got a copy of all of that.

Q.  Yes, we did.

A.  And so does the government.  But so the only thing I'm aware of that appellate counsel didn't see, and it was completely inadvertent because nobody realized stuff had been put into that file cabinet, was my -- the vouchers, time sheets for everybody, as well as my spiral trial notebooks.

Q.  And your spiral trial notebooks are those notebooks in which you keep handwritten notes from your cases?

A.  Correct.

Q.  And you keep them separately for each case, is that correct?  So Mr. Basham would have his own set of spiral notebooks?

A.  Well, they are normally kept with the file.  I didn't realize they weren't in one of those 77 boxes or -- again, I'll use 77.

Q.  We will stick with 77.

A.   So my understanding was they were in the 77 boxes.  There would have been to reason to have them outside, it's just that at some point years ago they were put into this cabinet and I was not aware of it when appellate counsel came.

Q.   And, please, I want to make sure as I question, I mean, you know as having reviewed the 2255 that we have alleged that the appellate counsel's failure to obtain the full record in your case hindered their ability to --

A.   That's absolute nonsense.  And I can explain.

Q.   No, I'm not asking you about that right now.  I'm just saying is it true we have alleged that?

A.   You've alleged it, I think it's nonsense.

Q.   And I understand that, but we will get back to that.  I want to make it clear that we're not suggesting and never have suggested that you've done anything to hide files from anyone deliberately.  It's not -- I mean so please don't think that that's what we're saying.  We do have -- my question for you, though, and I think we have answered it, is that we now know that appellate counsel did not receive your time sheets and your handwritten notes from the trial, correct?

A.   That's correct, because of inadvertence.  I did not know that they were not in there.

Q.   Absolutely.  As I said, we're not suggesting it was anything else but that.  Now, you did provide those files to us.

A.  Because I found, we found, when we went to that office, we went in there and somebody opened up the file cabinet and saw that that's what was being kept in there.  And that was several years ago, I mean, you know, after appellate counsel came, as far as I can recall.  I mean, Mr. Burke, there's no reason for me to not provide the files for your access, or appellate counsel.  If I didn't it was because of a mistake or inadvertence, it was never anything intentional.  My understanding is you've had an opportunity to go through every single page of the Basham file and just like I did.

Q.  Not just like you did, Mr. Swerling.  And let's talk about that for a second.  Let's imagine for a moment that when you were representing Mr. Basham, and you will agree it's -- the government has mentioned it many times and I'm sure they will mention it today, that this was a huge case.  You obtained thousands of documents, thousands.  You interviewed close to a thousand witnesses, or you and your team.  It is a huge case.

A.  Correct.

Q.  If all those records had been kept at the office of Mr. Basham's West Virginia counsel would you have been able to do your job?

A.  West Virginia counsel?

Q.  Yes, Mr. McHammock (ph).  If he had --

A.  I'm sorry, who's --

Q.  Jay McHammock?

A.   I don't know anything about that.

Q.   Were you not co-counsel for certain period of --

A.   Gary Collias I believe was my co-counsel in West Virginia.

Q.   Okay.  If the file in Mr. Basham's case had been kept in his office and you were to call him and ask him for which documents you needed, would you have been able to do an effective job?

A.   Mr. Burke, what I would have done is flown up to West Virginia, I would have gone through the entire file, I would have made arrangements to go ahead and honor that counsel's request that he be given a copy and that I have a copy.  So there's no question in my mind what I would have done.  And there's no question in my mind what I would have done is gone to the judge and said we have a very complicated situation here with all these boxes of discovery and both sides think that they, or you and I and the government, of course, is going to get it, as well, there needs to be some way worked out that we can get a copy and everybody can have a copy.  It just makes sense to me.

Q.   And did it make sense for you, though, to allow us --

A.   I already said that.

Q.   That did not make sense?

A.   I did not want to release the file, send it by Federal Express and take the chance that boxes would be destroyed or boxes wouldn't be returned.  So I thought I made a reasonable

request I be allowed to keep a copy and you work it out with me where you could get a copy, I could have a copy, and eventually we knew the government was going to get a copy, as well.

Q. Now, returning to appellate counsel --

A. Plus we did send you many documents.

Q. That we requested.

A. Absolutely.

Q. That's after we had been to your office we realized we needed.

A. Yeah, sure. There was never, you know, no attempt to -- and what I wonder is there anything you haven't seen or you need.

Q. Well, that's an interesting question, actually. Did you receive an e-mail from me on Tuesday night of this week?

A. And what was the e-mail?

Q. Requesting a copy of -- in preparing for this hearing there were time sheets that indicated that you had had an e-mail with Dr. Donna Schwartz-Watts in this case which had not been in the files that we had been provided. And I e-mailed you on Tuesday evening --

A. And I responded.

Q. You got that e-mail?

A. Yes. Mr. Burke, I did not get your e-mails last night.

Q. Mr. Swerling --

A.    I can't make it any clearer.

Q.    Mr. Swerling, let --

A.    You can look at my Blackberry.

Q.    Let's lay the groundwork here.  I respect the fact you are a well-regarded criminal defense attorney in this state.  I don't question that.

A.    Thank you.

Q.    Today I am the defense attorney and I am the one who gets to ask the questions.

A.    I didn't ask a question.

Q.    No, but --

A.    I just said is there something you need.

Q.    You are trying to direct -- please, please.  I don't want to argue with you, sir, okay?  I know you are a great lawyer, you are a great trial lawyer.  I'm trying to make a record here about what happens in this case.  Okay?

A.    Mr. Burke, I'm not arguing with you.

Q.    Okay.

A.    I did send you a response on Tuesday night.

Q.    Okay.  So those were files -- what was the response that you sent us?

A.    You want me to read it?  Did you not get it?

Q.    No, I got it.

A.    The response was that you were asking me for an e-mail to Donna Schwartz-Watts on May 3rd of 2003 because it was on my

time sheets and you couldn't find it.  I went Wednesday morning, maybe, or Tuesday morning, I can't remember how it worked, I can look at my Blackberry again, and I told Kelly, my paralegal, let's go find these, whatever e-mails there are regarding Donna Schwartz-Watts.  What she found was an e-mail -- no e-mail on May 3rd, and not even an entry on my voucher for May 3rd.  So that's what I told you.  And then I attached to the e-mail that I sent you three e-mails that we were able to find between me and Dr. Schwartz-Watts.

Q.  One second.

A.  Two or three.

Q.  Two or three?

A.  Whatever it was is what I sent you.

Q.  Okay.  And --

A.  I can look at my Blackberry.

Q.  Is your testimony today that you have provided us access to all e-mails that you had with all experts and team members in the Basham case?

A.  Every e-mail that's in the file.  Now, let me explain something to you.  I don't file my e-mails.  I send a copy to one of my secretaries or one of my paralegals and they are supposed to file it.  Does that mean that every one gets filed and I can vouch for that?  No, it's -- but it's not something that I do.  Whatever is in the boxes you have gotten and had access to.

Q.  Okay.

A.  And whatever it was on your e-mail was a mistake, because there was no e-mail of May 3rd, or not even an entry for May 3rd.

MR. BURKE:  Ask the court's indulgence for one moment, please.

(There was a pause in the proceedings)

THE WITNESS:  It may have been like May 6th.  We sent you that one.

Q.  (MR. BURKE) And that's the only e-mail that you have between you and Dr. Schwartz-Watts.

A.  Whatever I sent you is what Kelly was able to find. There's thousands -- well, I shouldn't say a thousand.  There are probably close to a thousand e-mails that were generated in this case between everybody.  So I had her -- because you requested it I had her go through my e-mail folder to see whether or not there was any other communications to Dr. Schwartz-Watts.  And whatever I sent you, whether it was Tuesday night or Wednesday, the attachment was what she was able to find.

Q.  And did your paralegal search for e-mails -- my request was specific.  I'm just asking did your paralegal search for e-mails with regard to other experts in the case?

A.  As far as I know, she did, yeah.  And there were copies of, you know, e-mails sent to people, not specifically to --

what I understood you wanted to know was what were the e-mails to Dr. Schwartz-Watts and to another expert, not copies that were sent out en masse. And as you know, a lot of the e-mails were sent out en masse to a number of people on a list. So, again, they are available. You can come back and look at them if you think something is missing.

MR. BURKE: This might be a good time to address this. Perhaps the court could help us resolve this unresolved issue. Our request all along with Mr. Swerling has been that we be allowed to take the file that is our client's property to Arizona to make a complete copy of all 77 boxes, to put them on disk for Mr. Swerling's assistance, if that would help, and then to return the originals to him. Would we be allowed to receive an order from the court?

THE COURT: You don't want them to leave your office.

THE WITNESS: Judge, I'm concerned. I've had bad experiences. I mean, so many boxes, and the file now, because so many people have gone through it, is just not organized the way I want it to be organized. So I had difficulty going back through and trying to see, find everything. I'm not saying anybody's going to take any documents out or not return them, but I think it's a reasonable request for me to be able to retain a copy.

THE COURT: I didn't realize that we had this situation. I thought the file had already been copied and

provided.

MR. BURKE:  No, your Honor, it was left with we were -- we attempted to -- we attempted repeatedly to accommodate Mr. Swerling.  We attempted to obtain copies, it became cost prohibitive, and so Mr. Swerling is accurate in his statements that he suggested that I come to you.  My thought was that there was no reason for us to come to you when our budget allowed us to make those copies and return them to Mr. Swerling.  Which is something, I might add, my office of experienced professionals does in every case we get.  And I don't know of a case in which we have lost a file or a record or a document.

THE COURT:  Well, so even now you want to look at those documents even though we're in the middle of the hearing?

MR. BURKE:  Your Honor, I'm preparing for this hearing this week and I'm seeing reference to e-mails I did not know existed.  Now, I will tell you that our office paid for my co-counsel and myself and my paralegal to come to South Carolina and spend a week going through the files in Mr. Swerling's office.

THE COURT:  Can you say you looked at most of the documents even though you haven't copied them?

MR. BURKE:  We looked at everything that was provided to us.  We -- the three of us opened those boxes and we went

through, we made to the best our ability an index of what we were seeing.  It was impossible for us to -- what we had was a small portable scanner, so what we had to do, what Miss Oliver, our paralegal, had to do was Miss Stone and I would flag documents and say please scan this.  Which is what she did.  We didn't -- what we could do in the period that we had. Now, I'm sure Mr. Swerling, I don't want to misstate the record, Mr. Swerling probably would have let us stay forever if we had wanted to.

THE WITNESS:  Which was what I would have done.  Or made arrangements.

THE COURT:  It's just a lot more cost beneficial to do it there in your office than have it sent out here.

MR. BURKE:  Absolutely, your Honor.

THE COURT:  I can see Mr. Swerling's point.  He's not being charged with any unethical conduct here, but he's just concerned about issues coming up and he's lost control of his file, he isn't able to deal with it.

MR. BURKE:  Your Honor, I would -- we researched this issue and do now know from the testimony from Miss Meister that Jenner & Block researched this issue, as well.

THE COURT:  All right.

MR. BURKE:  The file is the property of the client.

THE COURT:  All right.

MR. BURKE:  It is not Mr. Swerling's property.  So it

belongs to Mr. Basham and we are Mr. Basham's current counsel. We are not trying to prevent Mr. Swerling from having access to the records in this case, we're simply trying to effectively represent Mr. Basham in his 2255 proceedings.

THE COURT:  There's no way they could be scanned here locally by someone, bring in a scanner here and doing it here?

