121

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

---------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
    -vs-                                    October 10, 2012

BRANDON LEON BASHAM,

            Defendant

---------------------------------


                    BEFORE HON. JOSEPH F. ANDERSON, JR.
                   UNITED STATES DISTRICT COURT JUDGE
                            MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:        HON. WILLIAM N. NETTLES
                       UNITED STATES ATTORNEY
                       BY:  ROBERT F. DALEY, JR.
                            JIMMIE EWING
                            JEFFREY M. JOHNSON
                            WILLIAM K. WITHERSPOON
                       Assistant United States Attorneys
                       1441 Main Street
                       Columbia, SC  29201

FOR DEFENDANT:         JULIA G. MIMMS, ESQ.
                       JULIE G. MIMMS LAW OFFICE
                       1001 Elizabeth Ave., Suite 1A
                       Charlotte, NC  28204

                       ARIZONA FEDERAL PUBLIC DEFENDER
                       BY:  MICHAEL L. BURKE
                            SARAH E. STONE
                       Assistant Federal Public Defenders
                       850 W. Adams, #201
                       Phoenix, AZ  85007

122

COURT REPORTER:        DANIEL E. MAYO, RDR
                       Certified Realtime Reporter
                       901 Richland Street
                       Columbia, SC   29201


              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

THE COURT: All right. We're back on the record in United States versus Basham. Following the scuffle that occurred during the lunch recess yesterday and at the suggestion of the government we adjourned court for the remainder of the day and I suggested we needed to look at the defendant's competency at this point. To that end I called Dr. Robert Parker, who was the court's appointed expert last year when Mr. Basham indicated he wanted to drop his appeals and be executed. To my surprise Dr. Parker indicated that he would clear his schedule today and travel to Terra Haute and examine the defendant and be available to testify by satellite as to the defendant's competency to go forward with a Section 2255 hearing.

When we sent that information out to the lawyers who were still in the courtroom yesterday the word came back that possibly Dr. Thomas Michael Hyde, who is the defense expert, might be available for testimony by way of telephone call this morning, is that correct?

MR. BURKE: Yes, your Honor.

THE COURT: And he's ready right now if we called him?

MR. BURKE: It's my understanding he is. We also have Dr. Donna Schwartz-Watts in court available, as well.

THE COURT: All right. Well, any problem with proceeding to hear from -- Dr. Parker is going to need to see

Mr. Basham when he gets there so we don't need to waste any time hearing from Dr. Hyde.

MR. DALEY: Your Honor, I'm just wondering exactly what Dr. Hyde will be testifying about. And, obviously, the government at this point hasn't seen a report or had an opportunity to --

THE COURT: I know. I fully understand that, but he's going to testify about the defendant's competency to go forward with a 2255 hearing.

(There was a pause in the proceedings)

THE WITNESS: Dr. Hyde.

THE COURT: Dr. Hyde, this is Judge Joe Anderson in Columbia, South Carolina. Good morning.

THE WITNESS: Good morning, your Honor. How are you?

THE COURT: We appreciate you being available on short notice for us. We're in the courtroom with the lawyers for the government and for Mr. Brandon Leon Basham, who I understand you have examined in preparation for some possible testimony in this case.

THE WITNESS: Yes, sir.

THE COURT: Because of events that happened yesterday we found it necessary to get you on the phone on short notice this morning for you to give some testimony about Mr. Basham's condition. I'll let the lawyers take you from here. I guess to the extent we can we need to swear you under oath, miss

Floyd will --

THE WITNESS:  Would it be better if I was on a land line?  I am on a cell phone.

THE COURT:  I think a land line would be much better.

THE WITNESS:  All right, your Honor.  Who do you want me to give the number to?

THE COURT:  Just go ahead and say the number now.

THE WITNESS:  (410)955-0443.

THE CLERK:  Zero what?  I'm sorry, zero what?

THE WITNESS:  (410)955-0443.

THE CLERK:  Thank you.

THE COURT:  Hang up and we will call you right back.

THE WITNESS:  Yes, sir.

(There was a pause in the proceedings)

THE COURT:  Good morning, again, Dr. Hyde.  Miss Floyd, our clerk of court, is going to administer the oath to you in this case.

THE WITNESS:  Yes, sir.

(Thomas M. Hyde duly sworn)

THE COURT:  All right, Mr. Burke.

DIRECT EXAMINATION

BY MR. BURKE:

Q.  Thank you, your Honor.  Good morning, Dr. Hyde.  It's Michael Burke.

A.  Yes, sir.

Q.  Dr. Hyde, you have been retained by the office of the federal public defender as an expert in Mr. Basham's case, is that correct?

A.  Yes, sir.

Q.  And I won't spend the court's time going through your qualifications.  Can you just tell court what type of doctor that you are?

A.  I'm a behavioral neurologist, or some people call me a neuropsychiatrist.  I'm a person who occupies the space between neurology and psychiatry; in other words, I study people and treat people who have brain lesions and have behavioral manifestations.

Q.  And do you have any experience in conducting competency evaluations in forensic settings?

A.  Yes, I have done on numerous occasions, both for medical-legal work but also when I was -- as part of my clinical practice for the past 24 years, especially when I was head of neurology consultation clinics at St. Elizabeth's Hospital, Washington, D.C., which is a public mental health hospital for the District of Columbia.  I performed enumerable competency evaluations for a variety of legal and judicial settings.

Q.  Do you recall being contacted by our office sometime I believe in 2010 at a period of time in which Mr. Basham indicated he was desiring to waive his 2255 motion?

Hyde - Direct                              127

A.   I actually think it was 2011, but, yes, I do believe that that is the case, yes.

Q.   And did we ask you to travel to Terra Haute to evaluate Mr. Basham?

A.   Yes, sir.

Q.   Okay.  And do you know when you did that?

A.   Yes.  I visited with Mr. Basham on two occasions, the first was on April 20, 2012, the second was on September 28, 2012.

Q.   On the second occasion that you met with Mr. Basham was that at our request for purposes of evaluating or giving us an opinion on your -- your opinion as to his competency at the time of his trial in this case in 2004?

A.   Yes.

Q.   Okay.  And then we had conversations subsequent to your meeting with him in the last week or so, is that correct?

A.   Yes, sir.

Q.   Okay.  And then you and I spoke yesterday afternoon and I informed you that there had been an incident at the prison.

A.   Yes, sir.

Q.   Okay.  Are you able today to give the court any guidance as to Mr. Basham's current mental competency to proceed with the hearing that we are at right now, this 2255 proceeding?

A.   Yes, I am.

Q.   And can you tell us what your opinion is, please?

Hyde - Direct                              128

A.   Yes.  I believe that Mr. Basham is incompetent on the basis of both neurological and psychiatric problems.

Q.   And can you specify the neurological problems that you have determined that Mr. Basham suffers from?

A.   Yes.  I believe Mr. Basham suffers from what we would call a static encephalopathy, which basically is a generic term, means he's brain damaged and that brain damage is of significant proportion.  The brain damage manifests itself both in neurological findings, cognitive impairment, and behavioral abnormalities such as the one that he exhibited, sadly, yesterday in the jail.

     And I believe that this brain damage is irreversible, and it can be managed with appropriate medications and therapy, but I believe that he is permanently brain damaged and I believe that that limits his competence and makes him incompetent, in fact now and in the foreseeable future.

Q.   And, your Honor, excuse me, and, Dr. Hyde, did your answer incorporate your psychiatric findings, as well, or did you also find that he had additional psychiatric ailments, as well?

A.   Yes, he has psychiatric problems which compound his brain damage from his neurological issues.  On a psychiatric basis he has a mood disorder, clearly suffering from bipolar disorder with psychotic features at times.  And I believe that that intersects extremely adversely with his underlying

Hyde – Direct                     129

neurological damage and actually makes his prognosis much worse, in that individuals that have bipolar disorder and have organic brain damage have a much more protracted and irreversible course with respect to regaining competency than those individuals who suffer from bipolar disorder without concurrent brain damage.

Q.   And, Dr. Hyde, as part of your review of Mr. Basham's case and your evaluation of Mr. Basham, did we provide you with as many medical records from his period at the federal penitentiary in Terra Haute, and specifically with regard to the medications he received?

A.   Yes.  Yes, I have seen that.

Q.   And today, I know that this is very spur of the moment, but are you of the opinion that since Mr. Basham has been incarcerated in Terra Haute that he has been properly medicated for his neurological and psychiatric ailments?

A.   No, he is grossly under-medicated, and, sadly, I think we saw the results of that under-medication.  That medication should have been accompanied by therapy or counseling.  If you look at the treatment guidelines by the American Psychiatric Association, the APA, for individuals in this situation, medication management plus counseling yields a very positive outcome, at least as far as managing the behavioral problems such as the types of outburst we saw yesterday.  And that also must be accompanied by limitation of access to illicit

substances, if any of those are suspected to have intersected with his case, because individuals with mood disorders and brain damage should not be on any illicit substances, including alcohol.

Q.  And one final question from me, Dr. Hyde.  You also in preparation for your testimony, your upcoming testimony in this hearing in December, have reviewed some portions of the transcripts from Mr. Basham's trial that we provided to you, is that correct?

A.  Yes, sir.

Q.  And did those transcripts indicate instances in which Mr. Basham had difficulty or for whatever reason had outbursts of some nature while in court?

A.  Yes, sir.

Q.  Okay.  And there's been some -- there was suggestion made at Mr. Basham's trial, and there was some suggestion made yesterday, that the fact that these outbursts happened or appear to happen only during court proceedings suggests a level of manipulation on Mr. Basham's part.  Do you agree with that suggestion?

A.  Absolutely not.

Q.  And why is that?

A.  I think Mr. Basham has a limited mental capacity, he gets frustrated very easily, he's confused very easily, especially around complex legal proceedings.  He does not understand the

Hyde - Direct                    131

nuances or even some of the broad principles that underlie our legal system, making him unable to interpret what is going on around him.  He acts in a disinhibited and impulsive fashion in a way that he cannot govern himself due to the brain damage and concurrent mood disorder.

This is an individual who has front temporal damage.  The frontal and temporal lobe is very important in mood regulation, judgment, reasoning, and impulse control.  His behavior is classic for a disinhibited individual suffering from bipolar disorder with concurrent brain damage, and his behavioral outbursts in a setting of great stress, like court proceedings, that he cannot process and understand is almost to be expected, especially when he is unmedicated or under-medicated, as in this case.

Q.  And, Doctor, I misspoke, I do have one more question.  You mentioned a moment ago the detrimental effects of the use of illicit drugs for a person with Mr. Basham's ailments, is that correct?

A.  Absolutely.

Q.  Do you have reason to believe that Mr. Basham has been -- has used illicit drugs of any sort since your evaluations of him or during his incarceration?

A.  He has made references to certainly the use of alcohol while incarcerated, and if he can obtain alcohol-containing beverages while incarcerated it's likely he can also obtain

Hyde - Direct                              132

other substances.  And in these cases he's probably trying to self-medicate for his underlying psychiatric problems with these illicit substances, including alcohol, as I include alcohol as an illicit substance in anybody's who's incarcerated.

MR. BURKE:  Thank you, Dr. Hyde.  I believe the U.S. Attorney will have some questions for you.

THE COURT:  All right.  Cross-examination.

MR. DALEY:  Your Honor, may we have a couple of moments to confer?

THE COURT:  You want to take a recess?

MR. DALEY:  In a moment we may ask for one.  Just a second, your Honor.

THE COURT: All right.

(There was a pause in the proceedings)

THE COURT:  Doctor, if you will bear with us just a moment, please.

THE WITNESS:  Your Honor, it's fine.  There's no problem whatsoever.

MS. STONE:  Your Honor, Mr. Murray indicated they need a call.

THE COURT:  All right.  Go ahead.

(There was a pause in the proceedings)

MR. DALEY:  Your Honor, Mr. Witherspoon is going to do the cross-examination, but I have a few requests at this

moment.  This has been completely sprung on us.  Until this testimony we had no idea that there was going to be testimony about his current competency.  This doctor has not examined him in three weeks.

THE COURT:  Right.

MR. DALEY:  We would ask for several things.  One, an adjournment for a short while, at least, at the minimum. Secondly, we would request, if possible, from the court reporter an immediate just rough draft transcript of this testimony that we have just gotten in realtime.  And then we would also like a few moments to be able to -- we also would like that testimony provided to Dr. Parker who's going to do the competency evaluation.  I think that would make sense for him to have this testimony.  And then we would ask for an adjournment for some amount of time at a minimum to confer with our expert who we were able to get here this morning.

THE COURT:  I think those are all reasonable requests.  We need to adjourn fairly soon so that Dr. Parker can examine Mr. Basham anyway.  That would give you time to look at the transcript and let your expert look at it, as well.

MR. DALEY:  But I don't know how easy that's going to be for the court reporter to do, your Honor.

THE COURT:  He can give you -- he's got a pretty doggone good one right now.

Hyde - Direct                               134

MR. DALEY:  All right.

THE COURT:  Doctor --

MR. BURKE:  I'm sorry, your Honor.  May I ask the doctor one more question?

THE COURT:  All right.  Go ahead.

BY MR. BURKE:

Q.  Dr. Hyde, this is Michael Burke again.  I didn't clarify something that I think is important.  You have not evaluated doctor -- you have not evaluated Mr. Basham today, have you?

A.  I have not.

Q.  You have not had any communications with him?

A.  Not since I saw him on September 28.

Q.  Okay.  And you are -- where are you located right now?

A.  I am located in my office in Baltimore, Maryland, at the Lieber Institute for Brain Development at Johns Hopkins University and Medical Campus.

Q.  And if you had the opportunity would you have chosen to personally evaluate Mr. Basham today?

A.  Well, obviously, you know, contemporaneous examination would be helpful.  But the underlying problem here is a static problem, and that is to say that this individual has brain damage.  Now, I can go and tell the causes of brain damage now or we can leave that for later because I know the judge is on a tight schedule here.  But this is an individual who has clearcut brain damage, it's been present for a long time, it's

Hyde - Direct                    135

not going to get any better.  He has a clearcut mood disorder that's not going to be getting any better, although it might be ameliorated somewhat with medications.  But the conflict of those two events render him permanently incapacitated and incompetent.

Q.  So the fact you were not able to evaluate him today does not have a detrimental effect on your -- in your opinion, on your ability to render an opinion today?

A.  No.  This person is incompetent now, he will be incompetent tomorrow, he was incompetent yesterday, he was incompetent during the trial.

MR. BURKE:  Thank you.

THE COURT:  Before we adjourn I had one or two questions.

THE WITNESS:  Yes, your Honor.

THE COURT:  You said you were at your office in Baltimore at the present time.

THE WITNESS:  Yes, sir.

THE COURT:  What were the nature of your conflicts that prevented you from being able to come down and testify this week or next week?

THE WITNESS:  Unfortunately, I had made -- I am the chief operating officer of a large by biomedical research institute.  It's very hard for me drop things on a moment's notice.  I had not been given notice of this hearing in enough

time to allow me to reschedule a number of events, including visitors I'm bringing in from abroad to our global research initiative.

THE COURT: When were you told the date of this hearing? When were you notified that the hearing would be conducted beginning October 9?

THE WITNESS: I believe I heard that in the last few days.

THE COURT: Just one more question.

THE WITNESS: Yes, your Honor.

THE COURT: I spent a good bit of time looking through Dr. Parker's report, and his report goes into extensive medical history, and I did notice that someone at an early age diagnosed Mr. Basham as being manipulative.

THE WITNESS: Yes, sir.

THE COURT: No less authority than the Fourth Circuit Court of Appeals in Mr. Basham's first appeal said that he was a manipulative individual. But I take it from your testimony you totally disagree with that analysis.

THE WITNESS: I don't think you can explain his behavior on the basis of being manipulative, your Honor. I think this is an individual who genetically is predisposed towards cognitive problems and bipolar disorder. I think this is somebody who's had head trama that has caused him to have brain damage. This is somebody who has sniffed glue,

137

kerosene, and paint starting at a very young age, as well as using other substances, and those have rendered his brain, that was never good from the get go because of genetic factors, and to be an individual who now has significant brain damage.

And I think that even though he might be appear to be manipulative, I think one might agree that the way that he behaves is in a very primitive regressive fashion.  This is not a -- this not an individual who's trying to manipulate the system, this is the sign and symptoms of somebody who has frontal lobe damage and has bipolar disorder who can't help themselves.

THE COURT:  One final question.  I have a daughter who is a doctor.  Two or three years ago in a conversation with her totally unrelated to this case she put me on to a famous study.  Are you familiar with the Rosenhan experiment back in 1973?

THE WITNESS:  No, your Honor, I'm not.

THE COURT:  Well, it's widely written about in the literature.  There a study was done where pseudo patients were sent out to psychiatric hospitals in a given geographic area, and there was nothing wrong with any of them.  And all of them were then admitted as being mental ill to the hospital.  In other words, they had a 100 percent success ratio in faking out the doctors, so to speak.

And the second part of the study, one of the hospitals challenged the experiment producers to do it again. So the people conducting the experiment told the hospital they were going to send out a new group of pseudo patients, they didn't send out anybody, and the hospital then began rejecting a large number of people who came in with potentially real mental illness thinking that they were pseudo patients.

It was a very devastating study on -- well, I guess it points out how soft this science might be with someone who has a motive to manipulate. I'm not trying to be partisan, I'm just trying to explore fully, because I have a very tough call to make here, and we have a defendant who is really at the last stage of the proceedings against him in a death penalty case and arguably has a motive to fabricate.

I'm not challenging what you say in any respect. I respect your judgment and your training, and we appreciate the thorough analysis you've done. But I think I'm going to hear, well, I know I'm going to hear some contrary testimony, because I've already seen Dr. Parker's report earlier and every -- according to the government, every physician who examined Mr. Basham during the trial found him to be competent. And his own trial counsel, who was one of the best attorneys in the state of South Carolina, determined that it was not necessary to raise competency.

So I guess I'll leave it at that. I don't want to

sound like I'm engaging in an argument with you, I just asked you while we had you on the phone.

I am afraid we will have to ask you to just be available a little bit later on after the government has a chance to look at your testimony and share it with their expert. If you could stand by this phone and we will be back with you sometime later this morning.

THE WITNESS: Thank you.

THE COURT: If the court reporter will give both sides a quick transcript and we will take a recess. And, Mr. Daley, let me know when you are ready to proceed. Dr. Parker thought he would be ready to go on the satellite at 10:30. He'll be available on the satellite for visual and audio.

MR. DALEY: So you are going to excuse Mr. Basham to be examined?

THE COURT: Excuse him now to go meet with Dr. Parker. All right. We will be in recess.

(A recess transpired)

THE COURT: The prison has informed me Dr. Parker has completed his examination and is reviewing some other records, I assume that might be the transcript that was sent out there, and they proposed to bring him into the same room that Mr. Basham is in so he can be on satellite when he testifies. Is Mr. Basham restrained by handcuffs and shackles at this time?

MR. MURRAY: He is, your Honor.

THE WITNESS:  I ain't going to attack nobody.

THE COURT:  Before Dr. Parker comes in the Bureau of Prisons also told me Mr. Basham requested that he be allowed to exit the room and not participate further in this hearing. So what is the position of the defendant's attorneys on that issue?

MR. BURKE:  Your Honor, we would object to it.  We need Mr. Basham as long as -- as long as he has any competency to assist us we need him for that purpose, so we would object to having him absent himself from these proceedings.

THE COURT:  Of course, which is the exact same situation I faced at trial when Mr. Swerling said the same thing you just said, which leads to your claim number ten that I erred when I denied the defendant his right to leave the courtroom.

MR. BURKE:  Well, your Honor --

THE COURT:  You know, that's the frustrating thing about -- so you need to stay.

MR. BURKE:  Can you put that on mute, please?

THE COURT:  You want him to stay.

MR. BURKE:  I believe he needs to --

THE COURT:  What I don't want is another shouting match, especially when Dr. Parker is in there.

MR. BURKE:  I entirely agree, your Honor.  I would say that I think it should be obvious at this point that we

are unable to control Mr. Basham's responses as much as we would like to.

THE COURT:  All right.

MR. BURKE:  And if you will, your Honor, if there are any concerns about safety -- can I confer with my counsel for just one moment, please?

THE COURT:  All right.

(There was a pause in the proceedings)

MR. BURKE:  Your Honor, we do not object if the court has concerns about the safety, given what's happened in the last 24 hours, of Dr. Parker.  We don't object to having Mr. Basham outside of the room for the purposes of Dr. Parker's testimony.  And in an abundance of caution we do not object to that.

