281

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
     -vs-                                   October 11, 2012

BRANDON LEON BASHAM,

          Defendant

------------------------------

                BEFORE HON. JOSEPH F. ANDERSON, JR.
                UNITED STATES DISTRICT COURT JUDGE
                         MOTION HEARING

APPEARANCES:

FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                     UNITED STATES ATTORNEY
                     BY:  ROBERT F. DALEY, JR.
                          JIMMIE EWING
                          JEFFREY M. JOHNSON
                          WILLIAM K. WITHERSPOON
                     Assistant United States Attorneys
                     1441 Main Street
                     Columbia, SC  29201

FOR DEFENDANT:       JULIA G. MIMMS, ESQ.
                     JULIA G. MIMMS LAW OFFICE
                     1001 Elizabeth Avenue, Suite 1A
                     Charleston, NC  28204

                     ARIZONA FEDERAL PUBLIC DEFENDER
                     BY:  MICHAEL L. BURKE
                          SARAH E. STONE
                     Assistant Federal Public Defenders
                     850 W. Adams, #201
                     Phoenix, AZ  85007

282

COURT REPORTER:        DANIEL E. MAYO, RDR
                       Certified Realtime Reporter
                       901 Richland Street
                       Columbia, SC   29201


            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

THE COURT:  Miss Floyd says we have something to take up first?

MR. DALEY:  Your Honor, it's going to be very brief. As the questioning came out late yesterday afternoon it appeared to me that, and this happened in the Fulks case and so I'm a little more on high alert than I have been previously, claim two, if you look at claim two in the petitioner's motion and then even in their reply, it appears to only focus on the statements made after his -- after Basham's arrest and those three, four days before he was transported down to South Carolina.

If you look at page 19 of their motion, in fact they only cite in their first paragraph to transcript 2-24-04.  And then if you look in the substance of their claim two, the only two interviews that they are talking about are the interview of Detective Dan Mooney of the Ashland, Kentucky Police Department and then FBI Agent Scott Vito, who I think was also out of the Ashland office of the FBI.

It appeared yesterday that they were, I don't want to say shifting, but just they were now suddenly focusing on one statement made on Thanksgiving day and in South Carolina.  And so I would just like to put on the record that I believe that this is an attempt to amend the motion, and I just would ask that the court -- I don't think Miss Stone is going to elicit any more testimony from Mr. Harris, but I do think that later

on they will --

THE COURT: We have got Mr. Littlejohn coming on later in December, I guess. To be honest with you, I read the briefs, I thought that the statement of Sheriff Hewitt was at play.

MR. DALEY: No, it's at play, but if you look at -- it wasn't at play in claim two, your Honor. It is definitely at play in some other claims, but if --

THE COURT: I thought it was in play in claim two. But, anyway, I think no matter what, I need to allow the testimony to come in, then we will argue later whether it's properly before me.

MR. DALEY: Thank you, your Honor.

MR. BURKE: Thank you, your Honor. Your Honor, may I briefly make a record of Mr. Basham and his absence today?

THE COURT: All right.

MR. BURKE: I think the court is aware Mr. Basham will not come out of his cell. Our colleague Mr. Murray went to the prison this morning to attempt to meet with him and he would not come out of his cell to talk with him. We accept your Honor's order yesterday. We disagree with it. We believe that we have a client who is unable to assist us in this proceeding.

And we will today be questioning trial counsel about specific conversations that they had with Mr. Basham. If I

had a client who was capable I would be referring to him and conferring with him about those conversations. So short of a request that we would ask court to stay these proceedings so we could be -- get our client into a state where he could assist us, we would just simply note for the record that we do have a continuing objection to going forward without him. And we don't want to have him physically forced to sit in that room because it will just lead to more disruption.

THE COURT: All right. But I understand you don't have access to him today but you have had free access him to him in the prison leading up to this hearing to question him about his version of his conversations with counsel.

MR. BURKE: Your Honor, we had access to the extent that he was capable of conversing with us, as we talked about yesterday.

THE COURT: All right. Very good.

MR. BURKE: Thank you.

THE COURT: If Mr. Harris could resume the stand. Mr. Harris, you are still under oath.

THE WITNESS: Thank you, Judge.

BY MS. STONE:

Q. Good morning, Mr. Harris.

A. Good morning.

Q. Yesterday we finished up talking about the Jackson v. Denno hearing and not using competency as a potential

challenge to those statements.  I would like to now talk to you about competency in general in this case.  Were you aware that the original trial attorneys, Mr. Monckton and Mr. Littlejohn, had filed a motion for a competency evaluation for Mr. Basham?

A.  Yes.

Q.  And was that withdrawn at some point by you and Mr. Swerling?

A.  Yes, it was.

Q.  And was that a strategy decision?

A.  Yes.

Q.  And is it a fair summary of that strategy decision to say there was concern about letting the government speak to Mr. Basham an additional time?

A.  Yes.

Q.  Any additional strategy to withdrawing that competency motion?

A.  Well, I would add to that we wanted our doctors to discuss Brandon with Brandon before the government doctors.  So it was a little more than not having their -- them have a crack at it first.  It was as much we wanted to get to know Brandon with our doctors before they did.

Q.  And were there points leading up to trial and during trial where you were concerned about Mr. Basham's mental state?

A.  There were points during particular days at times during

the days that I was concerned, yes.

Q.  Mr. Harris, can you take a look at this?  This is a memo that you wrote after jury selection.  Can you look at header number one?

A.  Yes.

Q.  And that basically says that Brandon started out the trial on a high note, he was in good spirits.

A.  Just -- this is one of my memos?

Q.  I'm sorry, Susie.  For a moment, can you go back to page one.  I apologize.  This is exhibit -- Defense 22.  Can you see there?

A.  Yeah, let me --

Q.  And now you can go back to page two.  And then header number two, by the third day Mr. Basham started to deteriorate, he was distracted?

A.  Yes.

Q.  And the third heading, he had intermittent outbursts with the marshals, with you, and with Jack?

A.  Yes.

Q.  And is that consistent with your memory?

A.  Yes, it is.

Q.  And things were given to keep Mr. Basham busy and occupied during the trial so that he wasn't a distraction to counsel and to the jury?

A.  We wanted to keep Brandon, yes, we wanted to keep Brandon

busy.

Q.  And then number five, there was an issue with Brandon sleeping through some of the voir dire?

A.  That's correct.

Q.  And, Susie, can you bring up Defense Exhibit 91?  Go to the last page.  And can you highlight the last three small paragraphs?

A.  And this is media coverage?

Q.  This is media coverage.  And again it discusses Mr. Basham's sleeping and drawing with markers.  And that's consistent -- is that consistent with your recollection of Mr. Basham's behavior during jury selection?

A.  Yes, it is.

Q.  And, Susie, can you bring up Defense Exhibit 87?  And I'm going to have -- ask Susie to scroll through Defense Exhibit 87 through 90 and have you take a look at those.  And do you recognize any of these drawings?

A.  No, I do not.

Q.  Are these consistent with what you recall Mr. Basham doing?  And the last one is a coloring book that Mr. Basham had to work on during trial?

A.  I don't deny that that's his artwork, I just have no recollection of specifics.

Q.  You don't remember the specific drawings?

A.  Correct.

Q. But fair to say you do remember that --

A. Absolutely.

Q. -- is what he was doing during trial?

A. Yes, ma'am.

Q. Did you have concerns about Brandon controlling his behavior even leading up to trial?

A. Yes.

Q. Were there some incidents in the jail where he had trouble with arguing and fighting with guards and had his family visits suspended?

A. Absolutely.

Q. And do you recall advising him he had to control his behavior?

A. I remember doing that on numerous occasions.

Q. Numerous occasions you had to tell Brandon that. And did it work?

A. Well, yeah. I mean, did it work is -- it worked sometimes. But, obviously, the record is I think clear in this case that it didn't work all the time.

Q. And during trial at some point Mr. Basham had an altercation with the marshals. Do you recall that?

A. Oh, yes.

Q. Can you give us a little background on that incident?

A. Brandon on Monday the 20th, I think, was expecting that during a break he would receive a reward of sorts for not

Harris – Direct                                    290

acting out.  And that's -- that's an oversimplification of what happened, but at lunch or sometime around lunch break he learned that he was not going to get dip, I think, and he wanted to leave.  And he got up to leave and it led to what everyone has now seen a videotape.

Q.  And after -- after that incident was he removed from the courtroom?

A.  Yes, ma'am.

Q.  Was he evaluated by Dr. Schwartz-Watts shortly thereafter?

A.  And the next morning.

Q.  And do you recall shortly after that incident with the marshals that --

MR. DALEY:  Your Honor, at this point I would object to the leading.  I think at this point I would like to hear --

THE COURT:  I agree.  This is important testimony so don't lead your witness.

Q.  (MS. STONE) Do you recall what Dr. Schwartz-Watts' diagnosis or opinion of Mr. Basham's competency was the day immediately preceding the argument with the marshals?

A.  Dr. Schwartz-Watts informed us, the defense, as well as the court, in a hearing that he was not competent to continue that day.

Q.  And did you have any reason to doubt that that was Dr. Schwartz-Watts' honest opinion?

A.  No, that was her honest opinion.

Q.  And did you or Mr. Swerling ask her to give that opinion as any part of a strategy to the court?

A.  I asked her to render her best opinion, whatever it was. I just asked her opinion.

Q.  And, Susie, I'm going to bring up one transcript here. Can you bring up September 20, 2004, pages 157 to 158.

MS. STONE:  Your Honor, we did not mark the transcripts as exhibits because they are already part of the record.

THE COURT:  All right.

Q.   (MS. STONE) Susie is going to be highlighting a section of your statement to the court.  Can I ask you to read that?

A.  To respond to Mr. Schools, to get back on the issue about whether or not this is manipulation or whether he is competent, what I just saw in the courtroom didn't look like any attempt to manipulate anything I had ever seen.  Looked like someone who didn't have the ability to control the simple function of sitting down in a seat.

Q.  And do you have the bottom, as well?

A.  That is why we have a concern about the competence today, the 20th of September.

Q.  And, Mr. Harris, do you have a duty of candor to the court?

A.  Um–hmm.

Q.  And were you honoring that duty when you made that

statement?

A.  Absolutely.

Q.  Is it a fair statement you had an honest concern at that point at that day about Mr. Basham's competency?

A.  On the 20th of September at 2:00 o'clock in the afternoon, whenever I said this, I believed at that moment he was not competent to assist us in his defense.

Q.  And you expressed that concern to the court.

A.  Yes, I did.

Q.  Did Mr. Basham continue to have problems throughout the trial, especially with sleeping?

A.  Those are two questions.

Q.  First, did he continue to have problems throughout the trial?

A.  He had problems, Brandon always has problems focusing and paying attention.  So, yes, he had problems focusing and paying attention.  He also had -- there were situations where he did -- he was drowsy, and I don't know that he fell asleep during the trial but I know there were periods where he was drowsy.

THE COURT:  Let me jump in here.  You know, lawyers go to seminars on how to try death penalty cases.  We judges go to seminars on how to preside over death penalty cases.  And one thing we're taught, don't let a capital defendant build up a record at your expense by sleeping or appearing to

sleep during the trial.  So during this trial I obviously did not have my eye trained on the defendant all of the time, but periodically I would look to the defendant and any time I saw him appear to be sleeping I stopped and told him to wake up and offered to get him coffee, caffeine, gum, whatever it took to keep him awake.  I guess I'm becoming a witness in the case almost, but I don't want this record to go unchallenged that he slept through the trial and I did nothing about it.

THE WITNESS:  And I may add to that, Judge, I think the record is fairly clear that -- and this is responsive to your question -- that I would think almost every occasion where we did see him sleeping we made that known to the court at least to the extent that we could.

Q.   (MS. STONE) I guess my question is was Mr. Basham falling asleep something you were concerned with?

A.   Yes.

Q.   Something you were fairly constantly concerned with throughout trial?

A.   I wouldn't say fairly constantly, I would say it was a concern.  I would agree with that characterization.

Q.   Were there days that Mr. Basham did not get his appropriate medication?

A.   I remember one time, if you say there were two occasions I wouldn't dispute that, I do remember one occasion where he didn't get his medication, he received it when he got to

court, and there was an issue as to whether that was causing him to be drowsy. And that's just, again that is my vague recollection. I don't recall another instance where he didn't receive his medication.

Q.  And any time you had that kind of information you brought it to the attention of the court.

A.  Yes, ma'am.

Q.  So the record would be -- speak to that?

A.  Yes.

Q.  Do you remember addressing the issue of Mr. Basham sleeping with the jury in your opening of the penalty phase?

A.  Yes, I do.

Q.  Why did you do that?

A.  I think I needed in some way to explain why he may have looked disinterested. I didn't need to, I wanted to.

Q.  I'm sorry?

A.  I wanted to explain to the jury why he may have appeared disinterested.

Q.  Is it a fair statement you felt that was something that was important to address with them?

A.  Yes.

Q.  We talked about a little bit already with the incident. Do you recall asking the court to allow Mr. Basham dip?

A.  Yes.

Q.  And was one of the reasons for the dip to help Mr. Basham

stay awake?

A.   Mr. Basham wanted dip very badly, it was a very important -- it was very important to Brandon for whatever reason.  I discussed it with my experts.  As a lay person I know that there is some property or there's something in dip that, it's not caffeine, I don't know what it does, but it helps people stay awake.  So, yes, I thought it would help him.  I thought it would do a number of things to get him through the trial.

Q.   Do you recall if your expert opined that it would help him stay awake?

A.   Yes, she did.

Q.   Do you recall if the marshals objected to Mr. Basham getting that dip?

A.   They objected.

Q.   And do you recall that the judge overruled that objection and allowed him to have it?

A.   Yes.

Q.   Was part of that reason because Mr. Basham sleeping was such an issue?

A.   You would have to ask the judge, but I would suggest that the doctor came in, said it would help, and I would imagine that was part of the of the judge's reasoning to overrule the marshals service, because I know that that is -- it's a rare occasion where a judge overrules the marshals service.

Harris - Direct                           296

Q.  Do you recall Mr. Basham getting emotional during certain testimony?

A.  Yes.

Q.  Was that -- what times do you recall that?

A.  I remember when one of his teachers, and I don't know if it was Penny Titzer or whether it was Miss Mumford, but I remember he was upset, became upset when she was testifying. I know what it was, it was a witness that was testifying that he had been abused in his childhood.  And I can't remember who that was.

Q.  And how did Mr. Basham react?

A.  He was upset, he cried.

Q.  Was it difficult to try a case with Mr. Basham sitting at counsel table?

A.  Was it difficult?  It was trying.

Q.  Explain that a little bit.

A.  Brandon is -- you know, Brandon communicates, communicated a lot with us about matters sometimes not related to the case. And I find it trying when I have a client in any case, whether it's, you know, a death penalty case or a fraud case, when my client is talking to me while I'm trying to listen to a witness examination.  So, yes, that sometimes was difficult.

Q.  And when you say matters not related to the case, was Brandon trying to communicate -- let me rephrase that question, strike that.  Do you recall any of the things that

Mr. Basham --

A.   Yes.

Q.   -- would communicate about?

A.   You know, we previously discussed this dip issue.  Before Mr. Basham, before Brandon got his dip there was a lot of discussion at that table about dip.  After he got his dip it was much better.  And but, you know, an hour or 30 minutes leading up to his dip break in the morning, 30 minutes leading up to his dip break in the afternoon there was a lot of conversation at the table not related to the trial.

Q.   We had testimony yesterday from a court-appointed doctor.  He indicated that Mr. Basham had the ability to control his behavior for short periods of time?

MR. DALEY:  Your Honor, I'm not really sure she needs to preface her remarks with information about testimony yesterday.  I don't think that's relevant to what she's going to ask.  I think she's sort of giving away, suggesting an answer.

THE COURT:  Do you see a need to preface your question?

MS. STONE:  Your Honor, I think it's appropriate to the questions on whether or not Mr. Basham was able to control his behavior for large -- longer periods of time.

THE COURT:  All right, I'll allow it.  Go ahead.

Q.   (MS. STONE) As I was stating, Mr. Harris, there was

testimony yesterday from a court-appointed doctor that Mr. Basham can control his behavior in court and assist counsel for short periods of time, I believe the testimony was 20, 30 minutes. Would that be consistent with your observations of Mr. Basham?

A. No.

Q. Would Mr. -- Susie, can you bring back up Exhibit 22?

A. Let me understand the question. You are saying that he can only assist us for 30 minutes at a time? Is that your question? Is that what the doctor opined?

Q. Did Mr. -- let me rephrase.

MR. DALEY: Your Honor, I think I would object because now we're --

THE COURT: You seem like you are asking him to agree or disagree with what the expert said yesterday.

MS. STONE: I'm asking him if that is consistent with his recollection.

THE COURT: Ask him what he recalls about the trial process.

Q. (MS. STONE) Did you observe Mr. Basham becoming increasingly distractible during long periods of testimony?

A. On occasions, yes.

Q. Was Mr. Basham able to sit still and control his behavior for long periods of time?

A. On occasions, yes.

Harris - Direct                              299

Q.  Were you required or did you ask the judge to take breaks, for Mr. Basham to take a break and collect himself?

A.  I'm sure I did on a number of occasions.  Probably, the record is -- again, I would imagine the record reflects that. Yes, I would certainly have thought that was a good idea.

Q.  And why would you think that was a good idea for Mr. Basham in particular?

A.  Brandon wanted breaks so I asked the court for breaks. It's not unlike calling a time out in a football game. Sometimes Brandon needed a break so I would imagine we asked for a lot of breaks.

Q.  And if Mr. Basham did not get a break would he have trouble concentrating?

A.  I'm not sure we didn't get the breaks.  And, again, I'd have to look at the record, but we took a lot of breaks in this case.  I know that the court I think gave us a long break every morning and I know the court gave us a long break every afternoon.  And I would imagine the record is fairly -- I would imagine there were a lot of breaks.

Q.  Have you ever asked for breaks with this frequency with other cases?

A.  No.

Q.  Did you ever have concerns that Mr. Basham did not appreciate the gravity of the situation he was facing?

A.  No.

Q.  Susie, can you bring up Exhibit 23?  And can you highlight on number one.  I'm sorry, that was the wrong -- prior to number one, the first paragraph.  And, again, this is a memo from you to the Brandon Basham file.  When you visited him and told him about the Fulks verdict you noted he appeared alarmingly unaffected.  Why did you choose "alarmingly"?

A.  I was shocked, I'm sure.  That's an interesting use of the word alarmingly.  I don't recall this memo, but if I said that, which I obviously did, then I was shocked that he was unaffected by a death verdict.

Q.  And Mr. Fulks is his codefendant in this case?

A.  Yes.

Q.  Do you recall at a point during sentencing phase advising the court Mr. Basham was not competent to continue that day?

A.  Can you direct me --

Q.  Would you like that transcript?

A.  Let me say this:  I'm sure I did.  Would you direct me --

Q.  Sure.

A.  -- to where I said that?

Q.  Susie, transcript of October 26, 2004.  There are two from that.  The first one is the ex parte transcript at page four.

A.  This may be the day I was talking about where there was a witness on the stand that.  I don't know, let me look at it.

Q.  And, Susie, can you highlight the very top?  And can you see there that court is talking about whether or not Mr.

Basham was competent to go forward in front of a jury and having a colloquy with the defendant?

A.   Is that the judge?

Q.   Yes.  I apologize.  That's the court at the top speaking.

A.   And that's -- of course.  What's the question?

Q.   And then I'm going to -- Susie, can you also bring up the non-ex parte transcript at 14, starting at page 14?

A.   Is this when Brandon said he used drugs?

Q.   Yes.  That's what I'm trying to get to.

A.   Right.  And didn't Mr. Haraseth come in and drug test him?

Q.   Yes.  But did you immediately -- do you recall if you immediately knew the results of that?

A.   I think we did.  He was negative.

Q.   You don't recall at this point advising the court you weren't able to go forward?

A.   If Brandon Basham had -- I think he came in and said he used cocaine and I think we brought that to the court's attention, but I need to see the transcript.  I don't dispute that happened.

Q.   And about a little more than halfway down you can see, Mr. Harris, the first indication of your name.

A.   That's what I said.

Q.   And the same question I had before.  Were you honoring your duty of candor to the court there?

A.   Yes, I was.

Harris – Direct                         302

Q.  So if you said that, at that point on that day you had legitimate concerns about going forward.

A.  At that point on that day I did.

THE COURT:  Help me put this in context. October 28th, that was after the scuffle that broke out?

MS. STONE:  Correct, your Honor.  And this was the 26th.  I apologize if I said --

THE COURT:  The scuffle was on the 26th?

MS. STONE:  The scuffle was on the 20th, I believe.

MR. DALEY:  Of September.  This was October 26 right before Brawley's testimony, your Honor.

MS. STONE:  Yes, this is the penalty phase.and just one more question on competency.  No court-appointed evaluation was ever requested by you or Mr. Swerling, is that correct?

A.  When?

Q.  Ever during -- you never asked to have a competency evaluation -- is it a true statement you never asked to have a competency evaluation by anyone but your hired doctors?

A.  That's correct.

Q.  You never asked to have Brandon shipped off to Springfield or Butner.  I understand he went to Butner, but that was not at yours or Mr. Swerling's request, for a competency evaluation?

A.  That's correct.

Q.   Next I want to talk to you about Mr. Basham's IQ.   Who did
IQ testing for you?

A.   Dr. Brawley.

Q.   And were you responsible for coordinating with Dr.
Brawley?

A.   Yes.

Q.   Do you recall what Mr. Basham's IQ was?

A.   68?

Q.   Good job.   Did that raise concerns for you?

A.   Yes.

Q.   And what did you do with those concerns?

A.   I discussed them with Jack and with our doctors.

Q.   Susie, can you bring up Exhibit 27, Defense Exhibit 27?
This is a memo from you and Mr. Swerling to the file regarding
meeting with the death penalty review in Washington.   And it
indicates they had inquired about your mental retardation
testing and that you would get back with them.

     Was it your understanding that if you could make a strong
case that death might come off the table?

A.   We had hoped that.   That was the purpose of our meeting
with that organization, to see if they would recommend to the
district, to this district, that they not seek the death
penalty.

Q.   And, obviously, because we're here that ultimately did not
happen.

A.   That is correct.

Q.   Are you familiar with the Atkins case?

A.   Not sitting here today off the top of my head, I'm sorry, I can not -- is that the case having to do, can't execute individuals that are mentally retarded?

Q.   That's correct.

A.   Then, yes, I am familiar with that case.

Q.   In preparing for Mr. Basham's case did you attend any continuing legal education or seminars on mental retardation or Atkins litigation?

A.   I went to a week-long death penalty seminar, and I can't tell you whether that was one of the topics addressed or not.

Q.   If Mr. Swerling had said I think we need to have an Atkins hearing in this case would you have supported that decision?

A.   Not based on our doctors' evaluation of Brandon.

Q.   Did you --

A.   Because I don't think we would have had any testimony to put on the record.

Q.   Did you recover -- did the Basham team, not necessarily you personally, recover any anecdotal evidence that Mr. Basham might be mentally retarded?

A.   I mean, we had thousands and thousands and thousands of pages of medical documents about his entire lifetime.  By anecdotal do you mean had he done crazy things or had he done things that would indicate that he doesn't function at a high

Harris - Direct                    305

level in his lifetime?  If we had -- we had a lot of that type of evidence.

Q.  Bring up some examples.  Susie, Defense Exhibit 46.  This is not your memo, this is from Paige Tarr.  Would you have seen this memo?

A.  Oh, yes.  And that's kind of what I'm saying when I'm trying to figure out what you mean by anecdotal.  Yes, we interviewed a lot of people, we looked at a lot of documents, and there were a lot of people that would tell you that Brandon was slow.

Q.  So is it a fair statement that -- or would you disagree with me that the Basham file contains a lot of memos that have similar statements to this?

A.  Not -- I wouldn't say there are a lot of people that say he was mentally retarded, okay?  First of all, this is an opinion of a neighbor, I think is who this was --

Q.  I'm not asking doctors' opinions and medical testing, I'm asking about anecdotal evidence.

A.  A lot of people say that he was slow, a lot of people said -- you know, everybody has an opinion.  Not a lot of people said that Brandon was very, very, very smart.

Q.  Susie, can you bring up Defense Exhibit 59?  And can you highlight the very bottom two paragraphs of text?  Was fetal alcohol syndrome looked into in this case?

A.  We discussed that with our expert.

Q.  But that was also not pursued?

A.  It was not.

Q.  And, Susie, can you bring up Defense Exhibit 80.  And can you highlight, kind of hard to see, just do the bottom half.  That's fine.  And is this Mr. Swerling's writing?

A.  Yes, it is.

Q.  Do you see where it says retardation out.  It's in the -- in 12-5-03?

A.  Yes, I see that.  And --

Q.  At some point was a decision made not to pursue mental retardation?

A.  Yes.

Q.  And why was that?

A.  We didn't have an opinion to support it.

Q.  Are you familiar with the Flynn effect?

A.  No, I am not.

Q.  Susie, can you bring up Exhibit 65?  Defense Exhibit 65, I apologize.  Stop there, first paragraph on the page.  Did the Basham team in their investigation receive information there was a possibility that Mr. Basham -- well, let me back up.  Was one of the problems with making a case for mental retardation that Mr. Basham had some IQ tests that were higher?

A.  I remember three other IQ tests ranging anywhere from a hundred to the lowest being the test that we gave him.  I

think there was one in the 80s.  So, yes, I remember more than two IQ tests.

Q.  And in the course of the mitigation investigation did you and the team recover information that it's possible Mr. Basham's IQ may have been inflated by some facilities so that he could be admitted into them?

A.  Yes.

Q.  Was any effort made to rule those tests out as invalid, that you recall?

A.  I know that they were provided -- if I received them they would have been provided to Dr. Brawley for her evaluation. And but I can't tell you today whether -- what impact those tests had on her evaluation and her opinion.

Q.  And no -- was an Atkins hearing ever asked for in this case?

A.  No.

Q.  Was an independent mental retardation expert hired in this case?

A.  Dr. Brawley made that determination.  By independent do you mean --

Q.  Someone who specifically specializes in MR.

A.  No.

Q.  Susie, can you bring up defense Exhibit 98?  Mr. Harris, that was something from your file.  Were these questions that you typed up or -- can you tell us what the purpose of this

was?

A. It's kind of fuzzy on my screen. I don't think it's my eyes. Maybe --

Q. We will highlight a section. Voir dire questions on MR.

A. No, that would not have been something I typed up. That's probably something I may have gotten at a seminar I attended, or it might have been something I pulled up or Dr. Brawley may have provided me something like this. I can't at the time tell you where I got this. This was probably something I was just looking into when I was looking into the MR issue.

Q. Okay. And were you aware that in federal court the issue of mental retardation is submitted to the judge?

A. Um-hmm.

Q. Was that ever submitted to the court here?

A. It was not.

Q. Now I'm going to move on, and this will be very brief, the issue of conceding guilt in opening statement. And I understand you did not make those opening statements, which is why the section will be brief.

A. I understand.

Q. Do you recall Mr. Swerling conceding guilt on almost everything in Mr. Basham's case?

A. Yes.

Q. Were you on board with that strategy?

A. 100 percent.

Q.   Did you and Mr. Swerling discuss that conceding everything accept intent on the carjacking would also be an admission that Mr. Basham was death eligible?

A.   Yes.

Q.   And you were still on board with that strategy?

A.   Yes, I was.

Q.   Okay.  The next topic I want to move to is the intrinsic evidence or the Samantha Burns evidence.

A.   Okay.

Q.   Was the government successful in getting that evidence in front -- that Samantha Burns evidence in front of the jury?

A.   Yes, they were.

Q.   And just for some context, Miss Burns was not technically the victim in this case before the South Carolina federal court, is that correct?

A.   That is correct.

Q.   Do you recall the judge's ruling on how the evidence was allowed in?

A.   Yes, I do.

Q.   Can you explain it?

A.   The judge ruled after, I don't remember when the hearing was, that everything between the escape and Brandon's arrest was admissible and intrinsic to the charged conduct.

Q.   And you had a chance to look at the briefs filed by Mr. Basham and the government in this 2255 case, is that correct?

A.  I have.

Q.  One of the arguments the government makes, if you will recall, is that one of the reasons this evidence was important was to show that Miss Burns did not simply run off or run away.  Anywhere in the trial did you or Mr. Swerling ever argue that Samantha Burns was not dead?

A.  No.

Q.  Was there any discussion between you and Mr. Swerling after the court's ruling the evidence was intrinsic and would come in about an attempt to limit the scope of this evidence?

A.  The court had already ruled on that issue so I don't think on the record we objected.  Well, actually, I take that back. There are some objections that we made on the record, I don't know if they were about any of the Burns testimony.  But we did not revisit on the record, I don't believe we revisited the issue that the court had ruled on regarding the intrinsic nature of that evidence.

Q.  And my question is more -- was there a discussion between you and Mr. Swerling to limit from whom or how many witnesses brought that intrinsic evidence in?

