512

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

-------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
    -vs-                                    October 15, 2012

BRANDON LEON BASHAM,

          Defendant

-------------------------------

          BEFORE HON. JOSEPH F. ANDERSON, JR.
          UNITED STATES DISTRICT COURT JUDGE
                    MOTION HEARING

APPEARANCES:

FOR GOVERNMENT:     HON. WILLIAM N. NETTLES
                    UNITED STATES ATTORNEY
                    BY:  ROBERT F. DALEY, JR.
                         JIMMIE EWING
                         JEFFREY M. JOHNSON
                         WILLIAM K. WITHERSPOON
                    Assistant United States Attorneys
                    1441 Main Street
                    Columbia, SC  29201

FOR DEFENDANT:      JULIA G. MIMMS, ESQ.
                    JULIA G. MIMMS LAW OFFICE
                    1001 Elizabeth Avenue, Suite 1A
                    Charleston, NC  28204

                    ARIZONA FEDERAL PUBLIC DEFENDER
                    BY:  MICHAEL L. BURKE
                         SARAH E. STONE
                    Assistant Federal Public Defenders
                    850 W. Adams, #201
                    Phoenix, AZ  85007

513

COURT REPORTER:        DANIEL E. MAYO, RDR
                       Certified Realtime Reporter
                       901 Richland Street
                       Columbia, SC   29201


          STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

514

THE COURT:  All right.  If Mr. Swerling could resume the witness chair.  You are still under oath, Mr. Swerling.

THE WITNESS:  Yes, sir.

THE COURT:  Good morning.

THE WITNESS:  Good morning.

MR. BURKE:  Your Honor, if I could address two issues that are -- one is, I'm not sure, I would let the record reflect that the video conference on the screen is not on today.  I have been unable to -- I have not talked to Mr. Basham since last week.  I don't know if the court has heard anything from the prison or not.

THE COURT:  I have not heard a word.  Want me to make arrangements for you to talk to him today sometime?

MR. BURKE:  If that would be possible, because it takes a while for us to set it up, we would greatly appreciate.

THE COURT:  We will see if we can try to do it over lunch.

MR. BURKE:  All right.  That would be wonderful. Thank you.  And the other issue --

THE COURT:  Hold on one second.

(There was a pause in the proceedings)

THE COURT:  I'm going to leave word you would like to speak to him between 12:30 and 1:30 today on the phone.

MR. BURKE:  Thank you, your Honor.

THE COURT: All right.

MR. BURKE: The other issue, your Honor, concerns, and I address this to Mr. Swerling as much as to you, there were some questions asked by me on Thursday about e-mails that I had sent and my co-counsel had sent to Mr. Swerling, and Mr. Swerling, for the record, informed us after he was done with his testimony on Thursday and showed us his Blackberry, he had not received those e-mails from us until after he was done. So I would like the record to reflect that, I mean, Mr. Swerling did not receive those, so if there was any suggestion on our part to the contrary, we do apologize.

THE COURT: Okay. Very good.

BY MR. BURKE:

Q. Mr. Swerling, when we finished on Thursday we were talking about the investigation done by the Basham team and allegations of mental retardation on Mr. Basham's part, and I would like to return to that. There are a few more questions I had for you.

Susie, could you bring up Defense Exhibit 26, please. Can you see that, Mr. Swerling?

A. Yes.

Q. That's an e-mail that you received from Greg Harris on May 27th, 2003. Can you tell us what Dr. Brawley discovered Mr. Basham's IQ was?

A. Indicated he possesses a 68 full scale IQ based on a 75

verbal score and a 65 performance score.

Q.  This e-mail was sent May 27, 2003, so approximately one month after your appointment to the case, is that correct?

A.  If I was appointed in April, yes.  I'm not sure.

Q.  And then if you look at the bottom of that last -- the last paragraph, it says Dr. Brawley has requested all medical and school records that we have in the case -- that they have in case she is called to testify at a later date.  Who on your team was responsible for forwarding records on to your mental health experts?

A.  I can't tell you who was responsible for sending these on. I mean, what I would recall after eight years or ten years, nine years, I guess, is that all the doctors got -- we went ahead and secured the school records, we secured all the medical records, and they would have been forwarded on to our experts, Dr. Brawley, Dr. Schwartz-Watts and Dr. Brannon, so -- but who did it, I don't know.

Q.  And as far as you remember, there wasn't a particular person whose responsibility was to funnel records to experts?

A.  No.  I don't think at that point we had actually identified who was going to be responsible for certain people. As it got closer to trial we did that.  This is from Greg Harris so, you know, one can assume to the best my recollection, you know, after nine years, that Harris would have been the one who had talked to Dr. Brawley about that

information and would have followed up on it.

Q.  And I believe he did do her direct examination during the penalty phase?

A.  Yes.

Q.  Okay.  I noticed in Defense Exhibit 26 Dr. Brawley also offered to prepare a report.  From my review of the record there is no report done by her.  Can you explain to us why?

A.  I would have no recollection of why.  To the best my knowledge, in a lot of cases I do not ask experts to do a report because they would be discoverable.  So, you know, in this particular case, though, we did get reports from the doctors because we were required to notify the government at some point what their opinions were.  But actual formal reports, I'm not big on those.  But I can't say that that was the reason in this case.  I don't have any recollection whether one was done or not.

Q.  Okay.  Now, you testified on Thursday that Judge Anderson was very lenient in granting your requests for funding throughout the trial, is that correct?

A.  That's right.  It was a massive case, over, five, six states that we were covering.  And when we went to Judge Anderson and explained, you know, what we needed he was –– I don't think he ever turned down a request that we had.

Q.  And you have no reason to think that had you requested funds to hire an expert in mental retardation that he would

have declined that request?

A.  I thought we had an expert in mental retardation.

Q.  And who was your expert in mental retardation?

A.  Dr. Brawley is a neuropsychologist, Dr. Brannon is a neuro, whatever.  He was a neurologist.  Dr. Schwartz-Watts was a forensic psychiatrist.  I thought that would have been covered in one of those three.

Q.  One of those three.  Do you ever recall asking any of those three whether they felt qualified to diagnose mental retardation?

A.  I mean, Mr. Burke, I have to assume that they are.  They are all forensic -- I mean, Dr. Schwartz-Watts particularly is a forensic psychiatrist, and Dr. Brawley is a forensic, or a psychologist.  I don't know if she's a forensic psychologist, I can't remember if she's board certified.  But, gee, God bless, I just can't imagine that she wouldn't have been qualified to talk about mental retardation.

Q.  My understanding is the psychiatrists are medical doctors who treat mental illness.  Do you consider mental retardation a mental illness?

A.  I have no idea if it is or it isn't.  I don't have how that's classified in the DSM or not.  I assume it probably is.

Q.  That Exhibit 26 you were just looking at you received in May of 2003.  I would like to take us to Defense Exhibit 27, Susie.  So this is a memorandum from both Mr. Harris and

yourself to the file dated July 22, so approximately two months after learning that Dr. Brawley had identified an IQ of 68 for Mr. Basham.  And this e-mail or this memo appears to address the death penalty review committee that you attended in Washington, D.C.  Do you recall that trip?

A.  Yes, I do.

Q.  Okay.  If you could, Susie, could you highlight where it says Miss Griffey?  Apparently Miss Griffey was the chairperson of the Attorney General's committee in assessing whether the U.S. Attorney's Office would go forward with the death penalty in this case.  Can you read for us what you have highlighted in this memo that you prepared?

A.  Miss -- it's actually, I guess, prepared by Greg Harris, because this says Jack and I appeared.

Q.  Well, I see.  Okay.

A.  So I can't -- you know, it's from Mr. Harris.  Miss Griffey inquired about our MR allegations.  We informed her that we were in the process of getting a more definitive opinion from Dr. Watts but that we had no diagnosis yet.  They agreed to let us revisit the issue once Dr. Watts formulates an opinion.

Q.  Do you have any independent recollection of Miss Griffey making those comments when you were at the committee in D.C.?

A.  Not after nine years.  But we, as you can see, we kept detailed and regular memorandums and entries on everything we

did, so --

Q.  So if you had gotten back to Miss Griffey about the MR allegations that would be in your records, is that safe to say?

A.  I don't know.  I'm just saying we did keep records, as you can see, and having reviewed the file.  I have no recollection whatsoever whether that was done or not.

Q.  And, Susie, could you bring up Defense exhibit 79, please, and then highlight that top for me.  Just the very top.

Now, Mr. Swerling, you were also appointed to Mr. Basham's West Virginia case, is that correct?

A.  Yeah, I received a call about that case and since I was involved in this case and a lot of it overlapped I initially agreed to go ahead and accept an appointment up there, because I don't think that they had a lawyer at that time that -- I vaguely recall there was nobody up there who was really -- they didn't have a state death penalty, and so there was nobody really done any death penalty work and so they asked me if I would do it and I agreed to, initially.

Q.  And you went, in fact, to the Attorney General's death penalty review committee in the West Virginia case, as well?

A.  It appears so, in September of '03.

Q.  Do you remember if at that committee meeting there was any discussion about the possibility that Mr. Basham might have be a person with mental retardation?

Swerling – Direct                        521

A.   Well, without that memo right there in my own handwriting I wouldn't even have remembered going up to Washington.  So I guess the answer would be no.

Q.   Now, Susie, if you could stay on that and highlight the September 23rd for us.

So these, again, are your handwritten notes from your spiral notebooks that we discussed on Thursday.  It appears from your notes that the day after the meeting in Washington, D.C. on the West Virginia case you did in fact meet with your medical and mental health experts in the case, correct?

A.   Yes, it appears so.

Q.   And can you read what you have for me as to one, two, and three, just so we're clear as to what that says?

A.   Fetal alcohol component, Donna.  Fried his brain with drugs.  Three is IQ 68, verbal 75, performance 65.

Q.   Susie, could we go to your next page, as well?  Your notes continue on that next page, and if you could read three and four for us, please.

A.   Defendant fits in the first percentile on most testable issues and not malingering.

Q.   Okay.  So this is -- number four is an indication, as far as you remember, that one of the experts, perhaps all of the experts, informed you that Mr. Basham was not malingering with regard to his neurological and psychiatric deficits.

A.   Well, I don't know.  I don't know what they are referring

to, not malingering.  I mean, they just said not malingering, so I would assume he was not feigning things that they were looking at.  But I don't know specifically what they were talking about about not malingering, I just know what not malingering means in the general sense.

Q.  Any independent recollection of this meeting?

A.  No.  It's nine years ago.

Q.  I apologize.  We'll probably have that a few times today.  I realize it's been -- but I want to make sure if you do remember one I don't overlook it.

A.  Sure.

Q.  Your notes do reflect that Dr. Schwartz-Watts, that's the Donna, did indicate a fetal alcohol component in the case?

A.  According to those notes, yes.

Q.  Okay.  Susie, if you could turn to Exhibit 46, please.  Now, the first sentence of the second paragraph.

   Now, you had investigators out in the field in Kentucky interviewing the acquaintances and teachers and family members of Mr. Basham, correct?

A.  Yes.

Q.  And you were regularly receiving these e-mails from your investigators about their interviews?

A.  That's correct.

Q.  I think you stated that, at least in your interviews, I'm not sure in your testimony, that every piece of paper, every

memo, ever e-mail went across your desk, correct?

A.   I felt that I needed to review everything that came across me so I could put it where it was supposed to be or direct people to put it where it was supposed to be and direct people to follow up.  And as you saw all my to do lists, so I had to see everything.

Q.   Now, would you agree that in putting together a mitigation case in a capital case that in addition to working with your experts you also look for anecdotal evidence of the history of your client in order to look for clues of issues that you might be able to raise in mitigation?

A.   Well, I think we did that exhaustively in this case.  I mean, we talked to all of his teachers, we talked to neighbors, we talked to bus drivers that transported him to school, we talked to all the personnel at all the different institutions.  So we were looking for that.

Q.   Okay.  Can you read for us, Mr. Swerling, the first sentence of the section that's been enlarged there?

A.   The Garys always considered him to be mentally retarded or somewhere close that that.

Q.   And this was in a memo from Paige Tarr of October of 2003.

A.   Now, they are just neighbors, I guess.

Q.   I believe at the top it says interview with Tim Gary, a neighbor who tried to help Brandon from time to time?

A.   Right.

Swerling - Direct                                524

Q.  And then it also says, in fact, when asked they said that they would give him an F for intelligence?

A.  I assume intellectual, academic intelligence.  As I told you on Thursday, he was pretty shrewd and street smart, and that has to be factored in, as well.

Q.  Factored into what?

A.  An assessment of Brandon.  That's what we had -- you have had contact with him, we have had contact with him.  When you are looking at these kinds of issues like mental retardation you look at all the factors, not just the test results, as I understand it.  So we had to look at all of them.

Q.  So is it your understanding of mental retardation that if a person has what we call street smarts, that is a factor to consider in whether they are diagnosable as mentally retarded?

A.  No.  I'm not an expert, I was offering that as something that one would have to consider, I would think.  But I'm not an expert.

Q.  Can we turn, Susie, to Defendant's Exhibit 47.  Now, the e-mail we just looked at was from Paige Tarr, and Exhibit 47 is also a memo from Paige Tarr, who was one of your mitigation specialists?

A.  That's correct.

Q.  And, Susie, if you could, this was an interview of a person named Penny Titzer.  Do you remember anyone by the name of Penny Titzer in this case?

Swerling - Direct                    525

A.  I spent a lot of time with Penny Titzer, and she testified in the case and I believe I presented her as a witness.  I can tell you I've kind of done some notes on all that.  Yeah, she was from Charter Hospital and I believe I did her direct examination, if I'm not mistaken.

Q.  Okay.

A.  So and I spent a long time with Miss Titzer, not only up in, I think I was up in Evansville with her.  We had a meeting after this, which would be reflected in my vouchers and notes, as well as when they came in for the trial we spent an awful lot of time at night going through everything.  So I remember her.

Q.  She actually had a close relationship with Brandon, didn't she?

A.  Yes.  She was fond of him.

Q.  In this memo from Miss Tarr on October 9th she indicates that Brandon was admitted to Charter Evansville in January of 1992, excuse me, 1997, so that would have made him 15 years old at the time.

Susie, could you bring up the third paragraph and enlarge it for us?  Thank you.  How about -- how about the fourth, because that was the one I wanted.  Thank you.

Mr. Swerling, could you read the first two sentences of that memo?

A.  Penny is well aware of Brandon's intellectual functioning,

or lack thereof.  Instead of having a special ed teacher in the education room at Charter they hired a lady named Angela Matthews.

Q.  Okay.  And further down it states in the middle of that paragraph, 15-year-old Brandon would sit and struggle with the second and third grade books, correct?

A.  Yeah, Brandon would sit and struggle with -- yes.

Q.  Do you recall if you passed this or anyone on the team passed this information on to your mental health experts?

A.  It was supposed to have been.  I can't tell you a specific document was passed up.  It was supposed to be.

Q.  Susie --

A.  Let me just say they had -- we tried to provide, as far as I know, doctors, particularly Dr. Schwartz-Watts and Dr. Brawley, all the discovery in the case as well as all the investigation we conducted.  And I know Dr. Watts, I don't remember about Dr. Brawley, but I know Dr. Watts was up there, as well, and traveled several times to that area and she may have spoken with some of these people, as well.  But that would all be reflected in the vouchers.

Q.  Now, it would not have been a situation, though, since these were testifying experts, in which you would have given these actual memos to your experts, is it?

A.  What are you saying?

Q.  Well, if you anticipated that, let's say, for example, Dr.

Swerling - Direct                    527

Brawley was going to testify in Mr. Basham's penalty phase, would you have given her an internal work product memo like we're looking at right now?

A.  I can't tell you whether we did or we didn't.  I know we would have discussed it, but I don't remember whether she got the documents or not or just reviewed them at our office or we talked about it.  I just don't recall.

Q.  Would you have had concerns that an internal work product document like this memo could have been discoverable to the government?

A.  Probably so.  That would have been an issue, yeah.

Q.  Susie --

A.  But you are asking me to recall right now, and I can't recall.  If they had it, you know, I just don't remember.  If we didn't provide it to them, I don't remember.  But certainly what you just raised would be an issue that we would have thought about, whether or not -- turning it over or not to them.  We did turn over all the medical records, and those were reciprocally turned over to the government.

Q.  Defense Exhibit 52, please.

A.  I'd also say this.  They would be discoverable, we would have -- I'm sure that there was some documents that, memos turned over to them.  But they probably would have reviewed the medical records and things like that.  Whatever they got, medical records, would have been forwarded on to the

government.

Q.  And when you say them, do you mean the government?  You said would have been turned over to them.  Do you mean there may have been memos turned over to the government that --

A.  Whatever we forwarded to the doctors, whatever medical records we forwarded to the doctors would have been forwarded to Butner, per Judge Anderson's order.  So but the memos, I can't tell you whether they were sent or not sent.  They may have been reviewed and/or not reviewed, I don't recall.

Q.  Okay.  Now, Exhibit 52, which is on the screen in front of you, this is another memo from Miss Tarr.  This would be dated approximately a month later in November of 2003.

And, Susie, if you could highlight for us the paragraph, second from the bottom, and the lower sentences, Sharon also knew.

Now, this is a memo regarding an interview with Sharon Watkins, who was Mr. Basham's first grade teacher.  And this would have been a -- it does not say on here who the memo is directed to.  Did Miss Tarr -- were these memos she simply submitted to the file or were they provided to the team?

A.  They would come across my desk, I would assume.

Q.  It would --

A.  They would have come across my desk.  And let me just also add this.  I recall, the order that Judge Anderson signed was for us to turn over the medical records.  So I don't know if

Swerling - Direct                         529

it would have included, nine years ago, whether it would have included our internal memos.  I don't believe that the order covered that.  So we may have sent these documents directly on to the doctors, I just have no recollection.  I know the order provided medical records be turned over.

Q.  I will tell you right now, Mr. Swerling, and when I ask you that it's not because I'm trying to catch you up --

A.  No, I trying to give you an honest answer.

Q.  So maybe the best way we can do it, I won't ask you whether you remember, but if you do would you please let me know if you remember a specific document, with the assumption that it has been nine years, almost ten years?

A.  That's what I'm trying to do, yes.

Q.  Okay.  That's great.  This document then indicates that when Miss Tarr spoke with Mr. Basham's first grade teacher she had concerns about his abilities, as well.  It says -- well, could you read for us the sentence that is Sharon also knew?

A.  Sharon also knew from the first day of school onward he needed to be evaluated for special ed.  Although he stayed in her class for the entire year, she retained him in first grade and waited patiently for her request to have him tested -- tested be carried out.

Q.  This was information that Miss Tarr provided to the team in November of '03, so a little less than a year before the penalty phase in this case, correct?

Swerling - Direct                      530

A.  Yes.

Q.  Okay.  Now, Susie, could you go to the next exhibit, which is exhibit -- Defense Exhibit 53?  And if you could, first would you just highlight the very top so that we see who this document was sent to.  Thank you.

So this was an e-mail from Carlisle McNair to the team, and I see you are included on that, I wanted to confirm.

Now, Susie, if you could go to the very bottom for us where the substance of the e-mail is.  That's perfect.  Thank you.

Now, we spoke some on -- well, I'm actually not sure if I asked you, could you tell us who Carlisle McNair was and his role in the team?

A.  He was an investigator on the case.

Q.  And this is an e-mail to the team from Mr. McNair about a November 2003 interview he had with someone by the name of Ruby Watson.  It's not clear from his memo who she is.  But could you read the first line where it reads says miss -- Mrs. Watson advised?

A.  She advised that she knows for a fact Cathy Basham used drugs during her pregnancy with Brandon.  She was a drug addict then, she's a drug addict now.

Q.  Do you recall that in September of '03 at your meeting with Mr. -- well, we looked at notes, your contemporaneous notes from September of 2003 where Dr. Schwartz-Watts

indicated there might be a fetal alcohol issue in this case?

A.   And this would have been communicated to our experts, as well, in one form or another.  Either coming to the office to review it, either being sent to them or being discussed with them, just like all of these would have been.  Anything that would have dealt with his mental health would have been shared in some way with our experts.

Q.   But ten years removed you have no way of remembering how that --

A.   No, absolutely, there's no way I can remember.  I just would -- that would be the way we would have handled it.  There's no reason to do these things unless you share them with your experts, so in one way or another they were shared with the experts.  What I'm telling you is I mechanically cannot tell you how that information was transferred.

Q.   Okay.  And you --

A.   I trying to keep everybody advised.  Me and everybody in the team was advised to keep everybody else advised what was going on.

Q.   This memo from Mr. McNair also states that Miss Watson told him that Brandon was retarded and very, very slow mentally.

A.   Well, I don't think there was any question he was slow, I think the question is whether or not an expert said he was retarded.

Swerling – Direct                              532

Q.  Susie, could you bring up Defense Exhibit 99, please.  Mr. Swerling, this is another e-mail that you got from Miss Tarr a few days after the e-mail that she sent you that we looked at a few moments ago regarding her investigation in Kentucky.

And, Susie, can you highlight the second paragraph that begins, obtaining?  She's talking about highlights of her trip, and if -- right there.

Mr. Swerling, would you -- this is an e-mail you received.  Would you mind reading what she wrote to you?

A.  Obtaining a copy of Brandon's health department records would show him getting yearly health screenings to participate in the Special Olympics.  Tell me how someone can give the death penalty to someone who competed in the Special Olympics?

Q.  Now I would like to look at Defense Exhibit 54, Susie.  This is another e-mail, this one dated December of '03, by Mr. McNair, of an interview with someone by the name of Mark Phebus.  Do you remember who Mark Phebus was?

A.  The name is familiar but I couldn't tell you who it was.

Q.  I can tell you from my understanding of the record he was Brandon's sister's ex-husband or boyfriend or --

A.  It's an unusual name.  I just seem to remember the name.

Q.  It says -- it's a lengthy e-mail but, Susie if, you could, in the middle of this page it says hey, you got five dollars?  Right after that there is a sentence he, meaning Brandon, the next one after that, after the five dollars, has.  Thank you.

So according to Mr. McNair, Mr. Phebus was another one of the witnesses who informed the Basham team that Mr. Basham –– that Brandon had a very low IQ.  Now, Mr. Phebus would have known Mr. Basham, let's see, when he was still a teenager, probably.  Do you believe ––

A.  I have no idea.

Q.  Okay.

A.  I know he's opining he has a low IQ, but he's not an expert.  I just can't tell you what the basis of that was.  I do remember something about the huffing, and that was something that I think was brought out last week, that part of the testimony when I was testifying, or maybe I just read it, where there was discussion with the experts about huffing gasoline, what it could do to his brain.  And that was I think –– it may have been on Thursday afternoon I testified that Dr. Brawley may have opined that that had something to do with his deterioration in his IQ.

Q.  Do you recall how old Brandon was when he began huffing?

A.  No, absolutely I don't.

Q.  So if the records indicate, at least some of the records indicate, that he was eight years old when he began huffing you wouldn't have reason to disagree with that?

A.  I can't answer that question.  Again, this would have been shared with our experts in one form or another.

Q.  Now, Susie, can you go down two lines from that and where

it says Brandon is borderline, and then can you just go down the next line, too, as well.

I have two questions about this, Mr. Swerling.  So more anecdotal evidence, I realize Mr. Phebus is not an expert in mental health, but you have more anecdotal information, at least, that someone who knew Brandon at an earlier age believed he was borderline retarded.

A.  Yes.  Mr. Phebus opined that, yes.

Q.  And on a different subject, the next sentence reads Brandon and Bucky Emory were homosexual lovers.  Now, I will be addressing to a certain extent some of Mr. McNair's e-mails, but one of the things that we have observed, that there was a frequent reference to homosexuality in Mr. McNair's memos regarding his investigation.  Can you tell us, was there ever a focus of the investigation on Mr. Basham's sexuality or what that was or how that played into the case?

A.  I have no idea.  I do remember that somewhere in the back of my mind that we did have information and were getting information that Brandon would trade sexual favors for drugs. And I remember vaguely in the back of my mind something about he would perform oral sex on individuals so he could get some drugs.  That's all I remember about that, about his sexuality. I just remember that was something that, you know, I took particular note of because Brandon -- Brandon was always trying to manipulate something or get something.  He knew how

to get it.  And that was -- but what amazed me was he was willing to go to that extreme to go ahead and do it.  So that's why I remember it.

Q.  In your opinion, is providing oral sex to someone in exchange for drugs equivalent of manipulation?

A.  Well, to me it depends on what your definition of manipulation is.  Brandon, again what I was trying to tell you, I dealt with Brandon a long time.  You have, too.  And one of the things that interests me about Brandon a lot and one of the things we tried too explore is his ability to manipulate and/or to do things that were needed to get something done and this would have been something.  So you may not call it manipulation, but it was getting something done and going to an extreme to get it.  So you may not call that manipulation, but it's all -- to me it's all tied together.

