932

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
    -vs-                                    October 17, 2012

BRANDON LEON BASHAM,

          Defendant

------------------------------

BEFORE HON. JOSEPH F. ANDERSON, JR.
UNITED STATES DISTRICT COURT JUDGE
MOTION HEARING

APPEARANCES:


FOR GOVERNMENT:     HON. WILLIAM N. NETTLES
                    UNITED STATES ATTORNEY
                    BY:  ROBERT F. DALEY, JR.
                         JIMMIE EWING
                         JEFFREY M. JOHNSON
                         WILLIAM K. WITHERSPOON
                    Assistant United States Attorneys
                    1441 Main Street
                    Columbia, SC  29201


FOR DEFENDANT:      ARIZONA FEDERAL PUBLIC DEFENDER
                    BY:  MICHAEL L. BURKE
                         SARAH E. STONE
                    Assistant Federal Public Defenders
                    850 W. Adams, #201
                    Phoenix, AZ  85007

933

COURT REPORTER:        DANIEL E. MAYO, RDR

                       Certified Realtime Reporter
                       901 Richland Street
                       Columbia, SC   29201


            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

934

THE COURT:  Mr. Hammond, if you would resume the stand.  Mr. Hammond you are still under oath.  Let me follow up a few questions, if I could.  And, Mr. Hammond, again, I'm not trying to be adversarial with you, but after you leave I'm trying to anticipate some of the argument that might go back and forth.

THE WITNESS:  I understand.

THE COURT:  But in the Fulks case regarding the issue of allowing the client to make a statement to law enforcement with no reward in return, no promise to take the death off the table, Mr. Blume's strategy as he articulated it here in the hearing, and which the Fourth Circuit recognized, was that he wanted a way to get his client's version of what happened in front of the jury without having to take the stand and suffer cross-examination.  And he strategized the best way to do that was to make a statement to the officer putting a lot of the blame on Mr. Basham, knowing that the officers would be called as witnesses and would relay his version of what happened but yet he wouldn't have to get to the stand and say what happened.  And that struck me as at least a reasonable course of action.  I don't think Mr. Swerling articulated that as his strategy here, but what about that strategy?  What about that notion, in other words?

THE WITNESS:  Well, I did read the Fourth Circuit opinion, I don't know much more about the background.  I guess

I would just have to honestly tell you, I find that troubling. Whether it is an acceptable exception to what I think of as the rule I just can't tell you. But I think details make a lot of difference here. How well you know your client and your client's mental state, how controllable your client is, how clear the ground rules are, and I don't know any of those things with respect to Mr. Fulks' case.

THE COURT: All right. And one more question. You suggested yesterday that one flaw in the defense trial team's methodology was the failure to get someone who really knew a lot about mental retardation. And so I just went back and looked last night, tried to find out what type of mental professional would that be. And I do note that Mr. Swerling and Mr. Harris called to their assistance, if this list is correct, a neurologist, a neuropsychologist, a psychologist, a treating forensic psychiatrist, and a forensic psychiatrist.

So starting with the proposition that none of those people were qualified to deal with mental retardation, what type of medical professional would be?

THE WITNESS: Well, first of all, my impression is that of those five Tora Brawley comes closest. She is a psychologist, and if I'm not misinformed she may have administered the last round of IQ tests to Mr. Basham. But I believe she would say, and maybe did say, that she's not a sufficiently specialized psychologist to really evaluate the

entire collection of Atkins-related issues.  It's not just a matter of the IQ score, of course, it's also an evaluation of adaptive behavior and it's an examination of the records before someone -- before the defendant was 18 years old and trying to make sense of those records.  So I think it is a very specialized type of psychologist.

THE COURT:  I was wrong in focusing upon the title in front of the doctor's name, it's whether the psychologist has the experience in mental retardation.

THE WITNESS:  And I think I read somewhere that the percentage of psychologists who would consider themselves to be experts in mental retardation is actually a very small percentage of that field of psychologists.

THE COURT:  All right.  Well, thank you for clearing that up for me.  All right.  That's all I had.  Please resume, Mr. Johnson.

MR. JOHNSON:  Thank you, your Honor.

BY MR. JOHNSON:

Q.  Good morning again, Mr. Hammond.

A.  Good morning, Mr. Johnson.

Q.  And I'm going to move on.  We discussed claims one and two yesterday afternoon, and unless the judge has any further questions about those claims I'm going to move on and pick up with the claim 19, which is the claim about which the judge just asked his question, it concerns mental retardation.

Now, my understanding is that Dr. Brawley is a neuropsychologist. Is that also your understanding of what she is, and her title?

A. I know she is a psychologist and I think I have heard the phrase neuropsychologist associated with her name, but you really shouldn't rely on me for that.

Q. Now, did I understand you to say yesterday that you had not read Dr. Brawley's testimony?

A. That's correct.

Q. And my understanding is that mental retardation has -- it may have various definitions clinically, but there is also a legal standard for mental retardation, is that correct?

A. Yes, I think generally I would say that's correct.

Q. And what is your understanding of what that standard is for a person to qualify as mentally retarded under Atkins, for example?

A. As a standard I think the usual formulation is that there is a three-part test. That the first part is that there must be a qualifying IQ result or testing result within an appropriate range, and that appropriate range now varies from jurisdiction to jurisdiction. Some states -- and if I'm telling you more than you want to know stop me.

Q. No, please continue.

A. Some states I believe now still require scores below 70. Most, I shouldn't say most, I believe most jurisdictions

employ a kind of a sliding scale that may say we will go farther if we have scores between 70 and maybe 75.  But that first prong may require a little bit more of a sensitive analysis than just looking at an IQ score itself.

The second category is what I mentioned to the court a moment ago, but I think is generally called adaptive behavior measures.  And as you probably know, there's been a fair scientific morphing of adaptive behavior.  At one time the convention was that there had to be two factors among either ten or 11, depending on whether you were looking at the DSM-IV or at, and I'm blanking on the acronym for the other traditional measure, but you had to have at least two significant deficits in adaptive behavior.  And then, third, there has to be evidence of onset prior to the age of 18.

Q.  So what I understand based on your explanation there is that there's basically three prongs, there is an IQ prong, there is a functioning or adaptive behavior prong, and then there's an onset prong, when did it manifest itself, is that correct?

A.  I think that is, although I certainly don't want to suggest that I'm an expert on this.  That's my understanding but I could easily be corrected on any of the details of that.

Q.  Let me ask you about the first prong, the IQ prong.  Now, you testified that the appropriate IQ range may vary based on the jurisdiction.  That in some jurisdictions at some points

Hammond - Cross                                  939

in time and, maybe currently, 70 was kind of a magic IQ number, whereas in other jurisdictions they use a sliding scale, if you will?

A.   I think that's still being debated in the cases, yes.

Q.   What was the standard in federal jurisdictions in the time range that we're talking about of trial, let's say of trial, 2004?  What would have been the federal standard for qualifying IQ at that time?

A.   I would have to tell you I'm not -- I'm not 100 percent sure of what one would call the federal standard at that time, but I believe whatever it was just on that first prong the testing Dr. Brawley did would have satisfied that prong, whether it was below 70 and ranging up to 75.

Q.   And when you say testing Dr. Brawley did, are you talking about the IQ score that has been mentioned in court of around 68?

A.   Yes.

Q.   And I take it --

A.   Yesterday I wasn't sure she actually did the testing herself, but that was my understanding.

Q.   But that's -- but you mentioned Dr. Brawley.  That's an IQ score that you are associating in some way with her?

A.   Yes.

Q.   And I believe the testimony, and we mentioned it a couple of times, the number 68 has been thrown out.  Are you getting

that from the testimony from this hearing then?

A. You mean from the 2255?

Q. Well, that, too. I mean, you didn't read her testimony so I assume that you are getting the 68 number either from the filings or what's gone on in this hearing.

A. Yeah. I can't tell you precisely where I saw it, but I saw it in connection with my preparation in this case. So it must have been something that was in an exhibit or an attachment somewhere in the file in this case.

Q. I'll ask you a couple of followups, but I want to move to the second prong before I forget, the second prong being adaptive behavior. And I think you mentioned that at least in one point in time, and I'm just using common vernacular here, the standard was there has to be impairment or dysfunction in at least two life skills to satisfy the second prong. Is that kind of what we're talking about?

A. Right. Either two of ten or three of 11, depending on which scale you use.

Q. And I think you said that that has changed or some jurisdictions have changed that, the way that you count those life skills or the way that you analyze that prong, is that true?

A. Yeah. And I'm, again, I want to emphasize I'm not an expert and I'm relying on -- on this issue on things I have read recently, not necessarily in connection with this

proceeding.  But my understanding is that this multi-part list of adaptive behaviors has been truncated, maybe that's not the right word, but brought down to essentially three categories of adaptive behavior, one of the three being necessary to satisfy the test of mental retardation.

Q.  And do you know in 2004 in the federal jurisdiction what that standard had been as to the second prong at that time?

A.  I believe at that time most federal courts, and I can't say all, I think were using the three of 11 test.  But, again, I wouldn't feel comfortable stating that as an opinion.

