UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

----------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
    -vs-                                    October 9, 2012

BRANDON LEON BASHAM,

          Defendant

----------------------------------


               BEFORE HON. JOSEPH F. ANDERSON, JR.
                UNITED STATES DISTRICT COURT JUDGE
                         MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                     UNITED STATES ATTORNEY
                     BY:  ROBERT F. DALEY, JR.
                          JIMMIE EWING
                          JEFFREY M. JOHNSON
                          WILLIAM K. WITHERSPOON
                     Assistant United States Attorneys
                     1441 Main Street
                     Columbia, SC  29201

FOR DEFENDANT:       JULIA G. MIMMS, ESQ.
                     JULIE G. MIMMS LAW OFFICE
                     1001 Elizabeth Ave., Suite 1A
                     Charlotte, NC  28204

                     ARIZONA FEDERAL PUBLIC DEFENDER
                     BY:  MICHAEL L. BURKE
                          SARAH E. STONE
                     Assistant Federal Public Defenders
                     850 W. Adams, #201
                     Phoenix, AZ  85007

2

COURT REPORTER:      DANIEL E. MAYO, RDR
                     Certified Realtime Reporter
                     901 Richland Street
                     Columbia, SC   29201


              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

THE COURT: All right. We're here for the evidentiary hearing in the case of United States of America versus Brandon Leon Basham, it is docket number 4:02-992. We have counsel for both sides present. Mr. Basham is present by way of satellite conference. Mr. Basham, can you hear me satisfactorily?

DEFENDANT: I hear you, I hear you.

THE COURT: Who is seated there with you?

MR. MURRAY: Ken Murray with the Federal Defender in Arizona, your Honor.

THE COURT: All right. Very good. And you have good voice and visual communication with us here?

MR. MURRAY: We do.

THE COURT: All right. Let me ask counsel to make -- just note your appearance, present in the courtroom, to note your appearances just for the record.

MR. DALEY: Yes, sir, your Honor. This is Robert Daley on behalf of the United States. And seated at counsel table with me is Jimmie Ewing, behind me are Jeff Johnson and William Witherspoon, and we will be representing the government in this matter.

THE COURT: All right.

MR. BURKE: Good morning, your Honor. Michael Burke from the Federal Public Defender's Office on behalf of defendant Brandon Basham. And with me today at counsel table

4

is Sarah Stone who is also with the Federal Public Defender's Office, and Julia Mimms, who is local counsel.

THE COURT:  All right.  And the attorney in Terra Haute, give us your name again, sir.

MR. MURRAY:  Ken Murray, your Honor.  And I do have a request of you, if I could.

THE COURT:  All right.

MR. MURRAY:  Would it be possible to have the guards unshackle Mr. Basham's hands so he can take notes with us here today?

THE COURT:  Is the guard present in the room?

MR. MURRAY:  He is not in the room, he's right outside.  He said if we ask --

THE COURT:  I think that's a reasonable request.  Ask the guard to step in.

MR. MURRAY:  Let me get him real quick.

DEFENDANT:  Thank you.

OFFICER SLAGEN:  Yes, sir.

THE COURT:  Give your name, sir.

OFFICER SLAGEN:  Officer Slagen.

THE COURT:  The attorney for Mr. Basham has asked that I authorize you to release his handcuffs so that he can take notes during the hearing.  Would that present a security problem if we did that?

OFFICER SLAGEN:  No, sir.  He's locked in this room,

5

so I don't think it would be too much of a problem.

THE COURT: Well, go ahead, if you would then, unshackle his hands so he can participate in this hearing by way of taking notes.

DEFENDANT: Appreciate it.

OFFICER SLAGEN: All right.

THE COURT: All right. This is under Section 2255 challenging the defendant's conviction and death sentence in this court back in 2004. The original petition raised 34 claims. And two have been withdrawn, is that correct, claims 8 and 25?

MR. BURKE: Yes, your Honor.

THE COURT: And I would suggest that two additional claims were resolved by the Fulks appeal, claim 9 dealing with conceding guilt, and claim 25 dealing with the so-called two step mitigation jury charge issue. Do you disagree with that, or --

MR. BURKE: Your Honor, on the second claim I agree that that was addressed by the court in Fulks. With regard to claim 9, however, that claim is ineffective assistance, again is Mr. Basham's trial counsel. That's never been addressed by any court.

THE COURT: Well, but Mr. Fulks did essentially the same thing by conceding guilt and going to trial. I'm not trying to talk you out of it, I'm just thinking out loud. And

the Fourth Circuit said that that was a legitimate trial strategy. And here your argument is they conceded guilt on the kidnapping but had denied guilt on the other substantive claims, and by conceding guilt on the kidnapping made him death eligible.

MR. BURKE: Yes, your Honor.

THE COURT: Isn't that subsumed by the Fourth Circuit's holding in the Fulks case then?

MR. BURKE: I disagree, your Honor.

THE COURT: We will talk about it later. I'm not trying to talk you out of any issues, I was just trying to find out how many we've got to hear.

MR. DALEY: Your Honor, I would say that there is a subtle difference in that Mr. Swerling did not -- they did not enter a guilty plea, there was a guilt and then a penalty phase. So there is some distinction there, your Honor, I would note.

THE COURT: All right. Ready to proceed?

MR. DALEY: Your Honor, I have just one thing to put on the record. Special Agent Jeff Long is in the courtroom and I don't think there's any objection to him being here.

MR. BURKE: No objection.

THE COURT: All right.

MR. DALEY: I think the witnesses are going to be sequestered. I will tell Mr. Burke we have Dr. Frierson, who

may be a rebuttal witness for us after we see their expert's report.  Dr. Hyde is going to be testifying I think in December, and so we may be calling Dr. Frierson in to rebut that testimony.  He's in the courtroom this morning.  I didn't know if they had anything to --

MR. BURKE:  We have no objection, that's fine.

THE COURT:  No objection to the potential expert staying in, but all other fact witnesses are subject to the rule on sequestration then.  Both sides requested it and at this time if there's anyone here besides the doctor who is a potential witness you will need to step outside until such time as you are called to testify, except for the FBI agent, obviously.

MR. BURKE:  And Mr. Monckton who is going to be the first witness.

THE COURT:  Very good.  Please call your first witness.

MR. DALEY:  Your Honor, I thought that at the beginning we should go ahead and move all the exhibits that were agreed to into evidence.

THE COURT:  Very good.

MR. DALEY:  Your Honor, the government would move Government's Exhibits 1 through 223 into evidence.  I understand there's no objection from Mr. Basham's counsel.

THE COURT:  Mr. Burke, is that correct?

MR. BURKE:  And, your Honor, defense would move for the admission of Exhibits 1 through 101 with the exception of Defendant's Exhibit 45, which we are withholding at this time and may --

THE COURT:  Without objection then the Government's Exhibits numbers 1 through 223 are admitted and Defense Exhibits 1 through 101 are admitted except for Exhibit 45, which we may talk about later.

MR. DALEY:  And for clarity of the record, your Honor, we do not have an Exhibit 49, I think it was a duplicate, we do not have a Government's Exhibit 49.

THE COURT:  49 is a gap.

MR. DALEY:  Yes, sir.

THE COURT:  Very good.  Anything else before we begin?

MR. BURKE:  Your Honor, I just -- I thought to give the court a little bit of a roadmap I would briefly go over the witnesses we will be calling and the issues that we will primarily be focusing on.  As your Honor noted in one of our prior conferences, several of the claims in our 2255 motion are based on the record so they won't be the subject of testimony now.

I will tell the court that over the next few days the claims that we will be focusing on through the presentation of testimony would be claim one, which concerns a claim of

ineffective -- I will just tell court, otherwise we will be here for quite a while.  Claim one, claim two, claim five, claim seven, claim nine, claim 15, claim 16, claim 19, claim 20, claim 24, claim 27, and claim 30.  Some of those obviously to a much greater extent than others, but those are the ones we will be addressing.  So --

THE COURT:  Very good.

MR. BURKE:  With that, your Honor, we will call -- the defense could call their first witness, William Monckton.

(William H. Monckton, VI duly sworn)

DIRECT EXAMINATION

BY MR. BURKE:

Q.  Good morning, Mr. Monckton.

A.  Good morning.

Q.  Before we begin I wanted to take a moment to thank you for getting up at four in the morning and driving across the state to be here today.  You have been very accommodating, and your willingness to do that and your willingness to give up a date of work for this is much appreciated.  And throughout this proceeding you have been very candid with the United States Attorney and with us, so thank you very much for your assistance.

Can you tell us your -- give us a little bit of information about your background?

A.  From Myrtle Beach, graduated law school in 1992.  My first

job I clerked for Paul Burch on the Circuit Court bench, resident judge out of the Fourth Circuit.  After that I was a Solicitor in the Fourth Circuit for about a year-and-a-half, two years.  Then moved back home to Myrtle Beach in 1995 and went into private practice, primarily criminal defense and personal injury work.

Q.  Now, at one point were you appointed to represent Brandon Basham in federal district court proceedings?

A.  I was.

Q.  And can you tell us, do you recall when that occurred?

A.  It was November of 2002.  Don't remember the exact date, but it was the day before Thanksgiving.  I had come into the office, my office was closed, the phone rang and I answered, it was Judge Rogers calling me to -- to Florence at that time. The case is well-known, he said he was appointing me, that Brandon Basham was coming back, was going to assist in the discovery of Miss Donovan's body and he was appointing me second chair and I needed to be in Florence within I think two hours.

Q.  And do you recall this was before Thanksgiving of 2002, right?  You do --

A.  The Wednesday before Thanksgiving.

Q.  Okay.  So all happening in a very fast time frame then?

A.  Very rapid pace.  Went home, told my wife, changed clothes, went to court.  Met with Judge Rogers I think briefly

in chambers where he gave me some additional information.  I believe that Brandon Basham had -- already at that time was known had given some information to law enforcement where he was in Kentucky and had provided -- wanted to help find the body.  A search had already been organized to take place on Thanksgiving day and Judge Rogers did not want Mr. Basham going unrepresented.

Q.  Okay.  Now, before we go into the events that followed after your appointment, let me ask you a couple of questions just to confirm some issues about your background.  You are from the Myrtle Beach area, is that correct?

A.  That's correct.

Q.  You had been practicing criminal defense law in that area for approximately?

A.  Since 1995, about seven years.

Q.  About seven years.  Can you tell us the nature of your criminal practice?  Did you -- were you retained by private clients, did you accept court appointments?

A.  When I first got back to the beach, like most lawyers you take court appointments.  Being from there I had a lot of people I knew throughout the area where I got private clients from.  Being a solicitor in the Fourth Circuit, a lot of the attorneys up there referred clients to me when people got in trouble in Myrtle Beach.  So it was combination of both.

I think in 1996, actually Judge Seymour was the magistrate

Monckton - Direct                                    12

at the time in Florence, and I went and met with her about getting on the CJA list for federal appointments.

Q.   And did you get on the CJA list at that time?

A.   I did.

Q.   So for approximately six years before you became involved in that in case you had been representing criminal defendants in federal court, correct?

A.   That's correct.

Q.   Coming from the Myrtle Beach area were you familiar with -- personally familiar with any of the law enforcement officers who were involved in the investigation into Alice Donovan's disappearance?

A.   Yes.

Q.   And who, if you remember?

A.   Pretty much everybody with the Conway Police Department that was involved in the investigation.  There were some Horry County officers, Mr. Long with the FBI, Clyde Merriman with the FBI.  I did not know the North Carolina authorities but knew pretty much everybody in South Carolina.

Q.   Thank you.  We're going to be talking today about the events that occurred on Thanksgiving day in 2002.  And before we do that let me ask you, in your six years representing -- six years as of 2002 in representing clients in federal prosecution defense had you been involved in situations involving the interrogation and questioning of your clients by

law enforcement?

A.   Yes.

Q.   Would you describe that as something that happened regularly or infrequently or --

A.   I mean, typical case, a drug case, perfect example, I have been involved in numerous debriefings of drug clients, numerous proffer agreements in both state and federal court. So, yes, I was aware of the interrogation process.

Q.   All right.  Mr. Monckton, I would like to have you take a look at what's been admitted as Defense Exhibit 1.

          MR. BURKE:  And, Miss Floyd, I'm not sure, this is my first time appearing in this court, does it appear on the screen for Mr. Monckton?

          THE CLERK:  Yes, they do.

Q.   Do you prefer hard copies, Mr. Monckton or --

A.   That's fine.  This is fine.

Q.   Okay.  Thank you.

          THE CLERK:  I'm sorry.  Could you tell me the exhibit number?

          MR. BURKE:  Defense Exhibit 1.

Q.    (MR. BURKE) Mr. Monckton, do you recognize the handwriting on this document?

A.   Yes, that is my handing writing.

Q.   And can you tell us to the best of your memory what Exhibit 1 is?

Monckton - Direct                              14

A.  That was dated 11-27-02, which was Wednesday.  I think that was my first bit of information I was provided.  It's got Brandon Basham at the top, so that may have come from Brandon Basham.  I list Cam Littlejohn's name and my name, which means we were present.  I think I actually had spoken with Richard Hughes, who was the attorney in Kentucky, and he had provided, that's his address, his phone numbers, and I believe that information came from Mr. Hughes out of Kentucky.

Q.  And the information below that regarding Wal-Mart, is that correct?

A.  That's correct.

Q.  Okay.  So is it fair to say that the notes on this first page of Exhibit 1 reflect information that you probably obtained before meeting Mr. Basham?

A.  That's correct.  Actually, there should be other notes that -- where I actually spoke with Mr. Basham.

Q.  And if you can turn to the second page of Exhibit 1 there are more notes.  Can you tell us if you recall taking these notes and where you obtained the information?

A.  These notes would have been taken in Florence the day of the appointment.  I believe a lot of this information had come from Mr. Hughes where I was given basic background on Brandon, found out that he had a bunch of psychological hospitalizations.  And those are my notes and those are my thoughts on things that I needed to do.  If something was

important to me I have a star on both sides so I know going back through my notes it was something I needed to address.

Q. Thank you. If you could look at page two of Exhibit 1 for us, you have a notation near the top that says found incompetent, in a hospital psychiatric for four years.

A. That would have been information that I believe I would have received from Mr. Hughes, to the best my recollection.

Q. And then on the bottom of the page you have some notations with asterisks on each side. Why the asterisks?

A. That's where I describe where I star, asterisk, just things that when I review my notes as I'm taking them that I know I need to come back to and address.

Q. Do you recall, you make a notation, need an evaluation?

A. Yes.

Q. Do you recall, was that a conclusion you made on your own or was there a recommendation made to you about that?

A. That would have been -- those are my thoughts right there. That would have been me thinking that.

Q. Was that based on information you had received from Mr. Hughes in Kentucky?

A. Just based upon the prior information I had received regarding Brandon's prior history.

Q. So is it safe to say, Mr. Monckton, that the very first day you were appointed to this case you had on your to do list an evaluation of your client?

Monckton - Direct                          16

A.  That's correct.

Q.  And what do you mean by evaluation?

A.  What I'm looking for is a competency evaluation right off the bat, find out if Brandon is competent to go forward in representation.

Q.  If you could turn to the third page of Exhibit 1, and there are more notes.  Do you know when you would have taken these notes?

A.  If they are attached to the first page they probably would have been taken on 11-27-02.  I know the medications, I got that from Brandon himself.

