1003

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
     -vs-                                   December 3, 2012

BRANDON LEON BASHAM,

          Defendant

------------------------------

BEFORE HON. JOSEPH F. ANDERSON, JR.
UNITED STATES DISTRICT COURT JUDGE
MOTION HEARING

APPEARANCES:

FOR GOVERNMENT:     HON. WILLIAM N. NETTLES
                    UNITED STATES ATTORNEY
                    BY:  ROBERT F. DALEY, JR.
                         JIMMIE EWING
                         JEFFREY M. JOHNSON
                         WILLIAM K. WITHERSPOON
                    Assistant United States Attorneys
                    1441 Main Street
                    Columbia, SC  29201

FOR DEFENDANT:      JULIA G. MIMMS, ESQ.
                    JULIA G. MIMMS LAW OFFICE
                    1001 Elizabeth Avenue, Suite 1A
                    Charleston, NC  28204

                    ARIZONA FEDERAL PUBLIC DEFENDER
                    BY:  MICHAEL L. BURKE
                         SARAH E. STONE
                    Assistant Federal Public Defenders
                    850 W. Adams, #201
                    Phoenix, AZ  85007

1004

COURT REPORTER:        DANIEL E. MAYO, RDR
                       Certified Realtime Reporter
                       901 Richland Street
                       Columbia, SC   29201


            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

1005

THE COURT:  We're here for the resumption of the evidentiary hearing in the case of United States versus Brandon Basham.  I was just informed by my docket clerk and by the Bureau of Prisons that there's been a little bit of an outburst out in Terra Haute and the defendant does not wish to participate this morning.  I was told by the caseworker that Mr. Basham appeared to be intoxicated, had some words with the guards.  They requested that he submit to a breathalyzer that he refused to take, and he then announced he did not wish to participate.  So any position on that from the government?

MR. DALEY:  Your Honor, we believe we can go forward without his presence.

THE COURT:  Mr. Burke?

MR. BURKE:  Your Honor, it would seem to me that the federal government could house a prisoner on death row and manage him well enough that he couldn't make alcohol and become so intoxicated that he can't come to court.  We sent our colleague out to Terra Haute so he could be there and --

THE COURT:  I was surprised to hear that, too.  A death row inmate has become intoxicated, that was a shock to me.

MR. BURKE:  We have been dealing with this now for four years, three or four years.  Makes it very difficult for us to do our job.  I understand you have to go -- that you have a docket, as well.  I would only submit that -- well, we

Hyde - Direct                          1006

will agree to going forward today without Mr. Basham's presence.  But I'm at the end of my rope with the Bureau of Prisons, your Honor.

THE COURT:  Well, today we're going to get into competency, right?  We have two witnesses on competency?

MR. BURKE:  Yes, your Honor.

THE COURT:  It seems to me that that is a matter of medical testimony, I don't know that his presence is as critical now as is maybe on some other aspects of the trial.

MR. BURKE:  And I would agree with you, your Honor.

THE COURT:  Let's proceed without Mr. Basham.  And we will stay in contact with the Bureau of Prisons to see if his condition improves such that he can rejoin us.  All right?

MR. BURKE:  Your Honor, Mr. Murray is in a situation where if he leaves the prison he won't be able to come back in.  So could he just sit there and monitor --

THE COURT:  He can stay there just in case there's some development out there, I have no problem with it.

MR. BURKE:  Thank you, your Honor.

THE COURT:  Are you ready to put up your first witness?

MR. BURKE:  Yes.  Your Honor the defendant calls Dr. Thomas Hyde.

(Thomas M. Hyde duly sworn)

DIRECT EXAMINATION

BY MR. BURKE:

Q.  Good morning.  Could you state your name for the record, please?

A.  Dr. Thomas M. Hyde, H-Y-D-E.

Q.  Okay.  And, Dr. Hyde, there's water up there if you need some.  So, Dr. Hyde, what is your profession?

A.  I'm a behavioral neurologist and a biomedical researcher.

Q.  Can you explain for me what is a behavioral neurologist?

A.  A behavioral neurologist is that subsection of neurology which is diseases of the central nervous system and the neuromuscular system.  We specializes in the biological bases of behavior, those parts of the brain that are particularly involved in higher order functions, what we usually call intellectual abilities, cognitive activities.

Q.  From a lay person's perspective can you explain for me, are you a neurologist or are you a psychiatrist?

A.  Well, I occupy that demilitarized zone, that no man's land between the two professions.  I have been trained and board certified in general neurology, I have done extensive additional training in psychiatry such that I have been considered to be, both by my peers in academia and clinical practice, as well as for legal purposes, an expert in both neurology and in psychiatry.  And I specialize in seeing those patients who have behavioral problems which often fall in the psychiatric realm in trying to discern what, if any, component

of organic brain problems are contributing or causative of these behavior problems which are the types of behavior problems that are ordinarily classified as psychiatric illnesses.

Q.   Where do you practice, Dr. Hyde?

A.   Well, I have practiced in various parts of the country during the course of my training and in my clinical practice. Now I am restricted to the state of Maryland.

MR. BURKE:  And, your Honor, I believe that Exhibit 102 is Dr. Hyde's CV.

Mr. Witherspoon, we didn't discuss this directly, but do we have any objections to the admission of the CV and reports for both doctors?

MR. WITHERSPOON:  No objections.

THE COURT:  All right.  Admitted without objection.

Q.   (MR. BURKE) So, Dr. Hyde, your CV has now been part of the record.  So what I would like to do is just ask you a few questions about your experience and your training before we move on to the specifics of this particular case.

Where did you receive your medical training?

A.   I started my training as a medical student at the University of Pennsylvania in Philadelphia, where I did an MD PhD program, graduated in 1984.  I then did a general medical internship at the Presbyterian University of Pennsylvania Hospital of Philadelphia for one year before I moved on to

Hyde – Direct                              1009

Stanford, where I did a residency in neurology at Stanford University in Stanford, California for three years, serving as chief resident in neurology my final year there. Basically running in conjunction with the faculty the neurology training program. I then --

Q. Let me follow that up for a minute. I want to ask some questions about your education. You said you received a joint degree in medicine and you've also received a PhD. What was your PhD in?

A. My PhD was in the department of anatomy studying brain function, particularly involved at that point in food and body weight regulation, how the brain regulates those behaviors, what we call ingestive behaviors. Today that would be in the department of neuroscience, but back in those ancient times of the 19 -- late 1970s and early '80s that was subsumed under the department of anatomy in medical school.

Q. What was your responsibility -- you mentioned that you had been at Stanford for four years, is that correct?

A. Three years.

Q. Three years. And what were your responsibilities at Stanford?

A. The first few years were general neurology training. The last year was supervising other neurology residents, running clinics, and organizing the clinical program as well as the education program for all the neurology residents and the

Hyde - Direct                                  1010

residents from other departments who would rotate through the neurology service.  It was a fairly complex administrative and educational role within the purely clinical confines of the residency.

Q.  And when you left Stanford what was your next stop?

A.  My next stop was I was a contract employee of the National Institute of Mental Health, and I was sent to St. Elizabeth's Hospital, which at that time had just converted from being a federal mental health facility to run by the District of Columbia.  And I was placed in charge of the neurology consultation clinics to perform all the neurology consultations on the inpatients and outpatients of the District of Columbia mental health system.

In addition, I was involved in training of fellows and residents both of the National Institute of Mental Health and at St. Elizabeth's Hospital Department of Psychiatry residency training program.

Q.  And can you tell us a little bit about St. Elizabeth's?  It may not be as well-known to others outside of D.C.

A.  Yes.  It's one of the oldest public hospitals in the country, dating back to the late 19th century.  At one point it housed I think close to 10,000 inpatients and had a running farm and a variety of shops.  It was really a model institution in many ways with the evolution in the treatment of psychiatric patients as well as the social awareness that

Hyde - Direct                                    1011

these large institutions may have not been optimal.  Most of the inpatients were sent home but they became when I was there a core of about a thousand chronic inpatients as well as several hundred that would cycle through.  And many of them had neurological problems compounding their psychiatric problems, and I was asked to perform consultations to discern how much of the illness was purely psychiatric, how much was neurological, and how that conjunction of illnesses might affect their clinical care and presentation.

I was also frequently asked to provide written reports and occasionally testimony regarding their competency either for managing their own affairs, such as finance and medical conditions, whether they needed guardianship, wards of the court, whether they were -- there was a necessity for them to be involuntarily hospitalized and committed, was the word that they used for varying periods of time, and when they had regained competency or if they were permanently incapacitated, incompetent.  And I might just add, during the course of the average year we would evaluate probably in the clinic well over a thousand individuals.

Q.  Did you have responsibilities at St. Elizabeth's in addition to your neurological consultations or that the --

A.  Correct.  I also did at the same time, because I liked to keep myself busy, I also conducted an active research program into the neuropathological bases of mental -- major mental

Hyde - Direct                                    1012

illness with a focus on schizophrenia and other major mental disorders. I also from 1988 to 2010 about 12 to 15 hours a week I ran my own private neuropsychiatric clinic in Chevy Chase, Maryland.

Q. How long were you affiliated with St. Elizabeth's?

A. I was affiliated with St. Elizabeth's through 2006, but I ran the clinics only from 1988 through 1996. In 1996 I moved into a full-time research position with the National Institute of Mental Health. Although I continued to be active in the training programs at St. Elizabeth's, I turned over the day-to-day running of the clinic to another individual, another physician.

Q. Have you ever taught at medical school?

A. Yes, I have been an instructor at George Washington University School of Medicine and currently joined the faculty at Johns Hopkins in Baltimore in the department of psychiatry.

Q. How long have you been affiliated or were you affiliated with George Washington University?

A. I think from 1989 through 2010.

Q. And can you tell the court how you are currently employed?

A. Yes. I'm the chief operating officer of Leiber Institute for Brain Development. Leiber Institute is a non-profit biomedical research institution independent of but affiliated with Johns Hopkins University whose goal is to translate our findings into the genetic and biological bases of mental

Hyde - Direct                                          1013

illness and to do treatments to ameliorate the symptoms and to
even prevent the development or reverse the biological
problems that underlie almost all nature of mental illnesses.

Q.  And do you continue to maintain a private practice, as
well?

A.  No.  At 2010 I closed the private practice.  I do do a
fair amount of clinical consultation work, retain an
affiliation with the National Institute of Mental Health as a
special volunteer, which is basically a guest researcher of
the National Institute of Mental Health, helping them work on
their clinical research protocols and evaluating the
suitability of patients in order to enter those protocols from
a neuropsychiatric perspective.

Q.  Doctor, your CV that -- copy of the CV that we have from
you Exhibit 102 lists numerous publications.  Do you know
if -- I believe these run through it appears 2009 or 2010.  Is
this a current list of your -- complete list of publications?

A.  It's not the -- down to the bottom, I'm not sure.  There
should be peer-reviewed publications through 2012 in my
updated CV.

Q.  We may need to obtain after today, we might want to obtain
a more up-to-date --

A.  Absolutely.  I can e-mail it to you very quickly.

Q.  And you continue -- but you do continue to publish in
peer-reviewed journals?

A.   Yes.   I average about somewhere between three and five peer-reviewed articles per year.

Q.   In 2008 you were elected to the American College of Neuropsychopharmacology.  Can you tell us, what is that organization?

A.   The American College of Neuropsychopharmacology is a fairly select organization of about I'd say 500 to 800 individuals drawn from neurology, psychiatry, pharmacology, and neuroscience, primarily.  And those are individuals who are considered to be highly accomplished in the fields of neuropsychopharmacology, that is to say, studying medications and major mental illnesses that are primarily in the psychiatric sphere but also may have a neurological component, as well.

Q.   Have you previously testified as a forensic expert in the field of neurology?

A.   Yes.

Q.   Have you previously testified as a forensic expert in the field of psychiatry?

A.   Yes.

        MR. BURKE:  Your Honor, based on Dr. Hyde's education, training, and experience we'd ask that you recognize him as an expert in the fields of neurology and psychiatry.

        THE COURT:  Any voir dire by the government?

MR. WITHERSPOON:  None, your Honor.

THE COURT:  I find he has the requisite qualifications and you may proceed under Rule 702.

MR. BURKE:  Thank you, your Honor.

Q.   (MR. BURKE) Dr. Hyde, before we turn to your examination and evaluation of Mr. Basham I'd like to return, you testified telephonically before this court in October of 2012.  Do you remember that?

A.   Yes, I do.

Q.   And that was with regard to mr. Basham's functioning for purposes of proceeding with the proceedings that we are in today, do you recall that, his competency to proceed with his 2255 proceeding?

A.   Yes.

Q.   And during the U.S. Attorney's cross-examination of you you were asked your opinion about the death penalty.  Do you remember that question?

A.   Yes.

Q.   Okay.  If I'm correct, you stated that you're opposed to the death penalty except in cases of genocide.  Is that still your position?

A.   Yes.

Q.   Okay.  Do you believe that your opposition to the death penalty prevented you from making an objective diagnosis of Mr. Basham in this case?

Hyde - Direct                                          1016

A.   No.   I take the oath I swear before this court in a very serious fashion.

Q.   Would you ever compromise your professional ethics to assist a death sentence defendant?

A.   No.   In fact, in the majority of cases that I'm asked to evaluate I inform counsel that I have nothing pertinent to add to the legal proceedings that their defendant is facing.   In fact, I would say it's probably about 60 to 70 percent, I'd have to go back, I don't keep an exact number, but definitely a super majority of the cases I'm asked to evaluate I can not offer anything of substantive aid to the defendant's legal claims.

Q.   Okay.   And so in those situations you most likely do not end up testifying, would that be accurate?

A.   I am not asked to testify.

Q.   Okay.   Can you estimate for us generally what percentage of your professional practice today is devoted to forensic work?

A.   Probably ten to 15 percent.   Because I've closed my private practice and run the clinic the majority of my clinical work revolves around clinical research.

Q.   Now let's turn to Mr. Basham.   Do you recall, you may not recall the date, but do you remember being contacted by me earlier in 2012 and asked to evaluate Mr. Basham?

A.   Yes, I do.

Hyde - Direct                                        1017

Q.  And do you remember the circumstances under which we contacted -- I contacted you?

A.  I believe it had to do with his seizure disorder and other neurological issues confronting Mr. Basham.

Q.  And do you recall if we discussed or if Mr. Basham discussed with you his position at that time about proceeding with his legal case?

A.  Yes.  He just wanted to waive -- I believe he just wanted to waive all rights at that point and just let his sentence play out.

Q.  And so you evaluated Mr. Basham on how many occasions?

A.  Two occasions.

       MR. BURKE:  And, your Honor, Exhibit 103 is Dr. Hyde's report, and it is part of the record so I will just go over portions of it and refer to portions of it just to proceed as quickly as possible.

Q.  Your report indicates that your first evaluation of Mr. Basham was in April of 2012.  Can you tell us, what did your examination consist of?

A.  Well, there are two components to my visit.  One is the interview and the second is the examination.  So I usually break my visit into two components.  I can describe both or just the examination.  I'm not sure --

Q.  I would like you to describe both and in the order in which you conducted them.

A.   So I interview the defendant first and I try and get some background history about their memories of their early childhood, their educational history, their childhood, adolescent behavioral history, their social history, their past medical history, their psychiatric history, their neurological history, their substance abuse history, their family history, and then I move in -- so it's a fairly extensive neuropsychiatric interview.  I usually conduct it in the same fashion so I don't miss anything.

So I have a relatively, wouldn't say rigid, but formal procedure I go through in order to assess the individual fully from both the neurological and a psychiatric perspective.  And I get the history and I move on to an examination, which is a focused neurological examination which includes a mental status examination, cranial nerve examination.  Cranial nerves are those nerves which innervate the head and the face.  They are obviously involved in special senses such as vision, a motor examination which includes strength, coordination, reflexes, fine motor movements, and involuntary movements.  A gait examination, which is looking at both regular walking and specialized walking and balance, a sensory examination, and then a limited general physical examination, follow the head and neck and cardiovascular system.

Q.   And, Doctor, let me ask you first, with regard to your neurological examination of Mr. Basham, with regard to the

Hyde - Direct                                    1019

motor examination, what did your examination of Mr. Basham

reveal, do you recall?

A.   Is it possible for me to get a paper copy of my report, if

that's okay?

Q.   I believe --

A.   I have --

Q.   I believe it's page six in your report.

          THE COURT:  What is the exhibit number of this

report?

          MR. BURKE:  Your Honor, this is Exhibit 103,

Defendant's Exhibit 103.

          THE WITNESS:  So on his examination there were a

variety of abnormalities noted.  On the mental status

examination he could not spell the word "world" in reverse.

He could not perform simple division, he had difficulty

performing serial threes, he did not know the exact date, did

not know the county or state in which he was incarcerated, did

not know the current name of the president, the time of the

evaluation in 2012.  He had difficulty copying three

dimensional figures, and he scored 23 out of 30 on a formal

mini-mental state examination, which is a brief screen of

cognitive performance.

          He did have some abnormalities on a cranial nerve

examination, which is the nerves of the head and the face

region, the four level nystagmus and decreased sensory

Hyde – Direct                                    1020

function on the right side of his face.

His motor examination was notable for clumsy fine motor movements bilaterally, worse on the right than the left. Finger consecutive maneuvers clumsy bilaterally, rapid alternating hand movements are clumsy and uncoordinated bilaterally.

Q.   (MR. BURKE) Now, a lot of this means a great deal to the doctors and very little to lay persons, so what does that tell us, what is the significance of what you just told us about the right or the bilateral --

A.   Finger repetitive movements are fairly simple tests looking at manual dexterity, and the clumsiness worse on the right than the left suggests that he probably has dysfunction in the left hemisphere, as the left side of the brain controls motor function on the right side of the body.

He had clumsy finger consecutive movements bilaterally, suggesting there was some degree of bilateral frontal lobe dysfunction.  He also had clumsy rapid alternating hand movements bilaterally, which can be due to either cerebellar or frontal lobe dysfunction.  The fact that he had normal finger to nose and heal to shin testing suggests it's probably more frontal lobe then cerebellar.  I don't want to get down in the weeds too much here.

He also had clumsy rhythmic foot tapping bilaterally.  He had clumsy complex motor sequencing, which is a subtle

Hyde - Direct                              1021

neurological abnormality which is usually assigned to dysfunction of the frontal lobe, and he had one primitive reflex, a reflex you see in infants that disappears with normal brain development.  Persistent or reappearance in adults is often associated with lobe dysfunction, and that was a glabellar reflex.

Q.  And what is that?

A.  That's where you tap on the forehead between the eyes above the visual field, and the person blinks involuntarily. You see that in infants.  It disappears as the frontal lobe develops.  Its persistence or reappearance is a sign of frontal lobe dysfunction.

Q.  Now, Doctor, let me ask you a question:  When you are conducting this examination of Mr. Basham did you tell him why you were asking him to do these movements?

A.  I never tell a defendant the purpose of each one of these tests.  We move through it in a routine, smooth pattern.  I just explain to him this is part of my assessment of their medical status.  I don't even tell them it's part of a brain check, so to speak.  And he did not inquire at any point about any of these elements.  They were reproducible so I had him do them on several occasions just to make sure that it wasn't just a one-off problem, that he wasn't paying attention, and it was a persistent finding with each one of these findings.

Q.  Now, Doctor, Exhibit 103, Defendant's Exhibit 103, your

Hyde - Direct                                                    1022

report, does not list what documentation or records you reviewed in forming your opinion in this case. Let me first ask you, did you review any documents before you met with Mr. Basham in April of 2012?

A. No. I don't -- I make a habit of not reviewing documents because I like to go in there with a blank slate, hear what the defendant has to say in response to my questions without any preconceived notions either consciously or unconsciously. And that includes my neurological evaluation.

Q. Now, you evaluated Mr. Basham again in September of 2012. Can you tell us why you requested a second examination of Mr. Basham?

A. I was particularly interested at that point in looking into some of the details of his behavioral history, psychiatric history, and his psychiatric experiences within the realms of mood, obsessive compulsive disorder, anxiety and psychosis in order to make sure that, A, there was some consistency between the two visits and, B, to flesh out some of the details that I wanted some additional information on before rendering a final opinion.

Q. Now, when you first evaluated Mr. Basham in April of 2012 I think you testified one of the things that you were looking for was evidence of seizures, is that correct?

A. Yes.

Q. Did you come to any conclusions about whether Mr. Basham

Hyde – Direct                                                1023

suffers from seizures?

A.  Yes, I did.  Let me just flip to my report.  I think by history, both with an abnormal EEG in the past and the self-reporting of Mr. Basham, within a reasonable degree of medical certainty he has had seizures.  The frequency of those seizures and the disability associated with those seizures is somewhat difficult to assess.  But the presence of seizures present in the past and possibly into the present is an indication of organic or what we might call coarse, C-O-A-R-S-E, brain damage.  Seizures are an abnormal electrical phenomenon that is produced by abnormal brain tissue.

Q.  And Mr. Basham, you said that he had actually relayed to you some experiences of having seizures or blacking out, is that correct?

A.  Correct.

Q.  And to put this in proper context, this was in April -- April of 2012 at the time that Mr. Basham was wanting to waive his proceedings, is that correct?

A.  Correct.

Q.  Now I would like to turn, Doctor, to your findings with regard to Mr. Basham's psychiatric disorders.

A.  Yes.

Q.  You note in your report that Mr. Basham meets the criteria for bipolar disorder II, is that correct?

Hyde - Direct                                    1024

A.   Correct.

Q.   Okay.  Can you tell us what is that disorder and how does it differ from other types of bipolar disorder?

A.   Well, our concepts of bipolar disorder are undergoing somewhat of an evolution, but basically bipolar disorder is characterized by episodes of depression, fluctuating with or combined with, you can have alternating or mixed states, of depression and mania or and/or hypomania.

Q.   What is hypomania?

A.   Hypomania is basically a milder form of manic symptomatology.  So during those periods of time the person had a decreased need to sleep, attempts to talk a lot, they may have racing thoughts, difficulty focusing.  They often engage in excessive amounts of pleasurable activities.  They spend money recklessly, they often exhibit poor judgment during that period of time, and they often act irrationally.

     However, the degree of those behaviors is much lower than during a full manic spell.  They usually do not have well-formed grandiose delusions, for example.  They are usually not floridly psychotic as you often see in patients who are in a typical manic episode.

Q.   And does the existence of hypomania versus mania, does that have an effect on whether or not the diagnosis is bipolar I or bipolar II?

A.   Correct.

Hyde - Direct                                    1025

Q.  Okay.

A.  Abnormalities, as I said before -- the DSM, which is the Bible of the descriptives of psychiatric symptomatology, has evolved since the initial DSM-I and soon to be released DSM-V in how they subdivide bipolar disorder.  To me it's a little bit of excessive seminology, but that's left up to the clinical practitioners who devise these exact sub-types of bipolar disorder.

Q.  Now, you are not the first mental health professional to diagnose Mr. Basham with bipolar disorder, are you?

A.  No, I'm not.  Sprinkled throughout his medical records dating back to his adolescence.

Q.  And in reaching your conclusion that he suffers from bipolar disorder, what information did you rely on, solely his self-reports, or what were you looking at?

A.  I was looking at his self-reports, I was looking at the information in some of the records that I had been given, as well as some of the testimony by other practitioners who have evaluated Mr. Basham over the years.  But primarily by observations of his behavior and some of the mood fluctuations that I observed during my time with Mr. Basham, and his descriptors and his responses to my questions.

Q.  Psychiatry is a confusing subject for lay persons and when I review reports it's difficult for me to understand why one professional would find bipolar disorder and another wouldn't.

Hyde - Direct                                        1026

You had an opportunity to look at Dr. Frierson's report in this case?

A.   Yes, I did.

Q.   And am I correct that Dr. Frierson concluded that Mr. Basham suffers from bipolar disorder?

A.   He did not.

Q.   And can you explain in simplest terms possible, is one of you right, or why don't you agree?

A.   Why didn't we find the same thing?  Well, one goes to how detailed the interview and the examination is with the individual.  There's an element of trust, also, when you are asking people to reveal details of their behavioral history. And one of the reasons why I think I was drawn to the field of neuropsychiatry as opposed to just regular neurology was that I think that I have the ability to work carefully and sensitively with patients to the degree that they are willing to divulge very personal, very intimate details of their behavior, which they often are not willing to give to somebody who does not approach them in the same way or establish what we call therapeutic relationship with the individual.

