1193

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
    -vs-                                    December 4, 2012

BRANDON LEON BASHAM,

         Defendant

------------------------------


            BEFORE HON. JOSEPH F. ANDERSON, JR.
          UNITED STATES DISTRICT COURT JUDGE
                   MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                     UNITED STATES ATTORNEY
                     BY:  ROBERT F. DALEY, JR.
                          JIMMIE EWING
                          JEFFREY M. JOHNSON
                          WILLIAM K. WITHERSPOON
                     Assistant United States Attorneys
                     1441 Main Street
                     Columbia, SC  29201

FOR DEFENDANT:       JULIA G. MIMMS, ESQ.
                     JULIA G. MIMMS LAW OFFICE
                     1001 Elizabeth Avenue, Suite 1A
                     Charleston, NC  28204

                     ARIZONA FEDERAL PUBLIC DEFENDER
                     BY:  MICHAEL L. BURKE
                          SARAH E. STONE
                     Assistant Federal Public Defenders
                     850 W. Adams, #201
                     Phoenix, AZ  85007

1194

COURT REPORTER:      DANIEL E. MAYO, RDR
                     Certified Realtime Reporter
                     901 Richland Street
                     Columbia, SC   29201


              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

THE COURT: All right. I'll be pleased to hear from whoever's going to speak first on the arguments.

MR. BURKE: Good morning, your Honor. And may it please the court.

THE COURT: Let me ask, do we want to do this issue by issue going defendant, government, back and forth, or how do you think we should proceed?

MR. BURKE: Whichever you prefer. I think that might be easiest, although --

THE COURT: It seems to me it would be easier to hear the competing arguments back to back.

MR. BURKE: I would say that the claims one through -- excuse me, the ones that we're talking about, the competency claims here, they are --

THE COURT: All together.

MR. BURKE: All together.

THE COURT: All together on those, certainly, but then let me hear from the government on competency, then we will move on to the others.

MR. BURKE: That's fine, your Honor. Thank you.

THE COURT: Very good.

MR. BURKE: So this morning we would like to begin by addressing claims four, five, six, and seven, which concern the issues of Mr. Basham's competency to stand trial, his attorneys' effectiveness in representing him with regard to

1196

his competency, this court's independent constitutional obligation to determine that Mr. Basham was competent at all points throughout the trial.

And then if the court requests argument on claim seven, claim seven is that the attorneys who represented Mr. Basham on appeal were ineffective in failing to raise the competency issue on his direct appeal. Obviously, that would not apply to claim five, which is an ineffective assistance of counsel claim. Our position is that we don't really need to go into claim seven because the claims that he's raised here are ones that cannot be waived and that this court must consider at any point. And we briefed those, the legal arguments for those, in our pleadings.

The question of Mr. Basham's competency, not only has it permeated the proceeding that we have had this fall but it's been an issue in Mr. Basham's case from the very, very beginning. Mr. Monckton's very first notes in this case ten years ago concern his observations and concerns about whether Mr. Basham was competent. One of the very first pleadings ever filed in this case was a motion by Mr. Monckton and Mr. Littlejohn to determine Mr. Basham's competency to proceed, and ten years later we're still debating it and it's still a very, very, live issue.

THE COURT: The first lawyers filed a motion and then Mr. Swerling and Mr. Harris withdrew it, right?

1197

MR. BURKE:  Yes, your Honor.  Yes.  And on that point, your Honor, we have heard testimony and the government has made arguments that Mr. Swerling and Mr. Harris made a strategic decision to withdraw that motion because they did not want to make Mr. Basham available to the government for an evaluation.  And what I would submit is the record plainly indicates that whatever merit that, quote unquote, strategy might have had disappeared once Mr. Basham had been sent to Butner in early 2004.  And many of the competency issues we're dealing with occurred after that point.  And then more importantly, clearly an attorney, defense attorney cannot make a strategic decision to allow his client to be tried while incompetent.  There's no strategy involved there.

But if we look at this case we see that from the very beginning even before you ever had a hearing --

THE COURT:  I had forgotten, Mr. Basham was sent to Butner in 2004?

MR. BURKE:  Yes, your Honor.  He was sent to Butner twice.  In fact, he had just returned from Butner when you held the Jackson v. Denno hearing in February of 2004.  I believe he was at Butner from January through mid February of 2004.  I'm not entirely sure on my dates, but that is the time frame.

THE COURT:  I'm embarrassed to say I had forgotten that, and so they said he was competent.

1198

MR. BURKE:  They did a full evaluation for purposes of the fact that Mr. Basham was presenting mental health mitigating evidence, so that's why they were allowed to have Mr. Basham present and to evaluate him.  They did not specifically do a competency evaluation because by that point Mr. Swerling and Mr. Harris had withdrawn any claim for that.

And, in fact, you may recall at one point when Mr. Basham -- Mr. Basham in 2003 was moved to the Columbia Care facility at the request of his attorneys and Dr. Schwartz-Watts so that he can receive care for his psychiatric illnesses.  The attorneys then filed a motion with your Honor asking that that stay be extended and submitted an affidavit or letter from Dr. Schwartz-Watts saying that Mr. Basham had -- she had been unable to even evaluate Mr. Basham because of his mental condition once he was moved there.

At that point the government itself said that there was reasonable evidence to believe that Mr. Basham was incompetent and they filed a motion to have the competency determined.  They later withdrew that based on statements made by counsel that they were not raising the issue of competency.  But that gives a little bit of the process.

THE COURT:  So the initial two attorneys, Littlejohn and Monckton, filed a competency motion, withdrew it, the government filed a competency motion and withdrew it also.

MR. BURKE:  The original counsel filed the motion,

1199

Harris and Swerling withdrew it.  The government argued in response to the request that Mr. Basham be able to stay longer at Columbia Care that obviously there needed to be a competency determination.  They withdrew that orally in a hearing with your Honor.  So that's the history --

THE COURT:  And along this time was Dr. Schwartz-Watts on board telling Harris and Swerling that he was competent?

MR. BURKE:  Along this time they were not asking, as far as the record --

THE COURT:  Was she in the case at that point?

MR. BURKE:  Yes, she was, she was in the case.  She did submit, as I said, a letter to your Honor, doesn't use the word competence but says that she -- in order for her to do her evaluation of Mr. Basham she needed him to stay longer at Columbia Care because his condition for the first few weeks he was there was so poor, I think she used the term he decompensated, she couldn't even do an evaluation.  So then in 2004 Mr. Basham is sent to Butner, not for a competency evaluation but for the evaluation with regard to the defense's intention to put on mental health evidence at trial.

At that time, I believe in early February 2004, there's a suicide attempt by Mr. Basham and then on the 24th of February is when this court began its Jackson v. Denno hearing.

1200

And, Susie, if you could bring up the morning transcript for February the 24th, 2004 and go to page two of that transcript for us, please.

So this was the morning, your Honor, of the joint hearing on the Jackson v. Denno motions filed in Fulks and Basham. The very beginning of the hearing it begins with Mr. Swerling informing the court that Mr. Basham was incoherent and he didn't understand the nature or purpose of the proceedings. And on page three he informs the court that Mr. Basham had attempted to -- apparently attempted to slash his wrists, and I think he uses the word "again" the night before he appeared in court.

Your Honor properly reacted to this information and requested that Dr. Schwartz-Watts determine Mr. Basham's competency to proceed that day. And Dr. Schwartz-Watts did inform the court later that day that Mr. Basham had had some mix-up with the drugs in his system, the medications that he had been given, but that that he would become more alert throughout the day. And so then the court began the actual evidentiary hearing portion of the hearing later that day.

As the case moved towards trial we learned at this evidentiary hearing that Mr. Swerling and Mr. Harris made the decision that the way that they thought they could control their client during their trial was to have him focus his energy and attention on drawing in a Scooby Doo coloring book

1201

and other childlike activity books.  And we heard about a memorandum written by their chief mitigation specialist Lisa Watson in which she detailed her visit to Mr. Basham prior to trial in which she instructed him that this was what he needed to focus on, he needed to focus on his coloring books.

Now, Mr. Swerling may tell the court today and Mr. Harris may tell the court today that they didn't have any concerns about Mr. Basham's competency, but I'd submit those actions speak volumes.  The very idea that before the trial even started they were aware of Mr. Basham's limitations such that they felt they had to keep him preoccupied with busy work suggests, regardless of what they tell you today, that there were true concerns about whether he could be an active participant in his own defense.

And I know, your Honor, much of what I tell you is information and experiences that you've lived and I've only read about, but you know that throughout the trial there were ongoing issues regarding Mr. Basham's -- either his inability to stay awake during proceedings or his inability to control his behavior and his outbursts.

In our reply brief on the 2255 motion on pages 32 and 33 we cite to several of the record incidents in which this court, and I'll use the word diligently attempted to accommodate the defense in working with Mr. Basham.  And there were concerns about whether he was able to stay awake, there

1202

were concerns about whether he can control himself in court.

THE COURT:  Well, I'll say what I said back when we heard this testimony.  Every time it appeared to me he was sleeping or trying to sleep I stopped and said something.  I know you introduced a newspaper article that said he slept during trial, but to me that doesn't prove anything to me when I was here.  I'm not sure how much actual sleeping he did. I'm certain maybe he tried to sleep, but --

MR. BURKE:  Well, I would submit, your Honor, that he wasn't necessarily trying to sleep, but we know from even Dr. Frierson's testimony, we know that Mr. Basham was taking quite a bit of prescribed medication and one of those was an antipsychotic, the Seroquel, which had the effect of causing drowsiness.  And you are aware that there were situations, there were times, and I'll talk about one specifically in a moment, at which Mr. Basham came to court not having been given his medication, something totally beyond his control.

So I would also point to the trial attorneys' handwritten notes that were admitted during the evidentiary hearing.  They also, I think, speak more clearly about what Mr. Harris believed about Mr. Basham's ability to actively assist in his defense.  They talk about his, and we use the term perseveration, but his complete focus during some of the most critical parts of the trial on whether he would be allowed to have dip.

1203

And you will remember, your Honor, there are notes from Mr. Harris where he says morning, dip, afternoon break or afternoon, dip, break, dip, all he talks about is dip. There are other notes saying he can't -- he will not sit up, he cannot keep his head up. I tell him that the jury's looking at him and they are seeing this.

Now, with regard to the dip issue, Dr. Schwartz-Watts indicated at trial that in one of the conversations that you had with her that the dip -- I believe this is right, I don't -- if I misstate the record I do apologize, it's a voluminous record, but if my memory serves correctly Dr. Schwartz-Watts said the dip served the purpose for Mr. Basham, twofold, it kept him calm and it kept him awake.

THE COURT: Does dip have caffeine-type effects or not? I don't know.

MR. BURKE: From what I understand from speaking to experts about it, that the nicotine can have that effect.

THE COURT: I know I offered him coffee and other stimulants but he kept going back to the dip. And I thought if that's what it takes to make him happy, I actually sent my law clerk down to buy a can of dip. I think it's still in my desk drawer in my office. Out of my own pocket I bought the dip and we came back Monday and the marshal said can't do it. And I always defer to the marshal in matters of security. He said it creates a problem of him spitting something on our

1204

guards and there had been some incidents of scuffles. And I had to go back on what I told him, unfortunately.

MR. BURKE: Your Honor, I would like to share something with you, but may I confer briefly with Miss Stone?

(There was a pause in the proceedings)

MR. BURKE: Your Honor, on the point of the dip, since you bring it up, I want to share something with you that you will -- we all remember how this hearing started in October and it wasn't very pleasant.

THE COURT: All right.

MR. BURKE: Mr. Murray was with Mr. Basham that day, and I will tell you that Miss Stone and I have represented Mr. Basham for three years and never once during those three years has Mr. Basham ever mentioned dip to me. Mr. Murray had no experience with Mr. Basham and when the hearing started, the very day, the very morning the hearing started when Mr. Murray indicated that he wanted to talk to us, Mr. Basham almost immediately began perseverating about dip again, which we thought was very telling, that -- and this goes to the fact that you heard the testimony from Dr. Parker, your expert, that Mr. Basham can have difficulty dealing with the stress of the courtroom setting.

But my point on the dip is we have heard continuously from the government that Mr. Basham is a manipulator, that he manipulates his defense team, he manipulates you, he

manipulates experts.  I'm not sure in this instance, to me it strikes me that Mr. Basham was seeking to control his behavior.  He believes, and he may be right, that the dip helped him to stay calm and focused.  And we all know what happened when the court made the decision that you could not give him the dip.

So the question comes down to is this a matter of what the government would have you believe, that Mr. Basham just doesn't care, just doesn't want to control his behavior, or if he's not able to control his behavior.

And I would like to just talk for a minute about Dr. Hyde and Dr. Frierson.  And, your Honor, I can't imagine anything more frustrating for a jurist than a battle of experts, and when you have two experts who come forward and tell you two different things it has got to be extremely frustrating.

Dr. Hyde testified yesterday and he said in his report that Mr. Basham is permanently incompetent to stand trial.  He says that he's incompetent because of his brain damage and his cognitive disorders, because of his ADHD and because of his bipolar disorder, his mood swings, which according to Dr. Hyde happened in a very rapid fashion.

Now, Dr. Frierson, you know, your Honor, Dr. Frierson used a phrase in his report and the government asked him about this phrase, or perhaps we did, but he said that he thought

1206

that Mr. Basham was being coy and cagey with regard to his statements about hearing voices and auditory hallucinations. And, your Honor, frankly, I think that's a projection on Dr. Frierson's part. But I will tell you that I will do a projection, I believe that Dr. Frierson was being coy and cagey when he testified to you about Mr. Basham's competency at trial. He says that, there was essentially a double negative, there is insufficient evidence to show that he was not competent. He didn't say he wasn't competent, but that at this removed there's insufficient evidence to say he's -- say he was incompetent at trial.

THE COURT: Both doctors agreed that a look-back eight years after the fact is not desirable, not optimal.

MR. BURKE: Not the least bit.

THE COURT: But we did have Dr. Schwartz-Watts who has testified in this court many times, sometimes for the defense, sometime for the prosecution, who every step of the way said he was competent except for the one afternoon of the scuffle, and then the next morning she said he was good to go again.

MR. BURKE: And what she told you, your Honor, on that day of the scuffle, when she came back in she said he's not competent to proceed. And, your Honor, you did, you stopped the proceeding.

If you will look at her testimony, she said that the

1207

good news is that his competency will fluctuate, he will have -- I'm paraphrasing, but basically she said he will be competent again.  She did not say that -- she told you at least at that point that he was incompetent, but the good news was that he wasn't always going to be incompetent.  That's what Dr. Schwartz-Watts said.

And I'll talk about that more fully in just a minute.  But I want to focus just also on what Dr. Frierson and Dr. Hyde agree on.  They both agree that Mr. Basham has ADHD and he has cognitive deficits.

Now, Dr. Parker, and he didn't testify about trial competency but he did testify about Mr. Basham's abilities to function.  Said that he agreed with the ADHD, he agreed with the cognitive deficits, and he told your Honor that he thought Mr. Basham could only take a hearing such as this, so I would translate that certainly to a trial in front of a jury, in short segments, 15 minutes is what he suggested.  There were not, and I'm not saying accusatorially, the fact of the matter is there were not breaks every 15 minutes during trial and, really, I can't imagine how a court could function if it had to do that.

But I think despite what arguments you hear today from the government about the fact that Mr. Swerling and Mr. Basham were not concerned, I think their actions at that time, we saw -- we saw notes yesterday and that were apparently

1208

written by Mr. Basham.  And one of the issues that came up was that when, and I think Dr. Frierson testified to this, the one time he apparently did try to participate in his defense with his attorneys and asked them about a witness that they could call, and he was shushed by his lawyers.  He wasn't paying attention to his Scooby Doo book, which is what they needed him to do because they felt they could do their job.

Interestingly enough, I was looking back last night and it appears to me that this one thing that Mr. Basham showed interest in with regard to his trial really had to do with an incident at the jail, that didn't really go to anything about his guilt or innocence or his eligibility or appropriateness for the death penalty.  So, I mean, it shows Mr. Basham's, his limited focus, his limited ability and his preoccupation with what Dr. Frierson said is his immediate gratification.  Now, the question becomes is that because he's willfully trying to do that or is he simply unable.

You know, ADHD, we hear it all the time, but it has true meaning.  I mean, I don't suffer from ADHD, but from what I understand and what I have been told by my experts is that for Mr. Basham with the type of ADHD that he has, sitting here today he would be unable to differentiate, and Dr. Hyde uses the term that it all has the same balance, was the word he used.  But the fact that I was talking to you would not -- could not be the sole focus.  He would notice you are rocking

1209

in the chair, he would notice -- everything would be the same. He cannot -- he is physically incapable of bringing that focus in. And he's having to deal with that with an IQ in the lower six to seven percentile range.

No one disagrees about that either. Mr. Basham has an IQ that had it presented itself and we were able to prove it presented itself before the age of 18 likely would have made him constitutionally ineligible for the death penalty. I mean, he is a severely compromised human being.

And whether you believe he has bipolar disorder or not or whether or not you believe he hears voices or not really doesn't ultimately matter. I will say obviously the doctors who were giving him the antipsychotics felt there was a reason to give it to him. And we add on top of that then the fact that with his limited IQ, with his ADHD, he was then being given a medication that can have the effect of causing drowsiness.

And I -- I would point your Honor to some interesting language. There's a case called Riggins versus Nevada from the United States Supreme Court in 1992. And it's not a competency case. We do cite it in our pleadings in the reply brief. It isn't a competency case, per se, it's a question about whether the government could, could require that a defendant take antipsychotic medication. But Justice Kennedy wrote a concurrence in that decision where he talks, I think

1210

very cogently, about the effects of medicating a criminal defendant with antipsychotic medication.

And to quote part of what he says, the Riggins cite is 504 U.S. 127. Justice Kennedy wrote in his concurrence, the side effects of antipsychotic drugs can hamper the attorney-client relationship, preventing effective communication and rendering the defendant less able or willing to take part in his defense. Render him less willing.

So even if this court were to think that there was some volitional aspect to Mr. Basham's actions that could in fact be attributable to the medications he was on, I would submit that Dr. Frierson did not address at all the effect that these medications would have had on Mr. Basham.

He also doesn't take any issue, because he's not qualified to do so, with Dr. Hyde's neurological findings that provide objective evidence that Mr. Basham is brain damaged. And today we have seen that Mr. Basham is a damaged young man, and ten years ago or eight years ago when he stood trial he was frankly barely more than a child, and emotionally I don't know how -- emotionally and intellectually he really has not gotten any better.

On the point of manipulation, I looked the other night at the definition of manipulation in the Oxford English Dictionary on line and it talks about skillful or unscrupulous control of the situation or of a person. It implies that the

1211

person who manipulates is doing so to gain some advantage.

And I tried to think what advantage Mr. Basham was manipulating the court and his counsel to achieve through his outbursts at trial. He was alienating his defense team that was trying to save his life, he angered you, he alternately acted out and drowsed or maybe slept in front of the jury. He gave the jury the impression that perhaps he had no remorse, that he just didn't care. And alternatively that he was volatile. So we would ask you broadly to accept Dr. Hyde's testimony and his opinion that Mr. Basham is permanently incompetent to stand trial.

But I would like to focus on two particular issues, because even if you disagreed with that, your Honor, even if you were to reject Dr. Hyde's testimony, there are two incidents that occurred at this trial that I believe are dispositive of the issue in claim four, that indicate by a preponderance of the evidence that Mr. Basham was in fact tried while he was incompetent.

And I would like to begin with the September 20th, 2004 incident with regarding the dip and the struggle with the U.S. Marshals. Susie, could you go to the September 20th transcript at page 157?

And, your Honor, on that transcript at the bottom of 157 heading over to page 158, you have a statement from Mr. Harris that I think is interesting, because we heard during

1212

this evidentiary hearing that Mr. Harris and Mr. Swerling never had concerns about Mr. Basham's competency. Well, they obviously weren't remembering the statements they made to you in candor at the -- in trial on September 20th when Mr. Harris said to you, and he's talking about the incident with the marshals, what I just saw in the courtroom didn't look like any attempt to manipulate that I had ever seen. Looked like someone who didn't have the ability to control the simple function of sitting down in a seat. That is why we have concerns about Mr. Basham's competency. That was the day that Dr. Schwartz-Watts evaluated Mr. Basham, came back and told you that he was not competent at that moment and that he could not assist his attorneys.

Now, the standard for competency concerns the present ability to assist counsel, and I think that becomes an important factor in this case. Now, there's no contrary evidence in this case, none, that Mr. Basham was competent on September 20th. The only evidence that you have, your Honor, is that he was incompetent and you had that from Dr. Schwartz-Watts, you had that from doctor -- well, you have it -- let's focus that. You have it from Dr. Schwartz-Watts and you have the statements from his attorney saying, your Honor, I have a legitimate and serious concern about his competency.

Your Honor, you did the appropriate thing that day,

1213

you stopped court and you waited until Dr. Schwartz-Watts came in the next day and told you he was now competent to proceed.

THE COURT: Had she come in the next day and said he was still not competent I would have waited another day.

MR. BURKE: I entirely agree, your Honor. Here's the problem. That incident was videotaped and audio taped. And that videotape and that audio tape was played to the jury at the penalty phase.

THE COURT: I think I kept the audio out, didn't I?

MR. BURKE: I don't believe so. I can --

THE COURT: I thought because there was a lot of profanity used.

MR. BURKE: I think there might have been some editing done. But for the purposes of this the video alone is enough. The video was shown to the jury, and what we have is a record that says that Dr. Schwartz-Watts had said Mr. Basham was incompetent and the jury was shown a video of Mr. Basham at trial while incompetent. And even more egregiously, without any objection to competency from his trial attorneys that was admitted and the jury -- the jury heard argument from the government that this was evidence that they should give some weight to show what a dangerous man Mr. Basham was.

MR. WITHERSPOON: Your Honor, I'm going to have to object. This is a new claim. There was never an issue, excuse me, I'm sorry, Mr. Burke, the issue of whether or not

1214

there was some error committed by the court by allowing this videotape to be shown to the jury.  That is not a claim that's ever been raised.

THE COURT:  Dangerousness in prison was definitely an issue.  I thought the defense lawyers argued strongly to keep the whole thing out.

MR. WITHERSPOON:  They did.

MR. BURKE:  They did not argue on competency.

THE COURT:  They argued it was prejudicial, unfairly prejudicial to let it in, I think.  But you are saying that --

MR. BURKE:  They never --

THE COURT:  -- we've got a situation where he was incompetent and the jury got to see him behave on a day when he was incompetent.

MR. BURKE:  And the due process clause prohibits that.  And I disagrees with Mr. Witherspoon's suggestion this is a new claim.  This is set forth in a couple of places, but fully set forth in our reply brief to this court on page 31. The record in this case indicates by a preponderance of the evidence at the very least Mr. Basham was incompetent when the videotape and audio tape were made of the struggle with the U.S. Marshals and the court deprived him of his right not to be tried while incompetent when it allowed the government to use his incompetence to its own advantage.  That's in our pleadings, your Honor.  That's not a new claim.  And it's a

legitimate and troubling one.

THE COURT: I'm pretty sure I kept out the audio and let in the video. I think it was kind of a split decision there, because the government wanted the audio to come in, as well. Anyway, go ahead with your argument.

MR. BURKE: Thank you, your Honor. The next incident I would like to bring to the court's attention -- and I would submit to you that showing the jury that videotape alone violated Mr. Basham's rights to due process and requires that his conviction, at the very least his sentence, be reversed.

Then there is another incident which again standing alone requires relief in this case. And that is an incident that occurred, and it's discussed at length in our pleadings, on October 26th, 2004 during the penalty phase of Mr. Basham's trial.

But before I get to that I would like to give some context to Mr. Basham's mental state at that time and talk about Dr. Frierson's report and share with the court information that because of the attorney-client privilege prior to Dr. Frierson's report I was not able to share with the court.

On October 22, which was a Friday, the defense called as a witness a former counselor, program director, from the Charter Hospital in Evansville, Indiana, a woman whose name is Penny Titzer. And she testified about Mr. Basham's

1216

hospitalization at Charter Hospital, and then she proceeded to testify about Mr. Basham's trauma from the molestation that occurred to him when he was a young boy.

If the court would like to review -- and, Susie, perhaps we could bring this up, October 22, '04 at 212.  While one of the defense attorneys was examining Miss Titzer on direct appeal the other provided some signal to your Honor that they needed a break and that Mr. Basham was unable to go forward at that moment.

In our reply brief, so there's no question about this claim having been presented, we set forth the discussion with regard to Mr. Basham's statements that day.  He is clearly in emotional distress.  It's, obviously, it's not clear from the record why, but he was in clearly emotional distress.  And again, your Honor, to your credit, you stopped court that day and you did not go forward.  That was on Friday the 22nd.

When I read Dr. Frierson's report last week when we received it I saw a reference that frankly shocked me and leads me to question Dr. Frierson's -- the entirety of Dr. Frierson' findings.  But if you look at Dr. Frierson's report, with I believe is government -- let me check the exact number, but it's government's exhibit -- your Honor, I'm afraid I don't have the exhibit number for you at the moment, but it was submitted during Dr. Frierson's testimony without objection.  And it's his report that he just recently

1217

authored.

And under the section on page 11 entitled social history, third paragraph, Dr. Frierson wrote he, meaning Mr. Basham, reports that his first sexual experience occurred around age 14 or 15 with a therapist at Charter Ridge Hospital. He states that he fell in love with the therapist. He denies history of long-term relationship and reports that the relationship with Penny lasted approximately six months.

