**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

_____
      :

UNITED STATES OF AMERICA,     :

      :      Case No. 4:02-cr-992-JFA

      Respondent,     :

      :

      v.      :      Hon. Joseph F. Anderson

      :      United States District Judge

CHADRICK E. FULKS,     :

      :

      Petitioner     :      **CAPITAL CASE**

_____:

**RESPONSE TO PETITIONER'S MOTION TO TERMINATE**
**THE SERVICES OF COURT APPOINTED COUNSEL**

## I.    <u>Introduction</u>

Mr. Fulks is a death sentenced inmate in federal custody. He was convicted and sentenced to death in 2004. He challenged his convictions and sentence pursuant to 28 U.S.C. § 2255. That petition was denied, and its denial affirmed in 2013. Petitioner is currently represented by the Federal Community Defender Office for the Eastern District of Pennsylvania ("FCDO"), who serve as counsel for the purposes of appeal, clemency and any additional post-conviction litigation.

On April 1, 2015, Mr. Fulks submitted a *pro* se Motion to Terminate the Services of Court Appointed Counsel. In it, Mr. Fulks alleges a conflict of interest with the FCDO and requests that this Court remove the FCDO and leave him without the assistance of counsel for any additional proceedings.

This Court has ordered counsel to respond to Mr. Fulks' pleading.

Because the FDCO represents Mr. Fulks, we believe it would constitute a breach of our duty of loyalty to him to comment on the allegations he has made regarding any conflict between the FCDO and him. We, therefore, respectfully decline to do so.[1]

However, for the reasons set out below, we believe that Mr. Fulks is not capable of representing himself and that it would be in Mr. Fulks' best interest for the FCDO to continue representing him. We also discuss below the legal considerations we believe should guide this Court in deciding whether to grant or deny Mr. Fulks' request.

**II.      Procedural History Relevant to this Response.**

In May 2004, Petitioner pled guilty to eight charges, including two death-eligible offenses. On June 30, 2004, a jury sentenced Mr. Fulks to death. His convictions and sentence were affirmed by the United States Court of Appeals for the Fourth Circuit. United States v. Fulks, 454 F.3d 410 (4th Cir. 2006). Certiorari on Mr. Fulks' direct appeal was denied on June 25, 2007. Fulks v. United States, 551 U.S. 1147 (2007).

Mr. Fulks thereafter moved to vacate his convictions and sentence pursuant to 28 U.S.C. § 2255. After an evidentiary hearing held from February 22, 2010 to March 1, 2010, this Court issued its Order Denying Petition for Relief under 28 U.S.C. § 2255 on August 20, 2010. Dkt. No. 1344 ("§ 2255 Opinion"). Mr. Fulks was represented during his § 2255 proceedings by court appointed counsel Beattie B. Ashmore, Esq., William W. Watkins, Jr., Esq., and Kirsten E.

---

[1] We do note for the record that Attorney Billy H. Nolas has accepted a position with the Office of the Federal Public Defender for the Northern District of Florida. At such time as his employment with the FCDO ends, he will formally seek leave to withdraw from Mr. Fulks' case.

FCDO attorney Peter Konrad Williams has been part of Mr. Fulks' postconviction defense team for the past five years.

Small, Esq.[2]  Court appointed counsel were assisted by five attorneys from O'Melveny & Myers, LLP ("OMM") who functioned in a *pro bono* capacity.  After the evidentiary hearing had concluded, OMM counsel moved to withdraw as counsel on April 27, 2010, citing a breakdown in the attorney-client relationship.  Dkt. No. 1314.  On August 27, 2010, Mr. Ashmore requested to withdraw and also cited a breakdown in the attorney-client relationship.  Dkt. No. 1349.  This Court granted counsel's motions.  The Court replaced Mr. Ashmore with FCDO attorney Billy H. Nolas, who was later joined by undersigned FCDO counsel Amy Donnella.  The FCDO filed a Motion to Alter or Amend Judgment and Memorandum in Support pursuant to Fed.R.Civ.P. 59 on September 17, 2010, which this Court denied on January 13, 2011.  Dkt. Nos. 1356 and 1376.