MR. BURKE:  Well, your Honor, we did that with a portable scanner.

THE COURT:  I'm talking about with a full mainframe scanner.

MR. BURKE:  And I think Mr. Swerling and I, we discussed that, and I think --

THE WITNESS:  I never did have any problem with a scanner.  I mean, the government came over and did it.

MR. BURKE:  Perhaps, Mr. Daley, were you able to scan all his documents?

MR. DALEY:  Your Honor, what we did, and it was fairly straightforward, we came over with a scanner probably similar to Mr. Burke's scanner and we went through all the boxes, whatever the final number was.  And quite a bit of it, I mean, several of the boxes were discovery, government's discovery that we had sent over.  A bunch of it was the defense discovery.

And so we were selective in what we scanned.  I think we ended up scanning about 80,000 pages.  And so do I think I

27

have everything from his files?  I certainly don't.  But I have -- I mean, I didn't feel -- it took us six days, I think, so it was not a short task and it was long hours.

THE COURT:  You did it with a portable scanner?

MR. BURKE:  Well, it was a scanner, it's portable, it's a good -- older scanner.  It's five or six years old. It's not portable in the sense that I could carry it in a briefcase, no, your Honor.

We had -- but we did the same thing, just for your information, your Honor, with both Jenner & Block and Mr. Sullivan.  We FedExed it for about 120 bucks up to DC and did the same thing with them, with both Mr. Sullivan and with the Jenner & Block folks.

And I will say we encountered some resistance -- no, I don't want to say we encountered a little resistance, we encountered very significant resistance with Jenner & Block, who refused to let us take the boxes out of their conference room and who -- I'll leave it at that.  It was -- they would not let their files leave their conference room.  And we had to bring a scanner in to get their documents.  And we were there -- and there were 40 boxes, probably, for Jenner & Block.  But that's when --

THE COURT:  When you say the law is the file belongs to the client, that's -- we're talking about a cost problem. The client clearly is entitled to a copy of everything in

their file.

MR. BURKE:  You're right.

THE COURT:  But is that -- are you saying that the rule is the client's entitled to the original documents to leave the lawyer's office?

MR. BURKE:  Not necessarily, your Honor.  But our point is, I think you hit the nail on the head, is it's a cost problem.

THE COURT:  Right.

MR. BURKE:  We were able to do that at no cost outside of what our office budget already is --

THE COURT:  Right.

MR. BURKE:  -- to anyone.  We were able to do it.  We do it all the time.  And we scan them on, then we have a working copy of the entire file, and then we return it to trial counsel if they request it.

I will tell you in my experience doing this work I have never until this case had a trial counsel request the original files back.  But I'm not saying that Mr. Swerling would not be entitled to it if he wanted.  We didn't really research that as much as Mr. Basham's right to have access to all documents.

Now, Mr. Swerling's position is, and it's -- he's made it repeatedly, is he gave us access.  But, your Honor, as you know, this is a very complicated and huge case.  It's --

and you heard the testimony of Miss Meister and you saw the exhibits in which after she came down she was having to e-mail Mr. Swerling asking for him to go find specific documents in those 77 boxes.  And, frankly, I would have thought that would be a great inconvenience to Mr. Swerling, just as it's been an inconvenience, I would assume, when we e-mail saying do you have this document or do you have that document.

THE COURT:  What about the precedent of the appellate firm not giving the government physical custody of its files?

MR. BURKE:  We have had a similar problem.  In fact, the Jenner lawyers in that case, we did not have access to the e-mails that you saw until the government obtained them.  And Mr. --

MR. DALEY:  Again, your Honor, I will put on the record, I do --

MR. BURKE:  We're in agreement on this.

MR. DALEY:  I had to basically, let me be discreet, I had to be very forceful and patient in refusing to take no for an answer with the managing partner of Jenner & Block in Washington, D.C. to obtain any e-mails related to this case. Truth be told, you know, those e-mails that I got, a number of them are now defense exhibits.  But I think it's important for there to be a full record, so -- and I say that mainly to make a record that I was -- to the extent there was a claim made about how Mr. Swerling was conducting, how he was handling the

files, apparently there was at least one other firm, and it sounds like the defense had the same -- he had the same challenge.

I think we have the vast universe of documents that would be necessary for claim 30, but I just say that to make the record clear that apparently at least Jenner & Block has a similar approach as to how they handle their files.

MR. BURKE:  And, your Honor, I will add to that that Mr. Daley and I have commiserated with one other about the difficulty in obtaining records in this case.  We are in a somewhat different position because I actually represent the client whose file it is.  So we are in a somewhat different situation.  But, of course, your Honor, you did issue an order allowing them access to relevant materials, so --

THE COURT:  Let's take a quick recess.  Let me hit the books on this just a minute.  Let's take a ten minute recess.  All right?

(Recess, 3:00 p.m.)

THE COURT:  This case presents a number of difficult issues, this is one I did not expect, and it's a very difficult call.  Mr. Burke, I appreciate your office taking this case and handling it on a greatly reduced budget from what we normally see in death penalty litigation.  All your staff are on salary and I haven't had to look at these enormous vouchers I look at in other cases, and I appreciate

that.

At the same time, I understand Mr. Swerling's concern about letting go of the original documents out of his office. It looks like this should have been raised at the pretrial conference we had about a month ago so we could have thrashed it out before the hearing began. Any reason it wasn't raised earlier?

MR. BURKE: Your Honor, let me also clarify that I wasn't intending to raise this particular issue this morning, I was actually going into Mr. Swerling's ability to prepare for today's hearing. In my mind we fought this battle and we have already had to file a motion in June of 2011, and the case had been -- we had problems with competency. In my mind the ship had sailed, we had not been able to get the records. It wasn't my intent to bring this up as a new issue, but I can't waive it. We certainly don't have the file.

THE COURT: I thought about it over the break. Didn't find a whole lot of authority. It's my interpretation what Mr. Swerling proposes is reasonable and should have been accepted and still can be accepted. Bring in, send in a high powered scanner, he said he can -- he wants everything to be done on his premises and I find that's reasonable under the circumstances of this case, and it can still happen from this point forward. So with that, let's move forward.

MR. BURKE: Thank you, your Honor.

BY MR. BURKE:

Q.   Mr. Swerling, you had the opportunity now to review the 2255 petition filed on Mr. Basham's behalf?

A.   Yes.

Q.   And are you -- sitting through the interviews, the last three interviews we had, it was my impression that you're of the position that none of the claims that Mr. Basham has raised alleging ineffective assistance of counsel against you have any merit, is that fair?

A.   I think that's fair.

Q.   Okay.  So that --

A.   I don't think I was ineffective, if that's what you are asking.

Q.   Yes.  I mean, it was my impression, and I kind of want to figure out if there's areas we have agreement that we not talk about them.  But your position is none of the claims we have raised raise any serious claim that you were -- you fell below the standard of care in this case.

A.   I do not feel like I was ineffective, if that's answering your question.

Q.   Well, ineffectiveness is actually a legal standard and -- but my question is do you feel that you met the standard in this case of a -- of a reasonably competent attorney handling a federal death penalty case?

A.   Yes.

Q.  Okay.  Prior to Mr. Basham, how many clients had you represented who were charged with federal capital offenses?

A.  None.

Q.  None.

A.  Federal.

Q.  Federal capital offenses.  So this being your first, you are aware that we have retained a standard of care expert in this case, correct?

A.  That's correct.  That's what I heard.

Q.  Now, let me tell you, with all due respect, I know you have a very long and highly regarded career, our standard of care expert has been practicing for 40 years and in the course of that 40 years he has served as a Watergate prosecutor, he was a law clerk for Justice Hugo Black and for Justice Lewis Powell --

MR. DALEY:  Your Honor, I have to object.  I'm not sure why we need to know the credentials of their standard of care expert until he testifies.  And I'm not sure where he's going with that.

MR. BURKE:  I think the objection would be more appropriate after I ask the question.

THE COURT:  Go ahead with the question.

Q.  (MR. BURKE) And Mr. Hammond has represented at least seven federally charged death penalty clients.  If Mr. Hammond is of the opinion that there are various claims, a number of

claims in this case in which you fell below the standard of care, is your opinion he's simply mistaken?

A.  You are asking me if his opinion is mistaken?

Q.  Yes.

A.  I don't know what his opinion is.

Q.  That you fell below -- well, that's a little disingenuous, sir.  We have been through this in these -- in these hearings and we know that Mr. Hammond is -- said that you fell below the standard of care in a few areas.  And Mr. Daley spoke to you about that at Monday evening's interview.

A.  My understanding on Monday evening was that -- is it Hammond?  Is that what you said.

Q.  HAMMOND.

A.  My understanding was he hasn't even finished going through the file or the transcripts so how can he come to any opinion?  Isn't that what was said on Monday evening?

Q.  No, that's not what was said.  As I assumed you were aware, I think that the conversation occurred that Mr. Hammond had been interviewed prior to you coming in.  Do you recall that?

A.  On Monday.  But my understanding was when I voluntarily showed up on Monday evening that Mr. -- he was still reviewing documents and would be prepared to testify, I guess, at some future date.  So, I mean, I can't answer your question in the abstract.  If he has a -- if you have something specific to

ask me then I can respond to it, but I just don't know -- I can't respond to general, to a general question like that.

Q.   If Mr. Hammond is of the position that you fell below the standard of a reasonably competent attorney in litigating the Jackson v. Denno hearing in this case, would you say his position is incorrect?

A.   I would say that he's not taken into consideration all that I took into consideration.  It's easy to be, you know, a Monday morning quarterback.  Easy.

Q.   Well, I would -- Mr. Swerling, nothing about this case is easy.

A.   It's easy to be a Monday morning quarterback.

Q.   And is that your opinion of what a standard of care expert does in a federal death penalty post-conviction proceeding?

A.   No.  You just asked me a question and I'm telling you that it's easy to look at a case and say that there were things that were done that could have been done differently.  I'm just saying it's very easy to look back at what someone's done in any case, criminal or civil, and say it could have been done different.  So I disagree with him about the Jackson v. Denno issue because that was well thought out on my part and Mr. Harris' part about the way to approach that.

Q.   Okay.

A.   And if you will give me a chance at some point to explain why we did what we did then I will explain.

THE COURT:  I think we ought to move on into the facts now.  You laid the basis for the disagreement.  Let's get into what happened.

MR. BURKE:  All right.  Your Honor, I would like the opportunity to go over Mr. Swerling's experience and background, though.  It seems like reasonable questions I should be able to ask about his experience.

THE COURT:  Certainly, you can.  Go ahead.

Q.   (MR. BURKE) Mr. Swerling, in preparing for this examination I looked at your website jackswerling.com.

A.   Yes.

Q.   And it's very, very comprehensive.  And it seems to be updated quite frequently, is that correct?

A.   I haven't updated it probably in eight or nine months.  There's stuff to add, there has to be because I'm constantly litigating and doing things that I'd like to add to that, so --

Q.   Do you personally do that yourself?

A.   No, no way.  Lexis does it, and my paralegal.

Q.   Okay.  The government has marked and admitted as Exhibits 1 and 2, and if we could perhaps bring up -- actually, if you could just bring up Exhibit 2 so we can just go through this.

While they are doing that, Mr. Swerling, given your reputation --

A.   Mr. Burke, I'm sorry.  This is not clear.  I don't know

how to --

Q.  Okay.  I will have to blame the government for that. That's fine.  You are aware of your website, correct?

A.  I should be, yeah.

Q.  Okay.  Do you find that a large percentage of your business comes your website or does more come from simply your reputation in the community?