THE COURT:  I was going to suggest either that or putting Dr. Parker on telephone like we did with the other doctor.

MR. BURKE:  Whichever your Honor believes is best, there is no objection from us, I just want to make it clear.

THE COURT:  What's the government's position?

MR. DALEY:  Your Honor, I think we would like Mr. Basham in the room, as well.  I think it's -- he has the right to be there, and but maybe just as importantly we would like Dr. Parker, I think it's better for the court to be able to see if --

THE COURT:  Well, Dr. Parker didn't express any concerns about going in the room.  The prison, because I specifically asked them, they said there would be additional security in there when Dr. Parker's in there.  So let's just leave them all in the room.  And I told them when Dr. Parker and security walk in the room we will know he's ready to go, they would not need to call me back.

So I don't really know how long -- Dr. Parker said on the phone yesterday he thought he could be ready by 11:30, obviously that was just a prediction.  Why don't we go ahead and adjourn, there's no sense sitting here at attention.  When he comes in, Miss Floyd, you will tell me.

THE CLERK:  Yes, sir.

THE COURT:  All right.

(A recess transpired)

THE COURT:  All right.  Dr. Parker, can you see us on the screen there where you are?

THE WITNESS:  Yes, I can, sir.

THE COURT:  Good morning.  I would ask that you receive the oath from Miss Floyd, our courtroom deputy, at this time.

(George Parker duly sworn)

EXAMINATION

BY THE COURT:

Q.  Dr. Parker, as you know, an issue has been raised as to

Dr. Parker - Examination by the Court       143

whether the defendant Mr. Basham is competent at this time such that he can participate in this Section 2255 proceeding. The defendant has retained an expert, the government has retained an expert, and I have appointed you as the court's expert to look into the question of competency.

Just to put on the record your history with this case, about this time a year ago an issue was raised as to whether the defendant could -- had the ability to drop his appeals and proceed to be executed in this case, and I found it necessary at that time to appoint you to examine the defendant in terms of his competency to drop an appeal.  That issue fizzled out when the request to drop the appeal was withdrawn and so we're now on the merits of the petitioner's petition for relief from his conviction.

And so yesterday when the competency appeared to be an issue I called and asked you if you would be kind enough to set aside your other proceedings and go over and examine Mr. Basham for purposes of giving on opinion as a court-appointed expert on this issue.  Is that how we stand at the present time?

A.  Yes, sir, it is.

Q.  All right.  Have you had enough time to examine Mr. Basham this morning?

A.  I believe so.

Q.  All right.  And could you just give us a narrative of what

Dr. Parker – Examination by the Court          144

your opinion is as to his medical condition, his mental condition, and his competency.

A.  Well, I'm basing my opinion on the evaluation I completed a year ago.  There's a report dated December 4, 2011 that I submitted.  I met with Mr. Basham this morning for close to an hour.  I also had a chance to review a transcript of testimony by Dr. Hyde earlier this morning.  And the prison staff kindly provided me with a copy of Mr. Basham's medical records, the meetings with the psychologist, over the past year.  So based on that information I think I can make a reasonably good effort to describe his current clinical status, as far as general diagnoses and how he's doing now.  And I believe I can offer an opinion regarding his competence to proceed.

Q.  All right.  And would you give us that opinion, please?

A.  Okay.  The clinical or the competence?  Which would you prefer first?

Q.  We'll hear the clinical first.

A.  Okay.  Mr. Basham clearly continues to meet criteria for a diagnosis of attention deficit hyperactivity disorder, otherwise known as ADHD.  He has met that diagnosis since he was a young man, probably as a pre-teen, and he continues to meet criteria for that diagnosis.  That is his primary diagnosis at this time.

He has a history of oppositional defiant disorder, a history of conduct disorder, and currently meets the criteria

Dr. Parker – Examination by the Court        145

for a diagnosis of antisocial personality disorder.  He also has a long history of substance abuse, which is not unusual for folks who have both ADHD and antisocial personality disorder.  In particular, Mr. Basham abused inhalants for several years as a young adult, teenager or young adult.  He also abused alcohol and many other drugs.

The primary clinical picture now is that of ADHD, along with the antisocial personality disorder that accompanies it. So the primary issue is behavior, focus and attention on a clinical level.

During the interview today Mr. Basham made it quite clear that when he's left in the normal routine he does pretty well. He keeps to himself, he follows the routine of the unit, and nobody bothers him and he doesn't bother anybody.  When events happen, like court hearings or visits from lawyers or family, that is a stimulating event and that brings to the surface essentially all of his ADHD symptoms with overwhelming effects on him, particularly the court case, which is, I think everyone agrees, complicated with many legal issues and lots of argument, which is overwhelming for Mr. Basham.

And I think the court and prison saw the results of that yesterday at the end of the hearing when there was an altercation, likely the result of Mr. Basham being over-stimulated and having little behavioral control as a result.

Dr. Parker - Examination by the Court        146

He does not, in my opinion, meet criteria for a diagnosis of bipolar disorder, though he does have irritability and some mood instability that is not sufficient to make a diagnosis of bipolar disorder but instead reflects his ADHD and his antisocial personality disorder.  I think that's the quick clinical summary.

On the competency, it's my opinion he is competent to proceed with the current hearing.  Mr. Basham is not a sophisticated kind of guy.  He is someone that has struggled in the school setting all his life due to his ADHD, addiction problems, conflict disorder, oppositional defiant disorder, and antisocial personality disorder, so he is not a well-educated person.  He does know his mind, but he has difficulty, as I said earlier, in stimulating environments so it is difficult for him to focus and to maintain a consistent line of thought in those situations.  So he's easily overwhelmed.

As I said, this is complicated litigation involved here, and Mr. Basham does not understand the nuances of this litigation.  He is not a lawyer, he will never be a lawyer. He does make clear that he knows his own mind and understands that he has been sentenced to death, that he is on death row, that he is awaiting execution.  He does not enjoy being in this environment and sees death as his doorway out, his escape.

He believes he has made it clear to his attorneys that this is what he wanted to do, which makes it difficult for him to work effectively with his attorneys because they sometimes seem to be at cross purposes.  It's also founded in part because of his ADHD.  He has trouble following court proceedings because to him they are immaterial and boring. And I think as a result he's prone to being confused about events that have taken place.

Particularly he seems to be upset with Judge Anderson because he believed Judge Anderson turned down his request to be declared competent to waive his appeals when it actually appears that the judge's order was related to the request for medications and was not a denial of that request.

So Mr. Basham I think is easily confused by the legal issues, but maintains that he understands what he wants to do and feels conflicted because of the efforts of his attorneys and the conversations with his family.  In the end, though, I believe he retains the capacity to make decisions about the legal proceedings that he's involved with and retains the capacity to work with his attorneys.

THE COURT:  Does that cover your report?

THE WITNESS:  That's the summary, yes, sir.

THE COURT:  All right.  Any follow-up questions by counsel?  Mr. Burke?  This is the attorney representing Mr. Basham that will ask you some follow-up questions.

Dr. Parker - Examination by Mr. Burke          148

EXAMINATION

BY MR. BURKE:

Q.  Dr. Parker, can you see me now?

A.  Yes, I can.

Q.  Thank you for making yourself available for us today.  I have a few questions for you, first about your evaluation of Mr. Basham today.  Would you tell the court, were the conditions of your evaluation today, were they conducted in the ideal setting?

A.  Well, it's hard to say that any evaluation conducted in a jail or prison is ideal.  The conditions were pretty good, actually, compared to some of the county jails in Indiana.  It was a noncontact visit, we spoke through glass using the phones.  I had previously had contact visits with Mr. Basham and he recalled those visits, so we had a bit of a relationship already established.  Mr. Basham spoke freely, did not appear to be affected by it being a noncontact visit.  So I believe the conditions were satisfactory and certainly adequate.

Q.  Was anyone else present in this divided room in which you conducted the evaluation this morning?

A.  No, sir.  Mr. Basham was a little bit distracted by the traffic in the hallway behind him, as he could see the reflections when people passed by.  He's very alert to changes in his environment, so he noted the people walked by.  He was

Dr. Parker – Examination by Mr. Burke          149

a bit distracted by that but there were no people in the rooms.

Q.   Were there guards outside of the door, do you know?

A.   I was able to see one officer standing against the far wall of the hallway who was observing through the window, but he made no effort to come to the door except when Mr. Basham asked to use the bathroom.

Q.   Was Mr. Basham's attorney Mr. Murray present during your evaluation?

A.   No, sir, he was not.

Q.   Did you ask to speak to Mr. Murray as part of your evaluation this morning?

A.   I did not.

Q.   Did you ask to speak to myself or to Miss Sarah Stone, Mr. Basham's other attorneys?

A.   I did not.

Q.   Would you agree that a criminal defendant's ability to communicate effectively with his attorney is a relevant matter in assessing competency for a procedural hearing?

A.   Yes, it is.

Q.   Would you agree that the client's ability to comprehend instructions and advice from his counsel is a relevant factor to take into consideration?

A.   Yes.   Although in this situation it's a little bit more complicated than one would expect, because Mr. Basham has made

Dr. Parker – Examination by Mr. Burke        150

requests that his counsel have opposed.  So it's a difficult situation in which to ask attorneys about the issue when it's clear the attorneys have one goal and their client may have another goal.  So it's a rather fraught issue to bring up.  So it would be difficult to tease out all of the -- those issues.

Q.  All right.  I don't think anyone would disagree this is very difficult, Dr. Parker.  But let me ask you this:  You stated Mr. Basham had some confusion about whether the judge had ordered that he was not competent to waive his -- his 2255 proceedings earlier this year.  Is that correct?

A.  During the interview Mr. Basham made it clear that he was angry at the judge for daring to turn out down that -- turn down his request.  And from what I can gather, again this is from reading the psychologist's notes about some of the proceedings, that was not exactly the way it turned out.  But, again, I'm relying on sources that are not direct.

Q.  Would it have been a direct source to ask Mr. Basham's counsel about his -- the accuracy of his memory of the events that occurred?

A.  Yes, sir, that would be helpful.  I was on a rather tight time schedule so things happened quicker than I would have preferred.  But this was an urgent request.

Q.  Dr. Parker, in your report, I don't know if you have a copy of it available with you, but your report --

A.  I do.

Dr. Parker – Examination by Mr. Burke        151

Q.   -- from December 4, if you could please turn to page 11 of that report for me.

A.   Yes, sir.

Q.   The third paragraph of your report on that page, Doctor, the third sentence begins he did report a long history.  Do you see that?

A.   Yes, I do.

Q.   Of unstable mood, noting, quote, every day hour to hour I change, as well as problems with quick anger.  Do you stand by today that assessment of Mr. Basham?  Do you agree with that?

A.   That's his report, so I'm not going to disagree that that's his quote.  But it's clear from the history that Mr. Basham is prone to bouts of irritability and anger and to mood changes.  There was -- those are, as I believe I testified earlier, consistent with his ADHD, his antisocial personality disorder.  Those are the main explanation, to my understanding.

Q.   Doctor, would you agree with me that a defendant's ability to tolerate the stress of a trial and hearing is a relevant factor to consider in assessing his competency?

A.   Yes.

Q.   And you testified today, in fact, that the proceedings that are occurring right now cause Mr. Basham great stress, is that accurate?

A.   Well, since I said that I'm not going to disagree with

Dr. Parker - Examination by Mr. Burke       152

that, of course.  That was his report to me.  So my recommendation in a regular competence to stand trial evaluation for a gentleman like Mr. Basham I would recommend to the court that proceedings move at a slower pace than usual, that the distractions in the court be minimized in an attempt to help Mr. Basham maintain his focus, which he can only do for brief periods anyway, and so take it in small bites.

The change from the usual routine of Mr. Basham's unit to the relative maelstrom of the court proceedings he described as very upsetting and chaotic.  And I can see that that would be very difficult for him, given his previous existence and his underlying ADHD and antisocial personality.

Q.  Doctor, I believe you also testified a moment ago that there was a strong likelihood that the events of yesterday afternoon were precipitated by Mr. Basham -- by the stress Mr. Basham was experiencing during the hearing, is that correct?

A.  I'm not sure I called it stress.  He described it as being very frustrated with the proceedings, and given the change in routine he was easily set off and asserted himself into a discussion that he didn't need to, which is pretty classic for ADHD and for antisocial personality.

Q.  Would you agree, Doctor, that Mr. Basham's ADHD and other deficits would, especially as a hearing progressed, prevent him from communicating with his attorneys in an effective

Dr. Parker – Examination by Mr. Burke        153

manner?

A.  Well, he might communicate rather more than the attorneys are ready to handle.  That's, in fact, happening now.  Because he has relative low impulse control he's going to want to talk when he wants to talk.  You know, the fact that he has ADHD and he has some behavioral manifestation that accompany that, as well as his antisocial personality, those are certainly challenges for the smooth running of proceedings.  But to my mind they do not prevent a person from assisting one's attorney or understanding what's going on, it just makes it more difficult.  And there are I believe some accommodations that can assist with that, as I discussed earlier.

Q.  Are you aware of Mr. Basham's -- Mr. Basham has any visual deficits that might affect his ability to observe the hearing on the screen in front of him, based on your --

A.  Other than he wears glasses, no, I'm not aware of any visual deficits.

        MR. BURKE:  Just one moment, please.

Q.   (MR. BURKE) Doctor, do you anticipate then that if this hearing proceeds that further difficulties similar to what we are experiencing today are likely to occur?

A.  That's always a possibility.  I'm not very good at predicting the future, but Mr. Basham's history of being easily irritated, easily over-stimulated, would certainly suggest that that's a risk.  So, as I said earlier, my

Dr. Parker – Examination by Mr. Burke        154

suggestion would be that the proceedings move in sort of small bites with relatively frequent breaks so that Mr. Basham does not become overwhelmed by the ongoing discussions and which he has trouble following anyway.  Because he has trouble maintaining focus.  So the challenge is to assist or to adopt the proceedings to help Mr. Basham stay focused over relatively short periods of time.  That way that might break up the monotony of it and that would allow him to be a more involved participant.

Q.  And can you give us something a little bit more specific as a guideline if we are to go forward, how frequently Mr. Basham would need to take a break and for how long he would need that break?

A.  I'm not sure that I'm in a great position to give you a definitive answer.  Some of it may depend on what's being talked about at any given time and on how Mr. Basham is doing relative to that at that point in time.  But I would guess that breaks somewhere every 20 to 30 minutes would probably be about as long as he could handle at any one time.  But I'm -- you sort of asked me to speculate based on -- on not a large knowledge base.

Q.  Doctor, how long have we have been talking today in the last --

A.  My estimate would be, I believe my testimony, my cross-examination has been going about 15 minutes or so.

Dr. Parker - Examination by Mr. Burke        155

Q.  And, Doctor, I just -- I'm at an advantage that you probably don't have, but I can see the entire room and I just noticed Brandon put his head down on the table either out of frustration or exhaustion or he's tired of listening to me talk, I don't know, but --

DEFENDANT:  All of these.

THE WITNESS:  So the hearing itself has lasted about a half hour between the judge's questions and your questions. And Mr. Basham has been physically restless during that time, shifts his position quite a few times.  I can see him out of the corner of my eye.  He whispered several times to his attorney.  This is pretty classic for ADHD.  This is not a surprise to me based on my previous evaluations.  This is who Mr. Basham is.  So that's just -- that's going to be an issue the court will need to deal with as these proceedings go forward.  I'm suggesting the approach that might assist in decreasing the level of frustration over time.

Q.   (MR. BURKE) In your medical opinion is Mr. Basham being manipulative when he has outbursts?

A.  Well, it's hard to say that with any certainty.  I haven't witnessed the outbursts.  Certainly there is going to be an element of poor impulse control, easy irritability, and easy frustration, all of which are consistent with ADHD.  He also has a long history, as I said earlier, of oppositional behavior, antisocial behavior, and that's going to play a

Dr. Parker – Examination by Mr. Burke        156

role, as well.

I don't think it's going to be consciously manipulative. I don't know that he has long-term planning that is going to support that.  So in the short term it might look manipulative, but I suspect it's more just impulsivity and frustration that deal with that -- that leads to the behavior.

Q.  One final question, Doctor.  Would -- would Mr. Basham's ability to handle these proceedings or would issues that he's dealing with right now be decreased or -- would his ability to be present in a meaningful way in these proceedings be helped by any different regimen of medication than what he's on right now?

A.  Good question.  He's been tried on a lot of medications in various combinations over the past several years.  It's not clear that they have had any dramatic impact on his functioning.  Some of the medications are sedating, which is sort of a two-edged sword because you get better sleep but you also have decreased concentration as a result.  Mr. Basham's on an extended release form of quetiapine or Seroquel right now and he doesn't like the way it feels in the morning.  He feels a little bit hung over from that, which is not surprising.

You know, there are medications for ADHD, those are rarely prescribed in correctional settings because they are almost all stimulants and those have high abuse potential and so they

Dr. Parker - Examination by Mr. Burke        157

are not used in prisons or jails.  That might help, I don't know.  He hasn't been on those in several years.  So if this was a patient in a state hospital in Indiana he might get treatment with stimulant medication without being in a hospital setting.  It would depend on, you know, the clinical rules here and Mr. Basham's response to the treatment.

Q.  Do you think that it would be of any assistance to the court and Mr. Basham if he were to be removed from the facility he's currently in to a facility, a federal facility, that might be able to treat at least in the short run his medical and psychiatric needs?

A.  You mean like a federal medical center?

Q.  Yes.  I'm thinking something like Springfield, Missouri where there's a federal facility there.

A.  I don't know.  I mean, those facilities, in my understanding, are for folks that have serious medical illnesses, they are actively ill.  Mr. Basham has ADHD, which can certainly be a problem but it's not usually grouped with mental illnesses like schizophrenia or bad bipolar disorder. So from a clinical perspective he doesn't need to be in a hospital level care, he needs essentially good outpatient care, which -- and I believe he's received pretty adequate care here based on my quick review of the notes.

Q.  Doctor, didn't you say he has not received any medications for his ADHD?

Dr. Parker – Examination by Mr. Burke     158

A.  Yes.  But that doesn't mean that it's been a problem except in these settings.  During the regular course of events he has a very structured environment, very structured day, and for folks with ADHD they can actually adapt to that.  When they have the rules they follow them.  And Mr. Basham says, you know, if people just leave me alone I'm fine when I'm on my own.  When there's stimulation he's going to respond much more vigorously than somebody who doesn't have ADHD, and that's what we have seen over the past couple of days, in my opinion.

Q.  Well, and, Doctor, isn't it the -- didn't Judge Anderson ask you to determine whether Mr. Basham would be able to proceed with the required level of competency with the proceedings we're dealing with right now?  Wasn't that the question that was presented to you?

THE COURT:  I don't know if I asked him that question.  I asked was he competent or not competent.

Q.   (MR. BURKE) Well, then, let me ask you, you have told us that Mr. Basham because of his disabilities is -- it's very difficult for him to participate in the stressful nature of the evidentiary hearing we're having, is that correct?

A.  I said this is a stimulating environment for him and that given his ADHD he has difficulty following it, staying involved in it, and being an active participant.  This is not something he's ever been good at.

Dr. Parker – Examination by Mr. Burke        159

Q.  And he's not being treated for his ADHD at this moment, is he?

A.  He's being treated with medication, I believe he has an antidepressant medication, Paxil, and Seroquel for sleep and a bit of mood stabilization that might come with that.  Those are not classic treatments for ADHD, no.

MR. BURKE:  Thank you.  Thank you, Dr. Parker.

THE COURT:  Any questions from the government lawyers?

MR. WITHERSPOON:  Yes, sir, Judge.

THE COURT:  Mr. Witherspoon.

DEFENDANT:  That is just fucking garbage.

EXAMINATION

BY MR. WITHERSPOON:

Q.  Good afternoon, Dr. Parker.

A.  Good afternoon, sir.

Q.  Dr. Parker, my name William Witherspoon, I'm with the United States Attorney's Office.  I just want to ask you a few questions.  Now, you spent about an hour with Mr. Basham today, correct?

A.  I did.

Q.  And based upon your discussion with him did he understand what was happening today?

A.  His understanding was this is a hearing about his request for a waiver of his appeals.  I don't think if I asked him

Dr. Parker - Examination by Mr. Witherspoon    160

directly that he would be able to say exactly what was going to happen today.