A.  I'm sure we discussed it because it was a damaging -- those are damaging pieces of evidence.  But the court had ruled and us discussing it really wasn't -- we were going to focus how we were going to address it more than we were going to keep it out, because the court had ruled it in.  So, yes,

we did discuss it.  I don't know whether the record reflects we continuously objected to what the court had ruled on or not.  Yes, we did discuss it.

Q.  And was there any attempt to limit of testimony of Miss Burns' numerous family members as improper victim impact statements in the guilt phase?

A.  No.

Q.  And, Susie, can you bring up Defendant's Exhibit 101?  And can you highlight the whole section?  This is an e-mail from Mr. Swerling to the team discussing you and him speaking with the jurors after the trial and that they were overcome with the death of two women.  Is that consistent with your recollection speaking to the jury, as well?

A.  I stayed in that room 15 minutes.  I shook everybody's hand and I left.  I don't have -- didn't have any conversation with any jurors about this case.

Q.  So it would have just been a conversation Jack had with the jurors?

THE COURT:  Wait a minute.  Why wouldn't this be barred by the evidence rule on juror deliberations and what effect evidence had on their mental process?  Seems to me like it does.

MS. STONE:  Your Honor, I'm just trying to establish if this was --

MR. BURKE:  May I respond?

THE COURT:  Yes, sir.

MR. BURKE:  We're not offing this evidence to attack the jury's verdict.

THE COURT:  I understand.

MR. BURKE:  We're offering it for evidence of prejudice resulting from a claim of ineffective assistance of counsel.

THE COURT:  If it's not admissible it's not admissible for any purpose.  And the rule says a juror is not competent to testify as to the effect of anything on that juror or another juror's vote.  What caused the juror to vote for the death sentence is incompetent testimony.

MR. BURKE:  If your Honor --

THE COURT:  If it's incompetent I don't think it can be used for impeachment or anything else, it does not come in. I might be wrong, I'm just asking you.

MR. BURKE:  It's my understanding, your Honor, that the case law, and I will research it and perhaps we can address it later, I will be -- I will be attempting to discuss this with Mr. Swerling so I can discuss it then, as well.  But it's my understanding that Rule 606 applies for purposes of any attempt to attack the verdict.

THE COURT:  That's what you are doing.  This 2255 proceeding attacks the verdict.

MR. BURKE:  But we're not offering this statement

Harris - Direct                              313

by -- in the first place, this is not a statement by a juror, this is a statement by Mr. Swerling. It's not being --

THE COURT: It's a statement by Mr. Swerling quoting hearsay from a juror.

MR. BURKE: Yes, it is, your Honor. There has been no objection. In fact, it's already been admitted.

THE COURT: Well, so, for example, if a lawyer interviews a juror after a verdict and the juror says the foreman bullied us into a guilty verdict or we misunderstood the burden of proof, we thought it was preponderance rather than reasonable doubt, or anything that the court felt is off limits, and you can convert that to ineffective assistance of counsel argument by arguing that the lawyer should have done a better job of explaining the burden of proof or a better job of telling the juror not letting one bully them. I mean, you could -- you open a giant loophole to the bar on juror testimony to impeach a verdict.

MR. BURKE: Your Honor, my first response, I understand that you --

THE COURT: It's already in. We can debate this, it's already in. Even if I sustain the objection I would allow a proffer to be made in any event, so let's move forward.

MR. BURKE: Thank you.

THE COURT: All right.

BY MS. STONE:

Q.    Were you concerned about this evidence coming in to Mr. Basham's trial because it was such powerful evidence?

A.    Yes.  And we objected to it.

Q.    And do you recall the judge offering a limiting instruction on this evidence?

A.    Yes.

Q.    And do you recall if you and Mr. Swerling accepted that limiting instruction?

A.    We decided that it would only highlight the testimony and therefore we did not ask for any instruction from the court.

Q.    Thank you.  We talked about the Samantha Burns testimony and how -- and that was a concern that that was damaging.  I want to now move on to two statements that at trial the government argued were some of the most damaging, and that's Clifford Jay and Sheriff Hewitt's.

     First I want to talk to you about Mr. Jay, and specifically the issue is we killed her, we killed them.  Were you present for the interviews with Mr. Jay?

A.    Yes, I was.

Q.    And do you recall how many interviews there were?

A.    I think I met with Clifford Jay, I know I met with him in his home and I know that I had -- I think I interviewed him over the phone a second time.  I may have met with him three times.  I know that I met with him either telephonically or in

Harris - Direct                                     315

person at least twice.

Q.  And the in-person interviews with Mr. Jay, you were present for all of them, is that correct?

A.  I think.  I just -- I can't tell you.  I know one time I was in his home sitting on his sofa discussing the case with him.  So I know that I can tell you that.  I know that for a fact.

Q.  And can you explain this we killed her, we killed them issue a little bit?

A.  He said in his house that Brandon had told him that we killed her.  It's in my notes, it's in Jack's notes, it's in our investigator's notes.  And, you know, while that's not a good statement for a client to make, it's a lot better than we killed them, which is what it later morphed into when he was interviewed by law enforcement.

Q.  And that was my next question.  At some point you became aware that that statement had morphed?

A.  Yes.

Q.  And when was that?

A.  I can't --

Q.  Not time-wise, but --

A.  I would guess I found that out through discovery that was provided by the government.  And I can't tell you when, but I think that's how I found that out.

Q.  And was -- was the statement then changed to we killed

them?

A.  I mean, I found out that he had changed the statement he made to us.  Again, he changed it, I didn't change it.

Q.  Right.  I'm sorry, I was not clear on my question.  You became aware that Mr. Jay's statement had changed.

A.  Yes.

Q.  To we killed them?

A.  Yes.

Q.  Did you or the team go back and speak to him?

A.  I did.

Q.  And tell us about that.

A.  You know, I saw, working with you guys, again, I saw a memorandum I know I think I created.  I can't remember if I went and saw him face-to-face or if I called him.  But it's clear to me looking at memos that my purpose was only to ask that one question, but I asked a series of questions leading up to that and I tried to pin him back down why it had changed.  And his position was that it hadn't changed, that what Brandon told him was that we killed them.

Q.  And do you recall a Detective Addison who spoke to Clifford Jay before Detective Long?  Do you remember any of that?

A.  I remember that Clifford Jay had been interviewed by local law enforcement.  I can't tell you sitting here today who interviewed him or the names of the investigators.

Harris - Direct                    317

Q.  Susie, can you bring up Defendant's Exhibit 36?  And can you highlight the memo portion, or actually, all of it so we can see who it's from.  This is a memo from Mr. McNair to the Basham file.  And, again, if it was in the Basham file you would have seen this memo?

A.  Oh, yes.

Q.  And did either you or Mr. Swerling direct Mr. McNair to speak with Detective Addison about his conversations with Mr. Jay?

A.  Yes.

Q.  And what does Mr. McNair report here?

A.  I don't know what you are asking.  Is it -- I'm reading it.  What is the question, whether I saw this memo?

Q.  Yeah, did you see --

A.  Yeah, I saw this memo.

Q.  And the memo informed you that if Mr. Jay had told Detective Addison something like we killed them he would have included it in his report?

A.  Yes.

Q.  Is your recollection that was not included in Detective Addison's report and that was the purpose of sending McNair to talk to him?

A.  I would agree with that.

          THE COURT:  Wait a minute.

          THE WITNESS:  I don't have his report, but if his

report didn't have it in there that's why I would have sent Carlisle to go interview anyone that had had contact with Mr. Jay.

THE COURT: I thought, I didn't look at all the exhibits, I'll confess I have not looked at all the exhibits but I did read the briefs from each side three times, and I thought y'all said that the 302 statements or the statements of witnesses in this case by the investigators indicated that Mr. Clifford Jay told them he heard a conversation that said we killed her. That's what this memo says.

MS. STONE: The 302, your Honor, Agent Long's 302 statement, and I apologize if -- Agent Long's 302 statement indicates we killed them. So that was --

THE COURT: You are coming to that later, in other words.

MS. STONE: Well, I guess I glossed over that. That was information that Mr. Harris and Mr. Swerling received that made them go say, oh, this statement has changed from what he said to us and go back and reinterview him. Mr. Addison's -- Detective Addison's report didn't have either, it was silent --

THE COURT: All right.

MS. STONE: -- as to that. Does that clear that up? I apologize for confusing the issue.

THE COURT: Which exhibit number is this?

MS. STONE:  This is Defendant's Exhibit 36.

THE COURT:  All right.

BY MS. STONE:

Q.  Do you recall who questioned Mr. Jay -- who cross-examined Mr. Jay at trial?

A.  Jack.

Q.  And do you recall how Mr. Jay testified regarding we killed her, we killed them at trial?

A.  He stated -- he testified that Brandon had told him that we killed them.

Q.  Did you and Mr. Swerling call anyone to rebut that testimony?

A.  No, we did not.

Q.  You did not call Detective Addison?  And that's a no?

A.  I'm sorry, no, because I don't think Addison -- I mean, my recollection is and this memo suggests that he didn't say one way or the other, that Mr. Jay had not told him one way or the other what Brandon had said.

Q.  And you did not call Paige Tarr who was present for the interviews --

A.  No, we did not.

Q.  -- of Mr. Jay either.  Do you recall Mr. Swerling putting his strategic reasons for not doing that on the record?

A.  No.  I know there was a decision not to do that, but we didn't put that on the record, no.

Harris – Direct                                        320

Q.  Do you recall what that reason was?

A.  Well, I mean, that's not good testimony, usually, to put a witness on the stand to say that your client admitted killing anybody.  And, quite frankly, we wanted to move past that statement as quickly as we could, and to re-ring the bell, to put Paige Tarr on the stand to say that our client actually admitted to killing somebody is generally not something that I would think is a good idea.

Q.  Susie, can you bring up the transcript, September 29, 2004, at page nine?

        THE COURT:  Hold on one second.

        (There was a pause in the proceedings)

        THE COURT:  All right.  Go ahead.

        MS. STONE:  Thank you, your Honor.

Q.   (MS. STONE) Do you recall discussing with Mr. Swerling you wanted to keep Clifford Jay as a friendly witness for the penalty phase?

A.  Yes.

Q.  Was Clifford Jay ultimately called in the penalty phase?

A.  He was not.

Q.  Now I'm going to move to the Hewett statements specifically dealing with the purse strap.

A.  And you just reminded me of something, if I may?

Q.  Sure.

A.  There was also a discussion about not attacking him

because we did want to use him, we might want to use him again.  And I do remember that now that --

Q.  Remember talking about trying to --

A.  But we did, there was also a discussion about not attacking Clifford Jay because Clifford Jay actually had a lot of nice things to say about Brandon.

Q.  Do you recall what some of those nice things were?

A.  You know, he had been a caregiver during part of Brandon's life and felt bad about Brandon's home life and things like that.  So I can't tell you what the specifics are, but I do know that I briefly looked at the memo the other day y'all had and I do know there was at least a page-and-a-half of my notes that -- things that he had kind things that he had to say and he felt empathy for Brandon and those things, so we had considered him as part of our presentation at the penalty phase.

Q.  Thank you.  Do you recall the government arguing that the Hewitt statement about the purse straps sealed the deal in their closing argument or similar testimony?

A.  I'm sorry?

Q.  That the purse strap statement sealed the deal in the case against Brandon?

A.  Did I say that?

Q.  Do you recall the government arguing that?

A.  No, I don't.

Q.  Who crossed Sheriff Hewitt?

A.  I did.

Q.  And we have already discussed the Jackson v. Denno hearing and his previous testimony and that it was ambiguous on who used the strap.  We have also discussed that you sat through some of and got all of the transcripts from the Fulks case, is that correct?

A.  Yes.

Q.  And remind us again, how did the government characterize that statement in the Fulks case?

A.  They -- I can't verbatim tell you how they characterized it, but it was ambiguous as to who actually strangled Alice Donovan with that strap.

Q.  In the Fulks case it was ambiguous?

A.  No, not in the Fulks, in --

Q.  That was my question.  Do you recall --

A.  In the Fulks case, Chad Fulks, one of the government lawyers told the court at a hearing that law enforcement had indicated to him that Fulks actually used the strap.

Q.  And did they argue to the court that Fulks strangled Alice Donovan at any point, that you recall?

A.  I think they did.  But, you know, you would have to show me a transcript.  I believe that their position was that Fulks was the actor when it came to committing that act.  Is that a fair answer?

Q.  Sure.  And, Susie, can you bring up the Fulks transcript 6-22-04 at 255?

MR. DALEY:  Your Honor, for the record, I believe this is in a bench conference outside the presence of the jury.  I want that on the record.

MS. STONE:  That's correct, your Honor.  To give it some context, there was an argument over the admissibility of evidence, and this is discussed in the inconsistent theories claim more thoroughly.  The government was, excuse me, Mr. Fulks' lawyers were seeking to admit Mr. Basham's deer statement, I couldn't kill a deer and here I have -- they were stopped from doing that ultimately, and one of the reasons they were stopped from doing that was the government's argument here.

Q.  And you can see here, Mr. Harris, does that refresh your recollection on what the government said about the Hewitt statement?

A.  Brandon had said Chad, yes, that Chad Fulks was the one that strangled Miss Donovan.

Q.  And in preparing for your cross-examination of Mr. Hewitt would you have reviewed the Fulks transcripts --

A.  Yes.

Q.  -- that referenced him?

A.  Um-hmm.

Q.  In his cross-examination with you did Mr. Hewitt's

testimony evolve?

A.  Tell me in what way.

Q.  Did he say that Mr. Basham showed how Fulks strangled Miss Donovan?

A.  I asked Sheriff Hewitt a direct question, which was isn't it true, and we know what the question was, his response was not responsive, he said he showed me.

Q.  And he meaning who?

A.  He said Brandon showed me how she was strangled.

Q.  Were you --

A.  He did not tell me, he showed me, I think was something to the effect of his answer.

Q.  Were you at all surprised by his answer?

A.  Well, yes.  It was, A, not responsive, so anytime someone gives you a non-responsive answer you are surprised because that's not what you are trying to elicit.  And, yeah, I was surprised that he would have -- it was ambiguous as to what he was saying.  But, you know, it was open to -- well, it was open to the way his answer allowed Mr. Gasser, I think, to argue to the jury somewhat inconsistently with this.  I would agree with that.

Q.  And on that point do you recall if Mr. Gasser did any redirect of Sheriff Hewitt after your cross-examination?

A.  I don't know if he did or he didn't.  I don't think that he did.  It's been suggested to me the other day in meeting

Harris - Direct                                325

for these that there was no redirect.

Q.  And you alluded to it a little bit already, do you recall how the government used Sheriff Hewitt's statements to you on cross-examination in their closing?

A.  I think I looked at it and there was a comment made that it was real close to suggesting that Brandon had actually had some role with the strangling, which would be inconsistent with this, with this statement here.  But without looking at the transcript I can't tell you exactly what was said.

Q.  And is it a fair statement that in yours and Mr. Swerling's case, mitigation case, it was important to show that Brandon had less culpability than Mr. Fulks?

A.  Absolutely.

Q.  Was there any attempt after Mr. Hewitt's testimony with you on cross-examination to estop the government from taking a different position than they did in Mr. Fulks' case, filing any motions or anything like that?

A.  No.  I don't know that they did at all, first of all, even in closing.  But there wasn't anything inconsistent between the testimony of Hewitt and closing.

Q.  And, out of curiosity, are you aware what happened with Mr. Hewitt since the trial?

A.  You know, I was told that he was taken out of office for some impropriety.  I don't know the specifics.

Q.  And now I would like to move to what we have been calling

the puppet statement from Mr. Fulks' trial.  Do you recall seeking to admit statements from Chad Fulks' trial by the government into Mr. Basham's case?

A.  I do.

Q.  And can you talk about that a little bit.

A.  Well, we believed that it was, as you suggested earlier, important to demonstrate to the jury relative culpability, who was the leader, who was the follower, who was the puppeteer, who was the puppet.  When you read the Fulks transcript it was clear, crystal clear, that Fulks was the leader of this 13-day odyssey, that they went where Fulks wanted to go, they snatched individuals that Fulks wanted to snatch, they committed acts that Fulks wanted them to commit, and Brandon was reactive almost on every occasion to Chad Fulks.

We wanted to put in evidence that the government had that belief and had demonstrated that clearly to a jury some two months before we were given the opportunity, and we filed a motion asking for the evidence to come in, as well as the comments by the assistant united states attorney in his closing statement.

Q.  And that was my next question.  You and Mr. Swerling did file a motion on this issue?

A.  Yes.

Q.  And do you recall the court's ruling on that motion?

A.  The court at the conclusion of the hearing decided that it

would hear how the government put -- how the government
treated the evidence in the guilt phase and it would make a
determination, if we decided to raise the issue, as to whether
the government's theory of the case was inconsistent in the
Basham trial and the Fulks trial.

Q.   And was that issue renewed at the close --

A.   It was not.

Q.   And in reviewing your notes and e-mails and memos to come
here and testify, did you find any on this strategy for
abandoning that motion?

A.   No, I did not.

Q.   Okay.   That's my last question for you on the puppet
statement.   Very briefly I want to talk to you about the
causal nexus issue.   Again, you had a chance to review the
briefs in this case?

A.   Yes.

Q.   And do you recall the testimony, I'm sorry, the argument
by the government at trial about no cause and effect?

A.   I remember the cross-examination of numerous witnesses.
Is that what you mean by argument?

Q.   There was also -- that's part of it.   You do remember the
government crossing -- who were they cross-examining?

A.   I think a lot of witnesses.   You know, certainly the
experts.   I remember they examined Dr. Brannon, Dr. Brawley,
Dr. Jan Vogelsang on whether those -- Vogelsang, for instance,

people with his background, do they always kill, do people with bad brains, you know, is that --

Q.  Exactly.  Do you remember the government arguing that cause and effect issue in their closing statements?

A.  I mean, I don't know that I call it a cause and effect argument.  You would have to ask either Mr. Gasser or Mr. Schools what their intent was.  I know that they argued that people -- just because somebody has a bad brain doesn't mean they are going to go kill someone or carjack someone.  So I do remember -- I do remember them making those points.  I don't know that I would call them cause and effect arguments.

Q.  And were you concerned about those statements or arguments?

A.  I did not think they were improper.

Q.  Were you familiar with the Tennard case?

A.  Yes.

Q.  And --

A.  I don't want to say right now I can tell you exactly what Tennard says.  I know that you can't tell a jury what you have -- as you have suggested in your brief, you can't tell a jury that the cause and effect issue and problems with that. But I don't know that they violated that.

Q.  And was there a strategy on not objecting to those statements?

A.  I can't tell you there was a -- no, I cannot tell you that

we discussed not objecting to those statements.

Q.  And now I want to move on to your favorite issue, Miss Cynthia Wilson.

A.  Yeah.

Q.  Is it fair to say that you took the lead in the post-trial hearings regarding the jury misconduct?

A.  Yeah, I had a large role in that matter.

Q.  Can you give us some context and describe what happened with the forewoman of the jury in this case?

A.  The forewoman in this jury I believe contacted numerous media outlets during the trial, didn't tell anybody about it. The government was contacted within one or two days of the verdict by one of the media outlets who informed the government that Miss Wilson had, for whatever reason, contacted them trying to drum up some type of media attention to this case.  They notified immediately the defense and they notified the court, and the court had a hearing, numerous hearings, but initially had a hearing to ask Miss Wilson what she had done, if she had done anything, and why she had done it.

Q.  You went to my next question.  Were there several times that you recall Backford hearings on this juror misconduct issue?

A.  Numerous.

Q.  Do you recall Miss Wilson's excuse for contacting the

media?

A.   Yes.   I think her excuse was that she thought this case should get more attention as a public service to the public, so that people know this can actually happen.

Q.   What was your opinion of --

A.   I don't think she is a truthful person.

Q.   And was part of your strategy in these numerous hearings to attack her credibility?

A.   Absolutely.

Q.   Were there numerous calls to other jurors -- during the course of your investigation did you discover numerous calls to other jurors?

A.   Yes.

Q.   And can you talk about that a little bit?

A.   The court allowed us the latitude of subpoenaing Miss Wilson's cell phone records.  When we received her cell phone records we were able to identify numerous calls to numerous jurors as well as other media outlets, I might add, that she had not admitted to in previous hearings.  As a result of that we cross-referenced -- I spent a little bit of time cross-referencing the calls, length of calls, with particular days of the trial when impactful evidence might have been viewed by the jury or something interesting happened in the court, and I believe that there was a correlation.  We tried to explain that to the court the best that we could to

try to show when she is saying they are not talking about the case, which she did, it just didn't -- it didn't seem believable to me in light of the -- when the calls were made, the length of the calls and things like that.

Q.   When the results of the subpoena for those calls came in, was that before or after the jurors besides Cynthia Wilson had been called back to speak to the court?

A.   I think after.  Maybe.  I don't know.  You would have to -- you have --

Q.   Let me ask it this way:  Were you permitted by the court to specifically confront or question those individual jurors who she had calls with about those calls?

A.   We weren't able to confront them.  But to be clear about this, we had as many hearings as we needed, the court gave us as many hearings as we needed to flesh out, to try to flesh out the truth.  We were not allowed to directly confront any particular juror.

Q.   Do you recall if the jurors were brought back and questioned by the court about those individual calls?

A.   Absolutely.

Q.   About the calls?

A.   About the calls?  I don't remember.

Q.   But Miss Wilson was questioned about the calls.

A.   Um-hmm.

        MR. DALEY:  Your Honor, again, I just want to be

protective of the record.  I'm not sure that this falls within the scope of any of the claims, and I certainly don't want to suddenly have a new claim that you abused your discretion in failing to order more hearings or -- anyway, so I would object to the extent they are trying to expand --

MS. STONE:  And, your Honor, I'm not trying to expand the claim.  Where I'm going with this is I think Mr. Harris would agree that they were limited in what they could do with the jurors themselves, they were able to gather evidence and so what evidence was -- just trying to set the stage for that. And now I want to go into what evidence was gathered and what was presented to the court.  I'm not attempting to amend any claims.

THE COURT:  Go ahead.

BY MS. STONE:

Q.  In preparing for your strategy to attack Miss Wilson's credibility you looked at these calls, you looked at the times they were made.  Did you look at her testimony for why she spoke to individual jurors?

A.  Yes.

Q.  Do you recall --

A.  I was there when she testified.

Q.  And do you recall her testimony regarding a juror named Shannon Burnett?

A.  I don't have any recollection, but you informed me last

week what they talked about, sod, I think.

Q.  Correct.  And have you had a chance to -- Susie, can you bring up Exhibit 21?  Have you had a chance to see this declaration by a woman named Shannon Burnett?

A.  No.

Q.  Can you take a moment and read it over?

(There was a pause in the proceedings)

THE WITNESS:  Um-hmm, okay.

Q.  (MS. STONE) You don't have the benefit of your records now, but to give you some background, that 587 number was the number that your investigation showed Miss Wilson called.

Susie, can you bring up Defendant's Exhibit 30?  This a memo from Carolyn Graham to you and Mr. Swerling.  Do you recall the issue with Mr. Burnett's non-matching phone numbers to your attention?

A.  I mean, I'm sure I would have seen this memo.  I don't have any independent recollection of this memo.  It's eight years ago.

Q.  Was there any effort to call and see if that was the correct Shannon Burnett?

A.  I don't think I was calling jurors directly.  So, I mean, I can't say that I would have called a juror directly to ask if it was the Shannon Burnett that was in my trial.

Q.  If you had information that Miss Wilson had called a Shannon Burnett that was not the juror she testified if I

spoke to him it was about sod work, would you have brought that to the court's attention?

A.  I just -- I really don't know.  I will say this, if I had information that she had been untruthful to the court about anything I assure you I would have brought that to the court's attention.  Does that answer your question?

Q.  It does.  What about information that appeared to show she was seeking out people with the jurors' names to speak with?

A.  I would have brought that to the court's attention.

Q.  Do you believe Miss Wilson -- today do you believe Miss Wilson was honest with the court?

A.  No.

Q.  Do you believe she was seeking out jurors to speak with about this case?

A.  Yes.

Q.  Did you in fact recommend her for prosecution for perjury?

A.  Yes, I did.

Q.  And is it fair to say you would have presented any evidence to the court you had to show that?

A.  Yes.

Q.  The last thing I want to talk to you about, and then we are done, it's very brief, and it's about the claim on the appellate file.  You were briefly appointed as appellate counsel, is that correct?

A.  That is correct.

Harris – Direct                                335

Q.   And we spoke about it previously.  What was the purpose of your appointment?

A.   I believe the purpose was primarily to act as part of the transition team to make sure that the appellate lawyers, to the extent they needed some historical background or where we had been for the past year-and-a-half, to help them get up to speed, to transition the files.  I thought my role was to help them create the best appellate brief they could for Brandon.

Q.   And who kept the master file in this case?

A.   Jack.

Q.   Did you ever have that file in your office?

A.   No, I did not.

Q.   Did you have any involvement with the discussions between -- or let me ask you -- strike that.  Were you ultimately withdrawn from the case and new appellate counsel appointed?

A.   Yes.

Q.   Do you recall who that counsel was?

A.   No earthly idea.  I know Tim Sullivan was lead counsel, and whatever conversations I would have had about that transition would have been between Tim and myself.  I just don't have any recollection of how that occurred.

Q.   So did you have any involvement with the discussions between Jack Swerling and a law firm called Jenner & Block regarding acquiring Mr. Basham's file?

Harris - Direct                          336

A.   No, ma'am.

Q.   My last question.  Thank you very much for your patience.

A.   Thank you very much.

THE COURT:  It's time for our morning recess.  How long do you think your cross-examination will take?

MR. DALEY:  A couple of hours, probably, because it's sort of a direct, too, your Honor.

THE COURT:  All right.  We're behind schedule, obviously, but will we still be able to finish next week, do you think?

MR. BURKE:  Certainly, your Honor.  Mr. Daley and I were talking about that.  We will almost certainly Mr. Swerling this afternoon.  I seriously doubt we will finish with Mr. Swerling but we can return to him Monday, and then there will be our standard of care expert, Mr. Hammond.

THE COURT:  Who is the next --

MR. BURKE:  Mr. Hammond, Larry Hammond, is our standard of care expert who will be testifying immediately after Mr. Swerling.

THE COURT:  All right.

MR. BURKE:  That will be the end of the testimony.  So you had indicated you might want oral --

THE COURT:  Let's talk about that.  I was wondering if we could hear argument on any issues that are fully developed at this point.  Is that possible?  I'm amenable to

Harris - Direct                    337

hearing some argument now and the rest later, or hearing it all in December when all the evidence is in, whichever you think would be better.

MR. BURKE:  I always like to put off until tomorrow what I can do today, but we're willing to do either, your Honor, whichever would be of most assistance to you.  We can argue it next week after Mr. Hammond.

THE COURT:  Let me mention one thing, too.  The law school has this mentoring program and every year I am appointed to be a mentor for four, five, freshman law students, and we're supposed so meet with them three times during the year.  I always require them to come to one hearing to watch so they can see some court proceedings, and I try to pick out a good hearing.  Next Monday I think they come in at 3:30 or 4:30 to watch some of this trial.  We will clearly be going forward at that point, we're not going to finish early.

MR. BURKE:  No, your Honor, we will not be finishing early.

THE COURT:  Okay.  All right.  Let's take a 15 minute recess.

(A recess transpired)

THE COURT:  All right.  Who will be handling the cross-examination?  Mr. Daley?

MR. DALEY:  Yes, sir.

                    CROSS-EXAMINATION

BY MR. DALEY:

Q.  Good morning, Mr. Harris.

A.  Good morning, Mr Daley.

Q.  I just want to go to Government's Exhibit 3, if you could pull that up, please, Gail.  It's already been admitted into evidence.  But I just wanted to confirm with you that everything on Government's Exhibit 3 is correct and accurate. It's from your website.

A.  That is my website.

Q.  And --

A.  That's the bio on the website.

Q.  I'm sorry, that's your background, your --

A.  Yes.

Q.  -- biographical information.  One of the things I want to go over was a little bit about what you do besides this case. You have -- how many criminal cases would you say you've taken to trial?

A.  As prosecutor and a defense attorney?

Q.  Altogether, sure.

A.  A hundred.

Q.  A hundred.  Okay.  How many as a criminal defense lawyer at this point?

A.  Forty.

Q.  And what kinds of cases?  What's the range of case, just generally?

A.   I've tried DUIs to murders.

Q.   And how many murders have you actually tried, murder trials?

A.   Only three.  I defended only three.  I prosecuted a couple as a state court prosecutor.

Q.   And at this point are you somebody that does presentations for the bar?

A.   Yes.

Q.   What kind of presentations do you do?

A.   I speak at a program, Bridge the Gap program, twice a year until last year I have opted out.  But until last year for the past 15 years I had spoken at the South Carolina Bar convention every year on the federal practice, good federal practice session.

Q.   Covering criminal law?

A.   Yes, exclusively.

Q.   And what about any sort of federal sentencing?  You ever talk --

A.   I've spoken to various organizations, trial lawyers associations, I've spoken at bar functions on sentencing guidelines issues.  And I believe on a couple of occasions I have given presentations on updates, Fourth Circuit updates and Supreme Court updates as to federal issues.