Q.  Okay.  Susie, could you bring up Defendant's Exhibit 55?  And this is, Mr. Swerling, an e-mail from a Steve Hisker.  Could you tell us who Mr. Hisker is?

A.  Steve Hisker was one of the lawyers who worked in my office, and he was given a certain amount of hours to assist us in the case.

Q.  And the subject line is conversation with public defender Mike Ruschell, R-U-S-C-H-E-L-L.  And it appears from the substance of the memo that Mr. Ruschell was a public defender in Kentucky who represented Mr. Basham.  And, again, we're

Swerling - Direct                               536

looking at the anecdotal evidence that was provided to the court, excuse me, to the Basham team.  And, excuse me, I know it's hard, it's small, if you could -- and if you see the first large paragraph about two-thirds of the way down, Ruschell believes that Brandon has second -- down one paragraph, two-thirds of the way down, Ruschell, that line. Thank you.

Do you see enter there Mr. Hisker indicated that the public defender who represented Mr. Basham believed that he had a very low IQ?

A.  Oh, yes, yeah.

Q.  Now, Susie, could we bring up Defense Exhibit 80, please. And, Susie, if you could go down to the middle of the page where it has a 12-5-03 meeting and highlight that section, please.  Down one more.  There you go.

So, Mr. Swerling, we're now back again at your notes that you took as part of your preparation in this case.  And it appears that this was a meeting with Donna, who is Dr. Schwartz-Watts, correct?

A.  Correct.

Q.  Now, it says in your notes, no insanity under federal or state.  Can you tell us, did you consider pursuing an insanity defense in this case?

A.  We always would look at what the mental issues were, and so I must have written down that insanity was not an issue.

Swerling - Direct                                    537

It just obviously would have been something we would have thought about.  I have, just for your information, Mr. Burke, I have many people interviewed for insanity and competency as a -- to protect their interests.  And so in many of them, most of them come back that they are competent and they are not insane, but it's a precaution that I do.  And I have done it over and over and over again over the years.

Q.  And when you say you do this over and over again, is that you have them evaluated by someone you have retained?

A.  Sure, yes.

Q.  On those same sections of notes, can you -- there's a line that begins retardation.  Could you read that for us, please?

A.  It says retardation out.

Q.  And can you continue?

A.  If we have physical causes not before 18.

Q.  Do you recall Dr. Schwartz-Watts ever telling you that a person could not be diagnosed with mental retardation if there were physical causes for their low IQ?

A.  I have no independent recollection of that.  Those are just my notes that were made either contemporaneous with or shortly thereafter the meeting.  But probably contemporaneous because they are handwritten, and I think I kept these -- most of those spirals were done in realtime, the spiral books that you have.

Q.  And then, Susie, can we look at Defendant's Exhibit 73,

please.

A.   That would have been a good example of discussing the issues we have been talking about with Donna, communicating those things.  Donna Schwartz-Watts.

Q.   Susie, if you could highlight the title of this document first for us.

Mr. Swerling, this is a record that was among the thousands of records that you obtained and reviewed in this case.  And apparently this was a petition for involuntary hospitalization or involuntary admission that's completed in Kentucky regarding Mr. Basham.  And this is a document you would have reviewed, correct?

A.   Western State Hospital, I think.  I remember Western State Hospital.

Q.   Okay.  Susie, if you could click on the portion midway on that page where there's some boxes to be checked, and if you can enlarge that area a little bit lower.  There, perfect.

Now, this was a report done by a psychiatrist by the name of Irene Pasquin, and this was to have Mr. Basham admitted because of psychiatric issues.

Would you look for me, please, and tell me, under the information about Dr. Pasquin requested she had to check a box indicating what her qualifications were.  Can you tell us which -- there's two boxes, which one did she check?

A.   A qualified mental health professional.

Q.   And the other one is a qualified retardation professional, correct?

A.   Correct.

Q.   Could we look at the second page of that document, Susie? Mr. Swerling, this is -- number five on that page, please. This is a little bit off track, but since we have the exhibit up I wanted to ask you about it, as well.  Did Dr. Pasquin find that Mr. Basham had hallucinations?

A.   Apparently.

Q.   And he would bang his head on the wall?

A.   Apparently so.

Q.   And that he is impulsive?

A.   Apparently.

Q.   Susie, can we now go to the Defendant's Exhibit 59, please?  Now, we have managed now to January of '04 and we have another e-mail, if you would highlight for us the bottom portion of that where it says original message all the way down, please.  The second -- yeah, that's fine.

     Now, at the bottom we have a January 28th e-mail from Miss Tarr to you and the rest of the team.  And can you read -- it's Miss Tarr speaking about fetal alcohol syndrome. Can you read the second sentence of her first paragraph for us, please.

A.   As far as -- the first paragraph, you said?

Q.   The second sentence.

A.   It's fascinating because it describes Brandon perfectly and is the number one cause of nongenetic mental retardation.

Q.   And do you see in that second paragraph Miss Tarr asked if anyone knew of a pediatric dysmorphologist who could have a look at Brandon?  Do you know whether there was ever any followup done into Miss Tarr's request that you look into finding a pediatric dysmorphologist?

A.   I have no recollection of that one way or the other.

Q.   Do you know what a dysmorphologist is?

A.   Absolutely not.  Obviously, it has something to do with somebody who knows something about fetal alcohol syndrome, I would assume.  But it's a pediatric -- I just don't know what that word means.

Q.   Susie, could you bring up Defendant's Exhibit 56, please. Now, this is another e-mail from February of 2004, so we're talking about seven months before trial in this case.  And if you could highlight the lower portion, Susie, that begins from Lesa Watson, and highlight all that for us, please.

     This is an e-mail from Lesa Watson, she was your mitigation specialist, on February 10, 2004.  And can you read that first entire paragraph for us, please?

A.   In my interview last night with Brenda Shaner and Connie Baker they were noticing the difference between BB's, Brandon Basham's, verbal versus performance IQ results and that the large point spread was indicative of his inability to

Swerling - Direct                              541

verbalize his feelings.  Anyway, she said that back when BB

was in the system all facilities, public and private, had a

minimum IQ of 80 standard, that they would not take a child

unless the child had an IQ of 80.  It was intimated that

Brandon's IQ could have been skewed to get him in the

facilities, I assume.  I need to figure out how to go about

checking this out.  Run this by Donna, see if she has info or

has heard of this happening.  I'll check with my sources.

Q.  Thank you.  Any recollection today of following up on that

e-mail?

A.  I would assume it was.

Q.  I'm sorry?

A.  I would assume it was followed up on.

Q.  But no independent recollection?

A.  No.

Q.  Susie, Defense Exhibit 57, please.  Mr. Swerling, this is

an e-mail that was sent by Miss Tarr again, this one from June

of 2004 regarding her interview of a witness named Deputy Paul

Arson, ARSON, at the Hopkins County Detention Center.  Do you

recall Brandon was incarcerated at the Hopkins County

Detention Center, correct?

A.  Yes.

Q.  And this is an e-mail about the GED program at the jail

where Mr. Basham was.  Susie, could you highlight the first

sentence of the second paragraph for us?

Swerling - Direct                              542

Do you recall, Mr. Swerling, how old Brandon was when he was at Hopkins?

A. No.

Q. And, according to Miss Tarr, the deputy informed her that when Brandon came in he was tested at a third grade level, correct?

A. Correct.

Q. Okay. And this memo discusses Mr. Basham's attempts to attend the GED program. And, Susie, could you highlight the last line of that same paragraph for us, please? Just the very last line.

And Miss Tarr said Arson finally told Mr. Basham that no matter what he did he just didn't have the ability to learn enough to pass. You would have seen this e-mail as well, correct?

A. Yes. And we would, as I said, somehow or another it would have been communicated to our experts. As a matter of fact, I believe Dr. Schwartz-Watts actually interviewed some of the people at the Hopkins County jail, but I'll have to -- cannot remember that. It just seems to be in the back of my mind somewhere.

Q. Defense Exhibit 58, please. Now, this is a memorandum from Lesa Watson, who was your other mitigation specialist, and she was operating out of Kentucky, correct?

A. Yes.

Swerling – Direct                                    543

Q.   Okay.  And the date of this is June 30, 2004, and it concerns an interview of Sharon Watkins, who was Mr. Basham's first grade teacher.  And, Susie, if you could highlight the -- just enlarge the first paragraph for us, please.

And do you see on the fifth line down, if you could highlight, she found him to be socially -- that line.  And the line below it.  Thank you.

So according to Miss Watson in her investigation in Kentucky in June of 2004, she interviewed the first grade teacher, and can you read for us what she found, what the first grade teacher found with regard to that?

A.   The highlighted portion?

Q.   Yes, highlighted part.

A.   Short for his age but not thin.  She found him to be socially and academically far behind peers.  He was at the lowest academic level.  He was living with his father at the time.  Miss Watson testified in the -- in the penalty phase of the trial, if I recall correctly.

Q.   Susie, could we have Defendant's Exhibit 65, please.  Now, here's an e-mail, or a memorandum, excuse me, from Miss Watson dated February 2004, again regarding an interview with Connie Baker and Brenda Shaner.  I believe we have already seen the name Brenda Shaner.

A.   She testified at the trial, as well.

Q.   And I believe, if you could go to page three, Susie, of

that same memo.  I believe -- I may have asked you about this already, Mr. Swerling, and I apologize, it probably would have been on the Thursday, that top paragraph.  Miss Watson indicated in February of 2004 that Miss Shaner and Miss Baker had indicated that Brandon's IQ may have been -- may have been well lower than the 80 that was required to get him into a facility.  Do you remember that?

A.  Let me just read it.

Q.  Certainly.

A.  What's the question?

Q.  This e-mail from Lesa Watson, or this memo, was received eight months after the e-mail we looked at a minute ago where she raised the same issue with regard to the inflation of Mr. Basham's scores.  Do you recall whether anyone on the Basham team took steps to verify the fact that it had been relayed from Miss Shaner?

A.  Take steps to do what now?

Q.  To verify or to investigate whether the possibility that that Mr. Basham's IQ scores had been artificially inflated in order to get him into facilities where he could receive care?

A.  Mr. Burke, I would have no recollection of that.  I mean, the motion in limine speaks for itself.  These things would have been communicated to people on the team as well as to our experts, and I cannot answer that question because it's been nine years.

Q.   Susie, can we look at defendant's --

A.   Tried to follow up everything.

Q.   Defendant's Exhibit 61, please.  And, Susie, if you could go to the second page of that and I'll -- this is another e-mail from Lesa Watson, this one dated August 3, 2004.  So approximately a month before the beginning of trial in this case.

     Susie, could you go down to the last full paragraph where you are and highlight that for us?

A.   Who's being interviewed here?

Q.   This is an e-mail from Lesa Watson to a psychologist for -- from Cardinal Treatment Center by the name of Lisa Ann Potts?

A.   Lisa Ann -- I don't see the first page, I'm sorry.

Q.   Why don't we go back and highlight the information as to who --

A.   Lisa Ann Potts.  Okay, Cardinal Treatment.

Q.   And, actually, Susie, if you could go to page two, but highlight the first paragraph of page two for us.  Thank you.

     Now, this was a memo from Lesa Watson of a psychologist.  And then you were talking about a few moments ago about, Mr. Swerling, about looking into the question of what you perceived to be Mr. Basham's manipulation.  Do you see where she states in this memo that BB, meaning Mr. Basham, was very much a conduct disorder because of criminal history and

substance abuse, but she believed the cause of these traits were neurological in basis.  She strongly felt that BB had neurological damage because of his earlier fall, drug use and exposure, et cetera, and that is why she recommended to Dr. Stocker that a full neurological be done on BB.

Do you recall reading that and did that have any impact on your investigation as to what you called Mr. Basham's manipulation?

A.  Do I recall reading it?  No.  What I would have done about it would have been, as I believe we followed up on everything that was asked of us --

Q.  Okay.  And --

A.  -- communicated to the people who were making assessments.

Q.  Susie, could you bring up last the full paragraph of that page?  Thank you.

Could you read that paragraph for us, beginning when she reviewed.

A.  When she reviewed Dr. Laird's report she said she had not caught it at the time but Dr. Laird had calculated Brandon's IQ based upon symbol search instead of coding.  She said that this will cause the IQ to appear to be higher than it actually is.  She took down the symbol and coding scores and said she was going to put it through a computer program she had because she believes Brandon may have a lower IQ.

Q.  Could you bring up the next, Defendant's Exhibit 62,

Swerling - Direct                               547

please.  This is a -- if you could highlight the, yeah, that,
all the way down, please.  This is an e-mail report from Mr.
McNair again two days after the e-mail from or the memorandum
from Miss Watson.  And this is of an interview with someone by
the name of Ellis McKechnie.  It's not clear to me who he is
from Mr. McNair's e-mail and his report.  Do you recall who
Mr. McKechnie was?

A.  No, I don't, actually.

Q.  I will tell you, if this helps your memory, I believe that
there were family members by the name of McKechnie, a cousin
or something, but I'm just not sure.

A.  Well, I was going to say family, but I didn't want to be
wrong about it, so --

Q.  And the e-mail itself?

A.  I don't remember it.

Q.  E-mail itself doesn't indicate it.  So the second --

A.  We interviewed an awful lot of his family.

Q.  Mr. McNair interviewed a lot of his family?

A.  Pardon?

Q.  Is that what you say?

A.  I said we interviewed as many members of his family as we
could.

Q.  Okay.  That last, second to last line, Susie, could you
highlight Ellis advised?  Thank you.

     And so Mr. McNair informed the team in August 2004, about

a month before trial, that this gentleman had advised that he knows Cathy stopped using drugs while pregnant with Charlotte but continued using drugs with her pregnancy with Brandon Basham.  Again, we talked already about the fact that Dr. Schwartz-Watts indicated there might be a fetal alcohol issue in this case.  Based on your practice you are saying you would have passed this information on to her?

A.  As far as I know, everything was communicated to our experts in one form or another.

Q.  And then, Susie, Defendant's Exhibit 63, please.  Mr. Swerling we're getting close to trial in this case and so investigation is still ongoing.  And this is an e-mail -- I'm sorry, Susie.  Just one second.

        (There was a pause in the proceedings)

Q.   (MR. BURKE) I'm sorry.  Exhibit 63, Mr. Swerling, this is an e-mail you prepared, right?

A.  Yes.

Q.  And you -- we talked about Miss Titzer before, she testified at trial and you had quite a bit of dealings with her, correct?

A.  Yes.

Q.  Susie, could you highlight the first sentence of the second paragraph?

    And so according to your report Miss Titzer informed you that in school Brandon could not read?

A.  Yes.

Q.  And the second sentence, as well, Susie.  The kids looked up to him but started to tease him because of his intellectual capacity.  This is all things that Miss Titzer conveyed directly to you, correct?

A.  It's in the memo.

Q.  And then, Susie, can you go halfway down that page for he me, please, where she remembers, the line she remembers at 13?  That's fine.

You also note in the report, Mr. Swerling, she, meaning Miss Titzer, remembers at 13 he was functioning at a third grade level.  Now, you believe that Miss Titzer was a reliable witness, correct?

A.  I don't remember her testimony, but, I mean, she seemed to be nice.  I wouldn't have put there up there if I didn't think she was a good witness.  This looks like she was talking about being interviewed by Dr. Capehart up in Butner.

Q.  Oh, yes.

A.  Penny believes if she told him, I don't -- I can't read this.  Capehart was telling him to speak to his lawyer.  Penny believes if he told him that he would probably clam up.  She remembers at 13 he was functioning at a third grade level, something to that.  I assume it says Capehart, she's referring to Dr. Capehart.

Q.  I would assume so, as well.  Do you recall that Mr. Basham

was on social security while he was child, social security disability?

A.  Vaguely.

Q.  And vaguely, you don't remember the reason he was?

A.  No, I couldn't tell you he was or he wasn't.  I have a vague recollection that he was on social security.

Q.  Okay.  Now, Dr. Brawley gave Brandon an IQ test and found he had an IQ of 68.  The government gave him an IQ test, as well, found him to have an IQ, I believe a full scale IQ of 75.  Do you recall how long after Dr. Brawley gave him the IQ test that the government gave him an IQ test?

A.  No, but it would be in the reports.

Q.  Are you aware of the concept associated with IQ testing known as the practice effect?

A.  No.

Q.  Okay.  Are you aware of the standard of proof in federal district court for establishing mental retardation in a federal capital case?

A.  Not at this time.  I mean, probably when I was more boned up on the issues I probably would be able to tell you that.

Q.  I would like to focus for a moment on Mr. McNair, your investigator.

A.  Um-hmm.

Q.  Did you select Mr. McNair for the Basham team?

A.  Yes.

Swerling - Direct                                        551

Q.   And had you worked with him before?

A.   Mr. McNair was with the Lexington County Sheriff's Department and he was -- I believe at one point he had risen to captain, investigative detective division.  And he was on the opposite -- he was opposite me in a number of cases.  He investigated a number of cases I had in Lexington County that I tried over there.  When he left the sheriff's department he may have worked on a couple of cases prior to Basham, I don't recall, but I did hire him for the Basham case because I thought he was a good on-the-street cop.

Q.   Good on the street?

A.   And detective.

Q.   Were you aware in 2003 of the circumstances surrounding Mr. McNair's departure from the Lexington County Sheriff?

A.   I don't recall that I was.  I just don't know.  I probably was not.  I think we got some documents from the government.  I saw the subpoena was like April of '04, so I don't know when we would have gotten the discovery, but apparently they had his personnel file.

Q.   And that's --

A.   I really don't remember.

Q.   And so that you are aware that the U.S. Attorney's Office did subpoena his records as part of their investigation?

A.   Yeah.  And the -- as I said, I think there was a subpoena in April, but I don't know when we got it, the file, but that

would have been getting pretty close to trial. So I don't know, I don't believe that I had information about Carlisle's personnel record prior to that time.

Q. Okay. Susie, could you bring up Defendant's Exhibit 44, please. Mr. Swerling, you referred to Mr. McNair, I think, as an on-the-ground cop or something along those lines?

A. Good on-the-street cop.

Q. On-the-street cop. Susie, could you enlarge the body of this e-mail for us, please?

Now, the first sentence Mr. McNair says that he retired in 2002 from the Lexington County Sheriff's Department. At the time that he was working for you in 2003, is that what you believed, as well?

A. Pardon?

Q. Do you believe that he had retired from the Lexington County Sheriff?

A. I don't remember. I don't remember the circumstances that he told me why he left. I just don't recall.

Q. Susie, can you, on the fourth line down, the very last word is I. I know I am working.

A. Who is this to?

Q. This is an e-mail found in the file from Mr. McNair to law enforcement officers in the City of Conway, South Carolina where Miss Donovan was kidnapped. And it was sent in October of 2003.

A.  Okay.

Q.  And I will tell you that this is among the documents that we obtained from the files that we went through at your office.

A.  Sure.

Q.  Can you read what's been highlighted for us?  I have been appointed by the federal court as an investigator and that -- could you read the next sentence?

A.  Assigned to Jack Swerling, court-appointed attorney for Basham.  I know I am working on the other side, but the facts don't change.  I am and will always be a cop at heart.  Fulks and Basham are in a heap of trouble and I'm no way attempting to change the facts.

    That's actually one of the reasons why I like Carlisle.  What he can do, one cop can get more information from another cop than anybody else.  And I think what he was doing, he was letting them know he was a cop and always would be a cop.  So I think it's kind of cagey what he was doing there.

Q.  Do you think it was cagey for a member of the Basham team to inform the law enforcement that the Basham team believed Mr. Basham was in a heap of trouble?

A.  Well, he was in a heap of trouble.  I don't know that anybody can dispute that.

Q.  Can we look at Exhibit 43, please, sir?

A.  I think he was trying to get himself in with the cops.

Swerling - Direct                              554

Q.  This is another e-mail from Mr. McNair.  This e-mail, though, is to the team, the Basham team, and it's from Sunday, December 7th, 2003, and it is a report of his investigation in Kentucky.  I asked you before whether Mr. Basham's sexuality was an issue that the Basham team was investigating for any purpose in this case, and I believe you said other than Mr. Basham's sexual acts in return for drugs that it was not.  Is that correct?

A.  I said I didn't remember.  I believe that it was -- I remember that one issue about the trade sex for drugs.  What I don't -- I can't tell you and what I don't remember, because it's nine years ago, is that we were obviously trying -- I could tell you what I recall now or what I would think now. If he had those issues and they were being used by him in some way I would have wanted to know about it.

Now, whether or not -- if it was just being a homosexual that would not have been much of an issue.  But if he was -- if his homosexuality was used to further his aims or means or what he was trying to get then it would be an issue.  So I would think that it would have been just good investigation to try and look into those things.

Q.  Something you would certainly want to know, I would think, one way or the other.

A.  Yeah.  As I said on Thursday, I want to know more than the government knows when I'm getting involved in a case.  So, I

mean, did I specifically say I want you to find this out? I can't tell you I did. I just -- I would have wanted to know and I would want to know today.

Q. And one of the persons on the Basham team that would have been responsible for finding that out for you would have been Mr. McNair, correct?

A. That was not his purpose. It was part of the investigation, I would assume, that he was looking into that. I can't, you know, remember nine years later what the discussions were about it or not. But if I was assigned to the case today it would be something -- every aspect of Mr. Basham's background and his character would be something that I would want to explore.

Q. Now, in Exhibit 43 Mr. McNair is talking about who he's intending to interview. And, Susie, could you enlarge numbers three and four for us? And number three and number four. Yes. These are two witnesses that Mr. McNair was going to interview. Could you read that for us, please?

A. Jimmy Hill, homosexual friend of Brandon. Looking forward to this one. Jeremy Babar, another homo friend of Brandon's. Can't wait.

Q. Did this suggest to you that Mr. McNair had issues with dealing with witnesses who are homosexual?

A. Doesn't suggest to me anything. I don't remember it.

Q. Reading it today does it suggest that to you?

A.   It doesn't suggest anything other than what's written there.  You are reading something into it that I don't.

Q.   What did Mr. -- what did you read into the statement, another homo friend of Brandon's.  Can't wait?

A.   That he's looking forward to the interview.

Q.   Sincerely?

A.   Pardon me?

Q.   Sincerely looking forward to it?

A.   I don't understand what you are asking.

Q.   I'll move on.

A.   Can you define it?

Q.   Do you still retain Carlisle McNair in this case?  Excuse me.  Do still retain Carlisle McNair in any cases?

A.   He has actually stopped working, probably within the last year.  But he did a number of cases after this for me.

Q.   Now, I would like to switch focus again to another topic. This is a question that has been recurring in this case, and that's the question of Mr. Basham's competency.

Now, you were interviewed by the government I believe on three occasions in this case, is that correct?

A.   Right.  You were there each time, either by phone or physically.

Q.   And do you remember at one of those interviews did you state when asked by the government about Brandon's competency at trial that you only believed him to be incompetent on one

Swerling - Direct                    557

or two occasions?  Does that -- is that consistent with what
you remember saying?

A.   Well, when I -- being incompetent on one or two occasions,
there was events, that's what we were talking about.  As far
as I know there were events during the trial where we raised
the issue about whether or not he was competent to continue.
So that's what I'm talking about.

Q.   And what events are you talking?

A.   Well, I remember one was the situation after he got into a
fight with the marshals, and, I mean, I was just -- we just
could not communicate with him at all.  He was so riled up and
agitated that it was just impossible.  And I think we got --
the judge asked us to get Dr. Watts over here, and we got Dr.
Watts over here and she opined at that time that she didn't
feel like he was competent to go forward that afternoon but
felt like by the next morning that he would be.  And I think
she came in the next morning, I'm drawing from my memory, and
said that he was fine to go forward.

Q.   Your memory is accurate on that.

A.   Pardon me?

Q.   Your memory is accurate on that.  Now, were there any
other events that you had that you remember where you had
concerns about --

A.   There was one during -- during the Jackson v. Denno
hearing, I think, where the -- pretrial motions in February of

'04 we had to stop for a period of time to get Dr. Watts in. And she came over, and I think actually I was reading, I think Mr. Harris was the one that was having a dialogue with the court about that at that time and Dr. Watts came over.  I mean, she came over on more than one occasion.  But, in other words, they were events, not general incompetency.

Q.  Not an ongoing problem, in your opinion, only isolated events?

A.  Correct.

Q.  Susie, could you bring up Defendant's Exhibit 79, please, and go to page two.

A.  And, Mr. Burke, you know, if I can answer, what I interpret that to mean is that at that point for one reason or another he just couldn't go forward.  You know, Brandon can get pretty agitated and it's hard to reason with him and it's hard to get anything out of him or get him to keep quiet or to stop.  And so I guess it depends upon what the definition of incompetency is, but at that point, particularly the day with the marshals, I just remember that was an awful day and he just was not able to go forward.  Whether or not it was mental incompetency or he was just riling himself up so much we just couldn't go forward.