Q.  And then the third prong is that the first two have to manifest themselves prior to the age of 18, is that correct?

A.  Essentially, yes.

Q.  So you would have to have qualifying or low enough IQ score plus deficiencies in functioning which all manifest before you turn 18.

A.  Again, I don't want to say that I'm confident that that's precisely right, but I think essentially that is my understanding.

Q.  And I didn't hear you, excuse me, I didn't hear you mention -- you mentioned the IQ test has kind of fluctuated over time and based on the jurisdiction, and the adaptive behavior has done, as well.  But is this third prong one that has been kind of static in terms of the definition that it's always been, has to manifest before age 18?

A.   Well, static is not the word I would use.  We talked a little bit I think yesterday about learning that has occurred over the last now maybe 14 or 15 years about the way in which IQ testing has occurred over time.  I think we're gaining a deeper understanding of what -- of how to analyze IQ testing. We're looking, I shouldn't say we, the experts are looking in more detail at the type of testing, the age of the test, the things like we talked about yesterday, the practice effect, a series of other factors that may give a more -- a deeper understanding of the test scores someone achieved below age 18.

Q.   Thank you.  And I don't mean to suggest that the mental retardation is static.  Certainly we're learning more and more about the human body and the human brain and these kinds of things all the time.  I was asking more along the lines of the legal standard on when those sorts of things have to manifest themselves.  It seems to me, and I guess I'm asking you if you know anything to the contrary, it seems to be that the third prong has always been you've got to have this stuff before age 18.  Do you know of any legal standard that is different?

A.   No, I wouldn't suggest -- I agree with you on that.

Q.   Okay.  Thank you.

A.   My only point, Mr. Johnson, was that I know there are now cases and there are experts who have looked carefully at cases in which there is no IQ score below 70 for someone under the

age of 18 but have found in looking carefully at the test results that there are meaningful indicators of what the IQ -- the real IQ scores were.  That's all I was suggesting.

Q.  And that's fair enough.  I understand that.  But going back to what the legal standard was in 2004, if I were to posit to you that the legal standard were you had to have an IQ at or below 70, you had to have functioning deficiencies in X number of skills, and it has to manifest itself prior to the age of 18, you wouldn't dispute that that was the legal standard in 2004.

A.  I wouldn't dispute that that was -- that that's a fair characterization of the legal standard.  But I think if you ask in terms of a lawyer's responsibility in terms of developing defenses I think virtually all of the literature and training at that time was telling criminal defense lawyers, capital criminal defense lawyers, that you need to look into the details of that three-part test, and what your first impressions are from looking at the three-part test might very well be incorrect.  That's what I was trying to suggest earlier.

Q.  Okay.  But there's -- regardless of the investigation that an attorney does, and I understand that you are saying they can't just look at the tests and that's all the investigation that they do, I understand that you're suggesting that they have to do more, but in terms of what they would have to prove

to Judge Anderson or an appellate court or some court down the road if they wanted to say in 2004 that Brandon Basham was mentally retarded, they would have to work with the legal standard that was in place at that time, correct?

A.  I accept that.

Q.  If I told you that Brandon Basham had taken multiple IQ tests, including multiple IQ tests prior to turning 18, you wouldn't dispute that, would you?

A.  No, I certainly heard that.

Q.  And if I told you that on none -- let me rephrase this. If none of the tests returned an IQ score that was lower than 77 prior to age 18 you wouldn't dispute that, would you?

A.  No, I think I have seen a list that's consistent with what you've just said.

Q.  And if I told you that he took an IQ test when he was 17 years old and ten months and on that IQ test he scored a 89, you wouldn't dispute that, would you?

A.  I won't dispute it, but I don't recall that particular number.  I know there was an IQ test when he was a teenager before the age of 18 and I know it was above 70.

Q.  I want to ask you this:  When we had our interview back on October 8th, last Monday, Mr. Burke and Miss Stone presented me a list of claims on which you would be testifying as an expert and claim 19 was not among them.  And we were informed yesterday, I believe, that you would also be offering an

opinion as to claim 19.  When was it determined that you would offer expert testimony as to the mental retardation claim?

A.  Well, I can't tell you when Mr. Burke and Miss Stone decided, I know that I told them sometime last week, and it may have been over this last weekend.  They were here last week, and then sometime over the weekend I spoke to at least one of them, and I said at that time that I was troubled about the MR issue and we talked a little bit about why it might be troubling.  So I don't know if that's what led them to decide to add that claim or not.

Q.  Okay.  Let me make sure that I understand this. Obviously, we had part of this hearing last week, and you weren't present but you've looked at the transcripts of what happened last week?

A.  Yes.

Q.  And so was it in looking at that those transcripts that you became concerned about the mental retardation issue and then approached Mr. Burke and Miss Stone over the weekend?

A.  It wasn't -- I can't tell you that it was looking at the transcripts themselves as much as just the other reading that I was trying to do.  I think I told you on the 8th that I was going to try to continue to read more deeply into the claims. And, frankly, maybe this isn't proper, but I was affected a little bit in my thinking by the events that occurred last week with Mr. Basham during the effort to provide a television

Hammond – Cross                                946

link to him.

Q.  So it's fair to say that what prompted you to bring up the mental retardation issue was at least in part learning about what had happened with Mr. Basham in Indiana and also reading transcripts from last week.  And I'm not suggesting it was all of it, but that was part of it, correct?

A.  Yes.  And when you read about the history of this case and the history of Mr. Basham, the adaptive behavior prong continues to re-occur.  There seems to be significant areas in which his ability to adapt to the norms of society was in question.

Q.  And when you talk about the reading and reading about Mr. Basham's history, you are talking about reading the filings in this case and the exhibits attached to the filings, correct?

A.  I think so, although there -- I told you yesterday I'm not exactly sure which backup materials were marked, quote-unquote, as exhibits --

Q.  Okay.

A.  -- and which were other supporting documents.  I just don't know.

Q.  And I don't mean to be technical about any description between exhibits and attachments, but I think you testified yesterday that you had not read his mental history or his medical records, for example.

A.  That's correct.

Q.   And you had not read any of the discovery in this case.

A.   I think that's correct, too.  Unless it was in one of those categories, unless it was either attached to or part of the backup for a claim.

Q.   And other than the filings and the attachments and the exhibits, and I think you said that there were some portions of the transcript if they were cited in any of those you might go back and read selected portions of the transcripts that were mentioned.  But other than that you haven't read the other transcripts.

A.   Right.  And at some point I also watched the video of the September 20th event, I think what you all might have called the dip event here in court.

Q.   Is that the scuffle when he was on the floor with the marshals and --

A.   Yes.  Do I have the wrong date for that?  I thought it was the 20th of September.

Q.   And, yeah, but that's what we're talking about?

A.   Yes.

Q.   So when you said you didn't read anything in addition to considering the events of last week, that is the reading that you're talking about.

A.   Yes.

Q.   And you mentioned, I believe, when Miss Stone was asking you questions that it's, "not enough to gather IQ scores" in

determining whether a client may be mentally retarded.  Is that a fair representation of one thing you said yesterday?

A.  Yes.

Q.  So it's fair to say that mental retardation is more than just IQ.

A.  Of course.

Q.  But wouldn't you agree that while it is more than just IQ it can't be less?  In other words, you have to have a qualifying IQ score to qualify under the legal standard of mental retardation?

A.  Well, and that's why we have -- we started with the first prong, yes.

Q.  All right.  I want to turn to a related claim, which is claim five, on competency.  And if you will give me just one second.

You are aware, aren't you, that -- and Judge Anderson mentioned several experts that were retained by Mr. Basham's trial team, and among those was Dr. Donna Schwartz-Watts?

A.  Yes.

Q.  Are you aware that she determined that Brandon Basham was competent to stand trial?

A.  Yes, I've heard that.

Q.  And one thing that you said yesterday going on along with that is that, and I think we would all agree on the general proposition that a trial attorney has a duty to monitor his

client's competency and if he has concerns about competency should bring them to the court's attention. And I think one thing that you said in making this determination about competency, lawyers can't do this alone. Is that what you said yesterday?

A. I'm sure I said something like that.

Q. Well, in this case Mr. Swerling and Mr. Harris didn't do it alone, did they? They had a whole team of experts, including Dr. Schwartz-Watts and Dr. Brawley and all of the others that Judge Anderson mentioned. They had a team helping them in this case, correct?

A. Yes.

Q. Then you also said that while an attorney can't do it alone, the attorney's opinion is important. Would that be fair to say?

A. That I know I said.

Q. Because at the heart of the legal test for competency to stand trial is the ability of a client to communicate with his attorneys, right?

A. That would be part of it.

Q. That's one part of it. And on that part of it the trial attorneys are in -- it's not an exclusive position, they certainly are in a special position to know facts about whether their client is competent, correct?

A. The attorneys and those who are in the very closest

communication with the client.