Q.  So Mr. Basham told you that about the medications he was on, correct?

A.  That's correct.

Q.  Do you remember when you first met Mr. Basham?

A.  I'm fairly certain I met him on that day.  I know I had to wait for some time, but I'm fairly certain I spoke to him on the 27th.

Q.  While you were in Florence?

A.  In Florence.

Q.  And so to the best your recollection, if you look at the top of that third page of Exhibit 1, you've written, been off meds since arrested.  Do you believe that that was information you received from your client?

A.  Yes.

Monckton - Direct                        17

Q.   Okay.  So to put this in a time frame context, you first met Mr. Basham on November 27th of 2002.

A.   That's correct.

Q.   And on April 9 of 2003 this court issued an order disqualifying you and your co-counsel Cam Littlejohn from the case.  Does that sound correct?

A.   That does.

Q.   Okay.  So for a period of approximately four-and-a-half months you were counsel for Mr. Basham.

A.   And I'm not -- I think Judge Anderson may have had Jack Swerling and Greg Harris already involved to a degree as shadow counsel at the time.  I'm not certain.  But he wasn't unrepresented during that time period.

Q.   All right.  And if the record reflects that the government filed a motion to disqualify you and Mr. Littlejohn mid-January, January 14, 2003?

A.   That's correct.

Q.   Can you just tell us how your work on the case changed after that motion was filed?

A.   I believe Cam and I spoke, we got advice from several different people, and I think from that time period on until the disqualification issue was resolved we actually ceased making any decisions on Brandon's behalf.  I do remember law enforcement wanting to go back out and search again, and I informed them that we weren't going to do that because based

on what had happened during the first search we couldn't do that because the disqualification issue was pending.

MR. DALEY:  Your Honor, I just want to make clear, because this came up a few times in the Fulks hearing, I want to make sure that we know for the record that to the extent they are attempting to assert facts that they would try to amend their petition with, this seems to be outside of any of the claims as far as just the whole concept that they ceased representing him.  I don't want to suddenly be caught where we have a claim that there was a time period in which he did not have counsel.

MR. BURKE:  And, your Honor, that is not a claim we will make or -- no, I'm just --

THE COURT:  No substantive claim.

MR. DALEY:  Thank you.

MR. BURKE:  That's not a substantive claim.

MR. DALEY:  Thank you, Mr. Burke.

BY MR. BURKE:

Q.  During the four months that you were Mr. Basham's counsel do you recall how many times you met with him in person or over the phone?

A.  It was numerous times.  I've given you my notes, and even there's a time sheet in there with detailed notes and it lists the times.  But it was multiple times.  Usually every time I met with Brandon, for a time period he was in Darlington,

Monckton - Direct                              19

which is about an hour from the beach, hour and a half.  And he was at Columbia Care in Columbia, which is about two-and-a-half hours.  Whenever I came to meet with him I can't say I met with him for any time less than an hour. Sometimes it was longer than that.

Q.  Can you tell us what your impression was of Mr. Basham when you met him on November 27th?

A.  I think my initial impression of Brandon was he appeared not like he does today, he did not have facial hair, he had hair, he looked like a young child, was the best way to describe it.

Q.  And did you have any impressions of his demeanor when you met with him?

A.  I guess the best way to describe that, I can honestly say I don't think he understood the seriousness of the situation, to be honest with you.

Q.  And can you elaborate --

A.  Almost child-like.

Q.  And from your notes he apparently had told you at that time that he had been off medication since his arrest, is that correct?

A.  That's correct.  And I think he had been arrested several days prior to being transported back to Florence.

Q.  Okay.  Susie, could you bring up Defense Exhibit 6, please?

Monckton - Direct                    20

Mr. Monckton, what's on this screen is Defendant's Exhibit number 6.  Can you tell us what is that document?

A.  Those are my time notes with entries of what I had done with phone calls, e-mails.  Just a detailed time sheet I kept on my computer.

Q.  Exhibit 6 is a three-page document.  The pages are actually numbered five, six, and seven.  I'm not -- I'm not sure why, to be completely frank with you, but if you could go to the third page, Susie, of that document, which is technically page seven.

Mr. Monckton, if you would look for me, do you see on the second entry on that page an entry for December 4 at 3:32 p.m.?

A.  Yes.

Q.  And I know it's pretty small print, can you read that notation or would you like me to read it?

A.  Spoke with Cam, and extreme details concerning jurisdiction and Brandon's mental condition.

Q.  And this December 4th would have been approximately a week after you became involved in the case, correct?

A.  That's correct.

Q.  Do you recall today what you discussed with Mr. Littlejohn about Brandon's mental condition?

A.  I can't recall in detail, but I know it had to do with his prior history, the medications he was on, and his demeanor

just caused me to believe that Brandon was not normal, I guess the best way to describe it.  I'm not a psychiatrist, it's just my initial impression that he was not normal.

Q.  If you can turn to the second page of Exhibit 3, it's the one that's marked page six, Susie.  On that page we have notations from, excuse me, early November -- excuse me, early December.  And if you look at the third one down, Mr. Monckton, I can read it for you, it's December 9th, it says notes, an inmate called and said that Brandon needs to see Billy.  Not being allowed to shower and is not getting his meds.

Now, is it correct to assume from the way that that notation is written that this was written by somebody else in your office?  Do you recall?

A.  No, I was the only one that would write on this time sheet.  That may have been a notation to my office staff and they would have told me about it and then I would have made a note.  And then I believe shortly after that I may have gone to see him or made a phone call.

Q.  Do you have any independent recollection of that phone call today?

A.  I do not.

Q.  Okay.  Is it unusual in your practice for other inmates to call you on behalf of your clients?

A.  Honestly, no.

Monckton - Direct                    22

Q.  No?

A.  I've had clients don't have phone privileges, they get a note to somebody else, say, Mr. Monckton, such and such needs to see you, they can't get to the phone, they are in lock down.  A number of things.

Q.  On that same page, this is on a somewhat different topic, but the notation right above that, same day, December 9th, you make a notation that you spoke with Sheriff Hewitt.  Can you again tell us who Sheriff Hewitt is?

A.  Sheriff Hewitt was the lead local investigator in Brunswick County.  I believe he was the Brunswick County Sheriff at the time.

Q.  Do you recall the substance of your conversation with Mr. Hewitt that day?

A.  Since we're in that close proximity to the search in December -- on Thanksgiving day, I assume we were probably talking about additional searches for Miss Donovan.

Q.  Now I would like to turn your attention to Defendant's Exhibit number 3.  Is that up on the screen for you, Mr. Monckton?

A.  It is.

Q.  Okay.  Defendant's Exhibit number 3 is an e-mail, it's not authored by you, but if you will look at the CC line of that e-mail do you see that you were copied on this e-mail?

A.  I do.

Monckton - Direct                                23

Q.   Okay.  Can you tell us what this e-mail is in regard to?

A.   If you can highlight the next section so I can read on this screen.  It's hard to read on this screen.

Q.   Sure.  Susie, the line -- I can't see it.

A.   It's -- I believe initially in the case, because this was the first federal death penalty case in South Carolina, if I remember correctly, I made several calls and reached out to several people concerning what we may need to do with Brandon's mental condition.  I think I may have spoken with David Bruck, I know I spoke with Kevin McNally, and it was a federal death penalty resource center, I believe, is where they were connected to that I called.

Q.   Do you recall having a conversation with Mr. Bruck about your thoughts about obtaining a competency evaluation of Mr. Basham?

A.   Yes.  I would have to say yes.  It should be in my notes.

Q.   Now, sitting here today do you recall having a conversation where Mr. Bruck spoke to you about the importance of avoiding a nonconfidential court-appointed psychiatric evaluation?

A.   I believe it's in my notes.  I do remember I spoke to Mr. Bruck and I think I detailed those in my notes.  Without seeing my notes, I believe that's the conversation we did have.

Q.   Okay.  The government may correct me on this, I don't

believe I have seen any written notes on that.  That's fine.

A.  I believe it may have been a time entry in the time entry notes.

Q.  Okay.  That --

A.  Not handwritten notes, in my time entry notes.  I remember glancing at them this morning and saw some reference to Mr. Bruck.

Q.  Yes, that is correct.  Exhibit 6 on the first page, which is page five, there is an entry midway down the page for Wednesday, December 11th, more than halfway down the page.  Are those the notes you were thinking of?

A.  Donna Schwartz-Watts, she does a lot of competence work here in the state and I've used her in the past, and that was probably me reaching out to her for a private competency evaluation.

Q.  Let's look at -- if you note, it says phone call to David Bruck at the top.

A.  I'm look -- looking at the December 11, 2002 at 4:46.

Q.  Does that say phone call to David Bruck?

A.  Right.

Q.  So this might have been a conversation that you had, do you recall, with Mr. Bruck?

A.  He would have provided me that information on her phone number and pager.

Q.  Do you remember today, sitting here today, why Mr. Bruck

advised you against obtaining a confidential -- or a noncial evaluation of your client?

A.   Well, we didn't want to subject Brandon to a government evaluation where he would be basically interrogated.

Q.   On December 10th of 2002 you and Mr. Littlejohn had actually filed a motion for a determination of competency, and so I think that based on the record in this case it appears that the conversation with Mr. Bruck would have occurred after the motion had been filed, correct?

A.   I believe so.  I think that motion may have been withdrawn, if I'm not mistaken.

Q.   And we will talk about the history of the motion as we proceed.  On Defendant's Exhibit 6 there's an entry for Friday, December 13th, and at 11:39 a.m.  If you could just read to yourself, Mr. Monckton, your notes from that entry.

A.   Right.

Q.   So this references a telephone call you had with your co-counsel Mr. Littlejohn, correct?

A.   That's correct.

Q.   You mentioned that you spoke with him concerning our own treating psychiatrist.

A.   That's correct.

Q.   Do you remember that conversation?

A.   In detail that far back I do not know the details, other than we were discussing getting a private psychiatrist to

evaluate Brandon.

Q.  Now I would like to turn to Exhibit 2.  Is Defendant's Exhibit 2 in your handwriting, as well?

A.  That's correct, it is.

Q.  Okay.  And what do these notes reference?

A.  This would have been my meeting with Brandon.  I don't delineate where I am so I don't know if I'm in Darlington or Columbia Care.  I know I took some medical authorizations for him to sign because we were starting to track down a fairly large history of medical records from a young age from different facilities and we were trying to get those.

     The notes under that would have been my observations of him.  You know, I think I write, seems very dazed and confused.  Sometimes in my conversations with Brandon he would appear to understand what I was talking about and then sometimes he would -- just seems like he just drifted off. The Beth McGuffin, that was one of the girls that he had met throughout this time frame, and I think I later found out that law enforcement were using her to communicate with Brandon by sending letters, so I advised him to stop sending letters. And I may have even have had a conversation with her or authorities, I think she was out of West Virginia, not to do that anymore.

Q.  You also have a reference to needs psychiatry -- psychiatrist ASAP?

Monckton - Direct                    27

A.   That's correct.  It was my observation that something was just not right with Brandon and there was some talk about suicide.  I think I notified the Marshals that I was concerned that he may try something, and then shortly after that or some time period after that, I don't think Darlington County was equipped to handle Brandon, so he was transported to Columbia Care facility in Columbia.

Q.   To clarify, what do you mean by not equipped to handle Brandon?

A.   I don't know if you've ever been to Darlington County.

Q.   No.

A.   But they do not, other than maybe put Brandon in a maximum holding facility, in a cell by himself, they did not have the people on staff to handle something like that.

Q.   And so were you concerned then that day about a real potential of suicide attempt by Mr. Basham?

A.   Yes.  Because I actually wrote in my notes I notified the Marshals at 11:01 a.m. concerning a possible imminent suicide.

Q.   Do you recall -- we have do not have an exhibit for this, your Honor, but it is part of the record from the trial -- the arraignment for Mr. Basham on January 7, 2003?

A.   Is there a document --

Q.   I don't have a document for you.  It was an arraignment before Judge Rogers.

A.   Rogers, that's correct.

Q.  And you recall that.

A.  Vaguely.

Q.  Do you recall, and again there are notations in the record so if you don't, it's fine, but do you recall any discussion at that January 7th court hearing about competency evaluations?

A.  Without seeing notations, since it was January and I'd already had those notes there probably was some discussion, but I don't want to testify that I know for certain there was.

Q.  On December 14, a week after his arraignment, the government filed a motion to disqualify you.

A.  January 14.

Q.  Excuse me, January 14.  And I think, as you testified, you thought it appropriate to pull back until that was resolved afterwards, correct?

A.  That's right.  We did not -- I think I said we suspended representation, that's the wrong terminology, we did not actively make decisions that could strategically affect the case at that time.

Q.  Thank you.  Is it safe to say that during the time that you were regularly interacting with Mr. Basham then, based on what you've testified today, and your notes, that you had concerns about his competency?

A.  Yes, from my notes there's no doubt.

Q.  In your experience as of 2002 had you had dealings with

other clients who had problems with competency?

A.   Yes.

Q.   So this wasn't your first experience with this.

A.   No.

Q.   So I would like to completely shift focus now and talk to you about -- first let me ask you one other question, if -- Susie, could you bring up Exhibit 4, Defendant's Exhibit 4. Mr. Monckton, that's a letter from you to your co-counsel Mr. Littlejohn.  And it's somewhat lengthy, I just want to draw your attention to near the end of the first large paragraph you wrote, I'm hoping Rosemary will issue a letter to the Marshals and possibly do a consent order barring all law enforcement access to Brandon without you or I present.

A.   That's right.  The reason we did that is this case I've never seen in my involvement where you had so many law enforcement agencies wanting to take and prosecute Brandon. You had Rex Gore, the prosecutor in North Carolina, who wanted it, you had the U.S. Attorney's Office out of Columbia that wanted it, and you had Greg Hembree out of Horry County that wanted it.

     This occurred after we had been appointed and he had been charged federally.  The City of Conway charged him and they went and served a warrant and tried to interview Brandon at Darlington County.  And what upset me is these were the same officers that had been with us on the search and I knew them

all, so obviously they had been, in my opinion, had been told to not to go try and interview him.

THE COURT:  What did the City of Conway indict him for?

THE WITNESS:  They charged him with kidnapping, murder.  You know, Judge, without seeing -- but I know those two.  Because Horry County was also -- Greg Hembree's office was already talking about pursuing the death penalty against Brandon and Fulks.

BY MR. BURKE:

Q.  And based on your letter to Mr. Littlejohn is it correct to say that you had -- you had concerns about protecting your client from being questioned or interrogated without you being present?

A.  Well, I knew we had an issue with North Carolina hadn't charged him, nobody really knew where the body was, there was a girl missing out of West Virginia, so I was already seeing down the road, if Conway was coming, we were going to have law enforcement from West Virginia coming to try to interview him. And I was just trying figure out a way to protect him from being interviewed without us, a blanket representation agreement or to let everybody know nobody could talk to him without us being there.

Q.  Thank you.  So let's -- now I'm going to switch focus entirely and we're going to talk about the Thanksgiving day

Monckton - Direct                              31

2002 events.  Can you tell us what was the reason, as far as you know, I know you had just gotten on the case, behind allowing Mr. Basham to participate in the search that occurred in North Carolina on that day?

A.   Before we got appointed and even met Brandon wheels had already been put into motion, Brandon was being transported back from Kentucky, he had told either through his attorney or given statements in Kentucky that he knew where Miss Donovan's body was and he wanted to help find her.