     So I work very hard, even though I'm with the individual for a limited amount of time, to establish their trust, to tell them that I'm going to give them a fair hearing, that I'm going to listen to what they say, that I'm going to place import upon what they say.  But I also look to internal

Hyde – Direct                                      1027

consistencies in what they are saying, if there seems to be some fantastical or absurdity to what they are saying to try and formulate my opinions in individual cases.

So in this case he was quite specific in his responses to my questions.  I avoid leading questions so I try not to lead people down the road.  And he seemed to answer affirmatively. And the records seem to support somebody who had mood swings that were out of the ordinary, that there were aggressive episodes, suicidal gestures, and the other types of behavior that would be consistent with bipolar II.

I recognize that other people at other times have seen him and diagnosed him with bipolar I, bipolar NOS, a psychotic disorder NOS, NOS meaning not otherwise specified.  And that is always a problem in psychiatry, because there's some evolution of symptoms, particularly with affective disorders, and bipolar has probably been one of the most difficult disorders to diagnose due to its intermittent and fluctuating nature and often the lack of insight and cognitive problems that is -- that are associated with bipolar disorder.

Q.  Now, Dr. Frierson indicated in his report that Mr. Basham denied symptoms consistent with major depressive or manic episodes.  That was the reason in Dr. Frierson's report he states that he is unable to diagnose him with bipolar disorder.  Is that a -- is that the sole requirement for diagnosis with a bipolar disorder?

Hyde – Direct                                    1028

A.   In psychiatry, because it is a syndromic diagnosis, that is to say it is a checklist of behavioral experiences, one must have a trust relationship with the individual so that they are willing to participate in the examination and answer truthfully about their experiences, some of which they may be quite ashamed about or feel badly about.  And because of the social stigma attached to psychiatric disorders it often takes a fair amount of skill in order to elicit those responses.

I'm not going to toot my own horn, I'm not going to disparage Dr. Frierson's clinical abilities, all I can tell you is that with Brandon I was able to establish a good relationship, that I felt that he was being truthful, that I thought he answered my questions directly even though on occasion they had to be repeated or reworded in a way that he understood them.

Q.   And Mr. Basham shared with you this information about his mood swings and his behavior in your interview in April of 2012, correct?

A.   Both interviews.

Q.   Both interviews.  Okay.  Dr. Hyde, you also -- before I move on, have I provided you with an opportunity to describe your basis for diagnosing Mr. Basham with bipolar disorder?  Is there anything else you would like to tell us about that or --

A.   Only that I observed during the course of my interview

Hyde – Direct                                              1029

that I thought on my second interview, in particular, he was in hypomanic state in that his speech was pressured, he was rushing through things, he was tangential.  His affect at times was inappropriate given the severity of the situations that we were discussing.  He was excessively jovial.  And he ascribed to himself some degree of grandiosity that did not reach the level of a grandiose delusion, but certainly was not in touch with his real abilities.

Q.  You also diagnosed Mr. Basham with attention deficit hyperactivity disorder, correct?

A.  Correct.

Q.  And what is that?

A.  It is a developmental disorder of the central nervous system that often presents early in childhood and can persist through adulthood, the ability to sustain attention, to filter out extraneous environmental stimuli.  It is a hallmark of advanced cognitive functioning, the inability to filter out what is going on around you to focus on the matter at hand.

So with somebody with attention deficit order it's like all of us sitting in a busy airport, like I was yesterday, trying to write while there were overhead announcements going on, people rushing by, people screaming at the desk clerks, carts beeping as they rush by, the inability to filter that out makes it extremely hard for these individuals to process information and to sustain attention.

Hyde – Direct                                      1030

Now, even in a quiet environment, with prolonged proceedings, such as a legal proceeding, their attention often fluctuates, they tend to daydream, blank out, and so they have large gaps in the information.  And so it's a very difficult disorder, especially in extreme cases, it can be quite disabling.  And it is something that we see much more in males than females.  Usually the hyperactivity component disappears so there appears to be a genetic component, although it may be enhanced by other environmental factors on the central nervous system.

Q.  And in your review of the reports and records of Mr. Basham's case are you the only medical expert who has diagnosed him with ADHD?

A.  This has been fairly consistent since he was a child.

Q.  How could ADHD -- I think you might have given us some idea but I want to make sure I give you the opportunity to explain to us fully, how could ADHD affect a defendant's competence to stand trial?

A.  In most cases it doesn't because in most cases it's relatively mild or treatment responsive.  In Brandon's case, probably due to other organic brain factors, he seems to have severe attentional deficits and, in fact, he still seems to have some degree of hyperactivity, frequently squirming in his seat, even on occasion during the course of our interview and examination asking me if it was okay for him to get up and

walk around.  That's a characteristic symptom of hyperactivity, and also see that type of psychomotor agitation in hypomanic and manic states.

But within the context of legal proceedings, particularly in a complex legal matter such as this where there's a lot of extended legal proceedings and a lot of complicated language and decision making going on, it can be very hard for this individual to retain that information, utilize that information because they are actually missing it, they are not assimilating that information, they blanked on the tape recorder.

Q.  Is that because he's incapable or unwilling to pay attention?

A.  This is an incapacity, this is hard wired in his brain.

Q.  Now, Dr. Tora Brawley is a neuropsychologist who testified at trial, testified that Mr. Basham's IQ in 2003 was, full scale IQ, 68.  How would that affect a person's ability to cope with ADHD?

A.  The average IQ is set at a hundred in this country.  And it's a measure of both verbal abilities and performance activities, and there are a bunch of sub-scales that go along with it.  It's a fairly standardized assessment of general intellectual function.  When you get down to 80 you are at the boundary between what we consider to be within the normal range.  Below normal range, between 70 and 80, there's

significant cognitive impairment but it's considered to be borderline cognitive impairment.  Anything below 70 is considered to be quite significant cognitive disability in that their general intellectual powers as measured by both their verbal abilities as well as their performance on a variety of tests is so substandard that it's going to affect their ability to take information in, retain it, process it and utilize it in a rational and considered fashion.

Q.  Did you have an opportunity to review the report prepared by a Dr. Bruce Capehart of the Butner facility in this case?

A.  Yes, I did.

Q.  And did Dr. Capehart conclude that Mr. Basham suffered from ADHD?

A.  Yes, he did.

Q.  And did Dr. Capehart conduct any type of test or exam to determine whether Mr. Basham's neurological deficits, or his cognitive deficits, excuse me, could be explained by his ADHD?

A.  He did.  And, in fact, I recall Dr. Capehart retested Brandon while he was on Concerta, which is a medication commonly used to treat attention deficit order, and the test, if I can quote my report quoting Dr. Capehart?

Q.  Certainly.  If you can let us know what page that you are looking at?

A.  Page eight.  Mr. Basham was re-administered several tests while he was taking Concerta.  All the tasks revealed very

similar results with minimal non-statistically significant improvements noted.  Suggesting that Mr. Basham had both a severe type and a treatment unresponsive form of attention deficit hyperactivity disorder.

Q.   Doctor, you ultimately conclude Mr. Basham was incompetent when he stood trial in 2004, is that correct?

A.   Yes.

Q.   How were you able to make that determination eight years after the fact?

A.   On the basis of several issues.  Number one, his long-standing diagnosis of attention deficit hyperactivity disorder and his treatment resistance to that disorder; number two, his history of seizures or seizure-like episodes that dated back to childhood which were reflective of organic brain damage; number three, his extensive history of inhalant abuse, which is particularly toxic to the developing brain, which is why there are well-recognized neuropsychiatric syndromes of organic brain damage produced my inhalants that include both fine motor dysfunction this defendant possesses as well as cognitive disability, which this defendant possesses.

His findings of this cognitive disability, which is significant, coupled with his attention deficit disorder, coupled with a long-standing mood disorder characterized by fluctuating mood states, led me to believe that there were sufficient evidence by history and examination that the

Hyde – Direct                                    1034

disability which I observed in 2012 was present at the time of his trial, present at the time of the acts for which he was on trial, and persisted to the current time. And, moreover, the organic basis, which is part of his neuropsychiatric syndrome, that is to say the brain damage, whether it's from closed head injury and/or substance abuse from a young age, particularly inhalant abuse, is acting in concert to amplify his psychiatric problems, make them more treatment resistant. And those events occurred remotely, that is to say they occurred before the events for which he is charged and before the proceedings for which he was previously engaged and persist through the present time.

Q.  Now, because of the limited nature of the testimony you are providing today, which is with regard to his competency to stand trial in 2004, I've not asked a lot of questions I might normally ask in a typical evaluation because, for one, the court has heard extensive evidence throughout the years of Mr. Basham's deficits.

But I want to ask you about his neurological deficits, his brain damage. Are you able to say with any degree of medical certainty what caused his brain damage?

A.  Yes.

Q.  And what is that?

A.  I believe that there are three factors at work here. One is a genetic basis, that is to say this is a person who comes

Hyde - Direct                                    1035

from a relatively low-achieving family environment, suggesting probably that the genetic determinants of his IQ were never going to be great under optimal circumstances.  They probably would have been within a minimal range, but he certainly was not coming of a family of widely accomplished individuals.

Number two, that he has had several environmental events which by both his description and the descriptions that I have read in the extensive records and testimony of other individuals suggested that he has had some significant closed head injuries, particularly a fall around five years of age.

Third, his educational achievement has been substandard all along the way, complicated by his behavior problems, but also reflective of developmental organic disorders, so-called learning disabilities, which are hard wired evidence of developmental brain dysfunction.

And then, lastly, his substance abuse from a young age, including marijuana and other inhalants, and compounded in his teenage years.  The developing brain is very sensitive to the toxic effects of these agents.  There's a lot of brain development that is going on between birth and adulthood.  And those developmental processes, once interrupted, are at least in the current time almost impossible for us to effectively remediate.  The brain has some reserve capacity, but repeated and sustained insults, particularly with inhalant abuse, particularly with a genetic predisposition toward either

Hyde - Direct                                    1036

intellectual deficit or mood disorder, lead to us an individual such as the one that we are confronting here in this case.

Q.   Now, you mentioned inhalant abuse.  Could you be more specific?  What did Mr. Basham inhale and how does that damage the brain?

A.   Well, he inhaled inorganic fumes, kerosene, paint thinner, glue, just about any inhalant he could get his hands on. People inhale it because it makes them feel a little intoxicated and a mildly euphoric affect.  The agency by which these inhalants work is that through the lungs there are molecules that are given off, fumes is what we would call them, most of us find unpleasant both in smell and, in fact, actually go into the blood, circulate in the blood, pass through the blood vessels, the blood barrier, go into the brain.

      Those molecules affect brain function to produce that intoxicating effect so you feel a little bit high, a little bit euphoric, you get a little bit of a, quote, buzz.  But as they persist in the brain they are taken up by nerve cells and by the supportive cells called the glial cells that nurture the nerve cells and it causes those cells to be damaged.  And there are particular parts of the brain that are particularly vulnerable to those, and that includes the cerebellum, which is in the back of the brain which controls fine motor

Hyde – Direct                                    1037

coordination, and also those parts of the brain that are actively undergoing extensive remodeling and development in childhood and adolescence.  And those are primarily the frontal and to a lesser extent the temporal lobes.

So those late-maturing parts of the brain are particularly sensitive to the toxic effects of these agents.  So I have frequently seen in the course of my clinical practice individuals who used alcohol, used drugs, use inhalants, were exposed to lead paints in the inner cities, and these individuals have permanent irreversible brain damage.  These are well-known consequences of exposure to these agents.  This is why we heartily discourage it.  There's a huge amount of neurological and psychiatric literature about both the neurological and the behavioral consequences of these types of toxic exposures.

Q.  In your report you describe Mr. Basham as permanently incompetent to stand trial, correct?

A.  Yes.

Q.  As a lay person I read that to mean that Mr. Basham at all times is incompetent.  Is that what you are saying, that he never has moments of competency?

A.  I'm talking about competency within the context of assisting his legal counsel in a thoughtful and rational way and understanding the details of the legal proceedings for which he is actively participating and consequences of his

Hyde – Direct                              1038

choices and his actions during the course of these proceedings to weigh the information and make considered decisions, thoughtful decisions, instead of acting impulsively or acting on the basis of limited ability, a highly circumscribed ability to process information.

Q.  Now, you've mentioned, Doctor, several factors that had contributed to Mr. Basham's incompetence, his mood disorders, his hyper -- his ADHD, his neurological deficits.  Let me ask you, can medication or the lack of medication affect a defendant's competence to stand trial?

A.  On many occasions.  So, for example, there are some patients who have schizophrenia, for example, who have a dramatic response to that medication such that they may be floridly psychotic and incompetent but with medication, if they are that form of schizophrenia without a lot of associated cognitive deficits, medication can render them competent and withdrawal of that medication can render them incompetent.

You can see similar things with anxiety disorders, obsessive compulsive disorders, bipolar disorder.  You can even see it with neurological disorders.  There are patients with Parkinson's disease whose cognitive processing is extremely slow without medication, but you add on the proper dose of medication and you can restore their cognitive abilities such that they are competent to participate in legal

Hyde – Direct                1039

proceedings.

Q. Now, you are familiar with the medication known as Seroquel?

A. Yes.

Q. What is that medication?

A. Seroquel or quetiapine, Q-U-E-T-I-A-P-I-N-E, is an antipsychotic medication. It's considered an atypical or one of the modern antipsychotic medications which we use to treat patients with psychotic disorders, and it's a secondary treatment for bipolar disorder and refractory depression, even used sometimes as an adjunctive medication to treat severe obsessive compulsive disorder.

Q. Is Seroquel a medication a patient takes on a daily basis? How often do they take the medication?

A. It is designed to be used on a daily basis.

Q. And what effects could the failure to administer Seroquel have on a person who is taking that medication?

A. Particularly in people who have either severe anxiety problems or mood swings or psychosis there can be a rebound in their symptoms relatively quickly, because there's a short half life as it comes out of the brain.

Q. Does Seroquel have any affect on a patient's ability to stay alert or awake or --

A. One of the main problems with Seroquel is it tends to be a highly sedating medication. People in prisons and in hospital

situations like that because it sedates the patient. Unfortunately, on a functional basis many patients find Seroquel a difficult medication to tolerate because it makes them so sleepy.

Q.  I would like to ask you for a moment about a subject that has repeatedly appeared in this proceeding, and that is what many people refer to as Mr. Basham's manipulative personality, the fact that he, quote unquote, manipulates.  Did you have -- you had an opportunity, you told us, to review Dr. Frierson's report, correct?

A.  Yes.

Q.  And I believe Dr. Frierson at one point in his report referred to Mr. Basham as having shown great manipulation skills.  Do you agree with that assessment?

A.  From my reading of his records, both in prison and from the testimony of others, and the medical records, Mr. Basham has a highly regressed or childlike behavior pattern, such that he has difficulty formulating a rational considered response to most situations.  He often acts in an extremely childlike manner trying to get very simple things in relatively simple ways, in the way you might see a child do that.

Hiding money in his pants, asking people to slip him a little money, trying to get people to buy him snacks, very reminiscent of a small child to those of us who work with

children or have children or are around children a lot.  I'm sure you've all been going through the candy aisle at the supermarket and sometimes Johnny will throw a tantrum if he doesn't get a candy bar or Susie may grab some M&Ms and stick them in her backpack thinking that they can get something relatively quickly and relatively easily in a very childlike and simplistic fashion.  I don't really consider that to be manipulation, I consider that to be regressive behavior of somebody with severely cognitive limitations and behavioral abnormalities.

Q.  When you examined Mr. Basham in Terra Haute, could you give us a little bit of a context as to where the evaluation took place?

A.  Sure.  It's in a nondescript room, I believe it's on the second floor of the facility, where there's a table, two or three chairs, you and the defendant.

Q.  When you evaluated Mr. Basham did he ask you to buy him snacks from the vending machine?

A.  Yes.

Q.  Did you consider that manipulation?

A.  No.  I hear that a lot from defendants, particularly those who have the types of neurological deficits Mr. Basham displayed in conjunction with the psychiatric problems. Usually say no in a nice way, say I don't think it's an appropriate thing for me to do in the context of the

relationship that I'm establishing with them.  I've never had any problem with them.  Once I explained my position I didn't have any problem with Mr. Basham.

Q.  So you told Mr. Basham no?

A.  Yes, correct, I said no.

Q.  Okay.  And did he go forward with the evaluation?

A.  Absolutely.

MR. BURKE:  One moment, your Honor.

THE COURT:  All right.

(There was a pause in the proceedings)

MR. BURKE:  Your Honor, we have no further questions.

THE COURT:  All right.  Cross-examination.

MR. WITHERSPOON:  Judge, may I ask for about a ten minute break first?

THE COURT:  We can take the morning recess at this time.  Let's take a ten minute recess.

(A recess transpired)

THE COURT:  All right.  Just for planning purposes, we received a call from the Bureau of Prisons wanting to know when we would break for lunch because apparently a guard has to be with the attorney who's out in Terra Haute, and I told him we would break at 12:20.  So let's resume.  I don't know if we'll take another break between now and 12:20, but that's where I plan to stop for lunch.  All right, cross-examination.

CROSS-EXAMINATION

Hyde - Cross                                    1043

BY MR. WITHERSPOON:

Q.  Good morning, Dr. Hyde.  And first let me apologize.  I've been calling Dr. Hyde Dr. Frierson and Dr. Frierson Dr. Hyde, so if I make the mistake please forgive me.

Dr. Hyde, you are not a board certified psychiatrist, are you?

A.  No, sir.

Q.  And, in fact, you didn't go through a psychiatry residency, did you?

A.  No, I did not.

Q.  And you are not a member of the American Board of Psychiatry and Neurology, which is the group that certifies psychiatrists and neurologists, correct?

A.  Well, actually, it's a joint board, but I have been certified in neurology, not in psychiatry.

Q.  Not in psychiatry.

A.  Not in psychiatry.

Q.  So you've had no real formal training in psychiatry other than what, four years of medical school, correct?

A.  No, that's not correct.

Q.  What have you had?

A.  I have had extensive training through some of the leading psychiatrists in the world at the National Institute of Mental Health, through frequent case conferences, rounds, teaching rounds, case discussions, case interviews, on literally

hundreds of cases over the course of the past 20 years.  I have been asked to write chapters in books on psychiatry, I have been asked to lecture to medical students, residents, and fellows on purely psychiatric issues.  My research has been devoted for 24 years now to the biological bases of psychiatric disease.  So I have had training in psychiatry but not through a formal residency program.

Q.  And you are not board certified in psychiatry.

A.  Correct, sir.

Q.  Okay.  Now, you mentioned in your discussion about Mr. Basham that his brain damage was caused by genetic -- basically a bad family, that he had these closed head injuries, am I correct?

A.  Yes, sir.

Q.  And his educational achievement was bad.

A.  Yes, sir.

Q.  And his substance abuse.

A.  Yes, sir.

Q.  Have you ever met Mr. Basham's family?

A.  No, I have not.

Q.  So you are making a determination that he has a bad genetic family history and you've never met his family.

A.  Yes.

Q.  Isn't that a little strange to make that assertion if you never met his family?

Hyde – Cross                                1045

A.  No, it's fairly typical in clinical practice.

Q.  To determine how bad his genetics are without even talking to or meeting with the people that you are contending have these bad genetics?

A.  Well, look at the information contained in a variety of reports, people who have interviewed the family, as well as the patient's report and look for consistency within those documents.

Q.  And you said he has a low IQ which also causes him to have some problems with competence, correct?

A.  Yes, sir.

Q.  What was Mr. Basham's IQ when he was ten years old?

A.  If I can refer to my report?

Q.  Sure.

A.  So let's see.

Q.  Well, let's go back.  At seven years seven months, what was his IQ?

A.  Let's see.  IQ at seven years was 101.

Q.  And at eight years seven months what was his IQ?

A.  100.

Q.  And at ten years what was his IQ?

A.  88.

Q.  Does that indicate that he came from a bad genetic family?

A.  You know, the IQ measurements at a very young age are not usually that determinative and we usually don't rely upon

Hyde - Cross                                     1046

them.  There's a lot of problems with IQ testing in children, particularly under the age of 12.  So you have to look at the larger, broader sphere of achievement in individuals, in family members.  Did they go to college, what types of jobs have they had.  Particularly in contemporary American society you have to look at the genetics of the individuals involved, including his mother's genetics and her problems throughout life.

So I would say that there is a significant genetic load. When that appears as a consequence of cognitive disability it's quite variable, as genetic load can appear starting in infancy or that genetic trait can appear subsequently later in life.  So, for example, somebody who typically develops schizophrenia, which has a strong --

Q.  Let me stop you, Doctor.  Dr. Hyde, we're not talking about someone with schizophrenia, we're talking about --

A.  I'm using that as an example.

Q.  But my question was very direct about Mr. Basham here. Having that high IQ doesn't indicate that he came from a bad genetic family, does it?

A.  It does not in that limited context, sir, but that is not the way that these genes always play out in changing cognitive abilities.

Q.  But you don't know that because you haven't met and talked to his family, correct?

Hyde – Cross                                1047

A.  I have lots of information about his family.

Q.  But you haven't met or talked to his family, have you?

A.  I have already answered that, sir.

Q.  It is yes or no, sir.

A.  You can check the record.

Q.  Have you met and talked with his family, sir?

MR. BURKE:  Objection, your Honor.  Asked and answered.

THE COURT:  All right.  He said he didn't talk to the family.

Q.   (MR. WITHERSPOON) And at 17 years old he had an IQ of 89, which is close to being normal, isn't it, Dr. Hyde?

A.  Yes, it is.

Q.  And this is from a person who came from a bad genetic family, correct?

A.  Yes.

Q.  Now, I want to talk about your testifying.  You have -- I think you told Mr. Burke that in 60 to 70 percent of the cases that you're called to consult you do not testify because you find the person competent, correct?

A.  Correct.

Q.  So in almost 30 or 40 percent of the time when you are called to testify do you find frontal lobe damage issues?

A.  In some of them.

Q.  What's the biggest diagnosis you find when you find a

person incompetent, Dr. Hyde?

A.   Most of the cases that I'm asked to testify on are complicated, they can have frontal lobe damage, they can have temporal lobe damage, they can have a combination of those two areas.  But frontal and temporal lobe damage are the areas most often involved in their competency issues.

Q.   And you saw Mr. Basham for two times, correct?

A.   Yes, sir.

Q.   How many hours in those two times did you visit with Mr. Basham?

A.   Probably somewhere between four, four-and-a-half hours.

Q.   Is that total, four, four-and-a-half hours?

A.   Yes.

Q.   And in that time you were able to discern that eight years ago he was incompetent.

A.   Yes.

Q.   Did you ever talk to his lawyers at that time to see about their discussions?

A.   No.

Q.   Wouldn't that be a better determination of what he can and cannot do, his functioning abilities, by listening to his lawyers, reading transcripts of conversations?  Wouldn't that be a better way to determine his functioning eight years ago than relying solely on these tests?

A.   It would be useful --

Hyde - Cross                                      1049

Q.   But you --

A.   -- but not better.

Q.   I'm sorry?

A.   It would be useful but not better.

Q.   So you didn't -- you didn't do that.

A.   No.

Q.   Okay.  And to determine his competence don't you need to determine his functioning, what skills, what he can and can't do?

A.   Yes.

Q.   And with a person who is incompetent, would he be able to -- you don't call it manipulation, you call it childlike tendencies, by getting someone to buy something for him that he wanted, correct?

A.   Yes, sir.

Q.   But what about if a person is able to listen and make decisions about his legal proceedings?  Is that a -- would be a good indication of a person who's competent?

A.   It depends upon the context.

Q.   What do you mean, it depends upon the context?

A.   Well, if I asked somebody did you throw a rock and break the window, that's a pretty simple issue.  If you ask somebody how they want to proceed with respect to plea bargains, deals, intricacies of their case, remembering the details of their case, how everything fits together, that can be a different

Hyde – Cross                                          1050

issue.

Q.   That can be definitive?

A.   A different issue.

Q.   Okay.  Would that indicate a person is competent?

A.   Like I said before, it varies upon the context.

Q.   Well, let me -- did you have a chance to review the transcript of Mr. Basham's guilty plea in West Virginia about approximately less than a year after his trial here?

A.   No, I don't believe I did.

        MR. WITHERSPOON:  Your Honor, I'm moving at this point Government's Exhibit number 248 without any objection from the defense.

        THE COURT:  All right.