I was shocked to see Dr. Frierson refer to this as a sexual experience and put it under Mr. Basham's social history. Mr. Basham was a hospitalized 14 or 15 year old who told Dr. Frierson that he had a sexual relationship with an adult female who was in a position of control and power and in whom he had great trust. This is not a sexual relationship, this is an act of sexual abuse, of molestation.

Now, the part with the attorney-client privilege I was going to mention to you is Mr. Basham told Miss Stone and myself early on in our representation about this Miss Titzer. And he is a limited individual, he is a very limited individual --

THE COURT: Let me see what Mr. Witherspoon --

MR. WITHERSPOON: Excuse me, but it seems like he's testifying, Judge. I don't know what Mr. Basham told Mr. Burke and Miss Stone, that's evidence that we can't -- have never had, and he's coming in here, and he's done it couple of

1218

times, to come in, report about instances or during -- involved with Mr. Basham and what he has told them and what has happened.  There's no way for us to corroborate that.  I can't put Mr. Burke and Miss Stone on the stand and question them.  I think that's inappropriate at this point.

MR. BURKE:  We have also made it clear, your Honor, that we were -- Dr. Frierson made no request to speak to us and so -- but, your Honor, I'll move on.

The facts speaks for itself that Mr. Basham was in court on October 22nd when a person who had sexually abused him, who had been called by his own defense counsel to testify, testified about his own sexual abuse.  Anyone, I would submit, would be traumatized by that.  But when you look at Mr. Basham's limited psychiatric and cognitive abilities it's no wonder he fell apart that day.

And your Honor you did stop the hearing, I understand that, but that is preface, I think, for what happened next. And that is on October the 26th, which was the very next court date.

THE COURT:  Did we know about this sexual episode with the hospital worker --

MR. BURKE:  No, your Honor.

THE COURT:  -- by any other doctors?

MR. BURKE:  No, your Honor.

THE COURT:  So Frierson was the first one who

1219

uncovered that.

MR. BURKE:  The first -- I don't want to testify, he is the first health care professional who's ever reported that.

THE COURT:  All right.

MR. WITHERSPOON:  And that was from Mr. Basham.

MR. BURKE:  That was from Mr. Basham.  And that was reported by the government's expert.  Again, your Honor, you stopped court that day.  On October 26th, which was the next court day after a three-day break with the weekend, the court commenced and trial counsel informed you that Mr. Basham had not been given his Seroquel, the antipsychotic medication, and that he was not competent to go forward, in their opinion.

The judge, your Honor, you then held an ex parte hearing in which you instructed that Mr. Basham be sent back to the jail facility to be given his medication.  Mr. Basham expressed concerns that the medication would make him drowsy, but he was sent back, you took a break for the morning.  Reluctantly, but you did.  You informed the jury that the case for no one's fault had to break for the morning, it was going to delay the trial, in fact it was going to delay the deliberations into the next week, but -- and asked the jury to come back at 1:00 o'clock.

At 1:00 o'clock when trial recommenced trial counsel informed your Honor that they still were not ready to go

1220

forward with Mr. Basham and they asked for 15 minutes and you gave it to them.  And after 15 minutes they came back and said we still can't go forward, Mr. Basham is not capable to assist us today.

And, Susie, could you go to the transcript for October 26th of 2004, page 14?

Your Honor, this is set forth in total in our reply brief but I think it bears repeating here, and I will read the portions of the transcript to you.

Mr. Harris states, my observation of Mr. Basham is that he is not going to be able to sit in the courtroom and pay attention to the testimony and remain silent.  And I am concerned that he will -- that this jury will not look favorably upon the way he is appearing to me to be acting this afternoon.  Your Honor asked the prosecutors for their position.  Mr. Schools responded, our position is we need to go, Judge.  We have rearranged everybody's schedule to accommodate Mr. Basham's feelings from moment to moment.  I think we have done that enough.  I think we now are to the point where he thought he would get this if he did this by habit.  So we are there and I think we should bring the jury.  At some point he is going to have to suffer the consequences of his own behavior and this is as good a time to start now as any.

Your Honor responded, well, I agree with everything

1221

you said except the failure to take the medicine was not really his fault.  And the prosecutor responded, once again, Judge, it is a medical problem.  Dr. Schwartz-Watts should be here to testify about it.  And I think that is why they are paying all of these doctors all of this money to treat him.  I don't know where she is but she is not here.  So now we go to Mr. Harris to opine about whether his own client is competent or not rather than have a doctor who might actually know.

And you said to Mr. Harris, Mr. Harris, I have tried to bend over backwards to do everything possible to keep the defendant on an even keel and a good frame of mind, and especially so that he won't show out in front of the jury. But the jury is really worn out, they have sent signals indirectly to me they really want to see this case move along. I think there is a danger to be balanced against what you say. These continued delays are going to be held against the defendant, I think.  I think the jury will figure out that it is the defendant that is causing these delays.  So I think I have got to weigh in the balance of the aspect of it versus the danger of going forward with him appearing to be a little bit disheveled over there.

Your Honor, with all due respect, I believe when you made the decision to go forward that day when Mr. Basham's attorneys were telling you that their client was not able to do that, when Mr. Basham's attorneys had apparently failed in

1222

their obligation to have their client evaluated by their expert and the decision was made to go forward not because there was any disbelief about the sincerity of Mr. Basham's problems but because the trial simply had to go forward, so that as a result even if you were to reject everything else that I've argued about competency, that day Mr. Basham's tried while he was incompetent and it occurred during the penalty phase --

THE COURT:  This was after the scuffle incident on the 20th?

MR. BURKE:  Yes, your Honor.  It was one month after, one month and four days.  It was near the very end of the trial on October 26th.

I believe what happened on the 26th implicates three of the claims that we have.  As I just said, it supports our argument that by a preponderance of the evidence Mr. Basham was incompetent at this trial.  And I can't think of a more critical proceeding than the penalty phase of a death penalty trial.  It goes to claim five, our claim that trial counsel were ineffective in failing for have their client evaluated.

Now, we have argued and I still believe that they had an obligation much earlier to do so, but that day despite what they say today they can not take away their words there.  They were genuinely concerned about Mr. Basham's competence to proceed and they failed to get their expert to evaluate him,

1223

their expert who had previously only a month earlier said, yes, he's not competent at this moment but the good news is he will be competent again.

And I would point out, your Honor, it's just a matter of law, I was going to say a fine point, but it really is a matter of law, to succeed on claim five we need to prove that Mr. Basham's lawyers fell below the standard of competence of a federal death penalty lawyer.  Mr. Hammond testified that with regard to their failure to have Mr. Basham evaluated for competency that they did so.

We then need to prove, not by a preponderance of the evidence standard that we would need to show for claim four, but by a lesser standard under Strickland that is there a reasonable probability that an expert would have found Mr. Basham incompetent had he been evaluated that day.  I can give you a case that will support that position, we cite it in our briefing, but it's Futch, F-U-T-C-H, versus Dugger, 874 F.2d 1483.  It's a 1989 decision from the Eleventh Circuit.

So our obligation on claim five is we have to underline competence in the question of whether had counsel had Dr. Schwartz-Watts evaluate Mr. Basham that day that she would have informed the court as she did the month before that at that time he was not competent.

And, finally, your Honor, with greatest respect, I believe that by not independently asking that Mr. Basham be

1224

evaluated for competency on the 26th that the court violated his rights under Drope versus Missouri, the court's independent observation to maintain that throughout a trial a defendant remains competent. And so with that, your Honor, we would argue that Mr. Basham is entitled to relief on claims four, five, and six.

With regard to claim seven, it goes to the issue of procedural default. I haven't focused on that because not much has been said about whether any of these claims would be considered procedurally defaulted. I submit to you and we argued in the pleadings they would not be. They cannot be. They are the most fundamental type of constitutional claim, and they go to not only a defendant's due process right but to the integrity of the entire judicial system.

But even if this court were to find that what we would ask to show is appellate counsel chose to -- did not include this viable claim in the direct appeal and that they did so at the -- where they included less viable claims. And we know from the Fourth Circuit's opinion in Mr. Basham's direct appeal that that is exactly what his appellate lawyers did, they raised a claim that the trial judge, they said that you, your Honor, had erred in not allowing information about the government's statements about Mr. Basham being a puppet at the Fulks trial and not allowing that to come in.

And the court came back and said Mr. Swerling and Mr.

1225

Harris never asked him to do that.  We can't even -- even review this for fundamental or for plain error, there's no way we can review this.  That was a claim included by appellate counsel over these claims.  So even if we had to, which we do not, but even if we had to show there was some way procedural default we would submit that satisfies the standard, your Honor.

THE COURT:  All right.  Mr. Littlejohn is here.  Do you want to go ahead and take his testimony so as not to delay him?  Does the government mind waiting on your responsive argument?

MR. WITHERSPOON:  No, sir.  I didn't know if Mr. Burke was finished.

THE COURT:  Were you just about finished, Mr. Burke?

MR. BURKE:  I am finished, your Honor.

THE COURT:  Let's go ahead and allow Mr. Littlejohn to testify, then we will get back into the argument.

MS. STONE:  Your Honor, very briefly before we call him, can I clear up the issue on the audio and videotape?  I think I found the point in the transcript.

THE COURT:  All right.

MS. STONE:  On October 15, 2004 at page 18 your Honor makes your ruling and you state, it is my intention that much of the proceedings should be disclosed to the jury by way of testimony and publishing of the video and audio.  Consistent

with my practice in other criminal cases I will allow the transcript to be distributed to the jury to use as an aid in the understanding of the audio.  I will do so with a cautionary instruction that it is the audio tape itself that constitutes the evidence.

And then the following day in court Exhibit 469A and B note that there are audio/video/transcript of courtroom scuffle.

THE COURT:  I was wrong, I did allow the audio and the video to be --

MS. STONE:  That's what it appeared to me.  There were redactions, it would be a lot longer portion of transcript for me to read all of that, but overall --

THE COURT:  There were some redactions from the audio?

MS. STONE:  From the audio, and I believe the video was shortened in the beginning.  There was concerns about the jury thinking it was a reaction to you rather than the marshals' ruling and there was a fairly detailed discussion of that.

THE COURT:  All right.  Very good.  All right.  Go ahead and call Mr. Littlejohn.

MS. STONE:  The defense calls Mr. Littlejohn to the stand.

(Cameron B. Littlejohn, Jr. duly sworn)

DIRECT EXAMINATION

BY MS. STONE:

Q.  Good morning, Mr. Littlejohn.

A.  Good morning.

Q.  My name is Sarah Stone, and we have spoken briefly on the phone but we never actually met.  Thank you for adjusting your schedule to get here today.

A.  Yes, ma'am.

Q.  Can you give us a little background about yourself before we start talking about your involvement in the Basham case?

A.  Well, I guess you want academically?  You don't want me to go all the way back -- okay.  I graduated from Wofford College with a BA degree in 1972, I went to the University of South Carolina School of Law, graduated in 1975.  I was an assistant attorney general until 1980 when I became an assistant U.S. attorney.  I served in that capacity until 1987.  Since then I have been in private practice.  I did a little, about a year-and-a-half stint in the civil section of the attorney general's office, but I have been in private practice for the vast bulk of my practice years, which are I believe 36.

Q.  Is a large part of your practice in criminal law?

A.  Yes.

Q.  And I know you have someplace to be today and I'm going to keep this fairly brief.  There are just two areas I want to talk to you about, the Thanksgiving search and then competency

Littlejohn - Direct                          1228

concerns with Mr. Basham.

A.   That's fine.  Take your time.

Q.   I would like to start with the search, but first a little background.  Can you -- do you recall your appointment to represent Mr. Basham in federal court here?

A.   I do.

Q.   Can you describe that?

A.   It was Wednesday, I believe the date was November 26, 2002.  Judge Tom Rogers called me, I was getting dressed to go to work.  He told me he had a situation involving a potential death penalty case, needed a death penalty qualified attorney, and asked me to come over to Florence and so I got dressed and went straight to Florence.  And met with -- I think I initially went to Judge Rogers and he told me basically what it was and he was appointing me to represent Brandon Basham.

Q.   And you had to make some decisions fairly quickly in this case, is that a fair statement?

A.   Very quickly, yes.

Q.   Where was your information coming from about the case at this point?

A.   Well, Billy Monckton was also appointed to represent Mr. Basham.  Mr. Monckton got to the district courthouse in Florence about 20, 30 minutes before I did.  He was meeting with Rose Mary Parham when I went to the U.S. Attorney's Office.  She had given him kind of a thumbnail sketch of what

Littlejohn - Direct                    1229

had transpired in the last few days and the days preceding

that with the events that Brandon was accused of being

involved in.  And so then I joined in the conversation and we

learned through Rose Mary some of the basic details about what

was alleged to have happened and what Brandon had done upon

his arrest in West Virginia.

Q.  Did you also have an opportunity prior to the search to

talk to Richard Hughes?

A.  No.

Q.  Okay.  Did you have many police reports or medical records

at this point?

A.  None.

Q.  And when did you first meet Mr. Basham?

A.  I met him that day.

Q.  The day of your appointment or the day of the search?

A.  The day of the appointment.

Q.  And can you describe, where did you meet with him?

A.  If I recall, I'm trying -- I was trying to think whether

we met him at courthouse or just briefly talked to him in the

courthouse and then went to the jail and talked to him.  I

can't remember exactly.  But we did meet with him briefly on

that day.

Q.  And do you recall any initial impressions of Mr. Basham?

A.  Well, without going into an attorney-client privilege, Mr.

Basham was a young man who was in a lot of trouble.  So it was

kind of hard to assess his basic personality or -- I mean,
when somebody's in that situation they are obviously under a
lot of stress and everything so you can't really tell exactly
what they are like in a normal setting.

Q.  And you say your appointment was on November 26, 2002.  Is
it your recollection that the search was the following day,
November 27th, 2002?

A.  It was Thanksgiving day for sure.

Q.  And let's talk about the search itself.  Was that already
put into motion prior to your appointment, the plan to do a
search?  Were the wheels in motion on that search before you
and Mr. Monckton were appointed for Mr. Basham's case?

        MR. JOHNSON:  Your Honor, just on the date, I believe
the Wednesday would have been November 27th and Thursday would
have been the 28th, is my understanding, just for the record.

        MS. STONE:  Thank you.

        THE COURT:  All right.

        THE WITNESS:  Thank you.  That was ten years ago.

Q.  (MS. STONE) I had it wrong in my notes, too, if it makes
you feel better.

A.  Let's see.  On that Wednesday, the 27th -- no, as I
understood it they had brought Mr. Basham down because
Mr. Hughes had expressed to the government agents that Mr.
Basham wanted to participate and help find Miss Donovan.  And
so to that extent the plans had been made, because he was

brought down to South Carolina, as I understood, for that particular purpose. So that was kind of in the works, yes. As to the details and everything, no, that wasn't worked out until we talked to Mr. Basham.

Q. Okay. And do you recall the area where the search took place?

A. Yes. Brunswick County, North Carolina.

Q. And do you recall why that particular -- the search started in that particular area?

A. As I understood it, Mr. Basham had already identified that area or what he knew about that area to law enforcement prior to coming to Florence.

Q. Do you have any recollection that law enforcement had information that Mr. Basham and Mr. Fulks are believed to have been seen in the area, as well?

A. I understood from the agents that there was some people at a deer hunt clubhouse that had seen a vehicle matching the description of Miss Donovan's vehicle, and then there was also some mention of a vehicle, similar vehicle had been seen in a local cemetery, if I recall.

Q. And were those -- did you go to those locations during the search?

A. Well, we started out at the hunt club. I think it was Bee Tree Hunt Club, or something like that. And that's where -- when we got to Brunswick County that's where we stopped and

Littlejohn - Direct                    1232

that's where the officers and the firemen and the volunteers and everybody who had volunteered to go out and search that day had assembled.

Q.  And that brings me somewhat to my next question.  There were a lot of people involved in the search.  Do you have any recollection of a ball park number on how many law enforcement officers were there that day?

A.  Well, in the actual two-vehicle search there would have been -- officer-wise there would have been about six.  At the hunt club there must have been 25 or 30 folks who were with primarily local.  I can't remember how many.  We went in the clubhouse to use the facility and there were about 25 or 30 guys scowling at us.

Q.  And you mention a lot of officers that were involved in the search were local officers from that area.

A.  I believe so.  I think the impression I got was they were going to stay there at the hunt club lodge until there was an area identified and then they were going to come in and search on foot.

Q.  And did you know at that point if Mr. Basham had had any history with that area?  Had he ever lived in South Carolina or do you have any of that type of information?

A.  You mean historically?

Q.  Historically did he have any prior -- besides the Donovan crime, had he had any other contact with the area?

A.   My understanding was no, he had never been to Myrtle Beach or Brunswick County, North Carolina.

Q.   And prior to Mr. Basham being brought down for the search, do you recall where he was being housed after he was transferred to South Carolina?

A.   Miss Stone, if I remember, he was -- I think he was housed somewhere in Kentucky when he supposedly escaped.

Q.   I'm sorry, I apologize.  Once he was -- where was he housed once he was transferred in here in South Carolina?  My question was not clear.

A.   The Wednesday night before Thanksgiving he was housed at Darlington County Detention Center.

Q.   And about how far away is that from the Bee Tree Hunt Club where the search started?

A.   Miss Stone, I'm not sure.

Q.   It's been a long time.

A.   Yeah.

Q.   How did Mr. Basham get from -- how was he transported, if you know, from the jail to the hunt club?

A.   I can tell you specifically, we rode in a van.  Apparently two Conway police officers had borrowed a van from a local dealership for this purpose and so we -- I met them at the Darlington County Detention Center, and there were two officers from Conway, to FBI agents, Brandon and I, and I don't believe there was anybody else in the van, and we went

Littlejohn - Direct                    1234

up to Brunswick County and met the Brunswick County authorities.

Q.  So did you get to talk to Mr. Basham a little more during that ride to the search?

A.  I spoke with him briefly before we left the detention center and told him, you know, that this is what we're doing. And, you know, I feel like he understood.

Q.  And it sounds like from the description there was law enforcement officers in the van with you when you drove with Mr. Basham.

A.  Yes.

Q.  So fair to say you didn't get into too many detailed discussions with Mr. Basham in the van?

A.  No, not at all.

Q.  And that's because there would have been no privilege.  Is that because there would have been no privilege?

A.  Well, our purpose was to go and try and find Miss Donovan, so I didn't know what Brandon had told officers before I got involved in the case, so I didn't want him giving any statements, and so I didn't want him to say anything that could be overheard by officers and later be questioned whether it was admissible or not.

Q.  Okay.  We will talk a little bit more about keeping Mr. Basham from speaking in a moment, but first I want to talk about the logistics of the search.  You mentioned earlier

Littlejohn - Direct                              1235

there were two law enforcement cars and Mr. Basham rode in one of them, and that was the van, as well?  Is that the same van you guys rode down in?

A.  Yes, that was the same van.

Q.  Did more people join in with you and Mr. Basham and those two Conway officers in the van for the search?

A.  Yes.  The two FBI agents, I don't remember exactly what they did, I think they may have gone back to Florence.  But in the van when we got to the hunt club and started the search there was an officer from Conway driving the van, there was Sheriff Hewitt, there was Brandon, there was I, there was Billy Monckton, Jeff Long with the FBI, and then the other Conway police officer.

Q.  Okay.

A.  And there were two FBI agents in a car that followed us.

Q.  Do you recall where Mr. Basham sat in the van?

A.  Yes.

Q.  And where was that?

A.  Well, I can tell you specifically.  The Conway officer was driving, Sheriff Hewitt was the front passenger next to him, Brandon was in the seat, the captain's chair behind the driver, I was behind Sheriff Hewitt.  The back bench was Billy Monckton, Jeff Long, and the other Conway officer.

Q.  Did you or Mr. Monckton get any kind of proffer prior to doing the search with Mr. Basham?

Littlejohn - Direct                              1236

A.  Proffer agreement?

Q.  Yes.

A.  No.

Q.  Did you try to get a proffer agreement?

A.  If I recall, we asked about it, but it was Miss Parham refused to give us one.

Q.  Did you nonetheless advise law enforcement officers that were there that day about speaking with Mr. Basham?

A.  From the very get go, yes, we advised them we were not there to give a statement and that Brandon was not to be questioned, that we were there specifically and only for the purpose of him giving directions as best he could to where Miss Donovan might be located.

Q.  And were you -- I think you may have already answered this question, but were you aware that Mr. Basham had already made some statements in Kentucky?

A.  Yes.

Q.  But it sounds like you weren't exactly clear at this point the specifics of those statements, is that a fair statement?

A.  That's correct.

Q.  Did that affect -- did the knowledge that he had already spoken with law enforcement affect your decision to go forward with the search?

A.  Yes.  It was my understanding that he had sat down with agents for some hours and had more or less confessed to he and

Mr. Fulks' involvement in Miss Donovan's situation. And Miss Parham, I mean, it was kind of Miss Parham said it's a given, he's confessed.

Q. The record will reflect that Mr. Monckton said he believed that this was your best chance to save Mr. Basham's life, participating in this search. Would you agree with that characterization?

A. Yes.

Q. Did you feel you had a lot of leverage at this point?

A. I don't know how you define leverage or a lot, so I don't have -- it was a chance, you know, it was the kind of thing that if we didn't do anything he was probably not going to get any sort of consideration either from the prosecution or the jury or the court or the family of the victim. So this was kind of something he had to do, it was -- you know, we took a chance.

Q. And back to the search itself, you talked that you specifically advised the officers that were there that day that you weren't there to make statements. Was Mr. Basham allowed to make some, I think they were described as directional comments?

A. Yes.

Q. Were all of his communications to go through counsel?

A. No, that was -- as we were going down the road for the hundreds of miles that we went that day, no. We allowed

Littlejohn - Direct                    1238

Brandon to say, you know, this looks familiar or, you know, we're looking for this kind of thing, or that.  Anything that was directional, no, he made his own statements.

Q.  And did Mr. --

A.  I didn't want to run the risk of him saying something to me and me getting it wrong and then not finding Miss Donovan.  So he communicated directly to the officers.

Q.  In your presence?

A.  Yes.

Q.  Did Mr. Basham ever try to blurt out comments during that day?

A.  There were a couple of times that he started to say something, yes, that were not directional in nature.

Q.  And did you make efforts to stop him from making comments that were not directional in nature?

A.  Yes.

Q.  And, again, there were officers in the van.  Did they observe you trying to manage those communications?

A.  Apparently they did, yes.

Q.  And Mr. Hewitt was -- was Mr. Hewitt one of those officers?

A.  Yes.

Q.  Was Mr. Hewitt kind of the main questioner as far as the directional questions?  That's the impression I got from the record.  Would that be correct?

Littlejohn - Direct                    1239

A.   He was the only one in the van that knew that area so, yes, he was.

Q.   Was he able to build a little bit of a rapport with Mr. Basham by doing that?

A.   I don't know that he had any better rapport with him than any of the other officers, no.  I mean, he conversed with him more because they were obviously, you know, he was describing where the roads went and, you know, whether this looked familiar and that looked familiar.  And Brandon was, you know, speaking to him more than the other officers, yes.

Q.   Okay.  At some point as it got closer to the end of the day everybody stopped, and is it a fair assessment people were fairly frustrated by the end of the day?

A.   Yes, that would be a very fair statement.

Q.   Was there concern that Mr. Basham was playing games?

A.   That was expressed to me by the agents, yes.

Q.   And at some point, and this came up before, I'm not trying to get into another claim, trying to set the stage with a hypothetical, at some point you spoke with Mr. Basham and then presented a hypothetical to law enforcement.  Do you recall that?

A.   Yes.

Q.   And do you recall, for lack of a better word, the logistics of that?  Where did you talk to Mr. Basham prior to presenting the hypothetical?

Littlejohn - Direct                      1240

A.   Well, as I recall, we had pulled up at one of the two cemeteries that we went to and the officers asked to speak, I say the officers, it would have been Jeff Long, Special Agent Merriman, I think the Conway police chief was there, he may have been the second one in the follow car, I believe Sheriff Hewitt was in that meeting.  But, anyway, they drew Billy and I aside and basically said we're not searching anymore, your guy's lying.

Q.   And was it in the van then you stepped away and was Mr. Basham still in the van when you --

A.   He was still at the van.  I don't know that he was in the van.

Q.   Or near --

A.   I think he was sitting in the open door of the van, if I recall.

Q.   And who was there when you spoke with Mr. Basham about -- who was there when you spoke with Mr. Basham prior to presenting the hypothetical to law enforcement?

A.   It would have been Billy Monckton and I.

Q.   And where -- did you move away from the van to present that hypothetical to law enforcement?

A.   Well, it was like the van would have been like at the back of the courtroom, and so the agents had gotten out, we were kind of milling around there with Brandon, and they said would you come over here, so Billy and I went over there.  And

Littlejohn – Direct                    1241

that's when they told us that, you know, they thought Brandon

was taking them on a wild goose chase.  And one of the agents

was particularly mad, I think it was Special Agent Merriman,

he had waded around in a swamp or something a few days before,

that's when he made the statement that Brandon's lying.  So

Billy and I said well, wait a minute, let us go talk to him.

So we went back over to the van where Brandon was, and I think

one of the Conway police officers was standing there, we asked

him to kind of step away where we could speak in private.  And

so we spoke to Brandon for a few minutes and then we went back

and spoke to the group of officers.