Mr. Fulks filed a Notice of Appeal on March 2, 2011 with the United States Court of Appeals for the Fourth Circuit.  On March 7, 2011, the Fourth Circuit issued orders appointing Ms. Small and the FCDO as counsel for Mr. Fulks.  Dkt. Nos. 1388 and 1389.  On March 11, 2011, Ms. Small filed a motion with the Fourth Circuit to withdraw from Mr. Fulks' case.  This motion was granted on April 14, 2011.  See Motion for Leave to Withdraw as Counsel, United States v. Fulks, No. 11-3 (4th Cir. March 11, 2011); Order, United States v. Fulks, No. 11-3 (4th Cir. April 14, 2011).  This Court's denial of Petitioner's 2255 motion was affirmed on June 26, 2012.  United States v. Fulks, 683 F.3d 512 (4th Cir. 2012).  On October 7, 2013, the Supreme Court denied Mr. Fulks' Petition for Writ of Certiorari.  Fulks v. United States, 134 S.Ct. 52 (2013) (rehearing denied on Dec. 2, 2013).

Mr. Fulks' desire to litigate has fluctuated throughout the course of his § 2255 proceedings.  Prior to the evidentiary hearing, Mr. Fulks moved to discontinue his collateral

---

[2] In 2008, Mr. Watkins accepted an offer to become an Assistant United States Attorney for the District of South Carolina.  Ms. Small was appointed as his replacement.  Dkt. No. 1344 at 16-17.

challenge and proceed with his execution three times.  See Dkt. No. 1009 (filed Dec. 14, 2006); Dkt. No. 1114 (filed Sept. 9, 2008); Dkt. No. 1126 (filed Oct. 27, 2008).  Mr. Fulks withdrew each of these requests by February 25, 2009.  Dtk. No. 1015; Dtk. No. 1151.  After this Court denied Mr. Fulks' Rule 59 motion, on February 9, 2011, Mr. Fulks filed a letter with this Court indicating that he did not wish to file a Notice of Appeal.  Dkt. No. 1381.  On February 23, 2011, Mr. Fulks signed a declaration, which counsel filed on March 2, 2011, indicating that he wished to pursue his appellate remedies again.  Dkt. No. 1383, Ex. A.

On July 21, 2014, and January 26, 2015 Mr. Fulks filed handwritten *pro se* requests to remove the FCDO and appoint new counsel.  Dkt. Nos. 1594 and 1597.  The Court denied both of Mr. Fulks' requests.  On January 29, 2015, Mr. Fulks filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 in the United States District Court for the Southern District of Indiana, wherein he made a number of claims for relief, requested that the FCDO be removed from his case in South Carolina, and that new counsel be appointed.  This motion, which was prepared by another inmate, also averred that Mr. Fulks was "unschooled in areas of law" and requested the assistance of counsel for his § 2241 petition.  Dkt. No. 1600, Attachment 3 at 6-7.

Mr. Fulks' § 2241 action was assigned to United States District Judge William T. Lawrence.  Judge Lawrence gave Mr. Fulks until April 16, 2015 to establish why Mr. Fulks' § 2241 action can proceed under § 2241 and why it should not be transferred to this Court.  Order, Fulks v. LaRiva, 15-cv-33 (S.D. Ind. March 16, 2015) (Lawrence, U.S.D.J.), Dkt. No. 3.  On April 7, 2015, Mr. Fulks filed a response to Judge Lawrence's March 16, 2015 Order.  See Petitioner's Response to the Court's Entry Directing Further Proceedings,  Fulks v. LaRiva, 15-cv-33, Dkt. No. 6.  In it, Mr. Fulks stated that his § 2241 filings were prepared by David Paul

4

Hammer, another capital inmate housed in USP-Terre Haute, and that Mr. Fulks himself had only an eighth grade education and a "lack of knowledge in the law or even conducting legal research." Id. at 1, 7.

In a declaration attached to Mr. Fulks' April 7 filing, Mr. Hammer affirmed that he had prepared Mr. Fulks' § 2241 petition and Response, and that he (Hammer) was scheduled to be transferred out of USP-Terre Haute in the near future and would be unavailable to assist Mr. Fulks in the future. Mr. Hammer has now, in fact, been transferred out of USP-Terre Haute.

On April 1, 2015, Mr. Fulks filed a Motion to Terminate the Services of Court Appointed Counsel before this Court. Dkt No. 1600. In his Motion, Mr. Fulks alleges a conflict of interest with the FCDO, requests that this court terminate counsel's appointment, and states that he is not requesting the appointment of new counsel. Id. at 4-5.