A.  Well, the website was a defensive mechanism that I resisted for a long time.  But I guess about two years ago, two-and-a-half years ago, everybody, virtually, was having a website.  I don't do any advertising.  If you look in the phone book you will see Jack Swerling, Law Offices of Jack Swerling.

So what I decided to do was do a website but not advertise, not to advertise but just to have something that people could refer to, which is becoming much more common. When someone calls from Indiana or Arizona or Seattle they say I've looked at your website, or I refer them to the website. Because I don't like to, when I'm sitting and talking with a client talking to them on the phone, I am not comfortable trying to tell them what my experience is.

Q.  Has your entire career been in criminal defense work?

A.  I started off doing a little bit of everything in 1973 with state Senator Isadore Lourie.  I guess I did a little bit of everything.  I did a couple of real estate transactions

which turned into being disasters, did a couple of probate, and I did personal injury for five or six years, as well. But the criminal became something that kept coming into the firm, coming into me, and the person who in the firm was -- had been doing criminal went to Charleston, a fellow named Steve Knight.

So it really, combination of two factors, one is Mr. Knight left and went down to Charleston, another was a lot of the great criminal lawyers in this area had withdrawn or had passed away, Frank Taylor and some of the other guys in this area, Luther Lee, Alex Ball, people that had done criminal work. So the opening was there for me so I stepped into it and it kept coming. So eventually, I guess somewhere around '83, I defended a fellow name Donald Peewee Gaskins, and pretty much after that it was all criminal, I think. Whatever civil I got I passed off to somebody else in the firm or associated somebody from outside.

Q. Okay. And you mentioned a client in 1983. Could you give me his name again?

A. Donald Peewee Gaskins. That was a death penalty case.

Q. That was a death penalty case, correct?

A. Yes.

Q. So that was your first death penalty case in 1983?

A. No, actually not. Shortly after the new statute had been passed there was a murder at Transouth on Elmwood, and a

fellow named Wendell Moore was charged with murder, I can't remember his codefendant's name, but I was appointed to represent him. And we brought in the Southern Poverty Law Center, Millard Farmer and his staff, because no one had really ever tried a death penalty case under the new bifurcated system.

So we spent a lot of time with Millard Farmer and his staff. Gaston Fairy and I, who's a well-known lawyer in the area, defended Wendell Moore and we just got a great education from those fellows and gals who had done extensive death penalty work. I believe -- I believe it's Southern Poverty Law Center, Millard Farmer. So that case eventually, after several days of jury selection we had seated four or five jurors who opposed the death penalty. That's before they started ruling those people were not death qualified and couldn't get on a jury, so we got a life sentence out of it. That would have been the first one. And, obviously, we're already in the trial and the preparation, but I had the good fortune of learning from some of the best.

Q. And this would have been, Mr. -- so Mr. Moyes' case was in -- sometime in the 1970s?

A. It would have been in the late '70s, maybe, or 1980, somewhere around that time. If I remember right it was the first or second death penalty case after the statute. There had been another one but it had been a guilty plea that I

was -- I don't think I had the experience at that time to get appointed. But it was the Taylor Harkness murder, which was a particularly gruesome murder in this area, and it was a guilty plea and they both got the death penalty. But that probably was the first one.

Q. Now, it's my understanding from this proceeding and from this case that Mr. Basham's and Mr. Fulks' case were the first federal death penalty cases in the District of South Carolina, correct?

A. If I remember right, it was.

Q. So but you have had an extensive federal criminal defense practice, as well, correct?

A. Fortunately, yes.

Q. What type of cases have you handled in the federal courts?

A. Drug cases, fraud cases, other white collar crime cases, gun cases, interstate Hobbs Act cases. I mean, I think across the board.

Q. What was the one you just said?

A. I was trying to think, there was --

Q. Hobbs Act?

A. Yeah, Hobbs Act. I said Hobbs Act.

Q. Had you, prior to Mr. Basham's case, ever represented a defendant charged with a federal crime of carjacking?

A. I don't recall.

Q. How about the federal crime of kidnapping?

A.   Yes.

Q.   And who was that client?

A.   I don't remember the name, but it was -- we can get you the name.  It was actually in front of Judge Shedd.  And Judge Shedd ruled we had a -- at a pretrial motion, as I recall, Judge Shedd ruled that -- it was a natural mother who had -- the facts are a little blurry to me, but Judge Shedd ruled that did not violate the federal kidnapping statute and so we eventually, after working on the case and having the motion to dismiss, we got it dismissed.  So I was familiar with the federal kidnapping statute.  Grace something, I can't remember what it was.  Grace Shiek.

Q.   Your website jackswerling.com lists under represented in South Carolina criminal cases over I think a hundred cases that you handled in the course of your career.

A.   Those are not all.

Q.   These are simply --

A.   Just representative cases.

Q.   I think you described them as cases below is only a selection of cases Jack Swerling has successfully handled?

A.   Successfully.

Q.   Successfully.

A.   Put in, you know, most of my successful cases.  A lot of my successful cases.

Q.   And as a criminal defense lawyer you have to take success

in small doses and accept what comes your way.

A.   Reward is measured differently when you defend criminal cases.  But those, most of those, were acquittals or dismissals.

Q.   There are some --

A.   A couple of life sentences in death penalty case.

Q.   Life sentence in death penalty cases, okay.

A.   But that was successful, too.

Q.   And I guess that would explain why Mr. Basham's case is not on the list.

A.   It doesn't qualify under successful cases.  That's the -- you understand that.

Q.   I also noticed that --

A.   I don't consider the outcome for Mr. Basham to be successful.  He was sentenced to death, so why would I consider that a successful outcome?

Q.   Okay.  That was the question I was asking, so I accept your answer.  I see also that you on jackswerling.com under your heading on each page you list several, several television shows that you have been on?

A.   Yes.

Q.   And is that -- can you give us an example of why you've appeared on these types of television shows?  Does it vary or what's the reason for that?

A.   They asked me to do interviews, or that I was asked to be

a commentator.  For example, the Susan Smith case, NBC hired me to be a commentator for NBC in the Susan Smith case, and they paid me for it.  Another lawyer named IS Levy Johnson, he and I periodically went up to Union several days, actually a couple of times a week, and Mr. Harpootlian, who was my partner, was also hired by CNN, and we traveled up to Union to comment or be commentators on the Susan Smith case, which you are probably familiar with.

Q.  Yes.  South Carolina death penalty case, correct?

A.  Right.

Q.  Involving a woman and her children?

A.  Correct.

Q.  It is a very wide range of television shows.  Ricky Lake, what was --

A.  I have no recollection of why I was on that show, nor do I care.  It just -- it's representative of some of the shows I appeared on.  Nancy Grace, I was on that show, too.  I was on the show as a commentator and as a victim, which you've raised as a grounds for my being ineffective.

Q.  You were -- was that in 2005 after the -- after the man who had kidnapped your family escaped?  Is that why you were on Nancy Grace?

A.  Right.

Q.  Mr. Basham says -- raised several claims of ineffective assistance of counsel, and the judge asked us to get in the

merits of those.  And I will right now -- I just want to make it clear what we're not alleging.  I recognize we have alleged quite a lot, but there are things that I think that are important for purposes of focusing the issues that we have here.

One of them is that Mr. Basham has not alleged that you did not spend a remarkable amount of time working on his case.  We don't dispute that.  The records speak for themselves.  Mr. Basham doesn't dispute that you hired several supporting staff and you worked with Mr. Harris, you had a very large defense team.  He's not alleging that.  He has alleged some concerns of the way in which a few members of the defense team were managed and hired, but that is not a claim -- and I also want the court to know, just in case there would be any question of it, no one has ever alleged that you have not been anything but very personally supportive of Mr. Basham.

A.  Yeah.

Q.  Do you care could speak to --

A.  No.  I have a lot of empathy for Mr. Basham, having spent many, many hours with him and his family, and I found his upbringing to be one of the worst that I've ever seen.  And he had a lot of history of, you know, illnesses and going into various hospitals.  And so, I mean, there was a lot of empathy for him even despite the fact that this was a horrific crime.

He and I have maintained a relationship.  He writes me,

calls me.  I've told you about that.  And I think I asked my office manager to give me a rough idea of what -- how much money I've sent him in the last eight years, and it's about $2,500.  Because he periodically will call me and ask me for money for hygienic purposes.  Last -- two weeks ago he called and asked me if he could get an MP3 player, I think, for his birthday, so we sent him some money.  That's been over eight years.

As I've told you, and I definitely, when you got involved in the case, I said I want to make sure that that was okay with you that I continue to send him money because he has nothing.  And so you said you were very kind and said go ahead.

Q.  We were thankful.

A.  The public defender's office can't afford to give him the money and so I've -- I think somewhere around $2,500, my office manager told me.

Q.  All right.

A.  So we have a very congenial relationship.

Q.  Do your telephone conversations with Mr. Basham, are those calls in which you actually speak with him or does he call your office?

A.  No, no, he calls me.  I mean, he has called, and I spoke with him a couple of weeks ago.

Q.  Okay.

A.   And that was when he told me about his birthday.  And he writes me a letter and then he will follow it up, if he doesn't get a check within a couple of weeks.  Sometimes it lays on my desk for a while, but he follows up with a phone call.  And, you know, and I'm not going to say no.  Generally in the neighborhood of a hundred, 125 bucks, $75, something like that.

Q.  Okay.  So it's clear that we're not disputing in this case that you didn't get a heck of a lot of records.  That's what we have been talking about.  I mean, you didn't interview a ton of people.  So when you were interviewed by the government earlier this week you were shown several charts and the like showing the extent of the work that you had done, the extensive to do lists and the like.  We don't dispute that any of that was done and that's really not what we're here to talk about.

I would like then to turn to some of the substance issues, and I mentioned the Jackson v. Denno hearing.

A.  Yes.

Q.  Do you know, Mr. Swerling, if there are any successful Jackson v. Denno hearings listed on jackswerling.com on your --

A.  Nobody would have any idea what they are, other than a lawyer.  So if I put out I had the following successful Jackson v. Denno hearings people would say what the hell is

that.

Q.   Well, let me ask you, on your website, I refer to a case State versus Odom.  Do you remember that case?

A.   Yes.

Q.   Okay.  And your website says the defendant, a former prosecutor, was charged with solicitation of a minor over the internet.  We successfully argued the evidence should be suppressed.

A.   Right.  Well, that you understand.  Most people would understand that.  And what was interesting about that case was it was the first we raised the issue of whether or not a South Carolina judge could issue a warrant under the -- a telephone warrant, or I can't remember what the name of it is.  But, anyway, the process that was being used to go ahead and get the records in the case under Title III, it wasn't Title III, under the terrorism argument, we raised the issue of whether that could be done in South Carolina, whether or not South Carolina had another procedure which would have barred that. So it went up to the Supreme Court, the judge threw it out and the Supreme Court reversed.

Q.   Have you had successful -- had success in litigating Jackson v. Denno claims?

A.   I think yeah, sure.  I'm sure.

Q.   Now, I would like to focus on the Jackson v. Denno hearing in this case, which occurred over a three-day period in

February of 2004.

A.   Correct.

Q.   At that time would you agree that you had been on Mr. Basham's case for approximately ten months?

A.   Whatever.  I'll accept it if you tell me.

Q.   My review of the record shows you were appointed in April of 2003, February of '04 would have been approximately ten months?