Q.  Did he know who you were, sir?

A.  Yes, he recognized me after I introduced myself.  I explained to him that the judge has asked me to come again, talk to him about his competence to go forward with the proceedings.  And as I always do, I told him that what we would talk about I would then -- would not be secret because I'd be testifying about it later that same day.

Q.  And he knew who Judge Anderson was, correct?

A.  Yes.

Q.  And I think you testified earlier that he has some conflict with his lawyers because he wants to end his appeals and have the death penalty imposed, correct?

A.  That was the source of conflict in my first round of evaluations.  I believe I tried to explain earlier, because Mr. Basham is mad at the judge for turning down his request, or his understanding that the judge had turned down that request, he has been motivated to make life difficult for Judge Anderson by extending the appeals because he was annoyed with what he perceived as a denial of his request.

Q.  But my question was, I think you said earlier that there was a conflict between he and his lawyers about him -- his ability to drop his appeals.

A.  Correct, there was that difficulty.  That was the issue

Dr. Parker - Examination by Mr. Witherspoon    161

when I evaluated him last fall.

Q. So that difficulty has gone away?

A. Well, because Mr. Basham, from what I understand, again, having not talked to the defense attorneys, as was pointed out, believed that the judge had turned down the request to waive the appeals. And so he's now mad at the judge and is working with his attorneys in part to make Judge Anderson's life difficult with filling up his basket with appeals.

Q. So he's working with his attorneys in --

A. At this point in time.

Q. I'm sorry?

A. That's my understanding at this point in time. However, he does continue to express a desire to waive his appeals, although he said he's still conflicted about that position, as well.

Q. And he knows he's on death row, doesn't he?

A. Yes, he does.

Q. And he knows why he's on death row, correct?

A. Yes.

Q. And he knows the ultimate punishment that could be imposed, correct?

A. Correct.

Q. And I think you said he does not have bipolar disorder?

A. That is my opinion, yes, sir.

Q. How many patients have you diagnosed with bipolar

Dr. Parker – Examination by Mr. Witherspoon    162

disorder?

A.  Oh, my.  Well, I have evaluated hundreds of people for courts in Indiana and Ohio.  I've heard a lot of people who say they have bipolar disorder, many of whom do not meet the criteria for the bipolar disorder described in the DSM-IV, which lists manic episodes or hypermanic episodes as well as depression.  There are a lot of people who say they have bipolar disorder because they have unstable moods, and that, to my mind, does not meet the diagnostic criteria for the bipolar disorder in DSM-IV.  So I've got a fair amount of experience with that issue.

Q.  Okay.  And you mentioned it, I thought, Mr. Basham is whispering, conferring with his attorney there, is that correct?

A.  Yes.  I'm not sure they would be conferring, I think it's conversing.  He's making comments about what's going on. Again, consistent with ADHD, if he has something to say he's likely to say it.

Q.  But he knows who the person sitting beside him, who that person is.

A.  Yes, sir.

Q.  And because he has ADHD that doesn't mean he's incompetent, does it?

A.  Not necessarily, no, sir.  It would be -- yeah, it would be unusual for ADHD to make somebody incompetent to stand

Dr. Parker - Examination by Mr. Witherspoon    163

trial.

Q.   So Mr. Basham is not incompetent?

A.   In my opinion he is not incompetent to stand trial.

Q.   And because he has ADHD, that does not limit his ability to work with and assist his attorneys.  I think you said he's working with his attorneys to file as many appeals as he can to make Judge Anderson's life miserable.

A.   Right.  I think certainly having a difficult client is a challenge for any attorney, be it prosecutor or defense.  Mr. Basham is clearly a difficult person to work with because of his ADHD and his antisocial personality disorder and his addictions.  That does not necessarily mean he's incompetent to stand trial.

Q.   Does that mean he's not incompetent now, either, correct?

A.   No, he's not incompetent.  He may be difficult to deal with but he's not incompetent.

Q.   And you mentioned that these proceedings put additional stress on Mr. Basham, correct?

A.   Yes, because of his ADHD.

Q.   Wouldn't you agree with me that being on death row is also very stressful?

A.   Well, I would certainly agree.  I believe Mr. Basham would also agree.  But when he's left alone he has -- he falls back on the routine and life is quiet and uncomplicated.  And that's a relatively calm time for him, life just goes day to

Dr. Parker – Examination by Mr. Witherspoon    164

day.  He doesn't enjoy it, he misses a lot of things.  So when he gets a reminder of the outside world, when he's smells cut grass, that's a big deal to him.  But other than that it's relatively calm.  When there are disturbances, that's when he overreacts because he's just set up for that.

DEFENDANT:  That's why I'm not going to do this no more.

Q.  And that's because of ADHD, Dr. Parker?

A.  Yes, sir, that would be a good example.

DEFENDANT:  Oh, my God.

Q.  And are you saying he's not able -- he's not able to communicate?

A.  He has poor impulse control.  That is almost by definition part of ADHD.

Q.  Poor doesn't mean inability, though, does it?

A.  It's going to be difficult for him to control his impulses.

Q.  But that --

A.  It does not mean it's impossible.

Q.  What medications is Mr. Basham on now, do you know?

A.  I asked him --

Q.  You asked him?

A.  I asked him.  He's been on Paxil, which is an antidepressant medication, and Seroquel, the extended release in a low dose in the evening.  And that was confirmed by my

Dr. Parker – Examination by Mr. Witherspoon    165

quick review of the psychology notes from the facility.  He's been tried on a variety of medications over the past year, but I think that's where he stands right now on those two medications.

MR. WITHERSPOON:  Beg the court's indulgence one second.

(There was a pause in the proceedings)

DEFENDANT:  I don't care about this shit.  They can do it.  I have to go to the bathroom.  I'll be back.  Maybe they will be done but I'll be back.

MR. BURKE:  Let the record reflect Mr. Basham has left the room.

THE COURT:  All right.  Are you finished with your questions?

MR. WITHERSPOON:  I have one final one.

THE COURT:  Go ahead.

Q.  Dr. Parker, does he also know that these proceedings are broader than just waiving his appeal in this case?

A.  I'm not sure he understands the legal nuances of what's happening in these hearings well at all.  He's not focused on that.  And as we just witnessed, we're about 45 minutes into this particular portion of the hearing, he had to go to the bathroom and he left.  So he has difficulty following things for more than brief periods of time.  So I doubt that he understands all the legal ramifications of the current

Dr. Parker – Examination by Mr. Witherspoon    166

hearing.

Q.  Well, I don't expect him to know all the legal ramifications that the lawyer, sometimes we don't understand all those.  But he understands it's more than just waiving his appeals in this case, correct?

A.  He understands that's the heart of the current proceedings regarding his appeals.  I don't know that he knows more than that at this point in time.

MR. WITHERSPOON:  Thank you.

MR. BURKE:  Your Honor, could I ask the doctor one specific question about medication?

THE COURT:  One question.

EXAMINATION

BY MR. BURKE:

Q.  Doctor, were you given a list today of Mr. Basham's current medication from the Bureau of Prisons?

A.  I was given the printout of the notes, and the most recent referral to the psychiatrist refers to being on quetiapine and on amitryptyline and Peroxitine, and that was from July of 2012.  I do not have -- I did not get a copy of his MAR, the medication administration record, so I don't know exactly what he's on at this time.

MR. BURKE:  Thank you.

THE COURT:  Thank you very much, Doctor.  I think that concludes the questioning.  Let me express the

appreciation of all people associated with this case when I say we appreciate you taking this assignment on short notice and going over this morning. We're excusing you at this time. Thank you very much.

THE WITNESS: Yes, sir.

THE COURT: All right. Anything else from either party on the competency issue? Any other evidentiary developments?

MR. BURKE: Your Honor, I'm not sure that -- the government was not able to question Dr. Hyde, and I would -- I'm not trying to delay this proceeding, but it would seem in all fairness Dr. Hyde --

THE COURT: We need to get him back on the phone.

MR. BURKE: But he should be able to know what Dr. Parker said.

THE COURT: You want Dr. Hyde to see a transcript of what Dr. Parker said.

MR. BURKE: I'm afraid so. If we could e-mail it to him, it seems in all fairness he should know what the other -- what the court's psychiatrist said.

MR. DALEY: I would find it hard to object to that request, your Honor.

THE COURT: All right. Do you plan to put up any additional witnesses on competency?

MR. DALEY: At this time we don't. Your Honor, you

may at some point want to engage in some short colloquy with Mr. Basham, we would suggest, about whether he understands that this case is obviously broader than simply whether he gets to waive his appeal and that we're dealing with the issues in the 2255 petition. I'm not sure it is clear from the record at this point.

MR. BURKE: Your Honor, another additional evidentiary matter you might want to consider is an ex parte conversation with Mr. Basham's attorneys. That was something that the doctor --

THE COURT: Let's do this then. Let me speak to the defendant personally as Mr. Daley suggested and let's break for lunch and do the same thing --

THE WITNESS: I ain't coming back.

THE COURT: -- ask the court reporter to get a transcript and you can all make arrangements to get it to the doctor as soon as possible.

MR. BURKE: Yes, your Honor.

THE COURT: And come back at what time?

DEFENDANT: What are we doing now?

THE COURT: We need an hour to finish the transcript or to edit the transcript, that will put us at 1:30, and he's going to need an hour to look at it, maybe.

MR. BURKE: I think he could probably do it in 15 minutes. I know time is of the essence, so, your Honor, and

also to -- Dr. Schwartz-Watts came today on our request.  I didn't want to dismiss her if you had any questions --

THE COURT:  I don't have -- you don't plan on calling her.

MR. BURKE:  No, your Honor.  She was here to advise us.

THE COURT:  You can excuse her at this time.

MR. BURKE:  Thank you, Dr. Schwartz-Watts.

THE COURT:  Come back at say 2:15.  That will give us time to get the transcript done, get it to the defendant's expert, let him review it, and we will go back on the telephone with him and then go from there.

MR. BURKE:  Thank you, your Honor.  I've got to -- if it takes him a hour to pull off --

THE COURT:  Let's resume at 2:00.  Mr. Basham, let me speak to you, sir.  Can you hear me?

DEFENDANT:  I hear you.

THE COURT:  I want to be sure you understand the proceeding that we began yesterday is not a proceeding to determine if you can drop your appeals and proceed to be executed.  We have crossed that bridge previously and I held several hearings and heard from you and heard from your attorneys and it became apparent to me that you were ambivalent about what you wanted to do and you wanted to bargain with me in terms of --

170

DEFENDANT: I didn't --

THE COURT: Let me finish my --

DEFENDANT: I only --

THE COURT: Mr. Basham, let me finish my statement. It became apparent to me you wanted to bargain with me so that if I would agree to have you given different medicine and agree to let your family visit with you then you would drop your appeals. That puts me in a very unfavorable, untenable position because I'm not empowered to bargain with somebody about a death penalty sentence.

In addition, your attorneys strongly opposed your request to drop your appeals. They still strongly oppose that request. So the issue of whether you can drop your appeals has come and gone. What we are here to look at today is the petition filed by your court appointed counsel raising a total of 34 errors that they say occurred in your trial. They have withdrawn two of those claims so we're now down to 32 claims of error and I'm supposed to hear evidence on those claims and then determine whether any error occurred and, if so, whether a new trial should be ordered. That's the purpose of the hearing that we began on yesterday. I want to be sure you understand why we're here.

DEFENDANT: All right. All right. And first thing I want to say that those are misunderstandings. I never tried to bargain with you, I never asked for my family to visit and

171

I didn't -- only thing I said to you was that I had -- I had my lawyers are telling me that if -- if I was in a different place and I could visit my family and hug them and have contact with them and be able to see them more often because they're home, and if I was on my proper medication to where I could stay focused and be able to deal with shit like -- excuse my language, stuff like this then would I still want to be executed and I said no.  I said that's what I tried to tell you was that -- that's the same thing I tell all of them, I told everybody, yeah, okay, if I was -- if I had --

THE COURT:  Mr. Basham, Mr. Basham.  Slow down, Mr. Basham.  Mr. Basham, you need to slow down.  And, also, you need to know that everything that's said in this proceeding is being taken down by a court reporter.  I stand by what I said about you wanting to bargain with me.  You can't simply sit here today and tell me that's not true.  I will stick my -- you know what's in the record in the transcript of this case. We don't need to discuss that any further.  I told you -- I told you the purposes of these proceedings and I'm also going to tell you --

DEFENDANT:  Okay.

THE COURT:  -- the rules for this proceeding do not require your presence.  Your presence is optional.  And your -- let me finish, your attorneys asked that you be here in South Carolina --

172

DEFENDANT:  Good, I'm gone --

THE COURT:  Don't talk over me, Mr. Basham.

DEFENDANT:  You heard him.

THE COURT:  Let the record reflect Mr. Basham is now walking out of the room.  All right.  All I did was try to explain to him the nature of these proceedings and he stormed out of the room.  Now, as you know, the rules for 2255 proceedings do not expressly require that the defendant be present.  I asked counsel to give me an ex parte letter explaining the need to have the defendant present here in the courtroom in terms of what assistance he could provide.  I have received that letter, I have not filed it.  I will file it under seal because I think it was noticeably deficient in identifying anything that the defendant could assist with in this case.

The letter was a page-and-a-half long, and the first three-fourths of the letter explained how the defendant had bonded with his attorneys and felt warm and comfortable in their presence and therefore needed to be here in their presence so he would feel comfortable at these proceedings.  I don't think I disclosed anything that was confidential by saying that.

The remainder of the letter was very weak on what additional input the defendant could provide to his counsel.  In fact, yesterday in the United States Supreme Court the

issue argued there was whether there's any right to be present at a 2255 case when, as is usually the case, we're simply reviewing a fixed record, which I think is what we're doing here, we're reviewing a fixed record.  So if he doesn't want to come back I'm not going to delay these proceedings if he doesn't want to be here.

Mr. Burke, do you want me to force the marshals to physically sit him in the room and not let him leave?

MR. BURKE:  First may I respond to two things?

THE COURT:  All right.

MR. BURKE:  First, as point of clarification, your Honor, the arguments yesterday in the Supreme Court concerned whether a defendant had a right to be competent in a 2254 proceeding.

THE COURT:  In a state court, I understand.  And it was -- some courts held it was a statutory right but not a constitutional right.

MR. BURKE:  And I reviewed the arguments and the United States Department of Justice in the Tippits case conceded in oral argument the matter is much different in a 2255 proceeding.  That that is the first time often that new evidence is ever presented to the court for the very first time.  We are not --

THE COURT:  I understand the case is different. But -- I understand.  But I stand on what I said.  Your letter

to me was very short on what information he could impart on these 32 issues that I've got to decide. But I understand that. I'm not asking you to back off of any of your position. But my question to you is do you want me force him to be present on the camera in that room?

MR. BURKE: May I confer with my counsel, please?

THE COURT: Yes, sir.

(There was a pause in the proceedings)

MR. BURKE: Your Honor, we do not want you to force him to be in there against his will restrained. We don't want that. Miss Stone did point out for me for the record that Mr. Basham never responded to your question before he left the room whether he understood what these proceedings were about.

THE COURT: He never responded, he stood up and walked out. But I explained what the proceedings were about.

MR. BURKE: That does not mean he understands it.

THE COURT: I understand. Let's go ahead and adjourn for lunch so the court reporter can get started on this transcript. You want to say 2:30 just to be safe? Okay. Let's say 2:30 just to be safe. All right. We will be in recess until 2:30.

(A recess transpired)

THE COURT: All right. Just about five minutes ago while I was in contact with my people at the federal Bureau of Prisons in Terra Haute and I asked them to bring Mr. Basham

back to the room for one last effort to keep him here and let me explain he had a right to be here and it was important for him to be here, et cetera, et cetera. But I'm informed now he refuses to come back. Could I speak -- who is this on the screen now?

MR. ROYER: Your Honor, my name is Todd Royer. I am the case manager for the special compliance unit at USP Terra Haute.

THE COURT: Can you confirm what I just said, Mr. Basham refused to come back to the room with the camera?

MR. ROYER: That's correct, I can confirm that.

THE COURT: I guess we don't have any choice but to proceed. Y'all want me to forcibly bring him back?

MR. BURKE: Your Honor, I don't want you to forcibly bring him back. I think you are as well aware as any of us that that would be a disaster. I respectfully say that we believe we have an incompetent client and we believe without the expert that should be apparent to even a lay person today. And I know you are not making a decision, we're still going, but I don't want to -- I will for the purposes of Dr. Hyde's testimony and for Mr. Monckton's testimony waive his appearance today. The reality is Mr. Murray is no longer at the prison so there's no lawyer.

THE COURT: There's no need no keep the satellite up and running and spending that money, but I do think I need to

send word to the Bureau of Prisons if at any time he wants to return let us know ASAP and we will put him on satellite.

Let me tell the case manager, did you hear what I just said? We're going to shut down the --

MR. ROYER: I did, your Honor.

THE COURT: We're going to shut down the satellite. If at any time Mr. Basham expresses a desire to return to this hearing would you or the case manager contact my office right away so that we can set the satellite back up?

MR. ROYER: Yes, your Honor. In fact, I will notify Inmate Basham as soon as I leave this room that should he desire to return just to let us know.

THE COURT: Tell him that message, if he wants to come back he can come back and we will set it back up. All right? Thank you very much.

MR. ROYER: Yes, sir. Thank you.

MR. DALEY: Your Honor, the only other thing I would say, we don't know what the end result of this whole hearing is as far as your determination on competency, and I do want -- I have been conferring with folks in main Justice, we want to take whatever time you need to make that determination, whether it be orally or in writing. So that's just we are --

THE COURT: I thought what I would do is whichever way I go is rule orally and reduce it to a written order this

177

weekend sometime when I have time later on.

MR. DALEY:  Thank you.

(There was a pause in the proceedings)

THE COURT:  I didn't tell Mr. Basham if at any time he wants to talk with his attorney he has a right to consult with his attorney as this hearing progresses.  Why don't you go call and tell them that.  If he wants to talk to his attorney they will make arrangements for a telephone.

All right.  Ready to call the witness that we interrupted this morning?

MR. BURKE:  Yes, your Honor.  This would be the government's cross-examination of Dr. Hyde.  He should be available at the 410 number.

THE CLERK:  Are you ready for me to dial him?

THE COURT:  Yeah, go ahead and dial him.

(There was a pause in the proceedings)

THE COURT:  Yes, sir.  This is Judge Anderson again.

THE WITNESS:  Hi Judge.  How are you?

THE COURT:  We're ready to resume now.  It took a little longer than I thought this morning.  I think you have been furnished a transcript of that testimony to review, and at this time I'm going to recognize Mr. William Witherspoon, one of the U.S. Attorneys who is handling this case for any questions he might want to ask you.

THE WITNESS:  Yes, sir.

THE COURT:  Mr. Witherspoon?

CROSS-EXAMINATION

BY MR. WITHERSPOON:

Q.  Good afternoon, Dr. Hyde.

A.  Good afternoon, sir.

Q.  I'm not -- haven't had a chance to meet you and I'm looking forward to it, but I just have a few questions for you.  Can you tell the court your opinion on the death penalty, sir?

A.  I am opposed to the death penalty except for in cases of genocide.

Q.  I'm sorry, I couldn't hear you.

A.  I'm sorry.  I am opposed to the death penalty except for cases of genocide.

Q.  And when you say genocide, what do you mean?

A.  I mean political acts where there is mass murder under the auspices of a political act --

Q.  Okay.

A.  -- of a group of people.

Q.  And you mentioned earlier that you have been involved in cases dealing with competency before, correct?

A.  Many cases over the years.

Q.  Have you ever testified as an expert or a government witness where the death penalty was an issue?

A.  I have testified in many cases where the death penalty is

an issue.

Q. No, sir. Have you testified for the government when the death penalty was an issue?

A. No, I have not.

Q. Why not?

A. I've never been asked.

Q. If the government asked you to testify as an expert witness where the death penalty was an issue would you testify for the government in that case?

A. No, I would not.

Q. Why not?

A. As I said before, I think the death penalty should be reserved only for those very select cases. The reason being is that our justice system, as hard as everybody works in the justice system, is not a hundred percent perfect and there's only one penalty that is totally irreversible and irredeemable and that is the death penalty if a mistake is made along the way.

Q. With that in mind, isn't the science of psychiatry not a hundred percent either?

A. You are absolutely correct.

Q. And wouldn't it be more appropriate, Dr. Hyde, and what case would it be more appropriate, who could make the better determination of competency of someone in a case? Would it be someone who saw him immediately or someone who is reviewing

Hyde - Cross                                        180

records?