Q.   What about trial practice?

A.   I have been on round table discussions on a bunch of them.

I can't sit here and tell you -- you know, I get called often on most things. I was called to participate in one yesterday at the law school that I was unable to participate in. So, yes, I have participated in numerous trial advocacy programs at the law school and with the bar.

Q. I want to go to claim 14. There was an allegation in claim 14 that Mr. Swerling was under a conflict of interest because he had been a victim of a home invasion and a kidnapping, and the trial went forward I think in January or February of '04. You worked with Jack for how long? I mean in the same office.

A. In the same office we were together 14, 15 years.

Q. And during this trial how often did you meet with Jack Swerling?

A. Every day that we were in the office together I think it's safe to say we discussed this matter.

Q. And did you see any change in how he approached this case compared to any others as a result of during that time frame him being a victim of a crime?

A. Absolutely not.

Q. Thank you. Gail, would you pull up Exhibit 8? When were you appointed on the case, the Basham case?

A. April?

Q. Okay. And what I would like to do now is just talk through for a moment how -- who was on the defense team and

sort of what their role was, how it came together, I guess. So although they're in alphabetical order we will start with the lawyers. Jack was appointed first and then you were appointed?

A. I believe that's correct.

Q. And you believed you were contacted by perhaps David Bruck and/or John Delgado?

A. I know I was contacted by David Bruck. I also know that I had had conversations with John Delgado and maybe Bill Nettles about participating in this matter.

Q. And who at that point was already then on the team, or who quickly became a member of the dense team?

A. I know that it was very clear from the very beginning that we needed to put together a mitigation team, so my guess would be, and I cannot tell you in what particular order they came on, but I know that we wanted to bring Donna Watts, Schwartz-Watts in, because one of the concerns was that she would be hired by the government. She is probably the top testifying physician in the state in this area as to these issues. And normally in state death penalty cases, of which there are many more, the state snaps her up before the defense does. My guess is she would have been one of the very first ones. Paige Tarr would have come in early. Our investigators --

Q. Paige Tarr?

A.   Paige Tarr.

Q.   And what was her role going to be?

A.   She was a mitigation specialist.

Q.   Okay.  Who else?

A.   I'm sure that the investigators on the ground came in fairly early, which would have been Carlisle.

Q.   That's Carlisle McNair?

A.   Yes, Carlisle McNair.  My guess is, again, you know, I really don't have any specific recollection about who came first and who came second.  But, generally speaking, I think probably Carolyn Graham would have come in.  She was working for Jack at the time.

Q.   What was her role?

A.   Her role was keeping everything straight in terms of the volume of information that we were getting in, and she also conducted a large number of interviews.  She kind of became an investigator of sorts when we became shorthand and started, interviewed a lot of witnesses, also.

Q.   And what about Lesa Watson?  Who was she and what role did she play?

A.   Lesa Watson would have come in a little later, not much later.  But we had been assigned an expert of sorts, a Kevin McNally.

Q.   Kevin McNally?

A.   McNally.  He was assigned to us as a resource.

Q.  Resource counsel?

A.  Resource counsel.  He had dealt with Lesa Watson who was an investigator in the area, of the target area for our investigation and referred her.  So she would have been brought on fairly early as an investigator.

Q.  She's based out of Kentucky, I think Frankfort, Kentucky?

A.  Yes, that's correct.

Q.  Let me go through a few more of the names of the defense team.  And, by the way, are you and Jack talking about the different defense team members and deciding who to bring on or --

A.  Absolutely.  Absolutely.  Donna Watts would have probably referred Tora Brawley who came in later.  Tora and Donna had worked together.  I believe that --

Q.  Tora Brawley is a psychologist?

A.  She's a psychologist.

Q.  And has she testified in death penalty cases before?

A.  Yes.

Q.  With Dr. Watts?

A.  Yes.  Jan Vogelsang would have been brought in later, also.  And I cannot remember, I think that Donna might have worked, Donna Schwartz-Watts might have worked with her, also. I can't remember.  She is the preeminent expert in her area in the state, so --

Q.  Dr. Brawley?  No, Schwartz-Watts.

Harris - Cross                                344

A.   No, Vogelsang, Jan Vogelsang.

Q.   Vogelsang, okay.  What is her job, what's her role?

A.   I can't remember what her title was, but the best way that I can explain her role was to introduce Brandon's life, the compilation of his life, to the jury.  You know, where he had been, by whom he had been treated, the medications that he had been taking, that he had taken.  She just really explained Brandon to the jury the best that she could, or the best that we could.

Q.   Let's go through some other information.  There's a Steve Hisker?

A.   Steve was an attorney in Jack's office, and I believe that Steve conducted some interviews and did some computer programming work for us, exhibits, things like that, I think.

Q.   What about Harrison Saunders?

A.   Harrison had been with Jack forever.  Harrison started with Jack back when he was 16 as a runner, and had attended University of South Carolina, took some time off and worked for Jack in the interim as a something, I don't know what his role was.  Then he went to law school, graduated, and was an attorney in Jack's office I think during this time period.

Q.   What about Greg Cook?

A.   I think he was an investigator?

Q.   Investigator in West Virginia?

A.   West Virginia.  I think he worked for Mr. Collias.

Q.   Correct.

A.   Who was Brandon's counsel in West Virginia for the Burns matter.

Q.   Were you able to use some of the resources from the West Virginia case then to investigate your case, as well?

A.   Yes.  He was assigned a number of interviews and was assigned to find locations and to find people.

Q.   At some point did you then end up retaining a neurologist?

A.   Bill Brannon.

Q.   And how did you come to hire him?

A.   I feel certain that Bill Brannon came to us, he's been around Columbia forever.  I know Johnny Gasser had actually used Bill Brannon in cases as a prosecutor.  I know that he had testified numerous occasions in federal court.  I don't know if he had ever worked in a death penalty case before, but he would have been referred probably by Dr. Watts.

Q.   I see Diane Follingstad was a team member.

A.   Dr. Follingstad was a jury consultant.

Q.   And then Shealy Boland.  She was a law clerk?

A.   She was my law clerk, very detail orient and was actually a very good law clerk.  She's an attorney now in Columbia.

Q.   What was one of her primary tasks?

A.   Shealy did timelines and was inputting information into a timeline that I was keeping, that we were keeping.  Again, she was very detail oriented and really did a great job with

everything she was given.

Q. Lisa Kimbrough?

A. Lisa Kimbrough was brought in probably eight months in, maybe six months in, to assist in mitigation.

Q. She's actually a lawyer?

A. Yes, she is.

Q. But she was brought in as a mitigation person, mitigation investigator?

A. Yes.

Q. So by my count you have at least five lawyers, and I guess if you include Mr. -- maybe more. But then you had it looks like three, four investigators, if you take Mr. McNair, if you include him with Kimbrough, Watson, and Tarr, is that correct?

A. Yes.

Q. And then you had a Dr. Donald Morgan, another psychiatrist. What was his role?

A. He was treating Brandon. He was not evaluating Brandon, he was treating Brandon while Brandon was in the custody of the Richland County Detention Center, as well as while Brandon was in the custody of the Just Care Health Center here in Columbia.

Q. And what about James Aiken?

A. Jim Aiken was the expert on jails. And Jack actually found Mr. Aiken. I don't know that he had dealt with him before, but I know that Jack did -- looked into that. We

wanted to present that evidence to the jury and Jim Aiken was our expert.

Q.   And then you have David Good and Daniel Goldberg?

A.   David and Daniel spent a lot of time with Brandon reading discovery to him.

Q.   And a few other miscellaneous folks.  One is Jean Strickler.

A.   Jean was in Jack's office, she was a paralegal.  Again, I think Jean's primary function was to maintain order with regard to the files.  She did not participate in interviews, she did not really participate in any of our meetings, substantive meetings, about how the case should be handled or where people would go, conduct interviews or who would be interviewed.

Q.   And Anna Rawl?

A.   Anna was my law clerk during this entire time.  I think I had a couple of them, actually, but Anna was -- she assisted me.

Q.   And then Christina Rampy, who was with Nelson Mullins, I guess?

A.   Christina was working with the Nelson Mullins law firm, that is a law firm all over the country, and she just volunteered her time on a few of the issues as they arose.

Q.   Two of the allegations, claims 19 and 20, talk about the failure to assemble and supervise the team.  We will get to

Harris - Cross                          348

that a little bit later, but I thought I'd ask you first,
seems like a team that -- did you feel like you were
assembling everybody you needed?  I mean, was there ever a
time where you thought you needed somebody but we can't get it
either because the judge wouldn't give the money or just for
time purposes?  I don't know, just did you ever feel like you
didn't have what you needed?

A.  As I explained to both lawyers preparing for this, at no
time did Judge Anderson or any court ever deny us access to an
expert or to an investigator, or travel, or anything that we
needed to defend Brandon.

Q.  If you had needed an expert you would have gone to the
judge and tried to get it, right?

A.  Yes, sir.

Q.  As far as the management, again we're going to get to it
in a little more detail later, your and Mr. Swerling's
management and supervision of the team.  How often were y'all
keeping up with what was going on?  Was it every once in a
while, was it every day, was it 24/7?

A.  Every day without question something was done on this
case, someone was managed in this case, someone was
interviewed, discussions were had between myself and Jack and
the team.

Q.  Let's go ahead and start with claim two.  In claim two we
have an allegation that you rendered ineffective assistance of

counsel because you didn't prepare for and effectively litigate the Jackson v. Denno hearing. Do you remember the Jackson v. Denno hearing starting February 24 of '04?

A. Yes.

Q. And it spanned a number of statements, correct?

A. Correct.

Q. And did you and Jack prepare for it?

A. Yes.

Q. Did you read all of the reports regarding the various statements that were made by Mr. Basham from the moment he was arrested until he was transported into South Carolina?

A. Absolutely.

Q. And when you were doing that were you looking to see if there were ways that you might be able to keep out some of those statements?

A. Yes.

Q. And did you at any point find that you had strong evidence that Mr. Basham was coerced?

A. No.

Q. Or that food or drink was withheld?

A. No.

Q. Or that he was somehow forced to give statements in any way?

A. No.

Q. I would like for you to look at Exhibit 12, which we will

pull --

MS. STONE: Your Honor, this is the exhibit we talked about in chambers, and Agent Long is in the courtroom.

THE COURT: All right. You want him to step out at this time?

MS. STONE: Yes, please.

(There was a pause in the proceedings)

BY MR. DALEY:

Q. Can you tell me what this memorandum is?

A. It is a memo that I created after having conducted interviews in December of 2003 in West Virginia.

Q. I think it might have been Kentucky, but --

A. Was it Kentucky? Yes, that's where Brandon was arrested, that's correct.

Q. And who did you interview?

A. I interviewed Barbara McGuire, who was a -- who was a paralegal in the office, I interviewed Mr. Hewlett, who was a public defender, and I interviewed Richard Hughes, who was an attorney that did federal work Ashland, Kentucky.

Q. I'll try to speed it --

A. It's Brian Hewlett, I see it now.

Q. Did she at some point during the time Mr. Basham was being interviewed get into talk to him?

A. Yes.

Q. Could you go to page two, Gail? Just highlight the part

Harris - Cross                         351

that -- just the middle part, if you would bring that up.  I highlighted some parts, but the bottom line is during her time with Mr. Basham did she have any concerns that he didn't understand his rights?

A.  No.

Q.  And did she, in fact, have any concerns that he didn't understand what was going on?

A.  No.

Q.  In fact, did she say he's not stupid?

A.  Everything in this report is accurate as to what she told me.

Q.  And as a result of what she told you, that gave you a little less concern that he might somehow have been coerced?

A.  Yes.

Q.  Go to page three.  This is a continuation, and just -- the highlighted part, again, she says -- you recount that she said she went so far as to have Brandon sign in writing the fact he was waving his right to an attorney and that he understood his advice of rights?

A.  Correct.

Q.  So she actually separate and apart from the waivers and the Miranda readings that the police, the FBI and folks gave, she actually did one herself, is that correct?

A.  Correct.

Q.  Let's go to the next page.  This is actually the bottom of

page three.  It starts that you interviewed Brian Hewlett.

And this is the public defender?

A.  Correct.

Q.  And he went and talked to Brandon at some point, Mr.

Basham?

A.  I believe the following day.

Q.  And he, too, tried to keep Mr. Basham from talking, but

that Mr. Basham continued to talk, is that correct?

A.  That is correct.

Q.  Page five.  And then you talked with Mr. Hughes, who was

appointed by the federal court in Kentucky to represent Mr.

Basham in his proceedings in Kentucky?

A.  That's correct.

Q.  And, again, your recounting of what Mr. Hughes said is

that he understood his rights and he had decided he was going

to go ahead and talk and cooperate with law enforcement and

assist them in trying to find the bodies of Samantha Burns and

Alice Donovan.

A.  Yes, sir.

Q.  And, in fact, he on a tape that -- did you ever receive a

tape from him at some point?

A.  Yes, I had a transcript.

Q.  And in that tape it is Mr. Hughes and Mr. Basham talking?

A.  Yes, sir.

Q.  And in it he advises him of his rights again, Attorney

Hughes does?

A.   That is correct.

Q.   And Basham indicates he's not going to -- Mr. Hughes says don't talk and Mr. Basham says, no, I'm going to continue to cooperate with the FBI?

A.   To the best my recollection, that is on the tape.

Q.   And then last page, page six, Mr. Hughes' impression was that he understood all of his rights?

A.   Yes.

Q.   And he -- and Mr. Hughes even had went so far as to say to Mr. Basham how the statements he was making were going to be used against him.

A.   That is how he explained it to me, yes.

Q.   So at a minimum you had investigated well enough that you knew that when he was in Kentucky he was not only being advised of his rights by the law enforcement, but that he had had three different folks who were public defenders or the public defender's investigator telling him his rights, as well.

A.   Yes.

Q.   None of them indicating that he was incompetent, not able to give a statement, not understanding his rights.

A.   That is correct.

Q.   And, in fact -- will you pull up Exhibit 13, please? After the hearing and before trial, because there's an

Harris - Cross                               354

allegation in claim 13 that you should have argued this to the jury, argued that the statements were involuntary, did you and Mr. Swerling go back and reinterview Mr. Hughes and Mrs. -- Miss McGuire?

A.   Yes, we did.

Q.   And they simply confirmed what they had said previously.

A.   That is correct.

Q.   Now, with regard to preparing for the hearing on September 25th, which would have been statements that are given in South Carolina, particularly the statements -- not the 25th, the 28th, Thanksgiving, the hearing was on February 25, about the Thanksgiving day search, did you take time to talk with and interview Mr. Monckton and Mr. Littlejohn?

A.   I can't remember if I interviewed Mr. Monckton.  I know that Mr. Littlejohn and I spoke about these matters.

Q.   If I pulled up a time sheet of Mr. Swerling would that maybe refresh your recollection?

A.   It would.

Q.   Okay.  I think it's Government's Exhibit 162 at pages five and six.  Four, five, and six.  I think if you go to the page six, Gail, I think it's the 2-24, the third one down.  It's already been admitted into evidence.  These are Mr. Swerling's time records.  On 2-24 this has an entry, prep for motions hearing.  PC with Billy Monckton and Cam Littlejohn and Greg

Harris.  I don't know if that a refreshes your recollection.

A.  I really -- I'm not -- this doesn't surprise me.  Like I said, I know that Cam and I spoke a lot about this.  I just don't have any independent recollection of discussing with Billy Monckton these matters.  I'm sure that I did, if Jack says we did on that day I have no reason to -- certainly no reason to doubt that.

Q.  And my point is, though, you were prepared, you did not go into that --

A.  Yes.

Q.  -- by the seat of your pants, correct?

A.  No, that is correct.

Q.  Now, tell me why in the end you ended up making certain arguments that required a finding by the court that the statements should be admissible but that you didn't go full bore and try to argue that there was any coercion or manipulation or --

A.  Well, I didn't believe that there was.  Statements were going to come out based on the facts as I knew them.  Our goal, at least my goal, I can't speak for Jack, although I know this was the plan, my goal was to elicit as much information from the agents that I could as to Brandon's cooperation and assistance and to demonstrate that Brandon was trying to help from day one, from the moment that he was fished out of the river, trying to help the location of the

bodies.

Q.  Now, you did, however, attack as being outside the scope
of what was allowed some of the things that were said or done
on the Thanksgiving day search, isn't that correct?

A.  Yes, that's correct.

Q.  But, again, you didn't attack those statements based on
any police coercion, police withholding of food or making him
stay up too late or anything.

A.  No, we didn't.

Q.  And did Mr. Monckton or Mr. Littlejohn give you any
information that would have led you to want to pursue that,
pursue attacking the statements because he was being coerced,
for example?

A.  No.

Q.  Did you want to use the Jackson v. Denno hearing for
discovery purposes?

A.  Yes.

Q.  That's a yes?

A.  That was a yes.

Q.  And what about for general, I mean, discovery basically?
But then also to lock down testimony by --

A.  I wanted to lock down the agents for questions such as
isn't it true that Brandon was trying to help you.  I wanted
that agent on the record to say yes.  Isn't it true that
Brandon was not aggressive towards you.  I wanted the agent to

say yes, so I had them locked down on that testimony so that when it came time to cross-examine that agent I knew exactly what they were going to say with regard to Brandon's assistance.

Q.  Let's go to claim five.  Actually it's claims four through seven in the petition that talk about competency.  The original attorneys, Mr. Littlejohn and Mr. Monckton, filed a motion on December 11.  You and Mr. Swerling, though, did not want a competency evaluation done, is that correct?

A.  Yes.

Q.  In fact, if you could have avoided it would you like the government to never have examined Mr. Basham?

A.  Absolutely.

Q.  Was there any possible reason you could see that you would want to make a motion to allow the government experts at Butner, for example, to examine Basham, if you could help it?

A.  No, I did not want Brandon -- I wanted to keep Brandon away from the doctors, the government doctors, as long as possible, and if he never got examined that would have been fine with me.

Q.  And, in fact, if you pull up Government's Exhibit 12 again, page four.  Down towards the bottom didn't you in fact ask that Mr. Hewlett withdraw his motion for a competency evaluation?

A.  I had not remembered this, but, yes, I did.  I did that,

yeah, now that this refreshes my recollection.

Q.  And why were you --

A.  I did not want the government to rely on any member -- any legal advice that Brandon was getting from anybody in any jurisdiction.  I didn't want them saying he's being evaluated there, therefore we should be given access to him.

Let me also say another reason, Mr. Daley, we didn't want him evaluated.  And this was a continuing battle that actually the court weighed in on during numerous hearings.  We wanted control over the battery of tests that would be administered if the government got ahold of him.  MMPI, for instance.  I know there was a lot of discussion I remember about we didn't give that test, why should they.  And the government -- I believe the court's ruling was that they were only entitled to similar or like testing.  So there was somewhat of a battleground over what tests would be performed on Brandon.  So that was just another reason we just didn't want to turn him over to allow the government to poke and to prod and to do everything that they wanted to do to evaluate Brandon.

Q.  Do you believe there's an ongoing obligation to consider and make sure that your client's competent throughout the proceedings?

A.  Oh, yes.

Q.  And, in fact, isn't it true that each time you had a concern about Mr. Basham's competency you would bring it to

the court's attention?

A.   I did.

Q.   And at least in two instances, in the February 24th Jackson v. Denno hearing y'all had Dr. Schwartz-Watts come and examine him after getting a break for her to do so?

A.   I believe we did.

Q.   And then, of course, the September 20th incident, same thing happened.  And then I'm not sure whether you asked for it but you certainly brought it to the court's attention in October 26, is that correct?

A.   Is that when he told us he had ingested --

Q.   That was actually the September 21st morning after the altercation.  That's the morning when the cocaine --

A.   Yes.

Q.   When he said he --

A.   I agree there were a number of times I brought to the court's attention that I believed Brandon couldn't go forward for the rest of the day or for whatever reason.

Q.   And so competency becomes an issue.  Why didn't you say well, Judge, we should send him off to Butner then?

A.   Well, I think that on every occasion, given time, he was evaluated by our doctor, who knew him better than anyone, and she rendered an opinion he was competent to assist us, he knew what was going on in the trial and that he could go forward. I don't know how we would have at that time asked for an

evaluation inconsistent with that.

Q. Have you asked for evaluations previously or since that time for other clients?

A. No, I haven't.

Q. And is it the same reason, that you don't want to have the government get ahold of your client?

A. I mean, I've never done it, so -- haven't been put in that position. If given the same choice with a similar set of facts I would certainly have wanted to have my client tested by my doctors before turning him over to the government.

Q. And avoiding the government's doctors as much as possible.

A. Absolutely.

Q. Besides perhaps that night, September 20th, did Dr. Schwartz-Watts ever find Mr. Basham to be incompetent?

A. Not that I recall. She found him to be incompetent that day in court one day.

Q. That's what I am saying, that time period, September 20, you said?

A. Okay, all right.

Q. I'm talking about besides that one time.

A. No. She found him on occasion, to be clear, she found him on occasion when he was at the Alvin S. Glenn, she found -- he was such that he couldn't be evaluated by her. Now, I don't know that that makes him not competent. He was uncomfortable in his surroundings, he was having problems with some of the

guards and he was in a very agitated state because of environmental issues that were going on. That's why we had the court -- asked the court to move him so that we could conduct her examination, which occurred at Just Care. So I want to be clear that while she didn't find him to be -- she found him to be competent, but there were problems associated with Brandon and in her evaluations, even. So I want to be clear about that.

Q. Was he helpful to you? Could he give you information?

A. Yes.

Q. So he remembered names?

A. Yes.

Q. Could he remember events?

A. Yes.

Q. In fact, did he describe a lot of events that had happened?

A. Yes, he did.

Q. Did he sometimes lie to you?

A. Brandon lied.

Q. Did he sometimes lie to you?

A. I mean, Brandon told me things that were inconsistent with what other people had told me. Brandon told me things that were inconsistent with things -- with documents that I had been presented. So to the extent that he was untruthful to me, I would say that he on occasion was untruthful.

Harris - Cross                              362

Q.  And would one of those have been the Exhibit 12 where you interviewed those folks that had all explained to you the circumstances of the questioning?  Did he then give some inconsistent --

A.  Yes.

Q.  -- statements afterwards, because you wanted to check up on that?

A.  Yes.

Q.  Okay.

A.  I believe I -- I remember that I think I did a memo about that conversation.

Q.  Would you mind pulling up Exhibit 160.  160, which has been introduced into evidence, is a summary from your time sheets and Mr. Swerling's time sheets about how much time you spent with certain people.  I wanted to focus in on the time you spent with Mr. Basham.  This is the fourth to the right, Gail, and the first line, if you could highlight that.

    Why don't you take that down, sorry.

A.  I'm fine.  I can see --

Q.  From that can you tell how many times you met with Mr. Basham?

A.  I really can't now.  Can I look at the -- there we go.  It appears I met with, spoke with him on the phone 90 times.

Q.  That actually looks like the total for you and Mr. Swerling.

Harris - Cross                                363

A.  I'm sorry, 50.

Q.  For how long?

A.  What do you mean, for how long?

Q.  How many hours, total?  The next column.

A.  109.

Q.  Does that seem to you to be about right, is that --

A.  Yes, I met with Brandon a lot.

Q.  Again, he was helpful in giving you information, telling you certain things that helped you track down records and what had happened previously in his life?

A.  I'm not going to sit her and tell you that he was my source or even a really good source, Mr. Daley, because he wasn't.

Q.  Okay.

A.  You know, Brandon and I talked about a lot of things over the year-and-a-half that I spent with him.  And I'm not going to sit here and tell you that I would take him a report and ask him specific questions about his father Jimmy or his uncle Tommy or where did you go after you left Rivendell, things like that.  He really was not all that beneficial in terms of connecting dots.  We did discuss all those matters and he was -- he did know, you know, he had a lot of information about those places.  Had a lot of complaints about those places.  He had nice things to say about, you know, the people that were kind to him.

So, yes, he understood almost everything we ever talked about, and while he wasn't the greatest historian, I mean he remembered names, he remembered times and places and things like that.  Maybe not as you or I would, but he did have recall for a lot of the information.

Q.  And when he would remember somebody who had been kind to him or had nice feelings about, did that often turn out to be somebody who might be helpful?

A.  Absolutely.

Q.  On the last line, if you go over to the fourth column, you met with or talked with Dr. Schwartz-Watts it looks like ten times for a total of 22 hours?

A.  That would surprise me.  I met with her a lot more than that.  But if that's what I billed for, that's what I billed for.  I met with Donna a bunch.  I can't imagine -- I can't imagine I only -- only ten entries in here.  But, yes, that's what --

Q.  Is it possible, do you think, that all your hours were captured on your time sheets?

A.  No.

Q.  Or think they were low?

A.  They were low.

Q.  Again, so you talked with Dr. Schwartz-Watts numerous times about Brandon's condition.

A.  Absolutely.

Q.   And about how he was doing.

A.   Yes.

Q.   And if there were problems she would tell you?

A.   Right.

Q.   Or if you saw problems you would tell her.  And then if there was a problem that perhaps could be done with medication or treatment Dr. Morgan would be involved?

A.   I was going to say I didn't deal with Dr. Morgan much at all.  I can't imagine what my -- Jack dealt with Dr. Morgan a lot.  So if there were issues with regard to Brandon's meds, generally speaking Jack and Dr. Morgan would have addressed those issues.

Q.   Why didn't you pursue an incompetency claim in this case?

A.   Didn't have any witnesses to testify that Brandon was not competent to stand trial.

Q.   Let's go to claim nine, the concession of guilt in the guilt phase.  The mostly concession of guilt with -- you knew what y'all were doing.  This didn't surprise you that basically you were pleading guilty to a crime that he was going to be eligible for the death penalty in, correct?

A.   The kidnapping, yes.

Q.   Well, I believe there's going to be a criticism that you gave up too much.

A.   Well, they -- that criticism may exist.  I disagree with it.

Harris – Cross                          366

Q.   And, again, the strategy for conceding what you did and leaving intent on the table was?

A.   To the extent that the jury felt empathy for Brandon because he had accepted responsibility, and from, again, from the moment he got out of the water tried to make it better, we wanted to engender that.  And we wanted to do it from opening statement.  We didn't want to put a jury through a who done it for a month at the end of which it was obvious who done it, and then turn right around after a week break and say, okay, that didn't work, so how about sparing his life.

We thought a better course of conduct or better strategy, rather, to come in from the very beginning and say this is not a who done it, let me tell you what happened and, you know, start working from first opening bell until the trial end to try to work with the jury towards a good result.

Q.   Did you have any doubt that if you had tried to just defend this case as best you could, do you have any doubt that he was still going to be convicted?

A.   Oh, he was going to be convicted.  There was no doubt in my mind about that.

Q.   And the ex parte order where Mr. Swerling lays out the strategy I think is part of the record already.  But I think it's Government's Exhibit 20.  Did y'all talk about this with Mr. Basham?

A.   Yes.

Q.  Did you talk about it with each other?

A.  Yes.

Q.  And was there anybody who objected to this approach?

A.  No.

Q.  If you had an opportunity to do this again in a case like this would you do it?

A.  Absolutely.

Q.  Did you then later on try to use the concession that you had made later on in trial to try to explain to the jury that you had conceded because you weren't going to try to say that he didn't do it?

A.  I think Jack did in his arguments.  I don't know if we through the trial through witnesses ever -- that ever was ever really an issue.  I don't know that that would have been relevant to come in through a particular witness.

Q.  That was really talking more just about arguments, closing arguments.

A.  Yes, I think certainly that was addressed in argument.

Q.  Let's go to claim ten -- well, yeah, to claim ten, which is still -- claim ten still --

MS. STONE:  I'm sorry?

MR. DALEY:  Claim ten, you are still going forward with claim ten?

MR. BURKE:  We're not waiving it.  I think the record speaks for itself.

MR. DALEY:  Got you.

Q.  (MR. DALEY) Why did you want Brandon to be in the courtroom?

A.  I wanted the jury to see Brandon.  I mean, you always want your client in the courtroom.  I don't know what to say other than that.  Doing what we do, if a client is not in the courtroom there is -- I can't think of a positive inference to be drawn by a juror from your client not sitting beside you.

Q.  And I think you've said in the interviews that we had neither you nor Mr. Swerling saw the altercation with the marshals coming.  This was a surprise?

A.  The level --

Q.  Yeah.

A.  -- was a surprise.  The altercation was a surprise.

Q.  Let's go to 13 just for a minute.  Same thing as claim two about why you didn't argue the involuntariness of the statement to a jury.  And I guess the question, I mean, let me just ask you a leading question:  Did you think it would be inconsistent to suddenly argue that the statements were involuntary if you were trying to get some level of benefit from saying he was helpful from the beginning?

A.  Yes.

Q.  You want to say any more about why you didn't argue that to the jury, or do you think it covers --

A.  Trial strategy was to -- again, trial strategy was to

demonstrate a number of things.  One of the strategies was to demonstrate that from, again, the moment he was arrested he tried to help.