Q.  He was incompetent when he had the --

A.  No, he was not incompetent.  And I saw you suggested that. I don't believe he was incompetent when he had the fight, I

think he was incompetent after the fight.

Q.   And what do you base that opinion on?

A.   Because of his behavior.  Afterwards we just could not reason with him at all, at all.  Before Brandon did what he did during certain times during the trial, he insisted on doing stuff that he wanted to do.  At that point I think he was trying to leave the courtroom and I might have suggested that he be allowed to do that.  And the court after some delay in hearing -- it may have been an in camera hearing or something like that, I don't have -- I have a vague recollection of it, said no, and that's when he -- one of the marshals put his hand on him and he just went ballistic.  But I never thought at that moment he was incompetent, I thought he was incompetent when the whole thing came about afterwards.

Q.   Were you able to communicate with him when he was addressing the judge to calm him down?

A.   You can always communicate with him, the question was whether he was listening and whether he wanted to -- as you saw during the trial and you saw yourself, there were times when Brandon would just do what he wanted to do, it didn't matter what you wanted him to do.

Q.   And I'm not sure of your basis for this, Mr. Swerling. How do you differentiate between when Mr. Basham just doesn't want to listen and when he can't?

A.   It's just instinct.  I mean, it's being with him.  After

that fight, I mean there was no communicating with Brandon.

Q.   Was there communicating with him prior to the fight that morning?

A.   He understood -- I believe he understood what I was trying to do, and I was trying to get him excused from the courtroom, as I recall.  But he was insisting, he stood up, if I recall correctly, and started addressing the judge even though I told him not to.  That happened on a couple of occasions during the trial.  So I don't know that that made him incompetent, I think it made him impulsive and what he wanted to do he was going to do.

Q.   And your recollection is that you -- you tried to make it possible for Mr. Basham to leave the courtroom?

A.   It seems like it, but the record would have to speak for itself at that point.  It's thousands and thousands of pages and I just can't recall exactly.  I tried to read -- I read a good part of the transcript preparing for this, and but I remember reading about that, just don't remember exactly the dialogue that took place.

Q.   Would it have been sound strategy on your part to suggest that your client who was having problems that morning absent himself from the courtroom?

A.   I think I was just -- again, the record has to speak for itself.  I mean, I can't tell you exactly what's in the record, but it seems at that point I was asking if he could

leave the courtroom.  You know, I didn't want Mr. Basham out of the courtroom during the trial, if that's what you are asking.  I was opposed to it.  I mean, I think a lawyer would want his client in the courtroom during the trial and so the jury could see him.  If he's absent from the courtroom the jury would have to have some negative inference from that.

Q.  Okay.

A.  So I was -- and I know you've mentioned that before, but I was opposed to Mr. Basham being out of the courtroom when the jury was in the box.

Q.  Now, Mr. Swerling, what we have on the screen now is the second page of Defendant's Exhibit 79.  And it's -- I will tell you that your notes begin on September 23 of '03, so this is a year before trial.  And they are notes that you took during your meeting we discussed earlier with Dr. Schwartz-Watts, Dr. Morgan, Dr. Brannon, and Dr. Brawley.

A.  This is another page of that memo?

Q.  Yes, this is the second page of your notes.  Susie, right in the middle could you highlight Dr. Morgan, that line for us, please?  Thank you.

Can you read that line, just the first, one for us, please?

A.  Yeah, that's -- that's Don Morgan, who we had, we actually had him doing the -- he was not going to testify in the case, and there were a lot of reasons for that, but he was treating

him.  And he's treating and he says he's irrational off medicine.  Sent Dr. Brawley all the hospital records.  Using daily inhalants.  I don't know -- I don't know what that part of it meant.

Q.  Now, so now Dr. Morgan informed you as early as September of 2003 that if Mr. Basham was off his medicine he would be irrational?

A.  Apparently tried to keep him on his medicine.  I think -- I remember reading one dialogue between the court and I about we found out that he had been sent back from Butner and he was supposed to have some medicine and they were not giving him the medicine at the jail.  And we had to make sure that they did, Neurontin or something like that.  I don't know why I remember that, but probably because I just read it recently.

Q.  And you were at the -- it wasn't as if you were giving Mr. Basham his medication and --

A.  Pardon?

Q.  It wasn't as though -- you couldn't give Mr. Basham his medication.

A.  No.  But I remember informing the court on one of the days of the trial about this particular issue, and I remember the court being concerned that they, the jail, had not been following -- I think that's what it was, the jail had not followed Butner's recommendation what he was supposed to be on or what Dr. Morgan said he should be on.  And so I don't

remember what the outcome was, but I remember that I think it got straightened out.

Q.  Susie, on that same page could you highlight number six, all of the it, for us and just enlarge that for us?

These are your notes still, and they appear to be sort of a summary of each expert's nutshell of the situation that you were dealing with in September of 2003.  Do you see where you wrote with regard to Dr. Morgan, he apparently stated that Mr. Basham was psychotic?

A.  I remember writing it down.  As to what he meant at that point or when he was referring to, I have no idea.  Sometimes, you know, nine years later my notes can only remind me sometimes there are some things, so I don't know what he was referring to at that point.

Q.  I understand.  Now, in the summer of 2003 Mr. Basham was transferred to a place called Columbia Care?

A.  Yes.

Q.  Can you tell me what Columbia Care is?

A.  It's a medical facility that from the Alvin Glenn Detention Center, they send people there.  And he was being housed at the Alvin Glenn Detention Center, which is the Richland County jail, and he was in a security pod there, and Columbia Care is a medical facility for the jail, as far as I understand it.

THE COURT:  Mr. Burke, it's about time for our

Swerling – Direct                                564

morning recess.  Could we take a break here?

MR. BURKE:  Yes, sir.

THE COURT:  All right.  Let's take a 15 minute recess.

(A recess transpired)

THE COURT:  All right.  Miss Floyd made arrangements for a phone call to be made to Mr. Basham, but they wanted to have it at 12:25 so we will have to stop a little bit earlier this morning.

THE CLERK:  The call will be at 12:30 but we need to stop at 12:25 because they want it at 12:30 1230 on the dot.

MR. BURKE:  Thank you very much, Miss Floyd and your Honor.  Appreciate it.

THE COURT:  All right.

BY MR. BURKE:

Q.  Mr. Swerling, when we took the break we were talking about your -- you were telling us about the Columbia Care center in Columbia.  Do you recall why the defense made a request that Mr. Basham be sent there?

A.  Up on the screen before we reconvened there was something that you had asked me about Dr. Morgan.  And could I go back to that for a moment?  You don't have to put it back on the screen.

Q.  We can bring it back up.

A.  I think the record ought to reflect we could not put Dr.

Morgan on the stand as a witness.  There are memos in the file

as to why, communications he had with Brandon, and I can't

specifically recall what they were, but I think the record

ought to reflect we were not able to put him on the stand.

Q.  Okay.  Now, just so the record is clear, Dr. Morgan was

his treating psychiatrist, right?

A.  Yeah.  We had separated responsibilities so that Dr. Watts

would have opinion, give the opinions or have to be the

expert, Dr. Morgan was treating.  And, of course, he had -- I

think he had a long -- he had a relationship with Brandon even

after the trial.  He was also sending him some money, I think,

too, from what I heard.

Q.  Was it Dr. Morgan or Dr. Schwartz-Watts who suggested that

he, Brandon, be sent to Columbia Care?

A.  I really don't remember.  I don't remember why he was

sent, I apologize.  I'm sure there's something in the file to

reflect that, or a motion or something like that, but I just

specifically don't recall why he was sent there.

Q.  The record does reflect that at one point, I believe in

September of 2003, there was a request to extend his time at

Columbia Care, and that's in the record, it speaks for itself.

And there was attached to that request was a letter from Dr.

Schwartz-Watts explaining that she had had difficulties

evaluating Mr. Basham when he got to Columbia, and I don't

want to misstate it, as, again, it speaks for itself, but do

you independently recall having conversations with Dr.
Schwartz-Watts about her inability to evaluate Mr. Basham for
a period of time when he was at Columbia Care?

A.   I don't have any recollection of that.

Q.   Okay.

A.   One way or the other.  I have no recollection.  I just
don't have a recollection one way or the other.

Q.   Susie, could you bring open Defendant's Exhibit 83.  Mr.
Swerling, I think you mentioned that one of the occasions
where you may have had concerns about Mr. Basham's competency
was at the Jackson v. Denno hearing so I would like to talk
about that for a moment and go over -- Susie, if you could
highlight that bottom portion for us and just enlarge it for
us.

     These are your notes from the February 24, '04, which was
the first day of the hearings.  Can you read the second line
for us?

A.   Yeah, he's incoherent.

Q.   Okay.  And, Susie, could you bring up -- what we're going
to show you, Mr. Swerling, is a transcript from that day, part
of the record in this case from the 24th.  And if you can go
to page two, beginning at line 18, if you can enlarge that for
us, Susie, to the bottom.

     And, Mr. Swerling, could you read that first paragraph for
us?  You are addressing the court.

Swerling - Direct                    567

A.   Okay.   Judge, Mr. Basham at this point appears to Mr. Harris and I to be incoherent and not understanding the nature and purpose of the proceedings today.   He had told us he thinks he's here for trial today.

Q.   Okay.   Now, this would have been one of the occasions when you had concerns about his competency?

A.   Yeah, it speaks for itself.   You know, my recollection of, you know, specific things that were said nine years ago, eight years ago, is not very good.   But that the record speaks for itself.

Q.   Now, there was some -- Susie, can you go to the next page? I believe there may be some reference where you state, yes, the top -- that top paragraph.

You also informed the court that apparently there was some attempt last night by him, meaning Mr. Basham, to slash his wrists again and that's why he's in restraints today.   And any independent recollection today of that attempt to slash his wrists?

A.   No.

Q.   You said again.   So that suggests that there was previous attempts by him to slash his wrists.   Do you remember those?

A.   Again, you mean talking about the word "again"?

Q.   Yes.

A.   I mean, as to others?   There's a vague recollection somewhere but I don't recall, I really don't.

Swerling - Direct                          568

Q.  Okay.

A.  I remember my concern at this point was I think there was some dialogue between the court and I about whether we could go forward with the motions, and I thought specifically Jackson versus Denno hearing, I thought we could not because it would require maybe talking to Mr. Basham about things, and I was concerned.  Some of the other motions we argued, you know, maybe could have been done in his absence because they were legal issues, but this particular motion I thought was important for him to be here and I think we recessed.

Q.  Um-hmm.  Okay.  And I think that is what the record will reflect.

A.  This may be the situation, Mr. Burke, where he had the medicine problem, also, where Dr. Watts said that he did not get some medicine he was supposed to get or -- I don't remember.  But, anyway, I'm trying to draw on my memory, but it's hard.

Q.  And I -- and I appreciate that and I'm not -- and I can't, I think, to be honest with you, I'm not even sure myself so I don't want to speak to that so I wanted to ask you a question.

    Now, this is a government's exhibit so we have no -- certainly can bring it up, but I will tell you what I have here, maybe you can just answer a question for me.  So there was a suicide attempt or a slitting of the wrists, let's call it, by Mr. Basham immediately prior to the Jackson v. Denno

hearing in this case, which was the hearing started on the 24th. And the Government's Exhibit 162 is the time sheets from -- your time sheets from Mr. Basham's entire case?

A. Um-hmm.

Q. And I noticed on the 23rd of February of '04 there was an entry by you of a phone call to Andy Savage. Who is Andy savage, do you know?

A. He's lawyer in Charleston who is one of my contemporaries. And it's not unusual, he would be one of the people that I might have gone to and asked a question of.

Q. Regarding --

A. Anything.

Q. Anything. Okay.

A. He's a criminal lawyer down there, and we refer each other cases, so -- I can't tell you why I spoke with him, but I did, obviously, if it's on my time sheet.

Q. It could have been in relation to the Jackson v. Denno hearing?

A. Well, it had to be in relation to the Basham case if it's on the time sheet, but I really have no idea. I spoke with a lot of lawyers during this case trying to note --

Q. On the same day you spoke to another lawyer who we mentioned previously, Kevin McNally. You have a time entry for him.

A. I think Mr. McNally was the lawyer, if I remember

correctly, was the supervising -- I don't remember what the title was.

Q.  I think they called him resource counsel.

A.  Resource counsel.

Q.  Yeah.  Now, your notes in your time sheet, and I'm reading from Exhibit 162 here, it says PC with Kevin McNally.  Have judge make finding because of limited capacity.  Sitting here today can you tell us what you meant --

A.  I think -- I can't tell you exactly what that means, but that's what we did, we asked the judge to make a finding on Rule 104 as to each of the statements as to the voluntariness issues.  So we did do that.

Q.  Did you present evidence of Mr. Basham's limited capacity?

A.  Oh, no, no.  This was -- I told you the other day, that was not our strategy because the statements -- I mean, we can go back into that, but --

Q.  Yeah, I don't want to rehash.

A.  Miss McGuire and Mr. Hewlett and Mr. Hughes and Mr. Monckton and Mr. Littlejohn, those were the statements that were under advice of counsel and so those were the statements, the real serious statements, the efforts to find the Burns body, the efforts to find the Donovan body, those were the ones of particular concern.  But there were lawyers involved in those.

Q.  On this February 23 phone call with Mr. McNally you have

also an entry on your time sheet, don't call Dr. Watts, does not see mitigation problems.

A.  Please state, does not --

Q.  Does not see mitigation problems.  Do you remember that?

A.  No.

Q.  This was information -- these time sheets were submitted to the court, correct?

A.  Yeah.  Are you asking me if I remember it?  I don't remember it.

Q.  No, I understand that.  I'm curious, it would seem some of these statements would be work product and I'm not sure why they would be included on a time sheet.

A.  Mr. Burke, I don't know.  You know, I may have put something down there that, you know, maybe in retrospect maybe -- I don't know.  I mean, I tried to maybe explain why I was calling and so I can't tell you.

Q.  Okay.

A.  What did I put down?

Q.  This is with regard to a telephone call with Mr. McNally, have judge make finding because of limited capacity.  Don't call Dr. Watts, does not see mitigation problems.

A.  I have no idea what that means.  I guess the government wouldn't either, if they had seen it.

Q.  Returning to the morning of the 23rdth, Mr. Basham's incoherent, as your notes indicate.

Swerling - Direct                            572

Susie, could you go to page six of that transcript for me, please. Actually, make it page seven. And could you highlight that first paragraph for me, please, and enlarge that.

Mr. Swerling, this is on the previous page, it's you making a statement to the court. And can you read the sentence beginning, after my recollection, read the rest of the paragraph for us.

A. In situations where he has -- there have been notes made about his being sort of out of touch, talking to himself, and things of that nature, which one of the things he's doing right now, Mr. Harris overheard him talking to himself. But I don't believe there has been a judicial determination ever.

Q. Okay.

A. And that, I think what we were referring to there, to the best of my recollection, would be that there were some entries in some of his medical records about that. If so, that's what we would have been referring to.

Q. Now, that day Dr. Watts was called in to evaluate Mr. Basham for you and she testified later in the afternoon. And I think that doctor -- and, again, the record will speak for itself, but that Dr. Watts testified she was concerned about Mr. Basham's medication. I think that's what you alluded to?

A. That's what I was referring to before, yeah.

Q. Did she, to your recollection, talk to you that day about

her concerns about whether he was being properly medicated while at the jail?

A.  I do not recall.  I do recall that there was some -- I made some statements to the court about the jail and giving him medicine, but I don't know if it was that day or some other day.  I just remember that in the back of my mind.

Q.  Did you consider that day asking the court to stay your proceedings so that Mr. Basham could have a full competency evaluation performed?

A.  Did I?  Are you asking me did I?

Q.  Did you, yes.

A.  I don't think the record reflects that I did, and I think what the record reflects is I called Dr. Donna Schwartz-Watts, who I have great deal of confidence in, to come over and take a look at Brandon.  She had had experience with him already.

Q.  Now, you had testified, or least you said in your interview, at one point your strategy was that you did not want to have Mr. Basham evaluated for competency because you didn't want to make him available to the government.

A.  I didn't want him evaluated by the government at that time.

Q.  Now, the record indicates that Mr. Basham, for a different purpose, was sent to Butner from January -- late January to mid-February immediately preceding this Jackson v. Denno hearing.

Swerling - Direct                    574

A.  I don't remember the time.

Q.  But if this were the case, then your strategy to not have the government have access to him would no longer be in play, correct?  Because the government already had access to him for a month.

A.  I'm not sure I understand what you are asking.

Q.  I'll try to rephrase it.  The strategy that you did not want to raise competency to proceed because you didn't want to make Mr. Basham available to the government to be evaluated --

A.  We were talking about earlier in the case about giving him over to the government to determine competency.  At some point they were entitled to have him taken to Butner.  So, no, I'm not talking about that period of time, I'm talking -- your questions the other day were about early on and how there was a motion made by Mr. Monckton to have him determined -- determine whether or not he was competent or not or be evaluated, and I was opposed to that, Mr. Harris was opposed to that, because we didn't want to turn him over to the government at that point in time.

Q.  But any time after he had been to Butner that concern would no longer be there.  If you had competency concerns you could have requested a competency evaluation without having the concern of disclosing --

A.  I had my own doctors.

Q.  Okay.

A.  I mean, I didn't have a whole lot of faith in Dr. Capehart being objective.  He was the -- he was the doctor at Butner and we were getting vibes that he was not very favorable toward Brandon.

Q.  I would like to move on to Mr. Basham's competency, or lack thereof, at his trial.  First I have a question:  Did you ever consider having Mr. Basham, like his codefendant, plead to the offenses with which he was charged?

A.  Do what now?

Q.  Did you ever consider having Mr. Basham plead guilty to the offenses with to which he was charged?

A.  No.

Q.  No?  Can you tell us why?

A.  No, it's not a format that I like to do in a death penalty case because I think that it's important to have, if you can come up with a legitimate reason to have a bifurcated trial. Even if in the guilt-innocence phase you don't strongly argue about guilt or innocence, it's better to separate those issues, guilt or innocence, and then go into the sentencing phase of the trial.

So what I did in this case, and I've done in other cases once in a while, is in this particular case the carjacking issue had a specific intent requirement that when the car was -- when the car was hijacked, carjacked, that there was an intent to do bodily harm or there was a reasonable -- I don't

remember exactly how it's defined, but there was a reasonable chance of bodily harm.  So I felt like we could argue that and not lose the jury thinking that we were wasting their time, and therefore we could have the guilt-innocence phase of the trial, separate that from the penalty phase of the trial, and in the guilt-innocence phase of the trial really go after trying to show from these witnesses that Brandon was a follower, that Chad was in charge, that we -- we had all of these witnesses, Hawkins, who Brandon had done some favorable things with during that kidnapping, Tina Severance, Andrea Roddy, Beth McGuffin, all of these people, jailers, we were able to during the guilt-innocence phase of the trial bring out things that we wanted to and separate that from the penalty phase of the trial.

Number two, it didn't work in the Fulks case.  They tried that, they pled guilty, so it furthered my belief that that was just not the way to go.  But I do believe sometimes it's better to front load in the guilt or innocence phase and not seriously argue about guilt or innocence so he could keep credibility with the jury, come back and argue that, okay, you know, we went through the guilt-innocence phase, this is the reason why we did it but now we would like you to save his life.

Q.  Susie, could you bring up Defendant's Exhibit 86, please.  And, Mr. Swerling, this is another of the many, many e-mails

in the case.  This one's from Lesa Watson dated August 27, 2004, so just a couple of weeks before trial, correct?

A.  Yes.

Q.  And, Susie, could you highlight the first two lines for me, please, of the substance?  In this memo Miss Watson informed you that Brandon had just called her twice.  He wanted to tell me he is not pleading because he cannot say what he has to say because it is not true.  Do you remember receiving this e-mail from Miss Watson?

A.  I have no idea what he's talking about.

Q.  No idea?

A.  No.  There was never any really, as I recall, never made any kind of decision to try and get him to plead guilty.  It didn't work with Fulks, and my experience in the past, that's not the way I would have gone.

Q.  Mr. Swerling, Government's Exhibit 162 is a large exhibit we just discussed about your time sheets, and I would like to read for you your entry for August 23 of 2004, which would have been four days before the e-mail in which Miss Watson said that Brandon had called her about not being willing to plead.  There is an entry of a two-and-a-half hour visit with your client on August 23rd.  Thank you very much.  It's actually, Gayle, page ten of 14 for -- I don't know if that helps, and that's the bottom entry right now.  Thank you, Gayle, I appreciate it.

Now, the entry is difficult to read, but it appears to say on the very bottom, to jail with Greg Harris re plea, and a word I can't make out.  Can you make out that word?  Mr. Swerling, are you able to read what this word means?

A.   No.  I can't see the second word.

Q.   Does this refresh your recollection as to whether you ever had any conversations with Mr. Basham about pleading guilty in this case?

A.   Let's put it this way, we may have discussed it.  That was not anything I was ever asking him to do, that I can recall.  If you have my notes from this day, in all fairness put them up.  But I don't believe that that was something that I ever recommended him to do.  I think I discussed the -- probably would have discussed the options with him but not that I was serious about doing.

Q.   Okay.  And I will tell you that as far as I know I don't have notes from that day.  But, in all fairness, I would include them.

Susie, can you return to Defendant's Exhibit 86 for me for just a minute?

THE COURT:  It says plea and -- well, I can't --

Q.    (MR. BURKE) I really, I'm not sure what this word is, either, to be honest.  So --

A.   Rules.  Maybe rules, that was rules.

Q.   Okay.

A.   Maybe.

Q.   Now, this e-mail from Miss Watson, if you -- if you would look at the second paragraph which has been highlighted, she was talking with Mr. Basham about his behavior at the upcoming trial, and she said that he likes coloring books, connect the dot books and words, seek and find puzzles.  I told him Paige would have them and he is to work on them and focus on that. Was that -- was that the team's strategy, to have Mr. Basham focus on coloring books and word seek?

A.   Well, the strategy would have been to keep Mr. Basham from being fidgety and -- lack of a better -- I'm trying to think what another word would be.  Keep him focused.  And I think that at some point, I don't know if we already had this discussion with the judge, but he approved Miss Paige sitting with Mr. Basham because he really liked her and listened to her during the course of the trial.

     So, you know, Brandon was, for one reason or another, I didn't think was going to be actively participating in writing notes and telling me what questions to ask and opinions about things.  So I just wanted to keep him quiet and focused on something so he was not -- would not be disruptive.

Q.   Susie, could you bring up Defendant's Exhibit 90 for me, please?  Mr. Swerling, Defendant's Exhibit 90 is a multiple page document that we found actually in appellate counsel's file in this case.

MR. BURKE:  And, your Honor, may I make -- may I approach the witness to show him?

THE WITNESS:  I wonder how they got it and I didn't have it?

MR. BURKE:  Your Honor, may I approach the witness?

THE COURT:  Yes, sir.

MR. BURKE:  Thank you.

Q.   (MR. BURKE) Does that look familiar to you?

A.   No, no.

Q.   Do you recall whether Mr. Basham was working with a document or a book like this?

A.   No.  I mean, I don't remember at all.  What I was trying to do is give you a reason why we would have -- I would have said something like that, because I wanted to keep Brandon concentrated and quiet in the courtroom.

Q.   Susie, could you keep rolling down for me, please.  And I think if you -- there we go.

Mr. Swerling, I think the second to last page, I'm not sure you will be able to read that, but there appears to be notes written that to the best our knowledge is in Mr. Basham's handwriting.  So do you see that page, Mr. Swerling?

A.   Yes.

Q.   Do you remember receiving some type of note from Mr. Basham to the effect of why can't -- why you can't talk in front of me, it makes me feel --

Swerling - Direct                            581

A.   That's a note to me?

Q.   It's a note to someone.  Do you recall receiving that?

A.   No.

Q.   Okay.

A.   I don't know what it means either.  If you are suggesting
I didn't tell Brandon --

Q.   I just asked.

A.   I'm just telling you, it could be completely wrong.

Q.   I asked if you had seen the note, that's all I asked you.

A.   I like to explain the answer.

Q.   Susie, can we go to Defendant's Exhibit 91, please?

     Mr. Swerling, this is a newspaper article from
September 14th concerning the jury selection in Mr. Basham's
case and commencement of jury selection.

     And, Susie, could you go to the second page for me.  And
in the context of the last two paragraphs of -- right there,
could you highlight that for us?

     Now, this report in the newspaper says Basham's actions in
court also can influence jurors.  He appeared disinterested
during much of the jury selection, drawing with markers on a
sketch pad or sleeping.  They notice that, Sneed says.  If he
is -- if he's not paying attention it shows he doesn't care.

          THE COURT:  Let me jump in again here.  That is a
newspaper article.  Isn't this hearsay?