Q. I couldn't -- attorneys and who else?

A. I'm sorry. Those who are in the -- the attorneys and those who are in the closest communication on a regular basis with the client. So it might be -- in some cases it might be a paralegal or someone else who is also directly involved in the day-to-day communications with the client.

Q. And you wouldn't dispute that Dr. Donna Schwartz-Watts would be that kind of person who's in close -- who was in close communication with Brandon Basham?

A. Well, I'm really talking about people who see the client on a daily basis during the trial and in pretrial hearings and are meeting with the client about legal matters. So I wouldn't include Donna Schwartz-Watts necessarily in that category. Her opinion's important, but I was really focusing on the people who have the direct and immediate communication with the client.

Q. And there you are talking about people like Paige Tarr has been mentioned, spent a lot of time with Brandon, the reading clerks who read discovery to him, those sorts of people?

A. Right. But particularly the people at the -- at and closely before the time of trial.

Q. And I think another thing you said yesterday is that there were certain occasions during the trial, and we have already mentioned today the scuffle with the marshals over the dip.

Hammond – Cross                    951

That was a time when after that occurred Mr. Swerling came to Judge Anderson and said, your Honor, we do have concerns about his ability to go forward at this time, or today, we would like for him to take some time out to be evaluated.  There were occasions when Mr. Swerling, if he had concerns, brought those to the court's attention, is that fair for say?

A.  I understand that.

Q.  And I think your testimony yesterday where I was trying to get to in prefacing this question, is that you take them at their word on those occasions.  And I believe the phrase, you used word they weren't gilding the lily when they came to Judge Anderson and said we're concerned about his competency.

A.  I did say that.

Q.  And so while there were times when they brought those concerns to Judge Anderson and they weren't gilding the lily, then there were also many more times when they proceeded to trial, including the next day after he had been evaluated by Dr. Donna Schwartz-Watts, and the attorneys told Judge Anderson we're prepared to go forward, you have no reason to believe that they were gilding the lily then when they wanted to go forward, correct?

A.  Maybe I shouldn't have used that metaphor.  I don't have any reason to think that they were saying something that they didn't believe to be true.

Q.  We talked about Donna Schwartz-Watts, and that we know in

the history of this case that early on Cam Littlejohn and Billy Monckton filed a motion to have Brandon Basham evaluated for competency. And later on that motion was withdrawn, and while they were not asking the court to have him sent on to Butner or one of the other federal facilities, they had Dr. Schwartz-Watts evaluate him for competency, isn't that your understanding?

A. Yes.

Q. And Mr. Harris, I believe, and I know Mr. Swerling testified that one reason they did that was that in that stage of the proceeding they did want Brandon Basham to be sent off to Butner and talk to a government evaluator, they wanted to have their own evaluator talk to him because they had no reason for him to be turning over information to a government evaluator, correct?

A. Yes. At some point prior to trial I understand that was their view.

Q. And, again, she came back and told them that Brandon Basham was competent, correct?

A. Yes.

Q. And there was no one else on the trial team, either the attorneys or any of these people that you say are in close contact with Brandon Basham, or any of the other psychological or psychiatric experts, none of these other people came back and told Mr. Swerling or Mr. Harris that Brandon was

incompetent, correct?

A.  I accept that.  I don't know, but I accept that that's the case.

Q.  One of the defense exhibits, Defense Exhibit 3, is a communication from David Bruck, who we talked about a little yesterday.  Could we bring that up?

MR. BURKE:  We no longer have the staff to do that.

MR. DALEY:  We can do that.

MR. JOHNSON:  Exhibit, e-mail from Bruck.  If you would just bring up the text, the body of the e-mail.  Would you scroll so that we can see the to and the date line and all that?

Q.  Mr. Hammond, I'm showing you what is an e-mail dated December 12, 2002.  And I understand that this would be before Mr. Swerling or Mr. Harris was brought on to the case, it was still while Mr. Monckton and Mr. Littlejohn were the attorneys, and their names are there at the bottom.  But this appears to be or is an e-mail from David at Brucklaw.com, David Bruck, and there are several people who are CCed.  One of those is Kevin McNally and then Mr. Littlejohn and Mr. Monckton are also CCed.

And it says, Kevin, I spoke yesterday with Billy Monckton and discussed the importance of avoiding a nonconfidential court ordered psychiatric eval, et cetera.  So here Mr. Bruck is telling Mr. McNally that there are benefits to avoiding a

nonconfidential court ordered psychiatric evaluation, and that's what Mr. Swerling and Mr. Harris said they wanted to avoid as well, correct?

A.  Well, yes, but I think they did it -- the e-mail, I think David's e-mail expresses in the next sentence some of the concerns that had been communicated to him.

Q.  And that's fair enough.  And we have heard Mr. Monckton's testimony that he had concerns and we have seen his handwritten notes.  But we also know that it wasn't that Mr. Swerling and Mr. Harris were unconcerned about competency, was it?  Because they in fact wanted to have a competency evaluation done and in fact had a competency evaluation done by their own expert rather than the government's expert, correct?

A.  Yes.

MR. JOHNSON:  Beg the court's indulgence for one second.

(There was a pause in the proceedings)

Q.  (MR. JOHNSON) All right.  We will move --

THE COURT:  Let me jump in before you move on.  I just want to be sure I understand.  Mr. Hammond, you know, lawyers representing a criminal defendant have an obligation under the ethics rules to represent their client zealously within the bounds of the law, I think the way the phrasing goes.  And certainly that principle is at its height, zenith,

in a criminal death penalty case. But it just seems odd to me that here when you've got a defendant charged with a major crime who has been furnished at taxpayers' expense two of the best criminal defense lawyers anywhere in this region, in the southeast even, and has been given not one but five medical professionals, including Dr. Schwartz-Watts who, as has been noted, I've had her in my courtroom many, many times and sometimes she's on the stand for the government, sometimes she's on for defendant, she's not one that always chooses up one side or the other. And when she tells them her client's -- their client is competent are you suggesting they have an obligation to override their own expert and urge to the court that the client is not competent?

THE WITNESS: No, your Honor, I'm not suggesting that.

THE COURT: All right. Well, how --

THE WITNESS: What I was trying to communicate, and I know this is a difficult area, but what I was trying to communicate is competency is a fluid concept.

THE COURT: I understand.

THE WITNESS: It waxes and it wanes.

THE COURT: All right.

THE WITNESS: And there are times in dealing with a client who has very significant mental deficits that lawyers who are close to the client, communicate with the client on a

regular basis, must begin to have doubts in their own mind about with all of the things that go on around a trial, whether the additional pressure and the reliving of events and all of those kinds of factors may have caused a client to no longer be able to really assist in the defense and really --

THE COURT: Well, I'm sorry. I didn't mean to interrupt you.

THE WITNESS: What I was trying to say is that the lawyer needs to be excessively vigilant about the changes and the nuances.

THE COURT: Didn't we see an episode of that when the September 20th occurred? Mr. Swerling on the record expressed concerns that his client might not be competent at that time, Dr. Schwartz-Watts examined him right then and we adjourned court for the day and came back the next morning, and the next morning Dr. Schwartz-Watts gave us the green light and said he's competent now. So, granted, it can wax and wane, but it looks like the lawyers did all they could to bring it to my attention when they thought it was appropriate.

THE WITNESS: Well, I have no concerns about that. One is looking at the other things that were going on with this man prior to and during trial. I couldn't help but wonder why they didn't bring it to the court's attention earlier. It wasn't just this one episode, it was the other questions that I've heard talked about in this courtroom about

Hammond - Cross                    957

the coloring books and about the question whether the client was or wasn't sleeping in the courtroom, whether he was drowsy and attentive.  All of those things go into considering whether your client may no longer be competent.

And I frankly don't think that a one hour evaluation by Dr. Schwartz-Watts, or by anyone else, is necessarily going to answer that question, particularly if you're focused on a single episode that happened in court.  That outburst on the 20th of September may well be symptomatic of deeper problems. And I don't have confidence that in the span of an hour even an expert who knows him well could have come to the conclusion that he is now competent.

THE COURT:  All right.  Thank you, sir.  Please continue.

BY MR. JOHNSON:

Q.  And if I could follow up on just a couple of things based on your response to Judge Anderson.  You are mentioning an hour's not enough.  When you say that, what is this hour you're talking about?

A.  Well, I didn't mean to just call it an hour, but whatever -- however much time Dr. Schwartz-Watts spent talking to the client that day, I have real questions about whether that's the way to handle a competency problem.

Q.  But we also -- isn't it fair to say that we also had to put that in context?  It's not as if she was someone who just

came in out of nowhere, sat down with him for an hour and then said, Judge, he's good to go. We're talking about an expert retained by the defense, and you wouldn't dispute, would you, she had met with Brandon Basham multiple times and conferred with the attorneys multiple times over weeks and weeks prior to the trial? You wouldn't dispute that, would you?

A. Whatever the record shows on that I wouldn't dispute.

Q. And the things that you're mentioning that give you concern, other than the scuffle, you mentioned things like coloring books and drawing during the trial and wanting dip. Those are all things that you have been learning about this past week, correct?