They had also abducted a gentleman in Kentucky, I believe it was Kentucky, and left him duct taped to a tree and they found him alive.  So initially there was a thought that Miss Donovan, although it's in November, may be still alive was a thought.  So Brandon was coming back, law enforcement had already made arrangements to organize a fairly detailed search on Thanksgiving day.  I think I was even told that by Judge Rogers when he called me at my office on the Wednesday.

I got over there, met briefly with Brandon, and the U.S. Attorney Miss Parham, and confirmed that Brandon did in fact want to continue and help try and locate Miss Donovan's body.  From then, logistics, working on how we were going to accomplish that.

Q.   Do you recall where the search took place that day?

A.   The search took place in Brunswick County, North Carolina, which is right across the line in North Carolina from Horry

County, and it started at a recreational facility.  I remember -- let me set the stage a little earlier.  We had agreed that Cam would come up with Brandon.  Cam drove to Darlington County, got in the van with Brandon and law enforcement and he drove up.  I actually made arrangements to ride up with FBI Agent Jeff Long and we rode up and waited on Brandon to arrive at I believe it was a deer hunting camp is where Brandon first showed up.

Q.  How far from Conway, South Carolina was the location where you were conducting the search that day?

A.  Probably an hour, hour from Conway to Brunswick County, I'd say.  You got to go some back roads to get there, but it would be about an hour's driving.

Q.  Do you know, did Mr. Basham choose this location to search?

A.  No, the location had already been chosen by the authorities in Brunswick County.  Apparently Brandon and Chad and Miss Donovan were seen in the BMW, had pulled into this hunting camp, and that was where they wanted to start the search.  Brandon had apparently given information that it was near a hunting place or had seen hunting or an animal, was the information we were given, and law enforcement believed that it was somewhere around that area.

Q.  Do you recall today if you knew at the time Mr. Basham had any familiarity with South Carolina, North Carolina?

A.   My understanding this was Brandon's first time down here. And if I can set the stage, what it was is Brandon said they were near some animal facility and they had pulled off the road and Miss Donovan's body had been dumped right near the side of a road by a metal stake off a dirt road.  If you've ever been in this part of Brunswick county, North Carolina, all it is is a big pine forest and you have nothing but intersecting dirt roads with what I call forestry gates, big metal one sling-arm gates blocking off the different dirt roads.  And that was where he apparently, he and Mr. Fulks, had dumped her body.  And as soon as you started driving down these roads, if you've got any experience in the woods, you said there was no way we're going to find her.

Q.   You say that you said there's no way we're going to find her.  Was that a belief that you had that day?

A.   After about ten minutes that's a belief I had, that there's no way we're going to find her.

Q.   Jumping ahead seven years just for a moment, are you aware that in 2009 remains were discovered that were identified as the remains of the victim Alice Donovan?

A.   Yes, they were found on a place called Water Tower Road in Horry County.

Q.   In Horry County.  And where is that location in location to where the search occurred Thanksgiving 2002?

A.   Water Tower Road's about five minutes from my office.  It

actually intersects between Conway and Brunswick County. It would have been -- I'd say Water Tower Road where her body was found was maybe 35, 40 minutes from there to Brunswick County where we started the search.

Q. So returning to the day of the search and Thanksgiving 2002, had you had a chance that morning or previous to that morning to communicate with Mr. Littlejohn regarding the parameters of the search?

A. Yes. We had decided that -- well, actually, Cam rode up with Brandon, and when we got to the hunt camp, started doing the searching, since he had been riding in the car for about two-and-a-half hours it was decided that rather than both of us try and talk to him that he would primarily just talk to Cam Littlejohn.

And actually when we rode in the van I think I rode in the very back of the van with Agent Long and then Brandon and Cam Littlejohn sat on the front bench seat, there was another bench seat and then another bench seat, and there was a driver and I think Sheriff Hewitt was sitting in the front passenger's seat, if I remember correctly.

Q. Had you and Mr. Littlejohn had any conversations about whether you were going to allow Mr. Basham to be questioned?

A. On the 27th when I first met with the U.S. Attorney I asked for a proffer letter. They would not give us a proffer letter at that time. So when we met with everybody we

informed them that, you know, Brandon would not be -- unique situation, but Brandon would not be making any statements or being interrogated, everything would go through us.

And, you know, the thought process was Brandon would whisper to Cam and they will talk and through some way we would use that process trying to find Miss Donovan's body.  We knew from the -- from the information he had already given regarding his involvement that, you know, honestly, felt like the only way to save his life and not have the death penalty sought was to find Miss Donovan that day.

Q.  And you say about the information that had already been given.  You were aware at that time that Mr. Basham had made statements after his arrest in Kentucky?

A.  That's right.

Q.  How did that fact, the fact that he had made statements, affect your and Mr. Littlejohn's decision to have or not have law enforcement question Mr. Basham during the search?

A.  We didn't know the exact details of what was given so we were trying to protect Brandon.  Because, like I said, things were moving so fast, and that day there was some thought that maybe she's still alive.  So things were moving very fast and furious, so to speak.  It was not time to interrogate him, it was pretty much we're going in the morning, I think we left Myrtle Beach at 5:30, 6:00 a.m. that morning to get up there.  So things were moving at a furious pace.

We knew we weren't going to let anybody talk to him because we didn't know anything yet, we had not had a chance to interview Brandon in any great detail, but what he had -- he had been saying, our information was coming from the attorney out of Kentucky.  We got enough information there to know that, you know, we didn't need to be playing games, so to speak.  We had no leverage, so to speak.

Q.  I'm sorry?

A.  We had no leverage at that time.

Q.  Now, you testified that you rode up to the location with Agent Long and that Mr. Littlejohn came from several hours away with Mr. Basham.  When you and Mr. Littlejohn were together with Mr. Basham that morning did you ever discuss with him the -- whether he was to speak to law enforcement that day?

A.  The comment was everything would have to go through Mr. Littlejohn or me.

Q.  That conversation --

A.  Specifically, Mr. Littlejohn.  He was to speak to Mr. Littlejohn.

Q.  And that was a comment made to Mr. Basham?

A.  Yes.

Q.  Okay.  We have interviewed you in this case about two weeks ago, I believe, at your office in Myrtle Beach.  Do you remember in that interview commenting about your concerns for

Mr. Basham with regard to the number of law enforcement officers who were present that day?

A.   Actually, when I first got there with Agent Long we actually first pulled up to a recreational facility, and I bet there may have been 40 to 50 officers or people to help with the search.  And when we got to the deer camp we were there first before the van got there, and I knew from just my conversation with Brandon, I asked all the law enforcement to step inside so he did not see a bunch of law enforcement sitting out waiting on him.  I thought that that would rattle him somewhat so I asked law enforcement to do that and they in fact did.

Q.   Were there any, if you remember, any expressed statements made by you or Mr. Littlejohn to law enforcement that day that there were to be no questions --

A.   I don't remember making a big statement.  I know that I had made comments to the different law enforcement officers that, you know, he's not going to be interrogated.  You know, Brandon, when we rode around in the car, said some things that were not the result of any interrogation.  I mean, he would just speak out.

Q.   And when he did that do you recall what Mr. Littlejohn did in response?

A.   Mr. Littlejohn would squeeze his knee or try to get him under control or whisper to him.  Like I said, I was sitting

either right behind them or all the way in the back of the van.

Q.  But all of this was occurring in a van with law enforcement there so they could observe how Mr. Littlejohn was guiding and communicating with his client?

A.  Yes.

Q.  Now, obviously -- do you recall how long this search went on that day?

A.  I'm guessing we started about 8:00, 8:30 that morning, I know I got back to Myrtle Beach around 6:30, 7:00 o'clock.  So we probably went up until 4:00 or 5:00 o'clock that day.

Q.  And during the course of that search, that obviously -- well, who was asking most of the questions in the van, if you recall?

A.  Sheriff Hewitt was the only one really asking, does this look familiar, does this look familiar.  If you've ever -- they had information from Kentucky that it was near a dump or some kind of wildlife area.  So any sign, I remember specifically seeing some circus sign or something, so there's a circus sign, who knows?  We turned off down some road and rode around.  Anything to do with animals, I mean, it was like a -- I hate to say that, but it was you are trying to think of anything, any sign.  I mean, I remember asking are there any stables around here, are there any -- anything that sounds like what he's talking about.

Q.  So it sounds as though, and correct me if I am wrong, that almost everyone in the van was throwing out questions of one sort or another?

A.  Whenever I would -- I never really did that in front of Brandon.  We stopped at different places, it wasn't just a constant riding all day.  We may ride for 30, 40 minutes and then stop and try and regroup.  Because it was our van and -- I think we had two chase vehicles just kind of following with us.  At one point I remember one of the information pieces that had been given was that there was a large metal spike and her body was there, and I remember telling the van to stop because I saw a big metal spike off a dirt road, and stopped and everybody got out.  And, you know, Brandon stayed in the car, law enforcement went in and looked around.

But really we were trying to figure out anything because, if I remember correctly, they came through here in dusk or dark.  Brandon was not driving, he was the passenger in the vehicle.  And, just common sense, you don't really pay that much attention if you are not driving.  Plus there was allegations that there may have been some drug use going on, as well.  So literally we're trying to figure out, trying to put a puzzle together.  And where they actually found Miss Donovan makes sense based upon the descriptions that had been given, because there's a wildlife management area right there where her body was found.

Q.   So your testimony is that the statements that Mr. Basham was making that day you said now makes sense in the context that we now know of the location where Miss Donovan's remains were found.

A.   That I believe her remains were found right off Water Tower Road, it's paved now and at the time it was a dirt road. And it was part of that new development down there, Highway 31, Highway 22.  There's an overpass over Highway 31 just, if you know the Myrtle Beach area, Water Tower Road is right across from restaurant row in Myrtle Beach.  You go across the waterway and there's a road that crosses over Highway 31 which runs north and south.  And that's Water Tower Road and it runs out into basically a forest.

Q.   You say now that it makes sense, some of the statements that were made.  On that day did law enforcement ever express to you some frustration with the way the search was going?

A.   I would say near the end of the day we were stopped, I think we're back at the deer camp, I can't remember, and we stopped, actually it was a group of law enforcement, I believe some representatives of Conway were there, I believe Jeff was there, I know Clyde Merriman was there, because it's the first time we realized they had searched before.

Apparently a map had been sent by Brandon back to law enforcement in South Carolina, I assume through his attorney, and detailing an area.  And Clyde Merriman made the statement

Monckton - Direct                    41

he had been walking through a swamp or in his waders for two days and I think in the Red Bluff area, if I'm not mistaken. Now looking back that's I think what y'all informed me. And he thought Brandon was just yanking his chain, this was just a big game to Brandon. So they were extremely frustrated at that point in time. But later comes out where the body was found is right next to the Red Bluff area over there at Water Tower Road kind of intersects up to the Highway 90 area, which is -- a bunch of deer hunting kind of up in the Red Bluff area. I never saw the map, though, so I never saw what he drew, just what I was told.

Q.  As you testified earlier, you were in North Carolina because law enforcement wanted to be there, correct?

A.  Miss Donovan, I think her cell phone had pinged right next to that area was the last pinging of her cell phone, and her BMW was seen at that deer camp, so that's where everybody assumed that Miss Donovan was still in the vehicle at that deer camp.

Q.  You said that one of the law enforcement agents thought that Mr. Basham was yanking his chain or yanking their chain. Did they -- did anyone suggest to you they were going to terminate the search that day?

A.  It was getting to the point where it was going to end. At that time Brandon, we probably -- I don't know, maybe, 30, 40 feet outside of Brandon's hearing distance talking to law

Monckton – Direct                                    42

enforcement, there was one deputy I think from Conway may have been standing at the van, Brandon may have been outside of the van right there. And I think Cam and I went back, Cam talked to Brandon and then Cam came back and presented a hypothetical. We talked to law enforcement, I don't know, five, ten minutes more. And at that time I think we loaded back up and went and attempted to drive a couple other places.

Q. And there has been lots of discussion in this case about that hypothetical, and I will tell you right now, and let me let the court know we're not going there, be going into the hypothetical, that's not a point we really need to discuss today.

Just a couple of questions, though. You said that Mr. Littlejohn talked to Mr. Basham. Were you with them when --

A. I believe -- I know I was over there when the conversation started, I don't know if I stayed there the whole time because I think I may have gone back to talk to law enforcement. You know, hey guys, let's -- I knew this was our chance, you know, give him a second, let him talk to him, and then Cam came over and then, you know, the hypotheticals were presented to the officers.

Q. Were you with Mr. Littlejohn when the hypothetical was presented?

A. Yes.

Q. Was Mr. Basham?

Monckton - Direct                43

A.  No.  Brandon stayed back, we had to be 30, 40 feet away from the van, Brandon stayed over there.

Q.  Were you able to see the van while you were communicating with the law enforcement officers?

A.  No, the van would have been to my back.

Q.  Do you recall now, I know it's been ten years, but do you remember if Sheriff Hewitt was with law enforcement officers when the hypothetical was presented?

A.  I can't say that he was there or not.  Obviously, from reading 302s he said he walked off with Brandon and had a conversation with him.  I don't remember that occurring.  I didn't see that occur.  If it happened when we were giving the hypothetical, it could have, I don't know.  I just didn't see him walk off with Sheriff Hewitt.

Q.  Do you recall that my co-counsel Miss Stone and I met with you at your office in June of 2012 and at that meeting we informed you of the information about that?  And do you recall what your initial response was?

A.  No way, I think my initial response was.

Q.  Didn't happen.

A.  Didn't happen.

        THE COURT:  The information about what now?

        MR. BURKE:  The information regarding Mr. Basham being taken off alone with Sheriff Hewitt.

        THE COURT:  All right.

Monckton - Direct          44

MR. BURKE:  And Mr. Monckton responded to that, that didn't happen, correct?

THE WITNESS:  If it happened, I didn't see it.

THE COURT:  All right.

BY MR. BURKE:

Q.  This should be obvious but I want to make sure I made it clear, was it your intention that day to let law enforcement talk to Mr. Basham outside your presence?

A.  No.

Q.  Was that ever your intention?

A.  No.

Q.  Do you believe you made that intention clear to law enforcement that day?

A.  I think the way -- it had to be clear the way we rode in the van, the way everything had to go through Mr. Littlejohn, the fact that we were acting as a buffer pretty much the whole day.

Q.  If we could -- for the court's information, for your, I'm getting very close to the end of my questions.  So could you direct your attention, please, to Defendant's Exhibit number 5, Mr. Monckton?  And can you tell us, that's a two-and-a-half page document, can you tell us what that is?

A.  That was a summary of our representation that I did for Morgan Martin who represented myself in the disqualification hearing.  I did a summary for him so he did not have to go

through all my notes and everything, I just did a brief
summary for him.

Q.  So this document would have been created by you sometime
in early 2003.

A.  It would -- it would have been created probably in January
of 2003, early February.

Q.  If you could go to page two of that document, Susie, at
the very bottom, the very last line, going over in the next
page, beginning, at no time.

        THE COURT:  Hold on one second.  What happened to Mr.
Basham?

        MR. MURRAY:  Your Honor, he said he had an emergency
to go to the restroom.  They just walked him out.

        THE COURT:  All right.  Why don't we take the morning
recess at this time then.

        MR. BURKE:  Thank you your Honor.

        THE COURT:  Take a ten minute recess.

        (A recess transpired)

        THE COURT:  I understand the proposal now is to
interrupt the testimony of Mr. Monckton so we can hear from
Mr. Basham's appellate counsel who is on the phone from
California and will be testifying telephonically by
stipulation from both sides that that will be acceptable?