Q.    (MR. WITHERSPOON) I want to read you part of a transcript.  First of all, I want you to understand this, according to this transcript this hearing started at 9:30 in the morning and it lasted until 10:24, about an hour.

A.   Yes, sir.

Q.   During that entire hour, you haven't seen this, but as an officer of the court, there were no outbursts by Mr. Basham.  Okay?

A.   Yes, sir.

Q.   During this transcript the judge specifically asked Mr. Basham and the other lawyers if there was any issue dealing with his competency and nobody had an issue dealing with his

competency. But you are saying at that point he was incompetent.

A. Yes.

Q. Wouldn't those lawyers have a better perspective about his competency than you did eight years later?

A. It depends upon how good those lawyers were.

Q. I'm sorry?

A. It depends upon how good those lawyers were, how knowledgeable they were, how they work with their client.

Q. I would presume since it was a death penalty case they spent a considerable amount of time with their client, wouldn't you?

A. I have seen lawyers of varying degrees of legal skill and commitment to their client despite billing hundreds or thousands of hours, including lawyers who have fallen asleep during trial.

Q. But we don't --

A. With all due respect, I don't make any presumptions about the capabilities of lawyers, even involved in death penalty case.

Q. But we're not talking about lawyers falling asleep here, are we?

A. I have no idea.

Q. And the court made a determination at that time that he was competent. If a federal judge in West Virginia made a

Hyde - Cross                                        1052

determination he was competent --

A.   Yes.

Q.   -- and you disagree with that federal judge.

A.   Yes.

Q.   And then we go on, Gayle, can you pull up page five of Exhibit number 248?  We will begin at line six.

The court, all right.  You don't have any other medical conditions or problems that would interfere with your thinking or cloud your judgment?  And Mr. Basham said no.  You disagree with that?

A.   Yes.

Q.   Line ten.  Are you able to understand fully what's going on here in court today?  Again, Mr. Basham says yes.  You disagree with that?

A.   Yes.

Q.   And then he asked the two lawyers if they have any issues with Mr. Basham's competency and they both say no.  You disagree with that?

A.   Yes, sir.

Q.   Line 18.  Now, Mr. Basham, you've had enough time to discuss this case fully with your lawyers.  He says yes.  Have they been able to answer your questions, questions about what you should do, and he says yes.  Are you completely satisfied with your lawyers' advice they have given?  He says yes.

At that point you are saying he wasn't competent to make

Hyde – Cross                                              1053

that determination?

A.  Correct.

Q.  Page 11, Gayle, line two.  Now, Mr. Basham do you understand what this -- they have gone through the plea agreement that he has, seven page plea agreement that he has, the judge has gone through all the elements, and he asked Mr. Basham, do you understand what this agreement does and what it requires of you?  Mr. Basham says yes, sir.  You are saying he was incompetent, he had no idea.

A.  Correct.

Q.  And he asked -- the court asked him, did you go over each of these paragraphs with your lawyers before you signed this agreement?  He says yes.  He may have gone over it but you are saying he had no idea what he was doing.

A.  He may have a little bit of an idea, but I don't think he had an idea that rises to the level of competence.

Q.  What level does it take?

A.  To fully understand, to digest that material, to consider his options, to engage with his lawyers and discuss the language and the consequences of the decision that he's making.

Q.  Well, he knew he was pleading to get a life sentence here, so he knew the consequence of his guilty plea.

A.  Like I said before --

        MR. BURKE:  Objection.  It assumes facts not in

evidence.  And Dr. Hyde can't tell the court what Mr. Basham

knew or did not know.

MR. WITHERSPOON:  Judge, he's opined he was

incompetent.

THE COURT:  I think it's a fair question.  I'll allow

it.

Q.    (MR. WITHERSPOON) But he knew he was pleading to get a

life sentence here, didn't he?

A.   He may have known he was pleading to a life sentence, but

the details of what a life sentence meant, he was incompetent

to process all that information.  There are many different

types of life sentences, as you well know.

Q.   So he knew he was pleading to a life sentence but he

didn't know what a life sentence meant?

A.    In his case he probably did not know all the options.

Q.   Gayle, page 15.  After the judge has gone through and told

him the elements of the offense he asked Mr. Basham,

considering this explanation of the offense, do you believe

you're guilty of the count -- the charge in count one?  And

Mr. Basham said yes, sir.  Again, you don't believe he was

competent to make that decision.

A.    I don't think he was competent throughout this whole

proceeding.  You can go line by line, page by page, word by

word.

Q.   But you didn't consider any of this when you made your

determination, did you?

A. I considered his history, his examination, the information I had at hand.

Q. Well, there are other information that was available to you, you just chose not to review it, correct? Because this transcript was available to you, you just chose not to --

A. I worked with materials that were given to me by counsel.

Q. Okay. So this was available to you, you chose not to use it.

A. I don't understand your question.

Q. You didn't use this transcript.

A. I wasn't given a choice.

Q. Did you ask for it?

A. I didn't even know it existed, sir.

Q. And even if it had it wouldn't have changed your opinion, would it?

A. No, it wouldn't.

Q. Page 45, Gayle, line 14. This is his attorney. I want you to listen to this. Your Honor, in meeting with Mr. -- with Brandon over time preparing for this case, Brandon told me about the Burns family. This is the family of the lady in West Virginia that he pled guilty to, he and Chad Fulks, to murdering. Seeing them in South Carolina and seeing about them in the victim exact statement, so he read the victim impact statements, he told me something that I wrote down, and

Hyde – Cross                                1056

I'm quoting him directly.  This is what he asked me to read to the court as his allocution.  Line 21.

I want the Burns family to know that Samantha was a good person.  I know that she had something that I never had and never will have.  She had a good family that loved her and cared for her.  I helped Chad Fulks take that away.  Even if I had never met Chad Fulks or her, no matter what I ever did in life, page 46, it would never come near to what she was or could have been in her life.  I wish I could bring her back but I can't.  Thank you.

Is that the mind of a person who's incompetent, Dr. Hyde?

A.  It's a relatively limited statement.

Q.  Is that the mind of a person who's incompetent, Dr. Hyde?

A.  First of all, you are presuming that all that wording is directly coming from the client.  I have some doubts about that.

Q.  But the lawyers said it was.  As an officer of the court he wouldn't lie to the court.

A.  Lawyers have ways of working with clients to write statements for the court.

Q.  He told me something that I wrote down and I'm quoting him directly.

A.  Like I said before, there are ways of asking questions to derive information that somebody could not formulate on their own in a coherent way.

Hyde - Cross                                    1057

Q.  But wouldn't a person who has spent a considerable amount of time with him be able to make -- be better to make that determination?

A.  Like I said before, it depends upon the skill and the legal abilities and forensic abilities of the attorneys, the attention that they paid to the individual, and the depth to which they go in order no ascertain --

Q.  If you could just pull that mic -- I'm having a little hard time --

A.  I'm sorry.  And the degree to which they go to ascertain their cognitive abilities and how they are impacting their interaction.

Q.  So now you've spent four, four-and-a-half hours with Mr. Basham and you determined he was incompetent.

A.  Yes, sir.

Q.  What if I told you that his lawyers together spent more than 200 hours with him and made a determination that they were able to talk with him, he was able to talk with them, they were able to understand each other.  Would that give an indication that he's competent?

A.  From my perspective, what I found and what he has suffered from has been a persistent problem since he was a teenager, renders him incompetent then and rendered him incompetent throughout these proceedings and renders him incompetent now.

Q.  But his lawyers sitting there one on one with him for more

Hyde – Cross                                    1058

than 200 hours, wouldn't they have a good factual basis to determine if he's understanding them and they are understanding him and he knows what's going on?

A.  It really depends upon the skill of the lawyers.

Q.  But you don't know the skill of Greg Harris or Jack Swerling, do you?

A.  Well, I would have some questions given my history, examination, and review of the records at hand.

Q.  But you never met them, correct?

A.  No.

Q.  And you never read -- did you read their transcript of their testimony at this hearing back in October?

A.  No.

Q.  You have not?

A.  No.

Q.  So you are basing your total opinion upon four and four-and-a-half hours that you spent with Mr. Basham.

A.  And the records that I did review.

Q.  Well, let's talk about that.  What records did you review? I write slow, so please take a while.  Were there a lot of records?

A.  There were some records, it wasn't a huge amount.

Q.  Okay.  What did you review?

A.  I reviewed Mr. -- Dr. Capehart's report, I reviewed some of the testimony at various hearings, I reviewed some of the

medical records that were available to me, the EEG report that was abnormal.

Q.   I'm sorry?

A.   The EEG report that was abnormal.

Q.   Did -- there were some normal EEG reports, too, weren't there?

A.   Yes.

Q.   There were normal EEGs before the abnormal, and normal ones after, correct?

A.   Correct.

Q.   Okay.  What else?

A.   I think that was -- that was most of what I reviewed.

Q.   That's what you reviewed?

A.   Yes.

Q.   Did you review the testimony of Dr. Schwartz-Watts who was -- I'm sorry, go ahead -- the psychiatrist in the hearing who testified that she spent more than 40 -- saw Mr. Basham more than 40 times and spent more than a couple hundred hours with him?

A.   Yes, I reviewed her testimony.

Q.   And you disagree with her?

A.   Yes, I do.

Q.   You think she was wrong?

A.   Yes, I do.

Q.   And you only spent, four, four-and-a-half hours with him

Hyde – Cross                                    1060

and she spent more than 200 hours.

A.   I think that I stand by my judgment.

Q.   And, in fact, Dr. Hyde, you are the only medical expert who has found him incompetent, correct?

A.   As far as I know.

Q.   But you're right.

A.   I am right, yes, sir.

Q.   And you're right because Brandon trusted you but he didn't trust Dr. Frierson.

A.   That's not the reason why.

Q.   I'm sorry?

A.   That's not the reason why.

Q.   But you said that Dr. Frierson's report was invalid because Brandon didn't trust him but he trusted you.

A.   I said the reason why there was a difference in the psychiatric aspects has to do with trust.  But Dr. Frierson did not consider the neurological issues in his report, didn't consider the most recent IQ testing in his report.  So Dr. Frierson, with all due respect to his expertise, does not have the knowledge of the intersection between the neurological and the psychiatric in this case.

Q.   But, again, it goes back to his functioning, his functioning abilities, correct?

A.   That's part of it, yes.

Q.   Gayle, can you pull up Government's Exhibit number 247?

MR. WITHERSPOON:  Your Honor, I move Government's Exhibit number 247 into evidence without objections.

THE COURT:  All right.  Is that correct, Mr. Burke?

MR. BURKE:  Yes, your Honor.

THE COURT:  All right.  Without objection it's admitted.

Q.   (MR. WITHERSPOON) Government's Exhibit number 247, number one, Gayle, this is a note that was passed between Mr. Basham and his lawyers during the trial.  One of his lawyers asked do you want me to concede your involvement in the Samantha Burns case?  He writes no.  You are telling me he had no idea what that was?

MR. BURKE:  Objection, your Honor, foundation. There's no indication who wrote the note on that piece of paper.

MR. WITHERSPOON:  Your Honor, these were notes given to us by the defense they contend were notes in Mr. Swerling's file, notes between Mr. Swerling and Mr. Harris and Mr. Basham.

MR. BURKE:  I will agree with Mr. Witherspoon up until his last statement.  These were notes that we found in the file.

THE COURT:  I'll admit it for what it's worth.  It came from Mr. Swerling's files.

MR. WITHERSPOON:  We got these from Mr. Burke who I

presume got them from Mr. Swerling's files.

THE COURT:  All right.  I'm going to admit it for what it's worth.  I think it's a fair question.

Q.   (MR. WITHERSPOON) That's a mind of a person who's incompetent, correct, Mr. -- who doesn't understand what's going on, who didn't want to concede this fact, who wanted his lawyers to continue to fight to defend that fact.

A.   I can get somebody with end stage Alzheimer's to scribble a note on a piece of paper, doesn't mean they're competent to render that decision.

Q.   Let's take a look at the second page then.  We need to take pictures of all my injuries due to the attack by the officers that we can show to the jury how bad I was beat.  Again, these were notes by Mr. Basham, he's writing to his lawyers giving them advice on things to do in his trial.

A.   Yes.

Q.   And that's an incompetent person?

A.   Yes.

Q.   The third page, Gayle.  Please ask Stevens, and I think he could not spell Stevens so it's Cevens, to come see me at lunch break so I can talk to him, okay?  Because I don't really talk to you about this stuff because you are busy, focused on this trial, which I understood, so please have Stevens visit me here today while on lunch break.  He wants to talk to his lawyers about his case and realizes that Mr.

Hyde - Cross                                        1063

Harris and Mr. Swerling are busy, so he wants to talk to
another lawyer so they can discuss the case at lunchtime.
Doesn't that show his ability to communicate with his lawyers,
to understand what's going on and to provide assistance to
them?

A.   Only in a very limited context.

Q.   The next page, Gayle.   Okay.   Jack, I think there are a
lot of things piling up.   One is I need to be able to look at
all the jurors that have been qualified and I need to see the
supplemental juror questionnaires for the qualified jurors.
And you are going to have to send someone down to the jail
tonight to take pictures of my injuries plus to drop the money
order off so it will by in my account for Friday.   I'm going
to need to have someone help me decide to my understanding and
opinions on the ones that I feel is good and the ones that I
feel is bad.

     He's involved with his lawyers on selecting jurors for his
trial.

          MR. BURKE:   Objection, foundation, your Honor.   We
have conceded these records are in the file.   There's no
indication when they were written, if Mr. Basham received
assistance from anyone.   This very well could have been
written the night before at the jail and received assistance.
There's no basis for Mr. Witherspoon's questioning to assume
automatically that these were things done by Mr. Basham and

Hyde – Cross                    1064

they were provided at an appropriate time, and I would add that his attorney even listens to him, because with regard to his Samantha Burns stuff if he in fact said no, his attorney did not listen to him. So I object to the --

THE COURT: Well, you know, what we're talking about here is authentication or identification, and the fact that they came from Mr. Swerling's records produced to current defense counsel and copied for the prosecutors, together with the totality of the circumstances in terms of the substance of the communication, it's strong circumstantial evidence they were written by Mr. Basham. I'll hear argument that they may be construed some other way, but I think as a matter of admissibility a sufficient foundation has been laid, so the objection is overruled.

Q.    (MR. WITHERSPOON) But he's involved in helping his lawyers to select qualified jurors to sit at trial, on his trial.

A.    This assumes that he generated these on his own without any assistance, without any contact with paralegals, other lawyers, other inmates, which frequently work with individuals of very limited mental capacity to help them draft letters or even dictate to them what to say.

Q.    But you don't know he did, do you?

A.    We don't know he didn't, either.

Q.    Well, I know this is Mr. Basham's writing to his lawyers

telling his lawyers this is what we need to do and send

somebody down tonight, which means he's in court that day.

          MR. BURKE:  Objection.  Now Mr. Witherspoon is

testifying.  He does not know that.

          THE COURT:  All right.  I think that's a matter for

argument.  I think you made your point, Mr. Witherspoon.

Q.   (MR. WITHERSPOON) The next page, Gayle.  This is another

note from Mr. Basham to Mr. Swerling.  When we are done we

need -- need, really, really need to talk downstairs in the

cage before we go today.  I can really -- I can really turn

this case around.

    Does that cause you to doubt that he's competent?  He's

involved in his case, he's telling his lawyers he's got

information that can help them in their case.  Does -- is that

an indication of a person who's incompetent, Dr. Hyde?

A.   Given the facts of this case I would suggest this borders

on delusional.

Q.   It borders on delusional.  But that's your opinion again.

A.   I think I just said that, sir.

Q.   Okay.  Gayle, if you'd turn to this one.  Go to the first

page right there.  This is, again, a note that we got from the

defense that they got from Mr. Swerling's files.  And it

appears to be Mr. Basham asserting some issues with his

lawyers.  Jack, I don't know, but I feel I cannot go forward

in this trial with an unconcerned, self-righteous and no team

Hyde – Cross                                    1066

player, which is Greg.  I feel he holds some kind of grudge

against me so I am -- I am now request that Greg Harris be

removed from this case due to the lack of communication.  I

feel he is not going to do his civic duty.  He's complaining

about his lawyers.

A.  Right.

Q.  Which means he doesn't think his lawyers are doing a good

job for him.

A.  Well, he doesn't like the lawyer, that's what he's talking

about.

Q.  He doesn't think he's doing his civic duty.

A.  Right.

Q.  And he wants his lawyer removed.

A.  Correct.

Q.  But doesn't that indicate that he's involved with his

lawyers, talking to hem, making a determination of what they

are and are not doing?

A.  Only in a very limited capacity.

Q.  How much capacity do you have to have to be competent, Dr.

Hyde?

A.  You have to have the potential ability and intellectual

ability to make rational judgments, to consider the facts that

are at work with your case, process that information, and

offer thoughtful interactions with your attorneys.

Q.  Can it be on a limited basis?

Hyde – Cross                                  1067

A.   Competency?

Q.   Yes.

A.   Yes.

Q.   So he's competent.  You said he's doing this in a limited basis, so he's -- may not be yours, may not be mine, but he's still competent.

A.   No.

Q.   Gayle, this one.  This letter was written on 3-20-2004.  So a letter, it appears to be from Mr. Basham to his attorneys.  Dear Attorney Jack Swerling.  Jack, thank you for your able representation for my preparation and study as your client.  Would you please send to me a complete copy of my case file, to include all motions for discovery, investigative reports, petitions, motions, files, and briefs, et cetera.  Your cooperation and assistance is greatly appreciated.  He's asking for records.

A.   Correct.

Q.   So he knows the records are out there.

A.   I'm sure that he knows that there are paper documents out there.

Q.   Well, he would know -- I'm sorry.  I didn't want to interrupt you.

A.   Given my interactions with Mr. Basham, I have never heard him talk in this fashion.  This suggests to me somebody helped him prepare this note.  This not the way he talks.  This is

Hyde - Cross                                              1068

not his grammar, this is not his syntax, this is not his vocabulary.

Q. And you made that determination after four hours?

A. Yes.

Q. You said his syntax and all that was not an indication you can use, those were not his words.

A. Doesn't sound like the words that I'm familiar with from the way he talks with me.

Q. But if he put somebody up to do this wouldn't he know what to ask for? I mean, these may not be his words but he knew to tell somebody this is what I want, and the person may have written the words but he can tell I want my records from Jack so I can review them.

MR. BURKE: Objection, your Honor. This question assumes facts not in evidence. All we have before us is a letter that was written presumably by Mr. Basham to his lawyer. We don't know the genesis of this letter, we don't if Mr. Basham requested or whether it was asked -- if he asked for assistance or whether someone just volunteered it to him in the jail. So I object on that basis, your Honor.

THE COURT: Well, again, I'm going to admit it for what it's worth. I agree there's much more of a possibility some jailhouse lawyer may have assisted in drafting this, unlike the mid-trial notations we looked at so far. I will admit it for what it's worth and we can argue later about how

Hyde – Cross                                    1069

much weight it deserves.

MR. BURKE:  Thank you.

Q.   (MR. WITHERSPOON) I want to read you a letter presumably from Mr. Basham to his attorney.  Dear Jack, I am writing to show you a plan that I have made out.  You said you could send me $40 every two weeks for my canteen, and I know you are a very busy man and you said to just remind you and it would be no problem.  So I've come up with a schedule to make it a little more easier on the both us because I know how hard it is for you to remember to get someone to bring it out here every week or two and how hard it is for me to catch you at the office to remind you.  That's a person who realizes that he's having a hard time getting in contact with his lawyer and coming up with a plan, isn't it?

A.   That's what the letter says.

Q.   Pardon me?

A.   You are assuming that he wrote this, that he derived this plan, that he did this all on his own, that there wasn't another inmate, another jailhouse lawyer.  There's a whole host of presumptions that go into your statement that I'm not willing to accede to.

Q.   So this is what I came up with, for you to just send $60 once a month.  That will give me $15 a week to spend on things I need to live in here.  I have also attached an order list on the back of this letter to show you what I get with the money

Hyde - Cross                              1070

each week.  The last time you sent me a money order was on 10-17-03.  You sent $25.  Today's date is 11-10-03.  That's about it.  I hope you like my plan.  I put a lot of thought into it.  He's thought -- devising a plan to get money from his lawyer so he can buy items.

And, Gayle, if you go to the third page.  He's come up -- look at the third page.  He's come up with a budget, what he's going to buy every month with the $60 that his lawyer has bought, but that sends him the items and the amount.  Isn't that budgeting, isn't that functioning skills that Mr. Basham has?  So therefore if he -- even if he has this closed head injury or this frontal lobe injury he's able to still function.

A.  You could show me the Magna Carta, the Constitution of the United States, a revision to the Bill of Rights, Law Review article in Mr. Basham's handwriting, and unless I know that he generated that information on his own without counseling or assistance from either other members of his legal team, family members or other inmates then I am not willing to accede this represents anything other than something in his own handwriting.  I have no foundation as to the provenance of these notes whatsoever.

Q.  Well, he's in prison so his family members can't be coaching him, correct?

MR. BURKE:  Objection.  Assumes facts not in

evidence.

MR. WITHERSPOON:  Judge, I think we can all stipulate that at this point Mr. Basham, once he was arrested, he was never allowed out of prison.

MR. BURKE:  Your Honor -- Mr. Witherspoon, are you removing your request to admit Exhibit 252, a conversation with his mother?

THE WITNESS:  No, I'm not.

THE COURT:  So he did have some contact with his family.  I'll accept that.  All right.  Go ahead.

Q.   (MR. WITHERSPOON) So there's no indication that someone wrote this.  This is his -- his thoughts.  Even if he got a jailhouse lawyer he would have to come up with a plan to tell the lawyer this is what I need, these are the things I need, help me come up with a plan so I can purchase these items.

A.  Your question is, sir?

Q.  Isn't that an indication that he can function, he can sit there and talk to someone and give him ideas about things that he needs, how he can spend $60?

A.  The foundation for your question is not available to me. I have seen no evidence that has been produced to me that shows that -- I can say it one more time, I'll try different language.

Q.  You don't have to be condescending, Dr. Hyde.

A.  I'm just --

Hyde - Cross                    1072

Q.  Well, you and I both speak English.  You don't have to speak another language.

A.  I'm trying to put it in terms --

Q.  Well, you can use your terms, you don't have to be condescending.

A.  Well, if you keep repeating the question obviously you don't understand the answer, sir.

Q.  Probably because your answer may not be --

MR. BURKE:  Your Honor, I object to this.

THE COURT:  All right.  Let's just move forward.  Go ahead, ask the question.

Q.  (MR. WITHERSPOON) Simply because Mr. Basham had a closed head injury, frontal lobe damage, does not mean he's incompetent, does it, Dr. Hyde?

A.  No, it does not.

Q.  And as long as he can function, it may be less -- I'm sure it's less limited than you and I, he can still function, he can be found competent, isn't it, Dr. Hyde?

A.  People with closed head injuries and frontal lobe injuries can be found competent, yes.

Q.  And you diagnosed him with bipolar disorder, too, correct?

A.  Yes, sir.

Q.  What are the elements under the DSM, the Bible you talked about, for bipolar II?

A.  Bipolar II?

Hyde – Cross                                    1073

Q.  Yes, sir.

A.  Basically differentiates from bipolar I in that the severity of and symptomatology associated with the manic state is not nearly as severe.  So it's primarily hypomanic rather than full blown --

Q.  And he's hypomanic you have to have that hypomania for four days.

A.  Yes.

Q.  Now, according to your report his fluctuates hourly, so that -- doesn't that vary from the DSM, the Bible you said --

A.  Like I said before, there's a lot of discussion within the neuropsychiatric community as to the presence of rapid-cycling bipolar disorder.

Q.  If you will speak into the microphone, I'm having a hard time hearing you.

A.  I'm sorry.  I apologize.

Q.  It's my fault.

A.  There's a lot of discussion ongoing right now in the psychiatric community about rapid-cycling bipolar disorder, in which case there are people whose moods cycle hourly or every few hours rather than having the classic hypomanic duration of four to seven days.

Q.  But under the current state of psychiatry under the DSM-IV to be hypomanic you have to have it for four days, four consistent days.