Q.  And did -- if you recall, did Mr. Basham walk with you

over to the officers or --

A.  No, he did not.  He stayed at the van.

Q.  Do you recall when you spoke to the group of officers

seeing Sheriff Hewitt?  It's been a long time.

A.  Do I recall whether Sheriff Hewitt was in that group?

Q.  Right.

A.  To the best my recollection, he was.  I'm almost positive

he was.  I know he wasn't over at the van with Brandon at the

time.  But I believe he was in -- Sheriff Hewitt was trying to

be involved in the process.  By way of background, there was

going to be a territorial fight between Horry County and

Brunswick County as to who was going to prosecute this case

and so Sheriff Hewitt had a keen interest in it.  And so if I

Littlejohn - Direct                    1242

recall, he was there during that conversation.

Q.  And did you later learn through discovery through police reports that Mr. Hewitt claimed he walked off alone with Mr. Basham at some point near the end of that day?

A.  I think I learned that before I testified in 2004.  I didn't really -- before we got all the discovery and all the reports and everything the government had moved I be disqualified and that had happened.  So I wasn't privy to all the discovery in the case.

Q.  Okay.  And again, was Sheriff Hewitt one of the officers who was advised that Mr. Basham was only to make directional statements and not there to make any other kind of statements?

A.  I'm sure he was.  I think, if I recall correctly, and I'm almost positive of this, I know at Darlington County when we first started out I told the Agent and Mrs. Agent Bray that, and the other officers.  And then when we got to Bee Tree we started off on our trek I'm sure I repeated that and reiterated it to the officers that were in the van with us.  That was a different group.

Q.  Was it ever your intention that day to allow Mr. Basham to walk off alone with Mr. Hewitt?

A.  No.

Q.  Do you recall talking to Mr. Swerling or Mr. Harris prior to your testimony about your testimony at the Jackson v. Denno hearing, I don't believe it was what you were referencing

Littlejohn - Direct                    1243

previously, prior to your testimony at that hearing about Mr. Hewitt taking Mr. Basham off alone?

A. Do I recall discussing that with them?

Q. Yes.

A. Prior to the hearing?

Q. Correct.

A. Not in the hearing but --

Q. But prior to.

A. Miss Stone, it seems like we did discuss that. I can't remember exactly what the discussion was.

Q. If you had been asked specifically the question I just asked you, whether it was your intention to allow Mr. Basham to walk off alone, would you have said it was against your express direction to law enforcement if that happened?

A. Well, now, let me put it in context. We got out of that van several times to try and look for something that might be familiar with -- for Brandon, okay? One of the things that came up was a thing about the purse strap. And Brandon had said, well, if I recall, the purse strap went out of the car at a cemetery location. If you can find the purse strap then, you know, this must be the right place. And so we canvassed the cemetery area there to see if we could find a purse strap.

Now, whether Brandon walked off with one of the officers or not, he was always within my sight. I can't say he was always within my hearing. But we were trying to find that

strap.  He might have wandered off with Sheriff Hewitt for a few moments but, you know, he wasn't far away from me at any time.

Q.  But I guess my question was would it be a fair statement that if Brandon made any statements other than directional to law enforcement that was against your requests --

A.  Yes.

Q.  -- of law enforcement that day?

A.  Yes.

Q.  Now I want to move to the other topic I wanted to cover with you, and that's concerns about competency.

Susie, can you bring up Exhibit 1?  And these are already in the record, these are not your notes.  Susie, if you can go to page two.

Do you see about a third of the way down the page, need an evaluation?

A.  Yes, two-thirds of the way, um-hmm.

Q.  And, again, these are not your notes, these have previously been admitted during Mr. Monckton's testimony.  But did you agree with that opinion that is reflected in these notes that Mr. Basham needed an evaluation?

A.  Would I agree he needed one prior to going into a death penalty case?

Q.  Yes.

A.  Yes.

Littlejohn - Direct                              1245

Q.   And can you talk a little bit about why you felt that about Mr. Basham?

A.   Well, Mr. Basham, I mean, he had a history of mental health problems and, I mean, that's reason enough right there. But there were some things about Brandon's I guess I would say maturity for his age I thought would need the, you know, we would need the advice of a psychologist or psychiatrist as we went into the case later on.  Of course, that never happened.

Q.   And was it fairly -- well, you weren't on the case very long, but was it fairly, even for the period you were on the case, fairly early on you realized that this was something that would be important for Mr. Basham?

A.   Yes.

Q.   Were you aware that Mr. Basham had been on some medication?  If you don't recall --

A.   I don't know that I got into a history of -- prior to November of 2002 I don't know that I got into a real history of what his medications were.  Now, during the time that he was being held and I represented him they had him at the old Craft Sparrow Hospital where he was incarcerated so he could get some sort of mental health counseling and treatment.  And I know he was on some medications there.  What they were, I can't remember.

Q.   And, Susie, can you bring up Exhibit 6?  And it's the last page that's marked page seven.  And can you highlight the

Littlejohn – Direct                    1246

second full entry there.  Thank you.

    And, again, these are not your notes, these are previously admitted, Mr. Monckton's notes.  And can you see there the note he spoke with you, and extreme details concerning jurisdiction and Brandon's mental condition?

A.  Okay.

Q.  And this was from -- appears from December 4.  Do you recall talking with Mr. Monckton about Mr. Basham's mental issues?

A.  I don't recall specifically the conversation but I'm sure we talked about that, yes.

Q.  And shortly thereafter did you guys file a motion for a competency evaluation in Mr. Basham's case?

A.  Miss Stone, I don't recall whether we got to that point or not.

Q.  If the record reflects you did file one on December 10, 2002 you would not disagree with that?

A.  No, I would not.

Q.  And you already noted that you -- you were not on the case very long, the government moved to disqualify you.  And if the record reflects January 14, 2003 that that motion was filed would you dispute that?

A.  The government moved to have me disqualified?

Q.  Correct.

A.  No, they definitely did.

Littlejohn - Direct                    1247

Q.  After that motion to disqualify was filed did you pull back from making key decisions in Mr. Basham's case until that issue was resolved?

A.  Well, yes.  I mean, but there weren't really any key decisions to be made at that time.  Whether the government was going to seek the death penalty or not, I don't know if that had gone through DOJ to a conclusion.  But at that point it would have been a matter of doing some of the early pretrial stuff, getting the discovery materials and reviewing them, et cetera.  So I don't know that there were really any great decisions to be made while that motion was pending until Judge Anderson heard it.

Q.  Okay.  And so you don't -- do you have any recollection of making any movement to make that competency evaluation go forward during that period?

A.  Did we push it?  I don't recall doing that, no.

Q.  Okay.  And ultimately you were removed from the case and Mr. Swerling and Mr. Harris replaced you and Mr. Monckton.  Do you recall any conversations with either of them about competency concerns with Mr. Basham?

A.  Miss Stone, we probably talked about his prior mental health conditions, but it was very briefly.  I really, I was surprised I didn't have that much contact with Jack or Greg as they were working this case up, which was kind of strange because we're in the same building.  But they didn't really

converse with me much, I didn't bring it up much.  And I was really surprised at how little communication there was.

Q.  Okay.

MS. STONE:  May I have just a moment, your Honor, to confer with counsel?  I have no further questions, thank you.

THE COURT:  All right.  Let's take our morning recess.  I didn't realize we had run so long.  Let's take a ten minute recess and finish.  How long do you think the cross will be?

MR. JOHNSON:  An hour.

THE COURT:  How long?

MR. JOHNSON:  An hour.

THE COURT:  Okay.  Take a ten minute recess.

(A recess transpired)

THE COURT:  Please continue.  I'm sorry, cross-examination.

CROSS-EXAMINATION

BY MR. JOHNSON:

Q.  Thank you, your Honor.  Good morning, Mr. Littlejohn.

A.  Good morning, Mr. Johnson.

Q.  And, like Miss Stone, I want to thank you for rearranging your schedule so you could pop in this morning and talk to us.

A.  That's no problem.

Q.  Than I'm going to do my best to avoid just repeating questions that Miss Stone asked you.  Some of them may be the

Littlejohn – Cross                                    1249

same just so I can get the lay of the land here.

I want to go back to that Wednesday, November 27th, 2002 when you were first appointed to represent Mr. Basham, all right?

As I understand your testimony, you were here in Columbia and you got a call from United States Magistrate Judge Tom Rogers asking if you would accept an appointment to represent Mr. Basham?

A.   That's correct.

Q.   Now, when Magistrate Rogers called you, and correct me if I am wrong, didn't he kind of explain some of the background, that Mr. Basham had been transported from Kentucky to South Carolina because he wanted to participate on the ground in the search for Miss Donovan?

A.   Mr. Johnson, he told me he was being transported down to Florence.  I don't know that he went into the search part of it.  I mean, I don't recall, I just don't, whether he said that or not.  But, obviously, Mr. Basham was on the way down because that's why Judge Rogers was interested in appointing South Carolina counsel.

Q.   So he told you that he was on the way to Florence but he may not have gone into the other background information.

A.   He may have, I don't recall.  I was getting out of the shower, okay, when he called.

Q.   That was in the morning on that Wednesday?

A.   Yes.

Q.   All right.  So obviously you get out of the shower, you get dressed and you go to Florence.

A.   Yeah, I got dressed.  Yeah, I did that.

Q.   Now, as I understand the sequence, the first place you went was to meet with Mr. -- because Mr. Monckton was already in Florence, correct?

A.   By the time I got there Billy was already there, yes.

Q.   And was that at the courthouse in Florence?

A.   Yes, the U.S. Attorney's Office.

Q.   And the U.S. Attorney's Office and the court are in the same building.

A.   Yes.

Q.   So when you arrived was Mr. Monckton already talking with AUSA Rose Mary Parham?

A.   I believe so, yes.

Q.   And you just kind of joined in that conversation.

A.   Correct.

Q.   And after you and Mr. Monckton spoke with Miss Parham is when you and Mr. Monckton went out to the Darlington County jail to meet with Mr. Basham.

A.   I'm thinking at some point in there we appeared before Judge Rogers and put it on the record about our appointment. And then I know we met with Brandon that day, I'm not sure whether it was at Darlington or there at the courthouse.  I'm

Littlejohn - Cross                   1251

thinking it may have been at the courthouse, but they took him to Darlington that night because that's where we met the following morning.

Q. So you meet with Mr. Monckton and Miss Parham, then you have the appearance before Magistrate Rogers, and then you have a conversation with Mr. Basham?

A. I did all three of those, I'm not sure of the exact order.

Q. But all on Wednesday, November 27th.

A. Yes, sir.

Q. And after you met with Mr. Basham on that Wednesday arrangements were immediately made for Mr. Basham to assist law enforcement the next day, Thanksgiving day, in a search for Miss Donovan's body, correct?

A. Well, we talked to Miss Parham about it and then we talked to Brandon to make sure that he was, you know, down with that program. And then we told Miss Parham, yes, let's go ahead and line it up.

Q. And those arrangements were based on Mr. Basham's desire to help law enforcement find the body, correct?

A. Yes.

Q. And in your conversations, you know, without going into the substance of what you spoke about with Mr. Basham, did you learn that day that the reason Mr. Basham had been transported from Kentucky to South Carolina was to assist in the search for her body?

A.   Yes.

Q.   And obviously you and Mr. Monckton agreed to allow Mr. Basham to participate in that search.

A.   Obviously, yes.

Q.   And the reason that you agreed to let him participate is because you felt that it was in his best interests.

A.   Correct.

Q.   For example, if Mr. Basham helped find Miss Donovan that could assist you in plea negotiations, correct?

A.   That's one of the things it could help us with, yes.

Q.   Another thing it could help you with if Mr. Basham helped find Miss Donovan, that could be mitigating evidence you could present to a jury if plea negotiations failed.

A.   Correct.

Q.   And another reason was that at that time you still held out some hope that Miss Donovan might still be alive, correct?

A.   There was a slight chance.  I mean, that would have been ideal if that had come true, but, you know, we held out that hope.

Q.   So based on all those reasons it's safe to say, isn't it, that urgency was high and time was of the essence.

A.   Yes.  And the other thing is if we helped find Miss Donovan that might, you know, that might bode well for any recommendation by Miss Donovan's family on down the road.

Q.   And in all of that your ultimate objective was to save Mr.

Littlejohn – Cross                    1253

Basham's life, correct?

A. That's right.

Q. Now, you spoke about having a discussion with Mr. Monckton and Miss Parham on that Wednesday prior to the Thanksgiving day search. And I think you testified a little while ago that Miss Parham, although she didn't go into all the details, she shared with you some information about interviews Mr. Basham had given to law enforcement agents?

A. Right.

Q. And the gist of that was I think, as you said earlier, he had for several hours given confessions about being involved at least in some capacity in the abduction and killing of Alice Donovan.

A. Correct.

Q. Now let's go to the Thanksgiving day search. You testified that Mr. Basham was there to provide directions, correct?

A. That's right.

Q. So, in other words, and I think you said you made it clear to the law enforcement officers there he wasn't there to give another statement about the substance of the crime itself, but he was there to provide them with directions on how they might find her body.

A. That's correct.

Q. And wasn't it your understanding that any of this

Littlejohn - Cross                1254

directional information that he may give the officers that day could be used against him in court?

A.  Yes, certainly.  I mean, we would hope that ultimately if we went to court it would come out that he had helped participate in a search for Miss Donovan.  And, you know, we were hoping that we would find Miss Donovan.

Q.  So you expected and in fact wanted it to be used if it went to trial.

A.  Yes.

Q.  Now, you testified in the van, I want to make sure I get the layout correct, I think you said that there was a Conway police -- and when I say the van I'm talking about the actual search at this point, once you embarked on the search and you started the search from the hunt club, right?

A.  Correct.

Q.  And so when you get into this van there's a Conway police officer driving, and I believe you said that Sheriff Hewitt from Brunswick County was in the front passenger seat.

A.  Brunswick County.

Q.  What did I say?

A.  He was in the front passenger seat.

Q.  Sheriff Hewitt was in the front passenger seat.

A.  Right.

Q.  And Mr. Basham was directly behind the driver?

A.  Correct.

Littlejohn – Cross                        1255

Q.  You were directly behind Sheriff Hewitt.

A.  Correct.

Q.  And then on the back bench seat I believe it is was Agent Long, another Conway officer, and Mr. Monckton.

A.  Correct.  Billy was in the middle of the bench seat because he kept complaining about it.

Q.  Now, I think you told Miss Stone that as you're riding along in the van there would be times when Sheriff Hewitt, and I'm imagining turning around because Brandon would have kind of been diagonal from him, right?

A.  Right.

Q.  So there were times he would turn around and ask Brandon questions about directions, correct?

A.  Yes.

Q.  And it's my understanding that Sheriff Hewitt had some photographs that at times he would show Brandon, maybe -- I don't know if they were aerial maps or pictures of landmarks, asking him if he recognized certain things.  Do you remember that?

A.  I remember there being pictures involved, I don't recall what was in the pictures.

Q.  But you remember him showing Brandon pictures.  And would he also ask Brandon questions, maybe point out things out the window, do you recognize this, does that look familiar?

A.  Right.  That was an ongoing process.

Littlejohn - Cross                    1256

Q.  And during the ongoing process Brandon would answer those questions directly.

A.  Yes.

Q.  And at certain points during the van ride during the search there were occasions when Brandon would lean over to you and confer with you privately, weren't there?

A.  That happened on a couple of occasions, yes.

Q.  On a couple of occasions?

A.  Um-hmm.

Q.  And on one of those occasions he leaned over, you had a private conversation, and following the conversation you told the officers in the van that they should be looking for a purse strap, correct?

A.  Mr. Johnson, I don't remember whether that happened in the van or if that happened after we had gotten out of the van and were looking around one of the cemetery locations.

        MR. JOHNSON:  Beg the court's indulgence for one minute.

        (There was a pause in the proceedings)

Q.   (MR. JOHNSON) Do you recall, whether it happened in the van or out, do you recall whether it was prior to that final kind of showdown meeting you had at the cemetery at the end of the day when the officer said we think your client is lying?

A.  If I recall correctly, it was before, yes.

Q.  So he confers -- you agree there was at some point he

conferred with you and then you told the officers about the purse strap.

A.  Right.  Because I was telling them if we found the purse strap then we were probably in the right place.

Q.  So the purpose of telling them about the strap was it could assist them in finding the body.

A.  Exactly, it was directional.

Q.  So you considered that directional information.

A.  Right.

THE COURT:  But this was not the hypothetical statement that you mentioned the purse strap at this time, right?

THE WITNESS:  No, sir, that was not the hypothetical. This was before the hypothetical.

Q.  This was before the hypothetical?  You mentioned that towards the end of the day -- now, you started the search that day at the hunt club, correct?

A.  Yes.

Q.  Is the cemetery right by the hunt club, do you remember? Are those two adjacent to one another?

A.  Mr. Johnson, we went hundreds of miles through rural Brunswick County.  We irritated the heck out of I don't know how many deer hunters.  But all of it is dirt roads, pine trees, scrub oaks, and it all looks basically the same.  If I recall, there was one cemetery that was kind of as you came

Littlejohn – Cross                        1258

out of the hunt club you went for a distance, the road kind of wound around, and it dead ended to another road. And the cemetery, that particular cemetery was right across the road it dead ended into. There was another cemetery somewhere else that we went past. And if I recall correctly there were two cemeteries. Which one it was, I can't tell you.

Q. But suffice it to say that at the end of the day when they told you we think Brandon's lying, you were at the cemetery when this happened?

A. We were at one of the cemeteries.

Q. At one of the cemeteries?

A. Um-hmm.

Q. And they said to you we think he's lying and we're calling off the search.

A. Basically, yes. And a few expletives.

Q. And you didn't want them to call off the search, did you?

A. No.

Q. And the reason you didn't want them to call off the search was that you thought it might be Brandon's only hope of finding Miss Donovan and helping himself, correct?

A. Correct.

Q. So at that point when they tell you he's lying, the search is off, expletives, you wanted his interaction with the law enforcement officers to continue because you wanted hopefully to find the body.

Littlejohn – Cross                    1259

A.   Correct.  I knew if we ended it on that note that wouldn't
happen again, there would be no further searches.

Q.  So after they make this, it's not really an ultimatum, but
after they make this statement we're calling off the search,
was it then that you and Mr. Monckton pulled Brandon aside and
conferred with him?

A.  Well, Brandon was back at the van during this meeting.
And like I explained before, we left the meeting, went back to
the van, there was a Conway officer there, I think I asked him
to step away so we could have some privacy, and Billy and I
conferred with Brandon for a few minutes.

Q.  So when you are having the conversation with officers
about whether he's lying, Brandon is back in or near the van.

A.  Yes.  He wasn't in a position to hear that.

Q.  So he didn't hear the conversation that he was lying.

A.  Right.

Q.  Then after you have that conversation with the officers
you walk back over to where Brandon is and ask the officers to
leave so that you can talk with him attorney to client.

A.  The one Conway officer.  If I recall, yes.

Q.  The one Conway officer left so you could talk, or who was
still there?

A.  They always had somebody standing close to Brandon, so the
officer, I asked him to stand away so Brandon, Billy and I
could talk in privacy.

Littlejohn – Cross                    1260

Q.  So that the officer was nearby because he was the security detail, but he wasn't in on the conversation with you.

A.  That's correct.

Q.  And it was after, it was after you had this private conversation with Brandon that you went back to the officers and gave the hypothetical, correct?

A.  Correct.

Q.  And my understanding is that the hypothetical -- the hypothetical was -- was based on hypothetical facts, and at that point the information you had on the case was obviously conversations with Brandon that I'm not asking you to get in the substance of, but you had talked to your client, and the other information was information that you had received from Miss Parham.

A.  And information I had gleaned from the officers that day. They had -- when they said we're calling off the search, your client's lying, they said, you know, what he's saying doesn't match up with the forensic evidence we have.  So what I was trying to do is put together, and I said hypothetical, I should have said theory, I should have said this is my theory, not Brandon's, mine, about what could have happened.  And so that's when I gave the hypothetical.

Q.  And, again, the purpose of the hypothetical is because you want the search to continue.

A.  Correct.  I wanted them to not think that Brandon was

Littlejohn - Cross                    1261

trying to mislead them or lie to them.  Because I felt like Brandon, Brandon just -- well, let me back up.  Brandon never drove a car in his life, Fulks took him up there in the dark in the area he had never been before, there was nothing but dirt roads and pine trees, and for him to pick out where Miss Donovan was would have been -- I mean, it would have been surprising, but there was still a possibility that he could do that.

Q.  So the reason that you give them this hypothetical or you give them this theory is because they are thinking that Brandon's just leading them on a wild goose chase and you want to give them a theory of what could have happened that's plausible in light of the directions that he's giving them?

A.  In light of the directions and in light of their -- what I knew about the theory of the government's case, yes.

Q.  And the purpose is to convince them he's not lying, he's not leading you on a wild goose chase, he's doing the best that he can and so here's the theory of how all this could be fitting together to show maybe we are in the general area.

A.  Basically, yes.

Q.  And, obviously, the purpose was to assist the officers in the search and to assure them that he's being forthright?

A.  Right.

Q.  So it's fair to say that the information, the hypothetical information that you gave was relevant to helping them find

Littlejohn – Cross                    1262

the body.

A.  Well, I think that the information I gave them was in an attempt to show them that Brandon wasn't lying to them, that he wasn't leading them, consciously leading them on a wild goose chase.

Q.  And I guess what I'm asking is understanding that we're still talking about the hypothetical here, you wouldn't have thrown out hypothetical facts just about the crime itself for the sake of their investigation or their curiosity, it would all be related to continuing the search, it would all be with the purpose of honing in directionally so that they could see that he was being honestly cooperative.

A.  It was my hope that we would continue the search based on the hypothetical.  It was my anticipation that the hypothetical would not go anywhere further than the cemetery.  But apparently I was wrong.

Q.  And the hypothetical that you gave included the hypothetical fact that Miss Donovan had been strangled with a purse strap, correct?

A.  That Fulks had done it, yeah.

Q.  But it included a purse strap statement.

A.  Right.

        MR. JOHNSON:  Beg the court's indulgence one more time.

        (There was a pause in the proceedings)

Littlejohn – Cross                    1263

Q.  Mr. Littlejohn, I would like to show you a page from your testimony in the Jackson v. Denno hearing back in February of 2004.  It's on page 171, your Honor.  It's during your cross-examination, page 171, in which the government published and read aloud parts of the hypothetical.  And it continues on to page 172.

A.  Right, I read this.

Q.  Okay.  And I'm looking at line 17.  It says that after she was strangled with the pocketbook strap she was put in the trunk of the car.  That she was raped here and died here in the cemetery, she was put in the trunk and taken to a dumping area.

And then on page 172, line six, the question is, does any of that at least generally ring a bell as to what was part of your hypothetical that you provided to law enforcement?  And you answered generally, yes.  Correct?

A.  Right.  I answered generally yes, because I don't -- I can't say that all the details Sheriff Hewitt put in his report are true.  But it was generally right.

THE COURT:  Let me jump in here and be sure I understand.  So I'm a little bit rusty on this, I know we got deeply into it at the disqualification hearing, but you had already advanced the idea they should be looking for a strap earlier during the search.

THE WITNESS:  Yes, sir.

THE COURT:  And then they had the powwow at the end of the day where they said your client's lying, we're going to go home.  You consulted with Mr. Basham and came back with the hypothetical that included more than just the strap reference, it included Fulks used a strap, she was raped and put in the trunk and taken somewhere else and dumped.  So that hypothetical statement went far beyond what you had already said about the strap.

THE WITNESS:  Yes, your Honor.

THE COURT:  I want to be sure I understood, because I was a little bit rusty what was in the hypothetical.

THE WITNESS:  I'm not conceding that what Sheriff Hewitt put in his report about all these those details is true.  I didn't write down the hypothetical.

THE COURT:  I understand.  But it was more comprehensive than just reference to the strap.

THE WITNESS:  Yes, sir.

BY MR. JOHNSON:

Q.  And I think you testified on direct today that at all times Mr. Basham was in your sight.

A.  After we -- I think I can say that, yes.

MR. JOHNSON:  Just one moment, your Honor.

(There was a pause in the proceedings)

Q.  I just have one or two brief questions about competency. Now, I understand that Wednesday that you met -- Wednesday the

Littlejohn – Cross                    1265

day before Thanksgiving was obviously the first day you had

met Mr. Basham, correct?

A.  Correct.

Q.  And it was that day that you made the decision to go ahead

and arrange the search for Thanksgiving.

A.  Yes.  Billy Monckton and I, after meeting with Mr. Basham,

told the authorities, yes, let's go ahead with the search.

Q.  And in authorizing for the search to proceed isn't it fair

to say that you were comfortable with his level of competency

to assist you during the search and to assist law enforcement

during the search?

A.  Based on my limited meeting with him, yes.

        MR. JOHNSON:  I don't have anything else, your Honor.

        THE COURT:  All right.  Any redirect?

        MS. STONE:  I just have two questions, your Honor.

                    REDIRECT EXAMINATION

BY MS. STONE:

Q.  You've stated that you found -- you had Mr. Basham in your

sight at all times.  Did you ever see him walk off with Mr.

Hewitt alone?

A.  The only time I think that could have happened was when we

were looking for the purse strap in the cemetery.  He may have

wandered off in the direction with Sheriff Hewitt because we

were all looking but, I mean, we were all there in an area not

much bigger than this courtroom and I don't -- I'm sure I

Littlejohn – Redirect                    1266

didn't let Brandon out of my sight.

Q.  And the only other question I have is in regards to the questions of expecting Mr. Basham's statements to come in and that you had hoped they would come in and be helpful.  Just to clarify, again, were those only directional statements that you intended to have come in?