On April 15, 2015, this Court ordered that counsel for Mr. Fulks and the Government respond to Mr. Fulks' most recent filing. Dkt. No. 1601.

III.     **Because Mr. Fulks Has Significant Cognitive Impairments and Intellectual Limitations, This Court Should Not Allow Mr. Fulks To Represent Himself.**

   A.     **Mr. Fulks Has Significant Cognitive Impairments and Intellectual Limitations.**

This Court found that "trial counsel presented a substantial mental health case," including "hard evidence such as diagnostic tests including CAT scans, PET scans, and EEGs" of brain damage. § 2255 Opinion at 26, 38. The mental health case at both trial and during § 2255 proceedings included extensive evidence of Mr. Fulks' cognitive and mental health impairments. These impairments are relevant to Mr. Fulks' request to proceed *pro se*.[3]

---

[3] For ease of reference, the transcript from Mr. Fulks' June 2004 penalty phase trial will be cited by "TT" followed by the date of the relevant transcript and the page number. The transcript from the evidentiary hearing conducted in connection with his § 2255 litigation shall be cited with "HT" followed by the date of the relevant and the page number.

5

At Mr. Fulks' trial, defense counsel's presentation included six experts who provided opinions regarding Mr. Fulks' mental health and cognitive abilities: behavioral neurologist David Bachman, M.D.; biostatistics and morphometrics expert Fred Bookstein, Ph.D.; cognitive neuroscientist Ruben Gur, Ph.D., psychologist James Evans, Ph.D., FASD expert Howard Becker, Ph.D., and child development and family history expert Arlene Andrews, Ph.D. These experts consistently described him as brain damaged and intellectually impaired.

Dr. Bachman testified that Mr. Fulks suffered from Fetal Alcohol Spectrum Disorder ("FASD"), a diagnosis which encompasses neurological impairments resulting from fetal alcohol exposure. § 2255 Opinion at 30; TT 6/24/04 at 31. Dr. Bachman reviewed brain imaging, including an MRI, a PET scan, and an EEG. Consistent with Mr. Fulks' diagnosis of FASD, all of these studies revealed that Mr. Fulks had an abnormal brain. More specifically, Mr. Fulks had a cyst where an area of his brain had failed to develop and had "diffuse abnormality throughout the entire brain." TT 6/24/04 at 19-24. Dr. Bachman also testified that his neurological testing reflected that Mr. Fulks was in the borderline range of intellectual functioning, that he had frontal lobe impairment, and that the frontal lobe was the part of the brain that controlled decision making and behavior. TT 6/24/04 at 14, 18, 48. Dr. Bachman explained that Mr. Fulks' brain impairments were "exacerbated by Fulks's life of alcohol and drug abuse starting at a young age, which, together with his multiple head injuries, significantly impacted his cognitive ability." § 2255 Opinion at 30.

Dr. Bookstein examined "brain imaging studies [which] help[ed] confirm the FASD diagnosis." § 2255 Opinion at 27. These brain scans revealed that Mr. Fulks had an abnormal corpus callosum, which is highly correlated to FASD. TT 6/24/04 at 93-111. Based on his

review of these scans, Dr. Bookstein confirmed that Mr. Fulks' brain was affected prenatally by exposure to alcohol, and that the odds that he had FASD were 600 to 1. TT 6/24/04 at 111-112.

Dr. Gur reviewed scans of Mr. Fulks' brain, analyzed neuropsychological testing conducted of Mr. Fulks, and concluded that Mr. Fulks had a "highly abnormal brain." § 2255 Opinion at 30. Dr. Gur confirmed the presence of a cyst where a portion of Mr. Fulks' brain had failed to develop, and indicated that Mr. Fulks' entire brain was misshapen. TT 6/16/04 at 40, 70-80. Consistent with FASD, the nature of Mr. Fulks' brain abnormalities indicated that his brain had not properly developed while *in utero*. TT 6/16/04 at 77-78. Dr. Gur also observed brain damage above and beyond what would be expected from FASD, which was likely caused by head injuries and substance abuse occurring later in Mr. Fulks' life. TT 6/23/04 at 135. The area of Mr. Fulks' brain that was most impaired governs his executive functioning, which includes judgment and impulse control. TT 6/16/04 at 137.