A.   If you say ten months, it's ten months.

Q.   Did you at any time interview Mr. Basham about his interrogations?

A.   Sure.

Q.   Do you know if you did it on -- when you did it in your representation?  Was it early on?

A.   You have my notes and, you know, you have my spiral notebook and --

Q.   No, you --

A.   No, you have copies.

Q.   I have copies of some pages, that's true.

A.   So let's not be coy.  You have it and you have a page which says that I did interview him about it and he raised certain issues.

Q.   That's an undated page.  Can you tell us when that interview occurred?

A.   If you look at the page before and the page after it would

kind of give you an idea of when this took place.

Q.  I'm not trying to be coy, I don't have the original binder.  I made copies of pages that I believed relevant.

A.  You can look at it.  If you want to we can bring over the next day.

Q.  Why don't we bring up Defendant's Exhibit 81.  Mr. Swerling, is that your handwriting?

A.  That's correct.

Q.  Do you recall the meeting that you had with Mr. Basham when you took these notes?

A.  No.

Q.  No.  So you have no memory of when it occurred?

A.  No.

Q.  Okay.

A.  But I would say it's like a checkbook.  If you look at the page before and the page after you can figure out when it was done.  And I just don't have it with me but we can provide that to you.  Those have not been altered in any way.

Q.  And do you -- let's look at this particular document for a moment, and I have a question.  The notes begin on defendant now says statements are not voluntary.  When I read that it seems to me that you're suggesting that Mr. Basham had changed his account of what had happened.

A.  Yes.  And that was not unusual.

Q.  That was not unusual.  Do you have notes, and I will tell

you right now I have not seen them, of a prior interview with Mr. Basham in which you set forth what he told you about his interrogation following his arrest?

A.  Mr. Burke, I don't know.  I have not been through all of those.  But they are there for your review.  I cannot tell you.  Now you are talking about ten years ago.

Q.  Correct.

A.  You know, so I can't remember last week a lot of things.

Q.  Would you agree with me that it is most likely that these notes were taken prior to the Jackson v. Denno hearing in this case?

A.  I don't know.  I mean, without looking at the spiral notebook I don't know when it was and I can't -- I'm not going to guess, you know, sitting up here on the witness stand.  I don't know.

Q.  Have you had an opportunity to go through these files prior to the hearing today?

A.  I went through about as much as I could go through.  What I was really concentrating on was reading the transcript and going through the transcript.  Because, as you know, I did not have a copy of the transcript, I did not do the appeal.  So over the last few weeks we have gotten the total transcript, we have gotten the disk.  We also requested different hearings that we did not have that y'all have had the benefit of.  So I needed to read those things.

Q.  Mr. Swerling, would it surprise you to know that the indexes we made of our review of your boxes when we were there in February 2011 indicate that, in fact, you did have a full set of the transcripts in this case?

A.  Well, I think what we had was the daily transcripts.  And I stand to be corrected on that because I haven't been through the whole file.  You actually probably have more knowledge about what's in there right now than I do.  But I remember getting daily -- the court provided us with -- the court reporter was providing us daily, maybe daily or maybe not the next day, but we were getting realtime transcripts, so that's probably in there.  And they were unedited, if I recall correctly, and those would be in the boxes.  I don't recall having the transcript, and if I did I didn't read it.

Q.  Well, perhaps that would be something we will be able to clarify when we return under the judge --

A.  I think you will find those were the unedited daily transcripts that we were getting.

Q.  Were there any transcripts that you felt you needed that you weren't provided to prepare for your testimony today?

A.  Well, I don't have transcripts of a lot of the in camera hearings.  Because as I was looking through the transcript the in camera hearings were sealed and not -- they are not listed, or they are not set out, most of the them, in the actual transcript.  So I don't know that I have any of those.  Maybe

one or two.  There are other pretrial hearings.  Last week I requested the pretrial conferences that I noticed that we had not gotten from August of 2004, and I think you -- I asked and you sent them to me --

Q.  Correct.

A.  -- last Thursday night.

Q.  Correct.

A.  And I asked at some point for the February transcripts which we did not have.  Those were the, as far as I know, the argument on the motions between -- with Fulks, we were arguing Fulks and Basham together, we were still joined together.  So those motions I was -- those either you sent them to me or Mr. Daley sent them to me.  I don't remember.  There may be others, but I think I had -- I requested what I thought I needed.  There may be others that I'm not aware of yet.

Q.  But Mr. Daley or myself provided you access whenever you requested it, correct?

A.  Absolutely, sure.

Q.  Could you go with me for a moment and go over your notes from this meeting that you had with Mr. Basham?  And let me ask you, would that meeting have been, if you know, in person or on the phone?  What was more common for you with Mr. Basham?

A.  Most of the time I saw him.  He didn't have a whole lot of access to the phone back then that I'm aware of or -- I just

don't remember.

Q. These would have been interviews with him either at the jail or at Columbia Care, or whatever he was?

A. Yeah. I was down there frequently. I think, looking at, what, 60, 40 something occasions, or something like that, that I saw on the time sheets that y'all have.

Q. And that was something you were able to pick up from one of the charts the government prepared?

A. Either last Friday or Monday night one of y'all, I think there were some charts prepared that I interviewed him on 40 occasions, or something like that.

Q. Okay. Now, when you interviewed him on the occasion where you took these notes, I will read what I can and might need you to decipher some of it for me. It says defendant now says statements are not voluntary. One, no medicine.

A. Correct.

Q. Do you recall discussing with Mr. Basham the situation with regard to the medication he was on or was receiving?

A. What I know, what I can recall, which having refreshed my memory, is that he had been off of Ritalin for a while and there had been some effort to try and get some drug that simulated Ritalin while they were on their five-state spree. So I remember that, they bought something in the drug store that would kind of give him that kind of kick. But that's what I remember.

Q.  Do you --

A.  Bits and pieces, by the way, Mr. Burke.

Q.  Does -- you understand, and I recognize it's been ten years, so, just asking what you remember.  Is it your impression that Ritalin gives a person with ADHD a kick?

A.  Well, it gives them a kick to go ahead and focus.  When I say a kick I don't mean he gets high, he focuses, he has an ability to focus.

Q.  Okay.

A.  Which, you know, Brandon did not have.  I mean, he had some difficulty focusing at different times.

Q.  Your second entry on that reads cigarettes, have to sign. Do you know what you mean by have to sign?

A.  Actually, I don't.

Q.  Okay.

A.  Cigarettes I understand.  Have to sign, I don't know what this meant, unless somebody was saying -- maybe he was saying that he had to sign for when he got them, or something like that.

Q.  But no independent recollection today?

A.  No, I don't.

Q.  I believe that's snacks with the same requirement, and number four I can't read.  If you want to --

A.  If you want to live.

Q.  If you want to live?

A. Right. LIVE.

Q. You have to sign.

A. Yeah. I have no idea what that means.

Q. And then number five reads helped him -- could you read number five for me? I'm sorry.

A. Help.

Q. Helped him.

A. Help. Not helped, help.

Q. Helped with a P?

A. Yeah, but not with an ED on the end.

Q. Help him. Okay. Help him if he told everything, knew Chad was leader.

A. Right.

Q. No recollection today about what Mr. Basham told you with regard to that?

A. No, I don't have any recollection of any of this. This is a --

Q. We will -- I'll see if you can decipher some the of language for me then and we will go from there.

A. Sure.

Q. He told you he was coerced. Says he knew he had the right to a lawyer and told him if you told the truth would not be held against him, only Chad, no charges. Is that read correctly?

A. That's what I wrote in here.

Q.   Those are the notes you wrote in your interview with Mr. Basham when he was talking about his interrogation, correct?

A.   Pardon?

Q.   Those are the notes that -- that's an accurate reading of the notes that you took that day when you --

A.   Those are the notes I took that day.

Q.   Okay.  Do you recall, I know you have no memory of that meeting, do you recall doing any type of investigation following up on the specific statements that were made by Mr. Basham to you that are memorialized in this note?

A.   I mean, we investigated the case, I mean.  So, I mean, and part of that would have included the Jackson v. Denno hearing. So people who were involved, 302s, different kind of statements.  We, you know, we interviewed Richard Hughes, who was a lawyer up in West Virginia, I guess, who got appointed. We interviewed -- Greg interviewed on another trip up there Mr. Hewlett, another lawyer, the public defender up in West Virginia.  And also Barbara McGuire, who was the -- worked for the public defender's office.  These were three lawyers that had been appointed, or two lawyers and the staff, that had been appointed to represent Mr. Basham and overlap with these different statements that were being given.

Q.   Okay.  And so yourself --

A.   So we did.

Q.   You talked to those three people?

A. Oh, yeah. Those were three of the people I can identify right off the top of my head. And, of course, Mr. Littlejohn, Mr. Monckton. You know, all of whom were aware of the fact that Mr. Basham was talking to the authorities.

Q. Now, do you have any -- did your investigation reveal whether any of those people were with Mr. Basham when the events that he relayed to you here occurred? I mean, it's one thing to say you interviewed the lawyers, but this appears to be a situation in which your client is telling you inappropriate coercive statements were made to him by law enforcement. My experience is law enforcement usually doesn't do that in front of lawyers. Do you -- did you think that by talking to Mr. Basham's lawyers from Kentucky they would be able to help you?

A. That was background. I mean, we're trying to find out what the circumstances were surrounding the statements. I think, you know, I can't remember all -- you know, there were several hundred people interviewed. And, you know, I know attempts were made to interview agents and police officers from five states, or four states. Which ones were actually I could not name them for you, but I think we did, you know, some -- that we did some kind of investigation concerning the circumstances surrounding the statements.

Q. Now, it's correct to state that the information included in these notes was never brought out at the Jackson v. Denno

hearing in Mr. Basham's case, correct?

A.   No, you're right, it was not the strategy we adopted.  And I can't tell you that he did not change as we were going forward his -- his thought process with respect to those things.

Q.   You mentioned your strategy with regard to the Jackson v. Denno, and in the interviews we have discussed that.  I want to make sure I understand what the strategy was.  And is that your strategy was simply to get the officers' statements or the officers' version of what occurred on the record, pin down --

A.   That was part of it.

Q.   Why don't you tell me what was the purpose of the Jackson v. Denno hearing.

A.   Okay.  I need to give you a little bit of background, because, you know, here's the situation.  This was a horrific crime that took place over a period of some four, five states.  The two women were dead, had been brutally murdered, and they were -- their bodies were not discovered.  We --

Q.   Can I just clarify for one moment, though?

A.   I'm giving you my strategy.

Q.   No, I understand.  I want to clarify something.  How many victims were there in the case in which you represented Mr. Basham?

A.   Two.

59

Q.   Okay.

A.   Intrinsic evidence as to Miss Burns.

Q.   How many victims were there in the case in which you represented Mr. Basham in South Carolina?

A.   There was -- well, there was one victim in the death penalty case but there was evidence of intrinsic acts that the judge ruled on with Miss Burns, so we were dealing with two bodies.

Q.   Was he charged with anything --

A.   No, you know that.  But you are asking me how many victims there were and there were two.

Q.   There were -- your testimony today is there were two victims in the case in South Carolina with which Mr. --

A.   That's not what I said.  I said there was one victim in the South Carolina case but there was other evidence of another victim in West Virginia that was ruled to be intrinsic evidence in our case.  So that I'm talking about two women who were killed and their bodies were never discovered.  That's all I've said.