A.  I think that that is a very complicated question and I'm not quite sure I understand it.  Could you rephrase it, perhaps?

Q.  Sure.  When you make a determination of competency would you rather see the person then or would you rather just review records and make a determination?

A.  Well, always it's best if you can see the person head on. That being said, there are certain cases where competency is, with our current state of medical treatment, an irreversible condition and is not something that is going to change over the course of a day or a week or a month.

Q.  And so in your opinion when did Mr. Basham become incompetent?

A.  I think Mr. Basham has been incompetent throughout these entire legal proceedings.  I think he's incompetent as an adult.

Q.  So he's been incompetent since he's -- he was an adult?

A.  Yes.

Q.  Do you have -- and I think Mr. Burke has said you reviewed a number of his records, correct?

A.  I did.  I don't have them with me, sadly, because I wasn't anticipating this proceeding, I just have my notes from my actual evaluations of him and do have the testimony of Dr. Parker this morning.

Hyde - Cross                                    181

Q.  Other than yourself, has any other doctor determined he was incompetent?

A.  I think that there were proceedings where -- were interrupted during some portion of the trial because he was not able to participate.  I don't know if that was deemed that he was actually incompetent at the time.  I believe he was. But because I don't have those records in front of me I can't testify a hundred percent to that certainty.

Q.  But during those proceedings when there were interruptions do you realize he was seen by an expert, Dr. Donna Schwartz-Watts, who -- please let me finish -- who saw him and then determined that he was competent?

A.  I don't think that that competency evaluation was complete.

Q.  Would that surprise you that the defense now has hired Dr. Schwartz-Watts as an adviser to them?

A.  Well, I'm sure that they would want to know the information that she had provided at that time but have it contextualized within the broader view of this individual's central nervous system function.

Q.  I'm sorry, I am having a little hard time, maybe it's an echo, I'm having a hard time understanding you.

A.  I'm sorry.  Can you hear me now?

Q.  Yes, sir.

A.  I said I don't know the entire reasoning because the legal

staff has not shared this with me.  That being said, I would think that there was nothing wrong with hiring her as an adviser to get her opinion from her direct interaction with that individual.  But I think his overall competency issues have to be contextualized within the function of his central nervous system both from a neurological as well as from a psychiatric perspective.

Q.  Now, you said he has brain damage, correct?

A.  Yes, sir.

Q.  How did you determine he had brain damage?

A.  A combination of my examination and his history.

Q.  So you determined he had brain damage based upon your examination and his history.

A.  Yes, sir.

Q.  Isn't it true that the better forum to determine brain damage is with a CT scan or MRI scan?

A.  Well, that's a very interesting question, I'm glad you brought that up.  So, for example, I think --

Q.  Before you explain, you can say yes or no and then you can explain.

A.  It's not a yes or no answer.  So if somebody has a stroke, yes, if it's a large stroke.  If it's a tiny stroke, no, because it's within the resolution of what those scans would show.  But that presumes that you are looking at what we call a coarse, COARSE, brain lesion.  We know that, for example,

Hyde - Cross                                    183

people with schizophrenia usually have normal MRIs or CT scans yet their brains are markedly dysfunctional.  People with Down syndrome often have IQs in the 50s and 60s yet their MRI scans are often quite normal.  So there's a limit to the resolution of what these scans can tell us about the function and the structure of these brains once you get down below a large visual perspective.

Q.  So I guess the answer is yes in some cases and no in some cases?

A.  Absolutely.

Q.  Okay.

A.  Much more succinct than I said.

Q.  It was a yes or no answer there.  Would it --

A.  No, you offered binary.  So it's yes in some cases and no in some cases.  That's a little different than yes or no, with all due respect.

Q.  Did you do a neurological exam of Mr. Basham at some point?

A.  Yes, I did.

Q.  And what did it show?

A.  It showed that he had cognitive dysfunction, it showed that he had some abnormalities in his brain stem, it showed some abnormalities in his frontal lobe function.

Q.  Is that all?

A.  Yes, sir.

Hyde - Cross                                    184

Q.  Would that be recent damage or long-term damage?

A.  I would presume it would be long-term damage, from his history.

Q.  Okay.  Did you know that December of 1991 he had a neurological exam and it was normal?

A.  Well, I have not seen that report so I can't comment on that.

Q.  Did you know in 1994 he had a neurological exam and it was normal?

A.  Once again, I have not seen that report, I can't comment on that.

Q.  Did you know January of 1996 he had a neurological exam and it was normal?

A.  Once again, I'm relying upon your report.

Q.  Did you know in 1998 he had a neurological exam and it was normal?

A.  No.

Q.  Did you know in 1999 he had a neurological exam and it was normal?

A.  I have no record of that.

Q.  So if he had all of those exams at that point during those years and it was normal and now you said he has a negative or a bad neurological exam and it has gone back all these years, all those reports would be wrong, wouldn't they?

A.  I'd have to look at those reports to see how detailed that

Hyde – Cross                              185

examination was, who performed it, under what circumstances it was performed.  There are a lot of reasons why examinations can change, particularly in a neurological sphere, because it is dependent upon the expertise and the care with which it's done.  Some of these examinations are very cursory examinations, and so for when you are saying these neurological examinations were normal, he's not hemiplegic, he's not paralyzed on one side.  That's not what we're talking about.  We're talking about subtle findings which would be indicative of the type of brain damage that you would see with developmental or acquired brain damage.

And it's particularly hard to assay for brain damage in the frontal lobe on neurological examinations unless if you are doing the right tests.  So for you to presume that those examinations were equivalent to my examinations, I would propose they are not equivalent.  Therefore, without me looking at the actual paper record of them I am not prepared to say that those examinations were normal.  They were normal for what the test was done.

It's a little bit like taking your car in for an examination to check the tires and they check the battery and say it's fine and then you go down the highway and the transmission falls out.  Well, they didn't check the transmission so they wouldn't tell you that the car is fine.  There are different levels to examinations.

Hyde – Cross                                            186

Q.  Are you finished?  Dr. Hyde, are you finished?

A.  Excuse me?

Q.  Are you finished?  I just want to make sure you finish your answer.

A.  Yes, I am.

Q.  Okay.  And simply because he would have brain damage doesn't mean he would be incompetent, would it, Dr. Hyde?

A.  No, it would not.

Q.  Simply because he may have brain damage that doesn't -- doesn't indicate that he wouldn't know who the players are in this hearing today, would it, Dr. Hyde?

A.  He may recognize who the fundamental individuals are in the hearing, yes.

Q.  And what their roles are, wouldn't it, Dr. Hyde?

A.  He may have a very superficial understanding of what their roles are, yes.

Q.  Well, superficial, but he would know -- he's not a lawyer, he doesn't know all the roles, but he would know the roles of the judge, correct?

A.  Well, you know, it's very interesting that you ask that. So I asked -- actually asked him about some of those things.

Q.  And?

A.  He, like I said before, he has a very cursory definition of what these participants are.  Some of them were good, some are them were not good at all.  Would you like some examples?

Hyde - Cross                    187

Q.  Sure, Dr. Hyde, go ahead.

A.  So I asked him what a judge is, he said the judge, he judges me, he sentences me.  The jury listens to the facts and comes to a decision.  What is a sentence?  The jury, no, the judge, no, I don't know, decides a sentence.

Q.  Okay.  Now, let me move on then.  Simply because he had brain damage doesn't mean he can't control his behavior, true, Dr. Hyde?

A.  That's correct.

Q.  And because he has brain damage, that doesn't mean that he can choose -- cannot choose not to assault someone, correct, Dr. Hyde?

A.  It depends on the brain damage.  You're right, some people with brain damage can control that, other people cannot.

Q.  What's the standard, Dr. Hyde, that you use to determine that he was incompetent?

A.  That he understands the nature of the legal proceedings that are going on around him and is able to actively participate in assisting his counsel in his legal defense.

Q.  And you have determined that he's not capable of doing that.

A.  That is correct.

Q.  Even though he has met with his attorneys a number of times and talked with them?

A.  Sir, I have met with patients who are in a vegetative

state.  That doesn't mean they are competent in any way, shape or form.

Q.  But those people in a vegetative state can't talk to their attorneys, can they either, Dr. Hyde?

A.  No, they can't.

Q.  So that -- that example is not a good example, is it Dr. Hyde?

MR. BURKE:  I object, your Honor.  He's badgering the witness.  And the fact of the matter is that Mr. Witherspoon has no idea about the -- no one does, because no one asked us about the nature of our communications with our client.

MR. WITHERSPOON:  I'm not asking about the communication, but he's talked with him.  I'll move on, Judge.  I'll move on.

Q.   (MR. WITHERSPOON) Dr. Hyde, when did you determine Mr. Basham was incompetent?

A.  After my second visit with him.

Q.  So after September 28?

A.  Yes, sir.

Q.  And when did you notify his attorneys that he was incompetent?

A.  I don't remember the exact date, we have had a multiple conversations.  I think Mr. Burke can probably tell you the exact date.

Q.  Is it at that second meeting in September?

Hyde – Cross                                    189

A.   Yes.   I had suspicions after the first meeting but confirmed after my second meeting.

Q.   So would it surprise you if the defense attorneys told the judge yesterday they had no medical determination that he was incompetent?

A.   Yes, it would surprise me.

Q.   Now, if he's incompetent, Dr. Hyde, could he fashion, if he wanted -- put it this way.   If Mr. Basham sent a letter through a third person to get to someone he wanted to read the letter, would that be signs of a person who is competent?

A.   Probably it's not determinative, not dispositive one way or the other.

Q.   But an incompetent person would not be able to get around the rules by sending it to a third person, would they, Dr. Hyde?

A.   I don't think giving somebody a letter to give to somebody else is part of the legal definition of competence.   I don't think it's determinative or bears upon it one way or the other.

Q.   That wasn't my question, whether you determine it was part of the legal definition.   My question was if he was incompetent could he mail a letter to a friend to send to another friend on death row because he couldn't send it himself?

A.   There's a straw man you are setting up there because you

are presuming all those things happened, that chain of events, and I can't comment on because I don't know the details of it.

Q.   But assuming that happened, Dr. Hyde, is that a sign of a person who is incompetent?

A.   It is -- I will say it one more time for you, it is not dispositive one way or another.

Q.   And if he was incompetent since he was an adult, part of the crime here, Mr. -- Dr. Hyde, was he had to convince another person he kidnapped to allow them to use the phone, to use the phone, to convince that person to allow him to take him on a ride, and then to convince that person to take him to a different place.  Is that a sign of anyone who's incompetent?

       MR. BURKE:  Your Honor, I would like to object.  The purpose of the determination today is Mr. Basham's competency for purposes of this hearing.  These questions will be addressed --

       THE COURT:  I was going to get into, you intend to bring the doctor back when we get to competency at trial later.

       MR. BURKE:  Yes, your Honor.

       MR. WITHERSPOON:  Well, Judge, Dr. Hyde said he was incompetent during the proceedings and he continued to be incompetent.

       THE COURT:  I understand.  Well, I'm not going to

Hyde - Cross                          191

stop you, but understand we may get some of this again later
if he's called.

MR. WITHERSPOON:  Very fine, Judge.

Q.   (MR. WITHERSPOON) Dr. Hyde, your response?

A.  Could you repeat the question, please?

Q.  Could the fact that he was able to convince another person
that he kidnapped to allow them into his house, someone he did
not know, to give him a ride, someone he did not know, and
then convince that person to take him to another place, is
that a sign of incompetency?

A.  That would be a sign that he was behaving competently
within that sphere or function.

Q.  So he's -- part of the time he's competent and part of the
time he's not competent, is what you're saying now?

A.  No, I'm not saying that at all.  We're talking about legal
competence and you are talking about competence to perform a
relatively simple social interaction.

Q.  So that's -- he can do that, he just doesn't understand
all that's going on in the courtroom.

A.  Or the legal definitions or the legal terms or the options
that are available to him.  No, he does not.

Q.  And you would agree with me these legal terms, these legal
definitions, these legal concepts aren't things that everybody
on the street would understand, wouldn't you, Dr. Hyde?

A.  No, I wouldn't say that they don't understand, but I'm

Hyde - Cross                    192

sure that they would learn them pretty quickly if they were in proceedings like he was.

MR. WITHERSPOON:  Beg the court's indulgence.

(There was a pause in the proceedings)

Q.    (MR. WITHERSPOON) Dr. Hyde, one final -- couple of final questions.

A.  Yes, sir.

Q.  I may have misspoke.  The convincing the person to give him a ride and the use of a third party -- person to send a letter may not be dealing with competency, but that's certainly an indication that he's manipulative.

A.  Once again, I don't know the details of that.  He was certainly manipulating a situation but, in general, does that show him to be a manipulative person?  Not necessarily.

Q.  And would you agree with me that competency is better to determine at that moment rather than using records to make that determination?

A.  Like I said before, and I'll repeat it again, I thought I already answered that question, it's always best to see an individual in person, but there are certainly clinical situations where there are static problems that would lead someone to be incompetent across time.

Q.  And so if a doctor saw Mr. Basham more than 40 times and spent more than 40 hours or a hundred hours with him, they would be in a better position to determine competency,

wouldn't they?

A.  Depends upon the training of the doctor and the nature of the interactions.

MR. WITHERSPOON:  Thank you, Judge.

THE COURT:  All right.  Any redirect?

MR. BURKE:  Yes, your Honor.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. BURKE:

Q.  Dr. Hyde, this is Michael Burke.

A.  Yes, sir.

Q.  I have a few questions for you.  My first question is you reviewed records in this case.  Did you also evaluate Mr. Basham?

A.  Yes, I did.

Q.  In person?

A.  Yes.

Q.  And that was on two separate occasions, correct?

A.  Yes.

Q.  So you based your opinion not solely on your review of the records but also on your evaluation, your in-person evaluation of Mr. Basham?

A.  Yes.

Q.  Okay.  Let me ask you a specific question about what type of doctor you are.  Are you a psychiatrist or are you a

neurologist?

A.   I am a board certified neurologist in general neurology with additional training and expertise in psychiatry.  I have published over 140 per reviewed papers and over 30 chapters primarily in psychiatric journals and psychiatric textbooks, so I am a cross-dimensional physician.  I have been certified as an expert in both neurology and psychiatry in multiple venues around the country.

In addition, I'm a fellow -- I'm a member of the American College of Neuropsychopharmacology, which is a by invitation only college for experts in neuropsychopharmacology, which deals with drugs, neurological and psychiatric disorders.

Q.   Now, Doctor, would in your opinion -- could it, in your opinion, affect a doctor's ability to render an opinion on competency if they lacked experience in -- let's give an example of neurology.  If he were not a neurologist is that a factor that plays into a determination of competency in this case?

A.   Well, in this case absolutely, since there are significant neurological issues as well as psychiatric issues here.  And I think that having that background is very important in evaluating this individual.

Q.   Now, over the break you were sent, I apologize for the short -- the court reporter did it as quickly as possible and we tried to get it to you as quickly as possible via e-mail,

transcript from Dr. Parker's testimony today.  Have you had an opportunity to review that?

A.  Yes.

Q.  I'm sorry, I didn't hear your answer.

A.  I'm sorry, yes.  Yes.

Q.  And you had a chance to review it in your -- in its entirety?

A.  Yes.

Q.  Okay.  Dr. Hyde, do you -- first let me ask you, do you have any concerns about the manner in which the competency evaluation was conducted this morning?

A.  I do have some concerns, because I don't see any comments about his mood state.  There seems to be some suppositions here but I don't see any descriptors of this individual's mood, nor did I see any direct questions that would go to the core of competency.  And that has to do with the individual's ability to understand the nature of the legal proceedings in which he is engaged and to participate fully and actively in his defense with his attorneys and communicate rationally and thoughtfully.

Q.  And is that what you mean by the term mood?  A lay person usually thinks of mood --

A.  No, no.  Those are two separate things.  I'm sorry if I was obtuse in my response.  I don't see that there was any investigation of his current mood state today, which would be

Hyde - Redirect                                    196

fluctuating, nor did I see any assessment of his cognitive profile vis-a-vis competency; that is, how he understands the nature of the proceedings against him, what -- how he might interface with his attorneys to make rational and informed decisions.

Q. Now, before I forget, one point I would like to ask you, Mr. Witherspoon asked you if it would be -- if you would be surprised if Mr. Basham's attorneys had said that they had not been given a diagnosis, I believe, of incompetency or been told he was incompetent, and I think you seemed surprised by that. Would it surprise you if Mr. Basham's lawyers in fact said they did not have a report addressing Mr. Basham's competency?

A. That would be absolutely true. I have not had time to put together a report.

Q. As part of your -- I know I've changed subjects and I want to go back before I move on then. Let me ask you, are there any other concerns you have about the adequacy of Dr. Parker's evaluation today?

A. Well, I have to say it seems rather cursory, that's all I can say, is I didn't see any detail, at least in his testimony, other than he seemed to be fixated on the fact that Mr. Basham was distractable, which in fact he is, and that he is impulsive, which he is, which he ascribes to being antisocial and suffering from attention deficit hyperactivity

disorder.

Q.  Do you agree with Dr. Parker's determination that Mr. Basham is competent today?

A.  I disagree.

Q.  Does the fact that Dr. Parker was able to see Mr. Basham in person today and you were not affect your opinion?

A.  No.

Q.  In reaching your determination in this case that Mr. Basham is incompetent, and again we're focusing solely on the -- on this hearing, today we're focusing on his competence for this hearing, have you had any discussions with his attorneys regarding their communications with Mr. Basham?

A.  Yes, I have.

Q.  And did that have any affect on your decision or your opinion about his current state of competency?

A.  Yes.

        MR. BURKE:  Thank you, your Honor.  I have no further questions.

        THE COURT:  All right.  I don't have any further questions.

        MR. WITHERSPOON:  None from the government, your Honor.

        THE COURT:  Thank you very much, Doctor.  We appreciate you working with us on the telephone.  It appears that if we go forward with this case you might be called at a

hearing again later on the question of competency at the time of the trial --

THE WITNESS:  Yes, sir.

THE COURT:  -- back in 2004.  And if so we will hear from you then.

THE WITNESS:  Yes, your Honor.  Thank you for allowing me to participate.

THE COURT:  Thank you very much.  We will hang up now.

THE WITNESS:  Bye-bye.

THE COURT:  Anything further by way of evidentiary development on the competency question?

MR. WITHERSPOON:  Nothing from the government, your Honor.

MS. STONE:  Your Honor, I just wanted to respond briefly to a point that you made regarding that Rosenhan study you bought up.  I just wanted to make a record, I did some reading on that this afternoon.  When that study was done the DSM-II was the manual that was in place.  That study was actually used to help formulate the DSM-IV, which would be the diagnostic and statistical manual used here.  And so the general knowledge on that is -- that I read today is that those issues that were brought up in the Rosenhan study were addressed in the -- in creating the DSM-IV to try to eliminate those problems that the Rosenhan --

199

THE COURT:  I don't think I would base a decision on that study.  That was way back in '73.  I'm sure the literature and the science and medicine has developed, has advanced significantly since then.  I thought it was interesting.  I always wanted to ask some medical professional their opinion about that, because it's just remarkable that they were able to get a hundred percent success ratio in false diagnosis, bad diagnosis.  But I'm not going let that play any part in my decision.

MS. STONE:  Well, it looked like the industry was concerned about it, as well, and they responded to that.

MR. BURKE:  Your Honor, I would only add one other thing to the evidentiary development aspect of it, is that a critical aspect of a determination of a defendant's current competency is his ability to communicate effectively with his attorneys and to take guidance from his attorneys and be controlled by his attorneys.  I would submit without any inquiry from the court on an ex parte basis about, well, perhaps on a sealed basis, I think perhaps --

THE COURT:  You want to send the government out and tell me ex parte what you need to discuss with him?

MR. BURKE:  What we need to discuss --

THE COURT:  I mean you suggested this morning, I thought you suggested we needed an ex parte hearing with just you.

MR. BURKE:  Yes.

THE COURT:  You want to do that now?

MR. BURKE:  That would be fine.

THE COURT:  Let me ask the government to step out.

(There was a pause in the proceedings)

* * * * * * * * * *

THE COURT:  All right.  Mr. Burke, can I share any of what you told me here now during the argument stage or would you rather it not be disclosed?

MS. STONE:  Can we confer for a moment?