Q.  Claim 15 deals with the 404(b) evidence, in particular the Burns evidence, the Samantha Burns kidnapping evidence.  You did object to it, correct?

A.  Yes.

Q.  And the court found that it was intrinsic, correct?

A.  Yes.

Q.  And this, of course, is in the guilt phase.  They are only objecting to its admission, I guess the extent of it, in the guilt phase.  Do you think that even if it had been kept out that that would have impacted whether the jury convicted him of being guilty?

A.  I think not as to the conviction, not as to guilt or innocence in the guilt phase, no.

Q.  Okay.  And once you knew that the evidence was coming in did you see a potential benefit of that Burns evidence coming in to show the relative roles of Mr. Fulks and Mr. Basham?

A.  Now, I will say I see very little benefit at all in that evidence.

Q.  Okay.

A.  So I want to be clear about that.  For me to sit here and say I got any benefit out of that evidence coming in, that would be a ridiculous statement.  So, no, I saw no benefit at

Harris - Cross                          370

all.  To the extent that we could squeeze any juice out of that at all it would be to try to demonstrate that after they took that young lady that they took her to places that only Chad Fulks knew existed, they took her from places that only Chad Fulks -- took her from places only Chad Fulks had been to.  So to the extent that we could at all receive any benefit of that, from that, we tried to show that, again, as it related to the Burns abduction Chad Fulks was the leader.

Q.  Claim 16, the failing to renew the request to have select portions of the closing argument statements in Fulks put in in your case.  Do you remember whether you had a reason you didn't renew that?

A.  Well, there's a couple of reasons.  First of all, my recollection of the colloquy with the court, we kind of talked about this and I still haven't seen this in the transcript, but the court referred to the rule of completeness.  One of my concerns was that if we put in evidence that Johnny Gasser, who was the prosecutor that we're talking about, had used the word puppet 46 times or however ridiculously large number of times that it was, if we put in that evidence, that his entire closing argument would have come in.  And I don't know if you've read Johnny Gasser's closing argument, but they are generally pretty good and they are generally very impactful.  So I don't know that I would have -- I know that I didn't want that jury to read Johnny Gasser's closing argument in the

Fulks case.

The other reason that I don't think we raised it, because I still don't believe that they shifted theories. I thought that we were able to, through cross-examination, demonstrate who was the leader and who was the follower. I also thought, quite frankly, and I've looked at the -- I have looked at the testimony as to this issue, I thought the government fairly well intentionally diffused some of our cross-examinations by bringing out respective roles with their own witnesses, which kind of took the sting away from us when we got up and said isn't it true Chad Fulks was the leader, isn't it true Chad Fulks told Brandon Basham to tie you up and how to tie you up.

The Hawkins testimony was a good example of that, where they went to great lengths to talk about the respective roles of Fulks and Basham before we got to do it on cross-examination. So I never thought their position changed. I know that there was somewhat of a shift in Mr. Gasser's closing argument and I recognized that, but other than that, I don't know that the government ever shifted their positions. Which was the court's ruling, I will look at this if the government shifts their position. That's my recollection.

Q.  Let's go to claim 17, the Clifford Jay testimony. Let's pull up Government's Exhibit 23. These are some notes from Mr. Swerling's file. I'm wondering if you recognize those -- is that his handwriting?

A.   Oh, yes.

Q.   And could you decipher it?  Because it took me a very long time to decipher what it said.

A.   Didn't want to impeach him because we might want to keep him as a favorable witness during the penalty phase.  I mean, he's basically saying there that we don't want to say liar, liar, pants on fire to him and then call him later.  Because he had so many good things to say about Brandon if we chose to call him later.

Q.   So at the time that he testified in the guilt phase it was certainly possible that he was going to testify in the penalty phase?

A.   He was on our list of witnesses that we may present during the mitigation phase of our presentation.

Q.   Isn't it true, first, you don't want somebody to get up and testify, whether it be Paige Tarr or whoever else it might have been, to say oh, he didn't say we killed them, he said we killed her.  You didn't really want that coming out, correct?

A.   I just didn't think -- that was just not good -- that's no way to try a case, I don't think.  That would have been a bad witness.

Q.   And, secondly, if you had impeached him or tried to impeach him how would that have impacted your ability to call him as a penalty --

A.   Again, we're saying that that witness was untruthful on

the stand, don't believe that, but we want you to believe it when he tells you all these nice things about Brandon. I just didn't think that that was -- that doesn't make any sense to me.

Q. And you did, in fact, interview everybody you possibly could, the two other officers who Clifford Jay had called?

A. Yes.

Q. And did any of them -- was their testimony, did you think, going to be helpful in impeaching him?

A. No. Their testimony, here was the question to them, the question to them, and I sent Carlisle out to find out if their notes are correct, if their reports are correct. Because their reports don't say Clifford Jay called them up, because that's what he did, Clifford Jay picks up the phone and called Conway, South Carolina and says I've got some information about a murder in South Carolina. I know Brandon Basham, here's what he said. And he said that there was a murder that occurred.

I can't tell you verbatim what was in the report, but I know that it was a big deal when Clifford Jay all of a sudden said them instead of her and I wanted to know if that was in their report. And so all they would have said was it's not in the report, we wrote down what's in our report.

Q. And in his testimony it wasn't just simply he said we -- we killed them, I mean, Clifford Jay says that, but didn't he

give some reasons why that stuck in his mind so clearly when he testified?

A. You know, I can't remember, Mr. Daley. I'm sorry, I just --

Q. It's all right. The --

A. I know what he told me in his den, and he said that Brandon Basham said we killed her. And then he had, you know, he had -- it changed. It morphed into we killed them. I can't tell you why and, frankly, tell you specifics of his testimony.

Q. And you followed up, though, after you found out that he was saying that Basham said we killed them, and he confirmed that that's what his memory was when you -- when you reinterviewed him?

A. And I reminded him what he had told us and he stuck with we killed them.

Q. Let's go to claim 18. This is the cross-examination of Ronald Hewitt.

THE COURT: Before you move on, I still -- I'm a little confused. I thought the briefs by the petitioner said that the lawyers had information that two law enforcement officers were prepared to testify that they had talked with Clifford Jay and they would be prepared to say that Clifford Jay told them that Brandon Basham said, I'm sorry, that Mr. Basham said in a conversation we killed her. Is that not the

petitioner's position?

MS. STONE: Your Honor, I don't believe -- I'm not looking at it right now, but I believe our argument was they could have called Addison in rebuttal and he would say that Clifford Jay did not say we killed them, his report was silent as to her or them, but that he had spoken with Clifford Jay prior to Long. Long's report said them. The memos from Paige Tarr --

THE COURT: I know about Paige Tarr. This is yes or no. Is it your position that the defense team had information in its files that would suggest to them they should call two law enforcement officers, put them on the stand to impeach Clifford Jay and say that Jay said the word her and not them?

MS. STONE: No, to impeach Clifford Jay and say I never said them. But not -- not to call him as impeachment to say her. They could have called Paige Tarr with that impeachment. And I apologize if our arguments are not clear on that. Our position is not --

THE COURT: I thought when I read the briefs, I thought that was one of the most critical issues in this motion.

MS. STONE: No, we do not have their -- there are not police reports that say her. There are not. There are notes from Swerling, there are notes from Paige Tarr and notes from Mr. Harris. There is a 302 that came across which alerted

them to the change in testimony that says them.

THE COURT:  I guess I'm just mistaken looking at page 72 of your motion.  Mr. Swerling argued that he did have a good faith basis for the question, indicating that the defense team had checked with both of the officers and confirmed that Mr. Jay never told them about Mr. Basham's supposed reference to "them", in quote marks, in his statement to Jay.

MS. STONE:  And that's correct, your Honor.  The officers, as I said, the officers' report do not say what Agent Long's report says, them, but in all candor they do not say her either, they are silent.

THE COURT:  Okay.  All right.  I understand it.  I was -- I misread this a little bit.  I thought the argument was a little bit more straightforward, that he had direct impeachment 302s or something from the officers who used the word her.

MS. STONE:  No, your Honor.  Simply if that had been such a powerful -- if Jay had that elaboration it really struck me, why it struck him so strongly I think he would have been -- he would have told the officers, too.  But, no, they do not say her or them, they are silent.

THE COURT:  All right.

BY MR. DALEY:

Q.  Claim number 18 is the cross-examination of Sheriff Hewitt.  They criticize you for not -- after the questions

Harris - Cross                    377

were asked of Sheriff Hewitt you decided to turn to another subject very quickly.  And one criticism is you didn't try to come right back at him with a -- with his statement, I guess, or try to potentially impeach him.  What's your response to --

A.   The next question -- had I asked another question of that witness it would have been isn't it true you told Agent Long -- you know, isn't it true that what you are saying today is inconsistent with what you said to Agent Long.  That would have been the next question.  And he would have said the same thing to me that he said, which was non-responsive.  He would have said yeah, but, and then he would have -- he would have said what he said.  He would have said it all over again.

You know, sometimes we read witnesses and you can tell when somebody just wants to say something and it's not going to respond to your question.  He didn't respond to my question, he said what he wanted to say, and I just tried to get away from it.  Inartful or not, I just wanted to get away from that.

My intent with Sheriff Hewitt, if you look at his testimony, was there was two things.  I wanted for the jury to understand the miles and miles of pine trees and roads and how confusing it is for somebody, you know, in law enforcement, much less Brandon Basham.  And the other was to ask a very specific question and to address what he and Mr. Gasser had talked about on direct, which was that Brandon -- he made it

sound direct like Brandon was saying this, and I just wanted to point out that's nowhere in your notes, is it, and he didn't say that he did it, did he.  And it's a yes or no answer, really.  There's no explanation.  You know, usually can say yes, explain your answer.  The question is did you write it down and the answer is no, there's really no explanation.  And he you know, he gave me an explanation that was nonresponsive, I believe.

Q.  Let's go to claim 19 and 20.  That's the failure to investigate, develop, present mitigating evidence, and then also the failure to assemble team and supervise it.  I think we can go through this pretty quickly.  The mental retardation issue, that wasn't an issue you ignored, correct?

A.  Correct.

Q.  You had retained Tora Brawley.  One of her purposes was to determine his IQ, and if she found it to be low to potentially say he was mentally retarded if she could, correct?

A.  Correct.

Q.  And her opinion was that he was not mentally retarded.

A.  Correct.

Q.  In fact, there were at least three or four other IQs that were well above the magic 70 number, even though it's not really a magic number, correct?

A.  Again, I don't remember how many, but I know that there were a number of reports and testing that had been given,

tests that have been given to Mr. Basham over the years.

Q.  And did Mr. Basham strike you as someone who was mentally retarded?

A.  No, but I'm no expert.  That's why we hire experts to tell us, to make those evaluations.  I have obviously over my lifetime spent time with families with friends that have children with disabilities.  He did not strike me as someone that has problems that some of my friends' children have.  Again, that's merely a lay opinion.

Q.  Did the defense team, not just you, but did the defense team, you and Jack and Dr. Schwartz-Watts and Dr. Brawley, talk about the IQ issue?

A.  Yes.

Q.  And talked about it in some length, correct?

A.  Yes.

Q.  So, again, you did get out as much as you could, at least from Dr. Brawley, about his low IQ, right?

A.  Yes.

Q.  And his low functioning?

A.  That's correct.

Q.  And all the issues that go with that, and that he was in special ed class, correct?

A.  And all that is on the record.  That was the thrust of her presentation to the jury.

Q.  And do you understand, having sort of looked at the issue,

that obviously the IQ score alone is not determinative if somebody's mentally retarded, is that correct?

A.   Correct.

Q.   And were there ways he functioned that would have made it harder to argue that he was mentally retarded?

A.   Yes.

Q.   Separate and apart from the fact that apparently he hadn't been -- his IQs before made him really not able to be mentally retarded under the criteria?

A.   Yeah.  I mean, yes, Brandon could do things, and I don't know if this is responsive, but Brandon could do things that I can't do.  You know, it's -- there was a rope that was introduced in the trial that stretched from that wall to that wall, whatever the distance is.

Q.   The --

A.   It might be 40 or 50 feet.

Q.   The length of the courtroom.

A.   And it was created by Brandon by himself using the -- some type of equipment that was attached to the bed where he was housed at Columbia Care.  And he did it by tearing off tiny 12-inch or 12-inch strips of his bedding and intertwining them into what was a very complex rope.  You know, that doesn't mean somebody's not retarded, mentally retarded, it means they have some ability to function in some regards at a higher level than me.  And part of that, sad as it is, is because of

where he had been all of his life.  He learns things at the facilities where he goes from facility to facility, he learns things that you or I don't learn.  Again, does that mean he's mentally retarded or not?  It doesn't.  But it does mean that he has some ability to function at a level that's higher than others.

Q.  Fetal alcohol spectrum disorder is another portion of this claim.  They say you should have raised that, pursued that.  Did you know about this fetal alcohol spectrum disorder defense that's used sometimes in cases?

A.  Yes.  Fulks had, I believe Chad Fulks' team had presented evidence of that to the jury, so we were aware of it.  And our experts just said it did not exist in our case.

Q.  So it was looked at?

A.  Oh, yes.

Q.  And, again, you relied upon your experts --

A.  Yes.

Q.  -- to determine that he didn't have it.

A.  Another reason is there was a lot of family history with Brandon that suggested that that might have been something that -- might have had a factor in what he did and why he did it and how he lived his life.  It just unfortunately, once we did the testing, and we didn't have it.

Q.  Let's get to the team, to the defense team for a minute.  And although the focus is primarily on Investigator Carlisle

McNair and mitigation investigator Paige Tarr, that was not the only -- those are not the only two folks that did investigations of mitigation, is that correct?

A.   Correct.

Q.   There was Lesa Watson, correct?

A.   Yes.

Q.   And I know Lisa Kimbrough did some work, as well.  Carolyn Graham did interviews, is that correct?

A.   I think it's a fair statement to say that everybody was part of the mitigation team because this was a mitigation case.  So from my perspective everybody was a part of the mitigation team.

Q.   So the lawyers Hisker and --

A.   Everybody.

Q.   -- Saunders, everybody?

A.   Yes.

Q.   And, in fact, you and Mr. Swerling interviewed 60, 70 people yourself?

A.   I was part of the mitigation team.

Q.   And one of the criticisms, and we will go back to, I guess, a few specifics, one of the criticisms is is that Mr. McNair was somehow distracted by certain things because of, I guess, they allege prurient interest in certain things.  Did you see any instance where Mr. McNair was not doing what he needed to do?

A.   No.

Q.   Do you -- I don't know if you've looked at some of the exhibits that we had prepared, I think we had given you some, but do you remember how many interviews, for example, Mr. McNair did?

A.   I was not aware until you -- while we were preparing for this both sides presented me with raw numbers.  I was not aware until then.

Q.   So it didn't surprise you when it ended up being about 200 interviews?

A.   No, it does not surprise me at all.

Q.   And, in fact, did Mr. McNair have a skill for finding certain people that no one else could find?

A.   He could find people.  I'm not -- attribute any special skill to Carlisle McNair, but Carlisle was good at finding people.

Q.   Well, let me give you one example though.  Wasn't there an Andrea Roddy who --

A.   He found Andrea Roddy 50 miles outside of Boston, Massachusetts, on the third floor of a tenement house, which I thought was pretty good.

Q.   And Paige Tarr, there has been some allegation that Paige Tarr wasn't doing a good job and she wasn't getting her memos in on time.  And it sounds like that there was an issue with that at some point, is that correct?

A.   Yes.

Q.   Did that go unresolved or was it immediately remedied by Mr. Swerling?

A.   I'm not going to say it was immediately remedied, but it was remedied and it had no, I don't believe -- well, it didn't have any effect on the way that I defended the case or the way Jack defended the case.  We got her memos in time to adequately prepare for trial.

Q.   And I guess more globally with both Mr. McNair and Paige Tarr, anything -- I mean, this is one of those cases where -- have you been to Mr. Swerling's office where all those boxes are?

A.   Of course.

Q.   The 70 --

A.   Of course.

Q.   I mean, literally how many institutions do you think you got information from?

A.   I think I probably myself --

Q.   Um-hmm.

A.   -- visited at least ten institutions.  Eight to ten.

Q.   And --

A.   Probably obtained information from 30 institutions.

Q.   And I mean --

A.   When I say institutions, I mean clinics all the way up through healthcare facilities where you are an inpatient

status.

Q.  Let's talk for just a minute about Jan Vogelsang, too. What was her role?

A.  Again, as I stated earlier, she presented Brandon's history, medical history, family history, criminal history, where he had been, who had seen him, who gave him drugs, what they gave him, how many they gave him, the problems that he had had in his past.  She presented all of that to the jury.

Q.  When --

A.  Sociopsychological expert, something like that.

Q.  And she put in certain charts and --

A.  Right.

Q.  -- and that sort of showed his life history, back to, I can't remember, his mother's birth?  I can't remember.

A.  Well, I know that our charts and some of the timelines we were creating went back to his grandparents.  I think Jan's presentation, I think it began with Cathy and went through Cathy's problems all the way through the arrest.

Q.  Do you see this as a case where y'all missed some large chunk of his life when trying to investigate his background and sort of what happened in his life?

A.  Absolutely not.  In fact, I'm confident sitting here today that we did not miss one week of Brandon Basham's life.

Q.  And I don't think we have to show them, but there's been exhibits, 172 -- well, was there a thing called a cast of

characters?

A.  Yes.

Q.  Exhibit 169.

    MR. DALEY:  May I approach, your Honor?

    THE COURT:  Yes, sir.

Q.  (MR. DALEY) Just take a look at it for one second, Mr. Harris, and tell me what that is and why you had it in this case.

A.  This is order.  I mean, this is the only way to keep control over a case like this.  With the number of witnesses, the number of facilities, the locations, the only way to have order, any order at all, is to keep up with who needs to be interviewed, who has been interviewed, and what information they have.  And that's what a cast of characters is.

Q.  And so you had the name of the witnesses in alphabetical order?

A.  Um-hmm.

Q.  Then you had geographical areas, it looks like?

A.  Yes.

Q.  Because of the various geographical areas.  Then you'd have an address, if you had an address for the person, phone number if you got a phone number.  You would note when you had interviewed somebody and then initials of who did the interview, is that correct?

A.  Yeah.

Q.  And then if there were subpoenas that you had gotten, because I know some of these are actually institutions, you would say when you sent the subpoena and when it was received?

A.  Yes.

Q.  And then if there was information in the discovery you would then have that in a separate column?

A.  Yes.

Q.  Whose idea was this cast of characters concept?

A.  You know, I was actually involved in a case at the same time as this where we had one.  I don't know if it was my idea or Jack's idea, but it -- or Lesa's idea.  Quite frankly, I can't remember whose idea was and I don't know that anybody's claiming authorship over the idea.  It's just something that we all agreed we needed to have.

Q.  Do you now do a cast of characters in basically all your cases of any significance?

A.  Most cases you don't have a cast of characters because you don't have 600 witnesses.  But any time you have a case involving a large -- a lot of discovery, you probably ought to have a to do list, and what this is is a very fancy to do list.

Q.  I'm not going to go through them, but there is also a thing called a geographical index which was more by geography you would be able to track witnesses and what you had done?

A.  Yes.

Q.   And would that then be sent to people in geographic areas, whether it's Lesa Watson in Kentucky or Greg Cook in West Virginia, to help them know who they should be looking --

A.   No, I don't know if -- I don't know that you would send somebody the cast of characters and say Greg, you need to look at pages 13and14and tell me if you've got everything.  I think what would have happened is Jack and we would sit down, we would go through this often and say who do we need to interview and where are they.

And, you know, obviously some witnesses were more significant than others.  So, you know, a list would be generated and I called Lesa or I'd call Carlisle or whoever was going to travel, or even Paige, and we would say okay, you guys need to set up interviews with these five people in this location.  So that's how it would be used, more than just sending them the cast of characters list.

Q.   But everybody would end up with -- this would get updated?

A.   Yeah.

Q.   And it would get updated?

A.   Yes.

Q.   And I guess Lesa was doing most of the --

A.   I think Lesa Watson was in charge of making sure it was updated and it was accurate and it was orderly.

Q.   Gail, would you go he to Exhibit 31?  When this case first came up you obviously realized it was going to be enormous,

correct?

A.   Yes.

Q.   And I just wanted you to look at this e-mail dated September 23, '03.  This is after the Department of Justice has decided to pursue the death penalty and you've gotten funding.  I just wanted to ask you a few questions about that, because the allegation is, again, not great supervision.  In this e-mail isn't it correct that -- and this was sent to -- I mean, all these e-mails are the folks we talked about, basically --

A.   Yes.

Q.   -- is that correct, who were on the team that Jack and you were to see every document and interview?

A.   Yes.

Q.   They were put in a basket.  At this time you and Mr. Swerling had the offices next to each other, sort of --

A.   Fifty feet away from each other.

Q.   And everybody was required to give these memos in a timely fashion, isn't that correct?

A.   Yes.

Q.   And you and Mr. Swerling were going to talk about these things on a daily basis.

A.   We did.

Q.   And that is what happened?

A.   It is.

Q.  And about a week later, Exhibit 35, Mr. Swerling wants to obviously reiterate things, I guess.

A.  Jack does that a lot.

Q.  Is Mr. Swerling a hands off or hands on kind of manager?

A.  Extremely hands on.

Q.  Did anybody work on this case harder than Jack Swerling and Greg Harris?

A.  No.  No, Jack Swerling, leave me out of that equation, nobody worked harder than Jack Swerling.

Q.  Anyone else know more about this case than Jack Swerling?

A.  No.  Jack's not only the hardest worker I know, he's one of the smartest people I've ever known.

Q.  Did he bring all that to bear on this case?

A.  Um-hmm.  Absolutely.

Q.  Let's just pull up for a second Exhibit 166.  Can you see that on the screen?

A.  Yes.

Q.  This is another list.  This is a geographical to do list?

A.  Yes.

Q.  And there's writing in red.  Looks like this is dated July 13, 2004.  Whose handwriting is that?

A.  Jack's.

Q.  Go through the pages, Gail.

A.  And, you know, while I don't have a specific recollection of that day and those notes, this appears to be an afternoon

meeting between Jack and me, or a group of us, where each of us has our own list and we're going through saying okay, where are we on this thing, let's get that on the list, get an update. I would guess Lesa Watson was on the phone us. I would guess -- can you stop it for a second, please?

Q. Yes.

A. Get one that I can look at.

Q. Can we turn it?

A. Thank you. What would happen, we would all have -- Lesa could be in Kentucky, we would have one, Paige might be there, we might have everybody in the room, and we're just going through it line -- person by person.

Q. So page eight of Exhibit 166, you've got the first line it says interview, right?

A. This is -- this is probably the product of a four hour meeting where we're just going through them line by line, witness by witness, finding out where we are on the interviews, where we are on our investigation of every single person on this list.

Q. No stone is going to go unturned.

A. No.

Q. Let's go to Exhibit 51 real quickly. This is an e-mail from Lesa Watson. It says contacted/to be contacted. Who is she sending this to?

A. It looks like everyone.

Q.   It looks like the whole team.  And she is obviously reporting from the cast of characters and geographical to do list.  I guess she's updating what's going on, saying -- what's she basically telling y'all?

A.   I mean, it's fairly self-explanatory.  At this point in the investigation we had contacted 340 some odd people, but we had a lot more to do.

Q.   And these were the sorts of things that were just getting e-mailed back and forth.  I mean, can you imagine how many e-mails went back and forth in this case?

A.   No.

Q.   How could you tell Jack's e-mails, by the way?

A.   Jack writes in caps.  And Jack -- well, you know, I don't understand the question, really.

Q.   I just wondered if that's how you knew.  It seems like it always jumped out at me when I looked --

A.   Depending on Jack's mood you could -- you'd get e-mails from Jack at 10:30 at night, and I could always tell within two, three -- within two sentences whether he was aggravated or agitated or tired or what have you.  But, generally speaking, he was in all caps when he wanted something done immediately.  And he would write long e-mails, and the longer usually was not good.

Q.   Let's go to Exhibit 172.  This is a long document, so we're just going to show you the first page.  Do you recognize

that?

A. Yes.

Q. What is that?

A. This was the medical chronology, wasn't it?

Q. I think that's actually another one, medical psychiatric chronology.

A. I know Cathy's his mother, so --

Q. I think it was done by Shealy Boland.

A. She took medical records and put them together. Is this the medical record document?

Q. I think it isn't really the medical record document. I do know what you want to get to. Let's go to Exhibit 174. What is this?

A. That's the psychiatric chronology.

Q. I think it's 280 pages. This is -- how was this put together? Where were the sources of information?

A. This was all the information we got from the various facilities, medical facilities.

Q. And y'all put it in one document so it would be a resource and an encyclopedia of his life, I guess?

A. Yes.

Q. His medical life?

A. Yes.

Q. Let's go to claim 21.

MR. DALEY: Your Honor, if we can have until about

1:00 o'clock be should be able to get through Mr. Harris.

THE COURT:  All right.

Q.    (MR. DALEY) The allegation is that you failed to request that the court trifurcate the trial in a guilt phase and then a two-part penalty phase where you first do eligibility and then later a penalty/selection phase.  That's the allegation. Did you think of that issue?

A.    No.

Q.    Okay.  Claim 23, inconsistent theories claim.  You didn't object to presentation of what they say, they allege, are inconsistent theories.  Why did you not?

A.    I don't believe, I didn't believe then and I don't believe now, the government presented inconsistent theories.

Q.    The causal connection argument that there was no nexus between the mitigation evidence and the crime committed, again, do you --

A.    I've read their filings.  I disagree with their interpretation of the -- of why the questions were asked and the impact they had.  And, again, but you would have to ask Mr. Schools why he asked those questions.

Q.    I think some of these, claim 25 is the two-step mitigation jury instruction which I think the Fourth Circuit has actually rejected that in Mr. Fulks' --

A.    I think Fulks raised that issue.  But we didn't, we didn't address that in our case.

MR. DALEY: Bear with me for a moment, please, your Honor.

(There was a pause in the proceedings)

Q. (MR. DALEY) Would you mind putting up Defense Exhibit 44, please? Yesterday Miss Stone talked about this e-mail that Mr. McNair sent out that says on the part -- do you see who he sent that e-mail to?

A. Donald Addison.

Q. Addison, do you remember Addison being one of the --

A. One of the cops in -- he was one of the police officers, rather, excuse me, in Conway, I think. He was one of the ones that took the Clifford Jay --

Q. And there's I guess Sheriff Hendrick or chief -- chief of police out of the City of Conway? In other words, I guess my question is, or to the extent you are able to tell, at least some of these appear to be law enforcement officers?

A. Yes.

Q. And is it your -- having worked with Mr. McNair, does it surprise you that he would be talking to police officers and saying he's a cop at heart when introducing himself?

A. No. And let me also say this: I have a vague recollection, and again this is just coming to me now so I apologize if we didn't discuss that last week, I have a vague recollection that these people would not talk to me.

Q. Okay.

A.   That they would not sit for my interview.  And that we had
made inquiries previous to this into interviewing them as fact
witnesses in the case and they had called Greg Hembree --

Q.   The solicitor?

A.   The solicitor, and would not sit for an interview with me.
And I'm pretty sure that happened.

Q.   Right.

A.   And that may also understand about Carlisle would be
acting like this in an e-mail to them to kind of engender some
type of trust between the two of them.  But, no, I stand by
everything I told Miss Stone yesterday about this e-mail.  But
that's just Carlisle.  I don't disagree with her questions or
her suggestions about Carlisle in this regard.

Q.   I think there was -- they asked whether you had ever hired
Mr. McNair since this trial.  Is it your practice to hire SLED
agents for state investigations, primarily?

A.   I use agents, FBI agents and SLED agents, as my
investigators in my current practice of law.

Q.   And that's just what your preference is?

A.   Yes.

Q.   Is that from just experience, you like having them be
former --

A.   It's from the kind of cases I primarily have in my office
right now.  I'm not saying I wouldn't hire him, let's be
clear, I wouldn't say I wouldn't hire him, I haven't hired

him.

MR. DALEY: Beg the court's indulgence. Your Honor, I think that's the first time ever I finished before I told a judge that I would finish.

THE COURT: There's a first time for everything. All right. Any redirect we can get in before we break for lunch or do you --

MS. STONE: Yes, your Honor, I believe --

THE COURT: I'm sorry?

MS. STONE: I do have redirect and I think I can close up before --

THE COURT: Okay.

MS. STONE: But if you feel the need to interrupt me --

THE COURT: Suits me to keep going.

REDIRECT EXAMINATION

BY MS. STONE:

Q. Hello again, Mr. Harris.

A. Good afternoon.

Q. All right. Just to reiterate, you have significant trial experience and Mr. Basham was your first capital trial?

A. Yes, ma'am.

Q. And, accordingly, Mr. Basham's would have been your first penalty phase trial.

A. Yes, ma'am.

Q.   And have you ever done an Atkins hearing since Mr.
Basham's trial?

A.   No, ma'am.

Q.   The government discussed with you Miss McGuire and Mr.
Hughes and their conversations with Mr. Basham.  Are you aware
if either of them have any background in mental health?