          MR. BURKE:  It's hearsay, your Honor, and the

government did -- I have to tell you we got these documents late in the game and we were trying to be accommodating.  I'm not really sure how Mr. Swerling can testify to it.  I guess potentially to refresh his recollection.  But to the extent it --

THE COURT:  I've got a --

MR. DALEY:  The truth of the matter, sir, is it really is nothing but hearsay.

THE COURT:  Mr. Burke, what about it?

MR. BURKE:  We're not offering it, your Honor, for the truth of the matter asserted.  In the first place it's a -- I mean, it's a statement that I simply wanted to introduce to ask Mr. Swerling if he recalls Mr. Basham spending time drawing with markers during the jury selection in this case.

THE WITNESS:  I remember Mr. Basham, because we just went through the fact that there was some coloring books, and Paige Tarr was sitting with him there.  But the problem with Brandon was that Brandon listened to what he wanted to listen to and he didn't listen to what he didn't want to listen to.

Q.   (MR. BURKE) How do you know that?

A.   Because I -- I worked with him for eight weeks in court and some 60 hours prior to that.  And I know Brandon, and Brandon was responsive to what he wanted to be responsive to and not responsive to what he didn't want to.  And that was

his history.

Q. But you are not a psychiatrist, is that correct?

A. No.  I don't have be a psychiatrist to tell you that.

Q. That's your opinion then --

A. I worked with him for eight weeks.

Q. As his lawyer?

A. Yes.

Q. Correct?

A. One of my -- with you asking me questions about whether or not he was drawing and stuff, yes, we were trying to keep him focused in the courtroom so he would not be disruptive, not act out.  And that was the purpose of it.

THE COURT:  The reason I'm concerned, I had a conversation a long time ago with a state judge that tried a death penalty case, and I think it went all the way to the U.S. Supreme Court.  And the newspapers reported the defense lawyer who was appointed in state court was, you know, a retired real estate title examiner who has come out of drug rehab, was blind in one eye who slept through the trial.  And the judge was really irate that the newspaper reported that the lawyer slept through the trial when the judge said I was there and the lawyer did not sleep through the trial.

And it disarms me a little bit that a reporter from somewhere saying he slept through the trial when I did every single thing I could to stop him sleeping during the trial.

Swerling - Direct                          584

Every time I looked over and he appeared to have his eyes closed I would stop and do something.  So I will admit it for what it's worth, with that understanding.

MR. BURKE:  Thank you.  And we will move on.

THE WITNESS:  And I would like to say, I don't recall that he was sleeping.  There were a couple of occasions where, as the court just reported, that he would close his eyes, but there was -- one occasion I think we raised the issue that he was actually sleeping.  And that became a medication issue, if I recall.

Q.   (MR. BURKE) Susie, could you bring up Defendant's Exhibit 22, please.  Mr. Swerling, Defendant's Exhibit 22 is a memorandum from your co-counsel Greg Harris dated 9-13-04. Given the contents of the memorandum, which we'll go over in a second, I think that this might have been an ongoing memorandum that might have continued past September 13th, but the document will speak for itself.

Susie, if you could go to the second page of this.  And this is entitled jury selection, Basham, is the subject of the memo.  And can we go to a few observations, and can you raise that whole area for us, please.

Can you read number two for us, Mr. Swerling?

A.   By the third day of jury selection Brandon's relationship with the marshals had deteriorated and he was noticeably more distracted by the realization that trial had begun.

Q.   And what about number three?

A.   Intermittent outbursts between Basham and the marshals, Basham, Jack and me, and Basham and himself.  These outbursts were mixed with periods of time when Brandon would attempt to sleep through jury selection.  Attempted to sleep.  Brandon's inability to stay awake during portions of the jury selection is a matter of record.  That's what I said, I remember at least one occasion but I don't remember others.

Q.   Do you recall, as Mr. Harris noted, that Mr. Basham had intermittent outbursts with himself, between Basham and himself?  Do you remember him talking to --

A.   He would just shout out sometimes.  Could you go back to the beginning?  I thought there was something interesting in the beginning of this memo.  First of all, who wrote the memo?

Q.   Greg Harris, your co-counsel.

A.   Okay.  There was something in the first paragraph.

Q.   Okay.  We can increase that for you.

A.   Each morning Brandon, Jack, and I were provided with an outline regarding each individual juror and Dr. Follingstad's impression regarding their tendencies.  While we didn't give him a copy of every questionnaire he was upon his request allowed to look over each questionnaire regarding an individual juror.  So he was participating in jury selection.

        MR. BURKE:  Now, your Honor, we have references in our pleadings, and I won't go through these with Mr. Swerling

because they are just transcript records from the 7th of September, the 8th of September, the 17th of September, which addresses your attempts to work with Mr. -- with Mr. Basham to keep him awake and alert during the trial.

Q.  I would like though to look at Defendant's Exhibit 93, Susie, if you could bring that up.  Mr. Swerling, these are your handwritten notes from September 17th of '04.  And, actually, could you just read that entire entry for us, please?

A.  Yeah.  Brandon would not sit up, he has his head down, then he sits back and sleeps back in the chair.  He has refused my requests, Greg's requests, and Paige's requests. He said they can give him the death penalty, when I tell him the jury is looking at him.  We break, the judge talks to him, said he is tired of all this of.

Yeah, actually, I remember this exchange.  Will plead, sign the death warrant, wants to leave.  I said he needs to remain.  Can't render effective assistance of counsel.  We asked for a break, court refused, judge refuses.  So that's a situation that I can remember.

Q.  Do you recall, and, again, the records will speak for themselves, that judge -- that Dr. Schwartz-Watts testified or addressed the judge in an ex parte, at least one ex parte hearing on September 17th about Mr. Basham's difficulty staying awake and paying attention?

A.   That's what I was saying before.  I remember at least one occasion when we had that issue, and I thought it had to do something with the medication he took.  I could be wrong about that.  Obviously, my notes refreshed my memory that there might have been more than one occasion, but I was telling you what I remembered.  At least that one occasion that was the one time we called Donna over here.

Q.   And if the record indicates that Dr. Schwartz-Watts told the court that Mr. Basham was quite paranoid about legal counsel, would that --

A.   It wasn't me.

Q.   Okay.

A.   I don't think -- I don't think he had -- I don't think he ever said that about me.

Q.   No, and I think that's an accurate memory.  I think his difficulties were with Mr. Harris, at least in that regard.  And I think the record will reflect that.

A.   He had some kind of issue with Greg, and I don't remember what it was.  But, you know, Greg was doing a heck of a job trying to represent him, but he perceived something, I can't remember what it was.

Q.   On September 17th Dr. Schwartz-Watts also, and this is in the record, said we are seeing his brain damage.  Pretty much shut down, these are excerpts, and his brain damage making it difficult for him to relate to his attorneys.

Do you remember her making those statements to the court?

A.   No.  But she was my expert.

Q.   Now --

A.   If she felt he couldn't go forward then that's what we needed to do.  I listened to her.

Q.   The 20th of September is the day that we have talked about a few times.  That was the day with the struggle with the marshals.  I would like to look at Defense Exhibit 94, Susie. Now, and if you could for the 20th just enlarge all of that for us, please.

These, again, Mr. Swerling, are your notes from the 20th of September.  If you will recall, there was an incident in the trial in which the daughter of the victim may have made a comment in an elevator that might have been heard by a juror, and there was some question about that and the judge looked into it.

A.   Yeah, questioned the jurors, or the court did.

Q.   Can you read for me, please, the last entry of your hand notes on that page?

A.   About the dip?

Q.   Yes.

A.   The line before that, he's obsessing the whole time about the dip.  Yeah.  There was a big thing in this case.

Q.   So when you said obsessing, you mean he was focused on it and couldn't get off of it?

A.  He was just -- all he kept talking about is he wanted his dip.  And at one point the court considered it on a -- I don't remember if it was maybe a Friday or -- and then we came back on Monday and the court tried to work other ways, like nicotine gum or coffee, and the marshals didn't want him to have the dip.

And then as a couple of days progressed he kept talking about the dip, and which is Brandon's manipulation.  And he, as I recall what happened, was if we agreed or I had to agree to be with Brandon when he was having his dip during the breaks, and so that I would go back there in the holding cell and sit with Brandon while he had his dip.

Q.  Susie, can you scroll down that page for us of notes?  And we also see you have notes then from there were -- I'm sorry, Defendant's Exhibit 95.  I'm sorry.

And these are your notes from the 20th afternoon, and also the 21st.  And I would like to turn to page two of those notes.  And, Susie, if you could highlight the very last line, two lines for us, please.  And can you read that for us?

A.  Constantly talking loud, having problems with the marshals.  What day is this?

Q.  That is the 21st of September, the day after the incident with the marshals.

A.  He did that.

Q.  And then, Susie, can you go to the next page of that

exhibit, which is a continuation of the note from that day.

And, Mr. Swerling, could you read for us, there are two lines crossed out, but can you read the entry after that? There we go. Yeah. What does that say?

A. He was laughing, he was sitting inappropriately, looking inappropriately. Kept talking, telling him to stop. I made a deal with him to give him five dollars a day if he was quiet.

Q. And then could you, Susie, scroll down and highlight that entry for us, please. This is for the next day.

And I will read this for you to give you a break. Starts right off with dip. Before break, dip. During -- maybe you have to read that for me. During, something, trial, dip. After break, dip. Before lunch, dip. In your experience as a defense lawyer are you familiar with the psychological or psychiatric term called perseveration?

A. Who?

Q. Perseveration. Have you ever heard that term used?

A. I'm not sure I have. But I do know Brandon wanted his dip.

THE COURT: What is the term exactly?

MR. BURKE: It's P-E-R-S-E-V-E-R-A-T-I-O-N. And in lay terms, as I understand it, your Honor, it's an inability to remove yourself from a specific thought. And I've heard the example given of the movie Rain Man when he keeps talking about Judge Wapner, 4:00 o'clock. That type of thing is

considered a perseveration.

THE WITNESS:  Can I explain something in response to that, now that I know what it is?

MR. BURKE:  You can explain to Mr. Daley when questions you.  I don't have any more questions on that issue, so --

THE COURT:  We will let you come back to that on cross.

BY MR. BURKE:

Q.  Susie, can you go to Exhibit 96, please?  We're on to the next day now of -- we're at the guilt phase of the trial, and, Susie, can you highlight all of September 23rd for us?  And the 24th, as well.  That's fine.

And again I'll read what I can for you, Mr. Swerling. These are your notes for September 23rd.  Every day the dip. Now he wants me to spend lunch with him.  Morning break with him.  Says he wants to ask questions but conversation is really about dip.  And the next day you also have more dip incidents, correct?

A.  Yeah.  I mean, he wanted his dip and he -- there has been a discussion about whether he was going to get it or not, then there was a discussion he was not going to get it.  And he was just -- now, let me just say this to you.  This does not mean that we were not -- other things were going on, you know, that he was paying attention when we were in court, that he was

doing things in court.  This was not a constant -- I think you are trying to suggest that because I wrote it there it was constant dip, dip, dip, dip, dip.  It was not.

Q.  Well, I think --

A.  I made notes that he was asking for the dip, but that doesn't mean it was the whole afternoon and the whole morning.

Q.  Well, I think --

A.  There were other things going on.

Q.  And they can speak for themselves, but I would note on those dates when you were taking notes of what you thought were important there's no reference to any other information, isn't that correct?

A.  Well, I don't know.

Q.  Well, the notes are in front of you.

A.  I'm making a note there, obviously, that I wanted to reflect in my notes that he was asking for the dip.  But what I'm saying is that does not negate that there were other things going on in court that day and other discussions I had with him.  It was he kept coming back to the dip.  And it was getting to a point where he was -- he wanted his dip and he was -- he just was not going to get off that issue.  But not to the exclusion of everything else that was going on.

Q.  Susie, can we look at Defendant's Exhibit 97, please.  And if you could -- the September 30th entry is the date when the jury was being charged with instructions in the guilt phase of

Mr. Basham's case.  You did take some notes about that going on.  Could you read what you wrote after the asterisks for us, plea.

A.  During this difficult discussion the defendant is driving me crazy about the dip.  Which is what he was doing.  And now he -- that's what Brandon wanted.  Nothing else was going to satisfy him, the gum, the coffee, he wanted dip and he figured out a way where he could get dip in here and that's what he kept pushing.

Q.  He couldn't get his mind off of it, could he?

A.  He got his mind off of it, Mr. Burke.  These are notes that reflect that he was raising this issue with me.  But he did get his mind off of it when we were sitting in court.  These were just he kept -- would come back to it.  Now, you are trying to make this as a realtime situation.  There were other discussions we had during that period of time.

Q.  Well, Mr. Swerling, you have your spiral notebooks still in your possession, and what we're showing you are your notes from those days.  And would you agree with me that the vast majority of your notes from the guilt phase of trial concerns Mr. Basham's fixation on obtaining dip?

A.  No, I would not agree with that.

Q.  Well, the entries will speak for themselves on that.

A.  I made entries about the dip because it was an important issue.  But what you are trying to suggest is that the only

discussions we had, there's no way to make notes about your discussions all day long or what's going on in court all day long.  I was making these note because there was -- it kept coming back to that issue.

Q.  During these instructions to the jury was Mr. Basham driving you crazy with his --

A.  I don't remember.

Q.  Well, your notes say on November 30 -- September 30 --

A.  Tell me where.  Let's see.

Q.  September 30, the jury charge, during --

A.  You are talking about during this difficult discussion?

Q.  Right.

A.  He was asking me about dip.

Q.  Susie, do we have the transcript for October 26th of 2004?  If not I'll just -- could you go to page 92 and 93?

Now, Mr. Swerling, while she brings that up, October 26th was well into the penalty phase of the case.  And I would like, Susie, at the very bottom of that page Mr. Swerling addresses the court, if you could highlight that.  Yeah, that would be perfect.  Can you highlight down there to the next page for us?

So on the 26th of October, Mr. Swerling, you informed the court, before you bring in the jury I need to put this on the record.  Mr. Basham is slurring his words, he seems to be groggy and just out of it.  That is, for lack of a better

word, he was sleeping when Mr. Harris was doing the direct examination of Dr. Brawley. I just think that the record needs to reflect that, Judge. I understand that in the past he's caused delays but I think that this particular situation is not his fault. His medicine I think is taking affect on him that he normally had at night when he would go to sleep.

So this was one of those occasions in which you were concerned about his competency?

A. Doesn't talk about competence, just slurring his words. And I don't think I raised the issue of competency, I just said I wanted the court to be aware that he was slurring his words, he seems to be groggy.

Q. What would be the purpose of informing the court of that?

A. I don't remember. It's nine years ago, eight years ago.

Q. I would like to move on to another issue, Mr. Swerling, and that concerns the evidence that was presented in this case concerning the abduction of Samantha Burns.

Early in the guilt phase of Mr. Basham's trial the government presented testimony of 11 witnesses, by my count, who testified exclusively about the disappearance of Samantha Burns. You did not object to any of that testimony. Can you tell us why?

A. If you give me a moment.

Q. Certainly.

(There was a pause in the proceedings)

THE WITNESS:  Yeah, there were -- the court had ruled in March, March 5th, 4th or 5th, that all the evidence from the escape to arrest was intrinsic to the crime.  And the government called witnesses, starting I think with Melissa Jeffers and possibly ending with John Burns, I think.  But there were a number of witnesses and they were family or friends of Samantha Burns.  And each one of those witnesses was asked specific questions about the events of that day or the day before.  So the government very cagily was putting them up on the stand and but asking them specific questions concerning the disappearance of Samantha Burns.

My feeling at that time, I would think, looking back now and trying to refresh my memory, because I have no specific recollection as to what the issue was at that time, but just using my experience at that time and what I think I would have been thinking at that time was that we were not going to object to -- we had already objected to the testimony, we did not --

Q.   (MR. BURKE) When did you do that, Mr. Swerling?

A.   Back in February.  And there was an order issued in March by the court that everything between escape and arrest was intrinsic to the crime.  That would have included Samantha Burns.

Q.   And what --

A.   So -- if I can finish my answer.  So I used my experience

as a trial lawyer to decide not to object, which is something that I think is instinctive in a trial lawyer.  There are times when you object and there were times when you don't object.  You don't object when the parents of a victim are on the stand and they are not -- there's nothing in that testimony that's specifically hurting you.  So it's instinctive, it's experience, and that would have been the reason probably why I didn't object, because I did not want to have a negative inference from objecting to the friends and family testifying.

Q.  So just to make sure I understand, you are not saying the reason you didn't object was because the judge had already resolved the issue --

A.  I just said that.  The judge ruled that it was admissible, that the evidence concerning Samantha Burns was admissible.

Q.  As intrinsic evidence?

A.  As intrinsic evidence.  There's an order, March 4th.

Q.  And we will talk about that in a minute, Mr. Swerling. But in your experience then when a judge rules that evidence is intrinsic to the crime with which the defendant is charged does that mean that all evidence then just comes in and --

A.  No, you know better than that.  When I objected, for example, when Basham was in the motel with Roddy or Severance, I can't remember which one, and there was a police officer who was coming down on the motel, and there was some other --

there were some kids there, and I think there was some -- they were going to try and offer some testimony about Basham making a statement about shooting the cop or doing something to the kids, and I objected to that because I did not think that was intrinsic to the crime.  There was no crime.

So I did object to that.  I chose not to object specifically as to these witnesses, and all I can say is based on my experience and what I felt was the best course of action at that time.  And I've cross-examined hundreds of witnesses over the years and you decide when you want to object and when you don't want to object.  And, you know, people on the stand who are family of these folks, and it was coming in.  The fact that Samantha Burns was in, the fact that he knew about Samantha Burns, the fact that he with Richard Hughes told the officers that Samantha Burns was dead and where she was located, I did not think this testimony was something that I should individually object to when these people were testifying.

Q.  Did you consider filing a motion or making a motion outside the presence of the jury to the court asking him to limit the evidence pursuant to Rule 403 of the rules of evidence?

A.  Apparently -- I don't know.  If it's there, I did.  If --

Q.  You did not.

A.  Then, okay.

Q.   Okay.  This order that you mentioned, I never -- you said you filed a motion to preclude --

A.   I don't remember.  I know there was a motion -- at that point in time we were joined with Chad Fulks and there were motions filed and the court allowed us to adopt each other's motions.

Q.   You were adopting --

A.   I don't know that.

Q.   Well --

A.   I have no recollection of it.  There were hundreds of motions filed between both sides, I guess.  Scores of motions.

MR. BURKE:  My review of the record, your Honor, and the government can correct me if I am wrong on it, is there was a motion filed prior to the Jackson v. Denno hearing by the Fulks counsel.  But, of course, counsel had an understanding that they would join in, in which the court asked the judge to -- to disclose -- to order the government, excuse me, which defense counsel asked the government to disclose all prior bad act evidence under 404(b).

THE COURT:  Right.

MR. BURKE:  And on March 5th you concluded that the time frame from the escape from Kentucky to the arrest of the two codefendants was -- all acts were intrinsic so the government was not required to disclose those as prior bad acts but they were required to disclose all others.

Swerling – Direct                    600

THE COURT:  And that was a Fulks motion, a Fulks 404(b) advance disclosure motion, basically.

MR. BURKE:  Yes, your Honor.

THE COURT:  And I think we did have a deemer provision in effect where each defendant was deemed to have joined in the other defendant's motions.

MR. BURKE:  Absolutely.  There was no question Mr. Basham would have joined in that motion if it were made.  And the understanding was that defense counsel had to specifically opt out of a motion --

THE COURT:  Right.

MR. BURKE:  -- to not be included.

THE COURT:  I'm trying to think back.  Seemed like on the direct appeal one of the two defendants, the Fourth Circuit went into some other bad acts that the court, Fourth Circuit agreed were intrinsic, some of the shootings and using drugs and so forth.  And the argument on direct appeal was I should have kept that out, and the court said it's all intrinsic.  I don't think they necessarily addressed the Samantha Burns issue, maybe.

MR. BURKE:  Well, I don't want to misspeak, and I can check during the break, your Honor, to see.  It's my understanding at least in Mr. Basham's direct appeal to the Fourth Circuit that his appellate counsel conceded that the Samantha Burns evidence was intrinsic and so they did not

address that.

THE COURT:  Right.

MR. BURKE:  Our focus, your Honor, is on the trial counsel's failure to ask your Honor to limit the amount and scope of that testimony.

THE COURT:  Because you say victim impact crept into it.

MR. BURKE:  Right.  And we would also point out, your Honor, and I won't go through this with Mr. Swerling because the record speaks for itself, but I can give your Honor the transcript entries which indicate that when, after the Fulks trial when you were handling Mr. Basham's trial, you on numerous occasions gave defense counsel the opportunity to persuade you that this evidence was not intrinsic.  And so you were -- there was never any discussion during Mr. Basham's separate trial that this matter was closed.

The record is perfectly clear that throughout you said to counsel, you know, other than telling me that it hurts your client, if you give me a reason it's not intrinsic I will consider that.  And that was never made.  There was never a 403 motion made to your Honor.  And then after the evidence came in there was a -- you addressed defense counsel and asked if they wanted a limiting instruction and they, and this is in the pleadings, but they indicated they would get back to you.

Ultimately, and I don't want to be testifying here, I

Swerling - Direct                                602

just -- this is something in the record that I don't want us to waste time going through, you can look at the settling the jury instructions in this case which occurred on September 28th, 2004, and there's extensive discussion on pages 24 through 33 where the court is going over a 404(b) instruction that it gave to the jury on this very evidence.  I would like the record to reflect that it was not necessarily this court's ruling that all of that Samantha Burns evidence was intrinsic, you gave the defense counsel multiple opportunities to limit it, narrow it, and even try to convince you that it should not come in at all.

THE COURT:  All right.

BY MR. BURKE:

Q.  I would like to move on --

A.  I would like to comment on that.  I don't believe there were multiple opportunities, as you're overstating it.  The court did invite us if we wanted to at one or two of the pretrial conferences prior to the trial that if we wanted to re-raise the issue he would entertain it.  But I think it's just being overstated.

MR. BURKE:  Okay.

THE WITNESS:  And if you say we did not, then we did not.

Q.  And I --

A.  Just one other thing.  I don't ask for limiting

Swerling - Direct                               603

instructions.  I don't like them.

Q.  I would indicate for the record that the court can look at the following entries:  August 25th at pages 114 and 115, September 15th at page 291, September 17th at page ten, all of those are just discussions regarding the admission of this Samantha Burns evidence in the midst of its admission.

A.  I would agree with that, just not numerous.

Q.  I would like to move on to what's claim 16, Mr. Swerling, in our case.  On August 25th, which was less than a month before trial, you filed a pleading informing the court and the government that you intended to introduce relevant factual assertions from the government's closing argument in Fulks' trial pursuant to Federal Rule of Evidence 801(d)(2)(B).  Do you remember filing that motion?

A.  I don't remember the motion but I remember the theory.

Q.  And what was the theory?

A.  That if we wanted to we were going to try and argue or put in, try and put in what the government said in the Fulks trial regarding Brandon Basham and Chad Fulks in the Basham trial.

Q.  And what was the --

MR. DALEY:  Your Honor, may I, if we're -- I think we about need to break, just as informational purposes, but also I do want to make it clear that the government understands claim 16 to only involve statements made in the closing arguments in Fulks' case.

Swerling - Direct                            604

THE COURT:  Right.

MR. DALEY:  I'm looking at the claim, and that's what it appears to be focused on.  I just want to make sure, and my -- Mr. Burke might very well agree, I don't know.

MR. BURKE:  Your Honor, through the process we have -- there has been discussion of the limits of it.  And I went back and looked at the way we represented the claim and I think Mr. Daley is being accurate.  We did in our pleadings limit it to the statements that were made by the government in their closing arguments.  So I will limit my questions to that.

THE COURT:  But I raised this earlier.  Can't an argument be made that the Fourth Circuit put this issue to rest in the 2255 appeal in the Fulks case?  Because they quoted, if I remember correctly, the Fourth Circuit quoted from the argument made in one case and the arguments made in the other case and explained how they were not inconsistent, so --

MR. BURKE:  Your Honor, they were addressing that in the context of whether there was prosecutorial misconduct to presenting inconsistent theories.  What we're doing is saying that trial counsel had the opportunity to ask you to rule on whether the information, statements made by the government at the closing in Fulks could be used in Mr. Basham's case.

THE COURT:  All right.  So there is a difference

Swerling - Direct                              605

there, I guess.

MR. BURKE:  There is.  And I will tell you, the Fourth Circuit did rule in Mr. Basham's case that they couldn't address the issue because it was never presented to your Honor.

THE COURT:  All right.  We've got about two minutes before we need to break.

MR. BURKE:  Might be a good time to break.

THE COURT:  Let's go ahead and break right now.  We will be in recess until 2:00 o'clock.  We will pick up the testimony at 2:00 o'clock.