A. Yes.

Q. So there is nothing else in the record that you would point to, other than the scuffle, you are not basing your opinion on things that you've read in the record other than that, correct?

A. Well, I think the other thing we haven't really talked about is the emphasis that defense counsel seemed to have placed on what they call Mr. Basham's manipulation. As if -- as if to suggest that because they have observed him being what they would call manipulative, or what others over time have called manipulative, that must in some way mean that he is competent, he's just gaming the system. And the repeated references to manipulation as the reason why counsel didn't

Hammond – Cross                              959

address competency in a more aggressive way is also troubling to me. I don't know if I'm clear about that.

Q. I understand your answer, and I'm not expecting that we can, you know, come to an agreement and hold hands on this. But it's fair to say, is it not, that it's not as if they looked through the record and found all those references to manipulation and then just said well, he's probably competent. They had a team of experts in addition, and including Dr. Donna Schwartz-Watts, who all find that Brandon Basham was competent, correct?

A. Yes. My only point on the manipulation issue is that, and I don't know what Donna Schwartz-Watts would say so don't get me wrong on this, but I have been around too many cases in which lawyers decided, sometimes with the help of professionals, that their client was competent, and one of the things they seem to rely on is well, I've seen how manipulative he is in the jail, how he gets things he wants from people, how he gets people to give him money, to bring him snacks, in some cases to violate jail rules, which I know that Mr. Swerling and Mr. Harris wouldn't do.

But that kind of thinking by lawyers I find troubling. I think it's dangerous when you are trying to assess the competence of your client to conclude that he's -- he is not now incompetent because he has a history of exhibiting an ability to manipulate. I mean, a five-year-old can

manipulate.  That's what I was trying to suggest.

Q.  But you're not suggesting that instances of manipulation would be irrelevant, would you?

A.  They are not irrelevant, but I would urge, and I know other people have urged, as well, that you really need to look at this whole concept of manipulation and malingering with great care and with -- you know, I guess skepticism is the word I would use.

I think many good experts would tell you that the ability of someone who is severely compromised to manipulate little things like getting the favors they want, getting dip in the courtroom, is not a sign that they are competent.  It might indeed be a sign that would contribute to a finding that they are incompetent.

Q.  And I don't mean to belabor this, and I understand that your testimony is that evidences of manipulation are not dispositive, and I'm not necessarily suggesting that they are, but while not dispositive they are certainly relevant things that the attorneys have to consider in addition to the opinion of their own experts, including Dr. Donna Schwartz-Watts, correct?

A.  Right.

Q.  And, you know, maybe I'm making a confession to the court here, but there have been times when I doodle on my pad while things are going on to help me stay focused.  But I'm

listening, I'm doodling, does that make me incompetent?

A.   No, of course not.

Q.   I'm going to move on now from competency, unless the court has anything to follow up on that.  And, of course, the judge can jump in whenever.  But I want to go to claim number nine, which is a claim that and you opined that in making his opening statement Mr. Swerling conceded too much of the government case.  Is that your opinion?

A.   I'm not sure I'd put it exactly that way but, yes, I know what you're talking about.

Q.   Remind me how -- I'm not trying to be cute here, but how did you put it?

A.   Well, when we talked about this yesterday we talked about conceding guilt on the death eligible crime, on all the elements of a death eligible crime in this case.

Q.   So it was below the standard of care to concede away those elements that would have made Brandon death eligible?

A.   In my opinion it was in this case.  And I said yesterday I'm not suggesting that there might not be some case in which after you've considered everything else that might be warranted.  I just don't believe it was here.

Q.   One thing that Mr. Harris testified about and Mr. Swerling testified about was that they came to the conclusion that there was very little chance, if any chance, that Brandon Basham was going to be acquitted of the charges against him.

Did you read their testimony on that point?

A.   I did.  I read and saw testimony on that.

Q.   So you read and saw that they said we determined that he's not going to be found not guilty so we need to proceed on what the best strategy is to save his life.  Do you have any reason to question their assessment that they weren't going to get a not guilty verdict from the jury?

A.   Well, I think all of us would question at some level whether that was the 100 percent inevitable outcome.  Anyone who is a skilled trial lawyer, and these people are certainly skilled courtroom trial lawyers, would know that there's no such thing as an inevitability.  Too many things happen in trial to say it's absolutely the case that your client is going to be convicted, and I don't think ultimately these defense lawyers would say that.

Q.   You mentioned that none of us can say with a hundred percent certainty what a jury is going to come back and do.  But when we're talking about the Strickland standard of care we're not talking about a hundred percent probability standard, right?

A.   Right.

Q.   There are all sorts of probabilities that occur during a trial, and lawyers have to make decisions about what is more probable than not.  There's always a risk/reward calculus that has to be made, correct?

A.  Right.

Q.  And in making the determination that they weren't going to be able to secure a not guilty verdict from the jury and then proceeded on that to figure out what was going to have to happen to save Brandon's life, they were relying on a whole host of facts that were within their knowledge, correct?

A.  Yes.

Q.  And they had talked to Brandon, they had reviewed the discovery, they had gone out and interviewed hundreds of witnesses, and you just aren't privy, are you, to anywhere close to the type or the amount of information that they had at the time that they made that decision, correct?

A.  Of course.

Q.  Have you seen the video from the Wal-Mart parking lot that depicts Brandon Basham kidnapping and carjacking Alice Donovan?

A.  No, but I read about it.

Q.  But yet you haven't seen that video.

A.  No, I haven't actually seen the video.

Q.  Now, you're obviously aware that Brandon Basham had a codefendant Chad Fulks who started off together and at one point their cases were severed.  And you understand, don't you, that John Blume, he was one of Chad Fulks' attorneys, correct?

A.  Yes.

Q.   And the strategy that Blume and his team made in Chad Fulks' case was that they were going to plead guilty and then just have a sentencing phase trial.  You understand that to be their strategy, right?

A.   Yes.

Q.   And I think at least one of the reasons behind that was we want to plead guilty, maybe the jury will look upon that favorably in deciding whether to save his life.  And in the 2255 proceedings after Mr. Fulks was sentenced to death their standard of care expert in that case came back and said Mr. Blume should not have pled guilty, but what he should have done was at least have a bifurcated trial so that during the guilt phase of the trial the defense could have all the evidence of the crime front loaded, the jury could express their moral outrage in finding him guilty, and then having vented themselves through the guilty verdict the jury could then focus on mitigating evidence at sentencing.  Have you read those 2255 proceedings in the Fulks case that talk about those different issues?

A.   I have read about them.

Q.   And one thing that the standard of care expert and the attorneys for Mr. Fulks in the 2255 argued was that Mr. Blume should have gone done exactly what Mr. Harris and Mr. Swerling did in this case, which is have a bifurcated trial.  So the very thing that the standard of expert -- standard of care

expert in the Fulks case said should have happened there is what happened here, correct?

A.  I don't -- I don't think that those two propositions actually fit together.

Q.  But it seems to me --

A.  I mean, I don't know what the experts in the other case would say if they were here today talking about the strategy that was used here.  Because every situation does -- I've said before it has to be decided based upon the unique circumstances of this case.  And I understand that broad latitude has to be afforded counsel, and I said that yesterday.  But to say that a strategy that might have been deemed acceptable in some other case wouldn't be acceptable here is not what I was saying.

Q.  It just seems to me, and agree I'm not expecting we can come to a meeting of the minds on this, but it seems that you are a defense attorney and you've got a client who has confessed, he had made multiple statements to police, he's on video carjacking the woman from Wal-Mart security footage, that's there's a mountain of evidence against him, and they make the decision we don't think there's a real chance that he's going to be acquitted by the jury, there are basically three options that I see.  They can have him plead guilty and hope the jury looks upon that favorably and then just go straight to sentencing, or, on the other hand, they can say

you know what, we don't think that he's going to be found not guilty but it's going to be Katie, bar the door at trial, we're going to contest everything the government puts up and hopefully that small percentage will come through and he will be found not guilty, but we also risk losing credibility with the jury.

Or they can take a middle road, which is we're going to concede what we feel like we have to concede, but we're going to give us a credible reason why we're having a bifurcated trial, why we're putting the government to its proof, and so we're taking that middle road. And that's at least a strategic decision. Even though you may not agree with it, don't you have to agree that that is a strategic decision that they had to make at the onset faced with a mountain of evidence against their client?

A.   No, I don't agree with that.

Q.   You don't agree it was a strategic decision at all?

A.   I agree that it was a strategic decision, but I do not believe that there were only three choices, and nor do I believe that any criminal defense lawyer would look at it as has to either fight every element, every issue, every witness, plead, or concede guilt and hope to favor the jury.

Q.   So I think what you would say is between pleading guilty and contesting everything there's a middle road, and that middle road can be narrow or that middle road can be wide,

it's a question of what are you going to concede and what are you going to contest. But these are within that middle road. Where you want to line up on the road is also a strategic decision, is it not? What are we going to concede and what are we going to contest, correct?