        MR. DALEY:  Yes, your Honor, it's acceptable with the
government.

MR. BURKE: Yes, your Honor.

THE COURT: Mr. Basham, can you hear me?

DEFENDANT: Yeah.

THE COURT: The next witness is not going to be present in the courtroom, she's going to be on a telephone hookup where we can hear her voice but not see her presence. And your attorney tells me that that meets with your approval, is that correct?

MR. MURRAY: Just say yes.

DEFENDANT: Yeah, yeah, that's fine, whatever.

THE COURT: Mr. Basham, if you need to leave to go to the restroom that's fine, but tell us about it so we can coordinate our bathroom breaks here at the same time as yours because you need to be present for these proceedings, all right?

DEFENDANT: All right. Well, I didn't realize -- I just figured he was in here and I really wasn't thinking about it.

MR. MURRAY: I discussed it with him, your Honor, he should be doing that.

THE COURT: Please proceed.

MR. BURKE: Thank you, your Honor, for accommodating the schedules of the witnesses. I appreciate it. Is she --

THE CLERK: She can't hear you yet. Are you going to call her?

MR. BURKE:  Yes, your Honor, the defendant calls as its next witness Melissa Meister.

THE COURT:  Miss Meister, are you on the line?

THE WITNESS:  Yes, I am.

THE COURT:  If you will raise your right hand and state your name for the record.

THE WITNESS:  Melissa Ann Meister.

(Melissa A. Meister duly sworn)

DIRECT EXAMINATION

BY MR. BURKE:

Q.  Miss Meister, this is Mike Burke from the Federal Public Defender's Office.  We have spoken a few times?

A.  Yes.

Q.  Hi.  Just as a housekeeping matter I think the government, and I know we have tried to e-mail you exhibits in the last day.  Did you receive those?

A.  I did, yes.  I have them up right now.

Q.  Oh, wonderful.  Thank you.  I think this should go fairly smoothly.  Can you give us your name again for the record, please?

A.  Sure.  It's Melissa Ann Meister, MEISTER.

Q.  And, Miss Meister, where are you employed?

A.  Employed at the United States Attorney's Office in the Southern District of California.

Q.  And so it's approximately about 8:20 there this morning?

A.  Yes, sir.

Q.  Thank you.  I would like to spend just a minute going over your background so that the court has some familiarity with who you are and what role you play in this case.  Can you tell us a little bit about your background?  Where did you go to law school?

A.  Sure.  I went to law school at university of -- James E. Rogers College of Law at University of Arizona.

Q.  What year did you graduate?

A.  2003.

Q.  Following your graduation in 2003 what was your next job?

A.  I clerked for the United States Court of Appeals for the Ninth Circuit from 2003 to 2004.

Q.  And which judge in particular?

A.  Judge William C. Canby.

Q.  Miss Meister, was Judge Canby a senior judge when you were clerking for him?

A.  Yes, he was.

Q.  Did that affect the number of calendars he would hear each year?

A.  Yes.  He heard -- I believe when I was there he heard between four to six calendars per year.  The standard for the Ninth Circuit is eight.

Q.  Do you recall during your clerkship did you work both on a broad range of civil and criminal work, cases?

Meister - Direct                                   49

A.   I worked primarily on civil and immigration matters, and the judge excused himself from death penalty matters so we did not work on those.

Q.   Thank you.  Following the completion of your clerkship with Judge Canby what was your next employment?

A.   I was accepted into the Department of Justice Honors Program as a civil attorney with the civil fraud section of the civil division.

Q.   And what was -- what were your job responsibilities in that position?

A.   I was a trial attorney assigned to investigate and bring to court False Claims Act cases, individuals and companies that defrauded the government, and I also did immigration appeals.

Q.   Did you have any trials while you were with the Justice Department?

A.   I did not.

Q.   But I believe you did have some appellate work, correct?

A.   I did.  I did two oral arguments and four briefs.

Q.   Now, according to my research you began at the Justice Department October of 2004.

A.   That's correct.

Q.   When did you leave the Justice Department, Miss Meister?

A.   I believe it was March 2007.

Q.   And when you left the Justice Department what was your

Meister – Direct                    50

reason for leaving?

A.   I accepted a job offer with Jenner & Block.

Q.   And Jenner & Block, can you just give us -- I think most people know the firm, but it's a very large firm, isn't it?

A.   It's not in D.C., it is in Chicago, I accepted a job offer with D.C. which was about 60 to 70 attorneys.  The office in Chicago is well over 200.  It's now much bigger than it used to be when I applied.

Q.   Is Jenner divided into departments or sections?

A.   At the time I worked for them they only had two sections in D.C., litigation and government contracts.  I was hired in litigation.

Q.   Litigation.  Okay.  So that was it safe is to say that was a fairly large umbrella, litigation?

A.   It was, yes.

Q.   What type of cases, primarily, did you work on while you were at Jenner?

A.   The type of cases I primarily worked on, I did some False Claims Act cases, some government contract cases, I did appeals, and then just general litigation.  I did some of the Fanny Mae litigation with the government at the time, as well. So I guess fraud, False Claims Act, and appeals.

Q.   So in the fraud cases then is it correct to say you were representing agencies or companies or persons charged with fraud?

A.   I was representing companies that were either charged with fraud by the government or that had -- were charged with fraud or misconduct by other companies.

Q.   Was that in the civil context or criminal fraud?

A.   Primarily the civil context.  I don't think I worked on any criminal fraud cases while I was there.

Q.   Okay.  With the exception of Mr. Basham, while you were at Jenner & Block did you have any criminal defense clients?

A.   I worked on a criminal appeal to the Supreme Court prior to my work with Mr. Basham, although that was in a First Amendment context.

Q.   And that was in preparation of a brief to the U.S. Supreme Court?

A.   Yes, an amicus brief on behalf of the Free Speech Coalition.

Q.   So, Miss Meister, if you could, I apologize, I know this might be somewhat unwieldy, but you received exhibits from the government and you received exhibits from us.  And, unfortunately, I'm going to have to jump back and forth as we go, and I apologize in advance for the inconvenience on that.

A.   That's fine.  The government, just to let you know, the government's exhibits are broken up over four e-mails and they are by number, so -- and it might just be easier if you are looking at a government's exhibit if you just give me a number and give me a minute to pull it up.

Meister – Direct                          52

Q.   The first I would like to begin with is Defendant's
Exhibit number 8.

A.   Those are the time sheets?

Q.   The time sheets, correct.

A.   The time reports?

Q.   Yes.

A.   Okay, I have it.

Q.   Are you familiar -- just so that you know, Miss Meister,
the government and Mr. Basham have agreed that all of these
exhibits will be admitted into evidence so we don't have to
worry about the technical foundation on any of these, they are
already in the record, okay?

A.   Okay.

Q.   Okay.  Have you ever seen a time report like this?

A.   I would get my own time reports at the end of the month
when I worked for Jenner.

Q.   Okay.  Can you -- as far as you are aware, is this a time
report that deals specifically with the work that was done on
Mr. Basham's case?

A.   Yes, it looks -- because it looks like a time report that
was pulled by the client number, which would have been
specific to that one case.

Q.   Do you know -- now, you left the Department of Justice in
March of 2007.  When did you begin at Jenner?

A.   April 2007.

Meister - Direct                                        53

Q.   April 2007.  Okay.  Do you know when Jenner & Block became involved in Mr. Basham's case?

A.   There was an initial e-mail that went out for interest, and I want to say it was December of 2007, is my best recollection.

Q.   Okay.

A.   I don't know if there was involvement prior to that.  That was the first I became aware of it.

Q.   Okay.  And so an e-mail went out asking for attorneys in the firm who would be interested in working on the case?

A.   Yes.  It's generally how Jenner gives out pro bono work, because they would send out e-mails, this was what we have, is anyone interested in working on the case.

Q.   Now, what was Jenner's policy, if you know, at the time for pro bono work on the part -- let me just clarify.  You were an associate at that time?

A.   That's correct.

Q.   What was the Jenner policy with regard to working on pro bono matters?  Did you receive full hour credit for that?

A.   No, you received up to 50 hours of credit towards your overall billable hours.

Q.   So anything above 50 hours spent on a pro bono case was, for lack of a better --

A.   It was on the associate, and you needed to make it up in other ways.

Meister - Direct                        54

Q.   What was the billing hour requirement in Jenner in 2008?

A.   2,000 minimum, 2,200 if you wanted a bonus.

Q.   Do you recall staying -- we may have this in the records, we may get to it but it's not significant, but I'm just curious, how many hours did you spend on Mr. Basham's case?

A.   I believe -- I initially thought I spent about 500 with the argument.  I believe when you sent me the time reports it looks like it's more between 350 and 400, but I don't know if that calculates the argument prep and doing the argument.

Q.   That's correct, it does seem to be missing -- at least the time reports that we received from Jenner seem to be missing those entries for you during that time frame.  And I assume it's safe to assume you did prepare for the oral argument?

A.   Yes, quite a few hours, quite a few overnights.  So, I mean, I would add at least 50 hours to whatever it shows just preparing for the oral argument.

Q.   Okay.  Now, you were one of the attorneys who responded to the e-mail asking for interest in working on the case?

A.   Yes.

Q.   Can you tell us, if you remember, what happened next?  Who contacted you, how did you get involved?

A.   Sure.  I responded, I believe it was David DeBruin, Dave DeBruin who sent out the e-mail, I responded that I was interested.  Dave I believe either came by or shot me an e-mail or called me, I don't remember which, and said, you

know, I was the first person to respond and there were other people, he mentioned the other people.  We talked a little bit about his criminal background, we talked about my criminal background, or lack thereof at the time, and we came up with the plan to sort of set up the team with him and some other partners supervising because they had -- he and other partners in the firm had a lot of criminal law experience, I would oversee the associates.  And initially I was supposed to write just one part of the brief and oversee the younger associates writing other parts of the brief.

Q.  Now, when you mentioned younger associates, when you -- you had been at Jenner just a matter of months when you'd begun working on Mr. Basham's appeal, correct?

A.  Yes.

Q.  But did you come in, given your experience, at a somewhat higher level?

A.  Yes, I was considered a fourth year attorney at that point, so by younger associates I mean attorneys who were either in their first, second or third years.

Q.  And were there any such attorneys who worked on Mr. Basham's appeal?

A.  Yes, there were.

Q.  Do you recall now how many?

A.  There were three younger associates who worked on the appeal.

Meister – Direct                    56

Q.   Do you remember being interviewed by the government in this case on September 11, 2012?

A.   Yes.

Q.   I remember you testifying or you stating, if this helps to describe your role, your role was sort of as a fulcrum in the case.  Do you remember that?

A.   Yes, I think that was initially I was set to be the fulcrum passing -- basically the gatekeeper of the work done by the associates, clarifying it, giving them feedback, making it better, and then coordinating their efforts also with the partners, and then coordinating -- I was supposed to also make sure the statement of facts read as if it was a unified brief.

Q.   Okay.  But you mentioned that there were partners who worked on the case, as well, and you mentioned David DeBruin. And for the record that's DEBRUIN, one word.

A.   That's correct.

Q.   Was Mr. DeBruin, I believe he's now the managing partner of Jenner & Block, is he not?

A.   He is.

Q.   Was he at the time?

A.   He was not.

Q.   Okay.  To your knowledge, did Mr. DeBruin have experience in criminal law?

A.   Yes, he did.

Q.   And had experience in death penalty cases, as well?

Meister – Direct                    57

A.  Yes, he did.

Q.  So did you and Mr. DeBruin ever have a discussion regarding what role he would take in the case?

A.  Yes.  I believe during our initial discussion he, you know, he said he would advise us, he would be present at all the meetings to the extent that he could, he would help us when we were looking at issues, he would overlook snippets of the brief that were done.  He sort of divided that up amongst the partners.

Q.  Okay.  So there were other partners available to you that you could run issues by, run drafts by, that's correct?

A.  Yes.

Q.  Now, when you became involved in the case was there another lawyer appointed to Mr. Basham's appeal?

A.  Yes, there was.

Q.  And who was that?

A.  Timothy Sullivan.

Q.  Okay.  Mr. Basham was sentenced in 2005, and you stated that you became involved in the case somewhere late 2007.

A.  Yes.

Q.  Do you know what had been occurring in Mr. Basham's direct appeal in the several months before Jenner became involved?

A.  I believe Mr. Sullivan requested a number of continuances.

Q.  Okay.  Do you know if he was alone on that case during that period of time or did he have co-counsel?

Meister – Direct                          58

A.   If I remember correctly, there was a conflict with the trial counsel, because one of the trial counsel began a law firm with one of the prosecutors, and I think that's how Mr. Sullivan came into the picture.  And then I don't know why, I don't recall why he asked for so many continuances.

Q.   Referencing again the interview the government conducted of you on September 11, I have in my notes, and I don't know if this was accurate so let me ask you, that when you were asked about Mr. Sullivan's involvement and why Jenner got involved did you state that it was because Mr. Sullivan was in over his head?

A.   I believe he -- well, I don't know why he asked for so many continuances, but I believe he brought it to the firm not as far as he was over his head as far as the subject matter but because he was too busy.  I don't feel like he believed he had the time to take on the full direct appeal.

Q.   And would you agree that it's safe to say it was a fairly voluminous record?

A.   Yes, it was very voluminous.

Q.   Now, Miss Meister, I would like to direct your attention to government exhibit -- actually, let me see just one moment, please.

A.   Sure.

Q.   Yes, it's Government Exhibit 188.  And let me know when you have that available.

A.  188?

Q.  Yes, 188.  It's a consent motion.

A.  That was not sent to me.

Q.  Okay.

A.  Sorry.

Q.  That's fine.  No, that's fine.  Then let's go back to exhibit -- Defendant's Exhibit number 8.

A.  Okay.

Q.  And that is, again back to the time report, and you will hear me every once in a while refer to Susie, I'm not calling you Susie, my assistant over here is bringing up things for us to see.

A.  Sure, no problem.

Q.  Susie, could you enlarge the top maybe three lines of text -- right, yeah, right in there so that we can -- so, Miss Meister, what we're enlarging is on the first page, which is technically page three of Defendant's Exhibit 8, are some entries from January 7, 2008?

A.  Yes.

Q.  Do you see those?

A.  Yes.

Q.  Okay.  Do you recall having a meeting with Tim Sullivan in January of 2008?

A.  Yes.

Q.  So by this point you had been -- you had already been

appointed to the case to assist, correct?

A.   I believe so.

Q.   And I will tell you it's in the record, the record will speak for itself, but you were appointed by the Fourth Circuit as co-counsel to Mr. Sullivan.  Was there any discussion in the your firm as to who would be the -- who would be the attorney from your firm who would be named as co-counsel?

A.   Yes, it was supposed to be me.

Q.   Okay.  Okay.  So if you could look at those entries for January 7, 2008.  It appears that you and your colleagues, there's a reference to an E. Haren.  Who is E. Haren?

A.   E. Haren is Eric Haren.

Q.   Was he a partner or an associate?

A.   He was an associate.  I believe he was a second year associate.

Q.   And did Mr. Haren do a considerable amount of work in this case?

A.   Yes.  I believe he probably billed the most hours of anybody.

Q.   Okay.  So do you recall going to Greenbelt, Maryland to meet with Mr. Sullivan to discuss the case?

A.   Yes.

Q.   Okay.  All right.  So that was -- do you remember if when you met with Mr. Sullivan in January of 2008 if he had a copy of trial counsels' records?