Hyde - Cross                    1074

A.   That is what the manual says, yes, absolutely.

Q.   But you disagree with that also?

A.   I think there is considerable evidence within the
psychiatric community that within bipolar disorder there are
those individuals who have bipolar disorder who have rapid
cycling.  And I think that if you ask any psychiatrist,
including your own psychiatrist, about rapid-cycling bipolar
disorder, if they have any knowledge of bipolar disorder they
will see that there's a small subset of patients who have
rapid-cycling bipolar disorder.

Q.   But you disagree with the DSM-IV.

A.   Like I said before, I think there are forms of bipolar
disorder that are not covered by this rigid definition within
the DSM-IV.

Q.   So you made up your own diagnosis of bipolar II.

A.   I didn't make this up.  I think it's a best-fit diagnosis
given his symptomatology.

Q.   What if Mr. Basham -- I think we heard today he was maybe
intoxicated, and I presume disciplined.  The discipline record
indicates that -- there will be a discipline record.  What if
he worked with a person in the prison to defend himself in
these prison disciplinary records?  Let me ask you this:  Did
you review his disciplinary records?

A.   Yes, I have.

Q.   From those records does it indicate to you that he was

Hyde – Cross                        1075

working with people when he got disciplinary records?

A.  On some of them, yes.

Q.  Isn't that an indication that he's able to understand what he's charged with and make a determination of what the facts are to help a person who is then going to defend him in these disciplinary records?

A.  Like I said before, I think he can make very, very simple decisions.  I think when you get into complex or protracted proceedings, due to his cognitive disability, his working memory deficits, his impulsivity, his fluctuating mood and his inattention, he's incompetent.

Q.  Those four, four-and-a-half hours with you was he able to sit there than a talk with you?

A.  Yes, he was.

Q.  And you asked him questions about his family?

A.  Yes, I did.

Q.  You asked him questions about his, get my notes, his childhood?

A.  Yes.

Q.  You asked him about his behavior as a child growing up.

A.  Yes.

Q.  You asked him about his social abilities during that time frame.

A.  Yes.

Q.  You asked him about his psychological issues during that

Hyde – Cross                                                    1076

time frame.

A.  Yes.

Q.  You asked him about his substance abuse and his educational history during that time.

A.  Yes.

Q.  And he was able to recount all of that back to you, wasn't he, Dr. Hyde?

A.  In some limited ways.

Q.  But he was able to do it.

A.  In limited ways.

Q.  Isn't that an indication that's a person's brain who's able to function sufficiently to be competent?

A.  Within the context of those interactions.  And in the four-and-a-half hours I frequently had to repeat questions, reword questions, draw his attention back in and work with him very closely in order to get this information.

Q.  Same type problem I'm having with you understanding -- understanding things that you say to me, correct?

A.  I don't understand the question, sir.

Q.  Well, you told me I wasn't understanding you.

A.  I said that I should reword things because you repeated the question so I don't think you understood the answer.

Q.  So I was having that same issue with you that Brandon had when he was not understanding some of the questions you were asking him.

Hyde - Cross                                    1077

A.   No.   I think that yours is more of a legal technique in order to manipulate the witness.

Q.   I don't -- I can never manipulate you Dr. Hyde.   I wouldn't even try.

A.   I wouldn't underestimate your intellectual ability, sir.

Q.   Thank you.   Now, when Dr. Frierson didn't find Mr. Basham to be bipolar you went into the discussion about it may have been because Brandon, Mr. Basham, didn't trust him but he trusted you, he gave you truer answers to tests than he gave Dr. Frierson.   Do you remember saying that?

A.   Yes, I do.

Q.   And that's based upon what?

A.   The fact that he did not make this diagnosis that had been made by multiple practitioners over the years and that Mr. Basham answered my questions in a way that gave me the information that was consistent with bipolar disorder.

Q.   But there are other doctors other Dr. Frierson who did not diagnosis him being bipolar, correct?

A.   Correct.

Q.   And these were doctors before and after when doctor -- were determined he was bipolar and another one found him not bipolar.

A.   Correct.

Q.   So Dr. Frierson just didn't come up with the theory or didn't find him not bipolar solely by himself.

Hyde – Cross                                    1078

A.   There are other practitioners that have not diagnosed him
with bipolar disorder.

Q.   And, in fact, if he was bipolar in and of itself does not
make him incompetent, does it, Dr. Hyde?

A.   No, it does not.

Q.   Because a person with bipolar can still be competent.

A.   They can, yes.

Q.   And a person who has ADHD also can be competent.

A.   Yes, they can.

Q.   Because even with his ADHD, in that West Virginia
proceeding he was able to answer the judge's questions
correctly, not with the help of a jailhouse lawyer.  He said
he had understood, he made a determination of what he wanted
to do.  Even with his ADHD he was able to stay focused for the
entire hour.  So simply because he had ADHD doesn't mean he's
incompetent.

A.   Well, he made several statements along the way that I
might disagree with, especially saying well, he paid attention
throughout the whole proceeding.  We don't know that.  Now,
certainly there was no jailhouse lawyer with him but there was
legal counsel with him.  What they were whispering in his ear,
what they are telling him, how they were redirecting him I
have no idea.  I have not seen the videotapes of -- of this.
But I think from my examination and the history that I
obtained and the record that I reviewed I sincerely doubt that

he was attending fully throughout those proceedings of the sentencing.

Q.  I may disagree with you.  I think having seen Rule 11 colloquies, judges pay very close attention to what the defendant is doing and not doing.  But, nevertheless, in the only -- the other report you cite in your report is Dr. Capehart and you disagree with him.

A.  Yes, I do.

Q.  And you read the testimony Dr. Brannon?

A.  Yes, I did.

Q.  He was a neurologist, too, wasn't he?

A.  Yes.

Q.  He didn't find any issues with Mr. Basham's competency, did he?

A.  No, he did not.

Q.  And he spent quite a few more hours with him than you did, correct?

A.  It's the quality of the time, not necessarily the quantity of the time, sir, that is of determinative value here.

Q.  You disagree with Dr. Brannon's report or determination?

A.  Yes, I do disagree with his determination.  Yes, sir.

Q.  And I think when Mr. Burke asked you a question you said he lacked the ability to assist his counsel and understand the proceedings and consider his decisions.

A.  Yes, sir.

Q.  But, again, his lawyers who were there with him would be in a better condition, better shape to make that determination.

A.  Not in my opinion.

Q.  Not in your opinion.

(There was a pause in the proceedings)

Q.  (MR. WITHERSPOON) Dr. Hyde, I want you to listen to a phone conversation between Mr. Basham and his mother while he's in prison, the way he's -- I want you to listen to it.

MR. WITHERSPOON:  Judge, I move Government's Exhibit number 252 into evidence.  I think there's no objection from the defense.

MR. BURKE:  Yes, your Honor.  It appears this CD is already an exhibit in trial, so we have no objection.  We have not listened to it or heard it, we do not have a copy of it.

THE COURT:  All right.  Admitted without objection.

MR. WITHERSPOON:  Could we play Government's Exhibit 252?

(Audio played)

Q.  (MR. WITHERSPOON) He's planning with his mother someone, third person, is going to call her and she's supposed to send him money.  Any indication that that person is incompetent, Dr. Hyde?

A.  I don't think that that is germane to demonstrating that he's competent.

Hyde - Cross                                        1081

Q.  But -- but he's planning, isn't he?

A.  He had some information that he's asking his mother for a way to get him some money.

Q.  That doesn't indicate a person who's functioning, who has the ability to function?

A.  Well, A, to get money to somebody is a very, very limited decision.  This is hardly a Wall Street scheme of complicated proportions.  Secondly, I have no idea if anybody helped him generate this idea about how he might get money, whether he came up with this on his own, if he said to somebody, for example, I wish I had more money and they said well, call your mom and have them call somebody to give it to you.

Q.  What about if Mr. Basham, if he wants to write to another inmate, sending a letter to that other inmate through a third person with a note to pass it on?  Isn't that -- doesn't that show functioning and ability and thinking and rationing?

A.  Only if you have the presumption that that was generated independently, without input from anybody else.

        (There was a pause in the proceedings)

Q.  (MR. WITHERSPOON) But you don't know if that's -- and all these things I've showed you, you are making a determination or an assumption that you don't know if Brandon did these himself or he had help, because you didn't interview him, you didn't ask questions and you didn't investigate these incidents, did you Dr. Hyde?

A.  I did not investigate these incidents.

MR. WITHERSPOON:  Your Honor, I think I have given the defense a number of incident reports from Terra Haute, Indiana for Mr. Basham and I move them into evidence now. They are Government's Exhibit number 249.

THE COURT:  Any objection?

MR. BURKE:  Yes, your Honor.  Just a point of clarification.  Mr. Witherspoon, I'm not sure, is this entire stack 249?

MR. WITHERSPOON:  No.

MR. BURKE:  Your Honor, we do object to the admission of these documents on foundation and hearsay.

THE COURT:  Tell me what they are again, Mr. Witherspoon.

MR. WITHERSPOON:  These are incident reports, Judge. And some of these incident reports contain statements from Mr. Basham concerning different disciplinary actions that he has or had including conferring with a staff counselor to help him devise a defense in these disciplinary actions.

THE COURT:  Well, they do contain statements of third parties who cannot be cross-examined but they might be a public record.  What about that, Mr. Burke?

MR. BURKE:  Your Honor, these were not -- these are not public records in the sense they are regularly kept public records.  These are something that they obtained through FOIA.

Hyde - Cross                                1083

And each document contains fact-specific information about alleged incidents that occurred.  Some of these documents are just charges created by unknown entities about monitoring phone calls.

We simply -- I can't possibly cross-examine -- I have no knowledge of the basis for these.  There's no foundation, your Honor, and they clearly are hearsay.  So if the government wants to lay the foundation and give me the opportunity to cross-examine these guards, these unknown guards who wrote these documents, then --

THE COURT:  If the government lays a foundation and they are public records they come in as a hearsay exception without having the guards to be cross-examined.

MR. BURKE:  But, your Honor, our position is these are not regularly kept public records.  These are fact-specific reports filled with facts specific to incidents.  So it is not something that is routinely kept by the Bureau of Prisons.

THE COURT:  Well, Mr. Witherspoon, the principal point you want to prove is that he was able to actually consult with and seek the advice of some staff workers there at the prison about these reports, about these incidents?

MR. WITHERSPOON:  Yes, sir.  I'm not saying he did or didn't do it.  That is -- but my thing is he was able -- a charge was made, he was able to consult with a staff member to

Hyde – Cross                                    1084

come up with a potential defense, to at least lay out his

position of the facts that happened in each one of those

incidents.

THE COURT:  How many are there?

MR. WITHERSPOON:  I only have four.

MR. BURKE:  Your Honor, Mr. Witherspoon could

certainly ask Dr. Hyde questions on a hypothetical basis on

these and I would have no objection to that.  But these

documents themselves it's our position do not meet the -- the

exception for being a public document and they are filled with

hearsay.

BY MR. WITHERSPOON:

Q.  Well, let me ask you questions, Dr. Hyde.  If he was

written up for incidents and he asked for a staff

representative to help him in defending his case would that be

an indication he's able to communicate and confer with the

staff representative to form a defense for these accusations?

A.  I would have to know the circumstances under which these

events occurred, I would have to interview him.  Did somebody

tell him, well, you can get some help with these.  Did one of

the guards, one of the social workers, one of the therapists

there say well, ask for somebody how to deal with these

issues.

I have no foundation, I have no knowledge of how these are

generated, circumstances under which they were generated, who

Hyde – Cross                                    1085

helped hem generate, were they self-generated or were they generated with information, input, and advice from other individuals.

Q.  And the reason you don't know that is because you didn't review them.

A.  I actually didn't just review them, I didn't see any notation in there about how these were generated.

Q.  You only reviewed them this morning, is that correct?

A.  Yes, sir.

Q.  After you made your evaluations or determination that he was incompetent.

A.  Correct.

Q.  Prior to that determination you never reviewed any of his disciplinary records for any records from the prison to say how he was functioning on a day-to-day basis, did you, Dr. Hyde?

A.  Only what he told me.

Q.  I'm sorry?

A.  Only what he told me.

Q.  Only what he told you.

A.  Yes.

Q.  And he trusted you so he told you everything.

A.  I wouldn't say he told me everything, but he told me a lot.

        THE COURT:  We don't have a ruling yet.  Are you

moving --

MR. WITHERSPOON:  I'll move away from them, Judge.

THE COURT:  I'm going to ask you, did your expert rely on these reports in giving his opinion?

MR. WITHERSPOON:  He did.

THE COURT:  We may have to come back to it later then.  All right.

Q.   (MR. WITHERSPOON) And simply because -- I think you said in the transcript from West Virginia you weren't sure if his lawyers had to redirect him, explain things to him twice. Simply because they would have to redirect him and explain things twice doesn't say that he's incompetent, does it, Dr. Hyde?

A.   No, that doesn't.

Q.   And these outbursts that he has, could it have been because he just did not want to listen to what was being said about him during those outbursts?

A.   That's possible, but it's less likely within the context of his overall neuropsychiatric picture.

Q.   According to you.

A.   Yes, sir.

MR. WITHERSPOON:  Beg the court's indulgence one second.

(There was a pause in the proceedings)

Q.   You said your neurological exam indicated he had this

closed brain injury, correct?

A.  By history, yes.

Q.  Did you know in 1991 he had a neurological exam that was normal?

A.  Yes.

Q.  You disagree with that?

A.  Yes.

Q.  And in 1994 he had a neurological exam and it was normal. Are you familiar with that?

A.  I'm familiar with it, yes.

Q.  And you disagree with it?

A.  I think I said in my report I don't know the background of these neurologists.  I do have a lot of experience with the neurological examinations that are usually performed. Unfortunately, in psychiatric hospitals it's one of the more cursory types of examinations that are usually performed, at least looking for very gross neurological deficits.

Q.  But you don't know that's the case because you didn't review it, correct?

A.  I did see one report, Dr. Desai's report.

Q.  And what year was that?

A.  Let me see if I can -- I don't recall the exact year.  It was sometime in his childhood or adolescence, and that was a very cursory report.  The types of report I typically see from psychiatric hospitals are usually not helpful and oftentimes

Hyde – Cross                                    1088

not formative or useful in these cases.

Q.   And in 1996 he had another neurological exam and it was normal.

A.   Correct.

Q.   And in 1998 he had another neurological exam and it was normal.

A.   Correct.

Q.   And in 1999 he had another neurological exam and it was normal.

A.   Correct.

Q.   And you disagree with all of those.

A.   Like I said before, I have not seen what exactly they did. My experience has been these are often cursory examinations done in extremely short time, five minutes, ten minute examinations, and they often do not look for anything subtle in the neurological examination, it's just looking for gross findings such as weakness on one side, hemiplegia, paralysis, something like that.

Q.   Wouldn't a person in your position review those reports prior to or after your own examination?

A.   I reviewed the reports of -- Dr. Capehart's report when he summarized those.

Q.   But all these other neurological exams you did not.

A.   The only one I saw the actual paperwork was Dr. Desai's examination.

Hyde - Cross                                    1089

Q.  But wouldn't that be something you would take into consideration, a person as an expert in your field, take into consideration when he or she is making a determination on neurological --

A.  The more information --

Q.  -- deficits?

A.  The more information you have the better, but it does not disqualify my opinion.

Q.  I'm sure nothing would.  One second.

        MR. BURKE:  Objection, your Honor.

Q.   (MR. WITHERSPOON) One final question.

        THE COURT:  All right.  Do you object to the last editorial comment?

        MR. BURKE:  Yes, your Honor.

        THE COURT:  All right.  Sustained.

Q.   (MR. WITHERSPOON) There is indication in the record that Brandon told one of the marshals that they weren't going to be in court long that day.  Did you review that in the record?

A.  Yes, sir, I heard that, yes.

Q.  And, in fact, when he got to court shortly thereafter there was an incident and he had to be taken out.

A.  Yes.

Q.  Doesn't that indicate that he understands what's going on and is able to make decisions?

A.  Not necessarily.

Hyde - Cross                                    1090

Q.   What does that indicate to you, Dr. Hyde?  I almost called you Dr. Frierson.

A.   Just don't call -- just don't call me late for dinner.

Q.   As you can see, I'm never late.

A.   Me neither.  I would say that he could have been in an very irritable mood, he could be very depressed and knew he was not going to be in good control of his faculties at that present time, but not being complex beyond that.

Q.   But he would know that I may not be in control of my faculties, which indicates he is in control of his faculties.

A.   No, he can say I'm feeling extremely irritable and I just don't know how I'm going to cope.

Q.   And I'm going to act up in court and get taken out.

A.   Well, he's telling you that he is feeling irritable and that he may not be able to control himself.

MR. WITHERSPOON:  Thank you, Dr. Hyde.  I hope you get back to Fort Lauderdale soon today, sir.

THE COURT:  Any redirect?

MR. BURKE:  Yes, your Honor.

REDIRECT EXAMINATION

BY MR. BURKE:

Q.   Dr. Hyde, Mr. Witherspoon mentioned the term numerous times during his cross-examination of you, he used the term functioning.  Is that a psychiatric term?

A.   There's a psychiatric context to functioning, and that is

called adaptive functioning.  That's one of the very important components of mental retardation.  It's also an assessment we make in people with organic brain damage, what is their functional ability.  It's something called GAF, global assessment of function that's part of the DSM.  And so it's hard to do a GAF on somebody who is incarcerated, particularly because it depends upon social employment, vocational activities.

So you have to do retrospective analysis of somebody's level of functioning, whether they hold gainful employment, what their interactions were with other people.  There's a cohort of questions and there's a cohort of information that has to be ascertained.  So functioning, I guess it's a long answer.  I'm sorry, I just should say yes, it has a psychiatric component.

Q.  Is functioning, though, equivalent or equal to the concept of competency?

A.  Well, I do think that functioning does play some role in competency because it is an indication of the person's ability to use their inherent cognitive parameters.

Q.  Okay.  Would Mr. Basham's ability to converse with prison employees about charges, disciplinary charges, against him preclude a finding that he was not competent to stand trial in a capital federal case?

A.  Because of the complexity of the issues, the length of the

Hyde – Redirect                                   1092

proceedings, the information that has to be held, used, and manipulated in a meaningful fashion, like I said before, somebody can be competent to choose between apple juice and orange juice but they may not be competent to execute a will, for example.  So people have varying levels of function, but just because you can do some simple tasks does not make you competent from a legal standpoint of assisting your attorney and meaningfully participating in legal proceedings that you are engaged in.

Q.  Mr. Witherspoon asked you about your comments about Mr. Basham's family and his possible genetic predisposition to mood disorders and other psychiatric conditions, and he asked you about the fact that you did not personally meet with any member of Mr. Basham's family.  Did you review any records that involved investigation or discussion about the Basham family and it history?

A.  Yes.  Unfortunately, I didn't bring my file with me, but there were a variety of documents discussing his family history and family background, as well as my interviews with Mr. Basham.  And there was internal consistency within those records and testimony and things like that.

Q.  Mr. Witherspoon asked you about Mr. Basham's IQ.  And you have been provided with IQ scores, correct?

A.  Yes, I have.

Q.  Have you been provided with any of the raw data behind

Hyde - Redirect                                   1093

those IQ scores?

A.  No, I have not.

Q.  So is it true that you would simply have to accept those numbers on face value?

A.  They are what they are.  We have the scoring.  As I said before, there are a number of neurological syndromes and neurological conditions where you will see, and psychiatric conditions, for that matter, where you see in childhood relatively normal IQ and then a fall in IQ as a person advances in age.  Especially if there are intervening processes.

Q.  Could a person's use of inhalants such as gasoline be an intervening process?

A.  Absolutely.

Q.  So that could explain a decline in a person's IQ over time.

A.  Absolutely.

Q.  Okay.  Mr. Witherspoon asked you some questions about Mr. Basham's guilty plea in his West Virginia case in which he pled guilty to the kidnapping and -- the kidnapping of Samantha Burns.  And he read to you statements that Mr. Basham made at that hearing, correct?

A.  Yes, he did.

Q.  Okay.  Would you agree with me that most of Mr. Basham's statements to the court that day were one or two word

Hyde – Redirect                                    1094

statements, yes, no?

A.   That's what I was shown by Mr. Witherspoon.

Q.   Okay.  When a criminal defendant pleads guilty he's usually required to give what's called a factual basis for his guilty plea.  Would it be significant to you to know that in Mr. Basham's case his lawyer gave the factual basis for the court rather than Mr. Basham doing it himself?

A.   Given Mr. Basham's cognitive limitations I would expect that that would have happened.

Q.   Is a defendant who is capable of understanding when told by a lawyer if you plead guilty you won't get a death sentence, you will get a life sentence, is such a person necessarily competent if they can understand the benefit of such a deal?

A.   They can understand that and for that simple decision there is some competency.  But it has to be placed in the larger context of the entire proceedings, not just one question.  One question does not determine competency, one decision does not determine competency.  One has to look at the overall landscape of the person's neuropsychiatric condition, their overall intellect, their particularly deficits on testing, such as working memory deficits.  These are objective measurements, these are not assessments by lay personnel like lawyers, as talented as lawyers are.

    We have knowledge.  If he functions in the impaired range

Hyde - Redirect                                    1095

we have etiological clues as to why he is functioning in the impaired range.  This is not trivial impairment, this is significant impairment.  This is a brain damaged individual. To look at him in any other way than being brain damaged in my opinion is not examining the full facts of this case.

Q.  And let me ask you, Dr. Hyde, Mr. Witherspoon asked you about your disagreement with other mental health professionals who have been involved in this case on some of your diagnoses. But don't all the mental health experts who opined in this case agree that Mr. Basham has cognitive disorders?

A.  Every one that I saw.

Q.  With regard to your diagnosis of bipolar disorder with regard to Mr. Basham, did you review the findings and reports of psychiatrists who evaluated Mr. Basham when he was in facilities in Kentucky as a child?

A.  I reviewed some the those reports, yes.  Rivendell, I believe it was.

Q.  Would it affect your decision whether to rely on those reports if those reports were made in the context of a patient who has been in treatment, in a treatment facility for a significant period of time and never been observed by mental health professionals?

A.  I'm sorry, I don't understand.

Q.  Some of these diagnoses of bipolar disorder Mr. Basham received is when he was in inpatient care facilities in

Hyde - Redirect                          1096

Kentucky, group homes, a whole variety of them, where he had been for an extended period of time, either weeks or months, in which the staff and the doctors were able to observe him. And those doctors made a diagnosis of bipolar disorder.  Would you be more likely to give that more weight?

A.  I think that is a very good clinical paradigm to making a proper diagnosis.  It's a useful observation, it's useful material.

Q.  Mr. Witherspoon asked you about whether a defendant -- again you were asked multiple times about functioning, functioning, functioning, functioning.  Would you agree, can Mr. Basham function in some settings, whatever functioning means?

A.  In a limited context, yes.

Q.  The fact that he may have given a letter to a third person to be sent on to the intended recipient, does that change your opinion about Mr. Basham's competence to stand trial for federal capital kidnapping and carjacking?

A.  Does not change my opinion.

Q.  Do you remember grade school?

A.  Yes.

Q.  Did you ever pass a note?

A.  Absolutely.

Q.  Did you ask somebody who sat in front you to pass it to the person in front?

Hyde - Redirect                                    1097

A.   And got in trouble many times.

Q.   That's a sign you are a manipulative genius, was it?

A.   Only my mother would say I'm a genius.  I haven't been called manipulative.

Q.   And, lastly, Dr. Hyde, you heard, and I heard for the first time, a telephone call between Mr. Basham and his deceased mother.  Was there anything that you heard in that telephone call that led you to change your opinion about his competence in this case?

A.   No.  In fact, it ratified a lot of my opinions.  He was sort of scattered, a little repetitive, got irritated with his mother at one point, she got irritated with him at one point.  It was just a -- not exactly a caliber of a conversation of great intellectual depth or cognitive planning.

          MR. BURKE:  Thank you, your Honor.  I have no further questions.

          THE COURT:  All right.  Are we finished with the witness?  Thank you, sir.  You may step down.

          THE WITNESS:  Thank you your Honor.

          THE COURT:  Let me ask one quick question before you go.  And don't -- obviously, I'm a political science major.  I've always been curious about the type questions you said you asked Mr. Basham about who was the president, can you do long division, what city and state are we located in.

          How do you gauge whether someone is malingering or

1098

faking answers to those type basic questions?