A.  Can you rephrase that for me?

Q.  I apologize.

A.  I want to make sure I --

Q.  On Mr. Johnson's cross-examination he asked you about the statements that Mr. Basham made that day during the search and you responded you -- you intended for those or hoped that those would eventually come into the trial and be helpful to Mr. Basham.

A.  The directional statements in which he attempted to find Miss Donovan, yes.

Q.  And that's what I wanted to clarify, those statements that you were referring to were directional statements.

A.  Correct.

MS. STONE:  No further questions, your Honor.  Thank you.

THE COURT:  Anything further of Mr. Littlejohn?

MR. JOHNSON:  Not from the government, your Honor.

MS. STONE:  Not from the defense.

THE COURT:  Thank you very much for your time.

1267

THE WITNESS:  Thank you, your Honor.

THE COURT:  All right.  I had just a couple of quick questions for Mr. Burke before we hear argument from the government on competency.  Mr. Burke, just a couple of questions.  The telephone call that we heard with your client talking to his mother, he sounded very normal to me in that call.  I guess we don't have anything to characterize it other than just what we heard and the conversations that ensued, it just seemed like a very normal conversation by a very normal person to me.  I'm not trying to pick a fight with you, I'm asking you to comment on it if you can.

MR. BURKE:  I missed one point.  You are saying Mr. Basham sounded very normal?

THE COURT:  On the telephone call he sounded very normal talking with his mom from the prison.

MR. BURKE:  Your Honor, when I listened to the telephone call it seemed not unlike a call that any person might have with their mother.  I don't know that I can say anything about the Basham family as normal, but I think that that doesn't necessarily affect the argument that we have about competency.

THE COURT:  I guess, if anything, I was a little bit surprised he seemed a little bit happy go lucky almost.  Which might cut in your favor, actually.

MR. BURKE:  I would say that it does, he's incapable

1268

of really appreciating the reality of his --

THE COURT:  One other issue, I know I'm making way too much over this, every time competency became an issue at trial Mr. Gasser trotted out that 30-foot rope Mr. Basham made to try to escape with.  You heard -- have you seen the rope?

MR. BURKE:  I have not seen the rope, I heard about it.

THE COURT:  What he did, I think the testimony supported it, he took his bedsheets and very carefully ripped it into one-inch-wide strips and used the turn arm on the bunk bed to turn that into a fine filament and then wove that into a part of a rope and then wove that into a bigger part of a rope.  And the result was a rope that looked just like something you would buy at Home Depot.  I guess that doesn't prove competency, but it sure proves -- I don't know what it proves, but it was impressive to me that he was able to structure that rope try to escape being held pretrial in this case.

MR. BURKE:  Your Honor, I think you raise an important point, that it's critical, I don't believe that goes to competence at all.  It might go to the question of Mr. Basham's cognitive deficits.  But it's clear that mental health professionals who deal with mental retardation and the idea of adaptive behavior, that the concept of deficits doesn't exclude the possibility of capability.  There are many

1269

people who are actually mentally retarded who can hold jobs, there have been television actors who are mentally -- have Down Syndrome, they aren't necessarily exclusive, and often people who have deficits will develop skills in other areas. And Mr. Basham developed survival skills from childhood, and I think that's what you are seeing. It doesn't preclude a finding that he was incompetent to stand trial or that he had a low IQ.

THE COURT: All right. One more thing. My law clerk pointed out this nurse who testified, I believe from Charter Hospital?

MR. BURKE: Yes, your Honor.

THE COURT: I mean, it just seems almost hard to believe that Mr. Basham would have told anybody about that episode before telling Dr. Frierson, because if he told his lawyers I don't think the lawyers would have called a nurse who had sexual relations with their client while in a professional relationship knowingly. And I don't think the nurse would have come to testify without alerting the lawyers to that possibility of being brought out under oath. That's sort of a bombshell, isn't it?

I'm not saying that Mr. Basham wasn't being truthful with Dr. Frierson, but it's just a very hard thing to swallow that that testimony came in with no -- that the social worker didn't bring it up and Mr. Basham didn't bring it up and the

1270

lawyers for Mr. Basham put her on the stand.

MR. BURKE: I can tell you it's not very hard to comprehend why the social worker would not have brought it up, it was a crime she committed if she did in fact engage in those acts with regard to Mr. Basham, and --

THE COURT: Was she a mitigation witness?

MR. BURKE: She was a mitigation witness, yes.

THE COURT: I just don't remember her testimony at all.

MR. BURKE: I cannot tell you whether trial counsel knew about this situation. I don't know. So I can tell you, I don't want to testify, but I was told about this but could not do anything about it because it was told to me at the time in confidence.

THE COURT: You knew about it before you read it in the Frierson report.

MR. BURKE: Yes, your Honor, I did. I have known about it for quite some time.

THE COURT: But Swerling and Harris weren't asked about it while they were here.

MR. BURKE: No, your Honor. There was no way that I -- that we could ask them about it and still maintain our confidentiality with the client. So once he expressed that information to Dr. Frierson I felt that that freed us up to address that point.

1271

THE COURT: Right. All right. Thank you very much. All right, Mr. Witherspoon.

MR. WITHERSPOON: Your Honor, a couple of housekeeping matters. As far as the transcript for that videotape, your Honor, I think, or the audio, I think what you did was you redacted it where the only part heard was your discussion with Mr. Basham concerning dip. All the other racial remarks, all the other comments were redacted or the audio was taken completely out so the jury only knew there was a scuffle and it appeared between you and Mr. Basham over some dip. And the transcript on October 15, 2004, and it looks like it starts on page 2206.

THE COURT: All right. I thought I remember trying to excise out the profanity, and so forth, during the scuffle.

MR. WITHERSPOON: So, Judge, I think where I want to start is Mr. -- we talk about competency. But the question is what is competency. And I think the court has the legal standard. The test for determining competency is whether the defendant has sufficient present ability, present ability, to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as a factual understanding of the proceedings against him.

Now, we just heard from Cam Littlejohn who said that when they met with Mr. Basham they -- he understood what was going on. He was being brought back from Kentucky to South

1272

Carolina to help find the body of Mrs. Donovan that he and Chad Fulks had killed.  That's a rational understanding of the factual basis why he was being charged.

Mr. Littlejohn said that he wanted, when they were asked about competence, he said he needed the advice of a psychologist or psychiatrist to help him later on in the proceedings.  That's why he filed a motion for competency.

Judge, when you brought Jack Swerling and Greg Harris into the case you gave them from I think we have heard pretty much an unlimited budget, and they went out and hired all these professionals, Dr. Schwartz-Watts, Dr. Brawley, Dr. Brannon, I think Joel Vogelsang, and Dr. Moore, who was treating Mr. Basham, all of these professionals who have the expertise to determine Basham's competency.

At no time did anyone raise an issue about Mr. Basham's competency except on the date of the incident with the dip.  Dr. Schwartz-Watts didn't say he was incompetent, that's why we had the fight, her comment I think is, and you can look in the record, that he had gotten worked up because of this fight, and as a result of him getting worked up in the fight he was at that point incompetent.  So the jury -- what the jury saw in the video wasn't an incompetent person, it was a person who was upset with you.

Dr. Parker said on the video that he was doing everything he can, Mr. Basham was doing what he could to

1273

punish you, the judge.  Dr. Parker, a psychiatrist hired by the court, has examined him twice, said Mr. Basham's actions were to punish the court.  Judge, that's a person who has a rational understanding of what's going on and is making a decision that he's going to do whatever he can to prolong this, to upset the judge, do whatever he can not to be compliant.  That's a person who has a reasonable degree of rational understanding, Judge.

You appoint Jack Swerling, 40 years -- I think he testified he had 40 years of experience trying cases.  And his testimony at this 2255, he said his job was to save Brandon Basham's life.  What's the easiest way, Judge, to save his life?  Find him incompetent.  Why wouldn't he take that easy road out if it was available to him?  It wasn't available to him.

Mr. Harris and Mr. Swerling both testified they are not specialists in that area, they are not psychologists, they are not psychiatrists, they depended upon their experts, paid by this court.  Dr. Schwartz-Watts said she visited with Mr. Basham more than 40 times, more than 200 hours with him and his family and reading documents.  She never made the determination that he was incompetent except after the fight.  That was the only time any indication other than Dr. Hyde that he was incompetent.

Now, Dr. Hyde comes in and says I did a

1274

four-and-a-half hour exam and he's incompetent now, he is incompetent eight years ago, and he's going to be incompetent 20 years from now.  Nobody else has made that determination, Judge.  He made that determination after four-and-a-half hours by doing a glabellar reflex test, he said tapping on his forehead, the horizontal nystagmus they give people who are intoxicated, because of some cranial nerve issues that he felt.  But, Judge, every other neurologist who has examined Mr. Basham, no one else found that he had neurological damage.

Dr. Hyde is a very smart man and he very well may have thought that was the case.  But one of the things he said was he disagreed with Dr. Frierson's report because he thought Brandon Basham trusted him, Dr. Hyde, but didn't trust Dr. Frierson.  Whereas Mr. Burke has just said Mr. Basham told them about this sexual encounter with this social worker.  Frierson, he told Dr. Frierson that, he didn't tell Dr. Hyde that.  Who did he trust more?  Dr. Frierson, not Dr. Hyde.  He trusted him more, trusted Dr. Frierson more because he made that statement to him.

When you look at everything Dr. Frierson and Dr. Hyde said, Dr. Hyde said simply because he has frontal lobe damage and these other issues he doesn't have a rational understanding of what's going on.  But remember even doctor -- I mean Mr. Basham told Dr. Frierson, hey, when that officer was up there testifying and he is making those statements, he

1275

said those statements were wrong and he told his lawyers if you call this other person he will refute that.  He's telling his lawyers, Judge, in the case, he's helping to defend himself.

Now, he may have told them that in an inopportune time, but he told them this was important to him.  This was his words about an incident that he had involvement in, that he had recalled, and that he was providing his lawyers with help to defend him.  Simply because he had -- potentially has frontal lobe damage as Dr. Hyde opined doesn't mean he's incompetent.  But Dr. Hyde wants you to think you have got frontal lobe damage you are incompetent under this legal standard.

And also, Judge, remember the scuffle over the dip. Remember there was a discussion between you and Mr. Basham and there was even a note that we included in our documents where Mr. Basham is making an agreement with the court, you let me dip, put paper towel or toilet paper in the cup, I will spit into that and that way there won't be any reason for me to be able to throw this on the marshals.  This is from a person who has realized that if I want to get this dip I've got to find a way to alleviate this problem the court and the marshals have. Is that a person who doesn't have a rational understanding of what's going on, who does not have a rational, factual understanding of the proceedings against him, Judge?

1276

As far as manipulative, he got you to buy him dip. The Fourth Circuit has in its opinion that he is manipulative. He's manipulative.  He told Dr. Frierson that when he heard all this bad testimony or this recant -- recounting of his bad childhood, he tuned out.  He said I lived that, why do I want to hear it again.  You look a lot of the times when actions were happening, Judge, it was things concerning his bad childhood.  This incident with miss -- on the 26th that we're talking -- that Mr. Burke talked about, when you look at Greg Harris' statement, Greg Harris' statement doesn't say my client is incompetent, he says he can't sit still.  Being competent or incompetent doesn't mean you can or can't sit still.

THE COURT:  Those are his words, my client can't sit still?

MR. WITHERSPOON:  Those are his comments from Mr. Harris.  He never said competent, he said my client can't sit still.  Mr. Burke pulled that up in his statement.  Can you pull that up again?

MR. BURKE:  Sure, it's page 14.

MR. WITHERSPOON:  Line 15.  My observation of Mr. Basham is he's not going to be able to sit in the courtroom and pay attention to the testimony, remain silent.  I am concerned that he will -- that this jury will not look favorably upon the way he is appearing to me to be acting this

1277

afternoon.  Nothing about competency, the way he was acting.

THE COURT:  Is that all Mr. Harris said about the need to adjourn for the day?

MR. WITHERSPOON:  That's all that Mr. Burke has pulled up and shown the court in his statement.

THE COURT:  And this was the day after the social worker's testimony, I believe he said?

MR. WITHERSPOON:  That was the social worker testified on Friday, this happened on Tuesday.  I think you took Monday off for whatever reason.  But this happened Tuesday.

THE COURT:  All right.  Go ahead.

MR. WITHERSPOON:  And as far as making the strategic decision of sending Mr. Basham to Butner, Judge, again, they had Dr. Schwartz-Watts early on, she found him competent.

Now, Mr. Burke talked about this motion to move him from Alvin S. Glenn to the Columbia Care and extend it there. The reason for that was she says because of his medication, we need to get his medication regimented and then therefore we can make a determination about his competency.  She didn't say he was incompetent.  Before she could make an evaluation of him she had to be able to get his medicine regimented.

I think that motion is in the motion to transfer to the defendant, it was filed on June 9, 2003 in the record. And it also has her statements.  She doesn't say that he's

1278

incompetent.  We've just to get his medicine regimented because they are not doing a good job at the detention center and before we can make that determination I've got to have his medicine regimented.

And while -- why would an attorney allow an incompetent person to go to trial, again, Judge?  If they were trying to save -- given the facts of this case, this was a horrendous case.  Given the facts of this case, having known that your codefendant has already been found guilty and had been given the death penalty, if you could show that your client was incompetent why wouldn't Mr. Harris and Mr. Gasser not take the opportunity to save his life?  I think, as Dr. Hyde said yesterday, given these facts it was clear that the jury was going find him guilty.  The best thing that they could -- they could have done is found him -- have him determined to be incompetent, which would have saved his life.

Judge, in your order where you determined that Mr. Basham was competent, you cited this case Walton versus Angelone.  And there's a statement in that case, Judge, where the Fourth Circuit made this statement.  Not every manifestation of mental illness demonstrates incompetence to stand trial.  Let me go further.  Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.  This is on -- this is United States versus

1279

Angelone, 321 F.3d 442.  And that particular statement is found at 460.

Simply because Mr. Basham was using coloring books, asking for dip, talking when things were going on doesn't mean he's incompetent.  Especially on a -- and as an officer of the court, if I have a medical expert who tells me my client is incompetent, or my client's competent, why would I disagree with that?  Would I -- how many experts do I have to hire?  Certainly have to hire Dr. Hyde to find someone who has found him incompetent --

THE COURT:  I think I asked Mr. Burke that before when we were here in October, do the lawyers have an obligation to override the opinion of their court-appointed expert, their own retained expert, I should say, and seek to have him declared incompetent when their own doctors didn't support that?

MR. WITHERSPOON:  They have to have -- as an officer of the court they have to be able to come into court for those reasons, Judge, I think my client has those issues and needs to be determined competent.  They didn't have those reasons.  They had this expert, and I think the court has said Dr. Schwartz-Watts has testified in this court for both the government and the defendants.  As Jack Swerling said, he trusted all of them.  He has worked with her a number of times.  He thought she was fair.  He had no reason to disagree

with her.  He had no reason to disagree with her.  He had no reason to come to court and say I think my client is incompetent.

And as far as going to Butner, that wasn't to go to determine competency, that was only, Judge, so the government would have an opportunity to meet their mitigation evidence at trial.  Dr. Capehart never determined competency.  He never went into the facts of this case.  Totally different issue.

And if dip helps him to stay concentrated, Judge, I mean helps him to concentrate, that certainly doesn't mean he's incompetent.  He, being Mr. Basham, knows it helps him concentrate so he's asking to help him concentrate.  That doesn't show he's incompetent.

Dr. Frierson did use the word coy and cagey.  But he also reported exactly why he used that.  He also reported about that incident where the person assaulted him or sexually -- the sexual experience.  You can call it a sexual experience, and I'm not trying to degrade assault, but that's just the words that Mr. Basham and he used, sexual experience. I don't think that shows that Dr. Frierson is being coy or cagey.

Mindful, Judge, when the court initially was looking for a psychiatrist to be a court-ordered psychiatrist both the government and the defense had agreed upon Dr. Frierson.  This was someone based upon his qualifications everyone thought

1281

could give an opinion about Mr. Basham to the court.  I think the court decided not to use him because of the flight, trying to do somebody in Terra Haute, but that goes to substantiate his credentials.  He was someone that everybody thought would give a fair assessment of Mr. Basham.

And, again, I hate to go back to Dr. Schwartz-Watts, but, again, every time she saw him she said he was competent except that one time when she said he's so hyped up because of the fight.  Not that he's incompetent and caused the fight, the fight -- he became elevated, his elevation and that was what caused incompetence.  And the very next morning she came in and said he's at his baseline.

And on the October 26th incident, Judge, the medication, I think there's incidents in there where his -- he was supposed to be given Seroquel at night and there was an issue at the jail where they didn't give it to him at night, they gave it to him that morning.  And that is the morning he came to court and he was sleepy.  You did all you could do. You broke for the morning, came back at 1:00 o'clock, you broke for another 15 minutes.

At some point, Judge, you are in charge of the courtroom.  Simply because he's sleepy doesn't mean he's incompetent.  If we had allowed defendants to dictate the -- and I think that's what Mr. Schools was saying.  If we allowed defendants to dictate the court schedule we would never have

1282

trials.  You gave him every opportunity, you gave him dip, I think you gave him Mountain Dew, you gave him tea, you gave him whatever he asked for or needed to help stay awake.

Now, the medication made him a little bit sleepy, but as the court said at the hearing in October, whenever you noticed that he was dozing off you would stop, you addressed that issue, and we get back to where we were.  No indication that the court had any indication that Mr. Basham was incompetent.

Now, they made a claim that you had an obligation to do that, but there's no evidence in the record to indicate that the court had any idea or any rational basis for making a determination of competency of the defendant.  Especially in light of the fact that Dr. Schwartz-Watts was coming in and the attorneys were meeting with him and they were talking to him.  I think Mr. Harris said he met with him at least 50 times for over a hundred and some odd hours, and he thinks that's underestimated.  He would be in a better position to determine if his client has that rational basis, understands what is going on and to be able to provide them assistance more so than a court sitting in here eight hours a day.

Mr. Harris spent -- I mean Mr. Swerling said he spent more than 40 hours -- 40 times with him, more than 60 hours.  Who's in the better position to determine if their client is able to communicate with them, understand what they were

1283

talking to him about, and then be able to help him?

Say what you will, Judge, July 25, 2005 in West Virginia Mr. Basham, along with two attorneys, stood before another federal judge and said I am competent, the lawyers said I have no reason to doubt his competency. Two more lawyers in a case that Mr. Basham was being tried for the murder of this young lady in West Virginia stood before a federal judge and says I have no reason to doubt his competency. Neither did Mr. Swerling, neither did Mr. Harris. Only Dr. Hyde. Who says in 2004 he was incompetent so he had to be incompetent in 2005.

And you already found, Judge, in your ruling from the October hearing that Mr. Basham is competent now to go forward, which certainly contradicts what Dr. Hyde has opined. I think when you look at all the evidence that you have before you now you can opine that Dr. Hyde's statement that he was incompetent in '04 is also incorrect. Again, you have all the experts, including Dr. Frierson and Dr. Parker, who says he's competent and that he was competent to go forward. There's no evidence, Judge, no evidence of that, and it's by a preponderance of the evidence.

When you weigh the evidence it certainly weighs in favor of competency. It certainly weighs in favor of competency. And as far as ineffective for not raising competency, again, why would they do that? As Mr. Swerling

1284

said, I wanted to save his life.  I was doing whatever I could to safe his life.  If he wanted to save his life the easiest and quickest way would be determine he's incompetent.  But he had no reason to believe that, he had no reason to do that.

And as far as the lawyers and Jenner & Block who did the appeal, Miss Meister, I may be mispronouncing it, said they briefed the issue on competency and they made a determination that was not a strong issue, but they wanted to put the strongest issues that they had in front of the Fourth Circuit.

Now, sitting here today, you know, in 2012, we may be able to make some judgments about it, but that was their decision.  Given the record, the same records you have, there's no indication that he was incompetent.  That wasn't an issue that they thought would win in the Fourth Circuit.  They wanted to put their best foot forward.  You may disagree, we may disagree or Mr. Burke may disagree with what the issues were, but that was the issue they found.  They briefed it but they didn't think that was going to be a strong issue, it wasn't going to be a stand alone issue, it was going to be part of another issue.  But they determined to take that out because the facts, the record they had before them did not indicate to them that Mr. Basham was incompetent.  So they were trying to put their best foot forward.

Judge, when you think again about competency, don't

think about his mental defects, don't think about him dipping, don't think about the fight. Think, Judge, what you have to focus on, that he had a sufficient present ability to consult with his lawyers. And the only people who can tell you that, Judge, are his two lawyers. Or in this case the four lawyers. Mr. Swerling, Mr. Harris and the two in West Virginia have said that he had the present ability to communicate with them and he had a rational as well as a factual understanding of the proceedings against him.

He keeps telling, I want to die, impose the death penalty, kill me. As Dr. Frierson said, shit or get off the pot. He understands that he has been imposed the death penalty for this murder of Miss Donovan. When I read from the transcript about what his statement to the court through his lawyer, again, the lawyer said on the record these are words from Mr. Basham. Very coherent statement apologizing to the Burns family for what he and Chad Fulks did to their daughter. Is he competent? Certainly he's competent. Does he have ADHD? He very well may have ADHD, but it doesn't affect his competency, his ability to help his lawyers.

Does he have cognitive impairments? He may have cognitive impairments but it certainly doesn't affect his capability to work with his lawyers. Does he have bipolar, does he not have bipolar? Whatever he had didn't affect his ability to work with his lawyers. Did not affect the way he

1286

was working with his lawyers.  Beg the court's indulgence one second.

THE COURT:  All right.

(There was a pause in the proceedings)

THE COURT:  All right.  I think you pretty well covered your position.  Anything else you want to add?

MR. WITHERSPOON:  No, sir.  I was waiting for the court in case the court had questions.

THE COURT:  Anything in reply on competency and then we can break for lunch?

MR. BURKE:  Yes, your Honor, just a few points.  I think there is a serious danger in over-generalizing about what the record shows in this case.  I would like to begin with what Dr. Schwartz-Watts actually said to this court, but first let me say that it is not accurate to say that every time Dr. Schwartz-Watts saw Brandon Basham she said he was competent.  She's never testified to that.  She wasn't asked except on one occasion, as far as we know, to determine whether he was competent.  And on that time she said he is not competent.  And I --

THE COURT:  I thought Mr. Swerling, one of the e-mails Mr. Swerling sent to somebody, he said the reason we aren't raising competency is because our doctors don't say he's incompetent.  Didn't he?

MR. BURKE:  That was something he said to appellate

1287

counsel a few years after the case.  And he said because our -- but, of course, we showed you his notes from the hearing on the 20th of September when he wrote that she said he was not competent.  Competency is not yes or no.  And as Dr. Schwartz-Watts told you, the competency can be fluid.  And it is fluid in Mr. Basham's case.

Now, Mr. Witherspoon said that Dr. Schwartz-Watts came out and said to the court on the 20th of September that Mr. Basham had become incompetent after the incident, that he was upset and that was why he was competent.

Sarah, do we have -- I would like to read you, your Honor, the transcript, and it's from September 20th, 2004. It's Dr. Schwartz-Watts testifying to the court.  It begins on page 161 at the bottom, and she says, hello again.  On 162, I saw Mr. Basham this afternoon probably for about 15 or 20 minutes.  At this time I have a number of issues.  Number one, he needs medical attention.  He was -- specifically, I'm very concerned about looks like he's fractured his third metacarpal, his third knuckle.  I don't know if those injuries were self-inflicted or from the circumstances in the courtroom.

Secondly, I do have concerns about his competency. It is my opinion right now that because of his mental defect that he can't assist his attorneys.  Now, the problem with that, and the good news probably, and this is Dr.

1288

Schwartz-Watts testifying, his mental state fluctuates and there is going to be times in this trial where he has competence fluctuation. A little time, perhaps tomorrow, there will be no reason that I can foresee that he wouldn't be calm enough that we can proceed.

That's what Dr. Schwartz-Watts said. She never came out and said he was competent during this struggle. And that videotape and that audio and transcript were shown to the jury as proof that Mr. Basham was a dangerous man. That is our claim with regard to September 20th.

With regard to the government's statements about no neurologist finding -- no other doctors finding the neurological deficits that Dr. Hyde found, first, Dr. Frierson, the government's expert, didn't dispute them. He's not qualified to dispute them. And it plainly misstates the record, because the defense counsel called Dr. Brannon at trial, a neurologist who testified about Mr. Basham's neurological deficits. So these types of closing arguments to the jury statements don't accurately reflect what the record, the cold, hard, established record in this case actually shows.

For example, you know, if you go back and you read Dr. Hyde's testimony, Dr. Hyde never said he's got frontal lobe, therefore he is incompetent. He was -- that was not his testimony, your Honor. And it's misleading to suggest that it

1289

was.

Now, on September 26th, the day in which Mr. Basham was brought to court without his proper medication, there was an ex parte hearing that same day, it's a separate transcript, and I think I mentioned before, I didn't bring it up, but I think I mentioned to the court that it's worth a read because Mr. Basham speaks at length at that proceeding. And I think even from the cold record it's obvious that there are serious concerns about his abilities and his coherency and his competency on that day.

Oh, I'm sorry, October 26th and it's ex parte. And let me see if I can read to you -- I would like to read to you, your Honor, the government argued that all we were dealing with here is the prosecution saying that, or, excuse me, the defense counsel saying we're just worried that my client's not going to be able to sit still.