Dr. Gur further testified that "the abnormality in [Mr. Fulks'] brain structure and function explain a lot about the behaviors, and the cognitive and emotional deficits that have been documented in [Mr. Fulks'] case," that the abnormalities observed reflected impairments in his frontal lobe, and that these impairments caused Mr. Fulks to make poor decisions. § 2255 Opinion at 30.

Regarding his intellectual functioning, Dr. Gur testified that Mr. Fulks was "clearly not a bright individual," that his IQ testing reflected intellectual functioning that was "slightly above the cut of retardation," and that many of the measures in Mr. Fulks' IQ testing were "well below that threshold." § 2255 Opinion at 32.

Dr. Evans conducted a battery of psychological testing on Mr. Fulks, as well as a quantitative EEG. TT 6/23/04 at 5-22. Dr. Evans indicated that Mr. Fulks had borderline

7

intellectual functioning, reflecting a full scale IQ that ranged from 75-79.  Id. at 32.  Dr. Evans also gauged Mr. Fulks' reading ability, which was at the 6th to 7th Grade level and in line with the IQ findings.  TT 6/23/04 at 10.  Dr. Evans confirmed that Mr. Fulks had a "damaged frontal lobe, which caus[ed] him to act impulsively, learn slowly, fail to plan ahead, and puts him at higher risk for criminal behavior." § 2255 Opinion at 31.

Dr. Becker, an expert in FASD, testified that individuals such as Mr. Fulks with brain damage and FASD diagnoses have functional cognitive and intellectual impairments, such as lower IQ's, "learning and memory deficits," "impulsivity," "deficits in executive functioning," and "impaired social communication and social etiquette."  TT 6/23/04 at 135-138.  Consistent with Mr. Fulks' reported IQ of 75-79, FASD sufferers typically have IQ's in the 70's.  Id. at 138. Moreover, FASD sufferers do not learn from experience, have difficulty engaging in abstract reasoning, "don't understand what they are doing right now might have some impact on what might occur later on," and "tend to be impulsive."  TT 6/23/04 at 144-145.

Dr. Andrews conducted interviews with Mr. Fulks, his family and other people who knew him; reviewed records relating to his life; and testified to Mr. Fulks' life history.  Dr. Andrews "found the major theme in Fulks's life to be chaos, with his parents constantly drinking and fighting and his lacking any proper supervision and care givers."  § 2255 Opinion at 55.  Mr. Fulks was "beaten by his father," exposed to "inappropriate sexual activity including graphic pornography on the walls and ceilings" of his house, and "molested by an older man when he [Fulks] was a child." § 2255 Opinion at 33, 55.  "Dr. Andrews surmised that Fulks was inflicted with multiple stressors and deprived of emotional attention, that he did not have the resiliency or

intellect to handle them, so he turned to alcohol, drugs, and other negative behavior to cope with the anxiety." Id. at 57.[4]

At the hearing conducted in conjunction with Mr. Fulks' § 2255 proceedings, clinical psychologist James Hilkey, Ph.D., who had evaluated Mr. Fulks prior to his trial, indicated that Mr. Fulks had a full scale IQ of 78, which placed him in the bottom 7th percentile of the population. HT 2/23/10 at 225. Consistent with the trial testimony, Dr. Hilkey indicated that Mr. Fulks' IQ score reflected that "when it comes to executive functioning, that is, Mr. Fulks' ability to plan, to think about consequences, to use more sophisticated logic, Mr. Fulks is going to have some serious problems consistent with people who are functioning at the seventh percentile." HT 2/23/10 at 226. Dr. Hilkey also administered achievement testing, which reflected that Mr. Fulks' reading ability was at the 14th percentile, and his spelling and arithmetic abilities were at the 6th percentile. HT 2/24/10 at 8. This was consistent with Mr. Fulks' academic difficulties, which led ultimately to his dropping out of school in the 9th grade. Id. at 8-9.

Dr. Hilkey administered a battery of personality tests to Mr. Fulks which reflected, *inter alia*, impairments in decision making, impulse control, establishing and maintaining relationships with others, and "dealing with the world in accurate or real ways." Id. at 18-38. Dr. Hilkey's diagnoses for Mr. Fulks included, *inter alia*, dysthymic disorder (chronic depression) and cognitive disorder (brain damage). Id. at 44-46. As a result of his brain impairments and his dysfunctional and traumatic upbringing, Dr. Hilkey described Mr. Fulks as "developmentally very, very young," and a "person with very limited coping skills." Id. at 49, 53.