Q.   Okay.  I'm sorry to interrupt you.  You were telling us the strategy.

A.   So we had a situation where there had been an escape at the jail, there had been this picking up James Hawkins and various other people, Tina Severance, Andrea Roddy, Samantha Burns, the South Carolina part of it.  So what we had, there

was a lot of evidence in this case that both Mr. Fulks and Mr. Basham were guilty of the crimes, okay?  I mean, it would be, I think, an absurd position to argue otherwise.  So we had that.

We looked into Mr. Basham's background.  He had this history of going in and out of some institutions in western Kentucky and other places.  We had his family, his mother who, you know, she was just probably just one of the worst people I've ever met and ever heard of because of her upbringing of Brandon, her support of Brandon, what she got Brandon to do. So coupled with the fact that there were two horrific crimes, there was a crime spree from western Kentucky to South Carolina back up to West Virginia.  With his background, his family background, it called for thinking outside the box.

And when we -- the Jackson v. Denno hearings, what we adopted was a -- I adopted a strategy, and Mr. Harris, as well, that we had to look and see -- and, you know, from my opening statement we pretty much front-loaded the issue there about whether or not he was guilty or not and accepted the fact that we were going to go into a second phase of the trial, the penalty phase.

So looking at all of that in the overall strategy, when we had the Jackson v. Denno hearings what we were trying to do is show that Mr. Basham cooperated to the best of his ability, or could cooperate, to try to cooperate, to hopefully find out

later on or be able to show the jury that he did cooperate in some extent.  And there was a dispute about whether or not he was telling the truth all the time and whether or not he was being honest about some of the locations and exactly what happened.  But essentially Brandon was cooperating.

Early on he had told them about the Samantha Burns murder and that they could stop looking for her body, that she was dead.  He gave them a description over the phone, talking to FBI Agent Long, trying to describe an area down in South Carolina.  He took them on a ride on November 28, Thanksgiving day ride.  So those were kinds of things that we thought we ought to establish, get from the agents and the officers that he did -- he was cooperating, he was not insisting on a lawyer, that it was a voluntary, to somewhat extent, voluntary on his part to try and cooperate.

And so we had a Jackson v. Denno hearing, asked the court to pass on the voluntariness.  But, as you know, we did not argue voluntariness very much.  What we tried to do was get the officers locked in so that we could see how far we could go with this cooperation, to try and -- all the questions were really designed to try and show how much Brandon was cooperating over this period of time.

Now, let me also say this, which also took -- we also considered and I definitely considered over this period of time.  There were certain statements that were -- there's no

way you could argue voluntariness.  And, for example, with Mr. Littlejohn and Mr. Monckton, he had counsel there so it would be a little difficult to argue voluntariness on those statements.  Mr. Hughes, Richard Hughes, was an experienced criminal lawyer who had told Brandon he didn't think he should cooperate without getting anything in return.  But despite that Mr. Basham wanted Mr. Hughes to convey information to law enforcement about Samantha Burns, about Alice Donovan.  So you weren't going to be able to argue that Richard Hughes' statements or statements given while Mr. Hughes was there were anything but voluntary.

And then you had Barbara McGuire and you had Mr. Hewlett who also came to see Mr. Basham during this interviewing process that was going on, and it was going to be hard to argue that those were not -- statements were made after he consulted with counsel were not voluntary.

In addition to that, Mr. Basham initiated contact with FBI Agent Malley, I think it's Malley, called him and said he needed to talk with him.  So we had a number of statements that were just -- I did not think, Mr. Harris I believe did not think, we could contest seriously about voluntariness.  So that made the earlier statements that were given the first day or two less meaningful to try and suppress.

So we tried to adopt this consistency about his cooperation throughout not asking for a lawyer.  But certainly

the last four or five statements that the court ruled on were -- well, I'd say four or five, anything with Monckton, Littlejohn, Hughes, McGuire, and Hewlett, the statements that coincided with those days would be extremely difficult, if not impossible, to argue voluntariness.

Q.   And when you mention Mr. Monckton and Mr. Littlejohn, you are referring to the Thanksgiving day search in --

A.   November 28th.  So to answer your question, you have a -- a series of statements that were very incriminating where voluntariness was just not going to be able to attacked.  So we had to adopt a strategy outside the box, to go ahead and embrace the statements and try and use them to our advantage during the course of the trial.

Q.   Now, by the time of the Jackson v. Denno hearing you had accumulated a huge amount of records from Mr. Basham's past, correct?

A.   Yes.

Q.   So you were familiar by that time through the to do lists or the charts, all the charts that were made by Lesa Watson and others, of his history of psychiatric and emotional deficits, correct?

A.   Very extensive.

Q.   Very extensive.  And I understand what you are saying is that there were so many statements that, and I don't want to misstate it, and I will tell you right now I ask you these

questions because I'm not a trial lawyer, I have never done a motion to suppress. So, you know, I'm sincerely wanting to know what the strategy would be here.

And would there have been a downside to at least presenting to Judge Anderson the information about Mr. Basham's intellectual and psychiatric and emotional --

A. It wasn't in my plan and I don't believe Mr. Harris' plan at that time to use that hearing for that purpose. What we were trying to do is trying to adopt a strategy that we could use for the trial about the Jackson v. Denno -- about the statements that the officers were going to make about Mr. Basham and what he exactly did say and what the circumstances surrounding it were, and trying embrace those and use them to our advantage.

Mr. Burke, if you've never litigated one, then you realize that whatever he said in front of -- when Mr. Littlejohn and Monckton were there was going to be admissible. Couldn't be -- it's not going to be involuntary. Whatever he said to Mr. Hughes and conveyed through Mr. Hughes and what he -- leading these people on a search was in some way going to be used -- you know, I can't tell you exactly how it would be used, but it was -- he had advice of counsel, he had advice of counsel with Mr. Hewlett.

So, you know, I just think that we had to have a strategy that was something that we could use and embrace and use to

our -- use to some effectiveness for Brandon during the case and that's what we came up with. And we followed through with that throughout the case.

Q. Okay.

A. You know, bringing out these things when we had these witnesses on the stand.

Q. So in some ways we -- that is our long way of saying you were trying to pin the officers down for their future testimony.

A. We were trying to find out what they were going to say, sure. Sure. Let's put it this way, if you get a chance at a pretrial hearing, you have a 302, but if you can have a chance at a pretrial hearing to have someone on the witness stand you would be a fool not to take it. So you put them on the witness stand. We made a -- we made a good faith Jackson v. Denno hearing, asked the court to rule on it. But I think the record will bear out that we were not really arguing very strongly about voluntariness, we were obviously using it for some other purpose.

Q. What would have been the downside of arguing voluntariness?

A. You can't argue voluntary statements with Mr. Littlejohn and Mr. Monckton or Mr. Hughes.

Q. I realize that, but --

A. Or Mr. Hewlett. It would be absurd to try and take a

position that those were not voluntary statements.

Q.  So is it your position, your professional opinion, that in a criminal case that some statements can come in, let's just let them all in?

A.  No, that's not what I said.  What I said was we were faced with a number of statements where voluntariness was just not going to be an issue, he had counsel.  Okay?

Q.  Let me ask --

A.  So therefore -- let me finish.

Q.  Okay.

A.  Therefore the earlier statements took on less significance than the ones that were going to be no doubt admissible because he had counsel.  So what we did is try to use those to our advantage and embrace those and figure out a strategy where we could -- it could help Mr. Basham during the course of the trial.

Q.  Okay.  I'll return to the question.  What would have been the downside?  I understand the strategy, what would have been the downside of presenting information to Judge Anderson about Mr. Basham's intellectual deficits and his emotional deficits and his psychiatric deficits?

A.  Because it's not the strategy we adopted.

Q.  That's not my question, sir.

A.  So I can't tell you at this point because it wasn't something I considered.

Q.  You didn't consider --

A.  I don't believe that we -- I considered whether or not -- well, let's put it this way.  There might have been a period of time when we did consider it but we adopted a different strategy.  So, I mean, I'm sure that it was considered about his mental capacity.  But the strategy we adopted was a strategy that was put out in February of 2004.

Q.  So sitting here today what you remember is the ultimate strategy, but you don't have any particular recollection of what --

A.  No, and -- I don't.  And I will tell you this, we obviously had doctors who were telling us already about his mental problems, we already had the records.  I read every single page of the medical records.  And so, obviously, it was considered as to whether or not that would be an attack.  But the better approach that we thought was going to be the way we handled it because he had counsel.  At least starting with November 19, I believe.

Q.  Is it your opinion then, your professional opinion, that any defendant who has counsel, any statements he might make after being advised of his rights are -- are necessarily voluntary?  That's what I'm hearing.

A.  I don't understand the question.

Q.  Can you -- could it not be true that a defendant who is with counsel but who has such deficits that he cannot

knowingly and intelligently waive his rights could make involuntary statements despite having counsel?

A. Well, none of those lawyers said that.

Q. That wasn't my question.

A. But you would to have those lawyers at least support the fact that he didn't understand his rights. And somebody has -- how can a doctor come in -- let's just think about this for a minute. You've got three lawyers, four lawyers and an experienced paralegal for the public defender's office. Wouldn't one of them need to at least say that he did not understand what was going on? Even though he had these mental deficits, he knew we were lawyers, he knew we were telling him not to do it. None of those people said that they thought that Mr. Basham didn't understand. So I think that would have been essential. If you are asking me, that's what I'm telling you.

Q. Okay. All right. And now are you saying -- did you have conversations with Billy Monckton prior to the --

A. My notes reflect that I spoke with Billy. I would be surprised if I didn't. I know in preparation for the hearing, my recollection is prior to the hearing when there was some issues about -- I wasn't here for the disqualification, obviously. We didn't get involved in the case until after that. But as to whether or not the hypothetical was going to be admitted, I think both Monckton and Littlejohn were

interviewed by me or me or Greg or both and were -- they were as witnesses in the case, as far as I remember, during the pretrial hearings. So --

Q. We do have notes. Why don't we go through those. I don't want to act like I'm not giving you all the information you need.

A. Sure.

Q. So, Susie, could you please bring up Defense Exhibit 80? Mr. Swerling, I think we can all three agree that's -- this is your handwriting, right? I won't keep asking you that. These are your notes?

A. Yes. Nobody else writes like that.

Q. If we come across notes that don't look like yours and I'm saying they are, please stop me. And I once again --

MR. BURKE: Hold on. One moment, your Honor. I think I --

(There was a pause in the proceedings)

Q. (MR. BURKE) Well, let's -- first, there are notes, and if I can find them we will talk about them. Oh, here they are. The second page of that exhibit, that's what's throwing me.

Mr. Swerling, could you look at the entry for December 24, 2003, highlighted, about this -- this would have been exactly two months before -- who's Kevin McNally?

A. I'm not sure actually what the structure was, but there is a regional -- there is a group that manages each region of the

country that helps supervise death penalty cases. And David Bruck was the one for this particular area, who is someone I've known for many, many years. But David Bruck was already working, he was already in that capacity on the Fulks case so we got assigned to Kevin McNally and his group and went to them often for motions, for cases. I think I probably read every motion that's ever been filed in a federal death penalty case, and every case. So McNally, I think, was the head of whatever that supervisory team was. I don't remember what they are called.

Q. Okay. And I don't really -- I think it's resource counsel, but I'm not sure.

A. It could be.

Q. Okay. So do you have any independent recollection today looking at these notes of a phone call that you had with Mr. McNally about the Jackson v. Denno hearing?