THE COURT:  All right.  Take your time.

MR. BURKE:  It's such a delicate line, your Honor.

(There was a pause in the proceedings)

MR. BURKE:  Your Honor, I believe that any statement that we made to you regarding our inability to communicate with Mr. Basham would be appropriate for you to reveal to the government.  I know that's a broad statement, I'm not sure -- perhaps not the substance of the statements that he made.

THE COURT:  What about just your experiences that you've seen?

MR. BURKE:  Yes, your Honor.

THE COURT:  All right.  Well, Mr. Witherspoon, while you were out counsel told me that frequently when they went to

see Mr. Basham or try to contact him on a portable cell he was intoxicated as much as 40 percent of the time because he was able to brew or ferment fruit in his cell, which I have seen that happen before.  And so he has a -- frequently they couldn't communicate with him or conduct meaningful conversations because of his inebriated condition.  And then can I tell them about the hallucinations?

MR. BURKE:  Yes, your Honor.

THE COURT:  He also had some mice in his cell, and at one point he became distraught over the death of his mouse, and even began having hallucinations the mouse was speaking with him.  So we have that additional information from counsel which I will accept at face value.  I don't think it's necessary to try to get somebody from the Bureau of Prisons on the satellite to possibly rebut that, I think we just need to accept that.

So with those facts before me now let's -- I'll be glad to hear from you.  I guess it's your motion, Mr. Burke. Let me hear from you.

MR. BURKE:  Thank you, your Honor.  Your Honor, our position is based on the events of the last two days that Mr. Basham is not currently competent to go forward with this 2255 proceeding.  We believe that he has a right whose origin at this point I can't truly identify for you, because I'm not sure -- I would say the due process right, but looking at the

202

oral arguments yesterday from the Supreme Court I'm not sure even the Supreme Court is sure of the genesis of the right in this particular instance.

But even the United States government conceded in a 2255 proceeding the defendant should be competent and when he is not some type of brief recess should be taken, some period of time for an attempt to render the defendant competent.

Now, much has been made about -- and I think it's important for us to focus on the two elements of a competency determination under Dusky, and the first is where Mr. Basham has a present understanding of the proceedings. And I would tell the court that even your own expert today testified that Mr. Basham truly didn't understand the purpose of the proceedings today.

THE COURT: Well, he's still really mad at you and really mad at me for not granting his request to withdraw his appeal, I think. I think. And to this day I don't know why I backed off of that, but it became apparent to me it wasn't going anywhere, sooner or later he would change his mind or I would get in trouble because it looked like I bargained with him. And so I really don't know why I dropped the issue -- dropped that issue, because it never was fully and finally resolved in my mind what he wanted to do.

But your side kept objecting that we were invading the attorney-client privilege and I couldn't ask him what he

wanted to do straight up without y'all advising him what to say.  So I think part of the problem has been created by you and me, actually, in terms of understanding what this hearing is about today.

MR. BURKE:  Well, the second prong, your Honor, would be his ability to assist his attorneys in the proceeding.  And I would -- I was looking at a list of items relevant to competency to stand trial, I would think that it would have some relevancy to a 2255 proceeding.  This was something developed, your Honor, by the group for the advancement of psychiatry, and it's from a treatise that I can provide the court later.  I simply photocopied this before I left the -- my home so that I would have it for purposes of cross-examinations during the hearing.  But it's a 21-item list, and I would like to read a few of the items that are relevant to a determination of competency.

The defendant needs to have the ability to comprehend instructions and advice from counsel.  I think your Honor could see that much of the interaction between Mr. Murray and Mr. Basham was -- went unheeded by Mr. Basham.  And based on what we had told you about our experiences with Mr. Basham I think that further confirms it.  He has to be able to make decisions after receiving the advice.  And he clearly at this moment is not capable doing that.  He needs to maintain a collaborative relationship with his attorney to help plan

204

legal strategy.

THE COURT:  Well, all of what you say is certainly very true at trial.  But I go back to the question of the fact that here we're almost relying exclusively on a fixed record. I've got your letter dated September 21 you sent to me ex parte in which you outline the things you needed to discuss with your client at trial, and I think that I need to file this with the clerk under seal as a court's exhibit in case the Fourth Circuit wants to look at it if we have an appeal. Any objection to that?

MR. BURKE:  I do not, your Honor.  And I understand that you have -- I'll let you go ahead and do that.

THE COURT:  I've looked at the three categories of matters that you -- because I suggested I think at the pretrial conference that so many of these issues, whether my jury charge on the two-step process on mitigation was faulty or whether Mr. Swerling was rendered ineffective because he was a home invasion victim, Mr. Basham can't help counsel with any of those issues.

MR. BURKE:  Absolutely not, your Honor.  I agree with you.  But there are -- there are several -- as the court has repeatedly noted, we have raised many claims of ineffective assistance of counsel, and many of those involved Mr. Basham's communications with the defense team.  And so I would, if I had a competent client, need to confer with that client about

205

that.

THE COURT:  Let me ask you this then:  Is it or was it your intention to have Mr. Basham testify at this hearing?

MR. BURKE:  Never, no.

THE COURT:  So the communications would just be limited to confiding in you and suggesting questions that you would ask the various witnesses, in other words.

MR. BURKE:  And confirming the accuracy of certain testimony.  And if I could give an example of that, your Honor, we have two separate claims in the 2255 motion.  The first claim is a claim of ineffective assistance regarding Mr. Littlejohn and Mr. Monckton with regard to the Thanksgiving day search which we were questioning about.  We also had a claim about false testimony by Ronald Hewitt, Sheriff Ronald Hewitt.  Those two claims mesh together, and I think for one to be true the other is not true.

When we met with Mr. Monckton the first time his position was that event had never happened.  I can tell you, I can tell you that our client has -- was able to inform us when he was in his cell in a calm environment that in fact Mr. Hewitt did remove him from the van and did speak to him. That is the type of issue that I would require my client --

THE COURT:  You are going to have -- is Sheriff Hewitt going to be called, former Sheriff Hewitt going to be a witness?

206

MR. BURKE:  No, your Honor.  But that was Sheriff's Hewitt's testimony he did that.

THE COURT:  How about if Mr. Basham is not going to testify, Mr. Hewitt not going to be called, what good would a communication from the client to you about that issue?  What role would it play?

MR. BURKE:  There are two claims.  If it had never occurred, and that was what we had learned from Mr. Monckton the first time we met, it had never occurred, that would be in support of our claim that Sheriff Hewitt had been untruthful on the stand.  But when we were informed by our client that in fact those events had occurred then we knew that added -- that added strength to our claim of ineffective assistance of counsel by the first lawyers allowing that to happen.  So that's the type of issue.

This is not a record-based proceeding like you normally would have in a 2254, this is the equivalent of the first state post-conviction proceeding.  And so it does require us to be able to have meaningful communications with Mr. Basham, which we are clearly unable to have with him right now.  We would ask, your Honor, that we are fully aware of the length of time this case has been going, but I do represent a man who I believe is incompetent and --

THE COURT:  Well, if I agree with you and your expert then he will just be incompetent until infinity then, forever,

and there will -- the jury verdict will never be carried out. And that's the bottom line. Your expert is pretty clear he was and always will be incompetent.

MR. BURKE: Well, let me address that, your Honor. Two things. Dr. Hyde, and, of course, has not even truly testified on his report, has not testified that Mr. Basham is not competent to be executed. So that's a different issue. So but he says he is not competent to proceed at the hearing.

THE COURT: But still, if that's true and if the Supreme Court holds that you've got to stay the case pending a restoration of competency, then the case just drifts along forever, essentially.

MR. BURKE: But Dr. Hyde did testify that, and this is a quote from Dr. Hyde's testimony from this morning, that with medication management plus counseling yields a very positive outcome, at least as far as managing the behavioral problems such as the types of outbursts we saw yesterday. So our point is is that Mr. Basham has never been properly medically treated.

And there was some question by the government to Mr. -- to Dr. Hyde as to our hiring of Dr. Schwartz-Watts. I will tell the -- I will reveal our strategy. We hired Dr. Schwartz-Watts because our client was seeking to waive his appeals. Time was of the essence and there was no doubt that Dr. Schwartz-Watts had a working knowledge of this case. And

our primary concern was that Mr. Basham was being motivated by his lack of medication and his self-medication.  That is why we hired Dr. Schwartz-Watts, so she could advise us on that.

THE COURT:  All right.

MR. BURKE:  And that is I think what Dr. Hyde testified to, that it is not a foregone conclusion he would never -- I have to let Dr. Hyde's testimony speak for itself.  But at least with competency for this hearing it appears that with proper medication that Mr. Basham could possibly be competent to proceed.  And as Dr. Hyde testified, he's currently grossly under-medicated, and so and I would simply reiterate that, sadly, Mr. Basham's words themselves speak for themselves as to his ability to control himself.  And that's not -- your Honor, if you truly believe and if the government truly believes he wants to die, he has no reason to manipulate this court to make these proceedings go further.  He's simply incapable of understanding what's going on and then controlling the trauma that occurs to him when he is in the situation that he's in right now.

THE COURT:  All right.  Thank you, sir.  I'm going to make this -- ask the clerk to seal your September 21, 2012 letter to me, filed as a court's exhibit under seal.  Already have it under seal.  It was in response to my question of what discussions you might have with Mr. Basham if he were brought here in person.  Which is the same basic issue as the question

today of what information do you need to gather from him to help adequately represent him in this case.

All right. Mr. Daley?

MR. DALEY: Yes, your Honor. The only thing I was going to ask is does that mean that it's under seal for and only they -- in other words, no one can see it except the court and the defense.

THE COURT: Right.

MR. DALEY: Just wanted to make sure.

THE COURT: It is basically attorney-client type -- if the Court of Appeals wants to see it they can see it and look at it.

All right. Mr. Witherspoon?

MR. WITHERSPOON: Your Honor, I'm not privileged to what Mr. Burke and Miss Stone told you while we were out, and but let me just say I think they have done the best that they could. However, I don't think anything that has happened today indicates that Mr. Basham is incompetent. At some point they told you that 40 percent of the time they met with him he was drunk. That has nothing to do with incompetency, Judge, nothing at all to do with incompetency. He himself decided, I guess, to drink the alcohol, he himself decided to not -- has nothing to do with his brain or brain damage or competency. He made a choice and his choice was to get drunk.

And as far as seeing mice in his cell and

210

hallucinations, we saw no hallucinations today.  So if the issue is is he competent now but being drunk, and hallucinations are irrelevant because we saw none of that. And Mr. Burke said that Mr. Basham did not heed the advice given to him by his lawyers.  But, Judge, if you remember yesterday morning the first thing, and I forget the attorney's -- Mr. Murray asked the court was can we take the handcuffs off so Mr. Basham can take notes and be involved. Well, if he's incompetent what is he going to do?

And simply because Mr. Basham made a decision or has made decisions not to heed their advice, Judge, you can see him on the screen, he decides he will do what he wants to do when he wants to do it.  That's not incompetency.  That is not incompetency.

He doesn't want to assist his attorneys because he wants to die.  Why would he assist potentially when -- and have to spend potentially the rest of his life in jail, which he tells everybody he hates, when he wants to die?  The standard is, Judge, can he understand the nature and of these proceedings, and I think the answer is yes.  Can he consult with his counsel?  Not that he will consult, but can he consult and can he assist in the preparation of his defense. Not will he, but can he.  There has been no indication that he can't, it's just the choices that he has made, and that's not incompetency.

211

Oh, and one further thing, Judge.  Dr. Hyde said this morning, and I'll read, and I believe that this brain damage is irreversible and it can be managed with appropriate medications and therapy, but I believe he's permanently brain damaged and I believe that the limits -- this limits his competency and makes him incompetent in fact now and in the foreseeable future.  He will never be competent, according to Dr. Hyde, the person who disagrees with the death penalty, who would never work, provide the government assistance where the death penalty is involved.

And Dr. Parker, who the court hired, who the court instructed twice to go see Mr. Basham, and both cases who had no opinion for the government or the defense, on two occasions determined, including today, that Mr. Basham is competent. The court's psychiatrist has determined that he's competent. There has been no indications that he cannot assist in this trial.  He may not want to, he may choose not to, but that doesn't say he can't do it.  Thank you, Judge.

THE COURT:  Any rebuttal?

MR. BURKE:  First I would like to -- the record will speak for itself, but what Mr. Basham said to the court was that he had believed that could he be in a situation where he could, I forget his exact words, but have more freedom in the prison, essentially what I took that to mean and what our discussions have been was that if he could be off death row he

was interested in proceeding. And that was what -- that he communicated. And the transcript will speak for itself. So I think it is inaccurate to say Mr. Basham under all conditions still wants to die and wants us to stop and that's why he's not working with us. That is not accurate.

And just one second, if I may, your Honor.

(There was a pause in the proceedings)

MR. BURKE: And the final point, just, your Honor, is I think it's obvious from your expert that Mr. Basham today does not understand why we're here at these proceedings. We have informed him and he still does not understand and is incapable of understanding the true meaning of his proceedings. Thank you.

THE COURT: All right. Well, up until now in the long history of this case the jury has resolved all the disputed facts and all I've had to do was deal with the law. But today I'm called upon to make a factual determination in terms of the competency issue that was raised yesterday. And we spent the better part of a full day hearing from experts on both sides of the issue. I've heard argument from counsel on both sides, quite very capable argument on both sides, and after hearing all of the evidence and weighing the credibility of the doctors who testified it is my determination that Mr. Basham is in fact competent to proceed with the 2255 hearing in this case.

I intend to put my reasons for that decision in a written order because of the need for my reasons to be memorialized for the Court of Appeals. But suffice it to say I had to make a call between two conflicting medical opinions, and I don't mean any disrespect to Dr. Hyde who testified for the defendant, but on based upon the totality of the evidence that I heard and the basis for the opinions given by the two physicians who testified, it's my determination that Mr. Basham can understand the nature of the proceedings here, he does have the ability to consult with counsel, and he does have the ability to assist the counsel in his preparation of the defense if he chooses to do so. He's apparently chosen not to do so, which is his right.

So with that ruling we need to move forward. I understand that Mr. Monckton is still here, is that correct?

MR. WITHERSPOON: He is.

THE COURT: Will you ask him to come back? I believe at noontime today, is it remotely possible we can finish him today so he doesn't have to make the three-hour drive from Myrtle Beach tomorrow?

MR. BURKE: Your Honor, I have at most five questions left.

THE COURT: Let's see if we can finish him today then. Please bring him back.

(There was a pause in the proceedings)

THE COURT:  Mr. Monckton, we apologize for the long day.  We do the best we could to move things along.  We're going to resume your testimony, you are still under oath and Mr. Burke says he has just a few more questions for you.

THE WITNESS:  Thank you, your Honor.

BY MR. BURKE:

Q.  Mr. Monckton, I have to tell you you are the soul of patience.  And I thank you for your willingness to come back all across the -- all the way across the state for this and to be here today.  So thank you very much.  I only have a few questions left for you and then I will turn your examination over to the government.  Let me just --

When we left off yesterday we had been talking about the events of the Thanksgiving day search in 2002 and we were talking about the incident in which you and Mr. Littlejohn were away from the van in which Mr. Basham was sitting, presumably, and/or speaking with law enforcement about hypotheticals.  Do you remember that?

A.  I do.

Q.  And I asked you if you remembered if you are clear in making your intentions known to the law enforcement officers there that day that Mr. Littlejohn and yourself did not want Mr. Basham to be interrogated, is that correct?

A.  That's correct.

Q.  If I could have you look at Defendant's Exhibit 5, and we

Monckton - Direct                    215

spoke about this briefly also, as well, yesterday.  If I recall, you said that you created this about the time that the disqualification motion was filed.

A.  That's correct.

Q.  If you could look at page -- the bottom of page two of that.  And, again, this would have been created sometime in early 2003, is that correct?

A.  That's correct.

Q.  Okay.  And can you read for us the sentence that begins at no.

A.  At no time will the police be allowed to question or interview Brandon concerning this incident.  You want me to read --

Q.  No, that's the part.  Do you agree still that that was your intention?

A.  That's correct.

Q.  Okay.  Do you recall, Mr. Monckton, if Jack Swerling or Greg Harris ever contacted you to ask about Sheriff Hewitt removing Brandon Basham from the van while you were not present?

A.  I can't recall if they did or did not.  Obviously, I kept detailed notes when I was representing Brandon.  After I ceased to represent Brandon I know I sent or had given a bunch of my information to Mr. Harris and Mr. Swerling.  And I don't know specifically if we talked about that.  I know there was a

lot of talk about the Thursday search but I can't remember any specific conversation with him.

Q. And do you recall testifying in February 2004 at the Jackson v. Denno hearing in Mr. Basham's case?

A. Yes.

Q. And prior to that testimony did you ever discuss with anyone on Mr. Basham's defense team Hewitt's claim that Mr. Basham had made any incriminating statements outside of your presence?

A. See, I can't remember if I did or didn't, to be honest with you. Because I didn't see -- I don't know that I saw -- I saw the 302s so I know it became the subject of a conversation when I saw the 302 from Jeff Long prior to the disqualification hearing that we had issues with that. But I don't know that I ever saw Sheriff Hewitt's statements that he made. Does that make sense?

Q. It does. Based on the testimony that you have given us today and yesterday do you believe that had you been asked about that event that you would have indicated to Mr. Basham's counsel -- his present -- his counsel at the time that that -- any questioning was done against your express direction to law enforcement officers?

A. I think Mr. Littlejohn and I would both have said that.

MR. BURKE: Thank you. No further questions.

THE COURT: All right. Cross-examination.

Monckton - Cross                                217

CROSS-EXAMINATION

BY MS. EWING:

Q.  Mr. Monckton, I also appreciate you coming back today. It's taken a while.  I just have a few questions, and I'll try to expedite this.

Now, what was the purpose of the Thanksgiving day search out around Bee Tree Farms area?

A.  The purpose was hopefully find Miss Donovan's remains.

Q.  And, now, the government refused to offer a proffer, right?

A.  That's correct.

Q.  Okay.  And but Mr. Basham still wanted to cooperate.

A.  That's correct.

Q.  Okay.  And so because of that initially you said Basham could only speak to his or through Mr. Littlejohn, correct?

A.  That's correct.

Q.  Okay.  Now, since he didn't have a proffer, if he blurted something out then that could be used against him, correct?

A.  I would agree with that.

Q.  Okay.  And I would like to take a look at -- it's Government's Exhibit 221, but it's the defense exhibit that you just looked at, number 5, I believe.  Okay.  And going down to, or actually the first full sentence at the top of the third page that comes immediately after the sentence you just quoted, could you read that sentence?  It starts with in fact.

A.   In fact, they were advised that they would not be allowed to interview Brandon in any way, shape or form other than the search of Donovan.

Q.   Other than the search for Donovan.  Okay.  Now, do you recall testifying at the Jackson v. Denno hearing on February 5, 2004?

A.   I do.

Q.   And can I show you part of your -- may I approach?

THE COURT:  Yes, you may.

Q.    (MS. EWING) Part of your testimony on page 126 and 127 in response to Judge Anderson.

A.   The highlighted section?

Q.   Well, yes.  That and continuing on.

A.   I remember testifying.

Q.   All right.

A.   Okay.

Q.   Thank you.  And your testimony at that time, you explained the dilemma that, it appears to me, that you were in with the situation with Mr. Basham not having a proffer.  And you said but it gets to the point, you know, in this case there is no way I can take him up there and look without some communication back and forth.

A.   That's correct.

Q.   Directions, and quote, yeah, that looks familiar, no, that doesn't look familiar.  You know, I don't see how you do that.

Monckton - Cross                    219

And you went on, according to this, and I guess that's been my concern in this case is you've got to put us in those set circumstances at that time.  We are not -- everybody can Monday morning quarterback what's going on.  We really felt like we were going to find her that day.  Do you recall --

A.    That's right.

Q.    Okay.  Beg the court's indulgence.  Okay.  So you kind of summed it up, as I recall, when we met with Mr. Burke present that it's hard to find a body without talking.  Do you recall making that statement?

A.    I do.

Q.    Okay.  And was it your hope that day during the search that if Mr. Basham assisted in finding the body that he would benefit from that?

A.    Based on my conversations with the U.S. Attorney, yes.

Q.    Okay.  And basically didn't you feel that that was probably the only chance that you were going to save him from the death penalty?