A.   No, ma'am.

Q.   Do you know if they had any records or background
information on Mr. Basham at the point they spoke with him?

A.   I would guess that they didn't.

Q.   Did not?

A.   Did not.  As a matter of fact, I think it is a fair
statement to say that they absolutely didn't have any medical
background on Brandon before they conducted those interviews.

Q.   And just for context, were their interviews, is it your
understanding their interviews with Mr. Basham were in close
proximity to his arrest?

A.   Yes, that's correct.

Q.   Jumping to the Jackson v. Denno hearing, you've testified
that one of your strategies was cooperation, showing that Mr.
Basham was trying to help the law enforcement officers.  Is
that an accurate statement?

A.   Yes, ma'am.

Q.   Were you concerned about the counter-argument the
government raised that Mr. Basham was just leading the

government and officers on a wild goose chase?

A.   Yes, I was.

Q.   Were you aware through police reports prior to the Denno hearing Mr. Basham walked off alone with Sheriff Hewitt, according to Sheriff Hewitt, Mr. Basham walked off alone with him and made a statement?

A.   And I believe that didn't come in at trial, the deer statement?

Q.   No, the purse strap statement.

A.   You know, sitting here right now I can't remember exactly where it happened during that Thanksgiving day, so --

          MR. DALEY:  Your Honor, I think this is really outside the scope of redirect.

          THE COURT:  Well, I'll allow it.  Overruled.  Go ahead.

Q.   Did you speak with Mr. -- you testified you recalled speaking with Mr. Littlejohn and possibly Mr. Monckton.  The government showed an exhibit that indicated that may have happened.  Do you have any independent recollection of speaking with Mr. Monckton and Mr. Littlejohn about Mr. Basham wandering off with Sheriff Hewitt?

A.   I do not.

Q.   Okay.

A.   And again, quite frankly, I don't have an independent recollection of discussing this with Billy Monckton, so I

certainly don't have any recollection of discussing that particular issue with Mr. Monckton.

Q.  You also testified that and confirmed with the government that one of your strategies was to lock down the law enforcement officers in their testimony.

A.  Yes, ma'am.

Q.  Was Mr. Hewitt locked down on the purse strap statement?

A.  I thought he was, and I wasn't going to ask him the question because he had -- he testified on direct examination, so, you know, he already said on direct examination that Brandon showed me, he already said that once, I didn't want to ask him, give him the opportunity to say it twice.  And unfortunately I did.

Q.  Moving to competency, would you agree that you and Mr. Swerling made the determination you'd have to use mental health information as mitigation to present a case to save Mr. Basham's life?

A.  Did we make a decision at some point in time that it was going to be necessary to use experts in our -- during the penalty phase?

Q.  That's a much better way to say that.  Thank you.

A.  Yes, yes.

Q.  And that meant that the government would get to examine Mr. Basham, correct?

A.  Yes, that's correct.

Q.  And isn't it true that Mr. Basham's first trip up to Butner was in January 21, 2004, or would you disagree with the records if that's what this showed?

A.  No, I know that's when it was, because I made that drive in a snowstorm and I was there snowed in for a week waiting for those evaluations.  So, yeah, I would agree with that.

Q.  And January 21, 2004 was prior to the Jackson v. Denno hearing, correct?

A.  Yes.

Q.  Did Dr. Schwartz-Watts ever talk with you and Mr. Swerling that Mr. Basham's competency would ebb and flow based on stressful situations?

A.  Not his competency.

Q.  What word would you use, or what word did she use?

A.  I don't know.  And I know that it wouldn't be competency, it would be -- I know this, and I don't know if this is responsive, I know that based on my conversations with our doctors I knew that we needed to ask the court for latitude with breaks, and the court on all occasions except for a few times when the judge said we're going forward, have a seat, Mr. Basham, with all -- the court gave us breaks.

Q.  And leading up to trial do you recall ever being able to have a long focused conversation with Mr. Basham about the specifics of his case?

A.  Yes.

Q.   Were you able to keep him focused for several hours at a time?

A.   No.

Q.   Were his conversations with you frequently interrupted by him for other needs, for things like snacks, dip, new sweatshirts?

A.   Absolutely.

Q.   I want to turn now very briefly to the confession issue. And I want to be clear about something the government asked you about.  Intent was left on the table only for the carjacking, is that correct?

A.   Yes.

Q.   There was no intent factor for the kidnapping.

A.   That is correct.

Q.   So is it a correct statement there was a full confession on the kidnapping count?

A.   Yes.

Q.   And that was -- was this a death eligible count, as well?

A.   Yes, it was.

Q.   And because that kidnapping resulted in the death of Alice Donovan did that also concede one of the threshold factors to make Mr. Basham death eligible?

A.   Yes.

Q.   Was there any -- one of the strategies for conceding was to get good will with the jury, is that correct?

Harris – Redirect                           403

A.  Yes, I said that.  Maybe that's too strong a term.  It's hard to get good will with a jury in --

Q.  To the extent you could.

A.  To the extent we could, someone would be back there saying, you know, once he was caught he did what he could.  If that's good will, then that's what we were hoping for.

Q.  Were you ever concerned about losing that good will by making a jury sit through an almost month long trial that you conceded was a foregone conclusion?

A.  No.

Q.  Turning to the 404(b), or excuse me, intrinsic evidence about Samantha Burns.  You stated that you didn't think it would affect the guilt phase if that evidence didn't come in?

A.  No, I think what the question was was the guilty verdict.

Q.  The guilty verdict?

A.  There was a difference in his question in the guilt phase.  I think it had a pronounced effect on the trial, okay?  I don't think that was his question.  My answer was was Brandon Basham going to be convicted of that offense, even without the Samantha Burns evidence, and my answer to that was yes.

Q.  But do you believe it affected the penalty phase of the trial?

A.  Yes, absolutely.  That is why we attempted to have it excluded in pretrial motions.

Q.  Turning to the puppet statement, did one of the concerns

with the rule of completeness and that perhaps Mr. Gasser's closing arguments could come in in their entirety. Sitting here now can you recall anything from Mr. Gasser's closing argument in the Fulks trial that would have been more damaging to Mr. Basham than Gasser's closing argument in Basham's own trial?

A.  Well, any more damaging?

Q.  Any more damaging to anything that came out in Basham's.

A.  It was a really good closing in the sense that it was very effective, and also in the sense that it portrayed them not as equals, because that was the one we were trying to make. But he also said things like we're going to be standing in front of a jury in two months asking that Mr. Basham also be put to death. And he also -- and comments like that. I haven't looked at it in six years, but I watched it and I have reviewed it for the purposes of the motion we're talking about now. And while I don't have any specific recollection of things that he said, I do know that I didn't want it read to a jury.

Q.  All right. And just to confirm, Clifford Jay was not called in the penalty phase for Mr. Basham.

A.  He was not.

Q.  Turning to the mental retardation, you've already testified you weren't familiar with the Flynn effect. Did you have any discussions with Tora Brawley about the Flynn effect?

A.   I cannot tell if I did or I did not.  I just -- I don't remember.

Q.   Fair answer.  Is it a fair statement that Dr. Brawley could only rely on her testing and the records that she received to diagnose Mr. Basham?

A.   And her interviews.

Q.   And her interviews?

A.   She was given everything I believe she needed to make a proper evaluation.  That included medical records.  I don't have her testimony in front of me, but I know she interviewed a number of people, because she was looking at why his IQ had decreased, and to make that evaluation and determination she looked at drug usage, she looked at head trauma, she looked at a lot of environmental issues in reaching -- rendering her opinion.  So I think her opinion was based not on only records and Brandon's testing but also the universe of information that we had available about Brandon's life.

Q.   And universe of information provided to her by counsel and the team?

A.   Yes, ma'am.

Q.   You mentioned the MMPI.  Was one of the reasons that you all were successful in keeping that out was that Mr. Basham could not finish the MMPI in accordance with his protocol?

A.   No, it was because I didn't give it to him.

Q.   Didn't the government attempt to give it to him?

A.   They tried and we objected to it.

Q.   And do you recall that one of the reasons that objection was successful was that Mr. Basham could not complete it without having questions read to him?

A.   I recall that we argued that.and let me say this --

Q.   Sure.

A.   Again, it's going -- something coming back to me.  Donna Watts didn't give it to him because she said he will not, after all the testing I've done, all the time I spent with Brandon, he's not going to be able to sit for that test because the way that it is given.  So you're correct.  She may have testified to that in a hearing with the judge when he ruled that like testing meant you can't give him an MMPI if Donna gives him a CAT test, okay?  And so that might have been the testimony.  So I don't dispute that one of our grounds was yes, he couldn't sit for that test.  But we didn't give it to him.

Q.   Did you all hire independent FAFD experts, anybody that specialized in FAFD?

A.   No.

Q.   Do you recall what testing was done to rule out FAFD?

A.   I do not.  Done Schwartz-Watts would, Jack may know.  I do not.

Q.   Turning very briefly to Mr. McNair.  Would you say that Mr. McNair was just a cop at heart when talking to officers or

when dealing with pretty much anyone?

A.  My opinion is that he is a cop at heart when dealing with anyone.

Q.  And the government asked about possibly if you would hire him in the future.  Given the choice, if you had a hypothetical situation, two investigators relatively equal background and experience, would you prefer someone with or without the problems that Mr. McNair's background?

A.  Well, I mean, that's -- I think that question comes along with an obvious answer.

THE COURT:  Let me jump in here.  And I'm sure my ignorance -- did Mr. McNair testify at trial?

THE WITNESS:  No, sir.

MS. STONE:  No.  It's one of our claims, your Honor, is that he --

THE COURT:  Afraid to put him on the stand because of background.

MS. STONE:  He could not properly have been called to rebut anything if he needed to because my argument is because some of his issues regarded truth telling and veracity, that his background may have been relevant, and if that had come out in front of a jury they would not have liked that, especially the women on the jury.

THE COURT:  All right.

THE WITNESS:  I never conceded it was admissible.

Harris - Redirect                                    408

okay?

MS. STONE:  I understand, and I apologize --

THE WITNESS:  I just want to make sure I'm clear about that.

MS. STONE:  I don't want to misstate.

THE WITNESS:  I already testified about it.

Q.  You said it's an obvious answer, but what's the obvious --

A.  I would hire someone that hadn't -- didn't have some of the problems that were alleged to have occurred or been the case with Mr. McNair.  Certainly these were not even -- was never charged with anything, these were mere allegations, and we know about what those are worth.  So, you know, it was what it was.  We got a file jacket said somebody said he had done something with really no evidence or no proof.

Q.  Did he make admissions for some of those instances?  Like showing a video?

A.  You know what?  I'm still not -- show the video, I'm sorry, I can't recall.  But, no, I would rather have an investigator that didn't have any problems at all, that had a long history with an agency where he was honored on the way out than somebody that didn't.

Q.  And occasionally do you as a defense attorney, do you have to call an investigator to the stand?

A.  Yes.  Yes, I have in the past.

MS. STONE:  Your Honor, may I have just a moment to

confer with counsel?

THE COURT:  All right.

(There was a pause in the proceedings)

MS. STONE:  I have no further questions.  Thank you.

THE COURT:  All right.  Brief recross, rather.

RECROSS-EXAMINATION

BY MR. DALEY:

Q.  Mr. Harris, did you not call Mr. McNair to the stand because of was there a decision at some point we can't call him, we would like to impeach somebody but we can't because of his background?

A.  No.  The situation never presented itself in the trial.

Q.  And, obviously, you know about the Garrity issues, and a lot of this information potentially would not be allowed anyway, is that correct?

A.  Yeah.  Like I said, I never thought it was admissible after evaluating it personally.

MR. DALEY:  No further questions.

THE COURT:  All right.  Anything further?

MS. STONE:  Your Honor, I just want to clarify, because I think there were two different answers there, if I may.

REDIRECT EXAMINATION

BY MS. STONE:

Q.  Do you not recall a situation where Mr. McNair might have

Harris - Redirect                           410

been needed to be called to the stand, or you are certain that there was not?

A.  No, I don't recall.  I don't recall.

MS. STONE:  Thank you.

THE COURT:  Why don't we recess until 2:20 like we did yesterday.  That will be a hour and 20 minutes.  Mr. Swerling will be up next?

(A recess transpired)

THE COURT:  All right.  Ready to call your next witness?

MR. BURKE:  Yes, your Honor, thank you.  The defense calls Mr. Jack Swerling.

(Jack Swerling duly sworn)

DIRECT EXAMINATION

BY MR. BURKE:

Q.  Good afternoon, Mr. Swerling.

A.  Good afternoon.  How are you?

Q.  Good to see you again.  Before we start I wanted to make sure that if there's any misunderstanding or any confusion, but you asked me a moment ago if there was statements made about you receiving or not receiving e-mails.  So I just want to make sure that that's on the record, in case you had any questions about that.

A.  Well, yeah, I would like to clear that up because I heard it when I walked in.  I don't know --

Q.  Did you receive -- did you e-mail me last night?

A.  Yes, at 8:18.  I checked my Blackberry.

Q.  Did you receive a response from me?

A.  No.

Q.  You received an e-mail from me that was sent at 7:48, about a half hour before the e-mail you sent me last night?

A.  No.

Q.  Did you receive a response from me from your e-mail that was sent at 8:28?

A.  No.

Q.  Did you receive an e-mail from my co-counsel Miss Sarah Stone?

A.  No.

Q.  Did you receive an e-mail from the Assistant U.S. Attorney Bob Daley?

A.  I can check my Blackberry.  That's what I was basing that on.  In fact, I was wondering why I did not hear back from you.

        THE COURT:  What is the problem?  He's here, we haven't had a delay.

        MR. BURKE:  Your Honor, I think it's -- I would like to pursue this, if I might.  I think it goes to some of the issues that we're dealing with in this case.

        THE COURT:  All right.

        MR. BURKE:  Also Mr. Swerling's approach to me about

Swerling - Direct                          412

it.  And so I think we need to have a clear record on it.

THE WITNESS:  I want to know where that misunderstanding came about.

(There was a pause in the proceedings)

THE WITNESS:  I sent him one at about the same time and I said will I be reached tomorrow.  And I believe I got one back but I don't see -- well, I must have gotten one back because I said thank you to him at 8:51.  But there is no e-mail, nothing from you or your co-counsel.  You can look at my Blackberry.

Q.   (MR. BURKE) I think that clarifies the problem.  I mean, we sent three -- I sent three, she sent one and you didn't receive it.

A.  I didn't receive a response, so I thought that was unusual.

Q.  Did you send a follow-up e-mail to me?

A.  No.  I sent one to you and one to Mr. Daley asking if I was up tomorrow.

Q.  Okay.

A.  About 8:00, 8:15 last night.

Q.  Mr. Swerling, as you know, you are here today to testify about your role as the lead counsel in Mr. Basham's trial in 2004.

A.  Yes, sir.

Q.  And as you also know, Mr. Basham through his counsel have

raised several issues of ineffective assistance of counsel against you and Mr. Harris, correct?

A.  Yes, sir.

Q.  Okay.  In fact, shortly after Mr. Basham filed his 2255 petition in this case did you contact the U.S. Attorney's Office to request a copy of that motion?

A.  Absolutely.  And I got a chiding letter from you reminding me of my ethical responsibilities not to have any confidential communications with Mr. Daley.  And I sent you a letter back saying that I know my ethical obligations and I have not had that discussion with him.  And I called Mr. Daley because he was local and I just said can you send me a copy of it.

Q.  Do you have e-mail?  Well, we're not sure, are we?  I mean, it's not -- is it possible in this day and age to send someone an e-mail, is it not correct, with an attachment?

A.  I don't understand your question.

Q.  Isn't it as easy for me to send you an e-mail with the petition attached than --

A.  I saw nothing wrong with asking Mr. Daley to send me a copy of a petition.  You are the one bringing the petition against me with -- I don't see what the problem is.

Q.  Well, the petition is not being brought against you.

A.  It is.  Yes, it is.

Q.  Had we had communications before filing the petition in this case, we filed the petition in this case, other than my

letter chiding you?

A.   Yes.

Q.   Okay.  And had we met at your office on a couple of
occasions?

A.   Absolutely.

Q.   And, in fact, on one occasion my co-counsel Miss Stone and
I and our paralegal came to your office for approximately five
days to review and scan the documents in your case.

A.   That's correct.

Q.   Okay.  Now, your statement is that you needed to obtain a
copy of the 2255 petition so that you could review it because
the claims were against you, is that correct?

A.   I didn't need it, I just -- I heard that it had been filed
and so I called Mr. Daley, who I know, and saw absolutely
nothing wrong with asking him to send me a copy of the
petition.

Q.   And is it safe that say you were -- you would want to see
what was in the petition?

A.   Yes.

Q.   Okay.

A.   Yes.

Q.   Do you recall being interviewed by the government in the
past several weeks in preparation for this hearing?

A.   Three times.

Q.   Three times.

A.   And you were present on the phone or -- you were present physically or on the phone on one occasion, but it's been three different occasions that I agreed to sit down.

Q.   Okay.  Can you tell us why there were three interviews conducted, why was it necessary to leave the interview and return again and resume it?  Can you --

A.   Because I was reading documents, 77 boxes, probably over a hundred thousand pages of documents.  I wanted to, as we were going through, I wanted to review things so I could be prepared for the next meeting.  So, as I recall, on the first meeting we addressed, you know, I don't know the number, but probably most of the allegations.  And there were several that I needed to review the transcript to refresh my memory, or notes or documents, and so we came back the second time.

Q.   Okay.  And --

A.   The third time it was a similar thing.  There were some things I still needed to check and review to refresh my memory.  It is eight years ago.

Q.   That's correct.  Okay.  And did you feel that you had an ample opportunity to be interviewed or questioned?  If you had any questions did you feel you were able to raise them during those interviews?

A.   Did I have any questions?  No.

Q.   Okay.  You mentioned the 77 boxes, if that's the number we throw out.  Is that a guess we all have?

Swerling - Direct                                   416

A.  I have seen that number either from you or the government, there were 77.  It might have been 74, something like that.  I don't know.  You all have seen it, and I think the government came by maybe and took a picture of it.  And I was -- you know, could have brought 77 boxes with us.  I don't know.

MR. DALEY:  And, your Honor, for the record, I do think a couple of the boxes sort of say a certain number of boxes of 77.  I am pretty certain, though, that when we did it there's other miscellaneous boxes that turn out to be more than that.  But there's a numbering system, there's two numbering systems, I think, so it's a --

THE COURT:  All right.

MR. DALEY:  I don't think there's a clear number.

THE WITNESS:  There's a lot.

Q.  (MR. BURKE) That raises a question.  When we reviewed it we did notice that there seemed to be two numbering systems to your boxes, one of 30 some and one of -- do you have any recollection as to why that might be?

A.  No.  I mean, I had several different paralegals during this period of time and so I don't know how those numbers were assigned to the boxes.  What I tell them is I want -- what I would like them to do is have the full total number of boxes and then start labeling the boxes one of 50, two of 50.  So I don't know, I don't get involved in the numbering system.  But every box that I have has been made available to you and to

Mr. Daley.

Q.  And when you say made available, what do you mean by that?

A.  That you could -- that you looked at them or had the ability to come and look at them.  So did Mr. Daley.

Q.  So you are saying we had the ability to come to your office and review them?

A.  Yes.

Q.  Okay.  Did we at one time, Mr. Swerling, attempt to make an entire copy of your file?  Do you recall that?

A.  Well, there have been several things going on about that. When we started off I simply requested -- never, absolutely never said you could not have a copy.  What I said was I thought that I needed to retain a copy because I was trial counsel in the case.  So we tried to work that out, whether or not start copying in the office or send it out to a copy shop. I remember we sent a number of boxes out to the copy shop. The bill was pretty expensive and so you and your office decided not to continue that process.

As I recall, Kelly, Kelly Switzer, who's my paralegal, went ahead and sent you all the disks that were available from the government, every disk that we had, which was a lot of most of the discovery in the case.  Then there was some discussions about transporting the files.  And what I remember, it was, again, just asking that I be able to keep a copy.  There was a question about whether I keep a copy or an

original.  I eventually said I'll just keep a copy.

And I suggested on a couple of occasions going to the court to see whether or not there was any funding available to go ahead and do any copying of it.  Because it involves, you know, let's say a minimum of a hundred thousand pages or something in that neighborhood.  And we never got that far.  That was in February of '11 when you came there, and I believe it was February '11 you spent five days, you had full access to my conference room, nobody bothered you.  You know, whatever questions you had I was happy to answer.

Mr. Harris had a file, I don't know if you ever went over there to look at his file.  But we tried to work out, both of us, I think you and I both tried to work out a way to do it.  And after February of '11 I don't recall there was any other effort until this year.

And I think this year we went ahead again proposing that we look, and say I proposed or you proposed, I can't remember, going to the judge and asking for funding to make copies so that I could retain a copy and you could have it.  And I went ahead, you asked me to get an estimate of that.  And I brought in a copy shop and the copy shop did give us an estimate which I furnished you.  And that was basically the last conversation we had about that, I think.

Q.  Do you recall what the estimate was?

A.  It was expensive.  It was like $27,000, I think.

Q.  I believe, I mean, not to testify here, but I remember from our experiences the few boxes we sent over came to $8,000.

A.  It was a different kind of copy.

Q.  Different type of copy?

A.  The first time we were doing it we were taking the paper and making disks out of it.  Then the second time we did it we -- or proposed to do it is just make a hard copy, which was going to be cheaper.  It wouldn't have been $9,000 for several boxes, whatever it was.

Q.  Right.  Do you remember receiving a request from me personally to allow us to transfer your files to our office and to make a complete copy for you from our office?

A.  We discussed that and I said -- I didn't refuse, I was trying to work out where I could retain -- let me explain something, Mr. Burke.  I've got -- I was lead trial counsel in this case.  I had, let's say, 75 boxes.  I was worried about those boxes or the file in some way some part of it getting lost, some part of it being misplaced.  I'm responsible for it.  I mean, I was the trial counsel.  So I thought a reasonable accommodation was to give you complete access and also to request that I be allowed to retain a copy.  I still think it was a reasonable request.

Q.  And are you suggesting that we -- you do recall me asking if we could receive -- take and pay for transferring your

Swerling - Direct                                        420

entire files?

A.   Yes.  I said yes.

Q.   And you were not in favor of that, is that correct?

A.   I was not in favor of it going out of my office and me not having a copy, that's the bottom line.  That's correct.

Q.   And is it your opinion that although you have not represented Mr. Basham in eight years that you have the responsibility for retaining his trial file?

A.   It is my -- it's my belief that I have an obligation, obligation to retain a copy of the file.  Yes, because for exactly this reason here.

Q.   Exactly, exactly.  But if you were offered, as you were in this case, to have an entire copy prepared for you wouldn't that satisfy whatever obligations you seem to think you had?

A.   Mr. Burke, it's just a question of how you want to do it. I thought we could make a copy here and then send you the original.  So it was just -- it was just the way we were both looking at it.  Nobody ever said you couldn't have a copy or the originals.

Q.   Well, we agreed so far, though, that the expense was prohibitive for us to do it in South Carolina, that's correct?

A.   I don't think the cost of doing a hard copy would have been prohibitive.  It would have been a question of asking the judge for it.  I don't know if the judge would have agreed or not agreed.  But it never got that far, as far as I

understand.

Q.  So you retained the 77 boxes and now -- the government may show this, but just so that you know, Mr. Swerling, there are marked and admitted into exhibit photographs from the government of your conference room and the various boxes that are in there.  The court will be able to get a visual picture of what it is that we're talking about.  It is extensive.

In the process -- so when my colleagues and I came to your office in 2011 you said you had made the entire file available to us.

A.  That's correct.  I think there was one we discovered in June or July that my paralegal had a correspondence file somewhere starting, I don't know remember when it was, but most of it was letters between Brandon Basham and I over the last eight years.  And there was some post-trial correspondence between me and West Virginia, because I had originally been appointed up there.  So it was a folder, expando folder, which I sent you a copy of.  And we sent you copies of many other things, as well.  And I told you I was going to give you ten days to see if there was an objection that should be filed and if there was no objection then I was going to turn it over to the government.

Q.  And we did not object, correct?

A.  Correct.  And I gave the government a duplicate copy of that file.  But that file was in another area at the time and

actually my paralegal kept it.

Q.   Now, when appellate counsel came to your office in 2008 for a similar purpose were they provided access to the entire file?

A.   Absolutely.

Q.   Absolutely?

A.   Except that, and I've told you this, that office upstairs was not fully rented where the conference room is and where all the files are.  So they were provided access to the files. It was a file cabinet in an empty office that I put all the vouchers in, as well as my spiral trial notebooks.  They were in a locked cabinet.

Of course, several years after the event I had no recollection that they were in there, and I told you that as soon as I realized when we rented that office and opened up that cabinet that they were in there, explained to you that that's how it happened.  You've got a copy of all of that.

Q.   Yes, we did.

A.   And so does the government.  But so the only thing I'm aware of that appellate counsel didn't see, and it was completely inadvertent because nobody realized stuff had been put into that file cabinet, was my -- the vouchers, time sheets for everybody, as well as my spiral trial notebooks.

Q.   And your spiral trial notebooks are those notebooks in which you keep handwritten notes from your cases?

A.   Correct.

Q.   And you keep them separately for each case, is that correct?  So Mr. Basham would have his own set of spiral notebooks?

A.   Well, they are normally kept with the file.  I didn't realize they weren't in one of those 77 boxes or -- again, I'll use 77.

Q.   We will stick with 77.

A.   So my understanding was they were in the 77 boxes.  There would have been to reason to have them outside, it's just that at some point years ago they were put into this cabinet and I was not aware of it when appellate counsel came.

Q.   And, please, I want to make sure as I question, I mean, you know as having reviewed the 2255 that we have alleged that the appellate counsel's failure to obtain the full record in your case hindered their ability to --

A.   That's absolute nonsense.  And I can explain.

Q.   No, I'm not asking you about that right now.  I'm just saying is it true we have alleged that?

A.   You've alleged it, I think it's nonsense.

Q.   And I understand that, but we will get back to that.  I want to make it clear that we're not suggesting and never have suggested that you've done anything to hide files from anyone deliberately.  It's not -- I mean so please don't think that that's what we're saying.  We do have -- my question for you,

though, and I think we have answered it, is that we now know that appellate counsel did not receive your time sheets and your handwritten notes from the trial, correct?

A.   That's correct, because of inadvertence.  I did not know that they were not in there.

Q.   Absolutely.  As I said, we're not suggesting it was anything else but that.  Now, you did provide those files to us.

A.   Because I found, we found, when we went to that office, we went in there and somebody opened up the file cabinet and saw that that's what was being kept in there.  And that was several years ago, I mean, you know, after appellate counsel came, as far as I can recall.  I mean, Mr. Burke, there's no reason for me to not provide the files for your access, or appellate counsel.  If I didn't it was because of a mistake or inadvertence, it was never anything intentional.  My understanding is you've had an opportunity to go through every single page of the Basham file and just like I did.

Q.   Not just like you did, Mr. Swerling.  And let's talk about that for a second.  Let's imagine for a moment that when you were representing Mr. Basham, and you will agree it's -- the government has mentioned it many times and I'm sure they will mention it today, that this was a huge case.  You obtained thousands of documents, thousands.  You interviewed close to a thousand witnesses, or you and your team.  It is a huge case.

A.   Correct.

Q.   If all those records had been kept at the office of Mr. Basham's West Virginia counsel would you have been able to do your job?

A.   West Virginia counsel?

Q.   Yes, Mr. McHammock.  If he had --

A.   I'm sorry, who's --

Q.   Jay McHammock?

A.   I don't know anything about that.

Q.   Were you not co-counsel for certain period of --

A.   Gary Collias I believe was my co-counsel in West Virginia.

Q.   Okay.  If the file in Mr. Basham's case had been kept in his office and you were to call him and ask him for which documents you needed, would you have been able to do an effective job?

A.   Mr. Burke, what I would have done is flown up to West Virginia, I would have gone through the entire file, I would have made arrangements to go ahead and honor that counsel's request that he be given a copy and that I have a copy.  So there's no question in my mind what I would have done.  And there's no question in my mind what I would have done is gone to the judge and said we have a very complicated situation here with all these boxes of discovery and both sides think that they, or you and I and the government, of course, is going to get it, as well, there needs to be some way worked

out that we can get a copy and everybody can have a copy.  It just makes sense to me.

Q.  And did it make sense for you, though, to allow us --

A.  I already said that.

Q.  That did not make sense?

A.  I did not want to release the file, send it by Federal Express and take the chance that boxes would be destroyed or boxes wouldn't be returned.  So I thought I made a reasonable request I be allowed to keep a copy and you work it out with me where you could get a copy, I could have a copy, and eventually we knew the government was going to get a copy, as well.

Q.  Now, returning to appellate counsel --

A.  Plus we did send you many documents.

Q.  That we requested.

A.  Absolutely.

Q.  That's after we had been to your office we realized we needed.

A.  Yeah, sure.  There was never, you know, no attempt to -- and what I wonder is there anything you haven't seen or you need.