(A recess transpired)

THE COURT:  Miss Floyd says we need to have a quick ex parte conference to talk about the telephone call?

MR. BURKE:  Yes, sir.

THE COURT:  Could the government lawyers step out just a minute, please?

(There was a pause in the proceedings)

* * * * * * * * *

THE COURT:  Ready to resume?

MR. BURKE:  Thank you, your Honor.

BY MR. BURKE:

Q.  Mr. Swerling, I have just two very brief areas I would

like to cover with you and then I'll -- I'm done with my questioning. So the first area addresses something I touched on right before lunch, that was the motion that you filed prior to trial to admit statements made by the government at the closing arguments in Mr. Fulks' trial. And the way that issue was left was that it was going -- the court did not rule on the motion, the government's position was until they had presented their evidence it was not an issue that needed to be addressed.

In our pleadings we have said that you never raised the issue again and we have alleged that that was ineffective assistance. Can you explain to us why you chose not to raise the issue again?

A. Well, again, you know, trying to think back eight years as to what the decision was at the time is very difficult. I would say that I assessed it, thought about it, tried to use my experience and knowledge in making that decision. And in addition to that, after reading everything and trying to refresh my memory, there was in August when we -- in some pretrial conferences there was a discussion about that, about the government's position using him, or some reference there about a puppet on a string.

And, of course, government's position at that time was that they were referring to the puppet on the string as to the different things that they did during the course of their --

from going from the escape until eventually their arrest and it really had nothing to do with the actual killings of Donovan and Burns.

So that obviously would have been in my mind when I was making that decision. I think the government was talking about at that time maybe, you know, that that in and of itself, you know, if we tried to use something like that might invite some kind of response or maybe something else should come in from their closing statement. And I felt pretty good at that point. Again, we were talking about the guilty or innocence phase of the trial, that we had established pretty much that Brandon was sort of the follower in this whole thing. All of our questions, every witness that we examined who had knowledge of the two of them was basically acknowledging that. So rather than create the issue I went ahead and just did not pursue it during our closing statements, or the closing statements. I thought -- I thought we had established it sufficiently at that point without getting into that issue.

Q. Okay. My other question for you, did that analysis apply equally to the closing statements that -- arguments that were made both at penalty and -- at the guilt and penalty phase? Was --

A. Specifically what issue?

Q. Well, the decision that you felt that you had enough

evidence without risking having damaging evidence come in. That's sort of what I understand your response to be. Was that also your analysis for the penalty phase, as well?

A. I don't know what the analysis was. I'm trying to think back after refreshing my memory as to what I would have been thinking about.

As far as the penalty phase, and, again, that was not the only issue about inviting some other information back from the government. I know what the government's theory was and what they would have argued because they revealed their hand in the August hearings. So that was a part of my decision, I would assume, in not going ahead and asking the court to admit that into the guilt phase of the trial.

As far as the penalty phase of the trial, I again thought, I would think that I thought, that we had made that particular issue -- we had developed that pretty well. And I would think that one of the issues was was that inconsistent with what they had said in both the penalty phase, the guilt phase and the penalty phase. And according to what their explanation was going to be it was not inconsistent because they were saying that they were equally responsible for the murder. They had never put up any evidence who they thought was the actual killer, either one of them. So I'm sure that would have entered into my decision, as well.

Q. But they did also argue that Mr. Basham was a puppet of

Mr. Fulks.  I mean, it's clear that they did make -- did make that statement with regard to Mr. Basham, correct?

A.  Yes, that was what they said.  But, again, if you look at the August transcripts, I don't know if it was the 4th or 25th, or something like that, their explanation was that was as to other issues in the case and not the actual killings.  And I think that it was -- the evidence had been developed that he was actually a follower in that case and by virtually all of the witnesses.

Q.  Okay.  My last questions concern the concessions made by defense counsel to the jury at the outset of the guilt phase regarding the various charges against Mr. Basham.  And there was a concession, essentially, to all elements with the exception of the intent factor for carjacking?

A.  Correct.

Q.  And can you tell us what your strategy was in making those concessions?

A.  Well, I think I said earlier that what I was thinking about, we were not going to plead guilty to the charges, I wanted to have a bifurcated proceeding so we could put the guilt or innocence evidence up front and then bifurcate the trial into the penalty phase but try and maintain credibility with the jury that if, when they found him guilty, that we could go into the penalty phase and legitimately argue in good faith and without any damage to our case that they should

spare his life.

So that was the overall strategy that I developed, or that Mr. Harris and I developed. And I'm sure there were many other reasons. I just drew on my experience as a lawyer trying many, many cases to try and make the best judgment at that time.

And I don't think there was ever any question or could be any question that Mr. Basham was going to be found guilty of those offenses. I mean, the evidence was overwhelming. What I was trying to do is adopt a strategy that I could save his life. He was not going to be found not guilty in this case.

And that was another reason, I was thinking going to lunch, about Burns. One of the things that I probably was thinking about at that point about letting that kind of evidence in and not objecting to it would have been get it all in to desensitize the jury or put the issues out there what they were going to be hearing during the penalty phase of the trial, as well, and try and get it up front, load it up front so that we could come in later during the sentencing phase and try and argue that they should spare his life. As far as the opening argument to the jury, I'd do exactly the same thing today that I did then.

Q. One of the -- and I will concede I'm not a trial lawyer, so but one of the thoughts that occurred to me when I read that and then I read the rest of the trial is that I can

understand the concept of wanting to concede in order to boost credibility with the jury. But the jury was told that Mr. Basham was guilty of a capital offense and then they were required to sit through multiple weeks of I believe more than 90 witnesses on those issues. Do you feel that that damaged the credibility --

A. Absolutely not. I mean, we had the Fulks trial to go by, and I've had other people who I have seen try to do that, to go ahead and just plead guilty. I just didn't think that that was the appropriate way to go and then try and argue the penalty phase. What I wanted to clearly do is have a guilt or innocence phase and then a penalty phase.

And what I thought the appropriate way to do was have a legitimate argument that I could make in the opening and in the closing that there was a reason why we were here, and the jury is going to have to decide whether or not the intent element was there in the carjacking.

So, no, I don't feel like that worked against us. I think that it was a legitimate strategy. That's a strategy that's been employed by many trial lawyers, particularly in death penalty cases. That's a strategy I've employed in many other homicide cases and other kinds of case. It's, for lack of a better word, I think I read it once it's called confession of error, that you admit particular conduct but try and gain your credibility later to argue a particular issue. And this issue

was going to be to try and save his life.

So I do not believe it was an exercise that hurt us at all. I think we got a lot of evidence in in the guilt or innocence phase that helped us in the punishment phase and separated the two. So, again, if I was to try that case tomorrow, my argument, opening argument would have been the same. I would not change that at all.

Q. And it was your intention to concede that Mr. Basham was guilty of a capital offense, correct?

A. Well, he's guilty of kidnapping, I don't know anybody could get around that, and that's a death eligible charge. I mean, to me, to stand up in front of that jury and say he was not guilty of kidnapping I think would have been absurd.

Q. Why would the jury then need to decide on the carjacking intent, if they had already been told --

A. I think I just explained it to you and you are not apparently understanding what I'm trying to say. I wanted a legitimate reason to be able to argue to the jury that why we're trying the guilt or innocence phase, it was a legitimate reason. In fact, the jury was out a couple of hours on that issue, may have come back for a charge on the intent issue again. I don't remember.

But I remember commenting, or people commenting, you know, you may have them confused about that. So it was a legitimate argument to make that the carjacking was something they would

have to decide on the intent element.  So I certainly understood that kidnapping was a death eligible charge, but I was trying to legitimize my guilt or innocence phase part of the trial so the jury would not think they were there wasting their time, that there was an issue.  And apparently they debated that issue.

So, again, I would do it the same way.  There was no doubt, there's no way in that case that the jury could not come back with a kidnapping verdict, so I chose the carjacking because it had a different intent element.

MR. BURKE:  Thank you.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. DALEY:

Q.  Good afternoon, Mr. Swerling.

A.  Mr. Daley.

Q.  I would like to go over your experience for just a moment. I know we went through a lot of it already but I would like to go through a little bit more.  In particular let's focus on your death penalty experience that you've had over the years.

A.  Yes.

Q.  Some of it will be repetitive but I want to try to get it into the order that will make sense here.  As I understand it, the first death penalty case you tried was the Wendell Moye

Swerling – Cross                    614

Q.  case?

A.  Yes.

Q.  Is that M-O-Y-E.

A.  M-O-Y-E.  It was a Transouth murder on Elmwood.

Q.  And this was one of the first, if not the first, death penalty case after the new statute came about in the late '70s?

A.  The recollection is it might have been the first trial.  I did the Harkness case, it was I think before that, and they did a guilty plea on that and both defendants were sentenced to death.  So obviously I had that, would have had that on my mind, as well.

Q.  The next case that, and these may not be in chronological order but I'll try to get them as close as possible, the next case would have been Donald Peewee Gaskins?

A.  To the best my recollection, that would have been the next one.  I mean, there might have been one in there, but to the best my recollection that would have been the next one.

Q.  And that involved a fellow who committed a crime while in prison?

A.  He carried out a contract to kill another death row inmate.  And Mr. Gaskins had been convicted of about nine or ten murders previously.  After Furman versus Georgia his sentence was commuted to life.  And while he was in prison he took a contract to kill another inmate on death row, and so

they went for the death penalty again after the re-institution of the bifurcated proceeding in the death penalty cases.

Q.  And then the next one ones may have been the Larry Gene Bell cases.  There were two of those?

A.  Yes, '83, '84, '85, in that area.  I think the trial was, the first one was in '85, maybe a year later was a second trial.

Q.  And in that case were there a number of instances where you stopped the trial to have competency evaluations done?

A.  Yes, that was -- we had a first trial, was in Moncks Corner, and Bell was an extremely difficult person to handle. And there were a number of cases, a number of occasions during the trial in Moncks Corner where I had to call in my experts to determine competency.  And, of course, in that particular case, as I recall, there was -- there really was no -- we had evidence and our experts opined that he might have been definitely incompetent at various points, maybe even before the trial.  And he had a lot of mental -- he had a history of mental illness, as well.

Q.  And the first trial was a guilt and penalty phase.  Was the second trial guilt and penalty phase or was it just the penalty phase?

A.  No, they were both, they were both guilt phases and penalty phases.

Q.  And so you were successful, at least in the first

Swerling - Cross                                   616

instance, of having his conviction reversed?

A.   No, not Bell.

Q.   No?

A.   I don't believe so.

Q.   How did it work out there were two trials?

A.   There were two murders.

Q.   Oh, okay.

A.   They were about three weeks apart.  One was in -- I think they were actually both in Lexington.  One was in Saluda, one was in Lexington, and there were change of venues granted in both cases.  And one was tried in Moncks Corner and the second one was tried in Pickens.  And he was sentenced to death on both of them.  It was a particularly gruesome crime, and he had killed two young teenagers and just -- there was some chilling things in the trial and he was sentenced to death.

Q.   The next case I have is the Steve Beckham death penalty case?

A.   I think there was one -- there was a death penalty case down in Aiken where we eventually, Mr. Harpootlian and I represented him, and we were eventually able to get them to dismiss the case because of some evidence that we found that --

Q.   This is before Beckham?

A.   Yeah, I guess before that.  I'm trying to think if there was anything else before that.  Robert South.

Q.  Okay.

A.  Dick Harpootlian and I represented him over in Lexington. He shot and killed a police officer just for the hell of it. And Harpootlian was -- that's when he and I went into practice together and he and I tried that case together.

Q.  And then the next death penalty case you believe was Steve Beckham's case?

A.  Probably Beckham in the mid '90s.  That was a contract for hire, and Dick Harpootlian and I had -- he had already, I'm trying to remember, he had already been solicitor and then came back out in private practice.  His office was one-half of a floor where we have our office at 1720 now.  We were not in practice together at that time.  But I said why don't you try this case with me, and we tried the case together again, and he was given a life sentence.

Q.  Brett Hollis, I guess?

A.  Brett Hollis would have been -- chronologically I'm trying to figure out when that was, whether it was before Basham or after Basham.  It had to be, I guess, before Basham, and that was a pretty difficult murder case over in Lexington.  The difficulty in Lexington is that the jury over there, I think Donny Myers had an incredible string of convictions in death sentences, and I believe the Hollis case was maybe only the second time that a Lexington County jury did not return the death penalty when Myers wanted it.  And there were a lot of

Swerling - Cross                              618

interesting issues in that case, as well, and the jury came back with a life sentence.  And I remember trying that.  I believe I tried that with some of the folks from the death penalty resource center.

Q.  And then I know there's at least one more case in which you were associated, I'm not sure you actually tried the death penalty case, but the Mitchell and Carlton Simms case?

A.  Yeah.  And, frankly, I remember that was down in maybe Berkeley County, Moncks Corner.  An individual had killed some -- executed some people at a pizza -- Domino's Pizza and he had gone out to California and done the same thing.  And we were involved in the South Carolina case.  I can not remember how it happened, but they sent him out to California and he was appointed a public defender out in California, and they went for the death penalty there and I basically acted, you know, did some work on the ground here in South Carolina to help them out in California.

So, I mean, that case was not tried here and I don't remember actually how it ended.  I was trying to think about that the other day, whether -- whether he's actually ever been sentenced here.  But we may have done a life sentence on that case because I believe he got the death penalty out in California.  And there was another one that John Blume and I did, we were down in Clarendon County where I think there had at least been a notice given, but we were able to work out a

plea. There are probably a few cases where notices had been given and we worked out a plea.

Q. Okay. So --

A. And I don't remember the name of that case.

Q. I'm looking in my notes. What about the State versus Bradbury case? Was that --

A. That was the one in Aiken I was talking about that we had, Harpootlian and I had represented, and we eventually had the case dismissed.

Q. Okay. Some murder cases, I know, I think I asked you this question in our interviews but I don't know that you were able to give a firm answer. How many murder cases have you represented somebody? Whether they actually went to trial or not, do you know how many murder clients you've had?

A. I would say all homicides, you know, from whatever means, probably close to, you know, somewhere in the neighborhood of 150 to 200. I think back in '90s I tried to do some kind of calculation, I remember coming up with some significant number. Somewhere in that area. That's not the ones that went to trial, but -- I've always had three or four murder cases pending at a time, generally.

Q. How many murder cases can you think of that have actually gone to trial?

A. Dozens.

Q. Dozens?

A.   I'd have to say dozens.  I don't keep track of them, but I know it's been many of them.

Q.   One of the allegations is their claim nine where they talk about the fact you shouldn't have conceded in opening certain things and you did it for strategic reasons.  In a similar way have you had instances in your state practice murder cases where you are going to concede perhaps some, maybe even the killing, in the hopes of getting a lesser charge?

A.   Yeah, I have done that many times where, you know, there's no question about someone has done the killing, there's no question that a jury could come back with murder, and I have tried to argue up front that it was maybe voluntary manslaughter.  In other words, concede that there was a death, concede that there was, you know, a killing, an unlawful killing, and hope the jury comes back with a lesser charge.  So, I mean, that's a fairly typical strategy.

Q.   And let me just give you the names of a few of the cases that we talked about previously in our interviews.  Willy Earl Reese, is that a case where that --

A.   That one, unfortunately, he was found guilty of murder.  That was not a manslaughter.

Q.   Okay.

A.   But we tried -- that was one of those cases where we tried to argue that either, I can't remember if we -- what happened in that case is he put the gun up to his wife's head and shot

Swerling - Cross                                    621

her.  And I think he was arguing it was accidental and we were trying to, you know, argue that up front, trying to get a reduction in charge, obviously, from the jury.  But they came back with a murder.  It was a contact wound.

Q.  What about Willy Wiggins?  Remember that case, Willy Wiggins?

A.  The name is familiar.  I can't remember from where, though.  Maybe upstate, Bennettsville, somewhere around there.

Q.  What about Fay Huggins, or --

A.  Fay Huggins was a case I handled on appeal, got it reverses and then worked out a plea for time served, I believe.

Q.  What about Albert Fuller?  Was that a case that started as murder and ended up --

A.  Albert Fuller was a prison guard who was out near Mary's Celebrity Club.  He was accosted by a couple of guys, driven off the road, he came out of his car shooting.  And he was run off the road, actually.  And he was Afro American, they were two white males.  And the interesting thing about the Albert Fuller case was State versus Davis had come out in '84, which was -- the Supreme Court spoke out and said these are the four elements of self-defense.  And when we tried Fuller the court which tried that case, and I can't remember which judge it was, but only gave the State versus Fuller charge.  And we asked for all the other charges that would come along with

self-defense, like appearances, size, parties' -- prior acts of parties.

And so he was convicted of one of manslaughter and he was found not guilty of one. And we took it up to the Supreme Court and the Supreme Court decided that he was entitled to all of those charges, not just the State versus Davis charge. We went back to trial and he was acquitted.

Q. So if there had been any possibility that you thought you can pursue a strategy where perhaps Mr. Basham would not be convicted of a death eligible crime, would you have pursued that?

A. Oh, sure. I mean, yeah. I mean, that's not an easy decision to make, you know, as to whether or not, you know, you go in and go ahead and front load it and admit or confess some error in the case. I mean, you have to -- you would only do that in a situation where you were trying to save your chips for later and argue either for a lesser offense or you were trying to go ahead in a death penalty case and try and save a person's life.

Q. A few of the publications that you've done, you talked about, there has been some criticism about the cross-examination in some instances. Have you written a law review article about cross-examination for the South Carolina Law Review?

A. I wrote a law review article on cross-examination, and I

put a chapter on closing argument and cross-examination in Ralph King Anderson's trial book, Circuit Judge Ralph King Anderson. And I -- I've done a number of lectures on cross-examination, because it's really one of my passions.

Q. And I was interested about your comments earlier that you're adjunct instructor at the medical school. Could you explain how that came about?

A. Well, it came about after the Bell case. I worked so closely, there were a number of psychiatrists and psychologists on both sides of the fence, and so there was a -- there were a lot of things going on in that case dealing with mental illness. And at some point Dr. McKey, who was a forensic psychologist who testified for the state, thought it would be a great idea if I came over to the medical university and started working with their staff over there.

I think at that time it was the William Hall Institute that we started with, because that's where they did the forensic examinations at the Cooper Building. And then it transferred over at some point in the medical university itself when they took that over.

So over the years I've worked with some of the residents over there and I've conducted seminars with the staff there, social workers, psychiatrists and stuff. And one of the things that I've talked to them about is preparing them for cross-examination.

Swerling - Cross                                    624

Q.   We're going to pull up what's already been admitted into evidence as Government's Exhibit 8.

            MR. DALEY:  May I approach the witness, your Honor?

            THE COURT:  You may.

Q.    (MR. DALEY) One of the allegations is that you were ineffective in compiling a mitigation team, a defense team well, and so I thought I would go through this just for a moment about the defense team.  And, as you can see, I think -- I think you've reviewed this at least once in the interviews that we had, is that correct, Mr. Swerling?

A.   Yes.

Q.   And in it I think it lists the person, whether they are an expert or not, what their role was, the general times in which they were involved in the case, and then in some instances the amount of time that they -- I believe their vouchers reveal how much time they spent on the case.  Is that correct?

A.   Yes.

Q.   I'm not expecting you have read every single page of the underlying documents but I know you have reviewed it.  Does that look like a full and complete listing of the defense team for the Basham case?

A.   Yeah, it -- at a glance it does, yeah.

Q.   Let's just go over for a minute a few of the -- well, the players on the team.

A.   Okay.

Swerling - Cross                           625

Q.  There was -- obviously, you were first appointed, is that correct?

A.  Right.  Somehow or another in the back of my mind David Bruck, who I worked with, and John Blume, they were together, and but David called me and asked me if I would accept -- be willing to accept a death penalty appointment.  And I think he said Cam Littlejohn and William Monckton were out of the case at that point.  And he called me and asked me about that.

He did say at that point that he would not be in the position of, you know, supervising it but he would have someone else, and I guess that's when Ken McNally came in.

Q.  And then shortly thereafter Mr. Harris was also put on the case, maybe in the same order --

A.  I think David Bruck may have suggested that someone, that I be appointed in the case.  I don't remember how that happened.  And then Greg Harris came in on the case.  And Greg and I shared an office together for 14 years.  And I just had, you know, a very close, like brothers, and we confer all the time, so it would -- it was a perfect arrangement.  He was in the office, and I thought his skills were incredible, as well. So it was a great combination, I thought.

Q.  And then the investigators or the mitigation specialists in the case.  There was Lesa Watson, and she was out of Kentucky?

A.  Yeah.  And I don't remember, we may have gotten her name

through David Bruck or Kevin McNally as someone up in that area who could act as a mitigation specialist/investigator.

Q.  And Paige Tarr was --

A.  Paige was I believe already involved in the case with Cam Littlejohn and William Monckton.  And I knew Paige and knew her husband, who is a lawyer, as well.  And we -- I kept her on in the case.

Q.  And then there was Carlisle McNair who we have had talked about on direct a little bit.  And you said you used him previously before this case?

A.  I know we were -- we opposed each other several times in Lexington County when he was a detective, he worked up some of the cases that I tried.  And after he left Lexington County it's possible, I believe I said that I may have used him between his retirement, or whatever it was from Lexington County, and the time of the trial.  I can't give you a specific case, but I think I did.  So I got him involved in the Basham case and used him a number of times after the Basham case.  He was my go to investigator for a period of time.

Q.  And then we also have on the list a Greg Cook?

A.  I don't remember how he got involved.  I think -- well, I can tell you he got involved through the West Virginia case, because I think he's an investigator up there and we may have gotten his name from Gary Collias who was my co-counsel in

that case for a period of time I was involved in it.  But I don't remember exactly how he got involved in it.

Q.  So you actually at this point had investigators based out of Kentucky, out of West Virginia, and then out of South Carolina, as well.

A.  Correct.

Q.  Okay.  And going, moving down the list, Harrison Saunders?

A.  Harrison had been working for me since he was about 19 years old in various capacities, in college, law school, and then -- I think he graduated maybe in 2002, law school, and I employed him as a lawyer, as well as having previously employed him as a clerk.  And we're just very close, and he's a very capable and competent guy.  And he's back in my office now.  Not employed by me but sharing office space.  He left for a couple of years to go do some personal injury work but he's back.

Q.  And Steve Hisker, another lawyer?

A.  Hisker was a law clerk who became a lawyer and I employed him as a lawyer.  He and Saunders were the two lawyers in my office at that time that I employed.

Q.  And then I know that there was a Carolyn Graham who I guess was the investigator and paralegal?

A.  She was a paralegal.  At some point, I don't remember whether it was during Basham or after Basham, she and Carlisle McNair formed a business together.  And probably was after

Swerling – Cross                    628

Basham.  But she was my paralegal for a number of years.

Q.  And let's go to the lineup of the some of the experts and then we will see who's left here at the end.  Tora Brawley was the psychologist?

A.  Yeah, Tora is a well-known, respected --

Q.  Neuro --

A.  I think it's called a neuropsychologist.  And she is definitely a go to person when you have a case that requires that kind of discipline.

Q.  And had you used her before, or how did you come across her, do you remember?

A.  Well, I know I've used her, whether it was before or afterward.  She and Donna Schwartz-Watts worked a lot together, so I can't remember exactly.  I've used Donna Schwartz-Watts for a long time.  I've used her, Don Morgan.  I didn't hire Don, I guess he did some evaluations.  Harold Morgan.  So as to where these people fit in, but I have been using Donna for a long time.

And Donna, the reason I like Donna Schwartz-Watts so much is that she calls it like it is.  She has come back and told me I didn't have anything in a case, as well, that she could not help.  So I know that she and Tora worked together quite frequently.  They both might have been employed by the medical -- the school of medicine in Columbia at some point, or the university hospital, something like that.

Swerling – Cross                         629

Q.   So Dr. Brawley and Dr. Schwartz-Watts came on, Dr. Donald
Morgan was brought on more as a treating physician?
A.   I met Don Morgan during the Bell case.  I think he was the
head of the forensic unit at that time and he headed up the
forensic unit for South Carolina for years.  He had been the
psychiatrist over at Walter Reed, he was just an incredible
guy.  And so he was somebody we called in on this case.  He
had retired at that point and so he was brought in on this
case.
Q.   Dr. William Brannon, a neurologist?
A.   I have met Dr. Brannon before.  From what I understood
from Dr. Brawley and Dr. Schwartz-Watts, his willingness to
get involved in the case was a big coup because he did not
generally do criminal cases.  But he was a widely respected
neurologist.
Q.   Janet Vogelsang, Jan Vogelsang?
A.   I did not -- I met Jan during this case.  And she was
referred to us, I don't remember by who.  But she apparently
had had experience in a number of death penalty cases.
Q.   And she did his life social history kind of from birth to
the point he was arrested.
A.   Right.  Mr. Harris worked with her pretty closely.
Q.   And then we have got -- actually I left out one person who
was a mitigation investigator, Melissa Kimbrough, Lisa
Kimbrough?