A. Yes. But you have to remember that these defense lawyers concluded that their job here was to save this man's life, period. They both have been very clear about that being their goal. Well, when they looked at how to save his life their focus primarily was on two significant categories of mitigation, Mr. Basham's reduced role in the offense and his serious mental deficits. I think those considerations posed the question how do you best, if you want to save his life, how do you best develop those mitigating factors.

There are other considerations, as well, I'm not saying they are the only ones, but those are important considerations. And then the question is can you develop those considerations as part of your integrated strategy without conceding guilt. And I would urge that particularly experienced lawyers who know how variable jury thinking is, juries are good, I don't dispute that, but if you look at any of the significant studies that have been done of capital juries, and we now have the benefit of a lot of work that's been done on the things that motivate capital juries, I think you would have to come to the conclusion I articulated

yesterday, that you abandon the chance of jurors failing to find unanimously guilt on the underlying charge only in the very rarest of the circumstances.  There are just too many things that can happen.  And I don't think you forfeit your ability to make your defense simply by respectfully putting the government to its proof.

Q.  Okay.  Putting the government to its proof, obviously something that happened here because we had a guilt phase trial.  And one of the competing allegations is you allowed the government to put on too much proof.

A.  That's exactly right.  They went ahead and put on it looks to me -- and I haven't looked at everything, I said that.

Q.  So what should they have conceded and should they not have conceded?

A.  Well, I don't think at the point of opening statements it was necessary for them to concede any particular issue.  I think they could quite easily say we are going to have a trial here.  You can even say that it is not unlikely that there may be more than one phase to this trial, that will be up to you as jurors.  But having to concede any particular issue, I don't know that you have to.

Q.  Let's talk about what they did concede.  In the -- and you read the opening statement, correct?

A.  Yes.

Q.  In the opening statement -- was that delivered by Mr.

Swerling or Harris?

A.   I think the one I'm thinking about was Mr. Swerling, but I know Mr. Harris did a statement, as well.  So I'm not --

Q.   We're talking about the opening statement in the guilt phase, right?

A.   Yes.

Q.   All right.  What specific, explicit concessions did the lawyer make?  What did he say that he should not have said?

A.   Maybe you would have to pull up the transcript.  I can't tell you right now without anything in front of me exactly what he had said.  But I think he made it -- he made it very clear that they were going to find the elements of kidnapping.

Q.   Because my recollection is that he said something very similar to what you said he should have said, which is that we're here, we're having a trial, there is probably going to be a sentencing phase.  It seems like what the general statements that he was saying is exactly what you said would be appropriate to say.

A.   Yeah, maybe I'm not being articulate.  I wouldn't go that far and I would hope that counsel would not go that far.  I think you can acknowledge that there may be two phases to this trial without conceding that the jury is likely to find that. I just don't think you ought to take the burden off of the jury to have to decide unanimously guilt on the underlying charge.

Q.  But the decision that they made about how they were going to approach the trial and how they were going to approach opening statement was necessarily informed by the information that they had, having talked to Brandon, having reviewed all the government's discovery, and having generated all of their own discovery, and then knowing things that are in the universe of facts that aren't in any of the discovery, all of that informed the strategic decision that they made about how they were going to approach the guilt phase of the trial, correct?

A.  Well, I assume so.

Q.  Claim 15 is an argument that under 404(b), 403, various other evidentiary rules, a lot of information, a lot of evidence, their claim is there was a lot of stuff in the guilt phase trial about the abduction and killing of Samantha Burns and that you should have -- you should have opposed that more vigorously because the evidence itself and the extent of the evidence prejudiced Mr. Basham in the eyes of the jury and contributed to him being found guilty.

You are aware, aren't you, that the trial attorneys did in fact object to the admission of the Samantha Burns evidence and Judge Anderson ruled it was admissible because it was intrinsic to the crimes charged, correct?

A.  I'm a little unclear about whether the judge ruled the evidence was admissible as opposed to ruling prior to trial

that it was discoverable.  And I looked for that and I couldn't -- I couldn't find a place where the court had specifically ruled that the evidence of the Samantha Burns homicide was admissible at trial.

Q.  What do you mean by discoverable?  I'm not sure I understand.

A.  I think there was a discovery motion earlier on, not right on the eve of trial, for information with respect to the Samantha Burns, and there was a debate at that time about whether it was 404(b) or whether it might be appropriate because it was intrinsic.

Q.  My understanding is the ruling was that, an evidentiary ruling that the judge found that the evidence of everything from the escape from a Kentucky jail to arrest was intrinsic to the crimes charged and that therefore it was outside of the scope, actually, of 404(b) because it was intrinsic evidence. That's not your understanding?

A.  Well, I haven't seen a ruling that said precisely that. If there was one then I would stand corrected, but that's my impression is that -- sorry.

        MR. JOHNSON:  One second, your Honor.

        (There was a pause in the proceedings)

Q.  (MR. JOHNSON) I'm looking at an order, and I'll be happy to show it to you.

        MR. BURKE:  Can you provide a copy to the witness?

MR. JOHNSON: Do we have a copy? I have no objection to making a copy while we're assessing whether to do that. I'm looking -- I'll tell you I'm looking at an order from this case that's dated March 5, 2004 from Judge Anderson. It's order number 24 on rulings from the February 24th through 26th, 2004 hearings in this case. And on page eight of the order Judge Anderson addresses the defendant's motion -- and it's up. Page eight, down there at the bottom under that heading.

It says the government takes the position that anything that transpired from the time the defendants escaped from the Hopkins County jail November 4, 2002 until their arrest is intrinsic to the crime, and the court agrees. Therefore, the government obligation to disclose Rule 404(b) evidence includes only evidence of other crimes, wrongs, or acts that took place outside the time period.

So and I'll be happy to show --

A. That's the --

Q. Okay. Are you suggesting then that because the judge found that it was intrinsic for purposes of disclosure it may not have been intrinsic for purposes of admission into evidence?

A. Well, certainly how much of it was admissible at trial remained an open question, and what I was saying to you is I don't think that question was ever resolved.

Q.   So --

A.   And if it was I'm mistaken.  But that's the motion or the order that I had been referring to earlier.

Q.   Irrespective of that, it's obviously the case that the judge made a ruling that it was intrinsic and not within the scope.  Because the issue is you've got to disclose Rule 404(b) evidence, there's a motion turn over to us the Rule 404(b) evidence, there's a question of all of this stuff between escape and arrest is within the scope of the Rule 404(b), and Judge Anderson holds it's not, it's intrinsic to the crime.  So what's clear is there's a ruling, a written order from the court that it is in fact intrinsic to the crimes charged, correct?

A.   Okay.

Q.   Your opinion that -- I take it your issue is not necessarily the Samantha Burns evidence itself, which had been contested and deemed intrinsic, you're talking about the scope, well, even if some of it could have come in it's a separate question of how much of it could come in, is that fair to say?

A.   That's not a small question.  I mean, I haven't seen any 403 motions here, I haven't seen argument with respect to what you call the scope of the evidence.  I mean, I would think almost surely that given the prejudiciality of this evidence that the court would have entertained motions to limit how

much of the Samantha Burns evidence was going to get in, particularly that it wasn't specifically relevant to proving what happened and when it happened.

Q.  So it's fair to say scope is important.

A.  Yes.

Q.  Scope is important, but you haven't read all the trial transcript, have you?

A.  No.  But I read, I think, some of the testimony of the Samantha Burns-related witnesses at the trial.

Q.  You read excerpts but you can't say that you've read all of the Samantha Burns evidence.

A.  I absolutely cannot.

Q.  And you haven't read all of the evidence that was later put in at sentencing, correct?

A.  I have not.

Q.  Well, it seems to me that scope can only be measured in context.  If you are arguing that the scope of the evidence is too much or may have been too much wouldn't you have to know how much of it came in and in what context it came in?

A.  Well, I mean, if we were going to get down to the absolute final analysis that would be -- that would be important.  My point is that I don't see an effort to limit that evidence, and I can see no reason prior to trial or prior to witnesses testifying that there couldn't have been motions and arguments with the court about how much of this evidence was going to

get in.

    And particularly if you go back, Mr. Johnson, to the last claim we talked about, if you are going to decide to go to trial and to concede guilt on the kidnapping of Alice Donovan I would think you would want to be thinking real hard about what else is going to come in at this trial.  And insofar as possible limiting the damaging effect of that, knowing that the jury is going to hear it now and since you conceded guilt they are going to hear it again in the penalty phase.

Q.  But the claim that's been brought for this court is not -- you didn't think about limiting the scope of Samantha Burns evidence, it's that you just specifically made sure that these particular types of evidence didn't come in.  So it is a specific claim.

        MS. STONE:  Objection, your Honor.  Our claim does include the scope of the -- that misstates our claim.

        MR. JOHNSON:  My point, your Honor, is you can't consider scope unless you are specific about what you are talking about.  It's not just that too much came in, we're not going to tell you what shouldn't have come in, but it was just too much.