A.   He did not have a copy of trial counsels' records.

Q.   Okay.  Do you know, did he have a copy of the transcripts from the trial?

A.   Yes, he did.

Q.   Okay.  Do you recall in that meeting in January of 2008 if you had any discussion with Mr. Sullivan about obtaining trial counsels' records?  I know it's been several years, but if you can remember.

A.   Yes, I believe it was raised in that meeting, and it also had been raised in the -- on the phone with him during the month of January.

Q.   Okay.  Raised with him, you mean with Mr. Sullivan.

A.   That's correct.

Q.   Okay.  Do you recall what Mr. Sullivan said about the records?

A.   I believe Mr. Sullivan said he had asked for the records from Mr. Jack Swerling, that they would be sent up so that we could have them locally and that he had been having difficulty getting them.

Q.   Okay.  Sticking still with that same Exhibit 8, if you could look at an entry for January 10th for an attorney named Carrie Apfel?

A.   Yes.

Q.   Was Miss Apfel an associate at the firm?

A.   She was an associate.  I think she was actually a fourth

year associate.  She had volunteered to work on the case but she didn't have a lot of time so she just volunteered to do research inquiries.

Q.  And did she in fact do research on January 10, 2008?

A.  Yes.

Q.  And what was she researching?

A.  I had her research basically the right that appellate counsel had to trial counsel's records, i.e., whether we could force Mr. Swerling to send the records up or whether we had to go to South Carolina to review the records in his office.

Q.  Okay.  So by the time you became involved in the case, at least by January of 2008 there was an issue with regard to whether you were able to obtain your client's file?

A.  That was my understanding from Mr. Sullivan.  Up until that point Mr. Sullivan had been talking to Mr. Swerling.  I had no discussions with Mr. Swerling so that was based on my understanding from Mr. Sullivan there had been some difficulties.  And so that was why I was researching whether we could -- if Mr. Basham owned them we should be able to force Mr. Swerling to send the records up.

Q.  Now, did you receive Government's Exhibit 186, Miss Meister?

A.  Let's see.  No, I did not.  It goes Exhibit 14, 15, 16, 17 and then it skips to Exhibit 190.

Q.  All right.  That will help me in my questioning then.  Do

you recall traveling to South Carolina in January of 2008 with Tim Sullivan?

A.   I don't recall traveling in January of 2008, no.

Q.   Okay.  Are you aware of a letter Mr. Sullivan sent to Mr. Swerling in January of 2008 requesting the file in Mr. Basham's case?

A.   I am not.

Q.   Okay.  So sticking with Defendant's Exhibit number 8, and on that same page three there is a -- let's see.  Actually, excuse me, no, it would be -- can we go to the next page, Susie?  And one more, please.

So the third page of that exhibit is dated January 25, 2008.  And there's an entry for an attorney, I assume, named Mushtaq Gunja.

A.   That's correct.

Q.   Was that Mr. Gunja?

A.   Yes.

Q.   And was he an associate at the firm, too?

A.   Yes.  I think he was a first year associate.

Q.   And what was he researching for you on that day?

A.   He was researching -- following up on some research from Miss Apfel regarding ownership of the trial counsel's files, because Miss Apfel didn't have time to do more research.

Q.   Okay.  So it was still a live issue for you?

A.   Yes.

Q.  Okay.  Now, if we could still look at the same document, the same page, the page marked page 8 of February of 2006 -- excuse me, February 26 of 2008.  And there is, if you will see the exact -- I'm sorry, February 26.

A.  Yes, I have it.

Q.  February 26.  Was there an attorney on the case who did some more research on that date on the same issue?

A.  That appears Mr. Gunja did some more research on the same issue, yes.

Q.  So a month later is it safe to say that you were still having trouble getting the records?

A.  Yes, we still did not have the records, and I think I began pressing Mr. Sullivan more about why we don't have them, what the status is, et cetera.

Q.  Okay.  And enough so that you were actually still having other lawyers research the issue of your legal rights, correct, of your client's legal rights?

A.  Correct.

Q.  Okay.  Is it appropriate to say that the time that Jenner spent on this issue was spent because you believed it was important to receive trial counsels' file?

A.  Yes, I think that's fair to say.

Q.  Among the team in both -- in and out of Jenner, was there anyone who was considered to be the point person for contact with Mr. Swerling about getting that records from him?

A.   Originally that would have been Tim Sullivan.

Q.   Tim Sullivan.  Okay.  Now, I'm sorry, I'm going to write down this time so I don't have to ask again.  When did the government's exhibits begin for you?

A.   I have Exhibits 14 through 17 and then they start at 190.

Q.   Okay, great.

A.   And go up to 218.

Q.   Thank you.  Can we have you look at Defendant's Exhibit 18, please.

A.   Hold on, I'm getting to it.  Okay, I have it.

Q.   Okay.  Can you tell court what this is?

A.   Sure.  It's an e-mail from me updating everyone who was working on the Basham appeal about the conversation I had with Mr. Basham's initial attorney Cam Littlejohn.

Q.   Okay.  And in that e-mail do you also reference Mr. Basham's subsequent attorney Jack Swerling?

A.   Yes, I do.

Q.   Okay.  And is it correct to say that this e-mail indicates that you then had been trying to contact Mr. Swerling?

A.   It does, yes.

Q.   And were you successful?

A.   No.  From this e-mail, which would have been written contemporaneous with my discussion with Cam Littlejohn, it says that I have two calls in to Jack Swerling and they have not been returned.

Q.   Now, with regard to your conversation with Mr. Littlejohn, why did you call Mr. Littlejohn?

A.   Two reasons.  One, I wanted to see if he had any files -- specifically there was a motion for competency that he had filed that we were unsure whether it had been withdrawn at some point, so I was calling to see if he had any files related to Mr. Basham, specifically that motion.  And who -- to get a greater understanding of his disqualification, just to talk to him and what his understanding of it was.

Q.   Okay.  Now, to put all of this work in context, do you recall -- I will tell you the record indicates the following: The Jenner file, the opening brief in Mr. Basham's case on May 13, 2008, does that sound familiar?

A.   Yes.

Q.   Okay.  And did you at one point receive a two-week extension of time in order to do that?

A.   I don't recall, but if that's what the record says then I would agree with that.

Q.   Okay.  Okay.  And the record indicates that initially the brief was due April -- well, there had been other extensions, but for purposes of our discussion your brief was due April the 29th and then you received a two-week extension.

A.   Okay.

Q.   Can you now look at Government's Exhibit 190 for us, please?

A.    Okay.  I'm reviewing it, hold on.

Q.    Um-hmm.

(There was a pause in the proceedings)

THE WITNESS:  Okay.

Q.    (MR. BURKE) So does that reflect that you had a conversation on the phone with Mr. Swerling on March 26, 2008?

A.    Yes, it does.

Q.    And this was an e-mail to follow up, is that correct?

A.    That is correct.

Q.    And what was the purpose of the e-mail and the phone call?

A.    To get records from the trial files.

Q.    And was it to get specific records?

A.    It was to get specific records.  At that point, I mean in January I believe we already had all of the transcripts or most --  we had all of the transcripts and most of the motions, so we had most of the direct record but there were -- I asked all of the associates for things they felt they needed to complete their sections and I asked Mr. Swerling for those specific items.

Q.    So this was your followup from requests from your colleagues about specific information that they needed but did not have, correct?

A.    Correct.

Q.    Okay.  Then among the materials, if you can just look very quickly, were you requesting information on the competency

motion that was filed in Mr. Basham's case?

A.  Yes.

Q.  And do you recall whether any of your colleagues was researching the question of Mr. Basham's competency at trial?

A.  Yes.  I mean, that was an issue that we flagged.  I believe I flagged it and I think Mr. Haren also flagged it.

Q.  Okay.  And then if we look at Government's Exhibit 191.

A.  Okay.

Q.  Very short e-mail.  What is that e-mail?

A.  That's a an additional item that I'm adding to Jack's list of things to prepare, which includes the order by the judge that disqualified Mr. Basham's initial attorneys.

MR. BURKE:  And to try to speed things along, there are other exhibits and, your Honor, there are exhibits that are in the record that will show e-mails sent from Miss Meister to Mr. Swerling around that time, and I'm referring to the Government's Exhibit 192.  And I won't go through each of them, but they were requests for specific documents that the attorneys at Jenner did not have but were in need of.

THE COURT:  All right.

Q.  (MR. BURKE) Now, at some point did you ask a lawyer at your firm to research whether you had the right to compel Mr. Swerling to provide you with the records, do you recall?

A.  I don't.  I mean, I think that was the basis of the

Meister - Direct                    69

research that Mr. Gunja and Miss Apfel did.  I went to Mr. DeBruin when -- I mean, I kept asking him when are we going to get the records and, sorry, Mr. Sullivan, Mr. Sullivan was kind of like, you know, Mr. Swerling is being difficult but no worries, I'll get them.  And at a certain point I just -- I couldn't rely on Mr. Sullivan anymore so I went to Mr. DeBruin and I said, look, this is the status, we still don't have the records, I'm not confident Mr. Sullivan is going to get them, so here's my idea.  Which is to tell Mr. Swerling he can either allow us access to the records or I can get the court to order him to give us access to the records.

Q.   Okay.  And that takes us to Government's Exhibit 192.

A.   Okay.

Q.   Do you recognize Exhibit 192?

A.   It appears to be an e-mail I sent to Mr. Swerling.

Q.   Okay.  Actually, I'm looking for a faxed letter to Mr. Swerling dated April 1st.  I may have the wrong --

A.   That's 193.

Q.   Okay.  I was doing this pretty late last night.  Do you remember drafting that -- sending that letter to Mr. Swerling?

A.   I do.

Q.   Having been -- I think we have all been in this situation where we're relatively new lawyers having to deal with more experienced lawyers.  Did you find it sometimes to be a little bit daunting?

Meister - Direct                                70

A.  Not really, but that's just not my personality.

Q.  Well, Mr. Basham's glad to know that, because -- you sent a letter to Mr. Swerling on April 1, 2008, correct?

A.  On April 1 -- let me see.  Yes, that's correct, I sent it to him via fax but I also shot it to him via e-mail.

Q.  And this was essentially your shot across the bow, is it safe to say, now's the time to give us what we need?

A.  This is my attempt to create a paper record so that if he did not comply I had something to attach to a motion to the court.

Q.  Is it safe to say or is it correct you had previously had trouble getting Mr. Swerling to respond promptly to your requests?

A.  Yes, that's correct.

Q.  Okay.  Did he respond to this letter?

A.  Yes, he did, almost immediately.

Q.  Okay.  If you'd look at Government's Exhibit 194.

A.  Give me a minute.  Okay.

Q.  I believe that this is Mr. Swerling's response to you in which he calls your letter totally unnecessary in its tone and content?

A.  Yes, that's correct.

Q.  You remember receiving that?

A.  I do.  I also got a phone call from him.

Q.  And what occurred during that phone call?

A.   I was, to use the colloquialism, chewed out on the phone.

Q.   Do you recall why Mr. Swerling chewed you out?

A.   He said that, you know, how I impugned his integrity, he's been a member of the bar of South Carolina for longer than I think had been alive, is what he said.  That, you know, he's always done his best for his clients and he will give us anything we need, we have only to ask.

Q.   Okay.  Did Mr. Swerling say to you in the e-mail he sent you that no one had ever requested anything from him?

A.   That's correct.

Q.   Excuse me.  I didn't mean to interrupt you, but until the week before?

A.   That's what his e-mail says, yeah.

Q.   Do you believe that's accurate?

A.   That was not my understanding from Mr. Sullivan.  And I had asked him, I think the -- I mean, the week prior than the week before the 1st, I believe is when I started getting involved, and he didn't return my phone calls.

Q.   Okay.  If we could look, please, Gayle, at Exhibit 195, Government's Exhibit 195.  And if you could -- and again I've got the wrong number.  All right.

     Well, you had a series of e-mails with Mr. Swerling even that day, correct?

A.   Correct.

Q.   And what was decided about what you would do to obtain the

record or what you needed from the record?

A.   I basically volunteered to fly down on a moment's notice to South Carolina to go through all of the boxes he had, because he did not want to send them to D.C.

Q.   Did he tell you why he would not send them to D.C.?

A.   He did not.

Q.   Okay.  And so you say you would arrange a trip to South Carolina to get the documents that you needed?

A.   Yes.  Initially, I believe I told him I could come down Monday, March 31, he hadn't responded so that's when I sent the letter, and then I volunteered to come down that Thursday, and he said you can come down whenever you wish.

Q.   Gayle, could we see 196, please?  Hopefully this will be -- and I have written this down right.

     So Government's Exhibit 196, I believe you do have that one, Miss Meister?

A.   I do.

Q.   Okay.  That's an e-mail from you to Mr. Swerling, correct?

A.   The first part looks like it's an e-mail from Linda Brown, but there is an e-mail from me contained on that e-mail, yes.

Q.   Okay.  Is it an accurate description to say that you were -- once you were given permission to come down and at least go into the file you were doing what you could to accommodate Mr. Swerling's requirements?

A.   Yes, I was attempting to do what I could to accommodate

his requirements.

Q.  Okay.  When you went down to South Carolina you went to Mr. Swerling's office, is that correct?

A.  Yes.  Mr. Sullivan also went down, we met in the morning at the hotel, and then I went to Mr. Swerling's office for the day and Mr. Sullivan went to the courthouse.

Q.  Okay.  So you alone in going through the records in Mr. Swerling's office?

A.  I was.

Q.  Do you recall what you -- can you describe the record for us that you saw that day?

A.  Sure.  It was a room full of those plastic long boxes that you can get at Home Depot that have the white tops that sort of seal in a jigsaw on top.  And then a few file cabinets strewn over the entire room in no order whatsoever.

MR. BURKE:  Your Honor, we won't -- just for the record purposes, the government has admitted Exhibits 4 through 7 in this proceeding.  Those are actually photographs of the file in this case.  Miss Meister I don't believe has those so I won't ask her any questions.  Everyone stipulates that's a fair picture of the file situation in this case.

MR. DALEY:  What they looked like as of two or three days ago, yes, your Honor.

THE COURT:  What I understand, some were in bankers boxes and some were in filing cabinets?

THE WITNESS:  Some -- well, there was I think maybe one or two filing cabinets, there were some bankers boxes, but there's also these large plastic tubs that files were put into.

THE COURT:  All right.  I understand.

BY MR. BURKE:

Q.  And was your understanding at the time that that was the entirety of the record in the case?

A.  Yes.

Q.  Okay.  You had one day to go through those boxes?

A.  I had one day.  I believe I was there that day and -- I can't remember if I went back part of the next morning, as well.  But I had a day set aside to go through the records, yes.

Q.  Do you recall, you were going to make -- were you going to make copies of what you thought was important?

A.  Yes, I was supposed to make copies of everything that I found that was important and then bring those back or ship them back to Jenner's offices in D.C.

Q.  Do you remember having any conversations with Mr. Swerling about his requirements about boxes leaving his office?

A.  Yes, he had very strict requirements about boxes leaving his office and where they could be overnight, and so that was -- made it a little extra difficult to comply with.

Q.  So did you comply with that for him?

A.   As much as I was able.  I believe I probably violated a little bit, but -- because I think technically they were at the copy office from 10:00 o'clock at night until, I don't know, I think I went and picked them up at 3:00 in the morning because he didn't want them out of his office all night.

Q.   Did he tell you why?

A.   No.

Q.   Do you believe that the period of time that you were given in early April 2008 to review the numerous boxes in this case was sufficient time to become familiar with the records that were there?