THE WITNESS:  Usually when people are malingering they just say I don't know to everything.  They don't do well on some and can't perform on others.  And they oftentimes have inconsistencies, they'll tell you one thing once and then you recheck and they'd do it again differently.  So you are looking for inconsistencies, you are looking for global patterns of people giving you answers or observed answers.  Somebody says what state are you in and they go I'm in Russia, obviously unless you are incredibly delusional nobody thinks they are in Russia.

And then usually people, and I've seen a lot of malingering in my time, have feigned or hysterical deficits, and those are the most common you see.  Amnesia, total amnesia, can't recognize anybody, fake paralysis of a limb and things like that.  He exhibited none of those findings on examination.  In fact, it was very straightforward for me and I thought there no time was I being played or manipulated by this individual.

THE COURT:  All right.  Thank you, sir.

THE WITNESS:  Thank you, your Honor.

THE COURT:  Anything further?  Thank you, sir, you are excused.

THE WITNESS:  Thank you, sir.

THE COURT:  All right.  What does our schedule look

1099

like for the rest of this hearing?  How many more witnesses do we have?

MR. BURKE:  Your Honor, it was our -- let me ask you first, let me ask, when we spoke on Saturday you weren't clear whether you were going to be calling Dr. Frierson.  I see him here so I assume you are going to call --

Then there will be two more witnesses, Dr. Frierson who is here today who will be called by the government.  The other witness, as you know, is Mr. Littlejohn.  And when I contacted Mr. Littlejohn it was my -- I really had no idea how long this hearing was going to go.  He was not available today and there was some question if he would be available tomorrow.  And so I had told him Wednesday morning would be the day that we would need him.

We have since spoken, and I know the government has attempted to reach him to see if he could change his schedule around.  I don't know if he will be able to or not.  So what we would ask, with the court's indulgence, is after Dr. Frierson is done if we can at least begin argument on most claims, and then if we're able to get Mr. Littlejohn early we certainly will, or otherwise at this point I know he has to be in Florence tomorrow in the afternoon, so if we can get ahold of him later on today we may be able --

THE COURT:  Two more witnesses.

MR. BURKE:  Two more witnesses.

1100

THE COURT:  And maybe Mr. Littlejohn may not be available until Wednesday.  If that's the case we'll figure on some argument on Tuesday.

MR. BURKE:  Yes, your Honor.

THE COURT:  That's fine with me.

MR. DALEY:  Your Honor, I don't know if you want to go to lunch here in a minute, but I did want to introduce Government's Exhibit 245, it's a stipulation that the parties have agreed to.

THE COURT:  All right.

MR. DALEY:  And I would like to publish it to you, your Honor, having had an appeal recently where the actual stipulation was lost and it was by good fortune that the stipulation was read into the record.

THE COURT:  All right.

MR. DALEY:  I would like to do that.

THE COURT:  All right.

MR. DALEY:  So Government's Exhibit 245, stipulation of the parties.  Counsel for the government and defendant Brandon Leon Basham stipulate to the following:  One, defendant Basham has claimed that his trial counsel were ineffective for failing to determine that juror Cynthia Wilson was allegedly untruthful in responses on her juror questionnaire.  Two, in his claim 27 defendant Basham claims that Juror Wilson was untruthful when she answered question 41

which reads, quote, Have you ever sued someone or been sued, end quote, to which she said quote, no, end quote.

Number three, defendant Basham contends that this response was untruthful, that this response was untruthful based upon two judgments filed against her in the Court of Common Pleas in Spartanburg County prior to her selection as a juror in this case.

Four, Government's Exhibits 184 and 185 are certified copies of these judgments.  Five, upon further research the parties agree and stipulate that these judgments are actually administrative tax liens that were filed by the South Carolina Department of Revenue in the Spartanburg County Clerk of Court's office.

And, six, the parties now agree and stipulate that these tax lien judgments were filed administratively by the South Carolina Department of Revenue without either the South Carolina Department of Revenue or juror Cynthia Wilson filing suit in the Court of Common Pleas in Spartanburg County.  And that's signed by me, Robert F. Daley, Jr., and Mr. Burke for Mr. Basham.

And obviously, your Honor, this relates to claim 27.  So I would just -- that saves us one witness having to come in, your Honor.

THE COURT:  Let's go ahead and start with Dr. Frierson, if we could, and go to 12:20.

MR. WITHERSPOON: Your Honor, I know the court's conscious about time, I am, too. I think by the time we got to 12:20 we'd really just be getting into it.

THE COURT: Suits me to stop now. I just was trying to maximize our time in Terra Haute. I don't know how long they will let the lawyer stay in the room out there.

MR. BURKE: Your Honor, Mr. Murray might have more information, but it's our understanding that the prison has indicated that even if Mr. Basham indicated that he wanted to come out this afternoon, unless he was willing to take a breathalyzer test they would not allow him. Is that correct, Mr. Murray?

MR. MURRAY: Yes. I just talked to Mr. Edwards. They said there are three conditions to see if he would come back. One, he has to be able to take and pass a breathalyzer, and willing. And, two, he has to say he wants to come here. And then, three, they have to be assured that they don't think there's a security problem. Mr. Edwards is going there now to check on what Mr. Basham's position is with respect to that, but they said if any one of those fails they will not bring him out.

THE COURT: All right. Well, you are going to stay there with us until at least after lunch?

MR. MURRAY: Yes.

MR. BURKE: Your Honor, I am confident that at least

1103

in my experience one of those three conditions is going to be met in this case and Mr. Basham will not be able to participate this afternoon.  And I hate to have Mr. Murray sit there throughout the lunch period, and if he leaves the prison --

THE COURT:  I'm fine with releasing him right now if that's what you want to do.  Mr. Murray, you are excused, you don't to sit there any longer.

MR. MURRAY:  Thank you, your Honor.

THE COURT:  Thank you for your help.  It's 12:00 o'clock.  You want to come back at say 1:15?  Is that enough time?  Let's say 1:20, an hour and 20 minutes.  We will start back at 1:20.  See you then.

(A recess transpired)

THE COURT:  All right.  Please call your next witness.

MR. WITHERSPOON:  Your Honor, the government calls Dr. Richard Frierson.

(Richard L. Frierson affirms to tell the truth)

DIRECT EXAMINATION

BY MR. WITHERSPOON:

Q.  Good afternoon, Dr. Frierson.

A.  Good afternoon.

Q.  There's a container there of water if you need anything. I would like to start out by getting some of your background

Frierson - Direct                           1104

information.  Can you tell us a little bit about your education?

A.  Yes.  I attended the University of South Carolina School of Music here in 1980 to '84.  I got a bachelor's degree in music.  I then went straight to medical school at University of South Carolina School of Medicine, which I achieved my medical doctorate in 1988.  I then completed four years of residency in general psychiatry at the William S. Hall Psychiatric Institute, followed by one year of a forensic psychiatry fellowship at the William S. Hall Psychiatric Institute.  And I am board certified by the American Board of Psychiatry and Neurology in the specialties of general psychiatry and forensic psychiatry.

MR. WITHERSPOON:  One second, your Honor.

(There was a pause in the proceedings)

MR. WITHERSPOON:  Your Honor, I have spoken with defense counsel, and but we will be moving Government's, Exhibit number 253 into evidence, which will be Dr. Frierson's CV in this case.  And I think that's without objection.

MS. STONE:  That's correct, your Honor.

THE COURT:  All right.  Admitted without objection.

BY MR. WITHERSPOON:

Q.  All right.  From 1988 to 1992, tell us what you were doing then.

A.  That would be my residency in psychiatry.

Frierson – Direct                              1105

Q.   And from 1992 to 1993 what were you doing?

A.   I was basically doing my fellowship in forensic psychiatry that year.

Q.   And to become a psychiatrist, what are the steps for a person after medical school to be board certified in psychiatry?

A.   In order to become board certified after medical school you have to undergo four years of rigorous training in the field of psychiatry at a training program that is accredited by the American Council of Graduate Medical Education, ACGME. If you graduate from an accredited residency you are eligible to sit and take the board certification examination which consists of, when I did it, a written test, if you pass the written test you then have to take an oral examination that involves actual interviewing patients, presenting them, and formulating a treatment plan in front of examiners.

Q.   And you completed all of that?

A.   Yes.

Q.   Now in '92, '93 you were a fellow in forensic psychiatry at the William S. Hall Psychiatric Institute.  Tell us a little bit about that.

A.   That is an entire year that is spent learning the interface between psychiatry and the legal system.  We learn, for example, how to perform competency to stand trial evaluations, how to perform evaluations about a person's

Frierson - Direct                                    1106

mental state at the time of their offense, whether they would be eligible for a defense of insanity. We also learn a variety of civil types of evaluations, how to evaluate somebody for competence to manage finances, for their testamentary capacity, for evaluating undue influence, for evaluating just about anything. Malpractice, look at standards of care, malpractice cases, anything on the civil side of things.

And then you spend a great deal of time studying law, studying what we call landmark cases in forensic psychiatry. The first case we do is Dusky versus U.S. which is very relevant to today's proceedings, but we study probably 120 landmark cases that you should become familiar with and have a working knowledge of.

Q. Now, since that time you have been in either a teaching position in psychiatry, correct?

A. Yes.

Q. In psychiatry. Tell us a little bit, since that fellowship in 1992, a little bit about your teaching and what you -- courses you taught, who you taught, and what issues were raised.

A. Well, early on in my career after I finished my fellowship I was actually hired by Hall Institute to stay on and run and develop an outpatient forensic evaluation service. Prior to that everybody who had a competency evaluation was admitted to

the hospital.  That is very expensive to do, so they were interested in developing an outpatient forensic service, which I helped develop.  And in that service I also taught general psychiatry residents and medical students who rotate through that were on their third year psychiatry rotation.  I did that up until probably 2003.

Now, in '99 I was asked by the university to become the director of the forensic psychiatry fellowships, so even though I was still employed by DMH I ran the fellowship, which trains people outside of residency.  After they have completed the four year residency it trains them in that extra year to become a forensic psychiatrist.

Q.  And you are doing that even until today?

A.  I am doing that way too long.  Yes, until today.

Q.  How many students do you think you trained since --

A.  Well, we take, as far as fellows in forensic psychiatry, these are people that spent an entire year with me after their residency, we take two a year.  So 20, 25 that I work with for an entire year.  Am I doing the math right?  Yeah.  Yeah, 20, 25 people, somewhere in there.  And then I still train medical students and residents.

Q.  And today you are still a full professor of clinical psychiatry at the USC Medical School?

A.  Yes, I am professor of clinical psychiatry and vice chair of the department of neuropsychiatry and behavioral science.

Frierson - Direct                              1108

Q.  What professional appointments have you had and tell me a little bit about that.  First, in 2006 you were invited to be a faculty at the National Habeas Institute.  What is that?

A.  Yes.  It was actually to assist defense attorneys who are involved in capital litigation involved in defending people who are on death row trying to get their appeals overturned, their cases overturned on appeal.  So I did that in 2006.  I did a lot of work, because we had the National Advocacy Center here in Columbia for so long with the National College of District Attorneys, going all over the country training prosecutors in state level -- at the state level about mental illness and legal issues that relate to mentally ill defendants.

Q.  So it sounds like you have been an asset for both prosecutor and defense attorneys in this area of psychiatry.

A.  Yeah, I made myself available to both sides.

Q.  What board certifications do you have?

A.  I'm board certified in psychiatry and I'm board certified in forensic psychiatry.

Q.  And who -- what is the name of the -- the organization that certifies you in psychiatry?

A.  The American Board of Psychiatry and Neurology.

Q.  Okay.  And the name of the board that -- and it's also who certifies you in forensic psychiatry, too, isn't it?

A.  Yes.  Separate exam.

Frierson - Direct                    1109

Q.   And during some of that time did you perform -- were you an examiner for oral examinations and other forensic psychiatrists?

A.   Yes.  I traveled the country to 30 separate exams and examined people who were trying to become board certified.

Q.   Now, this is not your first time testifying in federal court, is it?

A.   It's my second.

Q.   Second.  The first time you were qualified as an expert in forensic psychiatry in 2001 in the federal court here in South Carolina, correct?

A.   Yes.  We were in a different courthouse then.

Q.   And the issue was what in that case, Dr. Frierson?

A.   Competency to stand trial.

Q.   And how -- what was your opinion in that case?

A.   It was my opinion that the defendant in that case was not competent to stand trial.

Q.   Have you been involved in any evaluations to determine competency, the competency to withdraw death penalty appeals?

A.   Yes.

Q.   Tell us a little bit about that.

A.   Well, in South Carolina the -- there's a state Supreme Court decision that equates competency to withdraw appeals to competency to be executed.  I mean, they declare it's one and the same.  So when we have had capital inmates want to

Frierson - Direct                          1110

withdraw their appeals and go ahead and be executed the court responds by issuing an order for competency to be executed. And I've probably performed a handful of those, maybe four or five.

Q.  And since 1992 can you give us a rough estimate of the number of times you have provided psychiatric testimony in any courts in the United States?

A.  It's well over 200 times.

Q.  And during that time how many times have you been ordered -- how many times have you done court-ordered competency to stand trial or criminal responsibility evaluations?

A.  How many of those have I done?

Q.  Yes, sir.

A.  Goodness.

Q.  I'll look at your resume --

A.  Probably well over -- and I think 1998 was -- I know I did 300.  Normally I'm doing about a hundred a year, so it's probably 1,500 to 2,000.

Q.  Your resume says 2,000, so that's about right.  Now, during that time, during this time, Dr. Frierson, you -- have you published a number of articles, peer reviewed articles in the field of psychiatry?

A.  Yes.

Q.  I want to ask you about a couple of them in particular.

Frierson - Direct                    1111

The study with R.G. Dwyer, The Presence of Low IQ in Mental Retardation Among Murder Defendants Referred to Pretrial Evaluation. When was that?

A. That study, that was actually sort of a sub-study of a larger study that we did. Basically we collected information on 270 consecutive defendants referred to the South Carolina Department of Mental Health for either competency or criminal responsibility evaluation, or both. And we looked at those who had an IQ below 70 and we compared those who received a diagnosis of mental retardation with those who did not receive a diagnosis of mental retardation to look at the differences, what led to them being tagged as with mental retardation.

Q. And on a follow-up to that one was one with Dr. Finkenbine F-I-N-K-E-N-B-I-N-E, The Psychiatric and Neurological Characteristics of Murder Defendants Referred for Pretrial Evaluation. That's a comparable, a sister --

A. That was the defense study. That was all 270, whether they had mental retardation or not. All of those defendants at the time had EEGs, MRI scans, complete neurological evaluation by a neurologist, psychiatric -- psychological testing including IQ measurements. And we took this on every murder defendant for years and years at the Department of Mental Health. And it's no longer done, for monetary reasons. That's expensive. They were stopping it around the time that we wrote the study and I just felt look, we have this wealth

of data that we can go back and pull and see what it shows as far as these individuals and their impairments.

Q.  I may have already asked you this, but if I have please forgive me, you are a member of the Committee for Examination in the Subspecialty of Forensic Psychiatry, right?

A.  I was for eight years.  It was an eight-year term limit. That's where you -- there's ten people on that committee, we write the exam that people take, the written exam in forensic psychiatry.  I'm serving on the committee that's doing the test for general psychiatry, so I'm writing questions every year.

MR. WITHERSPOON:  Your Honor, at this time we move Dr. Frierson in as an expert in forensic psychiatry.

MS. STONE:  No objection.

THE COURT:  All right.  Without objection you may proceed.

Q.  (MR. WITHERSPOON) Now, Dr. Frierson, can you give us a rough estimate of the number of times you have testified in competency cases?

A.  I think that I've appeared in court approximately 200 times.  The majority of those have been for competency, some of them were for criminal responsibility.  So I would say well over 150 for competency alone.

Q.  Now, when you testify, I think it's South Carolina has a rule when there's an issue that they hire someone to come in

Frierson - Direct                          1113

and make a determination on a competency, is that correct?  I may be stating it wrong, so explain what that is.

A.   The way it works in South Carolina is the Department of Mental Health, which is a state agency, provides the service for the courts throughout the state, Circuit Courts all over South Carolina.  So if they needed an evaluation the judge issues an order, it's a court ordered evaluation.  So we work for basically the court, but the court, DMH just offers it as a service and they bring the person and we evaluate them.

Q.   And after your examination are you sometimes called by both the state and the government and the defendant to testify based upon your examination?

A.   I'm usually called by whoever likes my opinion, if I am called.

Q.   Does that mean sometimes defendants like your opinion?

A.   Yes.

Q.   And, in fact, in a number of cases you have testified that a defendant was incompetent, correct?

A.   Yes.

Q.   For instance, State versus Brigid Williams, you found her incompetent.

A.   Yes.

Q.   State versus Lester Simmons, you found him incompetent.

A.   Yes.

Q.   State versus Brand, you found him, B-R-A-N-D, so State

Frierson - Direct                              1114

versus Joseph Brand, you found him incompetent?

A.   Yes.

Q.   State versus Lester Simmons, you found him incompetent.

A.   I found him incompetent twice.  You mentioned him already.

Q.   Oh, okay.  And, in fact, who is Donald Jones?  Were you involved in determination of competency of Donald Jones?

A.   Donald Jones is currently a death row inmate in South Carolina.  I have evaluated him at least twice, both times court ordered, both times I rendered an opinion that he, in my opinion, is not competent to be executed.

Q.   Now I want to turn your attention a little bit to Mr. Basham.  You were asked to give, render an opinion about Mr. Basham, correct?

A.   Yes.

        MR. WITHERSPOON:  Your Honor, at this time I move Government's Exhibit number 251, which is Dr. Frierson' report, into evidence without objection.

        THE COURT:  All right.  Without objection, admitted.

Q.    (MR. WITHERSPOON) Do you have a copy of your report there with you?

A.   Yes.

Q.   Okay.  Turn to page two.  Page two, three, and part of page four.  You reviewed a number of documents prior to and after meeting with Mr. Basham, correct?

A.   Yes.

Q.   Why would you review all of those documents, Dr. Frierson?

A.   Well, they have relevance to the questions that I have been asked to provide opinions for.  Namely, Mr. Basham's competence to proceed with his petition for collateral relief, his competence to be executed, and his competence to stand trial at the time of his 2004 death penalty trial.

Q.   Are these documents that give you some insight to what type questioning, what to be looking for when -- during your examination of Mr. Basham?

A.   Yes.  I want to make sure I know something about him before I see him so that I will know what might be specific areas that I need to ask him in-depth about.  For example, I knew going in that he had had IQ testing over the years that had declined.  I think it's important that I knew that before I went and met with him.  Because we were asked to look at competency at the time of the trial I thought it was important to know something about what happened at trial and also what his attorneys thought of working with him.

Q.   And so you reviewed the trial transcript?

A.   I didn't review the entire trial transcript.  I did review the transcript of all the experts that had testified about his mental state.  I believe that was Dr. Schwartz-Watts, Dr. Brannon, Dr. Brawley, Dr. Capehart and a social worker who provided mitigation testimony, Vogelsburg, I believe is her name.  I reviewed all of those because they had to do with his

mental state, people talking about his mental state.  I reviewed any medical records where he had gotten some psychiatric treatment.

Q.  And you know -- you were here in early October when we began these 2255 proceedings, correct?

A.  Yes.

Q.  And you understand his lawyers, a number of people testified during that first part of the proceedings.

A.  Yes.

Q.  Did you review those records, transcripts of those hearings?

A.  I reviewed the transcript of the testimony of Mr. Monckton, Mr. Harris, and Mr. Swerling.

Q.  Swerling.

A.  Swerling.

Q.  Why would you review those transcripts, Dr. Frierson?

A.  Because they worked with Mr. Basham at trial.  Normally, ideally when you are doing a competency evaluation you do it before the trial, not eight years later.  And so normally we don't have that type of record.  But because we were doing it after the fact it would be important for me to know what were the experiences like of his attorneys in working with him.

Q.  Now, I think at some point you reviewed some disciplinary records on Mr. Basham at the prison, correct?

A.  Yes.

MR. WITHERSPOON:  Beg the court's indulgence.

(There was a pause in the proceedings)

Q.  (MR. WITHERSPOON) Do you have your booklet with you?

A.  I do.

Q.  Did you review an incident report number 1385598 on or about September 26, 2005?

A.  What was the date?

Q.  September 26, 2005.

A.  Yes.

Q.  And did you review an incident report number 1641796 on August 16 of 2007?

A.  Yes.

Q.  Did you review incident report number 1610042?

A.  Yes.

Q.  Did you review incident report number 2008149 on or about April 27, 2010?

A.  Yes.

Q.  And do these reports help you in making a determination about competency for Mr. Basham?

A.  They assist and they provide a data point that I utilize in noting how he is able to respond with assistance to his disciplinary infractions for which he is charged in defending himself.

Q.  What do you mean by that, Dr. Frierson?

A.  For example, let me just give you a good example.  There

Frierson - Direct                    1118

was one incident where he was accused of having tobacco products or not, giving tobacco back to a chaplain who had given it to him for the purposes of some sort of religious ceremony.  I don't understand it, quite frankly, but apparently they smoke a peace pipe and it's Native American, and he was accused of holding onto tobacco that he was supposed to have turned in.

Q.  Now, let me stop you there.  So he went through a religious service, so he's able to understand what's going on in this religious service, presumably.

A.  I didn't ask him so I don't know.

Q.  So what about that incident formulated any part of your opinion about his competency?

A.  Well, there's a form that someone fills out that asks do you have anybody that you want to call as a witness at a hearing related to this allegation, and do you want the assistance of counsel to represent you?  He indicated that he did want the assistance of counsel and at one point had indicated that he would like two people to be called as potential witnesses who had seen what had happened.

And then there is a document dated June 17th, 2007 that is described as a statement for unit discipline committee.  And it's signed or typed signed Basham with his inmate number. Now, whether or not he created this document is irrelevant to me.  The fact that this document exists and eloquently gives

Frierson – Direct                            1119

specifics of actually what happened with the tobacco is relevant. That somehow, whether even if Mr. Basham did not do it, he was able to get his version of events outlined in a logical, coherent-type statement to give to the disciplinary committee, which speaks to me of his ability to obtain defense for himself in the prison system.

Q. And that helps help you in your determination of competency?

A. Yes. Because he has to provide specifics about what actually happened that led to his charge. And he was able to do that to whoever prepared this document. I am not guilty of the charges. The tobacco was provided for me for smoking by the chaplain. I did return the leftover tobacco to him as indicated in the incident report. The only question is how promptly I did so. So he's able to -- I never left the area with the ceremonial pipe, the service was taking place. He's able to provide a very detailed account of what actually happened.

Q. Now, report number 1385598 is an incident report that deals with Mr. Basham contacting a David Hammer person through a third person. Do you remember that?

A. That's the first one that I read.

Q. Can you tell us about that report, sir?

A. Well, David Hammer is another death row inmate and apparently Mr. Hammer and Mr. Basham are at least

acquaintances.  At one time he called him a friend, but he clarified that there are no friends on death row.  But he is not -- and Mr. Hammer at the time of this incident had been transferred to another facility, I'm thinking Springfield, Missouri, which is the other federal medical center, is my understanding.  And it is not allowed for death row inmates to mail each other.  And Mr. Basham had mailed a letter through a third party to Mr. Hammer, knowing that the third party could send it to Mr. Hammer without the prison officials knowing about it.

Q.  Now, when Dr. Hyde was asked about -- that I think Mr. Burke asked him did you send a note to a classmate when you were in elementary school.  Is there a difference between sending a note through another person in elementary school and what Mr. Basham did in this case?

A.  Yes.  I mean, this involves actually correctly labeling a U.S. mailing address to get it to the person, it involves knowing who the person is that you could trust that you might be able to get him to send the letter on to Mr. Hammer.  I think this involves a little bit more planning and execution than just passing a note in class in third grade.

Q.  And in one report, number 1641796, there was an incident where Mr. Basham was using the telephone illegally and he was aware of it.  Do you remember that?

A.  Yes.

Q.   What was that -- tell us a little bit about that, if you can remember.

A.   He was using a telephone that is designed for legal consultation, to call attorneys, it's called the legal line, he was using it to call sex lines, sex talk lines to talk to women.

Q.   And was he aware that his phone calls were being listened to?  Was there a discussion about that on the phone, about him not being able to use it for a particular -- on a particular day?

A.   I don't recall without looking at the incident report the specifics of that.  I mean, during a period of time he completed, attempted to complete or completed, 27 calls from the legal line during a period of time between August 16th, I believe, and the 31st.  This was eventually discovered and I think he lost privileges.