That is not what was transpiring that day. They had a client who was -- had not been properly medicated with an antipsychotic medication that he received, or he should have received, that he had been prescribed. And this wasn't a question about Mr. Basham just jumping up and down. And if you go to page three, the bottom of page three of the ex parte transcript, your Honor, you were directly conferring with Mr. Basham. And you say, your lawyers have convinced me because you are not on your medicine it is not fair for you to go

1290

forward with this trial.  So I sent the jury home.  If you --
if you are not competent to go forward in front of a jury I
don't think you should be telling me things here on the record
and making a transcript of things when your lawyers don't know
what you are going to say.  That's what transpired on
September -- October 26th.

Now, I agree with Mr. Witherspoon that you have the
patience of Job.  You've dealt with this case for ten years,
you went out of your way to try to accommodate what some
people might say is a very difficult man and some people might
say is a mentally ill man.  But on September 26th I think the
record shows that you had been pushed to your limit.

THE COURT:  You keep saying September, you mean
October --

MR. BURKE:  I'm sorry, October 26.  But you had been
pushed to your limit, that you were faced with a situation
where counsel was still saying we have concerns about him
going forward.  And if you look at the transcript of not the
ex parte, but from when you are back in court, there is -- and
we set this out, I believe, in our reply brief, where Mr.
Harris is saying, just so you are clear, your Honor, I want
the record to reflect that while I'm talking to you my client
is talking loudly to Mr. Swerling.  I can hear him up here.
These are real concerns about his competency.  They did not
ask -- you were told by the government a minute ago that they

1291

always asked Dr. Schwartz-Watts and she said she's competent. They didn't ask her that day. They should have. They had an obligation to ask.

And as a result when the court went forward three things happened. Mr. Basham on the 26th of October during that period was tried while he was not competent. That is to be shown by a preponderance of the evidence. Second, his attorneys rendered constitutionally ineffective assistance of counsel by not asking that he be evaluated by their expert or some other expert that day, and he was prejudiced, necessarily, because he was tried while he was not competent.

And, finally, with all due respect, your Honor, pushed to your limits, you violated Mr. Basham's rights under Drope to have the court independently determine whether he was competent to proceed. You were pressured, understandably, but I believe the record speaks for --

THE COURT: Anybody know how many interruptions we had had up to that point? Y'all are obviously much more on top of the record in this case than I am even though I was the one who was here when it happened. But this was eight years ago. Just how many episode likes this did we have in all? I'm just curious.

MR. BURKE: Episodes --

THE COURT: Where we had to stop and make a decision whether to go forward that day or take a break and come back?

1292

MR. BURKE: Well, you had several episodes, your Honor, and we set them forth on pages 32 and 33 of our reply brief, where you had ex parte hearings or you were trying to accommodate Mr. Basham's falling asleep or his inability -- and we cite September 7, September 8, September 17, September 20. September 20, page 88, you state last Friday there were two issues. You stressed that you were almost having a panic attack, supposedly, and then you are sleepy.

October 12, Mr. Harris felt it was necessary on October 12 during opening statements on the penalty phase of the case to bring this up to the jury. On October 12, 2004, page 69, he argued to the jury, why would someone after being charged and arrested and confronted with death penalty offenses sleep in his trial? And during his jury selection, why would someone argue with his lawyers during trial?

These things were real, they were happening, and the jury was seeing them. So I just want to stress that we ask that the court look closely at what the actual record is in this case.

And, finally, on the issue of appellate counsel, the facts speak for themselves. The appellate attorneys raised a claim that they had no basis raising because it was not even a legal claim that could be raised. Now, with regard to whether they made a knowing decision --

THE COURT: How many issues did they take up on

direct appeal?

MR. BURKE: I couldn't honestly tell you that at the moment. I think somewhere in the neighborhood of perhaps ten, but I don't -- I don't want to mislead the court. I just don't know. We can inform you after the break. But --

THE COURT: Ten lawyers with that firm, and I'm not sure they were all experienced criminal defense lawyers, necessarily.

MR. BURKE: Well, you will remember with regard to this decision, and Miss Meister testified and she reviewed some of the e-mails going back and forth at the very last minute. And David DeBruin, a very qualified lawyer and he is now the managing partner of Jenner Block, there were e-mails you recall where he expressed concerns about the competence issue, saying it's a very complex issue. But they were on the eve of filing the brief. And he then goes to another partner and he e-mails him saying, he says I have concerns about how I handled this case. I should not have put so much faith in these young attorneys. So, I mean, to say they made some foolproof and sound decision about what claims to preclude is not consistent with what the evidence presented would show. So thank you, your Honor.

THE COURT: All right.

MR. WITHERSPOON: Just one final thing and I'll shut up. I'll ask the court to read the entire transcript of the

1294

ex parte hearing where the court, after the October 26th incident, read the entire transcript and look at Mr. Basham's conversation with the court.

MR. BURKE:  We would encourage the court to do so, as well, your Honor.

THE COURT:  All right.  How long you want to break for lunch?  An hour and 15 minutes, is that enough?  Are we going to finish today or not?  I've set aside the whole week, so it doesn't matter to me.  And I don't want to rush you.

MR. BURKE:  I would certainly like to try to finish today.  Maybe Mr. Daley and I can confer when we break and see.

MR. DALEY:  We may be able, I don't want to speak for you, but there are some other issues that might be submitted on the briefs.  I think we're narrowing down what we really think are going to be the -- the key issues.  Not all the issues, obviously.

THE COURT:  All right.

MR. DALEY:  I'm willing to stay late.

THE COURT:  Well, I am, too.

MR. BURKE:  Our goal is to finish today.

THE COURT:  Let's, it's five minutes to one, come back at ten minutes after two?  All right.  We will be in recess until 2:10.

(A recess transpired)

1295

THE COURT:  All right.  Ready to move forward?

MR. BURKE:  Thank you, your Honor.  Your Honor, I've spoken with Mr. Daley, and what we're going to do is, as you suggested, argue a claim and then switch back and forth.  And I will try for the most part to go numerically through the claims.  But there's some overlap and some intertwining, so there will be some exceptions to that.

And I would like to start first with claim one from the petition.  And claim one is the claim involving ineffective assistance of counsel by Mr. Littlejohn and Mr. Monckton on the Thanksgiving day search.

Mr. Hammond testified about that incident, and I am going to try as much as possible not to repeat what he said because he can say it much better than I can.  And I'll just leave it to the court to review his testimony, but most of these claims he did address them and opined that counsel fell below the standard of care expected of capital federal attorneys.

Mr. Hammond identified actually two aspects of deficient performance with regard to the first claim.  The first concerns whether the Thanksgiving day search should have occurred at all.  There was evidence, and we heard again today, that the government offered defense no guarantees about what would happen with regard to the evidence that was gathered, statements that were obtained during the search.

1296

And that failing to have some type of guarantee about how evidence would be used, how statements would be used was deficient performance.

The attorneys had not been on the case for any length of time. They, as Mr. Littlejohn commented or testified this morning, he wasn't even sure exactly what statements Mr. Basham had made while he was in custody in Kentucky, and the U.S. Attorney's Office refused to give a proffer, so --

THE COURT: So they should have just clammed up and said we want a jury trial. But if they had done that, though, don't you know we would be here today arguing over whether the lawyers were ineffective for not participating in the search would have been the only way to save his life.

MR. BURKE: I disagree, your Honor. We know now that Miss Donovan's body wasn't even in that area. We would know that today. It would not be something we would be arguing. We know now that Miss Donovan's body was not even in the part of the state or the country where they were looking. And so we understand that the motivation and why they felt compelled to try some -- sometimes it's referred as a race to the body. They were trying to do their best.

But under these circumstances, given the fact that they did not have any guarantee and it was so ambiguous what would be used, what would not be used, statements about directions, I mean, from the outset it became obvious that

1297

there were going to be problems with that.

THE COURT:  Isn't this somewhat similar to the claim raised by Mr. Fulks, in that the argument there, as you know, was his lawyers were ineffective for letting him make a statement to the FBI without something in return.  And Mr. Blume testified it was his strategy to do that to get his client's version before the jury without his client having to testify.  There was something in it for him to do that without a reward in return.

MR. BURKE:  Right.  And Mr. Blume made that decision after he had represented Mr. Fulks for quite some time.  He knew full well what the evidence would show and what it would not show and so he made that strategic decision.  Mr. Hammond's testimony was that given these particular circumstances it was not an appropriate decision to make because the attorneys simply did not have enough information about what the evidence was and how it was going to be used.

More importantly, and I think the more clearcut issue with regard to claim one is the incident in which Sheriff Hewitt spoke to Mr. Basham outside the presence of his attorneys.  Now, there's some confusion or ambiguity as to what exactly happened.  If I remember correctly, Mr. Monckton said that he never saw Mr. Hewitt speaking to Mr. Basham.

THE COURT:  He was surprised to hear that in the courtroom, wasn't he?

1298

MR. BURKE: Yes. Mr. Littlejohn said this morning that he doesn't remember Mr. Hewitt talking to his client but that he was confident he never would have taken his eyes off of his client.

THE COURT: He said he was always within sight but not within earshot, I believe.

MR. BURKE: But he also has no recollection of any communication between those two. Which raises an interesting issue. Because either Sheriff Hewitt spoke to Mr. Basham or he didn't. If he didn't we have no IAC claim here, what we are saying was damaging never happened. But if he didn't that means that Sheriff Hewitt testified falsely. So I think given that neither Mr. Monckton nor Mr. Littlejohn are definitively able to say this never happened we have to at least assume that Mr. Hewitt, Sheriff Hewitt, did in fact talk to Mr. Basham.

THE COURT: And he did say that it was in response to his question, it was not something blurted out by Mr. Basham.

MR. BURKE: That's correct. There's never --

THE COURT: No provocation by the sheriff.

MR. BURKE: There was --

THE COURT: It was with provocation by the sheriff, I'm sorry.

MR. BURKE: Yes, your Honor. And so we have that situation. And Mr. Hammond's referred to it as the umbilical

cord rule.  That when you have your client, there are so many times when your client is outside of your control and they are in the jail and you can't control what happens to them.  But in the situation such as this when you are actually with your client and for something this critical you simply don't allow your client to communicate with law enforcement outside of your presence.

If you -- Mr. Littlejohn said that he would have been within his eyesight and in an area about the size of this courtroom.  But if he wasn't, if he didn't see this event occur then he wasn't doing his job.  He needed to keep control of his client.  And so that is the argument that we put forth with regard to claim one.

So it's twofold.  This never should have happened, they should not have been out there.  But once they were out there they had a very clearcut, unequivocal obligation to keep tabs on their client.  And either this occurred when Mr. Littlejohn and Mr. Monckton were off talking to other law enforcement or it occurred when they just weren't paying attention.  It doesn't matter.  It occurred.  And so much of the -- so many of the claims we're going to talk about this afternoon find their genesis in that one incident.  So there can be no question that there was severe prejudice as a result of what happened.

Your, Honor that's all we have on claim one so I'll

1300

let the government respond.

THE COURT:  Let me hear from the government. Miss Ewing?

MS. EWING:  Yes, your Honor.  Under claim one, first of all, we believe that Mr. Basham is arguing the wrong standard.  This umbilical cord standard seems to be something like strict liability, that whenever a defense attorney allows his clients out of his presence or away from him further than an umbilical cord it is per se ineffective assistance.

Well, that's not the standard.  The standard is that what a reasonable attorney would do under prevailing norms based on the facts of the particular case and from counsel's perspective at the time.  Well, what do we have the day of the search?  First off, Mr. Basham's right, no, they hadn't had a lot of time, they didn't have time to put together a defense team.  They got appointed the day before.  However, they knew enough that Mr. Basham was in a lot of trouble, he had already admitted to being involved in the murder --

THE COURT:  Didn't Mr. Littlejohn say he wasn't sure how much had been admitted up in Kentucky?

MS. EWING:  He said he wasn't sure how much had been admitted.  However, he did say I knew he was in a lot of trouble.  He, or at least certainly Mr. Monckton said that he had no doubt that if they didn't find Alice Donovan's body that -- or had very little doubt if they didn't find Alice

Donovan's body that Mr. Basham would receive the death penalty. So they felt very, very strongly that this was Mr. Basham's one opportunity to save his life. So those were the circumstances that they were operating under.

At the Jackson v. Denno hearing Mr. Littlejohn had testified that the fact that he would go and attempt to point out the location where Miss Donovan's body was located, obviously there was no way of keeping that evidence out. They knew it was incriminating, but at the same time they were between the proverbial rock and a hard spot. So they chose to pursue the search route in hopes that they would find her body. And as it turns out her body wasn't there, but they didn't know that at the time.

And the court has to look at what the attorneys knew at the time, and at the time Mr. Basham was saying her body is at this Bee Tree Farm area. They hadn't -- they didn't have any basis to not believe him at that time.

As far as Mr. Basham speaking with Sheriff Hewitt, that was all part and parcel of finding the body. Mr. Littlejohn said, well, as I recall, we went back to the cemetery and it was an area about the size of the courtroom. And, yeah, Mr. Basham may have spoken to Sheriff Hewitt during that time, but they were all looking around for the purse strap.

Maybe he didn't see the discussion but it didn't take

1302

a whole lot of time to walk over to the edge of a cemetery at the tree line that was testified to, Mr. Basham's talking about throwing the purse strap, look for the purse strap that was thrown in the tree line.

THE COURT:  Let's stop.  The sheriff already knew they were looking for a purse strap near a cemetery.

MS. EWING:  Absolutely.

THE COURT:  That was already out on the record through Mr. Littlejohn or with Mr. Littlejohn's consent.

MS. EWING:  Yes, your Honor.  He did not recall today talking about it in the van, but I believe that the record does show that when they were in the van Mr. Basham attempted to whisper something to Mr. Littlejohn and Mr. Littlejohn said yeah, go ahead and tell them.  And Mr. Basham said you need to look for a purse strap.  If you find the purse strap the body will be --

THE COURT:  They knew that before this disputed conversation.

MS. EWING:  Absolutely.

THE COURT:  And what happened in the disputed conversation, I read that transcript a dozen times and I still don't know what the sheriff said.  Did he say that Mr. Basham demonstrated how she was strangled, how the strangling occurred and how he threw it, or just demonstrated how he threw the strap?  It wasn't clear to me.

1303

MS. EWING:  It is ambiguous.

THE COURT:  And it's very ambiguous about whether Mr. Basham admitted he did the strangling.  He said how she was strangled and how he threw the strap, passive tense and active tense in a dual sentence, or whatever the word is.

MS. EWING:  It was.  The question at trial was to the effect but he never said he strangled her, and Sheriff Hewitt in both the Jackson versus Denno hearing and the trial said something to the effect, no, he demonstrated, and may I show you?  And he said -- he said Brandon, how did you do it?  And he said like this, and apparently at that point Mr. Basham made some demonstration.

THE COURT:  Of the strangling, not of the throwing but of the strangling leg.

MS. EWING:  Of the throwing, also, though.  Certainly one could interpret it to mean that he demonstrated how she was strangled and how it was thrown.  But I think your Honor pointed out when we were back last month in hearings that it seemed to be one of those situations where neither side really wanted to --

THE COURT:  Both sides were scared to touch it, I think.  That's what it looked like to me.  Because it surely could have been cleared up by one side or the other.  But I think it's like both sides leave the record where it was and argue the inferences in their favor.

1304

MS. EWING:  And I think that's exactly what happened, or least from reading the transcript that's what happened.

But at the end of the day when everybody ended up at that little cemetery Brandon Basham's attorneys, their focus was on extending that search because the agents were frustrated, they were tired, they were ready to call the search off and leave.

And Mr. Monckton testified my biggest fear was --

THE COURT:  Let me interrupt you.  I've got the transcript of the Jackson v. Denno and the trial testimony.  And the Jackson v. Denno hearing the sheriff said, let me just read it.  We walked back down to the cemetery, this is page 66 at line 15.  We walked back -- he walked down to the cemetery, he got tears in his eyes and tears rolled down his cheek and he showed me the length of strap.  Yes, how did he do that?  Answer:  May I demonstrate?  Certainly.  Answer:  Like this.  Because he couldn't pull his hands very far apart, he was shackled, he showed me the length of the strap, says that he believed it to be a Liz Claiborne strap, and that he had thrown it in the woods.  He then demonstrated the manner in which he threw it in the woods.  And he didn't say that he demonstrated how she was strangled at the Jackson v. Denno, right?

MS. EWING:  Right.

THE COURT:  He said he demonstrated how he threw it

1305

in the woods.  And then at the trial on cross-examination by Mr. Harris, Mr. Harris said refer to your notes.  Okay.  Question:  There's nothing in your notes nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?  Answer:  No, sir, he did not tell me he used the strap.  He demonstrated, though.  He demonstrated?  Yes, sir.  Your notes nor Lieutenant Crocker's notes say that he did that, isn't that true?  This is true, because he didn't say, he showed.

But there, again, it's not clear from what he says he -- that he demonstrated how she was strangled or how he threw the strap.  To me it's very ambiguous.  And both sides had a full chance to clear that up and neither side took advantage of the opportunity to ask the sheriff what did you mean that he demonstrated.

MS. EWING:  I think that both sides were afraid to ask.  Certainly at that time the government did not know what had occurred or what had been said prior to the trial.  We now know that Mr. Swerling and Mr. Harris had found out that Mr. Basham told Attorney Hughes that they had killed Samantha Burns, that he and Mr. Fulks had each taken an end of Samantha Burns' book bag strap or backpack strap and had strangled her together.  So my guess is that maybe Mr. Harris was a little concerned about --

THE COURT:  Maybe they did the same thing here?

MS. EWING:  Yes, your Honor.  They certainly -- well, we know that they attempted to kidnap Andrea Francis and her mother in the same manner that they kidnapped Alice Donovan in.  So certainly there seems to be an indication they had kind of an MO in the way they were committing these crimes.

THE COURT:  All right.

MS. EWING:  So, anyway, extending the search was what they needed to do, and they were focused on talking with law enforcement at the end of the day and trying to extend the search.  So if Mr. Basham wandered off with Sheriff Hewitt briefly, it was reasonable under the circumstances.

THE COURT:  Let me interrupt.  Let me -- I'm interested to hear Mr. Burke on this.  I know you say later the prosecutor argued that's all we need to hear right there is what Sheriff Hewitt said, but do you agree it's somewhat ambiguous and both sides agreed to just decide to stay away -- not agree to stay away from it, but decided it was just too dangerous to go there and they'd better leave it alone and try to argue the inferences to be drawn from it?

MR. BURKE:  Your Honor, I will agree with that second point.  But there is a very important distinction.  The government does not have the right to shy away from an ambiguity like that.  They have an obligation under the due process clause to clear up that ambiguity, and what happened in this case is when Mr. Hewitt, when Sheriff Hewitt --

1307

THE COURT:  The government elicited it.  And you say that's ineffective assistance.  But Mr. Harris really didn't know that was going to come out, did he?

MR. BURKE:  No, he did not.  He was surprised.  But the government, interestingly, given how much time Mr. Gasser spent speaking during the trial, he did not redirect on this point.  He didn't redirect at all, he just sat on his hands.  He had an obligation -- and this goes to our next claim.  Miss Ewing suggests that, yes, everybody was afraid of it.  Well, perhaps defense counsel was afraid of it, the government doesn't have that right.  They were the ones who were prosecuting this case and they could not simply say whoops, we don't know.

And another factor that is very important to consider is that at Mr. Fulks' trial Mr. Gasser said that Sheriff Hewitt had indicated that Brandon Basham had shown how Fulks had killed the victim.  So you had directly conflicting information there.  That goes to the claim --

THE COURT:  Say it again.  At the Fulks trial Mr. Gasser told the jury about Sheriff Hewitt --

MR. BURKE:  Excuse me.  It didn't come out in front of the jury.  What happened, this came up in the context of the deer statement when the government -- let's see.  Defense counsel wanted to bring in Mr. Basham's statement about the statement, I've never killed a deer, okay --

1308

THE COURT:  It was in that out-of-the-jury's-presence discussion about the deer statement that Mr. Gasser made the statement about the strap.

MR. BURKE:  Exactly.  And the government was asked, saying, wait a minute, that can't come in because this is what would come in in Mr. Fulks' trial.  Mr. Gasser said to you, your Honor, remember Sheriff Hewitt demonstrating how Brandon Basham said that Chad Fulks took the purse strap and strangled her.  That's from the Fulks transcript, June 22, '04 at 255.  And so --

THE COURT:  The reason he was saying that was I pointed out that to let the deer statement in by itself would be unfair because although it appears, you know, arguably it was an admission by Mr. Basham he had committed a crime or struck the fatal blow, Mr. Basham also said a lot of other things that have to be placed in context for the jury about the fact he didn't strike the fatal blow, right?  That's why we got into that discussion.

MR. BURKE:  Well, you also made the comment, your Honor, that that statement, the deer statement could have --

THE COURT:  It's somewhat ambiguous, right?

MR. BURKE:  Right.

THE COURT:  All right.  So the point is that Mr. Gasser didn't say that in front of jury at the Fulks trial, but he argued it to me.

1309

MR. BURKE: Well, and I would say, your Honor, with regard to Miss Ewing's statement that everybody was afraid, it shows that the prosecution believed that the evidence indicated that Mr. Basham had told Sheriff Hewitt that Mr. Fulks was the actual killer.

THE COURT: Of course, all that could have been avoided if we had one trial. And it was the defendants who argued strenuously for separate trials.

MR. BURKE: Which --

THE COURT: Right? Wasn't it?

MR. BURKE: They have a constitutional right to be tried separately, your Honor. If they exercise their constitutional rights they can't be punished for that.

THE COURT: I thought, I may be wrong, I thought they gave me a reason. Normally you try defendants who are indicted together, they are tried together. But I thought they gave me a reason we needed separate trials here, some evidentiary or strategic reason. I'm very rusty, that's way back in the past.

MS. EWING: As I recall, they did. I haven't looked at it for this hearing. But as I recall when we were handling the Fulks one we did take a look at it.

THE COURT: All right. Let's go back to the argument. I just wanted to get the benefit of the defendant's input on that point. Go ahead.

MS. EWING: Your Honor, the government doesn't deny that Brandon Basham did say that Fulks did strangle Alice Donovan. It was prior to the demonstration, I believe. But, yeah, Mr. Basham did at various times say Fulks did it. I think this was part of the problem with doing a joint trial, each one said the other one did it. As I recall Mr. Gasser's term, it was -- you referred to it as the TODDT defense, the other dude did it.

And just in response to the comment that the government had an obligation, no, your Honor, I don't believe that the government has an obligation to explore everything. The government had an obligation to present its evidence, sure, and to show the jury the evidence to make its case. It doesn't necessarily have an obligation to respond to what Mr. Basham was raising.

But, moving on, it was difficult for any of Mr. Basham's counsel to stop him from talking. He likes to talk. He was the one who asked to be transported to South Carolina so he could help find the body while still in Kentucky. He reached out to the FBI Special Agent Pat Maley and one of the supervisors and left him a voice mail that said he wanted to talk. This occurred after he had been appointed counsel in Kentucky. While preparing the map with his counsel right there, and Agent Maley said that counsel Hughes was quite protective of Mr. Basham but even in that setting in a small

1311

room trying to put together a map Mr. Basham pointed to a cemetery where he said there was a small cemetery and said, and this is where we did our thing.  He didn't say this is where Fulks killed her, he didn't say this is where Fulks raped her, he said this is where we did our thing, with his counsel right there.

He also during the same time talked about Alice's body being within dragging distance of the road.  This occurred before he ever came down to South Carolina and in the presence of counsel.  Yes, it was difficult for counsel to control Mr. Basham.

And then after the interview where he was coming up with the map Attorney Hughes actually called Agent Maley the following evening and said that he had been talking with Basham and needed to let him know that Basham was providing directions to where, quote, they dumped the body, unquote, of the missing girl in West Virginia.  So prior to even going to South Carolina he had made numerous statements incriminating himself.

During the search, again, he started talking about the purse strap, and in the Jackson v. Denno hearing Mr. Littlejohn said that, you know, he felt that was directional talking about the purse strap.  They needed something to show that he was telling the truth and if they found that purse strap it was certainly an indication that Basham was being

1312

straight up with them.

Also, during the search Mr. Basham said they pulled Alice Donovan out of the right side of the car and drug her 50 feet into the woods and covered her body with leaves.

THE COURT:  Who did he say that to?

MS. EWING:  I'm sorry, your Honor?

THE COURT:  Who did Mr. Basham say that to?

MS. EWING:  I believe he said that while they were in the van or at one point where they stopped and went into the woods.  I believe that was just prior to going into the woods, because he also at the same time talked about cutting his leg on a stake.  He said he remembered where they had gotten out because there was like a gopher hole with a stake in it and he had cut his leg.  And I believe that at the Jackson v. Denno or one of the hearings that Mr. Littlejohn or Sheriff Hewitt commented about how he pulled his pants leg up to show them where his leg was cut going into this place in the woods where he had said that they drug her body.

So we have all these statements coming from Mr. Basham and then a month, less than a month later, actually Christmas Eve, Mr. Basham calls Clifford Jay and again incriminates himself.  He calls him and says we killed them. Yes, sir, Mr. CJ, we killed them.

Now, is it ineffective assistance of counsel that if counsel weren't with him on Christmas Eve when he made this

1313

phone call? I don't think so.

But in addition to it not being ineffective assistance of counsel there was no prejudice. This ambiguous purse strap demonstration certainly did not prejudice Mr. Basham.