---

[4] A number of lay witnesses who testified at trial confirmed Dr. Andrews' description of Mr. Fulks' life history. § 2255 Opinion at 51, 60-62.

Psychiatrist Margaret Melikian, M.D., also evaluated Mr. Fulks prior to his trial. She testified, *inter alia*, that, as a result of prenatal alcohol exposure, multiple head traumas, poor environment, and substance abuse, Mr. Fulks suffered from a cognitive disorder. HT 2/24/10 at 125-126. Dr. Melikian concurred with other mental health experts that Mr. Fulks had borderline intellectual functioning, was in the bottom 8th percentile intellectually, and that his ability to think, plan, and organize was impaired. Id. at 126-127. In summarizing Mr. Fulks' cognitive development, Dr. Melikian indicated that "he started out with a bad brain and was born into a bad environment where he was hit on the head on several occasions. And then began using substances that were toxic to his brain at an early age." Id. at 142.

**B.      As a Death-Sentenced Prisoner, Mr. Fulks Lacks Access to the Resources Necessary to Represent Himself.**

Mr. Fulks' ability to proceed *pro se* is additionally hampered by his status as a capital inmate. Mr. Fulks does not have the ability to meet with and assess potential lay witnesses. Lay witnesses can play an important role in clemency proceedings in explaining why a capital inmate deserves to live, and the importance that inmate's continued existence has to family, friends and society.

Mr. Fulks also lacks the ability and resources to locate, interview or hire expert witnesses. He lacks the resources to contact and discuss clemency issues with the witnesses counsel previously used on his behalf at trial. Expert witnesses can also play an invaluable role in clemency proceedings.

Mr. Fulks has only limited access to word-processing and copying equipment, office supplies and the telephone. He has only limited access to legal research and other resources. He will not even be able to maintain his entire record in his cell.[5]

**C.** **It Would Not Serve Mr. Fulks' "Best Interests" To Allow Him to Proceed *Pro Se.***

The United States Supreme Court has held that a defendant does not have a constitutional right to represent himself once he or she has been convicted and sentenced at trial. Martinez v. California, 528 U.S. 152, 159-160 (2000). The Supreme Court there explained that "[t]he requirement of representation by trained counsel implies no disrespect for the individual inasmuch as it tends to benefit the appellant as well as the court." Id. at 163. Thus, while a court may still exercise its discretion to allow a lay person to proceed *pro se*, that discretion must be exercised "keeping the best interests of appellant and the government in mind." Id. (internal quotation marks omitted.).

Even at trial, a criminal defendant who is assumed competent may nonetheless be prohibited from proceeding *pro se* at trial if he lacks the mental capacity to represent himself. Indiana v. Edwards, 554 U.S. 164, 167 (2008). In adopting a different standard for *pro se* representation at trial than for competency in Indiana v. Edwards, the Supreme Court explained:

> Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways…. [D]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant.

---

[5] The Special Confinement Unit (SCU), where Mr. Fulks is house at USP-Terre Haute, imposes limitations on the amount of documents and legal materials that inmates may keep in their cells. Inmates are only permitted to possess as many materials as fit in the space beneath the bed in their cell (approximately 5 cubic feet). When this policy was implemented in 2011, SCU inmates were required to ship any materials in excess of this amount to their counsel or submit them for shredding.

Id. at 175-176 (internal quotations omitted).

In Edwards, the Supreme Court also reasoned that "a right of self-representation at trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel," and held that the "[c]onstitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." Id. at 176. Accordingly, the Supreme Court held that judges may "insist upon representation by counsel for those competent enough to stand trial … but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." Id. at 177.

This Court should not allow Mr. Fulks to represent himself. It would not be in Mr. Fulks' best interest to permit him to do so and it would not promote the interests of justice.

As noted above, Mr. Fulks is a brain damaged and intellectually limited individual. See, e.g., § 2255 Opinion at 28-33. He is not capable of representing himself at this stage of his litigation nor does he have access to the information he will need in order to engage in the complex end-stage litigation that remains.