A. No.

Q. No? All right. So apparently you took a notation of a call you had with him where he apparently recommended to do the Jackson v. Denno, no harm?

A. Um-hmm.

Q. Narrow answer re mental state. Now, what you talked to me about was your ultimate strategy was focused on the statements of the law enforcement officers, correct?

A. Yeah.

Q.   And so two months before the hearing at least, is this consistent with what you are saying, you may have considered other options but ruled them out?

A.   We adopted the strategy that we thought was the most successful.

Q.   Okay.

A.   Would have been the most successful.  Other things obviously were considered.

Q.   And you had no, again, no recollection whatsoever of this conversation with Mr. McNally.

A.   No.  It's nine years ago.

Q.   Okay.  Could we see Defendant's Exhibit 82, please, Susie?

A.   I'm saying there go ahead and do the Jackson v. Denno, which is what we did.  We had a different approach than what you might think was normal.  Again, you said your expert, you know, about the Jackson v. Denno, again, we had lawyers who would be testifying in court.  For us we could not bring them into court and say they weren't voluntary statements.

Q.   I'm just -- I'm just trying to go over the preparation that was done, Mr. Swerling.

A.   Sure.

Q.   That's really the extent of it.  If you could look at Defendant's Exhibit 82, for the bottom entry, Susie, could you highlight that for us.  I believe that says -- excuse me, February 16, 2004.  Meeting with Scott and Greg re Jackson v.

Denno?

A.   Right.

Q.   It's Scott Schools?

A.   Scott Schools.

Q.   Okay.  What would the purpose have been for this meeting, do you recall?

A.   Determining what the scope of the hearing was going to be, who was going to testify, how we were going to handle it, what he was going to require, stipulations.  I mean, I have no idea.  Scott Schools, you know, we have -- Scott was a very able Assistant United States Attorney and someone we worked with, him and Mr Gasser, on this case very closely.  And, you know, obviously tried to come to an understanding about many of the issues.  Stipulations, I mean, if you read the trial transcript, we entered into a lot of stipulations.  I mean, obviously we talked to each other about scheduling and who's coming in, so that was not unusual to meet with Scott Schools and Greg.

Q.   Okay.  Now, let me ask you, Susie, could we turn to the next page of that same exhibit?  And, again, there are entries for February 19, 2004.  So now it appears that you're in full throttle to prepare for the 24th, which was the beginning of the evidentiary hearing.

     Can we look at the first entry, please?  Could you -- all the way down.  I also spoke -- there you go, and highlight

that for us, please.

This is a conference with Monckton, is that correct?

A.    Yeah.   Yes.

Q.    And you mentioned previously the hypothetical issue.  Can you -- sorry, I just can't read your writing there.

A.    It says all the hypothetical information came from Rosemary, not Mr. Basham.  And there's a memo.  And what I can tell you, what I think that means, again, this is bits and pieces, but in reading, one of the things, reasons we had to have three different meetings because I kept going back reading to refresh my memory.

What I understand is that there was an argument about, in the hypothetical in the February hearings, that the information was not coming from Brandon, it was coming from law enforcement to the lawyers, a lot of the information.  So that was one of the reasons why we took the position the hypothetical should not be admissible, because a lot of the information was being fed to the lawyers from law enforcement, including Rosemary Parham, who was the AUSA involved in the case that wouldn't allow a proffer in the case, wouldn't allow it to be done under the terms of a proffer.

So that was just a -- there's an argument that, as you know, was made during the February hearings that -- and I think I made it myself, that we should not attribute those comments to Basham, they were coming from the government, a

lot of the comments. So it wouldn't be fair to let in a hypothetical if it wasn't his -- even if you get past the legal issues the question was not to let it in because a lot of the information was coming from the government, not from him.

Q. Okay. And I think, in fact, we have seen the memo that Mr. Monckton referred to in the conversation in this very proceeding, and I think your testimony --

A. I don't remember.

Q. Now, you have number ten. No idea what that refers to?

A. It's a number that could have been referring to a to do list or something. Could be.

Q. And there will be testimony -- well, let's get to this right now. You made a lot of to do lists in this case, correct?

A. Yes. I do a lot of to do lists in all my cases so that I have a running list of what we want done, and we cross them off as they are done. Then the to do list gets expanded again and they cross off more so that you have an ongoing script of what you want to accomplish or to do.

Q. And --

A. Kind of simple.

Q. And at least in this case you numbered your to do lists?

A. At some point I think we discovered when we were meeting, you were there, that I started numbering to do lists. But not

at the beginning.  I don't know why, I don't remember what the reason was.  At some point -- but maybe just to keep track of the to do lists between the team so that we could refer to to do list number ten.  Now, this could be a number ten on a particular to do list.  But it's obviously referring to something, either a to do list or a number in a to do list before we started numbering the to do lists.

Q.  Can you read for us your notes following that?

A.  Billy spoke with Larry Ellis and Sheriff Hewitt, Brunswick County.  Contradicts Thanksgiving, and also spoke to Joe Cicarelli.

Q.  Who is Larry Ellis?

A.  I have no idea.

Q.  You recall who Sheriff Hewitt is, correct?

A.  Yes.

Q.  Any recollection today what contradicts Thanksgiving meant?

A.  No.

Q.  Susie, can you just move down that page for us.  There were more -- there's more meetings on the same day with Mr. Monckton in your preparation for this.  This was a Thursday and the hearing began on the 24th, which is a Tuesday. Monckton conference with Greg.

Did you advise Brandon what he said would be used, is that correct?

A.   Yeah.   That was, again, that had to do with the hypothetical.   One of the arguments that we were making during the February hearings is that the hypothetical should not be admissible because no one told Brandon that what he said, what was going to be divulged in the hypothetical, could be used against him, and he didn't ever authorize that.   So that's what we were trying to -- and we argued it, I think, you know, as best we could that, you know, there was no informed, not informed consent.

That would be the thing, but what we were -- I guess what I'm trying to say is what we were trying to argue, and we did argue to the court, is that no one told Brandon that what was being said in a hypothetical could be used against him so therefore he should not -- it should not be admissible against him.

Q.   I understand.

A.   And I think that's what we did argue, the best I can recall.

Q.   And at this time the hypothetical issue was still very alive because it was still being litigated.

A.   We knew that was going to be an issue.

Q.   Okay.   And so, Susie, could you go to the next page of that same exhibit?

A.   And, of course, the judge ultimately ruled it was not admissible.

Q.  Right, right.  Which is -- and you are talking about Monday morning quarterbacking from the perspective that we see things, we know the future as it was here.  But it helps to hear from your perspective when you were there what was still, you know, a live issue.

On the next page there are notes from the 24th, which is the day of the evidentiary -- the beginning of the Jackson v. Denno evidentiary hearing.  And I just really want to, if I can, focus on one area.  Susie, can you move down where it says Hewett just fired off questions, and the sentence below that, too.  And I will read this and see -- Hewett just fired off questions.  They were told they could not talk to him.  Any memory of this phone conversation with Mr. Monckton?

A.  Well, I don't remember the phone conversation.  I do remember from the testimony that, you know, Brandon was not supposed to be talking to them, that was part of the understanding, but Brandon was saying things.  Now, I don't remember anything about what Hewett fired off questions is, because I don't remember about Hewett firing off questions.  But I do remember there was an understanding or supposed to be an understanding that they would not interview him.

Q.  Okay.

A.  But then I also remember there's some testimony that somebody allowed Brandon to walk off with the sheriff, which I never did quite understand and that's something I just read

recently that I can't imagine Mr. Monckton, Mr. Littlejohn allowing that.

Q. Do you remember Sheriff Hewitt's testimony at the Jackson v. Denno hearing where he testified that he, in fact, walked off alone with Mr. Basham?

A. Well, that's what I'm referring to, and that doesn't make sense knowing Monckton and Littlejohn. But apparently that's -- you know, I can't contradict it.

Q. Did you ask --

A. I don't remember. Obviously, we did.

Q. Okay. And your understanding was that Mr. Monckton and Mr. Littlejohn, from these notes, had informed law enforcement the day that Mr. Basham was on the Thanksgiving day search they weren't allowed to talk to him, correct?

A. My understanding was the rules were that they weren't going to be talking to him directly, but they overheard things. For example, the comment about the deer, deer running across the road and, you know, I can't believe I'm here, I couldn't even hurt a deer, and then it was cut off. And that statement was ruled admissible, as I recall.

Q. Do you remember the statements that Sheriff Hewitt claimed that Mr. Basham said to him when they walked off alone together?

A. If you can refresh your memory. I don't remember specifically what the comments were.

Q.   Sheriff Hewitt testified, and there is some dispute between defense and the government at this point as to whether his testimony ultimately morphed or changed, but at the hearing, the Jackson hearing, he testified he walked off alone with Mr. Basham and Mr. Basham showed him how the victim's purse strap was used to strangle her and then showed where it was thrown.  Does that refresh your memory?

A.   I remember something about the purse strap, but I thought that that was -- I didn't know -- I don't remember it being when they walked off.  I do remember a comment about the purse strap --

Q.   Okay.

A.   -- that he had mentioned.  I think it first came up that Brandon said something about look for a purse strap, that I threw a purse strap out the window, or something like that. So that started the conversation about the purse strap.  And they started looking for an area, or in the areas where they had driven they started looking for a purse strap.  I think it was a, I don't know, maybe Liz Claiborne.  I don't remember, but --

Q.   I think that's correct, yes.

A.   There was a purse strap, and that became the focus of trying to find the purse strap in the areas that Brandon had pointed out.

Q.   Now, I'm --

A.   That led to just other discussions.  But the purse strap obviously was an issue.

Q.   At the Jackson v. Denno hearing Sheriff Hewitt testified that during that exchange between him and Mr. Basham, Mr. Basham showed Sheriff Hewitt how the strap was used to strangle Miss Donovan.

A.   Correct, showed him how the strap was used.  But, again, I don't remember where that was.  I don't remember if it was in the vehicle.  You know, you say it was when they walked off.  I don't recall that and I want the record to reflect that.  I just remember there was a conversation where Hewett said Brandon showed him how the strap was used.

Q.   And you don't know at this point whether that statement was made outside the presence of Mr. Basham's counsel at the time?

A.   I don't recall that, where it was.  I don't even remember physically where it was.  I just remember it was said and there was testimony about it.  But I don't recall right now where it was.

Q.   Now --

A.   No, I don't recall where it was and who was present.

Q.   Oh, I see.  Where the statements were made and who was present when they were made.  So --

A.   I remember Hewett was not my witness, so if he was my witness I probably would have had a lot more, maybe had more

recollection of it.  But I remember it, I remember the comment and I remember the circumstances, but not where or who was present.

Q.  So Hewett was not your witness at trial.  Was he not also your witness at the Jackson v. Denno hearing?

A.  I think it was the other way around.  I don't remember, actually.  I did, I did actually examine him on one occasion, yeah.  I don't remember which one, though.  Probably at the Jackson v. Denno hearing.

Q.  If Mr. Hewett, given what you learned from Mr. Monckton and Mr. Littlejohn, if Sheriff Hewitt had testified at the Jackson v. Denno hearing, which the records speak for themselves as to what he testified, if he had testified that he walked off alone with Mr. Basham and Mr. Basham while they were alone showed him how he had used the strap, how the strap had been used to kill Miss Donovan, would you have had any concerns about the admissibility of that statement?