A.    It was his best option for him to be a witness against Fulks.

Q.    And wouldn't knowing how the murder happened help provide law enforcement with insight as to what to look for?

A.    I guess the answer to that can be both ways.  I mean, in that time frame the information we were given was very limited due to the fact that we had been told he confessed, we had

been given just a rough idea of what he had said he had done. We were told that the body was dumped on the side of the road by a stake, and that law enforcement was already assembled in North Carolina where they believed he could help get them there. Based upon that information we didn't interview him in any detail at that time, just because for a logistical concern we had to get it.

Q. Wouldn't finding the instrument of the murder possibly help locate the body?

A. The information that I was later given was the instrument, the knife, was thrown out -- out a car window as Fulks and Basham were going down a dirt road. I don't know how that would have helped, not knowing where -- where to look.

Q. But being a knife or a purse strap, wouldn't that possibly lead you to the general vicinity of her body?

A. I guess it could -- I guess the answer to your question is yes. But the issue where they say they may have seen a purse strap was at a cemetery, and when we got to the cemetery it had been cleaned up a day or two before. And the sheriff verified that to us, that they'd come in, it was all freshly raked up and cleaned up. They said oh, there's no evidence we're going to find here. That was one of the cemeteries we looked at where I think the car had been seen, the BMW had been seen close by.

Q. But if the purse strap had been thrown into the woods,

say --

A.  If we had found the purse strap, yes, I think that would have helped us maybe locate the body.

Q.  And didn't Cam Littlejohn actually tell Sheriff Hewitt that they should keep their eyes hope for a purse strap?

A.  I can't remember if Cam said that or not.  If he said he said it, I believe it.  Like I said, when we were driving around he was at the front of the van with Sheriff Hewitt and they were talking back and forth.  I was in the back of the van so I can't -- if Cam Littlejohn says he said that, I believe him.

Q.  Thank you.  And if that were the situation, I think you already basically said this, that the purse strap that Basham described would be intrinsic to the search for Alice Donovan.

A.  If we had found -- as we understood it, if we had found something to show that they had been there, other than eyewitnesses, yes, that would have been helpful.

Q.  And close to the end of the day during that search at some point you became aware that law enforcement felt that they were being led on a wild goose chase by --

A.  That's right.  Several FBI agents, I specifically remember Clyde Merriman, I believe there were several Conway officers, we were 30, 40 feet away from the van and they were telling me how they had searched an area a couple of days before in the Conway, Red Bluff area and had not found Miss Donovan from a

map that we -- Cam and I found out at that time that Brandon had sent a map or some map had been created.  And they felt like he was just yanking their chains, so to speak.

Q.  And didn't you believe that realistically this Thanksgiving day search would be Brandon's only opportunity to help find this body?

A.  Yes.

Q.  And why is that?

A.  I'm a deer hunter, there's a huge deer hunter population in Brunswick County, they dog hunt a lot, and I knew that the body, based upon what we had been told, it had been dumped near the side of the road.  I knew that with the number of dog hunters we were going to run into or would be up there around the holidays, actually we ran into a dog hunting party while we were searching, that some hunter was going to find Miss Donovan, and if the hunters found Miss Donovan before we did that then that would not be to Brandon's benefit.

Q.  Thank you.  Moving on to this competency issue that we have been talking about, did you and Mr. Littlejohn have any trouble during that Thanksgiving day search of talking to Mr. Basham?

A.  Honestly, I did not speak to Mr. Basham much that day, it was primarily Cam.  He understood we were going to look for a body and wanted to help.  I can say he wanted to help find Miss Donovan, he said that numerous occasions.

Q.  On Government's Exhibit 222, which were some of your notes, put that up there, there's a list of medications.  Who provided that list of medications, do you recall?

A.  That medication would have come, if I'm not mistaken, it could only have come from Brandon or the attorney out of Kentucky.  I'm fairly certain that came from Brandon, though.

Q.  And several pages over on that, starting with your notes made on December 1 of 2002, there are about nine pages of detailed notes.  That would be page 55, I believe.  I'm sorry.

A.  If you could switch me to the very first page of these notes I can tell you where they were taken and who was there.

Q.  Okay.  Let's see, page 54.  At the top is 12-1-02.  It actually looks like 2-1-02.

A.  That would have been at Darlington County where he was being housed.  The purpose of that meeting was I was speaking with Joe Ciccarelli, he was the lead case agent out of West Virginia looking for the girl that had been abducted, and he had sent me pictures of a bridge area where they had information I believe it was Miss Burns had been dumped.  And I was working with him showing the pictures to Brandon, seeing if that made sense, because they were trying to locate her body, they had information they were in this area.  As I understood it, it was a small river that connected into the Ohio, maybe a couple hundred yards up, and they were trying to locate -- they had divers on the scene and they were trying to

locate Miss Burns' body.

Q.  And the next page starting below where it says Brandon and Chad, were those notes based on what Mr. Basham told you? It's like several pages of notes after that detailed notes.

A.  If I could see, if you could go to the next page for me. Yeah, this would have been with my interview by myself with Brandon at Darlington County.

Q.  And that goes through like you have number one and it goes several pages over through number 21.

A.  That's right.

Q.  Okay.  Thank you.  And that goes through page 60 of those Monckton files.  And then below that you have West Virginia and, again, numbered items one and going over several pages --

A.  I think what I was doing is obviously they went through different states and I was trying to get a chronology and time line of what was going on in different states.  And I was asking Brandon, because I didn't have access to the records of the interviews that had already taken place, he was housed up in I think Kentucky, so I was trying to get an overview of exactly what we were dealing with.

Q.  So he was pretty helpful at providing detailed information that day.

A.  Yes.

Q.  Okay.  Now, on the second page of that same exhibit, 222, at the bottom right-hand corner, it's 51, there's a statement,

found incompetent in a hospital psychiatric for four years.
Now, where did that information come from, do you recall?

A.  I don't know if I'm looking at the right document.  Okay.
That would have more than likely come from Brandon, if I'm not
mistaken.  I don't know if the attorney out of -- I want to
say his name is Hughes, if it came from him.  I feel certain
that the way things are written here it may have come from
Brandon.

Q.  Okay.  And I didn't see anywhere in your records, you did
not have any mental health expert evaluation saying that Mr.
Basham was incompetent, did you?

A.  No, we -- when the disqualification motion was filed we
did not make any strategic decisions on behalf of Mr. Basham
as far as obtaining records, because we didn't know if we were
going to be the ultimate ones to stay on the case.  So I did
not have an opportunity -- I think you can see where my notes
were ramping up to start that process of gathering
documentation, but I never requested anything.  Once the
disqualification got filed we thought it best not to actively
pursue any records at that time.

Q.  Okay.  And even if a professional had found him to be
incompetent at that time it wouldn't necessarily mean he was
incompetent when he went to trial, correct?

          MR. BURKE:  Objection, beyond the scope of this
witness' expertise.

Monckton - Cross                          226

MS. EWING:  I'll move on, your Honor.

THE COURT:  All right.  Withdrawn.

Q.   (MS. EWING) Now, I may be wrong on this, but I believe I recall you saying that when you first spoke with Mr. Basham he seemed dazed and confused?

A.   If that's what my notes say from the first meeting, and I know the first time I met with him something just didn't seem right.  And I don't know -- I think I may have said dazed and confused, because I remember seeing it in one of my notes.

Q.   And I believe somewhere in the notes it says that he had not been on medications since his arrest.

A.   That's right.

Q.   Which in your experience of working with defendants is it possible that being off of medications could cause somebody to appear dazed and confused, just in your experience with defendants?

A.   I mean, yeah, anybody that's not on -- if you are being prescribed those meds, if you are not on them you are going to appear different.

Q.   Now, in your notes of 12-16-02, you did say on that date that he appeared dazed and confused.  And, I'm sorry, I will get you a page number and -- one second.  Okay.  That would be page 66.

Now, on that date on your agenda you had get medical authorizations.  Do you recall whether you obtained medical

authorizations from Mr. Basham on that date?

A.  I had -- I do a PI practice, too, so I think I had medical authorizations signed.  I can't remember then if they had the HIPAA notices on them.  Since it was going to be seeking psychological I feel like I had him sign them.  But I had -- because we were still trying to figure out where he had been, but I don't believe that we ever requested them.

Q.  Okay.  But if he were dazed and confused that day you would have some concern about actually having him sign a document authorizing that, wouldn't you?

A.  For the simple medical authorizations to get the records, no, I wouldn't.  I'd have just had him sign them, honestly, had him sign them to get the records to figure out what's going on.  Because he's going to be the only one that can authorize me to get them.

Q.  Okay.  And you also testified that you gave Mr. Basham a letter to give to law enforcement officers, and I believe that was Defendant's Exhibit 4.  It was a letter basically saying don't talk to me, because you were concerned that law enforcement officers were going to come in and talk with him?

A.  Well, the purpose of the letter was they did.  And the City of Conway took the position that I had been appointed, although they were the same officers that I had done the search with, they took the position that I was only appointed on the federal case and had nothing to do with the state case.

Monckton - Cross                              228

So to clear up any misunderstanding I may have given Brandon a letter that if anybody comes in, he's not to say a word to anybody and show them that.

Q.  Had he been incompetent wouldn't that be a problem, that he wouldn't know who to give this letter to or when to give it to someone?

A.  I mean, I didn't make a judgment call on incompetent or competent at that time.  I knew it was going to be an issue. And you got to understand I had people coming at me from so many different ways wanting to get to Brandon, and he was being housed an hour and a half away, that I wanted law enforcement to know that if it ever became an issue, they got a statement from him, that I was going to have that letter in court to show a judge or whatever that, you know, everybody knew they couldn't talk to him.

Q.  Switching gears once more, you discussed in an e-mail with David Bruck the possibility of getting a court-ordered competency evaluation, didn't you?

A.  That's correct.

Q.  And I believe in the exhibit, defendant's exhibit yesterday and Government's Exhibit 218, that Mr. Bruck advised against having a court-ordered competency evaluation.

A.  You know, my experience with a lot of court evaluations have been in the state system and they are done a lot differently in the state system.  So that's why I was reaching

out to someone like Mr. Bruck.  He advised not to do it, obviously, until we had a private interview done.

Q.  Okay.  And basically that's what Mr. Swerling ended up doing, wasn't it?

A.  Honestly, I don't know.

Q.  Okay.  Well, if I told you that Mr. Swerling with the assistance of a psychiatrist who saw Mr. Basham on a regular basis numerous, numerous times during the course of litigation, that based on this Mr. Swerling felt that Mr. Basham was competent, would you disagree with Mr. Swerling on that?

A.  I'm not going to disagree with Mr. Swerling.

Q.  Okay.  Thank you.

MS. EWING:  Beg the court's indulgence.

(There was a pause in the proceedings)

MS. EWING:  Thank you.  The government has no further questions.

THE COURT:  All right.  Mr. Burke, we're a little bit over time for our afternoon break.  Do you think you will be short or not?

MR. BURKE:  I only have three questions.  I think I only have three questions.

THE COURT:  All right.  Go ahead.

MR. BURKE:  That way Mr. Monckton can go home.

REDIRECT EXAMINATION

BY MR. BURKE:

Q.  Mr. Monckton, the Thanksgiving day search, the intention was to have Mr. Basham speak to law enforcement in order to assist in finding Miss Donovan's body but to do so in your presence, is that correct?

A.  That's correct.

Q.  And you made it clear to law enforcement that was your intention, correct?

A.  That's correct.

Q.  Would you agree with me as a defense attorney that it's a significantly different matter to allow your client to be interrogated by law enforcement outside of your presence?

A.  Yes, I would.

MR. BURKE:  Thank you very much.

THE COURT:  All right.  Let's take our afternoon recess.  We will be in recess for 15 minutes.  Who will be next?

MR. BURKE:  Mr. John Castro, who is our investigator from our office, who would be I think a very short --

THE COURT:  All right.  We will be in recess.

(A recess transpired)

THE COURT:  Please call your next witness.

MR. BURKE:  Your Honor, the defendant calls John Castro.

(John Castro duly sworn)

MR. BURKE:  Your Honor, just to give the court some guidance, Mr. Castro is going to provide some very brief testimony on his investigation regarding the issue regarding the juror Cynthia Wilson.

THE COURT:  All right.  Very good.

DIRECT EXAMINATION

BY MR. BURKE:

Q.  Would you state your name for the record, please?

A.  John Castro.

Q.  And, Mr. Castro, where are you employed?

A.  With the Federal Public Defender's office in Arizona.

Q.  And what is your position at the Federal Public Defender's office in Arizona?

A.  I'm a capital habeas investigator.

Q.  How long have you been in that position?

A.  For nine years.

Q.  Are you assigned to the case of Brandon Basham?

A.  Yes, I am.

Q.  As part of your role as investigator were you asked to investigate the issues in the case concerning the juror Cynthia Wilson?

A.  Yes, I was.

Q.  And did you review the transcripts of the several hearings that Judge Anderson conducted with regard to Juror Wilson's contact with the media?

A.  Yes, I did.

Q.  Do you remember any portions of the hearing transcripts concerning Cynthia Wilson's telephone calls to other jurors?

A.  Cynthia Wilson testified that, it's not verbatim, that if she made the call to Shannon Burnett it would have been about doing some sod work.

Q.  More generally, do you recall topics about questions regarding her calling jurors in the case?

A.  Yes.

Q.  Okay.  Did she testify concerning conversations she may have had with a juror by the name of Shannon Burnett?

A.  Yes, she did.

Q.  And let me first ask you, based on your investigation and based on the record, was the juror Shannon Burnett a male or a female?

A.  The juror was a male.

Q.  What did Juror Wilson testify to at the hearings about her calls to Mr. Burnett?

A.  She testified that, again, it's not verbatim, that if she made the call to Mr. Burnett that it would have been about him doing some sod work at her house.

Q.  Now, in May of 2011 in your work on this case did you travel to Maryland and Washington, D.C. with counsel?

A.  Yes, I did.

Q.  Okay.  And while you were there did you meet a man by the

name of Greg Wilson?

A.   Yes, I did.

Q.   And who was Greg Wilson.

A.   He is the former husband of the juror Cynthia Wilson.

Q.   And where did you meet with Mr. Wilson?

A.   We met in his home in Pikesville, Maryland.

Q.   Did Mr. Wilson appear reluctant to talk with you?

A.   No, he did not.

Q.   How long did you meet with him?

A.   I would say an hour and 15 minutes, maybe an hour and a half.

Q.   During that hour or hour and a half meeting did you talk with Mr. Wilson about his ex-wife's testimony at the hearings in this case?

A.   Yes.

Q.   Okay.  Did you ask him about her testimony about her possible contact with the juror Shannon Burnett?

A.   Yes.

Q.   And without telling the court what Mr. Wilson said, did Mr. Wilson tell you anything that led you to believe that Miss Wilson's testimony to this court might not have been accurate?

A.   Yes.

Q.   Did you conduct an investigation regarding the telephone number for Shannon Burnett that Miss Wilson called in 2004?

A.  Yes, I did.

Q.  Did you review the juror questionnaire completed by Mr. Burnett, the juror in this case?

A.  Yes.

Q.  Could you bring up Defendant's Exhibit 28?  Mr. Castro, are you able to see that?  We can enlarge it, possibly.

A.  That's fine.

Q.  And can you tell --

THE COURT:  Let me -- the Wilsons split up after the trial?

MR. BURKE:  Yes, your Honor.

THE COURT:  Okay.  All right.  Go ahead.

Q.  (MR. BURKE) That's my understanding.  Mr. Castro, do you know when Mr. and Mrs. Wilson divorced?

A.  Yes.

Q.  Is that based on Mr. Wilson's statements to you or did you find it in records?

A.  Yes.  He's since remarried.

Q.  Do you know when they divorced?

A.  Not off the top of my head, no.  I do have that information.

Q.  Can you tell us what Defense Exhibit 28 is, please?

A.  It's the juror questionnaire for Mr. Shannon Burnett, the juror in this case that we're talking about.

Q.  And was Mr. Burnett's telephone number available on that

questionnaire?

A.   Yes.  He had two numbers listed, including a home telephone number.

Q.   Mr. Castro, based on your review of the record in this case are either of the numbers listed for Juror Burnett numbers that were called by juror Cynthia Wilson?

A.   No, they are not.

Q.   And can you tell us what is an Accurint, ACCURINT, database search?

A.   That is a database available to us for searching for addresses and social security numbers, dates of birth and all kinds of information following that.

Q.   Is it used to locate witnesses?

A.   Yes, it is, among other things.

Q.   Did you do an Accurint database search for the name Shannon Burnett?

A.   Yes, I did.

Q.   Did you find an entry for Shannon Burnett with the telephone number that Juror Wilson in fact called?

A.   Yes, I did.

Q.   Okay.  Did that Accurint search indicate the gender of the person named Shannon Burnett who had the phone number that Juror Wilson called?

A.   Yes, it was a female who lived in Moore, south Carolina, a different town from the juror.

Castro - Direct                              236

Q.   Okay.  So your Accurint search suggested the number Cynthia Wilson called during the trial of Mr. Basham's case belonged to a woman named Shannon Burnett?

A.   That's correct.

Q.   And juror Shannon Burnett was a male, correct?

A.   Yes, sir.

Q.   Did you travel with members of the Basham defense team to South Carolina in June 2012?

A.   Yes, I did.

Q.   Okay.  What was the purpose of the trip?

A.   We were going to be doing juror interviews.

Q.   Were you in South Carolina for several days in 2012?

A.   Yes.

THE COURT:  I got lost on the numbers.  I'm trying to follow in the transcript here.  The juror with this name that served on the jury was a male and he found a number on the Accurint, Accurint, is the name that was a female?

MR. BURKE:  That had the number that Miss Wilson testified that Miss Wilson called.  We had printouts from the trial.

THE COURT:  Where are we going with this?

MR. BURKE:  Your Honor, the purpose of this testimony is to show that there is additional evidence that Miss Wilson testified untruthfully or inaccurately to this court about her actions.

Castro - Direct                          237

THE COURT:  You know, the whole time, just to stop and talk about lawyers, the whole time we had these juror hearings, I think we had what, nine hearings, maybe?

MR. BURKE:  Yes, your Honor.

THE COURT:  I was concerned about evidence Rule 606, I'm sure you are familiar with it, which makes a juror incompetent to testify to anything that would impeach the verdict.  And I teach a course of evidence at the law school and the case book, there's a case written by Justice O'Connor where the jurors, you know, I'm sure you read it, took drugs, drank alcohol, slept during the trial, and Justice O'Connor said, read the rule, it's not admissible.

And the rule's grounded upon the need for finality in litigation where you -- you go back and challenge the verdict and flyspeck everything a jury did you'd never have any end to litigation.  So the cases that have been decided, in addition to that one case, cite the things like premature deliberations, the foreperson of the jury bullied everybody into a guilty verdict, the jury misunderstood the beyond a reasonable doubt jury charge and thought it was a preponderance of the evidence, all of that is off the table.

So what are we going to here, premature deliberations?  Because I think that is mentioned.  Granted, it's misconduct, it could be misconduct, but if it is something the rules of evidence permit.

MR. BURKE:  Well, your Honor, you are absolutely correct that Rule 606 would prevent us from going into that and I'm not attempting to do that.  And I don't want to overstate the extent of the evidence that we have, but it is something I felt was important.

THE COURT:  I remember being shocked at the number of calls, nighttime calls.

MR. BURKE:  Right.

THE COURT:  But, as I said at the time, I have had cases where jurors form a romantic relationship during the trial.  Not this one, but I mean -- and at some point I felt like we had to respect the privacy of the jurors, especially, especially when whatever they might say could be incompetent evidence under Rule 606.  But, anyway, with that observation go ahead.  I'm not trying to cut you off.  Go ahead.

MR. BURKE:  And I will concede, your Honor, this is a little bit confusing, and I will also concede that this evidence has I think limited evidentiary weight but is something we would like the court to consider with regard to our issue.

THE COURT:  Go ahead.

MR. BURKE:  And I will avow that we do not intend to go into Rule 606(b) evidence, nor do we intend to go to anything personal with regard to the jurors.  Our concern is, of course, if there was information provided to one juror from

another juror from an outside source, and our greatest concern was were any of the jurors informed prior to their deliberations that Mr. Fulks had in fact been sentenced to death. That is the focus.

THE COURT: All right.