Q.  Well, that's an interesting question, actually.  Did you receive an e-mail from me on Tuesday night of this week?

A.  And what was the e-mail?

Q.  Requesting a copy of -- in preparing for this hearing

there were time sheets that indicated that you had had an

e-mail with Dr. Donna Schwartz-Watts in this case which had

not been in the files that we had been provided.  And I

e-mailed you on Tuesday evening --

A.  And I responded.

Q.  You got that e-mail?

A.  Yes.  Mr. Burke, I did not get your e-mails last night.

Q.  Mr. Swerling --

A.  I can't make it any clearer.

Q.  Mr. Swerling, let --

A.  You can look at my Blackberry.

Q.  Let's lay the groundwork here.  I respect the fact you are

a well-regarded criminal defense attorney in this state.  I

don't question that.

A.  Thank you.

Q.  Today I am the defense attorney and I am the one who gets

to ask the questions.

A.  I didn't ask a question.

Q.  No, but --

A.  I just said is there something you need.

Q.  You are trying to direct -- please, please.  I don't want

to argue with you, sir, okay?  I know you are a great lawyer,

you are a great trial lawyer.  I'm trying to make a record

here about what happens in this case.  Okay?

A.  Mr. Burke, I'm not arguing with you.

Q. Okay.

A. I did send you a response on Tuesday night.

Q. Okay. So those were files -- what was the response that you sent us?

A. You want me to read it? Did you not get it?

Q. No, I got it.

A. The response was that you were asking me for an e-mail to Donna Schwartz-Watts on May 3rd of 2003 because it was on my time sheets and you couldn't find it. I went Wednesday morning, maybe, or Tuesday morning, I can't remember how it worked, I can look at my Blackberry again, and I told Kelly, my paralegal, let's go find these, whatever e-mails there are regarding Donna Schwartz-Watts. What she found was an e-mail -- no e-mail on May 3rd, and not even an entry on my voucher for May 3rd. So that's what I told you. And then I attached to the e-mail that I sent you three e-mails that we were able to find between me and Dr. Schwartz-Watts.

Q. One second.

A. Two or three.

Q. Two or three?

A. Whatever it was is what I sent you.

Q. Okay. And --

A. I can look at my Blackberry.

Q. Is your testimony today that you have provided us access to all e-mails that you had with all experts and team members

in the Basham case?

A.   Every e-mail that's in the file.  Now, let me explain something to you.  I don't file my e-mails.  I send a copy to one of my secretaries or one of my paralegals and they are supposed to file it.  Does that mean that every one gets filed and I can vouch for that?  No, it's -- but it's not something that I do.  Whatever is in the boxes you have gotten and had access to.

Q.   Okay.

A.   And whatever it was on your e-mail was a mistake, because there was no e-mail of May 3rd, or not even an entry for May 3rd.

        MR. BURKE:  Ask the court's indulgence for one moment, please.

        (There was a pause in the proceedings)

        THE WITNESS:  It may have been like May 6th.  We sent you that one.

Q.    (MR. BURKE) And that's the only e-mail that you have between you and Dr. Schwartz-Watts.

A.   Whatever I sent you is what Kelly was able to find.  There's thousands -- well, I shouldn't say a thousand.  There are probably close to a thousand e-mails that were generated in this case between everybody.  So I had her -- because you requested it I had her go through my e-mail folder to see whether or not there was any other communications to Dr.

Swerling – Direct                              430

Schwartz-Watts.  And whatever I sent you, whether it was Tuesday night or Wednesday, the attachment was what she was able to find.

Q.  And did your paralegal search for e-mails -- my request was specific.  I'm just asking did your paralegal search for e-mails with regard to other experts in the case?

A.  As far as I know, she did, yeah.  And there were copies of, you know, e-mails sent to people, not specifically to -- what I understood you wanted to know was what were the e-mails to Dr. Schwartz-Watts and to another expert, not copies that were sent out en masse.  And as you know, a lot of the e-mails were sent out en masse to a number of people on a list.  So, again, they are available.  You can come back and look at them if you think something is missing.

MR. BURKE:  This might be a good time to address this.  Perhaps the court could help us resolve this unresolved issue.  Our request all along with Mr. Swerling has been that we be allowed to take the file that is our client's property to Arizona to make a complete copy of all 77 boxes, to put them on disk for Mr. Swerling's assistance, if that would help, and then to return the originals to him.  Would we be allowed to receive an order from the court?

THE COURT:  You don't want them to leave your office.

THE WITNESS:  Judge, I'm concerned.  I've had bad experiences.  I mean, so many boxes, and the file now, because

so many people have gone through it, is just not organized the way I want it to be organized. So I had difficulty going back through and trying to see, find everything. I'm not saying anybody's going to take any documents out or not return them, but I think it's a reasonable request for me to be able to retain a copy.

THE COURT: I didn't realize that we had this situation. I thought the file had already been copied and provided.

MR. BURKE: No, your Honor, it was left with we were -- we attempted to -- we attempted repeatedly to accommodate Mr. Swerling. We attempted to obtain copies, it became cost prohibitive, and so Mr. Swerling is accurate in his statements that he suggested that I come to you. My thought was that there was no reason for us to come to you when our budget allowed us to make those copies and return them to Mr. Swerling. Which is something, I might add, my office of experienced professionals does in every case we get. And I don't know of a case in which we have lost a file or a record or a document.

THE COURT: Well, so even now you want to look at those documents even though we're in the middle of the hearing?

MR. BURKE: Your Honor, I'm preparing for this hearing this week and I'm seeing reference to e-mails I did

not know existed.  Now, I will tell you that our office paid for my co-counsel and myself and my paralegal to come to South Carolina and spend a week going through the files in Mr. Swerling's office.

THE COURT:  Can you say you looked at most of the documents even though you haven't copied them?

MR. BURKE:  We looked at everything that was provided to us.  We -- the three of us opened those boxes and we went through, we made to the best our ability an index of what we were seeing.  It was impossible for us to -- what we had was a small portable scanner, so what we had to do, what Miss Oliver, our paralegal, had to do was Miss Stone and I would flag documents and say please scan this.  Which is what she did.  We didn't -- what we could do in the period that we had. Now, I'm sure Mr. Swerling, I don't want to misstate the record, Mr. Swerling probably would have let us stay forever if we had wanted to.

THE WITNESS:  Which was what I would have done.  Or made arrangements.

THE COURT:  It's just a lot more cost beneficial to do it there in your office than have it sent out here.

MR. BURKE:  Absolutely, your Honor.

THE COURT:  I can see Mr. Swerling's point.  He's not being charged with any unethical conduct here, but he's just concerned about issues coming up and he's lost control of his

file, he isn't able to deal with it.

MR. BURKE:  Your Honor, I would -- we researched this issue and do now know from the testimony from Miss Meister that Jenner & Block researched this issue, as well.

THE COURT:  All right.

MR. BURKE:  The file is the property of the client.

THE COURT:  All right.

MR. BURKE:  It is not Mr. Swerling's property.  So it belongs to Mr. Basham and we are Mr. Basham's current counsel. We are not trying to prevent Mr. Swerling from having access to the records in this case, we're simply trying to effectively represent Mr. Basham in his 2255 proceedings.

THE COURT:  There's no way they could be scanned here locally by someone, bring in a scanner here and doing it here?

MR. BURKE:  Well, your Honor, we did that with a portable scanner.

THE COURT:  I'm talking about with a full mainframe scanner.

MR. BURKE:  And I think Mr. Swerling and I, we discussed that, and I think --

THE WITNESS:  I never did have any problem with a scanner.  I mean, the government came over and did it.

MR. BURKE:  Perhaps, Mr. Daley, were you able to scan all his documents?

MR. DALEY:  Your Honor, what we did, and it was

fairly straightforward, we came over with a scanner probably similar to Mr. Burke's scanner and we went through all the boxes, whatever the final number was.  And quite a bit of it, I mean, several of the boxes were discovery, government's discovery that we had sent over.  A bunch of it was the defense discovery.

And so we were selective in what we scanned.  I think we ended up scanning about 80,000 pages.  And so do I think I have everything from his files?  I certainly don't.  But I have -- I mean, I didn't feel -- it took us six days, I think, so it was not a short task and it was long hours.

THE COURT:  You did it with a portable scanner?

MR. BURKE:  Well, it was a scanner, it's portable, it's a good -- older scanner.  It's five or six years old. It's not portable in the sense that I could carry it in a briefcase, no, your Honor.

We had -- but we did the same thing, just for your information, your Honor, with both Jenner & Block and Mr. Sullivan.  We FedExed it for about 120 bucks up to DC and did the same thing with them, with both Mr. Sullivan and with the Jenner & Block folks.

And I will say we encountered some resistance -- no, I don't want to say we encountered a little resistance, we encountered very significant resistance with Jenner & Block, who refused to let us take the boxes out of their conference

room and who -- I'll leave it at that.  It was -- they would

not let their files leave their conference room.  And we had

to bring a scanner in to get their documents.  And we were

there -- and there were 40 boxes, probably, for Jenner &

Block.  But that's when --

THE COURT:  When you say the law is the file belongs

to the client, that's -- we're talking about a cost problem.

The client clearly is entitled to a copy of everything in

their file.

MR. BURKE:  You're right.

THE COURT:  But is that -- are you saying that the

rule is the client's entitled to the original documents to

leave the lawyer's office?

MR. BURKE:  Not necessarily, your Honor.  But our

point is, I think you hit the nail on the head, is it's a cost

problem.

THE COURT:  Right.

MR. BURKE:  We were able to do that at no cost

outside of what our office budget already is --

THE COURT:  Right.

MR. BURKE:  -- to anyone.  We were able to do it.  We

do it all the time.  And we scan them on, then we have a

working copy of the entire file, and then we return it to

trial counsel if they request it.

I will tell you in my experience doing this work I

have never until this case had a trial counsel request the original files back. But I'm not saying that Mr. Swerling would not be entitled to it if he wanted. We didn't really research that as much as Mr. Basham's right to have access to all documents.

Now, Mr. Swerling's position is, and it's -- he's made it repeatedly, is he gave us access. But, your Honor, as you know, this is a very complicated and huge case. It's -- and you heard the testimony of Miss Meister and you saw the exhibits in which after she came down she was having to e-mail Mr. Swerling asking for him to go find specific documents in those 77 boxes. And, frankly, I would have thought that would be a great inconvenience to Mr. Swerling, just as it's been an inconvenience, I would assume, when we e-mail saying do you have this document or do you have that document.

THE COURT: What about the precedent of the appellate firm not giving the government physical custody of its files?

MR. BURKE: We have had a similar problem. In fact, the Jenner lawyers in that case, we did not have access to the e-mails that you saw until the government obtained them. And Mr. --

MR. DALEY: Again, your Honor, I will put on the record, I do --

MR. BURKE: We're in agreement on this.

MR. DALEY: I had to basically, let me be discreet, I

had to be very forceful and patient in refusing to take no for an answer with the managing partner of Jenner & Block in Washington, D.C. to obtain any e-mails related to this case. Truth be told, you know, those e-mails that I got, a number of them are now defense exhibits. But I think it's important for there to be a full record, so -- and I say that mainly to make a record that I was -- to the extent there was a claim made about how Mr. Swerling was conducting, how he was handling the files, apparently there was at least one other firm, and it sounds like the defense had the same -- he had the same challenge.

I think we have the vast universe of documents that would be necessary for claim 30, but I just say that to make the record clear that apparently at least Jenner & Block has a similar approach as to how they handle their files.

MR. BURKE: And, your Honor, I will add to that that Mr. Daley and I have commiserated with one other about the difficulty in obtaining records in this case. We are in a somewhat different position because I actually represent the client whose file it is. So we are in a somewhat different situation. But, of course, your Honor, you did issue an order allowing them access to relevant materials, so --

THE COURT: Let's take a quick recess. Let me hit the books on this just a minute. Let's take a ten minute recess. All right?

(Recess, 3:00 p.m.)

THE COURT:  This case presents a number of difficult issues, this is one I did not expect, and it's a very difficult call.  Mr. Burke, I appreciate your office taking this case and handling it on a greatly reduced budget from what we normally see in death penalty litigation.  All your staff are on salary and I haven't had to look at these enormous vouchers I look at in other cases, and I appreciate that.

At the same time, I understand Mr. Swerling's concern about letting go of the original documents out of his office.  It looks like this should have been raised at the pretrial conference we had about a month ago so we could have thrashed it out before the hearing began.  Any reason it wasn't raised earlier?

MR. BURKE:  Your Honor, let me also clarify that I wasn't intending to raise this particular issue this morning, I was actually going into Mr. Swerling's ability to prepare for today's hearing.  In my mind we fought this battle and we have already had to file a motion in June of 2011, and the case had been -- we had problems with competency.  In my mind the ship had sailed, we had not been able to get the records.  It wasn't my intent to bring this up as a new issue, but I can't waive it.  We certainly don't have the file.

THE COURT:  I thought about it over the break.

Didn't find a whole lot of authority. It's my interpretation what Mr. Swerling proposes is reasonable and should have been accepted and still can be accepted. Bring in, send in a high powered scanner, he said he can -- he wants everything to be done on his premises and I find that's reasonable under the circumstances of this case, and it can still happen from this point forward. So with that, let's move forward.

MR. BURKE: Thank you, your Honor.

BY MR. BURKE:

Q. Mr. Swerling, you had the opportunity now to review the 2255 petition filed on Mr. Basham's behalf?

A. Yes.

Q. And are you -- sitting through the interviews, the last three interviews we had, it was my impression that you're of the position that none of the claims that Mr. Basham has raised alleging ineffective assistance of counsel against you have any merit, is that fair?

A. I think that's fair.

Q. Okay. So that --

A. I don't think I was ineffective, if that's what you are asking.

Q. Yes. I mean, it was my impression, and I kind of want to figure out if there's areas we have agreement that we not talk about them. But your position is none of the claims we have raised raise any serious claim that you were -- you fell below

the standard of care in this case.

A.   I do not feel like I was ineffective, if that's answering your question.

Q.   Well, ineffectiveness is actually a legal standard and -- but my question is do you feel that you met the standard in this case of a -- of a reasonably competent attorney handling a federal death penalty case?

A.   Yes.

Q.   Okay.  Prior to Mr. Basham, how many clients had you represented who were charged with federal capital offenses?

A.   None.

Q.   None.

A.   Federal.

Q.   Federal capital offenses.  So this being your first, you are aware that we have retained a standard of care expert in this case, correct?

A.   That's correct.  That's what I heard.

Q.   Now, let me tell you, with all due respect, I know you have a very long and highly regarded career, our standard of care expert has been practicing for 40 years and in the course of that 40 years he has served as a Watergate prosecutor, he was a law clerk for Justice Hugo Black and for Justice Lewis Powell --

          MR. DALEY:  Your Honor, I have to object.  I'm not sure why we need to know the credentials of their standard of

care expert until he testifies.  And I'm not sure where he's going with that.

MR. BURKE:  I think the objection would be more appropriate after I ask the question.

THE COURT:  Go ahead with the question.

Q.   (MR. BURKE) And Mr. Hammond has represented at least seven federally charged death penalty clients.  If Mr. Hammond is of the opinion that there are various claims, a number of claims in this case in which you fell below the standard of care, is your opinion he's simply mistaken?

A.   You are asking me if his opinion is mistaken?

Q.   Yes.

A.   I don't know what his opinion is.

Q.   That you fell below -- well, that's a little disingenuous, sir.  We have been through this in these -- in these hearings and we know that Mr. Hammond is -- said that you fell below the standard of care in a few areas.  And Mr. Daley spoke to you about that at Monday evening's interview.

A.   My understanding on Monday evening was that -- is it Hammond?  Is that what you said.

Q.   HAMMOND.

A.   My understanding was he hasn't even finished going through the file or the transcripts so how can he come to any opinion?  Isn't that what was said on Monday evening?

Q.   No, that's not what was said.  As I assumed you were

aware, I think that the conversation occurred that Mr. Hammond had been interviewed prior to you coming in.  Do you recall that?

A.   On Monday.  But my understanding was when I voluntarily showed up on Monday evening that Mr. -- he was still reviewing documents and would be prepared to testify, I guess, at some future date.  So, I mean, I can't answer your question in the abstract.  If he has a -- if you have something specific to ask me then I can respond to it, but I just don't know -- I can't respond to general, to a general question like that.

Q.   If Mr. Hammond is of the position that you fell below the standard of a reasonably competent attorney in litigating the Jackson v. Denno hearing in this case, would you say his position is incorrect?

A.   I would say that he's not taken into consideration all that I took into consideration.  It's easy to be, you know, a Monday morning quarterback.  Easy.

Q.   Well, I would -- Mr. Swerling, nothing about this case is easy.

A.   It's easy to be a Monday morning quarterback.

Q.   And is that your opinion of what a standard of care expert does in a federal death penalty post-conviction proceeding?

A.   No.  You just asked me a question and I'm telling you that it's easy to look at a case and say that there were things that were done that could have been done differently.  I'm

just saying it's very easy to look back at what someone's done in any case, criminal or civil, and say it could have been done different. So I disagree with him about the Jackson v. Denno issue because that was well thought out on my part and Mr. Harris' part about the way to approach that.

Q.  Okay.

A.  And if you will give me a chance at some point to explain why we did what we did then I will explain.

THE COURT:  I think we ought to move on into the facts now. You laid the basis for the disagreement. Let's get into what happened.

MR. BURKE:  All right. Your Honor, I would like the opportunity to go over Mr. Swerling's experience and background, though. It seems like reasonable questions I should be able to ask about his experience.

THE COURT:  Certainly, you can. Go ahead.

Q.  (MR. BURKE) Mr. Swerling, in preparing for this examination I looked at your website jackswerling.com.

A.  Yes.

Q.  And it's very, very comprehensive. And it seems to be updated quite frequently, is that correct?

A.  I haven't updated it probably in eight or nine months. There's stuff to add, there has to be because I'm constantly litigating and doing things that I'd like to add to that, so --

Q.   Do you personally do that yourself?

A.   No, no way.  Lexis does it, and my paralegal.

Q.   Okay.  The government has marked and admitted as Exhibits 1 and 2, and if we could perhaps bring up -- actually, if you could just bring up Exhibit 2 so we can just go through this.

     While they are doing that, Mr. Swerling, given your reputation --

A.   Mr. Burke, I'm sorry.  This is not clear.  I don't know how to --

Q.   Okay.  I will have to blame the government for that. That's fine.  You are aware of your website, correct?

A.   I should be, yeah.

Q.   Okay.  Do you find that a large percentage of your business comes your website or does more come from simply your reputation in the community?

A.   Well, the website was a defensive mechanism that I resisted for a long time.  But I guess about two years ago, two-and-a-half years ago, everybody, virtually, was having a website.  I don't do any advertising.  If you look in the phone book you will see Jack Swerling, Law Offices of Jack Swerling.

     So what I decided to do was do a website but not advertise, not to advertise but just to have something that people could refer to, which is becoming much more common. When someone calls from Indiana or Arizona or Seattle they say

I've looked at your website, or I refer them to the website.

Because I don't like to, when I'm sitting and talking with a

client talking to them on the phone, I am not comfortable

trying to tell them what my experience is.

Q.   Has your entire career been in criminal defense work?

A.   I started off doing a little bit of everything in 1973

with state Senator Isadore Lourie.  I guess I did a little bit

of everything.  I did a couple of real estate transactions

which turned into being disasters, did a couple of probate,

and I did personal injury for five or six years, as well.  But

the criminal became something that kept coming into the firm,

coming into me, and the person who in the firm was -- had been

doing criminal went to Charleston, a fellow named Steve

Knight.

     So it really, combination of two factors, one is

Mr. Knight left and went down to Charleston, another was a lot

of the great criminal lawyers in this area had withdrawn or

had passed away, Frank Taylor and some of the other guys in

this area, Luther Lee, Alex Ball, people that had done

criminal work.  So the opening was there for me so I stepped

into it and it kept coming.  So eventually, I guess somewhere

around '83, I defended a fellow name Donald Peewee Gaskins,

and pretty much after that it was all criminal, I think.

Whatever civil I got I passed off to somebody else in the firm

or associated somebody from outside.

Q.   Okay.  And you mentioned a client in 1983.  Could you give me his name again?

A.   Donald Peewee Gaskins.  That was a death penalty case.

Q.   That was a death penalty case, correct?

A.   Yes.

Q.   So that was your first death penalty case in 1983?

A.   No, actually not.  Shortly after the new statute had been passed there was a murder at Transouth on Elmwood, and a fellow named Wendell Moore was charged with murder, I can't remember his codefendant's name, but I was appointed to represent him.  And we brought in the Southern Poverty Law Center, Millard Farmer and his staff, because no one had really ever tried a death penalty case under the new bifurcated system.

So we spent a lot of time with Millard Farmer and his staff.  Gaston Fairy and I, who's a well-known lawyer in the area, defended Wendell Moore and we just got a great education from those fellows and gals who had done extensive death penalty work.  I believe -- I believe it's Southern Poverty Law Center, Millard Farmer.  So that case eventually, after several days of jury selection we had seated four or five jurors who opposed the death penalty.  That's before they started ruling those people were not death qualified and couldn't get on a jury, so we got a life sentence out of it.  That would have been the first one.  And, obviously, we're

Swerling - Direct                                    447

already in the trial and the preparation, but I had the good fortune of learning from some of the best.

Q.   And this would have been, Mr. -- so Mr. Moyes' case was in -- sometime in the 1970s?

A.   It would have been in the late '70s, maybe, or 1980, somewhere around that time.  If I remember right it was the first or second death penalty case after the statute.  There had been another one but it had been a guilty plea that I was -- I don't think I had the experience at that time to get appointed.  But it was the Taylor Harkness murder, which was a particularly gruesome murder in this area, and it was a guilty plea and they both got the death penalty.  But that probably was the first one.

Q.   Now, it's my understanding from this proceeding and from this case that Mr. Basham's and Mr. Fulks' case were the first federal death penalty cases in the District of South Carolina, correct?

A.   If I remember right, it was.

Q.   So but you have had an extensive federal criminal defense practice, as well, correct?

A.   Fortunately, yes.

Q.   What type of cases have you handled in the federal courts?

A.   Drug cases, fraud cases, other white collar crime cases, gun cases, interstate Hobbs Act cases.  I mean, I think across the board.

Q.   What was the one you just said?

A.   I was trying to think, there was --

Q.   Hobbs Act?

A.   Yeah, Hobbs Act.  I said Hobbs Act.

Q.   Had you, prior to Mr. Basham's case, ever represented a defendant charged with a federal crime of carjacking?

A.   I don't recall.

Q.   How about the federal crime of kidnapping?

A.   Yes.

Q.   And who was that client?

A.   I don't remember the name, but it was -- we can get you the name.  It was actually in front of Judge Shedd.  And Judge Shedd ruled we had a -- at a pretrial motion, as I recall, Judge Shedd ruled that -- it was a natural mother who had -- the facts are a little blurry to me, but Judge Shedd ruled that did not violate the federal kidnapping statute and so we eventually, after working on the case and having the motion to dismiss, we got it dismissed.  So I was familiar with the federal kidnapping statute.  Grace something, I can't remember what it was.  Grace Sheik.

Q.   Your website jackswerling.com lists under represented in South Carolina criminal cases over I think a hundred cases that you handled in the course of your career.

A.   Those are not all.

Q.   These are simply --

A.   Just representative cases.

Q.   I think you described them as cases below is only a selection of cases Jack Swerling has successfully handled?

A.   Successfully.

Q.   Successfully.

A.   Put in, you know, most of my successful cases.  A lot of my successful cases.

Q.   And as a criminal defense lawyer you have to take success in small doses and accept what comes your way.

A.   Reward is measured differently when you defend criminal cases.  But those, most of those, were acquittals or dismissals.

Q.   There are some --

A.   A couple of life sentences in death penalty case.

Q.   Life sentence in death penalty cases, okay.

A.   But that was successful, too.

Q.   And I guess that would explain why Mr. Basham's case is not on the list.

A.   It doesn't qualify under successful cases.  That's the -- you understand that.

Q.   I also noticed that --

A.   I don't consider the outcome for Mr. Basham to be successful.  He was sentenced to death, so why would I consider that a successful outcome?

Q.   Okay.  That was the question I was asking, so I accept

your answer.  I see also that you on jackswerling.com under your heading on each page you list several, several television shows that you have been on?

A.  Yes.

Q.  And is that -- can you give us an example of why you've appeared on these types of television shows?  Does it vary or what's the reason for that?

A.  They asked me to do interviews, or that I was asked to be a commentator.  For example, the Susan Smith case, NBC hired me to be a commentator for NBC in the Susan Smith case, and they paid me for it.  Another lawyer named IS Levy Johnson, he and I periodically went up to Union several days, actually a couple of times a week, and Mr. Harpootlian, who was my partner, was also hired by CNN, and we traveled up to Union to comment or be commentators on the Susan Smith case, which you are probably familiar with.

Q.  Yes.  South Carolina death penalty case, correct?

A.  Right.

Q.  Involving a woman and her children?

A.  Correct.

Q.  It is a very wide range of television shows.  Ricky Lake, what was --

A.  I have no recollection of why I was on that show, nor do I care.  It just -- it's representative of some of the shows I appeared on.  Nancy Grace, I was on that show, too.  I was on

the show as a commentator and as a victim, which you've raised as a grounds for my being ineffective.

Q.  You were -- was that in 2005 after the -- after the man who had kidnapped your family escaped?  Is that why you were on Nancy Grace?

A.  Right.

Q.  Mr. Basham says -- raised several claims of ineffective assistance of counsel, and the judge asked us to get in the merits of those.  And I will right now -- I just want to make it clear what we're not alleging.  I recognize we have alleged quite a lot, but there are things that I think that are important for purposes of focusing the issues that we have here.

One of them is that Mr. Basham has not alleged that you did not spend a remarkable amount of time working on his case. We don't dispute that.  The records speak for themselves.  Mr. Basham doesn't dispute that you hired several supporting staff and you worked with Mr. Harris, you had a very large defense team.  He's not alleging that.  He has alleged some concerns of the way in which a few members of the defense team were managed and hired, but that is not a claim -- and I also want the court to know, just in case there would be any question of it, no one has ever alleged that you have not been anything but very personally supportive of Mr. Basham.

A.  Yeah.

Swerling - Direct                    452

Q.  Do you care could speak to --

A.  No.  I have a lot of empathy for Mr. Basham, having spent many, many hours with him and his family, and I found his upbringing to be one of the worst that I've ever seen.  And he had a lot of history of, you know, illnesses and going into various hospitals.  And so, I mean, there was a lot of empathy for him even despite the fact that this was a horrific crime.

He and I have maintained a relationship.  He writes me, calls me.  I've told you about that.  And I think I asked my office manager to give me a rough idea of what -- how much money I've sent him in the last eight years, and it's about $2,500.  Because he periodically will call me and ask me for money for hygienic purposes.  Last -- two weeks ago he called and asked me if he could get an MP3 player, I think, for his birthday, so we sent him some money.  That's been over eight years.

As I've told you, and I definitely, when you got involved in the case, I said I want to make sure that that was okay with you that I continue to send him money because he has nothing.  And so you said you were very kind and said go ahead.

Q.  We were thankful.

A.  The public defender's office can't afford to give him the money and so I've -- I think somewhere around $2,500, my office manager told me.

Q.  All right.

A.  So we have a very congenial relationship.

Q.  Do your telephone conversations with Mr. Basham, are those calls in which you actually speak with him or does he call your office?

A.  No, no, he calls me.  I mean, he has called, and I spoke with him a couple of weeks ago.

Q.  Okay.

A.  And that was when he told me about his birthday.  And he writes me a letter and then he will follow it up, if he doesn't get a check within a couple of weeks.  Sometimes it lays on my desk for a while, but he follows up with a phone call.  And, you know, and I'm not going to say no.  Generally in the neighborhood of a hundred, 125 bucks, $75, something like that.

Q.  Okay.  So it's clear that we're not disputing in this case that you didn't get a heck of a lot of records.  That's what we have been talking about.  I mean, you didn't interview a ton of people.  So when you were interviewed by the government earlier this week you were shown several charts and the like showing the extent of the work that you had done, the extensive to do lists and the like.  We don't dispute that any of that was done and that's really not what we're here to talk about.

     I would like then to turn to some of the substance issues,

and I mentioned the Jackson v. Denno hearing.

A.   Yes.

Q.   Do you know, Mr. Swerling, if there are any successful Jackson v. Denno hearings listed on jackswerling.com on your --

A.   Nobody would have any idea what they are, other than a lawyer.  So if I put out I had the following successful Jackson v. Denno hearings people would say what the hell is that.

Q.   Well, let me ask you, on your website, I refer to a case State versus Odom.  Do you remember that case?

A.   Yes.

Q.   Okay.  And your website says the defendant, a former prosecutor, was charged with solicitation of a minor over the internet.  We successfully argued the evidence should be suppressed.

A.   Right.  Well, that you understand.  Most people would understand that.  And what was interesting about that case was it was the first we raised the issue of whether or not a South Carolina judge could issue a warrant under the -- a telephone warrant, or I can't remember what the name of it is.  But, anyway, the process that was being used to go ahead and get the records in the case under Title III, it wasn't Title III, under the terrorism argument, we raised the issue of whether that could be done in South Carolina, whether or not South

Swerling - Direct                                    455

Carolina had another procedure which would have barred that.