Swerling – Cross                          630

A.   Yeah.  At one point Lisa Kimbrough started doing some of these chronologies and helping us with records, extracting or abstracting from records.  And she was actually in our building, 1720 Main Street.  At some point we moved her upstairs to the offices next door to me that I rented.  And she was right there and she was -- she was very effective.

Q.   We also on the list have a James Aiken.

A.   Yeah, Mr. Aiken was a -- he's been an expert in many death penalty cases.  And I believe he was the warden, I'm trying to -- I apologize, but I can't remember.  He was the director of the Department of Corrections, a commissioner, or he was the warden at CCI.  I apologize, I don't remember exactly.

Q.   You had a couple of law clerks.  It looks like one is Shealy Boland.  Do you remember what she did?

A.   Shealy was one of the law clerks in the office.  I think she might have been Greg's law clerk.  And, of course, she did work on the case, but she was not a -- she wasn't part of the financial -- we weren't charging for her.  I don't believe she was getting any remuneration.

Q.   She was doing the time line or chronology that we're going to talk about in a little while?

A.   That's from refreshing my memory and talking with people, that's what she did.  I have really -- I remember her but I don't remember exactly what she worked on.

Q.   And then you had a jury consultant Diane Follingstad?

A.  Diane Follingstad was a psychologist I worked with on cases before.  And she was one of the few in this area who did any work on jury research.  She had also done a lot of evaluations for me, along with Dr. Harold Morgan in years gone by.  I think she's left the area now.

Q.  And then a couple of reading clerks, Dan Goldberg and David Good.  They would go and read discovery or documents to Brandon Basham?

A.  Yes, among -- it seems like there was something else I had an -- I just can't remember.  Yes, but that's what they did.

Q.  Okay.  There may be a few others.  I think Jean Strickler, maybe, and Linda Brown?

A.  Jean Strickland was a secretary, Steve Hisker's secretary, and she did a lot of work on getting the vouchers together and did the motions, kept track of the motions.  But, yeah, she was another one.  I was just -- the reason I was looking is that she was not actually on paid staff.  We weren't submitting vouchers for her.

Q.  Mr. Swerling, you have been accused of not supervising people closely enough.  And from the questioning on direct it appears one of the allegations is that you weren't directing information that needed to go to certain people.  How would you describe your supervision of this team, this fairly large team spread out over several states?  Would you call it one of a hands off approach or one that was closer to a micromanager?

Swerling – Cross                         632

A.   Well, I mean, I tend to micromanage.  That's kind of just my nature.  And so I probably stayed on top of all these people.  At some point we divvied up the responsibilities, like Mr. Harris, Dr. Brawley and Dr. Vogelsang, or not -- she's not a doctor, I'm sorry.  But, you know, I tried to stay on top of all of it.

The rule was to go ahead and do a memo or to advise me of what was going on.  We had a basket outside my office.  If you did something, whatever it was, it went in that basket so I could review it and I can tell people where to file it.  And generally Greg and I would discuss all the time about followup and how we were going to follow up things.  Again, we were 15 feet apart and we spoke with each other numerous times during the day.  So I believe my -- I had hands on with all of these individuals.

Q.   Let's pull up Government's Exhibit 31, please.

A.   And I believe my vouchers would indicate that.  I'm not a timekeeper, I never did much with -- I probably have had in my 40 years maybe ten people that I've billed on an hourly basis. But in this particular case I really tried to put down whatever was going on in the case.  But I would say that probably it doesn't even come close to the number of hours that went -- were involved in the case, discussions, phone calls, meetings.

Q.   Let's look at Government's Exhibit 31.  This appears to be

an e-mail that you sent out in September in the case.  Can you explain what protocol or what procedures you were putting in place for the case to keep track of all these documents and all this information coming in?

A.  Yeah, this is what I was talking about, having -- this was outside my office, and they had to put everything in there and give Greg a copy.  And I said in here, this was September of --

Q.  '03, I think?

A.  I don't even see the date.  September -- it says September.

Q.  I think down at the bottom, perhaps?

A.  Okay.

Q.  All the way down.

A.  Yeah, September of '03.  But that Greg and I would be meeting daily, which, you know, we pretty much did.  I don't think there was a day that went by that we didn't have some discussion about the Basham case.

Q.  I want to get to this issue a little bit later.  Mental retardation, it appears that the suggestion is is that, you know, you didn't pursue that mental retardation well enough or that that information didn't get to the people that it needed to get to.  I mean, did you talk about mental retardation?  Was that an issue that you and Mr. Harris discussed and discussed with your experts?

Swerling - Cross                              634

A.   Yeah.  I think some of the memos that, or some of my handwritten -- I'm sure there are others, you know, I think y'all have seen.  I don't know, I wouldn't want to overestimate, it's got to be a thousand e-mails in the file, I would think, somewhere in that neighborhood.  But we -- our purpose was to gather the information.  And we virtually subpoenaed every medical record, every jail record, every school record that we could find, and we tried to get it out to the people in one form or another who were going to be following up with it, whether it be Lesa Watson, Carlisle McNair, Carolyn Graham, Paige Tarr, and also in one form or another tried to get to people who were ultimately going to be making some decisions about in the expert area.

   And what I said before was I don't remember the method of communicating, whether or not it was a memo to the experts or a phone call with the experts or sit down with the experts.  But, I mean, obviously what we were trying to do is get all the information we could, follow up on whatever information we still needed, and pass it on.

Q.   Let's go to Government's Exhibit 32.

A.   And if you will notice, Mr. Daley, a lot of these e-mails go to a number of, you know, like ten people or so.

Q.   I was about to say, let's look at the line, the block about who these e-mails were sent to.  So this would have been, at least at the time, perhaps the team in place that you

Swerling - Cross                                                635

were sending this e-mail to, is that correct?

A.  At this particular time that would have been -- Linda

Justice has been with me, she's my office manager, and --

Q.  That's' --

A.  My personal secretary, Linda Brown, she has been with me

like 25 years.

Q.  And then you have Carolyn Graham, e-mail, I guess?

A.  Jean Strickler, who was Hisker's secretary, Greg, Paige.

ECR, I think --

Q.  Was there a lawyer from Nelson Mullins involved in the

case for a while?

A.  Yes, Christina Rampey I think volunteered some time.

Nelson Mullins had a pro bono, I don't know if she came

through the pro bono program, but she assisted us for some

period time with some research.  Me, Tracey Thierolf, I think

that was -- she was one of the secretaries in the office.

Shealy Boland we talked about.  CJM is Carlisle McNair,

Harrison, and Yetto was Lesa Watson.

Q.  So you are keeping everybody informed.  There's basically,

when you are sending e-mails out, when memos are coming in,

it's getting shared across the whole team, is that correct?

A.  That was my goal.

Q.  Yeah.  And in this e-mail you are asking several things.

One, you are requesting, not requesting, saying they have to

do a separate memo for each interview.

A.   Yeah, I don't -- I tell my investigators I don't want a running investigative report, I want an e-mail, I want a memo on each person that's contacted, whether it's fruitful or not fruitful, that's the only way I can keep up with them, and stick them in a file.  So I think that's what I was probably saying there, a separate memo.

Q.   And they had to do a memo within five days, it looks like, from this --

A.   Yes.

Q.   -- e-mail?

A.   Yes, that's what it says.  Should be sent to us right away but in no event more than five days.  Monday of each week Greg and I would like a summary of what was done by you the week before.

Q.   What about team meetings?  Did you gather as a team?  And as he's thinking about that could you bring up Government's Exhibit 47, please?  Actually, the bottom part.

A.   Yeah, that's calling a meeting for December 23, 2003.  And those are the people who were -- Lesa Watson, she was going to be by phone conference, but everybody else was pretty much -- all of these people at that point were on premises, which also was a good thing.  The only one that was not was Lesa.  Carlisle had his own office.  But Jack Swerling, Carolyn Graham, Greg Harris, Harris Saunders, Steve Hisker, and I think Paige was using one of the desks next door, as well.

Q.   In your office?

A.   Yeah.  We had -- at that point I had not rented a lot of those offices in the -- next door to my office.  I bought that half of the floor sometime around this time.

Q.   And so you not only had the proximity of a lot of these people physically on the same floor, same building as you, but then to the extent anybody was outside of that area they were being kept in the loop by e-mails?

A.   Yes.

Q.   And did these meetings happen -- I mean this is on December 23rd.  I mean, how often would you have a group meeting like that, do you remember?

A.   I can't tell you how often it was.  I mean, I think the only thing I can to do is refer to the vouchers and the different notebooks I maintained.  I tried to keep pretty good records.  I can tell that you that e-mail was probably, looks like it was typed by me because at that time I only typed in capital letters because I couldn't do very well with the shift so I just typed it in one case, lower case or upper case.

Q.   Let's go ahead and go to claims two and 13, they are related.  Claim two is the allegation that you rendered ineffective assistance of counsel not preparing for and effectively litigating the Jackson v. Denno hearing.  Claim 13 is the allegation that you were ineffective because you didn't argue to the jury that Mr. Basham's post-arrest statements

were involuntary.

A.    Yeah.  If I can, over the weekend -- I had read all of these things, all the motions, all the transcripts prior to last week but I don't know that I felt quite organized on Thursday when I testified.  So I went back and tried to organize it in a different way so one can see what we were confronted with.  What I was talking about, trying to say on Thursday, was that there were some main statements that had been given that were sort of going to be the controlling statements in the case.  And it started with on, I would say, November 20th, which was a Wednesday.  He was arrested on the 17th.  So let me just go over this and maybe make it a little more intelligible than I was maybe Thursday.  He was arrested on the 17th, which appears to be a Sunday, and he was interviewed by David Sloane on site, no Miranda warnings.  He talked about at that point, I believe -- hold on one second.  He just -- only statement he made at that point was that I don't know why you are arresting me, he was just walking across the tracks.  There were no Miranda warnings, it was a spontaneous statement, so Miranda would not have been applicable.

On Sunday again he was given his rights by Todd Kelly and at 9:11 p.m. Kelly didn't ask him any questions but he heard another officer ask him something after the Miranda and he said I was shooting in the air.  Robert Brunte, also on that

date, did some interviewing of him after post-Miranda, and this was -- he was from the Ashland Police Department, and Mr. Basham said he did not know about a gun, he threw the gun in the water, he might want to talk to a lawyer.  Might want to talk with a lawyer.

MR. BURKE:  Your Honor, I would ask the record reflect Mr. Swerling is reading from whatever notes he prepared for his testimony.

THE COURT:  All right.  So noted.

Q.  (MR. DALEY) Mr. Swerling, just so the record is complete, those are just notes that you compiled?

A.  Yeah.  Anybody's welcome to them.

Q.  Reminding -- I mean, okay.

A.  And these were done in the recent week or two.  They were not something -- was not given to anybody because I just did them in preparation for the hearings.  We did litigate that and the court ruled that that was admissible.  That was one of the ones we asked the court to rule on.

On Sunday he was interviewed by Mooney, this is on the 17th -- I'm sorry, on Monday morning Mr. Mooney, who was with the Ashland PD, he acknowledges his Miranda warnings, he told Mr. Mooney he did not shoot, he tripped over a log and the gun went off, he fired to get the cop to start -- stop chasing him and he thought the cop was shooting at him.  And that was that comment he made in an equivocal statement about a lawyer, I

Swerling – Cross                    640

might want -- need an attorney.  And the court ruled that was admissible on February 24th or 25th, whatever date it was.

Then we get into the FBI, Scott Vito, November 18th, which was Monday.  And at that time I believe Vito knew that he was a suspect in a South Carolina kidnapping and a kidnapping in Indiana and shooting at an officer.  He got there at the jail at 11:00 o'clock and he, because of the equivocal asking for an attorney, he checked with his legal counsel, I guess, and it was determined by them that he could continue to interview him.  He had a signed waiver of rights from Mr. Basham on that date.  And they just -- what he did is discussed, and I'm giving you just a generality, but there was a general discussion about what happened from the time of his escape. He mentioned -- Vito mentioned Donovan for the first time and Brandon's remark was that last time he had seen Donovan was with Fulks at the Wal-Mart, and they did discuss the Hawkins case, and that was one that we presented to the court in the format that we did asking the court to rule on the voluntariness, and the court determined it was admissible.

Then Vito interviewed him again on the 19th, which was Tuesday, and got him to re-initial the Miranda form and he had a polygraph that day.  At that point what he had said was that generally that he last saw Donovan with Fulks and Fulks left with Donovan, came back alone to the hotel.

Then on the 20th, which was Wednesday, Scott Vito, the FBI

agent, interviewed him again and started 11:00 o'clock in the morning.  There had been no discussion of West Virginia at this point.  And I believe Pat Malley was also there from the FBI.  They did a new Miranda form, and the comments that were made generally were that he stayed with Beth McGuffin in West Virginia.  He told the FBI that Fulks had gotten an ID and a credit card from a girl in West Virginia.

As far as Donovan was concerned, Miss Donovan, he said that Fulks told him that he had sex with the woman and tied her up.  And there was some discussion about the area.  About 5:40 in the afternoon Barbara McGuire, who was the chief investigator for the public defender's Office there, came by and she described that she bullied her way in and spent about an hour and 15, 20 minutes with Mr. Basham and told him to keep his mouth shut and not to talk with the FBI but he said he was going to continue.  And she advised Mr. Vito after she left that Mr. Basham was going to continue to talk to him. Vito re-advised Mr. Basham of his rights after that and there was some kind of map drawn.  That was also presented to the court and was determined to be admissible.

On November 21st -- now, Mr. Harris interviewed Miss McGuire so we knew what Miss McGuire was going to say.  We could not call her because she had damaging things to say about Mr. Basham, and we have given both of you and Mr. Burke a copy of that memorandum.  But she was not somebody we could

Swerling – Cross                    642

call as a witness for obvious reasons, because she had –– her impressions of Mr. Basham were not good.

On November 21st the public defender went to see him, Mr. Hewlett, and Mr. Harris interviewed him.  Of course, Mr. Hewlett, according to the interview, as I recall, said he told Brandon to keep his mouth shut but that didn't work.  On November 22nd Mr. Hewlett went back to see him.  And so there were two days there Mr. Hewlett went to see him.  And now on the 25th, so far there wasn't a whole lot said until we get to the day when McGuire and Hewlett, McGuire is there and then ––

MR. BURKE:  Your Honor, I would object to the narrative.  If the U.S. Attorney has questions of Mr. Swerling that would be fine, but this is turning into a narrative.

THE COURT:  I sustain the objection on the narrative response.

Q.   (MR. DALEY) Okay.  As far as the context that you are trying to lay for us, you are setting forth sort of what happened up to this point and whether he's had a lawyer or not and what he's been advised of, correct?

A.   Right.  And the purpose of it is that there's been some question about why we didn't vigorously challenge the statements, and the whole purpose of this is to lay groundwork for the court to see that the real statements, the crux of the case came down to statements that were being made after he had counsel, after Miss McGuire came by on behalf of the public

Swerling - Cross                          643

defender's office, after Mr. Hewlett came by on behalf of the public defender's office and he continued to talk.

Q. Well --

A. So I was trying to -- what I was simply trying to do is explain that we're getting into the real meat of the cases, of the meat of discussions.

Q. Well, let's -- let me ask you some questions then regarding -- on November 25th what happened from your memory, and obviously in preparation for what you were going to do with this case, as far as litigating the Jackson v. Denno hearing, what happened on the 25th?

A. Well, the 25th was significant because at that point Mr. Hughes, Richard Hughes, had been appointed to represent Mr. Basham.

Q. And he had been appointed by the federal judge I believe in Kentucky?

A. Correct. Now, he had -- I think he actually had been appointed a few days before that. But on the 25th, and just so you know, Mr. Harris went up and interviewed him at one point, Mr. Harris and I went up together to interview Mr. Hughes. On that particular day Hughes met with Pat Malley at the jail. The other significant thing is that Brandon had actually called Mr. Malley himself and left him a message saying he wanted to talk to him.

So on the 25th there was a meeting with Basham with

Richard Hughes, who was his lawyer, Pat Malley, and Scott Vito. And this was when there was an advice of rights form done, and Hughes was providing directions to Donovan's body through Brandon Basham.

Also on that date -- so that was coming in, whether -- in some form or another the fact that Brandon was telling them where the Donovan body was seemed to be really critical in the case and it was being done with counsel being present. Malley wrote down Mr. Basham made some statements, or unilateral statements, also about an animal park, the gas station, the cemetery, tape being bought at the gas station.

Q. Now, and, again, this is all in the context so that you are setting up why it would have been -- anyway, why your strategy was the way it was in the Jackson v. Denno?

A. Exactly. Because now we're talking about counseled statements which were going to come in because they were counseled statements. You can start with McGuire and you can question whether or not that would have come in, but Mr. Hewlett was advising him to stop, Miss McGuire was advising him to stop, and now we have an actual meeting where Richard Hughes is telling the authorities how to find Alice Donovan's body and certain landmarks.

So this is, to me, was critical in the case and critical in our decision to try and, as we said on Thursday, embrace the statements, that the fact that Brandon was trying to

cooperate and was not asking for a lawyer, was trying to give them information even though it may not have -- at one time developed or it seemed to be truthful, but it was evolving. And so this was a critical meeting that day.

Q.  Okay.  And what -- anything happen after that?

A.  Well, Mr. Hughes was on the phone with the agents in South Carolina, as well, giving them a description about where Donovan's body was.  And I think one of the things that I tried to describe on Thursday was to try to use these hearings to try and get some good statements from the police.  I noticed on page 105 of the Jackson v. Denno hearing we, either Greg or I got, Mr. Malley to state that Brandon was cooperating to the best of his ability.  So these were the type of things that we were looking for in the way we litigated the Jackson v. Denno hearing.

Of course, then you had on the 26th Richard Hughes at Brandon's insistence --

Q.  And on November 26th Brandon Basham at that point is represented by Mr. Hughes?

A.  Correct.

Q.  And he is still speaking with the FBI?

A.  Right.  And has now given them information about Donovan's body, which would only indicate one thing, he was present when Alice Donovan was murdered.

Q.  And what happened on the 26th then at that point?

A.    The 26th, as I understand it, and from the testimony Pat Malley got a call from Richard Hughes and Brandon wanted him to convey to the FBI, because he was worried about Samantha Burns and he was concerned about the Burns case, that he wanted to convey to the family of Mrs. Burns that the -- their child was dead and the location of the body.  So he put them -- put himself right there in the middle of the Burns murder, as well, with the advice of counsel.  And he gave them information about where they dumped the body.  And according to Malley he passed that information on Joe Ciccarelli, I think is his name.

Q.    If I can now hand you -- or let's put it up on the screen Government's Exhibit 12.  I just want to go through this very briefly.  This was something that you were given fairly quickly after an interview that Greg Harris and Lesa Watson did of the three folks you've already talked about.  Barbara McGuire, who was she again?

A.    Barbara McGuire was the chief investigating -- chief investigator for the public defender's office up in Ashland. I don't know what the name of the county is, but whatever that county was where Brandon was arrested.

Q.    I think it says Polk County here in this memo.  Polk County.  And then who was again -- who was Brian Hewlett?

A.    Brian Hewlett was the public defender, and he was in court on the first day, and he sent Barbara McGuire over there and

Swerling – Cross                          647

she interrupted the meeting that he was having with Scott Vito. And, of course, you can read Barbara McGuire's interview and understand why we could not call her as a witness in the case.

Q. Right. And then the third person interviewed was Richard Hughes?

A. Yeah. He was very cooperative. In fact, he testified here, a portion -- I think the government called him as a witness. But he was the lawyer appointed on the federal case.

Q. Let's home in on couple of things. The top of page two at the -- near the top, if you will, this is Mr. Harris' notes about his interview with Miss McGuire. It appears that she was firm in her belief that he had been given his rights and he had waived them, he understood them, and despite advice to not talk he was continuing to talk.

A. That's correct.

Q. And then on page three she once again in her interview talks about the fact that although jittery, Mr. Basham was calm and emotionless during the four-hour interview. Is that correct?

A. Yes.

Q. And, again, she says that he understood his rights, he understood everything that she had told him, apparently.

A. That's correct.

Q. And, in fact, she, despite everybody else reading him

rights and having him sign an advice of rights form, she, too, did one that said he was waiving his right to an attorney and understood his advice of rights?

A.   That's correct.

Q.   And the next page would be page four, this is where Mr. Hewlett says that he requested that Basham stop talking because he believed Basham wasn't getting any credit for it, and that apparently Basham continued to talk to the police.

A.   Yes, that was on the -- right, exactly.

Q.   And then as far as the interview of Mr. Hughes on page five towards the top, Mr. Harris and Miss Watson in their interviews of Mr. Hughes said that Hughes said that the whole time I talked with him Mr. Basham was totally calm, he was more concerned about the West Virginia case than the South Carolina deal, but that Basham had reached a point where he was going to spend the rest of his life in prison and he decided to assist law enforcement in locating the body of Samantha Burns and Alice Donovan.

A.   That's correct.  And Mr. Hughes, there was no question that Mr. Hughes felt at that point that the best way to help save Brandon's life was to have him cooperate with the authorities and try to find at this point Alice Donovan's body.

Q.   And Mr. Hughes went so far as to even tape his conversation with Mr. Basham where he advised him that he

should stop talking and that Mr. Basham indicated he was not going to follow Mr. Hughes' advice.

A. Yes. Yeah, I mean, correct. Mr. Hughes was telling him that, but he was -- he was going to do it anyway.

Q. Right, and then the last --

A. That's what happened to Burns' situation, as well, as I understand it.

Q. Well, last page, page six, the highlighted portion, please, Gayle. Mr. Hughes also said that as to Mr. Basham's understanding of his constitutional rights, it was Mr. Hughes' impression that he understood them all, particularly because he had been told them numerous times.

A. Correct. And these were the three non-law enforcement people that we had to go to about the Jackson v. Denno issues.

Q. And then you said that you followed up later, so obviously after the Jackson v. Denno hearing. But we might as well go ahead and look at Government's Exhibit 13 now while we're on this topic.

You followed up with and interviewed both Mr. Hughes and Miss McGuire, and it appears down at the bottom of this that Miss McGuire reiterated, the next to last sentence, she said that he was not manic, he was coherent, he was using manipulation. He would not listen but he understood everything.

A. Yes. And he made some other comments which were not --

she described him as having no remorse.  Obviously, what I was saying before, there was no way we could call this woman to testify in the case.  But I forgot, I did interview her with Greg, apparently, on the second trip.

Q.  Why were you interviewing her again and Mr. --

A.  I can't tell you exactly now why we interviewed her again. Probably at that point I thought it was important to follow up on some questions maybe that we had.

Q.  In preparing for the Jackson v. Denno hearing you obviously interviewed these three folks.  You interviewed who else?  You obviously interviewed Mr. Littlejohn and Mr. Monckton.

A.  Yes, we talked with both of them.  Because this was, again, a continuation of counsel being involved in Brandon's cooperation.  They were trying to also save his life and felt like the best way to do that was to have him cooperate.  And, of course, he had advice of counsel at that point in time which would have made the Jackson versus Denno issue very difficult to litigate.

Q.  And did you interview any of the law enforcement that had done questioning of Mr. Basham?

A.  I have to defer to the memos and entries and vouchers.  I mean, independently I cannot tell you whether we did or not. I can remember bits and pieces.

Q.  And so by the 26th at some point it was determined that

Mr. Basham was going to -- he wanted to come down and try locate Miss Donovan's body, is that correct?

A.  That's correct.

Q.  And so then he comes down and the search ends up being fruitless.  But there was the hypothetical that y'all vigorously opposed, correct?

A.  I'm sorry?

Q.  There was the hypothetical that was opposed by --

A.  Yes.

Q.  -- Mr. Littlejohn?

A.  Yeah.

Q.  And that was vigorously opposed?

A.  Right, we did oppose that.  And we also, I mean, reference back to the transcripts from the Jackson v. Denno would also show that we were opposing, there is at least four, five pages that I was able to identify where we opposed anything, any statements other than statements had to do with directions.

Q.  Correct.

A.  The issue, to state it briefly, was that there was no proffer given in the case.  As everybody knows, the government refused a proffer.  And so basically it was fair game, whatever was going to be used -- whatever he said was going to be used.  Cam, Mr. Littlejohn, and Mr. Monckton made it very clear to everybody that it was not going to be an interview, but it was going to be used, the whole trip was going to be

used for directions so they could locate Miss Donovan's body.

There were statements made both to the sheriff and to -- about the deer.  There were a number of statements made that were not directional and we argued about those, we put forth those should be excluded, as well.  The court ruled that all the statements were admissible, including the statements on the 28th.  And but excluded -- sometime in, I think in August, the court issued an order excluding the hypothetical but having previously ruled on the other statements like killing the deer and that kind of thing.