Q.   (MR. JOHNSON) What specifically came in about Samantha Burns that shouldn't have?

A.  I have already said generally the kind of evidence that I think were problematic, but I haven't gone through each of the

witnesses.  I do believe that there were eight or more witnesses.  I believe that the testimony of some of those witnesses, from what I've heard about it here, was not essential to prove the elements that would be intrinsic to both crimes.

Q.  So you are not prepared to provide a list or to say this, this, this, this, and this are the portions of the testimony that shouldn't have come in?

A.  No.  But that should have happened, it should have happened a long time ago.  It should have happened at the time of trial.

Q.  But you are not prepared to say what that list is or what it should have been.

A.  No.  I mean, I just haven't had the time to do that.  But I think it could be done and it should have been done at the time of trial.

Q.  Sometimes this evidence that we have been talking about has been described as victim impact evidence.  And I think one thing that you said yesterday is that a problem is the jury gets hit with it twice if you are not careful, because they hear this victim impact evidence at the guilt phase and then they hear it again at sentencing and it just gets reinforced in their mind.  What victim impact evidence came out during the guilt phase of the trial?

A.  I've already tried to answer that.  And it wasn't just

Hammond - Cross                                977

what I would call victim impact evidence, but I think there were family members who testified who testified about the effect of the disappearance of Samantha Burns on them.  And I can't tell you which pages and lines, and if it's not there I'll stand to be corrected.  But I believe I have seen that and I have seen it in the government's closing in the guilt phase.

Q.  And I understand that.  But you cannot specifically identify anything that you would label as victim impact evidence other than saying you think you remember this general category of stuff but you can't point to anything specific, is that fair to say?

A.  But I think it could be done.  I just haven't had the time to do it myself.

Q.  And so you also can't point to anything specific that came out in the guilt phase and it came out again in sentencing?

A.  No, but I think -- I think it is certainly there and I think it can be done.

Q.  All right.  Last claim, claim 16, which is a claim that Mr. Swerling and Harris should have requested that at least a portion of the closing argument from the sentencing, and there was only a sentencing phase at Chad Fulks trial, there was a statement in Mr. Johnny Gasser's closing argument about a puppet.  And the claim is that the trial attorneys for Mr. Basham should have asked Judge Anderson to admit in that

statement from the Fulks closing argument.  Is that what you understand the claim to be?

A.  Essentially, yes.

Q.  And you've read the entirety of that closing argument from the Fulks trial?

A.  Yes, from both trials.

Q.  So, having read that, you know that there are also many references in that closing argument to Fulks and Basham working as a team.

A.  Yes.

Q.  And you are aware there are also references in that closing argument that Fulks couldn't have done without Basham and Basham couldn't have done without Fulks.

A.  Well, in a phrase, yes.

Q.  You wouldn't deny that those types of arguments are in there.

A.  Yes, but I think -- I think that's not an accurate characterization of the differences between the two closings.

Q.  What is not an accurate characterization?

A.  The suggestion that they were just a team and one couldn't have done this without the other.  I think that's a pretty good characterization of the Basham trial.

Q.  But you don't think that's in the Fulks?

A.  I don't think it's a fair characterization of the closing argument in the Fulks trial.

Hammond - Cross                          979

Q.   But if I were to tell you that there are many instances in the Fulks closing argument that match up almost verbatim with what is in the Basham closing argument about the teamwork, about working together, about one not being able to do it without the other, you can't dispute whether there are correlations between the two closing arguments.

A.   I think there are words that are quite similar and phrases that are similar.  But I do not think that's the impression that someone -- if we brought in a group of people just to listen to those two closings I think most people would agree that they take a very substantially different tact.

Q.   I'm not sure I understand that last statement.  It we had a group of people and asked them what now?

A.   And maybe I shouldn't have done it -- shouldn't have said it that way.  But what I'm essentially saying is that the approach in the Fulks trial was significantly different in terms of Fulks' leadership responsibility for these crimes, as opposed to the way that the roles of both defendants were characterized in the second trial.

Q.   And you understand that the Fourth Circuit has held that the government did not take inconsistent positions between the Fulks and the Basham trial?

A.   As I said yesterday, I read the Fourth Circuit opinion.

Q.   And the transcripts can speak for themselves and the closing arguments are what they are, but there's a legitimate

chance, isn't there, under the rule of completeness if Mr. Swerling and Mr. Harris get up and say we want the puppet on the string statement to be admitted into evidence so we can argue it to the jury, good chance the government also stands up, and if that's the case, Judge Anderson, we want the whole thing in, just not a snippet.

A.    We talked about that yesterday and the judge inquired about that, I believe.  I understand that that's a response that the government might have made, but I do not think it is anywhere close to being inevitable that the court would have said, well, then, that they are going to -- the government's going to get to read the whole closing.

But posit for a moment that that's what the court said. Would defense counsel at that point be barred from saying, well, your Honor, if that's your ruling we would disagree with it but we're not going to ask that the portions be read if in fact it's going to have to all be read.  But let me also say I don't know it would have been all that much worse to have the whole thing read.

Q.    A couple parts to your answer.  One is you used the word inevitable.  And, again, when we're talking about strategy developing over the course of the trial we don't hold lawyers to the standard of what is inevitable, correct?  We're always talking about probabilities.  If I'm a lawyer and I make a motion there's a probability that the judge may rule a certain

way, one way is going to hurt, one way may help.  And so it's the standard something far less than what is inevitable and what is a reasonable strategy under the situation.  So it's not an inevitability standard, right?

A.  I disagree with your conclusion there.  What I was saying is when a lawyer seeks to have evidence introduced and the opposing party says well, if you are going to introduce A then for the sake of completeness under Rule 104, I guess, whatever it is, then you must admit the remainder, I think it is pretty clear at that point that the lawyer who moved for admission can say well, your Honor, if that's the case then I withdraw my motion.  I disagree with the court, respectfully, but I'll withdraw it.  So when I say it's far from inevitable, I'm asking myself why not make the motion.

Q.  A couple of things in followup.  In preparing for your opinion today on this issue did you go back and read Rule 801(b?)

A.  (d)(2)(B).

Q.  (d)(2)(B).

A.  I didn't read it in preparation for today but I have read it in the last couple of weeks.

Q.  Is it your opinion that you can say to the degree of certainty that you have to have to testify as an expert under Rule 801(d)(2)(B) the closing argument from the other trial is something that would have been admissible?

A.  No, I can't say it is inevitable that it would have been.

Q.  And one thing that Mr. -- and I don't think I brought this out specifically, but I know Mr. Harris in his testimony talked about, you know, Johnny Gasser is pretty good at delivering closing argument and we sure didn't want two of his closing arguments in one trial.  It was an assessment of the harm that might come if they both come in.  Did you read that part of his testimony?

A.  I have heard that argument.

Q.  And part of the point is, well, they should have asked for the puppet statement because if the jury hears the puppet statement then they might think, yeah, Brandon Basham was less culpable than Chad Fulks, or they might think, gee, it seems like the government is -- wants to have it both ways.  They are arguing one thing there and another thing here.  But if it all comes in that really lessens the impact of what they want that evidence to show, doesn't it?  Because it can very well make this seem like no, the government has made the same argument in both trials and it seems like their theme has been consistent that these two guys were working together to kidnap and kill Alice Donovan.

A.  Well, again, whether the closing would have been read for the sake of completeness is a question that I think was still within the ability of the defense to control.  I do not believe that it is at all inevitable that the whole closing

would have -- it's not the choice they were faced with.  They didn't have to choose do I want to have this statement in along with all of the closing or nothing at all.  And as I've said before, there is significant power with juries, and I think every defense lawyer knows this, being able to stand up and say this is what the government said to a jury in another case on this exact point.  It's important enough, and particularly where diminished role in the offense is one of your two primary mitigation targets, it's important enough, respectfully, I would say, that you ought to raise it and attempt to use it.  That's all I was saying.

MR. JOHNSON:  Beg the court's indulgence.

(There was a pause in the proceedings)

Q.    (MR. JOHNSON) One final question.  When we had our interview back on October 8th I think you told me you, and correct me if I am wrong here, you said as a standard of care expert what you do is you're testifying as to the first prong of the Strickland test.  In other words, you are here to testify whether a given performance was deficient or not, but you are not proposing to the court what his ruling should be as to the prejudice prong of the standard.

A.    That's essentially correct.  I think I can testify, and have, that certain types of evidence are more or less prejudicial, the admission or exclusion is more or less prejudicial based upon my experience, but I wouldn't say that

I can be the expert, ultimately, on whom any judge relies in satisfying the second prong.

MR. JOHNSON:  Thank you for answering my questions, Mr. Hammond.  I have nothing else, your Honor.

THE COURT:  It's time for our morning recess.  How long do you think you will be?

MS. STONE:  I don't think it will be more than 15 minutes.

THE COURT:  Let's take a 15 minute recess.

(A recess transpired)

THE COURT:  You may proceed.