A.   I mean, it was enough time to look for the list of items I had that we needed to find, and I found some additional stuff, too.  As far as -- I mean, for a direct appeal I don't know if it was sufficient, it was pretty close to sufficient.  For a habeas appeal, no.

Q.   You mean -- I'm sorry.

A.   It would depend.

Q.   Okay.  At that time do you remember, it appears from the record, I don't want to state this as a fact, but it appears that the issue of Mr. Basham's competency was still an issue that you were considering as an issue for the brief, correct?

A.   Yes.

Q.   And as an appellate lawyer, of course, you are bound by the record on appeal, correct?

A.  Yes.

Q.  In assessing whether you had a viable claim, however, would it have helped you if you had had Mr. Swerling's notes from the trial and his pretrial notes in determining whether you had a valid claim of competency?

A.  That might have pointed us where in the direct appeal to look or what his thoughts were, but they weren't something we could have used on a direct appeal.

Q.  Thank you.  Now, I would like to turn for a moment and just to move away from the -- the obtaining of the record and talk about the actual issues that was raised in this case.

A.  Okay.

Q.  Could you just tell the court, if you remember, what were -- and this is, of course, it's a matter of public record, but what were the primary issues that were finally included in the appeal in this case.

A.  They were juror misconduct, improperly admitted 404(b) evidence, cumulative error, a verdict form irregularity, and improper disqualification of counsel, I believe.

Q.  And at that time what did you view as -- what was the first issue in the brief?  What was your primary issue?

A.  Juror misconduct.

Q.  Now, there are a series of e-mails that have been admitted and in the interest of time I won't make you go through them all, they are in the record and the government agrees they say

what they say and they were sent by whomever it says they were sent by.

Were there discussions occurring among the lawyers at Jenner & Block in the week of -- several days, let's say May 6 through May 13, where you were discussing the issues that would ultimately end up in the brief?

A.   Yeah, we had many -- we had many meetings about what issues would ultimately end up in the brief.

Q.   Do you recall at any point did -- at any point, not just that one week, but at any point was there ever any discussion about your issues regarding the selection of the jury in this case?

A.   There was some discussion.  I believe Mr. Haren pointed out some jury selection issues, yes.

Q.   Were those included in the brief that was ultimately filed?

A.   No, they were not.

Q.   Okay.  Was there discussion among the attorneys in this time frame regarding including the claim regarding Mr. Basham's competency?

A.   That was an issue that we discussed to include in the brief and deciding where it should go or should it be included at all, yes.

Q.   And but we have sent you these exhibits, and then I believe several days ago or a few days ago I sent you just a

general packet of e-mails for you to review, correct?

A.   Yes, I received a binder on Friday.

Q.   Okay.  Do you recall reviewing or recall from the time e-mails from Mr. DeBruin asking essentially where do we stand on the competency issue?

A.   There were e-mails.

Q.   And I can direct you actually -- I'm sorry, Defendant's Exhibit 13 might be one.

A.   Okay.  Hold on.

Q.   Did you find that?

A.   Wait, that's not 13.  Yes, there's an e-mail from David DeBruin to Steve Ascher and Kali Bracey that I wasn't included on.

Q.   And that is an e-mail dated March -- excuse me, May 6, 2008?

A.   That's correct.

Q.   And that's one week before the brief was filed in this case?

A.   Yes, I believe so.

Q.   And is that -- is that Mr. DeBruin asking if a decision had been made about including competency?

A.   It appears to be.

Q.   Okay.  Could you look at the top of that page for us, the very last entry?  These e-mails, you have to read them in the reverse order, so the top would be the last entry.  Was that a

Meister - Direct                                79

response from you, Miss Meister?

A.   Yes.

Q.   Okay.  And you were responding, you say agreed.  Do you remember what you were agreeing to?

A.   It looks -- based on the context it looks as if Steve -- Kali Bracey had sent an e-mail to Steve which had been on his to do pile, he said that he thought we should include the competency argument, Kali agreed, and then I agreed and said that I didn't think it was a weaker argument and it did favor the disqualification section, so I think there was an agreement we should include it.

Q.   Now, Miss Meister, you are working at a disadvantage, and we are too, in that -- and I think, Mr. Daley, you can speak on this, too, your former employer Jenner, we only have the e-mails that they gave us so we are not suggesting to you that this is the entirety of the e-mails that exist out there, but this is all that we were allowed access to.

A.   Sure.

Q.   This e-mail, as I said, was the week before you filed the brief.  Do you recall what discussions occurred in that final week regarding including the competency claim?

A.   I believe we discussed whether to make it a stand-alone section versus have it be part and parcel of the disqualification of counsel section.

Q.   Okay.

Meister - Direct                                    80

A.   And I believe it was ultimately decided that it was part and parcel -- to be included as part and parcel of the disqualification section.

Q.   But not just a stand-alone issue?

A.   No.

Q.   Okay.  Do you recall raising an issue on the appeal, it may not have been drafted by you, regarding the trial court's -- the district court's refusal to allow in evidence regarding Mr. Basham's codefendant Mr. Fulks from Mr. Fulks' trial?

A.   To allow in -- I'm sorry, I didn't understand the question.

Q.   Yes, certainly.  Do you remember an issue in the brief concerning a claim that the trial court here had erred in not allowing the defense to present evidence of Mr. -- from Mr. Fulks' trial concerning Mr. Fulks' prior actions and the government's description of Mr. Fulks?

A.   I believe that Eric Haren raised that issue.

         MR. BURKE:  And, your Honor, the record will speak for itself on that.  That issue was presented to the court and the Fourth Circuit found in that case that they could not even address it for plain error because your Honor was never given an opportunity by trial counsel to rule on the question because it was never renewed to you.  So the Fourth Circuit's ruling was this is not a viable issue, it was never presented

so we couldn't review it for that purpose.

Q. I'm not going to -- there are a series of exhibits, defendant's exhibits, that just focus on the various claims in the last week and what was -- and I think they speak for themselves. One thing that's not in there, and I'm curious, Miss Meister, did you ever have a conversation with Mr. DeBruin, and I'm going to direct to you Defendant's Exhibit number 10?

A. Okay.

Q. And this is actually an e-mail in which you were not included, so -- an e-mail from Mr. DeBruin to Mr. Ascher concerning his concerns about how he, Mr. DeBruin, had handled the case. Do you remember -- well, you've never seen this before. He says I now realize that I handled this project very poorly. I assumed I could let the associates run with it led by Melissa Meister. I should have been more involved or gotten help much earlier in evaluating the facts and the potential issues. But you, Mr. Ascher, are doing a great job of damage control.

    Did you have a conversation with Mr. DeBruin about his concerns about how the brief had been handled?

A. No, he never raised that with me.

Q. Okay. And ultimately you argued this case to the Fourth Circuit, did you not?

A. I did.

Meister – Direct                    82

Q.  And do you recall the primary issue in the argument concerned the juror issue with regard to Miss Wilson?

A.  That's correct.

Q.  Okay.

THE COURT:  Let me stop you and let me read this e-mail.  You are going through it pretty fast.  Hold on one second.

(There was a pause in the proceedings)

THE COURT:  Who is Stephen Ascher?

MR. BURKE:  Miss Meister, who was Stephen Ascher?

THE WITNESS:  Stephen Ascher was a partner from the New York office of Jenner & Block that had been assigned to work on the case.  And he also, like Mr. DeBruin, was assigned to review our work and provide input.

Q.  (MR. BURKE) Do you recall, Miss Meister, did Mr. Sullivan take an active role in the preparation of the brief?

A.  He did not.  He only drafted his section, which had to do with the verdict form.

Q.  Okay.

A.  He did read the brief but he had nothing substantive really in response to our draft.

Q.  Okay.  And then you argued this case October the 31st of 2008.  Do you remember that?

A.  Yes.

Q.  Okay.  There is an exhibit, and I do apologize, I'm having

Meister - Direct                              83

trouble finding it at the moment, but it was one of the exhibits I believe that -- well, it would have been sent to you.  I don't know if you had the opportunity to look at it. It is an e-mail from you to members of the team, it looks like sent out after midnight, Defendant's Exhibit number 7.  Let me know when you've found that.

A.  Yes.

Q.  Okay.  And that was sent out at 12:40 Friday, October 31. I'm sure you were staying up late doing prep for the argument that day?

A.  Yes.

Q.  Do you recall doing an internet search that day?

A.  This e-mail refreshes my recollection that I did.

Q.  You do remember that?  Can you read for us what you sent to the members of your team that early morning?

A.  Sure.  I had -- I had been looking at news information and I found a story, I believe it was local to South Carolina, about Chadrick Fulks' appeal.  There had been an anonymous comment on that news story, said I was on the jury for Brandon Basham.  If you could have heard the stories from the families and the things they did to these women you would see they truly deserve to die, but they need to suffer in prison for a while.  Death is too easy.

        MR. BURKE:  Thank you, Miss Meister.  I have no further questions.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. JOHNSON:

Q.   Thank you, your Honor.  Miss Meister, this is Jeff Johnson, I'm an Assistant U.S. Attorney here in South Carolina.  I'm the one who interviewed you back on September 11.

A.   Yes, I remember you, Mr. Johnson.

Q.   All right.  It's good to talk to you again.  And, like Mr. Burke, I want to thank you for your testimony today.  Obviously, you're having to do this fairly early in the morning there in California in addition to your work responsibilities that you have, and we both appreciate your time to come and testify with us.

A.   Thank you.

Q.   And just to let you know up front, Mr. Burke has been very thorough in his examination of you and I'm going to try my best to avoid any duplicative questions to the very best that I can.

A.   Okay.

Q.   I want to start off, go back to the team that you had at Jenner & Block.

A.   Okay.

Q.   You already testified some about that, but my understanding is that you had Tim Sullivan who was appointed

first and he was co-counsel for Mr. Basham, correct?

A.  Correct.

Q.  And there at Jenner & Block you had a team of attorneys who were working on Mr. Basham's appeal.

A.  Correct.

THE COURT:  Now, Mr. Sullivan wasn't with the firm.

MR. JOHNSON:  No, your Honor, I didn't mean to imply he was.

THE COURT:  I wanted to make sure I understood that correctly.

Q.  (MR. JOHNSON) That was correct, right.  Mr. Sullivan was not an associate or, excuse me, or a partner at Jenner & Block?

A.  Correct.  He had his own office at the time, of which I believe he was a partner.

Q.  So Mr. Sullivan had his own practice and he was, as an individual, was co-counsel.

A.  Correct.

Q.  And then you were named co-counsel while you were an associate at Jenner & Block.

A.  Correct.

Q.  And then also working with you at Jenner & Block was a team of other attorneys, right?

A.  Yes.

Q.  And I think we mentioned in your direct examination that

when you went back and looked at your time sheets your estimate of how many hours you personally spent on the case was between 350 and 400 hours, is that right?

A.   Yes, that would be accurate.

Q.   And those are just your personal hours, correct?

A.   Those are just my personal hours.

Q.   And I think we said that that did not account for time that you had spent in preparation for oral argument, right?

A.   That's correct.

Q.   And it certainly doesn't account for the hours spent by other attorneys from Jenner & Block, or Mr. Sullivan.

A.   No, it does not.

Q.   I believe you said on direct that Mr. David DeBruin was the supervising partner for the Basham appeal, correct?

A.   Yes.

Q.   I believe you also said Mr. DeBruin had considerable experience in the field of criminal law, is that right?

A.   Yes, he did.  That was my understanding.

Q.   And, more specifically, he also had death penalty experience, is that right?

A.   Yes.

Q.   And I also understand Mr. DeBruin at one time was a law clerk for Supreme Court Justice John Paul Stevens?

A.   Yes, I believe that's correct.

Q.   And he's now managing partner at Jenner & Block, although

he wasn't in that capacity at the time.

A.  Right, that's true.  He was the chair of the pro bono, I believe, at the time.

Q.  I want to go very briefly over some of the other lawyers who were working on this appellate team with you.  And I think some of them you've already mentioned.  In addition to yourself and Mr. DeBruin, Stephen Ascher was on the team, correct?

A.  Yes.

Q.  And was he a partner at the time?

A.  He was.

Q.  All right.  You've already mentioned Eric Haren, who I believe you said was an associate, is that right?

A.  Yes.

Q.  Was Kali Bracey another lawyer who was working on that team?

A.  She was.

Q.  Was she an associate or a partner?

A.  Partner.

Q.  All right.  Melissa Cox, she worked on the team as swell, didn't she?

A.  She did.  She was an associate.

Q.  And I also have Thomas Pulham?

A.  Yes, he was also an associate.

Q.  Are there any other -- we mentioned a couple of other

attorneys who made entries on the time sheets doing some research.  One of those was Carrie Apfel, and the name of the other gentleman I'm going to butcher, Mr. Gunja?

A.  That's correct.  Yes, they did small research projects but no writing.

Q.  All right.  Other than those that I just mentioned were there any other attorneys on the team that spent time working on the Basham appeal that you remember?

A.  Not that I remember.

Q.  Okay.  Thank you.

THE COURT:  So while you are on the subject, how many lawyers in all worked on the team, attorneys and associates? Go back and just do me a head count.

Q.  (MR. JOHNSON) All right.  The judge has asked for a head count of the total number of attorneys from -- well, you have Tim Sullivan, and then how many attorneys do we have from Jenner & Block that worked on the appeal?

A.  I think there were a total of seven who had some hand in writing it, and then approximately nine to ten who between writing and doing additional research.

Q.  Let's talk about the -- let's break that down even further and talk about the ones who were involved in writing.  Who were the seven that had a hand in writing the brief?

A.  Kali Bracey, Stephen Ascher, David DeBruin, myself, Eric Haren, Melissa Cox and Tom Pulham.

Meister – Cross                              89

Q.  And then who were the other ones that participated but did not write?

A.  Carrie Apfel and Mushtaq Gunja.

Q.  Thank you.  And we've spoken about Tim Sullivan.  He was appointed to the case on appeal prior to anyone from Jenner & Block being appointed, is that correct?

A.  Correct.

Q.  And I understand that one of his roles was to serve as the primary contact person who spoke with Brandon Basham personally, is that right?

A.  Yes.  He had a personal relationship with Basham so he was the point person there.

Q.  I want to talk about how the brief was put together. Actually, I'm going to grab a copy of it to help me.

     Miss Meister, there were six issues that were raised in the brief, and I want to talk to you about how these were broken down.

A.  Okay.

Q.  And since I just talked to you about Tim Sullivan being the first attorney appointed, serving as a contact liaison for Mr. Basham, and I believe you said he also drafted one of the arguments sections for the brief, is that right?

A.  Yes.  Well, he did the initial draft on Section 5, the special verdict form.

Q.  So Mr. Sullivan did the draft for the argument section

that the district court committed reversible error by excluding statutory other factors from the special verdict form that the jury used to return a death verdict.  He drafted that section?

A.  Yes.  I think -- I believe he drafted about 26 pages of it, which we narrowed down to seven.

Q.  So Mr. Sullivan drafted issue number five?

A.  Correct.

Q.  And so of the remaining portions of the brief, which would have included facts section, statement of the case, and all the other issues, those portions of the brief were divided up among the members of your Jenner & Block team, is that correct?

A.  Correct.

Q.  Let's start with your responsibilities.  I understand that you drafted the entire facts section regarding disqualification of counsel, is that right?