Q.   Did that indicate anything to you about his ability to rationally understand what's going on?

A.   Well, it indicates to me his ability to scheme to get certain wants that he -- and desires met on his part.

Q.   Let me take that back from you.

       MR. WITHERSPOON:  Your Honor, at this time I move in Government's Exhibit number 249.  There's four reports.  I do have all the reports, I've given the defense these four plus the rest of them.  I'm only moving to introduce these four.

Frierson - Direct                              1122

THE COURT:  These are the incident reports from prison?

MR. WITHERSPOON:  Correct.  That he testified that he reviewed and was used in making a determination about competency.

MS. STONE:  Your Honor, we don't object to the reports for the limited purpose Dr. Frierson relied on them.  And accepting Mr. Basham was writing this report we do object to the truth of the matter asserted in those reports.

THE COURT:  That's the gray area that the rules of evidence kind of leave up in the air.  An expert can base an opinion on evidence otherwise inadmissible as long as it is the type of evidence that that expert normally relies upon in the field.  And the rule goes on to say that the underlying data itself is, if it falls under a hearsay problem or something such as that, is not admissible unless it passes the reverse 403 balancing.  That's where we are right now, does it pass reverse 403 balancing.

Mr. Witherspoon, I'm just not too sure how terribly important it is.  You got in the fact your expert relied on this information to form his opinion.  I'm going to sustain the objection.  And just, you know, he used it to form his opinion, I think that's sufficient.  I'll sustain the objection to the underlying incident reports.

MS. STONE:  Thank you, your Honor.

Frierson - Direct                          1123

MR. WITHERSPOON:  Make sure -- I don't think she objected to them being introduced as something he relied upon, but they --

THE COURT:  All right.  Is that your understanding then, they can be part of the record to show what he relied upon?

MS. STONE:  Yes, your Honor.  I don't -- I agree that they are listed in his report and he relied on them.

THE COURT:  With that understanding then they are admitted.

BY MR. WITHERSPOON:

Q.  Now let's turn, Dr. Hyde, to your examination of Mr. Basham.

A.  Dr. Frierson.

Q.  I told you -- I apologize.  Let me do this right now.  I knew that was going to happen.  I told Dr. Hyde I was going to do it, I'm doing it again.

Dr. Frierson, let's turn to your examination of Mr. Basham.  When did you visit with Mr. Basham?

A.  I visited him in November, on the 15th and 16th.

Q.  And for how long did you interview Mr. Basham?

A.  Unfortunately, on the 15th I was only allowed to stay until 3:00 o'clock.  I thought I was going to be able to stay until 5:00, but -- so on the 15th it was one our hour and ten minutes.

Frierson - Direct                                     1124

Q.   On the 16th how long were you able to interview Mr. Basham?

A.   Four hours.

Q.   And where did this interview take place?

A.   This took place in a visiting area off of federal death row at the -- at the United States Penitentiary in Terra Haute, Indiana.

Q.   And you and Mr. Basham were there in the room together?

A.   Yes, it was a contact visit.

Q.   Contact visit.  All right.  Let's talk about your clinical information.  In your report you said -- say he's coy and cagey.  I'm looking at page four, last paragraph.

A.   Yes.

Q.   Explain to us, please, what you mean by coy and cagey.

A.   Well, he appeared that way only in the way he reported his auditory hallucinations.

Q.   Tell us what you mean by auditory hallucinations.

A.   I asked him if he heard voices, because hearing voices can be a symptom of major mental illness.

Q.   Did he tell you he heard voices?

A.   He did.  But the way he told me that was what I thought was both coy and cagey.

Q.   Tell us about that.

A.   Well, it's almost easier to almost imitate it.  I asked him do you ever hear things, voices or anything talking to you

Frierson - Direct                    1125

when -- and no one else is there?  And then he was silent for a while.  And then he's like well, are you going to write this down?  Well, I didn't tell the other doctors this, but yeah, I do hear some.  And then he turned his head to the side and started speaking as if he was speaking to someone who wasn't there, as if he were having a conversation with voices that he heard.

So we get in the interview and this behavior doesn't happen until I ask about it.  And then he described the voices in a manner that is not typical for mental illness, for people with genuine hallucinations.  He says they're continuous, they are from inside his head, they -- his mother tells him nice things like she loves him, and he hears the voice of Tommy, who is a person he states sexually abused him when he was six years old.  But Tommy tells him to move a bar of soap to one place and then move it back, and move it back again and move it back.  And I have never had a mentally ill person in my history of being a psychiatrist who said they heard voices telling them to move objects one place or another repeatedly.  So that's just not typical of genuine auditory hallucinations.  And it mirrors what has been observed by the psychology staff at Terra Haute as reflected in their medical records, on occasion.

Q.  And were you able to cause these -- him to act this way at a particular time?

Frierson - Direct                          1126

A.   Yes.  It became clear there was a pattern.  Whenever I

mentioned his mother or Tommy, the guy who sexually abused

him, he would turn and start talking all of a sudden.  It was

very dramatic and very sudden.  And then I'd just be quiet for

a minute and he would jerk his head back around and say, what

did you say?  So --

Q.   And I think you asked him about any delusional thinking?

A.   Yeah.

Q.   Did he tell you about a delusional thinking that he had?

A.   No, he denied -- he did not report anything that I thought

it was delusional.  The statement I ask is do you have any

unusual thoughts that other people don't believe or don't seem

to share.  Because frequently paranoid people will say well,

they're poisoning my food or something.  He said to me that,

once again, it sort of relates to native American things.

Q.   Look on page five of your report.

A.   You are looking on what page?

Q.   Page five, first paragraph at the end.

A.   Oh, yes.  He said he believes that the world is eventually

going to come to an end and that the human race has been very

destructive.  He was referring to the earth.  He states we

destroyed the ozone, we take from the earth.  The natives,

meaning the Native Americans, gave back to the earth and we

give nothing.  I did not consider that delusional.

Q.   Now, you did a psychiatric history of Mr. Basham, correct?

A.  Yes.

Q.  You asked him questions about hospitals and facilities where he had been treated?

A.  Yes.

Q.  Was he able to recount to you his history?  And how accurate was that history?

A.  He did an adequate job telling me all of the hospitals that he had been in that he remembered.  Now, if you had been in as many facilities as a child as Mr. Basham was I don't know that I would be able to name them all in order and correct order.  But he was able, and it was funny because one of them he called Carrot Toss, and I'm like what the hell's that?  And, you know, I said "Carrot Toss" and it's actually C-A-R-I-T-I-S, which is a spelling you might say Caritis or Carrot Toss or -- anyway.

But he was able to name that, Charter Louisville, Charter Evansville, Rice Otterman, Methodist Home, others, Western State Hospital.  So he was able to give me the names of the hospitals where he had been placed.  And it was my opinion that if he can tell me those things he could provide that information to an attorney, which would be of importance so the attorney could obtain those records.

Q.  And, in fact, we provided you the records from those hospitals, correct, because you reviewed those records?

A.  I did.  They are not full records but they are discharge

Frierson - Direct                          1128

summaries and that sort of thing from those hospitals.

Q.  Now let's turn to your diagnosis of Mr. Basham.  What was your diagnosis of Mr. Basham?

A.  Well, there are several.  The first diagnosis I assigned was attention deficit hyperactivity disorder.  This disorder has been long-standing and is well-documented in records from his childhood and adolescence.  The symptoms of the disorder are well described in the records, so I had no doubt that he likely has attention deficit hyperactivity disorder.  He was fidgety at times during my evaluation, he was distracted at times by extraneous sounds outside of the room.  He would look around.  He was easily redirectable.  But I diagnosed attention deficit hyperactivity disorder.

The second diagnosis I assigned was cognitive disorder, not otherwise specified.  In looking at Mr. Basham's IQs they have declined for the most part over time.  There have been some few places where they got better, but overall there's been a significant decline in his measured intelligence.  He had an IQ of over a hundred when he was very young and by the time trial came around it was measured either by the defense expert at 68 or by the government's expert at 75.  But, be that as it may, there has been a significant decline.

And I don't think that's happenstance.  I wanted the court to be aware that that had occurred.  It's my opinion it's likely the result of his longstanding use of illicit

substances.  However, even though his measured IQ has gone down significantly there is not sufficient evidence that his daily functioning has declined.

Q.  Let me stop you there.  Because I used that word with Dr. Hyde, functioning, and Mr. Burke wanted to say that -- what is daily functioning?

A.  I mean, his ability to manage his things that he has to do to survive in incarcerated situations.  His ability to obtain canteen items, to maintain his hygiene, to get his basic needs met, to interact with attorneys, to do the things that people do in their everyday lives.  It's of course harder to assess functioning when you're incarcerated.  You are not going to be out having a job, you know.  But his functioning does not appear any different now on death row than it did pretrial.

Q.  And is that an indication about competency?

A.  Well, it's an indication that his overall functioning on a daily basis, his ability to do the things that he needs to do to survive as a human being is -- does not appear any different even though he's had this decline in his IQ, which I think is noteworthy and I think the court should be aware of.

Q.  And that would mean if he needs to be conferring with his attorneys?

A.  Yeah.  That's like getting his defense done when he's got disciplinary charges, doing the things -- he mentioned having access to a law library or the computer.

Frierson - Direct                          1130

Q.  You also found him malingering?

A.  That was for the hallucinations, I diagnosed malingering and psychotic systems.  It had been the impression of -- first of all, he's not mentioned this to Dr. Hyde or Dr. Parker, who I believe was the court's expert.  He denied hallucinations to them and then he tells them to me, but then he does them in such a dramatic fashion in such a manner atypical of what you hear from genuinely mentally ill people who have had genuine hallucinations that I believe them to be feigned.

Q.  You also mentioned alcohol abuse.

A.  Yes.  He has continued to use alcohol in the United States Penitentiary.  He has been caught with it on numerous occasions.  He has had large -- relatively large blood alcohol levels measured.  And he knows that there are consequences for when he gets caught with alcohol, and his continued use despite the knowledge that there are potential adverse consequences would meet the diagnostic criteria for alcohol abuse.

Q.  And I think you also diagnosed him with being cannabis and cocaine dependent in a controlled environment.

A.  Yeah.  And you left out inhalant.

Q.  Okay.

A.  Inhalant dependence I put in full sustained remission because he quit on his own, he says, in adolescence.  He sort of got burned out on huffing so he hasn't used, even though

Frierson - Direct                    1131

periods of time when he was not incarcerated.  He was smoking cannabis and using cocaine, specifically crack cocaine, up until his arrest on the current charges for which he is serving his sentence.  And he said he was addicted to them, he used more than he intended, he could use at one point up to $800 of cocaine a day, which is a pretty significant amount, which would indicate tolerance to the affects of cocaine.  For that reason he would meet diagnostic criteria for dependence of those substances, meaning he was addicted.  But on assigning in a controlled environment as a specifier to reflect the fact he's incarcerated and hopefully does not have access to those substances.

Q.  And you also diagnosed him with learning disorder?

A.  Yes, I did learning disorder, but you notice I put by history.  That's because very early on when he had his first IQ measured in the hundreds his achievement tests were remarkably low for that IQ.  That is a typical pattern that you see in a learning disorder.  And they assigned diagnosis of learning disorder at that time.

What is not clear to me is how much his behavior and inability to control himself in the classroom might have led to the lower achievement scores, given his IQ.

Q.  And, in fact, you asked him about not being able to control his -- or not being controlled in a classroom.  What did he tell you about that?

Frierson – Direct                          1132

A.  Basically he said that he was never disciplined at home and when he got in school there was all of a sudden rules and he didn't want to follow them.

Q.  He made a choice?

A.  Yes.  He wanted to sleep and he would find ways to either go home or get expelled.  He was expelled from three separate school districts by the age of ten.

Q.  Now, his vocabulary, was it expected of someone with an IQ in the range that he has?

A.  His IQ on my exam -- well, his vocabulary was better than his grammar, but he used some very sophisticated words that I found surprising for someone with an IQ of 68.

Q.  What were some of those words?

A.  "Naive."  We were discussing his relationship with another inmate, Mr. Hammer, and he had said they were friends on Friday the 15th when I saw him, and on the 16th I said you said you were friends with Mr. Hammer, and he goes oh, no, we're not really friends.  I'm not that naive to think you can have friends on death row.  You have acquaintances.  But I thought that was a pretty sophisticated use of that word.  And he also used the word "incriminating" many times and used it correctly.

        THE COURT:  Used the word what?

        THE WITNESS:  Incriminating.

Q.   (MR. WITHERSPOON) And on Axis II you found him antisocial

personality disorder?

A.   Yes.

Q.   What does that mean?

A.   That means that he has a lifelong pattern beginning prior to the age of 15 of failing to conform to social norms.  He repeatedly has performed acts that are grounds for arrest, incarceration.  He's been very manipulative in a variety of settings.  He's been very impulsive, he has a chronic disrespect for authority figures, he's engaged in assaults on correctional officers.  So it is my opinion that he would meet diagnostic criteria for antisocial personality disorder.

Q.   You mentioned manipulative.  Did he try to manipulate you or did he manipulate you?

A.   I think he successfully manipulated me.

Q.   Tell us about that.

A.   Well, when I say manipulated, he got me to decide to do something that I don't normally do.

Q.   Tell us what happened.

A.   On the 15th when I saw him for the first evaluation I told him that I'd be coming back the next day.  I wanted to sort of outline for him my plan so that he would be mentally prepared. He made several statements on the 15th to me, or several requests, that I bring quarters on the 16th.  Can you bring some change, some quarters tomorrow?  You can bring up to $20 worth of quarters in here.  And I said what for?  And he said

so we could have some snacks out of the machines.

And I initially said well, I'm not sure I will be able to do that. And he implied well, it is legal. And so he made sure on the 15th that the person who escorted me out of the prison at the end of that interview, he made sure that that guy told me in his presence that it was okay to bring quarters in. He said tell Dr. Frierson it's okay to bring change and quarters in so he can get stuff out of the machines. And the guy looked at me and goes yeah, that's certainly -- there's nothing wrong with doing that. I said do people normally do that, he said yes, it's pretty common the people who visit him do that.

Now, to be fair he never said I'm not going to talk to you if you don't bring quarters, if you don't bring snacks. I was wrestling the whole night what do I do, do you bring the quarters in? It's not something I would normally do, could this be seen as me coercing him to talk to me on the 16th or bribing him to talk to me on the 16th. But in the end I decided I'm in Rome, I've never been in a U.S.P. death row before, this is commonly what's done there, so I am being told, so I decided I would bring some quarters.

Q. And you did?

A. I did.

Q. You bought him some snacks?

A. Yes. I bought him two Mountain Dews in the course of four

hours and some packaged sugared donuts and a danish.

Q.   Now let's turn to your opinion regarding competency.  Dr. Frierson, in your opinion is it best to determine competency at the time of an incident or look back in this case eight years?

A.   It's clearly better to do it at the time of the incident.

Q.   And why is that?

A.   Because it's more reliable at the time.  If you are seeing someone where you can assess right at the time that they are required to do something if they are competent to do it.

Q.   What is your opinion as to whether or not Mr. Basham is competent, was competent at his trial in 2004?

A.   Well, keeping in mind that retrospective determinations are less reliable, I chose to do several things with Mr. Basham.  I chose, number one, to assess his current knowledge of the legal system, how court works, what the people do at court, how can he plead, what's a plea bargain.

Q.   Did he know the role of a judge?

A.   Yes.  He was able to tell me who his two attorneys were at trial, he was able to explain how unhappy with them that he was, he was able to explain that he wished he still had Cam Littlejohn and Mr. Monckton, who were two initial attorneys that I believe were disqualified for some reason.

Q.   Did he use those names?

A.   Yeah.

Q.   Cam Littlejohn and Mr. Monckton?

A.   He stated all four names of his trial attorneys on his own.  He could not give me the last name of his current attorneys, he just referred to them by first name.  He was able to tell me what the -- that you wanted him to get killed, that was the role of the U.S. District Attorney, he wanted him to be found guilty.  He understood the judge makes decisions in the courtroom, the jury sits and watched the trial.  He remembers to talking to the jury -- to his attorneys about picking the jury at the time of his trial, and but he reported that he really didn't care who they picked.  He was able to recall aspects of the jury foreman, that she got in trouble for contacting the media and that he felt his case should be -- sentence should be overturned because of that juror misconduct.  I understand that was an issue on his direct appeal.

     He was able to tell me he could plead guilty or not guilty, he understood the basic concepts that are involved in plea bargaining.  One thing he did not know, he did not realize that the jury's opinion had to be unanimous.  He thought that it could just be seven of the 12, it would be a majority.  Which I didn't find a bar overall to competency, because he was clearly able and told that it would have to be all 12.

     So I examined his current knowledge of how court

Frierson – Direct                         1137

proceedings work.  I also then looked at the trial transcript, because I was aware and I'd asked to be given particular transcripts of times when Mr. Basham did not appear to be doing well in court, where there were concerns during trial about potential competency issues, like assaulting the officers or appearing to fall asleep.  So I wanted to review those and I wanted to talk to him about those.

Q.  Did you talk to him about those?

A.  Yes.  He frequently said I didn't want to be in court many times, I didn't feel like I wanted to be there.  He complained that the attorneys, when he tried to help them and confer with them, that they wouldn't confer with him.

Q.  And particularly he gave -- related to you a specific incident in that case, correct?

A.  He indicated an incident which I thought demonstrated some significant trial-related abilities on his part.

Q.  Tell us about that incident.

A.  Well, it's sort of a convoluted story, but it begins with an incident that happened in the Alvin S. Glenn Detention Center.  Apparently he stated he had problems breathing with the flap on his cell door shut.  And I used the word claustrophobic in my report, he didn't use that word, so I don't want to suggest -- but he would feel short of breath.

So Dr. Morgan, the treating psychiatrist that had been hired by his defense attorney, had written an order for the

Frierson - Direct                          1138

flap on his door where they insert the food tray to be left open.  Well, some officer that he did not like would not allow that to happen and shut the flap.  And then Mr. Basham popped open the flap somehow, I don't know how he did that, but he got it back open.  And there was an officer setting there with the last name McMillan, and Mr. McMillan said, look, these other officers have been looking for an excuse to come in your cell and take you down and you've just given them one.  So they may be coming in there after you since you popped the food flap.  And he told this officer to -- said I told this officer step back so he didn't get hurt.

     At his trial in the sentencing phase he said the officer that brought everybody into his cell to take him down had testified at trial that he was one of the worst inmates they had ever had and he realized this made him look bad.  Then he said that I told Mr. Harris specifically, look, you need to call this Officer McMillan because he was there and saw what happened and knew that there an order for the flap to be open and knew that they were looking for a reason to come in after me.  And you need to call him as a rebuttal witness against Mr. -- the other, I forget the name, I want to say it was Bishop, but the other officer who was testifying in a manner that made him look bad.

     So this told me first that he indicates he is able to recognize significant harmful testimony when he hears it.

Frierson - Direct                    1139

Number two, he's able to understand how such negative testimony might be remediated with a rebuttal witness, that you can respond to it with a rebuttal witness, and, finally and importantly, it tells me that he realized the importance of letting his attorney know about this potential rebuttal witness.

Q.   And did he let his attorneys know about this rebuttal witness?

A.   He said he turned and told them that they needed to call Mr. McMillan and they shushed him, they told him shush.

Q.   And how did he feel after that point?

A.   He told them -- he told me he told them if you shush me again I'm going to knock you out of the chair.  And that the one time he tried to do something to be helpful to them all they did was shush him.

Q.   And I think the defense has indicated, you know, Mr. Basham was disruptive, falling asleep and other forms of disruption in the trial.  Is that any indication of competency, Dr. Frierson?

A.   It would depend on what's causing it.  So just because you are disruptive in court doesn't mean you are not competent. If you are psychotic and you have symptoms of mental illness, you're out of touch with reality, you're paranoid in a manner that's not based on reality about what's going on against you and you act out, that might be a sign of incompetency.  But

Frierson - Direct                    1140

he's able to discuss exactly what happened with the assault, which I actually watched, against the officers after he was -- at a point where he felt the judge had reneged on something that had been promised to him.  And that was to be able to use dip.

Q.  And he was upset?

A.  Yes.

Q.  And that's --

A.  He was mad and at that point when he felt that -- found out that wasn't going to happen he didn't want to be in court anymore.

MR. WITHERSPOON:  Beg the court's indulgence one second.

(There was a pause in the proceedings)

Q.   (MR. WITHERSPOON) Do you have an opinion, Dr. Frierson, to a reasonable degree of medical certainty, concerning Mr. Basham's competency at trial?

A.  My opinion, to a reasonable degree of medical certainty, is there's insufficient evidence from the record, from reading what his attorneys said, from looking at his current functioning and from listening to what he has to say about what happened at his trial, to believe that he would not have been competent at that time.

Q.  Do you have an opinion, Dr. Frierson, to a reasonable degree of medical certainty, concerning Mr. Basham's current

Frierson - Direct                    1141

competency?

A.   Yes.   It's my opinion that he is currently competent to proceed with his petition for collateral relief under 28 United States Code Section 2255.  He understands what's going on.  He doesn't understand a lot of the intricacies and legal maneuvering that his attorneys are undertaking under his behalf, and I doubt he has read through all these counts contained in the petition.  I don't know.  He understands reasons that he believes his case should be overturned and he would be able to communicate those with his current attorneys. I asked about the outburst when the judge put him on mute back in October?

Q.   Correct.

A.   You know, he's a frustrated individual with this process. Mr. Basham is somebody who does not like delayed gratification.  And he stated I wished they would either, and I hate to use this word, but this is a direct quote, need to either shit or get off the pot.

Q.   Did you ask him what he meant by that?

A.   I he asked him what you do mean by that?  Either they need to give me a new trial or go ahead and execute me.  He indicated that he's tired of coming to these proceedings, he's tired of listening to doctors talk about his mental health.

Q.   And how does he feel about doctors and lawyers talking about his upbringing?

Frierson - Direct                        1142

A.  He doesn't like that either.  He told me I lived that life, I lived that horrible childhood, I don't like to sit there listening to people talk about it.

(There was a pause in the proceedings)

MR. WITHERSPOON:  Thank you, Dr. Frierson.  Please answer any questions Miss Stone may have for you.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MS. STONE:

Q.  Good afternoon, Dr. Frierson.

A.  Good afternoon.

Q.  I want to jump right to your evaluation of Brandon Basham if that's okay.

A.  Sure.

Q.  It was just the two of you in the room for the evaluation?

A.  Other than when I was escorted in and out, yes.

Q.  Okay.  And it was a contact visit?

A.  Yes.

Q.  And you were not expecting a contact visit, is that correct?

A.  I wasn't.  Because I heard the testimony, I believe it was of Dr. Parker or else his report, that he did not have a contact visit.

Q.  And were there -- there were guards outside the door?

A.  Yes.

Q.  Otherwise was there much distraction going on outside of the room?

A.  You can occasionally hear noise, noises like moving door shutting, that kind of thing.

Q.  And it's a room with blank walls and a window?

A.  There was a window, that like if you are Mr. Basham and we're sitting across from each other at a table there's a window exactly like it's in the court door.

Q.  In the doorway?

A.  Well, next to the door.

Q.  And there's no phone or video screen in the room.

A.  No.

Q.  And you testified you met with Mr. Basham on two occasions, two consecutive days?

A.  Yes.

Q.  Your first visit was an hour?

A.  Hour and ten minutes.

Q.  An hour and ten minutes.  And can you clarify for me what you accomplished with Mr. Basham that first day?

A.  I mean, I have my notes.  He knew why I was there.  He -- I said what's going on in your case, so he told me what was going on in his case.  I asked him how old are you, your date of birth, how long have you been here, are you taking psychiatric medications?  He was able to provide me not only the names of his medications but the actual doses.  He's

Frierson – Cross                              1144

taking Paxil, Neurontin, Seroquel, and Elavil.  He was also able to tell me the reasons he was taking all of those.

He is also -- he had just had a tele-psychiatry appointment with his treating psychiatrist, who I believe is in Springfield, Missouri.

Q.  Let me make this maybe a little easier.  Was the first day more of information gathering on your part?

A.  Yeah.  We talked about his schedule on death row, what happened at the last hearing, what is he convicted of, where does he get legal advice.  Then I asked him just about symptoms of mental illness in general, sleep, appetite, mood, voices, hallucinations, energy level.