Let's see what the evidence was against Mr. Basham. In addition to his various admissions, Mr. Basham was the one on the videotape kidnapping Alice Donovan. Had there not been Mr. Basham jumping into that car and kidnapping Alice Donovan Alice Donovan would still be alive. It was Mr. Basham who sat in the back seat with Alice Donovan to make sure she didn't escape before Mr. Fulks found a place where they could do their thing.

In fact, it's interesting there is evidence that and was evidence on the record that that's exactly what Mr. Basham was doing. If you will recall, there were two men who testified who had been at the deer camp cooking out and they testified -- at least one of them testified that he noticed the car and thought it was very odd because one young man was driving this blue BMW and in the back seat was another man and a woman sitting very close together in the back seat. So there was that testimony that Basham was sitting in the back seat keeping her there.

Also, Mr. Basham was the one who purchased the camo gear. There was testimony that he went into Wal-Mart and

1314

purchased the camouflage gear that they wore the night that they kidnapped Samantha Burns.

Also, Mr. Basham was the one wearing Samantha Burns' ring. Beth McGuffin testified about the ring that he wore around his neck that he gave to her and then I guess took back. And then there was even a replica of the ring that Samantha's mother had gotten to show what this ring looked like. Mr. Basham also had a knife belonging to Alice Donovan on him when he was arrested.

Mr. Basham was the one who talked James Hawkins into leaving his house and giving them a ride, purportedly to their broken down vehicle the night that they kidnapped him. Mr. Basham was the one who went up to Margaret Moore's house and tried to talk her into coming out and giving them a ride, and when she couldn't do that he tried to talk her into letting them into her house. Mr. Basham was the one who crouched down in the motel room in Indiana and said if the policeman came through the door that he would shoot him.

THE COURT: This is all going to overwhelming evidence of guilt to show what whatever errors might have occurred was harmless. That's where you are going with this.

MS. EWING: Yes, your Honor. And I'm about to wrap up on this.

THE COURT: I'm not trying to rush you. I just wanted to be sure, you said there was no prejudice, but what

1315

you are really saying is in the total scheme of things it wasn't that consequential because of the overwhelming other evidence.

MS. EWING:  Yes, your Honor.

THE COURT:  All right.

MS. EWING:  And it was Mr. Basham who was ready -- who was caught trying to kidnap the third and fourth victims. Andrea Francis testified and her mother testified about how Mr. Basham held the gun into Andrea Francis' side and tried to get into the car on top of her.  And it was Mr. Basham who attempted to shoot at the police or shoot the policeman as he was trying to avoid being captured.

And, finally, as far as this claim and the purse strap, the jury didn't find that Mr. Basham killed Alice Donovan.  The jury found the fourth intent factor, threshold factor.  Brandon Leon Basham intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to Alice Donovan.  Such participation in the act constituted a reckless disregard for human life and Alice Donovan died as a direct result of the act.  Mr. Gasser had argued this, jurors didn't need to find Mr. Basham specifically killed Alice Donovan, that it was his hand that killed her.

As to overall prejudice, the reference to the purse strap admission or whatever was three lines in a 76 page

1316

closing that continually, I don't know -- I didn't count how many times he said the team of Fulks and Basham in unison, acting as a team, a killing machine, they killed Alice Donovan.  It was constantly they did it.  So over --

THE COURT:  I think the record is pretty clear on that.  I think the government was smart enough to realize this could be an issue and they were very careful in both cases in their arguments to the jury to say they worked as a team.

MS. EWING:  Yes, your Honor.

THE COURT:  I think the Fourth Circuit already recognized that.

MS. EWING:  Yes, your Honor, I think so.  Beg the court's indulgence.

(There was a pause in the proceedings)

MS. EWING:  Thank you, your Honor.

THE COURT:  All right.  Let's hear reply on this argument and then we will move on to the next one.  Let me be sure I understand.  Mr. Burke, you said the government has a constitutional obligation to clear up an ambiguity.  You might be right, I just never thought about that before.  The government cannot knowingly use false evidence.

MR. BURKE:  And they have an obligation, your Honor, to investigate when they believe that there may have been false testimony.

THE COURT:  Here the government is faced with

1317

separate trials which they did not want, they opposed, and they are trying to not say something in one case that would hurt the other case. They are dancing on the head of a pin, so to speak. And one comment comes out on cross-examination that the government didn't bring out that might arguably signify that Basham struck the fatal blow, whatever you want to say. But knowing it's the government's position even if Basham struck the fatal blow, I mean Fulks struck the fatal blow, they were both equally culpable. The government had an obligation to clear that up, you say?

MR. BURKE: Well, your Honor, may I --

THE COURT: Yes, go ahead. I'm just saying, it's not a situation where the government knowingly used false testimony, they stayed away from a delicate subject that --

MR. BURKE: But under Napue and Giglio, your Honor, they have an obligation if they suspect there's false testimony to investigate that. And that is what happened here. And that's moving to the next claim. Let me briefly -- I'm turning to --

THE COURT: Go ahead on the next claim. Because they are all tied together.

MR. BURKE: A couple of points I would like to make is that Miss Ewing's statement that Mr. Basham said that the body was in the tree farm, that never occurred. They were at the tree farm because other people saw -- the believed they

1318

saw the vehicle up there.  Mr. Basham didn't say that, Mr. Basham didn't even know what little tree farm was.

And as far as the ambiguity is concerned, your Honor, it certainly wasn't ambiguous to Mr. Gasser.  He argued to the jury in Mr. Basham's case in closing argument Sheriff Hewitt says he, Mr. Basham, didn't say I killed Alice Donovan, Sheriff Hewitt said to you in this courtroom in front of you, the jury, no, he demonstrated it.

There was no ambiguity for Mr. Gasser.  He said it later in his closing arguments that the two key pieces of evidence, the ones that in his words sealed the deal, were Sheriff Hewitt's -- after seeing Sheriff Hewitt demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled.

THE COURT:  But she was strangled, though.  How she was strangled.

MR. BURKE:  Yes, your Honor.  But previously he said Mr. Basham didn't say I killed her, no, he showed, he demonstrated.

THE COURT:  All right.

MR. BURKE:  And so if this were so insignificant as the government is now arguing then why would Mr. Gasser have argued to the jury that this was -- this evidence sealed the deal?  And it is clear from the 302 report that was done by Officer Long, by the testimony that was given to the grand

1319

jury, that the government believed even through Mr. Fulks' trial where Mr. Gasser said to you, your Honor, that the evidence showed that Mr. Fulks was the actual killer, they believed that that was the truth.  And this Sheriff Hewitt, who is no longer a sheriff but is now I believe a prisoner, said on the stand, yes, on cross, he said that it was Brandon who was the actual killer.  He said he didn't show me, he demonstrated.  And so --

THE COURT:  Looks to me like he was being cagey himself.  He knew how to make a sentence and he could have said he didn't show me -- he didn't tell me she was killed, he demonstrated how he killed her.  But he just said he didn't tell me, he demonstrated.

MR. BURKE:  And it was left to the jury to --

THE COURT:  All right.

MR. BURKE:  The next issue ties into what I was --

THE COURT:  I guess looking back that might have been one of the instances I would have been justified for asking a question.  The judge can question witnesses.  I don't think I ever have in a jury trial.  But it would have been an awfully lot better if somebody had cleared that up.

MR. BURKE:  Well, in claim 11, your Honor, we argue that there was governmental misconduct because they didn't clear up that ambiguity.  Because the government had previously taken the position the actual killer was Mr. Fulks

1320

and that when this came out on cross-examination that it should have been a red flag to the prosecution that they had the potential for false testimony.  And that they have an obligation under the constitution to investigate that and clear it up.  We have asked the government for any record that they have that shows that Mr. Gasser, Mr. Schools, investigated whether Mr. Hewitt testified truthfully and --

THE COURT:  But -- I'm sorry.  Go ahead.

MR. BURKE:  And we have been told that there is no record, there was no investigation done.

THE COURT:  But am I not correct that 302 report that you say gave the government its belief that Fulks was the actual killer, wasn't that based on the statement that Mr. Basham gave?

MR. BURKE:  You are right, your Honor.

THE COURT:  It was a self-serving statement by Mr. Basham that went into the 302, wasn't it?

MR. BURKE:  You are right, your Honor.  I brought that up with me because I want to clarify that.  I was under the impression, and let me ask co-counsel, but I was under the impression that there is a reference, I may be wrong, in the 302 to Mr. Hewitt's conversation with Mr. Basham.  But I will certainly concede -- I don't want to misstate that.  And you are right, when I went and looked at that it's from the hypothetical that was given by Mr. Littlejohn, so --

1321

THE COURT:  All right.

MR. BURKE:  But we do believe there was at least enough evidence for the government to have concerns about the veracity of Mr. Hewitt's testimony and they should have investigated that.  And they did not.  And they, in fact, not only did they not investigate it but they pounced on it in closing arguments to show that Mr. Basham was -- was the actual killer.

And that's a significant factor.  The government argued all along that the gentlemen could have been convicted under either, they didn't have to be actual killer, that didn't matter.  But even as the Fourth Circuit noted in the Fulks decision, that a sentencing jury can be harsher on a defendant if they believe that defendant is the actual killer.  So this is something that clearly the government thought that was important information.

And there was -- we use the term ambiguity, I think in light of the what we know about Sheriff Hewitt, had an investigation been done that it would have revealed that perhaps his testimony was false and that that led to Mr. Basham's conviction.  That's our argument on claim 11.

THE COURT:  All right.  What's next?

MR. BURKE:  Did you want to respond to claim 11?

MS. EWING:  Your Honor, I would point out the government had no reason to believe that Sheriff Hewitt lied,

1322

still has no reason to believe that Sheriff Hewitt lied.  And as far as the comment about Mr. Basham not providing information about Bee Tree Farms area, I believe when he was giving directions up in Kentucky he did mention an Amoco station.

In all fairness he did talk about an area and described an area that appeared to be Savannah Bluffs, but he also talked about this other area, too, as I recall.  And certainly when he was there he was recognizing landmarks and recalling being out at Bee Tree Farms area cooking out.  And Amoco station, he clearly remembered that.

And I think that's all the government --

THE COURT:  Let me say, I have a short conference with some lawyers that should take about five minutes.  I told them to be here at 3:00 o'clock today.  Since we're in the middle of starting another issue could we take that break now and let me talk to them?  It shouldn't take just a minute.

All right.  Let's take a ten minute recess.  Let's say 15 minute recess, to be safe.

MR. BURKE:  Thank you.

(A recess transpired)

THE COURT:  All right.  What's next?

MR. BURKE:  Your Honor, I would like to address claim two.  I know that we have only gone through one, but we did throw some things in between.  But now I would like to address

1323

claim two, which concerns our Mr. Basham's claim of ineffective assistance of counsel with regard to the Jackson v. Denno hearing.

Mr. Hammond testified about his professional opinion that defense counsel, trial counsel fell blow the standard of care in their representation of Mr. Basham in Jackson v. Denno. He had two areas he discussed. One was Mr. Basham's inability to make a knowing and intelligent waiver of his constitutional rights. I'm going to let that testimony speak for itself because I would like to focus the court's attention on the second aspect of what Mr. Hammond testified to, and that concerns the failure of trial counsel to challenge the admissibility of any statements that Mr. Basham supposedly made to Sheriff Hewitt during that Thanksgiving day search.

MR. JOHNSON: And, your Honor, with respect, again we object because we think this is a subject matter that falls outside the scope of the claim they raised. The claim that they raised in the 2255 petition was that Mr. Swerling and Mr. Harris were ineffective based on Mr. Basham's history of diminished capacity and based on his drug use that he was not able to make a knowing and intelligent waiver of his Miranda rights. That's very different than arguing they should have filed a motion to suppress statements that he made to Sheriff Hewitt based on some improper conduct by Sheriff Hewitt.

THE COURT: It's been a while since I read the brief

1324

on this point, but I did think the argument -- claim two was related to his mental capacity to make these statements and not some constitutional violation of the discussion with Sheriff Hewitt.

MR. BURKE:  Your Honor, we made a very broad claim. Mr. Basham was denied effective assistance of counsel under the statutes and the Sixth Amendment when trial counsel failed to prepare for and effectively litigate the Jackson v. Denno hearing in this case.  This issue has been the subject of testimony, and it is the government --

THE COURT:  We're back to the statement to Sheriff Hewitt during the search, right?

MR. BURKE:  Yes, your Honor.

THE COURT:  It violated the constitution, basically.

MR. BURKE:  It was a clear violation of Edwards versus Arizona.  There's no question, we have been talking quite a bit about ambiguities.  One thing that's not ambiguous is that Mr. Littlejohn and Mr. Monckton made it clear to law enforcement officers that were there that day that they were not free to question Mr. Basham.

THE COURT:  All right.  But at the time of the Jackson v. Denno hearing did we know that Sheriff Hewitt was going to make this statement at trial?

MR. BURKE:  By that point we knew that -- in fact, at the Jackson v. Denno hearing Sheriff Hewitt did testify about

his conversations with Mr. Basham.  So it was --

THE COURT:  He did reveal they wandered off together, didn't he?

MR. BURKE:  Yes, your Honor.

THE COURT:  At the suppression hearing.

MR. BURKE:  At the suppression hearing.  And there's been no evidence presented to suggest what strategic reason there would have been for counsel not to move to preclude that clearly inadmissible evidence.

And as to prejudice, given that we have spent the last hour talking about the effect of those statements on Mr. Basham's trial, I think that the prejudice to Mr. Basham is quite evident.  And so I'm trying to make very brief arguments on these issues, your Honor, because they have been briefed.

But and the Edward versus Arizona issue, a Jackson v. Denno hearing is an opportunity to move to preclude statements that are obtained in violation of the constitution, and these statements were obtained in violation of the constitution.  Mr. Basham was denied his right to effective representation and he was prejudiced.  And for that reason alone he would be entitled to relief.

THE COURT:  All right.  Mr. Johnson?

MR. JOHNSON:  Your Honor, I think we have discussed this at some length so I'm not going to belabor.  I do know that our argument is this portion of the claim has been

1326

procedurally defaulted since I don't believe that it has been adequately raised in the pleadings.  But to the extent it has I would like to discuss it briefly.

Sheriff Hewitt did not ask Mr. Basham anything that was outside of the scope of the reason they were there that day.  Mr. Cam Littlejohn testified that the whole purpose of the Thanksgiving day search was just that, it was a search for Miss Donovan's body.  And so while he told law enforcement officers that Mr. Basham would not be giving a statement about the details of the crime, he would be providing directional information.

And Mr. Littlejohn testified that he fully expected that the directional information would be used against Mr. Basham and, in fact, he wanted it to be used.  Because if Mr. Basham was able to lead them to Miss Donovan's body, or at least to the extent that he was able to try and cooperate, that would be mitigating evidence on his behalf.

Mr. Basham wanted the interaction with law enforcement, Mr. Littlejohn and Monckton wanted the interaction with law enforcement because they all wanted to find Miss Donovan's body.  Mr. Littlejohn testified as they were driving along in the van Sheriff Hewitt would turn around and ask questions about directions to Mr. Basham and Mr. Basham would answer directly.

And there was also a point in the van when Mr. Basham

turned to Mr. Littlejohn, they had a private conversation, and following the private conversation Mr. Littlejohn informed the officers you need to be looking for a purse strap. And he told them the reason you need to be looking for this purse strap is because it's going to be a clue to help you find the body. If you find the purse strap, you might find the body.

And so long before the end of the day confrontation at the cemetery Mr. Littlejohn had already told them you need to be looking for a purse strap, and he testified that he considered that to be directional information. And Mr. Littlejohn also testified that when they were at the cemetery at the end of the day Mr. Basham was constantly within his field of vision, he was right there.

He testified that there was a time when they were all walking around the cemetery looking for the purse strap, and this question that Sheriff Hewitt asked Brandon concerned the purse strap. And we have already been through it today so I'm not going to go back over it.

But the testimony at the Jackson v. Denno hearing was not about the crime itself, it was about how the purse strap had been disposed of. And all of that was an effort to help guide law enforcement officers to where the body might be in relation to the cemetery. Based on that testimony Mr. Swerling and Mr. Harris would have had no reason to raise an objection to that.

1328

THE COURT:  Let me jump in here.  Another reason it's so confoundingly confusing is at the Jackson v. Denno hearing Sheriff Hewitt never tells us the question that he asked.  He never recites a question that he put to Mr. Basham, he just talks about him getting tears in his eyes and then he says he showed me the length of the strap, and then the question was how did he do that?  And the answer was, may I demonstrate:  Question:  Certainly.  Like this, because he couldn't pull his hands very far apart.  He showed me the length of the strap, said he believed it to be a Liz Claiborne strap, and he had thrown it into the woods.  He then demonstrated the manner in which he threw it in the woods.  Never did Sheriff Hewitt tell us what question he posed to initiate the conversation.

MR. JOHNSON:  And a few lines down from that, Judge, where the question is, would you stand up and do that for the court so the record is complete, as well.  Answer:  Yes, sir, I will.  We were standing at the corner of the cemetery, Brandon Basham is chained, I said Brandon, how did you do that, and he said like that, and I threw it over there.

THE COURT:  He did say a question, he said how did you do that.

MR. JOHNSON:  And in context, you know, the question is well, what is he referring to when he says that?  What is the antecedent of that?  And if you look back up at the most recent answer, the last sentence that Sheriff Hewitt said, he

1329

demonstrated the manner in which he threw it in the woods. And then the sheriff asked how did you do that, and he said like that, and I threw it over there.

So there's no testimony at the Jackson v. Denno hearing where Sheriff Hewitt says, you know, Brandon showed me how I killed her or how she was killed and it happened like this. The testimony is he made a demonstration, and there's some ambiguity to it, but the whole context is about Brandon Basham demonstrating how the purse strap was disposed of. And in context that makes sense, because the whole purpose of the interaction there at the cemetery was to find the body. And to find the body they felt if we find the purse strap we will have a clue.

So they are walking around the cemetery, as Mr. Littlejohn testified, they are looking for the strap, and all of that was because Mr. Littlejohn and Mr. Monckton were afraid that law enforcement were going to pack it up and go home for the day and they didn't want that to happen. They wanted that interaction to continue so that hopefully they could find the strap, they could find the body, there would be a powerful mitigating argument on Mr. Basham's behalf.

So at the Jackson v. Denno hearing Mr. Swerling and Mr. Harris testified that while they wanted this court to make a finding on the issue of voluntariness, they also wanted to have an opportunity to put the law enforcement officers like

1330

Sheriff Hewitt on the stand where they would have an incentive to talk about how cooperative and how helpful Brandon Basham was, hoping that this court would find his statements were voluntary and then later on in the trial they will have that testimony of the officers on record so that if the officers tried to deny that he was helpful they can be impeached, or so that they could -- they were building a foundation to show and have the opportunity to argue to the jury later that he was cooperative.

So they had no incentive to try to challenge this testimony because all it showed was that Brandon was being cooperative in helping them find the strap, helping to find the body.

THE COURT:  And I guess you could argue that the sheriff asking how you -- how did you do it, i.e., how did you throw the strap, was relevant to the search because if he just tossed it with his wrist it might have gone a few feet.  If he went back and threw it like a baseball pitch it might be way over in the woods.  So you argue that that was relevant to the search, not to who killed her.

MR. JOHNSON:  I agree with that.  And that is what we argue.  We think that's exactly why it was --

THE COURT:  Why else would the sheriff want to know how he threw the strap, except to know how far to look out into -- away from the cemetery.

1331

What about that, Mr. Burke?  Would you agree with that, that's probably what the sheriff was going for?

MR. BURKE:  No, I don't, agree, your Honor.  First I would ask what relevance is it that it was a Liz Claiborne purse strap.  How does that go to directions?  It has nothing to do with directions, it has to do with -- and first let's make something clear.  What we're arguing and what Mr. Johnson appears to be arguing is that you can ignore the violation of Mr. Basham's constitutional rights.  They clearly had invoked his right to counsel.  What we're saying now is, yeah, but he asked about directions.  Well, A, he didn't ask about directions, he took Brandon apart.  And we know later, we later found out that in fact he talked to him supposedly about how the murder was committed.  What does that have --

THE COURT:  I don't know that sheriff -- the sheriff ever said that Basham told him how the murder was committed from these two passages in these two days of testimony.

MR. BURKE:  He testified --

THE COURT:  That's what Mr. Gasser argued, I know, and that's what the 302 says that Basham said happened.  But did the sheriff ever say he demonstrated how she was killed?

MR. BURKE:  Yes.  He said that he showed how it was done.  He showed how it was done.

THE COURT:  Yeah, well, the question was -- nothing in your notes to indicate that Basham told you he used the

1332

strap, is there?  No, sir, he did not tell me, he demonstrated, though.  So I guess you're right, he did imply that it was a demonstration of how she was killed.

MR. BURKE:  And I think going back to argue that there was no violation of the Fifth Amendment because Mr. Hewitt ultimately was only asking questions that can be construed as going to directions, it misses the point that once a defendant invokes his right to counsel you cannot --

THE COURT:  But Sheriff Hewitt was leaning back and asking questions directed to Basham in the van, right?

MR. BURKE:  In the presence of his attorney.  With his attorney sitting right there whispering to him.

THE COURT:  All right.  Go ahead.

MR. JOHNSON:  Very briefly in reply.  The fact there is -- it was a Liz Claiborne strap was relevant because they needed to know if they find something that looks like a purse strap, is that what Mr. Brandon Basham is talking about.

And as to what Sheriff Hewitt testified at trial, on this point we're talking about whether Swerling and Harris were ineffective at the Jackson v. Denno hearing, and that didn't come out at the hearing, he's talking about what came out at trial.  And the point is that what Sheriff Hewitt was asking him about was not outside the scope of the authorization that Mr. Littlejohn and Monckton had given them to ask questions.

1333

Obviously, they were there to ask questions about directions. And Hewitt in the presence of Littlejohn was asking questions about directions. Littlejohn said that the purse strap was directional, and Littlejohn said that all of Sheriff Hewitt's interaction with Brandon Basham occurred in his presence as he was there watching them walk around the cemetery looking for this purse strap.

So at the Jackson v. Denno hearing Swerling and Harris had no reason to object or to raise any issue about what was going on because that was the very point that they wanted to be able to argue later on was that Brandon Basham was being cooperative with law enforcement. They had nothing to put them on notice that there was any type of constitutional violation committed by Sheriff Hewitt or by anybody else.

THE COURT: All right.

MR. BURKE: May I just sur-reply to two or three points?

THE COURT: Go ahead.

MR. BURKE: One, your Honor, Mr. Littlejohn also testified today that Mr. Swerling and Mr. Harris never spoke to him about what had occurred. So to suggest that they were acting strategically, or rationally, they had not spoken to Mr. Littlejohn. And the other part I would like to point to is that -- one moment, your Honor.

1334

THE COURT:  You can come back to it.

MR. BURKE:  Okay.

THE COURT:  You can come back to it.  All right.  Go ahead, Mr. Johnson.  Anything on this point?  Anything further?

MR. JOHNSON:  Not on this issue.

THE COURT:  All right.  What's next?

MR. BURKE:  Your Honor, our next claim is claim nine, which is the claim that trial counsel rendered ineffective assistance of counsel when they conceded in opening statements to the jury all of the elements of the offenses except that Mr. Basham committed a carjacking of Miss Donovan with the intent to cause death or serious bodily harm.

As we have argued, the result of those concessions was to concede to the jury in opening statements that Mr. Basham was death eligible, that he had committed a capital offense.

THE COURT:  But in the Fulks case didn't the Fourth Circuit say there was nothing at all wrong with an outright guilty plea to both carjacking and kidnapping?

MR. BURKE:  They did, your Honor.

THE COURT:  What we have here is sort of a hybrid soft guilty plea, almost, wouldn't you say?

MR. BURKE:  But there was no reason -- there was no strategic reason to do so.  Mr. Swerling testified he wanted

1335

essentially to show good faith to the jury that we were not going to contest charges that were so clearly easily proved. But yet that --

THE COURT:  Refresh my memory.  They pled guilty to count one and then count two, the carjacking count, they raised the intent element.  But then Mr. Swerling actually told the jury I think we're going to have a penalty phase after all.  Didn't he say something like that?

MR. BURKE:  He did.  And, in fact, Mr. Harris during jury selection even said you can count on having the penalty phase.

THE COURT:  That's almost like a soft guilty plea.

MR. BURKE:  But the differences in Mr. Fulks' case, the jurors didn't sit through a multiple week trial on claims that counsel had already conceded had been proven and they only heard so much of this damaging evidence one time.  And so there was no strategic reason, no viable strategic reason, we would submit, to do what Mr. Swerling did.

And as Mr. Hammond argued, and again I'm reluctant to make any argument on these because I think he makes the point much more cogently than I am, but that an experienced capital trial attorney would not see the benefit in doing what Mr. Swerling did in this case.  And he certainly did not engender any good will with the jurors by requiring them to sit through what was essentially a straw man, a trial on guilt when he

conceded that Mr. Basham was eligible for the death penalty.

THE COURT:  That was a point I raised at the hearing, at the 2255 hearing for Mr. Fulks, was that to put the jury through a trial risks the danger of really making the jury mad at the defendant for putting them through a guilt phase trial. And the expert who testified in that case said, well, the strategy is you might have some lingering doubt, some juror who was a little bit uncertain about guilt but went ahead with the guilt phase but then that lingering doubt came into play in the penalty phase and that juror may hold out for a life sentence at the penalty.  That was the argument made then. Now, what about that?

MR. BURKE:  Well, I think that --

THE COURT:  Did you follow what I said?