Mr. Fulks' two § 2241 pleadings confirm his own belief in his inability to represent himself. Both *pro se* § 2241 filings request the appointment of counsel *because* Mr. Fulks is not sophisticated in legal matters. Fulks v. LaRiva, 15-cv-33, Dkt. No. 6 at 1, 7; Dkt. No. 1600, Attachment 3 at 6-7. Significantly, both *pro se* 2241 filings were drafted by Mr. Hammer. Fulks v. LaRiva, 15-cv-33, Dkt. No. 6 at 7. As noted in the Procedural History, supra, Mr. Hammer, himself a capital inmate until recently, has been transferred to another facility and will be unavailable to assist Mr. Fulks in any additional litigation.

12

Moreover, the legal tasks that remain in Mr. Fulks' case are substantial. Clemency, which still lies ahead, is "deeply rooted in our Anglo-American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." Herrera v. Collins, 506 U.S. 390, 411-12 (1993). Effective representation at clemency requires not only preparation, investigation, and interviewing and discussions with witnesses, but an understanding of what would constitute a compelling presentation to the clemency authority and the ability to present the available information in a way that is understandable and persuasive. Guideline 10.15.2 – Duties of Clemency Counsel, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, American Bar Association (2003) (available at 31 Hofstra L. Rev. 913).

While the content of a clemency plea is important, so, too, is ensuring that a death sentenced prisoner is provided his or her due process rights during clemency proceedings. Consequently, effective representation at clemency also requires the ability to recognize and effectively litigate constitutional violations in the clemency process. See id.; see, also, Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 288-89 (1998) (O'Connor, J., concurring); id. at 291-92 (Stevens, J., dissenting) (majority of the court applying due process rights to death sentenced inmates in clemency proceedings). Given Mr. Fulks' low cognitive and intellectual functioning, his lack of legal training, and his lack of access to legal resources, he is not capable of protecting himself in this regard.

Mr. Fulks is also a plaintiff in lethal injection litigation, litigation that has been temporarily stayed because the government's protocols for execution have not yet been propounded by the government. Again, Mr. Fulks is ill-equipped to litigate the issues likely to

arise in these proceedings *pro se*, or even to understand his rights should he become part of a class of plaintiffs pursuing relief in these proceedings.

Other litigation may also become available to Mr. Fulks based on facts that are discovered in the future. As this Court is aware, the rules pertaining to federal postconviction capital litigation are difficult for even well-trained attorneys to navigate. McFarland v. Scott, 512 U.S. 849, 856-57 (1994). They present high procedural hurdles and unexpected pitfalls under the best of circumstances. These are not matters Mr. Fulks can handle *pro se.*

Accordingly, the undersigned asks that Mr. Fulks' motion to proceed without counsel be denied.

## IV. <u>The FCDO Stands Ready to Continue Its Representation of Mr. Fulks.</u>

This Court and the Fourth Circuit Court of Appeals both appointed the FDCO to represent Mr. Fulks after considering the FCDO's extensive record representing scores of death-sentenced inmates over the past two decades. The FCDO currently represents roughly 20% of the prisoners convicted and sentenced to death under federal statute. This is more than any other individual or office in the country.

As a result of representing so many prisoners sentenced to death under federal law, FCDO lawyers have developed expertise in federal capital litigation unsurpassed by any other defender organization or private attorney.

In addition, the FCDO operates pursuant to a federal grant and, therefore, does not need to seek funds from this Court or from the Fourth Circuit and so can provide Mr. Fulks with high quality legal work and expert evaluation and investigative services without requiring Court funding.

Mr. Fulks' best interests lie in ensuring he has well-trained, experienced lawyers who have sufficient funding to handle whatever litigation and clemency needs he may have in the future.

## CONCLUSION

For the reasons stated, the undersigned respectfully requests that this Court deny Petitioner's Motion to Terminate the Services of Court Appointed Counsel.

/s/ Amy Gershenfeld Donnella
Amy Gershenfeld Donnella
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Amy_Donnella@fd.org

*Counsel for Chadrick Evan Fulks*

May 6, 2015

**CERTIFICATE OF SERVICE**

I, Amy Gershenfeld Donnella, hereby certify that on this day, the forgoing document was

served on the following individuals in the manner recorded below:

By the ECF Filing System:

Robert F. Daley, Esq.
Office of the United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201
bob.daley@usdoj.gov

By U.S. Mail, postage prepaid:

Chadrick Evans Fulks
Inmate No. 16617-074
USP-Terre Haute
Post Office Box 33
Terre Haute, IN 47808-0033

/s/ Amy Gershenfeld Donnella
Amy Gershenfeld Donnella

Date: May 6, 2015