A.  Since I don't remember where it was I can't tell you.  I mean, I just don't know.

Q.  I'm asking you a hypothetical.  If he had testified that the statements were made outside the presence of counsel when he took Mr. Basham over to look at the area where the strap might be, if that was his testimony would you have had concerns about the admissibility of those statements, just those statements, the strap statements?

A.   I'm trying to put it in context of where -- I don't remember that being the issue.

Q.   Are you familiar with --

A.   You are saying that, but I don't remember that being that way.

Q.   Well, and the record will speak for itself.

A.   Yeah.

Q.   So are you -- you've handled lots of suppression and Jackson v. Denno hearings.  Are you familiar with the Supreme Court's decision in Edwards versus Arizona about the right of law enforcement to question?

A.   When a defendant initiates contact, yeah.

Q.   Exactly.

A.   I kind of remember that case.

Q.   Do you remember that the ruling of Edwards is that the law enforcement cannot initiate interrogation with a witness who, with a defendant, excuse me, who has invoked his right to counsel?  In a nutshell, that's the standard of Edwards.

Sitting here today does -- had you known at trial, or assume at the Jackson v. Denno hearing that Sheriff Hewitt had testified that he took Brandon away and walked off alone with him after being informed that he could not contact or could not communicate with Mr. Basham outside the presence of counsel, he testified he in fact did so and Mr. Basham ended up making statements that became critical to the government in

their case in Mr. Basham's trial.

A.   It's been characterized that way, yeah.  My understanding was the sheriff said he was not saying that Basham said he strangled her but that it was the way she was strangled.  But I mean --

Q.   Either way, is that --

A.   Let me say this to you, that it had already been out there.  I mean, Basham had already put in or they had already put in the fact that there was a strap.  They were looking for a strap that was used to strangle her.  So you are leaving out those very important facts that had nothing to do with any statement that Basham made to Hewett.  They were looking for the strap that had been used to strangle Miss Donovan.

Q.   Well, this goes back to the question I guess I asked earlier.  Is this how you approach your cases?  If something -- some things are coming in others aren't worth --

A.   No, it's not the way.  In this particular case, since from November 19 on he had counsel, the statements prior to that time took on less significance in determining our strategy.  So dealing with statements that were made with lawyers, then we had to look at the statements made prior to the lawyers being involved, and what we did is we adopted a strategy of embracing all of it to try and use it for Mr. Basham's advantage.

Q.   And the statements that Sheriff Hewitt testified at the

Jackson v. Denno hearing would be made by Mr. Basham after he had invoked his right to counsel but when he was outside the presence of his counsel.  And did you ever consider raising an argument that those statements were inadmissible, in violation of Edwards versus Arizona?

MR. DALEY:  Your Honor, I have to object.  I think we're expanding this claim number two.  There's absolutely no mention of this in claim number two.  Again, it doesn't deal with the 24th, if you look at claim number two.  If you look at their claim, unless I'm mistaken --

THE COURT:  I thought there was a claim counsel was ineffective, Mr. Littlejohn was ineffective for letting Mr. Basham walk off with the sheriff.  Now we're getting that should have been suppressed.

MR. DALEY:  And I think there's actually --

MR. BURKE:  Your Honor, can I read you the claim?  The government is raising this argument for the first time.

THE COURT:  Read the claim.

MR. BURKE:  Claim two.  Mr. Basham was denied the effective assistance of counsel guaranteed by certain statutes and the Sixth Amendment when his trial attorney failed to prepare for and/or effectively litigate the Jackson v. Denno hearing in this case.  That is the claim, and that is precisely what I'm asking Mr. Swerling about.

THE COURT:  I think it's properly before me.  How

late do you want to go today?

MR. BURKE:  I'll stop whenever you want to, your Honor.

THE COURT:  Are you flying out tonight?

MR. BURKE:  I'm flying out in the morning, so --

THE COURT:  We're obviously not going to finish with Mr. Swerling today.

MR. BURKE:  No, sir.

THE COURT:  It's about time to take our afternoon recess.  I don't like to work the court reporter longer than an hour-and-a-half at a time if I can help it.

MR. BURKE:  I am at a break in subject matter, so --

THE COURT:  Well, I know Mr. Swerling doesn't want to have to come back any longer than he has to next week.  Why don't we just take a ten minute break and come back and do another 15, 20 minutes, if we could.  Let's take a ten minute recess.

(Recess, 4:39 p.m.)

THE COURT:  Let's go about another 15 minutes, if we could.

MR. BURKE:  50 or 15?

THE COURT:  15.

MR. BURKE:  That's fine.

BY MR. BURKE:

Q.  My eyes got really big.  Mr. Swerling, are you familiar

with the U.S. Supreme Court's decision in Watkins versus Virginia?

A.   I've heard it.  I can't tell you what the principle is right now.  I used to be able to do that.

Q.   Okay.  That's the decision from 2002 where the U.S. Supreme Court held that it violated the Eighth Amendment to execute the mentally retarded.

A.   Right.

Q.   It came down in 2002, so about a year before --

A.   I remember.

Q.   -- that you were appointed to this case.  Do you recall for capital litigators like yourself that was kind of a big deal to have something positive from the Supreme Court that would actually be a complete bar in some situations.  But I know that there were a lot of seminars put on right after the decision came down.  Do you recall now whether you went to any seminars that talked about Watkins or talked about how to pursue a Watkins claim?

A.   I would have no recollection of that at all.  I did go to CLEs, I do teach CLEs, I stay up with the law.  In this particular case what I will tell you is this, there are several boxes over there in the conference room filled with virtually almost every Supreme Court case dealing with the death penalty, and also about every pleading that had ever been filed by a federal death penalty lawyer.  So I know I

kept up to that extent and sought out what other lawyers were doing around the country. Greg and I both did that.

Q. Okay.

A. I mean, whether or not it was a specific seminar about Watkins, I just couldn't tell you.

Q. Okay. Thanks. Did you know in 2003 how a claim of mental retardation, if it could be litigated, how it could be litigated in federal court in a death penalty case?

A. I don't recall.

Q. And clearly there had -- this was the first federal death penalty case in South Carolina in recent times, so it wouldn't have been --

A. I can tell you I just don't have a recollection.

Q. Okay. I would like to show you what's been admitted as Defense Exhibit 98. And I will tell you that this -- and, Susie, could you make -- just so the -- if you can make the title big enough, and the first two questions.

Mr. Swerling, I'm going to -- this was a document that was found among the 77 boxes.

A. I don't have anything on my screen. Yeah, okay.

Q. Do you recall ever seeing this document? It's a multiple -- multi-page document, I will tell you that.

A. Do I recall it? No. If it was in the box, though, I read it.

Q. Okay.

A.   And I remember seeking out -- obviously, we're looking at voir dire questions, which was one of the things --

Q.   Can you tell us, was the question of mental retardation an issue that you considered raising in Mr. Basham's case?

A.   Well, we considered whether or not he was mentally retarded, but we had our experts who said he was not mentally retarded.

Q.   And let's talk about that for a moment.  If you were to have a client that you had concerns might be mentally retarded, what type of expert would you retain to evaluate him?

A.   Neurologist, neuropsychiatrist, forensic psychologist, forensic psychiatrist.  I mean, whoever they recommended, as well.  Judge Anderson was very liberal and very generous about giving us money for whatever we needed on the team and whatever experts.  So I wouldn't have hesitated if we had been led in that direction, if someone said he would qualify for mental retardation.

Q.   Okay.  And I believe in this case testimony was admitted at the penalty phase from Tora Brawley, who was your neuropsychologist, about Mr. Basham's IQ.  So to refresh your memory, she was the expert --

A.   I know --

Q.   -- in your case.  We can agree that in a case such as this one where you have said that there was -- there was no hope

that Mr. Basham would not be convicted that the issue from your very first day was to save his life.

A.  I think that's a fair statement, that I just did not think -- guilt or innocence I thought -- we were going into a second phase of the trial, I pretty much figured that.

Q.  Right.  And --

A.  And I think on the voir dire with the jury we even started off with that, that there was going to be a second phase of the trial.  And my opening statement to the jury was we're going into a second phase of the trial, I believe.  Again, that was all consistent with our strategy.

Q.  Okay.  And we don't -- okay.  Well, let me -- I'm just curious about that strategy.  I do have a question.  There have been issues about the fact investigator in this case, Mr. McNair, Carlisle McNair, and your hiring and supervision of him.  He did an immense amount of work in this case and he was for the most part, as I understand it, and correct me if I'm wrong, he was a fact investigator, right, he wasn't a mitigation specialist?

A.  No.  I mean, we sent Carlisle where we thought he needed to be and, you know, he reported back and if we told him follow up on something.  So, I mean, he was an investigator.  That's what he was at the Lexington County Sheriff's Department, so he was out there.  Now, if he picked up something in interviewing a witness that looked like it

needed -- not only fact witness but went into the mental issues then we would follow up on that or ask him to follow up on it.  I don't remember specifics, but, I mean, obviously if -- if he was in western Kentucky talking to somebody and he called me up and said we got X, Y, Z, I said go ahead back and talk to the person.  So we didn't -- he was a fact investigator, but that doesn't mean he would not have crossed over and asked other questions, as well.

Q.  Okay.  Okay.  Well, turning to the question of this -- well, let me finish with that topic because it escaped my mind and I just remembered what I was going to ask you.  If your focus was in this case, as you said, let's focus on saving Mr. Basham's life, Mr. McNair did an extensive amount of investigation regarding the crime in this case.  Can you explain why there was so much focus on investigating the crime spree when you felt that he was -- he was almost virtually certain to be convicted?

A.  Well, I've tried scores of cases and dozens of murder cases.  I mean, my object in every case I've ever been involved in is to find out as much as the prosecution knows, and more.  That's the way I approach cases.  Anybody ever worked for me knows that.  I mean, I push people ad nauseam to find out -- you know, to interview people.  In this case it's a classic example.  I want to know it all.  I want to be able to put it all into the -- into the pot and come up with a

strategy.  We interviewed hundreds of witnesses in this case.

Now, you may suggest that some of it was not necessary.  That's not the way I look at it.  I want to know everything about every witness and every aspect of the case.  And I did, I believe.

Q.  Well, and I suppose I am suggesting that.  I guess my question is at some point in a case such as this don't you need to -- to choose the, you know, the wheat from the chaff and decide it's just not worth the time, we only have a limited amount of time before trial so we need to focus on those issues that are most important and --

A.  I don't agree with you.

Q.  You don't.  Okay.

A.  No.  And what we did -- well, I agree with you to some extent.  As it got closer to trial we did to that.  But in the beginning we had the resources, Judge Anderson had given us the resources and the people to track down all of these things.  And I would be up here answering questions about why I didn't track down something if we didn't do that.

So my strategy has always been in almost 40 years of the practice of law, my clerks, my investigators, everybody knows you find -- you talk to everybody about every incident that you can, and I want to know more than the government knows.

Q.  Okay.

A.  Or the state knows.  That's just the way I approach cases.

Now, as it got closer to trial obviously we did throw out the things that were not necessary, but we couldn't have made that decision unless we had interviewed everybody.

Q.  Okay.

A.  I certainly wasn't doing it for my health.

Q.  I can only imagine the toll this took on your health.  So have you -- you had not as of the time that you represented Mr. Basham ever had a client where you presented the claim of mental retardation and under Atkins, because that decision had only been out for about a year.  So that's a safe assumption to make, correct?