BY MR. BURKE:

Q. When you came to --

THE COURT: Let me stop right there. I think, I might be wrong, it's been a long time, there was a big debate about whether the jury should be told in this case what happened to Mr. Fulks. And it was a two-edged sword. I mean, if you represent the defendant, well, you could say, well, if this jury knows that Mr. Fulks has already been given the death penalty then this jury will be relieved to know that the real culprit has been caught and punished. Or you could say well, since they acted together and were equally culpable, if Mr. Fulks got the death penalty that means Mr. Basham should probably get it, as well.

So nobody knew how that might play out with the jury. And I think in the final analysis we just reached a consensus to keep that from the jury. And y'all probably know more about it than I do because you've read the transcript more recently than I have. But did the defense lawyers ask me to admit that, to admit that to the jury and I declined or was it just agreed to?

MR. BURKE:  Your Honor, I honestly can't give you an answer to that right now, but I can check and I can let you know.  I honestly don't recall.

THE COURT:  I remember it was discussed but I don't remember how it was resolved.  All right, go ahead.

MR. BURKE:  I just -- you are the fact finder here, Judge, and I want to make sure we're making -- so you understand the point we're trying to make, which is that we believe, and we presented some exhibits to suggest that Miss Wilson was not truthful to your Honor.  And that I know you held her in contempt, and I know that you asked the jurors whether any of them had had premature deliberations, and those were the exact words that you asked.  We're simply trying to create a record for your Honor to consider whether further, more detailed conversations with the jurors would have been appropriate.

THE COURT:  All right.  Well, the attorneys pushed me, Mr. Swerling and Mr. Harris pushed me hard to go further. And at some point I just said we have had nine hearings, we brought all the jurors back at least once, some of them several times.  So go ahead.

MR. BURKE:  Okay.  Well, your Honor, I will simply ask Mr. Castro, did you meet, when you were in South Carolina, with a juror, with a woman -- with a woman named Shannon Burnett?

THE WITNESS: Yes, I did.

Q. (MR. BURKE) And was she a juror in this case?

A. No, she was not.

Q. Did you meet with the male who was a juror in this case, Mr. Burnett?

A. Yes, I did.

Q. And without telling me his response, did you ask him whether he had been contacted by a Juror Wilson?

A. Yes.

Q. You did ask him that?

A. Yes.

Q. Without telling me his response, telling us his response, did you ask him if he had ever had the following phone number, (864)587-2341?

A. Yes.

Q. Okay. And after meeting with Mr. Burnett did you prepare a declaration for his signature?

A. Yes, I did.

Q. Did you return the next day in June of 2012 for him to sign it?

A. Yes.

Q. And were you successful?

A. No.

Q. What did you do with the declaration?

A. We got back to the office maybe four days later and I

wrote a letter and mailed it out to him.

Q.  When you met with jurors in 2012 did you carry with you a piece of paper that I had written that I asked everyone involved in the investigation to carry with them?  Do you recall that?

A.  Yes.

Q.  Did that sheet of paper inform the jurors who we were, who we represented, and that they did not have to speak with us?

A.  That's correct.

Q.  Did it also say if they had any questions that they could contact Judge Anderson?

A.  Yes.

Q.  Okay.  And you would have given that to Mr. Burnett?

A.  We gave them to all the jurors, yes.

Q.  When you met with the juror who was -- with the person who was not the juror who was a woman who was Shannon Burnett, did she talk with you about her knowledge of this case?

A.  Yes.

Q.  Did she have any knowledge of this case?

A.  No.

Q.  Okay.  Did you ask her about her phone number?

A.  Yes.

Q.  Did she prepare -- did you prepare a declaration for her signature?

A.  We actually prepared it together.  We were present with

her.

Q. Okay. I'd like you to take a look at Exhibit 21. It's been admitted as Defense Exhibit 21. Mr. Castro, is that --

A. Can you enlarge it a little bit?

Q. Okay.

A. Thank you.

Q. Is that the declaration you obtained from the juror -- the non-juror Shannon Burnett?

A. Yes.

Q. And that states that she had in 2003 the telephone number listed there, which is, in fact, the number that Juror Wilson called during Mr. Basham's trial, correct?

A. That's correct.

Q. Okay. How many times did Miss Wilson call this number that belonged to the female Shannon Burnett?

A. Three occasions.

Q. Three occasions?

A. Yes.

Q. And how long were those phone calls?

A. One was very short, the other two were eight minutes and 11 minutes, or somewhere around that.

        MR. BURKE: Okay. I have no further questions, your Honor.

        THE COURT: All right. Cross-examination.

                    CROSS-EXAMINATION

Castro - Cross                                    244

BY MR. WITHERSPOON:

Q.  Good afternoon, Mr. Castro.

A.  Good afternoon.

Q.  My name is William Witherspoon with the U.S. Attorney's Office.  I want to get little bit of background information from you.  You have been with the Federal Public Defender for nine years, correct?

A.  Yes, sir.

Q.  What did do you before that?

A.  I worked with the Maricopa County Public Defender's Office for a little over ten years.

Q.  And before that?

A.  Was with the Office of Special Investigations, state of Arizona, and before that I was a Chicago policeman for 13 years.

Q.  So you've had a lot of police experience.

A.  Yes, sir.

Q.  And as part of that experience during your training -- you had a lot of training, too, haven't you?

A.  Yes, sir.

Q.  And part of that training is, as a police officer or an investigator, to be thorough, isn't it?

A.  Yes, sir.

Q.  Now, you provided an affidavit in this case, didn't you?

A.  Yes, I did.

Q.  Do you remember it?

A.  Yes.

Q.  Would you like to see it?

A.  Yes.

Q.  And then we will talk about it.  This is Exhibit number 6 to the 2255 filed by the defendant.

A.  Thank you.

Q.  Now, according to your affidavit, I'm looking at paragraph three, you intimate that Miss Wilson lied on her jury questionnaire, didn't you?

A.  Yes, sir.

Q.  And you base that on some records in the Spartanburg Clerk of Court's office, correct?

A.  Yes.

Q.  Pull up Government Exhibit number 185.  Is that one of the documents you talk about there, the $650.18 from the South Carolina Department of Revenue?

A.  I don't have them with me, but that looks correct, yes. That was among the documents.

Q.  That was one of them.  Do you know what this document references?

A.  It's a tax lien, I believe.

Q.  It's a tax lien?

A.  Yes.

Q.  Do you know how that tax lien is filed in South Carolina?

A.   It's through the court, I believe.  There's a -- I know there was a judgment issued by the court.

Q.   There's a judgment issued by the court.  But does that mean that someone has sued or been sued?

A.   No, not necessarily.

Q.   When Miss Wilson said I have not been sued or been -- sued or been sued, based upon this she didn't lie, did she?

MR. BURKE:  Objection, calls for a legal conclusion. Mr. Castro is not a lawyer and cannot --

MR. WITHERSPOON:  He said that's the judgment there. He can tell whether or not she lied or didn't lie because she had been sued.

MR. BURKE:  There is a judgment.

THE COURT:  Well, we can argue it.  I understand the point.  I mean, I don't think his answer is going to help me one way or another.  I'm trying to remember -- what type of a tax lien was it?

MR. WITHERSPOON:  Judge, we're going to have a witness tomorrow, possibly, who will lay all this out for us.

THE COURT:  All right.

BY MR. WITHERSPOON:

Q.   Pull up Government Exhibit number 184.  This also is in your paragraph number three.  This is a tax lien for $1,761.69, correct?

A.   That's correct.

Q.  When you got that document did you verify what that document was?

A.  Only in the sense that it followed up with the other document which I pulled from the South Carolina court index. That's where I got the original information from, which indicated a judgment.

Q.  Did you call the Department of Revenue, see what that document was?

A.  I called several days -- well, it's been a couple of weeks ago.

Q.  Did they tell you -- so you only called a couple of weeks ago?

A.  Right.

Q.  You did an affidavit back in 2011.

A.  That's correct.

Q.  So when you saw that you didn't follow up to figure out what that was.

A.  I just saw this recently, too.  I, like I said, I saw the original document that showed the index from the state of South Carolina.  This document I saw recently.

Q.  So you didn't go to the records to figure out what the documents, tax liens were, you just said it was a tax lien and so she must not been truthful?

A.  That's correct.  I sent her this document later on.

Q.  You would agree with me that that's not being thorough as

an investigator, don't you?

A.  My understanding of what I was looking at with the South Carolina index judgment was that it was some kind of filing, civil filing in the South Carolina courts, and I was under the assumption she would need to report that on the jury questionnaire.

Q.  But as an investigator with all this experience you made assumptions and you didn't follow through, correct?

A.  That would be correct.

Q.  Look at paragraph four.  You state there that Miss Wilson lied or was not truthful when she stated that she had been working as a nurse for four years when actually she only had been licensed for two years and seven months, correct?

A.  That's correct.

Q.  Did you follow up and figure out if she had worked as a nurse without being licensed?

A.  That was based on the licensing itself.  That's all that statement means.

Q.  So when she said I have been working as a nurse for four years, that may not be untruthful, it just means she hadn't had a license for four years, is that correct?

A.  That would be correct.

Q.  But you didn't follow up to figure out if this two years and seven months could have also added on time as a student nurse or training as a nurse, did you?

A.  I believe I could not find anything on that information, as I recall.

Q.  You couldn't find it or you didn't find it?

A.  I didn't find it.

Q.  So you did look?

A.  Yes, my recollection.

Q.  So the simple fact that she said that she had been a nurse for four years, that indicates that she was untruthful on her questionnaire, did it?

A.  Just based on the issuance of a license, that's what I went by.

Q.  But that's not what you said in --

A.  Correct.  I understand.

Q.  Mr. Basham feels she lied because she has only been a nurse for two years and seven months, and that's not true, is it, Mr. Castro?

A.  That's correct.

Q.  Look at paragraph six.

        MR. BURKE:  Your Honor, I'm sorry, I object.  He's asking Mr. Castro to assume facts not in evidence.  We don't -- he's making an assumption she might have worked when she was not licensed.  Does he have in evidence of that?

        MR. WITHERSPOON:  Judge, I think the issue is did he do any investigation and the answer is no.

        THE COURT:  You said you had more testimony coming

from that tax lien.  Do you have more testimony coming about the --

MR. WITHERSPOON:  We do not.  We do not.

THE COURT:  As long as you just ask him about whether his investigation was thorough enough, I think it's a proper question.  I understand it might be speculation as to why the years were different, but I'll allow that question.

BY MR. WITHERSPOON:

Q.  Look at paragraph six in your affidavit.  You indicated that Miss Wilson was untruthful on April 28, 2008 when she was asked had she had any disciplinary action by a nursing board, correct?

A.  That's correct.

Q.  Do you know when this trial took place, sir?

A.  2004.

Q.  And do you know when the brief, the appeal briefs were filed in this case?

A.  Yes.

Q.  When?

A.  Well, no, I don't, actually.  I couldn't.

Q.  You wouldn't disagree it was filed in April of 2008, right?

A.  That sounds about right.

Q.  So the defendant and the court would not have been aware of something that happened on April 28, 2008, would they?

A.   That's correct.

MR. BURKE:  I'm not even sure I understand the question.  Can you say that again?

Q.   Certainly.  The brief in this case was filed when, Mr. Castro?  May 2008, wasn't it?

A.   That's what you said.

Q.   The appeal brief, right, correct?

A.   Yes.

Q.   And according to your paragraph six, Miss Wilson may have told a falsehood on April of 2008, correct?

A.   That's correct.

Q.   At that point the lawyers for Mr. Basham would not have been aware of that application, would they?

MR. BURKE:  Objection, your Honor.  This claim against -- regarding Juror Wilson is a claim of newly discovered evidence of her untruthfulness before the court in a hearing.  It's not a question of their ineffectiveness on that point.

THE COURT:  All right.

MR. WITHERSPOON:  Judge, April 2008 there was nothing before the court.  She had not been untruthful at least as far as that incident, because there was nothing here before the court.  It was in the appellate section.

THE COURT:  It was what?

MR. WITHERSPOON:  In the appellate section.  The

brief was filed May 2008.

THE COURT:  What was she sanctioned for?  What was she written up for?

MR. BURKE:  Your Honor, could I address that?

THE COURT:  Yes, sir.

MR. BURKE:  This goes to Miss Wilson's untruthfulness on her nursing license renewal.  When she was asked if she had -- I don't have the exact language.  After, your Honor, your Honor, after her contempt proceedings in your case when she answered no if she had any prior disciplinary actions before any nursing board in any jurisdiction.

THE COURT:  And my sanction was a disciplinary action.

MS. STONE:  I'm sorry, your Honor.  I worked on this claim a little bit more so I may be able to answer it.  Miss Wilson was asked initially by the nursing board on a nursing license renewal whether or not she had ever been -- had any convictions.  She lied, they found that she lied about the contempt conviction by your Honor in this court, and she was disciplined for that.  She then subsequently lied again, and that's what the paragraph six refers to, about lying about that contempt conviction.  Does that -- it's very convoluted.

THE COURT:  It's a two-step series of lies, in other words.

MS. STONE:  And that's --

Castro – Cross                        253

THE COURT:  But --

MS. STONE:  That's the point of our newly discovered evidence claim is this woman continued to lie and --

THE COURT:  Well, I'm just struggling with this, because we just got the rule on finality in inquiring into a jury verdict, if we went out and flyspecked every juror in every case to see if they had committed a lie later on in life to go back and impeach the verdict there would never be an end to litigation.

MR. BURKE:  Your Honor, not every -- you must agree with us that Miss Wilson is not every juror and --

THE COURT:  It's clear she was not a truthful person to me.  I mean, she lied right there in that chair several times.  So the fact that she was a perjurer has been well established.  I don't know that this really adds anything more to it.

MR. BURKE:  It's simply further evidence that we -- I understand she's not just any juror, she's the principal juror at the center of the misconduct that occurred.  But I understand your point, but --

THE COURT:  Mr. Witherspoon, anything else on this particular point?

MR. WITHERSPOON:  No, Judge.  If I can go into other points, exactly the same way.

THE COURT:  Go ahead.

BY MR. WITHERSPOON:

Q.  If you look at paragraph seven of your affidavit, you indicated that she was not truthful in April of 2010, correct?

A.  That's correct.

Q.  And, again, this was over in May -- at least in May of 2008 is when the brief was written, correct?

A.  That's correct.

Q.  Now look at paragraph eight.  In your affidavit you indicate that Miss Wilson was untruthful when she said that she has never been convicted under any federal law.  Correct?

A.  That's correct.

Q.  What federal law was she convicted of?

A.  This wording was from the document where she was disciplined.  I got this wording from their document.

Q.  What --

A.  They disciplined her for these -- for that very reason.

Q.  What federal law was she convicted of?

A.  Again, I'm reading -- taking this from their document.

Q.  So you didn't --

A.  The document's in evidence.  That's all I have.

Q.  So you didn't investigate, determine if that was a true statement or not?

A.  She was held in contempt and -- that's what they knew so they --

Q.  So being held in contempt is not a violation of federal

law, is it?

A.   What I'm saying is --

         MR. BURKE:  Objection.

         THE WITNESS:  This is dealing with what the report says.  I'm going -- I wrote what the report said in my declaration.

Q.   (MR. WITHERSPOON) But you never went further to investigate to make sure that was true, did you?

A.   I investigated as far as getting the document and reading it in the document.  Other than that, no.

         THE COURT:  Did you have an objection?

         MR. BURKE:  Your Honor, I have an objection to questions of Mr. Castro about criminal contempt being a -- I believe he answered the questions.  We withdraw the objection.

         THE COURT:  Go ahead.

Q.   Now, let's talk about these phone calls.  In Mrs. Wilson's testimony before the court isn't it true she says I'm not sure I called Shannon Burnett?

A.   I believe the word was if I called him it would have been about --

Q.   If I called him it would have been about sod, not that I did call him, correct?

A.   I said that when I testified.  I said if I called him.

Q.   So the fact that she called another Shannon Burnett at this telephone number indicates nothing, does it?

A.   It indicates she was trying to contact Shannon Burnett.

Q.   But other than that it indicates nothing else.  Because she said if I called him it would have been about sod.  She tried to call a Shannon Burnett, it wasn't the juror, correct?

A.   Correct.

Q.   It was another Shannon Burnett, correct?

A.   Correct.

Q.   And there's only three phone calls, correct?

A.   That's correct.

Q.   And Miss Burnett said I never talked to her, correct?

A.   The female Shannon, yes.

Q.   The female Shannon never -- said I never talked to her, correct?

A.   Correct.

Q.   So she -- there is no indication she was false, that she gave -- testified falsely, is there?

A.   Other than the fact she called someone other than the juror Shannon Burnett, no.

Q.   But she never said I called someone other than the juror, she said if I called Shannon Burnett it would have been about sod.

A.   Yes, sir.

Q.   So she didn't testify falsely, did she?

          MR. BURKE:  Objection.  Calls for a legal conclusion.

          THE COURT:  Overruled.  I think it's a fair question.

Q.   She didn't testify falsely, did she?

A.   That would be correct, I guess.

Q.   So the affidavit you supplied in this 2255 in a declaration from Mrs. Burnett, no indication that Mrs. Wilson was untruthful to this court during any time of the testimony when the judge was inquiring into the jury, correct?

A.   Related to the trial, no, sir.

          MR. WITHERSPOON:  Thank you.

          THE WITNESS:  Okay.

          THE COURT:  All right.

          MR. WITHERSPOON:  Let me get that back from you.

          THE COURT:  Any redirect?

                    REDIRECT EXAMINATION

BY MR. BURKE:

Q.   Mr. Castro, was Cynthia Wilson disciplined by the nursing board for making false statements on a renewal application?

A.   Yes, she was.

Q.   There's no question about that, is there?

A.   No, sir.

Q.   And the documents support that?

A.   Yes.

Q.   Did Cynthia Wilson make three phone calls to a person by the name of Shannon L. Burnett?

A.   Yes.

Q.   During the trial of Mr. Basham?

A.  Yes, she did.

Q.  No question about that, either, is there?

A.  No, sir.

Q.  Okay.  Is there any question about the fact that Miss -- Miss Wilson was calling a Shannon Burnett by a -- with a phone number totally different from the numbers that belong to the juror Shannon Burnett?

A.  Yes.

Q.  Can you take a look at the affidavit, the declaration in Exhibit 21 that was prepared by Miss Burnett in this case, prepared by you and signed by Miss Burnett.  And could you look, please, Mr. Castro, at paragraph five of that declaration by non-juror Shannon Burnett.  And can you read the dates of the phone calls that Cynthia Wilson made to the non-juror Cynthia Burnett -- I mean Shannon Burnett?

A.  She wrote, I do not recall receiving phone calls on the dates of October 15, 18, or 29th of 2004 from a Cynthia Wilson or anyone regarding the Basham trial.

Q.  And does the record in this case indicate that Miss Wilson called that number on October 15, October 18, and October 29?

A.  Yes.

Q.  Of 2004?

A.  Yes.

Q.  Do you know, was that during the penalty phase of Mr. Basham's trial?

Castro – Redirect                    259

A.  I believe, yes.

MR. BURKE:  No further questions.

MR. WITHERSPOON:  Just one follow up, Judge.  If you could leave that up.  If you could read paragraph six, please.

THE WITNESS:  I spoke with my husband Joey Burnett and he does not recall a Cynthia Wilson or receiving any calls on the previously mentioned dates.

MR. WITHERSPOON:  Thank you.

MR. BURKE:  Okay.

THE COURT:  I don't have any questions.  I mean, the ghost of Cynthia Wilson still hovers over this trial.  I mean, what -- to begin with, what are the odds the sheriff would be convicted for public corruption, the investigator hired by the defense lawyer we find out he's a sex pervert and had been disciplined, and now we find out Miss Wilson called somebody with the same name as a juror three times, two of the calls were eight minutes and 11 minutes, but the person who received those calls doesn't remember the calls.

MR. DALEY:  If you wanted to hear argument about this and get it over with right now.

THE COURT:  I want to make sure I'm not missing something.  It's a big question mark.

MR. BURKE:  I can say in one sentence, your Honor, we shouldn't execute someone when there's a big question about the fairness of his trial.

260

THE COURT: We will hear argument later. I just want to make sure I'm understanding the testimony.

MR. DALEY: The testimony is they have evidence she lied three or four years later on licensing board applications, they have evidence that perhaps she's trying to call juror Shannon Burnett and she instead calls the non-juror Shannon Burnett, and may -- or may have talked to the non-juror Shannon Burnett. And her testimony before you was I don't remember calling juror Shannon Burnett, but if I did I called about sod. And we have a declaration from her husband who said, I do all the yard work, actually her ex-husband, and there would have been no reason for me -- for her to have called somebody about sod. Well, I happen to do the yard work in my house and I don't do the sod. I mean, there's -- but anyway, I don't mean to --

THE COURT: We will argue it later. I just want to be sure I understand. There's sort of a question mark about the call. All right.