So it went up to the Supreme Court, the judge threw it out and

the Supreme Court reversed.

Q.   Have you had successful -- had success in litigating

Jackson v. Denno claims?

A.   I think yeah, sure.  I'm sure.

Q.   Now, I would like to focus on the Jackson v. Denno hearing

in this case, which occurred over a three-day period in

February of 2004.

A.   Correct.

Q.   At that time would you agree that you had been on Mr.

Basham's case for approximately ten months?

A.   Whatever.  I'll accept it if you tell me.

Q.   My review of the record shows you were appointed in April

of 2003, February of '04 would have been approximately ten

months?

A.   If you say ten months, it's ten months.

Q.   Did you at any time interview Mr. Basham about his

interrogations?

A.   Sure.

Q.   Do you know if you did it on -- when you did it in your

representation?  Was it early on?

A.   You have my notes and, you know, you have my spiral

notebook and --

Q.   No, you --

A.   No, you have copies.

Q.   I have copies of some pages, that's true.

A.   So let's not be coy.  You have it and you have a page which says that I did interview him about it and he raised certain issues.

Q.   That's an undated page.  Can you tell us when that interview occurred?

A.   If you look at the page before and the page after it would kind of give you an idea of when this took place.

Q.   I'm not trying to be coy, I don't have the original binder.  I made copies of pages that I believed relevant.

A.   You can look at it.  If you want to we can bring over the next day.

Q.   Why don't we bring up Defendant's Exhibit 81.  Mr. Swerling, is that your handwriting?

A.   That's correct.

Q.   Do you recall the meeting that you had with Mr. Basham when you took these notes?

A.   No.

Q.   No.  So you have no memory of when it occurred?

A.   No.

Q.   Okay.

A.   But I would say it's like a checkbook.  If you look at the page before and the page after you can figure out when it was done.  And I just don't have it with me but we can provide

that to you.  Those have not been altered in any way.

Q.  And do you -- let's look at this particular document for a moment, and I have a question.  The notes begin on defendant now says statements are not voluntary.  When I read that it seems to me that you're suggesting that Mr. Basham had changed his account of what had happened.

A.  Yes.  And that was not unusual.

Q.  That was not unusual.  Do you have notes, and I will tell you right now I have not seen them, of a prior interview with Mr. Basham in which you set forth what he told you about his interrogation following his arrest?

A.  Mr. Burke, I don't know.  I have not been through all of those.  But they are there for your review.  I cannot tell you.  Now you are talking about ten years ago.

Q.  Correct.

A.  You know, so I can't remember last week a lot of things.

Q.  Would you agree with me that it is most likely that these notes were taken prior to the Jackson v. Denno hearing in this case?

A.  I don't know.  I mean, without looking at the spiral notebook I don't know when it was and I can't -- I'm not going to guess, you know, sitting up here on the witness stand.  I don't know.

Q.  Have you had an opportunity to go through these files prior to the hearing today?

Swerling - Direct                                   458

A.   I went through about as much as I could go through.  What I was really concentrating on was reading the transcript and going through the transcript.  Because, as you know, I did not have a copy of the transcript, I did not do the appeal.  So over the last few weeks we have gotten the total transcript, we have gotten the disk.  We also requested different hearings that we did not have that y'all have had the benefit of.  So I needed to read those things.

Q.   Mr. Swerling, would it surprise you to know that the indexes we made of our review of your boxes when we were there in February 2011 indicate that, in fact, you did have a full set of the transcripts in this case?

A.   Well, I think what we had was the daily transcripts.  And I stand to be corrected on that because I haven't been through the whole file.  You actually probably have more knowledge about what's in there right now than I do.  But I remember getting daily -- the court provided us with -- the court reporter was providing us daily, maybe daily or maybe not the next day, but we were getting realtime transcripts, so that's probably in there.  And they were unedited, if I recall correctly, and those would be in the boxes.  I don't recall having the transcript, and if I did I didn't read it.

Q.   Well, perhaps that would be something we will be able to clarify when we return under the judge --

A.   I think you will find those were the unedited daily

transcripts that we were getting.

Q.  Were there any transcripts that you felt you needed that you weren't provided to prepare for your testimony today?

A.  Well, I don't have transcripts of a lot of the in camera hearings.  Because as I was looking through the transcript the in camera hearings were sealed and not -- they are not listed, or they are not set out, most of the them, in the actual transcript.  So I don't know that I have any of those.  Maybe one or two.  There are other pretrial hearings.  Last week I requested the pretrial conferences that I noticed that we had not gotten from August of 2004, and I think you -- I asked and you sent them to me --

Q.  Correct.

A.  -- last Thursday night.

Q.  Correct.

A.  And I asked at some point for the February transcripts which we did not have.  Those were the, as far as I know, the argument on the motions between -- with Fulks, we were arguing Fulks and Basham together, we were still joined together.  So those motions I was -- those either you sent them to me or Mr. Daley sent them to me.  I don't remember.  There may be others, but I think I had -- I requested what I thought I needed.  There may be others that I'm not aware of yet.

Q.  But Mr. Daley or myself provided you access whenever you requested it, correct?

A.  Absolutely, sure.

Q.  Could you go with me for a moment and go over your notes from this meeting that you had with Mr. Basham?  And let me ask you, would that meeting have been, if you know, in person or on the phone?  What was more common for you with Mr. Basham?

A.  Most of the time I saw him.  He didn't have a whole lot of access to the phone back then that I'm aware of or -- I just don't remember.

Q.  These would have been interviews with him either at the jail or at Columbia Care, or whatever he was?

A.  Yeah.  I was down there frequently.  I think, looking at, what, 60, 40 something occasions, or something like that, that I saw on the time sheets that y'all have.

Q.  And that was something you were able to pick up from one of the charts the government prepared?

A.  Either last Friday or Monday night one of y'all, I think there were some charts prepared that I interviewed him on 40 occasions, or something like that.

Q.  Okay.  Now, when you interviewed him on the occasion where you took these notes, I will read what I can and might need you to decipher some of it for me.  It says defendant now says statements are not voluntary.  One, no medicine.

A.  Correct.

Q.  Do you recall discussing with Mr. Basham the situation

with regard to the medication he was on or was receiving?

A.  What I know, what I can recall, which having refreshed my memory, is that he had been off of Ritalin for a while and there had been some effort to try and get some drug that simulated Ritalin while they were on their five-state spree. So I remember that, they bought something in the drug store that would kind of give him that kind of kick.  But that's what I remember.

Q.  Do you --

A.  Bits and pieces, by the way, Mr. Burke.

Q.  Does -- you understand, and I recognize it's been ten years, so, just asking what you remember.  Is it your impression that Ritalin gives a person with ADHD a kick?

A.  Well, it gives them a kick to go ahead and focus.  When I say a kick I don't mean he gets high, he focuses, he has an ability to focus.

Q.  Okay.

A.  Which, you know, Brandon did not have.  I mean, he had some difficulty focusing at different times.

Q.  Your second entry on that reads cigarettes, have to sign. Do you know what you mean by have to sign?

A.  Actually, I don't.

Q.  Okay.

A.  Cigarettes I understand.  Have to sign, I don't know what this meant, unless somebody was saying -- maybe he was saying

that he had to sign for when he got them, or something like that.

Q.   But no independent recollection today?

A.   No, I don't.

Q.   I believe that's snacks with the same requirement, and number four I can't read.  If you want to --

A.   If you want to live.

Q.   If you want to live?

A.   Right.  LIVE.

Q.   You have to sign.

A.   Yeah.  I have no idea what that means.

Q.   And then number five reads helped him -- could you read number five for me?  I'm sorry.

A.   Help.

Q.   Helped him.

A.   Help.  Not helped, help.

Q.   Helped with a P?

A.   Yeah, but not with an ED on the end.

Q.   Help him.  Okay.  Help him if he told everything, knew Chad was leader.

A.   Right.

Q.   No recollection today about what Mr. Basham told you with regard to that?

A.   No, I don't have any recollection of any of this.  This is a --

Q.  We will -- I'll see if you can decipher some the of language for me then and we will go from there.

A.  Sure.

Q.  He told you he was coerced.  Says he knew he had the right to a lawyer and told him if you told the truth would not be held against him, only Chad, no charges.  Is that read correctly?

A.  That's what I wrote in here.

Q.  Those are the notes you wrote in your interview with Mr. Basham when he was talking about his interrogation, correct?

A.  Pardon?

Q.  Those are the notes that -- that's an accurate reading of the notes that you took that day when you --

A.  Those are the notes I took that day.

Q.  Okay.  Do you recall, I know you have no memory of that meeting, do you recall doing any type of investigation following up on the specific statements that were made by Mr. Basham to you that are memorialized in this note?

A.  I mean, we investigated the case, I mean.  So, I mean, and part of that would have included the Jackson v. Denno hearing. So people who were involved, 302s, different kind of statements.  We, you know, we interviewed Richard Hughes, who was a lawyer up in West Virginia, I guess, who got appointed. We interviewed -- Greg interviewed on another trip up there Mr. Hewlett, another lawyer, the public defender up in West

Virginia.  And also Barbara McGuire, who was the -- worked for the public defender's office.  These were three lawyers that had been appointed, or two lawyers and the staff, that had been appointed to represent Mr. Basham and overlap with these different statements that were being given.

Q.  Okay.  And so yourself --

A.  So we did.

Q.  You talked to those three people?

A.  Oh, yeah.  Those were three of the people I can identify right off the top of my head.  And, of course, Mr. Littlejohn, Mr. Monckton.  You know, all of whom were aware of the fact that Mr. Basham was talking to the authorities.

Q.  Now, do you have any -- did your investigation reveal whether any of those people were with Mr. Basham when the events that he relayed to you here occurred?  I mean, it's one thing to say you interviewed the lawyers, but this appears to be a situation in which your client is telling you inappropriate coercive statements were made to him by law enforcement.  My experience is law enforcement usually doesn't do that in front of lawyers.  Do you -- did you think that by talking to Mr. Basham's lawyers from Kentucky they would be able to help you?

A.  That was background.  I mean, we're trying to find out what the circumstances were surrounding the statements.  I think, you know, I can't remember all -- you know, there were

several hundred people interviewed.  And, you know, I know attempts were made to interview agents and police officers from five states, or four states.  Which ones were actually I could not name them for you, but I think we did, you know, some -- that we did some kind of investigation concerning the circumstances surrounding the statements.

Q.  Now, it's correct to state that the information included in these notes was never brought out at the Jackson v. Denno hearing in Mr. Basham's case, correct?

A.  No, you're right, it was not the strategy we adopted.  And I can't tell you that he did not change as we were going forward his -- his thought process with respect to those things.

Q.  You mentioned your strategy with regard to the Jackson v. Denno, and in the interviews we have discussed that.  I want to make sure I understand what the strategy was.  And is that your strategy was simply to get the officers' statements or the officers' version of what occurred on the record, pin down --

A.  That was part of it.

Q.  Why don't you tell me what was the purpose of the Jackson v. Denno hearing.

A.  Okay.  I need to give you a little bit of background, because, you know, here's the situation.  This was a horrific crime that took place over a period of some four, five states.

Swerling - Direct                                            466

The two women were dead, had been brutally murdered, and they were -- their bodies were not discovered.  We --

Q.  Can I just clarify for one moment, though?

A.  I'm giving you my strategy.

Q.  No, I understand.  I want to clarify something.  How many victims were there in the case in which you represented Mr. Basham?

A.  Two.

Q.  Okay.

A.  Intrinsic evidence as to Miss Burns.

Q.  How many victims were there in the case in which you represented Mr. Basham in South Carolina?

A.  There was -- well, there was one victim in the death penalty case but there was evidence of intrinsic acts that the judge ruled on with Miss Burns, so we were dealing with two bodies.

Q.  Was he charged with anything --

A.  No, you know that.  But you are asking me how many victims there were and there were two.

Q.  There were -- your testimony today is there were two victims in the case in South Carolina with which Mr. --

A.  That's not what I said.  I said there was one victim in the South Carolina case but there was other evidence of another victim in West Virginia that was ruled to be intrinsic evidence in our case.  So that I'm talking about two women who

were killed and their bodies were never discovered.  That's all I've said.

Q.   Okay.  I'm sorry to interrupt you.  You were telling us the strategy.

A.   So we had a situation where there had been an escape at the jail, there had been this picking up James Hawkins and various other people, Tina Severance, Andrea Roddy, Samantha Burns, the South Carolina part of it.  So what we had, there was a lot of evidence in this case that both Mr. Fulks and Mr. Basham were guilty of the crimes, okay?  I mean, it would be, I think, an absurd position to argue otherwise.  So we had that.

We looked into Mr. Basham's background.  He had this history of going in and out of some institutions in western Kentucky and other places.  We had his family, his mother who, you know, she was just probably just one of the worst people I've ever met and ever heard of because of her upbringing of Brandon, her support of Brandon, what she got Brandon to do.  So coupled with the fact that there were two horrific crimes, there was a crime spree from western Kentucky to South Carolina back up to West Virginia.  With his background, his family background, it called for thinking outside the box.

And when we -- the Jackson v. Denno hearings, what we adopted was a -- I adopted a strategy, and Mr. Harris, as well, that we had to look and see -- and, you know, from my

opening statement we pretty much front-loaded the issue there about whether or not he was guilty or not and accepted the fact that we were going to go into a second phase of the trial, the penalty phase.

So looking at all of that in the overall strategy, when we had the Jackson v. Denno hearings what we were trying to do is show that Mr. Basham cooperated to the best of his ability, or could cooperate, to try to cooperate, to hopefully find out later on or be able to show the jury that he did cooperate in some extent. And there was a dispute about whether or not he was telling the truth all the time and whether or not he was being honest about some of the locations and exactly what happened. But essentially Brandon was cooperating.

Early on he had told them about the Samantha Burns murder and that they could stop looking for her body, that she was dead. He gave them a description over the phone, talking to FBI Agent Long, trying to describe an area down in South Carolina. He took them on a ride on November 28, Thanksgiving day ride. So those were kinds of things that we thought we ought to establish, get from the agents and the officers that he did -- he was cooperating, he was not insisting on a lawyer, that it was a voluntary, to somewhat extent, voluntary on his part to try and cooperate.

And so we had a Jackson v. Denno hearing, asked the court to pass on the voluntariness. But, as you know, we did not

argue voluntariness very much.  What we tried to do was get the officers locked in so that we could see how far we could go with this cooperation, to try and -- all the questions were really designed to try and show how much Brandon was cooperating over this period of time.

Now, let me also say this, which also took -- we also considered and I definitely considered over this period of time.  There were certain statements that were -- there's no way you could argue voluntariness.  And, for example, with Mr. Littlejohn and Mr. Monckton, he had counsel there so it would be a little difficult to argue voluntariness on those statements.  Mr. Hughes, Richard Hughes, was an experienced criminal lawyer who had told Brandon he didn't think he should cooperate without getting anything in return.  But despite that Mr. Basham wanted Mr. Hughes to convey information to law enforcement about Samantha Burns, about Alice Donovan.  So you weren't going to be able to argue that Richard Hughes' statements or statements given while Mr. Hughes was there were anything but voluntary.

And then you had Barbara McGuire and you had Mr. Hewlett who also came to see Mr. Basham during this interviewing process that was going on, and it was going to be hard to argue that those were not -- statements were made after he consulted with counsel were not voluntary.

In addition to that, Mr. Basham initiated contact with FBI

Swerling - Direct                        470

Agent Malley, I think it's Malley, called him and said he needed to talk with him.  So we had a number of statements that were just -- I did not think, Mr. Harris I believe did not think, we could contest seriously about voluntariness.  So that made the earlier statements that were given the first day or two less meaningful to try and suppress.

So we tried to adopt this consistency about his cooperation throughout not asking for a lawyer.  But certainly the last four or five statements that the court ruled on were -- well, I'd say four or five, anything with Monckton, Littlejohn, Hughes, McGuire, and Hewlett, the statements that coincided with those days would be extremely difficult, if not impossible, to argue voluntariness.

Q.   And when you mention Mr. Monckton and Mr. Littlejohn, you are referring to the Thanksgiving day search in --

A.   November 28th.  So to answer your question, you have a -- a series of statements that were very incriminating where voluntariness was just not going to be able to attacked.  So we had to adopt a strategy outside the box, to go ahead and embrace the statements and try and use them to our advantage during the course of the trial.

Q.   Now, by the time of the Jackson v. Denno hearing you had accumulated a huge amount of records from Mr. Basham's past, correct?

A.   Yes.

Swerling - Direct                    471

Q.  So you were familiar by that time through the to do lists
or the charts, all the charts that were made by Lesa Watson
and others, of his history of psychiatric and emotional
deficits, correct?

A.  Very extensive.

Q.  Very extensive.  And I understand what you are saying is
that there were so many statements that, and I don't want to
misstate it, and I will tell you right now I ask you these
questions because I'm not a trial lawyer, I have never done a
motion to suppress.  So, you know, I'm sincerely wanting to
know what the strategy would be here.

    And would there have been a downside to at least
presenting to Judge Anderson the information about Mr.
Basham's intellectual and psychiatric and emotional --

A.  It wasn't in my plan and I don't believe Mr. Harris' plan
at that time to use that hearing for that purpose.  What we
were trying to do is trying to adopt a strategy that we could
use for the trial about the Jackson v. Denno -- about the
statements that the officers were going to make about Mr.
Basham and what he exactly did say and what the circumstances
surrounding it were, and trying embrace those and use them to
our advantage.

    Mr. Burke, if you've never litigated one, then you realize
that whatever he said in front of -- when Mr. Littlejohn and
Monckton were there was going to be admissible.  Couldn't

be -- it's not going to be involuntary.  Whatever he said to Mr. Hughes and conveyed through Mr. Hughes and what he -- leading these people on a search was in some way going to be used -- you know, I can't tell you exactly how it would be used, but it was -- he had advice of counsel, he had advice of counsel with Mr. Hewlett.

So, you know, I just think that we had to have a strategy that was something that we could use and embrace and use to our -- use to some effectiveness for Brandon during the case and that's what we came up with.  And we followed through with that throughout the case.

Q.  Okay.

A.  You know, bringing out these things when we had these witnesses on the stand.

Q.  So in some ways we -- that is our long way of saying you were trying to pin the officers down for their future testimony.

A.  We were trying to find out what they were going to say, sure.  Sure.  Let's put it this way, if you get a chance at a pretrial hearing, you have a 302, but if you can have a chance at a pretrial hearing to have someone on the witness stand you would be a fool not to take it.  So you put them on the witness stand.  We made a -- we made a good faith Jackson v. Denno hearing, asked the court to rule on it.  But I think the record will bear out that we were not really arguing very

strongly about voluntariness, we were obviously using it for some other purpose.

Q.  What would have been the downside of arguing voluntariness?

A.  You can't argue voluntary statements with Mr. Littlejohn and Mr. Monckton or Mr. Hughes.

Q.  I realize that, but --

A.  Or Mr. Hewlett.  It would be absurd to try and take a position that those were not voluntary statements.

Q.  So is it your position, your professional opinion, that in a criminal case that some statements can come in, let's just let them all in?

A.  No, that's not what I said.  What I said was we were faced with a number of statements where voluntariness was just not going to be an issue, he had counsel.  Okay?

Q.  Let me ask --

A.  So therefore -- let me finish.

Q.  Okay.

A.  Therefore the earlier statements took on less significance than the ones that were going to be no doubt admissible because he had counsel.  So what we did is try to use those to our advantage and embrace those and figure out a strategy where we could -- it could help Mr. Basham during the course of the trial.

Q.  Okay.  I'll return to the question.  What would have been

the downside?  I understand the strategy, what would have been the downside of presenting information to Judge Anderson about Mr. Basham's intellectual deficits and his emotional deficits and his psychiatric deficits?

A.  Because it's not the strategy we adopted.

Q.  That's not my question, sir.

A.  So I can't tell you at this point because it wasn't something I considered.

Q.  You didn't consider --

A.  I don't believe that we -- I considered whether or not -- well, let's put it this way.  There might have been a period of time when we did consider it but we adopted a different strategy.  So, I mean, I'm sure that it was considered about his mental capacity.  But the strategy we adopted was a strategy that was put out in February of 2004.

Q.  So sitting here today what you remember is the ultimate strategy, but you don't have any particular recollection of what --

A.  No, and -- I don't.  And I will tell you this, we obviously had doctors who were telling us already about his mental problems, we already had the records.  I read every single page of the medical records.  And so, obviously, it was considered as to whether or not that would be an attack.  But the better approach that we thought was going to be the way we handled it because he had counsel.  At least starting with

November 19, I believe.

Q.   Is it your opinion then, your professional opinion, that any defendant who has counsel, any statements he might make after being advised of his rights are -- are necessarily voluntary?  That's what I'm hearing.

A.   I don't understand the question.

Q.   Can you -- could it not be true that a defendant who is with counsel but who has such deficits that he cannot knowingly and intelligently waive his rights could make involuntary statements despite having counsel?

A.   Well, none of those lawyers said that.

Q.   That wasn't my question.

A.   But you would to have those lawyers at least support the fact that he didn't understand his rights.  And somebody has -- how can a doctor come in -- let's just think about this for a minute.  You've got three lawyers, four lawyers and an experienced paralegal for the public defender's office.  Wouldn't one of them need to at least say that he did not understand what was going on?  Even though he had these mental deficits, he knew we were lawyers, he knew we were telling him not to do it.  None of those people said that they thought that Mr. Basham didn't understand.  So I think that would have been essential.  If you are asking me, that's what I'm telling you.

Q.   Okay.  All right.  And now are you saying -- did you have

conversations with Billy Monckton prior to the --

A.  My notes reflect that I spoke with Billy.  I would be surprised if I didn't.  I know in preparation for the hearing, my recollection is prior to the hearing when there was some issues about -- I wasn't here for the disqualification, obviously.  We didn't get involved in the case until after that.  But as to whether or not the hypothetical was going to be admitted, I think both Monckton and Littlejohn were interviewed by me or me or Greg or both and were -- they were as witnesses in the case, as far as I remember, during the pretrial hearings.  So --

Q.  We do have notes.  Why don't we go through those.  I don't want to act like I'm not giving you all the information you need.

A.  Sure.

Q.  So, Susie, could you please bring up Defense Exhibit 80?  Mr. Swerling, I think we can all three agree that's -- this is your handwriting, right?  I won't keep asking you that.  These are your notes?

A.  Yes.  Nobody else writes like that.

Q.  If we come across notes that don't look like yours and I'm saying they are, please stop me.  And I once again --

        MR. BURKE:  Hold on.  One moment, your Honor.  I think I --

        (There was a pause in the proceedings)

Q.    (MR. BURKE) Well, let's -- first, there are notes, and if I can find them we will talk about them.  Oh, here they are. The second page of that exhibit, that's what's throwing me.

Mr. Swerling, could you look at the entry for December 24, 2003, highlighted, about this -- this would have been exactly two months before -- who's Kevin McNally?

A.    I'm not sure actually what the structure was, but there is a regional -- there is a group that manages each region of the country that helps supervise death penalty cases.  And David Bruck was the one for this particular area, who is someone I've known for many, many years.  But David Bruck was already working, he was already in that capacity on the Fulks case so we got assigned to Kevin McNally and his group and went to them often for motions, for cases.  I think I probably read every motion that's ever been filed in a federal death penalty case, and every case.  So McNally, I think, was the head of whatever that supervisory team was.  I don't remember what they are called.

Q.    Okay.  And I don't really -- I think it's resource counsel, but I'm not sure.

A.    It could be.

Q.    Okay.  So do you have any independent recollection today looking at these notes of a phone call that you had with Mr. McNally about the Jackson v. Denno hearing?

A.    No.

Q.   No?  All right.  So apparently you took a notation of a call you had with him where he apparently recommended to do the Jackson v. Denno, no harm?

A.   Um-hmm.

Q.   Narrow answer re mental state.  Now, what you talked to me about was your ultimate strategy was focused on the statements of the law enforcement officers, correct?

A.   Yeah.

Q.   And so two months before the hearing at least, is this consistent with what you are saying, you may have considered other options but ruled them out?

A.   We adopted the strategy that we thought was the most successful.

Q.   Okay.

A.   Would have been the most successful.  Other things obviously were considered.

Q.   And you had no, again, no recollection whatsoever of this conversation with Mr. McNally.

A.   No.  It's nine years ago.

Q.   Okay.  Could we see Defendant's Exhibit 82, please, Susie?

A.   I'm saying there go ahead and do the Jackson v. Denno, which is what we did.  We had a different approach than what you might think was normal.  Again, you said your expert, you know, about the Jackson v. Denno, again, we had lawyers who would be testifying in court.  For us we could not bring them

into court and say they weren't voluntary statements.

Q.  I'm just -- I'm just trying to go over the preparation

that was done, Mr. Swerling.

A.  Sure.

Q.  That's really the extent of it.  If you could look at

Defendant's Exhibit 82, for the bottom entry, Susie, could you

highlight that for us.  I believe that says -- excuse me,

February 16, 2004.  Meeting with Scott and Greg re Jackson v.

Denno?

A.  Right.

Q.  It's Scott Schools?

A.  Scott Schools.

Q.  Okay.  What would the purpose have been for this meeting,

do you recall?

A.  Determining what the scope of the hearing was going to be,

who was going to testify, how we were going to handle it, what

he was going to require, stipulations.  I mean, I have no

idea.  Scott Schools, you know, we have -- Scott was a very

able Assistant United States Attorney and someone we worked

with, him and Mr Gasser, on this case very closely.  And, you

know, obviously tried to come to an understanding about many

of the issues.  Stipulations, I mean, if you read the trial

transcript, we entered into a lot of stipulations.  I mean,

obviously we talked to each other about scheduling and who's

coming in, so that was not unusual to meet with Scott Schools

Swerling - Direct                          480

and Greg.

Q.   Okay.  Now, let me ask you, Susie, could we turn to the next page of that same exhibit?  And, again, there are entries for February 19, 2004.  So now it appears that you're in full throttle to prepare for the 24th, which was the beginning of the evidentiary hearing.

Can we look at the first entry, please?  Could you -- all the way down.  I also spoke -- there you go, and highlight that for us, please.

This is a conference with Monckton, is that correct?

A.   Yeah.  Yes.

Q.   And you mentioned previously the hypothetical issue.  Can you -- sorry, I just can't read your writing there.

A.   It says all the hypothetical information came from Rosemary, not Mr. Basham.  And there's a memo.  And what I can tell you, what I think that means, again, this is bits and pieces, but in reading, one of the things, reasons we had to have three different meetings because I kept going back reading to refresh my memory.

What I understand is that there was an argument about, in the hypothetical in the February hearings, that the information was not coming from Brandon, it was coming from law enforcement to the lawyers, a lot of the information.  So that was one of the reasons why we took the position the hypothetical should not be admissible, because a lot of the

Swerling – Direct                                481

information was being fed to the lawyers from law enforcement, including Rosemary Parham, who was the AUSA involved in the case that wouldn't allow a proffer in the case, wouldn't allow it to be done under the terms of a proffer.

So that was just a -- there's an argument that, as you know, was made during the February hearings that -- and I think I made it myself, that we should not attribute those comments to Basham, they were coming from the government, a lot of the comments. So it wouldn't be fair to let in a hypothetical if it wasn't his -- even if you get past the legal issues the question was not to let it in because a lot of the information was coming from the government, not from him.

Q. Okay. And I think, in fact, we have seen the memo that Mr. Monckton referred to in the conversation in this very proceeding, and I think your testimony --

A. I don't remember.

Q. Now, you have number ten. No idea what that refers to?

A. It's a number that could have been referring to a to do list or something. Could be.

Q. And there will be testimony -- well, let's get to this right now. You made a lot of to do lists in this case, correct?

A. Yes. I do a lot of to do lists in all my cases so that I have a running list of what we want done, and we cross them

off as they are done.  Then the to do list gets expanded again and they cross off more so that you have an ongoing script of what you want to accomplish or to do.

Q.  And --

A.  Kind of simple.

Q.  And at least in this case you numbered your to do lists?

A.  At some point I think we discovered when we were meeting, you were there, that I started numbering to do lists.  But not at the beginning.  I don't know why, I don't remember what the reason was.  At some point -- but maybe just to keep track of the to do lists between the team so that we could refer to to do list number ten.  Now, this could be a number ten on a particular to do list.  But it's obviously referring to something, either a to do list or a number in a to do list before we started numbering the to do lists.

Q.  Can you read for us your notes following that?

A.  Billy spoke with Larry Ellis and Sheriff Hewitt, Brunswick County.  Contradicts Thanksgiving, and also spoke to Joe Ciccarelli.

Q.  Who is Larry Ellis?

A.  I have no idea.

Q.  You recall who Sheriff Hewitt is, correct?

A.  Yes.

Q.  Any recollection today what contradicts Thanksgiving meant?

A.   No.

Q.   Susie, can you just move down that page for us.  There were more -- there's more meetings on the same day with Mr. Monckton in your preparation for this.  This was a Thursday and the hearing began on the 24th, which is a Tuesday.  Monckton conference with Greg.