Q.  So your strategy, in a nutshell, was to challenge, to the extent you could legally, certain statements like the hypothetical being outside, I guess, the scope of the directional -- you know, only directions were supposed to come in as far as --

A.  Being allowed.

Q.  And that to the extent you were challenging any of the earlier statements back -- the 17th through the 26th, it would have been simply for the judge to make a determination about whether they were voluntary or not, but you weren't going to vigorously oppose --

A.  No, we were not.  Because what we were trying to do is show this evolution of cooperation, not asking for a lawyer, being willing to talk to the police.  And then when it gets down to counseled, where he's being given counsel, that's

where the real meat of the case, that's where it really starts getting incriminating.  And you had McGuire, Hewlett, Hughes and Monckton and Littlejohn.  So we had to recognize that.  And we again tried to embrace all of it to make it beneficial for us to be able to argue later he tried to cooperate.

Q.   Let's put up Government's Exhibit 9.  Do you recognize this e-mail?  Take a moment to read it.

A.   I had forgotten about that.  What this particular e-mail, what happened was we were given -- I'm a member of certain list serves, criminal list serves?  But this particular one was dedicated, I believe, to death penalty cases, as I recall.

Q.   Okay.

A.   And I remember putting out this e-mail on February 19th just putting it out there to see what people thought about it, and someone named Niland, I guess?

Q.   Right.

A.   Texas defender organization, e-mailed back this particular document.

Q.   And so you were obviously wanting to find out whether there could have been some downside to vigorously opposing or attacking the statements because they were coerced, is that correct?

A.   Yeah.  And if you see the -- my particular e-mail was that some discussion had taken place, and I don't remember when, or maybe it was --

Q.  I think the judge had suggested, and maybe the government, as well, that perhaps that you could get yourself in a situation where you were going to be, I don't know the word would be estopped, but at least the evidence could come in that you had previously vigorously challenged it?

A.  Right.  And the court, I remember the court saying I'm not ruling on it but it is something for you to consider, and whether or not you would challenge the voluntariness of the statement and then try and later argue that you were cooperating.

That was not the controlling issue here, though.  That was maybe a factor that we considered but it would not have been the controlling issue.  I mean, we had already obviously thought about the idea that we were going to try and use this for our benefit, and recognizing that a number of those statements were really incriminating were coming in because they were with advice of counsel.

Q.  Let's go to Exhibit number 10.  This looks like another response to that question.  Take a moment to look at that.

A.  Yep.

Q.  Again, you're thinking about the issue, you put it out there, you are getting back advice, at least this attorney is giving you the advice that it could be a double-edged sword, isn't that correct?

A.  Yeah.  Could you move this up a little bit?  No, I'm

Swerling - Cross                                    655

sorry, down. Down. Yeah, okay. It was from David Ruhnke and a copy to McNally, who was our supervising lawyer to me and Greg. I was just trying to see who it originated from. But Ruhnke was apparently someone who's involved in death penalty litigation, as well. I remember the name. Of course, I also know McNally, or know of his name, I don't know that I've ever actually met him. But we were putting that out there to see whether or not, you know, we could gain some advantage by doing it this way.

Q. And then it looks like if you go to Exhibit number 11 you respond to Mr. Ruhnke and you explain what you are going to do.

A. Yeah. That is actually what I was reviewing with all those statements, and the only one that was not Miranda was the first one at the scene. And then one or two involved other lawyers. I simply wanted the judge to make the necessary Jackson v. Denno findings and not pursue the issue with the jury, right.

Q. Did you have anybody that was going to be able to come in and testify that somehow the statement was coerced?

A. No.

Q. One of the suggestions is that you should have put up a whole bunch of mental health experts to show the conditions made it so that this was an involuntary statement. Did that -- did that approach cross your mind? Was that something

that you thought about seriously doing?

A.   I think I said on Thursday that I certainly probably would have considered those kinds of issues.  However, this was the way we opted to go based on all of the information we had and trying to make what I thought and what Mr. Harris thought would be the best approach with our experience and our knowledge of the case.

Q.   And then you were obviously hoping to be able to then use that attempt to help, attempt to cooperate, you were hoping to be able to use that to some benefit, particularly in the penalty phase.

A.   Right.  Let the jury know -- there was a couple of things going on in the penalty phase, I'm sorry, in the guilt phase. Did you say guilt phase?

Q.   I was talking more the penalty phase.

A.   And actually we tried to develop this all the way through. We put a lot of evidence in in the guilt phase which also would have been something to argue in the penalty phase.

Q.   And in the Jackson v. Denno hearing you were hoping that the police officers would talk about how helpful he was, because they obviously wanted to show that it was admissible, and that would lock down their testimony to some extent?

A.   Well, we were trying to lock down their testimony in the Jackson versus Denno hearings and try to get some favorable comments about the fact he was cooperating.  Of course, the

government was taking a position that he was misleading people all the way.

However, when you get down to the statements that were given by Mr. Hughes, I mean there were certain things there that were irrefutable, the fact of the Amoco station, the fact it was in North Carolina, the fact the tape was bought, the fact there was an animal park sign, those things were clearly, you know, obviously helpful for the government.

Q.  Let's go to claim five in particular, the competency claim.

THE COURT:  Mr. Daley, I have a quick conference call I have to take at 3:30.  You want to take a break?

MR. DALEY:  This would be a fine time to take a break, yes, sir.

THE COURT:  Let's take a recess, 15 minute recess.

(A recess transpired)

THE COURT:  Please continue.

MR. DALEY:  Your Honor, with agreement of opposing counsel we are introducing two more exhibits into evidence. They are Government's Exhibit 224, which is a letter to the Fourth Circuit from Mr. David DeBruin, who was appellate counsel in -- it is in support of their CJA voucher.  It just tells how many hours they worked and what they were actually requesting for their work in the case.  And then Government's Exhibit 225 is one page of Mr. Swerling's notes dated 7-6-04,

Swerling - Cross                                    658

July 6th, '04.  So those are two more government's exhibits that are being introduced without objection.

THE COURT:  All right.  Very good.

Q.  (MR. DALEY) Mr. Swerling, let's turn for a moment to the competency issue, about your decision on how to pursue the issue in this case.  In particular, there is question as to why you didn't request a competency evaluation.  I think you've pretty clearly articulated that that's because you didn't want the government's doctors to get to Mr. Basham first as far as an evaluation.  At least in part that's part of the reason.

A.  Correct.  Part of it, right.

Q.  Is it also part of the reason you wanted to limit whatever the -- whatever the doctors did, assuming you are going to put mental health evidence in, which I assume you always knew you were going to put mental health evidence in, is that correct?

A.  Yeah, we knew that from the beginning based upon the history.

Q.  So but one of the questions on direct was well, then once the evaluation was done by Butner then that reason sort of falls by the wayside.  My follow-up question to you would be, though, weren't you also trying to limit the scope of what kind of evaluation could be done by the government doctors?

A.  I mean, I can sit back and try and remember about eight years ago or nine years ago.  I really can't say, but it seems

Swerling - Cross                              659

like that would have been something that would have been on our mind.

Q.  Well, isn't it true that in this case the government doctors at Butner were only allowed to do an evaluation up to the scope of the evaluation or the scope of what you were going to present to the court?  In other words, they couldn't do tests that you didn't do and since you weren't raising competency they didn't actually do a competency evaluation?

A.  Yeah.  Actually, you are refreshing my memory and I think that's correct.  I can't remember all the details of that, but your statement is correct, as far as I can recall.

Q.  And was there any reason that you wanted a full-blown, broad evaluation that would have included a competency evaluation by the government, if you could avoid it?

A.  No.  I mean, our own experts were saying he was competent and so there really would have been no logical reason to let the government pass on that issue, as well.  I mean --

Q.  So when you say your experts found that he wasn't incompetent except -- I do want to -- the caveat would be that at least that September 20th after the altercation with the guards, it may very well have been that he was not able to assist you for at least the time, is that correct?

A.  Right.  According to -- I mean our observations and trying to communicate with him, and Dr. Schwartz-Watts, her conclusion, that is correct.  But there were generally no

Swerling – Cross                        660

general issues regarding competency at all.  There were individual episodes, but not generally.

Q.  And so let's talk about your experts for a second.  Dr. Schwartz-Watts, who you said is somebody who is a straight shooter, I think is the term you used, correct?

A.  Correct.

Q.  She will -- she's testified for both the state and for the defendants, is that correct?

A.  She does an awful lot of work for governmental agencies, including the state, you know, in criminal prosecutions.  So, you know, I think she has a lot of credibility because of that.  She's not gotten into this niche of just testifying for one side or the other.

Q.  And then Dr. Morgan, as well, long time, well-respected psychiatrist, correct?

A.  From everything I knew about him and my own impressions, yes.

Q.  Now, these two were treating him and then also examining him quite frequently, is that correct?

A.  Dr. Schwartz-Watts had a lot of contact.  I mean, Dr. Morgan, I can't remember how often Dr. Morgan was going down there, but I know he was like the treating -- he was prescribing the medicine, he was the treating physician.  I just -- I do not recall how often he went down there.

Q.  On direct there was a bunch of -- quite a bit of testimony

Swerling - Cross                             661

about certain things, about his drowsiness, about his wanting dip, his using coloring books.  All this information presented to Dr. Schwartz-Watts, I mean, would it be a shock if -- would she have -- and she knew about this, is that correct?

A.  Yeah.  You know, I spoke, Greg and I would both speak with her during the course of the trial.  She actually came over here a couple of occasions.  So, yes, I have no reason to believe that she was not aware of it.

Q.  And I want to clear this up.  Did all Brandon Basham do was talk about dip or were there certain times, at least, lots of times where he was providing you with some information, was at least engaging in conversations with you, helping you with the case?

A.  Yeah.  That's what I was trying to say before when Mr. Burke was asking the questions.  To have dip in my notes doesn't mean that's the only thing being discussed.  I put it in my notes, obviously, because I wanted the notes to reflect that this is really getting -- this was an issue for him.  But it doesn't mean that was -- I mean, we were in court all day long together and we had a lot of discussions.  I would be back there with him in the back.  So there are a lot of things going on, but I noted the dip because the dip was an issue that was a problem.

Q.  And whenever something got to be such a problem that you felt like he was not competent or that there was concerns

about his competency, his ability to be able to assist you in the case, did you call on the court to stop the proceedings and call for Dr. Schwartz-Watts to come and examine him?

A.  Right.  Not only in this case, but in any case I've ever been involved with, that is just something I do.  If there's a question about competency, you try and bring in an expert.  I did in the Bell case a number of times.  I did it in this case several times, as well.  I'm not going to let someone be tried who's not competent without raising the issue and having that person examined.

Q.  And when you went to your experts, I mean, here's the question, when you went to your experts did they ever say, look, we need to stay the proceedings because he's in and out of competency so much that he's not competent?

A.  No.  I think that Dr. Schwartz-Watts appeared before the court on a couple of occasions, and some of them were in camera hearings which I don't have the transcripts from, but there were colloquies, I am sure, that I recall where the court propounded questions to Dr. Schwartz-Watts, as well, as well as we did, too.  So, I mean, she was here when those issues came up.  Nobody ever said we have to stop the proceedings, nobody ever suggested we had to stop the proceedings.  Never saw any reason to try and ask to stop the proceedings.

Q.  You understand that it's an ongoing obligation and

responsibility to monitor whether somebody is competent throughout the trial, correct? You didn't just make a decision on the front end and say oh, well, he's competent, I don't have to worry about that anymore, did you?

A.   No.  That would be so uncharacteristic of me from my past experience and in this case.  I'm very attuned to that and would not have let that happen without raising the issue.

Q.   Again, was there ever a time where you strategically or just because you were fearful of how it would impact the case not bring it to the court's attention if you had a concern about Mr. Basham's competency?

A.   No.  I mean, I think the record has those indications in there that I did bring it to the court's attention when I thought there was a problem.  Mr. Daley, Brandon was a difficult client.  Like I said, I had a lot of empathy for him but he was difficult, and we did everything we could to try and keep his attention focused and to keep the trial moving and make sure, ensure he got a fair trial.  But that doesn't mean he was an easy client.

Q.   No, I certainly wasn't meaning to --

A.   No, no.  I just want everybody to understand that.

Q.   Have you had other clients that were difficult like Brandon Basham?

A.   I have had several.

Q.   And they -- and what would happen in those cases?

A.   I'd bring in somebody who I thought was qualified to try and either give an opinion to the court that the person was incompetent, or insane.  Had some insanity cases, which in South Carolina are very difficult because of the McNaughton standard.  But I am not hesitant to bring in someone if there's a mental issue involved and there's a competency issue and whether or not the person is participating to some -- to the extent that they want to in a trial.

Q.   Let's go and pull up Government's Exhibit 225 while we're -- if you can blow that up just a little bit, Gayle, maybe the first -- a little bit further down, too.  There you go.

     Mr. Swerling, this appears to be notes that you took on July 6, 2004.  Can you read that what that note says?

A.   Yeah.  Conference with Brandon.  He mouthed off to Captain Johnson.  There was an altercation with four guards and he was carried to the room.  Actually, it seems like I was there when this happened.  They were bringing him to me, seems like that was the case.  Carried him to the room, left -- let out after 30 minutes, spent the -- he spent the whole time talking about the incident, about the guards and who was at fault, who started it and this and that.  And then he was manipulating me to buy him dip.  Brandon --

Q.   You used that phrase "manipulate" a number of times.  What do you mean by that?

Swerling - Cross                               665

A.   Well, Brandon, with me and a couple of the law clerks, the readers, was always trying to convince somebody to bring something in there.  And dip would have been contraband.  And, you know, he liked dip because it gave him a kick, a high.  I guess some high.  I've never had it.  But, I mean, the dip was obviously, during the trial, this was back in July and when he wanted me to buy him -- to get him dip, which I had no problem with the financial part of it, it was just bringing it into the jail, I wasn't going to do that.  So he plays games trying to get you to -- he will stay on a subject trying to get you to concede eventually.  And I can't -- the readers were under instructions they were to bring nothing into the jail.  I specifically remember a couple of instances, and I can't remember exactly what it was he wanted, but there were a couple of instances where he wanted them to sneak something in there.  And I just wasn't going to allow it.

Q.   I'm now interested in focusing on this middle part of the notes.  Would you, Gayle, would you mind just highlighting this little part right here?

     Can you read what your notes say.

A.   The number 5434 and 55 --

Q.   Is that like a discovery number?

A.   It could have been a Bates stamp number, but it was something I must have been going over with him and said he can read very well, he also has complete comprehension.  For

example, 5433, which was a letter from Cabinet, that was one of the institutions, he understands this was a finding.  So I made a note of that at that time.  What date is that?

Q.  That is July 6th, '04.

A.  Okay.

Q.  Is it your memory that he could read well, or you don't recall now?  I mean --

A.  I don't recall but that -- the note has to speak for itself.  I wouldn't have made the note if he did not.  Whatever was going on that day he read it and I made that note.

Q.  Okay.

A.  But I don't have any independent recollection of that.

Q.  I understand.

        MR. DALEY:  Beg the court's indulgence for a moment, please.

            (There was a pause in the proceedings)

        THE WITNESS:  Mr. Daley, and also with reference to that, I thought it might have been pretty important to make a note of it and that's why I did.  It must have been important to me at the time that he could read or was reading.

Q.    (MR. DALEY) Okay.  We will pull up Government's Exhibit 14, please.  Mr. Swerling, I think I'm going to give you the original here so you can read the whole thing.

        MR. DALEY:  May I approach, your Honor?

Swerling - Cross                              667

THE COURT:  Yes, sir.

Q.   (MR. DALEY) Handing you Government's Exhibit 14, if you'd take a look at that for one second.  What is that?

A.   It's one of the e-mails, a number of e-mails between myself and Melissa Meister dated April 15, 2008.  She was asking me a question about the competency hearing and why we didn't want him assessed.  And I responded -- initially I didn't get the text in her message but then I did and then I answered saying our own psychiatrist said he was competent, and she said thanks for the quick response.  It was like four e-mails on one page, it looks like.

Q.   And so you're telling the appellate attorneys why you -- why competency ended up not being an issue in the case.

A.   Right.

Q.   For the same reason you are saying right here, correct?

A.   And I would also say if competency was an issue there was no reason for me not to raise it, I would have raised it.  No benefit to me not to raise it, no reason I wouldn't raise it.

Q.   Let's pull up Government's Exhibit 160, please.  Mr. Swerling, this is a chart of time spent with various people and I wanted to just get from you, on this chart it appears that you met at least 40 times or talked with Mr. Basham 40 times for a total of 61, a little over 61 hours.  This comes from your CJA vouchers.  Does that sound like -- does that sound low or high, as far as the amount of time you spent with

him outside of court?

A.   I would say that -- I would say the overall hours that I spent on the case are probably underestimated because they probably didn't include a lot of things that we were doing, discussions, phone calls.  I tried to be as accurate as I could, so if I said if there were 40 entries and 61.35 hours, I would try -- I would like to say I think that that is accurate.

Q.   But at a minimum you met with Mr. Basham at least 40 times before trial?

A.   That's correct.

Q.   And Mr. Harris met at least 50 times with him, is that correct?

A.   Yes.

Q.   Which looks like it works out to over 160 hours total?

A.   Yeah.  And in actuality the reason, Harris went up to Butner more than I did.  The agreement was when they were going to -- Dr. Capehart was going to talk to Brandon one of us was going to be there.  So we went up there to Butner, but I think Mr. Harris went more often than I did.

Q.   And actually, looking at this chart, and it turns out that between 40 and the 50 times there are only four times, apparently, where you went and met him on the same date.  So we were talking about 86 times at a minimum that the two of you met with Brandon Basham.

A.   Yeah, that would be accurate.

Q.   And if issues came up did you -- would y'all communicate about issues that might be coming up with Mr. Basham, or just in the case generally, but with Mr. Basham in particular?

A.   Sure, we communicated all the time.

Q.   And if there was a concern about his competency you would have shared it with one another, correct?

A.   Yes.

Q.   And if you needed to you would have sent Dr. Schwartz-Watts out to examine him, to talk with him, correct?

A.   Yes.

Q.   And, in fact, she did, didn't she?

A.   Yes.

Q.   Let's go down to the bottom here of this same chart.  And it looks like you met with Dr. Schwartz-Watts the chart says 29 times and for a total of almost 70 hours.  Again, does that sound like a reasonable amount, or maybe met with her more, or hard to recall?

A.   You know, the only thing I can pass on is the overall hours.  Individually I would assume that is fairly accurate. It might be a little bit under, it's never over.  I always give the benefit of the doubt to being a little bit less, you know.  And, for example, if I thought it was an hour, I wouldn't hesitate to put down 55 minutes because I just want to make sure I was trying to be accurate.  So I underestimated

a little.

Q.  What I'm trying to get to is is this an ongoing obligation of yours, Mr. Swerling, to make sure that he is competent, is that correct?

A.  Yes.

Q.  And so you're meeting with your forensic psychiatrist, the woman that you hired to deal with mental issues, correct?

A.  Yes.

Q.  And you're providing her with records, right?  She's not sort of doing this on the fly, correct?

A.  She and I spent a lot of time together, yeah.

Q.  And, again, if concerns came up you would have relayed those to her, is that correct?

A.  Without hesitation.

Q.  And it looks like Mr. Harris met with her another ten times, for a total of basically about 84 hours, it appears, if you take away the common hours.  So this is not an instance where you are not conferring with your forensic psychiatrist.

A.  No.

Q.  You didn't just -- let me put it this way, you didn't just simply say, here, Dr. Schwartz-Watts, go and give us an evaluation and then we will use it in court.

A.  No, it wasn't like that at all.  And I think that the vouchers would and my notes would clearly show that I was managing the team and trying to meet with them and keep

pushing them forward.

Q.  If he had problems sleeping she would have known about that.  You would have relayed that to her, correct?

A.  I would have relayed to her anything I thought was important, yes.

Q.  The dip, that issue, you --

A.  She was well aware, everybody was aware of the dip issue, yeah.  That's what he missed when he was in jail, he missed the dip.

Q.  On September, I'm sorry, not on September -- how about on February 24th of '04, this was before the Jackson v. Denno hearing, you asked for a delay so Dr. Schwartz-Watts can examine him, is that correct?

A.  Right.  There was some issue in court that day.

Q.  And isn't it true that he, right before he got into court, said he was hearing voices?

A.  I don't remember that, Mr. Daley.  But I guess the note would reflect it or the court proceedings would reflect it.  I don't remember.

Q.  Okay.  I may refresh your recollection with some notes, some transcript pages.  But let me ask you this --

A.  I think Mr. Harris made that comment about that, according to -- Mr. Burke asked me a question about it and I remember reading something Mr. Burke had up there, Mr. Harris was saying something about hallucinations, if that's the same day.

Q.   It is the same day.  And do you recall that the judge actually ended up having one of the marshals come and testify about whether -- about this, how Basham had acted before he got there?

A.   Yeah.  I think the judge was asking some questions of the marshals as to how he was reacting or how he was acting before he got into court that day.

Q.   And do you recall that at least there was some mention that he didn't seem to be hearing voices until just before he got into court?

A.   I think the marshal testified that he was fine.

Q.   Again, I know that you are not an expert, but would this be another example of ways in which he might try to manipulate the situation to get what he wanted?

A.   Yeah.  I mean, I think that I have said that Brandon was street savvy and smart and when he wanted something he would devise ways to go ahead and get it.  So that, to me, is manipulation.

Q.   And at least in one instance he was able, I don't know if you saw in one of the previous e-mails, he was able to escape for a short while.  In fact, let's go to Defense Exhibit 55, if you don't mind.  And this is an interview Steve Hisker did of the public defender in -- I believe it's in Kentucky.

A.   Let me just answer it.  That being said, what I just said doesn't mean that if we thought that this nicotine gum or the

coffee or the dip would assist the situation, you know, we didn't try and assist, because there were indications that he needed some sort of kick.  I think the court tried several things, nicotine gum and the coffee, even some -- there might have been some Mountain Dew or something.  At one point there was some drinks or drinks with caffeine in it.  There were several attempts made to try and give him some sort of stimulant.

Q.  Would you mind blowing up just the text?  What I'm interested in is that, one, he escaped.  You did know he escaped from a courtroom prior to this case?

A.  Yes.

Q.  And that as a result of Brandon Basham, who although he may have a low IQ, you say he has street smarts, he actually had -- they changed the way they did business in Hopkins County Courthouse as result of Brandon Basham, isn't that correct?

A.  I think that's correct, yes.

Q.  Mr. Swerling, were you -- if you had tried to put up, let's say you tried to strain and put up a -- let's say you went and tried to find an the expert to say he was incompetent, let's say you were advising another attorney, do you think that would be a wise approach in this case?  Because that's basically what they are saying you should have done. Or you should have tried to force a competency issue where you

didn't see one.  Because, I mean, I want you to be able to respond because that's the allegation against you, Mr. Swerling.

A.  We had -- I mean, our investigation tried to cover every aspect of Brandon's life, the people knew him, people saw him regularly, the people that treated him.  And so, obviously, we were trying to find anything we could about his mental health, his -- issues related to mental health.  So we were trying to find anybody we could that could assist in that area.  Which would include, you know, if there was any issue about competency.  No one ever said he was incompetent, that I'm aware of.  My memory could be refreshed, but there's thousands, what, a hundred thousand pages or something somebody told me, but so I don't -- I mean, it really would have been trying to manufacture something because there was nobody said he was not competent.  In fact, the three people, for example, just Hewlett --

Q.  Hewlett?

A.  Hewlett, the lawyer.

Q.  Um-hmm.

A.  And McGuire and Hughes all did, you know, they were saying he was competent.  I assumed that Mr. Littlejohn, Mr. Monckton would not have let him show these people, attempt all day long on Thanksgiving of 2002 to try and show where all these -- where Miss Donovan's body was and these different landmarks if

Swerling - Cross                                675

they didn't believe he was competent at that time.

Q.  So they never told you he was incompetent at that time?

A.  Not at that time.  I don't believe a lawyer would have let him do that if they thought he was incompetent.  I -- now, I'd be shocked if someone said he was incompetent on November 28th and they let him talk to the police and the authorities and led him on that -- led them on that excursion.  So I guess what I'm saying, there was really nobody, even people that -- non-law enforcement who said that.  And plus our own people who are saying he was competent.  If there had been an issue about competency we would have followed up with and pursued it.

Q.  The September 20th scuffle that led you to ask for a delay for a competency evaluation by Dr. Schwartz-Watts?

A.  Correct.

Q.  Next morning, no question she found him competent?

A.  She came in the next morning and told the court what her findings were, what she found, and that he was competent.

Q.  And, interestingly, that same morning he decided he's going to tell everybody that he's taken -- taken some cocaine?

A.  Yeah.  But I think didn't it turn out that there was -- I think the court gave a test or had a test administered by Probation.  It turned out there was no cocaine.