MS. STONE:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. STONE:

Q.  Mr. Hammond, I am going to briefly address the article from the Arizona Republic that was brought up yesterday.  Was that article a general article for abolition of the death penalty or did it address some unique problems with the death penalty in Maricopa County?

A.  No, it was focused on what was known at that time as the death penalty crisis in Maricopa County.  We had more than three times the number of pending death penalty cases than any other jurisdiction in the United States, and well more than the next three largest counties in the United States combined, Harris County, L.A., and Clark County, Nevada.

Q.  And the purpose of that article was to inform the readers of that paper of some of those issues unique to Maricopa County?

A.  Yes, to its charging decisions and to the funding made available to court-appointed lawyers in those 128 or so, I forget the exact number of cases.

Q.  And we talked some about your trial experience.  Are you a member of the American College of Trial Lawyers?

A.  I am.

Q.  And can you tell us a little bit about the size of that organization?

A.  Well, it's a national organization, it's been around for a great long time.  I notice that Mr. Swerling is also a member, I think he's been a member a good deal longer than I have. But it's a national organization that attempts to identify and select as members people who are experienced trial lawyers. The history of the organization has been almost entirely on the civil side, but there are a good number of criminal defense lawyers around the country who are members.  I believe there may only be three or possibly four criminal defense lawyers in the state of Arizona who have been asked to become members.

Q.  So this is not an organization where anyone can barge in and pay its dues and be a member.

A.  No, it's not.

Q.  Turning to your experience as a trial lawyer, can competent defense counsel sit back and wait to see if there's a withdrawal of the death notice or dismissal before they start working up a case?

A.  No, I would certainly hope not.

Q.  Do those things usually happen without substantial leg work on the part of the defense?

A.  No, they are very intense effort sorts of things.

Q.  Does competent defense counsel prepare for a penalty phase in every case where death is noticed?

A.  I would hope so.

Q.  And so although you've only had three cases actually go to trial, have you been involved in preparing for the penalty phase in other cases?

A.  Yes, in many cases.  And this has been, this theme of preparing for all phases of the trial at the same time has been a major issue.  And particularly in Arizona, because we went from judge sentencing to jury sentencing in 2002, and I'm sorry to say it took a while for some lawyers to get the idea that they really did need to integrate the trial, the innocence/guilt phase and the penalty phase.

Q.  Would you agree it's a good strategy for an attorney to work up a case and try and stop it from going to trial when death is on the table?

A.  Certainly.

Q.  You mentioned that you spoke with your coworker Anne
Chapman regarding some of the claims in this case.  Does she
have particular experience in competency issues?

A.  Yes, that's really her field.  She was a part of the
Zacarias Moussaoui defense team in the Eastern District of
Virginia before she joined my firm.  And since then she has
been a member of the Jared Loughner team focusing particularly
on the mental competence issues.  And that's a case that
involved the shooting of Gabrielle Giffords and the death of
Judge John R. Roll.

Q.  And on competency, does there come a point for a lawyer
where they have a client where competency, you used the term
waxes and wanes or there are individual incidents of
incompetency, where those become a larger issue for the
lawyer?

A.  Yes.  And I think that's what I was trying to say both on
direct and on cross.  That client competence issues tend too
often to be seen as very episodic, that they have a beginning,
middle, and end and may all be within a few minutes of each
other.

    But I think the important point for criminal defense
lawyers to recognize, and particularly in capital cases, is
that a client who has serious competence issues may very well
have the greatest stresses and the greatest occasions for
being unable to participate in a defense as cases get close to

trial.  Or into trial.

Q.  And regarding the Jackson v. Denno hearing, the government showed you their Exhibit 9, which was the e-mails between resource counsel and Mr. Swerling.  And you noted that one of the problems is that there's limited information in those e-mails.  If I told you the record would show that at one point Mr. Basham said that Alice Donovan was alive and tied to a tree and then later she -- those statements that Mr. Swerling hoped to use as cooperation, no, Alice is dead and I'm going to help you find her, would that be one example of missing information that would be important to making a strategy decision?

A.  Certainly.  And it's a defect, but I think it's one that I'm sure Mr. Swerling and Mr. Harris recognized to the list serve.  And particularly that one is a great resource.  Eric Friedman and the people at Hofstra have done a terrific job, and I do not want to suggest that they aren't a valuable resource.  But over and over again they have said, Mr. Friedman and others, Bruck, McNally, that it's an important resource but if you really intend to get advice that you want to seriously take into account, particularly on strategy questions, the way to do it is not to send out a global e-mail and look at a few one-paragraph responses.

Q.  Mr. Johnson also showed you an order regarding the Samantha Burns evidence from this court, that the evidence was

intrinsic and the government had an obligation to disclose, referring to 404(b).  Did you see anything in that order regarding scope of admissibility of that evidence?

A.  No, there isn't anything in there.

Q.  And do you recall Mr. Harris and Mr. Swerling testifying they were offered a limiting instruction and they declined that?

A.  I do know that they were offered a limiting instruction, and I honestly don't know why it was declined.

Q.  If part of their testimony was that they declined because they didn't want to call more attention to that evidence, would you agree with that strategy?

A.  No.  And that's what I heard here in court, but I don't understand that, since limiting instructions are almost inevitable, almost always used out of the presence of the jury.  It's difficult for me to understand how the strategy could have been not to ask for a limiting instruction when the jury was out of the room.

Q.  And you stated that you read the closing arguments on both guilt and penalty phase in this case?

A.  Yes.

Q.  And that includes the closing arguments of the government?

A.  Yes.

Q.  Do you have an opinion on whether or not that evidence, that Samantha Burns evidence, was an important part of the

government's closing, or a powerful part?

A.   Yeah, I think -- I would think that any reader who knew anything about this trial would say that the use of the Samantha Burns information was devastating.

Q.   You were also asked about the opinion in the Fulks evidentiary hearing that it's a valid strategy to have a bifurcated trial.  Would you agree with me that the strategy to have a bifurcated trial and strategy to have a bifurcated trial where guilt is admitted on almost every offense and every element of the offense are two very different things?

A.   Yes, and that's what I was trying to say.

Q.   In a federal mitigation penalty phase do the rules of evidence apply?

         MR. JOHNSON:  Objection, your Honor, to the leading in these questions.

         THE COURT:  I don't think the last one was a leading question.  Overruled as to the last question.

         THE WITNESS:  At the sentencing stages of the trial the rules of evidence do not limit the defense's ability to present information to the jury.

Q.   (MS. STONE) Would that have been a potential argument to bring in the puppet statement, in your opinion?

A.   There was no reason, as I've said before, not to attempt to introduce the puppet statement.

Q.   And one final question regarding your experience.  How

many former clients that you represented at the trial level where death was on the table at some point are now sitting on death row?

A.  Clients I represented?

Q.  At the trial level.

A.  None.

MS. STONE:  Your Honor, may I have just a moment to confer with counsel?

THE COURT:  Yes, certainly.

(There was a pause in the proceedings)

MS. STONE:  No further questions.  Thank you.

THE COURT:  All right.  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Before you get an away, just a quick question.  How long were you able to serve with Justice Black?

THE WITNESS:  Four months.  I spent a week with him before my clerkship because that's -- I was only across the street at the D.C. Circuit, so I spent a week with him when the Pentagon papers were argued, which was a wonderful experience for a young person to be able to watch somebody like Justice Black, who had such strong feeling about the First Amendment.  So I had that glorious week with him and then I was the only law clerk around for the first four months of -- after the end of that term.

THE COURT:  And he died suddenly, I guess.

992

THE WITNESS:  He did die and --

THE COURT:  And the Powell nomination took a while because it was tied up with the Haynesworth Carswell.

THE WITNESS:  That is so true.  So Justice Black died on the 16th of September 1971 and Lewis Powell was not sworn in until I believe it was the middle of December of 1971.

THE COURT:  So it was a short -- I thought a longer interruption there.

THE WITNESS:  It seemed like forever to me.

THE COURT:  So then how long did you work with Justice Powell?

THE WITNESS:  The rest of that term and the following term.  He asked me at the very end of the term that I thought was going to be the only term I would spend with him, he asked me if I would stay for another year.  And I've often mused since then that I am the only clerk Lewis Powell had for two years.  I think he learned a valuable lesson and never asked anybody else to clerk for him twice.

THE COURT:  Well, Hugo Black has always been one of my heroes.  And I was in Tuscaloosa, Alabama one year and went by the law school there, and they have, you might know, they have a room that is a reproduction of his study from his house with all his books around, all of his volumes.

THE WITNESS:  I was there last year, your Honor.

THE COURT:  Is that right?  Very impressive exhibit.

993

THE WITNESS:  I will just, since you asked and I can't resist this, a powerful experience I think for any judge would be to look at the library of Lewis Powell at Washington & Lee.

THE COURT:  They have the same thing there?

THE WITNESS:  But what they have there is Lewis Powell's complete files on every case.  Powell decided to make his records public of every case he was involved in, leaving out only the statements made by other justices.  So that library is really an enormous glorious historical basis.  Black's library, which I dearly love, is almost devoid of case-related information, and I'm sorry to say that was the case because Hugo Black's last wish was that his papers be destroyed.