A.  That's correct.

Q.  And I believe you also drafted the arguments section regarding disqualification of counsel.

A.  That's correct.

Q.  That would have been issue six in the brief.

A.  Yes, that's correct.

Q.  And when we talked to you back on September 11 I believe you told us that while other facts sections -- my

Meister – Cross                               91

understanding was that other facts sections of the statement of facts were crafted by the attorneys who were working with the corresponding arguments section, and then your job was to kind of take all those factual accounts and blend them or meld them into a cohesive whole.  Is that a fair way to say it?

A.   Yes.  I drafted the juror misconduct and disqualification statement of facts, everyone else did their statement of facts, and my job was no meld them into a uniform statement of facts.

Q.   Thank you.  I was just about to get to in addition to drafting the arguments section regarding disqualification of counsel you also drafted the arguments section regarding juror misconduct, which was issue one?

A.   Melissa Cox actually did the initial draft of that.  When it came up to me I went to David DeBruin and we agreed that it wasn't appropriate to include that in the brief, so I then took over and I believe I almost completely drafted a new section, yes.

Q.   So Melissa Cox had an initial draft and then you and Mr. DeBruin decided that it wasn't adequate so you basically redid the whole section.

A.   Correct.

Q.   So you drafted two issues then in the arguments section, the disqualification and juror misconduct?

A.   Correct.

Q.   And I believe you said when Mr. Burke was speaking with you that you acted as the head of the junior associates who were working on the case?

A.   Yes.

Q.   And how many of those were there?

A.   Three.

Q.   Three?  And who were those attorneys?

A.   Melissa Cox, Eric Haren, and Thomas Pulham.

Q.   Thank you.  So far we have you doing issues one and six, Mr. Tim Sullivan did issue five, that leaves us with three issues that were in the brief.  Eric Haren, who was one of the associates working under your supervision, he drafted the arguments section on the 404(b) claim, which was issue two, correct?

A.   Correct.

Q.   And I think he also worked with Thomas Pulham on issue three, which is evidentiary standard claim, is that right?

A.   That's correct.

Q.   And then I have that issue four was also drafted by Thomas Pulham, which is the argument that Basham's sentence was imposed under the influence of passion and prejudice, is that right?

A.   That's correct.

Q.   And then over all of this was Mr. DeBruin exercising supervisory authority and editorial review, is that fair to

say?

A.   Him and Stephen Ascher, I believe is more fair to say.

Q.   So DeBruin and Stephen Ascher together exercising --

A.   Yes.

Q.   -- supervisory authority.  And they were both partners, correct?

A.   Correct.

Q.   And Mr. DeBruin also exercised some decision-making authority about which issues would be included in the final version of the brief, is that right?

A.   Yes, he did.

Q.   Thank you.  I think that covers the team that was working on the brief and the roles that they had in the appellate process.  I want to talk to you a little bit now about the substance of the brief itself, or rather your decision-making process in determining which issues would be included and which would not.

     And in speaking with you back on September 11th it's my understanding when you were deciding which issues to include in the brief the team generally thought you would have an unfavorable audience in the Fourth Circuit and therefore wanted to include only those issues that had the best chance of success, is that correct?

A.   That's a fair and accurate representation.

Q.   In particular, you didn't raise the issue of about

Meister - Cross                                    94

Basham's competency on appeal because Mr. DeBruin made the decision that there was an insufficient basis in the record to raise that claim, is that right?

A.  I think we decided to raise it in the disqualification of counsel to point out different counsel would have taken different with Mr. Basham's case.  But, yes, we felt when we discussed the competency issue, we felt hamstrung by the fact that there was very little on the record by trial counsel that was ultimately selected.

Q.  I would like to talk to you a little bit more about that. I want you to find, if you could, Government's Exhibit 15.

A.  Okay.

Q.  And if we could blow up that paragraph there for those of us here in the court.  And you have seen this e-mail before, haven't you?

A.  Yes, I have.

Q.  And this was sent to you, you were one of the listed recipients, along with several other members of the appellate team that we have been talking about, correct?

A.  Yes, I am.

Q.  And this e-mail was sent on Thursday, May 8th, and this was very shortly before the final brief was filed, is that right?

A.  Yes.

Q.  And in this e-mail Mr. DeBruin says that he had reviewed

some of the competency materials in the trial court?

A.   Yes.

Q.   And he went on to say that there was nothing that provides independent support of the competency issue which would put the court on notice of an independent obligation to assess competency, is that right?

A.   Yes.   He's referencing -- we discussed competency and raising it in numerous phases of the trial.   This is in reference to the initial motion for competency that was filed shortly before Littlejohn and Monckton were removed as counsel.

Q.   So it's fair to say that this e-mail, which appears to be coming to a final decision on whether it was going to be included or not, this came at the end of a lengthy discussion among your appellate team about whether to raise competency as an independent issue in the brief, is that right?

A.   Yes, that's correct.

Q.   And ultimately Mr. DeBruin's conclusion was in the last sentence of that paragraph there, that the competency issue appears mixed and complex and he was reluctant to go down that road without knowing more than he did about the record.

A.   Yes, that's correct.

Q.   I'd also like you to look at Government's Exhibit 200. And as that's coming up on our screen --

A.   I have it up.

Q.  You have it up.  I wanted to ask you this:  Not only do you discuss the competency issue among yourselves at Jenner & Block, you had some correspondence with Mr. Swerling, did you not, about the competency issue?

A.  Yes, I did.

Q.  All right.  You have Exhibit 200 of the government's exhibits there before you?

A.  Yes, I do.

Q.  I would like you to go to the bottom of the page there, which would have been the e-mail prior in time, which was -- appears to be an e-mail from you to Jack Swerling sent April 15, 2008 at 3:58 p.m.

A.  Yes.

Q.  You see that?  And it seems that you were asking him in this e-mail, you mention there was this original competency motion that was filed when Cam Littlejohn and Billy Monckton were still the attorneys for Mr. Basham and that that was not ever followed up in asking the court to appoint someone to assess Mr. Basham's competency.  And it seems like you are asking Mr. Swerling more about why that decision was made or why there wasn't a formal request for an independent evaluation.  Is that what you were asking him?

A.  Yes.

Q.  All right.  And I would like to move toward the top of the page then to Mr. Swerling's response, an e-mail dated the same

day, April 15, a couple of hours later at 5:29 p.m.  I'm sorry, that's from you following up with him and he follows up that same day at 5:58 p.m. where he says our own psychiatrist said that he was competent.  That is an e-mail he sent to you?

A.  Yes, he did.

Q.  So it's fair to say, Miss Meister, that in addressing whether you were going to raise the competency issue on appeal, you discussed it with both trial counsel and the other members of your team and determined that there was an insufficient basis in the record to support that claim.

A.  Yes, for a direct appeal that's true.  With regards to the initial competency and the competency motion, yeah, we discussed it again.  Also when he was found incompetent for a time during trial, but for similar reasons we decided not to include it.

Q.  And, again, your strategy in deciding what issues would be included in the brief was to include the issues that you felt had a reasonable chance of success before the Fourth Circuit, is that correct?

A.  Correct.

Q.  And you didn't want to water your -- water your brief down with issues that were weaker.  And that was a strategy decision on your team's part, is that right?

A.  Yeah, that's one way to characterize.  But, yes, we didn't -- we wanted to present the best brief possible that we

Meister - Cross                                   98

thought the Fourth Circuit would have the most likelihood of granting in Mr. Basham's favor.

Q.  All right.  Thank you.  If you could give me just one second here --

A.  Sure.

Q.  -- I'm going to make another transition.

(There was a pause in the proceedings)

Q.  (MR. JOHNSON) All right.  I want to talk to you about other correspondence that you had with Mr. Swerling, particularly as it relates to obtaining or being able to review his trial files and notes and other things that may not have been in the record of the case.

A.  Okay.

Q.  Let's -- can we pull up Defense Exhibit 19?

A.  Okay.

Q.  And I'm looking at the middle message there, or the bottom message in that chain, which was sent on Tuesday, March 25th, 2008?

A.  Yes.

Q.  All right.  Remind me again, Kali Bracey is one of the individuals that's a recipient of this e-mail, was she a partner?

A.  She was a partner.

Q.  So she was one of at least three partners working on this case, right?  Her and Mr. DeBruin and Mr. Ascher?

Meister - Cross                                99

A.  Yes.

Q.  Now, first looking at this e-mail, your first contact with Mr. Swerling would have been in late March 2008, is that correct?

A.  Yes, my first contact would have been around that time.

Q.  All right.  Thank you.  I would like you to look also at Government's Exhibit 190.

A.  Okay.

Q.  Now, this is -- pull up the one there.  That's an e-mail you sent.  Apparently you had a phone conversation with Mr. Swerling on March 26th, 2008, correct?

A.  Yes.

Q.  And I take it that given that you say in this e-mail here, sent 2:15 p.m., it begins, pursuant to our conversation today.  So you had a phone call with Mr. Swerling earlier that day and then this e-mail was to follow up on that, correct?

A.  Correct.

Q.  And in this e-mail you provide Mr. Swerling with a list of items that you would like to review from his trial file, correct?

A.  Correct.

Q.  And some of these include motions that would have been part of the district court record, right?

A.  Yes, it should have been, but they weren't retrievable from the district court.  But we pulled everything from the

Meister – Cross                        100

district court before making this request.

Q.  Let's take a couple other government exhibits.  If you go to the top of that page there, are we at the top?  Okay. That's a follow-up that you sent on Thursday, March 27th, 2008, 7:45 p.m. following up to make sure he had gotten that list, correct?

A.  Correct, because I heard nothing from him.

Q.  All right.  Let's go from -- go in order here in the exhibits from Government 190 to Government 192.

A.  192?

Q.  192, correct.

A.  Okay.

Q.  If we can blow that up a little bit.  On the bottom is a message you sent on Monday, March 31st, 2008.  And then at the top is a response from Mr. Swerling?

A.  Yes.

Q.  And your e-mail to him was sent Monday, March 31st, if I'm doing the time transition correctly, at is that 8:38 p.m.? And then he responds at 8:42 p.m. that he's been out of town in Florida and was -- get with his staff in the morning?

A.  That's what the e-mails say.

Q.  If we can go to Government's Exhibit 193.

A.  Yes.

Q.  What is this?

A.  This is a letter that I sent to Mr. Swerling via fax and

via e-mail on April 1, 2008.

Q.  So this would have been the following day from the exhibit that we just looked at, the e-mail exchange that occurred on -- March 31 was I believe a Monday, correct?

A.  That's correct.

Q.  And then this, and this is a letter that you sent to him by fax and e-mail both on that same date?

A.  Yeah, on April 1st, correct.

Q.  And also like us to look at Government's Exhibit 194.

A.  Yes.

Q.  All right.  If we could pull up Mr. Swerling's message there at the top.  And in this message he says that he told you on Wednesday, which would have been March 26th, that he had told you he was on his way out of town.  I believe he was going to Florida.

A.  He said he was in Florida.  I don't recall him telling me he was on his way out of town.

Q.  But you remember him telling that he was in Florida?

A.  He sent me the e-mail saying he was in Florida, or FLA, yes.

Q.  Okay.  If we could go back to Government's Exhibit 192.  And just so I'm clear on the chronology here, and 193 being the letter that you sent to him because, as I understand it, you had asked what to do and Mr. DeBruin said you should send him a letter.  And I assume this is a response to their

Meister - Cross                    102

instruction, correct?

A.   Well, I mean, it was a little bit more extensive than
that.  But I had drafted this letter the week prior and it had
been sent up for review by Mr. DeBruin before it was sent.

Q.   So it was reviewed by Mr. DeBruin before it was sent?

A.   It was.

Q.   Thank you.  And I believe that you said on direct
examination that the purpose of this letter was to give you a
paper record, I believe you called it, of the attempts you had
made to contact Mr. Swerling regarding the file, correct?

A.   Yes, that's correct.

Q.   And so the purpose of this letter then would be to detail
the various contacts that you had with him so if you had to
file a motion to compel with the Fourth Circuit you could show
that you had done your due diligence, right?

A.   Correct.

Q.   All right.  Let's -- so according to this letter that you
send to Mr. Swerling, if we could scroll down just a little
bit toward the bottom, according to this letter, you contacted
him by phone on March 26th, which was a Wednesday.  And then
the next contact that you had with Mr. Swerling was an e-mail
that you sent him on Thursday, March 27th, correct?

A.   Well, according to the letter I contacted him via phone on
March 26th, I e-mailed him on March 26th, and then I e-mailed
him again on March 27th.

Meister – Cross                                                    103

Q.   Okay.  And in response to that e-mail on March 27th, and I know it's not in this letter, but he told you that he would get someone on it, correct?

A.   Yes.

Q.   And March 27th would have been a Thursday, and your next contact with him was the e-mail exchange you had with him on Monday, March 31st, correct?

A.   That's correct.

Q.   And so the e-mail you sent him on March 31st was around 8:00, 8:30 in the evening, he responded that he would get his staff on it in the morning, correct?

A.   That's correct.

Q.   And then the next contact would have been in the afternoon of Tuesday April 1, 2008, right?

A.   Actually, I believe I called him that morning and asked if his staff was on it, and he said they were not, before I sent the letter.

Q.   On --

A.   He said he would get with his staff in the morning.  So I believe I called him that -- the morning I sent the letter I called him and asked if he had gotten together with his staff yet, Mr. Swerling said no, so then I sent the letter.

Q.   Okay.  So you called him on April 1st and later that day you sent the letter?

A.   Yes.

Meister - Cross                                            104

Q.  If we could pull up Government's Exhibit 195.

A.  Okay.

Q.  And in one of his responses to your letter, this is -- I guess it would be at 9:53 p.m. that evening, he told you that you may come down whenever you wish and copy whatever you want, is that correct?

A.  Yes, he does represent that.

Q.  And then that's on Tuesday, April 1st.  And you actually went to South Carolina to visit his offices that Thursday, April 3rd, is that right?

A.  That's correct.

Q.  So based on what we have looked at, and I know it's fairly tedious to go through this and I appreciate your patience, but it seems to me that based on this chain of correspondence you first contacted Mr. Swerling middle of the week around Wednesday March 26th, and then eight days later on April the 3rd you were able to get into his office and copy the file.

A.  Me personally, yes, that's the first contact I personally had with him.  It's not the first contact Basham's team had with him.

Q.  Let's talk about the files that you looked at in his office.  And I believe you said there were a lot of files because it was a big case, but there were not any files that you requested to see that Mr. Swerling refused to let you see, correct?

A.   I have no idea what he -- whether he took anything out of the room or not.  He let me access to the room and he said all the files were there.  And there wasn't anything specific that he said you can't see.

Q.   In fact, he specifically told you that you could look at everything that he had, correct?

A.   That's what he said when he let me -- well, then he had his assistant let me into the room, correct.

Q.   And there were no files on your list that he refused to provide you.

A.   Not specifically, no.

Q.   And there weren't any appellate claims that you considered raising or were unable to raise because he refused to give you access to his files, correct?

A.   Let me think about that.  I mean, I think he made certain things more difficult and we were more rushed but, no, I don't think there were any appellate issues that we couldn't raise because of his behavior.

Q.   And, in fact, I think you told Mr. Burke that the access that he gave you was sufficient for direct appeal, which was what you were handling, correct?

A.   That's correct.  If it wasn't I would have stayed additional time.

Q.   Now, you mentioned the contact that you had with Mr. Swerling, and I know that in the letter you sent to him on

April 1st you talked about in addition to the contact that you had with him, contact that you had -- that Mr. Sullivan had had with him, is that right?