And then I completed a mental status examination, which is evaluating, like Dr. Hyde, is he oriented, can he pay attention, can he think abstractly, can he perform a calculation, can he use abstract reasoning.  And then we did a little bit of family history and medical history.  We went through his medical history, history of surgeries, his seizure episodes that had happened in the past, and his family history.  That was on Friday.

Q.  Okay.  How about the questions on psychotic symptoms?  Was that Thursday or Friday?

A.  That was both, but first came up on Friday.  I'm sorry, I think I'm using the wrong days.  The 15th is Thursday, that was what I just told you about.

Frierson - Cross                                    1145

Q.  Okay.

A.  The hour long interview.  Friday was the four hour interview on the 16th.

Q.  And I just want to clarify, so your testimony is that you discussed psychotic symptoms on both days?

A.  Yes.

Q.  Okay.  The majority of the testing you performed was on the second four-hour visit, is that correct?

A.  I don't know what you mean by testing.

Q.  You note that you performed a malingering test.  Was that on the second day?

A.  That was -- that was the end of the second day.

Q.  Okay.

A.  And that only took -- that's a five minute test.

Q.  And you didn't perform any of the -- you discussed some of the neurological tests formed by Dr. Hyde but you yourself did not perform any of those, correct?

A.  I'm not a neurologist.

Q.  And prior to visiting with Mr. Basham you testified you reviewed numerous records in this case?

A.  I reviewed many records that were -- I reviewed a binder of records that I was told was the same binder that had been given to Dr. Parker.

Q.  Can you ballpark for me how much time you spent reading records?

Frierson - Cross                          1146

A.   Now, when you say records, just those records or other records?

Q.   The records that you -- records, transcripts, everything that you read to prepare for this visit.

A.   Okay.  I spent just looking at transcripts, testimony of Vogelsang, Brannon, Brawley, Aiken, and Schwartz-Watts, and the motion for collateral relief, that took nine hours.  The testimony of Capehart took 1.25.  It took me two hours and 15 minutes to read through the 120 page report from Dr. Capehart, half an hour to review Dr. Parker's report.  I had a medical summary from Terra Haute that I reviewed that took 15 minutes.

     I have not calculated the amount of time it took me yet to -- I have it written down in my notes on the margins but I haven't even added up to even bill for my review of this binder, of medical records or the testimony of the attorneys at the October hearing because I got those later.

Q.   Okay.  You note in your report that Mr. Basham may have embellished a number of institutions and hospitalizations he had, but there's no question he had spent an enormous amount of time in facilities.

A.   I would say the majority of his childhood and adolescence he was either going to a hospital or institutionalized somewhere.

Q.   Also that those records reflect drug use at an early age of various substances?

Frierson – Cross                    1147

A.  Yes.  It's very interesting that inhalants are documented very early, at the time of his first hospitalization, which I believe was age ten.  He states that he started inhalants with his sister around age eight.

Q.  And would you agree with me that inhalants can be especially damaging to the brain?

A.  They are horrible for the brain.

Q.  Also, the records reflect evidence of sexual abuse?

A.  Yes.

Q.  Now, you were present for Dr. Hyde's testimony so you heard Mr. Witherspoon asking about talking to Mr. Basham's family members.  You did not do that either, correct?

A.  No.  His mother's dead, I believe.

Q.  She is.  So if that was a failure on Dr. Hyde's methodology that was -- for lack of a better word, methodology, that was something you did not do, as well.

A.  No, I don't agree that that was a failure of his methodology.  What was a failure is to testify that his parents are low IQ without ever having met them.

Q.  Were there records available of his parents' hospitalizations?

A.  I have not seen any, so I don't know.

Q.  Can a history of mental illness with that IQ be evidence of -- a family's mental illness be evidence of genetic pre-loading for an individual?

A.   There's genetic pre-loading for mental illness, there's genetic pre-loading for intelligence.  So certainly there is genetic pre-loading for mental illness.

Q.   Those are things that one could look at in a family history?

A.   Yes.  I do know his mother was prescribed Prolixin, which is not a benign drug, it's an antipsychotic.

Q.   And you are also aware his mother had fairly serious substance abuse problems herself.

A.   Yes, he was very forthcoming with that.

Q.   You also testified that you relied on some prison records that Mr. Witherspoon went over with you.  You did not talk to the individuals who wrote those reports, is that correct?

A.   No.

Q.   And you accepted those reports on their face.

A.   What's normally in a warden's jacket, is what we call it in our state system, I don't know what you call it in the federal system, but it contains the incident reports where Mr. Basham has been engaged in some activities that caused him to get in trouble.  I don't know who wrote the responses that we -- I testified to on direct, as far as who wrote his statement to be given to the panel that was going to decide his punishment.

But to me it doesn't matter really who wrote it.  The fact it got written and he was able to get it written is what

indicates that he has capacity to work with someone to defend himself.

Q.   And your ability to rely on those is only as good as the information contained in them, correct?

A.   Sure.

Q.   And I want to show you one example, I apologize to the court, we don't have exhibit numbers on these, but incident report number 17938761, and that is from November 10, 2008. It discusses that Mr. Basham was given two breathalyzer tests. Do you recall looking at that report?

A.   I recall looking at reports where he was given breathalyzer tests but I don't -- unless you show it to me I wouldn't off the top of my head remember it.

         MS. STONE:  Your Honor, may I approach?  I don't know the number to bring it up on the screen.

         THE COURT:  All right, you may.

         THE WITNESS:  Can I read it for one second?

         MS. STONE:  No problem.

         (There was a pause in the proceedings)

         THE WITNESS:  Okay.

Q.   Thank you.

A.   I recall reading that.

Q.   Okay.  And this report indicates that Mr. Basham was given two breathalyzers within 15 minutes of each other, and those breathalyzers he registered at .042 and then 15 minutes later

Frierson - Cross                           1150

at a .144.  I realize that you testify in much more significant cases than DUIs, but are you aware that in a DUI case if a breathalyzer was that far apart within a 15 minute period it's unlikely in any jurisdiction it would be admissible?

A.  I'm not a DUI lawyer, expert.  I'm sorry, I do not know.

Q.  Okay.  So fair to say --

A.  I could --

Q.  When you reviewed this record you weren't aware of the possible problem with the information contained in it.

A.  The breathalyzer may not be accurate?

Q.  Correct.

A.  I don't know that I actually thought that at the time I reviewed it, gave it that much thought.

Q.  And, also, these records are prepared presumably by the same individuals who are letting Mr. Basham drink to the point of incapacity before this hearing, is that correct?

A.  Well, I don't know that he was incapacitated before this hearing, I just heard the report.  But these are, I would imagine, prison officials.

Q.  Going back to Mr. Basham's records, you testified that you agree early on that in Mr. Basham's history there was diagnosis of ADHD?

A.  Yes.

Q.  You've no dispute with that.

A.  I do not dispute that diagnosis.

Q.  In fact, you find it yourself.

A.  Well, it's just so well-documented in the records, I mean, if I were come along and say he doesn't have ADHD that would be sort of ridiculous at this point.

Q.  Dr. Hyde and Dr. Schwartz-Watts and pretty much everyone who has seen Mr. Basham throughout his history has agreed at least on that.

A.  Yes.

Q.  Would you agree with that statement?  You -- your experience with Mr. Basham in the two days that you interviewed him you noted you had to take breaks?

A.  That was more the second day.  We didn't break, I don't think, the first day.  But the second day he kept having to go to the bathroom.

Q.  And you also had to repeat things for him?

A.  Occasionally, yes.

Q.  And you noted that he was easily distracted.

A.  Yes.

Q.  You also noted in your report he had significant impulsivity.

A.  Yeah.  He has a lifelong history of impulsivity.

Q.  And all of those symptoms, distraction, needing repetition and impulsivity, you agree are part and parcel to an ADHD diagnosis.

Frierson – Cross                    1152

A.   No.   I would agree that the difficulty concentrating is part of the ADHD, the fidgetiness is part of the ADHD.  The impulsivity I do not agree is attributed solely to ADHD, because impulsivity is also a symptom and characteristic of antisocial personality disorder.

Q.   You also found that some of his poor performance on tests that required concentration was consistent with his ADHD diagnosis.

A.   That's correct.  And, identical to Dr. Hyde, his ability like to spell "world" backwards, we ask people to do that because that's a specific test of concentration, and he had some difficulty with that.

Q.   And just to be clear, you did not believe he's malingering ADHD.

A.   No.

Q.   You do not believe he's malingering being easily distractible.

A.   No.

Q.   And you do not believe he's malingering impulsivity.

A.   I don't believe it's malingered but, like I said, I don't think it's all due to ADHD.

Q.   Okay.  Let's move on to some of the previous diagnoses that you disagree with, and I want to start with bipolar disorder.  On page four of your report you note that Mr. Basham lacks the symptoms of major depressive or manic

episodes and that for you was one of the issues with finding

bipolar disorder, correct?

A.   That was one of the data points, what he told me, that

contributed to my arriving at a conclusion that he did not

have bipolar disorder.

Q.   And you -- that was my next question.  You rely primarily

on Mr. Basham's self-reporting on this.

A.   No.

Q.   Did you also review the records?

A.   Yes.

Q.   And his history?

A.   Yes.

Q.   And your position is that there is not evidence of major

depressive or manic episodes.

A.   No, this is my impression, is that the records where he

was diagnosed with bipolar disorder primarily come from

private hospitals, Charter, the Charter hospitals he was in.

Bear with me one second.  I have a list of all the

hospitalizations so I can --

Q.   No problem.

        (There was a pause in the proceedings)

        THE WITNESS:  I made a three-page list all of his

hospitalizations, and the first place that you see bipolar is

Columbia Hospital Paris, which is also known as Stoner Creek

Center.  He had been sent there from the Methodist Home.

Frierson - Cross                    1154

Now, in reviewing what I had from that record, which was a hospitalization from August 7, 1996 through August 19, 1996, there he gets a diagnosis of bipolar I disorder, but there's no documented record of manic symptoms or depressive symptoms.  They are not well-outlined in the actual medical record in a manner that I would believe that they were present.

Q.  You do note he underwent a treatment, on page seven of your report, underwent a treatment of lithium, which is --

A.  Yes.

Q.  -- which is a commonly used medication for bipolar disorder?

A.  Yes.

Q.  And that he apparently noted it was helpful, or the doctors noted it was helpful?

A.  The record states it was helpful.  But, once again, lithium can be used to treat a variety of symptoms whether they are due to bipolar or not.

Q.  You also note on page nine of your report that Mr. Basham has engaged in numerous suicide attempts.

A.  Yes.

Q.  Is your testimony that suicide attempts cannot be major depressive episodes?

A.  Yes.

Q.  You also disagree with finding of psychotic symptoms, and

Frierson - Cross                              1155

you described Mr. Basham as coy and cagey when discussing these. Are coy and cagey diagnostic terms?

A. No, they are not.

Q. Are they projections of the examiner?

A. I don't believe so.

Q. Have you had instances where people you believe are legitimately mentally ill are reluctant to discuss symptoms with you?

A. Yes.

Q. Is that common?

A. It depends on what kind of symptoms they are. It's more common for people not to want to discuss psychotic symptoms, like delusions and hallucinations. Other symptoms people are generally more amenable to talk about, especially anxiety and mood disturbance.

Q. Have you also had people who you believe are legitimately mentally ill ask you not to write things down?

A. Yes.

Q. And you are aware that Dr. Schwartz-Watts was the trial expert in this case, correct?

A. Yes.

Q. And you heard, again, Mr. Witherspoon cross-examining Dr. Hyde, and he discussed how many hours that she spent with Mr. Basham over a period of a couple of years. Did you -- you heard that?

Frierson - Cross                          1156

A.   I heard that.  Yes, I was here.

Q.   And you are aware she spent a significant amount of time with Mr. Basham.

A.   Yes.  I mean, she was at the university at that time, so we were sort of colleagues and I knew that she was working on the death penalty case here.

Q.   You are aware that Dr. Schwartz-Watts did believe that Mr. Basham heard voices?

A.   Yes.

Q.   You also note in your report that Mr. Basham was incarcerated in Hopkins County Jail, the jail he escaped from prior to these offenses, on December of 2000, January of 2001, and he also was diagnosed with psychotic disorder there.

A.   Are you talking when he was sent to Western State?

Q.   I believe it's in the actual jail.

A.   I don't recall seeing records from the jail.  Maybe I did.  But I do recall when he went to Western Psyche from the jail after.

Q.   I apologize, that's the one note I don't have the page number.  We will move on.  And let's move now to Mr. Basham's IQ scores.

     You testified that Mr. Basham started out with an IQ of a hundred and then experienced a period of decline?

A.   Yes.

Q.   And Mr. Basham was back then diagnosed with a learning --

at a young age diagnosed with a learning disorder, correct?

A. Yes.

Q. And, again, that's something you diagnosed, as well, basing it on history?

A. Basing it on the history, yes.

Q. And to reiterate, you are aware Mr. Basham started abusing drugs at a fairly young age.

A. Yes.

Q. And you would agree that drug abuse could contribute to decline in IQ?

A. Not only could, but it's my opinion it likely did.

Q. And, again, one of the substances was huffing gas and other inhalants.

A. Yes.

Q. And that is -- would you agree that is one of the worst substances as far as IQ decline?

A. Well, it's hydrocarbons are not good for the brain, so it's not good. It can certainly cause IQ decline if it's chronically and in sufficient amounts.

Q. You also note in your report, and it's noted throughout his records, that his IQ jumps back up in his late teens. That's something you saw in the records?

A. Yes.

Q. And you hypothesized it's possibly because Mr. Basham didn't have access to substances to abuse at that time?

Frierson - Cross                                    1158

A.  Yes.  After he was incarcerated by the state authorities in Kentucky, it was only after that that you see a little bit of recovery in his IQ from this continuous decline previously.

Q.  And that is simply a hypothesis, you have no evidence in the record to support or disprove that.

A.  Of course not.

Q.  Are you aware that there's some anecdotal evidence that scores may have been inflated to get Mr. Basham into some of these facilities?

A.  I have read that, I think from the mitigation expert, her testimony.

Q.  And the only way to know if that was truly the case would be to get the raw data, is that correct?

A.  I think it would depend on -- yes, to see if it was scored properly, yes.  But I don't know, because the early scores, I don't know that it was -- they were done to get him into some facility, especially the Penny Royal outpatient scores.

Q.  If you had information that caused you to have concern about the legitimacy of an IQ score would you want to see the raw data to see if it was correctly scored?

A.  I wouldn't, but I would want a psychologist working with me to look at the raw data.  I'm not a psychologist.  You could show me the raw data and I wouldn't know what I was looking at.

Q.  But you would want somebody to look at it that you

trusted.

A.  Yes.

Q.  You don't dispute the findings of Dr. Capehart and Dr. Brawley, is that correct?  IQ findings, I'm sorry.

A.  I don't have any reason to dispute them.

Q.  So that would put his IQ somewhere between 68 and 75, between their two scores?

A.  Yes.

Q.  At the time of trial.

A.  Which is also consistent with the screening that Dr. Parker did.

Q.  That would put Mr. Basham at best at borderline intellectual functioning, is that correct?

A.  Yes.

Q.  And you wrote an article on mental retardation that Mr. Witherspoon referenced, and in that article you note that the IQ of 71 to 84 is six to seven percent of the population?

A.  Yes.

Q.  You disagree with the trial diagnosis of dementia, is that correct?

A.  Yes.

Q.  You state in your report, however, that you do not believe Mr. Basham's decline in IQ has been happenstance.  Can you explain what your belief is that caused that IQ decline?

A.  I think it's his use of substances is the most likely

Frierson - Cross                    1160

causative factor in his IQ decline.  There has been mention of possible head injuries.  But when -- for example, there was a big deal made of the falling out of the tree and bumping his head on the railroad tie.  In the very early records when he is seen at Penny Royal his mother says he was not unconscious and he had no ill effects from that, yet I read conflicting evidence in trial testimony that he was never the same after that.  So it's hard to know what the significance is, if any, of prior head injuries.

I do know that he abused substances, by his own report started at age eight, that's when he had his highest IQ, and it was heavily used between, inhalants, from eight to 13.  And I believe that is the most likely reason his IQ has declined.  And I don't think it's just happened for no reason.

Q.  And you diagnosed Mr. Basham with cognitive disorder not otherwise specified?

A.  Yes.

Q.  And we had a phone conversation prior to this hearing, and I don't want to misstate this so correct me if I am wrong, but you said that essentially you agree with Dr. Hyde's static encephalopathy, that is essentially the same thing as cognitive disorder not otherwise specified.  Is that a correct statement?

A.  It's correct on what I'm assuming he means by that.  But, once again, a static encephalopathy, all that means is brain

Frierson - Cross                              1161

pathology.  Encephalo is brain, opathy is fitness, static means stable.  Static brain fitness, if you do the Latin.  I'm not sure what this means.  If you look at the DSM-IV requirements for cognitive disorder not otherwise specified, it says mild neuro-cognitive disorder, impairment.  Cognitive functioning that's evidenced by mild neuro-cognitive disorder, impairment in cognitive functioning as evidenced by neuropsychological testing or quantified clinical assessment.  And I believe that's what we're seeing, that we have lower test scores as a result of something going on that I believe is likely due to his long-standing use of substances.

Q.  So to really dumb it down to lay person level, Dr. Hyde essentially testified Mr. Basham has a sick brain, and your finding of cognitive disorder NOS is essentially that Mr. Basham has a sick brain.  Would you agree with that statement?

A.  I'm not sure I'd use the term sick brain, but it's a brain that isn't functioning as well as it did before he started using substances.

Q.  And do you recall when you read Dr. Schwartz-Watts' testimony that she characterized Mr. Basham as having a bad brain?  Hers, of course, was because of her finding with dementia.  But you recall that testimony?

A.  Yes.

Q.  Going back to your article on mental retardation, you are

Frierson - Cross                               1162

talking in the article in the context of MR, but you note that where a person lacks sufficient cognitive ability to manage a given event they can exhibit lack of judgment and planning resources.  Would you agree that that applies to Mr. Basham?

A.  I couldn't understand the last part.

Q.  I'm sorry.  When the article notes that's evidence that suggests where a person lacks sufficient cognitive ability to manage a given event, whether it be trial, daily living, they exhibit lack of judgment and planning resources.  Does that also apply to someone with cognitive disorder or is that limited to MR?

A.  Some people with cognitive disorder can plan and some cannot.  I think there's some evidence that Mr. Basham has sufficient planning abilities.

Q.  Do you think Mr. Basham's planning abilities are sophisticated?

A.  Compared to?

Q.  The majority.

A.  You have a continuum.  So to say someone's sophisticated or not, it depends on where you want to draw the line.  He certainly doesn't have -- he can plan, he just doesn't like to delay gratification.  He's really good at planning gratification things, like getting money from the canteen by calling his mother and getting her to try to send money to somebody else so that he can have money for the canteen.

Certain things he plans quite well.  But his planning ability isn't going to be as good as you and I.

Q.  And, again, if we agree that his IQ falls somewhere in between the range of Dr. Brawley's findings and Dr. Capehart's findings that would put him, best case scenario, at six to seven percent of the population, borderline intellectual functioning, is that correct?

A.  If that's the accurate statistics from my article I would say yes.  I have not read that in many years.

Q.  Long-term alcohol abuse can contribute to decline in IQ as well, correct?

A.  Yes.

Q.  And you again have somebody with Mr. Basham, and there's evidence both in the record and from self-reporting, that Mr. Basham has engaged in alcohol abuse at least in his years in BOP?

A.  He says he drinks.  Whether those breathalyzers are accurate or not, I don't know.  They would indicate numerous times where he either smelled of alcohol or they found alcoholic beverages in his cell.  He tells me he can make it, he tells me he can make something stronger than just wine, that he can actually make pretty -- something you would need a still to do.  And he would not go into the details with me about how he does that because --

THE COURT:  Miss Stone, we have been going about an

hour and 45 minutes.  Is this a good place to break?

MS. STONE:  It's a fine place to break, your Honor.

THE COURT:  Let's take a 15 minute recess.

(A recess transpired)

THE COURT:  Ready to resume?

MS. STONE:  I am, your Honor.  Thank you.

Q.  Dr. Frierson, I want to jump back to talking about the prison briefly.  You note in your report you reviewed prison medical records in preparation for your evaluation.  Is that correct?

A.  Yes.

Q.  And your understanding is that Mr. Basham's evaluations at the prison are done by tele-psychiatry, is that correct?

A.  The psychiatric evaluations are done by tele-psychiatry. They don't have a psychiatrist at the prison, they do have several staff psychologists.  And what I reviewed were the staff psychologists' notes from USP Terra Haute.  They did a summary of the psychiatric treatment that had been provided to me in letter form.

Q.  Okay.  And all of that psychiatric treatment, your understanding is by they call it tele-psych?

A.  The medication prescribing is done by psychiatrist via tele-psych.

Q.  You do not treat or evaluate your patients or people who you are asked to evaluate by video, do you?

Frierson – Cross                    1165

A.  I don't do it by video, no.  There is tele-psychiatry used, however, in the South Carolina Department of Corrections.

Q.  But would you agree that it's not the ideal circumstance for evaluating an individual?

A.  Well, it's not as good as face-to-face, but there's been a lot of studies on tele-psychiatry that show it's really pretty good.

Q.  But not as good as face-to-face.

A.  Not as good as face-to-face.

Q.  You note in your report on page nine that the prison reports say Mr. Basham does not display signs of mental illness.  And then again on page 14 that psychiatrists found no psychotic symptoms, cognitive defects or disorganized thinking.  Your diagnosis of cognitive disorder NOS contradicts at least with their finding of cognitive defects, correct?

A.  I would say incorrect, and let me explain why.  The cognitive deficits that I found that led to my diagnosis of cognitive disorder not otherwise specified are the lower IQ scores that have gone down.  Absent sitting down and doing IQ scores with him, if you just talk with Mr. Basham on a daily basis, a clinical like little interview of him I'm not sure you are going to see that, which is why they probably said that they didn't see it.

Frierson – Cross                                    1166

Q.  And, again, you did not perform any of the neurological testing that Dr. Hyde did, but you reviewed it, correct?

A.  I reviewed his report, yes.

Q.  And you did not specifically dispute his neurological findings in your report.

A.  No.

Q.  I want to very briefly talk about the second day you met with Mr. Basham.  And you noted in your report that he may have been drinking alcohol.

A.  Yes.

Q.  And you based that belief on the fact he had bottles of liquid that were I believe you said pinkish in color?

A.  It looked like pink lemonade.  But I based my statement that he may have been drinking on the fact that he told me he was drinking, that that's what was in there, that was his homemade -- he called it wine.

Q.  And you continued ahead with your evaluation of Mr. Basham that day.

A.  Yes, I did.  I had a lot of what's he drinking, what do I do now, do I stop and come back another time?  How can I make sure he's not going to drink another time?  And I thought to myself well, if he's able to function well enough with drinking then he should be able to without drinking.  I also remembered that he had claimed he used cocaine during his trial and the direct screen was negative.  So I made the

Frierson - Cross                    1167

decision on that day as long as he does not appear intoxicated to me I was going to continue.

Q.  And you also note in your report that Mr. Basham has been called a con artist and a manipulator, and you testified that he, and you note in your report that he manipulated you to bring money for snacks.  Bringing money for snacks is not against the prison rules, is it?

A.  No, but it's outside of something I would normally do.

Q.  Okay.  But --

A.  It's not common for forensic examiners to feed people they are evaluating.

Q.  You probably value your medical license and if it was against prison rules you would have told Mr. Basham no.

A.  Yes.

Q.  You wouldn't have snuck a McDonald's cheeseburger in your pocket for him.

A.  No.

Q.  And Mr. Basham asked the guard to speak with you about it. I just want to clarify something.  The guard said it was normal for visitors.  Now, that's not just visitors for Mr. Basham, it's visitors for anyone in that unit, is that correct?

A.  Yeah.  I mean, anybody who has a -- my understanding is there's machines that are available for anybody.  So I'm sure other inmates probably have visitors who bring them snacks.

Frierson - Cross                         1168

The guard specifically told me it's common when people visit Mr. Basham, he likes them to bring snacks.

Q.  Okay.  And you testified Mr. Basham never said he would not participate in the interview if you didn't bring him change.