MR. BURKE:  No, I understand what you are saying, your Honor.  I haven't really given it any thought.

THE COURT:  She said, I don't know if that was her term or my term, but lingering doubt.  If you have a guilt phase even though it's a pretty strong case there may by one or two jurors who are not quite convinced, firmly convinced, but they still vote for a conviction beyond a reasonable doubt.  But then when you come back on phase two on penalty those two jurors are your strongest allies in terms of getting a life sentence.

MR. BURKE:  But what Mr. Swerling gave away in this

case, which is what Professor Lyon was talking about, that he gave away that any juror would have doubt. But then he told them except for this one little thing, have no doubt, he did it, he's guilty.

And which is what Mr. Hammond sort of went to. He says juries understand. You courteously and professionally put the government to its test. If you are going to have a trial, then have a trial. But to do this hybrid made no sense, to tell the jury that he was guilty of a capital offense but we're going to make you sit through this trial was of no benefit.

THE COURT: Let me ask, you said something about hearing the damaging testimony twice. When we held the penalty phase trial in this case I didn't permit the government to replay all of the very damning testimony about the 17-day crime spree, did I? The jury already heard it once, there was no need to hear all those witnesses again.

MR. BURKE: Well, at the very least that evidence was reargued to the jury and they were reminded.

THE COURT: But harkening back, I think in the Fulks case the expert there said if you do have a guilt phase, strategically that's good because the jury hears all the damning bad stuff in phase one, they don't hear it again in phase two. And phase two is primarily a mitigation case and so the bad stuff is more attenuated, so to speak. I think she

argued that, too, in that case?

What about that? That you get all the bad stuff out of the way in the guilt phase and then the most recent things the jury hears before verdict on the penalty is the mitigation stuff?

MR. BURKE: Well, again, your Honor, I think that there's nothing wrong with that argument, except in this case the jury was doing that after they had been already told the guilt had been proven. So that's the distinction here.

I mean, the jury, you know, you are getting out to the jury and they're hearing it, but they are also doing it, well, why are we wasting our time. And, you know, I was thinking about this when we were arguing earlier this morning about what happened on October 26th with Mr. Basham wanting -- his attorneys wanting to stop, and you made the comment that the jury had had it, they were worn out. And I think you said they are indirectly giving you signals.

THE COURT: Well, I think through Miss Floyd. Periodically jurors ask me how much longer are we going, and I'm always reluctant to say anything back. And Miss Floyd is always careful about saying we don't have any way of knowing. But I think we got little subtle questions from the jury that we had been here longer than we predicted. There was no direct contact with the jury to me, but that's why I said that.

1339

MR. BURKE:  My point being the jury, the jury had been told at the very outset that they were dealing with a guilty man, a man guilty of a capital offense.  And they were here for months.

THE COURT:  All right.  What is the government's response?  Mr. Daley?

MR. DALEY:  Your Honor, there couldn't be a more quintessential strategic decision.  Both Mr. Harris and Mr. Swerling said that there's no doubt the kidnapping was a slam dunk, he was going to be convicted of the kidnapping.  There was a videotape of him kidnapping here.

But two things.  One, admitting what you did that was clear.  That was what Mr. Harris said in his testimony.  I think his testimony is at pages 308 and 309 of this transcript, 365 and 366, and 402 and 403.  He said, Mr. Harris said, he was a hundred percent on board with the strategy to concede guilt on everything but the carjacking.

And if you look at Government's Exhibit 20, this was actually put on the record in an ex parte hearing.  Obviously, seeing into the future that this might be a claim.  Mr. Hammond made something of that as if as an officer of the court you shouldn't do that.  Mr. Swerling explained why he did do it.

But perhaps --

THE COURT:  Why did they do it on count two and not

count one?

MR. DALEY:  Why did they not do it on count two?  Here's what Mr. Swerling said.  Again, a strategic decision.  If you look at page 575 of the testimony in this case, Mr. Swerling said if you can come up with a legitimate reason to have a bifurcated trial you should have one.  And even if you don't argue hard for innocence it gives you an opportunity to separate out guilt and innocence from the penalty.

And if you look later on he actually uses the phrase front loading.  Let me give you the cites for Mr. Swerling's testimony regarding this issue, your Honor.  Transcript pages 575 and 576, 609 through 612, 679 and 680.  And I'm not going to go through it long, but I'll -- I will go to page 576.  He says that it's sometimes better to front load in the guilt or innocence phase and not seriously argue though about guilt or innocence so that they can keep credibility with the jury, so you are only arguing the intent issue in the carjacking and then you can come back and still argue to the jury.  Now, we promised that you were probably going to have it later.  And he's doing exactly what I believe Andrea Lyon testified should be done.

THE COURT:  It's coming back to me now.  She also said if you have a guilt phase it allowed the jury to vent their anger with the defendant by finding him guilty and then the pressure is let out of the room and then the penalty phase

1341

might go better.

MR. DALEY:  Your Honor, I'm not trying to import her opinion into this case, but clearly there are several schools of thought on what to do in these cases.  And it's not that -- Mr. Hammond might very well have tried it a little bit differently, he might have said I want -- we plead not guilty, go straightforward with it.

And you know what?  I have no doubt that there would be an expert who might be able to get up and say, that's not how I do it, that's not how I do it.  I think you need to do a hybrid or I think you need to do what Mr. Blume did in the Fulks case.

So I don't want to belabor the point.  The only thing I would add is at the end of the whole case, at trial transcript -- if you look at November 1st, which I believe is volume 29 at pages, I think it's 93 and then 101 and 102 and then 104, Mr. Swerling comes back to say now, look, we were straight up with you.  He's admitting what he -- what he had admitted in the very beginning of this case.  So they actually used the concession at the very beginning of the case in the closing of the penalty phase.  Which, again, I think is a strategic decision.

So the only other thing I guess that you might -- there's an interconnection with these issues so often when you start to think about it.  And one of the things that comes out

1342

is if you are front loading and you decide you want to get in this case I think we will be talking about the 404(b) evidence, supposedly, of Samantha Burns, if you can front load that in the guilt phase, as well, perhaps you are going to get that -- it's going to be a little more attenuated.  So then it's not done in this instance, which it wasn't really done, in the penalty phase.

So and, again, this is an art, it's not a science.  It's not as easy to just put in some facts, come up with a formula and you get your answer.  The complexity of some of these issues demonstrates that.  I think this is a clear instance where there was a strategic decision, they actually talked about it with Mr. Basham, and they pursued it.

THE COURT:  All right.

MR. DALEY:  Thank you.

THE COURT:  Thank you, sir.  Mr. Burke, anything in reply?

MR. BURKE:  Your Honor, just one point.  I would point out that I am still personally at a loss to know why Mr. Swerling would have Mr. Basham make a record that he conceded.  There would be no reason to do that, and perhaps it shows itself that Mr. Swerling had concerns about this decision he was making.  Other than that I'll leave it with the argument we made.

I will turn then, and I would like to each time

1343

remind the court that Mr. Hammond said much more eloquently than I could these points on these IAC claims.  So I will try and keep it short and ask that the court review his testimony.

On claim 15, claim 15 involves the Burns, Samantha Burns evidence, and trial counsels' failure to object in any way to the admission of extensive evidence about not only the kidnapping of and death of Samantha Burns, but also the life of Samantha Burns.  And we heard no explanation from trial counsel -- well, I take that back.  I guess we were told that they were of the impression that your Honor had already made the determination that this evidence was coming in because it was intrinsic to the crimes at issue in Miss Donovan's case. With regard to that I would say a few things.

There was an order that was discussed during the testimony, March order from 2004, in which the court discussed and made a ruling on whether the evidence for purposes of discovery can be considered intrinsic.  But I think a review of the trial in Mr. Basham's case indicates that the court was open to the question of whether the evidence regarding Samantha Burns was intrinsic or not.  And you gave counsel opportunities to argue that and they never did.

Also, even if that evidence were intrinsic to the crime that's not the end of the issue.  There are certain things that trial counsel could have done to lessen the impact of this evidence, and they did none of them.  They could

1344

have -- and Mr. Swerling commented he couldn't understand doing some of the things that were suggested because it would seem inappropriate to the jury. But the arguments are that outside the jury's presence counsel argued to you that bringing in Samantha Burns' mother, father, aunt, brother, child or college friends was beyond the scope of what was necessary to show that the Burns crime had occurred and that it could be done in many ways.

THE COURT: We heard from all those people, mother, father, aunts, brother, college friends?

MR. BURKE: At least two college friends, I believe. Are there others I'm missing? I think there were at least that many, your Honor, yes. And they talked about such things as that -- not about -- and, well, they talked about such things as the impact of Miss Burns' death on their life. And I will say this, the murder --

THE COURT: There was no objection at all.

MR. BURKE: None at all. The murder of Alice Donovan was tragic. The murder of Samantha Burns is even more tragic. She was a young woman who had not had the opportunity to start her life, she did not have a family of her own and that was something she had hoped for. And that was stuff -- that was information, that was testimony that the jurors in Mr. Basham's case heard. And it could easily -- even if this court had been given the opportunity ultimately to decide

whether the evidence was intrinsic, there are ways that it could have -- the impact could have lessened.

Defense counsel could have asked for a Rule 403 analysis. And the Fourth Circuit precedent is clear that even if evidence is intrinsic to a crime that the defendant is still entitled to a 403 analysis. And, your Honor, you offered to give a limiting instruction on this evidence, which was rejected.

There is no conceivable way in which the admission of this tragic evidence could have worked in any way to Mr. Basham's benefit. And I don't want to misstate the record, it's late in the day, but it's my understanding that trial counsel never did say that they made a strategic decision. I think, if I'm correct, their testimony was they thought you had ruled against them already. And that point they were incorrect.

So relying on what Mr. Hammond testified to, we will submit that of the claims that this is a clearcut case of deficient performance on the part of trial counsel, and there could really be no meaningful challenge to the fact that Mr. Basham was prejudiced by having the jury hear this extensive evidence. Thank you.

THE COURT: All right.

MR. JOHNSON: Just one moment, your Honor, please.

(There was a pause in the proceedings)

1346

THE COURT:  Mr. Johnson?

MR. JOHNSON:  Your Honor, this was not the victim impact evidence, that was victim identity evidence.  And if I may explain what I mean by that.  The issue that was before the jury at trial was whether at the time that Brandon Basham abducted Alice Donovan from that Wal-Mart parking lot in Conway, South Carolina, did he have the intent to kill her, did he have the intent to cause serious bodily harm, did he know that this was going to happen to her?  His argument, his theory at trial was no, I may have abducted her from the parking lot but I had no idea this was going to happen.

This evidence about Samantha Burns was intrinsic, as your Honor ruled, and it was relevant, if it was other act evidence it was relevant to show the very issue that was being contested at trial, which was what was Brandon Basham's intent at the time that he abducted her.  And so the events leading up to Alice Donovan's abduction were very relevant.  Because if Brandon Basham had participated in the abduction and killing of Samantha Burns in a very similar way to how Alice Donovan was abducted then the jury could infer from that that at the time he abducted Alice Donovan he intended to do the same thing that they had done to Samantha Burns.

So it became important for the government to prove not only that Samantha Burns went missing but that she had been abducted and killed by Chad Fulks and Brandon Basham.

1347

And so the evidence that came out through Samantha's two friends and four family members was not about the impact that her death had on their life, they testified about her personality and her plans, that all of that was relevant to show that she didn't just run off with somebody, that she didn't go to sow her wild oats.  She had a steady home life, she had steady plans, she had a vigorous personality that would not have done that.  And it was all relevant to show that she was in fact abducted and killed by Brandon Basham.

And so in that case your Honor had already ruled that it was intrinsic.  It was intrinsic, it was relevant.  And we're talking about ten volumes of trial testimony, dozens of witnesses, over 80 witnesses, ten volumes of testimony, this was six witnesses and it was about 20 pages of trial testimony.

Similar testimony was introduced about Alice Donovan's disappearance.  Her family members testified.  They do not contend on appeal that it was error for that testimony to have come in.  There's no indication that the testimony from Miss Burns' family members would have been any more damning than the testimony that came in from Miss Donovan's family members.

And we're talking about evidence that was introduced during the guilt phase of the trial.  And Miss Ewing has gone over the overwhelming evidence, I'm not going to go back

1348

through that.  But their contention is these handful of witnesses over a few pages of testimony was so damning that it overrode all of the other evidence that the jury heard, including the videotape of him committing the abduction, and including his confessions, these witnesses' testimonies overrode all of that and were an influence that the jury relied on, an impermissible influence they say, in concluding that he was guilty.

In fact, Mr. Swerling and Harris were able -- this is an example of the kind of evidence that they were able to front load.  Because they were able to get out the testimony of the Burns family and it didn't come back in in the penalty phase.  And so what that meant is they could focus in the penalty phase on the mitigating arguments that they wanted to present because the jurors had already heard about Samantha Burns' disappearance and they weren't going to go through that again.

But, again, during the guilt phase it was not testimony about how sad they were that she had died, it was testimony about her personality and the fact that she didn't just up and run off from her family.

And also the Fourth Circuit held, the Fourth Circuit didn't rule on the Samantha Burns evidence, but the Fourth Circuit in Brandon Basham's appeal did rule on the evidence of drug use and that sort of thing.  And they held that one of

1349

the reasons that it was not prejudicial to Brandon was that in going through all of the things that had happened in West Virginia they were able to argue that Chad Fulks was the leader of that crime spree, that they were going to places that Chad Fulks was familiar with.

And I submit the same thing is true with the Samantha Burns evidence. It fit in with their theory that Chad Fulks was the leader and that he was the one who was instigating these things. So in light of all the other evidence that came in at trial, how few witnesses there were, and the fact that this was relevant to the issue at trial, which was his intent in abducting Alice Donovan, there wasn't any error, there was no reason for them to object to that evidence.

THE COURT: All right. Mr. Burke?

MR. BURKE: Your Honor, the testimony regarding Samantha Burns began at page 160 of the transcript the day that the testimony was received and it went through page 277. We're not talking 20 pages here.

MR. JOHNSON: Your Honor, I think if you count up the pages that actually comprises witness testimony from these six witnesses, it's 20 pages.

THE COURT: All right. I'll take a look at that. You say there's --

MR. JOHNSON: On those limited subjects, your Honor. Mr. Burke may be correct that the total testimony of the --

1350

but what he's talking about he's characterizing as victim impact evidence and which we consider is victim identity evidence, is 20 pages.

MR. BURKE:  I'd appreciate if Mr. Johnson would let me make my on own arguments, your Honor, because what I'm saying is these witnesses should never have testified at all. There was no reason that Mr. Burns and Mrs. Burns and their son should have been on the stand.  If Mr. Johnson is suggesting that the issue to which their testimony was relevant was that it went to Mr. Basham's intent, there were other ways that competent counsel would have convinced this court to let that testimony, that type of evidence in.

There were at least two West Virginia law enforcement officers who investigated the disappearance of Samantha Burns, who interviewed her family, who could have talked, could have testified to the jury about their investigation, about who Samantha Burns was.  So what the jury did was they sat through close to a day of testimony from grieving friends and family of a victim who was not the victim in this case.

Now, the comment was made that this evidence was necessary to show that Samantha Burns did not just disappear. I have seen nowhere in this record where the defense ever suggested that Samantha Burns had run away, that she was not in fact gone and disappeared.  So it was -- that's a red herring, your Honor.  And so the issue is could counsel

1351

even -- if Mr. Johnson is correct and this evidence did have some relevance to the question of intent with regard to the carjacking, was there other ways that the facts, the relevant facts could have been brought to the jury's attention, and there clearly was. And trial counsel made no effort to bring those possibilities to the court's attention. And I disagree with the government's assertion that you had definitively ruled that this was intrinsic evidence for purposes of the trial.

THE COURT: We looked at that when Mr. Swerling was on the stand and it was an order on discovery matters.

MR. BURKE: Yes, your Honor. And I was trying to find it a minute ago and I couldn't.

THE COURT: The defendant was seeking some discovery from the government.

MR. BURKE: Right. And the government's response was that this was intrinsic evidence, so it was excluded.

MR. DALEY: Your Honor, just for the record, I think it's order number 24, the handwritten with --

THE COURT: Order number 24. The government's argument was it was not 404(b), that had been disclosed because it was intrinsic evidence?

MR. BURKE: Yes, your Honor.

THE COURT: All right.

MR. BURKE: Moving on to claim 16 very briefly.

1352

Claim 16 is another claim of ineffective assistance of counsel regarding trial counsel's failure to request that the government's argument and closing arguments in the Fulks case regarding Mr. Basham's lesser culpability or the fact that he was a puppet, trial counsel's failure to request to bring that information in.

There was significant discussion during Mr. Hammond's testimony with the court about the rule of completeness and whether the government would have been entitled to read into evidence the entire closing argument from the government's closing in Fulks.

Mr. Hammond's response was that assumes a lot of things. There was no argument with the judge, with your Honor, about what would be needed to satisfy this rule of completeness. And, more importantly, that had this court ruled that that evidence could come in, that the entire closing argument from the Fulks trial could come in, then trial counsel could have said if that's the case, your Honor, we withdraw our request, we don't need to have this.

But there was never any -- any request made to bring this evidence in. And what Mr. Hammond indicated is that to hear that the government itself describe Mr. Basham as a puppet would have been powerful evidence for the jury to hear. And so the evidence is in the record, it's in our briefing and it's in Mr. Hammond's testimony. So if the court has no other

1353

questions on this claim --

THE COURT:  Very good.  And there was some testimony in this trial about Mr. Basham being a puppet, wasn't there, or being a follower?

MR. DALEY:  I think in closing argument, I think he uses the term puppet, but --

MR. BURKE:  We will just say that the statements made by the defense attorney would have much less impact than the --

THE COURT:  I agree with you, I thought there was something I saw in something I read recently that told the jury here, some testimony that Mr. Fulks and Mr. Basham was more of the follower than the leader here.  But I might be wrong.  All right, Mr. Johnson.

MR. JOHNSON:  Your Honor, this was the issue that prior to the guilt phase Mr. Basham's trial defense counsel filed a notice that they intended to introduce certain comments from the government's closing arguments in Chad Fulks' trial.  And your Honor deferred the motion, saying you would take it under advisement and if during the trial the government presented conflicting evidence or contradictory theories that you would again entertain that motion if such contradictory evidence came out.  And defense counsel never raised the motion again because there were no conflicting theories or contrary evidence.

1354

The Fourth Circuit has held in the appeal from Mr. Fulks' 2255 that the government did not present contradictory theories at trial. I note it's a discreet claim in the 2255 and it is related here. I think as a threshold matter it's questionable whether the government's argument from the Fulks trial would have been admissible at all. The courts of appeal hold an attorney can make certain admissions of fact on behalf of a client, they can be admissible at a later proceeding.

However, for example, the case of United States versus McKeon, the cite for that is, it's in the pleadings, but 738 F.2d 26, is a case from the Second Circuit which is cited in the Fourth Circuit decision of United States versus Blood, 806 F.2d 1218. The McKeon case says speculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the opponent's case or invitations to a jury to draw certain inferences should not be admitted.

We submit that the statement that Fulks is a leader or Basham is a puppet or things to that -- of that nature are invitations to the jury to draw certain inferences rather than they are admissions of fact. So we think it's questionable whether it would have been admissible at all. However, it certainly would not have been admissible or equitable to admit that limited argument in the context of what the Fourth Circuit described are consistent theories, consistent

arguments in both cases.

Now, Mr. Burke suggests that counsel could have raised the issue and then if you said well, I'm not going to let it in unless it all comes in then he could have backed down. But the point is there was a prejudice to Mr. Basham because the reality is that there was no contradictory evidence, that this court likely would have ruled that, similar to the way it ruled in the deer statement, that if they wanted to introduce a portion of it then the court may well have said if we do that we're going to admit all of it.

And what the jury would have heard is that at both Mr. Fulks' trial and Mr. Basham's trial the government consistently contended that Fulks and Basham could not have killed Samantha Burns or Alice Donovan had they been acting alone, that they were working as a two-man team.

And, again, with all the other evidence that is in the record there is no reasonable probability that admission of the statement would have changed the result either during the guilt phase or the penalty phase.

THE COURT: All right. Thank you, sir.

MR. BURKE: Your Honor, the next claim, it's claim 19, the mitigation claim. Specifically, the claim that counsel rendered constitutionally ineffective assistance in failing to investigate and develop and present evidence that Mr. Basham was mentally retarded. Defense counsel learned

1356

from their investigation -- their neuropsychologist that her testing of Mr. Basham indicated that he had an IQ of 68.  We heard evidence that a diagnosis of MR, mental retardation, is a three-prong diagnosis that requires a finding of an IQ below 70, deficits in the adaptive behavior, and an onset of both of those conditions before the age of 18.

Dr. Schwartz-Watts and Dr. Tora Brawley both testified that Mr. Basham suffered from dementia because they were presented with IQ scores, and I want to emphasize this, they were presented with IQ scores that showed that Mr. Basham's IQ was above 70, had been tested above 70 before the age of 18.  We have heard testimony about his declining IQ, and at one point his IQ went up from a 77 to I believe a 86, so there was some variability.

Trial counsel testified that they relied on their experts to tell them if they had a claim of mental retardation, and we had some discussion, your Honor, about what type of expert would be required.  Dr. Frierson testified yesterday that both Dr. Schwartz-Watts and Dr. Brawley were qualified to diagnosis mental retardation.  I take issue with that.  I don't know any psychiatrist who would say that they are qualified to diagnosis mental retardation, and I know from personal experience that -- well, Dr. Brawley is a neuropsychologist, she does not specialize in the field of mental retardation.  Now, they were given numbers to work with

1357

and that was all they were given.  We presented evidence that the investigation in this case raised some concerns about the accuracy of the IQ numbers that were noted for Mr. Basham before the age of 18.

For example, there were witnesses who were interviewed who said that there was an unspoken, unwritten rule in Kentucky when Mr. Basham was a teenager that in order to be admitted to an in-care facility, of which there would be group discussions and the like, you had to have an IQ of 80 or above.  And there was concern from these witnesses that IQ scores for Mr. Basham that showed -- those two that showed him with IQs in the 80s were done in conjunction with his admission into those types of facilities.

There was also considerable anecdotal evidence from people who knew Brandon growing up who said that people considered Brandon to be mentally retarded.  That doesn't prove the case and I don't mean to suggest that it does.  But what it does is it puts a lawyer who is familiar with the relevant law on notice that a more thorough investigation is needed.

In this case the government admitted documents that they found in Mr. Swerling's files that had been provided to him by national resource counsel about the concept of mental retardation, about the Adkins decision.  They were unmarked by pen or highlighter, they had one notation that said "to read"

on them.  And I think it's clear from reviewing Mr. Swerling's testimony that he really was not familiar with the nature of mental retardation and the nuances and really even how he would have gone about proving it to this court.  And he was approached at -- by Justice Department employees at the authorization process who expressed interest in the possibility that Mr. Basham might be mentally retarded.  No followup was ever done.

Mr. Hammond testified that under the facts presented in this case a reasonably competent federal death penalty lawyer, especially one in 2003 who should have been keenly aware of the Adkins decision, would have done everything within his or her power to investigate the possibility that Mr. Basham was mentally retarded.  And what happened was really nothing.  We have a file that shows no raw data.

And let me give a little bit of context here.  An IQ score is a number, it can mean many different things.  But one of the underlying concepts is is that you have to have faith in the fact that the test was properly administered, properly scored, and that there were just no errors made.

And we don't have the raw data available.  I will avow to the court we have made every effort to try to obtain it and it no longer exists.  Had that information been sought and obtained in 2003 this court could have been presented with evidence that Mr. Basham, at least to a reasonable degree of

probability, would have been presented with evidence that Mr. Basham was mentally retarded, that those scores don't necessarily say what people think they say, that there are explanations.  And it's not uncommon, and you can do the research on cases where there are defendants who have been found to be mentally retarded who have what are called outlier scores, whose scores are above the range.  And there are explanations for that.

There are other explanations.  If you look at the number of tests that Mr. Basham took as a child, IQ tests, there is something known as the practice effect.  If a person takes an IQ test enough times they kind of learn it, they learn how to do it and it inflates their score.  There is something called the Flynn effect where if a test -- this is a phenomenon that has been observed and validated by a professor from New Zealand that society as a whole becomes more intelligent over time.  And that as a result an IQ test as time passes becomes antiquated and can't accurately reflect a person's IQ.  It inflates the IQ by as much as ten points.

And the first test that Mr. Basham received when he was a child was a test that at the time I believe he was 16 years old.  And so there was this type of evidence that could have been presented that is no longer available to us to present to you now.

And so the question becomes if trial counsel was

ineffective in failing to investigate this, and we believe that they were, this would have -- they testified several times what we wanted to do was save his life. This was a sure-fire way to save his life. He would have been constitutionally exempt from execution. It should have been given a top priority in their investigation and it was not.

There is a reasonable probability, and by that I mean under the Strickland standard, enough of a probability to undermine your confidence in whether had this evidence been brought to you you would have found Mr. Basham to be mentally retarded and as a result exempt.

And one last point on that. I make this point really I guess to preserve the record for future cases. But Dr. Frierson, Dr. Capehart, these doctors, they don't dispute that Mr. Basham has a low IQ. He does have a low IQ. The question is when did he finally cross that line and reach the 70 range. There's no question that Mr. Basham has the deficits of a mentally retarded person but because of the peculiarity of the Adkins decision which, as welcomed as it was, is a very narrow decision, it only applies to the mentally retarded.