A.  No, it's not.  Atkins obviously hadn't been decided, but I did have -- I've had cases where people were either borderline mentally retarded or mentally ill.  I mean, I started trying cases, Larry Gene Bell, for example, in 1985, was someone who I thought was insane, and I learned an awful lot about mental illness and insanity as a result of that trial.

Some of the doctors who were involved in that trial for the state asked me to come on the faculty as I guess you call it an adjunct or something for the medical university in the department of neuropsychiatry.  So I've always had a real -- you know, I like to look in those things, I like to have an understanding of them.  As a matter of fact, this afternoon I was supposed to be delivering a lecture over there and had to cancel it.  So it's something I am very aware of and very

attuned to.

Now, mental retardation, I can't tell you that there's a specific case that I recall, but I remember Bell had an awful lot of these things. I just don't remember if it was mental retardation or not. We were looking more at insanity on that situation.

Q. Okay, okay.

A. Which we have, as you probably know, the McNaughton standard in state court, which is very difficult.

Q. Yes. We have it other jurisdictions, as well. So although I've read some of the articles about Mr. Bell's case, and I will tell you it's very fascinating.

A. It gave me an angioplasty.

Q. Since your representation of Mr. Basham in 2003 have you represented any other clients in federal or state court who have been charged with the death penalty?

A. I don't remember if Richard Hollis was before or after that. But I tried a case, death penalty case in Lexington County, and in that particular case it was -- we got a life sentence out of the case. I think it was only the second time in Lexington County's history there was a life sentence. So whether it was before or after Basham, I can't remember. I won't do any more.

Q. You don't do death penalty work anymore?

A. No.

Q.  Is it safe to say this hearing might be one reason?

A.  No, absolutely not.  No.  I mean, that's not the issue at all.  I just think that it's very taxing, you know, working to 1:00 o'clock, 2:00 o'clock in the morning, getting up at 7:00 and always thinking there was something more to do.  Just may be for some younger lawyers.  I suppose if the right -- if a judge asked me to take a case for a specific reason or if it was something that came along I probably would do it.  I don't know that I'd relish doing it anymore.  I'm 66.  So sometimes you have to -- I still do murder cases, plenty of them.

Q.  It's just a different animal.

A.  There's no comparison between a death penalty case and a murder case.  You can't even put them in the same box.

Q.  Now, I know that in this case you had a division of resources as far as of manpower as to which attorney did the bulk of the work with one expert or another.  I mean, for example, perhaps I'm wrong about that, but, for example, at the penalty phase Mr. Harris was the attorney who did the direct examination of Dr. Brawley?

A.  Right.

Q.  So, I mean, was that -- did he tend to work more with Dr. Brawley or did you work together, just set up --

A.  Well, first of all, as you know, Mr. Harris' and my office were like 15 feet apart from each other, which was one of the great aspects of this case, that we were able to keep -- we

were in-house, we talked to each other all the time.  I mean, every day, lunch, whatever it was, I mean, very rare that Basham was not discussed during this period of time.  Plus many of the other people that were involved in the Basham team worked out of my office and the judge approved that.

So there was just a -- I couldn't tell you.  At one point Mr. Harris and I decided that I would do this witness or he would do this witness, but obviously there was collective input for a long time, and even after we separated, who was going to do what witness.  We collaborated all the time.

Q.  Okay.  Now, did you -- do you have a memory today of Dr. Brawley telling you what Mr. Basham's IQ was when she tested him?

A.  I think it was in the high 60s maybe, or something.

Q.  68 was Dr. Brawley's testimony.

A.  I have a vague recollection.

Q.  Are you familiar with the elements, the diagnostic elements of mental retardation, what is required to show that someone is mentally retarded?

A.  You'd have to tell me.

Q.  The first -- there's a three-pronged test.  The first test, the first element is that the person have an IQ of 70 or less.

A.  All right.

Q.  The second is that they have deficits in what's called

adaptive behavior, significant deficits in adaptive behavior. And the third is one that encompasses them all, which is that both of those two deficits must have been present prior to the age of 18.

Now, I will -- I will tell you, and if you want more information I will give it to you. But I will tell you, to move things along, in this case Dr. Brawley found that Mr. Basham had an IQ of 68, which both Dr. Brawley and Dr. Schwartz-Watts concluded that the appropriate diagnosis for Mr. Basham was dementia. And it appears from the testimony that the reason for that was that Dr. Brawley could not testify that Mr. Basham had an IQ below the required 70 before he turned 18.

A.   I don't remember that.

Q.   Okay.  Okay.

A.   What's ever in the record is what's in the record.  So, I mean, I guess what you are saying, also, is you look at other things, as well, not only just the IQ, but --

Q.   Exactly.

A.   You look at the person person's ability to do things in society on an everyday basis as factors to consider, as well. Correct?

Q.   Yes, that's true.  And then but the deficits have to be prior -- have to exist prior to the age of 18.

A.   Correct.

Q.   Now, in this case there were -- you've reviewed all the records in this case and you've told us in your interviews you looked at everything.  And there were a series of IQ tests that have been administered to Mr. Basham throughout his life.

MR. BURKE:  And I want to speed things along, your Honor.  If I begin to testify stop me, it's not my intent.  I think these are facts that everyone probably agrees with.

Q.   That Mr. Basham had numbers that from your investigation and from finding records had numbers that suggested his IQ had diminished over time from when he was a child.

A.   I seem to recall something like that.

Q.   So it was sort of a downward spiral.

A.   Right.

Q.   And at trial the counsel, Dr. Brawley, Dr. Schwartz-Watts testified about some explanations for why that might be.  Do you --

A.   Something like was the huffing.  I remember something about huffing.

Q.   Exactly.  So you remember in your investigation Mr. Basham started huffing at a very young age?

A.   Yeah.  I don't remember the details, I just remember bits and pieces.  But I remember huffing, I remember talking to witnesses about huffing.

Q.   Okay.  So your investigators in this case, Lesa Watson, Paige Tarr, they obtained these various records and they went

and talked to various people, with you or without you, and that information, the records were passed on to Dr. Brawley. Does that sound like that would have been what happened?

A.   I mean, that would be the way it would normally be done. I talked to a lot of the key people at the various institutions myself.  So did Mr. Harris.  And we would have passed it on to the doctor who -- you know, passed it on to the other doctor.  We would have shared all this information.

Q.   Do you remember personally any interaction with any witnesses, lay or medical, psychological, who indicated to you that they thought Mr. Basham might be mentally retarded?

A.   Sitting here I honestly can't say that I remember anybody saying he was mentally retarded.  You may have something in my notes that indicates otherwise and I stand to be corrected. Most -- a lot of the people we talked to, you know, had different opinions about Brandon.  Interestingly, some of the people at some of these institutions just thought the world of him and came down here to testify even knowing what he was accused of doing.  But a lot of the people talked about him being manipulative, most everybody talked about him being manipulative.  And, you know, very cunning, street smart, not intellectually smart, but street smart.  And so we had an awful lot of that.

Q.   There was a lot of that.  And you said -- would you say it was a consistent theme that when you talked to people from Mr.

Basham's past that they all tended to agree that he wasn't very intellectually bright?

A.   He was not intellectually bright.  But I was thinking about that the other day.  You go back and read the transcripts of the three letters that he wrote to Beth McGuffin which were introduced in trial and were stipulated it was his handwriting, I mean, those letters, I was just thinking about this the other day, those letters are pretty articulate and well thought out and well written.  And he writes me letters, so I really have to just not -- I don't know what's the point you're getting at.  Did we think he was mentally retarded?  Obviously not.  Did not think he was mentally retarded, not in my experience with him.  I would not -- you know, I just could not say that.

Q.   Well, and I think that is the point, that not only -- you would not be qualified to say that, correct?

A.   No, I'm just talking -- but I'm qualified to a lay opinion.  And having dealt with, you know, scores of people over the years who have had mental problems I certainly can give an opinion, a lay opinion.

Q.   On the professional --

A.   I'm not trying to hurt him, but I just don't see where he had -- he may have not had the intellectual functioning but he had all the other functions.

Q.   But ultimately you relied on your experts to tell you,

correct?

A.    Well, yeah.  I'm not the one, I can't get up there.  If they said he was mentally retarded then we would have been prepared to try and pursue that.  But we would have also had to be prepared for what the government would have come back at to show that he was not.

Q.    Would you agree that Dr. Brawley's assessment was only as good as the information that she was given by your defense team as far as his history?

A.    Well, no.  I mean, Dr. Brawley went out and did her own investigation, as well.  As I recall, all of them did.  The only one that may not have gotten out in the field was Dr. Brannon.  I don't remember whether he did or not.  But Dr. Watts was in western Kentucky with me several times, I believe.  I don't remember about Dr. Brawley.  But they had the medical records, they had the discovery, they had whatever we could get them, whatever they asked for.  So I can't accept that.

Q.    Dr. Brawley was provided with medical -- with IQ results and reports that were done on Mr. Basham's life.  And your investigators interviewed people, and I would like to show you an example of -- Susie, could we see exhibit, Defendant's Exhibit 65, please.  And if you could go to the three of four page.  It's the three of four.

THE COURT:  Mr. Burke, let's take up this exhibit and

let's adjourn for the day after you finish this.

Q.    (MR. BURKE) And then could you highlight for us, please, Susie, the first paragraph of that document.

Now, Mr. Swerling, this is the third page of a memorandum that was done in February, February 18, actually, 2004, done -- written by Lesa Watson, who was your mitigation specialist.  And it recounted an interview she conducted with two women by -- one by the name of Brenda Shaner, SHANER, and the other Connie Baker.  And they were both people who had contact with Mr. Basham in one of the facilities in which he had been housed as a child.

A.    Um-hmm.

Q.    And then I would like to read to you what Miss Watson said about her interview with them.  And they also pointed to the large skew between his verbal and performance IQs.  He did not have the mental ability to verbalize.  This should be investigated or brought to the attention of his current care providers.

Also, they question his IQ that was higher at a younger age.  Back then facilities would not take a child unless the IQ was 80 or greater.  Many times a DSS worker would contact a doctor for psychological evaluation and casually state that they had to place this child, needed a psychiatric evaluation, and that they wouldn't be able to place the child unless the IQ was 80 or better.  They feel that Brandon's earlier IQ was

a false or inflated number and suggested that if that original testing could be found to have it interpreted again. Do you recall reading this memorandum?

A. No.

Q. Do you know if any investigation was done by you or your defense team to find the original tests, the original -- what's known as the raw data of Mr. Basham's IQ tests from his childhood to have those tests reinterpreted?

A. I remember over the last -- in trying to get ready for this hearing that there was -- there were efforts made to try and find earlier IQ tests and all of that. I read it recently. But I can't remember who wrote the memorandum on it or not. But it seems like I recall reading something that there were efforts made to go back and try and find these records. It may have been Dr. Brawley who said that. I don't remember.

Q. But given the way this case was documented, if it was done it would have some type of notation either in an e-mail or memorandum in your -- in the file, is that correct?

A. Well it should, but I can't tell you that it does. I mean, I can't -- I can't speak for everybody in the case. I just know what we tried to do, and everybody was under instructions from me to document things.

MR. BURKE: Your Honor, that's all I have on this exhibit.

THE COURT: All right. Let's break for the day then. Mr. Swerling, can you be back Monday morning?

THE WITNESS: Yes, sir.

THE COURT: All right. Have a nice weekend everybody. See you back Monday at 9:30.

MR. BURKE: Thank you, your Honor.

(Recess 5:25 p.m.)


        I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  10-13-12                    s/  Daniel E. Mayo