MR. BURKE: Thank you.

THE COURT: Anything further? Thank you, sir.

THE WITNESS: Thank you, your Honor.

THE COURT: It's's little bit after 5:00. Do you have a witness we can start on?

MS. STONE: We do, your Honor. Mr. Greg Harris is here and we can go ahead and start with him.

261

THE COURT:  Go ahead and start with him.

(Greg Harris duly sworn)

MS. STONE:  Your Honor, as a preliminary matter, I just spoke to the government about this but I want to let you and Mr. Harris know, to try and speed things along, I had originally intended to go through larger sections of transcripts.  I am going to briefly summarize in my question what those transcripts are.  If at any time the government or Mr. Harris or the court would like to see that actual transcript we do have them loaded and we can bring up the pages.  But to try and speed things along I'm not --

THE COURT:  Let me emphasize we're a little bit behind schedule but I'm not rushing anybody.  We can take all the time necessary to hear this case.

MS. STONE:  I think we can get everything -- I want everybody to know, I don't want to mischaracterize anything and we have the transcripts if people need to see them.

THE COURT:  Very good.

MS. STONE:  Thank you.

DIRECT EXAMINATION

BY MS. STONE:

Q.  Good afternoon, Mr. Harris.

A.  Good afternoon.

Q.  Thank you for being here and being here yesterday and being willing to miss your daughter's tennis match.  I know

it's been a bit of an ordeal, so thank you for your patience.

A.   Not a problem.  I actually got to go, thank you very much.

Q.   Good.  Can you give us a little bit of information about your background, where you went to law school?

A.   My background, I went to Irmo High School here in the Columbia area.  I attended The Citadel from 1979 through 1983. I immediately entered into the University of South Carolina School of Law and graduated 1986.

Q.   And what did you do when you graduated?

A.   After graduation I worked for a circuit court judge, Marion Kinon, for a year.  After that I went into what we have here, the solicitor's office, which is the district attorney's office where you are, and prosecuted any number of crimes. The end of my tenure there I was prosecuting violent crimes.

     After that I was employed at the United States Attorney's Office here in the District of South Carolina.  I was there for approximately four years, where I served as a deputy chief of the criminal division under United States Attorney Bart Daniel.

Q.   And did you go into private practice at some point?

A.   Yes, I did.  Sometime I think March, it was March 3, 1993 I went to private practice.

Q.   And did you share office space with Jack Swerling?

A.   Yes, I did.

Q.   And how long did you do that for?

A.  I was sharing office space with Jack Swerling until five years ago in September, so I think it would have been 14 years.

Q.  You were sharing office space with Mr. Swerling at the time you were appointed on Mr. Basham's case, is that correct?

A.  That is correct.

Q.  And you were appointed in April of 2003?

A.  That's correct.

Q.  And is it correct that you were not the original lawyers appointed on Mr. Basham's case?

A.  Yes, it is.

Q.  Can you explain the circumstances of your appointment a little bit?

A.  Well, obviously, I believe Jack Swerling is on the top of everybody's list when it comes to appointing someone to a death penalty case.  I recall that Jack would have been contacted first.  I was contacted sometime thereafter, I can not remember by whom.  I know that I spoke with a number of death lawyers in the state.  I spoke with John Delgado, I spoke with Bill Nettles, I spoke with David Bruck.  I remember David Bruck called me and asked me would I be willing to be involved in the case.  And at some point I obviously spoke with Jack, and I believe that I was requested -- the court asked me to be involved in the case.

Q.  Thank you.  And would you agree with the characterization

that the Basham case was a massive undertaking?

A.   Oh, absolutely.

Q.   Can you expand on that little bit?  Can you describe maybe the scope of the case?

A.   It involved many states, it involved many witnesses.  And when I say many states, North Carolina, South Carolina, West Virginia, Kentucky, Indiana, Massachusetts.  I don't think we ever got to Florida, I don't think that we ever went into Tennessee.  But the states that I mentioned involved all those states and a lot of time in each of those states, with the exception of Massachusetts, where I think that we only had one appointment.

     In terms of witnesses, it was probably one of the largest cases that I've ever seen anyone be involved in, much less myself having been involved in.  And certainly in terms of witnesses and amount of discovery that was created by not only the government but also by the defense team, it was one of the largest cases I've ever seen anyone involved in.  So when you say -- your adjective was accurate in terms of describing this case.

Q.   And can you talk a little bit about the division of labor between you and Mr. Swerling to try and tackle this massive undertaking?

A.   Jack was in charge, and I think it was clear from the very beginning, as it should have been, that in terms of division

Harris - Direct                                    265

of labor I certainly had my own ideas about how things should be divided and about who should be doing what.  But at the end of the day I was -- you know, Jack and I have a very good relationship, so I'm not here to say I deferred to Jack on anything, but at end of the day I respected Jack's opinion enough, his expertise enough, and his involvement in other matters such as this enough to most of the time that if Jack had an opinion about something that's how it was going to be done, including the division of labor.

Q.  And were there also steps taken to keep track of the information gathered or things that had been done?  Specifically, was there a policy to write a memo for everything in this case?

A.  You know, I mean, Jack and I wanted memos when someone was interviewed, because Jack and I wanted to know as soon as someone was interviewed, or as close as possible to when they were interviewed, what they had to say about a particular topic or subject, no matter what it was.  Whether it was a doctor at Rivendell or whether it was a nurse at Cardinal, or whether it was a caregiver at one of the facilities that Brandon had visited when he was 12.  You know, obviously we wanted to stay on top of the interviews, we wanted to stay -- to know what everybody was saying and what information that they could give to us.  So, yes, in terms of keeping a memo, we wanted memos if we weren't involved in the interview so we

would know what people were saying.

Q.   And who was responsible for signing the vouchers in this case?

A.   Jack.

Q.   And who put the Basham team together?

A.   I think it was a collaborative effort in many respects.  I think, again, as the person most knowledgeable, the leader in this case, I think that certainly it could be fairly said that Jack had a very large role in putting that team together.

Q.   And at this point my understanding is that Mr. Basham and Mr. Fulks were the first federal death penalty case in South Carolina, is that correct, to your knowledge?

A.   Certainly in the last 50 to 70 years.  I cannot speak to what happened in the '40s, the '30s, the '20s, but certainly in my lifetime, yes, that is correct.

Q.   Did you have any state experience in death penalty cases at that point?

A.   I did not.

Q.   I want to go back to the team, and I want to focus on two team members and ask you some questions about Paige Tarr and then Carlisle McNair.  First Paige Tarr.  Would you agree that Paige Tarr fairly quickly built a relationship with Brandon Basham and some of the folks in Kentucky?

A.   Yes, she did.

Q.   And was she the lead litigation specialist?

A.   Initially she was.

Q.   And is it fair to say she was responsible for a fairly large number of interviews?

A.   You mean -- if you are looking at it now from when she started to where -- when she ended in her body of work, whether she participated in a large number of interviews, is that the question?

Q.   Whether she was responsible for finding a large number of individuals or taking a large chunk of that litigation investigation.

A.   Absolutely, I agree with that.

Q.   Was there an issue at some point in the case with Paige Tarr getting memos done in a timely manner?

A.   Yes.

Q.   And did Mr. Swerling have to speak with her about that issue?

A.   Yes.

Q.   At some point was Lisa Kimbrough brought in to replace some of Miss Tarr's hours?

A.   Yes, she was.

Q.   And did Miss Kimbrough have the same relationship with Mr. Basham as Miss Tarr did?

A.   I really can't speak to that.  I would guess yes, no, she wouldn't have, because I know Miss Tarr had really spent a good number of hours with Brandon's family and with Brandon.

So probably not.

Q.   Okay.  And I want to move on now to Mr. McNair.  Who hired Mr. McNair?  Who found him as a possible person --

A.   Jack.

Q.   And did you know Mr. McNair from his work when he was a law enforcement officer?

A.   You know, I thought about that.  I think someone asked me that question, you know, when we were preparing for this, maybe not that specific question, but I have given that some thought.  I do not think that I ever had a case with Carlisle McNair before he worked with us in Basham.

Q.   Okay.  And we have had a chance to speak prior to this hearing.  Is it a fair characterization of your words to say that you believe Mr. McNair was good at finding folks?

A.   Yes.

Q.   And folks, not Fulks.  I apologize.

A.   That's -- he was good at finding folks, yes.

Q.   And his purpose on the team was to be a fact investigator, is that correct?

A.   I mean, I would -- I don't want to say that was his singular purpose, but that was his role on the team was to -- that was one of his roles, yes.

Q.   Okay.  But I think, going into that thought, he also did interviews of witnesses who were potential mitigation witnesses?

A.  Correct.

Q.  Do you know if Mr. McNair had any training in mitigation work?

A.  I do not.

Q.  Another positive that's been said about Mr. McNair is he was good with interviewing law enforcement officers.  Would you agree with that?

A.  Yes.

Q.  Did Mr. McNair still view himself as a law enforcement officer?

A.  Did he?

Q.  Yes.

A.  I do not believe that he did.

Q.  Susie, can you bring up Exhibit 44?  And can -- the text part.  Thank you.  And just so you know, Mr. Harris, all of these have already been admitted in evidence by stipulation.  So this is an e-mail from Mr. McNair to the team.  Do you see there, once a cop always a cop?

A.  I see that, and that is Carlisle McNair.  When you said did he believe himself to be a cop, I want to make sure I'm clear.  He's a cop at heart.  I mean, you didn't have to show me this e-mail, my answer to you had you said, you know, did he believe to be a cop in the sense that he is always a cop, is he a cop at heart, I would have said yes.  Once a cop always a cop, I think that's probably the best description of

Mr. McNair, yes.

Q. So you think his description of himself there is accurate with your interactions with him?

A. Yes, that is correct.

Q. You are now aware Mr. McNair resigned from his job as a law enforcement officer after some issues, is that correct?

A. Yes.

Q. Do you recall what some of those reasons were?

A. It's a long time ago, I have not looked at those reports, but I think they had something to do with the inappropriate contact with an informant. It may have had something to do with inappropriate contact with young -- a young female, but --

Q. Do you recall?

A. It might have also had something to do with, and I don't want to say evidence tampering, but it might have had to do with a report or something that he pulled from a file that wasn't provided to defense during discovery.

Q. Do you recall anything about an obscene videotape, being disciplined for showing staff an obscene videotape?

A. No, I don't know that.

Q. You don't recall that. If it was in -- Susie, can you bring up 2255 exhibit -- I'm sorry, reply Exhibit 15. I'm sorry, 17. I apologize.

A. I don't deny that this document was provided to me. I'm

Harris - Direct                         271

just telling you I don't recall it today as I sit here.  But if you tell me that that was part of the investigative summary that was provided to us in discovery and that it was part of it, I accept that.

Q.  Okay.  One of the issues that shows up in the e-mail between McNair and the team is that Mr. McNair was trying to run down a sex tape of Veronica Evans.  Who was Veronica Evans?

A.  Veronica Evans was the girlfriend, lover slash part-time wife, maybe, of Chadrick Fulks.  I don't know that they ever got married but they had a relationship.

Q.  Do you recall her profession?

A.  Her profession?  I think she may have had a number of professions.  She may have at some time been a dancer, if that's the question.

Q.  Was he seeking out --  was Mr. McNair seeking out this sex tape at your direction?

A.  No.

Q.  Susie, can you bring up reply Exhibit 20?  And I apologize, there's a lot of text here.  If you look close to the bottom you can see that there's a sentence, asked if he had any videos of Veronica.  He advised he did, which he gave to us.  This particular video shows Veronica performing oral sex on Jones.  Did you ever see that video?

A.  Have not seen it.

Q.   Is it fair to say that was not an important part of the
case, mitigation case for Brandon Basham, from your point of
view?

A.   You know, whether it's important or not, I don't know that
I would have ever used it in a trial because she was never
going to testify in our trial against us.  It was, no, it was
of no importance to me.  It is -- as sit here today.

Q.   Another theme in Mr. McNair's e-mails was considerable
references to Brandon Basham's homosexual friends.  Do you
recall that at all?

A.   I really -- you know, again, you mention -- we talked
about it the other day.  I have no recollection that there was
an inordinate amount of references to Mr. Basham's
orientation.

Q.   If the e-mail showed that, you wouldn't dispute it.

A.   No.  No, ma'am.  I just don't remember it.

Q.   Was Mr. Basham's sexual orientation a theme of the case,
to your knowledge?

A.   No.

Q.   Was Mr. Basham gay, to your knowledge?

A.   I have no idea.

Q.   Okay.  And, again, if those questions were asked by Mr.
McNair were those at your direction?

A.   No.

Q.   And back to the issue with the discovery that you received

from the government about Mr. McNair's termination.  Did you know about those issues with Mr. McNair prior to receiving that discovery?

A.   No, ma'am.

Q.   And I think you already mentioned this, but do you recall that some of the issues with his firing may have been issues with dishonesty regarding disclosure?

A.   I don't know that I'd use the word dishonesty, because I can't remember the specifics.  I don't think it was anything -- no, I wouldn't use the word dishonesty.  I remember something about -- again, this is me remembering something from eight years ago, I do remember something about a piece of evidence that was in evidence when -- when discovery needed to be turned over to the defendant and it was later determined he may have had a role in it being taken out of the file or some way secreted out of the police department.

Q.   And one last question about Mr. McNair.  Have you hired him since?

A.   I may have been involved with cases with Jack after Brandon's case where Carlisle worked on the case.  I know, I know that I have hired Carolyn Graham in Carlisle's firm.  I cannot tell you that I've had any direct contact with Carlisle, outside of something I may have done with Jack.

Q.   Okay.  So cases where it was at your direction you have not hired Mr. McNair, his firm --

A.  I can't recall a time where I have called Carlisle up since this case and asked him to work on one of my cases.

Q.  Now I want to move on to some questions about the Jackson v. Denno hearing in this case.  At that point you all had been on this case just under a year, does that sound accurate?

A.  Sounds right.

Q.  And you had several statements to deal with in the Jackson v. Denno hearing, correct?

A.  Yes, ma'am.

Q.  Today I just want to focus in on the statements with Sheriff Hewitt.  At one point later in the case the government characterized that Hewitt statement, not the government here, the government at trial, as one of the most damaging.  Would you agree with that assessment?  And let me -- I'm referring specifically to the purse strap statement.

A.  Oh, I would agree that was an impactful statement.

Q.  And at the Jackson v. Denno hearing did Mr. Hewitt testify?

A.  Yes, he did.

Q.  And his testimony at that point, would you agree that it was ambiguous as to who used the strap?

A.  Yes.

Q.  Specifically, his language was Mr. Basham showed how the strap was used.

     Jumping ahead, you sat through much of the Chad Fulks

Harris - Direct                              275

trial, correct?

A.   Fact witnesses.

Q.   Fact witnesses.  Were you present when the government
discussed how -- who used the purse strap at the Chad Fulks
trial?

A.   I don't think that I was.  I think I had access to the
transcript so I'm aware of what references were made about
that.  But no, I can't say that I was at the trial for that
portion.

Q.   So through the transcript you were aware that the
government characterized that Chad Fulks used the strap to
strangle Alice Donovan.  And that's a yes, for the record?

A.   Yes.

Q.   Thank you.  What was your and Mr. Swerling's strategy at
the Jackson v. Denno hearing?

A.   The strategy was to elicit as much information as we could
from the officers to prove that Brandon Basham, from the
moment that he was fished out of the river by law enforcement
officers, began to attempt to assist law enforcement in the
location of the body of Alice Donovan.

Q.   Was one of the strategies also to nail down witnesses on
their statements?

A.   That's part of it, yes, ma'am.

Q.   And did you all call any witnesses at that hearing?

A.   I don't think that we did.

Q.   At this point, at the point of the Jackson v. Denno hearing you had several medical records on Mr. Basham, is that correct?

A.   Yes, ma'am.

Q.   And I realize it's been a long time, but if you had to estimate, how many placements and facilities had Mr. Basham been in as a juvenile?

A.   I have reviewed -- you know, I reviewed something I said in court, and is it 50 to 60 facilities that he had been shuffled between through his young life.  Mr. Daley?

        MR. DALEY:  Excuse me, your Honor.  I just wasn't sure.  Is she asking how many records he had in his possession at the time of the Jackson v. Denno hearing or when they finally got to trial?

        MS. STONE:  I apologize.  I'm asking at Jackson v. Denno.

        THE WITNESS:  Oh, I don't recall at that time.  I'm sorry.

Q.   But eight, nine months in you all had gathered a substantial amount of records.

A.   Yes, we would have had a substantial amount of records by that time.

Q.   Did you know at that point that Mr. Basham had had several mental health evaluations done at some of these facilities?

A.   I can't tell you whether I did or did not know at that

time.

Q.   Had you hired mental health experts at this point?

A.   Yes.

Q.   But a decision was made -- is it fair to say that a decision was made not to challenge the statements under any competency --

A.   Yes.

Q.   -- challenge?

A.   Absolutely.

Q.   Did Mr. Basham handle the Jackson v. Denno hearing well?

A.   That's a difficult question.  And I'm not trying to be difficult with you, but when you ask if Brandon handled something well, tell me exactly what you mean by that.

Q.   I'll get to the point.  Susie, can you bring in, I believe it's Exhibit 83.  Can you look, please, at the -- again, this is -- these are already admitted.  These are not your notes.

A.   That's fine.

Q.   These are Mr. Swerling's.  But can you look at the last entry.  Can you read Jack's writing?

A.   I'm probably better than anyone at reading his writing.

Q.   And does it reflect on the date of the Jackson v. Denno hearing defendant is incoherent?

A.   Well, it reflects at some point during that hearing he may have been having a difficulty with either the evidence that he was listening to or circumstances just surrounding that day.

Q.  And, Susie, can you bring up Exhibit 84?  And this is an e-mail a few days after that hearing showing that it appears that Brandon had some sort of suicide attempt.  Do you recall that?

A.  Yeah, I do recall this.

Q.  And that, again, was in close proximity to the Jackson v. Denno hearing.

A.  I just don't have the date.  I accept if you say it was, I accept that.  Was this after or before?

Q.  A few days after.

A.  Okay.

THE COURT:  Miss stone, we're past 5:30, it's been a long day, especially for the court reporter.  Unless you think you are close to finishing?

MS. STONE:  I'm not.

THE COURT:  Let's go ahead and break for the day. Doesn't look like we're going to get to a good breaking point, this is as good as any.

MS. STONE:  Thank you, your Honor.

THE COURT:  Thank you.  Mr. Harris, you need to be back at 9:30 tomorrow morning.

Anything before we adjourn?

MR. BURKE:  Your Honor, may I speak about -- given the unexpected events of the last few days is it still your Honor's position we will not go on Friday morning?

279

THE COURT:  Unless y'all want to.

MR. BURKE:  I certainly don't, but --

THE COURT:  We will be off Friday.

MR. DALEY:  And, your Honor, we may be able to stipulate to the South Carolina Department of Revenue guy.

MR. BURKE:  Yeah, we will be able to stipulate.

THE COURT:  Very good.  We won't hold court on Friday, and try to go maybe not quite this late tomorrow, and --

MR. DALEY:  It may be Mr. Swerling might have to testify on Monday, your Honor.

MS. STONE:  I'm not close to done, but I don't think I will be too terribly long.  I would imagine we will at least get --

MR. DALEY:  We will get started with Mr. Swerling.

THE COURT:  All right.  We will see you at 9:30 tomorrow morning.  We'll be in recess.

(Recess, 5:35 p.m.)


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  11-11-12                    s/  Daniel E. Mayo

280

DEFENSE WITNESSES

THOMAS M. HYDE

     DIRECT                    125

GEORGE PARKER

     BY THE COURT       143

     BY MR. BURKE        148

     BY MR. WITHERSPOON  159

     BY MR. BURKE        166

THOMAS M. HYDE

     CROSS                     178

     REDIRECT               193

WILLIAM H. MONCKTON, VI

     DIRECT                    214

     CROSS                     217

     REDIRECT               230

JOHN CASTRO

     DIRECT                    231

     CROSS                     244

     REDIRECT               257

GREG HARRIS

     DIRECT                    261