     Did you advise Brandon what he said would be used, is that correct?

A.   Yeah.  That was, again, that had to do with the hypothetical.  One of the arguments that we were making during the February hearings is that the hypothetical should not be admissible because no one told Brandon that what he said, what was going to be divulged in the hypothetical, could be used against him, and he didn't ever authorize that.  So that's what we were trying to -- and we argued it, I think, you know, as best we could that, you know, there was no informed, not informed consent.

     That would be the thing, but what we were -- I guess what I'm trying to say is what we were trying to argue, and we did argue to the court, is that no one told Brandon that what was being said in a hypothetical could be used against him so therefore he should not -- it should not be admissible against him.

Q.   I understand.

A.   And I think that's what we did argue, the best I can

recall.

Q.  And at this time the hypothetical issue was still very alive because it was still being litigated.

A.  We knew that was going to be an issue.

Q.  Okay.  And so, Susie, could you go to the next page of that same exhibit?

A.  And, of course, the judge ultimately ruled it was not admissible.

Q.  Right, right.  Which is -- and you are talking about Monday morning quarterbacking from the perspective that we see things, we know the future as it was here.  But it helps to hear from your perspective when you were there what was still, you know, a live issue.

On the next page there are notes from the 24th, which is the day of the evidentiary -- the beginning of the Jackson v. Denno evidentiary hearing.  And I just really want to, if I can, focus on one area.  Susie, can you move down where it says Hewett just fired off questions, and the sentence below that, too.  And I will read this and see -- Hewett just fired off questions.  They were told they could not talk to him.  Any memory of this phone conversation with Mr. Monckton?

A.  Well, I don't remember the phone conversation.  I do remember from the testimony that, you know, Brandon was not supposed to be talking to them, that was part of the understanding, but Brandon was saying things.  Now, I don't

remember anything about what Hewett fired off questions is, because I don't remember about Hewett firing off questions. But I do remember there was an understanding or supposed to be an understanding that they would not interview him.

Q. Okay.

A. But then I also remember there's some testimony that somebody allowed Brandon to walk off with the sheriff, which I never did quite understand and that's something I just read recently that I can't imagine Mr. Monckton, Mr. Littlejohn allowing that.

Q. Do you remember Sheriff Hewitt's testimony at the Jackson v. Denno hearing where he testified that he, in fact, walked off alone with Mr. Basham?

A. Well, that's what I'm referring to, and that doesn't make sense knowing Monckton and Littlejohn. But apparently that's -- you know, I can't contradict it.

Q. Did you ask --

A. I don't remember. Obviously, we did.

Q. Okay. And your understanding was that Mr. Monckton and Mr. Littlejohn, from these notes, had informed law enforcement the day that Mr. Basham was on the Thanksgiving day search they weren't allowed to talk to him, correct?

A. My understanding was the rules were that they weren't going to be talking to him directly, but they overheard things. For example, the comment about the deer, deer running

across the road and, you know, I can't believe I'm here, I couldn't even hurt a deer, and then it was cut off.  And that statement was ruled admissible, as I recall.

Q.  Do you remember the statements that Sheriff Hewitt claimed that Mr. Basham said to him when they walked off alone together?

A.  If you can refresh your memory.  I don't remember specifically what the comments were.

Q.  Sheriff Hewitt testified, and there is some dispute between defense and the government at this point as to whether his testimony ultimately morphed or changed, but at the hearing, the Jackson hearing, he testified he walked off alone with Mr. Basham and Mr. Basham showed him how the victim's purse strap was used to strangle her and then showed where it was thrown.  Does that refresh your memory?

A.  I remember something about the purse strap, but I thought that that was -- I didn't know -- I don't remember it being when they walked off.  I do remember a comment about the purse strap --

Q.  Okay.

A.  -- that he had mentioned.  I think it first came up that Brandon said something about look for a purse strap, that I threw a purse strap out the window, or something like that. So that started the conversation about the purse strap.  And they started looking for an area, or in the areas where they

Swerling - Direct                487

had driven they started looking for a purse strap.  I think it was a, I don't know, maybe Liz Claiborne.  I don't remember, but --

Q.  I think that's correct, yes.

A.  There was a purse strap, and that became the focus of trying to find the purse strap in the areas that Brandon had pointed out.

Q.  Now, I'm --

A.  That led to just other discussions.  But the purse strap obviously was an issue.

Q.  At the Jackson v. Denno hearing Sheriff Hewitt testified that during that exchange between him and Mr. Basham, Mr. Basham showed Sheriff Hewitt how the strap was used to strangle Miss Donovan.

A.  Correct, showed him how the strap was used.  But, again, I don't remember where that was.  I don't remember if it was in the vehicle.  You know, you say it was when they walked off. I don't recall that and I want the record to reflect that.  I just remember there was a conversation where Hewett said Brandon showed him how the strap was used.

Q.  And you don't know at this point whether that statement was made outside the presence of Mr. Basham's counsel at the time?

A.  I don't recall that, where it was.  I don't even remember physically where it was.  I just remember it was said and

there was testimony about it. But I don't recall right now where it was.

Q. Now --

A. No, I don't recall where it was and who was present.

Q. Oh, I see. Where the statements were made and who was present when they were made. So --

A. I remember Hewett was not my witness, so if he was my witness I probably would have had a lot more, maybe had more recollection of it. But I remember it, I remember the comment and I remember the circumstances, but not where or who was present.

Q. So Hewett was not your witness at trial. Was he not also your witness at the Jackson v. Denno hearing?

A. I think it was the other way around. I don't remember, actually. I did, I did actually examine him on one occasion, yeah. I don't remember which one, though. Probably at the Jackson v. Denno hearing.

Q. If Mr. Hewett, given what you learned from Mr. Monckton and Mr. Littlejohn, if Sheriff Hewitt had testified at the Jackson v. Denno hearing, which the records speak for themselves as to what he testified, if he had testified that he walked off alone with Mr. Basham and Mr. Basham while they were alone showed him how he had used the strap, how the strap had been used to kill Miss Donovan, would you have had any concerns about the admissibility of that statement?

Swerling - Direct                                    489

A.  Since I don't remember where it was I can't tell you.  I mean, I just don't know.

Q.  I'm asking you a hypothetical.  If he had testified that the statements were made outside the presence of counsel when he took Mr. Basham over to look at the area where the strap might be, if that was his testimony would you have had concerns about the admissibility of those statements, just those statements, the strap statements?

A.  I'm trying to put it in context of where -- I don't remember that being the issue.

Q.  Are you familiar with --

A.  You are saying that, but I don't remember that being that way.

Q.  Well, and the record will speak for itself.

A.  Yeah.

Q.  So are you -- you've handled lots of suppression and Jackson v. Denno hearings.  Are you familiar with the Supreme Court's decision in Edwards versus Arizona about the right of law enforcement to question?

A.  When a defendant initiates contact, yeah.

Q.  Exactly.

A.  I kind of remember that case.

Q.  Do you remember that the ruling of Edwards is that the law enforcement cannot initiate interrogation with a witness who, with a defendant, excuse me, who has invoked his right to

counsel?  In a nutshell, that's the standard of Edwards.

Sitting here today does -- had you known at trial, or assume at the Jackson v. Denno hearing that Sheriff Hewitt had testified that he took Brandon away and walked off alone with him after being informed that he could not contact or could not communicate with Mr. Basham outside the presence of counsel, he testified he in fact did so and Mr. Basham ended up making statements that became critical to the government in their case in Mr. Basham's trial.

A.   It's been characterized that way, yeah.  My understanding was the sheriff said he was not saying that Basham said he strangled her but that it was the way she was strangled.  But I mean --

Q.   Either way, is that --

A.   Let me say this to you, that it had already been out there.  I mean, Basham had already put in or they had already put in the fact that there was a strap.  They were looking for a strap that was used to strangle her.  So you are leaving out those very important facts that had nothing to do with any statement that Basham made to Hewett.  They were looking for the strap that had been used to strangle Miss Donovan.

Q.   Well, this goes back to the question I guess I asked earlier.  Is this how you approach your cases?  If something -- some things are coming in others aren't worth --

A.   No, it's not the way.  In this particular case, since from

November 19 on he had counsel, the statements prior to that time took on less significance in determining our strategy. So dealing with statements that were made with lawyers, then we had to look at the statements made prior to the lawyers being involved, and what we did is we adopted a strategy of embracing all of it to try and use it for Mr. Basham's advantage.

Q.   And the statements that Sheriff Hewitt testified at the Jackson v. Denno hearing would be made by Mr. Basham after he had invoked his right to counsel but when he was outside the presence of his counsel.  And did you ever consider raising an argument that those statements were inadmissible, in violation of Edwards versus Arizona?

        MR. DALEY:  Your Honor, I have to object.  I think we're expanding this claim number two.  There's absolutely no mention of this in claim number two.  Again, it doesn't deal with the 24th, if you look at claim number two.  If you look at their claim, unless I'm mistaken --

        THE COURT:  I thought there was a claim counsel was ineffective, Mr. Littlejohn was ineffective for letting Mr. Basham walk off with the sheriff.  Now we're getting that should have been suppressed.

        MR. DALEY:  And I think there's actually --

        MR. BURKE:  Your Honor, can I read you the claim? The government is raising this argument for the first time.

THE COURT:  Read the claim.

MR. BURKE:  Claim two.  Mr. Basham was denied the effective assistance of counsel guaranteed by certain statutes and the Sixth Amendment when his trial attorney failed to prepare for and/or effectively litigate the Jackson v. Denno hearing in this case.  That is the claim, and that is precisely what I'm asking Mr. Swerling about.

THE COURT:  I think it's properly before me.  How late do you want to go today?

MR. BURKE:  I'll stop whenever you want to, your Honor.

THE COURT:  Are you flying out tonight?

MR. BURKE:  I'm flying out in the morning, so --

THE COURT:  We're obviously not going to finish with Mr. Swerling today.

MR. BURKE:  No, sir.

THE COURT:  It's about time to take our afternoon recess.  I don't like to work the court reporter longer than an hour-and-a-half at a time if I can help it.

MR. BURKE:  I am at a break in subject matter, so --

THE COURT:  Well, I know Mr. Swerling doesn't want to have to come back any longer than he has to next week.  Why don't we just take a ten minute break and come back and do another 15, 20 minutes, if we could.  Let's take a ten minute recess.

(Recess, 4:39 p.m.)

THE COURT:  Let's go about another 15 minutes, if we could.

MR. BURKE:  50 or 15?

THE COURT:  15.

MR. BURKE:  That's fine.

BY MR. BURKE:

Q.  My eyes got really big.  Mr. Swerling, are you familiar with the U.S. Supreme Court's decision in Watkins versus Virginia?

A.  I've heard it.  I can't tell you what the principle is right now.  I used to be able to do that.

Q.  Okay.  That's the decision from 2002 where the U.S. Supreme Court held that it violated the Eighth Amendment to execute the mentally retarded.

A.  Right.

Q.  It came down in 2002, so about a year before --

A.  I remember.

Q.  -- that you were appointed to this case.  Do you recall for capital litigators like yourself that was kind of a big deal to have something positive from the Supreme Court that would actually be a complete bar in some situations.  But I know that there were a lot of seminars put on right after the decision came down.  Do you recall now whether you went to any seminars that talked about Watkins or talked about how to

pursue a Watkins claim?

A.  I would have no recollection of that at all.  I did go to CLEs, I do teach CLEs, I stay up with the law.  In this particular case what I will tell you is this, there are several boxes over there in the conference room filled with virtually almost every Supreme Court case dealing with the death penalty, and also about every pleading that had ever been filed by a federal death penalty lawyer.  So I know I kept up to that extent and sought out what other lawyers were doing around the country.  Greg and I both did that.

Q.  Okay.

A.  I mean, whether or not it was a specific seminar about Watkins, I just couldn't tell you.

Q.  Okay.  Thanks.  Did you know in 2003 how a claim of mental retardation, if it could be litigated, how it could be litigated in federal court in a death penalty case?

A.  I don't recall.

Q.  And clearly there had -- this was the first federal death penalty case in South Carolina in recent times, so it wouldn't have been --

A.  I can tell you I just don't have a recollection.

Q.  Okay.  I would like to show you what's been admitted as Defense Exhibit 98.  And I will tell you that this -- and, Susie, could you make -- just so the -- if you can make the title big enough, and the first two questions.

Mr. Swerling, I'm going to -- this was a document that was found among the 77 boxes.

A.  I don't have anything on my screen.  Yeah, okay.

Q.  Do you recall ever seeing this document?  It's a multiple -- multi-page document, I will tell you that.

A.  Do I recall it?  No.  If it was in the box, though, I read it.

Q.  Okay.

A.  And I remember seeking out -- obviously, we're looking at voir dire questions, which was one of the things --

Q.  Can you tell us, was the question of mental retardation an issue that you considered raising in Mr. Basham's case?

A.  Well, we considered whether or not he was mentally retarded, but we had our experts who said he was not mentally retarded.

Q.  And let's talk about that for a moment.  If you were to have a client that you had concerns might be mentally retarded, what type of expert would you retain to evaluate him?

A.  Neurologist, neuropsychiatrist, forensic psychologist, forensic psychiatrist.  I mean, whoever they recommended, as well.  Judge Anderson was very liberal and very generous about giving us money for whatever we needed on the team and whatever experts.  So I wouldn't have hesitated if we had been led in that direction, if someone said he would qualify for

mental retardation.

Q.   Okay.  And I believe in this case testimony was admitted at the penalty phase from Tora Brawley, who was your neuropsychologist, about Mr. Basham's IQ.  So to refresh your memory, she was the expert --

A.   I know --

Q.   -- in your case.  We can agree that in a case such as this one where you have said that there was -- there was no hope that Mr. Basham would not be convicted that the issue from your very first day was to save his life.

A.   I think that's a fair statement, that I just did not think -- guilt or innocence I thought -- we were going into a second phase of the trial, I pretty much figured that.

Q.   Right.  And --

A.   And I think on the voir dire with the jury we even started off with that, that there was going to be a second phase of the trial.  And my opening statement to the jury was we're going into a second phase of the trial, I believe.  Again, that was all consistent with our strategy.

Q.   Okay.  And we don't -- okay.  Well, let me -- I'm just curious about that strategy.  I do have a question.  There have been issues about the fact investigator in this case, Mr. McNair, Carlisle McNair, and your hiring and supervision of him.  He did an immense amount of work in this case and he was for the most part, as I understand it, and correct me if I'm

wrong, he was a fact investigator, right, he wasn't a mitigation specialist?

A.   No.  I mean, we sent Carlisle where we thought he needed to be and, you know, he reported back and if we told him follow up on something.  So, I mean, he was an investigator.  That's what he was at the Lexington County Sheriff's Department, so he was out there.  Now, if he picked up something in interviewing a witness that looked like it needed -- not only fact witness but went into the mental issues then we would follow up on that or ask him to follow up on it.  I don't remember specifics, but, I mean, obviously if -- if he was in western Kentucky talking to somebody and he called me up and said we got X, Y, Z, I said go ahead back and talk to the person.  So we didn't -- he was a fact investigator, but that doesn't mean he would not have crossed over and asked other questions, as well.

Q.   Okay.  Okay.  Well, turning to the question of this -- well, let me finish with that topic because it escaped my mind and I just remembered what I was going to ask you.  If your focus was in this case, as you said, let's focus on saving Mr. Basham's life, Mr. McNair did an extensive amount of investigation regarding the crime in this case.  Can you explain why there was so much focus on investigating the crime spree when you felt that he was -- he was almost virtually certain to be convicted?

Swerling - Direct                    498

A.  Well, I've tried scores of cases and dozens of murder cases.  I mean, my object in every case I've ever been involved in is to find out as much as the prosecution knows, and more.  That's the way I approach cases.  Anybody ever worked for me knows that.  I mean, I push people ad nauseam to find out -- you know, to interview people.  In this case it's a classic example.  I want to know it all.  I want to be able to put it all into the -- into the pot and come up with a strategy.  We interviewed hundreds of witnesses in this case.

     Now, you may suggest that some of it was not necessary. That's not the way I look at it.  I want to know everything about every witness and every aspect of the case.  And I did, I believe.

Q.  Well, and I suppose I am suggesting that.  I guess my question is at some point in a case such as this don't you need to -- to choose the, you know, the wheat from the chaff and decide it's just not worth the time, we only have a limited amount of time before trial so we need to focus on those issues that are most important and --

A.  I don't agree with you.

Q.  You don't.  Okay.

A.  No.  And what we did -- well, I agree with you to some extent.  As it got closer to trial we did to that.  But in the beginning we had the resources, Judge Anderson had given us the resources and the people to track down all of these

things.  And I would be up here answering questions about why I didn't track down something if we didn't do that.

So my strategy has always been in almost 40 years of the practice of law, my clerks, my investigators, everybody knows you find -- you talk to everybody about every incident that you can, and I want to know more than the government knows.

Q.  Okay.

A.  Or the state knows.  That's just the way I approach cases. Now, as it got closer to trial obviously we did throw out the things that were not necessary, but we couldn't have made that decision unless we had interviewed everybody.

Q.  Okay.

A.  I certainly wasn't doing it for my health.

Q.  I can only imagine the toll this took on your health.  So have you -- you had not as of the time that you represented Mr. Basham ever had a client where you presented the claim of mental retardation and under Atkins, because that decision had only been out for about a year.  So that's a safe assumption to make, correct?

A.  No, it's not.  Atkins obviously hadn't been decided, but I did have -- I've had cases where people were either borderline mentally retarded or mentally ill.  I mean, I started trying cases, Larry Gene Bell, for example, in 1985, was someone who I thought was insane, and I learned an awful lot about mental illness and insanity as a result of that trial.

Some of the doctors who were involved in that trial for the state asked me to come on the faculty as I guess you call it an adjunct or something for the medical university in the department of neuropsychiatry. So I've always had a real -- you know, I like to look in those things, I like to have an understanding of them. As a matter of fact, this afternoon I was supposed to be delivering a lecture over there and had to cancel it. So it's something I am very aware of and very attuned to.

Now, mental retardation, I can't tell you that there's a specific case that I recall, but I remember Bell had an awful lot of these things. I just don't remember if it was mental retardation or not. We were looking more at insanity on that situation.

Q. Okay, okay.

A. Which we have, as you probably know, the McNaughton standard in state court, which is very difficult.

Q. Yes. We have it other jurisdictions, as well. So although I've read some of the articles about Mr. Bell's case, and I will tell you it's very fascinating.

A. It gave me an angioplasty.

Q. Since your representation of Mr. Basham in 2003 have you represented any other clients in federal or state court who have been charged with the death penalty?

A. I don't remember if Richard Hollis was before or after

that.  But I tried a case, death penalty case in Lexington County, and in that particular case it was -- we got a life sentence out of the case.  I think it was only the second time in Lexington County's history there was a life sentence.  So whether it was before or after Basham, I can't remember.  I won't do any more.

Q.  You don't do death penalty work anymore?

A.  No.

Q.  Is it safe to say this hearing might be one reason?

A.  No, absolutely not.  No.  I mean, that's not the issue at all.  I just think that it's very taxing, you know, working to 1:00 o'clock, 2:00 o'clock in the morning, getting up at 7:00 and always thinking there was something more to do.  Just may be for some younger lawyers.  I suppose if the right -- if a judge asked me to take a case for a specific reason or if it was something that came along I probably would do it.  I don't know that I'd relish doing it anymore.  I'm 66.  So sometimes you have to -- I still do murder cases, plenty of them.

Q.  It's just a different animal.

A.  There's no comparison between a death penalty case and a murder case.  You can't even put them in the same box.

Q.  Now, I know that in this case you had a division of resources as far as of manpower as to which attorney did the bulk of the work with one expert or another.  I mean, for example, perhaps I'm wrong about that, but, for example, at

Swerling - Direct                              502

the penalty phase Mr. Harris was the attorney who did the direct examination of Dr. Brawley?

A.  Right.

Q.  So, I mean, was that -- did he tend to work more with Dr. Brawley or did you work together, just set up --

A.  Well, first of all, as you know, Mr. Harris' and my office were like 15 feet apart from each other, which was one of the great aspects of this case, that we were able to keep -- we were in-house, we talked to each other all the time.  I mean, every day, lunch, whatever it was, I mean, very rare that Basham was not discussed during this period of time.  Plus many of the other people that were involved in the Basham team worked out of my office and the judge approved that.

So there was just a -- I couldn't tell you.  At one point Mr. Harris and I decided that I would do this witness or he would do this witness, but obviously there was collective input for a long time, and even after we separated, who was going to do what witness.  We collaborated all the time.

Q.  Okay.  Now, did you -- do you have a memory today of Dr. Brawley telling you what Mr. Basham's IQ was when she tested him?

A.  I think it was in the high 60s maybe, or something.

Q.  68 was Dr. Brawley's testimony.

A.  I have a vague recollection.

Q.  Are you familiar with the elements, the diagnostic

elements of mental retardation, what is required to show that someone is mentally retarded?

A.  You'd have to tell me.

Q.  The first -- there's a three-pronged test.  The first test, the first element is that the person have an IQ of 70 or less.

A.  All right.

Q.  The second is that they have deficits in what's called adaptive behavior, significant deficits in adaptive behavior. And the third is one that encompasses them all, which is that both of those two deficits must have been present prior to the age of 18.

Now, I will -- I will tell you, and if you want more information I will give it to you.  But I will tell you, to move things along, in this case Dr. Brawley found that Mr. Basham had an IQ of 68, which both Dr. Brawley and Dr. Schwartz-Watts concluded that the appropriate diagnosis for Mr. Basham was dementia.  And it appears from the testimony that the reason for that was that Dr. Brawley could not testify that Mr. Basham had an IQ below the required 70 before he turned 18.

A.  I don't remember that.

Q.  Okay.  Okay.

A.  What's ever in the record is what's in the record.  So, I mean, I guess what you are saying, also, is you look at other

Swerling - Direct                                504

things, as well, not only just the IQ, but --

Q.   Exactly.

A.   You look at the person person's ability to do things in society on an everyday basis as factors to consider, as well. Correct?

Q.   Yes, that's true.  And then but the deficits have to be prior -- have to exist prior to the age of 18.

A.   Correct.

Q.   Now, in this case there were -- you've reviewed all the records in this case and you've told us in your interviews you looked at everything.  And there were a series of IQ tests that have been administered to Mr. Basham throughout his life.

         MR. BURKE:  And I want to speed things along, your Honor.  If I begin to testify stop me, it's not my intent.  I think these are facts that everyone probably agrees with.

Q.   That Mr. Basham had numbers that from your investigation and from finding records had numbers that suggested his IQ had diminished over time from when he was a child.

A.   I seem to recall something like that.

Q.   So it was sort of a downward spiral.

A.   Right.

Q.   And at trial the counsel, Dr. Brawley, Dr. Schwartz-Watts testified about some explanations for why that might be.  Do you --

A.   Something like was the huffing.  I remember something

about huffing.

Q.  Exactly.  So you remember in your investigation Mr. Basham started huffing at a very young age?

A.  Yeah.  I don't remember the details, I just remember bits and pieces.  But I remember huffing, I remember talking to witnesses about huffing.

Q.  Okay.  So your investigators in this case, Lesa Watson, Paige Tarr, they obtained these various records and they went and talked to various people, with you or without you, and that information, the records were passed on to Dr. Brawley. Does that sound like that would have been what happened?

A.  I mean, that would be the way it would normally be done. I talked to a lot of the key people at the various institutions myself.  So did Mr. Harris.  And we would have passed it on to the doctor who -- you know, passed it on to the other doctor.  We would have shared all this information.

Q.  Do you remember personally any interaction with any witnesses, lay or medical, psychological, who indicated to you that they thought Mr. Basham might be mentally retarded?

A.  Sitting here I honestly can't say that I remember anybody saying he was mentally retarded.  You may have something in my notes that indicates otherwise and I stand to be corrected. Most -- a lot of the people we talked to, you know, had different opinions about Brandon.  Interestingly, some of the people at some of these institutions just thought the world of

him and came down here to testify even knowing what he was accused of doing. But a lot of the people talked about him being manipulative, most everybody talked about him being manipulative. And, you know, very cunning, street smart, not intellectually smart, but street smart. And so we had an awful lot of that.

Q. There was a lot of that. And you said -- would you say it was a consistent theme that when you talked to people from Mr. Basham's past that they all tended to agree that he wasn't very intellectually bright?

A. He was not intellectually bright. But I was thinking about that the other day. You go back and read the transcripts of the three letters that he wrote to Beth McGuffin which were introduced in trial and were stipulated it was his handwriting, I mean, those letters, I was just thinking about this the other day, those letters are pretty articulate and well thought out and well written. And he writes me letters, so I really have to just not -- I don't know what's the point you're getting at. Did we think he was mentally retarded? Obviously not. Did not think he was mentally retarded, not in my experience with him. I would not -- you know, I just could not say that.

Q. Well, and I think that is the point, that not only -- you would not be qualified to say that, correct?

A. No, I'm just talking -- but I'm qualified to a lay

opinion.  And having dealt with, you know, scores of people over the years who have had mental problems I certainly can give an opinion, a lay opinion.

Q.  On the professional --

A.  I'm not trying to hurt him, but I just don't see where he had -- he may have not had the intellectual functioning but he had all the other functions.

Q.  But ultimately you relied on your experts to tell you, correct?

A.  Well, yeah.  I'm not the one, I can't get up there.  If they said he was mentally retarded then we would have been prepared to try and pursue that.  But we would have also had to be prepared for what the government would have come back at to show that he was not.

Q.  Would you agree that Dr. Brawley's assessment was only as good as the information that she was given by your defense team as far as his history?

A.  Well, no.  I mean, Dr. Brawley went out and did her own investigation, as well.  As I recall, all of them did.  The only one that may not have gotten out in the field was Dr. Brannon.  I don't remember whether he did or not.  But Dr. Watts was in western Kentucky with me several times, I believe.  I don't remember about Dr. Brawley.  But they had the medical records, they had the discovery, they had whatever we could get them, whatever they asked for.  So I can't accept

Swerling - Direct                                    508

that.

Q.  Dr. Brawley was provided with medical -- with IQ results and reports that were done on Mr. Basham's life.  And your investigators interviewed people, and I would like to show you an example of -- Susie, could we see exhibit, Defendant's Exhibit 65, please.  And if you could go to the three of four page.  It's the three of four.

THE COURT:  Mr. Burke, let's take up this exhibit and let's adjourn for the day after you finish this.

Q.  (MR. BURKE) And then could you highlight for us, please, Susie, the first paragraph of that document.

Now, Mr. Swerling, this is the third page of a memorandum that was done in February, February 18, actually, 2004, done -- written by Lesa Watson, who was your mitigation specialist.  And it recounted an interview she conducted with two women by -- one by the name of Brenda Shaner, SHANER, and the other Connie Baker.  And they were both people who had contact with Mr. Basham in one of the facilities in which he had been housed as a child.

A.  Um-hmm.

Q.  And then I would like to read to you what Miss Watson said about her interview with them.  And they also pointed to the large skew between his verbal and performance IQs.  He did not have the mental ability to verbalize.  This should be investigated or brought to the attention of his current care

providers.

Also, they question his IQ that was higher at a younger age. Back then facilities would not take a child unless the IQ was 80 or greater. Many times a DSS worker would contact a doctor for psychological evaluation and casually state that they had to place this child, needed a psychiatric evaluation, and that they wouldn't be able to place the child unless the IQ was 80 or better. They feel that Brandon's earlier IQ was a false or inflated number and suggested that if that original testing could be found to have it interpreted again. Do you recall reading this memorandum?

A. No.

Q. Do you know if any investigation was done by you or your defense team to find the original tests, the original -- what's known as the raw data of Mr. Basham's IQ tests from his childhood to have those tests reinterpreted?

A. I remember over the last -- in trying to get ready for this hearing that there was -- there were efforts made to try and find earlier IQ tests and all of that. I read it recently. But I can't remember who wrote the memorandum on it or not. But it seems like I recall reading something that there were efforts made to go back and try and find these records. It may have been Dr. Brawley who said that. I don't remember.

Q. But given the way this case was documented, if it was done

Swerling – Direct                              510

it would have some type of notation either in an e-mail or memorandum in your -- in the file, is that correct?

A.  Well it should, but I can't tell you that it does.  I mean, I can't -- I can't speak for everybody in the case.  I just know what we tried to do, and everybody was under instructions from me to document things.

MR. BURKE:  Your Honor, that's all I have on this exhibit.

THE COURT:  All right.  Let's break for the day then. Mr. Swerling, can you be back Monday morning?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Have a nice weekend everybody.  See you back Monday at 9:30.

MR. BURKE:  Thank you, your Honor.

(Recess 5:25 p.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  11-11-12                    s/  Daniel E. Mayo

511

DEFENSE WITNESSES

GREG HARRIS

      DIRECT                285

      CROSS                 338

      REDIRECT              397

      RECROSS               409

JACK SWERLING

      DIRECT                410