Q.  The record does reflect it was -- was field tested and it was negative.

A.   Yeah.  Which just showed he wasn't telling the truth.

Q.   And --

A.   If I recall correctly.

Q.   And then the one other time where you had a concern you -- this is on October 26th, I think right before the testimony of Tora Brawley, you again brought up the fact you heard his speech was slurred and that you thought maybe there should have been a delay?

A.   If that was the -- what was being referred to before, yes.

Q.   It was, yes.

A.   Yes.

Q.   So, again, when you had concerns you brought them to the court's attention.

A.   Yes.

Q.   Throughout --

A.   Always.

Q.   From the Jackson v. Denno hearing back in February up through near the end of the sentencing phase.

A.   Yeah.  I mean, here's the thing.  If he had demonstrated any signs of incompetency that would have only helped us in trying to save his life.  That was the whole goal.  You know, it would have contributed in some way to help us to do that. I mean, the whole goal here was to save Brandon Basham's life, so there would be absolutely no reason at all for me not to pursue it if it was there, if somebody was saying it was or if

anybody observed that he was incompetent.  We're talking about some situations but not overall.  Everybody thought he was competent.

Q.  Let's move to claim nine where there's an allegation that you shouldn't have conceded guilt, certainly not every -- not to the extent that you did.  And I think we have gone over, I think, you and Mr. Burke went over it fairly well.  I would want to, though, point to Exhibit 20, which is the transcript of the ex parte hearing right before opening statements.  Have you actually seen that?

A.  The ex parte hearing?

Q.  Yeah.  I mean you were obviously there.

A.  I didn't have -- the trial transcript was furnished to me but I don't remember getting -- the ex parte hearings were not part of the trial transcript.

Q.  Let me --

A.  Somebody may have shown me one at the meeting at your office.

Q.  You may have seen it at one of our interviews, but let me give it to you and have you read it for a moment.  I just want to ask you a few questions after you've had a chance to read it.

            (There was a pause in the proceedings)

            THE WITNESS:  Yeah.  I was pretty up front about it, about my conceding, except the carjacking.

Swerling - Cross                          678

Q.    (MR. DALEY) And you did it -- having read that, and you may have remembered this anyway, this was discussed with Mr. Basham, is that correct?

A.    Yes.

Q.    And then it was put on the record, obviously, I guess anticipating that this could be a claim later on, it was put on the record and the judge actually had a short colloquy with Mr. Basham, correct?

A.    Correct.  The reason I did that is that I have seen several situations where lawyers have done that and then the client comes back later and says well, I never authorized that.  And I recall either in conversations with -- I'm a member of certain groups that attend certain conferences, and I remember having some discussions with lawyers at one point or another, you know, that it's probably better to put it on the record, make sure you establish a record about it if you are going to go ahead and do that.

      One of the cases that I particularly remember was I was a local counsel in, and I think the lawyer -- the client later said the lawyer didn't have the authority to concede, that she was -- I think it was -- this was a CCE case, continuing criminal enterprise case, and he conceded certain issues up front to try and save her from the CCE, but she was convicted anyway.  That was years ago.  So, I mean, it's not something -- this is something that's out there and so I

thought it would be prudent to put it on the record. And, you know, he agreed, he understood.

Q. And when you then got later in the trial did you in fact make reference to your concessions, to your concession in the front end later on when you were doing your closing at the penalty phase?

A. Right. That is what I said before, that I wanted to let the jury know why we were starting this trial, what we were -- what they weren't going to have to be concerned about and what they needed to be concerned about. And I tied it back up later that that's what we told you at the beginning of the trial. And that was all trying to maintain our credibility with the jury going into what we knew was going to be a penalty phase.

Q. And let's go through it one other time, one more time, as far as why didn't you do the straight up guilty plea. What were the reasons that you didn't just say he's guilty, let's go to the penalty phase?

A. Well, I mean, my experience is they don't work, and they did not work in the Fulks case. So, I mean, we had something that had just taken place a couple of months before so let's try another approach and instead of putting it all into a penalty phase of the trial and having the jury decide that one issue, I thought that we were better off having to bifurcate a trial, guilt or innocence, and then go into the penalty phase.

But, you know, we put a lot of evidence, let a lot of evidence come in in the guilt or innocence phase trying to let the jury know what they were going to be -- what was going to be coming anyway. So sort of trying to desensitize them to what we knew was going to be coming in the penalty phase of the trial, front loaded in the guilt or innocence phase. For example, the Samantha Burns kinds of stuff. It was coming in.

Q. Claim number ten is an allegation that you rendered ineffective assistance of counsel by ignoring Mr. Basham's request to leave the courtroom right before his scuffle with the marshals.

A. Right.

Q. I think you've already said that you wanted Mr. Basham in the courtroom if the jury were in the box.

A. Yeah. I don't remember exactly the dialogue. There was one occasion where I asked the court to let him leave the courtroom and --

Q. This is a -- this is not that -- that is an allegation you didn't request and he didn't --

A. And I just remember a period of time where I just -- maybe just it was time to let him go out of the courtroom at that moment. Not permanently, but, yeah, at that point. I mean, I was asked my strategy. My opinion is that he needed to be there in front of the jury, he did not need to be absent. I had that happen with Bell, that Bell was not --

Q.  Larry Gene Bell case?

A.  For a short period of time he was -- the judge told him he could watch the trial, because he was very disruptive, he could watch the trial from a holding cell, as I recall.

Q.  And I think I do recall that.  In fact, that's one of the cases I believe we both briefed in getting ready for this case.  How do you feel that impacted the verdict?  How -- was there a -- did you notice a reaction, or what did the jury think, if you recall?

A.  I can't specifically remember a reaction, but I can't imagine a jury not looking over at the counsel table and seeing the defendant not there and they are going to have to surmise or they are going to have some conjecture or speculate as to why he's not there, and it can't be favorable.

Q.  Did you see this altercation coming?  I mean, was that surprise to you?

A.  Actually, I didn't that coming.  I mean, I think I was -- I knew there was an issue here because he was insistent at that point, and but I did not realize, I did not see that coming.  I think someone put their hand on his shoulder.

Q.  I believe --

A.  That's when he went just ballistic, and that I didn't see coming at all.  Couldn't imagine he was going to fight in the courtroom.

Q.  So have you ever allowed a defendant to voluntarily absent

Swerling - Cross                      682

themselves?  I know that in Larry Gene Bell he was forced out because of his conduct.  Have you ever agreed to let a defendant sit out?

A.  No, not that I can recall.  I just don't think that's something I would agree to.  I can only think of that one occasion it happened it was involuntarily done.  But it may have been more than one occasion.

Q.  We have already gone over the Jackson v. Denno hearing, and we sort of brushed over a little bit, but claim 13 actually is an allegation that you were ineffective, you and Mr. Harris were ineffective for failing to argue to the jury that Basham's post-arrest statements to law enforcement were involuntary, that you should have argued that to the jury. You probably don't need to add much, but what's your response to that allegation?

A.  I mean, especially when you get to the jury you want -- our whole strategy was to try and develop this, you know, evolving cooperation and not asking for a lawyer, being cooperative with law enforcement.  So I just don't think it would have been very -- it would not have been consistent to argue with the jury, it would have I think a negative impact if we took would the position that he's cooperating and trying to help authorities to his limited extent, because he obviously did not know that area, but then to come in front of the jury and say it was all involuntary.

Q.  I think at least in one conversation we had is that you would lose credibility with the jury if you tried to do that.

A.  Yeah, that's probably a better way of saying it.  But credibility is big issue with the jury.  You want to maintain credibility with the jury.

Q.  And the reality is you are not one who thinks that you should throw up every possible defense, you want to try to have a consistent theme and try to have a specific strategy, and you are going to push aside other things that might clutter up that strategy.  Is that a fair statement of your approach to trials?

A.  I watched other trials and I have seen lawyers, and it's just everybody has got their own approach, but I have seen lawyers throw it all up against the wall and hope something would stick, and that's just not the way I approach trials.  I like to try a theme and go for that and just not throw it all up there, see if one of it sticks.

Q.  Let's go to claim 14.  And I don't think we will spend much time on this, but I do want to cover it.  Claim 14 is the allegation that you had a personal conflict of interest that impacted your representation of Mr. Basham because you had been a victim of a home invasion, I think it was in 2002.

And, in particular, I think the allegation is that there was a close proximity in time to when the case was tried and that there were similarities in the charge that the defendants

Swerling - Cross                              684

in your case where you were a victim and the charges that Mr. Basham faced, those were similar, and finally that you had -- during your trial you grew angry with some approach that the defense counsel had taken in the case.

A.  The crime took place in the summer of 19 -- 2002.  It was a personal tragedy, two individuals entered my home with a pistol.  My wife and my daughter and I were sitting in the den.  They tied us up face down, they continually threatened me with a gun.  They wanted money.  And for about an hour my daughter, my wife, and I were laying on the floor and we were basically terrorized, okay?  It was a personal tragedy, one that took me -- obviously, it takes a while to recover from those things, as anybody would expect.  But I did.

It did not affect my representation of Mr. Basham or any other individual because I am dedicated to the defense of criminal cases, been doing it now for almost 40 years.  And I have my own, you know, standards by which I follow when I represent someone.  So it did not affect that, and never would, never would.  When the trial -- during the Jackson v. Denno hearings, somewhere around that time, I think we had the trial which, would have been in 2004.

Q.  I believe the trial was the first or second week of February of 2004.

A.  Something like that.  Yeah, it was very close in time to the Jackson v. Denno hearings.  And I remember I think there's

an allegation that I -- my attention was diverted during the trial.  But it was I was involved in a trial as a witness, my daughter was a witness, my wife as witness.  You know, we certainly thought we were going to be killed that night, or there was a good chance of it.

And but it's interesting that during that period of time when I was in the trial there was an entry, or at least one entry when I worked on the Basham case for three-and-a-half hours on one of the evenings, so it didn't divert me too much because I worked on Basham.

The defense in that case, I had no problem with them having lawyers.  Obviously, he was entitled to a defense.  The lawyers, who I knew, I brought them out to my house, showed them everything in my house, where the guy would have been hiding, when they came in, what they did.

Q.  You took the defense lawyers --

A.  Took the defense lawyers out there.  I mean, I'm a defense lawyer myself so I tried to make their job as easy as I could.  During the trial, to the amazement of everyone in the courtroom, because there was a lot of people in the courtroom, they suggested that my daughter was an accomplice in the case, that my daughter had left the door open, that her hands were not tied as tightly as mine.  And it just really shocked everybody in the courtroom.

And most of the people in the courtroom were my friends,

Swerling - Cross                           686

were lawyers, just could not understand where that was coming from.  So when the verdict came in it was guilty and it came back in just a few minutes.  When Judge Williams was going to sentence Mr. Causey, Causey would not come out of the holding cell to get sentenced.  And I got upset.

And, you know, I yelled a little bit and I told the lawyers what I thought about the way they handled the case.  And what I was referring to was about my daughter, suggesting that she may have been an accomplice in the case.  So I yelled some and told them I didn't like what they had done.

And the next day when I calmed down I went around to every judge in the courthouse who was also -- most of them were there when the sentencing took place and I apologized to them because I had lost my -- I really just momentarily lost it.  And, you know, it was about my daughter.

Q.  And now let's go --

A.  I still don't understand why they did it.  None of them ever -- and have never provided any kind of explanation before it.  Nobody has.

Q.  But now let's get to your representation of Mr. Brandon Basham as far as how this -- did this impact your defense of Brandon Basham?

A.  No, absolutely not.

Q.  Did it make --

A.  I'm still a lawyer.

Q.  Did it make it any difficult, just a smidge?  I'm just not going to work quite as hard because I now see what it's like to be a victim?  Did that impact you at all?

A.  My handling of Brandon Basham's case was in no way affected by my own personal problem.  And I never, I can honestly say this, it has never entered into my mind in the defense of any case.  And I've tried a lot of cases since Brandon Basham's case.  It's just not a factor in my work.  It was a tragedy and took a while for my family to get over it.

Q.  Was Brandon Basham any less a priority when you were appointed in 2003 than he was the week after or the day after this trial?

A.  He was always -- he was always a priority.  And, as I said, I think the records will reflect I worked on the case several hours during the trial.  I think when we were in your office I looked at it and whenever we pinpointed the date I remember some entry of like three-and-a-half hours on one of the days of the trial.

Q.  And if I remember right you've actually, with Mr. Burke's knowledge, you still keep up with Mr. Basham, is that correct?

A.  Yes.

Q.  And, in fact, have you told him that he shouldn't drop his appeal, he shouldn't give up?

A.  He called me some time ago, whenever this issue came up, and was telling me about he wanted information about waiving

the appeal.  I said Brandon, I'm not giving you any information.  The only thing I can tell you is you listen to your lawyers and you take advantage of everything the system affords you, you know, as far as this particular sentence is concerned.  And I've never hesitated from telling him that.  I mean, it's just --

Q.  So you are encouraging him to keep up his ineffective assistance of counsel claims against you --

A.  Sure.

Q.  -- in effect.

A.  That's part of the system.  And why I have -- I mean, I would never do anything other than that.  I spoke with him on the phone and I've written him letters and he writes me letters.  Every once in a while he wants a few bucks and I don't hesitate to send it to him.

Q.  Let's go on to claim 15, ineffective assistance of counsel for failing to object to the 404(b) evidence, or at least to the extent of the 404(b) evidence, in particular the Samantha Burns kidnapping evidence.  And specifically the allegation is in the guilt phase.  I don't think they are making any allegation about the sentencing phase, if it had come in then.  And their allegation is is that you should have, I guess, done a motion in limine to limit the testimony of the family members.  I believe if you were to reduce it down that would have been -- that's their real complaint.

A.   Right.

Q.   So why didn't you?

A.   Well, again, I can not specifically recall my thought process eight years ago.  I have gone over in my head what would have been the factors in my head even as late as the lunch hour trying to think about that.  And, again, the government was using those witnesses to establish certain points during the day to prove that she would not have just absented herself, that she was missing.  And certain, like the candy box and the money in the candy box and the license plate, there was a stadium seat, different things that each witness came brought to the table.

     And I guess one of the things that would have been on my mind is we're using this part of the guilt or innocence phase, we're going into a penalty phase so let's front load it a little bit.  So I let it in.  It's coming in anyway and I'm not going to object to a mother or father or sister or aunt being on the stand.  I did not think that any of the evidence that came in on the, still don't think, that any of the evidence that came in about Samantha Burns affected the verdict in the case because I think the verdict was pretty much going to be what it was going to be.

     So I just used my judgment, my experience, my instinct and did not object to it any further.  I did not object to it beforehand, either.  And I guess getting it in, put it before

the jury, and so they would not have been shocked when they heard it during the guilt or innocence phase -- I mean during the penalty phase.

So I think it was a logical process in my mind. But, again, specifically I can't tell you, I just can tell from you my experience those have been some of the things I would have been thinking about. And not to object, you know, the lawyer needs to learn when not to object as much as when he needs to object.

Q. Claim 16, the claim that you failed to request the trial court to admit the closing argument, at least a portion of the closing argument statements in the penalty phase of the Fulks case into your case, into Mr. Basham's case. The failure to reraise that issue.

A. You mean the puppet on the string comment?

Q. Correct. Were you concerned about the fact that if you let in a little bit of it that the court might potentially end up allowing most or all and then you would actually end with two closing arguments, basically, in front of jury that were done by the prosecution?

A. Well, certainly that was going to -- that was a possibility. I mean, I think Scott Schools and Johnny Gasser are very sharp prosecutors and good prosecutors. Gasser and I have tried a number of cases against each other before. I think that was my first experience actually trying a case with

Swerling – Cross                          691

Scott.  But they were already anticipating that and there were discussions about it at the August hearings.  So I wanted to keep it as clean as possible.

And my argument and their argument, the only way it would have come out is if it was really inconsistent, they took inconsistent positions.  I think -- well, actually that's one of the ways it would have come out.  The other way would have been just if they had changed their theory of the case.  And they were already thinking about it and they were very shrewd about it saying that, you know, we were not saying he was a puppet on a string with regards to the murders, it was a team effort.  The puppet on the string comment had to do with other things that Brandon and Fulks did together and that Basham did at Fulks' request or insistence.

And I thought that that had really been established during the testimony in the case from the jailers, all throughout, that Basham really was a follower, that Fulks was the leader.  Fulks controlled the money, Fulks did the driving, Fulks knew the areas, they went to places that Fulks knew, Fulks was in control.  So I thought we had really covered that without getting into a potential quagmire and problems during the closing statements.

Q.  Let's go to claim 17.  And if you would pull up Government's Exhibit 23.  This is the allegation that you failed to cross-examine Clifford Jay or call a rebuttal

witness after he testified on direct that Mr. Basham on Christmas Eve 2002 told him in response to some questions from Mr. Jay that we killed them.  And you did cross-examine Mr. Jay but he held firm to that, that statement.

A.  Right.

Q.  I just wanted you to look at this Exhibit 23 and tell me what is this exhibit?

A.  Well, this is a note made, apparently what this is, I think I guess I had -- I probably had typed up what each particular witness, the highlight of what they were going to testify to.  And then I wrote on the page what's here, decided not to offer impeaching evidence to keep him as potentially favorable in the penalty phase.  If we impeach him he would probably potentially become unfavorable.

Clifford Jay had some good things to say about Brandon, he had some negative things to say about Brandon.  This particular thing had to do with he had told us when I was up there, and I believe when Mr. Harris was up there, that Brandon had called and said we killed her.  So this particular statement seemed to be inconsistent of what he had told us.

So when he testified that and wouldn't back off of that I decided not to impeach him, it was one of those instinctive things that I thought was the best thing at that time not to. And I made a note about it because, you know, obviously it was important for me to go ahead and make a note and to

memorialize it so I would remember it.

And I decided not to because I thought that we would -- might potentially call him during the penalty phase of the trial, did not want to impeach him. The fact of the matter is the evidence was already in there that both women had been killed so I didn't see it was worth losing him as a potential penalty phase witness then by impeaching him.

The other thing was the two police officers in the case, I think some police officers had also written down that he had told them that, as well, and I was just not going to call the police officers as an impeachment witness because you can't control what happens when they get up there. And they are certainly not favorable to you. So I think all of those things went into that decision not to go ahead and impeach him on that.

Q.  And you had -- you had gotten a heads up there had been a 302 done where he had been interviewed by the FBI and he said that Basham had told him we killed them.

A.  Yeah.  That must have been where that came from, number 90, it must have been advising that we killed them.  That came from some document that I knew he was going to be inconsistent.

Q.  Well, it looks like not only did the FBI do their 302, but then Mr. Harris went back up there on August 5th, '04 and found out that that's what Mr. Jay was going to --

Swerling - Cross                          694

A.  Yes, he was interviewed a couple of times, once by me and maybe once together, or once together and once by Greg.

THE COURT:  Let me jump back in again here.  This came up last week, of course, and I still don't understand it. Is it the defense's contention that Mr. Swerling had some type of knowledge or documentation that two law enforcement officers had interviewed Mr. Jay and was told that the statement was we killed her?  I think you said that was not the case, that the statements were somewhat ambiguous or non-descriptive in terms of it was one killing or two, is that right?

MS. STONE:  That's correct, your Honor.  That our position is they were law enforcement officers whose reports did include the we killed them statement, and they had interviewed Mr. Jay previously to Mr. Long and at some point Mr. Jay added that information to Mr. Long.

THE COURT:  And let me ask one question.  Mr. Swerling, what type of favorable information did you think Mr. Jay could provide at the sentencing, penalty phase?  He had known him as a schoolchild, in other words?

THE WITNESS:  He had some favorable things to say about him, as I recall.  There should be a memo somewhere.

THE COURT:  Right.

THE WITNESS:  But he was -- he liked Brandon.  And that was the thing, it was obvious he liked Brandon.  This was

not something he felt comfortable about going over with us.

THE COURT:  And I remember you actually put on the record, I think, if I recall correctly, that you were making a conscious decision not to impeach Mr. Jay at that time for the reason you stated.  Is that correct?

THE WITNESS:  Judge, I don't remember if I put it on, but if that's your recollection -- I'm not sure.

THE COURT:  Isn't that in the transcript?

MR. DALEY:  It's in the transcript, your Honor.  And Mr. Burke can help me, or Miss Stone, I believe what Mr. Swerling said was we're not going to do that at this time, and I think he used the word it's our strategy, we will wait and see in the penalty phase.

THE COURT:  Right.  All right.

MR. DALEY:  And, your Honor, I would tell you that -- let's pull up Government's Exhibit 29.  Government's Exhibits 29 and 30 are interviews done by Carlisle McNair where he went and interviewed the two police officers who talked with Mr. Jay that night or the next night when Mr. Jay called.  And the bottom line is neither one of them, they are silent about whether -- I mean, they don't say Mr. Jay said that.  And so that's -- but it doesn't say that he said we killed her or we killed them.  It just -- there's no information that Mr. Jay told them anything about Mr. Basham saying that to him.  So that's Government's Exhibit 29 and 30, more for the court's

information than --

THE WITNESS:  Of course, that would have all gone, that decision, I had to make a decision at that point whether to do it or not, to try to impeach him or not.

Q.   (MR. DALEY) And you had just a week before, obviously, reached out to these police officers so you --

A.   Yeah, they were interviewed on September 20th, so --

Q.   You were obviously anticipating at least trying to impeach him if they potentially had given better information.

A.   Right.  I like to be prepared.

Q.   Let's just for a moment, though, let's say they said, no, I'm pretty sure I think he said or he did say we killed her, would you potentially have still wanted that in, two police officers getting up and repeating that -- and it may be it's speculation, but I'm just, as somebody who tries cases, I mean, so let's just think about it for a moment.

You have two police officers are saying no, Mr. Jay said that Basham said we killed her, not we killed them.  Do you put those two police officers up?  You just said you don't like calling police officers.

A.   I really don't like calling police officers.  And, you know, you have them on direct examination so I really can't say at that point.  I mean, you have to understand what -- all of this is a process, mental process that you go through at the time trying to decide what the best thing is, use your

Swerling – Cross                    697

experience and experience in examining hundreds of witnesses and try and decide what's the best approach, and that's what I did.  So all of these factors entered into that decision as to the way to approach it.

Q.  So you are not sure if -- if they had said we -- you know, Basham said to Jay that Jay relates to the police officers that Basham says we killed her, you may or may not have.  But you didn't even have it that good here, obviously?

A.  I'm sorry?

Q.  You didn't have anything that good.  It was just simply silent?

A.  It would be sheer speculation for me to say at this point I would have called them or not called them.  I would have had to put that into the formula.

MR. DALEY:  Your Honor, I know you wanted to end at 5:00.  I can --

THE COURT:  How much longer do you think you will be with Mr. Swerling?

MR. DALEY:  An hour, hour and a half.  I'm not sure. Maybe.

THE COURT:  We definitely won't finish today even if we went late.

MR. DALEY:  I don't think so.

THE COURT:  How long do you think redirect will take?

MR. BURKE:  At this point I would think no more than

Swerling - Cross                                    698

ten minutes.

THE COURT: All right.

MR. BURKE: Maximum.

THE COURT: How long is your standard of care expert going to be tomorrow, approximately? Just --

MR. BURKE: Perhaps an hour and a half.

THE COURT: We can still finish the testimony tomorrow and probably get in some argument, as well.

MR. BURKE: I believe so.

MS. STONE: We're hoping.

THE COURT: Y'all are the ones going to stay over an extra night. I can take a ten minute break and talk to my students and we can come back and have a little bit more if you need to. But since we're not going to finish him today, as long as you're sure we can finish tomorrow I would like to go ahead and break at this time.

MR. BURKE: We're growing to like Columbia so if we're going to stay another day that won't --

THE COURT: How long will your cross of the expert take?

MR. DALEY: I believe Mr. Johnson --

MR. JOHNSON: I would say about an hour.

THE COURT: All right. Have y'all picked out which five issues you want to argue about yet? Have you talked about it?

699

MR. BURKE:  We talked briefly in the men's room about it, but we haven't come --

MR. DALEY:  May be able to pick out five we don't have to argue at all, your Honor, maybe more.

THE COURT:  You can submit on the briefs?

MR. BURKE:  Correct.

MR. DALEY:  We may be able to decide on another five.

THE COURT:  Since we're quitting a little early today why don't you talk about that when you -- Mr. Swerling, you're going to have to come back tomorrow, it doesn't look like we're going to finish today.

Very good.  All right.  We will be in recess until 9:30 tomorrow morning.  Let me ask the students to step back into chambers, if you could.

(Recess, 5:00 p.m.)


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  11-14-12                    s/  Daniel E. Mayo


DEFENSE WITNESSES

JACK SWERLING

        DIRECT                515

        CROSS                 613