THE COURT:  Be destroyed.

THE WITNESS:  Be destroyed.  Because he did not believe that anyone should be able to know the internal deliberations of the court, but only what appears in a published opinion.

THE COURT:  Well, going back to Justice Powell, do his files have memos back and forth with law clerks and things like such as that, behind the scenes information?

THE WITNESS:  Yes, to my horror, they do.  And all of the communications.  I don't know if all of them, but the communications between Justice Powell and me on the Furman

994

case and on the Roe v. Wade are all there in the file.

THE COURT:  Interestingly, Justice Black was kind of a forerunner of Justice Scalia in terms of strict literal interpretation of the text of the constitution, right?

THE WITNESS:  Yes.

THE COURT:  Even though politically they differ, or not politically but philosophically, they both had that same belief.

THE WITNESS:  There was very recently an article that attempted to suggest that Hugo Black has the same philosophy as Clarence Thomas.  And I've disputed that.  But I think in terms of Black's approach to the constitution he's always said the words mean what they say they mean, which is why the First Amendment, no law means no law.

THE COURT:  No law means no law.

THE WITNESS:  And, you know, he distrusted judges all his life, and particularly after he became one.  But so he was concerned always throughout his life that if we had a constitution that was more malleable judges would make of it what they chose to make of it, which he thought was very bad.

THE COURT:  I thank you for that insight.  Thank you very much.  All right.

THE WITNESS:  It's been a pleasure to visit with you.

THE COURT:  Anything further before we adjourn until the first week of December?

MR. BURKE:  Not from the defense your Honor.

MR. DALEY:  Not from the government.  Your Honor, I think the only order of business, I think we can work it out, we're going to get a report in the next week, do you think?

MR. BURKE:  When I return to Arizona, I told Dr. Hyde we had two weeks, and I think we're approaching the end of that.

MR. DALEY:  The only other thing, I don't know that we actually asked for it, we are going to ask or request, I think, after we get Dr. Hyde's report, an order for our expert to be able to go and examine Mr. Basham.

MR. BURKE:  And we have no opposition to that, your Honor.

THE COURT:  Let me ask a couple of questions, three questions about three issues that y'all said were going to be submitted on the briefs.  These are real simple questions.  I know y'all didn't want to argue, but claim 14 about Mr. Swerling being a crime victim, it's not really fleshed out too well in the -- well, let me just ask this.  Is the argument that because Mr. Swerling was a victim of a crime similar to the crime at issue here that he is per se ineffective if any subsequent case he handled involved abductions or something similar, that he is just essentially disbarred from that type of practice because he was a crime victim?  Or is the argument that that episode, coming as it did close to the time of the

996

trial, caused him to pull back or be less aggressive or commit some malfeasance that owed in part to the fact he was a crime victim? And if it's the second one, if it's the second of those two we're just right back to ineffective assistance of counsel. You've got to show he did or didn't do something he was supposed to do, and the argument is really inconsequential, right?

MR. BURKE: Absolutely, your Honor. Yes. When we alleged the claim I will concede that I wasn't sure of that dichotomy in the law. In filing our reply to the government's response I realized exactly your point, your Honor. Which is that for it to be a per se bar that rule really only applies when you have conflicts in clients, represent conflicting clients.

So what we attempted to do was to show factually how that affected Mr. Swerling's preparation for the Jackson v. Denno hearing. And we chose not to pursue it here, you will see Mr. Hammond testified he wasn't comfortable. I will say that we simply want to --

THE COURT: You can step down.

MR. BURKE: We want to submit it on the briefs, your Honor. And I want to be a zealous advocate on behalf of my client --

THE COURT: I'm not faulting you. I just want to be sure I understand your position.

MR. BURKE: You actually --

THE COURT: Next question. Claim 31, one at the very end, it says the death warrant is unconstitutional because of race and geographical factors. I don't fault you raising it, but is there any race factor in this case? To my knowledge every victim was Caucasian and obviously both perpetrators were Caucasian. So does race have anything to do with this?

MR. BURKE: No, your Honor. This more of a systemic challenge.

THE COURT: I misspoke, it's 32. It's claim 32, not 31, and that's not withdrawn?

MR. BURKE: You are correct, your Honor. There was -- as far as I know there were -- both defendants in the case and the victims all --

THE COURT: I'm not talking about the two murder victims. The Highway Patrolman almost got run over, the law enforcement that got shot at, the gentleman who was duct taped to a tree, I think everybody was Caucasian, I think. And then the other woman who almost was lured at a shopping mall, that was the Fulks case, not this case, wasn't it?

MR. DALEY: Correct, your Honor.

THE COURT: Even she was white. But that doesn't have anything to do with this case. But I don't fault you raising it because it may be the Supreme Court will come along and say because race is a factor in other cases we're going to

998

wipe out death altogether.

MR. BURKE: Exactly.

THE COURT: I don't fault you for raising that but I don't want to leave the impression that race crept into this case in any way, shape or form. Because I don't think it did.

MR. BURKE: It did not, your Honor. If our pleadings suggested that we would make it clear we are not alleging that. This is a systemic challenge to the federal death penalty.

THE COURT: I don't fault you for rasing that. Finally, trifurcation. I spoke with Judge Bob Conrad up in Charlotte sometime last year and he was in middle of a death penalty case. He said I've got to decide if I'm going to trifurcate or not. And that's the first time I ever heard that word mentioned. I don't know what he ended up doing. But can you tell me, is that being done as a matter of course now in death penalty cases, or have some courts done it?

MR. BURKE: Yes, your Honor. In our reply brief we show a few district courts who have trifurcated. In candor I don't say that I can tell you that I know enough about it. The totality of federal death penalty cases right now say it's a matter of course. But we did cite in our brief, in the reply brief -- well, I'm looking at the government's. No wonder I'm not finding what I'm looking for.

THE COURT: Take your time.

999

MR. DALEY:  Your Honor, I know the government's research on this said that, the case law, it's certainly not required.  And I think several courts have said it's in the discretion of the court.  I think there's a Tenth Circuit case, this is all from memory right now, but that there is no requirement that the district court trifurcate under the federal death penalty act.  That's the case law now.  Mr. Burke is correct that there have been some district courts that have trifurcated.

THE COURT:  But, correct me if I am wrong, the federal death penalty statute envisions a bifurcated, it calls for a separate penalty, guilt and penalty phases, right?

MR. DALEY:  It does, yes.  Their argument is I think you still need to bifurcate the second part.

THE COURT:  The courts that have gone to trifurcation have just determined it's a fair way to do it but not called for by the statute per se.

MR. BURKE:  There is no case law I'm aware of that has interpreted the statute as requiring it, your Honor.

THE COURT:  That's all I wanted to ask.

MR. BURKE:  Thank you.

THE COURT:  Well, that took me over to page -- I have a nice round 100 pages of notes.  I don't think I took that many pages at the trial itself.  Of course, the jury was the fact finder there.  Here I've got to do more work myself.

1000

So we will pick up at page 101 in December. December 3rd at 9:30. How many witnesses will we have?

MR. DALEY: We have got that one situation, I don't know --

MR. BURKE: We're working out a stipulation, which I'm almost certain we will be able to do. At this point, your Honor, I have not received the report from Dr. Hyde, as well, so I don't want to say that he may not tell me something that I feel obligated to follow up on. But with that said, I think we're thinking three. Mr. Littlejohn, Dr. Hyde, our expert, and the government's expert. Is that where we stand right now?

MR. DALEY: Yes, that seems like -- again, with the caveat if something were to be raised in Dr. Hyde's report that we felt like we might need to get some other expert, I don't anticipate necessarily, but I don't want to be, you know --

THE COURT: All right. And give me a time prediction. And whatever you say I'm going to double it.

MR. DALEY: Four days, right?

MR. BURKE: Four days.

MR. DALEY: That's inflated.

THE COURT: You've already --

MR. BURKE: If Mr. Basham decides too attend, eight.

MR. DALEY: Four is a doubling on my part, but I

1001

don't mean to --

THE COURT: All right. We will set aside plenty of time.

MR. BURKE: Your Honor, I don't -- this just occurred to me, I honestly don't know what the answer would be. I'm wondering if it would assist you, given the information that's come out about experts and mental retardation, if the government and I were to jointly interview Dr. Brawley to see her position on whether she felt that she was an expert. I just throw that out there.

MR. DALEY: I am inclined not to go down that road because I don't want to suddenly allow further development that really we have already committed to. I think we're in the middle of trial, basically, and --

MR. BURKE: That's fine.

THE COURT: All right. Well, we will see you back on December 3rd. And I think that does it. I don't think I have any other questions.

MR. DALEY: Thank you, your Honor.

THE COURT: Nice to see all of you. We will be in recess.

(Recess, 12:05 p.m.)

1002

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  11-19-12                    s/  Daniel E. Mayo


DEFENSE WITNESSES

LARRY HAMMOND

CROSS                    936

REDIRECT                 984