A.   That's correct.

Q.   All right.  If we could go back to that, I think it's Government's 193?

A.   Yes, I have it.

Q.   And I know we're jumping around a lot.  I'm almost done. So the contacts that you detail in this letter between Mr. Sullivan and Mr. Swerling, you say that Mr. Swerling has known of the need for the files since at least January 14, 2008. And was that based on Mr. Sullivan's letter to Mr. Swerling on that date?

A.   Yes.  I think Mr. Burke asked me on direct if I remember the letter and I didn't recall, but now I recall I asked Mr. Sullivan if he ever sent him any correspondence, he sent me the letter he had sent Mr. Swerling on January 14.  That's when it was dated.

Q.   All right.  And then the letter also recounts that there was a meeting between Mr. Sullivan and Mr. Swerling here in Columbia on January 29th, 2008?

A.   That's correct.

Q.   And you weren't there for that meeting, is that right?

A.   I was not.

Q.   And you've never been party to any phone conversations or

Meister - Cross                              107

any other contacts that Mr. Sullivan had with Mr. Swerling, is that right?

A.   No, I have not.

Q.   We talked a little bit, or you talked a little bit in direct examination, and if we could pull up I think it's a Defense Exhibit 8, which is selections from the time sheets there at Jenner & Block.

A.   Uh-huh, yes.

Q.   And I may not know the exact page number, but it would be an entry for January 10th.  And we talked about an entry that Carrie Apfel had made where she was researching the right of appellate counsel to --

A.   Okay.

Q.   -- access files.  Do you see that?

A.   Yes.

Q.   Now, was she doing this -- she was doing this research on your behalf, correct?

A.   That's correct.

Q.   And the entry shows that that work was done on January 10th, 2008.  Does that date reflect the date that the work was actually done?  In other words, she would have spent in a hour researching on January 10th?

A.   Yes.

Q.   And the entry says that it was as to appellate counsel's rights to counsel below's records.  But from the face of that

that doesn't distinguish whether the issue she was researching was right to access the records or right to physical possession of the records, does it?

A.   It does not.

Q.   And I believe there was also an entry from Mr. Gunja, I know he had a couple, I know one was in February 26th and the other was in January, if we could pull up the one in January.

A.   Yes.

Q.   Do you know the date on that?

A.   January 25th.

Q.   January 25th.  Okay, I see it now.  January 25, 2008 it shows that he spent three hours researching ownership of client files.  But, again, it doesn't indicate whether ownership in this case refers to access or physical possession, does it?

A.   It does not so indicate.

Q.   If you would give me just one moment.

         (There was a pause in the proceedings)

         MR. JOHNSON:  All right, Miss Meister.  I know this hasn't been exactly fun, but I appreciate your cooperation and that's all the questions I have on cross-examination.

         THE WITNESS:  Thank you.

         THE COURT:  All right.  I don't have any questions. How long do you think you will be?

         MR. BURKE:  If I have five questions tops.

Meister - Cross                        109

THE COURT:  Go ahead and finish.  I apologize to the staff for going so long but I'm trying too finish while she's on the phone.

REDIRECT EXAMINATION

BY MR. BURKE:

Q.  Miss Meister, this is Mike Burke again.  I have just a couple of questions for you, okay?  On the government's -- Defendant's Exhibit 19, Mr. Johnson had you take a look at that, and it was some conversation, e-mail conversation between you and Mr. Swerling.  If we can -- if you could find that, I might have it handy.  Defendant's 19?

A.  I have Defendant's 19.  It's a conversation between myself and Mr. DeBruin and Stephen --

Q.  I'm sorry.  I wrote this down wrong.  Let me just ask you, you looked at some e-mails between you and Mr. Swerling --

A.  Okay.

Q.  -- in which Mr. Swerling commented about, you know, the delay in requesting the materials from him.  Did you -- when you asked Mr. Swerling to provide you with the copies or the files did you offer to pay for all copying?

A.  Yes.

Q.  And you offered to pay to have everything sent to you, didn't you?

A.  Yes.

Q.  Okay.  And I would like to refer to -- hopefully this is

the right one, Exhibit 15, Defendant's Exhibit 15.  And that is the e-mail Mr. Johnson asked you about competency?

A.  Defendant's Exhibit 15 or Government's Exhibit 15?

Q.  Defendant's Exhibit, I'm sorry, 11.  I do apologize to the court and you, Mr. Miss Meister.  Number 11 was the letter to you from Mr. DeBruin.  And Mr. Johnson asked you about that being Mr. DeBruin's last word on whether the competency claim should have been included.  Do you remember that?

A.  Yes, I have.

Q.  And what -- when was that sent?

A.  Thursday, May 8th at 8:25 in the evening.

Q.  Okay.  And what Mr. DeBruin concluded was that the issues was mixed and complex.  Correct?

A.  Yes.

Q.  Did he say I'm -- he said I'm reluctant to go down that road without knowing more than I do about the record, correct?

A.  Yes.

Q.  Okay.  I'd ask you to look at Defendant's Exhibit 10.  And then midway almost toward the bottom of the page there's an e-mail from David DeBruin, this is to Stephen Ascher?

A.  Yes.

Q.   Which Mr. DeBruin talks about his concerns about how he had handled the case.  When was that sent?

A.  Friday, May 9th, approximately 8:32 in the morning.

Q.  So twelve hours after he sent the e-mail saying he didn't

know enough about the competency issue to go into greater depth?

A.   Correct.

Q.   Okay.  Mr. Johnson asked you about whether you -- your intention was to include the strongest claims possible to the exclusion of the weaker claims, is that correct?

A.   Yes, he asked me that.

Q.   And was that -- what was your response?  Did you agree with him?

A.   Yeah, my response is that our appellate strategy was because we didn't feel the Fourth Circuit was very amenable to death penalty appeals that we wanted to present the strongest issues possible and not have them lost among many arguments that we didn't think were going to be successful.

Q.   And your law firm included a claim that the Fourth Circuit in fact was never even able to review because it had not been reserved, is that correct?

A.   Yes, that's correct.  I believe we included that.

         MR. BURKE:  Thank you.  I have no further questions.

         THE COURT:  I don't have any questions.  Anything further from the government?

         MR. JOHNSON:  No, your Honor.

         THE COURT:  All right.  Very good.  Thank you very much.  We will hang up now.  Thank you for being available.

         THE WITNESS:  Thank you, your Honor.

THE COURT: All right. And with that let's take our lunch recess. Is a hour and 15 minutes enough time or you want to take a hour and a half?

MR. BURKE: An hour and 15 is fine with us.

THE COURT: Let's say an hour and 20 minutes. Let's come back at 2:20, how about that? We will be in recess until 2:20.

(A recess transpired)

THE COURT: I don't know if you all heard what happened over lunch, but I received a call from the prison to indicate that as we adjourned Mr. Basham was being escorted out when he assaulted two officers and injured two officers and bit another officer, and the Bureau of Prisons does not want him to come back to the hearing. My law clerk also informed me this morning the Supreme Court of the United States heard argument on the question of what a judge should do when a competency issue arises in a 2255 hearing. And the quick blog that came out indicated that the court seemed to be leaning towards some strict requirements and not just referring to the judge's discretion. So here we are.

I had Dr. Parker examine Mr. Basham back late last year, who found him to be competent. Does the petitioner have any evidence to the contrary at this time from a medical doctor?

MR. BURKE: Your Honor, I can tell that you we have

spoken with Dr. Hyde, whose belief is that Mr. Basham was not competent at trial. We did not ask him to opine about his current competency and --

THE COURT: I'm raising the issue now on my own. Do you contend he's not competent at the present time?

MR. BURKE: We do, and I'll let Miss Stone address that.

MS. STONE: Your Honor, Mr. Murray, if you would like to get him on the phone, can speak in more detail. Part of how this went down is Mr. Murray was attempting to be let out of the prison over the lunch hour to call Mr. Burke and myself to let us know that he didn't think Brandon was competent this morning. He was emotional, he was struggling to sit through things, and Mr. Murray was having a very difficult time with Mr. Basham. Apparently the guard indicated Mr. Murray might not be allowed back in and --

THE COURT: I'm awaiting on the report from the prison as to what their official position is going to be. But let me just say this, I authorized them to take his cuffs off this morning, and the thanks I get to that he goes and bites a guard.

MS. STONE: And --

THE COURT: And it's awfully frustrating to try to manage this case and move it along. And I worked around y'all's schedules, I worked around everyone's schedule except

my own schedule.  I had cataract surgery a week ago and I have complications from the surgery where my vision is worse than before.  I'm having a difficult time reading.  And I don't appreciate it when a defendant disrupts a proceeding if he's in fact competent.  I ask again does defendant have a medical opinion that he is not competent at this time?

MS. STONE:  We do not have a medical opinion.

THE COURT:  That's a yes or no question.

MS. STONE:  No, your Honor.

THE COURT:  And I authorized your doctor to examine him, I signed an order authorizing the doctor to gain admission to the prison for the purpose of examining him.  So what happened, he didn't examine him?

MR. BURKE:  Your Honor, he did examine him.  And I guess we will present some of Dr. Hyde's testimony right now.  Dr. Hyde's position is because of Mr. Basham's brain damage and several other factors involved, his low IQ, he is not ever going to be able to be competent.  He wasn't when he was tried, he is not now.

We went forward with this on our belief that as -- that for the very reason you say, your Honor, we're trying to accommodate.  We would ask that you have some consideration for the difficulties that counsel have.

THE COURT:  The easiest thing for me to do is adjourn this hearing and have him examined.  Y'all are the ones that

are going to have to fly back home, and the next time I schedule this hearing it's going to be at my convenience and not counsel's convenience. Are we clear on this?

The easiest thing for me to do is say stop right now, have him examined. If the doctor says he's not competent, we'll stop, if he is competent we'll go forward. I'll probably rule he's waived his right to participate in this hearing by biting a guard after I authorized his handcuffs to be taken off.

Now, tell me why we shouldn't proceed that way?

MR. BURKE: We have no objection to that, your Honor.

THE COURT: What's the government's position?

MR. DALEY: Your Honor, we just would ask that any competency evaluation either be done by a court appointed expert or for us to be able to obviously have -- we retained an expert to do a competency evaluation.

THE COURT: Am I not correct, did I not authorize your doctor to go see him fairly recently?

MR. BURKE: Yes, your Honor.

THE COURT: Do we have a written report from that doctor?

MR. BURKE: He is preparing his written report right now. He's scheduled to testify in December, but Mr. Daley and I have talked, and he's preparing it. We should have it within a week or so.

THE COURT:  He's going to say what?

MR. BURKE:  Your Honor --

THE COURT:  He never has been competent, never will be competent?

MR. BURKE:  Well, let me specify that our purpose in asking him to evaluate Mr. Basham was for purposes of the evidence we wanted to present at this hearing, all right, not particularly concerning his current competency to participate in this hearing.  His competency, in our experience, has been fluid, very fluid, and we have had times without problems, we have had times with severe problems.

I can tell you, your Honor, we have never, ever had problems at least that has occurred here today.  This is shocking to us.  But clearly -- and Mr. Murray is there with him, Mr. Murray has a considerable amount of experience in psychological issues in addition to his law degree, and he's telling us that he believes he's not competent, your Honor.

Your Honor, for what it's worth, we were informed that apparently before this incident occurred we just learned he was actually re-cuffed, so I don't believe that the actual removal of his cuffs had anything to do --

THE COURT:  I don't care if he was cuffed or not, he bit an officer.

MR. BURKE:  We don't disagree with that, your Honor. That's what we have been told.

MR. DALEY: Your Honor, the government I think at this point would -- I think if we were to adjourn for the day and evaluate the situation we might be able to determine whether we're going to be able to go forward. I don't know that we're not. We're all assembled and we have all the witnesses here, I don't know that we want to just right this moment say let's stop it and give up, because we do have the time blocked out for this week.

THE COURT: Has your doctor gone out and examined him recently?

MR. BURKE: Not yet.

MR. DALEY: Not yet, your Honor. He was going to be in rebuttal to Dr. Hyde, and so we were waiting to get Dr. Hyde's report. So he has not. No, he hasn't.

THE COURT: You say wait a day. We won't know anything more tomorrow than we will today, will we?

MR. DALEY: Mr. Basham has had a history of doing certain things that can be categorized as potentially incompetent or can be seen as remarkably manipulative. In court in February of '04, February 24th, I believe, of '04, September 20th of '04, and I believe October 26th of '04, there may be more instances, where you were asked to stop proceedings, competency evaluations were done at least in February and in September, he was found to be competent by Dr. Schwartz-Watts, which was his own psychiatrist.

I can tell you that from our interviewing, and the defense has been on the other side during all the interviews, they have been in our interviews of Mr. Harris and Mr. Swerling, and both of them are going to say he's competent, he's been competent.  He may have had moments where there was some question in February.

So, your Honor, I don't want to overstate because I don't know what happened and I don't want -- but what I would tell you, your Honor, is there is certainly, as the Fourth Circuit said, a strong case to be made that perhaps he is just really downright manipulative.  And that's the only reason that I think we could pause.

THE COURT:  I agree with you.  But what do we know today that we won't know tomorrow?  That's my question.  Mr. Burke says it's going to take a week to get this report written.  Let me ask this, could we get an expedited report?

MR. BURKE:  If you'd like we could try to reach our expert, who's actually in Maryland, we could get his phone number and see if he could speak to you.  I've not had a chance --

THE COURT:  Can't he just give me a -- put him on the satellite and give me an oral report?

MR. BURKE:  We might be able to do that, although he hasn't seen Mr. Basham today, and Mr. Basham is clearly in a compromised state today, from what we have been told.  So I

don't know how much he would be able to inform your Honor about his current state of competency.

THE COURT:  Then we examine him, if he's competent then we come back in December and then we have to go through that all over again.  This case will never end.  If we have got to examine his competency on a day-by-day basis we will never -- there will be no end to it.

MR. DALEY:  And that seems to be the position that -- and I'm not casting aspersions, but that's the position that I think they are going to continue to take.

THE COURT:  I didn't look very closely at Mr. Parker's report, Dr. Parker's report, because the request to drop his appeal was withdrawn.  But did y'all get a copy of it?

MR. DALEY:  We both got a copy.

THE COURT:  Did he find any evidence of malingering or anything, or did he just say he was competent?

MR. DALEY:  Your Honor, I'd have to look back.  I have not looked at that for a few weeks.  I don't have that.

THE COURT:  Y'all want to adjourn and come back tomorrow morning?

MR. DALEY:  I think that would be the wisest approach, your Honor.

THE COURT:  I might see if I can get Dr. Parker over there to see him, as well.  From before he needs like two

120

months advance notice of when he was going to do it so it's probably not feasible.

MR. DALEY:  Your Honor, we're just realizing Mr. Monckton is here and I think he may have some scheduling issues for tomorrow anyway.  But that's something that was brought to my attention.

THE COURT:  Well, as I said, I scheduled this hearing around everybody's personal issues but my own, so I'm telling everybody don't schedule any nonrefundable trips or vacations from now until the end of the year.

All right.  We will be in recess and start back at 9:30 tomorrow morning.

MR. DALEY:  Thank you, your Honor.

(Recess, 2:41 p.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  11-9-12                         s/  Daniel E. Mayo

DEFENSE WITNESSES

WILLIAM H. MONCKTON, IV

  DIRECT                   9

MELISSA A. MEISTER

  DIRECT                   47
  CROSS                    84
  REDIRECT                 109