A.  That's correct, he never said that.

Q.  And you were not aware until today that he asked Dr. Hyde the same request.

A.  Well, he said that he asked a doctor, I assumed it to be Dr. Parker, to do the same thing, but --

Q.  I'm sorry, go ahead.

A.  But it may have been Dr. Hyde he was referring to.

Q.  And you heard Dr. Hyde's testimony today that he declined to bring Mr. Basham --

A.  Yes.

Q.  -- any change.

A.  But let me add, he didn't see him two days in a row.

Q.  He did seem him two different occasions, correct?

A.  Not two days in a row.  There's a difference when you see them two days in a row because on day one they can make a request knowing you are coming back the very next day, which I already told him.

Q.  And you noted in your testimony you've never been to the federal prison in Terra Haute before.

A.  This was my first time.

Frierson – Cross                              1169

Q.  And I think your words were, when in Rome.

A.  That's -- I did say that.  I said okay, if it's common practice I certainly -- even though he didn't say he wouldn't talk to me, that feeling, and it's a gut instinct, well, he may not if I don't do this.

Q.  Is it a fair assessment that your inexperience with Terra Haute and federal prisons, how they run visits there, also contributed to your decision to bring change for Mr. Basham?

A.  I think it may have.  I mean, it was difficult getting in and out of that prison.  It was very difficult.

Q.  All right.  I feel your pain on that one, believe me.

A.  They told me to be there at 8:00, I'll get right in.  I got there at 8:00 and waited 45 minutes.

Q.  That sounds about right.  Going back to your article on MR that we have talked about already, you note in there that the AAMR says that mental retardation is not always obvious to the casual observer.  Persons with MR can hide disabilities, can have jobs, can get married, have children, and interact with others.  The same goes for individuals with cognitive disorder, correct?

A.  Yes.

Q.  And people with cognitive disorders can lie?

A.  Yes.

Q.  People with mental retardation can lie?

A.  Yes.

Frierson - Cross                                    1170

Q.  People with brain damage or cognitive disorders -- I'm
sorry, people with cognitive disorders can manipulate?

A.  Yes.

Q.  And people with mental retardation can manipulate.

A.  Yes.  Not as well, usually, as people without, but --

Q.  But they are still capable of the most basic definition of
manipulation.

A.  Yes.

Q.  People with cognitive disorders can develop skills in
certain areas?

A.  Yes.

Q.  And some people with mental retardation can develop skills
in certain areas.

A.  Yes.  But what differentiates the two is their overall
adaptive functioning and the actual measured IQ.  I would say
that people with cognitive disorders not otherwise specified
are not as impaired as people with mental retardation.  They
are more likely to be married than people with mental
retardation.  They are much more likely to obtain a driver's
license, to be able to manage checking accounts, to do all
sorts of things compared to someone with mental retardation.

Q.  But it's a fair statement that none of those are mutually
exclusive to the other.

A.  No.  You have to look at the total package.

Q.  And I want to move now to the crux the matter that we're

Frierson – Cross                               1171

here, and that is your finding that Mr. Basham is competent. You took it in a few stages. First, you write in your report that Mr. Basham understands the legal process. Is Mr. Basham able to understand more complex ideas?

A. Such as?

Q. Did you discuss with Mr. Basham individual claims in his 2255 petition?

A. No, I did not.

Q. You noted that Mr. Basham has great difficulty delaying gratification. Is that -- would you agree with that, even when delaying gratification is in his best interest he has trouble seeing down that path?

A. There is delayed and then there's delayed. The legal process is a real big delay and I think that's more difficult for him because of his wanting what he wants when he wants it.

Q. And you are aware that he talks with other inmates to help him with understanding his legal matters?

A. Yes. He mentions getting legal advice from David Hammer.

Q. Are you aware that Mr. Hammer has written letters for him to send to this court previously?

A. I believe so. And it related to giving up his appeal?

Q. Correct.

A. Yes.

Q. And Mr. Basham signed his name to a letter that Mr. Hammer typed up.

Frierson – Cross                                    1172

A.   I would not be surprised.

Q.   Do you know if Mr. Basham has the ability to discern when the information he gets from someone like Mr. Hammer or another inmate is accurate?

A.   Technically accurate, legally accurate?

Q.   Correct.

A.   Some things yes, some things probably not.  More technical things he's probably not as good at.  But those would be things I would expect him to not necessarily be able to do himself, but to be able to form a working relationship with an attorney or a real representative that he could trust enough to do that for him, what he does not know.

Q.   And you note in your report an example of the court setting an execution date for him.  Would it surprise you if I told you that he's been advised multiple times that the federal government would have to set that date but he still believes the information he received from Mr. Hammer, which is that this court can do it?

A.   That does not surprise me.

Q.   I want to move now to Mr. Basham's ability to control himself in court and his outbursts.  Again, you don't find that he's malingering, poor concentration.

A.   No.

Q.   Nor distractibility.

A.   No.

Q.  Nor impulsivity.

A.  No.

Q.  The trial, you saw records that he was medicated for ADHD and he took Concerta, is that correct?

A.  I do note from the Alvin S. Glenn records he was on Concerta.

Q.  Is that a medication in your experience that has been used for ADHD?

A.  Yes.

Q.  And from your review of the prison records he is not medicated for ADHD now.

A.  Correct.

Q.  And that's really common in prison settings.

A.  It's common not to have the medications that are commonly used because they are amphetamine or amphetamine-like substances and there's a tremendous black market.  There are other medications that are not amphetamine and amphetamine-like substances that can be used in ADHD.

Q.  In your review of the medical records, though, Mr. Basham is not receiving any medicinal treatment for his ADHD.

A.  That's correct.

Q.  And we talked briefly about Mr. Basham sitting through this hearing, and I believe your statement was that a TV screen was not ideal, is that correct?

A.  I think he has the capacity to sit and watch proceedings

Frierson – Cross                                    1174

on the TV but it's less ideal than being live in court.

Q.  And is it a fair statement the more complex the testimony, the more difficult it is for him to focus?

A.  Yes.

Q.  How about the more emotional the testimony?  Does that also make it more difficult for him to focus?

A.  I don't think it makes it more difficult to focus.  In fact, I think the emotional testimony makes it easier for him to focus.  I think what it does, however, is make him less comfortable.  He doesn't want to hear it and he doesn't want to hear when his family, friends, uncle, and cousins that testified at his sentencing phase.  He didn't want to hear that, he didn't want to sit there and listen.  And he made a decision that no one is going to force me to sit here and listen.

Q.  With ADHD though, if someone is hyper-stimulated for some reason, whether it be frustration, anger, fear, grief, doesn't that contribute to the inability to focus or exacerbate the inability to focus?

A.  I think the inability to focus is likely to become more evident when the testimony is boring.

Q.  Okay.

A.  Like the psychiatric testimony, like I had trouble staying awake reading it.

Q.  And Mr. Basham, you read, had trouble staying awake during

Frierson – Cross                          1175

court during those sessions.

A.   Yes.

Q.   And you did note in your report that when there were problems with Mr. Basham court was stopped?

A.   I noted that in the record, yes.  The court was stopped and Dr. Schwartz-Watts was called to come evaluate him.

Q.   And that would be the scuffle with the marshals, would be one of those examples?

A.   Yes.

Q.   Would another -- did you read on October 26th, do you recall reading that there was a day when Mr. Basham did not get his Seroquel?

A.   I read that there was a day where he had not gotten his Seroquel, but then he got it in the morning because he had not gotten it the night before, and that might have made him sedated.

Q.   That was -- that's my next question.  What does Seroquel do?

A.   Seroquel, he's getting it now for an off-label use, which is to help him control his anger and frustration.  But normally it's used to treat schizophrenia or major mental illness, psychotic illness.  That's an antipsychotic.  But as a side effect it is very sedating, it can make people sleepy.

Q.   And do you recall that on that date that he didn't get it Mr. Basham's attorneys brought that issue to the court's

attention?

A.  I recall that, yes.

Q.  And you agreed with Mr. Witherspoon on direct testimony that at the time of trial, the best time to assess competency at the time of trial?  That was in inartful way of saying that, I apologize, but --

A.  Yes.  I mean, retrospective evaluations such as what I have been asked to do are inherently not as reliable as actually doing it at the time of trial.

Q.  And we briefly mentioned the scuffle with the marshals. You are aware that Dr. Schwartz-Watts evaluated him immediately following that scuffle and found him at that time to be incompetent?

A.  That's my understanding from reading the record.  It was very curious to me as to why she determined that.

Q.  The next part of competency that you addressed in your report is Mr. Basham's ability to work with his attorneys. And you believe that Mr. Basham is able to cooperate and assist his attorneys, correct?

A.  If he chooses to do so.

Q.  And you give an example in your report, and you also talked about it in direct testimony, where Mr. Basham wanted to call a rebuttal witness regarding an issue with a trap door in his cell.  Mr. Witherspoon was critical that Mr. Hyde didn't talk to Mr. Harris or Mr. Swerling about some of the

issues that Dr. Hyde addressed.  Did you talk to Mr. Harris or Mr. Swerling about Mr. Basham, bringing this issue to their attention?

A.  I did not, I just read their testimony about how he was at the trial.

Q.  And you don't know if Mr. Basham was able to talk to Mr. Harris or Swerling at an appropriate time, do you?

A.  I do not.

Q.  And would it surprise you to learn that Mr. Basham had to be given coloring books during trial?

A.  I was aware of that.

Q.  And is your understanding part of that reason was so that he wasn't constantly annoying his attorneys while they were trying to do the trial?

A.  I don't recall the reason.  I was under the impression it was done so he would stay focused on something.

Q.  And you don't know whether Mr. Basham was able to have a rational conversation with Mr. Harris and Mr. Swerling about the pros and cons of calling that witness.

A.  I do not know.

Q.  And you wrote another article that's listed in your CV, AAPL Practice Guideline for the Forensic Psychiatric, Evaluation of Competence to Stand Trial.

A.  I didn't write that, I participated in its writing.  I wrote one small section on ethics.

Frierson - Cross                          1178

Q.  Okay.  Your name appears as one of the authors of the article.

A.  I wrote the ethics section.

Q.  The article is not footnoted that's the only section you signed on to, correct?

A.  Well, I'm just telling you what I actually wrote.  I know it's a larger document.

Q.  Do you agree with -- do you sign on to the rest of that document?

A.  I think it is a guideline for competency to stand trial, it is not a standard.

Q.  Okay.

A.  It is ideal practice.

Q.  It's --

A.  Ideal practice.

Q.  Is a fair assessment, does the section of the article summarize -- you talked about the Dusky case and some of the other major legal standards for competency, and then the second half of the article is practice guidelines.

A.  That sounds correct.

Q.  One of the practice guidelines that is discussed in the article says that even for experts who are retained by the prosecution you can request to talk with defense attorneys.  Do you recall that?

A.  Yes.

Frierson - Cross                          1179

Q.   And the specific quote is, that may provide valuable information about the attorneys' specific concerns about the defendant's competence and examples of defendant's limitations related to trial procedure.

You never made a request to talk to Mr. Burke or myself prior to writing your report, did you?

A.   No.  I read your petition for collateral relief.

Q.   You never spoke with us -- never requested to speak with us about any difficulties we had with Mr. Basham.

A.   I did speak with you Saturday.

Q.   And your report was already completed at that time.

A.   Yes.

Q.   And you had already made your competency determination at that time.

A.   Yes.

Q.   And are you aware that Mr. Burke and I have been on this case for approximately three years?

A.   I believe so.

Q.   Another thing that it's noted in the article is the importance of avoiding bias.  And one of the recommendations is avoid working with one side or another exclusively.  You noted that you taught at the 2006 National Habeas Institute.  Is there any other teaching that you've done that your CV does not reflect for the defense?

A.   Specifically for the defense bar?

Q.  For the defense bar.

A.  I don't think so.

Q.  And I may have miscounted, but I count approximately 17 conferences you've taught at for district attorney associations.

A.  Yes.  They were based here in Columbia, and that's why they utilized me because I was convenient.

Q.  All of the defense -- excuse me, district attorney teaching you've done were here in town?

A.  A lot of them were here in town.  A lot of them were in Charleston, and because they plan and coordinate they wanted someone local to work with them on the curriculum itself before they did them in other cities.  And so they frequently used me.

Q.  Okay.

A.  I have been all the way to Alaska doing that.

Q.  Did I recall seeing -- you also noted that you evaluated numerous cases on both sides for pretrial competency or to be executed.  In death penalty cases you have never found anyone incompetent that did not have a psychotic disorder, is that correct?

A.  I don't recall finding someone incompetent that didn't have a major mental illness.

Q.  Finally, and I will finish up, you also evaluated Mr. Basham for competence to be executed.  You understand that's

Frierson - Cross                              1181

not the purpose of this hearing, correct?

A.   Yes.   I was doing what I was requested to by my retaining counsel.

Q.   Okay.  And going back to that practice guideline, it also notes that adjudication of competence should not take up other legal matters unless the jurisdiction requires it.  This jurisdiction does not require that you also assess for competency to be executed, does it?

A.   First of all, that guideline that you are reading you are taking the intention out of context.  What that means is when you are doing a competence to stand trial evaluation pretrial, which is when it should be done, you should not address issues of criminal responsibility or mental state at the time of the crime unless you have been specifically asked to do so.

Q.   And it also says if you do -- if you are specifically asked to do so a separate report should be done.

A.   It says that.  However, I can tell you there is a separate practice guideline on criminal responsibility determinations which will contrast what you just read and states the different jurisdictions require it done different ways.

Q.   And your name is not on that practice guideline, is it?

A.   The criminal responsibility one.  It's currently undergoing revision, I have been asked to contribute to it and we will see.

Q.   And you agree that that status, competency to be executed,

can change over time due to a variety of factors.

A.   Sure.

MS. STONE:  May I have just a moment, your Honor, to confer with counsel?

THE COURT:  You may.

(There was a pause in the proceedings)

Q.   I just want to clarify something briefly.  In the very last page of your report on the very last sentence you note you find insufficient evidence to suggest that Mr. Basham would not have been competent to stand trial at the time of his trial.  Does that mean that you find sufficient evidence he was competent or that --

A.   This is the way I prefer to word my finding when I'm asked to do it retrospectively.

MS. STONE:  Okay.  No further questions, your Honor. Thank you.

THE COURT:  Thank you.  Any redirect?

MR. WITHERSPOON:  Yes, sir, Judge.

REDIRECT EXAMINATION

BY MR. WITHERSPOON:

Q.   Just to make sure, Dr. Hyde --

A.   Frierson.

Q.   I apologize, please forgive me.  Just to be sure, Dr. Frierson, the way you wrote in the last sentence, again, it's your opinion -- what is your opinion, to a reasonable degree

Frierson - Redirect                    1183

of medical certainty, whether Mr. Basham was competent at the time of this hearing -- of the trial?

A.  It is my opinion, and I'm specifically wording it this way, that I, from looking at the transcripts, from talking with him about trial, from assessing his legal knowledge now, from looking at how he's able to defend himself, or at least obtain defense to a disciplinary charges, I find insufficient evidence that he was incompetent.  Therefore, I presume to a reasonable degree of medical certainty that he was competent.

But competent has to be a presumption because I did not evaluate him at that time and ask him all the questions that I asked him now.  I do note that there was a defense expert who did that, who did not have concerns about his competency, and I find in reviewing this retrospectively little evidence to suggest that he was incompetent.

Q.  Now, Miss Stone said that this study indicates that you could have an opportunity to talk to Miss Stone and Mr. Burke. Do you know what an attorney-client privilege is?

A.  Yes.

Q.  What is attorney-client privilege?

A.  My understanding is that it prevents attorneys from divulging information they obtained from their client.

Q.  So do you think that would preclude you from talking to them or them talking to you?

A.  It may or may not.

Frierson - Redirect                          1184

Q.   Now, you said doctor -- I think she mentioned Dr. Schwartz-Watts found him incompetent on the day of his scuffle with the marshals.

A.   Yes.

Q.   What did she determine the very next morning when the judge stopped the proceedings that day?

A.   That he was competent.

Q.   And Miss Stone said that Mr. Basham, I think you may have said this, he can talk with other inmates to get legal advice. Is that like consulting with his lawyer or lawyers to get legal advice or --

A.   Well, hopefully he gets better legal advice from his lawyers than he does from the people on death row.  But it at least shows a willingness to consult with someone who might know more than he does and provide whoever it is that's assisting him information that they can include in briefs or what have you that they are sending to the disciplinary board, an accurate account from his perspective of what actually happened at the time of the disciplinary offense.

Q.   And Miss Stone asked about mental retardation.  Isn't it true that Dr. Schwartz-Watts and Dr. Brawley determined that Mr. Basham was not mentally retarded?

A.   Yes.

Q.   And are they capable as experts of making that determination?

A.  Yes.

Q.  And I think Miss Stone said Mr. Basham -- or indicating he had a sick brain or something of that sort.  That doesn't mean that he's incompetent, does it?

A.  No.  Despite what Mr. Basham has, whether it be bipolar disorder, whether it be cognitive disorder, you know, whether it be dementia, he still illustrates or is able to demonstrate a factual understanding of the legal proceedings and ability to consult with his attorney with a reasonable degree of rational and factual basis and an understanding of the proceedings against him.  Therefore, that's why I opine that he appears to have been competent.

MR. WITHERSPOON:  Thank you very much, Dr. Frierson.

THE COURT:  Anything further of this witness?

MR. WITHERSPOON:  Nothing from the government your Honor.

THE COURT:  Thank you, sir.  You may step down.

How long do we need for argument?

MR. WITHERSPOON:  Judge, I spoke with Mr. Littlejohn at the break.  He is available tomorrow morning at 11:00 o'clock.  He doesn't have to be in Florence until 2:30.  I spoke to Miss Stone, she has 30 minutes, I think we probably may have an hour.  So he's available at 11:00 o'clock to come and he's coming tomorrow at 11:00 o'clock, so we should be able to finish him between 11:00 and 1:00.

THE COURT:  You want to wait until we get his testimony to start hearing the argument?

MR. WITHERSPOON:  I think we can start probably first thing in the morning and then break and finish.

MR. BURKE:  Your Honor, I think we can begin whenever you wanted to and argue until Mr. Littlejohn was available. And then we simply won't argue the issues that concern Mr. Littlejohn's testimony but we --

THE COURT:  I'm pretty tired today.  I'd rather not start the arguments today.

MS. STONE:  Us, too.

THE COURT:  You want to start at 9:30 and go until 11:00?  And can you tell me now what you might want to argue tomorrow morning so I can re-read those sections?  If you can, if you know?

MR. BURKE:  Certainly, your Honor.  I think what might make the most sense is if we begin by arguing the four competency claims four through seven.  And that very well could take us up to the point of Mr. Littlejohn's testimony. And then we would like to argue the various claims of ineffective assistance of counsel that we have alleged, most particularly focusing on claims nine, 15, 16, and then claims one and two.  That will involve at least in part the testimony of Mr. Littlejohn.  And then --

THE COURT:  You're outlining now all the ones you

1187

want to argue sometime this week.

MR. BURKE:  Well, my hope is that we can -- after Mr. Littlejohn is finished we can begin arguing and --

THE COURT:  That's what I'm saying.  You think the competency will take us until 11:00 o'clock, at least. Assuming you're almost finished or just about finished, we hear Mr. Littlejohn, then you start on the ineffective assistance claims you want to argue.

MR. BURKE:  Yes, sir.

THE COURT:  Tell me which ones you want to argue. Nine, 15, 16, one and two.

MR. BURKE:  One and two.  Let me just check.  This is not an ineffective assistance of counsel claim, but I would like to argue claim 11, which is the Napue claim against the government with regard to the testimony of Sheriff Hewitt.

And, your Honor, one of the claims that we didn't previously indicate that we would rely on the brief but we are now simply going to rely on the brief is claim three, which is the jury selection issue.  I don't think that there's anything that we can add to our argument that's not already in the pleadings.

THE COURT:  All right.  I'm not going to hold you to it.  I just want kind of a preview of what you think you are going to be arguing.

MR. BURKE:  Claim 20 with regard to -- no, excuse me,

1188

not claim 20.  I don't intend to argue that.  We will rely on the evidence presented to you and our argument.  Claim 19 I will briefly argue, as well, with regard to the issue of the investigation into mental retardation.

I think, your Honor, that that is the totality -- Mr. Daley, are there claims I'm overlooking?

MR. DALEY:  Claim 30?

MR. BURKE:  Oh, and we will argue claim 30, as well, your Honor.  And briefly argue claim eight with regard to Juror Wilson and the evidence -- 28.

THE COURT:  What does 30 deal with?

MR. BURKE:  Thirty is the claim that the appellate counsel were rendered ineffective by Mr. Swerling's refusal, is our position, to provide him with the original trial file in this case.

THE COURT:  All right.

MR. BURKE:  And one other claim, your Honor, which I have to tell you I have not yet been able to answer the question which you raised in October with regard to claim 23, which is the inconsistent theories.  You asked whether that issue had been resolved by the Fourth Circuit's opinion in Mr. Fulks' case.  I have not had the opportunity to go back, I will tonight.  My belief is that the Fulks decision does not in fact resolve the issue with regard to Mr. Basham.  So I would like to argue that one, as well.

1189

THE COURT:  All right.

MR. BURKE:  And claim 24 is our Tennard claims, and we also would like to argue that.  I have a busy night ahead of me.

MR. DALEY:  Your Honor, just so the record is complete, about a week-and-a-half ago Mr. Fulks filed his petition in Supreme Court, and one of the two issues that's raised is the inconsistent theories issue.  So he's seeking certiorari on that issue.

THE COURT:  He raised only two issues?

MR. DALEY:  He raised a juror selection issue and the inconsistent theories issue, the government argued inconsistently in his case and Mr. Basham's case.

MR. BURKE:  Your Honor, just also, since we're talking about the Supreme Court, we filed a certiorari petition from this court's order regarding the disclosure of trial counsel's files.  It is my understanding that the court requested that the solicitor general respond, and the solicitor general's office contacted me about a week or so ago and asked for some additional time to respond.  That's before the Supreme Court.  I don't anticipate it would be -- would be conferenced any time before probably April or so.

THE COURT:  All right.  Well, as far as what you want to argue, I have written down what you said.  Let me recap it, if I could.  You want to argue the full competency claims

tomorrow morning first thing before Mr. Littlejohn, and hopefully finish. If not, we will finish after his testimony. And then ineffective assistance of counsel claims nine, 15, 16, one and two. They all relate in some way to the Sheriff Hewitt testimony or the strap testimony.

MR. BURKE: No, your Honor, claim nine concerns Mr. Harris and Mr. Swerling's concession of the elements to the jury.

THE COURT: All right.

MR. BURKE: Claim 15 concerns their failure to object to the admission and then scope of the evidence regarding Samantha Burns. And claim 16 involves their failure to request the use of the government's statements regarding Mr. Basham that were made in the closing argument in the Fulks trial.

THE COURT: All right. And then one and two deal with what?

MR. BURKE: Claim one is a claim against the original trial counsel for ineffective assistance in allowing Mr. Basham to --

THE COURT: Walk away.

MR. BURKE: To walk away. And claim two is ineffective assistance of counsel at the Jackson v. Denno hearing. And Mr. Hammond testified about that in his testimony in October.

1191

THE COURT:  All right.

MR. BURKE:  One and two sort of go together, because much depends on what testimony we receive tomorrow.  But I would say that one, two, and 11 all deal with the Hewitt testimony.  Claim 11 is the proffer during the trial.

THE COURT:  I wrote down what you said about the rest.  I know you said 24.

MR. BURKE:  Claim 24 is our claim that there was an improper argument made about causal nexus to the jury, that the jury was improperly informed that they needed to find a causal nexus to the mitigating evidence that was presented.

THE COURT:  All right.  We will be ready to hear from you tomorrow morning at 9:30.  Anything else while you are all here?

MR. BURKE:  Your Honor, just with regard to Mr. Basham, I wanted to let you know that we made the decision, speaking with Mr. Murray, that he should return to Arizona, that the possibility of Mr. Basham deciding to come out or being able to come out is so remote it was not worth his time or the court's staff time.

THE COURT:  Very good.  I have no problem with that.  All right.  Thank you, we will see you at 9:30 tomorrow morning.

(Recess, 4:14 p.m.)

1192

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  12-19-12                    s/  Daniel E. Mayo


                         DEFENSE WITNESSES

THOMAS M.  HYDE

        DIRECT                 1007

        CROSS                  1043

        REDIRECT               1090



                      GOVERNMENT WITNESSES

RICHARD L.  FRIERSON

        DIRECT                 1103

        CROSS                  1142

        REDIRECT               1182