So it says someone who on their 18th -- the day after their 18th birthday receives a traumatic brain injury and has an IQ of 50 and severe deficits in their adaptive behavior could not be found mentally retarded because the DSM doesn't define it that way. That is viewed as a developmental

1361

disorder.

THE COURT:  The Adkins decision relies upon the DSM entirely?

MR. BURKE:  No, your Honor.  The Adkins decision left it to these individual jurisdictions to rely -- to choose their own basis for defining it.  Many, and I believe, I believe that the federal courts follow the DSM.  There is an organization known as the -- now it is known as the AAIDD, the American Association for Intellectual Developmental Disabilities, but it was known as the AAMR, American Association on Mental Retardation, and it has sort of been the leader in developing this.  And it sets forth those criteria, as well.

There isn't much distinction between the jurisdictions, all of them view that three-level, that three-prong.  And what we have here is a case in which no effort was made to disprove that -- no effort was made to prove that Mr. Basham satisfied the critical age 18 prong.  And as a result, now ten years after the investigation was done in this case the evidence that would enable us to do it has been destroyed, is no longer available, and that, we argue, raises sufficient concern that this court should have lack of confidence that it has sentenced a man to death who may in fact be mentally retarded.

THE COURT: Now, Mr. Swerling said he was asked to

1362

teach a course at the medical school here in Columbia, right?

MR. BURKE:  I believe he did, yes, sir.

THE COURT:  But did it deal with this type issue?
I'm a little bit rusty on what he said.

MR. BURKE:  I don't believe so, your Honor.  We can
go back and check, I don't want to misstate it.  I have to say
we interviewed Mr. Swerling and Mr. Harris together on
numerous occasions before the testimony and the reaction,
their reaction was, and, interestingly, it was -- it ties with
a comment you made.  Mr. Harris' response was have you seen
that rope he made?  And the idea that that was a disqualifier,
he can't be mentally retarded, that type of -- so it was
clear, I think it's clear from the testimony that there was
not a knowledge of what Adkins held and what power Adkins held
for defendants like Mr. Basham.

We don't -- no one is arguing he doesn't have a low
IQ, he does.  And there's that one aspect that was not
developed when it should have been developed, and we submit
that as a result Mr. Basham has been prejudiced, severely
prejudiced.

THE COURT:  All right, thank you.  Mr. Daley?

MR. DALEY:  I will keep it narrowly focused to the
mental retardation.  I think one of the things that happens in
these cases is you do an enormous amount of work.  I have to
tell you about the hundreds of exhibits, talk about the

1363

enormous amount of work that's done in this case on the mitigation side. This is one of those cases.

I think I told this court at the end of Mr. Fulks' 2255 I couldn't imagine another case where somebody spent more time and energy and effort in building a mitigation case and investigating a case. Well, your Honor, I believe I found that case. We're not sure how many witnesses were interviewed, but it looks somewhere between at least 600, but I think the count is closer to a thousand. So I'm not going to get into the weeds on that. You have an enormous number of exhibits that demonstrate what was done.

So, remember, this is all in the context of building a mitigation case, going through all of the institutions, interviewing enormous numbers of neighbors and friends and counselors and teachers. So having said that, though, let's go ahead and get to the mental retardation issue.

This is a case where there's no expert evidence in this record or was developed that Mr. Basham is mentally retarded. They failed to produce anybody. And the issue, of course, that they point to is the fact that the IQ scores, maybe they weren't scored right or maybe they should have been done differently. I do want you to know that it's not an instance where Dr. Brawley simply had the IQ scores, she had the reports. And I wanted to just point to the trial testimony just very briefly.

1364

It's actually volume number 25, which was the October 26th hearing. I believe she takes the entire day of testimony after the issues that arose earlier in the day. One of the things that I think is important to note is at page 59 through I think 65 or 66, I believe it's six, I'm sorry, seven IQ tests that were done were admitted into the court's -- admitted into evidence, Defense Exhibits 1A through 7H. Not an instance where you simply have just the scores, they did go back and get the reports. So it's not an instance where we simply have raw data.

I will tell you that Dr. Brawley did testify that he was not mentally retarded. So, I mean, whether she was a specialist, an Adkins specialist, which is how -- I believe I'll have to tell you, I thought Mr. Hammond was a remarkably nice fellow, had a very nice disposition, but if you read his testimony he has absolutely no basis to say some of the things he said. He said -- he never, by the way, never read Dr. Brawley's testimony. If you look at the record, he says, I don't think she's qualified. He just says it.

And, I'm sorry, having just said it, and maybe he knows her by reputation, or maybe -- I don't know. But that sort of struck me when I went back, and I appreciate -- and, remember, he didn't come up with this opinion until a few days before the hearing, I think is how he put it on cross-examination. So but let's go ahead and just go through

1365

why this issue doesn't have any merit.

If you look at Mr. Harris' testimony, he says that they retained Dr. Brawley to do IQ testing. That's the hearing transcript at 303. He goes through some testimony where he talks about the fact that when she found out that he had a 68 IQ, Basham did, he went and he talked with Mr. Swerling and their doctors and they talked about it. Harris said in the transcript at page 304 that he was familiar with the Adkins case. Asked pointedly a number of times why did you not pursue an Adkins hearing and he said we couldn't do it based on our doctor's evaluations.

Your Honor, both Dr. Brawley and Dr. Schwartz-Watts have been retained by numerous death penalty attorneys. I think, I don't want to -- I believe Mr. Burke, I think, has retained both of them. These are folks that are specialists in mental health in death penalty cases.

MR. BURKE: Your Honor, since my name has been invoked I will avow to the court that I have retained both of those experts. I have, having done several Adkins cases, I have never retained either of those experts in an Adkins-related case.

MR. DALEY: My point is not they're Adkins experts, which again I don't think --

THE COURT: You have retained them but not for Adkins purposes.

1366

MR. BURKE:  Yes, your Honor.  I retained Dr. Schwartz-Watts because she's a psychiatrist, and I have retained Dr. Brawley to testify about neurological damage in one of my clients.

MR. DALEY:  My whole point is simply that these folks are ones that if an issue comes up about mental retardation they know how to tell the attorneys what they need to pursue some of those other issues.  And that if they had, Mr. Harris testifies that -- well, let me just go through it.  He said we didn't have any testimony to put on the record for an Adkins issue.  They knew about the anecdotal evidence.  At page 305 of the transcript Mr. Harris says that.  He said that Mr. Basham had a lot of IQ tests.

Well, I think maybe as important as anything is at 17 years and ten months old, not for the purpose of getting him into any sort of home or anything, he ends up scoring a full scale 89.  We have heard discussions about the Flynn effect, the practice effect, we have heard assertions about it.  There's absolutely no evidence in the record about it.  But I will tell you this, at 17 years old and ten months he has an 89.  That's well beyond any of the ranges that could even get you where you might be able to -- maybe there's somebody that's been found mentally retarded with a 89, I don't know.  I haven't come across any in any court cases.

But, you know, Mr. Basham started off with a 101 full

1367

scale IQ, this is just from Dr. Brawley's testimony and the exhibits introduced when he was seven years old and seven months. When he was eight years old and seven months he scores a hundred. When he's ten years old he scores an 88, when he's almost 11 he scores a hundred. When he's 13 years old and eight months he drops down to a 77. When he's 14 years old and eight months he goes back up to a full scale 86. And when he's 17 years old and ten months he's at an 89. Under the prevailing law I don't see how counsel could have pursued mental retardation.

Now, Dr. Brawley finds a 68, but it's a 68 well past the 18th birthday. And, your Honor, you know, it's one of those things defense counsel have to do the best they can with what they have. Mr. Harris says at -- let me give you the pages that he testified about this issue. He testified that Dr. Brawley was probably retained at the recommendation of Dr. Schwartz-Watts at page 343 of the transcript. He then testifies again about the mental retardation issue, pages 378 through 380. He says during that, page 379, the defense team talked about the IQ score and the issue at length, at some length, he actually says.

And then I believe on cross-examination he says at transcript 405 that Brawley was given everything I believe she needed to make a proper evaluation, and he goes through sort of what she did. I know she interviewed a number of people

1368

because she was looking to see why the IQ had decreased. And she looked at drug usage, she looked at head trauma, she looked at a lot of environmental issues before rendering her opinion. So it was not based just on the records, but his testing was also the universe of information that she had available about Mr. Basham's life.

And then Mr. Swerling testified about this issue at some length. Pages 495 and 496, pages 720 through 723, page 724, as well, page 737, 736 and 37 through 742, talked more about mental retardation.

What Mr. Swerling said is that I would not have hesitated if we had been led in that direction towards pursuing the mental retardation issue, if someone had said he would qualify for mental retardation. That's in the transcript at pages 495 and 496. The bottom line is they didn't have experts who were supporting the fact that he might fit in the definition of mental retardation.

And so the one other thing I think I found a little interesting, because I didn't recall him testifying to this but he did, when I went back and looked at the transcript, the pages 739 and 740, Mr. Swerling says that he's pretty sure he remembers he thinks Dr. Brawley looking behind, trying to find the data behind a test, that's at pages 739 and 740, to try to check out whether there was, I guess, some validity of the test. He wasn't sure which one.

1369

In short, the defense did not have an expert to say that Brandon Basham was mentally retarded, and the attorneys say that the experts that they retained didn't point them in that direction. So, your Honor, I don't want to belabor the issue, but I think --

THE COURT: I think you covered it.

MR. DALEY: It's pretty clear.

THE COURT: We need to take a recess here, unless you want to talk about a reply.

MR. BURKE: Very briefly, your Honor, on the reply, your Honor. Can I ask a question? Did you say Mr. Swerling testified if they had been led in that direction they would have -- the page?

(Mr. Burke and Mr. Daley confer)

MR. BURKE: Very briefly, your Honor. I was asking Mr. Daley about a quote that he had from Mr. Swerling and I wanted to make sure I had it correct, because I think it's exactly the problem here. Mr. Swerling said if we had been led in that direction we would have pursued it. The problem was that Mr. Swerling needed to do the leading, he was the one that was the head of this case. And I don't question the qualifications of Dr. Brawley or Dr. Schwartz-Watts. As the government noted, I have hired both of them before.

I would -- to assist the court, I know that you've had questions about what this means and I would like to just

1370

throw out three names to you, and if you would like to Google them, feel free do so. But I think it would give you an idea of what a mental retardation expert is about.

There's a Mr. Marc, M-A-R-C, Tasse, T-A-S-S-E; a Mr. Denis, D-E-N-I-S, Keyes, K-E-Y-E-S, he's at the University of the South and that's in Charleston, and there's a Stephen with a PH, Greenspan. So when we talk about mental retardation experts those gentleman are the types of people that we are talking about. Dr. Brawley is a very accomplished neuropsychologist but she is not an MR expert and I think she would tell you the same thing.

And then she was not -- experts are only as helpful and only as reliable as the information that they are given. They have to be given the information. Dr. Brawley was given reports done by psychologists who had evaluated Mr. Basham who came up with scores. She wasn't given what's known as the raw data, the data that you can go back and look, how did he answer this question, did they have to prompt him on this question, did they properly take his raw scores and change them into scale scores. They are all of these things, and she was not given that information.

And so to hear Mr. Daley argue to you these scores as if they are gospel is exactly the issue that we have and why you should have doubts about whether counsel did an adequate job in this case. Thank you.

1371

THE COURT:  All right.  Let's take a ten minute recess.  How many issues do we have to talk through?

MR. BURKE:  Actually two, both very brief.

THE COURT:  I still would like to take a little break.  Let's take a ten minute recess.

Which two are they?  You had several more.  You had three or four more you had itemized yesterday.

MR. BURKE:  Your Honor, the only two we still want to address are the claim 23 of the inconsistent theory and claim 24, causal nexus, and claim 24B, which is the IACS?

THE COURT:  All right.  Let's take a ten minute recess.

(A recess transpired)

THE COURT:  All right.  Mr. Burke.  I'm sorry, Miss Stone.

MS. STONE:  That's okay.  Mixing it up.  The next claim we're going to address just very briefly is claim 23.  Your Honor had asked us fairly early on in this case why that wasn't precluded by the Fourth Circuit decision.  And so we agree that the issues are very similar, we can't make the arguments that they are not.  It's the same pieces of testimony that are at issue.

We also agree that the testimony at the Jackson v. Denno hearing by Sheriff Hewitt was ambiguous.  But at the Fulks hearing when they were arguing about keeping out the

1372

deer statement the government made a choice and that choice was to characterize that testimony as Fulks being the killer.

Then at the Basham trial in front of the jury, unlike in the Fulks case they made another choice after the testimony of Sheriff Hewitt and on 9-29-04 at page 80 they argue in closing Mr. Basham -- what did Mr. Basham say to Mr. Hewitt? He didn't say I killed Alice Donovan, I showed.

The other points at issue in inconsistent theory is the role. The court found that it was consistent throughout both trials to describe Mr. Basham and Mr. Fulks as a team. That's accurate, but there are some distinctions. To take the sports metaphor, in the Fulks trial Mr. Fulks was the captain of the team and Brandon was at best the kid you put in at the end of game when you're beating the other team by 40 points so he gets some playing time and everybody feels good.

In Mr. Basham's trial they were more equal partners, Fulks was the quarterback --

THE COURT: You are saying they used --

MS. STONE: I'm using that analogy, that -- I do not dispute in both trials they said team. But the emphasis on the roles there was some subtle distinctions. I concede they are subtle. Why it's different in Mr. Basham's case is it really does go to the core of his case. And that's what the case law talks about.

In Mr. Basham's case the testimony of Sheriff Hewitt,

1373

the testimony that we argue is inconsistent, is the testimony in Mr. Basham's case, not Mr. Fulks, the government said is one of the two most important pieces of evidence, the other being the Clifford Jay testimony. That didn't exist in the Fulks case and that makes the issue much more serious. And any inconsistency is much more of an insult to due process than it was in the Fulks decision.

And so for the reasons, because Mr. Basham's -- inconsistencies in Mr. Basham's case were in front of jury and in front of a sentencing jury, which the Fourth Circuit acknowledged can be tougher on the actual killer, because in Mr. Basham's case the evidence that is at issue was characterized by the government and themselves as one of the most important pieces that was before the jury, that makes the violation much more serious. And that's, we would submit, why the Fourth Circuit opinion doesn't apply.

THE COURT: All right. Thank you. Mr. Johnson?

MR. JOHNSON: Your Honor, this is going to be very brief so I'll just stay here if it's okay with you.

THE COURT: All right.

MR. JOHNSON: I don't have a lot to add, other than what's already been briefed. Of course, the government's contention is that the Fourth Circuit's decision in the Fulks 2255 appeal is controlling. And at the time that the Fourth Circuit rendered that decision it had all of the facts that we

1374

have now.  The facts as to this issue haven't change.

Obviously, by that point the Fulks trial had come and gone and

the Basham trial had come and gone.  And so the Fourth Circuit

had the opportunity to look at the transcripts of both trials,

this court did, as well, and had the opportunity to look at

all the arguments that were made in both trials.  And this

court in Fulks and the Fourth Circuit in Fulks ruled that

there was no inconsistency that went to the core of the cases.

Now, of course, when you are dealing with an argument

that the government has taken inconsistent positions in two

different trials there aren't two alleged errors, there's not

an alleged error in Fulks and an alleged error in Basham,

there's one alleged error or misconduct which is, government,

you have taken inconsistent positions at these two trials.  So

there's nothing new as to Mr. Basham's case that was not

before this court and the Fourth Circuit when this court and

the Fourth Circuit decided Mr. Fulks' case.

And given the Fourth Circuit has ruled that there is

no inconsistency that goes to the core of the cases our

contention is that that ruling is, it's a published decision,

it's controlling precedent, we respectfully contend that this

court make the same decision that it made in Fulks and that it

should follow the decision of the Fourth Circuit.

THE COURT:  All right.  Thank you.  What is next?

MR. BURKE:  Your Honor, the next is the last.  The

1375

last issue that we would like to discuss, and we will leave the others to submit on our pleadings and on the testimony that your Honor heard, concerns claim 24.  And, in particular claim 24B, which concerns arguments that were made by the government in Mr. Basham's trial challenging the mitigating evidence that was presented by the defense, in that it lacked a -- what the government called a cause and effect with the crimes that were committed.

In our brief we set forth on page 103 of our 2255 motion portions of the argument that the government made, and I'll read, just to give you an idea to remind the court what we're talking about here.  Mr. Gasser is talking about the defense experts, and he says, what is the most important thing they said?  Brandon Basham knows right from wrong and there is no cause and effect between whatever issues Brandon Basham is dealing with in the kidnapping and carjacking, Brandon and two innocent women.  And in that paragraph he goes on to say no cause and effect multiple times.

That similar issue came out during the cross-examination of defense mitigation witnesses.  I think all of the defense doctors and I think Miss Vogelsang were all asked questions along the same lines about the evidence they presented, what's the cause and effect.

There was never any objection from counsel to this line of questioning and, more importantly, there was never any

1376

attempt by counsel to explain to the jury that the constitution does not require that there be a cause and effect between mitigating evidence and the crime for which the defendant is convicted.

There are a series of cases beginning with Eddings from the United States Supreme Court, continuing through Lockett, and in 2004 shortly before the trial in this case the Supreme Court in the Tennard case again made it absolutely clear that it has never been a part of Eighth Amendment jurisprudence that there has to be a correlation, a cause and effect, a what is known as a causal nexus between mitigating evidence and the crime.

Now, can that evidence, can the lack of a causal nexus affect the weight of mitigating evidence?  Yes, it can. But it cannot act as a bar to a jury considering the evidence and giving it the weight that it deserves, that it determines that it deserves.

In this case in this hearing we asked Mr. Swerling why he did not attempt to counter the government's argument. And his testimony will speak for itself, but I had the impression he was somewhat confused by our question because he said we weren't trying to show a causal nexus, which is exactly the point.  Not only were they not trying to but they weren't required to.  But what the jury heard from the prosecution throughout their cross-examination of the defense

witnesses is okay, so what?  He's got brain damage.  How does it prove that he committed these crimes?  So he's got ADHD.  Lots of people with ADHD don't go out and kill.  What's the connection here?

THE COURT:  But couldn't it have been corrected by my instruction on the law to the effect that they had mitigating factors?

MR. BURKE:  I don't believe so, your Honor.  Because your instructions don't go to that particular issue that they -- that the issue of --

THE COURT:  I clearly didn't require a cause and effect.

MR. BURKE:  You did not.

THE COURT:  I think I stressed that any mitigating factor standing alone could be enough to find a life sentence is appropriate.

MR. BURKE:  Our concern, though, is that the jury could very easily have the impression from the government's argument that evidence is not mitigating unless there's a causal nexus.  So that you can consider -- you can instruct a jury consider any mitigating evidence, but if the jury thinks well, wait a minute, he does have ADHD but that doesn't tell me why he did this crime, so it must not be mitigating, then it doesn't get considered.

THE COURT:  This is a little bit like my two-step

analysis that I invented that Fourth Circuit approved in the first appeal, right? I said you've got to consider whether it occurred, the mitigating factor, and then is it in fact mitigating to any extent at all, I think.

MR. BURKE: Exactly.

THE COURT: The reason I got kind of painted in the corner of doing that was in the first trial Mr. Blume wanted just, you know, just an enormous number of mitigating factors and the government said that's just -- it's repetitive and duplicative and it's just sandbagging, so to speak. And I said well, couldn't I solve it by saying you've got to determine if any of these occurred and was any of that mitigating.

It wasn't my idea to come up with this two-step approach, but I was kind of back-doored into doing it by the sheer number of mitigating factors that existed. I think the government was concerned if the jury went through and checked off a large majority of those factors they may conclude, well, we've got to return a life sentence. And so but wouldn't you say this is a little bit like that?

MR. BURKE: It does bear similarity, your Honor. It certainly does. I think the most important factor, though, is that the jury should not be misled, and that's why -- what I'm focusing on in this part is defense counsel's obligation to protect his or their client to make sure that the jury isn't

1379

confused about whether this is a requirement.  Jurors have no experience dealing with the concept of mitigating evidence, it's completely novel for the lay person, and so they do need guidance.

And there are concerns about if you first have to determine whether something happened and then whether it's mitigating, some people would say it's just a matter of semantics.  Others would say well, if it occurred it is mitigating.  It's a one-step process.  But we're not challenging that aspect.  But what we're saying here is trial counsel had an obligation to take the time to explain to the jurors don't be misled by what the government is telling you.  You don't have to find that there is any connection whatsoever to find that these factors, whatever they may be, are something that would -- that leads you to feel that Mr. Basham should receive a life sentence.  So that's all that we have on that claim, your Honor.

THE COURT:  All right.  Thank you, sir.

MR. JOHNSON:  Judge, the claim and the argument, as I understand it, is that the government committed misconduct in the way it cross-examined certain witnesses in asking about was there a cause and effect, and then in argument to the jury that there was no cause and effect, and, relatedly, that Mr. Swerling and Mr. Harris should have objected to the cross-examination or least to the argument suggesting that the

1380

government was implying that the jury had to find cause and effect before it could consider that mitigating evidence.

I think the lines that we're talking walking is the line between should and could. And the argument is that the government told the jury you cannot consider this evidence unless there's a cause and effect, whereas the government's argument was that you should give no weight to this evidence if there's no cause and effect.

In volume 29 of the trial transcript, volume 29, page 89, I would like to briefly read a portion of the argument to put it in context. The prosecutor is describing certain mitigating evidence that have been put forward by the defense, and he says defense experts opine that he has a self or induced, inhalant induced psychosis and that he has got dementia, memory loss. Dr. Watts on the witness stand in response to Mr. Schools acknowledged that those two problems don't explain his behavior.

So the government psychiatrist diagnosed him with something that explained his behavior against Samantha Burns and Alice Donovan. And the defense expert opines two problems in which she acknowledges does not explain his behavior. Who got it right? That's for you to decide. You know, deciding on who got it right on that issue clearly only goes to show what mitigating -- what weight you will consider to give that when you are deliberating as to what the appropriate

1381

punishment will be.

Regardless of all the yelling, raising voices, and attacking someone for what school they went to, the facts speak for themselves, ladies and gentlemen. And one of the tougher points you can't forget, there's absolutely no question Mr. Basham knew right from prong. No question that whatever his issues are there is no cause and effect.

And in context what he was saying to the jury is not you can't consider this evidence at all unless there's cause and effect, he's saying we're asking you to give that evidence little or no weight because there is no cause and effect.

And, your Honor, you mentioned the jury instructions. And this court specifically instructed the jury that in addition to the statutory mitigating factors there was a whole list of nonstatutory mitigating factors for the jury to consider. And you also instructed them that they could consider any mitigating factor regardless of whether it was statutory or nonstatutory or whether it was even listed on the form that was given to them.

And so it was made clear they could consider these mitigating factors. And, in fact, of the nonstatutory mitigating factors the jurors found a number of these. All 12 jurors found that Mr. Basham had a family history of mental illness, that he grew up in a home filled with domestic violence, that his mother encouraged him to steal to support

1382

her drug habit, that he began using drugs at an early age. And there were other nonstatutory mitigating factors that a number of different jurors found, as well.

And I think the case of United States versus Fell, which is 531 F.3d 197, 2008 case from the Second Circuit, is directly on point. There the federal capital defendant made the same argument, essentially, that's raised here, which is that in his argument the prosecutor had suggested to the jury that they could not consider mitigating evidence unless there was shown to be a cause and effect. And the Second Circuit denied that argument and noted that not only did the court instruct the jury about what evidence they could consider, the jury in fact found a number of nonstatutory mitigating factors which mitigated against the argument that the jury was misled by anything that the prosecutor said.

And whenever you are making a claim that trial counsel should have made a certain argument and you're arguing it was ineffective for them not to have made that argument, obviously Strickland has two prongs. You have to show deficient performance and prejudice. And so when you're claiming they should have made a particular argument you've got to look at the merit of that argument, because if the argument lacks merit it wasn't deficient for them to fail to raise it, and if the argument lacks merit there was no prejudice for them not having raised it.

1383

And in this case the claim simply has no merit because it's clear that the jury heard the mitigating evidence, were instructed that they could consider the mitigating evidence, and in fact and did consider the mitigating evidence.  So in this context there's no error, no ineffective assistance on the part of trial counsel.

THE COURT:  Thank you, sir.  Any reply?

MR. BURKE:  No, your Honor.

THE COURT:  Well, I guess that does it today then, right?  All right.  Let me just say I've taken a whole bunch of notes again, as I did back in October.  And I'm probably going to wait to get a transcript of everything we have done here this week, as well as in October, so don't look for an order for at least a couple of months.  I mean, whatever I do I'm just going to take a while and get all used to writing.

MR. BURKE:  Don't rush on our account.

THE COURT:  Okay.  I just want to tell you, don't expect something right away.  I do want to get a transcript.  It's all coming at me pretty fast and I've got a lot to deal with.  But this case was well-briefed and well-argued, as I knew it would be.  Thank you very much.

MR. DALEY:  Thank you, your Honor.

THE COURT:  Miss Floyd, normally at the end of a trial we return exhibits to the party who offered them to be held pending an appeal.  But here we want to keep these.  We

1384

may return them to you later at some time but we're going to keep them for now.

MR. BURKE:  Thank you.

THE COURT:  Very good.  We will be in recess.

(Recess, 5:12 p.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  12-22-12                    s/  Daniel E. Mayo


DEFENSE WITNESSES

CAMERON B. LITTLEJOHN, JR.

DIRECT            1227

CROSS             1248

REDIRECT          1265